

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 01-0120-C.V.-GOLD/SIMONTON**

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., *et al.*,

               Plaintiffs,

      vs.

KATHERINE HARRIS, Secretary of State of
Florida, *et al.*,

               Defendants.



**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT BY DEFENDANT DEANIE LOWE
<u>VOLUSIA COUNTY ELECTIONS SUPERVISOR</u>**

**<u>PRELIMINARY STATEMENT</u>**

Defendant Deanie Lowe ("Lowe") has prematurely moved for summary judgment on grounds that are baseless and largely unsubstantiated by law. There are genuine issues of material fact as to each of the claims asserted against Lowe that preclude summary judgment as a matter of law. Alternatively, pursuant to Fed. R. Civ. P. 56(f), Lowe's motion for summary judgment should be denied without prejudice, the summary judgment hearing should be continued pending further discovery, or the Court should order such other relief as is just.

**<u>STATEMENT OF FACTS</u>**

The evidence gathered at this stage of the litigation demonstrates that Lowe, like the other defendants in this action, engaged in wrongful conduct that violated the rights of African Americans secured by Section 2 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973 *et seq.*, the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. §§1973gg *et seq.*, 42 U.S.C. §§ 1971(a)(2)(A) and 1971(a)(2)(B), Fla. Stat. Ann. §§98.045 and 104.0515, and other laws in connection with the November 2000 general election. In particular, named plaintiff Emery H.

Timberlake, Sr. ("Timberlake"), who is an African-American resident of Volusia County, never received an absentee ballot or notice that his request for an absentee ballot could not be timely processed or was denied. *See* Exhibit A (*Affidavit of Emery H. Timberlake, Sr.*) (hereinafter, *"Timberlake Aff."* ) ¶¶ 1,2,10 & 11. In addition, when Timberlake attempted to vote in person he was denied that opportunity by Volusia County election officials. *Id.* ¶¶ 13-16. Eventually, he discovered that he was wrongfully purged from the voter rolls because of Lowe's failure to seek written confirmation of his current address and place of registration in advance of the election or to otherwise safeguard against an erroneous purge. *See id.* ¶ 12. Similarly, Ursula Y. Harvey ("Harvey"),[1] who is also an African American resident[2] of Volusia County, attempted to vote in the last general election and was denied her right to vote because she had been wrongfully purged from the voter rolls without prior notification or an opportunity to confirm or deny the alleged basis of the purge. *See* Exhibit B (*Affidavit of Ursula Y. Harvey*) (hereinafter, *"Harvey Aff."* ) ¶¶ 1, 6, and 11-15. Moreover, neither Timberlake nor Harvey was afforded the opportunity to vote by affirming or confirming on election day their residence in Volusia County as provided by 42 U.S.C. §§1973gg-6(e)(3). *See id.* ¶ 15; *Timberlake Aff.* ¶ 15

Furthermore, by Lowe's and her staff's own admission, *see Affidavit of Deanie Lowe* ("*Lowe Aff.*")¶¶ 10-12 and *Affidavit of Sharon Pinkney* ("*Pinkney Aff.*") ¶¶ 4-6, at least fifty voter registration applications from voter registration drives at a local, historically Black college were rejected as incomplete without any notice to the individual registrants as required under law. *See id.* §1973gg-6(a)(2); Fla. Stat. Ann. §97.073(1). In addition, Lowe's office acknowledges that a "disproportionate number" of unregistered precinct voters--persons who voted in person and were later determined by Lowe not to be registered--came from precinct 621, which is a predominantly Black precinct.[3]

---

[1]Plaintiffs assert that Ms. Harvey is a member of the putative class as described and defined in their complaint. *See Complaint-Class Action* ("*Compl.*")¶¶ 34-40. Plaintiffs have not sought leave to amend their complaint to add Ms. Harvey as a named plaintiff at this time.

[2]Harvey is a student at Bethune-Cookman College in Daytona Beach, Florida, and resides in Volusia County during the school year. *See Harvey Aff.* ¶¶ 1 & 6.)

[3]Lowe testified that, excluding absentee ballots, 73 out of the 268 unregistered precinct voters came from Precinct 621. *See Lowe Aff.* ¶ 16. Volusia County has a total of 172 precincts. *Id.*

Lowe urges this Court to believe from her mere assertions and those of her staff that each of the incidents described above is isolated and unintentional. Moreover, Lowe prays this Court to give credence to these assertions before Plaintiffs have had the benefit of formal discovery. However, as demonstrated below, even at this early stage of fact development, there are genuine and specific issues of material fact underlying each of the allegations set forth above that bar summary judgment.

Finally, in responding to Plaintiff's public records request, Lowe has produced documents that indicate a continuing violation of the laws governing voter purges based on past felony convictions. Specifically, those documents, which were produced subsequent to the filing of this lawsuit, suggest that Lowe requires former felons whose civil rights were restored in another state to apply for restoration of their right to vote in the State of Florida in order to vote in Volusia County. This requirement is a direct violation of a directive from the Florida's Office of Executive Clemency State law and the United States Constitution; summary judgment in favor of Lowe is therefore inappropriate.

## ARGUMENT

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). In determining whether the moving party has met her burden of establishing that there is no genuine issue as to any material fact and that she is entitled to judgment as a matter of law, the court must view the evidence and inferences drawn from the evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts in the nonmovant's favor. *Mercantile Bank & Trust Co. Limited v. Fidelity and Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985). At the summary judgment stage, it is not the court's duty to "make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.* 530 U.S. 133, 150 (2000); *see also Rollins, Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). Moreover, "[t]he [nonmoving] party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts."

*WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir. 1988) (citing *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485 (5th Cir. Unit B 1982)).

Lowe contends that Timberlake's registration was lawfully canceled pursuant to 42 U.S.C. §1973gg-6(a)(3)(A) and Fla. Stat. §98.045, *Memorandum of Law in Support of Motion for Summary Judgment by Defendant Deanie Lowe, Volusia County Elections Supervisor* ("*Memo.*") at 7, and that there is no evidence of purposeful racial discrimination in violation of 42 U.S.C. §1971. *Memo.* at 9 & 10. Moreover, Defendant Lowe argues that summary judgment is appropriate because Timberlake "suffered no injury and lacks standing" and is not a member of the putative class. *Id.* at 3 & 4. Lowe also seeks summary judgment on the grounds that the National Association for the Advancement of Colored People ("NAACP") lacks standing, *id.* at 5 & 6, plaintiffs have failed to establish an intentional deprivation of the right to vote under §1983, *id.* at 6 & 7, and there is no private right of action under §1971 and Fla. Stat. §104.0515, *id.* at 8 & 9. Plaintiffs address each of these arguments in turn in the sections below and demonstrate that each of these assertions is erroneous and summary judgment must be denied.

## I.   THERE ARE GENUINE ISSUES OF MATERIAL FACT CONCERNING EACH OF THE CLAIMS ASSERTED AGAINST LOWE

In *Plaintiffs' Statement of Material Facts As to Which There Is a Genuine Issue In Opposition to Motion for Summary Judgment by Defendant Deanie Lowe Volusia County Elections Supervisor* ("*Plaintiffs' Statement of Material Fact*") and the supporting affidavits of Timberlake and Harvey, Plaintiffs have set forth specific and triable factual evidence that: (1) Lowe wrongfully purged Harvey and Timberlake from the voter rolls without prior notification; (2) Lowe denied Harvey and Timberlake the opportunity to affirm or confirm on election day that they reside in Volusia County; (3) Lowe failed to process Timberlake's absentee ballot request form or notify him that his request could not be timely processed or was denied; (4) Lowe rejected as incomplete at least fifty voter registration applications from a voter registration drive at a predominantly Black college without any notice to the registrants as required under law; and (5) Precinct 621, a predominantly Black precinct in Volusia County, had a "disproportionate number" of unregistered precinct voters.

### A. Lowe Wrongfully Purged Timberlake, Harvey, and Other Similarly Situated Black Voters Without Notification In Violation of the National Voter Registration Act of 1993, 42 U.S.C. §1973 *et seq.*

Lowe is required under both federal and state law to ensure that any eligible applicant for voter registration is registered to vote. 42 U.S.C. § 1973gg-6(a)(1)(A), Fla. Stat. Ann. § 98.045(1). Once a voter is registered, the name of that voter may not be removed from the registration books except at the request of that voter, or based on other specifically enumerated grounds and only after certain procedural safeguards are overcome. *See* 42 U.S.C. § 1973gg-6(a)(3),(c) & (e). In contradiction of both the letter and spirit of those statutory requirements, Lowe purged Timberlake, Harvey, and other similarly situated Black voters without prior notification. When presented with the fact of her wrongdoing at the polling sites, Lowe again violated the law by failing to permit Timberlake, Harvey, and other similarly situated Black voters to vote upon oral or written confirmation of their residency in Volusia County.

Lowe asserts that Timberlake was lawfully purged from the voter rolls pursuant to Fla. Stat. Ann. § 98.045(2) because Volusia County received a notice from the State of Alabama that an Emery Timberlake, whose profile allegedly matched that of named plaintiff Timberlake, had registered to vote in Russell County, Alabama.[4] *Memo.* at 7. Specifically, Lowe maintains that the notice from Alabama "constituted a written request to cancel [Timberlake's] registration."[5]

---

[4]Fla. Stat. Ann. § 98.045(2) provides that

[i]nformation received by a supervisor from an election official in another jurisdiction indicating that a voter in the supervisor's county has registered to vote in that other jurisdiction shall be considered as a written request from the voter to have the voter's name removed from the registration books of the supervisor's county.

*Id.*

[5]Lowe further alleges that Timberlake "did not register to vote in Volusia County following the reported Alabama registration." *Statement of Material Facts in Support of Motion for Summary Judgment by Defendant Deanie Lowe Volusia County Elections Supervisor* ¶ 4; *see also Lowe Aff.* ¶ 3). However, Timberlake re-registered to vote in Volusia County in February 2001. To the extent that Lowe does not recognize Timberlake's subsequent registration, he is suffering continuing violations of his rights.

*Id.*     Timberlake flatly denies ever registering to vote in Alabama or receiving any notification from Lowe that his Volusia County registration was subject to cancellation. *Timberlake Aff.* ¶¶ 8-9. Moreover, the NVRA specifically lays out certain procedures concerning removal of registered voters from the voter rolls based on information that a registrant has moved outside a registrar's jurisdiction. Specifically, the NVRA provides:

> (1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant--
>
>> (A) *confirms in writing* that the registrant has changed residence to a place outside that registrar's jurisdiction in which the registrant is registered; or
>> (B)(i) has failed to respond to a notice described in paragraph (2); and
>> (ii) has not voted or appeared to vote (and, if necessary, correct the registrant's record of the registrant's address) [during a prescribed period of time under the statute].

42 U.S.C. §1973gg-6(d)(1) (emphasis added). This prohibition against purging voters based on change of address without written confirmation or without notice and the opportunity to confirm their address and vote is also manifest in §1973gg-6(c)(1)(B) of the statute, which provides for notice to individuals whose change-of-address information is supplied by the Postal Service. *See id.* In addition, the legislative history of the NVRA explicitly prohibits, as does the Act, "removing the name of a registered voter by reason of a change in residence, *unless the registered voter confirms in writing that he or she has changed residence outside the jurisdiction in which registered*; or has failed to respond to a notice sent by the State and has not voted or appeared to vote within two general election for Federal office since the date of the notice." *Id.* at 16, 1993 U.S.C.A.N.N. at 120 (emphasis added); *see* 42 U.S.C. §1973gg-6(a) & (d).[6]

Moreover, the NVRA specifically provides that a voter who affirms or confirms that her address is within the supervisor's jurisdiction shall be permitted to vote. *See id.* §1973 gg-6(d);

---

[6]Fla. Stat. Ann. § 98.055 provides for similar measures for maintenance of voter registration lists, but includes §98.045(2), which is contrary to and not authorized by the NVRA. *See id.* To extent that §1973gg-6(a)(3)(A) of the NVRA, which provides for removal at the request of the registrant, appears to be inconsistent with §1973gg-6(3)(d) of the Act, which requires written *confirmation* that a resident has changed address, the latter provision controls as the more specific statutory mandate.

*see also* H.R. No. 103-9, at 17-18 (1993), *reprinted in* 1993 U.S.C.A.N.N. at 121-22 (if the registration records incorrectly indicate that a voter has changed her residence, "the voter *shall* be permitted to vote upon oral or written affirmation that the [voter] continues to reside at the same address."); H.R. Conf. Rep. No. 103-66 , at 21 (1993), *reprinted in* U.S.C.A.N.N. at 146 (same) (emphasis added).  Thus, Timberlake, Harvey, and other similarly-situated individuals should have been permitted to vote by affirming or confirming their residence on election day.

These passages, along with the express intent of the NVRA to increase voter registration and participation while ensuring accurate and current voter registration rolls,[7] stand for the proposition that no voter may be removed from the voter rolls based on any information suggesting a change of address outside of a registrar's jurisdiction, unless the voter confirms the change of address in writing or has been provided written notice and an opportunity for that voter to vote upon affirmation or confirmation that she resides within the applicable jurisdiction.  To the extent, if any, that Fla. Stat. Ann. § 98.045(2) obviates prior notification to voters before removal from voter rolls or the opportunity to vote upon written affirmation or confirmation that the voter resides within the applicable jurisdiction, it is clearly inconsistent with and superceded by the NVRA.

The sworn testimony of Timberlake, Harvey, and even Lowe create a genuine issue as to whether prior written notice or the opportunity to vote and affirm or confirm residency in Volusia County on Election Day was given to Timberlake and the class of Black voters he represents.  Accordingly, summary judgment must be denied.

**B. Lowe Failed to Process Timberlake's Absentee Ballot Request Form or Notify Him That His Request Could or Would Not Be Processed In Violation of Fla. Stat. Ann. §101.62(4)(b)**

---

[7]The NVRA expressly provides that its purpose is to, among other things, increase voter registration and participation and to ensure that voter registration rolls are accurate and current. 42 U.S.C. §1973gg(b); *see also* H.R. Rep. No. 103-9, at 18 (1993), *reprinted in* 1993 U.S.C.A.N.N. at 122 ("Subsection (e) attempts to incorporate an underlying purpose of the Act; that once registered, a voter should remain on the list of voters so long as the individual remains eligible to vote in that jurisdiction.").

In or about October 2001 Timberlake requested an absentee ballot for the November 2000 general election by filling out an Absentee Ballot Request Form and submitting it in an absentee ballot registration drive. (A true and correct copy of the Absentee Ballot Request Form is attached to Exhibit A.). Timberlake never received an absentee ballot and was never notified that his Absentee Ballot Request Form could or would not be processed. Lowe alleges that she did not receive Timberlake's Absentee Ballot Request Form. There is a genuine issue as to whether Lowe received Timberlake's request for an absentee ballot and, if so, why he never received an absentee ballot or notification that his application could or would not be processed. For these reasons, Lowe is not entitled to summary judgment as a matter of law.

### C. Lowe Failed to Process Voter Registration Applications from Voter Registration Drives at a Predominantly Black College

Lowe rejected as incomplete at least fifty voter registration applications from voter registration drives at a historically Black college without any notice to the registrants as required under law. Sharon Pinkney ("Pinkney"), who is "primarily responsible for receipt and review of registration applications" in the Volusia County Supervisor's of Elections office, *Pinkney Aff.* ¶ 2, testified to returning to a Michael Engram ("Engram") on two separate occasions a total of approximately 50 applications from a registration drive at Bethune-Cookman College ("BCC").[8] *Id.* ¶¶ 4-6. In addition, Pinkney testified that there were 18 additional registration applications that she received from Engram and 4 applications that she received from another registration drive at BCC (that was organized by a BCC faculty member, the Rainbow/PUSH Coalition, candidates, and churches) that were incomplete. *Id.* ¶¶ 5-6. Pinkney did not indicate whether she notified the registrants on these 22 additional applications that the applications were rejected as incomplete.

First, Pinkney admits that Lowe's office did not provide notice of disposition to each individual applicant as required by law. Second, there is a genuine issue of material fact as to, among other things, (1) whether Pinkney returned the applications to Engram as alleged, and (2) what, if anything, Pinkney did with the 22 additional registrations she received through

---

[8]Bethune-Cookman College is a historically Black college located in Daytona Beach, Florida.

registration drives at BCC that allegedly were incomplete.  Although Lowe characterizes Pinkney's actions as "isolated exceptions represent[ing] good intentions gone awry," *Memo.* at 3, Pinkney's actions as described in her affidavit are nonetheless actionable under 42 U.S.C. §1973gg *et seq.*, Fla. Stat. Ann. §97.073(1), and other applicable laws.  Therefore, Lowe is not entitled to summary judgment.

Indeed, constitutional and civil rights cases where determinations concerning a party's state of mind, motives, or intentions are an element of the claim are often unsuitable for summary judgment.  *See* 10B Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure: Civil 3d* § 2732.2 152-53, &164 (1998).  More specifically, in cases alleging discrimination where the court must determine whether discrimination was knowing and intentional, summary judgment is rarely granted.  *See Hunt v. Cromartie,* 526 U.S. 541, 553 n.9 (1999) ("Just as summary judgment is rarely granted in a plaintiff's favor in cases where the issue is a defendant's racial motivation, such as disparate treatment suits under Title VII or racial discrimination claims under 42 U.S.C. § 1981, the same holds true for racial gerrymandering claims of the sort brought here.").  Accordingly, the careful determinations that must be made regarding Lowe's and her staff's state of mind, motive, and intent militate strongly in favor of denying summary judgment.

### D. There Is a Genuine Issue As to Whether Lowe's Actions Violate §1983[9]

Lowe asserts that "the NAACP does not show for itself or its members any intentional impediment to registration or voting" in violation of §1983.  *See Memo.* at 7.  In support of this argument, Lowe cites a litany of cases, only a few of which are even remotely related to Lowe's argument that §1983 requires evidence of intentional deprivation.  *See id.* at 6 & 7 n.5.

Here again Lowe misses the point.  "Section 1983 . . . has never been found by the [Supreme] Court to contain a state-of-mind requirement."  *See Parratt v. Taylor,* 451 U.S. 527,

---

[9] Plaintiffs address a similar argument in response to Defendant ChoicePoint, Inc. d/b/a Database Technologies, Inc.'s motion to dismiss in part on the ground that negligence is insufficient to support a claim under §1983.  *See Plaintiffs' Memorandum of Law in Opposition to Defendant DBT's Motion to Dismiss* at 9-10.

534 (1981).  This principle was reaffirmed by the Supreme Court in *Daniels v. Williams*.  There, the Court held that §1983:

> contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right . . . .  In any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct [may or] may not be enough to state a claim.

*Daniels*, 474 U.S. 327, 330 (1986).  Negligence can be a sufficient basis for a claim under § 1983.  The measure of culpability depends upon the underlying constitutional or statutory violation.

Accordingly, to withstand summary judgment, Plaintiffs bear the burden of demonstrating that there is a genuine issue of material fact as to whether Lowe, at a minimum, was negligent in her conduct toward Timberlake and the putative class.  There is a genuine issue as to whether Lowe, acting under color of law, negligently applied different standards, practices or procedures in determining whether some voters were qualified to vote and denied individuals the right to vote because of immaterial error and omissions in registration and ballot applications, in violation of 42 U.S.C. §§ 1971(a)(2)(A) and 1971(a)(2)(B).  Accordingly, summary judgment cannot be granted on this ground.

**II.     THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER LOWE IS IN CONTINUING VIOLATION OF THE LAWS GOVERNING VOTER PURGES BASED ON PAST FELONY CONVICTIONS, THE FULL FAITH AND CREDIT CLAUSE, AND OTHER PROVISIONS OF THE UNITED STATES CONSTITUTION**

Subsequent to the filing of this lawsuit, Lowe produced documents in response to Plaintiffs' public records request that signal a continuing violation of the laws governing voter purges based on past felony convictions, the Full Faith and Credit Clause, U.S. Const.,

Art. IV, § 1, and other provisions of the Constitution.[10]  Specifically, Lowe indicated that she has
sent letters to over 90 registered voters who were listed by the Florida Department of State
Division of Elections as possible or probable felons convicted out-of-state, which falsely state
that "[e]ven if you did not lose your civil rights in the state where your felony conviction
occurred, you must still apply to have your civil rights restored in Florida."  (A sample copy of
this letter is attached hereto as Exhibit C); *see also* Exhibit D (Letter of Lowe to Borgen of
4/16/01, at 2 ("Since the election last November, we have mailed letters to the persons listed on
pages 1 through 8 of [a list of possible/probable felons provided by the Division of Elections."])).
However, pursuant to a directive of Florida's Office of Executive Clemency and in accordance
with the Full Faith and Credit Clause and other constitutional provisions, "[i]f a former felon's
civil rights were restored in another state, or if a person's civil rights were never lost after being
convicted of a felony in another state, the individual possesses his or her civil rights in Florida
and need not apply for restoration of civil rights in Florida."  Exhibit E (Letter from Keek to Kast
of 2/23/01.)[11]

     Any suggestion by Lowe that former felons whose civil rights were restored out-of-state
cannot vote in Florida has the potential effect of discouraging hundreds of former felons from
registering to vote in Volusia County.  Moreover, any purge of former felons based on this
misstatement of law is actionable under state and federal law.  Summary judgment is therefore
inappropriate here where there is clear indication that such violations may have occurred.[12]

---

[10]Article IV, § 1 provides as follows: "Full Faith and Credit shall be given in each State to
the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by
general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be
proved, and the Effect thereof." *Id.*

[11]The letter states that it was intended to correct any misunderstanding regarding the
effect of out-of-state restoration of civil rights on former felons' civil rights in Florida" and
reiterate current policy.  Exhibit E (Letter from Keek to Kast of 2/23/01.)

[12]In addition, Lowe's office has repeatedly denied using lists provided by Defendant
ChoicePoint, Inc. d/b/a Database Technologies, Inc. (DBT), which wrongfully identified voters
as ineligible to vote, to purge voters from its voter rolls.  However, in a news report published
after the November 2000 general election, Etta Rosado, who was described as a spokeswoman

III.   **TIMBERLAKE HAS STANDING AS A CLASS REPRESENTATIVE BECAUSE HE WAS INJURED BY LOWE'S ACTIONS IN DENYING HIS RIGHT TO VOTE AND HIS CLAIMS TYPIFY THOSE ALLEGED ON BEHALF OF THE CLASS**

Lowe summarily states in her brief that "Timberlake may not be a class representative since he is not a member of the class he seeks to represent.  It therefore would be error to certify a class opposing Lowe." *Memo.* at 4.  In addition, Lowe asserts that Timberlake has suffered no injury and, therefore, lacks standing. *Id.*  Plaintiffs maintain that these arguments are premature[13] and not a proper ground for summary judgment.  Plaintiffs seek to represent a class of "all Black citizens of the State of Florida eligible to vote, who were registered voters or who took timely and appropriate steps to register as voters, who sought to vote in the November 7, 2000 general election, and who were denied an equal opportunity to vote and have their vote counted in that election, by the action, policies and practices of the Defendants," in violation of applicable laws. *Compl.* ¶ 8.

As an African American who was eligible to vote in Volusia County and sought but was denied the right to vote by absentee ballot and in person, Timberlake's claims typify those alleged on behalf of the class.  Accordingly, Lowe's motion for summary judgment on the ground that Timberlake is not an adequate class representative should be denied.  Moreover, to the extent that Lowe's contentions rest upon the notion that Timberlake was lawfully purged

_____

for the Volusia County Department of Elections, made statements which suggest that Lowe's office in fact used the lists to purge voters without verifying their accuracy or notifying voters in advance of the purge. *See* Gregory Palast, *Florida's flawed "voter cleansing" program* (last modified Dec. 4, 2000) <http://salon.com/politics/feature/2000/12/04/voter_file/index.html>. Ms. Rosado was further quoted as follows:  "When we get the con felon list, we automatically start going through our rolls on the computer.  If there's a name that says John Smith was convicted of a felony, then we enter a notation on our computer that says convicted felon . . . .  If they show up at a polling place, we'll say, 'Wait a minute you're a convicted felon, you can't vote." *See id.*

Accordingly, there is a genuine issue as to whether Lowe used the DBT lists for unlawful purges.  Summary judgment is therefore improper and untimely. *See infra* Section VI.

[13]Pursuant to Local Rule 23.1, and this court's order of April 18, 2001, plaintiffs are not required to seek certification of the class until June 18, 2001.

from the voter rolls and therefore lacks standing, Plaintiffs rely upon their analysis in Section I, *supra*, to demonstrate that there are genuine issues of material fact that preclude summary judgment as a matter of law.

## IV.    NAACP HAS STANDING TO PURSUE CLAIMS AGAINST LOWE

In a clear grasping-at-straws attempt to frustrate the litigation, Lowe challenges the NAACP's standing to bring suit on grounds that have no basis in law or fact. Lowe argues that the NAACP's standing on behalf of itself as a national civil rights organization with a longstanding and proven record in promoting non-partisan voter registration, voter education, and political participation is "conclusory" and "factually unsupported." *Memo.* at 5. Lowe further argues that, to the extent that the NAACP's standing is premised on behalf of its individual members in Florida, Lowe is innocent of allegations in the complaint, and thus, NAACP members are not aggrieved. *See id.* at 5-6.

The NAACP's dual standing in this case is supported in the first instance by an extensive record of voter registration drives and voter education forums throughout Florida, and most notably, its enormously successful national "Get-Out-the-Vote" campaign in connection with the last general election. In Volusia County specifically, the Daytona Beach Branch has been, and continues to be, very active in increasing political participation among African Americans in the Daytona Beach area. *See* Exhibit F (*Affidavit of Cynthia Slater*) ¶ 5. Among other things, it conducts monthly voter registration drives, organizes periodic voter registration and education rallies and picnics, provides election-day transportation, and issues public service announcements and through various local media. *See id.* In preparation for the November 2000 general election, the Daytona Beach Branch organized at least one dozen voter registration rallies and picnics, issued public service announcements on local radio and in local newspapers, conducted numerous voter registration drives, including absentee ballot drives, distributed hundreds of flyers door-to-door, and provided transportation on election day for voters who did not have other means of getting to the polls. *See id.* ¶ 6. Moreover, with respect to the absentee ballot drives, the Daytona Beach Branch offered absentee ballot request forms to anyone who requested one, accepted completed forms, and delivered the forms to the Volusia County Supervisor of Elections office in advance of the November 2000 general election. *See id.* ¶ 7. In addition, the

Daytona Beach Branch made copies of each absentee ballot request form that it delivered to the Supervisor of Elections office, including the absentee ballot request form that it delivered for Mr. Timberlake. *See id.* Thus, the claims in this case are clearly germane to the NAACP's purpose and mission.

In the second instance, the NAACP is before this Court on behalf of its members in Florida, including those members belonging to its four chapters in Volusia County. *Compl.* ¶¶ 6&7. In *Warth v. Seldin*, supra, the Supreme Court stated:

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . . So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

422 U.S. 490, 511 (1975). Associational standing depends largely upon the nature of the remedy sought and is most appropriate where, as here, the association seeks a declaration, injunction, or some other form of prospective relief that "will inure to the benefit of those members of the association actually injured." *Id.* at 515; *see also Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977). As the facts of this case demonstrate, Black voters in Volusia County were injured by Lowe's actions. The prospective relief sought will benefit all voters in Florida, and in particular Black voters, including members of the NAACP, who were disproportionately affected by the violations that occurred in the last general election. NAACP members would otherwise have standing to sue on their own right based on the disproportionate effect of Lowe's actions on Black voters. *See id.* at 343 (an association has standing on behalf of its members only when "its members would otherwise have standing to sue in their own right").

14

## V.   THERE IS AN IMPLIED RIGHT OF ACTION UNDER 42 U.S.C. §1971 AND FLA. STAT. ANN. § 104.0515.[14]

### A. 42 U.S.C. § 1971

Lowe asserts that 42 U.S.C. §1971 is enforceable only by the Attorney General and does not create a private right of action. *Memo.* at 8. However, Lowe has cited no authority to suggest that the Eleventh Circuit has decided to overturn its longstanding precedent recognizing a private right of action pursuant to 42 U.S.C. §1971. *See, e.g., Reddix v. Lucky,* 252 F.2d 930 (5th Cir. 1958) (finding that complaint filed by individual voter stated a cause of action pursuant to 42 U.S.C. §§1971 and 1983 based on improper purge from voter list).[15]  Instead, Lowe erroneously states that *Reddix v. Lucky* stands for the position that 42 U.S.C. §1971 does *not* create a private right of action because §1983 provides for sanctions against state officials who violate §1971.

Lowe's reading of *Reddix* is erroneous. The *Reddix* Court specifically held that the complaint, which alleged violations of the Fourteenth and Fifteenth Amendment, as codified in §1971 as a private right of action, "stated a cause of action warranting relief." *Id.* at 932-34. This plain and unambiguous holding is additional confirmation that this Circuit recognizes a private right of action under §1971.

Indeed, other courts have recognized a private right of action under 42 U.S.C. § 1971. *See, e.g., Gray v. Main,* 291 F. Supp. 998 (M.D. Ala. 1966); *Brooks v. Nacrelli,* 331 F. Supp. 1350 (E.D. Pa. 1971). The most relevant Supreme Court precedent on this issue is *Allen v. State Board of Elections,* 393 U.S. 544 (1969) and *Cort v. Ash,* 422 U.S. 66 (1975).

In *Cort v. Ash,* the United States Supreme Court developed a test for courts charged with assessing whether a private remedy is implicit in a statute that does not expressly provide for one. 422 U.S. 66, 78 (1975). First, the court must consider whether the plaintiff is "one of the class

---

[14]Plaintiffs' analysis in support of this argument is set forth in more detail and in similar form in Plaintiffs' Memorandum of Law in Opposition to Defendant DBT's Motion to Dismiss. *See id.* at 10-13. Plaintiffs respectfully refer the Court to that pleading for a fuller analysis of the issue. A copy of that pleading is attached hereto as Exhibit G for the Court's convenience.

[15]Decisions of the former Fifth Circuit issued on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

for whose especial benefit the statute was enacted." *Id.* (citing *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39 (1916) (emphasis omitted)). Second, the court inquires whether there is an explicit or implicit indication of legislative intent to establish or deny a private cause of action. *Id.* Third, the court must ask if implying a private right of action would be consistent with the underlying purposes of the legislative scheme. *Id.* Finally, the court must ask if the cause of action is one traditionally relegated to state law or if it would be inappropriate to infer the action on federal law. *Id.*

A review of these factors establishes the existence of an implied right of action pursuant to 42 U.S.C. § 1971. Here, Plaintiffs are Black voters for whose benefit 42 U.S.C. §1971 was enacted. The legislative intent was to allow private actions. Private enforcement is consistent with the purpose of the Civil Rights Acts and appropriate for federal law.

In holding that a private right of action existed under the Voting Rights Act, the U.S. Supreme Court recognized in *Allen v. State Board of Elections* that:

> the achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General . . . . It is consistent with the broad purpose of the Act to allow the individual citizen standing to insure that his city or county government complies with the § 5 approval requirements.

393 U.S. 544, 556, 557 (1969). While the Court in *Allen* was referring to the Voting Rights Act, the Civil Rights Acts have the same purpose as the Voting Rights Act, making a private right of action necessary in order to afford meaningful protection against violations. *See, e.g., Reddix*, 252 F.2d at 933-34. The *Allen* Court drew support for its conclusion from the fact that it had previously held that a federal statute passed to protect a class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action. *See* 393 U.S. at 557, citing *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964). This Court should do the same with respect to the Civil Rights Acts of 1957 and 1960.

A private right of action has been and should be recognized in 42 U.S.C. § 1971 in order to achieve the goals of the Civil Rights Acts. It would frustrate the very purpose of the statute if voters, denied their right to vote in a Presidential election, were forced to rely solely on the

discretion of a Presidential appointee to vindicate their rights.  Under the relevant Supreme Court standards, it is clear that Plaintiffs have a private right of action pursuant to 42 U.S.C. § 1971 and Defendant's motion to for summary judgment must be denied.

### B. FLA. STAT. ANN. § 104.0515

Similarly, Lowe attempts to avoid the application of Fla. Stat. Ann. § 104.0515 by asserting that the 1982 Florida State Legislature would have made its intention clear if it in fact intended to create a private right of action.  As indicia of the Legislature's intent not to create a private right of action, Lowe cites its failure to amend §104.0515 to expressly provide for such a right in the wake of three federal district court decisions[16] that found no private right of action under §1971.  Lowe further argues that the 1982 Florida State Legislature had reason to know of the Supreme Court's narrowing focus on legislative intent by virtue of the Court's holdings in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979) ("[W]hat ultimately must be determined is whether Congress intended to create the private remedy."); *Touche Ross & Co. v. Redington, Trustee*, 442 U.S. 560, 568 (1979) ("[O]ur task is limited solely to determining whether Congress intended to create the private right of action."); and *Cannon v. University of Chicago*, 441 U.S. 677, 698-99 (1979) (acknowledging court "adhere[nce] to the strict construction of the remedial aspect of the statute").

To the contrary, if the Legislature were aware of this shift in statutory interpretation and wanted to ensure that private enforcement was precluded under the statute, it would have amended the statute accordingly.  *See Cannon*, 441 U.S. at 698-99 (appropriate to presume that legislature knew private rights of action were readily inferred at time of adoption); *Howing Co. v. Nationwide Corp.*, 826 F.2d 1470, 1475-76 (6th Cir. 1987) (same).  While the Legislature may have had reason to be aware of the developing Supreme Court precedent concerning statutory interpretation of remedial measures, it does not necessarily stand to reason that it would

---

[16]*See McKay v. Altobello*, 1996 U.S. Dist. LEXIS 16651 (E.D. La. 1996), *Cartagena v. Crew*, 1996 U.S. Dist. LEXIS 20178 (E.D.N.Y. 1996), *Willing v. Lake Orion Community Schools Board of Trustees*, 924 F. Supp. 815 (E.D. Mich. 1996).  Notably, none of these cases is in the Eleventh Circuit.

expressly provide for private enforcement when such enforcement is clearly contemplated by the charge of the statute and within the broader context of statute's enactment.

Lowe attempts to distinguish *Allen v. State Board of Elections, see supra,* by arguing that it construed dissimilar provisions of §5 of the Voting Rights Act ignores the substance and purpose of both statutes. As noted above, the analysis in *Allen* is applicable here because the Voting Rights Act and the Civil Rights Act are similarly intended to afford meaningful protection against the violations they respectively prohibit. Moreover, the history and text of Fla. Stat. Ann. § 104.0515 show that it is modeled after the Federal Voting Rights Act. In fact, the Florida statute's text tracks much of the language of the Federal Voting Rights Act. *Compare* Fla. Stat. Ann. § 104.0515(4) *with* 42 U.S.C. § 1973(a). By including this crucial parallel text, the Florida legislature expressly signaled its intent to include an *Allen*-style private right of action. *See Cannon v. University of Chicago*, 441 U.S. 677, 696 (1979) (legislature intended that Title IX contain private right of action because it was modeled after Title VI, which had been interpreted to contain private right of action); *Howing Co. v. Nationwide Corp.*, 826 F.2d 1470, 1475-76 (6th Cir. 1987) (legislature "indicates its desire to allow a private right of action" by modeling legislation after law previously interpreted to contain private right of action). Further, Florida provides even broader substantive rights in Fla. Stat. Ann. § 104.0515 subsections 1 through 3, which shows legislative intent to build on, not reduce, the effective protections of the Voting Rights Act.

## VI.    SUMMARY JUDGMENT IS IMPROPER PURSUANT TO FED. R. CIV. P. 56(F)

For the reasons set forth in Sections I and II of this memorandum summary judgment should be denied based on the genuine issues of material fact identified above and in Plaintiffs' Statement of Material Facts. Plaintiffs submit that summary judgment also should be denied without prejudice, the summary judgment hearing should be continued pending further discovery, or the Court should order such other relief as is just pursuant to Fed. R. Civ. P. 56(f). Rule 56(f) provides that:

> [s]hould it appear from the affidavits of a party opposing [a motion for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or

may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(6).[17] Elaborating on the scope and application of Rule 56(f), the Eleventh Circuit has held that "[R]ule 56(f) is infused with the spirit of liberality." *Wallace v. Brownell Pontiac-GMC Co., Inc.*, 703 F.2d 525, 527 (11th Cir. 1983); *see also Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841, 844 (11th Cir. 1989) (reaffirming same holding in *Wallace*); 10B Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure: Civil 3d* § 2740 at 402 (1998).

Although, Rule 56 does not require that a party wait until discovery has taken place before moving for summary judgment, the Eleventh Circuit has reversed grants of summary judgment in cases where there has been no opportunity for discovery and even in cases where discovery has begun but was not completed. *See, e.g., WSB-TV v. Lee*, 842 F.2d 1266, 1269 (11th Cir. 1988) (holding that summary judgment was erroneous where plaintiffs had been afforded no opportunity for discovery in a six-month-old case); *Parrish v. Board of Comm'rs*, 533 F.2d 942, 951 (5th Cir. 1976) (holding that summary judgment may not be granted if discovery is not complete); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 (Rule 56(f) provides that "summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition"); *Burks v. American Cast Iron Pipe Co.*, 212 F.3d 1333, 1337 (11th Cir. 2000) (reversing summary judgment and denial of Rule 56(f) motion and allowing appellants to amend their complaint to add claims supported by facts alleged in the complaint.); *Greensboro Lumber Co. v. Georgia Power Co.*, 844 F.2d 1538, 1545 (11th Cir. 1988) ("[Rule 56(f)] was designed to give parties a reasonable opportunity to prepare a case, and it is frequently invoked when there has not been a sufficient opportunity to conduct discovery.").

---

[17]The Affidavit of Janai S. Nelson, attached hereto as Exhibit H, sets forth, pursuant to Rule 56(f), the factual bases upon which the Court should deny summary judgment on this procedural ground.

Lowe moved for summary judgment before any discovery had been conducted.  To date, there has been no formal discovery in this case whatsoever.[18]  Plaintiffs have availed themselves of the public records laws to the extent practicable, but have had no opportunity to take advantage of the array of tools available through formal discovery.  Therefore, in light of the prematurity of Lowe's motion, a grant of summary judgment at this stage would do violence to the spirit of Rule 56 and its liberal interpretation in this circuit.  Plaintiffs plainly deserve an opportunity to conduct discovery in this matter and therefore summary judgment must be denied.

## CONCLUSION

For the foregoing reasons, Lowe's motion for summary judgment should be denied.  In the alternative, the summary judgment hearing should be continued pending completion of discovery or the court should order such other relief as is just.

Dated: June 1, 2001                                          Respectfully submitted,

New York, New York                                   Elaine R. Jones
                                                                           Director-Counsel
                                                                   Theodore M. Shaw*
                                                                   Norman J. Chachkin*
                                                                   Jacqueline A. Berrien*

                                                                   Janai S. Nelson*

                                                                   NAACP Legal Defense
                                                                           and Educational Fund, Inc.
                                                                   99 Hudson Street, Suite 1600
                                                                   New York, New York 10013-2897
                                                                   Tel. 212-965-2200
                                                                   Fax. 212-216-7592
                                                                   jnelson@naacpldf.org

---

[18]Not only has there been no formal discovery in this action, but the case had been stayed pursuant to this Court's order of April 18, 2001, until ten days after the close of the 2001 session of the Florida state legislature.  Moreover, the complaint in this case was filed a mere five months ago.  Finally, pursuant to April 18, 2001 order, the parties are not required to submit a scheduling report to the court pursuant to S.D. Fla. L.R. 16.1 until almost fourteen days after the filing of this response.

Todd A. Cox*
NAACP Legal Defense
   and Educational Fund, Inc.
1444 Eye Street, 10th Floor
Washington, D.C. 20005
Tel. 202/682-1300
Fax. 202/682-1312
tcox@naacpldf.org

Thomasina H. Williams
FL Bar No. 629227
Williams & Associates, P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Tel. 305-379-6676
Fax 305-379-4541
wmslaw@winstarmail.com

Dennis Hayes
Angela Ciccolo
NAACP Legal Department
4805 Mt. Hope Drive, Fifth Floor
Baltimore, MD 21215-3297
Tel. 877-622-2798
Fax. 410-358-9350
bgear@naacpnet.org

Barbara Arnwine
Thomas J. Henderson*
Anita Hodgkiss*
Lori Outzs Borgen*
Lawyers' Committee for
     Civil Rights Under Law
1401 New York Ave., N.W., Suite 400
Washington, D.C. 20005-2124
Tel. 202-662-8600 or 888-299-5227
Fax 202-783-5130
ahodgkis@LawyersComm.org

Laughlin McDonald
ACLU Voting Rights Project
2725 Harris Tower
233 Peachtree Street NE
Atlanta, GA 30303
Tel. 404-523-2721
lmcdonald@aclu.org

Penda Hair*
Judith Browne*
Monique Dixon*
The Advancement Project
1730 M Street NW, Suite 401
Washington, DC 20036
Tel. 202-728-9557
Fax. 202-728-9558
jbrowneesq@aol.com

Louis M. Bograd
American Civil Liberties Union Foundation
National Legal Department
733 15th Street, NW, Suite 620
Washington, DC 20005
Tel. 202-393-1918
Fax. 202-393-4931
lbograd@aclu.org

Elliot Mincberg*
Larry Ottinger*
Alma C. Henderson*
People for the American Way Foundation
2000 M Street, Suite 400
Washington DC 20036
Tel 202-467-2392
Fax. 202-293-2672
lottinger@pfaw.org

Attorneys for Plaintiffs

* Admitted *pro hac vice.*

# EXHIBIT  A

IN THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 01-0120-C.V.-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., *et al.*,

              Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of
Florida, *et al.*,

              Defendants.

## AFFIDAVIT OF EMERY H. TIMBERLAKE, SR.

EMERY H. TIMBERLAKE, SR., being duly sworn, deposes and says:

    1.    My name is Emery H. Timberlake, Sr. I am an African American and a named plaintiff in the above-captioned case.

    2.    I reside at 732 Georgia Street, Daytona Beach, Florida, which is located in Volusia County.

    3.    In or about September 1995 I registered to vote in Volusia County and, soon thereafter, received a voter registration card. (A true and correct copy of the card is attached hereto as Exhibit A-1.).

4.      On Election Day in November 1996 I presented my voter registration card to a poll worker at Precinct 617, located at World Harvest Church, 1840 Mason Avenue in Daytona Beach, and was permitted to cast a ballot.

5.      Subsequently, in November 1998, I presented my voter registration card to a poll worker at Precinct 617 at the same location cited above, and was permitted to cast a ballot.

6.      In or about December 1999, I visited Columbus, Georgia.  During that trip someone stole my checkbooks and wallet from my briefcase.  My wallet contained, among other things, my driver's license, a small copy of my birth certificate, and a business card of a relative bearing the address of 8 Griggs Court in Seale, Alabama.

7.      Immediately afterwards, I closed my existing bank accounts and reported my driver's license missing to the Department of Motor Vehicles in ~~Florida~~. *Georgia* ET.

8.      I have never registered to vote in any county other than Volusia County and never received any notice that my Volusia County voter registration was cancelled or invalid.

9.      I have never lived in Alabama, nor have I ever registered to vote in Alabama.

10.     In or about October 2000 I sent in an Absentee Ballot Request Form through an NAACP absentee ballot drive for the November 2000 general election.  (A true and correct copy of the Absentee Ballot Request Form is attached hereto as Exhibit A-2.).

11.     I never received an absentee ballot and was never notified that my Absentee Ballot Request Form could or would not be processed.

12.     I have also never received any notice from the Volusia County Supervisors of Elections office seeking confirmation of my address or registration status.

2

13.     Since I never received an absentee ballot, on November 7, 2000, at approximately 9:30 a.m., I went to Precinct 617, located at the same address cited above, to cast my vote in person.

14.     I waited in line for approximately thirty (30) minutes and then presented my voter registration card to an elderly, white, female poll worker with sandy, reddish hair and freckles. She was of a heavy build and stood approximately five feet, seven inches.

15.     After looking at my card, the poll worker asked me for my social security card, at which point I showed it to her. She looked at the voter rolls and then told me that I could not vote. I asked her why and she responded that my voter registration card was not valid. I then asked her where I could vote and she responded that I could not vote anywhere. She did not offer any further explanation, nor did she ask me to affirm or confirm my current address, attempt to verify my registration status, or suggest an alternative means of casting a ballot.

16.     As a result of the acts and omissions described above, I was not permitted to cast my vote in the November 2000 general election.

3

17.    Since I was not allowed to vote in November 2000, in February of this year,
I re-registered to vote in Volusia County.  (A true and correct copy of the 2001 registration card is
attached hereto as Exhibit A-3.).

I certify under penalty of perjury that the foregoing is true and correct.

Executed on May 2\4, 2001.

EMERY A. TIMBERLAKE, SR.

Sworn to and subscribed before me this
2\4 day of _____May_____, 2001.

_____
Notary Public Signature

_____
Notary _____ (typed, printed
or stamped)

My commission expires: 11/22/01

4

# EXHIBIT A-1



YOUR PRECINCT NUMBER IS: 517

Based on the location of your residence, you are eligible to vote for representatives for the districts below, as well as for your School Board and Special Districts representatives and your elected city officials

| 13 | 03 | | 15 |

REGARDING YOUR POLLING LOCATION

Your polling place is subject to periodic change, depending upon the availability of facilities for our use. Please check the newspaper on Sunday prior to each election to verify the location of the polling place for your precinct.

VOTER IDENTIFICATION
VOLUSIA COUNTY, FLORIDA

| 43233201 | 02/01/95 | NPA | | 17 |

EMERY HERSHALL TIMBERLAKE SR
1738 GEORGIA ST.
DAYTONA BEACH

SUPERVISOR OF ELECTIONS          SIGNATURE OF VOTER

# EXHIBIT A-2

## ABSENTEE BALLOT REQUEST FORM
### (Revised 6/29/00)

**Is the voter unable to go to the polls on election day?** *yes*
F.S. 101.64: You must be unable to go to your poll on election day in order to qualify for ordering an absentee ballot.
Exceptions: Handicapped or aged 64 or older (Voting Accessibility for the Elderly & Handicapped Act).
**Is someone other than the voter placing the order?** *No*
Must be member of voter's immediate family (spouse, child, parent, grandparent, sibling or inlaw) or legal guardian.
F.S. 101.62: Third degree felony for anyone other than immediate family member to place or y for another voter.
**Does requester have voter's permission to place an order for their absentee ballot?** *N/A*
F.S. 101.62: Third degree felony for anyone to order a ballot for a voter without the voter's permission.

Precinct # _617_                                Address Change: _____   Purge: _____

Voter's Name _Emery H Timberlake_                      ID # _10232201_

Last 4 digits of SS# _2317_ Date of birth _2-27-54_ Party _NPA_ Phone # _904-323-7942_

Residence Address _732 Georgia Street Daytona Bch, Fl 32114_

Permanent Mailing Address _Same as above_

**BY LAW, ABSENTEE BALLOTS CANNOT BE FORWARDED - Be sure mailing address is where you will be.**

Mail ballot(s) to:  _Emery H Timberlake_
_732 Georgia Street._
_Daytona Bch, Fl 32114_

Ballots being requested for following elections:
_____ 1st Primary                    _✓_ General Election
_____ 2nd Primary                    _____ All elections
                                     _____ Other _____

---

**If someone other than the voter is making the request, complete this box.**

Requester's name: _____

Relationship to voter: _____ Soc Sec # _____-____-_____ Driver License #_____

Requester's address: _____

---

Today's date: _____    _Emery Timberlake_
                      Signature of person ( ) Requesting ballot ( ) Picking up ballot

# EXHIBIT A-3

REGARDING YOUR POLLING LOCATION:
Your polling place is subject to periodic change, depending upon the availability of facilities for our use. Please check the newspaper on Sunday prior to each election to verify the location of the polling place for your precinct.

JAN022756

| U.S. CONGRESS | STATE SENATE | STATE HOUSE | COUNTY COUNCIL |
|---|---|---|---|
| C 3 | 08 | 27 | 03 |
| CITY ZONE | SCHOOL BO | SPEC. DIST. | |
| -- | 02 | -- | ----- |

Based on the location of your residence, you are eligible to vote for representatives for the above districts



**VOTER IDENTIFICATION**
**VOLUSIA COUNTY, FLORIDA**

| | REGISTRATION DATE | |  |
|---|---|---|---|
| 10414009 | 02/05/01 | DEM | 617 |

EMERY H TIMBERLAKE SR
752 GEORGIA ST
DAYTONA BEACH

SUPERVISOR OF ELECTIONS        SIGNATURE OF VOTER

# EXHIBIT B

**IN THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No. 01-0120-C.V.-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE ,
INC., *et al.*,

               Plaintiffs,

   vs.

KATHERINE HARRIS, Secretary of State of
Florida, *et al.*,

            Defendants.

## <u>AFFIDAVIT OF URSULA Y. HARVEY</u>

URSULA Y. HARVEY, being duly sworn, deposes and says:

1.     My name is Ursula Y. Harvey and I am an African-American student at Bethune-Cookman College (BCC) in Daytona Beach, Florida.

2.     In or about February 1998, before I enrolled at BCC, I registered to vote in Martin County where I lived with my mother.

3.     Soon thereafter, I received a voter registration card in the mail from Martin County. (A true and correct copy of the Martin County registration card is attached hereto as Exhibit B-1.)

4.      In or about September 1998, after entering BCC and moving to Daytona Beach, I registered to vote in Volusia County.

5.      Soon thereafter, I received my voter registration card in the mail from Volusia County.  (A true and correct copy of the Volusia County registration card is attached hereto as Exhibit B-2.).

6.      During the school year, I reside in Volusia County, Florida.  My current school address is 640 Dr. Mary McLeod Bethune Boulevard, Daytona Beach, Florida.

7.      On November 3, 1998, I presented the voter registration card to a poll worker at Precinct 620, located at the Richard V. Moore Community Center, 554 Dr. Mary McLeod Bethune Boulevard in Daytona Beach, and was permitted to vote.

8.      Since voting in the November 1998 election, I have not registered to vote in any other county, nor have I ever requested that my voter registration in Volusia County be canceled.

9.      I have never received any notice from the Volusia County Supervisor of Election's office seeking confirmation of my address or registration status.

10.     I also have never received any written notice that my Volusia County voter registration was cancelled or invalid.

11.     On November 7, 2000, at approximately 7:00 a.m., I went to the same polling place as I had in 1998 in order to vote in the 2000 general election.

12.     I presented my voter registration card and driver's license to an African-American, female poll worker.  She looked up my name in the voter registration rolls and told me that my name was not on the list.  She then called over a white, middle-aged, female poll worker,

who appeared to be the supervisor of the precinct, and explained to her that I had presented my voter registration card and driver's license, but that my name did not appear on the list.

13.     The supervisor then made a telephone call and described the situation to someone over the telephone.  While the supervisor was on the telephone, she told me that I could not vote because I was listed as being registered in Martin County.  She further stated that, in order to vote, I would have to go to Martin County.

14.     I explained to the supervisor and the other poll worker that I had registered in Martin County prior to moving to and registering in Volusia County.  I also explained that I had voted in the November 1998 general election in Volusia County.

15.     Neither the supervisor nor the other poll worker asked me to affirm or confirm my current address, suggested an alternative or provisional means of casting a ballot, or otherwise attempted to assist me in voting in Volusia or Martin Counties.

16.    As a result of the acts and omissions described above, I was not permitted to cast my vote in the November 2000 general election.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 25, 2001.

URSULA HARVEY

Sworn to and subscribed before me this
25 day of _____May_____, 2001.

_____
Notary Public Signature

_____
Notary Public Name (Typed, printed
or stamped)

My commission expires: 11/22/01

4

# EXHIBIT B-1

PERMANENT REGISTRATION IDENTIFICATION CARD
URSULA YUVONKA HARVEY   204242
1348 NW CHARLIE GREEN DR      NP
STUART FLORIDA                3F

21   02/25/98   01/11/80
PREGINCT   REG. DATE   BIRTH DATE

X _____
SIGNATURE OF VOTER

SIGNATURE OF MARTIN COUNTY SUPERVISOR OF ELECTIONS

# EXHIBIT B-2

REGARDING YOUR POLLING LOCATION:
Your polling place is subject to periodic change, depending upon the availability of facilities for our use. Please check the newspaper on Sunday prior to each election to verify the location of the polling place for your precinct.

UF 11183

| U.S. CONGRESS | STATE SENATE | STATE HOUSE | COUNTY COUNCIL |
|---|---|---|---|
| 3 | 16 | 27 | 03 |
| CITY ZONE | SCHOOL BD | SPEC. DIST. | |
| | 02 | | |

Based on the location of your residence, you are eligible to vote for representatives for the districts above.

FOLD HERE   DO NOT CUT

SUPERVISOR OF ELECTIONS
VOLUSIA COUNTY, FLORIDA

VOTER IDENTIFICATION
VOLUSIA COUNTY, FLORIDA

| REGISTRATION NUMBER | REGISTRATION DATE | POLITICAL PARTY | PRECINCT NUMBER |
|---|---|---|---|
| 103316904 | 10/02/93 | DEM | 620 |

URSULA Y HARVEY
642 M BETHUNE 219 JOYNER BCC
DAYTONA BEACH

SUPERVISOR OF ELECTIONS

SIGNATURE OF VOTER

# EXHIBIT C

# Deanie Lowe
## Supervisor of Elections
### Volusia County

136 North Florida Avenue
DeLand, FL 32720-4208
Internet Address:
*http://volusia.org/elections*
email address:
*dlowe@co.volusia.fl.us*



Telephone:
*Area Code for all numbers is 904
unless otherwise indicated*
736-5930   W.Volusia
254-4690   NE Volusia
423-3311   SE Volusia
574-0598 from 407 area
Fax: 822-5715

Date: January 12, 2001

Your name has been submitted to our office by the Florida Division of Elections on a list of voters who allegedly have been convicted of a felony in a state other than Florida. Therefore, your name will be removed from the voter registration rolls thirty days from the date of this letter, unless information is received indicating that you have not been convicted of a felony or have had your civil rights or right to vote restored.

If you have not been convicted of a felony, you must complete the enclosed affidavit, have it notarized and mail it to the Volusia County Elections Department in the enclosed, postage-paid envelope.

If you have been convicted of a felony, you must mail a copy of a document that shows that your civil rights or right to vote has been restored, either automatically or through a formal process, to the Volusia County Elections Department in the enclosed, postage-paid envelope.

If you have been convicted of a felony and have not had your civil rights or right to vote restored, you may apply to have your civil rights restored by contacting the Office of Executive Clemency, 2601 Blairstone Road, Building C, Room 229, Tallahassee, Florida 32399-2450, at 850/488-2952 or 850/488-0695. Even if you did not lose your civil rights in the state where your felony conviction occurred, you must still apply to have your civil rights restored in Florida.

Sincerely,

Deanie Lowe
Supervisor of Elections

felony 2

### Your Vote Counts!

# *AFFIDAVIT*

**STATE OF FLORIDA**
**COUNTY OF VOLUSIA**          **Voter ID #**_____

I,_____, do solemnly swear (or affirm)

that I have not been convicted of a felony, that I reside at the following address:

Legal Residence Address: _____

_____

Mailing Address: _____

_____

and that all the information on this affidavit is true. I understand that if it is not true,

I can be convicted of a felony of the third degree and fined up to $5,000 and/or

imprisoned for up to five years.

_____
Signature of Voter

Sworn to (or affirmed) and subscribed before me this ____day of _____, 20___

by _____who
    (Name of person making statement above)

❏ is personally known to me or
❏ produced identification. Type of identification produced:_____

_____
Signature of Notary Public-State of Florida

_____
(Print, type or stamp Commissioned Name of Notary Public)

felony affidavit

# Deanie Lowe
## Supervisor of Elections
### Volusia County

136 North Florida Avenue
DeLand, FL 32720-4208
Internet Address:
*http://volusia.org/elections*
email address:
*dlowe@co.volusia.fl.us*



Telephone:
*Area Code for all numbers is 904*
*unless otherwise indicated*
736-5930   W-Volusia
254-4690   NE Volusia
423-3311   SE Volusia
574-0598 from 407 area
Fax: 822-5715

Date: January 12, 2001

Your name has been submitted to our office by the Florida Division of Elections, on a list of voters who allegedly have been convicted of a felony and have not had their civil rights restored. Pursuant to Section 98.0975(4) Florida Statutes, your name will be removed from the voter registration rolls unless information is received that you have not been convicted of a felony or have had your civil rights restored.

If you believe that the information supplied to us by the Florida Division of Elections is incorrect, you should complete the enclosed *VOTER ELIGIBILITY STATUS FORM* and mail it to the Volusia County Supervisor of Elections office in the enclosed, postage-paid envelope (or fax it to 904/822-5715) within thirty days from the date of this letter. You will be notified by mail regarding your status as a voter, once we have completed the necessary verification process.

If you have been convicted of a felony and have not had your civil rights restored, your name will automatically be removed from the voter registration rolls. After serving your sentence, you may apply to have your rights restored by contacting the Office of Executive Clemency, 2601 Blairstone Road, Building C, Room 229, Tallahassee, Florida 32399-2450, at 850/488-2952 or 850/488-0695. You may re-register to vote when your civil rights are restored.

Sincerely,

Deanie Lowe
Supervisor of Elections

felony letter1

## Your Vote Counts!

## VOTER ELIGIBILITY STATUS FORM

Mail completed form to : Supervisor of Elections
136 N. Florida Ave.
DeLand, FL 32720

OR

Fax to : 1-904-822-5715

| Election Staff Use Only : |
| --- |
| VOTER ID# _____ |
| Date Sent To FDLE _____ |
| Date Sent To OEC _____ |

---

NAME OF VOTER : _____

              LAST                        FIRST              MIDDLE

DATE OF BIRTH : _____/____/_____   SOCIAL SECURITY NUMBER : _____-____-_____

CURRENT RESIDENCE ADDRESS OF VOTER :

_____

_____

_____     RACE : _____

CURRENT MAILING ADDRESS OF VOTER :

_____     SEX : _____

_____

_____

IS THIS A CHANGE OF ADDRESS FOR VOTER REGISTRATION : ☐ YES   ☐ NO

PHONE NUMBER OF VOTER : (____) ____ - _____ HOME    (____) ____ - _____ WORK

Please check the statement below that applies to you :
1.) ☐ I was never charged or convicted of a felony.
2.) ☐ I had a felony arrest that did not result in a conviction.
3.) ☐ I had a felony arrest that was reduced to a misdemeanor by the court.
4.) ☐ I was convicted of a felony but adjudication was withheld.
5.) ☐ I was convicted of a felony, but my rights have been restored.

I authorize the Florida Department of Law Enforcement and/or the Office of Executive Clemency to determine my voter eligibility status and to report the results to the Office of Supervisor of Elections.

_____      _____
SIGNATURE OF VOTER                                DATE

---

**DO NOT WRITE BELOW ———— FOR OFFICIAL USE ONLY**

---

FLORIDA CENTRAL VOTER FILE / VOLUSIA COUNTY REGISTRATION INFORMATION :

Conviction occured : County _____

Felon ID# _____     Conviction Date : _____

Voter ID# _____    DOB _____    SS# _____-____-_____

Name : _____

        Last                First              Middle

---

### Office of Executive Clemency/Disposition Response

_____ Records indicate subject's rights restored on _____/_____/_____

_____ Records indicate subject's rights have **NOT** been restored.

_____ No record of person named above in our system.

Research provided by : _____ Date : _____/____/_____

# Deanie Lowe
## Supervisor of Elections
### Volusia County

136 North Florida Avenue
DeLand, FL 32720-4208
Internet Address:
*http://volusia.org/elections*
email address:
*dlowe@co.volusia.fl.us*



Telephone:
*Area Code for all numbers is 904*
*unless otherwise indicated*
736-5930   W Volusia
254-4690   NE Volusia
423-3311   SE Volusia
574-0598 from 407 area
Fax: 822-5715

Dear Registered Voter:

Thank you for your help. The information you furnished made it possible to verify that you should not have been on the list of convicted felons whose rights have not been restored, which was provided to us by the state Division of Election. Your voter registration status will remain in good standing.

We greatly appreciate your assistance, and we regret that the procedures we are required by law to perform caused you inconvenience.

Sincerely,

Deanie Lowe

Deanie Lowe

felonclear

## Your Vote Counts!

# EXHIBIT D

APR-23-01  02:07pm   From-  C F C R L                    +2027930823              T-668   P 01/04   F-729



# Lawyers' Committee for
# Civil Rights Under Law

1401 New York Avenue, NW          Tel: 202-662-8600
Suite 400
Washington, DC 20005-2124

**Voting Rights Project**          Fax: 202-783-5130

## Fax Cover Sheet

| | | |
|---|---|---|
| **To:** | Dennis Hayes, Esq. | **Fax No:** 410-358-9350 |
| | Angela Ciccolo, Esq | |
| | | |
| | Penda Hair, Esq. | 202-728-9558 |
| | Judy Browne, Esq | |
| | Monique Dixon, Esq. | |
| | | |
| | Theodore Shaw, Esq. | 212-226-7592 |
| | Jackie Berrien, Esq. | |
| | Janai Nelson, Esq | |
| | Norman Chachkin, Esq. | 212-219-2052 |
| | | |
| | Todd Cox, Esq. | 202-682-1312 |
| | | |
| | Elliot Mincberg, Esq. | 202-293-2672 |
| | Larry Ottinger, Esq | |
| | Alma Henderson, Esq. | |
| | | |
| | Louis M. Bograd, Esq. | 202-393-4931 |
| | | |
| | Laughlin McDonald, Esq. | 404-653-0331 |
| | | |
| | Thomasina Williams, Esq. | 305-379-4541 |

**From:**    Lori Outzs Borgen, Esq.

**Re:**      **NAACP v. Harris –**
             **Letter dated April 16, 2001, from Deanie Lowe, Supervisor of Elections,**
             **Volusia County, regarding Public Record Request of March 28, 2001**

**Date:**       April 23, 2001
**Case code:**   185
This fax contains 4 pages (including this cover sheet). Please call us at the number above and ask
for Lori at 202-662-8321 if you do not receive all of the fax.
**Confidentiality Notice:** This fax may be intended as an attorney-client communication, which is
to be kept confidential. If you receive the fax in error, do not read the attached pages. Call the
number above to report the error, and then mail the entire fax to us by US mail. Thank you.

# Deanie Lowe
## Supervisor of Elections
### Volusia County

36 North Florida Avenue
DeLand, FL 32720-4208
Internet Address:
*http://volusia.org/elections*
email address:
*dlowe@co.volusia.fl.us*



Telephone:
*Area Code for all numbers is 904*
*unless otherwise indicated*
736-5930   W Volusia
254-4690   NE Volusia
423-3311   SE Volusia
574-0598   from 407 area
Fax: 822-5715

April 16, 2001

Lori Outz Borgen
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., NW, Suite 400
Washington, DC 20005-2124

Dear Ms. Outz Borgen:

Re:   Your Public Records Request

In response to the requests in your letter of March 28, 2001, we are addressing each of the items in the order that you listed them in your letter, as follows:

1.   NVRA Reports for September and October are enclosed as Exhibits A and B.

2.   The CD for our Power Point visuals from our poll worker training are enclosed as Exhibit C.

3.   A copy of our log of names of persons who picked up voter registration packets for registration drives during 2000 is enclosed as Exhibit D.

4.   There are no memoranda, meeting notes, etc., related to the voter registration process, other than our 1995 NVRA manual previously provided.

5.   We can provide total number of voters, by race (as far as what was given by the applicant) that registered from September 1 through October 10, 2000. However, the only way we can provide you with the dates of printing and mailing voter identification cards would be to run the list of voters who registered within that period and then have someone sit at a computer to individually look up each of the 8,220 names and write down the two dates for each. Since Florida law will not allow us to provide you with the names on the list, I am wondering what type of format we would use to report the type of information you are seeking. To complicate matters further, some of these voters will have changed their name, address or party affiliation since last October, meaning we would have printed and mailed them a new ID card, the date of which would replace the previous date of printing their initial ID card, preventing us from being able to determine the original dates for printing

## Your Vote Counts!

L. Outz Borgen
April 6, 2001
Page Two

and mailing their ID cards. If you choose to look at this information in the manner described above, we estimate the time involved to be approximately 250 hours, at a cost of approximately $3,800.00.

Regarding paragraph one, page two of your letter: We are enclosing as Exhibits E through J the Central Voter File lists of deceased voters, voters with duplicate registrations in our county and another Florida county and "possible/probable" felons provided to us by the Division of Elections. Notations on the lists will indicate which ones were used to cancel voters. As I explained to you during your visit to our office last month, we did not delete persons on the "possible/probable" felon list prior to the November election, since that list was thought to contain numerous errors and we did not feel we had sufficient time to contact the voters and give them an opportunity to respond prior to election time. Since the election last November, we have mailed letters to the persons listed on pages 1 through 8 of the January 2000 list (received June 19, 2000, as date stamped) at the end of Exhibit J. The correspondence mailed to those persons gave them the opportunity to provide information that would enable us to further determine if, in fact, they should be canceled; you were previously provided with copies of the types of letters we sent. Those who responded and provided satisfactory information were kept on the rolls; the remainder have been placed into a canceled status.

Regarding paragraph two, page two, of your letter: We do not have the ability to print a list of those whose applications had to be denied; however, we have the 538 applications on file in our office. You may either review them here, or we can copy those (redacting signatures) and mail them to you. As for those whose applications that did meet requirements and were therefore accepted during that time period, we are able to print a list that can be used for pulling their applications from our active files for your review. The list would include the information you itemized, except for mailing date of voter identification card; that date is not keyed into our registration program, but can be figured from the date of printing of the voter identification card. I would also want to point out that the precinct where a given voter is now listed could very well be different from the precinct where he/she was originally registered, due to the person having notified us of moving to a different address.

Regarding paragraph three, page two, of your letter: We have completed processing the multi-purpose affirmation/affidavit forms completed at the polls during our November, 2000, election. The numbers completed in each precinct are listed on the enclosed Exhibit K. You may either review the forms in our office or, should you desire, we will make copies (with signatures redacted) and mail them to you.

Regarding item number 6 on your public records request dated December 5, 2000: As you may remember, we took you upstairs in our office and showed you our file cabinets of canceled voters, which include deceased, felons, mentally incapacitated, those removed through list maintenance

L. Outz Borgen
April 6, 2001
Page Three

procedures (due to inactivity), those who moved to another county and those who simply chose to notify us that they wanted their registration canceled. We are able to run a list of those canceled since 1/1/96; however, we no longer have any paperwork on reasons for cancellation, except for those canceled during 1999 and 2000, since a two-year period is all we're required to retain such records. We do not contact the voter to notify him/her of cancellation, since that is not required by law. A vast majority of the cancellations are either iniated by the voter or occur as a result of list maintenance procedures, during which we try to reach the voters through mailings prior to canceling them. As for inactive voters, we can run a list of those currently in our files. From that list, we can have someone either pull the voters' application cards from the files for you to view, or we can pull the voters' maintenance screens up on a computer for you to view.

Regarding the poll worker manuals previously provided to you: Both the Poll Deputy Manual and the Accu-Vote Instruction Manual dated May 1998 are the versions currently in use. There have been no changes necessary to those since that printing, so we have not had any reason to update them.

We trust the information provided in this letter and the enclosed exhibits will meet your needs. Please let us know if we may be of further assistance.

Sincerely,

Deanie Lowe

Attachment:   Invoice for copying/diskette costs
Enclosures:   Exhibits A through K

# EXHIBIT E



**Lawyers' Committee for**
**Civil Rights Under Law**

1401 New York Avenue, NW          Tel: 202-662-8600
Suite 400                         BBS: 202-783-0854
Washington, DC 20005-0400

Voting Rights Project             Fax: 202-783-5130

# Fax Cover Sheet

danai Nelson                    Fax No: 212·219·2052

AMITA HODGKISS

FL FELON

5·21·01

code: 339

ax contains 2 pages (including this cover sheet).  Please call us at the
er above and ask for SUSAN_____ if you do not receive all of the fax.

hment: Clemency Board letter on out-of-state felons.

dentiality Notice: This fax may be intended as an attorney-client
unication, which is to be kept confidential.  If you receive the fax in error, do
ad the attached pages.  Call the number above to report the error, and then
he entire fax to us by US mail.  Thank you.

age:

STATE OF FLORIDA



..... .. ....... ..........

01 MAR 12 AM 9: 51

..., CHAIRMAN                                          TOM GALLAGHER, TREASURER
..., SECRETARY OF STATE                    CHARLES CRIST, COMMISSIONER OF EDUCATION
..., ATTORNEY GENERAL               TERRY RHODES, COMMISSIONER OF AGRICULTURE
..., COMPTROLLER                                    MRS. JANET K. KEELS, COORDINATOR

PHONE: ...

**OFFICE OF EXECUTIVE CLEMENCY**
2000 ...
BUILDING C, ROOM 200
TALLAHASSEE, FLORIDA 32399-2450

February 23, 2001

*FAX*
*To M. Cirullo*

Mr. Ed Kast, Assistant Director
Division of Elections
Department of State
The Capitol, Room 1801
Tallahassee, FL 32399-0250

Dear Mr. Kast:

Some confusion has recently arisen regarding the effect of out-of-state restoration of civil rights on former felons' civil rights in Florida. To correct any misunderstanding, this letter reiterates our current policy.

If a former felon's civil rights were restored in another state, or if a person's civil rights were never lost after being convicted of a felony in another state, the individual possesses his or her civil rights in Florida and need not apply for restoration of civil rights in Florida. If a former felon attempting to register to vote in Florida claims that his or her civil rights were restored in another state or that his or her civil rights were not lost in another state, but the individual cannot produce supporting documentation, please refer that individual to my office.

My office will attempt to confirm the individual's claim by contacting the state that assertedly restored the individual's civil rights. If possession of civil rights is confirmed, the individual does not need to apply for restoration of civil rights in Florida. My office will issue a letter to that effect to the individual. Please accept that letter as proof of possession of civil rights.

I hope this clarifies any misunderstanding as to our State's policy regarding these matters. Please do not hesitate to contact my office if you have questions.

Sincerely,

Janet H. Keels

Janet H. Keels
Coordinator

JK/jk

Mr. Clay Roberts, Division of Elections
Supervisors of Elections

# EXHIBIT F

**FOLLOWING IS A COPY OF THE AFFIDAVIT OF CYNTHIA SLATER.  THE ORIGINAL AFFIDAVIT WAS UNAVAILABLE AT THE TIME OF THIS FILING DUE TO A DELAY IN DELIVERY.  MS. SLATER'S  ORIGINAL AFFIDAVIT WILL BE FILED WITH THE COURT IMMEDIATELY FOLLOWING RECEIPT BY  COUNSEL FOR THE PLAINTIFFS.**

IN THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 01-0120-C.V.-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., *et al.*,

                Plaintiffs,

    vs.

KATHERINE HARRIS, Secretary of State of
Florida, *et al.*,

                Defendants.

## AFFIDAVIT OF CYNTHIA SLATER

CYNTHIA SLATER, being duly sworn, deposes and says:

1. My name is Cynthia Slater and I am the President of the Daytona Beach Branch of the National Association of the Advancement of Colored People, Inc. (hereinafter, "NAACP").

2. The Daytona Beach Branch is one of four NAACP branches located in Volusia County, Florida. The other branches are the West Volusia Branch, New Smyrna Branch, and the Ormond Beach Branch. Each of these branches covers different sections of Volusia County.

3. Named plaintiff Emery H. Timberlake, Sr. lives in an area covered by the Daytona Beach Branch.

4. Each branch of the NAACP is charged by the national office to increase political participation among African Americans and other groups through voter registration

drives, voter education forums, election-day transportation provision, and participation in the NAACP's national "Get Out the Vote" campaign, among other efforts.

     5.    In response to this charge, the Daytona Beach Branch has been, and continues to be, very active in increasing political participation among African Americans in the Daytona Beach area. Among other things, it conducts monthly voter registration drives, organizes periodic voter registration and education rallies and picnics, provides election-day transportation, and issues public service announcements and through various local media.

     6.    In preparation for the November 2000 general election, the Daytona Beach Branch organized at least one dozen voter registration rallies and picnics, issued public service announcements on local radio and in local newspapers, conducted numerous voter registration drives, including absentee ballot drives, distributed hundreds of flyers door-to-door, and provided transportation on election day for voters who did not have other means of getting to the polls.

     7.    With respect to the absentee ballot drives, the Daytona Beach Branch offered absentee ballot request forms to anyone who requested one, accepted completed forms, and delivered the forms to the Volusia County Supervisor of Elections office in advance of the November 2000 general election. In addition, the Daytona Beach Branch made copies of each

2

absentee ballot request form that it delivered to the Supervisor of Elections office, including the

absentee ballot request form that it delivered for Mr. Timberlake.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 31, 2001.

CYNTHIA SLATER

Sworn to and subscribed before me this
31 day of _____, 2001.

Notary Public Signature

Regenia Mitchell

Notary Public Name (Typed, printed
or stamped)

My commission expires: _____

Regenia A. Mitchell
MY COMMISSION # CC814086 EXPIRES
March 2, 2003
BONDED THRU TROY FAIN INSURANCE, INC.

3

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.01-CIV-120-Gold/Simonton

-----------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

Defendants.

-----------------------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT DBT'S MOTION TO DISMISS**

In their Complaint, Plaintiffs raise five constitutional and statutory challenges to

Defendants' actions regarding the election on November 7, 2000.  Plaintiffs bring these claims

against the parties responsible for administering the electoral system in Florida, namely, the

Secretary of State, the Director of the Florida Division of Elections, county Supervisors of

Elections, and the party that acted as a state agent in developing a list of eligible voters,

ChoicePoint, Inc., d/b/a Database Technologies, Inc. ("DBT").  The causes of actions are

supported by a host of factual allegations, which "must be taken as true and read in the light most

favorable to the plaintiffs" in adjudicating Defendant's motion to dismiss.  *Linder v.*

*Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992).

***ARGUMENT***

Defendant DBT has moved to dismiss the Complaint against it pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on the grounds that the Court lacks subject matter jurisdiction and that Plaintiffs have failed to state a claim against DBT. Defendant seeks to run from its responsibility for the wrongful purge of numerous eligible voters in Florida. This it cannot do as a matter of law.

The Court has subject matter over Defendant DBT based on DBT's actions as a state agent in carrying out its contract with the State of Florida to prepare a list of ineligible voters. Simply put, Plaintiffs seek a court order requiring DBT to correct the mistakes it made in compiling lists of potentially ineligible Florida voters, and to stop wrongfully identifying thousands of eligible voters as potentially ineligible. Plaintiffs seek from Defendant DBT specific enumerated relief as well as such additional relief as the Court may deem just and proper.

## I.   PLAINTIFF SEEK SUBSTANTIAL RELIEF FROM DBT TO REMEDY ITS WRONGFUL CONDUCT IN PURGING VOTERS FROM THE VOTER ROLLS.

The Complaint's allegations and request for relief from Defendant DBT are easily summarized. In paragraphs 33 and 61 to 73 of the Complaint, Plaintiffs set forth detailed allegations regarding the wrongful purging of voters from official lists of eligible voters, allegations which must be accepted as true for the purposes of this motion. Pursuant to state and federal law, Defendants are "charged with administering and maintaining the state's overall list maintenance programs and the state's central voter file." (Compl. ¶ 61.) *See* Fla. Stat. § 98.0975. Prior to the November 2001 presidential election, DBT entered into a contract with the State of Florida to "prepare a list of registered voters who were ineligible to vote." (*Id.* at ¶ 62.) DBT worked with the State to determine the criteria and information that would be used to create the list of ineligible voters. (*Id.* at ¶ 63.) In performing these functions, Defendant DBT "acted

as an agent of the State of Florida." (*Id.* at ¶ 33.) *See* Fla. Stat. Ann. § 98.0975(3)(b).[1]  DBT "wrongfully identified qualified voters as ineligible to vote and communicated that incorrect information" to the other Defendants. (*Id.* at ¶ 62.)  As a result of DBT's wrongful actions, numerous eligible voters, including named plaintiffs in this case, were unlawfully purged from the state voting rolls and not allowed to vote on November 7, 2000.

To remedy DBT's wrongful conduct and insure that such action does not occur again, Plaintiffs seek several specific forms of relief against DBT.  First, Plaintiffs request a declaratory judgment that Defendants' "wrongful purge of qualified voters" had a disparate impact on black voters and denied them an equal opportunity to participate in the November 2000 general election. (Compl., Prayer for Relief, ¶ 2.)  Plaintiffs also seek to have all Defendants, including DBT, enjoined immediately to discontinue election practices and procedures which have an unlawful impact on the right to vote. (*Id.* at ¶ 3.)

Next, Plaintiffs seek relief that DBT is uniquely situated to provide.  Plaintiffs ask that Defendants be required "to accurately determine and restore to appropriate status all persons

---

[1] Florida election law sets forth the procedure by which the central voter file is maintained. Fla. Stat. Ann. § 98.0975.  Pursuant to this statute, state and county officials determine if registered voters are ineligible to vote for reasons such as death and felony conviction without having civil rights restored.  Section (3) provides as follows:

> (3)(a)  In order to meet its obligations under this section, the division shall annually contract with **a private entity** to compare information in the central voter file with available information in other computer databases, including, without limitation, databases containing reliable criminal records and records of deceased persons.
> (b)      The entity contracted by the division is **designated as an agent of the division** for purposes of administering the contract, and must be limited to seeking only that information which is necessary for the division to meet its obligations under this section.  Information obtained under this section may not be used for any purpose other than determining voter eligibility.

Fla. Stat. Ann. § 98.0975(3) (emphasis added).

wrongfully purged based on the DBT list and all other persons purged in violation of state and

federal law," and discontinue all purges until fair standards are developed. (*Id.* at ¶ 3(e) and (f).)

Further, Plaintiffs request that *no one be removed from the voter lists unless the information has

been verified and determined to be a correct match.* (*Id.* at ¶ 3(g).)  Again, DBT is uniquely

situated to know the sources of information from which purge lists were derived, whether and

how the information has been verified, and what standards were used to match its data with the

State's registered voter lists.  In order for Plaintiffs to obtain complete relief on their claims,

DBT must accept its responsibility as a state actor and do its part to remedy its wrongful conduct

in relation to the November 2000 election in Florida.  It is clear that Plaintiffs have sought

substantial relief from Defendant DBT in the Complaint.

       The Complaint amply satisfies the minimal pleading requirements of the Federal Rules of

Civil Procedure, which "'do not require a claimant to set out in detail the facts upon which he

bases his claim.'" *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,

507 U.S. 163, 168 (1993) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (internal quotations

omitted)).  Rather, the Rules embody the policy of "notice pleading," and simply "require . . . a

short and plain statement of the claim that will give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests." *Id.*  "Because of the liberal pleading

requirements of the Federal Rules, rarely will a motion to dismiss for failure to state a claim be

granted." *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711

F.2d 989, 995 (11th Cir. 1983); *see also, e.g., Canadyne-Georgia Corp. v. NationsBank, N.A.*,

183 F.3d 1269, 1276 (11th Cir. 1999) (noting "the very low threshold of sufficiency prescribed

by the Federal Rules of Civil Procedure").  Defendant DBT's inaccurate characterization of the

Complaint as failing to seek relief against it does not meet its heavy burden here and the motion

must be denied.

## II.   PLAINTIFFS HAVE STANDING TO PURSUE CLAIMS AGAINST DBT.

DBT erroneously contends that dismissal is appropriate, arguing that no Plaintiff in this

lawsuit has standing against DBT, thereby stripping this Court of subject matter jurisdiction.

DBT correctly points to the *Lujan* test as the appropriate gauge for whether a plaintiff has

standing to assert a claim.  *See* Defendant DBT's Memorandum of Law in Support of Motion to

Dismiss ("Memo") at 4.  However, contrary to DBT's assertion, Plaintiffs have alleged facts

sufficient to demonstrate an injury in fact; a causal connection between that injury and DBT's

conduct; and the ability for the injury to be redressed by a favorable decision against DBT,

thereby satisfying all prongs of the *Lujan* test.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560 (1992).  *See also Dillard v. Baldwin County Com'rs*, 225 F.3d 1271, 1275-80 (11th Cir.

2000) (holding that individual voters have standing to challenge election practices).

### A.   PLAINTIFFS' INJURIES ARE DIRECTLY TRACEABLE TO DBT'S WRONGFUL CONDUCT.

Remarkably, DBT claims that even if it wrongfully identified numerous eligible voters to

be purged from the rolls, it cannot be held responsible because other Defendants actually purged

these voters.  (*See* Memo at 4-5.)  According to DBT, Plaintiffs' injuries resulted from the

"independent actions" of election officials, thereby making the causal link between its conduct

and Plaintiffs' injuries too attenuated.  (*Id.* at 5.)  DBT characterizes its work for the State of

Florida as merely providing "data processing services." (*Id.* at 7-8.)  This is both misleading and

contrary to the allegations in the Complaint, which must be accepted as true for the purposes of

this motion.  As discussed in Point I, DBT acted as a "state agent" in assisting in the review and

5

maintenance of the voter list.[2]  Indeed, DBT was one of the primary actors in a statutory scheme that involved all Defendants.  *See* Fla. Stat. Ann. § 98.0975.

DBT's unusual proposition that it is not responsible for its actions finds no support in the law.  Indeed, the sole case relied upon by DBT does not support its claim.  In *Loggerhead Turtle v. County Council of Volusia County, Florida*, 148 F.3d 1231 (11th Cir. 1998), the Eleventh Circuit held that the Turtle plaintiffs did not have standing to assert a claim against the County for the failure of individual municipalities to adequately enforce environmental regulations since the County had no authority over the enforcement measures selected by those municipalities. 148 F. 3d at 1250.  According to the court, the municipalities' exercise of their exclusive authority to choose not to enforce the standards set by the County acted as an "independent action" that cut off the plaintiffs' standing to assert a cause of action against the County for lack of enforcement.  *Id.*  In *Loggerhead*, as in other cases, the court considered the causal connection between the alleged injury and the action of the defendant, and concluded that since the plaintiffs' injuries resulted from the independent action of a non-party, they did not have standing to assert that particular cause of action against the defendant.  *Id.*  DBT's situation is significantly different.  State officials, unlike the municipalities in *Loggerhead*, are parties.  Nor

---

[2] DBT's argument in fact demonstrates that it is a proper party to sue for the unlawful purge.  Defendant argues that only "state and local election officials" can engage in purging of the voter rolls and that only those parties could have caused Plaintiffs' injuries. (Memo at 2, 4.) Given that DBT was a state agent specifically hired to assist with the voter purge, under DBT's own theory, it is an appropriate party to be held responsible for the injury alleged by Plaintiffs.

Furthermore, the means through which defendant hopes to escape liability here has been firmly rejected by the Supreme Court.  In *Nixon v. Condon*, 286 U.S. 73 (1932), a Black citizen challenged a resolution passed by the state Democratic Party to exclude Blacks from the primaries.  The defendants claimed that the Fourteenth Amendment did not apply because the alleged discrimination was caused by a private actor.  The Court rejected this argument, noting that the private actor was the instrument through which the government operated.  *See Smith v. Allwright*, 321 U.S. 649 (1944) (holding that duties performed by a private party pursuant to state statute are state action); *Terry v. Adams*, 345 U.S. 461 (1953); *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996) (rules governing who could participate in a political party's nominating convention involved "voting" within the meaning of the Voting Rights Act of 1965).

6

did Florida act independently when it purged Plaintiffs from the voting role. DBT and the other Defendants acted jointly. There was no independent action. The Plaintiffs were injured because they were improperly removed from the list of eligible voters. They were removed from the list because DBT wrongfully told the State that they were ineligible to vote. There is a direct causal connection between DBT's conduct and Plaintiffs' injuries. DBT cannot shield itself from liability because its wrongful actions were undertaken jointly with other Defendants.[3]

**B.     A FAVORABLE DECISION AGAINST DBT WILL REDRESS PLAINTIFFS' INJURIES.**

The third prong of the standing test requires a likelihood that the requested relief will redress the alleged injury. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45-46 (1976); *see also Lujan*, 504 U.S. at 560-61 ("it must be 'likely' . . . that the injury will be 'redressed by a favorable decision.'"). DBT first argues that there is no requested relief, i.e., that "plaintiffs do not seek any modification of DBT's behavior." (Memo at 5.) DBT is wrong. In arguing that there is no relief requested from it, DBT simply ignores the Prayer for Relief. *See* Point I, *supra* at 2-4 (discussing relief sought from DBT).

DBT next argues that even if Plaintiffs requested relief against it, Plaintiffs still lack standing because DBT can do nothing to redress Plaintiffs' injuries. Again, DBT is wrong. DBT erroneously included eligible voters on its lists of ineligible voters. (Compl. ¶ 62.) As a direct result of DBT's wrongful actions, eligible voters were purged from Florida's lists of eligible voters. As the party that created the inaccurate list, DBT is obviously in the best position to submit an accurate list. DBT is in the best position to uncover the problems that led to voters being misidentified and removed. For example, DBT knows the sources of its information about

---

[3] Even if DBT's actions could only be construed as *indirectly* impacting Plaintiffs, that would still be sufficient for purposes of standing. *Loggerhead*, 148 F.3d at 1250-51 (citing *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 697-98 (1995)).

the voters and how people were placed on various lists in the first instance. It certainly is not "powerless, as a matter of law" to correct the voter roll. (Memo at 6.) Moreover, ordering DBT to correct its inaccurate list is not only "likely" to, but will remedy Plaintiffs' injuries. With a correct list, something the taxpayers of Florida have presumably already paid for, the other defendants can rightfully restore Plaintiffs to the voting rolls and they will be able to vote in future elections.

Since Plaintiffs' requested relief against DBT is "likely" to restore their respective abilities to vote, Plaintiffs have met the "redressability" prong of the standing test. *See, e.g.,* *Smith v. Meese*, 821 F.2d 1484, 1493 (11th Cir. 1987) (in a case where the injury to plaintiffs' right to vote arises from identifiable discriminatory actions, an order enjoining the actions would redress the injury for the purposes of the standing requirement); *cf. Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 332 (1999) (standing found where requested relief – a permanent injunction against a proposed use of sampling in the census – will redress the alleged injury, Indiana citizen's expected future loss of a Representative in Congress); *Natural Law Party v. F.E.C.*, 111 F.Supp.2d 33, 49-50 (D.D.C. 2000) (injuries not rendered unredressable by the fact that the election was over).

The Complaint sets forth allegations sufficient to establish that Plaintiffs have been injured by DBT's wrongful conduct, and that the injury could be remedied by DBT's actions. Therefore, the Court has subject matter jurisdiction over Plaintiffs' claims. The motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) must be denied.

## III. PLAINTIFFS HAVE PLED SUFFICIENT FACTS TO STATE A CAUSE OF ACTION AGAINST DBT FOR VIOLATIONS OF 42 U.S.C § 1983, THE CIVIL RIGHTS ACTS OF 1957 AND 1960, AND FLA. STAT. ANN. § 104.0515.

**A.   PLAINTIFFS HAVE SATISFIED THE PLEADING REQUIREMENTS FOR A SECTION 1983 CLAIM AGAINST DBT.**

In Count III of the Complaint, Plaintiffs allege a violation of the rights secured to them under the Fourteenth Amendment to the United States Constitution, the National Voter Registration Act, and 42 U.S.C. § 1983. Defendant seeks to dismiss this claim by asserting that Plaintiffs allege only mere negligence by DBT and this is insufficient to support a § 1983 claim. Defendant DBT selectively quotes the Complaint, contending that the only basis for the claims against it is DBT's "failure to exercise diligence and care." (Memo at 10.) DBT fails to discuss the immediately preceding paragraph that alleges that "upon information and belief, in the course of carrying out this contract, Defendant DBT **wrongfully** identified qualified voters as ineligible to vote and communicated that incorrect information to Defendants." (Compl. ¶ 62 (emphasis added).) "Wrongful" acts include conduct characterized by unfairness, injustice, or that are contrary to law. *See Black's Law Dictionary* 1606 (7th ed. 1997). Furthermore, in ¶ 63, Plaintiffs allege that DBT failed to ensure and verify the reliability and accuracy of the lists it provided to the county supervisors. In the context of voting rights, this is reckless and deliberately indifferent behavior. Clearly, Plaintiffs' § 1983 allegations are based on more than mere negligence.

DBT's claim that "it is well settled that liability under § 1983 must rest on actions that are more than mere negligence" is erroneous. (Memo at 10.) To the contrary, "[s]ection 1983 . . . has never been found by the [Supreme] Court to contain a state-of-mind requirement." *See Parratt v. Taylor,* 451 U.S. 527, 534 (1981). This principle was reaffirmed by the Supreme Court in *Daniels v. Williams*, a case cited by DBT. (Memo at 10.) There, the Court held that § 1983:

> contains no state-of-mind requirement independent of that necessary to state a
> violation of the underlying constitutional right . . . In any given § 1983 suit, the

> plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct [may or] may not be enough to state a claim.

*Daniels*, 474 U.S. 327, 330 (1986).

Negligence can be a sufficient basis for a claim under § 1983. The measure of culpability depends upon the underlying constitutional or statutory violation. DBT's only support for its sweeping conclusion that a Plaintiff must allege more than mere negligence is *Marsh v. Butler County*. Not only does *Marsh* not stand for the broad proposition for which Defendant cited it, but also, it has been vacated by the United States Court of Appeals. *Marsh v. Butler County*, 225 F.3d 1243, *vacated and reh'g en banc granted*, 234 F.3d 1231 (11th Cir. 2000).

In their Complaint, Plaintiffs allege that DBT acted wrongfully in creating an inaccurate list of eligible voters and then communicating that inaccurate list to other Defendants. Such allegations include more than mere negligence, and therefore, Defendant's Motion should be denied. Nevertheless, even if the Court accepts DBT's erroneous argument, the Defendant's Motion should still be denied because they are patently mistaken in their underlying assertion that all § 1983 claims must plead more than mere negligence. Plaintiffs' § 1983 claim is based on the National Voter Registration Act, 42 U.S.C. § 1973gg et seq., and on an Equal Protection claim as stated in *Bush v. Gore*, 531 U.S. __ (2000). Defendant has not even asserted that Plaintiffs failed to allege the proper elements of such a claim. In short, Defendant's broad generalizations about § 1983 claims establish no basis for dismissal and DBT's motion must be denied.

**B.     THERE IS AN IMPLIED PRIVATE RIGHT OF ACTION UNDER 42 U.S.C. § 1971.**

Defendant asserts that Count IV of the Complaint fails to state a claim because there is no private right of action under 42 U.S.C. § 1971. (Memo at 11-12.) DBT admits that courts have recognized a private right of action under 42 U.S.C. § 1971. (*Id.* at 11.) *See, e.g., Gray v. Main*,

291 F. Supp. 998 (M.D. Ala. 1966); *Brooks v. Nacrelli*, 331 F. Supp. 1350 (E.D. Pa. 1971).

Nonetheless, DBT cites three district court cases to claim a "modern trend" against recognition

of a private right of action. *See Spivey v. Ohio*, 999 F. Supp. 987 (N.D. Ohio 1998) (citing only

*Willing* for the proposition that there is no private right of action under 42 U.S.C. § 1971);

*McKay v. Altobello*, No. 96-3458, 1996 WL 635987 (E.D. La. Oct. 31, 1996) (8-paragraph

opinion denying preliminary injunction); *Willing v. Lake Orion Community Schools Board of

Trustees*, 924 F.Supp. 815, 820 (E.D. Mich. 1996) (*pro se* plaintiff did not discuss § 1971 claim

in motion to amend; without reference to any precedent, court states there is no private right of

action). Significantly, none of these cases overrule or even discuss the prior case law, which held

that implying a private right of action under the Civil Rights Act was consistent with the already

existing interpretation of a similar provision in the Voting Rights Act. Finally, none of these

cases refers to the most relevant Supreme Court precedent, *Allen v. State Board of Elections*, 393

U.S. 544 (1969), and none applies the test in *Cort v. Ash*, 422 U.S. 66 (1975). Defendant has

cited no authority to suggest that the Eleventh Circuit has decided to overturn its longstanding

precedent of recognizing a private right of action pursuant to 42 U.S.C. § 1971. *See, e.g., Reddix

v. Lucky*, 252 F.2d 930 (5th Cir. 1958) (finding that complaint filed by individual voter stated a

cause of action pursuant to 42 U.S.C. §§ 1971 and 1983 based on improper purge from voter

list).[4]

Eleventh Circuit precedent holding that there is a private right of action pursuant to 42

U.S.C. § 1971 is consistent with Supreme Court analyses of when 42 U.S.C. § 1983 provides a

private right of action. An action may be brought pursuant to Section 1983 for violation of a

federal statute unless "(1) 'the statute [does] not create enforceable rights, privileges, or

---

[4] Decisions of the former Fifth Circuit issued on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

immunities within the meaning of § 1983,' or (2) 'Congress has foreclosed such enforcement of the statute in the enactment itself.'" *Wilder v. Virginia Hospital Assn.*, 496 U.S. 498, 508 (1990) (quoting *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 423 (1987)). Defendant does not dispute that the Civil Rights Acts of 1957 and 1960 create enforceable rights. Nor has such enforcement been foreclosed in the statute.  Thus, the Court must consider only whether the act provides a private right of action by which Plaintiffs may enforce that right.

In *Cort v. Ash*, the United States Supreme Court developed a test for courts charged with assessing whether a private remedy is implicit in a statute that does not expressly provide for one.  422 U.S. 66, 78 (1975).  First, the court must consider whether the plaintiff is "one of the class for whose especial benefit the statute was enacted." *Id.*  Second, the court inquires whether there is an explicit or implicit indication of legislative intent to establish or deny a private cause of action. *Id.*  Third, the court must ask if implying a private right of action would be consistent with the underlying purposes of the legislative scheme. *Id.*  Finally, the court must ask if the cause of action is one traditionally relegated to state law or if it would be inappropriate to infer the action on federal law. *Id.*

A review of these factors establishes the existence of an implied right of action pursuant to 42 U.S.C. § 1971.  Here, Plaintiffs are black voters for whose benefit 42 U.S.C. § 1971 was enacted. The legislative intent was to allow private actions.  Private enforcement is consistent with the purpose of the Civil Rights Acts and appropriate for federal law.

DBT's "modern trend" is directly contrary to the broad purpose of the Civil Rights Acts. In holding that a private right of action existed under the Voting Rights Act, the U.S. Supreme Court recognized in *Allen v. State Board of Elections* that:

> the achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General . . . . It is consistent with the broad purpose of

12

> the Act to allow the individual citizen standing to insure that his city or county government complies with the § 5 approval requirements.

393 U.S. 544, 556, 557 (1969). While the Court in *Allen* was referring to the Voting Rights Act, the Civil Rights Acts have the same purpose as the Voting Rights Act, making a private right of action necessary in order to afford meaningful protection against violations. *See, e.g.*, *Reddix*, 252 F.2d at 933-34. The *Allen* Court drew support for its conclusion from the fact that it had previously held that a federal statute passed to protect a class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action. *See* 393 U.S. at 557, citing *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964). This Court should do the same with respect to the Civil Rights Acts of 1957 and 1960.

A private right of action has been and should be recognized in 42 U.S.C. § 1971 in order to achieve the goals of the Civil Rights Acts. It would frustrate the very purpose of the statute if voters, denied their right to vote in a Presidential election, were forced to rely solely on the discretion of a Presidential appointee to vindicate their rights. Under the relevant Supreme Court standards, it is clear that Plaintiffs have a private right of action pursuant to 42 U.S.C. § 1971 and Defendant's motion to dismiss this cause of action must be denied.

### C.   PLAINTIFFS HAVE STATED A CLAIM AGAINST DBT UNDER FLA. STAT. ANN. § 104.0515 BASED ON THE IMPLIED PRIVATE RIGHT OF ACTION FOUND IN THE STATUTE.

The history and structure of Fla. Stat. Ann. § 104.0515 demonstrate that Plaintiffs are entitled to seek a remedy for violations of the statute. In arguing to the contrary, DBT lacks direct authority, neglects the historical and legal context of the statute's adoption, and assumes that the Florida legislature intended to protect the declared voting rights of its minority citizens solely through criminal proceedings against public entities or through expedited election contests in close elections.

In *Cort v. Ash*, the Supreme Court set forth the standard for determining whether a federal statute implies a private right of action to enforce it. *See supra* at 12. The Florida Supreme Court adopted a modified version of this test in construing state statutes, holding that the primary factor should be legislative intent, as evidenced by the language of the statute, the statutory structure, and the legislative history. *See Murthy v. N. Sinha Corp.*, 644 So. 2d 983, 985-86 (Fla. 1994). Although the *Murthy* Court emphasized the primacy of legislative intent, this standard does not foreclose courts from looking at the other two factors identified in *Cort*; it only gives legislative intent primacy over either the benefit or purpose test. *See* 644 So. 2d at 985.

Application of this standard to the Florida Voting Rights Act demonstrates that Plaintiffs do have a private right of action. The statute was clearly intended to incorporate such a right, given that Florida copied the crucial parts of a federal law already found to contain a private right of action and the legislature knew that, at the time of adoption, the courts would allow private enforcement absent statutory language to the contrary.

### 1.   Fla. Stat. Ann. § 104.0515 is Based on the Federal Voting Rights Act and Implies a Comparable Private Right of Action.

The history and text of Fla. Stat. Ann. § 104.0515 show that it is modeled after the Federal Voting Rights Act. The Federal Voting Rights Act was adopted in 1965, without an express private right of action, but the Supreme Court read the statute to authorize private enforcement because (1) the Act protected a class of citizens, (2) private enforcement was consistent with the Act's purpose, and (3) the Act's mandate "might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement." *See Allen,* 393 U.S. at 557. That reasoning applies with equal force to Fla. Stat. Ann. § 104.0515. Since *Allen*, private enforcement has played a critical role in protecting the voting rights of citizens, including Floridians. *See, e.g., McMillan v. Escambia County*, 748 F.2d 1037 (5th Cir. 1984) (tracing

lengthy history of case and finally affirming remedy sought by private plaintiffs).

The circumstances of adoption of the Florida Voting Rights Act demonstrate that the Florida legislature intended the same private enforcement. *See, e.g., Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979) (intent to create private right of action "may be found . . . in the circumstances of [legislation's] enactment"). Key provisions of the Voting Rights Act were set to expire in August 1982, and no one knew whether or in what form the Act would survive. *See* "Voting Rights Act Faces Renewal Test on Hill," *Christian Sci. Monitor*, Oct. 5, 1981, at 1; "Stage is Set for Brouhaha on Voting Act," *Wash. Post*, Sept. 29, 1981, at A3.[5]

Against this backdrop, the Florida legislature adopted Fla. Stat. Ann. § 104.0515; it was approved by the governor on March 29, 1982. *See* 1982 Fla. Laws ch. 82-59. Taking effect July 1, 1982, the statute was expressly intended to take the place of the Voting Rights Act should it be killed or weakened, *see* "State Voting-Rights Act is grassroots protection," *Tallahassee Democrat*, Mar. 22, 1982, at A4. ("[S]tate legislators . . have adopted an insurance policy to assure that the right to vote in Florida is not denied or abridged because of race or color, regardless of what Congress decides. . . . The House adopted 116-0 a Florida Voting Rights Act echoing the 1965 federal act, which will defend the civil rights of state citizens."), and thus was intended to include the private enforcement available under the Federal Act.[6] *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378 (1981) (where legislature "acts in a statutory context in which an implied private remedy has already been recognized by the courts"

---

5 It is entirely appropriate for the Court to consider "contemporary news accounts" to understand the context in which legislation was enacted. *See, e.g., Kirby Corp. v. Pena*, 109 F.3d 258, 264 (5th Cir. 1997) (using media accounts from 1954 to show reason for legislation's adoption).

6 It would not become clear that the Federal Act would survive, strengthened, until months later. *See* "Filibuster Ends on Voting Rights," *N.Y. Times*, June 18, 1982, at D17.

then only question is whether legislature "intended to preserve the pre-existing remedy");

*McClellan v. Cablevision of Connecticut*, 149 F.3d 161, 166 (2d Cir. 1998) (where courts have

already recognized private right of action, legislative silence is interpreted as decision to "leave

the remedy in place").

Moreover, the Florida statute's text tracks much of the language of the Federal Voting

Rights Act. *Compare* Fla. Stat. Ann. § 104.0515(4) *with* 42 U.S.C. § 1973(a). By including this

crucial parallel text, the Florida legislature expressly signaled its intent to include an *Allen*-style

private right of action. *See Cannon v. University of Chicago*, 441 U.S. 677, 696 (1979)

(legislature intended that Title IX contain private right of action because it was modeled after

Title VI, which had been interpreted to contain private right of action); *Howing Co. v.*

*Nationwide Corp.*, 826 F.2d 1470, 1475-76 (6th Cir. 1987) (legislature "indicates its desire to

allow a private right of action" by modeling legislation after law previously interpreted to contain

private right of action). Further, Florida provides even broader substantive rights in Fla. Stat.

Ann. § 104.0515 subsections 1 through 3, which shows legislative intent to build on, not reduce,

the effective protections of the Voting Rights Act.

### 2.     Contemporaneous Florida Law Made an Express Right of Action Unnecessary.

It is true that Florida courts have recently indicated skepticism of implied private rights of

action. *See Murthy*, 644 So.2d at 984 (noting that Florida law has changed; where former

question was whether legislation benefitted a class, "[t]oday" question is one of legislative

intent). Accordingly, for new legislation, the onus is on the Florida legislature to explicitly

codify a private right of action. However, the Florida Voting Rights Act was adopted in 1982,

well before *Murthy*, when Florida courts freely found private rights of action in the absence of

clear statutory text. *See, e.g., Paddington Corp. v. Southern Wine & Spirits, Inc.*, 397 So.2d 958

(Fla. 3rd DCA 1981) (private right of action found despite statutory command of enforcement by administrative agency); *Zorick v. Tynes*, 372 So.2d 133, 140 (Fla. 1st DCA 1979) (private right of action found despite any statutory support).  Given this context, the legislature's failure to preclude private enforcement demonstrates an intent to allow it.  *See Cannon*, 441 U.S. at 698-99 (appropriate to presume that legislature knew private rights of action were readily inferred at time of adoption); *Howing Co.*, 826 F.2d at 1475-76 (same).

Under Florida law, voters may equitably enforce voting laws to protect the integrity of the democratic process.  Well before the 2000 election, the Florida Supreme Court said it is "committed to the doctrine that any and all appropriate judicial writs, including writs of injunction in proper cases, are available *to electors [i.e., voters]* and office holders to prevent violations of statutes enacted for the purpose of regulating and securing the expression of popular will in election . . ." *State ex rel. Landis v. Tedder*, 143 So. 148, 149 (1932) (emphasis added).  The tradition has survived to modern times, and was still very much alive when Fla. Stat. Ann. § 104.0515 was enacted.  *See Adkinson v. Municipal Recall Committee*, 488 So.2d 621 (Fla. DCA 1st 1986); *Nunez v. City of Hileah*, 477 So.2d 655 (Fla. DCA 3d 1985).  Since it was clear at the time that private enforcement by voters would be allowed absent legislative clarification to the contrary, legislative silence is properly interpreted as positive proof of assent, certainly not evidence of a contrary intent.  *See Cannon*, 441 U.S. at 698-99; *Howing Co.*, 826 F.2d at 1475-76.

### 3.  Private Actions Supplement Criminal Enforcement.

The fact that the legislature added a criminal penalty in Fla. Stat. Ann. § 104.0515(5) does not indicate an intent to prevent private enforcement.  The existence of a criminal penalty is relevant, but it is hardly the end of the inquiry.  *See Cort v. Ash*, 422 U.S. 66, 79 (1975) ("Clearly, provision of a criminal penalty does not necessarily preclude implication of a private

17

cause of action . . . ."); *Leist v. Simplot*, 638 F.2d 283, 318 (2d Cir. 1980) (Friendly, J.) (inferring

private right of action despite criminal penalty), *aff'd sub. nom Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Curran,* 456 U.S. 353, 378 (1981). Moreover, Fla. Stat. Ann. § 104.0515 is hardly

a "bare criminal statute," *Cort,* 422 U.S. at 79; rather, it is a civil rights statute that includes

within its ambit public officials and entities. *See* Fla. Stat. Ann. § 104.0515(2) (election

officials); (4) (political subdivisions).  For Florida prosecutors to indict and seek conviction of

public officials acting in their official capacity and even public *entities* like cities, counties, and,

possibly, the State of Florida itself, would be historically novel, politically unimaginable, and

would raise ponderous legal and constitutional quandaries.  For example, it is far from clear

whether a governmental body could form the necessary criminal intent.  *See, e.g., Biondolillo v.*

*City of Sunrise*, 736 F.Supp. 258, 261 (S.D. Fla. 1990) (municipality "incapable" of forming

"criminal intent").  To Plaintiffs' knowledge, such a prosecution has never been attempted.  If the

Florida legislature indeed intended to apply criminal penalties to this public realm at all, such a

decision would have been remarkable; that the legislature intended only criminal enforcement

against public bodies is unthinkable.  The only reasonable interpretation is that the legislature

assumed a private right of action but also intended the potential, in extreme cases, for criminal

enforcement against individual public officials acting beyond their authority.[7]

   This interpretation is further supported by the legislature's intentional choice to model

---

[7] Nor could the legislature have thought that Florida's "now famous" election contest procedures offer more substantial hope of protecting the rights guaranteed by Fla. Stat. Ann. § 104.0515.  The contest provisions are aimed only at finding a winner; they contemplate no remedy beyond that necessary to correct errors in the past election, and no remedy is afforded at all unless the election is close.  *See* Fla. Stat. Ann. § 102.168(3),(8).  The time limits on contests also show that the legislature could not have intended them to be the remedy for cases containing the factually thorny issues posed by claims under Fla. Stat. Ann. § 104.0515.  *See* Fla. Stat. Ann. § 102.168(2) (ten-day limit for filing complaint) & (7) (expediency of testimony).  Moreover, *Bush v. Gore,* 531 U.S. __ (2000), proves the practical if not constitutional limits of using an after-the-fact election contest to remedy faulty election procedures.  The broad substantive reach of Fla. Stat. Ann. § 104.0515 makes DBT's theory untenable.

Fla. Stat. Ann. § 104.0515 after the Voting Rights Act.  The Federal Act also provides for

governmental enforcement, by the Attorney General, and the Supreme Court still found a private

right of action.  *See Allen*, 393 U.S. at 556-57 ("achievement of the Act's laudable goal could be

severely hampered" if enforcement depended solely on discretion of Attorney General).  The

Florida legislature knew this when it enacted Fla. Stat. Ann. § 104.0515, incorporating key

language of the Voting Rights Act.  Florida's addition of broader rights and a criminal penalty is

no evidence that the legislature intended to replace private enforcement.

**IV.    THERE IS NO BASIS FOR DISMISSAL AS TO "SETS OF PLAINTIFFS."**

Defendant DBT seeks dismissal as to three "sets of plaintiffs" because their injuries

"have no connection to DBT."[8]  (Memo at 16.)  DBT's motion ignores case precedent which

establishes that where multiple class representatives are suing multiple defendants, each named

representative must state a claim against at least one defendant but does not need to state a claim

against all defendants.  *In re Taxable Municipal Bonds Litigation*, No. 863, 1993 U.S. Dist. Lexis

10997, at *16, (E.D. La. Aug. 6, 1993).

A claim can be asserted on behalf of a class even if just one named plaintiff has suffered

the injury that gives rise to that claim.  *Griffen v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1988).

In *In re Taxable Municipal Bonds Litigation*, numerous class representatives brought suit against

underwriter defendants, issuer defendants, and indenture trustee defendants for eight different

bond issues.  The Court held that although no named plaintiff had a claim against every

defendant, the class had alleged sufficient injury because every defendant had claims asserted

against it by one or more named plaintiff.  *In re Taxable Municipal Bonds Litigation*, 1993 U.S.

Dist. Lexis at *16.  Here, at least one class representative has been injured by DBT.  Therefore,

---

[8] Plaintiffs do not allege that DBT is responsible for conduct described in factual sections
A, B, D and E of the Complaint.  The claims set forth against DBT in Counts II, III, IV and V of
the Complaint are based on its conduct described in the Complaint, principally in ¶¶ 61-73.

19

all members of the class may assert a claim against DBT and Defendant's motion should be denied.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendant DBT's motion to dismiss.

Dated:        February 19, 2001

Respectfully submitted,

| | |
|---|---|
| Thomasina H. Williams<br>Williams & Associates, P.A.<br>Brickell BayView Centre, Suite 1830<br>80 S.W. Eighth Street<br>Miami, FL 33130<br>Tel. 305-379-6676<br>Fax 305-379-4541<br>FL Bar No. 629227 | Barbara Arnwine<br>Thomas J. Henderson<br>Edward Still<br>Anita Hodgkiss<br>Lori Outzs Borgen<br>Lawyers' Committee for Civil Rights Under Law<br>1401 New York Ave., N.W., Suite 400<br>Washington, D.C. 20005-2124<br>Tel. 202-662-8600 or 888-299-5227<br>Fax 202-783-5130<br>E-mail: ahodgkis@LawyersComm.org |
| Dennis Hayes<br>Angela Ciccolo<br>Bruce Gear<br>NAACP Legal Department<br>4805 Mt. Hope Drive, Fifth Floor<br>Baltimore, MD 21215-3297<br>Tel. 877-622-2798 | Elaine R. Jones<br>   Director-Counsel<br>Theodore M. Shaw<br>Norman Chachkin<br>Jacqueline A. Berrien<br>NAACP Legal Defense & Educational Fund, Inc.<br>99 Hudson St., Suite 1600<br>New York, NY 10013<br>Tel. 212-965-2200 |
| Todd A. Cox<br>NAACP Legal Defense & Educational<br>   Fund Inc.<br>1444 Eye Street, N.W., 10th Floor<br>Washington, DC 20005<br>Tel. 202-682-1300 | Laughlin McDonald<br>ACLU Voting Rights Project<br>2725 Harris Tower<br>233 Peachtree Street NE<br>Atlanta, GA 30303<br>Tel. 404-523-2721 |

Penda Hair
Judith Browne
Monique Dixon
The Advancement Project
1730 M Street NW, Suite 401
Washington, DC 20036
Tel. 202-728-9557

Louis M. Bograd
American Civil Liberties Union Foundation
National Legal Department
733 15th Street, NW, Suite 620
Washington, DC 20005
Tel. 202-393-1918

Elliot Mincberg
Larry Ottinger
Alma C. Henderson
People for the American Way Foundation
2000 M Street, Suite 400
Washington DC 20036
Tel 202-467-2392

# EXHIBIT H

IN THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 01-0120-C.V.-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., *et al.*,

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of
Florida, *et al.*,

        Defendants.

## AFFIDAVIT OF JANAI S. NELSON, ESQ.

JANAI S. NELSON, ESQ. being duly sworn, deposes and says:

1.      I am an Assistant Counsel with the NAACP Legal Defense and Educational

Fund, Inc., attorneys for the plaintiffs in the above-captioned case, and have been admitted to appear

and participate *pro hac vice* in this case, pursuant to this court's order dated March 22, 2001. (A

true and correct copy of the order is attached hereto as Exhibit H-1.). I am fully familiar with the

facts set forth herein, and respectfully submit this affidavit, pursuant to Rule 56(e) and (f) of the

Federal Rules of Civil Procedure, in opposition to the Motion for Summary Judgment by Defendant

Deanie Lowe, Volusia County Elections Supervisor.

2.      This case was filed on January 10, 2001. On February 2, 2001, Defendant ChoicePoint, Inc. d/b/a Database Technologies, Inc. ("DBT") served Plaintiffs with a Motion to Dismiss. Plaintiffs served their Memorandum of Law in Opposition to Defendant DBT's Motion to Dismiss on February 19, 2001. The following day, on February 20, 2001, Defendant Deanie Lowe, Supervisor of Elections of Volusia County (hereinafter "Lowe"), served an answer and affirmative defenses to the complaint. Lowe then filed a motion for summary judgment on April 14, 2001, a motion to sever and transfer on May 9, 2001, and a motion for a status conference on May 11, 2001, the latter of which this Court denied by order of May 17, 2001.

On April 17, 2001, the parties appeared before the court for a status conference. On April 18, 2001, the case was stayed pending the close of the 2001 session of the Florida State Legislature, pursuant to a jointly proposed order of the court. The stay was lifted on May 18, 2001. The parties met telephonically pursuant to S.D. Fla. L.R. 16.1 to construct a scheduling report on May 22, 2001. As provided by the Court's April 18, 2001 order, the parties are not required to submit a scheduling report to the court pursuant to S.D. Fla. L.R. 16.1 until approximately fourteen days after the filing of this response.

On or about Wednesday, March 7, 2001, all parties except DBT met in Miami, Florida to discuss the possibility of settlement. Following that meeting, some of the parties[1] have engaged in, and are continuing to engage in, preliminary settlement discussions.

---

[1]Defendants Katherine Harris, Secretary of State of Florida, and Clay Roberts, Director of the Florida Division of Elections, (hereinafter "the State Defendants") and Lowe participated in settlement discussions intermittently and to varying degrees. Neither the State Defendants nor Lowe joined in any proposals under consideration by the other parties.

2

3.      To date there has been no formal discovery in this case. Plaintiffs utilized the public records laws to the extent practicable. But we have not been able to obtain all of the information that we would seek during formal discovery, which would enable us to gather information through interrogatories, sworn testimony in depositions, requests for admissions, and formal document requests.

4.      Specifically, plaintiffs need an opportunity to depose Lowe and her staff concerning, among other things, the allegations that Lowe and Sharon Pinkney (hereinafter, "Pinkney") set forth in their respective affidavits, office practices and procedures concerning voter registration, maintenance of voter registration rolls, and purging procedures, including inter- and intra-state notification of duplicate voter registrations and the opportunity for voters to affirm or confirm residence in Volusia County on election day.

5.      In addition, Plaintiffs will likely need to depose pollworkers and other elections officials who worked at relevant polling sites during the primary and general elections of 1996, 1998, and 2000.

6.      Pinkney, who is "primarily responsible for receipt and review of registration applications" in the Volusia County Supervisor's of Elections office, testified to returning to a Michael Engram (hereinafter, "Engram") on two separate occasions a total of approximately 50 applications from a registration drive at Bethune-Cookman College ("BCC").[2] *Affidavit of Sharon Pinkney* ¶¶ 2, 4-6. In addition, Pinkney testified that there were 18 additional registration

_____

[2]Bethune-Cookman college is a historically Black college located in Daytona Beach, Florida.

3

applications that she received from Engram and 4 applications that she received from another registration drive at BCC that was organized by a BCC faculty member, the Rainbow/PUSH Coalition, candidates, and churches that were incomplete. *Id.* ¶¶ 5-6. Pinkney did not indicate whether she notified the registrants on these 22 additional applications that they were rejected as incomplete. Accordingly, discovery is needed to determine, among other things, (1) whether Pinkney returned the applications to Engram as alleged, and (2) what, if anything, Pinkney did with the 22 additional registrations she received through registration drives at BCC that allegedly were incomplete.

        7.      Subsequent to the filing of this lawsuit, Lowe produced documents in response to Plaintiff's public records request that signal a continuing violation of the laws governing voter purges based on past felony convictions, the "full faith and credit clause" of the Constitution, and other constitutional provisions. Specifically, Lowe indicated that she has sent letters to over 90 registered voters who were listed by the Florida Department of State Division of Elections as possible or probable felons convicted out-of-state, falsely stating that "[e]ven if you did not lose your civil rights in the state where your felony conviction occurred, you must still apply to have your civil rights restored in Florida." *See* Exhibit C; *see also* Exhibit D , at 2 ("Since the election last November, we have mailed letters to the persons listed on pages 1 through 8 of [a list of possible/probable felons provided by the Division of Elections."])). Further discovery is needed to determine whether former felons were discouraged from registering to vote in Volusia County or purged from the voter rolls based upon this misstatement of law.

4

8.     There is a genuine issue of fact as to whether Lowe's office received Timberlake's Absentee Ballot Request Form.  Pursuant to Fla. Stat. Ann. §101.62(3), "[f]or each request for absentee ballot received, the supervisor shall record the date the request was made, the date the absentee ballot was delivered or mailed, the date the ballot was received by the supervisor, and such other information he or she may deem necessary."  This information is not available to Plaintiffs through informal discovery because the statute requires that the such information be confidential and exempt from disclosure under Fla. Stat. Ann. §119.07 (1).  Fla. Stat. Ann. §101.62(3).  Finally, Plaintiffs will need to conduct discovery concerning the records maintained pursuant to Fla. Stat. Ann. §101.62(3) in order to ascertain Lowe's compliance with the law governing the processing of absentee ballot requests and whether the applications of Timberlake and other similarly situated individuals were handled properly.

9.     Lowe testified that, excluding absentee ballots, 73 out of the 268 unregistered precinct voters came from Precinct 621.  *See Affidavit of Deanie Lowe ("Lowe Aff.")* ¶ 16.  Volusia County has a total of 172 precincts.  Plaintiffs will need to conduct discovery to determine the reason(s) for the disproportionate number of disqualified ballots and excluded voters in Precinct 621, what the count of unregistered precinct voters is including the absentee ballots, and whether other predominantly Black precincts also had a disproportionate number of unregistered voters.

10. The foregoing is not meant to be an exhaustive list of the discovery that Plaintiffs will need or the mechanisms through which such discovery will be obtained; rather it is illustrative of the type and categories of necessary information that Plaintiffs have identified at this early stage in the litigation.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on June 1, 2001.

JANAT S. NELSON, ESQ.

Sworn to and subscribed before me this
____ day of _____, 2001.

_____
Notary Public Signature

_____
Notary Public Attorney Name printed
or stamp:
My commission expires: _____

GERTRUDE A. REYNOSA
Notary Public, State of New York
No. 24-4624270
Qualified in Kings County
Commission Expires July 31, 2002

# EXHIBIT H-1

<strong>UNITED STATES DISTRICT COURT<br>
SOUTHERN DISTRICT OF FLORIDA</strong>

<strong>Case No. 01-120-CIV-GOLD/SIMONTON</strong>

COPY _____ D.C.

23 PH 3:36

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FL.-MIAMI

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,**

      **Plaintiffs,**

**vs.**

**KATHERINE HARRIS, Secretary of State of Florida, et al.,**

      **Defendants.**

_____/

<strong><u>ORDER STAYING CASE</u></strong>

THIS CAUSE is before the Court upon the Joint Motion for Initial Scheduling Order and

Stay of Proceedings [D.E. 45-1 and 45-2], filed on March 20, 2001. A status conference was held

before the Court on April 17, 2001. Pursuant to the discussion and the Court's instructions at the

status conference, it is

**ORDERED AND ADJUDGED** that:

1.    The Joint Motion for Initial Scheduling Order and Stay of Proceedings is

     GRANTED.

2.    Formal proceedings in this matter are STAYED until ten days after the close of the

     2001 session of the Florida state legislature.

3.    Not later than fourteen days after the end of the formal stay imposed by this Order,

     the parties shall meet to prepare an initial scheduling report in accordance with the

     Court's standard Rule 16 Order (which shall be issued under separate seal to all the

     parties at this time) and the other matters addressed by the Court at the April 17,

MAY-07-2001  2⁻ 48        VOTING RTS PROJECT                202  783 5130   P.03

2001 hearing. Specifically, included with the initial scheduling report shall be a status update on all ancillary related proceedings pertinent to the allegations in this complaint that are ongoing or have been completed at both the federal and state level, including related litigation. The status update should include a short description of the related proceeding, its status, the effect on this matter, and what, if any, coordination is required. The initial scheduling report and related documentation shall be filed within ten days after the meeting.

4. The time for serving responses for all defendants who have not yet done so shall be extended until ten days after the lifting of the stay.

5. The time for filing Plaintiffs' class certification motion shall be extended until thirty days after the lifting of the stay.

6. Notwithstanding the stay entered herein, the parties shall in good faith continue informally to exchange information concerning the matters raised in Plaintiffs' Complaint and shall continue to negotiate in good faith.

7. Notwithstanding the stay of formal proceedings, should the defendants need to fashion appropriate protective orders regarding the confidentiality of any information sought informally by Plaintiffs, United States Magistrate Judge Andrea M. Simonton will retain jurisdiction to receive the parties' submissions and to enter appropriate protective orders.

8. Notwithstanding the stay, Defendants may file motions with the Court, but no response will be required to such motions or to any motions currently pending at this time until fifteen days after the lifting of the stay.

2

**DONE AND ORDERED** in Chambers at Miami, Florida, this ___ day of April, 2001.

_____
ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
U.S. Magistrate Judge Andrea Simonton

See attached Service List

3

## SERVICE LIST

Thomasina H. Williams, Esq.
Law Offices Williams & Associates, P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130

John W. Little, III, Esq.
Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
1900 Phillips Point West
777 South Flager Drive
West Palm Beach, FL 33401

Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Anita Hodgkiss, Esq.
Lori Outzs Borgen, Esq.
Lawyers' Committee for Civil Rights
Under Law
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Post Office Box 1110
Tampa, FL 33601

Dennis Hayes, Esq.
Angela Ciccolo, Esq.
NAACP Legal Department
4805 Mt. Hope Drive, Fifth Floor
Baltimore, MD 21215-3297

Burnadette Norris-Weeks, Esq.
100 S.E. 6th Street
Ft. Lauderdale, FL 33301

Tracy I. Arpen, Esq.
Office of General Counsel
117 West Duval St., Suite 480
Jacksonville, FL 32202-3700

3

Todd A. Cox, Esq.
NAACP Legal Defense & Educational Fund Inc.
1444 Eye Street, N.W., 10th Floor
Washington, DC 20005

Elaine R. Jones, Esq., Director-Counsel
Theodore M. Shaw, Esq.
Norman Chachkin, Esq.
Jacqueline A. Berrien, Esq.
Janai Nelson, Esq.
NAACP Legal Defense & Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, NY 10013

Tucker Ronzetti, Esq.
Assistant County Attorney
Miami-Dade County
Stephen P. Clark Center
111 NW1st Street, #2810
Miami, FL 33128-1930

Michael Cirullo, Esq.
3099 E. Commercial Blvd., #200
Ft. Lauderdale, FL 33308-4311

Penda Hair, Esq.
Judith Browne, Esq.
Monique Dixon, Esq.
The Advancement Project
1730 M Street NW, Suite 401
Washington, DC 20036

Chris Haughee, Esq.
Bentley Law Group
710 Main Street
Bartow, FL 33830-4832

Laughlin McDonald, Esq.
ACLU Voting Rights Project
2725 Harris Tower
233 Peachtree Street NE
Atlanta, GA 30303

4

Louis M. Bograd, Esq.
American Civil Liberties Union Foundation
National Legal Department
733 15th Street, NW, Suite 620
Washington, DC 20005

Elliot Mincberg, Esq.
Larry Ottinger, Esq.
Alma C. Henderson, Esq.
People for the American Way Foundation
2000 M Street, Suite 400
Washington DC 20036

Mitchell Bloomberg, Esq.
Adorno & Zeder
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133-5413

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
725 Twelfth Street, NW
Washington, D.C. 20005-5901

Dan Eckert, Esq.
Frank Gummey, Esq.
County Attorney's Office
123 W. Indiana Avenue
DeLand, FL 32720-4613

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via US. Mail this 2nd day of June 2001, to:

Hon. Katherine Harris
Secretary of State
The Capitol
Tallahassee, FL 32399-0250

Clay Roberts
Director of the Florida Division of Elections
Room 1801
The Capitol
Tallahassee, FL 32399-0250

John Stafford
Duval County Election Supervisor
105 East Monroe Street
Jacksonville, FL 32202

Pam Iorio
Hillsborough County Election Supervisor
601 East Kennedy Boulevard
16th Floor
Tampa, FL 33602

William Cowles
Orange County Election Supervisor
119 West Kaley Street
P.O. Box 562001 (32856)
Orlando, FL 32806

Mitchell Bloomberg, Esq.
Adorno & Zeder
Attorneys for ChoicePoint, Inc.
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133-5413

Thomas A. Tucker Ronzetti, Esq.
Assistant County Attorney
Miami-Dade County, Florida
Attorney for Miami-Dade County Supervisor
of Elections David Leahy
111 N.W. First Street, Suite 2810
Miami, FL 33128-1993

Burnadette Norris-Weeks, Esq.
Burnadette Norris-Weeks, P.A.
Attorneys for Broward County Supervisor of
Elections Miriam Oliphant
100 S.E. Sixth Street
Fort Lauderdale, FL 33301

Christopher R. Haughee Esq.
The Bentley Law Group
Attorneys for Leon County Supervisor of
Elections Ion Sancho
710 East Main Street
Bartow, FL 33830-4832

Daniel D. Eckert, Esq.
County Attorney
County of Volusia
Legal Department
Attorney for Volusia County Supervisor of
Elections Deanie Lowe
123 West Indiana Avenue
DeLand, FL 32720-4613

Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Anita Hodgkiss, Esq.
Lori Outzs Borgen, Esq.
Lawyers' Committee for Civil Rights Under
  Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005-2124

Penda Hair, Esq.
Judith Browne, Esq.
Monique Dixon, Esq.
The Advancement Preoject
1730 "M" Street, N.W., Suite 401
Washington, DC 20036

Dennis Hayes, Esq.
Angela Ciccolo, Esq.
NAACP Legal Department
4805 Mount Hope Drive, Fifth Floor
Baltimore, MD 21215-3297

Ian Sancho
Leon County Election Supervisor
301 South Monroe Street, Suite 301
Tallahassee, FL 32301

James A. Cherof, Esq.
Kerry L. Ezrol, Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
Attorneys for Broward County Election
Supervisor
3099 East Commercial Boulevard
Fort Lauderdale, FL 33308

Michael Circullo, Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
Attorneys for Orange County Election
Supervisor
3099 East Commercial Boulevard
Fort Lauderdale, FL 33308

Laughlin McDonald, Esq.
ACLU Voting Rights Project
2725 Harris Tower
233 Peachtree Street, NE
Atlanta, GA 30303

Louis M. Bograd, Esq.
American Civil Liberties Union Foundation
National Legal Department
733 15th Street, NW, Suite 620
Washington, DC 20005

David C. Leahy
Miami-Dade County Election Supervisor
111 N.W. First Street, Suite 1910
Miami, FL 33128-1906

Deanie Lowe
Volusia County Election Supervisor
136 North Florida Avenue
DeLand, FL 32720-4208

Ray Allen, Esq.
Senior Assistant County Attorney
Hillsborough County, Florida
P.O. Box 1110
Tampa, FL 33601

Elliot M. Mincberg, Esq.
Lawrence S. Ottinger, Esq.
Alma C. Henderson, Esq.
People for the American Way Foundation
2000 "M" Street, NW, Suite 400
Washington, DC 20036

2

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Attorneys for ChoicePoint, Inc.
William & Connolly, LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

BY: _____
     Janai S. Nelson