UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-0120-Civ-Gold
Magistrate Judge Simonton

**NIGHT BOX**
**FILED**

ILH - i 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

--------------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

       Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida, et al.

       Defendants.

--------------------------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs file this memorandum of law in support of their Motion for Partial Summary Judgment filed herewith, and pursuant to Rule 56 (a) & (d) of the Federal Rules of Civil Procedure and Rule 7.5 of the Local Rules of the United States District Court for the Southern District of Florida.[1] Plaintiffs are seeking partial summary judgment on seven specific claims where there are no material facts in dispute and the Plaintiffs are entitled to judgment as a matter of law.

## STATEMENT OF FACTS

For a complete statement of the facts supporting Plaintiffs' Motion for Partial Summary Judgment, please refer to Plaintiffs' Statement of Undisputed Material Facts submitted in support of this motion. Plaintiffs therein set forth facts regarding voter purging, voter registration, and administration of the November 7, 2000 election, to support the following claims upon which they seek summary judgment:

---

[1] Plaintiffs have previously filed a motion seeking leave of the court to file a single memorandum of law that is forty pages or less in length.



1.  That the decision of Harris, Roberts, Iorio, Cowles, Leahy, and Lowe to use data from states that automatically restore an ex-felon's voting rights upon release from custody in removing voters from the voter rolls violated the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C.A. § 1973gg, and Section 2 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c.

2.  That Harris and Roberts directed a purge of qualified registered voters from the Central Voter File in a non-uniform and discriminatory fashion that violated the NVRA by wrongly asserting, based on flawed data, that qualified registered voters had been convicted of felonies and had not had their right to vote restored by the Florida Clemency Board.

3.  That Volusia County wrongfully purged Ursula Harvey and all similarly-situated voters in violation of the NVRA.

4.  That Volusia County's failure to offer Ursula Harvey an opportunity to vote by affirmation is a violation of the NVRA.

5.  That Kearney, as head of the Department of Children and Families ("DCF"), failed to provide uniform and consistent opportunities for persons receiving services at their offices to be offered the opportunity to register to vote and failed to transmit voter registration applications to Supervisor of Elections offices, and that Harris and Roberts filed to monitor the voter registration process, in violation of the NVRA.

6.  That Defendants Harris, Roberts, Leahy, Iorio and Lowe permitted or administered non-uniform practices on election day that had a disparate impact on the ability of minority voters to participate in the political process in violation of Section 2 of the Voting Rights Act.

7.  That all Defendants permitted or administered non-uniform practices on election day in violation of the Civil Rights Acts.

8.  That Defendants Harris and Roberts failed to insure that all voters were treated in a non-arbitrary, equal manner, in violation of the Fourteenth Amendment to the United States Constitution.


# A R G U M E N T

**I.    Plaintiffs Are Entitled to Summary Judgment Against Harris, Roberts, Iorio, Cowles, Leahy and Lowe For Purging Ex-Felons Whose Rights Were Restored by Other States.**

Many states that disenfranchise their voters as a consequence of being convicted of a crime automatically restore the right upon completion of sentence.  *See*, e.g. Ill. Const. art. III, §

2 (convicted felons right to vote "shall be restored not later than upon completion of sentence");
*See also* Conn. Gen. Stat. § 9-45; Ohio Rev. Code Ann. § 3503.18; S.C. Code Ann. § 7-5-120(3);
Tx. Code Ann., Election Code § 11.002; Rev. Code Wash. § 29.01.080.  This process contrasts
with that of other states who grant the power to reinstate voting rights within the discretion of the
Governor.  *See, e.g.*, Fla. Stat. §§ 97.041, 940.01, 940.03, 940.05 (2001); 2002 Ky. Rev. Stat. §
116.025(1); Va. Const., art 2, § 1.  Through the years, scores of people have moved to Florida
after having had their right to vote revoked and subsequently reinstated in "automatic
restoration" jurisdictions.  The State of Florida, however, has re-disenfranchised these
individuals because they have not sought restoration of their civil rights pursuant to section
940.01 and 940.03 of the Florida Statutes, which prescribe the process and guidelines for
applying to the Governor for restoration of civil rights after conviction of a felony.  In doing so,
Florida has abrogated ideals embodied in the United States Constitution, disregarded the
decisions of its own courts, and violated the NVRA and the Voting Rights Act.

  Article 4 of the Constitution requires that "Full Faith and Credit shall be given in each
State to the public Acts, Records and Judicial proceedings of every other State."  U.S. Const., art.
4, sec. 1.  The Supreme Court has expressed that "[i]t was the purpose of that provision to
preserve rights acquired or confirmed under the public acts and judicial proceedings of one state
by requiring recognition of their validity in others."  *The Florida Bar v. Wilkes*, 179 So.2d 193,
196 (Fla. 1965) (*quoting Pink v. A.A.A Highway Express*, 314 U.S. 201, 210 (1941)); *See also
Nevada v. Hall*, 440 U.S. 410, 421 (1979) ("The Full Faith and Credit Clause does require each
State to give effect to official acts of other States.").  The judiciary has characterized the right to
vote as a fundamental matter at the core of our constitutional system.  *See, e.g., Bush v. Gore*,
531 U.S. 98, 105-06 (2001); *Carrington v. Rash*, 380 U.S. 89, 96 (1965).  When states restore
their citizens' eligibility to vote, they are establishing the reinstitution of a right.  Under the Full
Faith and Credit Clause, Florida cannot take away that which was granted by a sister state.

  The Florida Courts have explicitly recognized this principle.  In a recent decision the
court concluded that "restoration of appellant's civil rights is entitled to full faith and credit in

Florida...once civil rights were restored by the state that suspended them, the matter was completed, and this State had no authority to suspend or restore those rights here on the basis of that earlier out-of-state suspension." *Schlencter v. Dep't of State, Div. of Licensing*, 743 So.2d 536, 536 (Fla. App. 1998) (Florida could not deny citizen weapons permit when person had been convicted of felony in Connecticut but had civil rights restored by that state before moving to Florida). Such reasoning is well established in Florida law. *See Doyle v. Fl. Dept. of State, Div. of Licensing*, 748 So.2d 353 (Fla. App. 1999); *Staluppi v. Dept. of Highway Safety and Motor Vehicles*, 688 So.2d 431 (Fla. App. 1997); 15A Fla. Jur. 2d Criminal Law § 2701 (2002) ("The Governor has neither the power to restore those civil rights of out-of-state offenders which have already been restored by another state, nor the authority to restore the civil rights of those whose rights were never suspended by another jurisdiction."). Under such precedent, it is difficult to understand where the State found authority to disenfranchise those who arrived in Florida in possession of their civil rights.

While the principles annunciated by Florida courts rest primarily on Constitutional ideals, they also reflect a logical interpretation of the plain language of the state statute governing disfranchisement. Florida Statute Section 97.041(2)(b) denies a citizen the right to vote if he or she has been convicted of a felony *and* "has not had his or her right to vote restored pursuant to law." There is no requirement that the right be restored pursuant to Florida law. Rather, the natural reading suggests that if an individual has had his rights legally restored by any jurisdiction, he is eligible to vote in Florida. Therefore, if an individual has had his right to vote automatically restored upon completion of a sentence in a previous jurisdiction, he is eligible to vote in Florida and the State violates its own laws by denying that right.

As described in the Statement of Material Facts, the Division of Elections instructed DBT to include on the felon exceptions lists for 2000, individuals with a felony conviction in states that grant automatic restoration of civil rights. Specifically, at instruction of Defendants Harris and Roberts, DBT included on the exceptions lists felons from Texas, Connecticut, South Carolina, Illinois and Wisconsin. Unless these individuals happened to have applied for and

received restoration from the State of Florida, they were included on the exceptions lists and subject to removal from voter rolls across the State of Florida. By including these individuals on the lists of individuals to be purged, Defendants violated the NVRA and Voting Rights Act, and Plaintiffs are entitled to summary judgment on this claim.

**II.      Summary Judgment against Harris and Roberts is Warranted for Allowing Non-Uniform and Discriminatory Purging and List Maintenance Activities.**

**A.      Harris and Roberts Have the Duty and the Authority to Insure Uniformity in Florida's Elections.**

Under the National Voter Registration Act ("NVRA"), each state is required to "insure that any eligible applicant is registered to vote in an election," 42 U.S.C.S. § 1973gg-6(1), and "provide that the name of the registrant may not be removed from the official list of eligible voters" except in accordance with certain procedures, 42 U.S.C.S. § 1973gg-6(4). In addition, the NVRA specifically provides that state list maintenance programs designed to ensure an accurate and current voter registration roll must be "uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965. . . ." 42 U.S.C. § 1973gg-6(b)(1). The constitutionality of the NVRA is firmly established. States that abrogate their responsibilities under the NVRA are ordered by Federal Courts to comply with its provisions. *See, e.g., Voting Rights Coalition v. Wilson*, 60 F.3d 1411 (9th Cir. 1995) (upholding Congressional authority to enact the NVRA and enjoining California to comply with its requirements); *Association of Community Org. for Reform Now v. Edgar*, 56 F.3d 791 (7th Cir. 1995) (upholding Congressional authority to enact the NVRA and enjoining Illinois to comply with its requirements); *Association of Community Org. for Reform Now v. Ridge*, No. 94-7671, 1995 U.S. Dist. Lexis 3933 (E.D. Pa. Mar. 30,1995) (upholding Congressional authority to enact the NVRA and enjoining Pennsylvania to comply with its requirements).

To ensure states' proper performance of duties under the NVRA, Congress directed each state to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this act." 42 U.S.C.S. §1973gg-8.

5

When the State of Florida enacted the Florida Voter Registration Act, 1994 Fla. Laws ch. 224, ("FVRA") the legislature designated the Secretary of State as the Chief Election Officer with the delegated responsibility of ensuring statewide compliance with the NVRA. *See* Fla. Stat. § 97.012 (2001). Furthermore, Florida Law provides that " [t]he Department of State shall have general supervision and administration of the election laws." Fla. Stat. § 15.13 (2001). Indeed, the Secretary of State, as the Chief Election Officer, bears the responsibility for the proper supervision and administration of Florida's election laws. *See Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1242 (11th Cir. 1998).

Under the FVRA, Defendant Harris, as the designated Chief Election Officer, has the *responsibility* to "obtain and maintain uniformity in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1) (2001); "[p]rovide uniform standards for the proper and equitable implementation of the registration laws," Fla. Stat. §97.012(2) (2001); "[p]rovide training to all affected state agencies on the necessary procedures for proper implementation of this chapter," Fla. Stat. §97.012(8) (2001); "[c]reate and maintain a central voter file." Fla. Stat. §97.012(11) (2001), and perhaps most importantly, to "[c]oordinate the state's *responsibilities* under the National Voter Registration Act" Fla. Stat. §97.012(7) (2001) (emphasis added). While county supervisors of elections share responsibility for voter registration and list maintenance, under state and federal law the Secretary of State is also responsible for statewide implementation and compliance with state and federal voter registration and list maintenance laws. *See*, Fla. Stat. §97.012 (1) (2001); Fla. Stat. §97.012 (2) (2001); Fla. Stat. §97.012 (7) (2001); 42 U.S.C.S. §1973gg-8; *see also National Coalition for Students with Disabilities Educ. and Legal Defense Fund v. Taft,* 2001 WL 1681115, 3 (holding that, as Ohio's designated chief election officer under §1973gg-8, the Secretary of State, and not the Governor, "has the duty and authority to implement and enforce the provisions of the NVRA").

In addition, Defendants Harris and Roberts clearly have the authority to adopt rules to satisfy their duties under Florida Statute § 97.012 (2001). Florida Law provides that "[t]he Department of State may adopt rules…to administer the provisions of law conferring duties upon

the department." Fla. Stat. § 20.10(3) (2001). Florida Courts have repeatedly held that implied rulemaking authority may be necessary for an agency to implement its statutory mandate, even in the absence of specific instructions to "adopt rules." *See, e.g., Board of Dentistry v. Payne*, 687 So. 2d 866, 868 (Fla. App. 1997) (holding that "[r]ule making authority may be implied to the extent necessary to properly implement a statute governing the agency's statutory duties and responsibilities"). In *PPI, Inc. v. Department of Bus. & Professional Regulation*, 698 So. 2d 306 (Fla. App. 1997), the court held that a statutory directive to "monitor the operation of...cardrooms" granted the Department of Business and Professional Regulation sufficient authority to adopt a rule requiring cardrooms to install electronic surveillance devices. *Id.* at 309. A Florida Appellate Court interpreting this decision reasoned that rule was upheld because there was "a clear logical connection between the law giving authority...to monitor the operations of cardrooms and the rule requiring surveillance equipment." *St. Petersburg Kennel Club v. Department of Bus. & Prof'l Regulation,* 719 So. 2d 1210, 1212 (Fla. App.1998). Similarly, in the present case, there is a "clear and logical connection" between Defendants' duty to "obtain and maintain uniformity in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1) (2001), and the rules which the Secretary of State must enact to satisfy the statutory duty to obtain and maintain uniformity in Florida's election laws. Thus, Defendants Harris and Roberts have the duty to make sure all of Florida's voters enjoy uniform procedures and they have the legal authority to do so.

**B.      Defendants Harris and Roberts Violated the NVRA by Failing to Administer State Purge Programs in a Uniform, Nondiscriminatory Manner.**

The NVRA requires state purging programs to be administered in a "uniform, non-discriminatory" manner. The Act provides in pertinent part that:

> Any State program or activity to protect the integrity of the electoral
> process by ensuring the maintenance of an accurate and current voter
> registration roll for elections for Federal office
> > (1) shall be uniform, nondiscriminatory, and in compliance with
> > the Voting Rights Act of 1965. . . .

42 U.S.C. § 1973gg-6(b) (2002). The NVRA specifically implemented this standard in light of the history of excluding minority groups from voting, coupled with a concern over low voter turnout, and the resulting desire to remove all unnecessary obstacles to the ability to vote. *See generally, Ass'n of Community Organizations for Reform Now (ACORN) v. Edgar*, 880 F. Supp. 1215 (N.D. Ill. 1995), *affirmed as modified*, 56 F.3d 791 (purpose of NVRA is to increase disproportionately lower voter participation by racial minorities). The Committee viewed the NVRA as "one positive action Congress can take to give the greatest number of people an opportunity to participate [in voting]." H.R. REP. NO. 103-9, at 3 (1993), *reprinted in* 1993 U.S.C.C.A.N. 105, 107; Ex. 70 to the Declaration of Angela Ciccolo in Support of Plaintiffs' Motion for Partial Summary Judgment, July 1, 2002, [hereinafter "Ex."]. The Committee also voiced a general concern that procedures used for the maintenance of voter registration lists had historically been abused for the purpose of excluding specific social and/or racial groups from the voting process.[2] *See id.* at 2. This concern led to the proposal of "uniform, nondiscriminatory" procedures for the purging of voter lists, the standard which ultimately appeared in the final version of the NVRA. *See id.* at 4-5. The House Report provides parameters for this standard, specifically defining the terms "uniform" and "nondiscriminatory" within the context of voter registration procedures: "The term 'nondiscriminatory' is intended to mean that the procedure complies with the requirements of the Voting Rights Act of 1965. The term 'uniform' is intended to mean that any purge program or activity must be applied to an entire jurisdiction." *Id.* at 15.

The Senate Report shed further light on the purpose of the bill, asserting that "once a citizen is registered to vote, he or she should remain on the voting list so long as he or she remains eligible to vote in that jurisdiction." S. REP. NO. 103-6, at 17 (1993). To illustrate, the Senate Report addressed the removal of individuals from voting lists because of a mere failure to vote in the past. *See id.* It noted that an integral part of the right to vote is the right to abstain

---

[2]   The primary concern here focused on the exclusion of blacks and other minorities and the poor from voting due to discriminatory purging procedures.

8

from voting. *See id.* Therefore, removal of individuals from voter registration rolls for failure to vote would diminish the very nature of the right to vote. *See id.*

The Senate Report also expressed an intent to target the historical discrimination of minorities and the poor in the purging of voter lists, specifically pointing out that purging practices in the past "tend[ed] to disproportionately affect persons of low incomes, and blacks and other minorities." *Id.* at 18. The identification of this type of discrimination places the focus of the Act squarely on the disparate dilution of minority voting rights. As the Senate report further explained:

> These processes, however, must be scrutinized to prevent poor and illiterate voters from being caught in a purge system which will require them to needlessly re-register. Such processes must be structured to prevent abuse which has a disparate impact on minority communities. Unfortunately, there is a long history of such list cleaning mechanisms which have been used to violate the basic rights of citizens.

*Id.* The report's language concerning the exclusion of minority populations through purging procedures addressed the central goal of the Act, the "open[ing of] the registration process" to as many otherwise qualified individuals as possible. *Id.* "Because a conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent." *Railway Labor Executives Ass'n v. ICC*, 735 F.2d 691, 701 (2d Cir. 1984). The House Conference Report for the NVRA specifically noted in its findings that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." H.R. CONF. REP. NO. 103-66, at 1 (1993), *reprinted in* 1993 U.S.C.C.A.N. 140. The report further explained,

> The purpose of the [uniform and non-discriminatory] requirement is to prohibit selective or discriminatory purge programs. This requirement may not be avoided by a registrar conducting a purge program or activity based on lists provided by other parties where such lists were compiled as the result of a selective, non-uniform, or discriminatory program or activity.

*Id.* at 15. The central theme consistent throughout the evolution of the NVRA was therefore a desire to address unequal diminution of voting access and voting rights within minority communities caused by non-uniform, discriminatory voter purging processes.

Additionally, members of the Senate expressed an intention to apply uniform and nondiscriminatory standards for registration procedures on a nationwide basis. As Senator Mosely-Braun stated during the Senate debates, "[W]e are going to try *to make uniform among the States* the fundamental citizen's right of access to the polls." 145 CONG. REC. S2738 (statement of Sen. Moseley-Braun) (emphasis added). Senator Ford expressed a similar sentiment: "The overriding benefit of the National Voter Registration Act is the degree of *nationwide uniformity* in registration." 139 CONG. REC. S2897 (statement of Sen. Ford) (emphasis added). Senator Akaka emphasized the importance of nationwide uniformity in registration as the best means of sustaining the intent of the Act, stating, "In order to register to vote, individuals now must contend with a variety of local registration laws and procedures that may inhibit voter participation. Enacting *uniform national registration procedures* would, I believe, be the most practical way to register eligible voters." 139 CONG. REC. S2988 (statement of Sen. Akaka) (emphasis added).

The purging programs in Florida violated the NVRA's central standard of nondiscriminatory uniformity by following procedures which necessarily had different applications to different classes of voters. Because of the variance in the implementation of Florida's voter list purging program, the minority groups the NVRA sought to protect experienced a disproportionately higher incidence of removal from eligibility. As the purging programs employed non-uniform applications of information regarding potential felon status and potential duplicate registration status, they did not comply with the federally-mandated requirements.

There are 67 counties in the state of Florida. Because the state provided no guidance to the counties with respect to list maintenance requirements pursuant to the NVRA, each county was free to conduct purging in whatever manner it chose, as evidenced by the different ways in

which the five remaining County Defendants purged voters identified as alleged felons in their respective counties. Defendants Leahy, Iorio, Stafford and Cowles relied on the DBT possible or probable felons lists to purge voters prior to the 2000 general election. Ex. 38, 39, 41, 44, 46, Def. Responses to Pls' First Set of Interrogatories, response no. 5. Defendant Lowe did not rely on the DBT list to purge any voters prior to the 2000 general election; however, she later relied on the DBT list to purge voters in 2001. Ex. 44, Def. Lowe's Response to Pls.' First Set of Interrogatories, response no. 5.

The verification process for voters identified as alleged felons drastically varied among counties. In Miami-Dade County, alleged felons whose rights had not been restored were sent an administrative hearing notice by certified mail. Individuals had the opportunity to submit an appeal form, but those who did not respond to the administrative hearing notice were removed from the registration rolls. Ex. 41, Def. Leahy's Response to Pls.' First Set of Interrogatories, response no. 5. In contrast to the verification processed employed in Miami-Dade County, in Duval County letters were mailed to the individuals identified on the DBT possible or probable felons list, asking voters to call Defendant Cowles' office to verify whether or not they were felons. If the voters confirmed they were felons, they were deleted. Voters who did not respond to the letters were *not* removed from the voter registration roll prior to November 7, 2000. Ex. 38, Def. Stafford's Response to Pls.' First Set of Interrogatories, response no. 5.

Ed Kast, Assistant Director for the Florida Division of Elections, implements and conducts trainings to county supervisors of elections' staff on list maintenance requirements pursuant to the NVRA. At his deposition, Mr. Kast explained that his office distributes copies of the Florida Election Code and, possibly, other handouts at these trainings. However, there is no manual provided to county supervisors on uniform procedures and practices for NVRA list maintenance compliance. Ex. 29, Deposition Transcript of Ed Kast, at 33. When asked at his deposition, "What do you train [county supervisors] regarding what they need to do to maintain the integrity of the voter roll?" he responded, ". . . we just provide them the training as it's outlined in the [NVRA] – that they're responsible for list maintenance. . . ." *Id.* at 35. It is clear

that what the state does not do is train county supervisors on uniform practices for implementation of their duties under the NVRA, as required by the NVRA. *See* 42 U.S.C. § 1973gg-6(b) (2002).

Defendant Iorio further illuminates the sheer lack of guidance counties received from Defendants Harris and Roberts on list maintenance procedures when she was asked at her deposition whether she received any written requirements from the state about how she should conduct removal of ineligible voters from the registration roll. Defendant Iorio stated:

> When we received the list in the summertime of 2000 from the state, the supervisors, at that time, did not receive information from the state as to how we were to proceed. And so the supervisors did what we often do, which was that we informally contacted one another, informally contacted like counties of similar size and decided what we thought would be the best process to use.

Ex. 30, Iorio Dep., at 42. As Defendant Iorio suggests, county supervisors were free to devise whatever purging practices they thought most appropriate for their respective county, in violation of the NVRA's requirement for statewide uniformity.

Defendants Harris and Roberts violated the NVRA by failing to ensure uniform and non-discriminatory purging and list maintenance activities across the State of Florida, and Plaintiffs are entitled to summary judgment on this claim.

III.    **Defendant Lowe Wrongfully Purged Harvey and Other Similarly Situated Black Voters Without Notification In Violation of the NVRA.**

Lowe is required under both federal and state law to ensure that any eligible applicant for voter registration is registered to vote. 42 U.S.C. § 1973gg-6(a)(1), Fla. Stat. § 98.045(1) (2001). Once a voter is registered, the name of that voter may not be removed from the registration books except at the request of that voter, or based on other specifically enumerated grounds and only after certain procedural safeguards are overcome. *See* 42 U.S.C. § 1973gg-6(a)(3), (c), (e) and (d). In contradiction of both the letter and spirit of those statutory requirements, Lowe purged Harvey and other similarly situated Black voters without prior notification. When presented with the fact of her wrongdoing at voting precincts on election day, Lowe again

12

violated the law by failing to permit Harvey and other similarly situated Black voters to vote upon oral or written confirmation of their residency in Volusia County.

Lowe concedes that Harvey was wrongfully purged from the voter rolls pursuant to Florida Statutes § 98.045(2) (2001) because her name erroneously appeared on the DBT duplicate list provided to Defendant Lowe by the state.[3] Ex. 29, Depo. of Deanie Lowe, at 275, lines 19-25, 276, lines 1-6. There is no dispute that Harvey, in fact, registered to vote in Volusia County *after* registering in Martin County and lawfully voted in Volusia County in the 1998 general elections. The records maintained by Volusia County verify this fact. Accordingly, Harvey should not have been removed from the voter rolls in Volusia County and should have been permitted to vote in the November 2000 elections.

Moreover, the NVRA sets forth certain specific procedures concerning the removal of registered voters from the voter rolls based on information that a registrant has moved outside a registrar's jurisdiction. Specifically, the NVRA provides:

> (1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant–
>
> (A) *confirms in writing* that the registrant has changed residence to a place outside that registrar's jurisdiction in which the registrant is registered; or
> (B)(i) has failed to respond to a notice described in paragraph (2); and
> (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) [during a prescribed period of time under the statute].

42 U.S.C. §1973gg-6(d)(1) (emphasis added). This prohibition against purging voters based on change of address without written confirmation or without notice and the opportunity to confirm their address and vote is also manifest in §1973gg-6(c)(1)(B) of the statute, which provides for notice to individuals whose change-of-address information is supplied by the United States Postal Service. *See id.* In addition, the legislative history of the NVRA explicitly prohibits, as

_____

[3] Fla. Stat. Ann. § 98.045(2) provides that "[i]nformation received by a supervisor from an election official in another jurisdiction indicating that a voter in the supervisor's county has registered to vote in that other jurisdiction shall be considered as a written request from the voter to have the voter's name removed from the registration books of the supervisor's county."

does the Act itself, "removing the name of a registered voter by reason of a change in residence, *unless the registered voter confirms in writing that he or she has changed residence outside the jurisdiction in which registered*; or has failed to respond to a notice sent by the State and has not voted or appeared to vote within two general election for Federal office since the date of the notice." *Id.* at16, 1993 U.S.C.A.N.N. at 120 (emphasis added); *see* 42 U.S.C. §1973gg-6(a) & (d).[4]

**IV.    It is Undisputed that Volusia County Failed to Allow Ursula Harvey to Vote in November 2002 by Affirmation, in Violation of the NVRA.**

The NVRA specifically provides that a voter who affirms or confirms that her address is within the supervisor's jurisdiction shall be permitted to vote. *See id.* § 1973 gg-6(d); *see also* H.R. No. 103-9, at 17-18 (1993), *reprinted in* 1993 U.S.C.A.N.N. at 121-22 (if the registration records incorrectly indicate that a voter has changed her residence, "the voter *shall* be permitted to vote upon oral or written affirmation that the [voter] continues to reside at the same address.") Ex. 70; H.R. Conf. Rep. No. 103-66, at 21 (1993), *reprinted in* U.S.C.A.N.N. at 146 (same) (emphasis added).  Thus, Harvey and other similarly-situated individuals should have been permitted to vote by affirming or confirming their residences on election day.

No voter may be removed from the voter rolls based on any information suggesting a change of address outside of a registrar's jurisdiction, unless the voter confirms the change of address in writing or has been provided written notice and an opportunity for that voter to vote upon affirmation or confirmation that she resides within the applicable jurisdiction.  If Florida Statute § 98.045(2) (2001) is interpreted to make prior notification to voters before removal from voter rolls unnecessary or to limit the opportunity to vote upon written affirmation or

---

[4]    Fla. Stat. Ann. § 98.055 provides for similar measures for maintenance of voter registration lists, however implicates §98.045(2), which is contrary to and not authorized by the NVRA.  To extent that §1973gg-6(a)(3)(A) of the NVRA, which provides for removal at the request of the registrant, appears to be inconsistent with §1973gg-6(3)(d)(1)(A) of the Act, which requires written *confirmation* that a resident has changed address, the latter provision controls as the more specific statutory mandate.

14

confirmation that the voter resides within the applicable jurisdiction, it is inconsistent with and superceded by the NVRA.

The sworn testimony of Harvey, and that of Defendant Lowe, demonstrate that the parties agree that Ursula Harvey was not given prior notice of her name being removed from the Volusia County list of registered voters based on a change of address; and that she was not given the opportunity to vote and affirm or confirm residency in Volusia County on Election Day. Similarly, notice and an opportunity to vote by affirmation was not provided to other Volusia voters who were mistakenly identified as duplicate registrants. Accordingly, summary judgment should be granted in favor of plaintiffs on this issue.

**V.      Plaintiffs are Entitled to Summary Judgment Against The Department of Children and Families for their Failure to Provide Uniformity in Voter Registration Activities and their Failure to Transmit Applications to the Supervisors' Offices.**

The National Voter Registration Act of 1993 ("NVRA"), among other things, requires states to provide voter registration services at motor vehicle and public assistance offices. 42 U.S.C. §§ 1973gg-3 and 1973gg-5. Plaintiffs allege and defendant Kearney admits that Kearney must take steps to ensure that DCF employees provide voter registration opportunities with each application for public assistance or services and with each recertification, renewal, or change of address form relating to such assistance and service. Def. Kearney's Answer to Pls.' Second Amend. Comp. ¶ 34; Ex. 36, Bowman Dep. at 38; Fla. Stat. § 97058(1) (2001); 42 U.S.C.A. 1973gg-5 (1994).

The NVRA requires states to create a system for voter registration in federal elections by mail and at various state agencies including at all offices in the state providing public assistance. 42 U.S.C. §§ 1973gg-4 and 5. The State of Florida enacted the Florida Voter Registration Act ("FVRA") in 1994 to implement the provisions of the NVRA. 1974 Fla. Laws Ch. 224. Under FVRA's provisions, several state offices, including those providing public assistance, have been

designated as voter registration agencies.  Fla. Stat. § 97.021 (2001); 42 U.S.C. § 1973gg-5(a)(2)(B).  The DCF is a voter registration agency because it provides economic self-sufficiency services, food stamps, Medicaid and cash assistance.  Ex. 36, Bowman Dep. at 23.  As such, all state offices providing public assistance and services must offer customers voter registration services which include:  distribution of voter registration applications, assistance to customers completing voter registration applications, and acceptance of completed voter registration applications for transmittal to the appropriate election officials within 5 days of receipt of the application. Fla. Stat. § 97.058 (2001); 42 U.S.C. § 1973gg-5(a)(2)(B).  Additionally, DCF offices must offer clients a voter preference form indicating the client's decision of whether he or she wanted to register to vote or update a voter registration.  Fla. Stat. § 97.058(2) (2001).

**A.     There are No Genuine Issues of Material Fact Concerning Claims Asserted Against Defendant Kearney.**

Plaintiffs' Statement of Material Fact and supporting evidence, taken as a whole, sets forth specific facts that support plaintiffs' claims that Defendant Kearney: 1) violated the NVRA by failing to transmit plaintiff Clark's voter registration application to the Broward County Supervisor of Elections' office thus contributing to Clark's denial of the right to vote during the November 7, 2000 presidential election; and (2) violated the NVRA by failing to provide voter registration opportunities to its clients during the period leading up to the November 2000 election and this failure continues to the present time.

**1.     Defendant Kearney Violated NVRA and FVRA by Failing to Transmit Voter Registration Applications to Supervisor of Elections Offices.**

The NVRA provides that "each voter registration agency shall distribute with *each* application for . . . services or assistance, with *each*  recertification, renewal or change of address form relating to such service or assistance . . ." 1)  a mail voter registration application; and 2) a form that includes questions that would determine whether or not the applicant would like to

16

register to vote.  42 U.S.C. 1973gg-5(a)6(A) & (B) (emphasis added); *see also National Coalition for Students with Disabilities Educ. and Legal Defense Fund v. Scales*, 150 F. Supp.2d 845, 854 (D. Md. 2001).  These agencies are required to accept "completed voter registration applications for transmittal to the appropriate State election official."  42 U.S.C. 1973 gg-5(a)(4)(A)(iii).

Similarly, the FVRA requires that voter registration opportunities be provided at agencies at the time the applicant applies for or renews services or assistance, or changes an address.  Fla. Stat. 97.058(1) (2001).  These agencies are required to forward completed voter registration applications to county supervisors of elections within 5 days of receipt of applications.  Fla. Stat. 97.058(6) (2001).

In or about April 2000, Joanna Clark went to a DCF office to apply/recertify for public assistance.  During her visit, Clark noticed voter registration applications by the receptionist desk and decided to change her address on her voter registration.  She completed an application and placed it in a box designated for completed voter registration applications. Ex. 5, J. Clark Decl. at ¶ 5.  Joanna never received a voter registration card with her new address in the mail.  Ex. 5, J. Clark Decl. at ¶ 7.  During the November 7, 2000 presidential election, Clark was not permitted to vote, in large part, because her voter registration was not updated by DCF.  Ex. 5, J. Clark Decl. at ¶¶ 8-10.

Defendant Kearney has not and can not produce any evidence to rebut Clark's allegation that she submitted a voter registration application at a DCF office in Broward County months before the 2000 general election.  In fact, Defendant Kearney has only presented evidence that confirms that Clark was at DCF and received services during the relevant period.   Ex. 57, Def. Kearney's Second Supp. Response to Plf's First Set of Inter. The only evidence that Defendant Kearney could have shown to dispute Clark's testimony would have been the production of a voter registration preference form that all public assistance office are required to offer to their clients. *See* Fla. Stat. § 97.058(2) (2001).  Ex. 72 & 73, voter registration preference forms Bates Nos. A039569 (Sep. 2000) & A039122 (Dec. 2000).  In fact, according to the testimony of John

Bowman, Acting Program Administrator of Special Programs for DCF, there is no way to know how many people have registered to vote in DCF offices other than checking voter registration preference forms on file which would indicate whether or not a customer decided to register to vote. Ex. 36, at 51-52.  But, when asked whether or not there were any voter preference forms for Clark, Bowman testified that he asked, but never received them. *Id.* at 102-105.

In the absence of any evidence to rebut Clark's claim, there is a presumption that she did in fact submit a voter registration application at DCF and that DCF failed to transmit it to the Broward County Supervisor of Elections as required by law.

The fact that Defendant Kearney is unable to produce a single voter registration preference for Clark suggests that DCF offices have not been providing Clark voter registration services.  This notion is particularly alarming when one considers the fact that according to Defendant Kearney's own records, Clark received services on at least four occasions after her April 2000 visit. *Id.* at 87-88; Ex. 57, Def. Kearney's Second Supp. Response to Pls' First Set of Inter.  Had she been offered the opportunity to register to vote *each* time she received public assistance, as required by law, then she could have updated her voter registration information again after realizing that she had not received a voter registration card in the mail.

The evidence shows that the DCF office in Broward County that served Clark is not the only one that has violated the NVRA by failing to transmit voter registration applications within 5 days of receipt of the applications.  Defendant Kearney admits that several voter registration applications that were submitted in late 2001 at a DCF office in St. Lucie County were not delivered to the supervisor of elections until March 2002. Ex. 55 & 56, Response to Pls' Second and Third Set of Inter. and Doc. Requests; Ex. 71, Bates nos. A041041- 42.  Even today, seven years after the implementation of the NVRA, and after the filing of this lawsuit, there is still confusion at DCF over whether or not the voter registration applications must be transmitted in 5 "working" or "calendar" days in order to be in compliance with state law.  Ex. 74, Bates No. A045949.

## 2. Defendant Kearney Violated the NVRA by Failing to Provide Voter Registration Opportunities to DCF Clients.

Defendant Kearney has also violated the NVRA and FVRA by failing to offer voter registration opportunities, by failing to provide applicants with a voter preference form, Fla. Stat. 97.058(2) (2001); 42 U.S.C.A. § 1973gg-5(a)(6)(B) (1994), and by failing to retain these "declinations" for two years, Fla. Stat. 97.058(7) (2001).

Plaintiff Joanna Clark has received public assistance and services from DCF from approximately 1995 to the present. Ex. 5, J. Clark Decl. Clark registered to vote in 1995 at a DCF office in Broward County when, without being asked whether she wanted to register, she completed a voter registration form she saw in the lobby. Ex. 5, J. Clark Decl. Over the years, Clark has visited DCF on several occasions to recertify for public assistance. During her April 2000 visit to DCF to apply or recertify, Clark again saw a voter registration application, completed it and placed it in a box at DCF, in order to update her voter registration address. Clark has visited DCF since her April 2000 visit, including on May 30, 2000, July 25, 2000, September 20, 2000 and May 3, 2001. Ex. 36, at 87-88. Not once has Clark ever been asked by a DCF employee whether she would like to register to vote or update her voter registration. Ex. 5, J. Clark Decl. at ¶ 11. Clark has never been provided with a voter registration preference form to indicate whether or not she wanted to register or update her voter registration. *Id.* In fact, defendant Kearney has produced no voter preference form for Clark's several visits, despite the requirement that such forms be maintained for two years.

Defendant Kearney has failed to ensure uniform voter registration services throughout the state for a significant period of time, not simply in random isolated instances. For example, from approximately 1995 to the present, Plaintiff Lorine Walden has received public assistance and services at the DCF office located at 7261 Sheridan Street, Hollywood, FL. Ex. 6, L. Walden Decl. at ¶ 3. Although on several occasions she has applied or recertified for public assistance at the DCF office, at no time during her visits was she asked by an employee whether she wanted to register to vote or was she offered a voter registration preference form. *Id.*

From 1999 to the present, Plaintiff Julia Stoner has received public assistance and services from DCF offices in Jacksonville. During her visits, however, no one ever asked her whether she wanted to apply to register to vote. Ex. 14, at 23:10 - 25:5.

Plaintiff Wallace McDonald was the guardian for four of his grandchildren from 1995-96, and received medical and cash assistance for them at a DCF office in Tampa. Ex. 7, W. McDonald Decl. at ¶ ¶ 3-4. McDonald was never asked by any DCF employee whether he wanted to apply to register to vote. He was never offered a voter registration preference form indicating whether he would like to register to vote or update a current voter registration. Ex. 7, W. McDonald Decl. at ¶ 4.

Currently, plaintiff Kandy Wells is the legal guardian of her niece and receives Medicaid and cash assistance for her at a DCF office in Brandon. On January 28, 2002, Kandy Wells visited the DCF office where she completed a public assistance application, but the DCF worker did not ask Wells whether she wanted to register to vote. Wells was not offered a voter registration preference form asking whether she would like to register to vote or update a current voter registration. Ex. 33, at 57-58. This omission occurred despite the fact that in October 2001, DCF administrators received specific instructions from the Department of State to provide voter registration services to any individual, including parents and guardians of a child, who applies or recertifies for public assistance or makes a change of address. Ex. 75, E-mail from Miller to Ferguson. Again, violations of the NVRA continue today. In May, 2002, DCF clients Robert Ketterer, Jakelin Green and Teresa James were not offered voter registration opportunities or voter registration preference forms. Ex. 8, 10, & 11, Bates Nos. A042771-73.

DCF offices are divided into thirteen (13) districts and one (1) region known as the SunCoast Region. Ex. 36, at 22. All sixty-seven counties in the state of Florida are divided unequally among these districts and region. *Id.* at 22-23. In explaining the steps taken by DCF to develop procedures for voter registration services, John Bowman, a DCF administrator, explained that the agency decided to use a "bottoms up approach" which required each district to designate a voter registration coordinator and develop their own NVRA implementation plan.

*Id.* at 26-27.  While DCF administrators believed in theory that this "bottoms up approach" would decrease the level of "local opposition to implementation of the voter registration act," Ex. 65, Memo dated 2/9/95 from Bill Hanson to Office of the Governor, in fact many DCF employees were not and are not offering voter registration services to their clients, and there is no mechanism in place to ensure compliance or standardized training.

      Indeed, DCF employees in Hillsborough County have admitted that they have not complied with the NVRA.  For example, in a January 8, 2002 e-mail from Robert Baker to Carol Canady, Senior Human Service Program Specialist for the SunCoast Region of DCF offices, which includes Hillsborough County, Baker stated that most staff at the office in Brandon were not aware of the voter registration preference forms and use of these forms "appears to be something that has not been happening here at Brandon." Ex. 76, Bates Nos. A040618-19.  An e-mail from another DCF employee, Roseann Liriano to Carol Canady states that "very few staff use the voter registration preference forms and "they have been over stocked for a very long time." Ex. 78, Bates No. A040620.  Carol Canady, admitted in January 2002 that "not all [DCF] service centers are following the correct procedures for Voter Registration requirements." Ex. 66, January 8, 2002 memo from Carol Canady, Bates Nos. A040772-75.

      Likewise, DCF employees in District 11 have admitted that voter registration preference forms are "not/rarely being used," and employees in Jackson County stopped providing voter registration services altogether due to a "hard freeze on positions . . . because of . . . budget constraints." Ex. 89, E-mail from Nivaldo Cruz to Sandra Stubbs dated 8/22/01; Ex. 77, E-mail from Janice Miller to Jerry Sewell dated 8/29/01 Bates Nos. A045943-44.  Even after these employees were advised that they were in violation of law, they continued to believe that they were not obligated to reinstate normal voter registration procedures in Jackson County if they could "justify" their "need to continue the exception." *Id.*  Supervisors of Elections have also reported problems with DCF's voter registration procedures. *See* Exs. 43-46, 48, 49, and 51.

The undisputed evidence in this case shows that Defendant Kearney violated the NVRA by consistently failing to provide the voter registration assistance required by that statute. Accordingly, plaintiffs are entitled to judgment as a matter of law.

**B.      There is No Dispute that Defendants Harris and Roberts Have Failed to Monitor Voter Registration Procedures, Entitling Plaintiffs to Summary Judgment on the Claim that Such Failure Violates the NVRA.**

Defendant Katherine Harris, in her capacity as the Secretary of State, is responsible for providing uniform standards for the proper and equitable implementation of voter registration laws. Fla. Stat. § 97.012 (2001). In addition, she is responsible for the coordination of the state's responsibilities under the NVRA. *Id.* Defendant Clay Roberts, Director of the Divisions of Elections, administers and coordinates the State's responsibilities under the NVRA. Ex. 28, E. Kast Dep. at 10-19. Several of the plaintiffs in this case were denied the right to vote on November 7, 2000, in part, because of the failure of defendants Kearney, Harris and Roberts to comply with their duties under the NVRA as it relates to voter registration.

Defendant Harris is the chief election official in Florida and as such has the responsibility to properly supervise and administer Florida's election laws. *See Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1242 (11th Cir. 1998). Under Florida law, Defendant Harris has been given several explicit duties to coordinate the state's responsibilities under the NVRA. *See* Fla. Stat. § 97.021(7) (2001); *See also*, 42 U.S.C. § 1973gg-8. Defendant Roberts as Director of the Division of Elections shares in this duty. Ex. 28, E. Kast Dep. at 22. Additionally, Defendant Harris must "actively seek out and collect the data and statistics necessary to knowledgeably scrutinize the effectiveness of election laws." Fla. Stat. § 97.021(3) (2001). Finally, Defendants Harris and Roberts have the authority to request information from supervisors of elections for program evaluation and reporting to the Federal Election Commission pursuant to the National Voter Registration Act of 1993. Fla. Stat. § 98.212(2) (2001).

22

Defendants Harris and Roberts are unwilling to exercise the statutory responsibility they have to monitor statewide compliance with the NVRA. The NVRA contemplates that monitoring is a part of a state's responsibility under the Act.[5] Despite this requirement, Defendants Harris and Roberts refuse to conduct statewide monitoring of voter registration activities that would help them to identify and resolve systemic problems. Florida law provides that "[t]he Department of State may adopt rules…to administer the provisions of law conferring duties upon the department." Fla. Stat. ch. 20.10(3) (2001). One of the duties of the Department of State is coordination of the state's responsibilities under the NVRA. Fla. Stat. § 97.021(7) (2001). Defendants Harris' and Roberts' failure to adopt rules for monitoring, or at least provide training to state agencies on how they should monitor voter registration procedures, has resulted in the administration of erroneous voter registration procedures at state agencies that have gone unchecked for years. These erroneous procedures have caused several of the plaintiffs in this case to be denied the opportunity to register to vote. Accordingly, plaintiffs are entitled to judgment in their favor on this claim.

Despite this explicit authority to do so, Defendants Harris and Roberts admit that they do not monitor the voter registration procedures of DHSMV and DCF arguing that the Department of State "does not and cannot supervise the operations of the DHSMV, the DCF or any other executive agency." Ex. 41, Defs. Harris and Roberts' Objs. and Ans. to Pls' First Set of Inter. Ed Kast, Assistant Director for the Division of Elections, elaborated on the State's failure to monitor the voter registration procedures at state agencies when he testified under oath that the Department of State does not monitor the way state agencies implement their responsibilities

---

[5]  In addition to such monitoring being legally required, it is also considered to be a crucial function of chief state election officials by those who are specialists in this area, including the Federal Election Commission. Gary McIntosh stated that "it is essential that someone, preferably the State's chief elections official, be responsible for monitoring the performance levels of state agencies that have designated responsibilities under the National Voter Registration Act." Ex. 27, at 102. McIntosh, who has approximately 23 years of experience as an elections administrator in the State of Washington, based his opinion on his experience as well as a Federal Election Commission Guide to Implementing the NVRA which encourages the appointment of someone who will monitor voter registration activities. G. McIntosh Expert Witness Report, Ex. 59, at 9-10.

under the NVRA because it has no "statutory authority" over how state agencies handle their
responsibilities under the NVRA.  Ex. 28, E. Kast  Dep. at 25.  Although the Department of State
has provided NVRA training to state agencies, it has not trained these agencies on how they
could monitor voter registration procedures to make sure that they have effective procedures and
are in compliance with the NVRA.  Ex. 28, E. Kast Dep., at 25-27.

VI.     **Defendants Violated the Voting Rights Act in Using Practices that had the Impact of
        Denying Black Voters an Equal Opportunity to Participate in Elections.**

        A.     **Complex Social and Historical Factors Create an Environment Where
               Certain Election Procedures Disparately Impact Black Voters.**

       Black Floridians continue to bear the brunt of past official race discrimination.  Complex
social and historical factors create an environment where black voters were more likely than non-
black voters to be disenfranchised during the 2000 general election.

       The undisputed fact that black voters are vastly overrepresented on inactive lists in
Miami-Dade County and Volusia County; complete more affirmation forms than non-black
voters in Hillsborough County; are overrepresented among voters purged for alleged felony
convictions in Hillsborough County and Miami-Dade County; are underserved at their precincts
in Hillsborough County, Volusia County, Broward County, and Pinellas County; and voted in
precincts that were less likely to have access to a computer in Hillsborough County and Orange
County, demonstrate the discriminatory impact of certain election practices on black voters.

       These disparities are due, in part, from a history of official race discrimination against
black citizens in Florida and the present day effects of that discrimination.  *See, e.g., Nash v.
Consolidated City of Jacksonville*, 905 F.2d 355 (1990) (reversing district court's finding that
city's examination given to firefighters did not disparately impact minorities); *Ammons v. Dade
City*, 783 F.2d 982 (1986) (holding that the city intentionally provided disparate services to black
and white communities, resulting in a discriminatory impact on the black community); *Baker v.
Kissimmee*, 645 F. Supp. 571 (1986) (finding that the city's conduct had a discriminatory impact
when it disproportionately allocated resources to racially segregated communities for street

paving and maintenance in such a way that the foreseeable outcome was a deprived black residential community); *Dowdell v. Apopka*, 698 F.2d 1181 (1983) (finding the municipal services to black residents "having foreseeable and anticipated disparate impact" on the black community); *See also*, Ex. 64, Select Historic Racial Discrimination in Florida.

African Americans continue to be disproportionately affected by limited education and employment opportunities, poverty, and residency in depressed areas, all of which are the effects of past official race discrimination. The effects of past official race discrimination in Florida are reflected by the relatively lower levels of education and income for African Americans. According to 2000 Census data, in Florida, 29.7% of African Americans age 25 or over have not graduated from high school or achieved the equivalent, compared with 14.5% for non-African Americans.[6] The percentage of African Americans living below poverty level in Florida in 1999 was 26.9 compared to 11.1% for non-African Americans. The average per capita income in 1999 in Florida for African Americans was $12,508, while the average for whites was $23,355.

Socio-economic differences between African Americans and non-African Americans are also a factor in African Americans being less likely than non- African Americans to own homes which leads to African Americans being more mobile than non-African Americans. Ex. 55, Flores Report at 8. The higher mobility rate of African Americans in Florida indicates that they will be more likely to encounter problems attempting to vote because they will be more likely to be designated as inactive.

Socio-economic factors and higher rates of mobility – leading to a greater likelihood of being placed on an inactive list – coupled with the undisputed fact that black voters in some counties voted in precincts with no access to computers to confirm voter eligibility, busy phone lines, and fewer poll workers assigned to assist voters in predominantly black precincts, created an environment where black voters' access to the political process was severely limited.

---

[6] The Court can take judicial notice of this data. Fed. R. Evid. 201.

**B.      There is a History of Racial Discrimination against Blacks in Florida's Electoral Process.**

Florida's electoral process reflects past and present race discrimination, including racially polarized voting, racial campaign appeals, limited success in attaining public office, and purging of purported ex-felons. *See* Ex. 62, Select Consent Judgments from Voting Rights Litigation Involving Florida Counties; *see also, e.g., Davis v. Chiles*, 139 F.3d 1414, 1416-18 & n.4 (11th Cir. 1998) (discussing discriminatory impact of at-large judicial elections, lack of available remedy under Section 2, the history of racially discriminatory voting practices in Florida); *McMillan v. Escambia County*, Fla., 748 F.2d 1037, 1044 (11th Cir. 1984) (Escambia County election systems were part of "a concerted state effort to institutionalize white supremacy"); *NAACP v. Gadsden County Sch. Bd.*, 691 F.2d 978 (11th Cir. 1982) (discussing all-white Democratic primary in Florida from 1901 until 1945); *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992) (noting that the "longstanding general history of official discrimination against minorities has influenced Florida's electoral process").

Current electoral practices and procedures continue to result in the disproportionate disenfranchisement of black voters. Referring to the many prominent national studies that followed the 2000 elections, Hayduk states:

> "This conclusion—that voter disenfranchisement was widespread in Florida during the 2000 elections—is inescapable when the findings of these other studies are also considered. . . . [S]pecific election problems . . . demonstrate that a significant number of eligible citizens—disproportionately minority voters—were deprived of their voting rights in the 2000 elections in Florida. These outcomes occurred because of a broad variety of problems in the administration of the elections. Many of these studies reveal how particular practices of election administration can lead to voter disenfranchisement. Some of these studies show a long pattern of racial discrimination in the administration of elections . . . ."

Ex. 63, Hayduk Report, at 3.

Count 2 of Plaintiffs' Second Amended Complaint alleges violations of the Voting Rights Act by Defendants Harris, Roberts, Leahy, Iorio, and Lowe. Plaintiffs were denied the right to vote on November 7, 2000 due to certain election practices employed by Defendants which disparately impacted black voters throughout the state of Florida.

Plaintiffs are entitled to summary judgment on their Voting Rights Act claim because the uncontroverted facts prove that election practices employed by county and state Defendants during the 2000 general election, resulting in the disproportionate denial of the franchise to black voters, violates Section 2 of the Voting Rights Act. Evidence produced during the course of discovery demonstrates the disproportionate disenfranchisement of black citizens throughout the state of Florida.

In determining whether a particular voting practice violates Section 2 of the Voting Rights Act, the focus of a court's inquiry is on the results, not the intent, of the practice. ("[P]ractices and procedures that result in the denial or abridgement of the right to vote are forbidden" even without proof of discriminatory intent. *Chisom v. Roemer*, 501 U.S. 380, 383 (1991)). To succeed on a Section 2 claim, Plaintiffs must prove that (1) a "standard, practice, or procedure" (2) impairs the ability of minority voters to equal participation in the political process. 42 U.S.C. § 1973(b); *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); *United States v. Jones*, 57 F.3d 1020, 1023 (11th Cir. 1995).

Regarding the first factor of the analysis, the "standard, practice, or procedure" at issue must be more than a "run-of-the-mill mistake" that one might encounter in the ordinary course of an election. *Jones*, 57 F.3d at 1023. In considering the second factor, a court must consider the "totality of the circumstances," and engage in a "searching practical evaluation of the past and present reality." *Gingles,* 478 U.S. at 45; *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1198 (11th Cir. 1999) (quoting 42 U.S.C. § 1973(b).) The required nexus between a voter qualification and race is based on the totality of circumstances, which may include many factors not directly causally related to the challenged practice. Factors courts consider are set out by the Senate Judiciary Committee in the Senate Report accompanying the 1982 amendments of the Voting Rights Act. *See also National Association for the Advancement of Colored People, Inc. v. Niagara Falls,* 65 F.3d 1002, 1007 – 08 (2d Cir. 1995) (citing Senate Report).

The U.S. Commission on Civil Rights, in its report entitled "Voting Irregularities in Florida During the 2000 Presidential Election, June 2001," noted that the disparate impact of

27

certain election practices on minority voters alone does not prove unlawful discrimination.  The report further indicates, however, that "[each practice] provide[s] one piece of evidence, considering the 'totality of the circumstances,' which supports the finding that the Florida election was not equally open to participation by all."  *Id.* at 14.  Restrictions on minority participation in the electoral system, whether direct or indirect, explicit or implicit, by law or by practice – when coupled with a history of official race discrimination in Florida, socio-economic differences between blacks and other Floridians, and other "totality of the circumstances" evidence – violate Section 2 of the Voting Rights Act.

    Although most Voting Rights Act claims arise out of issues related to redistricting, many courts have recognized that violations of Section 2 may exist outside of the redistricting context.  *See, e.g., Vargas v. Calabrese*, 634 F. Supp. 910, 927 (N.J. 1986) (recognizing that facially neutral election administration procedures may have a racially discriminatory impact on minority voters in violation of Section 2); *United States v. St. Landry Parish School Board*, 601 F.2d 859 (5th Cir. 1979) (holding that the acts of poll workers on election day may constitute a voting practice or procedure violative of Section 2); *Goodloe v. Madison County Bd. of Election Comm'rs*, 610 F. Supp. 240 (S.D. Miss. 1984) (holding that when the County Board of Election Commissioners voided all absentee ballots cast before a single notary public, the Board had engaged in a practice under Section 2 which had a disparate impact on black voters); *Brown v. Dean*, 555 F. Supp. 502 (D.R.I. 1982) (holding that a decision to change the location of a polling place constituted a "practice or procedure" that violated Section 2 because the changed location presented a substantial deterrent to black voters due to distance and lack of public transit to the new location); *Harris v. Siegelman*, 695 F. Supp. 517 (M.D. Ala. 1988) (holding that Alabama's retention of aspects of its historically discriminatory laws and policies regarding polling places violated Section 2 of the Voting Rights Act by denying black voters full participation in the political process).

## C.    Black Voters Appeared More Often Than Non-black Voters on County Inactive Voter Lists.

Black voters appeared on inactive voter lists disproportionately more than non-black voters in Miami-Dade County and Volusia County.[7] Ex. 55, Flores Report at 2; Ex. 56, Flores Supp. Report, at 1. Under Florida law, properly registered voters may be designated as inactive pursuant to list maintenance procedures. *See* Fla. Stat. § 98.065 (2001). Supervisors of election are required to conduct biennial registration list maintenance programs. *Id.* County supervisors receive change of address information from the United States Postal Service, among other sources, identifying voters whose address might have changed. Pursuant to list maintenance procedures, county supervisors are required to send address confirmation forms to those individuals identified as having changed their residence. *Id.* In addition, individuals who have not voted in two consecutive federal election cycles are also mailed address confirmation forms. Voters who fail to return the address confirmation form to the supervisor of elections within thirty days are moved to inactive status.

Individuals who move from one residence to another are less likely to receive the address confirmation form mailed to them by their supervisor of elections. In other words, they are more likely to be designated as inactive. Thus, individuals who have a high propensity for mobility are more likely than other voters to be identified as inactive and, as a result, will be more likely to encounter obstacles on election day.

Throughout the state, black Floridians "tend[] to have a higher propensity of populating the ranks of renters, as opposed to homeowners, than other racial groups. . . ." Ex. 55, Flores Report at 8. Renters are more mobile than homeowners and since blacks are more likely to be renters than non-blacks, they are similarly more mobile than non-blacks. Because black Floridians are highly mobile, they are also more likely to be placed on inactive status.

Most counties in Florida maintain lists of inactive voters at the precincts on election day. Several counties, including Defendant Cowles' Orange County, do not maintain inactive voter

---

[7]    Pursuant to order of the Court, all County Defendants are required to produce data on inactive voters as of November 7, 2000 and as of the present date; however, Plaintiffs have not received inactive voter data from some County Defendants.

data at the polls, requiring poll workers to contact the supervisor of elections or some other central office to confirm the eligibility of all inactive voters on election day.[8]  Even in those counties where inactive voter lists are maintained at the precincts, only the names of inactive voters within that precinct are maintained at the polls.  Therefore, an individual who shows up at her correct precinct, based on a new home address, but who is listed as inactive at her former precinct, would still be required to confirm her eligibility before voting.

For example, Plaintiff Rondrick Rose, a properly registered voter, was designated as inactive due to a change of residence within Hillsborough County.  On election day he attempted to vote at his correct precinct based on his new street address.  However, his name was listed as inactive on the precinct register at his former precinct, but not at his new precinct.  Before being permitted to vote, Mr. Rose was required to confirm his eligibility with a central elections office. Due to problems with the communications system in Hillsborough County, among other problems, the poll worker assisting him was unable to confirm Mr. Rose's eligibility and he was not permitted to vote.

Similarly, Admatha Israel was a properly registered voter in Miami-Dade County on November 7, 2000, who was designated as inactive due to a recent change of address and failure to return an address confirmation form.  Mr. Israel attempted to vote on election day, however due to busy phone lines, no access to a laptop computer, and poll workers who refused to assist Mr. Israel, his eligibility could not be confirmed and he was not permitted to vote.  Ex. 37, Deposition Transcript of Admatha Israel, at 12.

### D.    Fewer Poll Workers Were Assigned to Predominantly Black Precincts than Were Assigned to Predominantly White Precincts.

Because black voters were more likely than non-black voters to be designated as inactive, black voters were more likely than non-black voters to require assistance at the polls on election

---

[8]   Counties that do not maintain inactive voter lists at the polls on election day include Alachua, Charlotte, Desoto, Hernando, Martin, Union, and Orange.  *See* Declaration of Noni Jones, Ex. 1; *See also* Ex. 51, Def. Cowles' Response to Pls' First Set of Inter., response no. 11.

day. The uncontroverted facts indicate that in Broward, Hillsborough, Volusia, Pinellas and Orange Counties fewer poll workers were assigned to predominantly black precincts than were assigned to predominantly white precincts. Ex. 61, Flores Report, at 3-4; Ex. 62, Flores Supp. Report, at 2; Ex. 63, Hayduk Report, at 7.

In Orange County, the average number of poll workers per precinct was 10. Ex. 63, Hayduk Report, at 29-30. By contrast, the average number of poll workers in black plurality[9] precincts in the county was 7. *Id.* This inequitable distribution of poll workers has existed in Orange County at least as far back as 1998. *Id.* (citing documents produced by Defendant Cowles ("Cowles"), at J007400-J007404, J000464-J000612). Furthermore, the number of black plurality precincts grew from 18 in 1998 to 22 in 2000, which suggests that, over time, this disparity has affected an increasingly larger segment of Orange County's black population. Ex. 63, Hayduk Report, at 30 (citing Cowles, at J007425-J007443, J000464-J000612; J007425-J007443; J000113-J000118). Moreover, some black plurality precincts were assigned even fewer poll workers than Defendant Cowles suggested was the minimum number assigned to each precinct.[10] These lower numbers of poll workers in black plurality precincts are very significant because they suggest that voters in black plurality precincts received less voter assistance than those in white plurality precincts and were subjected to less effective election administration overall.[11]

---

[9]  For purposes of the analysis in this section, the term "plurality" means the most numerically of all considered groups.

[10]  In his deposition, Defendant Cowles testified that the minimum number of poll workers per precinct is "probably seven," noting that there are five people to cover general tasks and at least two PR/PL books covered by one poll worker each. Ex. 17, Deposition of William Cowles at 231-232. However, the data show that 5 black plurality precincts were assigned only 6 poll workers during the 2000 general elections and 4 black plurality precincts were assigned only 5 poll workers. (Bates Numbers J00464-J00612).

[11]  Poll workers assist voters and facilitate elections by checking voter rolls, answering questions, calling the central office for registration verification, and using the laptop for voter registration verification, among other things.

**E.     Predominantly Black Precincts Were Less Likely than Predominantly White Precincts to Have Access to a Computer on Election Day.**

In addition to fewer poll workers being assigned to predominantly black precincts in some counties, and the greater likelihood that black voters would require confirmation of their eligibility to vote, it is clear that the distribution of laptop computers in Hillsborough County and Orange County had a racially discriminatory impact on black voters.

Like the inequitable assignment of poll workers to black plurality precincts, the maldistribution of laptop computers in Orange County has persisted at least as far back as the November 1998 general elections. Ex. 63, Hayduk Report, at 16 (citing Cowles, at J001157, J007391-J007393; J007400-J007401). In 1998, 105, or 87.5%, of the 120 precincts that received laptops were white majority precinct listings. *Id.* Only 14 out of the 120 precincts, or 11.7 % , were majority black precincts. *Id.*

In Hillsborough County, 10 precincts received laptops for the 2000 general elections; however, none of those precincts had a majority black registered voter population or total population.[12] Ex. 63, Hayduk Report, at 19. According to Defendant Iorio, she distributed laptops in the manner that she did in order to assign laptops to precincts that were large in population and where there was heavy affirmation usage in previous elections. Ex. 30, Deposition of Pam Iorio, at 192, lines 22-24 and 193, lines 7-8. However, of the 10 precincts that received laptops, nearly half of them had fewer voters in the precinct than many other larger precincts. "For instance, precinct 341 had 2,280 voters, precinct 559 had 2,642 voters, 562 had 2,242 and 563 had 1,196. These precincts contain numbers of voters that are relatively low compared to many other precincts that had much larger numbers of voters. For example, precinct 139 had 3,885 voters, precinct 457 had 3,733, 761 had 3,734, and 817 had 3,709 voters—yet none of these precinct were provided laptops." Ex. 63, Hayduk Report, at 19. More important, many majority black precincts had a larger number of voters than the precincts to

---

[12]    Hillsborough County provided the following 10 precincts with laptops for the November 2000 general elections: Precinct 341, 361, 527, 559, 562, 563, 587, 751, 817, 829, 949.

which Defendant Iorio assigned laptops. For instance, 14 of the 26 black majority precincts had a greater number of voters than precinct 563, which received a laptop. *Id.* at 20.

If the precinct in Hillsborough County where Plaintiff Rondrick Rose attempted to vote on November 7, 2000 had access to a laptop computer, Mr. Rose's eligibility could have quickly and easily been confirmed because the poll worker assisting him would have had access to the countywide list of inactive voters where Mr. Rose's name appeared and Mr. Rose would have been permitted to vote. Instead, Mr. Rose waited over two hours while continuously attempting to contact the supervisor's office by telephone. Due to constantly busy phone lines, Mr. Rose's eligibility was not confirmed and he was not permitted to vote. Ex. 35.

**F.     Black Voters Completed More Affirmation Forms than Non-black Voters.**

Black voters in Hillsborough County completed more affirmation forms on November 7, 2000 than non-black voters in the county. Ex. 61, Flores Report, at 3. There are several reasons why a voter may be required to complete an affirmation form before voting, such as attesting to a change in one's name or address, or having no identification on election day. Because black Floridians are more mobile than other groups, they are more likely to be required to complete an affirmation form based on a change of address. Ex. 61, Flores Report, at 8. Also, a voter who is identified as inactive but whose eligibility is confirmed may still be required to complete an affirmation form before voting.

Voters completing affirmation forms may require greater assistance at the polls. It is uncontroverted that black voters in Hillsborough County completed more affirmations than non-black voters on November 7, 2000, that fewer poll workers were assigned to predominantly black precincts and that no laptop computers were assigned to predominantly black precincts. These election practices disparately impacted black voters in Hillsborough County. Ex. 61, Flores Report, at 3; Ex. 63, Hayduck Report, at 19. Plaintiffs are entitled to partial summary judgment on this claim.

G. **Black Voters Were More Likely Than Non-black Voters to Be Identified as Possible or Probable Felons.**

The state-mandated purge on account of alleged felony conviction disparately impacted black voters throughout the state of Florida. In Hillsborough County and Miami-Dade County, a higher percentage of black voters was purged from the voter roll in 2000 for alleged felony convictions than the population of blacks in those counties. Ex. 61, Flores Report, at 3; Ex. 62, Flores Supp. Report, at 2.

The Central Voter File felony purge lists that the state provided to county supervisors of elections erroneously included the names of thousands of eligible voters who did not have felony convictions. Wallace McDonald, for example, was one of the voters in Hillsborough County who was erroneously identified as a former felon. Although Mr. McDonald informed Defendant Iorio that he had never been conficted of a felony, Defendant Iorio purged Mr. McDonald from the voter roll without seeking independent verification of Mr. McDonald's alleged felony conviction. *See* Florida Department of Law Enforcement, Report on Wallace McDonald, Ex. 68 (indicating that Mr. McDonald has *no* felony convictions).

In Miami-Dade County thousands of eligible voters were misidentified as having felony convictions. A disproportionate number of those identified as former felons are black. According to the U.S. Commission on Civil Rights, approximately 14.1 percent of the names appearing on the Miami-Dade County purge list in January 2000 appeared erroneously. *Id.* at 23. The Miami-Dade County purge list consisted of more African Americans than any other race. *Id.* As the Commission reports:

> African Americans represented the majority of persons – over 65 percent – on both the June 1999 and the January 2000 lists. This percentage far exceeds the African American population of Miami-Dade County, which is only 20.4 percent. Comparatively, 77.6 percent of the persons residing in Miami-Dade are white; yet whites accounted for only 17.6 percent of the persons on the June 1999 convicted felons list.

*Id.*

Many individuals wrongfully removed from county voter rolls based on alleged felony convictions were not even informed that they were ineligible to vote.  Many never received notice from their county supervisor of elections and, therefore, believing they were eligible, attempted to vote on November 7, 2000.  Like individuals placed on inactive lists, these individuals similarly would require additional assistance from poll workers and, specifically, would require communication with the central elections office to check eligibility.

VII.   **Summary Judgment Should be Granted for Plaintiffs Against All Defendants on Their Claim under the Civil Rights Acts**

Plaintiffs allege a claim under the Civil Rights Act of 1957 and 1960 against all Defendants.  A claim under the Civil Rights Act can be shown where there is state action, racial discrimination through discriminatory application of the law, and the existence of a standard, practice or procedure that was applied differently to black voters as compared to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.  The practices described, *supra*, as part of Plaintiffs' argument under the Voting Rights Act, such as those regarding assignment of computers and poll workers to precincts, establish that Plaintiffs claim against Defendants under the Civil Rights Acts should be granted.

VIII.  **Defendants Harris and Roberts Violated the Voting Rights Act by Failing to Ensure Uniformity of Elections, Provide County Supervisors of Elections with Guidance or Set Minimum Standards for the Administration of Elections.**

Defendants Harris and Roberts are responsible for ensuring statewide compliance with the Voting Rights Act.  As the chief elections officers in the state of Florida, they are ultimately responsible for the proper and uniform enforcement of the election laws.  Defendant Harris, as Secretary of State, is responsible for the "general supervision and administration of the election laws," Fla. Stat. § 15.13 (2001), and must obtain and maintain uniformity "in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1) (2001).

Federal courts have recognized that Florida's Secretary of State, as the Chief Elections Officer, bears the responsibility for the supervision and administration of the election laws. *See,*

*Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1242 (11th Cir. 1998) ("when a state is sued with regard to its election laws, the proper state representative is the chief elections officer...[who] has the authority to bind the state as a whole [under Florida Law]"); *See also*, *Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324 (N.D. Fla. 2000). In addition to finding county supervisors of elections liable for improper administration of election laws, Florida courts have found the Secretary of State similarly liable. *See, e.g., CBS, Inc. v. Smith*, 681 F. Supp. 794 (S.D. Fla. 1988) (enjoining the Secretary of State and county supervisors of elections from enforcing an unconstitutional statutory restriction on exit polling).

Pursuant to its statutory duty to supervise the administration of election laws and ensure uniformity in their operation, application, and interpretation, the Department of State has been granted the authority to "adopt rules...to administer the provisions of law conferring duties upon the department." Fla. Stat. § 20.10(3) (2001).  Due in part to Defendant Harris' failure to adopt any rules, provide any guidance or set any minimum standards to ensure compliance with the Voting Rights Act, voters throughout the state were subjected to non-uniform election administration practices which had a racially discriminatory impact on black voters. To properly fulfill her mandate to obtain and maintain uniformity "in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1) (2001), Defendant Harris must provide guidance to county supervisors of elections to ensure nondiscriminatory administration of elections and compliance with the Voting Rights Act throughout the state of Florida.

The State's failure to ensure uniformity in the administration of elections in November 2000 created an environment where black voters were disparately impacted by certain election practices.  At a minimum, Defendants Harris and Roberts had a duty to provide county supervisors of elections with minimum standards and guidance on the proper administration of elections and monitor how well the counties were employing uniform procedures.  Instead, different procedures and practices were employed throughout the state.  This created a situation where black voters were disparately impacted by practices in some counties such as the unequal distribution of laptop computers to predominantly black precincts, unequal assignment of poll

workers to predominantly black precincts, and inadequate lines of communication to central election offices throughout the state. "[U]niform criteria for allocating poll workers and laptops, for designating voters to precincts and to poll sites . . . and a host of other practical changes would reduce poll site problems and disparate treatment." Ex. 63, Hayduk Report, at 47-48. In addition, "clear and uniform standards and practices [for] handling affirmation/affidavit ballots would reduce poll site problems and disputes." *Id.; See also,* Ex. 41 to Ex. 58, Defs' Responses to Pls' First Set of Interrogatories, responses 5, 6, 7, 8, 10, and 11.

IX.    **Summary Judgment Should be Granted for Plaintiffs Against Defendants Harris and Roberts Based of Defendants' Failure to Protect Plaintiffs' Rights Under the Fourteenth Amendment of the United States Constitution.**

Defendants Harris and Roberts violated Plaintiffs' rights under the Fourteenth Amendment to the U.S. Constitution. It has long been established that the right to vote is a fundamental right under the Fourteenth Amendment. *See e.g., Reynolds v. Sims*, 377 U.S. 533, 561-562 (1963). ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.") Importantly, the Supreme Court recently reaffirmed that the Fourteenth Amendment prohibits a state from valuing the voting rights of one person over another: "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104-105 (2000).

Federal Courts interpreting the *Bush* decision have found that the Fourteenth Amendment right of equal voting can be violated both before *and* during an election. *See, Charfauros v. Bd. of Elections*, 2001 U.S. App. LEXIS 15083, 2001 D.A.R. 7001 (9th Cir. 2001) (Defendant boards arbitrary practice of removing voters from the list of qualified voters treated them in a disparate manner, violating their fundamental right to vote under the 14th amendment); *see also, Black v. McGuffage*, 2002 U.S. Dist. LEXIS 5435, *28-29 (N.D. Ill. 2002) (refusing to dismiss Plaintiffs' claim because Illinois' selection and allowance of local voting systems with greatly varying accuracy rates "value[s] one person's vote over that of another," (quoting *Bush*, 104-

37

105), thus violating Plaintiffs equal right to vote under the 14th amendment).  In the case at bar, Defendants concede that there were *no* statewide standards to prevent the improper removal of registered voters from the rolls or to correct such mistakes at the polling place. Furthermore, the evidence discussed, *supra,* as set forth at length in the Statement of Material Facts, demonstrates the lack of uniformity in the administration of elections in Florida.  Defendants Harris and Roberts, through their failure to guarantee uniformity in the electoral system, have allowed Plaintiffs as a class to be removed from the registered voter rolls and treated at polling sites in a manner which was clearly arbitrary and disparate, and thus denied their right to vote in violation of the Fourteenth Amendment.

## CONCLUSION

Plaintiffs, moving for partial summary judgment on seven discrete claims, have met their burden to establish the lack of a genuine issue as to any fact material to those claims.  *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142(1970) (moving party has burden to establish absence of genuine issue of material fact); *Allen v. Tyson Foods, Inc.*, 121 F. 3d 642, 646 (11th Cir. 1997).  Summary judgment should be granted where "there is no genuine issue as to any material fact", *Canadyne-Georgia Corp. v. Continental Ins. Co.*, 999 F.2d 1547, 1555 (11th Cir. 1993) (internal cite omitted), and where the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Tyson Foods, Inc.*, 121 F.3d at 646; *see also*, Fed. R. Civ. P. 56 (c).  A genuine issue exists only when a reasonable trier of fact could find for the non-moving party based on the evidence presented.  *Jackson v. Carnival Cruise Lines,* No. 99-1813, 2000 U.S. Dist. LEXIS 9192 (S.D. Fl., May 21, 2002).

Here, it is undisputed that the policies and procedures which form the factual basis for these particular claims were used by the Defendants in this case to wrongly purge voters, fail to register voters and administer polling places on election day in a manner that had a

discriminatory impact.   These actions violated state and Federal law.  Therefore, Plaintiffs

NAACP, et al., request the Court to issue an order granting them partial summary judgment on

the seven claims discussed herein.


Dated:  July 1, 2002

                                            Respectfully submitted,


Barbara Arnwine
Thomas J. Henderson*
Anita Hodgkiss*                             Thomasina H. Williams
Lori Outzs Borgen*                          Williams & Associates, P.A.
Cara Fineman*                               Brickell BayView Centre, Suite 1830
Lawyers' Committee for Civil Rights         80 S.W. Eighth Street
    Under Law                               Miami, FL 33130
1401 New York Ave., N.W., Suite 400         Tel. 305-379-6676
Washington, D.C. 20005-2124                 Fax 305-379-4541
Tel. 202-662-8600 or 888-299-5227           FL Bar No. 629227
Fax 202-783-5130                            thwilliams@wms-law.com
lborgen@lawyerscomm.org


Dennis Hayes*                               Elaine R. Jones
Angela Ciccolo*                                 Director-Counsel
NAACP Legal Department                      Theodore M. Shaw*
4805 Mt. Hope Drive, Fifth Floor            Norman J. Chachkin*
Baltimore, MD 21215-3297                    Janai S. Nelson*
Tel. 877-622-2798                           NAACP Legal Defense & Educational Fund, Inc.
Fax 410-358-9350                            99 Hudson St., Suite 1600
aciccolo@naacpnet.org                       New York, NY 10013
                                            Tel. 212-965-2200
                                            Fax 212-216-7592
                                            jnelson@naacpldf.org


Todd A. Cox*                                Laughlin McDonald
NAACP Legal Defense & Educational           ACLU Voting Rights Project
    Fund Inc.                               2725 Harris Tower
1444 Eye Street, N.W., 10th Floor           233 Peachtree Street NE
Washington, DC 20005                        Atlanta, GA 30303
Tel. 202-682-1300                           Tel. 404-523-2721
Fax 202-682-1312                            Fax 404-653-0331
tcox@naacpldf.org                           lmcdonald@aclu.org

Penda Hair*
Judith Browne*
Monique Dixon*
Advancement Project
1730 M Street NW, Suite 401
Washington, DC 20036
Tel. 202-728-9557
Fax 202-728-9558
jbrowneesq@aol.com

Louis M. Bograd
American Civil Liberties Union Foundation
National Legal Department
733 15th Street, NW, Suite 620
Washington, DC 20005
Tel. 202-393-1918
Fax 202-393-4931
BOGRAD1@aol.com

Elliot Mincberg*
Larry Ottinger*
Alma C. Henderson*
People for the American Way Foundation
2000 M Street, Suite 400
Washington DC 20036
Tel. 202-467-2392
Fax 202-293-2672
lottinger@pfaw.org

* Admitted *pro hac vice.*

BY _____
     THOMASINA H. WILLIAMS

## CERTIFICATE OF SERVICE

I HEREBY certify that a true and correct copy of the foregoing was served by U.S. Mail on the following counsel on this __1__ day of July, 2002:

John W. Little, III, Esq.
Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
Attorneys for Secretary of State and
Director, Division of Elections
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Miami-Dade County
111 N.W. First Street, Suite 2810
Miami, FL 33128-1930

Mitchell Bloomberg, Esq.
Adorno & Zeder
Attorneys for ChoicePoint, Inc.
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133-5413

Tracey I. Arpen, Esq.
Office of General Counsel, Duval County
117 West Duval Street, Suite 480
Jacksonville, FL 32202-3700

H. Ray Allen, Esq.
Senior Assistant County Attorney
Hillsborough County, Florida
P.O. Box 1110
Tampa, FL 33601

George L. Waas, Esq.
Douglas B. MacInnes, Esq.
Office of the Attorney General
Department of Legal Affairs
PL-01 The Capital
Tallahassee, FL 32399-1050

Michael Cirullo, Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
Attorneys for Orange County Supervisor
3099 East Commercial Boulevard
Fort Lauderdale, FL 33308

Daniel D. Eckert, Esq.
County Attorney
Frank Gummey, Esq.
Assistant County Attorney
County of Volusia
123 West Indiana Avenue
DeLand, FL 32720-4613

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
Attorneys for ChoicePoint, Inc.
725 Twelfth Street, NW
Washington, D.C. 20005-5901

David V. Kornreich, Esq.
  Casey, Crosland & Bramnich
First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131

THOMASINA H. WILLIAMS