UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-0120-Civ-Gold
Magistrate Judge Simonton

**NIGHT BOX
FILED**

⌐ - 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

-------------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

　　　　　Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida, et al.

　　　　　Defendants.

-------------------------------------------------------------------------------x

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

　　　　　Plaintiffs National Association for the Advancement of Colored People, Inc. by its

Florida State Conference of Branches, et al., by and through undersigned counsel, hereby submit

the following undisputed material facts pertaining to Plaintiffs' claims, in support of their motion

for summary judgment.  These undisputed material facts are presented in sections in the

following order: 1) Voter Purging; 2) Voter Registration; and, 3) Administration of the

November 7, 2000 election.

### Voter Purging

1.　　　　　Pursuant to former Section 98.0975, in November of 1998 and December of 1999,

　　　　　the Department of State, Division of Elections hired a private company, Database

　　　　　Technologies d/b/a ChoicePoint (hereinafter "DBT") to assist it with compiling lists of

　　　　　individuals who were believed to be ineligible to vote.  Ex. 81, Data Processing Services

　　　　　Agreement; Ex. 82, Central Voter File Data Processing Services Agreement

　　　　　("Contracts")[1].

---

[1]　Hereinafter, "exhibits" are Exhibits to Declaration of Angela Ciccolo, Esq. in Support of
Plaintiffs' Motion For Summary Judgment, July 1, 2002 (Ex. 1-88) and Declaration of
Thomasina Williams, Esq. in Support of Plaintiffs' Motion For Summary Judgment, July 1, 2002
(Ex. 89-90).

2.      To create the list, DBT used the following computerized databases:  Florida's central voter file, the Florida Department of Law Enforcement's ("FDLE") felony convictions file, the Florida Department of Corrections's ("DOC") felony convictions file, the Florida Bureau of Vital Statistics death file, the Florida Department of Motor Vehicles file, Social Security Master deaths file, felony convictions databases that DBT obtained from states other than Florida, and the Florida file of individuals who had been granted clemency in the state. *See* Ex. 12, Dep. of George Bruder deposition at 76-78; Ex. 24, Dep. of Marlene Thorogood at 18-19, 28-34.

3.      By comparing information in the central voter file against itself and against these other databases, in 1999 and 2000, DBT created and provided the Division with lists of individuals who were believed to have been registered in more than one county in Florida ("duplicates list"), to have been deceased ("deaths list"), and to have been convicted of felonies ("felons exceptions").  *See* Ex. 24, Dep. of Marlene Thorogood at 18-19, 36-39; Ex. 22, Dep. of Janet Modrow at 25, 27-28.

4.      After receiving the 1999 and 2000 duplicate, death, and felon lists, Division of Elections' staff reviewed them, separated them by county, and then provided the counties with their portion of the list.  *See* Ex. 22, Dep. of Janet Modrow, at 36-39, 49-56; Ex. 23 Dep. of Janet Modrow , *Johnson, et al. v. Bush, et al.*, No. 00-3542-CIV-King (S.D.Fla.) at 48-49.

5.      To create the duplicate exceptions lists, DBT compared information in the central voter file against itself to identify voters who were registered to vote in more than one county. *See* Ex. 23 Dep. of Janet Modrow at 40-41; Ex. 24, Thorogood Dep. at 18-19.

6.      To create the felons exception lists provided to the Division in 1999, DBT compared the central voter file against the FDLE felony conviction files, the Florida DOE felony conviction files, and DBT's in-house files containing criminal history information about the following states:  Florida, Kentucky, Wisconsin, Virginia, New Jersey, Washington, and Illinois. *See* Ex. 24, Thorogood Dep. at 28, 31-32; Ex. 23, Modrow Dep. at 45.

7.     For the felons exceptions lists provided to the Division of Elections in 2000, DBT used criminal history information from the following states in addition to Florida: Connecticut, Illinois, Kentucky, New Jersey, Ohio, South Carolina, Texas, Virginia, Washington, and Wisconsin.  *See* Ex. 23, Modrow Dep. at 45; Ex. 24, Thorogood Dep. at 36-37.

8.     In 1999 and 2000, the names of individuals who DBT identified as having been convicted of a felony in Florida were then compared against the Office of Executive Clemency database. *See* Ex. 24, Thorogood Dep. at 62-63; Ex. 23, Modrow Dep.  at 41-46.

9.     In 1999, to determine whether individuals who were believed to have been convicted of felonies in states other than Florida had been granted clemency, DBT contacted government officials in those states. *See* Ex. 24, Thorogood Dep. at 59-62.

10.     DBT did not have access to computerized databases containing this information in 1999. *Id.*

11.     If the individuals were from states that automatically restored felons' right to vote after incarceration, probation or parole ("automatic restoration states"), DBT identified these individuals as having been granted clemency and as eligible to vote in 1999.  *Id.* at 62-63.

12.     The Division of Elections was aware that DBT was handling the records of individuals convicted in automatic restoration states in this way.  *Id.* at 59-60.

13.     In December 1999, Division of Elections informed DBT of a change in policy regarding the voting rights of individuals who had been convicted in the automatic restoration states.  *Id.* at 46-51, 55-59.

14.     The Division told DBT that individuals who had been convicted of felonies in automatic restoration states were not eligible to vote in Florida unless they had been granted clemency by the state of Florida or they could provide documentation that they had gone through some formal appeals process in the state where they were convicted to have their rights restored. *Id.* at 46-51.

3

15.     Because of this policy change, rather than being listed on the felons exceptions lists as a person who had been granted clemency – as they had been in 1999 – individuals from automatic restoration states were not considered to have been granted clemency.

16.     For the lists processed in 2000, DBT considered the following states to be automatic restoration states:  Texas, Connecticut, South Carolina, Illinois and Wisconsin. *Id.* at 48-51.

17.     DBT ran the names of individuals identified as having been convicted in automatic restoration states against the Florida Clemency file and if they had not been granted clemency by the State of Florida, DBT treated these individuals on the 2000 felons exceptions lists as individuals who had not been granted clemency. *Id.*

18.     DBT identified the following states as non-automatic restoration states:  New Jersey, Kentucky, Virginia and Washington. *Id.* at 51-52.  DBT contacted government officials in these non-automatic restoration states to determine if the individuals who were believed to have been convicted of felonies in those states had been granted clemency. *Id.* at 51-53.

19.     To develop the criteria and standards that were used by DBT to create the felons exceptions lists that it provided to the Division of Elections, DBT consulted with Division staff and produced "Requirements Documents" in 1999 and 2000 that outlined such criteria and standards. *Id.* at 20-21, 26-27.

20.     Modrow and other Division of Elections' employees ultimately determined which matching criteria and process to use. *Id.* at 22-26.

21.     The Division of Elections directed DBT to use very broad matching criteria to create the lists of voters who were believed to have been convicted of felonies, and broadened the match criteria throughout the term of the Contracts. *Id.* at 22-26, 94-100, 108-115; Ex. 12, Bruder Dep. at 29-35; Ex. 22, Modrow Dep. at 75-78; Ex. 23, Modrow Dep. at 63-64; Ex. 60, Klausner Expert Report at 9.

22.     DBT officials informed the Division of Elections that using broad matching criteria would result in a significant number of "false positives," (Ex. 24, Thorogood

Dep. at 22-26, 115-117) or incorrect matches, and recommended that the criteria be tightened to reduce the number of false positives. *Id.* at 22-26; Ex. 12, Bruder Dep. at 29-35.

23.     Rather than narrowing the matching criteria, the Division of Elections used as broad a net as possible to capture as many potentially ineligible voters as possible on the felon exceptions lists. *See* Ex. 12, Bruder Dep. at 33-34; Testimony of George Bruder before the U.S. Civil Rights Commission, February 16, 2001, at 214-15, incorporated as Exhibit 6 to Bruder deposition, at 29.

24.     Even after having been informed that some county Supervisors of Elections wanted more exacting criteria to be used, which would have resulted in fewer false positives, the Division insisted on broadening the criteria. *See* Ex. 12, Bruder Dep. at 32-34.

25.     Throughout 1999 and 2000, numerous errors were found in the databases that DBT used to compile the lists for the Division of Elections, which resulted in erroneous information being included on the lists that ultimately were provided to the county Supervisors of Elections. *Id.* at 77-78; Ex. 22, Modrow Dep. at 28-32; Ex. 21 Dep. of Emmett Mitchell, IV at 32, 41-42; Ex. 24, Thorogood Dep. at 85.

26.     For instance, in March 2000, DBT sent the Division of Elections, and the Division provided to the county supervisors, felon lists that mistakenly listed as felons the names of 8,000 individuals who had been convicted only of misdemeanors in Texas. *See* Ex. 24, Thorogood Dep. at 40-45; Ex.12, Bruder Dep. at 62-67.

27.     In June 1999, the former head of the Florida Division of Elections informed the supervisors of elections that the division needed to recall and have DBT re-run felons exceptions lists that had been provided to the supervisors 60,000 records that had been used by DBT to produce the lists had been incorrectly marked as felony convictions. *See* Memorandum from Ethel Baxter to All Supervisors of Elections (June 4, 1999) and letter from George Bruder to Baxter (June 4, 1999), incorporated as Exhibit 7 to Mitchell deposition, at 33-34; Bruder deposition at 79-82.

5

28.     In general, the information in the databases used by DBT was extremely
inaccurate and unreliable. Ex. 60, Klausner Expert Report at 4-9 .   County Defendants
used disparate practices for purging allegedly ineligible voters from the county
registration rolls. *See* Ex. 38, 39, 41, 44, 46, Def. Responses to Pls' First Set of
Interrogatories, response no. 5. Defendants Harris and Roberts provided no guidance to
the counties concerning how they should remove allegedly ineligible voters from the
county voter registration rolls. *See* Ex. 28, Deposition Transcript of Ed Kast, at 33.

### Voter Registration
### DCF Failed To Comply With NVRA

29.     Plaintiff Joanna Clark has received public assistance and services at the
Department of Children and Families (DCF) from about 1995 to the present. *See*  Ex. 57
Def. Kearney's Second Supplemental Response to Pls' First Set of Interrogatories; Ex. 5,
J. Clark Decl. at ¶ 11.  Ms. Clark registered to vote in Broward County, Florida in 1995
when completed a voter registration application during a visit at DCF. Ex. 5, J. Clark
Decl. at ¶ 3.

30.     In late 1999, Ms. Clark moved to a new address within Broward County. *Id.*. at ¶
4.  In May 2000, Ms. Clark went to a DCF office  to apply/ recertify for public assistance.
During her visit, Ms. Clark noticed voter registration applications by the receptionist desk
and decided to change her address on her voter registration by completing an application
and placing it in a box with other completed voter registration applications.  *Id.* at ¶ 5.

31.     Ms. Clark never received a new voter registration card in the mail. *Id.* at ¶ 7.  Ms.
Clark was not permitted to vote on November 7, 2000, despite the fact that her name was
on the voter roll at the polling place for her old address. *Id.* at ¶¶ 8-10.  Ms. Clark was not
offered an affirmation on which she could have indicated her change of address.  *Id.*  at
23.

32.     Although Ms. Clark has received public assistance and services since 1995, at no
time during any of her many visits to DCF from 1995 to 2001 was she asked, by a DCF

employee, whether she wanted to register to vote or update a current voter registration. *Id.* at ¶ 11. Although she completed forms for public assistance during those visits, she was not offered a voter preference form asking whether she would like to register to vote or update a current voter registration as required under the NVRA. *Id. See* Ex. 36, Bowman Dep. at 88-89.

33.      DCF admits that Ms. Clark should have been offered voter registration on at least the following dates: May 30, 2000, July 25, 2000, September 20, 2000 and May 3, 2001. *See.* Ex. 36, Bowman Dep. at 87-88. In fact, despite a requirement to maintain voter registration preference forms for two years, Kearney does not have a single voter preference form for Ms. Clark. *See.* Ex. 55, Def. Kearney's Response to Plts' 2nd Set of Requests for Documents; Ex. 36, Bowman Dep. at 31, 33. The District serving Ms. Clark would have maintained these forms if they existed. *See* Ex. 36, Bowman Dep. at 88-89.

34.      Defendant Kearney admits that plaintiffs Natalie Carnegie, Ursula Harvey, Admatha Israel, Wallace McDonald, Jimmie Pannell, Julia Stoner, Lorine Walden, Kandy Wells and Valerie Buford all received public assistance and services from DCF offices in or after 1995, yet DCF does not have a single voter preference form for any of these named plaintiffs. *See* Ex. 57, Def. Kearney's 2nd Supplemental Response to Pls' First Set of Interrogatories; Ex. 55, Def. Kearney's Response to Plts' 2nd Set of Requests for Documents.

35.      From about 1995 to the present, plaintiff Lorine Walden has received public assistance at the DCF office located at 7261 Sheridan Street, Hollywood, FL. *See* Ex. 6, L. Walden Decl. at ¶ 3. Although, on several occasions, she has applied or recertified for public assistance at the DCF office, at no time during her visits was she asked by an employee whether she wanted to register to vote or was she offered a voter registration preference form as required by the NVRA. *Id.*

36.      From 1999 to the present, plaintiff Julia Stoner has received public assistance and services from DCF offices in Jacksonville, FL. During her visits no one ever asked her

whether she wanted to apply for voter registration as required by the NVRA. *See* Ex.14, J. Stoner Dep. at 23-25.

37.　　From 1995-96, plaintiff Wallace McDonald received medical and cash assistance at a DCF office in Tampa. At no time during his visits was Mr. McDonald asked by an employee whether he wanted to register to vote as required by the NVRA. He was never offered a voter registration preference form asking whether he would like to register to vote or update a current voter registration. *See* Ex. 7, W. McDonald Decl. at ¶ 4.

38.　　On January 28, 2002, plaintiff Kandy Wells received Medicaid and cash assistance at a DCF office in Brandon, FL. Ms. Wells completed an initial application, but the DCF worker did not ask Ms. Wells whether she wanted to register to vote. Ms. Wells was not offered a voter registration preference form asking whether she would like to register to vote or update a current voter registration. *See* Ex. 33, K. Wells Dep. at 57-58.

39.　　DCF administrators are required under the NVRA to provide voter registration to any individual, including a parent or guardian of a child, who applies or recertifies for public assistance or makes a change of address. *See* Ex. 75, e-mails between Greg Ferguson and Donna Miller dated 10/29/01 & 10/30/01 Bates No. A040811. Despite this requirement, plaintiffs Wallace McDonald and Kandy Wells were not offered an opportunity to apply for voter registration when they received public assistance and services at DCF offices in Hillsborough County.

**DCF Admits Non-Compliance With NVRA**

40.　　The Department of Children and Family Services does not have an employee whose sole responsibility it is to implement NVRA. *See* Ex. 36, Bowman Dep. at 21. John Bowman, Acting Program Administrator of Special Programs is responsible for implementation but spends only one-eighth of his time to voter registration programs. *Id.* at 130, 141-42. Gregory Ferguson, Sr. Human Services Program Specialist and Liaison between District Voter Registration Coordinators and the Division of Elections, spends approximately one-eighth of his time on voter registration programs. *Id.*. at 141.

41.     DCF is divided into 13 districts and one region. *Id.* at 22. Each DCF District has its own NVRA implementation plan, *Id.* at 26-27, whereby it determines how the offices within that District will transmit voter registration to Supervisors of Elections. *Id.* at 54. Until approximately one month ago, DCF had no established procedure to determine whether DCF offices are complying with NVRA. *Id.* at 42. The only way of measuring compliance with NVRA is through complaints received by the Division of Elections and forwarded to DCF. *Id.* However, DCF clients would not know where to lodge such a complaint unless they receive a voter registration preference form from a DCF employee, which states that complaints may be forwarded to the Division of Elections. *Id.* at 43.

42.     DCF employees have admitted their failure to offer voter registration and voter registration preferences forms. In fact, they admit that "we all disagree with the voter registration process that we have to go through..." *See* Ex. 77, Bates No. A045943 Janice Miller e-mail.

43.     According to Carol Canady, Senior Human Service Program Specialist for the SunCoast Region of DCF offices, which includes Hillsborough County, as recent as January 2002, "not all [DCF] service centers are following the correct procedures for Voter Registration requirements." *See* Ex. 66, January 8, 2002 memo from Carol Canady Bates Nos. A040772-75. No corrective action was taken in response to this matter. *See* Ex. 36, Bowman Dep. at 136.

44.     In an e-mail from Robert Baker to Carol Canady dated January 8, 2002, stated that most staff at the office in Brandon, FL were not aware of the voter registration preference forms and use of these forms "appears to be something that has not been happening here at Brandon." *See* Ex. 72, Bates Nos. A040618-19.

45.     Bowman, who is responsible for NVRA implementation for Secretary Kearney, does not know if anything was done to resolve these reported NVRA implementation problems. *See* Ex. 36, Bowman Dep. at 127-128.

46.      An e-mail from Roseann Liriano to Carol Canady states that "very few staff" use the voter registration preference forms and "they have been over stocked for a very long time." *See* Ex. 78, Bates No. A040620.

47.      Like Hillsborough County, DCF employees from District 11, which includes Miami-Dade County, have admitted that voter registration preference forms are "not/rarely being used." (Ex. 89, Email from Nivaldo Cruz to Sandra Stubbs dated 8/22/01, Bates No. A039736.)

48.      DCF employees in Jackson County and another county provided voter registration opportunities only if DCF clients requested to register to vote. *See* Ex. 79, Bates No. A039027.

49.      DCF employees in Jackson County admit that they stopped providing voter registration opportunities to clients due to a "hard freeze on positions . . . because of . . . budget constraints." *See* Ex. 77, E-mail from Janice Miller to Jerry Sewell dated 8/29/01 Bates Nos. A045943-44. Even after these employees were advised that they were in violation of law, they continued to believe that they were not obligated to reinstate normal voter registration procedures in Jackson County if the could "justify" their "need to continue the exception[.]" *Id.*

50.      Indeed, in response to a request for documents, Defendant Kearney reported that she has "roughly 13, 000 voter preference forms," yet she provided public assistance and services to over 3 million clients during from July 2000 to February 2002. *See* Ex. 54, Defendant Kearney's Response to Plaintiffs' Request for Documents; Ex. 53, Defendant Kearney's Response to Plaintiffs' First Set of Interrogatories.

**SUPERVISORS OF ELECTIONS ADMIT NVRA PROBLEMS AT DCF**

51.      Supervisors of Elections have reported problems with regard to voter registration functions carried out by DCF. Miriam Oliphant, Supervisor of Elections for Broward County has reported incomplete applications and missing signatures. *See* Ex. 48 Defendants Oliphant's Response to Plaintiffs' First Set of Interrogatories, Response no. 13. Sandy Peloquin, an administrator for Volusia County Supervisor of Elections office,

reported that from the time leading up to the 2000 presidential election to the present, there were problems with DCF include missing signatures; use of outdated voter registration applications which cannot be accepted; incomplete applications and untimely delivery of applications. *See* Ex. 18-19, S. Peloquin Dep. at 109 -111.

52.     Defendant Pam Iorio, Hillsborough County Supervisor of Elections reports that DCF offices in her County have not adequately reviewed voter registration applications for completeness and there is a 30%-40% error rate because of incomplete or illegible items on the applications. *See* Ex. 44, Def. Pam Iorio's Response to Plts' First Set of Interrogatories.

53.     Defendant William Cowles, Orange County Supervisor of Elections reported that his office has had "no dialog [sic] with [DCF] since the NVRA was first implemented in 1995, [and] [w]e receive very few applications from DCF." *See* Ex. 51, Defendant Cowles Response to Pls. First Set of Interrogatories.  In addition, in September 2001, Defendant Cowles reported to the Department of State that "many application[s]" received from DCF offices in Orange County "were not dated" and many DCF "employees were unaware of the requirement to date stamp the application". *See* Ex. 80, Letter dated September 19, 2001 from Donna Miller to Greg Ferguson Bates No. A039025-26.  Finally, Defendant Cowles testified that some DCF offices in Orange County used "outdated [voter registration] applications." *See* Ex. 17, W. Cowles Dep. at 274- 275.

54.     Failure to consistently provide DCF clients an opportunity to apply for voter registration continues to be a problem.  For example, Robert Ketterer, Jakelin Green and Teresa James all received services from DCF offices in Broward and Palm Beach Counties during the month of May 2002, but none of them were offered an opportunity to register to vote. *See* Ex. 8, 10 & 11 Bates Nos. A042771- 73.  In fact, at least one DCF office in Palm Beach County did not have voter registration applications available at all. *See* Ex. 9, Figueroa Decl.

11

55.     Timely transmittal of voter registration forms from DCF to Supervisor of Election offices continues to be a problem.  Defendant Kearney admits that several voter registration applications that were submitted in late 2001 at a DCF in St. Lucie County were not delivered to the Supervisor of Elections until March 2002.  *See* Ex 54, Defendant Kearney's Response to Pls' Document Request No. 9; Ex. 56 Defendant Kearney's Response to Pls' Second Set of Interrogatories, No. 344; Ex. 71, 90 Bates nos. A041041-42;  There is also some uncertainty in District 7, which includes Orange County, as to whether the voter registration applications must be transmitted in 5 "working" or "calendar" days in order to be in compliance with state law.  Ex. 74 Bates No. A045949 - Email from Janet DeChristopher to John Bowman dated 4/29/02.

### Election Day Administration
### History of Racial Discrimination in Florida

56. There is a history of official race discrimination in Florida.  Ex. 64, Select Historic Racial Discrimination Data in Florida.

### Socioeconomic Data

57. According to 2000 Census data, in Florida 29.7% of African Americans age 25 or over have not graduated from high school or achieved the equivalent.  The comparable percentage of non-African Americans was over 15 percentage points less, 14.5%.

58. According to 2000 Census data, in Florida only 9.8% of African Americans age 25 or over had received a college degree or a graduate or professional degree.  The comparable percentage of non-African Americans was almost twice as high, 17.5%

59. According to 2000 Census data, in Florida African Americans had the lowest average per capita income for 1999 of all census groups, $12,508, except those identified as "other".

60. According to 2000 Census data, in Florida the per capita income of whites was $23,355, for American Indians, Eskimos, and Aleuts, $16,267, for Asian and Pacific Islanders, $20,998, and for Hispanics, $14,776.

61. According to 2000 Census data, in Florida the percentage of African American households in which the household income in 1999 was below the poverty level was 26.9%, more than double that for non-African American households, 11.1%.

62. According to 2000 Census data, in Florida the percentage of African Americans age 18 or older determined to be living below the poverty level was 14.3%. This was more than 4 times higher than the percentage for non-African Americans, which was 3.5%.

63. In Miami-Dade County and Volusia County, black voters populated the list of inactive voters in 2000 at a higher percentage than their population in those counties. Ex. 61, Expert Report of Henry Flores ("Flores Report"), April 26, 2002, at 2; Ex. 62, Supplemental Expert Report of Henry Flores ("Flores Supp. Report"), June 27, 2002, at 1.[2]

64. Inactive voter lists were not maintained at precincts in Orange County on November 7, 2000. Ex. 51, Defendant Cowles' Response to Plaintiffs' First Set of Interrogatories, at response no. 11.

65. In Hillsborough County, a larger percentage of black voters completed affirmation forms on November 7, 2000 than their population in the county. Ex. 61, Flores Report, at 3.

66. In Hillsborough County and Miami-Dade County, a higher percentage of black voters was purged from the voter roll in 2000 for alleged felony convictions than their population in those counties. *Id.*; Ex. 62, Flores Supp. Report, at 2.

67. In Broward, Hillsborough, Volusia and Pinellas Counties, fewer poll workers were assigned to predominantly black precincts compared to other precincts in those counties. Ex. 61, Flores Report, at 3-4; Ex. 62, Flores Supp. Report, at 2.

68. In Orange County, the average number of poll workers per precinct was 10. Ex. 63, Hayduk Report, at 29-30.

---

[2] Plaintiffs recognize that Dr. Ron Weber has been appointed by Defendants Harris and Roberts as an expert to rebut the findings of Plaintiffs' expert, Dr. Henry Flores. Pursuant to agreement of the parties, Dr. Weber's report has not yet been submitted.

69. The average number of poll workers in black plurality[3] precincts in Orange County was 7. *Id.* This inequitable distribution of poll workers has existed in Orange County at least as far back as 1998. *Id.* The number of black plurality precincts grew from 18 in 1998 to 22 in 2000. *Id.* at 30.

70. At his deposition, Defendant Cowles indicated that the minimum number of poll workers assigned to a precinct was probably 7. Ex. 17, Deposition of William Cowles at 231, line 25 and 232, lines 1-3. Some black plurality precincts were assigned fewer than 7 poll workers for the November 2000 elections. *Id.*

71. In Orange County, in 1998, 105, or 87.5%, of the 120 precincts that received laptops were white majority precinct listings. Ex. 63, Hayduk Report, at 16.

72. Only 14 out of the 120 precincts that received laptops in Orange County in 1998, or 11.7 % , were majority black precincts. *Id.*

73. In Hillsborough County, 10 precincts received laptop computers for the 2000 general election. *Id.*, at 19. None of the precincts that received laptop computers for the 2000 general election had a majority black registered voter population or total population. *Id.*

74. According to Defendant Iorio, she distributed laptop computers in the manner that she did in order to assign laptop computers to precincts that were large in population and where there had been heavy affirmation usage in previous elections. Ex. 30, Deposition of Pam Iorio, at 192, lines 22-24 and 193, lines 7-8.

75. Of the 10 precincts that received laptop computers in Hillsborough County, nearly half of them had fewer voters in the precinct than many other larger precincts. Ex. 63, Hayduk Report, at 19. Precinct 341 had 2,280 voters, precinct 559 had 2,642 voters, 562 had 2,242 and 563 had 1,196. *Id.* Precinct 139 had 3,885 voters, precinct 457 had 3,733, 761 had 3,734, and 817 had 3,709 voters—yet none of these precinct were provided laptops." *Id.* at 19.

76. Many majority black precincts in Hillsborough County had a larger number of voters than the precincts to which Defendant Iorio assigned laptops. *Id.* at 20. Fourteen of the

---

[3] For purposes of the discussion in this section, the term "plurality" means the most numerically of all considered groups.

26 majority black precincts had a greater number of voters than precinct 563, which received a laptop. *Id.* at 20.

77. There were problems with busy phone lines to central elections offices on November 7, 2000 in Volusia, Hillsborough, Miami-Dade, Duval, and Orange Counties. *See*, Ex. 83, Clerk Feedback Forms, 2000, Hillsborough County; Ex. 84, 2000 General Questionnaires, Volusia County; Ex. 37, Israel Dep., at 12; Ex. 38 to Ex. 47, Defendants' Responses to Plaintiffs' First Set of Interrogatories, response no. 1.

### Plaintiff Data on Election Administration

78. Admatha Israel has been a properly registered voter in Miami-Dade County since 1996. Ex. 37, Deposition Transcript of Admatha Israel, at 7.

79. In the fall of 2000, Admatha Israel moved from one address to another within Miami-Dade County. *Id.* at 10.

80. Admatha Israel changed his address at the United States Postal Service in the fall of 2000. *Id.*

81. Admatha Israel did not receive an updated voter registration card from Defendant Leahy, based on his new street address. *Id.* at 13.

82. On November 7, 2000, Admatha Israel attempted to vote, but was not permitted to do so because his name was not listed on the precinct register and the telephone lines to the central elections office to confirm eligibility were busy. *Id.* at 12-13.

83. Admatha Israel was designated as "inactive" in the November 7, 2000 election. Id.

84. Kandy Wells properly and timely completed a voter registration application prior to October 10, 2000, the last day in which Florida citizens could register to vote for the November 7, 2000 election. Ex. 33, Deposition Transcript of Kandy Wells ("Wells Depo."), at 15-16.

85. Kandy Wells did not receive her voter registration form – or any other form of notice of confirmation of her voter registration application – from Defendant Iorio prior to November 7, 2000. *Id.* at 26-27.

86. In December 1999, Rondrick Rose moved from one address to another within Hillsborough County. Ex. 35, Deposition Transcript of Rondrick Rose, ("Rose Depo."), at. 9.

87. Rondrick Rose updated his address with the United States Postal Service and the Department of Highway Safety and Motor Vehicles prior to November 7, 2000. *Id.* at 47-48.

88. Rondrick Rose was designated as "inactive" for the 2000 general election. *Id.* at 38-39.

89. Rondrick Rose went to his polling place based on his new street address on November 7, 2000 and attempted to vote. *Id.* at 26.

90. Rondrick Rose did not vote on November 7, 2000 because his eligibility could not be confirmed due to busy telephone lines to the central election office. *Id.* at 34-35

91. On November 7, 2000, Rondrick Rose was a properly registered voter in Hillsborough County. *Id.* at 16.

92. On November 7, 2000, Janice Kelly was a properly registered voter in Duval County. Ex. 25, Deposition Transcript of Janice Kelly, at 7, lines 17-20.

93. In 1996, Janice Kelly moved from one address to another within Duval County. *Id.* at 8, lines 4-7.

94. Janice Kelly obtained a new driver's license indicating her new address in 1996. *Id.* at 8, lines 15-21.

95. In 1998, Janice Kelly voted at her old polling site, based on her previous home address. *Id.* at 9, lines 18-25, and 10, lines 1-2.

96. On November 7, 2000 Janice Kelly unsuccessfully attempted to vote at several different precincts in Duval County. *Id.* at 11, line 13, and 16, line 24.

97. Ursula Y. Harvey is a matriculating African-American student at Bethune-Cookman College (BCC) in Daytona Beach, Florida. *See* Ex. 3, Affidavit of Ursula Harvey ¶ 1.

98. When she attends classes during the school year, Harvey resides in Volusia County, Florida. *Id.* ¶ 6.

99. At the time of the November 2000 elections, Harvey was a resident of Volusia County. *See id.*

100.     In or about February 1998, Harvey registered to vote in Martin County. *Id.* ¶ 2.

101.    In or about September 1998, after entering BCC and moving to Daytona Beach, Harvey registered to vote in Volusia County. *Id.* ¶ 4.

102.    Soon thereafter, Harvey received a voter registration card from the Supervisor's of Elections Office of Volusia County. *Id.* ¶ 5.

103.    Since September 1998, Harvey has not registered to vote in any other county or jurisdiction. *Id.* ¶ 8.

104.    Harvey has never received any notice from the Volusia County Supervisor of Election's office seeking confirmation of her address or registration status. *Id.* ¶ 9.

105.    On November 7, 2000, at approximately 7:00 a.m., Harvey went to a polling site located at 640 Dr. Mary McLeod Bethune Boulevard in Volusia County. *Id.* ¶¶ 7 and 11.

106.    Harvey presented her voter registration card and driver's license to a poll worker. *Id.* ¶ 12.

107.    The poll worker told Harvey that Harvey's name was not on the voter registration rolls. *Id.*

108.    A supervisor at the polling site later misinformed Harvey that, in order to vote, she would have to go to Martin County. *Id.* ¶ 14.

109.    Harvey explained to the supervisor and the other poll worker that she had registered in Martin County *prior to* moving to and registering in Volusia County. *Id.* ¶ 14.

110.    Neither the supervisor nor the other poll worker asked Harvey to affirm or confirm her current address, suggested an alternative or provisional means of casting a ballot, or otherwise attempted to assist her in voting in Volusia or Martin Counties. *Id.* ¶ 15.

111.    Ursula Harvey was not permitted to vote in Volusia County in the November 2000 elections. *Id.* ¶ 16.

112.    At the time of the November 7, 2000 elections, Harvey was a validly registered voter who should have been permitted to vote.

Dated: July 1, 2002

Respectfully submitted,

Thomasina H. Williams
Williams & Associates, P.A.
Brickell Bay View Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL  33130
(305) 379-6676
(305)-379-4541 (F)
FL Bar No. 629227
wmslaw@winstarmail.com

Elliott Minceberg*
Larry Ottinger*
Alma Henderson*
People for the American Way Foundation
2000 M Street, N.W.  Suite 400
Washignton, D.C 20036
(202) 467-2392
(202) 293-2672 (F)
lottinger@pfaw.org

Dennis C. Hayes*
Angela Ciccolo*
Dirk Lawson*
NAACP
4805 Mt. Hope Drive, Fifth Floor
Baltimore, Maryland 21215-3297
(410) 580-5792
(410) 358-9350 (F)
aciccolo@naacpnet.org

Janai S. Nelson*
Theodore M. Shaw*
Norman J. Chachkin*
NAACP Legal Defense & Educational
    Fund, Inc.
99 Hudson Street, Suite 1600
New York, NY  10013
(212) 965-2200
(212) 216-7592 (F)
jnelson@naacpldf.org

Todd A. Cox*
NAACP Legal Defense & Educational
    Fund, Inc.
1444 Eye Street, N.W., 10th Flr.
Washington, DC  20005
 (202) 682-1300
(202) 682-1312 (F)
tcox@naacpldf.org

Barbara Arnwine
Thomas J. Henderson*
Anita Hodgkiss*
Lori Outzs Borgen*
Cara Fineman*
Lawyers' Committee for Civil
    Rights Under Law
1401 New York Ave., Ste.  400
Washington, D.C. 20005-2124
(202) 662-8600/(888) 299-5227
(202) 783-5130 (F)
Lborgen@lawyerscomm.org

Penda Hair*
Judith Browne
Monique Dixon*
The Advancement Project
1740 M Street, N.W., Ste. 401
Washington, D.C. 20036
(202) 728-9557
(202) 728-9558 (F)
jbrowneesq@aol.com

Laughlin McDonald
ACLU Voting Rights Project
2725 Peachtree Tower
233 Peachtree Street, N.E.
Atlanta, GA 30303

(404) 523-2721
(404) 653-0331
mcdonald@aclu.org

## CERTIFICATE OF SERVICE

I HEREBY certify that a true and correct copy of the foregoing was served by U.S. Mail on

the following counsel on this ___ day of July, 2002:

John W. Little, III, Esq.
Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
Attorneys for Secretary of State and
Director, Division of Elections
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Miami-Dade County
111 N.W. First Street, Suite 2810
Miami, FL 33128-1930

Mitchell Bloomberg, Esq.
Adorno & Zeder
Attorneys for ChoicePoint, Inc.
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133-5413

Tracey I. Arpen, Esq.
Office of General Counsel, Duval County
117 West Duval Street, Suite 480
Jacksonville, FL 32202-3700

H. Ray Allen, Esq.
Senior Assistant County Attorney
Hillsborough County, Florida
P.O. Box 1110
Tampa, FL 33601

George L. Waas, Esq.
Douglas B. MacInnes, Esq.
Office of the Attorney General
Department of Legal Affairs
PL-01 The Capital
Tallahassee, FL 32399-1050

Michael Cirullo, Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
Attorneys for Orange County Supervisor
3099 East Commercial Boulevard
Fort Lauderdale, FL 33308

Daniel D. Eckert, Esq.
County Attorney
Frank Gummey, Esq.
Assistant County Attorney
County of Volusia
123 West Indiana Avenue
DeLand, FL 32720-4613

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
Attorneys for ChoicePoint, Inc.
725 Twelfth Street, NW
Washington, D.C.  20005-5901

David V. Kornreich, Esq.
  Casey, Crosland & Bramnich
First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131

THOMASINA H. WILLIAMS