UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 01-120-CIV-GOLD/SIMONTON

**NIGHT BOX**
**FILED**

JUN - 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

─────────────────────────────────x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

Defendants.

─────────────────────────────────x

EXHIBITS TO DECLARATION OF ANGELA CICCOLO. ESQ.
IN SUPPORT OF PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGEMENT

# VOLUME I

# EXHIBITS 1-16

**PLAINTIFFS' EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-120-CIV-GOLD/SIMONTON

-----------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. et al.

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

-----------------------------------------------------------------------------x

### DECLARATION OF NONI JONES

I, NONI JONES, hereby declare the following:

1.     My name is Noni Jones.

2.     I am a paralegal in the Voting Rights Project at the Lawyers' Committee for Civil Rights Under Law, located at 1401 New York Avenue, NW, Suite 400, Washington, D.C.

3.     From March 20, 2002 to March 26, 2002, I personally attempted to contact the office of the Supervisor of Elections for all 67 counties in Florida, except for Leon, Duval, Hillsborough, Orange, Volusia, Broward, & Miami-Dade Counties (the Defendant counties in the above-captioned matter). I was not able to reach anyone in the following seven counties: Hamilton County; Liberty County; Manatee County; Nassau County; Palm Beach County; Polk County; and St. John County.

4.     I asked questions about the inactive voter list and how it was maintained at the

precincts during elections. I asked if the inactive voter list was a separate list or if it was incorporated into the precinct register or voter roll. I also inquired as to whether a summary of the affirmations/affidavits collected were available.

5.      Of the 53 counties where I spoke to an individual in the Supervisor of Elections office, employees in six of the counties indicated that the inactive voters were not included on the precinct registers during the elections. These counties included: Alachua County; Baker County, DeSoto County; Hernando County; Martin County; and Union County.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June 27, 2002

NONI JONES

2

**PLAINTIFFS' EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-120-CIV-GOLD/SIMONTON

--------------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. et al.

        Plaintiffs,

   vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

--------------------------------------------------------------------------------x

## DECLARATION OF DR. HENRY FLORES

I, HENRY FLORES, hereby declare the following:

1.     My name is Henry Flores.

2.     I have been retained by Plaintiffs in the above-captioned litigation to render an

expert opinion regarding the disparate impact of certain election practices on black voters in

Florida.

3.     I prepared an initial expert report on April 26, 2002.

4.     I prepared a supplemental expert report on June 27, 2002 relying on additional

data that I received since the submission of my initial expert report.

5.     My findings and conclusions are contained in the attached report which bears my

signature.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that  the foregoing is

true and correct.

Executed on: June 27, 2002

_____
DR. HENRY FLORES

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 01-0120-CIV-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE, INC. et al,

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida, et al

Defendants.

**Supplementary Expert Report
of
Dr. Henry Flores**

**Introduction**

1. This report supplements the Expert Report I submitted on behalf of
Plaintiffs in the above-captioned case on April 26, 2002.

2. This supplementary report is based upon additional data I received
after I completed my initial report. I may conduct further analyses
pursuant to the receipt of information previously requested from Defendants through
Plaintiffs' Attorneys.

**Conclusions**

3. After receiving additional data from Volusia County on the number of
inactive voters by race on the election precinct level, the data were submitted to
regression analysis utilizing SPSS, v. 10 (Statistical Package for Social Sciences).
The dependent variable in this equation was the percentage of African American
Inactive Voters in each precinct as of 2000, while the independent variable was the
percentage of African American Registered Voters in each precinct according to the
2000 U.S. Census reports. The dependent variable was regressed on the independent
variable which resulted in the following outcomes:

$B = .885$   Std.Err. $= .017$   Std Beta $= .972$   $t = 51.091$   Sig. $= .000$

These findings indicate that there is a statistically significant and positive relationship between the percentage of African American Inactive Voters and the percentage of African American Registered Voters in Volusia County election precincts. Thus, the higher the percentage of African American Registered Voters in a precinct in the November 7, 2000 election, the higher the percentage of African American Inactive Voters.

After receiving additional data from Volusia County on affirmation/affidavits by election precinct and race for the November 7, 2000 election, the data were submitted to regression analysis utilizing SPSS, v.10. The percentage of affirmations per election precinct was the dependent variable and it was regressed on the percentage of African American Registered Voters per election precinct. The regression analysis yielded the following findings:

**B=1.616E-03  Std.Err.=.001  Std Beta=-.094  t=1.156  Sig.=.25**

As the statistics indicate, there appears to be no statistically significant relationship between the percentage of affirmations submitted on a precinct level basis and the percentage of African American Registered Voters in those precincts.

     5. Additional information was received from Miami-Dade County on the number of individuals purged from the rolls of registered voters. As of the year 2000, the percentage of African Americans, as a function of all purged voters, who were purged because they had been identified as felons was determined to be 55.9%. That is, 55.9% of all purged voters because they were identified as felons were African Americans. It is clear that the high percentage of African Americans purged because they were identified as felons was much higher than the proportion of African Americans residing in Miami Dade County (20.3%).

     6. I received additional information on the number of poll workers assigned to each election precinct on November 7, 2000 in Volusia County. These data were submitted to regression analysis as the dependent variable and regressed on the percentage of African American Registered Voters in each precinct as of the November 7, 2000 election. Below are the results of the regression analysis:

**Beta=-1.251E-03  StdErr=.000  StdBeta=-.228  t=-2.878  Sig.=.005**

2

As the statistics indicate, there is a statistically significant and negative relationship between the percentage of poll workers assigned to an election precinct and the percentage of African American Registered Voters in those precincts. Thus the higher the percentage of African American Registered Voters the lower the number of poll workers assigned to those polls.

7. The research that I have conducted with the additional information provided to me. The research I have conducted with the information provided to me substantiates the conclusions I reached in my initial report.

8. My conclusions are based upon the following analyses:

a. To derive the statistically significant relationship between the percentage of African American Registered Voters and the percentage of inactive voters in each voting precinct in Volusia County, I constructed a database derived from FREDS 2000 which is the demographic database the State of Florida utilized in their redistricting process and the list of inactive voters provided by Volusia County. A precinct-by-precinct percentage of African American Registered Voters based on 2000 U.S. Census data was extracted from the FREDS 2000 database and this was entered in a bivariate regression equation as the independent variable and the percentage of inactive voters per precinct was entered as the dependent variable. These data were then submitted to analysis by SPSS, v. 10 which is the traditional statistical software package utilized in most social science research and is also the software federal courts have recognized for use in voting rights cases. The relationship between the two variables was found to be statistically significant at the **.000** level and the relationship was positive. (The regression technique is explicated at Appendix A of the initial report.) In other words, in those voting precincts of Volusia County where there was a high percentage of African American Registered Voters one also found a high percentage of inactive voters. There are **no chances out of 1000** where this pattern could possibly be explained as occurring due to pure chance. Therefore, high percentages of inactive voters residing in precincts with high percentages of African American Registered Voters is the norm in Volusia County.

b. To derive the statistically significant relationship between the percentage of African American Registered Voters and the percentage of affirmation/

3

affidavits in each voting precinct in Volusia County, I constructed a database derived from FREDS 2000 and the list of affirmations/affidavits for the General Election of 2000 provided by Volusia County. A precinct-by-precinct percentage of African American Registered Voters was extracted from the FREDS 2000 database and this was entered in a bivariate regression equation as the independent variable and the percentage of affirmations/affidavits per precinct was entered as the dependent variable. These data were then submitted to analysis by SPSS, v. 10. The relationship between the two variables was found not to be statistically significant at the .25 level and was positive. In other words, in those voting precincts of Volusia County where there was a high percentage of African American Registered Voters one also finds a high percentage of affirmations/affidavits submitted during the General Election of 2000. However, this pattern could be produced by chance 25% of the times.

c. To reach the conclusion that the percentage of individuals identified as African Americans felons purged from the voter registration lists in Miami-Dade County in 2000 was higher than the percentage of African Americans residing in the county in the same year was based upon a comparison of percentages of those purged voters supplied by the county compared to the percentage of African Americans residing in Miami-Dade county as reported by the United States Bureau of the Census. The resulting comparison found that in 2000 in Miami-Dade County, 55.9% of voters purged because they were identified as felons were African Americans. The percentage of African Americans residing in Miami-Dade County as of the 2000 census was reported at 20.3%. One can easily discern that the percentage of purged African American felons was more than twice the percentage of African Americans residing in Miami-Dade County.

d. In reaching the conclusion that in Volusia County a statistically significant and negative relationship was found between the percentage of African American Registered Voters and the percentage of poll workers assigned to the precincts having higher percentages of African American Registered Voters, I utilized the percentage of individuals assigned as poll workers in each precinct as the dependent variable and the percentage of African American Registered Voters in each

precinct as the independent variable. The data for the African American Registered Voters was derived from the FREDS 2000 database. These data were then subjected to a bivariate regression analysis using SPSS, v. 10. The relationship between the two variables for Volusia County was statistically significant at the .005 level. Additionally, the relationship between the two variables was negative. This led me to conclude that in precincts having higher percentages of African American Registered Voters one found lower percentages of poll workers.

9. In the course of preparing this supplementary report the following works were consulted:

➢ Colburn, David R. and Lance deHaven-Smith. 1999. Government in the Sunshine State. Gainesville, FL: The University Press of Florida.

➢ Gannon, Michael, ed. 1996. The New History of Florida. Gainesville, FL: The University Press of Florida.

➢ Kousser, J. Morgan. 1999. Colorblind Justice : Minority Voting Rights and The Undoing of the Second Reconstruction. Chapel Hill, NC: University of North Carolina Press.

10. I expect to further supplement my conclusions at trial concerning inactive voters as additional data becomes available from defendant counties and the State of Florida.

Respectfully submitted by:

Henry Flores, Ph.D.
Consultant
June 27, 2002

5

# PLAINTIFFS' EXHIBIT 3

IN THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 01-0120-C.V.-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., *et al.*,

                    Plaintiffs,

    vs.

KATHERINE HARRIS, Secretary of State of
Florida, *et al.*,

                    Defendants.

## AFFIDAVIT OF URSULA Y. HARVEY

URSULA Y. HARVEY, being duly sworn, deposes and says:

1.      My name is Ursula Y. Harvey and I am an African-American student at Bethune-Cookman College (BCC) in Daytona Beach, Florida.

2.      In or about February 1998, before I enrolled at BCC, I registered to vote in Martin County where I lived with my mother.

3.      Soon thereafter, I received a voter registration card in the mail from Martin County. (A true and correct copy of the Martin County registration card is attached hereto as Exhibit B-1.)

4.      In or about September 1998, after entering BCC and moving to Daytona Beach, I registered to vote in Volusia County.

5.      Soon thereafter, I received my voter registration card in the mail from Volusia County. (A true and correct copy of the Volusia County registration card is attached hereto as Exhibit B-2.).

6.      During the school year, I reside in Volusia County, Florida. My current school address is 640 Dr. Mary McLeod Bethune Boulevard, Daytona Beach, Florida.

7.      On November 3, 1998, I presented the voter registration card to a poll worker at Precinct 620, located at the Richard V. Moore Community Center, 554 Dr. Mary McLeod Bethune Boulevard in Daytona Beach, and was permitted to vote.

8.      Since voting in the November 1998 election, I have not registered to vote in any other county, nor have I ever requested that my voter registration in Volusia County be canceled.

9.      I have never received any notice from the Volusia County Supervisor of Election's office seeking confirmation of my address or registration status.

10.     I also have never received any written notice that my Volusia County voter registration was cancelled or invalid.

11.     On November 7, 2000, at approximately 7:00 a.m., I went to the same polling place as I had in 1998 in order to vote in the 2000 general election.

12.     I presented my voter registration card and driver's license to an African-American, female poll worker. She looked up my name in the voter registration rolls and told me that my name was not on the list. She then called over a white, middle-aged, female poll worker,

2

who appeared to be the supervisor of the precinct, and explained to her that I had presented my voter registration card and driver's license, but that my name did not appear on the list.

13.     The supervisor then made a telephone call and described the situation to someone over the telephone. While the supervisor was on the telephone, she told me that I could not vote because I was listed as being registered in Martin County. She further stated that, in order to vote, I would have to go to Martin County.

14.     I explained to the supervisor and the other poll worker that I had registered in Martin County prior to moving to and registering in Volusia County. I also explained that I had voted in the November 1998 general election in Volusia County.

15.     Neither the supervisor nor the other poll worker asked me to affirm or confirm my current address, suggested an alternative or provisional means of casting a ballot, or otherwise attempted to assist me in voting in Volusia or Martin Counties.

3

16.     As a result of the acts and omissions described above, I was not permitted to cast my vote in the November 2000 general election.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 25, 2001.

URSULA HARVEY

Sworn to and subscribed before me this
25 day of ___May___, 2001.

_____
Notary Public Signature

_____
Notary Public Name (Typed, printed
or stamped)

My commission expires: 11/22/01

4

**PLAINTIFFS' EXHIBIT 4**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 01-120-CIV-GOLD/SIMONTON

-------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. et al.

        Plaintiffs,

   vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

-------------------------------------------------------------------------x

### **AFFIDAVIT OF DR. RONALD HAYDUK**

RONALD HAYDUK, being duly sworn, deposes and says:

1.     My name is Ronald Hayduk.

2.     I have been retained by Plaintiffs in the above-captioned litigation to render an expert opinion regarding election administration in Florida during and leading up to the November 2000 general election and in particular to prepare a rebuttal report.

3.     Specifically, I was asked to prepare a report to rebut the conclusions and findings as set forth in summaries, reports, and testimony of Defendants Pam Iorio and John Stafford and Defendants' expert, Dr. Susan MacManus.

4.     My findings and conclusions are contained in the attached report which bears my signature.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 27, 2002.

DR. RONALD HAYDUK

Sworn to and subscribed before me this
27 day of June , 2002.

Notary Public Signature

Evelyn Anderson

Notary Public Name (Typed, printed
or stamped)

My commission expires: _____

EVELYN ANDERSON
Notary Public, State of New York
No. 01AN5052182
Qualified in New York County
Commission Expires November 20, 2005

2

**PLAINTIFFS' EXHIBIT 5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.01-CIV-120-Gold/Simonton

----------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

Defendants.

----------------------------------------------------------------------------x

## DECLARATION OF JOANNA CLARK

I, Joanna Clark, hereby declare the following:

1.  I am a named plaintiff in this case. I give this declaration based upon personal

knowledge. I do not waive the confidentiality of any information for any purpose beyond the

above-entitled action.

2.  I am a citizen of the United States and a legal resident of the State of Florida and

Broward County. I am at least 18 years of age and African American.

3.  I have been a registered voter in Broward County since 1995 when I completed a

voter registration application at the Department of Children and Families (DCF) on Sample Road

in Pompano Beach, FL. During this visit to DCF, I saw a voter registration application in the

DCF office and took it upon myself to complete the form. I was not asked by my case worker or

any other DCF employee whether I wanted to register to vote, nor was I provided a voter

registration preference form.

A045917

4. When I originally registered to vote, I lived in Pompano Beach and voted in 1996 at the Pompano Beach Middle School, my local polling place. In late 1999, I moved from Pompano Beach to North Lauderdale which is also in Broward County. After I moved, I changed my address at a DCF office.

5. In or about April 2000, I went to the Department of Children and Family Services to re-certify for public assistance. While I was there, I saw voter registration applications by the receptionist desk. I decided to change my address on my current voter registration, so I completed one of the applications and placed it in a box with other completed voter registration applications.

6. After I placed the completed voter registration application in the box, I met with a DCF employee who helped me re-certify for public assistance. I was not asked by this employee or any other DCF employee, whether I wanted to register to vote. I was not offered a voter registration preference form indicating whether I wanted to register to vote or update a current voter registration.

7. Although I completed the voter registration form and placed it in the box at DCF, by November 2000, I had not received a new voter registration card.

8. On November 7, 2000, I went to my old polling place, Pompano Beach Middle School, to vote or find out where I should vote. The poll worker, a white woman, checked for my name and could not locate it. She asked for my current address and I explained that I moved from Pompano Beach to North Lauderdale several months before. She told me that I had to go some place in North Lauderdale to vote, but she did not tell me where to go.

9. I looked down on the voter registration roll and saw my name and old address listed.

2

The poll worker told me that she could not allow me to vote because I moved and that would be considered a felony and she could have me arrested. The poll worker did not tell me that I could sign an affirmation, nor did she try to contact the Broward County Supervisor of Elections' Office for instructions on what she should do for me. I was not allowed to vote.

10. On November 7, 2000, I was denied the right to vote because of the grossly inadequate administration of elections in Broward County. The Department of Children and Families failed to deliver my voter registration application to the Broward County Supervisors of Elections office and/or the elections office failed to process my voter registration application. Additionally, poorly trained poll workers did not provide appropriate assistance when I attempted to vote on Election Day 2000.

11. Although I have received public assistance from DCF for a number of years now, at no time during any of my visits to DCF to apply, recertify or change my address, from 1995-2001, was I asked whether I wanted to register to vote. Although I completed forms for public assistance during those visits, I was not offered a voter registration preference form asking whether I would like to register to vote or update a current voter registration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June 8 , 2002

JOANNA CLARK

3

A045919

**PLAINTIFFS' EXHIBIT 6**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.01-CIV-120-Gold/Simonton

---------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

Defendants.

---------------------------------------------------------------------------x

## DECLARATION OF LORINE WALDEN

I, Lorine Walden,  hereby declare the following:

1. I am a named plaintiff in this case.  I give this declaration based upon personal knowledge.  I do not waive confidentiality of any information for any purpose beyond the above-entitled action.

2.  I am a citizen of the United States and a legal resident of the State of Florida and Broward County.  I am at least 18 years of age and African American.

3. From about 1995 to the present, I have received public assistance from the Department of Children and Families (DCF).  Specifically, I have applied and recertified for medical assistance and food stamps at the DCF office at 7261 Sheridan Street, Hollywood, FL which is in Broward County.

4.  Although, on several occasions, I have applied or recertified for public assistance at the DCF office on Sheridan Street, at no time during any of my visits to DCF was I asked by an

A045924

employee whether I wanted to register to vote. Although I completed forms for public assistance during those visits, I was not offered a voter preference form asking whether I would like to register to vote or update a current voter registration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _O6 - 10_ , 2002         _Lorine Walden_
                                        LORINE WALDEN

A045925

**PLAINTIFFS' EXHIBIT 7**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.01-CIV-120-Gold/Simonton

---------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

Defendants.

---------------------------------------------------------------------------x

## DECLARATION OF WALLACE McDONALD

I, Wallace McDonald, hereby declare the following:

1. I am a named plaintiff in this case. I give this declaration based upon personal knowledge. I do not waive confidentiality of any information for any purpose beyond the above-entitled action.

2. I am a citizen of the United States and a legal resident of the State of Florida and Hillsborough County. I am at least 18 years of age and African American.

3. From about 1990-1996, I had guardianship of four of my grandchildren. During this period, I received medical and cash assistance for my grandchildren from the Department of Children and Families (DCF) in Tampa, Florida.

4. Although, on several occasions from 1995-1996, I received public assistance from DCF, at no time during any of my visits to DCF to apply or recertify for assistance was I asked by an employee whether I wanted to register to vote. Although I completed forms for public

A045922

assistance during those visits, I was not offered a voter registration preference form asking

whether I would like to register to vote or update a current voter registration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _6/8/02_____, 2002          _Wallace McDonald_

WALLACE MCDONALD

A045923

**PLAINTIFFS' EXHIBIT 8**

# DECLARATION OF Ronald Ketterer

1.     I am a resident of Broward County of the State of Florida.

2.     My current address is 2025 Fillmore Street, Rear Hollywood, FL 33020.

3.     My race/ethnicity is white.

4.     My daytime and evening telephone numbers are: (day) 954-923-1791 and (night) _____

5.     On May 29, 2002, I visited a Department of Children and Families Services office located at 7261 Sheridan St, Hollywood. The purpose of my visit was to apply for food stamps.

6.     During my visit, 2 (number) employee(s) at the Department of Children and Families Services assisted me, however, I was not offered the opportunity to apply for voter registration.

7.     I was not offered a voter registration preference form to complete and sign.

8.     In support of this declaration, I state further that:

_____

_____

_____

_____

954-923 1191

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct.

Printed Name: Ron Ketterer

Signature: Ron Ketterer       Date: 5-29, 02

A042771

**PLAINTIFFS' EXHIBIT 9**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 01-120-CIV-GOLD/SIMONTON

-------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE CONFERENCE
OF BRANCHES, et al.,

                    Plaintiffs,

      vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

                    Defendants.


-------------------------------------------------------------------------x

### DECLARATION OF LUIS FIGUEROA

LUIS FIGUEROA declares:

       1.      I am a law intern at the Advancement Project located at 1730 M Street,

N.W. Suite 401 Washington, D.C. 20036.  I give this declaration based on my personal

knowledge.

       2.      On May 29, 2002- May 31, 2002, I visited several Department of Children

and Families (DCF) offices in Broward, Miami-Dade, and Palm Beach Counties

In each office, I visually inspected public areas for voter registration forms and signs

about voter registration.

       3.      On May 29th, 2002, I visited three DCF offices in Broward County,

Florida.  The first office was located at 1400 Commercial Avenue in Fort Lauderdale.  I

entered an office providing Medicaid services and there were no signs or indications that

voter registration cards could be obtained from the receptionist.  The voter registration

cards were not available in the general seating area.  I approached the reception area and

1

asked for a voter registration card. The receptionist produced a voter registration card from the back of her work area.

A few minutes later, I entered room 115, the office for Aging and Protective Services, also located at 1400 Commercial Avenue. I again requested a voter registration card from the receptionist, but she claimed that her office did not provide voter registration cards. The receptionist then asked a co-worker if DCF had voter registration cards and told me that voter registration cards were not available at this office.

4.      The second office visited was located at 311 N. State Road 7 in Plantation, Florida in Broward County. There were no signs that voter registration cards could be provided upon request. I entered the general lobby area and asked the receptionist for a voter registration card. The receptionist went to an office behind her workstation and produced a voter registration card, which she gave me. I noticed, however, that brochures for "legal aid" were easily accessible and visible near the receptionist's work area.

5.      Finally, I visited the DCF office at 7261 Sheridan St. Hollywood, Florida. A sign in the reception area stated that voter registration cards were available, however the slot designated for voter registration was empty. I asked the receptionist for a voter registration card and I was directed to a table in the front of the lobby. I informed the receptionist that no voter registration cards were available at the table, and she provided me a form that she acquired from another employee behind her work area.

6.      On May 30, 2002, I visited four DCF offices in Miami-Dade County, Florida. The first office was located at 18301 N. Miami Ave. There were no signs indicating that voter registration could be obtained upon request. I requested a voter

2

A045913

registration form from the receptionist. The receptionist pulled the registration card from her workstation and handed it to me.

7.      The second office visited was located at 200 Opa-Locka Boulevard. I noticed voter registration cards on the bottom shelf of a bookshelf that contained numerous forms. There were no signs directing clients to the voter registration cards.

8.      The next office was Caleb Service Center, located at 5400 NW 22nd Avenue. Upon entering the lobby area, I approached the first available window and asked for a voter registration card. I was then directed to a window to the left, where I immediately noticed a yellow sign stating, "Don't let them decide for you. Register to vote here," or words to that effect. Upon request the receptionist provided me a registration card.

9.      The next office visited was located at 1490 NW 27th Avenue. I entered the main lobby area and found a sign directing me to the voter registration cards. Most of the clients in the office appeared to be Spanish speaking, however the voter registration applications and the signs were all in English.

10.     On May 31, 2002 I visited five DCF offices in Palm Beach County. The first office was the State Regional Service Center located at 111 S. Sapodilla Avenue. I entered room 301, which is the office for economic self-sufficiency and adult protect services. I saw no signs indicating one could apply for voter registration. I then spoke with a Ms. Deloise Harraway and asked for a voter registration card. Ms. Harraway contacted two DCF employees by phone and then told me that voter registration cards were not given out. She suggested I try the West Palm Beach County Courthouse at 240 S. Military. I then asked if voter registration cards were available only to clients, but Ms.

3

Harraway did not answer my question. She then provided me the phone number and the address to the County Courthouse.

11.     The receptionists at the 4100 Okechobee Boulevard office, in both the adult and aging protective services and the economic services, were able to provide me a voter registration card upon request. They both acquired the voter registration card from the back of their workstation. Neither office had signs or any indications that voter registration cards were available.

12.     When I visited the Riviera Beach Service Center at 2051 Martin Luther King, Jr. Blvd., I saw a sign in the lobby area that read "Voter Registration," whereupon I acquired a registration card.

13.     Next I visited the DCF office located at 1095 S. Main Street, Belle Glade, Florida. When I requested a voter registration card, the receptionist asked another employee and informed me that no voter registration cards were available. She then suggested I try City Hall. There were no signs or any indications that voter registration cards could be obtained at this office.

14.     Lastly, I visited the DCF office located at 2990 N. Main Street, Belle Glade, Florida. When I asked for a voter registration card from the receptionist, I was directed to another lobby area that provided food stamp services. Here, another receptionist was able to give me a voter registration card that she acquired from a backroom behind the reception area. There were no signs or indications that voter registration cards could be obtained upon request.

A045915

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2002.

LUIS FIGUEROA

5

A045916

**PLAINTIFFS' EXHIBIT 10**

DECLARATION OF _Teresa James_

1.  I am a resident of _Palm Beach_ County of the State of Florida.

2.  My current address is _263 N.W. 9th Street SouthBay, FL_

3.  My race/ethnicity is _Black_.

4.  My daytime and evening telephone numbers are: (day) _561-996-2029_ and (night) _Same_.

5.  On _May 8_, 2002, I visited a Department of Children and Families Services office located at _1095 S. Main Street, Belle Glade, FL_ The purpose of my visit was to _recertify for food stamps_.

6.  During my visit, _2_ (number) employee(s) at the Department of Children and Families Services assisted me, however, I was not offered the opportunity to apply for voter registration.

7.  I _was not_ offered a voter registration preference form to complete and sign.

8.  In support of this declaration, I state further that:
_I've been at this office three times this month (May) + was not offered an opportunity to register to vote_

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct.

Printed Name: _Teresa James_

Signature: _Teresa Cper_            Date: _5-31-02_

A042773

**PLAINTIFFS' EXHIBIT 11**

**DECLARATION OF** _Jakelia Green_

1.   I am a resident of _Palm Beach_ County of the State of Florida.

2.   My current address is _628 Southwest 11th Street_
_Belle Glade, FL 33430_                                    .

3.   My race/ethnicity is _Black_                    .

4.   My daytime and evening telephone numbers are: (day) _561-996-2789_
and (night) _____.

5.   On _May 28_, 2002, I visited a Department of Children and Families Services office
located at _1095 S Main Street, Belle Glade FL_ The purpose of my visit was to _____
_recertify for AFDC benefits_                              .

6.   During my visit, _1_ (number) employee(s) at the Department of Children and Families
Services assisted me, however, I was not offered the opportunity to apply for voter registration.

7.   I _was not_ offered a voter registration preference form to complete and sign.

8.   In support of this declaration, I state further that:
_I Have visited this office this year and never_
_offered an opportunity to vote._

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct.

Printed Name: _Jakelia Green_

Signature: _Jakelia Green_          Date: _5-31-02_

A042772

**PLAINTIFFS' EXHIBIT 12**



1   .

2              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
3
             CASE NO. 01-0120 CIV/GOLD/SIMONTON
4
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
5   COLORED PEOPLE, INC. ET AL

6                    Plaintiff,

7   vs.

8
KATHERINE HARRIS, ET AL
9

10                  Defendant.
   _____
11

12

13                    DEPOSITION

14

15                        OF

16

17                  GEORGE BRUDER

18

19

20

21

22            700 South Federal Highway
              Boca Raton, Florida
23
              Friday  May 31, 2002
24            9:10 a.m. - 4:30 p.m.

25



**Page 2**

```
 1              APPEARANCES
 2
 3   For the Plaintiff:
 4        ELLIOT M. MINCBERG, ESQ.
          People of the American Way
 5        Foundation
          2000 M Street, NW
 6        Suite 400
          Washington, DC 29936
 7
 8   For the Secretary of State:
 9        DAVID I. SPECTOR, ESQ.
          Of the Law Offices of
10        Steel Hector & Davis,
          1900 Phillips Point West
11        777 South Flagler Drive
          West Palm Beach, Florida 33128
12
13   For the Deponent and DBT:
14        RAYMOND W. BERGAN, ESQ.
          of the Law Office of
15        Williams & Connolly, LLP
          725 Twelfth Street, NW
16        Washington, DC 20005
17
18
19              I N D E X
20
     Witness     Direct    Cross
21
     GEORGE BRUDER
22   (By Mr. Mincberg)   3
23
24
25
```

**Page 3**

```
 1
 2
 3      E X H I B I T   I N D E X
 4   Plaintiff's   Description     Page No.
 5   EXH. 1   Statement of G. Bruder    183
        2     E-mail from Chuck Lieppe  183
 6      3     RFP Evaluation         183
        4     Data Processing Agreement  183
 7      5     Central Voter File       183
        6     Testimony before Civil Rights  183
 8            Commission
        7     Manual              183
 9      8-14  E-mails              183
        15    Memo 6/9/00          183
10      16    Memo DOE 6/4/99        183
        17    Memo DOE 11/24/99       183
11      18-21 E-Mails              183
        22    Memo 5/1/00          183
12      23    ChoicePoint Summary     183
        24    E-Mails              183
13      25    First Interrogatories     183
        26    Requirements          183
14      27    G. Palast Article       183
        28    E-Mail              183
15      29    Date Issues           183
        30    Felony Verification      183
16      31    E-Mail              183
        32    DOE year 2000 Issues     183
17      33    E-mail              183
        34    Letter 8/1/00          183
18      35    2nd Amended Complaint    183
        36    Memo 12/6/00          183
19
20
21
22
23
24
25
```

**Page 4**

```
 1   THEREUPON,
 2              GEORGE BRUDER
 3   a witness named in the notice heretofore filed,
 4   having been first duly sworn, deposes and says as
 5   follows:
 6              DIRECT EXAMINATION
 7   BY MR. MINCBERG:
 8      Q.  Mr. Bruder, would you state your full name
 9   for the record.
10      A.  George Bruder Junior.
11      Q.  Your address?
12      A.  45330 Conference Way South, Boca Raton 33431.
13      Q.  Are you designated on behalf of ChoicePoint,
14   Database Technology's 30B6 witness today?
15         MR. BERGAN: He is.
16      Q.  Let me mention a couple of things.  If at any
17   time I ask you a question that is unclear, or you don't
18   understand, please, let me know. We want the record to
19   be as clear as possible.
20      A.  Yes.
21      Q.  Second, if at any point you care to take a
22   break, we will finish up whatever line of questioning,
23   and we will accommodate that as well?
24      A.  Good.
25      Q.  What is your current position, Mr. Bruder?
```

**Page 5**

```
 1      A.  Vice-president with ChoicePoint, assigned to
 2   strategic sales out of our public records division.
 3      Q.  What is the relationship between ChoicePoint
 4   and Database Online?
 5      A.  DBT Online was a corporation that was merged
 6   with ChoicePoint in May 2001.
 7      Q.  Let me take you back in time then, if we
 8   could, to the period, let us go to just before that
 9   merger; at that time were you employed by DBT?
10      A.  Yes.
11      Q.  What was your position with DBT?
12      A.  Senior vice-president of operations.
13      Q.  For the record, when I use the term DBT, I am
14   referring to DBT Online.  Does that make sense?
15      A.  Yes, that makes sense to me.
16      Q.  Now, in the period immediately after the
17   merger, and we will get into this in more detail, DBT
18   was literally in the process of fulfilling its
19   contract to the Florida Division of Elections, is that
20   correct?
21      A.  Yes.
22      Q.  Did your responsibility at DBT, with respect
23   to that contract, change as a result of the merger or
24   did you pretty much continue the same responsibilities
25   that you had been assuming up to that point?
```

**Page 22**

1    A.  Yes.
2    Q.  There is a discussion about what is referred
3  to a felony conviction database on the second page.  It
4  states that DBT says it will compare the CVF with 8.25
5  criminal convictions.  That was something that you
6  indicated you would do in the contract, is that
7  correct?
8    A.  I believe it was in the unsuccessful RFP
9  response.
10    Q.  It is unclear whether these 8.25 million
11  conviction records are felonies, do you see that?
12    A.  Yes.
13    Q.  Does this refresh your recollection about any
14  discussion of the State officials after the submission
15  of the second bid, as to whether or not the records in
16  your database were all felonies?
17    A.  Does it?  You are asking me, so I am clear,
18  does this document remind me or cause me to recall a
19  specific discussion with the Division of Elections
20  officials regarding our database of the State criminal
21  history coverage as being a felony conviction.
22    Q.  It is just a general recollection of the
23  topic coming up?
24    A.  No.
25    Q.  So as far as you can recall, no one with the

**Page 23**

1  State Department at this point raised with you that all
2  those convictions were felonies?
3    A.  I don't remember having a specific
4  conversation on felonies and misdemeanors and it may
5  have happened; you are asking me to recall a specific
6  conversation, sorry, not coming to mind.
7    Q.  Do you remember that general topic coming up?
8    A.  In the most general of terms; in discussions
9  we all knew what we were looking at were felony
10  convictions and not misdemeanors.  Misdemeanors were
11  not going to get the job done.
12    Q.  Without necessarily recalling any specific
13  conversation at any period of time before the contract
14  was actually signed, do you recall in general,
15  discussing with the State any questions or concerns
16  about whether or not all those convictions that you had
17  in the records were felonies, or whether you could tell
18  which ones were felonies and which were not?
19    A.  I don't remember any conversations.  I do
20  know that the effort we were making was based on the
21  premise that these were being provided to the State as
22  far as looking up of their CVF file into our criminal
23  history database and looking for felons.  The
24  misdemeanants had no bearing on this whatsoever.
25  Included in the file, I do know that I directed my

**Page 24**

1  developers not to use misdemeanors on this.
2    Q.  That direction would have occurred when?
3    A.  After we were awarded the bid.
4    Q.  Shortly after?
5    A.  Immediately thereafter, if not sooner.
6    Q.  After you were not awarded the second time.
7    A.  I was quite deflated.
8    Q.  But you were then given an invitation to
9  negotiate, is that correct?
10    A.  Yes.
11    Q.  That invitation was extended to you and one
12  other company, do you recall that?
13    A.  Yes.
14    Q.  Do you have any information as to why you
15  were selected to be one of the companies to be involved
16  in the negotiation?
17    A.  Do I have, restate.
18    Q.  Do you have any information as to why the
19  State officials selected your company as one of the
20  companies to negotiate with?
21    A.  Not that I remember a specific conversation,
22  but generally speaking, what I was told was based on
23  our RFP response that we were the company that the
24  Division of Elections felt was most capable of handling
25  this job.

**Page 25**

1    Q.  In fact, that negotiation resulted in the
2  contract between you and the Division of Elections, is
3  that correct?
4    A.  Yes.
5    Q.  Let us take a look at that contract.  I have
6  a question or two about that.  I will ask to have it
7  marked as Exhibit 4, a document entitled, Data
8  Processing Services Agreement, bearing Bates number
9  C01784 to 1795.  Can you identify Exhibit 4?
10    A.  This is the Data Processing Services
11  Agreement between the Department of Elections and DBT.
12    Q.  In fact, the contract that resulted from that
13  invitation to negotiate, that occurred in the fall of
14  1998, is that correct?
15    A.  It appears to be.
16    Q.  Turning to page 11 of the contract, second
17  page from the back, is that your signature, do you
18  remember on behalf of DBT?
19    A.  Yes, it is.
20    Q.  While we were towards the back, flip over to
21  page 12, Exhibit A?
22    A.  Okay.
23    Q.  Am I correct that the amounts of money you
24  received under the contract for the 1998, 1999 period
25  was $2,317,800?

Page 26

1     A. Yes.
2     Q. As I understand it, the contract was in fact
3  renewed for 1999/2000?
4     A. Yes.
5     Q. You received a renewal of $1,024,000?
6     A. Yes.
7     Q. So that the total was 3.3 million for that
8  period, is that correct?
9     A. Yes.
10     Q. Do you know how that compares with the amount
11  for the Professional Analysis contract, the one that
12  you ultimately replaced?
13     A. How it compares? I believe their bid was
14  under 10,000 or $5,000, something like that.
15     Q. One other specific thing, flip back to page
16  ten, paragraph 29, Agency Status of Vendor, do you see
17  that?
18     A. Yes.
19     Q. The first sentence states, the parties agree
20  that DBT, pursuant to Chapter 98-129, Laws of Florida,
21  is designated as the agent of the Division, for the
22  sole purpose of administering the agreement. Did I
23  read that correctly?
24     A. Yes.
25     Q. Can you tell us your understanding of that

Page 27

1  provision?
2     A. The company was to act as an agent for the
3  Division of Elections in this data processing
4  agreement.
5     Q. I promise not to ask hardly any questions
6  about this. I want to identify for the record the
7  renewal contract. I will ask the reporter to mark as
8  Exhibit 5, the Central Voter File Data Processing
9  Services Agreement, revised 12/21/99. Bates numbered C
10  1760 to 1768. Is this the renewal agreement on the
11  contract?
12     A. Yes.
13     Q. Again, looking at page eight, that is your
14  signature on behalf of DBT?
15     A. Yes.
16     Q. What is DBT required to do under the
17  contract?
18     A. Overall, we were to create a list of
19  individuals based on the Central Voter File in which we
20  were able to identify from that file individuals that
21  were contained in other files, including deaths and
22  felons and also run the file against itself looking for
23  duplicate registrations overall and provide back to the
24  State that separate file.
25     Q. What was your understanding that separate

Page 28

1  file was to be used for?
2     A. It was to be used by the Supervisors of
3  Elections to verify that list and see if their voter
4  roles at the County level were accurate.
5     Q. And was it your understanding based on that
6  list that voters would be removed?
7     A. If they were not able to-- if they were able
8  to confirm if that individual was actually deceased,
9  duplicate registration or a convicted felon clemency.
10     Q. By they, the Supervisors of Elections?
11     A. Yes.
12     Q. Whose responsibility was it to determine what
13  information was to be used in the data processing and
14  data matching process?
15     A. Say that one more time?
16     Q. Whose responsibility was it to determine what
17  information was to be used in the data processing and
18  data matching process?
19     A. The State pretty much gave us all of the
20  requirements as far as the matching logic that was to
21  be utilized.
22     Q. I take it that you and others at DBT
23  discussed that request with the State?
24     A. Yes, we did.
25     Q. I imagine much of our discussion today will

Page 29

1  relate to some of those discussions. In those
2  discussions, did the subject of false positives come
3  up?
4     A. Yes.
5     Q. In order to save time, I want to go through
6  some of your testimony on that subject in front of the
7  Civil Rights Commission last year. Do you recall testifying
8  before the Civil Rights Commission in Miami in February of 2001?
9     A. I recall, yes.
10     Q. I will ask that the reporter mark as the next
11  exhibit, Exhibit 6, a document from the United States
12  Commission on the Civil Rights hearing on allegations
13  of election day irregularities in Florida, Friday,
14  February 16, 2001. Can you identify Exhibit 6?
15     A. It appears to be a transcript of testimony
16  between myself and the United States Civil Rights
17  Commission.
18     Q. By the way, did you have an opportunity to
19  review this transcript at some point and submit any
20  corrections?
21     A. I believe so.
22     Q. I want to ask you to turn in particular to
23  page 178 of the transcript, the first full paragraph.
24  So we are clear, the transcript states this was part of
25  your statement. I want to ask you about some of this.

Page 30

1  Looking at, quote, we advise the State of the
2  likelihood of a significant number of false positives
3  and made a recommendation to reduce those numbers, did
4  I read that correctly?
5     A.  Yes.
6     Q.  Do you recall testifying before the Civil
7  Rights Commission?
8     A.  Yes.
9     Q.  That is a true statement?
10    A.  Yes.
11    Q.  It we look at that page, we may have a
12  definition of that term.  If you look to the first
13  line, your testimony states, quote, a false positive is
14  an industry term that means something but not all data
15  elements match the data provided.  Did I read that
16  correctly?
17    A.  Yes.
18    Q.  Is that an accurate definition of a false
19  positive for these purposes?
20    A.  Yes.
21    Q.  Now, what is your recollection of -- focus on
22  the 1999 period-- the first year of the contract-- of
23  the advice you gave to the State of the likelihoods of
24  a significant number of false positives?
25    A.  What were my recommendations?

Page 31

1     Q.  First, what were your recommendations?
2     A.  At what point?
3     Q.  We can take it -- let us say the entire
4  calendar year of 1999, until, sorry.  Let us say in the
5  period of 1999 prior to your submitting to the DOE the
6  list, the exceptions list.  Let us define that term
7  too.  The exceptions list has been used in this
8  document, what is that?
9     A.  That was the list DBT created that included
10  duplicates, deaths and felony convictions.
11    Q.  In the period up to your submission of that
12  exceptions list in 1999, tell us what you recall about
13  your recommendations with respect to the State to
14  reduce the significant number of false positives.  In
15  the period up until your submission to the State in
16  1999 of the exceptions lists, tell us what you can
17  recall about your recommendations to the State how to
18  reduce the significant number of false positives?
19    A.  This is generally speaking, I do not recall
20  any specific conversation with anyone with the State or
21  internally.  The focus was getting our arms around the
22  file making and developing the matching logic and
23  getting it processed.  But in light of the fact that
24  the previous vendor had a product that not been used
25  because of -- I don't know whatever reasons--by the

Page 32

1  State -- my thoughts were along the lines of how to run
2  this job for them was to be as exacting as possible on
3  our matches so that we would limit down the numbers on
4  the exceptions list to being those that we had with a
5  level of confidence in being an exact match.
6     Q.  What was the response of the State officials
7  to those recommendations?
8     A.  They wanted to make it broader and capture
9  more names and let the supervisor go through the list
10  and pull out those they could not verify.
11    Q.  In fact, in 1999, do you recall having a
12  conversation with some of the supervisors about that
13  subject?
14    A.  Yes.
15    Q.  Would it be fair to say that the supervisors
16  would have preferred a more exacting match with less
17  false positives?
18    A.  That is the message I got.
19    Q.  Did you convey that message to State
20  officials?
21    A.  Yes.
22    Q.  Nonetheless, the State officials decided not
23  to do an exact match?
24       MR. SPECTOR:  I don't know.
25    Q.  What was the response to the State officials

Page 33

1  to your conveying of that information?
2     A.  Initially at that moment when I said it or
3  after, as we moved forward in time.
4     Q.  Initially.
5     A.  Initially, they had no response.  They kind
6  of nodded and went okay, but when they sent down their
7  technical person and we started meeting for developing
8  requirements on the matching logic, I again expressed
9  to that individual that there should be much tighter
10  parameters built on the matching logic, otherwise we
11  were going to create a number of false positives.  They
12  expressed back then that they understood that.  That
13  their direction to us was to do the matching logic and
14  develop the process in the form they wanted.
15    Q.  Which was a broader form?
16    A.  Much broader.
17    Q.  Which would produce a significant number of
18  false positives, is that correct?
19       MR. SPECTOR:  Objection to the form.
20    A.  It would create more false positives than
21  exacting, yes.
22    Q.  In fact, whenever there was a decision point
23  as to whether to go for a broader match or more
24  exacting match, was there ever a time when the State
25  officials decided on a more exacting match as opposed

## Page 34

1  to a broader match that you can recall?
2      A.  Speaking from a high level, no, but probably
3  down in some of the detailed meetings that they had
4  with our developer and product management people, they
5  probably had discussions back and forth as to what the
6  type of criteria should be.  From my perspective, I
7  said exact and they said broad.
8      Q.  I will again ask you in Exhibit 6, to flip
9  forward to page 215.  In particular, I want to focus
10  your attention on the questions and answers from
11  Ms. Wiggins. The transcript states Ms. Wiggins asking,
12  Division of Elections basically wanted to ask a
13  wide--as wide a net as possible for the felony list; is
14  that an accurate statement?  Your answer is, yes, it
15  is.  Did I read that correctly?
16      A.  You said, the Division of Elections basically
17  wanted to ask for a wide--
18      Q.  Okay. Going back again to Ms. Wiggins
19  question to you, she asked you, quote, the Division of
20  Elections basically wanted to cast a wide--as wide a
21  net as possible for the felony list.  Is that an
22  accurate statement?
23      A.  Yes.
24      Q.  And your answer was, yes, it is.  Did I read
25  that accurately?

## Page 35

1      A.  Yes.
2      Q.  Is that the answer that you gave to
3  Ms. Wiggins at the time?
4      A.  Yes, it is.
5      Q.  Do you believe that to be true?
6      A.  Yes, it is.
7      Q.  In fact, as you testified to the Civil Rights
8  Commission, there is no doubt at that time that the
9  lists that you provided included a number of false
10  positives, is that correct?
11      A.  Are you referring to a specific page?
12      Q.  Sure, let us go and to save time let us be
13  more specific, 177 at the bottom.  There you state, 177
14  to 178, there is no doubt the list includes a number of
15  what we call false positives as the Division of
16  Elections required the exceptions lists to be very
17  broad.  Did I read that correctly?
18      A.  Yes, you did.
19      Q.  Is that a true statement?
20      A.  It is a true statement.
21      Q.  The entire Exhibit is in the record.  The
22  State and others or your own counsel can bring it out
23  more.  If I went through all of your testimony at the
24  Civil Rights Commission, we would be here much longer.
25      A.  Thank you.

## Page 36

1      Q.  Did there a come a time after the signing of
2  the contract in 1999, that you arranged training
3  seminars for the Supervisors of Elections around the
4  State?
5      A.  Yes.
6      Q.  Can you describe that briefly for us?
7      A.  What part of it, why or what?
8      Q.  Both.
9      A.  Why, was it was something that I proposed in
10  the RFP and then in the invitation to negotiate, when
11  we were setting parameters, in order for the ultimate
12  end user of this product to understand what it is and
13  how to use it properly and most effectively, they would
14  require this training.  This was based on my industry
15  experience in working with people that are not as
16  literate in data processing methodologies and
17  recognizing that many of the supervisors were not as
18  literate with data processing capabilities and
19  methodologies and why we do things, I suggested to the
20  State we provide training sessions to educate them and
21  that would help eliminate some of the confusion and
22  frustration with the files, just based on the fact they
23  did not understand it.
24          Initially, the State declined to do that.
25  After the supervisors meeting in Sarasota, I again

## Page 37

1  requested to do that and the State advised, yes, let us
2  go ahead and develop those training sessions. We
3  developed five of those and built training materials to
4  be provided to each of the Supervisors of Elections,
5  and to disseminate out what it was we were doing, what
6  to do with questions, how to understand the files, read
7  them properly, the matching logic, and how we derived
8  that.  It seemed to assist a great deal.
9      Q.  Did you make a recommendation with respect to
10  training seminars the next year, in the year 2000?
11      A.  Yes, we did.
12      Q.  What were your recommendations?
13      A.  We continue the training sessions, and, if,
14  not develop it more and get more in depth with it.
15      Q.  Why did you feel that would be important?
16      A.  Because one, in the first session they were
17  getting familiarization with what data processing was
18  about and how to use those files.  We had a lag period
19  of almost a year and people get forgetful; you have
20  turnover with staff, and God knows what else went on
21  within their organization, and a refresher course
22  would eliminate some of the confusion and concerns with
23  the file, and it also allows us to continue to develop
24  relationships with the 67 supervisors so that we could
25  more effectively work with the Division of Elections in

Page 62

1 because there are some documents that are closer to the
2 time that this occurred that suggested a different
3 explanation I want to go through that with you so we
4 can try to figure out what happened, if we can. But
5 the explanation that you gave to the Civil Rights
6 Commission is that explanation as best you can recall
7 that was given to the State at the time?
8   A.   At the time that we found the issue with the
9 file, we were attempting to identify what caused it and
10 ultimately, I made a call to the State of Texas
11 Department of Public Safety and talked to the person
12 responsible for that file and what the changes were,
13 and I got communicated what they had done to the file.
14   Q.   I will ask you take a look at another E-mail
15 Bates stamped C00323 to 327. Please turn to the second
16 from the last page, labeled C 00326, in which there's
17 an E-mail from Ms. Thorogood and addressed to several
18 other individuals and a copy is shown to you, do you
19 see that?
20   A.   Yes.
21   Q.   By the way, the first individual, Chris
22 Knowles, who is he that this is addressed to?
23   A.   Our programming supervisor.
24   Q.   What were his responsibilities?
25   A.   Overseeing programmers who were working with

Page 63

1 logic and the files to complete this project for the
2 Division of Elections.
3   Q.   Is he still with the company?
4   A.   Yes, he is.
5   Q.   Looking at this document, was it around this
6 time approximately May 24, that you recall you first
7 learned about the Texas problem, May 24, 2000?
8   A.   Yes.
9   Q.   The E-mail from Ms. Thorogood indicates she
10 could consider this very serious. This will be, quote,
11 an embarrassment to DBT and will cause DOE to lose
12 faith in our processing, is that correct?
13   A.   Yes, it is.
14   Q.   You agree with that?
15   A.   Yes, I do.
16   Q.   Going deep into the E-mail chain, on 000327,
17 this is the last page of the document. This is the
18 E-mail from a Marci Strickland on that, earlier that
19 same day, do you see that?
20   A.   Yes.
21   Q.   She refers to a conversation that she had
22 with a Charlene Cain, who is from the Texas office?
23   A.   Yes.
24   Q.   According to the middle paragraph of this,
25 the records prior to March 1994 may not be indicated as

Page 64

1 a conviction in the level and degree offense field. Do
2 you see that reference?
3   A.   Yes.
4   Q.   Does that suggest that the problem that
5 records from 1994, on backwards, did not say whether
6 they were felonies or misdemeanors?
7   A.   Yes.
8   Q.   Did you investigate that?
9   A.   Yes.
10   Q.   What did you determine?
11   A.   Basically, the same thing prior to 1994, the
12 issue with it is, prior to the date of the file that we
13 would be receiving from the Texas Department of Public
14 Safety, it did not include misdemeanor convictions
15 prior to 1994. I don't think it held any misdemeanor
16 convictions. It was strictly a felony conviction file.
17 They began including misdemeanor convictions and then
18 prior to 1994 they had no way of populating that field
19 to know the degree of effect in ability to see felonies
20 or misdemeanors.
21      Then they published the file, and then
22 somehow, some way, I don't know if the documentation
23 was clear, or if it got down to our programmers, or if
24 we received any documentation at all from the Texas
25 Department of Public Safety, indicating that change.

Page 65

1 When we were processing it we were basing it off of the
2 prior data that we had received with the file
3 explaining what each file was and how populated.
4   Q.   So, am I correct in concluding from that,
5 that the changes occurred beginning in 1994 or 1995?
6   A.   The change occurred on those files including
7 records that they populated in existing files. That
8 did not occur until 2000, when they made the change.
9   Q.   The change they made occurred in 2000 but
10 related to the records from '94 and earlier?
11   A.   Yes.
12   Q.   Explain to us what change was made in 2000?
13   A.   If memory serves me correctly, what we were
14 receiving previously was the felony file convictions
15 only associated with misdemeanor, meaning, if I pulled
16 a record from that Texas Department of Public Safety,
17 the criminal history file, I knew it was a felony
18 conviction and no misdemeanors were populated in it. I
19 have looked at the file and never saw misdemeanors in
20 it. What they did after that, if they populated
21 misdemeanors, they went back and pulled misdemeanor
22 convictions including the file but due to how they had
23 incorporated the data into the file, anything prior to
24 1994 had no indication on it of whether it was a felony
25 or misdemeanor conviction.

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

17 (Pages 62 to 65)

Page 66

1  Q. Excuse me, it is your understanding that the
2  change occurred in 2000 and not in 1999?
3  A. I am pretty sure it occurred in 2000. I
4  could be mistaken about the first time it came to
5  light, but we did process it in 1999 and we had no
6  problems with it.
7  Q. But in '99, we will get to the documents on
8  this later on, in '99. Did you, in fact, provide
9  information that was used in the exceptions file on any
10  Texas convictions to the State of Florida?
11  A. I don't know.
12  Q. We will go back and look at that. I think
13  some documents will help us with that. In some of
14  these additional E-mail exchanges going up in the
15  document to page 325 to 326, there is some additional
16  discussion on data in the E-mail from Ms. Thorogood.
17  You are listed as having a copy of that?
18  A. Yes.
19  Q. Ms. Thorogood says that this, referring to
20  the Texas data, is not something I acquired for DOE.
21  Can you explain what is meant by that?
22  A. That means that this was a preexisting data
23  file bought by DBT for our other products and service
24  that we are using in conjunction with our DOE data
25  processing contract and it was not something that was a

Page 67

1  data file provided to us by the Florida Division of
2  Elections.
3  Q. Right underneath there is an E-mail from
4  Mr. Knowles 5:33 p.m. and there is a cc to you as
5  having a copy of it?
6  A. Yes.
7  Q. And the first thing he says, when we had this
8  problem with the Florida data, we asked this very
9  question. Do you know what is being referred to with
10  the problem with Florida data?
11  A. Yes.
12  Q. Can you explain that?
13  A. Well, I believe, and I can't say
14  definitively, I believe what he is referring to is an
15  issue we had with the Florida Department of Corrections
16  file.
17  Q. Where there confusion as to whether a
18  conviction was a felony or misdemeanor?
19  A. They were all felonies.
20  Q. What was the issue there?
21  A. The issue there was that the Department of
22  Corrections when they published their file, they were
23  unsuccessful or never made an attempt at removing
24  expunged or sealed records, or properly identifying
25  adjudication or adjudication withheld.

Page 68

1  Q. In the next sentence Mr. Knowles states, we
2  had asked that all of the State sources be contacted to
3  ensure that we had only received felony conviction
4  related data. Do you see that?
5  A. Yes.
6  Q. Do you know whether, in fact, that contact
7  had occurred in 1999?
8  A. I did not know what occurred. That was a
9  directive from a meeting and from myself that we would
10  go and verify these files where there were only
11  felonies before and we used them in the data
12  processing.
13  Q. That directive came from?
14  A. Yes.
15  Q. Then Mr. Knowles asked on 326, he referred to
16  that problem where any offenses prior to '94 may not be
17  correctly labeled. Why didn't this come up in our
18  discussions last year? Do you see that reference?
19  A. Yes.
20  Q. Do you know the answer to that question?
21  A. No.
22  Q. Now, in fact, was it known in '99 by
23  employees of DBT that some of the records back in the
24  '93, '94 earlier time frame from Texas, were not
25  labeled whether they were felony or misdemeanors?

Page 69

1  A. If they knew that, they never communicated it
2  to me.
3  Q. I want to put before you a document that may
4  indicate that, and I want to make sure I am
5  interpreting it correctly. Please look at another
6  E-mail to see if I am interpreting it correctly. Look
7  at the second page, C 00029, around the middle of the
8  page, a message from Marty Ekleberry to Rob Muth, with
9  a copy shown to Ms. Thorogood, do you see that?
10  A. Yes.
11  Q. Can you tell who Mr. Ekleberry and Mr. Muth
12  are?
13  A. Ms. Ekleberry. She is a data programmer in
14  our data processing group. Rob Muth is -- I don't know
15  what he is -- manager of something -- at the time he
16  was a data analyst in the data resources group.
17  Q. Looking to the middle of that E-mail,
18  Ms. Ekleberry referred to the Texas file. The problem
19  was only the latest records have the level of offense
20  field populated. Do you see that?
21  A. Yes.
22  Q. That in essence was the same problem. After
23  '94, the records state whether or not the individuals
24  convicted of a felony or misdemeanor, is that correct?
25  MR. SPECTOR: Objection to the form.

Page 74

1 communicated it back.
2    Q.  Do you know how long it took to get to the
3 people in charge of removing the voters from the rolls,
4 the Supervisors of Elections?
5    A.  I don't know.  I would say probably about two
6 days.
7    Q.  I ask you to take a look at an E-mail
8 exchange Bates stamped C 00607 to 608.  I direct your
9 attention to an E-mail from Ms. Thorogood to
10 Mr. Mitchell on the first page, dated June 6, 2000.  Do
11 you see that?
12    A.  Yes.
13    Q.  Ms. Thorogood states that the Texas problem
14 was identified at least two weeks prior to that, do you
15 see that reference?
16    A.  Yes.
17    Q.  Would it be fair to say she expresses concern
18 about the fact that the Counties were not notified of
19 that problem until then?
20    A.  She expressed that.
21    Q.  She suggested it be done immediately, yes?
22    A.  Yes.  That does not necessarily mean we did
23 not notify them.
24    Q.  Right.  Let me show you what I think is the
25 first notification that I found on that.  I ask you to

Page 75

1 take a quick look at it.  This will be Exhibit 15 a
2 memo from Edward Kast from the Florida Department of
3 State, three days afterward June 9, 2000.  By June 9 of
4 2000, this was getting publicity around Florida, as you
5 recall?
6    A.  As I recall.
7    Q.  This is the official notification,
8 specifically advising the supervisor you may wish to
9 delay the mailing of any notifications under this section
10 referring to felons until after the corrected
11 information is furnished to you?  Do you see that
12 reference?
13    A.  Yes.
14    Q.  Are you aware of any earlier advice from the
15 State to supervisors on this issue?
16    A.  I am not.
17    Q.  You referred a few minutes ago to a problem
18 in 1999, which I think you also testified about to the
19 Civil Rights Commission.  Please go back do Exhibit 1,
20 if you would, that is your statement to the Civil
21 Rights Commission.  This is on page nine, toward the
22 top of the page?
23    A.  Yes.
24    Q.  You state in May of 1999, the supervisors
25 were reporting that some of the felony convictions seem

Page 76

1 to be inaccurate.  Do you see that reference?
2    A.  Yes.
3    Q.  That is what you found, was that a public
4 record data file from the Department of Corrections,
5 which potentially contained errors in the source file?
6    A.  Yes.
7    Q.  You state what happened was that the
8 Department had inadvertently released felony records
9 that had been expunged or sealed, is that the problem
10 you referred to a few minutes ago?
11    A.  Yes.
12    Q.  Of course at DBT you had no control over the
13 accuracy or inaccuracy of the file provided to you by
14 various entities of the State of Florida, is that
15 correct?
16    A.  That would be correct.
17    Q.  In addition, while we are on this, in
18 addition to the file from the Department of
19 Corrections, would you have gotten files from other
20 State agencies in Florida?
21    A.  From our own collection or what was provided
22 to us by the Division of Elections or both.
23    Q.  Let us do them one at a time.  The ones
24 provided by the Division of Elections?
25    A.  Is the Central Voter File, the clemency file,

Page 77

1 the Florida Department of Law Enforcement felony
2 convictions file, the Bureau of Vital Statistics death
3 file.
4    Q.  Again, you were not responsible for making
5 any steps to verify the accuracy of those files, is
6 that correct?
7    A.  That is correct.
8    Q.  Basically, as good or bad as they were, you
9 had to deal with that?
10    A.  Correct.
11    Q.  What about the files from your own collection
12 from Florida?
13    A.  The files that we provide from Florida, the
14 Florida Department of Corrections, and the Florida
15 Department of Motor Vehicle files.
16    Q.  Which one would the records we are talking
17 about here fall within?
18    A.  Who owned them?
19    Q.  Right.
20    A.  The DBT.
21    Q.  This again is another example of the fact
22 that you were not able to quality control the files
23 that you got from other agencies, is that correct?
24    A.  That is correct.  There is no way for us to
25 do any Q&A on what they imputed into their data files,

Page 78

1   and what they released as a public records document.
2   We took them as is.
3       Q.  Then you go on to state, going back to
4   Exhibit 1, that of the files from the Florida
5   Department of Law Enforcement that they had provided to
6   the DOE, there were errors found in their conviction
7   records identified as felons, do you see that
8   reference?
9       A.  Yes, I do.
10      Q.  As a result of that you reprocessed the voter
11  file and delivered a revised file in the middle of June
12  of 1999?
13      A.  Yes.
14      Q.  That is accurate as far as you can recall?
15      A.  Yes.
16      Q.  Do you recall anything about what these
17  particular errors were?
18      A.  In which file?
19      Q.  The FDLE file?
20      A.  I don't know specifically, no.
21      Q.  I want to ask you about a letter you sent
22  around this period of time relating to this issue.  I
23  will ask that this be marked as the next Exhibit number
24  16, a document which has Bates stamped 33941 to 42, the
25  first being a memo to All Supervisors of Elections from

Page 79

1   Ethel Baxter, dated June 4, 1999, and the second being
2   a letter from you to Ms. Baxter of that same date.
3       A.  Yes.
4           MR. MINCBERG:  Let us take a break now before
5   lunch.
6           (Recess in Proceedings)
7       Q.  Turning Mr. Bruder to Exhibit 16, the second
8   page of Exhibit 16, is that a letter that you sent to
9   Ms. Baxter on the day it bears?
10      A.  Yes.
11      Q.  Do you recall getting a copy of the memo that
12  is the first page of Exhibit 16 that transmitted your
13  letter to the County?
14      A.  I don't have an individual recollection of
15  getting that.  I will assume that I did.
16      Q.  Now, that referred to Exhibit 16, is that the
17  same problem that we talked about in Exhibit 1, on the
18  first paragraph of page nine involving the Department
19  of Corrections who inadvertently released the felony
20  records that have been expunged or sealed?
21      A.  Yes.
22      Q.  That effected 60,000 records, is that
23  correct?
24      A.  That would probably be about the right
25  number.

Page 80

1       Q.  She goes on to talk somewhat about the--
2       A.  The 60,000, that would be like a total number
3   of felony convictions that we found.  That does not
4   mean that was 60,000 records that had been issued
5   around it, only a handful.
6       Q.  That is what is confusing me.  In the first
7   paragraph, the fourth line down, Ms. Baxter says,
8   quote, this on the first page of Exhibit 16, she states
9   that the DBT informed us this morning that in fact
10  there were over $60,000 records in the DOC files that
11  were incorrectly marked as felony convictions, end
12  quote.
13      A.  I would not say that is a correct statement.
14  It may be, but I don't know.  I don't think at the time
15  that this letter was authored by me to her.  I would be
16  able to tell her exactly how many records in this DOC
17  file we were having an issue with expunging, sealed or
18  lack of adjudication or adjudication.
19      Q.  In the second paragraph, she goes on to talk
20  about the work that the division has been doing.  In
21  particular the fourth line states that the division
22  focused its attention on the quote accuracy and
23  completeness of the data provided by DBT, end quote?
24      A.  Yes.
25      Q.  She claims that the first two sets of the

Page 81

1   three sets that have been received by the DBT contained
2   numerous errors and omissions.  Do you see that
3   reference?
4       A.  Yes.
5       Q.  That is a correct statement, do you think?
6       A.  Well, it is possible.  But what I recall is
7   that she is referring to the files that we were
8   providing that were the test files, building up to what
9   was an accepted file for them to groom it down to what
10  they wanted; but this was, we are referring to a
11  finished product.
12      Q.  Then, on your letter which is the second
13  page, you, at least as I am interpreting this, you
14  appear to state that in the first paragraph that the
15  difficulty was that your programming design was not to
16  consider the aspect of the Department of Corrections
17  file containing probation records that included
18  withheld adjudication dispositions.  Do you see that
19  reference?
20      A.  Yes.
21      Q.  Is that, in fact, correct?
22      A.  I don't know at this point.  Because it kind
23  of got confusing.  The directions on what the
24  programmers were supposed to do and what was developed,
25  and what we later -- because of the issues -- found

Page 82

1  errors with the file. There was a first thought that
2  the issue was a programming issue, specifically, they
3  inappropriately did not understand what withheld
4  adjudication meant and included them in the file.
5  However, digging down into the problem, we then found
6  there were sealed and expunged records being brought
7  forth. We found other withheld adjudications not
8  correctly labeled. At this point I made a trip to meet
9  with the administrator of the Department of Corrections
10 to discuss this issue, and at that meeting it came out
11 that, yes, indeed, there was a problem with their file.
12 They immediately stopped publishing it.
13    Q. So, let me clarify this. As of June 4th,
14 1999, the date of this letter, you believe that at
15 least a part of the problem was a programming design,
16 is that correct?
17    A. That is what my developers and project people
18 were laying the blame on.
19    Q. When you did a subsequent investigation to
20 which you referred, did that mean that the problems
21 with the Department of Corrections were an additional
22 problem or did it mean that there were no problems ever
23 with the programming design?
24    A. I don't know. At this point I could not go
25 back and reconstruct it. I know when we went forward

Page 83

1  with it we found there were problems with the file,
2  itself. So we had to have that corrected.
3    Q. You are not sure whether at this point that
4  was in addition to or instead of your initial
5  conclusion it was a programming design problem?
6    A. Yes.
7    Q. Hang on to Exhibit 1. That may refer to that
8  second problem to which you referred to in 1999. I
9  will ask that the reporter mark it as Exhibit 17, a
10 memo to the Supervisors of Elections dated November 24,
11 1999, which is Bates numbered B893 to 894. Do you
12 recall the problem referred to in Exhibit 17?
13    A. I don't know where you are saying there is a
14 problem.
15    Q. First of all, from my review it appears to me
16 and I want to confirm this with you, the issue in
17 Exhibit 17 is different than what we talked about in
18 Exhibit 1, is that your conclusion as well?
19    A. This document you handed me from Bucky
20 Mitchell is referring to the clemency records.
21    Q. Which is not what you were discussing with
22 the Civil Rights Commission?
23    MR. SPECTOR: Objection to the form.
24    MR. MINCBERG: Pages nine to ten of this
25 Exhibit 1.

Page 84

1    A. That is not what I was referring to.
2    Q. The issue referred to on Exhibit 17,
3  Mr. Mitchell states that the Office of Executive
4  Clemency has sent two updated files containing records
5  of individuals who received clemency. Do you see that?
6    A. Yes.
7    Q. He provided the numbers which, if you add
8  them together come up to about a little bit over 14,000
9  individuals in Florida who received clemency, do you
10 see that reference?
11    A. Yes.
12    Q. What you were required to do was to reprocess
13 those against the people who were convicted of felonies
14 in Florida, according to your files, is that correct?
15    MR. SPECTOR: Objection to the form.
16    A. No.
17    Q. Let me ask you --
18    A. Are you saying, our file -- they had handed
19 us a new clemency file that they received from the
20 Executive Board of Clemency, that included more records
21 than what was provided. They asked us to process those
22 against the existing felony file and not just to the
23 felony files, and see if there were additional
24 individuals on that file who had received clemency.
25 From this document there were an additional 2300 that

Page 85

1  had received clemency, and that is on existing felony
2  files when we produced it for the Division of
3  Elections.
4    Q. If I understand this document, the Division
5  found over 14,000 individuals who had received
6  clemency, and you found that out of those, about 2300
7  who were in your felony file?
8    MR. SPECTOR: Objection to the form.
9    A. By my assessment of these three numbers what
10 I would say is, there is the number 8,130, and another
11 of 6,000 records. What I don't know os if those can be
12 added together and made 14,130 or if that 6,000 is
13 contained in that 8,130.
14    Q. That is fair enough.
15    A. What I can say is that when this happened, we
16 reproduced it, and what is here -- when taking that
17 additional, those two additional files that he is
18 reflecting the 8,000 from, and I guess the 6,000,
19 approximately. We found 2300 with clemency on the
20 existing felon file that we had not found previously.
21 If we had not received those two files we would not
22 have found those people with clemency.
23    Q. That is part of what I am interested in. You
24 are telling us that the number of additional
25 individuals who received clemency, according to this

Page 182

1     A.  We were not.
2     Q.  Do you recall actually receiving an award
3  from the Voter Integrity Project?
4     A.  They did give me a plaque, yes.
5     Q.  Now, at the conference that you spoke at with
6  Voter Integrity, do you recall indicating not
7  necessarily in the elections that DBT had been using
8  databases to detect fraud since 1992 or thereabouts?
9     A.  That could have been said, yes.
10     Q.  What would that have been?
11     A.  The Autotrack system.
12     Q.  Do you use the Autotrack, yourselves, to
13  match potential fraud issues, or is it more of a matter
14  of making the Autotrack available and having your
15  clients use it in a specific way that they deem
16  appropriate?
17     A.  It is for our clients use.
18     (Thereupon, the Documents have been marked
19  as Bruder Exhibits Nos. 1-36 for identification.)
20     MR. MINCBERG:  Mr. Bruder, subject to the
21  reservations made during the course of the
22  deposition about documents and about a few of the
23  matters that we would like to try; if we can, with
24  your counsel, to resolve getting more definitive
25  answers to on behalf of ChoicePoint, I have no

Page 183

1  further questions for you.  Thank you very much
2  for your time.  Anybody else?
3     MR. SPECTOR:  No questions.
4     MR. BERGAN:  No questions.
5
6     (Thereupon, the deposition was concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 184

1
2             CERTIFICATE OF NOTARY
3
4  STATE OF FLORIDA:
            SS.
5  COUNTY OF DADE:
6             I, ILENE J. POMERANZ, a Shorthand
7  Reporter and Notary Public in and for the State of
8  Florida at Large, do hereby certify that I
9  reported in shorthand the deposition of
10  George Bruder, a witness called by the
11  in the above-styled cause; that the witness was first
12  duly sworn by me; that the reading and signing
13  of the deposition were not waived by the witness; that
14  the foregoing pages, numbered 1 to 185, inclusive,
15  constitute a true record.
16             I further certify that I am not an
17  attorney or counsel of any of the parties, nor
18  related to any of the parties, nor financially
19  interested in the action.
20             WITNESS my Hand and Official seal this 1 day
21  of June 2002.
22
23
   _____
   ILENE POMERANZ
24  Notary Public - State of Florida
   My Commission No. CC 825724
25  Expires:  May 30, 2003

**KRESSE, VALDES-PRIETO & ASSOCIATES, INC**
305-371-7692

47 (Pages 182 to 184)

**PLAINTIFFS' EXHIBIT 13**

NAACP, et al. vs. KATHERINE HARRIS, et al.

Deposition of DICK CARLBERG

**Page 1**

```
UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF FLORIDA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE INC.,
by its FLORIDA STATE CONFERENCE OF
BRANCHES, JIMMIE PANNELL, JULIA STONER,
NATALIE CARNEGIE, JOHN L. CHEEVER, JAMES
MARSHALL, LILLIE Q. ODOM, WILLIE STEEN,
WALLACE MCDONALD, JERMAINE TERRY, LORINE
WALDEN, EMERY TIMBERLAKE, VALERIE BUFORD-
WELLS, MICHELLE FLOYD, CONSUELO MARIA GRAHAM,
SHERRY EDWARDS, KANDY WELLS, JOANNA CLARK,
JANICE KELLY, PLACIDE DOSSOUS, RONDRICK
ROSE, URSULA HARVEY, and ADMANTHA ISREAL
in their own right and as representatives
of all similarly situated citizens and
residents of the State of Florida,

        Plaintiffs,

    vs.                CASE NO.:  01-0120-Civ-Gold

KATHERINE HARRIS, Secretary of State of
Florida; CLAY ROBERTS, Director of Florida
Division of Elections; DAVID C. LEAHY,
```

**Page 2**

```
       Deposition of DICK CARLBERG pursuant to Notice
of Taking Deposition, on Wednesday, May 15, 2002, at
9:40 a.m. at the Office of General Counsel, 17 West
Duval Street, Suite 480, Jacksonville, Florida, before
Cristina A. Stark, a Court Reporter and Notary Public in
and for the State of Florida at Large.
```

**Page 3**

A P P E A R A N C E S

ANGELA CICCOLO, Esquire
Deputy General Counsel
NAACP Legal Department
4805 Mt. Hope Drive
Baltimore, Maryland 21215-3297

Attorney for the Plaintiffs.

TRACEY ARPEN, Esquire
Office of General Counsel
City of Jacksonville
117 West Duval Street, Suite 480
Jacksonville, Florida 32202-3700

Attorney for Defendant Stafford.

DANIEL A. RESTREPO, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

Attorney for Defendant Choicepoint, Inc.,
    d/b/a Database Technologies, Inc.

DOUG MAC INNES, Esquire, via telephone
Assistant Attorney General
Office of the Attorney General
PL-01 The Capitol
Tallahassee, Florida 32399-1050

Attorney for Defendants Dickerson and Kearney

WALTER HARVEY, Esquire, via telephone
Steel, Hector, & Davis, International
200 South Biscayne Boulevard
Miami, Florida 33131-2398

Attorney for Defendants Harris and Roberts.

WILLIAM BOSCH, Esquire, via telephone
DAN ECKERT, Esquire, via telephone
County Attorney's Office
123 W. Indiana Avenue
DeLand, Florida 32720-4613

Attorneys for Defendant Lowe.

**Page 4**

A P P E A R A N C E S   C O N T I N U E D

SUSAN TORRES, Esquire, via telephone
County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128

Attorney for Defendant Leahy.

May 15, 2002

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 58 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

**5**

1        I N D E X

2   WITNESS:

3     DICK CARLBERG

4       DIRECT EXAMINATION BY MS. CICCOLO . . . . .PAGE 6

5       CROSS EXAMINATION BY MR. RESTREPO. . . . . PAGE 107

6       CROSS EXAMINATION BY MR. HARVEY. . . . . . PAGE 110

7       REDIRECT EXAMINATION BY MS. CICCOLO . . . .PAGE 113

8

9

10            N O   E X H I B I T S

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**6**

1              S T I P U L A T I O N

2        It was stipulated and agreed by and between

3   counsel for the respective parties and the witness that

4   the reading and signing of the deposition by the witness

5   be waived.

6                    - - -

7                DICK CARLBERG,

8   having been produced and first duly sworn, testified to

9   questions as follows:

10            DIRECT EXAMINATION

11   BY MS. CICCOLO:

09:42:14 12      Q    Good morning.  Would you state your full and

09:42:16 13   complete name for the record.

09:42:18 14      A    Richard Francis Carlberg.

09:42:22 15      Q    And, Mr. Carlberg, what is your business

09:42:24 16   address?

09:42:24 17      A    105 East Monroe Street, Jacksonville, Florida

03:42:28 18   32202.

09:42:30 19      Q    Mr. Carlberg, I'm going to take your deposition

09:42:34 20   this morning and ask you some questions about your work

09:42:38 21   in Duval County.  Have you ever given a deposition

09:42:42 22   before?

09:42:44 23      A    No, I haven't.

09:42:46 24      Q    Okay.  Have you had the chance, though, to

09:42:48 25   speak with Mr. Arpen and perhaps other attorneys about

**7**

09:42:52 1   how you give a deposition and what the rules are?

09:42:56 2      A    Yes.

09:42:58 3      Q    With that in mind, I would like to ask you

09:43:02 4   whether or not you've reviewed any documents to prepare

09:43:06 5   for your testimony today?

09:43:08 6      A    Yes, I did.

09:43:10 7      Q    Can you, please, sir, tell me what you reviewed

09:43:12 8   to prepare for today?

09:43:14 9      A    I looked through the poll precinct worker's

09:43:22 10   list for the 2000 presidential election.  I reviewed an

09:43:28 11   account of Janice Kelly's travails on election day and

09:43:36 12   looked through some individual voter records on Janice

09:43:42 13   Kelly and precinct clerks.

09:43:48 14      Q    Is there anything else that you reviewed?

09:43:52 15      A    No.

09:43:52 16      Q    Okay.  I noticed that you don't have any of

09:43:54 17   those documents with you this morning; is that correct?

09:43:58 18      A    That's correct.

09:43:56 19      Q    Do you anticipate that you may need to refer to

09:44:04 20   any of these documents --

09:44:04 21      A    No.

09:44:06 22      Q    -- today?

09:44:06 23      A    No.

09:44:08 24      Q    Okay.  Can you tell me in terms of the three

09:44:12 25   items that you mentioned, first the poll workers list

**8**

09:44:18 1   for the 2000 presidential election, how large a file is

09:44:22 2   that?

09:44:24 3      A    I looked at the paper file and we had 268

09:44:28 4   precincts so it's 268 pages, and each precinct would

09:44:32 5   probably have at least ten poll workers.

09:44:36 6      Q    And what's the reason that you reviewed that

09:44:40 7   document?

09:44:44 8      A    I wanted to find out who the clerks were for

09:44:44 9   two of the precincts in question in the Janice Kelly

09:44:48 10   problem.

09:44:48 11      Q    And from reviewing that poll worker list, were

09:44:52 12   you able to identify the poll workers or precincts in

09:44:58 13   question?

09:45:00 14      A    Yes.

09:45:00 15      Q    Would you please, sir, tell me the precincts

09:45:04 16   and/or poll workers that you identified by that search?

09:45:10 17      A    Precinct 8Z.

09:45:12 18      Q    Is that Z as in zebra?

09:45:18 19      A    Yes.  And the other precinct was 07, and the

09:45:22 20   clerk in 7 was Iris Miller.  I can't remember the clerk

09:45:30 21   in 8Z.

09:45:30 22      Q    Okay.  Would the clerk's name for 8Z be

09:45:38 23   reflected in the documents --

06:45:35 24      A    Yes.

09:45:36 25      Q    -- you said you reviewed?

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 59 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                                    Deposition of DICK CARLBERG

9

09:45:40 1      A   Yes.

09:45:40 2      Q   And, Mr. Carlberg, this is one of the hardest

09:45:42 3   parts about giving a deposition. Although you might

09:45:46 4   anticipate my question, if you would let me finish

09:45:50 5   before you actually answer, that way it makes it easier

09:45:52 6   for the court reporter and for our record. So will you

09:45:54 7   try and do that for me this morning?

09:45:58 8      A   Yes.

09:45:58 9      Q   Thank you. In terms of the poll worker that

09:46:04 10  you can't identify for precinct 8Z, is that something

09:46:06 11  that you would be able to refer to that record and find

09:46:10 12  out for me?

09:46:10 13     A   Yes.

09:46:12 14     Q   Okay. In terms of your review of the -- and

09:46:22 15  you called it the account of Janice Kelly's travails,

09:46:28 16  are you referring to her deposition transcript that you

09:46:30 17  may have read?

09:46:32 18     A   No, I'm not.

09:46:34 19     Q   What are you referring to?

09:46:36 20     A   An e-mail I received from Tracey Arpen

09:46:40 21  summarizing her accounting of the day's events.

09:46:42 22     Q   Do you have a copy of the e-mail?

09:46:48 23     A   Not with me.

09:46:48 24     Q   Okay. Where is a copy of the e-mail?

09:46:54 25     A   It's on my PC at my office.

10

09:46:56 1      Q   Okay. Then would you, please, for me, state in

09:46:58 2   complete detail the facts that you were provided by

09:47:02 3   Mr. Arpen regarding what you call Janice Kelly's

09:47:08 4   travails?

09:47:10 5      A   She voted at her -- she voted in 1998 in the

09:47:16 6   November election. Prior to that she had moved to

09:47:22 7   another precinct, but she went to her old original

09:47:28 8   precinct, which was 8Z. She informed the clerk that she

09:47:32 9   had moved. The clerk told her that she was in the --

09:47:38 10  that she could vote there. She filled -- Janice Kelly

09:47:42 11  then filled out a change of address form and departed.

09:47:48 12  For the 2000 presidential election, she went to that

09:47:52 13  same polling location. It was closed. There were no

09:47:58 14  signs reflecting the new polling location. She then

09:48:02 15  began driving around to look for a poll site. She found

09:48:06 16  one, a fire station on Main Street. She went there and

09:48:12 17  they told her they found her correct polling location.

09:48:18 18  She went to that polling location, which was a church on

09:48:24 19  North Main Street, 7173 North Main is where she went.

09:48:30 20  She was then told that the polls had closed, she was too

09:48:36 21  late. And she was told that by a short, white,

09:48:42 22  gray-haired lady.

09:48:52 23     Q   Okay. In reviewing -- first of all, can you

09:48:56 24  tell me when you received that account of Ms. Kelly's

09:49:00 25  travails?

11

09:49:00 1      A   It was a few days ago.

09:49:02 2      Q   Can you be more specific? Was it more than a

09:49:06 3   week ago, more than ten days ago?

09:49:08 4      A   It was probably more than a week, but I don't

09:49:12 5   -- I can't be very specific on it.

09:49:14 6      Q   Okay. Prior to that time that you received the

09:49:18 7   e-mail regarding Janice Kelly, have you ever been asked

09:49:22 8   at any time to investigate any allegations regarding her

09:49:24 9   claims as they pertain to the November 2000 presidential

09:49:30 10  election?

09:49:40 11     A   Yes, I have. Yes, I was.

09:49:58 12     Q   Mr. Carlberg, you answered in the affirmative

09:50:02 13  that someone -- that you had, in fact, looked at the

09:50:06 14  situation of Janice Kelly prior to receiving an e-mail

09:50:10 15  several weeks ago. Can you tell me the circumstances

09:50:14 16  under which you were asked to investigate her situation?

09:50:20 17     A   Really what I was told to do was to -- as far

09:50:28 18  as I can remember, was to check her registration, and I

09:50:36 19  think that was about all. Check where she was

09:50:40 20  registered, and if she was registered and who she was,

09:50:48 21  but that was all my involvement in that.

09:50:52 22     Q   And who asked you to do that, sir?

09:50:56 23     A   I don't remember.

09:51:02 24     Q   Do you know if you -- I'll call it assignment,

09:51:08 25  for lack of a better word. Do you know if you received

12

09:51:12 1   that assignment in writing --

09:51:12 2      A   No.

09:51:14 3      Q   -- or did you receive it verbally?

09:51:16 4      A   It was probably verbally. A group of us there

09:51:20 5   at the office were discussing the case and I suppose I

09:51:26 6   just went to the computer to do some investigating on

09:51:30 7   it.

09:51:36 8      Q   In terms of the records you needed to make that

09:51:38 9   investigation, were the sources you needed all available

09:51:44 10  electronically?

09:51:52 11     A   Yes.

09:51:58 12     Q   When you made that check, I think you said you

09:52:02 13  went to the computer. Can you tell me what, if

09:52:04 14  anything, you were able to determine at that time?

09:52:10 15     A   We -- I think there was some question as to

09:52:18 16  which Janice Kelly we were dealing with because there

09:52:24 17  were more than one on the system and I think we decided

09:52:42 18  it was probably Janice B. Kelly, but -- because it was

09:52:46 19  her -- because of -- her precinct was in the right

09:52:50 20  location or the right general area for the problem we

09:52:56 21  were facing.

09:52:58 22     Q   In terms of trying to identify the correct

09:53:00 23  Janice Kelly file, is it correct that those records that

09:53:06 24  you were accessing contained voter characteristics such

09:53:12 25  as race?

NAACP, et al. VS. KATHERINE HARRIS, et al.                                    Deposition of DICK CARLBERG

**13**

09:53:14 1      A   Yes.

09:53:20 2      Q   Is that information about -- in terms of racial

09:53:26 3  classification coded in some fashion on the record you

09:53:30 4  were accessing?

09:53:32 5      A   Yes.

09:53:32 6      Q   And were you provided information regarding

09:53:38 7  Ms. Kelly's racial classification?

09:53:44 8      A   Yes.

09:53:44 9      Q   And what information were you provided

09:53:46 10  regarding her race?

09:53:48 11      A   That she was black.

09:53:50 12      Q   Okay.  And were you able to determine from the

09:53:52 13  record you reviewed that Janice B. Kelly was, in fact,

09:53:56 14  African-American?

09:53:58 15      A   Yes.

09:53:58 16      Q   Okay.  So based on race and precinct and other

09:54:02 17  information you had been provided you were -- were you

09:54:08 18  confident that Janice B. Kelly was the correct record

09:54:12 19  for which you were searching?

09:54:14 20      A   Yes.

09:54:16 21      Q   Now, in terms of researching Janice Kelly's

09:54:22 22  situation, you have testified that -- and please correct

09:54:36 23  me if I misstate what you have said, that in 1998 in the

09:54:40 24  November election, Ms. Kelly moved, and prior to that

09:54:56 25  time she had been assigned to vote at precinct 8Z?

**14**

09:55:02 1      A   Yes.

09:55:12 2      Q   Did you receive any information at any time

09:55:16 3  regarding Ms. Kelly to indicate that she made a change

09:55:30 4  of address at her local Department of Highway and Motor

09:55:40 5  Vehicle Safety?

09:55:40 6      A   No.

09:55:48 7      Q   In doing your investigation regarding

09:55:50 8  Ms. Kelly, at any time did you make an effort to search

09:55:58 9  any record from the Department of Highway and Motor

09:56:02 10  Vehicle Safety to ascertain whether or not she made a

09:56:06 11  change of address form at that agency?

09:56:10 12      A   No.

09:56:30 13      Q   Let me go back, and I want to come back to this

09:56:34 14  area, and I want to ask you some questions about your

09:56:40 15  work.  You are employed by Duval County; is that

09:56:44 16  correct?

09:56:44 17      A   City of Jacksonville.

09:56:48 18      Q   What's the difference between the city and the

09:56:52 19  being employed by the county?

09:56:56 20      A   City of Jacksonville is consolidated

09:57:00 21  government.  We really don't have a county government

09:57:02 22  here.  So when asked where I'm employed, I always reply

09:57:10 23  the City of Jacksonville.

09:57:12 24      Q   Is it -- is it your assertion that the city and

09:57:18 25  county are synonymous in terms of governments?

**15**

09:57:18 1      MR. ARPEN:  Let me just object to the question

09:57:24 2  because it calls for legal conclusion on the

09:57:26 3  part of the witness, but you can answer it if

09:57:30 4  you can.

09:57:32 5      A   Yes.

09:57:32 6      Q   And what is your current job title?

09:57:36 7      A   Assistant Supervisor of Elections.

09:57:40 8      Q   How long have you held that position?

09:57:42 9      A   Since 1 July of '99.

09:57:46 10      Q   Prior to July 1st of 1999, what was your --

09:57:52 11  tell me about your employment.

09:57:54 12      A   I was the information systems coordinator for

09:58:00 13  the Supervisor of Elections in Duval County.

09:58:02 14      Q   Not the City of Jacksonville?

09:58:08 15      A   I worked for the Supervisor of Elections.  My

09:58:12 16  paycheck comes from the City of Jacksonville.

09:58:17 17      Q   Okay.  I just want to make sure that I have

09:58:18 18  this correct because you've said you work for the

09:58:22 19  government of the City of Jacksonville, and then in

09:58:26 20  describing your previous position you say you worked for

09:58:32 21  the county Supervisor of Elections?

09:58:36 22      A   That's correct.

09:58:38 23      Q   Okay.  But in terms of your understanding, that

09:58:42 24  is the same office or same entity?

09:58:48 25      A   Yes.

**16**

09:58:58 1      Q   How long did you work in information systems?

09:59:04 2      A   I joined the election's office in April of '93

09:59:08 3  as the information systems coordinator.

09:59:14 4      Q   Did you say '83 or '93?

09:59:18 5      A   '93.

09:59:18 6      Q   And as the information systems coordinator,

09:59:20 7  would you tell me a little bit about your duties?

09:59:22 8      A   I was responsible for all the computer systems

09:59:26 9  and equipment in the office.

09:59:30 10      Q   As part of that responsibility, did you have

09:59:34 11  any job duties that were related to election

09:59:40 12  administration?

09:59:42 13      A   Yes.

09:59:42 14      Q   Describe those duties for me, please.

09:59:46 15      A   I was in charge of all the software for

09:59:50 16  registration and election tabulation.

09:59:58 17      Q   Do you have any responsibility for maintenance

10:00:00 18  of the voter list?

10:00:02 19      A   Yes.

10:00:02 20      Q   Tell me about that.

10:00:04 21      A   I designed the system that when the National

10:00:12 22  Voter Registration Act was enacted, I had to modify --

10:00:16 23  designed the modifications for the software to encompass

10:00:20 24  that act.  And that was put in place on January 1st of

10:00:24 25  '95.

May 15, 2002

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 61 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

17

10:00:26 1    Q    19- --
10:00:28 2    A    '95.
10:00:30 3    Q    -- 95.  Okay.  Were there any other duties or
10:00:32 4    responsibilities you had in that position?
10:00:38 5    A    Relative to, in general or to --
10:00:42 6    Q    In general to election administration that you
10:00:46 7    have not already described.
10:00:50 8    A    No.
10:00:52 9    Q    Okay.  Did you have any supervisory
10:00:54 10   responsibility at that time?
10:00:56 11   A    No.
10:00:58 12   Q    And in that position, can you tell me who you
10:01:02 13   reported to in your chain of command?
10:01:04 14   A    The Supervisor of Elections.
10:01:10 15   Q    Prior to joining the office of Supervisor of
10:01:14 16   Elections in April 1993, what was your occupation?
10:01:20 17   A    I was senior application analyst with the
10:01:22 18   computer systems division of the City of Jacksonville.
10:01:30 19   Q    And how long did you hold that position?
10:01:36 20   A    Since May of 1976.  It was approximately 17
10:01:42 21   years.
10:01:44 22   Q    And in that position did you have any
10:01:48 23   responsibility for elections in the City of
10:01:52 24   Jacksonville?
10:01:54 25   A    No.

18

10:01:56 1    Q    Did you have any responsibility for elections
10:01:58 2    in Duval County?
10:02:00 3    A    No.
10:02:06 4    Q    And just briefly for the record, can you
10:02:10 5    summarize your educational background?
10:02:14 6    A    I have two bachelors degrees and two masters
10:02:18 7    degrees.
10:02:18 8    Q    Are they BAs or BSs?
10:02:22 9    A    BS and a BBA.
10:02:24 10   Q    In what fields?
10:02:26 11   A    General bachelor of science and then business
10:02:30 12   administration, accounting in particular.
10:02:34 13   Q    And from where did you obtain those degrees?
10:02:38 14   A    The BS from the Naval Academy and the bachelors
10:02:42 15   in accounting from the University of North Florida.
10:02:50 16   Q    Do you have any education or taken any academic
10:03:02 17   training in the field of election administration?
10:03:08 18   A    No.
10:03:12 19   Q    Do you have any formal training or education in
10:03:16 20   the field of statistics?
10:03:20 21   A    Yes.
10:03:22 22   Q    Okay.  Tell me about that background.
10:03:26 23   A    Graduate level course in business statistics.
10:03:34 24   Q    When did you take that course, Mr. Carlberg?
10:03:42 25   A    It was in 1974.

19

10:03:50 1    Q    Was that as part of a graduate program?
10:03:52 2    A    Yes.
10:03:52 3    Q    Is that a program that you did not complete?
10:03:56 4    A    I did complete it.
10:03:58 5    Q    Do you obtain a graduate degree?
10:04:00 6    A    Yes.
10:04:00 7    Q    Okay.  Did you fail to finish your -- giving me
10:04:06 8    your educational background?
10:04:10 9    A    No, I mentioned that I had two masters degrees
10:04:14 10   and two bachelors degrees.
10:04:14 11   Q    Okay.  I did not hear the masters degrees.
10:04:16 12   Tell me your master degrees.
10:04:20 13   A    One in business administration and one in
10:04:24 14   public administration.
10:04:24 15   Q    And from where did you obtain those degrees?
10:04:28 16   A    Both from the University of North Florida.
10:04:32 17   Q    In what year?
10:04:34 18   A    The MBA was in '74 and the MPA was in '90.
10:04:44 19   Q    Do you have any training in law?
10:04:44 20   A    Yes.
10:04:48 21   Q    Tell me about that.
10:04:50 22   A    I graduated from the Naval Justice School and
10:04:58 23   two undergraduate courses in business law.
10:05:00 24   Q    What's the Naval Justice School?
10:05:02 25   A    That's a school up in Newport, Rhode Island, if

20

10:05:08 1    it's still there, where the Navy sends both attorneys
10:05:14 2    and nonattorneys to receive training in military law,
10:05:22 3    UCMJ.
10:05:34 4    Q    Now, going back to your work in the Supervisor
10:05:40 5    of Elections, I understand that you designed the
10:05:50 6    registration system?
10:05:52 7    A    No, the registration system was already in
10:05:56 8    place and had been for some time.  I designed the
10:05:58 9    modifications to it so that it would comply with the
10:06:02 10   NVRA.
10:06:04 11   Q    Okay.  And that was for purposes of maintaining
10:06:06 12   voter registration lists?
10:06:08 13   A    Yes.
10:06:12 14   Q    In making -- I'll call it design modifications
10:06:18 15   to that system, I understand that that was done,
10:06:28 16   according to your testimony, so as to comply with the
10:06:34 17   NVRA and that those modifications took place January
10:06:38 18   1st, 1995?
10:06:40 19   A    That's when they were put into production.
10:06:44 20   Q    As part of the design modifications that you
10:06:48 21   undertook to make the system in Duval County compliant
10:06:54 22   with the NVRA, did you consider elements of that system
10:07:10 23   as they pertain to change of address information?
10:07:14 24   A    Yes.
10:07:16 25   Q    Okay.  Tell me how you made design

May 15, 2002

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 62 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

**21**

10:07:20  1    modifications to address -- changes of address that were
10:07:26  2    reported in Duval County.
10:07:36  3         A    First of all, we -- the State implemented a new
10:07:40  4    form -- registration form, and that form was also to be
10:07:46  5    used for changes of address.
10:07:50  6         Q    Does that form -- or did that form have a form
10:07:52  7    number?
10:07:54  8         A    Probably did.
10:07:56  9         Q    If it does, do you remember what the form
10:07:58 10    number was?
10:07:58 11         A    No.  No, I don't.
10:07:58 12         Q    Okay.
10:08:04 13         A    The -- one of the things I did was change the
10:08:12 14    computer screen format to comply with the form so that
10:08:16 15    it looked just the same as the form.
10:08:20 16         Q    So that I understand that, that the fields you
10:08:24 17    would see on a paper form would match your computer
10:08:28 18    fields?
10:08:28 19         A    Yes.
10:08:28 20         Q    What else did you do?
10:08:34 21         A    As far as changing an address from a voter, if
10:08:42 22    a voter changed an address, that was all that I did
10:08:48 23    because we simply entered a new address and transmitted
10:08:54 24    that change.
10:08:56 25         Q    And when you say transmitted that change, where

**22**

10:09:00  1    did you transmit that change?
10:09:02  2         A    The mainframe.
10:09:04  3         Q    And that would be to update the list of active
10:09:08  4    voters?
10:09:10  5         A    It would be to update the list of the record of
10:09:12  6    the voter who was making the change.
10:09:20  7         Q    Can you please describe for me the sources of
10:09:24  8    information where your office received change of address
10:09:34  9    information?
10:09:36 10         A    We could get those from the mail, from walk-in
10:09:42 11    customers, from telephone, which we would not accept,
10:10:00 12    e-mails.
10:10:04 13         Q    Did you accept e-mails?
10:10:06 14         A    Yes.  Driver's license had the capability to
10:10:18 15    do a change of address.  They could also come in from
10:10:22 16    various assistance -- State assistance agencies
10:10:26 17    throughout the city.  Another source would have been
10:10:30 18    Armed Forces recruiting, although that would have been
10:10:36 19    extremely rare.
10:10:38 20         Q    Any more sources that you're aware of?
10:10:40 21         A    No.
10:10:40 22         Q    Have those sources been pretty much consistent
10:10:44 23    during the time that you've worked in the Supervisor of
10:10:48 24    Elections Office?
10:10:48 25         A    Yes.

**23**

10:10:48  1         Q    Okay.  In terms of processing walk-in change of
10:10:54  2    addresses, can you tell me how or with what frequency
10:11:00  3    changes of address made by walk-in voters would be
10:11:06  4    processed?
10:11:08  5         A    They would be processed as they occur the
10:11:10  6    closer we get to an election, especially a cameo
10:11:15  7    election.
10:11:16  8         Q    What's a cameo election?
10:11:18  9         A    An election with the president, the governor,
10:11:20 10    and the mayor.
10:11:26 11         Q    Okay.  So you would process walk-ins as they
10:11:28 12    occur.
10:11:28 13         A    As they come into the office.  We can update
10:11:32 14    their addresses if that's what you're doing right then
10:11:36 15    and there and print them a new ID card.
10:11:42 16         Q    And then at that point, that voter making that
10:11:48 17    change receives their new ID card with new application,
10:11:52 18    if applicable?
10:11:54 19         A    Yes.
10:11:54 20         Q    Okay.  You said you didn't accept telephone
10:11:58 21    change of addresses.  What was the protocol when a voter
10:12:06 22    would attempt to make a change of address by telephone?
10:12:10 23         A    We'd tell them we'd have to have that change in
10:12:14 24    writing.
10:12:16 25         Q    And for e-mail change of addresses?

**24**

10:12:20  1         A    We made the change.  We consider that to be in
10:12:24  2    writing.
10:12:24  3         Q    In writing?
10:12:26  4         A    Yeah.
10:12:28  5         Q    In those circumstances, can you tell me how the
10:12:32  6    voter would receive a new registration card?
10:12:36  7         A    We would mail it to them to the new address.
10:12:40  8         Q    And with what regularity or frequency were
10:12:46  9    e-mail change of addresses processed in your office?
10:12:48 10         A    That would vary.  We could -- as they come in.
10:12:52 11    There's no real pattern except closer to a big election,
10:13:00 12    then they would come in, especially during, say, a
10:13:04 13    request for an absentee ballot.  If somebody requested
10:13:08 14    an absentee ballot, they could let us know this is a new
10:13:14 15    address.  After we did change the address via e-mail, we
10:13:20 16    print it there in the office live or allow the new ID
10:13:24 17    card records to tank, which meant -- means they would
10:13:30 18    build over a period of time.  And once a month we have a
10:13:36 19    computer job that would run that compiles all our
10:13:42 20    statistics, and at the time the job would print any ID
10:13:46 21    cards that were waiting to be printed.
10:13:48 22         Q    Now, when you talk about those -- I'm going to
10:13:52 23    call them records that have been tanked, was there a
10:13:56 24    particular day of the month that those jobs would run?
10:14:02 25         A    Yeah, I ran them usually on the first day of a

**May 15, 2002**

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 63 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

25

10:14:06 1   new month, might be the first, second, third, if there
10:14:10 2   was a weekend involved.  At least the first week of a
10:14:12 3   new month.
10:14:14 4       Q   In situations where an election was imminent,
10:14:18 5   did your office have any particular cutoff date for
10:14:24 6   making sure that those tanked records were processed
10:14:26 7   and, in fact, mailed to prospective voters?
10:14:30 8       A   Yeah, we would -- we would run our statistic --
10:14:38 9   that job that -- we call it a wrap-up -- I mean a
10:14:46 10  compilation, sorry.  And we would run that after the
10:14:48 11  books would close.  The books would close 29 days prior
10:14:54 12  to an election.  On that day, we would have new records
10:14:58 13  waiting to be added, records waiting to be changed, and
10:15:04 14  we would then get those processed, those that were in to
10:15:08 15  us by that 29th day.  We would get those all processed.
10:15:12 16  That might run us three or four more days.  At that time
10:15:16 17  I would run the compilation and it would print any ID
10:15:22 18  cards that were waiting to be printed.
10:15:24 19      Q   In terms of the tanked records, were records
10:15:28 20  that would await processing for this batch job come from
10:15:32 21  the various sources you've described, the e-mails, the
10:15:38 22  driver's license changes, and from the various State
10:15:42 23  assistance agencies and Armed Forces recruiting sources?
10:15:46 24      A   Yes.
10:15:46 25      Q   Okay.  So just to be clear, those change of

26

10:15:52 1   address forms, no matter what their source, would wait
10:15:56 2   for batch processing according to your schedule for
10:16:02 3   printing new registration cards?
10:16:04 4       A   Unless they were printed live.  Sometimes the
10:16:08 5   clerks will do that.  They will make changes and print
10:16:12 6   them live if they don't have many changes to do.  If
10:16:16 7   it's just a few, they will make the change, print the
10:16:20 8   card, and we will send it out that day.  If the workload
10:16:24 9   is heavy, then we allow the cards to tank.
10:16:28 10      Q   During the time that you have worked in the
10:16:30 11  Supervisor of Elections Office, has there been one
10:16:34 12  particular person or one particular job title that has
10:16:42 13  been assigned to making change of addresses for voters?
10:16:46 14      A   No.
10:16:48 15      Q   How many people throughout the years you've
10:16:52 16  worked in the office are assigned to that task at any
10:17:00 17  one time?
10:17:00 18      A   Well, again, it depends on the workload and
10:17:04 19  what other activities we have going on.  If the adds and
10:17:12 20  changes are light, maybe one or two people are doing
10:17:16 21  them.  If it's we're approaching a major election and
10:17:20 22  the business is very heavy, then we might have five or
10:17:24 23  six people doing it.
10:17:26 24      Q   In terms of receiving change of address
10:17:30 25  information from the Department of Highway Safety and

27

10:17:34 1   Motor Vehicles, can you tell me, did you receive that
10:17:38 2   information with any particular frequency prior to
10:17:42 3   November 2000?
10:17:46 4       A   I don't know.
10:17:48 5       Q   You don't know how often that information was
10:17:50 6   received by the Duval County Supervisor of Elections?
10:17:54 7       A   It came in in the mail.  I did not check the
10:17:58 8   frequency to establish a pattern.
10:18:22 9       Q   When change of address information would come
10:18:26 10  to the Supervisor of Elections of Duval County prior to
10:18:32 11  November 2000 from the Department of Highway and Motor
10:18:42 12  Vehicle Safety, did it come in list format?
10:18:45 13      A   No, it came on cards.  The computer generated
10:18:52 14  cards that were basically in the same format and looked
10:18:56 15  like the standard voter registration application forms.
10:19:02 16      Q   Was there a particular person or job title
10:19:06 17  assigned to make sure that -- that address changes that
10:19:12 18  were forwarded to this office were, in fact, made?
10:19:20 19      A   No.
10:19:26 20      Q   Was there any type of quality control to ensure
10:19:30 21  prior to November 7th, 2000, that changes of address
10:19:36 22  from the various sources you've described were made
10:19:42 23  accurately as reflected in the change record?
10:19:50 24      A   Yes.
10:19:52 25      Q   Tell me about that procedure.

28

10:19:55 1       A   When the application forms come in -- and I say
10:20:00 2   application form, that's the title of it -- it could
10:20:04 3   have changes on it.  They are reviewed for completeness
10:20:08 4   and they are reviewed for duplication.
10:20:10 5       Q   Are you saying that change of address
10:20:14 6   information is lumped with new registrations?
10:20:20 7       A   They all arrive in lumps, so we have to
10:20:24 8   separate them out to see whether they are changes or
10:20:30 9   adds.  Then the -- once the changes are separated, we
10:20:40 10  make sure that we actually have the voter -- the voter
10:20:44 11  is registered.  The changes are made, there's a computer
10:20:54 12  log -- transaction log that shows what changes were
10:21:00 13  made, the voter ID number, the changes that were made,
10:21:04 14  and the operator that did them.  Then the voters are
10:21:14 15  sent a new card.  Also, like I said before, if the
10:21:16 16  workload is light, they'll go ahead and print a new ID
10:21:20 17  card and mail that out.  Otherwise the records are
10:21:24 18  allowed to build to print the beginning of a new month.
10:21:30 19      Q   And that is a historic record that is
10:21:34 20  maintained in your office?
10:21:36 21      A   Yes, it's the -- which record are we talking
10:21:42 22  about?
10:21:42 23      Q   The record that you just described that shows
10:21:46 24  once the changes are separated and changes are made, the
10:21:52 25  computer log shows the changes that were made and

NAACP, et al. VS. KATHERINE HARRIS, et al.                           Deposition of DICK CARLBERG

29

10:21:56 1  identifies the operator that made the changes.
10:21:58 2      A   Yes.
10:22:00 3      Q   Does -- is that maintained electronically?
10:22:02 4      A   (Nods head.)
10:22:04 5      Q   You've got to give an oral answer.
10:22:04 6      A   Yes.
10:22:06 7      Q   Thank you.  In terms of researching the
10:22:12 8  situation of Janice Kelly, did you, in fact, review that
10:22:16 9  record to determine whether or not there had been a
10:22:20 10 change of address transmitted to your office from any
10:22:24 11 source?
10:22:26 12     A   No.
10:22:30 13     Q   You did not make that search?
10:22:32 14     A   No.
10:22:32 15     Q   Are you able to make that search?
10:22:34 16     A   Not really.  It's a paper list and it comes out
10:22:40 17 every day, so -- and I really don't know how long we
10:22:46 18 store that report, how far back in time it goes.
10:22:50 19 Probably not very, so we just -- we did not look at
10:22:58 20 that.
10:23:02 21     Q   You did -- you did not look at it, and as you
10:23:04 22 sit here today, you don't know if that record exists for
10:23:08 23 you?
10:23:10 24     A   I don't know.
10:23:10 25     Q   You mentioned -- you mentioned various sources

30

10:23:24 1  which change of address information comes in, mail,
10:23:28 2  telephone, walk-ins, e-mail, and the various agencies
10:23:36 3  like Department of Highway and Motor Vehicle Safety,
10:23:40 4  Armed Forces recruitment, and the various State
10:23:44 5  agencies.  One of the situations that you haven't
10:23:46 6  mentioned is one pertaining specifically to Janice
10:23:50 7  Kelly, and you have related to me that the information
10:24:00 8  you were given about Janice Kelly was that she filled
10:24:06 9  out a change of address form; is that right?
10:24:10 10     A   That's correct.
10:24:12 11     Q   Is it your understanding that that information
10:24:14 12 was filled out at the precinct that she voted in in the
10:24:22 13 1998 November election?
10:24:26 14     A   Yes.
10:24:26 15     Q   Okay.  And is it your understanding that that
10:24:30 16 change of address form would have -- or was made in
10:24:36 17 written form?
10:24:36 18     A   Yes.
10:24:38 19     Q   Okay.  Is there a -- or was there, prior to
10:24:48 20 November 2000, a process in place for the Supervisor of
10:24:52 21 Elections for Duval County to obtain change of address
10:24:58 22 information from the precinct such as presented in the
10:25:04 23 situation of Janice Kelly?
10:25:06 24     A   Yes.
10:25:06 25     Q   Okay.  What was that process?

31

10:25:10 1      A   If a voter went to a precinct and stated that
10:25:22 2  his address had changed, the clerk in charge of the
10:25:30 3  precinct would obtain his new address and determine the
10:25:36 4  correct precinct for that address.  The clerk would
10:25:40 5  then, if it was an out of precinct case -- in other
10:25:44 6  words, he had to go to another precinct, the clerk would
10:25:48 7  send him to that precinct, and when he arrived there at
10:25:52 8  the correct precinct, the clerk would have that
10:25:56 9  individual complete a voter registration application
10:26:02 10 form indicating a change of address.  That form then,
10:26:08 11 along with others collected during the day, would be
10:26:10 12 placed in a designated envelope.  The voter -- the
10:26:18 13 voter's name and ID number and address would be entered
10:26:24 14 on the -- what we call the changes page in the back of
10:26:28 15 the register.  There are blank pages inserted in the
10:26:34 16 back of the registers for voters who were not printed on
10:26:38 17 the register but belong in that precinct.  At the end of
10:26:42 18 the night when the polls were closed and all the
10:26:46 19 election supplies and equipment were returned to the
10:26:50 20 elections office, that envelope with the changes would
10:26:56 21 come back to the office and then they would be
10:27:00 22 processed.
10:27:00 23     Q   In this situation, were you able to determine
10:27:04 24 whether or not such a record was transmitted to this
10:27:08 25 office regarding Janice Kelly?

32

10:27:10 1      A   No.
10:27:12 2      Q   In your research of the issue, speaking with
10:27:22 3  personnel or precinct clerks, did you determine whether
10:27:24 4  or not any person had any personal knowledge of the
10:27:30 5  change of address form completed by Janice Kelly at a
10:27:34 6  precinct --
10:27:34 7      A   No.
10:27:36 8      Q   -- in 1998?  Now, you indicated that voters can
10:27:42 9  be recorded in the back page of the precinct log.  Can
10:27:50 10 you explain what you meant by that?
10:27:52 11     A   If a voter goes to a new precinct, that voter
10:27:58 12 will not be on that poll register because of a change of
10:28:04 13 address.  The voter is still on the old precinct where
10:28:08 14 he originally resided.  That's where his name is
10:28:12 15 printed.  If he goes to his old precinct and says I
10:28:16 16 don't live here anymore, he is sent to his new precinct.
10:28:20 17 Of course, his name will not be on the poll register,
10:28:22 18 but he lives in that precinct.  In the back of the poll
10:28:26 19 register, we insert blank pages to handle situations
10:28:32 20 like this.  The voter is then recorded in the back, his
10:28:40 21 ID number, name, address, and signature, and then he's
10:28:44 22 given a ballot to vote.
10:28:46 23     Q   In the situation presented by Janice Kelly,
10:28:52 24 would she, in fact, be the kind of voter whose name,
10:28:56 25 identification number, and signature should be recorded

33

10:29:00 1  in the back of a precinct log?
10:29:04 2      A   If she voted in a new precinct, yes.
10:29:08 3      Q   Well, her testimony is that she voted in the
10:29:12 4  November 1998 election.  Have you been able to verify
10:29:20 5  that fact?
10:29:20 6      A   Yes.
10:29:22 7      Q   And did she, in fact, vote in the November 1998
10:29:24 8  election?
10:29:26 9      A   Yes.
10:29:26 10     Q   Okay.  And is there a poll book in the back of
10:29:36 11  a register which shows Ms. Kelly, her name, ID number,
10:29:42 12  and signature where she voted in the November 1998
10:29:52 13  election?
10:29:52 14     A   No.
10:29:54 15     Q   Okay.  And can you explain why not?
10:29:56 16     A   Because it's not in the back, it's next to her
10:30:00 17  name.  She voted.  In fact, she voted in the wrong
10:30:04 18  precinct in November of '98, but her name was there and
10:30:10 19  that's where she signed.
10:30:12 20     Q   Okay.  So it's your testimony that she voted in
10:30:18 21  the wrong precinct in 1998?
10:30:24 22     A   Yes.
10:30:30 23     Q   Were you able to determine why in 1998
10:30:34 24  Ms. Kelly was not directed to the appropriate precinct
10:30:38 25  to vote in that election?

34

10:30:40 1      A   No.
10:30:40 2          MR. HARVEY:  Object to the form of the
10:30:42 3  question.
10:30:42 4          COURT REPORTER:  Is that Mr. Harvey?
10:30:50 5          MR. HARVEY:  Yes, this is Walter Harvey.
10:30:50 6  Object to the form of the question.
10:30:50 7          COURT REPORTER:  Thank you.
10:30:54 8          MR. HARVEY:  Also calls for speculation.
10:31:00 9      Q   From a factual standpoint, in your
10:31:02 10  investigation of the quote, travails of Janice Kelly,
10:31:08 11  Mr. Carlberg, you did not determine the reason Ms. Kelly
10:31:20 12  was not directed to the appropriate precinct to vote in
10:31:28 13  November 1998?
10:31:30 14     A   No.
10:31:30 15         MR. ARPEN:  Objection, calls for speculation.
10:31:50 16     Q   So based on your understanding of Ms. Kelly's
10:32:00 17  situation in 1998, she was permitted to vote at the
10:32:06 18  wrong precinct in November 1998?
10:32:08 19     A   Yes.
10:32:16 20     Q   And from your investigation, there is no record
10:32:22 21  of a change of address made by Ms. Kelly in 1998
10:32:34 22  emanating from that incorrect precinct where she voted?
10:32:38 23     A   That's correct.
10:32:46 24     Q   Now, that incorrect precinct, you described
10:32:52 25  that as 8Z?

35

10:32:58 1      A   Yes.
10:32:58 2      Q   Okay.  And you also stated that precinct 8Z was
10:33:06 3  subsequently closed subsequent to November 1998; is that
10:33:08 4  right?
10:33:08 5      A   Yes.
10:33:10 6      Q   Okay.  Can you tell me when that precinct 8Z
10:33:14 7  was closed?
10:33:16 8      A   In '99.
10:33:18 9      Q   Do you know when in 1999?
10:33:20 10     A   It was sometime after the City's general
10:33:28 11  election, which would have been in May of '99.  And it
10:33:32 12  was prior to a special election that was held -- I
10:33:40 13  believe it was in the fall of '99, a special state house
10:33:46 14  election.
10:33:56 15     Q   In situations where a precinct closes, is it
10:34:04 16  the practice of the supervisor -- Duval County
10:34:08 17  Supervisor of Elections to send notice to voters in that
10:34:12 18  precinct?
10:34:14 19     A   Yes.
10:34:20 20     Q   And, in fact, to your knowledge, was such a
10:34:26 21  notice sent with respect to the closing of precinct 8Z?
10:34:50 22     A   Yes.
10:34:30 23     Q   When was that notice sent?
10:34:34 24     A   I don't know the date.
10:34:36 25     Q   Do you -- I'm sorry.

36

10:34:36 1      A   I don't know.
10:34:38 2      Q   Do you know to whom said notice would have been
10:34:44 3  sent?
10:34:44 4      A   All voters affected by the polling site change.
10:35:08 5      Q   Is it the practice of your office to send said
10:35:12 6  notifications to individual voters or to particular
10:35:22 7  addresses within a precinct?
10:35:26 8      A   Individual voters.
10:35:36 9      Q   Do you know if Ms. Kelly received such a
10:35:40 10  notice?
10:35:42 11     A   I don't know.
10:36:02 12     Q   You said that that precinct closed in 1999
10:36:06 13  after the City's general election; is that right?
10:36:10 14     A   Yes.
10:36:10 15     Q   Okay.  Is it the practice of the Supervisor of
10:36:18 16  Elections to post any kind of notice at a closed polling
10:36:24 17  site directing voters to a new site?
10:36:26 18     A   Yes.
10:36:28 19     Q   Can you tell me how that occurs?
10:36:32 20     A   There will be a sign placed outside the old
10:36:34 21  polling site stating that that site is not being used
10:36:38 22  and then the new site -- the address of the new site
10:36:42 23  will be on it.
10:36:44 24     Q   Do you know how long such postings or such
10:36:50 25  signs are placed following the change of a precinct?

37

10:36:54 1    A   Yes, I do.
10:36:56 2    Q   How long?
10:36:56 3    A   One election.
10:37:04 4    Q   And how many elections were there in 1999 in
10:37:18 5  Duval County?
10:37:18 6    A   There were two that I know of, the regularly
10:37:26 7  scheduled and we had some specials.  I would have to
10:37:30 8  look at the record.  I don't know for sure how many of
10:37:32 9  those we had.
10:37:34 10    Q   So in the first situation and only situation
10:37:36 11  that a sign would have been posted notifying prospective
10:37:44 12  voters at 8Z that that polling place was closed, what
10:37:48 13  would have been the election?
10:37:48 14    A   It was a special house election for House 15.
10:37:54 15    Q   Special house?
10:37:56 16    A   Special election for State House of
10:38:00 17  Representatives, District 15.
10:38:04 18    Q   And how much notice was given prior to that
10:38:08 19  special house seat election to voters?
10:38:14 20    A   I don't remember.
10:38:14 21    Q   Can you find out?
10:38:16 22    A   What do you mean by notice?
10:38:18 23    Q   Well, I anticipate -- you correct me if I'm
10:38:22 24  wrong, that prior to an election that the Supervisor of
10:38:28 25  Elections gives notice to voters that the election for a

38

10:38:32 1  particular race will occur?
10:38:34 2    A   Yes, we can do that, but I can't quote the -- I
10:38:40 3  don't know the legal time frame, and since it was a
10:38:46 4  special election, it might have been done very quickly.
10:38:50 5  So I would have to check and see when we ran the
10:38:54 6  newspaper ads.
10:38:58 7    Q   Would newspaper ads have been the exclusive
10:39:06 8  form of notice disemanated by your office for that
10:39:10 9  special house seat election?
10:39:12 10    A   No.
10:39:12 11    Q   What would have been or what were the other
10:39:16 12  methods of disemanating notice for that election?
10:39:20 13    A   A sample ballot would have been in the
10:39:24 14  newspaper.
10:39:24 15    Q   Well, newspaper and newspaper are the same to
10:39:28 16  me.  Did you do any mailings?  Did you make any
10:39:32 17  telephone calls?  How did you notify voters other than
10:39:36 18  the newspaper that this special house seat election was
10:39:42 19  going to occur?
10:39:46 20    A   Put it on the web site, and that's all.
10:40:40 21    Q   What was the turnout for the special house seat
10:40:46 22  election for State House Representative, District 15 in
10:40:50 23  1999?
10:40:52 24    A   I don't know.
10:40:52 25    Q   Can you find that information out for me?

39

10:40:54 1    A   Yes.
10:41:00 2    Q   Do you have any recollection as to the turnout
10:41:06 3  for that special house seat election for District 15
10:41:14 4  that we have just been discussing?
10:41:16 5    A   No.
10:41:40 6    Q   And just to make sure that I understand
10:41:42 7  properly, polling place or precinct 8Z closed prior to
10:41:58 8  the special house seat election for District 15 in 1999?
10:42:04 9    A   Yes.
10:42:04 10    Q   For that race, polling signs were placed at 8Z
10:42:12 11  notifying voters of a change in polling place?
10:42:16 12    A   Yes.
10:42:18 13    Q   Okay.  Subsequently to that race for special
10:42:26 14  house seat election District 15, no notices would have
10:42:32 15  been placed or were placed at 8Z notifying voters of a
10:42:38 16  change of polling place?
10:42:40 17    A   That's correct.
10:42:58 18    Q   Is there a written policy that this office, the
10:43:06 19  office of the Supervisor of Elections, follows with
10:43:10 20  respect to posting signs, signs like the one we've been
10:43:18 21  discussing, which notify voters that there's a change of
10:43:22 22  polling place?
10:43:28 23    A   I don't know.
10:43:28 24    Q   Okay.  Do you know if there's any statute or
10:43:34 25  regulation that imposes a requirement for the posting of

40

10:43:?? 1  that kind of notice for any particular length of time?
10:43:46 2    A   I don't know.
10:44:10 3    MS. CICCOLO:  I want to take a break for about
10:44:14 4  five minutes.
10:44:14 5    (Brief recess.)
11:02:28 6  BY MS. CICCOLO:
11:02:28 7    Q   Mr. Carlberg, during the break, I understand
11:02:32 8  from Mr. Arpen you were able to make a telephone call;
11:02:40 9  is that right?
11:02:40 10    A   That's correct.
11:02:40 11    Q   And were you able to determine the turnout for
11:02:44 12  the special house seat election for District 15 that we
11:02:48 13  were discussing prior to the break?
11:02:52 14    A   Yes, the first primary, for that, turnout was
11:02:56 15  10.27 percent.
11:02:58 16    Q   10.27 percent?
11:03:00 17    A   Yes.
11:03:10 18    Q   Now, the first primary would have been the only
11:03:18 19  instance during which a sign would have been posted at
11:03:22 20  precinct 8Z notifying voters of a change in polling
11:03:26 21  place?
11:03:30 22    A   I'm not sure in this case.  We might because
11:03:38 23  these elections were -- if we posted for one election, I
11:03:48 24  would -- I wanted to see if these elections were two
11:03:52 25  weeks apart or a month apart and it looks -- appears to

41

1   be a month, so that would have been the only posting.

2       Q   Were you able to determine the actual dates of

3   the primary and special election?

4       A   Yes.

5       Q   Can you, just for the record, tell me those

6   dates and if you were able to determine the turnout for

7   those election contest, could you also give me that

8   information?

9       A   The special election -- first -- the primary

10  was on 9/28/99, and the general was held 11/2/99. I

11  gave you the percentage of 10.27 percent in the

12  primary. The general was 11.26 percent.

13      Q   Mr. Stafford described the council districts in

14  Duval County. Are you familiar with the number of

15  council districts in Duval County?

16      A   Yes.

17      Q   And similarly, he described that precincts or

18  council districts 7, 8, 9, and 10 are predominately

19  African-American council districts; is that correct?

20      A   Yes.

21      Q   With respect to the special house seat election

22  for District 15, were council districts 7, 8, 9, or 10,

23  I guess for lack of a better word, involved or

24  impacted --

25      A   Yes.

42

1       Q   -- for that election?

2       A   I don't know if all of them were, but some

3   were.

4       Q   Mr. Carlberg, can you tell me, to the best of

5   your knowledge, which council districts 7, 8, 9, and 10

6   would have been affected by that special house district

7   election?

8       A   To the best of my knowledge, all of them would

9   be.

10      Q   In addition to council districts 7, 8, 9, and

11  10, would there have been additional districts also

12  affected by the special election for House District 15?

13      A   Yes.

14      Q   And do you know how many?

15      A   No.

16      Q   Do you know the numbers of the council

17  districts?

18      A   No.

19      Q   Do you know if it is more than one?

20      A   If more than one council district was involved

21  in House 15 special election?

22      Q   In addition to council districts 7, 8, 9, and

23  10.

24      A   I don't know.

25      Q   Subsequent to the November 2000 election, did

43

1   your office -- Supervisor of Elections Office make any

2   changes in the method or manner in which it processes

3   changes of addresses?

4       A   No.

5       Q   In -- in -- in processing, or rather

6   maintaining the voter list for Duval County, does the

7   Supervisor of Elections Office compare in any way the

8   voter registration lists with the U.S. Postal Service's

9   national change of address files?

10      A   No.

11      Q   Does the Duval County Supervisor of Elections

12  mail nonforwardable return if undeliverable address

13  confirmation requests to voter -- to registered voters

14  in Duval County?

15      A   Yes.

16      Q   What, if any, steps does the Supervisor of

17  Elections Office in Duval County take when a

18  nonforwardable change of address form is returned to the

19  office for lack -- for nondelivery?

20      A   We don't have any nonforwardable change of

21  address forms that we mail out. We call them

22  confirmation notices -- address confirmation notices.

23      Q   Are those confirmation notices marked

24  nonforwardable?

25      A   Yes.

44

1       Q   Okay. Are there instances where those address

2   confirmations are returned to your office --

3       A   Yes.

4       Q   -- because they cannot be delivered?

5       A   Yes.

6       Q   In those instances, what happens when an

7   address confirmation is returned to your office?

8       A   If the post office states that the voter has

9   moved to a new address within Duval County and that

10  address is on there -- the post office gives us the

11  voter's new address -- we make the address change, send

12  the voter a new ID card. If the post office indicates

13  that the mail cannot be -- the piece cannot be

14  delivered, then we set that voter -- that voter up with

15  a final notice -- to be sent a final notice. The final

16  notice is forwardable. If the mail that has been

17  returned indicates that the voter has moved to an

18  address out of Duval County, we'll notify that county

19  supervisor's office and we will delete the voter from

20  our database.

21      Q   In taking such a step, does your office make

22  any effort to verify with the voter that they have, in

23  fact, moved out of the county either by telephone call

24  or other method?

25      A   No.

45

11:12:12 1    Q   Does Duval County compare its list of
11:12:18 2  registered voters with a list of jury notices signed by
11:12:24 3  voters and returned to the courts?
11:12:26 4    A   No.
11:12:30 5    Q   Does the Duval County Supervisor of Elections
11:12:36 6  Office compare the list of -- its list of registered
11:12:42 7  voters with the list of drivers who have been removed
11:12:46 8  from the Department of Highway Safety and Motor Vehicles
11:12:50 9  driver license database because that driver's licensed
11:12:54 10  in another state?
11:12:54 11    A   No.
11:13:32 12    Q   Prior to the November 2000 general election,
11:13:38 13  can you tell me the name of the employee in the
11:13:42 14  Supervisor of Elections Office that was responsible for
11:13:46 15  list maintenance, purges?
11:13:48 16         MR. RESTREPO:  Object to the form of the
11:13:52 17  question.
11:13:56 18    A   Richard Carlberg.
11:14:06 19    Q   And do you still have that responsibility,
11:14:08 20  Mr. Carlberg?
11:14:12 21    A   Yes.
11:14:14 22    Q   Did you also have that responsibility prior to
11:14:16 23  November 2000?
11:14:16 24    A   Yes.
11:14:24 25    Q   In maintaining the list of voters for Duval

46

11:14:32 1  County, do you have occasion to remove names of voters
11:14:36 2  who are no longer eligible to vote on account of a
11:14:42 3  felony conviction?
11:14:44 4    A   Yes.
11:14:44 5    Q   Can you tell me how often you remove the names
11:14:50 6  of persons who are no longer eligible to vote on account
11:14:56 7  of felony conviction?
11:14:58 8    A   When we receive the list from the State
11:15:00 9  Attorney's Office -- the felon list from the State
11:15:04 10  Attorney's Office -- I don't know the exact frequency on
11:15:10 11  that.  It's probably monthly or when a voter would reply
11:15:16 12  to one of our inquiries and tell us that yes, he is a
11:15:22 13  felon and has not had his rights restored, we'll remove
11:15:28 14  him.
11:15:28 15    Q   That presumes an inquiry has been made from
11:15:32 16  your office.  Is there some practice or procedure your
11:15:34 17  office follows when it receives the felon list from the
11:15:40 18  -- what is it, the county clerk?
11:15:44 19    A   The State Attorney's Office.
11:15:46 20    Q   State Attorney?
11:15:48 21    A   We don't communicate with the felon on that
11:15:52 22  instance.  If we can positively identify the voter on
11:15:56 23  our database, then we delete them.
11:16:02 24    Q   And what is the method that your office would
11:16:06 25  use or does use to identify a felon listed on the State

47

11:16:18 1  Attorney's list and also appearing on your voter rolls?
11:16:24 2    A   Name and date of birth, exact match.
11:16:40 3    Q   And has that process changed in any way since
11:16:44 4  November 2000?
11:16:46 5    A   No.
11:16:48 6    Q   Are there situations that you have encountered
11:16:56 7  in matching names on the felon list from the State
11:17:02 8  Attorney's Office and your voter registration list where
11:17:10 9  you have encountered less than exact matches?
11:17:16 10    A   I don't know.
11:17:26 11    Q   So, in other words, you have not encountered
11:17:30 12  situations where a name -- first and last name may
11:17:42 13  correspond in both lists but, for example, a birthdate
11:17:46 14  may be different?
11:17:46 15    A   I'm sure that has occurred, but I don't know
11:17:50 16  specifically if it has or not.
11:17:54 17    Q   Okay.  What is the reason that you do not know
11:17:56 18  specifically?
11:17:58 19    A   Because I don't do the work, clerks do that.
11:18:02 20    Q   How many clerks do that work?
11:18:04 21    A   Depends on the load and what we're doing.  It
11:18:06 22  might be one or two or three.  Some days if we have
11:18:10 23  people available, we'll break out the list and divide it
11:18:14 24  up among as many people that's available.
11:18:14 25    Q   But you supervise that work, don't you?

48

11:18:18 1    A   Not directly, no.
11:18:18 2    Q   Do you review that work?
11:18:20 3    A   No.
11:18:22 4    Q   Well, who does review it?  Who's responsible
11:18:24 5  for ensuring that work is done properly?
11:18:28 6    A   The office supervisor.
11:18:30 7    Q   And who is that?
11:18:34 8    A   Wilma Sapp.
11:18:40 9    Q   And who is Wilma Sapp's direct supervisor?
11:18:44 10    A   I am.
11:18:48 11    Q   Do you supervise Wilma Sapp's completion of
11:18:54 12  that task --
11:18:54 13    A   No.
11:18:56 14    Q   -- or performance of that task?
11:18:58 15    A   No.
11:19:00 16    Q   Do you provide her any direction in
11:19:04 17  accomplishing that task?
11:19:06 18    A   Only when situations change requiring a change
11:19:10 19  of procedures.
11:19:10 20    Q   Explain what you mean by that.
11:19:14 21    A   Laws change.
11:19:16 22    Q   Can you give me an example?
11:19:18 23    A   Or -- well, it's not really a law, but when we
11:19:22 24  got the felony list supplied to us from the Division of
11:19:26 25  Elections, that was a whole new ballgame that we had to

Case 1:01-cv-00120-ASG   Document 405   Entered on FLSD Docket 07/02/2002   Page 69 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                                    Deposition of DICK CARLBERG

49

11:19:30 1   deal with.  So that's when I established the office
11:19:34 2   procedures and then the staff carries it out.  I don't
11:19:38 3   do that floor-level work.
11:19:40 4       Q    Why was that a whole new ballgame?
11:19:44 5       A    Because we had never received those lists
11:19:48 6   before.
11:19:54 7       Q    When did you first receive those lists?
11:20:00 8       A    Well, let's see, they were dated October of
11:20:04 9   '99, and I think there was one that was January of 2000.
11:20:14 10  Two diskettes came over and we also had them on paper.
11:20:18 11      Q    I'm sorry, I didn't hear that last part.
11:20:18 12      A    We also had them on paper.  We had diskettes
11:20:22 13  with the files on them and paper lists, they were the
11:20:28 14  same.
11:20:28 15      Q    So there are two different disks, two different
11:20:34 16  paper lists, but you would have a paper list
11:20:38 17  corresponding to each diskette?
11:20:40 18      A    Yes.
11:20:48 19      Q    Did that list -- or do those lists have a
11:20:52 20  particular name that they were known by?
11:20:58 21      A    Yeah, but I don't remember what it was.
11:21:06 22      Q    Did it have a name that you commonly referred
11:21:14 23  to it?
11:21:14 24      A    Yeah, the felon list or the duplicate
11:21:20 25  registration list or the death list.

50

11:21:24 1       Q    Were those three different lists all part of
11:21:26 2   the same list?
11:21:28 3       A    There were three different files.
11:21:32 4       Q    Okay.  So those three different files would
11:21:36 5   have been encompassed on each of the diskettes you've
11:21:42 6   described and each of the paper lists you've described?
11:21:46 7       A    Yes.
11:21:52 8       Q    So you've got the felon list, the death list,
11:21:56 9   and the third again?  I'm sorry.
11:22:00 10      A    Duplicate registrations.
11:22:06 11      Q    Was there also a mental incompetence list?
11:22:10 12      A    No.
11:22:10 13      Q    Did your office receive such information
11:22:16 14  regarding mental incompetence?
11:22:18 15      A    No.
11:22:20 16      Q    Is it a function of your office to examine
11:22:38 17  records regarding mental incompetency as they pertain to
11:22:44 18  registered voters?
11:22:46 19      A    I'm not sure, but I believe those lists would
11:22:50 20  come to us from the HRS.
11:22:52 21      Q    And that -- what is HRS?
11:22:54 22      A    I think it's -- maybe it's a new name now,
11:22:58 23  Health and Rehabilitation Services, something like --
11:23:00 24  some health agency would send us.  Perhaps the State
11:23:02 25  Attorney on the incom-- -- I'm just not up to speed on

51

11:23:06 1   the mental incompetence.  I've never heard it being
11:23:08 2   talked about in the office, so I really can't give you
11:23:12 3   any definitive information on that one.
11:23:16 4       Q    That's -- just the mental incompetency list is
11:23:20 5   something that you have never dealt with?
11:23:22 6       A    No, I haven't.
11:23:24 7       Q    Do you know if Wilma Sapp would have dealt with
11:23:30 8   such a list for mental incompetency?
11:23:32 9       A    If it exists she would have.
11:23:50 10      Q    Have you ever discussed the maintenance of
11:23:44 11  Duval County voter registration lists as pertaining to
11:23:50 12  mental incompetency requirements with Ms. Sapp?
11:23:54 13      A    No.
11:24:00 14      Q    In terms of the list that you received in
11:24:04 15  October 1999 and January 1999 from the Division of
11:24:12 16  Elections, did you receive any instructional information
11:24:18 17  with those lists or diskettes about the information that
11:24:24 18  you would be provided?
11:24:28 19           MR. RESTREPO:  Object to the form of the
11:24:30 20      question.
11:24:30 21      A    Yes, we did.
11:24:32 22      Q    Can you tell me what you received with the
11:24:36 23  October 1999 diskette and list?
11:24:42 24      A    Well, we received record formats describing the
11:24:48 25  fields, describing some of the codes that were used in

52

11:24:52 1   determining or selecting those voters as probable
11:24:58 2   felons, duplicates, or deaths.
11:25:02 3       Q    Now, you say probable felons.  What do you mean
11:25:04 4   by that?
11:25:06 5       A    That was the -- they were listed and always
11:25:08 6   referred to, to my recollection, in documentation as
11:25:12 7   probable felons, probable dupes, probable deaths, they
11:25:18 8   weren't for sure.  And the codes -- they were indicated
11:25:30 9   whether or not the selections were made based on name --
11:25:34 10  I think based on date of birth and name.  There were
11:25:38 11  various selection criteria.  And then that was designed
11:25:40 12  to give some indication as to the level of probability,
11:25:44 13  high or low on the -- as to whether it was a good hit.
11:26:12 14      Q    When you say a good hit, what do you mean?
11:26:14 15      A    It means that the voter actually was a felon or
11:26:22 16  there would be a high degree of reliability that that
11:26:26 17  voter was, indeed, the same one that was on our file.
11:26:30 18      Q    And would that be an exact match?
11:26:34 19      A    I don't know.  I don't think so.  We didn't
11:26:36 20  treat it that way.
11:26:38 21      Q    Okay.  What's the reason you didn't treat that
11:26:42 22  information as an exact match?
11:26:44 23      A    Because the operative word -- I designed the
11:26:50 24  whole policy.  The operative word in my mind was
11:26:54 25  probable, and I just was not going to take a list of

53

11:27:06  1    probable voters and delete them off my file unless I
11:27:10  2    knew for sure and -- or knew legally that I could do
11:27:16  3    that for sure, so that was the policy we took.
11:27:20  4         Q    Did you request, then, legal guidance to
11:27:24  5    determine whether or not your office could legally
11:27:30  6    remove voters using the probable felon, death list,
11:27:42  7    duplicate registration list that was received in October
11:27:44  8    1999?
11:27:48  9         A    No.
11:27:54 10         Q    Can you tell me what, if anything, your office
11:28:00 11    did with the information contained in the October 1999
11:28:06 12    list?
11:28:10 13         A    We matched the files with our data file and
11:28:16 14    when we got a match -- they had ID numbers on them, if I
11:28:24 15    remember correctly, voter ID numbers, so that -- the
11:28:24 16    matching wasn't a problem.  When we got a hit -- when we
11:28:32 17    got the match between the State list and ours, we
11:28:36 18    changed the voter's status because we have a field on
11:28:40 19    our voter record called status.  We changed it to an F
11:28:46 20    for a probable felon, a U for a probable dupe, and a D
11:28:50 21    for probable death.
11:28:52 22         Now, what that did was it kept those voters --
11:28:56 23    prevented those voters from being counted in our
11:29:00 24    statistics.  We then mailed letters to those voters.  We
11:29:06 25    had three different letters, one tailored for felons,

54

11:29:10  1    one for dupes, and one for probable deaths.  We mailed
11:29:14  2    those letters out and we -- the basis -- the basis of
11:29:24  3    the letters was that we asked them to call us to confirm
11:29:28  4    whether they were, indeed, felons or whether they were
11:29:34  5    still with us on this earth or whether they had moved to
11:29:38  6    another county.  So -- not quite in that language, but
11:29:42  7    anyway, we mailed those letters and we received phone
11:29:48  8    calls.
11:29:48  9         Q    And that would have been after your office
11:29:52 10    received the October 1999 list, went through your
11:29:56 11    matching process, and mailed letters?
11:29:58 12         A    Yes.
11:30:02 13         Q    You had also mentioned a list that was provided
11:30:08 14    by the -- did you say county -- State Attorney's Office
11:30:12 15    -- State Attorney's --
11:30:14 16         A    State Attorney.
11:30:16 17         Q    During that time when your office was matching
11:30:20 18    records using the list provided in October 1999 from the
11:30:26 19    Division of Elections, were you also using the list
11:30:30 20    provided from the State Attorney's Office to match records
11:30:34 21    for felons, duplicate registrations, and probable
11:30:38 22    deaths?
11:30:38 23         A    The State Attorney does not provide those.
11:30:42 24    Provides felon lists, that's all.
11:30:46 25         Q    Felon lists only?

55

11:30:46  1         A    Yes.
11:30:46  2         Q    But at that time, were you also using the State
11:30:50  3    Attorney's Office list to match felons?
11:30:54  4         A    Yes.
11:30:54  5         Q    Okay.  So you were using the State Attorney's
11:30:58  6    list and this list provided by the Division of Elections
11:31:02  7    at the same time?
11:31:04  8         A    Yes.
11:31:04  9         Q    Okay.  Now, do you know when approximately this
11:31:14 10    first batch of letters went out to voters based on
11:31:22 11    matches made in your office that identified voters as
11:31:26 12    probable felons?
11:31:30 13         A    Approximately June of 2000.
11:31:36 14         Q    And is that the first time that a notification
11:31:49 15    went out from your office based on the use of the list
11:31:46 16    or lists provided by the Division of Elections for
11:31:50 17    felons, duplicate registrations, and probable deaths?
11:32:06 18         A    Yes.
11:32:06 19         Q    I'm just trying to get a better idea of
11:32:08 20    approximately what part of June these letters went out.
11:32:14 21    Do you know if it was closer to the beginning of June,
11:32:18 22    do you know if it was closer to the end of June?
11:32:22 23         A    I think it was early June.
11:32:24 24         Q    Mr. Carlberg, do you know approximately how
11:32:28 25    many letters were sent to voters for the particular

56

11:32:40  1    categories you've mentioned for the felon -- probable
11:32:44  2    felons, probable duplicates, or probable deaths?
11:32:46  3         A    No, I don't.
11:32:56  4         Q    Now, you've hinted at a response that this
11:33:00  5    office received to those letters.  I'd like for you to
11:33:06  6    describe for me what kind of response -- responses you
11:33:10  7    received as a result of sending those letters to voters.
11:33:18  8         MR. RESTREPO:  Object to the form of the
11:33:20  9    question.
11:33:20 10         A    The voters would call in and tell us
11:33:28 11    whether they were -- or not they still lived in Duval
11:33:34 12    County, if it was a dupe -- a dupe registration, or
11:33:38 13    whether they had been convicted of felonies or had not
11:33:42 14    been -- never been convicted of a felony.  And if they
11:33:44 15    had been, whether their civil rights had been restored.
11:33:52 16    The death, of course, people would call in and say I'm
11:33:56 17    still here and we took their word for it.
11:34:08 18         Q    Did your office maintain any kind of list or
11:34:12 19    log with respect to responses that came into the office
11:34:20 20    as a result of those letters?
11:34:50 21         A    No.
11:34:50 22         Q    Can you tell me what, if anything -- well, let
11:34:56 23    me just strike that.
11:35:00 24         How did it come to your attention that voters
11:35:00 25    were calling in to correct -- correct information

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 71 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                                    Deposition of DICK CARLBERG

57

11:35:18 1    regarding their voter status based on these letters?
11:35:24 2         MR. RESTREPO:  Object to the form of the
11:35:26 3    question.
11:35:26 4    A    How did I know they were calling in?
11:35:30 5    Q    Yes, how did that come to your attention?
11:35:34 6    A    The clerks would tell me that voters have been
11:35:38 7    responding to the letters.
11:35:42 8    Q    Did you understand that you were -- your office
11:35:50 9    was receiving a number of calls that caused your clerks
11:36:12 10   to question the accuracy of the information used to
11:36:18 11   generate the letters?
11:36:20 12        MR. RESTREPO:  Object to the form of the
11:36:22 13   question.
11:36:28 14   A    I don't understand, I'm sorry.
11:36:28 15   Q    Okay.  I take it that you spoke with your
11:36:34 16   clerks and your clerks communicated to you that calls
11:36:38 17   were coming in from voters who -- who wanted to
11:36:48 18   communicate to this office a number of factors, either
11:36:54 19   that they were living, that they were felons or were not
11:37:00 20   felons.  You were getting information -- a variety of
11:37:04 21   information --
11:37:04 22   A    Yes.
11:37:04 23   Q    -- is that correct?
11:37:06 24   A    Yes.
11:37:06 25   Q    Okay.  And did those calls cause you to

58

11:37:12 1    question the reliability of the felon list, death list,
11:37:24 2    or probable death list provided by the Division of
11:37:24 3    Elections?
11:37:28 4         MR. RESTREPO:  Object to the form of the
11:37:30 5    question.
11:37:30 6    A    No.
11:37:34 7    Q    Okay.  What, if anything, caused your
11:37:38 8    office to question the reliability of the lists provided
11:37:44 9    by the Division of Elections?  When I say list, I mean
11:37:50 10   the felon list, duplicate registration list, or death
11:37:54 11   list.
11:37:56 12        MR. RESTREPO:  Object to the form of the
11:37:58 13   question.
11:38:00 14   A    The word probable attached to the list.
11:38:02 15   Q    Did your office make any efforts to verify
11:38:06 16   information on the lists provided by the Division of
11:38:12 17   Elections to determine its accuracy?
11:38:22 18   A    Just the letters we sent out, that was all.
11:38:28 19   Q    And based on the letters that were sent out and
11:38:34 20   the responses to those letters, did your office -- did
11:38:42 21   the response to those letters cause in any way your
11:38:46 22   office to question the reliability of the lists provided
11:38:50 23   by the Division of Elections?
11:38:54 24        MR. RESTREPO:  Object to the form of the
11:38:56 25   question.

59

11:38:58 1         MR. ARPEN:  Objection, asked and answered.
11:39:00 2    A    No.
11:39:00 3    Q    So it did not concern you or your office
11:39:04 4    that voters who received letters who had erroneously
11:39:18 5    been identified as felons, duplicate registered voters,
11:39:28 6    or probable dead voters, that the information forwarded
11:39:42 7    to them by letter was incorrect?
11:39:44 8         MR. RESTREPO:  Object to the form of the
11:39:46 9    question.
11:39:46 10   A    No.
11:39:48 11   Q    What is the reason it did not concern you?
11:39:52 12   A    Because it was irrelevant based on the policy
11:39:56 13   that we had chosen to pursue in treating those lists.
11:40:02 14   Q    Explain why a voter's status based on those
11:40:06 15   lists -- well, strike that.
11:40:08 16        Explain why it's irrelevant.
11:40:12 17   A    We treated the lists, as I've said before, as
11:40:18 18   being probable occurrences -- lists of probable
11:40:22 19   occurrences.  Therefore, we took the philosophy that --
11:40:30 20   that is used by voter registration.  When a voter
11:40:36 21   registers, we don't question whether or not that -- he
11:40:40 22   has -- has been a felon.  He checks a block saying no,
11:40:44 23   I've never been a felon.  We don't question his
11:40:48 24   citizenship and a host of other pieces of information on
11:40:52 25   there.  We take the voter's word for it.  We don't

60

11:40:56 1    require any documentation.  Therefore, if a voter tells
11:41:00 2    us in response to our inquiries that no, I've never been
11:41:04 3    convicted of a felony, that is good enough for us.  Or
11:41:10 4    that the voter -- if the voter says I -- I'm registered
11:41:16 5    to vote in Duval County, I'm not registered in another
11:41:20 6    county or perhaps I was in another county, but I'm here
11:41:24 7    now, that's fine.  That's the policy we chose.  The
11:41:28 8    reliability of the lists from Tallahassee was
11:41:32 9    irrelevant.  We were going to take a look at every name
11:41:36 10   on there and process it.  We weren't going to make any
11:41:40 11   decisions as to delete those voters based on information
11:41:46 12   received from anyone other than the voter.
11:41:48 13   Q    Were there voters that did not respond to your
11:42:00 14   letters?
11:42:02 15   A    Yes.
11:42:02 16   Q    Approximately how many?
11:42:04 17   A    I don't know.
11:42:06 18   Q    Can you give me a reasonable estimate?
11:42:12 19   A    I would say about 2200.
11:42:24 20   Q    And with respect to the reasonable estimate of
11:42:28 21   2200, can you tell me approximately how many of that
11:42:36 22   2200 represented voters who had received the felon
11:42:48 23   letter?
11:42:50 24   A    I don't know.
11:42:54 25   Q    Similarly, do you have a reasonable estimate of

Case 1:01-cv-00120-ASG — Document 405 — Entered on FLSD Docket 07/02/2002 — Page 72 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.   Deposition of DICK CARLBERG

**61**

11:42:56 1 the number of voters that did not respond to the --

11:43:02 2  A No, I don't.

11:43:04 3  Q -- to the felon letter?

11:43:08 4  A (Shakes head.)

11:43:08 5  Q And similarly, with respect to the duplicate

11:43:10 6 registration letter -- those voters that did not respond

11:43:16 7 to the duplicate voter registration, do you have a

11:43:20 8 reasonable estimate of how many of that -- those

11:43:22 9 approximately 2200 nonrespondants were probable

11:43:26 10 duplicate --

11:43:28 11  A No, I don't.

11:43:30 12  Q -- voters.  And for the death list, do you have

11:43:38 13 a reasonable estimate of how many of those 2200

11:43:42 14 nonresponding voters received the death letter?

11:43:50 15  A No, I don't.

11:44:02 16  Q What, if any, action did your office take with

11:44:08 17 respect to the approximately 2200 voters that did not

11:44:14 18 respond to those letters?

11:44:18 19  A Ultimately they were deleted from the master

11:44:22 20 file.

11:44:22 21  Q And they were deleted even though you did not

11:44:26 22 receive any confirmation from the voter or communication

11:44:34 23 from the voter with respect to those notices?

11:44:38 24  A Yes.

11:44:44 25  Q And who made the decision to delete those

**62**

11:44:46 1 voters?

11:44:48 2  A I did.

11:44:50 3  Q When did you make the decision to delete those

11:44:52 4 voters?

11:44:54 5  A It was -- I think it was -- I think it was this

11:45:12 6 past January.

11:45:18 7  Q This past January?

11:45:18 8  A This January of 2002.

11:45:22 9  Q January of 2002.  So from June of 2000 when

11:45:30 10 those letters went out until January of 2002, your

11:45:34 11 office made no change or rather did not delete the names

11:45:46 12 of voters that did not respond to those letters?

11:45:50 13  A That's correct.

11:45:56 14  Q Back in June 2000 when the letters went out to

11:46:04 15 felons -- probable felons, probable duplicates, and

11:46:08 16 probable death, did you give voters any particular time

11:46:18 17 frame during which they needed to respond?

11:46:24 18  A No.

11:46:44 19  Q And for the list that your office received from

11:47:02 20 the Division of Elections -- people have called it in

11:47:06 21 this litigation different names, some people call it the

11:47:10 22 purge list, some people call it the removal list, you

11:47:16 23 called it a probable --

11:47:20 24  A Felon or dupe or death list.

11:47:24 25  Q -- felon, dupe, or death list.  For those

**63**

11:47:28 1 lists, the probable felon, dupe, or death lists that you

11:47:34 2 received from the Division of Elections, did Duval

11:47:38 3 County take any steps to verify that the people whose

11:47:44 4 names were on those lists were not eligible to vote?

11:47:50 5  MR. RESTREPO:  Object to the form of the

11:47:52 6 question.

11:47:52 7  MR. ARPEN:  Objection, asked and answered.

11:47:54 8  MS. CICCOLO:  I think it's a little bit

11:47:56 9 different question.

11:48:02 10  A Let me have that one again, please.

11:48:06 11  Q And I said for the -- the list, the death,

11:48:12 12 dupe, or felon list that Duval County received from the

11:48:18 13 Division of Elections, did Duval County take any steps

11:48:24 14 to verify that the people whose names were on those

11:48:30 15 lists were not eligible to vote?

11:48:34 16  MR. RESTREPO:  Object to the form of the

11:48:36 17 question.

11:48:36 18  MS. TORRES:  I have an objection, Susan

11:48:40 19 Torres.

11:48:48 20  A Yes.

11:48:50 21  Q Can you tell me what -- what were those

11:48:56 22 steps?

11:48:56 23  A We sent letters to everybody in the three

11:49:06 24 categories, and the other thing we did was to flag the

11:49:16 25 probable felons on the precinct registers at the polls.

**64**

11:49:24 1 The theory being that one of the felons who had not

11:49:28 2 received a letter or had not responded showed up to

11:49:32 3 vote, the clerk would then know that that person might

11:49:36 4 be a felon.  And she could then ask him, in essence,

11:49:42 5 just what we asked in our letter.

11:49:46 6  Q And that would occur on election day; is that

11:49:52 7 right?

11:49:52 8  A Yes.

11:49:52 9  Q That would have been true for the November 2000

11:49:56 10 election?

11:49:56 11  A Yes.

11:49:56 12  Q Okay.  What, if any, training did poll workers

11:50:02 13 receive with respect to the flagging of probable felons

11:50:08 14 on the precinct register?

11:50:10 15  A They were told the format of the flag, what it

11:50:16 16 looked like, what it meant.

11:50:18 17  Q What did it look like?

11:50:20 18  A It was asterisk F asterisk after the person's

11:50:26 19 name.  And poll workers were told that if a person with

11:50:32 20 that flag shows up, then that person -- the voter should

11:50:36 21 be directed to the clerk and the clerk would then ask

11:50:42 22 him if he had been convicted of a felony, if he'd had

11:50:48 23 his civil rights restored, whatever, and then make a

11:50:52 24 determination as to whether that voter could vote.

11:50:54 25  Q And those probable felons that were flagged on

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

65

11:51:00 1 the precinct list, that information came from the list
11:51:04 2 provided to Duval County from the Division of Elections?
11:51:08 3    A   Yes.
11:51:10 4        MR. HARVEY:  Object to the form of the
11:51:10 5 question.
11:51:14 6        MR. RESTREPO:  Object to the extent that
11:51:16 7 it wasn't a question.
11:51:42 8    Q   Information to flag -- and I'm using the
11:51:48 9 word flag because that's how you used it, because you're
11:51:52 10 using the word flag, it's to alert a poll worker to a
11:51:56 11 situation that requires their attention; is that right?
11:52:00 12   A   That's correct.
11:52:02 13   Q   Okay.  And that information, the flagging of --
11:52:14 14 I guess would you call it voters on the list or what do
11:52:18 15 you call it?
11:52:18 16   A   The voters on the precinct register.
11:52:22 17   Q   The flagging of voters on the precinct register
11:52:30 18 as probable felons was based on -- was that flagging
11:52:36 19 based on information obtained from the list provided to
11:52:44 20 Duval County from the Division of Elections?
11:52:48 21   A   Yes.
11:52:56 22   Q   In describing the list provided by the Division
11:52:58 23 of Election, you also identified duplicate registration
11:53:02 24 and probable death registrations, correct?
11:53:06 25   A   Yes.

66

11:53:06 1    Q   Okay.  Back in November 2000, did Duval County
11:53:18 2 similarly flag possible duplicate registrations or death
11:53:28 3 registrations on the precinct voter register?
11:53:32 4    A   No.
11:53:34 5    Q   What is the reason that information was not
11:53:38 6 flagged on the precinct registers?
11:53:46 7    A   The -- the easiest one we deal with first was
11:53:52 8 the probable deaths.  If the voter shows up to vote,
11:53:54 9 he's not dead, so therefore, we don't have to flag that.
11:53:58 10 On the duplicate registrations, if the voter -- the only
11:54:02 11 person -- people we flagged as far as dupes are
11:54:06 12 concerned were those who registered at registration
11:54:14 13 dates in another county that were later than their
11:54:20 14 registration date in Duval County.  So if that voter
11:54:26 15 showed up at the polls to vote, that meant that he
11:54:30 16 really lived in Duval County to us, so we didn't care
11:54:34 17 again.  We didn't have to flag him.  The system was set
11:54:40 18 up such that after the election was over and the poll
11:54:44 19 registers were scanned -- we have light pens and we scan
11:54:48 20 bar codes for each voter who voted, when we do that, the
11:54:52 21 voter gets credit for having voted and also the status
11:54:58 22 of the voter automatically is changed to active if it's
11:55:02 23 something other than active.  Voting reactivates a
11:55:06 24 voter.  It reactivates those voters who were inactive --
11:55:12 25 in an inactive status and often we use the same

67

11:55:18 1 principle to reactivate -- to change the status of the
11:55:20 2 dupes and the deaths.  The felon situation was a little
11:55:26 3 different.
11:55:28 4    Q   Explain why the felon situation was different
11:55:30 5 from the death and the duplicate registration system.
11:55:36 6    A   Felons are not supposed to be registered if
11:55:38 7 they are convicted felons.  They're not even supposed to
11:55:42 8 be registered and they're certainly not supposed to
11:55:42 9 vote, so we needed some type of system there, some
11:55:46 10 mechanism in place to stop the felon from voting if, in
11:55:50 11 fact, that voter was a felon.  So that's why we put the
11:55:54 12 flag on there.
11:55:56 13   Q   But you would agree deceased voters are not
11:56:01 14 entitled to vote, neither are incompetent voters or
11:56:04 15 duplicate registered voters.
11:56:06 16   A   That's correct, but as I said, if the voter
11:56:10 17 shows up, he's not dead, so we don't have to question
11:56:16 18 that.  And it would be the same as responding to one of
11:56:20 19 our letters calling in saying no, I'm not dead.  If a
11:56:24 20 possible or a probable duplicate registration voter
11:56:28 21 shows up because of the selection criteria we made to
11:56:34 22 flag them in the first place, if that voter is there and
11:56:38 23 on our poll register, then he's registered in Duval
11:56:44 24 County and so we don't have to prevent that person from
11:56:46 25 voting.

68

11:56:48 1    Q   Who made the decision in Duval County to flag
11:56:54 2 felons in the voter register rolls?
11:56:58 3    A   I did.
11:57:02 4    Q   And when did you make that decision?
11:57:06 5    A   Well, it was probably a month or two prior to
11:57:14 6 the elections.
11:57:18 7    Q   In November 2000?
11:57:20 8    A   Yeah.  Yes.
11:57:20 9    Q   Okay.  But you did not make that decision for
11:57:28 10 elections held at any prior time in Duval County?
11:57:32 11   A   No.
11:57:40 12   Q   Okay.  Was there some particular situation or
11:57:44 13 change in Florida law or some reason that made you
11:57:52 14 decide to flag probable felons on voter registration
11:58:00 15 lists for the November 2000 election?
11:58:06 16   A   Yes.  We mailed out the letters in June and we
11:58:12 17 wanted to give voters plenty of time to reply to those
11:58:16 18 letters.  There was a primary in September and another
11:58:24 19 one in October.  We had the voters flagged by that time,
11:58:34 20 so for those first two elections, the primary and the
11:58:38 21 October election, they weren't on the registers at all
11:58:42 22 because the software at that time would print only
11:58:48 23 active voters, the status of A.
11:58:52 24        Well, I thought about the fact that we had a
11:58:58 25 presidential election coming up.  I knew the voter

May 15, 2002

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 74 of 234

**69**

11:59:02 1  turnout would be huge. I knew it would not be much for
11:59:06 2  the primaries, so I decided that it would be -- it would
11:59:14 3  save us phone calls in the office if I put these people
11:59:20 4  on the poll register. If they were not on the poll
11:59:24 5  register, all those inactive voters, the probable -- the
11:59:30 6  three categories of probables had not been on that
11:59:34 7  register, we would have had even more problems with our
11:59:38 8  communications on election day because of voters -- of
11:59:42 9  the clerks calling into the office, so I put them on the
11:59:42 10 register.
11:59:46 11         My interpretation on the law of the inactive
11:59:52 12 voter was that there was a statement in the law that
11:59:54 13 says the inactive voters are not to be included in the
12:00:00 14 county statistics. And that is why in the past we
12:00:02 15 didn't have inactives on the register, but -- so I put
12:00:06 16 the inactives on there for that presidential election
12:00:10 17 and I made the same decision to put the probable dupes,
12:00:14 18 death, and felons on there because it was a high
12:00:18 19 probability they would show up to vote. And I still --
12:00:22 20 that would eliminate phone calls, and I also had the
12:00:28 21 system automated such that if an inactive voter voted or
12:00:32 22 a probable -- a felon or probable death person voted,
12:00:34 23 then that person would be automatically reactivated to a
12:00:40 24 status of A, as in active. But I had to catch the
12:00:44 25 felons and so I -- no pun intended there, please, but I

**70**

12:00:50 1  had to identify the felons in order to prevent their
12:00:52 2  voting if, in fact, they were felons. Perhaps I should
12:00:56 3  have put those -- followed that same policy on the two
12:01:02 4  primaries, but, quite frankly, it never occurred to me
12:01:06 5  until I started thinking about the big turnout we would
12:01:10 6  have for the presidential and -- and virtually zero
12:01:14 7  turnout for the second primary.
12:01:14 8      Q   So then there was a change of policy between
12:01:16 9  the primaries and the presidential election with respect
12:01:20 10 to flagging of possible felons on the voter
12:01:28 11 registration?
12:01:28 12     A   Yeah, they weren't on the registers at all in
12:01:32 13 the primaries, but they were on the register for the
12:01:36 14 general.
12:01:36 15     Q   And that was at least in your mind based on the
12:01:38 16 turnout you expected?
12:01:38 17     A   Yes.
12:01:42 18     Q   Okay. During the entire time that you have
12:01:44 19 worked in the Supervisor of Elections Office, has -- has
12:01:54 20 the policy regarding the ineligible -- ineligibility of
12:02:04 21 felons to vote been consistent?
12:02:08 22     A   Yes.
12:02:12 23     Q   And you've worked in this office since 1993?
12:02:16 24     A   Yes.
12:02:18 25     Q   Okay. And in no election prior to November

**71**

12:02:32 1  7th, 2000, to your knowledge, did this office identify
12:02:42 2  voters in the precinct registers as probable felons by
12:02:48 3  flagging their record?
12:02:f0 4      Q   Yes.
12:02:52 5      Q   Okay. Did Duval County collect any kind of
12:03:06 6  data on the number of people whose names appeared on the
12:03:14 7  Division of Elections list for felons, duplicate voters,
12:03:22 8  or probably dead voters who appeared on the list
12:03:22 9  erroneously?
12:03:30 10         MR. RESTREPO:  Object to the form of the
12:03:32 11 question.
12:03:32 12     A   No.
12:03:38 13     Q   Do you have any kind of estimate that you
12:03:42 14 have been able to make as to how many individuals were
12:03:58 15 erroneously included on the election -- the list
12:04:00 16 provided to Duval County from the Division of Elections?
12:04:06 17         MR. RESTREPO:  Object to the form of the
12:04:06 18 question.
12:04:08 19     A   No. No, I don't.
12:04:08 20     Q   No. Okay. Is that something you were
12:04:10 21 ever asked to do?
12:04:12 22     A   No.
12:04:14 23     Q   Okay. Is that something that you ever wanted
12:04:16 24 to find out for yourself?
12:04:18 25     A   No.

**72**

12:04:44 1      Q   Did Duval County determine if there were any
12:04:50 2  other errors -- errors that we haven't discussed on the
12:05:00 3  probable felon, probable duplicate, probable death list
12:05:04 4  provided by the Division of Elections?
12:05:08 5          MR. RESTREPO:  Object to the form of the
12:05:10 6  question.
12:05:10 7      A   No.
12:05:14 8      Q   Did Duval County ever communicate with the
12:05:22 9  Division of Elections regarding any problems pertaining
12:05:34 10 to the accuracy of those lists?
12:05:38 11         MR. RESTREPO:  Object to the form of the
12:05:40 12 question.
12:05:40 13     A   No.
12:05:52 14     Q   Did the Duval County office of elections
12:06:02 15 have any internal discussions concerning the accuracy of
12:06:10 16 the list provided by the Division of Elections?
12:06:12 17     A   No.
12:06:16 18     Q   Never discussed at any time?
12:06:24 19     A   We discussed it with media people, but among
12:06:34 20 ourselves, no, because it just -- because the policy
12:06:40 21 that we took, it was irrelevant. We had to deal with
12:06:44 22 it. We came up with a policy and whether it was
12:06:46 23 accurate or not made no difference because we did not
12:06:52 24 make decisions affecting the voters based on information
12:06:56 25 on that list as far as deleting voters is concerned. We

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 75 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

## 73

12:07:00 1  simply flagged them and then waited for situations to
12:07:02 2  develop that would provide us with information on it.
12:07:06 3  So we didn't -- we didn't really have a care whether it
12:07:10 4  was accurate or not.
12:07:18 5      Q   On election day November 7th, 2000, did this
12:07:24 6  office receive telephone calls from precincts concerning
12:07:38 7  voters who came to vote and who had been flagged as
12:07:46 8  felons on the list?
12:07:48 9      A   I don't know.
12:07:50 10         MR. RESTREPO:  Object to the form of the
12:07:50 11 question.
12:07:52 12     Q   You don't know one way or the other?
12:07:54 13     A   (Shakes head.)
12:07:54 14     Q   Is there anybody in this office who would know
12:07:58 15 that information?
12:08:00 16     A   Somebody might have gotten a call, somebody
12:08:04 17 might know.  I can't give you a specific name.  I'd have
12:08:06 18 to ask around.
12:08:06 19     Q   Did your office attempt in any way to determine
12:08:10 20 different categories of phone calls that came in from
12:08:18 21 precincts on election day?
12:08:20 22     A   No.
12:08:24 23     Q   Was there any interest in determining what
12:08:28 24 kinds of information that poll workers were trying to
12:08:36 25 receive from the Division of Elections for purposes of

## 74

12:08:42 1  future training or educational development?
12:08:46 2      A   No.
12:08:48 3          MR. RESTREPO:  Object to the form of the
12:08:50 4  question.
12:08:50 5      A   No.
12:08:50 6      Q   No.  At any time did your office -- and I
12:09:12 7  mean the Supervisor of Elections, receive any type of
12:09:18 8  notification from the Division of Elections that
12:09:22 9  concerned the accuracy of the purged lists it had
12:09:28 10 provided?
12:09:30 11         MR. RESTREPO:  Object to the form of the
12:09:30 12 question.
12:09:32 13     A   I don't know.
12:09:32 14     Q   Okay.
12:09:34 15     A   Other than the instructions attached to the
12:09:38 16 initial mailing of it.  I don't know of any -- anything
12:09:42 17 else.
12:09:42 18     Q   You don't know if there were any telephone
12:09:46 19 calls?
12:09:46 20     A   No, not to me.
12:09:48 21     Q   You don't know if there were telephone calls to
12:09:50 22 anybody in the Division of Elections -- I mean in the
12:09:54 23 Duval County Supervisor of Elections Office from the
12:10:00 24 Division of Elections regarding that list?
12:10:04 25     A   I did not get any personally.  I don't know if

## 75

12:10:08 1  anyone else did.
12:10:10 2      Q   Okay.  And similarly, did your office -- and
12:10:20 3  when I say your office, I mean the Supervisor of
12:10:22 4  Elections Office, receive any type of written
12:10:26 5  communication from the Division of Elections regarding
12:10:28 6  the accuracy of the purged lists?
12:10:32 7          MR. RESTREPO:  Object to the form of the
12:10:34 8  question.
12:10:34 9      A   I don't know.
12:10:36 10     Q   Do you know who would know that
12:10:38 11 information?
12:10:42 12     A   I know some people that might know, but I don't
12:10:48 13 know anyone who would know.
12:10:48 14     Q   Do you know, subsequent to the November 2000
12:10:50 15 election, if the Duval County Supervisor of Elections
12:10:54 16 Office received any communication from the Division of
12:10:58 17 Elections concerning the accuracy of the purged lists?
12:11:04 18         MR. RESTREPO:  Object to the form of the
12:11:04 19 question.
12:11:04 20     A   I don't know.
12:11:12 21     Q   Did the Duval County Supervisor of
12:11:20 22 Elections Office receive any type of communication from
12:11:28 23 DBT, which is also known as Choicepoint, concerning any
12:11:40 24 of the purged lists?
12:11:42 25         MR. RESTREPO:  Object to the form of the

## 76

12:11:44 1  question.
12:11:48 2      A   I don't know.
12:12:12 3      Q   Yesterday -- not yesterday, but Monday
12:12:14 4  Mr. Stafford described some situations where even
12:12:26 5  employees in the Supervisor of Elections Office
12:12:30 6  identified persons that they knew were erroneously
12:12:38 7  included on the lists that had been provided by the
12:12:42 8  Division of Elections as either being felons, duplicate
12:12:48 9  registrations, or dead.  Did you discuss any of those
12:12:52 10 circumstances with Mr. Stafford?
12:12:56 11         MR. RESTREPO:  Object to the form of the
12:12:56 12 question.
12:12:58 13         MR. HARVEY:  Object to the form of the
12:12:59 14 question.  This is Walter Harvey.
12:13:00 15     A   Yes.
12:13:00 16     Q   Can tell me what you discussed?
12:13:02 17     A   We had one young lady in the office and her
12:13:06 18 husband was on that list and he had never been convicted
12:13:14 19 of a felony before, so we discussed that instance.
12:13:20 20     Q   Did that raise any concern in your mind that a
12:13:26 21 similar situation could be present for other names
12:13:34 22 included in that list?
12:13:38 23     A   Didn't raise any concern at all.
12:14:02 24     Q   Are you familiar with DBT's Auto Track XP
12:14:08 25 program?

NAACP, et al. VS. KATHERINE HARRIS, et al.
Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 76 of 234
Deposition of DICK CARLBERG

77

12:14:10 1    A    No.
12:14:14 2    Q    Is that a database that your office has -- or
12:14:20 3 that your office used to verify any lists provided by
12:14:24 4 the Division of Elections?
12:14:24 5    A    No.
12:14:56 6    Q    As Assistant Supervisor of Elections, can you
12:15:00 7 tell me if your office has any communication with the
12:15:06 8 Florida Department of Correction and Law Enforcement
12:15:12 9 regarding individuals whose civil rights have been
12:15:16 10 restored?
12:15:18 11   A    No.
12:15:22 12   Q    Okay.  What about in terms of any communication
12:15:28 13 with your office and the Florida Department of
12:15:32 14 Corrections and Law Enforcement concerning individuals
12:15:34 15 who may have been granted clemency?
12:15:40 16   A    None that I know of.
12:15:40 17   Q    Is that a situation that you personally have
12:15:44 18 ever encountered in the office, receiving communications
12:15:48 19 regarding individuals whose civil rights have been
12:15:50 20 restored --
12:15:52 21   A    No.
12:15:52 22   Q    -- or who had been granted clemency?
12:15:56 23   A    No.
12:16:00 24   Q    During the time that you have worked in the
12:16:04 25 Duval County Supervisor of Elections Office, to your

78

12:16:12 1 knowledge, is there any process to obtain information
12:16:20 2 from any source regarding persons whose civil rights
12:16:28 3 have been restored or, in turn -- or granted clemency?
12:16:36 4    A    Yes.
12:16:38 5    Q    Okay.  And when did that process begin?
12:16:46 6         MR. RESTREPO:  Object to the form of the
12:16:48 7 question.
12:16:48 8    A    It didn't, it's always been there.
12:16:54 9    Q    At least since you've worked in the
12:16:56 10 office?
12:16:56 11   A    Yes, but maybe I don't understand.  We do not
12:17:00 12 in our office seek information on the rights.  That's
12:17:04 13 the voter's responsibility, we don't do it.
12:17:08 14   Q    And that's what I was trying to determine and
12:17:12 15 it's the way I asked the question.  Does your office
12:17:14 16 take any affirmative steps to determine voters whose
12:17:18 17 civil rights have been restored or who have been granted
12:17:24 18 clemency?
12:17:24 19   A    No.
12:17:30 20   Q    Are there any plans in place in Duval County to
12:17:34 21 take affirmative steps to determine or identify
12:17:38 22 individuals whose civil rights have been restored or who
12:17:42 23 have been granted clemency?
12:17:44 24   A    Yes.
12:17:44 25   Q    Okay.  Tell me about that.

79

12:17:48 1    A    The State Division of Elections is developing
12:17:52 2 and will put into production rather soon a centralized
12:18:00 3 voter database for the state of Florida.  And that
12:18:02 4 system, I believe, has the components of dealing with
12:18:08 5 felonies and we will be using those.
12:18:14 6    Q    But do you know if that database also concerns
12:18:18 7 the restoration of rights?
12:18:20 8    A    I don't know that.  I'm just assuming that that
12:18:24 9 would be a part of it.
12:18:36 10   Q    Did Duval County maintain copies of
12:18:40 11 affirmations completed by voters that were made on
12:18:44 12 November 7th, 2000?
12:18:45 13   A    Yes.
12:18:46 14   Q    Did your county provide the plaintiffs with
12:18:52 15 copies or summaries of those affirmations?
12:18:56 16   A    I don't know.
12:18:56 17        (Off-the-record discussion.)
12:19:24 18 BY MS. CICCOLO:
12:19:24 19   Q    Mr. Carlberg, are you familiar with the Florida
12:19:28 20 Election Reform Act?
12:19:30 21   A    Yes.
12:19:32 22   Q    Have you been -- in your capacity as Assistant
12:19:36 23 Supervisor of Elections for Duval County, have you made
12:19:40 24 any comments regarding that act?
12:19:44 25   A    No.

80

12:19:46 1    Q    Given any testimony regarding that act?
12:19:48 2    A    No.
12:19:50 3    Q    Okay.  Has Duval County purged any voters from
12:19:56 4 its roll since that act was passed?
12:20:02 5         MR. RESTREPO:  Object to the form of the
12:20:02 6 question.
12:20:04 7    Q    I'm talking about the Florida Election
12:20:08 8 Reform Act.
12:20:14 9    A    When was it passed?  Early 2001, wasn't it, or
12:20:20 10 middle of 2001?
12:20:30 11   Q    Do you know one way or another whether or
12:20:34 12 not --
12:20:34 13   A    Yes, I have purged some.
12:20:38 14   Q    Okay.  Do you know how many approximately?
12:20:44 15   A    2200.
12:20:44 16   Q    2200 we've described -- discussed previously?
12:20:48 17   A    Yes.
12:21:02 18   Q    I want to go back to the lists that were
12:21:05 19 provided to Duval County by the Division of Elections
12:21:10 20 in, I think you said October 1999 and January 2000.
12:21:10 21   A    (Shakes head.)
12:21:16 22   Q    Okay.  In the information that the county
12:21:22 23 received with those lists, were there any type of
12:21:28 24 instructions from the Division of Elections that
12:21:32 25 instructed the county to verify the accuracy of those

Case 1:01-cv-00120-ASG    Document 406    Entered on FLSD Docket 07/02/2002    Page 77 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

81

1    lists before using them to remove voters' names from the
2    voter rolls?
3        MR. HARVEY:  Object to the form of the
4        question, Walter Harvey.
5    A    I don't know.
6    Q    You don't know?
7    A    I can't be absolutely sure.  I think there
8    were.  Here's my understanding of it, we were given
9    options, methods, sources to verify, but whether we were
10   actually ordered or required to do one, two, three,
11   four, I don't remember seeing that.
12   Q    Okay.
13   A    So I can't say that we received instructions,
14   per se, on how to verify the information.
15   Q    Okay.  In answering that question -- I know
16   that you can't recall specifically, but does your -- do
17   you remember any of the options or methods that may have
18   been suggested?
19   A    I believe there was some type of an online
20   method, probably over the Internet, I'm not sure.  And I
21   think we were given addresses and phone numbers of the
22   FDLE and the clemency board, that type of information.
23   Q    Did Duval County use any of those options, to
24   your recollection?
25   A    No.

82

1    Q    Okay.  And what's the reason Duval County did
2    not use any of those options?
3    A    Because of manpower.  We didn't have the people
4    to dig.  We did not view ourselves as being in the
5    business of law enforcement, we are an elections office.
6    We don't pursue that type of application and we -- and,
7    again, I harp -- I keep going back to that word
8    probable, and we came up with a policy that we thought
9    would be efficient for us and wouldn't cause any bruises
10   so . . .
11   Q    But would you agree with me that not all of the
12   options were related to law enforcement issues?
13   A    Oh, yeah.
14   Q    Okay.  So were there other options that we have
15   not already discussed that your county took to verify
16   the accuracy of information in those lists?
17   A    No.
18   Q    Okay.  Did the Division of Elections provide
19   any type of assistance to Duval County with respect to
20   verifying the accuracy of those lists in any way?
21   A    No.
22   Q    Did the Division of Elections provide any type
23   of training regarding the use of those lists?
24   A    I think there was some provided on the online
25   searches, but I'm not definitely sure about that.

83

1    Q    Do you know, did Duval County participate in
2    any training conducted by DBT/Choicepoint concerning the
3    use of those lists?  And when I say lists, I mean the
4    lists provided by the Division of Elections that we've
5    been discussing which contained information regarding
6    possible felons, deaths, or duplicate registration.
7        MR. RESTREPO:  Object to the form of the
8        question.
9        MR. HARVEY:  Object to the form of the
10       question, this is Walter Harvey.
11   A    No.
12   Q    I'm sorry.  Is that a no that you don't
13   know --
14   A    We did not participate.
15   Q    You did not participate.  Do you know if any
16   such training was offered to Duval County?
17   A    Yes.
18   Q    And yes it was offered?
19   A    It was offered.
20   Q    What is the reason Duval County did not
21   participate in that training?
22   A    As I've said, because of manpower, timing.  We
23   were getting close to the elections -- presidential
24   elections and we just couldn't devote resources to it.
25   Q    I understand that Duval County didn't

84

1    participate in any training provided by DBT, but did DBT
2    provide any written training materials to Duval County
3    in lieu of training?
4    A    I don't know.
5    Q    You have described several sources of
6    information that the Duval County Supervisor of
7    Elections has used in the past to identify ineligible
8    voters that may appear on its rolls.  You described the
9    Division of Election list and then you've described a
10   list from the Florida State Attorney's Office.  Are
11   there any other sources other than those sources that we
12   have discussed that Duval County received information
13   from to use for purposes of identifying ineligible
14   voters reflected on the voter rolls?
15   A    No.
16   Q    Mr. Stafford Monday identified some cooperative
17   efforts between your office and other counties for a
18   number of different purposes.  Is there any sharing
19   between the counties of lists of individuals who may be
20   ineligible voters?
21   A    Yes.
22   Q    Okay.  Could you tell me about that or those
23   lists?
24   A    It's not really a list.  If a voter comes into
25   Duval County and registers here and let's say that voter

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 78 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

85

12:30:48 1    was from Broward County, that voter, as being a good
12:30:50 2    voter, will hand us the voter registration card for
12:30:54 3    Broward County.  We'll send that down to Broward and
12:30:54 4    they'll know that they can take that voter off their
12:30:58 5    rolls, he's now in Duval.  That's the kind of
12:31:00 6    cooperation there is between counties.
12:31:18 7        Q    Are you familiar with the central voter file
12:31:22 8    committee?
12:31:22 9        A    No.
12:31:28 10       Q    Do you serve on any committee pertaining to the
12:31:32 11   administration of elections?
12:31:34 12       A    No.
12:31:36 13       Q    Are you a member of any task forces or working
12:31:42 14   groups regarding election administration?
12:31:46 15       A    No.
12:31:48 16       Q    Have you ever been a part of any such group?
12:31:50 17       A    No.
12:32:22 18       Q    Did the Florida Division of Elections, to your
12:32:26 19   knowledge, provide any information to Duval County about
12:32:34 20   whether individuals who had been convicted of felonies
12:32:38 21   in states other than Florida were eligible to vote in
12:32:44 22   Florida?
12:32:50 23       A    I don't know.
12:33:02 24       Q    Prior to November 2000, did your office, the
12:33:10 25   Duval County Supervisor of Elections Office, have any

86

12:33:14 1    type of policy with respect to the eligibility of
12:33:24 2    out-of-state felons -- when I say out-of-state felons, I
12:33:28 3    mean individuals who have been convicted of felonies in
12:33:32 4    states other than Florida -- regarding their eligibility
12:33:36 5    to register and vote in the state of Florida?
12:33:40 6        A    No.
12:33:42 7        Q    Since November 2000, has your office formulated
12:33:48 8    any type of policy with respect to such persons?
12:33:52 9        A    No.
12:33:56 10            MS. CICCOLO:  I need to take another break for
12:33:58 11       five minutes.
12:33:58 12            (Brief recess.)
12:45:02 13   BY MS. CICCOLO:
12:45:32 14       Q    Mr. Carlberg, you indicated that the Duval
12:45:45 15   County Supervisor of Elections, I believe, receives
12:45:52 16   voter registration information from the Department of
12:45:58 17   Highway Safety and Motor Vehicles; is that right?
12:46:00 18       A    Yes.
12:46:02 19       Q    Okay.  Prior to the November 2000 general
12:46:06 20   election, did your office ever have any problems with
12:46:16 21   voter registrations received from the Department of
12:46:20 22   Highway Safety and Motor Vehicles?
12:46:26 23       A    No.
12:46:34 24       Q    Did the Duval County Supervisor of Elections
12:46:38 25   provide any type of training to Department of Highway

87

12:46:44 1    and Safety Motor Vehicle employees on voter
12:46:46 2    registration?
12:46:46 3        A    No.
12:46:56 4        Q    Do you know if mail-in voter registration
12:47:02 5    applications are available at local Department of
12:47:08 6    Highway Safety and Motor Vehicle offices in your county?
12:47:14 7        A    I don't know.
12:47:18 8        Q    Can you tell me in what form that you receive
12:47:25 9    voter registration applications or updates from the
12:47:26 10   Department of Highway Safety and Motor Vehicles?
12:47:30 11       A    They are on paper medium and they're the same
12:47:34 12   format as the voter registration application form.
12:47:36 13   They're generated by their computer, evidently as a
12:47:38 14   biproduct of doing some transaction with the DDL or --
12:47:46 15       Q    Is there a liaison that works between the
12:47:50 16   Department of Highway Safety and Motor Vehicles and your
12:47:52 17   Supervisor of Elections Office?
12:47:56 18       A    I think so.
12:48:00 19       Q    Do you know when that liaison was put in place?
12:48:02 20       A    No.
12:48:04 21       Q    Do you know, was it prior to November 7th,
12:48:06 22   2000?
12:48:08 23       A    I don't know.
12:48:12 24       Q    Do you believe that that liaison to have been
12:46:16 25   put in place after November 7th, 2000?

88

12:48:20 1        A    Yes.
12:48:20 2        Q    Okay.  Prior to the November 7th, 2000, general
12:48:26 3    election, were there ever times when completed
12:48:30 4    applications were lost at the Department of Highway
12:48:36 5    Safety and Motor Vehicles with respect to Duval County
12:48:40 6    registrations?
12:48:42 7             MR. ARPEN:  Objection, calls for speculation.
12:48:46 8        A    Repeat that again, please.
12:48:48 9        Q    Was there ever a time when completed
12:48:50 10   applications for voter registration or updates for Duval
12:48:54 11   County were lost at the Department of Highway Safety and
12:48:58 12   Motor Vehicles?
12:49:03 13       A    I don't know.
12:49:08 14       Q    Are the updates and voter registration
12:49:14 15   information that are provided to Duval County by the
12:49:18 16   Department of Highway Safety and Motor Vehicles provided
12:49:34 17   -- well, are they transmitted to your office by mail?
12:49:46 18       A    Sometimes.
12:49:54 19       Q    If not transmitted by mail, how are those
12:49:58 20   records received by your office?
12:50:00 21       A    We pick them up.  We have a driver that goes to
12:50:04 22   the DDLs.
12:50:06 23       Q    How often does the driver go to those offices?
12:50:10 24       A    He hits each one a couple times a week, I
12:50:12 25   think.

89

12:50:14 1     Q   And was that also true prior to November 7th,
12:50:16 2 2000?
12:50:18 3     A   No.
12:50:18 4     Q   What was the process for getting those
12:50:20 5 applications from the Department of Highway Safety and
12:50:26 6 Motor Vehicles prior to November 2000?
12:50:28 7     A   To my knowledge, mail was the only method.
12:50:46 8     Q   When Duval County receives registrations or
12:50:50 9 updates from the Department of Highway Safety and Motor
12:50:54 10 Vehicles, are those records reviewed for completeness?
12:50:58 11     A   Yes.
12:51:00 12     Q   And in the event a registration or update is
12:51:04 13 incomplete, can you tell me what process your office
12:51:08 14 takes with respect to those records -- incomplete
12:51:12 15 records?
12:51:12 16     A   We'll mail the voter -- the applicant a letter
12:51:18 17 stating what's missing and we'll include a blank voter
12:51:26 18 registration application form and ask the voter to
12:51:28 19 resubmit.
12:51:40 20     Q   I also understand that Duval County receives
12:51:44 21 registrations from the Department of Children and Family
12:51:48 22 Services?
12:51:48 23     A   Yes.
12:51:54 24     Q   Is there also a liaison person that works
12:52:00 25 between the Department of Children and Family Services

90

12:52:04 1 and Duval County?
12:52:06 2     A   I don't know.
12:52:14 3     Q   Mr. Carlberg, are mail-in voter registrations
12:52:18 4 ap- -- available -- I'm sorry, are mail-in voter
12:52:22 5 registration applications available at Department of
12:52:26 6 Children and Family Services offices in Duval County?
12:52:32 7     A   I don't know.
12:52:42 8     Q   Can you describe for me the format in which you
12:52:46 9 receive voter registration applications from the
12:52:48 10 Department of Child and Family Services?
12:52:52 11     A   We pick them up.
12:52:56 12     Q   Is there a standard voter registration
12:53:00 13 application used throughout Duval County?
12:53:02 14     A   Yes.
12:53:04 15     Q   It's the same for Department of Child and
12:53:06 16 Family Services, the same for Department of Motor
12:53:10 17 Vehicles, the same for voter registration drives?
12:53:16 18     A   The DDL, Department of Driver's License,
12:53:18 19 generates theirs off their computer, it prints it,
12:53:24 20 otherwise we use forms. The child services, I don't
12:53:28 21 know if they print theirs themselves or they use a form.
12:53:32 22 Voter drives, we use the state form, but they look --
12:53:36 23 the same data on there, it's just not, you know, the
12:53:36 24 right color or whatever.
12:53:40 25     Q   You just don't know if Department of Child and

91

12:53:44 1 Family Services uses their own form or the state form?
12:53:48 2     A   I don't know.
12:53:50 3     Q   All right. Did you have any involvement at all
12:54:04 4 with the Duval County election reform task force?
12:54:10 5     A   No.
12:54:14 6     Q   Did you attend any of the meetings or
12:54:16 7 workshops?
12:54:16 8     A   Attended one meeting, I think.
12:54:20 9     Q   Which meeting did you attend?
12:54:22 10     A   I don't know. I don't remember.
12:54:22 11     Q   Do you have any input into the election reform
12:54:28 12 task force final report?
12:54:30 13     A   No.
12:54:30 14     Q   Did you have any input in any draft provided
12:54:34 15 for the election reform task force?
12:54:38 16     A   No.
12:54:46 17     Q   The workshop or session that you attended, can
12:54:50 18 you tell me --
12:54:50 19     A   Let me get something, we had our own local task
12:54:54 20 force and there was a state task force. Which one are
12:54:54 21 we talking about here?
12:54:58 22     Q   I'm just talking about the Duval County
12:55:00 23 election reform task force.
12:55:04 24     A   Okay. I have no input with that, just one
12:55:10 25 attendance.

92

12:55:12 1     Q   Did you have any attendance with the state
12:55:16 2 reform task force?
12:55:18 3     A   No.
12:55:18 4     Q   The one meeting that you attended for the Duval
12:55:20 5 County task force, can you tell me what was discussed at
12:55:24 6 that meeting?
12:55:26 7     A   That one -- the reason I went to it was the
12:55:28 8 Supervisor of Elections spoke at that and the members of
12:55:36 9 the task force addressed him and he addressed them and
12:55:40 10 that was it. I don't remember there being a specific
12:55:44 11 agenda for that one.
12:55:48 12     Q   So would it be fair to say that Mr. Stafford
12:55:50 13 was the primary person from the Supervisor of Elections
12:55:56 14 Office involved with the Duval County task force?
12:56:00 15     A   Yes.
12:56:02 16     Q   As the Assistant Supervisor of Election, did
12:56:06 17 you provide him any information or any assistance with
12:56:12 18 respect to his involvement in that task force?
12:56:26 19     A   No.
12:56:28 20     Q   Did you read the task force report?
12:56:32 21     A   Yes.
12:57:16 22     Q   As part of the task force recommendation, there
12:57:20 23 was a particular section regarding registrant
12:57:26 24 identification. Are you generally familiar with that
12:57:32 25 portion of the task force report?

Case 1:01-cv-00120-ASG  Document 405  Entered on FLSD Docket 07/02/2002  Page 80 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

93

1  A  No.
2  Q  A section of that report deals with the problem
3  of mislocated registrants and recommends that the
4  supervisor explore the development of a joint initiative
5  with JEA to use the utilities' change of address process
6  to trigger updates of a voter's change of address.  Do
7  you know, are there any initiatives underway at this
8  time to have the Supervisor of Elections work in some
9  fashion with JEA to obtain change of address
10 information?
11  A  There are none.
12  Q  According to the task force report, there were
13 some recommendations made with respect to fraud
14 prevention.  According to the task force report, there
15 were cases where persons either voted absentee and then
16 in person or voted in person at the Supervisor of
17 Elections office and then again at the precinct.  Are
18 you aware of those situations?
19  A  Yes.
20  Q  Can you tell me what procedures were in place
21 prior to November 2000 to prevent a voter from casting
22 an absentee ballot and then voting in person?
23  A  It's a matter of timing.  You get to a point
24 where you can't prevent it.  Once the precinct register
25 has been printed, and that will be -- it's usually about

94

1  a week before the election.  Once that has been printed,
2  then a voter could vote absentee at the office and go to
3  the poll and vote.  Prior to the books being printed,
4  that can't occur because we print on the poll register
5  whether or not the voter has voted absentee or requested
6  an absentee ballot.  So if the voter shows up at the
7  precinct and there are absentees involved -- absentee
8  ballots involved, after the -- and this is what
9  happened, somebody -- after the precinct registers were
10 printed and we were not able to flag the absentees,
11 somebody or a few people voted twice.  You can do that.
12  Q  What is the -- at least in November 2000, what
13 was the time frame between the printing of the final
14 poll register books and the actual election?
15  A  Like I said, it's about a week we usually print
16 -- do it the Monday before the election in order to give
17 us time to assemble the books and get -- do the
18 logistics on it.  I don't know the exact date.
19  Q  Did your office provide any, for example, lists
20 of voters who had voted absentee to each precinct?
21  A  Subsequent to the printing of the book?
22  Q  Yes.
23  A  No.
24  Q  Are you familiar with other counties or other
25 Supervisors of Elections Offices who -- or that use that

95

1  kind of method, and I mean printing the list subsequent
2  to the printing of a book that contains the list of
3  absentee voters?
4  A  I know it's done, but I don't know the exact
5  counties that do it or their methods.  But there is a --
6  I know that there is some facsimilie thereof being done.
7  Q  Does -- subsequent to November 7th, 2000, has
8  Duval County made any changes in the method in which it
9  notifies precincts that particular voters have voted
10 absentee?
11  A  Not yet.
12  Q  You say not yet.  To me that implies that there
13 is a change in the works?
14  A  There probably will be, but it's a timing --
15 still a timing problem and we'll have to take a look at
16 it.  We don't have one in the works right now.
17  Q  Are there procedures that have been suggested
18 or recommended?
19  A  No.
20  Q  So then there is nothing in the works?
21  A  No.
22  Q  Okay.  Mr. Stafford indicated that you may be
23 able to answer some questions about different areas like
24 voter education, poll worker training, things of that
25 nature.  I want to ask you a couple of questions about

96

1  poll workers.  Your attorney has provided to me some of
2  the notices that your office has used over the past
3  several years notifying poll workers of their
4  appointment to serve as clerks or deputy clerks, things
5  of that nature.  Are you generally familiar with those
6  types of notifications?
7  A  Yes.
8  Q  He told me if -- according to a notice I'm
9  looking at that's dated August 2000 -- and I'm sorry, I
10 don't have another copy of it, but I'll just -- I'm not
11 even going to mark it, I'll just show it to you.  It's
12 Notice of General Election 2000 dated August 2000.  Is
13 that something you recognize?
14  A  Yes.
15  Q  Okay.  That notice indicates that clerks may
16 select workers for elections.  Can you explain to me
17 what that means?
18  A  Well, the county uses 2500-plus poll workers to
19 do a county-wide election, so coming up with those --
20 that number of people -- in other words, the recruiting
21 process can be difficult, so we had clerks do a lot of
22 the recruiting to get their -- the members of their --
23 we call it an election board.  So they can -- they help
24 us out in the recruiting.  Also we might have, say, 15
25 workers in a precinct, but we won't need them all if

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 81 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

**97**

13:06:52 1   it's a lightweight election, so the clerk can decide
13:07:00 2   which of those members to employ for election day.
13:07:04 3       Q   Are there any eligibility criteria for poll
13:07:06 4   workers?
13:07:08 5       A   Yeah, they have to be able to -- gosh, I just
13:07:16 6   put it up on our web site too.  They have to be able to
13:07:22 7   lift a certain amount of weight, they have to be able to
13:07:24 8   endure a long day.  They're not really all that tight,
13:07:30 9   but we do -- you know, they have to be -- physically to
13:07:32 10  be able to do an election day.
13:07:42 11      Q   Is there any requirement that they be
13:07:44 12  registered voters?
13:07:46 13      A   Yes, must be registered in Duval County.
13:08:04 14      Q   As part of the documents your counsel provided,
13:08:08 15  I was given a general description of the biannual file
13:08:14 16  maintenance program.  Are you familiar with that
13:08:16 17  program?
13:08:16 18      A   Yes.
13:08:16 19      Q   Is that actually a program that you created?
13:08:28 20      A   Yes.
13:08:34 21      Q   There's a step in that biannual file
13:08:38 22  maintenance program that I wanted to ask you about and
13:08:42 23  it's actually step seven and I'll just read it to you.
13:08:46 24  It says, "If an inactive voter does not vote or update
13:08:52 25  his record by the second federal election after the

**98**

13:08:54 1   final notice mailing, delete the voter."
13:08:58 2       A   Uh-huh.
13:09:04 3       Q   Okay.  I want to make sure I understand that
13:09:06 4   properly.  Does this suggest that if a voter does not
13:09:14 5   vote in two federal elections, he or she will be
13:09:18 6   eliminated from the voter rolls?
13:09:20 7       A   No.  First thing that has to happen is that the
13:09:26 8   voter goes inactive.  That means when we send out our
13:09:34 9   address confirmation notices, the notice comes back to
13:09:38 10  us as being undeliverable, we send a final notice.
13:09:44 11  Thirty days after printing that final notice if we
13:09:46 12  haven't heard from the voter, he becomes inactive.  Then
13:09:50 13  he sits on the file in an inactive status for two
13:09:54 14  federal general elections, and that would be a governor
13:09:58 15  and presidential.  Then once that period has been -- has
13:10:06 16  expired, if we have not -- if the voter has not voted,
13:10:10 17  has not otherwise updated his record, he will be deleted
13:10:14 18  on a batch job we run after each federal general and the
13:10:18 19  voter will go away.
13:10:22 20      Q   And that voter would not show up on an inactive
13:10:26 21  list?
13:10:26 22      A   We don't run any inactive lists.  He would be
13:10:30 23  flagged with an I in his status code and sit there for
13:10:34 24  approximately two years or more.
13:10:36 25      Q   If that person appeared to vote after having

**99**

13:10:40 1   been inactive for two federal election cycles such as
13:10:50 2   you've described, if that person appeared to vote, in
13:10:58 3   effect, he or she would have been eliminated due to
13:11:04 4   inactivity?
13:11:04 5       A   Yeah, after each federal election we run a
13:11:08 6   computer job that searches through the inactive voters,
13:11:12 7   and anybody that's been inactive for two federal general
13:11:16 8   elections will be deleted, other inactive voters will
13:11:22 9   not.  So if that voter shows up at the polls after
13:11:26 10  having been deleted, in effect, that voter is not
13:11:30 11  registered to vote.  They would have to reregister.
13:11:44 12      Q   Does your office keep any type of statistics on
13:11:46 13  how often that situation occurs?
13:11:50 14      A   No.
13:11:58 15      Q   And what -- on what basis are inactive voters
13:12:10 16  deleted from the rolls after not voting for two federal
13:12:16 17  elections?
13:12:16 18      A   It's in chapter 98 of the Florida statutes.  I
13:12:20 19  don't know the exact statute that's there.
13:12:24 20      Q   Do you understand that to be mandatory rather
13:12:28 21  than discretionary?
13:12:32 22      A   No, I don't.
13:12:40 23      Q   Your counsel provided some information about
13:12:50 24  budget -- budget.  Has your office seen a budget
13:13:02 25  increase since November 2000?

**100**

13:13:06 1       A   Yes.
13:13:06 2       Q   Can you describe for me the amount of the
13:13:10 3   increase?
13:13:12 4       A   I don't know, I'd have to look at the paper.
13:13:16 5       Q   I can show you what's been provided to me.
13:13:20 6   Take a look at it and tell me if it refreshes your
13:13:24 7   memory about the amount of the increase, and feel free
13:13:30 8   -- I can just unclip this and you can just take that and
13:13:40 9   take a look at it.
13:14:28 10      A   I can't really make a determination from those.
13:14:32 11  I'd have to actually see our budget reports from year to
13:14:36 12  year to tell you how much they've increased.
13:14:40 13      Q   Can you characterize the increase?
13:14:42 14      A   It's been significant.
13:14:48 15      Q   As supervisor -- assistant supervisor, do you
13:14:50 16  participate in any way in the budget formulation
13:14:56 17  process?
13:14:56 18      A   No, I don't.
13:14:56 19      Q   No?
13:14:58 20      A   No.
13:14:58 21      Q   Do you have any input whatsoever?
13:15:00 22      A   No, I don't.
13:15:04 23      Q   In terms of the increase -- I know you can't
13:15:08 24  tell me how much it is.  Can you give me a reasonable
13:15:12 25  estimate?

Case 1:01-cv-00120-ASG   Document 486   Entered on FLSD Docket 07/02/2002   Page 82 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DICK CARLBERG

101

13:15:18  1      A    I'd say probably a million.

13:15:20  2      Q    A million dollars?

13:15:20  3      A    Yeah, could be that much.  Depends on the --

13:15:24  4  the budget varies from year to year depending on the

13:15:28  5  number of elections we're going to have and the

13:15:30  6  popularity of those elections and -- so it's hard to say

13:15:36  7  -- to make or to base -- make decisions on the amount of

13:15:42  8  budget increase or decrease from year to year because

13:15:46  9  the business is so cyclical.  We are, for various

13:15:54 10  reasons, having to do things differently now.  And doing

13:15:58 11  those things costs money, new voting systems, the format

13:16:04 12  of the ballots cost a lot more, we had to hire more

13:16:10 13  people, new programs had to be put into place, so the

13:16:16 14  budget's going to go up.  But the dollar figure I just

13:16:18 15  don't know without looking at the reports.

13:16:20 16      Q    And for what reason are you doing things

13:16:22 17  differently?

13:16:22 18      A    Because we -- prior to the 2000 election, we

13:16:28 19  already had plans in place.  We were going to get new

13:16:32 20  voting -- the new voting equipment.  Then the Election

13:16:34 21  Reform Act comes out and subsequent laws are developed

13:16:38 22  to put into place.  For example, voter education has to

13:16:42 23  be greatly expanded, we had to hire three people to do

13:16:46 24  that.  So those are the -- and plus the task force

13:16:50 25  recommendations that for political purposes we have to

102

13:16:54  1  comply with.  So there were items like that and that's

13:16:58  2  not free, it runs up the cost.

13:17:02  3      Q    In terms of the increase, do you know, at least

13:17:14  4  for your office, is that money being spent on salaries

13:17:18  5  to hire new workers?

13:17:22  6      A    Some of it is.  We -- the education department

13:17:28  7  -- now, we got a grant, a one-year -- one-shot grant

13:17:32  8  from the State to handle that for this year.  And we

13:17:36  9  hired -- got two new people for the -- to do the

13:17:38 10  computer work so I didn't have to do it anymore because

13:17:42 11  we're getting voting equipment now that requires a lot

13:17:46 12  more maintenance, one person can't do it.  Under the old

13:17:48 13  punch card system, we had four work stations.  I could

13:17:52 14  handle that no problem, but now we're going to have 268

13:17:52 15  to 300 units out there in the field that have to be

13:17:58 16  maintained and set up, so we hired two people for that.

13:18:02 17  And that was a task force recommendation also.

13:18:06 18          The other expenditures would go to materials

13:18:10 19  that the educators are going to use.  Advertising should

13:18:14 20  go way up.  Mail -- the mail costs have gone to the moon

13:18:18 21  because we don't have -- we have to mail sample ballots

13:18:20 22  now to everybody.  We don't just put them in the

13:18:24 23  newspaper.  They go out to everybody, so the mail costs

13:18:26 24  have really gone up as has the paper cost.  We're now

13:18:30 25  using -- instead of the old punch card, we have to use

103

13:18:32  1  -- and that punch card would -- could be recycled, could

13:18:36  2  be held from election to election until they were used

13:18:40  3  up.  But the ballots now must be printed, it must be

13:18:42  4  machine readable and they cannot be used for more than

13:18:44  5  one election, they're dead.  So that's where a lot of

13:18:48  6  the budget money is going.

13:18:50  7      Q    Does any of your responsibility in the office

13:18:54  8  pertain to voter education?

13:19:00  9      A    Indirectly, yes.

13:19:00 10      Q    Indirectly?

13:19:02 11      A    Yes.

13:19:02 12      Q    Can you just explain to me how your

13:19:08 13  responsibilities relate to voter education indirectly?

13:19:12 14      A    Because the people that we hire to do the

13:19:14 15  educating come to me and say what are we supposed to do

13:19:22 16  and what are the laws, what are the rules, how do people

13:19:26 17  vote absentee.  The web site -- I'm the web master, so

13:19:34 18  they'll -- they'll want information, that they'll want

13:19:36 19  to post things on the web, they'll say is this right.

13:19:38 20          Right now the -- one of the things is that

13:19:42 21  they're new.  These people were hired within the last

13:19:46 22  year, they're not -- they came from the education

13:19:50 23  community, they're not from the election's community and

13:19:52 24  so they come to me for the answers.  We also use --

13:19:58 25  include in our voter education, poll worker training.

104

13:20:02  1  I'm in the process of writing the new poll worker

13:20:06  2  procedures.  So that's how I would effect the education

13:20:13  3  program and that's indirect.

13:20:12  4      Q    Prior to November 7th, 2000, your office

13:20:16  5  engaged in voter education programs, didn't it?

13:20:24  6      A    If we did, they were very limited, probably

13:20:28  7  done mostly through voter drives, private organizations,

13:20:32  8  the parties, that sort of thing.  But as far as -- and

13:20:36  9  we did some school elections if you would consider

13:20:40 10  something like that, but we did not have a voter

13:20:44 11  education department, per se.  We really didn't have a

13:20:48 12  formal program.

13:20:48 13      Q    I guess in terms of the amount of attention and

13:20:54 14  resources that were devoted to voter education prior to

13:21:00 15  November 7th, 2000, if you were to rate on a scale of

13:21:04 16  one to ten, where would voter education have fallen on

13:21:08 17  that scale in terms of a focus or priority for your

13:21:12 18  office?

13:21:12 19      A    One.

13:21:20 20      Q    A one?

13:21:14 21      A    (Nods head.)

13:21:14 22      Q    And I understand from your testimony that that

13:21:18 23  has changed since November 7th, 2000.  Are you able to

13:21:22 24  say on a scale from one to ten now where voter education

13:21:26 25  would fall in terms of a priority?

**105**

13:21:32 1    A    Probably nine.

13:21:34 2    Q    Probably nine?

13:21:34 3    A    Uh-huh.

13:21:40 4    Q    Let me ask you this, comparing pre-November

13:21:44 5    7th, 2000, to post November 7th, 2000, is it that the

13:21:50 6    information that's being disemanated via voter education

13:21:56 7    has changed, or is it just the amount of education

13:22:00 8    that's being provided that's changed?  I'm just trying

13:22:04 9    to get a better idea of what -- what precisely the

13:22:08 10   change is.

13:22:10 11   A    Well, it's all of the above that you just

13:22:12 12   mentioned.  Prior to the 2000 elections, we had had a

13:22:18 13   voting system in place in Duval County for 15, 20 years,

13:22:22 14   same system.  And now we have a new voting system, plus

13:22:32 15   we have a lot more mandates.  The laws rarely changed

13:22:38 16   back prior to the 2000 elections.  So, in other words,

13:22:42 17   what I'm saying is the entire elections environment in

13:22:48 18   Duval County and in the state of Florida has changed,

13:22:52 19   especially in Duval.  A lot of counties throughout the

13:22:54 20   state are not trying to incorporate new election

13:22:58 21   equipment -- new election systems.  We are, so that

13:23:00 22   means we have a whole new election process here in Duval

13:23:06 23   County and that requires more voter education.

13:23:10 24   Q    Since November 7th, 2000, are there any special

13:23:14 25   education efforts directed toward minority communities

**106**

13:23:20 1    in Duval County?

13:23:22 2    A    No.

13:23:30 3    Q    Okay.  I know you indicated that you did not

13:23:34 4    have, I guess, the complete budget form in order to be

13:23:44 5    able to answer questions about the budget, but I just

13:23:48 6    was going to ask you if you know generally or if you

13:23:58 7    could tell me the name of the person in your office who

13:24:02 8    selected the vendors for the media buys that are

13:24:12 9    detailed in the budget regarding voter education.

13:24:16 10   A    I could give you two names, but I'm not really

13:24:22 11   sure how that media -- what's the date on that, prior to

13:24:26 12   the election?

13:24:28 13   Q    There's one fiscal year '99 to 2000, and then

13:24:32 14   one for -- one -- another one for 2000 to 2001.

13:24:40 15   A    I think the person who did the media -- did the

13:24:42 16   media work then is no longer with us.

13:24:46 17   Q    Who was that person?

13:24:50 18   A    Her name was Susan Johnson and she's the lady

13:24:54 19   whose husband was on the felony list.  She -- we had a

13:24:56 20   -- she was a media person, that was her role then and

13:25:00 21   she left, I think, in the winter after the election.

13:25:04 22   Q    Did the supervisor of elections or you as

13:25:08 23   assistant supervisor have any or provide any type of

13:25:12 24   direction to Ms. Johnson with respect to the media buys?

13:25:18 25   A    I did not.  I don't know if the supervisor did

**107**

13:25:20 1    or not.

13:25:20 2    Q    Do you know if any of the vendors selected --

13:25:24 3    they look like television and radio stations, are

13:25:32 4    associated with urban radio formats or radio stations

13:25:40 5    that have significant populations in the minority

13:25:40 6    community?

13:25:48 7    A    I don't know for sure, but that's an extensive

13:25:52 8    list.  They are there.  I don't know which ones.

13:25:56 9    Q    Ms. Johnson would be the best person to ask

13:25:58 10   about that?

13:25:58 11   A    Yes.

13:26:00 12        MS. CICCOLO:  Well, Mr. Carlberg, I don't have

13:26:02 13   any further questions for you today.

13:26:02 14             CROSS EXAMINATION

13:26:10 15   BY MR. RESTREPO:

13:26:10 16   Q    I've got a couple of questions.  Allow me to

13:26:10 17   introduce myself.  My name's Dan Restrepo.  I'm going to

13:26:14 18   raise my voice, not at you but at the telephone.  I

13:26:16 19   represent Choicepoint/DBT.

13:26:22 20        During your testimony you talked about lists of

13:26:26 21   probable felons, probable duplicates, probable deaths

13:26:30 22   that you received from the Division of Elections.

13:26:32 23   A    Uh-huh.

13:26:34 24   Q    You also discussed list maintenance at a

13:26:38 25   different point in your testimony.  Is there any

**108**

13:26:40 1    relationship between those two processes?

13:26:44 2    A    When I say list maintenance, that's the

13:26:48 3    terminology used in the law book, the state statutes.

13:26:52 4    They refer to list maintenance and when they have been

13:26:54 5    doing so, really it's a national voter registration act

13:26:58 6    when they're talking about deleting voters who have not

13:27:02 7    participated over the year, that's list maintenance.

13:27:06 8    The lists that we got from Tallahassee are different.

13:27:12 9    They don't relate to that list maintenance program.

13:27:16 10   That was a special, I had hoped, one-shot effort there,

13:27:22 11   nonrecurring.

13:27:26 12   Q    In talking about list maintenance, you talk

13:27:30 13   about how eventually voters are deleted from the Duval

13:27:36 14   County voter registration database.

13:27:38 15   A    Uh-huh.

13:27:40 16   Q    What does that mean?  Does it mean that that

13:27:42 17   person's voter record is gone forever?

13:27:48 18        MS. CICCOLO:  Objection to the form.

13:27:50 19   A    That's correct.

13:27:50 20   Q    Once a voter is deleted from the Duval County

13:27:54 21   voter registration form, is it possible to find that

13:27:58 22   voter record on the database?

13:27:50 23        MS. CICCOLO:  Objection, calls for speculation.

13:28:02 24   A    No.

13:28:02 25   Q    Okay.  Are inactive voters present on the

May 15, 2002

109

| | |
|---|---|
| 13:28:10 1 | database? |
| 13:28:12 2 | A    Yes. |
| 13:28:12 3 | Q    Are the records of people who are flagged as |
| 13:28:16 4 | probable felons, probable duplicates, or probable |
| 13:28:20 5 | deaths? |
| 13:28:20 6 | A    Not anymore, no. |
| 13:28:22 7 | Q    Were they at the time of the November 7th |
| 13:28:22 8 | election? |
| 13:28:26 9 | A    Yes. |
| 13:28:28 10 | MS. CICCOLO:  Objection to the form because I'm |
| 13:28:30 11 | not sure that the question was completed before |
| 13:28:32 12 | it was answered. |
| 13:28:34 13 | Having heard my full question, is your |
| 13:28:38 14 | answer still yes? |
| 13:28:38 15 | A    Yes. |
| 13:28:46 16 | Q    You testified earlier that in the process of -- |
| 13:28:50 17 | excuse me, you testified earlier that when voters |
| 13:28:54 18 | responded to the letters sent out as a result of the |
| 13:29:00 19 | receipt of the Division of Elections' probable death, |
| 13:29:02 20 | probable duplicate, probable felon lists, that you took |
| 13:29:06 21 | the voter's word for it.  What does that mean? |
| 13:29:12 22 | A    If the voter said I'm not registered in more |
| 13:29:16 23 | than one county or that I live here in Duval County, |
| 13:29:18 24 | this is where my residence is, this is where I'm |
| 13:29:22 25 | registered to vote, then we say thank you, sir, and went |

110

| | |
|---|---|
| 13:29:26 1 | to the voter's record, changed the status back to |
| 13:29:30 2 | active.  Same general policy for the probable felons and |
| 13:29:34 3 | probable deaths. |
| 13:29:40 4 | Q    Earlier you testified that you -- it did not |
| 13:29:44 5 | cause you concern that what turned out to be |
| 13:29:48 6 | Ms. Johnson's husband's name was on the probable felon |
| 13:29:52 7 | list.  Why didn't it cause you concern? |
| 13:29:54 8 | A    Because we were not making decisions based on |
| 13:29:58 9 | that list.  And when I say decisions, bottom line was we |
| 13:30:04 10 | were not deleting any voters because of their presence |
| 13:30:06 11 | on that list. |
| 13:30:08 12 | MR. RESTREPO:  Thank you.  I have no further |
| 13:30:10 13 | questions. |
| 13:30:12 14 | MR. ARPEN:  Anybody on the phone? |
| 13:30:14 15 | MR. MAC INNES:  No questions from Doug Mac |
| 13:30:14 16 | Innes. |
| 13:30:18 17 | MS. TORRES:  No questions from Susan |
| 13:30:18 18 | Torres. |
| 13:30:18 19 | CROSS EXAMINATION |
| 13:30:20 20 | BY MR. HARVEY: |
| 13:30:20 21 | Q    This is Walter Harvey from the Division of |
| 13:30:24 22 | Elections and Secretary of State.  I'm sorry, I may be |
| 13:30:30 23 | asking some questions that have already been asked, but |
| 13:30:34 24 | I missed a certain portion of the beginning of the |
| 13:30:36 25 | deposition and just wanted to clarify a couple of points |

111

| | |
|---|---|
| 13:30:42 1 | that were -- also want to clarify a couple of points |
| 13:30:46 2 | that were raised during the course of your testimony so |
| 13:30:48 3 | that it's clear for the record.  You indicated earlier |
| 13:30:52 4 | that Duval County has a process by which it removes what |
| 13:30:58 5 | it determines to be or what may be eligible voters from |
| 13:31:10 6 | its voter rolls; is that correct? |
| 13:31:?2 7 | A    Yes. |
| 13:31:?2 8 | Q    Okay.  Now, as I understand it, there's several |
| 13:31:16 9 | procedures for removing ineligible voters that's |
| 13:31:22 10 | implemented by Duval County as well as other counties; |
| 13:31:26 11 | is that correct? |
| 13:31:26 12 | A    Yes. |
| 13:31:26 13 | There's a procedure which you refer to as list |
| 13:31:32 14 | maintenance where the county election supervisor sends |
| 13:31:38 15 | address confirmation notices; is that correct? |
| 13:31:40 16 | A    That's correct. |
| 13:31:42 17 | Q    And the address confirmation notices, is that |
| 13:31:46 18 | sent to every registered voter in Duval County or just |
| 13:31:50 19 | some? |
| 13:31:50 20 | A    No, only those voters who have had no activity |
| 13:31:54 21 | on their records for the previous two years. |
| 13:31:58 22 | Q    Okay.  So for those voters who have had no |
| 13:32:22 23 | previous activity on the voter rolls during the last two |
| 13:32:04 24 | years, they're sent the address confirmation notices |
| 13:32:10 25 | during odd years; is that correct? |

112

| | |
|---|---|
| 13:32:12 1 | A    That's correct. |
| 13:32:12 2 | Q    Okay.  They're not sent these notices during |
| 13:32:16 3 | even years; is that correct? |
| 13:32:18 4 | A    That's correct. |
| 13:32:18 5 | Q    Okay.  And if they do not respond to the -- I |
| 13:32:22 6 | believe you said the second notice, then they're placed |
| 13:32:26 7 | in an inactive status; is that correct? |
| 13:32:30 8 | A    That's correct. |
| 13:32:32 9 | MS. CICCOLO:  Objection, asked and answered. |
| 13:32:34 10 | Q    As pursuant to section 98 of -- Chapter 98 of |
| 13:32:38 11 | the voter registration act in Florida as well as the |
| 13:32:42 12 | National Voter Registration Act; is that correct? |
| 13:32:46 13 | A    Yes. |
| 13:32:46 14 | Q    Okay.  And you also have a voter removal pro- |
| 13:32:50 15 | -- I'm sorry, register removal program whereby you |
| 13:32:54 16 | remove individuals that appear on -- you said the State |
| 13:33:00 17 | Attorney's list of felons? |
| 13:33:04 18 | MS. CICCOLO:  Objection, asked and answered. |
| 13:33:06 19 | A    Yes. |
| 13:33:08 20 | Q    And then there's also removal through the death |
| 13:33:12 21 | list.  Is that a list that you receive independent of |
| 13:33:16 22 | the central voter file or is that something that is part |
| 13:33:20 23 | of the central voter file? |
| 13:33:22 24 | MS. CICCOLO:  Please note my continuing |
| 13:33:26 25 | objection as these questions have been asked |

May 15, 2002

**113**

13:33:28 1 and answered.

13:33:28 2     A   Yes, it's a separate entity.

13:33:32 3     Q   Okay. Are there any other lists that you

13:33:34 4 receive that we haven't covered here today whereby

13:33:40 5 voters ineligible are removed from the voter rolls in

13:33:48 6 Duval County?

13:33:52 7     MS. CICCOLO: Objection to the form.

13:33:54 8     A   No.

13:33:58 9     MR. HARVEY: Okay. I have no further

13:34:00 10 questions. Walter Harvey has no further

13:34:10 11 questions.

13:34:12 12     MR. ARPEN: Anybody else?

13:34:16 13     MR. ECKERT: This is Dan Eckert from

13:34:16 14 Volusia and I have no questions.

13:34:24 15     MS. CICCOLO: I just have one follow-up.

13:34:24 16            REDIRECT EXAMINATION

13:34:26 17 BY MS. CICCOLO:

13:34:26 18     Q   In Mr. Harvey's -- one of his questions, he

13:34:30 19 asked you about Duval and other counties. You aren't

13:34:38 20 here to describe the practices or procedures of any

13:34:40 21 other county other than Duval, are you?

13:34:44 22     A   I'm Duval only.

13:34:46 23     MR. HARVEY: Object to the form of the

13:34:48 24 question.

13:34:48 25     Q   You're Duval only.

**114**

13:34:48 1     MS. CICCOLO: Thank you. I don't have any

13:34:50 2 further questions. Do you want to advise your

13:34:54 3 witness?

13:34:54 4     MR. ARPEN: Dick, you have the right,

13:34:54 5 after it's typed up, to review it to see if it

13:34:56 6 was transcribed correctly and note any errors,

13:35:00 7 or you can waive that right, whichever you

13:35:04 8 prefer.

13:35:04 9     THE WITNESS: I think this lady does a

13:35:06 10 fine job. I think she can handle it.

13:35:10 11     MR. ARPEN: We'll waive.

12     (Deposition concluded at 1:35 p.m.)

13         - - -

**115**

1            CERTIFICATE OF OATH

2

3 STATE OF FLORIDA )

4 COUNTY OF DUVAL )

5

6       I, the undersigned authority, certify that

7 DICK CARLBERG personally appeared before me and was duly

8 sworn.

9

10       WITNESS my hand and official seal this 29th

11 day of May 2002.

12

13

14

15

16           Cristina A. Stark

17           Notary Public

           State of Florida

18           My Commission No. DD063433

           Expires: October 8, 2005

19

20

21

22

23

24

25

**116**

1           CERTIFICATE OF REPORTER

2

3 STATE OF FLORIDA )

4 COUNTY OF DUVAL )

5

6       I, Cristina A. Stark, Court Reporter and

7 Notary Public, certify that I was authorized to and did

8 stenographically report the deposition of DICK CARLBERG;

9 that a review of the transcript was not requested; and

10 that the transcript is a true and complete record of my

11 stenographic notes.

12

13       I further certify that I am not a relative,

14 employee, attorney, or counsel of any of the parties,

15 nor am I a relative or employee of any of the parties'

16 attorney or counsel connected with the action, nor am I

17 financially interested in the action.

18

19       DATED this 29th day of May 2002.

20

21

22           Cristina A. Stark

23

24

25

May 15, 2002

**PLAINTIFFS' EXHIBIT 14**

NAACP, et al. VS KATHERINE HARRIS, et al.   Deposition of JULIA STONER

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 87 of 234

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                CASE NO.:  01-0120-Civ-Gold
 3
    NATIONAL ASSOCIATION FOR THE ADVANCEMENT
 4  OF COLORED PEOPLE, INC., by its FLORIDA STATE
    CONFERENCE OF BRANCHES, JIMMIE PANNELL,
 5  JULIA STONER, NATALIE CARNEGIE, ERMA J. KELLY,
    JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q.
 6  ODOM, WILLIE STEEN, WALLACE MCDONALD,
    JERMAINE TERRY, LORINE WALDEN, SHERY
 7  TIMBERLAKE, VALERIE BUFORD-WELLS, MICHELLE
    FLOYD, CONSUELO MARIA GRAHAM, SHERRY
 8  EDWARDS, KANDY WELLS, JOANNA CLARK, JANICE
    KELLY, PLACIDE DOSSOUS and RONDRICK ROSE in
 9  their own right and as representatives of all
    similarly situated citizens and residents of the
10  State of Florida,

11       Plaintiffs,

12       vs.

13  KATHERINE HARRIS, Secretary of State of Florida;
    CLAY ROBERTS, Director of Florida Division of Elections;
14  DAVID C. LEAHY, Miami-Dade County Election Supervisor;
    MIRIAM OLIPHANT, Broward County Election Supervisor;
15  JOHN STAFFORD, Duval County Election Supervisor; PAM
    IORIO, Hillsborough County Election Supervisor; ION
16  SANCHO, Leon County Election Supervisor; WILLIAM
    COWLES, Orange County Election Supervisor; and DEANIE
17  LOWE, Volusia County Election Supervisor (all in their
    official capacities); and CHOICEPOINT, INC., a Georgia
18  corporation d/b/a DATABASE TECHNOLOGIES, INC.,

19       Defendants.

20
21
22
23
24
25
```

**Page 2**

```
 1           Deposition of JULIA STONER pursuant to Notice

 2  of Taking Deposition, on Monday, March 25, 2002, at 10:03

 3  a.m., at 5027 Lofty Pines Circle East, Jacksonville,

 4  Florida, before Cristina A. Stark, a Court Reporter and

 5  Notary Public in and for the State of Florida at Large.

 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2
 3      A P P E A R A N C E S
 4
        ANGELA CICCOLO, Esquire
        Assistant General Counsel
 5      NAACP
        4805 Mt. Hope Drive
        Baltimore, Maryland 21215-3297
 6
        Attorney for the Plaintiffs.
 7

 8      TRACEY ARPEN, Esquire
        Office of General Counsel
 9      City Hall-St. James
        117 West Duval Street, Suite 480
10      Jacksonville, Florida 32202

11      Attorney for Defendant Stafford.

12      WALTER J. HARVEY, Esquire, via telephone
        Steel, Hector & Davis International
13      200 South Biscayne Boulevard
        Miami, Florida 33131-2398
14
15      Attorney for Defendants Harris and Roberts.

        KERRY EZROL, Esquire, via telephone
16      Goren, Cherof, Doody and Ezrol
        3099 E. Commercial Boulevard, No. 200
17      Ft. Lauderdale, Florida 33308

18      Attorney for Defendant Cowles.

19      JEFF EHRLICH, Esquire, via telephone
        111 N.W. 1st Street, Suite 2810
20      Miami, Florida 33128

21      Attorney for Defendant Leahy.

22      DANIEL ECKERT, Esquire, via telephone
        County Attorney's Office
23      123 W. Indiana Avenue
        DeLand, Florida 32720-4613
24
25      Attorney for Defendant Lowe.
```

**Page 4**

```
 1   A P P E A R A N C E S   C O N T I N U E D

 2   DOUGLAS MACINNES, Esquire, via telephone
     Office of the Attorney General
 3   PL-01, The Capitol
     Tallahassee, Florida 32399-1050

 4   Attorney for Defendants Dickerson and Kearney.

 5
     TOM WHITE, Esquire, via telephone
 6   Adorno & Zeder, P.A.
     2601 S. Bayshore Drive, Suite 1600
 7   Miami, Florida 33133-5413

 8   Attorney for Defendant Choicepoint, Inc. d/b/a
            Database Technologies, Inc.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

1                    I N D E X

2    WITNESS:

3      JULIA STONER

4        DIRECT EXAMINATION BY MR. ARPEN. . . . . . .PAGE 6

5        CROSS EXAMINATION BY MR. MACINNES. . . . . .PAGE 21

6        CROSS EXAMINATION BY MR. HARVEY. . . . . . .PAGE 25

7        CROSS EXAMINATION BY MR. EHRLICH. . . . . .PAGE 32

8        CROSS EXAMINATION BY MR. WHITE. . . . . . .PAGE 36

9        CROSS EXAMINATION CONTINUED BY MR. MACINNES. PAGE 37

10       CROSS EXAMINATION BY MS. CICCOLO. . . . . .PAGE 37

11       REDIRECT EXAMINATION BY MR. ARPEN. . . . . .PAGE 39

12       RECROSS EXAMINATION BY MS. CICCOLO. . . . . .PAGE 40

13

14

15

16                   E X H I B I T S

17   FOR IDENTIFICATION

18   DEFENDANT STAFFORD'S EXHIBIT 1. . . . . . . . . PAGE 40

19

20

21

22

23

24

25

6

1                S T I P U L A T I O N

2              It was stipulated and agreed by and between

3    counsel for the respective parties, and the witness, that

4    the reading and signing of the deposition by the witness

5    was not waived.

6                          - - -

7                     JULIA STONER,

8    having been produced and first duly sworn, testified to

9    questions as follows:

10                 DIRECT EXAMINATION

11   BY MR. ARPEN:

12       Q    Ms. Stoner, I'm going to move this phone over

13   closer to you so that we make sure your responses get

14   picked up on the telephone so the others can hear.  My

15   name is Tracey Arpen and I'm representing Supervisor of

16   Elections John Stafford here in Duval County.  Let me

17   begin by asking you if you could state your name and your

18   current address.

19       A    Julia Stoner.  What is this address?  I can't

20   remember half the time.  5027, I know that.

21       Q    That would be 5027 Lofty Pines Circle East?

22       A    Lofty Pines Circle East.

23            (Brief interruption.)

24       MR. ARPEN:  Is everybody still there?

25       MR. MACINNES:  Yeah, I dropped off for a

7

1    minute, Doug MacInnes.

2       MR. ARPEN:  Okay.

3       MR. MACINNES:  Tracey, I'm having quite a

4    bit of trouble hearing the witness.  If there's

5    anything you can do to maybe make it a little bit

6    louder.

7       MS. CICCOLO:  Ms. Stoner, would you be able

8    to speak up a little bit louder?  We have several

9    attorneys on the telephone who are also listening

10   to what you have to say, and they're all over the

11   state of Florida and sometimes it gets lost in

12   the transmission lines, so if you could talk up

13   extra loud so that they can hear you.

14      THE WITNESS:  Okay.  I'll try.

15      MS. CICCOLO:  Okay.  You could try to do

16   that?

17      THE WITNESS:  I'll try.

18      MS. CICCOLO:  Because we can hear you, we

19   want to make sure they hear you as well.

20   BY MR. ARPEN:

21      Q    Ms. Stoner, how long have you lived at this

22   address?

23      A    This address I lived I guess about three or

24   four years.

25      Q    Okay.  Let me ask you, do you remember, were

8

1    you living at this address when the November 2000

2    election took place?

3       A    No, I wasn't living here.

4       Q    Do you remember what address you were living

5    at in November of 2000?

6       A    I -- no, I can't remember that.

7       Q    Okay.  Do you know -- do you know how long

8    you've been registered to vote?

9       A    I've been registered to vote that last year

10   was -- no, I didn't vote last year when I vote.

11      Q    Do you remember when in your life you first

12   voted?

13      A    When I first voted?  All I can remember when

14   -- when I -- when I went out and vote Republican or

15   Democrat, that's all I can remember.

16      Q    Let me see if I can help you out this way.

17   Do you remember who was running for president the first

18   time you voted?

19      A    Bush was running.

20      Q    Okay.  That was the first time you voted?

21      A    No.

22      Q    How about the first time going way back, if

23   it was way back, do you remember who was running for

24   president the first time you voted in an election?

25      A    Let's see, it would be Roosevelt.

9

10:10:12 1    Q    Okay.  And do you know how many, or for how
10:10:22 2  long you have been registered to vote in Duval County,
10:10:26 3  Florida?
10:10:30 4    A    One time.
10:10:32 5    Q    Okay.  Do you remember how many years ago you
10:10:36 6  registered to vote in Duval County?
10:10:38 7    A    One time.
10:10:40 8    Q    Do you know what year it would have been?
10:10:48 9    A    What year it would have been?  That would
10:10:50 10  have been 1900 when I voted.  I voted last year, didn't
10:11:08 11  I?
10:11:10 12    Q    Do you remember if you voted in more than one
10:11:14 13  election in Duval County?
10:11:16 14    A    One time.
10:11:18 15    Q    Just one time?
10:11:20 16    A    One time.
10:11:20 17    Q    And was that in November of 2000?
10:11:22 18    A    November.
10:11:24 19    Q    Had you ever voted anywhere else in Duval
10:11:28 20  County before that?
10:11:28 21    A    No, I hadn't.  I hadn't voted.
10:11:34 22    Q    Had you voted in other counties in Florida
10:11:38 23  before that?
10:11:38 24    A    No, I had -- I had not.
10:11:44 25    Q    Okay.  What other states had you been

10

10:11:46 1  registered to vote in?
10:11:50 2    A    West Virginia, Kentucky.
10:11:52 3    Q    Okay.  Do you remember --
10:11:54 4    A    Ohio.
10:11:56 5    Q    Do you remember when the last time was that
10:11:58 6  you voted in any of those states?
10:12:04 7    A    In Cleveland, Ohio.  I voted in Cleveland,
10:12:14 8  Ohio, but I can't remember.
10:12:18 9    Q    You can't remember what year it would have
10:12:22 10  been?
10:12:22 11    A    No, I can't remember the year.
10:12:28 12    Q    Whether you voted in any other counties in
10:12:30 13  Florida, do you know whether you were registered to vote
10:12:34 14  in any counties in Florida before you moved to
10:12:36 15  Jacksonville?
10:12:38 16    A    No, I hadn't registered to vote --
10:12:42 17    Q    Okay.
10:12:42 18    A    -- in Florida.
10:12:46 19    Q    Now, the elections that you voted in before
10:12:50 20  you moved to Florida, were those elections that used
10:12:56 21  what's known as a punch card voting system where you take
10:13:00 22  like a pen and punch a hole in the ballot for the
10:13:00 23  candidate you want to vote for?
10:13:00 24    A    Yes.  Yes.
10:13:02 25    Q    And was that the same kind of system they had

11

10:13:06 1  here in Duval County in November?
10:13:08 2    A    Yes.
10:13:10 3    Q    So you had used that type of voting equipment
10:13:14 4  before in other states?
10:13:14 5    A    Yes.  Yes.
10:13:16 6    Q    One thing I need to ask you to do, if I could
10:13:20 7  -- a couple of things I forgot to tell you when we
10:13:22 8  started.  Because the court reporter has to take down
10:13:24 9  everything that both you say and I say, if you can, if
10:13:28 10  you could, try to hold off on your answer until I get
10:13:32 11  finished with my question, that'll make it easier for the
10:13:32 12  court reporter.  And the other thing we haven't had any
10:13:38 13  problems with, but if you can make sure every time you
10:13:40 14  give an answer that it's a verbal answer rather than a
10:13:46 15  nod or shake of your head so the court reporter will have
10:13:48 16  some kind of response to take down as well.  And if at
10:13:54 17  any time I ask you any question that you don't understand
10:13:54 18  or would like to have repeated, just let me know and I'll
10:13:58 19  try and rephrase the question for you, okay?
10:14:02 20    A    Okay.
10:14:04 21    Q    All right.  Now, do you recall what precinct
10:14:14 22  you went to to vote in the November 2000 election?
10:14:20 23    A    No, I don't.  I can't recall.
10:14:22 24    Q    Okay.  Do you remember what street it was on?
10:14:28 25    A    No, I can't -- I can't remember the street.

12

10:14:32 1    Q    Okay.  Do you remember whether it was in, for
10:14:36 2  example, a church or a school or some meeting hall?  Do
10:14:40 3  you remember what the physical location was like?
10:14:44 4    A    It was a school.
10:14:46 5    Q    Okay.  Do you recall what time of day it was
10:14:56 6  that you went there to vote?
10:15:00 7    A    I can't remember that.
10:15:00 8    Q    Do you remember whether it was morning or
10:15:02 9  afternoon or evening?
10:15:04 10    A    Morning.
10:15:04 11    Q    Okay.  Do you remember when you got in line
10:15:10 12  to receive your ballot how many other people were in line
10:15:14 13  to vote at the time?
10:15:18 14    A    I can't remember how many people was in line.
10:15:24 15    Q    Now, as I understand it, you went to vote,
10:15:26 16  and was it your son-in-law and daughter went with you?
10:15:32 17    A    My son.
10:15:32 18    Q    Your son and daughter-in-law; is that right?
10:15:34 19    A    My son and daughter-in-law.
10:15:38 20    Q    Okay.  And that would be Mr. Pannell?
10:15:40 21    A    Yes.  Yes, my son.
10:15:42 22    Q    Now, after you received your ballot and went
10:15:50 23  to the voting booth, did you have any difficulty in
10:15:56 24  casting your ballot in that election?
10:16:00 25    A    You mean -- ask me that question again.

**March 25, 2002**

NAACP, et al VS. KATHERINE HARRIS, et al.
Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 90 of 234
Deposition of JULIA STONER

13

```
10:16:02  1      Q   Sure.  When you got your ballot and went to
10:16:06  2  the voting booth, did you have any trouble being able to
10:16:10  3  vote for the candidate you wanted to vote for on that
10:16:14  4  ballot?
10:16:14  5      A   I didn't have any trouble voting for that
10:16:18  6  person.  The only problem I had, I asked for help.
10:16:30  7      Q   And what was it that you asked for help with?
10:16:36  8      A   I had got down to punching and the chips fell
10:16:44  9  out.  Some fell out and some looked like they didn't fall
10:16:50 10  out, and I asked for help.  Would that -- why would that
10:16:52 11  happen, but I got no help.
10:16:56 12      Q   So you're talking about the -- when you --
10:16:58 13  when you say chips, are you referring to the little
10:17:00 14  pieces of paper that fall out when you vote?
10:17:02 15      A   The little pieces of paper, little pieces of
10:17:04 16  paper.
10:17:06 17      Q   Okay.  And what did you ask -- what did you
10:17:10 18  ask the poll worker to do?
10:17:12 19      A   I asked for help, could they help me with
10:17:18 20  that, why that was happening.  They said they couldn't
10:17:24 21  put their hands on me.
10:17:28 22      Q   What did you understand them to mean when
10:17:30 23  they said they couldn't put their hands on you?
10:17:34 24      A   I understood that they meant that they
10:17:36 25  couldn't help me.  They couldn't answer my question.
```

14

```
10:17:40  1      Q   Okay.  Do you remember specifically what your
10:17:44  2  question was to them?
10:17:50  3      A   Help me, tell me why these chips are falling
10:17:54  4  like they are falling.  Some will -- won't fall and some
10:17:58  5  will.  You can punch through.
10:18:00  6      Q   Now, what caused you to notice that some of
10:18:06  7  the, what you call chips were not falling off of the
10:18:08  8  ballot?
10:18:10  9      A   What caused me to notice?
10:18:12 10      Q   Yes.
10:18:12 11      A   Because they weren't falling.
10:18:14 12      Q   Okay.  Was this -- was this while your ballot
10:18:18 13  was still in the -- in the machine or after you pulled
10:18:22 14  your ballot out?
10:18:22 15      A   They was in the machine.
10:18:24 16      Q   Okay.  While the ballot was still in the
10:18:30 17  machine, how could you tell whether the chips or chads
10:18:36 18  had fallen out as you were voting?
10:18:40 19      A   I could see the pieces.
10:18:42 20      Q   Okay.  You could see through the hole that
10:18:44 21  there --
10:18:44 22      A   Yes.
10:18:46 23      Q   And do you remember -- or, first of all, do
10:18:48 24  you know the name of the poll worker that you talked to?
10:18:52 25      A   No, I don't know the name of the poll worker,
```

15

```
10:18:56  1  but I know she was white.
10:19:00  2      Q   Okay.  Can you describe her to me?
10:19:04  3      A   W-h-i-t-e.
10:19:04  4      Q   No, can you describe what she looked like,
10:19:06  5  how tall she was, what color her hair was, anything that
10:19:08  6  would help?
10:19:08  7      A   No, I didn't look at her that hard.
10:19:12  8      Q   Okay.  And after you talked to her, did you
10:19:18  9  talk to any other poll workers at the precinct about your
10:19:26 10  difficulty voting?
10:19:26 11      A   No, I did not.  The only answer I got from --
10:19:30 12  somebody in the crowd said -- they must have heard my
10:19:36 13  talk, speech, or whatever you call it, said go and do the
10:19:42 14  best you can.
10:19:46 15      Q   Now, did they -- do you know whether the poll
10:19:50 16  worker you talked to went and talked to anybody else
10:19:54 17  about the question you had raised?
10:19:58 18      A   Not right then.  She -- I heard nothing.
10:20:04 19      Q   Okay.  Who did you believe the other people
10:20:06 20  were that you heard talking about doing the best that you
10:20:10 21  could?
10:20:10 22      A   Like you and her, different people that was
10:20:16 23  there to vote like me.
10:20:18 24      Q   Voters that were there --
10:20:18 25      A   Yes.
```

16

```
10:20:18  1      Q   -- or poll workers?
10:20:20  2      A   No, it wasn't no poll workers, not the one I
10:20:24  3  was talking to.
10:20:24  4      Q   Okay.
10:20:26  5      A   It could have been poll workers, but not
10:20:28  6  those, not the one that I was talking to because they
10:20:32  7  gave me no help.
10:20:34  8      Q   Now, did -- did any of them, any of the poll
10:20:42  9  workers indicate to you that you could have someone in
10:20:48 10  your family assist you if necessary?
10:20:50 11      A   No.  No, they did not.
10:20:52 12      Q   And did you ask anybody in your family,
10:20:54 13  either your son or your daughter-in-law, to help you out?
10:20:58 14      A   No, I didn't ask either one because we wasn't
10:21:02 15  close together and we was split apart.
10:21:06 16      Q   Okay.  By that you mean there were other
10:21:08 17  people voting --
10:21:08 18      A   Yes.
10:21:10 19      Q   -- on either side of you?
10:21:10 20      A   On different sides.
10:21:24 21      Q   Now, you indicated that you were concerned
10:21:28 22  that some of the chads did not fall out when you punched
10:21:32 23  them?
10:21:32 24      A   No, they did not fall out, all of them.
10:21:36 25      Q   But you did not have any difficulty finding
```

17

10:21:40 1    the hole that you wanted to punch for the candidate?
10:21:40 2        A   No, I didn't -- I didn't have no problem
10:21:42 3    finding the holes.
10:21:44 4        Q   Okay.  Did you turn in your ballot before
10:21:52 5    leaving the polling place?
10:21:54 6        A   Yes, I did.  I turned it in.
10:21:58 7        Q   Okay.  So you don't -- so you turn in your
10:22:02 8    ballot and you don't know today whether the ballot
10:22:06 9    correctly recorded all of the votes that you cast or not?
10:22:10 10       A   That's right.
10:22:10 11       Q   Did you vote for more than one race on the
10:22:16 12   ballot?
10:22:18 13       A   I voted for all that was on there.
10:22:22 14       Q   Okay.  Now, after you left the polling place,
10:22:40 15   did you complain to anyone about the problems you had at
10:22:46 16   the polling place?
10:22:46 17       A   No, I did not.
10:22:48 18       Q   Okay.  At any time after the election up to
10:22:54 19   the time that this lawsuit was filed, did you appear
10:23:00 20   anywhere else at any of the public hearings or meetings
10:23:04 21   or anything to report your difficulty in voting?
10:23:10 22       A   No, I didn't appear nowhere.
10:23:14 23       Q   Do you know if anyone in your family
10:23:16 24   appeared in any of those meetings and explained either
10:23:22 25   difficulties they had or you had in voting?

18

10:23:24 1        A   No.
10:23:26 2        Q   Okay.  I asked a bad question because you
10:23:28 3    can't tell whether no, you don't know or no, they didn't.
10:23:32 4    To your knowledge, did anyone in your family appear at a
10:23:36 5    meeting and report any difficulty voting in the election?
10:23:42 6        A   No, anybody in my family did not have no
10:23:48 7    difficulty because I heard nothing from them.
10:23:52 8        Q   Okay.  And did they -- to your knowledge, did
10:23:56 9    they appear at any meeting and report to anyone your
10:24:00 10   difficulty voting?
10:24:04 11       A   Now, say that again.
10:24:06 12       Q   To the best of your knowledge, did anyone in
10:24:08 13   your family go to any public meeting and report at that
10:24:14 14   meeting difficulties you had had?
10:24:16 15       A   To the best of my knowledge --
10:24:16 16       Q   They did or did not?
10:24:18 17       A   -- they did not.
10:24:20 18       Q   Okay.  Now, what, if anything, would lead you
10:24:36 19   to believe that the difficulty that you had in voting in
10:24:42 20   the November 2000 election was related to the fact that
10:24:48 21   you're African-American?
10:24:52 22       A   Would you say that again?
10:24:54 23       Q   Sure.  What, if anything, would lead you to
10:24:58 24   believe that the problem you had in voting in the
10:25:02 25   November 2000 election was related to the fact that you

19

10:25:06 1    are African-American?
10:25:10 2        A   I don't believe it was related to
10:25:12 3    African-American.
10:25:14 4        Q   Okay.  Since the election, have you spoken
10:25:22 5    with anyone, the Supervisor of Elections office about
10:25:26 6    that election?
10:25:27 7        A   No, I haven't spoken to anybody.
10:25:38 8        Q   I need to ask you a couple of follow-up
10:25:40 9    questions and I think I'll be done.  Ms. Stoner, are you
10:25:44 10   a member of the NAACP?
10:25:48 11       A   No, I'm not.
10:25:50 12       Q   Have you ever in the past belonged to the
10:25:52 13   NAACP?
10:25:54 14       A   No, I've never belonged to it.
10:25:58 15       Q   And do you know how the -- how the NAACP
10:26:10 16   found out that you had trouble voting in this election?
10:26:14 17       A   I do not know.
10:26:26 18       Q   There was something that you filed in this
10:26:30 19   lawsuit, it's called Declaration of Julia Stoner, a
10:26:36 20   document that you signed on November 1st, 2001.  Let me
10:26:44 21   show you this, if I could, and ask you if that's your
10:26:48 22   signature at the bottom of the page.
10:26:54 23       MS. CICCOLO:  Ms. Stoner, you need to look at
10:26:58 24   both pages and see if that is your signature.
10:27:04 25       THE WITNESS:  Down -- down here where Julia

20

10:27:06 1    at?
10:27:08 2        MS. CICCOLO:  Well -- but you need to look
10:27:08 3    at both pages because they're all part of the
10:27:12 4    same thing.
10:27:14 5        THE WITNESS:  Okay.  That's my signature,
10:27:16 6    Julia Stoner.
10:27:22 7        MS. CICCOLO:  Okay.  Thank you.
10:27:28 8        Q   Do you know, Ms. Stoner, who actually
10:27:32 9    prepared this typewritten document?
10:27:34 10       A   No, I don't.  I don't know.
10:27:38 11       Q   Do you know where they got the information
10:27:40 12   that is contained in the document?
10:27:50 13       A   You want to ask me that again.
10:27:52 14       Q   Sure.  Do you know where the information came
10:27:56 15   from that was included in this document that's called
10:28:00 16   Declaration of Julia Stoner?
10:28:04 17       A   No, I don't know where that came from.
10:28:26 18       MR. ARPEN:  That's all the questions I have.
10:28:28 19   Thank you.  There may be other attorneys on the
10:28:30 20   phone who may have some questions for you as
10:28:34 21   well.
10:28:34 22       THE WITNESS:  Thank you.
10:28:44 23       MS. CICCOLO:  Hello?  Does anybody have any
10:28:48 24   questions for Ms. Stoner before I ask?
10:28:56 25       MR. ECKERT:  This is Dan Eckert.  I have no

March 25, 2002

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JULIA STONER

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 92 of 234

21

10:29:00  1      questions.
10:29:00  2                    CROSS EXAMINATION
10:29:00  3   BY MR. MACINNES:
10:29:00  4      Q    Ms. Stoner, this is Doug MacInnes calling.
10:29:02  5   Can you hear me?
10:29:04  6      A    Yes.
10:29:04  7      Q    I represent the Department of Highway Safety
10:29:08  8   and Motor Vehicles and Department of Children and
10:29:12  9   Families here in Tallahassee.  Do you have a driver's
10:29:16 10   license, Ms. Stoner?
10:29:18 11      A    No, I don't.  I don't have a driver's
10:29:18 12   license.
10:29:20 13      Q    And did you ever have a driver's license?
10:29:24 14      A    Yes, I have.
10:29:24 15      Q    And when did you give that up, ma'am?
10:29:28 16      A    In Cleveland, Ohio.
10:29:30 17      Q    So you never had a Florida driver's license?
10:29:34 18      A    I never have had a Florida license.
10:29:36 19      Q    Okay.  While you've lived in Florida, have
10:29:40 20   you ever applied at the Department of Children and
10:29:42 21   Families for public assistance?
10:29:46 22      A    Public assistance?
10:29:48 23      Q    Yes, ma'am.
10:29:50 24      A    Ask me that again.
10:29:52 25      Q    Have you ever applied for public assistance

22

10:29:54  1   at the -- within Florida at the Department of Children
10:29:58  2   and Families?
10:30:00  3      A    That's for help.  Isn't that for help?
10:30:04  4      Q    Yes, ma'am.
10:30:04  5      A    Yes, because my income was very small.
10:30:08  6      Q    And when did you apply for public assistance?
10:30:14  7      A    Last year.
10:30:22  8      Q    And where did you go to apply for public
10:30:26  9   assistance?
10:30:28 10      A    I don't know.  Here in Florida.
10:30:32 11      Q    Was it in Duval County?
10:30:34 12      A    Yes, sir.
10:30:36 13      Q    Jacksonville?
10:30:40 14      A    Jacksonville.
10:30:42 15      Q    Did you actually -- did you personally go to
10:30:44 16   the Department of Children and Families office?
10:30:46 17      A    Yes, I did.  I went.
10:30:52 18      Q    Do you -- do you go there regularly?
10:30:56 19      A    I go there a certain time they give you
10:31:00 20   before your card run out.
10:31:10 21      Q    Is it the same person every time?
10:31:12 22      A    I'm the same person every time.
10:31:14 23      Q    And what is that person's name?
10:31:18 24      A    Julia, Julia Stoner.
10:31:20 25      Q    But the employee at the Department of

23

10:31:24  1   Children and Families that you see, do you know that
10:31:24  2   person's name?
10:31:28  3      A    I know that person.
10:31:30  4      Q    And what is that person's name?
10:31:32  5      A    I don't know.
10:31:34  6      Q    Is it the same employee every time you go in?
10:31:40  7      A    It's the same -- same employee.  Just about
10:31:40  8   the same employee.  Sometimes it's a man, sometimes it's
10:31:46  9   a woman.
10:31:48 10      Q    And can you -- can you help me out where you
10:31:50 11   go in Jacksonville when you go to the Department of
10:31:52 12   Children and Families, can you recall the street you go
10:31:56 13   to?
10:31:58 14      A    I can't hear you.
10:32:00 15      Q    Can you tell me the street that this building
10:32:04 16   is --
10:32:04 17      A    No, I can't tell you the street.
10:32:08 18      Q    Is it in the heart of downtown Jacksonville?
10:32:14 19      A    I don't know if it's downtown or uptown.
10:32:20 20      Q    And when did you first apply for public
10:32:22 21   assistance in Florida?
10:32:24 22      A    I first applied when I first came here,
10:32:32 23   regularly after I first came here.
10:32:36 24      Q    And when did you come to Florida, ma'am?
10:32:38 25      A    In '99, 1999.

24

10:32:44  1      Q    Are you disabled at all?
10:32:50  2      A    What did you say?
10:32:52  3      Q    Are you disabled, physically disabled at all?
10:32:56  4      A    Yes.  Yes, I am.  I have one eye and I'm on a
10:33:02  5   walker.
10:33:04  6      Q    Now, when you -- when you go to the
10:33:06  7   Department of Children and Families, do you -- do you go
10:33:12  8   for your disabilities as well?
10:33:16  9      A    Yes, I go for everything I have to take care
10:33:20 10   of.
10:33:22 11      Q    And how often do you go there to the
10:33:24 12   Department of Children and Families?
10:33:26 13      A    When they send me a notice to come.
10:33:30 14      Q    Approximately how many times a year do you
10:33:32 15   go, do you recall?
10:33:34 16      A    I think it's -- it's once a year.
10:33:36 17      Q    Once a year.  Now, when you -- when you've
10:33:44 18   gone to the Department of Children and Families, has
10:33:48 19   anyone ever offered to -- to let you apply to register to
10:33:56 20   vote?
10:33:56 21      A    I have my own walker.
10:34:00 22           MS. CICCOLO:  She can't -- she can't hear
10:34:00 23   you.  Could you repeat that question?
10:34:04 24           MR. MACINNES:  Certainly.
10:34:04 25      Q    Ms. Stoner, when you went to the Department

NAACP, et al. VS. KATHERINE HARRIS, et al.

Deposition of JULIA STONER

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 93 of 234

25

10:34:08 1  of Children and Families office, did anyone ask you if
10:34:10 2  you also wanted to apply to register to vote?
10:34:18 3       A    To vote?
10:34:18 4       Q    Yes, ma'am.
10:34:20 5       A    No, sir, nobody asked me to vote -- to apply
10:34:22 6  to vote.
10:34:24 7       Q    Are you certain about that?
10:34:30 8       MS. CICCOLO:  I'm going to object.  She's
10:34:32 9  already answered the question.
10:34:36 10      Q    Ms. Stoner, are you certain about that?
10:34:38 11      A    Nobody asked me to vote.  I haven't -- I have
10:34:42 12 voted already when I voted in the year 2000.
10:34:48 13      Q    Now, when you came to Florida and you
10:34:52 14 registered to vote, where did you go to register to vote?
10:35:00 15      A    I can't answer that because I don't know.  I
10:35:06 16 don't know Florida, the city of Florida.
10:35:08 17      Q    Well, what I'm getting at is, did you -- do
10:35:10 18 you recall if you registered to vote at a Supervisor of
10:35:14 19 Elections office?
10:35:18 20      A    I can't answer that.  I don't know.
10:35:22 21      MR. MACINNES:  I have no further questions.
10:35:22 22              CROSS EXAMINATION
10:35:28 23 BY MR. HARVEY:
10:35:28 24      Q    Good afternoon, Mr. Stoner -- I'm sorry, Ms.
10:35:28 25 Stoner.

26

10:35:30 1       A    Good afternoon.
10:35:30 2       Q    My name is Walter Harvey.  I represent the
10:35:34 3  Division of Elections and the Secretary of State.  How
10:35:38 4  are you?
10:35:40 5       A    Pretty good.  A little shook up now.
10:35:42 6       Q    Okay.  Well, I'll try to keep it short and
10:35:46 7  simple.  Ms. Stoner, you've had an opportunity to look at
10:35:52 8  a declaration that was prepared and presented during the
10:35:56 9  course of this deposition.  Did you prepare that
10:36:04 10 declaration or was that prepared by your attorneys?
10:36:08 11      MS. CICCOLO:  Objection, asked and answered.
10:36:10 12 You can go ahead and answer.
10:36:12 13      A    I don't know.  I don't know who planted
10:36:16 14 that.
10:36:16 15      Q    Did you prepare it, Ms. Stoner?
10:36:18 16      A    No, I didn't prepare it.
10:36:20 17      Q    But you signed it; is that correct?  Did you
10:36:26 18 sign it, Ms. Stoner?
10:36:28 19      MS. CICCOLO:  Objection, asked and answered.
10:36:32 20 You can answer, Ms. Stoner, even though you've
10:36:36 21 already answered it, go ahead.
10:36:38 22      MR. HARVEY:  Well, I apologize.  I may not
10:36:42 23 have heard that answer.  I'm participating by
10:36:46 24 telephone and I still haven't heard the answer.
10:36:56 25      THE WITNESS:  You said objection?

27

10:36:56 1       MS. CICCOLO:  Yeah, Ms. Stoner, do you
10:36:58 2  remember the piece of paper, the declaration Mr.
10:37:04 3  Arpen showed you?
10:37:06 4       THE WITNESS:  What kind of paper was it?
10:37:06 5       MS. CICCOLO:  He showed you this paper
10:37:08 6  called the Declaration of Julia Stoner.
10:37:08 7       THE WITNESS:  I didn't -- I didn't read it.
10:37:10 8       MS. CICCOLO:  Okay.  Did you -- he asked
10:37:12 9  you, though, if that was your signature.
10:37:16 10      THE WITNESS:  My name on it.
10:37:18 11      MS. CICCOLO:  Okay.  And what he was asking
10:37:18 12 was that your signature on the declaration on
10:37:22 13 page two, did you sign -- sign that?
10:37:28 14      THE WITNESS:  Yes, I did.
10:37:28 15 BY MR. HARVEY:
10:37:28 16      Q    Okay.  Thank you.  And have you had an
10:37:34 17 opportunity to look at or read the second amended
10:37:40 18 complaint that was filed in this case, Ms. Stoner?
10:37:44 19      A    What is that?  What is that?  The second
10:37:48 20 what?
10:37:50 21      MR. HARVEY:  Mr. Arpen, do you have a copy of
10:37:54 22 the second amended complaint?
10:37:56 23      MR. ARPEN:  Not the entire complaint.  I
10:37:58 24 only have a few pages of it.
10:38:00 25      MR. HARVEY:  Okay.  Do you have the pages

28

10:38:02 1  that apply to Ms. Stoner?
10:38:04 2       MR. ARPEN:  I do.
10:38:06 3       MR. HARVEY:  Okay.  Would you show
10:38:08 4  Ms. Stoner paragraph 63, page 17 of the amended
10:38:08 5  complaint.
10:38:32 6       MS. CICCOLO:  Ms. Stoner, they're asking you
10:38:32 7  to take a look at section 63 on page 17.
10:38:40 8       THE WITNESS:  Right here?
10:38:40 9       MS. CICCOLO:  Yes, ma'am, section 63.
10:38:44 10      THE WITNESS:  63, where is 63 at?
10:38:48 11      MS. CICCOLO:  It's right here, Ms. Stoner.
10:38:50 12 With your permission, I'm just directing her to
10:38:54 13 paragraph 63.
10:38:56 14      MR. ARPEN:  Sure.
10:38:56 15      A    63.  I see 63.  I don't have but one eye.  I
10:39:00 16 don't see all these words.
10:39:04 17      Q    Okay.  Ms. Stoner, prior to today, have you
10:39:08 18 ever read this portion of the amended complaint?
10:39:16 19      A    Read this page?
10:39:22 20      MS. CICCOLO:  Have you read this part, part
10:39:24 21 63, before today, ma'am?
10:39:28 22      A    No.  No.  No, I haven't read it before.  I
10:39:32 23 don't read.  I don't even read my Bible because I can't
10:39:38 24 see it, see the words.
10:39:40 25      Q    Okay.  Yes, ma'am.  Okay.  In that particular

March 25, 2002

NAACP, et al. VS. KATHERINE HARRIS, et al.
Case 1:01-cv-01120-ASG   Document 405   Entered on FLSD Docket 07/02/2002   Page 94 of 234
Deposition of JULIA STONER

29

```
10:39:42  1   paragraph, paragraph 63, it is stated that, "State
10:39:48  2   defendants do not have uniform standards or procedures
10:39:52  3   adequate to ensure that voters are made aware prior to
10:39:56  4   the completion of the ballot casting process that their
10:40:02  5   ballots appear to contain nonvotes or duplicate votes in
10:40:04  6   one or more contexts so that they may correct any
10:40:08  7   unintended errors before their votes are tabulated,
10:40:08  8   although some of the electric systems approved for use by
10:40:16  9   defendants incorporate this feature."  Have you ever
10:40:18 10   heard those words prior to today?
10:40:22 11        A    The words you just said?
10:40:24 12        Q    Have you ever heard or read those words?
10:40:28 13        A    No, I haven't heard or read.
10:40:30 14        Q    Okay.  Ms. Stoner, do you know what standards
10:40:40 15   or procedures that the state defendants, or the county
10:40:42 16   defendants for that matter, have with regard to ensuring
10:40:46 17   that voters are made aware prior to the completion of the
10:40:52 18   ballot casting process that their ballots appear to
10:40:56 19   contain nonvotes or duplicate votes in one or more
10:40:58 20   contexts that they may correct any unintended errors
10:41:02 21   before they cast votes or their votes are tabulated, do
10:41:06 22   you know of any standards or procedures?
10:41:08 23        A    No, I don't.
10:41:10 24        Q    Do you know whether they exist or they don't
10:41:14 25   exist, Ms. Stoner?
```

30

```
10:41:16  1        A    I couldn't tell you something that I don't
10:41:18  2   know.  I don't know that.  I haven't read it.
10:41:22  3        Q    Okay.
10:41:24  4        A    I can't see.  I've but one eye.
10:41:36  5        Q    Yes, ma'am.  Okay.  Now, do you also have a
10:41:40  6   copy of the declaration that you signed in front of you?
10:41:54  7   Ms. Stoner?
10:41:54  8        A    Yes.  Yes, I have it in front of me.
10:41:58  9        Q    Okay.  Paragraph five reads as follows,
10:42:02 10   "Since November 7th, I have learned that Florida law
10:42:08 11   mandates poll workers to furnish voters with a new ballot
10:42:10 12   if the err" -- "if the voter errs on her first or second
10:42:14 13   attempt to vote."
10:42:22 14             MS. CICCOLO:  Are you going to complete the
10:42:24 15        paragraph, Counsel, for completeness?
10:42:26 16        Q    "None of the poll workers at my precinct
10:42:30 17   informed me of that right to cast a new ballot, and, as a
10:42:32 18   result, I was denied the opportunity to exercise my right
10:42:36 19   to vote for the candidate of my choice on November 7th,
10:42:40 20   2000."  Okay.  Let me ask you --
10:42:44 21             MS. CICCOLO:  Walter, hello?
10:42:44 22             MR. HARVEY:  Yes.
10:42:46 23             MS. CICCOLO:  May I read that to her again?
10:42:50 24   I'm sitting right next to her.  I, myself, am
10:42:50 25   having difficulty hearing -- hearing you come
```

31

```
10:42:54  1   through.  So with your permission, I'm just going
10:42:58  2   to read it to her again because I'm right by her
10:42:58  3   ear.
10:43:00  4             MR. HARVEY:  Okay.
10:43:00  5             MS. CICCOLO:  Paragraph five says, "Since
10:43:04  6   November 7th, I have learned that Florida law
10:43:08  7   mandates poll workers to furnish voters with a
10:43:12  8   new ballot if the voter errs on her first or
10:43:16  9   second attempt to vote.  None of the poll workers
10:43:20 10   at my precinct informed me of my right to cast a
10:43:24 11   new ballot, and, as a result, I was denied the
10:43:28 12   opportunity to exercise my right to vote for the
10:43:32 13   candidate of my choice on November 7th, 2000."
10:43:36 14   That's what he wanted you to hear.  Now, go
10:43:40 15   ahead.
10:43:42 16        Q    Okay.  Ms. Stoner?
10:43:42 17        A    Yes.
10:43:44 18        Q    Had you ever heard those words prior to
10:43:46 19   today, the words that your attorney just read to you?
10:43:54 20        A    Now, say it again.
10:43:56 21        Q    Have you ever heard those words prior to
10:43:58 22   today that your attorney just read to you?
10:44:02 23        A    November the 7th.
10:44:04 24        Q    Those words that your attorney just read,
10:44:06 25   have you ever heard those words read to you before today?
```

32

```
10:44:12  1        A    No, I haven't heard it.
10:44:14  2        Q    You never heard it?
10:44:16  3        A    No, I haven't read it because I can't read.
10:44:20  4             MR. HARVEY:  Okay.  I have nothing further.
10:44:20  5             CROSS EXAMINATION
10:44:24  6   BY MR. EHRLICH:
10:44:24  7        Q    Ms. Stoner, this is Jeff Ehrlich.  I
10:44:28  8   represent the Supervisor of Elections for Miami-Dade
10:44:32  9   County.  His name is David Leahy.  I'm just going to ask
10:44:34 10   you a couple of questions.  First, have you ever been to
10:44:40 11   Miami-Dade County?
10:44:42 12        A    Have I ever been -- repeat that again.
10:44:44 13        Q    Sure.  Have you ever been to Miami-Dade
10:44:48 14   County, Florida?
10:44:48 15        A    No, I have never been.
10:44:52 16        Q    Do you know how the Supervisor of Elections
10:44:54 17   in Miami-Dade County trains his poll workers?
10:44:58 18        A    No, I do not know.
10:45:02 19        Q    Do you know how the Supervisor of Elections
10:45:04 20   for Duval County trains the poll workers there?
10:45:08 21        A    I do not know how they train.
10:45:14 22        Q    Do you believe they have adequate training?
10:45:20 23        A    What did he say?
10:45:22 24        Q    I'll repeat the question.  Do you believe the
10:45:26 25   poll workers in Duval County were adequately trained on
```

Case 1:01-cv-10325-ASG Document 105 Entered on FLSD Docket 07/02/2002 Page 95 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JULIA STONER

33

```
10:45:30  1    November 2000?
10:45:32  2              MS. CICCOLO:  Objection.  It calls for, I
10:45:34  3    think, a legal conclusion, but go ahead and
10:45:34  4    answer.
10:45:36  5              MR. EHRLICH:  And, Counsel, I request that
10:45:36  6    you not make speaking objections.  Under the
10:45:38  7    local rules of the Southern District of Florida,
10:45:38  8    speaking objections are not allowed.
10:45:40  9         Q    Ms. Stoner, you may answer my question.  If
10:45:42 10    you need it repeated, I ask that the court reporter read
10:45:42 11    back the question.
10:45:48 12         A    Will you repeat that?  Repeat it.
10:46:12 13              MR. EHRLICH:  Court reporter, would you
         14    please read it back?
         15              COURT REPORTER:  Sure.
         16              (The following question was read by the
         17    court reporter:  "Do you believe the poll workers in
         18    Duval County were adequately trained in November 2000?")
         19    Did you hear me?
10:46:14 20              THE WITNESS:  Yes, I did.
10:46:14 21              COURT REPORTER:  Okay.
10:46:16 22              THE WITNESS:  Yes, I did.
10:46:16 23              MR. EHRLICH:  I have no further questions.
10:46:16 24    Thank you, Ms. Stoner.
10:46:20 25              MS. CICCOLO:  Ms. Stoner, did you -- she
```

34

```
10:46:22  1    didn't give a reply to your question.
10:46:22  2              MR. EHRLICH:  I'm sorry.  I thought the
10:46:28  3    answer was, yes, I do.
10:46:28  4              MS. CICCOLO:  No, she didn't give you a
10:46:30  5    response.
10:46:32  6              THE WITNESS:  I didn't give you no -- I
10:46:34  7    didn't give you no answer.
10:46:34  8         Q    Okay.  Well, would you please answer the
10:46:36  9    question?
10:46:36 10         A    I don't know.
10:46:38 11         Q    You don't know?
10:46:38 12         A    No, I do not know.
10:46:40 13         Q    In your declaration, you assert that the poll
10:46:46 14    workers were -- you called their training grossly
10:46:50 15    inadequate.  What facts do you have to support that
10:46:56 16    assertion?
10:47:00 17         A    What did he say?  What did you say?
10:47:04 18         Q    I'll repeat it.  In your declaration, the two
10:47:08 19    pages that you have in front of you, you stated that the
10:47:14 20    training of the poll workers in Duval County was grossly
10:47:22 21    inadequate.
10:47:22 22         A    Grossly -- that means -- meant -- mean --
10:47:32 23         Q    These are your words, you say as a result of
10:47:34 24    the gross inadequacies in the training and supervision of
10:47:38 25    the poll workers --
```

35

```
10:47:42  1         A    Training of the poll workers.
10:47:42  2         Q    -- you were denied the right to vote.  My
10:47:46  3    question is, what made their training inadequate?
10:47:56  4         A    Grossly.
10:48:04  5         Q    Was there an answer?
10:48:08  6         A    Did I answer?
10:48:10  7         Q    Yeah.  Go ahead and answer the question,
10:48:14  8    please.
10:48:14  9         A    Grossly, that mean they didn't want to do it,
10:48:20 10    and they didn't do it.
10:48:20 11         Q    But you say their training was inadequate.
10:48:24 12    What about their training was inadequate?
10:48:28 13         A    Training inadequate.
10:48:34 14         Q    Let me just make it a little more clear.  I
10:48:38 15    think what you're saying is they -- the poll workers on
10:48:40 16    election day did not want to give you a new ballot after
10:48:46 17    you had spoiled your ballot, as I understand, that's what
10:48:48 18    you're saying.  But you're also saying that they were
10:48:48 19    trained improperly, they did not have adequate training.
10:48:54 20    And my question to you is, how was their training
10:48:56 21    inadequate?
10:49:02 22         A    I wished I did know.  I don't know.
10:49:10 23         Q    You don't know whether they were adequately
10:49:14 24    trained, do you, Ms. Stoner?
10:49:16 25         A    No, I don't know.
```

36

```
10:49:18  1              MR. EHRLICH:  I have no further questions.
10:49:22  2    Thank you.
10:49:22  3              CROSS EXAMINATION
10:49:24  4    BY MR. WHITE:
10:49:24  5         Q    Good morning, Ms. Stoner.
10:49:24  6         A    Good morning.
10:49:26  7         Q    My name's Tom White.  I represent
10:49:30  8    Choicepoint, Incorporated, doing business as Database
10:49:32  9    Technologies, Incorporated, another one of the defendants
10:49:34 10    in this lawsuit.  Can you hear me okay?
10:49:36 11         A    Yes.
10:49:36 12         Q    Okay.  I just have a couple of questions for
10:49:38 13    you, Ms. Stoner.  Do you know anything about Choicepoint,
10:49:42 14    Incorporated?
10:49:48 15         A    What did you say?  Repeat it.
10:49:50 16         Q    Do you know anything about Choicepoint,
10:49:52 17    Incorporated, one of the defendants in this lawsuit?
10:49:56 18         A    No, I don't know.
10:49:58 19         Q    Do you know anything about Database
10:50:02 20    Technologies, Incorporated?
10:50:04 21         A    I do not know.
10:50:06 22              MR. WHITE:  Thank you, Ms. Stoner.  I don't
10:50:06 23    have anything further.
10:50:10 24              THE WITNESS:  You're welcome.
10:50:14 25              MR. EZROL:  This is Kerry Ezrol and I have
```

NAACP, et al. VS. KATHERINE HARRIS, et al.
Case 1:01-cv-00120-ASG  Document 465  Entered on FLSD Docket 07/02/2002  Page 96 of 234
Deposition of JULIA STONER

37

```
10:50:16  1        no questions.
10:50:16  2              CROSS EXAMINATION CONTINUED
10:50:20  3   BY MR. MACINNES:
10:50:20  4        Q     This is Doug MacInnes once again.  I have two
10:50:24  5   follow-up questions.  Ms. Stoner, do you have a Social
10:50:26  6   Security card?
10:50:28  7        A     Yes, I do have a Social Security card.
10:50:30  8        Q     Do you have it with you today, ma'am?
10:50:34  9        A     I have it put up.
10:50:38 10        Q     Do you know what your Social Security number
10:50:40 11   is?
10:50:40 12        A     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.
10:50:48 13        Q     And what is your date of birth, ma'am?
10:50:50 14        A     April the 5th, 1919.
10:50:54 15              MR. MACINNES:  That's all I have.  Thank you.
10:51:02 16              THE WITNESS:  You're welcome.
10:51:06 17              MS. CICCOLO:  Does anybody else on the phone
10:51:08 18   have any questions?
10:51:08 19              CROSS EXAMINATION
10:51:14 20   BY MS. CICCOLO:
10:51:14 21        Q     Ms. Stoner, this is Angela Ciccolo for the
10:51:18 22   NAACP.  I just have a couple of follow-up questions for
10:51:22 23   you.
10:51:22 24        A     All right.
10:51:22 25        Q     You described some of your physical
```

38

```
10:51:26  1   conditions during your deposition.  I just want to ask
10:51:30  2   you for clarification purposes back on November 7th,
10:51:36  3   2000, when you went to vote, can you tell us what the
10:51:40  4   disabilities, if any, you had at that time?
10:51:44  5        A     I had it then and I still have it, one eye.
10:51:50  6        Q     And did you have any use of the walker at
10:51:54  7   that time?
10:51:54  8        A     I had my walker.  I was using my walker.
10:52:10  9        Q     When you asked for help at the polls on
10:52:16 10   November 7th, 2000, how did you know the people you were
10:52:24 11   asking were poll workers?
10:52:26 12        A     They was beside me, walking beside me and
10:52:30 13   they the one that gave me my paperwork.
10:52:34 14        Q     And do you know how many poll workers were
10:52:38 15   there giving you paperwork?
10:52:40 16        A     No, I don't.  I do not know.
10:52:44 17        Q     When you asked for help, do you know how many
10:52:48 18   poll workers responded?
10:52:50 19        A     No, I do not know.
10:52:52 20        Q     Do you know if it was more than one?
10:52:56 21        A     It was more than one.
10:52:58 22        Q     Do you know if it was more than two?
10:53:00 23        A     It was more than two.
10:53:02 24        Q     And were these poll workers male or female?
10:53:10 25        A     Most of them was female.
```

39

```
10:53:14  1        Q     Okay.  When you asked for assistance, you
10:53:34  2   described that -- that you were told they could not put
10:53:38  3   their hands on you?
10:53:40  4        A     That's right.
10:53:40  5        Q     Did they say anything else to you at that
10:53:42  6   time?
10:53:44  7        A     No, they didn't say anything else.
10:53:46  8        Q     Did they offer you any kind of brochures or
10:53:50  9   other instructions to assist you?
10:53:50 10        A     No.
10:53:54 11              MR. EHRLICH:  Objection, leading.
10:54:02 12        A     No.
10:54:02 13              COURT REPORTER:  Who was objecting?
10:54:02 14              MR. EHRLICH:  Mr. Ehrlich from Miami-Dade
10:54:02 15   County.  Thank you.
10:54:08 16              COURT REPORTER:  Thank you.
10:54:08 17        Q     And, Ms. Stoner, how many ballots were you
10:54:12 18   offered that day when you went to vote?
10:54:16 19        A     One.
10:54:18 20              MS. CICCOLO:  Thank you.  I don't have any
10:54:20 21   further questions.
10:54:22 22              MR. ARPEN:  I just have one or two
10:54:24 23   follow-up.
10:54:24 24              REDIRECT EXAMINATION
10:54:24 25   BY MR. ARPEN:
```

40

```
10:54:24  1        Q     Ms. Stoner, you never asked for a second
10:54:28  2   ballot, did you?
10:54:28  3        A     No, I didn't.  I did not ask for a second
10:54:32  4   ballot.
10:54:32  5        Q     And is your -- one other thing I need to ask
10:54:34  6   you, is your eyesight today roughly the same as it was in
10:54:40  7   November 2000 in terms of your ability to see things?
10:54:44  8        A     Yes, it's gone in my left eye.
10:54:48  9              MR. ARPEN:  I don't have any other questions.
10:54:50 10   I would like to have Ms. Stoner's declaration
10:54:54 11   attached to the deposition as Defendant
10:54:56 12   Stafford's Exhibit.
10:54:56 13              (Defendant Stafford's Exhibit 1 was marked
10:54:58 14   for identification.)
10:54:58 15              MS. CICCOLO:  And let me -- I have a
10:54:58 16   follow-up question based on your question.
10:54:58 17              RECROSS EXAMINATION
10:55:02 18   BY MS. CICCOLO:
10:55:02 19        Q     You didn't ask for a second ballot,
10:55:04 20   Ms. Stoner, that's correct, right?
10:55:06 21        A     No, I did not ask for a second ballot.
10:55:10 22        Q     Did anyone offer you a second ballot?
10:55:12 23              MR. EHRLICH:  Object to the form.
10:55:14 24        A     No one offered me a second.
10:55:14 25              MS. CICCOLO:  Thank you.
```

NAACP et al VS KATHERINE HARRIS, et al
Case 1:01-cv-00120-ASG Document 408 Entered on FLSD Docket 07/02/2002 Page 97 of 234
Deposition of JULIA STONER

41

10:55:14 1      COURT REPORTER: Who just objected?
10:55:24 2      MR. EHRLICH: Mr. Ehrlich.
10:55:24 3      COURT REPORTER: Thank you.
10:55:24 4      MS. CICCOLO: I'm done.
10:55:26 5      MR. ARPEN: Do you want to -- does she want
10:55:28 6  to read and sign or do you want to waive?
10:55:30 7      MS. CICCOLO: I think that -- Ms. Stoner --
10:55:30 8      THE WITNESS: Yes.
10:55:34 9      MS. CICCOLO: -- you have the ability -- and
10:55:38 10  I'm just going to advise her -- to review your
10:55:44 11  deposition transcript for transcription errors.
10:55:46 12  Is that something that you would like to do, or
10:55:54 13  would you like to waive signature? Would you
10:55:54 14  like to read it to make sure that --
10:55:58 15      THE WITNESS: I'd like to read it and make
10:56:00 16  sure.
10:56:02 17      MS. CICCOLO: Okay. So she will read.
18      (Deposition concluded at 10:57 a.m.)
19      - - -
20
21
22
23
24
25

---

42

CERTIFICATE OF OATH

1
2
3  STATE OF FLORIDA  )
4  COUNTY OF DUVAL  ;
5
6      I, the undersigned authority, certify that
7  JULIA STONER personally appeared before me and was duly
8  sworn.
9
10      WITNESS my hand and official seal this 2nd
11  day of April 2002.
12
13
14
15
16
17      Cristina A. Stark
      Notary Public
18      State of Florida
      My Commission No. DD063433
19      Expires: October 8, 2005
20
21
22
23
24
25

---

43

CERTIFICATE OF REPORTER

1
2
3  STATE OF FLORIDA  )
4  COUNTY OF DUVAL  )
5
6      I, Cristina A. Stark, Court Reporter and
7  Notary Public, certify that I was authorized to and did
8  stenographically report the deposition of JULIA STONER;
9  that a review of the transcript was requested; and that
10  the transcript is a true and complete record of my
11  stenographic notes.
12
13      I further certify that I am not a relative,
14  employee, attorney, or counsel of any of the parties, nor
15  am I a relative or employee of any of the parties'
16  attorney or counsel connected with the action, nor am I
17  financially interested in the action.
18
19      DATED this 2nd day of April 2002.
20
21
22      _____
23      Cristina A. Stark
24
25

---

44

E R R A T A  S H E E T

1
2
3  STATE OF FLORIDA  )
4  COUNTY OF DUVAL  )
5
6      I, JULIA STONER, the undersigned deponent, have
7  this date read the foregoing pages of my deposition,
8  numbered 1 through 43, and with the suggestions noted
9  below, if any, these constitute a true and accurate
10  transcription of my deposition given on the 25th day of
11  March 2002, at the time and place stated therein.
12
13  PAGE NUMBER    LINE NUMBER    SUGGESTIONS/REASON
14  _____    _____    _____
15  _____    _____    _____
16  _____    _____    _____
17  _____    _____    _____
18  _____    _____    _____
19  _____    _____    _____
20  _____    _____    _____
21  _____    _____    _____
22
23      _____
24      JULIA STONER
25

---

**March 25, 2002**

**PLAINTIFFS' EXHIBIT 15**

NAACP, et al. VS. KATHERINE HARRIS, et al.                                    Deposition of JOHN STAFFORD

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA
 2
   NATIONAL ASSOCIATION FOR THE
 3 ADVANCEMENT OF COLORED PEOPLE INC.,
   by its FLORIDA STATE CONFERENCE OF BRANCHES,
 4 JIMMIE PANNELL, JULIA STONER, NATALIE
   CARNEGIE, JOHN L. CHEEVER, JAMES
 5 MARSHALL, LILLIE Q. ODOM, WILLIE STEEN,
   WALLACE MCDONALD, JERMAINE TERRY, LORINE
 6 WALDEN, EMERY TIMBERLAKE, VALERIE
   BUFORD-WELLS, MICHELLE FLOYD, CONSUELO
 7 MARIA GRAHAM, SHERRY EDWARDS, KANDY WELLS,
   JOANNA CLARK, JANICE KELLY, PLACIDE
 8 DOSSOUS, RONDRICK ROSE, URSULA HARVEY,
   and ADMANTHA ISRAEL in their own right
 9 and as representatives of all similarly
   situated citizens and residents of the
10 State of Florida,

11      Plaintiffs,

12      vs.          CASE NO.:  01-0120-Civ-Gold

13 KATHERINE HARRIS, Secretary of State of
   Florida; CLAY ROBERTS, Director of Florida
14 Division of Elections; DAVID C. LEAHY,
   Miami-Dade County Election Supervisor;
15 MIRIAM OLIPHANT, Broward County Election
   Supervisor; JOHN STAFFORD, Duval County
16 Election Supervisor; PAM IORIO,
   Hillsborough County Election Supervisor;
17 WILLIAM COWLES, Orange County Election
   Supervisor; and DEANIE LOWE, Volusia
18 County Election Supervisor (all in their
   official capacities); and CHOICEPOINT, INC.,
19 a Georgia corporation d/b/a DATABASE
   TECHNOLOGIES, INC.,
20
        Defendants.
21 _____

22
23
24
25
```

**Page 2**

```
 1          Deposition of JOHN STAFFORD pursuant to

 2 Notice of Taking Deposition, on Monday, May 13, 2002, at

 3 11:17 a.m., at the Office of General Counsel, 117 West

 4 Duval Street, Suite 480, Jacksonville, Florida, before

 5 Cristina A. Stark, a Court Reporter and Notary Public in

 6 and for the State of Florida at Large.
```

May 13, 2002

**Page 3**

```
 1            A P P E A R A N C E S

 2 ANGELA CICCOLO, Esquire
   Deputy General Counsel
 3 NAACP Legal Department
   4805 Mt. Hope Drive
 4 Baltimore, Maryland 21215-3297

 5 Attorney for the Plaintiffs.

 6
 7 TRACEY ARPEN, Esquire
   Office of General Counsel
 8 City of Jacksonville
   117 West Duval Street, Suite 480
 9 Jacksonville, Florida 32202-3700

10 Attorney for Defendant Stafford.

11 DOUG MAC INNES, Esquire
   Assistant Attorney General
12 Office of the Attorney General
   PL-01 The Capitol
13 Tallahassee, Florida 32399-1050

14 Attorney for Defendants Dickerson and Kearney.

15 DANIEL A. RESTREPO, Esquire
   Williams & Connolly LLP
16 725 Twelfth Street, N.W.
   Washington, D.C. 20005
17 Attorney for Defendant Choicepoint, Inc.,
        d/b/a Database Technologies, Inc.
18
19 WALTER HARVEY, Esquire, via telephone
   Steel, Hector, & Davis, International
20 200 South Biscayne Boulevard
   Miami, Florida 33131-2398
21 Attorney for Defendants Harris and Roberts.

22 KEN TINKLER, Esquire, via telephone
   County Attorney's Office
23 601 East Kennedy Boulevard, 27th floor
   Tampa, Florida 33602
24
25 Attorney for Defendant Iorio.
```

**Page 4**

```
 1    A P P E A R A N C E S   C O N T I N U E D

 2 BILL BOSCH, Esquire, via telephone
   County Attorney's Office
 3 123 W. Indiana Avenue
   DeLand, Florida 32720-4613
 4
 5 Attorney for Defendant Lowe.

 6 SUSAN TORRES, Esquire, via telephone
   MURRAY GREENBERG, Esquire, via telephone
 7 County Attorney's Office
   111 N.W. 1st Street, Suite 2810
 8 Miami, Florida 33128

 9 Attorneys for Defendant Leahy.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:01-cv-00120-ASG    Document 406    Entered on FLSD Docket 07/02/2002    Page 100 of
234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JOHN STAFFORD

5

1                    I N D E X

2    WITNESS:

3        JOHN STAFFORD

4        DIRECT EXAMINATION BY MS. CICCOLO. . . . . .PAGE 6

5        CROSS EXAMINATION BY MR. RESTREPO. . . . .PAGE 126

6        CROSS EXAMINATION BY MR. HARVEY. . . . . .PAGE 130

7

8

9

10

11                  E X H I B I T S

12   FOR IDENTIFICATION

13   PLAINTIFFS' EXHIBIT 1. . . . . . . . . . . . . PAGE 22

14   PLAINTIFFS' EXHIBIT 2. . . . . . . . . . . . . PAGE 121

15

16

17

18

19

20

21

22

23

24

25

6

1                S T I P U L A T I O N

2            It was stipulated and agreed by and between

3    counsel for the respective parties, and the witness, that

4    the reading and signing of the deposition by the witness

5    were not waived.

6                        - - -

7                    JOHN STAFFORD,

8    having been produced and first duly sworn, testified to

9    questions as follows:

10                  DIRECT EXAMINATION

11   BY MS. CICCOLO:

12       Q    Hi.  Would you please state your complete

13   name for the record.

14       A    John Lawton Stafford, Jr.

15       Q    And, Mr. Stafford, what is your business

16   address?

17       A    105 East Monroe Street, Jacksonville, Florida

18   32202.

19       Q    Mr. Stafford, I met you earlier out in the

20   lobby of Mr. Arpen's office.  My name is Angela Ciccolo

21   and I'm an attorney for the NAACP, co-counsel on this

22   case in the NAACP versus Harris.  I'm going to ask you

23   some questions today about your activities in your job

24   and -- as well as some opinions that you hold.  If you

25   have any questions in terms of my clarity -- as I

May 13, 2002

7

1    explained earlier, I'm working on very limited sleep

2    today, please stop me and I'll try and rephrase my

3    question so that it's clear and so that we both

4    understand it.  And similarly, if, for some reason, you

5    need to take a break or stop, if you would just let me

6    know, when we get to a good place we'll stop and then

7    we'll resume.

8        A    Okay.

9        Q    Okay.  Mr. Stafford, could you tell me what,

10   if any, documents you reviewed to prepare for your

11   deposition testimony today?

12       A    I checked some of our task force

13   recommendations and some of the things we've done in the

14   office to follow up on those to make -- you know, where I

15   could clearly state what we've done to improve things.

16       Q    Anything else that you took a look at?

17       A    I glanced at the lawsuit itself and the

18   testimony of -- I believe it was Ms. Kelly.

19       Q    Ms. Kelly?

20       A    Janice Kelly.

21       Q    Okay.  I want to emphasize that this is not a

22   memory game, so if there are some documents that perhaps

23   you need to refer to during your deposition that you

24   haven't mentioned, just let us know and then we'll be

25   clear as to what you may or may not be referring to.

8

1        A    Okay.

2        Q    Have you ever given a deposition before,

3    Mr. Stafford?

4        A    No, I haven't.

5        Q    And your office did receive a notice for you

6    to be deposed today, but also for a 30(b)6 deposition.

7    Did you also receive that notice?

8        A    That I'm not sure what it is.

9            MR. ARPEN:  Right there.

10           THE WITNESS:  That's it?

11           MR. ARPEN:  Yeah.

12       A    I received it, yes.

13       Q    And have you determined what individual would

14   be the best person to respond to the questions that are

15   listed or the areas that are covered in that rule 36?

16       A    Probably Dick Carlberg, my assistant.

17       Q    Dick Carlberg -- Carlsberg?

18       A    C-a-r-l-b-e-r-g, Carlberg.

19       Q    So -- and in light of the fact that I had

20   noted his deposition for Wednesday, we will take him on

21   Wednesday and try and finish up with him, then there

22   would be no need to go on Thursday unless, of course, for

23   example, there's some area that he can't cover.  But I'm

24   confident that if you have designated him, he will be

25   able to speak to those areas; is that agreeable?

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 101 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JOHN STAFFORD

9

```
11:22:44   1        A   Yes.
11:22:44   2        Q   Okay.
11:22:46   3            MS. CICCOLO:  Mr. Arpen, that's agreeable
11:22:48   4     with you as well?
11:22:50   5            MR. ARPEN:  Sure, that's fine.  In fact,
11:22:50   6     that's something I had planned to raise was if we
11:22:50   7     would need to do the one on Thursday if the
11:22:54   8     evidence was coming out through the other
11:22:56   9     witnesses today or Wednesday anyway.
11:23:00  10            MS. CICCOLO:  All right.  Well, we're going
11:23:00  11     to economize on our time and our efforts today to
11:23:06  12     try to get this done.
11:23:08  13        Q   Mr. Stafford, do you have a curriculum vitae
11:23:12  14     available or resumé?
11:23:18  15        A   Not readily available, but it's something we
11:23:22  16     could work up at the office.
11:23:26  17        Q   Well, since you don't have one available
11:23:28  18     today, I'm going to ask you some questions about your
11:23:30  19     background, probably take a few more minutes longer than
11:23:36  20     I normally would because I don't have that document.  Can
11:23:36  21     you tell me, sir, a little bit about your educational
11:23:40  22     background?  How far did you go in school?
11:23:44  23        A   High school graduate.  I took some courses at
11:23:46  24     junior college, but no degrees.
11:23:48  25        Q   Okay.  What year did you graduate from high
```

10

```
11:23:50   1     school, Mr. Stafford?
11:23:52   2        A   1963.
11:23:54   3        Q   And did you graduate from high school here in
11:23:58   4     Duval County?
11:24:00   5        A   Yes, Andrew Jackson High School.
11:24:06   6        Q   In terms of the additional courses that you
11:24:08   7     took that you just mentioned, could you tell me where you
11:24:14   8     took those courses?
11:24:14   9        A   Florida Community College of Jacksonville,
11:24:18  10     junior college.
11:24:20  11        Q   And during what time period did you take
11:24:22  12     those classes?
11:24:24  13        A   Probably the mid to late '60s.
11:24:28  14        Q   Can you tell me what, if any, area of
11:24:32  15     concentration you had with those courses?
11:24:36  16        A   They were basically general college courses.
11:24:40  17     At the time I was planning on working toward a degree and
11:24:44  18     never got there.
11:24:50  19        Q   And what is your current position?
11:24:54  20        A   I'm Supervisor of Elections for Duval County.
11:25:02  21        Q   How long have you served in that position?
11:25:06  22        A   I was elected in 1999.  July of 1999 I took
11:25:12  23     office.
11:25:16  24        Q   When you ran for that office, did you run
11:25:20  25     with any particular party affiliation?
```

11

```
11:25:22   1        A   Yes, Republican.
11:25:24   2        Q   Is that a position limited in any way by term
11:25:30   3     or the amount of years that you can serve in it?
11:25:32   4        A   Yes.  In Duval County there's a term limit,
11:25:38   5     two terms, two four-year terms.
11:25:46   6        Q   Going back to your educational background,
11:25:50   7     have you had any academic training in the field of
11:25:56   8     election administration?
11:25:58   9        A   Just, you know, the conferences that I've
11:26:00  10     attended over the years.  I was the Assistant Supervisor
11:26:04  11     of Elections from '93 to '99, and from '88 to '93 I was a
11:26:10  12     data processing coordinator, so I've attended conferences
11:26:16  13     and workshops all those years.
11:26:16  14        Q   In terms of the conferences and workshops,
11:26:20  15     would you be able to give me an idea of approximately how
11:26:2-  16     many conferences you would have attended?
11:26:30  17        A   Probably about 25.
11:26:32  18        Q   About 25?
11:26:32  19        A   There's a summer and -- there's a winter and
11:26:34  20     a summer conference and I attended both.
11:26:38  21        Q   And that would be over the period -- what
11:26:40  22     period of time?
11:26:42  23        A   From 1988 to the present.
11:26:44  24        Q   Are those conferences working conferences,
11:26:50  25     are they seminars, lecture format?  Could you describe a
```

12

```
11:26:54   1     little bit about them, please?
11:26:56   2        A   They're a little bit of both.  They have --
11:26:58   3     we have lecture series, we go over election law as it
11:27:04   4     applies to the state of Florida, and, like I say, mostly
11:27:07   5     workshops.  And we hear speakers on various subjects and
11:27:14   6     then we actually discuss things amongst ourselves, the
11:27:18   7     supervisors.
11:27:18   8        Q   Can you tell me -- and I think you've already
11:27:20   9     partially answered this question, but who actually
11:27:22  10     attends the conferences you've described?
11:27:26  11        A   Well, the Supervisors of Elections attend.
11:27:28  12     We get credit for going to those.  In Duval County, my
11:27:36  13     assistant goes and usually our data processing people.
11:27:40  14     And there's -- various counties bring -- you know,
11:27:42  15     according to what size staff they have, how many people
11:27:44  16     they bring.
11:27:46  17        Q   And when you say supervisors, you mean
11:27:48  18     Supervisors of Election for the state of Florida?
11:27:50  19        A   Right, for the counties in the state of
11:27:54  20     Florida.
11:27:54  21        Q   Now, you mentioned studying Florida law at
11:27:5-  22     those conferences.  Do you also discuss any federal laws
11:28:00  23     related to the administration of elections?
11:28:04  24        A   Yes, we do.
11:28:04  25        Q   Okay.  Can you give me some idea of what
```

Case 1:01-cv-00120-ASG Document 466 Entered on FLSD Docket 07/02/2002 Page 102 of
234
NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JOHN STAFFORD
13

15

11:28:06 1   kinds of federal laws you have discussed at those
11:28:10 2   conferences in the past?
11:28:12 3       A   Well, the National Voter Registration Act
11:28:14 4   when it took place. We talk about military voting,
11:28:20 5   federal voting as far as the military.
11:28:24 6       Q   Any other areas?
11:28:26 7       A   I can't think of any off the top of my head.
11:28:25 8       Q   Okay.
11:28:28 9       A   I'm sure there were.
11:28:30 10      Q   Okay. If you do, will you let me know --
11:28:30 11      A   Sure.
11:28:34 12      Q   -- at some point?
11:28:36 13      Q   Did you attend those conferences then also
11:28:38 14  when you were Assistant Supervisor of Elections?
11:28:42 15      A   That's correct, as well as when I was the
11:28:44 16  data processing coordinator.
11:28:48 17      Q   Okay. Apart from the conferences that you've
11:28:50 18  mentioned, you also mentioned some workshops. Do those
11:28:56 19  workshops differ in any way from the conferences that
11:28:58 20  you've described?
11:29:00 21      A   No, it's kind of a -- it may go into a little
11:29:04 22  more detail on some things. That's also done through the
11:29:06 23  Department -- Secretary of State, Division of Elections.
11:29:06 24  I've attended some of those.
11:29:10 25      Q   And those workshops, do they occur on a

14

11:29:12 1   regular basis?
11:29:14 2       A   Well, only the regularly scheduled, but we
11:29:18 3   usually have a couple every year. We have the
11:29:20 4   opportunity to attend.
11:29:22 5       Q   Are they mandatory conferences?
11:29:24 6       A   No.
11:29:24 7       Q   You did mention getting some type of credit,
11:29:28 8   however, for the workshops. What did you mean about
11:29:32 9   that?
11:29:32 10      A   Well, the Supervisor of Elections become
11:29:36 11  certified supervisors and they have to attend so many
11:29:40 12  hours of training to do so.
11:29:42 13      Q   And can you tell me what is the certifying
11:29:46 14  body for the Supervisors of Elections that you just
11:29:48 15  described?
11:29:50 16      A   It's the Division of Elections under the
11:29:50 17  Secretary of State's office.
11:29:52 18      Q   And is -- and I just want to make sure that I
11:29:56 19  understand I have it right. That's a certification from
11:30:00 20  the state of Florida, correct?
11:30:02 21      A   That's correct.
11:30:02 22      Q   Not a national certification?
11:30:04 23      A   No.
11:30:12 24      Q   In terms of your training regarding the field
11:30:16 25  of election administration, have you had any particular

11:30:20 1   training in the field of statistics?
11:30:22 2       A   No.
11:30:26 3       Q   Separate and apart from your description of
11:30:28 4   the conferences and your discussion of the law -- the
11:30:x 5   Florida law and the federal law, do you have any
11:30:36 6   particular training in the area of election law?
11:30:42 7       A   Just what we have at the conferences and
11:30:44 8   workshops.
11:30:48 9       Q   A few more areas I want to ask you about. Do
11:30:52 10  you have any specialized training or education in the
11:30:54 11  field of demography?
11:30:58 12      A   No.
11:31:00 13      Q   And then back once again to your work in
11:31:06 14  election administration, which I understand started in
11:31:10 15  about 1988?
11:31:10 16      A   That's correct.
11:31:12 17      Q   Okay. During the time that you've worked in
11:31:14 18  the field of election administration, have you had any
11:31:18 19  particular field of specialization within that area?
11:31:26 20      A   Well, we -- back when I was data processing
11:31:30 21  coordinator, I did the programming for the precincts to
11:31:34 22  actually tabulate the votes and attach some input on that
11:31:38 23  as well with redistricting when I was the assistant.
11:31:38 24      Q   Can you --
11:31:40 25      A   Basically set up elections and demographics

16

11:31:44 1   for that as to what ballot style, and Congressional
11:31:48 2   districts, house districts and things.
11:31:50 3       Q   Okay. Before you entered the field of --
11:31:56 4   I'll call it election administration, for lack of a
11:31:58 5   better term, can you tell me what kind of work you were
11:32:02 6   involved in?
11:32:02 7       A   I spent the previous 18 years -- I started in
11:32:04 8   1970 with the City's data processing division working on
11:32:10 9   various applications, financial applications, school
11:32:16 10  board applications, things like that, wide range.
11:32:13 11      Q   And was that work as a contractor or did you
11:32:22 12  work for the county?
11:32:24 13      A   I worked for the county.
11:32:26 14      Q   Okay. In terms of your work as the
11:32:40 15  Supervisor of Elections and in your work as assistant
11:32:44 16  supervisor and data processor, have you had any occasion
11:32:50 17  to do any consulting for any entities other than Duval
11:32:58 18  County?
11:32:58 19      A   No.
11:33:16 20      Q   Do you belong to any professional societies?
11:33:20 21      A   I belong to the International Association of
11:33:24 22  Clerks, Recorders, Elected Officials, Treasurers,
11:33:30 23  IACREOT. It's an acronym.
11:33:30 24      Q   Can you give me that acronym, please?
11:33:54 25      A   IACREOT.

Case 1:01-cv-00120-ASG   Document 106   Entered on FLSD Docket 07/02/2002   Page 103 of 234

17

11:33:42 1    Q   And back to your certification by the
11:33:46 2  Division of Elections, can you tell me how many hours or
11:33:52 3  courses are required to become certified?
11:33:58 4    A   I don't know the exact number.  I'm not
11:33:58 5  certified yet.  You would have to go through one
11:34:04 6  presidential election, which I just went through.  And
11:34:06 7  there's an exam that's given and you're required to have
11:34:08 8  quite a few hours, but I'm just not sure right now what
11:34:12 9  those are.
11:34:14 10    Q   Okay.  I just want to make sure that I
11:34:16 11  understand, you're not certified yet.  Are you eligible
11:34:22 12  to be certified at this point?
11:34:24 13    A   Yes.
11:34:26 14    Q   And, Mr. Stafford, what additional steps will
11:34:30 15  you need to go through to actually obtain that
11:34:34 16  certification assuming you're successful in it?
11:34:38 17    A   At this time all I have left to do is the
11:34:42 18  exam, so . . .
11:34:42 19    Q   Is that a written exam?
11:34:44 20    A   Yes.
11:34:44 21    Q   Okay.  And how often is that exam
11:34:48 22  administered?
11:34:50 23    A   Well, once you get your hours in and you get
11:34:52 24  that presidential election behind you, you're eligible to
11:34:56 25  take it.  I just haven't had the time to take it in the

18

11:34:56 1  last several months.
11:35:02 2    Q   Okay.  Did you ever work, Mr. Stafford, as a
11:35:06 3  precincter poll worker?
11:35:08 4    A   No.
11:35:10 5    Q   Just curious.  Would you give me a
11:35:12 6  description of your position as Supervisor of Elections?
11:35:16 7  Tell me what your duties and responsibilities are in that
11:35:20 8  position.
11:35:20 9    A   We maintain the records for all the voters in
11:35:24 10  the county.  We make sure that the list maintenance is
11:35:28 11  applied against -- keep it current.  We qualify certain
11:35:32 12  voters here in the county, locally, who they're qualifing
11:35:36 13  and keep records, financial records and disclosures.  And
11:35:42 14  say we're involved with list maintenance to keep all the
11:35:46 15  voter files up to date.
11:35:48 16    Q   Can you tell me about your staff?  How large
11:35:52 17  is your staff?
11:35:52 18    A   We have, I believe right now, 20 permanent
11:35:56 19  staff members.
11:35:58 20    Q   Do you also have temporary staff?
11:36:00 21    A   Yes, anywhere from eight to ten, depending on
11:36:04 22  the time or the election cycle.  The closer to election
11:36:06 23  we hire a few more people.
11:36:10 24    Q   Can you tell me about how many more people?
11:36:14 25  Describe how that works.

19

11:36:16 1    A   You mean when we bring more people in?
11:36:18 2    Q   Yes.
11:36:18 3    A   As we get closer to election, we deal with
11:36:22 4  absentee ballots and getting equipment ready.  We bring
11:36:26 5  probably six or seven people in at our warehouse to get
11:36:30 6  the equipment ready.  And then we probably bring about
11:36:32 7  six to ten in the office to work the last month leading
11:36:38 8  up to that election to take care of absentee ballots and
11:36:40 9  getting materials ready to go out.
11:36:5c 10    Q   Okay.  Now, I take it -- I want you to
11:36:56 11  correct me if I'm wrong, is this the first time that you
11:37:00 12  have asked to -- or you have served as an expert in a
11:37:04 13  legal case in the field of election administration?
11:37:10 14    A   We had one case I went to on dealing with the
11:37:16 15  legality of some petitions dealing with our local fire
11:37:20 16  department.  I was present at that meeting.
11:37:26 17    Q   Were you -- were you designated as an expert?
11:37:32 18    A   No.
11:37:32 19    Q   Okay.  Do you remember what that case is
11:37:38 20  called?
11:37:38 21    A   No, I don't.
11:37:40 22    Q   But it dealt with firefighters?
11:37:44 23    A   Firefighters and a petition they had.  It had
11:37:46 24  something to do with their pension.
11:37:50 25    Q   It didn't have anything to do, though, with

20

11:37:52 1  election administration?
11:37:52 2    A   No.
11:37:52 3    Q   Okay.
11:37:54 4    A   Just say whether the petition was worded
11:37:56 5  correctly and that sort of thing.
11:38:00 6    Q   Okay.  Do you remember what year that was,
11:38:02 7  approximately?
11:38:02 8    A   Approximately '96, somewhere along in there.
11:38:10 9    Q   Okay.  So separate and apart from that
11:38:14 10  firefighter's petition and this case that we're dealing
11:38:18 11  with today, have you ever been asked to serve as an
11:38:22 12  expert in any other legal case?
11:38:24 13    A   No.
11:38:34 14    Q   And in the context of litigation or legal
11:38:38 15  cases, have you ever been asked to serve as an expert for
11:38:52 16  purposes of reviewing documents or reports or practices
11:38:54 17  by anyone at any time?
11:38:58 18    A   No.
11:39:06 19    Q   And then as a follow-up, have you ever been
11:39:10 20  qualified by any court to give testimony as an expert
11:39:18 21  witness at trial?
11:39:22 22    A   No.
11:39:42 23    Q   I noticed from some information I read about
11:39:48 24  your work that you have served as an officer on a board
11:39:50 25  of governors with some -- related to these election

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 104 of 234

NAACP, et al. vs. KATHERINE HARRIS, et al.                    Deposition of JOHN STAFFORD

21

```
11:39:58  1    conferences; is that correct?
11:40:00  2         A    Yes, I've been on Get Out the Vote foundation
11:40:04  3    and a member of the board of directors with the
11:40:06  4    assocation.
11:40:08  5         Q    Okay.  Can you tell me about the Get Out the
11:40:10  6    Vote foundation?
11:40:12  7         A    This was a committee we had prior to the 2000
11:40:16  8    election where we worked on encouraging people to get out
11:40:16  9    to vote.  It was a statewide as well as a county effort
11:40:20 10    to encourage people to get out.
11:40:26 11         Q    Did you work on any particular committies in
11:40:28 12    that effort?
11:40:30 13         A    It's called the Get Out the Vote committee,
11:40:34 14    you know, with the supervisors.  We discussed different
11:40:36 15    ways to try to, you know, work with the media to get
11:40:40 16    people out to vote.
11:40:42 17         Q    Can you tell me what some of the suggestions
11:40:44 18    or methods your foundation came up with for that purpose?
11:40:50 19         A    We worked with this mediator where we had --
11:40:54 20    in fact, here in Duval County we had one of our local
11:40:56 21    Jacksonville Jaguar players do a promo on TV that he and
11:41:00 22    I appeared together telling people the importance of
11:41:02 23    voting.  And statewide there was some mailouts and then
11:41:06 24    some more efforts, you know, something like that.
11:41:10 25         Q    When did that campaign begin?
```

22

```
11:41:14  1         A    It began in, I want to say '99, in the year
11:41:20  2    '99 and carried over through the summer of 2000 prior to
11:41:24  3    that 2000 election.
11:41:26  4         Q    And what did the mailouts consist of?
11:41:28  5         A    Like I said, I don't know what the other
11:41:30  6    counties did, you know.  We sent out --
11:41:32  7         Q    But for Duval County and your involvement.
11:41:38  8         A    Well, we mailed out some, you know, brochures
11:41:40  9    suggesting people, you know, get out and vote and the
11:41:42 10    importance of it.  We've since stepped up that effort
11:41:46 11    greatly, but that was prior to 2000, and we feel like we
11:41:50 12    were fairly successful.
11:41:52 13         Q    I'm going to come back to that and ask you
11:41:56 14    more about that later, but first I'm going to have this
11:42:00 15    marked as Plaintiffs' Exhibit Number 1.
11:42:16 16              MR. ARPEN:  I'm sorry, that's the deposition
11:42:18 17    notice?
11:42:18 18              MS. CICCOLO:  I'm sorry.  That's his -- this
11:42:18 19    actually is his Disclosure of Expert Witness
11:42:22 20    Testimony.
11:42:22 21              MR. ARPEN:  Oh, okay.
11:42:22 22              (Plaintiffs' Exhibit 1 was marked for
11:42:24 23    identification.)
11:42:24 24              MS. CICCOLO:  And, gentlemen, I'm sorry I
11:42:26 25    don't have another copy of that to pass to you.
```

23

```
11:42:26  1         Do you have a copy?
11:42:36  2              MR. MAC INNES:  Yeah.
11:42:36  3              MS. RESTREPO:  We'll share.
11:42:44  4         Q    In the interest of time, since we've lost
11:42:46  5    some time this morning, I just want to cut to your
11:42:52  6    opinions and try and find out about your expert opinions
11:42:56  7    in this case.  If you would, take a look at what's been
11:43:04  8    marked as Plaintiffs' Exhibit Number 1, I would like you
11:43:10  9    to just take a look at it and tell me if you recognize
11:43:14 10    that.
11:43:30 11         A    Yes, I have seen this.
11:43:34 12         Q    And on page two -- sorry, strike that.
11:43:42 13         You have seen that?
11:43:44 14         A    Yes.
11:43:50 15         Q    Mr. Stafford, we -- I asked you a little bit
11:43:58 16    about what you had reviewed to prepare for your
11:44:00 17    deposition testimony, but now I'd like to ask you what,
11:44:06 18    if anything, that you reviewed to prepare this expert
11:44:10 19    witness report.
11:44:12 20         A    I studied our task force recommendations, the
11:44:18 21    things we have put into place through our office, and I
11:44:22 22    glanced, like I say, at the -- I guess it was the
11:44:28 23    statements from Janice Kelly.
11:44:32 24         Q    When you say statements, you mean her
11:44:36 25    deposition?
```

24

```
11:44:36  1         A    Yes, uh-huh.
11:44:36  2         Q    Okay.  Is there anything else that you
11:44:40  3    reviewed in preparing that report?
11:44:44  4         A    No.
11:44:45  5         Q    Okay.  Separate and apart from this report,
11:44:48  6    are there any other reports that you have prepared in
11:44:52  7    connection with your opinions for this case?
11:44:56  8         A    No.
11:45:04  9         Q    When you worked to prepare this report, did
11:45:08 10    you discuss it with your attorneys?
11:45:10 11         A    Yes.
11:45:18 12         Q    Okay.  Was it recommended that you make any
11:45:22 13    changes in your report based on those discussions?
11:45:26 14         A    No.
11:45:30 15         Q    Separate and apart from your task force
11:45:34 16    recommendations and the statements from Janice Kelly's
11:45:38 17    deposition, did you review any other materials, any
11:45:44 18    tables, any printouts, anything at all that you may have
11:45:52 19    considered in formulating your opinions?
11:45:56 20         A    I looked at some of the chapters in law, but
11:46:02 21    no reports as such.
11:46:04 22         Q    When you say you looked at chapters in law,
11:46:08 23    can you tell me what you mean?
11:46:08 24         A    I looked at the original chapters as it deals
11:46:12 25    with file maintenance to refresh myself on those.
```

May 13, 2002

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 105 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JOHN STAFFORD

25

```
11:46:16  1        Q   Can you be specific, tell me what chapters
11:46:20  2    you --
11:46:22  3        A   Chapter 98.
11:46:28  4        Q   Apart from the task force recommendations,
11:46:30  5    the statements or the deposition of Janice Kelly, and the
11:46:36  6    chapters in law, you call chapter 98, were there any
11:46:42  7    other texts, articles, or publications that you utilized
11:46:50  8    in preparing this report?
11:46:50  9        A   No.
11:47:00 10        Q   In making these opinions, do you intend to
11:47:08 11    offer other opinions beyond what is expressed in your
11:47:12 12    statement or report that I have here that's marked as
11:47:18 13    Exhibit Number 1?
11:47:24 14        A   I don't -- I don't know that I understand
11:47:26 15    exactly where we're going, but -- you know, I was under
11:47:32 16    the opinion you're going to be asking me questions, so I
11:47:34 17    would be venturing opinions at that point.  Maybe I don't
11:47:38 18    understand the question.
11:47:40 19        Q   Well, let me try and be clear so you
11:47:42 20    understand what I -- what I mean.  I have a report here
11:47:46 21    that's two pages -- actually it goes on to a third page
11:47:52 22    with the certificate of service, but basically your
11:47:56 23    opinions are in two pages.  I wanted to know if there are
11:48:00 24    other opinions that are not expressed here in your report
11:48:04 25    that you will be giving in this case.
```

26

```
11:48:08  1        A   No.
11:48:10  2        Q   Okay.  And just to make sure that I am clear,
11:48:24  3    your opinions in this report are confined to Duval
11:48:30  4    County; is that correct?
11:48:32  5        A   That's correct.
11:48:32  6        Q   Okay.  To be clear, you do not intend to give
11:48:38  7    opinions about any other county in the state of Florida;
11:48:44  8    is that correct?
11:48:44  9        A   That's correct.
11:48:46 10        Q   Do you intend to give any opinions about the
11:48:52 11    Florida State Division of Elections?
11:48:54 12        A   No.
11:48:56 13        Q   Okay.  Do you intend to give any opinions
11:48:58 14    about the Florida Department of Highway Safety and Motor
11:49:04 15    Vehicles?
11:49:04 16        A   No.
11:49:08 17        Q   Do you intend to give any opinions about the
11:49:10 18    Florida Department of Child and Family Services?
11:49:14 19        A   No.
11:49:14 20        Q   And then finally, do you intend to give any
11:49:18 21    opinion testimony about the operations of DBT, also known
11:49:30 22    as Choicepoint?
11:49:32 23        A   No.
11:49:38 24        Q   Okay.  I want to ask you, then, about your
11:49:42 25    opinions in this case as -- as in your report.  Your
```

27

```
11:49:54  1    first opinion is that the procedures and practices in
11:50:00  2    place in Duval County for processing new voter
11:50:04  3    registration applications prior to the November 2000
11:50:08  4    election were consistent with the requirements of state
11:50:10  5    and federal law; is that correct?
11:50:12  6        A   Yes.
11:50:14  7        Q   Could you explain for me, Mr. Stafford, how,
11:50:18  8    in your opinion, those procedures and practices were
11:50:24  9    consistent first with state law?
11:50:26 10        A   Okay.  We're -- with the National Voter
11:50:38 11    Registration Act, it requires us to work with the
11:50:40 12    Department of Motor Vehicles, collecting data from social
11:50:48 13    service organizations, from outside mailing information,
11:50:52 14    as far as registration, and we brought that work in and,
11:50:58 15    you know, registered people to vote and corrected their
11:51:02 16    address as we're required to do.
11:51:12 17        Q   And what is the -- your basis for saying that
11:51:18 18    your procedures and practices were consistent with state
11:51:26 19    law?
11:51:36 20        A   You're required if you get voter applications
11:51:42 21    you process them.  If you have problems where they're
11:51:46 22    incomplete, that you mail a copy, a correction -- a form
11:51:50 23    out for corrections to be made for incomplete forms.  We
11:51:54 24    complied with that.  We had a file that -- where we'd
11:52:00 25    send letters and waiting for other things to come back to
```

28

```
11:52:04  1    correct those.  We did those required mailings.  We
11:52:08  2    processed the applications that were complete, mailed
11:52:12  3    those cards out to people within probably five days of
11:52:16  4    receiving that information and made sure that -- did our
11:52:24  5    best to make sure we had everything in.  We got
11:52:28  6    information from the driver's license office and these
11:52:28  7    others and had a structure in place to make sure that
11:52:34  8    those mailings were received in a timely manner and
11:52:37  9    processed.
11:52:38 10        Q   With respect to the November 2000 election,
11:52:42 11    did it come to your attention that any of the procedures
11:52:44 12    or practices that Duval County had undertaken were in
11:52:56 13    need of improvement?
11:52:58 14        MR. ARPEN:  Let me object to the question as
11:53:00 15        being vague and overbroad unless you are
11:53:04 16        referring to any particular type of practice or
11:53:06 17        any particular area of the office operation.  Are
11:53:08 18        you still on the line of questioning regarding
11:53:10 19        the -- the processing of the registration
11:53:14 20        applications?
11:53:14 21        MS. CICCOLO:  Yes, I am.  Thank you.
11:53:34 22        MR. ARPEN:  You can go ahead and respond,
11:53:36 23    John.
11:53:36 24        A   Oh, okay.  I'm sorry.  You're talking about
11:53:40 25    improvements we --
```

NAACP, et al. VS. KATHERINE HARRIS, et al.

Case 1:01-cv-00120-ASG   Document 486   Entered on FLSD Docket 07/03/2002   Page 106 of 234

Deposition of JOHN STAFFORD

29

| | |
|---|---|
| 11:53:40 | 1 |

1   Q   Uh-huh.

2   A   We felt like, you know, that the -- you know,
3 with the complaints from the applications through the
4 driver's license office that that was a need for
5 improvement.
6   Q   Okay. Let me stop and ask you about that
7 area first. What kinds of complaints came to your
8 personal attention as the elections supervisor regarding
9 the -- did you call them driver's license registrations
10 or DMV registrations? I just -- I want to use the same
11 word that you used.
12   A   Okay. I call them driver's license, but it's
13 Department of Motor Vehicles.
14   Q   Okay.
15   A   We call them driver's license applications in
16 our office. We had complaints after -- you know, after
17 that November election. People said they sent in changes
18 or either registered and never received a card. And we
19 didn't have anything in our files that showed, you know,
20 that we'd actually received, you know, from a couple of
21 these people that had called. So we've tried to
22 incorporate some changes that would help that we've done.
23   Q   When you received those complaints, did you
24 investigate them?
25   A   Yes, and like I say, we only had one or two

30

1 of them.
2   Q   Were you able to identify what, if any,
3 particular problem was the cause of the complaint?
4   A   No, not really. We talked to the driver's
5 license office, Division of Elections, Helen Howard, who
6 is the new liaison, trying to get some information, but
7 there was nothing on record, you know, anybody, you know,
8 having done something with them. And that's something,
9 you know, that we've made a great effort to try to make
10 sure that all records get to us from those offices.
11   Q   Can you explain to me what you've done to
12 make sure that those records come to this office?
13   A   Yeah, one thing we did immediately after the
14 election, we put out some little note cards like -- that
15 said if you don't receive your card within 21 days,
16 please call the elections office where that way we can
17 kind of follow up to see if we're getting everything. We
18 now have a driver that picks up from those places about
19 three times a week, where in the past it was mailed once
20 a week to us. We want to make sure we get those in in a
21 timely manner and get them out.
22       And working with the Department of Motor
23 Vehicles, they now have in place, I've been told a couple
24 of days ago, a receipt that's given to the voter at the
25 time they make a change or -- which I think will be a big

31

1 help as far as tracking down things.
2   Q   And --
3   A   We have partnered also with Nassau, Clay
4 County, and St. Johns County to have a form that goes out
5 to the voter letting him know if they don't receive a
6 card to let us know because there's a lot of overlapping
7 with our driver's license office where maybe somebody
8 from another county is in Duval County, to make sure that
9 those people are aware.
10   Q   Okay. You mentioned -- are there any other
11 efforts that you've made with respect to the Department
12 of Motor Vehicles that you haven't mentioned already with
13 respect to the registrations?
14   A   Not that -- we've -- we've restructured our
15 office where we have somebody now in charge of that to
16 pay a little more attention to it. We basically have a
17 couple more staff members working on that just to try to
18 verify that we're getting everything in.
19   Q   And when were those assignments made?
20   A   About -- I want to say October. Right after
21 October of 2000 we got some new positions in the budget
22 through the efforts of our task force and we did some
23 reassigning and created an educational team and some
24 technical teams at that time.
25   Q   Can you tell me who's assigned to that

32

1 particular area or agency?
2   A   Robert Phillips is in charge. He is chief
3 operating officer -- chief elections officer, I'm sorry.
4   Q   Okay. Now, you mentioned the DMV. Were
5 there other procedures or practices that Duval County put
6 in place with other agencies or entities?
7   A   Well, we're basically -- the pickup I had
8 mentioned earlier. We're including not only driver's
9 license office, but all the other points of registration
10 application, libraries, and we have some tax collector
11 offices that we collect forms from and make available
12 registration there, so we make sure we get around and
13 that none of these registrations sit out there very long,
14 the applications.
15   Q   Okay.
16   A   I'd like to think we get them all in, you
17 know, within a week.
18   Q   And you said very long. You had mentioned
19 five days before, so you're looking about a one-week -- a
20 five-day turnaround business week?
21   A   Yes. Before, they were mailed and we would
22 get them, but it was usually about a ten-day turnaround
23 before -- to get a card out. Now, I feel like we've got
24 it down to where we can get it out within five working
25 days.

NAACP, et al. vs. KATHERINE HARRIS, et al.

Deposition of JOHN STAFFORD

Case 1:01-cv-00120-ASG Document 166 Entered on FLSD Docket 07/02/2002 Page 107 of 234

33

```
11:59:40  1        Q    Before these procedures were put in place,
11:59:42  2   did you get those applications on any kind of regular
11:59:48  3   basis?
11:59:48  4        A    They were mailed usually at the end of the
11:59:50  5   week from the Department of Motor Vehicle and the other
11:59:54  6   offices that collect that sort of material, they were
11:59:58  7   mailed to our office.
12:00:00  8        Q    Prior to November 2000, was there any
12:00:02  9   particular person on your staff charged with monitoring
12:00:08 10   those applications that were coming from the types of
12:00:14 11   entities you've named, like the DMV, the libraries, the
12:00:18 12   tax collector's offices?
12:00:20 13        A    We had a couple of employees.  One was an
12:00:22 14   election aide, which is one of our senior clerical-type
12:00:26 15   positions in a clerical support aide 3, in charge of
12:00:28 16   doing that, looking at the reports from the DMV to make
12:00:32 17   sure that we had the number of forms that they said they
12:00:38 18   sent us, and that was done on a daily basis.  And a lot
12:00:44 19   of those -- some of those things came in the mail, so
12:00:48 20   it's -- we're -- reporting to the division requires that
12:00:48 21   as well.
12:00:50 22        Q    So when the election aide -- and there was a
12:00:58 23   clerical person you also mentioned too.
12:01:00 24        A    Right.  And those people remain, we just
12:01:04 25   added the staff supervision there.
```

34

```
12:01:06  1        Q    Okay.  When they would review the reports
12:01:10  2   from these other entities like the DMV, the libraries,
12:01:14  3   the tax collector's office, can you tell me what they
12:01:18  4   would do with that information before November 2000?
12:01:22  5        A    Yeah, they -- we report to the Division of
12:01:26  6   Elections the number of applications we receive from each
12:01:28  7   entity, the number of changes, the number of new
12:01:34  8   registrations, those sort of things.  We kept those
12:01:36  9   records as well as incomplete forms that we mailed off
12:01:40 10   letters asking for them to be complete and keeping the
12:01:44 11   file from those until hopefully we got them back in.
12:01:48 12        Q    Were those workers that were monitoring those
12:01:52 13   reports, would those also be the same people who would
12:01:56 14   have been reviewing applications to see if they were
12:02:00 15   complete?
12:02:02 16        A    Yes.  And as the workload -- you know, if it
12:02:08 17   was really heavy, we would assign other people to help
12:02:10 18   them, but basically it was the same people.
12:02:14 19        Q    What, if any, procedure or practice was
12:02:20 20   followed by the election aide and the clerical worker
12:02:28 21   prior to November 2000 when an application from an
12:02:32 22   outside source was incomplete?
12:02:36 23        A    We mail them a new form marking what was
12:02:40 24   needed to be complete.  We sent that out and we sent a
12:02:46 25   letter, and if we didn't receive that back within two
```

35

```
12:02:50  1   weeks we'd send a follow-up letter and maintain, you
12:02:54  2   know, that file.
12:02:54  3        Q    Were there situations where there would be no
12:02:58  4   response to a follow-up letter?
12:03:00  5        A    Yes.
12:03:02  6        Q    And in those situations, can you tell me what
12:03:06  7   your office would do with an incomplete application that
12:03:08  8   no one had responded to your letter -- follow-up letter?
12:03:14  9        A    We held it in an incomplete file.
12:03:24 10        Q    Can you tell me what it means to hold a --
12:03:28 11   I'll call it a registration in an incomplete file.  What
12:03:32 12   does that mean, you just hold on to it or --
12:03:34 13        A    Hold on hopefully to hear from them.
12:03:34 14        Q    Okay.
12:03:35 15        A    A lot of the letters we'd mail out would come
12:03:40 16   back, you know, undeliverable, that sort of thing.
12:03:44 17        Q    Undeliverable for -- for what reason?
12:03:46 18        A    Address not correct.
12:03:54 19        Q    Would there be someone in your office who
12:03:54 20   would verify if the address that the letters were sent to
12:04:00 21   matched the address that had been indicated on the
12:04:04 22   registration form?
12:04:04 23        A    That I'm not sure.
12:04:10 24        Q    I guess when -- another way of asking that
12:04:12 25   was, was there someone checking for clerical errors to
```

36

```
12:04:16  1   make sure the letters were going to the actual --
12:04:18  2        A    Address that was on the card?
12:04:1c  3        Q    -- address?  Yes, sir.
12:04:20  4        A    Yeah, they would check that.  And if there
12:04:32  5   were phone numbers, you know, listed on that application,
12:04:34  6   we would try to make contact by phone.  All of them
12:04:38  7   didn't have phone numbers, though.
12:04:56  8        Q    In terms of the -- in your opinion, with
12:05:00  9   respect to the processing of new voter registration
12:05:06 10   applications, in particular, what state and federal laws
12:05:14 11   were you relying on?
12:05:18 12        A    I don't know the exact law, so to speak, the
12:05:22 13   number, but basically as it applies to NVRA, how you
12:05:28 14   process, you know, registrations.
12:05:32 15        Q    And in terms of state law?
12:05:36 16        A    Same thing.  Basically we -- the state law
12:05:40 17   mentions the NVRA.
12:05:44 18        Q    Were there any state law practices or
12:05:50 19   procedures by -- by way of, I guess, election practice
12:06:04 20   that your office utilized?
12:06:12 21             MR. HARVEY:  Object to the form.  This is
12:06:12 22   Walter Harvey.
12:06:16 23        Q    Separate and apart from the NVRA that you've
12:06:24 24   mentioned and the state law that you said, I believe,
12:06:28 25   incorporated NVRA elements, were there any practices or
```

Case 0:01-cv-00120-ASG Document 36 Entered on FLSD Docket 07/02/2002 Page 108 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.
Deposition of JOHN STAFFORD

37

**Page 37**

```
12:06:34  1   procedures -- other practices and procedures that you
12:06:38  2   haven't mentioned that you would have utilized prior to
12:06:42  3   November 2000 in order to process new voter registration
12:06:50  4   applicants in a manner consistent with the requirements
12:06:54  5   of state and federal law?
12:06:58  6            MR. HARVEY:  Object to the form of the
12:07:00  7   question.
12:07:06  8        Q   You can answer my question, if you
12:07:08  9   understand.
12:07:10 10        A   No.  You're talking about anything we did in
12:07:14 11   Duval County differently from that state law, no.
12:07:18 12        Q   Were there any things that you did in Duval
12:07:22 13   County that may not have been different from state law,
12:07:26 14   but perhaps practices or policies that you used that
12:07:32 15   helped facilitate the process of processing new voter
12:07:38 16   registration applications?
12:07:38 17        A   No.
12:07:48 18        Q   Let me ask you about the next opinion in your
12:07:52 19   report, and that opinion is is that the procedures and
12:08:02 20   practices of Duval County Supervisor of Elections to
12:08:06 21   verify changes of address by voters and to remove voters
12:08:14 22   ineligible to vote because of changes of address were
12:08:18 23   consistent with requirements of state law.  Let me ask
12:08:22 24   you first about procedures and practices to verify
12:08:24 25   changes of address by voters.  Can you tell me what
```

**Page 38**

```
12:08:30  1   procedures and practices were in place prior to November
12:08:34  2   2000 in Duval County just with respect to the
12:08:40  3   verification of changes of address?
12:08:42  4        A   The registration forms coming in, we would
12:08:46  5   check for duplications to see if it was a new
12:08:52  6   registration or if it actually was a change of address.
12:08:52  7   Most cases they check the box that says change of
12:08:56  8   address, but sometimes they don't.  And once we find out
12:08:58  9   that people are already registered, then we go through
12:09:04 10   the process of changing their address and making sure
12:09:06 11   that it's the correct address within Duval County, we
12:09:08 12   check the addresses.  If they were in another county,
12:09:12 13   we'd mail that information to the county that it would
12:09:14 14   apply to, and that's all part of our clerical process.
12:09:20 15   We had the elections aide and the clerical support aide
12:09:26 16   -- we had other clerical support aides that dealt with
12:09:30 17   actually, you know, processing the records once we knew
12:09:32 18   that all the information was there, whether it be a new
12:09:36 19   registration or a change of address.
12:09:38 20        Q   And this is prior to November 2000?
12:09:40 21        A   Yes.
12:09:40 22        Q   Okay.  Were there any changes you made to the
12:09:42 23   process you just described after November 2000?
12:09:46 24        A   No, it's still processed through the clerical
12:09:50 25   aides.
```

**Page 39**

```
12:09:56  1        Q   Can you tell me where that change of
12:09:58  2   information address comes from, the various sources?
12:10:02  3        A   The -- it's on the application form, the
12:10:06  4   change of address.  That's done at the driver's license
12:10:10  5   and these independent authorities.  Also on the back of
12:10:12  6   our registration card there's a place for a change of
12:10:16  7   address, change of name, change of party, and those come
12:10:20  8   in and get processed.  Those come in through the mail.
12:10:20  9        Q   Do any of those change of addresses, change
12:10:24 10   of parties, any of those other changes come in from the
12:10:30 11   polls themselves or the precincts -- special precincts?
12:10:32 12        A   On election day, if people have changed their
12:10:36 13   address, we direct them to their new polling place and
12:10:40 14   then a registration card -- we call it an affidavit, but
12:10:44 15   it's basically a registration card where people can do
12:10:48 16   name changes, changes of address, and they can actually
12:10:50 17   register.  They can't vote that day, but they can fill
12:10:54 18   out an application for a registration.  Most cases you
12:10:56 19   see change of addresses, though.
12:11:00 20        Q   Okay.  So -- I just want to make sure I
12:11:02 21   understand, on election day, a voter could have come in,
12:11:12 22   appeared at a precinct and then have been directed to a
12:11:14 23   new polling place --
12:11:16 24        A   That's correct.  We have --
12:11:18 25        Q   -- based on a change of address?
```

**Page 40**

```
12:11:18  1        A   Right.  We have a street file that we provide
12:11:24  2   each polling place and you can look at an address on
12:11:24  3   there and it tells you what polling location those people
12:11:28  4   are supposed to go to.  And they're sent to that polling
12:11:32  5   place and a new registration application is filled out
12:11:36  6   with their change of address and then when we get that
12:11:38  7   back in we process it.
12:11:42  8        Q   On election day in Duval County, is there a
12:11:48  9   method in place for poll workers to contact your office
12:11:54 10   to make verifications?
12:11:56 11        A   Yeah, we have -- we have telephone lines.  We
12:12:00 12   have eight lines into our office.  For the 2000 election,
12:12:02 13   we added another eight cell phones to basically -- for
12:12:06 14   the clerks to get through because we have a lot of calls,
12:12:10 15   people have moved, they don't know where to go, so that
12:12:14 16   is in place and our phone system was jammed.
12:12:18 17        Q   Okay.  And it was jammed in November 2000?
12:12:20 18        A   Yes.
12:12:22 19        Q   Okay.  When you say jammed, for someone who's
12:12:26 20   going to read this down the road, tell me what that
12:12:30 21   means.
12:12:32 22        A   For about an hour during the middle of the
12:12:34 23   day, our phone lines just went completely down because of
12:12:40 24   the number of calls coming through.
12:12:40 25        Q   Did anyone keep a record of how many calls
```

NAACP, et al. VS. KATHERINE HARRIS, et al.

Case 1:01-cv-00120-ASG   Document 166   Entered on FLSD Docket 07/03/2002   Page 109 of 234

Deposition of JOHN STAFFORD

41

43

12:12:44 1  had come into your office that day?

12:12:46 2      A   No, there was no record kept on that.  They

12:12:48 3  were constantly busy all day, though.

12:12:56 4      Q   Do you know what kind of calls these were?

12:12:58 5  Were they calls from citizens, were they calls from your

12:13:02 6  precincts?

12:13:02 7      A   I don't know, but I would feel they would be

12:13:06 8  a mixture of both because that's basically the calls we

12:13:10 9  get on election day.  It's either from a poll worker or

12:13:14 10  from someone that's moving asking where to go for their

12:13:18 11  new polling place.  Then we send them to the new polling

12:13:20 12  place and then the clerk has to call in and make sure

12:13:24 13  they're registered because they're not on their register,

12:13:24 14  so it's kind of a double deal there with the phones.

12:13:28 15      Q   Back in November 2000, were there dedicated

12:13:32 16  phone lines to allow a precinct to call directly to this

12:13:40 17  office?

12:13:40 18      A   Well, like I say, we had our eight main lines

12:13:42 19  that come into the office, but we had eight cell phones

12:13:44 20  with dedicated numbers that we gave out only to the

12:13:48 21  clerks to be able to call in on.

12:13:50 22      Q   And, sir, in November 2000, were those lines

12:13:54 23  jammed as well, the cell phone lines?

12:13:58 24      A   Yes.

12:14:04 25      Q   When that issue came to your attention about

---

12:14:08 1  the phone lines being jammed on election day, can you

12:14:12 2  tell me what, if any, action that you took as Supervisor

12:14:16 3  of Elections?

12:14:18 4      A   We called the telephone company trying to

12:14:20 5  get, you know, some expertise in our office to make that

12:14:24 6  happen, we had some people come in.

12:14:26 7      Q   Who was your phone company back then?

12:14:30 8      A   BellSouth.

12:14:30 9      Q   BellSouth?

12:14:30 10      A   Uh-huh.

12:14:32 11      Q   Okay.

12:14:32 12      A   And we had a rep come in and they were able

12:14:34 13  to get it back up.  But just like I said, the majority of

12:14:36 14  it -- it took an hour to make that happen, and we've

12:14:40 15  since made some changes in the office.

12:14:42 16      Q   Do you know what time the BellSouth rep came

12:14:46 17  in?

12:14:46 18      A   It was right around 12:15.  It was within ten

12:14:50 19  minutes after we started, you know, encountering

12:14:54 20  problems --

12:14:54 21      Q   What time --

12:14:56 22      A   -- and I would say about one it was probably

12:14:58 23  back up.

12:14:58 24      Q   By one o'clock.  When it was back up, was it

12:15:00 25  back up with the eight lines into the office and then the

---

12:15:04 1  cell phone lines up and operating?

12:15:08 2      A   The cell -- cell phone lines were up and

12:15:08 3  operating, but they were just -- there were just so many

12:15:10 4  calls we just couldn't -- I think what they were doing is

12:15:12 5  the clerks were calling in on the cell phones, some of

12:15:16 6  them were calling in on the main lines.

12:15:18 7      Q   Back on election day 2000, were there any

12:15:22 8  message capabilities for those phone lines?  For example,

12:15:25 9  where if someone called in and they couldn't reach a live

12:15:30 10  person either because the line was busy or there wasn't

12:15:34 11  anyone available to talk to them, was there any

12:15:40 12  capability for those lines to hold messages?

12:15:42 13      A   Not to hold messages, but the system was set

12:15:44 14  up to roll over to a main switchboard with the City and

12:15:48 15  they would tell the people, you know, that things were

12:15:50 16  backed up and someone would get to them shortly.

12:15:56 17      Q   So would those people remain on hold while

12:16:00 18  their calls rolled over and then -- I'm just trying to

12:16:04 19  understand how that worked.

12:16:06 20      A   Yeah, and I'm not sure whether they stayed on

12:16:08 21  hold or not.  I think they were probably encouraged to

12:16:12 22  call back, but I don't know that.

12:16:16 23      Q   Do you know if callers who could not get

12:16:20 24  through, would they get a busy signal, do you know if

12:16:24 25  they would get a ringing signal?

---

12:16:24 1      A   It would be busy, busy signal.

12:16:34 2      Q   Prior to the November 2000 election, is this

12:16:40 3  eight-line system a system that had been in place for

12:16:42 4  some time?

12:16:44 5      A   Yes.

12:16:44 6      Q   Can you tell me --

12:16:44 7      A   In fact, we probably had as little as five

12:16:48 8  lines at one time.

12:16:50 9      Q   Do you know when that would have been -- when

12:16:52 10  you would have gone up to the eight lines?

12:16:54 11      A   Probably about mid '90s, '94, somewhere along

12:16:58 12  in there.

12:17:00 13      Q   And what was the reason for the increase?

12:17:02 14      A   We had the opportunity to change our phone

12:17:04 15  system around.

12:17:04 16      Q   Oh, okay.

12:17:06 17      A   We were able to add a few more lines.

12:17:10 18      Q   So you took advantage of that?

12:17:12 19      A   Yes, we did.  And we've since had our phone

12:17:16 20  system changed again.

12:17:18 21      Q   Well, from the mid '90s until November 2000,

12:17:22 22  did that eight-line system work -- work pretty

12:17:26 23  adequately?

12:17:28 24      A   It worked.  You know, we were busy, I mean,

12:17:30 25  we never put the phone down there was so many calls

---

Case 1:01-cv-00120-ASG Document 2206 Entered on FLSD Docket 07/02/2002 Page 110 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                     Deposition of JOHN STAFFORD

45

12:17:34 1  coming in, but we didn't have that many backing up.
12:17:42 2      Q   I suppose after November 2000 you may have
12:17:46 3  received some complaints about -- from either poll
12:17:52 4  workers or citizens unable to get through to the
12:17:56 5  Supervisor of Elections; is that right?
12:17:58 6      A   That's correct.
12:17:58 7      Q   Okay.  Do you have any idea about how many
12:18:02 8  complaints you would have received?
12:18:04 9      A   A handful.  Not a great many, but a few.
12:18:08 10     Q   Did those complaints -- let's talk about the
12:18:12 11 complaints from the poll workers.  You did receive
12:18:16 12 complaints from poll workers.
12:18:18 13     A   Right.
12:18:20 14     Q   Did those complaints come from any particular
12:18:24 15 areas of Duval County?
12:18:26 16     A   No, it's pretty much completely around the
12:18:32 17 city.
12:18:32 18     Q   Around the city?
12:18:32 19     A   Yeah, the whole -- you know, not one area
12:18:36 20 more than another.
12:18:40 21     Q   Did you ever determine what, if any, the
12:18:44 22 reason for the phone system failure was that day?
12:18:48 23     A   What we were told was just that there was so
12:18:50 24 many calls it just overloaded the -- some kind of box
12:18:56 25 they had to transfer these things around and it caused

46

12:19:00 1  the system to go down.
12:19:02 2      Q   On election day when your staff received
12:19:06 3  complaints, did they make any kind of record or log of
12:19:10 4  the problem or issue being complained of or reported?
12:19:14 5      A   No, not other than word of mouth.  Somebody
12:19:16 6  would say they were having trouble.
12:19:20 7      Q   When you say word of mouth, what do you mean?
12:19:20 8      A   They would come tell a supervisor that clerks
12:19:22 9  are having trouble getting through, but we were pretty
12:19:26 10 much aware of that, you know, when the system went down.
12:19:28 11     Q   Are those complaints you received yourself
12:19:30 12 personally?
12:19:32 13     A   Some.
12:19:32 14     Q   What was your response when you got those
12:19:36 15 complaints?
12:19:38 16     A   Tell them we were doing everything we could,
12:19:40 17 you know, to keep the system up and we encouraged our
12:19:42 18 employees not to spend quite as much time on the phone
12:19:46 19 maybe as they had -- you know, to try to get the
12:19:48 20 processing through.
12:19:48 21     Q   To keep the calls moving?
12:19:48 22     A   Yes.
12:19:50 23     Q   To free up lines?
12:19:54 24     A   Yes, there was not a whole lot we could do.
12:19:56 25 There was so many calls.

47

12:20:04 1      Q   Is there any particular amount of time, based
12:20:06 2  on your training and experience in your work as elections
12:20:10 3  supervisor, that -- is there any typical amount of time
12:20:16 4  these calls usually take?
12:20:20 5      A   I would say somewhere between 30 and 40
12:20:22 6  seconds, because basically you're asking -- somebody's
12:20:24 7  asking where they go vote and you can call it up on their
12:20:28 8  record on the screen, and it will tell them, you know,
12:20:30 9  first if they're registered and eligible to vote.  And
12:20:30 10 you have the street file there in front of you, so
12:20:34 11 probably 30 to 45 seconds, maybe sometimes a minute or a
12:20:38 12 little longer if it's something special you have to go
12:20:42 13 look for.
12:20:44 14     Q   When you say something special you'd have to
12:20:46 15 go look for, what kind of special things?
12:20:46 16     A   Well, if we couldn't find them on file, we
12:20:48 17 might have to go to our inactive file, and that's a
12:20:52 18 process of walking back into another room and actually
12:20:56 19 looking up those records, so that would take a little
12:20:58 20 longer.
12:20:58 21     Q   Were those records computerized?
12:21:02 22     A   No, they're -- they are now, but they weren't
12:21:04 23 at that time.
12:21:06 24     Q   Could you give me an estimate of -- at that
12:21:10 25 time, November 2000, how large the inactive file was?

48

12:21:16 1      A   Well, we keep them, you know, as we remove,
12:21:20 2  so I would guess 50-, 60,000 records that we keep at any
12:21:25 3  one time.  We keep them for a length of time and then we
12:21:28 4  microfilm them.
12:21:32 5      Q   When you say you keep them for a length of
12:21:36 6  time, how long do you keep them?
12:21:36 7      A   We keep them a couple of years and then we
12:21:38 8  microfilm them and once we get them microfilmed, we store
12:21:40 9  them off site.  But we -- you know, we -- we didn't want
12:21:44 10 to store any off site.  And if you have to go to
12:21:46 11 microfilm, it actually takes longer than actually looking
12:21:50 12 through the cards, so we kept it through the 2000, so
12:21:50 13 about two years' worth.
12:21:52 14     Q   Back -- back to the changes you mentioned in
12:21:58 15 the phone system, can you tell me about those changes?
12:22:00 16     A   We had a special election in the summer of
12:22:04 17 last year.  We had 98 precincts and we actually added
12:22:10 18 five more phone lines in our office, which with the 98
12:22:16 19 precincts compared to 267 was adequate to take care of
12:22:20 20 it.  I'm meeting with people from the tax collector's
12:22:22 21 office tomorrow.  We're using a couple of their
12:22:26 22 facilities in the future, which would give us an
12:22:28 23 additional 35 to 40 phone lines for us to use.
12:22:34 24     Q   What kind of special election did you have?
12:22:36 25     A   It was a Senate race.  One of our senators

May 13, 2002

49

```
12:22:40  1    resigned, so we had to have a special election, there was
12:22:40  2    one race on the ballot. And we actually borrowed
12:22:44  3    equipment from Leon County to do an optical scan
12:22:48  4    election.
12:22:50  5         Q   How did the turnout for that special election
12:22:52  6    compare to the turnout for the November 2000 election?
12:22:56  7         A   It was quite a bit lighter. It was about --
12:22:58  8    I want to say 25 percent in our precincts. The
12:23:02  9    presidential election we had 68, I think it was.
12:23:10 10         Q   How did that 68 percent turnout in the 2000
12:23:14 11    presidential election compare to the voter turnout you
12:23:18 12    had seen during the time you have worked in the
12:23:22 13    supervisor's office?
12:23:22 14         A   I thought it was really good. I think the --
12:23:26 15    since the NVRA took place, a lot of people registered
12:23:28 16    that don't vote, so it's kind of hard to look at a real
12:23:32 17    target line. But we -- I think the highest turnout we
12:23:34 18    had had was around 70 percent and I was really thrilled
12:23:38 19    with the 68 percent. With the advent of NVRA I think
12:23:38 20    that probably -- prior to NVRA would probably compute to
12:23:46 21    a 75 percent turnout.
12:23:58 22         Q   In terms of situations during the November
12:24:02 23    2000 election where someone may have called and been
12:24:10 24    unable to get through, were there any other methods for
12:24:20 25    your poll workers to get through to this office? For
```

50

```
12:24:28  1    example, did you have any roving employees going from
12:24:32  2    precinct to precinct asking can I help you? Were there
12:24:38  3    any faxes you received, any messenger requests, any
12:24:44  4    things like that?
12:24:44  5         A   No. We've since put some of those things in
12:24:46  6    place, but not at the time of the 2000 election.
12:24:50  7         Q   Can you tell me what things you have put in
12:24:52  8    place?
12:24:52  9         A   We have what we call roving clerks or super
12:24:56 10    clerks.
12:24:56 11         Q   Super clerks?
12:24:56 12         A   Yeah, we call them super clerks. Basically
12:25:00 13    we're broken up into 14 council districts with our 268
12:25:06 14    precincts and we assigned 28 people to work as roving
12:25:10 15    clerks and they were responsible for like half of a
12:25:12 16    council district, which would equate to probably about
12:25:14 17    ten precincts, somewhere along in there. And they would
12:25:18 18    rove, see what kind of help was needed. You know, we
12:25:22 19    have the new machinery, the optical scanner, and they
12:25:22 20    were there in the mornings to make sure they got it up
12:25:26 21    properly and that everything was going smoothly and they
12:25:30 22    would check kind of a continuous circuit, you know,
12:25:32 23    riding around, checking those places and it worked real
12:25:34 24    well.
12:25:34 25         Q   Do you know if prior to November of 2000
```

51

```
12:25:38  1    other Florida counties used that roving clerk or super
12:25:42  2    clerk model?
12:25:44  3         A   I'm not sure. We will continue to use it in
12:25:58  4    Duval County, though, because, like I say, it worked
12:26:00  5    really well.
12:26:00  6         Q   Are these super clerks permanent employees or
12:26:02  7    are they just hired for the election day?
12:26:04  8         A   Basically what we did is took some of our
12:26:08  9    really good clerks and put them in that position --
12:26:12 10    somewhere we could find new clerks for the precincts, and
12:26:16 11    these people have been around the polls a long time where
12:26:16 12    they knew what they were doing. We've got some people
12:26:20 13    with a lot of experience. They're not permanent
12:26:22 14    employees, they're just brought in during the election
12:26:24 15    cycle as poll workers.
12:26:26 16         Q   Do those super clerks have dedicated phone
12:26:34 17    lines to reach your office?
12:26:36 18         A   Each one had a cell phone with a line to come
12:26:40 19    into our office.
12:26:50 20         Q   Let me move and ask you about your removal
12:26:54 21    process, your removal of voters from your rolls as stated
12:27:06 22    in your opinion. There have been different terms used in
12:27:06 23    this case, some people use the term purge, some people
12:27:10 24    use voter removal. What term do you use, Mr. Stafford,
12:27:16 25    as what we'll use today?
```

52

```
12:27:18  1         A   We really -- we call it, you know, inactive
12:27:22  2    process. We don't remove anyone or purge anyone, we put
12:27:24  3    them in an inactive status. It's called -- we call it a
12:27:30  4    purge process, I guess. And basically we send out
12:27:34  5    letters, you haven't voted or, you know, no transaction's
12:27:38  6    occurred in a while, we send out a letter. If we get
12:27:42  7    that letter back, there's a second letter that goes out,
12:27:42  8    final notice it's called. And then if it -- no response
12:27:46  9    at that point, we put them in an inactive status, they
12:27:50 10    still remain on the file, but not in an active status.
12:27:56 11         Q   How long does a voter in Duval County need to
12:28:00 12    stay inactive before he or she gets removed from the
12:28:06 13    active list to the inactive list?
12:28:08 14         A   It's after every second federal election.
12:28:14 15    You're looking probably about three years.
12:28:20 16         Q   In terms of the special Senate election you
12:28:22 17    had, would that have counted as a federal election for
12:28:26 18    purposes of determining voter inactivity?
12:28:30 19         A   No, that was a state Senate race.
12:28:30 20         Q   That was a state race.
12:28:32 21         A   Right. Any activity during that time period
12:28:32 22    keeps them active, even if it's just a change of address.
12:28:40 23         Q   So change of address, change of party?
12:28:44 24         A   Any activity on the record. What we do is
12:28:48 25    basically we have a transaction date that it's like if
```

NAACP, et al. vs. KATHERINE HARRIS, et al.

Case 0:01-cv-00120-ASG Document 466 Entered on FLSD Docket 07/02/2002 Page 112 of 234

Deposition of JOHN STAFFORD

53

```
12:28:50  1   you vote, it gets -- you know, you get updated as having
12:28:54  2   voted.  And we can tell you at any point in time up to 16
12:28:58  3   elections that you've voted in in the past and if you've
12:29:00  4   voted in -- you know, during that time period or had any
12:29:04  5   kind of transaction, we do not remove you.
12:29:14  6         Q    Were there any other processes or practices
12:29:18  7   you followed for removing voters from your voter list
12:29:24  8   separate and apart from the inactive status process you
12:29:28  9   described?
12:29:28 10         A    Yeah, we worked with felony lists, lists of
12:29:34 11   people adjudicated incompetent, death lists that we get.
12:29:38 12   We get those death lists monthly and we remove those
12:29:44 13   people.  We get a felon list from the clerk of the court
12:29:48 14   -- Duval County Clerk of the Court monthly and we remove
12:29:52 15   those people.  There is a list from the State of Florida,
12:29:56 16   a felon list that we found a lot of errors and we didn't
12:30:00 17   use that list.
12:30:00 18         Q    Now, is this prior to November 2000?
12:30:04 19         A    That's correct.
12:30:04 20         Q    How did you determine there were a lot of
12:30:06 21   errors in that list?
12:30:08 22         A    We sent a letter when we got that felon list
12:30:10 23   that we've been notified that they were a convicted felon
12:30:14 24   and we got literally hundreds of calls of inaccurate
12:30:20 25   transactions.  People were very angry.  In fact, two of
```

54

```
12:30:20  1   the ladies in our office's husband got one, so we started
12:30:24  2   looking into it and I just felt like it just was not an
12:30:28  3   accurate list.  We continued to pull felons from our list
12:30:32  4   that we knew was correct from our clerk of the court, but
12:30:36  5   we did not pull from the State list.
12:30:38  6         Q    In terms of the State list, what kind of
12:30:42  7   information were you provided that was utilized to allow
12:30:48  8   your office to match names or characteristics?
12:30:48  9         A    It had their name --
12:30:54 10         MR. RESTREPO:  Object to the form, sorry.
12:30:58 11         A    It had like their date of birth, their name,
12:31:04 12   addresses, those things, and in a lot of cases, ID
12:31:08 13   numbers, voter ID numbers and that was from the central
12:31:14 14   data file.
12:31:14 15         Q    Was there any employee who worked in your
12:31:16 16   office who was responsible for making those matches?
12:31:22 17         A    Yes --
12:31:24 18         MR. RESTREPO:  Object to the form.
12:31:24 19         A    -- we had one lady that was in charge of
12:31:28 20   doing that and she would have clerks assigned to her to
12:31:32 21   help, you know, with the volume.
12:31:32 22         Q    What was --
12:31:34 23         A    We identified -- first off, made sure there
12:31:38 24   was a definite match and we do that with the one we get
12:31:42 25   from the clerk of the court where we have to have the
```

55

```
12:31:44  1   date of birth and all this, and then, like I say, then a
12:31:46  2   letter's sent to that person giving them the opportunity
12:31:50  3   to reply, you know, if there's a problem.
12:31:52  4         Q    What was her name?
12:31:54  5         A    Marlea Hammond was her name.  She's no longer
12:31:56  6   with us.
12:31:56  7         Q    Has she retired?
12:32:03  8         A    Yes.
12:32:06  9         Q    Okay.
12:32:06 10         A    She had been handling that list for years and
12:32:10 11   years.  She'd been doing it for quite some time.  She's
12:32:14 12   the one that brought it to my attention, you know, the
12:32:18 13   inadequacies of that list.  She was finding a lot of
12:32:22 14   problems with it.
12:32:22 15         Q    Are there any other problems that you
12:32:24 16   remember she talked to you about that she experienced
12:32:28 17   with the list?
12:32:30 18         A    Well, she also handled this -- you know,
12:32:32 19   deaths and she had found one of our ex-Congressmen who
12:32:36 20   had retired that was on the death list and he was alive
12:32:38 21   and well and I didn't want to take him off, so -- but
12:32:42 22   she's -- she was very -- very astute.  Like I say, she
12:32:46 23   had done it for years and years and she just said those
12:32:48 24   lists were not reliable from the State and I agreed with
12:32:54 25   her.
```

56

```
12:32:58  1         Q    Is there a particular period or date in time
12:33:00  2   where you, in your dealing with Ms. Hammond, determined
12:33:08  3   that these lists were not reliable?
12:33:08  4         A    You know, it's probably -- like I say, I
12:33:14  5   don't remember exactly when we got the list, but it was
12:33:16  6   within a couple of weeks because we had sent out some
12:33:18  7   letters and we started getting very nasty replies from
12:33:22  8   people that had never had a traffic ticket that were on
12:33:24  9   the felony list, and I can understand their complaint.
12:33:26 10   But it was within -- within days of that -- you know, the
12:33:28 11   original letter we sent out and we probably sent out a
12:33:34 12   couple of thousand of those and we started getting those
12:33:36 13   replies back.
12:33:38 14         Q    And what year would that have been,
12:33:42 15   Mr. Stafford?
12:33:42 16         A    I want to say '99.  I believe it was in '99.
12:33:44 17         Q    Okay.  Fall, spring?
12:33:48 18         A    Probably spring.
12:33:52 19         Q    Once a person -- and I'm going to assume,
12:33:56 20   correct me if I'm wrong, that would the letter instruct
12:33:58 21   them to call Ms. Hammond if they had received a letter?
12:34:04 22         A    Yeah, call our office and her number was
12:34:06 23   listed there.
12:34:08 24         Q    Okay.  And in those situations where a person
12:34:10 25   would call Ms. Hammond and say, hey, this is an
```

Case 1:01-cv-00120-ASG  Document 186  Entered on FLSD Docket 07/02/2003  Page 113 of
NAACP, et al. VS. KATHERINE HARRIS, et al.                                    Deposition of JOHN STAFFORD
234

57

```
12:34:14  1   inaccurate statement about me, I'm not a felon, what --
12:34:18  2   what would be the next step that she would have taken
12:34:24  3   typically?
12:34:24  4        A   We ask her to report that to Robert Phillips,
12:34:26  5   who is my senior elections officer, where he could deal
12:34:32  6   with it.  He would kind of be the one to keep a handle on
12:34:34  7   it, you know, if it was just an isolated deal or if there
12:34:36  8   were a lot of them.  We found out quickly there were more
12:34:40  9   of them and we felt it was a good list to work with, and
12:34:46 10   we didn't remove anyone, you know, from that list.
12:34:50 11        Q   Can you give me an idea of how many, more
12:34:54 12   than a hundred?
12:34:54 13        A   I would say so.  I would say a couple --
12:34:56 14   couple hundred there that we got back.
12:34:58 15        Q   Once Mr. Phillips would get this information,
12:35:02 16   can you tell me what, if anything, he would do with it?
12:35:06 17        A   Well, he'd report it to me and he and my
12:35:08 18   assistant and I got our heads together and we just
12:35:10 19   decided to quit using that list and not use it anymore,
12:35:14 20   that it was an inaccurate list.  And we contacted those
12:35:18 21   people, let them know that, you know, their -- they
12:35:20 22   weren't going to be removed, that, you know, we
12:35:22 23   understood the problem.
12:35:24 24        Q   Did you make any requirements that those
12:35:28 25   people -- well, strike that.
```

58

```
12:35:36  1        Did you just stop using the list, disregard
12:35:38  2   those letters and start all over again using a list that
12:35:42  3   you felt was reliable?
12:35:42  4        A   Yeah, we didn't use the State list at all.
12:35:46  5   We kept using our monthly list from the clerk of the
12:35:50  6   court that we knew to be accurate.  We just didn't feel
12:35:52  7   right taking the chance removing someone that wasn't a
12:35:52  8   convicted felon.
12:35:54  9        Q   Did you report to the state Division of
12:35:56 10   Election any of your concerns about the list?
12:36:00 11        A   Yeah, I think a lot of the supervisors did
12:36:02 12   that because we were all getting calls that the list was
12:36:08 13   inaccurate.
12:36:10 14        Q   And when -- did you, yourself, make that
12:36:16 15   report to the Division of Elections?
12:36:16 16        A   No, Robert Phillips did, made the phone call.
12:36:20 17        Q   Robert Phillips did.  Can you tell me who he
12:36:22 18   would have reported that information to?
12:36:24 19        MR. RESTREPO:  Object to the form.
12:36:28 20        A   I would think the director of the Division of
12:36:32 21   Elections or one of their aides.
12:36:36 22        Q   And would that, Mr. Stafford, been at or near
12:36:40 23   the time that your office realized this list was
12:36:46 24   unreliable, I believe you said -- believe spring of 1999?
12:36:46 25        A   Yes.  That would be spring or summer, I'm not
```

59

```
12:36:52  1   sure of the exact time.
12:36:54  2        Q   Sir, once that report was made by Mr. Robert
12:36:58  3   Phillips, was there any kind of direction given from the
12:37:08  4   Division of Elections regarding the use of that list?
12:37:12  5        MR. RESTREPO:  Object to the form.
12:37:14  6        A   I don't remember exactly.  I can't testify as
12:37:18  7   to what they told him.
12:37:18  8        Q   Okay.
12:37:20  9        A   We were just basically letting them know that
12:37:22 10   we didn't think the list was reliable and we wouldn't be
12:37:26 11   using it.
12:37:28 12        Q   Was that something that you were permitted to
12:37:33 13   do in your discretion as the Supervisor of Elections?
12:37:36 14        A   I think so.  The way the thing -- we got the
12:37:38 15   list, it said possible felons.  It didn't say convicted
12:37:44 16   felons, it said possible, so I interpreted that as I had
12:37:48 17   the ability to use or not use at my discretion.
12:37:56 18        Q   You did discuss, though, this matter with
12:37:58 19   Robert Phillips?
12:38:02 20        A   Yes.
12:38:02 21        Q   And he would be the person who would have
12:38:06 22   more information about any discussions that this office
12:38:10 23   had with the Director of Elections on that particular
12:38:14 24   topic?
12:38:14 25        A   Yes, there would be very little discussion we
```

60

```
12:38:16  1   would have had, you know, other than just reporting it.
12:38:20  2        Q   Would there have been any correspondence on
12:38:22  3   that particular issue?
12:38:24  4        A   Probably not.
12:38:26  5        Q   Any memoranda?
12:38:28  6        A   No.
12:38:28  7        Q   Any e-mails?
12:38:30  8        A   No.  It's kind of an in-office thing the way
12:38:40  9   we handled that.  It was -- we felt like it was the right
12:38:44 10   thing to do.
12:38:46 11        Q   So for the November 2000 election, your
12:38:48 12   office used a list to remove felons, mentally incompetent
12:39:00 13   people, or those that were deceased that were
12:39:04 14   generated from --
12:39:06 15        A   From our clerk of the court's office.
12:39:06 16        Q   -- from your clerk of the court?
12:39:10 17        A   Yeah, our local Duval County Clerk of the
12:39:12 18   Court.
12:39:14 19        Q   Okay.  With respect to the use of the list
12:39:16 20   provided for those three areas from the clerk of the
12:39:20 21   court, did you uncover any inaccuracies with those lists?
12:39:30 22        A   No, those are -- those are very good lists.
12:39:34 23   We've been receiving those for years.
12:39:36 24        Q   You found them to be reliable?
12:39:40 25        A   Yes.
```

NAACP, et al. vs. KATHERINE HARRIS, et al

Deposition of JOHN STAFFORD

Case 1:01-cv-00120-ASG  Document 186  Entered on FLSD Docket 07/02/2002  Page 114 of 234

61

```
12:39:44  1        MS. CICCOLO:  Okay.  Gentlemen, I'd like to
12:39:46  2    take just a two- or three-minute break to get
12:39:48  3    some water.  I'm getting ready to lose my voice
12:39:48  4    here.
12:39:48  5        (Brief recess.)
13:12:30  6    BY MS. CICCOLO:
13:12:30  7        Q    Mr. Stafford, I want to continue to ask you
13:12:34  8    about some of the opinions contained in your expert
13:12:38  9    witness report dated April 26th, 2002, and we have had
13:12:48 10    the -- a chance this morning to have you describe your
13:12:54 11    opinions about practices and procedures for processing
13:13:00 12    new voter registration applications.  In your capacity as
13:13:08 13    an expert, based on your knowledge, training, and
13:13:12 14    experience in the field of election administration, do
13:13:18 15    you have an opinion as to what the standard is for
13:13:28 16    processing new voter registration applications in a
13:13:36 17    manner consistent with the requirements of state and
13:13:38 18    federal law?
13:13:40 19        A    Yeah, there's certain requirements on the
13:13:44 20    voter applications that have to be complete.  If they're
13:13:48 21    complete, you process them and add them, and there's
13:13:52 22    certain procedures you follow if they're not complete.  I
13:13:54 23    mentioned earlier you send a letter to the folks to get
13:13:58 24    them to fill in the part that was missing.
13:14:00 25        Q    Okay.  That's for the incomplete application,
```

62

```
13:14:04  1    but in terms of the standard for situations where the
13:14:08  2    application is complete, what is the standard required?
13:14:12  3        A    Well, like I say, there are certain fields
13:14:16  4    that are required on that form and if all those are
13:14:18  5    complete, then we're required to add them to our system
13:14:20  6    and we do so.
13:14:22  7        Q    Can you explain that a little -- a bit for
13:14:24  8    me, recognizing that people who may read this transcript
13:14:30  9    are not as familiar with election administration?  What
13:14:34 10    do you mean when you say fields are required, what fields
13:14:36 11    are you specifically talking about?
13:14:40 12        A    On the voter application, you have to have
13:14:42 13    the name, you have to have the date of birth and address,
13:14:44 14    and there are a couple of other fields on there.  And
13:14:48 15    they are all marked in a reddish color, kind of a pink
13:14:54 16    highlight, and it says these fields are necessary to
13:14:56 17    complete your application.  You have your party
13:14:58 18    affiliation on there, which you don't have to do, but you
13:15:02 19    do have to have your date and the signature has to be on
13:15:04 20    that record.  And then there are about six or seven
13:15:10 21    fields that are required and then there are other fields
13:15:12 22    that are optional that you put in there like sex and
13:15:16 23    things like that.  And once -- you know, like I say, when
13:15:20 24    you determine as you're processing the application if the
13:15:22 25    necessary fields are complete, then you, you know, add
```

63

```
13:15:26  1    the document.
13:15:28  2        Q    When you say add the document, do you mean
13:15:30  3    you add it to the voter roll?
13:15:32  4        A    Add it to the database.  Add it to our
13:15:34  5    database.
13:15:34  6        Q    And then that database becomes a voter roll
13:15:38  7    for Duval County?
13:15:42  8        A    That's correct.
13:15:42  9        Q    And before lunch, we did talk about the
13:15:50 10    inactive voter process, or the inactive voter situation.
13:15:56 11        A    Right.
13:15:58 12        Q    Is that -- that processing also a part of
13:16:04 13    your procedures and practices?
13:16:06 14        A    Right.  It's -- a biannual application is
13:16:10 15    required by law to update your files and rid yourself of
13:16:16 16    people that have moved to other counties and such that --
13:16:20 17    and like I say they become inactive.  Still remain on the
13:16:20 18    database, but in an inactive status.
13:16:32 19        Q    Is there a cutoff date for performing that
13:16:36 20    function biannually?
13:16:38 21        A    Yes, I think it's -- I believe it's November
13:16:40 22    of the -- that year that it has to be -- its mailouts
13:16:46 23    done.
13:16:58 24        Q    In terms of the procedures and practices for
13:17:04 25    verifying changes of address, you've described what you
```

64

```
13:17:08  1    do in Duval County.  Based on your knowledge, training,
13:17:14  2    and experience in this field, can you tell me what --
13:17:18  3    what you believe the standard is for verifying changes of
13:17:24  4    address in a manner consistent with the requirements of
13:17:26  5    state and federal law?
13:17:30  6        A    In Duval -- I can speak of Duval, we -- like
13:17:32  7    I say, we check the addresses to make sure they're valid
13:17:38  8    Duval County addresses.  If they're not, if they're in
13:17:38  9    another county, then we make sure that record gets to the
13:17:40 10    proper county.  And that's not unusual in Duval because
13:17:44 11    we have these offices that many people are -- live in
13:17:48 12    Clay County or St. Johns County, so we forward those to
13:17:52 13    those counties.  But we verify -- the first thing we do
13:17:54 14    is verify that it is, indeed, a -- the person is
13:17:56 15    registered.  It might have been that they were registered
13:18:00 16    years ago and think they're still registered, so we -- it
13:18:04 17    becomes a new application at that point, if they're not
13:18:08 18    on our database.  But if they're on our database and we
13:18:10 19    verify that the address is in Duval County, we update it,
13:18:12 20    send them a new card.  If it's not in Duval County and we
13:18:18 21    identify the county it's in and we send them to those
13:18:18 22    counties and those counties do the same thing for us.
13:18:22 23        Q    So is it your opinion that the procedure and
13:18:26 24    practice in Duval County is the standard --
13:18:32 25        A    Yes.
```

NAACP, et al. VS. KATHERINE HARRIS, et al.

Deposition of JOHN STAFFORD

Case 1:01-cv-00120-ASG  Document 406  Entered on FLSD Docket 07/02/2002  Page 115 of 234

65

67

**65**

```
13:18:32  1      Q   -- for verifying changes of address
13:18:36  2   consistent with the requirements of state and federal
13:18:38  3   law?
13:18:38  4      A   Yes.
13:18:38  5      Q   Okay.  And we didn't talk about this before,
13:18:44  6   and I know I'm really tired, if you will let me try and
13:18:50  7   finish my question before you answer.  I know you're
13:18:52  8   anticipating what I'm going to ask you, but then it helps
13:18:56  9   the court reporter and it just helps the record be clear.
13:18:58 10   And that's a hard thing to do, so bear with me on that.
13:19:04 11   In your testimony earlier you referred to your reading of
13:19:14 12   the deposition of Janice Kelly; is that correct?
13:19:18 13      A   Yes.
13:19:18 14      Q   Are you familiar with Ms. Kelly's assertions
13:19:26 15   regarding her attempts to vote on November 7th, 2000, and
13:19:32 16   prior to that time?
13:19:32 17      A   Yes.
13:19:34 18      Q   Can you tell me what your understanding of
13:19:36 19   the facts that Ms. Kelly related that were significant to
13:19:44 20   you?
13:19:46 21      A   I interpreted that she went to vote, I
13:19:48 22   believe '98 or sometime prior to 2000, and she had a
13:19:54 23   change of address and she told the clerks, and supposedly
13:19:58 24   an affidavit was filled out for her for a change of
13:20:02 25   address that would have come back to our office.  That --
```

**66**

```
13:20:06  1   if that had happened, it should have been changed.  But
13:20:10  2   then she went in 2000 -- I think she didn't -- never
13:20:12  3   received a new address -- change of address and went back
13:20:16  4   to the old place and they didn't have her on the file.
13:20:26  5      Q   Now, is it your understanding that if an
13:20:30  6   affidavit had come from clerks out at a precinct and
13:20:38  7   reached this office that that information should have
13:20:40  8   been changed in your voter file?
13:20:42  9      A   Yes, if we got it in.
13:20:44 10      Q   Okay.  Did you make any effort to investigate
13:20:48 11   that particular claim and determine what may have
13:20:54 12   happened in this situation with Janice Kelly?
13:20:56 13      A   We actually did.  We found out there were --
13:21:00 14   it was either three or four Janice Kellys and we didn't
13:21:04 15   know exactly which one.  We had no birth date or anything
13:21:08 16   like that to go on.  So we called each clerk in from the
13:21:10 17   precincts that would have been involved and none of the
13:21:12 18   clerks could recollect any Janice Kelly being there.
13:21:18 19   That doesn't mean she wasn't there, but they didn't
13:21:18 20   recollect her being there.
13:21:20 21      Q   But this would have been more than two years
13:21:24 22   after the fact; is that right?
13:21:26 23      A   It was after 2000 that we looked into it.
13:21:28 24   That's the first we heard of any problems.
13:21:32 25      Q   But it would have been more than two years
```

**67**

```
13:21:34  1   after Ms. Kelly would have tried to make that change at
13:21:40  2   her precinct during an election?
13:21:42  3      A   Yes.
13:21:52  4      Q   Did you determine whether or not there were
13:22:05  5   any written records associated with an attempt by
13:22:06  6   Ms. Kelly to change her address during election 1998?
13:22:12  7      A   We never found any.
13:22:20  8      Q   Did you make any efforts to review the poll
13:22:32  9   list kept in the precinct where Ms. Kelly voted in 1998?
13:22:38 10      A   I didn't personally, probably one of my
13:22:42 11   staff.  Dick Carlberg was working on that.
13:22:50 12      Q   Did you discuss that -- Janice Kelly with
13:22:56 13   Mr. Carlberg?
13:22:58 14      A   Yeah, we've talked.  Dick Carlberg, Robert
13:23:02 15   Phillips and myself have talked, and like I say, we could
13:23:06 16   find no -- no records, no recollection from the clerks or
13:23:08 17   anything else.  But we were dealing with three or four
13:23:12 18   Janice Kellys and I still don't know which one is the
13:23:16 19   exact one.  There was a -- I think she received a card, a
13:23:20 20   registration card in order to correct that problem.
13:23:22 21      Q   Were you able to determine based on
13:23:24 22   Ms. Kelly's information she gave during her deposition
13:23:28 23   including her date of birth and correct address of the
13:23:34 24   precinct that she voted at during the 1998 election?
13:23:38 25      A   I didn't myself.  Like I say, the people on
```

**68**

```
13:23:40  1   my staff were looking into that.
13:23:42  2      Q   Okay.  So if I have any questions about Ms.
13:23:46  3   Kelly and what was researched or discovered, should I ask
13:23:54  4   Mr. Carlsberg?
13:23:54  5      A   Carlberg.
13:23:58  6      Q   Carlberg?
13:23:58  7      A   Yeah.
13:23:58  8      Q   Okay.  Has Mr. Carlberg discussed his
13:24:04  9   findings with respect to Janice Kelly with you?
13:24:08 10      A   No.
13:24:08 11      Q   Okay.  But you have discussed her?
13:24:12 12      A   Yes.
13:24:14 13      Q   He hasn't shared any conclusions with you,
13:24:16 14   though, about her particular situation; is that right?
13:24:20 15      A   Right.  We know the procedure the clerks are
13:24:24 16   supposed to take, you know, and they've been taught to
13:24:28 17   take.  If she would have shown up like that, an affidavit
13:24:32 18   should have been filled out and she should have signed
13:24:38 19   it.  But there's no note that she actually signed
13:24:40 20   anything, which would lend one to believe maybe the clerk
13:24:42 21   didn't turn it in.  We're just not sure.
13:24:46 22      Q   But I should ask him about that?
13:24:48 23      A   Yes.
13:24:48 24      Q   Okay.  Were you able to determine -- and
13:24:50 25   maybe this is another question I should ask him, whether
```

Case 1:01-cv-00120-ASG   Document 209   Entered on FLSD Docket 07/02/2002   Page 116 of
234
NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JOHN STAFFORD

69

13:24:54 1  or not the poll list shows that she voted in that 1998
13:25:00 2  election?
13:25:00 3        A   He would have to answer that.
13:25:02 4        Q   He would have to answer that.  Would that be
13:25:08 5  the kind of information, though, that would be kept in
13:25:10 6  your records here in the Supervisor of Elections office?
13:25:14 7        A   Yeah.  We have copies of our poll registers
13:25:18 8  and we keep them for years so we can look up and find out
13:25:22 9  if somebody actually voted.
13:25:22 10       Q   Okay.
13:25:24 11       A   They may be on microfiche, but we would have
13:25:28 12 those.
13:25:28 13       Q   And as you sit here today, you don't have any
13:25:32 14 knowledge one way or another as to whether or not
13:25:36 15 Ms. Kelly shows up on your poll list as having voted for
13:25:42 16 the 1998 election?
13:25:44 17       A   No, I would have to look at those poll
13:25:48 18 registers.
13:25:50 19       Q   Okay.  Let me ask you some more about your
13:25:54 20 expert witness report.  In your report you indicate that
13:25:58 21 the manner in which voter registration rolls and eligible
13:26:04 22 voter lists were maintained in Duval County were not
13:26:08 23 intended to have the effect of improperly denying the
13:26:12 24 right to vote of any class of voters.  You also indicate
13:26:24 25 nor do I believe they had the effect of resulting in

70

13:26:30 1  disproportionately greater numbers of black voters being
13:26:36 2  denied the right to vote.  Can you tell me the basis of
13:26:42 3  that opinion, please?
13:26:44 4        A   We handle all of our poll registers the same
13:26:48 5  way.  There's a program that gives the poll register in
13:26:52 6  alphabetical order within each precinct with the person's
13:27:00 7  name and address and birthdate and all that on it.  It's
13:27:02 8  done the same throughout the city.  It's done
13:27:04 9  alphabetical within the precinct and then they have a few
13:27:06 10 blank pages on the back of each precinct register in case
13:27:10 11 people move in, they can be written on the register and
13:27:14 12 allowed to vote.
13:27:22 13       Q   Are there any other areas, such as voter
13:27:34 14 education, for example, that may impact, in your opinion,
13:27:52 15 the -- the conduct of the -- or election administration?
13:28:10 16       MR. ARPEN:  Let me object to the question as
13:28:12 17       being vague.  You can answer it if you're able
13:28:24 18       to.
13:28:24 19       A   Well, I think -- I think one of our biggest
13:28:28 20 problems that any election office has are people that
13:28:32 21 have moved, changed their address and don't tell us,
13:28:36 22 because that way their name's not on the proper register
13:28:36 23 and they -- if we do a change of a polling place, which
13:28:40 24 oftentimes we're asked to leave, we mail a new card to
13:28:44 25 everybody that -- if anything changes.  And if it goes to

71

13:28:46 1  an address where they're no longer there, then obviously
13:28:52 2  they're not going to get the change in polling place and
13:28:52 3  they go back to their old place and it may or may not be
13:28:54 4  there.  We post signs at those places, large signs that
13:28:58 5  tell where it's moved.  One of the things we're doing in
13:29:02 6  May, in fact, later this month is mailing out a pamphlet
13:29:06 7  to everybody in the city letting them know about the
13:29:10 8  upcoming redistricting, that things may change, and to
13:29:12 9  make sure that your address is correct, just try to get
13:29:14 10 that -- get our database updated with correct addresses
13:29:18 11 when we do mailings, that -- we'll do it.
13:29:20 12       Now, this particular mailing is not to an
13:29:24 13 individual, it's to a residence, that way whoever gets
13:29:28 14 it, if they're in the wrong place, hopefully they'll
13:29:30 15 update their record.  So it's one thing that we're really
13:29:30 16 concentrating on right now, is trying to get the proper
13:29:34 17 addresses to help us communicate as far as education.  We
13:29:38 18 have brochures that give the voter bill of rights and how
13:29:44 19 to vote with a new system and what you need to do to
13:29:46 20 change your address and we're sending those out.
13:29:48 21       Q   When did it come to your attention that this
13:29:52 22 change of address issue was a particular area of concern
13:29:58 23 in terms of election administration?
13:30:00 24       A   I think it's always been a concern.  As long
13:30:04 25 as I've been in the office I've noticed it.  We haven't

72

13:36:10 1  had any big moves to get it done.  We thought about
13:30:14 2  getting with the postal service maybe matching their
13:30:16 3  files, but we've heard there's some inaccuracies there as
13:30:16 4  well, so it's been a problem for a while, but it seemed
13:30:20 5  like it's just really snowballed on us.
13:30:26 6        Q   Besides mailings, has your office -- or did
13:30:28 7  your office prior to November 2000 do any kind of public
13:30:34 8  information campaigns with respect to the change of
13:30:38 9  address issue?
13:30:38 10       A   No.  We concentrated our efforts on
13:30:42 11 encouraging people to vote and that's -- and 2000 was the
13:30:48 12 first time we'd ever done that and we've never had a lot
13:30:52 13 of money in the budget to do that sort of thing.  One
13:30:54 14 thing when I was elected was to encourage people to get
13:30:56 15 out to vote and now that focus has turned to education.
13:31:02 16       Q   In preparing for your testimony in this case,
13:31:04 17 have you reviewed any kind of statistics regarding the
13:31:10 18 mobility of your population in Duval County?
13:31:18 19       A   No, we haven't.  We -- like I say, we've made
13:31:22 20 many efforts to get out to any event that's going on in
13:31:26 21 all the communities, different areas and clubs to
13:31:30 22 encourage those people to -- you know to basically teach
13:31:34 23 them how to use the system plus get their addresses
13:31:38 24 current.  We have a lot of apartment dwellers in Duval
13:31:40 25 County, so it's -- there's some considerable movement

NAACP, et al. VS. KATHERINE HARRIS, et al.

Deposition of JOHN STAFFORD

73

Case 1:01-cv-00120-ASG   Document 405   Entered on FLSD Docket 07/02/2002   Page 117 of 234

75

13:31:44 1   there and we're looking to put some information in the
13:31:48 2   apartment complexes to encourage people to -- you know,
13:31:50 3   when they change their address to go ahead and let us
13:31:50 4   know immediately, but it hadn't been done prior to 2000.
13:31:58 5       Q    Prior to 2000, did your office do any kind of
13:32:04 6   mailings -- general mailings to notify voters or people
13:32:08 7   in the community that they need to have correct addresses
13:32:12 8   on file with your office?
13:32:14 9       A    No.
13:32:24 10      Q    Do you have planned any additional public
13:32:28 11  information campaigns, any advertising, newspaper
13:32:32 12  articles, anything like that?
13:32:34 13      A    In the past, we've put sample ballots in the
13:32:38 14  newspaper Sunday prior. We're sending an individualized
13:32:44 15  ballot to every voter. We did that in that special
13:32:48 16  Senate race that I mentioned earlier and it worked well.
13:32:52 17  We're doing that, we're sending a mailout, like I said,
13:32:52 18  to every residence. We're working with the other four
13:32:58 19  counties -- the Nassau, St. Johns, Clay and Duval are
13:33:02 20  working together and we're working with Clear Channel,
13:33:04 21  it's Fox 30 Television, plus they have about 10 or 12
13:33:08 22  radio stations with a combined effort to -- wanting to
13:33:12 23  encourage people to change their address and other to --
13:33:14 24  you know, to let us know of any name changes or if you
13:33:18 25  need help in voting and we're sending out those

74

13:33:22 1   pamphlets. We're at all the big events like the Kuumba
13:33:26 2   festival Memorial weekend. We were at the Senior Expo
13:33:30 3   this past weekend, the World of Nations, and these sort
13:33:34 4   of things. Anywhere people are congregating or we know
13:33:38 5   there are going to be more than 100, we're definitely
13:33:38 6   there, and then we'll make ourself available to clubs and
13:33:42 7   civic organizations and churches.
13:33:44 8           One of the things we've done after the 2000
13:33:48 9   election, we've created an education team where I have a
13:33:50 10  director of education plus two members of my staff. And
13:33:54 11  we have an education advisory panel with members of the
13:33:58 12  NAACP, the Urban League, the different party headquarters
13:34:02 13  to try to advise on things. We've created a team board
13:34:06 14  to try to get a representative from every private and
13:34:08 15  public school in Jacksonville to encourage the 18- to
13:34:12 16  24-year-old people to get active in this process, so
13:34:16 17  we're making a mass effort education-wise to get that
13:34:18 18  done.
13:34:18 19      Q    Now, this mass education effort is since the
13:34:22 20  November 2000 election?
13:34:26 21      A    That's correct. We got money in the budget
13:34:28 22  as a result of our task force investigation last October
13:34:30 23  and that's when we put everything in place, it was in
13:34:32 24  October of 2000 -- that's the budget year starts for
13:34:36 25  Duval County at that time.

13:34:40 1       Q    Okay. Is there a reason or what was the
13:34:44 2   reason that a voter education campaign on the scale that
13:34:54 3   you've described with the various outreach you've
13:34:58 4   described was not implemented prior to November 2000?
13:35:04 5       A    We didn't have money in the budget to do it.
13:35:10 6   We're fortunate to get quite an increase, plus the State
13:35:14 7   gave us monies to each county to help with voter
13:35:18 8   education.
13:35:36 9       Q    Are you, in your capacity as election
13:35:40 10  supervisor, familiar with the term undervotes?
13:35:44 11      A    Yes.
13:35:46 12      Q    What does that mean to you, undervotes?
13:35:48 13      A    Means on any particular race you voted for no
13:35:52 14  candidate.
13:35:58 15      Q    In your capacity as Supervisor of Election,
13:36:02 16  have you had the opportunity to review election -- I'll
13:36:12 17  call them returns or results, I guess, have you had the
13:36:26 18  opportunity to review election results and -- for the
13:36:34 19  phenomenon you just described as undervotes?
13:36:36 20      A    Yes, we looked at ballots before to try to
13:36:38 21  determine, you know, if there was an intention to vote
13:36:42 22  and a lot of times people just don't like to vote in
13:36:46 23  certain races and don't vote.
13:36:48 24      Q    Is the undervote -- I'll call it the
13:36:50 25  undervote phenomenon, is that something that you had

76

13:36:54 1   looked at throughout your career in the Supervisor of
13:36:58 2   Elections --
13:37:00 3       A    Yes.
13:37:02 4       Q    -- Office?
13:37:02 5       A    Right.
13:37:04 6       Q    In your experience in reviewing the returns
13:37:10 7   for -- I believe you said you joined the office in 1988?
13:37:18 8       A    That's correct.
13:37:18 9       Q    Would you have had the opportunity to examine
13:37:26 10  election returns since that period for the undervote
13:37:30 11  phenomenon for a federal election?
13:37:32 12      A    Yes.
13:37:32 13      Q    And in doing so, did you arrive at any kind
13:37:38 14  of quantification of the expected rate of undervotes that
13:37:48 15  you have seen in your county during the time you have
13:37:54 16  been in this Supervisor of Elections Office?
13:37:56 17      A    Yeah, it's been fairly consistent through the
13:37:58 18  years. One thing that encouraged me to is move to get
13:38:04 19  rid of the punch card system, buy an optical scan system,
13:38:07 20  which I proposed during my campaign. And I've talked to
13:38:10 21  the former supervisor about it and basically was told
13:38:14 22  when you get elected you can do it. We now have that
13:38:18 23  system and it's going to help with the undervotes.
13:38:22 24      Q    When you say fairly consistent, are you able
13:38:24 25  to give me some kind of quantification of numbers, what

NAACP, et al. VS. KATHERINE HARRIS, et al.

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 118 of 234

Deposition of JOHN STAFFORD

77

79

13:38:28 1  you saw?

13:38:30 2      A   Well, when I looked at some major elections,
13:38:34 3  it seemed like it would be 3- or 4,000. Now, I say a 60
13:38:36 4  percent turnout, something like that, we usually get 3-
13:38:38 5  or 4,000 undervotes and it's fairly consistent, which was
13:38:44 6  quite a concern for me because that's -- you know, you
13:38:46 7  can't -- you can't anticipate whether people want to vote
13:38:50 8  for everything, but that does -- you know, I've looked at
13:38:52 9  cards where you can see maybe where somebody tried to
13:38:54 10  make a punch with a stylus and it wasn't lined up
13:39:00 11  properly and that can cause an undervote, and that's been
13:39:02 12  a concern of mine for years.

13:39:06 13      Q   Okay. This 3- to 4,000 figure, when you
13:39:14 14  looked at the November 2000 election, what did you --
13:39:18 15  what kind of undervote figure did you see?

13:39:20 16      A   It was up around 5,000, something like that.
13:39:24 17  It's fairly consistent with what we've had in the past,
13:39:28 18  maybe just a little bit higher.

13:39:34 19      Q   And at least, in your opinion, you attribute
13:39:38 20  at least a significant portion of that to the punch card
13:39:42 21  system?

13:39:42 22      A   I don't know that I would say significant,
13:39:44 23  because, like I say, you can't anticipate, you know,
13:39:48 24  whether a person wants to vote for a race or not. But
13:39:50 25  it's been a concern of mine and that's why I wanted to

78

13:39:54 1  change systems. I did not like the punch card system.

13:40:00 2      Q   Other than what you've already mentioned,
13:40:02 3  were there other concerns that you had about the punch
13:40:08 4  card system that made you, I guess, use that as a
13:40:14 5  campaign issue for your race?

13:40:16 6      A   Well, like I say, the undervotes over the
13:40:18 7  years have really been a concern to me, because, like I
13:40:22 8  say, I could see where there was an attempt to be made,
13:40:24 9  and optical scan eliminates that guesswork, and that's
13:40:30 10  where I wanted to head. Fortunately now we have that
13:40:34 11  system.

13:40:36 12      Q   You, I think, said earlier there are 14
13:40:38 13  election districts in Duval County?

13:40:40 14      A   14 council districts.

13:40:48 15      Q   14 council districts. And in terms of
13:40:52 16  population of the 14 council districts in Duval County,
13:40:58 17  are any of those 14 districts predominately
13:41:02 18  African-American, predominately a minority population?

13:41:06 19      A   4 of those 14 are.

13:41:12 20      Q   Can you tell me by name the four that are
13:41:14 21  minority districts?

13:41:18 22      A   Council districts 7, 8, 9, and 10, and
13:41:24 23  they're numbered 1 through 14.

13:41:30 24      Q   Okay. 7, 8, 9, and 10 -- council districts
13:41:34 25  7, 8, 9, and 10, are you able to describe for me the

13:41:42 1  racial makeup of those districts? Are they predominately
13:41:46 2  African-American, are they mixed
13:41:48 3  Hispanic/African-American? How would you describe the
13:41:52 4  racial makeup of those districts?

13:41:56 5      A   I'm sorry. I don't know the exact figures,
13:41:58 6  but I would say they're predominately African-American.
13:42:00 7  But you have a mix as well with Hispanics and Asian and
13:42:08 8  whites as well, but predominately African-American.

13:42:12 9      Q   When you say predominately, would you mean
13:42:12 10  greater than 50 percent or is it some other percentage?

13:42:16 11      A   No, it's greater than 50 percent.

13:42:30 12      Q   In terms of your study of the undervote
13:42:36 13  phenomenon since the time you've been in the Duval County
13:42:42 14  Supervisor of Elections Office, have you taken any study
13:42:50 15  of the number of undervotes, which are consistently 3- to
13:43:00 16  4,000, and tried to determine where or if those
13:43:08 17  undervotes are associated with any particular council
13:43:14 18  districts?

13:43:14 19      A   No. You did say prior to 2000, didn't you?

13:43:26 20      Q   Yes.

13:43:25 21      A   Okay.

13:43:28 22      Q   And then in terms of after the November 2000
13:43:36 23  election, similarly did your office or you, in your
13:43:42 24  capacity as Supervisor of Elections, make any effort to
13:43:48 25  identify the areas where undervotes occurred during the

80

13:43:56 1  November 2000 election by council district?

13:43:58 2      A   Yes, we've looked at that some and --

13:44:04 3      Q   When you say looked at it, what did you do?

13:44:08 4      A   We tried to get a count by each district on
13:44:12 5  how many undervotes there were. You know, there was not
13:44:14 6  a big difference. There were more in those areas, but
13:44:16 7  not a big deal -- not a big difference.

13:44:18 8      Q   When you say in those areas, do you mean
13:44:22 9  there were more -- were there more undervotes in the
13:44:24 10  predominately African-American districts 7, 8, 9, and 10
13:44:28 11  that you mentioned?

13:44:30 12      A   Percentagewise I would say yes. I don't have
13:44:34 13  those exact figures. Mr. Carlberg may have those.

13:44:44 14      Q   Are you able to give me an estimate, or are
13:44:50 15  you saying I should just ask him about this particular
13:44:52 16  area?

13:44:52 17      A   I would think he would probably know that. I
13:44:58 18  don't -- I don't have an answer for you on that without
13:45:00 19  doing some study.

13:45:02 20      Q   Okay. Does Mr. Carlberg have a background in
13:45:16 21  statistics?

13:45:20 22      A   He has a data processing background.

13:45:24 23      Q   Do you know, does he have a background in
13:45:24 24  quantitative analysis?

13:45:32 25      A   That I'm not sure. I know he's sought some

NAACP, et al. vs. KATHERINE HARRIS, et al.                    Deposition of JOHN STAFFORD

81                                                              83

**Page 81**

1    classes at the junior college level, but I'm not sure
2    exactly what they were.
3        Q    I'll ask him. I'll ask him about this issue
4    also.
5        A    Dick's a graduate of the Naval Academy, so
6    he's had a lot more exposure to academics than I have, so
7    he would have to answer that.
8        Q    All right. Let me ask you about, then,
9    another area called overvoting or overvote. Are you
10   familiar with that term?
11       A    Yes.
12       Q    And what does that term mean to you,
13   Mr. Stafford?
14       A    That means that in any particular race, more
15   than one candidate was selected, and in that case that
16   ballot -- that particular race is not counted on the
17   ballot.
18       Q    During the time you've worked in the Duval
19   County Supervisor of Elections Office, have you had a
20   chance to examine election returns for federal elections
21   for the overvote phenomenon?
22       A    Yes.
23       Q    Have you done that -- is that something that
24   you have done consistently since you joined the office in
25   1988?

**Page 82**

1        A    Yes.
2        Q    And in doing so -- I'm looking at that
3    phenomenon of overvoting from 1988 until the present,
4    were you able to discern whether or not there was a
5    fairly consistent or a predictable pattern of votes that
6    you could expect to be overvoted?
7            MR. RESTREPO: Object to the form of the
8        question.
9        Q    Or ballots that you expected to be
10   overvoted, in your experience?
11           MR. HARVEY: Object to the form of the
12       question.
13       A    I just -- you know, it's hard to say, you
14   know. I mean, you can look -- you can tell what
15   overvotes are, if they voted for more than one.
16       Q    Well, I guess what I'm getting at, as for
17   undervotes, you seem to see a pretty consistent pattern
18   of about 3- to 4,000 per election. What I'm trying to
19   find out is for overvotes, was there a similar pattern
20   where you would expect to see or that you had seen a
21   certain number?
22       A    Yeah, there probably is, probably consistent
23   with the undervotes, maybe a little more overvotes than
24   undervotes in the past until the 2000 election, then
25   there was quite a few more.

**Page 83**

1        Q    So before the November 2nd -- November 7,
2    2000, election, in your experience as a Supervisor of
3    Elections for Duval County, you would expect to see a
4    number of overvotes for federal elections exceeding, I
5    guess, 3- to 4,000 overvotes per --
6        A    That would be my estimate, but, you know, in
7    a big election probably that -- that amount. There are
8    always overvotes in every election. There are always
9    undervotes in a punch card election.
10       Q    Okay. I don't know if you can, and if you
11   can't just tell me, but in terms of undervotes, you seem
12   to be pretty confident of what that number is. Is it
13   just with overvotes it's more difficult for you to pin
14   that number down?
15       A    Well, I've never -- to be honest with you,
16   I've never done the research there because, you know,
17   when you vote for more than one you can't count it. And
18   with an undervote, I've always been concerned that
19   somebody had wanted to vote for somebody and couldn't.
20       Q    Okay.
21       A    That's why I've explored the undervotes more
22   than the overvotes in the past.
23       Q    I see. In terms of the overvotes for the
24   November 7th, 2000, election, did you look at the
25   overvotes for that election?

**Page 84**

1        A    Oh, yeah. They were extremely high for that
2    election.
3        Q    Okay. Tell me how that came to your
4    attention and what you did to study the number of
5    overvotes.
6        A    Well, it came to our attention -- two or
7    three days after the election, somebody brought it to our
8    attention that there seemed to be a lot of overvotes, so
9    we started looking at it and to our surprise there was
10   quite a bit.
11       Q    Did you determine how many overvotes --
12       A    There were slightly under 22,000, about
13   21,000, which is probably three or four times as much as
14   the normal rate would be, what we consider to be normal.
15       Q    Normal being the 3- to 4,000?
16       A    Yeah. Yes, or slightly higher, it's --
17       Q    Did you make any effort to determine -- or
18   did you attribute any particular cause to that number of
19   overvotes for November 7th, 2000?
20           MR. RESTREPO: Object to the form of the
21       question.
22           MR. HARVEY: Object to the form of the
23       question.
24       A    It would be speculation on my part. I know
25   in the past we've never had more than four presidential

NAACP, et al. VS. KATHERINE HARRIS, et al.

Case 1:01-cv-00120-ASG   Document 486   Entered on FLSD Docket 07/02/2002   Page 120 of 234

Deposition of JOHN STAFFORD

85

```
13:51:38  1    candidates.  Because of a change in law that allowed
13:51:38  2    minor parties to get on, we had 11 candidates plus a
13:51:44  3    write-in, so there were quite a few more opportunities
13:51:46  4    for people to overvote.
13:51:54  5         Q   To your knowledge, has anyone from your
13:51:58  6    office done a study to try and determine what source or
13:52:16  7    sources contributed to that overvote phenomenon that you
13:52:22  8    saw for November 7, 2000?
13:52:24  9         A   We've looked at the different areas of town
13:52:28 10    and council districts and found that approximately 60
13:52:30 11    percent of the overvotes were in council districts 7, 8,
13:52:36 12    9, and 10.
13:52:38 13         Q   And those are the predominately
13:52:40 14    African-American --
13:52:42 15         A   That's correct.
13:52:42 16         Q   -- districts?
13:52:44 17         A   And we tried to look at those ballots to
13:52:46 18    determine maybe if it was like one page, and then the
13:52:48 19    other -- but we found that in probably the precincts we
13:52:52 20    checked, 60 to 65 percent of those overvotes voted for
13:52:56 21    four and five people for president.  There's no logic to
13:53:00 22    it.
13:53:02 23         Q   And an overvote doesn't get counted; is that
13:53:06 24    right?
13:53:06 25         A   The ballot counts, it counts as a vote.  In
```

86

```
13:53:08  1    any race, there may be 10 or 12 races on that ballot, and
13:53:14  2    if one race was overvoted, that race would not count, but
13:53:16  3    all the other races that were properly voted would count,
13:53:20  4    and it would count as a ballot processed.
13:53:22  5         Q   So -- I just want to make sure I understand.
13:53:28  6    So if a voter had voted for the presidential race and
13:53:32  7    voted for three candidates, that voter would have
13:53:36  8    overvoted the presidential race.  But on the same ballot,
13:53:42  9    the voter could have voted for one Senate candidate and
13:53:48 10    not have overvoted the Senate race?
13:53:50 11         A   That's correct.
13:53:52 12         Q   Okay.  In November 2000, how many different
13:54:00 13    races were on your ballot?
13:54:04 14         A   That I don't -- I don't know.  It's -- we had
13:54:08 15    a lot of amendments and, like I say, it would be guessing
13:54:14 16    at this point, but it would be one of our larger ballots.
13:54:18 17         Q   Okay.  In terms of pages, several pages?
13:54:22 18         A   Yes, definitely.
13:54:26 19         Q   In looking at the overvote phenomenon, were
13:54:32 20    you able to determine if there were particular races on
13:54:42 21    that ballot that were -- this is a bad question --
13:54:48 22    overvoted more than other races?  I gave the example of
13:54:54 23    the presidental versus the Senate race.  In doing that look
13:54:56 24    back, did you find that the overvotes were occurring on
13:55:00 25    one of your referenda issues or presidential race or
```

87

```
13:55:04  1    Senate race, or where were those overvotes occurring?
13:55:08  2              MR. RESTREPO:  Object to the form of the
13:55:10  3    question.
13:55:10  4         A   Predominately in the presidential race, but
13:55:12  5    there were overvotes in other races as well.
13:55:36  6         Q   Other races as well.  Let me ask you about
13:55:40  7    your opinions about what you called isolated employee
13:55:46  8    error.  I understand it's your opinion that if qualified
13:56:00  9    voters were unable to vote in the 2000 election, it was
13:56:04 10    the result of isolated employee error and not the result
13:56:08 11    of any systemic policy or practice of the Supervisor of
13:56:14 12    Elections Office.  Can you explain to me what you mean by
13:56:20 13    that and give me the basis of that opinion?
13:56:24 14         A   Basically we have 2500 volunteers on a major
13:56:28 15    election like that, poll workers, and we train those poll
13:56:32 16    workers and they're told how to react to certain
13:56:32 17    procedures.
13:56:36 18         Q   Do they get paid?
13:56:36 19         A   Yes, they do.
13:56:36 20         Q   Okay.  How much do they get paid?
13:56:40 21         A   The clerk that's in charge of the precinct
13:56:42 22    make $150 a day.  The person that sets up the tables,
13:56:44 23    that's what we call inspectors that check you in when you
13:56:52 24    register, it's $120 a day.  And then the deputy gets $120
13:56:56 25    a day.  That's the fellow that sits outside, makes sure
```

88

```
13:57:00  1    there's security and helps people get their
13:57:02  2    identification out as they enter the polling place.
13:57:04  3         Q   And these people only work on the day of an
13:57:08  4    election; is that right?
13:57:12  5         A   Yes.  They work on that election day and
13:57:12  6    they're required to come to classes.  We used to pay them
13:57:16  7    for classes and then hourly and we've combined that pay
13:57:20  8    into one pay for the day, so they are required to attend
13:57:24  9    classes.
13:57:24 10         Q   And that was true prior to November 2000?
13:57:28 11         A   Yes, that's been true for quite some time, as
13:57:30 12    long as I've been around the office.
13:57:32 13         Q   If someone has been a poll worker for many
13:57:36 14    years and they couldn't attend training for some reason,
13:57:40 15    are there any exemptions that would allow that person to
13:57:46 16    work election day, or must they attend training in order
13:57:48 17    to work an election?
13:57:50 18         A   They have to attend training, but we have
13:57:54 19    make-up classes and we give them the opportunity if they
13:57:58 20    miss their regularly scheduled class that they can attend
13:58:00 21    the other one.  We have since changed our training a
13:58:04 22    little bit.  We've partnered with Florida Community
13:58:06 23    College where we use their classrooms, their smart
13:58:08 24    classrooms, per se, where our classes are 35 to 40 people
13:58:14 25    rather than 200.  So we're able to communicate a little
```

NAACP, et al. VS. KATHERINE HARRIS, et al.

Deposition of JOHN STAFFORD

Case 1:01-cv-00120-ASG Document 166 Entered on FLSD Docket 07/02/2002 Page 121 of 234

89

```
13:58:16  1    better with them.  And we're real pleased with that
13:58:20  2    effort as it's turning out now.
13:58:20  3        Q    What's the reason that you have made changes
13:58:22  4    to the training process?
13:58:24  5        A    Well, we -- first thing I did when I was
13:58:28  6    elected was change the process.  It used to be an
13:58:30  7    electric procedure, and I would go to some of those
13:58:34  8    classes and see people nodding off, so we did a
13:58:36  9    Powerpoint presentation with a video.  It's one of the
13:58:40 10    new things I did when I came in.  And, you know, when you
13:58:42 11    tell people to do certain things and then you find out
13:58:46 12    they don't, then you -- then we want to do something
13:58:48 13    better.  And one of our answers is this partnering with
13:58:52 14    the community college, creating that education team and
13:58:54 15    working with smaller classes.  We just finished a series
13:59:00 16    of classes that dealt with customer relations, so to
13:59:06 17    speak, where we learn how to deal with anger conflict and
13:59:06 18    things like that.  And we finished that cycle, and now
13:59:10 19    the State requires six hours of training in Duval County,
13:59:16 20    where we'll have -- everybody will have at least six and
13:59:18 21    the clerks will have ten.
13:59:20 22        Q    When did the State requirement for a
13:59:24 23    particular number of hours of training come into being?
13:59:28 24        A    That was part of the election reform package
13:59:30 25    this year that came after the 2000 election.
```

90

```
13:59:36  1        Q    Prior to November 2000, how many hours did
13:59:40  2    workers in Duval County get trained?
13:59:42  3        A    They were trained -- they had two three-hour
13:59:46  4    classes, so a total of six.  And that was done before --
13:59:50  5    when we start an election cycle, it's done before the
13:59:56  6    primary, and then again before the general -- in between
13:59:58  7    the primary and the general election.
13:59:58  8        Q    So you would take six hours total, three
14:00:02  9    before the primary and three before the general election?
14:00:04 10        A    That's correct, and they were usually the
14:00:08 11    same classes.  We've changed that around quite a bit.
14:00:18 12        Q    Do -- prior to November 2000, did poll
14:00:22 13    workers in Duval County take any kind of test or
14:00:26 14    examination to become certified poll worker clerks or --
14:00:30 15        A    No exams were given.
14:00:34 16        Q    Do you give any exams today?
14:00:36 17        A    We will be.  The first -- the first round of
14:00:40 18    classes was dealing with customer relations and conflict
14:00:44 19    resolution.  The next cycle will be actually how to do
14:00:50 20    the business at the polls and a test will be given at
14:00:52 21    that time.
14:00:54 22        Q    Will there be a required pass mark for your
14:01:00 23    poll workers?
14:01:00 24        A    Yes, and we -- and if they fail, we would
14:01:06 25    give them another opportunity to take the class again and
```

91

```
14:01:08  1    not just fire them, but there would be a required
14:01:12  2    passing.
14:01:26  3        Q    Prior to the November 2000 election in your
14:01:32  4    work at the Supervisor of Elections Office, did you
14:01:42  5    uncover or get reports of isolated employee error with
14:01:46  6    respect to election administration?
14:01:54  7        A    You would always get, you know, one or two
14:01:56  8    people calling and complained about being mistreated by a
14:02:00  9    clerk or, you know, some problem.
14:02:04 10        Q    And in those instances that your office
14:02:06 11    received complaints, what kind of steps did you take, if
14:02:12 12    any?
14:02:14 13        A    We would talk -- talk to the clerk and try to
14:02:16 14    get them on the same page where they wouldn't make the
14:02:20 15    same mistake again, and in some instances clerks were
14:02:24 16    replaced.
14:02:24 17        Q    With respect to the November 2000 election,
14:02:28 18    did you receive any complaints about poll workers?
14:02:34 19        A    Several.  Not many, but a few.  Most of them
14:02:38 20    were from people at the -- like maybe the minister at the
14:02:44 21    church didn't like something they were doing or they left
14:02:44 22    something dirty and things like that.  But we had a few
14:02:48 23    where -- people were told -- we tell our clerks, you
14:02:52 24    know, if you have -- people have to have a picture ID,
14:02:54 25    but if they don't have one, they can fill out an
```

92

```
14:02:56  1    affidavit and be allowed to vote.  And there were a
14:03:00  2    couple of instances where they were told they had to have
14:03:00  3    a picture ID and they were sent back to get that ID
14:03:02  4    rather than do what they were told to do with the
14:03:06  5    affidavit.
14:03:14  6        Q    What, if any, actions did your office take
14:03:22  7    with respect to employee error as related to the November
14:03:32  8    2000 election?
14:03:34  9        A    Well, on the complaints that we could
14:03:35 10    identify, we would call the clerks and let them know what
14:03:42 11    they did wrong and what our expectations that that
14:03:46 12    wouldn't happen again.  And, like I say, in a couple of
14:03:48 13    instances, clerks were released, they won't be working
14:03:52 14    again.
14:03:54 15        Q    Approximately how many clerks were released?
14:03:56 16        A    Probably three or four, not a great number.
14:04:00 17        Q    And can you tell me the reason that these
14:04:06 18    clerks were released?
14:04:08 19        A    In most cases it was -- they really lost a
14:04:12 20    polling place for us because the person -- either the
14:04:16 21    minister that was in charge there at the church we used
14:04:20 22    or the facility had an argument or confrontation with the
14:04:24 23    clerk that caused us to potentially lose, or in some
14:04:24 24    cases, actually lose some of those polling places.  That
14:04:32 25    was the main reason.  One person was extremely rude to
```

Case 0:00-cv-00626-ASG Document 186 Entered on FLSD Docket 07/02/2002 Page 122 of 234

NAACP, et al. vs. KATHERINE HARRIS, et al.                    JOHN STAFFORD

93

```
14:04:38  1    someone, we let them go.  But, like I said, there were no
14:04:42  2    more than three or four of those.  Now, we've had some
14:04:46  3    that have decided not to work again, but most of those
14:04:48  4    it's just people that have been around forever and are
14:04:48  5    ready to move on.
14:05:14  6         Q    In Duval County, in your city, in your
14:05:20  7    council districts, those districts are divided into
14:05:26  8    precincts; is that right?
14:05:28  9         A    That's correct.
14:05:30 10         Q    Okay.  Can you tell me what system Duval
14:05:34 11    County used prior to November 2000 to notify voters when
14:05:42 12    a precinct location would be moved or changed for
14:05:50 13    whatever reason?
14:05:54 14         A    There are couple of steps taken.  One thing
14:05:56 15    is we -- anybody that's precinct location changed was
14:06:00 16    sent a new card that had a note on it that said new
14:06:02 17    polling location with that polling location noted.  And
14:06:06 18    then we actually advertised in the paper on two occasions
14:06:10 19    that polling location so and so had changed from one
14:06:14 20    facility to another, and that was placed in the paper
14:06:16 21    twice, prior to the election -- the five weeks prior to
14:06:20 22    the election and three weeks prior to the election.
14:06:36 23         Q    Was it your office's practice to send a card
14:06:42 24    with the new location for all precinct changes?
14:06:48 25         A    Yes, any change in precinct location.
```

94

```
14:06:52  1    There's a -- you could do as -- we'd have as many as 15,
14:06:56  2    20 precinct location changes, but everyone was sent a new
14:07:02  3    card when that changed.
14:07:04  4         Q    And in terms of the advertisement that you
14:07:08  5    described, was that a practice that was done in
14:07:16  6    conjunction with the sending of the card to notify the
14:07:20  7    voter of the change in polling place?
14:07:22  8         A    Yes, we -- like I say, we're required by law
14:07:26  9    to do that advertisement.
14:07:36 10         Q    Has that policy for notifying voters of a
14:07:44 11    change in precinct location changed since the November
14:07:48 12    2000 election?
14:07:48 13         A    No, we haven't changed any since then, but we
14:07:54 14    would do the same thing.
14:07:56 15         Q    In Duval County, at any time has the
14:08:10 16    Supervisor of Elections, for example, placed a notice at
14:08:16 17    a former polling place to notify voters that the precinct
14:08:20 18    location had changed?
14:08:22 19         A    Yes.  In fact, I would like to mention that
14:08:26 20    in addition to the advertising and the new card, we put a
14:08:30 21    large poster sign at the old polling place saying it has
14:08:32 22    moved to the new location and we then identify that new
14:08:34 23    location.  And we try to put that in a large enough sign
14:08:40 24    and a predominate location where people can see it.
14:08:44 25         Q    And can you tell me what employees or poll
```

95

```
14:08:48  1    workers were responsible for placing notices that you've
14:08:56  2    just described at the old location, moving to a new
14:09:00  3    location, who actually did that function?
14:09:04  4         A    We have a voting equipment center and a
14:09:08  5    voting equipment supervisor and an assistant supervisor.
14:09:12  6    They are responsible for checking all the polling places
14:09:16  7    to make sure they are ADA compliant.  And that -- and
14:09:20  8    then you tell them where the locations are, they create
14:09:22  9    the signs and put them out themselves at the polling
14:09:24 10    locations to direct voters to the new place.
14:09:28 11         Q    Did your office receive any complaints about
14:09:32 12    precinct location changes with respect to the November
14:09:36 13    2000 election?
14:09:36 14         A    Not to my knowledge.  We did have quite a few
14:09:44 15    before that as a result of a petition that a lot of the
14:09:48 16    churches didn't like being circulated about legalizing
14:09:54 17    marijuana.  That caused a lot of our churches to decide
14:09:58 18    they didn't want us there, and there were about 27 of
14:10:02 19    those.  So we had a few more polling locations prior to
14:10:02 20    that election get changed, but traditionally we'll have
14:10:08 21    15 or so each cycle.
14:10:10 22         Q    When were those 27 or so changed?
14:10:14 23         A    They were done back in the presidential
14:10:15 24    preference back in March of 2000.  Like I said, there
14:10:20 25    were about 20 of them.
```

96

```
14:10:34  1         Q    What kind of voter turnout did you have for
14:10:36  2    your presidential preference election in March 2000?
14:10:40  3         A    I believe it was somewhere around 20, 25
14:10:44  4    percent, somewhere around there.  It was very low.
14:10:48  5    Traditionally that's about right.  If you get a 33
14:10:50  6    percent turnout, they're -- I hate to say happy, but it's
14:10:54  7    a shame to get happy over a 30 percent turnout, but
14:10:58  8    that's about what you expect in one of those.
14:11:00  9         Q    And that was compared to 68 percent for your
14:11:02 10    presidential election?
14:11:04 11         A    Presidential election -- you have your best
14:11:06 12    turnout for a general election, and it's usually 65 to 70
14:11:10 13    percent.
14:11:18 14         Q    In your opinion, you believe that no polling
14:11:26 15    place had any advantage in terms of trying to reach the
14:11:34 16    Supervisor of Elections Office on election day?
14:11:36 17         A    No, we make sure -- like I said, some
14:11:40 18    precincts have phone lines there.  If they don't have
14:11:44 19    one, you provide them with a phone so everybody has equal
14:11:44 20    opportunity to get through.
14:11:54 21         Q    You also are of the opinion that there were
14:11:58 22    no precincts equipped with communication capabilities not
14:12:04 23    available to other precincts; is that right?
14:12:06 24         A    That's correct.
14:12:10 25         Q    Okay.  Do you anticipate making any changes,
```

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 123 of
234

NAACP, et al. VS. KATHERINE HARRIS, et al.                                    Deposition of JOHN STAFFORD

97

14:12:12 1    or have you made any changes since November 2000 in terms
14:12:18 2    of communication capabilities that we haven't discussed?
14:12:22 3    You did tell me about the cell phones and increased
14:12:28 4    number of phone lines.  Do you have any plans to use
14:12:32 5    computers, any other communicating devices that we
14:12:36 6    haven't discussed?
14:12:36 7         A    We purchased last week 300 laptop computers.
14:12:40 8    We will have one of those in place at each precinct with
14:12:42 9    our database on there, which would hopefully -- if
14:12:46 10   somebody comes in and they don't know if they're
14:12:48 11   registered to vote, they can check that database rather
14:12:50 12   than having to call our office, which would eliminate
14:12:50 13   most of the calls from the clerks.
14:12:54 14        And we are working a program we're calling
14:12:56 15   Partners in Democracy where we get large businesses, or
14:13:00 16   even small businesses, in clubs to provide people that
14:13:02 17   are computer illiterate to work those laptops, to help
14:13:08 18   those clerks out there.  So that should eliminate
14:13:12 19   probably 90 percent of the calls the clerk makes to make
14:13:16 20   sure people are registered.
14:13:38 21        Q    We have discussed the number of calls you
14:13:40 22   received election day November 2000.  In your report,
14:13:46 23   however, you -- you say that the process and procedure
14:13:56 24   for communication between precincts and the main office,
14:14:00 25   while insufficient to handle the unanticipated number of

98

14:14:04 1    voters and calls, was not intended to result in any
14:14:10 2    disproportionate number of voters of any class being
14:14:12 3    unable to vote on election day, nor do I believe it had
14:14:16 4    any disproportionate effect on black voters.  When you
14:14:22 5    say insufficient, tell me what you mean.
14:14:28 6         A    We didn't have enough phone lines.
14:14:30 7         Q    Do you have -- is it your opinion that phone
14:14:32 8    lines, in and of themselves, would have -- more phone
14:14:36 9    lines would have solved the problem you had November 7th,
14:14:40 10   2000?
14:14:42 11        A    I don't think it would have solved it.  It
14:14:44 12   would have helped more people get through.  I think the
14:14:46 13   answer to solving that problem is the laptop computer at
14:14:48 14   the precinct, and that's why we've put those in place.
14:14:54 15   It just -- that one move cuts down probably 50 percent of
14:15:00 16   the calls.
14:15:22 17        Q    Since you wrote your report, have you
14:15:24 18   determined which exhibits you may utilize to support your
14:15:30 19   opinions?
14:15:32 20        A    No, not really.  Those -- Mr. Carlberg may
14:15:40 21   have some of those to use, but --
14:15:44 22        MS. CICCOLO:  Well, Mr. Carlsberg is not --
14:15:46 23   is Mr. Carlsberg going to also testify as an
14:15:50 24   expert, Mr. Arpen?
14:15:52 25        MR. ARPEN:  No, he's not.

99

14:15:54 1         Q    Okay.  Mr. Stafford, do you intend to
14:16:04 2    supplement this report so that you will be identifying
14:16:06 3    that information?
14:16:08 4         A    Not at this time.
14:16:24 5         Q    When or if you do identify which exhibits
14:16:26 6    that you intend to say support your report, we would
14:16:40 7    expect to receive your updated designation --
14:16:44 8         MR. ARPEN:  Sure.
14:16:48 9         Q    -- as well as copies just to ensure that we
14:16:54 10   are talking about identical documents.  There have been
14:16:58 11   so many documents provided.  Is there anyone else,
14:17:08 12   Mr. Stafford, that you anticipate will be giving expert
14:17:18 13   testimony with respect to elections and the issues that
14:17:2. 14   arise in this lawsuit for Duval County?
14:17:30 15        A    Like I say, the people that are involved in
14:17:34 16   the office would be myself, Dick Carlberg, and Robert
14:17:38 17   Phillips.
14:17:38 18        (Off-the-record discussion.)
14:18:26 19   BY MS. CICCOLO:
14:18:26 20        Q    Did you, Mr. Stafford, play any role in
14:18:32 21   election reform iniatives after November 2000?
14:18:36 22        A    No, just as input, you know, through the
14:18:38 23   Florida State Association of Supervisor of Elections.  We
14:18:42 24   have a legislative delegation.  We work through our
14:18:50 25   organization and we discuss things at the conferences and

100

14:18:52 1    they put together the legislative package.  So to that
14:18:56 2    point, yes, but very minoral.
14:18:5. 3         Q    Have you done any analysis of the
14:19:04 4    recommendations that have been put forth for -- by the
14:19:10 5    reform commissions and study groups?
14:19:12 6         A    Yes, to a certain extent.
14:19:16 7         MR. ARPEN:  Let me just object to the
14:19:16 8    vagueness.  Were you referring to the state task
14:19:18 9    force or commissions or local?
14:19:20 10        MS. CICCOLO:  Well, there was a state task
14:19:22 11   force, for example.  There was a county
14:19:32 12   commission, I understand.
14:19:44 13        Q    Did you do any analysis of the
14:19:46 14   recommendations put forth by the state task force?
14:19:50 15        A    Yes.  We looked at those and tried to put
14:19:54 16   them in any places we could.  We looked at the local task
14:19:58 17   force recommendations and a lot of those we put in place
14:20:02 18   before they actually finished the report.  We've got all
14:20:06 19   but one of those in place now.
14:20:0. 20        Q    Which one is not in place?
14:20:10 21        A    They suggested a voter fraud task force to
14:20:14 22   look into voter fraud and we're in the midst of doing it
14:20:18 23   now.  We're working with the General Counsel's Office and
14:20:20 24   the State Attorney's Office to have some process for
14:20:24 25   that.  I had a ten-point plan that I put into place

NAACP, et al. VS. KATHERINE HARRIS, et al.

Case 0:01-cv-00120-ASG Document 186 Entered on FLSD Docket 07/02/2002 Page 124 of 234

Deposition of JOHN STAFFORD

101

14:20:28 1    before the task force met, and a lot of the things I had
14:20:32 2    talked about doing were consistent with the task force.
14:20:36 3    We have instituted that ten-point plan as well as try to
14:20:38 4    do as much as we could from the task force
14:20:40 5    recommendations. One of their recommendations was
14:20:42 6    changing to optical scan technology with a move within
14:20:48 7    four years to touch screen or DRE. And we have
14:20:52 8    structured a contract, we bought the optical scan with
14:20:54 9    the idea that by the end of 2007, we could move to touch
14:20:58 10   screen and get full credit for the optical scan. So we
14:21:02 11   have looked at their suggestions and we are really trying
14:21:06 12   to conform to that as well as state -- on a state level.
14:21:20 13        Q    Are you familiar with the Florida Election
14:21:22 14   Reform Act?
14:21:26 15        A    Yes, somewhat. Not an expert on it, but --
14:21:32 16        Q    Okay. Have you -- have you developed any
14:21:42 17   opinions with respect to the provisions of the Florida
14:21:46 18   Election Reform Act as they relate to Duval County?
14:21:52 19        A    We don't have a definite opinion. We're
14:21:56 20   working through that. We're still talking and look
14:21:58 21   forward in June to some clarification on some issues at
14:22:02 22   our conference. And when we get through with that, we'll
14:22:06 23   have everything in place, hopefully.
14:22:08 24        Q    Is that your county conference or your state
14:22:10 25   conference?

102

14:22:12 1         A    That is a state -- that's the Florida State
14:22:12 2    Association of Supervisor of Elections.
14:22:14 3         Q    Separate and apart from that group, have you,
14:22:18 4    in Duval County, come to any opinions about the Florida
14:22:24 5    Election Reform Act?
14:22:24 6         A    We're -- we're working on -- we're rewriting
14:22:26 7    our poll worker books, you know, training procedures and
14:22:28 8    how to handle provisional ballots and all these sort of
14:22:34 9    thing. So we're working on that as we speak, rewriting
14:22:38 10   all our manuals and updating our security procedures to
14:22:42 11   make sure they comply with the new laws.
14:22:48 12        Q    Okay. Have you reached any conclusions
14:22:56 13   regarding possible disparate impact of any election
14:23:00 14   practices in Duval County?
14:23:04 15        A    I'm sorry, I don't understand exactly what
14:23:06 16   you're asking there.
14:23:08 17        Q    Are you familiar with the term disparate
14:23:10 18   impact?
14:23:12 19        A    Yes.
14:23:12 20        Q    Okay. What does that mean to you?
14:23:14 21        A    That means like you have an unequal impact,
14:23:18 22   it impacts some group of people more than another.
14:23:22 23        Q    With that in mind, have you reached any
14:23:26 24   conclusions regarding the possible disparate impact of
14:23:30 25   any election practices in Duval County?

103

14:23:34 1         A    No, you know, we just have to apply them
14:23:38 2    equally across the board.
14:23:42 3         Q    Have you conducted any analyses of possible
14:23:46 4    disparate impact?
14:23:56 5         A    No.
14:24:02 6         Q    Mr. Stafford, have you written any
14:24:04 7    publications on election administration --
14:24:06 8         A    No.
14:24:06 9         Q    -- articles! I want to go back to an area
14:24:42 10   that we touched on earlier, and this has to do with your
14:24:48 11   training and your, I guess, exchanging ideas with other
14:24:54 12   Supervisors of Election. You told me about the workshops
14:25:00 13   and the conferences you have, but can you tell me in your
14:25:04 14   capacity as Supervisor of Elections for Duval County, do
14:25:08 15   you have occasion to meet with employees of the Division
14:25:12 16   of Elections?
14:25:12 17        A    Yes, like I say, at workshops they have.
14:25:16 18        Q    Okay. And those workshops, are those
14:25:20 19   different from the ones you were talking about earlier
14:25:22 20   with the supervisors?
14:25:24 21        A    Right. In fact, we were called on by the
14:25:26 22   Division of Elections to have a workshop for candidates
14:25:30 23   here in Duval County about a month ago and we provided
14:25:34 24   the facilities for that. And I had staff members that
14:25:38 25   deal with candidates attend that workshop.

104

14:25:42 1         Q    How often do those types of meetings take
14:25:46 2    place?
14:25:48 3         A    It's hard to say, there's no schedule.
14:25:52 4    They're probably -- maybe every two or three months they
14:25:54 5    have some type of class or workshop available.
14:25:58 6         Q    Has that been fairly consistent since --
14:25:58 7                  (Off-the-record discussion.)
14:26:32 8    BY MS. CICCOLO:
14:26:30 9         Q    Going back to your meetings with the
14:26:32 10   employees of the Division of Elections, you say you get
14:26:36 11   notices about classes or workshops, things of that
14:26:40 12   nature. Has that been a pretty regular occurrence during
14:26:46 13   the time you've worked in this office?
14:26:46 14        A    No, it seems to have stepped up a little more
14:26:50 15   since 2000, a few more opportunities after that election
14:26:54 16   to talk about things.
14:26:56 17        Q    Can you compare for me, then, prior to
14:26:58 18   November 2000 what kind of frequency -- with what kind of
14:27:04 19   frequency did these meetings take place or did they occur
14:27:06 20   at particular intervals?
14:27:08 21             MR. HARVEY: Object to the form of the
14:27:08 22   question.
14:27:08 23        A    No particular interval, probably rare. Of
14:27:14 24   course, I wasn't Supervisor of Elections before '99, July
14:27:18 25   of '99, so a lot of those things I wouldn't be privy to

NAACP, et al. VS. KATHERINE HARRIS, et al.    Deposition of JOHN STAFFORD

Case 9:01-cv-00120-ASG    Document 90    Entered on FLSD Docket 07/02/2002    Page 125 of 234

105

14:27:22 1  even as assistant back before then.  I know there were
14:27:26 2  some, but not as many as there are now.
14:27:48 3          COURT REPORTER:  I'm sorry, did Mr. Harvey
        4      object to that?
        5          MR. ARPEN:  I think it was -- it sounded
        6      like Jeff --
        7          MR. HARVEY:  It was Mr. Harvey.
        8          COURT REPORTER:  Okay.
        9          MR. HARVEY:  Object to the form.
14:27:56 10      Q   Since you have been Supervisor of Elections
14:27:56 11  for Duval County, on occasion do you receive materials
14:28:04 12  regarding election administration from the Division of
14:28:08 13  Elections or Secretary of State?
14:28:10 14      A   Yes.
14:28:16 15      Q   Do those materials -- did you receive those
14:28:20 16  materials prior to November 7th, 2000, as well as after?
14:28:24 17      A   Yes, we've received legal opinions and things
14:28:28 18  like that from time to time.
14:28:34 19      Q   Did you also receive material regarding
14:28:38 20  election administration that were not legal opinions?
14:28:52 21          MR. HARVEY:  Object to the form of the
14:28:52 22      question.
14:28:52 23      Q   Did you receive any other kind of material
14:28:58 24  from the Division of Elections/Secretary of State other
14:29:04 25  than legal opinions at any time?

106

14:29:06 1          MR. HARVEY:  Object to the form of the
14:29:08 2      question.
14:29:10 3      Q   You can answer, go ahead.
14:29:12 4      A   I don't recollect anything.  We get -- most
14:29:16 5  -- what I consider we get from there is legal type.
14:29:24 6      Q   When you received this material -- this
14:29:28 7  quote, legal type material, would you describe it as
14:29:36 8  advisory material?
14:29:38 9      A   The legal opinions definitely would be
14:29:42 10  advisory, and we keep those in a file for use as issues
14:29:46 11  come up.  These are like, you know, where different
14:29:54 12  supervisors have asked for opinions and they send the
14:29:58 13  opinions to all of us where we can -- in case that should
14:30:02 14  occur in our jurisdiction.
14:30:16 15      Q   Are you able to describe for me the subject
14:30:26 16  matter of these opinions?
14:30:30 17      A   Well, like I said, they are widespread.  It's
14:30:34 18  like, you know, does the judge have to do a certain thing
14:30:36 19  in order to qualify, you know, resign to run issues and
14:30:40 20  things like that, mostly as it deals to candidates and
14:30:46 21  reporting -- financial reporting, things like that.
14:30:54 22      Q   Have you also received materials regarding
14:31:00 23  election policies and procedures from the Division of
14:31:04 24  Elections/Secretary of State?
14:31:06 25      A   Yeah, we receive law books, candidate

107

14:31:10 1  information.  Certain chapters deal with candidate
14:31:14 2  qualifying and reporting of expenditures and
14:31:20 3  contributions and things like that.  We have those books
14:31:20 4  that we get from the State and they are updated annually.
14:31:24 5      Q   But I -- what I'm asking is a little bit
14:31:28 6  different, really.  I'm asking do you receive information
14:31:32 7  regarding the actual election procedures.
14:31:36 8      A   Those are covered in the law book that we
14:31:40 9  receive updated annually.
14:32:20 10      Q   What type of voting system are you adopting
14:32:26 11  prospectively for Duval County?
14:32:28 12      A   We have purchased the precinct based optical
14:32:32 13  scan system that was formally Global, they've been bought
14:32:38 14  out by Diebold.  It's an optical scan, color in the
14:32:38 15  oval-type ballot.  And it's precinct based where if you
14:32:42 16  have overvotes, they can be rejected at the precinct.
14:32:48 17      Q   Have you done any training with those
14:32:50 18  machines?
14:32:50 19      A   Yes, we have actually used those machines in
14:32:54 20  98 precincts back last summer.  Plus an Atlantic Beach
14:33:00 21  election and Baldwin election we've run successful
14:33:04 22  elections with those.  We borrowed that equipment from
14:33:06 23  Leon County back for the June election, and then in the
14:33:30 24  fall of last year and January of this year, we borrowed
14:33:12 25  some of the similar equipment from Putnam County.  I

108

14:33:16 1  vowed I'd never have another punch card election.  We
14:33:22 2  didn't know we were going to have a special election
14:33:22 3  right after I said that, so we didn't have time to buy,
14:33:22 4  we had to borrow it.
14:33:24 5      Q   Speak of the devil, right?  Did your office
14:33:28 6  establish any criteria for determining how many optical
14:33:34 7  scanning machines you would place in each precinct?
14:33:38 8      A   Basically it's precinct based and there's one
14:33:42 9  machine that goes at each precinct, so it's determined by
14:33:44 10  the number of precincts.  We bought -- we have 268
14:33:48 11  precincts and anticipate some growth from redistricting.
14:33:52 12  So we purchased 315 with the idea that we may have 290
14:33:57 13  precincts and we could use the others for training.
14:34:00 14      Q   Do you have any plans for provisional
14:34:02 15  ballots?
14:34:02 16      A   Yes.
14:34:02 17      Q   Okay.  Tell me -- tell me what plans you've
14:34:04 18  made.
14:34:06 19      A   Well, the state law's still a little cloudy,
14:34:10 20  but we're going to have a ballot box or bag at each
14:34:14 21  precinct.  And if people come in and there's any
14:34:18 22  question, you know, whether they're eligible to vote or
14:34:20 23  not or they may be in the wrong precinct, we're going to
14:34:22 24  allow them to vote provisional ballot, put it in that
14:34:24 25  secured ballot box or envelope and then when it comes

Case 0:01-cv-08130-ASG Document 196 Entered on FLSD Docket 07/03/2002 Page 126 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al

Deposition of JOHN STAFFORD

109

14:34:28 1   back election night at the canvassing, we'll look at it
14:34:30 2   and determine if it's a valid ballot or not.
14:34:32 3      Q   What, for you, is cloudy in the state law
14:34:36 4   about the provisional ballot?
14:34:38 5      A   Well, the law reads that you have to be in
14:34:40 6   the proper precinct, and my feelings are if you're in the
14:34:42 7   proper precinct, you're probably going to be on that
14:34:44 8   register. So I'm concerned as to how many we'll really
14:34:50 9   do. If somebody had been removed erroneously, obviously
14:34:56 10   we'll be able to track that down and be able to count
14:34:58 11   that ballot.
14:34:58 12      Q   But if someone were in the wrong precinct,
14:35:00 13   the provisional ballot based -- according to your
14:35:02 14   interpretation wouldn't really help that voter.
14:35:04 15      A   If they're in the wrong precinct --
14:35:10 16      MS. TORRES: Object to the form, Susan
14:35:10 17   Torres.
14:35:10 18      A   If they're in the wrong precinct, then, you
14:35:12 19   know, obviously it's not going to be able to count.
14:35:16 20      Q   Do you have any suggestions or plans that you
14:35:20 21   would recommend to ensure that a voter can actually cast
14:35:22 22   a provisional ballot in the correct precinct?
14:35:32 23      A   Well, there's not a whole lot you can do, you
14:35:34 24   know, since -- we're going to really multiply our efforts
14:35:38 25   to get people to change their address. If they change

110

14:35:38 1   their address, they're probably going to be in the right
14:35:42 2   precinct.
14:35:42 3      Q   Have you made any determination of how soon
14:35:44 4   after an election you would count provisional ballots?
14:35:48 5      A   We would hopefully count them within 24
14:35:52 6   hours, council board would meet that night and we would
14:35:54 7   start looking at them. And the reason I say 24 hours,
14:35:58 8   we're going to have to get to some files to look up some
14:36:00 9   records that we wouldn't have available that night, like
14:36:04 10   the inactive file, things like that.
14:36:06 11      Q   Has Duval County made any plans to inform a
14:36:16 12   voter of the outcome of a provisional ballot? I guess
14:36:20 13   what I am thinking is that there could be some situations
14:36:28 14   where you might get a provisional ballot and determine it
14:36:30 15   was improperly cast. On the other hand, you might have
14:36:38 16   situations where it is properly cast, but I would think
14:36:42 17   that the person who has gone to the trouble to cast the
14:36:44 18   provisional ballot might need some feedback. Do you have
14:36:48 19   any kind of mechanism that you have envisioned for giving
14:36:54 20   that kind of feedback to the voter who will cast the
14:36:56 21   ballot under that system?
14:36:58 22      MR. TINKLER: Object to the form, Ken
14:36:58 23   Tinkler.
14:37:02 24      MS. TORRES: Object to the form, Susan
14:37:02 25   Torres.

111

14:37:04 1      MR. HARVEY: Object to the form, Walter
14:37:04 2   Harvey.
14:37:04 3      Q   You can answer.
14:37:06 4      A   We're planning on contacting those people and
14:37:10 5   letting them know yea or nay what was done with the
14:37:16 6   provisional ballot, where if there were problems, they
14:37:18 7   would be able to correct them and get their records
14:37:20 8   updated.
14:37:50 9      Q   In terms of your voter education training,
14:38:02 10   you've got a new voting system, the optical scanning
14:38:06 11   system, that you're going to be using. Are you receiving
14:38:14 12   a grant from the State for the purchase of those
14:38:18 13   machines, I take it?
14:38:20 14      A   Right.
14:38:22 15      Q   What plans have you made to train voters in
14:38:26 16   the use of those systems -- that new system?
14:38:30 17      A   As I mentioned earlier, we're appearing
14:38:34 18   anywhere where more than 100 people congregate, we make
14:38:38 19   sure we're there. We're going to nursing homes, we're
14:38:40 20   going to churches, any community group that wants us to
14:38:44 21   speak. We have a director of education plus two
14:38:50 22   specialists in that field. We're also working with the
14:38:52 23   Urban League where we train 20 or 30 of their employees,
14:38:52 24   and they're going to help us get out and go to some
14:38:58 25   places that maybe we couldn't get to, there's just three

112

14:38:58 1   of us on staff. So we're going to train them where we
14:39:04 2   know they know what they're talking about, because we
14:39:08 3   don't just let anybody go up there and train, we have
14:39:10 4   some control on it. But we're appearing daily. There's
14:39:12 5   not hardly a day goes by that we're not out educating
14:39:18 6   somebody on how to use the new machine, because basically
14:39:20 7   it's new for every voter in Duval County.
14:39:22 8      Q   Were you a supporter of statewide standards
14:39:26 9   for voting systems?
14:39:26 10      A   Yes.
14:39:28 11      Q   Can you explain the reason why you supported
14:39:30 12   statewide standards for voting systems?
14:39:34 13      A   I think we all need to be on the same page
14:39:36 14   where we're not sitting out there on 67 islands trying to
14:39:38 15   make something work. In fact, it would have pleased me
14:39:42 16   if they'd have told us to go to just one voting system
14:39:44 17   and not left it up to us not to pick optical scan or
14:39:53 18   touch screen. But I think we all need to be on the same
14:39:56 19   page. I think that's been a problem in the past, we've
14:39:58 20   been left to our own devices to make things happen. I
14:40:02 21   think it needs to be uniform, recount procedures and
14:40:04 22   everything else where we're all doing the same thing.
14:40:10 23      Q   Okay. That's the actual -- what I was going
14:40:10 24   to ask you, do you think that there should be statewide
14:40:14 25   standards in other areas besides the voting system?

NAACP, et al. VS. KATHERINE HARRIS, et al entered on FLSD Docket 07/02/2002 Deposition of JOHN STAFFORD

113    234    115

MR. HARVEY: Object to the form of the question.

A    Like I say, you know, recounts -- you know, what do we do in case of a recount, provisional ballots and all those sort of things, we ought to probably be doing it the same way.

Q    Give me a minute here, I'm trying to wrap up. Okay. I want to go back and ask you some more questions about the November 2000 election, in particular, and you mentioned some of the -- you mentioned some of the policies and procedures in place at the precincts. During the 2000 general election, were lists of active and inactive registered voters provided to each precinct?

A    I believe so. I know the active voters were there and I believe the inactive voters were included on that register as well.

Q    And that would be true for all precincts?

A    Yes.

Q    In terms of the inactive list, were there any steps taken by your office to notify voters that they had been placed on the inactive list?

A    Anytime a voter is purged, they are sent a notice. In fact, there's a letter sent, then a final notice is sent before they're actually declared inactive. Unless it's a case -- you know, like I say, if it's a

114

felony list, they're sent one letter letting them know that they've been removed because they've been convicted of a felony, same thing with mental problems. And then like changes of address, we receive records from other counties and we just remove those people.

Q    Can you tell me the policies or the procedures your poll workers take in Duval County when a person might arrive at a precinct to vote but not show up on the list of active voters?

A    Well, basically we find out if they're in the right precinct and they do that by looking at their address on that street file that I mentioned earlier. If they're in the wrong precinct, then they're sent to their proper precinct, or supposed to be. If they've moved into the area and they're not on the list, then they call our office to make sure they're a registered voter. And once they're -- know that they're a registered voter and the change in that precinct, then they're written on the changes page and allowed to vote.

Q    They're -- they are listed on the changes page?

A    Right. There's the one I mentioned where we print all the registers A to Z and then we leave about ten pages in the back of each register. For people that have moved into the district, they would not be on the

register but they are in the proper district, changed their residence but just never updated their record with us. The poll worker calls to make sure they are, indeed, a registered voter, and then if they're in there in their area, then they're written on that blank page.

Q    Now does that information on the change list get submitted to your office?

A    We get those poll registers back in, along with affidavits, and then they're processed. There's an envelope for affidavits and then we check on the changes page and make sure all that stuff's updated.

Q    So is it correct that every change listed should have an accompanying affidavit or affirmation?

A    Yes.

Q    Do poll workers receive training about the procedure you just described?

A    Yes. They're taught how to handle the exception and there's some information in the training manual on how to do that as well.

Q    In future elections, can you tell me what procedures a poll worker will be required to follow when a voter's name is not on the list of registered voters?

A    They'll have that laptop computer there at the polling place and they would look on that computer first to make sure they're a registered voter. If their

116

address hasn't changed and they're not on the register, they're probably in the wrong precinct. So that would -- that laptop computer, access to the database would tell them where they need to go so they can send them there. If they've changed their address and their address now is within that boundary, they would be able to determine that the person is, indeed, registered, go ahead and do a change of address affidavit, write them on the changes page and let them vote. Basically the laptop eliminates the need to call the office to find out if somebody's registered.

Q    Okay.

A    The street file will tell them if they're in the proper place.

Q    But I guess what I'm trying to fit in is the provisional ballot, how that will also come into play, if at all.

A    If they're not -- if they don't show they're registered on the laptop computer, then they're going to call our office and get us to look in the inactive file. If we look in the inactive file and they're not there and they insist they're a registered voter, they'll be given a provisional ballot and then the canvassing board will address the issue when we get that in.

Q    During the 2000 -- November 2000 election,

Case 1:01-cv-00120-ASG   Document 406   Entered on FLSD Docket 07/02/2002   Page 128 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JOHN STAFFORD

117

14:49:18 1   you indicated that poll workers were required to ask for
14:49:30 2   some form of identification for prospective voters?
14:49:34 3       A    Florida law requires that you have a picture
14:49:38 4   ID in order to vote.  But if you don't have a picture ID,
14:49:42 5   you can fill out an affidavit swearing that you are,
14:49:44 6   indeed, that person and then you're allowed to vote.  So
14:49:46 7   they either have to provide picture ID, like a driver's
14:49:50 8   license or something like that.  Once they do that,
14:49:52 9   they're allowed to vote.  And if they don't have it, they
14:49:56 10  fill out an affidavit and once the affidavit's complete,
14:49:58 11  then they're allowed to vote.
14:50:00 12      Q    Do you know also if voters who have moved
14:50:04 13  within the county were given the opportunity to use the
14:50:08 14  affirmation or affidavit form?
14:50:10 15      A    To change their address, you mean?
14:50:12 16      Q    Yeah, and to vote.
14:50:14 17      A    Basically the affidavit is a voter
14:50:18 18  registration card which is used for new registration,
14:50:22 19  changes of address, so, yes, they're given that
14:50:24 20  opportunity to change their address and that comes back
14:50:28 21  in.
14:50:28 22      Q    Do you know how many affirmation affidavits
14:50:32 23  your office collected in conjunction with the November
14:50:34 24  2000 election?
14:50:36 25      A    No, I don't.

118

14:50:38 1       Q    Is that a number that Mr. Carls- -- Carlberg
14:50:42 2   would know?
14:50:44 3       A    I don't know if he would know that number or
14:50:46 4   not.  I'm just -- I don't know how much study he did on
14:50:50 5   that.
14:50:50 6       Q    Is that something that you could find out?
14:50:56 7       A    I'm not sure.  I can certainly look, but I'm
14:51:00 8   just not sure.
14:51:04 9       Q    Are those affidavits or affirmations
14:51:06 10  maintained as part of any record?
14:51:08 11      A    Should be.
14:51:10 12      Q    When you say should be, that to me says they
14:51:14 13  may be or may not be.
14:51:18 14      A    Well, I don't know.  Like I say, I haven't
14:51:18 15  seen them since election day, so . . .
14:51:22 16      Q    Okay.  Is there a requirement that those
14:51:24 17  affirmations or affidavits be maintained for a period of
14:51:28 18  time?
14:51:28 19      A    Yes.
14:51:28 20      Q    And what period of time?
14:51:30 21      A    That I'm not sure, they're different.
14:51:34 22  Usually 22 months for election records, but it varies
14:51:38 23  according to what you have.
14:52:08 24      Q    So then, in turn, as you sit here today, you
14:52:12 25  would not be able to tell me how many African-American

119

14:52:18 1   voters may have completed affirmation or affidavits for
14:52:24 2   the November 2000 election?
14:52:24 3       A    No, I couldn't tell you any racial breakdown
14:52:28 4   on those.
14:52:40 5       Q    Okay.  What kind of assistance do poll
14:52:42 6   workers provide to voters who request assistance?
14:52:46 7       A    They are trained to -- two of the poll
14:52:50 8   workers will help them cast their ballot, and we use two
14:52:54 9   where one person won't do something they shouldn't do,
14:52:58 10  you know, if the person's -- say they can't see or has a
14:53:00 11  problem, we require two poll workers to assist them.  And
14:53:04 12  that's readily available if you have trouble reading the
14:53:08 13  ballot or have trouble seeing or whatever.
14:53:12 14      Q    Now, when an individual registers to vote,
14:53:16 15  can that person indicate in their application that they
14:53:20 16  may require some kind of assistance?
14:53:22 17      A    Yes, and that's -- there's a place on the
14:53:26 18  voter ID card, you know, whether they're blind or
14:53:30 19  illiterate or infirm, those are the categories, and they
14:53:34 20  can certainly ask.  And one of the things we're doing in
14:53:38 21  the future, we'll have somebody greeting them and asking
14:53:40 22  them if they need help rather than waiting for them to
14:53:40 23  come to us.  We'll ask the voter if there's anything we
14:53:44 24  can do to help them.
14:53:46 25      Q    Are you familiar with the contentions made by

120

14:53:54 1   Julia Stoner, who also lives in Duval County?  Have you
14:53:58 2   read Ms. Stoner's deposition?
14:54:00 3       A    I don't believe I have.
14:54:04 4            (Off-the-record discussion.)
14:54:02 5   BY MS. CICCOLO:
14:54:02 6       Q    Okay.  In terms of voter assistance, what
14:54:38 7   would be the policies and procedures that poll workers in
14:54:44 8   Duval County are required to take if a voter asks for
14:54:56 9   assistance during the voting process?
14:55:00 10      A    They would provide two -- you know, a clerk
14:55:04 11  and one of the inspectors would help that person cast
14:55:08 12  their ballot.
14:55:32 13      Q    And would that be -- that kind of assistance
14:55:36 14  be required as a matter of law, as you understand it?
14:55:44 15      A    Well, they could have someone of their
14:55:48 16  choosing help them in casting their ballot.  By
14:55:52 17  themselves, we provide two people to help them.  And
14:55:58 18  that's for security where we won't -- if somebody can't
14:56:02 19  see or read, we can't have one person casting it because
14:56:06 20  obviously they could be voting their own choice.
14:56:10 21      Q    And that assistance should be provided
14:56:12 22  regardless of the amount of people at the polls and the
14:56:22 23  number of voters in the area at a particular time?
14:56:28 24      A    That's correct.
14:56:30 25           MR. TINKLER:  Objection to the form, Ken

NAACP, et al. VS. KATHERINE HARRIS, et al.
Case 0:02-cv-00826-ASG Document 156 Entered on FLSD Docket 07/03/2003 Page 129 of 234
Deposition of JOHN STAFFORD
121    123

**121**

14:56:40 1    Tinkler.

14:56:40 2    Q    So, in other words, the precinct should make

14:56:44 3    provisions to provide assistance if that assistance is

14:56:46 4    requested?

14:56:48 5    A    That's right.  And, like I say, we're putting

14:56:50 6    an extra person out there next time to actually give the

14:56:54 7    person the opportunity.  If they're embarrassed to ask

14:57:00 8    for help, we like to at least let them know it's

14:57:02 9    available.  And there will be signs and things like that,

14:57:06 10   the bill of rights -- the voter's bill of rights will be

14:57:08 11   posted.

14:57:08 12   Q    Did you keep any kind of statistics in terms

14:57:12 13   of the November 2000 election with regard to how many

14:57:18 14   persons requested voter assistance in Duval County?

14:57:22 15   A    No.

14:57:24 16   Q    Do you have any idea or information from any

14:57:32 17   source concerning the number of voters who asked for

14:57:38 18   assistance in Duval County in the 2000 general election?

14:57:42 19   A    No.

14:57:42 20   MS. CICCOLO:  Can you mark this as

14:59:12 21   Plaintiffs' Exhibit Number 2?  These are

14:59:16 22   Mr. Stafford's responses to our second set of

14:59:20 23   interrogatories and document requests.

14:59:20 24   (Plaintiffs' Exhibit 2 was marked for

14:59:26 25   identification.)

**122**

14:59:26 1    (Brief recess.)

15:09:56 2    BY MS. CICCOLO:

15:09:56 3    Q    Mr. Stafford, I want to show you what's been

15:10:00 4    marked as Plaintiffs' Exhibit Number 2 and ask you to

15:10:02 5    take a look at it and tell me if you recognize it.

15:10:08 6    MR. ARPEN:  I'm sorry, was that the second

15:10:10 7    set?

15:10:12 8    MS. CICCOLO:  Yeah, that's the second set of

15:10:14 9    interrogatories.

15:10:30 10   A    I've seen it before, yes.

15:10:34 11   Q    You have seen it before?

15:10:34 12   A    Uh-huh.

15:10:38 13   Q    And you do recognize it?

15:10:38 14   A    Yes.

15:10:38 15   Q    Okay.  Mr. Stafford, I'd like to direct your

15:10:40 16   attention to the response to interrogatory number six,

15:10:50 17   and if you would take a moment just to read through that

15:10:54 18   interrogatory, I want to ask you about your response.

15:11:50 19   A    Okay.

15:11:52 20   Q    In the middle paragraph to your answer, you

15:11:56 21   describe a process whereby probable felons were flagged

15:12:04 22   so that precinct clerks could ask them about their

15:12:08 23   situations.  Now, the flagging of potential voters as

15:12:14 24   probable felons, what list were you using?  Were you

15:12:22 25   using -- you were using the Duval County generated list;

**123**

15:12:24 1    is that correct?

15:12:26 2    MR. RESTREPO:  Objection to the form.

15:12:28 3    A    This is a procedure that Dick Carlberg took

15:12:32 4    care of, and I believe -- I'm not sure exactly what list

15:12:36 5    he used.

15:12:38 6    Q    But you have testified that you found the

15:12:40 7    list that had been supplied from the Division of

15:12:48 8    Elections to be unreliable.  Do you remember that

15:12:52 9    testimony?

15:12:52 10   A    Yes.

15:12:54 11   Q    And we discussed your county's use of a list

15:12:58 12   of felons that was generated from information provided by

15:13:02 13   the county clerk.

15:13:04 14   A    This, I think, would have been -- if it was

15:13:08 15   flagged on there and not removed, it would have been from

15:13:10 16   the state list probably.

15:13:14 17   Q    And I guess what my question is, based on

15:13:18 18   that response, is it your testimony that both the state

15:13:24 19   list and the county list were being utilized for the

15:13:30 20   flagging of probable felons?

15:13:34 21   A    I would think this was done from the state

15:13:36 22   list, because the list we use from the clerk of the court

15:13:36 23   we've deemed to be very accurate and we would just -- we

15:13:40 24   remove voters with -- using that list.

15:13:40 25   Q    Okay.

**124**

15:13:46 1    A    This would be a measure we would have done --

15:13:52 2    you know, a list that we didn't consider responsible.

15:13:58 3    Q    In the following paragraph, it is indicated

15:14:04 4    that new procedures for processing future lists from the

15:14:08 5    division are under development.

15:14:12 6    A    We're -- we're developing a new database with

15:14:16 7    a different vendor, a statewide database.  That is in the

15:14:20 8    process of being developed now.  We're -- we're

15:14:24 9    processing -- we have some dummy databases that we're

15:14:30 10   working on to make sure that new central voter file

15:14:34 11   works.  These felons will be pulled from the new voter

15:14:36 12   files that we hope will be more accurate evolving from

15:14:42 13   the clerk of the courts throughout the state.

15:14:42 14   Q    Who is the new vendor?

15:14:44 15   A    I'm not sure.

15:14:46 16   Q    Is that process under bid right now?

15:14:50 17   A    No, there's somebody.  It's being put in

15:14:52 18   place.  Dick Carlberg is my data processing coordinator,

15:15:00 19   and Marolyn Bernard are working with them as far as

15:15:02 20   helping develop it, but I don't -- I don't remember the

15:15:04 21   name of the vendor.

15:15:10 22   Q    So -- so your assistant will have information

15:15:14 23   to give me about the procedures for processing future

15:15:16 24   lists?

15:15:18 25   A    Yes.

May 13, 2002

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of DON STAFFORD

125                                    234                                    127

15:15:28 1        Q    And really just one more area that I wanted
15:15:32 2   to talk to you about has to do with poll closing times.
15:15:42 3        A    Okay.
15:15:44 4        Q    Can you tell me what are the poll hours for
15:15:50 5   Duval County?
15:15:52 6        A    7 a.m. to 7 p.m.
15:15:54 7        Q    Okay.  And can you tell me what, if any,
15:16:00 8   procedures were in place prior to November 7th, 2000, to
15:16:06 9   ensure that precincts maintained uniform poll hours
15:16:12 10  throughout the county?
15:16:14 11       A    The clerks, you know, set their watches and
15:16:20 12  at the end of the day at seven o'clock the deputy that I
15:16:24 13  mentioned, that's the security person, goes to the end of
15:16:26 14  the line to ensure that everybody's in line at seven
15:16:30 15  o'clock's allowed to vote.
15:16:38 16       Q    Prior to November 7th, 2000, did Duval County
15:16:42 17  have any synchronization programs whereby poll workers
15:16:50 18  were required to synchronize their individual watches
15:16:56 19  with a standard time being used by your office for poll
15:17:02 20  hours?
15:17:04 21       A    No.
15:17:08 22       Q    Do you have in place at this time any plans
15:17:12 23  to synchronize poll times between precincts and this
15:17:16 24  office?
15:17:18 25       A    We don't at this time, but we will.

126

15:17:50 1        Q    You had also mentioned the publication of a
15:17:54 2   list of voter's rights.
15:17:56 3        A    Yeah, there's a bill of rights, voter's
15:18:00 4   rights in the state of Florida that -- as a result of
15:18:02 5   some of our election reform.  It basically has the
15:18:06 6   voter's right, what they can expect at the polls.  That's
15:18:10 7   going to be -- there will be a poster at the polls on an
15:18:12 8   easel for everybody to see plainly.  We're putting that
15:18:18 9   bill of rights, what the voter's expectations are going
15:18:20 10  to be on all the literature, poll worker recruitment, our
15:18:24 11  pamphlets that teach people how to vote.  We're also
15:18:26 12  letting them know what their voter rights are.
15:18:32 13       Q    Does Duval County have any plans to
15:18:38 14  disseminate those rights at precincts by using oral
15:18:50 15  medium such as videotape, audiotape for voters who may be
15:19:00 16  sight impaired or illiterate?
15:19:04 17       A    No, right now the only plans are to post them
15:19:08 18  and to make them available, you know, at all of our
15:19:10 19  training sessions.
15:19:12 20       MS. CICCOLO:  Okay.  Well, I don't have any
15:19:14 21  more questions for you, Mr. Stafford, at this
15:19:14 22  point.
15:19:14 23            CROSS EXAMINATION
15:19:24 24  BY MR. RESTREPO:
15:19:24 25       Q    I may have one or two questions,

127

15:19:26 1   Mr. Stafford.  Again, let me introduce myself, I'm Dan
15:19:32 2   Restrepo.  I represent Choicepoint DBT in this action.
15:19:35 3   I'm going to raise my voice where they can hear me on the
15:19:38 4   phone, so don't think that I'm screaming at you.  That
15:19:40 5   happened to the witness last week.
15:19:42 6        If we can go back to what I believe is
15:19:48 7   Exhibit 2, the last exhibit we were dealing with.  Was
15:19:50 8   that Exhibit 2?
15:19:52 9        MS. CICCOLO:  Yes, there are only two.
15:19:56 10       Q    Okay.  Exhibit 2.  Ms. Ciccolo asked you
15:20:02 11  some questions about interrogatory number six and the
15:20:02 12  response thereto.  Is it safe to say that Dick Carlberg
15:20:04 13  would be the person to ask about -- excuse me, would it
15:20:08 14  be safe to say that Dick Carlberg is more familiar with
15:20:10 15  the process described in question number six and the
15:20:14 16  response thereto than you are?
15:20:16 17       A    Yes.
15:20:20 18       MR. RESTREPO:  Okay.  I have no further
15:20:22 19  questions.
15:20:24 20       MR. MAC INNES:  I have no questions.
15:20:26 21       MR. ARPEN:  Anybody on the phone with
15:20:26 22  questions?
15:20:26 23       MR. HARVEY:  This is Walter Harvey.
15:20:32 24  Actually I have a couple of questions, but before
15:20:34 25  I get started, I just want to raise a couple of

128

15:20:38 1   issues with Ms. Ciccolo.  At the hearing on class
15:20:44 2   certification, it was argued by Duval County that
15:20:48 3   they began to implement an optical -- I'm sorry,
15:20:54 4   precinct based optical scan systems and that this
15:21:00 5   claim is now moot as to Duval County.  I noticed
15:21:04 6   that you were asking questions with regard to the
15:21:06 7   voting systems, and before I ask any questions on
15:21:10 8   cross examination, I'd like to know the
15:21:12 9   plaintiffs' position.  Is this claim moot as to
15:21:16 10  Duval County?
15:21:16 11       MS. CICCOLO:  Well, it's my position that
15:21:20 12  until the system is implemented -- and I had
15:21:24 13  spoken with Mr. Arpen about this probably several
15:21:28 14  months ago and I don't believe that I have gotten
15:21:34 15  any formal response.
15:21:36 16       MR. ARPEN:  Yeah, I sent an affidavit to
15:21:38 17  Lori Borgen the day before the hearing in Miami
15:21:42 18  and she represented to the judge at the hearing
15:21:44 19  that as far as she was concerned, that took care
15:21:46 20  of the punch card issue here in Jacksonville
15:21:50 21  because of the facts in the affidavit pertaining
15:21:52 22  to the switch to and funding for and the arrival
15:21:58 23  of the precinct based optical scan systems.
15:22:00 24       MR. HARVEY:  Right.  And as I understand it,
15:22:02 25  Duval County has used optical scan precinct based

May 13, 2002

NAACP, et al. vs. KATHERINE HARRIS, et al.

Case 0:01-cv-00120-ATB Document 6 Entered on FLSD Docket 07/02/2003 Page 6 of 8

DEPOSITION of JOHN STAFFORD

**129**

```
15:22:06  1   systems at least four or five times in smaller
15:22:12  2   municipal elections. And this affidavit's been
15:22:16  3   filed with the court and I was just wondering
15:22:18  4   before I ask a series of questions, you know, is
15:22:22  5   this claim moot or what? Ms. Ciccolo?
15:22:28  6        MS. CICCOLO: I would -- as I probably
15:22:34  7   indicated or maybe I wasn't clear, if that
15:22:38  8   affidavit has been filed, it's not something that
15:22:40  9   has made its way to me yet. And I did ask those
15:22:46 10   series of questions and very well the claim may
15:22:54 11   be moot. But I don't think that there's been any
15:22:56 12   kind of filing of a suggestion of mootness with
15:23:00 13   respect to Duval County.
15:23:02 14        MR. ARPEN: And I'm not sure that -- I did
15:23:04 15   not perceive that any were required as a result
15:23:06 16   of Anita's -- I thought it was Lori, but as
15:23:12 17   Anita's rep -- representations to the court in
15:23:14 18   Miami. As I recall, the judge asked her whether
15:23:18 19   the claims were moot as to all of the county
15:23:22 20   supervisors at this point and I think she said
15:23:24 21   that having received information from Duval,
15:23:26 22   which was the last one she had gotten, that that
15:23:30 23   dealt with all of the county supervisors.
15:23:32 24        MR. HARVEY: Okay. I'm sorry. I walked
15:23:34 25   away from that hearing under the impression that
```

**130**

```
15:23:36  1   that claim was moot, but in any event --
15:23:42  2        MR. ARPEN: I did too, Walter.
15:23:42  3        MR. HARVEY: At least I'm not the only one
15:23:44  4   that walked away from that hearing with that
15:23:46  5   impression, but anyway, everything's on the
15:23:48  6   record so -- all right.
15:23:48  7                    CROSS EXAMINATION
15:23:52  8   BY MR. HARVEY:
15:23:52  9        Q   Sir, then let me ask a few questions.
15:24:00 10   Mr. Stafford, my name is Walter Harvey. I represent the
15:24:04 11   Secretary of State and Division of Elections in this
15:24:06 12   lawsuit. How are you?
15:24:08 13        A   Good. How are you?
15:24:10 14        Q   Good. Good. If you will, will you tell me
15:24:12 15   whether or not you were aware of whether punch card
15:24:16 16   voting systems have been decertified in the state of
15:24:18 17   Florida?
15:24:22 18        A   They have been decertified.
15:24:22 19        Q   And with regard to the county of Duval, are
15:24:28 20   punch card voting systems currently being used in the
15:24:32 21   administration of elections in Duval County?
15:24:34 22        A   No.
15:24:34 23        Q   Okay. When did you last use punch cards in
15:24:38 24   Duval County?
15:24:38 25        A   It was the November election of 2000. As I
```

**131**

```
15:24:44  1   mentioned earlier, we've had five elections and we
15:24:46  2   borrowed equipment from other counties to use.
15:24:50  3        Q   And that's a precinct based optical scan; is
15:24:54  4   that correct?
15:24:54  5        A   That's correct.
15:24:54  6        Q   And you do not intend to use punch card
15:24:56  7   systems anymore in Duval County; is that correct?
15:25:00  8        A   That was my pledge.
15:25:04  9        Q   Okay. And is it true also that punch card
15:25:10 10   systems can no longer be used in statewide elections?
15:25:14 11        A   That's correct.
15:25:20 12        MR. HARVEY: All right. I have no further
15:25:54 13   questions.
15:25:58 14        MR. BOSCH: This is Bill Bosch, I have no
15:26:00 15   questions.
15:26:00 16        MS. TORRES: This is Susan Torres, I have no
15:26:02 17   questions.
15:26:02 18        MR. TINKLER: This is Ken Tinkler, no
15:26:04 19   questions.
15:26:06 20        MS. CICCOLO: Do you want to advise your
15:26:10 21   witness?
15:26:12 22        MR. ARPEN: John, you've got a right to,
15:26:14 23   after it's typed up, to read it to see if it was
15:26:16 24   correctly transcribed, if there are any errors in
15:26:18 25   the transcription or not, or you can waive that
```

**132**

```
15:26:22  1   right, whichever you prefer.
15:26:24  2        THE WITNESS: I prefer you give me advice on
15:26:26  3   it.
15:26:26  4        MR. ARPEN: I recommend you read it just to
15:26:30  5   make sure.
15:26:30  6        THE WITNESS: Okay.
15:26:32  7        MS. CICCOLO: Okay. We're done.
          8        (Deposition concluded at 3:25 p.m.)
          9                     - - -
         10
         11
         12
         13
         14
         15
         16
         17
         18
         19
         20
         21
         22
         23
         24
         25
```

May 13, 2002

Case 1:01-cv-00120-ASG Document 186 Entered on FLSD Docket 07/02/2008 Page 133 of 234

NAACP, et al. VS. KATHERINE HARRIS, et al          Deposition of JOHN STAFFORD

133

CERTIFICATE OF OATH

STATE OF FLORIDA    )

COUNTY OF DUVAL     )

           I, the undersigned authority, certify that
JOHN STAFFORD personally appeared before me and was duly
sworn.

           WITNESS my hand and official seal this 29th
day of May 2002.

                         _____
                         Cristina A. Stark
                         Notary Public
                         State of Florida
                         My Commission No. DD063433
                         Expires:  October 8, 2005

---

134

CERTIFICATE OF REPORTER

STATE OF FLORIDA    )

COUNTY OF DUVAL     )

           I, Cristina A. Stark, Court Reporter and
Notary Public, certify that I was authorized to and did
stenographically report the deposition of JOHN STAFFORD;
that a review of the transcript was requested; and that
the transcript is a true and complete record of my
stenographic notes.

           I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor
am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

           DATED this 29th day of May 2002.

                         _____
                         Cristina A. Stark

**PLAINTIFFS' EXHIBIT 16**

1        UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

2

CASE NO.: 01-0120-Civ-Gold

3

NATIONAL ASSOCIATION FOR THE
4    ADVANCEMENT OF COLORED PEOPLE
INC., by its FLORIDA STATE CONFERENCE
5    OF BRANCHES, JIMMIE PANNELL, JULIA
STONER, NATALIE CARNEGIE, JOHN L.
6    CHEEVER, JAMES MARSHALL, LILLIE Q.
ODOM, WILLIE STEEN, WALLACE
7    MCDONALD, JERMAINE TERRY, LORINE
WALDEN, EMERY TIMBERLAKE, VALERIE
8    BUFORD-WELLS, MICHELLE FLOYD,
CONSUELO MARIA GRAHAM, SHERRY
9    EDWARDS, KANDY WELLS, JOANNA
CLARK, JANICE KELLY, PLACIDE
10   DOSSOUS, RONDRICK ROSE, URSULA
HARVEY, and ADMANTHA ISRAEL in their
11   own right and as representatives of all
similarly situated citizens and residents
12   of the State of Florida,

13        Plaintiffs,

14   vs.

15   KATHERINE HARRIS, Secretary of State of
Florida; CLAY ROBERTS, Director of Florida
16   Division of Elections, DAVID C. LEAHY,
Miami-Dade County Election Supervisor;
17   MIRIAM OLIPHANT, Broward County
Election Supervisor; JOHN STAFFORD, Duval
18   County Election Supervisor; PAM IORIO,
Hillsborough County Election Supervisor;
19   WILLIAM COWLES, Orange County Election
Supervisor; and DEANIE LOWE, Volusia
20   County Election Supervisor (all in their
official capacities); and CHOICEPOINT, INC.,
21   a Georgia corporation d/b/a DATABASE
TECHNOLOGIES, INC.,

22

       Defendants.

23

24            DEPOSITION OF LINDA TANKO
                VOLUME I
25

**Page 2**

```
 1
 2              101 South Hall Lane
                Maitland, Florida
 3              Thursday, April 25, 2002
                9:03 a.m. until 6:01 p.m.
 4
 5
 6         The above-styled cause came on for hearing before
 7    me, Lisa L. Taylor, Registered Professional Reporter and
 8    Notary Public, State of Florida at Large, at the time and
 9    place indicated above for the purpose of taking testimony.
10
11
12
      APPEARANCES:
13
            JANAI S. NELSON, ESQUIRE
14          TODD A. COX, ESQUIRE
            LEXER I. QUAMIE, Legal Assistant
15          NAACP Legal Defense and Educational
            Fund, Inc.
16          99 Hudson Street
            New York, New York 10013
17
            On Behalf of the Plaintiffs
18
19          C. CORY MAURO, ESQUIRE
            (Via Telephone)
20          1900 Phillips Point West
            777 South Flager Drive, Suite 1900
21          West Palm Beach, Florida 33401
22          On Behalf of the Defendants/
            Katherine Harris, Secretary of State
23          of Florida; Clay Roberts, Director of
            Florida Division of Elections and the
24          Election Canvassing Committee
25
```

**Page 3**

```
 1
 2    APPEARANCES (Continued):
 3          JEFFREY EHRLICH, ESQUIRE
            SUSAN TORRES, ESQUIRE
 4          (Via Telephone)
            Assistant County Attorney
 5          Miami-Dade County Attorney's Office
            111 N.W. 1st Street, Suite 2810
 6          Miami, Florida 33128
 7          On Behalf of the Defendant/
            David C. Leahy, Miami-Dade County
 8          Election Supervisor
 9
            MICHAEL D. CIRULLO, JR., ESQUIRE
10          Goren, Cherof, Doody & Ezrol, P.A.
            3099 East Commercial Blvd., Suite 200
11          Fort Lauderdale, Florida 33308
12          On Behalf of the Defendant/
            William Cowles, Orange County Election
13          Supervisor
14
            WILLIAM J. BOSCH, ESQUIRE
15          (Via Telephone)
            Assistant County Attorney/Volusia County
16          123 West Indiana Avenue
            DeLand, Florida 32720
17
            On Behalf of the Defendant/
18          Deanie Lowe, Volusia County Election
            Supervisor
19
20          DANIEL A. RESTREPO, ESQUIRE
            Williams & Connolly LLP
21          725 Twelfth Street, N.W.
            Washington, D.C. 20005
22
            On Behalf of the Defendants/
23          Choicepoint, Inc., d/b/a Database
            Technologies, Inc.
24
25
```

**Page 4**

```
 1
 2    APPEARANCES (Continued):
 3
            DOUGLAS B. MAC INNES, ESQUIRE
 4          Assistant Attorney General
            Office of the Attorney General
 5          PL-01 The Capitol
            Tallahassee, Florida 32399-1050
 6
            On Behalf of the Department of Highway
 7          Safety and Motor Vehicles and the
            Department of Children and Families
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1                     I N D E X
 2    TESTIMONY OF LINDA TANKO
 3       Direct Examination by Ms. Nelson         6
         Cross-Examination by Mr. Cirullo       240
 4       Cross-Examination by Mr. Mac Innes     243
         Cross-Examination by Mr. Restrepo      250
 5
      CERTIFICATE OF OATH                        272
 6    CERTIFICATE                      273
 7               INDEX OF EXHIBITS
 8    Plaintiffs' Exhibit Tanko Number 1           9
      (Plaintiffs' Notice of Rule 30(b)(6) Deposition)
 9
      Plaintiffs' Exhibit Tanko Number 2         196
10    (Letter dated September 10, 2001)
11    Plaintiffs' Exhibit Tanko Number 3         199
      (Letter dated October 30, 2001)
12
      Plaintiffs' Exhibit Tanko Number 4         200
13    (Public Assistance Agency Assessment)
14    Plaintiffs' Exhibit Tanko Number 5         202
      (Library Agency Assessment)
15
      Plaintiffs' Exhibit Tanko Number 6         203
16    (E-mail, Subject: NVRA workshops & site assessment)
17    Plaintiffs' Exhibit Tanko Number 7         213
      (Clerks Comment Sheets)
18
      Plaintiffs' Exhibit Tanko Number 8         218
19    (Poll Worker Training Manual)
20    Plaintiffs' Exhibit Tanko Number 9         223
      (Clerk Manual)
21
      Plaintiffs' Exhibit Tanko Number 10        224
22    (November 7, 2000 General Election Phone Record)
23    Plaintiffs' Exhibit Tanko Number 11        224
      (November 7, 2000 General Election Phone Record)
24
      Defendant/DBT's Exhibit Tanko Number 1     253
25    (Felon lists)
```

2 (Pages 2 to 5)

6

1  WHEREUPON,
2          LINDA TANKO
3      having been first duly sworn, was examined and
4          testified upon her oath as follows:
5              DIRECT EXAMINATION
6  BY MS. NELSON:
7      Q  Good morning, Ms. Tanko. How are you?
8      A  Good morning.
9      Q  We have some folks on the phone this morning who
10 are representing different parties, as you heard, someone
11 representing Katherine Harris and Supervisor of Elections
12 Leahy, so we're going to try to keep our voices up so they
13 can hear us.
14     A  Okay.
15     Q  Do you know why you're here today?
16     A  I'm giving a deposition in the case where the
17 NAACP is -- it's the NAACP versus Katherine Harris and Clay
18 Roberts and a list of supervisors.
19     Q  Okay. Did you speak with your attorney about your
20 testifying here today?
21     A  Yes, I did.
22     Q  Do you have a general sense of how things will go?
23     A  Yes.
24     Q  Let me talk to you about that a little bit. I'll
25 be asking you a series of questions about the case. NAACP

7

1  v. Harris, as you mentioned.
2          And if I say anything at any point that you don't
3  understand, that's unclear, please let me know and I'll
4  repeat it so we can have a clear record.
5      A  Okay.
6      Q  I'm going to ask you to give audible answers as
7  well, so that -- you know, the court reporter can't record
8  nods or winks.
9      A  Okay.
10     Q  So I'm going to ask you to give an audible
11 response to my questions.
12          If you realize at any point in the deposition that
13 you've given an answer that's incorrect or incomplete, you
14 can feel free to complete it or make it more accurate.
15     A  Okay.
16     Q  And if you need to take a break at any point, let
17 me know and we'll find an appropriate time to do so.
18     A  Okay.
19     Q  How long did you meet with your attorney
20 concerning your deposition today?
21     A  We've met three different times; Sunday for about
22 an hour, briefly Tuesday afternoon and then yesterday.
23     Q  How long did you meet on Tuesday?
24     A  Tuesday, maybe 30 minutes.
25     Q  And how long did you meet yesterday?

8

1      A  Maybe 45 minutes.
2      Q  Did you review any documents in preparation for
3  your testimony either with your attorney or without?
4      A  I did look through one document. I believe it
5  was -- I think it's the charges that -- or the claims that
6  NAACP has in the case. I'm not sure what the document was.
7      Q  Was it the Second Amended Complaint?
8      A  Yes.
9      Q  Okay. I'm going to -- I'm going to show you
10 what's been previously marked as Plaintiffs' Exhibit 1
11 Cowles, and if you can tell me if this is the document to
12 which you just referred.
13     A  Yes, this was it.
14     Q  When did you first see that document?
15     A  Oh, I was given a copy of it on Sunday, but I
16 don't -- didn't look at it until yesterday.
17     Q  Okay. Can you tell me what your home address is?
18     A  Home address is 1355 Pleasant Ridge Place,
19 Orlando, Florida, 32835.
20     Q  And your business address?
21     A  119 West Kaley Street, Orlando, Florida. 32806.
22     Q  Is that the Supervisor of Elections Office for
23 Orange County?
24     A  Right.
25     Q  Do you understand that you are testifying here

9

1  today pursuant to a Notice of Deposition that was served on
2  your attorney?
3      A  Yes.
4      MS. NELSON: I'd like to mark as Plaintiffs'
5  Exhibit Tanko 1, Plaintiffs' Notice of Rule 30(b)(6)
6  Deposition for Orange County.
7          (Whereupon, the document was marked Plaintiffs'
8  Exhibit Tanko Number 1 for identification.)
9      THE WITNESS: I don't need that.
10 BY MS. NELSON:
11     Q  Well, you should take a look at it and tell me if
12 you've seen it before.
13     A  Okay. I've not seen this before.
14     Q  You've never seen this document before?
15     A  No.
16     Q  Do you understand that you've been designated to
17 represent the Defendant Supervisor of Elections William
18 Cowles?
19     A  Yes.
20     Q  Do you understand that you've been designated to
21 testify about the following subjects, and I'm going to run
22 through a few: The National -- compliance with the
23 National Voter Registration Act?
24     A  Yes.
25     Q  Election day administration, including compilation

3 (Pages 6 to 9)

10

1  and distribution of voter registration rolls, poll worker
2  training and assignment, communications and affirmations
3  and/or affidavits?
4    A  Yes.
5    Q  Voter registration and registration processing
6  including absentee ballots?
7    A  Yes.
8    Q  Voter registration verification, including use of
9  computers, telephones or other technology?
10   A  Yes.
11   Q  And Defendant Cowles' response to Plaintiffs'
12  interrogatories, document requests and public records
13  requests?
14   A  Yes.
15   Q  Okay.  And is Mr. Cirullo the counsel representing
16  you here today?
17   A  Yes.
18   Q  Have you discussed your testimony today with
19  anyone other than your attorney?
20   A  I had a brief conversation with Mr. Cowles and
21  Mrs. Dunn but it was mostly how to find the place, how many
22  people are in attendance, just basics like that.
23   Q  When did you talk to Mr. Cowles?
24   A  He was in the meeting with us on Sunday afternoon
25  with our attorney.  Then, on Tuesday morning, briefly for

11

1  about 30 minutes.
2    Q  And what did you and Mr. Cowles discuss, if
3  anything, about his testimony?
4    A  Like I said, just the layout of the room, how many
5  people were in attendance, the topics of your questions.
6  Like I say, nothing in any great detail.
7    Q  What did you discuss about the topics of the
8  questions?
9    A  Were there questions on the Central Voter File?
10  Yes, there were going to be lots of questions on the
11  Central Voter File.
12      That I would probably be speaking to the training
13  of laptop people, because I had trained those.  That's all
14  I recall.
15   Q  That's it with Mr. Cowles?
16   A  Right.
17   Q  What about with Ms. Dunn, did you speak to her
18  about her testimony?
19   A  Again, it was the same sort of thing, how long did
20  your testimony take, do you think mine will be that long or
21  longer, the focus of your questions.  And, again, she said
22  that there are a lot of questions about the Central Voter
23  File.
24   Q  What did Ms. Dunn say, if anything, about the
25  focus of the questions?

12

1    A  In terms of the focus just that there were going
2  to be a lot of questions about the Central Voter File.
3    Q  Anything --
4    A  No specifics, no.
5    Q  Did you say anything back to Mr. Cowles or Ms.
6  Dunn about their testimony?
7    A  No.  I had no questions of them in terms of the
8  specifics of their testimony, no.
9    Q  Did you talk to them about what you would be
10  saying today?
11   A  No.
12   Q  Have you talked to anyone else about your
13  testimony here today?
14   A  No.  Staff knows that I'm here today, but beyond
15  that, no.
16   Q  I understand you didn't see Plaintiffs' Exhibit 1
17  Tanko, but do you understand that there's a document
18  request outstanding to the person designated as the
19  30(b)(6) witness today?
20   A  Could I get you to repeat that?
21   Q  Sure.
22      Do you understand that there's been a request for
23  documents from the person who'd be testifying --
24   A  Oh, yes.
25   Q  -- as the designee?

13

1      Are you producing any documents today pursuant to
2  that request?
3    A  No.
4    Q  Were you aware of that document request prior to
5  your coming here?
6    A  No.
7      When you're saying "document request," I took it
8  to mean the documents that had already been provided.
9    Q  Okay.  Can you take a look at what's been marked
10  as Plaintiffs' Exhibit 1 Tanko?
11   A  Sure.
12   Q  And can you take a look at the third page, the
13  paragraph that begins, Please take further notice?
14   A  Uh-huh (affirmative).
15   Q  Do you know if there are any documents responsive
16  to that sentence there?
17   A  I'm aware of no documents that have not already
18  been produced.
19   Q  Okay.  Do you have any reason to believe that you
20  are not able to give competent testimony today?
21   A  No.
22   Q  Have you ever testified before?
23   A  No, I haven't.
24   Q  It's your first time?
25   A  First time.

4 (Pages 10 to 13)

14

1    Q   Okay. Have you ever been a party to a court or
2  administrative proceeding?
3    A   No.
4    Q   Why don't you tell me about your educational
5  background.
6    A   I have a four-year degree from the University of
7  Southern Mississippi. It's a business degree.
8    Q   When did you obtain that degree?
9    A   In 1981.
10   Q   Have you gotten any other degrees or certificates
11 since then?
12   A   No.
13   Q   Have you taken any classes since 1981?
14   A   No.
15   Q   When did you graduate from high school?
16   A   1978.
17   Q   What did you do in the -- did you go from high
18 school straight to college?
19   A   Yes.
20   Q   And you went worked there full time -- excuse
21 me -- you went to school full time?
22   A   Yes.
23   Q   What did you do upon graduating from college?
24   A   My degree, like I said, was in business with a
25 specialization in advertising. I went to Houston and

15

1  worked for an ad agency.
2    Q   For how long?
3    A   Five years.
4    Q   Would that be until 1986?
5    A   Right.
6    Q   And what did you do then?
7    A   By that time, I was married and my husband had a
8  job transfer to Mobile, Alabama. So we moved to Mobile.
9  We were there for about six months. He decided he wanted
10 to go back to graduate school, so we then moved to Orlando
11 in late '86, September of '86. And I've been here since.
12   Q   Did you work anywhere in between the time that you
13 left Houston and went to Mobile?
14   A   When we moved to Orlando, I worked for a small ad
15 agency for just under a year and then took some time off
16 with my first child and then started to work at the
17 elections office in February of '88.
18   Q   When you say the elections office, you mean the --
19   A   Orange County.
20   Q   Orange County Supervisor of Elections Office?
21   A   Right. Orange County Supervisor of Elections.
22   Q   What about the period of time between your leaving
23 Houston and arriving in Orlando, did you work at any point
24 during that time?
25   A   No.

16

1    Q   So you started at the Supervisor of Elections
2  Office in Orange County in 1988?
3    A   Right.
4    Q   And have you been there ever since?
5    A   Yes.
6    Q   What was your title when you started in 1988?
7    A   I was Betty Carter's secretary.
8    Q   How long did you remain in that position?
9    A   Less than a year.
10   Q   What did you do after that?
11   A   She then promoted me to be her Registration
12 Department manager and I've been in that position ever
13 since. It's a position that sort of evolved over time.
14   Q   How so?
15   A   I started off as -- with a title of Registration
16 manager. Basically, I was responsible for registering
17 people to vote, both in the office and out in the
18 community.
19      Then, in 1994 maybe -- I'd have to check for
20 sure -- the Data Entry Department was put under me, under
21 my supervision.
22      So now my job is essentially the same. I'm
23 responsible for registering people to vote in the office,
24 out of the office, processing that work, doing all of the
25 work that's related to the voter registration file.

17

1    Q   Okay.
2    A   Special projects.
3    Q   Let me just make sure I have my time periods
4  right.
5       You started off in '88 as Betty Carter's secretary
6  and then, by 1989, you had been promoted to the
7  Registration Department?
8    A   Yes.
9    Q   Were you the head of the Registration Department?
10   A   Yes.
11   Q   What was your title in 1989?
12   A   I believe it was Registration manager.
13   Q   Did your title change at any point since then?
14   A   I went from Registration manager to Voter Services
15 coordinator and then, in January of this year, I was
16 promoted to Senior Deputy Supervisor of Voter Services.
17   Q   Now, did your responsibilities stay the same over
18 time since 1989?
19   A   They've grown.
20   Q   Can you explain how they've grown?
21   A   My staff has -- the size of my staff has increased
22 over that period of time. The scope of my work probably
23 has increased. I've taken on a lot more special projects
24 for the supervisor, both for Mrs. Carter, Betty Carter, who
25 was supervise prior Mr. Cowles, and for Mr. Cowles.

5 (Pages 14 to 17)

18

1  Q  Has the department -- has the structure of the
2  Supervisor of Elections Office changed in the time that
3  you've been there?
4  A  Yes.
5  Q  Can you describe how it's changed?
6  A  When I became Registration manager, June Condron
7  was my immediate manager and then she then reported to the
8  supervisor, who, at that time, was Betty Carter. That
9  structure stayed the same once Mr. Cowles took office in
10  '96 -- or, I guess it would be, January of '97. That
11  structure stayed the same until January of this year.
12       We had a -- Nancy Lord, who was the Elections
13  coordinator, resigned and so Mr. Cowles restructured at
14  that point and moved me up.
15  Q  When do you recall Nancy Lord resigning?
16  A  I believe it was just before Thanksgiving last
17  year, so that would have been November 2001.
18  Q  How many different departments existed before
19  Nancy Lord resigned?
20  A  Three.
21  Q  And after?
22  A  Four.
23  Q  Can you tell me what those four departments are?
24  A  Information -- I guess it's Information Services.
25  It's our Computer Department. Administrative Services or

19

1  Administrative Support, which would be Margaret Dunn,
2  myself, as Voter Services, and June Condron is now
3  Elections, Senior Deputy Supervisor of Elections.
4  Q  Okay. Have you taken any courses since you've
5  graduated related to your professional development, your
6  professional work?
7  A  I've taken a number of the certified public
8  managers classes through Florida State University.
9  Q  Did you receive a certificate?
10  A  Not yet.
11  Q  I'm sorry. What institution did you say that was
12  at?
13  A  It's the certified public managers program through
14  Florida State University.
15  Q  How long have you been taking classes, those
16  classes, there?
17  A  Very slowly. The first one I took was -- Ms.
18  Carter was the supervisor at that point, so it had to have
19  been in the early '90s.
20  Q  Are there any other courses you've taken since you
21  graduated from college?
22  A  None that I recall.
23  Q  Can you tell me what your duties and
24  responsibilities were leading up to the November 2000
25  election?

20

1  A  At that point my title was Voter Services
2  coordinator. Under -- under me are two junior managers who
3  helped me perform the duties of my position. I have a
4  staff that is customer services focused. They're the ones
5  that operate the front counter, assisting the public as
6  they come in to register to vote, update their
7  registration, get an absentee ballot. They also handle the
8  telephone calls when the public comes in.
9       Then I have staff that assists me with the data
10  entry work and that is the processing of all the incoming
11  registration-related documents, those registration
12  applications, the letters that are used to update the
13  existing registrations. They also process the petitions
14  and do the absentee ballot work for me, issuing those
15  absentee ballots and then processing them as they come back
16  in.
17  Q  Now, you're referring to your current staff?
18  A  Yes. It's changed very -- very slightly since the
19  November 2000 election.
20  Q  Okay. Why don't you tell me how it's changed.
21  A  I believe we went into the November 2000 election
22  short one regular staff person. I would have to check
23  personnel records to be sure.
24       We supplement our staff with temporary workers.
25  One of those temporary workers did an outstanding job and

21

1  we hired her full time to fill that open slot.
2       I believe one of the young ladies that was one of
3  my Customer Service representatives on the front counter
4  resigned after the 2000 election. We've since replaced
5  her.
6  Q  You said you have two junior managers. Is that at
7  present or at the time of the -- leading up to the 2000
8  election?
9  A  Both.
10  Q  Who are those individuals?
11  A  Veronica Koval. It's K-O-V-A-L. She is my
12  Customer Service manager and then Pat Fletcher is my Voter
13  Services manager.
14  Q  How many permanent staff members were there in the
15  Voter Services Division leading up to the November 2000
16  election?
17  A  I'll need a minute to count them.
18  Q  Okay.
19  A  I believe I had 13.
20  Q  Leading up to the November 2000 election?
21  A  Right.
22  Q  Okay. Can you tell me what their titles were?
23  A  As I mentioned, Veronica Koval, Customer Service
24  manager. Then, under her were Customer Service
25  representatives. Then Pat Fletcher is my Voter Services --

6 (Pages 18 to 21)

22

1   my Voter Services manager. Susan Scatliffe is my Voter
2   Service -- my lead Voter Service clerk and then Voter
3   Service clerks under her. These are the ladies that
4   process the work for me.
5       Q   How many people work under Ms. Koval?
6       A   What time frame? For the November 2000 election?
7       Q   Yeah. Why don't we start with the period leading
8   up to --
9       A   Okay. I believe we had three.
10      Q   Three Customer Service reps?
11      A   Right.
12      Q   And what about under the Voter Services manager?
13      A   Eight.
14      Q   What title do they have?
15      A   Voter Service clerks.
16      Q   And then you said there was a lead Voter Service
17  clerk?
18      A   Yes.
19      Q   How many persons work --
20      A   One.
21      Q   And what's the title of that person?
22      A   The lead Voter Service clerk, her name is Suzanne
23  Scatliffe, and there's just one. She's the only one.
24      Q   Oh, there's just one person there.
25          Maybe my math isn't adding up. It doesn't seem

23

1   like that brings me to 13.
2       A   Well, I had included Suzanne in that 13.
3       Q   Okay.
4       A   One, two, three, four, five, six, seven -- well,
5   I'm sorry. I was adding the two groups together, Customer
6   Service and Voter Service.
7       Q   Okay. Now, you said that you were short one staff
8   person leading up to the November 2000 election?
9       A   I believe so.
10      Q   What title did that person hold?
11      A   I believe I was short one Customer Service
12  representative, which was filled with a temporary staff
13  member.
14      Q   What do Customer Service reps do?
15      A   They work with the public in registering to vote,
16  answering the basic, am I registered, how do I get
17  registered, where do I go vote-type questions.
18          They help them with the paperwork that they would
19  need with their registration record, whether it's to get
20  registered or updated.
21          (Whereupon, Mr. Mac Innes exited the deposition
22  room.)
23  BY MS. NELSON:
24      Q   Do you specifically recall having a temp fill that
25  position?

24

1       A   I would have to verify it with my Personnel
2   Department. Usually when we had open spots, they were
3   filled with a temporary worker because we needed the help.
4       Q   But right now, you can't remember?
5       A   Right. I would have to go back and check records.
6       Q   Okay. Is there anything else that Customer
7   Service reps do outside of what you've just described,
8   working with the public, answering basic voter questions?
9       A   They're heavily involved out in the community
10  doing registration drives and voter education.
11          When I say "voter education," that's where we go
12  out and take voting equipment and do demonstrations, but
13  that's basically the focus of their work.
14      Q   How much experience or training, if any, do
15  Customer Service reps have?
16      A   It's -- that's a hard question to answer. I mean,
17  of course when they come on staff, we do an intensive
18  training probably for about a three-month period. But we
19  tell all of our new hires that truly their training is a
20  four-year process. And the reason we say four years is
21  that a gubernatorial election year is very different from a
22  presidential election year so they really need to
23  experience the whole cycle.
24      Q   Okay. Are they required to come on with a certain
25  level of experience or training to be Voter Services

25

1   clerks -- or reps, sorry?
2       A   Well, for both Customer Service clerks and Voter
3   Service clerks, we basically just ask that they're familiar
4   with using a computer, that they know Windows. Because our
5   programming is written in-house and the type of work we do
6   is really not something that -- that's in high demand, that
7   there's a lot of people out there doing, so we train them.
8   We're not expecting them to come in and know all the
9   election laws and how to operate our equipment.
10      Q   Do you know how long the Customer Service rep
11  position was open prior to the November 2000 election?
12      A   No.
13      Q   Do you have any sense in terms of months, weeks?
14      A   No. I would say I'd have to go back and check.
15      Q   Okay. You said after the November 2000 election a
16  front counter rep resigned. Would that be a Customer
17  Service rep?
18      A   Yes.
19      Q   Why did that person resign?
20      A   She has a son that's in the military and he was
21  restationed to Virginia and asked her to come and live with
22  him. She was having some health problems so that -- that
23  worked out best for her, I suppose.
24      Q   Do you recall her name?
25      A   Hilda Ramirez.

7 (Pages 22 to 25)

26

1    Q   You went over earlier the duties and
2   responsibilities of the Voter Services Division, front
3   counter operations, updating registrations, processing
4   absentee ballots, answering telephone calls, data entry of
5   registration applications, handling petitions.
6        And you said that that changed slightly from the
7   November 2000 election to the present. What did you mean?
8    A   Since the 2000 election we've added some staff
9   members. We now have a lead Customer Service rep. This is
10  a person who oversees the front counter operation and just
11  takes some of the stress off of my Customer Service
12  manager.
13       (Whereupon, Mr. Mac Innes returned to the
14  deposition room.)
15       THE WITNESS: We've also brought in a young lady
16  to be our Community Outreach specialist, I believe is
17  her title. And her primary responsibility is working
18  out in the community with various groups and
19  organizations to promote voter registration and just
20  basic election information.
21  BY MS. NELSON:
22   Q   When was the lead Customer Service representative
23  position created?
24   A   I don't recall when it was created but I believe
25  she was hired in August of 2001.

27

1        We probably came out of January planning stages
2   and decided at that point, but --
3    Q   Did anyone have that position before she came on?
4    A   No.
5    Q   Who is that person?
6    A   This is our lead Customer Service rep.
7    Q   I'm sorry, by name.
8    A   Okay. Roni Vinson, R-O-N-I, V-I-N-S-O-N.
9    Q   And the Community Service Outreach position, is
10  that -- I'm sorry, is it manager or representative; what is
11  the title again?
12   A   I believe she's a specialist. I would have to go
13  back and check. I think it's Community Outreach
14  specialist.
15   Q   And what's her name?
16   A   Irma, I-R-M-A, Palacios, and it's P-A-L-A-C-I-O-S.
17   Q   When was the Community Outreach specialist
18  position created?
19   A   It would have been created in -- on the same time
20  table as my lead Customer Service rep. So it was probably
21  created in January of 2001 and was filled about August of
22  that year.
23   Q   Why did you create these -- who created these two
24  new positions?
25   A   It was a team decision with Mr. Cowles and Ms.

28

1   Condron -- June Condron was my manager at that point -- in
2   discussions with just the needs that we saw after the 2000
3   election.
4    Q   And what do you mean by "needs"?
5    A   Just that coming out of the 2000 election that
6   voter education was going to be a very important element in
7   our future plans and that we needed additional staff to
8   meet the needs of the community.
9    Q   What about the 2000 election gave you that
10  impression?
11   A   We -- coming out of the 2000 election, we had
12  decided that it was too much for -- too much work for the
13  amount of staff that we had at that point. We wanted to
14  better serve the community.
15       There's lots of demands right at election time, it
16  seems, for our office to go out and do voter registration
17  and things of that nature.
18       In the office, we're very busy processing the work
19  to get ready for the election, so we just needed an
20  extra -- some extra manpower to try to meet more of those
21  requests.
22   Q   So am I correct, then, that leading up to the 2000
23  election, you had 13 staff persons and you've increased
24  your staff now by two people?
25   A   Yes.

29

1    Q   So you're at about 15 now?
2    A   Uh-huh (affirmative), yes.
3    Q   Do you have any responsibilities relating to list
4   maintenance?
5    A   It's my staff that processes that work, yes.
6    Q   What responsibilities, if any, does June Condron
7   have for list maintenance?
8    A   At the 2000 election, like I said, June was my
9   manager, so anything that I was doing or my staff was
10  doing, we were working with her as a manager to get that
11  done.
12   Q   Okay. So at the time of the November 2000
13  election June was responsible for list maintenance; is that
14  right?
15   A   If I was in her division. I probably -- in terms
16  of our biannual list maintenance --
17   Q   Yes.
18   A   -- that was a project that typically I dealt with
19  directly with Mr. Cowles and then June was there in an
20  advisory capacity.
21   Q   This is leading up to the 2000 election?
22   A   Right.
23   Q   What about updating the voter rolls based on CVF
24  lists, Central Voter File lists, and county lists?
25   A   Uh-huh (affirmative).

8 (Pages 26 to 29)

30

1   Q   Were you responsible for that as well?
2   A   Yes, it was the function of my department to
3   process those lists.
4   Q   Okay.  So leading up to the 2000 election you
5   reported to June Condron and, June Condron, did she report
6   to William Cowles?
7   A   Right.
8   Q   You mentioned that you worked directly with Mr.
9   Cowles on certain list maintenance issues?
10  A   Yes.
11  Q   Were there any other issues that you reported to
12  him directly on?
13  A   Yes, I was involved in a number of special
14  projects leading up to the 2000 election.  The biggest one
15  was a "Get Out the Vote" project that was sponsored by the
16  Florida State Association of Supervisors of Elections.
17      There was a "Get Out the Vote" committee which Mr.
18  Cowles chaired and I was the one that did a lot of that
19  work, having had the advertising PR background.
20  Q   Were there other projects, special projects, that
21  you reported to Mr. Cowles directly on?
22  A   I'm sure there were, but that one was so big it
23  overshadowed everything.
24  Q   So you don't recall what the other projects were?
25  A   No, I don't recall.

31

1   Q   So list maintenance and "Get Out the Vote," those
2   are the only two matters you can recall having to report
3   directly to Mr. Cowles on?
4   A   Well, we worked very closely in our office.  Our
5   structure is not quite that formal.  Like I say, I'm sure
6   there were other projects.  I just can't recall what they
7   are.
8   Q   Right now to whom do you report?
9   A   As of January, I report directly to Mr. Cowles.
10  Q   January 2001?
11  A   2002.
12  Q   2002, sorry.
13      Okay.  What is your understanding of what this
14  case is about?
15  A   To be honest, I haven't spent a lot of time on the
16  subject, just due to the other projects that I'm involved
17  in.
18      I know that I've been involved in pulling a lot of
19  the information to respond to the interrogatories.  But
20  beyond that, I -- I know that -- or I suppose the NAACP has
21  some objections to the way that the State conducted -- the
22  State as a whole conducted our list maintenance work,
23  specifically the Central Voter File.  And I guess you're
24  exploring some of the problems that certain voters had
25  across the State.

32

1   Q   And what do you base that understanding on?
2   A   Some of the materials that I've read.  I'm not
3   sure what it's called here.  Whatever this document is
4   called.
5   Q   Are you referring to Plaintiffs' --
6   A   Oh, yes.
7   Q   -- Plaintiffs' Exhibit --
8   A   Second Amended Complaint, right.
9   Q   Okay.  Are there any other documents that gave you
10  a sense of what the case is about?
11  A   No.
12  Q   You said you spent a lot of time working on
13  pulling documents --
14  A   Right.
15  Q   -- related to the case.
16      Were you the person primarily responsible for
17  pulling documents for this case?
18  A   No.  In fact, I wouldn't say there's any one
19  person that was primarily responsible.  It really was a
20  team effort.
21  Q   Okay.  I'd like to show you what's been marked as
22  Plaintiffs' Exhibit Cowles 3.  It's Defendant William
23  Cowles' Responses to Plaintiffs' First Set of Document
24  Requests and Interrogatories.
25      Can you take a look at this document and tell me

33

1   if you've seen it before.
2   A   I know I've signed it, but I haven't read it in
3   detail, no.
4   Q   Okay.  Did you read the document in its entirety
5   before you signed it?
6   A   No.
7   Q   Did you read any portions of it?
8   A   Not that I recall.
9   Q   But that is your signature there?
10  A   Yes.
11  Q   Unfortunately there's no page number, but --
12  A   Yeah, I found it.
13  Q   Okay.  If you would turn with me to Page 2 of the
14  document, I'm going to walk you through these responses.
15  A   Okay.
16  Q   And --
17      MR. RESTREPO:  Do you happen to have additional
18  copies?
19      Thank you.
20  BY MS. NELSON:
21  Q   And see what participation you had, if any, in
22  responding to -- in creating some of these responses.
23  A   Okay.
24  Q   Can you read Paragraph 1, and when you're
25  finished, let me know and tell me if you participated in

9 (Pages 30 to 33)

34

1 responding to this request?
2 A Which paragraph, the one with the Number 1?
3 Q 1, yes.
4 A Okay.
5 Q And then the response.
6 A Okay.
7 Yes, I pulled documents for this response.
8 Q Do you know what documents you pulled?
9 A Affirmations would have come from my department,
10 phone logs, a portion of the phone logs would have come
11 from my department. If I had any correspondence, I would
12 have contributed that, too.
13 Q Overall, not just with respect to this answer, but
14 did you receive any instructions from someone in your
15 office about how to respond to document requests in this
16 case or interrogatories in this case?
17 A On how to respond, no.
18 Q On what files to look at?
19 A Well, Margaret Dunn was -- who is over the
20 Administrative Department and Records Department falls
21 under her responsibility. At times she would come and say,
22 I need you to find this for me.
23 Q Did you ever comb through -- well, let me back up.
24 Are you responsible for maintaining any particular
25 files?

35

1 A Paper files?
2 Q Yes.
3 A No.
4 Q What about electronic files?
5 A I guess if you wanted to consider the voter
6 registration database a file. That's a -- a portion of
7 that is my responsibility.
8 Q Okay. Are there any other --
9 A The only other thing that comes to mind is I do
10 the monthly NVRA report to the Division of Elections. Of
11 course I keep a copy for my files but, truly, it's the
12 Records Department that's the official record keeper.
13 Q Okay. When you refer to "your files," what do you
14 mean? What types of files do you maintain?
15 A I produce -- I have a spreadsheet where I keep all
16 of my NVRA totals and then, from that spreadsheet, I then
17 prepare a word document that I use to -- use as the report
18 to send to the Division of Elections.
19 Q Are there any other files that you keep?
20 A None come to mind.
21 Q Do you keep a correspondence file?
22 A Yes.
23 Q Do you keep a personal file?
24 A No.
25 Q Is there anything else you can think of along

36

1 those lines that you keep?
2 A I keep files on projects that I'm involved in.
3 Q Did you keep a file on the "Get Out the Vote"
4 project?
5 A Yes, I did.
6 Q Is that file still in existence?
7 A Yes. Well, I should back up.
8 Yes, I have a portion of them. A lot of the files
9 were turned over to Deborah Clark, the Supervisor of
10 Pinellas County, because she's now the chair of that
11 committee.
12 Q Do you know when those documents were -- when
13 those files were turned over to Deborah Clark?
14 A I would say -- would guess it would have been
15 January of 2001.
16 Q You said you retained a portion of those files --
17 A Right.
18 Q -- in your files?
19 A Uh-huh (affirmative).
20 Q What other project files do you have?
21 A A lot of the special projects that we work on.
22 For instance, we have conducted a -- we conduct high school
23 elections. We conduct an election in the elementary
24 schools primarily for the Sunshine State Young Readers
25 Program. The kids get to vote on their favorite book. So

37

1 we use that as an election and an opportunity to use real
2 equipment.
3 I have files on the letter that we send to
4 graduating high school students.
5 Since the 2000 election, we've created a Voter
6 Education Alliance. I have a file on that, the creation of
7 that and those meetings.
8 Q You said that was since the 2000 election?
9 A Right.
10 Q Any other files?
11 A There's plenty but I -- off the top of my head,
12 they're just -- just the routine projects that we're
13 involved in.
14 Q Are most of those voter education projects?
15 A Yes.
16 Q Are all of them voter education projects, all of
17 the projects that you referred to when I'm saying the
18 project files?
19 A Right. They're all voter education, community
20 outreach-based.
21 Q From what time period?
22 A For years. I tend to be a pack rat.
23 Q Okay. What is the Voter Education Alliance?
24 A It's a group that we formed in 2001. I believe
25 our first meeting was on June 14th, which, I believe, is

10 (Pages 34 to 37)

38

1  Flag Day.
2      We've invited as many groups as we can find and we
3  continue to invite groups to join us. It's an opportunity
4  for groups that are involved that have a voter education
5  element to their organization. We ask them to come and
6  meet with us. It gives Mr. Cowles an opportunity to share
7  with them changes in legislation, things that are coming up
8  on the election calendar, answer any questions that they
9  might have.
10     It almost becomes a train-the-trainer sort of
11 session, where they send a representative, we brief that
12 person or Mr. Cowles briefs that person and then they take
13 that information back to their organization who then
14 disseminates it to their membership.
15  Q  Do you do this project or any other voter
16 education projects with other counties?
17  A  We do some joint projects with our — the
18 immediate surrounding counties.
19     The one that comes to mind is, just before the
20 books close for an election, we go to one of the local TV
21 stations — it happens to be Channel 9 at the moment — and
22 we conduct a voter help line. It's sort of like a
23 phoneathon format, where, during the newscast, they promote
24 us as being in the studio to answer registration questions,
25 to send out voter registration applications. And we're

39

1  usually there for one to two days about two weeks before
2  the books close.
3      And initially when the project started, I don't
4  remember exactly how many counties, but all the counties
5  that are in Channel 9's viewing area, they would be in
6  their offices during a set period of time.
7      In the studio, Osceola and Seminole Counties sent
8  staff members to help us man those telephones.
9      We — in 2000, we had a city bus painted with the
10 "Get Out the Vote" message on it. And Seminole and Osceola
11 Counties were invited to help us in that project, too,
12 because the bus runs through those counties as well.
13     Those are the two — the two projects that jump
14 out at me.
15  Q  Was the — was the voter help line a 2000 project?
16  A  Yes.
17  Q  So it was something done in preparation for the
18 November 2000 election?
19  A  Right. We did it prior to definitely the first
20 primary and the general and I'd have to go back and see if
21 we did it before the October runoff. I think we might
22 have, but I would have to check.
23  Q  Okay. And what about the city bus, this painted
24 city bus that did the "Get Out the Vote" campaigning, did
25 you do this after the November 2000 election as well?

40

1  A  No. It was before.
2  Q  Okay. And it hasn't been used since then?
3  A  No.
4  Q  Are there any joint county projects that you know
5  of since the November 2000 election?
6  A  I know that we're in the stages of preparing for
7  our next voter help line and we've been in touch with those
8  offices again. I would have to ask Veronica Koval. She
9  helps — she's my Customer Service manager and she helps me
10 with a lot of those projects. Like I say, nothing is
11 coming to mind at the moment.
12  Q  Okay. Is Veronica Koval the person who would be
13 primarily responsible for interactions with other County
14 Supervisor of Elections?
15  A  It's situational. I mean, sometimes I'm dealing
16 with them; sometimes she is. We work as a team on a lot of
17 projects.
18  Q  When you say "we work as a team on a lot of
19 projects," who do you mean by "we"?
20  A  Oh, Veronica and I. And now that we have Irma
21 Palacios as our outreach specialist, she's part of that as
22 well.
23  Q  Okay. I sort of led us astray from our document
24 here.
25  A  Okay.

41

1  Q  Okay. So you worked on helping to respond to this
2  request.
3      You told me that you looked — you pulled
4  affirmations, phone logs and you would have pulled
5  correspondence in response to this request.
6  A  Yes.
7  Q  Is there any other documents that you contributed
8  to helping respond to this request?
9  A  Not that I recall.
10  Q  Did you give any other information, non-document
11 information? I mean, did you convey any information to
12 respond to this request?
13  A  None that — none that I recall.
14  Q  Now, I asked — well, strike that.
15     Did you receive any instructions from anyone
16 inside your office about how to search your files to
17 respond to document requests in this case?
18  A  I was told to look through everything.
19  Q  And who told you that?
20  A  Probably Margaret.
21  Q  Okay. And did you look through everything?
22  A  Yes.
23  Q  Do you know who else, if anyone, participated in
24 responding to this request?
25  A  Like I say, it was sort of an all call for help.

11 (Pages 38 to 41)

42

1   So it would have been -- from my department, besides
2   myself, I would have turned to Veronica Koval, Pat
3   Fletcher, Suzanne Scatliffe who is Pat's lead.
4       Like I say, we were all looking through
5   everything.
6       Q   Okay. Do you know whether the other departments
7   also participated in responding to this request?
8       A   Yes.
9       Q   Which other departments?
10      A   The Elections Department, I believe the Computer
11  Department, the IS Department assisted. Margaret's
12  Administrative Support Department would have been involved,
13  too, because that's -- records is under her. The telephone
14  system was under her at that point.
15      So, like I say, it was an officewide -- pretty
16  much an officewide project.
17      Q   Okay. Take a look at Number 3.
18      A   I'm missing a page. I believe I'm missing a page.
19      MR. RESTREPO: Seems to be missing from this copy
20  as well.
21      MR. CIRULLO: I can hand her -- you want her to
22  look at the response to Number 3?
23      MS. NELSON: Yeah. Numbers 2 and 3.
24      MR. CIRULLO: Okay. I'll hand her mine and we'll
25  get a copy made for afterwards.

43

1       MS. NELSON: Please. Thank you.
2   BY MS. NELSON:
3       Q   I'm sorry. 2, 3, 4 and 5, the ones on that page.
4       A   Uh-huh (affirmative). Okay.
5       Q   Have you looked at the responses for Paragraphs 2,
6   3, 4 and 5?
7       A   Yes.
8       Q   Did you participate in responding to those -- in
9   creating those responses?
10      A   Yes.
11      Q   Can you tell me what you did in response to each
12  question? You can walk me through it or if you used the
13  same method of responding for each, you can just give me a
14  global description of what you did.
15      A   Okay. On Question 2 -- or Paragraph 2, it was my
16  group that produced the affirmations. Then we would have
17  produced any correspondence that we might have had.
18      On Number 3, again, we had the affirmations.
19      Number 4, I don't recall -- I don't recall my
20  participation in Number 4.
21      Number 5, I probably produced procedures.
22      Q   What sort of procedures?
23      A   I would take -- well, maybe not procedures. I
24  would take Number 5 to be the list of people that we
25  received, I think, from the State Attorney's Office, where

44

1   we were answering their questions -- or, I guess, citizens
2   made complaints to the State Attorney's Office, who then,
3   in fact -- who then, in turn, sent us the list to research
4   and for us to reply to those.
5       Q   And you have procedures concerning how to reply to
6   those?
7       A   No. I'm mistaken about the procedures.
8       Q   Okay. So what, if anything, did you supply in
9   response to -- for Response Number 5?
10      A   I would have -- it would have been included in my
11  correspondence. I researched one set of those, so it would
12  have been my written response back to the State Attorney's
13  Office.
14      Q   For all of the responses in this case, did you do
15  anything beyond supplying documents? Did you supply, you
16  know, verbal information about processes and practices in
17  the office?
18      A   Yes. Usually it wasn't necessarily verbal. I
19  usually typed up a little narrative and gave it to Margaret
20  for inclusion in the materials.
21      Q   And those narratives -- were those narratives
22  produced?
23      A   I believe they were part of the interrogatories,
24  yes.
25      Q   Do you know if the document that you typed up as a

45

1   narrative was produced?
2       A   I -- no, I don't know that.
3       Q   Okay. Can you turn to Response Paragraph Number 6
4   and tell me whether you participated in responding to those
5   requests?
6       A   I don't recall participating in the response for
7   Number 6.
8       Q   Okay. Can you take a look at the paragraph that
9   begins, Yes, and then it says, Information relating?
10      A   Uh-huh (affirmative).
11      Q   The following sentence reads, The felon lists
12  received and used for purging were from states that have
13  automatic clemency restoration.
14      Do you know what that statement refers to?
15      A   There was -- we received a lot of felon lists that
16  included names of people who supposedly had been convicted
17  of a felony outside of the state.
18      It was my understanding that those individuals,
19  before we got their names, there had been some sort of
20  cross check to make sure that they did not have their
21  rights restored.
22      Q   Who did you receive the lists from?
23      A   I personally did not receive the lists.
24      Usually, when our felon lists came in, they were
25  given to June Condron who then researched those, marked the

12 (Pages 42 to 45)

46

1  records that she felt needed to be processed. The list was
2  then given to Pat Fletcher, who is my Voter Services
3  manager, for her staff to image and process those
4  documents.
5      Q   So you didn't see the list referred to here?
6      A   Maybe in passing but, no, I didn't handle the
7  lists.
8          Like I said earlier, I was heavily involved in
9  another project and June, as my manager, stepped in to
10 oversee most of the coordination on the felon lists.
11     Q   You said that the lists were cross checked. By
12 whom?
13         MR. RESTREPO:  Object to the form of the question.
14 BY MS. NELSON:
15     Q   You can answer.
16     A   Yeah. I don't -- I wouldn't know who did it prior
17 to us getting the list.
18     Q   So you're saying that you believe the list was
19 cross checked before the Supervisor of Elections Office
20 received the list?
21     A   Right. That was --
22         MR. EHRLICH:  Form. Jeff Ehrlich.
23         MR. RESTREPO:  Same objection.
24 BY MS. NELSON:
25     Q   You can go ahead.

47

1      A   That was my understanding, that it had been
2  checked by the vendor.
3          THE COURT REPORTER:  Jeff?
4          MS. NELSON:  Jeff Ehrlich.
5          MR. MAC INNES:  E-H-R-L-I-C-H.
6          MR. EHRLICH:  I guess you want me to say my name
7  when I object?
8          THE COURT REPORTER:  Please.
9          MS. NELSON:  Yes. And to make an appearance on
10 the record. We weren't aware that you were there.
11         MR. EHRLICH:  Oh, I'm sorry. At the beginning of
12 the deposition, nobody asked for appearances.
13         This is Jeff Ehrlich. I represent the Supervisor
14 of Elections from Miami-Dade County, David Leahy.
15         Perhaps we could take this moment to announce who
16 else is attending this deposition.
17         MS. NELSON:  We've done that, but we'll do it
18 again.
19         MR. EHRLICH:  I didn't hear it. When did you do
20 it?
21         MR. RESTREPO:  Before we went on the record.
22         MS. NELSON:  When your colleague was on the phone,
23 but we can do it again. I'd be happy to do it.
24         This is Janai Nelson, representing --
25         MR. EHRLICH:  And I think we should do it on the

48

1  record.
2          MS. NELSON:  We are doing it on the record, Jeff.
3  Can you hear through the phone clearly?
4          MR. EHRLICH:  I think I can.
5          MS. NELSON:  Okay. We're doing it on the record
6  now.
7          MR. EHRLICH:  Right now.
8          MS. NELSON:  This is Janai Nelson, NAACP Legal
9  Defense and Educational Fund, representing the
10 Plaintiffs.
11         MS. QUAMIE:  Lexer Quamie, assistant to Janai
12 Nelson, NAACP Legal Defense Fund.
13         MR. COX:  Todd Cox, NAACP Legal Defense Fund,
14 representing the Plaintiffs.
15         MR. RESTREPO:  Dan Restrepo, law firm of
16 Williams & Connolly, representing ChoicePoint/DBT.
17         MR. MAC INNES:  Doug Mac Innes, from the Attorney
18 General's Office, representing the Department of
19 Highway Safety and Motor Vehicles and the Department of
20 Children and Families.
21         MR. CIRULLO:  Michael Cirullo, the law firm of
22 Goren, Cherof, Doody & Ezrol, representing William
23 Cowles, the Orange County Supervisor of Elections.
24         THE WITNESS:  Linda Tanko, Orange County
25 Supervisor of Elections Office.

49

1          MR. MAURO:  This is Cory Mauro, Steel, Hector &
2  Davis, representing Katherine Harris, Clay Roberts and
3  the Election Canvassing Commission.
4          MR. BOSCH:  Bill Bosch, with Volusia County,
5  representing Deanie Lowe.
6          MR. CIRULLO:  Jeff?
7          MR. EHRLICH:  I'm sorry. I thought I announced.
8          MR. CIRULLO:  Is Susan still with you?
9          MS. TORRES:  I'm still here.
10         MR. CIRULLO:  Okay.
11         MS. NELSON:  Do you want to announce, Susan?
12         MS. TORRES:  Susan Torres, also for Supervisor
13 Leahy.
14         MS. NELSON:  Is there anyone else on the telephone
15 who has not announced himself or herself for the
16 record?
17         MR. EHRLICH:  But you can hear us clearly, Janai?
18         MS. NELSON:  Yeah, I can, anyone who speaks up.
19         MR. EHRLICH:  Okay. Thanks.
20         MS. NELSON:  Thank you.
21 BY MS. NELSON:
22     Q   Ms. Tanko, we were talking about lists.
23     A   Yes.
24     Q   Felon lists being cross checked, you mention that.
25     A   Yes.

13 (Pages 46 to 49)

50

1    Q   Explain what you mean by that, please.
2        MR. RESTREPO: Object to the form of the question.
3    BY MS. NELSON:
4    Q   You can go ahead.
5    A   Okay. Like I said, my involvement with this
6    portion of our work was very limited, because I was
7    involved with another project at the time.
8        But it was my understanding that these lists were
9    of individuals who had been convicted of a felony and did
10   not have their rights restored. There was a portion of the
11   lists that included individuals with out-of-state
12   convictions who did not have their rights restored.
13   Q   And what are you basing this understanding on?
14   A   Presentations made to the supervisors through the
15   Florida -- the FSASE, Florida State Supervisor of Elections
16   Association meetings. They meet twice a year.
17       Some of the correspondence that I would see that
18   came from the Division of Elections, conversations with Ms.
19   Condron, who, like I said, did the most -- the bulk of that
20   work.
21   Q   What did you mean when you used the term "cross
22   checked"?
23   A   When I say cross checked, that here's someone
24   who's been identified in the files as a felon and that
25   those records were then compared to clemency records to see

51

1    whether, in fact, their rights were restored.
2    Q   So is it your understanding that there were felon
3    lists that were cross checked?
4    A   It -- that was my belief, yes.
5    Q   And by whom were these lists cross checked?
6        MR. RESTREPO: Object; asked and answered.
7    BY MS. NELSON:
8    Q   You can go ahead.
9    A   Well, I would suppose it would have been the
10   vendor who prepared those lists. I have no specific
11   knowledge.
12   Q   What makes you think that the lists were cross
13   checked?
14   A   I thought I had recalled seeing some
15   correspondence to that effect.
16   Q   Do you have any other reason to believe that the
17   lists were cross checked?
18   A   No.
19   Q   And when you say "the vendor," who are you
20   referring to?
21   A   Again, I -- I didn't work with it closely. I
22   don't know whether it's ChoicePoint or DBT. I know the --
23   the company names changed at some point. I don't recall
24   when.
25   Q   Okay. Do you have any knowledge of how felon

52

1    lists -- and, actually, let me clarify something.
2        Lists that -- do you understand whether there are
3    lists that come from the county or from the state?
4    A   You mean the county --
5    Q   Felon lists.
6    A   Felon lists?
7    Q   Yes.
8    A   Yes. We get a felon list from our Orange County
9    Clerk of Courts.
10   Q   Okay.
11   A   As well as the list that was coming to us from the
12   Division of Elections.
13   Q   Now, the list that -- now, are you talking about
14   one list or plural lists that come from the Division of
15   Elections?
16   A   I believe we received a list off the Central Voter
17   File and that process. We occasionally get lists of --
18   well, really, it's not a list from the Division of
19   Elections. It's more like a legal document. I believe
20   these are individuals that have been convicted on like
21   federal felonies. But those -- we don't get very many of
22   those.
23       Otherwise, any felon information we would have
24   would come from the County Clerk of Court.
25   Q   What about during the time period leading up to

53

1    the November 2000 election, did you receive felon lists
2    from the Division of Elections?
3    A   I was aware that the office received lists, yes.
4    Q   Do you know anything about how those lists were
5    processed by your office?
6    A   As I said, when a list came in, it was given to
7    June Condron, who then went through the list name by name.
8    She then flagged the records that -- that looked like they
9    were positive matches and then the lists were then given to
10   Pat Fletcher and her staff to image and process.
11       Not every name that was on our list was processed.
12   It's my understanding that Ms. Condron would discard or
13   discount, I should say, the names where they were just too
14   common, John Smith, or maybe birth dates weren't matching
15   up or race wasn't matching up or -- really, I guess it was
16   my impression it was her judgment call as to which ones we
17   proceeded on.
18   Q   Now, you used the term "positive matches." What
19   does that mean to you?
20   A   That everything is matching up, the name, the date
21   of birth, the sex, the race. Where we had Social Security
22   numbers, that they were matching up.
23   Q   And you said it's your understanding that not
24   every name was processed?
25   A   Right.

14 (Pages 50 to 53)

54

1  Q  What is that understanding based on?
2  A  Conversations with Ms. Condron. Occasionally, she
3  would show me lists that she had been working on and would
4  · point out where some things weren't matching up and how she
5  was bypassing those names.
6  Q  And, similarly, how did you get the understanding
7  that she would discount common names?
8  A  Through conversations with her.
9  Q  Do you have any other reason for believing that
10  common names were discounted and not every name was
11  processed other than the conversations with Ms. Condron?
12  A  Like I said, occasionally I would see -- she would
13  show me pages from the lists and I would see that she had
14  bypassed them.
15  Q  What about the felon lists received from the
16  county, did you play any role in handling those lists when
17  they came into the office?
18  A  They would come in as regular mail and go into our
19  Imaging Department and just follow the normal path of our
20  incoming work.
21  Those lists didn't present the problems that the
22  Central Voter File lists presented. The lists would have
23  individuals on them that, when my Voter Services clerks
24  would query the name, they would not find a record. So, ᵀ
25  guess I should say, the lists were not prescreened before

55

1  the -- it got to the processing stage.
2  The Voter Service clerk that pulled up that batch
3  of work on the computer to work on would then be the one
4  taking the list and searching for a match in the computer.
5  Q  And would it be up to that individual to flag any
6  entries that didn't match?
7  A  Right.
8  Q  Or --
9  A  Well, they would bypass it. It wouldn't be
10  flagged in any fashion. It would just be -- it's a list of
11  names. Say there's a dozen names on the list, if
12  Number 1 -- they found no match to Number 1, they would
13  just then proceed down the list looking for a match to
14  Number 2.
15  I mean, essentially there's the chance they could
16  go through the whole page and find no voter matches.
17  Q  Were the bypassed names brought to anyone's
18  attention in your office?
19  A  No.
20  Q  What about outside your office to the county?
21  A  No, no.
22  Q  Do you see the -- back to the same paragraph that
23  begins, Yes. The last sentence states that, The office has
24  no knowledge as to whether the individual had their rights
25  restored in their previous jurisdiction.

56

1  Do you know if there was any attempt by the Orange
2  County Supervisor Of Elections Office to obtain such
3  knowledge?
4  A  No. I have no knowledge.
5  Q  So if someone said that Linda Tanko oversaw the
6  processing of felony lists leading up to the 2000 election,
7  would that be correct?
8  A  In my view, no, it's not correct.
9  Q  Why?
10  A  Yes. It -- well, it's a function of my department
11  to process the work. But, truly, it was -- like I say, the
12  lists came in and June was the one that reviewed them,
13  marked them and then passed them on.
14  I have, you know, just, like I say, a vague -- a
15  spotty knowledge of the process because of this other
16  project. Yes, I knew it was being processed. Yes, I was
17  aware of lists when they would come in. Oh, we've gotten
18  another list, comments that would be made. And would be
19  aware that my staff was working on them.
20  Q  You mentioned earlier, when we were talking about
21  the county lists, that the county lists didn't have the
22  problems that the other lists would --
23  A  Right.
24  Q  -- the Division of Elections lists had?
25  A  Uh-huh (affirmative).

57

1  Q  What did you mean when you said "problems"?
2  A  Well -- on the Central Voter File list, they
3  were -- "they" being the vendor -- was taking our voter
4  list and then running it against their information. So
5  they were doing that first initial matching of information.
6  I know some of the -- the entries that we would
7  see, we were curious as to how that could have been
8  identified as a match. Some of the information just didn't
9  seem very logical to us.
10  But when we process our local felon lists from our
11  Clerk of the Court and we send the letter out, it's really
12  rare that we get the voter contacting us saying, you know,
13  this is an error. It has happened in the past and we've
14  worked to resolve that with the person. But it's -- it's
15  very rare on that list. So we feel like the local clerk's
16  list is a pretty accurate list.
17  Q  How did you identify the problems you just
18  mentioned, that some of the entries seemed -- did not seem
19  logical and that the -- how did you identify the problems
20  you just mentioned?
21  A  June would occasionally -- as she was working on
22  it and would just get up to take a break, sometimes she'd
23  pass by my desk with a page in her hand and she'd just show
24  me a random name.
25  Q  Do you know whether she would show anybody else in

15 (Pages 54 to 57)

**58**

1 the office the list that she showed you?
2 A I have no specific knowledge of it. I'm sure she
3 probably did.
4 Q Do you know whether she showed it to -- showed the
5 list to Mr. Cowles?
6 A Specifically, no, but probably.
7 Q Do you know whether she had conversations about
8 the lists with Mr. Cowles?
9 A I know that -- that at various points it would be
10 discussed in senior staff meetings, so I would say, yes,
11 she more than likely did.
12 Q Did you learn information about the lists in
13 senior staff meetings as well?
14 A Yes.
15 MS. NELSON: Okay. Why don't we take a quick
16 break.
17 THE WITNESS: Okay.
18 MS. NELSON: We're going to go on break for five
19 minutes.
20 UNIDENTIFIED SPEAKER: Okay.
21 (Whereupon, a brief recess was taken at 10:30 a.m.
22 and the deposition reconvened at 10:40 a.m.)
23 MS. NELSON: We're ready to go back on.
24 UNIDENTIFIED SPEAKER: Okay.
25 MS. NELSON: I'd like to mark as Plaintiffs'

**59**

1 Exhibit Cowles 3A the page that is missing from
2 Plaintiffs' Exhibit Cowles 3, which is Page 3 of that
3 exhibit.
4 BY MS. NELSON:
5 Q Ms. Tanko, we were just talking about that page?
6 A Yes.
7 MS. NELSON: I just want to make sure we have a
8 complete record, so if you can mark that as such.
9 (Whereupon, the document was marked Plaintiffs'
10 Exhibit Cowles Number 3A for identification.)
11 BY MS. NELSON:
12 Q Can you look at what is Page 4 of Plaintiffs'
13 Exhibit Cowles 3, the paragraph that begins 7 and goes over
14 to Page 5. Can you take a look at that, and the response,
15 and tell me if you think the response is accurate?
16 A Yes. Those are the procedures we follow.
17 Q These are the procedures you follow if the voter
18 is deemed to have changed his or her address and then
19 appears at the polls and says they have not?
20 A Right.
21 Q Can you -- you see in -- what is this, the one,
22 two -- the fourth paragraph under the word "response,"
23 colon, it says, After two federal elections, a person who
24 has been inactivated due to the above process would move
25 from inactive to cancelled status.

**60**

1 A Right.
2 Q Can you define those terms for me, "inactive" and
3 "cancelled"?
4 A An inactive record is basically a voter that we've
5 lost touch with. It follows with some of the Florida
6 election laws, the list maintenance laws. They remain in
7 an inactive status until we have some kind of contact with
8 them. If we don't have it -- have any type of contact with
9 them, they will eventually roll over to the cancelled
10 status.
11 A cancelled record essentially is a dead
12 registration record. The person is not eligible to vote.
13 They would need to re-register and meet those registration
14 requirements and the book closing deadlines, things of that
15 nature.
16 Now, we leave cancelled records on our computer
17 database for a while, usually through one to two election
18 cycles. In case, on election day, we find -- or leading
19 up -- at any point, leading up to election day, election
20 day, we find that we have cancelled someone by mistake, we
21 then quickly restore that record to an active status.
22 Q What happens to cancelled persons after one or two
23 election cycles?
24 A We delete them off of the database, but they're
25 not completely deleted. The records are simply transferred

**61**

1 to, what used to be, microfiche. I don't know if they're
2 doing it to CD-ROM now or not, but some kind of storage.
3 Q Okay. When you say "database," what do you mean,
4 they're deleted from the database?
5 A The computer system, the active computer system.
6 Q Is that the voter registration rolls?
7 A Right.
8 Q So, for upcoming elections, if there's a person
9 who has been in cancelled status for two election cycles,
10 where will that person be? And let's take, for example,
11 the gubernatorial election that's coming up. Where will
12 that person's name be?
13 A Well, if it's been deleted off the system,
14 depending on how long it's been deleted off the system,
15 it's going to be stored over in our Records Department,
16 either on microfiche or, like I say, now they might be
17 using CD-ROM.
18 If we're dealing with a person, who, as we're
19 talking with them, we're discovering that we need to
20 explore whether we've cancelled them in error, we would
21 then go over to the Records Department and pull those
22 records and research it.
23 Q What if that person showed up at the polls on
24 election day, would there be any way for persons at the
25 polling site to pull up a record on this individual?

16 (Pages 58 to 61)

62

1    A   The timing -- if it's a case where the person's in
2  a cancelled status, their name is not going to be on the
3  poll list, the printed poll list.
4    Q   The PR/PL?
5    A   Right, the PR/PL.
6        That then triggers a whole set of procedures.  If
7  it's a precinct that does not have a laptop -- in 2000 we
8  had a hundred precincts with laptops -- they would then
9  call a phone bank for that -- for help.  If it was a
10 precinct with a laptop, they would be able to see cancelled
11 records that are still on the -- on the database, on the
12 voter roll.
13       If it's one that has been deleted, they're not
14 going to see it on that laptop.  In fact, if it's been
15 deleted, they wouldn't see it on the active live computer
16 system in the office.  They would then, in talking with
17 that person, have to go research those records over in the
18 Records Department, if it's been deleted off the system.
19   Q   So you can't access deleted persons from the
20 laptop --
21   A   No, not --
22   Q   -- is that right?
23   A   Right.
24   Q   Or from calling into the Supervisor of Elections
25 Office on election day?

64

1    Q   And what happens when you call the voter
2  authorization line?  You said that the Voter Services clerk
3  would know how to research it.  What would they do?
4    A   Yeah.  Well, they would start by looking on the
5  computer system, the online system.  And then just through
6  conversation and their training of the questions, they're
7  supposed to ask -- they would then see that further
8  research is needed through the Records Department.  They
9  would see that, well, I'm not seeing anything here on the
10 computer, you know.  When was it that you last voted?  You,
11 know, just asking a series of questions to sort of get a
12 time frame.
13       And they know that at certain points, usually the
14 end of a year, we delete records off of the computer system
15 and store them over in the Records Department.
16   Q   So, on election day, would the deleted files be
17 able to be accessed by anyone in the Supervisor of
18 Elections Office?
19   A   Yes, through the Records Department.
20   Q   Do they do that on election day?  Do they actually
21 look into the deleted files to see whether a voter was
22 cancelled?
23   A   As needed, yes.
24   Q   Do you know how many times that occurred in the
25 November 2000 election?

63

1    A   Well, there were several phone banks on election
2  day.  If someone had a lap -- if the polling place had a
3  laptop, no, they wouldn't be able to see a -- they would be
4  able to see a cancelled record.  They wouldn't be able to
5  see one cancelled and deleted off the system.
6        They have an individual standing there saying,
7  yes, but I know I'm registered.  Their instructions were to
8  then call our office to what we called -- it was a voter
9  authorization line.  That's the team -- that phone line goes directly
10 into my Voter Service clerks, my most experienced workers,
11 time.  That's the team -- that phone line goes directly
12 who then know how to research it from there.
13       In the other scenario, if it's a -- the voters
14 come into a precinct that does not have a laptop, then a
15 telephone call is made, would have been made to an offsite
16 telephone bank who would research it using essentially the
17 same system as the laptop operators had.
18       Again, because this is a cancelled and deleted
19 scenario we're going through, they would say, I'm not
20 seeing anything here on the computer system.  You need to
21 call into the office, into that experienced voter
22 service -- that group of Voter Service clerks who then do
23 the research.
24   Q   The voter authorization line?
25   A   Right.

65

1        MR. RESTREPO:  Object to the form of the question.
2        THE WITNESS:  No, no.
3  BY MS. NELSON:
4    Q   Do you have any sense of how often that occurs?
5    A   No.  I mean, I'm -- I know that it more than
6  likely does with each election, but I wouldn't be able to
7  put a number to it, no.
8    Q   Do you know who would know?
9    A   Possibly the Records Department staff, Margaret
10 Dunn and her staff.  But I don't know that we kept any --
11 well, she would have to answer the question.
12       To my knowledge there was no method of counting
13 how many times they went into those -- those files.
14   Q   Okay.  Did you provide any documents for the
15 response to -- for Response Number 7?
16   A   Documents?  I don't recall providing documents
17 other than perhaps I wrote the narrative that was then used
18 to prepare this.
19   Q   And did you provide those documents?
20   A   Yes.
21   Q   Okay.  When cancelled voters are deleted from the
22 database, is there a term associated with doing that?
23   A   Deleted.
24   Q   Okay.  What about the term "purge," is that used
25 in that context?

17 (Pages 62 to 65)

66

1    A   Purge? Purge, no. When we -- we really don't use
2   the word "purge" anymore.
3        We probably haven't -- I'd have to check. We
4   probably haven't used it since '95. Because the law now
5   talks about remove from active. I don't believe the law
6   even uses the word "purge" any longer.
7        When somebody uses the word "purge" to us, we then
8   have to say, Are you meaning that somebody goes from an
9   active to an inactive status or are you talking about
10  cancelled.
11       So I've lost track of what your question was.
12   Q   Well, let me try to bring you back.
13       So in terms of maintaining files concerning voters
14  who were once registered through the Supervisor of
15  Electionss Office of Orange County, there are active
16  voters; is that right?
17   A   Right.
18   Q   Inactive voters?
19   A   Right.
20   Q   Cancelled voters?
21   A   Right.
22   Q   And deleted voters?
23   A   Yes.
24   Q   Am I missing any category of status category?
25   A   Yes. We have a category that we call

67

1   preregistered. Those are the 17 year olds that have
2   applied. They're not converted to an active status until
3   they've had their 18th birthday.
4        And then we have a status that we call not
5   registered. That's someone who's attempted to register but
6   has failed to complete the paperwork properly.
7        All documents that come into the office are imaged
8   and we create a record for them. So there was a need to
9   have this sort of holding status.
10   Q   Okay. So with the addition of those two
11  categories, preregistered and not registered status --
12   A   Uh-huh (affirmative).
13   Q   -- is that --
14   A   Right, those are the --
15   Q   -- all of it?
16   A   We don't really consider deleted a -- we don't
17  count our deleted voters. Like I say, really, they're
18  just -- they're moved off onto microfilm and stored.
19   Q   Now, you said that a voter who's on cancelled
20  status would be deleted after one or two election cycles.
21       Does that mean one or two election cycles after
22  which they've been -- you know, why don't you walk me
23  through the time period that a voter would remain on a
24  cancelled status and then how long would it take for them
25  to become deleted?

68

1    A   Okay. From a cancelled status to then deleting
2   them from the system, at the end of each year, in December,
3   Lonn Fluke, who's our IS director, will give Mr. Cowles and
4   senior staff a report that says, Here's how many records
5   we're currently maintaining on the system. Here's how many
6   are active, inactive, not registered, all the different
7   categories that we've just talked about.
8    Q   Including deleted?
9    A   Well, no, because we don't -- we don't assign a
10  record a deleted category. It's almost like that's the
11  action that we take.
12   Q   Okay.
13   A   But he'll tell us, Here's how many records we have
14  in all these different status codes. And for -- and it's
15  purely for computer storage space that we then start
16  deleting records off and storing them in the Records
17  Department.
18       Under Ms. Carter's tenure, we probably removed
19  things, deleted things off faster than we have under Mr.
20  Cowles. We found that on election day it's a tremendous
21  tool to have those records that are at our fingertip when
22  we're sitting at our computer querying. So we tend to
23  leave records in a cancelled status online for a longer
24  period of time, because just from -- only, you know, just
25  the research time. It's election day. Everybody is trying

69

1   to get this person to vote, get this problem resolved, so
2   we can go on to the next voter.
3        We're trying to eliminate having to say, hang on,
4   put the phone down and walk over to the Records Department
5   to look for this information. So we leave it online for a
6   longer period of time.
7        But at -- in December of each year, he gives --
8   Lonn gives us this report and then we then, as a team, make
9   a decision what we're going to leave out and what we're
10  going to -- what we're going to leave online and what we're
11  going to delete.
12   Q   Are there any written procedures concerning, you
13  know, who you would leave online and who you would delete?
14   A   I'm aware of no written procedures.
15   Q   So how does the staff make that decision?
16   A   Well, it's a discussion, a debate. We try to look
17  into a crystal ball and figure out what the next election
18  cycle is going to be.
19       2000 was a busy election year, a presidential
20  year. So we will probably leave those 2000 records out. I
21  would -- I would bet we would leave them out until probably
22  the 2006 election cycle.
23   Q   I'm sorry. What do you mean, you would leave
24  those records out?
25   A   Leave them online, leave the cancels out there for

18 (Pages 66 to 69)

70

1　us to look at.
2　　　Because 2000, like I say, was a big election for
3　us. This year we're electing a Governor. Yes,
4　gubernatorial elections are normally not as busy as a
5　presidential election but, 2000 being what it was, I'm sure
6　2002 will be busy. 2004 will definitely be busy.
7　　　So we want to cut down on the number of trips over
8　to the Records Department, so we'll leave those cancels and
9　the -- we'll leave those cancels online for a longer period
10　of time just to help in our research.
11　　Q　Is there an effort to clear computer storage space
12　in advance of elections where you anticipate that there
13　might be a lot of voter registration activity?
14　　A　No, I'm not aware of any pre -- preclearing.
15　　Q　Do you know how many voters were -- how many
16　cancelled voters were deleted in the December before the
17　2000 election?
18　　A　No, I don't. In fact, I would -- if I had to
19　guess I would say we didn't remove any cancelled voters
20　prior to the 2000 election because we wanted those records
21　online going into the 2000 election.
22　　Q　Do you recall having a discussion with your other
23　staff colleagues?
24　　A　I know it's discussed every December. That
25　would -- the ones who'd be able to answer that question

71

1　would be Margaret Dunn and Lonn Fluke. But I'm sure we've
2　left cancelled records out, a significant number of
3　cancelled records online.
4　　Q　Are there ever instances where cancelled voters
5　are deleted more frequently than once a year --
6　　A　No.
7　　Q　-- once that December -- once every December?
8　　A　No. It's always done at year end.
9　　Q　Okay.
10　　A　If done at all.
11　　Q　Can you take a look at Response 8.
12　　　Please tell me if you participated in the
13　information -- gathering the information contained in this
14　response.
15　　A　I probably wrote the narrative that was used in
16　this response.
17　　Q　Okay. When you say "the narrative that was used
18　in this response," can you -- are you saying everything
19　that follows after, Response, colon, on Page 5 after
20　Paragraph 8 and then continues to Page 6?
21　　A　I would have -- I wouldn't have been able to write
22　the Paragraph Number 1, Defendant objects to the question,
23　but from there on, yes.
24　　Q　Okay. The paragraph beginning with, Because?
25　　A　Yes.

72

1　　Q　Okay. Can you look at the paragraph on Page 6
2　that begins, Yes, and the sentence that says, There's no
3　requirement of a written confirmation directly from the
4　voter prior to removing the voter from the voter rolls
5　based upon a change of residence outside the registrar's
6　jurisdiction if our action is based upon compliance with
7　list maintenance criteria or a cancellation notice
8　indicating that the voter has registered to vote in another
9　jurisdiction.
10　　A　Yes.
11　　Q　Have you ever discussed or do you know whether
12　it's been discussed in the Supervisor of Elections Office
13　whether the office should send written confirmation to
14　voters prior to moving them from the voter rolls under
15　these circumstances, whether it would be helpful to do
16　that?
17　　A　I don't recall any conversations, no.
18　　Q　Do you know whether the decision not to send
19　written confirmation to voters in this circumstance was
20　simply that there was no requirement to do so?
21　　A　These procedures were written to follow the
22　current -- the statutes, yes.
23　　Q　And do you know whether the office ever considered
24　doing more than what the statute required in this instance?
25　　A　I don't recall conversations, no.

73

1　　Q　Okay. And can you take a quick look at this and
2　tell me if this is an accurate statement on Page 6, the
3　statement that you identified that you wrote as a
4　narrative.
5　　A　Yes, it's accurate.
6　　Q　It reflects the procedures of the Supervisor of
7　Elections Office?
8　　A　Yes.
9　　Q　Turn to the following page, Page 7, Response 9.
10　　　And do you see the paragraph that says, Yes, we
11　are unaware of any voter who registered to vote in 2000 who
12　was not notified of the status of his or her application at
13　least 10 days prior to the November 7th 2000 election.
14　　　Do you see that paragraph?
15　　A　Yes.
16　　Q　Did you help prepare this response?
17　　A　Yes.
18　　Q　What did you do to -- what, if anything, did you
19　do to come up with this response? Did you look at
20　documents or anything else?
21　　A　Not documents necessarily.
22　　　Knowing our procedures, knowing that the books
23　close 29 days prior, I have to have all the work on the
24　computer system within 15 days and report statistics to the
25　state. All of that work would have been processed.

19 (Pages 70 to 73)

74

1     Any letters that needed to be generated to voters
2   would have been completed at least 10 days prior.
3     Q   So your basis for saying that, we are unaware of
4   any voter who registered to vote who was not notified of
5   the status of his or her application, et cetera, is that
6   based on the procedures and practices of your office?
7     A   Yes.
8     Q   Do you have any other way of -- was there any
9   other basis for that statement?
10    A   No.
11    Q   Okay. Look at Number 10 in the response there.
12    A   Okay. Okay.
13    Q   Did you provide the documents in response to --
14    A   A portion of them.
15    Q   Okay. Can you tell me what portion you provided?
16    A   In terms of poll worker training, the only -- the
17  only poll worker training that I was involved in was the
18  training of the laptop oath -- Internet oath people, I
19  believe is what we called them. So I would have provided
20  that training manual.
21    Q   Okay. Did you play any role with respect to the
22  other poll worker training that occurred before the 2000
23  election?
24    A   No.
25    Q   Who conducted those trainings?

75

1     A   Mr. Cowles.
2     Q   Who would be most knowledgeable about those
3   trainings?
4     A   Mr. Cowles.
5     Q   Look at Response 11.
6       Tell me if you participated in preparing this
7   response?
8     A   I don't recall -- I don't specifically recall
9   answering this one.
10    Q   When you say you don't recall answering, you don't
11  recall writing a narrative?
12    A   Right, I -- yeah, I don't remember.
13    Q   Do you recall how many narratives, in total, you
14  wrote?
15    A   No.
16    Q   Was there a good number?
17    A   Yeah, just the ones in my area --
18    Q   Okay.
19    A   -- were the ones that I assisted with.
20    Q   Would you say you wrote like a dozen narratives
21  or --
22    A   I have no idea.
23    Q   Okay. Well, please flag for me, as we go through
24  this document, where you --
25    A   Okay.

76

1     Q   -- believe the text reflects a narrative that
2   you've written.
3     A   Okay.
4     Q   Look at Response Number 12.
5     A   Okay.
6     Q   Is it true that you are responsible for the
7   courier service that's used for the -- for collecting
8   applications from the Department of Highway Safety and
9   Motor Vehicles?
10    A   Yes.
11    Q   Can you tell me about that process.
12    A   When NVRA took effect in '95, we were concerned --
13  that was the first time that voter registration had ever
14  taken place outside of our hands, I guess, that we were
15  relying on other people to help us as much.
16      And for our own sense of security, we decided that
17  rather than relying on the mail service to get those
18  applications to us, that we wanted to send our own staff
19  member out to all the mandated sites to collect the
20  applications.
21      Ms. Carter decided that she wanted a receipt
22  system developed where a joint signature, our staff member
23  and then a representative from that mandated site sign in
24  agreement to the number of applications that are changing
25  hands, and we list name by name all the applications that

77

1   were given.
2       Those applications, you know, our courier goes out
3   weekly to all the mandated sites to pick up those forms and
4   bring them to our office.
5     Q   Is that the same process that existed prior to the
6   November 2000 election?
7     A   Correct.
8     Q   Is it the same process that exists now?
9     A   Yes.
10    Q   Did you provide any documents in response to 12?
11    A   I probably supplied -- since it's asking for a
12  breakdown by month, I probably supplied numbers off of my
13  monthly NVRA reporting form to the Division of Elections.
14  I probably wrote a narrative about just the courier process
15  I just described.
16    Q   I asked you whether you were in charge of the
17  courier process but, more broadly than that, are you the
18  person responsible for the Supervisor of Elections Office's
19  interaction with the Department of Highway Safety and Motor
20  Vehicles, the Department of Children and Family Services
21  and the other federally mandated sites?
22    A   Yes. It's one of those cases where I -- when
23  NVRA went into effect, I set up the system. Over time,
24  I've been able to delegate that to my Customer Service
25  manager. She has -- Veronica Koval has a lot more

20 (Pages 74 to 77)

78

1  interaction with the mandated sites now than I do. And
2  then we have a Customer Service representative that does
3  the bulk of the actual courier runs.
4     Q  What is her name?
5     A  Laurie Hastings.
6     Q  Does Ms. Koval report directly to you on issues
7  concerning the federally mandated sites?
8     A  Yes.
9     Q  Under the NVRA?
10    A  Yes.
11    Q  So would you say you're aware of all the goings on
12 concerning the Supervisor of Elections Office and the
13 federally mandated sites?
14    A  Yes. She brings her concerns to me or questions.
15    Q  And was that the case back in 2000 as well?
16    A  Yes.
17    Q  Can you take a look at the response -- at
18 Interrogatory Number 13 and the response.
19    A  Okay.
20    Q  And tell me if you participated in those
21 responses.
22    A  Yes, I did participate in that response.
23    Q  What did you do in terms of your participation?
24    A  As I recall, I -- I included correspondence.
25    Q  Anything else?

79

1     A  Perhaps I wrote a narrative. I don't -- I don't
2  recall.
3     Q  Okay. Did you have a chance to read this
4  statement, that is, the response to Number 13?
5     A  Yes.
6     Q  Do you agree with the statements made in that
7  response?
8     A  Yes.
9     Q  Do you know what is meant by the term "poor
10 communication" in the second sentence, which is on Page 8,
11 the second sentence of the response?
12    A  The one example I can give you of poor
13 communication would be, for instance, the voter
14 registration application itself. The form itself has
15 changed over time. The legislature has added some
16 questions. Each time there was a new form we would go to
17 the mandated sites, collect all the old forms, issue them
18 the new ones, because if someone used an old form, it was
19 then invalid because it didn't ask all the questions it was
20 supposed to ask.
21    We would then -- our couriers would go in, we
22 would ask the managers, explain the situation, we've got a
23 new form, let's collect up the old ones. Tell all your
24 folks, you know, they've got to use these new forms, et
25 cetera. We battle old forms surfacing out of people's

80

1  desks.
2     Other communications would be just some of the
3  procedures that they need to follow. Make sure that the
4  person gets the form signed. I guess it's training issues
5  that we're trying to get across to the staff. That
6  sometimes you just, by virtue of the work that you're being
7  given, you see that it -- it hasn't trickled down as
8  thoroughly as you would want or it's not being retained by
9  those staff members as much.
10    That would be -- those are the types of
11 communication issues that we would have.
12    Q  You said that the -- if someone used an old form,
13 when new forms became available, that that form would be
14 invalid. What do you mean by that?
15    A  The law speaks to the questions that are required
16 on the form, the questions that the person is to be asked.
17 Then, as the law would change, the old forms become
18 obsolete because they're not asking the questions that are
19 now required.
20    Q  Would the Supervisor of Elections Office process
21 the old forms in any way?
22    A  We process everything that comes in. There's not
23 a document that we don't process. What would happen would
24 be we would create -- we would image the document. We
25 would create a record for it. This would be an example of

81

1  a document that would go into a not-registered status.
2  This is a person who has made the attempt to register but
3  has failed to meet the requirements. So we then generate a
4  letter to that person saying the form didn't -- just to
5  paraphrase it, The form doesn't have everything on it that
6  we need. Here's a new form. Will you please fill it out
7  and send it back to us.
8     Q  Do you recall how many -- well, what time period
9  are we talking about where there was --
10    A  This is ongoing.
11    Q  Is this starting from the enactment of the NVRA?
12    A  Correct.
13    Q  Does it continue through the present?
14    A  Yes, yes.
15    Q  Do you have a sense of how many applications come
16 in that -- from the Department of Motor Vehicles that
17 result in a voter being registered in a -- what is it --
18 non-registered status?
19    A  To my knowledge, we don't track by -- we don't
20 track by source the status of that application. Now,
21 that's not completely correct, I suppose, because on NVRA
22 reports, I have to give the number of new voters, the
23 applications. I'll get a hundred in from, say, a DMV but
24 50 of them were new. I do have to break that out. I have
25 to give the total number of new applications that come from

21 (Pages 78 to 81)

82

1  the various categories.
2    Q  And what's a new application?
3    A  A new voter, a brand new voter.
4  ·  Q  Is that someone who becomes active?
5    A  Right, brand new voter.
6    Q  Okay.  But if that person is not registered, it's
7  not considered a new application?
8    A  Well, the -- correct.  The application would come
9  in.  It would be processed.  If it was incomplete, they
10  would be in a not-registered status.  It would not -- on
11  that report, it's not counted as a new applicant.
12    Q  Now, you said that the problem is ongoing with the
13  Department of Motor Vehicles; is that correct?
14    A  From all of our mandated -- all of our mandated
15  sites, from all the outside groups that help us do
16  registration work.
17    Q  Okay.  So when you say all of your mandated sites,
18  does that include the Department of Children and Families
19  as well?
20    A  Yes, libraries, all of them.
21    Q  Do you see that further into that sentence it
22  reads -- it refers to an apparent negative attitude by
23  staff for these agencies toward voter registration duties?
24    A  Uh-huh (affirmative).
25    Q  Do you know what is meant by that?

83

1    A  Initially, when NVRA was enacted in '95, these
2  agencies weren't especially happy to be helping with voter
3  registration.  They're very busy agencies with their own
4  work and here was an extra level of work that the national
5  government and the state government was saying you will do
6  this.
7    (Whereupon, Ms. Quamie exited the deposition
8  room.)
9    THE WITNESS:  So there was some frustration, some
10  resentment that they were having to stop and do this.
11  It subsided over time.
12    Eventually the attitude became, well, we've got no
13  control, we have to do this.  There was a greater level
14  of cooperation among the higher level management than
15  the men in the trenches, you know, the clerk or the
16  examiner that's sitting there having to do the
17  paperwork.
18  BY MS. NELSON:
19    Q  Did you see that resentment and frustration that
20  you referred to expressed by the persons at these agencies?
21    A  Not so much in direct comments.  I mean, none that
22  I recall, anyhow.
23    I would say it would be more in a reflection of
24  the work that we were receiving, the applications we were
25  receiving, the incomplete -- the number of incomplete

84

1  applications that we were receiving.  And when we would be
2  emphasizing areas that needed improvement, we just really
3  weren't seeing that happening.
4    Q  To whom were you emphasizing these improvement
5  areas?
6    A  Well, it would be a case where, as the courier was
7  bringing in work and transferring it over to the Imaging
8  Department and the ladies to data entry, just starting to
9  see trends of, you know, large numbers that aren't signed
10  or are missing pieces.
11    The courier -- we would have our courier then
12  bring it to the attention of the manager or whoever our
13  contact person was at that site, that, you know, very
14  diplomatically saying, We've got some problems we'd like
15  you to address.
16    Like I say, even with repeated conversations about
17  these things, we weren't really seeing a change in the
18  paperwork, an improvement in the paperwork.
19    Q  Did your office have communications with contact
20  persons at each site over time?
21    A  Yes.  We always maintain a contact person.  Now,
22  those people have come and gone over time.  And we haven't
23  maintained any kind of list that said, you know, when we
24  started with this DMV office, this was our person and then
25  on this date it changed that that person, you know, that

85

1  progression of contact.  We haven't maintained lists like
2  that.
3    Q  Have you expressed your concerns to each of the
4  contact persons over time?
5    A  As needed.
6    Q  Do you continue to express concerns to --
7    A  Yes.
8    Q  -- persons at -- let me just finish, so I can get
9  my question out.
10    A  Okay.
11    Q  -- persons at the Department of Motor Vehicles
12  currently about concerns you have?
13    A  Yes.
14    Q  Do you have direct contact with those individuals
15  or is it Veronica Koval?
16    A  It's primarily Veronica Koval.
17    Q  Have you ever had direct contact with those
18  individuals --
19    A  Yes.
20    Q  -- on these issues?
21    A  Yes.
22    Q  Do you recall to whom you spoke?
23    A  No, because this would have been 1995, 1996.
24    Q  That you had direct contact?
25    A  That I, personally, was in touch with these

22 (Pages 82 to 85)

86

1  people.
2  Q   Now, you mentioned that applications come in, come
3  in from the Department of Motor Vehicles over time that
4  were incomplete. How were they incomplete?
5  A   The biggest problem was the lack of a voter
6  signature on the form.
7  Q   Were there other ones, some smaller problems?
8  A   For DMV, that's the primary problem because the
9  application is essentially computer generated. It's -- the
10  registration process is built in into their software as
11  they're doing their driver's license work. They get to
12  certain screens where it then triggers the voter
13  registration process.
14       (Whereupon, Ms. Quamie returned to the deposition
15  room.)
16       THE WITNESS: So I'm not aware that -- other than
17  being able to bypass that a person wants to register,
18  because I think that's the leading question is, do you
19  want -- you know, as we're doing your driver's license
20  work, do you want to register. Short of bypassing that
21  question, I don't -- I'm not aware that they can bypass
22  anything else.
23       The form then prints and they're to get the
24  signature. That's the final piece. So what was
25  happening in a lot of cases is, it's a very busy

87

1  office, there's a lot going on. The examiner might be
2  here and the printer across the room. There were some
3  cases where the paperwork wasn't making it back for the
4  individual to sign before the person would leave.
5  BY MS. NELSON:
6  Q   Okay. Do you have any sense of the number of
7  incomplete applications that you received from the
8  Department of Motor Vehicles, the percentage of persons who
9  responded to your letter saying that the application was
10  incomplete?
11  A   No, I don't.
12  Q   Do you know whether it's a large percent, a small
13  percent?
14  A   I don't know that we've ever tracked that, so I
15  don't know how to answer the question.
16  Q   Is there any way to track that?
17  A   I'm able to tell -- I now receive -- I don't
18  remember when I started receiving it. I now receive a
19  monthly report, in conjunction with my NVRA report, that
20  tells me how many, what we call, incomplete application
21  letters go out. But it's not broken down in a fashion that
22  tells me what the source was, whether it was driver's
23  license, the libraries, DCF, volunteer drives. And even
24  if -- even when I give you the -- would give you the number
25  of those letters going out, I don't have a number that

88

1  tells you how many come back --
2  Q   Okay.
3  A   -- and complete the process.
4  Q   You mentioned that the Department of Motor
5  Vehicles and -- Highway Safety and Motor Vehicles asks a
6  leading question, Do you want to register to vote. Do you
7  know with what consistency the Department of Highway Safety
8  and Motor Vehicles asks that question of persons coming
9  into their office for services?
10  A   No. I have -- I have no knowledge of that.
11  Q   Do you have any sense of whether it occurs
12  regularly or not?
13  A   I -- I would believe it's getting better, but, no,
14  I have -- I have nothing I would hang my hat on.
15  Q   Do you have a sense that it wasn't -- when you say
16  "getting better," what do you mean? Do you have a sense
17  that it wasn't --
18  A   Yeah.
19  Q   -- good in the past?
20  A   Well, for that first year after NVRA took effect,
21  we were just floored at the volume coming out of the
22  driver's license offices, each month, just a lot of
23  applications.
24       It seemed like after the '96 election, all of a
25  sudden, those totals just dropped significantly. So we

89

1  started asking the managers, you know, How did we go from
2  this number to that number. And the response was, Well,
3  people don't -- people aren't asking to vote -- or asking
4  to register. So, I mean, we had no choice but to accept
5  the answer.
6       We had rare occasions where the numbers would
7  spike up a little bit but it just -- we didn't know where
8  that pattern had gone to.
9       As the 2000 elections were approaching, voter
10  interest, of course, increases. People are more aware that
11  elections are coming, so those numbers started jumping up
12  again. So it was just purely my speculation, watching
13  those numbers.
14  Q   You said as the 2000 election approached, did the
15  numbers approach the numbers that you had observed in 1996,
16  where you were floored by the volume?
17  A   Since I didn't compare those numbers, I don't know
18  how to answer the question.
19  Q   Were you floored, so to speak, by the volume that
20  came in for the 2000 election?
21  A   Well, I know that it was increased, likewise,
22  everything was increased. I've not taken a look to see how
23  the numbers have adjusted in 2001.
24  Q   Okay.
25  A   It's like we do these peaks and valleys, you know,

23 (Pages 86 to 89)

90

1  that it starts building as the election grows closer. I
2  mean, that's true across the board. It's not unique to the
3  mandated sites.
4        But '95 wasn't an election year, so that's why I
5  say we were surprised to see it -- it drop so after the '96
6  election.
7     Q   Okay. How many DMV sites are in your county?
8     A   I believe we have four.
9     Q   What about DCF?
10    A   DCF? I would have to guess somewhere around six
11  to eight, but that's a pure guess. I would have to look at
12  the list.
13    Q   Okay. Of the four DMV sites, do you have any
14  sense of -- strike that.
15        Of the four DMV sites that you know of, have you
16  noticed any difference in how they operate?
17    A   No.
18    Q   Do they each turn out the same number or, you
19  know, roughly the same number of applications?
20    A   Well, we've got -- there are two of the four that
21  are busier, do a higher volume of work.
22        As I understand it, from some of the DMV folks,
23  they're among the busiest of the state.
24    Q   Can you tell me where those sites are or what
25  sites?

91

1     A   One is in Winter Park.
2     Q   Okay.
3     A   And the other one is on a street called South
4  Semoran.
5     Q   South Semoran?
6     A   Yes. S-E-M-O-R-A-N.
7        (Whereupon, Mr. Cox exited the deposition room.)
8  BY MS. NELSON:
9     Q   Are those the two busier sites?
10    A   Right.
11    Q   And what are the other two sites, if you recall?
12    A   One's on South Orange Blossom Trail. The other is
13  in Ocoee.
14    Q   You're going to have to spell that for me.
15    A   Oh, it's O-C-O-E-E.
16    Q   Okay. And when you say that the Winter Park and
17  South Semoran DMVs are busier, what do you mean, just in
18  terms of numbers?
19    A   In terms of the applications that come in? I
20  would have to look at reports to give you -- to give you
21  accurate numbers. I just know that the pattern always was
22  that they were -- we got more applications from those two
23  sites than the other two by virtue of them being busier
24  offices.
25    Q   Do you have any reason for an understanding

92

1  that -- let me strike that.
2        Do you think that the Winter Park and South
3  Semoran offices are busier for any reason other than the
4  fact that there are larger populations that those two
5  offices service?
6     A   No, I have no reason -- no idea why they would be
7  busier, other than the parts of town they're located in are
8  more congested.
9     Q   Maybe I'm assuming something here. Is Winter Park
10  a busier -- or does it have a higher concentration of
11  people living in the Winter Park area versus the other two
12  you mentioned?
13    A   Yes.
14    Q   Is that the same for South Semoran?
15    A   Yes.
16    Q   If you'd turn back to Page 8, the last sentence on
17  the page says, Requests by our office to participate in
18  training programs were rejected.
19    A   Yes.
20    Q   Do you know what time period that refers to?
21    A   '90 -- late '94, early '95.
22    Q   Late '94, early '95?
23    A   Yes.
24    Q   Since 1995, has your office asked to participate
25  in training programs with the Department of Motor Vehicles?

93

1     A   We have been out, my impression is, several times
2  since the 2000 election.
3     Q   What about in the period of time from 1995 to the
4  2000 election?
5     A   To the DMV offices?
6     Q   Yes.
7     A   No, no.
8     Q   Did you ask to participate in any training
9  programs between 1995 and 2000?
10    A   When we -- when we had asked in late '94, early
11  '95 could we participate, the answer we were given at that
12  point pretty well convinced us that we weren't going to be
13  able to get in unless something came down from a higher
14  source.
15    Q   Can you tell me what response you got that
16  convinced you so?
17    A   Mr. Cowles and I met with the managers of all four
18  branches of the DMV offices in -- well, I take it back. It
19  might have been '96, because Mr. Cowles had taken office.
20  Then that -- I would have to check the date. I believe Mr.
21  Cowles was in office as supervisor.
22        Anyway, we were told that they met -- they met
23  with their new employees in training purposes, but due to
24  scheduling, due to overtime pay issues, that it wasn't
25  going to be possible for us to get in there. That the best

24 (Pages 90 to 93)

94

1 thing was for us to provide -- or the DMVs had an internal
2 trainer that worked with these people and that this
3 individual, this DMV trainer, would be the one to then
4 train the examiners.
5    Q   This meeting with the four managers, during this
6 meeting did they ask you, or at any time did they ask you,
7 for materials to assist them in training their employees?
8    A   I don't recall being asked because I don't recall
9 supplying any.
10    Q   Do you recall offering any?
11    A   I'm sure we did. Specifically, I don't recall.
12    Q   Okay. Do you have any sense of whether the
13 internal trainers at DMV were effective?
14    A   No. I have no idea.
15    Q   So, after this meeting, you're not sure whether it
16 was '95 or '96?
17    A   Yeah. I guess I'm going to correct myself and say
18 it could have been anywhere from '95 to potentially '97
19 because Mr. Cowles would have taken office in January of
20 '97.
21    Q   Are we clear that it's not 1994, because that's
22 something that you initially said as a possible range? Is that
23 still --
24    A   Well, I know that we did go and meet -- we did go
25 and meet the managers prior to NVRA starting, because we

95

1 had to establish those contact people and things like that.
2        But the meeting I'm recalling with Mr. Cowles,
3 that was a meeting that was called at our request to try
4 to -- try to make some improvement.
5        (Whereupon, Mr. Cox returned to the deposition
6 room.)
7 BY MS. NELSON:
8    Q   So you met before the NVRA -- before the DMV sites
9 were required to implement the NVRA, you met with folks
10 there?
11    A   Yeah, I believe we did. It might have been, you
12 know, telephone calls or stopping by the site to get
13 familiar.
14        I, myself, did training at the libraries because,
15 under the statutes, the supervisor -- well, libraries and
16 the Center for Independent Living because, under the
17 statutes, the supervisor's responsible for training those
18 two sites.
19    Q   And you did the training there?
20    A   Yes.
21    Q   Do you recall how many meetings you had with
22 persons at the Department of Highway Safety and Motor
23 Vehicles from the time -- from before NVRA -- before they
24 were required to implement the NVRA through the 2000
25 election?

96

1    A   No. Because it would have -- we had the one --
2 the one sit-down meeting that I recall. I recall seeing
3 them at training workshops that the Division of Elections
4 sponsored. Anything other than that would have been just
5 individual based on the site.
6    Q   Did you discuss training with the department --
7 folks from the Department of Highway Safety and Motor
8 Vehicles, other than the sit-down meeting that you referred
9 to and the meeting that you said occurred before the NVRA
10 started?
11    A   Sitting down, no. We left it -- again, because
12 the statutes left that training responsibility to the
13 Division of Elections, we did our training, our coaching,
14 counseling, if you will, on a one-on-one basis as the
15 courier would go into the site and as they're writing those
16 receipts, collecting that material and noticing things, we
17 would have the courier mention to the contact person, you
18 know, Hey, we're really having a problem this week with
19 lack of signatures. Or if it was at the library, They're
20 forgetting to put a date on these things, things of that
21 nature. It was handled informally like that.
22    Q   So the courier was specifically instructed to talk
23 to persons at DMV about problems that you were
24 experiencing?
25    A   Yes.

97

1    Q   Do you know whether the courier did that?
2    A   I feel like they do, yes.
3    Q   And why do you feel that?
4    A   Well, they -- usually when we would say, Hey, you
5 need to talk to this site about this issue, they were able
6 to report back a conversation. I had no evidence that
7 somebody was manufacturing a conversation.
8    Q   And what would the couriers report back?
9    A   Just that, I've talked to this contact person and
10 explained the problem that they're having.
11        Well, I'll use the DCF as an example. I've talked
12 to this contact person, that we're still getting these old
13 forms, and she says she's gone desk by desk to everybody,
14 picking up old forms. She can't explain to me how these
15 old ones are still coming in.
16        So that would be the type of report back I would
17 get.
18    Q   And would you get reports back from the courier
19 who spoke to people at the Department of Motor Vehicles?
20    A   Yes.
21    Q   Since the 2000 election, has your office done any
22 trainings at the Department of Highway Safety and Motor
23 Vehicles?
24    A   Since 2000, yes.
25    Q   And can you describe to me what happened with the

25 (Pages 94 to 97)

98

1  trainings?
2      A   Veronica Koval, my Customer Service manager,
3  worked with the DMV managers and their trainer, I believe,
4  to schedule a time where she could go in and speak to those
5  staff members about registering and how the work they're
6  doing impacts what we're doing.
7      Q   Do you know how many times Veronica Koval or
8  anyone from your office attended training since 2000 with
9  DMV?
10     A   I don't recall. I'd have to ask.
11     Q   Do you know whether Veronica Koval was, in fact,
12 able to speak to the DMV employees or did she simply attend
13 the meeting?
14     A   No, she was a presenter.
15     Q   And you say you don't recall on how many
16 occasions?
17     A   No. I would have to ask.
18     Q   Do you think it was more than one?
19     A   Yes.
20     Q   Is this something that occurs regularly?
21     A   No. It's not a regularly scheduled thing.
22     Q   And when was the first training since the 2000
23 election that your office conducted for DMV employees?
24     A   Again, I'd have to ask to see her calendar.
25     Q   Do you have a sense of what year it began? Was it

99

1  after -- was it in 2000 after the 2000 election, in 2001 or
2  2002?
3      A   Where she went in to talk to the DMV staff
4  directly?
5      Q   Yes.
6      A   It's been since the 2000 election.
7      Q   Do you know the year, whether it was 2000 itself
8  or 2001 or 2002?
9      A   Oh, I would say 2001.
10     Q   And if you spoke to Veronica Koval you'd be able
11 to find out more definitively?
12     A   Yes, yes.
13     Q   Do you know who Helen Howard is?
14     A   Yes.
15     Q   Who is she?
16     A   I'm not sure exactly what her title is. She's
17 like a liaison that DMV has assigned as our -- the
18 go-between between all the Supervisors of Elections and the
19 DMV staff.
20     Q   So it's not just -- she's not just the liaison for
21 Orange County and DMV? As far as you understand she's the
22 liaison for all?
23     A   As far as I understand, she's the liaison for the
24 whole state.
25     Q   Do you have liaisons between Orange County and the

100

1  four DMV sites that are in Orange County?
2      A   Any time we have an issue, we would go to Helen.
3      Q   How long has Helen been the liaison as far as you
4  know?
5      A   I would have to check with Veronica because I
6  delegated that our representative for Helen be Veronica.
7  But I don't remember whether she was on board for the 2000
8  elections or not. I don't remember.
9      Q   Have you experienced an improvement in service at
10 the Department of Highway Safety and Motor Vehicles since
11 Helen Howard came on?
12     A   Yes, she's been able to help us resolve some
13 issues.
14     Q   Which ones?
15     A   Very basic ones. Printer problems, the printer
16 being located too far away from the examiners.
17         I guess when people are getting their driver's
18 license, they do their work and will turn and run out the
19 door before the poor examiner can get the paperwork over to
20 them.
21         So things on that basic level. Again, I'd have to
22 ask Veronica for other instances where we've contacted
23 Helen.
24     Q   Do you know whether that, in fact, occurs, that
25 persons registering to vote leave DMV before they're given

101

1  an opportunity to sign?
2      A   That's -- that's been things -- something that
3  we've witnessed and a problem that the managers have
4  reported.
5      Q   How did you witness that? What specifically did
6  you witness?
7      A   Well, couriers, my couriers, as they're in the
8  sites, will witness -- at one point, DMV was switching over
9  computer -- or printer hardware. And they were having some
10 trouble with the machines jamming. And by the time the
11 printer would be back online functioning, they would see
12 that the applicant had left.
13     Q   Do you know how long persons have had to wait on
14 average to get -- to get the application to sign it at DMV?
15     A   No. I've not timed it.
16     Q   Are there improvements that you would still like
17 to see at DMV in terms of their voter registration
18 services?
19     A   Other than just perfection, there's nothing that
20 comes to mind.
21     Q   I mean, is there anything within reason that you
22 would like to see them improve on?
23     A   Veronica and the courier haven't brought anything
24 to my attention. So I -- I have nothing specifically that
25 I could offer.

26 (Pages 98 to 101)

102

1    Q   When was the last time that they brought an issue
2    to your attention concerning a problem at the Department of
3    Highway Safety and Motor Vehicles, if you recall?
4    A   In terms of a problem, I don't recall. Within the
5    last -- probably the last week, there's been a request from
6    a DMV for us to -- for Veronica to come out and do some
7    training. That's the last time I remember a conversation
8    about a DMV office.
9    Q   Okay. What about with respect to DCF, have you
10   ever conducted trainings at DCF?
11   A   Yes. My recollection is that it was early in the
12   process, so around the '95 time frame.
13   Q   Was that the last time you conducted a training at
14   DCF?
15   A   I, myself, yes. Now, I recall Veronica going
16   out -- I can't recall the number of times but she has done
17   training at DCF as well.
18   Q   Do you know when, what years?
19   A   No.
20   Q   Do you know whether training -- whether Veronica
21   conducted trainings at DCF prior to the 2000 election?
22   A   It's my recollection that she did. I believe she
23   went to some manager-type meetings and spoke at those.
24   Q   Before the 2000 election?
25   A   I believe.

103

1    Q   What about after the 2000 election?
2    A   I would have to check with her.
3    Q   Okay. Did you ever or did your office ever invite
4    staff persons at DCF to attend trainings at the Supervisor
5    of Elections Office of Orange County?
6    A   The Division of Elections had a number of training
7    classes that they did around the state. And by virtue of
8    Orlando being sort of central to this part of the state,
9    we -- Mr. Cowles always made our office available for those
10   training sessions, so they were in attendance of those.
11   Q   What about trainings that the Supervisor of
12   Elections Office provided for its staff or temporary staff?
13   A   For?
14   Q   For -- were DCF employees invited to those
15   trainings?
16   A   No.
17   Q   What about Department of Highway Safety and Motor
18   Vehicle employees, were they invited to attend trainings at
19   your office?
20   A   No.
21   Q   Other than the Division of Elections training --
22   A   No. We always figured we'd have a better chance
23   of getting in if we went to them.
24   Q   Do you know of any problems with the voter
25   registration services provided at DCF, other than what

104

1    we've already -- well, why don't you answer that more
2    broadly. Do you know of any problems?
3    A   Any problems at DCF? Not -- nothing out of the
4    normal incomplete applications.
5    DCF has probably had more outdated applications
6    coming in. I would say that, followed by the volunteer
7    groups that do registration work. Volunteers can get
8    applications straight from the Division of Elections or
9    through us. And if they got a large quantity that they've
10   been holding for a while, they're just not aware that the
11   laws have changed.
12   Q   When you say -- oh, sorry. Go ahead.
13   A   I was going to say, other than that, that's the
14   outdated forms, is all I can think of for DCF.
15   Q   Okay. How does DCF compare to DMV in terms of the
16   number of outdated forms they have given your office over
17   the years?
18   A   I don't recall outdated forms being a problem at
19   DMV at all because, like I say, they're computer generated
20   out of the driver's license software.
21   Q   Okay. So when you talked about outdated forms
22   earlier, you were speaking exclusively to DCF?
23   A   Yes.
24   Q   What about --
25   A   Well, DCF and -- well, you're talking about

105

1    mandated sites, right?
2    Q   So you're including other sites in that?
3    A   Well --
4    Q   Do you get outdated forms from other sites?
5    A   We do. Again, I don't -- I don't feel like it's
6    as high as at DCF. Outdated forms, to my recollection, are
7    typically from DCF and all the different volunteer groups
8    that help us do registration. Or somebody has gone to a
9    location, picked up an application, held onto it long
10   enough before they filled it out and mailed it back that
11   it's become obsolete.
12   Q   So when we talked earlier about forms that were
13   outdated and therefore may not have contained certain
14   information that was then required when you received
15   them --
16   A   Uh-huh (affirmative).
17   Q   -- are you saying none of those came from the
18   Department of Highway Safety and Motor Vehicles?
19   A   If they did -- and I don't recall that being a
20   problem. If they did, these are going to be cases where
21   D -- wait, were we talking DCF or DMV?
22   Q   We're talking about DMV.
23   A   DMV.
24   If they did, DMVs keep on hand a supply of blank
25   forms, because it's not unusual for somebody to come in to

27 (Pages 102 to 105)

106

1  get a driver's license, they're working with the examiner
2  and theirs will generate off the computer system.
3       But say a spouse or friend is along and says, Hey,
4  I want to register, too. They have a supply of extra
5  forms. If we got any outdated forms, it would be in that
6  scenario, where they've gone to a box and pulled one out.
7  I don't recall it being that big of a problem at the DMVs.
8       Q   But it isn't your understanding that DMV has forms
9  that are not generated from the computer?
10      A   Right.
11      Q   That are hard copy forms?
12      A   Right.
13      Q   What about the number of incomplete applications,
14  how does DCF compare to DMV on that?
15      A   At DCF, there's probably a wider range of ways an
16  application can be incomplete. Like I say, DMV is ahead of
17  the game because the bulk of theirs are computer generated
18  and I don't believe the system allows them to bypass
19  fields, required fields.
20      At DCF, these are applications where it's just the
21  blank form and it's being hand filled in. I think there's
22  more of a potential for a question to be missed as one's
23  completed by hand.
24      We ask that they date the application, because the
25  date that it's received by a mandated site becomes the

107

1  person's registration date. Occasionally they forget to
2  date one and that can pose a problem at book closing time.
3       Q   When you say "they," who are you referring to?
4       A   The DCF staff member, that caseworker. The one that's
5  sure what the correct terminology would be. The one that's
6  assisting the voter in filling out that form.
7       Q   Is DMV also required to date the forms?
8       A   It's computer generated.
9       Q   Are they required to put a date on the back of the
10  form and then sign it?
11      A   No, because it's -- there's a date -- the system
12  dates it.
13      Q   Okay. I'm sorry. When I say "they," are DMV
14  employees required to sign the back of the
15  computer-generated forms?
16      A   No.
17      Q   Are they required to sign and date the back of the
18  hard copy forms that --
19      A   Yes.
20      Q   -- persons fill out?
21      A   Yes, yes.
22      Q   Do you know whether there are occasions where they
23  do not sign and date the back of those forms?
24      A   I'm sure there is. I'd have to ask. I don't --
25  it's not been brought to my attention that it's a

108

1  significant problem, though.
2       Q   Okay. Is there a liaison for DCF, the DCF offices
3  in Orange County? You said there are about -- I think you
4  said seven or eight?
5       A   No. Like a Helen Howard equivalent? No, there's
6  not.
7       Q   Do you think it would be helpful to have a Helen
8  Howard equivalent for the DCF offices in Orange County?
9       A   Yes.
10      Q   Are there improvements that you would like to see
11  at the DCF offices concerning their voter registration
12  process?
13      A   We would certainly like to become more involved.
14  I'd like to see us more involved in their training when it
15  comes to voter registration. I think that would help us
16  eliminate some problems.
17      I think -- strictly my opinion, I think DCF
18  probably suffers from a high turnover of staff and while
19  you're -- while you've trained the managers and their
20  understanding of your needs, just the shear volume of staff
21  turnovers, I think, impacts the process.
22      Q   Okay. Thank you.
23      A   Uh-huh (affirmative).
24      Q   One moment. I just want to check in where we are
25  here.

109

1       And did you -- can you read the response --
2  Interrogatory Number 15 and the response and tell me if you
3  participated in any way in constructing that response?
4       A   I think it has enough legal jargon in it that I
5  would need somebody to help me understand what they're
6  saying.
7       MR. CIRULLO:   Just to point out for the record, on
8  Page 13 there's a sentence that says, Counsel for
9  William Cowles provided the responses to
10  Interrogatories 14 to 20.
11      MS. NELSON:   I'm sorry. Can you --
12      MR. CIRULLO:   It's on Page 13, right above my
13  signature. It says, Counsel for William Cowles
14  provided the responses to Interrogatories 14 through
15  20.
16      MS. NELSON:   Are you representing on the record
17  that no other person -- that no persons inside the
18  Supervisor of Elections Office --
19      MR. CIRULLO:   I'm just pointing that out so when
20  she says it's all legal mumbo jumbo, she may have
21  assisted me in some respect, but a lot of these had to
22  do with the allegations in the Complaint.
23      MS. NELSON:   Okay. We'll find that out as we go
24  along.
25  BY MS. NELSON:

28 (Pages 106 to 109)

110

1  Q  Can you take a look at the paragraph that begins,
2  The incidents alleged, and refers to a discovery practices
3  handbook – I'm sorry. I'm very sorry. I thought this was
4  something else. Okay. You can scratch that.
5      What about the response to Interrogatory Number
6  17? And just to keep us going, I'm going to ask you the
7  same thing for 18, 19 and 20. So if you just take a look
8  at that and tell me if you contributed to any of those
9  responses, that would be helpful.
10  A  If I had any involvement in those, I'm not sure it
11  would have been more than just answering a question
12  occasionally.
13  Q  Do you have any recollection of participating in
14  constructing these responses?
15  A  No recollection, no.
16  Q  Okay. I'd like to show you what's been marked as
17  Plaintiffs' Exhibit Cowles Number 4, Defendant Williams
18  Cowles Responses to Plaintiffs' Second Set of
19  Interrogatories.
20      Take a look at it and tell me if you've seen this
21  document before and whether it's your signature that is
22  on – or whether your signature is contained on the page
23  after Page 23.
24  A  Yes, that's my signature.
25  Q  Have you seen this document before?

111

1  A  I believe I have.
2  Q  What makes you say that?
3  A  Well, pieces of it look familiar. I'll be honest,
4  a lot of it looks the same to me, but – I believe I've
5  probably seen it.
6  Q  Okay. Can you turn to Page 3, please?
7  A  3?
8  Q  Uh-huh. Interrogatory Number 1 in the response.
9      Can you take a look at it and tell me if you
10  contributed to constructing this response?
11  A  I would have contributed poll worker training
12  manual for my laptop people. And I probably had some
13  involvement in the third paragraph of the response about
14  training regular and temporary staff.
15  Q  Are you responsible for training temporary staff?
16  A  Well, some of them.
17  Q  Which ones?
18  A  I train the phone bank. I train – we have an
19  offsite phone bank. We call it the Pittman phone bank,
20  only because that's the street it's located on.
21      This is a phone bank that is used on election day
22  to answer questions from polling places that did not have
23  laptops. It was like our first line of defense.
24  Q  Was that phone bank designated to the precincts
25  that did not have laptops exclusively?

112

1  A  Yes.
2  Q  Were those the only calls that would go to that
3  phone bank?
4  A  Yes.
5  Q  And that's at the Pittman site?
6  A  Yes.
7  Q  Was there also a phone bank at the annex?
8  A  That's – it's probably a different term for the
9  same group of people.
10  Q  Okay. How many – can you just describe what the
11  phone setup was for us for the 2000 election?
12  A  Okay. Like I said, a hundred of the precincts had
13  laptops that were connected by telephone line into the
14  office. They had an abbreviated system, an abbreviated
15  look into the online voter registration system.
16      Then the precincts that did not have laptops were
17  given the phone number to a phone bank that I call the
18  Pittman phone bank. Others in the office might call it the
19  annex. They also had the same software where they had an
20  abbreviated look at the voter database.
21      Then we had a phone bank in the office that was
22  set up strictly to handle public calls. I don't know if
23  I'm registered, I don't know if I'm registered and get to
24  vote, I don't know where I go vote, questions of that
25  nature.

113

1      Then we had a phone bank that was a voter
2  authorization phone bank. As I said, these were the –
3  these were my experts. These were the regular staff
4  members that were doing the data entry work that understood
5  how to do the – the nitty-gritty research on some of these
6  situations.
7      The office had a switchboard, which, of course,
8  was taking calls for all types of situations that would
9  then funnel them to whether it be problems with a poll
10  worker calling in with an equipment problem or a question
11  on procedures. There were either direct lines or the
12  switchboard would direct them as needed.
13  Q  Were there separate telephone numbers for each of
14  these sites?
15  A  Yes.
16  Q  Each of the groups that you mentioned?
17  A  Yes.
18  Q  Okay. You said that the laptops, the 100 laptops
19  had telephone lines to the office. Do you mean to the
20  office database?
21  A  Well, they had – they were issued a cell phone to
22  call for help, you know, Oh, my laptop is frozen and I
23  can't get it back up again.
24  Q  Okay.
25  A  They had a cell phone they were issued along with

29 (Pages 110 to 113)

114

1  a phone number that took them straight into our technical
2  staff.
3        But the laptop itself connected by modem line
4  into -- it was using the Internet to connect to a file
5  server that allowed them this view of the database.
6     Q   The number that the precincts that had laptops
7  used to contact the technical staff, was that a designated
8  number for those precincts?
9     A   Yes.
10    Q   Directly to the technical staff?
11    A   Yes.
12    Q   And where was the technical staff situated?
13    A   At the main office.
14    Q   When you say that the laptop -- the laptops had
15 "an abbreviated look," what do you mean by "abbreviated"?
16    A   In previous elections, we had used the same
17 computer program as what we normally process our work in.
18 What we found was that when we brought in people, trained
19 them for a day on the system, they would see things that
20 would confuse them.
21       For instance, they would see over here on a line
22 where it would say absentee and nothing beside it. Well,
23 that was the header to an absentee character field where
24 there would be information in if the person had an absentee
25 ballot. I was noticing that they were beginning to get

115

1  confused and think, oh, this person has an absentee ballot.
2  But they don't.
3        One, for example, our regular screens that the
4  Voter Service clerks and the Customer Service reps use has
5  not only the basic registration information in it, it has
6  all of the documents that are associated with that record.
7  It has the voter's signature. It has the voter history,
8  petition information, absentee information. It was just
9  more information than the laptop people or this phone bank
10 group needed.
11       So we -- we give them -- we spoon feed them the
12 information that they need in order to help that voter in
13 the polling place on election day.
14    Q   Who decided what information would be contained in
15 the laptop and what information would be kept out?
16    A   Again, it was a team decision between myself and
17 the Elections Department and then our IS Department that
18 actually wrote the software.
19    Q   Was that the entire Elections Department and the
20 entire IS Department or just the heads?
21    A   It was probably Nancy Lord who was directions
22 coordinator at that time and June Condron, myself, Jerry
23 Smith, who was one of our programmers, and Lonn Fluke who
24 is head of the IS Department.
25    Q   And how did you all decide what would be included

116

1  on the laptop and what would be included -- and what would
2  be left out?
3     A   The questions that are on the affirmation, the
4  questions that we just knew from experience would be asked
5  in a polling place. That's probably the two driving
6  forces.
7     Q   So just so I'm clear, would the stuff -- the
8  information that you did not include on the laptops would
9  not pertain to questions on the affirmation or questions
10 that typically come to a polling place?
11    A   Yeah. It was either information that was not
12 needed on election day or it would be information that was
13 really too complex for them to make an accurate read of
14 that screen.
15       For instance, we don't give them access to all of
16 the documents that are in that voter record. We don't give
17 them the screens that show them the listing of those
18 documents either, because we don't want them misreading the
19 screen. That's why I said we spoon feed as much as we can
20 because we don't want room left for them to misread those
21 screens.
22       So we try to make it just as easy as possible,
23 keeping in mind that these are people that are coming in to
24 work for just a few days every other year.
25    Q   You mentioned that at the Pittman bank, those

117

1  workers had an abbreviated look as well?
2     A   Yes.
3     Q   Was it the same as was contained on laptops?
4     A   Yes.
5     Q   Did they have laptops at the Pittman facility?
6     A   Last time, no. They -- in 2000, it was a regular
7  computer, a regular PC workstation.
8     Q   And just, again, did the information contained on
9  the regular PC workstation differ in any way from what was
10 contained on the laptops?
11    A   No, it was exactly the same.
12    Q   Okay. And there was a separate number connecting
13 people to the Pittman phone bank?
14    A   Yes.
15    Q   And who had that number? Who was supposed to call
16 the Pittman phone bank?
17    A   The polling places that did not have laptops.
18    Q   Okay.
19    A   When they would have a voter there and there was
20 an issue that needed to be researched, that was the number
21 they were to call first.
22    Q   Were the precincts with laptops given that number?
23    A   They were, as a backup, in case their system went
24 down, they were given that number. Actually, they were
25 given -- everybody was given the same set of telephone

30 (Pages 114 to 117)

118

1  numbers. It was one master sheet of phone numbers. And
2  they were instructed, for this type of problem, you call
3  this number, for that type of problem, you call this
4  number.
5      Q   Okay. So the precincts with laptops were not
6  instructed to call in the first instance the Pittman phone
7  bank?
8      A   Correct.
9      Q   And the office lines were available -- well, not
10  available -- but, you know, who would be directed to call
11  the office lines?
12     A   Meaning, the special voter authorization group?
13     Q   No. You mentioned earlier that there were also
14  office lines that told a voter where to go. Were those
15  made available to the general public?
16     A   Yes.
17     Q   Did polling precincts also call into the office
18  lines?
19     A   I'm sure they did. I think -- being a poll worker
20  is a stressful job. Like I say, these are people that are
21  coming in for just a couple days every other year. And if
22  they're in need of talking to somebody, they'll try any and
23  all phone numbers to get the questions answered.
24     Q   Okay. And the voter authorization phone bank, who
25  had access to that phone number?

119

1      A   The only people that were to call that group were
2  the laptop operators. When they had done their search of
3  the system and could not answer the question, they didn't
4  have the information they needed, they were instructed to
5  call that number. Then --
6      Q   Oh, I'm sorry. Go ahead.
7      A   Then there would be cases where the precincts that
8  did not have laptops called the Pittman phone bank. The
9  Pittman phone bank said, I don't have the information to
10  give you, you need to call downtown. They would call that
11  same group also.
12     Q   Okay. So the polling precincts with laptops would
13  call the voter authorization line if they couldn't find the
14  information; is that right?
15     A   Right.
16     Q   And then persons without -- or precincts without
17  laptops would call Pittman in the first instance and then
18  be directed to call the voter authorization line?
19     A   Yes.
20     Q   Is that right?
21     A   Yes.
22     Q   Okay. And who called the office switchboard?
23  What purpose did the office switchboard serve?
24     A   The office switchboard would funnel calls to the
25  phone bank that dealt with the public primarily. I would

120

1  have to look at the telephone list to see if there were any
2  other calls that were routed through the switchboard.
3      But from past experience, we try to get as much
4  off the switchboard and onto its own phone number as we
5  can.
6      Q   Okay. Now, we started off by talking about
7  training. Can you tell me who you were responsible for
8  training for the 2000 elections or how -- actually, can you
9  just tell me more generally who was responsible for
10  training what group of people for the 2000 election?
11     MR. EHRLICH:  Object to form. Jeff Ehrlich.
12     MR. CIRULLO:  Okay.
13     THE WITNESS:  Okay. Mr. Cowles trained all of the
14  poll workers. I believe there were some break-out
15  sessions where June Condron would train the group that
16  we called the tabulator inspectors. I think Nancy Lord
17  would train some of the poll deputies. Otherwise, I
18  think Mr. Cowles trained the bulk of the poll workers.
19     My two managers, Pat Fletcher and Veronica Koval,
20  would train temporaries in their areas because, as I
21  say, we bring in temporary staff months before the
22  election to help us with the volume.
23  BY MS. NELSON:
24     Q   They would train temps in Customer Service and
25  Voter Services?

121

1      A   Right.
2      Then I trained the laptop operators and the
3  Pittman phone bank. Those are the major -- the major
4  groups.
5      The IS department would train their technicians,
6  their temporary technicians. But those are the bigger
7  groups.
8      Q   Okay.
9      MS. NELSON:  Why don't we take a lunch break?
10     THE WITNESS:  Okay.
11     MS. NELSON:  We're going to break for lunch for an
12  hour.
13     UNIDENTIFIED SPEAKER:  1:30?
14     MS. NELSON:  Yes.
15     (Whereupon, a brief recess was taken for lunch at
16  12:23 p.m. and the deposition reconvened at 1:30 p.m.)
17
18         End of Volume I
19
20
21
22
23
24
25

31 (Pages 118 to 121)



122

```
 1        UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF FLORIDA
 2
          CASE NO.: 01-0120-Civ-Gold
 3
    NATIONAL ASSOCIATION FOR THE
 4  ADVANCEMENT OF COLORED PEOPLE
    INC., by its FLORIDA STATE CONFERENCE
 5  OF BRANCHES, JIMMIE PANNELL, JULIA
    STONER, NATALIE CARNEGIE, JOHN L.
 6  CHEEVER, JAMES MARSHALL, LILLIE Q.
    ODOM, WILLIE STEEN, WALLACE
 7  MCDONALD, JERMAINE TERRY, LORINE
    WALDEN, EMERY TIMBERLAKE, VALERIE
 8  BUFORD-WELLS, MICHELLE FLOYD,
    CONSUELO MARIA GRAHAM, SHERRY
 9  EDWARDS, KANDY WELLS, JOANNA
    CLARK, JANICE KELLY, PLACIDE
10  DOSSOUS, RONDRICK ROSE, URSULA
    HARVEY, and ADMANTHA ISRAEL, in their
11  own right and as representatives of all
    similarly situated citizens and residents
12  of the State of Florida,
13             Plaintiffs,
14      vs.
15  KATHERINE HARRIS, Secretary of State of
    Florida; CLAY ROBERTS, Director of Florida
16  Division of Elections, DAVID C. LEAHY,
    Miami-Dade County Election Supervisor;
17  MIRIAM OLIPHANT, Broward County
    Election Supervisor; JOHN STAFFORD, Duval
18  County Election Supervisor; PAM IORIO,
    Hillsborough County Election Supervisor;
19  WILLIAM COWLES, Orange County Election
    Supervisor; and DEANIE LOWE, Volusia
20  County Election Supervisor (all in their
    official capacities); and CHOICEPOINT, INC.,
21  a Georgia corporation d/b/a DATABASE
    TECHNOLOGIES, INC.,
22
             Defendants.
23
24           DEPOSITION OF LINDA TANKO
                     VOLUME II
25
```

123

```
 1
 2          101 South Hall Lane
            Maitland, Florida
 3          Thursday, April 25, 2002
            9:03 a.m. until 6:01 p.m.
 4
 5
 6      The above-styled cause came on for hearing before
 7  me, Lisa L. Taylor, Registered Professional Reporter and
 8  Notary Public, State of Florida at Large, at the time and
 9  place indicated above for the purpose of taking testimony.
10
11
12  APPEARANCES:
13
       JANAI S. NELSON, ESQUIRE
14     TODD A. COX, ESQUIRE
       LEXER I. QUAMIE, Legal Assistant
15     NAACP Legal Defense and Educational
       Fund, Inc.
16     99 Hudson Street
       New York, New York 10013
17
       On Behalf of the Plaintiffs
18
19     C. CORY MAURO, ESQUIRE
       (Via Telephone)
20     1900 Phillips Point West
       777 South Flagler Drive, Suite 1900
21     West Palm Beach, Florida 33401
22     On Behalf of the Defendants/
       Katherine Harris, Secretary of State
23     of Florida; Clay Roberts, Director of
       Florida Division of Elections and the
24     Election Canvassing Committee
25
```

124

```
 1
 2  APPEARANCES (Continued):
 3     JEFFREY EHRLICH, ESQUIRE
       SUSAN TORRES, ESQUIRE
 4     (Via Telephone)
       Assistant County Attorney
 5     Miami-Dade County Attorney's Office
       111 N.W. 1st Street, Suite 2810
 6     Miami, Florida 33128
 7     On Behalf of the Defendant/
       David C. Leahy, Miami-Dade County
 8     Election Supervisor
 9
       MICHAEL D. CIRULLO, JR., ESQUIRE
10     Goren, Cherof, Doody & Ezrol, P.A.
       3099 East Commercial Blvd., Suite 200
11     Fort Lauderdale, Florida 33308
12     On Behalf of the Defendant/
       William Cowles, Orange County Election
13     Supervisor
14
       WILLIAM J. BOSCH, ESQUIRE
15     (Via Telephone)
       Assistant County Attorney/Volusia County
16     123 West Indiana Avenue
       DeLand, Florida 32720
17
       On Behalf of the Defendant/
18     Deanie Lowe, Volusia County Election
       Supervisor
19
20     DANIEL A. RESTREPO, ESQUIRE
       Williams & Connolly LLP
21     725 Twelfth Street, N.W.
       Washington, D.C. 20005
22
       On Behalf of the Defendant/
23     Choicepoint, Inc., d/b/a Database
       Technologies, Inc.
24
25
```

125

```
 1
 2  APPEARANCES (Continued):
 3
       DOUGLAS B. MAC INNES, ESQUIRE
 4     Assistant Attorney General
       Office of the Attorney General
 5     PL-01 The Capitol
       Tallahassee, Florida 32399-1050
 6
       On Behalf of the Department of Highway
 7     Safety and Motor Vehicles and the
       Department of Children and Families
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

32 (Pages 122 to 125)

126

```
              I N D E X
TESTIMONY OF LINDA TANKO
  Direct Examination by Ms. Nelson          6
  Cross-Examination by Mr. Cirullo        240
  Cross-Examination by Mr. Mac Innes      243
  Cross-Examination by Mr. Restrepo       250

CERTIFICATE OF OATH                       272
CERTIFICATE                               273
        INDEX OF EXHIBITS
Plaintiffs' Exhibit Tanko Number 1          9
(Plaintiffs' Notice of Rule 30(b)(6) Deposition)

Plaintiffs' Exhibit Tanko Number 2        196
(Letter dated September 10, 2001)
Plaintiffs' Exhibit Tanko Number 3        199
(Letter dated October 30, 2001)

Plaintiffs' Exhibit Tanko Number 4        200
(Public Assistance Agency Assessment)
Plaintiffs' Exhibit Tanko Number 5        202
(Library Agency Assessment)

Plaintiffs' Exhibit Tanko Number 6        203
(E-mail, Subject: NVRA workshops & site assessment)
Plaintiffs' Exhibit Tanko Number 7        213
(Clerks Comment Sheets)

Plaintiffs' Exhibit Tanko Number 8        218
(Poll Worker Training Manual)
Plaintiffs' Exhibit Tanko Number 9        223
(Clerk Manual)

Plaintiffs' Exhibit Tanko Number 10       224
(November 7, 2000 General Election Phone Record)
Plaintiffs' Exhibit Tanko Number 11       224
(November 7, 2000 General Election Phone Record)

Defendant/DBT's Exhibit Tanko Number 1    253
(Felon lists)
```

127

1    MS. NELSON: Hi. Who is on the line?
2    MR. EHRLICH: Jeff Ehrlich, Bill Bosch, Cory
3 Mauro.
4    MS. NELSON: Anyone else? Is Susan Torres on the
5 line?
6    MR. EHRLICH: She's not yet, but we can go ahead
7 and start.
8    MS. NELSON: We're ready to go back on.
9    MR. CIRULLO: Yeah.
10 BY MS. NELSON:
11   Q  We were looking at what was marked Plaintiffs'
12 Exhibit Cowles 4.
13   MS. TORRES: Susan Torres.
14   MS. NELSON: Hi.
15 BY MS. NELSON:
16   Q  Defendant Williams Cowles' Responses to
17 Plaintiffs' Second Set of Interrogatories?
18   A  Yes.
19   Q  Can you take a look at Interrogatory Number 2 and
20 tell me if you participated in the response to that
21 interrogatory?
22   A  Yes, I did.
23   Q  Did you draft a narrative for this response?
24   A  I don't recall a narrative. Seems like I provided
25 a list -- oh, wait. Yes, I did.

128

1    Q  Okay. I'd like to direct your attention to
2 Paragraph 3 that's part of the response to Number 2, the
3 one that starts with Internet?
4    A  Yes.
5    Q  Can you tell me whether there's any record that is
6 kept by the Orange County Supervisor of Elections Office of
7 persons who request a record via the web site -- sorry,
8 request a voter registration application via the web site?
9    A  No, there's no record kept.
10   Q  As far as you know, is there any way to record an
11 instance where someone comes to your web site to request a
12 registration application?
13   A  I'm not aware of any method of tracking that, no.
14   Q  Are you familiar with the claims of a Plaintiff
15 Consuelo Maria Graham in this case?
16   A  Only through this case, yes.
17   Q  What is your understanding of the claims that she
18 makes in this case?
19   A  It's my recollection that she claims to have
20 accessed a registration application on the Internet. I'm
21 not sure where that application was, you know, what the
22 site was that she visited. That she had filled that out.
23 I believe she then went to a college event and filled out
24 additional applications.
25       And I think the long and the short of it is that

129

1 our office had received none of it, none of these
2 applications. I believe the one that she did online was
3 returned to her by the post office and she is disputing it
4 unhappy, angry, challenging it.
5    Q  How do you know that your office did not receive
6 an application from Consuelo Maria Graham?
7    A  Every document that comes into the office, whether
8 it's from the mail or across our front counter, is
9 immediately clocked in, taken to our Imaging Department,
10 which is really just an extension of our Voter Services
11 Department. It's clocked in. They're bundled into batches
12 of work, imaged and then those images are out on the
13 computer system for our processors to access and then
14 process that work.
15       The way I know that none of her applications
16 reached our office is, like I say, every document that
17 comes in is imaged and processed, whether that results in
18 an active registration or a not-registered registration.
19 Because we don't have any computer file on her, I then know
20 that we didn't receive a document.
21   Q  Has there ever been an instance that you know of
22 where an application was received by your office and then
23 lost?
24   A  No.
25   Q  There's been no applications that have fallen

33 (Pages 126 to 129)

130

```
 1   between a desk or --
 2       A   No.
 3       Q   -- been lost in some other fashion that you know
 4   of?
 5       A   No, no.
 6       Q   Not even temporarily?
 7       A   No.
 8       Q   Can you take a look at Interrogatory Number 3 and
 9   the response and tell me if you drafted a narrative for
10   this response or participated in drafting the response in
11   any way?
12       A   Yes. I'm familiar with it and I helped by
13   drafting a narrative.
14       Q   Okay. Can you take a look at the paragraph that
15   is titled Driver's Licenses Offices on Page 5?
16       A   Okay.
17       Q   And do you see where it says, about mid paragraph,
18   It is our understanding that when drivers are sent renewal
19   notices by mail, the driver's license office should include
20   a voter registration application in that mailing.
21           And then, the following sentence, It is our
22   understanding that extra applications are kept on hand for
23   people visiting an office but not applying for a license.
24           What do you base that understanding on in the last
25   sentence that I read?
```

131

```
 1       A   We get applications from the DMV sites that are
 2   handwritten. They keep them -- it's my understanding they
 3   keep them not only for walk-in traffic that would want one,
 4   but in the event that their system goes down, they have a
 5   backup form.
 6           Like I say, we get completed forms from them. I
 7   would have to check to see whether we actually supply them
 8   with those applications or whether they get them through a
 9   central location. They probably get them from a central
10   location. That's been my experience.
11       Q   Do you know of instances when the system at the
12   Department of Highway Safety and Motor Vehicles has gone
13   down where they have had to rely exclusively on hard copy
14   registrations?
15       A   The only time that I recall, seems like they were
16   converting their system at one point, I mean, a major
17   system conversion. And I don't -- I don't remember whether
18   they were having some printer issues or whether it was
19   their whole system that was having some problems.
20           But, regardless, that would have been a point
21   where they would have used these backup forms.
22       Q   Do you recall what time period that was?
23       A   No, I don't. It was prior to 2000. But, no, I
24   would have to check and see if somebody could help me
25   remember.
```

132

```
 1       Q   You don't remember the year?
 2       A   No, I don't.
 3       Q   Do you know how long the system was down at DMV?
 4       A   I don't remember -- I don't remember it being an
 5   extended period of time, no. Maybe off and on for a couple
 6   days, maybe.
 7       Q   Do you know whether that affected the number of
 8   voter registration applications that DMV took in?
 9       A   No. I have no knowledge whether it would have or
10   not.
11       Q   Okay. And can you take a look at the two
12   paragraphs under driver's licenses offices and tell me
13   whether this is an accurate statement of the process as you
14   know it?
15       A   To the best of my knowledge, that's correct.
16       Q   We talked about DCF and DMV before lunch.
17           Can you tell me if you've experienced any
18   difficulties from public -- receiving voter registration
19   applications from public libraries?
20       A   Again, we suffer from incomplete applications.
21   The libraries are a little different than some of the other
22   mandated sites because at the library it's the applicant
23   themselves that -- that's completing the application as
24   opposed to a librarian.
25           We ask the librarians that as they're accepting
```

133

```
 1   that application to quickly look over it to make sure that
 2   those key questions are answered before the person leaves.
 3           Sometimes we receive incomplete applications
 4   because of, you know, questions missed. Sometimes our
 5   librarians forget to date it so we have a registration -- a
 6   date to use for a registration date.
 7           But in terms of problems, they're really no
 8   different than what we experience across all the avenues of
 9   registration, all the different ways a person can register.
10       Q   Okay. Can you turn to paragraph -- I mean, Page
11   6, another paragraph that begins Internet. And if you can
12   take a look at the second paragraph and tell me if that's
13   your understanding of the registration process?
14       A   The paragraph that starts, All incoming?
15       Q   All incoming. The registration process at the
16   Supervisor of Elections Office Orange County?
17       A   Yes, that's accurate.
18       Q   Okay. So we were talking about Consuelo Graham's
19   allegations that she sent in a voter registration
20   application.
21           Is it your -- is it your understanding that -- or,
22   rather, is it your statement that you do not know that she
23   sent in an application to your office because you don't
24   have one on record?
25       A   Correct. I mean, I understand that in a
```

34 (Pages 130 to 133)

134

1  deposition she -- she produced one I think that was
2  returned to her by the post office.
3       But me and the office having not received it, I
4  would be taking her word. And, I mean, I don't doubt that
5  she made the attempt, but it didn't reach us.
6     Q   And you say it didn't reach you because it's not
7  in your files?
8     A   Right. It's not -- right. There's no computer
9  record.
10    Q   Okay. Did you read Consuelo Graham's deposition
11 transcript?
12    A   No.
13    Q   Did you talk to someone about her testimony?
14    A   No. I mean -- well, at the time I guess when --
15 must have been when we were -- we learned that we were
16 involved in the lawsuit and eventually learned of her name,
17 then we started doing some research.
18       I suppose it was Mr. Cowles that told me her name
19 and had me do the research and gave me the bit of
20 information that I've shared with you.
21    Q   What research did you do concerning her claim?
22    A   Yeah. Initially, of course, we go out on the
23 voter database and looked for a record, looked for it under
24 several different names in the event that maybe she just
25 registered as C. Graham. A lot of times people forget how

135

1  they list their names. So researched it that way.
2       I believe she had gone to her father's polling
3  place. I don't recall how we found out what precinct that
4  would have been. I guess we must have known either the
5  father's name or we did some backtracking, anyway.
6       Went through the paperwork from that polling
7  place. When I say "paperwork," I mean the affirmations.
8  And there was no affirmation in that pile of -- in that
9  batch of work from the polling place.
10      When -- in my mind the scenario would have been
11 she would have walked into the polling place, checked in
12 with the PR/PL inspector, the one with the poll list, her
13 name would not have been found, that should have triggered
14 a set of procedures where the affirmation started, where it
15 would have been marked that, Here's this individual, their
16 name is not found on the PR/PL.
17      They would have gone to the oath person for the
18 further research. Off the top of my head, I can't remember
19 whether that was a laptop precinct or not.
20      But, regardless, if there had not been a laptop to
21 check, then the call would have been made, the research
22 done. Eventually, with a voter insisting, But I am
23 registered, I did do this, the call would have come into
24 our office and we would have had a telephone record in our
25 telephone log. We didn't find her name in any of those

136

1  logs.
2       So I didn't have any paperwork from the polling
3  place to try to check and see what had happened, so -- I
4  guess I've lost my train of thought.
5     Q   You were telling me what checking you did on her.
6     A   Oh, checking.
7       Yeah. At that point, after I've checked the
8  computer system, the registration system, I've checked the
9  polling place records, I really didn't have any further
10 tools to use to research it.
11    Q   Okay. Do you know whether anyone else performed a
12 search to see whether she had either attempted to vote on
13 election day or sent in a registration form?
14    A   Because we had so many telephone lists or the logs
15 that we keep, I had staff helping me look through those.
16 But any search beyond that, no, I don't recall any.
17    Q   You were the person who was primarily responsible
18 for this search into the records --
19    A   Yes.
20    Q   -- for her documentation?
21       Okay. We talked earlier about the Central Voter
22 Files for felon lists and the county files for felon lists.
23       Are you aware of any other types of lists provided
24 by the Division of Elections that pertain to list
25 maintenance?

137

1     A   We receive a list of duplicate records. This
2  would be a list where there's a registration record in our
3  county and a sister county, so then we're left to determine
4  which one is the most current, you know, to determine which
5  county the person lives in at that moment.
6       That happens because people, as they complete
7  their application, they forget to use the prior
8  registration portion of the application to let us know to
9  cancel.
10      We also receive a death list. The Central Voter
11 File voter registration records are run against -- I
12 believe it's the vital statistic records, looking for death
13 matches.
14    Q   When you say "they're run against," who runs them
15 against the vital statistics?
16    A   It was the vendor.
17    Q   And when you say "the vendor," who are you
18 referring to?
19    A   Again, I can't remember the company name. I don't
20 remember if it's ChoicePoint or DBT. I've forgotten.
21    Q   And we've been talking about these -- well, tell
22 me, one, are there any other lists besides the duplicate
23 lists and the death list that you receive, that your office
24 receives from the Central Voter File?
25       MR. CIRULLO: You mean from the Division of

35 (Pages 134 to 137)

138

1 Elections or from the Central Voting File?
2     MS. NELSON: The Central Voter File.
3     MR. CIRULLO: Receive lists from the Central Voter
4 File?
5 BY MS. NELSON:
6   Q  Do you receive Central Voter File lists from the
7 Department of -- from the Division of Elections?
8     MR. CIRULLO: Thanks.
9     THE WITNESS: I guess I'm not following then. A
10 Central Voter File list?
11 BY MS. NELSON:
12   Q  What is your understanding of the types of lists
13 that your office receives for purposes of list maintenance?
14   A  Okay. From the Central Voter File there would be
15 the felon list, the death list and the duplicate list.
16   Q  When you say "from the Central Voter File," what
17 do you mean?
18   A  I mean that the Division of Elections contracted
19 with a company, who I can't really remember the name, to --
20 all the supervisors send the Division of Elections their
21 list of registered voters, who then compile those, merge
22 them into one big list.
23     Then that list is compared by the -- through the
24 vendor's software, that list is then compared against FDLE
25 records on the felon portion of that list, vital statistics

140

1   Q  Okay. Are there other lists that your office
2 receives and uses for list maintenance purposes?
3   A  Well, like we discussed earlier this morning, we
4 received the list from the Clerk of the Courts on felony
5 convictions within the county. We use the Orlando
6 Sentinel's obituaries to see if we can find matches, only
7 because our death lists can be late in coming to us.
8   Q  Which death lists? The Central Voter File list?
9   A  Well, I'm trying to remember if we still receive a
10 list straight from vital statistics. I think that might
11 have gone away. I think that went away with the Central
12 Voter File.
13     Other lists? Those are the only lists that I
14 recall. The other -- the other items that we would use for
15 list maintenance would be returned mail under the
16 provisions of NVRA.
17   Q  Do you receive any lists concerning persons who
18 are deemed mentally incompetent?
19   A  I'm sorry. That's right. That's the last one.
20 We do receive -- we do receive a mentally incompetent list.
21   Q  From the county?
22   A  Yes, we do.
23   Q  Do you also -- have you ever received a mentally
24 incompetent -- a list of persons deemed mentally
25 incompetent from the Central Voter File?

139

1 on the death portion and duplicates would just be an
2 internal check.
3   Q  What do you mean by "internal check"?
4   A  Well, I mean, looking in Orange County's records
5 and comparing it to Miami-Dade's to see if somebody's name
6 shows up in both counties.
7   Q  And who would do that check?
8   A  It was my impression that it was the vendor.
9   Q  Okay. Do you have -- did you or have you at any
10 point had -- had any responsibilities for processing
11 duplicate lists?
12   A  Yes.
13   Q  Central Voter File duplicate lists?
14   A  Yes. Our department does that.
15   Q  Okay. And what about the death lists?
16   A  Yes. Our department processes that list, too.
17   Q  Are there any other Central Voter File lists that
18 your department is responsible for or has ever been
19 responsible for processing?
20   A  No.
21   Q  Was your office responsible for processing the
22 duplicate lists prior to the 2000 election?
23   A  Yes.
24   Q  And what about the death list?
25   A  Yes.

141

1   A  Yes, I believe there's one.
2   Q  Would your office have been responsible for
3 processing Central Voter File lists --
4   A  Yes.
5   Q  -- of persons deemed mentally incompetent?
6   A  Yes.
7   Q  So is it true to say that your office is
8 responsible for processing all lists, either from the --
9 either Central Voter File lists or county lists for list
10 maintenance purposes except for the felon lists?
11   A  My department processes all the lists, all the
12 incoming work like that.
13   Q  Including the felon lists?
14   A  Yes.
15   Q  From the CVF Voter File?
16   A  Yes.
17   Q  And the county's?
18   A  Yes.
19   Q  Is that directly under your supervision?
20   A  Right. Well, as we talked this morning, my
21 department is the one that processes all the work. The
22 difference that we had with the felon portion of the
23 Central Voter File is I, myself, didn't do a lot of that
24 work. It was primarily June Condron reviewing those lists,
25 marking the ones that needed to be processed.

36 (Pages 138 to 141)

142

1    But, right, anything within the voter database is
2    processed by my department.
3    Q   Okay. I'm trying to understand where your
4    responsibilities begin and end and where June Condron's
5    begin and end with respect to the lists.
6    A   Normally -- at that point, June was my direct
7    manager.
8    Q   We're talking about the period prior to the
9    November 2000 election.
10   A   Yeah, yeah.
11       And really, up until January of this year, June
12   was my direct manager. She oversaw my department, which
13   was the Voter Services Division, Customer Service and Voter
14   Services. She also oversaw the Election Division, so she
15   had a really big area of responsibility.
16       In terms of a lot of the processing work, it
17   bypassed both myself and June and would come into the
18   office through the mail, pick up, go straight into the
19   Imaging Department to be imaged and then processed by my
20   Voter Service clerks.
21       With the Central Voter File, we were just trying
22   to make sure -- you know, it was new to us. We're trying
23   to make sure we've got this under our belt. I was involved
24   in a different project, so that's why June stepped in to
25   work on the felon portion of that.

143

1    Q   Okay. Do you know how many felon lists your
2    office received leading up to the 2000 election, how many
3    Central Voter File felon lists?
4    A   No, I don't.
5    Q   Do you have any idea?
6    A   I recall at least two, but I'm not -- I don't
7    remember whether one was sent back or not.
8    Q   What about duplicate lists?
9    A   I know we received them. I don't know how many.
10   Q   Do you have any idea how many?
11   A   No.
12   Q   Leading up to the 2000 election?
13   A   No.
14   Q   What about death lists leading up to the 2000
15   election, do you know how many you received from the
16   Central Voter File?
17   A   No, I don't know how many.
18   Q   Have you received any Central Voter File felon
19   lists after the 2000 election?
20   A   I don't know.
21   Q   Who would know?
22   A   June Condron.
23   Q   What about duplicate registration lists after the
24   2000 election, duplicate Central Voter File registration
25   lists? .

144

1    A   Again, I would -- I would have to ask June.
2    Q   And what about Central Voter File death lists
3    after the 2000 general elections, has your office received
4    any?
5    A   I would have to ask June.
6    Q   Do you see the lists from the Central Voter File
7    concerning duplicate registrations when they come in?
8    A   No.
9    Q   Do they go directly to June?
10   A   The only list that goes directly to June is the
11   felon list, Central Voter File felon list. Otherwise, it
12   just -- it goes through the same funnel where it's imaged
13   and then batched and processed by our department.
14   Q   Okay. Who is the first person in your office to
15   take a look at the Central Voter File lists that are not
16   felon lists, so the mental -- the list of persons deemed
17   mentally incompetent, the list of persons listed as dead
18   and the duplicate registrations?
19   A   Take a look -- what do you mean by "take a look
20   at"? I mean --
21   Q   Who's the first person who receives them, who has
22   any responsibility toward that document?
23   A   That would be one of our Voter Service clerks
24   that's doing the imaging work. Her name is Etta, E-T-T-A,
25   Johnson. And all she's doing is purely opening the

145

1    envelope, clocking it in, date stamping it in and then
2    putting it into batches and imaging it for processing.
3        It's then put into a holding tray until the end of
4    the month when that month's work is boxed and put in the
5    warehouse. So she's really doing no reviewing of the list.
6    She's just prepping it for work.
7        Then our Voter Service clerks would call up that
8    electronic image and process the list following their data
9    entry procedures.
10   Q   How did the Voter Services clerks process -- well,
11   let's start with the period leading up to the 2000
12   election. How did the Voter Services clerks process the
13   duplicate registrations lists, the Central Voter File
14   duplicate registration lists?
15   A   I would need to check with June. Now that I've
16   said that she saw only the felon list, I'm trying to
17   remember if she saw the duplicate list.
18       But if we -- if we're processing a list and it's
19   got -- the image has got the voter's name on it, we then
20   call up in the computer that name to see if we can find the
21   match.
22       If the record in the other county is more recent,
23   then more than likely we're going to be cancelling our
24   record and making the assumption that they have moved and
25   that's our notice to cancel their registration.

37 (Pages 142 to 145)

146

1    If there's any doubt as to whether that's a match
2 or not, then we're not going to cancel that record. We're
3 going to leave it alone.
4    Q   Are there any written procedures concerning how to
5 process — were there any written procedures concerning how
6 to process the duplicate registration list leading up to
7 the 2000 election?
8    A   I believe there are some in the manual that Pat
9 Fletcher prepared for her staff, yes.
10   Q   You didn't prepare those instructions?
11   A   No.
12   Q   Okay.  What is — what is your role, if any,
13 concerning the processing of Central Voter File lists that
14 are not the felon lists?
15   A   Resource person, I suppose, is the best way to
16 phrase it.  No, I don't — I don't do — I don't handle the
17 lists.  I don't do any of the processing of the work.
18   But I'm there as a resource if there are questions
19 as to how to handle the processing of it, should I process
20 this or not process this.
21   Q   So what sort of — what sort of questions do you
22 get as the resource person concerning the processing of
23 Central Voter File lists?
24   A   On which list?
25   Q   Why don't we start with the duplicate registration

147

1 lists.  And let's stick to the time period before —
2 leading up to the November 2000 election.  What sort of
3 questions did you get as the resource person?
4    A   Leading up to the 2000 election, I was — I was
5 out of the loop on a lot of the Central Voter File work
6 because of this other project that I was on.  So,
7 consequently, most of the questions probably went to June.
8    I can remember cases where we would see a
9 duplicate and while everything was matching up, the voter
10 name, the voter date of birth, all that kinds of
11 information, we would see that the person had been actively
12 voting in Orange County right on through.
13   So, I mean, we got the impression, Well, this is
14 just coincidentally two people with the same name, same
15 date of birth, so we're not going to process that record.
16 We're going to leave it alone.
17   I can remember being asked about that, you know,
18 Is there a problem leaving this one alone?  No.  Let's
19 leave it there.  It's better to leave them out there than
20 to take them off the list.
21   Q   And why is that better?
22   A   Because, like I say, if there's two John Smiths,
23 one here and one there, and all of it is matching up
24 looking like they're a duplicate and it's — and it's not,
25 they are, in fact, two people, if we had gone ahead and

148

1 cancelled that — the Orange County John Smith, if he gets
2 to the polling place on election day, his name is not going
3 to be in the book and then we trigger this whole set of
4 procedures and phone calls and all of that, slow the
5 gentleman down.
6    Where, if we leave it out there and it's true that
7 he's really in the other county, there's been no harm that
8 he's been left on our books through an election.  He'll be
9 caught eventually through our — the list maintenance that
10 we have to do in all the odd numbered years.
11   (Whereupon, Mr. Cox exited the deposition room.)
12 BY MS. NELSON:
13   Q   If I were to ask you who was the most
14 knowledgeable person in the Orange County Supervisor of
15 Elections Office concerning the processing of Central Voter
16 File duplicate registration lists, who would that person
17 be?
18   A   It's going to be a combination of June Condron and
19 Pat Fletcher.
20   Pat is my expert on the procedures.  A lot of
21 times I forget — I get involved in other projects and
22 haven't processed in a long time and I forget what our —
23 what our key strokes and procedures are.  So she's the one
24 that works with the Voter Service clerks on the processing
25 end of it.

149

1    And, like I say, June Condron was the one that
2 handled the lists, reviewed the lists.
3    Q   Okay.  What about — who would be the most
4 knowledgeable person concerning the processing of Central
5 Voter File death lists?
6    A   Same people.
7    Q   Same people and same breakdown of information?
8    A   Uh-huh (affirmative).  Anything Central Voter
9 File.
10   Q   Including the lists of persons deemed mentally
11 incompetent?
12   A   Right.
13   Q   What about the county lists, who would be the most
14 knowledgeable person in your office concerning the county
15 lists, the processing of the county lists?
16   A   That would be Pat Fletcher.
17   Q   Does June play any role in processing the county
18 lists for list maintenance purposes?
19   A   No.  We've had the — the lists coming from the
20 County Clerk of the Court is not — not new.  That was a
21 process that was well in place well before NVRA started, so
22 those were established procedures.
23   Q   Okay.  What about other sources of information,
24 such as obituaries or — actually, why don't you tell me
25 what, if any, other sources of information do you use to

38 (Pages 146 to 149)

150

1  update your voter registration rolls outside of the Central
2  Voter File lists and the county lists and obituaries?
3     A  The greatest amount of work is done, outside of
4  what the voter himself sends us, would be returned mail
5  from the post office. We've -- we send something out and
6  it comes back as either completely undeliverable or
7  forwardable within the county or forwardable out of the
8  county. And then that -- that then sets off a whole string
9  of procedures, list maintenance procedures based on what
10  the post office has told us.
11     We probably do more work -- probably the largest
12  amount of work is done from the voter himself, second group
13  is from the post office.
14     Q  Okay. Is there any other information that you
15  look to to use for updating your lists, your voter
16  registration rolls outside of the Central Voter File lists,
17  the county list, the obituaries and the returned mail?
18     A  And the voter himself.
19     Q  And the voter himself.
20     A  No. Those are the groups.
21     Q  Who's the most knowledgeable person in your office
22  about the use of obituaries in updating the voter
23  registration files?
24     A  I guess that would be Pat Fletcher because she
25  manages that department.

151

1     Q  What about the returned mail from the post office,
2  who's the most knowledgeable person about processing that
3  information for the purpose of updating voter files?
4     A  I might be able to answer a large portion of those
5  questions. Anything I would have to seek help on. I would
6  be turning to Pat.
7     Q  And what about information from the voter himself
8  or herself?
9     A  Again, I would answer a large portion of those
10  questions and my second -- my backup would be Pat.
11     Q  Okay. Now, the breakdown you have given me of
12  people most knowledgeable about various subjects --
13     A  Uh-huh (affirmative).
14     Q  -- does that hold true for the period leading up
15  to the November 2000 election and subsequent to that?
16     A  Yes.
17     Q  Can you tell me what the procedures are that are
18  followed when you get returned mail from the post office
19  saying that the person -- that the mail is undeliverable?
20     A  Again, all incoming work is imaged and processed
21  from these electronic images. We would go into the voter
22  record and -- let's see, our scenario was they've moved?
23     Q  It's just undeliverable.
24     A  Completely undeliverable.
25        Then NVRA says that we have to send a notice to

152

1  that voter and we call it -- I believe the law refers to it
2  as the address confirmation final notice and we refer to it
3  in our office as an FA letter, final address letter.
4     We would send this -- this piece to the voter. It
5  has essentially a 30-day clock on it. They have 30 days to
6  reply. If they -- if they reply to us saying, I'm still
7  here, then the record -- that clock is turned off and that
8  record is untouched.
9     If it comes back to us undeliverable a second
10  time, we image -- we've imaged it, we've linked it to the
11  voter record, but we let those 30 days expire because we
12  don't know where the person is.
13     If we do not get the notice back at all, then the
14  30 days expires and that record is rolled to an inactive
15  status.
16     I guess I should say, in the scenario -- the
17  previous scenario where I said the undeliverable one
18  bounces back a second time, the 30-day clock runs out,
19  after that 30 days, the status changes from active to
20  inactive.
21     Q  So essentially a person whose mail is returned as
22  undeliverable gets one notice and if there's no response
23  within 30 days, they're taken off?
24     A  Right. Well, yeah. Essentially we've mailed to
25  them two times at that address and it's come back

153

1  undeliverable both times.
2     Q  What about forwardable mail within the county?
3     A  Within the county? NVRA says that if we get a
4  piece back that has the little yellow postal sticker on it
5  with an address in county, we can update that voter record,
6  which we would do. We'd, again, image it, process it, we'd
7  go into the voter record, change it, we would send them a
8  new voter ID card to reflect that change. Status remains
9  active.
10     Q  And that person's address is -- has been -- will
11  be changed within the database?
12     A  Right.
13     Q  Is there any address verification process that
14  goes on before the information is changed on the database
15  with respect to that voter?
16     A  Address verification in what regard?
17     Q  Like, for instance, when you get the letter
18  back --
19     A  Okay.
20     Q  -- with the yellow sticker on it that says
21  forwardable within the county, do you do anything else to
22  verify whether this person, in fact, moved?
23     A  Well, we go ahead and update the record because
24  that's what the law tells us to do. We then mail to the
25  voter at that address that the post office has given to us.

39 (Pages 150 to 153)

154

1    Q   The new address?
2    A   The new address, right.
3        So, essentially, we're watching to see what's
4    going to happen with that voter ID card.
5    Q   Is there ever a point in that -- in a scenario
6    where you receive mail back that's forwardable within the
7    county that you send any correspondence to the old address?
8    A   No.
9    Q   What about mail that's forwardable -- forwardable
10   outside of the county?
11   A   Okay. We would receive it with a sticker on it
12   that says they've moved out of the county. We process it
13   and, again, we're required to send our FA notice. If --
14   and it has the 30-day clock on it.
15       If it comes back -- if it comes back as
16   undeliverable, then we've got to turn around and send out
17   another FA notice.
18   Q   According to the undeliverable process that we
19   just talked about?
20   A   Right, right. This is where the list maintenance
21   portion of NVRA really gets to be like a spider web.
22       Okay. We've mailed the notice to the out of
23   county address and it's come back -- let's -- okay, handle
24   the undeliverable.
25       If it comes back, you know, forwarded again, we

155

1    just keep chasing this person essentially until we've run
2    out of avenues.
3        If we don't get it back, the 30-day clock will
4    expire and that record will roll to an inactive status.
5        I guess those are the different paths that one can
6    take.
7    Q   Has your office ever considered sending -- I'm
8    going to go back to the scenario where it's forwardable in
9    the county.
10   A   Okay.
11   Q   Has your office ever considered sending a notice
12   to the original address to confirm that the address has
13   changed?
14   A   No. Reason being, that -- that NVRA tells us that
15   we're supposed to change the record based on that postal
16   information. There have been very rare instances where the
17   post office has made a mistake. And what winds up
18   happening is we just correct it as it's discovered.
19   Q   How do you know that those instances are rare?
20   A   I haven't been involved with the processing
21   intimately within the last few years. But, initially, when
22   NVRA was getting started and I was more involved in the
23   data entry work, I had the opportunity to see one or two
24   cases where -- a situation where it's a family, one
25   individual of the family has moved out and the post office

156

1    has moved the whole family to the other address.
2        But, like I say, that has not happened but just on
3    rare occasion.
4    Q   How was that error detected?
5    A   Usually by the voter.
6    Q   And the voter contacts your office?
7    A   Right.
8    Q   Okay. Now, you said you hadn't been involved in
9    actual data entry processing for a number of years. Who's
10   the primary person responsible for that?
11   A   Would be Pat Fletcher.
12   Q   Okay. When you said that your office gets
13   information from the voter himself or herself that you use
14   to update the voter files, what sort of information is
15   that?
16   A   We do a lot of publicity work, work out in the
17   community trying to stress the importance of keeping your
18   record accurate.
19       The ways they notify us, they can either write us
20   a simple little letter or they can use an application to
21   update their name, update their address, their political
22   party affiliation. They can request a duplicate card.
23       So we're getting applications with those types of
24   updates, we're getting letters, we're getting faxes,
25   e-mails in some cases.

157

1        The law -- since 2000, the law has changed, so
2    it's really going to be a lot easier for people to update
3    their record than it had been prior to because before we
4    had to have a signature. Now the law is going to allow us
5    to do some things without a signature.
6    Q   Can you take a look at Interrogatory Number 6 and
7    the response and tell me if you participated in preparing
8    the response?
9    A   No, I was not involved in Number 6.
10   Q   Do you have any understanding of how the
11   Supervisor of Elections Office of Orange County coordinated
12   with the Division of Elections in election administration
13   from 1998 forward?
14   A   I guess I would need a little guidance on what you
15   mean in terms of election administration.
16   Q   Are there -- are there any, I guess, subjects or
17   areas in which you think the Division of Elections works
18   with the Orange County Supervisor of Elections
19   Office to -- you know, to run an election?
20   A   Well, Bill's -- Mr. Cowles is an elected
21   constitutional officer. He reports to the citizens of
22   Orange County. He really doesn't report -- no supervisor
23   reports to the Division of Elections.
24       The Division of Elections provides guidance in
25   terms of issuing legal opinions when asked. Once those

40 (Pages 154 to 157)

158

1  legal opinions are issued, then all supervisors are to
2  follow them.
3      I guess I would have to leave it to Mr. Cowles to
4  answer how he -- how he interacts with the division.
5      Q   What's your understanding of the division's
6  relationship with the Supervisor of Elections Office of
7  Orange County?
8      A   Well, they're -- they serve as a clearinghouse of
9  information for us. They coordinate workshops, statewide
10  workshops on various topics, such as NVRA and new candidate
11  workshops.
12      In the past, I don't remember what year it was. I
13  know there was a Central Voter File workshop. There's
14  about to be another one on the new and improved central
15  voter -- statewide voter database.
16      Q   Is that the extent of your understanding?
17      A   Yeah, yeah.
18      Q   Can you take a look at Interrogatory Number 7 and
19  the response and tell me if you participated in the
20  response?
21      A   I would have provided the monthly NVRA reports
22  that would have pulled the number of voter registration
23  applications.
24      Q   Is there anything else?
25      A   No, no.

159

1      Q   What about number -- Interrogatory Number 8 and
2  the response there?
3      A   I was not involved in Number 8. While I trained
4  the laptop operators in that one phone bank, the workers of
5  the phone bank, I -- I wasn't involved in the assigning,
6  the selecting and assigning of any of them.
7      (Whereupon, Mr. Mac Innes exited the deposition
8  room.)
9  BY MS. NELSON:
10      Q   Of the poll workers?
11      A   Right.
12      Q   Who was in charge of that?
13      A   That would have been Nancy Lord and her staff.
14  Again, Nancy Lord was under the direction of June.
15      Q   So who on staff now at the Supervisor of Elections
16  Office would be most knowledgeable about poll worker
17  assignment in the Supervisor of Elections Office?
18      A   I would say Mr. Cowles, for sure, and then
19  followed by June Condron.
20      Q   And you and I have spoken about the phone lines
21  and the whole setup there.
22      Who currently on staff is the most knowledgeable
23  person about the phone lines in the 2000 election?
24      A   I would say Margaret Dunn.
25      Q   You wouldn't say that you're one of the most

160

1  knowledgeable people in the office? Are you including
2  yourself in this -- in your analysis?
3      A   Oh, well, I guess to a limited degree. I guess
4  I'm taking it from the perspective of hardware.
5      Q   Okay. What about setup and determining how the
6  phone banks would function, what purposes they would serve
7  for the election, who was ultimately responsible for
8  coordinating all of that?
9      A   A lot of those types of -- a lot of that type of
10  planning was done as a team, a senior staff team, which
11  would have been Bill Cowles, June Condron, at that point
12  Nancy Lord, Lonn Fluke, myself and Claude Mann.
13      Q   Was there any one person who was the point person
14  on the phone system for the 2000 elections?
15      A   I believe it was Claude Mann.
16      Q   Claude Mann.
17      And he would be the point person on setup and
18  devising the strategies of where to route which calls?
19      A   He was our liaison with the phone companies that
20  set up the -- all the various phone numbers and hunt groups
21  and switchboards and things like that.
22      In terms of the strategy, you know, we're going
23  to -- in order to handle this -- this need, we're going to
24  handle in this fashion, that was -- that was really a team
25  decision.

161

1      Q   Okay. What about the distribution of laptops,
2  who, if anyone, was primarily responsible for determining
3  which precinct would get laptops and what number -- what
4  number of laptops would be distributed at those precincts
5  receiving laptops?
6      (Whereupon, Mr. Mac Innes returned to the
7  deposition room.)
8      THE WITNESS:  That would have been a combination
9  of, of course, Bill, June Condron and Nancy Lord.
10      My basic knowledge is that laptops went into the
11  precincts that had been identified in previous
12  elections as generating the highest numbers of
13  affirmations. These were precincts that had a real
14  mobile population. Usually these were heavy apartment
15  complexes in the -- a high number of apartment
16  complexes in those precincts.
17      So I'm not sure who actually identified those 100
18  precincts, but it would have been probably somebody in
19  that group.
20  BY MS. NELSON:
21      Q   What role, if any, did you play in determining
22  where the laptops would be distributed?
23      A   None.
24      Q   You seem happy about that?
25      A   Yeah. I just -- I showed up for class and whoever

41 (Pages 158 to 161)

162

1  sat down, that's who I trained.
2  Q   What about the distribution of the voting
3  machines, who, if any one person, was responsible for
4  determining that?
5  A   The vote --
6  Q   Yeah. Where the voting -- how the voting machines
7  would be placed? For instance, newer voting machines
8  versus older voting machines, was there any individual who
9  figured out where a particular voting machine would be
10  placed in a precinct? Not where within one precinct, but
11  to which precincts particular machines would go?
12  A   Yeah. For that topic, I'm not able -- I'm not
13  able to speak to that topic at all. I'm not involved with
14  the tabulators that you're speaking of.
15  Q   Who would that person be?
16  A   At that point, in terms of tabulators -- well,
17  Nancy Lord -- I don't really know how to answer your
18  question.
19      Dane Beavers is the one that is our technician,
20  voting equipment technician. He was the one, with his
21  assistant, Louis Torres, prepared the equipment for
22  election day. I don't know -- I don't know how they went
23  about assigning Tabulator A to Precinct 100 or -- you know.
24  Q   Okay. Okay. What about -- do you know who was
25  responsible for determining how many booths there would be

163

1  in a particular precinct?
2  A   Again, I would -- I would direct you to Bill and
3  June and Nancy Lord.
4  Q   Can you look at Interrogatory Number 9 in the
5  responses and tell me if you had any role in preparing the
6  response there?
7  A   No, I had no responsibility in that area.
8  Q   What about Interrogatory Number 10 in the
9  response?
10  A   My staff would have pulled the affirmations and
11  gone back through to try to pull out information.
12  Q   Do you recall your staff participating in getting
13  the information in response to this interrogatory?
14  A   I recall my staff going through the affirmations
15  for several bits of information, yes.
16  Q   Did you, yourself, have anything to do with
17  getting the data pulled?
18  A   I probably directed staff to do it.
19  Q   Okay. What about Interrogatory Number 11 and the
20  response?
21  A   I don't recall working on the response to 11, but,
22  yeah, I -- I wouldn't have anything to add to that.
23  Q   So the paragraph there that begins, The computer
24  system at the Orange County Supervisor of Elections, that
25  paragraph reflects all persons responsible for determining

164

1  voter eligibility with respect to the primary and general
2  elections from 1998 to the present?
3  A   Correct.
4  Q   Okay. Are there any human beings who played a
5  role in determining voter eligibility, who did from 1998 to
6  the present?
7  A   Human beings input -- well, human beings wrote the
8  programming, obviously. Human beings key in the
9  information. But then it's the system, through the
10  software, that gets us to an active status.
11  Q   So persons use the software?
12  A   Uh-huh (affirmative).
13  Q   And is it your sense that the software tells you
14  whether someone is eligible or not?
15  A   Right, right. It was written to try to ensure
16  that we're lessening the number of just pure data entry
17  mistakes. In fact, we've been talking so much about
18  processing work, it's really not one person that processes
19  the document.
20      We've got what we call a dual entry verification
21  system, where one person will go in and key it all in, then
22  it rolls over and another person goes right back through
23  that same batch of work and does it again.
24      And the system then matches those two -- the data
25  entry from those two people to make sure that it matches

165

1  up. If it doesn't, if there's a discrepancy between the
2  first entry person and second entry person, it's that
3  second entry person that is the one who gets to decide, who
4  makes that final call on what was correct.
5  Q   And what kind of -- what kind of data goes through
6  that matching process?
7  A   Oh, all of it.
8  Q   Voter registration applications?
9  A   Yeah, yeah. We have some documents -- again, I'd
10  have to turn to Pat. We have some documents that a single
11  person can process. They're not the more critical of the
12  pieces.
13      A lot of things that we're linking to a voter
14  record just for information, where we're really not taking
15  any further action on it, those are usually done by just
16  one person.
17  Q   How long has this process been in process in your
18  office?
19  A   I would have to say ever since I've been there.
20  Lonn Fluke is the one who could give you a better idea.
21  We -- I mean, we've upgraded the system several times since
22  I've been with the office. But in terms of the basic
23  setup, it's been there a long time.
24  Q   Okay. What is your understanding of a --
25  concerning how a person convicted of a felony in another

42 (Pages 162 to 165)

166

1 state, how that person's voter registration application
2 would be processed by your office?
3     A  Can I get you to repeat that for me?
4     Q  Sure. Yeah. I heard it myself and realized it
5 was jumbled.
6         How would the voter registration application of a
7 person who was convicted of a felony in another state be
8 processed in your office?
9     A  The -- when the application comes in, we have to
10 act on what the voters -- what the applicant's given us.
11 So if they have marked on there that they've never been
12 convicted of a felony or if they have been, their rights
13 are restored, we take them at their word.
14        They've signed that oath. When they sign that --
15 the application, they're signing that everything's true and
16 correct and that they're eligible, that they meet the
17 requirements to vote, so we go from there.
18     Q  What if they left that box blank on the voter
19 application form, the box that permits you to swear that
20 you've never been convicted of a felony?
21     A  It would be -- the system, the software system is
22 going to catch that question was not answered. And
23 then it's going to generate a letter asking the applicant
24 to answer that question before the record becomes a
25 complete active registration record.

167

1     Q  Do you know what that letter says?
2     A  In a nutshell, it's just saying, you know, thank
3 you for your recent application to register to vote.
4 Unfortunately, it's incomplete. It's missing some of the
5 required information. It lists exactly which question
6 numbers have to be answered. And it includes a new
7 application.
8        This was 2000 that we're talking about, right?
9     Q  Well, has the process changed?
10     A  There's been some recent legislation that is now
11 going to allow us to collect that missing information
12 without having to send out another application.
13     Q  Okay. But from the time period leading up until
14 2000, until right now, that's -- the process you've
15 described is what's followed?
16     A  Right.
17     Q  If a person was convicted of a felony in another
18 state and had -- and got their rights restored, went
19 through a restoration process in another state and they
20 wanted to vote in Florida, they applied to your office --
21     A  Uh-huh (affirmative).
22     Q  -- what would happen?
23     A  Well, I would assume that when they completed
24 their application they would go ahead and mark the box that
25 says, if I -- essentially, it says, If I've been convicted

168

1 of a felony, my rights are restored.
2        So they would mark that box that says essentially
3 they have their right to vote and we would proceed on from
4 there.
5     Q  What if the person had not gotten their rights
6 restored in Florida and had only gotten their rights
7 restored in a state other than Florida?
8     A  Yeah. If they've marked that box saying that they
9 have their -- that they have their right to vote, we go
10 ahead and process it. We don't do any sort of
11 preliminary --
12     Q  Check?
13     A  -- screening check, yeah.
14     Q  Do you -- do you know if there's any policy
15 concerning whether voters who got their rights restored in
16 a state other than Florida but did not get them restored in
17 Florida are eligible to vote in Florida?
18     A  I believe I've seen paperwork from the Division of
19 Elections that says -- I guess there was a court case, that
20 says if their rights were restored in another state, they
21 have their rights in Florida.
22        It wasn't -- we weren't always operating under
23 that -- that guideline, but I would say prior -- I don't
24 exactly remember when, but prior to the 2000 election, it
25 came to our attention that -- this court case that said if

169

1 they were convicted in another county, they got their
2 rights back in that other -- excuse me, other state, got
3 their rights back in that state, then they had the rights
4 in Florida.
5     Q  And is it your understanding that the Orange
6 County Supervisor of Elections Office was operating under
7 that guideline, as you said, prior to the 2000 election?
8     A  Yes.
9     Q  And has been operating --
10     A  Yes.
11     Q  -- like that since then?
12     A  Yes.
13     Q  Are you -- actually, can you turn to Interrogatory
14 Number 14 and the response and tell me if you participated
15 in responding to that request?
16     A  Yes. It's my department that processes the
17 absentee ballot requests.
18     Q  So you participated in this response?
19     A  Yes.
20     Q  Okay. One moment. Let me just see what's -- if
21 it's worth going through here.
22        Can you take a look at Interrogatory Number 19 and
23 the response?
24     A  Okay.
25     Q  And can you tell me if you helped draft a

43 (Pages 166 to 169)

170

1 narrative for that response?
2   A   Yes, I believe I did.
3   Q   Okay. Can you take a look at it and tell me if
4 that accurately reflects your understanding of the
5 processing of applications received after the book closing
6 deadline?
7   A   Yes, it does.
8   Q   Okay. Can you turn to Interrogatory Number 23 in
9 the response. We talked earlier about persons being
10 deleted from the rolls. Is the response in the response to
11 Interrogatory Number 23 a description of the process we
12 were talking about earlier?
13   A   Yes, that's a correct summary.
14   Q   Did you participate in drafting a narrative for
15 this response?
16   A   I believe I probably did.
17   Q   Okay.
18   A   That's kind of an answer, right?
19   Q   Yeah.
20   A   Yeah. I think -- I think I did.
21   Q   And the response to Number 24 and 25, did you help
22 compile the responses to those interrogatories?
23   A   I probably participated in both of them. Probably
24 more so to -- on Interrogatory 25.
25   Q   Have you had a chance to look at the responses to

171

1 both 24 and 25?
2   A   Yes.
3   Q   Do they -- are they an accurate description --
4   A   Yes.
5   Q   -- of the practices and procedures of the
6 Supervisor of Elections Office in Orange County?
7   A   Yes.
8   Q   Can you turn to Interrogatory Number 32?
9   A   Okay.
10   Q   Well, let me ask you this. Do you have -- do you
11 receive complaints from voters from elections? Is your
12 division responsible for responding to or analyzing
13 complaints received from voters in particular elections?
14   A   We're one group that does, yes.
15   Q   Are you responsible for analyzing a particular
16 category of complaints?
17   A   It would be my responsibility to look into the
18 complaints regarding a voter registration record, whether
19 someone got to vote or didn't get to vote.
20      Now, sometimes I might delegate the research to
21 another staff member, but we field a lot of calls. I mean,
22 some of them go to Mr. Cowles directly or to the Elections
23 staff. But probably the ones from the general public come
24 to us a lot.
25   Q   How do you go about looking into those complaints?

172

1   Are there particular documents that you rely upon, such as
2 phone logs, affirmations?
3   A   We rely on, of course, the computer system to
4 look, see what record was out there. We've pulled
5 everything from the affirmations or the paperwork from the
6 polling place. We refer back to the PR/PL books
7 themselves. We'll refer back to the phone logs, the
8 internal phone logs from the different phone banks that we
9 have.
10      We refer to -- there have even been some cases
11 where I have gone and pulled clerk comment sheets. Every
12 polling place clerk is given a sheet to make comments on
13 and I've even gone to look at those sometimes.
14   Q   With respect to the affidavits and affirmations,
15 do you go through each affirmation and affidavit of persons
16 who were not permitted to vote to analyze what happened in
17 each individual case?
18   A   The affirmations are processed the same as any
19 mail that would come into the office. After election day
20 or the -- election night they're brought back to the office
21 and they're set aside and taken to the imaging station, the
22 imaging room.
23      Those are then imaged, put into batches for
24 processing and then my Voter Service clerks go through and
25 process all of those. Because that's where we're getting a

173

1 lot of our update kind of information, this voter has moved
2 and we need to update the record.
3   Q   What do you mean by process the affirmations?
4   A   Like I say, it's imaged, it's put in an electronic
5 batch and then the data entry operator would -- looking at
6 that image of the document, they would then query the
7 system, look for the -- look for a voter record.
8      When they find the voter, they would see that the
9 voter is saying they moved, so they would then use that
10 image, update the voter record. And I guess I haven't
11 really explained that after that processing has taken
12 place, that there's a marriage between that image and that
13 voter record so the next time when I go into the voter
14 record, I can see the whole file of paperwork on that
15 voter.
16      In the case where somebody has gone to a polling
17 place and they've not been found on the PR/PL, it's --
18 we've gone through the whole sequence of events and found
19 out that they're not going to get to vote, still that
20 document is imaged and a record is created. It will end up
21 in a not-registered status, but at least I know that, you
22 know, the next election, if John Smith shows up at the
23 polling place saying, Well, I was here last time, I can go
24 back in and I can see the exact paperwork that was done in
25 that prior election and know what happened.

44 (Pages 170 to 173)

174

1    Q   Is there any independent check done at that stage
2  to see whether that person, in fact, should not have voted?
3    A   Well, the software is going to help us to a large
4  extent, because it's going to catch -- well, the data entry
5  operator is going to catch whether we find a record for the
6  person or not, but then the software is going to catch
7  whether that person was eligible to vote.
8    Q   How will the software catch it?
9    A   Well, to give an example -- maybe I shouldn't say
10 eligible to vote. Maybe I should say eligible to vote in
11 that precinct. That's probably a better way of phrasing
12 it.
13      Voters, a lot of times, will just show up at the
14 most convenient polling place for them. They don't
15 understand they have to vote in the precinct they live in
16 or they'll go back to an old polling place.
17      Sometimes we've found voters that have voted out
18 of precinct. They might have been eligible to vote, but
19 not in the precinct where they did cast their ballot. And
20 that's where the software is going to catch that there was
21 a -- they voted in the wrong spot.
22    Q   And how will the software do that, does it ring a
23 bell or --
24    A   It's a report that's generated at the end of
25 processing all of those affirmations. We get a report that

175

1  says, Voted out of precinct.
2    Q   The report will state that someone voted out of
3  precinct even if they were not permitted to vote?
4    A   If they were not permitted to vote? I don't
5  recall any report that will tell us that -- I think what
6  you're asking is, you've processed 100 affirmations, but
7  only 90 actually are getting the credit for voting; is that
8  what you're saying? Am I getting a report that accounts
9  for those 10?
10    Q   I'm saying, is there any process to detect from
11 the affirmations whether an individual was denied the right
12 to vote improperly?
13    A   Denied the right to vote improperly?
14      The data entry operator, as they're processing
15 that work, I'm going to -- in this scenario I'm going to
16 make the assumption that the affirmation is marked that
17 they were -- they didn't vote.
18      As the data entry operator is processing that
19 work, the system is going to come up and show the
20 eligibility. So, yes, there could be a case like that.
21    Q   And the data entry person is instructed to flag
22 that in that instance?
23    A   Yeah. They'll go ahead and -- and link it to the
24 voter record. And then I'm not sure that a report
25 generates, but more than likely, the operator is going to

176

1  make a print screen and bring it to Pat's attention.
2    Q   What is the title of the report that you
3  referenced that would tell you who voted out of precinct?
4    A   I don't know the exact title of it, but that's
5  what we know it as, voted out of precinct.
6    Q   Okay.
7      MS. NELSON: Why don't we take a break?
8      THE WITNESS: Okay.
9      MS. NELSON: We're going to take a five-minute
10 break.
11      UNIDENTIFIED SPEAKER: Okay.
12      (Whereupon, a brief recess was taken at 2:54 p.m.
13 and the deposition reconvened at 3:11 p.m.)
14 BY MS. NELSON:
15    Q   Ms. Tanko, can you look at Page 20,
16 Interrogatories 36 through 39, which will take you through
17 Page 33. If we can walk through those and you tell me what
18 role, if any, you played in helping gather the responses to
19 those interrogatories, I'd appreciate it.
20    A   And it was Interrogatories 36 through?
21    Q   Through the end.
22    A   Through the end.
23    Q   Through 39.
24    A   Okay. Well, that's pretty easy. I didn't have
25 anything to do with spoiled ballots, other than I did train

177

1  my laptop people on how to handle -- handle that situation
2  in a polling place if it arose. I didn't pull any of the
3  statistics. I'm not sure who would have done that.
4      And then -- that was -- I'm sorry. That was
5  Numbers 36 and 37.
6      38, I did not participate in.
7      39, my staff processed the affirmations. I would
8  guess that probably these statistics were done
9  electronically created through Lonn Fluke in the IS department. He
10 probably created some kind of report with that information.
11    Q   But you didn't have any direct input on that?
12    A   No.
13    Q   You mentioned that in terms of processing
14 complaints that you also look at telephone logs?
15    A   Yes.
16    Q   What exactly do you do with telephone logs?
17    A   As the phone bank -- whether it's the Pittman
18 phone bank or the voter verification phone bank or the
19 hallway phone bank, as they take a phone call, they were
20 logging it in, just simply making a hand entry on a paper
21 log.
22      The ones from the Pittman phone bank and the voter
23 authorization phone bank can be helpful when we're doing --
24 when we're processing the affirmations after the election
25 and doing our voter history or trying to figure out who

45 (Pages 174 to 177)

178

1  voted and who didn't.
2      A lot of times we will refer back to those logs to
3  try to get -- reform the picture of what happened on
4  election day, you know, how it all got started -- how the
5  situation came up and what steps it went through to being
6  resolved, who talked to who, what did they say, things of
7  that nature.
8      Q   Is the staff trained on what information to fill
9  out in a telephone log?
10     A   Yes, they're trained.
11     Q   Do you know whether they follow the training in
12 that regard?
13     A   For the most part. Calls are coming in so heavy
14 on election day, a lot of times there are gaps in their
15 notes. I've even found cases where occasionally they've
16 just missed making the entry altogether. So they're not
17 perfect, but they can be a help if we've got the
18 information.
19     Q   Do you know whether anyone looks at the telephone
20 logs for the purpose of checking to see whether any errors
21 occurred on the part of the Supervisor of Elections Office
22 on election day?
23     A   The only time it would be checked would be where
24 there's a specific voter, a specific situation and we're
25 backtracking to find it. We don't sit with the logs and

179

1  read through them looking for something there.
2      Q   And the same question for the affirmations,
3  affidavits?
4      A   Yeah.
5      Q   Does anyone in the office look at the affirmations
6  and affidavits for that purpose, for the purpose of
7  determining whether there was an error?
8      A   Yeah. With the phone log and with the
9  affirmation, the way it's going to be caught is as they're
10 processing that affirmation, the scenario that we talked
11 about earlier where the data entry, the Voter Service clerk
12 is processing the affirmation and it's marked there that
13 they didn't get to vote, but the VSC is finding that, no,
14 here's the record and they really should have been able to
15 vote. That -- it's at that point that we find out that
16 there was a problem and then we start tracking backwards.
17     Q   That's in the process of updating the voter files;
18 is that right?
19     A   Right.
20     Q   That's not a process to look for --
21     A   Right.
22     Q   -- errors in the record; is that right?
23     A   Right.
24     Q   And I have the same question with respect to the
25 clerk comment sheets, does anyone in your office look at

180

1  the clerk comment sheets for purposes of determining
2  whether any errors occurred during the elections?
3      A   When the clerk comment sheets come in, I believe a
4  copy goes to Mr. Cowles. He likes to read all of them.
5      And then the election coordinator, at that point,
6  Nancy Lord, would have had a set. And as she would read
7  through them, then she would flag areas for different staff
8  members to take a look at.
9      While I might not read all of the clerk comment
10 sheets, they would pull out some for me to look at.
11     The clerk comment sheets have a wide range of
12 comments on them, everything from, I need another handicap
13 parking sign for the next election, to -- to little
14 descriptions of -- well, voter situations, you know,
15 exchanges. This person left the polling place mad for this
16 reason. They were documenting that. Because they probably
17 figured that this person had said they're going to contact
18 the office, they will. So they've sort of outlined the
19 situation.
20     Q   You said that there are some clerk comment sheets
21 that were pulled out and given to you specifically?
22     A   Uh-huh (affirmative).
23     Q   What were those regarding?
24     A   Sometimes it would be things as simple as John
25 Smith -- John Smith has noticed that his name has been

181

1  misspelled on the PR/PL for the last two elections and he
2  wants to know why it's not corrected. I could then take
3  that document and use it to update the voter record.
4      Could be things -- usually they're pretty simple
5  things. This voter wants another ID card, or for the next
6  election, will you think about giving us this type of
7  supply, that would help us.
8      We -- in one election, I think it was probably the
9  '98 elections, we had been asked by poll workers to provide
10 like a little business card with the office telephone
11 number on it because there are so many people that would
12 come in and say, I need to get my husband registered to
13 vote. How can I do that? They wanted to be able to give
14 that voter our phone number. So we provided those.
15     Well, we found out it was good in theory, but it
16 kind of backfired on us because we would then have some
17 situations where there was maybe a question occurring in
18 the polling place that we needed to deal with right then.
19 We didn't want the person to leave the polling place and
20 then call us later. So we took those away. For the 2000
21 election, they didn't have those.
22     The -- no other -- like I say, I know there were
23 just a variety of comments, but those are the ones that
24 come to mind initially.
25     Q   Is there any one person who's charged with

46 (Pages 178 to 181)

182

1 analyzing the clerk comment sheets?
2 A   That would be the Elections Department. One
3 person, I guess, at that -- in the 2000 election, it would
4 have been Nancy Lord.
5 Q   Okay. Can you take a look at what's been marked
6 Plaintiffs' Exhibit Dunn Number 3 and just tell me if this
7 is a document you've seen before? It's Defendant Williams
8 Cowles Responses to Plaintiffs Second Set of Document
9 Requests.
10 A   I don't recall seeing this one, no.
11 Q   Okay. You've never seen it before?
12 A   No, not that I recall.
13 Q   Okay. I'd like to show you a document that's been
14 marked Plaintiffs' Exhibit Cowles Number 48. Can you tell
15 me what this document is?
16 A   This is a -- from a DMV office and it's a
17 combination of -- well, let me start over.
18      The first page is the cover sheet -- wait. Yeah.
19 That's a cover sheet. Then it's the computer printed
20 portion. These are -- the little check marks beside the
21 names are indicating that we've picked up an application
22 with that person's name on it.
23      Then the last page, the very last page, the
24 handwritten portion, these were applications that were
25 collected that were written by hand or they didn't appear

183

1 on the computer-generated report. So, essentially, this
2 was -- and you could see where it's signed at the bottom by
3 Laurie Hastings and then someone from the DMV office.
4      So this is where Laurie and this individual are
5 signing off to the effect that they've -- they have
6 exchanged 219 applications on September 21st, 2000, and
7 that these are the names on all of those applications.
8 Q   So the handwritten sheet, which is Bates stamp
9 number A026722, does that reflect the number of
10 noncomputer-generated applications that were picked up from
11 DMV during this pickup?
12 A   Yeah. It's either going to be noncomputer
13 generated or, for some reason, their name just didn't
14 appear on this list.
15 Q   It didn't appear on the front portion of the
16 report?
17 A   Right, right. Without looking at each individual
18 voter record to see that, I wouldn't be able to tell you
19 100 percent.
20 Q   Would a person's name be listed on this final
21 handwritten sheet if their name did not appear on this list
22 and there was no computer-generated report for that person?
23 I'm trying to understand how the name gets on this last
24 page.
25 A   It usually -- like I say, usually it's going to be

184

1 that -- an application written by hand, that it wasn't done
2 through the DMV software.
3 Q   Okay. But there's -- there is a chance that one
4 of these persons does have a DMV computer-generated
5 application; is that what you're saying?
6 A   Well, I wouldn't be able to say without looking --
7 wouldn't be able to comfortably say without looking at each
8 of these people.
9 Q   Is this the typical format for the agency
10 receipts, that there's a computer-generated report and then
11 a sheet that follows?
12 A   Yes.
13 Q   And that sheet would --
14 A   I'm supposing there would be some visits where
15 everything is on the computer-generated receipt or the
16 computer-generated list. We're still going to do the
17 receipt to acknowledge this transfer of paperwork.
18 Q   Do you know whose handwriting this is on this
19 report?
20 A   It would be Laurie's because she signed it. It's
21 always our courier when completes this portion. In other
22 words, I frequently collect applications from some
23 libraries, so I'm the one that will take those applications
24 and list them and then sign it with the librarian.
25 Q   Do you check each of these reports when they come

185

1 in?
2 A   Check, in what fashion?
3 Q   Do you look at them for any particular reason?
4 A   I, myself, no.
5 Q   Who -- who looks at these reports, if anyone?
6 A   Really it would be Laurie as she's doing it, as
7 she's issuing the receipt. As the packet comes in from the
8 site, it's going to stay in -- the receipt portion is going
9 to stay in the intake department. We file them in a
10 notebook. And then the applications are then imaged and
11 put out for processing.
12 Q   Okay. I'd like to show you what's been marked as
13 Defendant Cowles Exhibit 49 and Defendant Cowles Exhibit --
14 I'm sorry -- Plaintiffs' Exhibit Cowles 49 and Plaintiffs'
15 Exhibit Cowles 50.
16      Can you tell me if you've seen Plaintiffs' Exhibit
17 Cowles 49 before?
18 A   No, I've not.
19 Q   Do you know what it is?
20 A   It looks like -- it looks like a specially written
21 program that is going back -- that's going back in the
22 system tracking the registration site, then, from the voter
23 file, pulling their race and then, you know, doing a
24 summary, a count.
25 Q   Do you know who prepared this report?

47 (Pages 182 to 185)

186

1    A    No, I don't. But, I mean, I can make a guess,
2    but, no, I don't.
3    Q    Do you know who would know?
4    A    I would start with Lonn Fluke.
5    Q    Okay.
6    A    If not Margaret Dunn. I mean, Margaret --
7    Margaret was coordinating all these materials that we
8    provided for the interrogatories, so she -- she would have
9    knowledge of who had done it.
10   Q    Okay. Just so you know, we were told you did it.
11   A    Oh, really.
12   Q    You're saying you didn't do this report?
13   A    No, no.
14   Q    Okay. All right.
15   A    No. I might have done the -- the next one.
16   Q    Yes. Can you look at Plaintiffs' Exhibit Cowles
17   50?
18   A    Yes.
19   Q    Have you seen this document before?
20   A    It looks like some of the notes that I had
21   prepared to answer -- for the answering of this
22   interrogatory, yes.
23   Q    When you say "this interrogatory," are you
24   referring to an interrogatory in connection with this case?
25   A    Yes.

187

1    Q    Well, can you turn back to Plaintiffs' Exhibit
2    Cowles 49. Let's take, for example, the entry on
3    Plaintiffs' Exhibit Cowles 49 for February 1999.
4         And if you can look at the corresponding entry on
5    Plaintiffs' Exhibit Cowles 50 and particularly focusing on
6    the column marked public assistance.
7    A    Uh-huh (affirmative).
8    Q    If you look, there's -- do you want to take a
9    minute to maybe do the totals or see how those numbers
10   compare?
11   A    Well, I can tell they don't match.
12   Q    In the second paragraph -- or the paragraph right
13   above the table on Plaintiffs' Exhibit 50, Cowles --
14   A    Uh-huh (affirmative).
15   Q    -- can you read the last two sentences?
16   A    Starting with, For reporting purposes?
17   Q    Yes.
18   A    Okay. Okay.
19   Q    Do you have any understanding as to why the
20   numbers listed under public assistance for February 1999 on
21   Plaintiffs' Exhibit Cowles 50 would differ from those --
22   from the total of those listed in Plaintiffs' Exhibit
23   Cowles 49 for February 1999?
24   A    Since I had no involvement in this report, I don't
25   know how it was prepared. I can tell you that the --

188

1         MR. CIRULLO: For the record, that's 49. I'm
2    sorry.
3         THE WITNESS: Oh, sorry.
4         On the Exhibit 50, where it says there were 77 for
5    February of 1999, that number is directly from the NVRA
6    reporting form that I have to do for the Division of
7    Elections.
8    BY MS. NELSON:
9    Q    And what -- what does that number consist of, that
10   77?
11   A    That's simply a count by -- all the mandated
12   sites, we have assigned them an agency code. And for the
13   purposes of -- there's a portion of the NVRA report where I
14   have to say how many applications came from categories of
15   mandated sites, how many duplicate applications came from
16   these same categories of registration sites.
17        So the 77 is simply saying that for the month of
18   February 1999, we processed 77 applications from the public
19   assistance offices, which I was adding -- or I was, I
20   guess, clarifying that that was the food stamp offices, the
21   AFDC, WIC and Medicare -- Medicaid offices.
22   Q    Did that also include the DCF totals?
23   A    Yes.
24   Q    Now, when you say that the 77 reflects the number
25   processed, does that mean it reflects the number of

189

1    applications that you received from DMV?
2    A    Yes.
3    Q    So these 77 represents persons who -- whose
4    applications were processed and they were listed either as
5    prereg-ed, not reg-ed, active, et cetera?
6    A    Right.
7    Q    Okay. I'd like to show you what's been marked as
8    Plaintiffs' Exhibit Cowles 56, document bearing Bates stamp
9    J007284 to 86.
10        Can you tell me if you've seen this document
11   before?
12   A    This looks like document -- a report that Veronica
13   Koval did for Bill, Bill Cowles, concerning some of her
14   work with the DMV offices.
15   Q    Have you seen this document before?
16   A    It looks familiar, yes.
17   Q    Can you take a look at the line, Training, on the
18   first page of the document. Says, Was invited to come to
19   one training session for management staff back on 2-21-01.
20        Does that refresh your recollection at all as to
21   the number of training sessions your staff participated in
22   with DMV?
23   A    I would still -- since this was -- since this was
24   prepared May 14, 2001, I think I'd probably need to still
25   check to see how many total times we've been back. Because

48 (Pages 186 to 189)

190

1 you were asking since the 2000 election, right?
2    Q   Yes.
3    A   Yeah. Like I say, I know that if one hasn't
4 · happened recently, one's about to happen. So I would need
5 to check with Veronica Koval.
6    Q   Can you take a look at what's been marked as
7 Plaintiffs' Exhibit Cowles 51 and tell me if you've seen
8 this document before?
9    A   After the -- I can't say whether I've actually
10 seen this e-mail or not, but I know that after the 2000
11 election we had thought it would be a good idea for
12 Veronica Koval to make periodic audits, if you will, of our
13 mandated sites just to kind of monitor the kind of progress
14 we were making on improving some of the problems we had had
15 in the past.
16    Q   Do you know whether she did perform such audits?
17    A   Yes.
18    Q   How frequently?
19    A   I think she tries to, I think maybe once a
20 quarter, check in on a type of mandated site, be it DMVs or
21 DCF or libraries or the other types of mandated sites.
22    Q   Does she write up a report of her visits?
23    A   Yes.
24    Q   Have you seen copies of those reports?
25    A   Yes.

191

1    Q   Do you know how many such reports exist?
2    A   No.
3    Q   Do you know whether all of those reports were
4 produced in connection with this lawsuit?
5    A   I don't. And I don't recall -- I don't recall
6 whether it was asked, but I don't know.
7    Q   Okay. Do you have a general sense of what was
8 contained in those reports?
9    A   Yes.
10    Q   Can you tell me about it?
11    A   She would -- over, say, a track of or period of
12 time, maybe a week to two weeks, she would -- as the
13 courier came in, she would ask to see those documents,
14 those applications and the courier receipts.
15       And then she would just look through them to
16 see -- she was checking for completeness and trying to keep
17 some very simple statistics on what she was finding. And
18 then she would contact the agency, the contact person, to
19 try to improve.
20    Q   And that information that's contained in the audit
21 reports her findings concerning completeness?
22    A   Yes.
23    Q   Information about her contacts with the agency and
24 percentages?
25    A   Yes.

192

1    Q   Okay. Was there anything else that was contained
2 in the audit reports?
3    A   Not that I recall.
4    Q   You took a look at Plaintiffs' Exhibit Cowles 56.
5 Is this an audit report?
6    A   56?
7    Q   Yes.
8    A   Oh, sorry. I think this is where she was just
9 simply documenting some conversations. For instance, a DMV
10 visit with Curtis Hauck (phonetic). This looks like notes
11 where they were putting their heads together on trying to
12 make some improvements as opposed to, you know, a simple
13 count of here's how many applications were received and
14 here's how many weren't signed and here's how many were
15 missing this or that.
16    Q   Can you look back at Plaintiffs' Exhibit Cowles
17 51, the middle paragraph. I'm sorry. Actually, the e-mail
18 that begins, Original message?
19    A   Uh-huh (affirmative).
20    Q   And the paragraph that starts, Would you take a
21 look at this. That second sentence reads, I would like to
22 contact someone that has some type of authority over these
23 departments, slash, agencies because talking to the office
24 staff has done us no good as you can see by the number of
25 documents not being dated.

193

1       Do you understand what Ms. Koval was referring to
2 here?
3    A   As I've said before, whoever was doing the courier
4 function, whether it was Laurie or another staff member, as
5 we noticed problems when we're receipting that paperwork,
6 we try to coach and counsel on issues that we find.
7       If we see something that needs to be addressed, we
8 speak to the contact person, the manager of the site or
9 whoever is in charge.
10       This is referring to the fact that things have
11 been brought to the attention of these managers, but we're
12 continuing to see the same problem reoccurring. And it was
13 our understanding, under NVRA, that the Division of
14 Elections was the one that had the training authority over
15 all the mandated sites with the exception of the libraries
16 and the Center for Independent Living.
17       So this is where she's trying to bring it to Ed's
18 attention that it's time maybe for Ed Kast to contact
19 someone to try to get some top-down communications going.
20    Q   Who is Ed Kast?
21    A   He's with the Division of Elections. He initially
22 was the NVRA coordinator. Now I believe he's the assistant
23 director.
24    Q   Can you tell me the date of the original message
25 here?

49 (Pages 190 to 193)

194

1   A   July 17th, 2001.
2   Q   Then do you see that at the top of the page
3   there's a subsequent message from Veronica to Ed Kast?
4   A   Correct.
5   Q   Can you tell me the date of that?
6   A   August 3rd, 2001.
7   Q   Do you know whether Ms. Koval heard from Ed Kast
8   concerning this e-mail from July 17th to August 3rd?
9   A   I – specifically, no, I don't.  But I know
10  Veronica Koval and if she was looking for information out
11  of Ed Kast, she kept on him until he answered her.
12  Q   Do you know whether she ever heard back from Ed
13  Kast?
14  A   No, I don't.
15  Q   Since this e-mail was sent on July 17th, 2001, do
16  you know what, if anything, the Division of Elections has
17  done to train employees at the Department of Motor Vehicles
18  or to help improve the problems there?
19      MR. MAC INNES:  Objection as to form.
20  BY MS. NELSON:
21  Q   You can answer.
22  A   Since – since 2000, you said?
23  Q   Since this e-mail was sent.
24  A   Yeah.  The Division of Elections has staged some
25  training sessions around the state for all mandated voter

195

1   registration agencies.  In fact, one of them – our office
2   was the site for one of those training classes and I
3   believe – let's see.  This is, what, April?
4   Q   Yes.
5   A   I want to say it's been within the last month that
6   they've been here in town.
7   Q   Are these training – the training sessions that
8   were routinely given by the Division of Elections that you
9   mentioned earlier?
10  A   Yeah.  I can remember at least three previous
11  sessions that I personally attended.
12  Q   Do you know whether these sessions were in
13  response to Ms. Koval's complaints?
14  A   No.  I'm – this was – these training sessions
15  were established before 2001.  They have done them
16  periodically since NVRA was enacted.
17  Q   What about this last one that occurred within a
18  month or so, do you know whether it was in response to
19  Ms. Koval's complaints?
20  A   I don't think so.  No.  I think it was probably
21  already planned.
22  Q   Okay.  So, at this stage, you don't know for
23  certain that the Division of Elections has responded to
24  Ms. Koval's complaints here?
25  A   Specifically, no, I don't know.

196

1   Q   Can you take a look at – actually, I'd like to
2   introduce a document bearing J007291 to 93 as Plaintiffs'
3   Exhibit Tanko 2.
4       (Whereupon, the document was marked Plaintiffs'
5   Exhibit Tanko Number 2 for identification.)
6   BY MS. NELSON:
7   Q   Can you take a look at this and tell me if you've
8   seen this document before?
9   A   This is an example – to answer your original
10  question, yes, I probably helped her proofread it, so it
11  does look familiar.  And this is more in line with those
12  audits that I was describing earlier.
13  Q   Okay.  Were you familiar with the contents of the
14  letter and the issues described in there?
15  A   I recall it, yes.
16  Q   Can you tell me what Ms. Koval means when she
17  wrote, As you will see by the attached summary, the dating
18  of applications is still a big problem?
19      MR. MAC INNES:  Objection as to form.
20      THE WITNESS:  Well, what she's comparing is the
21  total number of applications received from the site
22  and then, out of that number, how many were
23  unsigned and just giving a summary.
24      I mean, to us, when you receive two applications
25  and two – well, I say unsigned, without dates or –

197

1   yeah.  I'm sorry.  I'm saying signed and I'm meaning no
2   dates.
3       Total number of applications received, two, but
4   two didn't have a date on it and the registration date
5   is the date it's received in the mandated site.
6       We get real concerned at book closing time if that
7   date becomes real critical.  So a two for two is pretty
8   significant to us.  So we're just trying to get some
9   help in retraining staff and getting those numbers
10  down.
11  BY MS. NELSON:
12  Q   Do you know whether anyone from the Division of
13  Elections responded to this letter?
14  A   I do not, no.
15  Q   Do you know whether, in fact, Ms. Koval sent this
16  letter out?  As you can see at the bottom, it's unsigned.
17  A   Yes, she did.  She more than likely just printed
18  this off of her PC as opposed to keeping a signed copy.
19  Q   Do you have any reason to believe that the
20  contents of the letter changed before she sent it?
21  A   No.
22  Q   And can you note the date of this letter for me?
23  A   September 10, 2001.
24  Q   I'd like to show you what's been previously marked
25  as Plaintiffs' Exhibit Cowles 52.

50 (Pages 194 to 197)

198

1    Actually, if I can go back to the previous
2 document for a moment, Plaintiffs' Exhibit Tanko 2, does
3 that document refresh your recollection that there were
4 still problems at the Department of Motor Vehicles
5 concerning the dating of applications as of September 2001?
6        MR. MAC INNES: Objection as to form.
7        THE WITNESS: Yes. I mean, at the DCF our biggest
8 problems have been outdated forms and undated -- I
9 mean, obsolete forms and undated forms.
10 BY MS. NELSON:
11   Q   And this is in respect to DMV?
12       MR. MAC INNES: Objection as to form.
13       THE WITNESS: DCF.
14 BY MS. NELSON:
15   Q   Oh, I'm sorry. DCF. Okay. So let me re-ask the
16 question then.
17   A   Okay.
18   Q   I was looking at the first line.
19       Does this document refresh your recollection that
20 there were -- that there were problems concerning the
21 dating of applications at the Department of Children and
22 Family Services as of September 2001?
23   A   Yes.
24   Q   Can you go back to what I showed you as
25 Plaintiff's Exhibit Cowles 52?

199

1    A   Yes.
2    Q   Have you seen this document before?
3    A   This one is not familiar.
4    Q   Okay. Do you know who created it?
5    A   No, I don't. Only because -- oh, the very last
6 line, I told her I would give this information to Veronica
7 Koval, the Customer Service manager.
8        If Veronica wrote it, I'm not sure I would know
9 why it was phrased that way, unless -- unless she was --
10 unless there's another page and she was sending it out
11 under Bill's signature. But, no, I really don't know what
12 this one is.
13   Q   Okay.
14   A   Or where it came from.
15       MS. NELSON: I'd like to mark as Plaintiffs'
16 Exhibit Tanko 3, a document bearing Bates stamp
17 J007294.
18       (Whereupon, the document was marked Plaintiffs'
19 Exhibit Tanko Number 3 for identification.)
20 BY MS. NELSON:
21   Q   Have you seen that document before?
22   A   No, I've not seen the document, but it answers the
23 previous question about who wrote the Exhibit 52. And it's
24 looking like these are the notes -- these are Roni Vinson's
25 notes. We have two Veronicas in the office. Veronica

200

1 Vinson is known as Roni Vinson in the office. So it -- it
2 looks like these were her notes.
3        And Plaintiffs' Tanko Number 3, no, I've not seen
4 this before.
5    Q   Were you aware of the situation described in this
6 letter?
7    A   I don't have any recollection of it, no.
8    Q   And the date of the letter is, what? I'm sorry.
9    A   Well, the date of this, looks like a note, is
10 October 30th, 2001.
11   Q   Can you take a look at the document bearing Bates
12 stamp J007297 to 72 -- sorry, 7297, which I'll be marking
13 as Plaintiffs' Exhibit Tanko 4?
14       (Whereupon, the document was marked Plaintiffs'
15 Exhibit Tanko Number 4 for identification.)
16 BY MS. NELSON:
17   Q   Have you seen this document before?
18   A   It looks familiar, yes.
19   Q   Can you tell me what it is?
20   A   It's another one of Veronica Koval's audits of --
21 this particular one is of the DCF sites.
22   Q   Do you -- can you take a look at the paragraph at
23 the top of the page that begins, Attached are the findings?
24   A   Okay.
25   Q   Do you know what's being referred to here?

201

1    A   Yes. In fact, I pointed out the article to
2 Veronica, the Orlando Sentinel article.
3    Q   Okay. Can you tell me about what you --
4    A   It was an article in the Orlando Sentinel that was
5 talking about how -- I guess that was a period of time
6 where the country was in a recession and there were more
7 people starting to depend on social services again, where,
8 I guess, there had been a time through welfare reform that
9 the numbers had dropped, but now it was increasing again.
10       And so it just caught my eye because our numbers
11 from the DCF office have never been very high. Like I
12 said, when NVRA started we had bigger numbers from all of
13 our sites than we do now.
14       So I had just pointed the article out to Veronica
15 Koval. And I said, Let's just watch and see if our numbers
16 from the DCF offices start to pick up because the Sentinel
17 is reporting that more people are starting to go there.
18       So, I mean, we should see some kind of correlation
19 or I would have assumed we would. But we never really saw
20 that happen.
21   Q   Do you have any sense of why you haven't seen an
22 increase that would correlate with -- with what's alleged
23 to be an increase in the use of public assistance?
24       MR. MAC INNES: Objection as to form.
25       THE WITNESS: No. I -- I have no idea why.

51 (Pages 198 to 201)

202

BY MS. NELSON:

Q   Why did you bring it to Ms. Koval's attention?

A   Only because I found it a curious item and I thought – knowing that our numbers from DCF historically had been on the low side, I just thought, okay, well, here's an opportunity to watch and see if – if, in fact, these applicants are being asked about voter registration.

I would have just assumed that we would have seen a little blip.

Q   And does this document, Plaintiffs' Exhibit Tanko 4, refer to a specific time period?

A   January 9 through January 15th, 2002.

Q   Since that time period, have you observed a spike in the number of applications from the Department of Children and Families?

A   I, myself, no. And I'm not – I'm not sure whether Ms. Koval has done another study or not.

MS. NELSON:  I'd like to mark as Plaintiffs' Exhibit Tanko 5, a document bearing Bates stamp J007288.

(Whereupon, the document was marked Plaintiffs' Exhibit Tanko Number 5 for identification.)

BY MS. NELSON:

Q   Can you tell me if you've seen this document before?

203

A   Yes. It looks familiar.

Q   What is it?

A   It's Ms. Koval's audit of our libraries, the library – well, it's not all of our libraries. She selected three out of the county to look at.

Q   Do you know whether there's any text that accompanies Ms. Koval's audit reports?

A   No, I don't know.

Q   Do you know whether this document, Plaintiffs' Exhibit Tanko 5, is a copy of an entire audit report?

A   No, I don't know.

MS. NELSON:  I'd like to mark as Plaintiffs' Exhibit Tanko 6, a document bearing Bates stamp J007296.

(Whereupon, the document was marked Plaintiffs' Exhibit Tanko Number 6 for identification.)

BY MS. NELSON:

Q   Tell me whether you've seen this document before.

A   Okay.

Q   Have you seen this document before?

A   No.

Q   Can you see the last line of the e-mail?

A   Yes.

Q   Do you know what report Ms. Koval is referring to in this document?

204

A   I can make an assumption that it was what you've marked as Plaintiffs' Tanko Number 4. But I'm strictly guessing by the dates on the documents.

Q   Okay. Do you know to whom Veronica sent this e-mail?

A   Yes.

Q   Who Donna is?

A   Yes.

Q   Can you tell me who she is?

A   Donna Miller. She is with the division – Florida Division of Elections. She now has the title of NVRA coordinator.

Q   Do you know whether Ms. Miller responded to Ms. Koval's e-mail?

A   No, I don't.

Q   Do you know what contact, if any, Ms. Koval has had with Ms. Miller since February 12th, 2002?

A   I – like I said, within the last month the Division of Elections has had NVRA workshops around the state. One of them was held in our office. Veronica attended that workshop.

Q   Do you know whether –

A   Well, I wasn't there. I'm making the assumption that they spoke.

Q   Do you know whether Donna Miller was there?

205

A   Yes, she was.

Q   Okay. Do you see the second sentence of the e-mail, where Donna Koval [sic] writes, I was just about to send you a copy of a recent assessment I did to get your help in reaching out to these offices.

Do you know whether Veronica Koval ever received the help she references here?

MR. RESTREPO:  Object to the form of the question.

THE WITNESS:  No, I don't know.

BY MS. NELSON:

Q   Okay. I'd like to show you what's been marked as Plaintiffs' Exhibit Cowles 33. Hold on. Let me just give you a copy of the actual exhibit.

Can you take a look at it and tell me if you've seen this document before?

A   No, I haven't, but that's not unusual. I don't deal with the polling places or precinct lines.

Q   Do you know the basis for any of the precinct changes that occurred from 1996 to 2000?

A   No.

Q   You can put that document down.

You said you are in charge of absentee ballots, is that correct, processing absentee ballot requests?

A   Right.

Q   If a voter requests an absentee ballot and decides

52 (Pages 202 to 205)

206

1 to go vote at a precinct, are they required to bring the
2 absentee ballot with them?
3   A   It's requested, but not required.
4   Q   Thanks.
5       Can you take a look at what's been marked as
6 Plaintiffs' Exhibit Cowles 34 and 35 and tell me if you've
7 seen this document before?
8   A   No, I haven't. I haven't seen either of them, I
9 should say. I haven't seen 34 or 35.
10  Q   Do you have anything to do with the subject matter
11 here, the mismarked ballots or the number of spoiled
12 ballots at election?
13  A   No, no. The only dealing I would have, as I've
14 said before, is training my laptop oath people how to
15 handle a voter that experiences a mismarked ballot or a
16 spoiled ballot.
17  Q   Okay. I'd like to show you what's been marked as
18 Plaintiffs' Exhibit Cowles 42. Let me know if you've seen
19 this document before, please?
20  A   No, I've not seen it, but I know what it is.
21  Q   Do you know who prepared it?
22  A   I would -- I would ask Shirley Hanners,
23 H-A-N-N-E-R-S. Shirley is in our IS Department and she was
24 the lady who worked with me, I trained on how to use the
25 laptop in terms of the -- the software that was on it.

207

1       She's the one that was our technician that trained
2 them on -- that issued the laptops and all these little
3 pieces and parts. And then she taught them how to set it
4 up, log in, the hardware aspect of it.
5       So this is her check sheet where she's -- she's
6 got her precinct numbers and then the materials that were
7 issued to these precincts.
8   Q   Okay. Thank you.
9       Has Orange County begun preparing for the use of
10 provisional ballots in upcoming elections?
11  A   Yes.
12  Q   How so?
13  A   We had some city elections earlier this year and
14 we had -- we prepared the provisional ballot envelopes that
15 are required and issued those to the polling places in case
16 they were needed during those elections.
17  Q   Did you do anything else in preparation?
18  A   Well, we -- in that election we had -- this was
19 a -- it was a municipal election day. There were several
20 cities involved.
21       But in the City of Orlando's election, there were
22 actually four provisional ballots issued and used, so we
23 had a trial run of how to handle those.
24  Q   How to handle the four ballots?
25  A   Yeah.

208

1   Q   And how did that trial run turn out?
2   A   It was fine.
3   Q   It was successful with all four?
4   A   It was successful, yeah. We think we have our
5 envelope designed the way we want it. The scary thing is
6 just not knowing how many to expect in the next elections.
7   Q   Are you working on preparing for the use of
8 provisional ballots for the upcoming elections?
9   A   Yes.
10  Q   What are you doing specifically on that?
11  A   I was the lead on designing the envelope, the
12 certificate portion of that envelope, the instruction
13 sheet. And for the city elections, I printed them myself.
14      Then it's my staff that -- that has to do the
15 research, work with those when they come back in. It would
16 be the Voter Service clerks.
17  Q   Have the instructions -- or have the instructions
18 changed since the municipal election you referred to?
19  A   No.
20  Q   What about the design of the envelope?
21  A   No.
22      We do have a forms meeting scheduled. I got an
23 e-mail just before I left, so I don't have the date
24 committed to memory. But that's where we will re-evaluate
25 that envelope and see if there's anything that we want to

209

1 change before the countywide election in September.
2   Q   Are there plans to try to estimate the number of
3 provisional ballots that will be used in the September
4 election?
5   A   No. We're prepared -- we are preparing for the
6 worse, meaning, a high volume. But we have no idea how
7 many will actually be used.
8   Q   What do you mean by "a high volume"?
9   A   Well, I can't put a number to it. But with 250
10 polling places, you know, if there's several done in each
11 one, then that's a lot of envelopes, a lot of research that
12 will have to be done.
13      And we're guessing that it won't -- won't really
14 be research that can always be answered just by looking in
15 our computer system, that we'll have to go dig in old
16 registration records over in the Records Department, those
17 microfiche records we had talked about earlier.
18      We might have to turn to outside sources to try to
19 give us the information we need.
20      And all of it has to be done in a relatively short
21 period of time, so that -- that is always a concern.
22  Q   Have you -- has your office begun that process of
23 looking in those files you referenced?
24  A   No. Because we would have to have the actual --
25 an actual provisional ballot issued used. We'd have to

53 (Pages 206 to 209)

210

1  know the voter and what the circumstances were. So we
2  won't be able to do any preliminary research until – I
3  mean, they'll have to be here in our – in the office in
4  our hands before we can do anything.
5      Q   Does your office estimate voter turnout prior to
6  an election?
7      A   The media always asks Mr. Cowles for a prediction.
8  That's one of their favorite things. It's always one
9  that – supervisors don't like to predict turnout in the
10 media, because sometimes that can be a disincentive rather
11 than an incentive to turn out.
12      Usually, Bill does make a prediction. It's
13 strictly just, you know, gut instinct.
14      Q   And does he use that for internal preparation for
15 the elections?
16      A   Well, in terms of our internal preparation, we
17 always plan for 100-percent turnout.
18      Q   With respect to each election?
19      A   Yeah. We always try – we've historically always
20 tried to plan on worse case scenarios and then be
21 pleasantly surprised if we're, you know, over-ready.
22      Q   So it's your understanding that – that for each
23 election you prepare for 100-percent turnout?
24      A   Yes.
25      Q   What do you mean by prepare for 100-percent

211

1  turnout?
2      A   That we're taking every step necessary to meet the
3  needs of that election, that we've done all we can in terms
4  of the quantity of supplies that we've issued, that we have
5  enough phone lines, enough staff members to process the
6  work, just anything we can do to make that day go easier,
7  with the understanding that there's no way to know how many
8  people are going to turn out on election day and what
9  problems you might encounter.
10      So you always come up with some contingency plans,
11 plans B, C, D and E, so you can easily switch from one to
12 the next.
13      Q   Did you prepare – did your office prepare for
14 100-percent turnout for the 2000 elections?
15      A   I felt like we did.
16      Q   Were there a sufficient number of poll workers at
17 each precinct to meet the needs of 100-percent turnout?
18      A   There's always room for improvement, so that's a
19 hard one to – hard one to answer.
20      Q   Do you think the number of poll workers who
21 serviced the precincts during the 2000 elections could meet
22 the needs of 100-percent turnout?
23      A   If you had an awful lot of preexisting conditions,
24 if you've gotten your message through to the public on the
25 importance of having their voter record accurate, if you've

212

1  gotten the message through to the voters that take
2  advantage of that sample ballot that we're mailing to you
3  to make sure that you know where you're going on election
4  day and that you're ready when you walk in, that you –
5  like I say, there's a – hard questions to answer because
6  you're doing your best to get ready for something that you
7  really can't know 100 percent what's going to turn out.
8      Q   Knowing the characteristics of the voter base, the
9  way I imagine you do over these years –
10      A   Uh-huh (affirmative).
11      Q   – did the number of poll workers at the
12 precincts – were there a sufficient number of poll workers
13 at the precincts to service 100-percent voter turnout,
14 knowing what you know about voters?
15      A   Yeah, yeah. I was about to say, since I'm on the
16 voter registration side of the house and was busy with
17 that, to be honest, I don't know, precinct by precinct, how
18 many poll workers there were in each precinct. I don't
19 know what the makeup of that precinct was.
20      So – because some precincts are more stable than
21 others, meaning, you know, they're older parts of town and
22 people don't move in and out as compared to the precincts
23 that have high apartments or the college students out at
24 the university.
25      Q   What about the phone system that services the

213

1  entire county, did the phone system for the 2000
2  election – do you think it was capable of handling
3  100-percent voter turnout, knowing the voter – the voter
4  base the way you do?
5      A   There's – this is something we always battle. In
6  fact, that's how we wound up with laptops. There's never
7  enough telephones. If I had enough telephones installed to
8  meet the needs, then my next problem is to find qualified
9  people to man those phones. And when I say "qualified,"
10 that they're sufficiently trained to give accurate
11 information.
12      So we've tried, through the laptops, that system
13 to lessen the number of phone calls that would come into
14 the office. We're trying to find other ways to solve those
15 problems.
16      Q   So would you say there were enough telephone lines
17 for the 2000 election?
18      A   No, probably not, no.
19      MS. NELSON: I'd like to show you – or I'd like
20 to mark as Plaintiffs' Exhibit Tanko 7, a document
21 bearing Bates stamp J000217 to 280.
22      (Whereupon, the document was marked Plaintiffs'
23 Exhibit Tanko Number 7 for identification.)
24      THE WITNESS: Okay.
25 BY MS. NELSON:

54 (Pages 210 to 213)

214

1    Q   Can you tell me what these documents are?
2    A   This is a photocopied set of our clerk comment
3    sheets.
4    Q   You mentioned those earlier in your testimony, you
5    referred to clerk comment sheets?
6    A   Yes.
7    Q   Have you seen all of those documents?
8    A   No.
9    Q   Did you see a sub-set of them like you mentioned
10   earlier?
11   A   Yes.
12   Q   Do you know who, in your office, has seen all of
13   those comment sheets, if anyone?
14   A   It would be Mr. Cowles and Nancy Lord, who's no
15   longer with the office. If there are others, I'm not aware
16   of who they would be.
17   Q   Have the clerk comment sheets been discussed in
18   staff meetings?
19   A   Yes.
20   Q   And what was said about them?
21   A   Well, after each election, one of our -- well, we
22   have a tradition of an "are we ready" meeting and a
23   tradition of "how did we do."
24       And this is -- the contents of the clerk comment
25   sheets is always an item that's brought up, what we've

215

1    gleaned -- what the election staff gleaned from these.
2    Q   Why are -- why are clerk comment sheets given to
3    clerks at polling precincts?
4    A   It's their opportunity to -- to give us some
5    feedback. Mr. Cowles would have to answer how the clerks
6    are trained to use the sheets, but that's my general
7    understanding. It's their vehicle for telling us whatever
8    they feel they need to tell us.
9    Q   Do you think it's important to have that
10   information from the clerks?
11   A   Yes.
12   Q   For what purpose?
13   A   To improve our operations, to do whatever it takes
14   to make election day easier, not only for the poll workers,
15   but for the voters.
16   Q   We talked a moment ago about provisional ballots.
17   Is there -- does Orange County have a target date by which
18   it intends to send notification to persons who cast a
19   provisional ballot about whether their ballot was, in fact,
20   counted; target date after the election?
21   A   Target date after the election? I'm not aware of
22   a date, no.
23   Q   Do you know if Orange County intends to inform
24   voters whose ballots were not counted as to why the ballot
25   was not counted?

216

1    A   We've talked about sending a letter to a person
2    who's cast a provisional ballot and we've found them not to
3    be registered. We've talked about sending them an
4    application so they will be registered and set for the next
5    election. I'm not aware of any discussions on procedures
6    beyond that.
7    Q   Have you decided as to whether you will be sending
8    an application to those persons?
9    A   Yes.
10   Q   And --
11   A   Yes, we plan to.
12   Q   Have you heard of the Central Voter File
13   Committee?
14   A   Yes.
15   Q   Have you ever attended any meetings of that
16   committee?
17   A   I've sat in on portions of, I think, two meetings.
18   Q   Do you recall when those were?
19   A   One in Daytona Beach, probably was in January of
20   this year, 2002.
21       Then the other one -- oh, the other one was here
22   in Orlando. I don't remember the date of it.
23   Q   Was it after the one in Daytona Beach?
24   A   Before.
25   Q   Before.

217

1        So it was last year?
2    A   Yes, yes.
3    Q   Do you recall the season?
4        MR. CIRULLO:   Florida.
5    BY MS. NELSON:
6    Q   Yeah. It would be hard to figure out here, but --
7    A   You know, I don't. I could probably look at an
8    old calendar and probably figure it out.
9    Q   Why did you go to those meetings?
10   A   Mr. Cowles is on that committee, as is Lonn Fluke,
11   our IS director. And just as a matter of curiosity, I sat
12   in on some of them.
13   Q   Did Mr. Cowles attend that meeting, as well?
14   A   Yes.
15   Q   And Mr. Fluke?
16   A   Yes.
17   Q   Did you take notes during that meeting?
18   A   I doubt -- I don't recall, but I doubt I took many
19   because, you know, during those stages they were still
20   doing a lot of development and I'm one that, I don't get
21   excited until it's decided. I don't want to spend a lot of
22   time on the preliminary stuff. Just tell me when it's
23   decided and that's what I'll do.
24   Q   So do you recall taking notes during either of
25   those meetings?

55 (Pages 214 to 217)

218

```
1      A  No, I don't.
2      MS. NELSON: I'd like to mark as Plaintiffs'
3  Exhibit Tanko 8, a document bearing Bates stamp A01730
4  through 74 -- A017430 through A017498.
5      (Whereupon, the document was marked Plaintiffs'
6  Exhibit Tanko Number 8 for identification.)
7      THE WITNESS: Okay.
8  BY MS. NELSON:
9      Q  Can you turn to Page A017442?
10     A  I'm sorry. What was it again?
11     Q  A017442, the page that says, Poll Deputy During
12  Voting Hours.
13     A  Okay.
14     Q  Can you tell me what -- what this page is about?
15     A  This is a Power Point presentation that Mr. Cowles
16  uses in poll worker training. This particular page was
17  used while he was training poll deputies.
18     And, basically, his message at this point would
19  have been that when you go vote, you're supposed to take a
20  driver's license; however, if they don't have a driver's
21  license, no one is to ever be turned away. The poll worker
22  is supposed to use the photo identification form as a
23  substitute.
24     Q  So after a person fills out a photo identification
25  form, what happens?
```

219

```
1      A  They proceed on through the voting process.
2      Q  Do they have to fill out an affidavit or an
3  affirmation?
4      A  No. Unless -- I mean, unless they've had an
5  address change or a name change or --
6      Q  But not by -- not because they didn't bring a
7  photo ID?
8      A  Right, right.
9      Q  Is that right?
10     A  Yes.
11     Q  How are voters educated by your office, if at all,
12  about the fact that they can vote without a photo ID?
13     A  I'm sorry. How are who educated?
14     Q  How are voters educated by your office?
15     A  Okay. Several ways. Mr. Cowles has a show on a
16  local government access channel. It's called Orange TV.
17  This would be a topic that he would plug repeatedly in the
18  shows leading up to the election. He's real good when he's
19  doing media interviews prior to election reminding voters
20  to bring photo ID.
21     The sample ballot that we send out prior to
22  election has the notice in there reminding them to bring
23  photo ID.
24     Those are the ones that come to mind.
25     Q  Okay. Would you say that voters receive as much
```

220

```
1  information from your office concerning the requirement to
2  bring a photo ID as they do about the ability to vote by
3  affirmation or affidavit?
4      (Whereupon, Mr. Mac Innes exited the deposition
5  room.)
6      THE WITNESS: The information that -- that -- I
7  guess the way Bill probably presents it at that point
8  is, Call us as soon as you can, let's make sure that
9  your record's up to date to avoid delays at the polling
10  place and extra paperwork.
11     I don't recall him ever specifically promoting it
12  as, you know, Go to the polling place and vote by
13  affirmation.
14  BY MS. NELSON:
15     Q  Okay. Do you know whether voters receive as much
16  information concerning their ability to vote by affirmation
17  as they do about the requirement to bring a photo ID to the
18  polls?
19     Let me phrase it --
20     A  Yeah.
21     Q  Are they informed more about the photo ID
22  requirements than they are about the ability to vote by
23  affirmation or affidavit?
24     A  I would -- I would say yes. Because we never use
25  the word affirmation as we're talking to the voters prior
```

221

```
1  to election. We refer to it as affirmation.
2      But, yes, there is a heavier emphasis on photo ID,
3  bring a photo.
4      Q  Than on voting -- the ability to vote without a
5  photo ID?
6      A  Right. Because our message is, Let's get all this
7  taken care of before election day. We can deal with it on
8  election day if we have to, but we're trying to take care
9  of it beforehand to lessen the aggravation that someone
10  might have on election day.
11     Q  Can you obtain a photo ID form before an election?
12     A  We've never been asked. But if we were asked, I'm
13  sure we wouldn't have a problem giving some out.
14     Q  So as far as you know, as it stands now, the only
15  place to obtain a photo ID form is when you're at the polls
16  attempting to vote?
17     A  We use them in the office some. But, yes, our
18  office or a polling place.
19     Q  Excuse me. So a voter can come to your office and
20  request a photo ID form and fill it out in advance of the
21  election?
22     A  Like I said, we've never been asked. I don't know
23  that we would have a problem if we had been. I'm sure we
24  would have given one.
25     (Whereupon, Mr. Mac Innes returned to the
```

56 (Pages 218 to 221)

222

1  deposition room.)
2  BY MS. NELSON:
3  Q  Can you turn to Page A017449 of the same document?
4  A  Okay.
5  Q  Can you tell me what this page is about?
6  A  This is the slide that Mr. Cowles uses to instruct
7  the PR/PL inspector. This is where he's showing them a
8  sample of what the PR/PL page looks like. And this
9  particular one is calling attention to voter signatures on
10  the PR/PL.
11  Q  Do you know what information, if any, is given to
12  poll workers about how to permit persons who are illiterate
13  or who cannot sign their names to vote?
14  A  We always say signature or mark. So I — to be
15  able to tell you exactly Bill's spiel, no, I can't
16  reiterate it — or reproduce it, but we always say
17  signature or mark.
18  Q  When you say you always say it, do you mean that
19  it's contained in training materials?
20  A  That, I would have to check on. I'm not sure.
21  Q  Do you know whether it's contained in training
22  materials?
23  A  No, I don't know if it's in there.
24  MS. NELSON: Can you turn — actually, let me mark
25  as Plaintiffs' Exhibit Tanko 9, a document bearing

223

1  Bates stamp A017364 to 27.
2  (Whereupon, the document was marked Plaintiffs'
3  Exhibit Tanko Number 9 for identification.)
4  BY MS. NELSON:
5  Q  And if you can turn to Page A017420, tell me when
6  you get there?
7  A  Okay.
8  Q  A017420?
9  A  Sorry. I'm dyslexic.
10  Q  This page.
11  A  Yeah. Okay.
12  Q  Can you walk me through this diagram, please?
13  A  This is the graphic that I've used in our
14  training manuals for a number of years. It's to give the
15  clerk, the poll workers, an idea of a typical flow within a
16  polling place.
17  The little man is entering the polling room down
18  by the deputy. The voter then goes and checks in at the
19  PL/PR table. That's where they would be presenting their
20  photo ID and signing the PR/PL book.
21  Once they're signed in, then they're sent to the
22  ballot issuer to get their ballot. He's then going over to
23  the vote pack, which is our voting booth, where they —
24  where the voter will mark their ballot.
25  The last stop on the path would be at the

224

1  tabulator, where they would insert their ballot into the
2  tabulator. That's the normal pattern.
3  Q  At what point does the voter show ID?
4  A  If I recall the — they will show it at the PR/PL
5  table. I believe that the poll deputy is asked to issue —
6  just perhaps make a reminder, They're going to want to see
7  photo ID, and then to issue the photo ID form if they don't
8  have one.
9  Q  And the photo ID form would be filled out at the
10  PR/PL table?
11  A  Yes, or thereabouts.
12  MS. NELSON: I'd like to mark as Tanko —
13  Plaintiffs' Exhibit Tanko 11 and 12 — 10 and 11 —
14  this will be 10. 10 is document bearing Bates stamp
15  J002086 through 002103. And 11 is J001990 through
16  J002031.
17  (Whereupon, the documents were marked Plaintiffs'
18  Exhibit Tanko Number 10 and 11, respectively, for
19  identification.)
20  THE WITNESS: Okay.
21  BY MS. NELSON:
22  Q  Have you seen these documents before?
23  A  I can't say that I've seen these specific
24  documents, but I know what they are. They're telephone
25  logs from the general election 2000.

225

1  Q  Are these the documents that you went through —
2  or are these a sample of the documents that you went
3  through after the November 2000 election?
4  A  Correct. These were the ones that, as I mentioned
5  before, when we're researching — as we're processing
6  affirmations and we have questions and we're trying to
7  recreate the picture on election day, we would turn to
8  these looking for information.
9  Q  Were persons in the phone bank instructed to put
10  their name at the top of a phone log?
11  A  Yes, they were.
12  Q  Do you know if there were instances in which phone
13  bank workers did not do that?
14  A  Yes, there were.
15  Q  Do you know how frequently that happened?
16  A  No. I know, coming out of 2000, there's — we've
17  decided that instead of having the telephone operators give
18  their names, we're going to number them. This is operator
19  number 1, how may I help you, as opposed to, This is Linda,
20  how may I help you.
21  Because sometimes our operators — the temporary
22  workers that are helping us have difficult names to spell
23  or to understand by phone, so —
24  Q  What about in filling out the phone records, are
25  they required to put their name on the phone records, the

57 (Pages 222 to 225)

226

1   telephone logs, like the documents you have before you?
2      A   Yes. Well, they're trained to do it and they
3   should have done it. But as we can see on Document Number
4   10, this one did not.
5      Q   Do you know how often that occurs?
6      A   No.
7      Q   Are they also trained to list the precinct number
8   and the name of the caller?
9      A   Yes.
10     Q   Okay. Do you know whether they always do that?
11     A   No, no. I'm quite sure that they miss some. In
12  fact, you know, when you -- when you look through, you
13  probably can find instances of it.
14         Normally -- on Document Number 10, I was flipping
15  through. Because normally when I found -- the phone banks
16  that I worked with, when I found that somebody did not
17  write their name on it, I usually wrote it on there. So
18  this one, I don't know where it came from, but --
19     Q   Okay. I'd like to show you what has been
20  previously marked as Plaintiffs' Exhibit Cowles 53. And
21  tell me if you've seen these documents before and what they
22  are?
23     A   These are notes from one of our "how did we do"
24  meetings after the September 7, 2000 primary.
25     Q   Can you turn to the document bearing Bates stamp

227

1   J004497?
2      A   Yes.
3      Q   Actually, before you do that, can you tell me
4   who -- the documents from J004493 through 97, do you know
5   who created these documents?
6      A   I can make a guess. I don't know specifically.
7      Q   Do you know generally who?
8      A   At that period of time, Mary Cruz, who is Bill's
9   secretary, usually took some notes and this looks like a
10  typed version of them.
11     Q   Okay. Can you turn to Page J004497?
12     A   Okay.
13     Q   Do you see the -- maybe a quarter into the page,
14  says, Thursday, 9-14-2000, ULCERS meeting in Tampa, hosted
15  by Tampa area?
16     A   Yes.
17     Q   Do you know what that refers to?
18     A   The ULCERS -- there is a group of supervisors
19  that's primarily made up of the larger urban counties.
20  They get together and it's just the supervisors. And they
21  talk about -- they share ideas, like procedural ideas, how
22  are you handling this, how are you handling that.
23         There have been occasions where we've had
24  questions and we've told Bill, Hey, when you go to this
25  meeting, ask these supervisors how they're handling this

228

1   and such.
2         So it looks like that's where Bill was covering
3   his calendar. And he mentioned that he had an ULCERS
4   meeting.
5      Q   Have you ever attended an ULCERS meeting?
6      A   No, I have not.
7      Q   Do you know what ULCERS stands for?
8      A   I was told once, but I can't remember.
9      Q   Okay. Go ahead.
10     A   Yeah. I know U is urban.
11     Q   If you don't remember, that's fine.
12     A   I don't. Yeah.
13     Q   Do you have any documents that have anything to do
14  with ULCERS meetings?
15     A   No, I don't.
16     Q   What does OMB stand for, which is on the following
17  line?
18     A   Well --
19     Q   If you know?
20     A   Bill usually refers to OMB, meaning, office of
21  management and budget, county budget people, Orange County
22  budget people.
23     Q   Do you know anything about the structure of ULCERS
24  in terms of whether there are officers or chairpersons?
25     A   No. I think it's just an informal group. I don't

229

1   even know how they decide where they're meeting. I don't
2   know who -- who designates the spot. But, no, it's an
3   informal gathering.
4      Q   Have you ever seen any documents out of those
5   gatherings?
6      A   No.
7      Q   Turn to the following page where there is some
8   handwritten notes.
9      A   Okay.
10     Q   Have you seen these before?
11     A   No.
12     Q   Okay. Can you look at the section that says,
13  Telephones?
14     A   Okay.
15     Q   And if you can read the handwriting there, do you
16  know what it refers to?
17     A   Well, I know from the handwriting it's
18  Mr. Cowles' notes. This was -- these were his notes from
19  our "how did we do" meeting for the November 2000 general
20  election.
21         And these were -- as we were critiquing telephones
22  for that election, these were the ideas that the team threw
23  out as changes that we wanted to make for the next
24  elections, the 2002 elections.
25     Q   So do you know what "more line, more ports" refers

58 (Pages 226 to 229)

230

1  to?
2      A   Just -- "more lines, more ports"? Probably just
3  to see if we can increase our telephone system any.
4      Q   What about, System crashed twice?
5      A   Okay.
6      Q   Followed by, the next line, Server crashed?
7      A   Okay.
8      Q   Do you know what that refers to?
9      A   Yes. On election morning, I was -- as I've said,
10  I'm with a phone bank offsite, at the Pittman location.
11  Shortly after seven, we started experiencing problems where
12  the system just wasn't responding as we made those queries.
13      So I immediately called Jerry Smith, who is the
14  technician that helps me. And I asked him, you know,
15  What's going on? He says, I don't know. I'm having some
16  problems with the server. I'll call you back.
17      So I guess in the final analysis what happened
18  was, there was one server that had both the -- my Pittman
19  phone bank on it and all the 100 people on laptops. And I
20  cannot remember -- the IS Department would have to answer.
21      I believe there was a phone system on that, too.
22  Our automated attendant has a -- at election time we enable
23  a feature where they can key in -- well, it may be out
24  there now. They can key in their house number, I believe
25  it is, and their date of birth and it will tell them where

231

1  they go vote, their polling place.
2      I think it was that telephone system that
3  overloaded this server. There was too many -- too many
4  people trying to get into the server at one time.
5      So what Jerry did was -- there were backup
6  servers. So he wound up rerouting my Pittman group to a
7  different server and then that allowed the other two groups
8  to stay on the server that had crashed, which was then
9  handling the telephone system and the laptop people.
10     Q   How long was that server down, if you know?
11     A   Well, from Bill's notes, it says from 7 to 11. I
12  don't -- in the morning. I don't remember it being down
13  that long. I remember -- I remember maybe an hour, two
14  hours tops.
15     Q   7 to 11 would be four hours?
16     A   Yeah. I really remember closer to an hour and
17  everybody -- no, it's longer. And what I wonder is the
18  difference is Jerry was getting me off first, so maybe I
19  felt relief on my end first.
20     Q   Do you know how long the 100 precincts that were
21  linked to this server were without service?
22     A   I would say the same time frame. By Bill's notes,
23  I would say the 7 to 11.
24     Q   Okay. Do you see the line that says, Absentee
25  bank, separate line?

232

1      A   Yes.
2      Q   Do you know what that refers to?
3      A   We had -- next election there will be a separate
4  telephone number for absentee questions from the polling
5  places. Your previous question had been, Is it required
6  that they bring the ballot -- the absentee ballot to the
7  polls to vote. No, it's not required, but it's requested.
8      If they don't surrender their ballot as they check
9  in, a telephone call needs to be made to the office to make
10  sure that we don't have that voted ballot in the office
11  before we issue them one, which is no problem to do that.
12      We're trying to separate those telephone calls off
13  to its own telephone number. In the 2000 election, it was
14  the voter authorization number that was handling these
15  calls. Like I say, whenever we're dealing with telephone
16  numbers we're trying to divide and conquer and lower
17  telephone -- reduce telephone calls, things of that nature.
18  So this was the note that for 2002 we'll have a separate
19  number for absentee.
20     Q   Do you see further down, it says, Poll workers,
21  and there's a notation that reads, Hispanic PW recruitment,
22  hyphen, law, question mark?
23     A   Uh-huh (affirmative).
24     Q   Do you know what that refers to?
25     A   Vaguely, because I don't deal with poll worker

233

1  recruitment that much. I believe the question was, because
2  we're required to do things in English and Spanish,
3  what's -- how does that translate into bilingual poll
4  workers, is it a countywide requirement or is it just
5  within the -- the demographics within that precinct?
6      So I think it was just his notation to research
7  that.
8      Q   Do you know whether that issue was resolved in
9  that meeting?
10     A   I believe he asked the -- Tim Maleck (phonetic).
11  He asked -- he asked the question. I don't know whether
12  he's been answered.
13     Q   Who is Tim Maleck?
14     A   I think he's with the Justice Department, U.S.
15  Justice Department.
16     Q   Can you turn to the following page, please, where
17  it says, Tabulators?
18     A   Okay.
19     Q   High N-O, period, of jams?
20     A   Okay.
21     Q   See conduct of election report.
22      Do you know what that refers to?
23     A   No, I don't.
24      Well, it's -- the heading is tabulators, slash,
25  IV-C. Tabulators are the -- it's the tabulating voting

59 (Pages 230 to 233)

234

1  equipment within the polling place, the VI-C, Roman numeral
2  IV, dash, C. Those are the high speed counters that are
3  used in the office to count the absentee ballots.
4      So, I mean, that doesn't answer your question
5  about high number of jams. I don't know what it was
6  referring to. But I just wanted you to know that they're
7  two different things.
8  Q   Thanks for clearing that up.
9      Can you turn to the following page where it says,
10  Customer Service voter status?
11  A   Okay.
12  Q   After the colon, Long lines in office election
13  day?
14  A   Okay.
15  Q   What does that refer to, do you know?
16  A   These were probably comments, things that Veronica
17  and the staff that was in the office on election day were
18  bringing up. Like I say, I was offsite with the phone
19  bank. I can make some assumptions about those comments,
20  but --
21  Q   About the comment, Long lines in office election
22  day?
23  A   Yeah.
24  Q   Do you know whether there were long lines in the
25  office on election day?

235

1  A   I was told there were.
2  Q   Do you know how long the lines were?
3  A   No.
4  Q   What about the asterisk, DMV, do you know what
5  that refers to?
6  A   No. Again, I can make some assumptions, but I
7  don't --
8  Q   Okay. Can you turn to the page Bates stamped
9  J004502?
10  A   Okay.
11  Q   Have you seen this document before?
12  A   Yes. Those are my notes.
13  Q   And the following page?
14  A   The continuation of it.
15  Q   Okay. You write at the top, Here are my notes.
16  I've covered up my doodles. Linda. Is that --
17  A   That's me. Yeah. I didn't figure you wanted to
18  see my pictures.
19  Q   When you say "doodles," what are you referring to,
20  what did you cover up?
21  A   Oh, funny faces and just scribbles.
22  Q   Did you cover up any text, any wording?
23  A   No. I was careful to not cover up any text,
24  because I knew I'd be questioned about it. But I didn't
25  want you to see my doodles.

236

1  Q   Did anyone instruct you to cover up your doodles?
2  A   No. That was purely my idea.
3  Q   Do you still have a copy that has your doodles on
4  it?
5  A   I do. I have the original.
6  Q   Do you see where you have, Telephones?
7  A   Yes.
8  Q   And there's the wording, Maxed out 32 lines five
9  times?
10  A   Yes.
11  Q   What does that refer to?
12  A   That would have been a statistic that Claude Mann
13  would have reported in that meeting. And when it comes to
14  the mechanics of the phone system, it's -- I'm really not
15  mechanically inclined or technically inclined to understand
16  a lot of it, so I would have just been writing down what he
17  had reported.
18      And usually, when the system is maxed out, that
19  would mean that no further incoming calls could come in,
20  that it would be ringing busy for the person.
21  Q   What about the following line, System crashed
22  several times and lines had to be reconnected line by line?
23  A   Again, that would have been part of his report.
24  That -- this is speaking to -- this is speaking strictly to
25  the -- well, my impression is, this was speaking strictly

237

1  to the main switchboard, the 836-2070 main Supervisor of
2  Elections number. Those would have been -- that would have
3  been the number that the general public is calling.
4  Those -- am I registered to vote, am I allowed to vote,
5  where do I go vote.
6      But some -- that would probably need to be
7  confirmed by Margaret Dunn, perhaps.
8  Q   Do you see the notation, 7 through 11 servers
9  down?
10  A   Yes.
11  Q   Does that refresh your recollection as to the
12  length of time the servers were down?
13  A   No. I mean, I recorded it because that's what was
14  reported in the meeting. But my recollection, in the
15  Pittman location where I was, was that I got relief faster
16  than that.
17  Q   Okay. Who attended -- well, was this meeting --
18  were these notes that you took taken at the same meeting at
19  which Bill Cowles took the previous set of notes we looked
20  at?
21  A   Yes.
22  Q   Who else attended that meeting?
23  A   Well, it's a pretty big group.
24  Q   Was it the entire staff?
25  A   Not the entire staff, but --

60 (Pages 234 to 237)

238

1    Q   You can tell me divisions, if that's applicable.
2    A   Yeah. There's key personnel from all divisions.
3    Q   Is there a document that reflects who attended the
4  meeting?
5    A   If it's -- I didn't notice. If there's a typed
6  copy, that would have been Mary's notes. If there's not,
7  then I would say, no, there's not one that exists.
8        Like I say, I can tell you who typically attends
9  them.
10   Q   And who typically attends the meetings?
11   A   It would be, of course, Mr. Cowles, June Condron,
12  myself, Veronica Koval, Pat Fletcher, from Voter Services.
13       From the Elections side, would have been Nancy
14  Lord, Cindy Fletcher.
15       From the IS Department, it would have been Lonn
16  Fluke, probably Shirley Hanners, Dane Beavers, Louis
17  Torres.
18   Q   You've mentioned Claude Mann --
19   A   Yeah.
20   Q   -- in your notes?
21   A   Then on into the administrative area, it would
22  have been Margaret Dunn, Claude Mann, probably Al Harris.
23  Rita Donald, perhaps, had been there.
24       That's all four areas. That's typically who would
25  come to this type of meeting.

239

1    Q   Okay. I'd like to show you the last exhibit of
2  mine for the day at this point.
3    A   Okay.
4    Q   And that is Plaintiffs -- something that's been
5  marked Plaintiffs' Dunn Number 5. Can you tell me if
6  you've seen this document before? Are these your notes?
7    A   No, these are not my notes. So I don't know -- I
8  can make a guess, but I don't know who they belong to.
9    Q   You don't know who they belong to?
10   A   No. Like I said, I can speculate.
11   Q   I don't want you to speculate. If you have a good
12  sense of who it is, that would be great, but if not --
13   A   You know, this isn't even from the 2000 election
14  cycle. It talks about -- talks about, in the first page,
15  one, two -- third paragraph, In addition to the table
16  space, four of the PSC computers were logged into the
17  Internet for training the oath person on query screens once
18  they connected, blah, blah.
19       The only time I trained in the annex using those
20  workstations I think was when we were developing the laptop
21  system and that was a source of debate in the office a
22  while back. It's probably while we were preparing the
23  responses for the interrogatories when we actually started
24  the laptops. Because we started them in '98 on a trial
25  basis with some city elections. And we did just a few in

240

1  '98.
2    Q   So you think the -- I'm sorry. Go ahead.
3    A   Yeah. I think -- I can safely say this is not
4  from the general election 2000.
5    Q   Do you know whether these are notes from various
6  staff from meetings during the 2000 -- the year 2000?
7    A   No. I would really have to put my thinking cap on
8  to figure out when these were from.
9    Q   So you don't know?
10   A   I don't know.
11       MS. NELSON: Okay. Well, I have no further
12   questions at this time. I reserve the right to recall
13   you if necessary, but I thank you for your time today.
14       THE WITNESS: You're welcome.
15       MR. CIRULLO: Can I just have a minute just to
16   stretch, take a couple minutes and relax.
17       MS. NELSON: We're going to take a quick break and
18   then come back to see if anyone has questions.
19       UNIDENTIFIED SPEAKER: Okay.
20       (Whereupon, a recess was taken at 5:04 p.m. and
21   the deposition reconvened at 5:14 p.m.)
22       MR. CIRULLO: I have a couple questions. This is
23   Mike Cirullo, for those of you on the phone.
24            CROSS-EXAMINATION
25   BY MR. CIRULLO:

241

1    Q   Linda, you mentioned this morning during your
2  testimony the Voter Education Alliance?
3    A   Yes.
4    Q   What is the Voter Education Alliance?
5    A   Coming out of the 2000 elections, like I say, it's
6  always our pattern to critique our performance and look for
7  ways to improve. We try to be pro-active. And immediately
8  Mr. Cowles was saying that he wanted to form a Voter
9  Education Alliance, pulling together key people in the
10  community who -- well, I shouldn't say key people. Key
11  groups in the community that already have a voter
12  registration, voter education aspect to their -- what they
13  do, to their being.
14       And he wanted to bring them together to -- it
15  almost becomes sort of like a train-the-trainer program.
16  It's where he calls -- calls the meeting, they send a
17  representative. He then shares with them changes in
18  legislation, key election dates that are coming up,
19  projects that we're working on. He asks them, you know,
20  what they're working on, you know, other ways we can
21  partner together.
22       Then these representatives take the information
23  back to their organization and share the information with
24  their membership.
25       So it's just -- just an extra way to educate the

61 (Pages 238 to 241)

242

1 public, get more involvement with these groups that are
2 already out there doing -- doing voter registration and
3 election education kind of work.
4 Q Do you know when the alliance first met?
5 A Yeah. It was June 14th, 2001. And the only
6 reason I know that is because it was Flag Day.
7 Q Yeah. You testified. I'm sorry.
8 A Yeah. We've got -- we had about 50 groups reply
9 that they wanted to join the group. And we've been
10 inviting and adding membership all along. But it's a real
11 cross-section of the community.
12 Q Do you know who are the members of the group?
13 A Well, like I say, we've got about 50. There are
14 groups from the Orange County Democratic Committee, the
15 Orange County Republican Executive Committee, AFLCIO,
16 Center for Independent Living, Senior Resource Alliance,
17 Arab -- Arab Alliance, I think it's called, NAACP, NAACP
18 National Fund, there's Rainbow Democrats. I mean, I could
19 keep going down the list if you want. Stop me when you're
20 ready.
21       There's a group called El Pueblo League of Women
22 Voters, Latino Leadership, Puerto Rican Hispanic Coalition
23 for Fair Representation, UCF Political Science Department,
24 Rollins Political Science Department, Valencia Community
25 College Student Government.

243

1       Let's see.
2 Q Well, do you know if any of these groups have
3 attended meetings?
4 A Yes, yes. We've had three so far and we've had
5 attendance at all.
6 Q And when's the next meeting scheduled?
7 A June 14th.
8       And then I think we've got another one in October.
9       MR. CIRULLO: Okay. Thank you. That's all I
10 have.
11             CROSS-EXAMINATION
12 BY MR. MAC INNES:
13 Q Ms. Tanko, my name is Doug Mac Innes and I work at
14 the Attorney General's Office and I represent the
15 Department of Highway Safety and Motor Vehicles and the
16 Department of Children and Families.
17 A Uh-huh (affirmative).
18 Q When an Orange County Supervisor of Elections
19 courier goes to a mandated agency to pick up motor voter
20 applications --
21 A Yes.
22 Q -- does the courier actually inspect each
23 application for completeness at that time?
24 A If -- no. They're not slowing down to necessarily
25 look at each and every one. What's happening is, as

244

1 they're having to hand write these receipts or count them,
2 they're just making a real cursory examination of them.
3 Q So if there are incomplete applications in the
4 packet, does the courier accept them and bring them back to
5 your office?
6 A Absolutely.
7 Q You mentioned early on in your testimony today
8 that there were some ongoing problems with mandated
9 agencies. With regard to Department of Highway Safety and
10 Motor Vehicles in particular, have they gotten better at
11 their motor vehicle -- motor voter responsibilities since
12 Helen Howard arrived?
13 A I feel like they have, yes. She's -- she's been
14 one that we've been able to turn to to help facilitate some
15 improvement.
16       Now, is it perfect? No. There's -- I think
17 that's just the nature of the beast we're going to always
18 battle, because we've got humans involved at so many
19 different points.
20 Q Do you know what percentage of all applications
21 the Department of Highway Safety is currently responsible
22 for intaking?
23 A Off the top of my head, no.
24 Q Do you know if the Department of Highway Safety
25 and Motor Vehicles gets NVRA training from any source?

245

1 A It's my understanding that the Division of
2 Elections trains the DMV staff. And then it's my
3 understanding that the new hires are trained by a DMV
4 trainer who incorporates the voter registration stuff into
5 that training.
6 Q So they get training by Division of Elections?
7 A Uh-huh (affirmative).
8 Q And in-house?
9 A It would be the managers that are at the Division
10 of Elections or I guess -- or whoever they would send.
11 Q Now --
12 A And then the trainer trains the actual examiners.
13 Q For the Department of Highway Safety and Motor
14 Vehicles offices that are in Orange County, do you know how
15 often they receive training from either the Division of
16 Elections or in-house trainers?
17 A No, I don't.
18 Q How would the training that those four offices in
19 Orange County -- referring to the Department of Highway
20 Safety and Motor Vehicle Offices, how would the training
21 that they would receive from you be different from the
22 training they would receive from the Division of Elections
23 or from in-house personnel?
24 A I can't speak to the in-house because I've never
25 seen it. I have attended the workshops that the Division

246

1  of Elections has conducted.
2      I would say we differ because they see us every
3  week and we probably nag a lot more. But I would say the
4  · information -- the content of the information is the same.
5      Q   Ms. Nelson asked you if the Department of Highway
6  Safety and Motor Vehicles needed to improve and your answer
7  was, Perfection.
8      Are any of the mandated agencies perfect in their
9  motor voter responsibilities?
10     A   No.
11     Q   Does that include the Supervisor of Elections
12 Office in Orange County?
13     A   Oh, no. There is no perfection in elections.
14     Q   So were you being factitious when you said
15 "perfection" in your answer to Ms. Nelson?
16     A   Well, that's always the goal. I think we had
17 agreed when I said that -- I think we both snickered that
18 that's not a realistic goal, but --
19     Q   Is the Department of Highway Safety and Motor
20 Vehicles substantially following the requirements of the
21 NVRA?
22     MS. NELSON: Objection; calls for a legal
23 conclusion.
24     THE WITNESS: Okay. I'm supposed to answer.
25     Substantially, yes.

247

1  BY MR. MAC INNES:
2      Q   Same question as to the Department of Children and
3  Families?
4      MS. NELSON: Same objection.
5      THE WITNESS: Yes, to the best of my knowledge.
6  BY MR. MAC INNES:
7      Q   Now, you had a discussion with Ms. Nelson about
8  Department of Children and Families date stamping and
9  signing the back of applications.
10     Do you know if there is any requirement to sign
11 the back of the application?
12     A   No. That was a practice that was started when
13 NVRA first got under way. There was the concern that, How
14 would we know who dated. And when I say "we," I mean the
15 entire state.
16     How would we know who put the date on that form.
17 And when I say "signed," they're really just putting their
18 initials by it. NVRA says they're not -- and the reason we
19 did initials is NVRA says the location where the person
20 registers to vote is confidential, so we didn't want them
21 stamping it Winter Park Library or Ocoee DMV. That's why
22 we did date and initials.
23     Q   But as far as you know, putting the initials down
24 is not a requirement?
25     A   No, I don't recall any statutory requirement.

248

1      Q   If a customer comes into a mandated office, picks
2  up a form, motor voter application and takes it home to
3  fill it out, how do they get that date stamped?
4      A   If they've picked up a form at a site, taken it
5  home and completed it, then they have the option -- they
6  have a couple options. They can mail it to us.
7      I guess I need to clarify my previous statement
8  when I said date is important, because that -- the date
9  that it's received in the mandated site becomes the
10 registration date. So we need that date. Like I say,
11 initials. That was just a procedure that we came up with.
12     So the individual's taken it home and they filled
13 it out. They have the option to mail it to us. The
14 postmarked date becomes the registration date. They have
15 the option to deliver it to our office. We're a mandated
16 site, so the date that it's received in our office is their
17 registration date.
18     They do have the option to take it to any other
19 mandated registration site and the date that it's received
20 there becomes their registration date.
21     Q   You made reference to, Under the new law, no
22 signature is needed to update a registration. Do you
23 recall saying words to that effect?
24     A   Yes.
25     Q   Were you referring to the 2001 Florida Election

249

1  Reform Act?
2      A   I believe that's some legislation that's just
3  passed.
4      Q   2002?
5      A   2002, right.
6      Q   Do you know if under that new law that you're
7  referring to, would you still have to have a signature on a
8  new registration?
9      A   Yes, yes.
10     Q   So it's just changing some information?
11     A   Right, right, updating an existing record.
12     Q   Would you refer to Plaintiffs' Exhibit 51 Cowles?
13     A   Okay.
14     Q   Is there anything in that exhibit that makes
15 specific reference to the Department of Highway Safety and
16 Motor Vehicles?
17     A   No.
18     Q   Is there anything there that makes specific
19 reference to the Department of Children and Families?
20     A   By name, no.
21     Public -- says, Public Service Agencies. I had
22 made the assumption that it said -- that she was meaning
23 Department of Children and Family Services.
24     MR. MAC INNES: Thank you. I have no further
25 questions.

63 (Pages 246 to 249)

250

1 CROSS-EXAMINATION
2 BY MR. RESTREPO:
3 Q Ms. Tanko, my name is Dan Restrepo. I represent
4 Defendant ChoicePoint, slash, DBT, as we are calling
5 ourselves these days in this litigation.
6 I understand the hour is a little on the late
7 side. We've all been here quite a while and I will try to
8 be as quick as I can be.
9 I'm going to refer you back to — there was an
10 extended discussion about CVF lists during Ms. Nelson's
11 questioning of you. Do you recall talking about CVF lists?
12 A Yes.
13 Q Do you know when the Orange County Supervisor of
14 Elections Office first received a CVF list?
15 A No.
16 Q No idea whatsoever? 1998, 1999, 2000, before
17 1998?
18 A No, I don't.
19 Q Do you know who you received lists from?
20 A It was, I believe, the Division of Elections.
21 Q Okay. During your discussion with Ms. Nelson, you
22 mentioned the vendor a number of times?
23 A Uh-huh (affirmative).
24 Q Is that correct, that you used that term a number
25 of times?

251

1 A Yes, yes.
2 Q Do you know whether the Division of Elections
3 worked with more than one vendor on CVF lists during the
4 time in which the division was providing you with such
5 lists?
6 A No. Like I said, I wasn't involved enough in that
7 project.
8 Q Do you know when DBT or Database Technologies or
9 ChoicePoint became involved, to the extent that you know if
10 they were involved, in the CVF list process?
11 A Again, I wasn't involved enough to recall the
12 sequence of events.
13 Q Does the company name Professional Analysis mean
14 anything to you in the context of Division of Election
15 provided CVF lists?
16 A No.
17 Q You, just a moment ago, said that you received —
18 that your office received the CVF lists from the Division
19 of Elections; is that correct?
20 A Yes.
21 Q Did your office ever receive such lists directly
22 from ChoicePoint or DBT or Database Technologies?
23 A As I've said earlier today, since they went
24 directly to June Condron, no, I don't know specifically who
25 they came from.

252

1 Q Okay. Have you seen — have you seen CVF lists?
2 A Yes.
3 Q Do you recall if they were divided into any
4 categories when you saw them?
5 A Yes.
6 Q What categories do you recall seeing?
7 A I recall the felon list, the duplicate list, the
8 death list and I'm fuzzy on the mentally incompetent list.
9 Q Do you recall if the individual lists, if the
10 so-called felon list or the so-called duplicate list or the
11 so-called death list or the so-called mental incompetent
12 list, was itself subdivided in any way?
13 A I believe there were, within the felon list, the
14 sections on out-of-state felony convictions. That's the
15 only subdivision that I recall.
16 Q You don't recall them being divided into probables
17 or possibles?
18 A I remember — I have a vague recollection. I
19 didn't work with the lists close enough.
20 Q But you have a vague recollection of —
21 A That they were, but —
22 Q You know how — and in here I'm meaning the
23 criteria used — to divide them into these probable and
24 possibles that you vaguely recall?
25 A No.

253

1 Q Does the Orange County Supervisor of Elections
2 Office have any written procedures on how it works with the
3 Central Voter File lists?
4 A If we did, they would be included in procedures
5 for the Voter Service clerks. We did prepare a summary
6 sheet that we used. Just after the 2000 election, we
7 started getting phone calls from the media. And so to
8 refresh ourselves, we did a cheat sheet, if you will, on
9 those lists and our processing procedures.
10 Q And at that time you wrote down what the process
11 had been leading up to the 2000 election?
12 A Yes.
13 MR. RESTREPO: Okay. I'd like to introduce, I
14 guess, Defendant/DBT's Tanko 1.
15 (Whereupon, the document was marked
16 Defendant/DBTs Exhibit Tanko Number 1 for identification.)
17 BY MR. RESTREPO:
18 Q Please take a moment to look that over. I'm going
19 to have a series of questions on a series of pages in
20 there.
21 A Okay. I'm familiar with it.
22 Q Would you please look at J004115?
23 A Okay.
24 Q It's the first page.
25 A Yes.

64 (Pages 250 to 253)

254

1    Q   Is the information under the heading Central Voter
2  File on that page a description of the Central Voter File
3  procedures used for the so-called felon lists as they
4  existed in the Orange County Supervisor of Elections Office
5  prior to the November 7, 2000 election?
6    A   Yes. In fact, I typed this document with the
7  input from June and -- June Condron and Pat Fletcher.
8    Q   Is this the document you were just referring to as
9  the cheat sheet --
10    A   Cheat sheet, uh-huh (affirmative).
11    Q   -- that you drew up to reflect the procedures that
12  had been used prior to the 2000 election?
13    A   Yeah. So much was happening at that point, we
14  were being asked questions from all different corners that
15  we needed a cheat sheet.
16    Q   Can you look at the paragraph under Central Voter
17  File heading, under In-State List, it begins -- that
18  paragraph begins, These lists are reviewed looking for near
19  certain matches, open bracket, name, open paren, including
20  middle name, close paren, date of birth, Social Security
21  number and race, close bracket. When matches are found,
22  the name is marked for processing.
23        Do you see where it says that?
24    A   Yes.
25    Q   Is that a description of the process that was used

255

1  in the Orange County Supervisor of Elections Office in
2  working with the felon -- CVF felon list prior to the
3  November 7, 2000 election?
4    A   Yes.
5    Q   When it says, When names are -- When matches are
6  found, the name is marked for processing --
7    A   Yes.
8    Q   -- what does that mean?
9    A   This is where, as I've said, the lists came into
10  the office, they went to June Condron. She went page by
11  page, name by name, and then made a notation out to the
12  side indicating to my data entry processors, process this
13  name, skip that name, process this name, skip, skip, skip
14  process, like that. So they knew which ones she was
15  identifying that she felt comfortable in moving forward on.
16    Q   And that's a decision that June Condron made?
17    A   Yes.
18    Q   As to which names should be moved forward on?
19    A   Right.
20    Q   If you could turn to Page 4122, the top of it
21  says, Death Lists, slash, Notices?
22    A   Yes.
23    Q   Take a moment to look that page over.
24        I draw your particular attention to the Central
25  Voter File section of that page.

256

1    A   Okay.
2    Q   Is the information under the heading Central Voter
3  File on that page an accurate description of the Central
4  Voter File procedures for the so-called death lists
5  received from the Division of Elections as they existed in
6  Orange County Supervisor of Elections Office prior to the
7  November 7, 2000 election?
8    A   To the best of my knowledge, yes.
9    Q   The second paragraph below Central Voter File
10  reads -- the first sentence thereof reads, When matches are
11  found where there is a high level of confidence that our
12  voter is not deceased, the name is marked for processing.
13        What does that sentence describe in terms of the
14  processing of Central Voter File death lists?
15    A   Well, the list is implying -- or the sentence is
16  implying that -- to me, that June Condron also looked at
17  this list. Now, I don't have any specific recollection one
18  way or the other, but that's what it's saying to me.
19    Q   Does -- the first paragraph under the Central
20  Voter File, which reads, These lists are reviewed looking
21  for near certain matches by comparing the name, open paren,
22  including middle name, close paren, date of birth, Social
23  Security number and race provided on the CVF list with the
24  information found on our database. Records are also
25  reviewed for voting history after the date of death.

257

1        Does that refresh your recollection at all as to
2  whether June Condron or someone else reviewed the records
3  on the lists before processing them?
4    A   Somewhat, because I know that I've had
5  conversations with June over duplicates and deaths, people
6  identified as duplicates and people identified as deceased,
7  where she was commenting that she was still seeing an
8  active correspondence, if you will, with that voter.
9        And she was just going to bypass that name because
10  it appeared that it was an incorrect match and that our
11  voter was still here with us.
12    Q   And when you say "bypass," both in the context of
13  the answer you just gave and earlier on the felon answer
14  that you gave, does that mean not move forward on the
15  processing to cancel that voter's status?
16    A   Correct. Skip it.
17    Q   Take no action with respect to that voter?
18    A   Take no action.
19    Q   If you could turn to J004125, please.
20    A   Okay.
21    Q   And, again, there's less information to draw your
22  attention to because I believe it's all talking about the
23  Central Voter File duplicate list, given the heading of the
24  page.
25        Take a moment to review that information.

65 (Pages 254 to 257)

258

1   A  Okay.
2   Q  Same question: Is this an accurate description of
3 the policies and procedures of the Orange County Supervisor
4 of Elections Office leading up to the November 7, 2000
5 election in processing Central Voter File duplicate lists?
6   A  To the best of my knowledge, yes. Like I said,
7 this cheat sheet was written immediately following the
8 November 2000 election, so I was turning to June and Pat
9 for help in compiling it.
10   I mean, they -- it was fresh on everybody's mind
11 because that's what they had been doing. I have a high
12 level of confidence that those were our procedures.
13   Q  And the purpose of writing this down was to record
14 the procedures that were used prior to the November 7, 2000
15 election?
16   A  Right.
17   Q  And you believe it does so accurately?
18   A  Right. Because like I say, reporters asking
19 questions, they can get you turned around pretty fast.
20   MR. CIRULLO: As lawyers?
21   THE WITNESS: Yeah. I wasn't going to say that,
22 but --
23   MS. NELSON: It was hanging out there.
24   MR. CIRULLO: It was too easy.
25   MR. RESTREPO: Begged to be asked in this context.

259

1   THE WITNESS: I'm outnumbered. I'm not going to
2 say that.
3 BY MR. RESTREPO:
4   Q  When do you recall seeing the Central Voter File
5 mental incompetence list?
6   A  Obviously, I don't recall. So I -- that's what I
7 say. I'm fuzzy as to whether there was one or not. I
8 cannot remember.
9   Now, by virtue of looking at this cheat sheet that
10 had a lot of Central Voter File information on it, I feel
11 safe in saying there was not one, that that information
12 came from the County Clerk of Courts.
13   Q  Were the Central Voter File lists ever used in
14 Orange County to move a voter's status from active to
15 inactive?
16   A  From active to inactive? No, not that I recall.
17   Q  Have you received any CVF lists since the November
18 7th, 2000 election from anyone?
19   A  I would defer to June on that question.
20   Q  Slightly leaving the CVF lists aside.
21   A  Okay.
22   Q  What, if any, other source of information did your
23 office, meaning the Orange County Supervisor of Elections
24 Office, use in determining ineligibility of people who were
25 ineligible to vote because they were felons or they had

260

1 died or they were registered elsewhere?
2   A  In terms of -- let's take deceased to begin with.
3 When we mail out a mailing, we have had occasion where a
4 piece will come back and it appears that the postal worker,
5 the mailman has marked, Deceased.
6   In those case, we generally send out a letter, To
7 the family of, trying to figure out whether that was
8 correct or not.
9   The other instance that comes to mind is at the
10 polling place on election day. We have a form available
11 where as a voter's checking in and they're signing the
12 book, occasionally they'll notice the spouse's name before
13 or after theirs or a neighbor down the street or something
14 of that nature.
15   And then they will complete a little form that we
16 have. It's included in the poll worker manual. It's
17 called a Notice of Ineligible Voter form.
18   Were we talking about just lists or just ways?
19   Q  We're talking about other sources of information.
20   A  Other sources of information, okay.
21   There's also family members that write. There's
22 always the voter that writes -- not in the case of a
23 deceased, but that they've moved.
24   MR. MAC INNES: Handwriting is kind of sloppy.
25   THE WITNESS: That they've moved or changed name,

261

1 change of party.
2 BY MR. RESTREPO:
3   Q  Let me interrupt you for a second.
4   A  Yeah. I've probably gotten off track.
5   Q  Is it safe to say the Orange County Supervisor of
6 Elections Office, prior to November 7 -- in the lead up to
7 the November 7, 2000 election, cancelled a voter because
8 they had died based on information other than that received
9 in the Central Voter File death list?
10   A  Yes.
11   Q  Same question for duplicates: Is it safe to say
12 that in the lead up to the November 7, 2000 election, the
13 Orange County Supervisor of Elections Office cancelled an
14 Orange County voter as being registered elsewhere in the
15 State of Florida based on information other than that
16 received in the Central Voter File duplicate list?
17   A  Yes, I can say that. We've had some cases where
18 information bounced between counties has been
19 misinterpreted or the voter has confused us and we've
20 cancelled somebody and had to reinstate them.
21   Q  But cancelled properly.
22   Do you ever get notification from other counties
23 in Florida that John Smith, formerly an Orange County
24 voter, has now moved to Santa Rosa and has registered here?
25   A  Yes. We -- we get information like that.

66 (Pages 258 to 261)

262

1   Q   And that would lead you to cancel John Smith?
2   A   Right.
3   Q   In Orange County?
4   A   Right.
5   Q   Again, in the lead up to the November 7th, 2000
6   election, did the Orange County Supervisor of Elections
7   Office cancel any voter -- properly cancel any voter based
8   on a felony conviction based on information received by
9   means other than the Central Voter File felon list?
10   A   Let me get -- let me paraphrase your question.
11   See if I get it right.
12   Q   Certainly. It was a convoluted question.
13   Q   Did we cancel anybody as being -- off of a
14   different felon list?
15   Q   For being a felon?
16   A   For being a felon.
17   Q   Based on other information other than that
18   received --
19   A   Yes.
20   Q   -- through the Central Voter File felon list?
21   A   Right. The Clerk of Courts felon list.
22   Q   Okay. Have you ever seen a Clerk of Court felon
23   list?
24   A   Yes, I have.
25   Q   How many such lists do you recall seeing over the

263

1   past couple of years, since 1998, let's say?
2   A   Not many. Because like I say, the incoming mail
3   bypasses my desk completely. So I know I've pulled samples
4   of the lists, so let's say two or three.
5   Q   Do you know how frequently the lists come?
6   A   They're supposed to come monthly, I believe.
7   Q   They're supposed to come monthly.
8   Do they?
9   A   Well, I don't think -- I think there's usually a
10   time lag, but I believe it's a monthly list.
11   Q   Do you recall the volume of names on these monthly
12   lists? Are we talking about thousands of names, hundreds
13   of names, dozens of names, a few names?
14   A   The sample that I pulled maybe had a few dozen
15   names on it. So it wouldn't -- wouldn't be any more than a
16   few hundred probably.
17   Q   Okay. And, again, you have seen the Central Voter
18   File felon list that comes from the Division of Elections?
19   A   Yes.
20   Q   Do you recall the volume of names on that list?
21   A   I recall them being greater, larger lists than
22   what we were given by the County Clerk of Courts.
23   Q   Do you recall the general content of the county
24   lists? What information is provided on these county lists?
25   A   Name, date of birth. I do not recall address. I

264

1   would have to look at a sample.
2   Q   Do the county lists make any efforts to say, This
3   person, who is a registered voter in Orange County, was
4   convicted of a felony, or does it simply say, This person
5   was convicted of a felony in Orange County?
6   A   This person was convicted of a felony in Orange
7   County.
8   Q   Let me go back to a discussion you had I think
9   fairly early on in the day about what happens after folks
10   have been cancelled and have been on the system for a
11   while.
12   A   Okay.
13   Q   The deletion discussion that you had with
14   Ms. Nelson earlier.
15   A   Okay.
16   Q   Just trying to better understand how long it takes
17   somebody to go from cancelled or inactive to deleted. And
18   I guess I'll put that question out there.
19   A   Okay.
20   Q   How long does it take someone who has been
21   cancelled as a result -- for any reason, to go from
22   cancelled on the active database to deleted, meaning,
23   they're on the -- they're in data storage rather than in
24   the active system?
25   A   There's no hard, fast rule. It's purely a

265

1   judgment call by senior staff every December. I would say
2   it takes years, meaning, four plus.
3   Q   If somebody had been cancelled in 1999, do you
4   think they're still on your active system -- active system,
5   meaning, in the database in cancelled status or do you
6   think they are -- have been moved to storage?
7   A   Still on the system in cancelled status.
8   Q   And what leads you to that conclusion?
9   A   Because we would have left them out there going
10   through the 2000 election cycle and we've not deleted
11   anything since the 2000 election cycle.
12   I would have to go back and check, talk with
13   Margaret and Lonn, but I wouldn't be surprised to find some
14   '96 records still on the system. I would have to verify
15   that, though.
16   Q   To your knowledge, is there any way on the active
17   database to find out when and why voters were cancelled?
18   A   A program would have to be written. It's not
19   going to give you very accurate data. Because as we work
20   in a voter record, we're linking documents to that voter
21   record and we have some basic audit comments that we use,
22   too, such as, We're linking -- this is just information
23   only. We're not sending letters out. We're not changing
24   status or anything like that.
25   Some of these voters that are going to be

67 (Pages 262 to 265)

266

1  cancelled, you're not going to know whether the voter wrote
2  you a letter telling us, I've moved, cancel my record, or
3  whether it was that Supervisor of Elections Office
4  notifying us to cancel a voter.
5      I would have to review the codes -- those tables
6  that we have. Yeah. I'd have to review -- I don't think
7  you're going to get a really clean picture. I think you're
8  going to find some reasons for cancellation lumped together
9  or you're not going to be able to distinguish why.
10     Q  Would you say you're the most knowledgeable person
11  in the Orange County Supervisor of Elections Office on the
12  question I just asked that you just answered?
13     A  No.
14     Q  And who would the person -- the most knowledgeable
15  person in the office be?
16     A  I feel like it's going to be a combination of
17  people. It's going to be Lonn Fluke, who's our IS
18  director. Other knowledgeable people would be Pat
19  Fletcher, who oversees the data entry work for me.
20        And then one of the programmers. Her name is
21  Kirsten Assar, A-S-S-A-R, I believe. She's -- she's one of
22  our -- one of the programmers that helps us a lot in my
23  area. So the questions would be easily answered with a
24  copy of those tables.
25     Q  When you say "those tables," what tables are you

267

1  referring to?
2      A  They're within the -- within the software that the
3  IS Department has written. In my layman understanding,
4  we're table driven. It's the way we set up that
5  programming.
6        So if we had a new reason for somebody to be
7  cancelled, we would have to go into those tables and start
8  a whole series of, If this happens, then that happens. But
9  if that happens, then this happens.
10        And I mean, for one transaction, I mean, you can
11  have lines and lines of codes.
12     Q  I am familiar with the phenomena.
13        Way back at the beginning of your deposition, you
14  and Ms. Nelson talked about a series of joint activities
15  that the Orange County Supervisor of Elections Office does
16  with other Supervisors of Elections.
17        Do you recall that conversation?
18     A  Yes.
19     Q  Do you recall what you understood joint to mean
20  when you were having that discussion?
21     A  That -- well, that we involved them in the
22  process. I mean, they had a role to play, as well as our
23  office.
24     Q  By joint activities, do you mean that another
25  Supervisor of Elections Office decided the policies and

268

1  practices of the Orange County Supervisor of Elections
2  Office?
3      A  Oh, no.
4      Q  Has that ever happened? Has another Supervisor of
5  Elections said, Orange County, you will do X-Y way?
6      A  No. I can say with 100-percent confidence that's
7  never happened.
8      Q  Has it happened in the reverse? Has Orange
9  County -- to your knowledge, the Orange County Supervisor
10  of Elections Office ever said to even somebody right next
11  door, Seminole County, and say, You must do this Y way?
12     A  No.
13     Q  And why is that?
14     A  Each -- each county Supervisor of Elections is
15  elected to perform their duties within that county. They
16  set their own policies and procedures based on the
17  statutes.
18        Counties -- the nature of counties varies. What
19  works in Orange County is not going to work in Lafayette
20  County. Just, you know, different worlds.
21        So while the supervisors are very good at sharing
22  information with each other and, you know, quote/unquote,
23  stealing from each other, ideas, forms, things of that
24  nature, in no way does one supervisor dictate to another
25  supervisor. Now, they may suggest, but it's never a

269

1  dictation.
2      Q  You talked a little bit about these ULCERS
3  meetings --
4      A  Uh-huh (affirmative).
5      Q  -- as well.
6        You've never been to one of those meetings, right?
7      A  No.
8      Q  So everything you know about what happens at an
9  ULCERS meeting is, I guess, necessarily secondhand, if
10  you've never been to one?
11     A  Right. Correct.
12     Q  You also discussed briefly the Central Voter File
13  Committee -- I guess the new Central Voter File Committee
14  that Supervisor Cowles is on?
15     A  Yes.
16     Q  You've attended meetings with respect to that
17  committee, correct?
18     A  Yes.
19     Q  And you attended one meeting in Daytona in 2002?
20     A  Yes.
21     Q  In January of 2002?
22     A  Yes.
23     Q  And another meeting that was actually here in
24  Orange County, in 2001; is that correct?
25     A  Yes.

68 (Pages 266 to 269)



270

1     Q   Do you recall there being a representative of
2 ChoicePoint or DBT or Database Technologies at either of
3 those meetings?
4     A   I was in those meetings for part of the time. So
5 I wasn't there when they went around the room and
6 introduced themselves. I remember some supervisors. I
7 remember technical staff. Faces I didn't recognize, but I
8 don't know who they are.
9       So I can't answer your question -- or I guess I
10 can answer your question. No, I don't know if they were
11 there or not.
12     Q   You spent a lot of time talking about preparation
13 for 100-percent turnout and whether Orange County was
14 prepared for 100-percent turnout on November 7th, 2000.
15       Did Orange County experience 100-percent turnout
16 on November 7, 2000?
17     A   No.
18     Q   What kind of turnout did you experience?
19     A   I truly don't recall. I would say it was probably
20 in the 60 percent range. But for us, the '92 election had
21 a far higher turnout, I believe. My recollection is '92
22 was truly a worse election year for us, busier.
23     MR. RESTREPO: Thank you. I have no further
24 questions.
25     MS. NELSON: Does anyone on the phone have

271

1 questions?
2     MS. TORRES: Susan Torres. We have no questions.
3     MR. MAURO: Cory Mauro. No questions.
4     MS. NELSON: Have we covered everyone on the
5 phone?
6     MR. CIRULLO: Bill Bosch, are you there?
7     MS. NELSON: I have no further questions.
8     (Whereupon, the taking of the deposition was
9 concluded at 6:01 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

272

1
2       C E R T I F I C A T E  O F  O A T H
3
4
5 STATE OF FLORIDA )
               )
6 COUNTY OF VOLUSIA )
7
8      I, LISA L. TAYLOR, RPR, the undersigned authority,
9 certify that LINDA TANKO personally appeared before me and
10 was duly sworn.
11
12      WITNESS MY HAND AND OFFICIAL SEAL this 6th day of
13 May, 2002.
14
15
16
17          _____
18          LISA L. TAYLOR, RPR,
          Notary Public
          State of Florida
19
          My commission expires:
20          November 1, 2003
21
22
23
24
25

273

1
2       C E R T I F I C A T E
3 STATE OF FLORIDA )
               )
4 COUNTY OF VOLUSIA )
5      I, LISA L. TAYLOR, Registered Professional
6 Reporter, CERTIFY that I was authorized to and did
7 stenographically report the deposition of LINDA TANKO; and
8 that the transcript is a true and complete record of my
9 stenographic notes.
10      I FURTHER CERTIFY that I am not a relative,
11 employee, attorney, or counsel of any of the parties, nor
12 am I a relative or employee of any of the parties' attorney
13 or counsel connected with the action, nor am I financially
14 interested in the action.
15      Dated this 6th day of May, 2002.
16
17
18
19
20          _____
21          LISA L. TAYLOR,
          Registered Professional Reporter
22
23
24
25

69 (Pages 270 to 273)

**A**

abbreviated 112:14,14
  112:20 114:15,15
  117:1
ability 220:2,16,22
  221:4
able 13:20 62:10 63:3,4
  63:4 64:17 65:6 70:25
  71:21 77:24 86:17
  87:17 93:13 97:5
  98:12 99:10 100:12
  151:4 162:12,13
  179:14 181:13 183:18
  184:6,7 210:2 222:15
  244:14 266:9
about 6:19,24,25 7:21
  9:21 11:1,3,7,17,18
  11:22,24 12:2,6,9,12
  14:4 15:9,22 22:12
  24:18 27:21 28:9 29:1
  29:23 31:14 32:10
  34:15 35:4 39:1,23
  41:16 44:7,16 49:22
  52:13,25 53:4 54:15
  55:20 56:20 58:7,12
  59:5 65:24 66:5,9
  68:7 75:2 76:11 77:14
  81:9 84:16 85:12 90:9
  93:3 96:23 97:5 98:5
  102:8,9 103:1,11,17
  104:21,24,25 105:12
  105:22 106:13 108:3
  110:5 111:13 120:6
  130:17 132:16 133:18
  134:13 136:21 137:21
  139:15,24 142:8
  143:8,14,23 144:2
  147:17 149:3,13,23
  150:22 151:1,2,7,12
  153:2 154:9,19
  158:14 159:1,16,20
  159:23 160:5 161:1
  161:24 162:2,23,24
  163:8,19 164:17
  167:8 170:9,12
  171:25 179:11 181:6
  190:4 191:10,23
  195:17 199:23 201:3
  201:5 202:7 205:3
  208:20 209:17 212:14
  212:15,25 214:20
  215:16,19 216:1,3
  218:14 219:12 220:2
  220:17,21,22 222:5
  222:12 225:24 227:21
  228:23 230:4 234:5
  234:19,21 235:4,24
  236:21 239:14,14

242:8,13 247:7
  250:10,11 257:22
  260:18,19 263:12
  264:9 267:14 269:2,8
  270:12
above 2:9 59:24 109:12
  123:9 187:13
above-styled.2:6 123:6
absentee 10:6 20:7,14
  20:15 26:4 114:22,23
  114:24 115:1,8
  169:17 205:22,23,25
  206:2 231:24 232:4,6
  232:19 234:3
Absolutely 244:6
accept 89:4 244:4
accepting 132:25
access 62:19 116:15
  118:25 129:13 219:16
accessed 64:17 128:20
accompanies 203:7
According 154:18
accounts 175:8
accurate 7:14 57:16
  59:15 73:2,5 91:21
  116:13 132:13 133:17
  156:18 171:3 211:25
  213:10 256:3 258:2
  265:19
accurately 170:4
  258:17
acknowledge 184:17
across 31:25 80:5 87:2
  90:2 129:8 133:8
act 9:23 166:10 249:1
action 68:11 72:6
  165:15 257:17,18
  273:13,14
active 60:21 61:5 62:15
  66:5,9,15 67:2 68:6
  82:4 129:18 152:19
  153:9 164:10 166:25
  189:5 257:8 259:14
  259:16 264:22,24
  265:4,4,18
actively 147:11
activities 267:14,24
activity 70:13
actual 78:3 156:9
  205:13 209:24,25
  245:12
actually 52:1 64:20
  115:18 117:24 120:8
  131:7 149:24 161:17
  169:13 175:7 190:9
  192:17 196:1 198:1
  207:22 209:7 222:24
  227:3 239:23 243:22

269:23
ad 15:1,14
add 163:22
added 26:8 79:15
adding 22:25 23:5
  188:19 242:10
addition 67:10 239:15
additional 28:7 33:17
  128:24
address 8:17,18,20
  59:18 84:15 152:2,3
  152:25 153:5,10,13
  153:16,25 154:1,2,7
  154:23 155:12,12
  156:1,21 219:5
  263:25
addressed 193:7
adjusted 89:23
ADMANTHA 1:10
  122:10
administration 9:25
  157:12,15
administrative 14:2
  18:25 19:1 34:20
  42:12 238:21
advance 70:12 221:20
ADVANCEMENT 1:4
  122:4
advantage 212:2
advertising 14:25 30:19
advisory 29:20
AFDC 188:21
affected 132:7
affidavit 17::15 219:2
  220:3,23
affidavits 10:3 172:14
  179:3,6
affiliation 156:22
affirmation 116:3,9
  135:8,14 172:15
  175:16 179:9,10,12
  219:3 220:3,13,16,23
  220:25 221:1
affirmations 10:2 34:9
  41:4 43:16,18 135:7
  161:13 163:10,14
  172:2,5,14,'8 173:3
  174:25 175:6,11
  177:7,24 179:2,5
  225:6
affirmative 13:14 29:2
  29:25 36:19 43:4
  45:10 56:25 67:12
  82:24 105:16 108:23
  149:8 151:13 164:12
  167:21 180:22 187:7
  187:14 192:19 212:10
  232:23 243:17 245:7

250:23 254:10 269:4
AFLCIO 242:15
after 16:10 18:21 21:4
  25:15 28:2 39:25
  59:23 60:22 67:20,21
  71:19,19 88:20,24
  90:5 94:15 99:1,1
  103:1 110:23 136:7
  143:19,23 144:3
  152:19 170:5 172:19
  173:11 177:24 190:9
  190:10 214:21 215:20
  215:21 216:23 218:24
  225:3 226:24 230:11
  234:12 253:6 256:25
  260:13 264:9
afternoon 7:22 10:24
afterwards 42:25
again 11:19,21 27:11
  40:8 43:18 47:18,23
  51:21 63:18 89:12
  96:11 98:24 100:21
  105:5 113:23 115:16
  117:8 132:20 137:19
  144:1 151:9,20 153:6
  154:13,25 159:14
  163:2 164:23 165:9
  201:7,9 218:10 235:6
  236:23 251:11 257:21
  262:5 263:17
against 57:4 137:11,14
  137:15 138:24
agencies 82:23 83:2,3
  83:20 192:23 195:1
  244:9 246:8 249:21
agency 5:13,14 15:1,15
  126:13,14 184:9
  188:12 191:18,23
  243:19
aggravation 221:9
ago 215:16 251:17
agree 79:6
agreed 246:17
agreement 76:24
ahead 46:25 50:4 51:8
  104:12 106:16 119:6
  127:6 147:25 153:23
  167:24 168:10 175:23
  228:9 240:2
AI 238:22
Alabama 15:8
allegations 109:22
  133:19
alleged 110:2 201:22
alliance 37:6,23 241:2,4
  241:9 242:4,16,17
allow 157:4 167:11
allowed 114:5 231:7

237:4
allows 106:18
almost 38:10 68:10
  241:15
alone 146:3 147:16,18
along 35:25 106:3
  109:24 113:25 242:10
already 13:8,17 104:1
  195:21 241:11 242:2
altogether 178:16
always 71:8 84:21
  91:21 103:9,22
  168:22 184:21 209:14
  209:21 210:7,8,17,19
  210:19 211:10,18
  213:5 214:25 222:14
  222:16,18 226:10
  241:6 244:17 246:16
  260:22
Amended 8:7 32:8
among 83:14 90:23
amount 28:13 150:3,12
analysis 160:2 230:17
  251:13
analyze 172:16
analyzing 171:12,15
  182:1
and/or 10:3
angry 129:4
annex 112:7,19 239:19
announce 47:15 49:11
announced 49:7,15
another 46:9 50:7
  56:18 72:8 133:11
  154:17 158:14 164:22
  165:25 166:7 167:12
  167:17,19 168:20
  169:1 171:21 180:12
  181:5 193:4 199:10
  200:20 202:17 243:8
  267:24 268:4,24
  269:23
answer 7:13 24:16
  34:13 38:8,24 46:15
  65:11 70:25 87:15
  89:5,18 93:11 104:1
  111:22 119:3 151:4,9
  158:4 162:17 166:24
  170:18 186:21 194:21
  196:9 211:19 212:5
  215:5 230:20 234:4
  246:6,15,24 257:13
  257:13 270:9,10
answered 51:6 118:23
  133:2 166:22 167:6
  194:11 209:14 233:12
  266:12,23
answering 23:16 24:8

26:4 44:1 75:9,10
110:11 186:21
**answers** 7:6 199:22
**anticipate** 70:12
**anybody** 57:25 262:13
**anyhow** 83:22
**anymore** 66:2
**anyone** 10:19 12:12
27:3 41:15,23 49:14
49:18 64:17 98:8
127:4 136:11 161:2
178:19 179:5,25
185:5 197:12 214:13
236:1 240:18 259:18
270:25
**anyone's** 55:17
**anything** 7:2 11:3,24
12:3,5 24:6 29:9
35:25 44:8,15 53:4
63:20 64:9 73:18,20
78:25 86:22 96:4
101:21,23 142:1
149:8 151:5 153:21
158:24 163:16,22
176:25 192:1 194:16
206:10 207:17 208:25
210:4 211:6 228:13
228:23 249:14,18
251:14 265:11,24
**anyway** 93:22 135:5
**anywhere** 15:12 94:18
**apartment** 161:14,15
**apartments** 212:23
**apparent** 82:22
**appear** 182:25 183:14
183:15,21
**appearance** 47:9
**appearances** 2:12 3:2
4:2 47:12 123:12
124:2 125:2
**appeared** 257:10 272:9
**appears** 59:19 260:4
**applicable** 238:1
**applicant** 82:11 101:12
132:22 166:23
**applicants** 202:7
**applicant's** 166:10
**application** 73:12 74:5
79:14 81:20 82:2,7,8
86:9 87:9,20 101:14
105:9 106:16,24
128:8,12,20,21 129:6
129:22 130:20 132:23
133:1,20,23 137:7,8
156:20 166:1,6,9,15
166:19 167:3,7,12,24
182:21 184:1,5 216:4
216:8 243:23 247:11

248:2
**applications** 20:12 26:5
38:25 76:8,18,20,24
76:25 77:2 81:15,23
81:25 83:24 84:1 86:2
87:7 88:23 90:19
91:19,22 104:4,5,8
106:13,20 128:24
129:2,15,25 130:22
131:1,8 132:8,19,20
133:3 156:23 158:23
165:8 170:5 182:24
183:6,7,10 184:22,23
185:10 188:14,15,18
189:1,4 191:14
192:13 196:18,21,24
197:3 198:5,21
202:14 243:20 244:3
244:20 247:9
**applied** 67:2 167:20
**applying** 130:23
**appreciate** 176:19
**approach** 89:15
**approached** 89:14
**approaching** 89:9
**appropriate** 7:17
**April** 2:3 123:3 195:3
**Arab** 242:17,17
**area** 39:5 75:17 92:11
142:15 163:7 227:15
238:21 266:23
**areas** 84:2,5 120:20
157:17 180:7 238:24
**arose** 177:2
**around** 90:10 102:12
103:7 154:16 194:25
204:19 258:19 270:5
**arrived** 244:12
**arriving** 15:23
**article** 201:1,2,4,14
**aside** 172:21 259:20
**asked** 25:21 41:14
47:12 51:6 77:16
80:16 92:24 93:10
94:8 116:4 147:17
157:25 181:9 191:6
202:7 221:12,12,22
224:5 230:14 233:10
233:11,11 246:5
254:14 258:25 266:12
**asking** 6:25 64:11
77:11 80:18 89:1,3,3
166:23 175:6 190:1
258:18
**asks** 88:5,8 210:7
241:19
**aspect** 207:4 241:12
**Assar** 266:21

**assessment** 5:13,14,16
126:13,14,16 205:4
**assign** 68:9
**assigned** 99:17 188:12
**assigning** 159:5,6
162:23
**assignment** 10:2 159:17
**assist** 94:7
**assistance** 5:13 126:13
187:6,20 188:19
201:23
**assistant** 2:14 3:4,15
4:4 48:11 123:14
124:4,15 125:4
162:21 193:22
**assisted** 42:11 75:19
109:21
**assisting** 20:5 107:6
**assists** 20:9
**associated** 65:22 115:6
**association** 1:3 30:16
50:16 122:3
**assume** 167:23
**assumed** 201:19 202:8
**assuming** 92:9
**assumption** 145:24
175:16 204:1,23
249:22
**assumptions** 234:19
235:6
**asterisk** 235:4
**astray** 40:23
**attached** 196:17 200:23
**attempt** 56:1 81:2
134:5
**attempted** 67:5 136:12
**attempting** 221:16
**attend** 98:12 103:4,18
217:13
**attendance** 10:22 11:5
103:10 243:5
**attendant** 230:22
**attended** 98:8 195:11
204:21 216:15 228:5
237:17,22 238:3
243:3 245:25 269:16
269:19
**attending** 47:16
**attends** 238:8,10
**attention** 55:18 84:12
101:24 102:2 107:25
128:1 168:25 176:1
193:11,18 202:2
222:9 255:24 257:22
**attitude** 82:22 83:12
**attorney** 3:4 4:4,4 6:19
7:19 8:3 9:2 10:19,25
48:17 124:4 125:4,4

243:14 273:11,12
**Attorney's** 3:5 43:25
44:2,12 124:5
**Attorney/Volusia** 3:15
124:15
**audible** 7:6,10
**audit** 191:20 192:2,5
203:3,7,10 265:21
**audits** 190:12,16
196:12 200:20
**August** 26:25 27:21
194:6,8
**authority** 192:22
193:14 272:8
**authorization** 63:9,24
64:2 113:2 118:12,24
119:13,18 177:23
232:14
**authorized** 273:6
**automated** 230:22
**automatic** 45:13
**available** 80:13 103:9
118:9,10,15 260:10
**Avenue** 3:16 124:16
**avenues** 133:8 155:2
**average** 101:14
**avoid** 220:9
**aware** 13:4,17 47:10
53:3 56:17,19 69:14
70:14 78:11 86:16,21
89:10 104:10 128:13
136:23 200:5 214:15
215:21 216:5
**away** 100:16 140:11,11
181:20 218:21
**awful** 211:23
**A-S-S-A-R** 266:21
**a.m** 2:3 58:21,22 123:3
**A01730** 218:3
**A017364** 223:1
**A017420** 223:5,8
**A017430** 218:4
**A017442** 218:9,11
**A017449** 222:3
**A017498** 218:4
**A026722** 183:9

**B**
**B** 4:3 125:3 211:11
**back** 12:5 15:10 20:15
24:5 25:14 27:13
34:23 36:7 38:13
39:20 44:12 55:22
58:23 66:12 78:15
81:7 87:3 88:1 92:16
93:18 97:6,8,16,18
101:11 105:10 107:9
107:14,17,23 113:23

127:8 143:7 150:6
152:9,13,18,25 153:4
153:18 154:6,15,15
154:23,25 155:3,8
163:11 164:22 169:2
169:3 172:6,7,20
173:24 174:16 178:2
185:21,21 187:1
189:19,25 192:16
194:12 198:1,24
208:15 230:16 239:22
240:18 241:23 244:4
247:9,11 250:9 260:4
264:8 265:12 267:13
**backfired** 181:16
**background** 14:5 30:19
**backtracking** 135:5
178:25
**backup** 117:23 131:5
131:21 151:10 231:5
**backwards** 179:16
**ball** 69:17
**ballot** 20:7,14 114:25
115:1 169:17 174:19
205:23,25 206:2,15
206:16 207:14 209:25
212:2 215:19,19,24
216:2 219:21 223:22
223:22,24 224:1
232:6,6,8,10
**ballots** 10:6 20:15 26:4
176:25 205:22 206:11
206:12 207:10,22,24
208:8 209:3 215:16
215:24 234:3
**bank** 62:9 63:16 111:18
111:19,19,21,24
112:3,7,17,18,21
113:1,2 115:9 116:25
117:13,16 118:7,24
119:8,9,25 121:3
159:4,5 177:17,18,18
177:19,22,23 225:9
225:13 230:10,19
231:25 234:19
**banks** 63:1 160:6 172:8
226:15
**base** 32:1 130:24 212:8
213:4
**based** 29:23 54:1 72:5,6
74:6 96:5 150:9
155:15 261:8,15
262:7,8,17 268:16
**basic** 23:16 24:8 26:20
100:15,21 115:5
161:10 165:22 265:21
**basically** 16:16 24:13
25:3 60:4 218:18

**basics** 10:22
**basing** 50:13
**basis** 74:3,9 96:14
 205:18 239:25
**batch** 55:2 135:9
 164:23 173:5
**batched** 144:13
**batches** 129:11 145:2
 172:23
**Bates** 183:8 189:8
 199:16 200:11 202:19
 203:13 213:21 218:3
 223:1 224:14 226:25
 235:8
**battle** 79:25 213:5
 244:18
**Beach** 2:21 123:21
 216:19,23
**bearing** 189:8 196:2
 199:16 200:11 202:19
 203:13 213:21 218:3
 222:25 224:14 226:25
**beast** 244:17
**Beavers** 162:19 238:16
**became** 18:6 80:13
 83:12 251:9
**become** 67:25 80:17
 105:11 108:13
**becomes** 38:10 82:4
 106:25 166:24 197:7
 241:15 248:9,14,20
**before** 2:6 9:12,13,14
 13:22 18:16,18 27:3
 33:1,5 38:19 39:1,21
 40:1 45:19 46:19
 47:21 54:25 70:16
 74:22 87:4 95:8,8,23
 95:23 96:9 100:19,25
 102:24 105:10 110:21
 110:25 120:21 123:6
 132:16 133:2 147:1
 149:21 153:14 157:3
 166:24 182:7,11
 185:17 186:19 189:11
 189:15 190:8 193:3
 195:15 196:8 197:20
 199:2,21 200:4,17
 202:25 203:18,20
 205:15 206:7,14,19
 208:23 209:1 210:4
 216:24,25 221:7,11
 224:22 225:5 226:1
 226:21 227:3 229:10
 232:11 235:11 239:6
 250:16 257:3 260:12
 272:9
**beforehand** 221:9
**began** 98:25

**Begged** 258:25
**begin** 142:4,5 260:2
**beginning** 47:11 71:24
 114:25 267:13
**begins** 13:13 45:9 55:23
 59:13 72:2 110:1
 133:11 163:23 192:18
 200:23 254:17,18
**begun** 207:9 209:22
**Behalf** 2:17,22 3:7,12
 3:17,22 4:6 123:17,22
 124:7,12,17,22 125:6
**being** 38:24 49:24
 56:16 57:3 70:5 80:6
 80:8 81:17 86:17
 91:23 94:8 100:16
 103:8 104:18 105:19
 106:7,21 118:19
 132:4 147:17 155:14
 170:9 178:5 192:25
 200:25 202:7 231:12
 241:13 246:14 252:16
 254:14 261:14 262:13
 262:15,16 263:21
 270:1
**beings** 164:4,7,7,8
**belief** 51:4
**believe** 8:4 13:19 17:12
 18:16 20:21 21:2,19
 22:9 23:9,11 26:16,24
 27:12 37:24,25 42:10
 42:18 44:23 46:18
 51:16 52:16,19 63:9
 66:5 74:19 76:1 88:13
 90:8 93:20 95:11 98:3
 102:22,25 106:18
 111:1,4 120:14
 128:23 129:2 135:2
 137:12 141:1 146:8
 152:1 160:15 168:18
 170:2,16 180:3
 193:22 195:3 197:19
 224:5 230:21,24
 233:1,10 249:2
 250:20 253:12 257:22
 258:17 263:6,10
 266:21 270:21
**believing** 54:9
**bell** 174:23
**belong** 239:8,9
**below** 256:9
**belt** 142:23
**beside** 114:22 182:20
**besides** 42:1 137:22
**best** 25:23 93:25 132:15
 146:15 212:6 247:5
 256:8 258:6
**bet** 69:21

**better** 28:14 88:13,16
 103:22 147:19,21
 165:20 174:11 244:10
 264:16
**Betty** 16:7 17:5,24 18:8
**between** 15:12,22 93:9
 99:18,25 115:16
 130:1 165:1 173:12
 261:18
**beyond** 12:14 31:20
 44:15 136:16 216:6
**biannual** 29:16
**big** 30:22 70:2 106:7
 138:22 142:15 196:18
 237:23
**bigger** 121:6 201:12
**biggest** 30:14 86:5
 198:7
**bilingual** 233:3
**Bill** 49:4 127:2 160:11
 161:9 163:2 189:13
 189:13 210:12 220:7
 227:24 228:2,20
 237:19 271:6
**Bill's** 157:20 199:11
 222:15 227:8 231:11
 231:22
**birth** 53:14,21 147:10
 147:15 230:25 254:20
 256:22 263:25
**birthday** 67:3
**bit** 6:24 89:7 134:19
 269:2
**bits** 163:15
**blah** 239:18,18
**blank** 105:24 106:21
 166:18
**blip** 202:9
**Blossom** 91:12
**Blvd** 3:10 124:10
**board** 90:2 100:7
**book** 36:25 60:14 107:2
 148:3 170:5 197:6
 223:20 260:12
**books** 38:20 39:2 73:22
 148:8 172:6
**booth** 223:23
**booths** 162:25
**bosch** 3:14 49:4,4
 124:14 127:2 271:6
**both** 16:17 17:24 21:9
 25:2 139:6 142:17
 153:1 170:23 171:1
 230:18 246:17 257:12
**bottom** 183:2 197:16
**bounced** 261:18
**bounces** 152:18
**box** 106:6 166:18,19

**167:24 168:2,8**
**boxed** 145:4
**bracket** 254:19,21
**branches** 1:5 93:18
 122:5
**brand** 82:3,5
**break** 7:16 57:22 58:16
 58:18 81:24 121:9,11
 176:7,10 240:17
**breakdown** 77:12 149:7
 151:11
**break-out** 120:14
**brief** 10:20 38:11 58:21
 115:21 176:12
**briefly** 7:22 10:25
 269:2
**briefs** 38:12
**bring** 66:12 77:4 84:12
 120:21 176:1 193:17
 202:2 206:1 219:6,20
 219:22 220:2,17
 221:3 232:6 241:14
 244:4
**bringing** 84:7 234:18
**brings** 23:1 78:14
**broadly** 77:17 104:2
**broken** 87:21
**brought** 26:15 55:17
 101:23 102:1 107:25
 114:18 172:20 193:11
 214:25
**Broward** 1:17 122:17
**budget** 228:21,21,22
**BUFORD-WELLS** 1:8
 122:8
**building** 90:1
**built** 86:10
**bulk** 50:19 78:3 106:17
 120:18
**bundled** 129:11
**bus** 39:9,12,23,24
**busier** 90:21 91:9,17,23
 92:3,7,10 270:22
**busiest** 90:23
**business** 8:20 14:7,24
 181:10
**busy** 28:18 69:19 70:4,6
 70:6 83:3 86:25
 212:16 236:20
**bypass** 55:9 86:17,21
 106:18 257:9,12
**bypassed** 54:14 55:17
 142:17
**bypasses** 263:3
**bypassing** 54:5 86:20

——————————
**C**
——————————
**C** 1:16 2:19 3:7 122:16

**123:19 124:7 134:25**
 211:11 234:2 272:2,2
 273:1,1
**calendar** 38:8 98:24
 217:8 228:3
**call** 41:25 53:16 62:9
 63:8,15,21 64:1 66:25
 67:4 87:20 111:19
 112:17,18 113:22
 117:15,21 118:2,3,6
 118:10,17 119:1,5,10
 119:10,13,17,18
 135:21,23 145:7,20
 152:1 164:20 165:4
 177:19 181:20 220:8
 230:16 232:9 265:1
**called** 32:3,4 63:8,9
 74:19 91:3 95:3 119:8
 119:22 120:16 219:16
 230:13 242:17,21
 260:17
**caller** 226:8
**calling** 62:24 113:10
 222:9 237:3 250:4
**calls** 20:8 26:4 95:12
 112:2,22 113:8
 119:24 120:2 148:4
 160:18 171:21 178:13
 213:13 232:12,15,17
 236:19 241:16,16
 246:22 253:7
**came** 2:6 27:1,3 45:24
 50:18 53:6 54:17
 56:12 89:20 93:13
 100:11 105:17 123:6
 168:25 178:5 184:14
 188:15 191:13 199:14
 226:18 248:11 251:25
 255:9 259:12
**campaigning** 39:24
**cancel** 137:9 145:25
 146:2 257:15 262:1,7
 262:7,13 266:2,4
**cancellation** 72:7 266:8
**cancelled** 59:25 60:3,9
 60:11,16,20,22 61:9
 61:20 62:2,10 63:4,5
 63:18 64:22 65:21
 66:10,20 67:19,24
 68:1,23 70:16,19 71:2
 71:3,4 148:1 261:7,13
 261:20,21 264:10,17
 264:21,22 265:3,5,7
 265:17 266:1 267:7
**cancelling** 145:23
**cancels** 69:25 70:8,9
**candidate** 158:10
**Canvassing** 2:24 49:3

123:24
cap 240:7
capable 213:2
capacities 1:20 122:20
capacity 29:20
Capitol 4:5 125:5
card 153:8 154:4
   156:22 185:5,10
care 221:7,8
careful 235:23
CARNEGIE 1:5 122:5
Carter 17:24,24 18:8
   19:18 76:21
Carter's 16:7 17:5
   68:18
case 1:2 6:16,25 8:6
   31:14 32:10,15,17
   34:16,16 41:17 44:14
   60:18 62:1 78:15 84:6
   117:23 122:2 128:15
   128:16,18 168:19,25
   172:17 173:16 175:20
   186:24 207:15 210:20
   260:6,22
cases 77:22 86:25 87:3
   105:20 119:7 147:8
   155:24 156:25 172:10
   178:15 261:17
caseworker 107:4
cast 174:19 215:18
   216:2
catch 166:22 174:4,5,6
   174:8,20
categories 67:11 68:7
   82:1 188:14,16 252:4
   252:6
category 66:24,24,25
   68:10 171:16
caught 148:9 179:9
   201:10
cause 2:6 123:6
CD-ROM 61:2,17
cell 113:21,25
Center 95:16 193:16
   242:16
central 11:9,11,22 12:2
   29:24 31:23 52:10
   54:22 57:2 103:8
   131:9,9 136:21
   137:10,24 138:1,2,3,6
   138:10,14,16 139:13
   139:17 140:8,11,25
   141:3,9,23 142:21
   143:3,16,18,24 144:2
   144:6,11,15 145:13
   146:13,23 147:5
   148:15 149:4,8 150:1
   150:16 158:13,14

216:12 253:3 254:1,2
   254:16 255:24 256:2
   256:3,9,14,19 257:23
   258:5 259:4,10,13
   261:9,16 262:9,20
   263:17 269:12,13
certain 24:24 30:9
   31:24 64:13 86:12
   105:13 195:23 254:19
   256:21
certainly 108:13 262:12
certificate 5:5,6 19:9
   126:5,6 208:12
certificates 14:10
certified 19:7,13
certify 272:9 273:6,10
cetera 74:5 79:25 189:5
chair 36:10
chaired 30:18
chairpersons 228:24
challenging 129:4
chance 55:15 79:3
   103:22 170:25 184:3
change 17:13 72:5
   80:17 84:17 153:7,8
   155:15 205:22 209:1
   219:5,5 261:1
changed 18:2,5 20:18
   20:20 26:6 51:23
   59:18 79:15 84:25
   104:11 153:11,14
   155:13 157:1 167:9
   197:20 208:18 260:25
changes 38:7 152:19
   205:19 229:23 241:17
changing 76:24 249:10
   265:23
channel 38:21 39:5
   219:16
character 114:23
characteristics 212:8
charge 77:16 159:12
   193:9
charged 181:25
charges 8:5
chasing 155:1
cheat 253:8 254:9,10,15
   258:7 259:9
check 16:19 20:22 24:5
   25:14 27:13 39:22
   45:20 66:3 93:20
   100:5 103:2 108:24
   131:7,24 135:21
   136:3 139:2,3,7
   145:15 168:12,13
   174:1 182:20 184:25
   185:2 189:25 190:5
   190:20 207:5 222:20

232:8 265:12
checked 46:11,19 47:2
   49:24 50.22,23 51:3,5
   51:13,17 135:11
   136:7,8 178:23
checking 136:5,6
   178:20 191:16 260:11
checks 223:18
CHEEVER 1:6 122:6
Cherof 3:10 48:22
   124:10
child 15:16
Children 4:7 48:20
   77:20 82:18 125:7
   198:21 202:15 243:16
   247:2,8 249:19,23
choice 89:4
choicepoint 1:20 3:23
   51:22 122:20 124:23
   137:20 250:4 251:9
   251:22 270:2
ChoicePoint/DBT
   48:16
Cindy 238:14
circumstance 72:19
circumstances 72:15
   210:1
cirullo 3:9 5:3 10:15
   42:21,24 48:21,21
   49:6,8,10 109:7,12,19
   120:12 124:9 126:3
   127:9 137:25 138:3,8
   188:1 217:4 240:15
   240:22,23,25 243:9
   258:20,24 271:6
cities 207:20
citizens 1:11 44:1
   122:11 157:21
city 39:9,23,24 207:13
   207:21 208:13 239:25
claim 134:21
claims 8:5 128:14,17,19
   128:23 212:23 242:25
clarify 52:1 248:7
clarifying 188:20
clark 1:9 36:9,13 122:9
class 161:25
classes 14:13 19:8,15
   19:16 103:7 195:2
Claude 160:12,15,16
   236:12 238:18,22
clay 1:15 2:23 6:17 49:2
   122:15 123:23
clean 266:7
clear 7:4 70:11 94:21
   116:7
clearing 234:8
clearinghouse 158:8
clearly 48:3 49:17

clemency 45:13 50:25
clerk 5:20 22:2,17,22
   52:9,24 55:2 57:11
   64:2 83:15 126:20
   140:4 149:20 172:11
   172:12 179:11,25
   180:1,3,9,11,20 182:1
   214:2,5,17,24 215:2
   223:15 259:12 262:21
   262:22 263:22
clerks 5:17 22:3,15 25:1
   25:2,3 54:23 61:11,22
   115:4 126:17 142:20
   144:23 145:7,10,12
   148:24 172:24 208:16
   215:3,5,10 253:5
clerk's 57:15
clock 152:5,7,18 154:14
   155:3
clocked 129:9,11
clocking 145:1
close 38:20 39:2 73:23
   252:19 254:20,21
   256:22
closely 31:4 51:21
closer 90:1 231:16
closing 60:14 107:2
   170:5 197:6
coach 193:6
coaching 96:13
Coalition 242:22
code 188:12
codes 68:14 266:5
   267:11
coincidentally 147:14
colleague 47:22
colleagues 70:23
collect 76:19 79:17,23
   167:11 184:22
collected 182:25
collecting 76:7 96:16
college 14:18,23 19:21
   128:23 212:23 242:25
colon 59:23 71:19
   234:12
COLORED 1:4 122:4
column 187:6
comb 34:23
combination 148:18
   161:8 182:17 266:16
come 20:6,15 24:17,24
   25:8,21 34:9,9,21,21
   35:20 38:5 52:3,14,24
   54:18 56:17 63:14
   67:7 73:19 81:15,25
   82:8 84:22 86:2,2
   88:1 91:19 102:6
   105:25 116:10 135:23

142:17 144:7 152:25
   154:23 171:23 172:19
   175:19 180:3 181:12
   181:24 184:25 189:18
   208:15 211:10 213:13
   219:24 221:19 236:19
   238:25 240:18 260:4
   263:5,6,7
comes 20:8 35:9 38:19
   80:22 101:20 108:15
   128:11 129:7,17
   150:6 152:9 154:15
   154:15,25 166:9
   185:7 236:13 248:1
   260:9 263:18
comfortable 255:15
comfortably 184:7
coming 13:5 28:5,11
   38:7 40:11 52:11
   61:11 88:8,21 89:11
   97:15 104:6 116:23
   118:21 140:7 149:19
   178:13 225:16 241:5
   241:18
comment 5:17 126:17
   172:11 179:25 180:1
   180:3,9,11,20 182:1
   214:2,5,13,17,24
   215:2 234:21
commenting 257:7
comments 56:18 83:21
   172:12 180:12 181:23
   234:16,19 265:21
Commercial 3:10
   124:10
commission 49:3
   272:19
committed 208:24
committee 2:24 30:17
   36:11 123:24 216:13
   216:16 217:10 242:14
   242:15 269:13,13,17
common 53:14 54:7,10
communication 79:10
   79:13 80:11
communications 10:2
   80:2 84:19 193:19
community 16:18 24:9
   26:16,18 27:9,13,17
   28:8,14 37:19 156:17
   241:10,11 242:11,24
companies 160:19
company 51:23 137:19
   138:19 251:13
compare 89:17 104:15
   106:14 187:10
compared 50:25 138:23
   138:24 212:22

comparing 139:5
  196:20 256:21
competent 13:20
compilation 9:25
compile 138:21 170:22
compiling 258:9
Complaint 8:7 32:8
  109:22
complaints 44:2 171:11
  171:13,16,18,25
  177:14 195:13,19,24
complete 7:14 59:8
  67:6 88:3 137:6
  166:25 260:15 273:8
completed 74:2 106:23
  131:6 167:23 248:5
completely 60:25 81:21
  150:6 151:24 263:3
completeness 191:16,21
  243:23
completes 184:21
completing 132:23
complex 116:13
complexes 161:15,16
compliance 9:22 72:6
computer 18:25 25:4
  42:10 55:3,4 60:16
  61:5,5 62:15 63:20
  64:5,10,14 68:15,22
  70:11 73:24 86:9
  101:9 104:19 106:2,9
  106:17 107:8 114:17
  117:7 129:13,19
  134:8 136:8 145:20
  163:23 172:3 182:19
  209:15
computers 10:9 239:16
computer-generated
  107:15 183:1,22
  184:4,10,15,16
concentration 92:10
concern 209:21 247:13
concerned 76:12 197:6
concerning 7:20 44:5
  66:13 69:12 78:7,12
  102:2 108:11 134:21
  140:17 144:7 146:4,5
  146:13,22 148:15
  149:4,14 165:25
  168:15 189:13 191:21
  194:8 198:5,20 220:1
  220:16
concerns 78:14 85:3,6
  85:12
concluded 271:9
conclusion 246:23
  265:8
conditions 211:23

Condron 18:6 19:2
  28:1,1 29:6 30:5,5
  45:25 50:19 53:7,12
  54:2,11 115:22
  120:15 141:24 143:22
  148:18 149:1 159:19
  160:11 161:9 238:11
  251:24 254:7 255:10
  255:16 256:16 257:2
Condron's 142:4
conduct 36:22,23 38:22
  233:21
conducted 31:21,22
  36:22 74:25 98:23
  102:10,13,21 246:1
CONFERENCE 1:4
  122:4
confidence 256:11
  258:12 268:6
confidential 247:20
confirm 155:12
confirmation 72:3,13
  72:19 152:2
confirmed 237:7
confuse 114:20
confused 115:1 261:19
congested 92:8
conjunction 87:19
connect 114:4
connected 112:13 114:3
  239:18 273:13
connecting 117:12
connection 186:24
  191:4
Connolly 3:20 48:16
  124:20
conquer 232:16
consequently 147:7
consider 35:5 67:16
considered 72:23 82:7
  155:7,11
consist 188:9
consistency 88:7
constitutional 157:21
constructing 109:3
  110:14 111:10
consuelo 1:8 122:8
  128:15 129:6 133:18
  134:10
contact 60:7,8 84:13,19
  84:21 85:1,4,14,17,24
  95:1 96:17 97:9,12
  114:7 180:17 191:18
  191:18 192:22 193:8
  193:18 204:16
contacted 100:22
contacting 57:12
contacts 156:6 191:23

contained 71:13 105:13
  110:22 115:14 117:3
  117:8,10 191:8,20
  192:1 222:19,21
content 246:4 263:23
contents 196:13 197:20
  214:24
context 65:25 251:14
  257:12 258:25
contingency 211:10
continuation 235:14
continue 38:3 81:13
  85:6
Continued 3:2 4:2
  124:2 125:2
continues 71:20
continuing 193:12
contracted 138:18
contributed 34:12 41:7
  110:8 111:10,11
control 83:13
convenient 174:14
conversation 10:20
  64:6 97:6,7 102:7
  267:17
conversations 50:18
  54:2,8,11 58:7 72:17
  72:25 84:16 192:9
  257:5
conversion 131:17
converted 67:2
converting 131:16
convey 41:11
convicted 45:16 50:9
  52:20 165:25 166:7
  166:12,20 167:17,25
  169:1 264:4,5,6
conviction 262:8
convictions 50:12 140:5
  252:14
convinced 93:12,16
convoluted 262:12
cooperation 83:14
coordinate 158:9
coordinated 157:11
coordinating 160:8
  186:7
coordination 46:10
coordinator 17:15
  18:13 20:2 115:22
  180:5 193:22 204:12
copies 33:18 190:24
copy 8:15 35:11 42:19
  42:25 106:11 107:18
  131:13 180:4 197:18
  203:10 205:4,13
  236:3 238:6 266:24
corners 254:14

corporation 1:21
  122:21
correct 28:22 56:7,8
  77:7 81:12,21 82:8,13
  94:17 107:5 118:8
  132:15 133:25 155:18
  164:3 165:4 166:16
  170:13 194:4 205:23
  225:4 250:24 251:19
  257:16 260:8 269:11
  269:17,24
corrected 181:2
correlate 201:22
correlation 201:18
correspondence 34:11
  35:21 41:5 43:17
  44:11 50:17 51:15
  78:24 154:7 257:8
corresponding 187:4
cory 2:19 49:1 123:19
  127:2 271:3
counsel 10:15 109:8,13
  193:6 273:11,13
counseling 96:14
count 21:17 67:17
  185:24 188:11 192:13
  234:3 244:1
counted 82:11 215:20
  215:24,25
counter 20:5 21:3 25:16
  26:3,10 129:8
counters 234:2
counties 38:16,18 39:4
  39:4,7,11,12 139:6
  227:19 261:18,22
  268:18,18
counting 65:12
country 201:6
county 1:16,17,18,18
  1:19,20 3:4,5,7,12,15
  3:15,18 8:23 9:6
  15:19,20,21 16:2
  29:24 36:10 40:4,13
  47:14 48:23,24 49:4
  52:3,4,8,24 54:16
  55:20 56:2,21,21
  66:15 90:7 99:21,25
  100:1 103:5 108:3,8
  122:16,17,18,18,19
  122:20 124:4,5,7,12
  124:15,15,18 128:6
  133:16 136:22 137:3
  137:3,5 140:5,21
  141:9 145:22 147:12
  148:1,7,14 149:13,14
  149:15,17,20 150:2,7
  150:8,17 153:2,3,5,21
  154:7,10,12,23 155:9

157:11,18,18,22
  158:7 163:24 169:1,6
  171:6 203:5 207:9
  213:1 215:17,23
  228:21,21 242:14,15
  243:18 245:14,19
  246:12 250:13 253:1
  254:4 255:1 256:6
  258:3 259:12,14,23
  261:5,13,14,23 262:3
  262:6 263:22,23,24
  264:2,3,5,7 266:11
  267:15 268:1,5,9,9,11
  268:14,15,19,20
  269:24 270:13,15
  272:6 273:3
countywide 209:1
  233:4
county's 139:4 141:17
couple 118:21 132:5
  240:16,22 248:6
  263:1
courier 76:7 77:2,14,17
  78:3 84:6,11,11 96:15
  96:17,22 97:1,1,18
  101:23 184:21 191:13
  191:14 193:3 243:19
  243:22 244:4
couriers 79:21 97:8
  101:7,7
course 24:17 35:11
  89:10 113:7 134:22
  161:9 172:3 238:11
courses 19:4,20
court 1:1 7:7 14:1 47:3
  47:8 52:24 57:11
  122:1 149:20 168:19
  168:25 262:22
Courts 52:9 140:4
  259:12 262:21 263:22
cover 182:18,19 235:20
  235:22,23 236:1
covered 235:16 271:4
covering 228:2
cowles 1:19 3:12 8:11
  9:18 10:11,20,23 11:2
  11:15 12:5 17:25,25
  18:9,13 27:25 29:19
  30:6,9,18,21 31:3,9
  32:22,23 38:6,12
  48:23 58:5,8 59:1,2
  59:10,13 68:3,20 75:1
  75:4 93:17,19,21
  94:19 95:2 103:9
  109:9,13 110:17,18
  120:13,18 122:19
  124:12 127:12,16
  134:18 157:20 158:3

159:18 160:11 171:22
  180:4 182:8,14
  185:13,13,14,15,17
  186:16 187:2,3,5,13
  187:21,23 189:8,13
  190:7 192:4,16
  197:25 198:25 205:12
  206:6,18 210:7
  214:14 215:5 217:10
  217:13 218:15 219:15
  222:6 226:20 229:18
  237:19 238:11 241:8
  249:12 269:14
cox 2:14 48:13,13 91:7
  95:5 123:14 148:11
crashed 230:4,6 231:8
  236:21
create 27:23 67:8 80:24
  80:25
created 26:23,24 27:18
  27:19,21,23 37:5
  173:20 177:10 199:4
  227:5
creating 33:22 43:9
creation 37:6
credit 175:7
criteria 72:7 252:23
critical 165:11 197:7
critique 241:6
critiquing 229:21
cross 45:20 46:11,19
  49:24 50:21,23 51:3,5
  51:12,17
cross-examination 5:3
  5:4,4 126:3,4,4
  240:24 243:11 250:1
cross-section 242:11
Cruz 227:8
crystal 69:17
curiosity 217:11
curious 57:7 202:3
current 20:17 72:22
  137:4
currently 68:5 85:12
  159:22 244:21
cursory 244:2
Curtis 192:10
customer 20:4 21:3,12
  21:23,24 22:10 23:5
  23:11,14 24:6,15 25:2
  25:10,16 26:9,11,22
  27:6,20 40:9 77:24
  78:2 98:2 115:4
  120:24 142:13 199:7
  234:10 248:1
cut 70:7
CVF 29:23 141:15
  250:10,11,14 251:3

251:10,15,18 252:1
  255:2 256:23 259:17
  259:20
cycle 24:23 69:18,22
  239:14 265:10,11
cycles 60:18,23 61:9
  67:20,21

**D**

D 3:9 5:1 105:21 124:9
  126:1 211:11
Dan 48:15 250:3
Dane 162:19 238:16
DANIEL 3:20 124:20
dash 234:2
data 16:20 20:9 26:4
  84:8 113:4 145:8
  155:23 156:9 163:17
  164:16,24 165:5
  173:5 174:4 175:14
  175:18,21 179:11
  255:12 264:23 265:19
  266:19
database 1:21 3:23
  35:6 60:17,24 61:3,4
  62:11 65:22 112:20
  113:20 114:5 122:21
  124:23 134:23 142:1
  153:11,14 158:15
  251:8,22 256:24
  264:22 265:5,17
  270:2
date 53:20 84:25 93:20
  96:20 106:24,25
  107:1,2,7,9,11,17,23
  133:5,6,6 145:1
  147:10,15 193:24
  194:5 197:4,4,5,7,22
  200:8,9 208:23
  215:17,20,21,22
  216:22 220:9 230:25
  247:8,16,22 248:3,8,8
  248:10,10,14,14,16
  248:17,19,20 254:20
  256:22,25 263:25
dated 5:10,11 126:10
  126:11 192:25 247:14
  273:15
dates 53:14 107:12
  196:25 197:2 204:3
  241:18
dating 196:17 198:5,21
david 1:16 3:7 47:14
  122:16 124:7
Davis 49:2
day 9:25 38:1 60:18,19
  60:20 61:24 62:25
  63:2 64:16,20 68:20

68:25 111:21 114:19
  115:13 116:12 136:13
  148:2 162:22 172:19
  178:4,14,22 207:19
  211:6,8 212:4 215:14
  221:7,8,10 225:7
  234:13,17,22,25
  239:2 242:6 260:10
  264:9 272:12 273:15
days 39:1 73:13,23,24
  74:2 116:24 118:21
  132:6 152:5,11,14,19
  152:23 250:5
Daytona 216:19,23
  269:19
DBT 51:22 137:20
  250:4 251:8,22 270:2
DCF 87:23 90:9,10
  97:11 102:9,10,14,17
  102:21 103:4,14,25
  104:3,5,14,15,22,25
  105:6,7,21 106:14,15
  106:20 107:4 108:2,2
  108:8,11,17 132:16
  188:22 190:21 198:7
  198:13,15 200:21
  201:11,16 202:4
dead 60:11 144:17
deadline 170:6
deadlines 60:14
deal 181:18 205:19
  221:7 232.25
dealing 40:15 61:18
  206:13 232:15
dealt 29:18 119:25
deanie i:19 3:18 49:5
  122:19 124:18
death 137:10,12,23
  138:15 139:1,15,24
  140:7,8 143:14 144:2
  149:5 252:8,11
  255:21 256:4,14,25
  261:9
deaths 257:5
debate 69:16 239:21
Deborah 36:9,13
deceased 256:12 257:6
  260:2,5,23
December 68:2 69:7
  70:16,24 71:7,7 265:1
decide 115:25 165:3
  229:1
decided 15:9 27:2 28:12
  76:16,21 115:14
  216:7 217:21,23
  225:17 267:25
decides 205:25
decision 27:25 69:9,15

72:18 115:16 160:25
  255:16
deemed 59:18 140:18
  140:24 141:5 144:16
  149:10
Defendant 3:7,12,17,22
  9:17 10:11 32:22
  71:22 110:17 124:7
  124:12,17,22 127:16
  182:7 185:13,13
  250:4
Defendants 1:22 2:22
  122:22 123:22
Defendant/DBT's 5:24
  126:24 253:14,16
defense 2:15 48:9,12,13
  111:23 123:15
defer 259:19
define 60:2
definitely 39:19 70:6
definitively 99:11
degree 14:6,7,8,24
  160:3
degrees 14:10
DeLand 3:16 124:16
delays 220:9
delegate 77:24 171:20
delegated 100:6
delete 60:24 64:14
  69:11,13
deleted 60:25 61:4,13
  61:14 62:13,15,18,19
  63:5,18 64:16,21
  65:21,23 66:22 67:16
  67:17,20,25 68:8,10
  68:19 70:16 71:5
  170:10 264:17,22
  265:10
deleting 68:1,16
deletion 264:13
deliver 248:15
demand 25:6
demands 28:15
Democratic 242:14
Democrats 242:18
demographics 233:5
demonstrations 24:12
denied 175:11,13
department 4:6,7 16:12
  16:20 17:7,9 18:1,25
  24:2 30:2 34:9,11,20
  34:20 35:12 42:1,10
  42:11,11,12 48:18,19
  54:19 56:10 61:15,21
  62:18 64:8,15,19 65:9
  68:17 69:4 70:8 76:8
  77:19,20 81:16 82:13
  82:18 84:8 85:11 86:3

87:8 88:4,7 92:25
  95:22 96:6,7 97:19,22
  100:10 102:2 103:17
  105:18 115:17,17,19
  115:20,24 121:5
  125:6,7 129:9,11
  131:12 138:7 139:14
  139:16,18 141:11,21
  142:2,12,19 144:13
  150:25 169:16 177:9
  182:2 185:9 194:17
  198:4,21 202:14
  206:23 209:16 230:20
  233:14,15 238:15
  242:23,24 243:15,16
  244:9,21,24 245:13
  245:19 246:5,19
  247:2,8 249:15,19,23
  267:3
departments 18:18,23
  42:6,9 192:23
depend 201:7
depending 61:14
deposition 1:24 5:8
  6:16 7:12,20 9:1,6
  23:21 26:14 47:12,16
  58:22 83:7 86:14 91:7
  95:5 121:16 122:24
  126:8 134:1,10
  148:11 159:7 161:7
  176:13 220:4 222:1
  240:21 267:13 271:8
  273:7
deputies 120:17 218:17
deputy 17:16 19:3
  218:11 223:18 224:5
describe 18:5 97:25
  112:10 256:13
described 24:7 77:15
  167:15 196:14 200:5
describing 196:12
description 43:14
  170:11 171:3 254:2
  254:25 256:3 258:2
descriptions 180:14
design 208:20
designated 9:16,20
  12:18 111:24 114:7
designates 229:2
designed 208:5
designee 12:25
designing 208:11
desk 57:23 97:13,13
  130:1 263:3
desks 80:1
detail 11:6 33:3
detect 175:10
detected 156:4

determine 137:3,4
determining 160:5
  161:2,21 162:4,25
  163:25 164:5 179:7
  180:1 259:24
developed 76:22
developing 239:20
development 19:5
  217:20
devising 160:18
diagram 223:12
dictate 268:24
dictation 269:1
died 260:1 261:8
differ 117:9 187:21
  246:2
difference 90:16 141:22
  231:18
different 6:10 7:21
  18:18 24:21 68:6,14
  105:7 112:8 132:21
  133:8,9 134:24
  142:24 155:5 172:8
  180:7 231:7 234:7
  244:19 245:21 254:14
  262:14 268:20
difficult 225:22
difficulties 132:18
dig 209:15
diplomatically 84:14
direct 5:3 6:5 83:21
  85:14,17,24 113:11
  113:12 126:3 128:1
  142:6,12 163:2
  177:11
directed 118:10 119:18
  163:18
direction 159:14
directions 115:21
directly 29:19 30:8,12
  30:21 31:3,9 63:10
  72:3 78:6 99:4 114:10
  141:19 144:9,10
  171:22 188:5 251:21
  251:24
director 1:15 2:23 68:3
  122:15 123:23 193:23
  217:11 266:18
discard 53:12
discount 53:13 54:7
discounted 54:10
discovered 155:18
discovering 61:19
discovery 110:2
discrepancy 165:1
discuss 11:2,7 96:6
discussed 10:18 58:10
  70:24 72:11,12 140:3

214:17 269:12
discussion 69:16 70:22
  247:7 250:10,21
  264:8,13 267:20
discussions 28:2 216:5
disincentive 210:10
disputing 129:3
disseminates 38:14
distinguish 266:9
distributed 161:4,22
distribution 10:1 161:1
  162:2
DISTRICT 1:1,1 122:1
  122:1
divide 232:16 252:23
divided 252:3,16
division 1:16 2:23
  21:15 26:2 29:15
  35:10,18 50:18 52:12
  52:14,18 53:2 56:24
  77:13 96:3,13 103:6
  103:21 104:8 122:16
  123:23 136:24 137:25
  138:7,18,20 142:13
  142:14 157:12,17,23
  157:24 158:4 168:18
  171:12 188:6 193:13
  193:21 194:16,24
  195:8,23 197:12
  204:10,11,19 245:1,6
  245:9,15,22,25
  250:20 251:2,4,14,18
  256:5 263:18
divisions 238:1,1
division's 158:5
DMV 81:23 84:24 86:8
  90:7,13,15,22 93:5,18
  94:3,13 95:8 96:23
  98:3,9,12,23 99:3,17
  99:19,21 100:1,25
  101:8,14,17 102:6,8
  104:15,19 105:21,22
  105:23 106:8,14,16
  107:7,13 131:1 132:3
  132:8,16 182:16
  183:3,11 184:2,4
  189:1,14,22 192:9
  198:11 235:4 245:2,3
  247:21
DMVs 91:17 94:1
  105:24 106:7 190:20
document 8:4,6,11,14
  9:7,14 10:12 12:17
  13:4,7 32:3,23,25
  33:4,14 34:15 35:17
  40:23 41:17 44:25
  52:19 59:9 75:24
  80:23,24 81:1 110:21

110:25 129:7,16,20
  144:22 164:19 173:6
  173:20 181:3 182:7,8
  182:13,15 186:19
  189:8,10,12,15,18
  190:8 196:2,4,8 198:2
  198:3,19 199:2,16,18
  199:21,22 200:11,14
  200:17 202:10,19,21
  202:24 203:9,13,15
  203:18,20,25 205:15
  205:21 206:7,19
  213:20,22 218:3,5
  222:3,25 223:2
  224:14 226:3,14,25
  235:11 238:3 239:6
  253:15 254:6,8
documentation 136:20
documenting 180:16
  192:9
documents 8:2 12:23
  13:1,8,15,17 20:11
  32:9,13,17 34:7,8
  36:12 41:7 44:15 46:4
  65:14,16,16,19 67:7
  73:20,21 74:13 77:10
  115:6 116:16,18
  165:9,10 172:1
  191:13 192:25 204:3
  214:1,7 224:17,22,24
  225:1,2 226:1,21
  227:4,5 228:13 229:4
  265:20
doing 16:24 24:10 25:7
  29:9,10 48:2,5 57:5
  61:2 65:22 72:24
  86:11,19 98:6,6 113:4
  134:17 144:24,25
  145:5 177:23,25
  185:6,23 193:3
  208:10 212:6 217:20
  219:19 242:2,2
  258:11
Donald 238:23
done 29:11 39:17 47:17
  71:8,10 97:21 102:16
  119:2 135:22 150:3
  150:12 160:10 165:15
  173:24 174:1 177:3,8
  184:1 186:9,15
  192:24 194:17 195:15
  202:17 209:10,12,20
  211:3 226:3
Donna 204:7,10,25
  205:3
doodles 235:16,19,25
  236:1,3
Doody 3:10 48:22

124:10
door 100:19 268:11
DOSSOUS 1:10 122:10
doubt 134:4 146:1
  217:18,18
Doug 48:17 243:13
DOUGLAS 4:3 125:3
down 55:13 69:4 70:7
  80:7 87:21 93:13
  96:11 117:24 131:4
  131:13 132:3 148:5
  162:1 197:10 205:21
  223:17 231:10,12
  232:20 236:16 237:9
  237:12 242:19 243:24
  247:23 253:10 258:13
  260:13
downtown 119:10
dozen 55:11 75:20
  263:14
dozens 263:13
draft 127:23 169:25
drafted 130:9
drafting 130:10,13
  170:14
draw 255:24 257:21
drew 254:11
Drive 2:20 123:20
driven 267:4
drivers 130:18
driver's 86:11,19 87:22
  88:22 100:17 104:20
  106:1 130:15,19
  132:12 218:20,20
drives 24:10 87:23
driving 116:5
drop 90:5
dropped 88:25 201:9
dual 164:20
due 31:16 59:24 93:23
  93:24
duly 6:3 272:10
Dunn 10:21 11:17,24
  12:6 19:1 34:19 65:10
  71:1 159:24 182:6
  186:6 237:7 238:22
  239:5
duplicate 137:1,22
  138:15 139:11,13,22
  143:8,23,24 144:7,18
  145:13,14,17 146:6
  146:25 147:9,24
  148:16 156:22 188:15
  252:7,10 257:23
  258:5 261:16
duplicates 139:1 257:5
  257:6 261:11
during 15:24 38:23

39:6 52:25 94:5 180:2
  183:11 207:16 211:21
  217:17,19,24 218:11
  240:6 241:1 250:10
  250:21 251:3
duties 19:23 20:3 26:1
  82:23 268:15
Duval 1:17 122:17
dyslexic 223:9
D.C 3:21 124:21
d/b/a 1:21 3:23 122:21
  124:23

                E
E 5:1 126:1 211:11
  272:2,2 273:1,1
each 43:11,13 65:6 68:2
  69:7 79:16 84:20 85:3
  88:22 90:18 113:13
  113:16 172:15,17
  183:17 184:7,25
  209:10 210:18,22
  211:17 212:18 214:21
  243:22,25 268:14,14
  268:22,23
earlier 26:1 46:8 56:20
  104:22 105:12 118:13
  136:21 140:3 170:9
  170:12 179:11 195:9
  196:12 207:13 209:17
  214:4,10 251:23
  257:13 264:14
early 19:19 92:21,22
  93:10 102:11 244:7
  264:9
easier 157:2 211:6
  215:14
easily 211:11 266:23
East 3:10 124:10
easy 116:22 176:24
  258:24
Ed 193:18,20 194:3,7
  194:11,12
educate 241:25
educated 219:11,13,14
education 24:10,11
  28:6 37:6,14,16,19,23
  38:4,16 241:2,4,9,12
  242:3
educational 2:15 14:4
  48:9 123:15
EDWARDS 1:9 122:9
Ed's 193:17
effect 51:15 76:12
  77:23 88:20 183:5
  248:23
effective 94:13
effort 32:20 70:11

efforts 264:2
ehrlich 3:3 46:22,22
  47:4,6,11,13,19,25
  48:4,7 49:7,17,19
  120:11,11 124:3
  127:2,2,6
eight 22:13 90:11 108:4
either 8:3 61:16 113:11
  116:11,18 135:4
  136:12 141:8,9 150:6
  156:19 183:12 189:4
  206:8 217:24 245:15
  270:2
El 242:21
elected 157:20 268:15
electing 70:3
election 1:16,17,18,18
  1:19,20 2:24 3:8,12
  3:18 5:22,23 9:25
  19:25 20:19,21 21:4,8
  21:16,20 22:6 23:8
  24:21,22 25:9,11,15
  26:7,8,20 28:3,5,9,11
  28:15,19,23 29:8,13
  29:21 30:4,14 36:23
  37:1,5,8 38:8,20
  39:18,25 40:5 49:3
  53:1 56:6 60:6,17,18
  60:19,19,23 61:9,11
  61:24 62:25 63:1
  64:16,20,25 65:6
  67:20,21 68:20,25
  69:17,19,22 70:2,5,17
  70:20,21 73:13 74:23
  77:6 88:24 89:14,20
  90:1,4,6 93:2,4 95:25
  97:21 98:23 99:1,6
  102:21,24 103:1
  111:21 112:11 115:13
  116:12 120:10,22
  122:16,17,18,18,19
  122:20 123:24 124:8
  124:12,18 126:22,23
  136:13 139:22 142:9
  142:14 143:2,12,15
  143:19,24 145:12
  146:7 147:2,4 148:2,8
  151:15 157:12,15,19
  159:23 160:7 162:22
  168:24 169:7 172:19
  172:20 173:22,25
  177:24 178:4,14,22
  180:5,13 181:6,8,21
  182:3 190:1,11
  206:12 207:18,19,21
  208:18 209:1,4 210:6
  210:18,23 211:3,8
  212:3 213:2,17

214:21 215:1,14,20
  215:21 216:5 219:18
  219:19,22 221:1,7,8
  221:10,11,21 224:25
  225:3,7 229:20,22
  230:9,22 232:3,13
  233:21 234:12,17,21
  234:25 239:13 240:4
  241:18 242:3 248:25
  251:14 253:6,11
  254:5,12 255:3 256:7
  258:5,8,15 259:18
  260:10 261:7,12
  262:6 265:10,11
  270:20,22
elections 1:16 2:23 6:11
  8:22 9:17 15:17,18,20
  15:21 16:1 18:2,12
  19:3,3 30:16 35:10,18
  36:23 40:14 42:10
  46:19 47:14 48:23,25
  50:15,18 52:12,15,19
  53:2 56:2,24 59:23
  61:8 62:24 64:18 70:4
  70:12 72:12 73:7
  77:13,18 78:12 80:20
  89:9,11 96:3,13 99:18
  100:8 103:5,6,12,21
  104:8 109:18 114:16
  115:17,19 120:8
  122:16 123:23 128:6
  133:16 136:24 138:1
  138:7,18,20 144:3
  148:15 157:11,12,17
  157:18,23,24 158:6
  159:15,17 160:14
  161:12 163:24 164:2
  168:19 169:6 171:16
  171:11,13,22 178:21
  180:2 181:1,9 182:2
  188:7 193:14,21
  194:16,24 195:8,23
  197:13 204:11,19
  207:10,13,16 208:6,8
  208:13 210:15 211:14
  211:21 229:24,24
  237:2 238:13 239:25
  241:5 243:18 245:2,6
  245:10,16,22 246:1
  246:11,13 250:14,20
  251:2,19 253:1 254:4
  255:1 256:5,6 258:4
  259:23 261:6,13
  262:6 263:18 266:3
  266:11 267:15,16,25
  268:1,5,10,14
Electionss 66:15
electronic 35:4 145:8

151:21 173:4
electronically 177:9
element 28:6 38:5
elementary 36:23
eligibility 164:1,5
  175:20
eligible 60:12 164:14
  166:16 168:17 174:7
  174:10,10,18
eliminate 69:3 108:16
elsewhere 260:1 261:14
EMERY 1:7 122:7
emphasis 221:2
emphasizing 84:2,4
employee 273:11,12
employees 93:23 94:7
  98:12,23 103:14,18
  107:14 194:17
enable 230:22
enacted 83:1 195:16
enactment 81:11
encounter 211:9
end 64:14 68:2 71:8
  121:18 142:4,5 145:3
  148:25 173:20 174:23
  176:21,22 211:19
English 233:2
enough 105:10 109:4
  211:5,5 213:7,7,16
  251:6,11 252:19
ensure 164:15
entering 223:17
entire 115:19,20 203:10
  213:1 237:24,25
  247:15
entirety 33:4
entries 55:6 57:6,18
entry 16:20 20:10 26:4
  84:8 113:4 145:9
  155:23 156:9 164:16
  164:20,25 165:2,2,3
  173:5 174:4 175:14
  175:18,21 177:20
  178:16 179:11 187:2
  187:4 255:12 266:19
envelope 145:1 208:5
  208:11,12,20,25
envelopes 207:14
  209:11
equipment 24:12 25:9
  37:2 113:10 162:20
  162:21 234:1
equivalent 108:5,8
error 57:13 61:20 156:4
  179:7
errors 178:20 179:22
  180:2
especially 83:2

ESQUIRE 2:13,14,19
  3:3,3,9,14,20 4:3
  123:13,14,19 124:3,3
  124:9,14,20 125:3
essentially 16:22 55:15
  60:11 63:16 86:9
  152:5,21,24 154:3
  155:1 167:25 168:2
  183:1
establish 95:1
established 149:22
  195:15
estimate 209:2 210:5
et 74:5 79:24 189:5
Etta 144:24
even 66:6 84:16 87:23
  87:24 130:6 172:10
  172:13 175:3 178:15
  229:1 239:13 268:10
event 128:23 131:4
  134:24
events 173:18 251:12
eventually 60:9 83:12
  134:16 135:22 148:9
ever 13:22 14:1 16:4,12
  34:23 71:4 72:11,23
  76:13 85:17 87:14
  102:10 103:3,3
  129:21 139:18 140:23
  154:5 155:7,11
  165:19 194:12 205:6
  216:15 218:21 220:11
  228:5 229:4 251:21
  259:13 261:22 262:22
  268:4,10
every 53:11,24 54:10
  70:24 71:7 116:24
  118:21 129:7,16
  172:11 211:2 243:25
  246:2 265:1
everybody 68:25 97:13
  117:25 231:17
everybody's 258:10
everyone 271:4
everything 30:23 41:18
  41:21 42:5 53:20
  71:18 80:22 81:5
  89:22 147:9 172:5
  180:12 184:15 269:8
everything's 166:15
evidence 97:6
evolved 16:13
exact 173:24 176:4
exactly 39:4 99:16
  117:11 167:5 168:24
  177:16 222:15
examination 5:3 6:5
  126:3 244:2

examined 6:3
examiner 83:16 87:1
  100:19 106:1
examiners 94:4 100:16
  245:12
example 61:10 79:12
  80:25 97:11 115:3
  174:9 187:2 196:9
except 141:10
exception 193:15
exchanged 183:6
exchanges 180:15
excited 217:21
exclusively 104:22
  111:25 131:13
excuse 14:20 169:2
  221:19
Executive 242:15
exhibit 5:8,9,11,12,14
  5:15,17,18,20,21,23
  5:24 8:10 9:5,8 12:16
  13:10 32:7,22 59:1,2
  59:3,10,13 110:17
  126:8,9,11,12,14,15
  126:17,18,20,21,23
  126:24 127:12 182:6
  182:14 185:13,13,14
  185:15,16 186:16
  187:1,3,5,13,21,22
  188:4 189:8 190:7
  192:4,16 196:3,5
  197:25 198:2,25
  199:16,19,23 200:13
  200:15 202:10,19,22
  203:10,13,16 205:12
  205:13 206:6,18
  213:20,23 218:3,6
  222:25 223:3 224:13
  224:18 226:20 239:1
  249:12,14 253:16
EXHIBITS 5:7 126:7
exist 191:1
existed 18:18 77:5
  254:4 256:5
existence 36:6
existing 20:13 249:11
exists 77:8 238:7
exited 23:21 83:7 91:7
  148:11 159:7 220:4
expect 208:6
expecting 25:8
experience 24:14,23,25
  116:4 120:3 131:10
  133:8 270:15,18
experienced 63:11,21
  100:9 132:17
experiences 206:15
experiencing 96:24

230:11
**expert** 148:20
**experts** 113:3
**expire** 152:11 155:4
**expires** 152:14 272:19
**explain** 17:20 50:1
79:22 97:14
**explained** 97:10 173:11
**explore** 61:20
**exploring** 31:24
**express** 85:6
**expressed** 83:20 85:3
**extended** 132:5 250:10
**extension** 129:10
**extent** 158:16 174:4
251:9
**extra** 28:20,20 83:4
106:4 130:22 220:10
241:25
**eye** 201:10
**Ezrol** 3:10 48:22
124:10
**E-H-R-L-I-C-H** 47:5
**e-mail** 5:16 126:16
190:10 192:17 194:8
194:15,23 203:22
204:5,14 205:3
208:23
**e-mails** 156:25
**E-T-T-A** 144:24

**F**
**F** 272:2,2 273:1
**FA** 152:3 154:13,17
**faces** 235:21 270:7
**facilitate** 244:14
**facility** 117:5
**fact** 32:18 44:3 51:1
62:14 70:18 92:4
98:11 100:24 147:25
153:22 164:17 174:2
193:10 195:1 197:15
201:1 202:6 213:6
215:19 219:12 226:12
254:6
**factitious** 246:14
**failed** 67:6 81:3
**Fair** 242:23
**fairly** 264:9
**fallen** 129:25
**falls** 34:20
**familiar** 25:3 95:13
111:3 128:14 130:12
189:16 196:11,13
199:3 200:18 203:1
253:21 267:12
**Families** 4:7 48:20
82:18 157:2 202:15

243:16 247:3,8
249:19
**family** 77:20 155:24,25
156:1 198:22 249:23
260:7,21
**far** 99:21,23 100:3,16
128:10 221:14 243:4
247:23 270:21
**fashion** 55:10 87:21
130:3 160:24 185:2
**fast** 258:19 264:25
**faster** 68:19 237:15
**father's** 135:2,5
**favorite** 36:25 210:8
**faxes** 156:24
**FDLE** 138:24
**feature** 230:23
**February** 15:17 187:3
187:20,23 188:5,18
204:17
**federal** 52:21 59:23
**federally** 77:21 78:7,13
**feed** 115:11 116:19
**feedback** 215:5
**feel** 7:14 57:15 97:2,3
105:5 215:8 244:13
259:10 266:16
**felon** 5:25 45:11,15,24
46:10 49:24 50:24
51:2,25 52:5,6,8,23
53:1 54:15 57:10
126:25 136:22,22
138:15,25 141:10,13
141:22 142:25 143:1
143:3,18 144:11,11
144:16 145:16 146:14
252:7,10,13 254:3
255:2,2 257:13 262:9
262:14,15,16,20,21
262:22 263:18
**felonies** 52:21
**felons** 259:25
**felony** 45:17 50:9 56:6
140:4 165:25 166:7
166:12,20 167:17
168:1 252:14 262:8
264:4,5,6
**felt** 46:1 211:15 231:19
255:15
**few** 9:22 116:24 155:21
239:25 263:13,14,16
**field** 114:23 171:21
**fields** 106:19,19
**figure** 69:17 177:25
217:6,8 235:17 240:8
260:7
**figured** 103:22 162:9
180:17

**file** 11:9,11,23 12:2
16:25 29:24 31:23
35:6,21,23 36:3,6
37:6 52:17 54:22 57:2
114:4 129:19 137:11
137:24 138:1,2,4,6,10
138:14,16 139:13,17
140:8,12,25 141:3,9
141:15,23 142:21
143:3,16,18,24 144:2
144:6,11,15 145:13
146:13,22 147:5
148:16 149:5,9 150:2
150:16 158:13 173:14
185:9,23 216:12
253:3 254:2,2,17
255:25 256:3,4,9,14
256:20 257:23 258:5
259:4,10,13 261:9,16
262:9,20 263:18
269:12,13
**files** 34:18,25 35:1,4,11
35:13,14,19 36:2,8,13
36:16,18,20 37:3,10
37:18 41:16 50:24
64:16,21 65:13 66:13
134:7 136:22,22
150:23 151:3 156:14
179:17 209:23
**fill** 21:1 23:24 81:6
107:20 178:8 219:2
221:20 248:3
**filled** 23:12 24:3 27:21
105:10 106:21 128:22
128:23 224:9 248:12
**filling** 107:6 225:24
**fills** 218:24
**final** 86:24 152:2,3
165:4 183:20 230:17
**financially** 273:13
**find** 7:17 10:21 34:22
38:2 54:24 55:16
60:18,20 99:11
109:23 119:13 135:25
140:6 145:20 173:8
174:5 178:25 179:15
193:6 213:8,14
226:13 265:13,17
266:8
**finding** 179:13 191:17
**findings** 191:21 200:23
**fine** 208:2 228:11
**fingertip** 68:21
**finish** 85:8
**finished** 33:25
**firm** 48:15,21
**first** 6:3 8:14 13:24,25
15:16 19:17 32:23

37:25 39:19 57:5
76:13 88:20 98:22
111:23 117:21 118:6
119:17 144:14,21
165:2 182:18 189:18
198:18 231:18,19
239:14 242:4 247:13
250:14 253:24 256:10
256:19
**five** 15:3 23:4 58:18
236:8
**five-minute** 176:9
**flag** 38:1 55:5 75:23
175:21 180:7 242:6
**Flager** 2:20 123:20
**flagged** 53:8 55:10
**Fletcher** 21:12,25 42:3
46:2 53:10 120:19
146:9 148:19 149:16
150:24 156:11 238:12
238:14 254:7 266:19
**flipping** 226:14
**floored** 88:21 89:16,19
**florida** 1:1,4,12,15,15
2:2,8,21,23,23 3:6,11
3:16 4:5 8:19,21 19:8
19:14 30:16 50:15,15
60:5 122:1,4,12,15,15
123:2,8,21,23,23
124:6,11,16 125:5
167:20 168:6,7,16,17
168:17,21 169:4
204:10 217:4 248:25
261:15,23 272:5,18
273:2
**flow** 223:15
**FLOYD** 1:8 122:8
**Fluke** 68:3 71:1 115:23
160:12 165:20 177:9
186:4 217:10,15
238:16 266:17
**focus** 11:21,25 12:1
24:13
**focused** 20:4
**focusing** 187:5
**folks** 6:9 79:24 90:22
95:9 96:7 264:9
**follow** 54:19 59:16,17
72:21 80:3 158:2
178:11
**followed** 104:6 151:18
159:19 167:15 230:6
**following** 9:21 45:11
73:9 130:21 138:9
145:8 228:16 229:7
233:16 234:9 235:13
236:21 246:20 258:7
**follows** 6:4 60:5 71:19

184:11
**food** 188:20
**forces** 116:6
**forget** 107:1 133:5
134:25 137:7 148:21
148:22
**forgetting** 96:20
**forgotten** 137:20
**form** 46:13,22 50:2
65:1 77:13 79:14,16
79:18,23 80:4,12,13
80:16 81:4,5,6 86:6
86:23 106:21 107:6
107:10 120:11 131:5
136:13 166:19 188:6
194:19 196:19 198:6
198:12 201:24 208:25
218:22,25 221:11,15
221:20 224:7,9 241:8
247:16 248:2,4
260:10,15,17
**formal** 31:5
**format** 38:23 184:9
**formed** 37:24
**formerly** 261:23
**forms** 77:3 79:17,24,25
80:13,17,21 97:13,14
104:14,16,18,21
105:4,6,12,25 106:5,5
106:8,11 107:7,15,18
107:23 131:6,21
198:8,9,9 208:22
268:23
**Fort** 3:11 124:11
**forward** 157:13 255:15
255:18 257:14
**forwardable** 150:7,7
153:2,21 154:6,9,9
155:8
**forwarded** 154:25
**found** 33:12 55:12
68:20 114:18 135:3
135:13,16 173:17,18
174:17 178:15 181:15
202:3 216:2 226:15
226:16 254:21 255:6
256:11,24
**four** 18:22,23 23:4
24:20 90:8,13,15,20
93:17 94:5 100:1
207:22,24 208:3
231:15 238:24 239:16
245:18 265:2
**fourth** 59:22
**four-year** 14:6 24:20
**frame** 22:6 64:12
102:12 231:22
**free** 7:14

frequently 71:5 184:22
  190:18 225:15 263:5
fresh 258:10
friend 106:3
from 12:23 14:6,15,17
  14:23 17:14 19:21
  24:21 26:6 34:9,11,14
  35:16 37:21 40:23
  41:15 42:1,19 43:25
  45:12,22 47:14 48:17
  50:18 52:3,3,8,11,14
  52:18,24 53:2 54:13
  54:15 57:10 59:1,25
  61:4 62:19,24 63:12
  65:21 66:5,8 68:1,2
  68:24 71:23 72:3,4,14
  76:8,23 81:11,16,23
  81:25 82:14,15 86:3
  87:7 89:1 90:22 91:22
  93:3,13 94:18 95:23
  95:23 96:7 97:18 98:8
  100:16 102:5 104:8
  105:4,7,17 106:9
  108:18 111:22 116:4
  117:9 120:3 129:6,8
  131:1,6,9 132:18,19
  132:20 135:6,9 136:2
  137:24,25 138:1,3,6,7
  138:14,16 140:4,10
  140:21,25 141:8,15
  143:15 144:6 149:19
  150:5,12,13 151:1,7
  151:18,21 152:19
  156:13 157:13 160:4
  164:2,5,25 166:17
  167:13 168:3,18
  170:10 171:11,11,13
  171:23 172:5,5,8
  175:10 177:22 180:12
  182:16 183:3,10
  184:22 185:7,22
  187:21,22 188:5,14
  188:15,18 189:1
  194:3,7,8,12 196:21
  197:12 199:14 201:11
  201:12,16 202:4,14
  205:19 211:11 215:1
  215:10 220:1 224:25
  226:18,23 227:4
  229:17,18 231:11,11
  232:4 238:2,12,13,15
  239:13 240:4,5,6,8
  242:14 244:25 245:15
  245:21,21,22,23
  250:19 251:18,22,25
  253:7 254:7,14 256:5
  259:12,14,16,18
  261:22 263:18 264:17

264:21 268:23
front 20:5 21:3 25:16
  26:2,10 129:8 183:15
frozen 113:22
frustration 83:9,19
FSASE 50:15
full 14:20,21 21:1
function 30:2 56:10
  160:6 193:4
functioning 101:11
Fund 2:15 48:9,12,13
  123:15 242:18
funnel 113:9 119:24
  144:12
funny 235:21
further 13:13 64:7
  82:21 135:18 136:9
  165:15 232:20 236:19
  240:11 249:24 270:23
  271:7 273:10
future 28:7
fuzzy 252:8 259:7

_____
          G
_____
game 106:17
gaps 178:14
gather 176:18
gathering 71:13 229:3
gatherings 229:5
gave 28:9 32:9 44:19
  134:19 257:13,14
general 4:4,4 5:22,23
  6:22 39:20 118:15
  125:4,4 126:22,23
  144:3 164:1 171:23
  191:7 215:6 224:25
  229:19 237:3 240:4
  263:23
generally 120:9 227:7
  260:6
General's 48:18 243:14
generate 81:3 106:2
  166:23
generated 74:1 86:9
  104:19 106:9,17
  107:8 174:24 183:13
generates 175:25
generating 161:12
gentleman 148:5
Georgia 1:21 122:21
gets 80:4 148:1 152:22
  154:21 156:12 164:10
  165:3 183:23 244:25
getting 46:17 88:13,16
  97:12 100:17 103:23
  155:22 156:23,24,24
  163:12,17 172:25
  175:7,8 197:9 231:18

253:7
give 7:6,10 13:20 41:10
  43:13 68:3 79:12
  81:22,25 87:24,24
  91:20,20 115:11
  116:15,16 119:10
  165:20 174:9 181:13
  199:6 205:12 209:19
  213:10 215:4 223:14
  225:17 265:19
given 7:13 8:15 45:25
  46:2 53:6,9 77:1 80:7
  93:11 100:25 104:16
  112:17 117:22,24,25
  117:25 151:11 153:25
  166:10 172:12 180:21
  195:8 215:2 221:24
  222:11 257:23 263:22
gives 38:6 69:7,8
giving 6:16 181:6
  196:23 221:13
gleaned 215:1,1
global 43:14
go 6:22 14:17 15:10
  23:17 24:5,11 25:14
  27:12 28:16 38:20
  39:20 46:25 50:4 51:8
  54:18 55:16 58:18,23
  61:21 62:17 69:2
  75:23 79:16,21 81:1
  87:21 89:1 94:24,24
  96:15 98:4 100:2
  104:12 109:23 112:2
  112:24 118:14 119:6
  127:6,8 134:22
  142:18 144:9 151:21
  153:7,23 155:8
  162:11 164:21 166:17
  167:24 168:9 171:22
  171:25 172:15,24
  173:13,23 174:16
  175:23 198:1,24
  201:17 206:1 209:15
  211:6 217:9 218:19
  220:12 227:24 228:9
  231:1 237:5 240:2
  264:8,17,21 265:12
  267:7
goal 246:16,18
goes 59:13 63:10 66:8
  77:2 131:4 144:10,12
  153:14 164:22 165:5
  180:4 223:18 243:19
going 6:12 7:6,10 8:9,9
  9:21 11:10 12:1 28:6
  33:14 58:18 61:15
  62:2,14 63:19 69:9,10
  69:10,11,18 70:21

87:1,25 91:14 93:12
  93:25 94:17 102:15
  104:13 105:20 110:6
  110:6 121:11 145:23
  146:2,3 147:15,16
  148:2,18 154:4 155:8
  157:2,4 160:22,23
  163:14 166:22,23
  167:11 169:21 173:19
  174:3,4,5,6,20 175:15
  175:15,19,25 176:9
  179:9 180:17 183:12
  183:25 184:16 185:8
  185:8,21,21 193:19
  211:8 212:3,7 223:22
  224:6 225:18 230:15
  240:17 242:19 244:17
  250:9 253:18 257:9
  258:21 259:1 265:9
  265:19,25 266:1,7,8,9
  266:16,17 268:19
goings 78:11
gone 84:22 89:8 97:13
  105:8 106:6 131:12
  135:2,17 140:11
  147:25 163:11 172:11
  172:13 173:16,18
good 6:7,8 75:16 88:19
  181:15 190:11 192:24
  219:18 239:11 268:21
Goren 3:10 48:22
  124:10
gotten 14:10 56:17
  168:5,6 211:24 212:1
  244:10 261:4
government 83:5,5
  219:16 242:25
Governor 70:3
go-between 99:18
graduate 14:15 15:10
graduated 19:5,21
graduating 14:23 37:4
graham 1:8 122:8
  128:15 129:6 134:25
Graham's 133:18
  134:10
graphic 223:13
great 11:6 239:12
greater 83:13 263:21
greatest 150:3
group 37:24 43:16
  63:22 112:9 115:10
  118:12 119:1,11
  120:10,15 150:12
  161:19 171:14 227:18
  228:25 231:6 237:23
  242:9,12,21
groups 23:5 26:18 38:2

38:3,4 82:15 104:7
  105:7 113:16 121:4,7
  150:20 160:20 231:7
  241:11 242:1,8,14
  243:2
grown 17:19,20
grows 90:1
gubernatorial 24:21
  61:11 70:4
guess 18:10,24 31:23
  35:5 36:14 44:1 47:6
  53:15 54:25 70:19
  76:14 80:4 90:10,11
  94:17 100:17 134:14
  135:4 136:4 138:9
  150:24 152:16 155:5
  157:14,16 158:3
  160:3,3 168:19
  173:10 177:8 182:3
  186:1 188:20 201:5,8
  220:7 227:6 230:17
  239:8 245:10 248:7
  253:14 264:18 269:9
  269:13 270:9
guessing 204:3 209:13
guidance 157:14,24
guideline 168:23 169:7
gut 210:13

_____
          H
_____
H 272:2
Hall 2:2 123:2
hallway 177:19
hand 42:21,24 57:23
  105:24 106:21,23
  130:22 177:20 182:25
  184:1 244:1 272:12
handbook 110:3
handicap 180:12
handle 20:7 46:6
  112:22 146:16,19
  154:23 160:23,24
  177:1,1 206:15
  207:23,24
handled 96:21 149:2
handling 26:5 54:16
  213:2 227:22,22,25
  231:9 232:14
hands 76:14,25 210:4
handwriting 184:18
  229:15,17 260:24
handwritten 131:2
  182:24 183:8,21
  229:8
hang 69:3 88:14
hanging 258:23
Hanners 206:22 238:16
happen 33:17 80:23

154:4 167:22 190:4
201:20
**happened** 57:13 97:25
136:3 156:2 172:16
173:25 178:3 190:4
225:15 230:17 268:4
268:7,8
**happening** 84:3 86:25
155:18 243:25 254:13
**happens** 38:21 60:22
64:1 137:6 218:25
264:9 267:8,8,9,9
269:8
**happy** 47:23 83:2
161:24
**hard** 24:16 106:11
107:18 131:13 211:19
211:19 212:5 217:6
264:25
**hardware** 101:9 160:4
207:4
**harm** 148:7
**harris** 1:15 2:22 6:11
6:17 7:1 49:2 122:15
123:22 238:22
**HARVEY** 1:10 122:10
**Hastings** 78:5 183:3
**hat** 88:14
**Hauck** 192:10
**having** 6:3 23:24 25:22
30:19 31:2 69:3 70:22
83:10,16 96:18 97:10
101:9 131:18,19
134:3 167:12 211:25
225:17 230:15 244:1
267:20
**head** 17:9 37:11 115:24
135:18 244:23
**header** 114:23
**heading** 233:24 254:1
254:17 256:2 257:23
**heads** 115:20 192:11
**health** 25:22
**hear** 6:13 47:19 48:3
49:17
**heard** 6:10 166:4 194:7
194:12 216:12
**hearing** 2:6 123:6
**heavier** 221:2
**heavily** 24:9 46:8
**heavy** 161:14 178:13
**Hector** 49:1
**held** 105:9 204:20
**Helen** 99:13 100:2,3,6
100:11,23 108:5,7
244:12
**help** 23:18 24:3 38:22
39:8,11,15 40:7 41:25

62:9 70:10 73:16
76:15 82:15 100:12
105:8 108:15 109:5
113:22 115:12 120:22
131:24 151:5 170:21
174:3 178:17 181:7
194:18 197:9 205:5,7
225:19,20 244:14
258:9
**helped** 20:3 130:12
169:25 196:10
**helpful** 72:15 108:7
110:9 177:23
**helping** 41:1,8 83:2
136:15 176:18 225:22
**helps** 40:9,9 230:14
266:22
**her** 6:4 11:17,18 16:11
21:1,5,24 22:3,22
25:21,23,24 26:17,17
27:15 29:10,15 34:21
42:13,14,21,21,24
46:3 53:10,16 54:8
57:23 59:18 65:10
73:12 74:5 78:4,14
98:24 99:16 103:2
129:3,15,19 134:2,4
134:13,16,18,21
135:2,12,25 136:5,20
144:24 146:9 159:13
189:13 190:22 191:21
191:23 194:11 196:10
197:18 199:6 200:2
207:5,6 266:20
**herself** 49:15 151:8
156:13
**Hey** 96:18 97:4 106:3
227:24
**he'll** 68:13 148:8
**Hi** 127:1,14
**high** 14:15,17 25:6
36:22 37:4 105:6
108:18 161:15 201:11
209:6,8 212:23
233:19 234:2,5
256:11 258:11
**higher** 83:14 90:21
92:10 93:13 270:21
**highest** 161:12
**Highway** 4:6 48:19
76:8 77:19 88:5,7
95:22 96:7 97:22
100:10 102:3 103:17
105:18 125:6 131:12
243:15 244:9,21,24
245:13,19 246:5,19
249:15
**Hilda** 25:25

**Hillsborough** 1:18
122:18
**him** 25:22 30:12 194:11
220:11 230:14
**himself** 49:15 150:4,12
150:18,19 151:7
156:13
**hired** 21:1 26:25
**hires** 24:19 245:3
**Hispanic** 232:21 242:22
**historically** 202:4
210:19
**history** 115:7 177:25
256:25
**hold** 23:10 151:14
205:12
**holding** 67:9 104:10
145:3
**home** 8:17,18 248:2,5
248:12
**honest** 31:15 111:3
212:17
**hosted** 227:14
**hour** 7:22 121:12
231:13,16 250:6
**hours** 218:12 231:14,15
**house** 212:16 230:24
**Houston** 14:25 15:13
15:23
**Howard** 99:13 100:11
108:5,8 244:12
**Hudson** 2:16 123:16
**human** 164:4,7,7,8
**humans** 244:18
**hundred** 62:8 81:23
112:12 263:16
**hundreds** 263:12
**hunt** 160:20
**husband** 15:7 181:12
**hyphen** 232:22
**H-A-N-N-E-R-S**
206:23

_____

**I**

**ID** 153:8 154:4 181:5
219:7,12,20,23 220:2
220:17,21 221:2,5,11
221:15,20 223:20
224:3,7,7,9
**idea** 75:22 92:6 94:14
143:5,10 165:20
190:11 201:25 209:6
223:15 236:2 250:16
**ideas** 227:21,21 229:22
268:23
**identification** 9:8 59:10
196:5 199:19 200:15
202:22 203:16 213:23

218:6,22,24 223:3
224:19 253:16
**identified** 50:24 57:8
73:3 161:11,17 257:6
257:6
**identify** 57:17,19
**identifying** 255:15
**II** 122:24
**illiterate** 222:12
**image** 46:3 53:10 80:24
145:8,19 152:10
153:6 173:6,10,12
**imaged** 67:7 129:12,17
142:19 144:12 151:20
152:10 172:23 173:4
173:20 185:10
**images** 122:12 151:21
**imagine** 212:9
**imaging** 54:19 84:7
129:9 142:19 144:24
145:2 172:21,22
**immediate** 18:7 38:18
**immediately** 129:9
230:13 241:7 258:7
**impacts** 98:6 108:21
**implement** 95:9,24
**implying** 256:15,16
**importance** 156:17
211:25
**important** 28:6 215:9
248:8
**impression** 28:10 53:16
93:1 139:8 147:13
236:25
**improperly** 175:12,13
**improve** 101:22 191:19
194:18 215:13 241:7
246:6
**improved** 158:14
**improvement** 84:2,4,18
95:4 100:9 211:18
244:15
**improvements** 101:16
108:10 192:12
**improving** 190:14
**inactivated** 59:24
**inactive** 59:25 60:2,4,7
66:9,18 68:6 152:14
152:20 155:4 259:15
259:16 264:17
**inc** 1:4,20,21 2:15 3:23
3:23 122:4,20,21
123:15 124:23,23
**incentive** 210:11
**incidents** 110:2
**inclined** 236:15,15
**include** 82:18 116:8
130:19 188:22 246:11

**included** 23:2 44:10
45:16 50:11 78:24
115:25 116:1 253:4
260:16
**includes** 167:6
**including** 9:25 10:6,8
68:8 105:2 141:13
149:10 160:1 254:19
256:22
**inclusion** 44:20
**incoming** 20:10 54:20
133:14,15 141:12
151:20 236:19 263:2
**incompetence** 259:5
**incompetent** 140:18,20
140:24,25 141:5
144:17 149:11 252:8
252:11
**incomplete** 7:13 82:9
83:25,25 86:4,4 87:7
87:10,20 104:4
106:13,16 132:20
133:3 167:4 244:3
**incorporates** 245:4
**incorrect** 7:13 257:10
**increase** 201:22,23
230:3
**increased** 17:21,23
28:23 89:21,22
**increases** 89:10
**increasing** 201:9
**independent** 95:16
174:1 193:16 242:16
**INDEX** 5:7 126:7
**Indiana** 3:16 124:16
**indicated** 2:9 123:9
**indicating** 82:8 182:21
255:12
**individual** 55:5,24
61:25 63:6 87:4 94:3
96:5 135:15 155:25
162:8 172:17 175:11
183:4,17 252:9
**individuals** 21:10 45:18
50:9,11 52:20 54:23
85:14,18
**individual's** 248:12
**ineligibility** 259:24
**ineligible** 259:25
260:17
**inform** 215:23
**informal** 228:25 229:3
**informally** 96:21
**information** 18:24,24
26:20 31:19 38:13
41:10,11,11 44:16
45:9 52:23 57:4,5,8
58:12 69:5 71:13,13

105:14 114:24 115:5
115:8,8,9,12,14,15
116:8,11,12 117:8
119:4,9,14 134:20
147:11 149:7,23,25
150:14 151:3,7
153:14 155:16 156:13
156:14 158:9 163:11
163:13,15 164:9
165:14 167:5,11
173:1 177:10 178:8
178:18 191:20,23
194:10 199:6 209:19
213:11 215:10 220:1
220:6,16 222:11
225:8 241:22,23
246:4,4 249:10 254:1
256:2,24 257:21,25
259:10,11,22 260:19
260:20 261:8,15,18
261:25 262:8,17
263:24 265:22 268:22
**informed** 220:21
**initial** 57:5
**initially** 39:3 83:1 94:22
134:22 155:21 181:24
193:21
**initials** 247:18,19,22,23
248:11
**innes** 4:3 5:4 23:21
26:13 47:5 48:17,17
125:3 126:4 159:7
161:6 194:19 196:19
198:6,12 201:24
220:4 221:25 243:12
243:13 247:1,6
249:24 260:24
**input** 164:7 177:11
254:7
**insert** 224:1
**inside** 41:16 109:17
**insisting** 135:22
**inspect** 243:22
**inspector** 135:12 222:7
**inspectors** 120:16
**installed** 213:7
**instance** 36:22 72:24
79:13 114:21 116:15
118:6 119:17 128:11
129:21 153:17 162:7
175:22 192:9 260:9
**instances** 71:4 100:22
131:11 155:16,19
225:12 226:13
**instead** 225:17
**instinct** 210:13
**institution** 19:11
**instruct** 222:6 236:1

**instructed** 96:22 118:2
118:6 119:4 175:21
225:9
**instruction** 208:12
**instructions** 34:14
41:15 63:7 146:10
208:17,17
**intake** 185:9
**intaking** 244:22
**intends** 215:18,23
**intensive** 24:17
**interaction** 77:19 78:1
**interactions** 40:13
**interacts** 158:4
**interest** 89:10
**interested** 273:14
**internal** 94:1,13 139:2
139:3 172:8 210:14
210:16
**Internet** 74:18 114:4
128:3,20 133:11
239:17
**interrogatories** 10:12
31:19 32:24 34:16
44:23 109:10,14
110:19 127:17 170:22
176:16,19,20 186:8
239:23
**interrogatory** 78:18
109:2 110:5 111:8
127:19,21 130:8
157:6 158:18 159:1
163:4,8,13,19 169:13
169:22 170:8,11,24
171:8 186:22,23,24
**interrupt** 261:3
**interviews** 219:19
**intimately** 155:21
**introduce** 196:2 253:13
**introduced** 270:6
**invalid** 79:19 80:14
**invite** 38:3 103:3
**invited** 38:2 39:11
103:14,18 189:18
**inviting** 242:10
**involved** 24:9 30:13
31:16,18 36:2 37:13
38:4 42:12 46:8 50:7
74:17 108:13,14
134:16 142:23 148:21
155:20,22 156:8
157:9 159:3,5 162:13
207:20 244:18 251:6
251:9,10,11 267:21
**involvement** 50:5
110:10 111:13 187:24
242:1
**in-house** 25:5 245:8,16

245:23,24
**In-State** 254:17
**IORIO** 1:18 122:18
**Irma** 27:16 40:20
**ISRAEL** 1:10 122:10
**issue** 79:17 97:5 100:2
102:1 117:20 224:5,7
232:11 233:8
**issued** 113:21,25 158:1
207:2,7,15,22 209:25
211:4
**issuer** 223:22
**issues** 30:9,11 78:6 80:4
80:11 85:20 93:24
100:13 131:18 193:6
196:14
**issuing** 20:14 157:25
185:7
**item** 202:3 214:25
**items** 140:14
**IV** 234:2
**IV-C** 233:25
**I-R-M-A** 27:16

**J**

**J** 3:14 124:14
**JAMES** 1:6 122:6
**jamming** 101:10
**jams** 233:19 234:5
**janai** 2:13 47:24 48:8
48:11 49:17 123:13
**JANICE** 1:9 122:9
**January** 17:15 18:10
18:11 27:1,21 31:9,10
36:15 94:19 142:11
202:12,12 216:19
269:21
**jargon** 109:4
**Jeff** 46:22 47:3,4,13
48:2 49:6 120:11
127:2
**JEFFREY** 3:3 124:3
**JERMAINE** 1:7 122:7
**Jerry** 115:22 230:13
231:5,18
**JIMMIE** 1:5 122:5
**JOANNA** 1:9 122:9
**job** 15:8 16:22 20:25
118:20
**john** 1:5,17 53:14 122:5
122:17 147:22 148:1
173:22 180:24,25
261:23 262:1
**Johnson** 144:25
**join** 38:3 242:9
**joint** 38:17 40:4 76:22
267:14,19,24
**JR** 3:9 124:9

**judgment** 53:16 265:1
**JULIA** 1:5 122:5
**July** 194:1,8,15
**jumbled** 166:5
**jumbo** 109:20
**jump** 39:13
**jumping** 89:11
**June** 18:6 19:2 28:1
29:6,8,13,19 30:5,5
37:25 45:25 46:9 53:7
56:12 57:21 115:22
120:15 141:24 142:4
142:6,11,17,24
143:22 144:1,5,9,10
145:15 147:7 148:18
149:1,17 159:14,19
160:11 161:9 163:3
238:11 242:5 243:7
251:24 254:7,7
255:10,16 256:16
257:2,5 258:8 259:19
**junior** 20:2 21:6
**jurisdiction** 55:25 72:6
72:9
**just** 8:12 10:22 11:4
12:1 15:15 17:3 18:16
22:23,24 24:7 25:3
26:10,19 28:2,5,19
31:6,16 34:13 37:12
37:12 38:19 43:13
53:13 54:19 55:10,13
56:14 57:8,17,20,22
57:23 59:5,7 64:5,11
67:18 68:7,24,24
70:10 75:17 77:14,15
80:2,6 81:4 84:2,8
85:8 88:21,22,25 89:7
89:12 91:17,21 96:4
97:9 99:20,20 101:19
104:10 106:20 108:20
108:24 109:7,19
110:6,7,11 112:10
115:8,20 116:4,7,22
116:24 117:8 118:21
120:9 129:10 134:24
139:1 142:21 144:12
145:6 147:14 151:23
154:19 155:1,18
156:2 161:25 164:16
165:14,15 167:2
169:20 174:13 177:20
178:16 181:23 182:6
183:13 186:10 190:13
191:15 192:8 196:23
197:8,17 201:10,14
201:15 202:5,8 205:3
205:12 208:6,23
209:14 210:13 211:6

217:11,22 224:6
227:20 228:25 230:2
230:2,12 233:4,6
234:6 235:21 236:16
239:25 240:15,15
241:25,25 244:2,17
247:17 248:11 249:2
249:10 251:17 253:6
254:8 257:9,13
260:18,18 264:16
265:22 266:12,12
268:20
**Justice** 233:14,15
**J000217** 213:21
**J001990** 224:15
**J002031** 224:16
**J002086** 224:15
**J004115** 253:22
**J004125** 257:19
**J004493** 227:4
**J004497** 227:1,11
**J004502** 235:9
**J007284** 189:9
**J007288** 202:20
**J007291** 196:2
**J007294** 199:17
**J007296** 203:14
**J007297** 200:12

**K**

**Kaley** 8:21
**KANDY** 1:9 122:9
**Kast** 193:18,20 194:3,7
194:11,13
**katherine** 1:15 2:22
6:11,17 49:2 122:15
123:22
**keep** 6:12 35:11,15,19
35:21,23 36:1,2,3
105:24 110:6 131:2,3
136:15 155:1 191:16
242:19
**keeper** 35:12
**keeping** 116:23 156:17
197:18
**KELLY** 1:9 122:9
**kept** 65:10 115:15
128:6,9 130:22
194:11
**key** 133:2 148:23 164:8
164:21 230:23,24
238:2 241:9,10,10,18
**kids** 36:25
**kind** 60:7 61:2 84:23
165:5,5 170:18 173:1
177:10 181:16 190:13
190:13 201:18 242:3
260:24 270:18

**kinds** 147:10
**Kirsten** 266:21
**knew** 56:16 116:4
  235:24 255:14
**know** 6:15 7:3,7,17
  13:15 25:4,8,10 31:18
  31:20 33:2,25 34:8
  36:12 40:4,6 41:23
  42:6 44:16,25 45:2,14
  46:16 51:22,22 53:4
  56:1,14 57:6,12,25
  58:4,7,9 61:1 63:7,12
  64:3,10,11,13,24 65:5
  65:8,8,10 67:22 68:24
  69:13 70:15,24 72:11
  72:18,23 77:2 79:9,24
  82:25 83:15 84:9,13
  84:23,25 86:19 87:12
  87:14,15 88:7 89:1,7
  89:17,21,25 90:15,19
  91:21 92:20 94:24
  95:12 96:18 97:1 98:7
  98:11 99:7,13 100:4
  100:24 101:13 102:18
  102:20 103:24 104:2
  107:22 112:22,23,24
  113:22 118:10 128:10
  128:21 129:5,15,19
  129:21 130:3 131:11
  132:3,7,14 133:4,22
  136:11 137:4,8
  142:22 143:1,9,9,15
  143:17,20,21 147:17
  152:12 154:25 155:19
  157:19 158:13 160:22
  162:17,22,22,23,24
  167:1,2 168:14
  173:21,22,25 176:4,5
  178:4,11,19 180:14
  181:2,22 184:18
  185:19,23,25 186:3,3
  186:10 187:25 190:3
  190:10,16 191:1,3,6
  192:12 194:7,9,12,16
  195:12,18,22,25
  197:12,15 199:4,8,11
  200:25 203:6,8,9,11
  203:24 204:4,13,16
  204:22,25 205:6,9,18
  206:18,20,21 209:10
  210:1,13,21 211:7
  212:3,7,14,17,19,21
  214:12 215:23 217:7
  217:19 220:12,15
  221:14,22 222:11,21
  222:23 224:24 225:12
  225:15,16 226:5,10
  226:12,18 227:4,6,7

227:17 228:7,10,19
  228:23 229:1,2,16,17
  229:25 230:8,14,15
  231:10,20 232:2,24
  233:8,11,22 234:5,6
  234:15,24 235:2,4
  239:7,8,9,13 240:5,9
  240:10 241:19,20
  242:4,6,12 243:2
  244:20,24 245:14
  247:10,14,16,23
  249:6 250:13,19
  251:2,8,9,24 252:22
  257:4 263:3,5 266:1
  268:20,22 269:8
  270:8,10
**knowing** 73:22,22
  202:4 208:6 212:8,14
  213:3
**knowledge** 51:11,25
  55:24 56:3,4,15 58:2
  65:12 81:19 88:10
  132:9,15 161:10
  186:9 247:5 256:8
  258:6 265:16 268:9
**knowledgeable** 75:2
  148:14 149:4,14
  150:21 151:2,12
  159:16,22 160:1
  266:10,14,18
**known** 135:4 200:1
**knows** 12:14
**Koval** 21:11,23 22:5
  40:8,12 42:2 77:25
  78:6 85:15,16 98:2,7
  98:11 99:10 120:19
  189:13 190:5,12
  193:1 194:7,10
  196:16 197:15 199:7
  201:15 202:17 203:24
  204:16 205:3,6
  238:12
**Koval's** 195:13,19,24
  200:20 202:2 203:3,7
  204:14
**K-O-V-A-L** 21:11

---

**L**

**L** 1:5 2:7 122:5 123:7
  272:8,17 273:5,20
**lack** 86:5 96:19
**ladies** 21:2 22:3 84:8
**lady** 26:15 206:24
**Lafayette** 268:19
**lag** 263:10
**Lane** 2:2 123:2
**lap** 63:2
**laptop** 11:13 62:7,10,14

62:20 63:3,14,17
  74:18 111:12 113:22
  114:3,14 115:9,15
  116:1 119:2 121:2
  135:19,20 159:4
  177:1 206:14,25
  231:9 239:20
**laptops** 62:8 111:23,25
  112:13,16 113:18,18
  114:6,14 116:8 117:3
  117:5,10,17,22 118:5
  119:8,12,17 161:1,3,4
  161:5,10,22 207:2
  213:6,12 230:19
  239:24
**large** 2:8 84:9 87:12
  104:9 123:8 151:4,9
  174:3
**larger** 92:4 227:19
  263:21
**largest** 150:11
**last** 18:16 55:23 63:9
  64:10 92:16 102:1,5,5
  102:7,13 117:6
  130:24 140:19 155:21
  173:23 181:1 182:23
  182:23 183:23 187:15
  195:5,17 199:5
  203:22 204:18 217:1
  223:25 239:1
**late** 15:11 92:21,22
  93:10 140:7 250:6
**later** 181:20
**Latino** 242:2?
**Lauderdale** 3:11
  124:11
**Laurie** 78:5 183:3,4
  185:6 193:4
**Laurie's** 184:20
**law** 48:15,21 66:4,5
  80:15,17 152:1
  153:24 157:1,1,4
  232:22 248:21 249:6
**laws** 25:9 60:6,6 104:11
**lawsuit** 134:16 191:4
**lawyers** 258:20
**layman** 267:3
**layout** 11:4
**lead** 22:2,16,22 26:9,22
  27:6,20 42:3 208:11
  261:6,12 262:1,5
**Leadership** 242:22
**leading** 19:24 21:7,15
  21:20 22:7 23:8 28:22
  29:21 30:4,14 52:25
  56:6 60:18,19 86:18
  88:6 143:2,12,14
  145:11 146:6 147:2,4

151:14 167:13 219:18
  253:11 258:4
**leads** 265:8
**League** 242:21
**leahy** 1:16 3:7 6:12
  47:14 49:13 122:16
  124:7
**learn** 58:12
**learned** 134:15,16
**least** 73:13 74:2 143:6
  173:21 195:10
**leave** 60:16 68:23 69:5
  69:9,10,13,20,21,23
  69:25,25 70:8,9 87:4
  100:25 146:3 147:16
  147:19,19 148:6
  158:3 181:19
**leaves** 133:2
**leaving** 15:22 147:18
  259:20
**led** 40:23
**left** 15:13 71:2 96:11,12
  101:12 116:2,20
  137:3 148:8 166:18
  180:15 208:23 265:9
**legal** 2:14,15 48:8,12,13
  52:19 109:4,20
  123:14,15 157:25
  158:1 246:22
**legislation** 38:7 167:10
  241:18 249:2
**legislature** 79:15
**length** 237:12
**less** 16:9 257:21
**lessen** 213:13 221:9
**lessening** 164:16
**let** 6:24 7:3,16 17:3
  33:25 34:23 52:1
  66:12 85:8 92:1 137:8
  152:11 169:20 171:10
  182:17 198:15 205:12
  206:18 220:19 222:24
  261:3 262:10,10
  264:8
**letter** 5:10,11 37:3
  57:11 81:4 87:9
  126:10,11 152:3,3
  153:17 156:20 166:23
  167:1 196:14 197:13
  197:16,20,22 200:6,8
  216:1 260:6 266:2
**letters** 20:12 74:1 87:21
  87:25 156:24 265:23
**let's** 61:10 79:23 145:11
  147:1,18 151:22
  154:23 187:2 195:3
  201:15 220:8 221:6
  243:1 260:2 263:1,4

**level** 24:25 83:4,13,14
  100:21 256:11 258:12
**lexer** 2:14 48:11 123:14
**liaison** 99:17,20,22,23
  100:3 108:2 160:19
**liaisons** 99:25
**librarian** 132:24
  184:24
**librarians** 132:25 133:5
**libraries** 82:20 87:23
  95:14,15 132:19,21
  184:23 190:21 193:15
  203:3,4
**library** 5:14 96:19
  126:14 132:22 203:4
  247:21
**license** 86:11,19 87:23
  88:22 100:18 104:20
  106:1 130:19,23
  218:20,21
**licenses** 130:15 132:12
**like** 9:4 10:22 11:4,6
  14:24 23:1 29:8 31:5
  32:21 38:22 40:10
  41:25 42:4,15 46:8
  50:5,19 52:19,20 53:8
  54:12 56:11,14 57:15
  58:25 61:16 67:17
  68:10 70:2 75:20
  84:14,16 85:1 88:24
  89:25 95:1 96:21 97:2
  99:17 101:16,22
  104:19 105:5 106:16
  108:5,10,13,14
  110:16 111:23 112:12
  118:20 127:24 128:1
  129:16 131:6,15
  140:3 141:12 147:22
  147:24 149:1 153:17
  154:21 156:2 160:21
  169:11 173:4 175:20
  181:10,22 182:13
  183:25 185:12,20,20
  186:20 189:7,12
  190:3 192:10,21
  196:1 197:24 199:15
  199:24 200:2,9
  201:11 202:18 203:12
  204:18 205:11 206:17
  210:9 211:15 212:5
  213:19,19 214:9
  218:2 221:22 222:8
  224:12 226:1,19
  227:9,21 228:2
  232:15 234:18 238:8
  239:1,10 241:5,15
  242:13 244:13 248:10
  251:6 253:13 255:14

258:6,18 261:25
263:2 265:24 266:16
**likely** 58:11 65:6
145:23 175:25 197:17
**likes** 180:4
**likewise** 89:21
**LILLIE** 1:6 122:6
**limited** 50:6 160:3
**linda** 1:24 5:2 6:2 48:24
56:5 122:24 126:2
225:19 235:16 241:1
272:9 273:7
**line** 38:22 39:15 40:7
63:9,10,24 64:2
111:23 112:13 114:3
114:21 119:13,18
127:1,5 189:17
196:11 198:18 199:6
203:22 228:17 229:25
230:6 231:24,25
236:21,22,22
**lines** 36:1 113:11,19
118:9,11,14,18
159:20,23 205:17
211:5 213:16 230:2
234:12,21,24 235:2
236:8,22 267:11,11
**link** 175:23
**linked** 152:10 231:21
**linking** 165:13 265:20
265:22
**lisa** 2:7 123:7 272:8,17
273:5,20
**list** 6:18 29:3,7,13,16
30:9 31:1,22 43:24
44:3 46:1,5,17,18,20
52:8,11,13,14,16,18
53:6,7,11 55:4,10,11
55:13 56:18 57:2,4,15
57:16,16 58:1,5 60:6
62:3,3 72:7 76:25
84:23 90:12 120:1
127:25 135:1,12
136:24 137:1,2,10,23
138:10,13,15,15,15
138:21,22,23,24,25
139:16,24 140:2,4,8
140:10,15,20,24
141:9 144:10,11,11
144:16,17 145:5,8,16
145:17,18 146:6,24
147:20 148:9 149:18
150:9,17 154:20
183:14,21 184:16,24
226:7 242:19 250:14
251:10 252:7,7,8,8,10
252:10,11,12,13
254:17 255:2 256:15

256:17,23 257:23
259:5 261:9,16 262:9
262:14,20,21,23
263:10,18,20
**listed** 144:17 183:20
187:20,22 189:4
**listing** 116:17
**lists** 5:25 29:24,24,24
30:3 45:11,15,22,23
45:24 46:7,10,11
49:22,24 50:8,11 51:3
51:5,10,12,17 52:1,2
52:3,5,6,14,17 53:1,3
53:4,9 54:3,13,15,16
54:21,22,22,25 56:6
56:12,17,21,21,22,24
57:10 58:8,12 85:1
126:25 136:14,22,22
136:23 137:22,23
138:3,6,12 139:11,13
139:15,17,22 140:1,7
140:8,13,13,17 141:3
141:8,9,9,10,11,13,24
142:5 143:1,3,8,14,19
143:23,25 144:2,6,15
144:16 145:13,14
146:13,14,17,23
147:1 148:16 149:2,2
149:5,10,13,15,15,18
149:19 150:2,2,15,16
167:5 250:10,11,19
251:3,5,15,18,21
252:1,9,19 253:3,9
254:3,18 255:9,21
256:4,14,20 257:3
258:5 259:13,17,20
260:18 262:25 263:4
263:5,12,21,24,24
264:2
**litigation** 250:5
**little** 6:24 44:19 89:7
132:21 153:4 156:20
157:14 180:13 181:10
182:20 202:9 207:2
223:17 250:6 260:15
269:2
**live** 25:21 62:15 174:15
**lives** 137:5
**living** 92:11 95:16
193:16 242:16
**LLP** 3:20 124:20
**local** 38:20 57:10,15
219:16
**located** 92:7 100:16
111:20
**location** 105:9 131:9,10
230:10 237:15 247:19
**log** 135:25 177:21

178:9 179:8 207:4
225:10
**logged** 239:16
**logging** 177:20
**logical** 57:9,19
**logs** 34:10,10 41:4
136:1,14 172:2,7,8
177:14,16 178:2,20
178:25 224:25 226:1
**long** 7:19,23,25 11:19
11:20 15:2 16:8 19:15
25:10 61:14 67:24
100:3 101:13 105:9
128:25 132:3 148:22
165:17,23 231:10,13
231:20 234:12,21,24
235:2 264:16,20
**longer** 11:21 66:6 68:23
69:6 70:9 214:15
231:17
**Lonn** 68:3 69:8 71:1
115:23 160:12 165:20
177:9 186:4 217:10
238:15 265:13 266:17
**look** 8:4,16 9:11 13:9
13:12 32:25 34:18
41:18,21 42 17,22
45:8 59:12,14 64:21
69:5,16 70:1 71:11
72:1 73:1,19 74:11
75:5 76:4 78:17 89:22
90:11 91:20 110:1,7
110:20 111:3,9
112:15,20 114:15
117:1 120:1 127:19
130:8,14 132:11
133:1,12 136:15
144:15,19,19 150:15
157:6 158:18 163:4
169:22 170:3,25
171:17 172:4,13
173:7,7 176:15
177:14 179:5,20,25
180:8,10 182:5 185:3
186:16 187:4,8
189:17 190:6 191:15
192:4,16,21 196:1,7
196:11 200:11,22
203:5 205:14 206:5
217:7 226:12 229:12
241:6 243:25 253:18
253:22 254:16 255:23
264:1
**looked** 41:3 43:5 53:8
134:23,23 237:19
256:16
**looking** 42 :4 55:13 64:4
127:11 137:12 139:4

147:24 171:25 173:5
179:1 183:17 184:6,7
194:10 198:18 199:24
209:14,23 225:8
254:18 256:20 259:9
**looks** 111:4 178:19
185:5,20,20 186:20
189:12,16 192:10
200:2,9,18 203:1
222:8 227:9 228:2
**loop** 147:5
**Lord** 18:12,15,19
115:21 120:16 159:13
159:14 160:12 161:9
162:17 163:3 180:6
182:4 214:14 238:14
**LORINE** 1:7 122:7
**lost** 60:5 66:11 129:23
130:3 136:4
**lot** 11:22 12:2 17:23
25:7 30:18 31:15,18
32:12 36:8,21 40:10
40:16,18 45:15 70:13
77:25 86:25 87:1
88:22 109:21 111:4
134:25 141:23 142:16
147:5 148:20 156:16
157:2 160:9,9 165:13
171:21,24 173:1
174:13 178:2,14
209:11,11 211:23
217:20,21 236:16
246:3 259:10 266:22
270:12
**lots** 11:10 28:15
**Louis** 162:21 238:16
**low** 202:5
**lowe** 1:19 3:18 49:5
122:19 124:18
**lower** 232:16
**lumped** 266:8
**lunch** 121:9,11,15
132:16

**M**

**mac** 4:3 5:4 23:21
26:13 47:5 48:17,17
125:3 126:4 159:7
161:6 194:19 196:19
198:6,12 201:24
220:4 221:25 243:12
243:13 247:1,6
249:24 260:24
**machine** 162:9
**machines** 101:10 162:3
162:6,7,8,11
**mad** 180:15
**made** 42:25 44:2 50:14

56:18 63:15,15 79:6
81:2 103:9 118:15
134:5 135:21 155:17
227:19 230:12 232:9
248:21 249:22 255:11
255:16
**mail** 54:18 76:17 129:8
130:19 140:15 142:18
150:4,17 151:1,18,19
152:21 153:2,24
154:6,9 172:19 248:6
248:13 260:3 263:2
**mailed** 105:10 152:24
154:22
**mailing** 130:20 212:2
260:3
**mailman** 260:5
**main** 114:13 237:1,1
**maintain** 35:14 84:21
**maintained** 84:23 85:1
**maintaining** 34:24
66:13 68:5
**maintenance** 29:4,7,13
29:16 30:9 31:1,22
60:6 72:7 136:25
138:13 140:2,15
141:10 148:9 149:18
150:9 154:20
**Maitland** 2:2 123:2
**major** 121:3,3 131:16
**make** 7:14 17:3 45:20
47:9 59:7 69:8,15
80:3 95:4 116:13,22
133:1 142:22,23
164:25 172:12 175:16
176:1 186:1 190:12
192:12 204:1 210:12
211:6 212:3 215:14
220:8 224:6 227:6
229:23 232:9 234:19
235:6 239:8 264:2
**makes** 51:12 111:2
128:18 165:4 249:14
249:18
**makeup** 212:19
**making** 87:3 145:24
177:20 178:16 190:14
204:23 244:2
**Maleck** 233:10,13
**man** 39:8 213:9 223:17
**management** 83:14
189:19 228:21
**manager** 16:12,16
17:12,14 18:6,7 21:12
21:13,24 22:1,12
26:12 27:10 28:1 29:9
29:10 40:9 46:3,9
77:25 84:12 98:2

142:7,12 193:8 199:7
**managers** 19:8,13 20:2
21:6 79:22 89:1 93:17
94:5,25 98:3 101:3
108:19 120:19 193:11
245:9
**manager-type** 102:23
**manages** 150:25
**mandated** 76:19,23
77:3,21 78:1,7,13
79:17 82:14,14,17
90:3 105:1 106:25
132:22 188:11,15
190:13,20,21 193:15
194:25 197:5 243:19
244:8 246:8 248:1,9
248:15,19
**Mann** 160:12,15,16
236:12 238:18,22
**manpower** 28:20
**manual** 5:19,20 74:20
111:12 126:19,20
146:8 260:16
**manuals** 223:14
**manufacturing** 97:7
**many** 10:21 11:4 18:18
21:14 22:5,19 38:2
39:4 52:21 64:24
65:13 68:4,5,13 70:15
70:15 75:13 81:8,15
87:20 88:1 90:7 95:21
98:7,15 112:10
136:14 143:1,2,9,10
143:15,17 162:25
181:11 188:14,15
189:25 191:1 192:13
192:14,14 196:22
208:6 209:7 211:7
212:18 217:18 231:3
231:3 244:18 262:25
263:2
**Margaret** 19:1 34:19
41:20 44:19 65:9 71:1
159:24 186:6,6,7
237:7 238:22 265:13
**Margaret's** 42:11
**maria** 1:8 122:8 128:15
129:6
**mark** 9:4 58:25 59:8
167:24 168:2 199:15
202:18 203:12 213:20
218:2 222:14,17,24
223:24 224:12 232:22
**marked** 8:10 9:7 13:9
32:21 45:25 56:13
59:9 110:16 127:11
135:15 166:11 168:8
175:16 179:12 182:5

182:14 185:12 187:6
189:7 190:6 196:4
197:24 199:18 200:14
202:21 203:15 204:2
205:11 206:5,17
213:22 218:5 223:2
224:17 226:20 239:5
253:15 254:22 255:6
256:12 260:5
**marking** 141:25 200:12
**marks** 182:20
**marriage** 173:12
**married** 15:7
**MARSHALL** 1:6 122:6
**Mary** 227:8
**Mary's** 238:6
**master** 118:1
**match** 55:4,6,12,13
57:8 145:21 146:1
187:11 257:10
**matches** 53:9,18 55:16
137:13 140:6 164:24
164:25 254:19,21
255:5 256:10,21
**matching** 53:14,15,20
53:22 54:4 57:5 147:9
147:23 165:6
**material** 96:16
**materials** 32:2 44:20
94:7 186:7 207:6
222:19,22
**math** 22:25
**matter** 206:10 217:11
**matters** 31:2
**mauro** 2:19 49:1,1
123:19 127:3 271:3,3
**maxed** 236:8,18
**may** 105:13 109:20
189:24 225:19,20
230:23 268:25 272:13
273:15
**maybe** 7:24 8:1 16:19
22:25 43:23 46:6
53:14 92:9 132:5,6
134:24 174:9,10
181:17 187:9 190:19
191:12 193:18 227:13
231:13,18 263:14
**MCDONALD** 1:7
122:7
**mean** 13:8 15:18 24:16
26:7 28:4 35:14 40:15
40:19 41:11 50:1,21
52:4 53:19 55:15 57:1
61:3 65:5 67:21 69:23
80:14 83:21 88:16
89:4 90:2 91:17
101:21 113:19 114:15

131:16 133:10,25
134:4,14 135:7
137:25 138:17,18
139:3,4 144:19,20
147:13 157:15 165:21
171:21 173:3 186:1,6
188:25 196:24 198:7
198:9 201:18 209:8
210:3,25 219:4
222:18 234:4 236:19
237:13 242:18 247:14
251:13 255:8 257:14
258:10 267:10,10,19
267:22,24
**meaning** 66:8 118:12
197:1 209:6 212:21
228:20 249:22 252:22
259:23 264:22 265:2
265:5
**means** 196:16 262:9
**meant** 79:9 82:25
**mechanically** 83:17
**mechanics** 236:14
**media** 210:7,10 219:19
253:7
**Medicaid** 188:21
**Medicare** 188:21
**meet** 7:19,23,25 28:8
28:20 38:6 50:16
60:13 81:3 94:24,25
166:16 211:2,17,21
213:8
**meeting** 10:24 37:25
94:5,6,15 95:2,3 96:2
96:8,9 98:13 208:22
214:22 217:13,17
227:14,25 228:4,5
229:1,19 233:9
236:13 237:14,17,18
237:22 238:4,25
241:16 243:6 269:9
269:19,23
**meetings** 37:7 50:16
58:10,13 95:21
102:23 214:18 216:15
216:17 217:9,25
226:24 228:14 238:10
240:6 243:3 269:3,6
269:16 270:3,4
**member** 23:13 76:19,22
107:4 171:21 193:4
**members** 21:14 26:9
39:8 80:9 98:5 113:4
180:8 211:5 242:12
260:21
**membership** 38:14
241:24 242:10
**memory** 208:24

**men** 83:15
**mental** 144:16 252:11
259:5
**mentally** 140:18,20,23
140:24 141:5 144:17
149:10 252:8
**mention** 49:24 96:17
**mentioned** 7:1 21:23
30:8 56:20 57:18,20
86:2 88:4 92:12
113:16 116:25 118:13
177:13 195:9 214:4,9
225:4 228:3 238:18
241:1 244:7 250:22
**merge** 138:21
**message** 39:10 192:18
193:24 194:3 211:24
212:1 218:18 221:6
**met** 7:21 93:17,22,22
95:8,9 242:4
**method** 43:13 65:12
128:13
**Miami** 3:6 124:6
**Miami-Dade** 1:16 3:5,7
47:14 122:16 124:5,7
**Miami-Dade's** 139:5
**michael** 3:9 48:21
124:9
**MICHELLE** 1:8 122:8
**microfiche** 61:1,16
209:17
**microfilm** 67:18
**mid** 130:17
**middle** 192:17 254:20
256:22
**might** 38:9 39:21 43:17
61:16 70:13 87:1
93:19 95:11 112:18
140:10 151:4 171:20
174:18 180:9 186:15
209:18 211:9 221:10
**Mike** 240:23
**military** 25:20
**Miller** 204:10,13,17,25
**mind** 35:9,20 38:19
40:11 101:20 116:23
135:10 181:24 219:24
258:10 260:9
**mine** 11:20 42:24 239:2
**minute** 21:17 187:9
240:15
**minutes** 7:24 8:1 11:1
58:19 240:16
**MIRIAM** 1:17 122:17
**misinterpreted** 261:19
**mismarked** 206:11,15
**misread** 116:20
**misreading** 116:18

**miss** 226:11
**missed** 106:22 133:4
178:16
**missing** 42:18,18,19
59:1 66:24 84:10
167:4,11 192:15
**Mississippi** 14:7
**misspelled** 181:1
**mistake** 60:20 155:17
**mistaken** 44:7
**mistakes** 164:17
**mobile** 15:8,8,13
161:14
**modem** 114:3
**moment** 38:21 40:11
47:15 108:24 137:5
169:20 198:2 215:16
251:17 253:18 255:23
257:25
**monitor** 190:13
**month** 77:12 88:22
145:4 188:17 195:5
195:18 204:18
**monthly** 35:10 77:13
87:19 158:21 263:6,7
263:10,11
**months** 15:9 25:13
120:21
**month's** 145:4
**more** 7:14 17:23 28:20
52:19 58:11 65:5 71:5
72:24 77:17,25 83:23
89:10 91:22 92:8
98:18 99:11 104:1,5
106:22 108:13,14
110:11 115:9 120:9
145:22,23 150:11
155:22 165:11 170:24
175:25 196:11 197:17
201:6,17 212:20
220:21 229:25,25
230:2,2 242:1 246:3
251:3 263:15
**morning** 6:7,8,9 10:25
140:3 141:20 230:9
231:12 241:1
**most** 37:14 46:10 50:19
63:11 75:2 137:4
147:7 148:13 149:3
149:13 150:21 151:2
151:12 159:16,22,25
174:14 178:13 266:10
266:14
**mostly** 10:21
**motor** 4:7 48:19 76:9
77:19 81:16 82:13
85:11 86:3 87:8 88:4
88:5,8 92:25 95:22

96:7 97:19,22 100:10
102:2 103:17 105:18
125:7 131:12 194:17
198:4 243:15,19
244:10,11,11,25
245:13,20 246:6,9,19
248:2 249:16
**move** 59:24 212:22
257:14 259:14
**moved** 15:8,10,14
18:14 67:18 145:24
151:22 153:22 154:12
155:25 156:1 173:1,9
255:18 260:23,25
261:24 265:6 266:2
**moving** 72:14 255:15
**much** 24:14 28:12,12
42:16 76:15 80:9
83:21 116:19 120:3
164:17 219:25 220:15
233:1 254:13
**mumbo** 109:20
**municipal** 207:19
208:18
**must** 134:15 135:4
268:11
**myself** 19:2 42:2 94:17
95:14 102:15 115:16
115:22 141:23 142:17
160:12 166:4 185:4
202:16 208:13 238:12

**N**

N 5:1 126:1
**NAACP** 2:15 6:17,17
6:25 8:6 31:20 48:8
48:12,13 123:15
242:17,17
**nag** 246:3
**name** 22:22 25:24 27:7
27:15 47:6 53:7,7,11
53:20,24 54:10,24
57:24 61:12 62:2
76:25,25 78:4 134:16
134:18 135:5,13,16
135:25 137:19 138:19
139:5 144:24 145:19
145:20 147:10,14
148:2 156:21 180:25
182:22 183:13,20,21
183:23 219:5 225:10
225:25 226:8,17
243:13 249:20 250:3
251:13 254:19,20,22
255:6,11,11,13,13,13
256:12,21,22 257:9
260:12,25 263:25
266:20

**names** 45:16,19 51:23
53:13 54:5,7,10 55:11
55:11,17 134:24
135:1 182:21 183:7
222:13 225:18,22
255:5,18 263:11,12
263:13,13,13,15,20
**Nancy** 18:12,15,19
115:21 120:16 159:13
159:14 160:12 161:9
162:17 163:3 180:6
182:4 214:14 238:13
**narrative** 44:19 45:1
65:17 71:15,17 73:4
75:11 76:1 77:14 79:1
127:23,24 130:9,13
170:1,14
**narratives** 44:21,21
75:13,20
**NATALIE** 1:5 122:5
**national** 1:3 9:22,23
83:4 122:3 242:18
**nature** 28:17 60:15
96:21 112:25 178:7
232:17 244:17 260:14
268:18,24
**near** 254:18 256:21
**necessarily** 44:18 73:21
243:24 269:9
**necessary** 211:2 240:13
**need** 7:16 9:9 21:17
23:19 24:22 34:22
60:13 61:19 63:20
67:8 80:3 81:6 97:5
109:5 115:12 118:22
119:10 145:15 157:14
160:23 173:2 180:12
181:12 189:24 190:4
209:19 215:8 237:6
248:7,10
**needed** 24:3 28:7,19
46:1 64:8,23 74:1
84:2 85:5 113:12
115:10 116:12 117:20
119:4 141:25 181:18
207:16 246:6 248:22
254:15
**needs** 28:2,4,8 108:20
193:7 211:3,17,22
213:8 232:9
**negative** 82:22
**neighbor** 260:13
**nelson** 2:13 5:3 6:6 9:4
9:10 23:23 26:21
33:20 42:23 43:1,2
46:14,24 47:4,9,17,22
47:24 48:2,5,8,8,12
49:11,14,18,20,21

50:3 51:7 58:15,18,23
58:25 59:4,7,11 65:3
83:18 87:5 91:8 95:7
109:11,16,23,25
120:23 121:9,11,14
123:13 126:3 127:1,4
127:8,10,14,15 138:2
138:5,11 148:12
159:9 161:20 176:7,9
176:14 188:8 194:20
196:6 197:11 198:10
198:14 199:15,20
200:16 202:1,18,23
203:12,17 205:10
213:19,25 217:5
218:2,8 220:14 222:2
222:24 223:4 224:12
224:21 240:11,17
246:5,15,22 247:4,7
250:21 258:23 264:14
267:14 270:25 271:4
271:7
**Nelson's** 250:10
**never** 9:14 166:11,20
182:11 201:11,19
213:6 220:24 221:12
221:22 245:24 268:7
268:25 269:6,10
**new** 2:16,16 24:19
27:24 79:16,18,23,24
80:13 81:6,22,24,25
82:2,3,3,5,7,11 93:23
123:16,16 142:22
149:20 152:8 154:1,2
158:10,14 167:6
245:3 248:21 249:6,8
267:6 269:13
**newer** 162:7
**newscast** 38:23
**next** 40:7 69:2,17
173:13,22 180:13
181:5 186:15 208:6
211:12 213:8 216:4
229:23 230:6 232:3
243:6 268:10
**night** 172:20
**nitty-gritty** 113:5
**nobody** 47:12
**nods** 7:8
**noncomputer** 183:12
**noncomputer-genera...**
183:10
**none** 19:22 35:20 41:13
41:13 83:21 105:17
129:1,1,15 161:23
**non-document** 41:10
**non-registered** 81:18
**normal** 54:19 104:4

224:2
**normally** 70:4 114:17
142:6 226:14,15
**Notary** 2:8 123:8
272:18
**notation** 232:21 233:6
237:8 255:11
**note** 197:22 200:9
232:18
**notebook** 185:10
**notes** 178:15 186:20
192:10 199:24,25
200:2 217:17,24
226:23 227:9 229:8
229:18,18 231:11,22
235:12,15 237:18,19
238:6,20 239:6,7
240:5 273:9
**nothing** 11:6 40:10
88:14 101:19,24
104:3 114:22
**notice** 5:8 9:1,5 13:13
72:7 126:8 145:25
151:25 152:2,13,22
154:13,17,22 155:11
219:22 238:5 260:12
260:17
**noticed** 90:16 180:25
193:5
**notices** 130:19 255:21
**noticing** 96:16 114:25
**notification** 215:18
261:22
**notified** 73:12 74:4
**notify** 156:19
**notifying** 266:4
**not-registered** 81:1
82:10 129:18 173:21
**November** 5:22,23
18:17 19:24 20:19,21
21:15,20 22:6 23:8
25:11,15 26:7 29:12
39:18,25 40:5 53:1
64:25 73:13 77:6
126:22,23 142:9
147:2 151:15 225:3
229:19 254:5 255:3
256:7 258:4,8,14
259:17 261:6,7,12
262:5 270:14,16
272:20
**number** 5:8,9,11,12,14
5:15,17,18,20,21,23
5:24 9:8 19:7 30:13
33:11 34:2 42:17,22
43:18,19,20,21,24
44:9 45:3,7 55:12,12
55:14 59:10 65:7,15

70:7 71:2,22 74:11
75:16 76:4,24 78:18
79:4 81:22,25 83:25
87:6,24,25 89:2,2
90:18,19 102:16
103:6 104:16 106:13
109:2 110:5,17 111:8
112:17 114:1,6,8
117:12,15,20,22,24
118:3,4,25 119:5
120:4 126:8,9,11,12
126:14,15,17,18,20
126:21,23,24 127:19
128:2 130:8 132:7
156:9 157:6,9 158:18
158:22 159:1,1,3
161:3,4,15 163:4,8,19
164:16 169:14,22
170:8,11,21 171:8
181:11,14 182:6,14
183:9,9 188:5,9,24,25
189:21 192:24 196:5
196:21,22 197:3
199:19 200:3,15
202:14,22 203:16
204:2 206:11 209:2,9
211:16,20 212:11,12
213:13,23 218:6
223:3,14 224:18
225:18,19 226:3,7,14
230:24 232:4,13,14
232:19 234:5 237:2,3
239:5 250:22,24
253:16 254:21 256:23
**numbered** 148:10
**numbers** 42:23 53:22
77:12 84:9 89:6,11,13
89:15,15,17,23 91:18
91:21 113:13 118:1,1
118:23 160:20 161:12
167:6 177:5 187:9,20
197:9 201:9,10,12,15
202:4 207:6 232:16
**numeral** 234:1
**nutshell** 167:2
**NVRA** 5:16 35:10,16
76:12 77:13,23 78:9
81:11,21 83:1 87:19
88:20 94:25 95:8,9,23
95:24 96:9 126:16
140:16 149:21 151:25
153:3 154:21 155:14
155:22 158:10,21
188:5,13 193:13,22
195:16 201:12 204:11
204:19 244:25 246:21
247:13,18,19
**N-O** 233:19

N.W 3:5,21 124:5,21

**O**

O 272:2,2
oath 5:5 6:4 74:18,18
 126:5 135:17 166:14
 206:14 239:17
obituaries 140:6 149:24
 150:2,17,22
object 46:13 47:7 50:2
 51:6 65:1 120:11
 205:8
objection 46:23 194:19
 196:19 198:6,12
 201:24 246:22 247:4
objections 31:21
objects 71:22
observed 89:15 202:13
obsolete 80:18 105:11
 198:9
obtain 14:8 56:2 221:11
 221:15
obviously 164:8 259:6
occasion 156:3 260:3
occasionally 52:17 54:2
 54:12 57:21 107:1
 110:12 178:15 260:12
occasions 89:6 98:16
 107:22 227:23
occurred 64:24 74:22
 96:9 178:21 180:2
 195:17 205:19
occurring 181:17
occurs 65:4 88:11 98:20
 100:24 226:5
Ocoee 91:13 247:21
October 5:11 39:21
 126:11 200:10 243:8
odd 148:10
ODOM 1:6 122:6
off 15:15 16:15 17:5
 26:11 37:11 52:16
 60:24 61:13,14 62:18
 63:5 64:14 67:18
 68:16,19 77:12 106:2
 120:4,6 132:5 135:18
 147:20 150:8 152:7
 152:23 183:5 197:18
 231:18 232:12 244:23
 261:4 262:13
offer 101:25
offering 94:10
office 3:5 4:4 8:22
 15:17,18,20 16:2,17
 16:23,24 18:2,9 28:16
 28:18 31:4 34:15
 41:16 43:25 44:2,13
 44:17 46:19 48:18,25

53:3,5 54:17 55:18,20
 55:23 56:2 58:1 62:16
 62:25 63:8,21 64:18
 66:15 67:7 72:12,13
 72:23 73:7 74:6 77:4
 78:12 80:20 84:19,24
 87:1 88:9 92:17,24
 93:19,21 94:19 97:21
 98:8,23 102:8 103:3,5
 103:9,12,19 104:16
 109:18 112:14,18,21
 113:7,19,20 114:13
 118:9,11,14,17
 119:22,23,24 124:5
 125:4 128:6 129:1,3,5
 129:7,16,22 130:19
 130:23 133:16,22
 134:2,3 135:24
 137:23 138:13 139:21
 140:1 141:2,7 142:18
 143:2 144:3,14
 148:15 149:14 150:5
 150:10,13,21 151:1
 151:18 152:3 153:25
 155:7,11,17,25 156:6
 156:12 157:11,19
 158:6 159:16,17
 160:1 165:18,22
 166:2,8 167:20 169:6
 171:6 172:19,20
 178:21 179:5,25
 180:18 181:10 182:16
 183:3 192:23 195:1
 199:25 200:1 201:11
 204:20 209:22 210:3
 210:5 211:13 213:14
 214:12,15 219:11,14
 220:1 221:17,18,19
 228:20 232:9,10
 234:3,12,17,21,25
 239:21 243:14 244:5
 246:12 248:1,15,16
 250:14 251:18,21
 253:2 254:4 255:1,10
 256:6 258:4 259:23
 259:24 261:6,13
 262:7 266:3,11,15
 267:15,23,25 268:2
 268:10
officer 157:21
officers 228:24
offices 39:6 40:8 88:22
 91:24 92:3,5 93:5,18
 108:2,8,11 130:15
 132:12 188:19,20,21
 189:14 201:16 205:5
 245:14,18,20
officewide 42:15,16

Office's 77:18
official 1:20 35:12
 122:20 272:12
offsite 63:15 111:19
 230:10 234:18
often 65:4 226:5 245:15
oh 8:15 12:24 22:24
 32:6 40:20 47:11
 56:17 91:15 99:9
 104:12 113·22 115:1
 119:6 127:25 136:6
 160:3 165:7 186:11
 188:3 192:8 198:15
 199:5 216:21 235:21
 246:13 268:3
okay 6:14,19 7.5,9,15
 7:18 8:9,17 9:13
 10:15 13:9,19 14:1
 17:1 19:4 20:20 21:18
 21:22 22:9 23:3,7
 24:6,24 25:15 27:8
 29:12 30:4 31:13 32:9
 32:21 33:4,13,15,23
 34:4,6 35:8,13 37:23
 39:23 40:2,12,23,25
 41:1,21 42:6,17,24
 43:4,15 44:8 45:3,8
 48:5 49:10,19 50:5
 51:25 52:10 58:15,17
 58:20,24 61:3 65:14
 65:21,24 67:10 68:1
 68:12 71:9,17,24 72:1
 73:1 74:11,12,12,15
 74:21 75:18,23,25
 76:3,5 78:19 79:3
 82:6,17 85:10 87:6
 88:2 89:24 90:7.13
 91:2,16 94:12 102·9
 103:3 104:15,21
 107:13 108:2,22
 109:23 110:4,16
 111:6 112:10,12
 113:18,24 117:12,18
 118:5,24 119:12,22
 120:6,12,13 121:8,10
 128:1 130:14,16
 132:11 133:10,18
 134:10 136:11,21
 138:14 139:9,15
 140:1 142:3 143:1
 144:14 146:12 149:3
 149:23 150:14 151:11
 153:19 154:11,22,23
 155:10 156:8,12
 160:5 161:1 162:24
 162:24 163:19 164:4
 165:24 167:13 169:20
 169:24 170:3,8,17

171:9 176:6,8,11,24
 182:5,11,13 184:3
 185:12 186:5,10,14
 187:18,18 189:7
 191:7 192:1 195:22
 196:13 198:15,17
 199:4,13 200:24
 201:3 202:5 203:19
 204:4 205:2,11
 206:17 207:8 213:24
 218:7,13 219:15,25
 220:15 222:4 223:7
 223:11 224:20 226:10
 226:19 227:11,12
 228:9 229:9,12,14
 230:5,7 231:24
 233:18,20 234:11,14
 235:8,10,15 237:17
 239:1,3 240:11,19
 243:9 246:24 249:13
 250:21 252:1 253:13
 253:21,23 256:1
 257:20 258:1 259:21
 260:20 262:22 263:17
 264:12,15,19
old 79:17,18,23,25
 80:12,17,21 97:12,14
 97:15 154:7 174:16
 209:15 217:8
older 162:8 212:21
olds 67:1
OLIPHANT 1:17
 122:17
OMB 228:16,20
once 18:9 66:14 71:5,7
 71:7 157:25 190:19
 223:21 228:8 239:17
one 8:4 19:17 20:22,25
 21:2,22 22:20,23,23,24
 23:4,7,11 30:14,18,22
 32:18 34:2 38:19,20
 39:1 44:11 52:14 55:3
 56:12 59:21 60:17,22
 62:13 63:5 67:20,21
 75:9 77:22 79:12 91:1
 91:3 94:3 96:1,2
 98:18 101:8 106:6
 107:2,5 108:24 115:3
 115:23 118:1 128:3
 129:2 131:3,16
 133:24 134:1 135:12
 137:4,22 138:22
 140:19 141:1,21
 143:7 144:23 147:18
 147:23,23 148:23
 149:1 152:17,22
 155:5,23,24 158:14
 159:4,25 160:13

162:3,10,19,20
 164:18,21 165:3,16
 165:20 169:20 171:14
 181:8,25 182:2,10
 184:3,23 186:15
 189:19 190:3 193:14
 195:1,2,17 199:3,12
 200:20,21 204:20
 207:1 209:11 210:8,8
 211:11,19,19 214:21
 216:19,21,21,23
 217:20 218:21 221:24
 222:9 224:8 226:4,18
 226:23 230:18 231:4
 232:11 238:7 239:15
 243:8,25 244:14
 251:3 256:17 259:7
 259:11 266:20,21,22
 267:10 268:24 269:6
 269:10,19
ones 20:4 43:3 53:16
 70:25 75:17,19 79:18
 79:23 86:7 97:15
 100:14,15 111:17
 141:25 171:23 177:22
 181:23 219:24 225:4
 255:14
one's 91:12 106:22
 190:4
one-on-one 96:14
ongoing 81:10 82:12
 244:8
online 64:5 68:23 69:5
 69:10,13,25 70:9,21
 71:3 101:11 112:15
 129:2
only 22:23 31:2 35:9
 68:24 74:16,17
 111:20 112:2 115:5
 119:1 128:16 131:3
 131:15 140:6,13
 144:10 145:16 168:6
 175:7 178:23 199:5
 202:3 206:13 215:14
 221:14 239:19 242:5
 252:15 265:23
onto 67:18 105:9 120:4
open 21:1 24:2 25:11
 254:19,19 256:21
opening 144:25
operate 20:5 25:9 90:16
operating 168:22 169:6
 169:9
operation 26:10
operations 26:3 215:13
operator 173:5 174:5
 175:14,18,25 225:18
operators 63:17 119:2

121:2 159:4 225:17
225:21
opinion 108:17
opinions 157:25 158:1
opportunity 37:1 38:3
38:6 101:1 155:23
202:6 215:4
opposed 132:24 192:12
197:18 225:19
option 248:5,13,15,18
options 248:6
Orange 1:19 3:12 8:23
9:6 15:19,20,21 16:2
48:23,24 52:8 56:1
66:15 91:12 99:21,25
100:1 103:5 108:3,8
122:19 124:12 128:6
133:16 139:4 147:12
148:1,14 157:11,18
157:22 158:7 163:24
169:5 171:6 207:9
215:17,23 219:16
228:21 242:14,15
243:18 245:14,19
246:12 250:13 253:1
254:4 255:1 256:6
258:3 259:14,23
261:5,13,14,23 262:3
262:6 264:3,5,6
266:11 267:15 268:1
268:5,8,9,19 269:24
270:13,15
order 115:12 160:23
organization 38:5,13
241:23
organizations 26:19
original 155:12 192:18
193:24 196:9 236:5
Orlando 8:19,21 15:10
15:14,23 103:8 140:5
201:2,4 216:22
Orlando's 207:21
Osceola 39:7,10
other 10:9,19 14:10
19:20 30:11,20,24
31:6,16 32:9 35:8,9
35:19 36:20 37:10
38:15,16 40:13 41:7
41:10 42:6,9 51:16
54:9,11 56:15,22
63:13 65:17 70:22
74:8,9,22 76:15 77:21
80:2 86:7,16 91:3,11
91:12,23 92:3,7,11
96:4,8 100:22 101:19
103:21,25 104:13
105:2,4 109:17
116:24 118:21 120:2

130:3 132:21 136:23
137:22 139:17 140:1
140:13,14,14 145:22
147:6 148:7,21
149:23,25 150:14
156:1 168:7,16 169:2
169:2 176:25 181:22
184:21 190:21 213:14
216:21,21 231:7
241:20 248:18 256:18
259:22 260:9,19,20
261:8,15,22 262:9,17
262:17 266:18 267:16
268:22,23
others 112:18 212:21
214:15
Otherwise 52:23
120:17 144:11
ourselves 250:5 253:8
out 16:17,24 24:9,12
25:7,23 26:18 27:1
28:5,11,16 30:15,17
31:1 36:3 38:25 39:10
39:14,24 54:4 57:11
69:9,17,20,21,24,25
71:2 76:19 77:2 79:25
81:6,24 85:9 87:21,25
88:21 90:18 93:1
99:11 100:18 102:6
102:16 104:3,20
105:10 106:6 107:6
107:20 109:7,19,23
115:15 116:2 128:22
128:23 129:12 134:22
135:3 147:5,19 148:6
150:5,7 152:18
154:12,16,22 155:2
155:25 156:16 162:9
163:11 167:12 172:4
173:19 174:17 175:1
175:2 176:3,5 177:25
178:9 179:15 180:10
180:21 181:15 185:11
194:10 196:22 197:16
199:10 201:1,14
203:5 205:5 208:1
210:11 211:8 212:7
212:22,23 217:6,8
218:24 219:2,21
221:13,20 224:9
225:16,24 229:4,23
230:23 236:8,18
240:8 241:5 242:2
248:3,13 255:11
258:23 260:3,6,7
264:18 265:9,17,23
outdated 104:5,14,16
104:18,21 105:4,6,13

106:5 198:8
outlined 180:18
outnumbered 259:1
outreach 26:16 27:9,13
27:17 40:21
outreach-based 37:20
outside 24:7 45:17
55:20 72:5 76:14
82:15 150:1,3,16
154:10 209:18
outstanding 12:18
20:25
out-of-state 50:11
252:14
over 16:13 17:17,22
26:1 34:19 36:9,13
59:13 60:9 61:15,21
62:17 64:15 69:4 70:7
77:23 79:15 83:11
84:7,20,22 85:4 86:3
100:19 101:8 104:16
114:21 133:1 164:22
182:17 191:11 192:22
193:14 209:16 212:9
223:22 253:18 255:23
257:5 262:25
Overall 34:13
overloaded 231:3
oversaw 56:5 142:12,14
oversee 46:10
oversees 26:10 266:19
overshadowed 30:23
overtime 93:24
over-ready 210:21
own 1:11 76:16,18 83:3
120:4 122:11 232:13
268:16
O-C-O-E-E 91:15

P
pack 37:22 223:23
packet 185:7 244:4
page 13:12 33:11,13
42:18,18 43:3 55:16
57:23 59:1,2,5,12,14
71:19,20 72:1 73:2,9
73:9 79:10 92:16,17
109:8,12 110:22,23
111:6 130:15 133:10
176:15,17 182:18,23
182:23 183:24 189:18
194:2 199:10 200:23
218:9,11,14,16 222:3
222:5,8 223:5,10
227:11,13 229:7
233:16 234:9 235:8
235:13 239:14 253:24
254:2 255:10,11,20

255:23,25 256:3
257:24
pages 54:13 253:19
painted 39:9,23
Palacios 27:16 40:21
Palm 2:21 123:21
PAM 1:18 122:18
PANNELL 1:5 122:5
paper 35:1 177:20
paperwork 23:18 67:6
83:17 84:18,18 87:3
100:19 135:6,7 136:2
168:18 172:5 173:14
173:24 184:17 193:5
220:10
paragraph 13:13 33:24
34:2 43:15 45:3,8
55:22 59:13,22 71:20
71:22,24 72:1 73:10
73:14 110:1 111:13
128:2 130:14,17
133:10,11,12,14
163:23,25 187:12,12
192:17,20 200:22
239:15 254:16,18
256:9,19
paragraphs 43:5
132:12
paraphrase 81:5
262:10
paren 254:19,20 256:21
256:22
Park 91:1,16 92:2,9,11
247:21
parking 180:13
part 40:21 44:23 103:8
128:2 178:13,21
236:23 270:4
participate 43:8 78:22
92:17,24 93:8,11
170:14 177:6
participated 33:25
41:23 42:7 45:4 71:12
75:6 78:20 109:3
127:20 130:10 157:7
158:19 169:14,18
170:23 189:21
participating 45:6
110:13 163:12
participation 33:21
43:20 78:23
particular 34:24 162:9
162:11 163:1 171:13
171:15 172:1 185:3
200:21 218:16 222:9
244:10 255:24
particularly 187:5
parties 6:10 273:11,12

partner 241:21
parts 92:7 207:3 212:21
party 14:1 156:22
261:1
pass 57:23
passed 56:13 249:3
passing 46:6
past 57:13 88:19 120:3
158:12 190:15 263:1
Pat 21:12,25 42:2 46:2
53:10 120:19 146:8
148:19,20 149:16
150:24 151:6,10
156:11 165:10 238:12
254:7 258:8 266:18
path 54:19 223:25
paths 155:5
pattern 89:8 91:21
224:2 241:6
Pat's 42:3 176:1
pay 93:24
PC 117:7,9 197:18
peaks 89:25
people 1:4 10:22 11:5
11:13 16:17,23 22:5
25:7 28:24 43:24
45:16 74:18 76:15
84:22 86:1 89:3,3,10
92:11 94:2 95:1 97:19
100:17 111:12 112:9
114:18 115:9 116:23
117:13 118:20 119:1
120:10 122:4 130:23
134:25 137:6 147:14
147:25 149:6,7
151:12 157:2 160:1
164:25 177:1 181:11
184:8 201:7,17
206:14 211:8 212:22
213:9 228:21,22
230:19 231:4,9 241:9
241:10 257:5,6
259:24 266:17,18
people's 79:25
percent 87:12,13
183:19 212:7 270:20
percentage 87:8 244:20
percentages 191:24
perfect 178:17 244:16
246:8
perfection 101:19
246:7,13,15
perform 20:3 190:16
268:15
performance 241:6
performed 136:11
perhaps 47:15 65:17
79:1 224:6 237:7

238:23
**period** 15:22 17:22
 22:7 24:18 37:21 39:6
 52:25 67:23 68:24
 69:6 70:9 81:8 92:20
 93:3 131:22 132:5
 142:8 145:11 147:1
 151:14 167:13 191:11
 201:5 202:11,13
 209:21 227:8 233:19
**periodic** 190:12
**periodically** 195:16
**periods** 17:3
**permanent** 21:14
**permit** 222:12
**permits** 166:19
**permitted** 172:16 175:3
 175:4
**person** 12:18,23 20:22
 22:21,24 23:8,10
 25:19 26:10 27:5
 32:16,19 38:12,12
 40:12 57:14 59:23
 60:12 61:8,10,18,23
 62:17 69:1 77:18 80:4
 80:16 81:2,4 82:6
 84:13,21,24,25 86:17
 87:4 96:17 97:9,12
 109:17 114:24 115:1
 133:2,9 135:17
 136:17 137:5 144:14
 144:21 146:15,22
 147:3,11 148:14,16
 149:4,14 150:21
 151:2,19 152:12,21
 153:22 155:1 156:10
 159:23 160:13,13,17
 162:3,15 164:18,21
 164:22 165:2,2,3,11
 165:16,25 166:7
 167:17 168:5 174:2,6
 174:7 175:21 180:15
 180:17 181:19,25
 182:3 183:22 191:18
 193:8 216:1 218:24
 236:20 239:17 247:19
 264:3,4,6 266:10,14
 266:15
**personal** 35:23
**personally** 45:23 85:25
 195:11 272:9
**personnel** 20:23 24:1
 238:2 245:23
**persons** 22:19 28:23
 60:22 61:24 62:19
 83:20 84:20 85:4,8,11
 87:8 88:8 95:22 96:23
 100:25 101:13 103:4

107:20 109:17 119:16
 128:7 140:17,24
 141:5 144:16,17
 149:10 163:25 164:11
 170:9 172:15 184:4
 189:3 215:18 216:8
 222:12 225:9
**person's** 61:12 62:1
 107:1 153:10 166:1
 182:22 183:20
**perspective** 160:4
**pertain** 116:9 136:24
**petition** 115:8
**petitions** 20:13 26:5
**phenomena** 267:12
**Phillips** 2:20 123:20
**phone** 5:22,23 6:9
 34:10,10 41:4 47:22
 48:3 62:9 63:1,10
 69:4 111:18,19,19,21
 111:24 112:3,7,11,17
 112:17,18,21 113:1,2
 113:21,25 114:1
 115:9 117:13,16
 118:1,6,23,24,25
 119:8,9,25 120:4
 121:3 126:22,23
 148:4 159:4,5,20,23
 160:6,14,19,20 172:2
 172:7,8,8 177:17,18
 177:18,19,19,22,23
 179:8 181:14 211:5
 212:25 213:1,13
 225:9,10,12,23,24,25
 226:15 230:10,19,21
 234:18 236:14 240:23
 253:7 270:25 271:5
**phoneathon** 38:23
**phones** 213:9
**phonetic** 192:10 233:10
**photo** 218:22,24 219:7
 219:12,20,23 220:2
 220:17,21 221:2,3,5
 221:11,15,20 223:20
 224:7,7,9
**photocopied** 214:2
**phrase** 146:16 220:19
**phrased** 199:9
**phrasing** 174:11
**pick** 77:3 142:18
 201:16 243:19
**picked** 105:9 182:21
 183:10 248:4
**picking** 97:14
**picks** 248:1
**pickup** 183:11
**picture** 178:3 225:7
 266:7

**pictures** 235:18
**piece** 86:24 152:4 153:4
 260:4
**pieces** 84:10 111:3
 165:12 207:3
**pile** 135:8
**Pinellas** 36:10
**Pittman** 111:19 112:5
 112:18 116:25 117:5
 117:13,16 118:6
 119:8,9,17 121:3
 177:17,22 230:10,18
 231:6 237:15
**place** 2:9 8:18 10:21
 63:2 76:14 115:13
 116:5,10 123:9 135:3
 135:7,9,11 136:3,9
 148:2 149:21 172:6
 172:12 173:12,17,23
 174:14,16 177:2
 180:15 181:18,19
 220:10,12 221:15,18
 223:16 231:1 234:1
 260:10
**placed** 62:7,10
**places** 111:22 117:17
 205:17 207:15 209:10
 232:5
**PLACIDE** 1:9 122:9
**Plaintiff** 128:14
**Plaintiffs** 1:13 2:17 5:8
 5:8,9,11,12,14,15,17
 5:18,20,21,23 8:10
 9:4,5,7 10:11 12:16
 13:10 32:5,7,22,23
 48:10,14 58:25 59:2,9
 59:12 110:17,18
 122:13 123:17 125:8
 126:8,9,11,12,14,15
 126:17,18,20,21,23
 127:11,17 182:6,8,14
 185:14,14,16 186:16
 187:1,3,5,13,21,22
 189:8 190:7 192:4,16
 196:2,4 197:25 198:2
 199:15,18 200:3,13
 200:14 202:10,18,21
 203:9,12,15 204:2
 205:12 206:6,18
 213:20,22 218:2,5
 222:25 223:2 224:13
 224:17 226:20 239:4
 239:5 249:12
**Plaintiff's** 198:25
**plan** 210:17,20 216:11
**planned** 195:21
**planning** 27:1 160:10
**plans** 28:7 209:2

211:10,11
**play** 54:16 74:21
 149:17 161:21 267:22
**played** 84:4 176:18
**Pleasant** 8:18
**pleasantly** 210:21
**please** 7:3 13:13 43:1
 47:8 50:1 71:12 75:23
 81:6 111:6 206:19
 223:12 233:16 253:18
 253:22 257:19
**plenty** 37:11
**plug** 219:17
**plural** 52:14
**plus** 265:2
**PL-01** 4:5 125:5
**PL/PR** 223:19
**point** 2:20 7:2,12,16
 15:23 17:13 18:14
 19:18 20:1 27:2 28:1
 28:13 42:14 51:23
 54:4 60:19 93:12
 101:8 109:7 123:20
 131:16,20 136:7
 139:10 142:6 154:5
 160:11,13,17 162:16
 179:15 180:5 218:15
 218:18 220:7 224:3
 239:2 254:13
**pointed** 201:1,14
**pointing** 109:19
**points** 58:9 64:13
 244:19
**policies** 258:3 267:25
 268:16
**policy** 168:14
**political** 156:21 242:23
 242:24
**poll** 5:19 10:1 62:3,3
 74:16,17,22 111:11
 113:9 118:19 120:14
 120:17,18 126:19
 135:12 159:10,16
 181:9 211:16,20
 212:11,12,18 215:14
 218:11,16,17,21
 222:12 223:15 224:5
 232:20,25 233:3
 260:16
**polling** 61:25 63:2
 111:22 115:13 116:5
 116:10 117:17 118:17
 119:12 135:2,6,9,11
 136:2,9 148:2 172:6
 172:12 173:16,23
 174:14,16 177:2
 180:15 181:18,19
 205:17 207:15 209:10

215:3 220:9,12
 221:18 223:16,17
 231:1 232:4 234:1
 260:10
**polls** 59:19 61:23
 135:2 212:15 232:7
**poor** 79:9,12 100:19
**population** 161:14
**populations** 92:4
**portion** 34:10 35:6 36:8
 36:16 50:6,10 74:14
 74:15 137:8 138:25
 139:1 141:22 142:25
 151:4,9 154:21
 182:20,24 183:15
 184:21 185:8 188:13
 208:12
**portions** 33:7 216:17
**ports** 229:25 230:2
**pose** 107:2
**position** 16:8,12,13
 20:3 23:25 25:11
 26:23 27:3,9,18
**positions** 27:24
**positive** 53:9,18
**possible** 93:25 94:22
 116:22
**possibles** 252:17,24
**Possibly** 65:9
**post** 129:3 134:2 150:5
 150:10,13 151:1,18
 153:25 155:17,25
**postal** 153:4 155:15
 260:4
**postmarked** 248:14
**potential** 106:22
**potentially** 94:18
**Power** 218:15
**PR** 30:19
**practice** 247:12
**practices** 44:16 74:6
 110:2 171:5 268:1
**pre** 70:14
**precinct** 62:7,10 63:14
 135:3,19 161:3
 162:10,10,23 163:1
 174:11,15,18,19
 175:1,3 176:3,5
 205:17,18 206:1
 207:6 211:17 212:17
 212:17,18,19 226:7
 233:5
**precincts** 62:8 111:24
 112:12,16 114:6,8
 117:22 118:5,17
 119:7,12,16 161:4,11
 161:13,16,18 162:11
 207:7 211:21 212:12

212:13,20,22 215:3
231:20
**precleaning** 70:14
**predict** 210:9
**prediction** 210:7,12
**preexisting** 211:23
**preliminary** 168:11
210:2 217:22
**preparation** 8:2 39:17
207:17 210:14,16
270:12
**prepare** 35:17 65:18
73:16 146:10 210:23
210:25 211:13,13
253:5
**prepared** 51:10 146:9
162:21 185:25 186:21
187:25 189:24 206:21
207:14 209:5 270:14
**preparing** 40:6 75:6
157:7 163:5 207:9
208:7 209:5 239:22
**prepping** 145:6
**preregistered** 67:1,11
**prereg-ed** 189:5
**prescreened** 54:25
**present** 21:7 26:7 54:21
81:13 164:2,6
**presentation** 218:15
**Presentations** 50:14
**presented** 54:22
**presenter** 98:14
**presenting** 223:19
**presents** 220:7
**presidential** 24:22
69:19 70:5
**pretty** 42:15 57:16
93:12 176:24 181:4
197:7 237:23 258:19
**previous** 55:25 114:16
152:17 161:11 195:10
198:1 199:23 232:5
237:19 248:7
**previously** 8:10 197:24
226:20
**primarily** 32:16,19
36:24 40:13 85:16
119:25 136:17 141:24
161:2 227:19
**primary** 26:17 39:20
86:8 156:10 164:1
226:24
**print** 176:1
**printed** 62:3 182:19
197:17 208:13
**printer** 87:2 100:15,15
101:9,11 131:18
**prints** 86:23

**prior** 13:4 17:25 25:11
39:19 46:16 70:20
72:4,14 73:13,23 74:2
77:5 94:25 102:21
131:23 137:7 139:22
142:8 157:3 168:23
168:24 169:7 173:25
210:5 219:19,21
220:25 254:5,12
255:2 256:6 258:14
261:6
**probable** 252:23
**probables** 252:16
**probably** 11:12 17:22
24:18 27:1,20 29:15
41:20 43:21 58:3,6
66:3,4 68:18 69:20,21
71:15 77:11,12,14
102:5 104:5 106:15
108:18 111:5,12
112:8 115:21 116:5
131:9 147:7 150:11
150:11 161:18 163:18
170:16,23,23 171:23
174:11 177:8,10
180:16 181:8 189:24
195:20 196:10 213:18
216:19 217:7,8 220:7
226:13 230:2 234:16
237:6 238:16,22
239:22 246:3 261:4
263:16 270:19
**problem** 69:1 82:12
86:5,8 96:18 97:10
101:3 102:2,4 104:18
105:20 106:7 107:2
108:1 113:10 118:2,3
147:18 179:16 193:12
196:18 213:8 221:13
221:23 232:11
**problems** 25:22 31:24
54:21 56:22 57:1,17
57:19 84:14 86:7
96:23 100:15 103:24
104:2,3 108:16 113:9
131:19 133:7 190:14
193:5 194:18 198:4,8
198:20 211:9 213:15
230:11,16 244:8
**procedural** 227:21
**procedure** 248:11
**procedures** 43:21,22,23
44:5,7 59:16,17 62:6
69:12,14 72:21 73:6
73:22 74:6 80:3
113:11 135:14 145:9
146:4,5 148:4,20,23
149:22 150:9,9

151:17 171:5 216:5
253:2,4,9 254:3,11
256:4 258:3,12,14
268:16
**proceed** 55:13 168:3
219:1
**proceeded** 53:17
**proceeding** 14:2
**process** 20:13 22:4
24:20 30:3 46:3 52:17
53:10 56:11,15 57:10
59:24 76:11 77:5,8,14
77:17 80:20,22,23
86:10,13 88:3 102:12
108:12,21 114:17
129:14 132:13 133:13
133:15 145:8,10,12
146:5,6,19,20 147:15
149:21 153:6,13
154:12,18 165:6,11
165:17,17 167:9,14
167:19 168:10 170:11
172:25 173:3 175:10
179:17,20 209:22
211:5 219:1 251:10
253:10 254:25 255:12
255:13,14 267:22
**processed** 46:1 53:5,11
53:24 54:11 56:16
73:25 82:9 129:17
141:25 142:2,19
144:13 148:22 151:20
162:2,8 172:18 175:6
177:7 188:18,25
189:4
**processes** 29:5 44:16
139:16 141:11,21
164:18 169:16
**processing** 10:5 16:24
20:10,15 26:3 28:18
55:1 56:6 139:10,19
139:21 141:3,8
142:16 145:2,18
146:13,17,19,22
148:15,24 149:4,15
149:17 151:2 155:20
156:9 164:18 170:5
172:24 173:11 174:25
175:14,18 177:13,24
179:10,12 185:11
205:23 225:5 253:9
254:22 255:6 256:12
256:14 257:3,15
258:5
**processors** 129:13
255:12
**produce** 35:15
**produced** 13:18 43:16

43:17,21 44:22 45:1
134:1 191:4
**producing** 13:1
**professional** 2:7 19:5,6
123:7 251:13 273:5
273:21
**program** 19:13 36:25
114:17 185:21 241:15
265:18
**programmers** 115:23
266:20,22
**programming** 25:5
164:8 267:5
**programs** 92:18,25
93:9
**progress** 190:13
**progression** 85:1
**project** 29:18 30:15
36:4,20 37:18 38:15
39:3,11,15 42:16 46:9
50:7 56:16 142:24
147:6 251:7
**projects** 17:2,23 30:14
30:20,20,24 31:6,16
36:2,21 37:12,14,16
37:17 38:16,17 39:13
40:4,10,17,19 148:21
241:19
**promote** 26:19 38:23
**promoted** 16:11 17:6
17:16
**promoting** 220:11
**proofread** 196:10
**properly** 67:6 261:21
262:7
**provide** 65:14,19 74:13
77:10 94:1 181:9
**provided** 13:8 74:15,19
103:12,25 109:9,14
127:24 136:23 158:21
181:14 186:8 251:15
256:23 263:24
**provides** 157:24
**providing** 65:16 251:4
**provisional** 207:10,14
207:22 208:8 209:3
209:25 215:16,19
216:2
**provisions** 140:16
**pro-active** 241:7
**PR/PL** 62:4,5 135:12
135:16 172:6 173:17
181:1 222:7,8,10
223:20 224:4,10
**PSC** 239:16
**public** 2:8 5:13 10:12
19:7,13 20:5,8 23:15
24:8 112:22 118:15

119:25 123:8 126:13
132:18,19 171:23
187:6,20 188:18
201:23 211:24 237:3
242:1 249:21,21
272:18
**publicity** 156:16
**Pueblo** 242:21
**Puerto** 242:22
**pull** 61:21,25 163:11
177:2 180:10
**pulled** 34:7,8 41:3,4
55:2 106:6 158:22
163:10,17 172:4,11
180:21 263:3,14
**pulling** 31:18 32:13,17
185:23 241:9
**pure** 90:11 164:16
**purely** 68:15 89:12
144:25 236:2 264:25
**purge** 65:24 66:1,1,2,6
66:7
**purging** 45:12
**purpose** 2:9 119:23
123:9 151:3 178:20
179:6,6 215:12
258:13
**purposes** 93:23 138:13
140:2 141:10 149:18
160:6 180:1 187:16
188:13
**pursuant** 9:1 13:1
**put** 16:20 65:7 69:4
96:20 107:9 145:3,4
172:23 173:4 185:11
205:21 209:9 225:9
225:25 240:7 247:16
264:18
**putting** 145:2 192:11
247:17,23
**PW** 232:21
**P-A-L-A-C-I-O-S**
27:16
**P.A** 3:10 124:10
**p.m** 2:3 121:16,16
123:3 176:12,13
240:20,21 271:9

**Q**

**qualified** 213:8,9
**quamie** 2:14 48:11,11
83:7 86:14 123:14
**quantity** 104:9 211:4
**quarter** 190:20 227:13
**queries** 230:12
**query** 54:24 173:6
239:17
**querying** 68:22

question 24:16 43:12
43:15 46:13 50:2 65:1
65:11 66:11 70:25
71:22 85:9 86:18,21
87:15 88:6,8 89:18
106:22 110:11 113:10
119:3 162:18 166:22
166:24 167:5 179:2
179:24 181:17 196:10
198:16 199:23 205:8
232:5,22 233:1,11
234:4 247:2 258:2
259:19 261:11 262:10
262:12 264:18 266:12
270:9,10
questioned 235:24
questioning 250:11
questions 6:25 7:11
11:5,8,9,10,21,22,25
12:2,7 23:17 24:8
38:8,24 44:1 64:6,11
78:14 79:16,19 80:15
80:16,18 111:22
112:24 116:3,4,9,9
118:23 133:2,4
146:18,21 147:3,7
151:5,10 212:5 225:6
227:24 232:4 240:12
240:18,22 249:25
253:19 254:14 258:19
266:23 270:24 271:1
271:2,3,7
quick 58:15 73:1
240:17 250:8
quickly 60:21 133:1
quite 31:5 226:11 250:7
quote/unquote 268:22

_____
R
R 272:2 273:1
race 53:15,21 185:23
254:21 256:23
Rainbow 242:18
Ramirez 25:25
random 57:24
range 94:22 106:15
180:11 270:20
rare 57:12,15 89:6
155:16,19 156:3
rat 37:22
rather 76:17 133:22
210:10 264:23
reach 134:5,6
reached 129:16
reaching 205:5
read 32:2 33:2,4,7,24
79:3 109:1 116:13
130:25 134:10 179:1

180:4,6,9 187:15
229:15
Readers 36:24
reads 45:11 82:22
192:21 232:21 256:10
256:10,20
ready 28:19 58:23
127:8 212:4,6 214:22
242:20
real 37:1 161:13 197:6
197:7 219:18 242:10
244:2
realistic 246:18
realize 7:12
realized 166:4
really 24:22 25:6 32:19
52:18 53:15 57:11
66:1 67:16,17 84:2,17
96:18 116:13 129:10
133:7 136:9 138:19
142:11,15 145:5
148:7 154:21 157:2
157:22 160:24 162:17
164:18 165:14 173:11
179:14 185:6 186:11
199:11 201:19 209:13
212:7 231:16 236:14
240:7 247:17 266:7
reason 13:19 24:20
51:16 54:9 91:25 92:3
92:6 101:21 155:14
180:16 183:13 185:3
197:19 242:6 247:18
264:21 267:6
reasons 266:8
recall 11:14 18:15
19:22 23:24 25:24
26:24 30:24,25 31:2,6
33:8 41:9,13 43:19,19
45:6 51:23 65:16
70:22 72:17,25 75:8,8
75:10,11,13 78:24
79:2 81:8 83:22 85:22
91:11 94:8,8,10,11
95:21 96:2,2 98:10,15
102:3,4,15,16 104:18
105:19 106:7 127:24
131:15,22 135:3
136:16 140:14 143:6
163:12,14,21 175:5
182:10,12 191:5,5
192:3 196:15 216:18
217:3,18,24 220:11
224:4 240:12 247:25
248:23 250:11 251:11
252:3,6,7,9,15,16,24
259:4,6,16 262:25
263:11,20,21,23,25

267:17,19 270:1,19
recalled 51:14
recalling 95:2
receipt 76:21 184:15,17
185:7,8
receipting 193:5
receipts 96:16 184:10
191:14 244:1
receive 19:9 34:14
41:15 45:22,23 53:1
87:17,18 129:5,20
133:3 137:1,10,23
138:3,6 140:9,17,20
140:20 154:6,11
171:11 196:24 219:25
220:15 245:15,21,22
251:21
received 43:25 45:12,15
46:20 52:16 53:3
54:15 87:7 105:14
106:25 129:1,22
134:3 140:4,23 143:2
143:9,15,18 144:3
170:5 171:13 189:1
192:13 196:21 197:3
197:5 205:6 248:9,16
248:19 250:14,19
251:17,18 256:5
259:17 261:8,16
262:8,18
receives 137:24 138:13
140:2 144:21
receiving 83:24,25 84:1
87:18 132:18 161:5
recent 145:22 167:3,10
205:4
recently 190:4
recess 58:21 121:15
176:12 240:20
recession 201:6
recognize 270:7
recollection 102:11,22
105:6 110:13,15
128:19 189:20 198:3
198:19 200:7 237:11
237:14 252:18,20
256:17 257:1 270:21
reconnected 236:22
reconvened 58:22
121:16 176:13 240:21
record 5:22,23 7:4,7
23:19 35:12 47:10,21
48:1,2,5 49:16 54:24
59:8 60:4,11,12,21
61:25 63:4 67:8 68:10
80:25 109:7,16 115:6
116:16 126:22,23
128:5,7,9,10 133:24

134:9,23 135:24
137:2 145:22,24
146:2 147:15 151:22
152:7,8,11,14 153:5,7
153:23 155:4,15
156:18 157:3 165:14
166:24,25 171:18
172:4 173:2,7,10,13
173:14,20 174:5
175:24 179:14,22
181:3 183:18 188:1
211:25 249:11 258:13
265:20,21 266:2
273:8
recorded 237:13
records 10:12 20:23
24:5 34:20 35:12
42:13 46:1 50:25,25
53:8 60:16,25 61:15
61:21,22 62:11,17,18
64:8,14,15,19 65:9
68:4,13,16,16,21,23
69:4,20,24 70:8,20
71:2,3 136:9,18 137:1
137:11,12 138:25
139:4 209:16,16,17
225:24,25 256:24
257:2 265:14
record's 220:9
recreate 225:7
recruitment 232:21
233:1
reduce 232:17
refer 35:13 152:2 172:6
172:7,10 178:2
202:11 221:1 234:15
236:11 249:12 250:9
reference 248:21
249:15,19
referenced 176:3
209:23
references 205:7
referred 8:12 37:17
46:5 83:20 96:8
200:25 208:18 214:5
referring 20:17 32:5
51:20 107:3 137:18
186:24 193:1,10
203:24 234:6 235:19
245:19 248:25 249:7
254:8 267:1
refers 45:14 82:22
92:20 110:2 152:1
227:17 228:20 229:16
229:25 230:8 232:2
232:24 233:22 235:5
reflect 153:8 183:9
254:11

reflection 83:23
reflects 73:6 76:1
163:25 170:4 188:24
188:25 238:3
reform 178:3 201:8
249:1
refresh 189:20 198:3,19
237:11 253:8 257:1
regard 153:16 178:12
244:9
regarding 171:18
180:23
regardless 131:20
135:20
register 20:6 67:5 81:2
86:17,20 88:6 89:4
106:4 133:9 167:3
registered 2:7 23:16,17
23:20 63:7 66:14 67:5
67:11 68:6 72:8 73:11
74:4 81:17 82:6
112:23,23 123:7
134:25 135:23 138:21
181:12 216:3,4 237:4
260:1 261:14,24
264:3 273:5,21
registering 16:16,23
23:15 98:5 100:25
registers 247:20
registrar's 72:5
registration 9:23 10:1,5
10:5,8 16:11,15,25
17:7,9,12,14 18:16
20:7,11 23:19 24:10
26:5,19 28:16 35:6
38:24,25 60:12,13
61:6 70:13 76:13
79:14 82:16,23 83:3
86:10,13 101:17
103:25 104:7 105:8
107:1 108:11,15
112:15 115:5 128:8
128:12,20 129:18,18
130:20 132:8,18
133:5,6,9,13,15,19
136:8,13 137:2,8,11
143:23,24 145:14,25
146:6,25 148:16
150:1,16,23 158:22
165:8 166:1,6,25
171:18 185:22 188:16
195:1 197:4 202:7
209:16 212:16 241:12
242:2 245:4 248:10
248:14,17,19,20,22
249:8
registrations 20:13
26:3 131:14 144:7,18

145:13
**registration-related** 20:11
**regular** 20:22 54:18 111:14 113:3 115:3 117:6,7,9
**regularly** 88:12 98:20 98:21
**reg-ed** 189:5
**reinstate** 261:20
**reiterate** 222:16
**rejected** 92:18
**related** 16:25 19:5 32:15
**relating** 29:3 45:9
**relationship** 158:6
**relative** 273:10,12
**relatively** 209:20
**relax** 240:16
**relief** 231:19 237:15
**rely** 131:13 172:1,3
**relying** 76:15,17
**remain** 16:8 60:6 67:23
**remains** 153:8
**remember** 24:4 39:4 75:12 87:18 100:7,8 102:7 131:17,25 132:1,4,4 135:18 137:19,20 138:19 140:9 143:7 145:17 147:8,17 158:12 168:24 195:10 216:22 228:8,11 230:20 231:12,13,13,16 252:18 259:8 270:6,7
**reminder** 224:6
**reminding** 219:19,22
**remove** 66:5 70:19
**removed** 68:18
**removing** 72:4
**renewal** 130:18
**reoccurring** 193:12
**rep** 25:10,16,17 26:9 27:6,20
**repeat** 7:4 12:20 166:3
**repeated** 84:16
**repeatedly** 219:17
**replaced** 21:4
**reply** 44:4,5 152:6,6 242:8
**report** 30:5 31:2,8,9 35:10,17 68:4 69:8 73:24 78:6 82:11 87:19,19 97:6,8,16 157:22 174:24,25 175:2,5,8,24 176:2 177:10 183:1,16,22 184:10,19 185:25

186:12 187:24 188:13 189:12 190:22 192:5 203:10,24 233:21 236:23 273:7
**reported** 18:7 30:5,11 30:21 101:4 236:13 236:17 237:14
**reporter** 2:7 7:7 47:3,8 123:7 273:6,21
**reporters** 258:18
**reporting** 77:13 187:16 188:6 201:17
**reports** 81:22 91:20 97:18 157:21,23 158:21 184:25 185:5 190:24 191:1,3,8,21 192:2 203:7
**represent** 9:17 47:13 243:14 250:3
**Representation** 242:23
**representative** 23:12 26:22 27:10 38:11 66:23 78:2 100:6 241:17 270:1
**representatives** 1:11 21:3,25 122:11 241:22
**representing** 6:10,11 10:15 47:24 48:9,14 48:16,18,22 49:2,5 109:16
**represents** 189:3
**reproduce** 222:16
**reps** 22:10 23:14 24:7 24:15 25:1 115:4
**Republican** 242:15
**request** 12:18,22 13:2,4 13:7 34:1 41:2,5,8,12 41:24 42:7 95:3 102:5 128:7,8,11 156:22 169:15 221:20
**requested** 206:3 232:7
**requests** 10:12,13 28:21 32:24 34:15 41:17 45:5 92:17 169:17 182:9 205:23,25
**required** 24:24 72:24 80:15,19 95:9,24 105:14 106:19 107:7 107:9,14,17 154:13 167:5 206:1,3 207:15 225:25 232:5,7 233:2
**requirement** 72:3,20 220:1,17 233:4 247:10,24,25
**requirements** 60:14 81:3 166:17 220:22 246:20

**rerouting** 231:6
**research** 44:3 61:22 62:17 63:12,16,23 64:3,8 68:25 70:10 113:5 134:17,19,21 135:18,21 136:10 171:20 208:15 209:11 209:14 210:2 233:6
**researched** 44:11 45:25 117:20 135:1
**researching** 225:5
**resentment** 83:10,19
**reserve** 240:12
**residence** 72:5
**residents** 1:11 122:11
**resign** 25:19
**resigned** 18:13,19 21:4 25:16
**resigning** 18:15
**resolve** 57:14 100:12
**resolved** 69:1 178:6 233:8
**resource** 146:15,18,22 147:3 242:16
**respect** 34:13 74:21 102:9 109:21 142:5 153:15 164:1 172:14 179:24 198:11 210:18 257:17 269:16
**respectively** 224:18
**respond** 31:19 34:15,17 41:1,8,12,17
**responded** 87:9 195:23 197:13 204:13
**responding** 33:22 34:1 41:24 42:7 43:8,13 45:4 169:15 171:12 230:12
**response** 7:11 10:11 34:5,7 41:5 42:22 43:11 44:9,9,12 45:3 45:6 59:14,15,22 65:15,15 71:11,14,16 71:18,19 73:9,16,19 74:11,13 75:5,7 76:4 77:10 78:17,18,22 79:4,7,11 89:2 93:15 109:1,2,3 110:5 111:8 111:10,13 127:20,23 128:2 130:9,10,10 152:22 157:7,8 158:19,20 159:2 163:6,9,13,20,21 169:14,18,23 170:1,9 170:10,10,15,21 195:13,18
**responses** 32:23 33:14 33:22 43:5,9 44:14

78:21 109:9,14 110:9 110:14,18 127:16 163:5 170:22,25 176:18 182:8 239:23
**responsibilities** 17:17 19:24 26:2 29:3,6 139:10 142:4 244:11 246:9
**responsibility** 26:17 34:21 35:7 96:12 142:15 144:22 163:7 171:17
**responsible** 16:16,23 29:13 30:1 32:16,19 34:24 40:13 76:6 77:18 95:17 111:15 120:7,9 136:17 139:18,19,21 141:2,8 156:10 160:7 161:2 162:3,25 163:25 171:12,15 244:21
**responsive** 13:15
**restationed** 25:21
**restoration** 45:13 167:19
**restore** 60:21
**restored** 45:21 50:10,12 51:1 55:25 166:13 167:18 168:1,6,7,15 168:16,20
**restrepo** 3:20 5:4 33:17 42:19 46:13,23 47:21 48:15,15 50:2 51:6 65:1 124:20 126:4 205:8 250:2,3 253:13 253:17 258:25 259:3 261:2 270:23
**restructured** 18:13
**result** 81:17 264:21
**results** 129:17
**retained** 36:16 80:8
**retraining** 197:9
**returned** 26:13 86:14 95:5 129:3 134:2 140:15 150:4,17 151:1,18 152:21 161:6 221:25
**reverse** 268:8
**review** 8:2 257:25 266:5 266:6
**reviewed** 56:12 149:2 254:18 256:20,25 257:2
**reviewing** 141:24 145:5
**re-ask** 198:15
**re-evaluate** 208:24
**re-register** 60:13
**Rican** 242:22

Ridge 8:18
**right** 1:11 8:24 11:16 15:5,21 16:3 17:4 21:21 22:11 24:4,5 28:15 29:14,22 30:7 31:8 32:8,14 36:17 37:9,19 39:19 46:21 48:7 53:25 55:7 56:23 59:20 60:1 61:7 62:5 62:22,23 63:25 66:16 66:17,19,21 67:14 75:12 82:5 91:10 105:1 106:10,12 109:12 119:14,15,20 121:1 122:11 134:8,8 140:19 141:20 142:1 147:12 149:12 152:24 153:12 154:2,20,20 156:7 159:11 164:15 164:15,22 167:8,14 167:16 168:3,9 170:18 175:11,13 179:18,19,21,22,23 181:18 183:17,17 186:14 187:12 189:6 190:1 205:24 219:8,8 219:9 221:6 240:12 249:5,11,11 255:19 258:16,18 262:2,4,11 262:21 268:10 269:6 269:11
**rights** 45:21 50:10,12 51:1 55:24 166:12 167:18 168:1,5,6,15 168:20,21 169:2,3,3
**ring** 174:22
**ringing** 236:20
**Rita** 238:23
**roberts** 1:15 2:23 6:18 49:2 122:15 123:23
**role** 54:16 74:21 146:12 149:17 161:21 163:5 164:5 176:18 267:22
**roll** 60:9 62:12 155:4
**rolled** 152:14
**Rollins** 242:24
**rolls** 10:1 29:23 61:6 72:4,14 150:1,16 164:22 170:10
**Roman** 234:1
**RONDRICK** 1:10 122:10
**Roni** 27:8 199:24 200:1
**room** 11:4 23:22 26:14 83:8 86:15 87:2 91:7 95:6 116:20 148:11 159:8 161:7 172:22 211:18 220:5 222:1

223:17 270:5
**Rosa** 261:24
**ROSE** 1:10 122:10
roughly 90:19
**route** 160:18
**routed** 120:2
**routine** 37:12
**routinely** 195:8
**RPR** 272:8,17
**rule** 5:8 9:5 126:8
264:25
**run** 9:21 100:18 137:11
137:14 155:1 157:19
207:23 208:1
**running** 57:4
**runoff** 39:21
**runs** 39:12 78:3 137:14
152:18
**R-O-N-I** 27:8

**S**

**S** 2:13 123:13
**safe** 259:11 261:5,11
**safely** 240:3
**Safety** 4:7 48:19 76:8
77:19 88:5,7 95:22
96:7 97:22 100:10
102:3 103:17 105:18
125:7 131:12 243:15
244:9,21,24 245:13
245:20 246:6,19
249:15
**same** 11:19 16:22 17:17
18:9,11 27:19 43:13
46:23 55:22 63:17
77:5,8 90:18,19 92:14
110:7 111:4 112:9,19
114:16 117:3,11,25
119:11 144:12 147:14
147:14 149:6,7,7
164:23 172:18 179:2
179:24 188:16 193:12
222:3 231:22 237:18
246:4 247:2,4 258:2
261:11
**sample** 212:2 219:21
222:8 225:2 263:14
264:1
**samples** 263:3
**Santa** 261:24
**sat** 162:1 216:17 217:11
**saw** 28:2 145:16,17
201:19 252:4
**saying** 12:10 13:7 37:17
46:18 57:12 63:6
71:18 74:3 81:4 83:5
84:14 87:9 105:17
109:6 151:19 152:6

167:2 168:8 173:9,23
175:8,10 184:5
186:12 188:17 197:1
241:8 248:23 256:18
259:11
**says** 45:9 59:19,23 68:4
72:2 73:10 92:17
97:13 106:3 109:8,13
109:20 130:17 151:25
153:3,20 154:12
167:1,25,25 168:2,19
168:20 175:1 188:4
189:18 218:11 227:14
229:12 230:15 231:11
231:24 232:20 233:17
234:9 247:18,19
249:21 254:23 255:5
255:21
**scary** 208:5
**Scatliffe** 22:1,23 42:3
**scenario** 63:13,19 106:6
135:10 151:22 152:16
152:17 154:5 155:8
175:15 179:10
**scenarios** 210:20
**schedule** 98:4
**scheduled** 98:21 208:22
243:6
**scheduling** 93:24
**school** 14:15,18,21
15:10 36:22 37:4
**schools** 36:24
**Science** 242:23,24
**scope** 17:22
**scratch** 110:4
**screen** 116:14,19 176:1
**screening** 168:13
**screens** 86:12 115:3
116:17,21 239:17
**scribbles** 235:21
**SEAL** 272:12
**search** 41:16 119:2
136:12,16,18
**searching** 55:4
**season** 217:3
**second** 8:7 32:8 79:10
79:11 110:18 127:17
133:12 150:12 151:10
152:9,18 165:2,3
182:8 187:12 192:21
205:2 256:9 261:3
**secondhand** 269:9
**secretary** 1:15 2:22
16:7 17:5 122:15
123:22 227:9
**section** 229:12 255:25
**sections** 252:14
**security** 53:21 76:16

254:20 256:23
see 8:14 12:16 33:21
39:20 46:5 50:17,25
54:12,13 55:22 57:7
59:21 62:10,14,15
63:3,4,5 64:7,9,21
73:10,14 80:7 82:21
83:19 84:9 89:22 90:5
98:24 101:11,17,22
108:10,14 1 4:19,21
120:1 130:17 131:7
131:24 136:3,12
139:5 140:6 144:6
145:20 147:8,11
151:22 154:3 155:23
169:20 172:4 173:8
173:14,24 174:2
178:20 183:2,18
187:9 189:25 191:13
191:16 192:24 193:7
193:12 194:2 195:3
196:17 197:16 201:15
201:18 202:6 203:22
205:2 208:25 214:9
224:6 226:3 227:13
230:3 231:24 232:20
233:21 235:18,25
236:6 237:8 240:18
243:1 246:2 254:23
262:11
seeing 51:14 63:20 64:9
84:3,17 96:2 182:10
252:6 257:7 259:4
262:25
seek 151:5
seem 22:25 57:9,18
161:24
seemed 57:18 88:24
seems 28:16 42:19
127:24 131:15
seen 9:12,13,14 33:1
110:20,25 111:5
168:18 182:7,11
185:16 186:19 189:10
189:15 190:7,10,24
196:8 199:2,21,22
200:3,17 201:21
202:8,24 203:18,20
205:15 206:7,8,9,18
206:20 214:7,12
223:13 224:22,23
226:21 229:4,10
235:11 239:6 245:25
252:1,1 262:22
263:17
selected 203:5
selecting 159:6
Seminole 39:7,10

268:11
**Semoran** 91:4,5,17
92:3,14
**send** 35:18 37:3 38:11
38:25 57:11 72:13,18
76:18 81:7 138:20
150:5 151:25 152:4
153:7 154:7,13,16
167:12 205:4 215:18
219:21 241:16 245:10
260:6
**sending** 155:7,11
199:10 216:1,3,7
265:23
**sends** 150:4
**senior** 17:16 19:3 58:10
58:13 68:4 160:10
242:16 265:1
**sense** 6:22 25:13 32:10
65:4 76:16 81:15 87:6
88:11,15,16 90:14
94:12 98:25 164:13
191:7 201:21 239:12
**sent** 39:7 44:3 130:18
133:19,23 136:13
143:7 194:15,23
197:15,20 204:4
223:21
**sentence** 13:16 45:11
55:23 72:2 79:10,11
82:21 92:16 109:8
130:21,25 192:21
205:2 256:10,13,15
**sentences** 187:15
**Sentinel** 201:2,4,16
**Sentinel's** 140:6
**separate** 113:13 117:12
231:25 232:3,12,18
**September** 15:11 183:6
197:23 198:5,22
209:1,3 226:24
**sequence** 173:18
251:12
**series** 6:25 64:11
253:19,19 267:8,14
**serve** 28:14 119:23
158:8 160:6
**served** 9:1
**server** 114:5 230:6,16
230:18 231:3,4,7,8,10
231:21
**servers** 231:6 237:8,12
**service** 21:3,12,23,24
22:2,2,3,10,15,16,22
23:6,6,11,14 24:7,15
25:2,3,10,17 26:9,11
26:22 27:6,9,20 40:9
55:2 63:11,22,22 76:7

76:17 77:24 78:2 92:5
98:2 100:9 115:4,4
120:24 142:13,20
144:23 145:7 148:24
172:24 179:11 199:7
208:16 212:13 231:21
234:10 249:21 253:5
**serviced** 211:21
**services** 17:14,16 18:24
18:25 19:2 20:1,4
21:13,15,25 22:1,12
24:25 26:2 46:2 54:23
64:2 77:20 88:9
101:18 103:25 120:25
129:10 142:13,14
145:10,12 198:22
201:7 212:25 238:12
249:23
**session** 38:11 189:19
**sessions** 103:10 120:15
189:21 194:25 195:7
195:11,12,14
**set** 32:23 39:6 44:11
62:6 77:23 110:18
112:22 117:25 127:17
135:14 148:3 160:20
172:21 180:6 182:8
207:3 214:2 216:4
237:19 267:4 268:16
**sets** 150:8
**setup** 112:11 159:21
160:5,17 165:23
**seven** 23:4 108:4
230:11
**several** 63:1 93:1
134:24 163:15 165:21
207:19 209:10 219:15
236:22
**sex** 53:21
**share** 38:6 227:21
241:23
**shared** 134:20
**shares** 241:17
**sharing** 268:21
**shear** 108:20
**sheet** 118:1 172:12
182:18,19 183:8,21
184:11,13 207:5
208:13 253:6,8 254:9
254:10,15 258:7
259:9
**sheets** 5:17 126:17
172:11 179:25 180:1
180:3,10,11,20 182:1
214:3,5,13,17,25
215:2,6
**SHERRY** 1:8 122:8
**she'd** 57:22,23

**Shirley** 206:22,23
238:16
**short** 20:22 23:7,11
86:20 128:25 209:20
**Shortly** 230:11
**show** 8:9 32:21 54:3,13
57:23,25 110:16
116:17 174:13 175:19
182:13 185:12 189:7
197:24 205:11 206:17
213:19 219:15 224:3
224:4 226:19 239:1
**showed** 58:1,4,4 61:23
161:25 198:24
**showing** 222:7
**shows** 139:6 173:22
219:18
**sic** 205:3
**side** 202:5 212:16
238:13 250:7 255:12
**sign** 76:23 87:4 101:1
101:14 107:10,14,17
107:23 166:14 180:13
184:24 222:13 247:10
**signature** 33:9 76:22
86:6,24 109:13
110:21,22,24 115:7
157:4,5 199:11
222:14,17 248:22
249:7
**signatures** 96:19 222:9
**signed** 33:2,5 80:4 84:9
166:14 183:2 184:20
192:14 197:1,18
223:21 247:17
**significant** 71:2 108:1
197:8
**significantly** 88:25
**signing** 166:15 183:5
223:20 247:9 260:11
**similarly** 1:11 54:6
122:11
**simple** 156:20 180:24
181:4 191:17 192:12
**simply** 60:25 72:20
98:12 177:20 188:11
188:17 192:9 264:4
**since** 14:11,13 15:11
16:4,13 17:13,18 19:4
19:20 20:18 21:4 26:8
37:5,8 40:2,5 66:4
77:11 89:17 92:24
93:2 97:21,24 98:8,22
99:6 100:10 157:1
165:19,21 169:11
187:24 189:23,23
190:1 194:15,22,22
194:23 195:16 202:13

204:17 208:18 212:15
244:11 251:23 259:17
263:1 265:11
**single** 165:10
**sister** 137:3
**sit** 178:25
**site** 5:16 61:25 76:23
84:13,20 95:12 96:5
96:15 97:5 106:25
112:5 126:16 128:7,8
128:11,22 185:8,22
190:20 193:8 195:2
196:21 197:5 248:4,9
248:16,19
**sites** 76:19 77:3,21 78:1
78:7,13 79:17 82:15
82:17 90:3,7,13,15,24
90:25 91:9,11,23 95:8
95:18 100:1 101:8
105:1,2,4 113:14
131:1 132:22 188:12
188:15,16 190:13,21
193:15 200:21 201:13
**sitting** 68:22 83:16
96:11
**situated** 1:11 114:12
122:11
**situation** 79:22 155:24
177:1 178:5,24
180:19 200:5
**situational** 40:15
**situations** 113:6,8
180:14 181:17
**sit-down** 96:2,8
**six** 15:9 23:4 90:10
**size** 17:21
**skip** 255:13,13,13,13
257:16
**slash** 192:23 233:24
250:4 255:21
**slide** 222:6
**slightly** 20:18 26:6
259:20
**sloppy** 260:24
**slot** 21:1
**slow** 148:4
**slowing** 243:24
**slowly** 19:17
**small** 15:14 87:12
**smaller** 86:7
**Smith** 53:14 115:23
148:1 173:22 180:25
180:25 230:13 261:23
262:1
**Smiths** 147:22
**snickered** 246:17
**social** 53:21 201:7
254:20 256:22

**software** 86:10 104:20
112:19 115:18 138:24
164:10,11,13 166:21
174:3,6,8,20,22 184:2
206:25 267:2
**solve** 213:14
**some** 6:9 15:15 25:22
26:8,11 28:20 31:21
31:24 32:2 33:20
38:17 45:19 50:17
51:14,23 54:4 57:6,8
57:18 60:5,7 61:2
79:15 80:2 83:9,9
84:14 86:7 87:2 90:22
95:4 100:12 101:9
102:6,23 108:16
109:21 111:12,16
113:5 120:14,17
130:3 131:18,19
132:21 134:17 135:5
146:8 156:25 157:5
165:9,10 167:4,10
171:22 172:10 177:10
180:10,20 181:16
183:13 184:14,22
186:20 189:13 190:14
191:17 192:9,12,22
193:19 194:24 197:8
201:18 207:13 211:10
212:20 215:4 217:12
221:13,17 226:11
227:9 229:7 230:15
234:19 235:6 237:6
239:25 244:8,14
249:2,10 261:17
265:13,21,25 266:8
270:6
**somebody** 66:7,8 97:7
105:8,25 109:5
118:22 131:24 161:18
173:16 226:16 261:20
264:17 265:3 267:6
268:10
**somebody's** 139:5
**someone** 6:10 34:14
50:23 56:5 60:20 63:2
67:5 79:18 80:12 82:4
128:11 134:13 164:14
171:19 175:2 183:3
192:22 193:19 221:9
257:2 264:20
**something** 25:6 39:17
52:1 92:9 93:13 94:22
98:20 101:2 110:4
150:5 179:1 193:7
212:6 213:5 239:4
260:13
**sometimes** 40:15,16

57:22 80:6 133:3,4
171:20 172:13 174:17
180:24 210:10 225:21
**Somewhat** 257:4
**somewhere** 90:10
**son** 25:20
**soon** 220:8
**sorry** 19:11 23:5 25:1
27:7,10 31:12 43:3
47:11 49:7 69:23
104:12 107:13 109:11
110:3,3 119:6 128:7
140:19 177:4 185:14
188:2,3 192:8,17
197:1 198:15 200:8
200:12 218:10 219:13
223:9 240:2 242:7
**sort** 11:19 16:13 38:10
38:22 40:23 41:25
43:22 45:19 64:11
67:9 103:8 146:21,21
147:2 156:14 168:10
180:18 241:15
**source** 81:20 87:22
93:14 239:21 244:25
259:22
**sources** 149:23,25
209:18 260:19,23
**South** 2:2,20 91:3,5,12
91:17 92:2,14 123:2
123:20
**southern** 1:1 14:7 122:1
**so-called** 252:10,10,11
252:11 254:3 256:4
**space** 68:15 70:11
239:16
**Spanish** 233:2
**speak** 6:19 11:17 89:19
98:4,12 162:13 193:8
245:24
**SPEAKER** 58:20,24
121:13 176:11 240:19
**speaking** 11:12 104:22
162:14 236:24,24,25
**speaks** 49:18 80:15
**special** 17:2,23 30:13
30:20 36:21 118:12
**specialist** 26:16 27:12
27:14,17 40:21
**specialization** 14:25
**specially** 185:20
**specific** 51:10 58:2
178:24,24 202:11
224:23 249:15,18
256:17
**specifically** 23:24 31:23
58:6 75:8 94:11 96:22
101:5,24 180:21

194:9 195:25 208:10
220:11 227:6 251:24
**specifics** 12:4,8
**speculate** 239:10,11
**speculation** 89:12
**speed** 234:2
**spell** 91:14 225:22
**spend** 217:21
**spent** 31:15 32:12
270:12
**September** 5:10 126:10
**spider** 154:21
**spiel** 222:15
**spike** 89:7 202:13
**spoiled** 176:25 206:11
206:16
**spoke** 85:22 97:19
99:10 102:23 204:24
**spoken** 159:20
**sponsored** 30:15 96:4
**spoon** 115:11 116:19
**spot** 174:21 229:2
**spots** 24:2
**spotty** 56:15
**spouse** 106:3
**spouse's** 260:12
**spreadsheet** 35:15,16
**stable** 212:20
**staff** 12:14 17:21,21
20:4,9,17,22,24 21:14
23:7,12 24:17 26:8
28:7,13,23,24 29:5,9
39:8 46:3 53:10 56:19
58:10,13 65:9,10 68:4
69:15 70:23 76:18,22
80:5,9 82:23 98:5
99:3,19 103:4,12,12
107:4 108:18,20
111:14,15 113:3
114:2,7,10,12 120:21
136:15 146:9 159:13
159:15,22 160:10
163:10,12,14,18
171:21,23 177:7
178:8 180:7 189:19
189:21 192:24 193:4
197:9 208:14 211:5
214:18 215:1 234:17
237:24,25 240:6
245:2 265:1 270:7
**STAFFORD** 1:17
122:17
**stage** 55:1 174:1 195:22
**staged** 194:24
**stages** 27:1 40:6 217:19
**stamp** 183:8 188:20
189:8 199:16 200:12
202:19 203:13 213:21

218:3 223:1 224:14
226:25
**stamped** 235:8 248:3
**stamping** 145:1 247:8
247:21
**stand** 228:16
**standing** 63:6
**stands** 221:14 228:7
**start** 22:7 64:4 68:15
127:7 145:11 146:25
179:16 182:17 186:4
201:16 267:7
**started** 15:16 16:1,6,15
17:5 39:3 84:24 87:18
89:1,11 96:10 120:6
134:17 135:14 149:21
155:22 178:4 201:12
230:11 239:23,24
247:12 253:7
**starting** 81:11 84:8
94:25 187:16 201:7
201:17
**starts** 90:1 128:3
133:14 192:20
**state** 1:4,12,15 2:8,22
19:8,14 30:16 31:21
31:22,25 36:24 43:25
44:2,12 45:17 50:15
52:3 73:25 83:5 90:23
99:24 103:7,8 122:4
122:12,15 123:8,22
166:1,7 167:18,19
168:7,16,20 169:2,3
175:2 194:25 204:20
247:15 261:15 272:5
272:18 273:2
**statement** 45:14 73:2,3
74:9 79:4 132:13
133:22 248:7
**statements** 79:6
**states** 1:1 45:12 55:23
122:1
**statewide** 158:9,15
**station** 172:21
**stations** 38:21
**statistic** 137:12 236:12
**statistics** 73:24 137:15
138:25 140:10 177:3
177:8 191:17
**status** 59:25 60:7,10,21
61:9 62:2 66:9,24
67:2,4,9,11,20,24
68:1,14,23 73:12 74:5
81:1,18,20 82:10
152:15,19 153:8
155:4 164:10 173:21
234:10 257:15 259:14
265:5,7,24

**statute** 72:24
**statutes** 72:22 95:15,17
96:12 268:17
**statutory** 247:25
**stay** 17:17 185:8,9
231:8
**stayed** 18:9,11
**stealing** 268:23
**Steel** 49:1
**STEEN** 1:6 122:6
**stenographic** 273:9
**stenographically** 273:7
**step** 211:2
**stepped** 46:9 142:24
**steps** 178:5
**stick** 147:1
**sticker** 153:4,20 154:11
212:12
**still** 36:6 49:8,9 62:11
94:23 97:12,15
101:16 140:9 152:6
173:19 184:16 189:23
189:24 196:18 198:4
217:19 236:3 249:7
257:7,11 265:4,7,14
**STONER** 1:5 122:5
**stop** 83:10 223:25
242:19
**stopping** 95:12
**storage** 61:2 68:15
70:11 264:23 265:6
**store** 64:15
**stored** 61:15 67:18
**storing** 68:16
**straight** 14:18 104:8
114:1 140:10 142:18
**strategies** 160:18
**strategy** 160:22
**street** 2:16 3:5,21 8:21
91:3 111:20 123:16
124:5,21 260:13
**stress** 26:11 156:17
**stressful** 118:20
**stretch** 240:16
**strictly** 108:17 112:22
204:2 210:13 236:24
236:25
**strike** 41:14 90:14 92:1
**string** 150:8
**strokes** 148:23
**structure** 18:1,9,11
31:5 228:23
**Student** 242:25
**students** 37:4 212:23
**studio** 38:24 39:7
**study** 202:17
**stuff** 116:7 217:22
245:4
**subdivided** 252:12

**subdivision** 252:15
**subject** 5:16 31:16
126:16 206:10
**subjects** 9:21 151:12
157:16
**subsequent** 151:15
194:3
**subsided** 83:11
**substantially** 246:20,25
**substitute** 218:23
**sub-set** 214:9
**successful** 208:3,4
**sudden** 88:25
**suffer** 132:20
**suffers** 108:18
**sufficient** 211:16
212:12
**sufficiently** 213:10
**suggest** 268:25
**Suite** 2:20 3:5,10
123:20 124:5,10
**summary** 170:13
185:24 196:17,23
253:5
**Sunday** 7:21 8:15 10:24
**Sunshine** 36:24
**supervise** 17:25
**supervision** 16:21
141:19
**supervisor** 1:16,17,18
1:18,19,20 3:8,13,18
6:11 8:22 9:17 15:20
15:21 16:1 17:16,24
18:2,8 19:3,18 36:9
40:14 46:19 47:13
48:23,25 49:12 50:15
56:2 62:24 64:17
66:14 72:12 73:6
77:18 78:12 80:20
93:21 95:15 103:4,11
109:18 122:16,17,18
122:18,19,20 124:8
124:13,18 128:6
133:16 148:14 157:11
157:18,22 158:6
159:15,17 163:24
169:6 171:6 178:21
237:1 243:18 246:11
250:13 253:1 254:4
255:1 256:6 258:3
259:23 261:5,13
262:6 266:3,11
267:15,25 268:1,4,9
268:14,24,25 269:14
**supervisors** 6:18 30:16
50:14 99:18 138:20
158:1 210:9 227:18
227:20,25 267:16

268:21 270:6
**supervisor's** 95:17
**supplement** 20:24
**supplied** 77:11,12
**supplies** 211:4
**supply** 44:8,15 105:24
106:4 131:7 181:7
**supplying** 44:15 94:9
**Support** 19:1 42:12
**suppose** 25:23 31:20
51:9 81:21 134:18
146:15
**supposed** 64:7 79:20
117:15 155:15 218:19
218:22 246:24 263:6
263:7
**supposedly** 45:16
**supposing** 184:14
**sure** 8:6 12:21 13:11
16:20 17:3 20:23
30:22 31:5 32:3 45:20
58:2 59:7 70:5 71:1
80:3 94:11,15 99:16
107:5,24 110:10
118:19 128:21 133:1
142:22,23 159:18
161:17 164:25 166:4
175:24 177:3 199:8
202:16 212:3 220:8
221:13,23 222:20
226:11 232:10
**surfacing** 79:25
**surprised** 90:5 210:21
265:13
**surrender** 232:8
**surrounding** 38:18
**susan** 3:3 22:1 49:8,11
49:12 124:3 127:4,13
271:2
**Suzanne** 22:22 23:2
42:3
**swear** 166:19
**switch** 211:11
**switchboard** 113:7,12
119:22,23,24 120:2,4
237:1
**switchboards** 160:21
**switching** 101:8
**sworn** 6:3 272:10
**system** 42:14 61:5,5,13
61:14 62:16,18 63:5
63:17,20 64:5,5,14
68:2,5 73:24 76:22
77:23 106:2,18
107:11 112:14,15
114:19 117:23 119:3
129:13 131:4,11,16
131:17,19 132:3

136:8,8 160:14
163:24 164:9,21,24
165:21 166:21,21
172:3 173:7 175:19
185:22 209:15 212:25
213:1,12 230:3,4,12
230:21 231:2,9
236:14,18,21 239:21
264:10,24 265:4,4,7
265:14
**S-E-M-O-R-A-N** 91:6

**T**

**T** 272:2,2,2 273:1,1
**table** 27:20 187:13
223:19 224:5,10
239:15 267:4
**tables** 266:5,24,25,25
267:7
**tabulating** 233:25
**tabulator** 120:16
162:23 224:1,2
**tabulators** 162:14,16
233:17,24,25
**take** 7:16 9:11 11:20
13:9,12,13 24:12
32:25 38:12 42:17
43:23,24 45:8 47:15
57:22 58:15 59:14
61:10 67:24 68:11
71:11 73:1 78:17
93:18 110:1,7,20
111:9 121:9 127:19
130:8,14 132:11
133:12 144:15,19,19
147:20 155:6 157:6
158:18 166:13 169:22
170:3 176:7,9,16
177:19 180:8 181:2
182:5 184:23 187:2,8
189:17 190:6 192:20
196:1,7 200:11,22
205:14 206:5 212:1
217:17 218:19 221:8
240:16,17 241:22
248:18 253:18 255:23
257:17,18,25 260:2
264:20
**taken** 14:13 17:23 19:4
19:7,20 58:21 76:14
89:22 93:19 94:19
121:15 129:19 152:23
172:21 173:11 176:12
221:7 237:18 240:20
248:4,12
**takes** 26:11 215:13
248:2 264:16 265:2
**taking** 2:9 19:15 55:4

57:3 113:8 123:9
134:4 160:4 165:14
211:2 217:24 271:8
talk 6:24 10:23 12:9
96:22 97:5 99:3
134:13 227:21 265:12
talked 12:12 68:7 97:9
97:11 104:21 105:12
132:16 136:21 141:20
154:19 170:9 178:6
179:10 209:17 215:16
216:1,3 267:14 269:2
talking 49:22 52:13
56:20 59:5 61:19
62:16 66:9 81:9
104:25 105:21,22
118:22 120:6 133:18
137:21 142:8 164:17
167:8 170:12 192:23
201:5 220:25 250:11
257:22 260:18,19
263:12 270:12
talks 66:5 239:14,14
Tallahassee 4:5 125:5
Tampa 227:14,15
tanko 1:24 5:2,8,9,11
5:12,14,15,17,18,20
5:21,23,24 6:2,7 9:5,8
12:17 13:10 48:24
49:22 56:5 59:5
122:24 126:2,8,9,11
126:12,14,15,17,18
126:20,21,23,24
176:15 196:3,5 198:2
199:16,19 200:3,13
200:15 202:10,19,22
203:10,13,16 204:2
213:20,23 218:3,6
222:25 223:3 224:12
224:13,18 243:13
250:3 253:14,16
272:9 273:7
target 215:17,20,21
taught 207:3
taylor 2:7 123:7 272:8
272:17 273:5,20
team 27:25 32:20 40:16
40:18 63:10 69:8
115:16 160:10,10,24
229:22
technical 114:1,7,10,12
270:7
technically 236:15
technician 162:19,20
207:1 230:14
technicians 121:5,6
technologies 1:21 3:23
122:21 124:23 251:8

251:22 270:2
technology 10:9
telephone 2:19 3:4,15
20:8 26:4 42:13 49:14
63:15,16 95:12
112:13 113:13,19
117:25 120:1 123:19
124:4,15 135:24,25
136:14 177:14,16
178:9,19 181:10
213:16 224:24 225:17
226:1 230:3 231:2,9
232:4,9,12,13,15,17
232:17
telephones 10:9 39:8
213:7,7 229:13,21
236:6
tell 8:11,17 9:11 14:4
18:23 19:23 20:20
21:22 24:19 32:25
33:25 43:11 45:4
59:15 68:13 71:12
73:2 74:15 75:6 76:11
78:20 79:23 87:17
90:24 93:15 109:2
110:8,20 111:9 120:7
120:9 127:20 128:5
130:9 132:12,17
133:12 137:21 149:24
151:17 157:7 158:19
163:5 169:14,25
170:3 175:5 176:3,17
182:6,14 183:18
185:16 187:11,25
189:10 190:7 191:10
193:24 194:5 196:7
196:16 200:19 201:3
202:24 203:18 204:9
205:14 206:6 214:1
215:8 217:22 218:14
222:5,15 223:5
226:21 227:3 230:25
238:1,8 239:5
telling 136:5 215:7
266:2
tells 87:20,22 88:1
153:24 155:14 164:13
temp 23:24
temporaries 120:20
temporarily 130:6
temporary 20:24,25
23:12 24:3 103:12
111:14,15 120:21
121:6 225:21
temps 120:24
tend 37:22 68:22
tenure 68:18
term 50:21 53:18 65:22

65:24 79:9 112:8
250:24
terminology 107:5
terms 1:7,21 25:13
29:15 60:2 66:13
74:16 78:23 91:18,19
101:17 102:4 104:15
133:7 142:16 157:15
157:25 160:22 162:16
165:22 177:13 206:25
210:16 211:3 228:24
256:13 260:2
TERRY 1:7 122:7
testified 6:4 13:22
242:7
testify 9:21
testifying 6:20 8:25
12:23
testimony 2:9 5:2 8:3
10:18 11:3,18,20 12:6
12:8,13 13:20 123:9
126:2 134:13 214:4
241:2 244:7
text 76:1 203:6 235:22
235:23
thank 33:19 43:1 49:20
108:22 167:2 207:8
240:13 243:9 249:24
270:23
Thanks 49:19 138:8
206:4 234:8
Thanksgiving 18:16
their 1:10,20 12:6,8
20:6 21:22 23:19
24:13,19 36:25 38:5
38:13,14 39:6 44:1
45:19,20 50:10,12
51:1 55:24,25 57:4
62:2 63:7 64:6 67:3
83:3 86:10,11 88:9
93:23 94:7 98:3
100:17,18 101:17
108:11,14,19 117:23
119:2 120:20 121:5,6
122:10,20 131:4,16
131:19 135:1,15
137:7 138:20 145:8
145:25 156:21,21,21
157:3 166:12,13
167:18,24 168:3,5,6,9
168:9,15,20,21 169:1
169:3 174:19 178:14
183:13,21 185:23
192:11 210:8 211:25
215:4,7,19 220:16
222:13 223:19,22,24
224:1 225:10,18,25
226:17 230:24,25

231:1 232:8 241:12
241:13,23,24 244:11
246:8 247:17 248:16
248:20 268:15,16
theirs 106:2,17 260:13
themselves 132:23
172:7 270:6
theory 181:15
thereabouts 224:11
thereof 256:10
thing 11:19 35:9 94:1
98:21 110:7 208:5
things 6:22 28:17 38:7
54:4 60:14 68:19,19
84:17 95:1 96:16,20
96:20 100:21 101:2
114:19 157:5 160:21
165:13 178:6 180:24
181:4,5 193:10 210:8
232:17 233:2 234:7
234:16 268:23
think 8:5 11:20 27:13
35:25 39:21 43:25
47:25 48:4 51:12
59:15 86:18 92:2
98:18 104:14 106:21
108:3,7,15,17,17,21
109:4 115:1 118:19
120:16,18 128:25
134:1 140:10,11
157:17 170:20,20
175:5 181:6,8 189:24
190:19,19 192:8
195:20,20 208:4
211:20 213:2 215:9
216:17 228:25 231:2
233:6,14 239:20
240:2,3 242:17 243:8
244:16 246:16,17
263:9,9 264:8 265:4,6
266:6,7
thinking 240:7
third 13:12 111:13
239:15
thoroughly 80:8
though 108:1 265:15
thought 49:7 51:14
110:3 136:4 190:11
202:4,5
thousands 263:12
three 7:21 18:20 22:9
22:10 23:4 195:10
203:5 243:4 263:4
three-month 24:18
threw 229:22
through 8:4 9:22 19:8
19:13 33:14 34:23
39:12 41:18,21 42:4

43:12 48:3 50:14 53:7
54:8 55:16 60:17
63:19 64:5,8,19 66:14
67:23 75:23 81:13
95:24 104:9 109:14
120:2 128:16 131:8
135:6 136:15 138:23
142:18 144:12 147:12
148:8,9 163:11,14
164:9,22 165:5
167:19 169:21 172:15
172:24 173:18 176:16
176:16,17,20,21,22
176:23 177:9 178:5
179:1 180:7 184:2
191:15 201:8 202:12
211:24 212:1 213:12
218:4,4 219:1 223:12
224:15,15 225:1,3
226:12,15 227:4
237:8 262:20 265:10
Thursday 2:3 123:3
227:14
Tim 233:10,13
TIMBERLAKE 1:7
122:7
time 2:8 7:17 13:24,25
14:20,21 15:7,12,15
15:22,24 16:13 17:3
17:18,22 18:2,8 21:1
21:7 22:6 27:19 28:15
29:12 31:15 32:12
37:21 39:6 50:7 52:25
63:10 64:12 67:23
68:24,25 69:6 70:10
76:13 77:23 79:15,16
81:8 83:11 84:20,22
85:4 86:3 92:20 93:3
94:6 95:23 98:4 100:2
101:10 102:1,7,12,13
107:2 115:22 117:6
123:8 131:15,22
132:5 134:14 147:1
148:22 152:10,18
165:23 167:13 173:13
173:23 178:23 191:12
193:18 197:6 201:5,8
202:11,13 209:21
217:22 227:8 230:22
231:4,22 237:12
239:19 240:12,13
243:23 251:4 253:10
263:10 270:4,12
timed 101:15
times 7:21 34:21 64:24
65:13 93:1 98:7
102:16 134:25 148:21
152:25 153:1 165:21

174:13 178:2,14
189:25 236:9,22
250:22,25
**timing** 62:1
**title** 16:6,15 17:11,13
20:1 22:14,21 23:10
26:17 27:11 99:16
176:2,4 204:11
**titled** 130:15
**titles** 21:22
**today** 6:15,20 7:20 9:1
10:16,18 12:10,13,14
12:19 13:1,20 240:13
244:7 251:23
**todd** 2:14 48:13 123:14
**together** 23:5 192:11
227:20 241:9,14,21
266:8
**told** 41:3,18,19 93:22
118:14 134:18 150:10
186:10 199:6 227:24
228:8 235:1
**tool** 68:21
**tools** 136:10
**top** 37:11 135:18 194:2
200:23 225:10 235:15
244:23 255:20
**topic** 162:12,13 219:17
**topics** 11:5,7 158:10
**tops** 231:14
**top-down** 193:19
**torres** 3:3 49:9,12,12
124:3 127:4,13,13
162:21 238:17 271:2
271:2
**total** 75:13 81:25
187:22 189:25 196:21
196:22 197:3
**totals** 35:16 88:25
187:9 188:22
**touch** 40:7 60:5 85:25
**toward** 82:23 144:22
**town** 92:7 195:6 212:21
**track** 66:11 81:19,20
87:16 191:11 261:4
**tracked** 87:14
**tracking** 128:13 179:16
185:22
**tradition** 214:22,23
**traffic** 131:3
**Trail** 91:12
**train** 25:7 94:4 111:18
111:18 120:15,17,20
120:24 121:5 136:4
176:25 194:17
**trained** 11:13 108:19
114:18 120:13,18
121:2 159:3 162:1

178:8,10 206:24
207:1 213:10 215:6
226:2,7 239:19 245:3
**trainer** 94:2,3 98:3
245:4,12
**trainers** 94:13 245:16
**training** 5:19 10:2
11:12 24:14,18,19,25
64:6 74:16,17,18,20
74:22 80:4 92:18,25
93:8,23 94:7 95:14,17
95:19 96:3,6,12,13
98:8,22 102:7,13,17
102:20 103:6,10,21
108:14 111:11,14,15
120:7,8,10 126:19
178:11 189:17,19,21
193:14 194:25 195:2
195:7,7,14 206:14
218:16,17 222:19,21
223:14 239:17 244:25
245:5,6,15,18,20,22
**trainings** 74:25 75:3
97:22 98:1 102:10,21
103:4,11,15,18
**trains** 245:2,12
**train-the-trainer** 38:10
241:15
**transaction** 267:10
**transcript** 134:11 273:8
**transfer** 15:8 184:17
**transferred** 60:25
**transferring** 84:7
**translate** 233:3
**tray** 145:3
**tremendous** 68:20
**trenches** 83:15
**trends** 84:9
**trial** 207:23 208:1
239:24
**trickled** 80:7
**tried** 210:20 213:12
**tries** 190:19
**trigger** 148:3
**triggered** 135:13
**triggers** 62:6 86:12
**trips** 70:7
**trouble** 101:10
**true** 76:6 90:2 141:7
148:6 151:14 166:15
273:8
**truly** 24:19 35:11 56:11
270:19,22
**try** 6:12 28:20 66:12
69:16 95:3,4 116:22
118:22 120:3 136:3
163:11 164:15 178:3
191:19 193:6,19

209:2,18 210:19
241:7 250:7
**trying** 68:25 69:3 80:5
140:9 142:3,21,22
145:16 156:17 177:25
183:23 191:16 192:11
193:17 197:8 213:14
221:8 225:6 231:4
232:12,16 260:7
264:16
**Tuesday** 7:22,23,24
10:25
**turn** 33:13 44:3 45:3
73:9 90:18 92:16
100:18 111:6 133:10
154:16 165:10 169:13
170:8 171:8 187:1
208:1 209:18 210:11
211:8 212:7 218:9
222:3,24 223:5 225:7
226:25 227:11 229:7
233:16 234:9 235:8
244:14 255:20 257:19
**turned** 36:9,13 42:2
152:7 218:21 258:19
**turning** 151:6 258:8
**turnout** 210:5,9,17,23
211:1,14,17,22
212:13 213:3 270:13
270:14,15,18,21
**turnover** 108:18
**turnovers** 108:21
**TV** 38:20 219:16
**Twelfth** 3:21 124:21
**twice** 50:16 230:4
**two** 20:2 21:6 23:4,5
27:23 28:24 31:2 39:1
39:1,13,13 59:22,23
60:17,22 61:9 67:10
67:20,21 90:20 91:9
91:11,22,23 92:4,11
95:18 116:5 120:19
132:11 143:6 147:14
147:22,25 152:25
155:23 164:24,25
181:1 187:15 191:12
196:24,25 197:3,4,7,7
199:25 216:17 231:7
231:13 234:7 239:15
263:4
**type** 25:5 60:8 97:16
118:2,3 160:9 181:6
190:20 192:22 238:25
**typed** 44:19,25 227:10
238:5 254:6
**types** 35:14 80:10 113:8
136:23 138:12 156:23
160:9 190:21

**typical** 184:9 223:15
**typically** 29:18 105:7
116:10 238:8,10,24

**U**

**U** 228:10
**UCF** 242:23
**uh-huh** 13:14 29:2,25
36:19 43:4 45:10
56:25 67:12 82:24
105:16 108:23 111:8
149:8 151:13 164:12
167:21 180:22 187:7
187:14 192:19 212:10
232:23 243:17 245:7
250:23 254:10 269:4
**ULCERS** 227:14,18
228:3,5,7,14,23 269:2
269:9
**ultimately** 160:7
**unaware** 73:11 74:3
**unclear** 7:3
**undated** 198:8,9
**undeliverable** 150:6
151:19,23,24 152:9
152:17,22 153:1
154:16,18,24
**under** 15:15 16:20,20
20:2,2 21:24 22:3,5
22:12 34:21 42:13,14
59:22 68:18,19 72:14
78:9 95:15,16 132:12
134:23 140:15 141:19
142:23 159:14 168:22
169:6 187:20 193:13
199:11 247:13 248:21
249:6 254:1,16,17
256:2,19
**undersigned** 272:8
**understand** 7:3 8:25
9:16,20 12:16,17,22
52:2 90:22 99:21,23
109:5 133:25 142:3
174:15 183:23 193:1
225:23 236:15 250:6
264:16
**understanding** 31:13
32:1 45:18 47:1 50:8
50:13 51:2 53:12,23
54:1,6 91:25 106:8
108:20 128:17 130:18
130:22,24 131:2
133:13,21 138:12
157:10 158:5,16
165:24 169:5 170:4
187:19 193:13 210:22
211:7 215:7 245:1,3
267:3

**understood** 113:4
267:19
**Unfortunately** 33:11
167:4
**unhappy** 129:4
**UNIDENTIFIED** 58:20
58:24 121:13 176:11
240:19
**unique** 90:2
**UNITED** 1:1 122:1
**university** 14:6 19:8,14
212:24
**unless** 93:13 199:9,9,10
199:10
**unsigned** 196:23,25
197:16
**until** 2:3 8:16 15:4
18:11 60:7 67:2 69:21
123:3 142:11 145:3
155:1 167:13,14
194:11 210:2 217:21
**untouched** 152:8
**unusual** 105:25 205:16
**upcoming** 61:8 207:10
208:8
**update** 20:6,12 150:1
153:5,23 156:14,21
156:21 157:2 173:1,2
173:10 181:3 248:22
**updated** 23:20
**updates** 156:24
**updating** 26:3 29:23
150:15,22 151:3
179:17 249:11
**upgraded** 165:21
**urban** 227:19 228:10
**URSULA** 1:10 122:10
**use** 10:8 35:17,17 37:1
37:1 66:1 79:24 97:11
115:4 133:6 136:10
137:7 140:5,14
149:25 150:15,22
156:13,20 164:11
173:9 181:3 201:23
206:24 207:9 208:7
210:14 215:6 218:22
220:24 221:17 259:24
265:21
**used** 20:12 40:2 43:12
45:12 50:21 53:18
61:1 65:17,24 66:4
71:15,17 76:7 79:18
80:12 111:21 114:7
114:16 131:21 207:22
209:3,7,25 218:17
223:13 234:3 250:24
252:23 253:6 254:3
254:12,25 258:14

259:13
uses 66:6,7 140:2
   218:16 222:6
using 25:4 61:17 63:16
   114:4 239:19
usually 24:2 39:1 44:18
   44:19 45:24 60:17
   64:13 97:4 156:5
   161:14 165:15 181:4
   183:25,25 210:12
   226:17 227:9 228:20
   236:18 263:9
U.S 233:14

_____
        V
_____
v 7:1
vague 56:14 252:18,20
vaguely 232:25 252:24
Valencia 242:24
VALERIE 1:7 122:7
valleys 89:25
varies 268:18
variety 181:23
various 26:18 58:9 82:1
   151:12 158:10 160:20
   240:5
vehicle 103:18 215:7
   244:11 245:20
Vehicles 4:7 48:19 76:9
   77:20 81:16 82:13
   85:11 86:3 87:8 88:5
   88:5,8 92:25 95:23
   96:8 97:19,23 100:10
   102:3 105:18 125:7
   131:12 194:17 198:4
   243:15 244:10,25
   245:14 246:6,20
   249:16
vendor 47:2 51:10,19
   57:3 137:16,17 139:8
   250:22 251:3
vendor's 138:24
verbal 44:16,18
verification 10:8
   153:13,16 164:20
   177:18
verify 24:1 153:22
   265:14
Veronica 21:11,23 40:8
   40:12,20 42:2 77:25
   85:15,16 98:2,7,11
   99:10 100:5,6,22
   101:23 102:6,15,20
   120:19 189:12 190:5
   190:12 194:3,10
   199:6,8,25 200:20
   201:2,14 204:4,20
   205:6 234:16 238:12

Veronicas 199:25
version 227:10
versus 6:17 92:11 162:8
very 19:17 20:18,18
   24:21 28:6,18 31:4
   50:6 52:21 57:9,15
   83:3 84:13 86:25
   100:15 110:3 155:16
   182:23 191:17 199:5
   201:11 265:19 268:21
via 2:19 3:4,15 123:19
   124:4,15 128:7,8
view 56:8 114:5
viewing 39:5
Vinson 27:8 200:1,1
Vinson's 199:24
Virginia 25:21
virtue 80:6 91:23 103:7
   259:9
visit 192:10
visited 128:22
visiting 130:23
visits 184:14 190:22
vital 137:12,15 138:25
   140:10
VI-C 234:1
voices 6:12
volume 1:24 88:21
   89:16,19 90:21
   108:20 120:22 121:18
   122:24 209:6,8
   263:11,20
volunteer 87:23 104:6
   105:7
Volunteers 104:7
volusia 1:19 3:18 49:4
   122:19 124:18 272:6
   273:3
vote 16:17,23 20:6
   23:15 30:15,17 31:1
   36:3,25 39:10,24
   60:12 69:1 72:8 73:11
   74:4 88:6 89:3 100:25
   112:24,24 136:12
   162:5 166:17 167:3
   167:20 168:3,9,17
   171:19,19 172:16
   173:19 174:7,10,10
   174:15,18 175:3,4,12
   175:13,17 179:13,15
   181:13 206:1 218:19
   219:12 220:2,12,16
   220:22 221:4,16
   222:13 223:23 231:1
   232:7 237:4,4,5
   247:20 259:25
voted 64:10 174:2,17
   174:21 175:1,2 176:3

176:5 178:1 232:10
voter 9:23 10:1,5,8 11:9
   11:11,22 12:2 16:25
   17:14,16 19:2 20:1
   21:12,15,25 22:1,1,2
   22:2,12,15,16,22 23:6
   24:8,10,11,25 25:2
   26:2,19 28:6,16 29:23
   29:24 31:23 35:5 37:5
   37:14,16,19,23 38:4
   38:15,22,25 39:15
   40:7 46:2 52:16 54:22
   54:23 55:2,16 57:2,3
   57:12 59:17 60:4 61:6
   62:12 63:8,11,21,22
   63:24 64:1,2,21 67:19
   67:23 69:2 70:13 72:4
   72:4,4,8,14 73:11
   74:4 76:13 79:13
   81:17 82:3,3,5,23
   83:2 86:5,12 89:9
   101:17 103:24 107:6
   108:11,15 112:15,20
   113:1 115:4,7,12
   116:16 117:19 118:12
   118:14,24 119:13,18
   120:25 128:8 129:10
   130:20 132:8,18
   133:19 134:23 135:22
   136:21 137:10,11,24
   138:2,3,6,10,14,16
   139:13,17 140:8,12
   140:25 141:3,9,15,23
   142:1,13,13,20,21
   143:3,16,18,24 144:2
   144:6,11,15,23 145:7
   145:10,12,13 146:13
   146:23 147:5,9,10
   148:15,24 149:5,8
   150:1,2,4,12,15,16,18
   150:19,22 151:3,7,21
   152:1,4,11 153:5,7,8
   153:15,25 154:4
   156:5,6,13,14 158:13
   158:15,15,22 164:1,5
   165:8,13 166:1,6,18
   171:18 172:24 173:1
   173:7,8,9,10,13,13,15
   175:24 177:18,22,25
   178:24 179:11,17
   180:14 181:3,5,14
   183:18 185:22 194:25
   202:7 205:25 206:15
   208:16 210:1,5
   211:25 212:8,13,16
   213:3,3,3 216:12
   221:19 222:9 223:18
   223:24 224:3 232:14

234:10 238:12 241:2
   241:4,8,11,12 242:2
   243:19 244:11 245:4
   253:3,5 254:1,2,16
   255:25 256:2,4,9,12
   256:14,20 257:8,11
   257:17,23 258:5
   259:4,10,13 260:17
   260:22 261:7,9,14,16
   261:19,24 262:7,7,9
   262:20 263:17 264:3
   265:20,20 266:1,4
   269:12,13
voters 31:24 63:13
   65:21 66:13,16,18,20
   66:22 67:17 70:15,16
   70:19 71:4 72:14,19
   74:1 81:22 138:21
   166:10 168:15 171:11
   171:13 174:13,17
   212:1,14 215:15,24
   219:11,14,19,25
   220:15,25 242:22
   265:17,25
voter's 115:7 145:19
   257:15 259:14 260:11
vote-type 23:17
voting 24:12 138:1
   147:12 162:2,6,6,7,8
   162:9,20 175:7
   218:12 219:1 221:4
   223:23 233:25 256:25
votor 246:9 248:2
vs 1:14 122:14
VSC 179:13
V-I-N-S-O-N 27:8

_____
        W
_____
wait 101:13 105:21
   127:25 182:18
WALDEN 1:7 122:7
walk 33:14 43:12 67:22
   69:4 176:17 212:4
   223:12
walked 135:11
walk-in 131:3
WALLACE 1:6 122:6
want 42:21 47:6 49:11
   59:7 70:7 80:8 86:19
   86:20 88:6 106:4
   108:24 116:18,20
   131:3 181:19 187:8
   195:5 208:5,25
   217:21 224:6 235:25
   239:11 242:19 247:20
wanted 15:9 28:13 35:5
   70:20 76:18,21
   167:20 181:13 229:23

234:6 235:17 241:8
   241:14 242:9
wants 86:17 181:2,5
warehouse 145:5
Washington 3:21
   124:21
wasn't 44:18 53:15 87:3
   88:15,17 90:4 93:24
   159:5 168:22 184:1
   204:23 230:12 251:6
   251:11 258:21 270:5
watch 201:15 202:6
watching 89:12 154:3
way 31:21 61:24 74:8
   80:21 87:16 109:3
   117:9 128:10 129:15
   130:11 135:1 146:15
   174:11 179:9 199:9
   208:5 211:7 212:9
   213:4 220:7 241:25
   247:13 252:12 256:18
   265:16 267:4,13
   268:5,11,24
ways 106:15 133:9
   156:19 213:14 219:15
   241:7,20 260:18
web 128:7,8,11 154:21
week 96:18 102:5
   191:12 246:3
weekly 77:3
weeks 25:13 39:1
   191:12
welcome 240:14
welfare 201:8
well 7:7 9:11 23:2,4
   25:2 30:1 31:4 34:19
   34:23 36:7 39:12,25
   40:22 41:14 42:20
   43:23 51:9 52:11,18
   55:9 56:10 57:2 58:13
   61:13 63:1 64:4,9
   65:11 66:12 68:9
   69:16 75:23 78:15
   81:8 82:8,19 83:12
   84:6 88:20 89:2,21
   90:20 93:12,18 94:24
   95:15 97:4,11 101:7
   102:17 104:1,25,25
   105:3 111:3,16
   113:21 114:22 117:1
   118:9 134:14 137:21
   139:4 140:3,9 141:20
   145:10 147:13 149:21
   149:21 152:24 153:23
   157:20 158:8 160:3
   162:16 164:7 167:9
   167:23 171:10 173:23
   174:3,4,9 176:24

# LDF

## NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
99 Hudson Street
Suite 1600
New York, NY 10013-2897
(212) 965-2200.
Fax (212) 226-7592

## FACSIMILE INFORMATION SHEET

DATE: _5/29/02_

### *PLEASE DELIVER THE FOLLOWING FAX IMMEDIATELY*

TO: _Janai Nelson_

FAX #: _305 655-9121_

FROM: _Lexis Quinie_

SUBJECT: _Torto last 3 - Index._

TOTAL NUMBER OF PAGES INCLUDING FAX SHEET: _____

COMMENTS: _____

_____

_____

_____

_____

_____

Confidentiality Note: The information transmitted in this facsimile message is intended to be confidential and for the use of only the individual or entity named above. If the recipient is a client, this message may also be for the purpose of rendering legal advice and thereby privileged. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copy of this telecopy is strictly prohibited. If you receive this facsimile in error, please immediately notify us by telephone and return the original message to us at the address above via the mail service (we will reimburse postage). Thank you.

The NAACP Legal Defense and Educational Fund, Inc. (LDF) is not a part of the National Association for the Advancement of Colored People (NAACP) although LDF was founded by the NAACP and shares its commitment to equal rights. LDF has had, since 1957, a separate board, program, staff, office and budget. Contributions are deductible for U.S. income tax purposes.

Regional Offices
1444 Eye Street, N.W., 10th Floor
Washington, D.C. 20005
202-682-1300   202-682-1312 fax

Western Regional Office
1055 Wilshire Blvd., Ste. 1480
Los Angeles, CA 90017
Gen. 213-975-0211/ F. 213-202-5773

180:14 181:15 182:17 184:6 187:1,11 196:20,25 200:9 202:5 203:4 204:23 207:18 209:9 210:16 214:21,21 217:13 226:2 228:18 229:17 230:23 231:11 233:24 236:25 237:17,23 240:11 241:10 242:13 243:2 246:16 256:15 263:9 267:21,22 269:5
**WELLS** 1:9 122:9
**went** 14:20,21,25 15:13 17:14 20:21 26:1 47:21 53:7 65:13 77:23 99:3 102:23 103:23 117:23 128:23 135:6 140:11 147:7 161:10 162:22 167:18 178:5 225:1,2 251:23 255:10,10 270:5
**were** 11:5,9,10 12:1 13:4 15:19 17:9 19:24 21:14,22,24 23:7 24:2 29:10 30:1,11,20,22 30:24 31:6 32:16 36:9 36:12,13 39:11 42:4 44:1,21,23 45:12,24 46:11 47:10 49:22 50:8,25 51:1,2,3,5,12 51:17 53:4,9,9,13,22 54:10,25 55:17 56:20 57:3,5,7 59:5 63:1,7 66:14 70:15,16 72:21 75:19 76:12,14 77:1 77:16 81:24 83:20,24 83:24 84:1,4 86:4,4,7 87:2 88:21 89:9,16,19 90:5 91:22 92:18 93:11,22 94:13 95:9 95:24 96:23 97:5 101:9 103:10,14,18 104:22 105:12,21 112:2,13,16 113:2,3,3 113:4,11,13,21,25 114:25 117:21,22,23 117:24,24 118:2,5,9 118:13,14 119:1,1,4 120:1,2,7,14 127:11 131:15,18 133:18 134:15,15 136:5,17 142:21 146:5 148:13 149:22 161:13,14 168:20 169:1 170:12 172:16 175:3,4,17 177:8,19 180:16,21

180:23 181:22 182:24 182:24,25 183:10 186:10 188:4 189:4,4 190:1,14 191:3 192:11,13,14 195:8 195:12,15 196:13,22 198:3,20,20 200:2,5 201:6 207:6,16,19,21 210:1 211:16 212:12 212:18 213:16 215:24 216:18 217:19 221:12 224:17 225:4,9,11,12 225:14 229:18,21,21 229:22 231:5,20,21 234:16,17,24 235:1,2 237:12,18 239:16,20 239:22 240:8 244:8 246:14 248:25 251:10 252:3,13,21 254:8,14 258:12,14 259:13,24 259:25 260:1,18 263:22 265:17 267:20 270:10
**weren't** 47:10 53:14 54:4 83:2 84:3,17 93:12 168:22 192:14
**West** 2:20,21 3:16 8:21 123:20,21 124:16
**we'll** 7:17 42:24 47:17 70:8,9 109:23 172:7 209:15 232:18
**we're** 6:12 25:8 28:18 37:12 38:25 40:6 48:5 58:18,23 61:18,18,19 63:19 68:5,22 69:3,9 69:9,10,10 70:3 80:5 86:19 96:18 97:12 98:6 105:22 121:11 127:8 137:3 142:8,22 145:18,23 146:2,2 147:15,16 154:3,13 155:15 156:23,24,24 160:22,23 164:16 165:13,14 167:8 171:14 172:25 176:9 177:23,24 178:24 184:16 193:5,11 197:8 209:5,13 210:21 211:2 212:2 213:14 220:25 221:8 225:5,5,6,18 232:12 232:15,16 233:2 240:17 241:19 244:17 248:15 260:19 265:20 265:22,23,23 267:4
**we've** 7:21 21:4 26:8,15 · 37:5 38:2 40:7 47:17 56:17 57:13 60:4

61:20 68:7 71:1 79:22 83:12 84:14 87:14 90:20 100:22 101:3 104:1 137:21 142:23 149:19 150:5 152:10 152:10,24 154:16,22 155:1 164:17,20 165:21 172:4 173:18 174:17 178:17 182:21 189:25 210:19 211:3 211:4 213:12 214:25 216:1,2,3 221:12,22 225:16 227:23,24 242:8,9,13 243:4,4,8 244:14,18 250:7 261:17,19 265:10
**whatsoever** 250:16
**when's** 243:6
**while** 60:17 104:10 108:18,19 147:9 159:3 180:9 218:17 239:22,22 250:7 264:11 268:21
**whole** 24:23 31:22 55:16 62:6 99:24 131:19 148:3 150:8 156:1 159:21 173:14 173:18 267:8
**WIC** 188:21
**wide** 180:11
**wider** 106:15
**william** 1:19 3:12,14 9:17 30:6 32:22 48:22 109:9,13 122:19 124:12,14
**Williams** 3:20 48:16 110:17 124:20 127:16 182:7
**WILLIE** 1:6 122:6
**Windows** 25:4
**winds** 155:17
**winks** 7:8
**Winter** 91:1,16 92:2,9 92:11 247:21
**witness** 9:9 12:19 26:15 48:24 58:17 65:2 83:9 86:16 101:5,6,8 120:13 121:10 138:9 161:8 176:8 188:3 196:20 198:7,13 201:25 205:9 213:24 218:7 220:6 224:20 240:14 246:24 247:5 258:21 259:1 260:25 272:12
**witnessed** 101:3
**Women** 242:21
**wonder** 231:17

**word** 35:17 59:22 66:2 66:6,7 134:4 166:13 220:25
**wording** 235:22 236:8
**words** 184:22 248:23
**work** 15:12,16,23 16:24 16:25 17:22 19:6 20:10,14 22:4,5,19 23:15 24:13 25:5 28:12,18 29:5 30:19 31:22 36:21 40:16,18 50:6,20 51:21 54:20 55:3,3 56:11 73:23,25 80:6 82:16 83:4,4,24 84:7 86:11,20 90:21 98:5 100:18 104:7 113:4 114:17 116:24 129:12,14 135:9 141:12,21,24 142:16 142:25 144:24 145:4 145:6 146:17 147:5 150:3,11,12 151:20 152:23 156:16,16 164:18,23 175:15,19 189:14 208:15 211:6 242:3 243:13 252:19 265:19 266:19 268:19
**worked** 14:20 15:1,14 25:23 30:8 31:4 41:1 57:14 94:2 98:3 206:24 226:16 251:3
**worker** 5:19 10:1 24:3 74:16,17,22 111:11 113:10 118:19 126:19 159:16 218:16,21 232:25 260:4,16
**workers** 20:24,25 63:11 117:1 120:14,18 159:4,10 181:9 211:16,20 212:11,12 212:18 215:14 222:12 223:15 225:13,22 232:20 233:4
**working** 24:8 26:17 29:10 32:12 54:3 56:19 57:21 106:1 163:21 208:7 241:19 241:20 255:2
**works** 148:24 157:17 253:2 268:19
**workshop** 158:13 204:21
**workshops** 5:16 96:3 126:16 158:9,10,11 204:19 245:25
**workstation** 117:7,9
**workstations** 239:20
**worlds** 268:20

**worse** 209:6 210:20 270:22
**worth** 169:21
**wouldn't** 32:18 46:16 55:9 62:15 63:3,4 65:6 71:21 159:25 163:22 183:18 184:6 184:7 221:13 263:15 263:15 265:13
**wound** 213:6 231:6
**write** 71:21 156:19 190:22 226:17 235:15 244:1 260:21
**writes** 205:3 260:22
**writing** 75:11 96:15 236:16 258:13
**written** 25:5 44:12 69:12,14 72:3,13,19 72:21 76:2 146:4,5 164:15 182:25 184:1 185:20 253:2 258:7 265:18 267:3
**wrong** 174:21
**wrote** 65:17 71:15 73:3 75:14,20 77:14 79:1 115:18 164:7 196:17 199:8,23 226:17 253:10 266:1

**X**
**X** 5:1 126:1
**X-Y** 268:5

**Y**
**Y** 268:11
**yeah** 22:7 33:12 42:23 46:16 49:18 64:4 75:12,17 88:18 94:17 95:11 116:11 127:19 134:22 136:7 142:10 142:10 152:24 158:17 158:17 161:25 162:6 162:12 163:22 165:9 165:9 166:4 168:8,13 170:19,20 175:23 179:4,8 182:18 183:12 190:3 194:24 195:10 197:1 207:25 208:4 210:19 212:15 212:15 217:6 220:20 223:11 228:10,12 231:16 234:23 235:17 238:2,19 240:3 242:5 242:7,8 254:13 258:21 261:4 266:6
**year** 15:15 16:9 17:15 18:11,17 24:21,22 27:22 50:16 64:14

67:1 68:2 69:7,19,20
70:3 71:5,8 88:20
90:4 98:25 99:7
116:24 118:21 132:1
142:11 158:12 207:13
216:20 217:1 240:6
270:22
**years** 15:3 24:20 37:22
102:18 104:17 148:10
155:21 156:9 212:9
223:14 263:1 265:2
**yellow** 153:4,20
**yesterday** 7:22,25 8:16
**York** 2:16,16 123:8:16
**young** 21:2 26:15 36:24

---
**0**

002103 224:15
01-0120-Civ-Gold 1:2
122:2

---
**1**

1 5:8,24 8:10 9:5,8
12:16 13:10 33:24
34:2,3 55:12,12 71:22
111:8 126:8,24
225:19 253:14,16
272:20
**1st** 3:5 124:5
**1:30** 121:13,16
**10** 5:10,21 73:13 74:2
74:11 126:10,21
163:8 175:9 197:23
224:13,14,14,18
226:4,14
**10:30** 58:21
**10:40** 58:22
**100** 113:18 161:17
162:23 175:6 183:19
212:7 230:19 231:20
**100-percent** 210:17,23
210:25 211:14,17,22
212:13 213:3 268:6
270:13,14,15
**10013** 2:16 123:16
**101** 2:2 123:2
**11** 5:23 75:5 126:23
163:19,21 224:13,13
224:15,18 231:11,15
231:23 237:8
**111** 3:5 124:5
**119** 8:21
**12** 76:4 77:10 224:13
**12th** 204:17
**12:23** 121:16
**123** 3:16 124:16
**13** 21:19 23:1,2 28:23
78:18 79:4 109:8,12

1355 8:18
**14** 109:10,14 169:14
189:24
**14th** 37:25 242:5 243:7
**15** 29:1 73:24 109:2
**15th** 202:12
**17** 67:1 110:6
**17th** 194:1,8,15
**18** 110:7
**18th** 67:3
**19** 110:7 169:22
**1900** 2:20,20 123:20,20
**196** 5:9 126:9
**1978** 14:16
**1981** 14:9,13
**1986** 15:4
**1988** 16:2,6
**1989** 17:6,11,18
**199** 5:11 126:11
**1994** 16:19 94:21
**1995** 85:23 92:24 93:3
93.9
**1996** 85:23 89:15
205:19
**1998** 157:13 164:2,5
250:16,17 263:1
**1999** 187:3,20,23 188:5
188:18 250:16 265:3

---
**2**

2 5:9 33:13 42:23 43:3
43:5,15,15 55:14
126:9 127:19 128:2
196:3,5 198:2
**2-21-01** 189:19
**2:54** 176:12
**20** 109:10,15 110:7
176:15
**200** 3:10 5:12 124:10
126:12
**2000** 5:22,23 19:24
20:19,21 21:4,7,15,20
22:6 23:8 25:11,15
26:7,8 28:2,5,9,11,22
29:8,12,21 30:4,14
37:5,8 39:9,15,18,25
40:5 53:1 56:6 62:7
64:25 69:19,20 70:2,5
70:17,20,21 73:11,13
74:22 77:6 78:15 89:9
89:14,20 93:2,4,9
95:24 97:21,24 98:8
98:22 99:1,1,6,7
100:7 102:21,24
103:1 112:11 117:6
120:8,10 126:22,23
131:23 139:22 142:9
143:2,12,14,19,24

144:3 145:11 146:7
147:2,4 151:15 157:1
159:23 160:14 167:8
167:14 168:24 169:7
181:20 182:3 183:6
190:1,10 194:22
205:19 211:14,21
213:1,17 224:25
225:3,16 226:24
229:19 232:13 239:13
240:4,6,6 241:5
250:16 253:6,11
254:5,12 255:3 256:7
258:4,8,14 259:18
261:7,12 262:5
265:10,11 270:14,16
**20005** 3:21 124:21
**2001** 5:10,11 18:17
26:25 27:21 31:10
36:15 37:24 89:23
99:1,8,9 126:10,11
195:15 197:23 198:5
198:22 200:10 242:5
248:25 269:24
**2002** 2:3 31:11,12 70:6
99:2,8 123:3 202:12
204:17 216:20 229:24
232:18 249:4,5
269:19,21 272:13
273:15
**2003** 272:20
**2004** 70:6
**2006** 69:22
**202** 5:14 126:14
**203** 5:15 126:15
**21st** 183:6
**213** 5:17 126:17
**218** 5:18 126:18
**219** 183:6
**220** 5:20 126:20
**224** 5:21,23 126:21,23
**23** 110:23 170:8,11
**24** 170:21 171:1
**240** 5:3 126:3
**243** 5:4 126:4
**25** 2:3 123:3 170:21,24
171:1
**250** 5:14 126:4 209:9
**253** 5:24 126:24
**27** 223:1
**272** 5:5 126:5
**273** 5:6 126:6
**280** 213:21
**2810** 3:5 124:5
**29** 73:23

---
**3**

3 5:11 32:22 42:17,22
42:23 43:3,6,18 59:2
59:2,13 111:6,7
126:11 128:2 130:8
182:6 199:16,19
200:3
**3A** 59:1,10
**3rd** 194:6,8
**3:11** 176:13
**30** 5:11 7:24 11:1
126:11 152:5,11,14
152:19,23
**30th** 200:10
**30(b)(6)** 5:8 9:5 12:19
126:8
**30-day** 152:5,18 154:14
155:3
**3099** 3:10 124:10
**32** 171:8 236:8
**32399-1050** 4:5 125:5
**32720** 3:16 124:16
**32806** 8:21
**32835** 8:19
**33** 176:17 205:12
**33128** 3:6 124:6
**33308** 3:11 124:11
**33401** 2:21 123:21
**34** 206:6,9
**35** 206:6,9
**36** 176:16,20 177:5
**37** 177:5
**38** 177:6
**39** 176:16,23 177:7

---
**4**

4 5:12 43:3,6,19,20
59:12 110:17 126:12
127:12 200:13,15
202:11 204:2
**4122** 255:20
**42** 206:18
**45** 8:1
**48** 182:14
**49** 185:13,14,17 187:2
187:3,23 188:1

---
**5**

5 5:14 43:3,6,21,24
44:9 59:14 71:19
126:14 130:15 202:19
202:22 203:10 239:5
**5:04** 240:20
**5:14** 240:21
**50** 81:24 185:15 186:17
187:5,13,21 188:4
242:8,13
**51** 190:7 192:17 249:12
**52** 197:25 198:25

199:23
**53** 226:20
**56** 189:8 192:4,6

---
**6**

6 5:3,15 45:3,7 71:20
72:1 73:2 126:3,15
133:11 157:6,9
203:13,16
**6th** 272:12 273:15
**6:01** 2:3 123:3 271:9
**60** 270:20

---
**7**

7 5:17,22,23 59:13
65:15 73:9 126:17,22
126:23 158:18 213:20
213:23 226:24 231:11
231:15,23 237:8
254:5 255:3 256:7
258:4,14 261:6,7,12
270:16
**7th** 73:13 259:18 262:5
270:14
**72** 200:12
**725** 3:21 124:21
**7297** 200:12
**74** 218:4
**77** 188:4,10,17,18,24
189:3
**777** 2:20 123:20

---
**8**

8 5:18 71:11,20 79:10
92:16 126:18 159:1,3
218:3,6
**836-2070** 237:1
**86** 15:11,11 189:9
**88** 15:17 17:5

---
**9**

9 5:8,20 38:21 73:9
126:8,20 163:4
202:12 222:25 223:3
**9's** 39:5
**9-14-2000** 227:14
**9:03** 2:3 123:3
**90** 92:21 175:7
**90s** 19:19
**92** 270:20,21
**93** 196:2
**94** 92:21,22 93:10
**95** 66:4 76:12 83:1 90:4
92:21,22 93:11 94:16
94:18 102:12
**96** 18:10 88:24 90:5
93:19 94:16 265:14
**97** 18:10 94:18,20

| | | | | |
|---|---|---|---|---|
| 227:4<br>**98** 181:9 239:24 240:1<br>**99** 2:16 123:16 | | | | |