UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 01-120-CIV-GOLD/SIMONTON

NIGHT BOX
FILED

JUL - 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

———————————————————x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE, INC. by its FLORIDA STATE CONFERENCE OF BRANCHES, et al.,

       Plaintiffs,

   vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

       Defendants.

———————————————————x


**EXHIBITS TO DECLARATION OF ANGELA CICCOLO, ESQ.
IN SUPPORT OF PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**


**VOLUME III**

**EXHIBITS 20-23**

**NAACP v. Harris, 01-120-Civ-Gold/Simonton**

**Exhibits to Declaration of Angela Ciccolo, Esq. in Support of its Motion for
Summary Judgment**

**Table of Exhibits**

**Declarations & Affidavits**

1. Declaration of Noni Jones
2. Declaration of Dr. Henry Flores
3. Affidavit of Ursula Y. Harvey
4. Affidavit of Dr. Ronald Hayduk
5. Declaration of Joanna Clark
6. Declaration of Lorine Walden
7. Declaration of Wallace McDonald
8. Declaration of Ronald Ketterer
9. Declaration of Luis Figueroa
10. Declaration of Theresa James
11. Declaration of Jakelin Green

**Deposition Transcripts and Excerpts**

12. Deposition of George Bruder
13. Deposition of Dick Carlberg
14. Deposition of Julia Stoner
15. Deposition of John Stafford
16. Deposition of Linda Tanko, Volume I
17. Deposition of William Cowles
18. Deposition of Sandra E. Peloquin, Volume I
19. Deposition of Sandra E. Peloquin, Volume II
20. Deposition of Dr. Henry Flores
21. Deposition of Emmett Mitchell, IV (May 20, 2002)
22. Deposition of Janet Modrow (October 22, 2001)
23. Deposition of Janet Modrow in *Johnson v. Bush,* Case No. *00-3542-CIV-King*
    (December 3, 2001)
24. Deposition of Marlene Thorogood (October 18, 2001)
25. Deposition of Janice Kelly (March 25, 2002)
26. Deposition of Joanna Clark (January 28, 2002)
27. Deposition of Gary  E. McIntosh (June 4, 2002)
28. Deposition of Edward C. Kast (May 21, 2001)
29. Deposition of Deanie Lowe
30. Deposition of Pam Iorio (May 6, 2002)
31. Deposition of Adora Nweze
32. Deposition of Deborah Sue Berlinger

33. Deposition of Kandy Wells
34. Deposition of Shirley Rivers-Edwards (May 23, 2002)
35. Deposition of Rondrick Rose
36. Deposition of John Bowman (May 21, 2002)
37. Deposition of Admatha Israel
38. Deposition of David Leahy (May 24, 2002)
39. Deposition of Placide Dossous (January 28, 2002)
40. Deposition of Jermaine Terry (February 1, 2002)

## Responses to Requests for Production of Documents & Interrogatories

41. Defendant's Secretary of State Katherine Harris and Clay Roberts' Objections and Answers to Plaintiff's First Set of Interrogatories
42. Defendant Choicepoint's Responses to Plaintiffs' First Set of Interrogatories
43. Defendant John Stafford's Response to Plaintiff's First Request for Production of Documents
44. Defendant Iorio's Objections and Responses to Plaintiffs' First Set of Document Requests and Interrogatories
45. Defendant Iorio's Objections and Responses to Plaintiffs' Second Set of Document Requests and Interrogatories
46. Defendant David Leahy's Response to Plaintiffs' First Set of Interrogatories
47. Defendant David Leahy's Response to Plaintiffs' Second Set of Interrogatories
48. Defendant Miriam Oliphant's Responses to Plaintiffs' First Set of Interrogatories
49. Defendant Deanie Lowe's Answers and Objections to Interrogatories
50. Defendant Deanie Lowe's Answers to Plaintiffs' Second Set of Interrogatories and Document Request
51. Defendant William Cowles' Response to Plaintiffs' First Set of Document Requests and Interrogatories
52. Defendant William Cowles' Responses to Plaintiffs' Second Set of Interrogatories
53. Defendant Kearney's Response to Plaintiffs' First Set of Interrogatories
54. Defendant Kearney's Response to Plaintiffs' Documents Requests
55. Defendant Kearney's Response to Plaintiffs' Second Set of Requests for Documents
56. Defendant Kearney's Response to Plaintiffs' Second Set of Interrogatories
57. Defendant Kearney's Second Supplemental Response to Plaintiffs' First Set of Interrogatories
58. Defendant Dickinson's Responses to Plaintiffs' First Set of Interrogatories and Request for Production of Documents

## Expert Witness Reports

59. Expert Witness Report of Gary McIntosh
60. Expert Witness Report of David Klausner
61. Expert Witness Report of Dr. Henry Flores
62. Supplementary Expert Witness Report of Dr. Henry Flores
63. Rebuttal Expert Witness Report of Ronald Hayduk

**Memoranda**

64. Memorandum from Ethel Baxter, Division Director, Florida Department of State to All Supervisors of Elections dated June 4, 1999 re: Central Voter File
65. Memorandum from Bill Hanson, Acting Chief, Benefit and Recovery and Special Programs, to Michael Spellman, Office of the Governor, dated February 9, 1995.
66. Memorandum from Carol Canady, Senior Human Service Program Specialist to Operational Program Administrators, Public Assistance Specialist supervisors, Clerical Supervisors dated January 8, 2002

**Tables, Charts & Other Relevant Information**

67. Select Consent Judgments from Voting Rights Litigation Involving Florida Counties
68. Certified Copy of Wallace McDonald's Criminal History from the Florida Department of Law Enforcement
69. Select Historic Racial Discrimination in Florida, Post-1864 State Statutory Provisions
70. Senate Report No. 103-6, Establishing National Voter Registration Procedures for Federal Elections, and for Other Purposes
71. Florida Voter Registration Application Form (Nazyle Rios)
72. DCF Voter Registration Preference Form (A039569)
73. DCF Voter Registration Preference Form (A039122)
74. E-mail Janet DeChristopher, 4/29/02 (A045949)
75. E-mail from Donna Miller to Greg Ferguson, 10/30/2001 (A040811)
76. E-mail from Robert Baker to Carol Canady (A040618-A040619)
77. E-mail from Janice Miller to Norene Moore dated 8/29/01 (A045943-A045944)
78. E-mail from Roseann Liriano to Carol Canady dated 1/09/02 (A040620)
79. E-mail from Norene Moore to Greg Ferguson dated 8/29/2001 (A039027)
80. Letter to Greg Ferguson from Donna Miller dated September 19, 2002 ( A039025-A039026)

**Miscellaneous**

81. Data Processing Services Agreement between Database Technologies ("DBT") & the State of Florida, Department of State, Division of Elections (the "Division")
82. Central Voter File Data Processing Services Agreement between the Division and DBT
83. Clerk Feedback Forms, Hillsborough County, 2000
84. 2000 General Questionnaires, Volusia County
85. Michael T. Lavin's Voter Registration Complaint filed November 10, 2000
86. Letter from Veronica Koval to DCF dated October 30, 2001
87. Letter from Scott Petullo to Ms. Carroll dated November 9, 2000
88. Letter from Veronica Koval to Ed Kast dated September 10, 2001

# PLAINTIFFS' EXHIBIT 20

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3                     MIAMI DIVISION

4

5          Case No. 01-0120-CIV-GOLD/SIMONTON

6    - - - - - - - - - - -:- - - - - x

7    NAACP, INC., et al.,               :

8                    Plaintiffs,        :

9               vs.                     :

10   KATHERINE HARRIS, Secretary of     :

11   State of Florida, et al.,          :

12                    Defendants.       :

13   - - - - - - - - - - - - - - - x

14                         Washington, D.C.

15                         Thursday, May 30, 2002

16          Deposition of HENRY FLORES, PH.D., a witness

17   herein, called for examination by counsel for

18   Defendants, in the above-entitled matter, pursuant to

19   notice, the witness being duly sworn by KAREN YOUNG, a

20   Notary Public in and for the District of Columbia, taken

21   at the offices of Lawyers' Committee for Civil Rights

22   Under Law, 1401 New York Avenue, Northwest, Suite 400,

23   Washington, D.C., at 10:24 a.m. on Thursday, May 30,

24   2002, and the proceedings being taken down by Stenotype

25   by KAREN YOUNG, and transcribed under her direction.

Henry Flores, Ph.D.                                                                    May 30, 2002
Washington, D.C.

**Page 2**

1    APPEARANCES:
2      On Behalf of the Plaintiffs:
3        LORI OUTZS BORGEN, ESQ.
         CARA H. FINEMAN, ESQ.
4        Lawyers' Committee for Civil Rights Under Law
         1401 New York Avenue, N.W.
5        Suite 400
         Washington, D.C. 20005-2124
6        (202) 662-8600
7
       On Behalf of ChoicePoint, Inc.
8        d/b/a Database Technologies:
9        DANIEL A. RESTREPO, ESQ.
         Williams & Connolly, LLP
10       725 12th Street, Northwest
         Washington, D.C. 20005
11       (202) 434-5000
12
     On Behalf of Katherine Harris and Clay Roberts:
13
         JOHN W. LITTLE, III, ESQ.
14       Steel Hector & Davis, LLP
         1900 Phillips Point West
15       777 South Flagler Drive, Suite 1900
         West Palm Beach, Florida 33401-6198
16       (561) 650-7270
17
     On Behalf of William Cowels:
18
         (by telephone)
19
         JAMES CHEROF, ESQ.
20       Josias Goren Cherof Doody & Ezrol, P.A.
         3099 East Commercial Boulevard, Suite 200
21       Ft. Lauderdale, Florida 33308-4311
         (954) 771-4500
22
23
24
25

**Page 3**

1    On Behalf of David Leahy:
2        JEFFREY P. EHRLICH, ESQ.
         SUSAN TORRES, ESQ. (by telephone)
3        Dade County Attorney's Office
         Metro Dade Center
4        111 Northwest 1st Street, Suite 2810
         Miami, Florida 33128
5        (305) 375-5151
6
     On Behalf of John Stafford:
7
         (by telephone)
8
         TRACY I. ARPEN, JR., ESQ.
9        Office of General Counsel
         City of Jacksonville
10       117 West Duval Street, Suite 480
         Jacksonville, Florida 32202
11       (904) 630-1835
12
     On Behalf of Pam Iorio:
13
         (by telephone)
14
         KEN TINKLER, ESQ.
15       Hillsborough County Attorney's Office
         601 East Kennedy Boulevard, 27th Floor
16       Tampa, Florida 33602
         (813) 272-5670
17
18   On Behalf of Deanie Lowe:
19       (by telephone)
20       WILLIAM J. BOSCH, ESQ.
         Volusia County Attorney's Office
21       123 West Indiana Avenue
         DeLand, Florida 32720-4613
22       (386) 736-5950
23
24
25

**Page 4**

1      On Behalf of Fred Dickinson and Kathleen Kearney:
2          (by telephone)
3        GEORGE L. WAAS, ESQ.
         Department of Legal Affairs
4        PL-01, The Capitol
         Tallahassee, Florida 32399-1050
5        (850) 414-3662
6
     ALSO PRESENT:
7
         Corlie McCormick
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1
2              C O N T E N T S
3    THE WITNESS:
4    HENRY FLORES, PH.D.
5        By Mr. Ehrlich ........................... 7
6        By Mr. Little ........................... 39
7        By Mr. Ehrlich ........................ 132
8        By Mr. Waas ........................... 175
9        By Mr. Restrepo ....................... 182
10       By Mr. Arpen .......................... 193
11       By Mr. Bosch .......................... 201
12       By Mr. Tinkler ........................ 207
13       By Mr. Cherof ......................... 207
14       By Ms. Borgen ......................... 216
15       By Mr. Restrepo ....................... 230
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

Henry Flores, Ph.D.                                                                May 30, 2002

Washington, D.C.

Page 6

```
 1           E X H I B I T S
 2   HENRY FLORES, PH.D.
 3   1   Dr. Flores' curriculum vitae ................. 33
 4
 5   2   Hodgkiss letter to Flores, 3/6/02, etc. ....... 54
 6
 7   3   Dr. Flores' expert report ..................... 63
 8
 9   4   Draft report .................................. 65
10
11
12                    - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1      A.   No, not more than 20, but more than ten for
 2   sure.
 3      Q.   Okay.  So you know the general rules of court
 4   reporter etiquette, that I'll let you finish your
 5   answers and you need to let me finish questions.  The
 6   court reporter can't take us both talking at the same
 7   time.  Of course, you need to answer by speaking, for
 8   example, yes or no answer rather than shaking your head
 9   or saying uh-huh or uh-uh, two words that the court
10   reporter can't take down.
11           If at any point you don't understand my
12   question or the questions of anybody today, just ask us
13   to -- tell us so.  Just ask us to rephrase or say our
14   questions a different way.  We want to have a clear
15   record.  At least speaking for myself, I'm not trying to
16   trick you or anything.  I want to make sure we're
17   understanding each other as we go along today.  You are
18   currently a professor?
19      A.   That's correct.
20      Q.   What do you teach and where?
21      A.   I teach political science at the graduate and
22   undergraduate level at St. Mary's University in San
23   Antonio, Texas.
24      Q.   Have you been retained to provide expert
25   opinions in this case?
```

Page 7

```
 1           P R O C E E D I N G S
 2   Whereupon,
 3               HENRY FLORES, PH.D.,
 4       called for examination by counsel for
 5       Defendants and having been duly
 6       sworn by the Notary Public, was examined and
 7       testified as follows:
 8                    - - -
 9   EXAMINATION BY COUNSEL FOR DAVID LEAHY
10       BY MR. EHRLICH:
11      Q.   Please state and spell your name.
12      A.   Henry Flores, H-E-N-R-Y F-L-O-R-E-S.
13      Q.   Professor Flores, my name is Jeff Ehrlich.  I
14   represent the supervisor of elections for Miami-Dade
15   County, David Leahy, one of the defendants in this case,
16   and I will begin questioning today.  When one of our
17   colleagues join us, we may switch and switch back, but
18   I'm going to begin by asking you some questions about
19   your background.  I see that you have testified many
20   times, and I imagine you've had your deposition taken
21   many times; is that right?
22      A.   That's true.
23      Q.   About how many times have you been deposed?
24      A.   I really can't remember.
25      Q.   More than 20?
```

Page 9

```
 1      A.   Yes, I have.
 2      Q.   By whom have you been retained?
 3      A.   The Lawyers' Committee.
 4      Q.   Is it your understanding that you have a
 5   particular contact person in the Lawyers' Committee?
 6      A.   Yes, I do.
 7      Q.   Who is that?
 8      A.   Lori Borgen.
 9      Q.   Have you worked with other lawyers from the
10   Lawyers' Committee?
11      A.   Yes, I have.
12      Q.   Who?
13      A.   Cara Fineman.
14      Q.   Anyone else?
15      A.   No, I have not.
16      Q.   Have you worked with any other lawyers who you
17   understand to represent the plaintiffs in this lawsuit?
18      A.   Not that I know of.
19      Q.   When were you retained to give expert opinion
20   testimony?
21      A.   The exact date I'm not sure of.  I have looked
22   at the contract letter, but we have a letter of
23   agreement between us and it's dated.
24      Q.   Is that in the documents that you provided
25   this morning?
```

3 (Pages 6 to 9)

Page 10

1    A.   That's correct.
2         MS. BORGEN:  Jeff, I believe it's in the
3    documents that were provided earlier this week.
4         MR. EHRLICH:  To John, okay.
5         MS. BORGEN:  To John, right.  Sent to John and
6    to the repository.
7         BY MR. EHRLICH:
8    Q.   Okay.  Well, do you recall whether that
9    retention occurred this year, in 2002?
10   A.   Yes, it did.
11   Q.   I know you said you couldn't remember an exact
12   date.  Do you remember what month?
13   A.   I think it was March, early March if I'm not
14   mistaken.
15   Q.   Do you recall how you were first contacted
16   about working on this case?
17   A.   If I remember correctly, it was by telephone.
18   Q.   And do you know who called you?
19   A.   Cara Fineman.
20   Q.   Was that before you were retained to give
21   opinions?
22   A.   Yes.
23   Q.   Do you recall how long it was before you were
24   retained that you were first contacted?
25   A.   Just -- no more than a couple weeks.  I don't

Page 11

1    remember the exact timing.
2    Q.   So that might have been in February 2002?
3    A.   It could have been.
4    Q.   Professor Flores, please tell me a bit about
5    your educational background starting with your college
6    education.  Where did you obtain your college education?
7    A.   My B.A.'s from St. Mary's University in 1974
8    in political science and English.  My master's degree I
9    obtained in 1975 from the University of California at
10   Santa Barbara in political science, and my Ph.D. in
11   1981, December of 1981 from the University of California
12   Santa Barbara.
13   Q.   You did a dissertation.  Was that part of your
14   Ph.D.?
15   A.   That's correct.
16   Q.   The dissertation was on land use in Los
17   Angeles?
18   A.   That's correct.
19   Q.   Is that a rough statement?
20   A.   That's a pretty accurate statement.  It's the
21   politics of land use.
22   Q.   Does the subject of your dissertation have
23   anything to do with the opinions you're giving in this
24   case?
25   A.   No, not at all.

Page 12

1    Q.   Since college, where have you been employed?
2    A.   My first employment was for two years
3    beginning in the fall of '79 at Occidental College in
4    Los Angeles, California.
5    Q.   Have all of your -- has all of your employment
6    been in the context of academia since college?
7    A.   Well, one year I taught in a middle school in
8    between Occidental College and Delta College.
9    Q.   That could be academia, couldn't it?
10   A.   It was quite an experience.  It was a magnet
11   school for gang members.  It was street gang members in
12   Los Angeles.
13   Q.   But first -- you began your career at
14   Occidental?
15   A.   Uh-huh.
16   Q.   And I presume you were teaching there?
17   A.   Yes, I was.  I was also the director of urban
18   studies.
19   Q.   What department were you a professor with?
20   A.   Urban studies.
21   Q.   Okay.  Did your teachings in urban studies
22   have anything to do with the opinions that you're giving
23   in this case?
24   A.   Only that I taught an advanced statistics
25   class, but, you know, if anything, it's just a

Page 13

1    technique, but as far as the substantive issues of the
2    case are concerned, no.
3    Q.   Did you use any of the techniques that were
4    the subject of your courses at Occidental College in
5    preparing your report or formulating your expert
6    opinions in this case?
7    A.   One technique, yes, I did.
8    Q.   Which technique is that?
9    A.   Regression analysis.
10   Q.   Did you use regression analysis with regard to
11   all of the subjects that are included in your expert
12   report?
13   A.   No.  In only -- I only used it in three of the
14   areas I looked at.
15   Q.   Tell me the three that you used it in.
16   A.   In comparing the relationship between inactive
17   voters and African American registered voters and
18   comparing the affirmation affidavits in African American
19   registered voters and in comparing the poll workers
20   assignments and African American registered voters.
21   Q.   And so the one that -- you also offered an
22   opinion relating to voters who were removed because they
23   were felons; is that right?
24   A.   That's correct.
25   Q.   And for that -- for the opinions associated

4 (Pages 10 to 13)

Henry Flores, Ph.D.
Washington, D.C.
May 30, 2002

Page 14

1  with that subject, you did not use regression analysis?
2      A.   No, I did not.
3      Q.   How long were you at Occidental?
4      A.   Two years.
5      Q.   And where did you go from there?
6      A.   I went to LA City Schools for a year.
7      Q.   That's the year that you talked about earlier?
8      A.   That's correct, and then from there, I went to
9  Delta College in Bay City, Michigan, which is a
10  community halfway between Saginaw and Midland.
11      Q.   The year you taught at the magnet school in
12  Los Angeles, did your experiences there have anything to
13  do with the opinions you're giving in this case?
14      A.   Not really.
15      Q.   Then you said you moved to -- the name of the
16  college again?
17      A.   Delta.
18      Q.   Delta College in Michigan?
19      A.   That's correct.
20      Q.   Is that college still in existence as far as
21  you know?
22      A.   I think so.
23      Q.   And what did you do there?
24      A.   I taught political science.
25      Q.   Can you be more specific about what you

Page 15

1  taught?
2      A.   American government and a course called Raza
3  Studies, R-A-Z-A.
4      Q.   What is Raza Studies?
5      A.   It is -- I'm not sure exactly what it is, but
6  what it has to do with is the political history of
7  Latinos in the United States.
8      Q.   You're confirming my suspicions about many of
9  my own professors.
10      A.   What I meant was that that particular term
11  came under all kinds of -- when my dean told me to teach
12  it, I said excuse me?  What did you say?
13      Q.   So broadly, you stated it had to do with
14  Latino studies; is that --
15      A.   That's correct, broadly stated.
16      Q.   And that course, I imagine, had nothing to do
17  with the opinions you're offering in this case?
18      A.   No.
19  -- Q.   The American government course you taught --
20  that didn't have anything to do with the opinions you're
21  giving in this case?
22      A.   Only when I covered the subjects of civil
23  rights for about a week or so, but that's about it.  I
24  didn't really go into any great depth.
25      Q.   Where did you go after Delta?

Page 16

1      A.   St. Mary's University, where I'm currently
2  employed.
3      Q.   And did you go as a professor?
4      A.   Yes, I arrived as an assistant professor at
5  St. Mary's.
6      Q.   And you taught political science there?
7      A.   That's correct.
8      Q.   The same general area that you teach now?
9      A.   It's changed a little bit over the years.
10      Q.   I reviewed your resume and it looks as though
11  you teach some classes now that relate to elections or
12  redistricting at least?
13      A.   Correct.
14      Q.   Well, I suppose the answer -- let me ask the
15  question first.  Do any of the courses that you teach
16  now relate to the opinions you've given or are going to
17  give in this case?
18      (Whereupon, Ms. Fineman joined the deposition.)
19      A.   Yes, they do.
20      Q.   What courses?
21      A.   The research methods and statistics classes
22  that I teach at both the graduate and undergraduate
23  level.  I teach the regression technique as part of the
24  class but I also use case studies from voting rights
25  cases to explain how the regression technique is

Page 17

1  utilized, how you can use it in -- with different sorts
2  of databases.
3      Q.   That would be similar to the way you used the
4  regression analysis for the subjects you've already
5  identified?
6      A.   That's correct.
7      Q.   Do you teach any classes that are specifically
8  related to the subject of African Americans and voting
9  rights?
10      A.   In a class I teach that's entitled The
11  Politics of Race and Class -- it used to be race, class
12  and gender until we separated gender out and now there's
13  a subset of gender-related political science classes in
14  my department.  I've taught The Politics of Race
15  Relations and -- which includes the civil rights
16  movement, and I teach everything from the theories of
17  racism that George Morganthau first stipulated to, to
18  the current literature that's available, Cornell West's
19  work for instance.
20          And then I've also included in there
21  literature on Latinos and literature on American Indians
22  and -- so I cover all the major racial groups in the
23  United States and how they've been affected by the
24  political system, how they interact with the political
25  system.  I discuss their voting patterns as well.  And

5 (Pages 14 to 17)

Henry Flores, Ph.D.                                              May 30, 2002
Washington, D.C.

**Page 18**

1  so as far as African Americans, that's where it would
2  appear, in that particular class.
3     Q.   So we've been talking about one class to date;
4  is that correct?
5     A.   Yeah.
6     (Whereupon, Mr. Little joined the deposition.)
7     BY MR. EHRLICH:
8     Q.   Now talking about the entire time you've been
9  employed at St. Mary's, did you teach any classes other
10 than the one you've already talked about that in any way
11 relate to African Americans and their participation in
12 the electoral process?
13    A.   No, not specifically, but I do cover them in
14 other classes. I mean, when I speak -- when I teach my
15 intro to American government class, which is a freshman
16 class, I spend a significant amount of time on civil
17 rights now, more than I used to when I first started
18 teaching, and I do talk about African American politics
19 in that class.
20    Q.   What percentage of the overall class is this
21 civil rights aspect?
22    A.   Probably about 30 percent.
23    Q.   And then what percentage of that is related to
24 voting rights?
25    A.   A significant part of it because I'm more

**Page 19**

1  familiar with that area than I am with other areas of
2  civil rights.
3     Q.   And how does the subject of that class relate
4  to the opinions you're giving in this case?
5     A.   It relates because over the years as I've
6  prepared that particular class, I've had to do some
7  background reading, so my understanding of the general
8  politics of African Americans throughout the southern
9  part of the United States comes out of my preparation
10 for all those classes.
11    Q.   And what specifically about your readings
12 relates to the opinions you've been retained to provide
13 in this case?
14    A.   Well, work -- I mean, you go back as far as
15 1948 with V.O. Key's classical study on southern
16 politics where he discussed the politics of race in
17 various states in the South and how he was the first
18 political scientist who ever really sat down and used
19 empirical techniques to look at the way the different
20 racial groups voted, and he discussed racial politics in
21 great detail in that work. It's like 500 pages long.
22 It's a very big piece. The paperback itself is very
23 large; to Bernie Grofman's "Quiet Revolution," of just
24 now recent vintage where he discusses also the politics
25 of redistricting and voting rights in the various states

**Page 20**

1  in the South.
2     Q.   And what specifically about the politics of
3  voting rights relates to the opinions that you're going
4  to give in this case?
5     A.   Well, fundamentally that African Americans
6  have been discriminated against historically in the
7  United States.
8     Q.   All over the United States?
9     A.   Generally, but more specifically in the South.
10    Q.   And specifically in Florida?
11    A.   There are some examples from Florida, yes,
12 broad histories.
13    Q.   Well, why don't you give some specific
14 examples if you could.
15    A.   Well, the one to refresh my memory that I dug
16 up last night was -- I was -- to help to prepare for my
17 deposition this morning, I was trying to figure out what
18 would be a good example of race relations in Florida, so
19 I typed in Rosewood in the search engine and it dropped
20 all kinds of information on DVDs and anniversary
21 celebrations of the Rosewood massacre, and so I did some
22 reading on that last night. There's a classic example
23 of how ugly race relations could possibly get.
24    Q.   When did the Rosewood massacre occur?
25    A.   1923.

**Page 21**

1     Q.   Can you think of a more recent example of
2  racial discrimination against African Americans in the
3  State of Florida?
4     A.   Well, only newspaper records of police
5  brutality in Miami over the years that have happened.
6     Q.   Can you think of any specific reports?
7     A.   Just from readings in the newspaper of those
8  particular incidents.
9     Q.   And how do you know those are incidents of
10 discrimination?
11    A.   Well, if you -- I don't know.
12    Q.   Do you know of any history of discrimination
13 against African Americans in the State of Florida?
14    A.   Only as a general artifact of the general
15 discrimination African Americans have been experiencing
16 historically in the South.
17    Q.   Is the history of your claimed racial
18 discrimination against African Americans in the State of
19 Florida -- how does it differ from the history of
20 discrimination against African Americans in other
21 southern states?
22    MS. BORGEN: Objection as to form.
23    BY MR. EHRLICH:
24    Q.   You may answer if you understood the question.
25    A.   Could you be more specific?

6 (Pages 18 to 21)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 22

1    Q.   Yes.  Is the history of racial discrimination
2  against African Americans in the State of Florida more
3  severe than the history of discrimination against
4  African Americans in other southern states?
5    A.   What do you mean by more severe?
6    Q.   Is there more of it?
7    A.   I'm not sure you can quantify something like
8  that.
9    Q.   Okay.  So you can't quantify the history --
10  the prominence of racial discrimination against African
11  Americans in the State of Florida; is that right?
12      MS. BORGEN:  Objection as to form.
13    A.   I don't understand your question.
14    Q.   Well, in your report, you conclude that -- you
15  speak of sort of conclusory -- in a conclusory way of
16  this history of racial discrimination in the State of
17  Florida, and I want to understand what is the factual
18  basis for that opinion.
19    A.   Oh, it's just -- I'm just relating to a broad
20  history of discrimination of African Americans in the
21  South generally, and Florida being part of that South,
22  I'm including that as part of the history.
23    Q.   Okay.  And can you -- and I asked you to name
24  if you could specific incidents of racial discrimination
25  towards African Americans in the State of Florida, and

Page 23

1  you mentioned the Rosewood incident.
2    A.   Correct.
3    Q.   Can you think of any others?
4    A.   Not right off the top of my head.
5    Q.   Can you think of any others in Miami-Dade
6  County?
7    A.   Not right off the top of my head.  I'd have to
8  look into that.
9    Q.   Have you looked into that?
10    A.   Not for this report.
11    Q.   Do you intend to look into that?
12    A.   I may.  I may.
13    Q.   I want to talk to you a bit about some of the
14  testimony you've listed in your expert report along with
15  your resume.
16      MS. BORGEN:  Jeff, could we go off the record
17  for a minute?
18      MR. EHRLICH:  Sure.
19      -  -   (Discussion off the record)
20      BY MR. EHRLICH:
21    Q.   Professor Flores, in reviewing your litigation
22  research and expert legal testimony section, it appears
23  as though you've testified regarding a history of racial
24  discrimination before; is that right?
25    A.   That's correct.

Page 24

1    Q.   You have found a history of racial
2  discrimination in San Antonio, Texas; is that correct?
3    A.   That's correct.
4    Q.   In the State of Texas, in west -- I'm sorry.
5    A.   That's correct.
6    Q.   You need to --
7    A.   Yes, that's right.
8    Q.   So for the State of Texas the answer is yes?
9    A.   Yes.
10    Q.   West Texas?
11    A.   Yes.
12    Q.   East Texas?
13    A.   Yes.
14    Q.   Pecos County?
15    A.   Yes.
16    Q.   If I pronounced that right.
17    A.   Pecos.
18    Q.   Pecos County
19    A.   Right.
20    Q.   Harris County?
21    A.   That's true.
22    Q.   The state of New Mexico?
23    A.   I didn't do the history of racial
24  discrimination.  Did I state that in my --
25    Q.   I don't mean to imply that you did.  That was

Page 25

1  my understanding, but if you have not, then feel free to
2  clarify.
3    A.   No, not New Mexico I don't think.  I think
4  what I did is I just did some -- they sent me some
5  data -- I never even appeared -- I was not deposed in
6  that particular trial.
7    Q.   Okay.  Have you made any opinions ever
8  regarding a history of racial discrimination in the
9  state of New Mexico?
10    A.   No.
11    Q.   Have you done work regarding racial
12  polarization in the state of New Mexico?
13    A.   Yes, I have.
14    Q.   What does that mean?
15    A.   What does what mean?
16    Q.   Racial polarization.
17    A.   Racial polarization?  In election studies,
18  it's when voters of two different racial groups vote
19  dramatically different from each other.
20    Q.   Is that a product of racial discrimination?
21    A.   It's an artifact of it.
22    Q.   Have you found a history of racial
23  discrimination in Arizona?
24    A.   I'm beginning to.  I'm just beginning that
25  research right now.

7 (Pages 22 to 25)

**Page 26**

1    Q.  Have you formed an opinion yet regarding a
2 history of racial discrimination in Arizona?
3    A.  Not -- I haven't finished my work there yet so
4 I'm not ready to conclude too many different things.
5 That trial's been put off to January I guess at this
6 point so my work has stopped for the time being.
7    Q.  Have you formed any opinions yet regarding a
8 history of racial discrimination in the state of
9 Arizona?
10    A.  Not yet. What I've formed opinions of are
11 just racial polarization at this point.
12    Q.  Okay. What about Wisconsin?
13    A.  I didn't do any history of racial
14 discrimination in Wisconsin.
15    Q.  Was that also a polarization study?
16    A.  Yes.
17    Q.  Did you conclude that there is racial
18 polarization in the state of Wisconsin?
19    A.  Yes, I did.
20    Q.  Have you ever undertaken an analysis and
21 concluded at the end of your analysis that there was not
22 racial polarization in a geographic area you were
23 studying?
24    A.  In parts of geographical areas I've studied,
25 yes.

**Page 27**

1    Q.  I'm talking about the geographical area. If
2 you need an example, I can give one. For example, if
3 you were asked to determine whether there's racial
4 polarization in the city of Milwaukee, my question is
5 have you ever undertaken such an analysis and concluded
6 that there was not a history of racial polarization in
7 the city of Milwaukee? Not parts of the city of
8 Milwaukee. So now if you understand what I'm talking
9 about when I say a geographical unit --
10    A.  Sure.
11    Q.  I'll repeat the question. Have you ever
12 undertaken an analysis of a particular geographical unit
13 and concluded that there is not a history of -- or that
14 there is not racial polarization in that unit?
15      MS. BORGEN: Objection as to form.
16      MR. EHRLICH: What's the objection?
17      MS. BORGEN: To clarify what type of analysis
18 of racial polarization in what? Is it in voting? In --
19 You have --
20      BY MR. EHRLICH:
21    Q.  I'm sorry. You used racial polarization, and
22 I think you said in the elections context.
23    A.  In elections.
24    Q.  That's what I'm speaking of.
25    A.  Okay.

**Page 28**

1    Q.  So to repeat, have you ever undertaken an
2 analysis of a particular geographic unit and at the end
3 of your analysis concluded that there is not racial
4 polarization in that unit?
5    A.  Give me a moment to reflect on that.
6    Q.  Sure.
7    A.  No, not in the unit.
8    Q.  Okay. And I'm going to ask the same sort of
9 question now with regard to a history of racial
10 discrimination. Have you ever been asked to -- have you
11 ever undertaken a study of a particular geographical
12 unit and concluded at the end of your analysis that
13 there is not a history of racial discrimination within
14 that unit?
15    A.  Of the ones that I've studied that are listed
16 in my litigation part or any study at all?
17    Q.  Any.
18    A.  Again, give me a moment.
19    Q.  Sure.
20    A.  Go back and think about that for a second.
21 Not that I can think of, but that question is very -- is
22 really too broad I think. There's like parts of
23 jurisdictions and parts of areas of cities and things
24 that don't show racial polarization. Sometimes there's
25 elections that don't show racial polarization,

**Page 29**

1 individual elections.
2    Q.  Just keep in mind please that my question
3 wasn't asking about polarization. I was asking about a
4 history of racial discrimination.
5    A.  Oh, I'm sorry.
6    Q.  So if you want to think again and give the
7 answer, you might have been focused on the wrong --
8    A.  Yes, I was focused on the wrong thing.
9    Q.  So the question is whether you've ever
10 undertaken a study of a particular geographical unit and
11 concluded at the end of your analysis that there is not
12 a history of racial discrimination in that unit as a
13 whole.
14    A.  I can't recall. I really can't recall. The
15 reason is I've looked at some counties in California and
16 you'll find discrimination in the school system, but you
17 won't necessarily find it in other parts of the
18 community.
19    Q.  Right.
20    A.  So it will -- you know, it will vary from
21 jurisdiction to jurisdiction, but if you want one
22 complete broad statement and say if you find one issue,
23 one item of racial -- or one example of racial
24 discrimination in one jurisdiction and classify that as
25 the total of everything, all those things being -- you

Henry Flores, Ph.D.                                                    May 30, 2002
Washington, D.C.

---

**Page 30**

1  know, I don't know how to answer that particular
2  question.
3      Q.   Well, my question was a bit more focused.
4  What I'm asking is if you've been asked to undertake a
5  study of a particular school district.
6      A.   Yeah.
7      Q.   Have you ever concluded, for example, using
8  this as an example, that in that school district,
9  there's not a history of racial discrimination?
10      A.   In the school districts that I've studied for
11  litigation purposes, I've always found a history of
12  discrimination.
13      Q.   How about this. Have you ever offered an
14  expert opinion in litigation that there was no history
15  of racial discrimination?
16      A.   No. In some of the employment cases I have,
17  but those are specific organizations.
18      Q.   Right. I'm talking about geographical units.
19      A.   No.
20      Q.   The type of testimony that you've been
21  retained to give here, for example, with regard to the
22  State of Florida.
23      A.   Yeah, no.
24      Q.   That type of testimony, have you ever
25  concluded that there's not a history of racial

---

**Page 31**

1  discrimination?
2      A.   No, I have not.
3      Q.   Have you ever testified regarding a history of
4  racial discrimination in the State of Florida?
5      A.   No, I have not.
6      Q.   Anywhere in the State of Florida, including
7  sub-geographical units?
8      A.   No.
9      Q.   Do you recall approximately how many times
10  you've actually testified in court as an expert witness?
11      A.   We counted them last night but I can't
12  remember what the final total was. Do you remember what
13  it was?
14      MS. BORGEN:  You have to answer.
15      A.   Oh, I have to answer. No, I can't. I'd have
16  to count through my resume.
17      Q.   Do you want to give me an estimate or you can
18  feel free to look through your resume if that will --
19  refresh
20      A.   Almost 50 times, and I think 24 of them were
21  voting rights cases.
22      Q.   Okay. So you've testified in court
23  approximately 24 times as an expert in voting rights
24  cases?
25      A.   Not actually testified in court. Sometimes

---

**Page 32**

1  it's settled before.
2      Q.   Right.
3      A.   You know, or it just depends.
4      Q.   Okay. My question is limited to testifying in
5  court. Can you --
6      A.   I'd have to go through to tell you the exact
7  number of times I've testified in court.
8      Q.   Can you give me an estimate?
9      A.   Well, just say it's more than ten.
10      Q.   Has a court, to your knowledge, ever refused
11  your attempt to testify as an expert witness in a case
12  in court?
13      A.   No.
14      Q.   In how many of these cases listed in your
15  resume was your expert opinion related to discrimination
16  or polarization involving African Americans?
17      A.   Three or four.
18      Q.   I'll let you take a look at it. Can you maybe
19  identify for me which ones?
20      A.   Sure.
21      MS. BORGEN:  I'm not sure which document --
22  what you've given to the witness to look at. In the
23  materials we provided this morning was an updated
24  version of his resume which does not have any changes --
25      MR. EHRLICH:  Why don't we then mark -- oh,

---

**Page 33**

1  this is his updated resume?
2      MS. BORGEN:  Yes.
3      MR. EHRLICH:  Okay. And this differs from the
4  report that you produced in this case?
5      MS. BORGEN:  There's some updates on it,
6  correct, since the time of the report.
7      MR. EHRLICH:  The rest of the report remains
8  the same?
9      MS. BORGEN:  The report's the same, correct.
10      MR. EHRLICH:  Why don't we mark then this
11  separately as an exhibit and then at least we'll know
12  which one we're talking about.
13      MS. BORGEN:  Okay.
14      MR. EHRLICH:  If we can mark as Exhibit 1 a
15  resume provided by Professor Flores this morning through
16  his counsel. We can go off the record while you do
17  that.
18          (Flores Exhibit No. 1
19             was marked for
20             identification.)
21      THE WITNESS:  Do you want me to just identify
22  the cases by name for the record or mark them here?
23      BY MR. EHRLICH:
24      Q.   I tell you what. If you don't mind putting a
25  little check next to the cases --

---

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC  20005

Henry Flores, Ph.D.                                                        May 30, 2002
Washington, D.C.

**Page 34**

1    A.    Sure.
2    Q.    -- that you have listed on your resume that
3    relate to African Americans.
4    A.    These either relate to African Americans or
5    African Americans were part of the lawsuit.
6    Q.    Okay.
7    A.    LULAC and FOCUS versus Midland Community
8    College District, 1993; Willie J. Rollins, Ervine O.
9    Grice and League of United Latin American Citizens
10   Number 188 versus Fort Bend Independent School District,
11   1993; LULAC and Dr. Harold Jones versus North East
12   Independent School District, 1983 through 1995;
13   Milwaukee Branch of the NAACP and Ramon Valdez versus
14   Governor Tommy Thompson and the Wisconsin Association of
15   Trial Judges, 1996. And the current case.
16   Q.    Right, thank you. The first one you
17   identified, LULAC and FOCUS versus Midland Community
18   College District -- what was that case about?
19   A.    It was a Section 2 Voting Rights Act case
20   challenging the at-large election system in the
21   community college district elections.
22   Q.    Is this a vote dilution case?
23   A.    Vote dilution.
24   Q.    And what was your opinion promptly summarized
25   in that case?

**Page 35**

1    A.    I was the Gingles 2, 3 expert in that case.
2    Q.    Sorry to interrupt, but what are 2 and 3?
3    A.    Well, sure.
4    Q.    Relating to -- referring to factors?
5    A.    Yeah, the Gingle -- there -- it's where I look
6    at racial polarization among the electorate and -- which
7    is Gingles 2, and then Gingles 3 is whether or not the
8    white majority votes in the block sufficiently large and
9    consistently enough to negate any possibility of a
10   minority group to elect a candidate of choice.
11   Q.    Are you performing any type of Gingles
12   analysis for this case?
13   A.    No, I have not.
14   Q.    What were your conclusions in LULAC FOCUS?
15   A.    I found that there was racial polarization in
16   that particular election and also not sufficient
17   crossover Anglo votes to combine with the minority votes
18   to elect a minority candidate. That settled out of
19   court.
20   Q.    The next case you identified was Willie J.
21   Rollins et al. versus Fort Bend Independent School
22   District. Was that a voting right case?
23   A.    That was a voting rights case.
24   Q.    And was it a vote dilution case?
25   A.    Yes, it was.

**Page 36**

1    Q.    And what was the subject of your testimony?
2    A.    Again, it was -- I performed the Gingles 2, 3
3    analysis, racial polarization, block voting analysis for
4    that particular case. I found that it existed, but they
5    did not give us Gingles 1 so the court ruled against us.
6    The minority group is not compact enough to draw a
7    district.
8    Q.    Why did you not perform a Gingles analysis in
9    this case?
10   A.    I was not asked to.
11   Q.    The third case you identified is LULAC and
12   Dr. Harold Jones versus North East Independent School
13   District, right?
14   A.    That's correct.
15   Q.    What is LULAC?
16   A.    LULAC is the League of United Latin American
17   Citizens. It's a civic organization founded in 1929 in
18   Corpus Christi, Texas by Mexican American middle class
19   persons I guess, and what -- they have councils in
20   almost every city in the State of Texas and a lot of the
21   large communities throughout the United States, and
22   fundamentally, they do various sorts of civic things.
23   Sometimes they'll sponsor -- they will be plaintiffs in
24   lawsuits, but a lot of times they'll raise money for
25   scholarships and things of that nature.

**Page 37**

1    Q.    And was that a vote dilution case?
2    A.    Yes, it was.
3    Q.    I'm sorry. Did you talk about your analysis
4    in that case yet?
5    A.    In that case?
6    Q.    Yeah. What was the opinion you reached in
7    that --
8    A.    Oh, I found racial polarization in that
9    particular election, and at that time, the court agreed
10   with us.
11   Q.    Racial polarization is the second Gingles
12   factor?
13   A.    Yes.
14   Q.    Did you have any conclusions with regard to
15   other Gingles factors in that case?
16   A.    Just Gingles 3.
17   Q.    Because the reason I ask is you said you found
18   racial polarization. What was your opinion with regard
19   to Gingles 3?
20   A.    That there wasn't a sufficient number of Anglo
21   voters crossing over to vote for the minority candidates
22   so that they could get elected.
23   Q.    The next case you identified is Milwaukee
24   branch of NAACP?
25   A.    Uh-huh.

10 (Pages 34 to 37)

Henry Flores, Ph.D.
May 30, 2002
Washington, D.C.

---

Page 38

1    Q.   That's a voting rights case?
2    A.   Yes.   That was -- I was an expert for an
3  intervener there, so it was a very small segment of that
4  case.
5    Q.   Was that a vote dilution case?
6    A.   Vote dilution.
7    Q.   And what were your conclusions?
8    A.   That racial polarization existed in trial
9  judge elections in Milwaukee.
10   Q.   Any other conclusions?
11   A.   Well, the Gingles 3 also existed, insufficient
12 number of Anglo crossover votes.
13   Q.   And then the last one you identified was this
14 case.
15   A.   That's correct.
16   Q.   What is your understanding of the type of case
17 that this is?
18   A.   That --
19   Q.   And by that, that might be an unclear
20 question.   We've identified some of your other cases --
21   A.   It's a tough.
22   Q.   -- as voting rights cases.   Is it your
23 understanding that this is a voting rights case?
24   A.   Yes.
25   Q.   And what type of voting rights case?

---

Page 39

1    A.   A vote denial case; not a dilution case.
2    Q.   Have you ever testified in a vote denial case
3  as an expert before?
4    A.   No, I have not.
5    Q.   So it's fair to say then that you've never
6  been qualified as an expert on vote denial?
7       MS. BORGEN:   Objection as to form.
8       BY MR. EHRLICH:
9    Q.   Is that true?   Have you ever been qualified as
10 an expert?
11   A.   Specifically in vote denial?
12   Q.   Right.
13   A.   No.
14      MR. EHRLICH:   If I could just take a couple
15 minutes to talk to counsel who joined us late and --
16      MS. BORGEN:   Sure.
17      (Recessed at 11:04 a.m.)
18      (Reconvened at 11:13 a.m.)
19      EXAMINATION BY COUNSEL
20      FOR KATHERINE HARRIS AND CLAY ROBERTS
21      BY MR. LITTLE:
22   Q.   Good morning, Dr. Flores.   My name is John
23 Little, and as I said, I represent the Secretary of
24 State for Florida and the Division of Elections in this
25 litigation, and I'm going to be picking up on the

---

Page 40

1  questioning.   I missed the first few minutes, so if I
2  repeat a question, I'm sure I'll be shouted down asked
3  and answered, and it's not intentional.   If I do ask you
4  a question that you do not understand, I would ask that
5  you stop me, tell me you do not understand the question
6  and I will rephrase it.   All right?
7    A.   Okay.
8    Q.   And if I ask a question and you answer it,
9  we'll have an understanding that you've understood that
10 questioning and -- you understand that question and
11 you're answering it to the best of your ability.
12   A.   Okay, certainly.
13   Q.   Counsel in this case --
14      MS. BORGEN:   Hold on just a minute.   Anyone on
15 the phone still?
16      (Discussion off the record)
17      BY MR. LITTLE:
18   Q.   Dr. Flores, in connection with your
19 deposition, documents were produced to us by counsel for
20 the plaintiffs.   Were you involved in the preparation
21 and collection of those documents?
22   A.   Not really.
23   Q.   Did you send any documents to the plaintiffs'
24 counsel for them to provide to defense counsel?
25   A.   Yes, I did.

---

Page 41

1    Q.   I want to go over if I could briefly some of
2  the deposition transcripts that were provided in this
3  case because we were just talking about the different
4  cases you've testified in.   The first, and I'm not going
5  to mark this as an exhibit but I'll read into the
6  record.   It's Bates page A041347 through 443, and it's a
7  transcript from January 29, 1999.   If you would tell us
8  the style of that case?
9    A.   It's styled Richard Reynoso, Joe Bosquez --
10 That's B-O-S-Q-U-E-Z -- Billy Swain, S-W-A-I-N, League
11 of United Latin American Citizens, Council Number 4427,
12 parentheses, LULAC, plaintiffs, versus --
13   Q.   I'm sorry.   You can just give us the first
14 plaintiff and the first defendant.
15   A.   Oh, okay.   Versus Amarillo Independent School
16 District.
17   Q.   Who were you retained by in that case?
18   A.   The League of -- the United Latin American
19 Citizens through the Mexican American Legal Defense and
20 Education Fund, MALDEF.
21   Q.   And what was the scope of your retention in
22 that case?
23   A.   I was retained to determine whether or not
24 there was any racial polarization in the elections of
25 that -- that occurred in Amarillo City and Amarillo

---

11 (Pages 38 to 41)

**Page 42**

1   Independent School District.
2      Q.   Did you select that deposition transcript to
3   be provided to us?
4      A.   No, I did not.
5      Q.   Do you know where it came from?
6      A.   It came from the files of the Mexican American
7   Legal Defense and Education Fund.
8      Q.   Did you contact them and ask them for a copy
9   of that deposition?
10     A.   No, I did not.
11     Q.   Do you know who did?
12     A.   I think Ms. Borgen of the Lawyers' Committee
13   did.
14     Q.   Do you know why this particular transcript was
15   provided as opposed to, say, some of the other cases
16   you've just discussed with Mr. Ehrlich?
17     A.   I have no idea.
18     Q.   Is there any relation between the issues that
19   you addressed in that case and the case that you're
20   currently involved in, NAACP versus Harris?
21     A.   Only that I discussed some history -- some
22   specific instances of racial discrimination in the
23   community of Amarillo, so really only in that regards.
24     Q.   Do you know of any correlation between racial
25   discrimination in the city of Amarillo and any city in

**Page 43**

1   the State of Florida?
2      A.   No, I do not.
3      Q.   How about any correlation between the city of
4   Amarillo and any alleged racial discrimination within
5   the entire State of Florida?
6      A.   Only that racial discrimination is
7   fundamentally the same thing regardless of whether it's
8   in the State of Florida or any other state of the union.
9   Any time you use race to make a decision against a
10   particular group of people, that's racial
11   discrimination.
12     Q.   But I think in response to Mr. Ehrlich's
13   earlier questions, you've not done any study or analysis
14   of racial discrimination in Florida in order to make a
15   comparison or a contrast with the racial discrimination
16   issues you evaluated with the city of Amarillo, correct?
17     A.   Oh, no, I have not.
18     Q.   The next transcript is Bates page A041444
19   through 778, and it's the case styled Helen Dutmer,
20   D-U-T-M-E-R, versus the City of San Antonio.
21     A.   That's correct.
22     Q.   I'm handing you those two volumes of
23   transcript. Who were you retained by in that case?
24     A.   Ms. Dutmer.
25     Q.   And what were the claims in that case?

**Page 44**

1      A.   Ms. Dutmer claimed that the term limitation
2   law as it exists in San Antonio, Texas discriminated
3   against the Hispanic voters who elected her to her city
4   council district office.
5      Q.   And what conclusions did you reach in that
6   case?
7      A.   I concluded that -- and in fact, the way the
8   term limits were structured in San Antonio, Texas, that
9   they had a dilutive effect on voters generally and
10   Hispanics specifically.
11     Q.   Did you prepare an expert report in that case?
12     A.   I think I did.
13     Q.   Do you have a copy of that report?
14     A.   In the Dutmer files. I'd have to go dig them
15   out. They're in my storage facility.
16     Q.   If you have a copy, we would request that you
17   provide us with a copy of that report.
18     A.   Absolutely.
19     Q.   Thank you. Again, did you select this
20   transcript to be provided to defense counsel or was this
21   handled in the same way as the previous transcript?
22     A.   No, I have never even seen this transcript, so
23   it was provided the same way, I'm assuming.
24     Q.   Any issues in the Dutmer case that have any
25   relationship or correlation to the issues in the NAACP

**Page 45**

1   versus Harris case?
2      A.   Only when I referred to just general racial
3   discrimination.
4      Q.   And when you use that -- or when you give me
5   that category, you're simply saying that in that case,
6   there was an issue of racial discrimination, and in this
7   case, there's a question of racial discrimination; is
8   that correct?
9      A.   There's a history of racial discrimination in
10   San Antonio is what I'm saying, and just discrimination
11   in general exists throughout the South. I'm using it in
12   very broad, general terms.
13     Q.   And do you consider -- when you say
14   discrimination throughout the South, are you talking
15   historical discrimination or present-day discrimination?
16     A.   Historical discrimination is what I'm
17   referring to.
18     Q.   When you use the term "historical
19   discrimination," tell me what you mean by that. Is that
20   more than ten years ago, more than five years ago? In
21   your field of expertise, when you use the term
22   "historical discrimination," what do you mean?
23     A.   It could go from yesterday back 150 years,
24   200, 300 years.
25     Q.   When you've used the term in this deposition

12 (Pages 42 to 45)

Henry Flores, Ph.D.                                                          May 30, 2002
Washington, D.C.

Page 46

1  "historical discrimination," what do you mean? What
2  period of time?
3      A.  I'm referring to just in broad general terms
4  from recent – from a recent time frame from the current
5  year to back through the days of slavery.
6      Q.  All right.  The next transcript is Bates page
7  A041779 through 856, and it's the case League of Urban
8  Latin American Citizens versus Roscoe Independent School
9  District.
10     A.  Yeah, Roscoe, yes.
11     Q.  Same question and answer about the selection
12  of that transcript.  You did not select that transcript
13  to provide to us?
14     A.  No, I did not.
15     Q.  Who were you retained by in that case?
16     A.  By LULAC through the offices of Mr. Rolando
17  Rios.
18     Q.  And what were the issues in that case?
19     A.  Again, I was retained to look at the racial
20  polarization among the electorate in Roscoe, Texas.
21     Q.  What conclusions did you reach in that case?
22     A.  That there was severe racial polarization in
23  the history of Roscoe, and there was also a very ugly
24  history of racial discrimination in that particular
25  community.

Page 47

1      Q.  Same question, any correlation or relationship
2  between your analysis and conclusions in the Roscoe case
3  and the present case of NAACP versus Harris?
4      A.  If you had Rosewood, we have Roscoe in
5  Florida.
6      Q.  Are you saying, Dr. Flores, that the Rosewood has
7  something to do with the NAACP versus Harris case?
8      A.  What I'm saying is the Roscoe -- the African
9  American community in Roscoe was burned out.  They were
10  literally run out of town.  Their community was burned
11  down, and that was part of the evidence I spoke of in
12  this particular case.
13     Q.  Well, let me return to my specific question.
14  Are you claiming, Dr. Flores, that the Rosewood case in
15  Florida has anything to do with the NAACP versus Harris
16  case?
17     A.  Only that it's part of the history of racial
18  discrimination, an artifact of that in Florida.
19     Q.  No other purpose?
20     A.  No other purpose.
21     Q.  The last transcript, A041857 through 1967,
22  Perez versus Pasadena Independent School District.  Same
23  question on your selection of that transcript.  Not
24  involved?
25     A.  Not involved.

Page 48

1      Q.  Okay.  Who was your client?
2      A.  The Perez family.
3      Q.  What were the issues in the case?
4      A.  The issues had to do -- I was retained to do
5  the Gingles 2, 3 analysis in this particular case,
6  racial polarization and white block voting against
7  minority candidates.
8      Q.  And what conclusions did you reach in that
9  case?
10     A.  That there were in both categories.
11     Q.  Same question as any relationship between your
12  analysis or conclusions in the Pasadena case and the
13  NAACP versus Harris.
14     A.  I didn't do a history of racial discrimination
15  in this particular case.  I did not testify to that in
16  the Pasadena case, so there's no relation.
17     Q.  You've been qualified to testify as an expert
18  witness in courts before, correct?
19     A.  That's correct.
20     Q.  What fields have the courts qualified you as
21  an expert?
22     A.  Voting rights law and labor law, employment
23  law.
24     Q.  Any other fields you can recall?
25     A.  No.

Page 49

1      Q.  Has a court ever refused to qualify you as an
2  expert in any area?
3      A.  Never.
4      Q.  And I understood previously that no court has
5  ever refused to qualify you as an expert overall.  Is
6  that accurate?
7      A.  Correct.
8      Q.  Have you ever had an expert report that you
9  prepared strickened?
10     A.  No.
11     Q.  Have you ever had any challenges to your
12  opinions under the Daubert or Kumho Tire standards?
13         MS. BORGEN:  Objection as to form.
14     A.  I don't understand what those standards are.
15     Q.  Are you familiar with the Supreme Court
16  decision of Daubert or Kumho Tires?
17     A.  No.
18     Q.  There's a lack of foundation for that question
19  then.  Going back to Exhibit Number 1 and the cases that
20  you marked that involved your analysis of African
21  American voters, do you have transcripts of any
22  depositions given in those cases?
23     A.  Let me look at those cases again so I can
24  refresh my memory.
25     Q.  And my question assumes that there was a

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Henry Flores, Ph.D.                                                    May 30, 2002
Washington, D.C.

---

Page 50

1   deposition given in the case. I'm just trying to hurry
2   it along.
3        A.   Right, sure. I was deposed in LULAC and Focus
4   versus Midland Community College District, Rollins
5   versus Font Bend Independent School District, and LULAC
6   versus North East Independent School District, but I
7   don't have copies of my depositions in any of those
8   cases that I know of. I'm assuming the attorney of
9   record has them.
10       Q.   Do you keep copies of depositions you've given
11  in any cases?
12       A.   Just on occasion. I don't really make a habit
13  of it.
14       Q.   Do you know of any cases that you have copies
15  of your depositions that are shown on Exhibit Number 1
16  that are not in the stack that we've just walked through
17  and identified by Bates number on the record?
18       A.   Yes.
19       Q.   Which transcripts do you have, Dr. Flores?
20       A.   Harris versus City of Houston, and what's the
21  other one? I'm trying to remember. There's another
22  one. It was very, very short. Oh, no. You got it
23  here. It's Dutmer. It's part of the Dutmer deposition,
24  so only one.
25       Q.   And what did Harris versus City of Houston

---

Page 51

1   involve? What issues?
2        A.   I was retained to do the Gingles 2, 3 analysis
3   for Mr. Harris, Dr. Harris. He was challenging the City
4   of Houston's annexation of his community, and the
5   municipal utility districts hired me as the expert for
6   that particular case. It was a temporary restraining
7   order. They hired another expert for the trial I think
8   it was, or they settled it. I'm not sure exactly what
9   went on beyond the TRL, but it's a very short
10  deposition, just a few pages long, but I'll be glad to
11  furnish that for you.
12       Q.   Dr. Flores, we've used the term in this
13  deposition African American voters. Do you consider
14  black Florida voters and African American Florida voters
15  to be the same group of people?
16       A.   Yes.
17       Q.   And you would see no difference, in other
18  words, as we would use those terms, those two groups of
19  people would be identical and overlap identically?
20       A.   Well, you know, I'm sure that there's some
21  national origin questions as well there. For instance,
22  there might be some Haitians in the population or
23  whatever, but generically speaking, when I do the voting
24  analysis, I use both terms interchangeably, yes.
25       Q.   That being black voters and African American

---

Page 52

1   voters?
2        A.   That's correct.
3        Q.   What do you understand the class of plaintiffs
4   to be in this case or the class that is seeking to be
5   certified in this case to be?
6        MS. BORGEN: Objection as to form.
7        BY MR. LITTLE:
8        Q.   You can answer.
9        A.   Well, I'm not testifying in a class
10  certification case, am I? At least that's not my
11  understanding. Pardon me?
12       Q.   Sorry. I didn't mean to interrupt you.
13       A.   Well, you were starting first, so go ahead.
14  What were you going to say?
15       Q.   Have you reviewed the second amended complaint
16  filed in this case?
17       A.   Yes.
18       Q.   Do you know what class the plaintiffs are
19  seeking to certify in this case?
20       A.   All I was asked to do is to look at the
21  statistical relationship between inactive voter lists
22  and the African American registered voters in various
23  counties, so I wasn't asked to look at specific class,
24  so I'm looking at African American voters.
25       Q.   Okay. So the answer to the question is you

---

Page 53

1   don't know what classes the plaintiffs are seeking to
2   certify in this case, correct?
3        A.   You know, I'd have to make an assumption, and
4   I'm not willing to make an assumption without looking at
5   the amended complaint and reading it very carefully.
6        Q.   But as you sit here today, in answer to my
7   question, you don't know what classes the plaintiffs are
8   seeking to certify, correct?
9        A.   Unless it's African American voters.
10       Q.   When were you initially contacted about
11  becoming an expert in this case?
12       MS. BORGEN: Objection, asked and answered,
13  though if you want to go through a few questions to
14  clarify for your own understanding, that's fine.
15       MR. LITTLE: Let's go ahead and mark this as
16  Composite Exhibit Number 2.
17       MR. EHRLICH: For the record, Exhibit 1 was
18  also a composite exhibit. It included multiple pages.
19  I don't know if it was marked that way, but I guess it
20  should be.
21            (Flores Exhibit No. 2
22                 was marked for
23                 identification.)
24       BY MR. LITTLE:
25       Q.   For the record and those on the phone, we've

14 (Pages 50 to 53)

Page 54

1  marked as Composite Exhibit 2 documents that were
2  produced by the plaintiffs starting at Bates page
3  A041968 through A042011, and I will note that within
4  these Bates ranges, as part of this composite exhibit,
5  there are some other Bates numbers because these
6  documents include materials from the repository -- the
7  depository, and their Bates pages are reflected as well.
8  And this is a composite exhibit because it seems to be a
9  multitude of documents that have gone back and forth
10  between the expert and the counsel for the plaintiffs.
11  Dr. Flores, let me direct your attention to page 41976.
12  I'll give you a moment to read that page.
13      A.   Okay.
14      Q.   Was this your first contact with plaintiffs'
15  counsel in this case?
16      A.   It might have been the second contact.
17      Q.   What was the first contact?
18      A.   Just a telephone call.
19      Q.   And you've previously testified about that
20  initial telephone call, right?
21      A.   Correct.
22      Q.   This e-mail is dated February 21st, 2002 at
23  4:56 p.m., as shown on Bates page 41976.  It appears
24  from this single page that you did receive a copy of the
25  plaintiffs' second amended complaint; is that correct?

Page 55

1      A.   That's correct.
2      Q.   The next page is 41977.  What is this
3  document, Dr. Flores?
4      A.   That's my response to Ms. Fineman.
5      Q.   I'm sorry.
6      A.   No, go ahead.
7      Q.   This is dated February 21st at 6:51 p.m.
8      A.   That's correct.
9      Q.   Between the time you received the second
10  amended complaint and the time that you sent your e-mail
11  that's on page 41977, what did you do in connection with
12  this case?
13      A.   I read the second amended report -- complaint.
14  Excuse me.
15      Q.   The first paragraph of your response states,
16  quote, "After reviewing the complaint, I decided that I
17  would very much like to be your statistical expert in
18  the NAACP et al. versus Harris et al.," closed quote.
19  Why did you reach that decision, Dr. Flores?
20      A.   Because I read the second amended complaint,
21  at least parts of it that I was asked to look at for
22  purposes of my retention, and I concluded that I could
23  perform that work.
24      Q.   So your response is in connection with your
25  capabilities?

Page 56

1      A.   That's correct.
2      Q.   In the third paragraph, you detail some areas
3  that you would address, and you ask the question, quote,
4  "Is there more you wish me to look at?" question mark,
5  closed quote.  Were you given other topics to look at
6  subsequent to this e-mail of February 21st?
7      A.   I cannot remember.
8      Q.   In the fourth paragraph, you state, "Given the
9  above data, I can perform regression analyses on the
10  percentages of the occurrences in each of those
11  categories."  Did you perform those analyses?
12      A.   Not in all those categories.
13      Q.   Which categories did you perform the analysis
14  in?
15      A.   I didn't perform regression analysis in any of
16  those categories.
17      Q.   I think you previously told us about the areas
18  where you did perform a regression analysis, correct?
19      A.   That's correct.
20      Q.   When you did perform the regression analyses
21  that you've already told us about, did you perform those
22  against the percentage of African American registered
23  voters or voting age population in each precinct?
24      A.   It was registered voters.
25      Q.   African American registered voters?

Page 57

1      A.   That's correct.
2      Q.   At the very end of your e-mail, you say, "This
3  is" -- quote, "This is indeed an honor, to be asked to
4  be part of such an important case," closed quote.  Why
5  do you consider this to be an important case?
6      A.   Because it was part of the Presidential
7  elections.  I mean, all these difficulties arose as a
8  result of the -- it was part of the Presidential
9  election, so it's an honor to be a part of this.
10      Q.   Have you written or lectured about the 2000
11  Presidential election?
12      A.   No.
13      Q.   Have you written or lectured about any aspect
14  of the 2000 Presidential election in Florida?
15      A.   I haven't given formal lectures, but I've
16  talked about some of the politics surrounding the
17  elections in a couple of my classes.
18      Q.   Which classes were those?  Can you recall?
19      A.   It's a graduate seminar I teach on campaign
20  management, and another graduate seminar on American
21  political institutions.
22      Q.   Have you written or lectured about any of the
23  court decisions that were rendered in connection with
24  the November of 2000 Presidential election?
25      A.   No, I have not.

15 (Pages 54 to 57)

Henry Flores, Ph.D.                                                                    May 30, 2002
Washington, D.C.

| Page 58 | Page 60 |
|---|---|
| 1    Q.  Have you ever been retained by a governmental<br>2 body as an expert?<br>3    A.  Yes.<br>4    Q.  And what governmental body?<br>5    A.  The City of San Antonio has retained me. I've<br>6 been retained by the Arizona Redistricting Commission to<br>7 defend them in a voting rights challenge.<br>8    Q.  On how many occasions have you been retained<br>9 by the City of San Antonio?<br>10    A.  I think only once.<br>11    Q.  Is that the Graham versus City of San Antonio<br>12 case?<br>13    A.  That's correct.<br>14    Q.  Have you been retained by any other<br>15 governmental entity other than the City of San Antonio<br>16 and the redistricting group you just described?<br>17    A.  No, but another governmental agency was an<br>18 intervener in the 1990 round of redistricting in Texas,<br>19 and I had to come to Washington to share findings with<br>20 the Attorney General, 1991 or 2, whenever that was.<br>21    Q.  Were you actually retained by the governmental<br>22 entity or you were analyzing a particular issue and then<br>23 you were coming to --<br>24    A.  I was retained by the Republican Party of<br>25 Texas. | 1    Q.  And what time period do these visits to<br>2 Florida cover?<br>3    A.  I guess the first time I visited Florida had<br>4 to be -- I'm not even sure. Maybe 18 years ago. Maybe<br>5 20 years ago, in round figures.<br>6    Q.  Have you ever read any books on politics of<br>7 the State of Florida, alleged racial discrimination in<br>8 the State of Florida, anything of that nature?<br>9    A.  I've read books and studies on the Cuban<br>10 community in the State of Florida.<br>11    Q.  Can you recall any of those books?<br>12    A.  The book titles, no, but the authors are Maria<br>13 Lourdes Torres, T-O-R-R-E-S. She wrote a book on Cuban<br>14 immigration children. She is a professor at De Paul<br>15 University, and various articles by Professor Dario<br>16 Moreno, M-O-R-E-N-O, from -- I think he's at Florida<br>17 International. I'm not sure, but he is considered one<br>18 of the experts on Cuban voting behavior in the United<br>19 States.<br>20    Q.  Have you read any books with respect to the<br>21 demographics of African Americans in the State of<br>22 Florida, voting trends, politics, social issues, alleged<br>23 discrimination?<br>24    A.  No.  Only the government documents I've looked<br>25 at in preparation for this case. |

| Page 59 | Page 61 |
|---|---|
| 1    Q.  Have you ever been retained as an expert in<br>2 connection with any matter involving the State of<br>3 Florida?<br>4    A.  No, I have not.<br>5    Q.  And then it would logically follow you've<br>6 never testified in a Florida court?<br>7    A.  That's correct.<br>8    Q.  Have you ever worked in Florida?<br>9    A.  No, I have not.<br>10    Q.  Have you ever lived in Florida?<br>11    A.  Just passed through.<br>12    Q.  On how many occasions have you visited the<br>13 State of Florida?<br>14    A.  Maybe four or five.<br>15    Q.  What areas of the state have you been to?<br>16    A.  Miami, Fort Lauderdale, Clearwater and St.<br>17 Augustine.<br>18    Q.  What were the purposes of those trips to<br>19 Florida?<br>20    A.  Visiting friends and just pleasure, vacation.<br>21    Q.  How many days would you say you have been in<br>22 the State of Florida total?<br>23    A.  Probably no more than a few weeks grand total.<br>24    Q.  Two weeks?<br>25    A.  Maybe three. | 1    Q.  Flipping over if we could in Composite Exhibit<br>2 2 to page 41968 to 41969, this is your letter of<br>3 retention; is that correct?<br>4    A.  Yes, it is.<br>5    Q.  It states in the second paragraph of the<br>6 letter that you will be examining mobility rates of<br>7 black Floridians. Did you in fact examine that issue?<br>8    A.  I looked at it, yes. We were talking about<br>9 geographical mobility.<br>10    Q.  The next phrase is whether black Floridians<br>11 are disparately impacted by certain election practices<br>12 and procedures in that state. Did you look at that<br>13 issue?<br>14    A.  Yes.<br>15    Q.  Who selected the certain election practices<br>16 and procedures that you looked at?<br>17    A.  The Lawyers' Committee.<br>18    Q.  Did you have any input in selecting the<br>19 practices and procedures or were you told the practices<br>20 and procedures to look at?<br>21    A.  No.  I was asked to look at certain things.<br>22    Q.  In the last phrase, "and other issues that may<br>23 arise during the course of your work," have you done any<br>24 work that would fall within that rather ambiguous<br>25 category? |

16 (Pages 58 to 61)

Henry Flores, Ph.D.                                                                    May 30, 2002

Washington, D.C.

Page 62

1    A. I don't know.
2    Q. Well, let me ask it this way: Have you
3  performed any work or analysis that would not fall into
4  the two prior categories we just discussed?
5    A. Not that I'm aware of.
6    Q. The last paragraph on the first page asks you
7  not to spend more than a total of 80 hours on the case
8  without consulting with counsel. Do you know
9  approximately how many hours you have on the case now,
10 Dr. Flores?
11   A. I think I'm pushing -- it's more than 90.
12   Q. If I could direct your attention to page 41974
13 of Composite Exhibit 2, what is that document, sir?
14   A. Oh, that's what I was looking for actually.
15 That's my last bill, billing statement.
16   Q. Is that also your first bill?
17   A. So far, yes.
18   Q. The letter dated April 25th -- is that your
19 only billing statement to date in this case?
20   A. That's correct.
21   Q. You have a number of time entries on page
22 41974. Did anyone work with you in performing the
23 services that are reflected on this statement or are all
24 of the hours listed totalling as of April 25th 72.5
25 hours your time?

Page 63

1    A. This is strictly my time.
2    Q. Have you had anyone assisting you on this
3  case?
4    A. I paid an undergraduate student to do some
5  data entry for me.
6    Q. Has anyone else assisted you in performing
7  your work on this case?
8    A. No, not at all.
9    Q. And I take it you've not billed separately for
10 that person's time?
11   A. No. I paid her out of my own funds.
12   Q. And that was strictly data input?
13   A. Strictly data input.
14   Q. No analysis or interpretation?
15   A. None whatsoever.
16      MR. LITTLE: Mark this as Exhibit 3 please.
17        (Flores Exhibit No. 3
18          was marked for
19          identification.)
20      BY MR. LITTLE:
21   Q. Can you tell us what Exhibit 3 is, Dr. Flores?
22   A. It's my expert report.
23   Q. Who was it prepared by?
24   A. Myself.
25   Q. Do you know when you finalized this report?

Page 64

1    A. No, there's no date on this. I'd have to --
2  where would it be? The date is on the -- probably the
3  computer file that holds the report, but I'm assuming
4  that it was completed -- I sent it two days -- I think
5  it was two days prior to its -- when it had to be in, if
6  I'm not mistaken.
7    Q. Are there any opinions that you intend to
8  offer at trial that are not contained in Exhibit Number
9  3?
10   A. There may be depending on any kind of
11 follow-up work I may do.
12   Q. When you say follow-up work, what do you mean
13 by that?
14   A. Well, I may be -- depending on the
15 availability of data from the various counties being
16 made available to me, I may be doing similar sorts of
17 analysis that I performed in here with that new data.
18   Q. Let me ask the question this way: With
19 respect to the data that you have analyzed and described
20 in Exhibit 3, do you have any other opinions about that
21 data other than as stated in Exhibit 3?
22   A. No, not really.
23   Q. Did you prepare a draft of Exhibit 3?
24   A. Yes, I did.
25      MR. LITTLE: Mark this as 4.

Page 65

1        (Flores Exhibit No. 4
2          was marked for
3          identification.)
4      BY MR. LITTLE:
5    Q. For those on the phone, we're marking as
6  Exhibit 4 some documents that were produced in the
7  deposition. Exhibit 3 was the report that's been
8  previously circulated. For the record, Exhibit Number 4
9  is Bates page A042047 through 2075. Can you identify
10 Exhibit 4 for the record, Dr. Flores?
11   A. It's a copy of my draft report.
12   Q. Were there multiple draft reports that you
13 prepared?
14   A. This is the only full-length draft report that
15 I prepared. In other words, there were bits and pieces
16 that I wrote the report up that eventually all came
17 together in this one document.
18   Q. As you prepare the report and edit it, does it
19 overwrite the document as you make corrections?
20   A. Yes.
21   Q. So in other words, on your computer system,
22 this report, for lack of a better term, would be version
23 number 1. It would be the only version on your
24 computer, as opposed to versions 1, 2, 3, 4, 5 as you go
25 through the various edits?

17 (Pages 62 to 65)

Henry Flores, Ph.D.                                                                    May 30, 2002

Washington, D.C.

Page 66

1    A.   Yeah, it would be the only copy on my
2  computer.
3    Q.   Exhibit 4 was sent to the Lawyers' Committee
4  for review; is that correct?
5    A.   That's correct.
6    Q.   Do you know who reviewed it at the Lawyers'
7  Committee?
8    A.   Lori Borgen and Cara Fineman I assume.
9    Q.   Are you aware of any changes that were made
10  between the draft, which is Exhibit 4, and the final
11  report, which is Exhibit 3?
12    A.   Yes.
13    Q.   What changes were those?
14    A.   Give me a moment please.  In paragraph 4D of
15  the draft, I excluded the data from the Orange County
16  Office of the Florida Department of Highway Safety and
17  Motor Vehicles Registration from the final report.
18  Let's see.  What else?
19    Q.   So if I understand you, paragraph 4D in the
20  draft, which is marked as Exhibit 4, was deleted.
21    A.   That's correct.
22    Q.   Why was it deleted?
23    A.   Essentially what I was trying to do at that
24  point was to look at the percentage of -- compare the
25  persons registered at the Department of Motor Vehicles

Page 67

1  in Orange County with the percentage of African American
2  registered voters in Orange County.  The problem was I
3  wasn't sure of what the population of the DMV offices
4  were in that particular county.  In other words, I
5  didn't know if there was one particular county office
6  that was actually servicing clients from another county,
7  and there's no way I could match the data up, so I just
8  said because I couldn't do that, I just left it out of
9  the report.  It's a methodological issue.
10    Q.   So if -- you didn't know whether people who
11  resided in Seminole County could cross the Orange County
12  line and go to the driver's license office and register
13  to vote at that driver's license office?
14    A.   Or get their motor vehicle license.  I didn't
15  know who that agency was servicing.  You know, I didn't
16  know whether it was a regional office, a district office
17  that cut across county lines or what.
18    Q.   The second sentence in paragraph 4D of Exhibit
19  4 relates to the Department of Children and Family
20  Services.  Why was that deleted?
21    A.   For the same reason.  I just wasn't sure how
22  that -- their client group is set up, so I might be
23  comparing more than people from other counties as to
24  just Orange County voters.
25    Q.   Was the subject matter of paragraph 4D in

Page 68

1  Exhibit 4 suggested to you by the plaintiffs' lawyers as
2  one of the topics they wanted you to look at?
3    A.   The registered -- the DMV registrations?
4    Q.   Yes.
5    A.   Yes, and I still may complete that analysis if
6  I can work my way through the methodological issue.
7  That may be part of my follow-up work.
8    Q.   And the methodological issue you're talking
9  about is the one you just described to us?
10    A.   That's correct.
11    Q.   And specifically what would you need to know
12  in order to complete that analysis?
13    A.   What I would need to know is -- to do the
14  regression analysis, I would love to have the
15  registered -- the clientele served by precinct level if
16  I knew that's possible, but I'm not sure that's
17  possible.  If they're given -- if they're registered
18  voters though, I'm assuming that the precinct is
19  assigned in a particular DMV office, but more
20  importantly, I need to know that these are all voters
21  from just Orange County going to that particular office.
22  That's really what I would need to know.
23    Q.   And if voters from other counties go to the
24  particular DMV or Department of Children and Family
25  Services office in Orange County, you would not be able

Page 69

1  to perform this type of analysis?
2    A.   Well, unless I could glean them out one way or
3  the other.
4    Q.   Any other changes or differences between
5  Exhibits 4 and Exhibit 3, your draft and final reports?
6    A.   Let me check.  In paragraph 4E, the fourth
7  line of the paragraph that begins with "Dade County,"
8  comma, I struck everything from "however" to the end of
9  that sentence.
10    Q.   It says "However, there appears to be a
11  negative and statistically significant relationship
12  between non-Hispanic white registered voters and the
13  percentage of poll workers assigned to those precincts
14  having higher percentages of non-Hispanic white
15  registered voters."
16    A.   That's correct.
17    Q.   Why did you strike that language?
18    A.   Well, because I was curious as to why that
19  came out that way, and one of the rules that you always
20  follow in doing statistical work is when there's a
21  statistic that appears to deviate slightly, you try to
22  find the reason for the deviation.  It could be caused
23  by a data entry problem or whatever.  And so what I went
24  and did is I went back and looked at the database that I
25  ran the statistics on and I couldn't find any strange

18 (Pages 66 to 69)

Henry Flores, Ph.D.                                                    May 30, 2002
Washington, D.C.

Page 70

1  patterns.
2      And then I went to the lists where the
3  database came from and I found out something very
4  interesting about Miami-Dade County in that Hispanic
5  voters sometimes identify themselves as African American
6  or Hispanic or white, and I would have to go through
7  every registered voter in Miami-Dade, take all the
8  Hispanics out of the white list and make sure I was
9  looking at just strictly non-Hispanic white voters. It
10  wasn't clear that I could do that, so I just didn't do
11  that work.
12      Q.  Any other changes between Exhibits 3 and 4?
13      A.  Well, I expanded the document list to include
14  more documents.
15      Q.  That's in paragraph number 5?
16      A.  That's correct. I've updated my resume, but
17  give me a moment to go through it again. Let me check
18  it. It doesn't look like it.
19      Q.  The two changes that you have identified for
20  us, apart from the listing of the materials you relied
21  upon, were those changes suggested by you or by the
22  Lawyers' Committee or other counsel in the case?
23      A.  No, they were suggested by me, although I did
24  discuss them with the Lawyers' Committee counsel.
25      Q.  Were there any other suggestions that counsel

Page 71

1  for the plaintiffs made to you in connection with the
2  report that was finalized as Exhibit Number 3?
3      A.  Could you repeat your question again?
4      Q.  Were there any other changes suggested to you
5  by attorneys representing the plaintiffs with respect to
6  the final report that you prepared, which was Exhibit
7  Number 3?
8      A.  Just stylistic, but not substantive.
9      Q.  Returning to your resume, which is marked as
10  Exhibit Number 1, I wanted to ask you quickly about two
11  publications.
12      A.  Sure.
13      Q.  Page 7, bottom of the page, can you tell me
14  what that publication involves?
15      A.  "When Is a Sample Not a Sample?"
16      Q.  Yes, sir.
17      A.  "Some Problems Using Multivariate Statistical
18  Analysis in Voting Rights Litigation Research."
19  Essentially what I was referring to there was a
20  discussion that has been kind of ongoing among
21  statisticians that do voting rights work in the area of
22  statistical significance. When we do regression
23  analysis in an election study, we do generally -- for a
24  litigation case where that's an issue, we're doing an
25  analysis of every vote cast possibly with the exception

Page 72

1  of maybe a few little missed votes here and there that
2  are either overs or unders or whatever, and sometimes we
3  include those in our analysis as well depending on what
4  we're looking at. So what we're really doing a
5  statistical test on is the entire population. We're not
6  looking at a sample.
7      Now, you could -- so there's a debate going on
8  whether that election is really a sample of all the
9  registered voters or a sample of the population or are
10  you just looking at the whole population of votes and
11  just trying to make some conclusion about just the
12  voters that cast their votes that particular day.
13      In that case, it makes the whole issue of
14  statistical significance come into play because if your
15  statistical significance is used to verify whether or
16  not a sample reflects the characteristics of the general
17  population that you're studying, but if you're using the
18  statistical test to measure every possible case in your
19  population, then statistical significance takes on
20  something other than statistical significance.
21      You could say, for instance, that you could
22  run a test on an entire population today and use that as
23  a sample of 100 tests of the population you're going to
24  do 100 days in a row, but as a reflection of -- as that
25  population of a sample as something else, it can't be.

Page 73

1  It's impossible because it's the whole population.
2  That's really what that's about.
3      Q.  Do you have a copy of that paper?
4      A.  Not anymore. I tried to find a copy of that
5  paper the other day actually.
6      Q.  To your knowledge, there is not a copy of this
7  in existence that you're aware of?
8      A.  Well, that was a paper delivered at a
9  conference. I don't know if they kept a copy of those
10  papers or not. Sometimes I don't keep copies of papers.
11  That's not an article that was published.
12      Q.  What does the term "multivariate statistical
13  analysis" mean?
14      A.  Simply that you're using more than one
15  variable when you're doing your analysis.
16      Q.  Are you aware of any authoritative treatises
17  on multivariate statistical analysis in the voting area
18  or the elections area?
19      A.  I don't know if there are authoritative
20  treatises, but I know of a couple of articles. I've
21  seen them. I've not really spent too much time on them.
22      Q.  Are there any articles or treatises that you
23  would consider authoritative in the area of multivariate
24  statistical analysis in voting?
25      A.  Well, it depends on what you mean by

19 (Pages 70 to 73)

Page 74

1 authoritative. To me, all articles are, if they're in
2 refereed journals, are authoritative, just period. I've
3 seen some articles --
4     Q.   You would consider them authoritative?
5     A.   If they're in refereed journals, sure. I
6 think that there -- I've seen a couple.
7     Q.   Can you tell me what those are?
8     A.   No.
9     Q.   Do you know the approximate time frame when
10 you saw those articles?
11     A.   I ran across them a couple years ago. They've
12 been around a few years. There's -- it's not performed
13 very often in voting cases though. Not in voting rights
14 cases.
15     Q.   Can you give me any better leads on where I
16 might find those articles?
17     A.   No, no, but I'm sure that you -- it could be
18 searched out on a regular document search. I'm trying
19 to remember. I think I saw one in a law journal, but
20 I'm not even sure. Maybe Stetson Law Review. Don't
21 quote me on that. I'd have to dig for those things
22 because they are rare pieces.
23     Q.   How about on page 8, the article "Playing
24 Power Politics the American Way?"
25     A.   Again, these are papers that I delivered.

Page 75

1     Q.   What was that about?
2     A.   1987? I don't remember. Oh, that's the one I
3 won the award for. I remember that because I got an
4 autograph on the copy of my paper from a musician who
5 had just picked up a Grammy ward. I accidentally sat
6 next to him on an airplane so I made him autograph my
7 award-winning paper. Essentially what that was is a
8 look at -- it's a structural analysis of economic
9 development politics and their effects on racial
10 segregation in urban areas. It grew out of my doctoral
11 dissertation, is what it was.
12     MR. LITTLE: We're off the record for a
13 minute.
14     (Discussion off the record)
15     BY MR. LITTLE:
16     Q.   Dr. Flores, have you ever been retained by the
17 Lawyers' Committee before?
18     A.   No.
19     Q.   How about any of the other plaintiffs' groups
20 there referenced on the retainer letter, which is the
21 top page of Composite Exhibit 2?
22     A.   The NAACP.
23     Q.   On how many occasions?
24     A.   They were part of group that retained me.
25 They weren't -- they didn't retain by themselves. Maybe

Page 76

1 twice. I'd have to check.
2     Q.   Have you worked with any of the specific
3 lawyers involved in this case on other cases before?
4     A.   I don't know all of the lawyers on this case,
5 but I've never worked with Ms. Borgen or Ms. Fineman
6 before.
7     Q.   Have those been your principal contacts about
8 this case?
9     A.   Yes.
10     Q.   Have you spoken with any of the plaintiffs in
11 this case?
12     A.   No, I have not.
13     Q.   Let me ask you if you would to look at Exhibit
14 Number 3. In paragraph 5, you state that your opinions
15 expressed in paragraphs 4A through 4F is based upon a
16 review of the following documents and data sets and
17 analyses of various data sets that were constructed from
18 the following documents and data sets. Have we been
19 provided with a copy of the analyses of the various data
20 sets that were constructed from the documents and data
21 sets that are listed here in paragraph number 5?
22     A.   Could you be more specific about that?
23     Q.   Well, as I understand what you've written here
24 in paragraph 5, you're saying that your opinion is based
25 on a review of a list of documents and data sets that

Page 77

1 are on pages 4 and 5.
2     A.   That's correct.
3     Q.   And then the sentence continues, "and analyses
4 of various data sets that were constructed from the
5 following documents and data sets." My question is have
6 the defendants been provided with the various data sets
7 that were constructed by you from these various
8 categories listed in paragraph --
9     A.   Oh, I don't know.
10     Q.   Tell me what data sets you constructed.
11     A.   They were data sets that I used to run my
12 regression analyses with so that the data sets
13 themselves include data from other larger data sets.
14 For instance, I was provided by Broward County officials
15 a count of all poll workers in every precinct, so I used
16 that to construct -- that particular variable in one
17 regression analysis. Then the registered voters came
18 out of another data set. I just matched up the precinct
19 numbers to run our regression analysis. So that
20 specific data set was uniquely constructed just to do
21 that work from other sources.
22     MR. LITTLE: Lori, I noticed that there was a
23 CD-ROM that we were given this morning. Is that the
24 data sets he's describing?
25     MS. BORGEN: Yes, you have two CD-ROMs. One

20 (Pages 74 to 77)

Henry Flores, Ph.D.                                                           May 30, 2002
Washington, D.C.

Page 78

1  is called FREDS 2000, and that's one big database, and
2  then the other one is called NAACP versus Harris, and
3  that includes several files on there with these
4  databases that Professor Flores is describing. And if
5  you have specific questions about those or if you want
6  to take a look at what's on the CD, Professor Flores
7  does have his laptop computer here and if you wanted to
8  put in the CD-ROM and open up the CD so you can see
9  exactly what files are on there, we can do that now or
10 after lunch if you're interested in doing that.
11      BY MR. LITTLE:
12      Q.   Dr. Flores, let me ask you to look at these
13 two CDs that counsel just described. The first one is
14 marked FREDS 2000, and then below it, it says, "Files of
15 plaintiffs' expert, Professor Henry Flores, 5/30/02."
16 Do you know what is on that CD?
17      A.   It's a list of -- it's a count of registered
18 voters for the entire State of Florida by precinct and
19 by race.
20      Q.   Is that data -- has that data been in any way
21 changed or manipulated by you in performing your
22 analyses in this case?
23      A.   Only that I took out of there the counts of
24 African American voters for the specific counties that I
25 was looking at, but other than that, it's not been

Page 79

1  changed.
2      Q.   When you say you took out of there, I'm not
3  sure I understand.
4      A.   Well, essentially the process goes like this.
5  I'll take a database of that magnitude and I'll make a
6  copy of it so that I don't touch the master database,
7  and on that copy, I'll eliminate, for instance, if I
8  were looking at Miami-Dade, I would just delete all the
9  other counties off of that second copy of the database,
10 so they're just gone.
11      And then with the Miami database, if I'm
12 looking at just the African American registered voters,
13 I'll eliminate all the rest of the registered voters
14 with the exception of the total count so I can have a
15 percentage of African American registered voters, and
16 then that gives me a database of all the African
17 American voters in Miami-Dade County by precinct.
18      Q.   With that explanation then, if we were to open
19 up the first of these two CDs that are marked FREDS
20 2000, what would we find on there?
21      A.   You should find, if it copied correctly and
22 everything, a count of all the registered voters in the
23 State of Florida by precinct level, identified by
24 county, identified by Congressional district, identified
25 by State Senate, State Assembly district. You'll find

Page 80

1  also a count of registered voters by age, by race and
2  ethnicity. I think they're even listed by gender and by
3  party affiliation.
4      Q.   So this first CD that's marked FREDS 2000 is
5  the raw data that has not been changed or massaged by
6  you; is that correct?
7      A.   That's correct.
8      Q.   The second CD is marked "NAACP versus Harris,
9  Files of Plaintiffs' Expert, Professor Henry Flores,
10 5/30/02." Is this second CD the data that you have
11 analyzed and constructed in connection with forming your
12 opinions?
13      A.   The second CD contains every file that I
14 constructed together with a copy of my expert report and
15 all the exhibits -- actually, there's like duplicate
16 copies of exhibits on there, for all my analyses. There
17 are even some -- I noticed there was even some scratch
18 files that are still in there where I was halfway
19 through the construction of the database. They're not
20 usable, but it's what -- it's everything I have.
21      Q.   So in paragraph 5 of Exhibit 3 where you say
22 that your opinion is based on analyses of various
23 databases that -- or data sets that were constructed,
24 those data sets that were constructed are found on the
25 CD we just described?

Page 81

1      A.   That should be the complete set, yes.
2      Q.   And you don't know of any other data sets
3  constructed by you that would not be on that CD?
4      A.   No.
5      Q.   If -- we'll just do one last thing before we
6  break for lunch. If I could direct your attention to
7  paragraph 5 of Exhibit 3 --
8      A.   Okay.
9      Q.   I just want to run through these documents and
10 data sets. If I understand your report correctly,
11 Exhibit Number 3 is based on the 14 sources of data that
12 are identified in paragraph 5; is that correct?
13      A.   Hold it just one second.
14      MS. BORGEN: Objection as to form.
15      THE WITNESS: Can I confer with counsel for a
16 second?
17      MS. BORGEN: No, actually, you can't. If you
18 know the answer, you can answer, and if you don't, if
19 there are any questions about the question, you can ask
20 for clarification.
21      THE WITNESS: There are some documents left
22 off of this, off this list.
23      BY MR. LITTLE:
24      Q.   Can you tell me what those documents are?
25      A.   And there's also -- there's some CDs --

21 (Pages 78 to 81)

Henry Flores, Ph.D.                                                                                May 30, 2002
Washington, D.C.

. Page 82

1   there's four CDs of data that was provided by Duval
2   County and Hillsborough that I left in San Antonio,
3   Texas that was the basis for Exhibit 3.
4       Q.   All right. So to be complete, Exhibit Number
5   3 of your report was based on you said four CDs?
6       A.   That's correct.
7       Q.   From which counties?
8       A.   Duval and Hillsborough and I think Broward --
9   there was a collection of different counties, but I have
10  those CDs in my study at home.
11      Q.   And these four CDs you know covered Duval and
12  Hillsborough, you think perhaps Broward?
13      A.   Yes.
14      Q.   Are you certain there are four CDs and no
15  more?
16      A.   That's correct, there's only four.
17      Q.   And you said they're at your study at home?
18      A.   That's correct.
19      Q.   And those four CDs were used in preparing
20  Exhibit 3?
21      A.   That's correct.
22      Q.   Were these four CDs used for any other purpose
23  in connection with this report, which is marked as
24  Exhibit 3?
25      A.   Maybe, but I can't be certain because like I

Page 83

1   said, I sometimes take bits and pieces off the data sets
2   but I don't use the whole data set, and sometimes data
3   was provided that I just couldn't use so I just didn't
4   use it.
5       MS. BORGEN: John, can I ask one question for
6   clarification? When you say Exhibit 3, are you
7   referring to the whole report as Exhibit 3 or Exhibit 3
8   of the report?
9       MR. LITTLE: I am -- in the last question, I
10  was referring to Exhibit 3 in this deposition. In the
11  earlier question, I was referring to his Exhibit Number
12  3 to Exhibit 3.
13      THE WITNESS: Oh, okay. I was speaking to
14  Exhibit 3 of Exhibit 3.
15      BY MR. LITTLE:
16      Q.   Correct, when you talked about the four CDs?
17      A.   That's correct.
18      Q.   And then my other question was are these four
19  CDs the basis for any other parts of your final report,
20  which we marked as Exhibit 3 to your deposition.
21      A.   Oh, okay. I don't know. I'd have to
22  double-check that.
23      Q.   Going back to paragraph 5, you said that you
24  saw some documents or databases that you have reviewed
25  and form the basis of your opinions in your final report

Page 84

1   that are omitted from paragraph 5. Did I understand you
2   correctly?
3       A.   Well, I was referring to the four CDs.
4       Q.   Anything else?
5       A.   No.
6       Q.   So between the 14 items listed in paragraph 5
7   of Exhibit 3 to your deposition, the four CDs that are
8   back in San Antonio, Texas and the two CDs that we've
9   previously identified on the record, NAACP versus Harris
10  and FREDS 2000, that is the totality of the documents
11  and data sets that form the bases for your opinions
12  found in this final report?
13      A.   To the best of my knowledge, that's all that's
14  there.
15      Q.   And that's all of the documents or data sets
16  that you've used to form the opinions in your final
17  report?
18      A.   That's correct.
19      MR. LITTLE: Why don't we break here, if
20  that's convenient.
21          (Recessed at 12:29 p.m.)
22          (Reconvened at 1:48 p.m.)
23      BY MR. LITTLE:
24      Q.   Dr. Flores, directing your attention to
25  Exhibit 3, which is your final report, paragraph 5 on

Page 85

1   page 4, I just want to run through the documents and
2   data sets that are referred to in paragraph 5, and my
3   question is how did each of the items listed in
4   paragraph 5 contribute to the opinions which you form in
5   your final report. That's the general question, and I
6   mean, I can ask you that question on each of the items
7   or we can just walk through them and you can tell me
8   what they were and how they formed a basis for your
9   opinion if that would help us speed it along.
10      A.   Okay, I can do the latter. The first one is
11  the NAACP, Inc. et al. versus Katherine Harris,
12  secretary, et al. It's the second amended complaint and
13  it just provided me with what I'm supposed to be looking
14  at and just some background information on the case
15  itself. The next one is Geographical Mobility
16  Population Characteristics, March 1999 to March 2000
17  from the current population reports produced by the U.S.
18  Bureau of the Census, and that provided me with some
19  general data on geographical mobility patterns by race
20  in various -- let me look at it very quickly. It's in
21  the documents that we provided for you.
22      Q.   All right.
23      A.   I did use it.
24      MS. BORGEN: It's -- if you want to take a
25  look at it first, it's in the pile that was produced --

22 (Pages 82 to 85)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 86

1 the documents produced this morning.
2      BY MR. LITTLE:
3      Q. All right. For the record, this is Bates page
4 A042174 through 2180, and as counsel said, the documents
5 that were produced this morning. I'm not going to mark
6 it since we've identified it by Bates page, but if you
7 want to refer to it, Dr. Flores --
8      A. Yes, just to refresh my memory. Yeah, it just
9 gave me a feel for the mobility rates of African
10 Americans on a regional basis throughout the United
11 States. It also provided me with some background
12 information on mobility rates for different sorts of
13 demographic subgroups, age, gender, et cetera et cetera,
14 but it's on a general basis, so it's kind of background
15 information.
16      David Lublin and D. Stephen Voss, Federal
17 Elections Project, American University, was a database
18 of registered voters that they had constructed through
19 the Federal Elections Project. I just used it to really
20 verify lots of the data that I received from FREDS 2000,
21 which I'll talk about in a second.
22      Richard L. Forstall, Population By Counties By
23 decimial Census 1900 to 1990 for the State of Florida
24 from the Population Division of the U.S. Bureau of the
25 Census is a historical -- is a document showing the

Page 87

1 population per census by race for the State of Florida
2 in general. I was trying to get a feel for any kind of
3 trend in the proportional growth rates of African
4 Americans in Florida.
5      Q. Let me stop you there.
6      A. Sure.
7      Q. Did you see any trend in proportional growth
8 rates?
9      A. The population stayed relatively stable until
10 about -- from 1900 to about 1980, and then since 1980,
11 we've seen a huge differential take place in growth
12 rates. It seems like the African American community has
13 grown more in the last 20 years in Florida than at any
14 other time. Either that or the non-Hispanic white
15 community is diminishing. They're either leaving or
16 whatever, the population ratios are changing.
17      Q. Did you see these growth rates throughout the
18 state or in particular areas in the state?
19      A. No, no, it was just the state in general.
20 Population 1999-2000, Florida vital statistics annual
21 report, these I produced for the defendant counties, and
22 what they are are -- wait a minute. I may be mistaken.
23 No, they're quick facts. They're also in the set of
24 documents I think we were giving you this morning, the
25 Florida -- these I downloaded off of the U.S. Bureau of

Page 88

1 the Census web site that produced general demographics
2 for each county in the State of Florida. What I brought
3 with me from Texas was just the defendant counties and
4 the State of Florida itself. I didn't bring the rest of
5 them, but I produced it for every county in the state,
6 and you can just download those off the U.S. Bureau
7 of the Census.
8      Q. And these are Bates pages A042181 through
9 2220, correct? That's what you've produced and just
10 described?
11      A. That's correct.
12      Q. And you used this information in what way?
13      A. To look at the percentage of renters in
14 various counties for the state.
15      Q. Did the information break down the renters by
16 race?
17      A. No. The other thing I used it for was to
18 determine some general population characteristics by
19 race for each county looking at what else I did, and
20 that was just it. I was trying to get a feel for also
21 characteristics of housing, the age of the housing.
22 Nothing that appeared in the report. It's just kind of
23 background information for myself to become familiar
24 with Florida statistics.
25      Q. Did you make notes on those documents as to

Page 89

1 the areas that you focused on?
2      A. No, I didn't write on these documents.
3      Q. The next category was I believe affirmation
4 summary?
5      A. Oh, affirmation summary for the 2000 general
6 election summary, Hillsborough county. Those are data
7 provided by Hillsborough County. They were counts of
8 affirmation, and it was whether, if I remember
9 correctly -- well, that's all it was, counts of
10 affirmation by change of address I think it was and
11 change of name.
12      Q. And how did you make use of that information?
13      A. I used the raw counts, the total counts of
14 affirmations regardless of whether change of address or
15 change of name in my regression analysis that appeared
16 in my expert report.
17      Q. All right.
18      A. Registered voter list 2000 general election
19 for Miami-Dade County.
20      Q. What was that?
21      A. That's a database that I created out of FREDS,
22 so it should be on that -- it will be -- you'll see that
23 database on the NAACP versus Harris CD isolated by
24 itself.
25      Q. That list that's on the CD you just described

23 (Pages 86 to 89)

Henry Flores, Ph.D                                                     May 30, 2002
Washington, D.C.

---

Page 90

1  does not have names on it, correct? It's just voter
2  numbers?
3     A. Oh, gee. Maybe I'm thinking of a different
4  list. I did give a list of names, but I don't think --
5  I didn't use that list. I did get a list of registered
6  voters from Miami-Dade. They have names and they self-
7  identify by Hispanic, et cetera et cetera et cetera, but
8  I didn't use that list at all.
9     Q. So the list that you recall seeing from Miami-
10  Dade that had voters names on it you did not use in
11  rendering the opinions that are found in your final
12  report, Exhibit 3?
13     A. That's correct.
14     Q. And how did you use the -- this synopsis of
15  the Dade elections information out of FREDS for
16  Miami-Dade?
17     A. Oh, I used that as a master data list to just
18  pull all the registered voters off. I assumed that
19  because the State of Florida had used those data to
20  construct their districts, their Congressional districts
21  and their state assembly districts and state Senate
22  districts, that it was good solid data because the state
23  produced it for their own use, so I used all the
24  registered data from the FREDS list for my analysis.
25        In the Schlicting, Tuckel and Maisel --

Page 91

1  Schlicting is S-C-H-L-I-C-T-I-N-G. Tuckel is
2  T-U-C-K-E-L, and Maisel is M-A-I-S-E-L, a scholarly
3  article entitled "Racial Segregation and Voter Turnout
4  in Urban American," The American Politics Quarterly. I
5  just -- it's a scholarly article that I just used for
6  background reading to just get a feel for -- I'd never
7  really seen an article that talked about racial
8  segregation and voter turnout in urban America, so I
9  read it and I used it as kind of background information,
10  but it's not part of my report.
11     Q. Is that a report that's been produced to us?
12     A. Yeah, there's a copy of the article.
13     Q. Bates page A042155 through 2173?
14     A. Yes, this is it.
15     Q. Okay.
16     A. Then there's the FREDS 2000, Florida
17  redistricting system. Do you want me to go over that
18  one again?
19     Q. Is there anything other than what we just
20  spoke to before lunch about the way you used that data?
21     A. No. Response to interrogatory number 39 from
22  Defendant William Cowels -- excuse me if I mispronounced
23  that. Affirmation affidavit from the primary general
24  elections of 2000. Again, I just used that to create --
25  those were raw counts of affirmations by precinct, and I

Page 92

1  used that in my regression analysis as one of the
2  variables.
3        Count of poll workers for Broward, Miami-Dade
4  and Pinellas Counties and for the 2000 general
5  elections. Again, those were literally sheets produced
6  by the election offices that had poll workers counts and
7  the duties that they had, and all I extracted from that
8  are the raw counts of poll workers to use in my database
9  construction.
10        Raymond E. Wolfinger and Steven J. Rosenstone.
11  Wolfinger is spelled W-O-L-F-I-N-G-E-R, and Rosenstone
12  is R-O-S-E-N-S-T-O-N-E. It's a book entitled "Who
13  Votes?" question mark. It's the classical study that --
14  on why people vote in the United States. I was just
15  refreshing myself. G. Bingham Powell. Bingham is
16  B-I-N-G-H-A-M, Powell, P-O-W-E-L-L, "American Turnout in
17  Comparative Perspective." It's a scholarly article that
18  appeared in the American Political Science Review in
19  1986. Again, just some background information on
20  turnout, how to measure turnout, just background reading
21  for myself.
22        And I don't know if I'm pronouncing either the
23  first or last name correctly on this last document. Ruy
24  Teixeira. The first name is R-U-Y. The last name is
25  T-E-I-X-E-I-R-A, a book entitled "The Disappearing

Page 93

1  American Voter," and it's the classical work on why
2  people don't vote. It's kind of the opposite study of
3  what Wolfinger and Rosenstone did.
4     Q. And how was that used in your final report?
5     A. Just some background information on
6  methodologies and things of that nature.
7     Q. Now, I think you also told us about four CDs
8  that you left in your study back in Texas.
9     A. That's correct.
10     Q. And how was that information used by you?
11     A. From each of those CDs, I extrapolated some
12  data for some of my analysis in the specific counties,
13  Duval, Hillsborough. I'd have to look at what the other
14  counties are for sure, but those two I know for sure are
15  on those data sets.
16     Q. And then the last source of information that
17  you used in rendering your opinions that are found in
18  Exhibit 3 to your deposition was the NAACP versus Harris
19  CD that we discussed before lunch, correct, and those
20  were the different data sets that you constructed from
21  these sources that we've just gone through?
22     A. That's correct.
23     Q. Going back to page 2 of your report,
24  Dr. Flores, in paragraph number 2, next to the last
25  line, it states that you've been retained to act as a

---

24 (Pages 90 to 93)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

**Page 94**

1 statistical consultant in this case. Is that the -- is
2 that your understanding as to the nature of your
3 retention?
4    A.   Yes.
5    Q.   And so in your view, the opinions that you are
6 offering are statistical opinions?
7    A.   They're based on statistical analysis, yes.
8    Q.   Do you bring any other discipline into play
9 when you interpret this information other than
10 statistical analysis?
11    A.   I'm not sure I understand your question.
12    Q.   Well, you've said that this is an analysis
13 that you're doing of information, statistical analysis
14 of information, correct?
15    A.   Correct.
16    Q.   Are you bringing any other expertise or
17 discipline to bear when you look at that data that
18 you're analyzing?
19    A.   Just my experience as a statistician and my
20 experience as an expert witness in voting rights cases
21 over the years, and also in employment cases that I've
22 worked.
23    Q.   When you say employment cases, what do you
24 mean by that as to how that has any bearing on this
25 case?

**Page 95**

1    A.   Only in the fact that in almost all of those
2 cases, I perform some sort of statistical process. I
3 ran statistics in those cases to uncover whether or not
4 there was any kind of disparate treatment of employees,
5 and so fundamentally, just my statistical background in
6 legal cases.
7    Q.   The next heading before paragraph 3 is object
8 of reporting, and it states, "I was asked to investigate
9 and report on the following," and you list four
10 categories, correct?
11    A.   That's correct.
12    Q.   Each of those four categories in paragraph 3
13 of Depo Exhibit 3 were identified by plaintiffs'
14 counsel, correct?
15    A.   That's correct.
16    Q.   Paragraph 4 contains your conclusions with
17 respect to the four areas you were asked to investigate
18 in paragraph 3. Is that accurate?
19    A.   That's correct.
20    Q.   In paragraph 4A, in the second sentence, you
21 state, "Given the history of racial discrimination
22 throughout the State of Florida and generally toward
23 African Americans." I'm going to stop there. Which of
24 the documents or databases that we just reviewed in
25 paragraph 5, if any, provided you information about the

**Page 96**

1 history of racial discrimination throughout the State of
2 Florida generally toward African Americans?
3    A.   None.
4    Q.   You told us that you did some research last
5 night and identified the Rosewood case.
6    A.   Yes.
7    Q.   Apart from that research you did last night,
8 is there any other research or information that you have
9 to support your statement "Given the history of racial
10 discrimination throughout the State of Florida generally
11 toward African Americans" as used in this report?
12    A.   As used in this report, what I'm referring to
13 is just the entire pattern of my findings really seem to
14 be reflective of some sort of discriminatory treatment
15 of African Americans because there's just too much
16 consistency involved here. It seems like everything I
17 looked at, there was disparate treatment, whether it was
18 an over-preponderance of inactive voters in those
19 precincts having a high percentage of African American,
20 whether there was an over-preponderance of affirmation
21 affidavits in precincts having a large number of African
22 American registered voters, the purged voters in Duval
23 and Hills County were over -- African Americans were
24 over-represented in those rolls as compared to the
25 population ratios in those two counties, lack of poll

**Page 97**

1 workers in Broward and, what was it? Hillsborough
2 County I guess it was.
3          It just kept going on and on and on, and I
4 said you know, if you look at the totality of the whole
5 thing, then you're seeing, there's a history there based
6 on -- there's got to be a history someplace of this
7 disparate treatment. Where is it so consistent? Why
8 are these patterns so consistent, is really what I'm
9 saying.
10    Q.   So if I understand your answer, because you
11 found in your view disparate treatment in the four areas
12 you looked at, there must be a history of racial
13 discrimination throughout the State of Florida generally
14 toward African Americans?
15    A.   That, and then you get the examples like
16 Rosewood, you know, and even though it occurred in 1923
17 and it was particularly violent, a violence like that,
18 it's been my experience in voting rights cases that I've
19 testified in various parts of the State of Texas
20 specifically, violence like that is only generated when
21 there is a perception of a particular group of people
22 that is -- or their being is defined as less than
23 everybody else and they have no worth, and they're
24 identified by race.
25          If you can go in there and just massacre an

25 (Pages 94 to 97)

Henry Flores, Ph.D.                                               May 30, 2002
Washington, D.C.

Page 98

1  entire community, you really don't care for those people
2  as human beings simply because you're doing it because
3  of their race, and those feelings are generated through
4  a whole history of social relationships between races of
5  people. I'm married to an individual from Mississippi.
6  I go deer-hunting in Mississippi a couple times a year,
7  and inevitably -- you know, I deer-hunt with the former
8  President of the State Senate of Mississippi and a bunch
9  of other very prominent individuals in these particular
10  communities and inevitably, you sit around the campfires
11  talking and they make open jokes of selling black people
12  back and forth.
13       You go to Texas and you still find histories
14  of segregated classrooms that were openly segregated by
15  race. You have histories of violence towards the
16  African American community. You go to Roscoe, Texas,
17  and what was the African American neighborhood is
18  just -- are just charred remains of buildings and
19  concrete foundations. The families were either murdered
20  or run out of town.
21       And there's just too much of that that goes on
22  in the history of the South just in general for Florida
23  to have escaped single-handedly of being the only state
24  in the South that didn't have any type of history of
25  racial discrimination.

Page 99

1    Q.  Dr. Flores, have you ever perceived yourself
2  as being the subject of racial discrimination?
3    A.  I've not perceived myself. I've seen myself
4  be the subject of racial discrimination, certainly.
5    Q.  Could you share that with us?
6    A.  Certainly. The first time I was aware of it
7  was when I started my undergraduate career at Texas Tech
8  University, which is in Lubbock, Texas, and the first
9  day I was there -- I started in mid-semester in the
10  middle of the year, January semester, and the first day
11  I was there, I showed up. It was a dust storm that day
12  and I was not feeling very clean. Not everybody had
13  come back from Christmas break yet. I decided to go
14  down the hallway to take a shower.
15       So I started taking a shower and it was kind
16  of one of those shower rooms that has like 13 shower
17  heads in it, typical in an athletic gym or whatever, and
18  I suddenly felt like I was being watched and I turned
19  around and sure, there was like a dozen or more white
20  guys standing along the wall watching me take a shower,
21  and one of them just bluntly told me, he says, you know,
22  we've never seen a Mexican take a bath before so we
23  thought we'd just check this out. It was pretty --
24  almost a helpless feeling standing there like that.
25       I sit down to the table and eat breakfast and

Page 100

1  everybody would get up and leave. I was the only
2  Mexican in the dorm. I was told by a teacher that I had
3  no business being in college, I should be digging
4  ditches with the rest of the Mexicans simply because
5  that's what Mexicans did, and just -- I mean, I ran into
6  it in the military. I was an Army officer and I served
7  in the first cavalry in Vietnam for two years and I ran
8  into it over there. I ran into it among the officers
9  ranks, I ran into it in the enlisted ranks. I had to
10  deal with it in my unit because the white soldiers and
11  the black soldiers were beating each other at night with
12  baseball bats and I had to put a stop to it. Let's see.
13  Where else did I run into it?
14    Q.  And I'm talking about directed to you,
15  Dr. Flores. That was the question, and you've shared
16  with us in your college days and I think also in your
17  military service.
18    A.  Yeah.
19    Q.  So any other examples that you can think of
20  where you've been the subject of racial discrimination?
21       MS. BORGEN:  Objection as to form.
22    A.  Do you have a more clear question?
23    Q.  You've shared with us some circumstances in
24  which you believe you were subject to racial
25  discrimination.

Page 101

1    A.  Right.
2    Q.  I'm asking are there any others, other
3  circumstances that you can recall other than those that
4  you've shared with us?
5       MS. BORGEN:  Objection as to form.
6    A.  Yeah, there was times in Austin, Texas
7  where -- they let you go into the restaurant but they
8  wouldn't serve you, and after sitting there for an hour,
9  you finally got the hint that no waitress was going to
10  bring you a menu. The waitress just kind of avoided you
11  like the plague, and that happened in my adult life not
12  too long ago. But that's -- you know, I'd have to think
13  some more, but I'm sure I can run across a lot more.
14    Q.  Can you recall any act that you perceive to be
15  a matter of racial discrimination during any of the two
16  to three weeks that you spent in the State of Florida
17  over the last 20 years?
18       MS. BORGEN:  Objection as to form.
19       MR. LITTLE:  Basis of the objection?
20       MS. BORGEN:  No foundation or relevancy to the
21  work he's done in this report.
22       BY MR. LITTLE:
23    Q.  You can answer.
24    A.  I really don't remember.
25    Q.  You cannot recall any circumstance as you sit

26 (Pages 98 to 101)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 102

1  here today?
2      A.   No, I can't.
3      Q.   Have you ever perceived yourself to be the
4  subject of racial discrimination in the context of your
5  voting?
6          MS. BORGEN: Objection as to form.
7      A.   Yes.
8      Q.   Would you please tell me about that?
9      A.   An election judge refused to allow me to vote
10  in San Antonio, Texas because I didn't have a voter
11  registration card and he tried to make a situation
12  uncomfortable enough for me to leave without casting a
13  ballot and I told him I wasn't budging until he verified
14  my registration. I didn't care how long it took.
15      Q.   I don't know the Texas system of voting, so
16  tell me what a registration judge is.
17      A.   Well, it's just an election judge in a polling
18  place. It's not really a judge like in the legal sense
19  of the word. There are poll workers that are certified
20  by the county to make certain decisions about the
21  verification of registered voters, and you present your
22  voter registration card when you come to vote. They'll
23  check you against the rolls and then they'll give you a
24  ballot and you can proceed in your voting at that
25  particular point.

Page 103

1          That day I didn't have my voter registration
2  card and he told me that I couldn't vote, and I told him
3  that -- this is an old white man, and I told him that I
4  have my driver's license, you can look me up in the
5  computer system because there was a laptop there, and he
6  says it would take 45 minutes, it's going to take too
7  long, and I said well, good. I'm going to stand right
8  here until you do it. I'll hold the whole line up if I
9  have to because you're going to check my registration
10  because I have my driver's license, and he did. It took
11  him 20 seconds.
12      Q.   What year was that? Can you recall?
13      A.   The year? It was about three years ago.
14      Q.   Can you recall any other instance of what you
15  perceived yourself to be racial discrimination when
16  you've voted?
17          MS. BORGEN: Objection.
18      A.   No, I can't remember.
19      Q.   Returning to paragraph 4A and the sentence
20  "Given the history of racial discrimination throughout
21  the State of Florida generally toward African
22  Americans," you referenced Rosewood as an example when I
23  asked you to give me the basis for that statement --
24      A.   Uh-huh.
25      Q.   -- in your report, and the fact is you did not

Page 104

1  know about Rosewood at the time you wrote this report,
2  which has been marked as Exhibit 3. You learned about
3  it last night when you were looking on the internet,
4  correct?
5          MS. BORGEN: Objection as to form.
6      A.   No. I'll answer that question.
7      Q.   Then please clarify.
8      A.   No. I mean, I've known about Rosewood for a
9  long long time. It's a very important date in the
10  history of race relations in the United States. I just
11  hadn't recalled it until last night. I was thinking
12  about what would be good examples and then I remembered
13  Rosewood, so I just looked it up on the internet and it
14  gave me a whole history of everything that was going on.
15      Q.   So is it your testimony that when you wrote
16  this sentence, "Given the state of racial discrimination
17  throughout the State of Florida generall toward African
18  Americans" in paragraph 4A of your report, you had
19  Rosewood in mind?
20      A.   No. I had, as I said before, the totality of
21  the continual appearance of disparate treatment of
22  African Americans every time I was putting a data set
23  together.
24      Q.   And I want to come back to that, but you've
25  referred on several occasions in your deposition to the

Page 105

1  history of racial discrimination toward African
2  Americans throughout the South, and if I'm understanding
3  your testimony, you don't have specific incidences in
4  the State of Florida in mind when you make that
5  statement; rather, you're looking at the history of the
6  southern part of the United States. Florida is part of
7  the southern part of the United States. You're aware of
8  a history of racial discrimination in the southern part
9  of the United States, and therefore, that's the basis
10  for your statement of the history of racial
11  discrimination throughout the State of Florida generally
12  toward African Americans?
13          MS. BORGEN: Objection as to form.
14      A.   In general, yes.
15      Q.   Is there a piece that I've missed there? You
16  say in general yes, and I guess what I'm trying to say,
17  is there something specifically that I'm missing when
18  you tell us that you're looking at the history of the
19  South as a whole?
20      A.   I'm not sure what you think you're missing. I
21  don't know -- no, I don't think so.
22      Q.   The rest of that sentence in paragraph 4A
23  states, "And given that the defendant counties share
24  similar racial population percentages as Miami-Dade, I
25  surmise that similar statistical findings may exist in

27 (Pages 102 to 105)

Page 106

1  the defendant counties and in the state as a whole."
2  What similar racial population percentages are you
3  referring to?
4      A.  If you look at Exhibit 9 of my report.
5      Q.  And that Exhibit 9 is the basis for your
6  statement about the similar racial population
7  percentages as Miami-Dade?
8      A.  That's correct.
9      Q.  You finish that sentence by saying, quote, "I
10 surmise that similar statistical findings may exist in
11 the defendant counties and in the state as a whole," end
12 quote.  That's really a supposition on your part; is
13 that correct?
14     A.  Well, also, you know, it will be more -- I
15 guess firmed up more as I do more work on these
16 counties.  If I can get more data from the counties in
17 these four categories and continue the statistical
18 analysis, then that statement will become more firm I
19 think, but at this point, because the patterns are so
20 consistent, if you look at each one of these categories
21 as a whole, you know, together, these patterns are so
22 consistent that I don't see how the consistency will
23 change.
24     Q.  Well, let me go back to my question.  When you
25 say "I surmise that similar statistical findings may

Page 107

1  exist in the defendant counties and in the state as a
2  whole," at this point, that's a supposition on your
3  part, correct?
4      MS. BORGEN:  Objection as to form.
5      A.  It's a general conclusion based upon what I've
6  produced in this report.
7      Q.  It's a supposition, isn't it, Doctor?
8      MS. BORGEN:  Objection as to form.
9      A.  What do you mean by supposition?
10     Q.  It's a guess.
11     A.  No.  It's a conclusion -- general conclusion
12 based upon -- as I said, this is the fourth time I've
13 said this, in the various findings throughout my report.
14     Q.  Well, you use the term "may exist."  You don't
15 state that it does exist, and that's my question,
16 Dr. Flores, and I'm trying to understand where you draw
17 the line between a conclusion and what I'm asking you
18 about, which would be supposition or a guess or, to be
19 fair, an educated guess.
20     A.  To be fair, "may" can be based upon further
21 work as well, but the patterns are so consistent in
22 these counties, in these different areas, that I don't
23 think you're going to find the data suddenly changing
24 midstream and completely showing the opposite effect
25 from here on out.  I think the patterns are going to be

Page 108

1  consistent in every one of these counties I look at.
2  You may find some deviation, but I think in the overall,
3  consistency's going to be there.
4      Q.  But until you look at that additional data in
5  those counties, you don't know that to be a conclusion
6  that you would state as a matter of fact, correct?
7      A.  I can state as a matter of fact based upon
8  what's in this report.
9      Q.  You can state as a matter of fact --
10     A.  Based on what's in my report.  There's facts
11 in my report.
12     Q.  Correct, but when you say that you surmise
13 that similar statistical findings may exist in the other
14 counties and in the state as a whole, until you look at
15 that other data, you cannot state that conclusion that
16 it is in fact the case, correct?
17     MS. BORGEN:  Objection as to form.
18     A.  "May" is just a word that's used because
19 everything -- you know, I use it because I found all
20 these patterns already existing.  If I do more work, I'm
21 concluding these patterns are going -- will be
22 consistent all the way through, as I said.  They're so
23 consistent that there's got to be an unusual turn of
24 events for all of a sudden the data to just turn around
25 and completely show me something different at this

Page 109

1  particular point.  There may be some deviation here and
2  there, but I think if I were to do the same analyses for
3  these four categories for every one of the defendant
4  counties in the overall, I'm willing to bet my
5  reputation that the pattern's going to be the same.
6      Q.  But without the data before you and without
7  your having run that data, is it just that, it's a bet
8  or an educated guess as to what the results would
9  actually show, correct?
10     MS. BORGEN:  Objection, asked and answered.
11     A.  I think I've answered that question.  I did
12 already.  Do you want me to answer it again?
13     Q.  Please.
14     A.  I think that as I gather more data on these
15 same four categories and I rerun the analysis for all
16 the defendant counties and if I could have the data for
17 the entire State of Florida as well and do that
18 analysis, I think overall, you're going to see the same
19 patterns emerge.  I don't think that there's going to be
20 a sudden deviation and these are the only counties in
21 these categories that are going to show disparate
22 treatment and all of a sudden, all the remainder
23 counties go the other way.  Just based upon my
24 experience, I think you're going to see the same
25 consistent pattern all the way through.

28 (Pages 106 to 109)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 110

1  Q.   Now, a moment ago when I asked you about the
2  history of racial discrimination throughout the state,
3  you said that when you look at these four areas and you
4  see this consistent pattern, that leads you to conclude
5  there must be a history of racial discrimination against
6  African Americans in the State of Florida.  Is that
7  correctly stating what you told me?
8  A.   Sure, and I've testified in other voting
9  rights cases that the reason you see statistical
10 patterns play themselves out as far as racially
11 polarized voting is concerned or any kind of racial
12 disparate treatment is because they're based on a
13 history of racial discrimination existing in that
14 particular jurisdiction.
15 Q.   Is your conclusion in this regard affected at
16 all by your only looking at four practices and reaching
17 conclusions in those four areas?  In other words, you
18 didn't look at ten different practices and conclude that
19 there were disparate treatment occurring in some of the
20 ten.  You just looked at four and saw four, so you're
21 concluding a hundred percent, therefore, we must have a
22 history of racial discrimination?
23        MS. BORGEN:  Objection as to form.
24 A.   What I'm doing is testifying to these four
25 particular practices as being a result of that, racial

Page 111

1  discrimination.
2  Q.   Your next sentence says, "If this is the case,
3  then an additional burden is placed on the shoulders of
4  African Americans to verify their registration every
5  time they cast a ballot."  What do you mean, if this is
6  the case?
7  A.   Well, again, if these patterns hold true in
8  all the defendant counties, then that would logically
9  follow.  That's what I mean.
10 Q.   The last sentence of 4A talks about the burden
11 becoming even heavier in these counties that do not
12 maintain lists of inactive voters, and you list six
13 counties, correct?
14 A.   That's correct.
15 Q.   Where did you get that information?
16 A.   I was provided that information by counsel.
17 Q.   Have you done anything to verify the accuracy
18 of that information?
19 A.   No, I have not.
20 Q.   Do you know where those six counties maintain
21 their list of inactive voters?
22 A.   No, I do not.
23 Q.   In paragraph -- excuse me.  In paragraph 4B,
24 the last sentence, you state that, "The contention is
25 borne out additionally by the data from Orange County

Page 112

1  where I found that the percentage of African Americans
2  signing affirmations" slash "affidavits during the 2000
3  general election was higher than the proportion of
4  African Americans residing in that county" -- excuse me,
5  "in the county."  What is the basis for that statement?
6  A.   It was aggregate data provided by Orange
7  County.  In other words, I didn't get it by precinct
8  level.  I just got it by total numbers, total counts.
9  Q.   Is this one of the four disks that's back in
10 Texas?
11        MS. BORGEN:  I believe this was already
12 provided to counsel in the materials that were provided.
13        BY MR. LITTLE:
14 Q.   If the witness could help me know the basis
15 for that statement --
16 A.   Yeah, I don't think it came off of those CDs
17 because it was one sheet that just had aggregate counts.
18        MS. BORGEN:  Actually, it was on the list -- I
19 don't know if you want me to clarify the basis or not?
20 If you would like to -- I can give you a document that
21 if you want to take a look at, you might want to show
22 the witness.
23        BY MR. LITTLE:
24 Q.   I'm showing you what is an excerpt of
25 Defendant Cowels' responses to plaintiff's second set of

Page 113

1  interrogatories, interrogatory number 39.
2  A.   Yes, this is the list.
3  Q.   And so the document we've just identified as
4  interrogatory answer 39 is the basis for your statement
5  that we just read into the record at the end of
6  paragraph 4B in your final report?
7  A.   That's correct.
8  Q.   If I understood your testimony before I
9  arrived today, your conclusions in paragraph 4A and 4B
10 were the result of a regression analysis?
11 A.   That's correct.
12 Q.   Paragraph 4C was not the result --
13 A.   No.
14 Q.   -- of a regression analysis, correct?
15 A.   Correct.  Sorry.
16 Q.   In paragraph 4B, you again use the term "I
17 surmise," and "similar statistical findings may exist in
18 the defendant counties and in the state as a whole."  Is
19 your answer the same with respect to paragraph 4B as 4A
20 on the use of the term "surmise" and "may exist"?
21 A.   Yes.
22 Q.   In paragraph 4D of your final report,
23 Dr. Flores, at the top of page 4, how did you measure
24 the percent of poll workers assigned to a particular
25 precinct?

29 (Pages 110 to 113)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 114

1    A.   Essentially what I did was, for instance,
2   Broward County supplied me with a list of counts of
3   individuals that worked at a specific poll and which
4   polling place they were assigned to.  They were
5   identified by precinct number.  What I did was enter
6   that into -- actually, I didn't do it.  My undergraduate
7   assistant entered it into an Excel spreadsheet, and then
8   I transferred that data to an SBSS spreadsheet where I
9   could do the statistical work.
10       From there, what I did was I computed the sum
11  of all of those poll workers and then created a
12  percentage for each precinct based upon the total sum of
13  all the poll workers, so I literally divided the sum of,
14  for instance, the sum of the number of poll workers in
15  the first precinct by the total number of poll workers,
16  came up with a percentage for that precinct, and that
17  particular exercise was computed for every precinct.
18       Q.   And that's found on the CD that you provided
19  today?
20       A.   Yes.
21       Q.   Marked NAACP versus Harris?
22       A.   That's correct.
23       Q.   Paragraph 4E states that, "A thorough and
24  complete analysis of each of the above relationships
25  mentioned in paragraphs 4A through 4D above was not

Page 115

1   completed because each of the defendant counties did not
2   make available or made available in an unusable format
3   the necessary data."  What counties did not make data
4   available to you?
5       A.   I asked for the same data on inactive voters,
6   affirmation affidavits, purged voters and poll worker
7   counts from each of the defendant counties, and some of
8   the counties gave me different lists, but not one county
9   gave me everything.  So for instance, one county would
10  give me a list of poll workers and then maybe some
11  affirmation affidavits but wouldn't provide me with the
12  purged.
13       That's why you see regression analysis on like
14  three or four of the defendant counties on one topic and
15  not on the others, because I didn't have the data from
16  those other three counties.  So it just depends on -- I
17  mean, there's data missing -- different types of data
18  missing for different counties I guess is what I'm
19  saying.
20       Q.   When you say you requested, you requested
21  through your counsel?
22       A.   That's correct.
23       Q.   What about unusable format?  What information
24  are you referring to there?
25       A.   There was one county, and without disparaging

Page 116

1   anybody, I think it was Orange.  I might be wrong, but
2   Orange, I asked for a list of registered voters at one
3   point from Orange County, and what I received was two
4   CDs of -- they were in a PDF format, so I received
5   beautiful pictures of everybody's registration card, but
6   there was like 46,000 pages of pictures and I couldn't
7   use it.  There's no way I could translate that into a
8   database, so it was just unusable technologically.
9       Q.   Tell me what you mean by your next sentence
10  that starts "Nevertheless" in paragraph 4E.
11       A.   Essentially that the patterns were just so
12  consistent to me in every one of these categories
13  that -- it goes to what I was saying earlier about --
14  when you were discussing the sentences in 4A and 4B,
15  that the patterns were just so consistent that I don't
16  see the patterns deviating very much from here on out.
17       Again, if I were to receive all the data sets
18  for each one of these categories for all the defendant
19  counties, I think in the overall, you're going to see
20  the same patterns emerge, you know.  Again, there may be
21  one pattern or one area where it might deviate, but I
22  think in the overall, you're going to see the same
23  patterns.
24       Q.   So you think -- without looking at this
25  information that you described as either not having been

Page 117

1   provided or unusable, you think your conclusions will
2   remain the same?
3       A.   Fundamentally.
4       Q.   Well, when you say fundamentally, is that a
5   yes or no?
6       A.   Yes.
7       Q.   And the last sentence in paragraph 4E, it's
8   again referring to the long history and you're surmising
9   a similar pattern.  Is your answer the same as to that
10  sentence and what you mean as what we just finished
11  talking about in 4A and 4B when you use that term
12  "surmise" to refer to long history of discrimination?
13       A.   That's correct.
14       Q.   Paragraph 4F of your final report, the first
15  phrase says, "My final conclusion is that African
16  Americans are over-represented on inactive voting
17  lists."  What is the denominator that you are using in
18  reaching that conclusion of over-represented on inactive
19  voter lists?
20       A.   Well, the denominator for the dependent
21  variable is a total number of inactive voters in that
22  county.  The numerator is the total number of inactive
23  voters per precinct, and that's the dependent variable.
24  The independent variable is the percentage of African
25  American voters, which is the total count of African

30 (Pages 114 to 117)

Henry Flores, Ph.D.                                                                 May 30, 2002
Washington, D.C.

Page 118

1  American registered voters in a specific precinct
2  divided by the total number of African American voters
3  in that county.
4      Q.  So that gives me the numerator and denominator
5  for both the independent and the dependent.
6      A.  That's correct.
7      Q.  How about the next phrase,
8  "Over-representation in submissions of affirmation
9  affidavits." Would you give me the numerators and
10  denominators for each of those?
11      A.  Sure. The affirmation affidavits is -- again
12  the absolute number of affirmation affidavits by
13  precinct is the numerator, and the denominator is the
14  total for the entire county.  And the numerator for the
15  African American registered voters is the total number
16  of African American registered voters per precinct
17  divided by the total number of African American voters
18  for the entire county.
19      Q.  The next phrase is "Over-represented among the
20  voters purged because they are identified as felons."
21  Same question.
22      A.  The numerator is the total number of
23  individuals identified as African American felons who
24  were reported as purged divided by the total number of
25  felons purged for that particular county, and -- versus

Page 119

1  the -- there I didn't use African American voters
2  because there was no regression analysis. I compared it
3  to the total population of the county, so the numerator
4  is the percent of African Americans -- the total number
5  of African Americans in the county divided by the total
6  population of the county.
7      Q.  And then lastly, "And are underserved at the
8  polls." Same question.
9      A.  Again, the numerator or the dependent variable
10  is the total number of poll workers in a specific
11  precinct divided by the total number of poll workers for
12  the county, and the independent variable is the total
13  numbers of African American registered voters in a given
14  precinct divided by the total number of African American
15  voters for the county.
16      Q.  In the next sentence, you use the phrase,
17  quote, "The totality of their circumstances," in
18  quotations. Do you see that?
19      A.  Yes.
20      Q.  What are you quoting from?
21      A.  That comes from -- it's kind of a quote out of
22  Gingles versus Thornburg, the Supreme Court decision
23  that laid out the three-prong Gingles test and section 2
24  challenges that talks about the effects of what -- to
25  better understand the discrimination context, you can't

Page 120

1  look at one specific issue or one specific Senate factor
2  or one specific occurrence. You have to consider the
3  totality of all possible circumstances that exist within
4  a particular case around a specific jurisdiction to
5  understand what the disparate treatment of a particular
6  group of people.
7      Q.  Give me the totality of the circumstances
8  here.
9      A.  Well, the totality of the circumstances here,
10  and one of the reasons I put it in quotation marks is
11  they're specific to the four areas that I looked at in
12  this report and specific to the data results that came
13  out of these four variables.
14      Q.  So in this particular report that's been
15  marked as Exhibit 3, the totality of the circumstances
16  are the four areas -- 4A through D, and the data that
17  you've identified in your report, correct?
18      A.  That's what I was asked to look at, yes.
19      Q.  And there's nothing else that would come
20  within this, quote, totality of the circumstances,
21  closed quote?
22      A.  Not as far as my report is concerned.
23      Q.  You then proceed to state, quote, "They deny
24  African Americans an equal opportunity to participate in
25  the electoral processes in the defendant counties

Page 121

1  specifically and throughout the State of Florida
2  generally," end quotation. What is your basis for that
3  statement?
4      A.  It's based on my analysis in my report here,
5  that these -- the disparate treatment of African
6  Americans in each one of these categories acts as an
7  additional burden for African American -- for the
8  ability of African Americans to participate in the
9  polls.
10      Q.  Dr. Flores, if you could turn to page -- let
11  me see. It's not numbered. Exhibit Number 1 to your
12  final report, which is Depo Exhibit 3 --
13      A.  Okay.
14      Q.  The fourth column is marked STD period beta,
15  B-E-A -- excuse me. B-E-T-A.  What does that stand for?
16      A.  That is the standardized beta.  If you were
17  doing a correlation coefficient, that would be Pearson's
18  R for that particular regression analysis.
19      Q.  What does standardized beta mean?
20      A.  How you standardize data I can't explain to
21  you, to tell you the truth, because it's done by the
22  software package, but a standardized beta is -- any time
23  you use the word "standardized" in a statistical test,
24  whether it's a standardized T, a T test or a Z test or
25  an F statistic, what they've gone and done is through

31 (Pages 118 to 121)

Page 122

1    the mathematical manipulation in that particular
2    technique that created an array of numbers that are -- I
3    guess that run from like zero to 1.0, so it's kind of
4    like a standardized format. That's where that term
5    comes from. And then from that, you can use it to
6    compare what is generated with this particular technique
7    to a table and to determine whether it's statistically
8    significant.
9        Q.   What do you consider to be a strong
10   relationship?
11       A.   What do you mean by that?
12       Q.   Well, in the sense of you said statistically
13   significant. The term "strong relationship" and "weak
14   relationship" is used in statistical analysis, correct?
15       A.   Right.
16       Q.   And so -- and you use those terms, correct?
17       A.   That's correct.
18       Q.   What do you mean when you use the term "strong
19   relationship"?
20       A.   It is relative to the type of data that you're
21   using. I'll give you an example. If you are -- if
22   you're working in radiochemistry where you can measure
23   the elements very, very carefully and very precisely and
24   so forth, you're going to have -- a strong relationship
25   could be above a point 9 or something of that nature.

Page 123

1        If you're working with social statistics
2    that -- or population data which is based upon
3    statistical sampling and self-identification where there
4    can be a lot of margins for error, then the strong
5    relationship would be indicated by a much lower figure.
6    So it just depends on your database. So the way you
7    would determine strength in a relationship is dependent
8    upon the specific data you're looking at.
9        Q.   Let's take it in this case specifically and
10   the analyses that you have performed in this case. In
11   this case, what do you consider to be a strong
12   relationship?
13       A.   I wasn't looking at the strength of the
14   relationship here. I was looking at the significance
15   level and the direction of the relationship. I was
16   looking for general patterns.
17       Q.   When you say significance level, tell me what
18   you mean by that.
19       A.   Well, significance level in statistics is
20   based upon a convention of understanding. If you go
21   back and look at the history of this thing, somebody
22   asked Karl Pearson, who's the inventer of Pearson's
23   product moment correlation coefficient, and they asked
24   him what do you consider a strong statistically
25   significance level. He said 95 percent. So that's the

Page 124

1    convention we use now to this day and that's the way it
2    was derived.
3        So different researchers set different
4    standards and levels of significance based upon what
5    they're looking at. Again, go back to the hard sciences
6    where they can absolutely control the sorts of variables
7    that they have. They set statistical significance
8    levels of point 00001. They're extremely high. You go
9    into -- with psychologists and they'll set a
10   significance level of point 01 or point 001 because they
11   have very finite constructive testing instruments that
12   they use in their investigations, and they work a lot in
13   experimental settings so they can control all these
14   variables.
15       You get into the world of sociology and
16   political science and the significance level, the
17   general convention is point 05. Sometimes we'll even
18   use point 10. We never go generally beyond that for the
19   most part. But fundamentally what you're doing, when
20   you say statistically significant is you're saying well,
21   these findings that you have are generally the result of
22   a sample that's been drawn from a larger population, and
23   you use the significance level to determine whether or
24   not your sample mirrors the general characteristics of
25   your total population.

Page 125

1        And if we say that it falls within a certain
2    range of significance, then we can say with a certain
3    percentage of certainty that if you were to draw 100
4    samples from this population and use this test over and
5    over 100 times and 90 percent of the time, 95 percent of
6    the time, 99 percent of the time, you should have
7    similar results.
8        Q.   So if I understood your answer, you did not
9    look to see where the relationships were strong or weak
10   in the report that you prepared as Exhibit 3 in this
11   case. Rather, you looked to see whether there was a
12   statistical significance in your mind and a positive
13   relationship?
14       A.   I was looking for whatever the relationship --
15   whatever the data was going to give me, and -- I mean, I
16   didn't have any preconceived notion. I mean, for all I
17   know, it could have come out looking completely
18   different in some cases, and as a matter of fact -- go
19   ahead. You can look at the significance levels, and
20   they fluctuated all the over the place. The data drove
21   this.
22       Q.   But if I'm understanding your testimony, you
23   looked and found in your exhibits statistical
24   significance and positive relationship. Is that the
25   right terminology?

32 (Pages 122 to 125)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 126

1    A.   In some cases it was positive.  Sometimes it
2  was negative, yes.
3    Q.   The negatives though aren't in the report,
4  right?
5    A.   Sure they are.  Yeah, there's negative
6  relationships in the report.
7    Q.   Okay.
8    A.   Yes, it just depended on what I was looking
9  at.
10   Q.   But going back to the question, you were
11 looking at statistically significant in a positive or
12 negative relationship; not the strength or weakness of
13 the particular relationship; is that right?
14   A.   That's correct.
15   Q.   In this case, how does a point 072 compare
16 with a point 108?
17       MS. BORGEN:  Objection as to form.
18       BY MR. LITTLE:
19   Q.   Those are two standard betas that are found in
20 your charts.
21   A.   Oh.
22   Q.   Point 108's in Exhibit 1 and point 072 is in
23 Exhibit 4.
24   A.   Oh, well, I don't know how they compare
25 because you're looking at two different things.  Exhibit

Page 127

1  1 is registered voters and percent of inactive voters,
2  and Exhibit 4 is registered voters and percent of poll
3  workers.
4    Q.   My question is how do the standard betas
5  compare.
6    A.   You can't compare them.
7    Q.   Looking over at Exhibit Number 6 where your
8  standard beta is point 604, do you consider that a
9  strong relationship?
10   A.   Well, the significance level is point 151.
11 It's only significant 85 percent of the time.  You know,
12 if you were to offer that in a refereed journal of
13 social sciences, you wouldn't accept that.
14   Q.   As a strong relationship?
15   A.   Right.
16       MR. LITTLE:  Can we take about a five-minute
17 break?
18           (Recessed at 2:53 p.m.)
19           (Reconvened at 3:16 p.m.)
20       BY MR. LITTLE:
21   Q.   Dr. Flores, in performing your analyses, did
22 you consider the use of a multivariate statistical
23 analysis?
24   A.   No, but I've been thinking about it.  I
25 haven't -- if I do any more work, I may do it, but I

Page 128

1  haven't looked at it seriously.
2    Q.   Why did you not do it initially?
3    A.   Fundamentally because I was just looking at
4  one variable at a time and I just didn't really think
5  that I needed to do a multiple regression.
6    Q.   And now you're thinking perhaps you might
7  consider it?
8    A.   Maybe.
9    Q.   In what context?
10   A.   In those counties -- if I get all the data for
11 each one of those four areas that I looked at for each
12 county, I may do a multiple regression at that time for
13 the counties where I have complete data sets just to see
14 if there's a multiple effect, but if I don't get the
15 data, I am not going to do that.
16   Q.   How about on mobility, in looking at the
17 impact on mobility?  Were there other factors that you
18 could have considered to see if it had an impact on your
19 conclusions?
20   A.   Other than what's in my report, I don't think
21 I --
22   Q.   I mean, you looked at mobility and race,
23 correct?
24   A.   Correct.
25   Q.   Did you look at any other factors, such as

Page 129

1  mobility and age?
2    A.   I glanced at it but I didn't really spend any
3  time on it because I really didn't have those kind of
4  data.  In other words, the only mobility data on age
5  that I saw was what I produced to you, that Bureau --
6  U.S. Bureau of the Census report that they put out on
7  general mobility in the various regions of the United
8  States, so I didn't -- other than background thinking,
9  material to help me think about mobility, I just didn't
10 really use that report.
11   Q.   So you did not do any type of analysis to
12 control for the possibility of voters' mobility, age, as
13 against race, correct?
14   A.   Not in the statistical analysis, no.
15   Q.   How about in any other context?
16   A.   Just in a general context of where I looked at
17 the renters.
18   Q.   And how did you factor that in in looking at
19 the renters?
20   A.   When I was looking at renters as a general
21 category, I ran them against -- excuse me.  I regressed
22 them against the percentage of African American
23 registered voters in the seven defendant counties I did
24 that regression analysis that -- it appears in Exhibit
25 6.

33 (Pages 126 to 129)

Henry Flores, Ph.D.                                                                May 30, 2002
Washington, D.C.

Page 130

1    Q.   Let me ask if you would pull Exhibits 3 and 4
2    to --
3    A.   In my report?
4    Q.   You've got Exhibit 3, which is the final
5    report, and let me get you Exhibit 4, which is the
6    draft.
7    A.   Right.
8    Q.   And if you would look at paragraph 7 --
9    A.   Of --
10   Q.   -- of the draft and paragraph 7 of the final.
11   A.   Okay.
12   Q.   And specifically, I'd like you to read the
13   first sentence of paragraph 7 in the draft and paragraph
14   7 in the final.
15   A.   The --
16   Q.   I'm sorry.  I meant just give you a moment to
17   read them to yourself.
18   A.   Oh, to myself.  I'm sorry.  All right.
19   Q.   I'm not clear.
20   A.   Okay.
21   Q.   You initially wrote paragraph 7 to refer to a
22   dilution of voting power of African Americans, correct?
23   A.   That's correct.
24   Q.   Why did you write it that way?
25   A.   Because I was mistaken, and I corrected it in

Page 131

1    the final draft.
2    Q.   What were you mistaken about?
3    A.   Well, since I traditionally do vote dilution
4    studies, I just wrote in vote dilution studies, and
5    realized when I was revising it for final submission,
6    that it wasn't.  You know, I just made a
7    mistake.  It's a vote denial.
8    Q.   Did counsel point out that mistake to you when
9    they were reviewing your draft?
10   A.   I don't remember.
11   Q.   In the second sentence of your final report in
12   paragraph 7, you say, "This makes the mobility of
13   African Americans a major cause as to why they tend to
14   populate the list of inactive voters."  What is the
15   correlation between moving and being on an inactive
16   voting list?
17   A.   I didn't do a correlation study, so --
18   Q.   Well, tell me why mobility of African
19   Americans is a major cause as to why they populate the
20   list of inactive voters.
21   A.   Because if they're constantly changing
22   addresses, they're constantly having to update their
23   registration, and because they move at a higher rate
24   than other racial groups, that means that their constant
25   reregistration rate's going to be always higher than

Page 132

1    everyone else's, if they even choose to reregister.
2    Q.   And that puts them on the inactive voter list?
3    A.   I would think that would be one of the reasons
4    for it.
5    Q.   You're not offering any opinions concerning
6    the remedies being sought in this case, correct,
7    Dr. Flores?
8    A.   Correct.
9    Q.   Do you anticipate preparing any demonstrative
10   exhibits for use at trial?
11   A.   Probably my exhibits that are in my expert
12   report.  Beyond that, at this point I'm not thinking of
13   any others.
14   MR. LITTLE:  I don't have any other questions
15   at this time.  Thank you.
16   FURTHER EXAMINATION BY COUNSEL FOR DAVID LEAHY
17   BY MR. EHRLICH:
18   Q.   Professor Flores, again, my name is Jeff
19   Ehrlich, and I represent the Supervisor of Elections for
20   Miami-Dade County, David Leahy.  I'm going to ask you a
21   few questions that are more specific to your analysis as
22   it pertains to Miami-Dade County.
23   A.   Okay.
24   Q.   Before I get to that, I just had a couple of
25   follow-up questions.  Earlier you described an incident

Page 133

1    regarding your voter experience in Texas.
2    A.   Uh-huh.
3    Q.   Did that incident occur during the November 7,
4    2000 Presidential election?
5    MS. BORGEN:  Objection as to form.
6    A.   The incident where I was appointed to the poll
7    myself to cast my ballot and I didn't have my
8    registration card?
9    Q.   Right.
10   A.   No, not the 2000 election.
11   Q.   Was it before or after the 2000 election?
12   A.   It was before.
13   Q.   You testified that in this case, you have not
14   performed any analysis with regard to the Gingles
15   factors?
16   A.   That's correct.
17   Q.   And I think I asked you why and you said you
18   were not asked to; is that correct?
19   A.   That's correct.
20   Q.   Did you suggest that you perform an analysis
21   of the Gingles factors?
22   A.   No.
23   Q.   Were you instructed not to perform an analysis
24   of the Gingles factors?
25   A.   No.

34 (Pages 130 to 133)

Henry Flores, Ph.D.                                                  May 30, 2002
Washington, D.C.

Page 134

1    Q.   Is examination of the Senate factors
2  identified in Gingles one way to determine whether in
3  the totality of the circumstances, a particular class of
4  persons has been denied an equal opportunity to
5  participate in the electoral process?
6        MS. BORGEN:  Objection.
7    A.   I think the courts have ruled that that's part
8  of what you look at, and I think -- and there's a whole
9  array of them, and I think that you -- that whole array
10 put together with voting history, electoral history,
11 things of that nature all go into the soup and then it's
12 up to the judge at that particular time to determine in
13 that specific case if in fact something like that
14 happened.
15   Q.   Did the Senate factors identified in
16 Gingles -- do those generally factor into that
17 determination, that totality of the circumstances
18 determination?
19       MS. BORGEN:  Objection as to form.
20   A.   Well, I'm not a judge, but if I were a judge,
21 you know, and I think I probably might look at it, but
22 like I said, I'd leave that up to the judge to decide
23 that.
24   Q.   Well, you've testified about the other
25 opinions you've given in other cases, and you have

Page 135

1  analyzed Gingles factors.  For what purpose in those
2  other cases?
3    A.   I have most of the time only testified to
4  Gingles 2, 3.  Sometimes I've testified to Senate
5  factors, and on occasion, I've testified to Gingles 1,
6  but most of the time I'm usually considered a Gingles 2,
7  3 expert.  I just look at racial polarization and/or
8  racial block voting.
9    Q.   And when you testified or used those Gingles
10 factors in formulating your opinions, why do you do
11 that?
12   A.   Because I'm asked to do that by whoever
13 retains my services.
14   Q.   And do you know why they ask you to do that,
15 that particular analysis with regard to the Gingles
16 factors?
17   A.   Oh, because that's what I'm recognized as an
18 expert at doing.
19   Q.   And how does that assist you in forming
20 opinions?
21   A.   Well, I form the opinions about racial
22 polarization because it provides hard data for those
23 opinions.
24   Q.   For what opinions?
25   A.   For my opinions on racial polarization in a

Page 136

1  given situation.
2    Q.   Do the Gingles factors assist you in forming
3  your opinions, analysis of the Gingles factors?
4        MS. BORGEN:  Objection as to form.
5        THE WITNESS:  Well, what they are is just
6  really three-prong tests that the court has declared
7  saying, you know, this is what you look at, and then the
8  court determines whether or not the degree of my
9  presentation merits whether or not Gingles 2 or 3
10 exists.
11       MR. EHRLICH:  Court Reporter, could you please
12 read back the last question?
13           - - -
14       THE REPORTER:  Question: "Do the Gingles
15 factors assist you in forming your opinions, analysis of
16 the Gingles factors?"
17           - - -
18       BY MR. EHRLICH:
19   Q.   Professor Flores, I heard your answer and I
20 don't think it was responsive to that question.  Could
21 you please answer that question?
22   A.   Well, the Gingles factors as identified by the
23 court are the guidelines that give me direction as to
24 what I do in my expert reports, so with them as
25 guidelines, they do help me form my opinion.

Page 137

1    Q.   Do you know where in Florida the city of
2  Rosewood is?
3    A.   Not exactly.
4    Q.   Do you know whether it's in the panhandle area
5  of Florida?
6    A.   I don't know.
7    Q.   Do you know whether it's in Miami-Dade County?
8    A.   I said I don't know.
9    Q.   I'm just helping you narrow the question.
10   A.   Yeah, I --
11   Q.   Do you consider Haitian Americans to be
12 African Americans as you've used those terms?
13   A.   I would probably consider them to be African
14 Americans for -- I think in general, but I think they're
15 going to think of themselves as either Haitians or
16 they're going to think of themselves as Caribbean -- the
17 way we know who's an African American is the way they
18 self-identify.
19   Q.   Right.
20   A.   Right, and I did not look to see specifically
21 for any kind of Haitian American or group in my
22 research.
23   Q.   So when you rely on statistics regarding
24 racial population, the figures that you're relying on
25 are the product of self-identification by persons.

35 (Pages 134 to 137)

Henry Flores, Ph.D                                                      May 30, 2002
Washington, D.C.

Page 138

1   A.  That's correct.
2   Q.  So if a person identifies themselves as
3   Hispanic, you don't necessarily know whether that person
4   meets industry definitions of Hispanic?
5       MS. BORGEN:  Objection as to form.
6       BY MR. EHRLICH:
7   Q.  Is that right?
8   A.  What do you mean by industry definition?
9   Q.  Well, you seem to make some general
10  statements.  Even in your report, for example, you talk
11  about how racial populations are similar for the
12  defendant counties.
13  A.  Oh, okay.
14  Q.  And you're using terms like African American,
15  Hispanic.  What do you have in mind when you use the
16  term African American, for example?
17  A.  When I'm using that term African American for
18  virtue of this particular report, I'm using the data
19  that's provided to me by the Florida State Redistricting
20  Committee, however they've created that category of
21  African American registered voters, and it's probably
22  based upon self-identification.  People that go in and
23  register is the category I'm using.
24  Q.  So whatever definition they use you rely on in
25  forming your opinions?

Page 139

1   A.  That's correct.
2   Q.  Do you know how a person gets on the inactive
3   voter list in Miami-Dade County?
4   A.  Not exactly, no.
5   Q.  Do you have any idea?
6   A.  I don't want to venture a guess, no.
7   Q.  Turning back to paragraph 7 of your report,
8   you say that mobility of African Americans is a major
9   cause as to why they tend to populate the lists of
10  inactive voters.  Do you know what the causes are of a
11  voter being placed on the inactive voter list?
12  A.  Well, one reason is changing addresses, but
13  that's the only reason I really know of.
14  Q.  Okay.  So it's your understanding that when a
15  voter changes his or her address, they're placed on the
16  inactive voter list?
17      MS. BORGEN:  Objection as to form.
18      THE WITNESS:  That's my understanding.
19      MR. EHRLICH:  What's the objection?
20      MS. BORGEN:  Mischaracterizing the witness's
21  statement.
22      BY MR. EHRLICH:
23  Q.  Is it your understanding that when a voter
24  changes his or her address, they are placed on the
25  inactive voter list?

Page 140

1   A.  I think that -- My understanding, that's one
2   of the reasons.
3   Q.  Do you know any other reasons?
4   A.  No.
5   Q.  From the data that you used in forming your
6   opinions, I believe they're listed -- it's the items
7   that you went through with Mr. Little on page 4 and 5 of
8   your report.  Which of those items contains a list of
9   inactive voters that you used for purposes of
10  subparagraph A in your opinions relating to inactive
11  voters?
12  A.  Oh, those are on the four CDs that are in my
13  study.
14  Q.  Okay.
15  A.  There's inactive voters on those lists.
16  Q.  Okay.  So one of the files on the -- is it the
17  -- you said four CDs.  Are you talking about the four
18  that you left in your study?
19  A.  That's correct.
20  Q.  Okay.  One of the items on those four CDs --
21  on those four CDs is a list of inactive voters in
22  Miami-Dade County?
23  A.  That's correct.
24  Q.  And you did not have information as to
25  inactive voters in other counties; is that right?

Page 141

1   A.  Let's see.  I forget -- which one is it?  I
2   think I just did Miami-Dade as far as inactive voters
3   were concerned.  Yeah, I just did Miami-Dade.  I didn't
4   have it for the other counties.
5   Q.  In that paragraph A, I think that's where you
6   first talk about the history of racial discrimination
7   toward African Americans.  Do you have an opinion as to
8   whether the history of discrimination towards African
9   Americans is stronger in Miami-Dade County than it is
10  elsewhere in the State of Florida?
11  A.  No, I do not.
12  Q.  Do you have an opinion as to whether there is
13  a history of racial discrimination in every county in
14  the State of Florida?
15  A.  No, I do not.
16  Q.  Are you aware of a history of discrimination
17  in any particular county in the State of Florida?
18  A.  No.
19  Q.  In that paragraph A, you talk about an
20  additional burden that is placed on the shoulders of
21  African Americans to verify their registration every
22  time they cast a ballot.  What additional burden are you
23  talking about?
24  A.  Just the process of having to go through that
25  exceptional state.  If you're a registered voter and

36 (Pages 138 to 141)

Henry Flores, Ph.D.                                                              May 30, 2002
Washington, D.C.

---

**Page 142**

1   you're just normally registered, all you have to do is
2   just present your registration certificate and cast your
3   ballot after it's verified, but to sit there and go
4   through the whole process, it takes additional time to
5   do that and sometimes it can become a very threatening
6   experience for someone who doesn't understand the
7   process.
8       Q.   Is it your understanding that inactive voters
9   are treated differently than active voters at precincts
10  in Miami-Dade County?
11      A.   I have no understanding of how they're treated
12  at the polls. I just know that there's an over -- that
13  there's a statistical relationship between the number of
14  inactive voters in those precincts and the number of
15  African American registered voters in those precincts.
16      Q.   If inactive voters are -- face the same
17  requirements to vote that active voters have, would you
18  agree that there's not an additional burden placed on
19  African American voters as a result of being
20  over-represented on the inactive lists as you concluded?
21      MS. BORGEN:  Objection.
22      THE WITNESS:  Could you rephrase your
23  question?
24      BY MR. EHRLICH:
25      Q.   Sure. You conclude that there's an additional

---

**Page 143**

1   burden placed on the shoulders of African Americans,
2   right?
3       A.   Correct.
4       Q.   And that's because African Americans are
5   over-represented on the list of inactive voters in your
6   opinion; is that correct?
7       A.   Yes.
8       Q.   If inactive voters were treated the same as
9   active voters at the polls, would you still conclude
10  that there is an additional burden placed on African
11  American voters in Miami-Dade County?
12      MS. BORGEN:  Objection.
13      MR. EHRLICH:  What's the objection?
14      MS. BORGEN:  Calls for speculation.
15      BY MR. EHRLICH:
16      Q.   You may answer.
17      A.   I don't know because I'd have to guess at it
18  and I'm not going to guess.
19      Q.   I'm asking you -- it's a hypothetical
20  question. You can treat it that way. Assume that
21  inactive voters are treated the same as active voters at
22  precincts in Miami-Dade County.
23      A.   Okay.
24      Q.   Would you still conclude that there is an
25  additional burden placed on the shoulders of African

---

**Page 144**

1   Americans when they cast a ballot in Miami-Dade County?
2       MS. BORGEN:  Same objection.
3       A.   If you want to treat it as a purely
4   hypothetical situation, no relationship to reality,
5   they're treated evenly, equally and so forth, then I
6   think the burden is still there but it's minimized to
7   some extent.
8       Q.   What is the additional burden if they're
9   treated the same?
10      A.   Well, just having to prove that they're active
11  voters because they're going to have to make that proof.
12      Q.   But active voters have to make that proof too,
13  don't they?
14      A.   But only if the action of proof is the same.
15      Q.   And that's what I'm telling you to assume.
16      A.   Okay.
17      A.   Assume that --
18      A.   If it's exactly the same -- ·
19      Q.   Right.
20      A.   And everything -- all things are perfectly
21  equal, then the burden's not there.
22      Q.   Do you know whether poll workers in Miami-Dade
23  County are able to discern between active and inactive
24  voters?
25      MS. BORGEN:  Objection to the form.

---

**Page 145**

1       MR. EHRLICH:  What's the objection?
2       MS. BORGEN:  Use of "discern."
3       BY MR. EHRLICH:
4       Q.   Okay. Do you understand what that means?
5       A.   In the Biblical sense I do.
6       Q.   You tell me, what does it mean in the Biblical
7   sense? What does it mean in the Biblical sense?
8       A.   It means that you can understand certain
9   things that come in Bible teachings, that you have a
10  gift to discern it.
11      Q.   Okay. Let me use a simpler phrase. Do you
12  know whether poll workers in Miami-Dade County are able
13  to tell the difference between an active voter and
14  inactive voter who appears before them?
15      A.   I don't know that.
16      Q.   Do you know whether the precinct registers in
17  Miami-Dade County distinguish between active voters and
18  inactive voters?
19      A.   I don't know that because I've never seen a
20  register.
21      Q.   Did you ask to look at one?
22      A.   No, I did not.
23      Q.   Would that have been helpful in forming your
24  conclusion in paragraph A?
25      A.   Maybe, but I just don't know what one looks

---

37 (Pages 142 to 145)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 146

1   like. If I saw it, I could answer that question.
2       Q.   A minute ago you said -- you said that the
3   question I was asking you bears no resemblance to
4   reality. I think those were your words. You don't know
5   whether it bears any resemblance to reality, do you?
6           MS. BORGEN: Objection as to form.
7       A.   That's not what I said.
8       Q.   What did you say?
9       A.   I said if we treat it that way, then it
10  would -- it's purely a hypothetical situation, I said
11  that then let's treat it as a hypothetical situation.
12      Q.   Okay.
13      A.   That's what I said.
14      Q.   Okay. You identify six counties where you
15  believe they do not maintain lists of inactive voters at
16  the polls.
17      A.   That's correct.
18      Q.   Are there any counties other than those six
19  that you're aware of that do not maintain lists of
20  inactive voters at the polls?
21      A.   Not that I'm aware of.
22      Q.   You don't know then whether any of the
23  defendants in this case do not maintain lists of
24  inactive voters at the polls?
25      A.   That's correct.

Page 147

1       Q.   It's in this paragraph A that you also say for
2   the first time that the defendant counties share similar
3   racial population percentages, and I believe earlier you
4   referred to Exhibit 9 of your report.
5       A.   That's correct.
6       Q.   Is it your testimony that Volusia County
7   shares similar racial population characteristics with
8   Miami-Dade County?
9       A.   No. That one's a little bit out of whack.
10      Q.   Would you agree that Volusia County and
11  Miami-Dade County do not share similar racial population
12  characteristics?
13      A.   That's correct, that's correct.
14      Q.   Would you agree that Leon County and Volusia
15  County do not share similar racial population; is that
16  correct?
17      A.   Correct.
18      Q.   You'd agree?
19      A.   I'd agree.
20      Q.   Would you agree that Duval County and Volusia
21  County do not share similar racial population
22  characteristics?
23      A.   I'll agree.
24      Q.   Would you agree that Broward County and
25  Volusia County do not share similar racial population

Page 148

1   characteristics?
2       A.   I'll agree.
3       Q.   Would you agree that Orange County and Volusia
4   County do not share similar racial population
5   characteristics?
6       A.   I'll agree.
7       Q.   Of these counties, which do you contend share
8   similar racial population characteristics with Volusia
9   County?
10      A.   None of them. What they share is that the
11  African American population is much much smaller than
12  the non-Hispanic white population with the exception of
13  Miami-Dade, but you're not going to find -- when you
14  look at social statistics, you're not going to find
15  absolute sameness and in the proportionalities and of
16  racism all up and down the line. You're going to see
17  variation. Volusia is probably the outlier here in this
18  data set.
19      Q.   And you understood my question as not to be
20  asking for absolute similarity, right?
21      A.   Correct, I understand.
22      Q.   Would you agree that Miami-Dade County does
23  not share similar racial population percentages with any
24  of the other counties in Exhibit 8?
25      A.   I'll half agree with you.

Page 149

1       Q.   Okay. What do you mean?
2       A.   Well, the African American population is very
3   similar to the other counties.
4       Q.   Would you agree that the African American
5   population in Miami-Dade County is not a similar racial
6   population percentage with that in Leon County?
7       A.   I think it's similar.
8       Q.   How are they different?
9       A.   Nine percentage points.
10      Q.   On a percentage basis, are there 50 percent
11  more African Americans in Leon County than Miami-Dade
12  County?
13      A.   On a percentage basis, I would say almost,
14  yeah, but in total population, you're looking at a lot
15  more probably in Miami-Dade than Leon County.
16      Q.   Right, but approximately three out of every
17  ten people in Leon County is African American, right?
18      A.   That's correct.
19      Q.   And that number's only two out of ten for
20  Miami County, correct?
21      A.   A difference of one.
22      Q.   Right.
23      A.   Right.
24      Q.   Out of ten?
25      A.   That's correct.

38 (Pages 146 to 149)

Henry Flores, Ph.D.                                                  May 30, 2002
Washington, D.C.

Page 150

1    Q.  Is that statistically significant?
2    A.  I didn't try to draw any conclusions as far as
3  statistical significance.
4    Q.  Do you have an opinion now as to whether that
5  three out of ten as compared to two out of ten is
6  statistically significant?
7    A.  No, I do not.
8    Q.  Did you examine the population of African
9  Americans in the counties in Florida other than those
10 listed in Exhibit 9?
11   A.  I looked at percentages of what the
12 populations were in the counties, and you'll find them I
13 think in Exhibit 7.
14   Q.  The third category, AFA?
15   A.  Correct, African Americans.
16   Q.  So with Alachua County, for example, is it
17 your belief that 19.3 percent of the population in
18 Alachua County is African American?
19   A.  That's correct.
20   Q.  Do you believe that Gadsden County shares
21 similar racial population characteristics with
22 Miami-Dade County as far as African Americans?
23   A.  No.
24   Q.  They do not share similar racial population
25 characteristics?

Page 151

1    A.  No.  There's a higher percentage of African
2  Americans in Gadsden.  As a matter of fact, it looks
3  like in Gadsden, the majority of population's African
4  American, but again, Gadsden has 45,000 individuals and
5  Miami-Dade has more than 2 million.
6    Q.  Right.  My question is whether they share
7  similar racial population characteristics, and you said
8  they do not?
9    A.  Well, in percentages, right.
10   Q.  Right.
11   A.  Right.
12   Q.  Would you agree that Madison County does not
13 share similar racial population characteristics as
14 Miami-Dade County with regard to African Americans?
15   A.  Correct.
16   Q.  Would you agree that Okeechobee County does
17 not share similar racial population percentages as
18 Miami-Dade County with regard to African Americans?
19   A.  Correct.
20   Q.  Is the same true for Monroe County?
21   A.  Correct.
22   Q.  Martin County?
23   A.  Correct.
24   Q.  Santa Rosa County?
25   A.  Correct.

Page 152

1    Q.  Sarasota County?
2    A.  Correct.
3    Q.  St. John's County?
4    A.  Correct.
5    Q.  Walton County?
6    A.  Correct.
7    Q.  Did you count affirmation -- the affirmations
8  or affidavits from Miami-Dade County that were collected
9  during the November 2000 election?
10   A.  No, not the actual affirmations, no.
11   Q.  Were they made available to you?
12   A.  No.
13   Q.  Did you ask for them?
14   A.  No.
15   Q.  Why not?
16   A.  Because I wasn't asked to look at the
17 affirmations themselves.  I was just asked to look at
18 the statistical relationship between the percentage of
19 affirmations that existed in a specific precinct and the
20 percentage of African American registered voters in
21 those precincts.
22   Q.  Did you have data from Miami-Dade County as to
23 the number of affirmations collected in each precinct?
24   A.  I don't know.  I don't think so.  Did I?  No.
25 All I received was affirmation data from Hillsborough

Page 153

1  County.
2    Q.  Did you request affirmation data from
3  Miami-Dade County?
4    A.  Yes, through counsel.
5    Q.  To whom did you make that request?
6    A.  Either Ms. Borgen or Ms. Fineman.
7    Q.  Do you remember which one?
8    A.  No, I do not.
9    Q.  Do you know whether they requested that
10 information from Miami-Dade County?
11   A.  No, I don't know that.
12   Q.  If your assumptions regarding the racial
13 populations of the defendant counties prove false, would
14 that alter your conclusion with regard to subparagraph B
15 with respect to counties other than Hillsborough and
16 Orange?
17   MS. BORGEN:  Objection.
18   A.  Could you rephrase your question please?
19   Q.  Sure.  In paragraph B, you make certain
20 conclusions about Hillsborough County; is that right?
21   A.  That's correct.
22   Q.  And that's based on data related to the
23 affirmations and affidavits collected in Hillsborough
24 County during the 2000 election, correct?
25   A.  That's correct.

39 (Pages 150 to 153)

Henry Flores, Ph.D.                                                                                                                    May 30, 2002

Washington, D.C.

Page 154

1    Q.   And you say that that -- your conclusions are
2    borne out from data that you reviewed from Orange
3    County; is that right?
4    A.   That's correct.
5    Q.   You testified that you don't have the similar
6    data from Miami-Dade County.
7    A.   That's correct.
8    Q.   You surmise that you would make similar
9    conclusions with regard to Miami-Dade Counties --
10   Miami-Dade and other counties because all of these
11   counties share similar racial population
12   characteristics; is that correct?
13   A.   Well, I think it's not just similar racial
14   population characteristics. It's a matter of also
15   history of racial discrimination just in general.
16   Q.   In fairness, you make both those points. You
17   say given the history of racial discrimination and given
18   that the defendant counties share similar racial
19   population percentages --
20   A.   That's correct.
21   Q.   -- that allows you to conclude that you would
22   have similar opinions with regard to counties other than
23   Hillsborough and Orange; is that right?
24   A.   That's correct.
25   Q.   And my question is if your assumption

Page 155

1    regarding the racial populations of the defendant
2    counties proved false, would that alter your conclusion
3    with regard to opinions that you're forming as to
4    Miami-Dade and other counties other than Hillsborough
5    and Orange?
6        MS. BORGEN:  Objection as to form.
7    A.   Yeah, could you clarify that a little bit
8    more? Are you saying if the population percentages are
9    the same?
10   Q.   No.
11   A.   By race?
12   Q.   You're saying given that the defendant
13   counties share similar racial population percentages.
14   A.   Okay.
15   Q.   I'm now asking you to assume hypothetically,
16   if you'd like, that that part of your sentence is false,
17   that the counties do not share similar racial population
18   percentages.
19   A.   Oh, I see.
20   Q.   Okay? So in other words, taking that out,
21   would you still make the same -- would you still have
22   the same opinions as to over-representation with regard
23   to affirmations in Miami-Dade County and other counties
24   other than Hillsborough and Orange?
25   A.   If I had the affirmations from Miami-Dade and

Page 156

1    I could do the analysis and the analysis came out
2    different from Hillsborough, then I can conclude that
3    Miami-Dade doesn't have the same problem Hillsborough
4    has.
5    Q.   Right, but that wasn't the question. Did you
6    understand that to be the question?
7    A.   Yeah.
8    Q.   Okay. I'll state it differently.
9    A.   Sorry.
10   Q.   Your conclusion that Miami-Dade County is
11   likely to have the same over-representation of African
12   Americans filling out affirmations it seems to me is
13   based on two points, one, the history of racial
14   discrimination throughout the State of Florida, and two,
15   that all of these counties share similar racial
16   population percentages. Is that true?
17   A.   Yeah, that's true.
18   Q.   Now I'm asking you to assume that they do not
19   share similar racial population percentages.
20   A.   Oh.
21   Q.   Would your conclusion be the same as to Miami-
22   Dade and the other counties?
23   A.   I don't know. I really don't know. I mean,
24   it would also include the statistical analysis as well.
25   Q.   Okay, but you don't know whether you would

Page 157

1    have the same conclusion or not?
2    A.   No, I don't know.
3    Q.   What is the significance of your conclusion in
4    paragraph B that African Americans are over-represented
5    among those who have to fill out affirmations?
6    A.   Again, that whatever it is that causes them to
7    fill out more affirmations than any other racial group
8    is an additional burden to them on election day because
9    they've got to go through that additional process
10   besides voting.
11   Q.   Could one of the causes of them having to fill
12   out more affirmations be the fact that African Americans
13   tend to move more than other racial populations?
14   A.   Yes.
15   Q.   And I think you identified that one of the
16   reasons for having to fill out an affirmation is change
17   of address, right?
18   A.   Yeah, the data that I received from
19   Hillsborough was very clear, and also in Orange County,
20   the majority of the -- the vast majority of individuals
21   that had to fill out an affirmation affidavit was due to
22   the fact they had moved. The other category was name
23   change.
24   Q.   Do you have an opinion as to whether a voter
25   who moves and then goes to a precinct where he's

40 (Pages 154 to 157)

Henry Flores, Ph.D.                                                          May 30, 2002
Washington, D.C.

Page 158

1  supposed to vote should not be required to fill out an
2  affirmation and just be allowed to vote?
3       MS. BORGEN: Objection as to form.
4    A.  Yeah, no, I don't have an opinion on that.
5    Q.  You just -- you're just concluding that they
6  have to fill out affirmations -- Africans Americans have
7  to fill out affirmations at a higher rate than other
8  racial populations?
9    A.  Yes, that's what I'm concluding.
10   Q.  Do you have an understanding as to whether
11  after someone fills out an affirmation, they're allowed
12  to vote?
13   A.  I really don't know exactly how that's treated
14  at the polls in the State of Florida, so I can't answer
15  that question.
16   Q.  If after someone fills out an affirmation
17  they're allowed to vote, would you consider that to be a
18  vote denial?
19   A.  If they fill out an affirmation and they're
20  allowed to vote immediately?
21   Q.  Right.
22   A.  No.
23   Q.  In paragraph C, you talk about the percentage
24  of those removed from voting lists as felons compared to
25  percentage of African Americans who are registered

Page 159

1  voters in each county; is that right?
2    A.  That's correct.
3    Q.  Do you have an opinion as to Miami-Dade County
4  with regard to that issue?
5    A.  Well, only partially. The reason is the
6  data -- I received one sheet, but it came from the
7  government report and it was one page that was Xeroxed,
8  and I looked at it and I drew some conclusions that
9  African Americans appear to be over-represented on a
10  proportional basis out of that list of purged
11  individuals because they are identified as felons in
12  relationship to their percentage in the population. I
13  think it ran something like three to one actually.
14   Q.  Do you know whether the population of felons,
15  of African Americans who are felons, is proportional to
16  the population of African Americans?
17   A.  I think it's higher.
18   Q.  Do you know in Miami-Dade County what the
19  ratio is?
20   A.  No. I'd have to look it up.
21   Q.  So do you know whether that ratio is different
22  than the ratio that you're talking about on the list of
23  people who were removed as felons?
24   A.  Oh, I couldn't answer that question. I don't
25  know.

Page 160

1    Q.  Okay. So back to my question, do you have an
2  opinion as to whether in Miami-Dade County African
3  Americans were removed from the voter lists as felons at
4  a disproportionate rate?
5    A.  I'm just saying that the sheet that I was
6  provided indicated that -- I have it in here.
7    Q.  Well, I understand you're talking about a
8  sheet. I'm asking about your report.
9    A.  It's not in my report.
10   Q.  Is that an opinion that you intend to testify
11  about at trial?
12   A.  I may.
13   Q.  But it's not in your report now?
14   A.  No, it's not in my report right now.
15   Q.  Are you going to change your report at any
16  time to give the parties notice about these new opinions
17  that you're going to testify about?
18   A.  If I do change, you'll get proper notice,
19  absolutely.
20   Q.  Before the trial?
21   A.  Oh, yeah, absolutely.
22   Q.  As you sit here now, do you intend to talk
23  about whether African Americans are purged at a higher
24  rate in Miami-Dade County?
25   A.  I don't know. I didn't have time to really

Page 161

1  look at those data well enough to really sit down and
2  decide whether I could put it in my report by the time
3  my report was due, and so I left it out.
4    Q.  Did you leave out any other opinions about
5  Miami-Dade County?
6    A.  No.
7    Q.  So your report is complete except for this one
8  area relating to removal of felons in Miami-Dade County?
9    A.  That's correct.
10   Q.  And if you decide to offer a new opinion,
11  you'll let us know sometime before trial, I presume?
12   A.  Oh, yeah.
13   Q.  All right. Will you let us know in time so
14  that we might consider hiring a rebuttal witness?
15   A.  Absolutely.
16   Q.  Will you let us know more than 90 days before
17  trial?
18       MS. BORGEN: Objection.
19   A.  When's the trial?
20   Q.  I don't know. Do you know when the trial is
21  in this case?
22   A.  August 26th?
23   Q.  Okay.
24   A.  When's 90 days prior to August 26th?
25   Q.  I'm asking the questions, Professor.

41 (Pages 158 to 161)

Page 162

```
1        MS. BORGEN: Objection to the line of
2   questions to the extent you're asking the witness for
3   legal answers that are to be decided by the lawyers.
4        MR. EHRLICH: Or the court, I presume.
5        MS. BORGEN: Ultimately, certainly.
6        BY MR. EHRLICH:
7        Q.  Turning to subparagraph D, is it your opinion
8   that there was no statistically significant relationship
9   found between percentages of African American registered
10  voters and the number of poll workers at precincts in
11  Miami-Dade County?
12       A.  Yeah, it's right -- it fell outside the
13  statistically significant zone at point 09.
14       Q.  Is the answer yes? Do you want me to repeat
15  the question?
16       A.  No. I'll answer the question. It would be
17  statistically significant 90 percent of the time, but
18  ten percent of the time, it doesn't seem to be a
19  problem.
20       Q.  Well, let me quote from your report and I'll
21  just ask you if this is true.
22       A.  Yeah.
23       Q.  "There was no statistically significant
24  relationship found between these two variables in
25  Miami-Dade County." Is that true?
```

Page 163

```
1        A.  That's true.
2        Q.  And those two variables are the percentage of
3   African Americans at a particular precinct and the
4   percentage of poll workers assigned to those precincts.
5        A.  That's correct.
6        Q.  I think you stated that -- well, tell me what
7   data from Miami-Dade County you did not have at the time
8   you formed your report and opinions that you think you
9   need.
10       A.  The number of affirmation affidavits by -- at
11  the precinct level.
12       Q.  And let's take these one at a time. Do you
13  know whether your lawyers have requested that
14  information?
15       A.  I don't know that.
16       Q.  By your lawyers, I mean the lawyers with whom
17  you're working.
18       A.  That's correct. No, I don't know.
19       Q.  Go ahead.
20       A.  I think that's really all I need. And to
21  justify the data that I've seen in that one government
22  report on the number of African Americans, it identifies
23  felons that were purged. If that data are accurate --
24  if Miami-Dade could provide me with the county-wide
25  data, not by precinct level but just the total counts in
```

Page 164

```
1   the county by race, that's what I would need. Just
2   those two pieces of information.
3        Q.  And have you asked the lawyers with whom
4   you're working to provide that information to you?
5        A.  No because I got -- like I said, by the time I
6   received what I received, I looked at it. I had to turn
7   my report in. I wasn't sure I could -- the data was
8   that particularly useful for me, but if Miami-Dade could
9   provide me with that information, then I could include
10  it in my report.
11       Q.  Do you know whether your lawyers have
12  requested that information from Miami-Dade?
13       A.  I don't know.
14       Q.  You agree you would need that information in
15  order to form any conclusions with regard to the subject
16  matter of subparagraph C?
17       MS. BORGEN: Objection as to form.
18       BY MR. EHRLICH:
19       Q.  I'm sorry. What was your answer?
20       A.  Let me go back. Just a second.
21       Q.  Sure.
22       A.  Yes.
23       Q.  Let's talk about that because it's an opinion
24  that you may form between now and trial. Would it also
25  be important for you to know the percentage of felons in
```

Page 165

```
1   Miami-Dade County who are African American?
2        A.  No because I'm comparing it to the overall
3   population of African Americans in the county; not the
4   felon population.
5        Q.  If you were looking to see whether -- well,
6   tell me, is your conclusion with regard to paragraph C
7   that African Americans are removed as felons at a higher
8   rate than whites and Hispanics are removed as felons?
9        A.  No. What I'm saying is in relationship to the
10  way they're represented in the general population of
11  their county, that individuals that have been
12  incarcerated and identified as felons and purged by race
13  are over-represented in relationship to the way they're
14  represented in the population of their home county. So
15  for instance, Miami-Dade has a 20 percent African
16  American population more or less but the sheet that I
17  saw that is yet to be verified indicates that 63 percent
18  of the individuals identified as felons and African
19  Americans were purged from the rolls, so it's 63 percent
20  compared to 20 percent of the population, so that's the
21  comparison I wanted to make.
22       Q.  Assuming that all felons should be removed
23  from the voting rolls in Miami-Dade County -- is that
24  your understanding, that felons are supposed to be
25  removed from the voting rolls?
```

42 (Pages 162 to 165)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 166

1    A.   I'm not drawing any conclusions about that at
2  all.
3    Q.   Assume these facts then, another hypothetical.
4  Assume that all felons are supposed to be removed from
5  the voting rolls who have not -- assume that all felons
6  who have not had their right to vote -- felons and ex-
7  felons who have not had their right to vote restored are
8  to be removed from the voting lists in Miami-Dade
9  County, okay?  Assume also that 63 percent of people
10 living in Miami-Dade County who are either felons or ex-
11 felons who have not had their right to vote restored are
12 African American.
13   A.   Okay.
14   Q.   You're saying that because 63 percent of those
15 removed were African American, there's an
16 over-representation?
17        MS. BORGEN:  Objection as to form.
18        BY MR. EHRLICH:
19   Q.   Assuming those facts.
20   A.   If those are the assumed facts, then there
21 would be over-representation among the individuals
22 identified as felons and are African Americans as
23 compared to their representation in the general
24 population of --
25   Q.   Is the problem that you're identifying that

Page 167

1  African Americans are convicted as felons at a higher
2  rate than their percentage of the overall population?
3  Isn't that what you're identifying?
4    A.   No.  I'm talking about individuals that are
5  identified as felons and then purged.
6    Q.   Right.
7    A.   Not all felons.
8    Q.   Okay.  Could I direct your attention to
9  Exhibit 8 of your report?
10   A.   Sure.
11   Q.   What is the source for the data contained in
12 Exhibit 8?
13   A.   I'd have to check my records exactly, but this
14 was -- came off of an Excel spreadsheet that's in the CD
15 that I provided to you all, and the file is labeled as
16 such, but I can't remember the source just off the top
17 of my head right now.
18   Q.   Could it be one of the documents that you
19 provided to us either yesterday or this morning?
20   A.   It's on the CD-ROM.
21   Q.   Well, I think you're saying the spreadsheet
22 format is --
23   A.   Yeah, and I can't remember --
24   Q.   You don't remember where you got it to put on
25 that?

Page 168

1    A.   I think I received it as an Excel spreadsheet
2  just like that.
3    Q.   Okay.  You just don't remember why you
4  received it?
5    A.   I can't remember what the source of the data
6  is, yeah, I can't remember.
7    Q.   Do you know whether it's accurate?
8    A.   I didn't independently verify this, although
9  what I did do is I compared these to the U.S. Bureau of
10 the Census geographic mobility report that appears in
11 the Jason Schacter 2001 geographical mobility study, and
12 the percentages here are very similar to the percentages
13 that they produced.
14   Q.   Why did you not use those percentages in your
15 report?
16   A.   Because those weren't Florida specific.
17   Q.   So --
18   A.   They're regional.
19   Q.   Okay, but that wouldn't tell you whether the
20 numbers included in Exhibit 8 are accurate.
21   A.   Well, just nationally across the country, this
22 same pattern is common to all African Americans.  They
23 move at a higher percentage rate than other racial
24 groups.
25   Q.   Did you find that African Americans in Florida

Page 169

1  move in different patterns than they do nationally?
2    A.   No.  There seems to be a pattern of moving
3  within the county more than anything else, that they're
4  moving apparently from apartment to apartment within the
5  same county.
6    Q.   Is that different than nationally?
7    A.   No.  Nationally it's pretty much the same
8  pattern.
9    Q.   When an African -- you say that African
10 Americans tend to move more and you just stated that
11 they tend to move I guess near where they're moving
12 from.  Is that a fair --
13   A.   Yeah.
14   Q.   -- statement of what you just said?
15   A.   Right.
16   Q.   Do you know what percentage of African
17 Americans that move to a new home in the same voting
18 precinct?
19   A.   No, I don't know that.
20   Q.   Do you know whether when people move and stay
21 in the same voting precinct, they're required to fill
22 out an affirmation or an affidavit at the precinct where
23 they vote?
24   A.   If they stay within the same voting precinct,
25 I wouldn't think so, but I don't know that for sure.

43 (Pages 166 to 169)

Page 170

1    Q.   Would that be helpful to your analysis, to
2  know of those African Americans that move, what
3  percentage move but stay within the same precinct?
4    A.   It may, yeah, but I'm not sure. I'd have to
5  look at the data.
6    Q.   Right. Another hypothetical. If -- assuming
7  that a large percentage of African Americans who move
8  move to a new home in the same precinct, could that
9  change your opinion as to the burdens placed on African
10 Americans with regard to having to fill out
11 affirmations?
12       MS. BORGEN:  Objection.
13    A.   Again, I don't know. I'd have to see the data
14 and see how it plays out. It may.
15    Q.   You've testified about the history of
16 discrimination that you perceive in the State of Florida
17 towards African Americans. Would you contend that every
18 practice that has a disparate impact on African
19 Americans is the result of this history of
20 discrimination?
21    A.   I think that there are probably artifacts of
22 it.
23    Q.   Would it be possible in Florida for there to
24 be a practice or policy that has a disparate impact on
25 African Americans that is not an artifact of the history

Page 171

1  of racial discrimination in Florida?
2    A.   I don't know. I really don't know. I do know
3  that housing values, for instance, just in general --
4  there's been research on this, and my dissertation
5  was -- I did similar sort of research. A lot of the
6  racial segregation patterns you have are due to the
7  inability of individuals of particular races to be able
8  to afford houses of certain values. They're literally
9  locked into smaller amounts of choices and end up being
10 restricted to, if you have a larger percentage of them
11 that are poor or lower middle class or working class,
12 they're going to be restricted to that kind of market of
13 houses, and that has -- it's kind of a structurally
14 organized kind of segregation that occurs. Nobody
15 consciously says just because you're poor, you have to
16 live over here. The market drives that sort of
17 situation, so --
18    Q.   Is that something that one of the parties in
19 this case should be held accountable for?
20    A.   No. I'm just giving you an example of a type
21 of thing that does occur in urban areas, and there's a
22 large body of literature on that particular thing. No
23 one's consciously discriminating. It's just that the
24 market creates those kinds of housing patterns.
25    Q.   Right, I understand what you're saying, and my

Page 172

1  question is -- I'm not asking whether these practices
2  and policies are the result of intentional
3  discrimination. What I'm asking is is it possible in
4  the State of Florida, given your opinions about the long
5  history of racial discrimination towards African
6  Americans in the State of Florida, is it possible for a
7  practice that has a disparate impact on African
8  Americans not to be the result of this long history of
9  discrimination or an artifact of this long history of
10 discrimination? Because all the ones that you've
11 identified you said are an artifact of that history of
12 discrimination.
13    A.   I guess it's possible, but I --
14    Q.   You haven't found one thing?
15    A.   I've only looked at four things at this
16 particular point.
17    Q.   And it's your conclusion that they're all a
18 result of the history of discrimination that you've
19 talked about today?
20    A.   That's correct.
21    Q.   I just want to be real clear because you've
22 talked about this other opinion that you might have
23 before trial relating to paragraph C, the removal of
24 voters identified as felons, and you said that is the
25 only opinion that you might have at trial that is not

Page 173

1  currently contained in this report with regard to Miami-
2  Dade County.
3    A.   Well, the other one would be if Miami-Dade
4  were to provide me with the affirmation affidavits by
5  precinct, then I could do some work on that.
6    Q.   Okay. But for that, one, you already have a
7  conclusion with regard to Miami-Dade County. You're
8  making conclusions based on the similar history of
9  discrimination and the similar racial characteristics,
10 so the information on affirmations might alter your
11 opinion, but it would be on the same subject matter at
12 least, correct?
13    A.   Oh.
14    Q.   You see what I'm saying? You're talking about
15 in C, you don't have an opinion right now as to
16 Miami-Dade County in C, but you said you might if you
17 get this other data that you're interested in.
18    A.   Sure.
19    Q.   So do you understand the distinction I'm
20 drawing? I'm asking whether you're going to have any
21 new opinions as to a new subject matter relating to
22 Miami-Dade County that's not already in this.
23    A.   Oh, the subject matter I'm going to stick to,
24 these four areas.
25    Q.   Okay.

44 (Pages 170 to 173)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 174

1    A.   That's all I'm going to stick to.
2    Q.   Okay.  And right now, you don't have an
3 opinion as to Miami-Dade County with regard to the
4 subject matter found in C, but you might form one before
5 trial?
6    A.   That's correct.
7    Q.   Okay.  For A, B and D, you already have
8 opinions as to Miami-Dade County?
9    A.   I don't have one for B.
10   Q.   Okay.
11   A.   That's the affirmation affidavits.
12   Q.   Okay.  For D, you said there was no
13 relationship, so you don't have —
14   A.   See, I have the poll workers.  That's D.
15   Q.   Right, and B you just said you don't have an
16 opinion as to Miami-Dade County.  For A, of course you
17 do.  You've stated it already.
18   A.   Right.
19   Q.   And for C, you may form one later but you
20 don't have one right now.
21   A.   That's correct.
22   Q.   And other than those that we've just
23 discussed, there's no other opinion that you have in
24 relation to Miami-Dade County?
25   A.   No.

Page 175

1    Q.   No meaning correct?
2    A.   Correct.
3    Q.   There's no other opinion?
4    A.   That's correct.
5        MR. EHRLICH:  I have no further questions.
6 Thank you.
7        MR. LITTLE:  Guys, before we go on, can I talk
8 to Lori for just a second?
9        MS. BORGEN:  Off the record?
10       MR. LITTLE:  Yeah.
11       (Discussion off the record)
12       EXAMINATION BY COUNSEL FOR
13       FRED DICKINSON AND KATHLEEN KEARNEY
14       BY MR. WAAS:
15   Q.   Dr. Flores?
16   A.   Yes, I'm here.
17   Q.   Can you hear me?  You can.  My name is George
18 Waas.  I'm with the Florida Attorney General's office in
19 Tallahassee, and I represent the Florida Department of
20 Highway Safety and Motor Vehicles and the Florida
21 Department of Children and Families, and I'll try to be
22 brief and to the point.  On pages 4 and 5 of your
23 report, you list 14 categories of documents.  My first
24 question is is there any reference in those documents to
25 records, documents or data sets involving the Florida

Page 176

1 Department of Highway Safety and Motor Vehicles?
2    A.   No, there is not.
3    Q.   Same question with respect to the Department
4 of Children and Families.
5    A.   No, there is not.
6    Q.   So then am I correct in stating that the
7 opinions that you've expressed here today and opinions
8 that you expressed in your report are not based on any
9 documents furnished by or provided to you from the
10 Department of Highway Safety and Motor Vehicles or the
11 Department of Children and Families?
12   A.   That is correct.
13   Q.   You mentioned at the very outset of your
14 examination today that you were seeking additional
15 documents or you may be seeking additional documents.
16 Does that effort include documents from either one or
17 both of these agencies?
18   A.   I don't think so at this point.
19   Q.   What is it that might cause you to change that
20 position?  You qualified it by saying at this point.
21 What is it that might cause you to qualify or change
22 that position?
23   A.   At an early point in my research, I began
24 looking at the rate of registration of African Americans
25 by the Department of Motor Vehicles and in one of the

Page 177

1 counties.
2    Q.   I think you mentioned Orange County.
3    A.   I think it was Orange County, and I had a
4 methodological problem because I didn't know what the
5 clientele base of what those offices were in Orange
6 County.  In other words, I don't know whether a
7 particular DMV office in Orange County services a region
8 that may cross county lines, and that would throw my
9 analysis all off, and so I just stopped there.
10       If I were to be able to somehow or other
11 verify the proper jurisdiction in relationship to
12 registered voters and — individuals registered by the
13 DMV and I could verify that these individuals came from
14 the specific defendant counties and I could isolate them
15 on a county-by-county basis, then I would probably add
16 that to my report, but at this particular point, if I
17 can't verify it, I just can't do that.
18   Q.   Am I correct in also saying that as you sit
19 there today, you have no facts that allows you to
20 conclude that any information in the possession of the
21 Department of Highway Safety and Motor Vehicles or the
22 Department of Children and Families is erroneous or
23 inaccurate?
24   A.   No, I can't draw that conclusion.
25   Q.   Okay.  And am I also correct in stating that

45 (Pages 174 to 177)

Henry Flores, Ph.D.                                                May 30, 2002
Washington, D.C.

---

**Page 178**

1  you've not undertaken any study or review of any matter
2  pertaining to either one or both of these agencies?
3      A.   With the exception of just what I looked at
4  briefly in Orange County, I have not.
5      Q.   Do you have any personal knowledge regarding
6  the claims in this lawsuit against either one or both of
7  these agencies?
8      A.   Other than what I saw in the second amended
9  complaint, I do not.
10     Q.   Does your retention agreement contemplate
11  undertaking any study or review of either one or both of
12  these agencies other than what you've already mentioned?
13     A.   It may.  The reason is there's a sentence in
14  my -- I think you have a copy of my letter of retention,
15  and in the second paragraph, it reads that you will
16  being examining mobility rates of black Floridians where
17  black Floridians are disparately impacted by certain
18  election practices and procedures in that state, and
19  other issues that may arise during the course of your
20  work.  Other -- that would probably fall under that
21  particular disclaimer, but if it doesn't, I won't
22  be doing the work.
23     Q.   Okay.  As you sit here today, do you have any
24  facts that the Department of Highway Safety and Motor
25  Vehicles has or bears any responsibility or has any

---

**Page 179**

1  involvement in the matters addressed in the lawsuit?
2      A.   I have no opinion on that at this point.
3      Q.   Do you have any facts?
4      A.   Oh, no, uh-uh, I do not.
5      Q.   Same question with respect to the Florida
6  Department of Children and Families.
7      A.   No, I do not.
8      Q.   Is it your opinion that the present effects of
9  past discrimination prevent African Americans from
10  registering to vote in Florida?
11     A.   I haven't looked specifically at the
12  registration process, so I cannot answer that question.
13     Q.   Okay.  Is it your opinion that the present
14  effects of past discrimination prevent African Americans
15  from voting in Florida?
16     A.   I think that the history of racial
17  discrimination and the manner in which they appear on
18  inactive voting rolls and having to move and fill out
19  affirmation affidavits and being underserved in polls
20  places a burden on their ability to participate.
21     Q.   Are you aware of any cases from any Florida
22  court, federal or state, that agrees with the opinion
23  that you just stated?
24     A.   I'm not aware of any.
25     Q.   Are you aware of any cases from any Florida

---

**Page 180**

1  court, federal or state, which rejects the opinion that
2  you just stated?
3      A.   No.
4      Q.   If you were to find out that there were cases
5  which addressed this particular subject area, would you
6  find that surprising?
7      A.   Oh, I don't know.
8      Q.   Okay.  Do you know how many African Americans
9  were denied the right to vote by the Department of
10  Highway Safety and Motor Vehicles in the 2000 general
11  election?
12     A.   No, I do not.
13     Q.   Do you know how many African Americans were
14  denied the right to vote by the Department of Children
15  and Families in the 2000 general election?
16     A.   No, I do not.
17     Q.   Do you have any facts as to the conduct that
18  either one or both of these agencies engaged in or
19  failed to engage in that denied African Americans the
20  right to vote in the year 2000 general election?
21     A.   I do not.
22     Q.   Do you know or have any facts as to the
23  relationship between the number of African Americans as
24  opposed to the number of Hispanics and Caucasians by
25  percentages that are attributable to either one or both

---

**Page 181**

1  of these agencies with respect to being denied the right
2  to vote in the 2000 general election?
3          MS. BORGEN:  Objection as to form.
4      A.   Yeah, could you simplify that question a
5  little bit please?
6      Q.   I'm in effect asking the same question with
7  respect to the percentages of African Americans as
8  related to the percentage of Hispanics and Caucasians
9  who were denied the right to vote in the 2000 general
10  election based on conduct or lack of performance
11  attributed to either one or both of these agencies.
12     A.   No -- yeah, I do not know any of that.
13         MR. LITTLE:  George, before you ask the next
14  question, does anybody have a conference feature on
15  their phone so they can dial Tracy Arpen in?  He cannot
16  get back in, and the operator says that somebody who has
17  a conference feature who's on this call needs to call
18  him in.
19         (Discussion off the record)
20         BY MR. WAAS:
21     Q.   Dr. Flores, I had just one final question.  Do
22  you have any knowledge at this time regarding the
23  operation of either one or both of these agencies with
24  respect to the allegations in the lawsuit?
25     A.   No, I do not.

---

46 (Pages 178 to 181)

Henry Flores, Ph.D.                                                    May 30, 2002

Washington, D.C.

Page 182

1    MR. WAAS: I have no further questions and I
2  thank you for allowing me to interrupt the rest of you.
3    EXAMINATION BY COUNSEL FOR CHOICEPOINT, INC.
4    BY MR. RESTREPO:
5    Q.  Dr. Flores, my name is Dan Restrepo, and I
6  represent ChoicePoint DVT in this action. I have a
7  number of questions about your report. First, with
8  regard to section 4A of your report, is it correct that
9  you performed a statistical regression analysis to
10  formulate the opinions expressed in section 4A?
11    A.  For Hillsborough County I did.
12    Q.  Is it correct that you constructed a database
13  used for the analysis with regard to Hillsborough County
14  which led to the conclusions in section 4A in your
15  report?
16    A.  That's correct.
17    Q.  Moving on to section 4B, is it correct that
18  you again performed a statistical regression analysis to
19  formulate the opinions in section 4B of your report?
20    A.  I did.
21    Q.  Did you again construct a database used for
22  the analyses which led to the conclusions in section 4B
23  of your report?
24    A.  For Hillsborough County I did.
25    Q.  Skipping to 4D for a second, is it correct

Page 183

1  that you performed -- again performed a statistical
2  regression analysis to formulate the opinions expressed
3  in section 4D?
4    A.  4D?
5    Q.  D.
6    A.  As in dog?
7    Q.  Yes.
8    A.  I did -- yes, I did.
9    Q.  Did you again construct a database to be used
10  in the analysis in section 4D as in dog?
11    A.  Yes.
12    Q.  What does a statistical regression analysis
13  do?
14    A.  It is used to determine whether or not there
15  is a -- in this particular case, a linear relationship
16  between a dependent variable and an independent variable
17  to determine if the value of the independent variable
18  and the value of the dependent variable are somehow
19  related.
20    Q.  Can you make that determination any other way,
21  the linear relationship determination?
22    A.  There's different types of regression
23  techniques. There's curvilinear regression and then
24  there's a cubic regression, and then there's
25  experimental work on a nonlinear dynamical regression.

Page 184

1  It's based on chaos theory, but I don't think so. I
2  really don't think so.
3    Q.  So short of doing some sort of regression
4  analysis of the various forms you just described to get
5  a statistically -- to understand the relationship
6  between two variables, regression analysis is the way to
7  do it; is that correct?
8    A.  Well, it depends on -- if we're speaking in
9  generic terms, what you want to do is use the basic
10  statistical technique for the data. The data determines
11  the test, and these type of data are best evaluated in
12  my opinion by a simple regression analysis, because the
13  other principle you want to follow is the more simple
14  the statistical technique, the better it is and the more
15  powerful it is really.
16    Q.  I believe that way back at the beginning of
17  today's deposition, you testified that the courses you
18  are currently teaching are related to the opinion
19  testimony you're offering in this case in part because
20  of the research and statistic methods taught in those
21  courses are some of the same ones used in formulating
22  your opinions as expressed in this report; is that
23  correct?
24    A.  I used a statistical term to describe that.
25  There's a two-way interaction. They kind of feed each

Page 185

1  other.
2    Q.  Of the research and statistic methods that you
3  teach in your classes, which if any of them did you
4  bring to bear on your opinion expressed in Section 4C of
5  your report?
6    A.  Oh, the basic most fundamental one. It's
7  simply a display of descriptive statistics.
8    Q.  When you say a display of descriptive
9  statistics, can you explain to me how you went about --
10  actually, strike that. Let's go step by step. In
11  formulating the opinion in Section 4C, am I correct that
12  one step in reaching the conclusions in Section 4C was
13  to find out the percentage of African Americans in the
14  population of Duval County?
15    A.  That's correct.
16    Q.  And how did you make that determination?
17    A.  From the U.S. Bureau of the Census report.
18    Q.  Did you do anything to verify the accuracy of
19  the U.S. Bureau of Statistics information?
20    A.  The U.S. Bureau of the Census? No. I'm
21  assuming that before they release them to the public,
22  they verify those because I pulled it off of a public
23  web site.
24    Q.  So you took a publicly available number as the
25  percentage of African Americans in the population of

47 (Pages 182 to 185)

Henry Flores, Ph.ᵀ                                                    May 30, 2002
Washington, D.C.

Page 186

1  Duval County; is that correct?
2      A.   That's correct.
3      Q.   Am I correct another step in reaching the
4  conclusion in 4C was finding out the percentage of
5  African Americans in Hillsborough County?
6      A.   That's correct.
7      Q.   Same question.  How did you make that
8  determination?
9      A.   I pulled it from the same web site.
10     Q.   So we now have two pieces of publicly
11 available information, one the percentage of African
12 Americans in Duval County, and the percentage of African
13 Americans in the population of Hillsborough County; is
14 that correct?
15     A.   That's correct.
16     Q.   Am I correct that another step in reaching the
17 conclusions in Section 4C was finding out the percentage
18 of African Americans removed from the Duval County voter
19 rolls on account of being a felon or ex-felon whose
20 right to vote had not been restored?
21     A.   That's correct.
22     Q.   And how did you make that determination?
23     A.   It was data that I received through our
24 counsel on those specific counties.
25     Q.   And what, if anything, did you do -- did the

Page 187

1  data come -- this is the percentage of African Americans
2  on the removal list?
3      A.   It came as counts for county by race and
4  identified as either felons or purged because of death,
5  and I think there was one other category.  I can't
6  remember exactly what it was anymore.
7      Q.   Do you know if that information is publicly
8  available?
9      A.   I don't know that.
10     Q.   Same question with respect to Hillsborough
11 County.  How did you come -- am I correct that the
12 fourth number here is the percentage of African
13 Americans among those removed from the voter rolls in
14 Hillsborough County as felons or ex-felons whose right
15 to vote had not been restored?  Is that another number
16 that you used in your --
17     MS. BORGEN:  Objection to form.
18     THE WITNESS:  Would you repeat your question
19 please?
20     BY MR. RESTREPO:
21     Q.   I may have clearly misstated something.  In
22 reaching the conclusion in Section 4C, was another step
23 finding out the percentage of African Americans among
24 those removed from the voter rolls in Hillsborough
25 County on account of their being a felon or ex-felon who

Page 188

1  had not had their rights restored?
2      A.   They were just identified as felons, purged
3  because they were identified as felons.  There was no
4  indication that they were ex-felons or not.
5      Q.   Okay.  And you got that number from where?
6      A.   Through counsel.
7      Q.   Do you have any idea if the Hillsborough
8  County number is a publicly available number?
9      A.   I don't know that.
10     Q.   Once you had these four numbers, what did you
11 do with them?
12     A.   I just created simple percentages of the -- I
13 just determined what the percentage of African Americans
14 that were identified as felons and purged was of all
15 those purged as felons, and I compared it to the
16 percentage of African Americans of the population of
17 that particular county.
18     Q.   So you did some long division and --
19     A.   Yes.
20     Q.   -- put that result next to the publicly
21 available U.S. Census number?
22     A.   That's correct.
23     Q.   What, if anything, did you do in formulating
24 those -- in the felon removal opinion, the opinion in
25 4C, that required any expertise beyond long division?

Page 189

1      A.   No, if I could have -- if the data were
2  available of felons purged on a per-precinct level, then
3  I could maybe -- you know, I might have been able to do
4  regression analysis on it, but it wasn't available.  It
5  was just available for the county as a whole, so because
6  the data appears that way, the only way you can display
7  it is by the way I did.
8      Q.   Okay.  So it's nice to understand what you
9  didn't do.
10     A.   Yeah.
11     Q.   In answer to my question, what, if anything,
12 did you do beyond -- to formulate the opinion in 4C
13 beyond some long division, putting the result of long
14 division next to a number publicly available from the
15 U.S. Census Bureau?
16     A.   No, nothing.
17     MS. BORGEN:  Objection as to form.
18     BY MR. RESTREPO:
19     Q.   So I'm getting -- I just want to make one
20 thing clear in my mind here.  You compared -- is it
21 correct that you compared the percentage of African
22 Americans removed as felons in Duval and Hillsborough
23 County to the percentage of African Americans in the
24 population of either of those counties?
25     A.   That's correct.

48 (Pages 186 to 189)

Henry Flores, Ph.D.                                                                 May 30, 2002
Washington, D.C.

Page 190

1    Q.   Or each of those counties?
2    A.   Each of those counties.
3    Q.   To what, if anything, do you attribute the
4  over-representation that you discussed in Section 4C
5  regarding the percentage of African Americans among
6  those removed as felons?
7    A.   Oh, I don't know.
8    Q.   You have no idea why that exists?
9    A.   No. I just know that there appears -- that
10  Africans Americans were over-represented in that
11  particular category.
12    Q.   Upon seeing that, was there any intellectual
13  curiosity as to why that was?
14    A.   Oh, sure, but -- you know, I had so many other
15  things to do -- maybe after this election, I could do --
16  or after this case, I can do a research project to look
17  into the specific details of something like that, but
18  you know, I could be intellectually curious, but I don't
19  have time to dig at that particular point.
20    Q.   Did you express your intellectual curiosity to
21  the folks who had retained you in this?
22    A.   No, no, I did not.
23    Q.   Did they tell you not to come up with a reason
24  why?
25    A.   No.

Page 191

1    Q.   Or not to look into the reason why?
2    A.   No, they did not.
3    Q.   In forming your opinion on the
4  over-representation of African Americans among those
5  removed as felons as compared to African American
6  percentage of the population in Duval and Hillsborough
7  Counties, did you consider the percentage of African
8  Americans in the felon and ex-felon population in Duval
9  and Hillsborough Counties?
10    A.   I didn't look at ex-felons.
11    Q.   How about felons?  Did you look at the racial
12  composition of the felon population?  Not the felon
13  removed population, but the felon population --
14    A.   No, I did not.
15    Q.   -- in Duval or Hillsborough Counties?
16    A.   No, I did not.
17    Q.   Do you have any understanding of what the
18  racial composition of the felon population -- felon or
19  ex-felon population in the State of Florida would look
20  like?
21    A.   No.
22    Q.   You never looked into that?
23    A.   No, I never looked into that.
24    Q.   Do you know what source or sources of
25  information the County of Duval or the Duval County

Page 192

1  Supervisor of Elections relied upon in deciding whether
2  to remove felons prior to the November 7, 2000 election?
3    A.   No, I do not.
4    Q.   Same question for Hillsborough County.
5    A.   No, I do not.
6    Q.   Now, you have no opinion as to why these
7  people were removed, correct?
8    A.   That's correct.
9    Q.   Other than they were -- you were handed a list
10  that said number of people removed as felons.
11    A.   That's right.
12    Q.   And your report doesn't purport to state that
13  there's a statistically significant relationship between
14  race and being removed from the voter rolls in Duval and
15  Hillsborough County, does it?
16    A.   No, it does not.  It's just a depiction of
17  what I have concluded is over-representation in that
18  particular category.  There's just a comparison of
19  percentages.
20    Q.   Quick question.  If you could look at Exhibit
21  7 in Exhibit 3 -- Exhibit 7 to your report in Deposition
22  Exhibit Number 3, what is the source of the data
23  contained in Exhibit 7?
24    A.   The U.S. Bureau of the Census reports.
25    Q.   And again, did you do anything to verify the

Page 193

1  accuracy of the information before using it?
2    A.   No, I did not.
3    Q.   And why is that?
4    A.   Because I assumed that the U.S. Bureau of the
5  Census verified it as accurate before they put it on
6  their web site and made it available to the general
7  public.
8       MR. RESTREPO:  I have no further questions.
9       MS. BORGEN:  If we could take -- I'm sorry to
10  do this to you guys, a short break again.
11       (Recessed at 4:50 p.m.)
12       (Reconvened at 5:04 p.m.)
13       EXAMINATION BY COUNSEL FOR JOHN STAFFORD
14       BY MR. ARPEN:
15    Q.   Good afternoon, Mr. Flores.
16    A.   Hi.  How are you?
17    Q.   Good.  My name is Tracy Arpen, and I represent
18  the Duval County Supervisor John Stafford, and I
19  apologize if I ask anything that was asked recently but
20  I was disconnected for about 15 minutes and hopefully
21  I'm not going to repeat what someone else asked, but if
22  I do, please forgive me.
23    A.   Okay.
24    Q.   Let me ask you first if I could to maybe take
25  a look at your report, paragraph 4B on page 3.

49 (Pages 190 to 193)

Page 194

1    A.   Yes.
2    Q.   And also I'll ask you to refer to Exhibit 9.
3  With respect to your comment in paragraph 4B that
4  defendant counties share similar racial population
5  percentages as Hillsborough County, is it your opinion
6  that Duval County shares similar racial population
7  percentages with Hillsborough County?
8    (Whereupon, Mr. Little left the deposition.)
9    A.   Well, the non-Hispanic white population is
10  very close and -- though the African American
11  populations in both those counties are markedly smaller
12  than non-Hispanic white ones.
13    Q.   Well, let me see if I can ask you then, as I
14  recall your testimony earlier, I believe you testified
15  in your opinion that the racial population percentages
16  in Volusia County and Broward County were not similar.
17    A.   Yeah, that's correct.
18    Q.   And I believe you said that in your opinion,
19  the racial population percentages in Volusia and I
20  believe you said Orange County were not similar.
21    A.   No, that's correct.
22    Q.   And according to my calculations, the
23  difference in the African American percentages in
24  Broward and Volusia Counties were about 11 percent or
25  so; is that correct?

Page 195

1    A.   That's correct.
2    Q.   The difference between Duval and Hillsborough
3  in the African American population, the difference there
4  is about 12.8 percent; is that correct?
5    A.   That's correct.
6    Q.   So I'm not sure now if I recall or if I got an
7  answer to the question as to whether or not in your view
8  the racial population percentages in Hillsborough and
9  Duval County were similar.
10    A.   Yeah, they're more similar than Volusia simply
11  because the non-Hispanic white population is so skewed
12  in Volusia.
13    Q.   Okay.  Then let's ignore Volusia and talk
14  about some of the others I believe you referred to,
15  which was I believe a comparison between -- I believe
16  there was a reference between Leon and Hillsborough, is
17  that correct, as to whether those two were similar?
18    MS. BORGEN:  Objection as to form.
19    A.   I don't remember.
20    Q.   Okay.  Well, let me ask you freshly then.  In
21  your opinion, are the racial percentages -- racial
22  populations percentages in Hillsborough and Leon
23  Counties similar?
24    A.   I think they're similar, yes.
25    Q.   To decide whether those populations are

Page 196

1  similar or dissimilar, what is the factor you look at to
2  make that determination?
3    A.   Just the general difference between the
4  percentage of African Americans and the percentage of
5  non-Hispanic whites.
6    Q.   So in your view then, a county which has --
7  Leon County, which has approximately twice the
8  percentage of African Americans as Hillsborough County,
9  would still have similar racial populations
10  characteristics; is that correct?
11    A.   Could you restate your question?  I'm sorry.
12  I was --
13    Q.   Sure.  Is it your opinion then that Leon
14  County, which has approximately twice as many African
15  Americans percentage wise as Hillsborough County,
16  nevertheless shares similar racial population
17  percentages with Hillsborough County?
18    A.   Yeah, I used the word "similar."  I didn't use
19  the word "exact."
20    Q.   How great would the difference in percentages
21  need to be before it ceases being similar?
22    A.   Well, it's not just the percentage of African
23  Americans.  As I said, what makes Volusia really really
24  stand out is the non-Hispanic white population being so
25  dense, or so high rather.

Page 197

1    Q.   Is there a percentage of -- is there a point
2  at which the percentages just in the African American
3  column would make the counties dissimilar?
4    A.   Only if they were very, very extreme from each
5  other.
6    Q.   What would constitute very, very extreme?
7    A.   Oh, if you're talking about maybe one percent
8  or 80 percent.  You know, it's a real judgment call
9  really.
10    Q.   Okay.  With respect to your opinions in
11  paragraph 4B of your report on page 3 regarding
12  affirmations and affidavits in Hillsborough County and
13  also in Orange County, did you make any comparison with
14  the -- or let me ask you this:  Did you consider the
15  percentage of voter turnout by racial population at all?
16    A.   No, I haven't looked at that.
17    Q.   So you haven't compared whether one segment of
18  the racial population had a higher percentage turnout in
19  any particular county than did the other racial
20  population?
21    A.   No, I have not looked at that.
22    Q.   With respect to your opinions in paragraph 4C
23  on page 3 concerning the removal of voters in Duval
24  County, I believe you were asked if you had compared the
25  racial breakout of those persons removed from the voting

50 (Pages 194 to 197)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 198

1  rolls for the reason of felony convictions with the
2  racial breakout of the felony convictions population in
3  general.
4     A.   That's right, I was asked that question.
5     Q.   And have you or have you not made such a
6  comparison?
7     A.   No, I have not made a comparison.
8     Q.   Do you in fact know what the racial breakout
9  of those persons in Duval County with a particular
10 felony would be?
11    A.   No.
12    Q.   Do you have any opinion as to whether or not
13 the voters referenced in paragraph 4B of your report and
14 Exhibit 3 of your report were properly or improperly
15 removed from voter rolls?
16    A.   I have no information on the process of
17 removal at all.
18    Q.   So then you would have no opinion as to
19 whether in Duval County, the removal of voters based on
20 felony convictions was in any manner other than as
21 provided by law?
22    A.   Yeah, I didn't draw any conclusion concerning
23 that at all.
24    Q.   And am I correct that the only opinion
25 regarding Duval County which were based upon statistics

Page 199

1  obtained from Duval County would be those contained in
2  paragraph 4C concerning removal of voters from the voter
3  registration rolls?
4     MS. BORGEN:  Objection as to form.
5     A.   Yes, could you be a little more specific with
6  your question please?
7     Q.   Sure.  Was -- were the opinions expressed in
8  paragraph 4C of your report concerning removal from the
9  voter rolls for felony convictions the only opinion
10 regarding Duval County which were based upon Duval
11 County's statistics as opposed to another county's
12 statistics?
13    A.   What appears in paragraph 4C are the only data
14 I received on Duval County through counsel.  Any other
15 data in the report that appears concerning Duval County
16 came from the U.S. Bureau of the Census databases.
17    Q.   And can you tell me what other portions of the
18 report use any data from the Census with respect to
19 Duval County?
20    A.   Oh, besides the exhibit -- the data in Exhibit
21 9, the data in Exhibit 7 on just general population
22 percentages and total population.
23    Q.   Okay.  That would be the first column on
24 Exhibit 7?
25    A.   Yeah.  You see there for each county and then

Page 200

1  right next to it is the total population of Duval, and
2  then the percentage white, et cetera, and the only other
3  statistic is in that last column where it says the
4  percent renters, 37.8.  Do you see that, point 378?
5     Q.   Yes, I do.
6     A.   That appeared as one of the data entry numbers
7  in the regression analysis on renters that's part of
8  Exhibit 6, but all the counties in Florida were included
9  in that.
10    Q.   So the percentages -- the final product on
11 Exhibit 7 comes from the statewide statistics; is that
12 correct?
13    A.   From the U.S. Bureau of the Census, yes.
14    Q.   But they're statewide as opposed to county-
15 specific statistics; is that correct?
16    A.   No, no.  In Exhibit 7, each county's broken
17 down, so for each county, there's specific population
18 percentages, and then at the end, on the second page of
19 Exhibit 7, the last line is the state total.
20    Q.   Okay, thanks.
21    A.   Do you see that?
22    Q.   One final question.  With regard to your
23 reference in several paragraphs of the report concerning
24 the history of racial discrimination throughout the
25 State of Florida generally towards African Americans, do

Page 201

1  you have any specific knowledge of any history of racial
2  discrimination with regard to Duval County?
3     A.   No, I do not.
4     MR. ARPEN:  That's all I have.  Thank you.
5     THE WITNESS:  Thank you.
6     MS. BORGEN:  Anyone else on the phone?
7     MR. BOSCH:  Yeah, this is Bill Bosch.  Let me
8  go if that's all right.
9     MS. BORGEN:  Sure.
10    EXAMINATION BY COUNSEL FOR DEANIE LOWE
11    BY MR. BOSCH:
12    Q.   Sir, my name is Bill Bosch.  I represent
13 Deanie Rowe.  That's the Supervisor of Elections for
14 Volusia County.  I think most everything's been asked
15 already, so I should be fairly quick here.
16    A.   Okay.
17    Q.   Plus I'm hungry.
18    A.   As we all are.
19    Q.   So quickly, did you render any specific
20 opinions with regard to Volusia County?
21    MS. BORGEN:  Objection as to form.
22    A.   Give me time for a moment please.
23    Q.   Sure.  Let me repeat that question.  Did you
24 render any specific opinions which are unique to Volusia
25 County, different from the other counties?

51 (Pages 198 to 201)

Henry Flores, Ph.D.                                                                    May 30, 2002
Washington, D.C.

Page 202

1  A.  I had -- I could not include Volusia County in
2  the four areas that I looked at because I didn't have
3  any data that I could use.
4  Q.  Okay.  And you have some data regarding
5  Volusia County, correct?
6  A.  Well, I had what I could glean from the U.S.
7  Bureau of the Census, that's correct.
8  Q.  Okay.  And that data is contained on Exhibit
9  7, and I believe you have the summary of it on Exhibit
10 9, correct?
11 A.  That's correct.
12 Q.  And from that data, it's been pointed out
13 today, has it not, that Volusia County is significantly
14 different from the other counties, correct?
15     MS. BORGEN:  Objection as to form.
16     BY MR. BOSCH:
17 Q.  With regard to its racial makeup.
18     MS. BORGEN:  Objection as to form.
19 A.  Yeah, I don't know what you mean by
20 significantly different, but it is different.
21 Q.  Well, would you agree with me that the
22 percentage of African American population of Volusia
23 County is at least half of what it is in the other
24 counties listed on that Exhibit 9?
25 A.  Except for Hillsborough.

Page 203

1  Q.  Okay.
2  A.  And except for the Florida state as a whole.
3  Q.  Okay.  With the exception of Hillsborough,
4  which is still 50 percent higher with regard to the
5  African American population, Volusia County is
6  significantly lower, is it not?
7      MS. BORGEN:  Objection as to form.
8  A.  Again, the word "significantly," I'm not sure
9  exactly what that means.  It's just very different, and
10 it's mostly, as I've been pointing out, not necessarily
11 the African American population is different.  It's the
12 non-Hispanic white population that's extraordinarily
13 high, at 81.9 percent.
14 Q.  Well, in fact, on Exhibit 9, both percentage
15 of African American and the non-Hispanic white
16 population are different than the other defendants
17 involved in this lawsuit.  Is that not correct, sir?
18 A.  That's correct.
19 Q.  On page 4 and 5 of your report, the documents
20 that were available to you and that you considered in
21 preparing this report, are any of those documents or
22 does any of that data pertain to Volusia County?
23 A.  Only the data from the U.S. Bureau of the
24 Census that were general population characteristics that
25 I extracted and put in my report in Exhibit 7 and

Page 204

1  Exhibit 9.  Other than that, no.
2  Q.  That data which you did put in there from --
3  that's on Exhibit 9 is the data which we just discussed
4  that shows Volusia County as being different than the
5  other counties, correct?
6      MS. BORGEN:  Objection as to form.
7  A.  It is different from the other counties,
8  that's correct.  I might add that in FREDS 2000, in the
9  middle of that data on page 5 --
10 Q.  Yes, sir.
11 A.  There's registered voting numbers for Volusia
12 County, but I couldn't use it because I didn't have data
13 on inactive voters or affirmations or numbers of poll
14 workers.
15 Q.  Did you request that information?
16 A.  Yes, I did.
17 Q.  From whom?
18 A.  Through my counsel.
19 Q.  And was it provided to you?
20 A.  No, I don't have the data.  I never received
21 it.
22 Q.  Based on the differences that you have pointed
23 out in your report between Volusia County and the other
24 counties with regard to the racial percentages, would
25 you agree with me, sir, that your opinions rendered on

Page 205

1  pages -- apply to Volusia County?
2      MS. BORGEN:  I'm sorry.  If you could repeat
3  the question?
4      THE WITNESS:  Yeah, something skipped in your
5  transmission.
6      MS. BORGEN:  You blanked out on the phone for
7  a while.
8      MR. RESTREPO:  If you repeat the page numbers,
9  I think we'll be all right.
10     THE WITNESS:  Yeah, the page numbers we
11 missed, were skipped.
12     MR. BOSCH:  Pages 2 through 4.
13     THE WITNESS:  Okay.  Now I forget the
14 substance of the question.  I'm sorry.
15     MR. BOSCH:  Maybe we can have the court
16 reporter read back --
17     THE WITNESS:  That might be easier.
18            - - -
19     THE REPORTER:  Question:  "Based on the
20 differences that you have pointed out in your report
21 between Volusia County and the other counties with
22 regard to the racial percentages, would you agree with
23 me, sir, that your opinions rendered on pages 2 through
24 4 apply to Volusia County?"
25            - - -

52 (Pages 202 to 205)

Henry Flores, Ph.D.                                                    May 30, 2002
Washington, D.C.

---

Page 206

1    A. No because I didn't have the data to include
2 Volusia in my statistical analysis.
3    Q. But my question was will you agree with me
4 that the opinions do not apply to Volusia County?
5    A. Well, given the lack of data, you're correct.
6 If I had the data and if it's made available to me, I
7 may conclude something completely different.
8    Q. Have you been asked to do any additional work
9 with regard to Volusia County?
10    A. No, not beyond the four categories I looked at
11 in my report.
12    Q. Do you anticipate, with the exception of being
13 asked by counsel, do you anticipate performing any
14 additional studies or rendering any additional opinions
15 with regard to Volusia County?
16    A. If Volusia County makes those data available
17 for me that I can use in looking at the categories in
18 4A, B -- C and B, then I could draw -- I might be able
19 to draw an opinion about Volusia County.
20    Q. I'm not asking whether you could. I'm asking
21 right now, do you anticipate doing so.
22    A. I anticipate it, but I don't know if I'll get
23 it done. In other words, if I receive the data, I'll do
24 it. If I don't receive the data, I cannot do it. Do
25 you see what I mean? I'd love to do it.

---

Page 207

1    MR. BOSCH: I don't have any other questions.
2 Thank you.
3    EXAMINATION BY COUNSEL FOR PAM IORIO
4    BY MR. TINKLER:
5    Q. Dr. Flores, this is Ken Tinkler with the
6 Hillsborough County Attorney's Office representing Pam
7 Iorio. Just two quick questions. Your Exhibit 5 to
8 your report -- has that data set been provided to
9 defense counsel?
10    A. I don't know. Did we provide that data? Yes,
11 it should be because I included it on the -- it's in the
12 CD-ROM that we gave a copy to defense counsel.
13    Q. Okay. And is the same answer for Exhibit 6?
14    A. Yes.
15    MR. TINKLER: Okay. Thank you very much.
16    EXAMINATION BY COUNSEL FOR WILLIAM COWELS
17    BY MR. CHEROF:
18    Q. Doctor, Jim Cherof for Orange County.
19    A. Hi. How are you?
20    Q. Fine. How are you?
21    A. Just fine.
22    Q. Make reference to Exhibit 3 if you would in
23 your report please. Are each of your opinions that are
24 set forth in paragraph 4A through F applicable to Orange
25 County?

---

Page 208

1    MS. BORGEN: When you refer to Exhibit 3, are
2 you referring to the report as Exhibit 3 or Exhibit 3 to
3 the report?
4    BY MR. CHEROF:
5    Q. I'm referring to the report specifically. I'm
6 asking about the conclusions that begin on page 2 with
7 paragraph 4.
8    A. Correct. No, only because I did not receive
9 -- as with Duval County, I did not receive data from
10 Orange County.
11    Q. Tell me which ones as of today are not
12 applicable to Orange County.
13    MS. BORGEN: Objection as to form.
14    A. I cannot do the analysis on the relationship
15 between African American registered voters and the
16 percentage of individuals identified as inactive voters.
17    Q. That's A, correct?
18    A. That's correct. I cannot do the statistical
19 analysis on the affirmation affidavits. I have the data
20 for Orange County as a whole for the county but not at
21 the precinct level data, so lacking precinct level data,
22 I cannot do the regression analysis. That's B. I do
23 not have any data on felons purged from Orange County,
24 so I cannot do C, and I do not have any data on the
25 number of poll workers assigned on a precinct level

---

Page 209

1 basis from Orange County, so I cannot do D. If I had
2 the data, I will do it, if the data's made available to
3 me.
4    Q. How about E and F?
5    A. Well, lacking the data, you know, I can't say
6 anything about that obviously.
7    Q. What data have you requested from Orange
8 County that you have not received?
9    A. Just those data that I referred to, inactive
10 voters at the precinct level, affirmation affidavits at
11 the precinct level, the number of felons purged by race
12 for the entire county. I don't need that at the
13 precinct level, and the number of -- the count of poll
14 workers assigned to each precinct during the general
15 election of 2000.
16    Q. And is that information that you requested of
17 Orange County through your -- through the attorneys?
18    A. Yes.
19    Q. The plaintiffs?
20    A. Yes.
21    Q. Is it your opinion that the act of filling out
22 an affirmation affidavit operates to deny African
23 Americans equal opportunity to participate in the
24 electoral process?
25    A. It's my opinion that the act of filling out an

---

53 (Pages 206 to 209)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

**Page 210**

1  affirmation form is an additional step that's placed on
2  any voter during the voting process regardless of race,
3  but in this particular case -- my particular analysis in
4  this case for the data that I have -- that was made
5  available or made available for me, I concluded that
6  there was a statistically significant relationship
7  between the number of affirmations in those precincts
8  having high percentages of African American registered
9  voters, and so there's an additional step being placed
10  on the voters in those particular precincts,
11  consequently, an additional burden.
12      Q.   Are you unable to answer my question?
13      A.   I thought I just did. I'm sorry.
14      Q.   Why don't I restate it for you.
15      A.   Okay.
16      Q.   Is it your opinion that the act of filling out
17  an affirmation affidavit operates to deny African
18  Americans equal opportunity to participate in the
19  electoral process in Orange County?
20      A.   I don't know how Orange County does that, so I
21  can't answer your question.
22      Q.   Can you answer it on a statewide basis in
23  Florida?
24      A.   Again, I don't know that. I don't know the
25  process, the exact process that's going -- that takes

**Page 211**

1  place at the polls. I know that that process does tend
2  to discourage voting in the State of Texas by Hispanics
3  and African Americans because we have data on that.
4      Q.   Have you looked at any data or are you aware
5  of any data that establishes that fact in Florida?
6          MS. BORGEN: Objection as to form.
7      A.   Only the data that I have been made -- that's
8  been made available to me and I've incorporated into my
9  report.
10      Q.   Well, you made reference to data that you
11  would rely upon in Texas to reach that conclusion. Is
12  there similar data that you've relied upon in Florida in
13  reaching your conclusion?
14      A.   Yeah, as I said, the only data that I have
15  available to me -- well, the only data that I've ever
16  performed any statistical analysis in relationship to
17  Florida are those data that were made available to me
18  for use in my report, period.
19      Q.   Is it your opinion that the process of having
20  to complete an affirmation affidavit at a polling place
21  would have a greater impact on African Americans than
22  any other voting group?
23      A.   I don't know. I can't answer that question
24  because I don't know. If people -- if there's been a
25  history of difficulty in politically participating on

**Page 212**

1  the part of any particular group, any time an additional
2  step is placed in their participation process that
3  questions whether or not they have a right to cast a
4  ballot becomes -- is a step toward the denial of that
5  vote simply because lesser educated voters or people
6  that don't understand everything that's going on with
7  elections that even may be pretty well educated may not
8  know that they can fill out an affirmation form, may not
9  even know to ask for one.
10      Q.   Do you know how many affirmation affidavits
11  were filled out in Orange County?
12      A.   No, I do not.
13      Q.   Would it be your opinion that any negative
14  effect that the use of affirmation affidavits would have
15  on somebody who wants to vote would be mitigated by
16  having a list of inactive voters at a polling place?
17      A.   Could you repeat your question? I'm sorry.
18      Q.   Sure.
19      A.   I accidentally spaced just for a second.
20  Sorry.
21      Q.   Would it be your opinion that the negative
22  effect of having to fill out an affirmation affidavit at
23  a polling place could or would be mitigated by having a
24  list of inactive voters at the polling place?
25      A.   Maybe.

**Page 213**

1      Q.   Do you know whether Orange County was one of
2  the counties that had lists of inactive voters at the
3  polling places?
4      A.   As far as I know, only the six counties I
5  mentioned in my report were the ones that indicated they
6  did not maintain lists of inactive voters, and I don't
7  know if that's a complete list or not so, you know, I
8  can't really answer that question for Orange County.
9  I'm assuming they did maintain that list or they do
10  maintain that list.
11      Q.   Your report uses the phrase "history of racial
12  discrimination" several times. What historic time frame
13  did you use in relationship to that phrase?
14          MS. BORGEN: Objection, asked and answered.
15      A.   Several times.
16      Q.   Well, let me make it more specific. What
17  historic time frame in Orange County did you consider?
18      A.   Oh, in Orange County specifically, none.
19      Q.   Can you identify any historical act of racial
20  discrimination in Orange County?
21      A.   Not without doing further research.
22      Q.   If I counted correctly, you used the term
23  "artifact" on several occasions, I think four or five
24  times, specifically when you were asked to relate the
25  1923 Rosewood event --

54 (Pages 210 to 213)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

---

Page 214

1    A.   Uh-huh.
2    Q.   -- to the allegations of this complaint, and I
3    think you described that as the issues that are before
4    us today are an artifact of the 1923 Rosewood event.
5    A.   Well, the Rosewood event was just one event.
6    I mean, the issues that -- of vote denial that are being
7    addressed today are really artifacts of the whole
8    history of African Americans having a difficult time
9    casting a ballot throughout the South.  It's a legacy of
10   that whole history.  That's why we have a Voting Rights
11   Act.
12   Q.   Well, maybe I just don't understand your use
13   of the term "artifact."  Is there some other word that
14   you can substitute for "artifact" in what your answers
15   have been?
16   A.   I like "artifact."  I use it a lot in my
17   writing.  An artifact could be -- the way I mean to use
18   that particular word is that whatever I would call an
19   artifact would be something like one element of a legacy
20   that's a result of past historical occurrences or
21   relationships that have happened.  For instance, I'll
22   give you a for instance.  The lower educational levels
23   of African Americans currently are a legacy of a history
24   of the denial of first education during the days of
25   slavery and post slavery, and later, of segregated

---

Page 215

1    schools, and later even, poorly economically financed
2    and managed school systems.
3    Q.   So the term "legacy" might be a good
4    substitute?
5    A.   Well, I don't like legacy because legacy kind
6    of -- an artifact does not necessarily connote
7    intentionality.  Legacy may connote it.
8    Q.   What is it about the manner in which Orange
9    County conducted its elections that you believe denies
10   African American voters equal opportunity to vote?
11   A.   I don't know because I don't have any data
12   from Orange County to do my analysis.  Orange County's
13   one of the defendant counties, and I would like to
14   include them in my analysis, but at this point, given
15   the consistency of the patterns and the other
16   statistical analyses I've run, I would be surprised if
17   there were dramatic differences in Orange County.  There
18   may be, but I can't answer that question because I've
19   not seen the data.
20   Q.   Taking into consideration the data that you
21   have looked at and the statistical information, your
22   factors, which other counties in the list of defendant
23   counties is Orange County most like for comparison
24   purposes?
25   A.   For the entire state or just those -- did you

---

Page 216

1    say defendant counties?
2    Q.   Yes, defendant counties.  Just the ones that
3    are listed in this litigation.
4    A.   Okay.  Oh, Broward, Duval, Leon, Hillsborough
5    would be the principal ones.
6    MR. CHEROF:  Okay.  Thank you.  Remind me not
7    to sit next to them at trial.  Thank you.
8    MS. BORGEN:  Any other questions?
9    MR. CHEROF:  That's all I've got.  Thank you.
10   MS. BORGEN:  Anyone else on the phone?  No?
11   No one else on the phone with questions?  Okay.  I have
12   a few questions.  I'll try to make it quick because I
13   know everybody is getting hungry.
14   EXAMINATION BY COUNSEL FOR PLAINTIFFS
15   BY MS. BORGEN:
16   Q.   Professor Flores, you testified earlier -- is
17   it correct that you testified earlier that you have a
18   background in political science?
19   A.   That's correct.
20   Q.   And did you use that background in political
21   science to help you in preparing your report?
22   A.   Yes, I did.
23   Q.   And you also testified earlier that you have
24   been involved in a number of cases where you were
25   looking at vote dilution; is that correct?

---

Page 217

1    A.   That's correct.
2    Q.   And did you use statistical methods in those
3    vote dilution cases?
4    A.   Yes, I did.
5    Q.   Were those similar statistical analyses to
6    what you did in this case?
7    A.   They're identical.
8    Q.   You also spoke earlier about some of your past
9    litigation and cases that dealt with race discrimination
10   with African Americans, and you mentioned four cases,
11   LULAC and FOCUS, Rollins, LULAC and Dr. Harold Jones,
12   and Milwaukee branch of the NAACP.  Do you know if there
13   are any other cases in which you've served as an expert
14   that dealt with racial discrimination against African
15   Americans?
16   A.   There was one more I overlooked, and it was --
17   Q.   And you're looking at your resume, or your
18   C.V. there to answer it?
19   A.   Yes, I'm looking at my C.V., Exhibit Number 1,
20   Deposition Exhibit Number 1, and it is labeled -- it's
21   not on here, but my deposition in the case is -- oh,
22   there it is.  Reynosa versus Amarillo Independent School
23   District.
24   Q.   And what type of case is that?
25   A.   It was a racial polarization case and I looked

---

55 (Pages 214 to 217)

Henry Flores, Ph.D.                                                           May 30, 2002
Washington, D.C.

Page 218

1    at the political cohesiveness of African American and
2    Hispanic voters in Amarillo, whether or not they had
3    similar voting patterns.
4        Q.   You testified earlier that I believe there's
5    an undergraduate student who assisted you with some data
6    entry?
7        A.   That's correct.
8        Q.   Were there any other assistants who -- or any
9    other students who assisted you in any way with your
10   report?
11       A.   No, there were not.
12       Q.   You've spoken at times during the deposition
13   about a history of discrimination in Florida.  Would you
14   say that the history of discrimination in Florida
15   includes various socioeconomic factors?
16       A.   I think that's -- yeah, the demographic
17   factors of renters and low income and those kinds of
18   characteristics that are in U.S. Bureau of Census
19   reports are reflective of a history of discrimination,
20   and the courts have concluded that.  They were very
21   specific in Gingles since Thornburg when they were
22   discussing the Senate factors, that those could be
23   considered as artifacts of a history of racial
24   discrimination.
25       Q.   And what sort of factors would those include?

Page 219

1    You mentioned housing or renters.
2        A.   It would include income levels, educational
3    levels, renters versus owner-occupied housing, among
4    others.  There could be -- but those are the principal
5    ones.
6        Q.   Are those factors ones that you anticipate you
7    might testify about in the trial in this case?
8        A.   I anticipate discussing those during trial.
9        Q.   During your deposition, you used the term
10   "Gingles factors."  When you say Gingles factors, what
11   do you mean by that term?
12       A.   Well, what I'm speaking of is the three-
13   pronged Gingles test that was stipulated by the court in
14   Gingles V Thornburg, and essentially those are the three
15   factors that must be met when a plaintiff is
16   challenging -- is making a Section 2 challenge against a
17   particular political jurisdiction.  Generally the first
18   Gingles factor is that the plaintiffs must prove that
19   the minority group that's bringing the challenge is
20   geographically cohesive and a district can be drawn for
21   that particular group of people.
22       The second factor is whether or not the
23   electorate in a specific jurisdiction has a history of
24   racially polarized elections, in other words, whether or
25   not African Americans and/or Latinos and/or Native

Page 220

1    Americans or whichever the specific covered group is in
2    a case vote differently than the white voters do.  And
3    Gingles 3 is whether or not there's a history of white
4    block voting so that whites don't vote in high enough
5    percentages for minority candidates to win in an
6    at-large configuration.
7        Q.   In the cases where you have examined Gingles
8    factors, were those vote dilution cases?
9        A.   Yes, they were.
10       Q.   Are you familiar with the term "Senate
11   factors"?
12       A.   Yes, I am.
13       Q.   When you use the term "Gingles factors," does
14   that include Senate factors?
15       A.   No, not really, but Senate factor's a part of
16   the Gingles I guess proof for the court.  Essentially
17   the Senate factors -- the court has concluded the Senate
18   factors are what are the cause of the racially polarized
19   voting and the segregation that allows for the drawing
20   of a single member district for racial minority groups,
21   and the white block voting is an artifact of that
22   particular -- of all the Senate factors as well.
23       Q.   You were asked earlier whether you'd reached
24   any conclusions about the Department of Highway Safety
25   and Motor Vehicles in Florida.

Page 221

1        A.   That's correct.
2        Q.   Do you anticipate that you might look at any
3    statewide information about the Department of Highway
4    Safety and Motor Vehicles?
5        A.   If the data are provided to me, I will look at
6    it.
7        Q.   Do you anticipate looking at any statewide
8    data regarding the Department of Children and Families?
9        A.   If the data, again, are provided for me, I
10   will look at that.
11       Q.   In your analysis, you used regression analysis
12   to look at some data.
13       A.   That's correct.
14       Q.   Are there other research methods that could be
15   applied to the same data to analyze the relationship
16   between the -- between the data?
17       MR. RESTREPO:  Objection, asked and answered.
18       MR. TINKLER:  Objection to form.
19       THE WITNESS:  Could you repeat your question?
20       BY MS. BORGEN:
21       Q.   Certainly.
22       A.   Can you be more specific?
23       Q.   Other than regression analysis, are there
24   other research methods that could be applied to election
25   data to determine whether there's a relationship between

56 (Pages 218 to 221)

Henry Flores, Ph.D.                                                        May 30, 2002
                              Washington, D.C.

**Page 222**

1   certain pieces of data?
2       A.   Oh, certainly.  When we really -- when we do a
3   vote dilution case, we do not just the ecological
4   regression analysis, but we perform what's called
5   extreme case analysis where we look at homogeneous --
6   sometimes it's also called homogeneous precinct analysis
7   where we look at precincts that have at least a 90
8   percent population of a given racial group and we look
9   at their historical voting patterns in those particular
10  precincts.
11      There's also -- Gary King, I guess for lack of
12  a better statistical term, Gary King's approach at
13  Harvard University where he uses kind of -- the best way
14  to describe it is it's a maximum likelihood estimation
15  of how given precincts behave electorally.  Sometimes
16  that's used.  Sometimes it's not used.  It's very
17  difficult to explain to lay people, so sometimes because
18  it's complex, they don't want to use it, but that's a
19  call of the expert in a given case.
20      And then on occasion, there have been -- John
21  Luwen pioneered and he wrote a book on methods to use in
22  civil rights cases, statistical research methods used in
23  civil rights cases, pioneered a technique called an
24  overlapping percentages technique where it's a very
25  simple -- it's an arithmetic technique where you just

**Page 223**

1   literally look at a given precinct and assume that all
2   voters of one race vote for a specific candidate.
3   Anything left over goes to another candidate and then
4   you can draw some conclusion.
5       When you're doing a vote dilution case as an
6   expert, you would use multiple combinations of those
7   techniques to present your data, so I've used various
8   combinations of those in the past, and actually, in
9   employment cases, discrimination cases, I've used
10  different sorts of other statistical techniques, maximum
11  likelihood chi squared.  I've used comparison of means
12  test a couple of times.  I've used the fi coefficient
13  correlation statistic.
14      It depends on the data.  The data -- the
15  general rule of thumb in statistics is the data
16  determine which statistical test you're to use, the
17  level of measurement of that data.  It's a racial level
18  data, you're going to use regression analysis.  If it's
19  nominal level analysis, you're going to use chi squared
20  analysis.  It just depends.
21      Q.   In paragraph 4C of your report, if I could ask
22  you to take to that -- I think it's marked as Deposition
23  Exhibit 3.  I believe you testified earlier that in that
24  paragraph, you did not do a regression analysis.
25      A.   That's correct.

**Page 224**

1       Q.   Do you think the type of analysis you did in
2   paragraph 4C is an appropriate research method for
3   analyzing the purged data?
4       A.   Well, when we look at Senate factors in a
5   given vote dilution case, the technique that I used in
6   here to compare the ratios of African American --
7   African Americans identified as felons and purged with
8   the total percentage of African Americans in a given
9   county is the same technique we used to present Senate
10  factor data, so it's appropriate I would think.
11      Q.   If I could ask you to turn to page 4 of your
12  report, the last sentence in paragraph D, you state
13  there that there is no statistically significant
14  relationship found between these two variables in
15  Miami-Dade County.  At what level was no statistical
16  significance found between those two variables?
17      A.   Well, it was barely insignificant, point 083,
18  and in the methodological appendix to my report, I
19  discussed that.  Essentially if you were to interpret
20  that, the relationship I found in Miami-Dade would occur
21  the same way 90 percent of the time if you were to do
22  this particular analysis 100 times.  Statistical
23  significance can be interpreted that way.
24      Q.   Okay.  If I could ask you to turn to page 2 of
25  your report, paragraph 4A, the paragraph regarding

**Page 225**

1   inactive voters?
2       A.   Uh-huh.
3       Q.   And you state near the top of page 3 that,
4   "Given that the defendant counties share similar racial
5   populations as Miami-Dade, I surmise that similar
6   statistical findings may exist in the defendant counties
7   and in the state as a whole."  Now, for your analysis in
8   paragraph A, is it correct that you only looked at
9   specific inactive data for Miami-Dade?
10      A.   That's correct.
11      Q.   But do you believe that the findings for
12  Miami-Dade may apply to other defendant counties in this
13  litigation?
14      A.   Certainly.
15      Q.   Again, in paragraph B, you state that -- is it
16  correct that you looked at the affirmation affidavits by
17  precinct for Hillsborough County?
18      A.   Yes, I did.
19      Q.   And then the county-wide affirmation
20  information for Orange County?
21      A.   That's correct.
22      Q.   And you surmised that similar statistical
23  findings may exist in the defendant counties and in the
24  state as a whole?
25      A.   Yes.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC  20005

Henry Flores, Ph.D

May 30, 2002

Washington, D.C.

Page 226

1    MR. TINKLER: Objection to form.
2    BY MS. BORGEN:
3    Q.   Is it your testimony that the findings in
4    paragraph B may apply to some of the other defendant
5    counties?
6    A.   They may.
7    Q.   And would the same case be from your findings
8    in paragraph 4D regarding poll workers, that your
9    findings may apply to other counties beyond where you
10   looked at the data?
11   A.   That's correct.
12   Q.   Turning back to paragraph 4C of your report on
13   page 3, do you believe that your academic experience
14   that you've testified about today assisted you in making
15   the conclusions in paragraph 4C?
16   A.   Could you be more specific?
17   Q.   Sure.  You testified earlier about your work
18   as a political scientist and in statistics, and do you
19   think that work assisted you in preparing this portion
20   of your report that's marked as paragraph 4C?
21   MR. TINKLER: Objection to form.
22   THE WITNESS: Oh, yeah.
23   MR. RESTREPO: I join the objection.
24   THE WITNESS: Well, I agree with her, yes.
25   BY MS. BORGEN:

Page 227

1    Q.   And in what way would you say that your
2    background assisted you in the preparation of paragraph
3    4C of your report?
4    A.   Well, from a statistical point of view, the
5    way that -- the form that the data came to me, I found
6    that the way I displayed them in Exhibit 3 was the best
7    way to display those data.  You can't really do much
8    more with it, so in my experience as a statistician
9    resulted in my determining that's the way to display the
10   data, those data in Exhibit 3.  And as a political
11   scientist, I write and teach on race relations, and I
12   know from just the reading that I've done over the last
13   20, 25, 30 years, that the minority groups overpopulate
14   prisons and so forth in general.  For a specific county
15   in Florida, I don't have those kind of data.  I just
16   have it as a broad general background, understand those
17   sorts of things, and so it made sense to me to see this.
18   And I do know that -- and again, I have a
19   broad background in this.  I do know that there's a
20   broad variety of different techniques used by different
21   states to either allow felons to vote or purge them from
22   the rolls.  It varies from state to state.  In some
23   states you're purged for life.  In some states you can
24   petition to request your rights back.  In some states
25   you can vote when you're in jail.  I think Massachusetts

Page 228

1    is the only state like that, but I don't know exactly
2    how Florida does it, so -- I know that there's a
3    relationship between being a felon and being a purged as a
4    voter, and so that all comes from just my own background
5    and doing reading and research in preparation for my
6    classes and things of that nature.
7    Q.   I'd like to show you a document that's Bates
8    numbered A042001 to A042003 that was produced to
9    defendants.  They received it yesterday.  If you could
10   just look at that and let me know if you recognize it.
11   A.   Yes, I do recognize the document.
12   MS. BORGEN: Actually, I would like to note
13   for the record that this is part of the consolidated
14   exhibit?
15   MR. RESTREPO: Composite exhibit.
16   BY MS. BORGEN:
17   Q.   Composite exhibit.  Composite Exhibit Number 2
18   marked for the deposition.  Could you tell me what that
19   information is?
20   A.   It's a set of percentages of -- it's
21   identified as percentage of black and non-black movers
22   and non-movers in Florida that I reproduced as Exhibit 8
23   in my report.
24   Q.   And do you know what the basis of this
25   information is?

Page 229

1    A.   Yes, it's identified in the e-mail cover
2    letter to me from Ms. Cara Fineman of the Lawyers'
3    Committee.  It reads as follows: "Please see the
4    attached tables, which were prepared using the data from
5    March background of the current population surveys
6    carried out nationwide by the U.S. Bureau" -- "Census
7    Bureau.  They show separately for blacks and non-blacks
8    in Florida the numbers and percentages of respondents
9    who report any change of residences in the year before
10   the survey, and for those who moved, the numbers and
11   percentages who moved across county lines, state lines
12   or national borders."
13   Q.   Would it be correct to say that the source of
14   this data is the U.S. Census Bureau?
15   A.   It would be because I trust Ms. Fineman.
16   Q.   Did you take any independent steps to
17   determine the origin of this information?
18   A.   I don't think so.
19   Q.   But you say this is the source for Exhibit --
20   A.   Eight.
21   Q.   -- 8 of your report?
22   A.   That's correct.  As I said earlier, it did
23   compare to the geographical mobility study that I cited
24   in my report as part of Deposition Exhibit Number 2 from
25   the U.S. Bureau of Census.

58 (Pages 226 to 229)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

---

**Page 230**

1    MS. BORGEN: No further questions.
2    FURTHER EXAMINATION BY COUNSEL FOR CHOICEPOINT, INC.
3        BY MR. RESTREPO:
4    Q.   I've got a couple. Dr. Flores, you talked
5    about — a moment ago about a number of alternative
6    approaches to doing statistical analysis; is that
7    correct?
8    A.   That's correct.
9    Q.   Did you use any of those approaches here?
10   A.   The only ones I used were the bivariate
11   regression analysis and sometimes it's known as an
12   orderly squares or OLS.  Sometimes it's also known as
13   ecological regression.  And then I just, for number C, I
14   did a simple data display of the comparisons of felons
15   and compilation.  Those are the only two techniques I
16   used in this report.
17   Q.   Is it your understanding that — excuse me.
18   Is this a vote dilution case?
19   A.   No.
20   Q.   Going back to Exhibit 3, which is related to
21   4C I believe, did I understand your testimony correctly
22   that your academic training taught you how to display
23   the information in Exhibit 8 in the manner in which you
24   displayed it in Exhibit 3?
25   A.   Both my training and my experience.

---

**Page 231**

1    Q.   .Okay.  And one final training and experience
2    question.  At what point in your academic career did you
3    learn how to do long division?
4    A.   Long division?
5    Q.   Yes.
6    A.   I don't remember.
7    Q.   Before your graduate studies?
8    A.   Yeah, in elementary school.
9        MR. RESTREPO: Okay, thank you very much.
10       MS. BORGEN: Any other questions?
11       MR. TINKLER: No.
12       MS. BORGEN: Any questions from anyone on the
13   phone?  All right.  I think that's it then.  Thanks,
14   everyone on the phone.
15       (Whereupon, at 6:00 p.m., the taking of the
16   instant deposition ceased.)
17
18
19
20
21
22
23
24
25

---

**Page 232**

1
2    _____
3        Signature of the Witness
4
5    SUBSCRIBED AND SWORN TO before me this _____
6    day of_____, 200__.
7                                    _____
8        NOTARY PUBLIC
9
10   My Commission Expires _____.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 233**

1    UNITED STATES OF AMERICA )
2                            ss:
3    DISTRICT OF COLUMBIA     )
4
5        I, KAREN C. YOUNG, a Notary Public within and
6    for the District of Columbia, do hereby certify that the
7    witness whose deposition is hereinbefore set forth was
8    duly sworn and that the within transcript is a true
9    record of the testimony given by such witness.
10       I further certify that I am not related to any
11   of the parties to this action by blood or marriage and
12   that I am in no way interested in the outcome of this
13   matter.
14       IN WITNESS WHEREOF, I have hereunto set my
15   hand this _____day of_____, 200__.
16
17
18                                  _____
19
20
21
22   My Commission Expires:
23   July 31, 2004
24
25

---

59 (Pages 230 to 233)

**A**

ability 40:11 121:8 179:20
able 68:25 144:23 145:12 171:7
  177:10 189:3 206:18
above-entitled 1:18
absolute 118:12 148:15,20
absolutely 44:18 124:6 160:19,21
  161:15
academia 12:6,9
academic 226:13 230:22 231:2
accept 127:13
accidentally 75:5 212:19
account 186:19 187:25
accountable 171:19
accuracy 111:17 185:18 193:1
accurate 11:20 49:6 95:18 163:23
  168:7,20 193:5
act 34:19 93:25 101:14 209:21,25
  210:16 213:19 214:11
action 144:14 182:6 233:11
active 142:9,17 143:9,21 144:10,12
  144:23 145:13,17
acts 121:6
actual 152:10
add 177:15 204:8
additional 108:4 111:3 121:7
  141:20,22 142:4,18,25 143:10,25
  144:8 157:8,9 176:14,15 206:8
  206:14,14 210:1,9,11 212:1
additionally 111:25
address 56:3 89:10,14 139:15,24
  157:17
addressed 42:19 179:1 180:5 214:7
addresses 131:22 139:12
adult 101:11
advanced 12:24
AFA 150:14
Affairs 4:3
affidavit 91:23 157:21 169:22
  209:22 210:17 211:20 212:22
affidavits 13:18 96:21 112:2 115:6
  115:11 118:9,11,12 152:8 153:23
  163:10 173:4 174:11 179:19
  197:12 208:19 209:10 212:10,14
  225:16
affiliation 80:3
affirmation 13:18 89:3,5,8,10
  91:23 96:20 115:6,11 118:8,11
  118:12 152:7,25 153:2 157:16,21
  158:2,11,16,19 163:10 169:22
  173:4 174:11 179:19 208:19
  209:10,22 210:1,17 211:20 212:8
  212:10,14,22 225:16,19
affirmations 89:14 91:25 112:2
  152:7,10,17,19,23 153:23 155:23
  155:25 156:12 157:5,7,12 158:6
  158:7 170:11 173:10 197:12
  204:13 210:7
afford 171:8
African 13:17,18,20 17:8 18:1,11
  18:18 19:8 20:5 21:2,13,15,18,20
  22:2,4,10,20,25 32:16 34:3,4,5
  47:8 49:20 51:13,14,25 52:22,24

53:9 56:22,25 60:21 67:1 70:5
78:24 79:12,15,16 86:9 87:3,12
95:23 96:2,11,15,19,21,23 97:14
98:16,17 103:21 104:17,22 105:1
105:12 110:6 111:4 112:1,4
117:15,24,25 118:2,15,16,17,23
119:1,4,5,13,14 120:24 121:5,7,8
129:22 130:22 131:13,18 137:12
137:13,17 138:14,16,17,21 139:8
141:7,8,21 142:15,19 143:1,4,10
143:25 148:11 149:2,4,11,17
150:8,15,18,22 151:1,3,14,18
152:20 156:11 157:4,12 158:25
159:9,15,16 160:2,23 162:9
163:3,22 165:1,3,7,15,18 166:12
166:15,22 167:1 168:22,25 169:9
169:9,16 170:2,7,9,17,18,25
172:5,7 176:24 179:9,14 180:8
180:13,19,23 181:7 185:13,25
186:5,11,18 187:1,12,23
188:13,16 189:21,23 190:5 191:4
191:5,7 194:10,23 195:3 196:4,8
196:14,22 197:2 200:25 202:22
203:5,11,15 208:15 209:22 210:8
210:17 211:3,21 214:8,23 215:10
217:10,14 218:1 219:25 224:6,7
224:8
Africans 158:6 190:10
afternoon 193:15
age 56:23 80:1 86:13 88:21 129:1,4
  129:12
agencies 176:17 178:2,7,12 180:18
  181:1,11,23
agency 58:17 67:15
aggregate 112:6,17
ago 45:20,20 60:4,5 74:11 101:12
  103:13 110:1 146:2 230:5
agree 142:18 147:10,14,18,19,20
  147:23,24 148:2,3,6,22,25 149:4
  151:12,16 164:14 202:21 204:25
  205:22 206:3 226:24
agreed 37:9
agreement 9:23 178:10
agrees 179:22
ahead 52:13 53:15 55:6 125:19
  163:19
airplane 75:6
al 1:7,11 35:21 55:18,18 85:11,12
Alachua 150:16,18
allegations 181:24 214:2
alleged 43:4 60:7,22
allow 102:9 227:21
allowed 158:2,11,17,20
allowing 182:2
allows 154:21 177:19 220:19
alter 153:14 155:2 173:10
alternative 230:5
Amarillo 41:15,25,25 42:23,25
  43:4,16 217:22 218:2
ambiguous 61:24
amended 52:15 53:5 54:25 55:10
  55:13,20 85:12 178:8
America 91:8 233:1

American 13:17,18,20 15:2,19
17:21 18:15,18 34:9 36:16,18
41:11,18,19 42:6 46:8 47:9 49:21
51:13,14,25 52:22,24 53:9 56:22
56:25 57:20 67:1 70:5 74:24
78:24 79:12,15,17 86:17 87:12
91:4,4 92:16,18 93:1 96:19,22
98:16,17 117:25 118:1,2,15,16,17
118:23 119:1,13,14 121:7 129:22
137:17,21 138:14,16,17,21
142:15,19 143:11 148:11 149:2,4
149:17 150:18 151:4 152:20
162:9 165:1,16 166:12,15 191:5
194:10,23 195:3 197:2 202:22
203:5,11,15 208:15 210:8 215:10
218:1 224:6
Americans 17:8 18:1,11 19:8 20:5
21:2,13,15,18,20 22:2,4,11,20,25
32:16 34:3,4,5 60:21 86:10 87:4
95:23 96:2,11,15,23 97:14
103:22 104:18,22 105:2,12 110:6
111:4 112:1,4 117:16 119:4,5
120:24 121:6,8 130:22 131:13,19
137:11,12,14 139:8 141:7,9,21
143:1,4 144:1 149:11 150:9,15
150:22 151:2,14,18 156:12 157:4
157:12 158:6,25 159:9,15,16
160:3,23 163:3,22 165:3,7,19
166:22 167:1 168:22,25 169:10
169:17 170:2,7,10,17,19,25 172:6
172:8 176:24 179:9,14 180:8,13
180:19,23 181:7 185:13,25 186:5
186:12,13,18 187:1,13,23 188:13
188:16 189:22,23 190:5,10 191:4
191:8 196:4,8,15,23 200:25
209:23 210:18 211:3,21 214:8,23
217:10,15 219:25 220:1 224:7,8
amount 18:16
amounts 171:9
analyses 56:9,11,20 76:17,19 77:3
77:12 78:22 80:16,22 109:2
123:10 127:21 182:22 215:16
217:5
analysis 13:9,10 14:1 17:4 26:20,21
27:5,12,17 28:2,3,12 29:11 35:12
36:3,3,8 37:3 43:13 47:2 48:5,12
49:20 51:2,24 56:13,15,18 62:3
63:14 64:17 68:5,12,14 69:1
71:18,23,25 72:3 73:13,15,17,24
75:8 77:17,19 89:15 90:24 92:1
93:12 94:7,10,12,13 106:18
109:15,18 113:10,14 114:24
115:13 119:2 121:4,18 122:14
127:23 129:11,14,24 132:21
133:14,20,23 135:15 136:3,15
156:1,1,24 170:1 177:9 182:9,13
182:18 183:2,10,12 184:4,6,12
189:4 200:7 206:2 208:14,19,22
210:3 211:16 215:12,14 221:11
221:11,23 222:4,5,6 223:18,19,20
223:24 224:1,22 225:7 230:6,11
analyze 221:15
analyzed 64:19 80:11 135:1

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 235

analyzing 58:22 94:18 224:3
and/or 135:7 219:25,25
Angeles 11:17 12:4,12 14:12
Anglo 35:17 37:20 38:12
annexation 51:4
anniversary 20:20
annual 87:20
answer 8:7,8 16:14 21:24 24:8 29:7
  30:1 31:14,15 40:8 46:11 52:8,25
  53:6 81:18,18 97:10 101:23
  104:6 109:12 113:4,19 117:9
  125:8 136:19,21 143:16 146:1
  158:14 159:24 162:14,16 164:19
  179:12 189:11 195:7 207:13
  210:12,21,22 211:23 213:8
  215:18 217:18
answered 40:3 53:12 109:10,11
  213:14 221:17
answering 40:11
answers 8:5 162:3 214:14
anticipate 132:9 206:12,13,21,22
  219:6,8 221:2,7
Antonio 8:23 24:2 43:20 44:2,8
  45:10 58:5,9,11,15 82:2 84:8
  102:10
anybody 8:12 116:1 181:14
anymore 73:4 187:6
apart 70:20 96:7
apartment 169:4,4
apologize 193:19
apparently 169:4
appear 18:2 159:9 179:17
appearance 104:21
APPEARANCES 2:1
appeared 25:5 88:22 89:15 92:18
  200:6
appears 23:22 54:23 69:10,21
  129:24 145:14 168:10 189:6
  190:9 199:13,15
appendix 224:18
applicable 207:24 208:12
applied 221:15,24
apply 205:1,24 206:4 225:12 226:4
  226:9
appointed 133:6
approach 222:12
approaches 230:6,9
appropriate 224:2,10
approximate 74:9
approximately 31:9,23 62:9 149:16
  196:7,14
April 62:18,24
area 16:8 19:1 26:22 27:1 49:2
  71:21,73:17,18,23 116:21 137:4
  161:8 180:5
areas 13:14 19:1 26:24 28:23 56:2
  56:17 59:15 75:10 87:18 89:1
  95:17 97:11 107:22 110:3,17
  120:11,16 128:11 171:21 173:24
  202:2
arithmetic 222:25
Arizona 25:23 26:2,9 58:6
Army 100:6

arose 57:7
Arpen 3:8 5:10 181:15 193:14,17
  201:4
array 122:2 134:9,9
arrived 16:4 103:19
article 73:11 74:23 91:3,5,7,12
  92:17
articles 60:15 73:20,22 74:1,3,10
  74:16
artifact 21:14 25:21 47:18 170:25
  172:9,11 213:23 214:4,13,14,16
  214:17,19 215:6 220:21
artifacts 170:21 214:7 218:23
asked 22:23 27:3 28:10 30:4 36:10
  40:2 52:20,23 53:12 55:21 57:3
  61:21 95:8,17 103:23 109:10
  110:1 115:5 116:2 120:18 123:22
  123:23 133:17,18 135:12 152:16
  152:17 164:3 193:19,21 197:24
  198:4 201:14 206:8,13 213:14,24
  220:23 221:17
asking 7:18 29:3,3 30:4 101:2
  107:17 143:19 146:3 148:20
  155:15 156:18 160:8 161:25
  162:2 172:1,3 173:20 181:6
  206:20,20 208:6
asks 62:6
aspect 18:21 57:13
assembly 79:25 90:21
assigned 68:19 69:13 113:24 114:4
  163:4 208:25 209:14
assignments 13:20
assist 135:19 136:2,15
assistant 16:4 114:7
assistants 218:8
assisted 63:6 218:5,9 226:14,19
  227:2
assisting 63:2
associated 13:25
Association 34:14
assume 66:8 143:20 144:15,17
  155:15 156:18 166:3,4,5,9 223:1
assumed 90:18 166:20 193:4
assumes 49:25
assuming 44:23 50:8 64:3 68:18
  165:22 166:19 170:6 185:21
  213:9
assumption 53:3,4 154:25
assumptions 153:12
athletic 99:17
attached 229:4
attempt 32:11
attention 54:11 62:12 81:6 84:24
  167:8
attorney 50:8 58:20 175:18
attorneys 71:5 209:17
Attorney's 3:3,15,20 207:6
attributable 180:25
attribute 190:3
attributed 181:11
at-large 34:20 220:6
August 161:22,24
Augustine 59:17

Austin 101:6
authoritative 73:16,19,23 74:1,2,4
authors 60:12
autograph 75:4,6
availability 64:15
available 17:18 64:16 115:2,2,4
  152:11 185:24 186:11 187:8
  188:8,21 189:2,4,5,14 193:6
  203:20 206:6,16 209:2 210:5,5
  211:8,15,17
Avenue 1:22 2:4 3:21
avoided 101:10
award 75:3
award-winning 75:7
aware 62:5 66:9 73:7,16 99:6 105:7
  141:16 146:19,21 179:21,24,25
  211:4
a.m 1:23 39:17,18
A041347 41:6
A041444 43:18
A041779 46:7
A041857 47:21
A041968 54:3
A042001 228:8
A042003 228:8
A042011 54:3
A042047 65:9
A042155 91:13
A042174 86:4
A042181 88:8

| B |
|---|

B 6:1 153:14,19 157:4 174:7,9,15
  206:18,18 208:22 225:15 226:4
back 7:17 19:14 28:20 45:23 46:5
  49:19 54:9 69:24 83:23 84:8 93:8
  93:23 98:12 99:13 104:24 106:24
  112:9 123:21 124:5 126:10
  136:12 139:7 160:1 164:20
  181:16 184:16 205:16 226:12
  227:24 230:20
background 7:19 11:5 19:7 85:14
  86:11,14 88:23 91:6,9 92:19,20
  93:5 95:5 129:8 216:18,20 227:2
  227:16,19 228:4
ballot 102:13,24 111:5 133:7
  141:22 142:3 144:1 212:4 214:9
Barbara 11:10,12
barely 224:17
base 177:5
baseball 100:12
based 76:15,24 80:22 81:11 82:5
  94:7 97:5 107:5,12,20 108:7,10
  109:23 110:12 114:12 121:4
  123:2,20 124:4 138:22 153:22
  156:13 173:8 176:8 181:10 184:1
  198:19,25 199:10 204:22 205:19
bases 84:11
basic 185:6
basis 22:18 82:3 83:19,25 85:8
  86:10,14 101:19 103:23 105:9
  106:5 112:5,14,19 113:4 121:2
  149:10,13 159:10 177:15 209:1

Case 1:01-cv-00120-ASG   Document 408   Entered on FLSD Docket 07/02/2002   Page 67 of 340
Henry Flores, Ph.I                                                      May 30, 2002
Washington, D.C.

Page 236

210:22 228:24
Bates 41:6 43:18 46:6 50:17 54:2,4
   54:5,7,23 65:9 86:3,6 88:8 91:13
   228:7
bath 99:22
bats 100:12
Bay 14:9
Beach 2:15
bear 94:17 185:4
bearing 94:24
bears 146:3,5 178:25
beating 100:11
beautiful 116:5
becoming 53:11 111:11
began 12:13 176:23
beginning 12:3 25:24,24 184:16
begins 69:7
Behalf 2:2,7,12,17 3:1,6,12,18 4:1
behave 222:15
behavior 60:18
beings 98:2
belief 150:17
believe 10:2 89:3 100:24 112:11
   140:6 146:15 147:3 150:20
   184:16 194:14,18,20 195:14,15
   195:15 197:24 202:9 215:9 218:4
   223:23 225:11 226:13 230:21
Bend 34:10 35:21 50:5
Bernie 19:23
best 40:11 84:13 184:9,11 222:13
   227:6
bet 109:4,7
beta 121:14,16,19,22 127:8
betas 126:19 127:4
better 65:22 74:15 119:25 184:14
   222:12
beyond 51:9 124:18 132:12 188:25
   189:12,13 206:10 226:9
Bible 145:9
Biblical 145:5,6,7
big 19:22 78:1
bill 62:15,16 201:7,12
billed 63:9
billing 62:15,19
Billy 41:10
Bingham 92:15,15
bit 11:4 16:9 23:13 30:3 147:9
   155:7 181:5
bits 65:15 83:1
bivariate 230:10
black 51:14,25 61:7,10 98:11
   100:11 178:16,17 228:21
blacks 229:7
blanked 205:6
block 35:8 36:3 48:6 135:8 220:4
   220:21
blood 233:11
bluntly 99:21
body 58:2,4 171:22
book 60:12,13 92:12,25 222:21
books 60:6,9,11,20
borders 229:12
Borgen 2:3 5:14 9:8 10:2,5 21:22

22:12 23:16 27:15,17 31:14
   32:21 33:2,5,9,13 39:7,16 40:14
   42:12 49:13 52:6 53:12 66:8 76:5
   77:25 81:14,17 83:5 85:24
   100:21 101:5,18,20 102:6 103:17
   104:5 105:13 107:4,8 108:17
   109:10 110:23 112:11,18 126:17
   133:5 134:6,19 136:4 138:5
   139:17,20 142:21 143:12,14
   144:2,25 145:2 146:6 153:6,17
   155:6 158:3 161:18 162:1,5
   164:17 166:17 170:12 175:9
   181:3 187:17 189:17 193:9
   195:18 199:4 201:6,9,21 202:15
   202:18 203:7 204:6 205:2,6
   208:1,13 211:6 213:14 216:8,10
   216:15 221:20 226:2,25 228:12
   228:16 230:1 231:10,12
borne 111:25 154:2
Bosch 3:20 5:11 201:7,7,11,12
   202:16 205:12,15 207:1
Bosquez 41:9
bottom 71:13
Boulevard 2:20 3:15
branch 34:13 37:24 217:12
break 81:6 84:19 88:15 99:13
   127:17 193:10
breakfast 99:25
breakout 197:25 198:2,8
brief 175:22
briefly 41:1 178:4
bring 88:4 94:8 101:10 185:4
bringing 94:16 219:19
broad 20:12 22:19 28:22 29:22
   45:12 46:3 227:16,19,20
broadly 15:13,15
broken 200:16
brought 88:2
Broward 77:14 82:8,12 92:3 97:1
   114:2 147:24 194:16,24 216:4
brutality 21:5
budging 102:13
buildings 98:18
bunch 98:8
burden 111:3,10 121:7 141:20,22
   142:18 143:1,10,25 144:6,8
   157:8 179:20 210:11
burdens 170:9
burden's 144:21
Bureau 85:18 86:24 87:25 88:6
   129:5,6 168:9 185:17,19,20
   189:15 192:24 193:4 199:16
   200:13 202:7 203:23 218:18
   229:6,7,14,25
burned 47:9,10
business 100:3
B-E-A 121:15
B-E-T-A 121:15
B-I-N-G-H-A-M 92:16
B-O-S-Q-U-E-Z 41:10
B.A 11:7

C
                     C 5:2 7:1 158:23 164:16 165:6
   172:23 173:15,16 174:4,19
   206:18 208:24 230:13 233:5
calculations 194:22
California 11:9,11 12:4 29:15
call 54:18,20 181:17,17 197:8
   214:18 222:19
called 1:17 7:4 10:18 15:2 78:1,2
   222:4,6,23
Calls 143:14
campaign 57:19
campfires 98:10
candidate 35:10,18 223:2,3
candidates 37:21 48:7 220:5
capabilities 55:25
Capitol 4:4
Cara 2:3 9:13 10:19 66:8 229:2
card 102:11,22 103:2 116:5 133:8
care 98:1 102:14
career 12:13 99:7 231:2
carefully 53:5 122:23
Caribbean 137:16
carried 229:6
case 1:5 7:15 8:25 10:16 11:24
   12:23 13:2,6 14:13 15:17,21
   16:17,24 19:4,13 20:4 32:11 33:4
   34:15,18,19,22,25 35:1,12,20,22
   35:23,24 36:4,9,11 37:1,4,5,15,23
   38:1,4,5,14,16,23,25 39:1,1,2
   40:13 41:3,8,17,22 42:19,19
   43:19,23,25 44:6,11,24 45:1,5,7
   46:7,15,18,21 47:2,3,7,12,14,16
   48:3,5,9,12,15,16 50:1 51:6 52:4
   52:5,10,16,19 53:2,11 54:15
   55:12 57:4,5 58:12 60:25 62:7,9
   62:19 63:3,7 70:22 71:24 72:13
   72:18 76:3,4,8,11 78:22 85:14
   94:1,25 96:5 108:16 111:2,6
   120:4 123:9,10,11 125:11 126:15
   132:6 133:13 134:13 146:23
   161:21 171:19 183:15 184:19
   190:16 210:3,4 217:6,21,24,25
   219:7 220:2 222:3,5,19 223:5
   224:5 226:7 230:18
cases 16:25 30:16 31:21,24 32:14
   33:22,25 38:20,22 41:4 42:15
   49:19,22,23 50:8,11,14 74:13,14
   76:3 94:20,21,23 95:2,3,6 97:18
   110:9 125:18 126:1 134:25 135:2
   179:21,25 180:4 216:24 217:3,9
   217:10,13 220:7,8 222:22,23
   223:9,9
cast 71:25 72:12 111:5 133:7
   141:22 142:2 144:1 212:3
casting 102:12 214:9
categories 48:10 56:11,12,13,16
   62:4 77:8 95:10,12 106:17,20
   109:3,15,21 116:12,18 121:6
   175:23 206:10,17
category 45:5 61:25 89:3 129:21
   138:20,23 150:14 157:22 187:5
   190:11 192:18
Caucasians 180:24 181:8

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 237

cause 131:13,19 139:9 176:19,21
220:18
caused 69:22
causes 139:10 157:6,11
cavalry 100:7
CD 78:6,8,16 80:4,8,10,13,25 81:3
89:23,25 93:19 114:18 167:14
CDs 78:13 79:19 81:25 82:1,5,10
82:11,14,19,22 83:16,19 84:3,7,8
93:7,11 112:16 116:4 140:12,17
140:20,21
CD-ROM 77:23 78:8 167:20
207:12
CD-ROMs 77:25
ceased 231:16
ceases 196:21
celebrations 20:21
census 85:18 86:23,25 87:1 88:1,7
129:6 168:10 185:17,20 188:21
189:15 192:24 193:5 199:16,18
200:13 202:7 203:24 218:18
229:6,14,25
Center 3:3
certain 61:11,15,21 82:14,25
102:20 125:1,2 145:8 153:19
171:8 178:17 222:1
certainly 40:12 99:4,6 162:5
221:21 222:2 225:14
certainty 125:3
certificate 142:2
certification 52:10
certified 52:5 102:19
certify 52:19 53:2,8 233:6,10
cetera 86:13,13 90:7,7,7 200:2
challenge 58:7 219:16,19
challenges 49:11 119:24
challenging 34:20 51:3 219:16
change 89:10,11,14,15 106:23
157:16,23 160:15,18 170:9
176:19,21 229:9
changed 16:9 78:21 79:1 80:5
changes 32:24 66:9,13 69:4 70:12
70:19,21 71:4 139:15,24
changing 87:16 107:23 131:21
139:12
chaos 184:1
characteristics 72:16 85:16 88:18
88:21 124:24 147:7,12,22 148:1
148:5,8 150:21,25 151:7,13
154:12,14 173:9 196:10 203:24
218:18
charred 98:18
charts 126:20
check 33:25 69:6 70:17 76:1 99:23
102:23 103:9 167:13
Cherof 2:19,20 5:13 207:17,18
208:4 216:6,9
chi 223:11,19
children 60:14 67:19 68:24 175:21
176:4,11 177:22 179:6 180:14
221:8
choice 35:10
ChoicePoint 2:7 182:3,6 230:2

choices 171:9
choose 132:1
Christi 36:18
Christmas 99:13
circulated 65:8
circumstance 101:25
circumstances 100:23 101:3
119:17 120:3,7,9,15,20 134:3,17
cited 229:23
cities 28:23
Citizens 34:9 36:17 41:11,19 46:8
city 3:9 14:6,9 27:4,7,7 36:20 41:25
42:25,25 43:3,16,20 44:3 50:20
50:25 51:3 58:5,9,11,15 137:1
civic 36:17,22
civil 1:21 2:4 15:22 17:15 18:16,21
19:2 222:22,23
claimed 21:17 44:1
claiming 47:14
claims 43:25 178:6
clarification 81:20 83:6
clarify 25:2 27:17 53:14 104:7
112:19 155:7
class 12:25 16:24 17:10,11,11 18:2
18:3,15,16,19,20 19:3,6 36:18
52:3,4,9,18,23 134:3 171:11,11
classes 16:11,21 17:7,13 18:9,14
19:10 53:1,7 57:17,18 185:3
228:6
classic 20:22
classical 19:15 92:13 93:1
classify 29:24
classrooms 98:14
Clay 2:12 39:20
clean 99:12
clear 8:14 70:10 100:22 130:19
157:19 172:21 189:20
clearly 187:21
Clearwater 59:16
client 48:1 67:22
clientele 68:15 177:5
clients 67:6
close 194:10
closed 55:18 56:5 57:4 120:21
coefficient 121:17 123:23 223:12
cohesive 219:20
cohesiveness 218:1
colleagues 7:17
collected 152:8,23 153:23
collection 40:21 82:9
college 11:5,6 12:1,3,6,8,8 13:4
14:9,16,18,20 34:8,18,21 50:4
100:3,16
Columbia 1:20 233:3,6
column 121:14 197:3 199:23 200:3
combinations 223:6,8
combine 35:17
come 58:19 72:14 99:13 102:22
104:24 120:19 125:17 145:9
187:1,11 190:23
comes 39:19 119:21 122:5 200:11
228:4
coming 58:23

comma 69:8
comment 194:3
Commercial 2:20
Commission 58:6 232:10 233:22
Committee 1:21 2:4 9:3,5,10 42:12
61:17 66:3,7 70:22,24 75:17
138:20 229:3
common 168:22
communities 36:21 98:10
community 14:10 29:18 34:7,17,21
42:23 46:25 47:9,10 50:4 51:4
60:10 87:12,15 98:1,1,16
compact 36:6
Comparative 92:17
compare 66:24 122:6 126:15,24
127:5,6 224:6 229:23
compared 96:24 119:2 150:5
158:24 165:20 166:23 168:9
188:15 189:20,21 191:5 197:17
197:24
comparing 13:16,18,19 67:23
165:2
comparison 43:15 165:21 192:18
195:15 197:13 198:6,7 215:23
223:11
comparisons 230:14
compilation 230:15
complaint 52:15 53:5 54:25 55:10
55:13,16,20 85:12 178:9 214:2
complete 29:22 68:5,12 81:1 82:4
114:24 128:13 161:7 211:20
213:7
completed 64:4 115:1
completely 107:24 108:25 125:17
206:7
complex 222:18
composite 53:16,18 54:1,4,8 61:1
62:13 75:21 228:15,17,17
composition 191:12,18
computed 114:10,17
computer 64:3 65:21,24 66:2 78:7
103:5
concerned 13:2 110:11 120:22
141:3
concerning 132:5 197:23 198:22
199:2,8,15 200:23
conclude 22:14 26:4,17 110:4,18
142:25 143:9,24 154:21 156:2
177:20 206:7
concluded 26:21 27:5,13 28:3,12
29:11 30:7,25 44:7 55:22 142:20
192:17 210:5 218:20 220:17
concluding 108:21 110:21 158:5,9
conclusion 72:11 107:5,11,11,17
108:5,15 110:15 117:15,18
145:24 153:14 155:2 156:10,21
157:1,3 165:6 172:17 173:7
177:24 186:4 187:22 198:22
211:11,13 223:4
conclusions 35:14 37:14 38:7,10
44:5 46:21 47:2 48:8,12 95:16
110:17 113:9 117:1 128:19 150:2
153:20 154:1,9 159:8 164:15

166:1 173:8 182:14,22 185:12
    186:17 208:6 220:24 226:15
conclusory 22:15,15
concrete 98:19
conduct 180:17 181:10
conducted 215:9
confer 81:15
conference 73:9 181:14,17
configuration 220:6
confirming 15:8
Congressional 79:24 90:20
connection 40:18 55:11,24 57:23
    59:2 71:1 80:11 82:23
Connolly 2:9
connote 215:6,7
consciously 171:15,23
consequently 210:11
consider 45:13 51:13 57:5 73:23
    74:4 120:2 122:9 123:11,24
    127:8,22 128:7 137:11,13 158:17
    161:14 191:7 197:14 213:17
consideration 215:20
considered 60:17 128:18 135:6
    203:20 218:23
consistency 96:16 106:22 215:15
consistency's 108:3
consistent 97:7,8 106:20,22 107:21
    108:1,22,23 109:25 110:4 116:12
    116:15
consistently 35:9
consolidated 228:13
constant 131:24
constantly 131:21,22
constitute 197:6
construct 77:16 90:20 182:21
    183:9
constructed 76:17,20 77:4,7,10,20
    80:11,14,23,24 81:3 86:18 93:20
    182:12
construction 80:19 92:9
constructive 124:11
consultant 94:1
consulting 62:8
contact 9:5 42:8 54:14,16,17
contacted 10:15,24 53:10
contacts 76:7
contained 64:8 167:11 173:1
    192:23 199:1 202:8
contains 80:13 95:16 140:8
contemplate 178:10
contend 148:7 170:17
contention 111:24
context 12:6 27:22 102:4 119:25
    128:9 129:15,16
continual 104:21
continue 106:17
continues 77:3
contract 9:22
contrast 43:15
contribute 85:4
control 124:6,13 129:12
convenient 84:20
convention 123:20 124:1,17

convicted 167:1
convictions 198:1,2,20 199:9
copied 79:21
copies 50:7,10,14 73:10 80:16
copy 42:8 44:13,16,17 54:24 65:11
    66:1 73:3,4,6,9 75:4 76:19 79:6,7
    79:9 80:14 91:12 178:14 207:12
Corlie 4:7
Cornell 17:18
Corpus 36:18
correct 8:19 10:1 11:15,18 13:24
    14:8,19 15:15 16:7,13 17:6 18:4
    23:2,25 24:2,3,5 33:6,9 36:14
    38:15 43:16,21 45:8 48:18,19
    49:7 52:2 53:2,8 54:21,25 55:1,8
    56:1,18,19 57:1 58:13 59:7 61:3
    62:20 66:4,5,21 68:10 69:16
    70:16 77:2 80:6,7 81:12 82:6,16
    82:18,21 83:16,17 84:18 88:9,11
    90:1,13 93:9,19,22 94:14,15
    95:10,11,14,15,19 104:4 106:8,13
    107:3 108:6,12,16 109:9 111:13
    111:14 113:7,11,14,15 114:22
    115:22 117:13 118:6 120:17
    122:14,16,17 126:14 128:23,24
    129:13 130:22,23 132:6,8 133:16
    133:18,19 138:1 139:1 140:19,23
    143:3,6 146:17,25 147:5,13,13,16
    147:17 148:21 149:18,20,25
    150:15,19 151:15,19,21,23,25
    152:2,4,6 153:21,24,25 154:4,7
    154:12,20,24 159:2 161:9 163:5
    163:18 172:20 173:12 174:6,21
    175:1,2,4 176:6,12 177:18,25
    182:8,12,16,17,25 184:7,23
    185:11,15 186:1,2,3,6,14,15,16
    186:21 187:11 188:22 189:21,25
    192:7,8 194:17,21,25 195:1,4,5
    195:17 196:10 198:24 200:12,15
    202:5,7,10,11,14 203:17,18 204:5
    204:8 206:5 208:8,17,18 216:17
    216:19,25 217:1 218:7 221:1,13
    223:25 225:8,10,16,21 226:11
    229:13,22 230:7,8
corrected 130:25
corrections 65:19
correctly 10:17 79:21 81:10 84:2
    89:9 92:23 110:7 213:22 230:21
correlation 42:24 43:3 44:25 47:1
    121:17 123:23 131:15,17 223:13
council 92:11 44:4
councils 36:19
counsel 1:17 3:9 7:4,9 33:16 39:15
    39:19 40:13,19,24,24 44:20
    54:10,15 62:8 70:22,24,25 78:13
    81:15 86:4 95:14 111:16 112:12
    115:21 131:8 132:16 153:4
    175:12 182:3 186:24 188:6
    193:13 199:14 201:10 204:18
    206:13 207:3,9,12,16 216:14
    230:2
count 31:16 77:15 78:17 79:14,22
    80:1 92:3 117:25 152:7 209:13

counted 31:11 213:22
counties 29:15 52:23 64:15 67:23
    68:23 78:24 79:9 82:7,9 86:22
    87:21 88:3,14 92:4 93:12,14
    96:25 105:23 106:1,11,16,16
    107:1,22 108:1,5,14 109:4,16,20
    109:23 111:8,11,13,20 113:18
    115:1,3,7,8,14,16,18 116:19
    120:25 128:10,13 129:23 138:12
    140:25 141:4 146:14,18 147:2
    148:7,24 149:3 150:9,12 153:13
    153:15 154:9,10,11,18,22 155:2,4
    155:13,17,23 156:15,22 177:1,14
    186:24 189:24 190:1,2 191:7,9
    191:15 194:4,11,24 195:23 197:3
    200:8 201:25 202:14,24 204:5,7
    204:24 205:21 213:2,4 215:13,22
    215:23 216:1,2 225:4,6,12,23
    226:5,9
country 168:21
counts 78:23 89:7,9,13,13 91:25
    92:6,8 112:1,8,17 114:2 115:7
    163:25 187:3
county 3:3,15,20 7:15 23:6 24:14
    24:18,20 66:15 67:1,2,4,5,6,11,11
    67:17,24 68:21,25 69:7 70:4
    77:14 79:17,24 82:2 88:2,5,19
    89:6,7,19 96:23 97:2 102:20
    111:25 112:4,5,7 114:2 115:8,9
    115:25 116:3 117:22 118:3,14,18
    118:25 119:3,5,6,12,15 128:12
    132:20,22 137:7 139:3 140:22
    141:9,13,17 142:10 143:11,22
    144:1,23 145:12,17 147:6,8,10,11
    147:14,15,20,21,24,25 148:3,4,9
    148:22 149:5,6,11,12,15,17,20
    150:16,18,20,22 151:12,14,16,18
    151:20,22,24 152:1,3,5,8,22
    153:1,3,10,20,24 154:3,6 155:23
    156:10 157:19 159:1,3,18 160:2
    160:24 161:5,8 162:11,25 163:7
    164:1 165:1,3,11,14,23 166:9,10
    169:3,5 173:2,7,16,22 174:3,8,16
    174:24 177:2,3,6,7,8 178:4
    182:11,13,24 185:14 186:1,5,12
    186:13,18 187:3,11,14,25 188:8
    188:17 189:5,23 191:25,25 192:4
    192:15 193:18 194:5,6,7,16,16,20
    195:9 196:6,7,8,14,15,17 197:12
    197:13,19,24 198:9,19,25 199:1
    199:10,14,15,19,25 200:14,17
    201:2,14,20,25 202:1,5,13,23
    203:5,22 204:4,12,23 205:1,21,24
    206:4,9,15,16,19 207:6,18,25
    208:9,10,12,20,20,23 209:1,8,12
    209:17 210:19,20 212:11 213:1,8
    213:17,18,20 215:9,12,17,23
    224:9,15 225:17,20 227:14
    229:11
county's 199:11,11 200:16 215:12
county-by-county 177:15
county-wide 163:24 225:19
couple 10:25 39:14 57:17 73:20

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 239

74:6,11 98:6 132:24 223:12
230:4
course 8:7 15:2,16,19 61:23 174:16
178:19
courses 13:4 16:15,20 184:17,21
court 1:1 8:3,6,9 31:10,22,25 32:5
32:7,10,12 35:19 36:5 37:9 49:1
49:4,15 57:23 59:6 119:22 136:6
136:8,11,23 162:4 179:22 180:1
205:15 219:13 220:16,17
courts 48:18,20 134:7 218:20
cover 17:22 18:13 60:2 229:1
covered 15:22 82:11 220:1
Cowels 2:17 91:22 112:25 207:16
create 91:24
created 89:21 114:11 122:2 138:20
188:12
creates 171:24
cross 67:11 177:8
crossing 37:21
crossover 35:17 38:12
Cuban 60:9,13,18
cubic 183:24
curiosity 190:13,20
curious 69:18 190:18
current 17:18 34:15 46:4 85:17
229:5
currently 8:18 16:1 42:20 173:1
184:18 214:23
curriculum 6:3
curvilinear 183:23
cut 67:17
C.V 217:18,19

**D**

D 7:1 86:16 120:16 162:7 174:7,12
174:14 183:5 209:1 224:12
Dade 3:3,3 69:7 90:10,15 156:22
173:2
Dan 182:5
DANIEL 2:9
Dario 60:15
data 25:5 56:9 63:5,12,13 64:15,17
64:19,21 66:15 67:7 69:23 76:16
76:17,18,19,20,25 77:4,5,6,10,11
77:12,13,13,18,20,24 78:20,20
80:5,10,23,24 81:2,10,11 82:1
83:1,2,2 84:11,15 85:2,19 86:20
89:6 90:17,19,22,24 91:20 93:12
93:15,20 94:17 104:22 106:16
107:23 108:4,15,24 109:6,7,14,16
111:25 112:6 114:8 115:3,3,5,15
115:17,17 116:17 120:12,16
121:20 122:20 123:2,8 125:15,20
128:10,13,15 129:4,4 135:22
138:18 140:5 148:18 152:22,25
153:2,22 154:2,6 157:18 159:6
161:1 163:7,21,23,25 164:7
167:11 168:5 170:5,13 173:17
175:25 184:10,10,11 186:23
187:1 189:1,6 192:22 199:13,15
199:18,20,21 200:6 202:3,4,8,12
203:22,23 204:2,3,9,12,20 206:1

206:5,6,16,23,24 207:8,10 208:9
208:19,21,21,23,24 209:2,5,7,9
210:4 211:3,4,5,7,10,12,14,15,17
215:11,19,20 218:5 221:5,8,9,12
221:15,16,25 222:1 223:7,14,14
223:15,17,18 224:3,10 225:9
226:10 227:5,7,10,10,15 229:4,14
230:14
database 2:8 69:24 70:3 78:1 79:5
79:6,9,11,16 80:19 86:17 89:21
89:23 92:8 116:8 123:6 182:12
182:21 183:9
databases 17:2 78:4 80:23 83:24
95:24 199:16
data's 209:2
date 9:21 10:12 18:3 62:19 64:1,2
104:9
dated 9:23 54:22 55:7 62:18
Daubert 49:12,16
David 3:1 7:9,15 86:16 132:16,20
Davis 2:14
day 72:12 73:5 99:9,10,11 103:1
124:1 157:8 232:6 233:15
days 46:5 59:21 64:4,5 72:24
100:16 161:16,24 214:24
De 60:14
deal 100:10
dealt 217:9,14
dean 15:11
Deanie 3:18 201:10,13
death 187:4
debate 3:21
December 11:11
decide 134:22 161:2,10 195:25
decided 55:16 99:13 162:3
deciding 192:1
decimial 86:23
decision 43:9 49:16 55:19 119:22
decisions 57:23 102:20
declared 136:6
deer-hunt 98:7
deer-hunting 98:6
defend 58:7
defendant 41:14 87:21 88:3 91:22
105:23 106:1,11 107:1 109:3,16
111:8 112:25 113:18 115:1,7,14
116:18 120:25 129:23 138:12
147:2 153:13 154:18 155:1,12
177:14 194:4 215:13,22 216:1,2
225:4,6,12,23 226:4
defendants 1:12,18 7:5,15 77:6
146:23 203:16 228:9
defense 40:24 41:19 42:7 44:20
207:9,12
defined 97:22
definition 138:8,24
definitions 138:4
degree 11:8 136:8
DeLand 3:21
delete 79:8
deleted 66:20,22 67:20
delivered 73:8 74:25
Delta 12:8 14:9,17,18 15:25

demographic 86:13 218:16
demographics 60:21 88:1
demonstrative 132:9
denial 39:1,2,6,11 131:7 158:18
212:4 214:6,24
denied 134:4 180:9,14,19 181:1,9
denies 215:9
denominator 117:17,20 118:4,13
denominators 118:10
dense 196:25
deny 120:23 209:22 210:17
department 4:3 12:19 17:14 66:16
66:25 67:19 68:24 175:19,21
176:1,3,10,11,25 177:21,22
178:24 179:6 180:9,14 220:24
221:3,8
depended 126:8
dependent 117:20,23 118:5 119:9
123:7 183:16,18
depending 64:10,14 72:3
depends 32:3 73:25 115:16 123:6
184:8 223:14,20
depiction 192:16
Depo 95:13 121:12
deposed 7:23 25:5 50:3
deposition 1:16 7:20 16:18 18:6
20:17 40:19 41:2 42:2,9 45:25
50:1,23 51:10,13 65:7 83:10,20
84:7 93:18 104:25 184:17 192:21
194:8 217:20,21 218:12 219:9
223:22 228:18 229:24 231:16
233:7
depositions 49:22 50:7,10,15
depository 54:7
depth 15:24
derived 124:2
describe 184:24 222:14
described 58:16 64:19 68:9 78:13
80:25 88:10 89:25 116:25 132:25
184:4 214:3
describing 77:24 78:4
descriptive 185:7,8
detail 19:21 56:2
details 190:17
determination 134:17,18 183:20
183:21 185:16 186:8,22 196:2
determine 27:3 41:23 88:18 122:7
123:7 124:23 134:2,12 183:14,17
221:25 223:16 229:17
determined 188:13
determines 136:8 184:10
determining 227:9
development 75:9
deviate 69:21 116:21
deviating 116:16
deviation 69:22 108:2 109:1,20
dial 181:15
Dickinson 4:1 175:13
differ 21:19
difference 51:17 145:13 149:21
194:23 195:2,3 196:3,20
differences 69:4 204:22 205:20
215:17

different 8:14 17:1 19:19 25:18,19
   26:4 41:3 82:9 86:12 90:3 93:20
   107:22 108:25 110:18 115:8,17
   115:18 124:3,3 125:18 126:25
   149:8 156:2 159:21 169:1,6
   183:22 201:25 202:14,20,20
   203:9,11,16 204:4,7 206:7
   223:10 227:20,20
differential 87:11
differently 142:9 156:8 220:2
differs 33:3
difficult 214:8 222:17
difficulties 57:7
difficulty 211:25
dig 44:14 74:21 190:19
digging 100:3
dilution 34:22,23 35:24 37:1 38:5,6
   39:1 130:22 131:3,4 216:25
   217:3 220:8 222:3 223:5 224:5
   230:18
dilutive 44:9
diminishing 87:15
direct 54:11 62:12 81:6 167:8
directed 100:14
directing 84:24
direction 1:25 123:15 136:23
director 12:17
Disappearing 92:25
discern 144:23 145:2,10
discipline 94:8,17
disclaimer 178:21
disconnected 193:20
discourage 211:2
discriminated 20:6 44:2
discriminating 171:23
discrimination 21:2,10,12,15,18,20
   22:1,3,10,16,20,24 23:24 24:2,24
   25:8,20,23 26:2,8,14 28:10,13
   29:4,12,16,24 30:9,12,15 31:1,4
   32:15 42:22,25 43:4,6,11,14,15
   45:3,6,7,9,10,14,15,15,16,19,22
   46:1,24 47:18 48:14 60:7,23
   95:21 96:1,10 97:13 98:25 99:2,4
   100:20,25 101:15 102:4 103:15
   103:20 104:16 105:1,8,11 110:2
   110:5,13,22 111:1 117:12 119:25
   141:6,8,13,16 154:15,17 156:14
   170:16,20 171:1 172:3,5,9,10,12
   172:18 173:9 179:9,14,17 200:24
   201:2 213:12,20 217:9,14 218:13
   218:14,19,24 223:9
discriminatory 96:14
discuss 17:25 70:24
discussed 19:16,20 42:16,21 62:4
   93:19 174:23 190:4 204:3 224:19
discusses 19:24
discussing 116:14 218:22 219:8
discussion 23:19 40:16 71:20 75:14
   175:11 181:19
disks 112:9
disparaging 115:25
disparate 95:4 96:17 97:7,11
   104:21 109:21 110:12,19 120:5

121:5 170:18,24 172:7
disparately 61:11 178:17
display 185:7,8 189:6 227:7,9
   230:14,22
displayed 227:6 230:24
disproportionate 160:4
dissertation 11:13,16,22 75:11
   171:4
dissimilar 196:1 197:3
distinction 173:19
distinguish 145:17
district 1:1,2,20 30:5,8 34:8,10,12
   34:18,21 35:22 36:7,13 41:16
   42:1 44:4 46:9 47:22 50:4,5,6
   67:16 79:24,25 217:23 219:20
   220:20 233:3,6
districts 30:10 51:5 90:20,20,21,22
ditches 100:4
divided 114:13 118:2,17,24 119:5
   119:11,14
division 1:3 39:24 86:24 188:18,25
   189:13,14 231:3,4
DMV 67:3 68:3,19,24 177:7,13
Doctor 107:7 207:18
doctoral 75:10
document 32:21 55:3 62:13 65:17
   65:19 70:13 74:18 86:25 92:23
   112:20 113:3 228:7,11
documents 9:24 10:3 40:19,21,23
   54:1,6,9 60:24 65:6 70:14 76:16
   76:18,20,25 77:5 81:9,21,24
   83:24 84:10,15 85:1,21 86:1,4
   87:24 88:25 89:2 95:24 167:18
   175:23,24,25 176:9,15,15,16
   203:19,21
dog 183:6,10
doing 64:16 69:20 71:24 72:4 73:15
   78:10 94:13 98:2 110:24 121:17
   124:19 135:18 178:22 184:3
   206:21 213:21 223:5 228:5 230:6
Doody 2:20
dorm 100:2
double-check 83:22
download 88:6
downloaded 87:25
dozen 99:19
Dr 6:3,7 34:11 36:12 39:22 40:18
   47:6,14 50:19 51:3,12 54:11 55:3
   55:19 62:10 63:21 65:10 75:16
   78:12 84:24 86:7 93:24 99:1
   100:15 107:16 113:23 121:10
   127:21 132:7 175:15 181:21
   182:5 207:5 217:11 230:4
draft 6:9 64:23 65:11,12,14 66:10
   66:15,20 69:5 130:6,10,13 131:1
   131:9
dramatic 215:17
dramatically 25:19
draw 36:6 107:16 125:3 150:2
   177:24 198:22 206:18,19 223:4
drawing 166:1 173:20 220:19
drawn 124:22 219:20
drew 159:8

Drive 2:15
driver's 67:12,13 103:4,10
drives 171:16
dropped 20:19
drove 125:20
due 157:21 161:3 171:6
dug 20:15
duly 1:19 7:5 233:8
duplicate 80:15
dust 99:11
duties 92:7
Dutmer 43:19,24 44:1,14,24 50:23
   50:23
Duval 3:10 82:1,8,11 93:13 96:22
   147:20 185:14 186:1,12,18
   189:22 191:6,8,15,25,25 192:14
   193:18 194:6 195:2,9 197:23
   198:9,19,25 199:1,10,10,14,15,19
   200:1 201:2 208:9 216:4
DVDs 20:20
DVT 182:6
dynamical 183:25
D-U-T-M-E-R 43:20
D.C 1:14,23 2:5,10
d/b/a 2:8

───────────────────────────────────
                      E
───────────────────────────────────
E 5:2 6:1 7:1,1 92:10 209:4
earlier 10:3 14:7 43:13 83:11
   116:13 132:25 147:3 194:14
   216:16,17,23 217:8 218:4 220:23
   223:23 226:17 229:22
early 10:13 176:23
easier 205:17
East 2:20 3:15 24:12 34:11 36:12
   50:6
eat 99:25
ecological 222:3 230:13
economic 75:8
economically 215:1
edit 65:18
edits 65:25
educated 107:19 109:8 212:5,7
education 11:6,6 41:20 42:7 214:24
educational 11:5 214:22 219:2
effect 44:9 107:24 128:14 181:6
   212:14,22
effects 75:9 119:24 179:8,14
effort 176:16
Ehrlich 3:2 5:5,7 7:10,13 10:4,7
   18:7 21:23 23:18,20 27:16,20
   32:25 33:3,7,10,14,23 39:8,14
   42:16 53:17 132:17,19 136:11,18
   138:6 139:19,22 142:24 143:13
   143:15 145:1,3 162:4,6 164:18
   166:18 175:5
Ehrlich's 43:12
Eight 229:20
either 34:4 72:2 87:14,15 92:22
   98:19 116:25 137:15 153:6
   166:10 167:19 176:16 178:2,6,11
   180:18,25 181:11,23 187:4
   189:24 227:21

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 241

elect 35:10,18
elected 37:22 44:3
election 25:17 34:20 35:16 37:9
  57:9,11,14,24 61:11,15 71:23
  72:8 89:6,18 92:6 102:9,17 112:3
  133:4,10,11 152:9 153:24 157:8
  178:18 180:11,15,20 181:2,10
  190:15 192:2 209:15 221:24
elections 7:14 16:11 27:22,23 28:25
  29:1 34:21 38:9 39:24 41:24 57:7
  57:17 73:18 86:17,19 90:15
  91:24 92:5 132:19 192:1 201:13
  212:7 215:9 219:24
electoral 18:12 120:25 134:5,10
  209:24 210:19
electorally 222:15
electorate 35:6 46:20 219:23
element 214:19
elementary 231:8
elements 122:23
eliminate 79:7,13
else's 132:1
emerge 109:19 116:20
empirical 19:19
employed 12:1 16:2 18:9
employees 95:4
employment 12:2,5 30:16 48:22
  94:21,23 223:9
engage 180:19
engaged 180:18
engine 20:19
English 11:8
enlisted 100:9
enter 111:5
entered 114:7
entire 18:8 43:5 72:5,22 78:18
  96:13 98:1 109:17 118:14,18
  209:12 215:25
entitled 17:10 91:3 92:12,25
entity 58:15,22
entries 62:21
entry 63:5 69:23 200:6 218:6
equal 120:24 134:4 144:21 209:23
  210:18 215:10
equally 144:5
erroneous 177:22
error 123:4
Ervine 34:8
escaped 98:23
ESQ 2:3,3,9,13,19 3:2,2,8,14,20
  4:3
essentially 66:23 71:19 75:7 79:4
  114:1 116:11 219:14 220:16
  224:19
establishes 211:5
estimate 31:17 32:8
estimation 222:14
et 1:7,11 35:21 55:18,18 85:11,12
  86:13,13 90:7,7,7 200:2
ethnicity 80:2
etiquette 8:4
evaluated 43:16 184:11
evenly 144:5

event 213:25 214:4,5,5
events 108:24
eventually 65:16
everybody 97:23 99:12 100:1
  216:13
everybody's 116:5
everything's 201:14
evidence 47:11
ex 166:6,10
exact 9:21 10:11 11:1 32:6 196:19
  210:25
exactly 15:5 51:8 78:9 137:3 139:4
  144:18 158:13 167:13 187:6
  203:9 228:1
examination 1:17 7:4,9 39:19
  132:16 134:1 175:12 176:14
  182:3 193:13 201:10 207:3,16
  216:14 230:2
examine 61:7 150:8
examined 7:6 220:7
examining 61:6 178:16
example 8:8 20:18,22 21:1 27:2,2
  29:23 30:7,8,21 103:22 122:21
  138:10,16 150:16 171:20
examples 20:11,14 97:15 100:19
  104:12
Excel 114:7 167:14 168:1
exception 71:25 79:14 148:12
  178:3 203:3 206:12
exceptional 141:25
excerpt 112:24
excluded 66:15
excuse 15:12 55:14 91:22 111:23
  112:4 121:15 129:21 230:17
exercise 114:17
exhibit 33:11,14,18 41:5 49:19
  50:15 53:16,17,18,21 54:1,4,8
  61:1 62:13 63:16,17,21 64:8,20
  64:21,23 65:1,6,7,8,10 66:3,10,11
  66:20 67:18 68:1 69:5 71:2,6,10
  75:21 76:13 80:21 81:7,11 82:3,4
  82:20,24 83:6,7,7,10,11,12,14,14
  83:20 84:7,25 90:12 93:18 95:13
  104:2 106:4,5 120:15 121:11,12
  125:10 126:22,23,25 127:2,7
  129:24 130:4,5 147:4 148:24
  150:10,13 167:9,12 168:20
  192:20,21,21,22,23 194:2 198:14
  199:20,20,21,24 200:8,11,16,19
  202:8,9,24 203:14,25 204:1,3
  207:7,13,22 208:1,2,2 217:19,20
  223:23 227:6,10 228:14,15,17,17
  228:22 229:19,24 230:20,23,24
exhibits 69:5 70:12 80:15,16
  125:23 130:1 132:10,11
exist 105:25 106:10 107:1,14,15
  108:13 113:17,20 120:3 225:6,23
existed 36:4 38:8,11 152:19
existence 14:20 73:7
existing 108:20 110:13
exists 44:2 45:11 136:10 190:8
expanded 70:13
experience 12:10 94:19,20 97:18

109:24 133:1 142:6 226:13 227:8
  230:25 231:1
experiences 14:12
experiencing 21:15
experimental 124:13 183:25
expert 6:7 8:24 9:19 13:5,11 23:14
  23:22 30:14 31:10,23 32:11,15
  35:1 38:2 39:3,6,10 44:11 48:17
  48:21 49:2,5,8 51:5,7 53:11
  54:10 55:17 58:2 59:1 63:22
  78:15 80:9,14 89:16 94:20
  132:11 135:7,18 136:24 217:13
  222:19 223:6
expertise 45:21 94:16 188:25
experts 60:18
Expires 232:10 233:22
explain 16:25 121:20 185:9 222:17
explanation 79:18
express 190:20
expressed 76:15 176:7,8 182:10
  183:2 184:22 185:4 199:7
extent 144:7 162:2
extracted 92:7 203:25
extraordinarily 203:12
extrapolated 93:11
extreme 197:4,6 222:5
extremely 124:8
ex-felon 186:19 187:25 191:8,19
ex-felons 187:14 188:4 191:10
Ezrol 2:20
e-mail 54:22 55:10 56:6 57:2 229:1

F

F 121:25 207:24 209:4
face 142:16
facility 44:15
fact 44:7 61:7 95:1 103:25 108:6,7
  108:9,16 125:18 134:13 151:2
  157:12,22 198:8 203:14 211:5
factor 37:12 120:1 129:18 134:16
  196:1 219:18,22 224:10
factors 35:4 37:15 128:17,25
  133:15,21,24 134:1,15 135:1,5,10
  135:16 136:2,3,15,16,22 215:22
  218:15,17,22,25 219:6,10,10,15
  220:8,11,13,14,17,18,22 224:4
factor's 220:15
facts 87:23 108:10 166:3,19,20
  177:19 178:24 179:3 180:17,22
factual 22:17
failed 180:19
fair 39:5 107:19,20 169:12
fairly 201:15
fairness 154:16
fall 12:3 61:24 62:3 178:20
falls 125:1
false 153:13 155:2,16
familiar 19:1 49:15 88:23 220:10
families 98:19 175:21 176:4,11
  177:22 179:6 180:15 221:8
family 48:2 67:19 68:24
far 13:1 14:20 18:1 19:14 62:17
  110:10 120:22 141:2 150:2,22

213:4
**feature** 181:14,17
**February** 11:2 54:22 55:7 56:6
**federal** 86:16,19 179:22 180:1
**feed** 184:25
**feel** 25:1 31:18 86:9 87:2 88:20
   91:6
**feeling** 99:12,24
**feelings** 98:3
**fell** 162:12
**felon** 165:4 186:19 187:25 188:24
   191:8,12,12,13,18,18 228:3
**felons** 13:23 118:20,23,25 158:24
   159:11,14,15,23 160:3 161:8
   163:23 164:25 165:7,8,12,18,22
   165:24 166:4,5,6,7,10,11,22
   167:1,5,7 172:24 187:4,14 188:2
   188:3,14,15 189:2,22 190:6
   191:5,11 192:2,10 208:23 209:11
   224:7 227:21 230:14
**felony** 198:1,2,10,20 199:9
**felt** 99:18
**fi** 223:12
**field** 45:21
**fields** 48:20,24
**figure** 20:17 123:5
**figures** 60:5 137:24
**file** 64:3 80:13 167:15
**filed** 52:16
**files** 42:6 44:14 78:3,9,14 80:9,18
   140:16
**fill** 157:5,7,11,16,21 158:1,6,7,19
   169:21 170:10 179:18 212:8,22
**filled** 212:11
**filling** 156:12 209:21,25 210:16
**fills** 158:11,16
**final** 31:12 66:10,17 69:5 71:6
   83:19,25 84:12,16,25 85:5 90:11
   93:4 113:6,22 117:14,15 121:12
   130:4,10,14 131:1,5,11 181:21
   200:10,22 231:1
**finalized** 63:25 71:2
**finally** 101:9
**financed** 215:1
**find** 29:16,17,22 69:22,25 73:4
   74:16 79:20,21,25 98:13 107:23
   108:2 148:13,14 150:12 168:25
   180:4,6 185:13
**finding** 186:4,17 187:23
**findings** 58:19 96:13 105:25 106:10
   106:25 107:13 108:13 113:17
   124:21 225:6,11,23 226:3,7,9
**fine** 53:14 207:20,21
**Fineman** 2:3 9:13 10:19 16:18 55:4
   66:8 76:5 153:6 229:2,15
**finish** 8:4,5 106:9
**finished** 26:3 117:10
**finite** 124:11
**firm** 106:18
**firmed** 106:15
**first** 10:15,24 12:2,13 16:15 17:17
   18:17 19:17 34:16 40:1 41:4,13
   41:14 52:13 54:14,17 55:15 60:3

62:6,16 78:13 79:19 80:4 85:10
   85:25 92:23,24 99:6,8,10 100:7
   114:15 117:14 130:13 141:6
   147:2 175:23 182:7 193:24
   199:23 214:24 219:17
**five** 45:20 59:14 213:23
**five-minute** 127:16
**Flagler** 2:15
**Flipping** 61:1
**Floor** 3:15
**Flores** 1:16 5:4 6:2,3,5,7 7:3,12,13
   11:4 23:21 33:15,18 39:22 40:18
   47:6,14 50:19 51:12 53:21 54:11
   55:3,19 62:10 63:17,21 65:1,10
   75:16 78:4,6,12,15 80:9 84:24
   86:7 93:24 99:1 100:15 107:16
   113:23 121:10 127:21 132:7,18
   136:19 175:15 181:21 182:5
   193:15 207:5 216:16 230:4
**Florida** 1:2,11 2:15,21 3:4,10,16,21
   4:4 20:10,11,18 21:3,13,19 22:2
   22:11,17,21,25 30:22 31:4,6
   39:24 43:1,5,8,14 47:5,15,18
   51:14,14 57:14 59:3,6,8,10,13,19
   59:22 60:2,3,7,8,10,16,22 66:16
   78:18 79:23 86:23 87:1,4,13,20
   87:25 88:2,4,24 90:19 91:16
   95:22 96:2,10 97:13 98:22
   101:16 103:21 104:17 105:4,6,11
   109:17 110:6 121:1 137:1,5
   138:19 141:10,14,17 150:9
   156:14 158:14 168:16,25 170:16
   170:23 171:1 172:4,6 175:18,19
   175:20,25 179:5,10,15,21,25
   191:19 200:8,25 203:2 210:23
   211:5,12,17 218:13,14 220:25
   227:15 228:2,22 229:8
**Floridians** 61:7,10 178:16,17
**fluctuated** 125:20
**Focus** 34:7,17 35:14 50:3 217:11
**focused** 29:7,8 30:3 89:1
**folks** 190:21
**follow** 59:5 69:20 111:9 184:13
**following** 76:16,18 77:5 95:9
**follows** 7:7 229:3
**follow-up** 64:11,12 68:7 132:25
**Font** 50:5
**forget** 141:1 205:13
**forgive** 193:22
**form** 21:22 22:12 27:15 39:7 49:13
   52:6 81:14 83:25 84:11,16 85:4
   100:21 101:5,18 102:6 104:5
   105:13 107:4,8 108:17 110:23
   126:17 133:5 134:19 135:21
   136:4,25 138:5 139:17 144:25
   146:6 155:6 158:3 164:15,17,24
   166:17 174:4,19 181:3 187:17
   189:17 195:18 199:4 201:21
   202:15,18 203:7 204:6 208:13
   210:1 211:6 212:8 221:18 226:1
   226:21 227:5
**formal** 57:15
**format** 115:2,23 116:4 122:4

167:22
**formed** 26:1,7,10 85:8 163:8
**former** 98:7
**forming** 80:11 135:19 136:2,15
   138:25 140:5 145:23 155:3 191:3
**forms** 184:4
**formulate** 182:10,19 183:2 189:12
**formulating** 13:5 135:10 184:21
   185:11 188:23
**Forstall** 86:22
**Fort** 34:10 35:21 59:16
**forth** 54:9 98:12 122:24 144:5
   207:24 227:14 233:7
**found** 24:1 25:22 30:11 35:15 36:4
   37:8,17 70:3 80:24 84:12 90:11
   93:17 97:11 108:19 112:1 114:18
   125:23 126:19 162:9,24 172:14
   174:4 224:14,16,20 227:5
**foundation** 49:18 101:20
**foundations** 98:19
**founded** 36:17
**four** 32:17 59:14 82:1,5,11,14,16
   82:19,22 83:16,18 84:3,7 93:7
   95:9,12,17 97:11 106:17 109:3
   109:15 110:3,16,17,20,20,24
   112:9 115:14 120:11,13,16
   128:11 140:12,17,17,20,21
   172:15 173:24 188:10 202:2
   206:10 213:23 217:10
**fourth** 56:8 69:6 107:12 121:14
   187:12
**frame** 46:4 74:9 213:12,17
**Fred** 4:1 175:13
**FREDS** 78:1,14 79:19 80:4 84:10
   86:20 89:21 90:15,24 91:16
   204:8
**free** 25:1 31:18
**freshly** 195:20
**freshman** 18:15
**friends** 59:20
**Ft** 2:21
**full-length** 65:14
**Fund** 41:20 42:7
**fundamental** 185:6
**fundamentally** 20:5 36:22 43:7
   95:5 117:3,4 124:19 128:3
**funds** 63:11
**furnish** 51:11
**furnished** 176:9
**further** 107:20 132:16 175:5 182:1
   193:8 213:21 230:1,2 233:10
**F-L-O-R-E-S** 7:12

---

**G**

**G** 7:1 92:15
**Gadsden** 150:20 151:2,3,4
**gang** 12:11,11
**Gary** 222:11,12
**gather** 109:14
**gee** 90:3
**gender** 17:12,12 80:2 86:13
**gender-related** 17:13
**general** 3:9 8:3 16:8 19:7 21:14,14

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 243

45:2,11,12 46:3 58:20 72:16 85:5
85:19 86:14 87:2,19 88:1,18 89:5
89:18 91:23 92:4 98:22 105:14
105:16 107:5,11 112:3 123:16
124:17,24 129:7,16,20 137:14
138:9 154:15 165:10 166:23
171:3 180:10,15,20 181:2,9
193:6 196:3 198:3 199:21 203:24
209:14 223:15 227:14,16
**generall** 104:17
**generally** 20:9 22:21 44:9 71:23
95:22 96:2,10 97:13 103:21
105:11 121:2 124:18,21 134:16
200:25 219:17
**General's** 175:18
**generated** 97:20 98:3 122:6
**generic** 184:9
**generically** 51:23
**geographic** 26:22 28:2 168:10
**geographical** 26:24 27:1,9,12
28:11 29:10 30:18 61:9 85:15,19
168:11 229:23
**geographically** 219:20
**George** 4:3 17:17 175:17 181:13
**getting** 189:19 216:13
**gift** 145:10
**Gingle** 35:5
**Gingles** 35:1,7,7,11 36:2,5,8 37:11
37:15,16,19 38:11 48:5 51:2
119:22,23 133:14,21,24 134:2,16
135:1,4,5,6,9,15 136:2,3,9,14,16
136:22 218:21 219:10,10,13,14
219:18 220:3,7,13,16
**give** 9:19 10:20 16:17 20:4,13 27:2
28:5,18 29:6 30:21 31:17 32:8
36:5 41:13 45:4 54:12 66:14
70:17 74:15 90:4 102:23 103:23
112:20 115:10 118:9 120:7
122:21 125:15 130:16 136:23
160:16 201:22 214:22
**given** 16:16 32:22 49:22 50:1,10
56:5,8 57:15 68:17 77:23 95:21
96:9 103:20 104:16 105:23
119:13 134:25 136:1 154:17,17
155:12 172:4 206:5 215:14 222:8
222:15,19 223:1 224:5,8 225:4
233:9
**gives** 79:16 118:4
**giving** 11:23 12:22 14:13 15:21
19:4 87:24 171:20
**glad** 51:10
**glanced** 129:2
**glean** 69:2 202:6
**go** 8:17 14:5 15:24,25 16:3 19:14
23:16 28:20 32:6 33:16 41:1
44:14 45:23 52:13 53:13,15 55:6
65:24 67:12 68:23 70:6,17 91:17
97:25 98:6,13,16 99:13 101:7
106:24 109:23 123:20 124:5,8,18
125:18 134:11 138:22 141:24
142:3 157:9 163:19 164:20 175:7
185:10 201:8
**goes** 79:4 98:21 116:13 157:25

223:3
**going** 7:18 16:16 20:3 28:8 39:25
41:4 49:19 52:14 68:21 72:7,23
83:23 86:5 93:23 95:23 97:3
101:9 103:6,7,9 104:14 107:23
107:25 108:3,21 109:5,18,19,21
109:24 116:19,22 122:24 125:15
126:10 128:15 131:25 132:20
137:15,16 143:18 144:11 148:13
148:14,16 160:15,17 171:12
173:20,23 174:1 193:21 210:25
212:6 223:18,19 230:20
**good** 20:18 39:22 90:22 103:7
104:12 135:15,17 215:3
**Goren** 2:20
**government** 15:2,19 18:15 60:24
159:7 163:21
**governmental** 58:1,4,15,17,21
**Governor** 34:14
**graduate** 8:21 16:22 57:19,20
231:7
**Graham** 58:11
**Grammy** 75:5
**grand** 59:23
**great** 15:24 19:21 196:20
**greater** 211:21
**grew** 75:10
**Grice** 34:9
**Grofman's** 19:23
**group** 35:10 36:6 43:10 51:15
58:16 67:22 75:24 97:21 120:6
137:21 157:7 211:22 212:1
219:19,21 220:1 222:8
**groups** 17:22 19:20 25:18 51:18
75:19 131:24 168:24 220:20
227:13
**grown** 87:13
**growth** 87:3,7,11,17
**guess** 26:5 36:19 53:19 60:3 97:2
105:16 106:15 107:10,18,19
109:8 115:18 122:3 139:6 143:17
143:18 169:11 172:13 220:16
222:11
**guidelines** 136:23,25
**guys** 99:20 175:7 193:10
**gym** 99:17

| **H** |
| --- |

**H** 2:3 6:1
**habit** 50:12
**Haitian** 137:11,21
**Haitians** 51:22 137:15
**half** 148:25 202:23
**halfway** 14:10 80:18
**hallway** 99:14
**hand** 233:15
**handed** 192:9
**handing** 43:22
**handled** 44:21
**happened** 21:5 101:11 134:14
214:21
**hard** 124:5 135:22
**Harold** 34:11 36:12 217:11

**Harris** 1:10 2:12 24:20 39:20 42:20
45:1 47:3,7,15 48:13 50:20,25
51:3,3 55:18 78:2 80:8 84:9
85:11 89:23 93:18 114:21
**Harvard** 222:13
**head** 8:8 23:4,7 167:17
**heading** 95:7
**heads** 99:17
**hear** 175:17
**heard** 136:19
**heavier** 111:11
**Hector** 2:14
**held** 171:19
**Helen** 43:19
**help** 20:16 85:9 112:14 129:9
136:25 216:21
**helpful** 145:23 170:1
**helping** 137:9
**helpless** 99:24
**Henry** 1:16 5:4 6:2 7:3,12 78:15
80:9
**hereinbefore** 233:7
**hereunto** 233:14
**Hi** 193:16 207:19
**high** 96:19 124:8 196:25 203:13
210:8 220:4
**higher** 69:14 112:3 131:23,25
151:1 158:7 159:17 160:23 165:7
167:1 168:23 197:18 203:4
**Highway** 66:16 175:20 176:1,10
177:21 178:24 180:10 220:24
221:3
**Hills** 96:23
**Hillsborough** 3:15 82:2,8,12 89:6,7
93:13 97:1 152:25 153:15,20,23
154:23 155:4,24 156:2,3 157:19
182:11,13,24 186:5,13 187:10,14
187:24 188:7 189:22 191:6,9,15
192:4,15 194:5,7 195:2,8,16,22
196:8,15,17 197:12 202:25 203:3
207:6 216:4 225:17
**hint** 101:9
**hired** 51:5,7
**hiring** 161:14
**Hispanic** 44:3 70:4,6 90:7 138:3,4
138:15 218:2
**Hispanics** 44:10 70:8 165:8 180:24
181:8 211:2
**historic** 213:12,17
**historical** 45:15,16,18,22 46:1
86:25 213:19 214:20 222:9
**historically** 20:6 21:16
**histories** 20:12 98:13,15
**history** 15:6 21:12,17,19 22:1,3,9
22:16,20,22 23:23 24:1,23 25:8
25:22 26:2,8,13 27:6,13 28:9,13
29:4,12 30:9,11,14,25 31:3 42:21
45:9 46:23,24 47:17 48:14 95:21
96:1,9 97:5,6,12 98:4,22,24
103:20 104:10,14 105:1,5,8,10,18
110:2,5,13,22 117:8,12 123:21
134:10,10 141:6,8,13,16 154:15
154:17 156:13 170:15,19,25

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 244

172:5,8,9,11,18 173:8 179:16
200:24 201:1 211:25 213:11
214:8,10,23 218:13,14,19,23
219:23 220:3
Hodgkiss 6:5
hold 40:14 81:13 103:8 111:7
holds 64:3
home 82:10,17 165:14 169:17
170:8
homogeneous 222:5,6
honor 57:3,9
hopefully 193:20
hour 101:8
hours 62:7,9,24,25
houses 171:8,13
housing 88:21,21 171:3,24 219:1,3
Houston 50:20,25
Houston's 51:4
huge 87:11
human 98:2
hundred 110:21
hungry 201:17 216:13
hurry 50:1
hypothetical 143:19 144:4 146:10
146:11 166:3 170:6
hypothetically 155:15
H-E-N-R-Y 7:12

_____
                I
_____
idea 42:17 139:5 188:7 190:8
identical 51:19 217:7
identically 51:19
identification 33:20 53:23 63:19
65:3
identified 17:5 34:17 35:20 36:11
37:23 38:13,20 50:17 70:19
79:23,24,24 81:12 84:9 86:6
95:13 96:5 97:24 113:3 114:5
118:20,23 120:17 134:2,15
136:22 157:15 159:11 165:12,18
166:22 167:5 172:11,24 187:4
188:2,3,14 208:16 224:7 228:21
229:1
identifies 138:2 163:22
identify 32:19 33:21 65:9 70:5 90:7
146:14 213:19
identifying 166:25 167:3
ignore 195:13
III 2:13
imagine 7:20 15:16
immediately 158:20
immigration 60:14
impact 128:17,18 170:18,24 172:7
211:21
impacted 61:11 178:17
imply 24:25
important 57:4,5 104:9 164:25
importantly 68:20
impossible 73:1
improperly 198:14
inability 171:7
inaccurate 177:23
inactive 13:16 52:21 96:18 111:12

111:21 115:5 117:16,18,21,22
127:1 131:14,15,20 132:2 139:2
139:10,11,16,25 140:9,10,15,21
140:25 141:2 142:8,14,16,20
143:5,8,21 144:23 145:14,18
146:15,20,24 179:18 204:13
208:16 209:9 212:16,24 213:2,6
225:1,9
incarcerated 165:12
incidences 105:3
incident 23:1 132:25 133:3,6
incidents 21:8,9 22:24
include 54:6 70:13 72:3 77:13
156:24 164:9 176:16 202:1 206:1
215:14 218:25 219:2 220:14
included 13:11 17:20 53:18 168:20
200:8 207:11
includes 17:15 78:3 218:15
including 22:22 31:6
income 218:17 219:2
incorporated 211:8
independent 34:10,12 35:21 36:12
41:15 42:1 46:8 47:22 50:5,6
117:24 118:5 119:12 183:16,17
217:22 229:16
independently 168:8
Indiana 3:21
Indians 17:21
indicated 123:5 160:6 213:5
indicates 165:17
indication 188:4
individual 29:1 98:5
individuals 98:9 114:3 118:23
151:4 157:20 159:11 165:11,18
166:21 167:4 171:7 177:12,13
208:16
industry 138:4,8
inevitably 98:7,10
information 20:20 85:14 86:12,15
88:12,15,23 89:12 90:15 91:9
92:19 93:5,10,16 94:9,13,14
95:25 96:8 111:15,16,18 115:23
116:25 140:24 153:10 163:14
164:2,4,9,12,14 173:10 177:20
185:19 186:11 187:7 191:25
193:1 198:16 204:15 209:16
215:21 221:3 225:20 228:19,25
229:17 230:23
initial 54:20
initially 53:10 128:2 130:21
input 61:18 63:12,13
insignificant 224:17
instance 17:19 51:21 72:21 77:14
79:7 103:14 114:1,14 115:9
165:15 171:3 214:21,22
instances 42:22
instant 231:16
institutions 57:21
instructed 133:23
instruments 124:11
insufficient 38:11
intellectual 190:12,20
intellectually 190:18

intend 23:11 64:7 160:10,22
intentional 40:3 172:2
intentionality 215:7
interact 17:24
interaction 184:25
interchangeably 51:24
interested 78:10 173:17 233:12
interesting 70:4
International 60:17
internet 104:3,13
interpret 94:9 224:19
interpretation 63:14
interpreted 224:23
interrogatories 113:1
interrogatory 91:21 113:1,4
interrupt 35:2 52:12 182:2
intervener 38:3 58:18
intro 18:15
inventer 123:22
investigate 95:8,17
investigations 124:12
involve 51:1
involved 40:20 42:20 47:24,25
49:20 76:3 96:16 203:17 216:24
involvement 179:1
involves 71:14
involving 32:16 59:2 175:25
Iorio 3:12 207:3,7
isolate 177:14
isolated 89:23
issue 29:22 45:6 58:22 61:7,13 67:9
68:6,8 71:24 72:13 120:1 159:4
issues 13:1 42:18 43:16 44:24,25
46:18 48:3,4 51:1 60:22 61:22
178:19 214:3,6
item 29:23
items 84:6 85:3,6 140:6,8,20

_____
                J
_____
J 3:20 34:8 35:20 92:10
Jacksonville 3:9,10
jail 227:25
JAMES 2:19
January 26:5 41:7 99:10
Jason 168:11
Jeff 7:13 10:2 23:16 132:18
JEFFREY 3:2
Jim 207:18
Joe 41:9
John 2:13 3:6 10:4,5,5 39:22 83:5
193:13,18 222:20
John's 152:3
join 7:17 226:23
joined 16:18 18:6 39:15
jokes 98:11
Jones 34:11 36:12 217:11
Josias 2:20
journal 74:19 127:12
journals 74:2,5
JR 3:8
judge 38:9 102:9,16,17,18 134:12
134:20,20,22
Judges 34:15

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 245

judgment 197:8
July 233:23
jurisdiction 29:21,21,24 110:14
 120:4 177:11 219:17,23
jurisdictions 28:23
justify 163:21

---

**K**

KAREN 1:19,25 233:5
Karl 123:22
Katherine 1:10 2:12 39:20 85:11
Kathleen 4:1 175:13
Kearney 4:1 175:13
keep 29:2 50:10 73:10
Ken 3:14 207:5
Kennedy 3:15
kept 73:9 97:3
Key's 19:15
kind 64:10 71:20 86:14 87:2 88:22
 91:9 93:2 95:4 99:15 101:10
 110:11 119:21 122:3 129:3
 137:21 171:12,13,14 184:25
 215:5 222:13 227:15
kinds 15:11 20:20 171:24 218:17
King 222:11
King's 222:12
knew 68:16
know 8:3 9:18 10:11,18 12:25
 14:21 21:9,11,12 29:20 30:1,1
 32:3 33:11 42:5,11,14,24 50:8,14
 51:20 52:18 53:1,3,7,19 62:1,8
 63:25 66:6 67:5,10,15,15,16
 68:11,13,20,22 73:9,19,20 74:9
 76:4 77:9 78:16 81:2,8 82:11
 83:21 92:22 93:14 97:4,16 98:7
 99:21 101:12 102:15 104:1
 105:21 106:14,21 108:5,19
 111:20 112:14,19 116:20 125:17
 126:24 127:11 131:6 134:21
 135:14 136:7 137:1,4,6,7,8,17
 138:3 139:2,10,13 140:3 142:12
 143:17 144:22 145:12,15,16,19
 145:25 146:4,22 152:24 153:9,11
 156:23,23,25 157:2 158:13
 159:14,18,21,25 160:25 161:11
 161:13,16,20,20 163:13,15,18
 164:11,13,25 168:7 169:16,19,20
 169:25 170:2,13 171:2,2,2 177:4
 177:6 180:7,8,13,22 181:12
 187:7,9 188:9 189:3 190:7,9,14
 190:18 191:24 197:8 198:8
 202:19 206:22 207:10 209:5
 210:20,24,24 211:1,23,24 212:8,9
 212:10 213:1,4,7,7 215:11
 216:13 217:12 227:12,18,19
 228:1,2,10,24
knowledge 32:10 73:6 84:13 178:5
 181:22 201:1
known 104:8 230:11,12
Kumho 49:12,16

---

**L**

L 4:3 86:22

LA 14:6
labeled 167:15 217:20
labor 48:22
lack 49:18 65:22 96:25 181:10
 206:5 222:11
lacking 208:21 209:5
laid 119:23
land 11:16,21
language 69:17
laptop 78:7 103:5
large 19:23 35:8 36:21 96:21 170:7
 171:22
larger 77:13 124:22 171:10
lastly 119:7
late 39:15
Latin 34:9 36:16 41:11,18 46:8
Latino 15:14
Latinos 15:7 17:21 219:25
Lauderdale 2:21 59:16
law 1:22 2:4 44:2 48:22,22,23
 74:19,20 198:21
lawsuit 9:17 34:5 178:6 179:1
 181:24 203:17
lawsuits 36:24
lawyers 1:21 2:4 9:3,5,9,10,16
 42:12 61:17 66:3,6 68:1 70:22,24
 75:17 76:3,4 162:3 163:13,16,16
 164:3,11 229:2
lay 222:17
leads 74:15 110:4
League 34:9 36:16 41:10,18 46:7
Leahy 3:1 7:9,15 132:16,20
learn 231:3
learned 104:2
leave 100:1 102:12 134:22 161:4
leaving 87:15
lectured 57:10,13,22
lectures 57:15
led 182:14,22
left 67:8 81:21 82:2 93:8 140:18
 161:3 194:8 223:3
legacy 214:9,19,23 215:3,5,5,7
legal 4:3 23:22 41:19 42:7 95:6
 102:18 162:3
Leon 147:14 149:6,11,15,17 195:16
 195:22 196:7,13 216:4
lesser 212:5
letter 6:5 9:22,22 61:2,6 62:18
 75:20 178:14 229:2
let's 53:15 66:18 100:12 123:9
 141:1 146:11 163:12 164:23
 185:10 195:13
level 8:22 16:23 68:15 79:23 112:8
 123:15,17,19,25 124:10,16,23
 127:10 163:11,25 189:2 208:21
 208:21,25 209:10,11,13 223:17
 223:17,19 224:15
levels 124:4,8 125:19 214:22 219:2
 219:3
license 67:12,13,14 103:4,10
life 101:11 227:23
likelihood 222:14 223:11
limitation 44:1

limited 32:4
limits 44:8
line 67:12 69:7 93:25 103:8 107:17
 148:16 162:1 200:19
linear 183:15,21
lines 67:17 177:8 229:11,11
list 70:8,13 76:25 78:17 81:22
 89:18,25 90:4,4,5,5,8,9,17,24
 95:9 111:12,21 112:18 113:2
 114:2 115:10 116:2 131:14,16,20
 132:2 139:3,11,16,25 140:8,21
 143:5 159:10,22 175:23 187:2
 192:9 212:16,24 213:7,9,10
 215:22
listed 23:14 28:15 32:14 34:2 62:24
 76:21 77:8 80:2 84:6 85:3 140:6
 150:10 202:24 216:3
listing 70:20
lists 52:21 70:2 111:12 115:8
 117:17,19 139:9 140:15 142:20
 146:15,19,23 158:24 160:3 166:8
 213:2,6
literally 47:10 92:5 114:13 171:8
 223:1
literature 17:18,21,21 171:22
litigation 23:21 28:16 30:11,14
 39:25 71:18,24 216:3 217:9
 225:13
little 2:13 5:6 16:9 18:6 33:25
 39:21,23 40:17 52:7 53:15,24
 63:16,20 64:25 65:4 72:1 75:12
 75:15 77:22 78:11 81:23 83:9,15
 84:19,23 86:2 101:19,22 112:13
 112:23 126:18 127:16,20 132:14
 140:7 147:9 155:7 175:7,10
 181:5,13 194:8 199:5
live 171:16
lived 59:10
living 166:10
LLP 2:9,14
locked 171:9
logically 59:5 111:8
long 10:23 14:3 19:21 51:10 101:12
 102:14 103:7 104:9,9 117:8,12
 172:4,8,9 188:18,25 189:13,13
 231:3,4
look 19:19 23:8,11 31:18 32:18,22
 35:5 46:19 49:23 52:20,23 55:21
 56:4,5 61:12,20,21 66:24 68:2
 70:18 75:8 76:13 78:6,12 85:20
 85:25 88:13 93:13 94:17 97:4
 103:4 106:4,20 108:1,4,14 110:3
 110:18 112:21 120:1,18 123:21
 125:9,19 128:25 130:8 134:8,21
 135:7 136:7 137:20 145:21
 148:14 152:16,17 159:20 161:1
 170:5 190:16 191:1,10,11,19
 192:20 193:25 196:1 221:2,5,10
 221:12 222:5,7,8 223:1 224:4
 228:10
looked 9:21 13:14 23:9 29:15 60:24
 61:8,16 69:24 96:17 97:12
 104:13 110:20 120:11 125:11,23

128:1,11,22 129:16 150:11 159:8
164:6 172:15 178:3 179:11
191:22,23 197:16,21 202:2
206:10 211:4 215:21 217:25
225:8,16 226:10
**looking** 52:24 53:4 62:14 70:9 72:4
72:6,10 78:25 79:8,12 85:13
88:19 104:3 105:5,18 110:16
116:24 123:8,13,14,16 124:5
125:14,17 126:8,11,25 127:7
128:3,16 129:18,20 149:14 165:5
176:24 206:17 216:25 217:17,19
221:7
**looks** 16:10 145:25 151:2
**Lori** 2:3 9:8 66:8 77:22 175:8
**Los** 11:16 12:4,12 14:12
**lot** 36:20,24 101:13 123:4 124:12
149:14 171:5 214:16
**lots** 86:20
**Lourdes** 60:13
**love** 68:14 206:25
**low** 218:17
**Lowe** 3:18 201:10
**lower** 123:5 171:11 203:6 214:22
**Lubbock** 99:8
**Lublin** 86:16
**LULAC** 34:7,11,17 35:14 36:11,15
36:16 41:12 46:16 50:3,5 217:11
217:11
**lunch** 78:10 81:6 91:20 93:19
**Luwen** 222:21

**M**

**Madison** 151:12
**magnet** 12:10 14:11
**magnitude** 79:5
**maintain** 111:12,20 146:15,19,23
213:6,9,10
**Maisel** 90:25 91:2
**major** 17:22 131:13,19 139:8
**majority** 35:8 151:3 157:20,20
**makeup** 202:17
**making** 173:8 219:16 226:14
**MALDEF** 41:20
**man** 103:3
**managed** 215:2
**management** 57:20
**manipulated** 78:21
**manipulation** 122:1
**manner** 179:17 198:20 215:8
230:23
**March** 10:13,13 85:16,16 229:5
**margins** 123:4
**Maria** 60:12
**mark** 32:25 33:10,14,22 41:5 53:15
56:4 63:16 64:25 86:5 92:13
**marked** 33:19 49:20 53:19,22 54:1
63:18 65:2 66:20 71:9 78:14
79:19 80:4,8 82:23 83:20 104:2
114:21 120:15 121:14 223:22
226:20 228:18
**markedly** 194:11
**market** 171:12,16,24

**marking** 65:5
**marks** 120:10
**marriage** 233:11
**married** 98:5
**Martin** 151:22
**Mary's** 8:22 11:7 16:1,5 18:9
**Massachusetts** 227:25
**massacre** 20:21,24 97:25
**massaged** 80:5
**master** 79:6 90:17
**master's** 11:8
**match** 67:7
**matched** 77:18
**material** 129:9
**materials** 32:23 54:6 70:20 112:12
**mathematical** 122:1
**matter** 1:18 59:2 67:25 101:15
108:6,7,9 125:18 151:2 154:14
164:16 173:11,21,23 174:4 178:1
233:13
**matters** 179:1
**maximum** 222:14 223:10
**McCormick** 4:7
**mean** 18:14 19:14 22:5 24:25 25:14
25:15 45:19,22 46:1 52:12 57:7
64:12 73:13,25 85:6 94:24 100:5
104:8 107:9 111:5,9 115:17
116:9 117:10 121:19 122:11,18
123:18 125:15,16 128:22 138:8
145:6,7 149:1 156:23 163:16
202:19 206:25 214:6,17 219:11
**meaning** 175:1
**means** 131:24 145:4,8 203:9
223:11
**meant** 15:10 130:16
**measure** 72:18 92:20 113:23
122:22
**measurement** 223:17
**meets** 138:4
**member** 220:20
**members** 12:11,11
**memory** 20:15 49:24 86:8
**mentioned** 23:1 114:25 176:13
177:2 178:12 213:5 217:10 219:1
**menu** 101:10
**merits** 136:9
**met** 219:15
**method** 224:2
**methodological** 67:9 68:6,8 177:4
224:18
**methodologies** 93:6
**methods** 16:21 184:20 185:2 217:2
221:14,24 222:21,22
**Metro** 3:3
**Mexican** 36:18 41:19 42:6 99:22
100:2
**Mexicans** 100:4,5
**Mexico** 24:22 25:3,9,12
**Miami** 1:3 3:4 21:5 59:16 79:11
90:9 149:20 156:21 173:1
**Miami-Dade** 7:14 23:5 70:4,7 79:8
79:17 89:19 90:6,16 92:3 105:24
106:7 132:20,22 137:7 139:3

140:22 141:2,3,9 142:10 143:11
143:22 144:1,22 145:12,17 147:8
147:11 148:13,22 149:5,11,15
150:22 151:5,14,18 152:8,22
153:3,10 154:6,9,10 155:4,23,25
156:3,10 159:3,18 160:2,24
161:5,8 162:11,25 163:7,24
164:8,12 165:1,15,23 166:8,10
173:3,7,16,22 174:3,8,16,24
224:15,20 225:5,9,12
**Michigan** 14:9,18
**middle** 12:7 36:18 99:10 171:11
204:9
**Midland** 14:10 34:7,17 50:4
**midstream** 107:24
**mid-semester** 99:9
**military** 100:6,17
**million** 151:5
**Milwaukee** 27:4,7,8 34:13 37:23
38:9 217:12
**mind** 29:2 33:24 104:19 105:4
125:12 138:15 189:20
**minimized** 144:6
**minority** 35:10,17,18 36:6 37:21
48:7 219:19 220:5,20 227:13
**minute** 23:17 40:14 75:13 87:22
146:2
**minutes** 39:15 40:1 103:6 193:20
**mirrors** 124:24
**Mischaracterizing** 139:20
**mispronounced** 91:22
**missed** 40:1 72:1 105:15 205:11
**missing** 105:17,20 115:17,18
**Mississippi** 98:5,6,8
**misstated** 187:21
**mistake** 131:7,8
**mistaken** 10:14 64:6 87:22 130:25
131:2
**mitigated** 212:15,23
**mobility** 61:6,9 85:15,19 86:9,12
128:16,17,22 129:1,4,7,9,12
131:12,18 139:3 168:10,11
178:16 229:23
**moment** 28:5,18 54:12 66:14 70:17
110:1 123:23 130:16 201:22
230:5
**money** 36:24
**Monroe** 151:20
**month** 10:12
**Moreno** 60:16
**Morganthau** 17:17
**morning** 9:25 20:17 32:23 33:15
39:22 77:23 86:1,5 87:24 167:19
**motor** 66:17,25 67:14 175:20 176:1
176:10,25 177:21 178:24 180:10
220:25 221:4
**move** 131:23 157:13 168:23 169:1
169:10,11,17,20 170:2,3,7,8
179:18
**moved** 14:15 157:22 229:10,11
**movement** 17:16
**movers** 228:21
**moves** 157:25

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 247

moving 131:15 169:2,4,11 182:17
multiple 53:18 65:12 128:5,12,14
  223:6
multitude 54:9
multivariate 71:17 73:12,17,23
  127:22
municipal 51:5
murdered 98:19
musician 75:4
M-A-I-S-E-L 91:2
M-O-R-E-N-O 60:16

**N**

N 5:2,2 7:1
NAACP 1:7 34:13 37:24 42:20
  44:25 47:3,7,15 48:13 55:18
  75:22 78:2 80:8 84:9 85:11 89:23
  93:18 114:21 217:12
name 7:11,13 14:15 22:23 33:22
  39:22 89:11,15 92:23,24,24
  132:18 157:22 175:17 182:5
  193:17 201:12
names 90:1,4,6,10
narrow 137:9
national 51:21 229:12
nationally 168:21 169:1,6,7
nationwide 229:6
Native 219:25
nature 36:25 60:8 93:6 94:2 122:25
  134:11 228:6
near 169:11 225:3
necessarily 29:17 138:3 203:10
  215:6
necessary 115:3
need 8:5,7 24:6 27:2 68:11,13,20
  68:22 163:9,20 164:1,14 196:21
  209:12
needed 128:5
needs 181:17
negate 35:9
negative 69:11 126:2,5,12 212:13
  212:21
negatives 126:3
neighborhood 98:17
never 25:5 39:5 44:22 49:3 59:6
  76:5 91:6 99:22 124:18 145:19
  191:22,23 204:20
nevertheless 116:10 196:16
new 1:22 2:4 24:22 25:3,9,12 64:17
  160:16 161:10 169:17 170:8
  173:21,21
newspaper 21:4,7
nice 189:8
night 20:16,22 31:11 96:5,7 100:11
  104:3,11
Nine 149:9
nominal 223:19
nonlinear 183:25
non-black 228:21
non-blacks 229:7
non-Hispanic 69:12,14 70:9 87:14
  148:12 194:9,12 195:11 196:5,24
  203:12,15

non-movers 228:22
normally 142:1
North 34:11 36:12 50:6
Northwest 1:22 2:10 3:4
Notary 1:20 7:6 232:8 233:5
note 54:3 228:12
notes 88:25
notice 1:19 160:16,18
noticed 77:22 80:17
notion 125:16
November 57:24 133:3 152:9 192:2
number 32:7 34:10 37:20 38:12
  41:11 49:19 50:15,17 53:16
  62:21 64:8 65:8,23 70:15 71:2,7
  71:10 76:14,21 81:11 82:4 83:11
  91:21 93:24 96:21 113:1 114:5
  114:14,15 117:21,22 118:2,12,15
  118:17,22,24 119:4,10,11,14
  121:11 127:7 142:13,14 152:23
  162:10 163:10,22 180:23,24
  182:7 185:24 187:12,15 188:5,8
  188:8,21 189:14 192:10,22
  208:25 209:11,13 210:7 216:24
  217:19,20 228:17 229:24 230:5
  230:13
numbered 121:11 228:8
numbers 54:5 77:19 90:2 112:8
  119:13 122:2 168:20 188:10
  200:6 204:11,13 205:8,10 229:8
  229:10
number's 149:19
numerator 117:22 118:4,13,14,22
  119:3,9
numerators 118:9
N.W 2:4

**O**

O 5:2 7:1 34:8
object 95:7
objection 21:22 22:12 27:15,16
  39:7 49:13 52:6 53:12 81:14
  100:21 101:5,18,19 102:6 103:17
  104:5 105:13 107:4,8 108:17
  109:10 110:23 126:17 133:5
  134:6,19 136:4 138:5 139:17,19
  142:21 143:12,13 144:2,25 145:1
  146:6 153:17 155:6 158:3 161:18
  162:1 164:17 166:17 170:12
  181:3 187:17 189:17 195:18
  199:4 201:21 202:15,18 203:7
  204:6 208:13 211:6 213:14
  221:17,18 226:1,21,23
obtain 11:6
obtained 11:9 199:1
obviously 209:6
occasion 50:12 135:5 222:20
occasions 58:8 59:12 75:23 104:25
  213:23
Occidental 12:3,8,14 13:4 14:3
occur 20:24 133:3 171:21 224:20
occurred 10:9 41:25 97:16
occurrence 120:2
occurrences 56:10 214:20

occurring 110:19
occurs 171:14
offer 64:8 127:12 161:10
offered 13:21 30:13
offering 15:17 94:6 132:5 184:19
office 3:3,9,15,20 44:4 66:16 67:5
  67:12,13,16,18 68:19,21,25
  175:18 177:7 207:6
officer 100:6
officers 100:8
offices 1:21 46:16 67:3 92:6 177:5
officials 77:14
oh 22:19 29:5 31:15 32:25 37:8
  41:15 43:17 50:22 62:14 75:2
  77:9 83:13,21 89:5 90:3,17
  126:21,24 130:18 135:17 138:13
  140:12 155:19 156:20 159:24
  160:21 161:12 173:13,23 179:4
  180:7 185:6 190:7,14 197:7
  199:20 213:18 216:4 217:21
  222:2 226:22
okay 8:3 10:4,8 12:21 22:9,23 25:7
  26:12 27:25 28:8 31:22 32:4 33:3
  33:13 34:6 40:7,12 41:15 48:1
  52:25 54:13 81:8 83:13,21 85:10
  91:15 121:13 126:7 130:11,20
  132:23 138:13 139:14 140:14,16
  140:20 143:23 144:16 145:4,11
  146:12,14 149:1 155:14,20 156:8
  156:25 160:1 161:23 166:9,13
  167:8 168:3,19 173:6,25 174:2,7
  174:10,12 177:25 178:23 179:13
  180:8 188:5 189:8 193:23 195:13
  195:20 197:10 199:23 200:20
  201:16 202:4,8 203:1,3 205:13
  207:13,15 210:15 216:4,6,11
  224:24 231:1,9
Okeechobee 151:16
old 103:3
OLS 230:12
omitted 84:1
once 58:10 188:10
ones 28:15 32:19 172:10 184:21
  194:12 208:11 213:5 216:2,5
  219:5,6 230:10
one's 147:9 171:23
ongoing 71:20
open 78:8 79:18 98:11
openly 98:14
operates 209:22 210:17
operation 181:23
operator 181:16
opinion 9:19 13:22 22:18 26:1
  30:14 32:15 34:24 37:6,18 76:24
  80:22 85:9 136:25 141:7,12
  143:6 150:4 157:24 158:4 159:3
  160:2,10 161:10 162:7 164:23
  170:9 172:22,25 173:11,15 174:3
  174:16,23 175:3 179:2,8,13,22
  180:1 184:12,18 185:4,11 188:24
  188:24 189:12 191:3 192:6 194:5
  194:15,18 195:21 196:13 198:12
  198:18,24 199:9 206:19 209:21

Henry Flores, Ph.D

May 30, 2002

Washington, D.C.

209:25 210:16 211:19 212:13,21
**opinions** 8:25 10:21 11:23 12:22
  13:6,25 14:13 15:17,20 16:16
  19:4,12 20:3 25:7 26:7,10 49:12
  64:7,20 76:14 80:12 83:25 84:11
  84:16 85:4 90:11 93:17 94:5,6
  132:5 134:25 135:10,20,21,23,24
  135:25 136:3,15 138:25 140:6,10
  154:22 155:3,22 160:16 161:4
  163:8 172:4 173:21 174:8 176:7
  176:7 182:10,19 183:2 184:22
  197:10,22 199:7 201:20,24
  204:25 205:23 206:4,14 207:23
**opportunity** 120:24 134:4 209:23
  210:18 215:10
**opposed** 42:15 65:24 180:24
  199:11 200:14
**opposite** 93:2 107:24
**Orange** 66:15 67:1,2,11,24 68:21
  68:25 111:25 112:6 116:1,2,3
  148:3 153:16 154:2,23 155:5,24
  157:19 177:2,3,5,7 178:4 194:20
  197:13 207:18,24 208:10,12,20
  208:23 209:1,7,17 210:19,20
  212:11 213:1,8,17,18,20 215:8,12
  215:12,17,23 225:20
**order** 43:14 51:7 68:12 164:15
**orderly** 230:12
**organization** 36:17
**organizations** 30:17
**organized** 171:14
**origin** 51:21 229:17
**outcome** 233:12
**outlier** 148:17
**outset** 176:13
**outside** 162:12
**OUTZS** 2:3
**overall** 18:20 49:5 108:2 109:4,18
  116:19,22 165:2 167:2
**overlap** 51:19
**overlapping** 222:24
**overlooked** 217:16
**overpopulate** 227:13
**overs** 72:2
**overwrite** 65:19
**over-preponderance** 96:18,20
**over-representation** 115:22
  156:11 166:16,21 190:4 191:4
  192:17
**over-represented** 96:24 117:16,18
  118:19 142:20 143:5 157:4 159:9
  165:13 190:10
**owner-occupied** 219:3

---
                    P
---

**P** 3:2 7:1
**package** 121:22
**page** 41:6 43:18 46:6 54:2,11,12,23
  54:24 55:2,11 61:2 62:6,12,21
  65:9 71:13,13 74:23 75:21 85:1
  86:3,6 91:13 93:23 113:23
  121:10 140:7 159:7 193:25
  197:11,23 200:18 203:19 204:9

205:8,10 208:6 224:11,24 225:3
  226:13
**pages** 19:21 51:10 53:18 54:7 77:1
  88:8 116:6 175:22 205:1,12,23
**paid** 63:4,11
**Palm** 2:15
**Pam** 3:12 207:3,6
**panhandle** 137:4
**paper** 73:3,5,8 75:4,7
**paperback** 19:22
**papers** 73:10,10 74:25
**paragraph** 55:15 56:2,8 61:5 62:6
  66:14,19 67:18,25 69:6,7 70:15
  76:14,21,24 77:8 80:21 81:7,12
  83:23 84:1,6,25 85:2,4 93:24
  95:7,12,16,18,20,25 103:19
  104:18 105:22 111:23,23 113:6,9
  113:12,16,19,22 114:23 116:10
  117:7,14 130:8,10,13,13,21
  131:12 139:7 141:5,19 145:24
  147:1 153:19 157:4 158:23 165:6
  172:23 178:15 193:25 194:3
  197:11,22 198:13 199:2,8,13
  207:24 208:7 223:21,24 224:2,12
  224:25,25 225:8,15 226:4,8,12,15
  226:20 227:2
**paragraphs** 76:15 114:25 200:23
**Pardon** 52:11
**parentheses** 41:12
**part** 11:13 16:23 18:25 19:9 22:21
  22:22 28:16 34:5 47:11,17 50:23
  54:4 57:4,6,8,9 68:7 75:24 91:10
  105:6,6,7,8 106:12 107:3 124:19
  134:7 155:16 184:19 200:7 212:1
  220:15 228:13 229:24
**partially** 159:5
**participate** 120:24 121:8 134:5
  179:20 209:23 210:18
**participating** 211:25
**participation** 18:11 212:2
**particular** 9:5 15:10 18:2 19:6 21:8
  25:6 27:12 28:2,11 29:10 30:1,5
  35:16 36:4 37:9 42:14 43:10
  46:24 47:12 48:5,15 51:6 58:22
  67:4,5 68:19,21,24 72:12 77:16
  87:18 97:21 98:9 102:25 109:1
  110:14,25 113:24 114:17 118:25
  120:4,5,14 121:18 122:1,6
  126:13 134:3,12 135:15 138:18
  141:17 163:3 171:7,22 172:16
  177:7,16 178:21 180:5 183:15
  188:17 190:11,19 192:18 197:19
  198:9 210:3,3,10 212:1 214:18
  219:17,21 220:22 222:9 224:22
**particularly** 97:17 164:8
**parties** 160:16 171:18 233:11
**parts** 26:24 27:7 28:22,23 29:17
  55:21 83:19 97:19
**party** 58:24 80:3
**Pasadena** 47:22 48:12,16
**passed** 59:11
**pattern** 96:13 109:25 110:4 116:21
  117:9 168:22 169:2,8

**patterns** 17:25 70:1 85:19 97:8
  106:19,21 107:21,25 108:20,21
  109:19 110:10 111:7 116:11,15
  116:16,20,23 123:16 169:1 171:6
  171:24 215:15 218:3 222:9
**pattern's** 109:5
**Paul** 60:14
**PDF** 116:4
**Pearson** 123:22
**Pearson's** 121:17 123:22
**Pecos** 24:14,17,18
**people** 43:10 51:15,19 67:10,23
  92:14 93:2 97:21 98:1,5,11 120:6
  138:22 149:17 159:23 166:9
  169:20 192:7,10 211:24 212:5
  219:21 222:17
**perceive** 101:14 170:16
**perceived** 99:1,3 102:3 103:15
**percent** 18:22 110:21 113:24 119:4
  123:25 125:5,5,6 127:1,2,11
  149:10 150:17 162:17,18 165:15
  165:17,19,20 166:9,14 194:24
  195:4 197:7,8 200:4 203:4,13
  222:8 224:21
**percentage** 18:20,23 56:22 66:24
  67:1 69:13 79:15 88:13 96:19
  112:1 114:12,16 117:24 125:3
  129:22 149:6,9,10,13 151:1
  152:18,20 158:23,25 159:12
  163:2,4 164:25 167:2 168:23
  169:16 170:3,7 171:10 181:8
  185:13,25 186:4,11,12,17 187:1
  187:12,23 188:13,16 189:21,23
  190:5 191:6,7 196:4,4,8,15,22
  197:1,15,18 200:2 202:22 203:14
  208:16 224:8 228:21
**percentages** 56:10 69:14 105:24
  106:2,7 147:3 148:23 150:11
  151:9,17 154:19 155:8,13,18
  156:16,19 162:9 168:12,12,14
  180:25 181:7 188:12 192:19
  194:5,7,15,19,23 195:8,21,22
  196:17,20 197:2 199:22 200:10
  200:18 204:24 205:22 210:8
  220:5 222:24 228:20 229:8,11
**perception** 97:21
**Perez** 47:22 48:2
**perfectly** 144:20
**perform** 36:8 55:23 56:9,11,13,15
  56:18,20,21 69:1 95:2 133:20,23
  222:4
**performance** 181:10
**performed** 36:2 62:3 64:17 74:12
  123:10 133:14 182:9,18 183:1,1
  211:16
**performing** 35:11 62:22 63:6 78:21
  127:21 206:13
**period** 46:2 60:1 74:2 121:14
  211:18
**person** 9:5 138:2,3 139:2
**personal** 178:5
**persons** 36:19 66:25 134:4 137:25
  197:25 198:9

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 249

person's 63:10
Perspective 92:17
pertain 203:22
pertaining 178:2
pertains 132:22
per-precinct 189:2
petition 227:24
Phillips 2:14
phone 40:15 53:25 65:5 181:15
    201:6 205:6 216:10,11 231:13,14
phrase 61:10,22 117:15 118:7,19
    119:16 145:11 213:11,13
Ph.D 1:16 5:4 6:2 7:3 11:10,14
picked 75:5
picking 39:25
pictures 116:5,6
piece 19:22 105:15
pieces 65:15 74:22 83:1 164:2
    186:10 222:1
pile 85:25
Pinellas 92:4
pioneered 222:21,23
place 87:11 102:18 114:4 125:20
    211:1,20 212:16,23,24
placed 111:3 139:11,15,24 141:20
    142:18 143:1,10,25 170:9 210:1
    210:9 212:2
places 179:20 213:3
plague 101:11
plaintiff 41:14 219:15
plaintiffs 1:8 2:2 9:17 36:23 40:20
    40:23 41:12 52:3,18 53:1,7 54:2
    54:10,14,25 68:1 71:1,5 75:19
    76:10 78:15 80:9 95:13 209:19
    216:14 219:18
plaintiff's 112:25
play 72:14 94:8 110:10
Playing 74:23
plays 170:14
please 7:11 11:4 29:2 63:16 66:14
    102:8 104:7 109:13 136:11,21
    153:18 181:5 187:19 193:22
    199:6 201:22 207:23 229:3
pleasure 59:20
Plus 201:17
PL-01 4:4
point 2:14 8:11 26:6,11 66:24
    102:25 106:19 107:2 109:1 116:3
    122:25 124:8,10,17,18 126:15
    126:16,22,22 127:8,10 131:8
    132:12 162:13 172:16 175:22
    176:18,20,23 177:16 179:2
    190:19 197:1 200:4 215:14
    224:17 227:4 231:2
pointed 202:12 204:22 205:20
pointing 203:10
points 149:9 154:16 156:13
polarization 25:12,16,17 26:11,15
    26:18,22 27:4,6,14,18,21 28:4,24
    28:25 29:3 32:16 35:6,15 36:3
    37:8,11,18 38:8 41:24 46:20,22
    48:6 135:7,22,25 217:25
polarized 110:11 219:24 220:18

police 21:4
policies 172:2
policy 170:24
political 8:21 11:8,10 14:24 15:6
    16:6 17:13,24,24 19:18 57:21
    92:18 124:16 216:18,20 218:1
    219:17 226:18 227:10
politically 211:25
politics 11:21 17:11,14 18:18 19:8
    19:16,16,20,24 20:2 57:16 60:6
    60:22 74:24 75:9 91:4
poll 13:19 69:13 77:15 92:3,6,8
    96:25 102:19 113:24 114:3,11,13
    114:14,15 115:6,10 119:10,11
    127:2 133:6 144:22 145:12
    162:10 163:4 174:14 204:13
    208:25 209:13 226:8
polling 102:17 114:4 211:20
    212:16,23,24 213:3
polls 119:8 121:9 142:12 143:9
    146:16,20,24 158:14 179:19
    211:1
poor 171:11,15
poorly 215:1
populate 131:14,19 139:9
population 51:22 56:23 67:3 72:5,9
    72:10,17,19,22,23,25 73:1 85:16
    85:17 86:22,24 87:1,9,16,20
    88:18 96:25 105:24 106:2,6
    119:3,6 123:2 124:22,25 125:4
    137:24 147:3,7,11,15,21,25 148:4
    148:8,11,12,23 149:2,5,6,14
    150:8,17,21,24 151:7,13,17
    154:11,14,19 155:8,13,17 156:16
    156:19 159:12,14,16 165:3,4,10
    165:14,16,20 166:24 167:2
    185:14,25 186:13 188:16 189:24
    191:6,8,12,13,13,18,19 194:4,6,9
    194:15,19 195:3,8,11 196:16,24
    197:15,18,20 198:2 199:21,22
    200:1,17 202:22 203:5,11,12,16
    203:24 222:8 229:5
populations 138:11 150:12 153:13
    155:1 157:13 158:8 194:11
    195:22,25 196:9 225:5
population's 151:3
portion 226:19
portions 199:17
position 176:20,22
positive 125:12,24 126:1,11
possession 177:20
possibility 35:9 129:12
possible 68:16,17 72:18 120:3
    170:23 172:3,6,13
possibly 20:23 71:25
post 214:25
Powell 92:15,16
power 74:24 130:22
powerful 184:15
practice 170:18,24 172:7
practices 61:11,15,19,19 110:16,18
    110:25 172:1 178:18
precinct 56:23 68:15,18 77:15,18

78:18 79:17,23 91:25 112:7
    113:25 114:5,12,15,16,17 117:23
    118:1,13,16 119:11,14 145:16
    152:19,23 157:25 163:3,11,25
    169:18,21,22,24 170:3,8 173:5
    208:21,21,25 209:10,11,13,14
    222:6 223:1 225:17
precincts 69:13 96:19,21 142:9,14
    142:15 143:22 152:21 162:10
    163:4 210:7,10 222:7,10,15
precisely 122:23
preconceived 125:16
preparation 19:9 40:20 60:25
    227:2 228:5
prepare 20:16 44:11 64:23 65:18
prepared 19:6 49:9 63:23 65:13,15
    71:6 125:10 229:4
preparing 13:5 82:19 132:9 203:21
    216:21 226:19
present 4:6 47:3 102:21 142:2
    179:8,13 223:7 224:9
presentation 136:9
present-day 45:15
President 98:8
Presidential 57:6,8,11,14,24 133:4
presume 12:16 161:11 162:4
pretty 11:20 99:23 169:7 212:7
prevent 179:9,14
previous 44:21
previously 49:4 54:19 56:17 65:8
    84:9
primary 91:23
principal 76:7 216:5 219:4
principle 184:13
prior 62:4 64:5 161:24 192:2
prisons 227:14
probably 18:22 59:23 64:2 132:11
    134:21 137:13 138:21 148:17
    149:15 170:21 177:15 178:20
problem 67:2 69:23 156:3 162:19
    166:25 177:4
Problems 71:17
procedures 61:12,16,19,20 178:18
proceed 102:24 120:23
proceedings 1:24
process 18:12 79:4 95:2 134:5
    141:24 142:4,7 157:9 179:12
    198:16 209:24 210:2,19,25,25
    211:1,19 212:2
processes 120:25
produced 33:4 40:19 54:2 65:6
    85:17,25 86:1,5 87:21 88:1,5,9
    90:23 91:11 92:5 107:6 129:5
    168:13 228:8
product 25:20 123:23 137:25
    200:10
professor 7:13 8:18 11:4 12:19
    16:3,4 23:21 33:15 60:14,15 78:4
    78:6,15 80:9 132:18 136:19
    161:25 216:16
professors 15:9
project 86:17,19 190:16
prominence 22:10

prominent 98:9
promptly 34:24
pronged 219:13
pronounced 24:16
pronouncing 92:22
proof 144:11,12,14 220:16
proper 160:18 177:11
properly 198:14
proportion 112:3
proportional 87:3,7 159:10,15
proportionalities 148:15
prove 144:10 153:13 219:18
proved 155:2
provide 8:24 19:12 40:24 44:17
  46:13 115:11 163:24 164:4,9
  173:4 207:10
provided 9:24 10:3 32:23 33:15
  41:2 42:3,15 44:20,23 76:19 77:6
  77:14 82:1 83:3 85:13,18,21
  86:11 89:7 95:25 111:16 112:6
  112:12,12 114:18 117:1 138:19
  160:6 167:15,19 176:9 198:21
  204:19 207:8 221:5,9
provides 135:22
psychologists 124:9
public 1:20 7:6 185:21,22 193:7
  232:8 233:5
publication 71:14
publications 71:11
publicly 185:24 186:10 187:7 188:8
  188:20 189:14
published 73:11
pull 90:18 130:1
pulled 185:22 186:9
purely 144:3 146:10
purge 227:21
purged 96:22 115:6,12 118:20,24
  118:25 159:10 160:23 163:23
  165:12,19 167:5 187:4 188:2,14
  188:15 189:2 208:23 209:11
  224:3,7 227:23 228:3
purport 12:12
purpose 47:19,20 82:22 135:1
purposes 30:11 55:22 59:18 140:9
  215:24
pursuant 1:18
pushing 62:11
put 26:5 78:8 100:12 120:10 129:6
  134:10 161:2 167:24 188:20
  193:5 203:25 204:2
puts 132:2
putting 33:24 104:22 189:13
P-O-W-E-L-L 92:16
P.A 2:20
p.m 54:23 55:7 84:21,22 127:18,19
  193:11,12 231:15

**Q**

qualified 39:6,9 48:17,20 176:20
qualify 49:1,5 176:21
quantify 22:7,9
Quarterly 91:4
question 8:12 16:15 21:24 22:13

27:4,11 28:9,21 29:2,9 30:2,3
32:4 38:20 40:2,4,5,8,10 45:7
46:11 47:1,13,23 48:11 49:18,25
52:25 53:7 56:3,4 64:18 71:3
77:5 81:19 83:5,9,11,18 85:3,5,6
92:13 94:11 100:15,22 104:6
106:24 107:15 109:11 118:21
119:8 126:10 127:4 136:12,14,20
136:21 137:9 142:23 143:20
146:1,3 148:19 151:6 153:18
154:25 156:5,6 158:15 159:24
160:1 162:15,16 172:1 175:24
176:3 179:5,12 181:4,6,14,21
186:7 187:10,18 189:11 192:4,20
195:7 196:11 198:4 199:6 200:22
201:23 205:3,14,19 206:3 210:12
210:21 211:23 212:17 213:8
215:18 221:19 231:2
questioning 7:16 40:1,10
questions 7:18 8:5,12,14 43:13
  51:21 53:13 78:5 81:19 132:14
  132:21,25 161:25 162:2 175:5
  182:1,7 193:8 207:1,7 212:3
  216:8,11,12 230:1 231:10,12
quick 87:23 192:20 201:15 207:7
  216:12
quickly 71:10 85:20 201:19
Quiet 19:23
quite 12:10
quotation 120:10 121:2
quotations 119:18
quote 55:16,18 56:3,5 57:3,4 74:21
  106:9,12 119:17,21 120:20,21,23
  162:20
quoting 119:20

**R**

R 7:1 121:18
race 17:11,11,14 19:16 20:18,23
  43:9 78:19 80:1 85:19 87:1 88:16
  88:19 97:24 98:3,15 104:10
  128:22 129:13 155:11 164:1
  165:12 187:3 192:14 209:11
  210:2 217:9 223:2 227:11
races 98:4 171:7
racial 17:22 19:20,20 21:2,17 22:1
  22:10,16,24 23:23 24:1,23 25:8
  25:11,16,17,18,20,22 26:2,8,11
  26:13,17,22 27:3,6,14,18,21 28:3
  28:9,13,24,25 29:4,12,23,23 30:9
  30:15,25 31:4 35:6,15 36:3 37:8
  37:11,18 38:8 41:24 42:22,24
  43:4,6,10,14,15 45:2,6,7,9 46:19
  46:22,24 47:17 48:6,14 60:7 75:9
  91:3,7 95:21 96:1,9 97:12 98:25
  99:2,4 100:20,24 101:15 102:4
  103:15,20 104:16 105:1,8,10,24
  106:2,6 110:2,5,11,13,22,25
  131:24 135:7,8,21,25 137:24
  138:11 141:6,13 147:3,7,11,15,21
  147:25 148:4,8,23 149:5 150:21
  150:24 151:7,13,17 153:12
  154:11,13,15,17,18 155:1,13,17

156:13,15,19 157:7,13 158:8
168:23 171:1,6 172:5 173:9
179:16 191:11,18 194:4,6,15,19
195:8,21,21 196:9,16 197:15,18
197:19,25 198:2,8 200:24 201:1
202:17 204:24 205:22 213:11,19
217:14,25 218:23 220:20 222:8
223:17 225:4
racially 110:10 219:24 220:18
racism 17:17 148:16
radiochemistry 122:22
raise 36:24
Ramon 34:13
ran 69:25 74:11 95:3 100:5,7,8,9
  129:21 159:13
range 125:2
ranges 54:4
ranks 100:9,9
rare 74:22
rate 131:23 158:7 160:4,24 165:8
  167:2 168:23 176:24
rates 61:6 86:9,12 87:3,8,12,17
  178:16
rate's 131:25
ratio 159:19,21,22
ratios 87:16 96:25 224:6
raw 80:5 89:13 91:25 92:8
Raymond 92:10
Raza 15:2,4
reach 44:5 46:21 48:8 55:19 211:11
reached 37:6 220:23
reaching 110:16 117:18 185:12
  186:3,16 187:22 211:13
read 41:5 54:12 55:13,20 60:6,9,20
  91:9 113:5 130:12,17 136:12
  205:16
reading 19:7 20:22 53:5 91:6 92:20
  227:12 228:5
readings 19:11 21:7
reads 178:15 229:3
ready 26:4
real 172:21 197:8
reality 144:4 146:4,5
realized 131:5
really 7:24 14:14 15:24 19:18
  28:22 29:14 40:22 42:23 50:12
  64:22 68:22 72:4,8 73:2,21 86:19
  91:7 96:13 97:8 98:1 101:24
  102:18 106:12 128:4 129:2,3,10
  136:6 139:13 156:23 158:13
  160:25 161:1 163:20 171:2 184:2
  184:15 196:23,23 197:9 213:8
  214:7 220:15 222:2 227:7
reason 29:15 37:17 67:21 69:22
  110:9 139:12,13 159:5 178:13
  190:23 191:1 198:1
reasons 120:10 132:3 140:2,3
  157:16
rebuttal 161:14
recall 10:8,15,23 29:14,14 31:9
  48:24 57:18 60:11 90:9 101:3,14
  101:25 103:12,14 194:14 195:6
recalled 104:11

Henry Flores, Ph.D.
Washington, D.C.

May 30, 2002

Page 251

receive 54:24 116:17 206:23,24
  208:8,9
received 55:9 86:20 116:3,4 152:25
  157:18 159:6 164:6,6 168:1,4
  186:23 199:14 204:20 209:8
  228:9
Recessed 39:17 84:21 127:18
  193:11
recognize 228:10,11
recognized 135:17
Reconvened 39:18 84:22 127:19
  193:12
record 8:15 23:16,19 33:16,22
  40:16 41:6 50:9,17 53:17,25 65:8
  65:10 75:12,14 84:9 86:3 113:5
  175:9,11 181:19 228:13 233:9
records 21:4 167:13 175:25
redistricting 16:12 19:25 58:6,16
  58:18 91:17 138:19
refer 86:7 117:12 130:21 194:2
  208:1
refereed 74:2,5 127:12
reference 175:24 195:16 200:23
  207:22 211:10
referenced 75:20 103:22 198:13
referred 45:2 85:2 104:25 147:4
  195:14 209:9
referring 35:4 45:17 46:3 71:19
  83:7,10,11 84:3 96:12 106:3
  115:24 117:8 208:2,5
reflect 28:5
reflected 54:7 62:23
reflection 72:24
reflective 96:14 218:19
reflects 72:16
refresh 20:15 31:19 49:24 86:8
refreshing 92:15
refused 32:10 49:1,5 102:9
regard 13:10 28:9 30:21 37:14,18
  110:15 133:14 135:15 151:14,18
  153:14 154:9,22 155:3,22 159:4
  164:15 165:6 170:10 173:1,7
  174:3 182:8,13 200:22 201:2,20
  202:17 203:4 204:24 205:22
  206:9,15
regarding 23:23 25:8,11 26:1,7
  31:3 133:1 137:23 153:12 155:1
  178:5 181:22 190:5 197:11
  198:25 199:10 202:4 221:8
  224:25 226:8
regardless 43:7 89:14 210:2
regards 42:23
region 177:7
regional 67:16 86:10 168:18
regions 129:7
register 67:12 138:23 145:20
registered 13:17,19,20 52:22 56:22
  56:24,25 66:25 67:2 68:3,15,17
  69:12,15 70:7 72:9 77:17 78:17
  79:12,13,15,22 80:1 86:18 89:18
  90:5,18,24 96:22 102:21 116:2
  118:1,15,16 119:13 127:1,2
  129:23 138:21 141:25 142:1,15

152:20 158:25 162:9 177:12,12
  204:11 208:15 210:8
registering 179:10
registers 145:16
registration 66:17 102:11,14,16,22
  103:1,9 111:4 116:5 131:23
  133:8 141:21 142:2 176:24
  179:12 199:3
registrations 68:3
regressed 129:21
regression 13:9,10 14:1 16:23,25
  17:4 56:9,15,18,20 68:14 71:22
  77:12,17,19 89:15 92:1 113:10
  113:14 115:13 119:2 121:18
  128:5,12 129:24 182:9,18 183:2
  183:12,22,23,24,25 184:3,6,12
  189:4 200:7 208:22 221:11,23
  222:4 223:18,24 230:11,13
regular 74:18
rejects 180:1
relate 16:11,16 18:11 19:3 34:3,4
  213:24
related 17:8 18:23 32:15 153:22
  181:8 183:19 184:18 230:20
  233:10
relates 19:5,12 20:3 67:19
relating 13:22 22:19 35:4 140:10
  161:8 172:23 173:21
relation 42:18 48:16 174:24
relations 17:15 20:18,23 104:10
  227:11
relationship 13:16 44:25 47:1
  48:11 52:21 69:11 122:10,13,14
  122:19,24 123:5,7,12,14,15
  125:13,14,24 126:12,13 127:9,14
  142:13 144:4 152:18 159:12
  162:8,24 165:9,13 174:13 177:11
  180:23 183:15,21 184:5 192:13
  208:14 210:6 211:16 213:13
  221:15,25 224:14,20 228:3
relationships 98:4 114:24 125:9
  126:6 214:21
relative 122:20
relatively 87:9
release 185:21
relevancy 101:20
relied 70:20 192:1 211:12
rely 137:23 138:24 211:11
relying 137:24
remain 117:2
remainder 109:22
remains 33:7 98:18
remedies 132:6
remember 7:24 10:11,12,17 11:1
  31:12,12 50:21 56:7 74:19 75:2,3
  89:8 101:24 103:18 131:10 153:7
  167:16,23,24 168:3,5,6 187:6
  195:19 231:6
remembered 104:12
Remind 216:6
removal 161:8 172:23 187:2
  188:24 197:23 198:17,19 199:2,8
remove 192:2

removed 13:22 158:24 159:23
  160:3 165:7,8,22,25 166:4,8,15
  186:18 187:13,24 189:22 190:6
  191:5,13 192:7,10,14 197:25
  198:15
render 201:19,24
rendered 57:23 204:25 205:23
rendering 90:11 93:17 206:14
renters 88:13,15 129:17,19,20
  200:4,7 218:17 219:1,3
repeat 27:11 28:1 40:2 71:3 162:14
  187:18 193:21 201:23 205:2,8
  212:17 221:19
rephrase 8:13 40:6 142:22 153:18
report 6:7,9 13:5,12 22:14 23:10
  23:14 33:4,6,7 44:11,13,17 49:8
  55:13 63:22,25 64:3 65:7,11,14
  65:16,18,22 66:11,17 67:9 71:2,6
  80:14 81:10 82:5,23 83:7,8,19,25
  84:12,17,25 85:5 87:21 88:22
  89:16 90:12 91:10,11 93:4,23
  95:9 96:11,12 101:21 103:25
  104:1,18 106:4 107:6,13 108:8
  108:10,11 113:6,22 117:14
  120:12,14,17,22 121:4,12 125:10
  126:3,6 128:20 129:6,10 130:3,5
  131:11 132:12 138:10,18 139:7
  140:8 147:4 159:7 160:8,9,13,14
  160:15 161:2,3,7 162:20 163:8
  163:22 164:7,10 167:9 168:10,15
  173:1 175:23 176:8 177:16 182:7
  182:8,15,19,23 184:22 185:5,17
  192:12,21 193:25 197:11 198:13
  198:14 199:8,15,18 200:23
  203:19,21,25 204:23 205:20
  206:11 207:8,23 208:2,3,5 211:9
  211:18 213:5,11 216:21 218:10
  223:21 224:12,18,25 226:12,20
  227:3 228:23 229:9,21,24 230:16
reported 118:24
reporter 8:4,6,10 136:11,14 205:16
  205:19
reporting 95:8
reports 21:6 65:12 69:5 85:17
  136:24 192:24 218:19
report's 33:9
repository 10:6 54:6
represent 7:14 9:17 39:23 132:19
  175:19 182:6 193:17 201:12
representation 166:23
represented 165:10,14
representing 71:5 207:6
reproduced 228:22
Republican 58:24
reputation 109:5
request 44:16 153:2,5 204:15
  227:24
requested 115:20,20 153:9 163:13
  164:12 209:7,16
required 158:1 169:21 188:25
requirements 142:17
reregister 132:1
reregistration 131:25

Henry Flores, Ph.D.
Washington, D.C.
May 30, 2002

rerun 109:15
research 16:21 23:22 25:25 71:18
  96:4,7,8 137:22 171:4,5 176:23
  184:20 185:2 190:16 213:21
  221:14,24 222:22 224:2 228:5
researchers 124:3
resemblance 146:3,5
resided 67:11
residences 229:9
residing 112:4
respect 60:20 64:19 71:5 95:17
  113:19 153:15 176:3 179:5 181:1
  181:7,24 187:10 194:3 197:10,22
  199:18
respondents 229:8
response 43:12 55:4,15,24 91:21
responses 112:25
responsibility 178:25
responsive 136:20
rest 33:7 79:13 88:4 100:4 105:22
  182:2
restate 196:11 210:14
restaurant 101:7
restored 166:7,11 186:20 187:15
  188:1
restraining 51:6
Restrepo 2:9 5:9,15 182:4,5 187:20
  189:18 193:8 205:8 221:17
  226:23 228:15 230:3 231:9
restricted 171:10,12
result 57:8 110:25 113:10,12
  124:21 142:19 170:19 172:2,8,18
  188:20 189:13 214:20
resulted 227:9
results 109:8 120:12 125:7
resume 16:10 23:15 31:16,18 32:15
  32:24 33:1,15 34:2 70:16 71:9
  217:17
retain 75:25
retained 8:24 9:2,19 10:20,24
  19:12 30:21 41:17,23 43:23
  46:15,19 48:4 51:2 58:1,5,6,8,14
  58:21,24 59:1 75:16,24 93:25
  190:21
retainer 75:20
retains 135:13
retention 10:9 41:21 55:22 61:3
  94:3 178:10,14
return 47:13
Returning 71:9 103:19
review 66:4 74:20 76:16,25 92:18
  178:1,11
reviewed 16:10 52:15 66:6 83:24
  95:24 154:2
reviewing 23:21 55:16 131:9
revising 131:5
Revolution 19:23
Reynosa 217:22
Reynoso 41:9
Richard 41:9 86:22
right 7:21 10:5 13:23 22:11 23:4,7
  23:24 24:7,16,19 25:25 29:19
  30:18 32:2 34:16 35:22 36:13

39:12 40:6 46:6 50:3 54:20 82:4
  85:22 86:3 89:17 101:1 103:7
  122:15 125:25 126:4,13 127:15
  130:7,18 133:9 137:19,20 138:7
  140:25 143:2 144:19 148:20
  149:16,17,22,23 151:6,9,10,11
  153:20 154:3,23 156:5 157:17
  158:21 159:1 160:14 161:13
  162:12 166:6,7,11 167:6,17
  169:15 170:6 171:25 173:15
  174:2,15,18,20 180:9,14,20 181:1
  181:9 186:20 187:14 192:11
  198:4 200:1 201:8 205:9 206:21
  212:3 231:13
rights 1:21 2:4 15:23 16:24 17:9,15
  18:17,21,24 19:2,25 20:3 31:21
  31:23 34:19 35:23 38:1,22,23,25
  48:22 58:7 71:18,21 74:13 94:20
  97:18 110:9 188:1 214:10 222:22
  222:23 227:24
Rios 46:17
Roberts 2:12 39:20
Rolando 46:16
Rollins 34:8 35:21 50:4 217:11
rolls 96:24 102:23 165:19,23,25
  166:5 179:18 186:19 187:13,24
  192:14 198:1,15 199:3,9 227:22
rooms 99:16
Rosa 151:24
Roscoe 46:8,10,20,23 47:2,4,8,9
  98:16
Rosenstone 92:10,11 93:3
Rosewood 20:19,21,24 23:1 47:4,6
  47:14 96:5 97:16 103:22 104:1,8
  104:13,19 137:2 213:25 214:4,5
rough 11:19
round 58:18 60:5
row 72:24
Rowe 201:13
rule 223:15
ruled 36:5 134:7
rules 8:3 69:19
run 47:10 72:22 77:11,19 81:9 85:1
  98:20 100:13 101:13 109:7 122:3
  215:16
Rny 92:23
R-A-Z-A 15:3
R-O-S-E-N-S-T-O-N-E 92:12
R-U-Y 92:24

S

s 5:2 6:1 7:1 11:7
Safety 66:16 175:20 176:1,10
  177:21 178:24 180:10 220:24
  221:4
Saginaw 14:10
sameness 148:15
sample 71:15,15 72:6,8,9,16,23,25
  124:22,24
samples 125:4
sampling 123:3
San 8:22 24:2 43:20 44:2,8 45:10
  58:5,9,11,15 82:2 84:8 102:10

Santa 11:10,12 151:24
Sarasota 152:1
sat 19:18 75:5
saw 74:10,19 83:24 110:20 129:5
  146:1 165:17 178:8
saying 8:9 45:5,10 47:6,8 76:24
  97:9 106:9 115:19 116:13 124:20
  136:7 155:8,12 160:5 165:9
  166:14 167:21 171:25 173:14
  176:20 177:18
says 69:10 78:14 99:21 103:6 111:2
  117:15 171:15 181:16 200:3
SBSS 114:8
Schacter 168:11
Schlicting 90:25 91:1
scholarly 91:2,5 92:17
scholarships 36:25
school 12:7,11 14:11 29:16 30:5,8
  30:10 34:10,12 35:21 36:12
  41:15 42:1 46:8 47:22 50:5,6
  215:2 217:22 231:8
schools 14:6 215:1
science 8:21 11:8,10 14:24 16:6
  17:13 92:18 124:16 216:18,21
sciences 124:5 127:13
scientist 19:18 226:18 227:11
scope 41:21
scratch 80:17
search 20:19 74:18
searched 74:18
second 28:20 37:11 52:15 54:16,25
  55:9,13,20 61:5 67:18 79:9 80:8
  80:10,13 81:13,16 85:12 86:21
  95:20 112:25 131:11 164:20
  175:8 178:8,15 182:25 200:18
  212:19 219:22
seconds 103:11
secretary 1:10 39:23 85:12
section 23:22 34:19 119:23 182:8
  182:10,14,17,19,22 183:3,10
  185:4,11,12 186:17 187:22 190:4
  219:16
see 7:19 51:17 66:18 78:8 87:7,17
  89:22 100:12 106:22 109:18,24
  110:4,9 115:13 116:16,19,22
  119:18 121:11 125:9,11 128:13
  128:18 137:20 141:1 148:16
  155:19 165:5 170:13,14 173:14
  174:14 194:13 199:25 200:4,21
  206:25 227:17 229:3
seeing 90:9 97:5 190:12
seeking 52:4,19 53:1,8 176:14,15
seen 44:22 73:21 74:3,6 87:11 91:7
  99:3,22 145:19 163:21 215:19
segment 38:3 197:17
segregated 98:14,14 214:25
segregation 75:10 91:3,8 171:6,14
  220:19
select 42:2 44:19 46:12
selected 61:15
selecting 61:18
selection 46:11 47:23
self 90:6

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 253

**self-identification** 123:3 137:25
  138:22
**self-identify** 137:18
**selling** 98:11
**semester** 99:10
**seminar** 57:19,20
**Seminole** 67:11
**Senate** 79:25 90:21 98:8 120:1
  134:1,15 135:4 218:22 220:10,14
  220:15,17,17,22 224:4,9
**send** 40:23
**sense** 102:18 122:12 145:5,7,7
  227:17
**sent** 10:5 25:4 55:10 64:4 66:3
**sentence** 67:18 69:9 77:3 95:20
  103:19 104:16 105:22 106:9
  111:2,10,24 116:9 117:7,10
  119:16 130:13 131:11 155:16
  178:13 224:12
**sentences** 116:14
**separated** 17:12
**separately** 33:11 63:9 229:7
**seriously** 128:1
**serve** 101:8
**served** 68:15 100:6 217:13
**service** 100:17
**services** 62:23 67:20 68:25 135:13
  177:7
**servicing** 67:6,15
**set** 67:22 77:18,20 81:1 83:2 87:23
  104:22 112:25 124:3,7,9 148:18
  207:8,24 228:20 233:7,14
**sets** 76:16,17,18,20,21,25 77:4,5,6
  77:10,11,12,13,24 80:23,24 81:2
  81:10 83:1 84:11,15 85:2 93:15
  93:20 116:17 128:13 175:25
**settings** 124:13
**settled** 32:1 35:18 51:8
**seven** 129:23
**severe** 22:3,5 46:22
**shaking** 8:8
**share** 58:19 99:5 105:23 147:2,11
  147:15,21,25 148:4,7,10,23
  150:24 151:6,13,17 154:11,18
  155:13,17 156:15,19 194:4 225:4
**shared** 100:15,23 101:4
**shares** 147:7 150:20 194:6 196:16
**sheet** 112:17 159:6 160:5,8 165:16
**sheets** 92:5
**short** 50:22 51:9 184:3 193:10
**shoulders** 111:3 141:20 143:1,25
**shouted** 40:2
**show** 28:24,25 108:25 109:9,21
  112:21 228:7 229:7
**showed** 99:11
**shower** 99:14,15,16,16,20
**showing** 86:25 107:24 112:24
**shown** 50:15 54:23
**shows** 204:4
**Signature** 232:3
**significance** 71:22 72:14,15,19,20
  123:14,17,19,25 124:4,7,10,16,23
  125:2,12,19,24 127:10 150:3

157:3 224:16,23
**significant** 18:16,25 69:11 122:8,13
  124:20 126:11 127:11 150:1,6
  162:8,13,17,23 192:13 210:6
  224:13
**significantly** 202:13,20 203:6,8
**signing** 112:2
**similar** 17:3 64:16 105:24,25 106:2
  106:6,10,25 108:13 113:17 117:9
  125:7 138:11 147:2,7,11,15,21,25
  148:4,8,23 149:3,5,7 150:21,24
  151:7,13,17 154:5,8,11,13,18,22
  155:13,17 156:15,19 168:12
  171:5 173:8,9 194:4,6,16,20
  195:9,10,17,23,24 196:1,9,16,18
  196:21 211:12 217:5 218:3 225:4
  225:5,22
**similarity** 148:20
**simple** 184:12,13 188:12 222:25
  230:14
**simpler** 145:11
**simplify** 181:4
**simply** 45:5 73:14 98:2 100:4 185:7
  195:10 212:5
**single** 54:24 220:20
**single-handedly** 98:23
**sir** 62:13 71:16 201:12 203:17
  204:10,25 205:23
**sit** 53:6 98:10 99:25 101:25 142:3
  160:22 161:1 177:18 178:23
  216:7
**site** 88:1 185:23 186:9 193:6
**sitting** 101:8
**situation** 102:11 136:1 144:4
  146:10,11 171:17
**six** 111:12,20 146:14,18 213:4
**skewed** 195:11
**skipped** 205:4,11
**Skipping** 182:25
**slash** 112:2
**slavery** 46:5 214:25,25
**slightly** 69:21
**small** 38:3
**smaller** 148:11 171:9 194:11
**social** 60:22 98:4 123:1 127:13
  148:14
**socioeconomic** 218:15
**sociology** 124:15
**software** 121:22
**soldiers** 100:10,11
**solid** 90:22
**somebody** 123:21 181:16 212:15
**someplace** 97:6
**sorry** 24:4 27:21 29:5 35:2 37:3
  41:13 52:12 55:5 113:15 130:16
  130:18 156:9 164:19 193:9
  196:11 205:2,14 210:13 212:17
  212:20
**sort** 22:15 28:8 95:2 96:14 171:5
  171:16 184:3 218:25
**sorts** 17:1 36:22 64:16 86:12 124:6
  223:10 227:17
**sought** 132:6

**soup** 134:11
**source** 93:16 167:11,16 168:5
  191:24 192:22 229:13,19
**sources** 77:21 81:11 93:21 191:24
**South** 2:15 19:17 20:1,9 21:16
  22:21,21 45:11,14 98:22,24
  105:2,19 214:9
**southern** 1:2 19:8,15 21:21 22:4
  105:6,7,8
**spaced** 212:19
**speak** 18:14 22:15
**speaking** 8:7,15 27:24 51:23 83:13
  184:8 219:12
**specific** 14:25 20:13 21:6,25 22:24
  30:17 42:22 47:13 52:23 76:2,22
  77:20 78:5,24 93:12 105:3 114:3
  118:1 119:10 120:1,1,2,4,11,12
  123:8 132:21 134:13 152:19
  168:16 177:14 186:24 190:17
  199:5 200:15,17 201:1,19,24
  213:16 218:21 219:23 220:1
  221:22 223:2 225:9 226:16
  227:14
**specifically** 17:7 18:13 19:11 20:2
  20:9,10 39:11 44:10 68:11 97:20
  105:17 121:1 123:9 130:12
  137:20 179:11 208:5 213:18,24
**speculation** 143:14
**speed** 85:9
**spell** 7:11
**spelled** 92:11
**spend** 18:16 62:7 129:2
**spent** 73:21 101:16
**spoke** 47:11 91:20 217:8
**spoken** 76:10 218:12
**sponsor** 36:23
**spreadsheet** 114:7,8 167:14,21
  168:1
**squared** 223:11,19
**squares** 230:12
**ss** 233:2
**St** 8:22 11:7 16:1,5 18:9 59:16
  152:3
**stable** 87:9
**stack** 50:16
**Stafford** 3:6 193:13,18
**stand** 103:7 121:15 196:24
**standard** 126:19 127:4,8
**standardize** 121:20
**standardized** 121:16,19,22,23,24
  122:4
**standards** 49:12,14 124:4
**standing** 99:20,24
**started** 18:17 99:7,9,15
**starting** 11:5 52:13 54:2
**starts** 116:10
**state** 1:11 7:11 21:3,13,18 22:2,11
  22:16,25 24:4,8,22,24 25:9,12
  26:8,18 30:22 31:4,6 36:20 39:24
  43:1,5,8,8 56:8 59:2,13,15,22
  60:7,8,10,21 61:12 76:14 78:18
  79:23,25,25 86:23 87:1,18,18,19
  88:2,4,5,14 90:19,21,21,22 95:21

Henry Flores, Ph.J                    Washington, D.C.                        May 30, 2002

95:22 96:1,10 97:13,19 98:8,23
101:16 103:21 104:16,17 105:4
105:11 106:1,11 107:1,15 108:6
108:7,9,14,15 109:17 110:2,6
111:24 113:18 120:23 121:1
138:19 141:10,14,17,25 156:8,14
158:14 170:16 172:4,6 178:18
179:22 180:1 191:19 192:12
200:19,25 203:2 211:2 215:25
224:12 225:3,7,15,24 227:22,22
228:1 229:11
**stated** 15:13,15 64:21 163:6 169:10
174:17 179:23 180:2
**statement** 11:19,20 29:22 62:15,19
62:23 96:9 103:23 105:5,10
106:6,18 112:5,15 113:4 121:3
139:21 169:14
**statements** 138:10
**states** 1:1 15:7 17:23 19:9,17,25
20:7,8 21:21 22:4 36:21 55:15
60:19 61:5 86:11 92:14 93:25
95:8 104:10 105:6,7,9,23 114:23
129:8 227:21,23,23,24 233:1
**statewide** 200:11,14 210:22 221:3
221:7
**stating** 110:7 176:6 177:25
**statistic** 69:21 121:25 184:20 185:2
200:3 223:13
**statistical** 52:21 55:17 69:20 71:17
71:22 72:5,14,15,18,19,20 73:12
73:17,24 94:1,6,7,10,13 95:2,5
105:25 106:10,17,25 108:13
110:9 113:17 114:9 121:23
122:14 123:3 124:7 125:12,23
127:22 129:14 142:13 150:3
152:18 156:24 182:9,18 183:1,12
184:10,14,24 206:2 208:18
211:16 215:16,21 217:2,5 222:12
222:22 223:10,16 224:15,22
225:6,22 227:4 230:6
**statistically** 69:11 122:7,12 123:24
124:20 126:11 150:1,6 162:8,13
162:17,23 184:5 192:13 210:6
224:13
**statistician** 94:19 227:8
**statisticians** 71:21
**statistics** 12:24 16:21 69:25 87:20
88:24 95:3 123:1,19 137:23
148:14 185:7,9,19 198:25 199:11
199:12 200:11,15 223:15 226:18
**stay** 169:20,24 170:3
**stayed** 87:9
**STD** 121:14
**Steel** 2:14
**Stenotype** 1:24
**step** 185:10,10,12 186:3,16 187:22
210:1,9 212:2,4
**Stephen** 86:16
**steps** 229:16
**Stetson** 74:20
**Steven** 92:10
**stick** 173:23 174:1
**stipulated** 17:17 219:13

**stop** 40:5 87:5 95:23 100:12
**stopped** 26:6 177:9
**storage** 44:15
**storm** 99:11
**strange** 69:25
**street** 2:10 3:4,10 12:11
**strength** 123:7,13 126:12
**strickened** 49:9
**strictly** 63:1,12,13 70:9
**strike** 69:17 185:10
**strong** 122:9,13,18,24 123:4,11,24
125:9 127:9,14
**stronger** 141:9
**struck** 69:8
**structural** 75:8
**structurally** 171:13
**structured** 44:8
**student** 63:4 218:5
**students** 218:9
**studied** 26:24 28:15 30:10
**studies** 12:18,20,21 15:3,4,14 16:24
25:17 60:9 131:4,4 206:14 231:7
**study** 19:15 26:15 28:11,16 29:10
30:5 43:13 71:23 82:10,17 92:13
93:2,8 131:17 140:13,18 168:11
167:11,11 229:23
**studying** 26:23 72:17
**style** 41:8
**styled** 41:9 43:19
**stylistic** 71:8
**subgroups** 86:13
**subject** 11:22 13:4 14:1 17:8 19:3
36:1 67:25 99:2,4 100:20,24
102:4 164:15 173:11,21,23 174:4
180:5
**subjects** 13:11 15:22 17:4
**submission** 131:5
**submissions** 118:8
**subparagraph** 140:10 153:14
162:7 164:16
**SUBSCRIBED** 232:5
**subsequent** 56:6
**subset** 17:13
**substance** 205:14
**substantive** 13:1 71:8
**substitute** 214:14 215:4
**sub-geographical** 31:7
**sudden** 108:24 109:20,22
**suddenly** 99:18 107:23
**sufficient** 35:16 37:20
**sufficiently** 35:8
**suggest** 133:20
**suggested** 68:1 70:21,23 71:4
**suggestions** 70:25
**Suite** 1:22 2:5,15,20 3:4,10
**sum** 114:10,12,13,14
**summarized** 34:24
**summary** 89:4,5,6 202:9
**supervisor** 7:14 132:19 192:1
193:18 201:13
**supplement** 229:5
**supplied** 114:2
**support** 96:9

**suppose** 16:14
**supposed** 85:13 158:1 165:24 166:4
**supposition** 106:12 107:2,7,9,18
**Supreme** 49:15 119:22
**sure** 8:2,16 9:21 15:5 22:7 23:18
27:10 28:6,19 32:20,21 34:1 35:3
39:16 40:2 50:3 51:8,20 60:4,17
67:3,21 68:16 70:8 72:7 74:5,17
74:20 79:3 87:6 93:14,14 94:11
99:19 101:13 105:20 110:8
118:11 126:5 142:25 153:19
164:7,21 167:10 169:25 170:4
173:18 190:14 195:6 196:13
199:7 201:9,23 203:8 212:18
226:17
**surmise** 105:25 106:10,25 108:12
113:17,20 117:12 154:8 225:5
**surmised** 225:22
**surmising** 117:8
**surprised** 215:16
**surprising** 180:6
**surrounding** 57:16
**survey** 229:10
**surveys** 229:5
**SUSAN** 3:2
**suspicions** 15:8
**Swain** 41:10
**switch** 7:17,17
**sworn** 1:19 7:6 232:5 233:8
**synopsis** 90:14
**system** 17:24,25 29:16 34:20 65:21
91:17 102:15 103:5
**systems** 215:2
**S-C-H-L-I-C-T-I-N-G** 91:1
**S-W-A-I-N** 41:10

**T**

**T** 5:2,2 6:1 121:24,24
**table** 99:25 122:7
**tables** 229:4
**take** 8:6,10 32:18 39:14 63:9 70:7
78:6 79:5 83:1 85:24 87:11 99:14
99:20,22 103:6,6 112:21 123:9
127:16 163:12 193:9,24 223:22
229:16
**taken** 1:20,24 7:20
**takes** 72:19 142:4 210:25
**talk** 18:18 23:13 37:3 39:15 86:21
138:10 141:6,19 158:23 160:22
164:23 175:7 195:13
**talked** 14:7 18:10 57:16 83:16 91:7
172:19,22 230:4
**talking** 8:6 18:3,8 27:1,8 30:18
33:12 41:3 45:14 61:8 68:8 98:11
100:14 117:11 140:17 141:23
159:22 160:7 167:4 173:14 197:7
**talks** 111:10 119:24
**Tallahassee** 4:4 175:19
**Tampa** 3:16
**taught** 12:7,24 14:11,24 15:1,19
16:6 17:14 184:20 230:22
**teach** 8:20,21 15:11 16:8,11,15,22
16:23 17:7,10,16 18:9,14 57:19

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 255

185:3 227:11
**teacher** 100:2
**teaching** 12:16 18:18 184:18
**teachings** 12:21 145:9
**Tech** 99:7
**technique** 13:1,7,8 16:23,25 122:2
  122:6 184:10,14 222:23,24,25
  224:5,9
**techniques** 13:3 19:19 183:23
  223:7,10 227:20 230:15
**technologically** 116:8
**Technologies** 2:8
**Teixeira** 92:24
**telephone** 2:18 3:2,7,13,19 4:2
  10:17 54:18,20
**tell** 8:13 11:4 13:15 32:6 33:24 40:5
  41:7 45:19 63:21 71:13 74:7
  77:10 81:24 85:7 102:8,16
  105:18 116:9 121:21 123:17
  131:18 145:6,13 163:6 165:6
  168:19 190:23 199:17 208:11
  228:18
**telling** 144:15
**temporary** 51:6
**ten** 8:1 32:9 45:20 110:18,20
  149:17,19,24 150:5,5 162:18
**tend** 131:13 139:9 157:13 169:10
  169:11 211:1
**term** 15:10 44:1,8 45:18,21,25
  51:12 65:22 73:12 107:14 113:16
  113:20 117:11 122:4,13,18
  138:16,17 184:24 213:22 214:13
  215:3 219:9,11 220:10,13 222:12
**terminology** 125:25
**terms** 45:12 46:3 51:18,24 122:16
  137:12 138:14 184:9
**test** 72:5,18,22 119:23 121:23,24
  121:24 125:4 184:11 219:13
  223:12,16
**testified** 7:7,19 23:23 31:3,10,22,25
  32:7 39:2 41:4 54:19 59:6 97:19
  110:8 133:13 134:24 135:3,4,5,9
  154:5 170:15 184:17 194:14
  216:16,17,23 218:4 223:23
  226:14,17
**testify** 32:11 48:15,17 160:10,17
  219:7
**testifying** 32:4 52:9 110:24
**testimony** 9:20 23:14,22 30:20,24
  36:1 104:15 105:3 113:8 125:22
  147:6 184:19 194:14 226:3
  230:21 233:9
**testing** 124:11
**tests** 72:23 136:6
**Texas** 8:23 24:2,4,8,10,12 36:18,20
  44:2,8 46:20 58:18,25 82:3 84:8
  88:3 93:8 97:19 98:13,16 99:7,8
  101:6 102:10,15 112:10 133:1
  211:2,11
**thank** 34:16 44:19 132:15 175:6
  182:2 201:4,5 207:2,15 216:6,7,9
  231:9
**thanks** 200:20 231:13

**theories** 17:16
**theory** 184:1
**thing** 29:8 43:7 81:5 88:17 97:5
  123:21 171:21,22 172:14 189:20
**things** 26:4 28:23 29:25 36:22,25
  61:21 74:21 93:6 126:25 134:11
  144:20 145:9 172:15 190:15
  227:17 228:6
**think** 10:13 14:22 21:1,6 23:3,5
  25:3,3 27:22 28:20,21,22 29:6
  31:20 42:12 43:12 44:12 51:7
  56:17 58:10 60:16 62:11 64:4
  74:6,19 80:2 82:8,12 87:24 89:10
  90:4 93:7 100:16,19 101:12
  105:20,21 106:19 107:23,25
  108:2 109:2,11,14,18,19,24
  112:16 116:1,19,22,24 117:1
  128:4,20 129:9 132:3 133:17
  134:7,8,9,21 136:20 137:14,14,15
  137:16 140:1 141:2,5 144:6
  146:4 149:7 150:13 152:24
  154:13 157:15 159:13,17 163:6,8
  163:20 167:21 168:1 169:25
  170:21 176:18 177:2,3 178:14
  179:16 184:1,2 187:5 195:24
  201:14 205:9 213:23 214:3
  218:16 223:22 224:1,10 226:19
  227:25 229:18 231:13
**thinking** 90:3 104:11 127:24 128:6
  129:8 132:12
**third** 36:11 56:2 150:14
**Thompson** 34:14
**Thornburg** 119:22 218:21 219:14
**thorough** 114:23
**thought** 99:23 210:13
**threatening** 142:5
**three** 13:13,15 32:17 59:25 101:16
  103:13 115:14,16 149:16 150:5
  159:13 219:12,14
**three-prong** 119:23 136:6
**throw** 177:8
**thumb** 223:15
**Thursday** 1:15,23
**time** 8:7 18:8,16 26:6 33:6 37:9
  43:9 46:2,4 55:9,10 60:1,3 62:21
  62:25 63:1,10 73:21 74:9 87:14
  99:6 104:1,9,22 107:12 111:5
  121:22 125:5,6,6 127:11 128:4
  128:12 129:3 132:15 134:12
  135:3,6 141:22 142:4 147:2
  160:16,25 161:2,13 162:17,18
  163:7,12 164:5 181:22 190:19
  201:22:1 213:12,17 214:8
  224:21
**times** 7:20,21,23 31:9,20,23 32:7
  36:24 98:6 101:6 125:5 213:12
  213:15,24 218:12 221:12 224:22
**timing** 11:1
**Tinkler** 3:14 5:12 207:4,5,15
  221:18 226:1,21 231:11
**Tire** 49:12
**Tires** 49:16
**titles** 60:12

**today** 7:16 8:12,17 53:6 72:22
  102:1 113:9 114:19 172:19 176:7
  176:14 177:19 178:23 202:13
  208:11 214:4,7 226:14
**today's** 184:17
**told** 15:11 56:17,21 61:19 93:7
  96:4 99:21 100:2 102:13 103:2,2
  103:3 110:7
**Tommy** 34:14
**top** 23:4,7 75:21 113:23 167:16
  225:3
**topic** 115:14
**topics** 56:5 68:2
**Torres** 32:6 60:13
**total** 29:25 31:12 59:22,23 62:7
  79:14 89:13 112:8,8 114:12,15
  117:21,22,25 118:2,14,15,17,22
  118:24 119:3,4,5,10,11,12,14
  124:25 149:14 163:25 199:22
  200:1,19 224:8
**totality** 84:10 97:4 104:20 119:17
  120:3,7,9,15,20 134:3,17
**totalling** 62:24
**touch** 79:6
**tough** 38:21
**town** 47:10 98:20
**Tracy** 3:8 181:15 193:17
**traditionally** 131:3
**training** 230:22,25 231:1
**transcribed** 1:25
**transcript** 41:7 42:2,14 43:18,23
  44:20,21,22 46:6,12,12 47:21,23
  233:8
**transcripts** 41:2 49:21 50:19
**transferred** 114:8
**translate** 116:7
**transmission** 205:5
**treat** 143:20 144:3 146:9,11
**treated** 142:9,11 143:8,21 144:5,9
  158:13
**treatises** 73:16,20,22
**treatment** 95:4 96:14,17 97:7,11
  104:21 109:22 110:12,19 120:5
  121:5
**trend** 87:3,7
**trends** 60:22
**trial** 25:6 34:15 38:8 51:7 64:8
  132:10 160:11,20 161:11,17,19
  161:20 164:24 172:23,25 174:5
  216:7 219:7,8
**trial's** 26:5
**trick** 8:16
**tried** 73:4 102:11
**trips** 59:18
**TRL** 51:9
**true** 7:22 24:21 39:9 111:7 151:20
  156:16,17 162:21,25 163:1 233:8
**trust** 229:15
**truth** 121:21
**try** 69:21 150:2 175:21 216:12
**trying** 8:15 20:17 50:1,21 66:23
  72:11 74:18 87:2 88:20 105:16
  107:16

**Tuckel** 90:25 91:1
**turn** 108:23,24 121:10 164:6 224:11,24
**turned** 99:18
**Turning** 139:7 162:7 226:12
**turnout** 91:3,8 92:16,20,20 197:15 197:18
**twice** 76:1 196:7,14
**two** 8:9 12:2 14:4 25:18 43:22 51:18 59:24 62:4 64:4,5 70:19 71:10 77:25 78:13 79:19 84:8 93:14 96:25 100:7 101:15 116:3 126:19,25 149:19 150:5 156:13 156:14 162:24 163:2 164:2 184:6 186:10 195:17 207:7 224:14,16 230:15
**two-way** 184:25
**type** 27:17 30:20,24 35:11 38:16,25 69:1 98:24 122:20 129:11 171:20 184:11 217:24 224:1
**typed** 20:19
**types** 115:17 183:22
**typical** 99:17
**T-E-I-X-E-I-R-A** 92:25
**T-O-R-R-E-S** 60:13
**T-U-C-K-E-L** 91:2

U

**ugly** 20:23 46:23
**uh-huh** 8:9 12:15 37:25 103:24 133:2 214:1 225:2
**uh-uh** 8:9 179:4
**Ultimately** 162:5
**unable** 210:12
**unclear** 38:19
**uncomfortable** 102:12
**uncover** 95:3
**undergraduate** 8:22 16:22 63:4 99:7 114:6 218:5
**unders** 72:2
**underserved** 119:7 179:19
**understand** 8:11 9:17 22:13,17 27:8 40:4,5,10 49:14 52:3 66:19 76:23 79:3 81:10 84:1 94:11 97:10 107:16 119:25 120:5 142:6 145:4,8 148:21 156:6 160:7 171:25 173:19 184:5 189:8 212:6 214:12 227:16 230:21
**understanding** 8:17 9:4 19:7 25:1 38:16,23 40:9 52:11 53:14 94:2 105:2 123:20 125:22 139:14,18 139:23 140:1 142:8,11 158:10 165:24 191:17 230:17
**understood** 21:24 40:9 49:4 113:8 125:8 148:19
**undertake** 30:4
**undertaken** 26:20 27:5,12 28:1,11 29:10 178:1
**undertaking** 178:11
**union** 43:8
**unique** 201:24
**uniquely** 77:20
**unit** 27:9,12,14 28:2,4,7,12,14

29:10,12 100:10
**United** 1:1 15:7 17:23 19:9 20:7,8 34:9 36:16,21 41:11,18 60:18 86:10 92:14 104:10 105:6,7,9 129:7 233:1
**units** 30:18 31:7
**University** 8:22 11:7,9,11 16:1 60:15 86:17 99:8 222:13
**unusable** 115:2,23 116:8 117:1
**unusual** 108:23
**update** 131:22
**updated** 32:23 33:1 70:16
**updates** 33:5
**urban** 12:17,20,21 46:7 75:10 91:4 91:8 171:21
**usable** 80:20
**use** 11:16,21 13:3,10 14:1 16:24 17:1 43:9 45:4,18,21 51:18,24 72:22 83:2,3,4 85:23 89:12 90:5 90:8,10,14,23 92:8 107:14 108:19 113:16,20 116:7 117:11 119:1,16 121:23 122:5,16,18 124:1,12,18,23 125:4 127:22 129:10 132:10 138:15,24 145:2 145:11 168:14 184:9 196:18 199:18 202:3 204:12 206:17 211:18 212:14 213:13 214:12,16 214:17 216:20 217:2 220:13 222:18,21 223:6,16,18,19 230:9
**useful** 164:8
**uses** 213:11 222:13
**usually** 135:6
**utility** 51:5
**utilized** 17:1
**U.S** 85:17 86:24 87:25 88:6 129:6 168:9 185:17,19,20 188:21 189:15 192:24 193:4 199:16 200:13 202:6 203:23 218:18 229:6,14,25

V

**V** 219:14
**vacation** 59:20
**Valdez** 34:13
**value** 183:17,18
**values** 171:3,8
**variable** 73:15 77:16 117:21,23,24 119:9,12 128:4 183:16,16,17,18
**variables** 92:2 120:13 124:6,14 162:24 163:2 184:6 224:14,16
**variation** 148:17
**varies** 227:22
**variety** 227:20
**various** 19:17,25 36:22 52:22 60:15 64:15 65:25 76:17,19 77:4,6,7 80:22 85:20 88:14 97:19 107:13 129:7 184:4 218:15 223:7
**vary** 29:20
**vast** 157:20
**vehicle** 67:14
**Vehicles** 66:17,25 175:20 176:1,10 176:25 177:21 178:25 180:10 220:25 221:4

**venture** 139:6
**verification** 102:21
**verified** 102:13 142:3 165:17 193:5
**verify** 72:15 86:20 111:4,17 141:21 168:8 177:11,13,17 185:18,22 192:25
**version** 32:24 65:22,23
**versions** 65:24
**versus** 34:7,10,11,13,17 35:21 36:12 41:12,15 42:20 43:20 45:1 46:8 47:3,7,15,22 48:13 50:4,5,6 50:20,25 55:18 58:11 78:2 80:8 84:9 85:11 89:23 93:18 114:21 118:25 119:22 217:22 218:21 219:3
**Vietnam** 100:7
**view** 94:5 97:11 195:7 196:6 227:4
**vintage** 19:24
**violence** 97:17,20 98:15
**violent** 97:17
**virtue** 138:18
**visited** 59:12 60:3
**Visiting** 59:20
**visits** 60:1
**vitae** 6:3
**vital** 87:20
**volumes** 43:22
**Volusia** 3:20 147:6,10,14,20,25 148:3,8,17 194:16,19,24 195:10 195:12,13 196:23 201:14,20,24 202:1,5,13,22 203:5,22 204:4,11 204:23 205:1,21,24 206:2,4,9,15 206:16,19
**Voss** 86:16
**vote** 25:18 34:22,23 35:24 37:1,21 38:5,6 39:1,2,6,11 67:13 71:25 92:14 93:2 102:9,22 103:2 131:3 131:4,7 142:17 158:1,2,12,17,18 158:20 166:6,7,11 169:23 179:10 180:9,14,20 181:2,9 186:20 187:15 212:5,15 214:6 215:10 216:25 217:3 220:2,4,8 222:3 223:2,5 224:5 227:21,25 230:18
**voted** 19:20 103:16
**voter** 52:21 70:7 89:18 90:1 91:3,8 93:1 102:10,22 103:1 117:19 132:2 133:1 139:3,11,11,15,16,23 139:25 141:25 145:13,14 157:24 160:3 186:18 187:13,24 192:14 197:15 198:15 199:2,9 210:2 228:4
**voters** 13:17,17,19,20,22 25:18 37:21 44:3,9 49:21 51:13,14,14 51:25 52:1,22,24 53:9 56:23,24 56:25 67:2,24 68:18,20,23 69:12 69:15 70:5,9 72:9,12 77:17 78:18 78:24 79:12,13,15,17,22 80:1 86:18 90:6,10,18 96:18,22,22 102:21 111:12,21 115:5,6 116:2 117:21,23,25 118:1,2,15,16,17,20 119:1,13,15 127:1,1,2 129:12,23 131:14,20 138:21 139:10 140:9 140:11,15,21,25 141:2 142:8,9,14

142:15,16,17,19 143:5,8,9,11,21
143:21 144:11,12,24 145:17,18
146:15,20,24 152:20 159:1
162:10 172:24 177:12 197:23
198:13,19 199:2 204:13 208:15
208:16 209:10 210:9,10 212:5,16
212:24 213:2,6 215:10 218:2
220:2 223:2 225:1
**votes** 35:8,17,17 38:12 72:1,10,12
92:13
**voting** 16:24 17:8,25 18:24 19:25
20:3 27:18 31:21,23 34:19 35:22
35:23 36:3 38:1,22,23,25 48:6,22
51:23 56:23 58:7 60:18,22 71:18
71:21 73:17,24 74:13,13 94:20
97:18 102:5,15,24 110:8,11
117:16 130:22 131:16 134:10
135:8 157:10 158:24 165:23,25
166:5,8 169:17,21,24 179:15,18
197:25 204:11 210:2 211:2,22
214:10 218:3 220:4,19,21 222:9
**vs** 1:9
**V.O** 19:15

---
### W

**W** 2:13
**Waas** 4:3 5:8 175:14,18 181:20
182:1
**wait** 87:22
**waitress** 101:9,10
**walk** 85:7
**walked** 50:16
**wall** 99:20
**Walton** 152:5
**want** 8:14,16 22:17 23:13 29:6,21
31:17 33:21 41:1 53:13 78:5 81:9
85:1,24 86:7 91:17 104:24
109:12 112:19,21,21 139:6 144:3
162:14 172:21 184:9,13 189:19
222:18
**wanted** 68:2 71:10 78:7 165:21
**wants** 212:15
**ward** 75:5
**Washington** 1:14,23 2:5,10 58:19
**wasn't** 29:3 37:20 52:23 67:3,21
70:10 102:13 123:13 130:19
131:6,6 152:16 156:5 164:7
189:4
**watched** 99:18
**watching** 99:20
**way** 8:14 17:3 18:10 19:19 22:15
44:7,21,23 53:19 62:2 64:18 67:7
68:6 69:2,19 74:24 78:20 88:12
91:20 108:22 109:23,25 116:7
123:6 124:1 130:24 134:2 137:17
137:17 143:20 146:9 165:10,13
183:20 184:6,16 189:6,6,7
214:17 218:9 222:13 224:21,23
227:1,5,6,7,9 233:12
**weak** 122:13 125:9
**weakness** 126:12
**web** 88:1 185:23 186:9 193:6
**week** 10:3 15:23

**weeks** 10:25 59:23,24 101:16
**went** 14:6,8 51:9 69:23,24 70:2
140:7 185:9
**weren't** 75:25 168:16
**west** 2:14,15 3:10,21 24:4,10
**West's** 17:18
**we'll** 33:11 40:9 81:5 124:17 205:9
**we're** 8:16 33:12 65:5 71:24 72:4,4
72:5 75:12 184:8
**we've** 18:3 38:20 50:16 51:12 53:25
84:8 86:6 87:11 93:21 99:22
113:3 174:22
**whack** 147:9
**whatsoever** 63:15
**When's** 161:19,24
**WHEREOF** 233:14
**whichever** 220:1
**white** 35:8 48:6 69:12,14 70:6,8,9
87:14 99:19 100:10 103:3 148:12
194:9,12 195:11 196:24 200:2
203:12,15 220:2,3,21
**whites** 165:8 196:5 220:4
**William** 2:17 3:20 91:22 207:16
**Williams** 2:9
**Willie** 34:8 35:20
**willing** 53:4 109:4
**win** 220:5
**Wisconsin** 26:12,14,18 34:14
**wise** 196:15
**wish** 56:4
**witness** 1:16,19 5:3 31:10 32:11,22
33:21 48:18 81:15,21 83:13
94:20 112:14,22 136:5 139:18
142:22 161:14 162:2 187:18
201:5 205:4,10,13,17 221:19
226:22,24 232:3 233:7,9,14
**witness's** 139:20
**Wolfinger** 92:10,11 93:3
**won** 75:3
**word** 102:19 108:18 121:23 196:18
196:19 203:8 214:13,18
**words** 8:9 51:18 65:15,21 67:4
110:17 112:7 129:4 146:4 155:20
177:6 206:23 219:24
**work** 17:19 19:14,21 25:11 26:3,6
55:23 61:23,24 62:3,22 63:7
64:11,12 68:6,7 69:20 70:11
71:21 77:21 93:1 101:21 106:15
107:21 108:20 114:9 124:12
127:25 173:5 178:20,22 183:25
206:8 226:17,19
**worked** 9:9,16 59:8 76:2,5 94:22
114:3
**worker** 115:6
**workers** 13:19 69:13 77:15 92:3,6
92:8 97:1 102:19 113:24 114:11
114:13,14,15 115:10 119:10,11
127:3 144:22 145:12 162:10
163:4 174:14 204:14 208:25
209:14 226:8
**working** 10:16 122:22 123:1
163:17 164:4 171:11
**world** 124:15

**worth** 97:23
**wouldn't** 101:8 115:11 127:13
168:19 169:25
**write** 89:2 130:24 227:11
**writing** 214:17
**written** 57:10,13,22 76:23
**wrong** 29:7,8 116:1
**wrote** 60:13 65:16 104:1,15 130:21
131:4 222:21
**W-O-L-F-I-N-G-E-R** 92:11

---
### X

**x** 1:6,13 6:1
**Xeroxed** 159:7

---
### Y

**yeah** 18:5 30:6,23 35:5 37:6 46:10
66:1 86:8 91:12 100:18 101:6
112:16 126:5 137:10 141:3
149:14 155:7 156:7,17 157:18
158:4 160:21 161:12 162:12,22
167:23 168:6 169:13 170:4
175:10 181:4,12 189:10 194:17
195:10 196:18 198:22 199:25
201:7 202:19 205:4,10 211:14
218:16 226:22 231:8
**year** 10:9 12:7 14:6,7,11 46:5 98:6
99:10 103:12,13 180:20 229:9
**years** 12:2 14:4 16:9 19:5 21:5
45:20,20,23,24 60:4,5 74:11,12
87:13 94:21 100:7 101:17 103:13
227:13
**yesterday** 45:23 167:19 228:9
**York** 1:22 2:4
**YOUNG** 1:19,25 233:5

---
### Z

**Z** 121:24
**zero** 122:3
**zone** 162:13

---
### 0

**00001** 124:8
**001** 124:10
**01** 124:10
**01-0120-CIV-GOLD/SIMONT...**
1:5
**05** 124:17
**072** 126:15,22
**083** 224:17
**09** 162:13

---
### 1

**1** 6:3 33:14,18 36:5 49:19 50:15
53:17 65:23,24 71:10 121:11
126:22 127:1 135:5 217:19,20
**1st** 3:4
**1.0** 122:3
**1:48** 84:22
**10** 124:18
**10:24** 1:23
**100** 72:23,24 125:3,5 224:22
**108** 126:16

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 258

**108's** 126:22
**11** 194:24
**11:04** 39:17
**11:13** 39:18
**111** 3:4
**117** 3:10
**12th** 2:10
**12.8** 195:4
**12:29** 84:21
**123** 3:21
**13** 99:16
**132** 5:7
**14** 81:11 84:6 175:23
**1401** 1:22 2:4
**15** 193:20
**150** 45:23
**151** 127:10
**175** 5:8
**18** 60:4
**182** 5:9
**188** 34:10
**19.3** 150:17
**1900** 2:14,15 86:23 87:10
**1923** 20:25 97:16 213:25 214:4
**1929** 36:17
**193** 5:10
**1948** 19:15
**1967** 47:21
**1974** 11:7
**1975** 11:9
**1980** 87:10,10
**1981** 11:11,11
**1983** 34:12
**1986** 92:19
**1987** 75:2
**1990** 58:18 86:23
**1991** 58:20
**1993** 34:8,11
**1995** 34:12
**1996** 34:15
**1999** 41:7 85:16
**1999-2000** 87:20

**2**

**2** 6:5 34:19 35:1,2,7 36:2 48:5 51:2
  53:16,21 54:1 58:20 61:2 62:13
  65:24 75:21 93:23,24 119:23
  135:4,6 136:9 151:5 205:12,23
  208:6 219:16 224:24 228:17
  229:24
**2:53** 127:18
**20** 7:25 8:1 60:5 87:13 101:17
  103:11 165:15,20 227:13
**200** 2:20 45:24 232:6 233:15
**2000** 57:10,14,24 78:1,14 79:20
  80:4 84:10 85:16 86:20 89:5,18
  91:16,24 92:4 112:2 133:4,10,11
  152:9 153:24 180:10,15,20 181:2
  181:9 192:2 204:8 209:15
**20005** 2:10
**20005-2124** 2:5
**2001** 168:11
**2002** 1:15,24 10:9 11:2 54:22

**2004** 233:23
**201** 5:11
**202** 2:6,11
**207** 5:12,13
**2075** 65:9
**21st** 54:22 55:7 56:6
**216** 5:14
**2173** 91:13
**2180** 86:4
**2220** 88:9
**230** 5:15
**24** 31:20,23
**25** 227:13
**25th** 62:18,24
**26th** 161:22,24
**27th** 3:15
**272-5670** 3:16
**2810** 3:4
**29** 41:7

**3**

**3** 6:7 35:1,2,7 36:2 37:16,19 38:11
  48:5 51:2 63:16,17,21 64:9,20,21
  64:23 65:7,24 66:11 69:5 70:12
  71:2,7 76:14 80:21 81:7,11 82:3
  82:5,20,24 83:6,7,7,10,12,12,14
  83:14,20 84:7,25 90:12 93:18
  95:7,12,13,18 104:2 120:15
  121:12 125:10 130:1,4 135:4,7
  136:9 192:21,22 193:25 197:11
  197:23 198:14 207:22 208:1,2,2
  220:3 223:23 225:3 226:13 227:6
  227:10 230:20,24
**3/6/02** 6:5
**3:16** 127:19
**30** 1:15,23 18:22 227:13
**300** 45:24
**305** 3:5
**3099** 2:20
**31** 233:23
**32202** 3:10
**32399-1050** 4:4
**32720-4613** 3:21
**33** 6:3
**33128** 3:4
**33308-4311** 2:21
**33401-6198** 2:15
**33602** 3:16
**37.8** 200:4
**375-5151** 3:5
**378** 200:4
**386** 3:22
**39** 5:6 91:21 113:1,4

**4**

**4** 6:9 64:25 65:1,6,8,10,24 66:3,10
  66:20 67:19 68:1 69:5 70:12 77:1
  85:1 95:16 113:23 126:23 127:2
  130:1,5 140:7 175:22 203:19
  205:12,24 208:7 224:11
**4A** 76:15 95:20 103:19 104:18
  105:22 111:10 113:9,19 114:25
  116:14 117:11 120:16 182:8,10

  182:14 206:18 207:24 224:25
**4B** 111:23 113:6,9,16,19 116:14
  117:11 182:17,19,22 193:25
  194:3 197:11 198:13
**4C** 113:12 185:4,11,12 186:4,17
  187:22 188:25 189:12 190:4
  197:22 199:2,8,13 223:21 224:2
  226:12,15,20 227:3 230:21
**4D** 66:14,19 67:18,25 113:22
  114:25 182:25 183:3,4,10 226:8
**4E** 69:6 114:23 116:10 117:7
**4F** 76:15 117:14
**4:50** 193:11
**4:56** 54:23
**400** 1:22 2:5
**414-3662** 4:5
**41968** 61:2
**41969** 61:2
**41974** 62:12,22
**41976** 54:11,23
**41977** 55:2,11
**434-5000** 2:11
**4427** 41:11
**443** 41:6
**45** 103:6
**45,000** 151:4
**46,000** 116:6
**480** 3:10

**5**

**5** 65:24 70:15 76:14,21,24 77:1
  80:21 81:7,12 83:23 84:1,6,25
  85:2,4 95:25 140:7 175:22
  203:19 204:9 207:7
**5/30/02** 78:15 80:10
**5:04** 193:12
**50** 31:20 149:10 203:4
**500** 19:21
**54** 6:5
**561** 2:16

**6**

**6** 127:7 129:25 200:8 207:13
**6:00** 231:15
**6:51** 55:7
**601** 3:15
**604** 127:8
**63** 6:7 165:17,19 166:9,14
**630-1835** 3:11
**65** 6:9
**650-7270** 2:16
**662-8600** 2:6

**7**

**7** 5:5 71:13 130:8,10,13,14,21
  131:12 133:3 139:7 150:13 192:2
  192:21,21,23 199:21,24 200:11
  200:16,19 202:9 203:25
**72.5** 62:24
**725** 2:10
**736-5950** 3:22
**771-4500** 2:21
**777** 2:15

**778** 43:19
**79** 12:3

---
**8**
---

**8** 74:23 148:24 167:9,12 168:20
228:22 229:21 230:23
**80** 62:7 197:8
**81.9** 203:13
**813** 3:16
**85** 127:11
**850** 4:5
**856** 46:7

---
**9**
---

**9** 106:4,5 122:25 147:4 150:10
194:2 199:21 202:10,24 203:14
204:1,3
**90** 62:11 125:5 161:16,24 162:17
222:7 224:21
**904** 3:11
**95** 123:25 125:5
**954** 2:21
**99** 125:6

**PLAINTIFFS' EXHIBIT 21**

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF FLORIDA

3

4        NATIONAL ASSOCIATION FOR THE

5        ADVANCEMENT OF COLORED PEOPLE

6        INC., by its FLORIDA STATE CONFERENCE

7        OF BRANCHES, et al.,

8                    Plaintiffs,

9        vs.                          CASE NO. 01-0120-Civ-Gold

10       KATHERINE HARRIS, Secretary of

11       the State of Florida, et al.,

12                   Defendants.

13       ------------------------------/

14

15

16                DEPOSITION OF EMMETT MITCHELL, IV

17           Taken in the above-styled cause, pursuant to notice,

18       at the offices of Steel, Hector & Davis, 215 South Monroe

19       Street, Tallahassee, Florida, on May 20, 2002, commencing

20       at 1:30 p.m.

21

22                        Reported by:

23                    CLARA C. ROTRUCK

24                    Court Reporter

25

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1      APPEARANCES OF COUNSEL:

 2      On behalf of the Plaintiffs:

 3      ANITA S. HODGKISS, Esq.
        CARA FINEMAN, Esq.       (via telephone)
 4      Lawyers' Committee for Civil Rights Under Law
        1401 New York Avenue, NW, Suite 400
 5      Washington, D.C.  20005-2124
        (202) 662-8600
 6
        On behalf of the Defendants:
 7
        DAVID I. SPECTOR, Esq.
 8      Steel, Hector & Davis, LLP
        200 South Biscayne Boulevard, 41st Floor
 9      Miami, FL  33131-2398
        (305) 577-2934
10
        and
11
        KENNETH A. TINKLER, Esq.
12      Assistant County Attorney
        Hillsborough County Attorney's Office
13      County Center, 27th Floor
        Tampa, FL  33601
14      (813) 272-5670

15      and

16      DENIS DEAN, Esq.
        General Civil Litigation
17      Office of the Attorney General
        PL-01 The Capitol
18      Tallahassee, FL  32399-1050
        (850) 414-3300
19
        and
20
        DEBORAH K. KEARNEY, Esq.
21      General Counsel
        Department of State
22      PL-01 The Capitol
        Tallahassee, FL  32399
23

24

25
```

```
 1       APPEARANCES OF COUNSEL:   (continued)

 2       On behalf of the Defendants:

 3       DANIEL A. RESTREPO, Esq.
         William & Connolly, LLP
 4       725 12th Street, NW
         Washington, D.C.  20005
 5       (202) 434-5000

 6       and

 7       TRACEY I. ARPEN, JR., Esq.   (via telephone)
         Office of General Counsel
 8       City of Jacksonville
         117 W. Duval Street, Suite 480
 9       Jacksonville, FL  32202
         (904) 630-1835
10
         and
11
         SUSAN TORRES, Esq.     (via telephone)
12       Assistant County Attorney
         Dade County Attorney's Office
13       Metro Dade Center
         111 NW 1st Street, Suite 2810
14       Miami, FL  33128
         (305) 375-5151
15
         and
16
         DANIEL D. ECKERT, Esq.       (via telephone)
17       Volusia County Attorney's Office
         123 W. Indiana Avenue
18       DeLand, FL  32720-4613
         (386) 736-5950
19

20

21

22

23

24

25
```

4

1                    INDEX TO WITNESS
2        EMMETT MITCHELL, IV
3              Examination by Ms. Hodgkiss                Page
4                                                          05
5
6
7        No.                INDEX TO EXHIBITS
8        1                                                Page
9        2                                                 18
10       3                                                 19
11       4                                                 24
12       5                                                 27
13       6                                                 28
14       7                                                 30
15       8                                                 33
16       9                                                 35
17       10                                                44
18       11                                                47
19       12                                                48
20       13                                                49
21       14                                                50
22       15                                                50
23                                                         51
24
25

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1                            D E P O S I T I O N

2       Whereupon,

3                            EMMETT MITCHELL, IV

4       was called as a witness, having been first duly sworn to

5       speak the truth, the whole truth, and nothing but the

6       truth, was examined and testified as follows:

7                            EXAMINATION

8       BY MS. HODGKISS:

9            Q     Mr. Mitchell, my name is Anita Hodgkiss.   I'm an

10      attorney representing the Plaintiffs in the NAACP versus

11      Harris litigation.

12                 Would you state your full name for the record,

13      please?

14           A     It's Emmett Mitchell, IV.   My nickname is Bucky

15      Mitchell.

16           Q     Have you ever had your deposition taken before?

17           A     No.

18           Q     As you know, the court reporter will be taking

19      down everything that anyone says, and it is very important

20      that if you don't understand my question, please ask me to

21      explain it or let me know what you don't understand.   It's

22      important that we get as accurate an answer as possible,

23      and you can't answer a question if you don't understand it.

24           A     Okay.

25           Q     Also, if you want to take a break at any time,

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1      just let me know.

 2                  How are you employed, Mr. Mitchell?

 3      A      How am I employed?

 4      Q      Yes.

 5      A      I work with the Florida Legislature.

 6      Q      And what is your position with them?

 7      A      I'm an attorney with the House Rules Committee.

 8      Q      When did you take that position?

 9      A      December of 2001.

10      Q      And how were you employed prior to that?

11      A      I worked for the Department of Education for a

12      year, from November of 2000 to November of 2001.

13      Q      And prior to working with the Department of

14      Education?

15      A      I was with the Division of Elections as an

16      attorney for the Division, from March of '97 to November of

17      2000.

18      Q      And what other employment have you had as an

19      attorney?

20      A      Prior to '97, I was an assistant general counsel

21      with the Department of State in their General Counsel's

22      Office, from '94 to '97.

23                  Prior to that, I worked as an attorney for a

24      small corporation here in town called Water Spectrum.

25      Q      And where did you go to law school?
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1          A    University of Georgia.

 2          Q    In any of the -- well, you had two positions.  Am

 3    I correct that after law school you went to the small firm

 4    in Georgia?

 5          A    Right out of law school I went to work with an

 6    association here in town, the Florida Osteopathic

 7    Association, as a lobbyist.

 8          Q    Am I correct in that you worked in three legal

 9    settings prior to coming to the Division of Elections?

10          MR. SPECTOR:  Object to the form.

11    BY MS. HODGKISS:

12          Q    Did you work in three prior settings before

13    coming to the Division of Elections?

14          MR. SPECTOR:  I still object to the form.

15          MS HODGKISS:  I'm sorry, what is --

16          MR. SPECTOR:  Just as to the definition of

17          "settings."

18    BY MS. HODGKISS:

19          Q    Did you work as an attorney for three different

20    employers?

21          A    One of the employers, the Association, I worked

22    really in a legislative director capacity.  I had a chance

23    to use some legal skills, but I wasn't working as an

24    attorney then.

25          Q    Thank you.  For the employers where you -- well,
```

1      for all of those employers, did you have any involvement

2      with matters related to voting?

3              MR. SPECTOR:  Object to the form.

4              MS. HODGKISS:  What's wrong with the form?

5              MR. SPECTOR:  "Those employers" meaning when he

6          acted as a lawyer or the ones before that?

7              MS. HODGKISS:  No, I'm saying any employment that

8          he had since law school, prior to coming to the

9          Division of Elections, did any of that employment

10          involve matters relating to voting or elections.

11              THE WITNESS:  Tangentially, I probably did some

12          voting-related work when I was in the General

13          Counsel's Office of the Department of State.  I may

14          have worked on some pleadings for redistricting,

15          reapportionment, things that like, but, no, not

16          directly to voting.

17      BY MS. HODGKISS:

18          Q     And what were your responsibilities when you

19      first started your employment with the Division of

20      Elections?

21          A     I was an assistant general counsel.  I was, I

22      guess I was the second attorney in command, so to speak, at

23      the Division.  The bulk of our work, and I think it's still

24      the case, involved legal opinions, providing formal legal

25      opinions and informal legal advice over the phone to

```
 1    candidates, political committees, Supervisors of Elections.
 2         Q    And generally what matters would those legal
 3    opinions and advice cover?
 4              MR. SPECTOR:  Object to the form.
 5              MS. HODGKISS:  What's the problem with the form
 6         in that question?
 7              MR. SPECTOR:  Are you asking for generally what
 8         matters would that cover?  Are you asking for specific
 9         instances of his representations?
10              MS. HODGKISS:  No.
11              MR. SPECTOR:  Just generally?
12              MS. HODGKISS:  Yes.
13              MR. SPECTOR:  If you understand the question, you
14         can answer it.
15              THE WITNESS:  The only opinions we're really
16         authorized to give relate to the Election Code,
17         Chapters 97 to 106 of the Florida statutes.
18    BY MS. HODGKISS:
19         Q    Did you at any point in time during your
20    employment with the Division of Elections hold any other
21    positions besides the one you just described?
22         A    Well, if you're getting at did I serve in other
23    capacities, I did serve as a contract manager for the
24    central voter file.
25         Q    When did that responsibility begin?
```

```
 1        A    Probably in 1998 sometime.

 2        Q    At that point were you still second in command --

 3        A    Yes.

 4        Q    -- in the General Counsel's Office?

 5        A    Well, in the Division of Elections I was, yes.

 6        Q    I'm sorry.  Did you have any supervisory

 7   responsibilities as second in command in the Division of

 8   Elections?

 9        A    Only with my secretary assistant.

10        Q    During the time that you were contract manager

11   for the central voter file, did you have any other

12   responsibilities that you were carrying out simultaneously?

13        A    Well, the same legal opinion duties, still

14   providing legal advice to the various entities I mentioned

15   earlier.

16        Q    Were there any other assistant general counsels

17   working for the Division of Elections or any -- during the

18   time that you were employed there?

19        A    Yes.  Mike Cochran was the lead attorney there

20   until probably early 1999.  After that, he left the

21   Department of State and Division of Elections.  I became

22   the lead attorney.  We hired another attorney in the

23   office, Kristi Bronson.

24        Q    When you became lead attorney, did you supervise

25   Kristi Bronson?
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1          A     To a certain degree, yes.

 2          Q     And then am I correct you left in November of

 3     '99?

 4          A     I left the Division in November of 2000.

 5          Q     2000, I'm sorry, I just wrote that down wrong.

 6                Other than having the responsibility for contract

 7     management for the central voter file, were there other

 8     duties or responsibilities that you had during the time

 9     that you worked for the Division of Elections relating to

10     voter registration matters?

11          A     No.

12          Q     What was the first task that you completed or

13     what was the first thing that you had to do as contract

14     manager for the central voter file?

15          A     If I recall, the first thing we had to do was

16     gather some information and put out a request for proposal

17     in 98, and we had to do it in a pretty short period of

18     time.

19          Q     How did you go about gathering the material?

20          A     Well, we had databases that we had to deal with.

21     I guess first we had to identify which databases were going

22     to be matched and used.  FDLE's felony conviction database

23     was one of those.

24                We had to find out what was available from the

25     Executive Office of Clemency.  We had duplicate information
```

1    already, and we were also beginning to talk to the Clerks'

2    Association about mental incompetence, which turned out to

3    be a difficult task.

4         Q    When you say "we," who are you referring to?

5         A    Mike Cochran and myself.  At the time the

6    Division director was Ethel Baxter; some related computer

7    personnel in the Department, Sandy Brill.

8         Q    Prior to the time that you began working on the

9    contract management for the central voter file, had you had

10    any experience working with computerized databases?

11        A    No.

12        Q    Once you -- describe for me the next step you

13    took after compiling the material that you discussed

14    earlier, the databases that you were trying to pull

15    together.

16        A    The next step, we learned that the Clemency

17    office had no electronic files available on clemency

18    records.  FDLE had an ongoing felony database and the Court

19    Clerks had no uniform centralized mental incompetence

20    database that was available for our use.

21            So really, we were looking at death information

22    from the Office of Vital Statistics that was available, and

23    the felony information.  We gave that information to the

24    contractor at the time, which was a company whose acronym

25    is PASS, P-A-S-S.  I don't recall what that stands for.

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1  Q Do you know when the contract with PASS, when the

2 Division entered into a contract with PASS?

3  A I believe it was sometime in August of '98, it

4 was the early fall of '98.

5  Q Were you involved in selecting that contractor?

6  A I mean, yes, I guess I was involved, yes.

7  Q And what did they -- what were they requested to

8 do?

9  A We had them run the felony conviction database

10 against the central voter file which we already had within

11 the Division, and they also ran death records from the

12 Office of Vital Statistics, and I believe they also ran

13 duplicate registrations.

14  Q And what were they looking for when they ran

15 these different databases against the central voter file?

16  MR. SPECTOR:  Object to the form.

17  MS. HODGKISS:  I'm sorry?

18  MR. SPECTOR:  To the extent that he knows that he

19  has any knowledge what PASS was looking for at the

20  time, so if he knows.

21  MS. HODGKISS:  I believe he stated that he was

22  involved in establishing the contract for PASS.

23  MR. SPECTOR:  To the extent he knows, he can

24  answer the question.

25  THE WITNESS:  We were looking for individuals

```
 1            that potentially matched what was in our central voter

 2            file with those various databases.

 3    BY MS. HODGKISS:

 4        Q    How did you determine that an individual on a

 5    felony list would match an individual in the central voter

 6    file?

 7            MR. RESTREPO:  Object to the form of the

 8        question.

 9            MR. SPECTOR:  Object to form.

10            MS. HODGKISS:  I'm sorry, what's the objection?

11            MR. SPECTOR:  Lack of foundation, lack of

12        predicate.

13    BY MS. HODGKISS:

14        Q    Can you tell me what your responsibilities were

15    with regard to running the felony databases against the

16    central voter file database?

17        A    I personally did not run the databases against

18    the central voter file.  I'm not sure I know what you're

19    asking.

20        Q    I'm asking, did you have any role whatsoever in

21    determining how that process should occur?

22        A    Not on a computer level, no, that was left up to

23    our computer personnel, probably Sandy Brill or Janet

24    Modrow.

25        Q    What about on a substance level?
```

```
 1              MR. SPECTOR:  Let me object.  To the extent that
 2         you're asking him about his duties also as an attorney
 3         for the Division of Elections, that would be
 4         privileged information, he wouldn't have to answer
 5         that.  To the extent that you're asking him as non-
 6         legal duties that he had, I think you can answer that,
 7         but don't answer anything with regard to any advice
 8         you rendered as an attorney.
 9              MS. HODGKISS:  Thank you.
10              THE WITNESS:  Could you repeat the question?  I'm
11         not sure I'm clear on what you're asking.
12    BY MS. HODGKISS:
13         Q    When I asked you previously if you had any role
14    at all with running the central voter file against the
15    other databases, the felony and death and clemency
16    databases, you said no, you didn't have anything to do with
17    the computer running of those.
18         A    Right.
19         Q    So my question, then, is, did you have any role
20    in, and I said the substance of how that process occurs,
21    but basically not legal advice that you provided, but
22    whether you participated in any meetings or provided any
23    input into decision-making about how that process would
24    occur.
25              MR. SPECTOR:  Object to the form.
```

16

```
1      BY MS. HODGKISS:
2          Q     You can answer if you understand the question.
3          A     I was present in the meetings, but again, I
4      deferred to Sandy Brill.  He had been running duplicate
5      registrations for the counties for a year or two prior to
6      that.  Quite frankly, I didn't know anything about the
7      computer area and what we were doing with the central voter
8      file.  I mean, I was present, but I didn't have any hand in
9      how the matches were going to be conducted.
10         Q     What was your role at the meetings that you were
11     present at as this process was being developed?
12         A     With the PASS contract?
13         Q     Yes.
14         A     Well, with the PASS contract the statute that
15     required us to do this matching process I think was
16     effective in May of '98, and we had to complete this
17     matching process by August of '98.  We didn't get the money
18     to do the project until July of '98, so once the contract
19     was awarded we simply gave them access to the central voter
20     file and we collected these three, I believe, databases and
21     said please match them up for us.
22               That was the extent of my involvement in that
23     contract.  Once they did their matching in August, they
24     completed their contract requirements.
25         Q     After they completed their contract in August,
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1     what was the next step?

 2                MR. SPECTOR:  Object to the form.

 3     BY MS. HODGKISS:

 4          Q    What was the next action that you took with

 5     regard to your responsibilities as contract manager for the

 6     central voter file?

 7          A    Again, Mike Cochran was kind of taking the lead

 8     on this at this point, but I recall that we weren't

 9     terribly satisfied with the product that was produced by

10     PASS, and sometime over the next couple of months we began

11     preparing for a new RFP with another contractor.

12          Q    In what ways were you not satisfied with the data

13     provided by PASS?

14          A    Specifically, I don't recall.  One of the

15     concerns that we had was obviously that the Clemency

16     information was not available in electronic format, so at

17     that point we hired some OPS personnel to try to get

18     Clemency up to speed and make their database electronic in

19     form.  I don't recall specifically what we were unhappy

20     with about the PASS contract, but we just weren't happy

21     with it.

22          Q    Did you have a role in drafting the request for

23     proposal that went out after you determined that -- after

24     it was determined that there were some concerns regarding

25     the data that PASS had come up with?
```

1      A     Do you have a copy of it there?

2      Q     Well, I don't know that I do.

3            No, I don't have a copy of the RFP with me.  I

4      assume that -- was it one of the documents that you

5      provided to us, are you aware of that?

6      A     I don't know.

7            MR. SPECTOR:  I don't know, either.

8      BY MS. HODGKISS:

9      Q     Do you recall now, as we're sitting here, whether

10     you had any role in developing the RFP?

11     A     I probably did have a role.  Again, Mike Cochran

12     was kind of the lead on this at the time.  I had a role,

13     Ethel Baxter probably had a role, and our computer people

14     had a primary role in it.

15     Q     And what was your role in developing the request

16     for proposal?

17     A     My role was really working with the purchasing

18     office and making sure that we had the state purchasing

19     requirements contained in the RFP.

20     Q     What are those requirements?

21     A     Any of the requirements that are required under

22     Chapter 287, any Department of State purchasing rules.

23           MS. HODGKISS:  Can I have this marked as Exhibit

24           1, please?

25           (Whereupon, Exhibit No. 1 was marked for

19

```
 1      identification.)

 2              MS. HODGKISS:  I'm sorry, I begin -- I have

 3          copies of some of these documents with different Bates

 4          numbers because we have five or six copies of the same

 5          thing from different people.

 6              MR. SPECTOR:  Sure.  What I will do, if it's okay

 7          with you, I will pass it around the room so everybody

 8          can see it.

 9              MS. HODGKISS:  If we take a break I can get

10          copies made of the rest.

11              MR. SPECTOR:  Okay.  For the purposes of you that

12          are on the phone, it's an August 12, 1998, letter from

13          Emmett Mitchell, it's Bates number A027391.

14              MS. HODGKISS:  Thank you.

15      BY MS. HODGKISS:

16          Q    Now that you have had a chance to review this

17      document, I want to ask you if you know what this is.

18          A    Yes, I recognize it.  It's a letter to Pat

19      Hollarn.

20          Q    And did you write that letter?

21          A    Yes.

22              MS. HODGKISS:  Next I'm asking that a document be

23          marked as Exhibit 2, and this is a Bates stamp number

24          A027392 through A027400.

25              (Whereupon, Exhibit No. 2 was marked for
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1       identification.)

2    BY MS. HODGKISS:

3         Q    Have you had an adequate chance to review the

4    document?

5         A    Yes.

6         Q    Can you tell me what they are, what those

7    documents are?

8              MR. SPECTOR:  I object to the form.

9    BY MS. HODGKISS:

10        Q    I have handed you a document that's marked and

11   previously identified as Mitchell No. 2.  What's the first

12   page of that document?

13        A    It's a letter or memo from Pat Hollarn to Mike

14   Cochran or Bucky Mitchell.

15        Q    Do you recall receiving that letter?

16        A    Vaguely.  It may have come to Mike.

17        Q    Do you know whether that letter is in response to

18   your letter to her of August 12th, which is marked as

19   Exhibit 1, and request that she perform an evaluation of

20   DBT?

21        A    I would assume so, yes.

22        Q    Then what is the second page of that Exhibit No.

23   2?

24        A    It's an evaluation sheet.

25        Q    And what was the evaluation sheet used to

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1      evaluate?

 2           A     DBT's proposal.

 3           Q     And what is page 3 of that?

 4           A     It's another evaluation sheet from probably one

 5      of the other evaluators.

 6           Q     And what is page 4?

 7           A     This is a memo from our Inspector General at the

 8      time, George MacLafferty.  He was also one of the

 9      evaluators.  This one looks like Mike Cochran's evaluation.

10           Q     Can you tell me the Bates number at the bottom of

11      the one you're referring to?

12           A     This one?

13           Q     Yes.

14           A     A027398.  Do you want me to continue?

15           Q     Yes, please.

16           A     These are some comments on the previous

17      evaluation sheet, and this looks just like a very simple

18      spreadsheet of everyone's evaluation numbers.

19           Q     And would you read the Bates stamp number of the

20      page you're referring to?

21           A     A027400.

22           Q     Can you describe for me the evaluation process

23      that the persons who completed those pages you have just

24      identified went through?

25           A     I don't recall.  They took the proposal submitted
```

1     by DBT and evaluated it based on the criteria that was set

2     out in the RFP.  It looks like there were four criteria.  I

3     don't remember what the range of scores, potential scores

4     that you could receive on the criteria were.  It looks like

5     the maximum was 25 on some of the criteria or maybe all of

6     the criteria.

7         Q    Was anything else done to evaluate DBT's proposal

8     in response, that was made in response to the RFP?

9         MR. SPECTOR:  Object to the form.

10    BY MS. HODGKISS:

11        Q    Did DBT respond to the RFP with a proposal?

12        A    Yes.

13        Q    Is that the proposal that these documents refer

14    to?

15        A    Yes, I believe so.

16        Q    Was anything else done to evaluate the proposal?

17        A    Not to my knowledge.

18        Q    Were you involved in the decision to choose DBT

19    as a company that would carry out the terms of the RFP?

20         MR. RESTREPO:  Object to the form of the

21        question.

22    BY MS. HODGKISS:

23        Q    You can answer if you understand.

24        A    I think on this RFP we ended up not contracting

25    with DBT based on its proposal.  We did an invitation to

1    negotiate after that and brought in another contractor, I

2    believe.  This was four years ago.  My memory is sketchy.

3        Q    Did you review anything in preparation for your

4    deposition here today?

5        A    I looked at some of the old documents, tried to

6    refresh my recollection on some of this stuff, yes.

7        Q    What documents did you review?

8        A    Just my old correspondence, memos, e-mails,

9    things like that.

10       Q    Did you bring those with you here?

11       A    No.

12       Q    Have those been provided to your counsel?

13       A    I assume so, yes.

14       Q    I need to know.  They're in your possession,

15   correct?

16            MR. SPECTOR:  Let me object.  They're not in his

17       possession.  They were our documents, all of them have

18       been produced.

19            MS. HODGKISS:  Thanks.

20   BY MS. HODGKISS:

21       Q    Describe for me what you did after concluding

22   that you wouldn't contract with DBT based on that RFP.

23       A    I think we issued an invitation to negotiate and

24   there was another vendor that we were able to bring in that

25   provided us with a proposal.  This was kind of a new

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

24

1      purchasing process that our purchasing director had told us

2      we may want to try, given that we only had one respondent.

3            We brought in this other company and sat down and

4      talked to them, and having spoken with DBT and this other

5      company from Americus, Georgia, it was clear that DBT had a

6      better proposal and could handle the volume of the work.

7      Q     Do you recall -- so based on what you just

8      indicated, that DBT seemed better able to handle the work,

9      did you complete a contract with DBT?

10     A     Yes.

11     Q     Do you recall roughly when that was?

12     A     I think it was November of '98, I think the

13     latter part of '98.

14     Q     Was that contract revised at any point in time?

15           MR. SPECTOR:  Let me object.  To the extent that

16     revisions were made based upon your actions as

17     counsel, don't reveal anything that was done as a

18     lawyer in your revisions.  Absent that, you can answer

19     the question.

20           THE WITNESS:  I think there probably were some

21     amendments made.

22           MS. HODGKISS:  Can I have this marked as Exhibit

23     3?

24           (Whereupon, Exhibit No. 3 was marked for

25     identification.)


FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

25

1         MS. HODGKISS:  For those of you on the phone, I

2      have marked an exhibit that's Bates stamp A027309

3      through A027317.  It's the Central Voter File Data

4      Processing Services Agreement, Revised 12/21/99.

5      That's, at least, the words on the top of the first

6      page of the document.

7    BY MS. HODGKISS:

8         Q     Have you had a chance to review what has been

9    marked as Mitchell Exhibit No. 3?

10        A     Yes.  It looks like a revised contract with DBT.

11        Q     Did you participate in the process that led to

12   this revised contract being signed?

13        A     Yes.

14        Q     Without revealing any legal advice, is there

15   anything that you can tell me about why the first contract

16   was revised?

17        A     May I see that again, please?

18        Q     Sure.

19        A     I believe it was because we renegotiated the

20   price.  It looks like there was a renewal on a four-year

21   contract with options of one-year renewals, with the fourth

22   year being no charge.  I think that's the only reason why

23   we renegotiated the contract.

24        Q     I want to go back to the process that you

25   followed initially in contract management for the central

1    voter file.

2            In the process of gathering the information you

3    described and in carrying out your responsibilities to

4    manage the contract, did you at any point become aware of,

5    and I'm talking now about the time period prior to any

6    contract with DBT, did you become aware of any inaccuracies

7    in the central voter file?

8            MR. SPECTOR:  Object to the form.

9            THE WITNESS:  No.

10   BY MS. HODGKISS:

11       Q    Were you aware that Supervisors of Elections were

12   concerned or were experiencing problems with regard to the

13   felony information contained in the central voter file?

14           MR. SPECTOR:  Object to the form.

15           MS. HODGKISS:  Please, what's the basis of the

16       objection?

17           MR. SPECTOR:  What type of problems?

18           THE WITNESS:  I think I can answer.

19           The central voter file is just made up of

20       registered voters in Florida.  It has no felons in it

21       that have been identified.  It has no deaths in it

22       that have been identified.  These are lists of

23       registered voters in 67 counties that have been

24       submitted to the Division of Elections and completed

25       and compiled into a database and that's it.  It's just

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1        registered voters.
 2                MS. HODGKISS:  Can I have this marked as Exhibit
 3        4?
 4                (Whereupon, Exhibit No. 4 was marked for
 5     identification.)
 6                MS. HODGKISS:  I'm marking as Mitchell Exhibit 4
 7        a one-page document, Bates stamp number B000572, a
 8        memorandum to all Supervisors of Elections from
 9        Michael T. Cochran.
10                MR. RESTREPO:  What's the date on it?
11                MS. HODGKISS:  Dated August 20, 1998.
12                THE WITNESS:  It's a memo from Mike Cochran to
13        the supervisors.
14     BY MS. HODGKISS:
15        Q    The first paragraph of this letter, could you --
16     what is your understanding of what that paragraph means?
17        A    Well, I think I understand what it means.  The
18     way it's written, it's probably inartfully drafted.  I
19     think what he's meaning to say is that there are some
20     problems with the felony information that's contained in
21     FDLE's felony conviction database.
22        Q    At the time that memo was written in August of
23     '98, had information from FDLE concerning convicted felons
24     been compared in any fashion to the central voter file?
25        A    I believe so, by the PASS vendor.  These
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1      references to the central voter file probably should be

 2      references to the FDLE conviction database.

 3          Q    You said that PASS compared the two files.  Was

 4      any information -- was any information from that comparison

 5      used to make any changes whatsoever to the central voter

 6      file?

 7          A    Not by the Division of Elections, no.

 8          Q    To your knowledge, by anyone else?

 9          A    If it was done by anyone, it would have been by

10      the Supervisors of Elections.

11          Q    Now, the second paragraph starts off, "As we said

12      in our prior communications, the CVF is not a 100 percent

13      accurate list."

14               Are you saying that your understanding was that

15      it's the FDLE that was not a 100 percent accurate list?

16          A    Correct.

17               MS. HODGKISS:  I would like to mark this document

18          as Exhibit 5.

19               (Whereupon, Exhibit No. 5 was marked for

20      identification.)

21               MR. SPECTOR:  It bears Bates number B000573 and

22          B000374.

23               (Brief recess.)

24               MS. HODGKISS:  We're back on the record.

25      / / / / /
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1    BY MS. HODGKISS:

 2         Q    Mr. Mitchell, have you had a chance to review

 3    what has been marked as Mitchell Exhibit 5?

 4         A    Yes.  It's a memo from Ethel Baxter to the

 5    Supervisors of Elections, I suppose just for clarification.

 6    Ethel was probably referring to the central voter file just

 7    kind of in a general way when she sends out these reports.

 8         Q    So then what's your understanding of the sentence

 9    in the third paragraph of the letter or memo where it says,

10    "I would reiterate that the CVF cannot be a 100 percent

11    accurate list"?

12         A    My understanding is what Ethel meant was that

13    the information that we were sending back to the

14    supervisors, the felony information, the death information

15    may not be 100 percent accurate.  It was only as good as

16    what we received from those agencies.

17         Q    And what's your understanding of whose

18    responsibility it was to verify whether the information was

19    accurate or not?

20              MR. SPECTOR:  Object to the form.

21    BY MS. HODGKISS:

22         Q    You can answer.

23         A    The statute required the Supervisors to verify

24    the accuracy.

25         Q    I can ask you a few questions while I'm waiting
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1       on the rest of the documents.

2               I asked you earlier whether you reviewed anything

3       to prepare for the deposition, but I don't believe I asked

4       you, other than counsel, did you talk with anyone in

5       preparation for this deposition?

6       A       I spoke to Janet Modrow and asked her how long

7       her deposition was, yes.

8               MS. HODGKISS:  Can I have this marked as Exhibit

9       6?

10              (Whereupon, Exhibit No. 6 was marked for

11      identification.)

12      BY MS. HODGKISS:

13      Q       Do you recognize what has been marked as Mitchell

14      Exhibit No. 6?

15      A       Yes.  It's a letter to me, I think from Marlene

16      Thorogood.

17      Q       And do you recall receiving this letter?

18      A       Vaguely, sure.

19      Q       And is the third page the enclosure that's

20      referred to in the letter?

21      A       I don't know, it may be.

22      Q       Well, perhaps I can point you to --

23      A       It looks like it is.

24      Q       I can point you to a specific point in the

25      letter.  If you read the first sentence of the paragraph on

1  the second page that says, "In the response to the concern"?

2    A  Okay.  This looks like the correct attachments.

3    Q  Now, in this letter Marlene Thorogood states,

4  "The results provided to us by our statistician are as

5  follows," and then in quotations, "the true value of the

6  proportion of database errors is less than 0.4 percent at a

7  99.9 percent confidence level."

8    Did you have any other source of information

9  about how accurate DBT's methodology was at the time this

10  letter was written in March of '99?

11    MR. SPECTOR:  Object to the form.

12 BY MS. HODGKISS:

13    Q  You can answer.

14    A  Any other source of accuracy, is that what you're

15  asking?

16    Q  Yes.

17    A  No, not at the time.

18    Q  Was the Division in March of 1999 receiving, to

19  your knowledge, any complaints from supervisors or voters

20  or members of the public concerning problems with them

21  being identified as felons when they contended, in fact,

22  they were not felons?

23    A  No.

24    MR. SPECTOR:  Object to the form.

25  / / / / /

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1    BY MS. HODGKISS:

 2         Q    At any point during the time that you were

 3    responsible for managing the contracts for the central

 4    voter file, did you have any information from any source

 5    that the central voter file and not simply the data being

 6    provided was not accurate?

 7              MR. RESTREPO:  Object to the form.

 8              MR. SPECTOR:  Object to the form.

 9              MS. HODGKISS:  I agree, that was confusing.

10              THE WITNESS:  I don't think I was ever aware of

11         any problems with the central voter file with the

12         voter registration information.  I wasn't aware of

13         any.

14    BY MS. HODGKISS:

15         Q    Were you aware of any problems with the data that

16    was being provided from other sources?

17         A    Yes.

18         Q    And what were those problems?

19         A    FDLE's records are only as good, my

20    understanding, as the records that are provided to them by

21    the court clerks in each county.  I think there were some

22    problems with FDLE's conviction database.  There may have

23    been some data entry errors with the Office of Vital

24    Statistics' death records from time to time.  There may

25    have been some data entry errors with the Clemency
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1   records.  So nothing specifically, but we were learning

2   that there were problems with some of these databases.

3        Q    And did you do anything in response to that

4   information?

5        A    Yes.

6        Q    What did you do?

7        A    Well, we did what we could to correct the problem

8   with those databases, or at least alert the custodians of

9   those databases that there may be problems with them.  We

10  had no control over those databases, but we did alert

11  Clemency, Vital Statistics, FDLE about the problems that we

12  were finding.

13        MS. HODGKISS:  I would like to have this two-page

14        document marked as Exhibit 7.  This is Bates stamp

15        number B005136A and B005137A.

16        (Whereupon, Exhibit No. 7 was marked for

17  identification.)

18  BY MS. HODGKISS:

19        Q    Have you had a chance to review what has been

20  marked as Mitchell Exhibit No. 7?

21        A    Yes.

22        Q    And do you know what that document is?

23        A    It was a memo that Ethel Baxter sent out to the

24  supervisors.

25        Q    And do you have any knowledge of the information

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    that she provides, looks like the third sentence of the

2    first paragraph, where she says, "DBT informed us this

3    morning that in fact over 60,000 records in the DOC file

4    were incorrectly marked as felony convictions"?

5              MR. SPECTOR:  What was your question?

6              MS. HODGKISS:  Does he have many knowledge of

7         that.

8              MR. SPECTOR:  Of that sentence?

9              MS. HODGKISS:  Of what it's referring to.

10             THE WITNESS:  It's referring to the letter

11        attached.  I mean, I don't have any additional

12        knowledge other than what's contained in the letter

13        from DBT.

14   BY MS. HODGKISS:

15        Q    And what's your understanding about what was done

16   after that information came to light?

17             MR. SPECTOR:  Object to the form.

18             THE WITNESS:  DBT ran the reports and they were

19        resubmitted to the Supervisors within a week, I

20        believe.  Our deadline was June 1st to get that report

21        out, and this memo is dated June 4th, so three days

22        later DBT caught the problem.

23             MS. HODGKISS:  Could I have a two-page document

24        -- it's often difficult to know where one document

25        begins and the next one ends, but I will just mark

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1              these two pages, Bates stamp A027716 and A027717.
 2                   (Whereupon Exhibit No. 8 was marked for
 3         identification.)
 4         BY MS. HODGKISS:
 5              Q    Have you had a chance to look at this?
 6              A    Yes.
 7              Q    Can you identify what that has been marked as
 8         Mitchell Exhibit No. 8?
 9              A    It's a memo from me to the Supervisors dated
10         October 6th.  I think it just thanks the Supervisors for
11         attending a training.  It looks like during our training
12         sessions we encountered the wrong code of county
13         convictions that was listed on some of the reports, and
14         this is just notifying the Supervisors that that was going
15         to be corrected.
16                   (Whereupon, Ms. Kearney joined the deposition.)
17                   MS. KEARNEY:  I'm Debbie Kearney, and I'm the
18         General Counsel for the Florida Department of State.
19                   MS. HODGKISS:  Did those of you on the phone
20              catch that?  We have one more person join us in person
21              here, Debbie Kearney, who is General Counsel for the
22              Department of State.
23         BY MS. HODGKISS:
24              Q    So going back to what has been marked as Exhibit
25         No. 8.  I'm going to refer you to the paragraph, the third
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1      full paragraph on that exhibit.  My question is, I want to
2      understand, you wrote this memo, correct?
3          A    Yes.
4          Q    In the third paragraph you say, "It appears that
5      64 of the 39,861 felon matches are no longer identified as
6      felon convictions by FDLE."
7               How did you get that information?
8          A    I suppose from FDLE.
9          Q    In the second paragraph on the page you say,
10     "Before the next CVF reports are run, DOE," which I assume
11     is the Division of Elections, "will meet with Database
12     Technologies to further refine the matching process."
13              Were you involved in those meetings that you're
14     referring to in this sentence?
15         A    I don't know.
16              MR. SPECTOR:  Object to the form.
17              MR. RESTREPO:  Object to the form.
18     BY MS. HODGKISS:
19         Q    Do you recall who at DOE was working on this
20     project, all of the people who were working on the project?
21              MR. SPECTOR:  Object to the form.
22     BY MS. HODGKISS:
23         Q    Do you recall the people at DOE who were working
24     on this form?
25              MR. SPECTOR:  Object to the form.  At what time,

1          referring to which project?  Just CVF in general

2          versus a specific reference in the memo?

3              MS. HODGKISS:  I'm asking my question based on

4          the specifics in the first sentence, and the time

5          period is October 6, 1999, as indicated on the memo.

6              THE WITNESS:  Probably Janet Modrow.

7      BY MS. HODGKISS:

8          Q   In October 6 of 1999, did you have any knowledge

9      of how the matching process was being carried out?

10         A   I generally, but the actual matching process was

11     left up to Janet working with DBT.

12         Q   And what was your general knowledge of how that

13     happened?

14         A   Well, I mean, it was done with a series of

15     criteria, name, date of birth, Social, if that was

16     available, Social Security number, gender, address.

17         Q   Did you have any discussions at any point during

18     the time that you had responsibility for managing, contract

19     management for the central voter file, did you have any

20     conversations or written exchanges with Database

21     Technologies concerning the matching process?

22             MR. RESTREPO:  Object to the form.

23     BY MS. HODGKISS:

24         Q   You can answer if you understand the question.

25         A   I'm sure I did, yes.


FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1          Q     Did you have any conversations or written

2    correspondence with Database Technologies specifically or

3    any period of time specifically concerning what parameters

4    DBT was using to determine whether records matched?

5                MR. SPECTOR:  Object to the form.

6                MR. RESTREPO:  Object to the form.

7                MS. HODGKISS:  I'm sorry, what's the basis for

8          the objection?

9                MR. SPECTOR:  Lack of predicate; the word

10         "parameters" which has not been defined for the

11         witness.

12               MR. RESTREPO:  And communication with an

13         entity.

14   BY MS. HODGKISS:

15         Q     Who at DBT did you have communication with over

16   the course of the time that you worked on this project?

17         A     Primarily Marlene Thorogood.

18         Q     Did you have any conversations with Marlene

19   Thorogood during the time that you managed this project

20   concerning how one record was determined to be a match with

21   another record?

22         A     I think all the matches were considered to be

23   potential matches.  I didn't give her any guidance as to

24   what was considered a match.  I'm not sure I understand

25   what you're asking.

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1          We had names in these various databases matched

2      to names that were in our central voter file, and in that

3      sense they were matches, name, address, Social Security

4      number if that was available.

5          Q    In order for a name to show up on a list, two

6      names to show up as a match, did all of the factors that

7      you just listed, name, address, Social Security number,

8      date of birth, did all of those factors have to be

9      identical in order for those two names to show up as a

10     match?

11              MR. SPECTOR:  Object to the form.

12              MR. RESTREPO:  Joining in the objection.

13     BY MS. HODGKISS:

14         Q    You can answer.

15         A    No.

16         Q    Do you have knowledge of what of those elements

17     needed to match in order for two names to show up on the

18     match?

19              MR. SPECTOR:  Object to the form.

20              MS. HODGKISS:  What's the basis of the objection?

21              MR. SPECTOR:  We haven't identified what the list

22     is.  I think it assumes -- it's a lack of foundation

23     for whatever list you're referring to.

24     BY MS. HODGKISS:

25         Q    I have to say at this point I'm trying to get

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    through this deposition and I really find repeated,

2    repeated objections truly is a waste of time, and I'm just

3    letting you know that in case we have to suspend the

4    deposition and go to the courts.

5           MR. SPECTOR:  So noted.

6    BY MS. HODGKISS:

7       Q    Now, your counsel objects because we're not clear

8    what list.

9           Is it not true that when Database Technologies

10   ran the central voter file data against the other sources

11   of data that you have previously discussed that they came

12   up at various points in time with lists of names that

13   matched?

14      A    Correct.

15      Q    That's correct?

16      A    That's what we hired them to do.

17      Q    And what data, what data was DBT matching with

18   the central voter file?

19      A    Name, address, Social Security number.

20      Q    I'm sorry, what was the source of the other data

21   that they were matching with the central voter file?

22      A    The FDLE database, the Clemency database, the

23   Office of Vital Statistics database.  I think they had some

24   information from the Social Security Administration in

25   Washington regarding death information.  I believe they had

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1     some proprietary databases from the Department of

2     Corrections in Florida.  I believe they had felony

3     information from eight states other than Florida, eight,

4     nine, something in that area.

5          Q     In the process -- do you know how many of these

6     lists DBT produced for the Department, Division of

7     Elections, over the course of the contract?

8          A     How many reports?

9          Q     Yes.

10         A     Well, they were required to produce one report

11    for us right before June 1st of 1999, and then another

12    report was produced just prior to April of 2000.  I believe

13    there were a few occasions that you have identified when

14    DBT found errors in felony information with the Department

15    of Corrections where they reran the reports, so I have not

16    counted those, but we'd resubmit a new felony report to the

17    Supervisors if that occurred.

18         Q     So DBT, in carrying out the terms of the

19    contract, produced a list by June 1st of 1999 and April of

20    2000?

21         A     2000.

22         q     And those were the only two lists they produced?

23         A     Those were the only two lists they were required

24    to produce.

25         Q     You have mentioned the list that they produced in

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    order to correct errors that they found.  Did they produce

2    any general lists in addition to -- did they produce the

3    list on June 1st of 1999 and April of 2000?

4         A    Yes.

5         Q    Did they produce any other list, general list?

6         A    No.

7         Q    Now, referring to the two general lists that we

8    have just identified, June 1, 1999, and April 2000, let me

9    start with the June 1, 1999, list.

10            Did you have any discussions with Marlene

11   Thorogood, conversations now, just conversations,

12   concerning how much -- how much of the information on one

13   list had to match information on the central voter file in

14   order to be considered a match?

15            MR. SPECTOR:  I'm going to object to the form.

16   BY MS. HODGKISS:

17        Q    Do you understand the question?

18        A    I think I do.  I don't really recall any specific

19   conversations with Marlene about what it took to be a

20   match.  Janet Modrow would handle most of that.

21        Q    What did you mean when you wrote in this memo

22   that DOE will meet with Data Technologist to further refine

23   the matching process, what were you referring to?

24        A    I think I was trying to reassure the

25   Supervisors.  I certainly was going to get Janet to meet

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

 1    with DBT and discuss any problems they could address.  But

 2    again, once the contract was issued, my role changed to a

 3    certain degree.  I didn't have a whole lot to do with the

 4    day-to-day process, at least to the extent that Janet did.

 5         Q    When you were referring to refining the matching

 6    process, what did you mean by refine?

 7         A    I don't specifically recall.  I think we were

 8    trying to make the reports easier for the Supervisors to

 9    read.  What was the date of that memo again?

10         Q    October 6, 1999.

11         A    Right.  In that context, we just conducted five

12    or six training programs.  So we were trying to get

13    feedback from the Supervisors as to what would make these

14    list easier for them to read and to use.

15         Q    The next sentence says, "This process will become

16    easier, the matches even more reliable and the reports

17    shorter."

18              In the first sentence where you say that they

19    will be needing to further refine the matching process, was

20    making the matches even more reliable part of the way in

21    which the matching process would be refined?

22         A    Probably so.

23         Q    I have another document that was apparently not

24    copied.

25              Maybe I can ask a question that's copied.  Here

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    is one that's copied and short.

2              (Whereupon, Exhibit No. 9 was marked for

3    identification.)

4    BY MS. HODGKISS:

5         Q    I have marked a document that's Bates-stamped

6    B004931, and it's just one page.

7              Have you had a chance to review Mitchell Exhibit

8    No. 9?

9         A    Yes.

10        Q    Can you tell me what it is?

11        A    I think it was a short memo again to the

12   Supervisors telling them about a product that DBT was

13   offering called AutoTrack, that would allow them to

14   complete their verification process.

15        Q    Can you describe to me what the AutoTrack product

16   was?

17        A    It was a -- I will do my best.  It was kind of a

18   nationwide database that they had put together from UCC

19   filings, Department of Motor Vehicles license applications,

20   things like that, that would allow the Supervisors to go in

21   and try to verify that an individual was who they thought

22   they were.

23             It showed previous addresses.  Oftentimes it

24   showed Social Security numbers, things that made it easier

25   for the Supervisors to do their job.

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1          Q      Can you describe for me in a little more detail

2    how AutoTrack allowed Supervisors to determine that someone

3    was who they said they were?

4          A      Let me see I can do that with using an example.

5                 Maybe with a duplicate registration, where you

6    may have someone that was registered in Orange County who

7    then moved to Hillsborough County, if a Supervisor was

8    concerned that the person that had moved to Orange County

9    was a different person, they could go into AutoTrack and

10   pull this person's name up and verify whether that person

11   did indeed live at one time in Orange County.  That would

12   be one way they could use it.

13         Q      Do you have any knowledge of whether or not the

14   Supervisors, in fact, used that system?

15         A      I think a handful of them did.

16         Q      Now, was Clemency information put into the

17   AutoTrack system?  That's to say, was information

18   concerning residents of Florida who had been convicted in

19   Florida and then received clemency, were the records of

20   those individuals put into the AutoTrack system?

21         A      I think it was made available on line by DBT.  It

22   was not actually part of AutoTrack, but I think it was an

23   online database that the Supervisors could use.

24         Q      Again, do you have any knowledge of whether or

25   not the Clemency data that was online was ever used by any

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    Supervisors?

2         A    No firsthand knowledge.  I assume they used it.

3         Q    I want to ask you now about the -- previously

4    when you were identifying what databases were used by DBT

5    to match with the central voter file, you indicated that

6    there were databases found in approximately eight or nine

7    states.  Can you tell me what was in those databases?

8         A    I assume it was felony convictions from those

9    states, that's what was presented to us.

10        Q    At any point in time did you become aware of

11   difficulties with how that information was being used, the

12   out-of-state felony conviction information?

13             MR. SPECTOR:  I object to the form.  Would you

14        restate the question?

15   BY MS. HODGKISS:

16        Q    At any point in time did you become aware that

17   there were problems with using the out-of-state felony

18   conviction data?

19             MR. SPECTOR:  I object to the form.

20             MR. RESTREPO:  As well.

21             THE WITNESS:  One of the problems was that the

22        Supervisors had a more difficult time verifying the

23        accuracy of that data than they would with a Florida

24        conviction.  I know there were some concerns about how

25        clemency was treated in the other states, and I think

1          that's probably borne out in the documents.

2                At one point with the Clemency Office here, they

3          would not recognize out-of-state clemency.  Sometime

4          in '99 I believe they started recognizing clemency

5          from other states with a valid court document or

6          something from a Clemency Board in another state, but

7          those are the only problems I'm aware of.

8     BY MS. HODGKISS:

9          Q    I just want to show you a document, I'm not going

10    to mark it as an exhibit unless you're familiar with it.

11                MS. HODGKISS:  For those of you on the phone, I

12          will just identify the Bates number.  This is B00352

13          and B00353, which in our collection of documents was

14          apparently stapled to B00351.

15    BY MS. HODGKISS:

16         Q    What I want to know is whether the handwriting

17    on the top of page 00352, whether you recognize that

18    handwriting.

19         A    Yes, it's mine.

20                MS. HODGKISS:  I would like to mark it as 10.

21                (Whereupon, Exhibit No. 10 was marked for

22          identification.)

23    BY MS. HODGKISS:

24         Q    So I'm marking pages B000352 and 353.

25         A    Okay.

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
1        Q     Can you identify that document?

2        A     It looks like a verification procedure that was

3  established by the Division of Elections for, primarily,

4  felony convictions and mental incapacity.

5        Q     And do you know when that process was used?

6              MR. SPECTOR:  Object to the form.

7  BY MS. HODGKISS:

8        Q     Do you know when the process identified in

9  Mitchell Exhibit No. 10 was used?

10       A     Probably 1998.

11       Q     Do you know if it was used after 1998?

12       A     I doubt it.

13       Q     Thank you.

14             MS. HODGKISS:  I'm asking that document Bates

15             stamp numbers B004400 through B004409 be marked as

16             Exhibit 11.

17             (Whereupon, Exhibit No. 11 was marked for

18       identification.)

19  BY MS. HODGKISS:

20       Q     Have you had a chance to review the document that

21  has been marked Mitchell Exhibit No. 11?

22       A     Yes.

23       Q     Can you tell me what that document is?

24       A     It looks like a letter to Bill Cowles, the

25  Orange County Supervisor, alerting him to the new clemency
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    procedure after a case called Schlenther.

2         Q    And did you write that letter?

3         A    I did.

4         Q    And the second paragraph of that letter, which is

5    dated July 5, 2000, does that accurately represent your

6    understanding at the time of the impact of that decision?

7         A    I don't know if it represents the impact of that

8    decision, but it represents the Office of Executive

9    Clemency's position after that decision and how they would

10   handle restoration of civil rights in Florida.

11        Q    Thank you.

12             MS. HODGKISS:  Can you mark as Mitchell Exhibit

13   No. 12 this two-page document that's Bates stamped

14   B004434 and B004435?

15             (Whereupon, Exhibit No. 12 was marked for

16   identification.)

17   BY MS. HODGKISS:

18        Q    Do you recognize it?

19        A    Yes, I recognize it.

20        Q    Can you tell us what that document is?

21        A    It's just an instruction to the Supervisors that

22   DBT wanted any out-of-state felony conviction verifications

23   conducted through its office.

24        Q    And did you write that memo?

25        A    Yes.


FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1      Q    And as of the date of that memo, which is July

2    11, 2000, is there anything in there that you now believe

3    is inaccurate?

4      A    No.

5           MS. HODGKISS:  I'm asking that three documents

6           consecutively numbered B000964 through B000966 be

7           marked as Mitchell Exhibit 13.

8           (Whereupon, Exhibit No. 13 was marked for

9    identification.)

10          THE WITNESS:  I recognize it.  It's a letter from

11          me to Janet Keels.

12   BY MS. HODGKISS:

13     Q    My question is whether those three letters in

14   Mitchell Exhibit 13 document correspondence that you had

15   concerning how the Office of Clemency was handling out-

16   of-state convictions.

17     A    Yes.

18     Q    Thank you.

19          I want to go back to something I asked you about

20   earlier.  I may have found the document we're looking for.

21          MS. HODGKISS:  If we can have marked B000370

22          through B000375 as Exhibit 14?

23          (Whereupon, Exhibit No. 14 was marked for

24   identification.)

25   / / / / /


FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1    BY MS. HODGKISS:
 2         Q    Have you had a chance to review Mitchell Exhibit
 3    No. 14?
 4         A    Yes.
 5         Q    Do you know what it is?
 6         A    It looks like data processing specifications.
 7    From what period of time, I don't know.
 8         Q    Can you determine from that document whether it
 9    refers to the contract with PASS or the contract that you
10    ultimately signed with DBT?
11         A    I think it's probably with PASS.
12              MS. HODGKISS:  I'm asking that a document be
13         marked.  This document is not Bates-stamp-numbered.
14         It's a document of 42 pages, and I will ask that it be
15         marked as Exhibit 15.
16              (Whereupon, Exhibit No. 15 was marked for
17         identification.)
18    BY MS. HODGKISS:
19         Q    Do you recognize what has been marked as Mitchell
20    Exhibit No. 15?
21         A    No.
22         Q    Have you ever seen that document before today?
23         A    I don't remember it, no.
24         Q    Thank you.
25              Do the words "false positive" have a meaning in
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1    relationship to the work that you did as contract manager
 2    for the central voter file?
 3         A    I think it was a term Janet used to use.  It may
 4    have been the term that was, returned back to us, it was a
 5    match that was returned back to us by DBT that the
 6    Supervisor would then determine was not an accurate match.
 7         Q    Did you have any conversations with Marlene
 8    Thorogood concerning the number of false positives, as you
 9    have defined it, that were occurring in the list that we
10    have previously identified as being provided by Database
11    technologies?
12              MR. SPECTOR:  I just object to the form.
13              THE WITNESS:  Not specifically.  I mean, we had
14         conversations about accurate hits all the time, yes.
15    BY MS. HODGKISS:
16         Q    And what was the nature of those conversations
17    about accurate hits?
18         A    Well, we were dealing with different databases
19    that input their information all in different formats, so
20    we were trying to identify as many accurate hits as we
21    could.  I don't know how else to answer it.
22         Q    And what was your understanding about any factors
23    that impacted the number of accurate -- did you know of any
24    factors that impacted the number of accurate hits that you
25    got?
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1      A     Data entry errors for the various databases is

2    one factor, and the incompatibility of the databases to

3    each other.

4      Q     How would the database, how would the entry

5    errors affect the number of accurate hits that you would

6    get?

7      A     Well, I guess if you have got, for example, with

8    the Social Security match, if one digit is off because

9    someone that's entering voter registration information

10   enters a 2 instead of a 1, you won't have a match.

11     Q     In that circumstance, do you have what's called a

12   false positive as you defined false positive?

13     A     Not necessarily, no.  You wouldn't find a match

14   there or a Social Security match because the numbers don't

15   match up.

16     Q     Was your primary concern in talking about

17   accurate hits that you might not discover matches that are,

18   in fact, matches?

19         MR. SPECTOR:  Let me object to the extent that

20         you're asking for his mental impressions as an

21         assistant general counsel with the Division of

22         Elections.  That would constitute his work product.

23         MS. HODGKISS:  No, he testified that he had

24         discussions with Marlene Thorogood.

25         MR. SPECTOR:  If you're asking about the

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    discussions, that's fine, but if you're asking what

2    his intentions were in his head --

3    BY MS. HODGKISS:

4         Q    I'm asking, in the course of those discussions

5    when you were talking with Marlene Thorogood, was your

6    concern with, how did you describe it, accurate hits, was

7    that concern based on the problem that you just described

8    where someone -- where data entry errors result in a Social

9    Security number being one number off and a match not being

10   reported that is, in fact, a match?

11        MR. SPECTOR:  I'm going to object to the form.

12   BY MS. HODGKISS:

13        Q    You can answer it.

14        A    I think we did our best to identify as many

15   possible legitimate matches as we could.  There again,

16   FDLE's felony database may have had the name, for example,

17   Thomas Mitchell, the Leon County Supervisor may have listed

18   the individual as Tom Mitchell.  That's what we were

19   dealing with.

20             So we were trying to find those kinds of people

21   that may have used aliases when they were arrested.  When

22   they filled out a voter registration card they may have

23   used a different name or a slightly different name.  They

24   may have since gotten married and used a hyphenated name,

25   the last portion of their married name and their new

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    married name attached to the hyphen.  We were trying to

2    identify those people as best as we could.

3         Q    In all of the examples that you just gave, what

4    would occur with the composition of the central voter file

5    -- I'm sorry, the list that DBT produced, what would occur

6    in those circumstances?

7              MR. SPECTOR:  Object to the form.

8              MR. RESTREPO:  Object to the form.

9              THE WITNESS:  I don't know what you're asking.

10   BY MS. HODGKISS:

11        Q    You just went through a series of things that

12   could happen.  A person could use their married name in one

13   context, a married name when they register and a maiden

14   when they commit a crime.  A person could be using an alias

15   when they're arrested and their real name when they

16   register to vote.  People could change their name through a

17   legal process and be registered in one county under the

18   name they had then and in the new county a name that they

19   had after they legally changed their name.  You described

20   circumstances like those, different names, married names

21   and aliases.

22             My question is, how do those circumstances,

23   someone in that situation, how does that affect the list

24   that DBT provided?

25             MR. SPECTOR:  Object to the form.


FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    BY MS. HODGKISS:

2        Q    You can answer if you understand the question.

3        A    I don't know if I understand.

4        Q    It's really not complicated.  I'm only trying to

5    lay out and clarify each step of the process.  So let me

6    ask again.

7             You identified those problems that might occur.

8    What's the result of those problems?

9             MR. SPECTOR:  Object to the form.

10            THE WITNESS:  Well, Janet was working with

11            Marlene to identify people that may match if they had

12            a slight name verification or a slight Social

13            variation or a misspelled street address.  We worked

14            with DBT to do that.

15   BY MS. HODGKISS:

16       Q    If they had a name variation, what would happen?

17   Would there be a match or would there not be a match?

18            MR. SPECTOR:  Object to the form.

19            THE WITNESS:  Generally for there to be a match,

20            if my memory serves me correctly, they had to match on

21            at least two criteria.

22   BY MS. HODGKISS:

23       Q    If someone used an alias in the felon database

24   and their own name in the central voter file, would DBT

25   have identified that as a match?

```
 1        A    Potentially, yes.

 2        Q    And how would they do that?

 3        A    Perhaps with the date of birth and a Social

 4   Security number, perhaps an address.  Any of the other

 5   criteria may have matched up.

 6        Q    When you said that you -- earlier you testified

 7   that you were attempting to find ways of matching aliases.

 8   How did do you that?

 9             MR. SPECTOR:  Object to the form.

10   BY MS. HODGKISS:

11        Q    Matching aliases to a person's real name, whether

12   the alias was in the central voter file or the alias was in

13   the FDLE data or the alias was in data from a different

14   state, you said you were trying to find how to match when

15   people use aliases.

16             MR. SPECTOR:  I object to that form.  I don't

17        recall that testimony.  If you as a witness recall

18        that testimony, you can answer her question.  I don't

19        recall that to be the testimony.

20             I think it mischaracterizes what he testified to,

21        so I'm going to object to the form.

22   BY MS. HODGKISS:

23        Q    Do you understand what I'm talking about?

24        A    I don't remember how we tried to identify people

25   that may have used aliases when they were arrested.  Most
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    of the examples that I remember getting questioned from the

2    Supervisors were about a slight variation on someone's name

3    or an individual using his brother's name.  Those are the

4    kinds of examples that the Supervisors would call us about,

5    but I don't know what process was used to identify those

6    people.

7         Q    Going back to the question of false positives,

8    I'm not trying to misstate how you defined it, so let me

9    ask you to define again for us again "false positive."

10        A    A potential match that turned out not to be a

11   match.

12        Q    Did you have any discussions with Marlene

13   Thorogood concerning false positives?

14        A    I think earlier I said I had conversations with

15   her, yes.

16        Q    And what was discussed concerning false

17   positives?

18        A    Well, certainly we talked about the possibility

19   of there being false positives, but we also talked about

20   the possibility of identifying more legitimate valid hits,

21   matches.  We talked about both of those.

22        Q    In discussing the possibility, in your

23   discussions with Marlene Thorogood in discussing the

24   possibility of false positives, did she provide any

25   information about how those might be avoided?

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1          A     Might be avoided?

2          Q     Yes.

3          A     Sure.  You could make the matching criteria so

4     specific that you wouldn't pick up anything, to use an

5     extreme example, yes.  You could make the criteria very,

6     very, very restrictive.

7          Q     Did Marlene Thorogood -- did you have discussions

8     about false positives with anybody else from Database

9     Technologies?

10         A     Not that I can recall.  It might have been George

11    Bruder, but it would have been George Bruder or Marlene.

12         Q     In any of the discussions that you had with

13    Marlene Thorogood, did she make any recommendations about

14    the matching criteria that should be used by DBT?

15         A     Probably, yes.  She probably would have made

16    those to Janet Modrow.

17         Q     Do you have any knowledge of what those

18    recommendations were?

19         A     I don't recall.  I mean, I know she made some.

20    She and Janet spoke frequently.

21         Q     Do you recall whether the Division of Elections

22    -- let me start with you.

23               Do you recall whether you made, whether you gave

24    Marlene Thorogood any directions about what -- how the

25    matching should occur, what matching criteria should be

1      used?

2          A      Marlene and Janet probably talked about some

3      matching procedures, and the way it usually worked is Janet

4      would bounce ideas off of me and I would typically defer to

5      Janet, whatever Janet thought was the most comprehensive

6      way to handle this and the most accurate way.  I usually

7      just signed off on whatever Janet recommended if she and

8      Marlene had discussed it.

9          Q      And when you say the most comprehensive way, what

10     do you mean by that?

11         A      Identifying people who may have used aliases when

12     there was a slight name variation, that kind of thing.

13         Q      When you say the most accurate way, what are you

14     referring to?

15         A      Identifying people that truly were matched with

16     the central voter file.

17         Q      Do you recall what recommendations Janet Modrow

18     made that you signed off on?

19         A      Not specifically.

20         MR. SPECTOR:  To the extent you're asking for

21     specific communication between him and Janet Modrow,

22     an employee of the Division of Elections, in his role

23     as counsel, I will object and instruct him not to

24     answer.

25     / / / / /

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1    BY MS. HODGKISS:

 2        Q    I'm not asking you to tell me anything about your

 3    legal advice to Janet Modrow or any conversations that you

 4    had with her relating to the legality.  My question is

 5    whether -- you testified that she would bounce ideas off of

 6    you and that you would generally, in the course of that

 7    testimony, I'm only asking do you recall now any specifics

 8    about the ideas that Marlene Thorogood -- I'm sorry, Janet

 9    Modrow was bringing to you.

10        A    I don't specifically, no.

11            MS. HODGKISS:  Could we take a break at this

12        point?

13            MR. SPECTOR:  Sure.

14            (Brief recess.)

15    BY MS. HODGKISS:

16        Q    Mr. Mitchell, I want to go back to the

17    conversations that you had with Marlene Thorogood, and my

18    question is whether at any point in time she suggested

19    using address histories and financial records as additional

20    information to help confirm the match of names on the

21    central voter file to the other databases.

22        A    I don't recall her discussing that with me as a

23    matching criteria.  That formation may have been available

24    to the Supervisors under their AutoTrack system, but I

25    don't recall that being a criteria.
```

 1        Q    Do you recall any discussions -- what's the basis
 2   for your thought that that may have been available to the
 3   Supervisors?
 4        A    I think that was the kind of information that was
 5   available on AutoTrack.
 6        Q    Is there a document that details what information
 7   was available on the AutoTrack, to your knowledge?
 8        A    There was, I think, a flyer or something that was
 9   provided to the Supervisors, a one- or two-page flyer that
10   was provided to them with a phone number that they could
11   call for training, but I don't have anything.
12        Q    Now, you left in November of 2000.  Was that
13   before or after the election?
14        A    Two days after.
15        Q    At the time you left, had DBT performed all of
16   its obligations under the contract?
17             MR. SPECTOR:  I object to the form.
18             MR. RESTREPO:  Object to the form.
19             THE WITNESS:  They had provided a report prior to
20        April, 2000, and any follow-up that was necessary, to
21        my knowledge, yes.
22             MS. HODGKISS:  I have no further questions.
23             MR. SPECTOR:  I have no questions.
24             Gentlemen?  Anybody on the phone have any
25        questions?

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1          MR. ARPEN:  No questions.

2          MS. TORRES:  No questions.

3          MS. FINEMAN:  Cara Fineman has no questions.

4          MR. SPECTOR:  We will read.

5          MS. HODGKISS:  I think that means I'm done.  I

6    guess we will say goodbye until tomorrow morning.

7          (Whereupon, the deposition was concluded at 4:00

8    p.m., and reading and signing by the witness was not

9    waived.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1                    C E R T I F I C A T E

 2    STATE OF FLORIDA    )

 3    COUNTY OF LEON      )

 4              I, CLARA C. ROTRUCK, Court Reporter and Notary

 5    Public at Tallahassee, Florida, hereby certify that the

 6    witness in the foregoing transcript was first duly sworn,

 7    having identified himself to me;

 8              That the foregoing transcript was taken down as

 9    stated in the caption, and the questions and answers

10    thereto were reduced to typewriting under my direction;

11              That the foregoing pages 5 through 63 represent a

12    true, correct, and complete transcript of the evidence

13    given upon said hearing;

14              And I further certify that I am not of kin or

15    counsel to the parties in the case; am not in the regular

16    employ of counsel for any of said parties; nor am I in

17    anywise interested in the result of said case.

18              Dated this _____ day of _____, 2002.

19

20

21                         _____

22                         CLARA C. ROTRUCK

23                         Court Reporter and Notary Public

24                         State of Florida at Large

25
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

# PLAINTIFFS' EXHIBIT 22

1

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF FLORIDA

3

4              CASE NO. 01-120-CIV-GOLD/SIMONTON

5

6

7     NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF

8     COLORED PEOPLE, INC., by its FLORIDA STATE

9     CONFERENCE OF BRANCHES, et al.,

10              Plaintiffs,

11     vs.

12     KATHERINE HARRIS, Secretary of State of Florida;

13     et al.,

14              Defendants.

15     _____/

16

17

18                   DEPOSITION OF JANET MODROW

19          Taken in the above-styled cause, pursuant to
notice,

20     at the offices of Steel, Hector & Davis, 215 South
Monroe

21     Street, Suite 601, Tallahassee, Florida, on October 22,

22     2001, commencing at 2:35 p.m.

23                   Reported by:

24                   MARLO D. FARNSWORTH

25                   CERTIFIED SHORTHAND REPORTER

4      Examination by Ms. Torres                    80

5      Further Examination by Ms. Ciccolo           88

6

7

8

9

10

11                    INDEX TO EXHIBITS

12     NO.                                        PAGE

13     1                                            59

14     2, 3 and 4                                   65

15     5                                            72

16

17

18

19

20

21

22

23

24

25

8

1                    D E P O S I T I O N

2      Whereupon,

3                         JANET MODROW

4      was called as a witness, having been first duly sworn to

```
 5    speak the truth, the whole truth, and nothing but the

 6    truth, was examined and testified as follows:

 7                         EXAMINATION

 8    BY MS. CICCOLO:

 9         Q    Hi.  Will you please state your complete name
for

10    the record?

11         A    Janet Lynn Modrow.

12         Q    And, Ms. Modrow, what is your business
address?

13         A    We just moved to a new building.  I think it's

14    411 Bloxham Street.

15         Q    Spell that for me.

16         A    No, actually, we're on Monroe, I'm sorry.
It's

17    411 Monroe.

18         Q    And that's in Tallahassee?

19         A    Tallahassee, Florida, 32399.

20         Q    Ms. Modrow, have you ever given a deposition

21    before?

22         A    No.

23         Q    Okay.  Have you had time to meet with someone
to

24    understand what a deposition is and what the rules are
and

25    how we're going to proceed today?

 9


 1         A    Yes.

 2         Q    Okay.  I'm going to be asking you some
questions

 3    about your work and some other issues that have arisen
```

in

2       the records?

3           A    Not that I know of.

4           Q    Are you aware of any other fields used by DBT
to

5       compare records for matching purposes other than the
ones

6       you have described?

7           A    No.

8           Q    We've talked about running matches and
comparing

9       records.  Can you tell me what's the reason that process

10      was performed?

11          A    Well, the -- to find as high of a hit, as

12      accurate of a hit as you could.  So you've got to
compare

13      the fields.  I mean, the purpose of it was to find
voters

14      who were registered duplicately or possibly dead or

15      convicted of a felony without receiving restoration of

16      their voting rights.

17          Q    So some of the fields that you didn't mention,
it

18      seems like you may have mentioned them now, Vital

19      Statistics records, felony records --

20               MR. HARVEY:  Object to the form of the
question.

21      BY MS. CICCOLO:

22          Q    I'm just trying to understand your answer.

23               Those other fields, the Vital Statistics

24      information, is that also information that would have
been

25      used to compare records for matching purposes?

24

```
 1          A    Yes.

 2          Q    Okay.  And you didn't mention that before, so
--

 3          A    I'm saying fields.  You have both fields in
both

 4     files.  You have a name field in your Vital Statistics,
you

 5     have a name field in the voter.  You're comparing those

 6     fields.  Those fields are in both -- in all those sets
of

 7     data.

 8          Q    Okay.  Then could you explain then if there
are

 9     any other fields that you haven't talked about for
matching

10     purposes?

11          A    No.  I mean, those are the only fields that
you

12     have between all the files.  You've got a name, a last

13     name, a first name, a middle name, a date of birth and a

14     Social Security number.

15          Q    Is race ever a file?

16          A    A file?

17          Q    A factor?

18          A    No.

19          Q    Okay.  And I should say field factor.

20               Is gender ever a field factor?

21          A    I know that it was discussed.  I don't know if
we

22     ended up using it or not, to be honest with you.

23          Q    When you say "we," do you mean the Division of

24     Elections?
```

25          A     Database Technologies.

25

1          Q     Can you describe for me the process or what is

2     done once matches are found in fields of records?

3          A     Basically for the duplicates, if the match is

4     found, it's just put into a table.  For the -- the same

5     thing for the deaths; if a match is found, it's put into

a

6     table, it's flagged what kind of match that was based on

7     fields.  And for felons, once a felon match was found,

that

8     was then run against the Clemency data to see if the

person

9     received Clemency, and if they did they not, that was so

10    noted in the table.

11         Q     Was there any matching done to perhaps

identify

12    other types of unqualified voters, for example, voters

with

13    mental incapacity?

14         A     No, that data was not available.  There was no

15    repository of it.

16         Q     I'm sorry, I'm having trouble --

17         A     That data was not available, there was no

18    repository of it that we could find.

19         Q     In terms of the mental incapacity data, during

20    your time with the Division of Elections, did you ever

have

21    occasion where a Supervisor of Elections might forward

that

22    information to your office?

23        A    I wouldn't know.  Nothing was forwarded to me.

24        Q    Okay.  If something along those lines had been

25   forwarded to the Division of Elections, what person would

26

1    that information have been forwarded to?

2         A    I don't know.  I mean, I don't know who they

3    would address it to.

4         Q    You mentioned the Clemency data.  When did the

5    Division of Elections start reviewing Clemency data with

6    respect to felony matches?

7         A    I'm not sure what you mean.

8         Q    Is that a process that's been in place since

9    you've worked at the Division?

10             MR. HARVEY:  Object to the form of the question.

11             MS. DONNELLY:  I am going to object.  This is

12             outside the issues in the complaint as I see it

13             framed.

14             MS. CICCOLO:  I think it goes to numerosity and

15             technicality, and if you would let me continue --

16             MS. DONNELLY:  All right.

17             THE WITNESS:  Since the felons have been run, the

18             Clemency has been used, as far as I know.  Since I've

19             worked with DBT and they ran the felon matches,

20             Clemency was always used.

21   BY MS. CICCOLO:

22      Q    When did the Division of Elections first begin

23    working with DBT as a contractor?

24      A    I don't know.

25      Q    Do you have an approximate estimate of when

that

27

1    might have occurred?

2      A    No, because I wasn't there.

3      Q    Let me try and see if I understand, then.  You

4    have a central voter file.  There's a matching process

that

5    DBT undergoes to identify ineligible voters?

6      A    Yes.

7      Q    Once that information is gathered by DBT, do

they

8    transmit it to the Division of Elections?

9      A    Yes.

10      Q    Does that come to your office?

11      A    Yes.

12      Q    In what format does it come to your office?

13      A    Electronically.

14      Q    How often do you receive that information?

15      A    They only ran it three times, so three times.

16      Q    When is the first time that information was

run?

17      A    It was based off of -- the first time would

have

18    been based off the March, 1999, data.

19      Q    Okay.  The second time?

20      A    June, '99.

21    Q    And then the third time?

22    A    In January, 2000.

23    Q    With respect to the March, 1999, data, do you

24    have an idea or can you give me an estimate of about how

25    many names were on that list?

28

1          MR. RESTREPO:  Objection to the form of the

2    question.  "That list"?

3          MS. CICCOLO:  Well, we're talking about the

4    March, 1999, data list that the witness described

the

5    Division of Elections received from DBT.

6          THE WITNESS:  I don't know how many hits were

on

7    that one.

8    BY MS. CICCOLO:

9    Q    Would it have been more than a hundred?

10    A    Yes.

11    Q    Would it have been more than a thousand?

12    A    Yes.

13    Q    Would it have been more than 10,000?

14    A    Yes.

15    Q    Would it have been more than 50,000?

16    A    I don't know, because you have your different,

17    you know, duplicates, deaths and felons.  So if you have

18    those combined, I would probably say yes.

19    Q    Is there some document that would give you

that

20    figure?

21      A    No.

22      Q    Did the Division of Elections retain that
list,

23    the March, 1999, list?

24      A    No.

25      Q    What happened to it?


29


1      A    After some problems were found, we recalled
the

2    list.

3      Q    I'm sorry, you said you called the list?

4      A    Recalled it.

5      Q    Recalled it.  But that doesn't tell me what

6    happened to it.  Do you know what happened to that list?

7      A    Yes.

8      Q    Okay.  What happened to it?

9      A    Basically some errors were found on it, so the

10    decision was made to recall it.

11      Q    Who made that decision?

12      A    Probably -- I don't know for sure, but I would

13    imagine Ethel Baxter.  I would imagine Ethel Baxter.
She

14    was the Division director at the time.

15      Q    And when it was recalled, what happened to it?

16      A    You mean by each Supervisor?  I don't know.
What

17    happened to it by who?

18      Q    I don't know if you would know what happened
with

19    each Supervisor, but what happened with it in the
Division

20      of Elections?

21           A      Nothing.  I mean, the data -- we didn't have

22      copies of the reports, we just had the electronic data in

23      the database.

24           Q      What happened to the electronic data in the

25      database?

30

1            A      Over time, it's hard to say.  We switched

2       computers.  We went from a different SQL to another SQL.

3       Between the May and the June one, whole new formats were

4       made, so a whole new database was created.

5            Q      Now, you said there were some problems in that

6       list.  Can you be more specific and tell me what kinds of

7       problems were identified?

8            A      DBT used some proprietary data that they had to

9       run against it that we did not supply them, and some of

10      that data was found to be, I guess, inaccurate.

11           Q      When you say proprietary data, what specifically

12      are you referring to?

13           A      They had Department of Corrections data that they

14      maintained from various states, and the Social Security

15      Administration death file.                        .

16           Q      And how did it come to your attention that there

17      was a problem with that list?

18      A     Some Supervisors had called and asked to have

19   some things checked on, some records checked on.

20      Q     Did those calls come to you?

21      A     Some of them.

22      Q     Okay.  About how many did you receive?

23      A     Gosh, I don't know.  I mean, I probably received

24   two or three, and I took down the information.

25      Q     Do you remember who you received those calls from?

31

1      A     No.

2      Q     Did you make any notes or records of those calls?

3      A     Gosh, I don't know, to be honest with you.

4      Q     Did you receive any reports or written complaints

5   about that March, 1999, list?

6      A     I didn't.

7      Q     Do you have knowledge of anyone else in the

8   Division of Elections receiving complaints about the March,

9   1999, list?

10      A     Not that I know of.

11      Q     Once you became aware and you had gotten some

12   calls about the March, 1999, list, what, if anything, did

13   you do to verify the accuracy of that list?

14      A     Well, basically, with the examples that were

15   given me, I called DBT and asked them to check it out and

16      see what the problem was.

17          Q      And what was the response?

18          A      They said that there was a flag in their field

19      that -- something to the effect that it wasn't getting

20      interpreted correctly, so there were some misdemeanors in

        that were listed as felonies when they should have just

21

22      been misdemeanors.

23          Q      Do you know approximately how many records that

24      particular problem affected?

25          A      No, I don't.

32

1           Q      Do you have any reasonable estimate of that

2       figure?

3               MS. DONNELLY:  I object to the competency of this

4               witness to testify to DBT matters and the

5               interpretation of their data.

6               MR. HARVEY:  Yes.

7       BY MS. CICCOLO:

8           Q      Insofar as you had been alerted that there was a

9       problem at least in terms of what the Supervisors felt with

10      the data, did you make any independent effort to verify any

11      of the information on the DBT list?

12          A      Well, I don't have their data so there's nothing

13      I could have done.  That's why I passed it along to them.

14          MS. DONNELLY:  I'm going to make my objection as

15          to anything involving this particular problem dealing

16          with felons a continuing objection throughout this. I

17          don't believe that this was mentioned in these

18          pleadings.  There's another case that's involving

19          this, it's a suit that's filed here in Leon County and

20          I think that's appropriate to be investigated in that

21          realm as opposed to the case that's filed here in the

22          Southern District of Florida.

23          MS. CICCOLO:  Well, insofar as the dealing with

24          this particular issue may shed some light on how

25          purges were undertaken, how records were reviewed or

33

1          matched, I am going to have some more inquiries in

2          that area and I'll note your continuing objection for

3          the record. .

4     BY MS. CICCOLO:

5          Q    I want to go back to the March, 1999, list, and

6     you indicated that you did receive some complaints from

7     some Supervisors about some of the data in that record.

8          When that record was provided to the Supervisors,

9     was it provided by the Division of Elections or was it

8      Bucky?

9            A      Emmett Mitchell, the attorney.

10           Q      He's the attorney for the State?

11           A      For the Division of Elections.

12           Q      Apart from any meetings, did you have any

13     discussions with anyone in the Division of Elections about

14     the problems that had come to your attention about the

15     list, the 1999 list, March, 1999, list?

16           A      Pretty much any time I got a call, I would inform

17     Bucky.

18           Q      Did you have any discussions with anyone from DBT

19     about the problems?

20           A      Well, I had informed DBT as well.

21           Q      And who did you inform at DBT?

22           A      Marlene Thorogood.

23           Q      And what was her position with DBT?

24           A      I don't know what her position was, but she was

25     project manager for this project.

36

1            Q      So was she the person that you would have had the

2      most contact with?

3            A      Yes.

4            Q      If you had a problem or concern or comment, she

5      would have been the one you would have worked with?

6        A    Yes.

7        Q    After that March, 1999, list went back to DBT,

8    were there any specific problems that DBT brought to your

9    attention that they had identified?

10             MR. HARVEY:  Object to the form of the question.

11             THE WITNESS:  Just the one I had told you about

12        the felons, the misdemeanors being interpreted as

13        felons.

14    BY MS. CICCOLO:

15        Q    Okay.  There was a second list that you mentioned

16    that was a June, 1999, data, correct?

17        A    Yes.

18        Q    And did you also receive that data electronically?

19        A    Yes.

20        Q    Okay.  When you received that data in the

21    Division of Elections, what, if anything, did you do with

22    the data?

23        A    When I get the data from DBT, I just kind of

24    check it over, make sure that, you know, that it's correct

25    or looks correct or, you know, the matches that they

37

1    indicated were actually what the fields were based on, and

2    I just have, you know, just standard checks to do on the

3    data.

4       Q      How long did it take you to check that list
over?

5       A      It probably takes me three to four days.

6       Q      And when you -- and I'm talking about the
June,

7       1999, list.  When you did the check of that list, were
you

8       satisfied that the matches provided by DBT matched the

9       central voter file list?

10              MR. HARVEY:  Object to the form of the
question.

11              MS. TORRES:  Object to the form.

12              MS. CICCOLO:  And I agree.  I'm going to
withdraw

13          that question.

14      BY MS. CICCOLO:

15      Q      Let me ask you, when you took three or four
days

16      to check over that list, after performing that check,
were

17      you satisfied with -- were you satisfied in your review

18      that DBT had actually or correctly matched fields that
the

19      Division would use to remove ineligible voters from the

20      central voter file?

21              MR. HARVEY:  Object to the form of the
question.

22              THE WITNESS:  The Division doesn't remove
anyone,

23          period.

24      BY MS. CICCOLO:

25      Q      Well, then, were you satisfied that the
matches

38

```
 1        were indeed matches, that they were accurate matches?

 2                 MR. HARVEY:  Object to the form of the
question.

 3             What do you mean, accurate matches?

 4   BY MS. CICCOLO:

 5        Q    Well, you've described some fields that are
used,

 6   Social Security numbers, names, birthdates, you've

 7   described a process whereby those fields are matched and

 8   duplicates are removed and deceased persons are removed
and

 9   felons may be removed.  What I'm trying to find out is -
-

10                 MR. HARVEY:  Objection, because there's a

11                 mischaracterization.

12                 MS. CICCOLO:  Well, I'm not trying to -- I'm
not

13                 trying to mischaracterize her testimony, and I am

14                 trying to, though, understand and maybe put into
words

15                 for someone who doesn't deal with this issue all
day

16                 or every day.

17   BY MS. CICCOLO:

18        Q    You reviewed the information that DBT provided
in

19   June of 1999, yes?

20        A    Yes.

21        Q    Did you review that information to determine

22   whether the concerns that had been raised with respect
to

23   the March, 1999, list had in fact been corrected?

24        A    The -- it's their data that caused the problem
in
```

25      March of 1999.  They didn't use that data in June of
1999,

39

1       so there was nothing for me to check.

2           Q     So what data did DBT use in June of 1999?

3           A     The FDLE data that was supplied to them and
some

4       of their other states' Department of Corrections data,
but

5       not Florida's.

6           Q     And what was the approximate size of the June,

7       1999, list?

8           A     In total?

9           Q     Yes.

10          A     I'm guessing 80,000 to 90,000.  I don't know
the

11      exact figure.

12          Q     Is there some record that you could look at
that

13      would give you an accurate figure?

14          A     Yes.

15          Q     What is that document?

16          A     Just a printout of the counts.

17          Q     Is that a document that you could provide to
your

18      attorney that you could supply at some later time?

19              MR. HARVEY:  Yes, there's some documents and I

20          believe some discs, some compact discs, that we
have

21          in our possession.  As a matter of fact, I believe

22          your co-counsel has requested copies and they've
been

23          shipped to them, Lori Borgan and Cara Feinman.

24                MS. CICCOLO:  Do you know when those were

25          shipped?

40

1                MR. HARVEY:  Last week sometime.

2                MS. CICCOLO:  Last week.  Let me go off the

3          record just a second.

4                (Discussion off the record.)

5     BY MS. CICCOLO:

6          Q    Ms. Modrow, when you received the June, 1999,

7     list from DBT, did that list have a name?

8          A    I think it was just called -- not really.  We

9     just -- it was the matches that they found.

10         Q    The matches?

11         A    I don't know.  It really didn't have a name,

to

12    be honest with you.

13         Q    Has it ever had a name?

14         A    You just have the separate ones.  You have the

15    felons, deaths and dupes, and that's all we -- we didn't

16    really know.  We never really called it anything other

than

17    referring to the felon matches or the death matches or

the

18    duplicate matches.

19         Q    So when I'm referring to the list, are you

saying

20    there are three separate lists that come together to

make a

21    master matches list?

1    think Martha Wright was at one of them.

2        Q    Did you provide training materials in those

3    workshops?

4        A    Yes.

5        Q    And what's that training material called?

6        A    It was just a manual, CVF manual, I guess.

7        Q    During those workshops, did you receive any
kind

8    of feedback from Supervisors about their experiences
with

9    the list?

10            MR. HARVEY:  Objection to the form.  Which
list?

11            THE WITNESS:  Which list?

12   BY MS. CICCOLO:

13       Q    Well, how many lists did the Division of

14   Elections provide to Supervisors, county Supervisors, in

15   September, 1999?

16       A    There was really just one report that went out
to

17   each Supervisor that contained their multiple list of

18   felons, death, dupes.

19       Q    There was a third list that you mentioned that

20   was prepared in January, 2000, correct?

21       A    Yes.

22       Q    What was the reason a list was prepared in

23   January, 2000?

24       A    I'm not sure what you're asking.

25       Q    Well, was there -- you had a list that was

49

```
 1        prepared in -- let's see, you said June, 1999?

 2        A    Uh-huh, yes.

 3        Q    Okay.  And there was a list in January, 2000?

 4        A    Yes.

 5        Q    What's the reason a list was prepared in
January,

 6        2000?

 7        A    Well, contractually, they were to do the list

 8        once per year, and it -- we thought it would be
beneficial

 9        for the Supervisors to get the list early since 2000 was
an

10        election year and they have a lot of things going on.
So

11        the earlier they got the list, the more time they would

12        have to verify it and do what they needed to do with
having

13        to do all the other work preparing for the election.

14        Q    Did the Division of Elections receive the list
in

15        January of 2000?

16             MR. HARVEY:  Object to the form of the
question.

17             THE WITNESS:  I'm not sure what you're asking.

18        BY MS. CICCOLO:

19        Q    I'm trying to find out when your office
received

20        this list that you call the January, 2000, list.

21        A    Okay.  It was based on the January, 2000,
data.

22        DBT would have given it back to us sometime in April,
end

23        of March, April.  It's hard to say the exact date.  See,
```

24     because it takes us all of January to process
we
25     hand it off to DBT in February, it takes them

50

1     so --
2          Q     So it took until March or April for DBT to get
3     what you call the January list back to you?
4          A     Yes.
5          Q     Did you also review that list -- when I say
that
6     list, you called it the January, 2000, list, now it
looks
7     like it's the March or April, 2000, list.
8          A     Well, we always refer to it whatever central
9     voter data it was based on.  Since it was based on the
10     January data, we always refer to it --
11          Q     The January, 2000, data?
12          A     Yes.
13          Q     Well, I'll call it that.
14               When you got the list back in March or April,
15     what, if anything, did you do with the data?
16          A     Well, I run my checks just to look at the
data.
17          Q     When you run your checks, do you run -- how
many
18     checks do you run?
19          A     I couldn't say.  I mean, I just try to make
sure
20     that, you know, that the match basis that they've
indicated
21     is really what it should be, and I just try to double-

check

22      what they're giving me is accurate at least --

23          Q     Well --

24          A     -- as far as the matching goes, you know, from

25      field to field.


51


1           Q     Would it be fair to say that in doing that
check,

2       you would review thousands of records?

3           A     Yes.

4           Q     And in doing that check, did you review
records

5       for each of the Florida counties?

6           A     Yes, because I'm just doing queries against a

7       table, so I'm not singling out any county, my checks go

8       against the whole table, so all of the data in my checks
is

9       getting processed.

10          Q     How long did that review take you?

11          A     I'm sure it probably took me a few days.

12          Q     When you review that data, do you make a

13      printout, a printout of the information?

14          A     No.

15          Q     Okay.  Do you -- have you ever done that?

16          A     No.

17          Q     Did you find any errors in the data that you

18      checked?

19              MR. HARVEY:  Objection to the form of the

20              question.

21          MR. RESTREPO:  Objection to the form of the

22      question.

23  BY MS. CICCOLO:

24      Q    Did you find any fields -- did you find any

25  fields that did not correspond as matches, accurate

52

1   matches, when you performed that check?

2          MR. HARVEY:  Object to the form of the
question.

3          THE WITNESS:  All of the matches were
accurate.

4          I mean, some of the things that I found were like
that

5          the history codes that I had given them, they
didn't

6          -- in one case, they didn't use the most recent
file

7          that I had sent them, so I had to update some
history

8          codes.  It was -- it's more like little things like

9          that, making sure that what I gave them is what I'm

10         getting back.  So I compare like the data I gave
them

11         on the voter to what I currently still have in my

12         table and see does all that data still match.

13  BY MS. CICCOLO:

14      Q    When you said the history codes, were there
other

15  -- you call them little areas that came to your
attention

16  doing that check?

17      A    They had some on the matched names.  When they

18      take a first name, they take it and standardize the
name.

19      So like a Bill would become William, or Kathy would
become

20      Katherine.  I found a few cases where -- especially
where

21      you have Cathy with a C, and -- actually just Kathy
spelled

22      K-a-t-h-y and Kathy spelled t-h-i, and one would be as

23      Katherine and one would be spelled differently as --
with a

24      C-a-t-h-y, compared to the K-a-t-h-e-r-i-n-e.  So, I
mean,

25      I found a couple of those cases where they didn't --
they

53

1      still made the match, but it should have been based on a

2      different basis because of how they standardize the
name,

3      the first name.

4             So that one came up as a Social Security hit

5      rather than being a name hit, which is what it should
have

6      been.

7      Q    When you did your check, did you check the

8      matches dealing with duplicate registrations?

9      A    Yes.

10     Q    Approximately how many duplicate registration

11     matches did you examine?

12     A    As I said, I just run it against the whole
table.

13     Anything I do, it's just done electronically.

14     Q    Do you have any idea about, in terms of the

15   number of records you checked, how many you checked for

16   duplicate registration?

17        A    The number of duplicates, I don't know the exact

18   number.  I'm guessing there's probably 30,000, but I, once

19   again, would have to verify that against the counts.

20        Q    That would be in the table of data that was

21   shipped last week?

22        A    Yes, that would have been in there, uh-huh.

23        Q    If in your checking that you've described, you

24   identify an incorrect match, what did you do?

25        A    What do you mean by incorrect?

54


1             MR. HARVEY:  Object to the form the question.

2    BY MS. CICCOLO:

3         Q    If you found a record that you reviewed and you

4    were not satisfied that there was an actual match based on

5    the fields that you were examining, Social Security, date

6    of death, the name changes that you've described, residency

7    or some of the historical data, what would you do?

8         A    The only case that that came up in was with the

9    deaths, when they compared it against their Social Security

10   administrative file, the matches that -- they had matches

11   against that, but the Social Security administrative

file I

12      found out doesn't contain very many middle names, and
when

13      you're comparing, you know, an average person's name

14      against all of the United States, it's pretty likely
that

15      you're going to find a hit, but without that extra piece
of

16      data in there, it doesn't probably make it a very strong

17      hit.  So, you know, those ones that were outside of
Florida

18      that didn't contain middle names in the Social Security

19      administrative file, I excluded from sending out to the

20      Supervisors because it was unlikely that those would
have

21      been accurate just due to the fact that they were
missing

22      middle names in the Social Security administrative file.

23          Q      When you say strong hit, what does that mean?

24          A      Well, depending on how many fields you match
is

25      going to determine the strength of your hits.  If you've

55

1      got a last name, a first name, part of a middle name,
your

2      date of birth, then you've got a stronger match, where
if

3      you only have Social Security number and last name,
that's

4      probably not as likely a match, but it still could be a
as

5      match, which is why, you know, the reports are labeled

6      probable and possible.

7        Q    And who labeled reports as possible or

probable?

8        A    The Division.

9        Q    And the -- this labeling occurred during your

10       check that you've been describing?

11       A    No, it's all based off of the criteria that

they

12       use.  They said they have a code field for each record

13       match, what the match was based on.

14       Q    Now, you're using the word "criteria."  Let me

15       just ask you, do you mean fields?

16       A    Right, fields.  Whatever fields were used, a

code

17       is going to indicate to me what fields were used to

match

18       it, and based off of that code, that tells me what

fields

19       were used and then I can -- I put it on the report as

20       either probable matches or possible matches.

21       Q    When you say you put it on the report, do you

22       mean you write it on the report?

23       A    Yes, it's printed on the report, probable

felon

24       matches, probable death matches, probable duplicate

matches

25       and possibles.

56

1        Q    And that information, if you indicated

probable

2        or possible match, is that a report that's kept in the

3        Division of Elections or is that a report that's been

4        annotated, for lack of a better word, is the annotated

```
      5      report sent to the Supervisors?

      6            A    That was on the report sent to the
Supervisors.

      7            Q    Once the January, 1999 -- 2000 list, excuse
me,

      8      was sent to the Supervisors, did you receive any
feedback?

      9            A    Yes, we did receive some.  In the January run,

     10      some extra states were added, Texas being one of them,
and

     11      I had gotten some calls from some Supervisors saying
some

     12      of the Texas felons didn't seem accurate.  So DBT -- we

     13      gave that information to DBT and asked them to check on

     14      that as well.

     15            Q    Do you know how many records that would have

     16      affected?

     17            A    How many were in Texas?  I don't know.

     18            Q    Or how many Florida voters would have been

     19      affected by that information?

     20            A    I don't have an exact count.

     21            Q    Do you have an estimate?

     22            MR. HARVEY:  Reasonable estimate.

     23            THE WITNESS:  Reasonable estimate, probably --

     24            MR. HARVEY:  If you know.

     25            THE WITNESS:  -- 10,000, 8,000.  I mean,
you're

57

      1      saying how many hits came from Texas exactly.  I'm

      2      guessing 10,000.
```

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

93

1                     C E R T I F I C A T E

2        STATE OF FLORIDA    )

3        COUNTY OF LEON      )

4               I, MARLO D. FARNSWORTH, Certified Shorthand

5        Reporter at Tallahassee, Florida, do hereby certify as

6        follows:

7               THAT I correctly reported in shorthand the

8        foregoing proceedings at the time and place stated in
the

9        caption hereof;

10              THAT I later reduced the shorthand notes to

```
11      typewriting, or under my supervision, and that the

12      foregoing pages 8 through 92 represent a true, correct,
and

13      complete transcript of said proceedings;

14              And I further certify that I am not of kin or

15      counsel to the parties in the case; am not in the
regular

16      employ of counsel for any of said parties; nor am I in

17      anywise interested in the result of said case.

18              Dated this _____ day of _____,
2001.

19

20

21             _____

22             MARLO D. FARNSWORTH

23             Certified Shorthand Reporter

24

25

94
```

```
1                    C O R R E C T I O N S

2       Corrections to the deposition of JANET MODROW, taken in
the
        case of NAACP, et al., vs. Harris, et al., Case No.
3       01-120-CIV-GOLD/SIMONTON

4       Page-Line                        Correction

5

6

7

8

9
```



10

11

12

13

14

15

16

17        _____

_____
          Date                      Signature

18

19                        AS TO SIGNATURE ONLY

20              IN WITNESS WHEREOF, I have set my hand and affixed

21        my seal this _____ day of _____, 2001;

22        said instrument was acknowledged before me by JANET MODROW,

23        who is personally known or identified herself to me.

24
                              _____

25                               Notary Public

**PLAINTIFFS' EXHIBIT 23**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| THOMAS JOHNSON, et al., | ) 00-3542-CIV-King |
| | ) |
|     Plaintiffs, | ) Magistrate Judge O' |
| | ) |
| vs. | ) |
| | ) |
| JEB BUSH, et al., | ) |
| | ) |
|     Defendants. | ) |

THE DEPOSITION OF:          JANET MODROW

TAKEN AT THE INSTANCE OF:   Attorneys for Plaint.

DATE:                       Monday, December 3, :

TIME:                       Commenced at 11:15 a
                            Adjourned at 3:40 p.ı

LOCATION:                   2601 Blairstone Road
                            Tallahassee, Florida

REPORTED BY:                MICHELLE SUBIA, R.P.I
                            Notary Public in and
                            the State of Florida
                            Large

ACCURATE STENOTYPE REPORTERS, INC.
100 Salem Court
Tallahassee, Florida  32301
850-878-2221

ACCURATE STENOTYPE REPORTERS, INC.

1    APPEARANCES:

2                      REPRESENTING THE PLAINTIFFS:

3              LORI OUTZS BORGEN, ESQUIRE
               Lawyers' Committee for Civil
4                Rights Under Law
               1401 New York Avenue, NW, Suite 400
5              Washington, DC  20005-2124

6              JAMES K. GREEN, ESQUIRE
               James K. Green, P.A.
7              222 Lakeview Avenue
               Suite 1630 Esperante'
8              West Palm Beach, Florida  33401

9

                      REPRESENTING FLORIDA CLEMENCY BOARD AND
10                THE SECRETARY OF STATE:

11             HAMISH P.M. HUME, ESQUIRE
               Cooper & Kirk, PLLC
12             1500 K. Street, NW, Suite 200
               Washington, DC  20005

13

14                    REPRESENTING SUPERVISOR OF ELECTIONS:

15             RONALD A. LABASKY, ESQUIRE
               Skeldiing, Labasky & Cox
16             Post Office Box 669
               Tallahassee, Florida  32302

17

18

19

20

21

22

23

24

25

ACCURATE STENOTYPE REPORTERS, INC.

3

1                                  I N D E X

2     WITNESS                                                  PAGE

3     JANET MODROW

4            Direct Examination by Ms. Borgen                    4

5

6

7     EXHIBITS

8     Number

9        1     199906 & 200001 Clemency Chart              38
         2     Clemency 10/5/99 CD-ROM (not attached)      47
10       3     6/29/99 Requirements Document               70
         4     June 1999 CVF                               76
11       5     Code Named for Matching                     90
         6     Notice of Taking Deposition for Clemency Board  100
12       7     Notice of Taking Deposition for Jeb Bush    100
         8     Notice of Taking Deposition for Katherine Harris 100
13       9     Clemency Data, April 2001 CD-ROM (not attached) 143

14

15

16

17    CERTIFICATION OF OATH                                   148

18    CERTIFICATION OF REPORTER                               149

19

20

21

22

23

24

25

ACCURATE STENOTYPE REPORTERS, INC.

4

PROCEEDINGS

1
2     The following deposition of JANET MODROW was
3     taken on oral examination, pursuant to notice, for
4     purposes of discovery, and for use as evidence, and for
5     other uses and purposes as may be permitted by the
6     applicable and governing rules.  And reading and signing
7     is not waived.
8                            *   *   *
9     Thereupon,
10                        JANET MODROW
11    was called as a witness, having been first duly sworn,
12    was examined and testified as follows:
13                     DIRECT EXAMINATION
14    BY MS. BORGEN:
15          Q     Good morning, Ms. Modrow.  My name is Lori
16    Borgen.  I'm an attorney for the plaintiffs in this case,
17    Johnson v. Bush.
18                Could you please state your name for the
19    record.
20          A     Janet Modrow.
21          Q     And what is your business address?
22          A     We just moved two weeks ago.  It's Gaines --
23    I don't recall the exact address.  I'm sorry.  It's on
24    Gaines Street.
25          Q     It's at the office -- what office is it?

---

ACCURATE STENOTYPE REPORTERS, INC.

5

1          A        The Division of Elections, Gaines Street,

2    Tallahassee, Florida.

3          Q        Okay.  We're here this morning as part of

4    the Johnson v. Bush lawsuit pursuant to deposition

5    notices served on three of the defendants pursuant to

6    Federal Rules of Civil Procedure 30(b)(6).

7                And pursuant to that rule, we have asked

8    Governor Jeb Bush, Defendant, Secretary of State

9    Katherine Harris and the Clemency Board to designate one

10   or more officials, supervisors, directors, employees who

11   would consent to testify on their behalf on certain

12   issues.

13               And counsel for those defendants have

14   designated that you would be the employee to testify on

15   their behalf on issues regarding the secretary of state

16   and the purge process for felons.

17               Do you consent to testify on their behalf?

18         A        Yes.

19         Q        And have you been deposed before?

20         A        Just once.

21         Q        And when was that?

22         A        A couple of weeks ago.

23         Q        And on what issues?

24         A        Pretty much on the same thing, on the

25   central voter file and the matching of the felon records.

ACCURATE STENOTYPE REPORTERS, INC.

1      Q     Okay.  Are you familiar with the deposition

2  process?

3      A     Yes.

4      Q     Okay.  I'm going to be asking you questions

5  today.  If anything is unclear, please let me know.  I

6  definitely like to make sure that we have a record that

7  everyone believes is an accurate reflection of happened.

8           So if something is unclear, just let me know

9  and we can come up with a way to clarify it, if you don't

10  understand what I'm asking you about.

11           If you need a break at some point in time,

12  let me know that as well and we can figure out what may

13  be a good time in the deposition so we can all take a

14  break.  We don't want anyone tired testifying under oath

15  if they're not comfortable doing so.

16           Did you speak to anyone in preparation for

17  the deposition today?

18      A     Just Hamish Hume and Debbie Kearney.

19      Q     And what is the relation of Mr. Hume and

20  Ms. Kearney to you?

21      A     Debbie is the general counsel for the

22  secretary of state, and Hamish Hume is an attorney

23  working for this case.

24           MR. HUME:  I'll just introduce myself for

25           the record.  I'm Hamish Hume, H-U-M-E, at the law

1     firm of Cooper & Kirk in Washington, D.C.  And I

2     represent the Clemency Board, including the

3     secretary of state in this lawsuit as outside

4     counsel.

5          MS. BORGEN:  Why don't we go ahead and go

6     around and introduce the others in the room.

7          MS. KEARNEY:  I'm Deborah Kearney, and I'm

8     general counsel for the Florida Department of

9     State.

10          MS. BORGEN:  I'm Lori Borgen with the

11     Lawyers' Committee for Civil Rights representing

12     the plaintiffs.

13          MR. GREEN:  I'm James Green from West Palm

14     Beach representing the plaintiffs as well.

15  BY MS. BORGEN:

16        Q    Ms. Modrow, as part of the deposition

17  notices, we also asked that whoever was deposed would

18  bring documents with then that responded to the questions

19  we had asked.

20        Did you bring any documents with you today?

21        A    Yes, I did.

22        Q    Okay.  So if we reach a point in time with

23  the questioning where you think you have a document that

24  is responsive to the question or would relate to it,

25  please feel free rather than -- you know, if there's a

1    document you would like to refer to in answer to the

2    question, let me know and we can discuss that document at

3    that point in time.

4          A      Okay.

5          Q      Rather than having you try to remember

6    numbers, you know, just pull them from memory or anything

7    like that.

8          A      Okay.

9          Q      Ms. Modrow, what is your position with the

10   Division of Elections?

11         A      I'm a systems project consultant.  I pretty

12   much work with our software applications.  I write

13   programs.

14         Q      And how long have you been with the Division

15   of Elections?

16         A      I've worked for them a total of ten years.

17   However, I was briefly with another company from October

18   of '98 through March of '99.

19         Q      And that was a separate -- that was a

20   private company?

21         A      No.  It was the Department of State Group

22   Insurance.

23         Q      And then you came back to the Division of

24   Elections?

25         A      Yes.

ACCURATE STENOTYPE REPORTERS, INC.

1          Q       Was there a particular motivation for your

2     return?  Were they lobbying to get you back?

3          A       Exactly.  Most of their other technical

4     support had left.  So since I was familiar with all of

5     the applications, they had asked me to come back.

6          Q       And did they ask you back to work on a

7     particular project or just generally to do technology

8     support?

9          A       Technology support, because they didn't have

10     anyone in-house.

11          Q       Okay.  Ms. Modrow, do you have any

12     post-secondary education?

13          A       Yes.

14          Q       And what is that education?

15          A       I've got a bachelor's degree in management

16     information systems.

17          Q       And where is that degree from?

18          A       Florida State University.

19          Q       Any other post-secondary education?

20          A       No.

21          Q       And when did you graduate from college?

22          A       In 1991.

23          Q       Okay.  And did you speak to anyone else with

24     the Division of Elections in preparation for your

25     deposition today?

ACCURATE STENOTYPE REPORTERS, INC.

1     A    No, I didn't.

2     Q    Ms. Modrow, I want to turn to one of the

3  questions we had raised in the 30(b)(6) deposition

4  notices, something you may be familiar with.

5          The first question we were wondering about

6  is the responsibilities of the secretary of state,

7  including any divisions thereof, the Division of

8  Elections or any other divisions, regarding

9  disenfranchisement of felons and the restoration of

10  felons' Civil Rights.

11          Could you explain to me what the role is at

12  the Secretary of State's Office regarding that process?

13     A    We don't disenfranchise voters.  But the

14  secretary is responsible for creating and maintaining a

15  central voter file.  And we're also responsible for

16  identifying any possible felons and reporting those to

17  the supervisors of elections.

18     Q    Okay.  And how do you go about carrying out

19  those tasks?

20     A    We had contracted with a company called

21  Database Technologies, who I believe is now known as

22  something choice -- I forget -- Choice Point.

23          Basically we compile the central voter file

24  data and hand that out to Database Technologies.  I'm

25  going to call them that because I'm used to calling them

ACCURATE STENOTYPE REPORTERS, INC.

1     that.

2                    We also give them data that we get from the

3     Florida Department of Law Enforcement and data we receive

4     from the Bureau of Vital Statistics.  And then they have

5     some proprietary data that they use in processing the

6     files as well.

7          Q     Okay.  Let me take a step back then.  When

8     did you begin working with Database Technologies on this

9     process?

10         A     In March of '99.

11         Q     Prior to March of '99, were you involved

12    with the disenfranchisement of felons, you know,

13    identifying felons in any way as part of your

14    responsibilities with the Division of Elections?

15         A     The only thing that I did in relationship to

16    the central voter file was I wrote some of the code for

17    translating the county files into our database.  But that

18    was my only aspect of that process.

19         Q     And which county files would those have

20    been?

21         A     All 67.  Pretty much I wrote a visual basic

22    application because all of the data comes in in different

23    formats, all of the counties have different types of

24    voting registration systems.  So the format that it comes

25    in is different.

1       They also have different codes in their

2  tables, so I have to write conversion programs so it's

3  all standard and uniform in our table.

4       Q     And I guess what data was coming in from the

5  counties?  Was it all voter registration data?

6       A     Yes, voter registration data and voter

7  history.

8       Q     And during the entire period of time that

9  you worked with the Division of Elections, did that data

10  come in to you?

11       A     We used to collect it on a monthly basis,

12  but then that was switched to a quarterly basis.  And it

13  pretty much just holds the active voters at that point in

14  time.

15       We try to ask all of the supervisors to cut

16  their discs almost at the beginning of the month -- that

17  doesn't always happen -- so at least it would be all

18  around the same time period that we received it.

19       It generally takes about a month to process

20  them all and get them into a table.  So basically, as I

21  said, we have it just as a point in time, the data

22  consists of when we process the new one, the old files

23  are deleted, tables, and we just have the new files.

24       Q     So is there storage of the old files?

25       A     We have them on CD, but we don't have them

---

ACCURATE STENOTYPE REPORTERS, INC.

1    live.

2         Q     And when did you switch from monthly to

3    quarterly reporting?

4         A     I'm really not sure when they did that.    I

5    know when I came back in '99, it was on a quarterly

6    basis, I believe.

7         Q     So it seemed to be during that time period

8    in which you were at another job they switched from

9    monthly to quarterly?

10        A     Right.

11        Q     Okay.  And that data that comes from the

12   counties, does that include individuals who were purged

13   from the voter rolls?

14        A     No.  As I said, they send us their data.  We

15   just keep the active voters.  That's all we store are the

16   active voters.

17        Q     Okay.  So the report that comes in from the

18   counties, is it essentially a report of registered

19   voters, that that's what they're asked to report to you

20   in each report period?

21        A     Yes.  And in an electronic format.

22        Q     Would it be possible to compare the lists

23   between different time periods to determine who was

24   removed from the voter rolls?

25        A     You could do that.  You would have to load

ACCURATE STENOTYPE REPORTERS, INC.

14

1    all of the -- as I said, we only keep it at one point in

2    time, so we don't have multiple versions of the central

3    voter file on-line at any one time.  But, yes, that could

4    be done.

5           Q    Okay.  Prior to March 1999, in your

6    collection of this data, was the Secretary of State's

7    Office interested in individuals who were purged by the

8    counties as alleged felons?  Is that something you were

9    asking the counties to provide?

10              MR. HUME:  I would just object to the

11         vagueness of the term "purged."

12              And I'll ask you to read the question back,

13         please.

14              (Requested portion read.)

15              THE WITNESS:  I'm not sure exactly what the

16         counties did, and I don't think anybody has ever

17         -- it depends on what you mean by "purged."

18   BY MS. BORGEN:

19         Q    When I say "purged," I -- well, I can phrase

20   it differently.

21              Speaking of removing voters from the voter

22   rolls for different reasons and removing them as alleged

23   felons, prior to March of 1999 did you ask counties to

24   report to the state who they were removing from the voter

25   rolls as alleged felons?

ACCURATE STENOTYPE REPORTERS, INC.

1          A      No.

2                 MR. HUME:  I object again to the question as

3          to the use of the phrase "alleged felons."

4                 But you can answer.

5                 THE WITNESS:  No, we did not collect that

6          data.

7     BY MS. BORGEN:

8          Q      Okay.  Are you aware of any interaction

9     between the secretary of state and the county supervisors

10    of elections before March of 1999 regarding the removal

11    of voters from the voter rolls as alleged felons?

12                MR. HUME:  Same objection.

13                THE WITNESS:  Repeat that.

14    BY MS. BORGEN:

15         Q      Prior to March of 1999, do you know if the

16    secretary of state or anyone working for the secretary of

17    state was involved in monitoring what the counties were

18    doing in terms of removing voters from the voter rolls as

19    alleged felons?

20                MR. HUME:  I object to the vagueness of the

21         phrase "alleged felons."

22                THE WITNESS:  As I said, I stated my process

23         in the central voter file, which was just on the

24         program.  I did not process any data regarding

25         that.

ACCURATE STENOTYPE REPORTERS, INC.

BY MS. BORGEN:

    Q    Are you aware of anyone else in the Secretary of State's Office who was processing any data like that?

    A    No, I'm not.

    Q    Are you aware of anyone in the Secretary of State's Office who was in contact with the supervisors of elections to ask them what they were doing in regard to the disenfranchisement of felons in Florida?

    MR. HUME:  During what time period are we talking about?

    MS. BORGEN:  Prior to March of '99.

    MR. HUME:  Anytime prior to March of '99?

    MS. BORGEN:  Yes.

    THE WITNESS:  I myself do not because I wasn't involved in that aspect of it.  And I don't know if anyone else did.

BY MS. BORGEN:

    Q    Okay.  Is it possible that someone else at the Secretary of State's Office was involved, you know, was in contact with the county supervisors of elections about the disenfranchisement of ex-felons before March of 1999?

    MR. HUME:  Objection to the vagueness of the question.

1          Would you please read it back.

2          (Requested portion read.)

3          MR. HUME:  I object to the vagueness of

4      asking whether they were in contact about the

5      disenfranchisement.  I don't think it's clear.

6  BY MS. BORGEN:

7          Q     About the counties' policies, what the

8  counties were doing in regard the disenfranchisement of

9  felons?

10         A     Well, I guess I'm still -- you're not asking

11  what kind of data we are collecting?

12         Q     No.

13         Do you know, for example -- I'll give you an

14  example -- whether someone from the Secretary of State's

15  Office prior to March of 1999 had a meeting with the

16  county supervisors of elections to discuss what they were

17  doing in regard to disenfranchisement of felons?

18         A     Somebody must have.  I do know when I got

19  there in March of '99 that they had formed a supervisor

20  of elections committee to come up with, I guess,

21  procedures on how to handle possible felons, and then

22  they came up with some sample letters for sending out.

23  So somebody must have been in contact with them.  I don't

24  know who.

25         Q     Okay.  So someone from the Secretary of

ACCURATE STENOTYPE REPORTERS, INC.

1   State's Office was involved with this committee of

2   supervisor of elections?

3        A    I don't know if they were directly involved.

4   All I can say is that I know that the committee was

5   formed.

6             And I don't know if somebody on the

7   division's team was a part of that committee or not, to

8   be honest with you.

9        Q    Okay.  To your knowledge, prior to March of

10  1999, was the Secretary of State's Office forwarding any

11  information to the county supervisors of elections about

12  individuals who had felony convictions?

13       A    From what I understand, there was a run made

14  in 1998 by a company called Pass.  I believe they did

15  identify possible felons.  And I believe reports were

16  sent out on those.

17            But as I said, I wasn't involved in any of

18  that so I can't give you any specifics.

19       Q    Do you know who would have been involved

20  with that?

21       A    It probably would have been my old boss,

22  Sanford Brill.

23       Q    All right.  Does she still work with the

24  Division of Elections?

25       A    It's a man.

ACCURATE STENOTYPE REPORTERS, INC.

1    Q    I'm sorry.  Does he still work with the

2    Division of Elections?

3    A    No, he doesn't.

4    Q    When did he leave that office, if you know?

5    A    Prior to me coming back in March of '99,

6    which was one of the reasons why they wanted me back

7    because they lost their technical assistants.

8    Q    Okay.  To your knowledge, does the Secretary

9    of State's Office receive any information about

10   individuals who have been convicted of a felony in

11   federal court?

12   A    Yes, we do.

13   Q    And where do you receive that information,

14   from what source?

15   A    I believe there's five or six districts in

16   Florida that send the information to the Division of

17   Elections.

18   Q    And what does the Division of Elections do

19   with that information?

20   A    If it doesn't have a specific county listed

21   on it, they type it into a report and mail it to all of

22   the counties.

23        If it has a specific county listed on the

24   paperwork, I believe they mail that to that particular

25   county.

ACCURATE STENOTYPE REPORTERS, INC.

1    Q    And who at the Division of Elections is

2    involved with that process?

3    A    Currently I'm not sure who handles it.

4    Q    Have you been involved with the processing

5    of that data?

6    A    No.

7    Q    Do you know who used to work on that at the

8    Secretary of State's Office?

9    A    No.  It was just one of their clerical

10   people.

11   Q    And what is the basis of your knowledge

12   about this process?  Did somebody tell you about it in

13   preparation for the deposition or is it just something

14   that you know from around the office or how do you know

15   about that process?

16   A    No.  I looked into it briefly because we're

17   working on a new system, and I was made aware that we did

18   get this data.  I hadn't realized that we had gotten it

19   before, so I did check in to see how it came about.

20        And I found out that we don't really record

21   all of it.  As I said, the papers that have the counties

22   on them, that gets forwarded to the county and the other

23   ones a list is made up and mailed out to them.  So that's

24   when I found out.

25   Q    So when that data comes to the Secretary of

1   State's Office, to your knowledge is a record kept of

2   that information at the Division of Elections or is it

3   just forwarded on to the counties?

4        A    If it had a particular county listed, I

5   believe it was just forwarded on.  There was talk of

6   changing that so we could record all the names.  I don't

7   know if that took effect yet or not.

8        Q    Do you know if that's something they are

9   planning to do?  Has a decision been made that they are

10  going to start collecting that data at the Division of

11  Elections?

12       A    Yes.  I believe we are going to start

13  collecting that data.

14       Q    And would that be electronically, you're

15  going to maintain an electronic database of those

16  individuals?

17       A    Yes.

18       Q    And who is working on that process?

19       A    One of the other technical personnel.  I

20  believe Jason Carpenter has written something for that.

21  I don't know if it's being used yet or not though.

22       Q    And when did these discussions occur of

23  whether there should be a change that the Division of

24  Elections would start collecting this data?  When did

25  that come up?

ACCURATE STENOTYPE REPORTERS, INC.

1          A     It was very briefly, and there was nothing

2    formal.  It's just we had some new programmers come

3    aboard.  And we new that there were some areas that we

4    weren't recording it, and we thought we might want it for

5    future use.  Probably just a few months ago.

6          Q     Did any of these discussions come up in

7    relation to the new Florida Election Reform Act and the

8    changes to the central voter file that were required

9    under that act?

10         A     The ones that were just recently passed?

11         Q     Yes.

12         A     Well, that was part of it, yeah.  We figured

13   that we would be able to then utilize that in the system

14   if we recorded it electronically.

15         Q     So prior to 2001 when you had these

16   discussions about -- when you learned about this data,

17   were you involved at all in the processing of this data

18   from the federal courts to the counties?

19         A     No.

20         Q     Let's go back then to March of 1999.  You

21   said that's when you started becoming more involved in

22   the process of felon disenfranchisement.

23               What was the nature of your involvement?

24   What were you doing with the Division of Elections?

25         A     My responsibility was to work with Database

ACCURATE STENOTYPE REPORTERS, INC.

1   Technologies, hand data off to Database Technologies and

2   receive the data back from them to process and compile

3   reports to send to the supervisors of elections.

4          I worked with them creating a requirements

5   document on how the data was actually processed and

6   compared.

7          Q      And what were the requirements that were set

8   up in regard to felons in the state of Florida?

9          A      With regards to felons, the basic processing

10  was that they were to do name matches first based on the

11  person's last name, first name, the least common

12  denominator of their middle name, and date of birth.  And

13  if all of those fields matched between the two files, a

14  record was created in another table.

15         After they did the name matches, they would

16  try doing like a Social Security match.  If they had a

17  Social Security match, they would then go and look at

18  other data to see if it matched.

19         Because you can't solely rely on Social

20  Security numbers.  Data entry errors can happen or the

21  person could just give out a false one at time of their

22  arrest.

23         So if the last name matched, first name,

24  date of birth, that was taken into account.  And as long

25  as you had a match in some other fields, that was then

1   written up to the file.

2          After those were all collected, that data

3   was then run against the clemency data to see if the

4   person received clemency.  And if they received clemency,

5   that was so noted, and obviously that was not reported to

6   the supervisors if they had received clemency.

7      Q      Going back to the processing for just a

8   minute.  You just mentioned that the data was compared

9   against the clemency data.

10          What was that clemency data that you

11   compared it against?  What kind of data did you have

12   regarding clemency?

13      A      An electronic file of their data containing

14   first name, last name, date of birth, date of clemency

15   granted.

16          They had some other fields in there that we

17   didn't utilize like Department of Corrections number, an

18   identification number for clemency called the tag ID,

19   just basic information on the person, their date of

20   birth.

21      Q      When you say "they," to whom are you

22   referring?

23      A      The person that received clemency.

24      Q      Okay.  And where did you get this data?

25      A      From the Office of Executive Clemency.

25

1        Q      And did it include an identifier or a field

2    regarding race of the individual?

3        A      Yes, it did.

4        Q      Okay.  And was that information provided for

5    most of the individuals in the clemency files?  Was that

6    file completed for most of them, do you know?

7        A      I don't know.  I didn't check.

8        Q      And when did you get this data from the

9    Office of Executive Clemency?

10       A      At various times.  We would have gotten some

11   in probably March of '99, and then we got the files -- I

12   did look this up to see -- in the beginning of October of

13   '99, we got a file.  At the end of October, we got a

14   file.  And in January of 2000, we got a file from them.

15       Q      So the beginning of October of '99?

16       A      Uh-huh (affirmative.)

17       Q      The end of October of '99?

18       A      Yes.

19       Q      And I'm sorry --

20       A      In January of 2000.

21       Q      January of 2000.

22              And you said also March of 1999.  Was that

23   the first one?

24       A      That was the first one.

25       Q      Okay.  So you received four files from the

1    Office of Executive Clemency?

2          A      Yes.

3          Q      Okay.  And you said you looked it up to see

4    when you got those.  What did you look up or what did you

5    check to get that information?

6          A      I just tried to look in my e-mails to see

7    what I got when.  And those were the ones that I found.

8    I found the files and brought them up and just noted how

9    many records were in each file.

10         Q      Okay.  And do you have that information

11   there, how many records were in each file?

12         A      I have specific counts for the last three.

13   The first one I just know that it was greater than

14   127,000.

15         Q      Greater than, I'm sorry, 127,000?

16         A      Yes.

17         Q      For the one at the beginning of October of

18   1999, what was the count on that one?

19         A      135,512.

20         Q      Okay.  At the end of October of 1999?

21         A      142,121.

22         Q      And in January of 2000?

23         A      144,779.

24         Q      And is it your understanding that each of

25   these -- for example, the January of 2000 file that has

1    144,779 records, that includes all of the files that were

2    listed in the earlier records or it's all new entries?

3           A     No.  It's a whole dump of their file, so it

4    includes the one from previous.

5           Q     Okay.  And they were expanding the file and

6    giving you a larger database each time?

7           A     Right.  They either had done some more data

8    entry off of their old card files.

9           Q     And do you still have all of those files in

10   your possession?

11          A     Yes, I do.

12          Q     And could we get a copy of those today?

13          A     Sure.  I brought the one from -- the first

14   one in October, but I can supply the other ones to you as

15   well.

16          Q     Okay.  And those came directly from the

17   Office of Executive Clemency?

18          A     Yeah.  I had to take out the Social Security

19   number field from that.  So you have everything that they

20   sent me less the Social Security number field.

21          Q     And what was your basis for removing that?

22          A     Because it's not allowed to be -- it's not

23   public information.

24          Q     Okay.  And if we were to -- and this may be

25   more a question directed towards your lawyer -- but if we

ACCURATE STENOTYPE REPORTERS, INC.

1    wanted that data and we signed a confidentiality

2    agreement, could we get that information?

3              MR. HUME:  I'm not sure.  Certainly with the

4         other clemency files that were produced in this

5         case, we had to enter into a protective order that

6         reserved the right to assert privilege over any

7         personal data.

8              With respect to the clemency database for

9         different iterations of it like this, I imagine

10        that the Office of Executive Clemency has fairly

11        established confidentiality rules that we need to

12        carefully look at to determine what we can do.

13        And I think it may be more appropriate to discuss

14        it in Janet Keels' deposition.

15             MS. BORGEN:  Okay.  We'll come back to that.

16   BY MS. BORGEN:

17        Q    Ms. Modrow, what was your understanding of

18   what was included within this database that you were

19   receiving from the Office of Executive Clemency?  What

20   was that data you were receiving?

21        A    Most of the individuals who received their

22   rights to vote, the ones that had their right to vote

23   restored.

24             I know, from my understanding, that they

25   have them all in card files.  And I forget what year they

1    went back to, but there were still, I think, some that

2    were extremely, extremely old that they didn't have

3    enough information to actually enter into the database.

4                If they had enough information on their card

5    files to enter, they entered them in their database.  And

6    that I received.

7        Q    Okay.  Did the Office of Executive Clemency

8    provide to you a written explanation of what was in the

9    database when they provided it to you, either the first

10   time or each time they sent it to you?

11       A    No.  They usually just e-mailed me the

12   database in an access database.

13       Q    Okay.  Could we get copies of the e-mails as

14   well that they sent you in addition to the database with

15   the e-mail or whatever accompanying correspondence?

16       A    Sure.  The one in March, I don't think that

17   one came to me.  That was probably there before I even

18   got there because I don't recall it.  But I do have

19   e-mails on the other three that I can give you.

20       Q    Would you be able to determine who at the

21   Secretary of State's Office received the March of 1999

22   database?

23       A    I can try.  I don't know if I will be able

24   to or not, but I can try.

25       Q    Thank you.

ACCURATE STENOTYPE REPORTERS, INC.

1          Was it your understanding that the database

2    you were receiving from the Office of Executive Clemency

3    included everyone in Florida who had received clemency

4    from the state of Florida whom they were able to put into

5    the database, whom they were able to have enough

6    information in their written records to put into an

7    electronic database?

8          A     That was my understanding, yes.

9          Q     Did you have any sense of an approximate

10   number of individuals who might not have been included in

11   the database?

12              MR. HUME:  I would object to that as I think

13         a question more appropriate to the deponent who

14         will speak to the clemency files from the Office

15         of Executive Clemency.  It's beyond the scope of

16         the secretary of state's knowledge, if I

17         understand the question correctly.

18              MS. BORGEN:  I can rephrase it so it's a

19         question specifically within her area of

20         knowledge.

21   BY MS. BORGEN:

22         Q     When you received this information from the

23   Office of Executive Clemency, did anyone tell you or give

24   you an approximation of how many clemency files might not

25   be included in this database?

ACCURATE STENOTYPE REPORTERS, INC.

1      A      No.

2      Q      And did you have any difficulty obtaining

3   this data from the Office of Executive Clemency?

4              MR. HUME:  Object to the vagueness of the

5         term "difficulty."

6   BY MS. BORGEN:

7      Q      Prior to March 1999 when the first file

8   came, do you know if anyone at the Secretary of State's

9   Office had sought data on clemency records from the

10  Office of Executive Clemency and not received it?

11     A      I wouldn't know because I wasn't involved in

12  that.  Not until I came in March was I involved in that.

13             And to be honest with you, I don't even

14  remember the first one, whether I got it or someone else

15  had already gotten it.  But I know in subsequent times,

16  all I did was call and ask them for a new file and they

17  e-mailed it to me.

18     Q      Do you know if they created this file at the

19  request of the Secretary of State's Office or if it was a

20  preexisting file of the clemency records?

21     A      I don't know.

22     Q      Once you received this information from the

23  Office of Executive Clemency, what did you do with it at

24  the Secretary of State's Office?

25     A      I sent it off to Database Technologies for

ACCURATE STENOTYPE REPORTERS, INC.

1    them to use to match against the felon records.

2            Q     Okay.  And did you tell them how to use it?

3    Did you give them instructions on how to use it?

4            A     Well, that would have been in the

5    requirements document.  The fields were matched up with

6    the record hits.

7                  The voter's name, the voter's last name,

8    first name, date of birth was matched against the

9    clemency record.  And if that didn't provide a hit, they

10   also looked at the felon's first name, last name.

11                 So you had various fields that you were

12   comparing against.  And it would also do Social matches

13   as defined in the requirements document.

14           Q     And were there problems in doing these

15   matches where you ran the clemency database against the

16   list of alleged felons or the list of felons and you

17   weren't getting very many matches?

18                 MR. HUME:  Object to the vagueness of the

19           term "problems."

20   BY MS. BORGEN:

21           Q     I identified the specific problem in the

22   question, if you know, either you at the Division of

23   Elections or DBT ran these databases against each other,

24   the Office of Executive Clemency data versus their list

25   of alleged felons and did not come up with very many

33

1    matches?

2         A     The very first one they did did not.  It

3    just looked strange that they had so few so I asked them

4    about it.  And they were setting the flag wrong, so they

5    fixed that flag and reran it and got a substantial amount

6    of clemency matches.

7               They also did put the clemency file in their

8    on-line application for access through the Web.

9         Q     Okay.  When you say "they put it in their

10   on-line application," what is that?

11        A     Database Technologies had an on-line

12   application that was called AutoTrack.  And the

13   supervisors could through the Web log on to that and

14   access clemency data.

15        Q     So was this entire clemency file that you

16   received from the Office of Executive Clemency, was that

17   included in the AutoTrack system?

18        A     Yes, it was.

19        Q     And was it updated each time you received a

20   new file from the Office of Executive Clemency?

21        A     Yes.  Whenever I received the data, I handed

22   it to off to Database Technologies and they then updated

23   their file.

24        Q     And who could access the AutoTrack system,

25   to your knowledge?

ACCURATE STENOTYPE REPORTERS, INC.

1    A    All of the supervisor of elections.  I was

2  given a password, and obviously the people at Database

3  Technologies.

4    Q    Do you know if anyone else was allowed to

5  access that database?

6    A    Not that I know of.

7    Q    And how long were the supervisors of

8  elections allowed to access the database?  Was it

9  unlimited or was there a set time period?

10    A    Originally they were supposed to have it

11  free for at least a month.  On the first round, they

12  probably had it free for at least four or five months.

13  And in 2000, I know it was longer than a month as well.

14    Q    Okay.  And you indicated they had it free

15  for a time period.  Was there another time period where

16  they could access it but they had to pay to do so?

17    A    I believe so.  I'm not sure how many did or

18  didn't, but yeah.

19    Q    And do you know what the fee basis was for

20  accessing that database, how much it cost them?

21    A    I don't know.  I don't know what they worked

22  out.  Each county supervisor worked it out with Database

23  Technologies.

24    Q    And for those kinds of negotiations, they

25  would not go through your office?

ACCURATE STENOTYPE REPORTERS, INC.

1          A      No.

2          Q      Can you tell me what is the math database

3     that's operated by the Office of Executive Clemency, if

4     you know?  Is that something you're familiar with?

5          A      No, I'm not.

6          Q      Did your office have any other databases

7     available to assist supervisors of elections with the

8     clemency review for alleged felons?

9                 Was it you just worked with this AutoTrack

10    system?  Was there any other system that you had

11    available to assist supervisors?

12         A      No.  I did have a couple call me up.  And

13    just from having the data in a table, I did some look-ups

14    for them directly.  But no, there was no other access to

15    it.

16         Q      So supervisors of elections would contact

17    you for assistance with determining whether someone had

18    clemency?

19         A      Yeah.  I had a couple.  It wasn't a

20    tremendous amount.

21         Q      And how did you generally handle those

22    calls?

23         A      Well, the one that I remember most was one

24    of the supervisors called up and said this person said

25    that they had clemency.  And I asked, you know, well,

ACCURATE STENOTYPE REPORTERS, INC.

1       what was their name, that I would try to do a look-up.

2                       And if they gave me their full name and date

3       of birth, then I looked it up just under last name and

4       date of birth and brought them up and found that the

5       problem was his name is Greg and was spelled G-R-E-G-G in

6       the voter file but clemency had it entered as G-R-E-G, so

7       the match did not occur because we go off of full

8       matches, which is why it was nice for the supervisors to

9       have access to it on-line to do those kind of searches

10      because data entry errors are obviously going to happen

11      where we're going to miss the match because it was

12      entered wrong.

13                      So the supervisors could at least go on-line

14      and look up based just on the last name or date of birth

15      and might be able to find the person that way.

16                      MR. HUME:  Could we just pause and welcome

17              --

18                      MR. LABASKY:  I'm Ron Labasky.  I'm one of

19              the attorneys for supervisors of elections.

20      BY MS. BORGEN:

21              Q       Going back to the process we were talking

22      about of the purge starting in March of 1999.  In your

23      work with Database Technologies, how many lists of felons

24      did they produce to the Division of Elections?

25              A       Since March, they produced three lists to

1    the division.

2            Q     And when were those lists produced?

3            A     The first one was based off the March 1999

4    central voter file.  And I would have received their data

5    back to me at the end of -- probably the end of May.

6            The second run was based off of the June

7    1999 central voter data, and that would have been gotten

8    back to me probably September of '99.

9            And the third time was based off of the

10   January 2000 central voter database, and that would have

11   been gotten back to me probably April of 2000.

12           Q     When you refer to these lists, do you

13   generally refer to them as -- the first one, for example,

14   as the March of '99 list or the May of '99 list?

15           A     The March.  We always referred to them as to

16   whatever the central voter file was.  So it would have

17   been referred to as the March of '99, the June of '99 or

18   the January of 2000.

19           Q     Okay.  And just to make it clear, that's the

20   date of the central voter file data data?

21           A     Yes.

22           Q     So between -- well, first of all, do you

23   know how many felons were on each of the lists provided

24   to you by DBT, by Database Technologies?

25           A     I definitely have the counts for the '99,

1    the June of '99 and the January of 2000 counts.  Let me

2    see if I have it for March.  And yes, I have the counts

3    for March as well.

4        Q    Okay.  You said you have it with you.  You

5    brought some documents that show that information?

6        A    Yes.

7        Q    What documents did you bring?

8        A    Just reports that show how many counts were

9    matched for the different files that were run.

10        Q    Okay.  Let's take a look at the first

11    document, if you could show me what you have there.

12        A    Sure.  It just shows you in '99 the clemency

13    matches, the death matches, the duplicate matches and the

14    felony matches.

15        Q    Okay.  And I see there's one column that

16    says at the top "199906."

17        A    Right, June.

18        Q    That's June of 1999, okay.  And then the

19    second one is the January of 2000?

20        A    Right.

21        MS. BORGEN:  I'd like to mark this as

22        Exhibit 1 to your deposition.

23        (Exhibit 1 marked for identification.)

24    BY MS. BORGEN:

25        Q    On this document, we have some categories

ACCURATE STENOTYPE REPORTERS, INC.

1    listed.  If you could please explain to me what each of

2    these categories are.  First of all, we have CVF.

3         What does that stand for?

4         A     Okay.  In regards to the clemency database,

5    the processing is quite involved when you're matching

6    records from one table to another.  And as I said, it

7    involves matching based on different criteria.

8         A name match would be considered having the

9    match done on the last name, the first name, the least

10   common denominator, the middle name, and the date of

11   birth.  Those four fields have to match completely in

12   order for it to be considered a hit.

13        You also look at fields like Social Security

14   numbers, as I explained earlier, where if you have a

15   Social match, you then start looking at other fields that

16   are hit.

17        And all depending on what type of hit was

18   made, that data is also recorded so I know whether it was

19   a name match or a Social match and what fields were

20   involved for the matches.

21        When you look at clemency, the central voter

22   file is matched against the felony database and that

23   produces a subset of records that were hits.  Then that

24   data, which contains voter name information and felony

25   name information, is stored in a table.  That data is

1      then run against the clemency data.

2                  And remember, you have two sets of names

3      over here.  You have a central voter file name, which is

4      matched against it.  And if no matches occur there, you

5      also look at the felony information and see if there's a

6      match through that means.

7                  So the CVF, or the clemency, is indicating

8      that the voter name was used to match against the

9      clemency data.

10                  The DBT is referring to their proprietary

11      data.  They had out-of-state data that they got, and they

12      did all of their clemency manually and just reported it

13      to me.

14                  And I'm not sure what the DNT is.  I would

15      have to go back and look.  I think that looks like it

16      should have been DVT but they messed up on the code that

17      they typed in, and they probably typed in DNT.

18                  And the FEL would stand for the felon data

19      that was matched against the clemency data.

20                  For the deaths, the DBT would mean that that

21      data was run against the Social Security administrative

22      death file.  And the DOE was a file that we provided them

23      that was gotten from the Bureau of Vital Statistics.

24          Q      DOE stands for what?

25          A      Well, just the data that we provided them,

ACCURATE STENOTYPE REPORTERS, INC.

1  Division of Elections data.  Once again, duplicates.

2  Obviously they're all going to be DOE because the data is

3  run against itself.

4          DBT is, once again, their proprietary data.

5  They collect data from various Department of Corrections.

6  And DOE would be the data that we provided them from the

7  Florida Department of Law Enforcement.

8          Q     Okay.  Let me make sure I'm understanding

9  this correctly then.  If we're looking at the category

10  here of clemency with source CVF and we've got 12,722

11  individuals, that means that you took the central voter

12  file list of -- you started off with the central voter

13  file list of individuals, you know, everyone who was

14  registered in the state of Florida, and compared that to

15  the Clemency Board?

16          A     No.

17          Q     Okay.  Who did you compare that list to?

18  Where did the 12,722 come from?

19          A     The central voter database was compared

20  against, let's say, against the FDLE database.  And a

21  certain number -- like actually probably over 50,000 were

22  found.

23          Those 50,000 records were then compared

24  against the clemency data.  And any matches that we found

25  went to another table, and that was 13,000 records that

ACCURATE STENOTYPE REPORTERS, INC.

1       were matched there.

2                       So those 13,000 were then pulled out of the

3       felony ones because their rights were restored to vote.

4       So the supervisors did not get that data.

5              Q      Okay.  So essentially with this chart here,

6       we have one category at the top of clemency and at the

7       bottom felons?

8              A      Yes.

9              Q      At one point in time, would all of these

10      individuals have been together in one file?

11             A      Well, they are in one file together, but

12      they're indicated the ones that have clemency.  There's a

13      flag that's set.  So those don't get sent to the

14      supervisors.

15             Q      Okay.  So all of them would have been in one

16      file together and run against the clemency list, or not?

17             A      Well, the clemency is how many of --

18             Q      How many of them actually had clemency?

19             A      Let's say you have 50,000 records, you're

20      comparing that against the clemency file.  And any

21      matches that you find, you're notating, yes, this person

22      was identified as being a possible felon but they have

23      had their rights restored.

24                      So in that case, they're not really -- I

25      mean, they're allowed to vote, so the supervisors are not

1    informed of them.

2          Q    Okay.  So you have one file that you ran

3    against the clemency data -- well, you ran all of the

4    felons against the clemency data.  The individuals who

5    were found to have clemency are listed here in the

6    clemency category?

7          A    Yes.

8          Q    And those were not provided to the

9    supervisors of elections?

10         A    Correct.

11         Q    And then individuals from that big pool of

12   felons who are run against the clemency data and found

13   not to have a match for clemency records are listed in

14   this bottom category of felons; is that correct?

15         A    Correct.

16              MR. HUME:  Could you repeat that question.

17              (Requested portion read.)

18              THE WITNESS:  The felons are first run

19         against the central voter file.  And that produces

20         the file that gets run against clemency.

21              The clemency is not run against the FDLE

22         felon data by itself or against the central voter

23         data file by itself.  That does not occur.

24              We only run it against possible matches that

25         occurred between the central voter file and the

ACCURATE STENOTYPE REPORTERS, INC.

1          FDLE file.

2     BY MS. BORGEN:

3          Q     Okay.  And you would have run it also --

4     that would be that first category, that CVF category?

5          A     (Nodding head affirmatively.)

6          Q     You also then ran -- you had the central

7     voter file data of registered voters that you ran against

8     the DBT list of felons in addition to the FDLE list; is

9     that correct?

10         A     Correct.

11         Q     Okay.  And then those individuals you would

12    have run against the clemency data as well?

13         A     Well, the DBT, if they were out of state,

14    they did those checks themselves because it was out of

15    state and we don't have access to that data.

16         Q     Okay.

17         A     And then if they had an out of state, it was

18    just -- yes, it was listed that they received clemency

19    out of state.  That's what that indicated there.

20         Q     Okay.  So the DBT files included only

21    convictions outside of Florida; is that correct?

22         A     Their proprietary data consisted of -- they

23    had data they collected from the Department of

24    Corrections in Florida and various other states, which I

25    have the states here in this.

ACCURATE STENOTYPE REPORTERS, INC.

1          In '99, it was Illinois, Kentucky, Virginia,

2     Wisconsin.  And in 2000, it was Connecticut, Illinois,

3     Kentucky, New Jersey, Ohio, South Carolina, Texas,

4     Virginia, Washington and Wisconsin.

5          Q     Okay.  I'm going to come back to that in

6     just a minute.

7               So you said the DBT database did include

8     convictions in Florida?

9          A     From the Department of Corrections?

10         Q     From the Department of Corrections?

11         A     Yes.

12         Q     And that is different data from the Florida

13    Department of Law Enforcement?

14         A     Correct.

15         Q     Okay.  So the DBT database, the individuals

16    here listed as clemency DBT 450, to your knowledge does

17    that include some individuals who had convictions in

18    Florida and clemency in Florida?

19         A     It could.  I don't know.  I would have to

20    look at the database to tell you?

21         Q     Okay.  But it could include those

22    individuals?

23         A     It could.

24         Q     Okay.  So look at this list then from 1999,

25    the information that would have been forwarded to the

ACCURATE STENOTYPE REPORTERS, INC.

1     county supervisors of elections would not include the

2     clemency data here at the top?

3          A    Correct.

4          Q    In terms of felons, just the felon category

5     here at the bottom?

6          A    Correct.

7          Q    So the list that the Division of Elections

8     forwarded to the supervisors of elections in June of 1999

9     included 39,240 individuals as felons?

10         A    Correct.

11         Q    And then looking at that data for January of

12    2001, and once again to the top category of clemency,

13    these individuals would not have been forwarded to the

14    supervisors of elections; is that correct?

15         A    Correct.

16         Q    The Division of Elections would have

17    forwarded 42,322 individuals on their felon list; is that

18    correct?

19         A    Correct.

20         Q    Okay.  Ms. Modrow, I wanted to go back to

21    the CD-ROM that you had provided to us with earlier this

22    morning.  Now, that CD-ROM was labeled on the outside of

23    the case "Clemency 10/5/99."

24         And, again, if you could tell me what is

25    your understanding of what this file includes?

1          A       That was their database at that point in

2     time.  That included all the individuals that were

3     granted -- their voting rights were restored.

4          Q       And when you say "their," to whom are you

5     referring?

6          A       The Office of Executive Clemency.

7          MS. BORGEN:  I'd like to mark this as

8          Exhibit 2.

9          (Exhibit 2 marked for identification.)

10    BY MS. BORGEN:

11         Q       Do you know who prepared this database?

12         A       The original one was done by, I believe, Ben

13    Rouse, who is no longer there.  And the subsequent ones

14    were done by Yi Qui, Y-I, Q-U-I, is his name.

15         Q       What's the spelling again?

16         A       I think his first name is Y-I, and I believe

17    his last name is Q-U-I.  That's it.

18         Q       Okay.  And Ben Rouse, do you know how his

19    name is spelled?

20         A       B-E-N, and then Rouse, R-O-U-S-E.

21         Q       And were these the individuals who e-mailed

22    the files to you?

23         A       Yes.

24         Q       And did you speak to them about the files?

25         A       Briefly.  I talked to Ben once just asking

1  him like as far as in there there's two fields, one

2  called data clemency and date board granted, and I needed

3  to know which one would be filled in to show what date

4  they actually had clemency.

5        And he explained to me that it was either

6  one or the other.  So if there wasn't a date in the

7  other, then you knew it was the other fields that were

8  granted.

9        I asked him about the Social Security number

10  because when I received it, it was sent to me as a number

11  field instead of a character field so zeros were dropped

12  off.

13        Other than that -- I mean we could have

14  talked about something else.  Those are the two things I

15  can think of specifically.

16        I do know after one of the runs, probably

17  the June of '99 run, it appeared that some of the

18  clemency we had picked up in March were no longer in

19  there.  So I had asked him why those were no longer in

20  the file, which is why I think he ended up sending me the

21  subsequent file at the end of October.

22        Q    Okay.  So that's why there are two files,

23  one at the beginning of October and the second one at the

24  end of October?

25        A    Exactly.

49

1      Q      After you called him and said there seemed

2  to be some files missing?

3      A      Uh-huh (affirmative.)

4      Q      How did that problem come to your attention?

5      A      Some of the records that should have been in

6  there weren't.  Obviously one of the checks that I ran

7  against the data, I mean the data that I get from

8  Database Technologies, I try to check and verify that the

9  requirements document processing was done correctly and

10  that the data I gave him that we're sending back to the

11  supervisors is what they should be receiving.

12          So I tried to double-check the clemency as

13  well.  And it seemed like some of the records that we had

14  received originally that had matches were no longer

15  there.  So I contacted him, and he sent me a new file.

16      Q      Did you do a spot check with just a few

17  names that you found?

18      A      No.  Everything is in our sequel server.

19  And when you have them in a table that you can access,

20  you can usually just create a query.

21          And it's run against the whole table.  So

22  anything that I ran was always against every record.

23      Q      Did you receive any explanation from

24  Mr. Rouse as to why these files were missing from the

25  early October of '99 file?

ACCURATE STENOTYPE REPORTERS, INC.

1        A       At that point, I think he was leaving and I

2    might have talked with Yi.  I don't remember what he

3    said, but he sent me a new file and everything was there.

4    So I don't know what the problem was.

5        Q       Okay.  So approximately when was that

6    conversation with Yi Qui, Mr. Qui, Q-U-I?

7        A       I don't know how you pronounce his name.  I

8    think the first is Yi though.

9                I don't know exactly.  I can probably try to

10   look through my e-mails and get you a date.

11       Q       And that conversation with him about that

12   October file, was that your conversation with him?

13       A       With who?

14       Q       With Yi, regarding the files.

15       A       Probably.  I pretty much just had contact

16   with him first through e-mail.  So he was the one that

17   sent me the file.

18       Q       Is he still working for the Office of

19   Executive Clemency?

20       A       Yes, he is.

21       Q       And do you know where Mr. Rouse is now?

22       A       No, I don't know.

23       Q       Do you know approximately the last time you

24   spoke to him, to Mr. Rouse?

25       A       I don't have any idea.  I don't know when he

1  exactly left.  I think I e-mailed him.  He's the one that

2  responded back to me, so I don't know when that occurred.

3      Q    Okay.  But you would have e-mails about

4  those -- perhaps when you would e-mail Mr. Rouse and he

5  had responded, would you have e-mails regarding those

6  interactions with the Office of Executive Clemency?

7      A    I should.

8      Q    Could we get a copy of those?

9      A    Certainly.

10     Q    Going back to the CD-ROM that's been marked

11  as Exhibit 2.  At the top of that file in the computer --

12  and I can turn this around to take a look at this as

13  well.  I don't want you to have to do that from memory

14  either.

15          There are a couple of rows.  For the record,

16  there's a category called DC Num.

17     A    Yes, the first one.

18     Q    Yeah, the first one.  Do you know what that

19  indicates?

20     A    The Department of Corrections number.

21     Q    And what's your understanding of where that

22  number comes from?

23     A    I'm assuming the Department of Corrections.

24  We don't really use it.

25     Q    Okay.  And there's another category, which

ACCURATE STENOTYPE REPORTERS, INC.

52

1    is the second one there EC Num.

2          A    I think that's an internal executive

3    clemency number.  I'm not sure what they use that for

4    either.

5          Q    Did you use that category at all with your

6    work?

7          A    No.

8          Q    Okay.  And the category later Tag ID?

9          A    That, once again, is just an internal number

10   for them.  I believe that's a unique identifier for the

11   record.

12         Q    Okay.  And Clem Type ID?

13         A    And my understanding is that's also a unique

14   identifier.

15         Q    Assigned by the Office of Executive

16   Clemency?

17         A    Yes.

18         Q    Okay.  We touched on this briefly before,

19   but some of the records include race, there's a category

20   for race; is that correct?

21         A    There's a category for race.

22         Q    There's one category listed here as race and

23   there's a race ID category.  It appears to me that there

24   are two categories that involve race; is that correct?

25         A    Yeah.  The race ID is just a code for

ACCURATE STENOTYPE REPORTERS, INC.

1    whatever.  And then they also gave me the description.

2    It's the same thing.  It's indicating the same thing;

3    it's just one is their code and one is their description.

4         Q     So that one would include -- for example, on

5    the record here of Richard Eldridge, it says, "White" and

6    then "two."

7         A     Right.

8         Q     So two would be their code?

9         A     Right.

10        Q     For the race?

11        A     Right.

12        Q     Okay.  And do you have any information on

13   why some of the records do not include race?

14        A     I'm not sure how they populated their data,

15   no, I don't.

16        Q     And did the Division of Elections use the

17   race category in matching any of the data?

18        A     No, we do not.  Because it's too easy to

19   make mistakes for code fields when you're entering that,

20   even in the matches of trying to figure out -- even when

21   we're matching the central voter file against any of the

22   other files, we don't use that field.

23        Q     After you've done the match -- and you don't

24   use the race for matching -- but then you do provide the

25   list to the counties of who has been matched.

ACCURATE STENOTYPE REPORTERS, INC.

54

1          At that point in time, do you include the

2     race information?

3          A     Yes, we do.

4          Q     And what is your basis for providing it at

5     that point in time?

6          A     Because that might be a field that the

7     supervisors could directly look at on the report and

8     decide maybe this is not the same person, especially if

9     they are -- you know, if you have black and white, they

10    might say, okay, well, this probably is not the same

11    person, especially if it's a common name.  You're

12    probably going to get a hit.

13          So it was used for the supervisors to be

14    able to directly look at the data and be able to weed out

15    ones that probably are not hits.

16          When you have data, you've obviously got --

17    especially dealing with the felony data, you've got a lot

18    of alias information that was entered into there.

19    Whatever name was given at the time of the arrest, that

20    is what goes into the file.

21          The person doesn't always tell the truth,

22    they make take somebody else's identity or whatever.  But

23    some of the other information, I believe, comes from the

24    office of arrest.

25          So that's why you try to stress to the

ACCURATE STENOTYPE REPORTERS, INC.

55

1    supervisors when you're looking at these lists, take

2    everything into account and maybe you will be able to

3    weed off the ones that probably are not matches.

4              Like if we do a name match, you could look

5    at the Social, and if it's not anywhere close then you

6    could probably eliminate that from your list as not being

7    the same person.

8         Q    Okay.  So in the list of felons that the

9    Division of Elections provided to the supervisors of

10   elections, it would have included individuals whose race

11   listed in the central voter file did not match the race

12   listed in the DBT files; is that correct?

13        A    In the other matching files, yes.

14        Q    Okay.  So it could have had someone who was

15   in the clemency file whose race was listed as black --

16   I'll withdraw that question.

17             On this list for those where race is

18   unknown, how would you determine the race of those where

19   it's listed as unknown?

20        A    You don't.

21        Q    You just don't give them that field?

22        A    Right.

23        Q    Okay.  And even though you didn't use that

24   data in doing your matching, how would you -- you know,

25   in your professional capacity, how would you go about

1     trying to determine that information if someone at the

2     Division of Elections said, you know, we want to try to

3     fill in that field and use it, how would you go about

4     trying to do that?

5          A     We wouldn't for one thing.  Even on our

6     voter registration application, race is there but it's an

7     optional field.  And that's why on a lot of those you'll

8     see unknown for the race because they didn't fill it in.

9     And nobody tries to guess what it is.

10         Q     Okay.  Would any efforts be made to try to

11    find other records where everything seems to match up and

12    if those records included race then fill it in to this

13    database, anything like that?

14        A     I wouldn't know.  I mean, the data is

15    collected at the county level and we just get a copy of

16    it.  So I wouldn't be able to answer that question.

17        Q     Turn back to the three lists that the

18    Division of Elections had received from DBT, from

19    Database Technologies, the March of '99, June of '99 and

20    January of 2000.

21        And you mentioned before that there was a

22    requirements document for doing the matching coming up

23    with these lists.

24        A     Yes.

25        Q     When was that requirements document created?

 1          A     It was created after the March one.   It was

 2     created after -- probably in July or June, I guess it

 3     would have been in June of '99 the first version would

 4     have been created.

 5          Q     So the requirements document was created

 6     after the first list was run?

 7          A     Correct.

 8          Q     So what requirements were used in running

 9     that first list, the March of '99 list?

10               MR. HUME:  Object only because I think she

11          said she wasn't there then.

12               THE WITNESS:  Right.  I wasn't there.  And

13          I'm not sure what they were using.

14     BY MS. BORGEN:

15          Q     Do you know who at the Division of Elections

16     would know what requirements were used for running that

17     first list?

18          A     No one currently there.   It probably would

19     have been Sandy Brill.

20          Q     And what was Sandy Brill's position?

21          A     He was the bureau chief for the Bureau of

22     Applications.  I'm trying to think of what it was called

23     then.

24          Q     Has that office changed names?

25          A     Yeah.  It's been so long.

ACCURATE STENOTYPE REPORTERS, INC.

1          He was the bureau chief of the Departmental

2     Applications Bureau.

3          Q     And what is that office called now?

4          A     I'm not sure.  I think it's still called

5     something along those lines.

6          Q     Do you know approximately when the name

7     changed?

8          A     It's probably still called the same thing.

9     It's something like departmental applications.

10          Q     Okay.  And that's within the Division of

11     Elections?

12          A     That section right there was within the

13     Department of State.

14          Q     And do you know where Mr. Brill is now?

15          A     He's, I think, working for Health Plan

16     Southeast.

17          Q     A private company?

18          A     Yes.

19          Q     And do you know approximately when he left?

20          A     My guess would be probably like January or

21     February of '99.

22          Q     Before you returned?

23          A     Before I returned.

24          Q     Do you know if there's information at the

25     Division of Elections that would describe what

ACCURATE STENOTYPE REPORTERS, INC.

1    requirements were used for the March of '99 list?

2         A    I don't know if there are or not.  I don't

3    know how much was detailed in the contract with them.  I

4    don't think it got into exactly how the matches were

5    done.  It might have.  I don't remember.

6              But I don't know of any document that's

7    there that specifies how the matching was done.

8         Q    Would Database Technologies have provided

9    any list to the Division of Elections saying these are

10   the criteria we used or these are the requirements we

11   used in producing this list to you?

12             MR. HUME:  Same objection as before.

13   BY MS. BORGEN:

14        Q    Well, you were there for the production of

15   the June of '99 and January of 2000 list, correct?

16        A    I was there for -- I came in right in March

17   of '99, so that data we did hand off.  They already had

18   all of their coding done at that point and had samples of

19   their product.

20             I guess they did a test run before I got

21   there and they printed out some reports.  So I don't know

22   how those reports were done and how the matching was

23   done.

24        Q    Okay.  Were you involved in discussions in

25   approximately May and June of 1999 to establish the

ACCURATE STENOTYPE REPORTERS, INC.

1    requirements document that Database Technologies used?

2         A    Yes.

3         Q    And at those meetings, did you discuss how

4    the requirements would be changed from how they were used

5    from the March of '99 list?

6         A    Well, we discussed what the processing was

7    going to be in June.  We didn't go back and talk about

8    what they did in the past.  We talked about how they were

9    going to do in the future.

10        Q    Okay.  So there was no discussion of, well,

11   this is what we did before but it didn't seem to work so

12   let's do it this way instead?  There was nothing like

13   that?

14             MR. HUME:  Objection; asked and answered.

15   BY MS. BORGEN:

16        Q    You can answer.

17        A    No.  We pretty much started with a clean

18   slate because we didn't want to go with how they had done

19   it before and we wanted to take everything fresh, so we

20   started at base one.

21        Q    Okay.  And why didn't you want to go with

22   how they had done it before?

23        A    Because for one thing, I wasn't sure how it

24   was done.  And the order of how they were doing the

25   matches based off the different fields wasn't in the

ACCURATE STENOTYPE REPORTERS, INC.

1    correct order.

2                 We wanted to take in -- since we were

3    starting with a clean slate -- use more of the data

4    fields like middle name and just make sure that every

5    file was handled in the same manner with the same

6    process.  So we just decided we were going to start with

7    a blank slate, and that's what we did.

8          Q     The March '99 list that was done before you

9    were there, to your knowledge were those lists provided

10   to the supervisors of elections?

11         A     Yes, they were provided.

12         Q     Do you have a copy of the requirements list

13   that was -- the requirements document that was

14   established in June of 1999?

15         A     Yes, I do.  I don't have it with me.

16         Q     Okay.  Would it be possible to get a copy of

17   that document?

18         A     Certainly.

19         Q     And were those the requirements that were

20   used for the June '99 list?

21         A     Yes.

22         Q     The ones that were sent out in that memo,

23   that would be the requirements, the exact ones that were

24   used for the June of '99 list?

25         A     Yes.  The requirements in that document is

ACCURATE STENOTYPE REPORTERS, INC.

1    how the processing was done for the June.

2         Q    Okay.  Would there have been any other

3    changes that someone came up with just after the

4    requirements document was developed, someone thought, oh,

5    let's do this instead and something was added on or

6    changed?

7              Would there have been any requirements

8    changed from that document before the list was run?

9              MR. HUME:  Which list is this?

10             MS. BORGEN:  The June of '99 list.

11             THE WITNESS:  I would have to look at my

12             e-mails to be sure.  But offhand, I would say no

13             from what I recollect, which was two years ago.

14             I can't think of anything offhand that was

15             changed.  But if there was, I'm sure it would have

16             been sent in an e-mail.

17   BY MS. BORGEN:

18        Q    And that's something you could check for us?

19        A    I could check for you, sure.

20        Q    And the third list was the January of 2000

21   list.  What requirements were changed between June of '99

22   and January of 2000 between those lists?

23        A    We did change, especially with the deaths.

24   In June of '99, the deaths that was run against their

25   Social Security administrative file, we found out -- or

1    at least I found out -- that that file doesn't really

2    contain very many middle names.  So we were getting an

3    exorbitant amount of hits on common names when we were

4    comparing it to all of the United States.

5            So we decided to go ahead -- generally we do

6    the name matches first and then Social matches.  But in

7    that particular file, we switched where we were going to

8    do the Social match first because it's going to be more

9    accurate without middle names, so we switched that.  That

10   was one of the main differences.

11           Q    Any changes in the requirements regarding

12   the felon matching?

13           A    Nothing really changed in the felon matches

14   other than we added some more states of their proprietary

15   data.

16           Q    Did you change anything in how the names

17   were matched?

18           A    Between '99 and 2000, the only thing that

19   changed was once a Social match was made off of the last

20   name -- I discovered when I was doing my checks on the

21   '99 data, that the code for, let's say, a Social name

22   match, which would have been their Social Security, the

23   last name and either the first name or date of birth, the

24   last name should have matched completely, but I

25   discovered quite a few that didn't.

ACCURATE STENOTYPE REPORTERS, INC.

1       And I had asked them about it.  And they

2   were saying that once they had a Social match that they

3   were doing a 90 percent match on last name to try to pick

4   up the ones that you have typographical errors going in

5   the database.  I mean, it wasn't a large quantity.

6       And each of the areas that that's duplicates

7   and felons, there may have been a couple hundred, that

8   got picked up on that.  And I looked at them, and they

9   looked reasonable, you could see where the typographical

10  error could be.

11      In our meeting for the 2000, it was

12  suggested that we drop that to 80 to see what was picked

13  up.  And I said that would be fine, that I would check

14  the data.  So that was dropped.

15      And I did look at the data, and, once again,

16  it looked very reasonable.  It picked up maybe another

17  couple hundred at the most in the different categories.

18      Q      And was that change made to the 80 percent

19  match after -- well, let me take a step back.

20      Are you familiar with Bucky Mitchell?

21      A      Yes, I am.

22      Q      And who is he?

23      A      He was an attorney for the Division of

24  Elections.

25      Q      And did you work with him as part of this

1      process of working with these lists with Database

2      Technologies?

3                A     Yes, I did.

4                Q     And what was his role in working with you?

5                A     Well, he handled obviously all of the legal

6      matters.  I mean, I was the technological person and he

7      was our legal representative.  So any questions that

8      would come to me that were of a legal nature, I would

9      pass them on to him.

10                    He worked heavily obviously with the

11      supervisors and with FDLE in coming up with the process

12      that was followed and handling the hits and how the

13      supervisors dealt with them.  So at least uniformly they

14      could look at the reports and try to process them.

15                    He did all of the workshops with me that we

16      did around the state.

17                Q     Okay.  And was he involved at all or did you

18      have -- let me step back.

19                    Did you have any discussions with him

20      regarding the change in the requirements between the June

21      of '99 list and the January of 2000 list?

22                    MR. HUME:  Object just to remind the witness

23            that to the extent any of those conversations may

24            have been privileged, she should not disclose

25            them.  And I instruct her not to answer if any of

1            them were privileged since he was a lawyer.

2                    Is that right?

3                    THE WITNESS:  Yes, he was a lawyer.

4                    Not that I remember.

5    BY MS. BORGEN:

6            Q    When you spoke to Bucky Mitchell about some

7    of the questions on the list, were you seeking legal

8    advice from him?

9            A    Was I seeking legal advice?

10           Q    Yes.

11           A    I don't know.  I mean, I don't recall any

12   conversations to say whether I was seeking legal advice

13   or not.  I don't recall.

14           Q    Okay.

15                   MS. BORGEN:  I have a question for counsel,

16           whether you would withdraw the objection since

17           it's not clear from the witness that she was

18           seeking legal advice from Mr. Mitchell?

19                   MR. HUME:  Well, as I understand the answer,

20           she doesn't recall the specifics of any of the

21           conversations either way, which means that she

22           doesn't recall enough to answer either way.

23                   So I'm not sure the purpose of withdrawing

24           the objection would be since it's not clear that

25           it was not to seek legal advice.  I wouldn't

ACCURATE STENOTYPE REPORTERS, INC.

1    withdraw the objection and let the objection stand

2    to the extent any conversation might have been

3    regarding a request for legal advice and the

4    objection should stand.

5         I would also just like to object generally

6    at this stage to the line of questioning, which

7    I've let go, but which strikes me as utterly

8    irrelevant to the claims in this case in terms of

9    the changes of policies over the last couple of

10   years in the implementation of -- or the

11   information given by the secretary of state to the

12   counties and different methodologies used.

13        I will allow the questioning to continue.

14   But at some stage I will reiterate the objection

15   in the sense that no relevance foundation has been

16   laid, that I can perceive anyway, to the claims in

17   this case.

18        MS. BORGEN:  As you know from the 30(b)(6)

19   deposition notices, clearly one of the issues we

20   had raised was the purge process, which is

21   directly what we are dealing with.

22        MR. HUME:  I understand the relevance of

23   taking discovery on the basic methodology of the

24   purge process, as you call it, and of the

25   secretary of state's responsibility, statutory

ACCURATE STENOTYPE REPORTERS, INC.

1   responsibility for implementing the felon

2   disenfranchisement rule.  And we're here to answer

3   questions or Janet Modrow is here to answer

4   questions on that.

5       But the relevance of changes of policy,

6   which you've had an extensive line of questioning

7   on, does seem to me to be totally irrelevant as a

8   legal matter for the case.

9       I'm objecting to it.  I want to preserve the

10  objection.

11      I also want to put you on notice that that's

12  our position and that if the line of questioning

13  continues at length, I would consider objecting to

14  and instructing the witness no longer to answer as

15  a relevant line of questioning.

16      MS. BORGEN:  That certainly will be noted

17  for the record.  I would simply respond that it

18  goes directly to the issue of how the members of

19  our plaintiff case are disenfranchised and how

20  their names are struck from the voter rolls and

21  how the policy of the law of the state of Florida

22  is applied to our clients.

23      MR. HUME:  Okay.  And, again, just to be

24  clear, my objection is that discovery on how that

25  law is applied does seem relevant; discovery on

ACCURATE STENOTYPE REPORTERS, INC.

1   how it was applied in the past does not seem

2   relevant.

3          MS. BORGEN:  Discovery of how it was applied

4   in the past is directly relevant to -- how the

5   state implemented the policy in the past goes

6   directly towards the interest of the state in

7   having this policy and to the number of

8   individuals in the plaintiff class who may be

9   affected by this, it goes directly to that.

10         MR. HUME:  The legal relevance is not

11  evident to me.

12         MS. BORGEN:  Well, you've indicated at this

13  point in time you have no objection to her

14  continuing at this stage?

15         MR. HUME:  I object.  But I'm not

16  instructing the witness not to answer.

17         MS. BORGEN:  Okay.

18         MR. HUME:  In other words, I am preserving

19  the right to move to strike the deposition as

20  irrelevant.

21  BY MS. BORGEN:

22         Q    I would like to show you one document

23  perhaps to save you a step from looking in your record.

24  We discussed a requirements document that was used in

25  June of '99.

1        A      Uh-huh (affirmative.)

2        Q      If you could take a look at this document

3   and tell me if this is the requirements document that you

4   were describing?

5        A      Yes, it is.

6        Q      Take your time to look through it to see if

7   it looks like a complete document.

8        A      Okay.

9        Q      That appears to you to be the complete

10  requirements document from June of '99?

11       A      It appears to be, yes.

12              MS. BORGEN:  I would like to make that

13          Exhibit 3 to your deposition.

14              Though, I would ask your counsel if we could

15          make a copy of that perhaps when we take a break

16          because actually this copy I have here is an

17          exhibit to another deposition?

18              MR. HUME:  Okay.

19              MS. BORGEN:  So we'll wait and at break

20          we'll make a copy and after that it's Exhibit 3.

21              (Exhibit 3 marked for identification.)

22  BY MS. BORGEN:

23       Q      I'd like to show you a copy of an e-mail

24  from Marlene Thorogood to Bucky Mitchell cc'd to you

25  dated March 24th, '99.  I'll let your counsel look at it

---

ACCURATE STENOTYPE REPORTERS, INC.

1    first.

2                    MR. HUME:  Who is Marlene Thorogood?

3    BY MS. BORGEN:

4         Q    Do you know who Marlene Thorogood is?

5         A    Yeah.  She was the project manager for

6    Database Technologies.

7         Q    Did you work with her on the Database

8    Technologies contract that we've talked about?

9         A    I worked with her on the contract.  I worked

10   with her on the requirements document.

11        Q    The requirements document that was entered

12   as Exhibit 3, you did not work with her on that?

13        A    No.  I worked with her technical personnel.

14        Q    But you worked with her with the processing

15   of the lists, the March of '99, June of '99 and January

16   of 2000 lists?

17        A    Yeah.  She was the project manager, so she

18   was my main contact person.

19                   MR. HUME:  I take it you're showing this to

20            me to give me an opportunity to object as to its

21            privileged nature?

22                   MS. BORGEN:  For your review.  Any privilege

23            of that document has, I believe, been waived.  It

24            was produced to us.

25                   MR. HUME:  Was it produced in this

1       litigation?

2              MS. BORGEN:  It was produced to us in other

3       litigation, in NAACP v. Harris by counsel for

4       Database Technologies.  That is the Bates number

5       that is on the bottom right corner.

6              MR. HUME:  By counsel for Database

7       Technologies?

8              MS. BORGEN:  That is correct.

9              MR. HUME:  Well, I'll reserve our right to

10      revisit any possible privilege claim we'll make

11      later, but I'm not going to instruct her not to

12      answer.

13   BY MS. BORGEN:

14      Q      The e-mail begins in the middle of the page.

15   If you could please read that.

16      A      Okay.

17      Q      Ms. Modrow, are you familiar with the

18   discussion between Bucky Mitchell and Marlene Thorogood,

19   the e-mails between them regarding the requirements that

20   would be used for processing the felon lists?

21      A      Yes.

22      Q      And are you familiar with Mr. Mitchell's

23   instructions regarding changing the requirements for the

24   list that would be produced in January of 2000?

25      A      The dates on these were before that, were

ACCURATE STENOTYPE REPORTERS, INC.

1      they not?

2          Q     You're right.  This is a March 24, '99

3      e-mail.

4          A     So this is for the June we're discussing

5      here.

6          Q     Okay.  Would Mr. Mitchell have been involved

7      in setting the requirements document for June of '99?

8          A     No.  What was discussed was how the names

9      were being processed.  That's all that was discussed

10     there, which was covered in the requirements document in

11     June.

12         Q     And did you have any sense of Mr. Mitchell's

13     approach to the matching that would take place?  Had he

14     given you any instructions regarding how broad the

15     matching should be?

16         A     No, just how the names themselves were going

17     to be processed.

18         Q     Okay.  According to this e-mail,

19     Mr. Mitchell had informed Marlene Thorogood that the

20     Secretary of State's Office would rather, quote, capture

21     more names that possibly aren't matches and let the

22     supervisors make a final determination rather than

23     exclude certain matches all together.

24             Do you recall that policy being discussed?

25         A     Well, what I recall out of that is coming up

ACCURATE STENOTYPE REPORTERS, INC.

1    with them with a way to process the names that would be

2    standard for everyone.

3              When you're dealing with so many different

4    data files, each agency in each county can enter a name

5    the way they want it.  So depending on what county puts

6    in the first name compared to another county can vary.

7              Some may put first and middle in the first

8    name field, some may just put the first, some may put the

9    first and initial.

10             The same with FDLE, you've got multiple

11   people entering data in different files.  So what you end

12   up having to come up with is a standard way to process

13   those names.

14             What we came up with in the requirements

15   document was to take anything in the first name up to the

16   first character and that would be considered the first

17   name and everything else is put in the middle name field.

18             And then if you have any names like Bill,

19   you can break it down to William and so forth.  But you

20   just don't ignore the middle name either.  That's why we

21   use the least common denominator of the middle name.

22             So you're taking the whole name and you're

23   doing that with every single file that's involved, that

24   way everybody is on the same level.  That way you're

25   eliminating the way the data is initially entered into

ACCURATE STENOTYPE REPORTERS, INC.

1      the tables.

2                  Do you understand?

3            Q      Right.  I understand.

4            A      I know it's hard to explain this sometimes

5      to people when you're not used to dealing with data.

6            Q      And when you're setting up these matching

7      criteria, did you generally -- was it your sense that you

8      would capture more individuals if you set the

9      requirements a certain way that you would have more hits?

10           A      No.  What you're going to come up with is

11     you're trying to get the highest accuracy you can.

12                  And once again, you've got to treat all of

13     the data the same.  And if you do that, then you can be

14     assured you're not going to miss any, but you're also not

15     going to include ones that shouldn't be in there.

16                  So as long as you treat everything the same

17     -- you're probably always going to miss more than you get

18     due to data entry errors.  I mean, if everything was

19     entered absolutely perfectly, you would probably end up

20     with a lot more hits.

21                  But in each field, you're dealing with data

22     entry errors that are obviously going to exclude a lot

23     more that you'd ever be able to catch.  I mean, that's

24     just impossible to get everybody.

25           Q      I want to go back to one of the requirements

ACCURATE STENOTYPE REPORTERS, INC.

1    changes that you started to discuss earlier regarding

2    which felons were included in the DBT database.

3                Am I correct in that's how you identified

4    it?

5         A    Yes, the proprietary data.

6         Q    You had brought an exhibit with you with a

7    list that referred to the change in those requirements;

8    is that correct?

9         A    Yes.

10        Q    Okay.  And what is that list that you

11   brought with you?

12        A    It just shows by state the number of hits

13   that were received.  And obviously anything out of state,

14   would be their proprietary data.

15               Anything with DBT would have come from the

16   Florida Department of Corrections.  And those are the

17   counts per state.

18        Q    Okay.

19               MS. BORGEN:  I would like to mark this as

20          Exhibit 4.

21               (Exhibit 4 marked for identification.)

22   BY MS. BORGEN:

23        Q    This list is called at the top

24   "Probable/Possible Felon Counts by Source."

25               Who created this document?

1          A      I did.

2          Q      And how did you create it?

3          A      The data that was returned to me, I just did

4    a summary for the counts based on the fields indicated

5    there, which would have been the felon state and the

6    source saying whether it came from DBT's proprietary data

7    or the FDLE data that we supplied.

8          Q      Okay.  And there are handwritten notations

9    at the bottom, one saying "Automatic restoration 2,120"

10   and "Out of state 3,063."

11                Is that your handwriting?

12         A      Yes, they are.

13         Q      Okay.  And those are notations you made on

14   this document?

15         A      Yes, they are.

16         Q      Okay.  And where did you get that

17   information?

18         A      I just added the figures up top.  I mean,

19   these reports that I brought I have been using for the

20   last year for people that are coming and asking

21   questions.

22                I get a lot of press calling and wanting

23   summary figures, so I just keep the file so I can just

24   open it and rattle it off.  Those were the questions

25   they've asked, how many were out of state, how many had

ACCURATE STENOTYPE REPORTERS, INC.

78

1    automatic restoration.  So really those figures are just

2    adding the top numbers up.

3           Q     Okay.  So you would have an electronic file

4    with all of the records that are summarized here?

5           A     Yes.

6           Q     And if we wanted to get a copy of those, we

7    could get those from you?

8           A     Yes.  Other than Social.  That's, again,

9    removed.

10          Q     Okay.  And I'm not asking you to prepare

11   them at this point in time, but just to know you have

12   those.

13                On this document on source it says, "DBT."

14   What does that tell us?

15          A     It's telling us that it comes from their

16   proprietary data, so it's the Department of Corrections

17   data that they get.

18          Q     Okay.  And then state, that's which state

19   that DBT's data comes from, so it's DBT's proprietary

20   data from Florida, from Illinois, Kentucky?

21          A     Correct.

22          Q     Okay.  And do you know where they get that

23   data?

24          A     From the Department of Corrections in those

25   states.

ACCURATE STENOTYPE REPORTERS, INC.

1        Q    Do you know if anything is done to verify

2  that data?

3        A    I don't know.

4        Q    Okay.  And for the June 1999 list, then we

5  have a category that says, "FDLE, Florida."  And what is

6  that?

7        A    That's the data that it's run against, the

8  Florida Department of Law Enforcement data that I

9  supplied DBT.

10        Q    Okay.  This would be the same information

11  that's referred to on Exhibit 1 as the felon DOE data?

12        A    Exactly.

13        Q    Okay.  And for June of 1999, there are five

14  states listed; is that correct?

15        A    Correct.

16        Q    Okay.  And then we've got additional states

17  listed.  There's a star next to some of the states.  Are

18  those the additional states that were used in January of

19  2000?

20        A    I would imagine so.

21        Q    Did you place these stars next to the

22  states?

23        A    Yes, I did.  Yes, they're the additional

24  states.  They also indicate automatic restoration with

25  the stars.

1          Q       Okay.  So all of the states added to the
2    list in January of 2000 were those where automatic
3    restoration of rights was granted?
4          A       Correct.
5          Q       Okay.  So individuals from those states,
6    Connecticut, New Jersey, Ohio, South Carolina, Texas and
7    Washington were states that were then added to the
8    matching database.
9                  So individuals who were living in Florida
10   and had convictions in those states were identified on
11   the January of 2000 list; is that correct?
12                 MR. HUME:  Could I ask you to read the
13           question back.
14                 (Requested portion read.)
15                 THE WITNESS:  Yes.
16   BY MS. BORGEN:
17         Q       And if those individuals had received
18   automatic restoration in the state where they were
19   convicted, would there have been a clemency match for
20   those individuals or would they still have been on the
21   felon list?
22         A       We ran clemency matches to see if they had
23   any clemency.  And if they did not have clemency in
24   Florida, then they went on to the supervisors.
25         Q       So you were looking for a clemency match in

ACCURATE STENOTYPE REPORTERS, INC.

1       Florida only?

2               A       Yes.

3               Q       Okay.  So if they had automatic -- say, for

4       example, we had a category in Connecticut.  So if an

5       individual had their Civil Rights restored automatically

6       in Connecticut, you would then check your files to see if

7       they had their rights restored in Florida; is that

8       correct?

9               MR. HUME:  Could you read that question

10      back, please.

11              (Requested portion read.)

12              THE WITNESS:  Yes.

13      BY MS. BORGEN:

14              Q       Okay.  And if that individual did not have

15      clemency granted by the state of Florida, would they have

16      remained on the felon list that was forwarded to the

17      supervisor of elections?

18              A       Yes, they would have.

19              Q       And was it the position of the Division of

20      Elections that that individual was not eligible to vote

21      in Florida?

22              MR. HUME:  I object as to the vagueness of

23      the word "position."

24      BY MS. BORGEN:

25              Q       In your opinion as an employee of the

1    Division of Elections, is an individual who has had their

2    Civil Rights restored automatically in the state of

3    conviction (sic) but has not had their rights restored by

4    the state of Florida allowed to vote in Florida?

5         MR. HUME:  Objection.  That calls for a

6         legal conclusion.  It's clearly beyond the scope

7         of this witness's testimony as identified in the

8         30(b)(6).

9         MS. BORGEN:  I would disagree with that.

10        This witness has been designated by the Secretary

11        of State Katherine Harris, Governor Jeb Bush and

12        the Clemency Board to answer questions about the

13        secretary of state and the purge process.

14        MR. HUME:  That's true.

15        MS. BORGEN:  This question is certainly

16        within the -- would this individual be purged and

17        is allowed to vote or not, that's the ultimate

18        question.

19        MR. HUME:  No.

20        MS. BORGEN:  This individual has been

21        designated to answer that question.

22        MR. HUME:  No.  The question is what is the

23        process for removing people from the voting rolls,

24        it is not calling for a legal analysis of who is

25        and is not allowed to vote and why they are or are

ACCURATE STENOTYPE REPORTERS, INC.

1  not allowed to vote, which is a purely legal

2  question.

3      MS. BORGEN:  Presumably you only have a

4  process to purge individuals who you believe

5  should not be able to vote.

6      MR. HUME:  Well, I think that the question

7  of what you mean by "purge" and how that works are

8  themselves the questions that I think you're here

9  to ask, not what is a legal interpretation of who

10  is and isn't allowed to vote.

11      Let's read back the question.  It's a

12  straightforward legal question.

13      (Requested portion read.)

14      MR. HUME:  Objection stands.  That's a legal

15  question.

16  BY MS. BORGEN:

17      Q    Ms. Modrow, is an individual who has been

18  convicted of a felony in a state where their rights have

19  been automatically restored and that individual has not

20  had their Civil Rights restored by the state of Florida,

21  is that individual eligible to vote in Florida?

22      MR. HUME:  Same objection.  It's the same

23  question.

24      MS. BORGEN:  Are you instructing the witness

25  not to answer?

ACCURATE STENOTYPE REPORTERS, INC.

1              MR. HUME:  I'm objecting that it calls for a

2         legal conclusion.  I can only instruct not to

3         answer on grounds of privilege.  So I'm stating

4         the objection that I believe it calls for a legal

5         answer.

6    BY MS. BORGEN:

7         Q     You can answer the question.

8         A     Can you say that again?

9         Q     Sure.  If someone has been convicted --

10   we'll use an example to get there.  If someone has been

11   convicted in Connecticut and has had their rights

12   automatically restored by the state of Kentucky, that

13   individual moves to Florida and has not had their Civil

14   Rights restored in Florida, is that individual eligible

15   to vote in Florida?

16             MR. HUME:  Same objection.

17             THE WITNESS:  Am I supposed to answer?

18             MR. HUME:  I would remind you that you can

19        answer any question that's within your personal

20        knowledge and that you're not called here as a

21        lawyer since you are not a lawyer.

22             But you can answer the question.  I'm not

23        instructing you not to answer the question.

24   BY MS. BORGEN:

25        Q     You're here today as a representative or

ACCURATE STENOTYPE REPORTERS, INC.

85

1  designee of the secretary of state, the governor and the

2  Clemency Board.  So to the extent that you can answer the

3  question, go ahead and do so.

4             Your attorney's objection will be on the

5  record.

6        A    It's my understanding that if the person

7  doesn't have a certificate showing the automatic

8  restoration -- and once again, DBT does check with all of

9  these states to see if they issue certificates or what is

10  done -- then I believe it gets verified through the

11  Clemency Board that they truly have clemency is my

12  understanding of it.

13             I'm not sure, you know, of the whole

14  process, and obviously I don't know any legal issues of

15  what Clemency actually does, but that's kind of how it

16  was explained to me.

17        Q    Do you know which states give certificates

18  of restoration?

19        A    No, I don't.

20        Q    And you said that if someone doesn't have a

21  certificate that it's your understanding that the Office

22  of Executive Clemency might check on it?

23        A    Yes.

24        Q    Do you know what they do?

25        A    I don't know what they do.

ACCURATE STENOTYPE REPORTERS, INC.

1      Q      Okay.  And if you know, would an individual

2   who has a certificate showing that their rights were

3   restored automatically in another state, would that

4   individual be permitted to vote in Florida?

5      A      Say that again.

6      Q      If an individual was convicted of a felony

7   in Connecticut and has a certificate saying my rights

8   were automatically restored and that individual has not

9   sought clemency in Florida, would that individual be

10  allowed to vote in Florida?

11     A      My understanding is, yes, they would.

12     Q      And what do you base that understanding on?

13     A      Just from what I've heard said in like the

14  workshops that we have discussing this.

15     Q      Okay.  And did you hear someone discussing

16  -- I guess who would have been discussing that at the

17  workshops?

18     A      Most likely Bucky Mitchell.

19     Q      And this would have been he was explaining

20  the process to the supervisors of elections?

21     A      Or them having a discussion concerning it.

22     Q      Okay.  And when did those workshops take

23  place?

24     A      They took place in September and October of

25  '99.  There were five of them.

ACCURATE STENOTYPE REPORTERS, INC.

1    Q    And where did they take place?

2    A    All throughout the state.  There was one

3    here in Tallahassee.  There were others.

4    Q    And what was the subject of those workshops?

5    A    To educate the supervisor of elections on

6    how to read the reports and to process the reports,

7    hopefully at least in somewhat of a uniform fashion.

8         Once again, when you're dealing with data

9    and so many different elements -- I mean, all of these

10   reports are listed as probable or possible.  And it still

11   comes down to the supervisor to look at the data and try

12   to verify what they can, and if they can't contact the

13   voter themselves.

14        So included in the training was sample

15   letters that could be sent out and sample reports that we

16   specifically went over, individual cases, how they could

17   use AutoTrack to possibly verify if the person was the

18   same.

19   Q    Okay.  And you mentioned that the list

20   included possibles and probables?

21   A    Uh-huh (affirmative.)

22   Q    Is that something that you had an identifier

23   that Database Technologies developed?

24   A    Myself and them together.  Basically the

25   matches that were based off of the criteria of the name,

ACCURATE STENOTYPE REPORTERS, INC.

1    like your last name, first name, middle name, date of

2    birth, when you have all four fields that match it's

3    considered a name match, and that was listed under a

4    probable.

5         The ones that death with Social Security

6    numbers and just one or two other fields are possibles

7    since you didn't have as many data items matching.  So we

8    split them up there.

9         And once again, we stressed that there are

10   obviously probables in there that might not be hits and

11   there are possibles in there that might be -- don't

12   ignore possibles even though it was not as many data

13   fields, that they are probably still good hits as well.

14   And we went over examples of both kinds.

15        Q    When the Division of Elections received the

16   three different lists from DBT, were they divided into

17   possibles and probables?

18        A    It's all based off of the match field that's

19   on each record.  And if the match fields -- I mean, you

20   have codes for the matches.  Like NAM was a name match;

21   N&S was a name and a Social match; SSB was a Social and a

22   date of birth match.

23        That determined anything that started with

24   an N would indicate a probable because it was based off a

25   name.  Anything that started with an S in that code field

1    was put into the category of possible.

2         Q    Okay.  When they actually e-mailed you or

3    mailed you the electronic databases, when they sent them

4    to you, was there one that said here's a list of possible

5    matches and here is a list of probable matches?

6         A    No.  There is a field in the table.  So

7    basically I got here is all of the duplicate matches,

8    here is all of the death matches, here is all of the

9    felon matches.

10             Within each one of those tables, there's a

11   field that says, "Match basis."  And the match basis

12   would either be name, the code NAM or SSN.

13             Here is your different codes right here.  So

14   there would be a field in every one of those tables.  And

15   off of that field, the reports that I did would split

16   them into either probable or possible.

17        Q    First of all, what is this document that

18   you're referring to?

19        A    This is just a little a cheat sheet kind of

20   for the supervisors to be able to look at the match basis

21   and know what fields they were matched on and possibly

22   ideas of what they could do to verify it or check it or

23   what it would indicate.

24        Q    Okay.  And this was provided by the Division

25   of Elections to the supervisors?

1    A     Yeah.  DBT actually printed them up.  But

2    they were all passed out in the training materials at the

3    workshops.

4         Q     Okay.  Is that an extra copy that we can

5    mark?

6         A     Sure.

7              MS. BORGEN:  Mark this as Exhibit 5.

8              (Exhibit 5 marked for identification.)

9    BY MS. BORGEN:

10        Q     Referring to what's been marked as

11   Exhibit 5, the code names, you said this was provided to

12   the supervisors of elections at the trainings in the fall

13   of 1999; is that correct?

14        A     Yes.

15        Q     And you were listed then -- it says at the

16   bottom, "For more information contact Janet Modrow,

17   Division of Elections"?

18        A     Correct.

19        Q     So you were the point person?  If the

20   supervisors of elections had any questions about the

21   data, they would contact you?

22        A     Correct.

23        Q     When you provided the lists to the counties

24   and they were divided up, is it correct that each county

25   received data only for that specific county?

ACCURATE STENOTYPE REPORTERS, INC.

1      A      Correct.

2      Q      And that they were divided by deaths,

3  duplicates and felons?

4      A      Correct.

5      Q      And within each of those categories, divided

6  up into possibles and probables?

7      A      Correct.

8      Q      And did you sometimes switch -- when you

9  were reviewing the data you received from DBT, did you

10  sometimes switch categories of data from possible to

11  probable based on your review of the data?

12      A      Yes, especially in the case of the felonies.

13  When they did -- with the felony data, you have one felon

14  and multiple alias records.  Whatever they were arrested

15  at the time, that's what was entered into the database.

16           If they got matches off of a Social Security

17  number and they had other data in their other alias

18  records that identically matched the voter, then the

19  match really moved from a Social match up to a name match

20  because you have for that individual felon all of the

21  data that does match your central voter file data.

22      Q      So you would look at the nature of the match

23  and determine that perhaps some things that --

24      A      Yes.

25      Q      -- DBT might have been calling possible you

1    thought were probable based on the type of match?

2         A     Based strictly off of what other data was in

3    the felon database for that individual, yes.

4         Q     Okay.  And what were your instructions to

5    the counties on how to use the possible list versus the

6    probable list?

7         A     I would have to see that.  I mean, on some

8    of the possibles, one of the big things was the SSN and

9    date of births.

10         Usually you could see it was a lady who had

11   gotten married, a name change, the last name wouldn't

12   match but you could see -- sometimes their last name

13   would even be in their middle name or somewhere in there.

14   So those usually indicated name changes.

15         For the SSLs, we have a Social Security and

16   a last name.  A lot of times what we found was it was the

17   wife using the husband's Social, especially back in the

18   early 1900s they shared the same Social.

19         So if they saw that it obviously was a man

20   and wife, they could ignore it because that's how that

21   came into play.

22         Q     So were your instructions to the supervisors

23   essentially about how to use the source of data that

24   might be included in the different lists?

25         For example, would you say to them in the

1    possible list you need to do a little more checking than

2    on the probable list or something like that?

3        A    Or at least to understand what some of the

4    things are that come up.  Like if it was -- if the date

5    of birth was in the early 1900s, look into the

6    possibility that the Social was shared between the

7    husband and wife.  If it's a Social and date of birth,

8    look to see if it was possibly a name change because the

9    person had gotten married or whatever.

10       So we tried to tell them things to look for

11   in there in those categories.  And in the samples, it

12   really comes to light on the samples we went over.  When

13   you look at them, you can see the name changes and the

14   ones clearly with the husband's name and the wife's name

15   with the same Social.

16       Q    Okay.

17            MS. BORGEN:  I think that's all on this

18       line.  We can go ahead and take a break now.

19            (Lunch recess.)

20            MS. BORGEN:  For the record, we just made a

21       copy of the requirements document from June 1999

22       which was described as Exhibit 3 earlier, and

23       we've placed that into the record.

24   BY MS. BORGEN:

25       Q    Ms. Modrow, I just want to remind you you're

ACCURATE STENOTYPE REPORTERS, INC.

94

1      under oath, we're continuing your deposition.

2              Did you take any steps to prepare for the

3      deposition over the lunch break?

4          A      Just ate.

5          Q      Sounds like a good idea.

6              Before we continue, I wanted to clarify one

7      issue regarding the scope of the deposition since that is

8      a question that had come up earlier in the deposition.

9              And I would like to enter as Exhibit 6 a

10     copy of the deposition notices along with Exhibit A.  And

11     I'd like to show to you, Ms. Modrow, a copy of Exhibit A.

12             Have you seen this exhibit before?

13         A      I believe so.

14         Q      Feel free to look through the whole document

15     there.  It's attached as Exhibit A to the deposition.

16         A      I don't know if I saw this exact one, if not

17     something very similar to it when you first contacted me.

18     I don't know if it's this exact one or not.

19         Q      Okay.

20         A      But a lot of these things were covered.  I

21     don't know if I've ever read this exact one.

22         Q      In that Exhibit A, if I could ask you to

23     turn to Section A called "Secretary of State."  There are

24     three items there.

25             If you could please read through those and

ACCURATE STENOTYPE REPORTERS, INC.

95

1    tell me if you agree today to testify on all of the

2    issues set forth on those three?

3         A    I'm not sure of what some of them are.  I

4    mean, "In light of the Clemency Board defendants'

5    assertion in their answer to Paragraph 14 of the

6    complaint," I don't know what that is.

7         Q    Okay.  Would you be prepared to testify as

8    to at least the first part of that sentence regarding

9    "The responsibilities of the secretary of state,

10   including any divisions thereof and any appointed

11   successor regarding disenfranchisement of felons and

12   restoration of rights"?

13        A    I can certainly testify as to the

14   responsibility of the secretary of state.  I mean, they

15   don't disenfranchise any voters, so I guess I don't agree

16   with the terminology.  And restoration of rights is

17   really clemency's area.

18        Q    Okay.  But you're prepared today to

19   generally talk about the secretary of state's

20   responsibilities in this area?

21        A    Sure.

22        Q    Number 2 is regarding electronic files.  And

23   if you want to take a moment to read through that, please

24   do.

25        A    Yes.  Once again, I wasn't here in 1998 so I

---

ACCURATE STENOTYPE REPORTERS, INC.

1    would be more applicable from March of '99 forward.

2         Q    Okay.  And what was the time period you were

3    out of the office?

4         A    It was either September or October of '98 to

5    March of '99.

6         Q    Okay.  So from January of '98 until you left

7    later in '98, you could talk about that time period?

8         A    Sure.

9         Q    But not that block of time when you were not

10   in the office?

11        A    Exactly.

12        Q    Okay.  And Number 3, "Record keeping of

13   voter registration data," although we haven't turned to

14   that yet in the deposition, but are you able to testify

15   or willing to testify today about that?

16        A    Well, I can tell you in regards to what we

17   have in the central voter file.  I can't tell you exactly

18   what the supervisors do within their own offices

19   regarding this.

20        Q    Okay.  But you can testify as to what the

21   Division of Elections and the secretary of state has?

22        A    Yes.

23        Q    Okay.  If I could ask you then to turn two

24   pages over to Section D called "The Purge Process."

25   Number 1, "Records regarding the wrongful or erroneous

ACCURATE STENOTYPE REPORTERS, INC.

1    purging of registered voters since 1998," and generally

2    how the purge process works.

3              I think we've covered most of that, but

4    you're prepared today to talk about that process since

5    1998, excluding, of course, the time period you were not

6    in the office?

7        A    Right.  And once again, I wouldn't refer to

8    it as purging and some of the terminology.

9        Q    Okay.  You may have objections to the

10    terminology, but generally to that topic area you're

11    comfortable?

12        A    Yes.

13        Q    Okay.  And Number 2, "Communications and

14    records between the governor, secretary of state, any

15    other cabinet members or the Clemency Board and the

16    Republican Party or any other committee" -- and I'll let

17    you read the rest -- "in regard to the identification and

18    purging of registered voters in Florida."  And this would

19    be from January 1st of 1997 until present.

20              Are you willing today to testify on that

21    general area, to the extent that you can, understanding

22    that you were out of the office for a period of time and

23    that you may not be able to testify as to the Clemency

24    Board?

25        A    Right.  And I can tell you communications

1 for myself.  I can't obviously say for absolutely

2 everybody else within those offices.

3   Q Okay.

4   A I mean, I can tell you anything regarding

5 myself.  Do you understand what I'm saying?

6   Q Right.

7   A Because you're saying communications.  I

8 mean, I wouldn't know obviously about a call somebody

9 else made in the office next to me.

10   Do you see what I'm saying?

11   Q I do understand.

12   In preparation for the deposition, did you

13 speak to other people in the office to learn about any

14 communications that they might have had regarding this

15 topic?

16   A No, I did not.

17   Q Okay.  Well, understanding those

18 limitations, with the understanding of what you explained

19 and what you are able to testify about, you are willing

20 today to testify on those topics as the designee of the

21 defendants?

22   A Yes.

23   MR. HUME:  Could I have a moment to confer

24 with the witness?

25   MS. BORGEN:  Yes.

ACCURATE STENOTYPE REPORTERS, INC.

1          MR. HUME:  Off the record.

2          MS. BORGEN:  Yeah, let's go off the record.

3          (Off the record.)

4          THE WITNESS:  In my answer to the

5    Question 2, I mean I did discuss obviously with

6    Debbie and Hamish on Friday these questions, they

7    did go over them.

8          And before, I was referring to just my

9    fellow employees, not involving the lawyers as far

10   as this.  And we did discuss it as far as not

11   knowing -- I don't know of any communications that

12   was directly with the Republican Party.

13         The only thing that there might be a record

14   of is I know the Republic Party requests the

15   central voter file.  And the -- well, I'll call

16   them ineligible or possible lists of deaths,

17   duplicates and felons are public records.  And I

18   know we have had requests in the past.

19         I don't know if it was the Republican Party,

20   but I know the press has certainly gotten that

21   data.  And whether they did or not, I don't know.

22   I don't keep track of who that data goes to.  But

23   those files are available publicly.

24   BY MS. BORGEN:

25         Q    Okay.  And when you refer to Number 2,

ACCURATE STENOTYPE REPORTERS, INC.

1    you're referring to Question Number 2 in Exhibit A of the

2    deposition notice in the category called "The Purge

3    Process"; is that correct?

4           A    Right, Number 2 under "The Purge Process."

5           Q    Okay.  Was there anything else you wanted to

6    elaborate upon on your earlier answers regarding those

7    questions?

8           A    I don't think so.

9           MR. HUME:  I'm really sorry.  I have to now

10          take an unrelated break for one minute.  I've been

11          interrupted for something.  I hope it's going to

12          take no more than one minute.  I apologize.

13          MS. BORGEN:  Okay.

14          (Off the record.)

15          (Exhibits 6, 7 and 8 marked for

16          identification.)

17          THE WITNESS:  Can I say as regards to me

18          seeing this before, I didn't see it, but some of

19          it was read to me over the phone.  I knew some of

20          it sounded familiar, but I knew I hadn't --

21   BY MS. BORGEN:

22          Q    Okay.  And we have marked as Exhibits 6, 7

23   and 8 copies of the notices of taking deposition for each

24   of the defendants.

25          Exhibit 6 is the notice to the Clemency

ACCURATE STENOTYPE REPORTERS, INC.

1    Board, 7 is the notice to Jeb Bush, and 8 is the notice

2    to Katherine Harris.  And all three notices have

3    identical Exhibit As as well as two other attachments.

4           Ms. Modrow, while you're looking at

5    Exhibit 6, the deposition notice, turn to -- after the

6    listing of questions, there is a memo attached, a

7    Division of Elections memorandum.

8           A    Okay.

9           Q    If I could ask you to take a look at that

10   and tell me if that looks familiar to you.

11          A    Okay.

12          Q    And in particular, turning your attention to

13   Paragraph 4, there's a reference to an updated clemency

14   file from the Office of Executive Clemency that I want to

15   ask you about.

16          A    Uh-huh (affirmative.)

17          Q    Have you seen this memorandum before?

18          A    Yes.

19          Q    Did you help in the preparation of this

20   memorandum?

21          A    Yes.

22          Q    And was that worked out during the course of

23   your regular business with the Division of Elections?

24          A    Yes, it was.

25          Q    And in Paragraph 4 where there's a reference

ACCURATE STENOTYPE REPORTERS, INC.

 1    to the updated clemency file for the Office of Executive

 2    Clemency, is that the file that you described to us

 3    earlier in the deposition?

 4         A    Yes.

 5         Q    And would that have been the file from early

 6    October of 1999?

 7         A    Yes, it would have.

 8         Q    Okay.  And then the other files you've

 9    described that you received later would have been updates

10    to this same file that's referenced here?

11         A    Yes.

12         Q    Okay.  Did you ever receive any other

13    clemency files from the Office of Executive Clemency

14    other than the ones you described earlier?

15         A    Just the ones that I described earlier that

16    I know of.

17         Q    Thank you.  No further questions on that.

18              I wanted to turn back briefly to the

19    structure of the Secretary of State's Office.  Could you

20    please describe to me the general structure of the

21    Secretary of State's Office and the Division of Elections

22    and who is involved with the process of processing felons

23    who might be ineligible to vote and checking these

24    records, working with Database Technologies?  Who works

25    with you on that process and what's the structure in the

ACCURATE STENOTYPE REPORTERS, INC.

1  office?

2       A    Okay.  There's our division director.  And

3  under him, is the assistant director, some of the

4  lawyers.  And then there was me as the technical

5  employee.

6            I was pretty much the main one that worked

7  with DBT, giving them data and receiving data from them.

8            Bucky Mitchell was the attorney, and he

9  worked with the supervisors on it as well.  That's really

10 about it from the division.

11      Q    Okay.  So this is the Division of Elections

12 within the Secretary of State's Office?

13      A    Correct.

14      Q    And did you work for a subdivision or

15 subgroup or bureau of the Division of Elections?

16      A    No.  I'm employed by the Division of

17 Elections.

18      Q    Directly by the division?

19      A    Yes.

20      Q    And who is your direct supervisor at this

21 point in time?

22      A    At this point in time, Caroline Wilkinski.

23      Q    And what is her title?

24      A    Data processing manager.

25      Q    And who is her supervisor?

ACCURATE STENOTYPE REPORTERS, INC.

1      A      Her supervisor, I think, is Paul Craft.

2      Q      And what is his position?

3      A      He is chief officer of the voting system

4   section.

5      Q      Okay.  And who would his direct supervisor

6   be, if you know?

7      A      Ed Kast, the assistant director to the

8   Division of Elections.

9      Q      Okay.  So you work within -- what would the

10   bureau name be then that you work within?

11      A      Mine would probably be now the Bureau of

12   Voting Systems.

13      Q      Is that a recently created bureau?

14      A      I believe so, or section.  I think it's a

15   section.

16      Q      Has there recently been restructuring of the

17   Division of Elections?

18      A      In July when all the -- I mean, in July

19   Service First came into play, so a bunch of the positions

20   got changed or moved.  And I'm guessing it's from that.

21      Q      And you said Service First came in.  What is

22   that?

23      A      Jeb Bush -- a new employment -- just how

24   personnel is in the state.

25      Q      Would you say it's a restructuring of

1   government agencies?

2       A    I guess.  I mean, it involves moving people

3   that were Career Service employees up to Select Exempt

4   employees.

5       Q    All right.  So recently there has been

6   restructuring within the Division of Elections?

7       A    Yes.

8       Q    And is there anyone else who you haven't

9   mentioned yet who was involved in 1999 or 2000 with the

10  process of working with Database Technologies and the

11  central voting file regarding felons?

12      A    When I first came back, there were one or

13  two employees that were down in our central computing

14  facility, and I actually was handing the data off to

15  them.

16           And even when I came back, since I was still

17  new and they were used to doing the processing, you know,

18  they did the first hand-off to them in March of that

19  data.  That was Joseph Sema.  But I don't know if he

20  really did any -- had much contact with DBT itself other

21  than getting the data files ready for them.

22      Q    Okay.  And you said Mr. Brill used to be

23  your supervisor; is that correct?

24      A    Yes.

25      Q    Was he your direct supervisor?

ACCURATE STENOTYPE REPORTERS, INC.

1          A     Yes.

2          Q     Did he work with Database Technologies?

3          A     I believe so.

4          Q     And if you recall, when did he leave the

5     office?

6          A     I don't know exactly when.  I'm guessing

7     January or February.  I'm guessing January or February of

8     1999.

9          Q     That is while you were away?

10         A     Right.

11         Q     While you were working at another government

12    agency, you left?

13         A     Right.

14         Q     And do you have any familiarity of why he

15    left the office?

16         A     Because he got a new job.

17         Q     Do you know if he had problems with any

18    other employees at the office?

19         A     Not that I know of, no.  The job he had

20    gotten was kind of like a promotion, so I'm guessing

21    that's why he left and took it.

22         Q     Okay.  Let me ask you when you prepared the

23    lists -- or after you prepared the lists of possible and

24    probable felons and forwarded them to the county

25    supervisors of elections in 1999 and 2000, what was your

1   process for following up with the counties in terms of
2   how they used those lists?
3          A    Well, in 1999, we had the five regional
4   workshops explaining the reports, you know, how to
5   process them.  We went over in detail specific examples.
6   We came up with a process.
7               One thing that does happen -- and obviously
8   when you're matching data, it's very easy or not that
9   common, but you can have a case where you have two
10  different people with the exact same information, same
11  name, same date of birth.  And that is what's called a
12  false hit.
13              We came up with a system where we gave them
14  discs electronically just a list of all the matches that
15  were made.  And then if they did come across those cases
16  where they knew they were definitely two different
17  people, they could identify that as a false hit and send
18  it back to me.  So in the future when we ran these lists
19  again, we wouldn't report that back to them.
20              Other than that, other than giving them the
21  educational knowledge of how to process them, we didn't
22  follow up -- we didn't say, you know, you have to tell us
23  exactly what you're doing, because my understanding is
24  they're constitutional officers, it's their job to
25  process the reports.

ACCURATE STENOTYPE REPORTERS, INC.

1      Q      Okay.  Were the county supervisors of

2   elections required to send you back a list of false hits?

3      A      No.  But it was instituted so it would ease

4   their workload in future reports and they're not getting

5   the same hits over and over again and having to go

6   through them when they knew already that they were two

7   different people or there was a data entry error in one

8   -- like in the deaths, maybe they made a data entry error

9   or on the Social Security number and you know it was

10  incorrect but they can't correct that.  So it was just a

11  way to ease future reporting to them.

12     Q      Okay.  And do you know how many counties

13  provided the Division of Elections with information about

14  false hits?

15     A      I don't offhand, but I could find out for

16  you.  I mean, I do have it reported.

17     Q      Okay.  If we could get that information,

18  that would be helpful.

19     A      Sure.

20     Q      Do you have a sense if it was most of the

21  counties or just a handful?

22            MR. HUME:  What year is this?

23  BY MS. BORGEN:

24     Q      Let's start with 1999.  Do you recall in

25  1999 if you received any information from counties on

109

1   false hits?

2          A      Yes, I did.  I received some in both.  But

3   it's been so long ago that I don't know whether if I --

4   saying half could be about right, it could be wrong.  I

5   just don't remember.  I would guess maybe half.

6          Q      Okay.

7          A      But once again, I would have to verify that.

8          Q      Okay.  You can check that for both 1999 and

9   2000?

10         A      Uh-huh (affirmative.)

11         Q      And to your knowledge, how many of the

12  counties used the list that you provided to purge felons

13  or to remove felons from their voter rolls?

14         A      I don't know.

15         Q      Did you do any kind of survey or

16  questionnaire to the counties to ask them what they had

17  done with the lists or who had used them and who didn't?

18         A      No.

19         Q      To your knowledge, did any other employee of

20  the Division of Elections or secretary of state do such a

21  survey or questionnaire?

22         A      No.

23         Q      I guess I should clarify that.  Is it

24  possible that someone did it and you don't know about it?

25         A      I mean, it's possible, but I doubt it.

ACCURATE STENOTYPE REPORTERS, INC.

110

1      Q      Okay.  Other than the trainings in the fall

2  of 1999 that we've discussed and some of the materials

3  that were given to the counties with the trainings, were

4  there any other materials provided to the county

5  supervisors of elections telling them how they should use

6  the lists in 1999 and 2000?

7      A      Well, just when we sent the reports out, we

8  sent them out with our standard letter that said how to

9  read them and how to use them.  Mostly everything was

10 covered in those training session and reiterated in the

11 letter.

12            I mean, it covered how the matches were done

13 and what the matches were based on, indications of what

14 those could be, such as a name change when it was a

15 Social Security and date of birth match.  And then they

16 also had access to AutoTrack.

17     Q      Are those extensive materials or is that

18 something you could pull together fairly easy?

19     A      It was basically -- you know, this binder

20 was really about -- this was the training manual.  I

21 don't know if they handed out anything as far as training

22 on AutoTrack or not.

23            And then the letters were pretty -- you

24 know, three or four pages -- you know, the general how to

25 read the CVF report is in here as well.

---

ACCURATE STENOTYPE REPORTERS, INC.

1      Q      And what you're looking at, is that a copy

2  of the training manual that was distributed to the county

3  supervisors of elections?

4      A      Yes.

5      Q      And is that pretty much an exact copy, it

6  was bound this way with these types of exhibit tabs?

7      A      Yes.

8      Q      Is that an extra copy?

9      A      No, it's not.  And the other problem with

10  this is the examples in the back have Social Security

11  numbers on them, so I don't know --

12          MR. HUME:  And let me just say for the

13      record I believe based on inquiry I've made that a

14      copy of these materials was produced in this case.

15      But I'm trying to confirm that it was an exact

16      replica of what Ms. Modrow brought to the

17      deposition today.

18          I'm not certain that it was exact, but I

19      believe at least a version, presumably a redacted

20      version of this was produced.

21          MS. BORGEN:  That sounds correct.

22          THE WITNESS:  I know this one right here was

23      taken and copies were made and Socials stricken

24      out, but I just don't know for sure who they were

25      all given to.

ACCURATE STENOTYPE REPORTERS, INC.

1           MS. BORGEN:  I'll just make a note that she

2       has that.  But I think you're right, some things

3       have been produced.

4    BY MS. BORGEN:

5           Q    Ms. Modrow, do you know if there were any

6    audits conducted or any reviews of the process that

7    Database Technologies undertook to review the process

8    that they used for putting together the matching lists?

9           A    I'm not sure what you're asking.

10          Q    Did the Division of Elections -- we'll start

11   with the Division of Elections -- kind of step back and

12   do a review or an audit to say, let's look at what

13   Database Technologies did and do we think it was a good

14   process and how did it work and reviewing that, what you

15   might call an audit or just a review or something along

16   those lines?

17          A    I know the data that I received from them I

18   ran quite a few checks on it to make sure that all of the

19   matched bases were correct, that if they said it was a

20   name that all of the required fields really did match,

21   that the data I gave them from the county was the same

22   thing I got back from them and that that data got

23   changed.

24          Since they normalized some of the names like

25   Bill to William, I made sure that they were consistent

---

ACCURATE STENOTYPE REPORTERS, INC.

1    with that throughout the fields.

2              When you're matching two long names from two

3    different files, that you come up with the same short

4    name for it or vice versa.  So, yes, I mean, I ran

5    numerous checks like that.

6         Q    Okay.  And did governmental agency outside

7    the Division of Elections do any kind of review or audit,

8    perhaps from the Office of Attorney General or any agency

9    say, Ms. Modrow, we would like to see the files and what

10   you've been doing on this process?

11        A    Not that I know of, no.

12        Q    Okay.  And either formally or informally?

13        A    No.

14        Q    Okay.  We were talking quite a bit about the

15   policy of how the list was put together working with

16   Database Technologies.  It's my understanding that you're

17   no longer working with Database Technologies; is that

18   correct?

19        A    Correct.

20        Q    What's the current process for review of the

21   central voter file and removing individuals who you

22   believe are felons?

23        A    Well, currently we're not doing it at all.

24   We are in the process of creating a new application which

25   will go on-line June 1st, 2002.

ACCURATE STENOTYPE REPORTERS, INC.

114

1        Q       And who will be doing that process?   Who

2    will be doing the matching and the removal of individuals

3    from the central voter file?

4        A       The consultants that we hired, who is

5    Excenture.   They used to be Anderson Consulting.   They

6    are teamed up with election.com.

7        Q       And will they be doing the same sort of

8    process that Database Technologies did?

9        A       Well, they won't be using -- they don't have

10   any proprietary data, and it will all be run on an

11   in-house hardware.   So they are creating the application,

12   and we will be running it ourselves.

13            Do you see what I'm saying?

14       Q       Right.

15       A       They're not running it and sending me the

16   data like DBT did.   We're collecting all of the data and

17   storing it on our own hardware.   But the system itself

18   will be identifying those.

19       Q       So how would you describe their role in the

20   process, they're just developing --

21       A       They're developing the software.

22       Q       And will it be a similar process to what

23   Database Technologies did?

24       A       Somewhat, except Database Technologies was

25   done really once a year.   This is an on-line application

ACCURATE STENOTYPE REPORTERS, INC.

1    that will be updated daily by the supervisors of

2    elections.

3              So really every day they send us the new

4    data, and they will be run immediately and they're get an

5    immediate response back.

6              And as far as the data from FDLE and Vital

7    Statistics, we will be getting that on a monthly basis.

8         Q    Do you know what other data will be inputted

9    into the system?  You indicated FDLE data will be in the

10   system on a daily basis?

11        A    No.  FDLE will be on a monthly basis.

12        Q    Okay.

13        A    Vital statistics will be on a monthly basis.

14   Clemency will be on a monthly basis.  And we're also

15   going to attempt to get data on mentally incompetence

16   with regards to voting.

17             Currently it looks like the supervisors of

18   elections get that data.  But we are going to try to work

19   it where they enter that data on-line so we have a

20   database of that.

21             We'll probably try to include the federal

22   felons that we get into the system.  And I guess we get

23   out-of-state cancellations, like if somebody has moved

24   out of Florida to another state, we'll get that

25   information.  So we'll probably try to put that into the

1    system as well so we can notify the supervisors.

2         Q    And information from the Department of

3    Corrections, the data that Database Technologies had in

4    their proprietary files from the Department of

5    Corrections, will that be included directly from the

6    Department of Corrections?

7         A    No.

8         Q    Is that information available?

9         A    I don't know.  We've never looked into it.

10         Q    Okay.  And when was the last time -- was the

11    June 2000 list -- the January 2000 list, the last list of

12    felons that the Division of Elections provided to the

13    supervisor of elections?

14         A    That was the last list, yes.

15         Q    Okay.  So from the time that that list was

16    provided until currently, the Division of Elections has

17    not identified any felons to be potentially removed from

18    the voter rolls?

19         A    No, other than handing out or sending copies

20    of those federal ones we get.

21         Q    Okay.  That's been going on on a regular

22    basis?

23         A    Right.

24         Q    Okay.  And once the system that you're

25    developing for the future, starting in June 2002, is it

ACCURATE STENOTYPE REPORTERS, INC.

1  anticipated that the Division of Elections will send

2  information to the supervisors of elections or that the

3  supervisors of elections will just use this new system

4  themselves and take care of it?

5  　　　A　　Say that again.

6  　　　Q　　Under this new system in June of 2002, do

7  you anticipate that the Division of Elections will be

8  running lists of possible or probably felons and

9  forwarding those to the supervisors of elections?

10  　　　A　　The supervisors will either go on-line and

11  can get the list off the on-line system or they'll

12  receive the data electronically.

13  　　　Q　　Okay.  And will they receive the data

14  electronically from the Division of Elections?

15  　　　A　　Yes.

16  　　　Q　　And will you be sending them a list of here

17  are the individuals we've identified this month as

18  possible felons, you should look into removing them from

19  the rolls or what kind of list will you send?

20  　　　A　　They will on a daily basis run any data they

21  send that is new from the previous day or changed, that

22  will get run, and they would get that on a daily basis.

23  　　　　　　Every month when we get the new data from

24  FDLE, we will run the new data against it and say, okay,

25  well, here are the ones that were identified based on the

1    new data FDLE gave us.

2        Q     Okay.  So each day the county supervisor

3    should be submitting to the central system information on

4    new voters they register; is that correct?

5        A     Yes.

6        Q     Or updates on voter files?

7        A     Both.

8        Q     Okay.  And then if you have a match in the

9    file, some supervisor submitted information on someone

10    and it matches up in your file someone with a felony

11    conviction, that restoration, will the Division of

12    Elections then send the supervisor a message or some kind

13    of an indication saying that we think that individual is

14    a felon or how will that process work?

15        A     Yes.  Counties will either get it

16    electronically the hits that were gotten off of the list,

17    or they would just go on and look at a list over the Web.

18             So it depends on which county and which way

19    they're going to access the data.  We're not going to

20    print out hard copies.

21        Q     The way you did it before in sending the

22    list out?

23        A     No.

24        Q     Okay.  So a supervisor of elections could

25    get onto this new system and look up the ten new voters

1       that they have to see if this is supposed to be a felony

2       conviction, would that be possible?

3                       MR. HUME:  Can you repeat that question.

4                       MS. BORGEN:  I can try rephrasing it.

5                       MR. HUME:  No, that's okay.  Could you just

6               read it back.

7                       (Requested portion read.)

8                       THE WITNESS:  Yes.  Basically what would

9               happen is they would come on the next day or later

10              that day after they send the file and see were

11              there any matches against those records is how

12              they would do it.

13      BY MS. BORGEN:

14              Q       Okay.  And that would be automatically run

15      by the system?

16              A       Yes.

17              Q       So that you wouldn't have to go in each day

18      and say, I'm going to sit down and program it, but that's

19      part of the way that the programming is set up?

20              A       Yes.

21              Q       That it automatically checks for those

22      matches?

23              A       Yes.

24              Q       Okay.  And would the system be set up also

25      to automatically update it when the new information comes

120

1    in each month from FDLE and other sources, the system

2    will automatically run that against the new voter

3    registrants?

4         A    Yes, on a monthly basis.

5              The same with clemency, when we get the

6    clemency data, it will be run monthly.  And if we find

7    that there were previously identified voters as possible

8    felons that suddenly have a clemency match, the

9    supervisors would be notified of that as well.

10        Q    Ms. Modrow, do you know somebody by the name

11   of Adam Goodman?

12        A    No.

13        Q    That name doesn't ring a bell?

14        A    No.

15        Q    How about somebody by the name of J.M. Mack

16   Stipanovich?

17        A    No.

18        Q    Okay.  How about Donald Tighe, T-I-G-H-E?

19   I'm not sure of the pronunciation.

20        A    No.

21        Q    Okay.  Do you know of anyone who is

22   affiliated with either the Republican or Democratic

23   Parties who were doing work in the Secretary of State's

24   Office in 2000?

25        A    No, I don't.

ACCURATE STENOTYPE REPORTERS, INC.

1       Q    We discussed earlier the Division of

2    Elections policy towards individuals who received

3    restoration of rights out of state, someone who had been

4    convicted of a felony, for example, in Connecticut and

5    received automatic restoration.

6          Do you know if there was a change in policy

7    by the Division of Elections regarding those individuals

8    in 1999 or 2000 regarding how those individuals would be

9    treated on the list that you were creating?

10       A    Can you state that again?  I'm not sure what

11    you mean.  It was confusing.

12       Q    Let's take a look at what we've marked as

13    Exhibit 4.  And we have on this list information about

14    the lists provided, the June of 1999 CVF list and the

15    January of 2000 one and individuals from the different

16    states where they had had felony convictions from

17    different states.

18          Do you know if those individuals were

19    treated differently regarding restoration of rights from

20    June of 1999 to June of 2000?  Let me withdraw that

21    question.

22          Do you know why in June of 1999 individuals

23    from Connecticut and New Jersey, for example, were not

24    included on that list?

25          MR. HUME:  Objection.  On what list?

1           MS. BORGEN:  On the June of 1999 list.

2     BY MS. BORGEN:

3           Q     According to Exhibit 4, in June of 1999

4     individuals with convictions in Connecticut and New

5     Jersey were not included in that data that was matched by

6     DBT.

7                 Do you know why they were not included?

8           A     I think they were not included because they

9     had automatic restoration.  I mean, once again, this is a

10    legal realm which I'm not in.  I mean, I know it had

11    something to do with that.

12                And then it was determined that unless they

13    had a certificate to show that they had clemency, we

14    couldn't be sure unless somebody verified it from the

15    state for sure that they had it.  Because for all we

16    know, they could be an escaped convict.  I mean, without

17    proof on a certificate, you didn't know.

18                So it was determined that at least someone

19    here -- and obviously it would have to deal with clemency

20    -- would have to at least verify that they did get it and

21    then that clemency would be accepted here.

22          Q     And do you know who informed you -- I'm

23    sorry.

24          A     Other than I know in one of our trainings, I

25    know this was brought up.  Bucky and one of the

ACCURATE STENOTYPE REPORTERS, INC.

1   supervisors were having a discussion.  So I was just kind

2   of listening in.  And then Bucky followed up on it

3   talking with clemency.

4        Q    Okay.  And do you know who he was speaking

5   to at clemency?

6        A    He was speaking with Janet Keels.

7        Q    So to the extent that you know, you learned

8   about this change in policy from Bucky Mitchell at the

9   trainings in the fall of '99?

10            MR. HUME:  Objection.  I think that

11       mischaracterizes her testimony.

12            Go ahead.

13  BY MS. BORGEN:

14       Q    You can go ahead and explain.  If I

15  mischaracterized it, please go ahead and clarify it.

16       A    Other than I just know it was mentioned

17  there.  I mean, the topic was brought up there.  It

18  wasn't decided there, but I know it was brought up there.

19  And at some point, I'm sure obviously Bucky followed up

20  on it.

21       Q    Okay.  And do you know if the policy

22  regarding individuals with automatic restoration outside

23  of Florida that was filed in January of 2000, do you know

24  if that's the same policy that will be used in the new

25  system that will be up and running in June of 2002?

ACCURATE STENOTYPE REPORTERS, INC.

124

1          MR. HUME:  Objection to the term

2     "individuals with automatic restoration."  You

3     mean individuals from --

4          MS. BORGEN:  From states other than Florida.

5          MR. HUME:  Individuals convicted in states

6     that are asterisked on here?

7          MS. BORGEN:  Yes.  We can start with that.

8          THE WITNESS:  We don't have out-of-state

9     felony data that we are running this against.

10     BY MS. BORGEN:

11          Q     Okay.

12          A     That's not in the new system.

13          Q     So the new system will not include

14     information --

15          A     No, because that was proprietary data from

16     Database Technologies.  All we're going to run it against

17     is the Florida Department of Law Enforcement data.

18          Q     Okay.  So if an individual -- let's say, in

19     November of 2002 the new system is up and running and an

20     individual registers to vote and is from Connecticut and

21     has a felony conviction and has had their rights

22     restored, when that's entered in the central voter file

23     and run against the system and the different databases,

24     there will be no Connecticut data that would match up on

25     that individual?

ACCURATE STENOTYPE REPORTERS, INC.

1              MR. HUME: Objection; asked and answered.

2    BY MS. BORGEN:

3         Q    Basically I'm trying to understand how it

4    would work with a specific individual.  If you have an

5    individual who has moved to Florida, if someone was

6    convicted in Connecticut of a felony, has been released

7    from prison and has automatic restoration of Civil Rights

8    in Connecticut, that individual moves to Florida and

9    registers to vote and their name gets run in the system,

10   the new system that you're setting up, would there be any

11   data in the system to match up with that voter to say

12   that this individual doesn't have clemency, this

13   individual has a felony conviction, doesn't have clemency

14   in Florida, would they be allowed to vote?

15           MR. HUME:  Objection; asked and answered.

16         You're asking her under the new system do they

17         have out-of-state felonies?

18         THE WITNESS:  We don't have that data.

19   BY MS. BORGEN:

20       Q    Okay.  So the individual from Connecticut,

21   there would be nothing to match for that individual from

22   Connecticut?

23           MR. HUME:  Or Illinois or Kentucky.

24         THE WITNESS:  Right, because we don't have

25         that data.  That's not our data.

126

BY MS. BORGEN:

    Q    Okay.  Do you have any plans to try to obtain that data and include it in the new system?

    A    Not that I know of.

    Q    Okay.  So the new system -- just to make sure I understand it -- will include information regarding convictions in Florida?

    A    From FDLE.

    Q    And only from FDLE?

    A    Yes.

    Q    Okay.  And I should add to that you had also said before it may include the federal convictions?

    A    Yes.

    Q    Okay.  We're going to turn to a different topic that we discussed briefly earlier, the voter registration data.

        To the extent that you're aware, what voter registration data is maintained by the Division of Elections, and specifically does that voter registration data identify race of the voters?

    A    Do you want to know the fields, is that what you mean?

    Q    Yes.  Is there a race field?

    A    Yes, there is.

    Q    And is that complete for most records?

1        A       If they don't know it, I believe they put a

2   code in of unknown, so there is data in that field.   I

3   know on the application, it's not a required field so

4   they don't have to fill it out.

5               We get it from every county, and most have a

6   code in there.   And if it's not filled out, I'm sure that

7   we would put unknown as the code for that field.

8        Q       Okay.  And do you know how long the voter

9   registration application has included a field of race as

10  either an optional or a mandatory category?

11       A       I don't know.

12       Q       All right.  Do you know if at any point in

13  time the Division of Elections did what I would call a

14  Hispanic name search and completed a race or ethnicity

15  category based on surname?

16       A       Not that I know of.

17       Q       Okay.  I should also ask you does the voter

18  registration data include a separate ethnicity category

19  or only race?

20       A       Just race.

21       Q       Okay.  And what categories of race are

22  included?

23       A       Asian, Indian/American, black, white,

24  Hispanic.  I don't know if there's anything in here to

25  tell me or not.

1       I think that they -- on the application, it

2  gives a list of them.  I think there's five or six of

3  them, Pacific Islander, Native American, white, black,

4  Hispanic and I think other.  And if they don't put

5  anything, it goes to unknown.  I think that's about it.

6       Q    Okay.  Have you ever done any work to try to

7  complete the unknown category if it's not provided on

8  someone's application, taking other steps such as a

9  surname evaluation or checking other databases to

10  complete that race category?

11       A    No.

12       Q    Do you know who within the Division of

13  Elections has primary responsibility for maintaining the

14  voter registration data that's provided by the counties

15  to the Division of Elections?

16       A    Well, pretty much myself.  Dawn Edwards

17  actually processes the files themselves.

18       Q    And what is his name?

19       A    Dawn.

20       Q    D-A-W-N?

21       A    Yes.

22       Q    Okay.  And what is her position?

23       A    She's a systems programmer.

24       Q    And how long has she been with the Division

25  of Elections?

ACCURATE STENOTYPE REPORTERS, INC.

1      A      Actually, I think she's a computer

2   programmer is her position.

3             She's been with the division maybe a year

4   and a half.

5      Q      Do you know who would have done that work

6   before her?  Was there another employee?

7      A      Caroline Wilkinski did it for a short while.

8   And before that, Joseph Sema did it.

9      Q      Okay.  Was he there for a short time or was

10  he around for a long time?

11     A      No.  He's still there.  I don't know how

12  long he did it.  He probably did it for at least a year

13  or so.

14     Q      And then he changed positions?

15     A      Well, it just got transferred to a different

16  person.

17     Q      Okay.  And what sorts of files did Dawn

18  Edwards in that current position -- what sorts of files

19  does she receive from the county?

20     A      She receives county registration information

21  and history information and any -- and if they have

22  changed any codes, she would receive new code values.

23     Q      Okay.  Going back to one thing you mentioned

24  before about the work of Database Technologies.  You said

25  they established an AutoTrack system that had the

ACCURATE STENOTYPE REPORTERS, INC.

1    clemency files available so the supervisors could look

2    at.

3              Do you know if that system is still

4    available or did it end when your contract with Database

5    Technologies ended?

6        A     I don't know when it ended.  I don't know if

7    it's still available.  I would be surprised if it was.

8    For one thing, the lists haven't been done in so long.

9    But I don't know when it was cut off.

10        Q     Okay.  Speaking of the list being done in so

11    long, is the Office of Executive Clemency preparing a new

12    list of clemency data to be used with the new system?

13        A     Yes.  We will get a new file from them.  And

14    then each month, we'll get monthly updates.

15        Q     Do you know when you anticipate getting that

16    file from them?

17        A     I'm sure it will be sometime -- I'll

18    probably get one -- it really doesn't matter -- it

19    doesn't go into play until next June, so sometime in the

20    beginning of 2002 we'll get a file from them.  And then

21    we'll get another one probably -- I'm going to guess

22    maybe May of 2002, and then after that monthly updates.

23              So we'll get a complete dump, probably one

24    or two of them before then, just depending on where we

25    are in the programming of the application.

1    Q    Have you been in meetings with anyone from

2    the Office of Executive Clemency regarding how the new

3    system will work and what files will be shared and those

4    sorts of things?

5    A    I met briefly with Janet Keels and Yi last

6    Monday, I guess.  And she attended a meeting we had last

7    Wednesday that involved a technical group from some

8    supervisors.  It was a public meeting.

9         When I met with her, I was basically trying

10   to see what kind of information they had that we could

11   get in addition to making verification of the process

12   easier for the supervisors.

13        Like if they have any address information so

14   maybe the supervisor could -- if the address happened to

15   be the same, you know, that's an added plus.  At least

16   the address was the same so it's probably the same

17   person, or their circuit number that the court case was

18   in.

19        And actually after this, I'm probably going

20   to go over there and just look at her application so I

21   can see if there's anything else we missed.

22   Q    And you said that meeting was last Monday?

23   A    Yes.

24   Q    So a week ago?

25   A    Yes.

ACCURATE STENOTYPE REPORTERS, INC.

1      Q      And was there anyone else in attendance

2  other than yourself and Ms. Keels and Yi?

3      A      On conference call there was a Kathy Procope

4  from Excenture and Dan Ray from Excenture.

5      Q      I'm sorry, what was Kathy's last name?

6      A      Procope, P-R-O-C-O-P-E.

7      Q      And Dan Ray?

8      A      Yes.

9      Q      How is his last name is spelled?

10      A      R-A-Y.

11      Q      And they're with Excenture?

12      A      Yes.

13      Q      Do you know where their office is located?

14      A      He lives in Illinois and she lives in

15  Maryland or someone else not even close.

16      Q      Okay.  Do you generally speak to them by

17  conference call?

18      A      No.  They're usually in Sunday night.  But

19  that was right after Thanksgiving so they took that day

20  off and came in the next day.

21           Kathy is generally here Monday through

22  Thursday, and Dan generally is too.

23      Q      Okay.  And you indicated that there was a

24  meeting last Wednesday?

25      A      Yes.

ACCURATE STENOTYPE REPORTERS, INC.

133

1    Q    That was three business days ago, just last

2    week?

3    A    Yeah, on the 27th, 28th.

4    Q    28th?

5    A    Yes.

6    Q    And who was at that meeting?

7    A    Lots of people.  There's a list I can get

8    you that everyone signed.

9         Quite a few supervisors were there.  From

10   Excenture, Kathy Procope was there, Dan Ray, Meg

11   Maclaughlin.

12   Q    I'm sorry, who is Meg Maclaughlin?

13   A    Meg Maclaughlin is, I think, a partner in

14   Excenture.  They had a mediator there -- I can't think of

15   her name.

16   Q    You said a mediator?

17   A    Yeah.

18   Q    Someone who was facilitating the meeting?

19   A    Yes, facilitator, I guess, is the more

20   accurate term.

21   Q    Was she hired by -- I'm sorry.

22   A    She works for Excenture.

23   Q    Okay.  And how long did the meeting last?

24   A    It ran from nine, and then we broke at 12 or

25   12:30, I guess, and started back up about one or 1:15 and

ACCURATE STENOTYPE REPORTERS, INC.

134

1    then went until four or five.  I guess it was four or

2    five.

3         Q    Okay.  And the purpose of that meeting was

4    to discuss the new system?

5         A    Yeah.  We basically have been having monthly

6    meetings with the technical group and whatever

7    supervisors are available just to go over some of the

8    technical aspects of it.

9             And in this one, we concentrated on some of

10   the issues we covered in the last meeting as well as

11   trying to pinpoint or decide on a process for handling

12   felons like what the supervisors are going to do.

13        Q    Okay.  Are there any working documents from

14   that group in terms of the process that's being developed

15   for handling felons?

16        A    We didn't come out with a set plan for that

17   one.  What ended up at the end of that meeting is FDLE is

18   going to do some research on their data.

19             And at the next meeting, which will be

20   January 7th, we'll go over the findings of that and

21   they'll try to decide on a process.

22        Q    Okay.  You said that's scheduled -- it's a

23   public meeting?

24        A    Yes.

25        Q    And do you know where the meeting will be

ACCURATE STENOTYPE REPORTERS, INC.

1    held?

2           A    I don't.  I'm pretty sure it's going to be

3    in Datona Beach though.

4           Q    Has the supervisor of elections from Daytona

5    Beach been involved in the process or from Volusia

6    County, Dennie Lowe?

7           A    I'm pretty sure she was there.

8           In each meeting -- once again, they are all

9    public meetings so any of the supervisors can come.  And

10   I know we have a list of everybody to sign in.  But I

11   don't really know most of the supervisors by name because

12   I usually deal with their technical staff.

13          So we could probably get you a list of the

14   ones that attended each meeting.

15          Q    Okay.  Ms. Modrow, I would like to ask you

16   about an electronic file that we're going to pull up on

17   the computer and ask you to take a look at it and see if

18   you recognize it and know what it is.

19          A    Okay.

20          Q    We'll show you a computer file that is

21   called "Clemency, April 2001" and has different fields

22   across the top here.

23          If you could just take a look at it and tell

24   me if you recognize it.

25          A    Well, it looks like the standard clemency

1       file.  I mean, it looks like almost the same format that

2       I usually get from them.

3                   MR. HUME:  It's obviously a big document.

4               Are you able to represent what it is that she's

5               identifying?

6                   MR. GREEN:  Well, we don't know what it is.

7               This was provided to us through discovery.

8                   MR. HUME:  Okay.

9                   THE WITNESS:  It looks almost identical to

10              what I gave you on the disc, other than mine is in

11              a text document and this is in Access.

12                  MR. GREEN:  Would it be possible for you to

13              just scroll down and describe what it appears to

14              be?

15                  THE WITNESS:  I can look over it.

16      BY MS. BORGEN:

17          Q      I guess what would you look at to tell

18      whether you can recognize that, either the fields or the

19      number of data entries?

20          A      I don't know what this SD is on here.  Other

21      than that, all of the fields up above we get other than

22      SD.  I don't know what that is.

23          Q      And SD, that's a field indicated at the top

24      of the document?

25          A      Yes.

1    Q    Okay.

2    A    But everything else is something that I

3    receive in the file that they send me.

4    Q    Okay.  So you receive a file called EO?

5    A    No.  These are fields.

6    Q    I'm sorry.  A field called EO?

7    A    Yeah, which is your executive order number.

8    Q    Okay.  And date EO granted is the date the

9    executive order is granted?

10   A    Yes.

11   Q    And date board?

12   A    That's clemency.  You're either going to

13   have one date or the other.  And that's still, once

14   again, whether it was granted by a board or whether it

15   was granted in some other way.  You're either going to

16   have a date in that field or that field.

17   Q    Okay.  Either the date board field or the

18   date EO granted field?

19   A    Right.

20   Q    Okay.  And SD is the field you said you do

21   not know what that one is?

22   A    No, I don't know what that is.

23   Q    Okay.  Status field, status is whether

24   clemency has been granted?

25   A    Yes.  And all I ever get from them is ones

ACCURATE STENOTYPE REPORTERS, INC.

138

1       that say grant.

2            Q       Okay.   Tag ID?

3            A       Right.   And that's just a unique number that

4       they generate.

5            Q       Okay.

6            A       Clem type ID, same thing, it's a unique

7       identifier.

8            Q       And the last one, race ID?

9            A       It's a race code.

10           Q       Okay.   And those are the same files that you

11      had received from the Office of Executive Clemency files?

12           A       Yes.

13           Q       And if you could scroll down.

14           A       Okay.   But I'm not used to using this thing.

15                   MR. HUME:   What are you trying to do, go

16           down?

17                   THE WITNESS:   I just wanted to make sure

18           that I saw all of the files up top.

19                   Yeah, other than SD, that's pretty much

20           exactly what they send me.

21      BY MS. BORGEN:

22           Q       Okay.   And could you tell from this how many

23      records are in this file?

24           A       145,524.

25           Q       Does that sound like about the size of the

ACCURATE STENOTYPE REPORTERS, INC.

1    documents that you were receiving from the Office of

2    Executive Clemency?

3         A    Yeah, from the counts I gave you earlier.

4    The one I received in January of 2000 was 144,779, so

5    it's increased some but not tremendously.

6         Q    Okay.  And when you would receive files of

7    this type, who were the authors of those files, to the

8    best of your knowledge?

9         A    I know three of the files were sent to me by

10   Yi, who is an employee of the Office of Executive

11   Clemency.  And the first one was by Ben Rouse, who, once

12   again, was an employee of the Office of Executive

13   Clemency.

14        Q    Okay.  So to the best of your knowledge,

15   would you -- certainly you don't know exactly who

16   authored this file, but this looks like the type of file

17   that you had received before from the Office of Executive

18   Clemency by either Yi or Mr. Rouse?

19        A    Yes.

20        Q    Okay.  And you indicated earlier that you

21   had received similar files to this.  Am I correct that

22   you received files like this four times from the Office

23   of Executive Clemency?

24        A    Yes.

25        Q    And what was the frequency that you received

ACCURATE STENOTYPE REPORTERS, INC.

1    the files?  Was it on an as-needed basis, you would call

2    them up and say, I'm running a new list, can you send me

3    an updated file?

4         A    Well, obviously the first time was just to

5    get the data to begin with.  And in October -- once

6    again, it just seemed like when I looked at the data some

7    records were missing out of it, so I asked for it to be

8    -- actually, what I think in the first one of October

9    would be just that they had added a lot more records

10   since the last time so they gave it to me.

11              And then when I got that one, it seemed like

12   there were some records missing to me so they did it

13   again at the end of October as well and I got that.

14              And then I got it again in January because,

15   once again, we were doing a new run.  So you're always

16   repopulated with new data.

17        Q    Okay.  And since that one, you have not

18   received any other list from the Office of Executive

19   Clemency of the clemency list?

20        A    No.

21        Q    Okay.  Ms. Modrow, earlier in the

22   deposition, we looked at Exhibit 2, which you had

23   provided to us was the clemency data from October 5th of

24   1999.  And in that exhibit, there didn't seem to be many

25   records that had the race identification information

ACCURATE STENOTYPE REPORTERS, INC.

1    included.

2                 This database, this file that we're showing

3    you that's dated April of 2001 seems to have more

4    information provided in the race field.

5                 Do you have any idea why that might be?

6                 MR. HUME:  Object as to the --

7                 I'm sorry, could you just read that question

8          back again.  I want to make sure I got that.

9                 (Requested portion read.)

10                MR. HUME:  I would object as to the

11          vagueness of the foundation of the question.

12   BY MS. BORGEN:

13        Q     You can go ahead and answer to the extent

14   you're able to do so.

15        A     It could be any number of reasons.  For one

16   thing, you're only looking at maybe 20, 25 records out of

17   145,000.

18                Depending on how this file is output from

19   clemency, if they're giving you their most recent data,

20   this is the data they entered most recently, which if

21   they just granted it they would probably have more data

22   than they had when they were entering data off of their

23   cards that are years and years old, would be my guess.

24                And once again on that, you're just looking

25   at the top 20 out of 140,000.  I mean, you have to

ACCURATE STENOTYPE REPORTERS, INC.

1    obviously do some analysis to say give me a count of what

2    the race is for every single record and then you would

3    know, we would be able to compare those two.

4        Q    Would you be able to in looking at this file

5    now to manipulate that data and determine how many of the

6    records include race information?

7        A    Yeah.  It would be a little bit hard using

8    the scroll pad.  But since you have Access on here I

9    could.

10       Q    Would it be possible for you to go ahead and

11   do that?

12       A    Yes.

13            This is 2000.  I have not worked with 2000.

14   We're still on '97 so we're a little behind.  I'm sure I

15   could come up with something.

16            I'm not used to 2000.  I don't know what

17   kind of version you have here.

18            MR. HUME:  Does this need to be done now?

19        It's beyond the scope of the questioning here.

20            This is just helping manipulate the data,

21        right?

22            MS. BORGEN:  Well, if it's something that

23        she could do easily and then answer a question

24        about that, that was why we were asking.

25            MR. HUME:  I know.  But given that it's not

1    that straightforward --

2         THE WITNESS:  Only the fact that you've got

3    Access 2000 and I've not worked with it and they

4    have changed it.  It doesn't appear like you have

5    -- I don't know if you have a full version of it

6    on this or not.

7         MR. HUME:  The question is how many of the

8    race fields are filled in?

9         MS. BORGEN:  Right, how many of the entries

10    include the race field.

11         THE WITNESS:  It doesn't seem like the

12    version you have on here is complete.

13         MR. HUME:  I think we should just move on.

14         THE WITNESS:  I don't know 2000.

15    BY MS. BORGEN:

16         Q    Okay.  So on this system at this point in

17    time, you're not able to do that?

18         A    No.  On '97 it is very easy.

19         Q    Thank you.

20         MS. BORGEN:  I'd like to mark as Exhibit 9

21    the CD-ROM called "Clemency Data, April 2001."

22         (Exhibit 9 marked for identification.)

23    BY MS. BORGEN:

24         Q    Ms. Modrow, do you know what OAG stands for

25    if I used that abbreviation?

ACCURATE STENOTYPE REPORTERS, INC.

1       A       I would guess it was the Office of Attorney
2    General, but I'm not sure.
3               MR. HUME:  Is there a new exhibit?
4               MS. BORGEN:  Exhibit Number 9, which is the
5    file that we were just looking at on the computer.
6               MR. GREEN:  It simply says, "Clemency" on
7    it.  It doesn't have a date on the label.
8               MS. BORGEN:  It's the file itself, but it's
9    April 2001.
10              MR. HUME:  Are you able to tell us where it
11   comes from?
12              MR. GREEN:  I believe it came from the
13   Office of Executive Clemency.
14              MR. HUME:  Was it produced in discovery in
15   this case?
16              MR. GREEN:  No.  We've asked for it and it
17   wasn't produced.
18              MR. HUME:  You asked for it in this case but
19   you obtained it from somewhere else?
20              MR. GREEN:  Correct.
21              MR. HUME:  Where did you obtain it from?
22              MR. GREEN:  I don't think we need to
23   disclose that.
24              MR. HUME:  So you're not telling us where
25   you got it from?

1              MR. GREEN:  No.

2              MR. HUME:  I mean, you asked the witness to

3        identify it.

4              MR. GREEN:  Right.

5              MR. HUME:  I mean, it is what it is.

6        Although, I think on that --

7              MR. GREEN:  We don't know what it is, that's

8        why we asked her.

9              MR. HUME:  But you must know where you got

10       it?

11             MR. GREEN:  I know where I got it, right.

12  BY MS. BORGEN:

13       Q    Ms. Modrow, just one last question I think

14  here.  Were you aware of anybody affiliated with either

15  the Democratic Party or the Republican Party who was in

16  contact with you or anyone else in the Division of

17  Elections about the felon identification process that

18  you're working on with Database Technologies other than

19  the public records requests?

20             I understand you said before that people

21  submitted public records requests wanting data.

22             Was there anyone else that came to your

23  office asking what's going on with the process, could we

24  talk about it, or called you and just wanted to talk

25  about what was going on that you recall?

1          A      Not that I know of.

2          Q      Okay.

3                 MS. BORGEN:  No further questions.

4                 MR. HUME:  If I could take a moment just to

5          confer.

6                 MS. BORGEN:  Sure.

7                 (Off the record.)

8                 MR. HUME:  I don't have any questions.

9                 MS. BORGEN:  I have one quick follow-up

10         question.

11     BY MS. BORGEN:

12         Q      Were there any other documents that you

13     brought with you in responding to the deposition that we

14     haven't reviewed yet during the course of the deposition?

15         A      I brought, as I said, the statistic that I

16     used when people call up and want the figures, and I

17     brought the memos that had been sent out to supervisors

18     over the course of the time.

19         Q      Okay.

20         A      I don't know if you got copies of them.  And

21     the manual, which we went over and talked about.

22         Q      Okay.

23                MS. BORGEN:  I would just ask your counsel

24         to the extent any of those materials have not yet

25         been produced as part of discovery, if we could

ACCURATE STENOTYPE REPORTERS, INC.

147

```
1          get copies of those?

2              MR. HUME:  We should try to make sure that

3      there are Bates numbered produced copies of all of

4      that, and we will do that.

5              MS. BORGEN:  Okay.  Thank you.

6              No further questions.

7              (Proceedings adjourned at 3:40 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE OF ADMINISTERING OATH

STATE OF FLORIDA:

COUNTY OF LEON:

     I, MICHELLE SUBIA, Registered Professional Reporter and Notary Public in and for the State of Florida at Large:

     Do HEREBY CERTIFY that on the date and place indicated on the title page of this transcript, an oath was duly administered by me to the designated witness(s) before testimony was taken.

     DATED THIS 6TH DAY OF DECEMBER, 2001.

MICHELLE SUBIA
100 SALEM COURT
TALLAHASSEE, FL   32301
904-878-2221

MICHELLE ANN SUBIA
MY COMMISSION # CC 743831
EXPIRES: June 7, 2002
Bonded Thru Notary Public Underwriters

ACCURATE STENOTYPE REPORTERS, INC.

1                        CERTIFICATE OF REPORTER

2

3        STATE OF FLORIDA:

4        COUNTY OF LEON:

5             I, MICHELLE SUBIA, do hereby certify that the

6        foregoing proceedings were taken before me at the time

7        and place therein designated; that my shorthand notes

8        were thereafter translated under my supervision; and the

9        foregoing pages numbered 1 through 149 are a true and

10       correct record of the aforesaid proceedings.

11            I FURTHER CERTIFY that I am not a relative,

12       employee, attorney or counsel of any of the parties, nor

13       relative or employee of such attorney or counsel, or

14       financially interested in the foregoing action.

15            DATED THIS 6TH DAY OF DECEMBER, 2001.

16

17

18

19

20

21

22       MICHELLE SUBIA, R.P.R.
         100 SALEM COURT
23       TALLAHASSEE, FL  32301
         (904) 878-2221
24       800-934-9090

25

ACCURATE STENOTYPE REPORTERS, INC.

ERRATA SHEET

I have read the transcript of my deposition Pages 1
through 149 and hereby subscribe to same, including any
corrections and/or amendments listed below.

12/17/01                        _Janet Modrow_
DATE                            JANET MODROW
                                In the matter of:
Page/Line                       JOHNSON VS. BUSH

| Page/Line | Correction |
|-----------|------------|
| 22/3 | news should be knew |
| 35/2 | math should be mac |
| 40/16 | DVT should be DBT |
| 44/25 | states should be Stats |
| 51/1 | He's should be Yi's |
| 64/6 | that's should be deaths |
| 88/5 | death should be dealt |
| 98/21 | NDS should be NSS |
| 103/22 | Wilbinski should be Malkinski |
| 114/5 | Excenture should be Accenture |
| 129/7 | Wilbinski should be Malkinski |
| 132/4 | Excenture should be Accenture |
| 132/11 | " " " " |
| 133/10 | " " " " |
| 138/18 | files should be fields |

COURT REPORTER:      MICHELLE SUBIA
org. Borgen          12/03/01 deposition
cc:  Hume