UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 01-120-CIV-GOLD/SIMONTON

**NIGHT BOX FILED**

-----------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

JUN - 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

Defendants.

-----------------------------------------------x

EXHIBITS TO DECLARATION OF ANGELA CICCOLO, ESQ.
IN SUPPORT OF PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

VOLUME IV

EXHIBITS 24-27

409 A

## NAACP v. Harris, 01-120-Civ-Gold/Simonton

**Exhibits to Declaration of Angela Ciccolo, Esq. in Support of its Motion for Summary Judgment**

### Table of Exhibits

#### Declarations & Affidavits

1. Declaration of Noni Jones
2. Declaration of Dr. Henry Flores
3. Affidavit of Ursula Y. Harvey
4. Affidavit of Dr. Ronald Hayduk
5. Declaration of Joanna Clark
6. Declaration of Lorine Walden
7. Declaration of Wallace McDonald
8. Declaration of Ronald Ketterer
9. Declaration of Luis Figueroa
10. Declaration of Theresa James
11. Declaration of Jakelin Green

#### Deposition Transcripts and Excerpts

12. Deposition of George Bruder
13. Deposition of Dick Carlberg
14. Deposition of Julia Stoner
15. Deposition of John Stafford
16. Deposition of Linda Tanko, Volume I
17. Deposition of William Cowles
18. Deposition of Sandra E. Peloquin, Volume I
19. Deposition of Sandra E. Peloquin, Volume II
20. Deposition of Dr. Henry Flores
21. Deposition of Emmett Mitchell, IV (May 20, 2002)
22. Deposition of Janet Modrow (October 22, 2001)
23. Deposition of Janet Modrow in *Johnson v. Bush,* Case No. *00-3542-CIV-King* (December 3, 2001)
24. Deposition of Marlene Thorogood (October 18, 2001)
25. Deposition of Janice Kelly (March 25, 2002)
26. Deposition of Joanna Clark (January 28, 2002)
27. Deposition of Gary E. McIntosh (June 4, 2002)
28. Deposition of Edward C. Kast (May 21, 2001)
29. Deposition of Deanie Lowe
30. Deposition of Pam Iorio (May 6, 2002)
31. Deposition of Adora Nweze
32. Deposition of Deborah Sue Berlinger

33. Deposition of Kandy Wells
34. Deposition of Shirley Rivers-Edwards (May 23, 2002)
35. Deposition of Rondrick Rose
36. Deposition of John Bowman (May 21, 2002)
37. Deposition of Admatha Israel
38. Deposition of David Leahy (May 24, 2002)
39. Deposition of Placide Dossous (January 28, 2002)
40. Deposition of Jermaine Terry (February 1, 2002)

### Responses to Requests for Production of Documents & Interrogatories

41. Defendant's Secretary of State Katherine Harris and Clay Roberts' Objections and Answers to Plaintiff's First Set of Interrogatories
42. Defendant Choicepoint's Responses to Plaintiffs' First Set of Interrogatories
43. Defendant John Stafford's Response to Plaintiff's First Request for Production of Documents
44. Defendant Iorio's Objections and Responses to Plaintiffs' First Set of Document Requests and Interrogatories
45. Defendant Iorio's Objections and Responses to Plaintiffs' Second Set of Document Requests and Interrogatories
46. Defendant David Leahy's Response to Plaintiffs' First Set of Interrogatories
47. Defendant David Leahy's Response to Plaintiffs' Second Set of Interrogatories
48. Defendant Miriam Oliphant's Responses to Plaintiffs' First Set of Interrogatories
49. Defendant Deanie Lowe's Answers and Objections to Interrogatories
50. Defendant Deanie Lowe's Answers to Plaintiffs' Second Set of Interrogatories and Document Request
51. Defendant William Cowles' Response to Plaintiffs' First Set of Document Requests and Interrogatories
52. Defendant William Cowles' Responses to Plaintiffs' Second Set of Interrogatories
53. Defendant Kearney's Response to Plaintiffs' First Set of Interrogatories
54. Defendant Kearney's Response to Plaintiffs' Documents Requests
55. Defendant Kearney's Response to Plaintiffs' Second Set of Requests for Documents
56. Defendant Kearney's Response to Plaintiffs' Second Set of Interrogatories
57. Defendant Kearney's Second Supplemental Response to Plaintiffs' First Set of Interrogatories
58. Defendant Dickinson's Responses to Plaintiffs' First Set of Interrogatories and Request for Production of Documents

### Expert Witness Reports

59. Expert Witness Report of Gary McIntosh
60. Expert Witness Report of David Klausner
61. Expert Witness Report of Dr. Henry Flores
62. Supplementary Expert Witness Report of Dr. Henry Flores
63. Rebuttal Expert Witness Report of Ronald Hayduk

**Memoranda**

64. Memorandum from Ethel Baxter, Division Director, Florida Department of State to All Supervisors of Elections dated June 4, 1999 re: Central Voter File
65. Memorandum from Bill Hanson, Acting Chief, Benefit and Recovery and Special Programs, to Michael Spellman, Office of the Governor, dated February 9, 1995.
66. Memorandum from Carol Canady, Senior Human Service Program Specialist to Operational Program Administrators, Public Assistance Specialist supervisors, Clerical Supervisors dated January 8, 2002

**Tables, Charts & Other Relevant Information**

67. Select Consent Judgments from Voting Rights Litigation Involving Florida Counties
68. Certified Copy of Wallace McDonald's Criminal History from the Florida Department of Law Enforcement
69. Select Historic Racial Discrimination in Florida, Post-1864 State Statutory Provisions
70. Senate Report No. 103-6, Establishing National Voter Registration Procedures for Federal Elections, and for Other Purposes
71. Florida Voter Registration Application Form (Nazyle Rios)
72. DCF Voter Registration Preference Form (A039569)
73. DCF Voter Registration Preference Form (A039122)
74. E-mail Janet DeChristopher, 4/29/02 (A045949)
75. E-mail from Donna Miller to Greg Ferguson, 10/30/2001 (A040811)
76. E-mail from Robert Baker to Carol Canady (A040618-A040619)
77. E-mail from Janice Miller to Norene Moore dated 8/29/01 (A045943-A045944)
78. E-mail from Roseann Liriano to Carol Canady dated 1/09/02 (A040620)
79. E-mail from Norene Moore to Greg Ferguson dated 8/29/2001 (A039027)
80. Letter to Greg Ferguson from Donna Miller dated September 19, 2002 ( A039025-A039026)

**Miscellaneous**

81. Data Processing Services Agreement between Database Technologies ("DBT") & the State of Florida, Department of State, Division of Elections (the "Division")
82. Central Voter File Data Processing Services Agreement between the Division and DBT
83. Clerk Feedback Forms, Hillsborough County, 2000
84. 2000 General Questionnaires, Volusia  County
85. Michael T. Lavin's Voter Registration Complaint filed November 10, 2000
86. Letter from Veronica Koval to DCF dated October 30, 2001
87. Letter from Scott Petullo to Ms. Carroll dated November 9, 2000
88. Letter from Veronica Koval to Ed Kast dated September 10, 2001

# PLAINTIFFS' EXHIBIT 24

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
                CASE NO.   01-120-CIV-GOLD/SIMONTON
 3

 4  NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE, INC.,
 5  by its FLORIDA STATE CONFERENCE OF
    BRANCHES, et al.,
 6
                          Plaintiffs,
 7  vs.

 8  KATHERINE HARRIS, Secretary of
    Florida, et al.,
 9
                          Defendants,
10  _____/

11

12

13

14              DEPOSITION OF MARLENE THOROGOOD

15

16

17
                    THURSDAY, OCTOBER 18TH, 2001
18              888 SOUTHEAST 3RD AVENUE, SUITE 500
                     FORT LAUDERDALE, FLORIDA
19                     1:45 p.m. - 5:15 p.m.

20

21

22

23

24

25
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

2

```
 1

 2   APPEARANCES:

 3   LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW.
     BY:  LORI OUTZS BORGEN, ESQUIRE.
 4   APPEARING ON BEHALF OF THE PLAINTIFFS.

 5
     PEOPLE FOR THE AMERICAN WAY FOUNDATION.
 6   BY:  ALMA HENDERSON, ESQUIRE.
     APPEARING TELEPHONICALLY ON BEHALF OF THE PLAINTIFFS.
 7

 8   STEEL, HECTOR & DAVIS, LLP.
     BY:  WALTER JAMES HARVEY, ESQUIRE.
 9   APPEARING ON BEHALF OF KATHERINE HARRIS and
     CLAY ROBERTS, DIRECTOR OF FLORIDA DIVISION OF
10   ELECTIONS.

11
     DADE COUNTY ATTORNEY'S OFFICE.
12   BY:  JEFFREY P. EHRLICH, ESQUIRE.
     BY:  SUSAN TORRES, ESQUIRE.
13   APPEARING ON BEHALF OF MIAMI-DADE COUNTY, SUPERVISOR
     OF ELECTIONS, DAVID LEAHY.
14

15   GOREN, CHEROF, DOODY & EZROL, P.A.
     BY:  MICHAEL D. CIRULLO, JR., ESQUIRE.
16   APPEARING ON BEHALF OF ORANGE COUNTY, SUPERVISOR
     OF ELECTIONS, WILLIAM COWLES.
17

18   WILLIAMS & CONNOLLY, LLP.
     BY:  DANIEL A. RESTREPO, ESQUIRE.
19   BY:  RAYMOND W. BERGAN, ESQUIRE.
     APPEARING ON BEHALF OF CHOICEPOINT, INC.
20

21   VOLUSIA COUNTY ATTORNEY'S OFFICE.
     BY:  DANIEL D. ECKERT, ESQUIRE.
22   APPEARING TELEPHONICALLY ON BEHALF OF VOLUSIA
     COUNTY, SUPERVISOR OF ELECTIONS, DEANIE LOWE.
23

24

25
```

3

```
 1
        APPEARANCES:
 2

 3      ATTORNEY GENERAL'S OFFICE.
        BY:  DOUGLAS B. MAC INNIS, ESQUIRE.
 4      APPEARING TELEPHONICALLY ON BEHALF OF FRED
        DICKINSON, FLORIDA DEPARTMENT OF HIGHWAY SAFETY
 5      & MOTOR VEHICLES and KATHLEEN KEARNEY, SECRETARY
        OF THE FLORIDA DEPARTMENT OF CHILDREN & FAMILIES.
 6

 7      HILLSBOROUGH COUNTY ATTORNEY'S OFFICE.
        BY:  KENNETH TINKLER, ESQUIRE.
 8      APPEARING TELEPHONICALLY ON BEHALF OF HILLSBOROUGH
        COUNTY, SUPERVISOR OF ELECTIONS, PAM IORIO.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

4

```
1                      INDEX

2  WITNESS            DIRECT  CROSS  REDIRECT  RECROSS
   MARLENE THOROGOOD
3
   BY MS. BORGEN        5             145
4                      161
   BY MS. TORRES            122
5  BY MR. CIRULLO          132
   BY MR. HARVEY           133
6  BY MR. ECKERT          136
                          144                  159
7  BY MR. TINKLER         139

8

9

10

11

12                     EXHIBITS

13 PLAINTIFF'S                   FOR IDENTIFICATION

14 A         DATA PROCESSING AGREEMENT      PAGE 16
   B         E-MAIL 3/24/99                 PAGE 21
15 C         BATCH PROCESSING VOTER FILES   PAGE 29
   D         E-MAIL 11/10/00                PAGE 29
16 E         E-MAIL 3/4/00                  PAGE 48
   F         SERIES OF E-MAILS (C01183)     PAGE 55
17 G         SERIES OF E-MAILS (C00467)     PAGE 64
   H         SERIES OF E-MAILS (C00374)     PAGE 77
18 I         E-MAIL (C00004)                PAGE 108

19

20

21

22

23

24

25
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

5

```
 1          Deposition of MARLENE THOROGOOD, taken

 2   before VALERIE LEHTO, Court Reporter/Registered

 3   Professional Reporter and Notary Public in and

 4   for the State of Florida at Large, in the above

 5   cause.

 6

 7               ------------

 8

 9   Thereupon,

10

11               MARLENE THOROGOOD

12   having been first duly sworn or affirmed, was

13   examined and testified as follows:

14

15               DIRECT EXAMINATION

16

17   BY MS. BORGEN:

18       Q.   Can you please state your name for the

19   record.

20       A.   Marlene Thorogood.

21       Q.   And your address?

22       A.   10094 Aqua Vista Way in Boca Raton,

23   Florida.

24          MR. MAC INNIS:  Can you put the phone a

25       little closer to the witness, please.
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

18

```
 1   work on that contract?
 2        A.    To oversee it and run it from a project
 3   management perspective.
 4        Q.    And what did that involve?  What type
 5   of work did you have to do to oversee that
 6   project?
 7        A.    As a project manager you take the lead
 8   of the project, you take full responsibility of
 9   the project and you coordinate with all parties
10   involved on the project, that being the client,
11   in this case the Division of Elections, my
12   management at the company and then all parties
13   involved, such as Programming, Quality Assurance,
14   any special teams that need assignment, Customer
15   Service.
16        Q.    What was the nature of the work that
17   you were doing with this?  What was the ultimate
18   goal for your work?
19        A.    The ultimate goal according to our
20   contract was to identify three of the parameters
21   in the Division of Elections disqualification
22   parameters.
23            The three that we were to concentrate
24   on were the duplicate voters on the central voter
25   file, the deceased individuals referred to as
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

19

```
 1    deaths on the central voter file, and convicted
 2    felons that have not had clemency, and our focus
 3    was to identify those individuals to the Division
 4    of Elections.
 5         Q.   So the Division of Elections provided
 6    you with a copy of the central voter file for the
 7    State of Florida and then your task was to
 8    identify people listed in that central voter file
 9    who fit these three categories?
10         A.   Correct.
11         Q.   How did you go about determining which
12    individuals were in those three categories?
13         A.   We used many files, and I'll describe
14    the high level.  If you want more details you
15    have to let me know.
16         Q.   We'll start there.
17         A.   We used many different files.  Each
18    category had its own set of files that were used,
19    and we would compare those files with the central
20    voter file and then determine a link between the
21    records in those files, linking of the voter with
22    a record in another file, perhaps a felony
23    conviction file or a death file, or for the
24    duplicates the central voter file itself was
25    compared against itself.
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

20

1    Q.    And how did you set the standards for

2  comparing the files?

3    A.    We met with the Division of Elections

4  technical contact Janet Modrow from what we call

5  our requirements meeting.  Out of that meeting

6  comes your requirements document, and she met

7  with myself, the programming team and also the

8  monitor of that meeting from Project Planning who

9  would put the document together and from that

10  meeting would come the requirements that we were

11  to follow in order to come up with a matching

12  logic, the matching criteria used to link the

13  records together.

14    Q.    Okay, and were the same matching

15  criteria used throughout the course of the

16  contract, or did they change at times?

17    A.    The criteria changed especially during

18  1999, the criteria did not stay within the exact

19  directives of the requirements document.  Janet

20  made changes throughout the year as she saw fit.

21  The ultimate decision was always hers, she was

22  our client and we would advise her as things came

23  up and she had final say and decision in how

24  match criteria was to be made.

25    Q.    And you said there were several changes

ESQUIRE DEPOSITION SERVICE (954) 728-9004

21

```
1    in 1999?

2         A.    Uh-huh.  (Affirmative response).

3         Q.    Do you recall when the first change was

4    made?

5         A.    No, not off the top of my head.

6         Q.    Do you recall approximately how many

7    changes were made in 1999?

8         A.    I couldn't really take a stab at

9    guessing.  You know, some changes were made over

10   the phone if she called me and said, oh, I would

11   like you to make X, Y, Z change or sometimes she

12   spoke with my programmers directly, sometimes the

13   requests might have been via E-mail.

14              I wouldn't feel comfortable taking a

15   guess.

16        Q.    Okay, I'd like to show you another

17   document.

18              First I'm going to pass this around for

19   counsel to take a look at.  It's an E-mail that

20   begins in the middle of the page.

21

22              (Whereupon, Plaintiff's Exhibit B was

23   marked for Identification).

24

25   BY MS. BORGEN:
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

22

1     Q.    This is an E-mail that is dated March

2   24th, 1999 that's bates numbered C00459 to C00460

3   that's produced to us by your counsel.

4           Let me show this to you, and if you can

5   please tell me if this is an E-mail message that

6   was from you.  It starts in the middle of the

7   page.

8     A.    Okay, what do you want to know?

9           I just wanted to refresh my memory.

10    Q.    Is this an E-mail that you had sent?

11    A.    Yes.

12          MR. RESTREPO:  To clarify, the document

13      we're looking at has a number of E-mails on

14      it.  Which E-mail are we talking about?

15          MS. BORGEN:  The E-mail beginning in

16      the middle of the page marked C00459 dated

17      March 24th, 1999, 10:59 a.m.

18  BY MS. BORGEN:

19    Q.    Is that an E-mail from you?

20    A.    Yes.

21    Q.    Do you recognize that E-mail?

22    A.    Yes.

23    Q.    And who is that E-mail sent to?

24    A.    Bucky Mitchell.

25    Q.    And do you remember what that E-mail

23

1   was addressing, what the issue was that was

2   discussed in that E-mail?

3       A.   After reading it I can remember, yes.

4       Q.   What was the subject of that E-mail?

5       A.   That we wanted to talk to them about

6   short name index.

7            In the technology world, whenever

8   you're dealing with individuals you're dealing

9   with names and there are files out there that are

10  purchased and used often referred to as short

11  name index or nickname files, so that if one file

12  you put your name down as Robert but on another

13  file you put your name down as Bob, you can use

14  that file or use that type of index so that Bob

15  is a match for Robert because it's considered the

16  same name.

17      Q.   And did you change the matching

18  criteria that you're using so it would match with

19  nicknames and other names?

20      A.   I presented that option to the DOE, to

21  Bucky and Janet Modrow and explained that in this

22  E-mail, asked them if that was a programming

23  modification that they wanted but did warn them

24  that if they chose this option it would produce

25  more false positives in the outcome.

ESQUIRE DEPOSITION SERVICE (954) 728-9004

24

```
 1        Q.    Was that option used then in the

 2   selection criteria?

 3        A.    Yes.  Janet Modrow responded in this

 4   E-mail and said this sounds like it will work as

 5   long as they are still performing nickname

 6   matches, Deborah and Deb, Debbie and so forth, so

 7   yes, they did accept that.

 8        Q.    Okay, excuse me just a second.

 9              Were there any other changes that were

10   made in terms of first name matching?  As you had

11   indicated in her response E-mail, Janet Modrow

12   indicates this sounds like it will work as long

13   as they're still performing nickname matches.  It

14   seemed like there might be something else going

15   on that there might be other name matching that

16   was added on.  Do you recall if the criteria was

17   extended so it wasn't just nickname matching but

18   some other criteria used to match names?

19        A.    I don't recall any further changes.

20   Not that I remember.

21        Q.    Okay, and were those matching criteria

22   used for the remainder of the contract?

23        A.    Yes.

24        Q.    So starting in March, 1999 through the

25   remainder of the contract the nickname matching
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

25

1    was used as one of the criteria?

2        A.   Yes.

3        Q.   And what would be the result of using

4    that matching criteria?

5        A.   Obviously by using that you're going to

6    create more matches than you would without it.

7        Q.   And would you also then create more

8    false positives?

9        A.   Yes.  I indicated that in my E-mail.

10        Q.   And did you find that to be problematic

11    that that criteria would create more false

12    positives?

13        A.   It wasn't my place to determine if it

14    was problematic.  I just simply linked the

15    matches as the client asked me to do, so I

16    wouldn't consider it a problem on my side.

17             If they supplied me the criteria to

18    provide matches, I simply used that criteria.

19        Q.   But it was a criteria that did result

20    in more false positives?

21        A.   I can't say for certainty.  I don't

22    know.

23        Q.   That from your professional judgment

24    it's a criteria that would have resulted in more

25    false positives than the prior criteria that were

ESQUIRE DEPOSITION SERVICE (954) 728-9004

26

1   used?

2         A.   Yes.

3              MR. HARVEY:  Objection to the form of

4         the question.

5              MS. BORGEN:  Let me rephrase it.

6   BY MS. BORGEN:

7         Q.   You indicated earlier, was it in 1998

8   that the requirements were established for the

9   matching criteria?

10        A.   1999.

11        Q.   Early 1999?

12        A.   Uh-huh.  (Affirmative response).

13        Q.   Prior to March, 1999?

14        A.   Uh-huh.  (Affirmative response).

15        Q.   And this change that we were discussing

16   with the matching with nicknames, that change

17   came subsequent to the establishment of the

18   requirements in the master document?

19        A.    Well, we were following their contract

20   and we had a formal meeting in June which

21   produced a requirements document.  Prior to that

22   we had not much as far as formal writing down to

23   the detail from the Division of Elections.  That

24   came a little bit later, I believe it was in

25   June.

ESQUIRE DEPOSITION SERVICE (954) 728-9004

27

1       Q.   Of 1999?

2       A.   Yes.

3       Q.   So in June of 1999 you established a

4  written set, or a document that established what

5  requirements would be used --

6       A.   Correct.

7       Q.   -- for further processing?

8       A.   Yes.

9       Q.   Then at this point in time when this

10  E-mail was written in March, 1999, you were

11  adjusting criteria that had been set earlier in

12  1999 but were not yet in the document?

13       A.   Correct.

14       Q.   And it's your professional view that

15  this criteria, this change using the nickname

16  matches could have resulted in more false

17  positives?

18       A.   Yes.

19            MR. HARVEY:  Objection to the form of

20       the question.

21  BY MS. BORGEN:

22       Q.   I'd like to turn to the issue of the

23  matching that was done in regard to ex felons.

24            What files did you use to come up with

25  the matches in the central voter file for those

ESQUIRE DEPOSITION SERVICE (954) 728-9004

28

1    individuals who you believed were felons or who

2    might be felons?

3             MR. RESTREPO:  Objection to the form.

4        Who is you?

5    BY MS. BORGEN:

6        Q.    Pursuant to the contract when DBT was

7    identifying felons -- When DBT was identifying

8    felons pursuant to the contract, what criteria

9    did you use or what list to do that matching?

10       A.    In 1999?

11       Q.    In 1999, yes.

12       A.    In 1999 the Division of Elections

13   provided to us a file of felony convictions from

14   the Florida Department of Law Enforcement and DBT

15   provided a file from the Florida Department of

16   Corrections which was a felony conviction file

17   and we also used a handful of out of state

18   criminal history files, felony files as well.

19       Q.    And do you recall which out of state

20   files you used?

21       A.    Not off the top of my head.  They

22   changed from 1999 to 2000, so I would have to

23   refer to a list.

24       Q.    Do you remember approximately when in

25   1999 they were established?

29

```
 1        A.    What was established?

 2        Q.    Which states, which out of state felon

 3   records you were using or conviction records.

 4        A.    I don't remember in which month, no.

 5        Q.    Do you recall when it changed in 2000?

 6        A.    There was no set time period to when it

 7   actually changed.  It was always in process as

 8   research was being done and information was being

 9   gathered and information being provided to me by

10   the Division of Elections.  Some states might

11   have not been included the second year or some

12   states that weren't used the first year may have

13   been included the second year.

14             MR. EHRLICH:  Let's go off the record.

15

16             (Whereupon, there was an off the record

17   discussion had, after which the deposition resumed).

18

19             (Whereupon, Plaintiff's Exhibits C and

20   D consecutively were marked for Identification).

21

22   BY MS. BORGEN:

23        Q.    Okay, going back on the record, I'd

24   like to show you a document that is entitled

25   Database Technologies, Incorporated.  Customer,
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

30

```
 1   Florida Division of Elections, and it says at the
 2   top, document, requirements, version, date,
 3   6/29/99 and it's bate stamped C02426 to C02460.
 4          Miss Thorogood, if you can take a look
 5   at that.  You mentioned earlier that in 1999
 6   pursuant to the contract with the Division of
 7   Elections you came up with document requirements
 8   that would be followed in the matching.  Is this
 9   the document to which you were referring?
10          MR. RESTREPO:  Again, who is you?
11   BY MS. BORGEN:
12       Q.  To which you, Miss Thorogood, were
13   referring shortly ago in your testimony.
14          MR. RESTREPO:  Excuse me.  A different
15       you.
16          The requirements that you came up with.
17   BY MS. BORGEN:
18       Q.  The requirements that DBT used pursuant
19   to the contract with the Division of Elections.
20       A.  This is the requirements document, yes.
21       Q.  And so this is the document then, the
22   working document saying what criteria DBT would
23   use in matching data as of June, 1999?
24       A.  Yes.
25       Q.  I would like to turn your attention to
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

31

```
 1    page eight of that document where in the document
 2    describes a file called CRIM name and the
 3    document states, "This file contains information
 4    on persons that have been convicted of a felony.
 5    The file contains information from the following
 6    states:  Florida, Kentucky, Wisconsin, Virginia,
 7    New Jersey, Washington and Illinois."  Are those
 8    the states that you would have initially used in
 9    1999 to match those with felony convictions to
10    individuals in the central voter file in Florida?
11             MR. HARVEY:  Objection to the form of
12         the question.
13             THE WITNESS:  Can you ask it one more
14         time.
15    BY MS. BORGEN:
16         Q.   Certainly.
17             In the requirements document on page
18    eight of that document there's a list in the
19    middle of the page that lists several states
20    which include Florida, Kentucky, Wisconsin,
21    Virginia, New Jersey, Washington, and Illinois.
22    Are those the states for which you used
23    conviction information regarding felony
24    convictions to match to the Florida central voter
25    file?
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

32

```
 1        A.    These are some of the file, yes.

 2        Q.    And there would have been additional

 3   files?

 4        A.    Yes.

 5        Q.    Do you know which states those would

 6   have been?

 7        A.    Well, there's also the FDLE file and

 8   the Florida D.O.C. file, and without looking at

 9   my own notes to verify, I can't say for certain

10   if this was all of the criminal history files.

11        Q.    And if you had used other criminal

12   history files, where would you have obtained

13   those?

14        A.    From in-house, DBT would have had those

15   in-house criminal history files.  I'm just not

16   sure if and when -- I know this says June, but

17   I'm not sure if that was the exact cut-off for

18   the states or not without checking my notes.  I

19   don't want to say a hundred percent certainty.

20   I'm sure that these were all included, I know

21   that they were.  Whether or not there was one or

22   two more, I'm not sure.

23        Q.    Was that criminal history file used at

24   DBT, was that created for this project or is that

25   a general file that you use in the office for any
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

33

```
1    project that it might be applicable to?

2         A.   I can't say with certainty.  I don't

3    know.

4         Q.   Okay, do you have general data files

5    that you maintained in the office that you'll use

6    for various projects?

7         A.   Yes.

8         Q.   And are there other ones that are

9    project specific that are created just for one

10   project?

11        A.   Yes.

12        Q.   Where do you get the information that

13   you used for the criminal history?  Where do you

14   obtain that information?

15             MR. RESTREPO:  Again, whose you?

16   BY MS. BORGEN:

17        Q.   Where does DBT obtain the information

18   that it uses for the criminal history files?

19        A.   The suppliers of the files would vary

20   from state to state.  There is no one general

21   source.

22        Q.   What are the types of sources that you

23   might have in the state?

24        A.   Examples would be a Department of

25   Corrections from a different state, bureaus of
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

34

1   Public Safety.  It depends on who holds those

2   criminal records in that particular state.

3           For instance, in Florida for state

4   records there are two sources, Department of

5   Corrections and Florida Department of Law

6   Enforcement.  In other states they're held by

7   other sources.  Each state varies, so it would

8   vary state to state.

9       Q.   And do you verify the information after

10  you receive it from the state?

11      A.   I couldn't say.  I don't work in the

12  Data Acquisitons Department.  I don't know.

13      Q.   Who at DBT would know the standards or

14  whether there is verification of information that

15  you obtained?

16          MR. RESTREPO:  Objection as to form.

17      Verification.

18  BY MS. BORGEN:

19      Q.   Do you know what DBT does with the

20  lists from the different states regarding

21  criminal history when it obtains them?

22      A.   We just key them and load them and put

23  them on our systems what steps are exactly taken,

24  what quality assurance steps are taken.

25          I don't know.  I don't work in that

ESQUIRE DEPOSITION SERVICE (954) 728-9004

36

```
 1        Q.    And the date is?  If you can just tell
 2   me the date on that document.
 3        A.    November 10th, 2000.
 4        Q.    And in that document you discuss
 5   criminal history information that was used; is
 6   that correct?
 7        A.    Yes, I do.
 8        Q.    And what states do you identify as
 9   being -- Which criminal history was used?
10        A.    States other than Florida processed for
11   felons, there were ten states, Connecticut,
12   Illinois, Kentucky, New Jersey, Ohio, South
13   Carolina, Texas, Virginia, Washington, and
14   Wisconsin.
15        Q.    And that would have been the complete
16   list of states as of what time period?
17        A.    Those would have been used in the year
18   2000 processing.
19        Q.    So 1999 processing might have involved
20   different states?
21        A.    Yes.
22        Q.    But for 2000 that would be all of them?
23        A.    Yes.
24        Q.    And the 2000 processing was completed
25   at what point in time?
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

37

```
1        A.   Our initial delivery to the Division of
2   Elections, I believe, was in March, end of March.
3        Q.   The initial delivery?
4        A.   The initial delivery.
5        Q.   And the final delivery was at what
6   point?
7        A.   I think it was June 13th or 14th,
8   somewhere around there.
9        Q.   Of 2000?
10        A.   Yes.
11        Q.   And during what time period would that
12   processing have taken place?  If information was
13   delivered in March and then June, 2000, what time
14   would someone have been doing that matching?
15   Would they have been doing it from January to
16   March of 2000, would they have started in 1999?
17             MR. RESTREPO:  Objection.  Which
18         matching?
19             MS. BORGEN:  The matching that was
20         turned over to the state in 2000.
21             MR. RESTREPO:  The one turned over in
22         March or the one turned over in June?
23             MS. BORGEN:  Let's start with March.
24   BY MS. BORGEN:
25        Q.   The information that was turned over in
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

38

1  March, 2000, when would DBT have performed the

2  matching that was done and done the work that was

3  required to come up with that list that was

4  turned over to the state?

5      A.   Well, there was work going on behind

6  the scenes as far as programming and capabilities

7  pretty much non stop from the year before.

8           When the new set of files were

9  received, I think it was the end of January or

10  the beginning of February, I can't say for

11  certain, it was around that time frame, and

12  that's when the processing itself began.

13      Q.   Okay, so it would be the end of

14  January, 2000?

15      A.   Yes.

16      Q.   And that would be for the list that was

17  turned over in March, 2000?

18      A.   Right.

19      Q.   And for the list that was turned over

20  in June, 2000, what time period would you have

21  been working on that list?

22      A.   We never stopped.

23      Q.   So that was a continuous update from

24  the work that began in January, 2000 and then you

25  had an update list that was turned over in June,

ESQUIRE DEPOSITION SERVICE (954) 728-9004

39

1    2000?

2        A.    Right.

3              There were periods of time where we

4    delivered the files to the Division of Elections,

5    and, of course, there was no processing being

6    done because the files were delivered and then

7    they were asked to be reprocessed, that's when

8    work started again and then we would send the

9    files back.

10       Q.    Okay, and what was the nature of the

11   reprocessing that was done between March and June

12   of 2000?

13       A.    I know that the first request from

14   Janet was very simple.  One of the programmers

15   had left some data into the central voter file,

16   what we call derived data from the Florida

17   driver's license file and she wanted those fields

18   to remain empty, to keep that file exactly the

19   same as they had given it to us so as not to

20   confuse the supervisors, and one of the

21   programmers did forget to remove some of the data

22   from one field, it was a very small request, so

23   she called him, asked him to remove it, I think

24   we have E-mails about it, he removed the data and

25   we sent the file back.

ESQUIRE DEPOSITION SERVICE (954) 728-9004

40

```
1              There were no changes made.  It was
2     simply clearing a field.
3          Q.   When you mentioned Janet, to whom were
4     you referring?
5          A.   Janet Modrow from the Division of
6     Elections.
7          Q.   And what other changes were done
8     between March and June of 2000?
9          A.   I think after that around May 24th or
10    25th I was notified by the Division of Elections
11    that they were receiving calls regarding our
12    felony records that the voters were complaining
13    that the records indicated they had a felony
14    conviction when, in fact, they were misdemeanors,
15    and so I investigated the problem and confirmed
16    that problem within twenty-four hours, that
17    information was accurate and we then immediately
18    started reprocessing that file and delivered back
19    to them on June 13th.
20             They did not want the whole file sent
21    back, they just wanted a list of who those
22    individuals were that had misdemeanors so that
23    Janet was going to deal with that on the state
24    level and just simply remove those names from the
25    exception list.  So she didn't want us to give
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

41

1   the whole list back, just the list of those that

2   were affected by the Texas records.

3       Q.   Okay, when you mentioned Janet, again,

4   you're referring to Janet Modrow?

5       A.   Yes.

6       Q.   And the records that were listed --

7   You've indicated records were listed as felony

8   convictions when, in fact, they are misdemeanor

9   elections; is that correct?

10      A.   For the State of Texas, yes.

11      Q.   Was it only for the State of Texas?

12      A.   As far as I know.

13      Q.   Is it possible that there were other

14  convictions that were listed as felonies when

15  they're actually misdemeanors?

16      A.   Anything can be possible.

17      Q.   And approximately how many records fell

18  into that category of Texas convictions that were

19  listed as felonies when they, in fact, were

20  misdemeanors?

21      A.   About eight thousand.

22      Q.   And approximately when did you say this

23  problem came to light?

24      A.   I think it was May 24th.

25      Q.   Of 2000?

ESQUIRE DEPOSITION SERVICE (954) 728-9004

42

1      A.    Yes.

2      Q.    And then you provided to the state a

3   list of those eight thousand individuals who had

4   previously been listed as having a felony

5   conviction when, in fact, it was a misdemeanor

6   conviction?

7      A.    Yes.

8      Q.    And how did that problem come up?  When

9   you received the data from Texas, were the

10  individuals listed as having felony convictions

11  rather than misdemeanor, or was it -- Well, let

12  me start there.  Was it in the information you

13  had initially received from Texas that these

14  individuals were listed as having felony

15  convictions rather than misdemeanor convictions?

16     A.    Once we started investigating the

17  problem we uncovered that there were some changes

18  in the file that DBT was receiving from Texas.

19  Those changes were not communicated properly

20  between the supplier and DBT.

21          In the file previously it was all

22  felonies.  I think even after we had uncovered

23  the problem there was still communications

24  between DBT and the Texas supplier confirming,

25  yes, they are all felonies when, in fact, that

ESQUIRE DEPOSITION SERVICE (954) 728-9004

43

```
 1    was not the case.  They had changed what we
 2    referred to as field indicators in the file
 3    because the change basically captured
 4    misdemeanors prior to, I think it was 1994 that
 5    they weren't able to earlier identify, so Texas
 6    was able to make this change and identify these
 7    misdemeanors all prior to 1994.
 8         This change was not communicated
 9    properly between Texas and DBT, therefore, DBT
10    believed that these misdemeanors were files
11    according to our records and our record layouts,
12    so we handled them as though they were felonies.
13    Once the problem was identified the records were
14    changed and the misdemeanors were removed and the
15    new file, basically a corrected list was sent to
16    the Division of Elections.
17         Q.   And this problem came to light after
18    individuals in the State of Florida started
19    calling -- Did they call DBT directly saying I
20    received a letter saying I have a felony
21    conviction and I thought it was a misdemeanor?
22    Did people call you and tell you that, or did you
23    hear that from the Division of Elections?
24         A.   I heard it from the Division of
25    Elections.
```

44

1     Q.   And who is your provider of the State

2  of Texas?

3     A.   I don't know the name of the exact

4  department.

5     Q.   Is it a government agency in Texas or a

6  private contractor?

7     A.   It's a government agency.

8     Q.   From the states where you received the

9  criminal conviction information, did you also

10  receive files related to clemency?

11     A.   No.

12     Q.   Did you receive it from any of the

13  states?

14     A.   No.

15     Q.   Did you review clemency records for

16  those individuals who had a felony conviction?

17     A.   I did not review them, no.

18     Q.   Did anyone at DBT?

19     A.   No.

20     Q.   Do you know if anyone at the Division

21  of Elections did so?

22     A.   No.

23         MR. HARVEY:  No, did you know?

24         MS. BORGEN:  Let me rephrase it.

25  BY MS. BORGEN:

ESQUIRE DEPOSITION SERVICE (954) 728-9004

45

1        Q.    Do you have any personal knowledge --

2   Do you have personal knowledge as to whether --

3        A.    No, I do not have knowledge as to

4   whether or not anyone at the Division of

5   Elections looked at any clemency records.  I do

6   not know that.

7             MR. HARVEY:  Thank you.

8   BY MS. BORGEN:

9        Q.    For felony conviction records from the

10  State of Connecticut, for those individuals who

11  would receive clemency from Connecticut, would

12  there have been any indication in DBT's records

13  that those individuals had received clemency?

14       A.    Without my notes in front of me I don't

15  know which states fall into which category as far

16  as clemency goes.

17       Q.    What are you thinking of generally when

18  you refer to categories?  What are you thinking

19  of?

20       A.    In some states the clemency procedure

21  is automatic, your civil rights are automatically

22  restored when it comes to voting.  In those

23  states where restoration is considered automatic,

24  there's not a formal process to go through.

25  Bucky Mitchell at the Division of Elections

ESQUIRE DEPOSITION SERVICE (954) 728-9004

46

1    informed me that Florida does not recognize that

2    procedure and they must apply for Florida

3    clemency in order to have their rights restored,

4    so in a state where the clemency is automatic, I

5    was to take those felony convictions and run

6    those against the Florida clemency file.  If they

7    did not have a record in the Florida clemency

8    file then that indicated to us they did not have

9    clemency or the right to vote in the State of

10   Florida.

11       Q.    Okay, for states where clemency was not

12   automatic and an individual had to go through a

13   process and would receive some sort of

14   certificate regarding clemency, what was your

15   process for those individuals?

16       A.    Once the programmers identified

17   possible felony convictions for those states,

18   they would provide me with a list by state, I

19   then took that list and sent that either via

20   E-mail or fax to different government agencies

21   within those states who handled the clemency or

22   were able to tell me whether or not someone had

23   the right to vote.

24            In some states if you're incarcerated

25   you cannot vote, so as long as that person was

ESQUIRE DEPOSITION SERVICE (954) 728-9004

47

1    not incarcerated they did have the right to vote.

2              In other states they had manual lists,

3    there was no automatic process.  The only way

4    they told me I could do this was to send them the

5    list, they would manually check it and then send

6    back to me whether or not that person had

7    clemency or not, because in most states clemency

8    is not automated, the records are hard copy.

9         Q.   Did you receive information from states

10   regarding -- Did you get responses to these

11   requests?

12        A.   Yes.

13        Q.   And do you have those stored at DBT?

14        A.   Probably most of them are.  I would

15   assume they're in my notes somewhere.

16        Q.   I would like to show you another

17   E-mail.

18             MR. EHRLICH:  Is there a particular

19        E-mail that you're going to ask about?

20             MS. BORGEN:  The top one.

21             MR. EHRLICH:  Thanks.

22             MR. HARVEY:  Just let the record

23        reflect once again there are some notes

24        scribbled here on the right.  I'm not sure

25        exactly where they come from.

48

1          (Whereupon, Plaintiff's Exhibit E was

2    marked for Identification).

3

4    BY MS. BORGEN:

5          Q.   I would like to show you an E-mail

6    which has been marked as Exhibit E bate numbered

7    C00265 to C00266.  The name at the top is Nick

8    Hindle.  The message states it's from Marlene

9    Thorogood to Nick Hindle.  There is also some

10   handwriting in the upper left corner.

11          MR. RESTREPO:  Upper right hand corner.

12   BY MS. BORGEN:

13          Q.   The other left.  The upper right hand

14   corner.

15          MR. RESTREPO:  And upper left.

16   BY MS. BORGEN:

17          Q.   Both corners.

18          Do you recognize not the handwriting

19   but the E-mail itself?  Was that an E-mail from

20   you?

21          A.   Yes.

22          Q.   And do you recognize that E-mail?

23          A.   Yes.

24          Q.   Do you recognize the handwriting in the

25   upper corners of the E-mail?

ESQUIRE DEPOSITION SERVICE (954) 728-9004

49

1      A.    No.

2      Q.    Directing your attention just to the

3    text of the E-mail, you've mentioned earlier that

4    there were some states for which you deemed have

5    automatic restoration and use one process

6    regarding the felony conviction files and there's

7    some states for which you used a different

8    process.  In looking at this E-mail, does it

9    refresh your recollection in terms of which

10   states fell into which category?

11     A.    Yes.

12     Q.    For which states did you deem them to

13   have automatic restoration for which they had to

14   have restoration in Florida in order to be deemed

15   to have their rights restored?

16     A.    According to the notes in this E-mail,

17   Texas, Connecticut, South Carolina, Illinois and

18   Wisconsin.

19     Q.    And for which states did you feel that

20   you needed to - or did you check with other

21   states to see if rights had been restored?

22     A.    New Jersey, Kentucky, Virginia, and

23   Washington.

24     Q.    And to the best of your recollection,

25   was the policy that's stated in this E-mail the

ESQUIRE DEPOSITION SERVICE (954) 728-9004

50

1    policy that was actually followed by DBT?

2              MR. RESTREPO:  Objection to form.

3    BY MS. BORGEN:

4        Q.   In the E-mail it is stated that the

5    certain group of states that you had just named

6    have automatic restoration and that those

7    individuals would have to have the rights - those

8    were the states with automatic restoration.  To

9    the best of your recollection, was it the ongoing

10   policy of DBT that for those states that had

11   automatic restoration and the individuals with

12   convictions in those states had to have their

13   rights restored in Florida in order to be listed

14   as having clemency in your matching procedure?

15             MR. RESTREPO:  Objection as to form.

16           .  MR. HARVEY:  Objection to form.

17             MS. TORRES:  Object to the form.

18   BY MS. BORGEN:

19       Q.   In this E-mail, Miss Thorogood, you say

20   that Texas, Kentucky, South Carolina, Illinois,

21   Wisconsin have automatic restoration and that

22   those states "Only need to be run through the

23   Florida clemency, that's it."  Was that DBT's

24   policy throughout its 2000 contract period?

25             MR. HARVEY:  Object to the form of the

ESQUIRE DEPOSITION SERVICE (954) 728-9004

51

```
 1      question.
 2           MS. BORGEN:  Objection to form as to
 3      what?
 4           MS. BORGEN:
 5           MR. HARVEY:  I'm sorry.  You said
 6      policy?
 7  BY MS. BORGEN:
 8      Q.   It stated here in this E-mail that for
 9  those states Texas, Connecticut, South Carolina,
10  Illinois and Wisconsin, "These only need to be
11  run through the Florida clemency, that's it."
12  Was that the policy, the policy that states that
13  they only need to be run through Florida
14  clemency, was that the policy used by DBT from
15  March, 2000 forward?
16      A.   As directed to me by the Division of
17  Elections, yes, it was.
18      Q.   Thank you.
19           And according to this E-mail for New
20  Jersey, Kentucky, and Washington, those states
21  did not have automatic restoration, and to the
22  best of your knowledge from March, 2000 forward,
23  were those states deemed not to have automatic
24  restoration and you needed to look into those
25  individual states regarding restoration?
```

52

```
 1        A.    That's correct.

 2        Q.    And do you recall for New Jersey

 3   whether you sent a list of individuals with

 4   felony convictions to the State of New Jersey to

 5   see if they had their rights restored?  Do you

 6   recall if you sent a list like that to New

 7   Jersey?

 8        A.    In one form or another I can't say if I

 9   physically sent it.  I may have E-mailed it, I

10   may have faxed it, I may have even done it on the

11   phone depending on the number of alleged felons

12   in that state.  A lot of communication was done

13   over the phone.  The people that I was dealing

14   with were busy, it wasn't their project, and so I

15   did it in whatever form they would allow me to

16   do.  Some of them said just read them to me over

17   the phone, some of them might have wanted it

18   faxed or E-mailed, so there wasn't a set

19   procedure.  I was at the mercy of the other

20   states.

21        Q.    And would there be times then, for

22   example, where you would read a list of names and

23   someone would just tell you over the phone yes or

24   no and you would be making notes regarding

25   restoration?
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

53

```
 1        A.    That might be more true on the reverse.
 2   Like if I sent them a list they may have not
 3   responded, if I called them somebody might have
 4   said to me none of them.  I checked the list,
 5   none of them have clemency in this state or the
 6   only ones that have clemency are X,Y, Z.  If it
 7   was so few they sometimes would have communicated
 8   that to me over the phone.
 9        Q.    And do you recall approximately how
10   many individuals were on the list from New
11   Jersey?  Do you recall whether you had a number
12   of individuals with alleged felony convictions in
13   New Jersey who you had been calling to check to
14   see if they had clemency?
15        A.    I have no idea.
16        Q.    Do you recall generally when you were
17   calling to check out of state clemency records if
18   most of the states had more than a hundred
19   individuals or less than a hundred?
20        A.    I can't remember.
21        Q.    Would you have that information at
22   DBT's offices?
23        A.    They are probably somewhere within my
24   notes.
25        Q.    In this E-mail you indicated that you
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

55

```
 1        Q.    And you indicated earlier that for
 2   individuals with automatic restoration in the
 3   states of convictions you were instructed that
 4   Florida would not honor that automatic
 5   restoration; is that correct?
 6        A.    That's correct.
 7            MR. HARVEY:  Objection to the form.
 8   BY MS. BORGEN:
 9        Q.    Do you recall any other details about
10   what you were told regarding Florida's policy on
11   those clemency records?
12        A.    Bucky Mitchell, general counsel for the
13   Division of Elections, had done some research in
14   that area, and he is the one that communicated
15   with me basically as you're referring to it the
16   policy that I followed.  That was basically it,
17   just that out of states were not received as
18   having their rights restored if it was automatic
19   and they needed Florida clemency as well.
20            MR. CIRULLO:  Which one are we looking
21       at, all four?
22            MS. BORGEN:  Yes.  It's a series.
23            (Whereupon, Plaintiff's Exhibit F was
24   marked for Identification).
25   BY MS. BORGEN:
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

56

1        Q.    I would like to show you a document

2    that's been marked as Exhibit F, it's bate

3    stamped C01183 to C01184.  These are two series

4    of E-mails, one from December 28th, 1999 from

5    Bucky Mitchell to Marlene Thorogood and the other

6    one from December 21st, starts with December

7    22nd, 1999 in which I believe you are cc'd, but

8    if you could just take a look at those and tell

9    me if you recognize those E-mails and if they

10   were, indeed, or did, indeed, involve you.

11       A.    I recognize them.

12       Q.    Okay, and do you recall receiving those

13   E-mails?

14       A.    Yes.

15       Q.    And what was the substance of those

16   E-mails?

17       A.    Clarifying the clemency issue.

18       Q.    And when you mentioned earlier that you

19   had been told by Bucky Mitchell from the state

20   regarding the state's policy on what they would

21   do with clemency, were you referring to the

22   E-mails?

23       A.    These E-mails and subsequent telephone

24   conversations.

25       Q.    So after getting these E-mails, did you

ESQUIRE DEPOSITION SERVICE (954) 728-9004

57

1  call him to ask him for further clarification

2  about the policy?

3      A.   We spoke on the phone.  Who called who,

4  I don't remember.

5      Q.   Do you remember approximately when

6  those calls would have taken place?

7      A.   On or about these days.  Within this

8  time frame.  I don't know exactly what day.  It's

9  a couple years back.

10     Q.   Do you recall any of the substance of

11 what was discussed in those phone calls?

12     A.   Just clarifying the procedures making

13 sure that I fully understood it.

14          As you can see, I think I asked for

15 clarification in my E-mails.  I say just checking

16 and I restate what they're stating to make sure I

17 have full understanding of what they are

18 explaining to me and also did that and telephone

19 conversations.

20     Q.   And so your understanding of the policy

21 that you were being instructed to follow was

22 what?  Tell us that policy again now.

23     A.   The policy as explained to me is that

24 an individual receives what's referred to as

25 automatic clemency in a state other than Florida,

ESQUIRE DEPOSITION SERVICE (954) 728-9004

58

1    they must apply for clemency in Florida in order

2    to have their right to vote restored.  If they go

3    through a formalized process, basically an appeal

4    process in another state then Florida does honor

5    that clemency.

6         Q.    And these E-mails were from December,

7    1999; is that correct?

8         A.    Yes.

9         Q.    From December, 1999 to the conclusion

10   of your contract, did you follow the guidelines

11   set by the state in these E-mails and in your

12   phone calls?

13             MR. RESTREPO:   Objection as to form.

14        Which contract?

15   BY MS. BORGEN:

16        Q.    In your contract that has been marked

17   Exhibit A.

18             In DBT's contract with the State of

19   Florida Division of Elections regarding

20   processing of the central voter file for 2000,

21   was this the policy that DBT followed regarding

22   clemency records to review that for those states

23   where automatic restoration was granted

24   individuals who had felony convictions, you only

25   had to check the Florida clemency files?

59

1      A.    For the year 2000 processing, yes, that

2   was the procedure followed.

3      Q.    Was a different procedure followed for

4   1999 processing?

5      A.    Yes.

6      Q.    And what was the procedure followed in

7   1999?

8      A.    Basically there was only one procedure

9   which was checking with those states individually

10   as to whether or not that individual had received

11   clemency.  I was unaware of any of the issues

12   addressed here in these E-mails regarding Florida

13   not accepting an automatic restoration, and so if

14   somebody's restoration was automatic then we

15   accepted that restoration and the DOE knew that

16   we were acting under those guidelines as well.

17          Myself and a law firm in Florida that

18   we retained, Holland & Knight, assisted us with

19   the clemency research for the states that we

20   would be accessing during 1999 and 2000

21   processing, and so they helped us to research the

22   clemency issues, and those states that were used

23   in 1999 were only those states in which I could

24   comfortably and correctly verify whether or not

25   someone had clemency.

60

1    Q.    So for individuals where if you weren't

2    sure if somebody had clemency, you could not tell

3    from the records, what would show up in your

4    records regarding clemency?

5    A.    If a state had a process that was

6    extremely unclear as to whether or not someone

7    had clemency, we did not use those criminal

8    histories from that state.  That state was

9    excluded from the processing.

10    Q.    Do you recall any particular states

11    that were excluded because of that?

12    A.    I don't want to guess without referring

13    to my notes.

14    Q.    Do you recall if there was more than

15    one state --

16    A.    Yes.

17    Q.    -- that was excluded?

18          More than three states?

19    A.    It's possible.

20    Q.    More than ten states?

21    A.    No.

22    Q.    And would you have that information in

23    your records at DBT?

24    A.    Yes.

25    Q.    For the 2000 processing, were there any

ESQUIRE DEPOSITION SERVICE (954) 728-9004

61

1    states for which you were unclear what the

2    clemency procedure was and you excluded them from

3    your records on that basis?

4         A.   Yes.

5         Q.   Do you remember which states?

6         A.   No.

7         Q.   Do you remember approximately how many?

8         A.   Just a very small number.

9         Q.   Okay, and those states you just did not

10   use any of that criminal conviction information?

11        A.   Correct.  We only wanted to use those

12   states that we had absolute certainty on.

13        Q.   Going back then to the change in

14   policy.

15             So for the year 1999 when you were

16   doing the processing pursuant to the 1999 - the

17   contract that was in effect for 1999, if an

18   individual received automatic restoration in the

19   state of conviction, you deemed that individual

20   to have received clemency in your files; is that

21   accurate?

22        A.   Yes.

23        Q.   And that policy changed then in

24   December of 1999 and after that point in time if

25   an individual had automatic restoration they were

ESQUIRE DEPOSITION SERVICE (954) 728-9004

62

1    deemed not to have clemency unless they had

2    received it from Florida?

3        A.   Yes.

4             MR. HARVEY:  Objection to the form.

5    BY MS. BORGEN:

6        Q.   So again just to make sure we're clear

7    on the 2000 policy, that it changed first of

8    all - it changed in December, 1999; is that

9    correct?

10       A.   Correct.

11       Q.   And it changed so that if someone had

12   automatic restoration of their civil rights from

13   the state where they were convicted but they had

14   not yet received - they had not received clemency

15   in Florida, they were deemed not to have

16   clemency?

17       A.   Correct.

18            MS. TORRES:  Object to the form.

19            MR. HARVEY:  Object to the form.

20   BY MS. BORGEN:

21       Q.   Thank you.

22            No further questions on that.

23            Miss Thorogood, did you have a means in

24   your database to match directly, to match

25   clemency records with criminal conviction

ESQUIRE DEPOSITION SERVICE (954) 728-9004

63

1    records?

2            Which clemency records -- Let me take a

3    step back.

4            Which clemency records were included in

5    your database?  Did you have Florida clemency

6    records?

7    A.    Only Florida clemency records.

8    Q.    Only Florida.

9            So for every other state you had to do

10   the process we discussed before where you

11   contacted the states individually and asked them

12   to look at the lists?

13   A.    Or ran them against the Florida

14   clemency records.

15   Q.    But the only one you had an actual

16   database that you could run against was the

17   Florida clemency records?

18   A.    Correct.

19   Q.    Did you have any problems in doing the

20   comparison of the convictions and the clemency

21   records?

22   A.    Define problem.

23   Q.    Was there anything that indicated to

24   you that the matches may not - that you were not

25   getting as many matches as you would have

ESQUIRE DEPOSITION SERVICE (954) 728-9004

63

1    records?

2           Which clemency records -- Let me take a

3    step back.

4           Which clemency records were included in

5    your database?  Did you have Florida clemency

6    records?

7       A.   Only Florida clemency records.

8       Q.   Only Florida.

9           So for every other state you had to do

10   the process we discussed before where you

11   contacted the states individually and asked them

12   to look at the lists?

13      A.   Or ran them against the Florida

14   clemency records.

15      Q.   But the only one you had an actual

16   database that you could run against was the

17   Florida clemency records?

18      A.   Correct.

19      Q.   Did you have any problems in doing the

20   comparison of the convictions and the clemency

21   records?

22      A.   Define problem.

23      Q.   Was there anything that indicated to

24   you that the matches may not - that you were not

25   getting as many matches as you would have

ESQUIRE DEPOSITION SERVICE (954) 728-9004

64

```
 1    expected to in running the list together?
 2         A.   Not that I recall.
 3         Q.   Let me show you another series of
 4    E-mails.
 5              I'll pass those around.
 6              MR. EHRLICH:  Is there a particular
 7         E-mail?
 8              MS. BORGEN:  It's a series.
 9
10              (Whereupon, Plaintiff's Exhibit G was
11    marked for Identification).
12
13    BY MS. BORGEN:
14         Q.   I'd like to show you what's been marked
15    as Exhibit G bate stamped C00467 to C00469 which
16    is a series of E-mail communications that involve
17    you.  If you could just take your time and look
18    through those and see if you recognize those
19    E-mails?
20         A.   Yes, I do.
21         Q.   And you received some of those E-mail
22    communications and sent others or were cc'd on
23    them?  You were involved with those E-mail
24    communications?
25         A.   Yes, I was involved in these.
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

65

1    Q.    And do you recognize the substance of

2    those E-mails?

3    A.    Yes.

4    Q.    And what was the discussion about in

5    the E-mail?

6    A.    Working out some programming in regard

7    to clemency.

8    Q.    And were there some problems in

9    matching clemency records with the conviction

10   records?

11   A.    Yes, but I wouldn't call it a problem.

12   This was during phase one of the processing of

13   the year 1999.  Phase one was a building and

14   testing phase, and this is no more than a

15   building and testing situation.  It was not the

16   actual processing that was being done for the

17   Division of Elections and it was not the final

18   records that were turned over to the Division of

19   Elections, it was merely test files as we built

20   our system.

21   Q.    And the E-mails indicate that at one

22   point in time in one of the test runs there were

23   very few matches with the clemency files.  Is

24   that accurate?  I believe it was a hundred and

25   ten.

ESQUIRE DEPOSITION SERVICE (954) 728-9004

66

1         A.    A hundred and one.

2         Q.    A hundred and one matches.

3               And did that seem low to you, that

4    there should have been more matches at that point

5    in time to the clemency records?

6         A.    I have no idea how many clemency

7    records to expect.  I've never done this kind of

8    project before, clemency records.

9         Q.    Do you recall, and look at the E-mail

10   if you need to, how many entries there were in

11   the clemency files, how large was that clemency

12   file, how many data entries were there?

13        A.    According to Janet Modrow's notes here

14   she said the file had a hundred and twenty-seven

15   thousand and change records.

16        Q.    And in phase one when you tried

17   matching those records with your criminal

18   conviction records there were only one hundred

19   and one hits, would that be accurate, a hundred

20   and one that matched up saying these individuals

21   have clemency?

22        A.    Yes.  But again, it was a building

23   phase.  You have to realize the project was not

24   completed at this point.

25        Q.    Do you know if changes were made to the

ESQUIRE DEPOSITION SERVICE (954) 728-9004

67

1    system after phase one --

2         A.   Yes.

3         Q.   -- in regard to the clemency records?

4         A.   Yes.

5         Q.   Do you know what was changed?

6         A.   Specifically, no.

7         Q.   Do you know if anyone had concerns that

8    if there were not a sufficient number of hits

9    between the conviction records and the clemency

10   records in Florida?

11        A.   I have no knowledge of that being

12   anyone's concern.

13        Q.   Okay, and the information you said from

14   phase one then was not provided to the Division

15   of Elections or to any counties on a list of

16   individuals that were probable or possible

17   felons?

18        A.   Absolutely not, not during phase one.

19             We worked hand in hand with the

20   Division of Elections, I would say internally

21   between the two of us thus building the project,

22   building the process, writing the code, testing

23   the files.  Nothing was disseminated from phase

24   one.

25        Q.   Okay, and do you have any information

ESQUIRE DEPOSITION SERVICE (954) 728-9004

85

1    Q.   Were you cc'd?  Did you receive

2    information from Janet Modrow about those calls?

3    A.   Some of them, either her or Bucky

4    Mitchell.

5    Q.   And so would individuals at the

6    Division of Elections contact you when they had

7    problems that had been raised by the Supervisors

8    of Elections?

9         MR. HARVEY:  Objection to the form.

10        THE WITNESS:  Sometimes.

11   BY MS. BORGEN:

12   Q.   Do you recall what sorts of problems

13   were raised?

14   A.   Just a general lack of understanding, I

15   think, in the summer of '99 as well as the

16   Department of Corrections with the records that

17   were sealed or expunged.

18   Q.   So that the Department of Corrections

19   was an additional problem?  You're saying that

20   there were at least two types of problems, that

21   they didn't understand how the lists worked and a

22   separate set of problems with the Department of

23   Corrections?

24   A.   And they didn't understand who to go to

25   with questions, like who do I go to if I have a

ESQUIRE DEPOSITION SERVICE (954) 728-9004

94

```
 1    that problematic?
 2         A.    You're going to have to rephrase that.
 3         Q.    We talked before, for example, about
 4    the nicknames and that if you were matching not
 5    just a full first name but a nickname you're
 6    going to get more hits, you're going to have more
 7    matches; is that correct?
 8         A.    Yes.
 9         Q.    If you use a matching criteria matching
10    more individuals that you could set a criteria
11    one of two ways and a second way is going to
12    result in more people, more matches but more of
13    them are going to be false matches, would be
14    false positives?
15              MR. RESTREPO:  Objection as to form.
16              MR. HARVEY:  Same objection.
17              THE WITNESS:  I don't understand the
18         question.
19    BY MS. BORGEN:
20         Q.    Okay, let me ask you a different
21    question then.
22              You stated earlier in 1999 based on the
23    criteria you used then there were false positives
24    but you don't know how many.
25         A.    Right.
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

95

1     Q.   You indicated earlier in December, 1999

2  you changed some of the criteria that were used

3  for matching; is that correct?

4     A.   Correct.

5     Q.   And those criteria then applied to the

6  2000 work that you did, is that accurate, that

7  you made changes in December, 1999 that were then

8  applied in 2000?

9     A.   Yes.

10     Q.   Would your 2000 matching then have more

11  false positives than your 1999 matching did?

12     A.   There is no way to measure false

13  positives, so I don't know the answer to that

14  question.

15     Q.   Based on the criteria that were

16  changed, do you think it might have resulted in

17  more false positives?

18        MS. TORRES:  Object to form.

19  BY MS. BORGEN:

20     Q.   In December, 1999, what criteria were

21  changed for your matching?

22     A.   I don't know if all the criteria.  I

23  know of the one we spoke of earlier.  Whether or

24  not there was more, I have no idea without

25  referring to my notes.

96

1              I know you're referring to the short

2     name index.

3         Q.    Also in December, 1999 the procedure

4     regarding clemency was changed; is that accurate?

5         A.    Uh-huh.   (Affirmative response).

6         Q.    Can you think of anything else off the

7     top of your head, any other procedures that were

8     changed?

9         A.    From 1999 to 2000?

10        Q.    Yes.

11        A.    I know that in a couple of our match

12    criteria the percentage of the last name was

13    changed from ninety percent to eighty percent.

14        Q.    And what would the result be of that

15    change?

16        A.    Obviously that would capture more

17    records.  If you lower the percentage of that

18    last name match, it will pick up obviously more

19    records if there are misspellings in the previous

20    records, so that's an assumption.

21        Q.    And would that likely result in more

22    false positives?

23        A.    I can't say that with certainty.  It

24    depends on the records.  There's no way for

25    somebody to give you a logical answer.  There is

ESQUIRE DEPOSITION SERVICE (954) 728-9004

97

1    no yes or no to that question without knowing if

2    a record is a false positive or not or without

3    knowing how every record is spelled.  There is no

4    way I can answer you yes or no to that question.

5        Q.   Okay, but it was changed from a ninety

6    percent change, last name, to an eighty percent?

7        A.   Yes, on some criteria.

8        Q.   Which criteria?

9        A.   Those that involved a Social Security

10   match and possibly another piece of data.

11            I can't remember right now.

12       Q.   Is that in regard to all the matches

13   that you're doing, deaths, duplicates and felons?

14       A.   I believe two out of several matching

15   criteria.

16       Q.   So the criteria would change for all

17   categories?

18       A.   Yes, but only in some matching

19   categories.

20       Q.   And that change was made, do you know

21   if that was approximately December, 1999?

22       A.   No.  That was made in our requirements

23   meeting in January of 2000, I believe.

24       Q.   And do you know whose idea it was to

25   make that change?

ESQUIRE DEPOSITION SERVICE (954) 728-9004

98

```
 1        A.    I believe it was Janet Modrow's, but I
 2    can't say for certainty.  It was in a room with a
 3    lot of people and a discussion was going on, but
 4    I believe Janet wanted to lower that to eighty
 5    percent.
 6        Q.    And do you recall her saying why she
 7    wanted to lower it to eighty percent?
 8        A.    Because of misspellings and last names,
 9    human error on records.  For instance, if my last
10    name is Thorogood, people can spell that in many
11    ways.  She felt comfortable if you had a Social
12    Security number match but the last name only
13    matched eighty percent that that was a good
14    indication of a match, because allowing for human
15    error on the spelling of the last name she felt
16    if you captured eighty percent of the last name
17    and had a Social Security match, and I'm not sure
18    if there was another matching factor as well,
19    that that was sufficient enough to indicate a
20    match and she wanted us to link the records.
21        Q.    Do you recall if there were any
22    particular files where these last name records
23    were coming from that she was concerned about
24    where there might be more misspellings?
25        A.    No, no file in particular.
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

99

```
 1        Q.    Was there any particular discussion
 2   about this being more of an issue regarding felon
 3   matches?
 4        A.    Yes, I do remember having a discussion
 5   regarding felons, not only the misspellings but
 6   their names in general.  Felons when arrested can
 7   give any name, they can call themselves a variety
 8   of things which we see from our records.  You
 9   know, they can call themselves Santa Claus if
10   they want to, it's not their given name and it is
11   the name that is on their felony record, so
12   therefore she wanted to open up the criteria.
13        Q.    Would the eighty percent match versus
14   ninety percent match something like that where
15   someone names one thing and they use Santa Claus
16   on another?
17        A.    No, because if your name is Santa Claus
18   and Thorogood, that's not eighty percent.
19        Q.    So it still has to be an eighty percent
20   match?
21        A.    Yes, and the first letter had to match.
22   So if your name was Bond, B-o-n-d and then the
23   match on another file was Fond, F-o-n-d, that did
24   not apply.
25             The first letter, I believe, had to
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

100

```
 1    match as well as eighty percent.
 2         Q.   And so it would be your testimony that
 3    there was particular concern that the names in
 4    the felon files might not be matching and the
 5    criteria should be changed to an eighty percent
 6    match rather than a ninety?
 7         A.   It was not addressed in the criminal
 8    felon file, that was for all records, but we did
 9    discuss in length the problem in general with the
10    names in felony files.
11         Q.   And when you say we, who is that?
12              Take a step back.
13              You say this was a meeting in January,
14    2000?
15         A.   Yes.
16         Q.   And where was this meeting held?
17         A.   At DBT in Boca.
18         Q.   And who was in attendance at that
19    meeting, if you recall?
20         A.   Myself, Janet Modrow from the Division
21    of Elections and then programmers from our
22    development team that was assigned to this
23    project, Chris Knowles, Nick Hindle, Richard
24    Crook (phonetic), the moderator from our Planning
25    Department, Grant Merada (phonetic), and another
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

108

1   something like that.  There's too many issues

2   right now for me to remember exactly which one it

3   was, but I know it's in an E-mail, I know I have

4   it in my notes and I think it's been turned over

5   as well.  I can't remember the exact particular

6   item of topic.

7       Q.   I'd like to show you an E-mail.  I'll

8   circulate it first before I show it to you.

9           MS. TORRES:  What number is this going

10      to be?

11          MR. RESTREPO:  I.

12

13          (Whereupon, Plaintiff's Exhibit I was

14  marked for Identification).

15

16  BY MS. BORGEN:

17      Q.   I'd like to show you a document that's

18  been marked Exhibit I bate stamp numbered C0004

19  with the name at the top George Bruder.  If you

20  can take a look at this and see if you recognize

21  that, if that's an E-mail to you.

22      A.   I recall the E-mail, yes.

23      Q.   And is it an E-mail that you received?

24      A.   No.  I sent it.

25      Q.   That you sent, okay.  And on what date?

ESQUIRE DEPOSITION SERVICE (954) 728-9004

109

```
 1        A.    June 21st, 2000.

 2        Q.    And does it refresh your recollection

 3   in reading that or do you recall your views

 4   regarding the numbers of false positives on the

 5   list in 2000?

 6        A.    Repeat that.

 7        Q.    What was your view of the number of

 8   false positives on the list that you produced to

 9   this date for 2000 compared to 1999?

10        A.    I'm not sure I know what you're asking

11   me.

12        Q.    Let me specifically direct you to the

13   E-mail.

14             You indicate in the E-mail that, "The

15   numbers in 2000 are higher or close to those in

16   1999 because we, DOE and DBT, modified the

17   matching logic to pick up more hits.  The logic

18   was appropriate, in my opinion, not loose."  And

19   you indicate also that the process numbers do not

20   take into account false positives.

21             How was the matching logic changed to

22   pick up more hits?  Was that in the ways we

23   discussed earlier, or were there other ways that

24   the matching logic was changed?  What are you

25   referring to in that E-mail?
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

110

1      A.    Point me to exactly that part here.

2            Oh, right here.

3            Okay, exactly what we discussed

4      earlier, the eighty percent rule, the different

5      way the felonies were handled, the small changes

6      that were made so it picked up more records.

7      Q.    It picked up more records, but it's

8      your testimony that -- In picking up those more

9      records, would there have been more false

10     positives picked up?

11     A.    I don't know if there would have been

12     more false positives from the year before.

13     Q.    If the same criteria that were used in

14     1999 were used in 2000, looking at the 2000 data

15     and the two possible matching criteria that could

16     have been used being first of all the ones that

17     were used in 1999, if you used those again in

18     2000 or if you used the modified 2000 ones, those

19     being the two criteria we're looking at, do you

20     have a sense if one of those would have resulted

21     in the same number of false positives in 2000?

22            MR. HARVEY:  Objection to the form.

23            MS. BORGEN:  I'll try to restate the

24        question then.

25     BY MS. BORGEN:

ESQUIRE DEPOSITION SERVICE (954) 728-9004

111

1      Q.    In 1999 you established earlier that

2   there was one set of matching criteria used in

3   1999; is that correct?

4      A.    Yes.

5      Q.    And that those criteria were changed

6   for the 2000?

7      A.    Yes.

8      Q.    So if you applied both of those

9   matching criteria in 2000 and you used the same

10  ones you used in '99, if you had repeated those

11  same ones in 2000 as opposed to changing them in

12  2000, do you think you would have had fewer false

13  positives in 2000 than with the criteria that

14  were actually used in 2000?

15     A.    Well, there's no way to know that.

16  That would be complete assumption on my part.

17  There's no way to say with any certainty what

18  number of false positives you would or would not

19  pick up based on the records unless you manually

20  looked at millions and millions and millions of

21  records, not just the 8.2 million but all the

22  other millions of records that we used in this

23  process, so it would be a complete assumption on

24  my part which I would not be comfortable making.

25     Q.    So when you changed search criteria to

ESQUIRE DEPOSITION SERVICE (954) 728-9004

112

1   pick up more records, if you changed it from a

2   ninety percent matching in the names to eighty

3   percent so you would pick up more records then

4   you don't necessarily pick up more false

5   positives?

6        A.   You are in terms loosening the

7   criteria, but that doesn't mean that we are going

8   to pick up more or less records.  You would have

9   to go back and evaluate the data that you're

10   matching against in order to make that

11   assumption.

12        I don't know if it picked up more or

13   less records.  Again, that is someone's

14   assumption.  No one can know that unless you

15   manually look at every single record to see what

16   records are affected by a short name index.

17        Maybe I used my short name index file

18   and it never affected one record, maybe all

19   records were Catherine and not Catherine and

20   Kate.  There is no way for us to know that, it is

21   simply one person's assumption, and my assumption

22   could be different than the person sitting next

23   to me.

24        Q.   Is it generally your experience with

25   the matching work that you do that if you use

113

1      broader criteria that are going to have more hits

2      that you're more likely to have more false

3      positives?

4              MR. RESTREPO:  Objection as to form.

5              MS. BORGEN:  What is your objection?

6              MR. RESTREPO:  You're assuming they do

7          other matching work.

8      BY MS. BORGEN:

9          Q.   Have you done matching work other than

10     under this Florida contract?

11         A.   Yes.

12         Q.   And what types of other matching work

13     have you done?

14         A.   Just various batch processing jobs for

15     many different industries.

16         Q.   Do you feel qualified to speak about

17     the general standards that you use in doing

18     matching?

19         A.   Yes.

20         Q.   And generally when you were doing

21     matching work, if you have matching criteria that

22     are going to result - that are going to have

23     broader results, have more hits, the eighty

24     percent rather than the ninety percent match, for

25     example, if you use criteria that are going to

ESQUIRE DEPOSITION SERVICE (954) 728-9004

114

1    have more hits, do you generally expect that

2    you're going to have more false positives?

3        A.   You are going to have more records

4    linked together.  That's a difference than saying

5    I'm going to have more false positives, okay?

6    Saying that I'm going to have more false

7    positives is an assumption.  I'm not sure how to

8    describe it so you understand what I'm saying,

9    but you are going to match more records together.

10            To say you're going to have more false

11   positives is an assumption I would not say

12   because I don't know if that's going to create

13   false positives.  I don't know that Katherine's

14   records and Kate's records aren't real records.

15   You're saying that they're going to create false

16   positives, okay?  I don't know that that's the

17   case.

18            Katherine's records may be a valid

19   match with Kate's records, okay, and by loosening

20   that criteria we now created a perfect match.

21            I can't make the assumption that

22   Katherine does not match Kate.  If they don't

23   match, that's a false positive.  So by loosening

24   that criteria, again, I'm not comfortable saying

25   that you're going to get more false positives.

115

1          I would feel is it possible?  Yes.  Did

2     it occur?  I don't know.

3          Q.   Did DBT advise the Division of

4     Elections that in loosening the criteria they

5     might capture more false positives on the list?

6          A.   Yes.

7          Q.   Do you recall when they advised the

8     state about that, when DBT advised the state?

9          A.   I advised them of that several times

10    throughout the two years during various steps,

11    that making certain decisions would create more

12    false positives and worked with Janet Modrow in

13    informing her of that, and she came up with a

14    system in which to handle false positives when

15    they were identified by the supervisors.

16         Q.   And do you recall at what occasions you

17    indicated to Janet Modrow that the change might

18    result in more false positives?

19         A.   When discussions came up on name

20    variations or matching criteria in general or in

21    the order in which you searched a file, maybe

22    perhaps searching by Social Security number first

23    on a particular file as opposed to name, DOB,

24    that in the sequence you do it is just as

25    important as in how you're searching.

ESQUIRE DEPOSITION SERVICE (954) 728-9004

116

1      Q.    Do you recall on approximately how many

2  occasions there were when there were changes

3  proposed where you advised the state that that

4  was likely to result in more false positives?

5      A.    I have no idea how many times we

6  discussed it, no.

7      Q.    Not how many discussions necessarily

8  you had but how many changes that would have been

9  involved in?

10     A.    Over the course of the two years?

11     Q.    Over the course of the two years.

12     A.    Where I had warned them that that would

13  create more false positives?

14     Q.    Yes.

15     A.    I honestly can't say.  I have no idea.

16     Q.    Do you have any sense it would be fewer

17  than ten changes?

18     A.    Fewer than ten, yes.

19     Q.    And do you recall if you advised them

20  that there might be more false positives when you

21  made the change regarding the eighty percent -

22  the change to eighty percent rather than ninety

23  percent, was that one of the occasions when you

24  advised them that there might be more false

25  positives?

ESQUIRE DEPOSITION SERVICE (954) 728-9004

117

1      A.   Yes.

2      Q.   And the state said nonetheless they

3  wanted to go forward and make that change?

4      A.   Yes.

5      Q.   Just a couple of questions to clarify

6  things you mentioned before.

7           You said that part of your training to

8  the Supervisors of Elections was on, I think is

9  it the Auto XP system?

10      A.   Auto Track XP.

11      Q.   Auto Track XP.

12           Was that part of the training that you

13  covered at those regional training sessions?

14      A.   Yes.

15      Q.   And how did the Auto Track XP system

16  work?

17      A.   Auto Track XP is DBT's premier product,

18  it is a nationwide compilation of various public

19  record databases.  It's primarily used by

20  government and law enforcement in locating

21  individuals, checking assets, property records,

22  driver's license information.  Numerous reasons.

23           We knew that it would be extremely

24  beneficial for the supervisors to have access to

25  our system to help them to verify the information

164

```
 1
 2                     CERTIFICATE
 3   The State of Florida,     )
 4   County of Broward         )
 5
 6          I hereby certify that I have read the
 7   foregoing deposition by me given, and that the
 8   statements contained herein are true and correct
 9   to the best of my knowledge and belief, with the
10   exception of any corrections or notations made
11   on the errata sheet, if one was executed.
12
13          Dated this _____ day of _____,
14   2001.
15
16
17                            _____
18
19
20
21
22
23
24
25
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

165

```
 1
 2                      CERTIFICATE
 3    STATE OF FLORIDA
 4    COUNTY OF BROWARD
 5         I, VALERIE LEHTO, Registered Professional
 6    Reporter, do hereby certify that I was authorized
 7    to and did stenographically report the foregoing
 8    deposition as hereinabove shown, and the testimony
 9    of said witness was reduced to computer
10    transcription under my personal supervision and that
11    the record is a true record of the testimony given
12    by the witness.
13         I further certify that I am not a
14    relative, employee, attorney, or counsel of any of
15    the parties, nor am I a relative or employee of any
16    of the parties' attorney or counsel connected with
17    the action, nor am I financially interested in the
18    action.
19         Dated this 26th day of October, 2001.
20
21
22                   _____
                     VALERIE LEHTO
23                   Registered Professional Reporter
                     COMMISSION NO. CC759583
24                   MY COMMISSION EXPIRES 8/22/2002
25
```

ESQUIRE DEPOSITION SERVICE (954) 728-9004

**PLAINTIFFS' EXHIBIT 25**

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              CASE NO.:  01-0120-Civ-Gold

 3  NATIONAL ASSOCIATION FOR THE ADVANCEMENT
    OF COLORED PEOPLE, INC., by its FLORIDA STATE
 4  CONFERENCE OF BRANCHES, JIMMIE PANNELL,
    JULIA STONER, NATALIE CARNEGIE, ERMA J. KELLY,
 5  JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q.
    ODOM, WILLIE STEEN, WALLACE McDONALD,
 6  JERMAINE TERRY, LORINE WALDEN, EMERY
    TIMBERLAKE, VALERIE BUFORD-WELLS, MICHELLE
 7  FLOYD, CONSUELO MARIA GRAHAM, SHERRY
    EDWARDS, KANDY WELLS, JOANNA CLARK, JANICE
 8  KELLY, PLACIDE DOSSOUS and RONDRICK ROSE in
    their own right and as representatives of all
 9  similarly situated citizens and residents of the
    State of Florida,
10
         Plaintiffs,
11
         vs.
12
    KATHERINE HARRIS, Secretary of State of Florida; CLAY
13  ROBERTS, Director of Florida Division of Elections; DAVID
    C. LEAHY, Miami-Dade County Election Supervisor;
14  MIRIAM OLIPHANT, Broward County Election Supervisor;
    JOHN STAFFORD, Duval County Election Supervisor; PAM
15  IORIO, Hillsborough County Election Supervisor; ION
    SANCHO, Leon County Election Supervisor; WILLIAM
16  COWLES, Orange County Election Supervisor; and DEANIE
    LOWE, Volusia County Election Supervisor (all in their
17  official capacities); and CHOICEPOINT, INC., a Georgia
    corporation d/b/a DATABASE TECHNOLOGIES, INC.,
18
         Defendants.
19
    _____
20
21
22
23
24
25
```

**Page 2**

```
 1          Deposition of JANICE KELLY pursuant to Notice

 2  of Taking Deposition, on Monday, March 25, 2002, at 1:10

 3  p.m., at the Office of General Counsel, City Hall-St.

 4  James, 117 West Duval Street, Suite 480, Jacksonville,

 5  Florida, before Cristina A. Stark, a Court Reporter and

 6  Notary Public in and for the State of Florida at Large.
```

**Page 3**

```
 1  A P P E A R A N C E S

 2
 3  ANGELA CICCOLO, Esquire
    Assistant General Counsel
 4  NAACP
    4805 Mt. Hope Drive
 5  Baltimore, Maryland 21215-3297

 6  Attorney for the Plaintiffs.

 7
 8  TRACEY ARPEN, Esquire
    Office of General Counsel
 9  City Hall-St. James
    117 West Duval Street, Suite 480
10  Jacksonville, Florida 32202

11  Attorney for Defendant Stafford.

12  WALTER J. HARVEY, Esquire, via telephone
    Steel, Hector & Davis International
13  200 South Biscayne Boulevard
    Miami, Florida 33131-2398

14  Attorney for Defendants Harris and Roberts.

15  MICHAEL D. CIRULLO, JR., Esquire, via telephone
16  Goren, Cherof, Doody and Ezrol
    3099 E. Commercial Boulevard, No. 200
17  Ft. Lauderdale, Florida 33308

18  Attorney for Defendant Cowles.

19  SUSAN TORRES, Esquire, via telephone
    111 N.W. 1st Street, Suite 2810
20  Miami, Florida 33128

21  Attorney for Defendant Leahy.

22  DANIEL ECKERT, Esquire, via telephone
    County Attorney's Office
23  123 W. Indiana Avenue
    DeLand, Florida 32720-4613
24
    Attorney for Defendant Lowe.
25
```

**Page 4**

```
 1  A P P E A R A N C E S   C O N T I N U E D

 2  DOUGLAS MACINNES, Esquire, via telephone
    Office of the Attorney General
 3  PL-01, The Capitol
    Tallahassee, Florida 32399-1050

 4
    Attorney for Defendants Dickerson and Kearney.
 5
    TOM WHITE, Esquire, via telephone
 6  Adorno & Zeder, P.A.
    2601 S. Bayshore Drive, Suite 1600
 7  Miami, Florida 33133-5413

 8  Attorney for Defendant Choicepoint, Inc. d/b/a
            Database Technologies, Inc.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

1                I N D E X
2  WITNESS:
3    JANICE KELLY
4       DIRECT EXAMINATION BY MR. ARPEN . . . . . . PAGE 6
5       CROSS EXAMINATION BY MR. MACINNES . . . . . PAGE 26
6       CROSS EXAMINATION BY MS. TORRES. . . . . . PAGE 29
7       CROSS EXAMINATION BY MR. CIRULLO. . . . . . PAGE 30
8       CROSS EXAMINATION BY MR. HARVEY. . . . . . .PAGE 31
9       CROSS EXAMINATION BY MR. ECKERT. . . . . . .PAGE 35
10      CROSS EXAMINATION BY MR. WHITE. . . . . . . PAGE 35
11      CROSS EXAMINATION CONTINUED BY MR. MACINNES.PAGE 36
12
13
14               E X H I B I T S
15  FOR IDENTIFICATION
16  DEFENDANT DICKERSON AND KEARNEY'S EXHIBIT 1. . . PAGE 38
17
18
19
20
21
22
23
24
25

6

1                S T I P U L A T I O N
2            It was stipulated and agreed by and between
3   counsel for the respective parties, and the witness, that
4   the reading and signing of the deposition by the witness
5   was not waived.
6                     - - -
7              JANICE KELLY,
8   having been produced and first duly sworn, testified to
9   questions as follows:
10             DIRECT EXAMINATION
11  BY MR. ARPEN:
12       Q    Ms. Kelly, could you begin, please, by giving
13  us your name and your current address.
14       A    Janice Bartley Kelly.  Address -- excuse me,
15  6555 Kathryn, K-a-t-h-r-y-n, Drive, Jacksonville, Florida
16  32208.
17       Q    Ms. Kelly, I'm -- my name is Tracey Arpen.  I
18  represent the Supervisor of Elections John Stafford and
19  I'm going to be asking you some questions first probably
20  followed by the other attorneys.  And if there are any of
21  the questions I ask that you don't understand or like for
22  me to rephrase or repeat them, please let me know and
23  I'll be glad to do that.  The other thing is as you
24  answer, could you please be sure that you answer with a
25  verbal response rather than a nod or shake of the head so

7

1   the court reporter will have some sort of a verbal
2   response to take down.
3        A    Okay.
4        Q    And let me ask you, if I could, how long you
5   have resided at your current address.
6        A    Since 1996.
7        Q    Okay.  And what was your address prior to
8   that?
9        A    It was 1000 Broward Road, Apartment 103,
10  Island Point Apartments.
11       Q    And how long did you live at that address?
12       A    For two years.
13       Q    Okay.  Have you lived in Duval County all or
14  most of your life?
15       A    I've lived here all my life until I went in
16  the military.
17       Q    Now, as I understand it from allegations in
18  the complaint, you've been registered to vote since
19  approximately 1994; is that correct?
20       A    Yes, that is correct.
21       Q    Do you recall when you registered to vote, at
22  what location you were registered?  Was it, for example,
23  at a Supervisor of Elections office, some voter
24  registration drive, or do you recall?
25       A    It was at the actual voter's registration

8

1   drive.
2        Q    Okay.  Do you recall where that was?
3        A    No.  No.
4        Q    Okay.  Now, so as I understand it, you
5   registered to vote in 1994 and moved in approximately
6   1996; is that correct?
7        A    Right, that is correct.
8        Q    Now, when you moved to the new address in
9   1996, did you obtain a new driver's license at that
10  point?
11       A    No, I didn't have a new driver's license at
12  that point.
13       Q    Okay.  Let me ask you, then, about the
14  allegation in the amended complaint which -- with regard
15  to the allegation pertaining to you, states that, "After
16  her initial registration in Duval County, Ms. Kelly moved
17  to a new address within the county.  When she moved,
18  Ms. Kelly obtained a new driver's license."  Is that
19  information there correct or incorrect?
20       A    That's the one that had the 1000 Broward Road
21  address, which is where I had went to.
22       Q    Okay.  So the new driver's license was
23  changed to the Broward Road address?
24       A    To the -- because I had my original driver's
25  license from when I was a teenager when I got out of the

March 25, 2002

9

```
13:13:14  1    service.
13:13:14  2         Q    Uh-huh.
13:13:14  3         A    Those was the license I've always had until I
13:13:18  4    moved, then I got that one done.  And then I turn around
13:13:22  5    and bought my home, which is when I had my address
13:13:26  6    changed for the Kathryn Drive.
13:13:26  7         Q    Okay.  And just so I'm clear, the Kathryn
13:13:30  8    Drive move was the 1996 move?
13:13:32  9         A    That -- no, that wasn't the 1996.
13:13:34 10         Q    I'm sorry, to Broward was 1996?
13:13:38 11         A    When I left -- I bought my home in '96.
13:13:38 12         Q    Okay.
13:13:40 13         A    I got out of the service in '93.  I bought my
13:13:44 14    home the end of '94, '95, went to Broward.  I moved out
13:13:50 15    of Broward 1996 and moved to Kathryn Drive.
13:13:54 16         Q    Okay.  That's what I thought.
13:13:56 17         A    Okay.  All right.
13:13:56 18         Q    Okay.  Now, according to the allegations in
13:14:14 19    the complaint, you, in 1998, went to vote at your old
13:14:20 20    polling place.  Was that the polling place where you
13:14:24 21    would have voted when you lived at Broward Road?
13:14:28 22         A    Right.
13:14:28 23         Q    Okay.  Do you recall where that precinct was?
13:14:32 24         A    It's at Highlands Elementary School on Depaul
13:14:36 25    Street.
```

10

```
13:14:38  1         Q    Okay.  And did you vote in the 1998 election?
13:14:42  2         A    Yes, I did.
13:14:44  3         Q    Did you have to fill out or sign any
13:14:46  4    additional paperwork in order to be able to vote in the
13:14:52  5    1998 election?
13:14:54  6         A    When I went over there she -- I basically
13:14:56  7    told her that I had moved.  There was a lady sitting at
13:15:00  8    the desk and that was the only place that I had to vote.
13:15:04  9    My card still said the same thing, and she told me that I
13:15:06 10    could vote there.  And she filled out some paperwork and
13:15:08 11    told me to go on over to the desk, do my voting, which I
13:15:10 12    went over and did that.  And we talked about my house and
13:15:14 13    whatever and I left.  She said that they would be
13:15:18 14    forwarding me a new card or whatever and that was it.
13:15:22 15         Q    Okay.  And do you recall what the paperwork
13:15:30 16    was that was filled out?
13:15:32 17         A    No.  She just took a sheet -- because I told
13:15:36 18    her I had moved and I didn't know whether -- and she told
13:15:36 19    me, yeah, I could vote there and she had my driver's
13:15:40 20    license and my little information -- she was writing and
13:15:40 21    I went and voted.
13:15:42 22         Q    Do you recall if it appeared that she was
13:15:44 23    filling out a form or was she taking this information
13:15:46 24    down on a blank sheet of paper?
13:15:48 25         A    Well, I assume she was taking it down on
```

March 25, 2002

11

```
13:15:50  1    forms since they was going to mail me a new card, so I
13:15:54  2    didn't know.
13:15:58  3         Q    Okay.  Now, did you ever receive a new voter
13:16:06  4    registration card?
13:16:06  5         A    No, I still have my old one.
13:16:10  6         Q    And during the time between 1998 and November
13:16:12  7    of 2000, did you ever check back with the supervisor's
13:16:16  8    office to find out what may have happened with the new
13:16:22  9    card?
13:16:22 10         A    No, never checked back.
13:16:26 11         Q    And in the November 2000 election, where did
13:16:32 12    you go to vote?
13:16:32 13         A    I went over on Depaul to Highlands
13:16:36 14    Elementary.  You want everywhere I went or just that one?
13:16:42 15         Q    No, let's start -- was that the first one?
13:16:42 16         A    That's the first place I went.
13:16:46 17         Q    Okay.  What happened when you got to the
13:16:46 18    Highlands Elementary precinct?
13:16:50 19         A    There was a cleaning trash can with the
13:16:50 20    cleaning people, items normally at the front of the
13:16:52 21    building, that's where you walk in at and you can vote.
13:16:56 22    Nobody was there, no cars, nothing like that, and I was
13:16:58 23    looking for the cleaning person.  Couldn't find nobody on
13:17:02 24    the premises that was sitting out by the sidewalk.  So I
13:17:06 25    left there and there was, you know, no signs or nothing
```

12

```
13:17:10  1    telling you where to go at, but over where my new house
13:17:14  2    is, I know that the fire station up on Main Street, they
13:17:18  3    vote there.  I saw them that morning on my way to work,
13:17:24  4    so I know they had voting up there.  So I went up to that
13:17:26  5    particular place to vote.
13:17:28  6         Q    Okay.
13:17:28  7         A    And --
13:17:30  8         Q    Is that the one out on Main Street near --
13:17:32  9         A    Right across from the cemetery.
13:17:32 10         Q    -- Evergreen Cemetery?
13:17:36 11         A    Right.
13:17:36 12         Q    Okay.  And what happened when you got to that
13:17:42 13    precinct?
13:17:42 14         A    Well, when I walked -- well, got up there and
13:17:44 15    they have the books sitting to the right and I went up to
13:17:48 16    the case and she said I wasn't on the book, told me I
13:17:54 17    needed to get in the center line because it was like two
13:17:56 18    -- a couple and then another two people up in front of
13:18:00 19    them, told me to get behind them because that was the
13:18:02 20    main book that I could check on.  And I got up there and
13:18:06 21    the lady told me that my name was there, but I couldn't
13:18:10 22    vote there based on where my address was and told me that
13:18:14 23    I could try down on 61st, I believe it is, at the church.
13:18:18 24    And I asked her, you know, why I couldn't vote there and
13:18:22 25    she told me I couldn't vote there because I didn't live
```

NAACP, et al. VS. KATHERINE HARRIS, et al.    Deposition of JANICE KELLY

Case 1:01-cv-00120-ASG   Document 409   Entered on FLSD Docket 07/02/2002   Page 84 of 304

13

```
13:18:22  1    in that district, and jumped in my car, drove down.
13:18:28  2        Q    Okay.  Hold on before you get too far down
13:18:30  3    the road.  Let me ask you, you described it check the
13:18:36  4    main book, was that your assumption or did somebody
13:18:42  5    describe it to you as the main book or --
13:18:42  6        A    The lady that had the case -- the
13:18:44  7    representative that had the case, she looked on there,
13:18:50  8    she didn't see my name.  She told me the main book --
13:18:50  9    that didn't mean nothing, the main book was located right
13:18:52 10    there to my front.  So just basically making a left
13:18:56 11    standing in line.
13:18:56 12        Q    Okay.  And so they found you in that book?
13:19:02 13        A    Yes, she had me in there with my correct
13:19:06 14    address.
         15        Q    With your --
         16        A    6555 --
         17        Q    -- Catalina --
         18        A    -- Kathryn --
         19        Q    Oh, Kathryn, I'm sorry.
13:19:08 20        A    Kathryn, K-a-t-h-r-y-n, Drive.
13:19:12 21        Q    Okay.  And they then sent you to the church
13:19:24 22    on 61st Street?
13:19:26 23        A    Down there.
13:19:26 24        Q    Okay.  Do you recall what the precinct number
13:19:30 25    was?
```

14

```
13:19:30  1        A    No, I do not.
13:19:32  2        Q    Okay.  Let me ask you, what time of day was
13:19:34  3    it when you got to the Main Street fire station precinct?
13:19:40  4        A    It had to be about -- I say probably -- it
13:19:42  5    was daytime.  I mean, around -- I say probably about
13:19:48  6    6:30, 6:35, -40 somewhere up in there because these
13:19:54  7    places aren't but like so far apart.
13:19:58  8        Q    Okay.  Then you went to the church at 61st
13:20:06  9    Street.  First, let me ask you, do you know approximately
13:20:08 10    how long you were in the fire station precinct from the
13:20:12 11    time you walked in the door until you left?
13:20:16 12        A    It wasn't -- I give it maybe five, ten
13:20:20 13    minutes.  It wasn't long because it wasn't a crowd in
13:20:24 14    there.  You had the couple that was in front of me,
13:20:28 15    somebody that was in front of them.  On the side people
13:20:30 16    were still checking for their names that was still
13:20:32 17    standing there, so it was like as soon as you walk in you
13:20:36 18    could walk up to a representative.  Other people was off
13:20:40 19    to the left voting.  That particular area had a bunch of
13:20:42 20    people.  So I know it was me, the couple that was in
13:20:46 21    front of me, and it was someone in front of them that was
13:20:46 22    finishing up and walking off.  It only was taking like
13:20:50 23    minutes, you know, to get the information.
13:20:52 24        Q    Okay.  Okay.  Do you know approximately what
13:20:56 25    time you arrived at the church precinct on 61st Street?
```

15

```
13:21:02  1        A    I can't say.  I know when we got to the door
13:21:04  2    of the voting, based on the lady that came up the same
13:21:10  3    time I did, her watch had five minutes till.  The lady
13:21:14  4    inside the church said that they were closed, it was
13:21:18  5    seven o'clock.  And myself and the other lady and another
13:21:22  6    person was coming up.  All of them, you know, all of us
13:21:26  7    was saying the same thing, it's not seven o'clock.  It
13:21:28  8    was a guy still voting in there and another lady was over
13:21:32  9    there packing up, breaking down the different things and
13:21:36 10    she told us we couldn't vote there, that they were
13:21:38 11    closed.  And now everybody pretty much were like in shock
13:21:42 12    and, you know, turned around and -- I mean, there wasn't
13:21:48 13    nothing you could do.  She wasn't letting you vote.
13:21:52 14        Q    Now, when you arrived there, were you, what I
13:22:02 15    would call, the first person in line at the door?  Was
13:22:04 16    there anyone in line at the door ahead of you?
13:22:04 17        A    When I got to the church, I pulled in the
13:22:08 18    parking lot, got out of my car.  It was a door -- when
13:22:10 19    you walk up this sidewalk -- because there wasn't no
13:22:12 20    signs say voting over here.  You walk down the walkway.
13:22:14 21    That was dark.  It's a door to the church, ringing the
13:22:18 22    doorbell, knocking on the door.  The girl that got out of
13:22:22 23    her car was right behind me.  Do you see anybody in
13:22:24 24    there?  No, ain't nobody in there.  We started heading
13:22:26 25    because it's like an L-shaped crosswalk you got to go
```

16

```
13:22:32  1    around.  A lady, guy in a wheelchair, they were coming
13:22:34  2    around.  They say, "Y'all here to vote?  You got to go
13:22:36  3    around there to the voting polls."  So we went that way,
13:22:38  4    because, I mean, there was nothing directing you to it,
13:22:42  5    so we went that way, opened up the door, you know, we
13:22:44  6    rushing in.  And she's standing there, you know, and it's
13:22:46  7    like made it in time, you know, and she told us we
13:22:50  8    couldn't vote, that they were through.  But the guy was
13:22:54  9    still over there voting.
13:22:56 10        Q    Okay.  But you don't know what time he would
13:22:58 11    have arrived at the precinct?
13:23:02 12        A    No, I couldn't tell you what time he got
13:23:04 13    there.
13:23:04 14        Q    But by the time you saw him, he already had
13:23:04 15    his ballot and was at the voting machine?
13:23:06 16        A    The guy was -- he was still writing, voting.
13:23:10 17        Q    Okay.  Now, was the -- the other voter who
13:23:16 18    showed up around the same time as you anyone that you
13:23:20 19    knew?
13:23:20 20        A    No.
13:23:22 21        Q    Was she African-American or white?
13:23:26 22        A    African-American.  Everybody that was out
13:23:28 23    there, even the people that pulled up when we were going
13:23:30 24    back to our car, was African-American.
13:23:32 25        Q    And how about the man that was in there
```

March 25, 2002

**NAACP, et al. VS. KATHERINE HARRIS, et al.**          Deposition of JANICE KELLY

Case 1:01-cv-00120-ASG   Document 409   Entered on FLSD Docket 07/02/2002   Page 85 of 304

17

```
13:23:36  1    voting?
13:23:36  2        A   He was a black, yeah, African-American.
13:23:40  3        Q   And did you get the name of the poll worker
13:23:42  4    who told you that it was too late to vote?
13:23:48  5        A   Nope.  I know she was short with
13:23:52  6    grayish-white hair, that's it.
13:24:02  7        Q   Now -- and was she white or black?
13:24:08  8        A   White.
13:24:32  9        Q   Now, did you -- did you make any complaint to
13:24:42 10    the Supervisor of Elections office at any time after the
13:24:48 11    election regarding your not being able to vote?
13:24:50 12        A   I called the next day from work, as well as I
13:24:54 13    called Corrine Brown's office because we were at work.  A
13:25:00 14    lot of people were -- it was an upsetting day.  And I
13:25:04 15    called there and they told me a representative would call
13:25:10 16    me back, and no one ever called me back from Supervisor
13:25:14 17    of Elections other than Corrine Brown called me back and
13:25:22 18    that was pretty much it.
13:25:26 19        Q   Do you know the name of the person you spoke
13:25:26 20    with at the supervisor's office?
13:25:30 21        A   Not right off, I can't remember.
13:25:32 22        Q   Okay.  Do you have it written down anywhere?
13:25:34 23    Is there anything that would -- any notes or anything
13:25:36 24    that would give you that person's name?
13:25:38 25        A   Not -- not right now that I can think of.
```

18

```
13:25:42  1        Q   Okay.  Now, did you make any complaint with
13:26:02  2    any other office or organization regarding your inability
13:26:08  3    to vote other than the supervisor's office you said you
13:26:10  4    contacted and Congresswoman Brown's office you said you
13:26:16  5    contacted?  Was there any other organization or office
13:26:18  6    that you contacted regarding your not being able to vote?
13:26:24  7        A   Not -- I mean, as far as calling anybody
13:26:26  8    else, no.  I was trying to get why I hadn't got an ID
13:26:30  9    card, you know, any of that, that I can remember.
13:26:32 10        Q   And did you appear at any of the meetings
13:26:38 11    that were convened by local NAACP regarding the election?
13:26:42 12        A   Yes, I did.
13:26:44 13        Q   Okay.  Do you remember which were the ones
13:26:46 14    you spoke at?  Or first, let me ask you, did you speak at
13:26:48 15    any of those meetings?
13:26:48 16        A   Yes, I did.
13:26:50 17        Q   Do you remember which one you went to?
13:26:52 18        A   The one up off Soutel at the school,
13:26:58 19    elementary school up there off Soutel, I think it's Mary
13:27:04 20    McCloud -- Bethune, one of the first schools and also I
13:27:06 21    went to the one at Ed -- EWC, Edward Waters College.
13:27:12 22        Q   Right.  Did you speak at both of those or
13:27:14 23    just one of them?
13:27:16 24        A   I spoke at both of them.
13:27:22 25        Q   And since that time, have you received a --
```

19

```
13:27:26  1    any sort of a transcript of your remarks at those two
13:27:34  2    meetings?
13:27:34  3        A   No.  If I have, I haven't --
13:27:38  4        Q   Do you recall if there was a court reporter
13:27:40  5    there taking down what everyone said or not?
13:27:44  6        A   I can't recall.  I don't know who all was
13:27:46  7    there.  There was a lot of people there.
13:27:50  8        Q   Do you recall if you were placed under oath
13:27:52  9    before you made your statement at either one of those
13:27:56 10    meetings?
13:27:58 11        A   Yes, I was placed under oath.  I don't know
13:28:00 12    who the people were.
13:28:02 13        Q   And do you recall the substance of your
13:28:06 14    comments at those meetings?
13:28:08 15        A   The same thing I just -- they pretty much
13:28:10 16    asked the same questions, you know, that was it.
13:28:36 17        Q   Now, what, if anything, about your experience
13:28:42 18    in attempting to vote in November 2000 would lead you to
13:28:46 19    believe that you not being able to vote was the result of
13:28:54 20    your race?
13:29:00 21        A   Basically voting, I never had a problem
13:29:04 22    before.  I mean, address problem, whatever they want to
13:29:08 23    call it, I've never had a problem when I voted before.
13:29:12 24    And to have to go from the place that I originally vote,
13:29:18 25    that being closed, no signs, no nothing, no kind of
```

20

```
13:29:22  1    information whatsoever, going over by my home.
13:29:26  2            Now, I was allowed to vote at the other one.
13:29:30  3    You got me on your books, but here I am.  I can't vote.
13:29:34  4    You've got all those other people over here voting, and,
13:29:38  5    you know, just the comments that were made in there,
13:29:42  6    especially to the people that were in front of me because
13:29:46  7    they were a black couple.  They step up to the desk to
13:29:50  8    tell them they got to go over by Gateway.  You know, time
13:29:52  9    is ticking down.  You're on the books.  Everybody in this
13:29:54 10    line is on the books, but you're not allowed to vote.
13:29:54 11    Then you tell these people they got to go over by
13:30:00 12    Gateway.  The older lady that's sitting here to my right
13:30:04 13    facing her tells this younger lady sitting right next to
13:30:06 14    her, call over, these people been in this line.  Advised
13:30:12 15    them that they're coming over to vote.  Let them go ahead
13:30:12 16    and vote because they were in this line.  She sits there
13:30:16 17    while these people walk off and then makes the comment,
13:30:18 18    "Well, I guess they won't make it," looking at her watch.
13:30:22 19    But then you got everybody hopping up, you know,
13:30:26 20    assisting all these other people, then I step up here.
13:30:28 21    I'm in your book.  I'm not allowed to vote.  I done ran
13:30:32 22    from one side of town to the other side of town, not
13:30:36 23    saying that distancewise, but from one voting poll to the
13:30:38 24    other.  I tried to vote.  You got me right here on the
13:30:40 25    books, you know, slip of paper, whatever you have to do,
```

**March 25, 2002**

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JANICE KELLY

Case 1:01-cv-00120-ASG   Document 409   Entered on FLSD Docket 07/02/2002   Page 86 of 304

21

```
13:30:44  1    do it, let me vote, let me go home. Then you, in turn,
13:30:48  2    send me back up the road, which ain't even a good ten
13:30:52  3    blocks at the most, to vote at a church, you know, making
13:30:56  4    them kind of rounds just to vote and you never had those
13:31:00  5    kind of problems.
13:31:00  6          I really -- I don't see it. I don't know
13:31:04  7    what's going on, you know. I can't say because I'm not
13:31:08  8    in those people position. I'm not no voter, you know --
13:31:12  9    I didn't work at the poll, but everything in there -- as
13:31:14 10    far as I'm concerned, it was wrong. I should have been
13:31:18 11    allowed to vote. I wasn't allowed to vote, and that's
13:31:22 12    it, bottom line.
13:31:22 13          You know, everybody who was in there --
13:31:26 14    majority of the people in there were black. People were
13:31:30 15    getting turned around. You had more people -- people
13:31:32 16    were coming out saying comments. I don't know what their
13:31:37 17    case was, but I know the people that were in there with
13:31:38 18    me, all of us got turned around. And to have people rush
13:31:40 19    back out to go to Gateway, back down the street to 61st
13:31:44 20    when you know that there's some kind of way to fix it
13:31:50 21    right there with the people in there until you can get it
13:31:52 22    corrected.
13:31:52 23          Here it is 2002, March. I still am walking
13:31:56 24    around with the one with the Broward Road address. I
13:32:00 25    still have not got an updated card, so something ain't
```

22

```
13:32:04  1    working. My address is the same. I mean, it's on my
13:32:08  2    license, send me a card, you know. What it's going to be
13:32:12  3    the next time I go to vote?
13:32:14  4          Q    Well, I appreciate all that, but I didn't
13:32:18  5    hear anything in there that indicated to me that you were
13:32:22  6    treated any differently than a white person would have
13:32:26  7    been in the same circumstances, for example. What about
13:32:30  8    your treatment believes -- leads you to believe that you
13:32:32  9    were treated that way because you were black?
13:32:34 10          A    I mean, everybody there is white. You got
13:32:38 11    the two -- you got these two elderly white guys out here.
13:32:44 12    You got these workers over here. You got these two
13:32:44 13    ladies here. I mean, everybody -- you had like two on
13:32:48 14    your left-hand side. The majority of the people over
13:32:52 15    there other than one person were white. They were over
13:32:56 16    there voting. You got -- I mean, as far as I'm
13:32:56 17    concerned, I should have been allowed to vote. I mean,
13:33:00 18    the only people I saw going out the door were black. I
13:33:04 19    didn't see white people going out the door. All the
13:33:06 20    blacks were being turned around. I'm black, so, you
13:33:10 21    know, evidently that's the only thing you can hold
13:33:12 22    against me, because you didn't know who I was going to
13:33:14 23    vote for. So, I mean, what other reason would it be for
13:33:16 24    me not to be allowed to vote? The same thing going down
13:33:20 25    to the other poll. You know, nobody's notifying -- you
```

23

```
13:33:22  1    know, why wasn't I allowed to vote?
13:33:24  2          Q    Did I understand you to say that you did not
13:33:28  3    live within -- or that you were advised that you could
13:33:34  4    not vote there because you didn't live within the
13:33:38  5    district voting there?
13:33:38  6          A    Per her, if I wasn't in that particular
13:33:42  7    voting area that I could vote. Now, my house is located
13:33:48  8    right up the street, right behind -- a street behind
13:33:50  9    them. I'm on Pearl, they're on Main.
13:33:54 10          Q    Do you know whether, for example, there are
13:33:54 11    any district boundary lines for any of the races on the
13:34:00 12    ballot that were near your home?
13:34:04 13          A    No, sir, I don't know anything about that.
13:34:12 14          Q    Other than the fact that the -- well, let me
13:34:16 15    ask you this, do you know the circumstances of any of the
13:34:20 16    other people you saw being turned away as to why they
13:34:26 17    weren't able to vote at that precinct?
13:34:26 18          A    The people that were in front of me, they
13:34:28 19    were told the same thing I was told, they were out of
13:34:32 20    their district. They had moved from over there. They
13:34:34 21    could not vote over there. They had to go over by
13:34:38 22    Gateway. Everything was go down here and try them, go
13:34:40 23    over here, you know, they just -- you either had to go to
13:34:44 24    another precinct on the same side of town, but it just
13:34:48 25    happened to be, you know, down the street and around the
```

24

```
13:34:54  1    corner type.
13:34:56  2          Q    Now, other than the fact that you and the
13:34:58  3    other voters you saw turned away were black and the poll
13:35:04  4    workers happened to be white, was there anything else
13:35:08  5    about the experience which led you to believe that you
13:35:10  6    were not able to vote because of your race?
13:35:16  7          A    I mean, that's the only way I saw it. I
13:35:20  8    mean, everybody else was doing what they had to do, that
13:35:22  9    -- that's pretty much my reason behind it.
13:35:56 10          Q    Let me -- let me ask you this, there is some
13:36:02 11    allegations in the complaint regarding the election which
13:36:20 12    pertain to the training of poll workers. Do you have any
13:36:28 13    knowledge as to the training given to poll workers in
13:36:34 14    Duval County prior to the November 2000 election?
13:36:38 15          A    No, I don't.
13:36:46 16          Q    Do you have any knowledge as to the -- as to
13:36:50 17    the supervisor's method of handling change of addresses
13:36:58 18    here in Duval County?
13:36:58 19          A    No, I don't, not right now.
13:37:08 20          Q    With respect to your personal claims in this
13:37:12 21    lawsuit, what would you like to see happen, or what would
13:37:18 22    you like to see come out of this lawsuit that you would
13:37:20 23    see as a benefit to yourself?
13:37:24 24          A    They need to update -- keep their information
13:37:28 25    updated, you know, get these actual -- get your voter's
```

March 25, 2002

25

13:37:32  1   registration cards out ASAP.  You know, I mean, that's --
13:37:38  2   things are just too backed up in the system.  Everything
13:37:42  3   is backed up, backed up, and it caused a massive problem.
13:37:46  4   It really caused a massive problem, you know, the time,
13:37:52  5   everything.  My daughter is sitting somewhere waiting for
13:37:54  6   me and I'm running up and down the street trying to vote.
13:37:58  7   You know, it was just a real big inconvenience.  If
13:38:04  8   they're going to have polling sites that move, notify
13:38:08  9   people in enough time.  If they're going to have where
13:38:10 10   you can't, you know, necessary -- based on what people --
13:38:12 11   we're all a working society and to have to get off from
13:38:16 12   work and you have to go to this particular location, that
13:38:16 13   particular location.
13:38:20 14           If you can break it down for as how to notify
13:38:24 15   people from computers nowadays, the way technology is,
13:38:28 16   there is no reason for somebody not to be able to step
13:38:30 17   outside of their job, go in a voting poll, vote, and go
13:38:32 18   back to work.  All of this you've got to live here,
13:38:32 19   you've got to move here, you've got to go through all of
13:38:36 20   this here, it's uncalled for.  The way technology is
13:38:40 21   today, it makes no sense for anybody to go through this
13:38:44 22   much trouble just to put their vote in.  All of these
13:38:48 23   things should be tallied automatically through the
13:38:50 24   system.  Get it done, get the count out, and everybody is
13:38:52 25   more peaceful and more calmer.  I don't feel that I

26

13:38:56  1   should have to run from poll to poll to poll just to
13:39:00  2   vote, and it's all based on one little card that has the
13:39:06  3   same information.
13:39:06  4           I've been running around all this time -- you
13:39:10  5   figure all of this been going on since '96.  I'm still
13:39:12  6   walking around with 1000 Broward Road, Highlands, Depaul
13:39:18  7   Street as my voter's registration.  I still don't have a
13:39:24  8   correct voter's registration right now, and we're in
13:39:26  9   2002.  I mean, it's ridiculous.
13:39:28 10       Q   Do you recall or do you know whether you
13:39:32 11   received any information regarding the relocation of the
13:39:46 12   Highlands precinct?
13:39:50 13       A   I haven't received anything, that's why I
13:39:52 14   went over there.
13:40:02 15       Q   Since the -- since your initial call after
13:40:06 16   the election, have you had any communications with anyone
13:40:10 17   in the Supervisor of Elections office regarding your
13:40:16 18   voter registration status or your change of address?
13:40:20 19       A   Nobody's called me.
13:40:22 20       Q   And have you called them back?
13:40:22 21       A   No.
13:40:48 22           MR. ARPEN:  I don't have any other questions
13:40:50 23   at this time.  Any of the other defense counsel
13:41:00 24   have any questions?
13:41:00 25           MR. MACINNES:  On the telephone?

27

13:41:00  1           MR. ARPEN:  Yes.
13:41:02  2                       CROSS EXAMINATION
13:41:02  3   BY MR. MACINNES:
13:41:02  4       Q   This is Doug MacInnes.  Ms. Kelly, this the
13:41:08  5   Doug MacInnes from the Attorney General's Office in
13:41:12  6   Tallahassee.
13:41:12  7       A   Hi.
13:41:12  8       Q   I represent the Department of Children and
13:41:14  9   Families and the Department of Highway Safety and Motor
13:41:18 10   Vehicles.
13:41:18 11       A   Uh-huh.
13:41:18 12           MS. CICCOLO:  Can we turn it up?  Can we turn
13:41:18 13   it up a little bit?  Thanks.
13:41:18 14       Q   Do you have your driver's license with you,
13:41:20 15   ma'am?
13:41:22 16       A   Yes, I do.
13:41:24 17       Q   Would you mind pulling it out and asking the
13:41:26 18   court reporter to make a Xerox copy of it, please.  But
13:41:30 19   before you give it to her, I want to ask you a question.
13:41:36 20           MS. CICCOLO:  You can go ahead.
13:41:42 21       Q   Is it out?
13:41:44 22       A   Yes, it's out.
13:41:44 23       Q   What is the date that your driver's license
13:41:46 24   was issued?
13:41:48 25       A   Okay.  This one here was issued on March

28

13:41:52  1   23rd, '99.
13:41:54  2       Q   Okay.  Do you recall where you got that one
13:41:56  3   issued?
13:41:58  4       A   Over there off Dunns [sic] Avenue.
13:42:00  5       Q   Okay.  Was it a Department of Highway Safety
13:42:02  6   and Motor Vehicles?
13:42:02  7       A   Yes, sir.
13:42:06  8       Q   Was it at a DMV office or a tax collector's
13:42:12  9   office?
13:42:12 10       A   No, it was at the driver's license.
13:42:14 11       Q   Okay.  Do you recall when you went in on
13:42:18 12   March 23rd, 1999, to get your driver's license, did the
13:42:24 13   employee there ask you if you wanted to apply to register
13:42:28 14   to vote at that time?
13:42:28 15       A   No, she didn't.
13:42:36 16       Q   Go ahead.
13:42:38 17       A   I had been in the service and she was talking
13:42:42 18   to me about the perfect driver's thing or something where
13:42:46 19   a lot of the stuff you didn't have to go through, so it
13:42:50 20   wasn't nothing done about voting or anything.  We just
13:42:52 21   went through whatever your normal steps are and that was
13:42:54 22   it.
13:42:58 23       Q   Can you -- was it a lady that waited on you?
13:43:02 24       A   Yes, it was.
13:43:02 25       Q   You don't happen to recall her name, do you?

**29**

```
13:43:08  1    A   Oh, no.
13:43:08  2    Q   And do you recall what race she was?
13:43:10  3    A   She was black.
13:43:10  4    Q   Do you recall telling her on March 23rd,
13:43:14  5  1999, that you were already registered to vote?
13:43:18  6    A   No, I didn't.  Not that I know of.
13:43:20  7    Q   You don't recall?
13:43:22  8    A   No, I don't recall that.
13:43:30  9    Q   Do you have any dealings with the Department
13:43:32 10  of Children and Families?
13:43:34 11    A   No, sir.
13:43:34 12    Q   Okay.  You're not on public assistance or
13:43:36 13  you're not disabled?
13:43:38 14    A   No, I'm not.
13:43:40 15        MR. MACINNES:  Thank you.  I have no further
13:43:42 16  questions.
13:43:42 17            CROSS EXAMINATION
13:43:50 18  BY MS. TORRES:
13:43:50 19    Q   My name is Susan Torres.  I represent David
13:43:52 20  Leahy, the Supervisor of Elections in Miami-Dade County.
13:43:56 21  Can you hear me?
13:43:58 22    A   Yes, I can.
13:43:58 23    Q   Are you a member of the NAACP?
13:44:00 24    A   No, I'm not.
13:44:02 25    Q   Have you ever registered to vote in
```

**31**

```
13:44:58  1    A   I lived in Fort Bragg -- well, Fort Jackson;
13:45:02  2  Fort Bragg, North Carolina; Germany; Carlisle,
13:45:08  3  Pennsylvania; and back to Germany.
13:45:10  4    Q   Have you ever been registered to vote
13:45:10  5  anywhere besides Duval County?
13:45:12  6    A   No, I wasn't.
13:45:14  7    Q   Have you ever lived in Orange County,
13:45:16  8  Florida?
13:45:18  9    A   No, I haven't.
13:45:18 10    Q   Do you have any knowledge of any of the
13:45:20 11  procedures used by William Cowles and the administration
13:45:24 12  of his office in Orange County?
13:45:26 13    A   No, sir.
13:45:28 14        MR. CIRULLO:  I don't have any further
13:45:30 15  questions.  Thank you for your time this
13:45:32 16  afternoon.
13:45:32 17        THE WITNESS:  Okay.
13:45:32 18            CROSS EXAMINATION
13:45:36 19  BY MR. HARVEY:
13:45:36 20    Q   Good afternoon.  My name is Walter Harvey.  I
13:45:38 21  represent the Secretary of State and the Division of
13:45:42 22  Elections.  How are you?
13:45:42 23    A   I'm fine.
13:45:44 24    Q   Okay.  Good.  Just a quick -- questions here.
13:45:50 25  Have you had an opportunity to review the amended
```

**30**

```
13:44:06  1  Miami-Dade County?
13:44:08  2    A   No, ma'am.
13:44:10  3    Q   Have you ever lived in Miami-Dade County?
13:44:10  4    A   No, ma'am.
13:44:12  5    Q   Do you have any knowledge concerning how
13:44:16  6  David Leahy processes changes of address for voters in
13:44:18  7  Miami-Dade County?
13:44:18  8    A   No, ma'am.
13:44:20  9    Q   Do you have any knowledge about how David
13:44:22 10  Leahy trains his poll workers?
13:44:26 11    A   No, ma'am.
13:44:26 12    Q   Do you have any complaints in this case
13:44:28 13  against David Leahy?
13:44:32 14    A   Not that I know of.  No, not that I know of.
13:44:40 15        MS. TORRES:  I have no other questions.
13:44:42 16  Thank you, Ms. Kelly.
13:44:42 17        THE WITNESS:  Okay.
13:44:42 18            CROSS EXAMINATION
13:44:46 19  BY MR. CIRULLO:
13:44:46 20    Q   Ms. Kelly, this is Mike Cirullo.  I represent
13:44:50 21  William Cowles, the Orange County Supervisor of
13:44:52 22  Elections.  Can you hear me?
13:44:52 23    A   Yes, I can.
13:44:54 24    Q   I just have a couple of questions.  When you
13:44:56 25  were in the military, where did you live?
```

**32**

```
13:45:52  1  complaint that was filed in this case?
13:45:54  2    A   No, I haven't.
13:45:56  3    Q   Okay.  Had you ever seen it?
13:46:00  4    A   If I have it, it's probably enclosed in my
13:46:04  5  paperwork that's at home.
13:46:06  6        MR. HARVEY:  Okay.  Mr. Arpen, do you have a
13:46:08  7  copy of it?
13:46:10  8        MR. ARPEN:  I've got some pages of it.  I
13:46:10  9  can walk across the hall and get the entire
13:46:14 10  complaint.
13:46:16 11        MR. HARVEY:  Do you have the portion that
13:46:16 12  has paragraph 97 on it?
13:46:20 13        MR. ARPEN:  No, I don't.  I'll have to run
13:46:20 14  get that.
13:46:24 15        MR. HARVEY:  Okay.
13:46:24 16        MR. ARPEN:  In fact, if you want to take a
13:46:24 17  quick break, I'll get a copy made of the driver's
13:46:24 18  license.
13:46:26 19        MR. HARVEY:  That's okay.  Let me see if I
13:46:28 20  can do this without it.
13:46:28 21        MR. ARPEN:  Okay.
13:46:30 22  BY MR. HARVEY:
13:46:30 23    Q   Okay.  On paragraph 97, there is an
13:46:34 24  allegation that -- and you say, "Upon information, it is
13:46:36 25  believed the defendants Roberts and Harris have failed to
```

NAACP, et al. VS. KATHERINE HARRIS, et al.                    Deposition of JANICE KELLY

Case 1:01-cv-00120-ASG   Document 409   Entered on FLSD Docket 07/02/2002   Page 89 of 304

33

```
13:46:42  1    provide and require or enforce uniformed standards and
13:46:46  2    procedures for a timely, accurate, proper processing of
13:46:52  3    voter registration applications, the registration of
13:46:52  4    voters and the updating of voter registrations, including
13:46:56  5    changes of address."  Okay.  Do you have any knowledge
13:47:02  6    with regard to what standards or procedures that
13:47:04  7    defendants Harris or Roberts have failed to require as it
13:47:10  8    relates to standards or procedures for the timely,
13:47:14  9    accurate, proper processing of voter registration
13:47:18 10    applications for the registration of voters and updating
13:47:22 11    of voter registration -- voter registrations?
13:47:26 12            MS. CICCOLO:  I'm going to object to the
13:47:28 13    form.  And, Mr. Harvey --
13:47:28 14            MR. HARVEY:  Yes.
13:47:30 15            MS. CICCOLO:  -- if you -- I don't know,
13:47:34 16    would you let us get that paragraph so that we
13:47:38 17    can look at it so we can verify what was read?
13:47:44 18    Is that -- do you have a minute for us to get
13:47:46 19    that?
13:47:48 20            MR. HARVEY:  Yeah, sure.  You can get it.
13:47:50 21    Do you have a copy of the complaint itself?
13:47:54 22            MS. CICCOLO:  I have part -- partial file
13:47:54 23    here.  The rest is outside.  Mr. Arpen is getting
13:48:00 24    it if you just wait just a second.
13:48:00 25            MR. HARVEY:  Okay.
```

34

```
13:48:02  1            MS. CICCOLO:  And I say that -- you can't
13:48:04  2    see it here, but the witness had a confused look
13:48:08  3    on her face, so I would like to be able to let
13:48:08  4    her have the opportunity to see what you're
13:48:10  5    seeing, if you don't mind.
13:48:12  6            MR. HARVEY:  Okay.
13:50:16  7            MS. CICCOLO:  Mr. Harvey --
13:50:16  8            MR. HARVEY:  Yes.
13:50:18  9            MS. CICCOLO:  -- are you starting on page 25?
13:50:22 10            MR. HARVEY:  26.
13:50:22 11            MS. CICCOLO:  26, and what paragraph?
13:50:24 12            MR. HARVEY:  Paragraph 97.
13:50:26 13            MS CICCOLO:  Okay.  There you go.  She has it
13:50:30 14    in front of her now.
13:50:34 15            MR. HARVEY:  Okay.  The first sentence.
13:50:34 16    BY MR. HARVEY:
13:50:52 17       Q   Okay.  Ms. Kelly, have you had an opportunity
13:50:54 18    to review that?
13:50:56 19       A   Yeah, and -- I mean, I have no comment.  I
13:51:00 20    mean, I don't know anything about this.  This is my first
13:51:04 21    time seeing it, so I can't really comment on it.
13:51:08 22       Q   Okay.  Would you, if you will, just answer --
13:51:14 23    tell me whether you know or not, would you -- do you have
13:51:16 24    any knowledge of any facts upon which you base this
13:51:20 25    allegation that the defendants Harris and Roberts have
```

35

```
13:51:24  1    failed to provide, require, or enforce uniform standards
13:51:28  2    and procedures with a timely, accurate, and proper
13:51:30  3    processing of voter registration applications, that the
13:51:34  4    registration of voters and updating of voter
13:51:38  5    registrations, including changes of address?
13:51:44  6       A   No, I can't -- I mean, I can't say I know.
13:51:46  7    You're saying do I know any facts?  No.  No.
13:51:50  8            MR. HARVEY:  Okay.  Thank you.
13:51:50  9                  CROSS EXAMINATION
13:52:04 10    BY MR. ECKERT:
13:52:04 11       Q   Ms. Kelly, this is Daniel Eckert.  I'm the --
13:52:04 12       A   Hi.
13:52:08 13       Q   I represent the Volusia County Supervisor of
13:52:12 14    Elections, Deanie Lowe.  Hi.
13:52:12 15       A   Hi.
13:52:14 16       Q   Have you ever lived in Volusia County?
13:52:16 17       A   No, I haven't.
13:52:18 18       Q   Do you know of any complaints that you have
13:52:20 19    against Deanie Lowe, Supervisor of Elections of Volusia
13:52:24 20    County?
13:52:24 21       A   No, not that I'm aware of.
13:52:28 22            MR. ECKERT:  Thank you.  I have no further
13:52:30 23    questions.
13:52:30 24                  CROSS EXAMINATION
13:52:30 25    BY MR. WHITE:
```

36

```
13:52:30  1       Q   Good afternoon, Ms. Kelly.  My name's Tom
13:52:32  2    White.  I represent Choicepoint, Incorporated, doing
13:52:32  3    business as Database Technologies, Incorporated, another
13:52:36  4    defendant in this lawsuit.
13:52:36  5       A   Okay.
13:52:38  6       Q   Can you hear me okay?
13:52:38  7       A   Yes, I can.
13:52:40  8       Q   Okay.  Do you know anything about
13:52:42  9    Choicepoint, Incorporated?
13:52:44 10       A   No, I don't.
13:52:44 11       Q   You don't know anything about Database
13:52:48 12    Technologies, Incorporated?
13:52:50 13       A   No, I don't.
13:52:50 14            MR. WHITE:  Thank you.  I have nothing
13:52:52 15    further.
13:52:52 16                  CROSS EXAMINATION CONTINUED
13:53:04 17    BY MR. MACINNES:
13:53:04 18       Q   Ms. Kelly, this is Doug MacInnes again.  I
13:53:04 19    have a follow-up question on a line of questioning that
13:53:08 20    you and I pursued just a few minutes ago about the
13:53:12 21    Department of Highway Safety and Motor Vehicles.
13:53:12 22       A   Uh-huh.
13:53:16 23       Q   When you went into the office on March 23rd,
13:53:18 24    1999, first you said that they did not ask you if you
13:53:24 25    wanted to apply to register to vote.  And then I asked
```

37

13:53:28 1  you if you recall telling them that you were already
13:53:30 2  registered and you said you didn't recall that, and I
13:53:34 3  guess I'm still a little confused about that. Does that
13:53:36 4  mean -- does your answer mean that it's possible they did
13:53:42 5  ask you and you just don't remember?
13:53:44 6      A    No, I mean, we didn't discuss anything about
13:53:48 7  voting when I went in there. We were only talking about
13:53:52 8  the military and the license and that was it because I
13:53:56 9  thought I had to take a driving test and all of that.
13:53:58 10 That was pretty much it. She told me to step over, took
13:54:00 11 the picture. I waited and left out of there.
13:54:02 12     Q    Okay. If Department of Highway Safety and
13:54:10 13 Motor Vehicle's records indicated that you said you were
13:54:14 14 currently registered, would your answer be -- would your
13:54:20 15 be less confident of your answer today?
13:54:24 16     A    No, I wouldn't. I mean -- I mean, I know how
13:54:27 17 the conversation -- I wasn't in there that long to get --
13:54:28 18 I mean, I just got in, took my photo and that was it. It
13:54:34 19 wasn't like she stood there and we talked, talked, talked
13:54:38 20 for hours. It was just the changing of the license, that
13:54:40 21 was it.
13:54:42 22     Q    Okay. By the way, where were you stationed
13:54:42 23 in Germany?
13:54:48 24     A    Fort -- excuse me, Ludwigsburg, Germany, and
13:54:52 25 Munich and Bad Albling.

38

13:54:54 1      Q    Uh-huh. Did you enjoy it?
13:54:54 2      A    I loved it.
13:54:54 3      Q    Me too.
13:54:56 4      A    Okay.
13:54:56 5          MR. MACINNES: I don't have any more --
13:54:56 6          MS. CICCOLO: Wunderbar. Hold on just a
13:55:04 7  second, is that everybody on the phone with
13:55:06 8  questions? You all done? Ms. Kelly, I don't
13:55:14 9  have any question for you today.
13:55:14 10         THE WITNESS: Okay.
13:55:16 11         MS. CICCOLO: But let me advise you about
13:55:18 12 your right to review the deposition transcript.
13:55:24 13 The court reporter's been taking down everything
13:55:26 14 that you say. You have the right to review your
13:55:28 15 deposition for transcription errors, numbers are
13:55:34 16 transposed or something like that. You cannot
13:55:34 17 change the substance of your answers. Would you
13:55:36 18 like to read your deposition when she completes
13:55:40 19 it? It's not going to be today.
13:55:44 20         THE WITNESS: Yeah, I would.
13:55:46 21         MS. CICCOLO: Okay. She would like to read
13:55:48 22 and sign.
13:55:48 23         MR. ARPEN: And, now, I can't recall, did
13:55:50 24 you want us to have the driver's license copied
13:55:54 25 and attached as an exhibit? I forget, who was it

39

13:55:54 1  that asked?
13:55:58 2          MR. MACINNES: This is Doug MacInnes. Yes,
13:56:00 3  if you would, please.
4          (Defendant Dickerson and Kearney's Exhibit 1
5  was marked for identification.)
6          (Deposition concluded at 1:55 p.m.)
7                   - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

40

1                   CERTIFICATE OF OATH
2
3  STATE OF FLORIDA  )
4  COUNTY OF DUVAL   )
5
6
7          I, the undersigned authority, certify that
8  JANICE KELLY personally appeared before me and was duly
9  sworn.
10         WITNESS my hand and official seal this 2nd of
11 April 2002.
12
13
14
               _____
15             Cristina A. Stark
               Notary Public, State of Florida
16             My Commission No. DD 063433
               Expires: October 8, 2005
17
18
19
20
21
22
23
24
25

**March 25, 2002**

NAACP, et al. VS. KATHERINE HARRIS, et al.    Deposition of JANICE KELLY

Case 1:01-cv-00120-ASG   Document 409   Entered on FLSD Docket 07/02/2002   Page 91 of 304

41

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF DUVAL  )

        I, Cristina A. Stark, Court Reporter and
Notary Public, certify that I was authorized to and did
stenographically report the deposition of
JANICE KELLY; that a review of the transcript was
requested; and that the transcript is a true and complete
record of my stenographic notes.

        I further certify that I am not a relative,
employee, attorney, or counsel employed of any of the
parties, nor am I a relative or employee of any of the
parties' attorney or counsel connected with the action,
nor am I financially interested in the action.

        DATED this 2nd day of April 2002.


        _____
        Cristina A. Stark

---

42

E R R A T A   S H E E T

STATE OF FLORIDA )
COUNTY OF DUVAL  )

        I, JANICE KELLY, the undersigned deponent, have
this date read the foregoing pages of my deposition,
numbered 1 through 41, and with the suggestions noted
below, if any, these constitute a true and accurate
transcription of my deposition given on the 25th day of
March 2002, at the time and place stated therein.

| PAGE NUMBER | LINE NUMBER | SUGGESTIONS/REASON |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |


        _____
        JANICE KELLY

March 25, 2002

**PLAINTIFFS' EXHIBIT 26**

```
                                                      1
 1            IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2
               CASE NO.  01-120-CIV-GOLD/SIMONTON
 3
 4   NATIONAL ASSOCIATION FOR THE
     ADVANCEMENT OF COLORED PEOPLE, INC.,
 5   by its FLORIDA STATE CONFERENCE OF
     BRANCHES, et al.,
 6
                    Plaintiffs,
 7
     vs.
 8
     KATHERINE HARRIS, Secretary of
 9   Florida, et al.,

10                  Defendants,
     _____/
11
12
13
14         DEPOSITION OF JOANNA CLARK
15
16
17
             MONDAY, JANUARY 28TH, 2002
18        600 SOUTH ANDREWS AVENUE, SUITE 200
               FORT LAUDERDALE, FLORIDA
19               2:30 p.m. - 3:25 p.m.
20
21
22
23
24
25
```

```
                                                      2
 1   APPEARANCES:
 2   THE ADVANCEMENT PROJECT.
     BY:  MONIQUE L. DIXON, ESQUIRE.
 3   APPEARING ON BEHALF OF THE PLAINTIFFS.
 4
     LAW OFFICES OF BURNADETTE NORRIS-WEEKS, ESQUIRE.
 5   BY:  BURNADETTE NORRIS-WEEKS, ESQUIRE.
     APPEARING ON BEHALF OF BROWARD COUNTY SUPERVISOR
 6   OF ELECTIONS.
 7
     STEEL, HECTOR & DAVIS, LLP.
 8   BY:  WALTER JAMES HARVEY, ESQUIRE.
     APPEARING ON BEHALF OF KATHERINE HARRIS and
 9   CLAY ROBERTS, DIRECTOR OF FLORIDA DIVISION OF
     ELECTIONS.
10
11   DADE COUNTY ATTORNEY'S OFFICE.
     BY:  JEFFREY P. EHRLICH, ESQUIRE.
12   APPEARING ON BEHALF OF MIAMI-DADE COUNTY, SUPERVISOR
     OF ELECTIONS, DAVID LEAHY.
13
14   GOREN, CHEROF, DOODY & EZROL, P.A.
     BY:  MICHAEL CIRULLO, ESQUIRE.
15   APPEARING ON BEHALF OF ORANGE COUNTY, SUPERVISOR
     OF ELECTIONS, WILLIAM COWLES.
16
17   ADORNO & ZEDER, P.A.
     BY:  THOMAS W. WHITE, ESQUIRE.
18   APPEARING ON BEHALF OF CHOICEPOINT, INC.
19
     ATTORNEY GENERAL'S OFFICE.
20   BY:  DOUGLAS B. MAC INNIS, ESQUIRE.
     APPEARING ON BEHALF OF FRED DICKINSON,
21   FLORIDA DEPARTMENT OF HIGHWAY SAFETY & MOTOR
     VEHICLES and KATHLEEN KEARNEY, SECRETARY
22   OF THE FLORIDA DEPARTMENT OF CHILDREN & FAMILIES.
23
     HILLSBOROUGH COUNTY ATTORNEY'S OFFICE.
24   BY:  KENNETH TINKLER, ESQUIRE.
     APPEARING ON BEHALF OF HILLSBOROUGH
25   COUNTY, SUPERVISOR OF ELECTIONS, PAM IORIO.
```

```
                                                      3
 1
 2                      INDEX
 3   WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
     JOANNA CLARK
 4
     BY MS. NORRIS-WEEKS    4
 5   MR. MAC INNES            23              51
     BY MR. EHRLICH          30
 6   BY MR. CIRULLO          44              55
     BY MR. WHITE            46
 7   BY MR. HARVEY           47              55
     BY MS. DIXON            53
 8
 9
10
11
12
13
14                    EXHIBITS
15   DEFENDANT'S                FOR IDENTIFICATION
16   A       DRIVER'S LICENCE        PAGE 58
     B       VOTER'S REGISTRATION CARD  PAGE 58
17   C       DECLARATION             PAGE 58
18
19
20
21
22
23
24
25
```

```
                                                      4
 1            Deposition of JOANNA CLARK, taken before
 2   VALERIE LEBTO, Court Reporter/Registered
 3   Professional Reporter and Notary Public in and
 4   for the State of Florida at Large, in the above
 5   cause.
 6
 7            ------------
 8
 9   Thereupon,
10
11            JOANNA CLARK
12   having been first duly sworn or affirmed, was
13   examined and testified as follows:
14
15            DIRECT EXAMINATION
16
17   BY MS. NORRIS-WEEKS:
18       Q.   Bi.  I'm Burnadette Norris-Weeks and I
19   represent Miriam Oliphant who is the Supervisor
20   of Elections for Broward County.
21            I'm here to take your deposition here
22   today.
23            I want you to know that this deposition
24   is in no way intended to harass you or embarrass
25   you or anything like that.
```

1 (Pages 1 to 4)

5

```
1        If I say something that you don't
2   understand, feel free to ask me to repeat it.
3   I'll be happy to do that.
4        If you shake your head like this like
5   I'm shaking my head now, the court reporter is
6   not going to be able to pick it up, so I would
7   ask that you say yes or no when you're responding
8   to questions.
9        Additionally, if you say hu-huh or
10  uh-huh, she's not going to be able to record
11  that.
12      A.   Okay.
13      Q.   The other thing that I'd ask is let me
14  finish the question before you answer it so that
15  we make sure that everything's on the record and
16  recorded properly, okay?
17      A.   Okay.
18      Q.   If you answer something, I'm going to
19  assume that you understood the question.  Is that
20  fair?
21      A.   Yes.
22      Q.   All right.
23          Please state your name for the record,
24  please.
25      A.   Joanna Lynn Clark.
```

6

```
1       Q.   Okay, and are you known by any other
2   names or have you been known by any other names?
3       A.   Nicknames you mean?
4       Q.   Well --
5       A.   Peaches.
6       Q.   Peaches.
7           Anything else?
8       A.   No.
9       Q.   Are you married?
10      A.   No.
11      Q.   Have you had your deposition taken
12  before?
13      A.   No.
14      Q.   What is your current address?
15      A.   7735 Tam Oshanter Boulevard, North
16  Lauderdale, Florida 33068.
17      Q.   Spell Tam Oshanter, if you would.
18      A.   T-a-m  O-s-h-a-n-t-e-r.
19      Q.   Are you a U.S. citizen?
20      A.   Yes.
21      Q.   What is your date of birth?
22      A.   7/23/70.
23      Q.   '70?
24      A.   Yes, '70.
25      Q.   Do you have your driver's license with
```

7

```
1   you today?
2       A.   Yes.
3       Q.   Can I take a look at that?
4       A.   Sure.
5       Q.   And while you're getting that, if you
6   could get your voter's registration as well.
7       A.   I have to go to the car and get it.
8       Q.   Okay.
9           MS. DIXON:  Do you have your driver's
10  license?
11          THE WITNESS:  In my car.
12          MS. NORRIS-WEEKS:  Well, maybe we
13  should.
14          Yes, why don't you go ahead and get it.
15
16          (Whereupon, there was a brief recess
17  observed by all parties present, after which the
18  deposition resumed).
19
20  BY MS. NORRIS-WEEKS:
21      Q.   Miss Clark, I see on your voter
22  registration card you have a 1101 Northeast 3rd
23  Avenue address.
24      A.   Yes.
25      Q.   How long ago did you live there?
```

8

```
1       A.   The end of '99.
2       Q.   December of '99?
3       A.   More like September, '99.
4       Q.   Through?
5       A.   You mean how long ago did I move from
6   there?
7       Q.   Well, I guess what I'm asking you is
8   through what dates, from when to when did you
9   live there?
10      A.   '96 to '99.
11      Q.   And after moving from that address,
12  where did you move?
13      A.   I moved to 7735 Tam Oshanter.
14      Q.   So at the time of the November 7th,
15  2000 election you were at the address on your
16  driver's license, right?
17      A.   Yes.
18      Q.   And you said you were not married; is
19  that right?
20      A.   Correct.
21      Q.   Did you graduate from high school?
22      A.   Yes.
23      Q.   And when was that?
24      A.   1988, June.
25      Q.   What high school did you graduate from?
```

2 (Pages 5 to 8)

21

```
1    I had no way of getting to a phone.
2         Q.   Did you at any time after that day, not
3    necessarily during that day but between November
4    7th, 2000 and today, have you called there to
5    find out --
6         A.   No.
7         Q.   -- why you weren't able to vote on
8    November 7th, 2000?
9         A.   No.
10        Q.   Where you vote, is that predominantly
11   an African American district or is it mixed?
12        A.   African American.
13        Q.   Is that the only district where you've
14   ever voted in Broward County?
15        A.   Yes.
16        Q.   Are you a member of the NAACP?
17        A.   No.
18        Q.   Have you ever been a member?
19        A.   No.
20        Q.   Do you know anyone else in the county
21   who had similar problems to the ones that you're
22   complaining of here today?
23        A.   No.
24        Q.   You said you went with a co-worker when
25   you went to the precinct.  Who drove?
```

22

```
1         A.   Me.
2         Q.   Did she also vote there?
3         A.   No.
4         Q.   She was just going with you, just
5    accompanying you?
6         A.   Yes.  Yes.
7         Q.   Did you try to go to any other polling
8    places to vote?
9         A.   No.
10        Q.   On your declaration you state that you
11   understand your roles and responsibilities as a
12   class member.  What do you mean by that?  What
13   kind of roles and responsibilities do you have as
14   a class member?
15        A.   To make sure this don't happen again to
16   me or nobody else.
17        Q.   And what class are you representing?
18        A.   I represent a class of Black voters
19   that was registered to vote and they couldn't't,
20   they was turned away.
21        Q.   What relief are you seeking here today?
22   Well, not here today but with this lawsuit, what
23   kind of relief are you seeking?
24        A.   For them to better the system, because
25   I put in the change of address way in enough time
```

23

```
1    for them to, you know, redo it and mail out
2    another one, but I didn't receive it.  Just for
3    them to get stuff - speed up on things, you know?
4         Q.   When you were at the precinct, did
5    anybody ask you to fill out any affirmation forms
6    or anything like that that you recall?
7         A.   No.
8         Q.   Were you given any other type of forms
9    to fill out, maybe not an affirmation form but
10   some other type of form?
11        A.   No.
12        Q.   I don't think this is the case, but
13   have you ever been convicted of a felony?
14        A.   No.
15        Q.   Do you have any disabilities?
16        A.   No.
17        Q.   Have you ever been declared
18   incompetent?
19        A.   No.
20             MS. NORRIS-WEEKS:  That's all that I
21        have right now.
22             Thank you.
23                  CROSS EXAMINATION
24   BY MR. MAC INNES:
25        Q.   Hi, Miss Clark.  My name is Doug Mac
```

24

```
1    Innes and I represent the Department of Highway
2    Safety & Motor Vehicles and the Department of
3    Children & Families in this case, and I have a
4    few more follow-up questions.
5             I understand that you first registered
6    to vote in 1995; is that correct?
7         A.   Yes.
8         Q.   Where did you register, ma'am?
9         A.   It was at the Children & Family.
10        Q.   On Sample Road?
11        A.   Yes.
12        Q.   The same place that you had --
13        A.   Okay, I'm not sure.  I'm not sure if it
14   was on Powerline Road or Sample Road at the time.
15        Q.   But you're pretty sure it was a DCF
16   office?
17        A.   Yes.
18        Q.   And was that registration application
19   successful?
20        A.   Yes.
21        Q.   Were you successfully registered to
22   vote?
23        A.   Yes.
24        Q.   So after you moved in late '99 you went
25   to another DCF office to apply to register to
```

25

```
1    vote; is that correct?
2         A.   No.  It was the one on Sample Road.
3         Q.   And to the best of your recollection
4    after you moved, when did you attempt to register
5    to vote again?
6         A.   It was probably March of 2000.
7         Q.   Do I understand you correctly from your
8    first questions that you walked into the DCF
9    office at Sample Road, picked up a form, filled
10   it out and put it in the box?  Is that correct?
11        A.   I didn't go up there just for that
12   purpose, but while I was waiting to be
13   recertified I filled out the application and I
14   put it in the box.
15        Q.   Where were these applications sitting?
16        A.   It was on a desk upstairs right by the
17   secretary.
18        Q.   So it was available to the general
19   public?
20        A.   Yes.
21        Q.   Anybody could have come in and filled
22   one out?
23        A.   Yes.
24        Q.   Did you request anyone's assistance in
25   filling out the form?
```

26

```
1         A.   No.  I didn't need it.
2         Q.   Did you fill out all of the blanks on
3    the form?
4         A.   Yes.
5         Q.   Are you sure about that?
6         A.   Yes.
7         Q.   Are you certain that you put your new
8    address on the application?
9         A.   Yes.
10        Q.   Did you sign the application?
11        A.   Yes.
12        Q.   And after you signed it, what did you
13   do with the application?
14        A.   I put it in the box.
15        Q.   And you put it in the box yourself?
16        A.   Yes.
17        Q.   Did you ask anybody to look at it
18   before you did that?
19        A.   No.
20        Q.   You didn't make a copy of it?
21        A.   No.
22        Q.   Did anybody date stamp it before you
23   put it in the box?
24        A.   No.
25        Q.   I know this is a hard question, but do
```

27

```
1    you have any evidence that you can show us that
2    would prove that you filled out all of the
3    portions of the application that day?
4         A.   No, I don't have any evidence but I
5    filled one out before and got a card.
6         Q.   Well, the reason I ask is another
7    person in this lawsuit was pretty much in the
8    same shoes as you and we looked at her
9    application and she hasn't signed it and I was
10   wondering if the same thing might have happened
11   to you.
12        A.   No.
13        Q.   Is it possible?
14        A.   Anything is possible, but I believe I
15   filled out the whole thing.
16        Q.   Now, following that visit to the Sample
17   Road DCF office, did you receive a new voter
18   registration card in the mail?
19        A.   No.
20        Q.   And following that visit to the Sample
21   Road DCF office, did you attempt to register to
22   vote again before the November general election?
23        A.   Yes.
24        Q.   Tell me about that.  Where did you
25   attempt to do that?
```

28

```
1         A.   I was out to the park with the day-care
2    with the kids and somebody came around with voter
3    registration forms trying to get people to get
4    voter registration, but I told the lady that I
5    already had one and that I just never received
6    it, I changed the address, so she told me to fill
7    out a whole new one, so I filled out a new one
8    and that was it.  That was the last I heard of
9    it.
10        Q.   Do you know where this person was from?
11        A.   No.  I didn't ask her.
12        Q.   Do you know if she was from the
13   Supervisor of Elections Office?
14        A.   I have no idea.
15        Q.   So you filled out another application
16   to register to vote at that time; is that
17   correct?
18        A.   Yes.
19        Q.   And where was this, in a park?
20        A.   Yes.  Pompano Park.
21        Q.   What did you do with that application?
22        A.   I gave it back to her.
23        Q.   Do you recall with any more specificity
24   what the date was, when that was?
25        A.   I think it was more like in June, June
```

7 (Pages 25 to 28)

ESQUIRE DEPOSITION SERVICES (954) 331-4400

**PLAINTIFFS' EXHIBIT 27**

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

---

NATIONAL ASSOCIATION FOR THE ADVANCEMENT      )
OF COLORED PEOPLE, INC., by its FLORIDA STATE  )
CONFERENCE OF BRANCHES, et al.,                )
                                               )
                          Plaintiffs,          )
                                               ) No.
                vs.                            ) 01-120-CIV
                                               )
KATHERINE HARRIS, Secretary of State of Florida, )
et al.,                                        )
                                               )
                          Defendants.          )

---

**VIDEOTAPED DEPOSITION OF GARY E. McINTOSH**
June 4, 2002
Seattle, Washington

**BYERS & ANDERSON - COURT REPORTERS & VIDEO**

2208 North 30th Street             One Union Square
       Suite 202                   600 University Street
Tacoma, WA  98403-3351                   Suite 2300
    (253) 627-6401                 Seattle, WA  98101-4112
  Fax: (253) 383-4884                  (206) 340-1316
                 1 (800) 649-2034
            scheduling@byersanderson.com

APPEARANCES

For the Lawyers' Committee for Civil Rights
    Under Law:

        **Cara J. Fineman**
        **Lori Outzs Borgen** (telephonically)
        Lawyers' Committee for Civil
        Rights Under Law
        1401 New York Avenue NW, Suite 400
        Washington, D.C.   20005
        (202) 662-8600
        (202) 783-5130 Fax
        cfineman@lawyerscomm.org

For Secretary of State Katherine Harris and the
    Director of the Division of Elections L.
    Clayton Roberts:

        **Alvin F. Lindsay, III**
        Steel Hector Davis
        200 South Biscayne Boulevard
        Miami, Florida   33131-2398
        (305) 577-7000
        (305) 577-7001 Fax
        afl@steelhector.com

For Fred Dickinson and Kathleen Kearney:

        **Douglas B. MacInnes**
        Assistant Attorney General
        PL-01 The Capitol
        Tallahassee, Florida   32399-1050
        (850) 414-3300
        (850) 488-4872 Fax
        Douglas_MacInnes@oag.state.fl.us

For Duval County Supervisor of Elections John
    Stafford:

        **Tracy I. Arpen, Jr.** (Telephonically)
        Office of General Counsel
        City of Jacksonville
        117 W. Duval Street, Suite 480
        Jacksonville, Florida   32202-3700

2

*Gary E. McIntosh, 6/4/02 - Appearances*

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | For Miami-Dade County Supervisor of Elections<br>David C. Leahy: |
| 4 | **Susan Torres** (Telephonically)<br>Assistant County Attorney |
| 5 | Miami-Dade County Attorney's Office<br>111 N.W. 1st Street, Suite 2810 |
| 6 | Miami, Florida 33128 |
| 7 | For Deanie Lowe, Volusia County Supervisor: |
| 8 | **William Bosch** (Telephonically)<br>Volusia County Attorney's Office |
| 9 | 123 W. Indiana Avenue<br>DeLand, Florida 32720-4613 |
| 10 | |
| 11 | For Choicepoint, Inc./DBT: |
| 12 | **Daniel Restrepo** (Telephonically)<br>Williams & Connolly, LLP |
| 13 | 725 12th Street N.W.<br>Washington, D.C. 20005 |
| 14 | For Hillsborough County Election Supervisor<br>Pam Iorio: |
| 15 | |
| 16 | **Ken Tinkler** (Telephonically)<br>Hillsborough County Attorneys Office |
| 17 | 601 E. Kennedy Boulevard, 27th Floor<br>Tampa, Florida 33602 |
| 18 | For Orange County Election Supervisor William<br>Cowles: |
| 19 | |
| 20 | **Michael Cirullo** (Telephonically)<br>Goren Cherof Doody & Ezrol |
| 21 | 3099 E. Commercial Boulevard<br>Suite 200 |
| 22 | Fort Lauderdale, Florida 33308 |
| 23 | Also Present: |
| 24 | Stefani Nichols<br>Videographer, Byers & Anderson |
| 25 | Court Reporters & Video |

3

*Gary E. McIntosh, 6/4/02 - Appearances*

```
 1                    EXAMINATION INDEX

 2

 3     EXAMINATION BY:                          PAGE NO.

 4     Mr. Lindsay                              7, 202

 5     Mr. MacInnes                                110

 6     Ms. Fineman                            197, 205

 7

 8                     EXHIBIT INDEX

 9     EXHIBIT NO.   DESCRIPTION               PAGE NO.

10

11        1    5-page Notice of Deposition of       7
               Gary McIntosh.

12        2    14-page e-mail with attachment       7
               to Cara Fineman from Gary McIntosh

13             dated April 25, 2002 Subject:
               Florida Expert Witness Report of

14             Gary McIntosh
               A042269 - A042282.

15

16        3    16-page Expert Witness Report of     7
               Gary McIntosh.

17        4    169-page composite exhibits          7
               beginning with Plaintiff's First

18             Set of Interrogatories and
               Document Requests to Defendant

19             Fred Dickinson.

20        5    3-page Web page printout from      109
               The Detroit News Complaints over

21             Elections commonplace around country.

22        6    2-page Web page printout from      109
               ABCnews.com Broken System?

23

24        7    4-page Testimony of Gary McIntosh  109
               before the Committee on Governmental

25             Affairs United States Senate dated
               Thursday, May 3, 2001.


                                                      4
```

*Gary E. McIntosh, 6/4/02 - Exhibit Index*

EXHIBIT INDEX

EXHIBIT NO.    DESCRIPTION                                      PAGE NO.

        8      1-page memo to Operational Program              109
               Administrators from Carol Canaday
               dated January 8, 2002.

        9      1-page e-mail string to Greg                    145
               Ferguson from Norene Moore dated
               8/29/2001.

       10      5-page letter to Gary E. McIntosh               205
               from Cara Fineman dated April 15,
               2002
               A042264 - A042266
               A042262 - A042263.

5

*Gary E. McIntosh, 6/4/02 - Exhibit Index*

Byers & Anderson Research & Color Reporters & Video

1          BE IT REMEMBERED that on Tuesday,

2    June 4, 2002, at Hilton Hotel, Seattle, Washington, at

3    11:00 a.m., before Shauna L. Beach, CCR, RDR, CRR,

4    Notary Public in and for the State of Washington,

5    appeared **GARY E. McINTOSH**, the witness herein;

6          WHEREUPON, the following proceedings

7    were had, to wit:

8

9               <<<<<<  >>>>>>

10

11          THE VIDEOGRAPHER:  Good morning.  We

12   are now on the record.  My name is Stefani Nichols, the

13   videographer for Byers & Anderson Court Reporters &

14   Video.  We are located at 2208 North 30th Street, Suite

15   202, Tacoma, Washington, 98403.  Our telephone number is

16   (800) 649-2034.

17          Today is Tuesday, June 4th, 2002, and the time is

18   now 11:00 a.m.  This is the videotaped deposition of

19   Gary McIntosh being taken on behalf of the defendant in

20   the case of NAACP vs Harris, et al., Southern District

21   of Florida.  The Cause No. is 01-120-CIV-GOLD/SIMONTON.

22   This deposition is being held at the Hilton Hotel, 17620

23   International Boulevard, SeaTac, Washington.

24          Will the attorneys please introduce themselves for

25   the record.

6

*Gary E. McIntosh, 6/4/02*

1          MR. LINDSAY:  Good morning.  This is

2     Alvin Lindsay on behalf of the Secretary and Director.

3          MR. MacINNES:  This is Doug MacInnes

4     on behalf of the Florida Department of Highway Safety

5     and Motor Vehicles and the Florida Department of

6     Children and Families.

7          MS. FINEMAN:  Cara Fineman on behalf

8     of the plaintiffs.

9          MR. LINDSAY:  Would you swear in the

10    witness, please, madam court reporter.

11          THE VIDEOGRAPHER:  Our reporter

12    today is Shauna Beach.

13                    (Exhibit Nos. 1-4 marked

14                     for identification.)

15

16    **GARY E. McINTOSH,**          having been first duly sworn

17                               by the Notary, deposed and

18                               testified as follows:

19

20

21                    EXAMINATION

22    BY MR. LINDSAY:

23  **Q**  Please state and spell your name.

24  **A**  My name is Gary McIntosh; G-a-r-y, M-c, capital I,

25    n-t-o-s-h.

                                                    7

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1   Q   Mr. McIntosh, I know you've been deposed before.  But to
 2       refresh your memory, I'm -- I ask the questions.  You
 3       understand you're under oath to answer truthfully, and
 4       that oath carries the penalties with it -- and that oath
 5       carries with it the penalties of perjury.  You
 6       understand that, right, sir?
 7   A   I do.
 8   Q   At any time you don't understand a question, please let
 9       me know and I'll do my best to rephrase so that it is
10       understandable; otherwise, I'll have to assume that you
11       do understand the question.  Do you understand that?
12   A   I do.
13   Q   And if at any time you want a break to have some of this
14       delicious coffee or for whatever reason, just let me
15       know, and I'm sure we'll be able to accommodate you.
16   A   Thank you.
17   Q   All right.  What is your current address?
18   A   My current address is 606 Sherman Street Southwest,
19       Olympia, Washington, 98502.
20   Q   Have you always lived in Washington State?
21   A   Except for a couple of years, yes.
22   Q   And those couple of years, where did you live?
23   A   I resided in Lake Oswego, Oregon.
24   Q   And when was that?  Many years ago?
25   A   Many years ago.
```

8

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1    Q    Okay.  Do you have any intent on moving your residence
 2         in the near future?
 3    A    No.
 4    Q    Okay.  And what is your work address?
 5    A    My work address is the same as my home address.
 6    Q    Do you work out of your house?
 7    A    Yes, I do.
 8    Q    Do you have a separate office in your house?
 9    A    Yes, I do.
10    Q    And what is your home telephone number?
11    A    My home telephone number is area code (360) 352-8408.
12    Q    And what is your work number?
13    A    Area code (360) 709-0603.
14    Q    What is your date of birth, sir.
15    A    12/16/49.
16    Q    Are you affiliated or registered with any political
17         party?
18    A    No, I'm not.
19    Q    Are you affiliated with any political organization?
20    A    No, I'm not.
21    Q    Have you taken any medication today or is there anything
22         else that would affect your ability to testify
23         truthfully in this matter?
24    A    No.
25    Q    Now, I understand that you have been deposed before.  Is
```

9

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        that correct?

 2    A   Yes.

 3    Q   How many times?

 4    A   I have been deposed twice.

 5    Q   And what were those cases?

 6    A   Umm, the cases are noted in my report.  The first case

 7        deals -- dealt with -- with a lawsuit here in the state

 8        of Washington concerning the blanket primary.  The

 9        second case involved a lawsuit involving a purchase of a

10        voting system in the state of Pennsylvania.

11    Q   The blanket primary case, is that the National

12        Organization on Disability versus -- I'm sorry.  Was

13        that the Washington State Democratic Party versus State

14        case?

15    A   Yes.

16    Q   That's the blanket primary case?

17    A   Yes.

18    Q   And in that case, were you retained to give an expert

19        opinion?

20    A   Yes.

21    Q   And did you provide that expert opinion?

22    A   Umm, I believe I did.  If I don't, I can certainly get

23        it for you.

24    Q   And I -- and I didn't mean did you provide it to us in

25        this case.
```

                                                              **10**

1   A   Oh, okay.  I'm sorry.

2   Q   I was unclear.

3           You gave an opinion in that case?

4   A   I did.

5   Q   And what was that opinion, the sum and substance -- the

6       sum and substance of that opinion?

7   A   These -- sorry.

8           The substance of the opinion dealt with a

9       comparison of California election law with Washington

10      State election law.

11  Q   With regard to primaries?

12  A   It focused on primaries, but it also focused -- focused

13      on some other issues that were related to the elections

14      process, such as voter registration and some of the

15      generic activities that you would have to carry out in

16      an -- in the elections process.

17  Q   What was your opinion in that case?

18  A   My opinion in that case was that there were significant

19      differences between Washington State law and California

20      state law.

21  Q   Is that your only opinion?

22  A   I believe so.

23  Q   Are you able to articulate that opinion with any greater

24      degree of specificity?

25  A   Yes.

11

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    Q    Would you, please.

2    A    Umm, in that opinion I was asked to try to discern if

3         there were differences in California law and Washington

4         law that were substantial enough to affect the kind of

5         primary that would be conducted in -- in each of those

6         states.  The California primary system had been changed

7         as a result of an initiative.  The primary system that

8         was adopted by the State of California was a blanket

9         primary system similar to that here in Washington.

10        The -- what I was asked to do in that particular report

11        was, however, to look at other differences that would

12        affect how the primary would be conducted and what

13        effect those differences would have on the rights of

14        associations, the political parties in each state.

15   Q    When you say "look at other differences," are you

16        talking about differences in the -- in the various state

17        statutory schemes?

18   A    Yes.  Specifically, what the political parties in the

19        lawsuit were asserting were that the -- the rights of

20        the association were in a sense taken away from them

21        because they allowed -- it allowed -- our primary system

22        allowed for other party members to participate in their

23        primary process.  One of the key differences -- and --

24        and that was an argument that was made in the California

25        case that was eventually decided by the U.S. Supreme

12

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   Court.

2        What I did in my report, however, was to look at

3   how the differences in election law might have different

4   kinds of effects on the rights of association of the

5   political parties.  For example, in Washington State, we

6   do not register by political party here.  In California,

7   they do.  So it was easy to demonstrate in California

8   when and where party members or at least registered

9   voters of political parties -- if and when they were

10  participating in the other parties' primaries.  That, of

11  course, was not as easy to do in Washington, because we

12  didn't have that -- that provision in our -- in our

13  state law.

14       That -- that is an example of the kinds of things

15  that were included in the report.  I also looked at how

16  political parties were treated under state law and what

17  the -- how the parties were governed under state law and

18  that kind of thing, as well.

19  **Q**   Who did you represent?

20  **A**   Umm, I was retained by --

21  **Q**   I'm sorry.  Let me clarify that statement.

22       Who were you retained by?

23  **A**   I was retained by the State of Washington.

24  **Q**   Were you in that case -- has that case gone to trial?

25  **A**   Yes, it has.

13

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   Q   Were you accepted as an expert by the Court in that

2       case?

3   A   Yes.

4   Q   And what was the expertise that you were accepted as

5       having in that case?

6   A   Umm, in the areas that -- that I reported on; that is,

7       the -- having the knowledge of both -- of Washington

8       State election law and a review of the California

9       statutes.

10   Q   Did you testify in the trial of that case?

11   A   Umm, no, it did not go to trial.  It was eventually

12       settled by summary judgment at the Federal District

13       Court level.

14   Q   I'm sorry.  You said it was settled by summary judgment?

15   A   Well, I mean -- I guess I shouldn't say it was settled.

16       There was a summary judgement so there was no trial.

17   Q   Was there ever in that case an expressed finding by the

18       judge that found that you were competent to provide

19       expert testimony?

20   A   Not that I'm aware of.  I don't -- no would be the

21       answer to that question.

22   Q   Did you -- did that case relate in any way to the

23       National Voter Registration Act, which I will refer to

24       as the NVRA from this point forward?

25   A   No.

**14**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1  Q   Okay.  And there's -- there was one other case that you

2      were deposed in; is that correct?

3  A   Yes.

4  Q   And that was the National Organization on Disability

5      versus City of Philadelphia?

6  A   Yes.

7  Q   And who did you represent in that case?

8  A   I was retained by an organization called The

9      Disabilities Law Project.

10 Q   Did you provide an expert -- did you provide an opinion

11     in that case?

12 A   Yes.

13 Q   And what was that opinion?

14 A   That opinion dealt with the current availability of

15     voting systems that are on the market, their ability to

16     provide audio devices for the visually impaired so that

17     the visually impaired could vote a secret ballot.

18 Q   And what -- and what did you opine?

19 A   I opined that in my report that there were voting

20     systems available on the market that did provide audio

21     devices for the visually impaired.

22 Q   Has that case been concluded?

23 A   No.

24 Q   Has it gone to trial?

25 A   No.

**15**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    **Q**   Has there been a finding by the -- by the Court in that

2        case accepting you as an expert?

3    **A**   Not that I'm aware of.

4    **Q**   Are you currently involved in any other litigation as --

5        as a -- as a punitive expert?

6    **A**   No.

7    **Q**   Have you ever been?

8    **A**   No.

9    **Q**   So the -- the two cases that we just discussed, plus the

10       instant case, the case we're here about today, are the

11       only cases that you have been called upon to opine an

12       expert testimony -- strike that.  Horrible question.

13           These three cases -- the Washington State

14       Democratic Party versus State; The National Organization

15       on Disability versus City of Philadelphia; and the

16       National -- the NAACP versus Harris, et al. -- are the

17       only cases that you've ever been affiliated with and in

18       any way provided expert opinion; is that correct?

19    **A**   That's correct.

20    **Q**   All right.  Yeah, you're here today with Ms. Fineman.

21       Did you discuss this deposition with Ms. Fineman before

22       the -- before the deposition?

23    **A**   Yes.

24    **Q**   And -- and what did you and she discuss?

25    **A**   We discussed the witness report that I prepared for this

**16**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    case.  We discussed possible questions that could be

2    asked.  We went over some of the -- some of the material

3    that I used for -- in terms of preparing the report.

4    And I guess that was about -- about it.

5 Q  All right.  Now, when you say you discussed the witness

6    report, did you discuss the first draft of the witness

7    report that you prepared in any way?

8            MS. FINEMAN:  Objection to the

9    extent that it calls for him to --

10            MR. LINDSAY:  I'm sorry.

11            MS. FINEMAN:  Objection to the

12    extent that it will reveal any privileged information.

13            MR. LINDSAY:  Well, are you

14    asserting that there is an attorney-client relationship

15    between you two?

16            MS. FINEMAN:  No.  No.

17            MR. LINDSAY:  Okay.

18 Q  (By Mr. Lindsay)  All right, sir.  Did you -- did you

19    and Ms. Fineman discuss the first draft of the expert

20    report that you prepared?

21 A  Not specifically.  We discussed the fact that there were

22    drafts, the various drafts of the report that were

23    prepared, and we discussed what some of the changes were

24    generically between what the -- what were contained in

25    those drafts and what was finally contained in the final

                                                        **17**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byron Anderson Beach – Court Reporters & Video

1    report.

2  Q  And did you discuss how to handle questions today

3     concerning those changes?

4  A  Yes.

5  Q  And -- and what did she tell you with regard to that

6     and what did you tell her?

7  A  She didn't really tell me anything.  I told her what my

8     impression was of the -- of the various differences

9     between the final report and the -- the earlier drafts.

10 Q  And what did you tell her?

11 A  I told her that there were two areas that I thought

12    were -- were the fundamental differences between the

13    final draft and the earlier versions.

14        First area just dealt with punctuality (sic) and

15    grammar and spelling and those kinds of things.

16        The second dealt with a request on the part of --

17    on their part of -- of looking at specific -- let me

18    back up by saying -- by looking at the opinions, and

19    then applying those opinions to situations in Florida

20    that were described in the material that was -- that was

21    given -- supplied to me.

22 Q  So in other words, you -- you prepared an initial expert

23    report in this case, correct?

24 A  Yes.

25 Q  And -- and you provided that to the parties that

18

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
1        retained you, correct?
2    A   Yes.
3    Q   And who were those parties that retained you?
4    A   Well, it was The Lawyers Committee for Civil Rights
5        Under Law.  And the -- are you asking for the two
6        specific people that I worked with?
7    Q   Well, the -- the corporate -- the organizational
8        entities and the individuals.  If you want to go that
9        far, it's fine.
10   A   The organization, as I said, was The Lawyers Committee
11       for Civil Rights Under Law, and the two individuals that
12       I had worked with there are Lori Borgen and Cara
13       Fineman.
14   Q   Let me just -- let me provide you with what has been
15       previously marked and identified as McIntosh 2.  And I'm
16       going to ask if you could share that with Ms. Fineman.
17       I apologize for not having enough copies.
18                  MS. FINEMAN:  That's fine.
19   Q   (By Mr. Lindsay)  Let me just show you the second page
20       of that, which is Bates No. A042270, through the end.
21       Is this the -- is the -- it says, "Working Draft
22       Document 2."  Was there a prior draft that you created
23       before this draft?
24   A   Umm, I believe there was.
25   Q   Do you know if that was produced in this litigation?
```

19

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   **A**   I don't know.

2   **Q**   Would it -- if -- would it still exist, the first draft,

3       if -- if there were a prior draft?

4   **A**   It's possible that I may still have retained it on my

5       computer at home.  That's about the only way -- think

6       that I could -- the only way I could answer that.

7   **Q**   I -- I haven't seen it.  And it may exist and I just

8       haven't seen it.  But if it doesn't -- if we haven't

9       gotten it, I would request that -- that production be

10      supplemented with --

11              MS. FINEMAN:  We can make sure you

12      get it.

13              MR. LINDSAY:  -- with the first

14      draft.

15   **Q**   (By Mr. Lindsay)  Now, did you provide this draft to

16      Ms. Fineman and/or Ms. Borgen?

17   **A**   Yes.

18   **Q**   And before you provided this draft, what did they tell

19      you with regard to the expert opinions that they were

20      seeking?

21   **A**   The only conversation that I recall between the first

22      and the second draft dealt with an opinion that I ended

23      up not including, that is referred to in the cover memo

24      to the E-mail that is on this particular document.  I

25      had included the -- the first opinion.  And in that

20

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   particular opinion I talked a little bit more about the

2   differences between a simultaneous application required

3   under NVRA for the motor voter section of NVRA and the

4   opportunity or application procedure for the social

5   service agencies and the designated agencies that are

6   covered under the National Voter Registration Act.

7       In my discussion with Lori Borgen in particular,

8   we came to the conclusion that that was not really an

9   issue at issue in this case.  And so essentially what I

10  did was I took -- I took that first opinion and rewrote

11  it so that it -- it now reflects what it is, I think,

12  pretty much currently in the current report.

13  **Q**   Okay.  And why don't we go back before then.

14  **A**   Okay.

15  **Q**   When were you first contacted by The Lawyers Committee

16      or anybody associated therewith?

17  **A**   I don't recall the specific date.  I would guess it was

18      probably sometime in late March or early April.

19      Something like that.

20  **Q**   And what did they tell you in the first conversation?

21  **A**   It was a phone conversation.  They told me -- explained

22      a little bit to me about the case.  I have to admit that

23      since I dabble a lot in elections professionally, I knew

24      a little bit about it already.  They explained to me

25      what they were attempting to do and what kinds of --

21

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    what information they were looking for.  And they
2    described to me what they wanted in an expert -- not in
3    an expert witness, but what they were looking for in
4    terms of a resource to -- to assist them in this
5    particular lawsuit.
6  Q  What did they tell you they were attempting to do?
7  A  I don't recall particularly what -- in terms of their
8    complaint and relief and all of that kind of thing.  I
9    didn't get specifically into that with them.  What they
10    were looking for was -- what they told me they were
11    looking for was someone who could prepare a report that
12    would look at the National Voter Registration Act and
13    would also entail a review of certain documents from the
14    State of Florida and looking for comment on Florida's
15    procedures as they related to the National Voters
16    Registration Act.
17  Q  Now, I wrote down that you said that they -- in this
18    first conversation they told you what they were
19    attempting to do, No. 1; information that they were
20    looking for, No. 2; and what they were looking for in
21    terms of a resource, No. 3.  And I thought I asked you
22    what they were -- what they told you they were
23    attempting to do.  And then we -- and then you told me
24    what information they -- they told you they were looking
25    for.  Did they tell you anything about what they were

                                                            22

           *Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1       attempting to do with this litigation?

2   **A**   Not that I can recall.

3   **Q**   But you do recall that they told you what -- what they

4       were attempting to do?

5   **A**   Well, they -- they told me that they were representing

6       the plaintiffs in the case, that -- that I recall.  And

7       that they were looking, as I -- as I said, they were

8       looking to produce a report with -- with the kind of

9       analysis that -- that I described earlier.

10  **Q**   Did they tell you that they were interested in an

11      opinion as to whether Florida and its various officials

12      and functionaries were in compliance with the NVRA?

13  **A**   No.  They did not -- it was not that specific.

14      Generally, what they were looking for, in terms of my

15      involvement, they were looking for someone who had some

16      knowledge of the National Voters Registration Act.

17  **Q**   And did they tell you at that time specifically what

18      sorts of opinions they were interested in with regard to

19      this litigation?

20  **A**   No.

21  **Q**   So is there anything else about that first conversation

22      that you can recall?

23  **A**   Not -- not particularly, no.  We discussed the -- the

24      amount of time I would have to -- to make available to

25      them to produce a report like that.  We -- we discussed

                                                        **23**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

By Mr. Anderson — Beach — Court Reporters & Video

1    my -- a little bit about my expertise and my -- and my

2    background and that kind of thing.  But it was -- all in

3    all, it was a -- I would describe it as being a very

4    brief conversation.

5 Q  Approximately how long?

6 A  Five, 10 minutes.

7 Q  Did you have any other -- any further conversations

8    before you provided your first draft of an expert

9    report?

10 A  Yes.

11 Q  How many?

12 A  I don't recall specifically how many.  I would guess --

13    estimate three or four conversations after that.

14 Q  And with whom were those conversations?

15 A  Umm, most of them were with Cara.

16 Q  And during the course of those conversations, did

17    Miss -- when you say Cara, it's Miss Fineman?

18 A  I'm sorry.

19 Q  That's fine.  Did she provide you with any greater

20    degree of specificity as to the type of expert report

21    that they were interested in?

22 A  Well, let me back up by saying that my role in this

23    case, as we originally discussed, it was probably a

24    little sketchy.  What I had indicated to them and -- and

25    subsequently to the first conversation was that I didn't

24

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byerr Anderson Beach Court Reporters & Video

1    feel that I had a great deal of time to produce a very

2    large report.  The other problem was that we were up

3    very close to whatever deadline had been agreed to for

4    the submission of those reports.  So most of the

5    conversations that we had initially were about what I

6    was going to do to help them in -- in terms of this

7    particular case and whether or not I would even do a

8    report.

9         So the first couple of conversations were not

10   specific at all as to what the report contained.  It was

11   not clear at that point that I would even be doing a

12   report.  And I would say it was not until the third or

13   fourth conversation that it was agreed that I would --

14   that I would do a report at all.

15  **Q**   What is your understanding as to what subject or area

16   you are being proffered as an expert in for purposes of

17   this litigation?

18  **A**   I was -- I think I'm being -- my expertise is -- is with

19   the National Voter Registration Act.  I have a fairly

20   lengthy background in terms of the Act.  I worked for an

21   elected official who was highly supportive of the Act,

22   who worked with a -- a member of Congress from the --

23   from the state of Washington, who was instrumental in

24   drafting the Act.  So my expertise would the National

25   Voter Registration Act goes back quite a ways.  We had

**25**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1     in Washington State implemented a part of the Act, part

2     of the law, the NVRA, before it was enacted; that is,

3     the motor voter portion of the -- of the NVRA.  I had

4     participated and worked with the Federal Elections

5     Commission when they did their implementation and

6     training sessions for implementing the National Voter

7     Registration Act.  I had been asked by other states to

8     make presentations on the Act.  I had worked with some

9     of the -- what I would refer to as the coalition groups

10    who had worked on -- in support of the Act, as well.

11    So -- plus, as the state elections director, I had been

12    involved in the implementation of all of the provisions

13    of the Act here in -- here in this state.  So I was

14    familiar, I think, with some of those issues, as well.

15  **Q**  Umm, you say you worked with an elected official who was

16    supportive of the Act.  Did you work -- did your work

17    with that elected official involve the Act?

18  **A**  I'm sorry.  Maybe I don't understand the question.

19  **Q**  Well, I think you said that one of the things is that

20    you worked with an elected official who was supportive

21    of the NVRA.  In working with that elected official --

22    first of all, who was that elected official?

23  **A**  The elected official was Secretary of State -- Secretary

24    of State Ralph Monroe, who was at the time Secretary of

25    State.  There is a new one now.

26

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   **Q**   And he -- and Mr. Monroe was -- Secretary Monroe was

2        supportive of the Act?

3   **A**   Yes.

4   **Q**   And other than working with him, did you -- did -- and

5        other than the fact that he was supportive of the Act,

6        did you do anything with regard to that relationship

7        that related to the Act?

8   **A**   Yes.

9   **Q**   What?

10   **A**   I was asked by Congressional staff to review various

11        drafts of the Act.  We were asked -- I was asked by

12        Secretary Monroe -- first off, I should point out that I

13        was appointed by Secretary of State Monroe to a position

14        that I had at that time.

15   **Q**   And that position was director of elections?

16   **A**   Correct.  And I was asked to review drafts of the Act,

17        to note -- I monitored the Act daily.  He was -- he

18        testified in Congress a couple of times on the Act.  I

19        was involved in the preparation of that testimony.  We

20        monitored -- monitored the -- the Act almost daily as it

21        went through Congress.  Secretary Monroe was also active

22        in the National Association of Secretaries of State and

23        provided them with a lot of information regarding the

24        Act, as well.  And a lot of that material I was asked

25        to -- to work with him on.  We traveled to D.C. quite

27

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        often to meet with Congressional staff regarding the
 2        Act.
 3             So those are the kinds of activities that I was
 4        involved in prior to the law being signed into law.
 5   Q    And those activities you just described were all prior
 6        to the law being enacted?
 7   A    That's -- that's correct.
 8   Q    And you say you worked with a member of Congress who
 9        drafted portions of the Act?
10   A    Well, probably to be more specific, I worked for a
11        member of Congress who was one of the major sponsors of
12        the Act.  It was Congressman Al Swift from the Second
13        Congressional District in the state of Washington at the
14        time.
15   Q    Did that work with Congressman Swift involve the Act?
16   A    Yes.
17   Q    What type of work was that?
18   A    Again, it was the kind of work I described earlier.  It
19        was looking at drafts, coming up with suggestions,
20        setting up meetings with Congressman Swift and local
21        election officials here in this state regarding the Act.
22        I think Congressman Swift at the time was pretty
23        sensitive to the needs and desires of local -- state and
24        local election officials at the time and sought a lot of
25        their input.  So we arranged opportunities for him, at
```

28

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        least in this state, to be able to get that kind of

 2        input in terms of the drafting of the -- of the Act.

 3   Q    What did you do with the FEC regarding the Act?

 4   A    Actually, a couple of things.  The FEC prior -- again,

 5        when the Act was being drafted, did have a couple of

 6        meetings where they brought together members of the

 7        coalition group.  And what I mean by that are groups

 8        that were supporting the passage of the Act.  We also

 9        brought together state and local election officials to

10        sit down and to really -- we had a couple of meetings

11        that I recall where we sat down and talked about our

12        mutual concerns with the eventual adoption of the

13        National Voter Registration Act.  So I was involved in

14        those meetings.  And they actually paid my expenses

15        to -- to go back there and to -- to Washington, D.C., to

16        be involved in some of those meetings.

17             After the -- the Act was signed into law, they

18        asked me to participate with the -- with their -- with

19        their clearinghouse -- information clearinghouse section

20        of the FEC to do a series of regional -- I wouldn't call

21        them training sessions necessarily, but they were

22        educational seminars that were organized by the FEC that

23        involved representatives from the social service

24        agencies covered under the Act, representatives from the

25        motor vehicle departments involved with licensing
```

29

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    duties, along with state and local election officials.
2    And we did a series of those regional seminars for about
3    two or three months.
4         Again, they -- they paid my expenses to go and --
5    and to take part in -- in the -- in those seminars.
6  Q  Am I correct that you are not, however, a member of the
7    Federal Elections Commission?
8  A  Oh, no.  I was not -- not a member of the Federal
9    Elections Commission.
10 Q  Let me -- let me go back to your conversations with
11   Miss Fineman and Miss Borgen.
12        Did they -- and this is before -- before the first
13   draft.  You testified there were approximately four
14   conversations, I guess, mostly with Miss Fineman.  Is
15   that correct?
16 A  In terms of the draft -- the drafts, I -- I spoke
17   with -- with both Lori Borgen and Cara Fineman.  Some --
18   I can't recall which ones I spoke with the most between
19   each individual draft, but Lori, I would say, near
20   the -- Lori Borgen near the end was the one that I spoke
21   with most often.
22 Q  Now, setting aside for -- for the moment the business
23   about the report.  I want to talk about your opinion.
24   Did they, either of -- of them, Miss Borgen or
25   Miss Fineman, tell you what type of opinion they were

30

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    interested in?

2  **A**  No.  They covered with me the specific -- actually, no.

3    I -- as I said, I -- I did the official set of -- I

4    mean, in my first couple of drafts, I did write my

5    opinions.  I presented what my opinions were.  But they

6    never specifically asked for a particular kind of

7    opinion at all.

8  **Q**  Did you ever give them an opinion as to whether Florida

9    was in compliance with the NVRA?

10  **A**  I gave them no other opinions other than what was --

11    what were contained in the opinions that were contained

12    in the drafts of my report.

13  **Q**  Were you ever asked to give them an opinion as to

14    whether Florida was in compliance with the NVRA?

15  **A**  Not specifically, no.

16  **Q**  Well, generally?

17  **A**  No.  What they asked me to do was to -- after I had

18    formed the opinions, they asked me to comment on the

19    State of Florida's practices and procedures under the

20    National Voter Registration Act, as they related

21    specifically to those opinions.  But that was the extent

22    of the conversation and the request.

23  **Q**  Did they ever ask you in any way as to whether those

24    procedures that were -- that were being used in Florida

25    were violative of the NVRA?

31

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1   A   No.  We had no conversations specifically involving the
 2       specific compliance or noncompliance of Florida with the
 3       NVRA.
 4   Q   And you've expressed no opinion in this litigation as to
 5       Florida's compliance or noncompliance with the NVRA;
 6       isn't that correct?
 7   A   That's correct.
 8   Q   And you've expressed no opinion in this litigation as to
 9       the Secretary of State or the Director of the Division
10       of Elections of Florida's compliance or noncompliance
11       with the NVRA; isn't that correct?
12   A   That's correct.
13   Q   Now, at some point you gave a first draft that I don't
14       have and I'm not casting any aspersions, but there was
15       something -- there was an opinion in that first draft
16       that you said related to the simultaneous motor voter
17       and registration process.  And that opinion was
18       determined to be irrelevant.  Is that fair?  And so it
19       was dropped?
20   A   Yes.
21   Q   Okay.  And then you prepared at some point this draft
22       that we've marked and identified as McIntosh 2, correct?
23   A   Yes.
24   Q   Okay.  Now, after providing this draft -- and please
25       take your time and look it over and become comfortable
```

32

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1  with -- with which draft I'm talking about -- did you

2  then receive any comment from either Ms. Borgen or

3  Ms. Fineman regarding this draft?

4  **A**  I don't recall whether it was this draft or the next

5  draft, but I know that after a couple of the drafts and

6  a couple of the comments that we had, that we did

7  have -- other than grammatical and format changes and

8  things like that, the only -- in terms of the substance

9  of the report, the only conversations that we had

10  pertained to comments or views I might have regarding

11  practices and procedures in the state of Florida, as it

12  related to the opinions that I expressed in the report.

13  **Q**  And in fact, sir, they suggested that you include

14  opinions regarding practices and procedures in Florida

15  that were not in this report; isn't that correct?

16  **A**  They asked me to --

17  **Q**  You can answer "yes" or "no" and then explain.

18  **A**  Okay.  Please restate your question.

19       MR. LINDSAY:  Will you please read

20  back the question.

21       (Question on Page 33, Lines 13

22       through 15, read by the

23       reporter.)

24

25       THE WITNESS:  Yes.  And

33

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Gary E. McIntosh - By Mr. Lindsay

1    specifically, what they had asked me to comment on --

2    and I don't know that necessarily -- I suppose you could

3    call them opinions -- but what would be to tie the

4    opinions that I had in the report to specific practices

5    and procedures in the state of Florida.

6  Q  (By Mr. Lindsay)  Did they suggest with any specificity

7    which practices they wanted you to tie your opinions to?

8  A  No.  The only specificity I guess you would say would be

9    that other -- the fact that they did want them to be

10    tied to the opinions that I had expressed that I had in

11    there -- in the report.

12  Q  After you provided this report that we're looking at

13    that's McIntosh 2, did they provide you with any further

14    documents to review?

15  A  I don't recall.  Let me explain by saying that I

16    received lots of documents on various days throughout

17    a -- throughout this entire process.  I -- I would say

18    that whatever -- and so I can't recall specifically if

19    there were additional documents that were provided

20    between certain drafts or not.  I do know that I was

21    receiving documents throughout the -- the particular --

22    this particular process.  Some of which I had a chance

23    to review; some of which I didn't.  Again, I was working

24    under a very tight timeline in terms of getting this

25    done.  So I did list in the report the specific

34

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byron Anderson Beach - Court Reporters & Video

1    documents that I relied on to express whatever opinions

2    I had about the State of Florida.

3  Q  Now, you -- you did not in that section of your report

4    set forth any section of the Florida statutes; is that

5    correct?

6  A  That's correct.

7  Q  And that's because you did not review any section of the

8    Florida statutes in preparation for your report,

9    correct?

10 A  That's correct.

11 Q  Now, we got off on this whole section when I was asking

12   you about conversations you had with Miss Fineman

13   regarding the preparation for this deposition.  And

14   you -- you said that one of the areas you discussed was

15   the report.  And I asked you if you discussed the two

16   different reports, being the version that I've given you

17   as McIntosh 2 and the current -- and the current report

18   that was submitted.

19       Did you and she in preparation for this deposition

20   discuss any questions I would ask with regard to the

21   differences in those two reports, other than the grammar

22   and that kind of thing?

23 A  No.  The only thing that Cara Fineman said in

24   preparation for the deposition is that there may be some

25   questions regarding the differences in the drafts and

                                                          35

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

 1    that I should anticipate those.

 2  Q  And did you and she discuss possible answers to those

 3    questions?

 4  A  I expressed to her what my feelings were regarding what

 5    those differences were, which are -- which are the --

 6    essentially the statement that I made to the -- to the

 7    point -- the responses to the questions that you had

 8    earlier.

 9  Q  Did she say anything at all?

10  A  No.

11  Q  Okay.  You also testified that you discussed with her

12    possible questions and suggested -- and suggested

13    answers.  That's what my notes say.  Is that fair?

14    Strike that.  Let me strike that.

15      You also -- you testified that you discussed with

16    her in advance of this deposition possible questions

17    that I would ask.  Is that correct?

18  A  That's correct.

19  Q  Okay.  Did you discuss possible -- suggested answers?

20  A  I gave her answers that I would give if -- if asked

21    those questions.  And she had very little comment on --

22    on any of those answers.

23  Q  What questions did you suggest might be asked?

24  A  She suggested there may be questions regarding my -- my

25    background, my knowledge of the case, the differences in

                                                            **36**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    the drafts of the report.  I hate to use the phrase, but
2    things like that.  We went through the report very --
3    very briefly; spent some time looking at the -- at the
4    resume that I had in the report and my qualifications
5    and questions that I might be asked about that.
6  Q  How long did you two spend together preparing for this
7    deposition?
8  A  I would say a little over two and a half hours.
9  Q  Did you do mock question and answers?
10  A  Very briefly.
11  Q  Do you remember -- when was this preparation?
12    Yesterday?
13  A  This morning.
14  Q  This morning?
15  A  Sorry.
16  Q  What mock questions did she ask you?
17  A  Umm, well, I'm trying to recall already.  How soon we
18    forget, I guess.
19        She asked me, oh, questions about my background,
20    what knowledge I had of the NVRA, what my experience was
21    in working with the NVRA, what -- what I did with the
22    FEC, how -- my background in terms of my work with the
23    National Association of State Election Directors.  I
24    suppose those were the main -- the main things.
25  Q  Did you touch on your experience or lack thereof with

                                                        37

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1          regard to Florida and Florida law?

 2    A     She indicated to me that I could be asked some questions

 3          about that, yes.

 4    Q     And it is true, you don't have any experience with

 5          regard to Florida law; isn't that right, sir?

 6    A     I don't have any experience with Florida law, no.

 7    Q     Well, you -- you seem to emphasize the word "law" there.

 8          What experience do you have with -- with Florida and the

 9          NVRA?

10    A     Well, other than I -- I have reviewed the material,

11          obviously, presented to me in this particular case.  I

12          don't -- I mean, I have certainly been acquainted with

13          Florida election officials over the years, but I don't

14          know that there's any -- anything that -- about those

15          acquaintances that would give me any special knowledge

16          about the practices and procedures in the state of

17          Florida.

18    Q     And as we've discussed, you haven't reviewed Florida

19          election law, right?

20    A     That's correct.

21    Q     And you haven't therefore reviewed the -- the portions

22          of Florida election law that implement the NVRA,

23          correct?

24    A     That's correct.

25    Q     Did you discuss your testimony here today with anyone
```

38

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1      other than Miss Fineman?

2  **A**  No.

3  **Q**  And you also stated that with Miss Fineman you went over

4      some --

5  **A**  Sorry.

6  **Q**  Sure.

7  **A**  I'm sorry, I didn't mean to interrupt.  I'd like to go

8      back.  I did have a very brief phone conversation

9      yesterday with Lori Borgen, which I should mention, in

10     which we touched upon some of the same issues that we --

11     that I've stated here earlier.  It was a very brief

12     phone conversation.

13  **Q**  Approximately, how long did it last?

14  **A**  Five minutes if it was even that long.

15  **Q**  And what did you two discuss?

16  **A**  We discussed, again, the -- the anticipation of

17     questions regarding my experience with the state --

18     specifically with the state of Florida.

19  **Q**  She told you to anticipate questions with regard to --

20     when you say your experience, you mean your lack of

21     experience with the state of Florida; isn't that right,

22     sir?

23  **A**  That's correct.

24  **Q**  What type of questions did she tell you to anticipate?

25  **A**  One question that I recall was whether or not I'd ever

39

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        been to the state of Florida.

 2   Q    Have you ever been to the state of Florida?

 3   A    Not professionally, no.

 4   Q    When was the last time you were there personally?

 5   A    Many years ago.  And even then, only very briefly.

 6   Q    That was probably before the NVRA was even passed,

 7        wasn't it?

 8   A    Yes.

 9   Q    Do you recall any other questions Miss Borgen told you

10        to anticipate yesterday during this conversation?

11   A    No.

12   Q    You said -- you stated that you went over some materials

13        in preparation for this deposition.  What materials did

14        you go over?

15   A    We went over -- actually, we went over just a couple of

16        the pieces of materials that I had listed in the report.

17        I don't even recall specifically which ones they were.

18        It was very brief.

19   Q    And this was this morning you went over these materials?

20   A    Yes.

21   Q    And you don't recall which ones they were?

22   A    Well, I think in fact I was the one that probably was

23        the one that pointed out a couple of things in -- in

24        the -- in the material that I had brought with me.  And

25        I think we looked at some of the material on training,
```

                                                              **40**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    again, very -- very briefly.

2  Q  What material on training?

3  A  Umm, excuse me for just a moment.

4  Q  Sure.  Take your time.  Go ahead.  If you want to take a

5     break to look at those, you can.

6  A  No, I don't think I need a break.  I think -- I believe

7     that if we -- I looked -- I pointed out to her something

8     in regard to a point that I made in the report on the

9     role of the Secretary of State's Office under NVRA.  And

10     there was a slide -- there were a couple of slides in --

11     in this particular document, which is entitled

12     Department of State Katherine Harris.  And I think we

13     looked over --

14  Q  That's the PowerPoint presentation?  It appears to be a

15     Power Point --

16  A  It appears to be a Power Point presentation.  And sort

17     of looked at that in terms of what the role was of the

18     Secretary of State in carrying out the duties under the

19     National Voter Registration Act.  I think this was the

20     main document that we -- I just reviewed.

21  Q  What was your -- what was your comment with regard to

22     that role?

23  A  Umm, my comment is contained in the report, essentially;

24     that is, the -- what exactly -- excuse me -- what they

25     did -- what the Secretary of State's Office did in terms

41

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1  of -- or how they viewed their responsibilities under

2  the Act.

3  Q  Your report opines on how the Secretary of State of

4  Florida viewed their responsibilities under the Act?

5  A  That's correct.

6  Q  Which one of your opinions sets forth what -- how they

7  viewed their responsibilities under the Act?

8  A  In reference to the report, it involves the second

9  opinion.  There were four opinions presented in the --

10  in the report.  The report is laid out where I present a

11  series of opinions and then go back and -- and take each

12  opinion separately.

13  Q  And the second opinion, what --

14  A  I'm not looking at the second opinion now.  I'm looking

15  at the final opinion.

16  Q  And I'm -- I'm looking at the final opinion, too.  No. 2

17  within the final opinion.

18  A  I'm sorry.  I'm sorry.  Yes, on Page 9, talked about --

19  the first couple of paragraphs in that -- in the report

20  -- dealing with the -- what the FEC stressed in terms of

21  responsibility in training.  And I also talked a little

22  -- and then I go on to talk about what responsibility

23  means as described by the FEC in their -- in their

24  implementation guidelines.

25  Q  What do you say that responsibility means as described

**42**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    by the FEC in their guidelines?

2  **A**  There's a quote in the report. Would you like me to

3    read it?

4  **Q**  Yeah, why don't you, please.

5  **A**  "A principal ingredient of a successful agency

6    registration program is the appointment of someone in

7    each agency office to be in charge of, responsible for,

8    and enthusiastic about all voter registration

9    activities, ensuring an adequate supply of forms,

10    monitoring voter registration activities, training new

11    employees, resolving questions and problems that arise

12    in coordination with state or local election officials

13    and the like. Such a task may not be full time, but it

14    must be ongoing."

15  **Q**  And is it your testimony that that -- that that quote

16    relates to the Secretary of State versus the agencies

17    such as the Department of Motor Vehicles and the --

18  **A**  That quote obviously applies to specific agencies. But

19    it is also tied in to how the FEC's -- it also -- it's

20    tied into the FEC's comments that someone -- and I think

21    it's what they -- in terms of -- in their language is

22    preferable to be the state chief elections official,

23    although that's -- it is a preference, it's not

24    certainly necessary -- but that someone at the state

25    level has designated responsibilities under the National

43

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

By Examination Read on ICSD Rec 07/02/002 Video

1       Voter Registration Act statewide.

2   Q   Well, sir, is it your testimony that that quote says

3       that someone should have statewide responsibilities?

4   A   Not that particular quote, no.

5   Q   Okay.  Because that -- because that quote deals with the

6       -- at the agency level, correct?

7   A   Yes.

8   Q   In other words, the Department of Motor Vehicles and --

9       and Division of Children and Families and that kind of

10      thing, right, sir?

11  A   That's correct.

12  Q   All right.  So how did your review of that Power

13      Point -- that apparent Power Point presentation relate

14      to this opinion?  And as I see it, this is the last

15      opinion you present in your report.  What I call Opinion

16      No. 4.  How does that -- how did that --

17  A   Well --

18  Q   -- Power Point presentation relate to this, if any?

19  A   I'm sorry to interrupt you.

20  Q   That's all right.

21  A   First off, I would say that our conversation regarding

22      that particular training document was about 15 to 20

23      seconds, so I would not -- it was not an in-depth

24      conversation.  We were talking specifically about the

25      opinion that is expressed here.  And looking at what the

**44**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    role was of the person who was designated under Section
2    10 of the Act; that is where each state is required to
3    designate a state official who is responsible for
4    coordinating activities of the National Voter
5    Registration Act. And it was in relation to that
6    particular requirement and this particular opinion that
7    we had a very brief conversation regarding that -- that
8    requirement.
9  Q  And you talked about -- you just called that document a
10    training document, correct?
11 A  I believed it was a training document. It appeared to
12    be a Power Point presentation, which would have
13    indicated to me that it was to be presented to a large
14    group of people. The -- the information that was in
15    there would appear to be training material.
16 Q  And it would -- and that would appear to be training
17    material provided by the Secretary of State of Florida,
18    correct?
19 A  Correct.
20 Q  Regarding the NVRA, correct?
21 A  Correct.
22 Q  Was there anything that you found in that training
23    material that was improper or incorrect?
24 A  No.
25 Q  Why don't we deal with documents at this time. You --

45

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    let me place before you what's been previously marked as

2    McIntosh Exhibit 1, which is a Notice of Deposition.

3    And you saw -- you saw that -- that notice before today,

4    sir, right?

5  A  Yes.

6  Q  And you provided documents in response to the duces

7    tecum portion of that, correct?  Or the portion

8    requesting documents?

9  A  Yes.

10  Q  Now, I -- I received before getting on a plane

11    yesterday, two packets of documents under cover letters,

12    the first from Miss Fineman dated May 30th and a second

13    from Miss Borgen dated May 31st.  Additionally,

14    Miss Fineman has brought some documents that before the

15    deposition she informed me were documents that you

16    relied upon.  Is that true?  Are these documents that

17    you relied upon?

18  A  They appear to be, yes.  I was given these while I was

19    giving this testimony, but the -- from my thumbing

20    through them, they appear to be the documents that I

21    relied upon to prepare the report.

22  Q  Okay.  Now -- and let me hand you -- let me hand you

23    these two packets and ask you if you've seen those.

24  A  (Examination of documents.)

25  Q  That's the May 30 and May 31st letter that I received

46

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1       with documents attached.

2 **A**   Oh, I was asked to produce these reports. I don't

3       recall particularly seeing the letter, but I did provide

4       the -- the -- these are copies of the House and Senate

5       reports and -- under NVRA.

6 **Q**   And -- and -- and actually, with regard to those, I'll

7       just note for the record that my copy that I was given

8       only contains only every other page. And again, I don't

9       know which copy service or whose copy service made that

10       mistake. It also contains every other Bates number, so

11       I'm sure you Bates-labeled the pages correctly, but

12       we're going to have to get that resolved at some point,

13       also.

14           But my question to you, sir, is having reviewed

15       the Notice of Deposition, having reviewed the documents

16       that Miss Fineman is providing here today, and the two

17       packages that I've -- I've given you, to your knowledge,

18       are these all of the documents that were requested --

19       that were requested that exist that you are aware of --

20       and we did -- and I will caution you that we did talk

21       about the first draft that may or may not exist

22       somewhere on a computer -- but -- but are these all of

23       the documents that you are aware of responsive to the

24       notice of this deposition?

25 **A**   Umm, they appear to be except for I did receive some

**47**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    documents yesterday that were some depositions that --
2    copies of depositions that were taken from three
3    individuals.  I got them yesterday afternoon and I -- I
4    have them with me, but those I just reviewed briefly
5    yesterday afternoon before packing up and getting ready
6    to get here.
7  Q   Other than those depositions and perhaps a first draft
8    of your expert report, are there any other documents
9    that you're aware of that is responsive to this
10   deposition notice that have not been produced?
11 A   Let me answer by saying this, that these were the
12   documents that I used for the preparation of the report.
13   In terms of the preparation of the deposition, there
14   were -- there were other documents that I received -- I
15   shouldn't say even in terms of the preparation of the
16   deposition.  There were other documents that I was asked
17   to review that I did not use for -- for the preparation
18   of the report in particular.
19 Q   Okay.  Well, what documents were those?
20 A   I don't know.  We may want to take a break, if that's
21   okay.
22 Q   That's fine.  Let me just -- before we do that, and
23   we'll do that, just a second.  Let me just close out.
24       Whose depositions were you provided with
25   yesterday?

**48**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1   A   I wish I could tell you what their names were.  But
 2       there was someone from Baldwin -- Mr. Baldwin, I
 3       believe, that was from DCF.  I may be butchering the
 4       names there.  But there was a Beringer deposition.  And
 5       there was one other, whose name I cannot recall.
 6   Q   Ed Kast?
 7   A   Ed Kast I received.
 8   Q   But that's not one of the three?
 9   A   That was not one of the three.  There was a third one.
10   Q   Did you review all of those documents?
11   A   Very briefly.
12   Q   Anything in those documents cause you in any way to
13       change the opinions that you've been asked to give?
14   A   No.  In fact they seemed to substantiate the opinions
15       that I've presented.
16   Q   Nothing in any of those depositions causes you to --
17       causes any inquiry with regard to the opinions that
18       you've given?
19   A   No.
20   Q   Okay.
21               MR. LINDSAY:  Why don't we take that
22       break.  And as I understand it, we're taking this break
23       so that you can attempt to figure out which documents
24       you reviewed but did not rely on in providing your
25       opinions in this case.
```

49

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byers, Anderson Beach & Court Reporters & Video

```
 1                    THE WITNESS:  Okay.  Thank you.

 2                    MR. LINDSAY:  Okay.  Thank you.

 3                    THE VIDEOGRAPHER:  We are going off

 4        the record.  The time is 12:05.

 5                         (Recess 12:05 - 12:15 p.m.)

 6

 7                    THE VIDEOGRAPHER:  We are now back

 8        on the record.  The time is 12:15.

 9                    MR. LINDSAY:  All right, sir.

10        Before we continue, now would be a good time to get

11        everybody's appearances who are attending by telephone.

12                    MS. BORGEN:  Lori Borgen

13        representing the plaintiffs.

14                    MR. TINKLER:  This is Ken Tinkler of

15        the Hillsborough County Attorney's Office representing

16        Supervisor of Elections Pam Iorio.

17                    MR. RESTREPO:  Dan Restrepo from the

18        law firm of Williams & Connolly representing Choicepoint

19        DBT.

20                    MS. TORRES:  Susan Torres

21        representing David Leahy and the Miami-Dade County

22        Supervisor of Elections.

23                    MR. CIRULLO:  Michael Cirullo

24        representing William Cowles, the Orange County

25        Supervisor of Elections.
```

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    MR. BOSCH:  This is William Bosch

2  representing Deanie Lowe, the Volusia County Supervisor

3  of Elections.

4    MR. LINDSAY:  Okay.  Thank you.

5

6

7    EXAMINATION (Continuing)

8  BY MR. LINDSAY:

9  Q  I'm going to hand the witness this packet of documents

10    that -- that -- that Miss Fineman produced to us.  And

11    I've put a label on it, McIntosh 4.  It will be a

12    composite.  And again, I'm going to hand that to you,

13    have you look at it with the May 30th and 31st letters.

14    And I believe these are all the documents you say are

15    responsive to the notice of -- correct, sir?

16  A  That's correct.

17  Q  And you say there were other documents that you looked

18    at in this -- in -- with regard to this litigation that

19    you did not rely upon.  And we just took a break and --

20    are you prepared at this time to tell me or indicate

21    which documents those are?

22  A  Those would be the documents that were referred to in

23    the correspondence from March 29th, 2002; from April

24    15th, 2002.  And I think those were -- those were --

25    those were the documents.

51

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   Q   Would you just read the Bates numbers on those letters
2       that you're referring to.
3   A   A042262, A042263, A042264, A042265, and A042266.  I also
4       should add that there was also forwarded to me a copy
5       of -- although, which I did not review, was the Federal
6       Election Reform Act.  And that was E-mailed to me
7       covered by documents A042267 and A042268.
8   Q   Okay.  So other than those documents that were marked as
9       McIntosh 4, you did not rely on any other document in
10      the preparation of your opinion and report in this case,
11      correct?
12  A   That's correct.
13  Q   All right.  Now, let me -- let me digress a little to
14      your background.
15          What college did you go to, sir?
16  A   I attended Washington State University.
17  Q   When did you graduate?
18  A   I graduated in 1972.
19  Q   Did you obtain a degree?
20  A   Yes.  I have a bachelor's degree in political science.
21  Q   And I -- I assume, from the date of your graduation and
22      the date of the implementation of the NVRA, that in the
23      course of your studies at Washington State you did not
24      study the NVRA in any way.  Is that correct?
25  A   No.

52

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    **Q**   No, that I'm incorrect?

2    **A**   I did not study the NVRA while I was in college.

3    **Q**   Okay.  Did you attend any other institute of higher

4         learning?

5    **A**   No.

6    **Q**   Have you taken any seminars or other outside educational

7         endeavors?

8    **A**   No.

9    **Q**   Have you taught any seminars?

10   **A**   Yes.

11   **Q**   Why don't you tell us -- go through all of those

12        seminars that you have taught.

13   **A**   Well, I don't know specifically what you would refer to

14        as a seminar necessarily.  I would point out to make

15        reference to my resume, where I did talk about making a

16        presentation to a continuing legal education seminar in

17        Olympia, Washington, last year, which dealt with

18        election issues in Washington State, election

19        administration in Washington State.  And also for a

20        time, a very brief period of time, I was a part-time

21        faculty member at South Puget Sound Community College.

22        This was a number of years ago.

23   **Q**   What did you teach there?

24   **A**   I taught a night school course on external relationships

25        and public administration.

53

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byers Anderson Beach - Court Reporters & Video

1    Q    I assume because of the timing that that did not have
2         anything to do with the NVRA.
3    A    No, it did not.
4    Q    And going back to the CLE program in Olympia, did that
5         have anything to do with the NVRA?
6    A    No, it didn't.
7    Q    You -- you referred earlier to some -- something you did
8         for the FEC with regard to the NVRA.  Tell me about
9         that.
10   A    The FEC --
11   Q    And I'm specifically talking about the teaching aspect,
12        if there was any.
13   A    The only, I guess you would say, teaching aspect of it,
14        I was asked by the FEC, as I stated earlier, to conduct
15        -- or assist them in conducting some educational
16        meetings regarding NVRA shortly after the law was
17        enacted.  Specifically with those I discussed the
18        implementation of motor voter; that is, the simultaneous
19        application for voter registration at the Department of
20        Motor Vehicle offices or licensing offices.  We had
21        implemented that particular provision a year before the
22        law was adopted, so I -- I had some expertise in that
23        area.  And they asked me to make a presentation
24        regarding that implementation.
25   Q    And that is solely with regard to the simultaneous

                                                          54

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byers Anderson Beach - Court Reporters & Video

1    application at the DMV?

2  A   Yes, that's what I recall.  There may have been a few

3      other things, but I -- that was the specific reason why

4      I was asked to -- to participate.

5  Q   So you have not taught with regard to the NVRA in

6      general; is that correct?

7  A   That's true.

8  Q   And you have not written anything about the NVRA; is

9      that correct?

10 A   No.

11 Q   And I'm -- again, bad question.  That's, no, you have

12     not written anything?

13 A   No, I have not written anything.  No published papers or

14     anything like that regarding NVRA.

15 Q   And you have not taken any courses in higher education

16     regarding the NVRA?

17 A   No.

18 Q   And you've not studied Florida law with regard to the

19     NVRA?

20 A   No.

21 Q   All right.  Let's talk a little bit about your

22     employment history.

23         We discussed earlier that you were currently

24     working out of your home.  What is -- what is that

25     business?

55

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   **A**   Umm, the business that I'm currently involved in is

2       the -- the type -- the name of the business is McIntosh

3       Election Services.  It's a consulting business.  The

4       main focus right now of the business is working with a

5       company in Bellevue, Washington, that is -- will soon be

6       marketing touch screen voting systems and is also doing

7       research on the potential -- on the possibility, I

8       should say, of voting over the Internet.

9           I also have -- as described earlier -- done some

10      work with various groups on other election-related

11      issues, as well.

12  **Q**   Under the umbrella of the McIntosh Election Services?

13  **A**   Yes.

14  **Q**   Okay.  What -- what -- what have you done for those

15      other groups?

16  **A**   Well, those are the -- those are the clients that we

17      discussed earlier.  In addition to the case that I've

18      been working on here, again, I've worked on the case in

19      Pennsylvania.  I also worked as a -- on the case in the

20      state of Washington, the blanket primary.  I've also --

21      was asked to write a letter from -- by the state of --

22      the Secretary of State's Office in the state of Oregon

23      regarding an issue in -- in Oregon regarding the date of

24      their primary.  But most of the work that I have been

25      involved in has been working with the company entitled

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1       Vote Here.

2   Q   Other than Vote Here, how many clients does McIntosh

3       Election Services have, currently?

4   A   Currently, including the one here, three.

5   Q   And they all --

6   A   Oh, I'm sorry.  I should say in addition to Vote Here it

7       would be two.  It would be the Disabilities Law Project

8       in Philadelphia and the one in this case here that I'm

9       currently working on.

10   Q   All right.  So in -- in this case and The Disabilities

11       Law Project case, are you -- is it McIntosh Election

12       Services that is -- that is involved or is it you

13       individually?

14   A   Well, I am McIntosh Election Services, so both the

15       business, I guess, and me.  Obviously, I do the work

16       under the name of my business.  But I am the -- the sole

17       employee of that business.  I'm an LLC, so I do the work

18       under -- under the title of McIntosh Election Services.

19   Q   And you have never been asked to opine on the NVRA in

20       any lawsuit, have you, sir?

21   A   No, I have not.

22   Q   And you have never been asked to deal with the NVRA in

23       any -- in -- with regard to any client of McIntosh

24       Election Services; isn't that correct, sir?

25   A   Yes, that is correct.

57

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Anderson Beach on F980 - Court Reporters - Video

1   Q   Other than the -- the report that you provided in this

2       case, have you ever provided any sort of report

3       whatsoever regarding the NVRA or the NVRA

4       implementation?

5   A   No.

6   Q   How long has McIntosh Election Services been in -- in

7       existence?

8   A   McIntosh Election Services has been in business since

9       May of last year.

10   Q   May 2001?

11   A   Yes.

12   Q   Approximately a year?

13   A   A little over a year.

14   Q   Do you do any other -- strike that.

15       Other than the expert services and these

16       litigations we've discussed, and the -- and the Vote One

17       is the only other client, correct?

18   A   Vote Here --

19   Q   I'm sorry.

20   A   -- is the only other client.  That's -- that for

21       McIntosh Election Services is a pretty major -- major

22       client.  Most of the work I do is with -- with that

23       organization.

24   Q   How many hours a week would you estimate you spend

25       working on matters for Vote Here?

58

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1  A  Well, under contract I'm to be available to them 16 days
2     a month.  Probably I don't work for them that -- to that
3     extent, at least in terms of an eight-hour day.  I would
4     say on average I work per week eight to 12 hours a
5     day -- or eight to 12 hours a week, I should say, on
6     their -- on their issues.  It's a little hard to
7     estimate because there are some months when I may be
8     involved, especially during the election season and
9     during the conference -- normally election conferences
10    occur in the summer.  There are times when I may be on
11    the road with them for weeks and then there may be other
12    months where I don't hardly do any work for them at all.
13 Q  Do you have any other source of outside employment -- or
14    strike the "outside."
15        Do you have any other source of employment?
16 A  No.
17 Q  So at this time, and for the last year, you've been
18    averaging approximately 10 hours a week working for Vote
19    Here, plus -- plus the services you've provided in these
20    litigations we've discussed?
21 A  That's correct.
22 Q  And you have not done any further employment?
23 A  That's correct.
24 Q  Okay.  What was your previous employment?
25 A  Previously I was employed as the state director of

59

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        elections for the State of Washington.

 2   Q    And for how long?

 3   A    I was there for about a little over 12 years.

 4   Q    How did that employment come to an end?

 5   A    I resigned.  I had an offer -- the previous Secretary of

 6        State I referred to earlier, Secretary of State Ralph

 7        Monroe, did not choose to run for election in the year

 8        2000.  He subsequently became a board member of the --

 9        of the Vote Here company.  They asked me if I would

10        consider having a contractual relationship with them and

11        to do some work for them.  And I made the career

12        decision at that time to resign my position as a

13        director of elections and to enter into that contract.

14   Q    In Washington, how does it work?  Does a -- the

15        Secretary of State runs for office?

16   A    Yes.  The Secretary of State is an elected position.

17   Q    And is -- is -- was Mr. Monroe affiliated with any

18        political party?

19   A    Yes.

20   Q    What party?

21   A    He was a Republican.

22   Q    And when he left office, is it normal for the

23        administration to submit their resignation, people

24        of the Director of the Division of Elections level?

25   A    Well, it's hard to talk a little bit about what is
```

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    normal.  I think we've had three Secretaries of State

2    since the early 1960s, so there is not a clear pattern

3    in terms of recent -- of recent years.  It was not done

4    in this particular case where the transfer of power took

5    place.  And my resignation didn't have really to do with

6    who the new Secretary of State was.

7  Q  Currently, do you have any prospects for other clients

8    or other employment?

9  A  No.

10 Q  What did you do prior to being the director of division

11   of elections for Washington State?

12 A  Prior to that, I was the county elections supervisor in

13   Thurston County, Olympia, Washington.

14 Q  Have you ever -- have you ever worked for any -- in a

15   government -- for any government other than the State of

16   Washington?

17 A  No.  I -- let me qualify that by saying that I was asked

18   by the Federal Government, as I said earlier, to do some

19   work for them.  I was also asked -- appointed by the

20   State Department, U.S. State Department, to do some work

21   overseas, as noted in my resume.  So I have done other

22   work with the -- with -- with this -- I would say a

23   couple of departments at the Federal level, although I

24   was not really what I would call a full-time employee of

25   those departments.

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   Q   And how long did you spend on the -- the -- I think it's

2       the Bosnia issue; isn't that right?  How long did you

3       spend working on that?

4   A   I was in Bosnia in 1997 for -- I did two stints over

5       there.  I was there initially for about two and a half

6       months.  And then I went back at the end of 1997 for

7       about two weeks.  So all total in that year, I was there

8       about three months.

9   Q   Other than those issues that you've just clarified,

10      you've not done any work for any other government

11      entity, correct?

12   A   No, I was not -- I have not been involved with any other

13      governmental entity.

14   Q   All right.  Let me hand you what we've previously marked

15      as McIntosh 3.  And I'd ask you to take a look at it and

16      tell me what it is.

17   A   (Examination of documents.)

18          This is the expert witness report that I prepared

19      for this case.

20   Q   And this is the -- the final version, correct?

21   A   It appears to be.  Yes, it is.

22   Q   All right.  Now, directing your attention to Page 3, did

23      you read the NVRA before -- strike that.

24          Did you rely on the NVRA itself with regard to

25      your opinion in this case?

62

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    A   It was certainly an element that I relied on for the
2        purpose of preparing this report.
3    Q   And I don't mean to be tricky.  I mean, you cite it in
4        several footnotes, I noticed.  And it just is not in
5        the -- it's not set forth as one of the documents that
6        you relied on, correct?
7    A   Well, it is contained within the requirements issues and
8        examples that the national clearinghouse -- at the time
9        which was entitled the National Clearinghouse Election
10       Administration Federal Election Commission January 1,
11       1994.  It is a part of that particular document.  But I
12       did not set it off as -- separately in the list of items
13       that I used in preparation for the report.
14   Q   All right.  Now, and you say -- you say -- on Page 3,
15       after the -- the list of documents that you reviewed,
16       you state that based on your review of that material,
17       and your experience at both the state and national
18       levels, you're rendering the following opinions.  And
19       then there's Section 4, which contains four opinions,
20       correct?
21   A   Yes.
22   Q   All right.  And again, to be clear, when you say your
23       experience at the state level, that -- the only
24       experience at the state level that you have is with
25       regard to Washington State, correct, not any other

                                                              63

        *Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1       state?

2   A   Yes.

3   Q   And the experience you have at the national level is

4       with regard to the work you did at Bosnia that you

5       testified -- well, that -- that work does not relate to

6       the NVRA -- did not relate to the NVRA, correct?

7   A   That is correct.

8   Q   So the only other work would be the -- the -- this --

9       this work that -- with regard to the FEC, correct?

10  A   Yes.  It would be with the work that I did with the FEC.

11      Also, I would -- to what extent this -- this is

12      appropriate, I was asked -- if you will note in my

13      resume, made presentations about Washington State to

14      other states.  But specifically, again, that was related

15      to Washington State.

16  Q   And, again, the FEC work only related to assisting and

17      conducting some educational meetings regarding the --

18      the implementation of the motor voter simultaneous

19      application process?

20  A   That was my -- that was one of the -- that was the

21      presentation, the focus of my presentation for that

22      particular seminar, yes.

23  Q   That's what you did.  That's your Federal experience

24      that relates to the NVRA, correct?

25  A   Umm, well, it's -- I guess to differentiate between

                                                          64

        *Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    the -- the Federal experience I had in terms of

2    drafting -- helping to assist in the drafting of the

3    original NVRA document, when I was at the state, I

4    guess, that's sort of a combination of state and Federal

5    experience.  Working with Congressional staff, a lot of

6    it I did in my capacity as the state elections director,

7    but it certainly did involve working with certain

8    groups, certain members of Congressional staff and that

9    kind of thing in terms of the original drafting of the

10   NVRA -- the Act.

11  **Q**   I'm sorry to interrupt.

12          Just so we're clear, you personally did not draft

13   any portion of the NVRA, correct?

14  **A**   Umm, no.  Although, there were -- I mean, I've not --

15   there were sections of it that we did -- when I say

16   "we," being me and a couple of other people offered and

17   suggested language to the NVRA that I can't say that

18   specifically was adopted.  But, yes, we actually did --

19   we certainly worked -- I participated as a team in

20   working with some of the election officials, as well as

21   Congressional staff on -- on certain pieces of the -- of

22   the NVRA.

23  **Q**   Other than what you've described, do you have any other

24   state or Federal experience that you used to base your

25   opinions upon?

65

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1   A   Not other than what I've described in my previous
 2       testimony here.
 3   Q   All right.  And you set forth in Section 4 a summary of
 4       your opinions.  Do you see that, sir?
 5   A   Yes.
 6   Q   And there are four paragraphs with opinions set forth
 7       therein --
 8   A   Yes.
 9   Q   -- is that correct?
10           And you are not providing in this litigation any
11       other opinions, other than what is set forth in those
12       four paragraphs, correct?
13   A   That's correct.
14   Q   All right.  I'm going to ask you to -- do you have with
15       you still what we've -- what we've identified, I believe
16       it was McIntosh 2, the second draft?
17   A   I did.  Yes, I do.
18   Q   By the way, did you read the amended complaint in this
19       case before setting about to write your opinions?
20   A   Yes.
21   Q   Did that in any way influence your conclusions?
22   A   No.
23   Q   And let me just clarify.  I believe I said amended
24       complaint.  And there have been a number of complaints.
25       Did you review the second amended complaint?
```

66

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1   A   Oh, yes.

 2   Q   And -- and you wrote that -- you reviewed that before

 3       drafting your -- the first draft of your opinion in this

 4       case?

 5   A   Yes.

 6   Q   So you understood the issues that had been adjured in

 7       this case -- or alleged in this case before you drafted

 8       the first opinion -- the first draft of your opinions in

 9       this case, correct?

10   A   Yes.

11   Q   All right.  Now let me have you take a look at the --

12       what I would -- which is the only -- the preliminary

13       draft that I have as McIntosh 2.  And on Section 4 it

14       says Summary of Opinions.  And you say there, as you say

15       in your final report, that "The National Voter

16       Registration Act requires that a voter registration

17       application process be an integral part of an

18       application process for services at various agencies

19       designated under the National Voter Registration Act."

20           Now, that portion, that right there, that

21       sentence, is simply your summary of what the NVRA

22       requires; isn't that correct, sir?

23   A   Yes.

24   Q   So all you're saying there is you're summarizing the

25       actual statute itself in a short sentence, correct?
```

67

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1  A  That's what I attempted to do, yes.

2  Q  And by the way, you -- you -- and we discussed this, but

3     you have no legal education, correct?

4  A  That's -- that's correct.  Not other than what I had at

5     the undergraduate level.

6  Q  You're not a lawyer?

7  A  No, I'm not.

8  Q  And you're not attempting to give any legal opinion in

9     this case or assist --

10 A  No.  And I'm sorry.

11 Q  And you're not attempting to assist the judge in -- in

12    analysis of the law in this case; isn't that correct,

13    sir?

14 A  That is correct.

15 Q  All right.  And in the second draft of the McIntosh 2,

16    that is your only -- that is all you set forth with

17    regard to Opinion No. 1 in Section 4; isn't that

18    correct?

19 A  Yes.

20 Q  And then on the final draft you add another sentence,

21    correct?

22 A  Yes.

23 Q  And the sentence that you add states, "It appears that

24    in Florida some offices providing services through the

25    Department of Children and Families (DCF) were not

68

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        always offering the opportunity to register to vote to

 2        all clients, as prescribed" by "the National Voter

 3        Registration Act."

 4              And you see that, right, sir?

 5   A    Yes, I do.

 6   Q    Now, I want you to, you know, focus and be careful when

 7        you answer this question.

 8              Did Miss Fineman or Miss Borgen in any way suggest

 9        that you add that language to this first opinion?

10   A    Not specifically, no, they didn't.

11   Q    Generally?

12   A    Generally, they did, as I testified earlier, ask me

13        to -- to look at this opinion and to look at the -- at

14        the documentation that I had listed in terms of what I

15        relied on in the report, and to offer any comment I

16        could on how this opinion applied to the practices and

17        procedures in the state of Florida.

18   Q    Did they suggest that you look at any particular

19        document?

20   A    No.

21   Q    Did --

22   A    Not other than the documents that they submitted to me.

23   Q    Well, did they suggest with peculiarity that you take a

24        look at the January 8th, 2002, memorandum from Carol

25        Canaday at the DCF?
```

69

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   **A**   No, they didn't.  I -- I selected that one in

2        particular, though, after looking at this opinion and

3        looking for some specific items from Florida that I

4        could use to make any kind of comment on that -- on that

5        particular opinion.

6   **Q**   With regard to that second and final sentence in Section

7        No. 1, tell me everything that you base that opinion on.

8   **A**   Well, again, it would be on the documentation in the --

9        I don't recall specifically.  I would have to go through

10       and look at all of the documentation that I listed, but

11       I think it was whatever was in that -- in that

12       particular set of documents was what I relied on to --

13       to offer that particular opinion.

14  **Q**   All right.  I'm going to -- you know, I'm going to have

15       to -- I need to know with specificity what you relied

16       on, and I'm just right now talking about where you say

17       it appears that in Florida some offices providing

18       services through the Department of Children and Families

19       were not always offering the opportunity to register to

20       vote to all clients, as prescribed in the NVRA.

21           Now, I need to know all of the documents that you

22       relied on for your opinion that it appears that some

23       offices were not providing --

24  **A**   Well, for that particular opinion, I did not, obviously,

25       rely on anything dealing with motor voter in this

70

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    particular matter.  I -- as you alluded to earlier, I --

2    the -- the documents that I have from the Department of

3    Children and Family Services in Florida are -- that are

4    listed in my report was, I believe, the AFDC Info Memo,

5    it was not in the trainings, and there -- it was the

6    AFDC memo -- let's see, the -- let me look at the --

7    the -- the Carol Canaday memo.

8         It may have been also one of the District 3 voter

9    registration procedures, although I don't specifically

10   recall what that was about.  And -- and it may have also

11   been one of the Kearney responses to the doc requests,

12   although I don't recall specifically what those were.  I

13   don't have them in front of me.  So I would have to go

14   back --

15 Q  We do have every document that you relied upon in front

16   of you.

17 A  I don't have them -- yeah, I have them -- in front of me

18   is a loose term right now.  So --

19 Q  And I need to know --

20 A  All right.

21 Q  -- every document that you base every -- everything you

22   base that opinion on.

23            MR. LINDSAY:  The videographer

24   informs me that now would be a good time to change the

25   tape, so while you're looking, why don't we change the

71

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    tape and go off the record for a moment.

2                    THE WITNESS:  Okay.

3                    THE VIDEOGRAPHER:  We are now going

4    off the record.  This concludes Tape 1.  The time is

5    12:50.

6                    (Recess 12:50 - 1:01 p.m.)

7

8                    THE WITNESS:  One of the documents

9    that I did rely on was the Defendant's Kearney response

10   to Documents Request No. 1, which takes up the issue

11   that you mentioned.  Also, there was, I believe,

12   something in the -- although I don't seem to have this

13   one in front of me at the moment for some reason -- but

14   the January 8th, 2002, memo from Carol Canaday, which I

15   don't -- for some reason I can't seem to locate here.

16   But I know that at least with the -- Kearney's response

17   to doc request No. 1, which is listed in my report, is

18   one of those documents that I did rely on in making that

19   particular opinion.

20

21

22                    EXAMINATION (Continuing)

23   BY MR. LINDSAY:

24   Q   Could you show me which documents in that response

25       you -- you -- support that opinion?

                                                          72

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    **A**   It was a series of E-mails that were listed as an

2          attachment, which were -- the author is Norene Moore.

3          And it was a memo -- an E-mail message to Greg Ferguson.

4               Also there is on the same subject some

5          correspondence to Greg Ferguson who -- which references

6          a conversation with Donna Miller, which state --

7          states -- which states -- as I said, addresses the

8          issues that we were talking about earlier.

9    **Q**   All right.  So can you show me exactly which -- which

10        E-mails you're talking about?

11   **A**   (Indicating.)

12   **Q**   Are these the only E-mails you're talking about?

13   **A**   Yes.

14   **Q**   This -- on this one page?

15   **A**   Uh-huh.  (Witness answers affirmatively.)

16   **Q**   And this is an E-mail dated August 29, 2001?

17   **A**   Uh-huh.  (Witness answers affirmatively.)

18   **Q**   So this -- this page that has that E-mail authored by

19        Norene Moore and then there is -- the original E-mail, I

20        guess, is authored by Greg Ferguson; and the January

21        8th, 2002, memorandum from Carol Canaday are the only

22        documents that you base -- or the only basis, whether

23        they are documents or not, for your opinion in that

24        second sentence -- sentence of Opinion No. 1.

25   **A**   Yes.

73

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   Q   That's correct, right?

2   A   Yes, uh-huh.

3   Q   What Florida offices of DCF were not always providing

4      the opportunity to register?

5   A   Well, apparently at least the -- in this particular

6      instance, those at D02 HQ, at least that is where this

7      is from.  And I -- I'm not familiar with the

8      organization of the DCF in Florida, but it would appear

9      that at least District 2 for a period of time was not

10     offering the opportunity to register to vote to those

11     who were making applications there.

12   Q   All offices in District 2?

13   A   I can't tell that from looking at this particular memo.

14   Q   In fact, you don't know with any particularity what, if

15     any, offices were not offering the opportunity to

16     register?

17   A   Not other than those that were listed in this particular

18     E-mail.  I think the opinion, as it states -- it states

19     -- it does not state that all offices were not doing it.

20     Just it states that some -- it appeared that some were

21     not always offering the opportunity to register to vote

22     to all clients.

23   Q   And you don't know for how long -- when you say "were

24     not always offering," you don't know what time frame

25     that entailed?

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1    A    No, nor does the opinion express a time frame.

 2    Q    In fact, it's not really an opinion, is it?  It's just

 3         your summary of that E-mail and that memoranda --

 4         memorandum that we've discussed; isn't that true, sir?

 5    A    I think the opinion is -- is certainly accurate based on

 6         the information that I had.  The information is, is that

 7         not all -- that -- that some of the offices were not

 8         always offering the opportunity to register to vote to

 9         all clients as prescribed in the NVRA, which I think is

10         an opinion -- is an accurate one based on the

11         documentation that I reviewed.

12    Q    Which was two -- two pieces of paper, correct?

13    A    That's correct.

14    Q    And you did not review any studies regarding that,

15         correct?

16    A    No.

17    Q    And you did not review any learned treatise or any other

18         scholarly publication discussing that, did you?

19    A    No.

20    Q    And in fact, you're not aware of any scholarly

21         publication or learned document that discusses whether

22         or not the DCF was always offering the opportunity to

23         register to vote to all clients, are you, sir?

24    A    I'm not aware of one, no.

25    Q    And in this -- this first opinion of yours, you have no
```

75

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1      opinion as to -- you make no opinion in this first

2      Opinion No. 1 as to whether Florida's Secretary of State

3      or director of divisions of elections were doing

4      anything whether or not in compliance with the NVRA,

5      correct?

6   A  Not in regards to the first opinion, no.

7   Q  All right.  In -- in your -- in the section -- you

8      summarize the opinions in Section 4.  And then in

9      Section 5 you give the basis and reasons for your

10     opinions.  Right?  That's the way you have your report

11     laid out?

12  A  Yes.

13  Q  And is it fair to say that -- strike that.

14        In the Section 5, you give all the bases and all

15     the reasons for your opinions, right, sir?

16  A  Yes.

17  Q  There are no bases or reasons that support your opinions

18     that you have not set forth in Section 5, correct?

19  A  No, I -- I suppose other than any other sort of general

20     impressions that I got from reviewing any of the

21     documents that I relied on to make the report.  The

22     answer to your question would be these are specifically

23     the ones that I used to -- to -- to prepare the report

24     specifically.

25  Q  And when you in -- in the bases and reasons for your

                                                        76

       *Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1      opinions section with regard to Opinion No. 1, which is

2      the opinion we've been talking about thus far, you state

3      on Page 6 and you -- last sentence of the first full

4      paragraph, you state that, "For example, it would not

5      suffice for an agency to simply have declination forms

6      and voter registration applications made available on a

7      counter for public distribution."  You're not implying

8      there that that's what the DCF did, are you, sir?

9   **A**  I've not cited that.  Although, in terms of the

10     preparation of the -- for this particular report, I

11     would have to refer back to the document that I relied

12     on; and specifically, the E-mail document that I had

13     earlier.  In that particular E-mail document it states,

14     and if you would allow me to quote from --

15   **Q**  Sure.

16   **A**  "According to the person at the DCF office they only

17     deal with voter registration if client asks about it.

18     As you know, that is not the way it works."

19        I don't know that it was in this document or

20     perhaps the Canaday document where they -- again, I

21     don't have that one particularly in front of me --

22     whether they had discussed the fact that -- that at

23     least at those offices they had made forms available on

24     the counter for public distribution.

25        I have to add I don't think there is anything

**77**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

1    wrong with that, but --

2  Q  Here is the Canaday document.  That does not discuss it.

3  A  That may not either, so -- yeah.  Okay.

4  Q  So there is no document that discusses that anybody had

5     just left the voter registration applications --

6  A  Not in any of the documents that I used to prepare the

7     report.

8  Q  Well, not in any document that you've ever seen?

9  A  Oh, yes, there -- yes, absolutely.  There was

10     a reference in one of the documents that -- that I did

11     not rely on for the report that talked about the fact

12     that voter registration forms were available on the

13     counter for public distribution.  I -- again, I would

14     have to go back to all of the documents that I've

15     reviewed and see that particular area.  In fact, at --

16     one of the agencies seemed to -- listed in one of the

17     depositions that I reviewed yesterday quickly, they took

18     pride in the fact that they had those forms available

19     for -- for the general public to use.

20  Q  But there is a difference between having them available

21     on the counters and simply having them available on the

22     counters, right?

23  A  Yes.  I do believe that one of the documents did allude

24     to the fact that they did make voter registration

25     applications available in lieu of providing for the

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

1    services -- in lieu of -- of asking people to apply

2    to -- to register.  I did not specifically in this

3    report state that.  I used, as an example, of the fact

4    that you would not be in compliance with the Act if that

5    is all that you simply did.  But I did not for the

6    purposes of this particular report make any specific

7    reference to that particular practice in any office, if

8    that's the question you're asking.

9  Q   It's not your opinion and you have not set forth that it

10    is your opinion that that is all that the DCF did,

11    correct?

12  A   No.  I'm just saying that if that is what they did, that

13    would not suffice.

14  Q   And it is not your opinion that that is what they did,

15    correct?

16                    MS. FINEMAN:  Objection to form.

17                    THE WITNESS:  It was not my opinion

18    in terms of the preparation of this report that that is

19    what they did.

20  Q   (By Mr. Lindsay)  And I have to be clear.  You're not

21    going to be attempt to suggest that that is your

22    opinion, are you, sir?

23                    MS. FINEMAN:  Objection to form.

24                    THE WITNESS:  Not in terms of this

25    report, no.

79

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1    Q    (By Mr. Lindsay)  Well, in terms of your testimony with
 2         regards to this litigation.
 3    A    Umm, I don't know.  I would have to -- in terms of this
 4         litigation, I would have to go back and rereview the
 5         material.  If I find items in the material that would
 6         seem to suggest that, it could be, I suppose,
 7         potentially part of my testimony.  I don't know that --
 8         whether or not that will -- you know, will occur or not.
 9    Q    And you haven't seen -- well, strike that.
10              Sir, you've already testified that these are your
11         opinions.  These are all of your opinions, correct?
12    A    That's correct.
13    Q    Now, you say here on Page 6, "It also appears that in
14         some cases DCF offices were not always providing an
15         opportunity for clients to register."
16              It's fair to say, sir, you don't know in how many
17         of those offices DCF -- in how many of those offices
18         clients were not always provided an opportunity to
19         register, do you?
20                        MS. FINEMAN:  Objection to form.
21                        MR. LINDSAY:  What's your form
22         objection?
23                        MS. FINEMAN:  You already asked this
24         question.
25                        MR. LINDSAY:  You can answer.
```

80

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1          THE WITNESS:  Restate -- I'm sorry.

2      Restate the question.

3  Q   (By Mr. Lindsay)  You didn't -- so we're clear.  You

4      don't know in how many DCF offices clients were not

5      always provided an opportunity to register, do you?

6  A   No.

7  Q   And you do not know when that occurred, if it occurred,

8      do you?

9  A   No.  Well, let me -- let me just say that not

10     specifically as to when it occurred.  I know that the

11     dates on the E-mails were August 2001, although, there

12     is no references to time.

13 Q   The fact is, with regard to this so-called opinion, you

14     don't bring any expertise to this opinion with regard to

15     this opinion.  All you are doing is reading two

16     documents and -- and -- and attempting to extract what

17     you believe those documents say.  Isn't that correct?

18 A   That's true.  But the documents are from the -- in one

19     case both from the Florida Department of Children and

20     Families.  I wouldn't have any reason to -- to -- to

21     doubt the -- the accuracy of those documents at all.

22 Q   But nothing about your background or -- or expertise

23     adds anything to the -- to the interpretation of those

24     documents, other than what the judge himself could

25     infer; isn't that true, sir?

81

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    A    Well, I think that based on my knowledge of the National

2         Voter Registration Act and based on my knowledge of what

3         the -- the work that went into the Act, I think that I

4         have enough expertise to be able to read a document from

5         a state agency, in any state, and determine from -- and

6         to make some conclusions from that document as to

7         whether or not that particular -- a particular practice

8         is -- at least have an opinion as to whether or not it

9         complies with the Act or not.

10                       MR. LINDSAY:   Would you read back

11        the question, please.

12                       (Question on Page 81, Line 23

13                       through Page 82, Line 1, read

14                       by the reporter.)

15

16   Q    (By Mr. Lindsay)   Yes or no?

17   A    In terms of what a judge could infer?

18   Q    Right.

19   A    I would not attempt to try to express an opinion that

20        would have -- infer something that would be up to a --

21        any --

22   Q    I mean --

23   A    -- judge to infer.

24   Q    My point is that the judge can read these documents,

25        correct?

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byers Anderson Beach - Court Reporters & Video

```
 1   A   Yes.

 2   Q   And there is nothing -- you're not adding anything

 3       because of your life experiences or expertise to the

 4       interpretation of those documents that the judge could

 5       not already determine for himself?

 6   A   That may be true.

 7   Q   Let's move on to your second opinion.  Your original --

 8       in McIntosh 2, the second draft of your opinion, you

 9       say, "Agency based voter registration programs will work

10       best in those situations where the chief State election

11       official designated for coordinating 'State

12       responsibilities' under the National Voter Registration

13       Act assumes the responsibility for providing statewide

14       leadership in the development and implementation of all

15       activities related to a State's compliance with the

16       Act."

17            You see that, right, sir?

18   A   Yes.

19   Q   And after your conversations with Miss Fineman and

20       Miss Borgen, you added in the -- in the final draft a

21       second sentence to that Opinion No. 2, correct, sir?

22   A   I would agree with the statement that the second

23       sentence was added subsequent to the conversation that I

24       had with those two.  I would not infer from that that

25       there was anything in that conversation that
```

83

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1     specifically talked about that specific language being

2     added to the opinion.

3  Q  But there was something in that conversation that

4     impressed upon you after two prior drafts, where you did

5     not have any further language, the notion that you were

6     going to add something more; isn't that correct?

7  A  The --

8  Q  Yes or no, and then you can explain.

9  A  Yes.  I was asked to -- again, to repeat myself -- I was

10    asked to look at the opinions and to make some comment

11    based on the material that I -- that I had, that the

12    State had not -- did not appear to have exercised the

13    kind of statewide authority or statewide leadership in

14    terms of carrying out the development of the programs

15    under NVRA.

16  Q  All right.  Just so we're clear.  After you had two

17    prior drafts of this expert report or this -- or this

18    report without any further language than what we just

19    read, on the final draft you added language, the second

20    sentence of Opinion No. 2, which states:  "In Florida it

21    appears that no one was granted statewide authority or

22    exercised statewide leadership in the development of

23    various programs established by the National Voter

24    Registration Act."  Correct?

25  A  Yes.

84

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1   Q   You added that sentence only in the last draft.  And
 2       that sentence was not in either of the first two drafts,
 3       correct?
 4   A   That's -- that's correct.
 5   Q   All right.  Now, going back to the first sentence, you
 6       say, "Agency based voter registration programs will work
 7       best in those situations where the chief State election
 8       official" designates -- "designated for coordinating
 9       'State responsibilities' under the" NVRA "assumes the
10       responsibility for providing statewide leadership in the
11       development and implementation of all activities related
12       to the State's compliance with the Act."
13           What do you base that?
14   A   I base that on two things:  One, I based it on my
15       reading and my understanding of the NVRA.  I also based
16       it on language that was contained in the Federal
17       Elections Commission document, the implementing
18       guidelines.
19   Q   And what language is that?
20   A   Do you want me to pull it out of the language of the --
21       of this document?
22   Q   Let me just clarify.
23   A   Okay.
24   Q   First you say you base it on the NVRA.  What portion of
25       the NVRA do you base that on?
```

85

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1   A    Section 10.

 2   Q    Stating what?

 3   A    Of the original Act.  Section 10 of the original Act

 4        states, "Each state shall designate a state officer or

 5        employee as the chief state election official to be

 6        responsible for coordination of State responsibilities

 7        under this Act."

 8   Q    Okay.  So all that says is that there should be someone

 9        designated for coordinating State responsibilities,

10        correct?

11   A    Well, I -- yes.

12   Q    It does not say that it will work best, in your words,

13        in those situations where that person, the coordinating

14        person, assumes the responsibility for providing

15        statewide leadership in the development and

16        implementation of all activities related to the State's

17        compliance with the Act, right, sir?

18   A    Restate your question.

19   Q    Do you want me to restate it or read it back?

20   A    Read it back.  I don't care.  Either one is fine.

21                    MR. LINDSAY:  Okay.  Could you read

22        it back, please.

23                           (Question on Page 86, Lines 12

24                            through 17, read by the

25                            reporter.)
```

86

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1        THE WITNESS:  The Act does not
2   specifically state that, no.
3  Q  (By Mr. Lindsay)  The Act does not say anything about
4     how agency-based voter registration programs might work
5     best, right, sir?
6  A  No.
7  Q  So the other thing that you base this on is the -- an
8     FEC report?
9  A  Yes.  I -- it was not an FEC report.  It was an FEC
10    guide to implementing the -- the NVRA.
11 Q  And what portion of that guide states that agency-based
12    voter registration programs will work best where the
13    coordinating person assumes the responsibility for
14    statewide leadership in the development and
15    implementation of all activities related to the State's
16    compliance with the Act?
17 A  Well, there are a couple of pages in that guide, both on
18    Page 1-5 and I believe I even cited some of the language
19    on 1-6.
20 Q  And by the way, this is the language that's -- that I
21    appear not to have in -- in the pages that were --
22    that -- where I got every other page in the report.  So
23    would you just please read the language that you rely on
24    from Section 1-5.
25 A  And 1-6.

                                                              87

       *Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    Q    I was going to get to that, but --

2    A    All right.  Would you like me to read both 1-5 and 1-6?

3    Q    I want you to read all of the language that you rely on

4         for that -- for that opinion.

5    A    The Act requires each State to designate a State officer

6         or employee as the chief State election official to be

7         responsible for coordination of State responsibilities

8         under this Act.  It is not, however, specified how or

9         even when this designation is to be made.  Most states

10        are likely to designate a responsible State official in

11        their conforming legislation.  In the interim, the

12        FEC -- I should say the Federal Elections Commission --

13        will continue working with the chief election officials

14        or chief registration officials of the state unless some

15        other state officer is designated.

16             The Act further assigns the chief State election

17        official the duty of making national and state mail

18        registration forms available for distribution through

19        governmental and private entities, with particular

20        emphasis on making them available for organized voter

21        registration programs.

22             Finally, the Act designates the chief State

23        election official as the recipient of notices from the

24        United States Attorneys regarding felony convictions in

25        Federal courts of any persons who claim residence in the

88

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    state, and should such a conviction have a bearing on

2    the person's eligibility to be a registered voter in

3    that state, the Act requires the chief State election

4    official to notify the voter registration official of

5    the local jurisdiction in which the offender resides.

6         As a practical matter -- I'm now going over to

7    Page 1-6 -- although not addressed in the Act, states

8    might also want to consider assigning the chief State

9    election official related responsibilities including but

10   not limited to receiving and forwarding notices from

11   State courts regarding felony convictions, if

12   appropriate; as well as declarations of disqualifying

13   mental incapacity; receiving and forwarding notices from

14   State bureaus of vital statistics regarding deaths;

15   receiving and forwarding some or all voter registration

16   applications from voter -- from motor vehicle offices,

17   public assistance agencies and by mail, especially

18   national mail registration applications; receiving and

19   forwarding notices from local jurisdictions regarding

20   the cancellation of new registrant's prior registration;

21   designing all forms and procedures represented in the

22   NVRA; training all local election officials regarding

23   the forms and procedure; and receiving and compiling

24   reports from the local election officials pursuant to

25   the FEC's reporting regulations and in turn forwarding

89

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   the compilations to the FEC.

2        And then the -- there's a part of Page 6 which

3   doesn't apply to this particular section.

4                MS. FINEMAN:  Can we just note for

5   the record that Mr. McIntosh was just reading from a

6   document entitled Implementing the National Voter

7   Registration Act of 1993 Requirements, Issues and

8   Examples prepared by the FEC produced January 1, 1994.

9                MR. LINDSAY:  And that is part of

10  the production in this case, right?

11               MS. FINEMAN:  Yes.

12               MR. LINDSAY:  That we reviewed

13  earlier?

14               MS. FINEMAN:  That -- that is noted

15  in his list of documents that he relied upon.

16               MR. LINDSAY:  Well, that was

17  actually produced as one of the documents he relied on

18  that you gave us earlier?

19               MS. FINEMAN:  No.  That was sent to

20  you by Lori --

21               MR. LINDSAY:  That's when I thought.

22  I thought it was the May 31st letter.  Right?  It was

23  attached thereto?

24               MS. FINEMAN:  Yes.

25               MR. LINDSAY:  It was in a different

90

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        form and mine missed every other page.
 2                        MS. FINEMAN:  Yes.
 3                        MR. LINDSAY:  All right, sir.
 4     Q  (By Mr. Lindsay)  So with regard to the opinion in the
 5        first sentence of Opinion No. 2, that is your only basis
 6        for the opinion that agency-based voter registration
 7        programs will work best in those situations where the
 8        chief state election official designated for
 9        coordinating state responsibilities under the Act
10        assumes the responsibility for providing statewide
11        leadership in the development and implementation of all
12        activities related to the state's compliance with the
13        Act?
14     A  I would also add that it was also based on my experience
15        in working -- in observing other states in my capacity;
16        for example, with the National Association of State
17        Election Directors, fielding inquiries from them
18        periodically, questions from them regarding
19        implementation of the Act, and my overall experience as
20        being a state elections director for 13 years and
21        implementing the Act, and having experience in
22        implementing the Act in our state.
23     Q  And you don't rely on any data that would tend to show
24        that these programs would work best where the
25        coordinating person assumes the responsibility for
```

91

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1          providing statewide leadership in the development and
 2          implementation of all activities related to the state's
 3          compliance with the Act, right?
 4    A     No.
 5    Q     And you don't rely on any learned treatises that say
 6          that, do you?
 7    A     No.
 8    Q     And you're not aware of any peer-reviewed publications
 9          that -- that -- scholarly publications that say that in
10          any way, are you, sir?
11    A     I'm not aware of any, no.
12    Q     And in fact, the Act itself does not require that the
13          coordinating person assume responsibilities for
14          providing statewide leadership in the development and
15          implementation of all activities related to the state's
16          compliance with the Act, does it, sir?
17                    MS. FINEMAN:   Objection.
18                    THE WITNESS:   Well, the Act does --
19    Q     (By Mr. Lindsay)  Yes or no, then you can explain.
20    A     No, the Act doesn't specifically contain that language,
21          but the Act does contain language that does refer to the
22          requirement that the activities be coordinated in some
23          way by whoever that official happens to be.  And I mean,
24          it certainly would be my opinion that -- that that would
25          include coordinating the activities that are required
```

92

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1      under the Act.

2  Q   Well, in fact, you're not opining in this -- in this

3      opinion that there is any violation of the NVRA, are

4      you?

5  A   No.

6  Q   Okay.  And then in -- in the second sentence, you -- it

7      says, "In Florida it appears that no one was granted

8      statewide authority or exercised statewide leadership in

9      the development of various programs established by the"

10     NVRA.

11         What do you base that sentence on?

12 A   Umm, I base that sentence against -- again, on the

13     documents --

14 Q   You're going to have to be specific.

15 A   -- that I reviewed.  Here we are.  Sorry.

16 Q   First of all, we know that you did not base that on any

17     reading of the Florida statutes, correct?

18 A   That's correct.

19 Q   All right.

20 A   Umm, I have Interrogatory No. 12, Memorandum of Law,

21     that was -- that I received dealing with -- where the

22     question was asked for the State defendants for the

23     period from January 1, 1999, to November 7th, 2000.

24     Their response -- I don't know if you want me to read

25     the response or just reference that was a -- a document

93

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        that I used in the development of --
 2    Q   You're referring to --
 3    A   -- of that opinion.
 4    Q   -- a March 2002 memorandum from Ms. Fineman that
 5        summarizes -- or probably encapsulates is a better
 6        word -- certain responses to certain interrogatories.
 7        Is that correct?
 8    A   That's correct.
 9    Q   All right.
10    A   And I just want to make sure that this one also
11        contained -- this actually contained -- this particular
12        document contained a couple of references to that.
13        Also, Interrogatory No. 13, again, the responses from
14        Defendants Harris and Roberts.
15    Q   And that is where Harris and Roberts note that the
16        Department of State and Division of Elections does not
17        participate in voter registration functions under the
18        Florida election code?
19    A   That's correct.  And also I just would look at the
20        Department of State -- I have a document, Katherine
21        Harris, it appears to be the PowerPoint presentation
22        that I think we discussed earlier.  This is a
23        document -- the training appears to be to those involved
24        with carrying out the functions of NVRA at the agency --
25        state agency level.  There is a slide in that particular
```

94

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1       presentation on communications, which I also looked at,

 2       as well.

 3   Q   The one that says -- that you circled -- "The division

 4       of elections is always available"?

 5   A   Correct.

 6   Q   I'm just curious, sir --

 7   A   Yeah, the first element -- the first element says that

 8       communication is -- and this is, I believe, referencing

 9       activities under NVRA.  The communication is between the

10       supervisors of elections.  I would believe that that

11       would be referring to counties -- and you, which is

12       referring to the state agencies.  It's talking about how

13       that is to be -- that communication is to take place.

14       The division of elections, which is part of the

15       Secretary of State's Office, is described as being,

16       quote, available.

17   Q   In fact, it says "always available," doesn't it?

18   A   It's always available.  Quote, always available.

19   Q   And so does that somehow support your opinion that no

20       one exercised statewide leadership?

21   A   I think that slide in conjunction with the other

22       documents that I relied on to form that opinion speak

23       for themselves, yes.

24   Q   When you -- when you -- is there anything else that --

25       that you -- other than this -- this slide from the
```

95

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

*Byers Anderson Beach — Court Reporters & Video*

1    apparent Power Point presentation of -- of training
2    offered by the Department of State and the interrogatory
3    answer No. 13 of Defendants Harris and Roberts, and the
4    interrogatory answer to -- is it No. 12?
5  **A**  Yes.
6  **Q**  Other than those three items, does anything -- did you
7    use anything else as a basis for your opinion set forth
8    in the second sentence of Opinion No. 2?
9  **A**  No.  Not -- no, I did not.
10 **Q**  And when you say it appears that no one was granted
11   statewide authority, granted by whom?
12 **A**  In this particular case, I'm -- I'm referencing the law.
13 **Q**  The Florida law --
14 **A**  Either the -- the Florida legislature or any -- there
15   did not appear to be any of these documents --
16   any reference to any rule at all.
17       I should make note that there is a reference to a
18   constitutional provision in the response from Defendants
19   Harris and Roberts in the -- their response to
20   Interrogatory No. 12.
21 **Q**  And would you read that, please.
22 **A**  Just the response?
23 **Q**  The part -- the portion to which you are referring.
24 **A**  In response -- the response -- the response is --
25   states, "In Florida, the Department of State does not

96

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    and cannot supervise the operations of the DHSMV, the

2    DCF or any other executive agency."

3           So that would be the one that I would be

4    referring -- referring to.

5    **Q**   And do you have any reason to doubt the truthfulness of

6    that statement you just read?

7    **A**   No.

8    **Q**   And have you ever read the Florida constitution?

9    **A**   No.

10   **Q**   Do you understand how the supervisors of elections --

11   what role they play under the Florida constitution?

12   **A**   Not under the constitution, no.  I have not read the

13   constitution.

14   **Q**   Do you know whether they are constitutionally elected

15   officers?

16   **A**   I believe they are.  It seems that I -- that I have read

17   that in one of the documents, yes.

18   **Q**   All right.  So with regard to the second sentence of

19   Opinion No. 2, that sentence you've told me what you

20   based it on.  And I just want to clarify that you do not

21   base that opinion set forth in that second sentence on

22   any review of the Florida constitution, correct?

23   **A**   That's correct.

24   **Q**   On any review of the Florida statutes, correct?

25   **A**   That's correct.

97

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1  Q  On any published learned treatises, correct?

2  A  That's correct.

3  Q  Or on any type of compilation of data, other than the

4     interrogatory answers that we've discussed, correct,

5     sir?

6  A  That's correct.

7  Q  All right.  Moving on to No. 3.  Again, sir, I'm going

8     to -- I'm going to take you first to the -- to your

9     second iteration of your report that we've marked as

10    McIntosh 2, where the Opinion No. 3 says, "Agency based

11    voter registration programs will operate more

12    efficiently when there is a greater reliance on the

13    electronic transfer of...data."

14         And that is all you set forth in -- in the first

15    two iterations of your expert report, right, sir?

16  A  Yes.

17  Q  And -- but in the final version that you produced, you

18    add another sentence, which says, Florida -- "Florida's

19    agency based voter registration programs may be hampered

20    by its reliance on paper forms."  Right, sir?

21  A  Yes.

22  Q  And by the way, you don't opine that Florida's

23    agency-based voter registration programs are hampered by

24    its reliance on paperwork forms, do you, sir?

25  A  No.

98

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1   Q   Because you don't know, right, sir?

2   A   No, I just -- it's that I -- based on the material I --

3       I read that -- again, the material that I reviewed,

4       there seemed to be some problems with the processing of

5       the forms at the motor vehicle agencies and -- and the

6       paperwork that was going back and forth.  And so to that

7       extent the -- we knew that there were -- I mean, I could

8       tell by just reading that -- those documents that there

9       were some problems with -- with the paper form in terms

10      of its overall effect, however, on the voter

11      registration programs.  I've -- I've not -- it was

12      difficult for me to -- to ascertain what the overall

13      impact of that would be.

14  Q   And you're not opining here on No. 3, that there was any

15      violation of the NVRA, are you, sir?

16  A   Umm, no, I'm not -- no, I'm not.

17  Q   And just as -- and I'm sorry to do this to you.  I don't

18      mean to jump around, but I didn't ask you so I'm going

19      to.

20          In No. 2 --

21  A   Sure.

22  Q   -- you're not opining that the secretary or the director

23      in any way violated the NVRA, are you, sir?

24  A   Not -- not in that opinion, no.

25  Q   Okay.  So you're -- you're not opining in Opinion No. 1

99

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byess Anderson Beach - Court Reporters & Video

1     that the secretary or director violated the NVRA. And

2     you're not opining in -- in No. 2 that they violated the

3     NVRA. And you're not opining in No. 3 that they

4     violated the NVRA; isn't that correct, sir?

5  **A**  Yes. I have made no comment in the -- about the

6     compliance with the National Voter Registration Act.

7  **Q**  In any of your opinions?

8  **A**  That's correct.

9  **Q**  You do not set forth any opinion whatsoever alleging

10    that either the secretary or director violated the NVRA,

11    correct, sir?

12  **A**  Umm, I am not. I'm just presenting to you in my report

13    my conclusions based on the review of the data that I

14    looked at --

15  **Q**  All right.

16  **A**  -- or the reports that I looked at.

17  **Q**  And those conclusions specifically do not include a

18    conclusion that the secretary or director violated the

19    NVRA?

20  **A**  I have not stated that in the report. No, I have not.

21  **Q**  Going back to No. 3. You -- do you have any studies

22    that -- that backs up your conclusion that programs will

23    operate more effectively or efficiently when there is a

24    greater reliance on electronic transfer of election

25    data?

100

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

Byers, Anderson Beach — Court Reporters & Video

```
1    A    No.

2    Q    Any learned scholarship or treatises that say that?

3    A    No.

4    Q    Any studies that you've conducted that say that?

5    A    No.

6    Q    Do you know whether Florida does electronically transfer

7         any voter registration data?

8    A    It depends -- it appeared -- it did not appear to me

9         from my reading of the material that I had reviewed that

10        they provided what I would call a document -- a data in

11        a machine readable file.  I'll stop at that, I guess.

12   Q    You're aware, sir, that in Florida, at least, for a

13        voter registration application to be valid, it needs a

14        signature, correct?

15   A    Yes.  That -- that's true in our state, as well.

16   Q    And you're not talking about transferring those

17        signatures electronically, are you, sir?

18   A    Well, ideally that would be nice.  But, no, I'm not --

19        I'm talking about the -- about the registration data

20        itself.  We've -- we in our state are looking towards

21        doing something along that line eventually.  I know

22        that's what -- what's certainly in the works here.  But

23        specifically, I'm talking about the -- about the data

24        elements for voter registration.

25   Q    All right.  The NVRA doesn't discuss at all electronic
```

101

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    transfer of voter -- voter registration data, does it,

2    sir?

3  **A**  No.

4  **Q**  All right.  And the FEC report that you -- or the FEC

5    guide to implementation doesn't discuss that at all,

6    either, does it, sir?

7  **A**  No.

8  **Q**  All right.  Let's --

9  **A**  Let me just say, though, that the F -- the FEC guide --

10   sorry -- does talk about the desirability of having a

11   statewide voter registration base, but it doesn't

12   specifically talk about the electronic transfer of data

13   into that base from an agency voter registration -- a

14   voter registration agency.

15 **Q**  All right.  And let's move on to No. 4.  And, again --

16   let's see here.  I'm going to take you to McIntosh 2,

17   the second iteration of your draft, where the first

18   sentence reads -- well, strike that.

19       The only sentence reads, "At the statewide level,

20   it is essential that someone, preferably the State's

21   chief election official, be responsible for monitoring

22   the performance levels of state agencies that have

23   designated responsibilities under the National Voter

24   Registration Act."

25       And that was your only opinion -- the only

102

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1        sentence in Opinion No. 4, as set forth in the -- in the

 2        first two iterations of your report; isn't that correct,

 3        sir?

 4   A    Umm, yes.  Sorry.  I was a page behind.  I had to catch

 5        up.

 6   Q    I understand.

 7             And then subsequent to conversations with counsel,

 8        you added another sentence to that opinion before

 9        providing your final report.  And that sentence reads --

10        well, strike that.

11             Isn't that true, sir?

12   A    Yes.

13   Q    And that sentence reads, "Florida would be able to more

14        efficiently operate its agency based voter registration

15        programs if monitoring programs were in place."  Right,

16        sir?

17   A    Yes.

18   Q    And again -- and we've discussed this, I believe, but I

19        want to make sure -- you're not opining there that --

20        that Florida's doing anything illegal or not in

21        compliance with the NVRA, with regard to monitoring

22        programs; isn't that true, sir?

23   A    Yes.

24   Q    Because the NVRA does not require the monitoring

25        programs that you opine would be essential or
```

103

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

*Byers Anderson Beach – Court Reporters & Video*

```
 1        preferable; isn't that true, sir?
 2   A    The NVRA does require that certain statistical data --
 3        and I'm talking generally now -- that certain
 4        statistical data be made available in terms of the FEC
 5        making its reports back to Congress at the time.  And it
 6        required, at least to that extent, that the state have
 7        some program in place to have some sort of statistical
 8        data available so that it could be determined how
 9        effective various problems in the NVRA were in terms of
10        registering voters.
11   Q    Are you aware, sir, that Florida has complied by
12        providing those reports to the FEC?
13   A    I have no idea.
14   Q    So you have not reviewed the FEC reports submitted by
15        Florida?
16   A    No.
17   Q    What do you -- what do you base the first sentence of
18        Opinion No. 4 on?
19   A    Umm, I would base that based on my own experience at the
20        state level in terms of our implementation of the motor
21        voter program -- national voter -- in terms of our
22        implementing the responsibilities under the -- under the
23        National Voter Registration Act.
24   Q    When you say "our," you mean Washington State?
25   A    Washington State's.  Sorry.
```

**104**

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
 1              I would also state that this is -- opinion is one
 2         held by me as a result of my work with certain coalition
 3         groups that were responsible for the development of the
 4         Act.  It's also based upon my just overall observation
 5         of what -- again, queries that I have gotten in from
 6         other states about practices we've -- we have in place
 7         and so forth.  But I guess that's primarily why I would
 8         stand behind that particular opinion.
 9    Q    So there is no document that you used to base that
10         opinion upon, correct?
11    A    No, there is no -- no particular -- you know, particular
12         document, no.
13    Q    There is no study or learned treatise?
14    A    No.
15    Q    And when you say it is essential that someone,
16         preferably the state's chief elections official, be
17         responsible for monitoring the performance levels of
18         state agencies, when you say it is essential, you're --
19         you're not opining that that is a requirement of the
20         NVRA, are you, sir?
21    A    Umm, no.
22    Q    And you're not opining that that is a requirement
23         of Florida election statutes, are you, sir?
24    A    No.  I have not read the Florida election statutes.
25    Q    And you're not opining that it is -- when you say it's
```

105

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    essential, you're not opining that that is a requirement

2    of any law, are you, sir?

3  A  No.  I'm -- I'm merely offering that opinion as -- from

4    an administrative point of view.

5  Q  And when you say in the second sentence that Florida

6    would be able to more efficiently operate its

7    agency-based voter registration programs if monitoring

8    programs were in place, again, you're not basing that on

9    any studies that have been done or that you've done,

10   correct?

11 A  Well, I wouldn't say studies that I have done in terms

12   of published studies or anything like that, no.

13 Q  You're not -- you're not basing that on any -- anything

14   that -- that is published and subject to peer review,

15   are you, sir?

16 A  No.

17 Q  You in fact know of no study or data that supports this

18   conclusion, other than your general feelings and

19   experience; isn't that true?

20 A  I know of no studies; no empirical data, no.

21 Q  All right.

22        MR. LINDSAY:  We've been going at it

23   for quite a while.  Why don't we take a few minutes.

24        THE VIDEOGRAPHER:  We are now going

25   off the record.  The time is 1:48.

106

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1          (Recess 1:48 - 2:12 p.m.)

2

3                    THE VIDEOGRAPHER:   We are now back

4      on the record.   The time is 2:12.

5

6

7                    EXAMINATION (Continuing)

8      BY MR. LINDSAY:

9   Q   Sir, when were you last in Florida?

10  A   I was in Florida -- I changed airplanes at the Miami

11      airport in 1970 -- approximately '77 or '78.

12  Q   Is that the only time you've ever been in Florida?

13  A   Yes.

14  Q   And, again, with regard to your conclusions in this

15      matter, nothing you have reviewed in this case, nothing

16      provided to you by counsel, or nothing you've reviewed

17      outside in any other context has led you to come to any

18      opinion that -- that either the Director of the Division

19      of Elections or the Secretary of State of Florida

20      violated either the NVRA or any other law; isn't that

21      correct, sir?

22                    MS. FINEMAN:   Objection.   Objection

23      to form.

24                    THE WITNESS:   I have not made any

25      conclusions, as I stated earlier, as to compliance with

                                                          107

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1    the National Voter Registration Act.  I just merely

2    stated the opinions that I have -- have here.

3  **Q**   (By Mr. Lindsay)  So that's a correct statement, then?

4  **A**   Yes.

5  **Q**   Who would you consider to be the foremost experts in the

6    country with regard to the NVRA?

7  **A**   Umm, you want me to list them by name, organization?

8    Oh, I would say Mr. Bill Kimberling, who is with

9    the Office of Elections Administration, Federal

10   Elections Commission.

11   Pennelope Bonzel, who is the director of the

12   Office of Election Administration at the Federal

13   Elections Commission.

14   Joanne Chasnow, who was with an organization

15   entitled Human Serve, which is an organization that no

16   longer exists.  But they were very active in the

17   enactment of -- of NVRA.

18   Probably a few state election directors who have

19   been around a long time and know a lot about NVRA and

20   about the issues regarding implementation.  Those that I

21   would mention would be Tom Wilkie, who is the executive

22   director for the New York State Board of Elections;

23   Chris Thomas, Mr. Chris Thomas, who is the Director of

24   Elections in the Michigan Secretary of State's Office.

25   I suppose those would be the ones that come

108

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

1     immediately to mind.

2  Q  Where is Joanne Chasnow -- how do you spell her last

3     name, Chasnow?

4  A  C-h-a-s-n-o-w.

5  Q  Where does she live?  Do you know?

6  A  She lives in Weehawken, New Jersey.

7  Q  Do you know -- do you know whether she's employed,

8     currently?

9  A  I don't believe she is.

10  Q  Again, I am going to request that you take a look and I

11     would like to find --

12              MR. LINDSAY:  Yeah, the telephone is

13     on, correct?

14              UNIDENTIFIED SPEAKER:  Yeah.

15              MR. LINDSAY:  Counsel was inquiring.

16     It is on.

17     I'm going to request that you provide the first

18     iteration of your expert report that you provided in

19     this case.

20     And I have nothing further at this time.  I'm

21     going to turn it over to my colleague.

22              (Exhibit Nos. 5-8 marked

23               for identification.)

24     ////

25     ////

109

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

```
                              EXAMINATION
 1
 2     BY MR. MacINNES:
 3   Q     Good afternoon, Mr. McIntosh.  My name is Doug
 4         MacInnes.  I work in the Florida Attorney's General
 5         Office.  And I represent in this case the Florida
 6         Department of Highway Safety and Motor Vehicles and the
 7         Florida Department of Children and Families.  And just
 8         in case I forget to say this during my questions,
 9         anytime I refer to the Department of Highway Safety and
10         Motor Vehicles or the Department of Children and
11         Families, I, of course, am referring to the Florida
12         departments.
13              Mr. McIntosh, how much are you being compensated
14         for your testimony as an expert?
15   A     I have quoted to The Lawyers Committee for Civil Rights
16         Under Law a rate of $125, which is my normal rate for
17         preparing expert witnesses -- expert witness reports.  I
18         have verbally quoted to them a rate of $250 an hour for
19         my actual participation in the deposition itself.
20                        UNIDENTIFIED SPEAKER:  Off the
21         record for a second.
22                        MR. LINDSAY:  Hang on.
23                        THE VIDEOGRAPHER:  We are going off
24         the record.  The time is 2:17.
25                        (Discussion off the record.)
```

110

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1                    THE VIDEOGRAPHER:  We are back on
 2       the record.  The time is 2:18.
 3
 4
 5                 EXAMINATION (Continuing)
 6       BY MR. MacINNES:
 7    Q   Mr. McIntosh, when Mr. Lindsay was questioning you, you
 8        said you had received yesterday, I believe it was three
 9        transcripts of deposition.  One was from someone named
10        Baldwin from DCF; someone named Beringer from DCF.  And
11        by DCF I mean the Department of Children and Families.
12        Do you recall who the third one was from?
13    A   No, I don't, other than it was from somebody who was
14        with the motor vehicle division.
15    Q   Okay.
16    A   The only one that I had from DCF I believe was the one
17        from Mr. -- I think it was Mr. Baldwin.
18    Q   Okay.  When Mr. Lindsay was asking you about your
19        Opinion No. 1, your first opinion in Exhibit 3, your
20        expert report, he asked you on what documents you relied
21        on -- on what documents you relied in order to form this
22        opinion.  And at first you said there were four
23        documents.  One was an AFDC memo.  Next was the Carol
24        Canaday memo.  Next was maybe the District 3
25        registration procedures.  And last was Secretary
```

                                                            111

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    Kearney's responses to interrogatories.  And then I

2    believe after you had a chance to review all of the

3    documents in front of you, you came back and said that

4    you relied on the Carol Canaday memorandum of January

5    8th, 19 -- or 2002, and a one-paged document that was

6    contained in Secretary Kearney's responses to

7    interrogatories.  And that was -- was an E-mail from

8    Norene Moore to Greg Ferguson; is that correct?

9  A  Yes.

10 Q  So when you clarified that for Mr. Lindsay, are you

11   saying that you did not rely on the AFDC information

12   memorandum?

13 A  I did not -- I don't believe I did -- I don't believe I

14   relied on that for that particular opinion.

15 Q  And are you saying that you did not rely on the District

16   3 registration procedures in giving your opinion to --

17   Opinion No. 1?

18 A  That's correct.

19 Q  All right.  Would you please describe for us the nature

20   of your work for the company called Vote Here with

21   regard to Internet voting.

22 A  With regard to Internet voting, Vote Here is a company

23   that has pursued the concept of Internet voting for

24   quite some time.  In fact, in Europe they are already

25   conducting some elections by using -- through the use of

112

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1        the Internet.  They are also involved in work in the
 2        private sector through the use of the Internet for --
 3        for voting; things such as student body elections, proxy
 4        voting for corporations, things like that.  They are
 5        also -- as I said, they are continuing to pursue and
 6        develop a market for Internet voting here in the United
 7        States for public elections.
 8    Q   Following -- immediately following the November 2000
 9        election, while you were the director of elections in
10        the state of Washington, were you asked your opinion by
11        members of the media on Internet voting?
12    A   Yes.
13    Q   And what was that opinion at that time?
14    A   My opinion at that time, and continues to be, that I
15        was -- I continue to be very cautious in terms of
16        Internet voting.  I do believe that eventually we will
17        have Internet voting, but I do believe that there are a
18        number of issues of perception that are going to have to
19        be dealt with along with various technical issues, as
20        well.
21    Q   What concerns, specifically, do you have with Internet
22        voting?
23    A   Umm, I think there are a couple.  One is certainly the
24        integrity of the voting process and how well we can
25        protect the integrity of the voting process through
```

113

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1        Internet -- and still being -- still be able to conduct
 2        elections via the Internet.  And certainly, as I said, I
 3        think that there needs to be public confidence in the
 4        elections process.  And to the degree that there are,
 5        for whatever reason, many in our particular culture that
 6        are concerned about Vote Here and those kinds of issues,
 7        that it's important that those voices be heard, as well,
 8        as we begin to -- to develop this.
 9             As I stated earlier, I do think -- I am cautious.
10        I do think that Internet voting is something that's
11        going to have to be phased in over an extended period of
12        time before we are actually voting on the Internet at
13        home using our personal computers.
14   Q    And what fee arrangements do you have with Vote Here?
15   A    Actually, I have -- I have a contract with Vote Here.
16        It's a -- it's a yearly -- it's a yearly contract.  And
17        they pay me a certain amount of money a month and for
18        that I -- as I say, I make -- said earlier -- I make 16
19        days a month available to them to work.  And also I have
20        an exclusive relationship with them in terms of anyone
21        else in the vendor community for voting systems.
22   Q    Do you know how much they pay you annually?
23   A    $100,000.
24   Q    Is the creation of Internet voting in the United States
25        a potentially lucrative enterprise?
```

114

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1    A    Yes, it is.  Although I would place the emphasis on
 2         "potentially."
 3    Q    Is Vote Here competing to win the Internet voting
 4         market?
 5    A    Well, I think once there is an Internet voting market,
 6         they will be competing for that market.  At least in
 7         terms of the United States, I'm not sure that there is a
 8         market currently for that, other than what is a, as I
 9         stated earlier, market in the private sector.
10    Q    Do you have any idea -- do you have any idea what that
11         market is worth?
12                        MS. FINEMAN:  Objection.
13                        THE WITNESS:  No.
14    Q    (By Mr. MacInnes)  Could it be in the billions of
15         dollars?
16                        MS. FINEMAN:  Objection.
17                        THE WITNESS:  Let me -- let me
18         answer that question this way by saying I don't know of
19         any market for any voting system in the United States
20         that's probably worth in the billions of dollars.  I --
21         marketing voting systems in this country is a very, very
22         difficult proposition.  And it's highly competitive;
23         margins are very thin.  So it's difficult to, I think,
24         ascertain what -- what potential dollar value is in any
25         kind of voting system.
```

115

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Andersen Beach – Court Reporters & Video

1   **Q**   (By Mr. MacInnes)   Do you know approximately how many

2       registered voters there were in the state of Washington

3       in November 2000?

4   **A**   There were a little over 3 million.

5   **Q**   Now, Mr. McIntosh, I'm handing you what has been marked

6       as Exhibit 5.   Exhibit 5 was downloaded from the

7       Internet.   It purports to be from the Detroit News dated

8       Saturday, November 11, 2000.   And it purports to be a --

9       an article entitled "Complaints over elections

10      commonplace around country."   And in the center of the

11      first page I've put some brackets around several

12      sentences that read, "Glitches crop up in every election

13      and in every state, said Gary McIntosh, elections

14      supervisor in the state of Washington and president of

15      the National Association of State Election Directors.

16         "'Oh, man, there are billions of them,' he said.

17      'When you have this many people attempting to vote, and

18      human beings" are "in charge of the process, you're

19      going to have mistakes made.'"

20         Is that an accurate quote, Mr. McIntosh?

21   **A**   Yes.   Although, I would say that maybe the term

22      "billions" was obviously an exaggeration, but certainly

23      the gist of the quote and the accuracy of the verbiage

24      used in the quote is certainly accurate.

25   **Q**   And were you referring to the November 2000 election in

116

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    that article?

2    **A**   No.  I think I -- well, as the first paragraph says,

3    "Glitches crop up in every election."  So I guess to

4    some degree I was speaking generally.  Although, I was

5    certainly being asked the question because of the

6    circumstances surrounding the 2000 election.

7    **Q**   Is it your opinion that there were billions of mistakes

8    made in the November 2000 election?

9    **A**   I don't know.  I would not use the word "billions," no,

10   specifically.

11   **Q**   Did you use the word "billions" back on November 11th of

12   2000?

13   **A**   I probably did, yes.  I don't recall the quote

14   specifically, no.  But it's something I could have said,

15   yes.

16   **Q**   Would it be safe to say that there were a very large

17   number of mistakes made in the November 2000 election?

18   **A**   Yes.

19   **Q**   Is it your opinion that mistakes will be made in the

20   election process in every election in every state?

21   **A**   Yes.

22   **Q**   And what is the basis for that opinion?

23   **A**   My basis for that opinion is knowing what it takes to

24   put an election together and knowing how many people are

25   involved in the election; knowing how many -- the

117

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1     factors that as an election supervisor, the

2     circumstances that exist that you have very little

3     control over.  So certainly when you -- I'm not talking

4     here generally in terms of how large the mistakes are or

5     maybe somebody leaving the seal off of a ballot box or

6     not writing the number for -- the seal number that's

7     being used to seal a tray of ballots has been -- the

8     numbers have been transposed on the log-in sheet.  There

9     are all kinds of steps in the process where mistakes --

10    mistakes are made.

11  **Q**  Is it your opinion today that when you have human beings

12     in charge of the process, you're going to have mistakes

13     made?

14  **A**  Yes.

15  **Q**  Does your opinion about the number of mistakes made in

16     elections apply to the registration process, as well?

17  **A**  To -- to a degree.  Although, I have to admit that when

18     it comes to a registration process, I'm probably a

19     little less forgiving because in the registration

20     process, unlike what you have in an election -- in the

21     elections process, you have the opportunity to exercise

22     a little more control over that process than you do with

23     an election that's held on the day -- the day of the

24     election.

25  **Q**  But are mistakes made in the registration process

**118**

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1   because there are humans involved?

2   A   Sure.

3   Q   How long have you held this opinion that there will be

4   mistakes made in every election and in every state?

5   A   Probably ever since I was responsible for conducting my

6   first election.

7   Q   And that goes back to what year?

8   A   I think the first election I ever conducted was in -- I

9   was at Thurston County and it was a school election in

10   February of 1979.

11   Q   How long were you the director of elections in

12   Washington State?

13   A   For about 12 years.

14   Q   Were there mistakes made by humans in the election

15   process in Washington while you were the director of

16   elections?

17   A   Are you referring to -- let me just answer that question

18   by saying yes.

19   Q   And how long were you the supervisor of elections in

20   Thurston County, Washington?

21   A   For about ten years.

22   Q   Were there mistakes made -- mistakes made by humans in

23   the election process while you were the supervisor of

24   elections in Thurston County, Washington?

25   A   Yes.  In fact, I made some of them.

119

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1   Q   Now, if you knew there were mistakes being made by
 2       humans in the elections process while you were the
 3       supervisor of elections in Thurston County, and the --
 4       while you were the director of elections in Washington
 5       State, did you try to put a stop to the mistakes being
 6       made?
 7   A   Yes.
 8   Q   Is it -- were you successful in putting a stop to
 9       mistakes being made by humans?
10   A   To some degree there were certain kinds of mistakes that
11       were made that we did put a stop to.  Again, what we
12       did, and I think this -- I think this is fairly normal
13       for what other election officials do, is that following
14       an election we would -- essentially what we would do was
15       we would essentially conduct an autopsy of that
16       election.  We would look for common errors.  We would
17       look for breakdowns that we may have had during our
18       training sessions.  We would have had in -- we -- we
19       conducted an ongoing monitoring of the elections process
20       at both the county level and at the state level so that
21       we could identify as many of those breakdowns as we
22       could and so that we could make a -- the systemic
23       changes that we needed to make in order to at least
24       reduce the number of mistakes that were made.  And
25       that's why we had, as I said, an ongoing monitoring
```

120

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach — Court Reporters — Video

1  process of -- of everything that -- that happened during

2  that election.

3  Q  Is it possible to eliminate human error in the elections

4  process?

5  A  No.  Not all of human error, certainly.

6  Q  Does your answer include the voter registration

7  application process?

8  A  If you're asking if -- yes, it would include the voter

9  registration process in terms of eliminating all human

10  error.

11  Q  What entities or agencies are responsible for providing

12  the opportunity to apply to register to vote under the

13  NVRA?

14  A  Umm, social service agencies that are designated under

15  NVRA, plus any other designated agencies that the state

16  chooses to designate beyond those agencies that are

17  listed in -- in the NVRA.  And those would -- NVRA lists

18  the Medicaid and food stamps and those kinds of

19  agencies, as well.

20  Q  Driver's license offices?

21  A  Yes.

22  Q  Military recruiting offices?

23  A  Yes, military recruiting offices, driver's license

24  offices, as well.

25  Q  Public libraries?

121

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    A    Umm, public libraries I -- are -- are optional.  I mean,

2         they can be designated by the -- by the state as a voter

3         registration agency.  I don't -- I don't believe that

4         they are designated under the -- specifically under the

5         National Voter Registration Act.

6    Q    If we poured millions of dollars into the -- into NVRA

7         training of all of these employees of these agencies,

8         could you ever eliminate human error in the voter

9         registration application process?

10   A    I think you could eliminate some human error, but

11        certainly not all of it.

12             But let me add that in order to -- to do that,

13        again, you would need to have a monitoring mechanism in

14        place in order to identify where those errors are

15        occurring, so that you could work towards eliminating

16        them.

17   Q    Well, even if you had a monitor, could you ever

18        eliminate human error in the elections process?

19   A    Well, let me -- the answer to that question -- let me

20        first off by saying no, you can't.  But let me also go

21        on by saying that human error covers a lot of different

22        things.  Human error can cover, as I say, transposing

23        numbers off a voter registration form.  It can involve

24        some fairly -- some errors that really have very little

25        impact on the -- on the registration process itself.  Or

123

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach - Court Reporters & Video

1    it could be a series of errors that can have a fairly

2    significant impact on the elections process, depending

3    upon what the error happens to be.

4  Q  Do you know who Deborah Phillips of the Voting Integrity

5    Project is?

6  A  I have met Deborah Phillips.

7  Q  I'm handing you a document marked Exhibit 6.  Exhibit 6

8    is also taken from the Internet.  And it purports to be

9    a newspaper article entitled, "Broken System?," by

10   Geraldine Sealey, S-e-a-l-e-y, dated November 10, 2000.

11   And in the center of the page there's a quote that

12   purports to be from Deborah Phillips.  And the -- and

13   the Exhibit 6 has that quote as "'There's nothing

14   particularly unusual about the type or number of

15   complaints we have been getting,' said Deborah Phillips

16   of the Voting Integrity Project.  'What is unusual is

17   the level of hysteria, which is understandable given the

18   closeness of the vote and what is at stake.'

19       "'Most of the irregularities reported in Tuesday's

20   vote - and in most elections in recent times - can be

21   attributed to human error,' she said.  'We have a very

22   organic system of election in the United States,'

23   Phillips said, 'I think that is by design.'"

24       Do you agree with the quote that is attributed to

25   Miss Phillips in this article that says most of the

123

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1     irregularities reported in Tuesday's vote and in most

2     elections in recent times can be attributed to human

3     error?

4  **A**  No.

5  **Q**  Why not?

6  **A**  Well, because I think that most of the irregularities

7     that came out of the -- and I want to point out that --

8     go back by saying most.  I'm not saying all.  Most of

9     the irregularities that occurred across the country went

10    far beyond human error, so I -- that would be my

11    opinion.

12 **Q**  What kind of errors are you talking about?

13 **A**  I'm talking about equipment that is outdated, voting

14    equipment that is outdated; a reliance on election

15    administrators who do not have the resources to carry

16    out properly their functions and requirements under

17    various Federal and state laws.  I'm talking about a lot

18    of reliance on people to work at the polls, who -- who

19    have to do so 12- to 14-hour days, who get paid a very

20    small wage.

21        I'm talking about states that are -- that -- that

22    do not properly carry out their duties at the state

23    level in order -- in terms of both voter registrations

24    and elections.  I'm talking about local election

25    officials who often are untrained, who have not been

124

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    tested as to their capability of carrying out election

2    functions at their level, what are required of them by

3    state and Federal law.

4          To -- to look at the elections process as a whole,

5    I think to attribute irregularities that were reported

6    in -- in the 2000 elections to just human error is -- is

7    not demonstrating much of an understanding of how the

8    elections process works in this country.

9  Q  Do you know what Miss Phillips means when she says we

10   have a very organic system of election in the United

11   States?

12                     MS. FINEMAN:  Objection.

13                     THE WITNESS:  No, I don't know what

14   she means.

15 Q  (By Mr. MacInnes)  Have you ever heard the term

16   "organic" used in relationship to elections?

17 A  No.

18 Q  Do you agree with the statement attributed to

19   Miss Phillips that says, "There is nothing particularly

20   unusual about the type or number of complaints we've

21   been getting," referring to the November 2000 election?

22 A  I have no idea about the number of complaints that --

23   that the Voting Integrity Project received.  I don't

24   know whether -- I don't know what types of complaints

25   they get normally and whether or not the complaints they

125

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    received in the 2000 election would be unusual or not.

2  Q   Do you agree with the statement attributed -- attributed

3    to Miss Phillips that says, "What is unusual is the

4    level of hysteria, which is understandable given the

5    closeness of the vote and what is at stake"?

6  A   Are you asking do I agree that there was a level of

7    hysteria?

8  Q   Yes, sir.

9  A   Well, "hysteria" is -- is a -- is a pretty strong word.

10    I don't know that "hysteria" would be the word that I

11    would have used, let's put it that way.

12  Q   What word would you use?

13  A   Well, I -- certainly there was a great deal of national

14    attention on the elections process that occurred

15    following the 2000 election.

16  Q   Do you think there was any hysteria following the

17    November 2000 election?

18  A   There were people who were upset about what happened in

19    the 2000 election.  Hysteria -- hysteria means to me

20    that they were hysterical.  And I'm not sure that --

21    while I talked to a lot of voters who were upset, I

22    don't know that I would describe them as being

23    hysterical.  I would -- I would guess it's a matter of

24    semantics.

25  Q   As a director of elections in the state of Washington,

126

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1        did you receive any complaints about the November 2000

 2        election?

 3   A    Personally I received very few complaints regarding

 4        the -- the conducting of the November 2000 election.  We

 5        always will have some complaints regarding the 2000

 6        election -- or any election, I should say, not

 7        referencing the 2000 election.

 8   Q    Are you aware of any complaints that the supervisors of

 9        elections in the state of Washington received following

10        the November 2000 elections?

11   A    Not specifically.  Although, I mean, that's been a

12        couple of years.  We -- we always receive some

13        complaints following an election.

14   Q    Did any of those complaints or complainants complain

15        that they were denied the right to vote?

16                         MS. FINEMAN:  Objection to form.

17                         THE WITNESS:  Yes.

18   Q    (By Mr. MacInnes)  Were those complaints investigated?

19   A    Umm, yes.  In -- in nearly all cases, the complaints

20        were investigated in our state.  If you'd like me to

21        explain that, I could.

22   Q    Sure.

23   A    In our state, if you -- if you come to the polling place

24        to vote and your name is not on the voter registration

25        list, you are given an opportunity to cast a provisional
```

                                                            127

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1  ballot. We are one of the states that has that process.
2  At which time the voter will make -- state their claim
3  that they should be entitled to vote in that particular
4  election. Each of the -- every one of those ballots is
5  eventually investigated. They are presented to a county
6  canvassing board and the decision is made as to whether
7  or not to count that ballot based on the information
8  that we received from the ballot and information that we
9  can ascertain from other records in that office.
10         So those are handled in that particular manner.
11         We always will get some complaints from people
12  that they were wrongfully directed to a different
13  polling location or something like that. And that, too,
14  we will -- we will make an attempt to investigate what
15  had occurred there. But our statewide -- our policy has
16  been to allow people to vote and to investigate any
17  problems or complaints or anything that they had -- and
18  to do that later.
19  Q  Were any of the complaints alleging denial of the right
20     to vote unfounded?
21  A  Umm, let me answer that this way: Whenever we go
22     through that, that process, we will find mistakes made
23     and we will go ahead and count the ballot. In fact, I
24     don't -- don't ask me a percentage of those -- but many
25     of them we do end up counting.

128

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1            Some of the complaints were unfounded.  We were

2      not able to locate a voter registration record or in

3      some -- when I'm saying "we," I should say I'm really

4      referring to our counties.  And there maybe was not a

5      record that could be found or it may have been -- be

6      that the voter had moved without notifying the proper

7      election official, what have you.

8  Q   I'm handing you a document that has been marked Exhibit

9      7.  Did you testify in -- on May 3rd of 2001, before the

10     Senate Committee on Governmental Affairs regarding

11     Federal election practices and procedures?

12 A   Yes.

13 Q   Is Exhibit 7 a copy of your testimony before that

14     committee?

15 A   Umm, it appears to be.

16 Q   Would you please turn to Page 2 of Exhibit 7.

17 A   Uh-huh.  (Witness answers affirmatively.)

18 Q   Am I correct that on Page 2 you are describing the way

19     driver licensing agencies in the state of Washington

20     conduct their responsibilities under the -- under the

21     NVRA?

22 A   Yes.

23 Q   In the first full paragraph on Page 2 you say, "Eligible

24     citizens are offered a near-automatic method of

25     registering to vote."  What do you mean by

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1      "near-automatic"?

2  **A**   Well, we have a simultaneous application process in our

3      state.  We -- without reading verbatim off this

4      report -- have a computer link between -- that links the

5      voter registration -- or driver's licensing data with

6      the voter registration data.

7          We -- one of the things that we did when we

8      designed our system, we noted the fact that almost

9      everything that the driver's license examiner asked for

10     in terms of processing the driver's license application

11     was information that we could use to register that

12     applicant to vote.  We did not want to have to repeat

13     any of the questions that were asked of the voters.  We

14     did not want to have them fill out an additional form.

15     So what we tried to do was to capture the -- the

16     essential information electronically, as best we could,

17     and then simply have the applicant sign a form with what

18     contained an oath stating their qualifications to be a

19     registered voter.

20  **Q**   Does the State of Washington require an original

21     signature on a voter registration application?

22  **A**   Yes, we do.

23  **Q**   So if a person goes into a State of Washington driver's

24     license office, gets a driver's license and also

25     completes a voter registration application, do they

                                                          130

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1       basically have to give two signatures:  One for the

2       driver's license and one for the motor voter

3       application?

4   A   I believe they have to give a separate one for the

5       driver's license one.  And as I mentioned earlier, is

6       what we are attempting -- will be -- I just want to

7       say -- that potentially is what we're going to be

8       looking for in terms of capturing a signature.  But

9       actually, there is an additional signature that is

10      required.  Washington State has a -- the initiative

11      process.  It's a little -- it's a little unusual.  I

12      suppose every state has its little idiosyncracies along

13      the way.  But we also require a signature on an

14      initiative card, which is a perforated card that is used

15      -- is kept separately at the state level for use in

16      capturing -- in identifying -- or comparing signatures,

17      I should say, that are contained on initiative

18      petitions.

19  Q   What is an initiative card or an initiative petition?

20  A   In Washington we have an initiative and referendum

21      process, which enables citizens to enact new legislation

22      or to attempt to amend existing law or can refer acts of

23      the legislature back to the people.  It's a petition

24      process.  The petitions come directly to the Secretary

25      of State's office and they are -- currently -- it's a

131

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1        little difficult to explain, but it's a fairly manual
 2        process.  Now, many counties have digitized their
 3        signatures, and we make use of those signatures in terms
 4        of making signatures -- signature comparisons to the
 5        petition.
 6             By the way, I should say "we" being the Secretary
 7        of State's Office, who I'm technically no longer with,
 8        but haven't gotten over the habit of using the term "we"
 9        when talking about them.
10             But generically, the State of Washington uses
11        those -- those cards to make that signature -- signature
12        comparison.
13    Q   So when a person comes into a State of Washington
14        driver's license office, they're going to require three
15        signatures from them:  One for their driver's license,
16        one for their motor voter registration application, and
17        one for the initiative petition.  Is that correct?
18    A   When we were -- when I was nearing the end of my term,
19        we were getting away from asking for that third
20        signature because of the fact that we were looking at
21        having -- because many -- many of these signatures were
22        now digitized by the counties anyway.  And since it was
23        those -- it was -- the digitized signature that we were
24        using to make the signature comparison, I believe that
25        now they no longer require that third signature and they
```

132

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1        just simply leave it -- if the county is already
 2        digitizing it, then they don't need to worry about it
 3        because that will always be captured in their voter
 4        registration system.  And for those that don't have it,
 5        they simply just make a -- usually these are in counties
 6        that are fairly small and they just merely make a
 7        photocopy of the signature and -- and send it -- and
 8        forward that to us -- to the Secretary of State's
 9        Office.
10   Q    Will a county supervisor of elections in the state of
11        Washington accept an electronic signature on a voter
12        registration application?
13   A    Yes, for the purpose -- for the purposes of what they're
14        going to use it for.  The original signature, even
15        today, in Washington State, is kept, but it's kept only
16        for the purpose of, as I -- and I'm not an expert in --
17        in criminal law, but it is my understanding that in --
18        in criminal law there is still a reliance on an original
19        signature in terms of bringing action against a
20        particular individual.
21             So for the -- the purpose of protecting the
22        integrity of the process, the -- the original signature
23        is kept.  Usually it is kept separately.  In those
24        counties where there -- they did digitize the
25        signatures, they keep them in a box.  They keep them
```

133

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1   someplace they can find them if they need to have it.

2   But the -- the signature that is used to process

3   absentee applications, to compare signatures on local

4   petitions or any of those other kinds of actions, are --

5   are a digitized -- is a digitized signature.

6   Q   Where are these original signatures kept?

7   A   They are kept -- I -- they are kept separately, as I

8       said.  They're usually kept in another file cabinet,

9       another box, depending on the county that that action --

10  Q   They are kept at the county level?

11  A   Yes.

12  Q   Oh, okay.  So do I understand that when you apply for a

13      voter registration -- for voter registration, you still

14      do have to sign an original document?  Is that correct?

15                      MS. FINEMAN:  Object to the form.

16                      THE WITNESS:  Yes.

17  Q   (By Mr. MacInnes)  Do you know if the supervisors of

18      elections in Florida will accept an electronic signature

19      on a voter registration application?

20  A   I -- I do not know.

21  Q   Are you aware of any instances in the state of

22      Washington where a driver's license employee forgot to

23      get a customer's signature on a voter registration

24      application?

25                      MS. FINEMAN:  Object to the form.

                                                        134

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
1                    THE WITNESS:   Yes.

2   Q   (By Mr. MacInnes)   Did that ever occur while you were

3       the director of elections?

4   A   Yes.

5   Q   Did you put a stop to that?

6   A   We certainly attempted to do so, yes.

7   Q   Did you put a stop to it?

8   A   I think to a large degree we have.   One of the things

9       that came up in fact during -- I believe during the

10      questioning during the Senate hearing that we talked

11      about is the -- the fact that over time we were able to

12      minimize -- let me say this -- to reduce the number of

13      those kinds of errors.   We did that in a couple of

14      different ways.

15          One is we had all of the voter registration

16      application forms come directly to the state office, to

17      a state central office.   We examined those applications

18      for any potential error.   If there was a missing

19      signature, a missing data record or something like that,

20      we were the ones at the state level acting under our

21      responsibilities under the NVRA.   In terms of

22      coordinating the programs under NVRA, we were the ones

23      that assumed the responsibility for taking care of those

24      kinds of -- of identifying those kinds of errors and

25      doing everything we could to coordinate with the state
```

135

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    agencies in making sure that those errors, as best we

2    could, did not occur again.

3  Q  Okay.  So when you -- so every voter registration

4    application comes to the Secretary of State's Office

5    for --

6  A  Absolutely.

7  Q  -- for review?

8  A  Again, that is part -- we viewed that as part of our

9    responsibility under NVRA, to make sure that we were --

10   we were carrying out our duties in terms of the

11   coordination responsibilities of NVRA.

12  Q  And when you found a form coming from a driver's license

13   office that was missing a signature or missing some

14   other required information, what did you do about that?

15  A  We contacted the office.  We -- we were the ones that

16   attempted to contact the voters.  We sent them another

17   form.  We did whatever we could to get that signature

18   captured to make sure that that voter was registered.

19  Q  Do you know if -- if in the state of Florida, whether

20   the supervisors of elections are performing that

21   identical process?

22  A  It -- based on the documents that I received, there were

23   some that -- that it appeared from the documents that I

24   received that the supervisors of elections were doing

25   what had -- were doing that in relationship to the

136

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1              offices that were in their particular county.  There did

 2              not seem to be any statewide program at all that

 3              performed that particular function.

 4      Q       Well, do you agree that in the information you looked

 5              at, there were supervisors of the elections in the state

 6              of Florida who were performing that same function of

 7              checking applications and if they found mistakes,

 8              coordinating or going back to both the agency that made

 9              the mistake and going forward to the voter and asking

10              them to fill out a new application?

11      A       Let me -- let me answer that by saying of the

12              counties -- I -- obviously the documents that I received

13              were from some of the counties in Florida.  As I stated

14              earlier, I didn't do an empirical study of this.  I did

15              not look at every county, nor do I have documentation

16              from every county.  It appeared to me from the

17              description, as I understand it from reading the

18              documentation and reading the -- some of the -- of the

19              depositions that I reviewed yesterday briefly, it

20              appeared that supervisors certainly were making attempts

21              to try to resolve problems with applications that they

22              received from driver's license offices within their

23              particular county.

24                   It was not always clear to me that there was any,

25              you know, follow-up to those or anything like that.  I
```

                                                                    137

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1      mean, I do know that they attempted to send registration

2      forms out. At least they stated that was a part of

3      their policy. But there seemed to be no statewide

4      policy as to what they were supposed to do. Maybe there

5      was one and I just didn't get it or didn't review it.

6      But there didn't seem to be any statewide program at all

7      in terms of coordinating how those various kinds of

8      problems that can occur, how they were to be resolved.

9      That was not clear to me from the documents that I

10     reviewed.

11  **Q**  Do you know how many registered voters there are in the

12     state of Florida?

13  **A**  No, I don't.

14  **Q**  Are you saying -- is it your testimony that the State of

15     Florida is doing it wrong by not following the process

16     that you described in the State of Washington?

17  **A**  Wrong in what respect? I don't want to be questioning

18     the questioner here.

19  **Q**  Okay. Are you saying that the system that the State of

20     Florida uses -- that being the supervisors of elections

21     conduct this checking process versus the Secretary of

22     State, that's the system I'm talking about -- does that

23     violate the NVRA?

24  **A**  No, I'm not making that assertion.

25  **Q**  Are you -- are you saying -- are you suggesting that the

138

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1     State of Florida is doing something incorrect by having

2     the supervisors of elections versus the -- the

3     Department of State do that checking function?

4               MS. FINEMAN:  Object to the form.

5               THE WITNESS:  I'm -- let me answer

6     that this way, by saying that, no, I don't believe

7     they're doing anything incorrectly or that any state

8     would be doing it incorrectly by -- by relying on the

9     county officials to perform that function.  I think as

10    long as -- I think that function will work as long as

11    there is a statewide official who is responsible for

12    coordinating all of those activities; if there is a set

13    of agreed-upon procedures for -- that govern that

14    activity; where there is, you know, someone at the state

15    level working with them in a -- in a broad way of

16    identifying what those problems are and how they're

17    being resolved, so that there is some uniformity in that

18    process.

19  Q  (By Mr. MacInnes)  Well, if the -- at the county level

20    in the state of Florida, if the supervisor of elections

21    is that person that is responsible for coordinating --

22    coordinating all of the voter registration checks and

23    balances, if you will, in that county, would that be

24    proper?

25  A  That would be proper for that county.

                                          139

*Byers Anderson Beach - Court Reporters & Video*

1    Q    Why does there need to be uniformity throughout the

2         state of Florida?

3    A    Well, because I -- I -- I think that there -- there --

4         there needs to be some agreed-upon procedures, it seems

5         to me, as to how that process is going to work.  And as

6         you alluded to earlier, that doesn't mean everybody is

7         going to follow it, but it certainly -- there -- there

8         needs to be some -- it seems to me, some statewide

9         coordination over how these various responsibilities are

10        carried out.  That's my own -- my own personal opinion.

11        I think that it's not improper for the counties to do

12        that.  It's not improper for the counties to have those

13        responsibilities.

14   Q    But doesn't your opinion suggest that at least some of

15        the supervisors of elections in counties in the state of

16        Florida are not doing their job?

17                      MS. FINEMAN:  Objection to form.

18                      THE WITNESS:  Umm, actually, no, I

19        don't -- I didn't -- to be honest, in my review of the

20        voter registrations -- documents that I had, the

21        problem, I guess, with your question is that I don't

22        know if they're doing their jobs.

23             And the reason I don't know that is because

24        there's nothing in place -- there is no structure in

25        place that has them report back to anybody as to what

140

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    those problems are and -- at least in the documentation

2    that I have.  There may be something there, but I

3    don't -- I don't -- I couldn't make that conclusion

4    because I don't have any -- the information is not there

5    for anyone to -- to make that kind of conclusion,

6    unfortunately.

7         I think that if there was some sort of monitoring

8    process in place at the -- at the state level, you could

9    certainly demonstrate that they are or they aren't.  I

10   don't -- I don't believe there is enough here to make

11   that -- to come to that particular conclusion.

12   Q   (By Mr. MacInnes)  I believe you told Mr. Lindsay in

13       response to one of his questions that you understood

14       that in Florida the supervisors of elections are

15       constitutionally elected officers.  Is that correct?

16   A   I believe I read that somewhere.  And that -- that seems

17       to conform with my -- with my original understanding was

18       just from passing and being -- my work with elections

19       over the years.

20   Q   And do you know what that -- what impact that fact has

21       on the supervisors' relationship with the Secretary of

22       State and the Division of Elections in the state of

23       Florida?

24   A   I don't know -- no, I don't.  I don't know what impact

25       that has on that particular relationship.  I'm not sure

141

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    that it makes a lot of -- necessarily makes a lot of

2    difference in the National Voter Registration Act, but

3    it might.  I don't know.  But I don't know what their

4    relationship is, so... (Pause.)

5  Q    If I told you that each supervisor of elections in the

6    state of Florida is an independent officer and makes his

7    or her decisions about the way they are going to run the

8    elections process in their respective county, would that

9    change your opinion about having to have a statewide

10    coordinator?

11  A    No, it really wouldn't.  Because I don't think that that

12    particular fact, legal fact, has anything to do with

13    precluding -- would in any way -- let me put it this

14    way -- would in any way preclude the officer designated

15    under Section 10 of the National Voter Registration Act

16    from working with the local supervisors, developing a

17    set of agreed-upon procedures, asking for them to

18    provide reports to the State so that they could monitor

19    the activity, looking at -- making on-site visits to the

20    counties, doing, you know, all of these other kinds of

21    things.  I don't think that that -- that that particular

22    fact, that they don't have any legal authority over

23    them, would preclude them from exercising those kinds of

24    responsibilities in terms of coordinating their duties

25    under the NVRA.

142

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    Q    Well, let's take your opinion, then, to its logical

2         conclusion.  Let's say that you are the statewide

3         coordinator in the state of Florida and you have gone

4         around and looked at how each supervisor of elections is

5         conducting his business.  And you find one that you

6         don't like.  And you say, Change your procedures.  Can

7         you do that in Florida?

8    A    Maybe not.  I'm not sure even in the state of Washington

9         that you could do that.  But that does not preclude you

10        from asking them to do it, nor does it -- nor does it,

11        it seems to me, to -- to at least reduce your

12        responsibility under NVRA to conduct that kind of

13        statewide -- to assume that kind of statewide

14        responsibility.

15   Q    Well, are you suggesting, then, that there should be an

16        informal relationship between the statewide coordinator

17        and the supervisors of elections as opposed to a formal

18        relationship?

19   A    I don't think that the inability to have a formal

20        relationship precludes in any way the ability to have an

21        informal relationship.

22   Q    Do you know that there is not an informal relationship

23        currently between the supervisors of elections in

24        Florida and the Division of Elections in Florida?

25   A    It appears there isn't.  As I said, I'm not -- I think

143

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1      that's unfortunate.

2  Q   I'm sorry.  I didn't hear your answer.

3  A   I said, it does not appear that there is even an

4      informal relationship.

5  Q   But you don't know that -- you don't know that for a

6      fact, right?

7  A   Umm, no, I don't.

8  Q   Okay.  Now, going back to the system that you had in

9      the -- in the state of Washington where you would review

10     -- or your office would review all of the applications

11     and if you found a mistake you would go to the offending

12     agency and talk to them about it.  By using that

13     process, were you able to eliminate mistakes made by

14     those agencies?

15 A   Over the years we certainly have.  We've reduced them

16     greatly.  Obviously, we have not eliminated them.  I'm

17     not sure that anyone would suggest that that's probably

18     even possible.  But we certainly have reduced the number

19     of errors that we have had over the years just simply

20     because of the fact that we had that -- that statewide

21     coordination.

22 Q   If a driver's license agency employee in the state of

23     Washington failed to get a signature on a voter

24     registration application, does that mean that the

25     customer has been denied his or her right to vote?

                                                         144

       *Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach - Court Reporters & Video

```
 1    A    No.

 2                       MR. MacINNES:  The videographer is

 3         telling me that we're at about the time for a break, so

 4         why don't we change tapes.

 5                       THE VIDEOGRAPHER:  We are going off

 6         the record.  The time is 3:13.  This is the end of Tape

 7         2.

 8                       (Recess 3:13 - 3:21 p.m.)

 9

10                       THE VIDEOGRAPHER:  This the

11         beginning of Tape 3.  We are back on the record.  The

12         time is 3:21.

13                       (Exhibit No. 9 marked

14                            for identification.)

15

16

17              EXAMINATION (Continuing)

18         BY MR. MacINNES:

19    Q    Mr. McIntosh, I'd now like to turn to your expert

20         opinion, which I believe is Exhibit 3.  And I apologize

21         if I replow some of the ground that Mr. Lindsay covered

22         with you, but I need to make sure that I covered all of

23         the questions that I need to ask on behalf of my two

24         clients.

25              Were you asked to render an expert opinion on
```

                                                          **145**

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach — Court Reporters & Video

```
 1        voter registration programs under the NVRA conducted in

 2        Florida by the Department of Highway Safety and Motor

 3        Vehicles or the Department of Children and Families?

 4   A    Yes.

 5   Q    What is your opinion as to how the Florida Department of

 6        Highway Safety and Motor Vehicles conducted their

 7        responsibilities under the NVRA?

 8   A    I don't believe that I had any specific comments in the

 9        report that I'm -- that I can recall that addressed

10        anything -- anything specifically with the motor vehicle

11        department, other than my comments on the electronic

12        transfer of data and the desirability to have that.

13   Q    Well, in your expert report, Exhibit 3, you do make some

14        negative comments about the Department of Children and

15        Families.  Can I assume from the absence of comments

16        about the Department of Highway Safety and Motor

17        Vehicles, that you are satisfied or pleased with their

18        performance under the NVRA; the Highway Safety, that is?

19   A    Based on the material that I had reviewed so far, I

20        would say that I was satisfied that -- with what they

21        had done.

22   Q    Are you going to be looking at more materials and

23        conducting further studies with regard to the Department

24        of Highway Safety and Motor Vehicles in this case?

25   A    I don't know.
```

146

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1  Q   Did you review any Department of Highway Safety and

2      Motor Vehicle documents that describe that agency's

3      voter registration application procedures when you were

4      conducting your study?

5  A   Umm, I believe I did.  If you -- if you would like, I

6      could just take a moment to review --

7  Q   I don't need specifics.

8  A   Okay.  Yes, without getting into specifics, yes, I think

9      I had a fairly good understanding of how the process

10     worked based on my review of the material that I -- that

11     I had available.

12 Q   I'm sorry.

13         Do you recall if the Department of Highway Safety

14     and Motor Vehicles is doing anything -- with regard to

15     voter registration, that is -- that goes beyond what the

16     NVRA requires?

17 A   There was reference to a declination form that was used

18     in the Department of Licensing -- Department of

19     Licensing Office.  It was not clear to me exactly how

20     that part of the process worked.  But it appeared as if

21     there was some sort of a -- an opportunity similar to

22     what you would have in your social service -- within

23     your social service agencies that had the applicant fill

24     out or there was some record made of a -- of a -- of a

25     decline.

147

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1      The only thing I would state here is that based on

2   my understanding of the NVRA, there is not a -- there is

3   no declination that is required under NVRA.  So if there

4   is something along that line that -- that has them go

5   through some sort of declination procedure, that would

6   certainly be something that would be beyond what would

7   be required under NVRA.

8   Q   Now, the documents that you did review on behalf of both

9       the Department of Highway Safety and Motor Vehicles and

10      the Department of Children and Families, were all of

11      those documents provided to you by your counsel?

12  A   Yes.

13  Q   Did you go out on your own and look for any other

14      documents, other than what was provided to you by your

15      counsel?

16  A   No.

17  Q   All right.  Do you recall if your counsel provided you

18      with any information on the receipt that the Department

19      of Highway Safety and Motor Vehicles gives to its

20      customers when they come in and apply to register for --

21      to vote?

22  A   Yeah, I believe there was reference to that.  I -- I

23      don't know if that was before 2000 or after or whatever.

24      That was another thing that was somewhat -- a little

25      confusing.  Some of the material I read was undated.

148

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1      But I do recall reference to a receipt, yes.

2  Q   And now, was a receipt required by the NVRA?

3  A   My understanding would be that it is not.

4  Q   Now, did you render an opinion as to the Department of

5      Children and Families?

6  A   Yes.

7  Q   And is the entirety of that opinion contained in Exhibit

8      3?

9  A   Yes.

10 Q   What is the date of that opinion?

11 A   Of Exhibit 3?

12 Q   Yes, sir.

13 A   April 26th, 2002.

14 Q   Did you conduct a study into the Florida Department of

15     Children and Families' NVRA program in order to render

16     your opinion?

17 A   No.  I think "a study" is a strong word.  I reviewed

18     the -- the documents that -- that were made available to

19     me.

20 Q   Only those documents given to you by your counsel?

21 A   In terms of Florida's -- Florida agencies, yes.

22 Q   And once again, you didn't go outside those documents at

23     all in forming your opinion as to whether the Department

24     of Children and Families in Florida is satisfying its

25     obligations under -- strike that.

149

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1        You didn't -- in rendering -- strike that

2    question.

3        In rendering your opinion as to the Department of

4    Children and Families, you did not consult anything

5    other than the documents provided you by counsel?

6                MS. FINEMAN:  Object to the form.

7                THE WITNESS:  No.  No, I didn't.  I

8    did obviously already have things like copies of the Act

9    and the implementation guide, but those did not speak

10   specifically to Florida, obviously.

11   Q  (By Mr. MacInnes)  Now, with regard to your first

12   opinion on Page 3 of your expert opinion you say, "It

13   appears that in Florida some offices providing services

14   through the Department of Children and Families were not

15   always offering the opportunity to register to vote to

16   all clients, as prescribed in the National Voter

17   Registration Act."  Is that correct?

18   A  Yes.

19   Q  And I believe in response to Mr. Lindsay's line of

20   questioning, you said that in forming that opinion, you

21   relied on two documents.  One was a January 8th, 2002,

22   memorandum from Carol Canaday regarding voter

23   registration procedures, and the other -- well, let me

24   do it this way.

25        I'm handing you what has been marked as Exhibit 8.

                                                           150

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1        Did you rely on this document in forming your opinion on

 2        Page 3?

 3   A    Yes.

 4   Q    And Exhibit 8 is, for the record, the January 8th, 2002,

 5        Carol Canaday memorandum; is that correct?

 6   A    Yes.

 7   Q    I'm handing you what is Exhibit 9.  Do you recognize

 8        that document?

 9   A    Yes.

10   Q    And what is Exhibit 9?

11   A    Exhibit 9 is an attachment of some kind, titled

12        Attachment -- Attachment A.  It contains an E-mail

13        message from a Norene Moore to Greg Ferguson with a CC

14        to Janice Miller.  Following that there is a reply

15        separator and a message from Greg Ferguson.

16   Q    Now, are these the only two documents that you relied

17        upon in forming your opinion that appears on Page 3 of

18        Exhibit 3?

19   A    Yes.

20   Q    Do you know who Carol Canaday is?

21   A    On Exhibit -- in Exhibit 8, on Exhibit 8, she is

22        identified as the senior human service program

23        specialist.

24   Q    Do you know where she's located?

25   A    The letterhead seems to indicate that it came from
```

151

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    Tampa, Florida.

2  Q   Do you know if she has statewide responsibilities or

3      something less than statewide responsibilities?

4  A   I have no idea what this -- what this senior human

5      services program specialist responsibilities are in the

6      state of Florida.

7  Q   Did you interview Carol Canaday regarding this memo?

8  A   No, I did not.

9  Q   Do you know what office Carol Canaday works in?

10  A   The -- again, referring to the letterhead, it's from the

11      Florida Department of Children and Families.

12  Q   But you don't know which office within DCF she works?

13  A   No.  There -- the only thing that is at the bottom of

14      the page, it refers to a -- to a Sun Coast Region.

15  Q   Do you know where -- where the Sun Coast Region is?

16  A   No.

17  Q   Do you know how many service centers were not following

18      the correct procedures for voter registration

19      requirements in that memorandum?

20  A   How many there were?

21  Q   Yes, that's correct.

22  A   That were not following it?

23  Q   Right.

24  A   No.  I just know based on at least this memorandum that

25      one of them were.

152

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1  Q  Do you know how many offices are in the Sun Coast

2     Region?

3  A  No, I do not.

4  Q  Do you know what voter registration procedures Carol

5     Canaday is talking about in that memorandum?

6  A  Well, I -- I did review a set of procedures that were

7     used to train DCF personnel.  I would presume without --

8     not having talked to Carol Canaday about the memo, that

9     she would be referring to those -- to those procedures

10    in some manner.

11 Q  But you don't know what procedures this document refers

12    to, do you?

13 A  If it's something other than the procedures that they

14    are to follow in terms of processing voter registration

15    applications, no.

16 Q  I mean, are you assuming from that memorandum that they

17    were not following any voter registration procedures?

18 A  No.  I would assume from this memorandum, based on

19    the -- what is referred -- based on what is stated in

20    the second sentence, that the particular issue that she

21    was speaking to was the fact that all clients were not

22    being offered the opportunity to register to vote.

23 Q  Do you know how long these procedures, whatever they

24    were, had not been followed?

25 A  No, I do not.

153

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
1   Q   So you don't know if it was months, weeks, or days?

2   A   No, I don't.

3   Q   Do you know if the procedures were corrected?

4                   MS. FINEMAN:  Objection to form.

5                   THE WITNESS:  No, I don't.

6   Q   (By Mr. MacInnes)   Did you visit any of the DCF offices

7       in Florida when you were preparing your opinion?

8   A   No.

9   Q   Did you make any telephone calls to DCF offices in

10      Florida when you were arriving at your opinion?

11  A   No.

12  Q   Did you conduct any interviews of DCF employees when you

13      were arriving at your opinion?

14  A   No.

15  Q   Did you interview Joanna Clark in arriving at your

16      opinion?

17  A   No.

18  Q   Do you know who Joanna Clark is?

19  A   I believe she's one of the defendants.

20  Q   Defendants?

21  A   I -- I don't remember.  I -- I know that her -- the

22      question of her record came up in the -- in the

23      deposition yesterday.  There was some sort of a problem

24      with her registration.  I just happen to remember -- I

25      think that was her name.
```

154

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

```
 1   Q   Did you interview Candy Walls in arriving at your
 2       opinion?
 3   A   No.
 4   Q   Did you interview any of the named plaintiffs in
 5       arriving at your opinion?
 6   A   No.  And I'm sorry, I should have said plaintiff
 7       earlier.
 8   Q   Other than the documents provided to you by counsel --
 9       strike that.
10           Other than the two pieces of paper I've handed
11       you, Exhibit 8 and Exhibit 9, did you rely on any other
12       source of information in reaching your conclusion or
13       your opinion as to DCF?
14   A   No.
15   Q   Do you know how the Florida Department of Children and
16       Families conducts its responsibilities under the NVRA?
17                   MS. FINEMAN:  Objection to form.
18                   THE WITNESS:  I have reviewed
19       training materials, various documents that, again, I
20       have listed in the report that I believe contained some
21       of the procedures that were to be followed in terms of
22       processing applicants for the purpose of giving them an
23       opportunity to register to vote under NVRA.
24   Q   (By Mr. MacInnes)  Did you see anything in those
25       training materials that was illegal?
```

155

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1           MS. FINEMAN:  Objection to form.

2           THE WITNESS:  No.

3    Q    (By Mr. MacInnes)   Did you see anything in those

4         training materials that violated the NVRA?

5    A    No.

6    Q    Do you have -- do you understand how Florida Department

7         of Children and Families actually goes through the voter

8         registration application process with a client?

9    A    I think I have a fairly basic understanding -- good

10        understanding of that based on the -- on the way at

11        least they are supposed to under the -- under the

12        procedures, but the process would be for them to -- to

13        invite or to give the opportunity for a client to

14        register.

15   Q    Now, this is based upon the training materials?

16   A    Yeah, it's based on the training materials.  I believe

17        there were actually -- one of the documents actually had

18        some procedures in it that talked about what the

19        responsibilities were for these offices to conduct

20        their -- or to carry out the responsibilities under the

21        NVRA.

22   Q    Now, when you said in response to my question just a

23        moment ago you have a basic understanding of the way

24        they are supposed to do their obligations, are you

25        implying that they are not following the training

156

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    materials?

2  **A**  I don't know whether they're following them or not.

3  **Q**  Now, you told Mr. Lindsay this morning that you do

4    consider yourself an expert on the NVRA; is that

5    correct?

6  **A**  I consider -- I do think I have a -- a -- certainly a

7    very, very strong knowledge and background in NVRA and

8    would feel very comfortable in testifying to anything

9    that -- that would come under the -- that Act.

10  **Q**  Are you testifying here today as an expert on the NVRA?

11  **A**  Yes.

12  **Q**  Under the NVRA, to whom must the Florida Department of

13    Children and Families offer the opportunity to apply to

14    register to vote?

15  **A**  The applicants who apply for services in their -- in

16    their particular agencies, any recertification, change

17    of address, any contact that they would -- they would

18    have that would cause them to come into that office

19    to -- to seek whatever services that agency provides.

20  **Q**  "Whatever services that agency provides," is that what

21    you said?

22  **A**  Yes.

23  **Q**  So is it your testimony today that DCF has a

24    responsibility, under the NVRA, to offer the opportunity

25    to apply -- to register to vote to every client they

157

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1   have who comes in for any service they provide?  Is that

2   correct?

3   **A**   Well, not necessarily every client.  There are some

4   clients that would obviously need -- would -- would --

5   for one reason or another would not be qualified to be a

6   registered voter.  But the opportunity as -- I believe

7   under the Act is that they are to have a process in

8   place that is to be an integral part of the application

9   process for their services at whatever agency comes

10   under their purview.

11   **Q**   And that's -- that opinion is based upon the fact that

12   you're an expert in NVRA; is that correct?

13   **A**   Well, it's not entirely based on that.  It is based on

14   my understanding of the NVRA, as I said in -- not on my

15   knowledge of the NVRA, but also having been involved in

16   the implementation of the NVRA in a state.  I do believe

17   that I certainly have -- am in a position to offer

18   opinions, as I stated earlier, on the National Voter

19   Registration Act.

20   **Q**   So let me make sure I understand you correctly.  It's

21   your testimony today that DCF must offer an opportunity

22   to apply to register to vote to all of its customers for

23   all of its services?

24                    MS. FINEMAN:  Objection to form.

25                    THE WITNESS:  If there are services

158

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1   that are not covered under the Act, then they would not

2   be, but in terms of those services that are required

3   under the Act, they would be required to give that

4   opportunity to register.

5       Now, in our state there are very few that offer

6   services outside of -- of what is in the Act.  But I

7   don't know about Florida.  There may be things that --

8   for example -- well, without getting into an example --

9   but there may be -- there may be a service that would be

10  offered by a particular agency that is not covered under

11  the Act.  The Act covers not just the agency, but it

12  covers the service that the agency provides so that if

13  there are people seeking those specific kinds of

14  services, then they would be required to be given an

15  opportunity to -- to register.

16  **Q**  (By Mr. MacInnes)  Thank you.  And that's what I'm

17  trying to get at.  Under the NVRA, what services require

18  or trigger motor voter responsibilities for DCF in

19  Florida?

20  **A**  I mean, I could go back and read them.  But I could tell

21  you off the top of my head:  Medicaid services, services

22  that are provided under the WIC program, food stamps,

23  disabilities.  Also we have military, as we alluded to

24  earlier.

25  **Q**  I'm only talking about DCF.

159

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    A    Well, presuming if -- that's not under DCF, but those

2         are examples.  Medicaid, I guess, is another one where

3         they would be required to provide an opportunity to

4         register.

5    Q    Is it true that under the NVRA, all offices in the state

6         that provide public assistance, that would -- that would

7         trigger motor voter responsibilities?

8    A    Yes.

9    Q    Is it true that under the NVRA, offices that provide

10        services to persons with disabilities would have motor

11        voter responsibilities?

12   A    Yes.   Yes.

13   Q    Aside from those two things, public assistance and

14        persons with disabilities, does the NVRA require

15        services be provided to any other category of client?

16   A    Well, I mean, I could get the NVRA out and I could

17        review that, if you'd like.

18   Q    Please.   Turn to Section 1973gg-5.

19   A    (Witness complies.)   Yes.   Okay.   I have 1973gg-5 in

20        front of me.

21   Q    Have you had an opportunity to review it?

22   A    Sure.   I've read it many times.   But it says each state

23        shall designate -- would you like me to read it?   I'm

24        sorry.

25   Q    No, if you could just -- you can either read it or just

160

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    tell me in your own words to whom DCF has motor voter

2    responsibilities.

3  **A**  To those offices in the state that provide public

4    assistance and all offices in the state that provide

5    state-funded programs primarily engaged in providing

6    services to persons with disabilities.

7  **Q**  All right.  Now, public assistance means money, does it

8    not?

9  **A**  I think generally that is the interpretation that states

10    have given to that particular provision.

11  **Q**  Does the Florida Department of Children and Families

12    have any customers to whom it does not owe any

13    responsibilities under the NVRA?

14  **A**  I don't know because I don't know what all of the

15    responsibilities are for the Department of Children and

16    Family Services in Florida.  There may be -- there's a

17    possibility, I would suppose, that there are offices

18    that they have or services that they provide that are

19    not public assistance and would be considered public

20    assistance and I -- or would be offices that are not

21    engaged in providing state-funded programs, but

22    providing services to persons with disabilities.

23  **Q**  Well, if a person -- let me state it this way.

24    Does the NVRA require DCF to offer the opportunity

25    to register to vote to clients who come in to apply for

**161**

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1   foster care?

2   A   I would say probably under NVRA that they -- that they

3       don't.  And there may a number of -- numerous other

4       examples of -- of those kinds of services.

5   Q   Does the NVRA require DCF to offer the opportunity to

6       register to vote to clients who come in to apply for

7       guardianship?

8   A   Umm, I know that in our state, we did not have a program

9       in place to do that.  But I would not, you know, I

10      guess, form some sort of legal conclusion as to whether

11      or not -- I imagine there are going to be other examples

12      given here.  I think each state has to first off decide

13      for itself what those agencies are.  I don't think -- I

14      think there is a reason that NVRA specifically

15      designates what those offices are in more a general way.

16          But, again, I guess I would rely on the verbiage

17      of the Act.  And I think each state has to make a

18      determination as to whether or not a service that is

19      provided by their state would be included in the

20      categories that are in the National Voter Registration

21      Act.

22  Q   Well, you're holding yourself out as an expert on NVRA

23      and I'm asking you the question, does the NVRA require

24      DCF to offer the opportunity to register to vote to

25      clients who come in to apply for guardianship?

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1              MS. FINEMAN:  Objection.

2              THE WITNESS:  I don't know what

3     kinds of services are included in providing

4     guardianship.  But my answer to that would be, because

5     I'm -- while I might be familiar with the NVRA, I am not

6     purporting to be an expert on the guardianship program

7     in the state of Florida.  I would say if the

8     guardianship program in the state of Florida is one that

9     involves providing public assistance or involves in some

10    way providing state-funded programs engaged in providing

11    services to persons with disabilities, then it would; if

12    it doesn't, then it would not.

13  Q   (By Mr. MacInnes)  Is there anything in the NVRA that

14    says if we provide -- if a person comes in for

15    guardianship, they must be offered the opportunity to

16    register to vote?

17  A   Guardianship is not a term that's used in that section

18    of NVRA.

19  Q   Well, since we've determined that foster care is not a

20    service for which the -- that triggers motor voter

21    responsibilities --

22  A   Well, let me clarify that, again, by stating that,

23    again, if there is -- if there is nothing in the foster

24    care program that would involve either providing public

25    assistance or services -- or the implementation of

                                                        163

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1   state-funded responsibilities for people with

2   disabilities, then it would not -- it would not be a --

3   it would not be required to offer those services.

4       Again, I am not a -- an expert on the foster care

5   program in the state of Florida.

6   **Q**   Well, your expert opinion says that -- and I'm talking

7   about the bottom of Page 3 and the top of Page 4, "It

8   appears that in Florida some offices providing services

9   through the Department of Children and Families were not

10  always offering the opportunity to register to vote to

11  all clients, as prescribed in the National Voter

12  Registration Act."

13      And yet I believe you've testified just recently

14  here that perhaps in Florida not all clients are -- are

15  required to be given voter registration application

16  forms.  Is that correct?

17  **A**   That may be.

18  **Q**   So your opinion, then, at the top of Page 4 is

19  incorrect, is it not?

20  **A**   Well, I -- I -- again, I would not -- without getting

21  into the semantics of it, I think obviously I was

22  referring there to clients who were to be given the

23  opportunity to -- to vote under -- as prescribed by the

24  National Voter Registration Act.  That is the language

25  that I used at the end of that sentence.

**164**

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach – Court Reporters & Video*

1    If was not prescribed by the National Voter

2    Registration Act, then they would not be clients who

3    would be required to be given an opportunity to

4    register.  If it was in an agency where they -- where

5    the activity was prescribed by the National Voter

6    Registration Act, then they would be required to be

7    given that opportunity.

8         And that would be my testimony that based on the

9    review of the documents, that the clients who were to be

10   given an opportunity were not always -- apparently were

11   not always given that opportunity.

12   Q   So you're not trying to tell the Court in -- in this

13   Exhibit 3 that all clients in the State of Florida

14   Department of Children and Families are required to

15   receive motor voter assistance?

16                 MS. FINEMAN:  Objection to form.

17                 THE WITNESS:  Again, I am not

18   purporting to be an expert on the programs that are

19   administered by the Department of Children and Family

20   Services -- Children and Families, I guess.  I am

21   stating, however, that certainly with -- in terms of

22   those programs where it is required, it is required in

23   terms of public assistance agencies and, again, dealing

24   with agencies that deal with disabilities, that it would

25   be -- that those clients are -- are required to be given

165

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach – Court Reporters & Video*

1   that opportunity.

2   Q   (By Mr. MacInnes)  And only those clients, right?

3   A   Yes.

4   Q   Which -- which offices in Florida were not always

5   offering the opportunity to register to vote to all

6   clients?

7                         MS. FINEMAN:  Objection to form.

8                         THE WITNESS:  The only ones that

9   I -- the ones that I get -- the only ones that I --

10  again have are the ones that are referenced in these

11  particular exhibits.  I do not know from reading these

12  exhibits which ones were specifically being referred to.

13  Although, it is -- it does refer to procedures for voter

14  registration requirements, which would indicate that

15  there was some sort of requirement that would carry out

16  the voter registration function.

17  Q   (By Mr. MacInnes)  Did you make any attempt to find out

18  which offices were not doing so before you rendered your

19  opinion?

20  A   No.

21  Q   Do you know how many DCF offices there are in Florida?

22  A   No.

23  Q   Do you know how many were not offering clients the

24  opportunity to register to vote?

25  A   No.

166

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach - Court Reporters & Video

1    **Q**    Do you know what percentage of all DCF offices in

2         Florida were not offering clients the opportunity to

3         register to vote?

4    **A**    No.

5    **Q**    So you don't know whether it was one percent or a tenth

6         of a percent or even less than that, do you?

7    **A**    No.  I think it would be difficult to -- to ascertain

8         that basically because there was -- again, there were no

9         statewide reporting requirements under the Act.  So it

10        was difficult to make any kind of a determination along

11        that -- along that line.

12    **Q**    When were those offices not offering the opportunity to

13        vote -- register to vote?

14    **A**    Well, at least it must have been sometime prior to

15        January -- January 8th, 2002, under the Canaday memo

16        or -- and also the dates of the other one -- other

17        E-mails that are referenced were August 27th and August

18        29th.

19    **Q**    And do you know for what period of time those offices

20        were not offering the opportunity to register to vote?

21    **A**    No, I do not.

22    **Q**    Did you make any attempt to find out when those offices

23        were not doing so before you rendered your opinion?

24    **A**    No.

25    **Q**    Did you do any statistical analyses before coming to

167

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    your opinion that some DCF offices in Florida were not

2    offering clients the opportunity to register to vote?

3  **A**   No.

4  **Q**   Would you please turn, now, to Page 4 of your report,

5    which is Exhibit 3.

6  **A**   Uh-huh.  (Witness answers affirmatively.)

7  **Q**   You refer to the last sentence in Paragraph 2, which

8    says, "In Florida it appears that no one was granted

9    statewide authority or exercised statewide leadership in

10   the development of various programs established by the"

11   NVRA.  Do you see that language?

12 **A**   Yes.

13 **Q**   Does the NVRA require one person to have statewide

14   authority or to exercise statewide leadership in the

15   development of various programs established by the NVRA?

16 **A**   The language of the NVRA is that the states are required

17   to designate a state officer or the -- or employee as

18   the chief state election official to be responsible for

19   coordination and state responsibilities under the Act.

20 **Q**   And what's the cite to that?

21 **A**   1973gg-8.

22 **Q**   Does the NVRA require one person to have statewide

23   authority or to exercise statewide leadership over the

24   Department of Children and Families in the development

25   of various programs established by the NVRA?

168

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1                MS. FINEMAN:  Objection to form.

2                THE WITNESS:  I think that -- that

3    the Act would require that someone be responsible for

4    coordinating the activities, not just of DCF, but of all

5    activities required under the Act for that -- for that

6    state.

7    Q    (By Mr. MacInnes)  Well, within -- the question is:

8    Within DCF, does the Act require someone to act as a

9    statewide authority or exercise statewide leadership

10   over just DCF -- DCF?

11   A    No.

12   Q    Same question as to the Department of Highway Safety and

13   Motor Vehicles.

14   A    The Act does not require anybody specifically within

15   those agencies to perform that function.

16   Q    Could the Florida Department of Children and Families

17   use a decentralized approach to its NVRA

18   responsibilities, allowing its DCF districts to

19   establish their own respective NVRA programs and still

20   be in compliance with the NVRA?

21               MS. FINEMAN:  Objection.

22               THE WITNESS:  I would suppose they

23   could.

24   Q    (By Mr. MacInnes)  Would you please turn to Paragraph 3

25   on Page 4 of your report.  The last sentence says,

169

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    "Florida's agency based voter registration programs may

2    be hampered by its reliance on paper forms."

3            Do you see that language?

4    **A**   Yes.

5    **Q**   Specifically, what Florida agencies were you referring

6    to in that sentence?

7    **A**   Umm, I was -- in that sentence I was -- I was referring

8    to all of them.  That would include agencies both under

9    DCF as well as the Department of Motor Vehicles --

10   Highway Safety and Motor Vehicles.  Sorry.

11   **Q**   Does the NVRA prohibit the use of paper forms by

12   agencies in carrying out their NVRA responsibilities?

13   **A**   No, it does not.

14   **Q**   Would you please refer to the first sentence on Page 9

15   of your report where you say, "The State of Florida

16   through their Department of Highway Safety and Motor

17   Vehicles and the Department of Children and Families

18   still relies heavily on paper forms."

19           Do you see that language?

20   **A**   Yes.

21   **Q**   Does the Florida Department of Highway Safety and Motor

22   Vehicles rely heavily on paper forms in

23   administrating -- in administering its NVRA

24   responsibilities?

25   **A**   In my opinion, it does because the electronic data is

170

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    printed out on a paper form, which then is forwarded to

2    the supervisor of elections.

3  Q    Is there anything improper about that?

4                        MS. FINEMAN:  Objection.

5                        THE WITNESS:  Maybe you could

6    define -- give me a little more clarification.  Is there

7    anything "improper"?

8  Q    (By Mr. MacInnes)  Okay.  Does the NVRA prohibit that?

9  A    No.

10  Q    When you say the Department of Highway Safety and Motor

11    Vehicles relies on paper forms, do you mean information

12    going to the respective supervisor of elections?

13  A    What I'm referring to there is -- it was my

14    understanding, from reading through this -- this

15    process, that the data elements for voter registration

16    are printed onto a -- onto a form which the applicant

17    signs.  That form is then sent on to the supervisor of

18    elections.  There seemed to be some sort of a batch

19    process by which that -- that took place.  I would --

20    what the county supervisor of elections does at that

21    point I would imagine would vary from county to county.

22    But that still is a piece of paper that is being

23    transmitted to the supervisor of elections, and that is

24    what I was referring to in -- in this particular

25    section -- this particular paragraph.

171

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach - Court Reporters & Video

1  Q  The "piece of paper" being the voter registration

2     application?

3  A  Yes.

4  Q  Do you know --

5  A  The printed -- whatever the printed piece is that comes

6     off of the -- the printer.  I got a full description of

7     that process yesterday in one those depositions which

8     talked about that process.

9  Q  And do you know why the Florida Department of Highway

10    Safety and Motor Vehicles uses that procedure?

11 A  I would imagine it's based on a policy that they decided

12    to implement at some point in time after the enactment

13    of NVRA.

14 Q  That they decided to implement?

15                        MS. FINEMAN:  Objection to form.

16                        THE WITNESS:  I don't know who

17    decided to implement it.  It may have been them or it

18    may have been some -- I don't know.  It's not clear to

19    me.

20 Q  (By Mr. MacInnes)  Well, if an original signature is

21    required on a motor voter application --

22 A  Uh-huh.  (Witness answers affirmatively.)

23 Q  -- wouldn't they have to send a paper form to the

24    supervisor of elections?

25 A  They wouldn't have to send a paper form that contains

172

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byels Anderson Beach - Court Reporters & Video*

1   all of the data elements of the -- that are needed to

2   register that particular applicant to vote.  They could,

3   for example, down -- download the data elements onto a

4   machine-readable format and then electronically transfer

5   that data, along with the signature, and that would give

6   the opportunity for the county to download that

7   information directly onto their voter registration

8   system; do whatever they wanted to do with the

9   signature; scan it, file it, do whatever.

10       And that would not preclude them from -- from

11   taking that electronic -- that -- the voter registration

12   data -- what I mean by that is the name, the address, in

13   your -- in your state, political party preference -- we

14   don't have that in Washington -- but date of birth,

15   residence, all of those things -- all of those things

16   that you need for voter registration.  They could still

17   capture that on -- electronically and forward it

18   electronically on to the county.

19  Q   So is what you're stating here just a nice-to-have

20   system or is it required by some law?

21                     MS. FINEMAN:  Objection to form.

22                     THE WITNESS:  It's not required,

23   certainly, under NVRA.

24  Q   (By Mr. MacInnes)  That's just the way they do it in

25   Washington, right?

173

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1          MS. FINEMAN:  Objection to form.

2          THE WITNESS:  Umm -- sorry -- umm,

3     that is how we do it here.  It is my understanding

4     that -- I mean, there are -- let me answer it just by

5     saying that is how we do it here.

6  **Q**  (By Mr. MacInnes)  But in the state of Washington, a

7     person applying at a driver's license office does have

8     to sign an original signature, correct?

9  **A**  Yes.

10 **Q**  In the state of Washington does a person applying to

11    register to vote in a public assistance office have to

12    sign a paper voter registration application?

13 **A**  Yes, they do.

14 **Q**  Why is that?

15 **A**  Because we do not have, in the state of Washington, a

16    means for electronically transmitting that data to -- to

17    the State.  Again, our forms and our applications all

18    come through the State -- to the Secretary of State's

19    Office.  The only state that I'm aware of that has a

20    system for electronically transferring data from social

21    service offices is the state of Kentucky.

22 **Q**  How many supervisors of elections are in the state of

23    Washington?

24 **A**  39.

25 **Q**  How many supervisors of elections are in the state of

                                                         174

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byer, Anderson Beach - Court Reporters & Video

```
 1        Florida?

 2    A   I don't know.

 3    Q   How many driver's license offices are in the state of

 4        Washington?

 5    A   I don't know the answer to that either.

 6    Q   How many driver's license offices are in the state of

 7        Florida?

 8    A   I don't know.

 9    Q   How many public assistance offices are in the state of

10        Washington?

11    A   I don't know.

12    Q   How many public assistance offices are in the state of

13        Florida?

14    A   I don't know.

15    Q   Do you know if all of the supervisors of elections

16        offices in the state of Florida have computer systems

17        that are compatible with the Department of Children and

18        Families' computer systems?

19                       MS. FINEMAN:  Objection to form.

20                       THE WITNESS:  I don't know.

21    Q   (By Mr. MacInnes)  Would you please turn to Page 6 of

22        your report.  I'm referring to the first full paragraph

23        of that report, which reads, "It appears that Florida in

24        their Department of Children and Families" --

25    A   I'm sorry.  I'm off.  Page 6?
```

175

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1   **Q**   Page 6.

2   **A**   I'm sorry.  I was a page ahead of you.

3   **Q**   Page 6, first paragraph.

4   **A**   I'm sorry.

5   **Q**   "It appears that Florida in their Department of Children

6        and Families (DCF) uses a separate 'preference form.'

7        However, it is important to note that when using a

8        separate form, it is still important that such a form be

9        used as an 'integral' part of the agency's application

10       process.  For example, it would not suffice for an

11       agency to simply have declination forms and voter

12       registration applications made available on a counter

13       for public distribution."

14            Does the NVRA prohibit the use of a voter

15       preference form?

16                      MS. FINEMAN:  Objection to form.

17                      THE WITNESS:  It doesn't prohibit

18       it.  In fact, I would argue that it would require some

19       sort of a declination form or preference form for social

20       service agencies and designated agencies under NVRA.

21   **Q**   (By Mr. MacInnes)  Do you have any evidence that the

22       Florida Department of Children and Families does not use

23       the voter preference forms as an integral part of its

24       voter registration application process?

25   **A**   Based on my review of the documents, it is certainly a

176

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    form that is required to be filled out by a client when

2    they are seeking services that are covered under the

3    National Voter Registration Act.

4  Q  Well, that's not my question.  My question is:  Do you

5    have any evidence that the Florida DCF does not use the

6    voter preference form as an integral part of its voter

7    registration application process?

8  A  Well, as I stated earlier, there were occasions,

9    apparently, when they did not in -- invite clients to --

10    to -- to register, which I would -- I don't know how

11    that involved the preference form at all.  If there were

12    not -- if those offices were not using -- or were not

13    giving an opportunity for clients to fill out a

14    preference form, then they would be in violation; if

15    they are, then they would not -- then they would be --

16    they would be in compliance if they were giving them

17    that opportunity.

18  Q  Now, the -- what evidence gave you that --

19  A  Again, the -- I'm sorry.  It was the two documents that

20    I referred to earlier.

21  Q  Exhibits 8 and 9?

22  A  Yes, I believe those were the -- were the documents.

23  Q  Do you have any other evidence, other than Exhibits 8

24    and 9, that -- that lead you to believe that Florida

25    Department of Children and Families does not use the

177

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    voter preference form as an integral part of its voter

2    registration application process?

3  A  No.

4  Q  In the last sentence of the first full paragraph of Page

5     6 of your report, it says, "For example, it would not

6     suffice for an agency to simply have declination forms

7     and voter registration applications made available on a

8     counter for public distribution."

9          Do you see that language?

10 A  Yes.

11 Q  And what's your authority for saying that?

12 A  Again, my -- my knowledge of -- of NVRA and the

13    requirements of NVRA to -- to have the declination forms

14    and the voter registration -- the declination form and

15    the voter registration application process to be an

16    integral part of the application for services.

17 Q  Is there anything in NVRA that prohibits having

18    declination forms and applications sitting out in public

19    access?

20 A  It doesn't prohibit it, no.  But certainly merely doing

21    that would not put a -- an agency that is covered under

22    the Act in compliance with their responsibilities under

23    the Act.

24 Q  Well, isn't your assumption there that by having the

25    preference form and the application sitting out in a

178

*Byers Anderson Beach - Court Reporters & Video*

1    public area, that the employees are not also using those

2    forms as an integral part of the application process?

3                          MS. FINEMAN:  Objection to form.

4                          THE WITNESS:  They may or they may

5    not be.  I don't know.

6    Q    (By Mr. MacInnes)  Do you have any evidence that Florida

7    DCF merely puts out voter preference forms and voter

8    registration applications and does not use them as an

9    integral part of their application process?

10   A    I don't -- as I stated earlier, I don't -- I don't -- I

11   didn't have anything in the -- in the original documents

12   that I had that would -- that -- that I used in

13   preparation for this report that would lead one to that

14   conclusion.

15   Q    Well, if you didn't have any evidence that would lead

16   one to that conclusion, why did you choose this language

17   at the end of the first full paragraph on Page 6 of your

18   report?  And by that I mean, "For example, it would not

19   suffice for an agency to simply have declination forms

20   and voter registration applications made available on a

21   counter for public distribution."

22   A    It was, I think, to -- to clarify the point that I was

23   making, that the application process needed to be an

24   integral part of the application process for the

25   services.  That -- that one would not be able to simply

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    comply with the Act by simply having the forms out on

2    the counter.  That -- that in contrast to that, the

3    application process for voter registration needed to be

4    an integral part of the application for -- for services.

5  **Q**  But you have no evidence that DCF merely puts those two

6    forms out on the counter and does nothing further?

7  **A**  I don't -- I don't see that the report actually makes

8    any reference to DCF offices in -- specifically in

9    Florida.

10  **Q**  The second full paragraph on Page 6 of your report says,

11    "It also appears that in some cases DCF offices were not

12    always providing an opportunity for clients to register.

13    Reasons given were budgetary constraints or a general

14    policy of...providing voter registration 'if client asks

15    about it.'"

16        Do you see that language?

17  **A**  Yes.

18  **Q**  And then this sentence that I just read to you is

19    followed by Footnote 5 --

20  **A**  Uh-huh.  (Witness answers affirmatively.)

21  **Q**  -- which refers to Exhibit 8, the Carol Canaday

22    memorandum of June 8th, 2002.  Is that correct?

23  **A**  It refers to two documents.  One is a doc request 1 from

24    Kearney and this quote comes from the Greg Ferguson

25    E-mail that was part of Exhibit 9.

180

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1  Q  Okay.  Now, please refer to Exhibit 9.  So is it true

2     that your statement in the middle of Page 6 of your

3     report refers, once again, only to Exhibit 8 and Exhibit

4     9?

5  A  Yes.

6  Q  Refer to the Greg Ferguson E-mail on Exhibit 9.

7  A  Yes.

8  Q  Where -- which office is not offering the clients the

9     opportunity to register to vote?

10 A  DCF -- the DCF office on East Clinton is the one that's

11    specifically referred to here.

12 Q  Okay.  One office; is that correct?

13 A  That's correct.

14 Q  Does it refer to --

15 A  That is the reference to -- on this particular one.

16 Q  Does it refer to any other office?

17 A  No.

18 Q  Do you have any other evidence that any other office --

19    DCF offices, other than the one on East Clinton, were

20    not offering clients the opportunity to register to

21    vote?

22 A  Other than the E-mail above it, which -- which was from

23    Norene Moore, which says -- I don't know if you'd like

24    me to read that.

25 Q  Sure.  Go ahead.

181

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach — Court Reporters & Video*

1   A   "Due to a hard freeze, District 02 had to suspend some

2       activities.  The unit offices were given an option of

3       offering the voter registration on a request basis.  Two

4       of the offices chose this option with Jackson County

5       being one of them.  The regular voter registration

6       process is now being reinstated."

7   Q   Keep reading.

8   A   Oh, I'm sorry.  "All of our unit offices are aware of

9       the voter registration process and it is not felt that

10      retraining is necessary.  Please notify us if we may be

11      of further assistance."

12  Q   All right.  Other than Exhibit 9, do you have any other

13      evidence that DCF offices were not offering clients the

14      opportunity to register to vote?

15  A   Well, there was also Exhibit 8.

16  Q   Well, does -- where on Exhibit 8 does it say that people

17      were not --

18  A   The second sentence seems to indicate by the emphasis

19      there that the -- the emphasis needs to be to inform the

20      staff that all clients must be offered -- offered the

21      opportunity to register to vote.  I have assumed that

22      the reason that the senior human service program

23      specialist made that point was because that some clients

24      were not being offered the opportunity to register to

25      vote.

182

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1   Q   Let's turn back to Exhibit 8.

2   A   Yes.

3   Q   Look at the -- at the top E-mail from Norene Moore.

4   A   Yes.

5   Q   Why did District 02 suspend some activities?

6   A   Due to a hard freeze.

7   Q   All right.  And which activities were suspended?

8   A   Some.

9   Q   Do you know which --

10  A   And then it goes on to clarify that by saying that some

11      activities were suspended.  And the offices were given

12      an option of offering a voter registration on a request

13      basis.

14  Q   So we're not saying that -- this E-mail is not saying

15      that no voter registration opportunities were given.

16      They were just somewhat reduced.  Is that correct?

17  A   Well, I -- I don't know that I would agree with

18      "somewhat reduced."  If one was only going to offer

19      voter registration on a request basis, that would seem

20      to me to be a fairly substantial reduction.  That's my

21      own opinion.

22  Q   All right.

23  A   "Substantial" being a relative term.

24  Q   What in this E-mail leads you to believe that it's

25      substantial?

183

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1   A   Based on the fact that the unit option -- offices were

2       given an option of whether or not they were going to

3       follow the -- their responsibilities under the National

4       Voter Registration Act.

5   Q   And how many offices are we talking about?

6   A   It is in plural.  The unit offices.  There is not a

7       clarification as to how many there are.

8   Q   Could that be two?

9   A   It would be more than one.

10  Q   Where did you get the information that people were not

11      being offered the opportunity to register to vote

12      because of budgetary constraints?

13  A   I don't know.  I'm not sure what was meant by "hard

14      freeze."  Maybe I was in -- my quick perusal of this was

15      thought they were referring to a freeze of -- of money

16      or something like that.  Hold on just a second, though.

17      Let me review that -- review that -- that particular

18      piece for just a moment.  I may have been mistaken in

19      that.  But either way it doesn't take away from the -- I

20      didn't know what the -- that she was referring to when

21      she said "hard freeze," whether that is a climatic term

22      or a budget term.

23  Q   If it were a climatic term, then your statement about

24      budgetary restraints would be incorrect; is that right?

25  A   In terms of the budget restraints would be incorrect.

184

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

```
 1        But the point is not why it took place.  The fact is

 2        that it did take place, of course.

 3   Q    Where is the -- where did you find the information that

 4        there is a general policy of only providing voter

 5        registration if a client asks about it?

 6   A    I got that from the memo from Greg -- that was authored

 7        by Greg Ferguson.

 8   Q    And that's limited to one office; is that correct?  The

 9        East Clinton office?

10   A    Well, it is limited to that office.  Although, I would

11        presume it would apply to the offices above, as well.

12        If in the Norene Moore memo they -- they make reference

13        to the fact that the services were being offered only if

14        it was being done on a request basis, I would presume

15        that that would only mean that -- would mean that it was

16        only done if the applicant asks about it.

17   Q    Where does it say that there was a general policy of

18        that or are those your words?

19   A    Those are my words that -- and again, I got that from

20        the first -- certainly from the first one, that -- that

21        it caused them to -- you know, there was a cause to

22        suspend certain activities and that the unit offices, I

23        would presume, as -- according to some policy, was given

24        the opportunity to offer voter registration on a -- on a

25        request basis.
```

185

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

By   Anderson Beach - Court Reporters & Video

1    **Q**   Would you please turn to Page 9 of your report.

2    **A**   (Witness complies.)

3    **Q**   And looking near the top at the bold print, which says

4       that "At the statewide level, it is essential that

5       someone, preferably the State's chief elections

6       official, be responsible for monitoring the performance

7       levels of state agencies that have designated

8       responsibilities under the" NVRA.  "Florida would be

9       able to more efficiently operate its agency based voter

10     registration programs if monitoring programs were in

11     place."

12        Do you see that language?

13   **A**   Yes.

14   **Q**   Does -- does that paragraph apply to the Department of

15     Highway Safety and Motor Vehicles and the Department of

16     Children and Families?

17   **A**   No.  I -- again, I -- I would make reference to that as

18     a -- as something -- something I mentioned earlier in my

19     testimony today, that that would be something that would

20     be desirable at a statewide -- on a statewide basis for

21     all activities and programs in the -- in a state.

22   **Q**   Do you know if the Department of Children and Families

23     has just such a person?

24   **A**   Who is responsible for monitoring all activities of all

25     responsibilities in the -- that come under the National

186

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1      Voter Registration Act?

2   **Q**   Right.

3   **A**   No.  I know that there was a liaison in the Department

4      of Human Services -- or Department of Highway Safety and

5      Motor Vehicles that was acting as a liaison.  It was not

6      clear to me now whether they were responsible for DCF

7      offices and mail-in registration programs and designated

8      agencies and things like that.

9   **Q**   Do you know whether the Department of Children and

10      Families has such a person?

11   **A**   I do not.

12   **Q**   Would you please turn to Page 10 of your report.

13   **A**   (Witness complies.)

14   **Q**   I'm looking at the large paragraph right in the center

15      of that page.

16   **A**   Uh-huh.  (Witness answers affirmatively.)

17   **Q**   It says, "In terms of assessing the levels of voter

18      registration, it is important to determine the total

19      number of customers for each agency office.  In other

20      words, how many customers does each office serve in

21      terms of processing applications for whatever particular

22      service the office provides?  It then becomes important

23      to determine the total number of voter transactions for

24      each office.  Once these figures are determined, then it

25      is fairly easy to compare offices of similar size based

187

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

By s Anderson Beach - Court reporters & Video

1   on total customers and then make a reasonable

2   determination of the number of voter registration

3   transactions an agency office should be generating.

4   This analysis is most effective when it is done

5   statewide."

6        Does that opinion apply to the Department of

7   Children and Families?

8   **A**   That opinion would apply to all agencies covered under

9   the National Voter Registration Act.  And to the extent

10   that that would include Children and Families, then the

11   answer to your question would be yes.  However, it would

12   not be, certainly, exclusive to the Department of

13   Children and Families.

14   **Q**   Well, the paragraph seems to imply or at least to me

15   that all you have to do to -- to assess the level of

16   compliance would be to take the total number of clients

17   served and compare it to the total number of people who

18   got -- who completed voter registration applications or

19   declinations.

20   **A**   Declinations.  It seems that one of the things that we

21   have -- we have looked at doing in terms of monitoring

22   our program, particularly with -- with our licensing

23   function but certainly with the other agencies, as well,

24   is trying to make a reasonable determination upon how

25   many voter transactions -- registration transactions

188

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

1    ought to be taking place in a certain office of Children

2    and Families or what have you.

3         And that should be done on a statewide level,

4    again, for all agencies -- not just for licensing

5    agencies or social service agencies, but those

6    designated agencies -- so that you could make -- you

7    could have some way of reasonably comparing whether or

8    not -- and by that, at least, maybe raise some questions

9    as to whether or not a particular agency is -- is

10   actually performing its responsibilities under the Act.

11   Q   Well, I don't want to belabor this point, but a little

12       while ago we talked about whether DCF has a motor voter

13       responsibility to all of its clients versus only those

14       that are required under the Act.

15   A   Uh-huh.  (Witness answers affirmatively.)

16   Q   So is -- is your statement in this paragraph on Page 10

17       modified to the extent that you mean only those clients

18       to whom DCF motor voter responsibilities are owed?

19   A   This paragraph refers to all offices --

20   Q   I understand that.

21   A   -- covered under NVRA.  If it is an office that is

22       covered -- if it's a public library that is not a

23       designated agency, it's an office of the state, but it

24       certainly would not be required to provide voter

25       registration services.  But it would -- what I'm trying

189

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*By s Anderson Beach - Court Reporters & Video*

```
 1      to get at is this would apply to all offices that are
 2      covered -- that provide services that are covered under
 3      the National Voter Registration Act.
 4   Q  I understand that.  Of course, my only interest today is
 5      in DCF and Highway Safety.  So here's all I'm trying to
 6      get at; and that is, you've proposed a formula for
 7      determining whether an agency -- let's use DCF as the
 8      agency.  You've proposed a formula to determine whether
 9      the agency is performing its motor voter functions.  And
10      as I understand it, that -- that formula is to take the
11      total number of clients served, compare it to the
12      combined number of motor voter declinations and
13      applications received.  Now, that'll give you a ratio;
14      is that correct?
15   A  That's correct.
16              MS. FINEMAN:  Objection to form.
17   Q  (By Mr. MacInnes)  Now, is your formula modified?  I
18      mean, if you use that formula that you -- that you
19      stated on Paragraph 10, you would get an overinflated
20      result as to DCF, wouldn't you, if you used all clients?
21   A  It would depend upon how the office kept its numbers.
22      If, for example, an office was performing two functions,
23      A and B.  A were clients that were being serviced under
24      a program that was covered by NVRA; and B, not.  I don't
25      know how -- what kind of record keeping would take place
```

190

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach - Court Reporters & Video

1    in an office that was performing those kinds of

2    services.  But it seems to me that it is not

3    unreasonable to -- to try to find out how many clients

4    were provided services under A and how many were

5    provided services under B, taking the A applicant total

6    and determining based on that how many registration

7    applications were being distributed or how many

8    declination forms had been processed or whatever.

9         I mean, preferably it would seem to me that in

10   these kinds of cases that one would probably do that,

11   maybe, as an end-of-the-day function.  We had nine

12   people that came in and applied for services under

13   service A.  How many declination forms?  If we only have

14   two, then we know something is wrong.  If we had nine,

15   everything would seem to balance.  And having some sort

16   of a report mechanism that would go back to some office

17   who would be responsible for monitoring those kinds of

18   things, I guess that is what I'm trying to say.  Yes.

19        And to the extent that an office would be

20   providing services under that B classification, it would

21   not be covered, then we wouldn't worry about any of

22   those particular applicants, as to whether or not they

23   were being offered any kind of opportunity to vote -- or

24   register to vote.

25   Q   Let's turn for just a moment to the Department of

191

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1    Highway Safety and Motor Vehicles.

2  **A**  Uh-huh.  (Witness answers affirmatively.)

3  **Q**  Are you aware of what their end-of-day report contains

4    now?

5  **A**  Yes.  I'm sorry.  Yes.  And -- and for -- and for the

6    Department of -- of Licensing, and even that's true in

7    our state, as well, that's a lot easier because

8    you're -- you're -- there's a computer -- many of those

9    functions are computerized; whereas, in a lot of social

10    service agencies, I understand they are not.

11        But it would seem to me -- but that would still

12    not preclude them from some kind of accounting or some

13    sort of tally at the end of the day.  And that's the

14    only thing that I'm suggesting.

15  **Q**  Okay.  But the system you're proposing is not a

16    requirement under the NVRA, is it?

17  **A**  Umm, no, it is -- it is not required.  Again, there are

18    statistical -- there is statistical data -- excuse me --

19    that is required to be reported back to the FEC.  And

20    that I know has changed over the years in terms of what

21    they require, because they have -- the FEC has done a

22    lot of this stuff administratively.  But there is a

23    requirement for statistical information to be reported

24    back to the FEC, so that they can report back to

25    Congress as to the effectiveness of the program.

192

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Bye, Anderson Beach - Court Reporters & Video*

1   **Q**   Have you been asked to assess the level of voter

2       registration at the Department of Children and Families

3       in Florida?

4   **A**   No.

5   **Q**   Would you turn to Page 11 of your report.  Look at the

6       first full paragraph.  The last sentence of the first

7       full paragraph says, "At the end of the day the total

8       number of declination forms" -- strike that question.

9       We've already covered that.

10  **A**   Okay.

11  **Q**   On Page 11 of your report, in the last sentence of

12      paragraph -- of the paragraph that begins with the words

13      "In summary," do you see that?

14  **A**   Yes.

15  **Q**   "In particular" it says -- or you state, "In particular

16      the State of Florida through their" DCF or "Department

17      of Children and Families does not appear to provide a

18      log which contains all of the information necessary to

19      ensure that each applicant is being given the

20      opportunity to register to vote."

21          Do you see that sentence?

22  **A**   Yes.

23  **Q**   What evidence do you have that DCF does not provide a

24      log which contains all of the information necessary to

25      ensure that each applicant is being given the

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

1     opportunity to register to vote?

2   A   I did not see that in -- in my review of the documents

3     that were presented to me.

4   Q   Does the NVRA require DCF to provide a log which

5     contains all of the information necessary to ensure that

6     each applicant is being given the opportunity to

7     register to vote?

8   A   No.

9   Q   Are you aware of any of the awards that DCF has won for

10     its NVRA implementation?

11                 MS. FINEMAN:  Objection.

12                 THE WITNESS:  Somewhat.

13   Q   (By Mr. MacInnes)  What are you aware of?

14   A   Umm, I recall human services -- not human services --

15     Human Serve, I'm sorry, which is a private organization,

16     nonprofit organization, made I know a number of awards

17     to states based on the implementation of the Act early

18     on.  We, in fact, I think, won one of those awards, as

19     well.  I know that Florida did for their work with DCF

20     offices, in particular.  I am somewhat aware of that,

21     anyway.

22   Q   I want you to know I'm near the end of my questioning.

23         Do you have any evidence that the Florida

24     Department of Children and Families has violated the

25     NVRA?

194

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach - Court Reporters & Video

1    A    I -- that was not a part of my report, part of my paper,

2         part of my research.  I certainly have not purported to

3         have evidence to that -- to that effect.

4    Q    Do you have any evidence that the Florida Department of

5         Highway Safety and Motor Vehicles is violating -- or has

6         violated the NVRA?

7    A    No.

8    Q    Do you have any evidence that Highway Safety is

9         violating the NVRA now?

10   A    No.

11   Q    In preparing your expert opinion as to the Department of

12        Children and Families, did you find any evidence of

13        racially discriminatory practices by the Department of

14        Children and Families in conducting its responsibilities

15        under the NVRA?

16   A    No.

17   Q    In preparing your expert report or your expert opinions,

18        did you find any evidence of racially discriminatory

19        procedures by the Department of Children and Families in

20        conducting its responsibilities under the NVRA?

21   A    No.

22   Q    In preparing your opinion, did you find any evidence of

23        racially discriminatory practices or procedures by the

24        Department of Highway Safety and Motor Vehicles in

25        conducting its responsibilities under the NVRA?

195

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

Byers Anderson Beach - Court Reporters & Video

```
 1    A    No.

 2                        MR. MacINNES:  I'm done.

 3                        MS. FINEMAN:  Does anyone on the

 4    phone have questions?

 5                        UNIDENTIFIED SPEAKER:  No questions.

 6                        MS. FINEMAN:  Ready to go home for

 7    the night?

 8                        UNIDENTIFIED SPEAKER:  No questions.

 9                        MS. FINEMAN:  Okay.  I have a few

10    questions.

11                        MR. ARPEN:  Tracy Arpen.  No

12    questions.

13                        MS. FINEMAN:  Can we take a

14    five-minute break before I ask my questions?

15                        THE VIDEOGRAPHER:  We are going off

16    the record.  The time is 4:39.

17                        (Recess 4:39 - 4:44 p.m.)

18

19                        THE VIDEOGRAPHER:  We are back on

20    the record.  The time -- we are back on the record.  The

21    time is 4:44.

22    ////

23    ////

24    ////

25    ////
```

196

*Gary E. McIntosh, 6/4/02 - By Mr. MacInnes*

*Byers Anderson Beach - Court Reporters & Video*

EXAMINATION

BY MS. FINEMAN:

Q    Okay.  Mr. McIntosh, I only have a few questions for you.  Is it possible that you may elaborate on the conclusions that you have noted in your report?

A    Yes.

Q    Okay.  And I just -- I just want to clear a few things up.

You -- you noted that you reviewed documents in addition to those noted in your report.  And those documents are listed on -- listed in two letters Bates-stamped A042262 through 2266.  What opinions did you form in reviewing those additional documents?

MR. MacINNES:  Could we see those documents so we know what you're talking about?

MS. FINEMAN:  Sure.

Q    (By Ms. Fineman)  Or rather, do those additional documents substantiate the opinions that you have noted in your report?

MR. LINDSAY:  Object to the form.

THE WITNESS:  Generally, yes.  Yes.

Q    (By Ms. Fineman)  Okay.  How many years of experience do you have working with the NVRA in terms of both assisting in its creation and implementing the Act?

A    Probably around -- close to 10, given the fact that

197

*Gary E. McIntosh, 6/4/02 - By Ms. Fineman*

*Byers Anderson Beach - Court Reporters & Video*

1   there were a number of years prior to the actual

2   enactment where there were various proposals and drafts

3   and so forth.  So probably dating back to about 1990 or

4   so.

5   Q   And -- I'm sorry.

6        And how many years of experience do you have

7   working as an elections administrator?

8   A   Probably around 23 years.

9   Q   And do you believe that that experience assisted you in

10   forming your conclusions in this report?

11   A   Yes.

12   Q   Okay.  Are all states required to comply with the NVRA?

13   A   No.  There are some states that were -- that have

14   election day registration that were granted exemptions

15   from the National Voter Registration Act.  I believe

16   Wyoming is one of them, Idaho is another, and I think

17   maybe Minnesota are -- are -- are three states that have

18   election day registration and they are -- they were --

19   do not come under the -- under the provision of the Act.

20   Q   Do you know whether the state of Florida is required to

21   comply with the National Voter Registration Act?

22   A   Yes.

23   Q   Have you read the National Voter Registration Act?

24   A   Yes.

25   Q   Okay.  You testified a while ago in response to

198

*Gary E. McIntosh, 6/4/02 - By Ms. Fineman*

*Byen  s Anderson Beach  -  Court Reporters & Video*

1   questions from Mr. MacInnes about human error and that

2   human error is found in all elections.  I would like to

3   draw your attention to Exhibit 9, which you have.  Okay.

4            Now, I know we've spent a lot of time talking

5   about this one exhibit.  Can you just quickly read the

6   first two sentences of -- of the first paragraph.

7   A  "Due to a hard freeze District 02 had to suspend some

8   activities.  The unit offices were given an option of

9   offering the voter registration on a request basis."

10  Q  Is -- now, would you consider that human error?

11  A  No.

12  Q  Okay.  Would you please read this sentence here,

13  beginning with the word "According."

14  A  "According to Supervisor the DCF office on East Clinton

15  (phone # 482-9584) is not offering the clients the

16  opportunity to register to vote."

17  Q  Would you consider that human error?

18  A  No.

19  Q  Okay.  I would like to draw your attention to

20  document -- part of the composite Exhibit No. 4.  And

21  it's Bates-stamped A042257.  And it is part of a

22  memorandum of law written by myself, Cara Fineman, March

23  2002, in regard to Defendants' Responses to

24  Interrogatory No. 13 by Plaintiffs.  And the

25  interrogatory asks:  "Please identify any problems or

199

*Gary E. McIntosh, 6/4/02 - By Ms. Fineman*

1   barriers that you experienced in regard to the voter

2   registration functions to be carried out by the DHSMV

3   and the DCF."

4        Defendant Iorio responds:  "There were two problem

5   areas of note with the DCF offices.  No. 1, state DCF

6   subordinate units that produce voter registration

7   application which have not been adequately reviewed for

8   completeness.  In some cases we received application

9   with a 30 to 40 percent error rate because of incomplete

10  or illegible items on the application."

11       Would you consider a 30 to 40 percent error rate

12  simply human error?

13                  MR. MacINNES:  Objection to form.

14                  MR. LINDSAY:  Join.

15                  THE WITNESS:  It would be hard to

16  know specifically without knowing exactly the pattern of

17  the incomplete or illegible items.  Human error can --

18  can involve someone just missing something on a form or

19  failing to -- to ask somebody for some specific

20  information or -- it's hard to apply to -- it's hard

21  to -- to adequately describe what human error would be.

22       If, for example -- but, you know, if -- if it was

23  the error rate applied to a -- the same item, for

24  example, all of the forms, one would think perhaps there

25  would be a pattern there which would suggest there may

*Gary E. McIntosh, 6/4/02 - By Ms. Fineman*

Byers Anderson Beach - Court Reporters & Video

1    be a policy or something that -- that is in place for

2    them not to fill out that particular section where they

3    haven't been trained properly or whatever.

4        So I think it's difficult -- I guess what I'm

5    saying, it's difficult to answer that question without

6    knowing specifically what the errors -- what the errors

7    were, but it would certainly seem with that high of an

8    error rate, there is something systemic with either the

9    form or the process that would lead to that kind of an

10   error rate.

11   Q  (By Ms. Fineman)  Would you consider a 30 to 40 percent

12      error rate an acceptable level -- level of human error?

13   A  No.

14   Q  Thank you.  One more question.

15       Drawing your attention to Defendant Cowles'

16   response to the same interrogatory.  He states, "As to

17   DCF, we have had no dialogue with them since the NVRA

18   was first implemented in 1995.  We received very few

19   applications from DCF."

20       Now, you testified before in response to some of

21   Doug MacInnes' questions about your opinion No. 4.  If I

22   could draw your attention to that Exhibit 3, Page 4,

23   Paragraph 4.  Could you please read your opinion there.

24   A  The entire opinion?

25   Q  Yes.

                                                        201

*Gary E. McIntosh, 6/4/02 - By Ms. Fineman*

By s Anderson Beach - Court Reporters & Video

```
 1   A    "At the statewide level, it is essential that someone,

 2        preferably the State's chief elections official, be

 3        responsible for monitoring the performance levels of

 4        state agencies that have designated responsibilities

 5        under the National Voter Registration Act.  Florida

 6        would be able to more efficiently operate its agency

 7        based voter registration programs if monitoring programs

 8        were in place."

 9   Q    Do you think that Defendant Cowles' response to

10        Interrogatory No. 13 supports your conclusion then --

11                         MR. LINDSAY:  Object --

12   Q    (By Ms. Fineman)  -- to No. 4?

13                         MR. LINDSAY:  -- leading.

14                         THE WITNESS:  It would seem to me

15        that it would support that, yes.

16                         MS. FINEMAN:  No further questions.

17                         MR. LINDSAY:  Just a couple of

18        follow-up ones, sir.

19

20

21                    FURTHER EXAMINATION

22   BY MR. LINDSAY:

23   Q    Did you discuss on the break we just had with

24        Miss Fineman -- did you have any discussions with

25        Miss Fineman on the break?
```

202

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

By s Anderson Beach - Court porters & Video

1   A   No.

2   Q   When -- when you answered her question that you possibly

3       may elaborate on your conclusions in your report, what

4       was the basis for that answer?

5   A   The fact that I don't know yet what's going to be

6       expected of me in terms of -- of anything else that they

7       may be asking me to do.

8   Q   So in other words, anything is possible?

9   A   I would presume so.

10  Q   You have no present intention of elaborating on the

11      conclusions in your report?

12  A   Not presently, no.

13  Q   And you have, certainly, no intention of providing any

14      additional opinions, other than those four opinions set

15      forth in your report, correct?

16  A   Not presently, no.

17  Q   And directing your attention to these two documents that

18      I believe Miss Fineman referenced.  One of them is the

19      March 29th letter to you from Ms. Borgen and the other

20      is the April 15th letter to you from Miss Fineman

21      setting forth a list of documents.  I presume you

22      reviewed these documents.  Right?

23  A   Umm, the -- the latter ones I -- I did review, although

24      I didn't have as much time to review the ones from the

25      April letter as I did from the first letter.

203

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

*By  s Anderson Beach - Court  porters & Video*

1    Q    If you could just hand that back to me.  I'm going to

2         mark these letters as composite McIntosh 10.  And I just

3         want to ask you straightforward.  We went through at

4         some length the documents and the basis for each one of

5         your opinions.  And you're not suggesting that there are

6         any other documents or bases for your opinions, other

7         than those that you indicated earlier, correct?

8    A    I -- I would stand by what I said in the report.  There

9         was a list of documents that I relied on to prepare the

10        document -- to prepare the report.  I didn't review

11        other documents.  But the documents that I used to

12        prepare the report are the documents that I listed in

13        the report.

14   Q    And with regard to each one of your opinions that we

15        discussed earlier, I asked you -- do you recall, I asked

16        you what documents or what are your bases for each one

17        of those opinions.  Do you recall that?

18   A    Right.

19   Q    And you provided me your bases for each opinion,

20        correct?

21   A    Correct.

22   Q    And there are no other bases for those specific

23        opinions, other than those that you indicated earlier --

24                        MS. FINEMAN:  Objection to form.

25   Q    (By Mr. Lindsay)  -- correct, sir?

                                                            204

*Gary E. McIntosh, 6/4/02 - By Mr. Lindsay*

*By   s Anderson Beach - Court Reporters & Video*

1   **A**   That's correct.

2                           MS. FINEMAN:  I have one further

3   question.

4                           MR. LINDSAY:  Nothing further at

5   this time.

6                           MS. FINEMAN:  Just one last

7   question.

8

9

10                         FURTHER EXAMINATION

11   BY MS. FINEMAN:

12   **Q**   Is it possible that you may produce a supplemental or

13   rebuttal report?

14                           MR. MacINNES:  Objection to form.

15                           MR. LINDSAY:  Objection to form.

16                           MR. TINKLER:  Objection to form.

17   Ken Tinkler.

18                           THE WITNESS:  I suppose that that is

19   possible.

20                           MS. FINEMAN:  Thank you.

21                           MR. LINDSAY:  We're done.

22                           THE VIDEOGRAPHER:  This concludes

23   today's deposition.  We are now off the record.  The

24   time is 4:57.  This is the end of Tape 3.

25                           (Exhibit No. 10 marked

**205**

*Gary E. McIntosh, 6/4/02 - By Ms. Fineman*

By : Anderson Beach - Court Reporters & Video

1                  for identification.)

2               (Signature reserved.)

3               (Deposition concluded

4                at 4:59 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

206

*Gary E. McIntosh, 6/4/02 - By Ms. Fineman*

*By's Anderson Beach - Court Reporters & Video*

```
 1    STATE OF WASHINGTON )      I, SHAUNA L. BEACH,
                          ) ss CCR #BE-AC-HS-L322DL a
 2    County of Pierce    )      duly authorized Notary
                                 Public in and for the
 3                                State of Washington
                                 residing at Tacoma,
 4                                do hereby certify:

 5

 6

 7              That the foregoing deposition of GARY E.
       McINTOSH was taken before me and completed on June 4,
 8     2002, and thereafter was transcribed under my direction;
       that the deposition is a full, true and complete
       transcript of the testimony of said witness, including
 9     all questions, answers, objections, motions and
       exceptions;

10
               That the witness, before examination, was by
11     me duly sworn to testify the truth, the whole truth, and
       nothing but the truth, and that the witness reserved the
12     right of signature;

13             That I am not a relative, employee, attorney
       or counsel of any party to this action or relative or
14     employee of any such attorney or counsel and that I am
       not financially interested in the said action or the
15     outcome thereof;

16             That I am herewith securely sealing the said
       deposition and promptly delivering the same to Attorney
17     Alvin F. Lindsay, III.

18             IN WITNESS WHEREOF, I have hereunto set my
       hand and affixed my official seal this 6th day of
19     June, 2002.

20

21
                          _____
22                        Shauna L. Beach, CCR, RDR, CRR
                          Notary Public in and for the State
23                        of Washington, residing at Tacoma.

24

25
```

207

*Certificate*