UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 01-120-CIV-GOLD/SIMONTON

**NIGHT BOX**
**FILED**

11 11 ~ 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

————————————————x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

Defendants.

————————————————x


EXHIBITS TO DECLARATION OF ANGELA CICCOLO, ESQ.
IN SUPPORT OF PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT


VOLUME V

EXHIBITS 28-31

410A

## NAACP v. Harris, 01-120-Civ-Gold/Simonton

**Exhibits to Declaration of Angela Ciccolo, Esq. in Support of its Motion for Summary Judgment**

### Table of Exhibits

#### Declarations & Affidavits

1. Declaration of Noni Jones
2. Declaration of Dr. Henry Flores
3. Affidavit of Ursula Y. Harvey
4. Affidavit of Dr. Ronald Hayduk
5. Declaration of Joanna Clark
6. Declaration of Lorine Walden
7. Declaration of Wallace McDonald
8. Declaration of Ronald Ketterer
9. Declaration of Luis Figueroa
10. Declaration of Theresa James
11. Declaration of Jakelin Green

#### Deposition Transcripts and Excerpts

12. Deposition of George Bruder
13. Deposition of Dick Carlberg
14. Deposition of Julia Stoner
15. Deposition of John Stafford
16. Deposition of Linda Tanko, Volume I
17. Deposition of William Cowles
18. Deposition of Sandra E. Peloquin, Volume I
19. Deposition of Sandra E. Peloquin, Volume II
20. Deposition of Dr. Henry Flores
21. Deposition of Emmett Mitchell, IV (May 20, 2002)
22. Deposition of Janet Modrow (October 22, 2001)
23. Deposition of Janet Modrow in *Johnson v. Bush,* Case No. *00-3542-CIV-King* (December 3, 2001)
24. Deposition of Marlene Thorogood (October 18, 2001)
25. Deposition of Janice Kelly (March 25, 2002)
26. Deposition of Joanna Clark (January 28, 2002)
27. Deposition of Gary E. McIntosh (June 4, 2002)
28. Deposition of Edward C. Kast (May 21, 2001)
29. Deposition of Deanie Lowe
30. Deposition of Pam Iorio (May 6, 2002)
31. Deposition of Adora Nweze
32. Deposition of Deborah Sue Berlinger

33. Deposition of Kandy Wells
34. Deposition of Shirley Rivers-Edwards (May 23, 2002)
35. Deposition of Rondrick Rose
36. Deposition of John Bowman (May 21, 2002)
37. Deposition of Admatha Israel
38. Deposition of David Leahy (May 24, 2002)
39. Deposition of Placide Dossous (January 28, 2002)
40. Deposition of Jermaine Terry (February 1, 2002)

## Responses to Requests for Production of Documents & Interrogatories

41. Defendant's Secretary of State Katherine Harris and Clay Roberts' Objections and Answers to Plaintiff's First Set of Interrogatories
42. Defendant Choicepoint's Responses to Plaintiffs' First Set of Interrogatories
43. Defendant John Stafford's Response to Plaintiff's First Request for Production of Documents
44. Defendant Iorio's Objections and Responses to Plaintiffs' First Set of Document Requests and Interrogatories
45. Defendant Iorio's Objections and Responses to Plaintiffs' Second Set of Document Requests and Interrogatories
46. Defendant David Leahy's Response to Plaintiffs' First Set of Interrogatories
47. Defendant David Leahy's Response to Plaintiffs' Second Set of Interrogatories
48. Defendant Miriam Oliphant's Responses to Plaintiffs' First Set of Interrogatories
49. Defendant Deanie Lowe's Answers and Objections to Interrogatories
50. Defendant Deanie Lowe's Answers to Plaintiffs' Second Set of Interrogatories and Document Request
51. Defendant William Cowles' Response to Plaintiffs' First Set of Document Requests and Interrogatories
52. Defendant William Cowles' Responses to Plaintiffs' Second Set of Interrogatories
53. Defendant Kearney's Response to Plaintiffs' First Set of Interrogatories
54. Defendant Kearney's Response to Plaintiffs' Documents Requests
55. Defendant Kearney's Response to Plaintiffs' Second Set of Requests for Documents
56. Defendant Kearney's Response to Plaintiffs' Second Set of Interrogatories
57. Defendant Kearney's Second Supplemental Response to Plaintiffs' First Set of Interrogatories
58. Defendant Dickinson's Responses to Plaintiffs' First Set of Interrogatories and Request for Production of Documents

## Expert Witness Reports

59. Expert Witness Report of Gary McIntosh
60. Expert Witness Report of David Klausner
61. Expert Witness Report of Dr. Henry Flores
62. Supplementary Expert Witness Report of Dr. Henry Flores
63. Rebuttal Expert Witness Report of Ronald Hayduk

**Memoranda**

64. Memorandum from Ethel Baxter, Division Director, Florida Department of State to All Supervisors of Elections dated June 4, 1999 re: Central Voter File
65. Memorandum from Bill Hanson, Acting Chief, Benefit and Recovery and Special Programs, to Michael Spellman, Office of the Governor, dated February 9, 1995.
66. Memorandum from Carol Canady, Senior Human Service Program Specialist to Operational Program Administrators, Public Assistance Specialist supervisors, Clerical Supervisors dated January 8, 2002

**Tables, Charts & Other Relevant Information**

67. Select Consent Judgments from Voting Rights Litigation Involving Florida Counties
68. Certified Copy of Wallace McDonald's Criminal History from the Florida Department of Law Enforcement
69. Select Historic Racial Discrimination in Florida, Post-1864 State Statutory Provisions
70. Senate Report No. 103-6, Establishing National Voter Registration Procedures for Federal Elections, and for Other Purposes
71. Florida Voter Registration Application Form (Nazyle Rios)
72. DCF Voter Registration Preference Form  (A039569)
73. DCF Voter Registration Preference Form (A039122)
74. E-mail Janet DeChristopher, 4/29/02 (A045949)
75. E-mail from Donna Miller to Greg Ferguson, 10/30/2001 (A040811)
76. E-mail from Robert Baker to Carol Canady (A040618-A040619)
77. E-mail from Janice Miller to Norene Moore dated 8/29/01 (A045943-A045944)
78. E-mail from Roseann Liriano to Carol Canady dated 1/09/02 (A040620)
79. E-mail from Norene Moore to Greg Ferguson dated 8/29/2001 (A039027)
80. Letter to Greg Ferguson from Donna Miller dated September 19, 2002 ( A039025-A039026)

**Miscellaneous**

81. Data Processing Services Agreement between Database Technologies ("DBT") & the State of Florida, Department of State, Division of Elections (the "Division")
82. Central Voter File Data Processing Services Agreement between the Division and DBT
83. Clerk Feedback Forms, Hillsborough County, 2000
84. 2000 General Questionnaires, Volusia  County
85. Michael T. Lavin's Voter Registration Complaint filed November 10, 2000
86. Letter from Veronica Koval to DCF dated October 30, 2001
87. Letter from Scott Petullo to Ms. Carroll dated November 9, 2000
88. Letter from Veronica Koval to Ed Kast dated September 10, 2001

# PLAINTIFFS' EXHIBIT 28

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3

4              CASE NO. 01-120-CIV-GOLD

5

6

7    NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF

8    COLORED PEOPLE, INC., by its FLORIDA STATE

9    CONFERENCE OF BRANCHES, et al.,

10           Plaintiffs,

11   vs.

12   KATHERINE HARRIS, Secretary of State of Florida;

13   et al.,

14           Defendants.

15   _____/

16

17              DEPOSITION OF EDWARD C. KAST

18        Taken in the above-styled cause, pursuant to notice,

19   at the offices of Steel, Hector & Davis, 215 South Monroe

20   Street, Suite 601, Tallahassee, Florida, on May 21, 2001,

21   commencing at 9:18 a.m.

22              Reported by:

23              MARLO D. FARNSWORTH

24           CERTIFIED SHORTHAND REPORTER

25                                              ORIGINAL

```
 1      APPEARANCES OF COUNSEL:

 2

 3      On behalf of the Plaintiffs:

 4      ANITA S. HODGKISS, ESQ.

 5      CARA FINEMAN, Esq.        (via telephone)

 6      Lawyers' Committee for Civil Rights Under Law

 7      1401 New York Avenue, NW, Suite 400

 8      Washington, DC  20005

 9      (202) 662-8600

10

11      On behalf of Katherine Harris, Secretary of State of

12      Florida, and Clay Roberts, Director of the Florida Division

13      of Elections:

14      ALVIN F. LINDSAY, III, ESQ.

15      Steel, Hector & Davis, LLP

16      200 South Biscayne Boulevard

17      41st Floor

18      Miami, FL  33131-2398

19      (305) 577-2934

20

21

22

23

24

25
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1    APPEARANCES OF COUNSEL CONTINUED:

 2

 3    On behalf of Fred Dickinson, Executive Director, Florida

 4    Department of Highway Safety and Motor Vehicles, and

 5    Kathleen Kearney, Secretary of the Florida Department of

 6    Children and Families:

 7    DENIS DEAN, ESQ.

 8    Assistant Attorney General

 9    Department of Legal Affairs

10    PL-01, The Capitol

11    Tallahassee, FL  32399-1050

12    (850) 414-3662

13

14    On behalf of Miami-Dade County Supervisor of Elections

15    David Leahy:

16    SUSAN TORRES, ESQ.  (via telephone)

17    Assistant County Attorney

18    Dade County Attorney's Office

19    Metro Dade Center

20    111 NW 1st Street, Suite 2810

21    Miami, FL  33128

22    (305) 375-5151

23

24

25
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    APPEARANCES OF COUNSEL CONTINUED:

2

3    On behalf of ChoicePoint, Inc., d/b/a Database

4    Technologies, Inc.:

5    DANIEL A. RESTREPO, ESQ.

6    Williams & Connolly, LLP

7    725 12th Street, NW

8    Washington, DC   20005

9    (202) 434-5000

10

11   On behalf of Orange County Supervisor of Elections William

12   Cowles:

13   MICHAEL CIRULLO, JR., ESQ.   (via telephone)

14   Josias, Goren, Cherof, Doody & Ezrol, P.A.

15   3099 East Commercial Boulevard, Suite 200

16   Ft. Lauderdale, FL   33308-4311

17   (954) 771-4500

18

19   On behalf of People for the American Way:

20   ALMA HENDERSON, ESQ.   (via telephone)

21   People for the American Way

22   2000 M Street, NW

23   Suite 400

24   Washington, DC   20036

25   (202) 467-4999

```
 1     APPEARANCES OF COUNSEL CONTINUED:

 2

 3     On behalf of Hillsborough County Supervisor of Elections

 4     Pam Iorio:

 5     KENNETH A. TINKLER, ESQ.   (via telephone)

 6     Assistant County Attorney

 7     Hillsborough County Attorney's Office

 8     601 East Kennedy Boulevard, 27th floor

 9     Tampa, FL  33602

10     (813) 272-5670

11

12     On behalf of Volusia County Supervisor of Elections

13     Deanie Lowe:

14     DANIEL D. ECKERT, ESQ.   (via telephone)

15     Volusia County Attorney's Office

16     123 West Indiana Avenue

17     Deland, FL  32720-4613

18     (386) 736-5950

19

20

21

22

23

24

25
```

```
 1                    INDEX TO WITNESS

 2    EDWARD C. KAST                              PAGE

 3         Examination by Ms. Hodgkiss            09

 4         Examination by Mr. Restrepo            46

 5         Further Examination by Ms. Hodgkiss    47

 6

 7

 8                    INDEX TO EXHIBITS

 9    NO.                                         PAGE

10    1                                           09

11    2                                           38

12    3                                           42

13    4                                           44

14    5                                           45

15    6                                           65

16

17

18

19

20

21

22

23

24

25
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1                    D E P O S I T I O N
 2            MS. HODGKISS:  This is Anita Hodgkiss, and I'll
 3       let everyone tell you who's here.
 4            MR. RESTREPO:  Dan Restrepo.
 5            MR. DEAN:  Denis Dean.
 6            MR. LINDSAY:  Alvin Lindsay.
 7            MR. KAST:  Ed Kast.
 8            MS. HODGKISS:  Can those of you on the phone let
 9       us know who you are?
10            MS. FINEMAN:  Cara Fineman.
11            MS. TORRES:  Susan Torres for Supervisor Leahy.
12            MR. TINKLER:  Ken Tinkler for Supervisor Iorio.
13            MR. ECKERT:  This is Daniel Eckert for Deanie
14       Lowe, Supervisor of Elections for Volusia County.
15            MS. HODGKISS:  Maybe we should start by putting
16       on the record our -- what I believe is agreed
17       procedure this morning that this witness has been
18       designated as a 30(b)(6) witness, and so we'll start
19       the deposition with his testimony regarding the
20       matters that he's been identified as having the
21       ability to answer under that notice, and then we'll
22       take -- we'll give everyone, apparently, a chance to
23       ask their questions and then break and begin with the
24       questions relating to this witness's designation as an
25       expert witness.
```

```
 1          MR. LINDSAY:  Correct, and just to clarify, on
 2     the 30(b)(6) notices dated May 16th to the Director
 3     and Secretary --
 4          MR. LINDSAY:  Can I make that -- I would like to
 5     make that an exhibit to the deposition just so that we
 6     have in the record what we requested.
 7          MR. LINDSAY:  I have no objection.  I have no
 8     objection.  Let me just note that we have here Mr.
 9     Kast, and he is -- Mr. Ed Kast is going to be
10     responsive to a portion of number 1 regarding list
11     maintenance.
12          Now, it says "list maintenance including use of
13     central voter file."  He is not the central voter file
14     30(b)(6) designee, that will be Mr. Clay Roberts, but
15     he does have knowledge and can speak to list
16     maintenance pursuant to the NVRA.
17          In addition, he will speak to category 2,
18     National Voter Registration Act compliance; category
19     number 4, voter registration and registration
20     processing; and category number 6, relationship
21     between the Secretary of State and Division of
22     Elections, and the A, Supervisors of Elections; B,
23     Department of Highway Safety and Motor Vehicles; and
24     C, the Department of Children and Families.
25          And after we -- again, I believe as you stated,
```

```
 1          Ms. Hodgkiss, after we are concluded with his 30(b)(6)
 2          deposition, we've agreed to make Mr. Kast available to
 3          testify about the opinion testimony that we have
 4          designated that he may offer in this action, and that
 5          will be done as a separate proceeding.
 6          Thank you.  You may proceed.
 7   Whereupon,
 8                        EDWARD C. KAST
 9   was called as a witness, having been first duly sworn to
10   speak the truth, the whole truth, and nothing but the
11   truth, was examined and testified as follows:
12                        EXAMINATION
13   BY MS. HODGKISS:
14          Q    Now that you're under oath, would you state your
15   full name, please?
16          A    Edward C. Kast.
17          Q    Mr. Kast, how are you employed?
18          A    I'm employed by the Department of State as the
19   Assistant Director for the Division of Elections.
20          MS. HODGKISS:  Could you mark this as Exhibit 1,
21          please?
22          (Whereupon, Exhibit No. 1 was marked for
23   identification.)
24   BY MS. HODGKISS:
25          Q    I'm handing you what's been marked as Exhibit 1.
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1        Have you seen that document before today, before now?

2             A     Yes.

3             Q     And have you had a chance to review the matters

4        listed on the second page, items 1 through 7?

5             A     Yes.

6             Q     You just heard counsel outline the areas in which

7        you are being offered as a designee of Defendant Katherine

8        Harris.  Are you willing to testify on her behalf in those

9        areas?

10            A     With respect to those areas, yes.

11                  MR. LINDSAY:  Those areas that I discussed

12            earlier are not all the areas that are listed in

13            Exhibit 1.

14                  MS. HODGKISS:  Correct.  I understand.

15       BY MS. HODGKISS:

16            Q     Okay.  How long have you worked for the Division

17       of Elections?

18            A     I started work for the Division of Elections in

19       1994, October of 1994.

20            Q     What was your position when you first started?

21            A     When I first started, I was an Administrative

22       Assistant II working for the Legal Section, for one of the

23       attorneys.

24            Q     And what were your duties as an administrative

25       assistant to working for one of the attorneys?

1      A      To assist the attorney in the Legal Section

2   primarily on the implementation of the National Voter

3   Registration Act and responsibilities in the state.

4      Q      Can you describe for me what your activities were

5   in assisting the attorney?

6      A      It was administrative in nature in that I

7   gathered -- compiled data, if you will, from the counties

8   on a monthly basis and provided coordination for the

9   responsibilities of the Department of State under NVRA.

10     Q      And how long were you in that position as an

11   Administrative Assistant II?

12     A      Well, the position -- I was promoted out of the

13   position sometime the latter part of '95 or '96, I'm not

14   sure exactly when it was.

15     Q      And what position were you promoted to?

16     A      It's -- it was called an Operational Management

17   Consultant II.  Actually, it was -- it was a budget

18   specialist position that converted to an operational -- it

19   was the same position, it was just upgraded.

20     Q      What were your duties as an operation management

21   consultant?

22     A      As the consultant, I was -- assisted the Director

23   and Assistant Director and Division staff members on a

24   variety of things to include the budget -- performance-

25   based budgeting that the State uses, again administering

1    and coordinating the National Voter Registration Act

2    responsibilities for the State.

3        Q    What activities generally did you perform in the

4    duty of administering NVRA activities for the State?

5        A    We, under our responsibilities, provide training

6    to the agencies and to the Supervisors of Elections of

7    their responsibilities to be filled for NVRA and coordinate

8    the State's responsibilities.

9        Q    How long did you have that position?

10       A    I was in that position for the most part until

11   June of 2000.

12       Q    And what position did you take in June of 2000?

13       A    I was promoted to the Assistant Division

14   Director.

15       Q    What are your duties as Assistant Division

16   Director?

17       A    I assist the Director in the overall

18   administration of the Division; again, coordinate our

19   responsibilities under NVRA with staff members; provide

20   just general administration of the Division itself,

21   personnel, budget and things of that nature.

22       Q    Going back to 1994, when you were compiling data

23   from the Supervisors' offices, what kind of data were you

24   compiling about them?

25       A    Well, at that particular time, we were just

1     building how we were going to compile the data that would

2     be required by the Federal Elections Commission under NVRA.

3          Q     Did you have -- when you were an Operations

4     Management Consultant II and you were providing training to

5     agencies, training to Supervisors and coordinating the

6     State's NVRA responsibilities, were there other employees

7     of the Division who either assisted you with those

8     responsibilities or had additional responsibilities

9     relating to that?

10         A     Well, I had -- during the time that I was the

11    OMC-II, there were -- I had staff members that, or

12    subordinates that I was the supervisor of that provided

13    assistance to me in providing, just helping me compile

14    whatever I needed to do.

15         Q     And how many assistants did you have during that

16    period?

17         A     Off and on, one to two.

18         Q     Did they also assist you with your other

19    responsibilities relating to budget and budget planning?

20         A     Not so much budget.

21         Q     So you had one to two staff persons who -- did

22    they have any responsibilities other than assisting you

23    with the administration of the State's NVRA

24    responsibilities?

25         A     Yes, there were other assigned duties to them.

```
 1          Q     What other duties?

 2          A     Well, for example, one of the individuals that

 3     helped me was a receptionist as far as telephones were

 4     concerned, directing all the telephone calls.

 5               MR. LINDSAY:  Just let her finish her question

 6          before you --

 7     BY MS. HODGKISS:

 8          Q     And what other duties did your staff have outside

 9     of the area of administering the NVRA?

10          A     For example, they would assist in the gathering

11     of the book-closing figures during an election cycle,

12     making copies of different things and assisting in just

13     general administrative procedures.

14          Q     In your position as Assistant Division Director,

15     in your responsibility to assist with the overall

16     administration of the Division, how many different types of

17     major functions does the Division carry out?

18               MR. LINDSAY:  How many major types?

19     BY MS. HODGKISS:

20          Q     I'm sorry.  For example, I'm just trying to get

21     an understanding of, obviously the Division is

22     administering the NVRA, but what else does the Division do,

23     what else does the Division of Elections do?

24          A     We have three bureaus.  We have the Bureau of

25     Voting Systems, the Bureau of Election Records and the
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1      Bureau of Administrative Laws and Code.

 2           Q      And, Mr. Kast, I apologize that I didn't say

 3      earlier, have you had your deposition taken before?

 4           A      No.

 5           Q      I should have explained.  First let me say if at

 6      any point you want to take a break, please just let me

 7      know.

 8           A      Okay.

 9           Q      And in addition, if I ask any question that's not

10      clear to you, please let me know --

11           A      Sure.

12           Q      -- and I'll try to clarify it for you.

13           A      Okay.

14           Q      That's important.

15                  Going back to the three main responsibilities or

16      -- that you outlined, that the Division of Elections

17      carries out, do you assist in the administration of all

18      three of those functions?

19           A      I am the supervisor of the bureau chiefs.  The

20      bureau chiefs are responsible for their bureaus.

21           Q      How many people overall are under your

22      supervision?

23           A      The three bureau chiefs are under my direct

24      supervision, and with one budget person, for a total of

25      four.
```

```
 1          Q     Do you have any support staff that you directly
 2    supervise?
 3          A     We have an executive assistant, but the
 4    supervisor for that assistant is Clay Roberts.  We share
 5    her.
 6          Q     And are there three bureau chiefs?
 7          A     Yes.
 8          Q     Are there any other assistant division --
 9    assistant -- I'm sorry, your title is Assistant Division
10    Director?
11          A     That's correct.
12          Q     Are there any other Assistant Division Directors?
13          A     No.
14          Q     Okay.  And who's your immediate supervisor?
15          A     The Division Director, Clay Roberts.
16          Q     How much of your time, say, on a monthly basis
17    would you estimate you spend in the performance of your
18    responsibilities relating to the administration of the
19    NVRA?
20          A     I'm not real sure I could put a number to that
21    because it's the elections -- the elections operations is
22    cyclic, it would depend if we're in an election cycle.
23    Answering questions of the public and the Supervisors and
24    things like that would increase, so I don't know that I
25    could actually put a hard number to that.
```

1       Q     Well, can we divide it up, then, and say in the

2    part of the cycle where there's a lot of NVRA-related

3    activity, does it consume 90 percent of your time, 50

4    percent of your time, can you give us an estimate?

5       A     I could tell you it's less than 50 percent, but

6    again, it's kind of hard-pressed, I mean, it may be a day

7    that we get a question or two, and then, you know, we may

8    go a day or two with no questions or no requirement.  And

9    it depends on whether we're in a training cycle or

10   something like that.

11      Q     At the point in time when you're not in a

12   training cycle, not in an election cycle, it's not the busy

13   period in terms of getting calls, can you estimate what

14   percentage of your time is involved in administering the

15   NVRA requirements for the State?

16      A     I mean, administration of the NVRA is kind of on

17   a continuous basis in that because we do provide

18   coordination and ensure uniform training, and so there's

19   something going on all the time, you know, we're updating

20   training or answering questions from the public, but it's

21   just hard to put a number on that.

22      Q     Okay.  But would it be fair to say that it would

23   be not as much of your time as those responsibilities take

24   during a period of increased activity, whether it's

25   training --

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1              UNIDENTIFIED SPEAKER:   (Unintelligible.)

 2      BY MS. HODGKISS:

 3          Q    -- or election activity?

 4              MR. LINDSAY:  I couldn't make out what the lady

 5          said on the phone, but I'm going to object to the form

 6          of that question.

 7              MS. HODGKISS:  Let me repeat the question.

 8      BY MS. HODGKISS:

 9          Q    My question is -- I was asking you to estimate

10      what percentage of your time roughly you spend on NVRA-

11      related responsibilities at a time when you're not involved

12      in training and you're not getting a lot of calls for

13      assistance.

14              MR. LINDSAY:  And that's been asked and answered.

15              MS. HODGKISS:  No.  No, excuse me, counsel, but

16          he answered the question during a peak period how much

17          time does he spend.  I'm now asking him at the other

18          end of the spectrum.

19      BY MS. HODGKISS:

20          Q    When there are not a lot of demands relating to

21      NVRA, how much time did you spend, and you said it was hard

22      to estimate.  My question now is, is it true that it's less

23      of your time than during a peak period.  That's my

24      question.

25              MR. LINDSAY:  Object to the form.
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1        BY MS. HODGKISS:

 2             Q    You can answer the question.

 3             A    Yes, it would be less.

 4             Q    Okay, thank you.

 5                  Is it your understanding that the -- as part of

 6        the State's responsibilities in implementing the NVRA, the

 7        State is to designate a chief state election official

 8        responsible for coordinating the NVRA activities?

 9             A    Yes.

10             Q    And who in Florida is the chief state elections

11        official?

12             A    In the Florida statute it's designated as the

13        Secretary of State.

14             Q    Do you work with the Secretary of State in your

15        work administering the NVRA?

16             A    You mean do I work with her directly?

17             Q    Yes.

18             A    Not normally.  As I said, my immediate supervisor

19        is the Division Director.

20             Q    Is there anyone in the Division of Elections who

21        has full-time responsibilities for coordinating statewide

22        the State's activities in implementing the NVRA?

23                  MR. LINDSAY:   Object to the form.

24        BY MS. HODGKISS:

25             Q    Do you understand the question?
```

1    A    Well, I'm not sure if you're asking if that's my

2    responsibility or not.

3    Q    No.  I'll restate the question.

4         Is there anyone -- is there any employee of the

5    Division of Elections whose full-time responsibilities,

6    they have no other job duties, their full-time

7    responsibility is to coordinate the State's NVRA

8    responsibilities?

9    A    We have an NVRA administrator whose primary role

10   is to coordinate the State's responsibilities, and that was

11   the position I held until promoted to Assistant Director

12   under the OMC-II.  That's their primary responsibility, but

13   they have other duties just like everyone else in the

14   Division.

15   Q    And who is currently holding that position?

16   A    Currently it's Donna Miller.

17   Q    Do you have any supervisory role with regard to

18   Donna Miller?

19   A    Not direct supervision.  I supervise her bureau

20   chief, and as the Assistant Director, I've got some

21   supervisory responsibilities or authority.

22   Q    Do you work directly with Donna Miller?

23   A    I have on NVRA because of the fact that she's

24   newly assigned.

25   Q    When was she assigned to this position?

21

```
 1        A    I'm not sure of the date that she was assigned.

 2        Q    Roughly, was it this year, last year?

 3        A    I think she was assigned the summertime of last

 4   year.

 5        Q    Now, correct me if I'm wrong, but you left that

 6   position as Operation Management Consultant II in June of

 7   2000?

 8        A    That's correct.

 9        Q    Who was in that position between June of 2000 and

10   summer of last year?

11        A    That would be Martha Bohannon.

12        Q    Did she also have other responsibilities in

13   addition to her responsibility to coordinate statewide the

14   NVRA?

15        A    Martha didn't really coordinate statewide

16   responsibilities.  That was kind of something I kept as the

17   Assistant Director.

18        Q    Can you just explain, then, the process by which

19   Donna Miller has been newly assigned and begun to take on

20   some of those responsibilities?

21             MR. LINDSAY:  Object to the form.

22             Go ahead.

23             THE WITNESS:  As I got more into my job as the

24        Assistant Director, I found that my times were being

25        split in much more areas, and we had a position
```

1          available and we provided the job description that

2          would include the National Voter Registration Act.

3              And in hiring her, I've worked directly with

4          Donna on what the State's responsibilities are.

5     BY MS. HODGKISS:

6          Q    Okay.  What are the major responsibilities that

7     you have in relationship to administering the NVRA?

8              MR. LINDSAY:  Can I just ask for a

9          clarification --

10             MS. HODGKISS:  Yes.

11             MR. LINDSAY:  -- as to the term "you"?  The State

12        or Mr. Kast?

13             MS. HODGKISS:  I'm sorry, I'm asking specifically

14        about Mr. Kast.

15             THE WITNESS:  Providing coordination on the

16        responsibility of the State's -- or coordination on

17        the State's responsibilities of NVRA, providing

18        training to state agencies and Supervisors of

19        Elections, providing the statewide voter registration

20        application and providing the information required by

21        the Federal Elections Commission on an every-other-

22        year basis for reporting the information on NVRA.

23    BY MS. HODGKISS:

24        Q    And what are Donna Miller's responsibilities?

25        A    She shares those same responsibilities with me as

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1      she's -- we're kind of in a training session, if you will.

2      As she grows along and goes, she will pick those up in a

3      more thorough manner.

4          Q     Which state agencies do you provide training to?

5          A     The agencies identified as responsible for NVRA.

6      There's several of them.  We provide training to all of

7      them, but -- or -- am I understanding you want like a list

8      of the agencies?

9          Q     Yes.

10         A     Department of Highway Safety, Children and

11     Families, Elder Affairs, Department of Health, Division of

12     Blind Services under the Department of Education I believe

13     they still are, and then portions of the Department of

14     Labor and Employment Security.  To the best of my

15     knowledge, that's all of them.  There may be others.

16         Q     When you -- what is your role, you, Mr. Kast, in

17     the training process?

18         A     Now, currently?

19         Q     Yes, yes.

20         A     Well, based on my past experiences of NVRA and

21     everything else and in the training process of Donna, I

22     have provided the training to the agencies, primarily it's

23     coordinating with the Supervisors of Elections at a

24     training site and, you know, the logistics of it is worked

25     out, as well as myself and several of us, we'll go over the

```
 1      training material to make sure it's in compliance.

 2          Q    Do you actually attend any of the training

 3      sessions yourself?

 4          A    Yes, I attend and, you know, have conducted it.

 5          Q    Okay.  I believe you said earlier that you also

 6      provide training to the Supervisors of Elections?

 7          A    That's correct.

 8          Q    And again, I just ask what your role is in that

 9      training program.

10          A    The same thing, plus having conducted the

11      training.  We've been training under NVRA since 1994.

12          Q    Do you have a regular schedule that you provide

13      training to the state agencies?

14          A    You mean an actual set schedule?

15          Q    Right.

16          A    No, but we try to provide that on like an every-

17      other-year basis or if there's a change to the laws.

18          Q    And do you have a different training session for

19      each agency?

20          A    No, it's all combined.

21          Q    Do members of -- or employees of the various

22      agencies come to the same training session, or --

23          A    Our training session is -- it's a uniform

24      training session that covers all the agencies and the

25      Supervisors of Elections' responsibilities under NVRA.
```

```
 1        Q    I see.  So do the Supervisors of Elections also

 2   come to the same training program?

 3        A    They do.

 4        Q    There's not a separate --

 5        A    We provide them with some separate training at

 6   different workshops of those areas that the agencies have

 7   no responsibilities in.

 8        Q    Okay.  In addition to the activities that you've

 9   outlined, do you have any -- do you have any responsibility

10   for monitoring how the state agencies implement their

11   responsibilities under the NVRA?

12        A    No, because we have no statutory authority for

13   oversight of NVRA.  Our responsibilities are coordination.

14        Q    Do you assist -- in your role as a coordinator,

15   do you assist the state agencies in developing ways that

16   they can monitor how well they are implementing NVRA?

17        A    If the question were asked, we would assist them

18   in coordinating what their responsibilities were under NVRA

19   so that they could develop that.  Again, the Department of

20   State has no statutory authority over them to direct how

21   they handle their responsibilities.

22        Q    Of course.  In your role as training, the fact

23   that you don't have -- in your training role, the fact that

24   you don't have statutory authority over them I presume does

25   not prevent you from providing training to them?
```

1     A     We provide them training on their

2     responsibilities of NVRA.  It's kind of a uniform training

3     to the specifics of NVRA of, again, what their requirements

4     under NVRA are.

5     Q     Well, is there anything in the way that your

6     statutory responsibilities are laid out that would prevent

7     you from providing them training in how they might monitor

8     their activities?

9     A     The only thing that prevents us from doing that

10    is the fact that we don't have the statutory authority over

11    those agencies.

12    Q     Right, but understand, I'm not asking you do you

13    actually monitor them, but is there anything in the -- or

14    let me ask it this way:  Can you be more specific about how

15    the fact that you don't have statutory -- you say statutory

16    authority over that agency.  How does that prevent you from

17    providing them training on ways in which they could monitor

18    how well they're implementing the NVRA?

19    A     We do that by providing the uniform training of

20    their requirements in a uniform manner of what their

21    requirements of responsibilities are of NVRA and meeting

22    those requirements.

23    Q     Has any state agency raised with you the question

24    of how can we monitor the extent to which we're complying

25    with our responsibilities under the NVRA?


FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1        A       Not to my knowledge.

2        Q       Now, among the agencies that you listed, can you

3    identify for me which agencies in your experience register

4    or receive the most voter registration applications, state

5    agencies, now?

6        A       Department of Highway Safety.

7        Q       And is there any agency that comes close to

8    equaling that Department in terms of the number of voter

9    registration applications they receive?

10       A       There's no agency, but applications received via

11   the mail are probably the second highest.

12       Q       Do you work -- have you worked directly with the

13   Department of Highway Safety and Motor Vehicles in their

14   administering of their responsibilities under the NVRA?

15       A       By providing them the training about what their

16   responsibilities are.

17       Q       Right.  In addition to training, do you speak --

18   do you ever have occasion to work with their managers in

19   developing the business processes that they would follow to

20   carry out their responsibilities?

21       A       We coordinate -- each agency has their own voter

22   registration coordinator, and we coordinate with that

23   coordinator their responsibilities under NVRA.  Their

24   internal procedures are a responsibility of the agency of

25   which we don't have any authority over.

```
 1        Q    I understand that you don't have any authority,
 2   but do you offer them any suggestions or advice as to how
 3   they might best design their processes?
 4        A    Only to the extent of what their requirements are
 5   under NVRA.
 6        Q    Can you outline for me generally what the -- what
 7   the state agencies' requirements are under the NVRA?
 8        A    You mean to -- as far as voter registration
 9   offered to individuals?
10        Q    Just anything that comes under the National Voter
11   Registration Act.
12        A    Well, the agencies are responsible for offering
13   voter registration assistance to the individuals that come
14   in their office, or clients, for lack of a better term.
15   They're responsible overall for, upon their application for
16   services, their renewal of services or request for change
17   of address, with those services the agencies are
18   responsible to provide a voter registration declamation
19   statement for the individual to decide whether they want to
20   apply to register to vote or not, or make the changes
21   appropriate to their voter registration.
22             We identify their responsibilities in providing
23   the voter registration application and ensuring that the
24   applications are provided to the Supervisor of Elections in
25   the county in which the office is located, and there are --
```

```
 1      there's several other pieces in there that just kind of
 2      slip right now, but there are other responsibilities they
 3      have.
 4           Q     But these are the major responsibilities that
 5      they have?
 6           A     Yes.
 7                 MR. LINDSAY:  Object to the form.  It calls for a
 8           legal conclusion.
 9                 MS. HODGKISS:  Well, I'm asking this witness in
10           his capacity as coordinating the State's
11           responsibilities under the NVRA.
12      BY MS. HODGKISS:
13           Q     I'm only trying to find out if there are any
14      other major responsibilities that state agencies have to
15      carry out beyond the ones that you've identified.
16           A     I don't know if you would call them major or not.
17      I mean, there are other responsibilities that they have.
18      Those are the ones that just come to mind right now.
19           Q     What are the other responsibilities that you're
20      referring to?
21           A     Well, I mean, they have the responsibility of --
22      through the declamation form of ensuring that an individual
23      knows that their decision not to register to vote or to
24      register to vote has no bearing on their receiving
25      services.  And there's other -- just things like that that
```

1    come along.

2        Q    Going back to the first responsibility that you

3    outlined, that they must offer voter registration

4    assistance, what specifically do you train agencies they

5    need to do in order to provide that assistance?

6        A    Oh, we explain to them that there's primarily

7    three different places they must offer the voter the

8    opportunity to apply to register to vote, and that's on the

9    person's initial request for services, their renewal of

10   those services or if they come in for change of address of

11   those services.  We also tell them they must provide the

12   same level of assistance to them that they would provide in

13   their normal operation or day-to-day handling of that

14   individual.

15       Again, as I said, they offer the declamation form

16   that is to be provided for the individual to decide whether

17   they want to register to vote or if they want to make those

18   changes to their application or if they decide not to.

19       Q    If an individual declines, what's the agencies'

20   responsibility with regard to that declamation statement?

21       A    With regard to the declamation form?

22       Q    Correct.

23       A    It's maintained at the agency for two years.

24       Q    And in providing the -- giving the completed

25   voter registration applications to the Supervisor of

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    Elections, what are the specifics of the agencies'

2    responsibilities in that regard?

3        A    If I understand your question, you're asking what

4    the agency does as far as when they get the application

5    turned in to them?

6        Q    I'm asking what do you train agencies are the

7    details of their requirements in terms of providing the

8    application?  In other words, are there time limits within

9    which they must provide it, are there methods they have to

10   use to get it over there, that kind of thing, the mechanics

11   of it?

12       A    We do.  We identify to them that Florida statute

13   requires that they forward the applications to the

14   Supervisor of Elections in the county in which their office

15   is located within five days.

16       Q    In your responsibilities as administering the

17   State's compliance with the NVRA, have you ever had

18   occasion to consider whether it would be possible to have

19   those voter registration applications provided to the

20   Supervisor of Elections' offices in an electronic format?

21           MR. LINDSAY:  I'm sorry, would you read back the

22       question, please?

23           (Whereupon, the court reporter read the pending

24       question.)

25           MR. LINDSAY:  Okay.


FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1              THE WITNESS:  To my knowledge, that hasn't been
 2         considered.  One of the statutory requirements is that
 3         we have a signature on the application, and I don't
 4         know that the agencies -- nor am I aware if agencies
 5         have the capability of providing that to the
 6         Supervisors of Elections.  That's not an area of my
 7         expertise when it comes to electronics and computers.
 8    BY MS. HODGKISS:
 9         Q     What are the responsibilities of the Supervisors
10    of Elections with regard to the implementation of the NVRA?
11         A     Well, the Supervisors of Elections are
12    responsible for -- as elected constitutional officers are
13    responsible for the elections within their county and the
14    entire voter registration function within their county, to
15    include maintaining voter rolls and -- as well as
16    registering individuals and maintaining the entire
17    electoral process.
18         Q     When you -- you discussed earlier the way in
19    which the Supervisors of Elections' offices receive
20    training from your office, and as I understand, they do
21    come to the general training that you have, but you also
22    have additional information that you provide them relating
23    to their specific duties that the state agencies don't
24    have.  Do you provide -- is that correct?
25         A     That's correct.
```

1      Q     Do you provide that specific training to

2   Supervisors of Elections with any written materials?

3      A     Other than providing them copies of the

4   requirements under the statute, you know, at times there's

5   probably been handouts that we've given them.  I'm not real

6   sure.  I have not been the only provider of training in

7   that area.

8      Q     And basically I was just asking -- or let me just

9   be clear.  Then as far as you know, there's not a manual or

10  a -- that -- there's not a manual that you provide to the

11  Supervisors of Elections relating to their responsibilities

12  under the NVRA?

13     A     We provide copies of the Florida Election Code.

14     Q     Do you provide the Supervisors of Elections any

15  training with regard to list maintenance functions?

16     A     We have, yes.

17     Q     Are there any -- and what -- how would you define

18  list maintenance?

19           MR. LINDSAY:  Object to the form.

20           MS. HODGKISS:  Do you understand -- is the

21           question -- I'm sorry, what's the problem with the

22           form of the question?

23           MR. LINDSAY:  It's vague, calls for a legal

24           conclusion.

25   / / / / /

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1    BY MS. HODGKISS:

 2         Q    Well, Mr. Kast, when I say list maintenance, does

 3    that term have any meaning for you?

 4         A    I mean, list maintenance is a -- I'm not sure the

 5    right term is procedure, but is a procedure by what

 6    Supervisors of Elections are responsible for at the county

 7    level.

 8         Q    Okay.  I'm only trying to make sure that we're

 9    talking about the same thing.

10              When a Supervisor of Elections engages in a list

11    maintenance activity, what are they doing?

12              MR. LINDSAY:  Object to the form; calls for

13         speculation.

14              MS. TORRES:  Susan Torres, and I join the

15         objection.

16    BY MS. HODGKISS:

17         Q    Well, I'll rephrase the question then.  And I

18    believe I asked -- I know that I asked you do you provide

19    the Supervisor of Elections with training in list

20    maintenance activities, and my recollection is you said

21    yes.  Is that --

22         A    We have in the past, yes.

23         Q    Yes.  What training -- what do you instruct the

24    Supervisors of Elections when you provide them training in

25    list maintenance activities?
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1          A    We provide them uniform training on their

2     responsibilities under NVRA and the Florida statutes.

3          Q    And with regard to list maintenance, what are

4     their responsibilities?

5               MS. TORRES:   Object to form; Susan Torres.

6               MR. LINDSAY:   Same objection.

7     BY MS. HODGKISS:

8          Q    You provide training to the Supervisors of

9     Elections on list maintenance activities?

10         A    We have in the past, yes.

11         Q    And you just said that you instruct them on what

12    their responsibilities are.   What instruction do you

13    provide them on what their responsibilities are?

14         A    Those requirements as listed in the statute on

15    list -- maintaining the integrity of the voter roll.

16         Q    What do you train them regarding what they need

17    to do to maintain the integrity of the voter roll?

18         A    The responsibilities as outlined in the statutes.

19    I'm not sure what you're looking for, I apologize, I just

20    -- I mean, we just provide them the training as it's

21    outlined in the statute of -- that they're responsible for

22    list maintenance, and again, I'm not sure what you're

23    asking.

24         Q    I'm asking, can you explain any additional

25    details regarding what you train the Supervisors to do when

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1      they're engaging in list maintenance activities to comply

2      with the NVRA?

3          A      Their responsibilities as far as time frames that

4      list maintenance activities are taking place, their

5      responsibilities as far as notification to the individuals,

6      who can be removed from rolls, things of that nature.

7          Q      Okay.  Do you have -- and I just want to be clear

8      because sometimes these -- this seems to me sometimes, or

9      at least in my mind, I will apologize if this is

10     idiosyncratic, but sometimes the notions of list

11     maintenance and the central voter files seem to overlap,

12     but do you have any responsibilities at all with regard to

13     the central voter file?

14         A      Not really.  That comes out of the Bureau of

15     Voting Systems, and they run the voter file.

16         Q      With regard to voter registration and

17     registration processing, do you have any -- or what are

18     your responsibilities relating to registration processing?

19         A      Registration processing is actually done in the

20     counties.  The only other processing is at the state

21     agencies where they offer the opportunity for an individual

22     to apply to register to vote, and our responsibilities are

23     in the training of those agencies on their responsibilities

24     of NVRA.

25         Q      In addition to providing training, are there any

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    other ways in which you work with state agencies in

2    implementing the NVRA?

3        A    Yes.  We act as the coordinator on the State's

4    responsibilities of NVRA by -- we have -- we provide the

5    statewide voter registration application to all the

6    agencies.  We have provided them posters to inform their

7    clients or public that they can register to vote in those

8    agencies, and if there's -- if a question arises, or a

9    problem, we coordinate that to the agency, or at least

10   forward that over to the agency for their resolution.

11       Q    And when you say there's a problem, can you

12   explain that?

13       A    Well, if there's a question or if there's -- if

14   someone were to call one of the -- say the Supervisor were

15   to call and want to talk about a particular field office,

16   we would forward that and coordinate with the agency

17   involved so that the Supervisor's information would flow

18   over to them and get a resolution.

19       Q    Can you give me any examples of that type of

20   process occurring since the time that you've -- since June

21   of 2000 when you've been the Assistant Division Director?

22            MR. LINDSAY:  Object to form.  Go ahead.

23            THE WITNESS:  I'm not sure as far as June of

24       2000.  There was at one time a problem with the

25       printers in Highway Safety, and as it was identified

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

38

```
 1            to us, we identified it to Highway Safety and they

 2            resolved the problem, they fixed it.

 3    BY MS. HODGKISS:

 4        Q    How did -- do you know how they fixed the

 5    problem?

 6        A    I'm not exactly aware of all the intricacies,

 7    other than the fact that I know they went out and bought

 8    new printers.  The printers they originally had started in

 9    '94 or '95 upon the implementation, so they were old and

10    they replaced the printers.

11        Q    Do you ever receive phone calls or requests for

12    assistance from members of the public?

13        A    Yes, we answer phone calls and e-mails and things

14    about questions on voter registration.

15            MS. HODGKISS:  Can you mark this as Kast Exhibit

16        No. 2, please?

17            (Whereupon, Exhibit No. 2 was marked for

18        identification.)

19            MS. HODGKISS:  For those of you on the phone, I'm

20        requesting that an exhibit with Bates stamp -- it's a

21        one-page exhibit, Bates stamp No. A027389, be marked

22        as Kast Exhibit No. 2.

23            MR. LINDSAY:  Okay.  I --

24            MS. HODGKISS:  I'd just like to ask the witness

25        about the document.
```

39

```
1                    MR. LINDSAY:  Go ahead.  I would just note for
2          the record that this is a document apparently
3          regarding central voter files, but go ahead.
4     BY MS. HODGKISS:
5          Q    Have you had a chance to briefly -- or have you
6     had an opportunity to look at what has been marked as Kast
7     Exhibit No. 2?
8          A    Right now, yes, just for this second.
9          Q    Do you know what that document is?
10                    MR. LINDSAY:  Why don't you take your time to
11          read it?
12                    THE WITNESS:  (Examining document.)
13                    MR. LINDSAY:  Are you ready?
14                    THE WITNESS:  (Nods in the affirmative.)
15                    MR. LINDSAY:  Okay.  Go ahead.
16     BY MS. HODGKISS:
17          Q    You've read that?
18          A    As the title indicates, it's "General Outline for
19     Central Voter File List Maintenance."
20          Q    And do you have any role with regard to any of
21     the responsibilities outlined there?
22          A    I'm sorry, could you --
23          Q    Well, I guess I'm trying to understand, do you do
24     anything related to the processes that are out there in
25     your role as Assistant Division Director?
```

 1          A     No.   This is the responsibility of the Bureau of

 2     Voting Systems under the current central voter registration

 3     database.   This is actually an outline of the central voter

 4     file of an older system.

 5          MR. LINDSAY:   I'm sorry, I don't mean to be

 6          difficult, but let me interject, this is a one-page

 7          document, it is marked page number 1, there's a page

 8          number at the bottom.   Also at the bottom it appears

 9          to be the beginning of an outlined section that is not

10          finished.   There also appears to be a staple photocopy

11          at the top.   This is one page, and there may be other

12          pages, and for the record, we're dealing with this

13          first page of whatever this document is.

14          I'm sorry.   Thank you.

15          MS. HODGKISS:   Well, I think I stated earlier

16          that I have a one-page document.

17     BY MS. HODGKISS:

18          Q     I just want to be clear then, in your

19     responsibility as coordinating the state's implementation

20     of its responsibilities under the NVRA, do you have any

21     role whatsoever in working with Supervisors of Elections

22     with regard to their list maintenance activities?

23          A     Other than providing the uniform training of

24     their responsibilities of NVRA, list maintenance activities

25     are the responsibility of the Supervisor of Elections, the

```
 1      elected constitutional officer of the county.

 2          Q    Okay.  I think I asked earlier whether you were

 3      involved at all with the central voter file and the

 4      development of that central voter file, and I don't want to

 5      misstate what you said, but am I correct that your answer

 6      was no?

 7          A    As far as the development of the central voter

 8      file, absolutely I do not.  The only involvement that I

 9      have of central voter file would be administrative in

10      nature, not the workings or the dealings of it.  It's a

11      technical aspect that's handled by the Bureau of Voting

12      Systems.

13          Q    And when you say the administration of that file,

14      what do you mean by that?

15          A    If we needed to purchase something for the

16      central voter file, you know, some server or database or

17      something of that nature, I would be the -- between myself

18      and the budget person would be the one to approve the

19      requisition for it.

20          Q    I see.  Did you have any dealings with Database

21      Technologies as they perform their contract with the State?

22              MR. LINDSAY:  Again, I'm going to object.  This

23          goes beyond the scope of the 30(b)(6) deposition.

24          We're talking about the central voter file, which we

25          said at the beginning is one area of list maintenance
```

```
 1          that this is not our designee on.  I'll let you answer
 2          that question, but --
 3                   THE WITNESS:  I'm sorry, what was the question?
 4   BY MS. HODGKISS:
 5          Q    The question was did you have any, did you work
 6   with Database Technologies as they carried out their
 7   contract.
 8          A    Did I work directly?  No, I did not work with
 9   Database Technologies directly.
10                   MS. HODGKISS:  Okay.  Can I have this marked as
11          Kast Exhibit No. 3, please?
12                   (Whereupon, Exhibit No. 3 was marked for
13   identification.)
14                   MS. HODGKISS:  This is -- for those of you on the
15          phone, I have marked a one-page document that is Bates
16          stamp number 004921 as Kast Exhibit No. 3.
17   BY MS. HODGKISS:
18          Q    And, Mr. Kast, I want to hand that to you and ask
19   you to take a look at that.
20                   MR. LINDSAY:  And again, I'm going to assert the
21          same objection.  This is about -- the central voter
22          file is not something that Mr. Kast is a 30(b)(6)
23          designee to discuss.  I think I've been gracious in
24          allowing some preliminary, perhaps some background
25          questions, but I'm not going to let it continue.  I
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1    will terminate the deposition if it turns into a

2    central voter file inquiry, because we have somebody

3    else designated for that.

4         MS. HODGKISS:  I understand that, counsel, but

5    your witness has testified that he has no

6    responsibilities in carrying out the NVRA, he has no

7    responsibility with regard to the central voter file.

8    I would now like to ask him regarding documents that I

9    think relate to that testimony, and I'm entitled to

10   ask that.

11        MR. LINDSAY:  And that's an incorrect

12   characterization of his testimony.  He said his

13   background was administration only and he said he

14   didn't work directly with DBT.

15        But be that as it may, that might be background,

16   but I'm not going to permit inquiry regarding central

17   voter file.  It is not -- this is a 30(b)(6)

18   deposition, and he's not a 30(b)(6) designee on that

19   subject.

20        MS. HODGKISS:  Counsel, I think you need to let

21   me ask my question before you object.  I'm not asking

22   him about the operation of central voter file.  I'm

23   showing him a document and I'll ask him a question

24   regarding that document.

25        MR. RESTREPO:  You handed me the wrong thing.

```
1            MS. HODGKISS:  I know, and I'm sorry, counselor.
2            MR. RESTREPO:  Okay.  Let me scratch this out.  I
3       have now written on this, sorry, because I thought it
4       was a copy.  That's not the memo that's in front of
5       him.
6            MS. HODGKISS:  You're correct.
7  BY MS. HODGKISS:
8       Q    Mr. Kast, would you please read the Bates stamp
9  number at the bottom of the document that's marked as Kast
10 Exhibit No. 3?
11           MR. LINDSAY:  The Bates number, yeah.
12           THE WITNESS:  B004921.
13           MR. RESTREPO:  Thanks.
14 BY MS. HODGKISS:
15      Q    And my question is, can you identify that
16 document?
17      A    Yes.  It's a memo to the Supervisors of Elections
18 that I sent, obviously, on June 9, 2000.
19           MS. HODGKISS:  I would ask that a one-page
20      document, Bates stamp number 004437, be marked as Kast
21      Deposition Exhibit No. 4.
22           (Whereupon, Exhibit No. 4 was marked for
23 identification.)
24 BY MS. HODGKISS:
25      Q    Mr. Kast, I'm handing you what's been marked as
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1      Kast Exhibit No. 4.  Would you please read that document
 2      and let me know whether you can identify it?
 3           A     This is a -- it's a memo addressed to me which --
 4      from the Office of Executive Clemency.
 5           Q     Did you receive that memo?
 6           A     Well, yes, I did, actually.  However, it wasn't
 7      -- it really shouldn't have been addressed to me.
 8                 MS. HODGKISS:  I would ask that a document --
 9           one-page document, Bates stamp number B004932, be
10           marked as Kast Exhibit No. 5.
11                 (Whereupon, Exhibit No. 5 was marked for
12      identification.)
13      BY MS. HODGKISS:
14           Q     Okay.  I'm handing you what's been marked as Kast
15      Exhibit No. 5.  Would you take a moment to read that
16      document, please?
17           A     (Examining document.)
18                 MR. LINDSAY:  Are you done?
19                 THE WITNESS:  This is a memo to the Supervisor of
20           Elections sent out by me on June 14, 2000.
21      BY MS. HODGKISS:
22           Q     Okay, thank you.
23                 MS. HODGKISS:  Those are all the questions I have
24           on the designation of Mr. Kast as a 30(b)(6) witness.
25                 MR. DEAN:  I don't have any questions.
```

46

```
 1              MR. RESTREPO:  I have one question.
 2                        EXAMINATION
 3    BY MR. RESTREPO:
 4         Q    Mr. Kast, again, my name is Dan Restrepo.  I
 5    represent ChoicePoint, DBT.  You may have already answered
 6    this question, and my apologies if you have.
 7              Do you have responsibilities in the office of the
 8    Division of Elections other than those related to the NVRA?
 9         A    Yes.
10         Q    Thank you.
11              MR. LINDSAY:  I have nothing.
12              MS. HODGKISS:  Does anyone on the phone have any
13    questions?
14              MR. TINKLER:  No questions from Hillsborough.
15              MR. ECKERT:  Volusia has no questions.
16              MS. FINEMAN:  Cara Fineman, I have no questions.
17              MS. HODGKISS:  Why don't we take -- if it's all
18    right with all of you, I'd like to take a ten-minute
19    break and reconvene at 10:30.
20              MR. LINDSAY:  That's fine.
21              (Brief recess.)
22              MS. HODGKISS:  Okay.  We're back on the record,
23    if everyone is ready, and we're now going to begin the
24    part of the deposition that relates to Mr. Kast's
25    expert testimony.
```

```
 1                      FURTHER EXAMINATION
 2   BY MS. HODGKISS:
 3       Q    Mr. Kast, what opinions have you formed in this
 4   matter?
 5       A    Pertaining to what?
 6       Q    Well, that's what I'm asking you.  What -- you've
 7   been designated as a witness who may provide opinion
 8   testimony, and I'm just asking what opinions have you
 9   formed in this case that you will testify -- well, what
10   opinions have you formed in this case?
11            MR. LINDSAY:  Object to the form.
12            THE WITNESS:  I'm still not sure what you're
13       looking for.
14   BY MS. HODGKISS:
15       Q    Have you done any -- well, let me start back
16   here.
17            Did you review any documents to prepare for your
18   deposition today?
19       A    Yes.
20       Q    What did you review?
21       A    I reviewed various letters or memos and our
22   training materials, other documents that were found in the
23   Division and provided to the depositor.
24       Q    Which letters and memos did you review?
25       A    There were several of them.  I don't remember
```

```
 1     exactly specific ones other than, like I said, just memos
 2     or items dealing with NVRA.
 3          Q    Would it be possible for you to make a list of
 4     what letters and memos you reviewed in preparation for this
 5     deposition?
 6          A    Make a list now?
 7          Q    No, no.
 8               MR. LINDSAY:  The question is is it possible for
 9          you to do that.
10               THE WITNESS:  Well, I could go back through those
11          items that I've reviewed.
12     BY MS. HODGKISS:
13          Q    Okay.  What training materials did you review?
14          A    The uniform training program that we use for
15     agencies and Supervisors of Elections.
16          Q    Does that -- we've -- as I'm sure you understand,
17     we have so many documents with so many different dates, is
18     there any possibility that you recall roughly what date
19     those -- the particular uniform training program materials
20     that you reviewed, what date is on that document?
21          A    No, because it was actually -- there's two
22     different copies of the training material, one when I was
23     the administrator of the NVRA and then the new one that
24     Donna has been working on.
25          Q    And which copy did you review?
```

49

```
1        A    I've looked at them both.

2        Q    And have both of them been provided to counsel?

3        A    I would say yes.

4        Q    Okay.  And then you said in addition to training

5   materials, you looked at other documents?

6        A    Yes.

7        Q    What other documents?

8        A    Just different memos, staff meeting notes.

9             MS. HODGKISS:  Counsel, I'm going to request that

10       you provide us with a list -- I understand that he

11       can't recollect at this point, but he's testified that

12       he can -- it's possible for him to go back and

13       reconstruct the list of what he's reviewed for his

14       deposition today.

15            MR. LINDSAY:  I object to providing that.  I

16       mean, he testified what he reviewed, he has testified

17       to the best of his ability what he's reviewed, we

18       produced to you the documents.

19            MS. HODGKISS:  He's not --

20            MR. LINDSAY:  We're not under any obligation in

21       deposition format to do anything further than that.

22            MS. HODGKISS:  Oh, counsel, the summary of his

23       expert testimony did not in any way identify the

24       documents that he relied on in coming to any of the

25       opinions that he plans to express in this case.  We're
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

50

1          entitled to know, if he's going to give expert

2          testimony, what materials he's relying on to form

3          those opinions.

4                    MR. LINDSAY:   I think you're taking a little leap

5          here, because you asked him what documents did he

6          review to prepare for his deposition and he answered

7          truthfully.   You have not yet asked him what documents

8          he relied on in coming up with his expert opinions.

9                    We still do not know what expert opinions, we

10         have not gone through the list we provided you stating

11         which opinions he made, what opinion testimony he may

12         offer, and I notice that there is no duces tecum

13         attachment to the 30(b)(6) notice, so we will be

14         pleased to comply with our obligations of discovery

15         pursuant to the federal rules.   Other than that, we

16         must respectfully object.

17                    You may proceed.

18                    MS. HODGKISS:   Well, counsel, all I'm asking you

19         to do is comply with the Rules of Civil Procedure.

20    BY MS. HODGKISS:

21         Q    Mr. Kast, the documents that you reviewed prior

22    to your deposition, are those documents that you relied

23    upon in coming to the opinions that you have in this case,

24    or any of them?

25         A    My opinion would probably be more based on the

51

```
 1        NVRA and the Florida statutes and the uniform -- the way
 2        that we've provided training and the implementation of it.
 3             Q    So is it your testimony that the two uniform
 4        training manuals are not, you did not rely on those in
 5        coming to your opinions about the training?
 6                  MR. LINDSAY:  Object to the form.
 7        BY MS. HODGKISS:
 8             Q    Go ahead.  You can answer.
 9             A    No, they're a part of that, as I said, the
10        uniform training that we provided to agencies and
11        Supervisors of Elections.
12             Q    Okay.  I'll ask you again, then, what opinions
13        have you formed in this matter?
14                  MR. LINDSAY:  Object to the form.
15                  THE WITNESS:  That the Division of Elections is
16             in compliance with the NVRA.
17        BY MS. HODGKISS:
18             Q    Okay, and what did you do in order to reach that
19        opinion?
20             A    I've reviewed the Florida statutes and the
21        National Voter Registration Act, our responsibilities.
22             Q    Are there any other opinions that you have formed
23        regarding this -- the subject matter of this litigation?
24                  MR. LINDSAY:  Again, I'm going to object to the
25             form.  We've provided you with a list of several areas
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1      that he may offer opinion testimony, if you want to

2      ask him about those lists.

3           MS. HODGKISS:  But, counsel, I'm just asking him

4      what opinions he has formed.  There's nothing

5      inappropriate about that question.

6           MR. LINDSAY:  And I'm not saying there's anything

7      inappropriate other than this is a big lawsuit, he's

8      not a lawyer, he's not -- you ask him what his

9      opinions are in connection with this case, calls for a

10      legal conclusion as to what this case is, to some

11      extent.  So if you want to ask him, go ahead and ask

12      him what you want, but I'm going to object to form as

13      overbroad and vague and overly burdensome and calls

14      for a narrative.

15           MS. HODGKISS:  But none of those are objections

16      to the form of the question.

17           MR. LINDSAY:  They all are, but that's all right.

18      I've made my objection and I'll remain silent.  You

19      can proceed.

20  BY MS. HODGKISS:

21      Q    Mr. Kast, were you asked to review any particular

22  subject matters in connection with this case?

23           MR. LINDSAY:  Object to the extent that invades

24      the attorney-client privilege.

25           MS. HODGKISS:  Well, you're offering him as an

1    expert witness.  I'm entitled to know what you asked

2    him to do, what you asked him to provide opinions on.

3      MR. LINDSAY:  We've set forth that he may offer

4    opinion testimony.

5      MS. HODGKISS:  You certainly haven't set forth

6    what those opinions are.  I'm simply asking him what

7    opinions has he formed in connection with the matters

8    you've asked him to form opinions on in this case.

9      MR. LINDSAY:  We have --

10      MS. HODGKISS:  I don't want to talk to you.  I

11    want to depose the witness.

12      MR. LINDSAY:  But to say we haven't set forth·

13    what those opinions are, we've given you a whole list

14    of areas that he may offer expert testimony in.

15      MS. HODGKISS:  You've identified subject areas;

16    you have not said what the opinions are, and I'm

17    asking the witness what opinions -- I really want to

18    know what you have been asked to express opinions on

19    in this case.

20      MR. LINDSAY:  Same objection.

21      MS. HODGKISS:  We're entitled to know that.

22  BY MS. HODGKISS:

23    Q  I'd ask you to answer the question.

24    A  The opinions I've formulated are on the

25  Division's compliance with the National Voter Registration

1    Act and the Division's compliance with its responsibilities
2    under NVRA to both state agencies and Supervisors of
3    Elections and in the area of education to the public in the
4    administration of the NVRA.
5         Q    And what is your opinion -- let's take those one
6    by one.
7              MS. HODGKISS:  If you could read back his answer
8         for me?  Thank you.
9              MR. LINDSAY:  And I'll join in that request.
10             (Whereupon, the court reporter read the requested
11   portion of the record.)
12   BY MS. HODGKISS:
13        Q    Are there any other areas in which you have
14   formed opinions?
15             MR. LINDSAY:  Object to the form.
16   BY MS. HODGKISS:
17        Q    You can answer the question.
18        A    Those compliance with our statutory mandates, say
19   with the interaction between the Division and agencies and
20   Supervisor of Elections; again, the requirement of training
21   programs for agencies and Supervisors of Elections.
22        Q    Okay.  Let me go back, then, to the first area
23   that you identified, the Division's compliance with the
24   NVRA.
25             What is your opinion regarding the Division's

55

1       compliance with the NVRA?

2           A    That the Division is in compliance with NVRA.

3           Q    What's the basis for that opinion?

4           A    The Division provides coordination and uniform

5       training to state agencies, the Supervisors of Elections,

6       provides for the statewide voter registration application

7       and coordination on the State's responsibilities of NVRA as

8       well as its responsibilities in reporting to the Federal

9       Elections Commission.

10          Q    What materials did you rely upon to reach that

11      conclusion?

12          A    The NVRA itself, and the Florida statutes.

13          Q    Anything else?

14          A    Not that I recall.

15          Q    Did you undertake any review or examination of

16      the Division of Elections specifically and only for the

17      purpose of formulating your opinion in this case on this

18      particular -- the opinion you just expressed?

19          A    I'm sorry, I don't understand the question.

20          Q    I'm asking you with regard to the opinion you

21      just expressed, did you conduct any reviews, examinations

22      or studies of the Division's operations?

23          A    Just the reviews, if you will, of our compliance

24      with the Division's responsibilities under NVRA and in

25      providing coordination for state responsibilities and in

1     providing the uniform training to the agencies and to the

2     Supervisors of Elections, and the actual training materials

3     that we use.

4          Q     And did you undertake that review specifically

5     for the purpose of coming to your opinion, the opinion you

6     just expressed?

7          A     I don't know that I would say I did it

8     specifically for my opinion to express.  I have reviewed it

9     more as a refresher for my own memory.  It's been my

10     opinion all along that the Division is in compliance with

11     NVRA.

12          Q     Let's -- I would like to go to the second area

13     that you identified.

14          You said the Division's compliance with its

15     responsibilities under the NVRA to state agencies and

16     Supervisors of Election.  What opinion do you have with

17     regard to those matters?

18          A     That the Division is in compliance with those

19     responsibilities.

20          Q     And what's the basis for that opinion?

21          A     Because the Division -- or the Division complies

22     with its responsibilities by providing the training for

23     Supervisors of Elections and the uniform training for

24     agencies of their responsibilities under NVRA, and that the

25     Division complies by providing the voter -- standard voter

57

```
 1      registration application form to the agencies and the

 2      Supervisors.

 3          Q    And is there any -- are there any materials that

 4      you relied upon to come to that opinion?

 5          A    Again, the NVRA and the state statutes and the

 6      review of the training material.

 7          Q    Is there any data that you reviewed in coming to

 8      that opinion?

 9          A    No.

10          Q    Okay.  Let's go to the third area that you

11      identified, the education of the public, I believe.  Can

12      you tell me what opinions -- I assume you're talking about

13      the Division's responsibility to provide education to the

14      public?

15          A    In that we do provide information and education

16      to the public, yes, on voter registration.

17          Q    Okay.  And what's your opinion about the

18      education that you provide to the public on voter

19      registration?

20          A    That we do provide it and it's informative.

21          Q    And did you rely on any material -- well, let me

22      ask you this way:  What's the basis for that opinion?

23          A    The basis is the information that we supply to

24      the public in general and the ways and the means in which

25      we do it.
```

1       Q     Can you identify for me what information you're

2   referring to?

3       A     Yes.   The Division on an ongoing basis provides

4   -- we have provided billboards all across the state that

5   identify a toll-free number that we have that individuals

6   can report voter fraud; we provide a voter registration

7   guide that identifies when the elections are going to be

8   held, what offices are up for election, when you have to be

9   registered, provides information on absentee ballots, gives

10  you the names and addresses and phone numbers of all the

11  Supervisors of Elections; we provide on our Web site voter

12  information registration as well as on our Web site we

13  provide a place where you can complete the voter

14  registration application for us to mail back to you; we

15  have provided posters to agencies so that the public would

16  know that that's a place that they can register to vote; we

17  provide posters to the Supervisors of Elections to place in

18  their polling places that inform the individuals of

19  Florida's primary procedures of voter fraud information and

20  instructions to voters; we've just recently contracted with

21  the Florida News Network, I think it's called, Florida

22  radio network on getting information out about the new

23  voting systems that may be in the counties and encouraging

24  them to contact their Supervisors of Elections to find out

25  what kind of voting system they have in their county, to

1    find out if they're registered, if they need to change

2    their registration and see where their precincts are.

3              And there may be some other things in there that

4    I can't recall off the top of my head.

5       Q    The voter registration guide and the information

6    regarding absentee ballots, how do those materials get to

7    the public?

8       A    We distribute them upon request from, like a

9    private organization, if they call and say, hey, we want to

10   do a voter education thing, we'll give them as many copies

11   as they want.  We also provide them to the Supervisors of

12   Elections for them to put them out around their counties.

13      Q    And does any of this informational material

14   include information about how a voter's name might be

15   removed from the voter registration rolls?

16      A    To the best of my knowledge, I don't think so.

17   The voter guide might, but I'm not sure.

18      Q    And what materials did you rely upon in coming to

19   this opinion?

20      A    That same information that I just gave you, the

21   posters that we provide and everything.

22      Q    Was there anything else that you reviewed in

23   connection with this area?

24      A    There may be something else that we're providing

25   that I'm just -- I can't think of at this point in time.

1      I'm not sure whether I mentioned the universal primary

2      poster that we provide that's placed in the polls.  If I

3      didn't, that may be one of the other ones, and there may be

4      some other ones.

5          Q    The next area I believe you identified, and

6      please correct me if I'm wrong, but in the administration

7      of the NVRA, you provide -- and I'm sorry I don't have this

8      writing as well as I can -- you provide information to the

9      public, but you also provide information to the state

10     agencies and the Supervisors of Elections?

11         A    As that's part of our responsibilities in the

12     administration, we provide the uniform training to the

13     agencies and the Supervisors of Elections.  We provide them

14     the voter registration application, statewide voter

15     registration application and --

16         Q    Do you also --

17         A    -- coordinate the State's responsibilities of the

18     NVRA.

19         Q    Do you also provide them with a declamation form?

20         A    We prescribe the form and have provided it to

21     them.

22         Q    And are the state agencies trained by you that

23     they are required under the NVRA to provide those

24     declamation forms to the people they serve?

25         A    Yes.


FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

61

1    Q    What's your opinion regarding the administration

2    and coordination of the State's NVRA activities?

3    A    That the State is in compliance, at least the

4    Division of Elections is.

5    Q    And what's the basis for that opinion?

6    A    Based on the Florida statutes and the NVRA and

7    the training that we provide to the agencies and the

8    Supervisors of Elections.

9    Q    And were there any materials that you reviewed in

10   coming to that opinion?

11   A    The Florida statutes, the Voter Registration Act

12   and the training program or guide that we use.

13   Q    Now, you also identified as an area interaction

14   between the agencies and the Division.  What's your opinion

15   regarding that?

16   A    The interaction between the agencies and the

17   Division is that we comply with the NVRA through our

18   coordination under the State's responsibilities of NVRA.

19   Q    Okay.  And what's the basis for that opinion?

20   A    The requirements of the Florida statutes and the

21   NVRA.

22   Q    Okay.  In coming to your opinion regarding the

23   interaction between the agencies and the Division, did you

24   review any materials?

25   A    The Florida statutes and the National Voter

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

 1    Registration Act and the training materials that we use.

 2         Q    I have also as an area that you identified the

 3    requirement of training programs for agencies and

 4    Supervisors of Elections.  Have we already covered that?

 5         A    We provide training to the Supervisors of

 6    Elections and to the agencies on the requirements of NVRA

 7    and Florida statutes.

 8         Q    Have you formed -- or what opinions have you

 9    formed regarding the training that you provide?

10         A    That the training is in compliance with the NVRA

11    and the Florida statutes.

12         Q    Okay.  And what's the basis for that opinion?

13         A    The review of the NVRA, the Florida statutes and

14    reviewing the training.

15         Q    Were there any materials that you reviewed or

16    relied upon in coming to that conclusion?

17         A    The Florida statutes, the NVRA, the training

18    guide -- or not training guide, the training Power Point

19    program, which, as I recall now, when you were asking about

20    like the billboards and everything --

21         Q    Yes.

22         A    -- the training Power Point that we use for

23    agencies is also on our Web site for any agency to go and

24    look at it in between when we're doing formal training

25    classes.

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

1        Q    I see.  Okay.  Are there any other -- or I should

2    ask it this way:  Are there any other opinions that you

3    have formed regarding the areas that you have identified

4    that you have not told me about?

5              MR. LINDSAY:  Object to the form.

6              THE WITNESS:  Not at this point that I recall,

7         other than part of the education as far as the public

8         is a -- we provide on -- kind of on request speakers

9         to organizations on voter registration.  I don't know

10        whether you'd consider that a different area or not.

11    BY MS. HODGKISS:

12        Q    The speakers that you provide, that's part of

13    your -- the education of the public?

14        A    Yes.

15        Q    Okay.  I'm looking at a document provided by

16    counsel and it states that you intend -- or it states the

17    subject matter of your expert testimony would include

18    election administration?

19        A    As it pertains to NVRA.

20        Q    Are there any opinions that you have formed

21    concerning election administration as it pertains to the

22    NVRA?

23        A    Yes, that we're in compliance with the State's

24    responsibilities of administering the NVRA.

25        Q    And that's the -- that's the same as the first

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

64

1    opinion that you -- we discussed?

2        A    It's to provide the training to the agencies and

3    to the Supervisors of Elections, provide the statewide

4    voter registration database to coordinate the State's

5    responsibilities, but in addition to that, it's to provide

6    every two years to the Federal Election Commission the

7    reporting requirements of the Federal Election Commission

8    by the State.

9        Q    Are there any materials that form the basis of

10   that opinion that you have not already identified?

11       A    Not to my knowledge.

12       Q    Do you have any opinions regarding the impact of

13   the Florida Election Reform Act and administrative

14   rulemaking on voter registration -- I can read that again,

15   I'm sorry.

16            Any opinions regarding the impact of the Florida

17   Election Reform Act and administrative rulemaking on voter

18   registration?

19       A    The -- I'm sorry, the impact of the Florida --

20   what was that again?  I'm sorry.

21       Q    Sure.  Impact of the Florida Election Reform Act

22   and administrative rulemaking on voter registration,

23   training and administration -- oh, I should have read the

24   whole sentence.  I do apologize.  Let me read the whole

25   sentence to you.

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1              Impact of the Florida Election Reform Act and
 2    administrative rulemaking on voter, registration, training
 3    and administration of elections.
 4         A    To the best of my knowledge, what I recall,
 5    that's a 1994 paper or something that was actually put out
 6    -- I'm not sure whether it was put out before I was
 7    employed or not, but as far as an opinion on it, no, I
 8    haven't reviewed it.
 9              MS. HODGKISS:  Okay.  I have a two-page document
10         that I would like to have marked as Kast Exhibit 6.
11              (Whereupon, Exhibit No. 6 was marked for
12    identification.)
13              MS. HODGKISS:  For those of you on the phone,
14         I've marked a two-page document that was provided as
15         Exhibit 3 to the -- I'm sorry, let me find my pleading
16         that was attached to -- to the -- I believe it's
17         Hillsborough County and Katherine Harris's Designation
18         of Expert Witnesses, but I'll let the witness identify
19         for you what the document is.
20    BY MS. HODGKISS:
21         Q    I'm handing you what's been marked as Kast
22    Exhibit No. 6.  Can you tell me what that document is?
23         A    Yes.  It's my resume.
24         Q    Okay.  Is that an accurate resume as of today?
25         A    Without sounding sarcastic, unless you know
```

```
 1    something I don't know, yes.

 2         Q    Okay, very good.  Can I just -- so I can read

 3    it.  That's great.

 4              Prior to your work with the Division of

 5    Elections, you worked for the Department of Environmental

 6    Protection in the Bureau of General Services?

 7         A    That's correct.

 8         Q    What -- I guess I want to ask this way:  Did your

 9    responsibilities in that position relate at all to the NVRA

10    or -- well, to the NVRA?

11         A    No.

12         Q    Did it relate at all to election administration?

13         A    No.

14         Q    Then prior to that, and I want to make sure I can

15    read the resume correctly, it says that you were in the

16    United States Air Force.  Was that July 1969 to May 1990?

17         A    (Nods in the affirmative.)

18              MR. LINDSAY:  Is that a yes?

19              THE WITNESS:  Yes.  I'm sorry.  Yes, 21 years

20         roughly.

21    BY MS. HODGKISS:

22         Q    Wow.  In that -- and it says you had various

23    assignments throughout the world.  In that work, did you

24    have any involvement with armed services voting?

25         A    Other than my own voting, no.
```

67

1        Q     And your educational experience, again I just

2    want to make sure I can read the dates here, you attended

3    the Community College of the Air Force in 1986?

4        A     Yes.

5        Q     Okay.  And the degree that you obtained there,

6    logistics management, did that -- would the information

7    that you -- or what you learned in obtaining that degree

8    relate in any way to your current duties as Assistant

9    Division Director?

10        A     Well, if I can explain in this way, logistics

11    management is the military degree and it's probably

12    equivalent to business management, so, yes, in a roundabout

13    way, I guess.  I'm not trying to be vague, but --

14        Q     Sure.

15        A     -- it's just because the degree in the Air Force

16    is obviously geared to the Air Force, but it's equivalent

17    to like a business management associates degree.

18        Q     Are there any -- to your knowledge, are there any

19    professional journals that are devoted to administration of

20    a state's responsibilities under the NVRA?

21        A     You mean are there journals that are devoted

22    solely to responsibilities?

23        Q     Correct.

24        A     Not to my knowledge.

25        Q     Are there any professional journals or regular

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

68

```
1     publications that, at least in part, have articles or

2     discussions regarding a state's compliance with the NVRA?

3          A     I have read, and it's been years, but I've read

4     some articles that have to do with NVRA, not a specific

5     state's compliance to it.

6          Q     And I'm sorry, I didn't mean a specific state's,

7     I meant general articles about best practices that states

8     might follow.

9          A     Not that I recall, no.

10          Q     Do you know if there are any recognized

11     authorities in the area of -- general area, not any

12     particular state --

13          A     Sure.

14          Q     -- but the general area of how to comply -- how a

15     state can comply with the NVRA?

16          A     Not that I recall.

17          Q     Okay.  Have you written any articles that relate

18     in any way to the subject matter of the opinions that you

19     have just reviewed?

20          A     I developed the training -- uniform training

21     guide that -- or presentation that the State uses to train

22     agencies and Supervisors of Elections.

23          Q     Okay.  Any other written -- any other written

24     materials that you've produced?

25          A     That I've produced?
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

69

```
1        Q    Yes.

2        A    No.

3        Q    Okay.  Have you published any articles relating

4   to any of the subject areas that we discussed?

5        A    No.

6        Q    Have you been following any of the election

7   reform bills that are currently pending in Congress?

8        A    To a slight extent.

9        Q    Do you have any sense of how that might affect

10  Florida's activities under the NVRA?

11            MR. LINDSAY:  Object to the form.

12  BY MS. HODGKISS:

13       Q    Whether, let me ask it this way:  Do you have any

14  opinion about whether those bills would affect Florida's

15  activities under the NVRA?

16       A    Not at this point in time.

17       Q    Now have you ever testified as an expert witness?

18       A    Ever?

19       Q    Yes.

20       A    No.

21            MS. HODGKISS:  If you give me just one moment.

22            MR. LINDSAY:  Take your time.

23            (Brief pause.)

24  BY MS. HODGKISS:

25       Q    Just one more question.
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

```
 1              In the course of the carrying out your
 2    responsibilities for the State relating to the NVRA -- and
 3    so I'm talking not only about your current position, but in
 4    the position you had immediately prior to this one where I
 5    believe you testified you had a responsibility for
 6    coordinating the State's activities, during that time, were
 7    there any workshops or training programs that you attended
 8    not as a trainer, but as a trainee where you were learning
 9    about the State's administration of the NVRA?
10        A    I have attended training in Houston, and I can't
11    remember what the date was, but it was more on election, it
12    wasn't specifically on NVRA.  NVRA was part of it, but it
13    was a broader base of elections.
14        Q    And when was that, roughly?
15        A    It was shortly after being selected as the
16    Assistant Director, so it was sometime in the summer, I
17    think, of 2000.
18        Q    And --
19        A    I'm not sure exactly of the time frame.
20        Q    That's close enough.  Do you recall who sponsored
21    or conducted the training?
22        A    An organization called The Elections Center.
23        Q    And how -- was it a week-long program or a day
24    and a half, how long was it?
25        A    I don't think it was a full week.  I think it was
```

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

71

```
 1      more like three or four days.

 2           Q    Okay, I have no further questions.   Thank you.

 3                MR. RESTREPO:  I have no questions.

 4                MR. DEAN:  No questions.

 5                MR. LINDSAY:  I don't think I have any, but can

 6      we take a break for three or four minutes?

 7                MS. HODGKISS:  Does anybody on the phone have

 8      questions?

 9                MS. TORRES:  Susan Torres, I have no questions.

10                MR. TINKLER:  This is Ken Tinkler, no questions.

11                MS. FINEMAN:  Cara Fineman, no questions.

12                MR. LINDSAY:  Can I have four minutes?

13                (Brief recess.)

14                MR. LINDSAY:  I have nothing further.

15                MS. HODGKISS:  Okay.  Thank you.

16                (Whereupon, the deposition was concluded at

17      11:25 a.m., and reading and signing by the witness was not

18      waived.)

19

20

21

22

23

24

25
```

72

```
 1                    C E R T I F I C A T E
 2      STATE OF FLORIDA    )
 3      COUNTY OF LEON      )
 4               I, MARLO D. FARNSWORTH, Certified Shorthand
 5      Reporter and Notary Public at Tallahassee, Florida, hereby
 6      certify that the witness in the foregoing transcript was
 7      first duly sworn, having identified himself to me;
 8               That the foregoing transcript was taken down as
 9      stated in the caption, and the questions and answers
10      thereto were reduced to typewriting under my direction;
11               That the foregoing pages 7 through 71 represent a
12      true, correct, and complete transcript of the evidence
13      given upon said hearing;
14               And I further certify that I am not of kin or
15      counsel to the parties in the case; am not in the regular
16      employ of counsel for any of said parties; nor am I in
17      anywise interested in the result of said case.
18           Dated this 24th day of May            , 2002.
19
20
21           MARLO D. FARNSWORTH
22           Court Reporter and Notary Public
23           State of Florida at Large
24
25
```

Marlo D. Farnsworth
MY COMMISSION # DD050142 EXPIRES
November 11, 2005
BONDED THRU TROY FAIN INSURANCE, INC.

FOR THE RECORD REPORTING TALLAHASSEE, FLA 850-222-5491

**PLAINTIFFS' EXHIBIT 29**

Deanie Lowe

1

```
1              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA
2           CASE NO.: 01-0120-CIV-GOLD/SIMONTON

3
   NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
4  PEOPLE, INC., by its FLORIDA STATE CONFERENCE OF
   BRANCHES, JIMMIE PANNELL, JULIA STONER, NATALIE
5  CARNEGIE, JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q.
   ODOM, WILLIE STEEN, WALLACE MCDONALD, JERMAINE TERRY,
6  LORINE WALDEN, EMERY TIMBERLAKE, VALERIE BUFORD,
   MICHELLE FLOYD, CONSUELO MARIA GRAHAM, SHERRY EDWARDS,
7  KANDY WELLS, JOANNA CLARK, JANICE KELLY, PLACIDE
   DOSSOUS, RONDRICK ROSE, URSULA HARVEY, and ADMATHA
8  ISREAL in their own right and as representatives of
   all similarly situated citizens and residents of the
9  State of Florida,

10              Plaintiffs,

11      -vs-

12  KATHERINE HARRIS, Secretary of State of Florida; CLAY
    ROBERTS, Director of the Florida Division of
13  Elections; FRED DICKINSON, Executive Director of the
    Florida Department of Highway Safety and Motor
14  Vehicles; KATHLEEN A. KEARNEY, Secretary of the
    Department of Children and Families; DAVID C. LEAHY,
15  Miami-Dade County Election Supervisor; MIRIAM
    OLIPHANT, Broward County Election Supervisor; JOHN
16  STAFFORD, Duval County Election Supervisor; PAM IORIO,
    Hillsborough County Election Supervisor; ION SANCHO,
17  Leon County Election Supervisor; WILLIAM COWLES,
    Orange County Election Supervisor, and DEANIE LOWE,
18  Volusia County Election Supervisor (all in their
    official capacities); and CHOICEPOINT, INC., a Georgia
19  corporation d/b/a DATABASE TECHNOLOGIES, INC.,

20              Defendants.
    ─────────────────────────────────────────/
21

22                        128 Live Oak Avenue
                          Daytona Beach, Florida
23                        April 24, 2002
                          9:15 a.m.
24
                   DEPOSITION OF DEANIE LOWE
25                        VOLUME I
```

2

```
1           The above-styled cause came on for hearing

2  before me, Christine Sammaro, Certified Shorthand

3  Reporter, Registered Merit Reporter, and Notary

4  Public, State of Florida at Large, at the time and
```

Page 1

Deanie Lowe

5   place above indicated for the purpose of taking

6   testimony.

7

8   APPEARANCES:

9

10          JANAI S. NELSON, ESQUIRE
            TODD A. COX, ESQUIRE
            LEXER I. QUAMIE
11          NAACP Legal Defense and Educational Fund, Inc.
            99 Hudson Street
12          New York, New York  10013

13          On Behalf of Plaintiffs

14

15          WILLIAM J. BOSCH, ESQUIRE
            Volusia County Attorney's Office
            123 West Indiana Avenue
16          DeLand, Florida  32720-4613

17          On Behalf of Volusia County Supervisor of
            Elections Deanie Lowe

18

19          DANIEL A. RESTREPO, ESQUIRE
            Williams & Connolly, LLP
20          725 12th Street, N.W.
            Washington, DC  20005

21
            On Behalf of ChoicePoint, Inc. d/b/a Database
22          Technologies, Inc.

23

24

25

                                                    3

1   APPEARANCES: (Continued)

2

3           DOUGLAS B. MAC INNES, ESQUIRE
            Assistant Attorneys
            General Department of LEgal Affairs
4           PL-01, The Capitol
            Tallahassee, Florida  32399-1050

5
            On Behalf of Fred Dickinson, Executive Director
6           Florida of Highway Safety and Motor Vehicles
            and Kathleen Kearney, Secretary of the Florida
7           Department of Children and Families

8

9           JOHN W. LITTLE, III, ESQUIRE
            Steel Hector & Davis, LLP
            1900 Phillips Point West
10          777 South Flagler Drive, Suite 1900

Page 2

                            Deanie Lowe
                   West Palm Beach, Florida  33401
11
                   On Behalf of Katherine Harris, Secretary of
12                 State of Florida, and Clay Roberts, Director of
                   the Florida Division of Elections
13

14                 JASON TEAL, ESQUIRE
                   Office of General Counsel
15                 City of Jacksonville
                   117 West Duval Street, Suite 480
16                 Jacksonville, Florida  32202

17                 On Behalf of Duval County Supervisor of
                   Elections John Stafford
18

19                 JEFFREY P. EHRLICH, ESQUIRE
                   SUSAN TORRES, ESQUIRE
20                 Assistant County Attorney
                   Dade County Attorney's Office
21                 111 NW 1st Street, Suite 2810
                   Miami, Florida  33128
22
                   On Behalf of Miami-Dade County Supervisor of
23                 Elections David Leahy

24

25

                                                              4
1                        I N D E X          Page

2

3       Direct Examination by Ms. Nelson          5

4       Certificate of Reporter                   133

5

6                        E X H I B I T S       Page

7

8       Plaintiff's Exhibit No. 1 Lowe            9
        (Documents)

9       Plaintiff's Exhibit No. 2 Lowe            33
        (Documents)
10
        Plaintiff's Exhibit No. 3 Lowe            40
11      (Documents)

12      Plaintiff's Exhibit No. 4 Lowe            40
        (Documents)
13
        Plaintiff's Exhibit No. 5 Lowe            107
14      (Documents)

15      Plaintiff's Exhibit No. 6 Lowe            108
        (Documents)
                           Page 3

Deanie Lowe

16

17    Plaintiff's Exhibit No. 7 Lowe                109
      (Documents)

18

19

20

21

22

23

24

25

                                                    5

1         THEREUPON

2                        DEANIE LOWE

3    was called and, having first been duly sworn,

4    testified as follows:

5                    DIRECT EXAMINATION

6    BY MS. NELSON:

7         Q    Good morning, Ms. Lowe, how are you?

8         A    Fine, thank you.

9         Q    My name is Janai Nelson, I'm an attorney for

10   the NAACP Legal Defense and Educational Fund, and I

11   represent the plaintiffs in the case NAACP v Harris.

12   I will be talking to you today about some issues in

13   the case, asking you questions, and if at any time I

14   say something that isn't clear or that you don't

15   understand, please let me know --

16        A    Okay.

17        Q    -- and I will do my best to rephrase it and

18   help you to understand.

19             Have you spoken with your attorney today

20   about your deposition?

21        A    I'm trying to remember if we talked about my

                        Page 4

Deanie Lowe

22    deposition.  I have spoken to my attorney, yes.  I

23    don't believe we discussed the deposition.

24         Q    Did you talk to your attorney before today

25    about the deposition testimony?

6

1         A    Oh, yes, yes.

2         Q    Do you understand what's going to go on here

3    today in terms of the rules of the deposition --

4         A    Yes, I do.

5         Q    -- and how it will proceed?

6         A    Yes.

7         Q    If you need a break at any point, let me

8    know --

9         A    Okay.

10         Q    -- and we'll find a suitable time to do so.

11    And I don't want you to guess or speculate, I want you

12    to answer as to your personal knowledge, and if at any

13    time you need to go back and correct an answer or

14    complete an answer, let me know and we can do that.

15         A    Okay.

16         MR. BOSCH:  Before we begin, Ms. Lowe, you

17         had two things you wanted to correct with regard

18         to previous filings?

19         THE WITNESS:  Right.  As I was reviewing the

20         responses to the interrogatories and the

21         affidavits that we had submitted this past

22         weekend, I found two mistakes in them that I

23         would like to go on record to correct.  And I

24         probably will be submitting this in writing to

25         them to correct.

7

Page 5

Deanie Lowe

1          MR. BOSCH:  That's correct.  We'll be making

2      the amended --

3      A    The first one is in the affidavit that we

4  submitted, I think it was dated April 13th of 2001,

5  and it's on page seven, and we gave an address of 1717

6  Mason Avenue in Daytona Beach for an overflow -- a

7  motel where overflow students that couldn't get into

8  the dorms at Bethune Cookman College were placed

9  temporarily, and we were mistaken about that address.

10  It's actually 2900 International Speedway Boulevard.

11     Q    Is there anything else?

12     A    The other one is in the response to

13  interrogatories that was dated March 22nd, 2002, on

14  page ten, and it's under Number 16 that's asking for

15  the book closing dates, and --

16     Q    One moment.  Let me grab the document, if

17  you don't mind.

18     A    It looks like this.

19     Q    I'm sorry, what page?

20     A    It's page ten and it's question Number 16.

21  The response to it, the second line says second

22  primary and November 3rd for the general election.

23  The general election was November 3rd, and I don't

24  know how I missed that when we -- when I reviewed it

25  before it was turned in, and I'm sorry, it's 29 days

                                              8

1  prior to November 3rd, and I forgot to go back and

2  check that so I could give you that correction, but if

3  I could just point out that it was not November 3rd,

4  it was 29 days prior to that.

5      Q    Okay.

6      A    It's probably October 5th, but I don't know

Page 6

Deanie Lowe

 7    exactly, without looking at a calendar for that year.

 8        Q    This is for 1998 --

 9        A    Yes.

10        Q    -- book closing dates?

11        A    Right.

12        Q    All right.  Was there anything else you

13   wanted to correct?

14        A    No.

15        Q    Can you please state and spell your full

16   name?

17        A    The full name is Ora, O-r-a, Deane,

18   D-e-a-n-e, Lowe, L-o-w-e.  I have always gone by my

19   middle name, with an I in it for Deanie, D-e-a-n-i-e.

20        Q    What is your current address?

21        A    1065 North Halifax Drive in Ormond Beach.

22        Q    And the address to the Volusia County

23   Supervisor of Elections office?

24        A    136 North Florida Avenue in DeLand.

25        Q    Are you represented by counsel here today?

                                              9

 1        A    Yes, I am.

 2        Q    Who is that?

 3        A    Bill Bosch.

 4        Q    Do you understand that you're here pursuant

 5   to a Notice of Deposition served on your attorney

 6   pursuant to Rule 30B6 of the Federal Rules of Civil

 7   Procedure?

 8        A    Yes, I do.

 9             MS. NELSON:  I'd like to mark as Plaintiff's

10             Exhibit 1 Lowe Plaintiff's Notice of Rule 30B6

11             Deposition.  Can you tell me if you've seen this

Page 7

Deanie Lowe

12      document before?

13      A    Yes, I have.  That's why I'm here.

14      Q    You can hold on to it, we need to get it

15      marked.

16           (Plaintiff's Exhibit No. 1 Lowe was marked

17      for identification.)

18      Q    Did you read it when you saw it?

19      A    Yes.

20      Q    Did you understand it?

21      A    Yes.

22      Q    Did you discuss it with anyone, other than

23      your attorney?

24      A    Yes.

25      Q    Who did you discuss it with?

                                              10

1       A    With some members of my staff.

2       Q    Do you recall which ones?

3       A    With Sandy Peloquin, probably -- are you

4       talking about did I discuss this particular document

5       with them or did I discuss other matters?

6       Q    Did you discuss that document?

7       A    Only with Sandy Peloquin and Dan Eckert, my

8       attorney.

9       Q    What did you discuss with Miss Peloquin?

10      A    The fact that, you know, where the place was

11      and what time it started and how long we anticipated

12      being here.

13      Q    Did you understand that document to also

14      request a production of documents from you?

15      A    Yes, I did.

16      Q    Are you producing any documents today --

17      A    No, I'm not.

Page 8

Deanie Lowe

18      Q      -- pursuant to that request?

19      A      We've sent tons of them.  I believe we've

20  sent everything that we could in response to your

21  request.  If there are any other requests, we'll

22  continue to search to be able to supply whatever you

23  need.

24      Q      Okay.  I'm going to ask, just so that we

25  have a clear record, that you let me get my questions

                                                    11

1  out fully and then answer.

2      A      I'm sorry.  I'm bad about that.

3      Q      That's okay.  I understand.  Do you have any

4  reason to believe that you cannot give competent

5  testimony today?

6      A      No.

7      Q      Have you ever testified before?

8      A      Yes.

9      Q      And in what circumstances?

10      A      Are you talking about a deposition?

11      Q      Any testimony, court testimony, deposition

12  testimony.

13      A      Okay.  I have testified twice in court and

14  once in a deposition.

15      Q      Can you tell me about the court testimony

16  you gave?  In what cases did you give the testimony?

17      A      The first one was approximately 15 or 20

18  years ago, it was a court case involving a swindle by

19  a car wash salesman and I was a witness for the State

20  against him.

21      Q      And what about the second court proceeding?

22      A      That was in the Beckstrom trial in Volusia

Page 9

Deanie Lowe

23    County after the 1996 election.

24         Q    And the deposition?

25         A    That was approximately ten years ago, and it

                                                      12

1     was dealing with a real estate lawsuit.

2          Q    Did you also give a deposition in the

3     Beckstrom trial?

4          A    No.

5          Q    What about the car wash swindle?

6          A    No.

7          Q    Do you understand that at the outset of the

8     deposition you took an oath to tell the truth, and

9     that it is the same effect as if you had taken it in a

10    court of law?

11         A    Yes, I do.

12         Q    Have you ever been a party to a court

13    proceeding or administrative proceeding other than --

14    well, why don't you answer the question there.

15         A    No, just the ones that I've mentioned.

16         Q    Were you a party in each of those

17    proceedings?

18         A    Well, I may not understand the term party.

19    Does that include being a witness?

20         Q    No.  Were you named in the lawsuit?

21         A    Okay.  Only in the Beckstrom I was named as

22    part of the county canvassing board.

23         Q    Is that the only legal proceeding or

24    administrative proceeding in which you were named as a

25    party, other than the present case?

                                                      13

1          A    For foreclosure one time.  I don't know if

2     my name was on it or if it was only my husband.

                        Page 10

Deanie Lowe

3      Q    Can you think of any other proceeding in

4   which you were --

5      A    No, I cannot think of any.

6      Q    What did you do, if anything, to prepare for

7   your testimony today?

8      A    Well, I was heavily involved in coming up

9   with the responses to the interrogatories and the

10  affidavits and I reviewed those.  I've reviewed

11  reports that have been generated by my department.

12  I've talked with my staff.

13     Q    Did you do anything else?

14     A    Not that I can think of at this moment.

15     Q    What reports did you review in preparation

16  for your testimony?

17     A    Primarily the one -- the assessment that was

18  done by the county internal auditor, the review of our

19  department after the election.

20     Q    Any other documents?

21     A    I reviewed the VRA procedures manual that

22  was generated by the Federal Elections Commission.  I

23  reviewed Florida Statutes and went back over and over

24  what we've submitted to you.

25     Q    Did you review any documents that you have

                                              14

1   not produced to us?

2      A    Not that I know of.

3      Q    Who did you talk to on your staff?

4      A    Sandy Peloquin, Lana Hires, Debbie Allen,

5   Denise Hanson.

6      Q    Anyone else?

7      A    That's it.

                    Page 11

Deanie Lowe

8      Q      What is Sandy Peloquin's title?

9      A      She's the director of our Registration

10    Division.

11    Q      And Lana Hires?

12    A      The director of our Elections Division.

13    Q      And what about Debbie Allen?

14    A      The director of our Outreach Division.

15    Q      And Denise Hanson?

16    A      She's my assistant Supervisor of Elections.

17    Q      Can you tell me about your educational

18    background after graduating from high school?

19    A      Okay.  I went through a year and a half at

20    Daytona Beach Community College, and then went back to

21    take courses in computers and in real estate.

22    Q      Did you receive a degree?

23    A      No, I received my real estate salesman's

24    license.

25    Q      Did you have any other schooling after that?

                                                      15

1      A      No.

2      Q      What year was that?

3      A      The community college would have been 1957

4      through 1959.  It began partway through '57.  And the

5      later courses would have been in the 1960s for the

6      real estate certification and in the 19 -- I believe

7      it was the 1980s for the computer course.

8      Q      Have you taken any courses that relate to

9      election administration?

10    A      I have taken -- I've attended all of the

11    workshops that have been sponsored by the Division of

12    Elections; they sponsor those twice a year since I

13    entered office.  I cannot name them right off the bat,

Page 12

Deanie Lowe

14   but there have been regional workshops that have been

15   given that I've participated in.

16        Q     Regional workshops that are in addition to

17   the two conferences each year?

18        A     Yes.  And these are not always sponsored by

19   the division, they're sponsored by the Association of

20   Supervisors in some cases, but they're sanctioned by

21   the division.

22        Q     Is that the Florida State Association of

23   Supervisor of Elections that sponsors some of the

24   regional workshops?

25        A     That's correct.

16

1        Q     Is there any other entity that sponsors the

2   regional workshops, that you know of?

3        A     Only the division itself periodically if

4   there's a need for it.

5        Q     So it's either the Division of Elections or

6   FSASE?

7        A     Right.

8        Q     Have you kept copies of any of the materials

9   from these workshops?

10        A     Yes, I have.

11        Q     Do you know whether they've been produced in

12   connection with this lawsuit?

13        A     I don't believe so.  May I take that back?

14   I know that some of them have.  Not a workshop that I

15   attended, but that one of my staff attended.

16        Q     So you still have copies of the materials

17   from these workshops in your office?

18        A     What we would have would be the agendas for

Page 13

Deanie Lowe

19   the conference, and those would be in with our travel

20   vouchers because we have to use that as a

21   justification, but the materials would have been

22   distributed to the proper person to put in their files

23   for reference.

24       Q    What about the DOE workshops that occur

25   twice a year, did you keep copies of any materials

                                                        17

1   handed out in those conferences?

2       A    Yes.

3       Q    Do you know whether those materials were

4   produced?

5       A    I know that at least some of them were, if

6   it was responsive to the request.

7       Q    Are there copies of those materials in your

8   office?

9       A    Yes.

10       Q    Who else from your office attends the DOE

11   workshops that occur twice a year?

12       A    Normally my division heads and my assistant

13   are the ones who almost always attend.  Other staff,

14   if the content of the program is pertinent to their

15   area of work, and if our budget will allow it, are

16   able to attend.

17       Q    Is there a record of who attended each

18   conference?

19       A    Yes.

20       Q    Would that be in the travel files?

21       A    Yes.

22       Q    Would it be anywhere else in your office?

23       A    No.

24       Q    What about the regional workshops that are

                        Page 14

Deanie Lowe

25    sponsored either by DOE or FSASE?

                                              18

1         A    Those would be in our travel files.

2         Q    who attends those conferences?

3         A    That would be -- depending upon what the

4    workshop was about, it would be the person in my

5    office who would be in charge of the area of work that

6    it involved.

7         Q    Did you begin your coursework at Daytona

8    Beach Community College upon graduating from high

9    school?

10        A    No, it was about a year later.

11        Q    what did you do -- I'm sorry, I said

12   graduating, but when you left after a year and a half,

13   what did you do after that?

14        A    well, actually, I was working at the time

15   that I went to college.  I was working in television

16   for about four years, and then -- are you asking my --

17        Q    Your professional background, if you could

18   sort of walk me through it.  Is that beginning in 1957

19   you started in television?

20        A    '56 I started in television.  And then in

21   the 1960s I ran a car wash business.  Yes, I got out

22   there and did the work.  In the 60s and early 70s I

23   ran a business for the manufacture and distribution of

24   a tie rack that I invented and patented.

25        Q    Of a tie rack?

                                              19

1         A    Yes.  Not a tire rack, but a tie rack.

2         Q    That's in the 70s?

3         A    Yes.

                        Page 15

Deanie Lowe

 4      Q    And what did you do in the 80s?

 5      A    I was involved with my husband in developing

 6    and leasing professional office complexes.

 7      Q    Is this a business that you and your husband

 8    owned?

 9      A    Yes.

10      Q    What was the name of the business?

11      A    Well, it didn't have a name, it was just we

12    built offices and leased them.  And then I became

13    involved in public office and served ten years on the

14    Ormond Beach Planning Board, and then four years on

15    the County Council, and then in 1993 stepped into my

16    job as Supervisor of Elections.

17      Q    What year did you begin on the Ormond Beach

18    Planning Council?

19      A    Let me back it up.  That would have been

20    '78.

21      Q    And how long did you serve on the council?

22      A    On the planning board?

23      Q    I'm sorry, on the planning board.

24      A    Ten years.

25      Q    So '78 to '88?

                                                20

 1      A    Right.

 2      Q    And then you joined the County Council?

 3      A    I was elected to the County Council in 1988.

 4      Q    Did you stay on there until 1993?

 5      A    Right.  I stayed there through 1992, and it

 6    was during 1992 that I ran for and was elected

 7    supervisor and took office in 1993 as supervisor.

 8      Q    Did you have any other jobs at the time that

 9    you were on the planning board?

                        Page 16

Deanie Lowe

10      A      I continued with the work of developing and
11  leasing rental offices.
12      Q      Anything else during that time period?
13      A      No.
14      Q      What about 1988 to '92 when you were on the
15  county commission?
16      A      No, I had no other job.
17      Q      And from 1993 forward?
18      A      There is no time for other jobs.
19      Q      Have you had your hands full?
20      A      Yes.
21      Q      Okay.  So how many terms have you served as
22  Supervisor of Elections for Volusia County?
23      A      I'm in my third term now.
24      Q      When does that term expire?
25      A      The end of 2004.

                                                        21

1       Q      Do you have any plans to run for
2   re-election?
3       A      No.
4       Q      I take it there are no term limits here?
5       A      No, there aren't.  Not on that office.
6       Q      Not on that particular office?  Okay.
7              Can you tell me what your duties and
8   responsibilities were on the planning board of Ormond
9   Beach?
10      A      Yes.  This was to study land uses to make
11  recommendations to the city commission on a
12  comprehensive plan that was developed for how the
13  various areas of our city would be zoned and what uses
14  would be allowed.  We also reviewed applications to

Page 17

Deanie Lowe

15    the commission on special exception approvals,

16    variances to setback requirements and zoning

17    requirements.  It was an advisory board.

18         Q    What about on the -- is it the County

19    Council or County Commission?

20         A    County Council in Volusia County.  By

21    charter we're called a council.

22         Q    What were your duties and responsibilities

23    on the County Council?

24         A    To set policy for county government that

25    would be carried through by the county manager.

                                                    22

1          Q    Did you work on any issues relating to

2     elections?

3          A    No.

4          Q    Did you approve any budgets for elections?

5          A    Yes.

6          Q    So you did work on some issues that relate

7     to elections?

8          A    I'm sorry, I didn't understand it in that

9     respect.  Yes, we reviewed the budgets submitted by

10    the Supervisor of Elections and approved it.

11         Q    Did you take any other action that related

12    to elections during your time on the County Council?

13         A    We did approve the purchase of a new voting

14    system at that time.

15         Q    And what was that voting system, if you

16    recall?

17         A    Oh, I recall.  It was a punch card system.

18    We moved from the old lever machines, and upon the

19    supervisor's recommendation, went with a punch card

20    system.

                        Page 18

Deanie Lowe

21      Q     How long were the punch card machines in use
22   in Volusia County?
23      A     They were used 1989 through 1994.
24      Q     So you were a Supervisor of Elections for a
25   year during which the punch card systems were used in

                                                          23

1    Volusia County?
2       A     That's correct.
3       Q     Did you take any other action on your -- in
4    your capacity as a council member in regard to
5    elections?
6       A     No, I cannot remember any other action.
7       Q     What are your duties and responsibilities as
8    a Supervisor of Elections?
9       A     To register persons who would like to vote;
10   to maintain those registration files on those persons;
11   and to conduct local, state, and federal elections.
12   We also put a great deal of emphasis on voter
13   education.
14      Q     Do you report to anyone in your capacity as
15   Supervisor of Elections?
16      A     In Volusia County, by charter, my office is
17   not a constitutional officer position.  I am an
18   elected department head.  And we have a certain
19   obligation to work with the county, even though I am
20   an elected official.  It's a little bit hard for
21   others who are constitutional officers to understand
22   our setup, but my main body that I report to are the
23   voters of Volusia County, the residents of Volusia
24   County; however, I also am under the County Council to
25   some degree.

Deanie Lowe

24

1       Q    And what do you mean that you're under the

2   County Council by some degree?

3       A    I'm required, by charter, to deal with the

4   person -- through the personnel department for hiring

5   and firing of personnel.  I'm required to deal through

6   the purchasing -- the county's purchasing department

7   for my purchasing.  I use the internal services of

8   county government, such as the information systems

9   division, such as the county attorney's office.  Any

10  of the internal services provided by county government

11  in Volusia County are used by all the department

12  heads, whether we were elected or appointed.

13      Q    Now, your use of the internal services of

14  the County Council, is that mandated by charter?

15      A    Yes, it is.

16      Q    And the same with the personnel and the

17  purchasing department, those --

18      A    Yes, it is.

19      Q    It's mandated by charter that you use those

20  departments of the County Council?

21      A    That's correct.

22      Q    So does the Supervisor of Elections office

23  have its own personnel division at all?

24      A    No, we do not.

25      Q    Or purchasing department?

25

1       A    No, we do not.

2       Q    Cna you describe to me what the setup is at

3   the Supervisor of Elections in terms of division,

4   employees, who reports to whom?

5       A    Okay.  We have three divisions:

Page 20

Deanie Lowe

 6    Registration, Elections, and Outreach.  It is not a

 7    division, we don't call it a division, but there is an

 8    administrative area of the office.

 9        Q    Are there persons who serve as heads of

10    those three divisions?

11        A    Yes.

12        Q    Can you tell me -- I think we walked through

13    those individuals.  Would that be Sandy Peloquin as

14    the Registration Division head?

15        A    Correct.

16        Q    And the Election Division?

17        A    Is Lana Hires.

18        Q    And Outreach is Debbie?

19        A    Debbie Allen.

20        Q    And is there anyone who is charged with the

21    administrative duties, being the head of them?

22        A    I am.

23        Q    So the admin area has no particular head --

24        A    No.

25        Q    -- except for you?

                                              26

 1        A    That's correct.

 2        Q    What functions fall under the Registration

 3    Division?

 4        A    They are charged with processing the voter

 5    registration applications that we receive and with

 6    maintaining the voter registration files.

 7        Q    Is there anything else that they do in that

 8    division?

 9        A    Under that division comes our mapping of

10    precinct lines, and so they would be involved in

Page 21

Deanie Lowe

11   revising any precincts that are necessary.

12        Q    Is there anything else that they do?

13        A    Not that I can think of at this moment.

14        Q    How many other employees work in the

15   Registration Division, besides Sandy Peloquin?

16        A    There would be 11 in addition to her.

17        Q    And do those 11 individuals have specific

18   responsibilities?

19        A    Yes; however, they may vary from day-to-day.

20   They're cross-trained to work in different areas.

21        Q    Are there some individuals who are assigned

22   to work on mapping issues, some on processing, some on

23   maintaining voter registration applications?

24        A    There is one person who is assigned to

25   mapping and has the skills for that area.

                                                    27

1        Q    Who is that person?

2        A    That's John Harrington.

3        Q    Harrington?

4        A    Yes.

5        Q    H-a-r-r?

6        A    I-n-g-t-o-n.  He does assist the rest of

7    them in the Registration Division by helping to place

8    the new applicant into the correct precinct.

9        Q    When you say that, do you mean on a

10   particular type of software or system?

11        A    Yes.  We are tied in with the county's

12   Geographic Information Systems Division and he has a

13   computer that he is tied in on and he maintains five

14   levels of a mapping that is done in that division.

15        Q    Is there anyone who works specifically on

16   processing applications?

                        Page 22

Deanie Lowe

17      A     That would involve all the rest of the staff

18   in the election -- the Registration Division.

19      Q     What about maintaining the voter

20   registration files?

21      A     That would involve all of them.

22      Q     Has the staff in the Registration Division

23   changed since 1998?

24      A     Since '98?

25      Q     Yes.

                                              28

1       A     Yes.  And I believe in one of our responses

2    we listed when a couple of them came in, what dates

3    they were hired, but we do have some new people who

4    have come on board, replacing employees that we've

5    lost.

6       Q     Do you recall, sitting here today, who those

7    new individuals are?

8       A     Yes.  One would be Barbara Francisco,

9    another one would be Pam Clemmons.

10      Q     I'm sorry?

11      A     Pam Clemmons.  And actually a third one

12   would be Charlene Kovarovic, K-o-v-a-r-o-v-i-c.

13      Q     Do you have an organizational chart of the

14   personnel in the Supervisor of Elections office?

15      A     Yes.

16      Q     Do you know whether that was produced in

17   connection with this lawsuit?

18      A     I don't believe it was.  Actually, that's

19   something that was actually drawn up in the past few

20   months in connection with a space study -- spatial

21   needs study.

Deanie Lowe

22      Q     Was there an organizational chart that

23   existed before that?

24      A     No.

25      Q     Was this -- is this the first organizational

29

1   chart that you know of for your office?

2      A     First one that looks presentable that I

3   would even show to anybody.  The rest of it is by

4   hand.

5      Q     Okay.  What about the Elections Division,

6   how many people work in that area?

7      A     Four full-time employees.

8      Q     And what functions occur under the Elections

9   Division?

10      A     They're the ones who are in charge of

11   obtaining polling places; maintaining and servicing

12   all the voting equipment; designing the ballots and

13   ordering the printing of the ballots; filling requests

14   for absentee ballots; assigning -- training and

15   assigning runners on election day.  We call people who

16   go around to help with any problems on election day,

17   we call them runners, and they train and assign them.

18   They train and assign the people who work at our drop

19   sites on election night where the materials are

20   collected to be brought into our office.  They train

21   and assign work for the temporary help that is brought

22   in during election season.  This division also is

23   responsible for facilities; in case repairs are

24   needed, they make arrangements for the repairs.  They

25   also maintain the records of all of our inventory,

30

1   whether it be office furnishings and equipment or

Deanie Lowe

 2   voting equipment at the warehouse.

 3        Q    Is there anything else?

 4        A    No.

 5        Q    The four full-time employees, does that

 6   include Lana Hires?

 7        A    Yes.

 8        Q    Were the other three individuals there at

 9   the time -- from 1998 forward?

10        A    One of them was working in the Registration

11   Division that has since been transferred over into the

12   Elections Division, and I believe that took place

13   about a year ago, so prior to that the person who was

14   in that slot had to leave for medical reasons.

15        Q    What do you mean when you say a part of the

16   Registration Division transferred over?

17        A    Claudette Payer was an employee in the

18   Registration Division, and then last year when we had

19   an -- I believe it was last year, it may have been,

20   you know, a year and a half ago, but when an opening

21   came in the Elections Division, when one of the

22   long-time employees had to retire, then we opened that

23   position for anybody who would like to apply for it,

24   and she applied and we moved her from Registration

25   Division over into the Elections Division.

                                                    31

 1        Q    Let me ask you a question about the

 2   Registration Division.  Is that the division that

 3   performs list maintenance procedures?

 4        A    Yes.

 5        Q    And who, if anyone, is specifically

 6   responsible for list maintenance within that division?

                        Page 25

Deanie Lowe

 7      A    That would be Sandy Peloquin.

 8      Q    Is there anyone else in the division who
 9  works on list maintenance?

10      A    Everyone in that division works on list
11  maintenance.

12      Q    All of the employees?

13      A    All of the employees of the Registration
14  Division.

15      Q    What about Outreach, what does that entail,
16  the Outreach division?

17      A    These are the people who will work with
18  persons in the public who want to run registration
19  drives.  They make up packets for them to use.  They
20  do speaking engagements, they demonstrate how to use
21  our equipment, our voting equipment at things like
22  county fairs and home shows or meetings of civic and
23  church groups.  They do a program in the middle and
24  senior high schools to teach students about
25  registering to vote and how to use our voting system.

                                              32

 1  And they help with student elections and with mock
 2  elections in the schools.  They do press releases
 3  periodically, as we need to get information out to the
 4  public.  On election day they oversee and manage our
 5  telephone bank for the general public.  And on
 6  election night they put on like a party in the County
 7  Council chambers for the public to attend to watch the
 8  results as they're brought in from the polls.

 9      Q    Is there anything else?

10      A    No.

11      Q    What about the administration area that you
12  referenced, what falls under that?

                      Page 26

Deanie Lowe

13    A    My Assistant Supervisor of Elections is in

14  charge of all the paperwork for the personnel, hiring

15  and firing recommendations that go to the personnel

16  department.  She also does all the requisitions --

17  requisition paperwork for purchases; she helps to

18  devise the training for the poll workers; and she is

19  the one who qualifies all the candidates that qualify

20  for our office.  She maintains the records of past

21  elections, and the candidate records.  And she serves

22  as a right arm to me on whatever else I need her to

23  do.

24    Q    Do you have a personal assistant or

25  secretary within the Supervisor of Elections office?

                                                33

1    A    No.  There is an assistant to my assistant

2  who helps her with some of the filing and the

3  paperwork and generally can do almost any job that's

4  available in that office.

5    Q    What's that person's name?

6    A    Nancy Prodoehl, and it's P-r-o-e-h-d-e-l, I

7  think.  It's a very strange spelling, and we have it

8  in one of our responses to you.  If you want, at the

9  break I'll check it and give you the spelling.

10    Q    Okay, thank you.  What entity pays your

11  salary?

12    A    The Volusia County Council.

13    Q    Have you ever seen a copy of the Complaint

14  in this case?

15    A    Yes.

16        MS. NELSON:  I'd like to mark as Plaintiff's

17      Exhibit 2 Lowe a copy of the Second Amended

Page 27

Deanie Lowe

18    Complaint Class Action.

19         (Plaintiff's Exhibit No. 2 was marked for

20    identification.)

21    Q    Can you take a look at it and tell me when

22    you finish?

23    A    I have not seen the Second Amended

24    Complaint.

25    Q    So you haven't seen that document before?

34

1     A    No.  I'm sorry, I thought you were asking

2     about the original filing.  Yes, I have seen that one,

3     but I have not seen the Second Amended.  I knew that

4     it had been filed.

5     Q    Have you seen any Complaints, other than the

6     first one, the first Complaint in the case?

7     A    I'm not sure.  I cannot remember whether

8     there were additional ones that I saw.

9     Q    When was the first time you saw a Complaint

10    in this case, if you recall?

11    A    No, I don't recall the date or even the

12    month.

13    Q    Do you recall the year?

14    A    In 2001.

15    Q    You don't recall whether you saw a new

16    Complaint after that?

17    A    I believe I did.  I think in the first one

18    it was just Emery Timberlake that was mentioned in

19    conjunction with Volusia County, and then I saw the

20    one where Ursula Harvey was brought in, so that, I'm

21    sure, was a later filing.

22    Q    Did you understand the Complaint, or

23    Complaints, when you read them?

Page 28

Deanie Lowe

24    A    Yes, I did.

25    Q    What is your understanding of what this case

35

1    is about?

2    A    Well, of course, I have been so focused on

3    the part that we're involved in, that's the only one I

4    can speak to.  I understand that there were two people

5    who are saying that they were denied the right to

6    vote, one of whom I agree with, and the other one I

7    don't.

8    Q    Do you have any other understanding about

9    what this case is about?

10    A    No.

11    Q    That's the extent of your understanding,

12    that there are two people in Volusia County who claim

13    they were denied the right to vote?

14    A    Well, that's the only part that I understand

15    I'm involved in at this point.  That's all the places

16    that I was named.  I really -- I don't know the whole

17    involvement of this case, and so it would be hard for

18    me to answer that question.

19    Q    Did you read portions of the complaint that

20    did not reference Volusia County specifically?

21    A    Yes, in the beginning.

22    Q    And did you have any understanding of the

23    portions of the Complaint that you read that did not

24    specifically mention Volusia County?

25         MR. BOSCH:  Objection; asked and answered.

36

1    Go ahead.

2    A    I could understand what was printed in

Page 29

Deanie Lowe

3    there, but not seeing the responses from the other --

4    from the Defendants, I would not have any total

5    understanding of what was going on with it.

6         Q     So what was the understanding that you had?

7         A     That there were complaints about voting

8    equipment; there were complaints about cancellations

9    from the rolls; there were complaints about, I

10   believe, poll worker treatment.  That's all that I can

11   remember.

12        Q     You mentioned that there's one person you

13   agreed with in terms of the people who claim they were

14   denied the right to vote in Volusia County.  Who is

15   that person?

16        A     Ursula Harvey.

17        Q     And why do you agree with Ursula Harvey --

18        A     Because --

19        Q     -- on that point?

20        A     -- upon examination of our records we found

21   that she was canceled in error through a human error

22   and not following procedures.

23        Q     And how did you detect that?  When did you

24   first learn that Ursula Harvey was improperly removed

25   from the voter rolls?

37

1         A     When you filed whatever paper it was.  I

2    don't know the proper names for these things that you

3    file, but when you filed that and named her and we

4    were doing the research to respond is when we found

5    it.

6         Q     Was it the Complaint that you saw that

7    read -- that stated that Ursula Harvey had some

8    problems voting in Volusia County?

Page 30

Deanie Lowe

9      A     Yes.

10     Q     But before that you were unaware?

11     A     No.

12     Q     No, you were not unaware, or yes, you were

13     unaware?  Let me rephrase.

14           Were you aware of the fact that Ursula

15     Harvey had been removed from the rolls prior to

16     reading the Complaint?

17     A     I personally was not aware of it.

18     Q     Do you know whether anyone else in your

19     office --

20     A     I understand that on election day a call was

21     placed.  I don't know if it came into the phone bank

22     or if it came into our office.  And so someone at that

23     point knew that she had been removed from the file.

24     Q     Had that fact been reported back to you, or

25     anyone else in your office, before you read it in the

                                              38

1      Complaint?

2      A     No.

3      Q     Do you know who received the call?

4      A     No, I don't.

5      Q     Do you know the names of any individuals who

6      knew, prior to you receiving the Complaint, about

7      Ursula Harvey's removal from the voter rolls?

8      A     No.

9      Q     Is there any way of identifying those

10     individuals?

11     A     Not that I can think of.

12     Q     Do you know what role or title those

13     individuals hold?  Were they poll workers?  Were they

Page 31

Deanie Lowe

14    supervisors?

15        A    Well, a poll worker would have been the

16    person who placed the call from the polling place, but

17    whether the call came into one of my office staff or

18    came into the phone bank that's set up to handle calls

19    from the general public, I don't know.

20        Q    So the call could have gone to either of the

21    two case places, your office, the Supervisor of

22    Elections office, or a phone bank?

23        A    That's right.

24        Q    And where was the phone bank set up?

25        A    The phone bank was across the street from

                                                    39

1     our office in the training rooms of the county

2     administration building.

3         Q    Who staffed the phone bank?  And we're

4     talking about the November 7, 2000, election here.

5         A    Uh-huh.

6         Q    Who staffed the phone bank that day?

7         A    We were using temporary help that were

8     supervised by Debbie Allen and her assistant Etta

9     Rosado, R-o-s-a-d-o.

10        Q    And in terms of the office staff, who

11    staffed the phones on the November 7th, 2000,

12    election?

13        A    We submitted that in one of our responses to

14    you, and I can't think of their names right off the

15    top of my head.

16        Q    Do you know the number of individuals who

17    staffed the phones in your office that day?

18        A    On November 7th?  Are you talking about

19    November 7th, 2000?

Deanie Lowe

20      Q    Yes, the November 7th, 2000, election.

21      A    There were 17 people working in the office

22  on that day, and any one of them could have answered a

23  telephone.  The ones that were assigned were

24  approximately eight people, as I remember it.

25           MS. NELSON:  I'd like to mark as Plaintiff's

                                                    40

1       Exhibit 3 Lowe Answer and Affirmative Defenses to

2       Second Amended Complaint of Defendant Deanie Lowe

3       Supervisor of Elections for Volusia County.

4            (Plaintiff's Exhibit No. 3 was marked for

5       identification.)

6       Q    Can you take a look at the document and let

7   me know when you finish, please?

8       A    I'm finished.

9       Q    Have you seen this document before?

10      A    I don't remember seeing this.  I may have

11  seen it, but I don't remember seeing it.

12      Q    So you have no specific recollection of

13  seeing this document?

14      A    No.

15      Q    Do you know whether anyone on your staff has

16  seen this document?

17      A    No, I don't know.

18      Q    Do you know whether your office received a

19  copy of that document?

20      A    I don't believe we did, but I don't know

21  that for a fact.  I just don't remember having seen

22  it.

23           MS. NELSON:  I'd like to mark as Plaintiff's

24      Exhibit 4 Lowe the Affidavit of Deanie Lowe.

Page 33

Deanie Lowe

25          (Plaintiff's Exhibit No. 4 was marked for

41

1      identification.)

2          Q    Take a look at this document and tell me if

3      you've seen it before?

4          A    Yes, I have.

5          Q    What is that document?

6          A    This is my affidavit.  It's my affidavit

7      that's dated April 13th, 2001.

8          Q    And can you turn to page nine and tell me

9      whether your signature is on that page?

10         A    Yes, it is.

11         Q    Did you read this document before you signed

12     it?

13         A    Yes, I did.

14         Q    And do you believe the contents of the

15     document to be true?

16         A    Yes, I do.

17         Q    I'd like to turn your attention to

18     Paragraph 6 of your affidavit, which is on page three

19     of Plaintiff's Exhibit Lowe 4.  Can you take a moment

20     to read the paragraph and let me know when you're

21     finished, please.

22         A    I've finished.

23         Q    Do you still maintain today that you did not

24     use the Central Voter File list to purge felons prior

25     to the November 2000 election?

42

1          A    Yes, I do.

2          Q    To purge alleged felons?

3          A    That's correct.

4          Q    If you'd turn to the following page.

Page 34

Deanie Lowe

5    Actually, Paragraph 8, which begins on page three and

6    follows to page four, if you can take a look at that

7    paragraph and let me know when you've finished.

8         A    I've finished.

9         Q    Do you see the sentence that begins on page

10   three and continues on page four, it says inactive

11   voters with an unreported address change, who on

12   election day went to their new residence precinct,

13   were allowed to vote upon completion of the

14   affirmation provided and poll worker verification of

15   registration?  What did you mean there by poll worker

16   verification of registration?

17        A    If they were not on the precinct register at

18   the location where they arrived, then the poll worker

19   was to call our office to get verification that they

20   were a registered voter and in the correct precinct

21   and then allow them to complete the affirmation and

22   vote.

23        Q    Why did the poll workers have to call your

24   office?

25        A    Because if they were not -- if that person

43

1    was not on the precinct register, the poll worker

2    could not be sure that they were a registered voter.

3         Q    So the precinct registers didn't contain

4    information about voters that were not within that

5    designated precinct; is that correct?

6         A    That's correct.

7         Q    And what information is at the Supervisor of

8    Elections office that would permit a poll worker to

9    verify registration?

Page 35

Deanie Lowe

10      A    At our office we would have the names in our

11  files of everybody in the county who is registered, so

12  if that person had shown up at a precinct where they

13  weren't on the register, the poll worker could call us

14  and we could find out where we did have them on the

15  rolls as being registered.

16      Q    Look at the following sentence that reads:

17  poll workers verified the registration of such voters

18  by calling the elections office, which sometimes

19  resulted in unfortunate delay.  What do you mean in

20  the second clause of the sentence which sometimes

21  resulted in unfortunate delay?

22      A    I mean that it took many, many calls for the

23  poll workers to be able to get through to us.  The

24  phone lines were jammed on election day.

25      Q    Why was that unfortunate?

44

1       A    Because it meant that voters either had to

2   wait a long time to get their eligibility verified or

3   miss out on voting.

4       Q    Do you know whether any eligible voters were

5   unable to vote because of the delay?

6       A    Ask the question again, please.

7       Q    Do you know whether any eligible voters were

8   unable to vote because of the delay?

9       A    I'm not sure.  I'm not sure.

10      Q    Can you be certain that any eligible voters

11  were not denied the right to vote because of the

12  delay?

13      A    You're giving me a double negative.

14          MR. LITTLE:  Objection to form.  John

15      Little.  I joined about three minutes into the

Page 36

Deanie Lowe

16        deposition, representing the Secretary of State

17        and the Division of Elections.

18        Q    Can you be certain that voters on election

19   day were not denied the right to vote due to the delay

20   of the telephones at the precincts in Volusia County?

21             MR. BOSCH:  Object to the form.

22             MR. LITTLE:  Same objection.

23        Q    Do you understand the question?

24        A    Yes, I understand, and I cannot -- I'm not

25   certain.  I don't know.

                                                45

1         Q    Were poll workers instructed to -- let me

2    rephrase that.  If a voter told a poll worker that

3    they moved from a particular precinct, were those poll

4    workers instructed to call the previous precinct to

5    see if they were registered?

6         A    No.

7         Q    Do you know whether any poll workers did

8    that?

9         A    Yes, they did.

10        Q    What was the result?

11        A    In some cases they were able to verify

12   through that contact that the person had been

13   registered at the other polling place, or at the other

14   precinct.

15        Q    Why weren't the poll workers instructed to

16   do that as a general matter?

17        A    Because we felt that the contact with our

18   office would be more reliable.  Actually, we had never

19   even thought about having poll workers call each

20   other, and I didn't know that this was done until

Page 37

Deanie Lowe

21    after the election.

22        Q    Do you have a sense of how many instances

23    that occurred where a poll worker called another

24    precinct to verify registration of a voter?

25        A    No, I don't know how many times it occurred.

46

1        Q    Do you know whether that occurred in

2    elections prior to the November 2000 election?

3        A    I don't know if it ever occurred before.  If

4    so, I was not told about it.

5        Q    The following sentence you state:  In some

6    instances poll workers apparently could not reach the

7    elections office and allowed persons to vote who

8    ultimately were determined not to be registered.  Do

9    you know how many persons were ultimately determined

10    not to be registered?

11        A    Over 200, but I don't remember the exact

12    number, but we have provided that information to you.

13        Q    Do you know what the basis of the finding

14    that they were not registered was?

15        A    There were a variety of reasons.  In some

16    cases we had never received an application for the

17    person.  In some cases we had received an application

18    that was incomplete.  In some cases they had been

19    canceled from our rolls for one or another reason.  I

20    believe that covers the reasons.

21        Q    Those are all the reasons that might --

22        A    Right.

23        Q    -- might have been?

24             Do you know the number of persons who were

25    canceled from your rolls out of the 200 and therefore

47

Page 38

Deanie Lowe

1   were determined not to be registered?

2       A    I can't specifically say, but we have

3   provided that to you.  I can't remember.

4       Q    Do you have a general sense, sitting here

5   today?

6       A    I want to say fewer than a half a dozen, but

7   I could be very wrong on that.  I just know that we

8   have presented that information to you.

9       Q    In the last sentence of that paragraph you

10  say I have attempted to remedy the problem of phone

11  access to the elections office on election day by

12  additional staffing and lines.  I'm sorry, that's the

13  next to last sentence.  What do you mean by that?

14      A    Okay, I was referring to prior to 2000, and

15  I was saying that we have increased the number of

16  people on our phone bank, as well as in our office,

17  that were taking calls.  Which sentence are you

18  referring to Janai?

19      Q    I'm referring to the next to last sentence.

20  I may have misspoken, so it was the last.  The one

21  that says I have attempted to remedy the problem.

22      A    Okay.  And it's talking about by additional

23  staffing and lines.  Okay.

24      Q    What do you mean by additional staffing, in

25  terms of numbers?

                                              48

1       A    You're asking me for numbers?

2       Q    Yes.

3       A    Okay.  We went from about eight people on

4   the phone bank up to 12, and I believe we increased

5   the number of staff assigned in my office to be

                   Page 39

Deanie Lowe

6   answering phones.

7       Q    From what number to what number?

8       A    I don't remember.

9       Q    Do you know who would know?

10      A    Perhaps Sandy Peloquin would know because it

11  was primarily her staff that were doing the answering.

12      Q    Are you referring to a specific election at

13  which the additional staffing was there?  Is this an

14  election subsequent to the November 2000 election?

15      A    Well, each year we've tried to add more ever

16  since I've come in office, so I don't know at what

17  point we went from what number to what number.

18      Q    When you say you attempted to remedy the

19  problem of phone access to the elections office on

20  election day, when you referred to the problem, are

21  you referring to the problems in the November 2000

22  election?

23      A    Are we talking about this thing right here?

24      Q    Yes, we are.  We're still on Paragraph 8 of

25  your affidavit.

                                                    49

1       A    Well, then let me go back here and see what

2   I was referring to, okay?

3       Q    Okay.

4       A    And it would help me if I could see the

5   question that was asked.  Or no, I guess this is the

6   affidavit, so it's not in response to a question, is

7   it?

8       Q    That's right.

9       A    All right.  I believe here we were talking

10  about the 2000 election because the paragraph above is

11  referring to the 2000 general election, so I think

Deanie Lowe

12    this whole paragraph is talking about the 2000

13    election.  All right.  Now, ask me your question

14    again, and I'm sorry, I apologize.

15        Q    That's no problem.  You say that you

16    attempted to remedy the problem of phone access to the

17    elections office on election day by additional

18    staffing and lines?

19        A    Right.

20        Q    Does that mean that you have increased your

21    staffing for phone lines since the November 2000

22    election?

23            (Mr. Mac Innes left the room.)

24        A    Since the November 2000, yes.

25        Q    And when you said that you went from eight

50

1    people to 12 people on the phone bank, was that after

2    the November 2000 election?

3        A    No, that was prior to the November 2000

4    election.  I believe we went up to 14 for the 2000

5    general election on the phone bank.

6        Q    So since the November 2000 election was

7    there an increase in the staff?

8        A    Yes.

9        Q    And you went from what number of staff for

10    the phone bank to what number?

11        A    Fourteen to 20.

12        Q    Did the staff of the Supervisor of Elections

13    office increase to staff phone lines since the

14    November 2000 election?

15        A    No.

16        Q    So the sum total of the additional staff was

Page 41

Deanie Lowe

17    the -- or is the six people added from the phone bank

18    from 14 to 20?

19         A    Right.  You understand we're talking about

20    2001 now?

21         Q    Yes, we're talking about everything after

22    the November 2000 election.

23         A    Right.  We hold municipal elections and --

24         Q    How -- sorry.  Go ahead.

25         A    There wasn't a need to increase it beyond

                                                        51

1     that number on the staff because we were holding

2     municipal elections in 2001 and a one-issue

3     county-wide referendum that did not generate a lot of

4     calls to the office.

5          Q    So in the 2001 election you had 20 people

6     staffing the bank?

7          A    Right.

8          Q    Do you have any plans for additional

9     staffing for the November 2002 election?

10         A    Yes.

11         Q    What are those plans?

12         A    We will continue to have 20 people on the

13    phone bank for the general public.  In addition to

14    that, we have room for an additional eight in a

15    different area of the office that can either expand

16    that phone bank or can be used for other phone calls.

17    We will continue -- we're limited in the number of our

18    staff that can be assigned to answer those phones on

19    election day, but I anticipate the number of staff to

20    increase because we won't be as involved with the

21    absentee ballot opening and processing on election

22    day.

                         Page 42

Deanie Lowe

23      Q    When you say you won't be as involved with
24   the absentee ballot processing, why do you say that?
25      A    Because the new law that was passed last

52

1   year allows us to open and start processing those
2   ballots four days prior to the election, and we'll be
3   doing that to alleviate some of the work load on my
4   staff on election day.
5      Q    And by new law, you're referring to the
6   Florida Election Reform Act of 2001?
7      A    Yes.
8          (Mr. Mac Innes returned to the room.
9      Q    So is it certain at this point that there
10  will be eight additional phone bank operators for the
11  2002 elections?
12      A    Are you talking about taking it up to the
13  20?  And that's an additional six.  And yes, it is.
14      Q    I'm sorry, maybe I'm confused here.
15  Currently for your upcoming election there are 20
16  persons to staff the phone bank?
17      A    The main phone bank, yes, for the general
18  public.
19      Q    And then you mentioned that there's room for
20  eight additional persons?
21      A    Yes.
22      Q    Will you be using eight additional persons?
23      A    If the need arises.
24      Q    How did you determine that additional
25  staffing was needed after the 2000 election?

53

1      A    Because the -- in 2000 the phone bank lines

Page 43

Deanie Lowe

2    rolled over to my staff lines.  When the phone -- when

3    the 14 phones that were set up for the phone bank all

4    were busy, the phone setup was such that the lines

5    rolled over into my office and rang on the desk of the

6    employees that were assigned to take calls from the

7    poll workers, so it was causing calls from the poll

8    workers not to be able to get through.  So we have

9    since changed the whole phone system where the calls

10   coming in from the general public go to the phone

11   bank, and if all lines are busy, they're put into a

12   holding pattern to wait for the next available

13   operator and it doesn't roll over to my office staff.

14   And I've gotten off on a tangent again and I've

15   forgotten your question.

16       Q    That's okay.  I'll follow up with some

17   questions.

18            For any given election, how do you determine

19   the number of staff needed for answering phones?

20       A    We put all available staff onto answering

21   phones, and we're limited only by the number of staff

22   that we have.

23       Q    So do you perform any analysis to determine

24   how many people you would need to answer telephones to

25   respond to the voters who are calling in at an

                                              54

1    election or the poll workers who are calling in?

2        A    Actually, no, we just put everybody that we

3    can onto the phones.

4        Q    Have you ever determined what the need was,

5    in terms of staffing?  Beyond what your capacity as

6    the Supervisor of Elections -- or notwithstanding your

7    capacity as the Supervisor of Elections office, have

Deanie Lowe

8      you ever analyzed what the need was for staffing for

9      the phone lines in any given election?

10         A    No.

11         Q    Have you done that in preparation for the

12     2002 election?

13         A    We've approached it from many angles.

14         Q    Can you tell me what those angles are?

15         A    Yes.  To decrease the number -- the

16     necessity for the number of calls to come in, and to

17     add more phone lines to insure that the public lines

18     are not spilling over to the office lines.  Because,

19     again, we're limited with the number of knowledgeable

20     staff, knowledgeable experienced staff that we can

21     place on those calls.

22         Q    Did you look at any specific criteria to

23     determine how many additional persons you might need

24     for the 2002 election?

25         A    No, I can't say that we did.

                                              55

1          Q    Did you do that for the 2000 election?

2          A    No.  It's always been our practice to put as

3      many as possible, as many as we have that can answer

4      the questions on the phones.

5          Q    Prior to the 2000 election, how many persons

6      were on staff to serve the phone bank?

7          A    Are we talking about two different things?

8      When I talk about persons on staff, I'm talking about

9      my regular full-time employees.

10         Q    For the phone bank.

11         A    The phone bank was manned by temporary staff

12     that were brought in for that purpose.

Page 45

Deanie Lowe

13      Q     Okay.  Let me rephrase my question.  I think

14   I was confusing.

15           How many people staffed the phone bank prior

16   to the 2000 election, the election preceding the 2000

17   election, not the primaries, but the last general

18   election, do you know how many people staffed the

19   phone banks?

20      A     I don't remember.

21      Q     Do you know whether there was an increase in

22   the number of persons staffing the phone bank from the

23   last general election to the 2000 election?

24      A     Yes.

25      Q     Do you know what that increase was?

                                                56

1       A     No.  If I did, I could subtract it and I

2    could tell you what it was before.

3       Q     In Paragraph 8 you say:  In addition to

4    adding staffing, you added lines, additional lines?

5       A     Ask it again, please.

6       Q     In addition to adding staffing, you added

7    additional lines?

8       A     For the phone bank?

9       Q     Yes.  And I'm referring to Paragraph 8,

10   which is -- the second half of which is on page four

11   of your affidavit.

12      A     May I read this?

13      Q     Sure.  Sure.  Do you see the sentence where

14   you say I've attempted to remedy the problem of phone

15   access to the elections office on election day by

16   additional staffing and lines?

17      A     Okay.  All right.  What's that referring to?

18   I'll get it in a minute, Janai.  Please forgive.

                    Page 46

Deanie Lowe

19      Q       No, no, that's okay.

20      A       Okay, the additional staffing is because we

21   increased the number of people that were assigned to

22   the phone bank, and the additional lines is because we

23   have changed our whole telephone system so that we

24   can, you know, do this business of referring them to

25   the right phone, whether it be the general public

57

1    calling in to the phone bank or the hotline that we

2    assigned for the clerks to call from the polls to call

3    in to knowledgeable full-time employees in my office.

4    So those are your additional lines.  The additional

5    staff is referring to more people on the phone bank.

6    And what we're intending and working very hard to do

7    is increasing the number of my full-time staff who are

8    available to answer phones because we're not going to

9    be working with absentee ballots so heavily on that

10   day.

11      Q       Can you tell me how many additional lines

12   there are now as opposed to the number that were used

13   at the November 2000 election?

14      A       No, I really -- I can't.

15      Q       So you don't know what the amount of

16   increase in lines is, of phone lines?  How many new

17   lines were added since the November 2000 election?

18      A       Well, actually, there's not new phone lines,

19   they're just going to additional phones on the phone

20   bank, and there's the same number of lines that come

21   in on the county trunk line and they're dispersed to

22   more phones, so when you're talking about how many

23   lines coming in, I don't believe that has increased

Page 47

Deanie Lowe

24    any to take care of our new phone system.  I just
25    think that they're going to more telephones.

58

1     Q    So when you said additional staffing and
2     lines in the sentence here, did you mean --
3     A    I mean telephones.
4     Q    You mean telephones?
5     A    Yes.
6     Q    How many more telephones do you have as
7     compared to the number that you had in the
8     November 2000 election?
9     A    Okay.  We're getting where I can answer
10    questions now.
11    Q    Good.  Good.
12    A    All right.  We've got -- we've gone from the
13    14 telephones that were being answered by the phone
14    bank up to 20 that are on the set phone bank, and then
15    there's an additional eight that are available --
16    eight stations that we can open up to add to it, if
17    needed.  The number of employees who have phones are
18    still the same.  I have the same number of employees.
19    Q    And there's one phone line that goes to each
20    of those telephones, each --
21    A    No, there's a phone line that comes in, and
22    when it comes in, it goes to eight numbers.
23    Q    Okay.  So there's one phone line --
24    A    You're into a technical area that I really
25    can't answer.  I just know how many end users you're

59

1     going to get in that office.
2     Q    Who in your office is the most knowledgeable
3     person about the phone system?
                    Page 48

Deanie Lowe

4        A     We work with the county's communications
5    division, and the person in my office probably most
6    knowledgeable would be Lana Hires, but then she works
7    with the county's communication division that could
8    answer your questions much better than I can.
9        Q     Do you know the individual in the county
10   communication division who works on the phone line
11   issues?
12       A     I do.  It's a good friend, and I can't think
13   of his name right now.
14       Q     If you remember --
15       A     Lana would be able to tell you his name.
16       Q     We're still on Paragraph 8, and I'd like you
17   to take a look at the last sentence that reads:  No
18   increase has proven sufficient, so I'm attempting to
19   develop other options beyond these.  What did you mean
20   when you said no increase has proven sufficient?
21       A     Well, each time we've increased the number
22   of people answering the phones on the phone bank, it
23   has not -- it hasn't made it to where people don't get
24   busy signals at least part of the time when they try
25   to reach our office.

                                               60

1        Q     What would be sufficient in your mind?
2        A     A sufficient number of -- it's unreachable.
3    I believe if we had had over 100 telephone operators
4    on election day and 100 staff we could not have
5    handled the calls.
6        Q     Can you take a look at Paragraph 10 of your
7    affidavit.  It's on the same page, page four, and I'm
8    looking four sentences in, the sentence that reads:

                        Page 49

Deanie Lowe

9      Volusia includes a new application with denials for

10     incompleteness?

11         A    Yes.

12         Q    Can you explain to me what that means?

13         A    When we receive an application from someone

14     wanting to become a registered voter and it does not

15     include all the required responses on the application,

16     then we send them a letter explaining that we cannot

17     process it because it was incomplete, and we were, for

18     a period of time, enclosing a new application for them

19     to totally complete.

20         Q    So was that the process in 2000?

21         A    In the latter part of 2000, I believe, is

22     when we went to that.  Prior to that, we were filling

23     in the information that they had previously given us,

24     but we were running short of time to do that for them,

25     so we just enclosed the application and in our letter

                                                      61

1      reminded them which items had to be filled in for it

2      to be considered complete.

3          Q    When you say the latter part of 2000, do you

4      mean after the November 7th, 2000, election?

5          A    Oh, no.  This was prior to that.

6          Q    Do you recall when?

7          A    No, but it's in one of our responses as to

8      when we switched over.  It was sometime, I believe, in

9      the early part of 2000, or mid-2000, that we just ran

10     out of time to do that.

11         Q    What is your procedure currently with

12     respect to incomplete applications?

13         A    We're back to putting the information onto

14     the application when we mail it to them that they

                           Page 50

Deanie Lowe

15    previously provided because there was a change in the
16    law last year that now says that you only ask them for
17    whatever information was missing.
18         Q    So how long of a period was it that you sent
19    back a new application for incompleteness?
20         A    Ever since NVRA took effect, we have sent
21    them an application for completion.  It's just that to
22    begin with we filled in whatever information they gave
23    us on the incomplete application, so that they
24    wouldn't have to write that again, and highlighted the
25    area that they had missed before so that they could

                                                        62

1     just fill that in and sign it and return it.
2          Q    Just so I can recap, there was a period of
3     time when an individual would have to fill out the
4     entire application again?
5          A    That's right.
6          Q    How long of a period of time is that?
7          A    If I can look at my response in here, I
8     can -- it will jog my memory, but I don't remember,
9     you know, the exact period of time.  I just know we
10    got to a point to where we did not have time to type
11    it on there, we had too many of them to process.
12         Q    On the following page, page five, where
13    Paragraph 10 is continued, the last sentence you say:
14    Some denials were not mailed until after election day.
15    Do you have a sense of how many denials --
16         A    No, I don't.
17         Q    -- were mailed?
18         A    I don't.  I think we've provided that
19    information to you, but I'm not sure.

                           Page 51

Deanie Lowe

20      Q    Sitting here today, you don't --

21      A    No, I don't remember.

22      Q    Do you know why some denials were mailed

23  after election day?

24      A    Because we did not have time to do it before

25  election day.

63

1       Q    And when I refer to election day, I'm

2   referring to the November 2000 election.

3       A    That's what I'm talking about.

4       Q    Can you take a look at Paragraph 11, the

5   following paragraph, still on page five?  There's a

6   part of that paragraph where you talk about Sharon

7   Pinkney, the intake coordinator?

8       A    Right.

9       Q    There's a sentence that reads:  Ms. Pinkney

10  has stated that applications observed by her to lack

11  required information were returned to Mr. Ingram.  Do

12  you know when she observed that information was

13  allegedly lacking?

14      A    When he delivered the applications to the

15  office.

16      Q    Further down you mention that Ms. Pinkney

17  unfortunately did not retain copies of those

18  applications.  Those persons have not received written

19  notice from my office of the disposition of their

20  application.  What was the Supervisor of Elections'

21  policy concerning applications returned from voter

22  registration drives?

23           MR. RESTREPO:  Object to the form of the

24      question.

25      Q    You can answer.

Deanie Lowe

64

1        A     The policy was that we accept them, and then
2   they would be set over to the side, you know, in the
3   rack where they were being picked up as they got to
4   process them.
5        Q     Was there any policy concerning the
6   applications that were -- that came in that were
7   incomplete?
8        A     No, there was no policy about -- are you --
9   what are you referring to as far as a type of policy
10  concerning what type of matters?
11       Q     Well, in this example, if someone drops off
12  applications and your intake coordinator deems that
13  they lacked information, what is the policy or
14  practice, if any, concerning keeping copies of those
15  documents, making any record of those documents?
16       A     There's no written policy form.
17            MR. LITTLE:  Object to form because it's
18       nonspecific as to time.  This is John Little
19       again.
20       Q     I'm referring to the November 2000 election,
21  which is the subject of your affidavit.
22       A     The normal procedure is just to accept them
23  and place them over in the intake area to start the
24  process.
25       Q     Let me direct your attention to the last

65

1   sentence.  It says Ms. Pinkney's effort to facilitate
2   registration, though commendable, is an exception to
3   office practice.  What do you mean by office practice?
4        A     The office practice is to accept the

Page 53

Deanie Lowe

5      applications and put them over into the intake area to

6      start the process.

7          Q      So her not accepting the application was an

8      exception to office practice?

9          A      Yes, it was.

10         Q      Are you saying that she should have accepted

11     the applications?

12         A      No, I'm not saying that, because I know why

13     she didn't, and -- if she had done it the way we

14     normally do it, and probably the better way, in

15     hindsight, would have been to just take those

16     applications and put them over in the intake area.

17     She allowed them to be taken back because she felt it

18     was the only way that those students were going to be

19     able to be registered in time.

20         Q      Have you spoken with Ms. Pinkney about this

21     issue?

22         A      Yes, I have.

23         Q      Have you spoken to any other staff members

24     who process or are responsible for taking applications

25     that come in about the procedures for doing so, since

                                                            66

1      this incident?

2          A      Sandy Peloquin.

3          Q      Is she the only other person you spoke to?

4          A      Yes.

5          Q      Is this the only instance in which you know

6      that applications were dropped off that lacked the

7      required information, according to your staff, and

8      were not accepted?

9          A      Were allowed to be taken back, that's

10     correct.

Page 54

Deanie Lowe

11      Q      Can you be certain that this is the only

12      instance that that happened?

13      A      No --

14             MR. BOSCH:  Object to the form.

15      A      -- I can't be certain.  It's the only one

16      that I know of.

17      Q      On Paragraph 12 the sentence that begins at

18      the bottom of the page and continues to page six, two

19      NAACP drive coordinators picked up applications, but

20      did not deliver them back as a group.  Is there a

21      record of how many applications the NAACP coordinator

22      picked up?

23      A      I'm assuming -- well, they told me don't

24      assume.  You even told me don't assume.  If we put

25      this in -- we put this in here and it means that we

                                                        67

1      have on our log sheet that this person picked up a

2      packet.  Some of the packets -- normally the packets

3      will contain anywhere from 25 to 50 applications.  If

4      the person requests additional applications, we will

5      give them up to 100 at a time.  So we don't keep a

6      record of how many applications were distributed, so

7      it could be anywhere from 25 to 100, so I don't know

8      how many went with those.

9      Q      Paragraph 13, toward the middle of the page

10      there's a sentence that says:  The voting locations

11      again were separated prior to September 2000 because

12      the large number of voters in each precinct had

13      outgrown a single facility.  And there I believe

14      you're referring to the Bethune Cookman College

15      precinct 620 and 621; is that correct?

Page 55

Deanie Lowe

16      A    Yes.  Actually, it's not Bethune Cookman

17  College only.  That includes more area.  It's not just

18  the college.

19      Q    Okay.  Do you know what the increase was for

20  the population of those precincts?

21      A    No.  We submitted that.  I don't have that

22  memorized.  I don't know if it was in this affidavit

23  or if it was in a response to an interrogatory, but

24  they had grown quite a bit.

25      Q    Is there a threshold in terms of the number

                                              68

1   of persons that can be assigned to a particular

2   precinct?

3       A    No, we don't have a hard and fast threshold

4   because it depends upon the facility and the parking

5   availability as to how many we can get there.

6       Q    Do you have any written procedures

7   concerning whether a precinct should be split or not?

8       A    No, no written procedures.

9       Q    Concerning when a precinct should be moved

10  based on capacity issues?

11      A    We don't have anything in writing.

12      Q    Do you have an unwritten policy?

13      A    Yes.

14      Q    Can you tell me what that is?

15      A    When a precinct reaches approximately 2,000,

16  we start carefully watching it to see -- make sure

17  that we're not having lines on election day, because

18  you're limited to how many voting booths you can get

19  into the room, or any other type of situation that

20  would cause a delay in the voting.  Once it gets to

21  3,000, we really start looking at splitting up the

Page 56

Deanie Lowe

22    precinct; however, we do have some better -- greater

23    than that because the facility is so magnificent and

24    the parking area is fine that we don't have a problem.

25         Q    I'm sorry, I can't recall whether you

                                              69

1    mentioned it's 2,000 registered voters or this total

2    population?

3         A    No, 2,000 registered voters.

4         Q    And the 3,000 threshold is registered voters

5    you're referring to?

6         A    Right.  But it really -- the basic thing, it

7    depends upon the facility, because if we can't handle

8    the number of registered voters at 500, we will move

9    it.

10         Q    I'd like to turn to Paragraph 15 of your

11    affidavit on page seven.  Can you read that paragraph

12    and let me know when you finished, please?

13         A    Yes, I'm through.

14         Q    In your first sentence you say:  I have

15    observed a potential voter registration problem in the

16    Daytona Beach Department of Highway Safety and Motor

17    Vehicles office, and you go on to describe it.  Can

18    you tell me, in your own words today, what the problem

19    is?

20         A    We have, in the past, received incomplete

21    applications that were either accidentally cut off at

22    the top where the United States citizen and the felony

23    and the competent questions are.  We've received them

24    without signatures or with the wrong person's

25    signature on it.  We went through a period of time for

                                              70

Page 57

Deanie Lowe

1    about -- I think it was almost a year there where we

2    did not receive any applications at all from the

3    Daytona Beach office and --

4        Q    What -- I'm sorry, go ahead.

5        A    -- naturally it was a concern to us because

6    other offices were submitting applications on a

7    daily -- well, they were getting applications on a

8    daily basis and forwarding them to us.  That's the

9    type of problems we've had.

10       Q    Are there any other ones you can think of?

11       A    Most recently a change in procedures has

12   been instigated and we're having a little trouble

13   understanding some of the log sheets that are

14   transmitted to us.

15       Q    Let me go back to some of the problems you

16   identified.  You said there was a time period in the

17   past where you received incomplete applications, wrong

18   signatures, or applications without signatures.  What

19   time period are you referring to?

20       A    Beginning in 1995, and primarily the first

21   couple of years, we had a lot of problems, and then it

22   has dwindled since then.

23       Q    When you say the first couple of years, what

24   do you mean?  Are you talking about '95 to '97?

25       A    Yes.

71

1        Q    Do you know whether it went beyond 1997?

2        A    Yes.

3        Q    How long did these problems last?

4        A    Probably -- Sandy Peloquin could answer that

5    better than I can because she deals with it on a daily

6    basis, but there were sporadic spells of problems that

Page 58

Deanie Lowe

```
 7    ranged all the way up through the 2000 election.
 8         Q    Has there ever been a point since 1995 when
 9    you stopped receiving incomplete applications?
10         A    I don't know that.
11         Q    What about applications with wrong
12    signatures, was there a point at which you stopped
13    receiving such applications?
14         A    I don't know, but -- I just don't know.  It
15    may not have been brought to my attention, so I don't
16    know.
17         Q    What about the applications without
18    signatures?
19         A    I believe we still do get some of those at
20    times.
21         Q    Do you recall the last instance that you
22    knew of applications coming in with wrong signatures?
23         A    No, I don't recall.
24         Q    But you would say it's at least as late as
25    1998?
```

                                              72

```
 1         A    I'm sorry, I cannot remember.
 2         Q    1997 -- you mentioned that it was a couple
 3    of years after 1995, so is that --
 4         A    Right.
 5         Q    So -- sorry.  Go ahead.
 6         A    That's as far back as I could remember.  But
 7    I couldn't tell you when it seemed to stop.
 8         Q    You said that there was a period of time
 9    when you did not receive any applications from the
10    Daytona Beach Department of Highway Safety and Motor
11    Vehicles; is that right?
```

Page 59

Deanie Lowe

12    A    That's right.

13    Q    What time period was that?

14    A    I don't remember.  We did give that to you

15 in one of my responses.  I remember it stopped around

16 mid-July of the year that it stopped, but beyond that,

17 I can't remember.

18    Q    You don't recall whether it was in 1998,

19 '99, 2000?

20    A    No, I don't remember.

21    Q    You have said that most recently you've

22 experienced problems, or trouble, you said, in

23 understanding the reports that come in from the

24 Department of Highway Safety and Motor Vehicles?

25    A    Yes.

73

1    Q    Can you explain what you mean by that?

2    A    They have the log sheet broken down into

3 sections referring to new applications that were

4 received.  And they have a new category called

5 ineligibles, and then they have the list called

6 declinations, and they're a printed list, and yet out

7 to the side under the new applications they've

8 handwritten in a couple of names on one of the reports

9 we got, and we received the application to go with

10 those names, the applications appear to be complete

11 and meet all the requirements, but those names are

12 also listed in the printed form under the ineligibles,

13 and so we don't know if maybe we've been sent

14 applications and for some other reason that is not

15 being given this person is ineligible.  Their name is

16 not crossed off of the ineligible section, and yet

17 it's handwritten in on the eligible area.  So it's

Page 60

Deanie Lowe

18    very hard for us to understand what we're being
19    transmitted.  We don't know whether to accept those
20    applications as people who are eligible to register
21    and who wanted to register, or whether they were
22    accidentally enclosed and yet they're someone who are
23    not eligible.
24        Q    How are -- how do you handle those
25    applications?

74

1        A    With phone calls to the office.  And that
2    has not been most satisfactory.
3        Q    When you say phone calls to the office, you
4    are referring to the Department of Highway Safety and
5    Motor Vehicles' office?
6        A    Correct.
7        Q    Who, at DMV?  I'll use the short form, if
8    that works for you.
9        A    I don't know who my staff has talked to.
10       Q    Who on your staff calls DMV?
11       A    Sharon Pinkney.
12       Q    Have you ever called DMV on this particular
13   issue of the reports being confusing to your office?
14       A    No, I have not.
15       Q    Do you know whether any voter applications
16   that you received from DMV have gone unprocessed as a
17   result of your inability to understand the DMV report?
18       A    No, they have not.
19       Q    All of the applications that you receive
20   from DMV are processed?
21       A    Correct.
22       Q    When I say processed, are these individuals

Page 61

Deanie Lowe

23    ultimately registered to vote?

24         A    No.  My belief -- definition of the word

25    process is we either register them and send them a

75

1     voter ID card, or if we cannot accept it, if it

2     doesn't meet the criteria, then we will send them a

3     letter of denial, explaining why, or a letter saying

4     that their application was incomplete, and offering

5     them the chance to reregister -- or to reapply.

6          Q    Do you have a sense at present how many

7     applications you received from DMV where voters are

8     sent a denial letter?

9          A    No, I don't.

10         Q    Do you know if most applications are

11    processed and the voter is registered?

12         A    I would say that most of them are.

13         Q    Did you call or contact in any form the

14    Department of Motor Vehicles concerning the problems

15    we discussed earlier, the incomplete applications, the

16    wrong signatures, the applications without signatures?

17         A    Yes.

18         Q    You personally contacted DMV?

19         A    No.

20         Q    Who contacted DMV at your office?

21         A    Sharon Pinkney.

22         Q    Did Sharon Pinkney report back to you as to

23    what her conversations or communications were with

24    DMV?

25         A    In some instances.

76

1          Q    Can you tell me what she reported back

2     concerning the incomplete applications, the wrong

Page 62

Deanie Lowe

3    signatures, and the lack of signatures on certain
4    applications?
5        A    She would just tell me that she had talked
6    to them and they would say that -- you know, whatever
7    response that they had.
8        Q    Do you recall what the responses were?
9        A    It was always that they would try to look
10   into it to see what could be done to correct the
11   situation.
12       Q    Were there instances where Sharon reported
13   back that they would look into it and improve it and
14   you learned subsequently to that that the problem was
15   still ongoing?
16       A    I don't remember specific instances of that.
17       Q    What about the more recent issue about the
18   reports, has Sharon Pinkney reported back to you --
19   I'm sorry, Sandy Peloquin reported back to you
20   concerning her communications with DMV?
21       A    Yes.
22       Q    And what has she told you?
23       A    She has given me a copy of an e-mail that we
24   were forwarded on correspondence between DMV and I
25   can't remember who about a possible reason for the

                                              77

1    problems, so it satisfied my mind that somebody was
2    working on it.
3        Q    Based on the e-mail?
4        A    Yes.
5        Q    Do you have any other reason, besides the
6    e-mail, to believe that someone's working on it?
7        A    No.

                    Page 63

Deanie Lowe

8    Q    You mentioned earlier that the response from

9  DMV was unsatisfactory.  What did you mean by that?

10    A    Say it again.

11    Q    You said the response from DMV was

12  unsatisfactory.

13    A    I can't remember in what regard I said that.

14  If you can refresh my memory on what I was referring

15  to, then I'll be happy to explain it further.

16    Q    We were talking about the recent issue

17  concerning the reports.

18    A    Oh, okay.  The person -- what was relayed to

19  me by Sandy Peloquin was that the person did not know

20  why we had received those applications and why it was

21  handwritten in and did not know whether or not it was

22  someone who was ineligible, so to me that was an

23  unsatisfactory response.

24    Q    What is the general basis for your statement

25  that there were problems and there continue to be

78

1  problems at the Department of Motor Vehicles

2  concerning the registration of voters?

3              MR. MAC INNES:  Objection as to form.

4              MR. BOSCH:  Join in the objection.

5    Q    You can answer.

6    A    Okay.  Well, the reason why I -- you're

7  asking me the reason why I say there are problems?

8    Q    Yes.  And were problems -- there were

9  problems.

10    A    The main problem we had was that we were not

11  receiving applications, and we could not believe that

12  the biggest DMV office in Volusia County was not

13  getting any people who wanted to register to vote,

Page 64

Deanie Lowe

14    when the two smaller ones were getting lots of people

15    who wanted to register to vote.  We were concerned

16    about whether or not the operators at DMV were

17    actually offering this availability to the workers

18    or -- I mean to the public, and if they were and if

19    they were taking applications, why weren't they being

20    forwarded to us?  We were just very concerned during

21    the period that we were not receiving any

22    applications.

23            On one occasion I did -- and I just now

24    remember talking with somebody -- I called and asked

25    them why aren't we getting any applications from you?

                                                    79

1     And it was something to do with a printer that was

2     down or a software problem and -- is what she told me,

3     and she said we are offering them -- the applications

4     are here available for them to pick up, fill them out

5     at home and mail them to you.

6         Q    So are you basing your statements regarding

7     problems at DMV on personal knowledge?

8         A    Some of them, yes, from seeing the log

9     sheets and having talked to the person and trusting

10    that my staff is telling me exactly what is going on.

11        Q    To the extent that you're not basing it on

12    personal knowledge, what are you basing it on?

13        A    Well, I've had complaints from people who

14    felt that they registered to vote at the driver's

15    license office and wound up not being registered, but

16    I don't know that that -- you know, what they've told

17    me is correct.  You don't know whether or not to

18    believe something like that.  Some people can think

                        Page 65

Deanie Lowe

19    that they were when they weren't actually registered.

20    That's the only other thing that I can think of that

21    would be the basis for my belief that there's a

22    problem.

23        Q    Based on your experiences with DMV, when

24    people state to you that they believe they were

25    registered at DMV and ultimately turn out not to have

                                                        80

1     been registered, do you tend to think that's true?

2             MR. LITTLE:  Objection to form.

3             MR. MAC INNES:  Objection to form.

4         Q    You can answer.

5         A    Do I tend to think it's true that they did

6     register or that they did not register?

7         Q    That they did register.

8         A    No, I really don't -- I'll tell you about an

9     experience, okay --

10        Q    Okay.

11        A    -- and then you'll understand why I don't

12    lay any credence in this area, because I had a man,

13    after the 2000 election, who swore up and down that he

14    and his wife registered at the driver's license

15    office, and they were blaming me for not processing

16    their application.  And I went to the log sheet -- I

17    told him I can go to the log sheet, if you'll tell me

18    the date you registered and what office, and I can go

19    and find if they transferred an application to us.  He

20    gave me a date of December in 1993 that he swore up

21    and down he registered at the driver's license office,

22    and he was very apologetic when I explained to him

23    that NVRA did not take effect until 1995, so he

24    couldn't possibly have registered at the driver's

                         Page 66

Deanie Lowe

25    license office.  So, you know, that instance tells

81

1    me -- this man was so adamant that he was sure he

2    registered at the driver's license office, so you

3    can't always lay a lot of stock in what the people

4    think that they're telling you.

5         Q    We'll finish your affidavit and then we can

6    take a quick break, if that's okay with you.

7              If you can take a look at Paragraph 14 of

8    your affidavit on page seven, we're continuing down

9    the line, and you have a statement that this does not

10   occur with the same frequency in other Volusia DHSMV

11   offices located in DeLand and New Smyrna?

12             MR. RESTREPO:  What paragraph?

13        Q    Fifteen, I'm sorry.  Paragraph 15 on page

14   seven.  How often do you receive applications from the

15   DeLand and New Smryna Beach offices of DMV?

16        A    I don't know.  It's on a regular basis, but

17   I don't remember how frequently they come in, whether

18   it's a weekly or bi-weekly, I don't know.

19        Q    And are those offices larger than the

20   Daytona Beach office of DMV?

21        A    No, they're smaller.

22        Q    And the final sentence -- or sorry, the next

23   to last sentence you say:  However, my concern has

24   been such that I have asked for and received signed

25   reports stating that no one registered on a given day.

82

1    You're referring to the Daytona Beach DMV office in

2    that sentence; is that right?

3         A    That's correct.

Page 67

Deanie Lowe

```
 4       Q    Who did you ask for reports or any
 5   verification regarding the voter registration
 6   applications?
 7       A    Our main contact person there, Darlene
 8   Wiles, I believe is her last name.
 9       Q    And when did you ask for reports?
10       A    This was during that time period that I
11   mentioned earlier where we went for months without
12   getting any applications from them, and early on in
13   that we just could not believe that we weren't getting
14   any from them, so we asked them to, you know, send us
15   a report anyway and sign it that you did not receive
16   any applications.
17       Q    Is Darlene still your contact at DMV in
18   Daytona Beach?
19       A    Yes.
20       Q    Is she only your contact for the Daytona
21   Beach DMV office?
22       A    Yes.
23       Q    Does she work for any other offices?
24       A    No.  Not that I know of.  She's not our
25   contact there.
```

83

```
 1       Q    How long has she been your contact at the
 2   DMV Daytona Beach office?
 3       A    I believe since the beginning, 1995, but I'm
 4   not positive about that.
 5       Q    Paragraph 16, the second sentence, you state
 6   there were 268 unregistered precinct voters
 7   county-wide in the 2000 general election; 73 were in
 8   precinct 621.  Do you know whether any of these
 9   individuals filled out affirmations, any of the 268?
```

Page 68

Deanie Lowe

10      A     I believe they did.

11      Q     Do you know what percentage?

12      A     I don't know by percentage, but I think we

13   supplied you with the exact numbers and who they were.

14      Q     Just sitting here today do you have any

15   sense?

16      A     No.

17      Q     If you continue to read along in the

18   paragraph, you discuss possible sources of legitimate

19   confusion contributing to this disproportionate

20   number.  Are you referring -- when you say

21   disproportionate number, are you referring to the 73

22   individuals who were unregistered in precinct 621?

23      A     Yes.

24      Q     Did you gather any data that would explain

25   the disproportionate number in precinct 621?

                                             84

1       A     We talked, when I say we, I mean my

2    assistant, Denise, talked with the clerk of that

3    precinct.

4       Q     Do you recall the clerk's name?

5       A     No, I don't.

6       Q     What did you discuss with the clerk?

7       A     My assistant discussed with her how come,

8    you know, we had so many people who were allowed to

9    vote who were not registered.

10      Q     What did you determine?

11      A     She was unable to get through to us on the

12   phone line to verify whether or not the people were

13   registered.

14      Q     Of the individuals who were not registered,

Page 69

Deanie Lowe

15    do you know the number of whom had some form of

16    application on your system?

17        A    I know there's a chart that tells you that

18    these responses -- and if you want, I'll find it and

19    then I can respond to those questions, but we told,

20    you know, how many had -- county-wide we gave you a

21    list of all those who had voted that should not have

22    voted, and evidently we had affirmations on them,

23    otherwise we wouldn't have known their names.  But we

24    told whether or not that person had been canceled and,

25    if so, the reason.  We told you whether it might have

85

1    been an incomplete application that we had not gotten

2    a complete one on later.  Every reason -- or maybe we

3    had never received an application for them.  But every

4    one of the people who voted who should not have voted

5    we gave you that on a list.

6        Q    Paragraph 18 on page eight, the next to last

7    sentence you say:  On election day I received a

8    complaint that the clerk was not allowing voters to

9    take materials into the polling room and I called the

10   clerk to correct the problem.  The following sentence

11   says:  I also received another complaint that the

12   clerk was not allowing solicitation signs to be placed

13   on the property and called the clerk a second time to

14   correct the problem.  Was there any additional

15   follow-up with this poll worker?

16        A    She was thanked for her previous services

17   and released.

18        Q    So she's no longer in the potential pool of

19   poll workers for Volusia County?

20        A    That's correct.

Page 70

Deanie Lowe

21      Q    Look at the final paragraph of your

22  affidavit, Paragraph 19. You state:  I have never

23  established a practice of procedure with the intention

24  of impeding registration and full participation by any

25  eligible voter, black or otherwise.  Do you know

                                                        86

1   whether, without intending to do so, any practice or

2   procedure of the Volusia County Supervisor of

3   Elections office had the effect of impeding black

4   voters --

5           MR. BOSCH:  Object to the form.  Go ahead.

6       Q    -- from participating in the --

7       A    No.

8       Q    Let me --

9       A    I know nothing --

10          MR. BOSCH:  Let her finish the question.

11      Q    -- from participating in the election

12  process?

13          MR. BOSCH:  Object to the form.  Go ahead.

14      Q    You can answer.

15      A    Still the same, I know of nothing, and I

16  would not stand for it if it were to come to my

17  attention.

18      Q    But do you know whether, without intending

19  to do so, any practice or procedure in your office had

20  the effect of impeding the right to vote of black

21  voters in Volusia County?

22          MR. BOSCH:  Object to the form.

23          MR. RESTREPO:  Objection; asked and

24      answered.

25      A    No, I don't know.

Page 71

Deanie Lowe

87

1            MS. NELSON:  Why don't we take a break for

2       ten minutes.

3            (Recess had.)

4    BY MS. NELSON:

5       Q    Ms. Lowe, did you have any discussions

6    during our break with your attorney regarding your

7    testimony here today?

8       A    No.

9       Q    Did you have any conversations with anyone

10   else regarding your testimony here today during the

11   break?

12      A    Not regarding my testimony.

13      Q    Regarding issues in the case?

14      A    No, regarding Scrabble.

15      Q    As tempted as I am, I will refrain from

16   questioning you on that.

17      A    That's about as far away as you can get.

18      Q    I'd like to bring you back to your affidavit

19   to some of the attachments there, and unfortunately,

20   since it's not Bates stamped, I can only tell you the

21   document.  It's a few documents in, a letter on your

22   letterhead that's dated January 12th, 2001, and it has

23   an attachment and affidavit and another letter with an

24   affidavit and then another letter.  This document

25   right here.

88

1       A    Regarding the felons?

2       Q    Yes.

3       A    Okay.

4       Q    Can you turn to that letter?

5       A    Yes.

Page 72

Deanie Lowe

6    Q    Have you seen this document before?

7    A    Yes.

8    Q    Is that your signature at the bottom of the

9    page?

10   A    Yes.

11   Q    Can you tell me what this document is?

12   A    This is one of the forms of letters that we

13   sent out to persons that had been submitted to us on a

14   list from the Division of Elections who were potential

15   felons.

16   Q    Did you create this letter?

17   A    I copied a lot of it from a letter that was

18   developed by the -- either by the Central Voter File

19   committee, the original one, or by David Leahy

20   himself.

21   Q    Is there anything that you added on your own

22   or that you can claim to be your own words here?

23   A    I tried to soften it some to, you know, help

24   the voter understand that we weren't accusing them of

25   being a felon, that we were trying to verify some

                                              89

1    information we had received.

2    Q    Do you believe that this letter presents an

3    accurate portrayal of what the -- what the procedures

4    are for felon -- alleged felon voter registration?

5         MR. LITTLE:  Objection to form, Little.

6         MR. RESTREPO:  Objection to form.

7         MR. BOSCH:  Join in the objection.

8    A    Can I join in, because I don't understand

9    it?

10   Q    You're on the record, you've got your

Page 73

Deanie Lowe

11    objection.  Okay, let me rephrase it.  If it garnered

12    your objection, I know that I must rephrase it.

13            Does this letter accurately reflect the laws

14    of Florida concerning the registration of ex-felons,

15    the voter registration of ex-felons?

16            MR. EHRLICH:  Object to the form, Jeff

17        Ehrlich.

18            MR. LITTLE:  John Little, same objection.

19            MR. RESTREPO:  Same objection down here.

20            MR. BOSCH:  I'll join the objection.

21    Q    Do you understand the question?

22    A    Let me make sure we're talking about the

23    same letter because there are two different letters,

24    one that went out to persons who had supposedly been

25    convicted of a felony in Florida, and a different

                                                    90

1    letter went out to ones who had been convicted of a

2    felony in other states, and which of those letters are

3    you referring to?

4    Q    Well, why don't you take a look at the

5    document that is dated January 12th, 2001, that bears

6    your signature at the bottom and also has in the

7    bottom left corner something that says felony.two?

8    A    Okay.

9    Q    Are we on the same page?

10    A    Yes.

11    Q    Can you take a look at that document and

12    tell me what letter this is and then I'll restate my

13    question.

14    A    Okay.  This one is referring to people who

15    had been convicted of a felony in another state.

16    Q    Take a look, if you will, at the last

                          Page 74

Deanie Lowe

17    sentence of your letter.  Do you believe that -- I'll
18    just read it for the record.  Even if you did not lose
19    your civil rights in the state where your felony
20    conviction occurred, you must still apply to have your
21    civil rights restored in Florida.  Do you believe that
22    that is an accurate statement?
23         A    Not --
24              MR. EHRLICH:  Object to form, Jeff Ehrlich.
25              MR. LITTLE:  John Little, same objection.

                                                        91

1         Q    You can answer.
2         A    At the time we believed it to be correct.
3    We have since learned that that was incorrect.  We
4    received a letter in early March that was a copy of a
5    letter sent by some lady whose last name is Keels that
6    was written sometime in February after we had already
7    sent our letter out in January that said that people
8    who came from a state where their rights were
9    automatically restored did not have to apply for
10   clemency here in Florida, and that was our first
11   understanding to the contrary of what we had put in
12   the letter.
13        Q    So, I'm sorry, when did you first learn that
14   this statement was inaccurate?
15        A    In the first part of March of 2001.
16        Q    What did you base this statement on when you
17   wrote it?
18        A    We based it on information, number one, that
19   I personally obtained by conversation with the Office
20   of Clemency shortly after I first came in office,
21   because I questioned why a person who had had their

                         Page 75

Deanie Lowe

22    rights automatically restored in another state would

23    still have to apply to have their rights restored in

24    Florida, and I was told that that was the case, that

25    they had to apply to Tallahassee to the Office of

92

1    Executive Clemency.

2        Q    You said this was shortly after you came on

3    board, so was this in 1993?

4        A    It would have been in '93 or '94, somewhere

5    in that time period.

6        Q    Do you recall who you spoke to at the Office

7    of Clemency?

8        A    No, I did not write down their name, the

9    date or time or anything like I should have.

10       Q    Did you have any conversations subsequent to

11   the one you referred to in 1993 or 1994 with the

12   Office of Executive Clemency concerning ex-felon voter

13   registration status?

14       A    Yes.  I believe it was in 19 -- I believe it

15   would have been in '98, early '98, when the

16   legislature was considering passing the legislation

17   concerning the Central Voter File and that we would be

18   dealing with a list of felons, or potential felons,

19   and I called one of the local offices dealing with

20   parole and I called the Office of Clemency trying to

21   find out what was the process that someone went

22   through to have their rights restored, whether this

23   was something that should have -- the paperwork should

24   have automatically been completed at the time they

25   finished their parole, or was it something that they

93

1    had to initiate on their own.  I was trying to get

Page 76

Deanie Lowe

2    more information to be able to help my people, who

3    might have to be canceled because they had been

4    convicted of a felony, on how to go about having their

5    rights restored.  And I don't know who I talked to in

6    those instances, but I was -- and -- but, again, the

7    question came up about this business of someone who

8    was convicted of a felony in a state where their

9    rights were automatically restored.  You know, again I

10    questioned them, why do they have to apply in Florida,

11    and again I was told that was the law, they had to

12    apply to the Office of Executive Clemency.  And I

13    believe in one instance they referred me to a

14    pamphlet, and that pamphlet has since been revised,

15    and I don't have a copy of the old pamphlet to verify

16    that that was actually in print, so I don't remember.

17         Q    Do you know the name of the pamphlet?

18         A    No, I don't.  It's changed names, but I

19    don't recall what name that was.

20         Q    Do you know the title of the individual you

21    spoke to in 1998?

22         A    No, I don't.

23         Q    What about 1993 or 1994?

24         A    No.

25         Q    And I asked whether you had any

                                              94

1    conversations with persons at the Office of Executive

2    Clemency.  Did you have any other communications

3    outside of conversations?

4         A    Not myself personally.

5         Q    Did anyone on your staff, that you know of?

6         A    On a regular basis my staff will check with

Page 77

Deanie Lowe

7      the Office of Clemency to see if someone's rights were

8      restored when a question arises.

9          Q    Do you know whether those staff persons

10     discussed the issue of felon voter registration when

11     the felony occurred in another state?

12         A    No, I don't know.

13         Q    Now, you mentioned that -- I'm sorry, why

14     don't you tell me right now what is your current

15     understanding concerning persons -- the registration

16     of persons who were convicted of a felony in another

17     state and who attempt to register in Volusia County.

18         A    If their rights were automatically restored

19     in the state where they were convicted of a felony,

20     then they do not have to apply and they are eligible

21     to register.

22         Q    What do you mean when you say automatically

23     restored?

24         A    Well, that's a good question.  That term

25     appears to be used loosely and it means different

                                                    95

1      things in different states, but if it means anything

2      in a state at this point, we go ahead and let them

3      apply and register them.

4          Q    What does the term mean to you?

5          A    It means that they have served the time that

6      they were declared to need to serve and that, like I

7      say, in some instances it means further restitution to

8      victims, or it means serving their parole time.

9      That's my understanding, that it would be the time

10     incarcerated and parole time before they'd have their

11     rights restored or be eligible to have their rights

12     restored.  But I understand in certain instances there

Deanie Lowe

13    are other obligations that must be met, but I don't

14    know what those are, and they vary from state to

15    state.

16        Q    What is your understanding of what happens

17    with persons who are convicted of a felony in another

18    state and they applied and received restoration of

19    their rights from that other state, are they eligible

20    to vote and register to vote in Florida?

21        A    Yes, I understand that they are eligible.

22        Q    Regardless of whether they went through a

23    restoration process that they initiated or whether

24    their rights were automatically restored, meaning that

25    they had to not go through any process to get their

96

1    rights restored?

2        MR. BOSCH:  Object to the form.

3        Q    Do you understand the question?

4        A    I believe I understand it and I'm going to

5    repeat it the way I think you're asking.

6        Q    Great.

7        A    You're asking me that if they had their

8    rights restored in another state, whether it be

9    automatically or they had to go through a process of

10    submitting paperwork to have their rights restored,

11    whether or not I considered them eligible to register

12    in Volusia County, and the answer is yes, I understand

13    that now.

14        Q    When did you come to that understanding?

15        A    When we got the copy of the letter written

16    by Ms. Keels.

17        Q    And that was in March 2001?

Deanie Lowe

18      A    Correct.

19      Q    At that time you had already sent this

20   letter out to persons who were alleged to be felons;

21   is that correct?

22      A    Yes, that's correct.

23      Q    Did you do anything following your new

24   understanding in March 2001 about the restoration of

25   rights concerning felons and the applicability in

97

1   Florida?

2       A    Yes.  The person -- we tried to find out

3    what states automatically restore the rights.  We

4    checked with the Office of Clemency, they gave us a

5    couple of states.  We checked with the Division of

6    Elections, with Janet mod droa, and she e-mailed us a

7    list of those that she knew.  And any that we had sent

8    out, you know, and eventually put into the

9    cancellation status from that mailing in January, if

10   they were from those states, we went back and

11   reactivated that registration.

12      Q    Did you notify the voter of this

13   reactivation?

14      A    No.

15      Q    Why not?

16      A    Well, I'm sorry.  I don't know if we

17   notified them or not.

18      Q    Now, you mentioned that you reactivated

19   persons who came from states where there was an

20   automatic restoration of rights?

21      A    Right.

22      Q    What about persons in states where they have

23   to initiate a restoration process, did you do anything

Page 80

Deanie Lowe

24    with respect to those individuals?

25        A    In the letter that we sent out to them, we

                                                        98

1     asked them to provide us with any -- well, actually,

2     on that particular letter we just had them sign an

3     affidavit stating that they had -- I'm trying to see

4     if it stated that, you know, they could sign the

5     affidavit if they had had their rights restored, or if

6     it was just an affidavit stating that they had never

7     been convicted of a felony.  Let me refresh my memory

8     just a minute.  I thought that this form included a

9     place for them to check, you know, to send us the

10    paperwork that they had had their rights restored.  It

11    does not.

12        Q    So did you do anything with respect to those

13    individuals, the individuals who received this letter

14    that states even if you did not lose your civil rights

15    in the state where your felony conviction occurred,

16    you must still apply to have your civil rights

17    restored in Florida?

18        A    And you're asking me did I do what?

19        Q    Did you do anything to retract that

20    statement which you subsequently learned was

21    inaccurate?

22        A    We haven't sent out any further letters

23    since then, so I haven't changed anything.  Until we

24    get to a point to where we'll start sending anything

25    again, at that point we will revise the letter.  But I

                                                        99

1     just stepped through what we did is we automatically

2     reactivated them.

                        Page 81

Deanie Lowe

3    Q   So is it possible that there are voters who

4   were removed from your voter rolls and who are no

5   longer eligible to vote in Volusia County who had

6   their rights restored in another state but did not

7   have them restored automatically?

8         MR. RESTREPO:  Objection to form and

9      foundation.

10       MR. BOSCH:  Same objection.

11       MR. LITTLE:  Same objection, John Little.

12   A   I'm sorry, I don't understand the question.

13   Q   Let me rephrase it.  Let me understand.  Who

14  received this letter, this January -- let's make sure

15  we're on the same page about the letter.  This

16  January -- dated January 12th, 2001, an attachment to

17  your affidavit, and the bottom left-hand corner says

18  felony.two.

19   A   I can't give you the names right off the

20  bat.  I think we've provided those.  I know we have.

21   Q   what category of persons received this

22  letter?

23   A   These were persons that we had received a

24  list saying that they had been convicted of a felony

25  in another state.

100

1   Q   And those persons who were convicted of --

2  alleged to be convicted of a felony in another state,

3  presumably some of those persons could have had their

4  rights restored automatically; is that right?

5        MR. EHRLICH:  Object to the form, Jeff

6      Ehrlich.

7       MR. LITTLE:  John Little, same objection.

8       MR. RESTREPO:  Same objection.

Page 82

Deanie Lowe

9       A     That is my understanding.

10      Q     And could some of those persons have had

11   their rights restored through a process that they

12   initiated?

13            MR. EHRLICH:  Object to the form, Jeff

14      Ehrlich.

15            MR. RESTREPO:  Same.

16            MR. LITTLE:  Same, John Little.

17            MR. BOSCH:  I'll join in the objection.  Go

18      ahead.

19      A     The lists were supposed to be of people who

20   had been convicted of a felony and had not had their

21   rights restored, but I cannot say for a fact that some

22   of those people did not have their rights restored by

23   going through submitting paperwork.

24      Q     Did you send any correspondence, any

25   subsequent correspondence, to persons who received

                                              101

1    this January 12th, 2001, letter who were not from the

2    states that you understand to give automatic

3    restoration of rights?

4       A     No, I did not.

5       Q     Did you restore those individuals to the

6    voter rolls?

7       A     The ones from states that we cannot

8    determine automatically restored rights, we did not

9    restore them.  No, we did not restore them.  I'm just

10   trying to think back and make sure.

11      Q     So there are persons out there who received

12   your January 12th, 2001, letter with this inaccurate

13   statement?

Page 83

Deanie Lowe

14          MR. EHRLICH:  Object to the form, Jeff
15     Ehrlich.
16          MR. RESTREPO:  Object to the form.
17          MR. LITTLE:  Same objection, John Little.
18          MR. BOSCH:  I join in the objection.
19     Q    Is that right?
20          MR. BOSCH:  Go ahead.
21     A    There are persons out there who received
22 this letter, yes.
23     Q    And who have not been subsequently notified
24 by your office that this statement was incorrect?
25          MR. EHRLICH:  Object to the form, Jeff

                                                    102
1      Ehrlich.
2           MR. RESTREPO:  Object to the form.
3      A    Correct.
4      Q    I'd like to turn your attention to another
5  document in --
6      A    May I point out something in that letter we
7  were just discussing?
8      Q    Sure.
9      A    In the first paragraph the final sentence is
10 what we were -- that if they had not been convicted of
11 a felony or if they had had their rights restored, to
12 contact our office.
13     Q    I'm sorry.  What are you saying?
14     A    Therefore your name will be removed in the
15 voter registration rolls 30 days from the date of this
16 letter unless information is received indicating that
17 you have been -- have not been convicted of a felony,
18 or have had your civil rights or right to vote
19 restored.  So we were asking the voter to let us know

Deanie Lowe

20     if they had had their rights restored.

21          Q     Okay.  Does what you just said dispute that

22     you stated in your letter that even if such persons

23     had their rights restored in another state, they must

24     still apply to have those rights restored in Florida

25     in order to vote in Florida?

                                                          103

1          A     No.

2                MR. EHRLICH:  Object to the form, Jeff

3           Ehrlich.

4                MR. LITTLE:  Same objection, John Little.

5          Q     What was your answer?

6          A     No, it does not dispute the fact that we

7     included that in there.

8          Q     If you can turn to another document included

9     as an attachment to your affidavit, it says Deanie

10    Lowe, Supervisor of Elections County of Volusia

11    First-Class Mail US postage, and it's a three-page

12    document.

13               MR. RESTREPO:  Do you happen to have an

14          extra copy of this, given how much time we spent

15          on it?

16               MR. QUAMIE:  Actually, it was passed around

17          and it came back.

18               MR. RESTREPO:  Thank you.

19         A     I'm having trouble finding that.

20         Q     It's after the poll worker manual and before

21    the News Journal -- the document that's entitled News

22    Journal.  It should be right in between that.

23         A     Okay.  And it's addressed to Shaymaa Agha?

24         Q     I'm sorry?

Page 85

Deanie Lowe

25        A    Is it the one addressed to Shaymaa Agha?

                                                      104

1         Q    I'm sorry.

2         A    Yes.

3         Q    Can you turn to the second page of that

4    attachment, tell me what this document is, please.

5         A    We keep a record of all of the postage

6    connected with a particular project, and so this is

7    our record that one of my employees kept of what

8    polling place change notices were mailed out and how

9    much the postage was on it.

10        Q    Do you recall the circumstances of the

11   polling place change for precinct 614?  It's

12   referenced in the first line of the page you're

13   looking at.

14        A    No, I don't.  Let me refer to the ad that we

15   ran so that it will refresh my memory as to where that

16   polling place is and that might help me.

17        Q    Sure.

18        A    614 is located at the fire station on Nova

19   Road in Daytona Beach, and I don't believe we changed

20   the polling place, but it could have been that some

21   voters were moved into a precinct or something with

22   their -- maybe there was a mistake on the assignment

23   of their precinct.  For one of those reasons we would

24   have sent them out a notice on the polling place, but

25   I don't remember the exact circumstances with 614.

                                                      105

1         Q    Do you maintain any records concerning the

2    basis for changing polling places?

3         A    I believe in most instances we do.

4         Q    Do you have a record concerning the change
                          Page 86

Deanie Lowe

5  of precinct 614 referenced here?

6      A    I don't know that that was a change of

7  polling place because there are other reasons why we

8  may have sent a polling place change notice to a voter

9  because we change them due to a move of a line or

10  something; an annexation sometimes will change them

11  into a new polling place.

12      Q    How would you determine the basis of that

13  polling change?  What documents or records would you

14  look at to figure out what happened there?

15      A    I'd go back to look at the contracts that

16  we've had with the polling places.

17      Q    Would you look at anything else?

18      A    A record of changing of precinct lines for

19  the area, we keep that.

20      Q    Anything else?

21      A    Institutional knowledge among my staff.

22      Q    What about the polling place change for

23  precinct 621, which is the second to last entry on

24  that same page?

25      A    Yes.

                                                    106

1      Q    Do you recall anything about the

2  circumstances of this mailing of a polling place

3  change notice regarding 621?

4      A    Yes.

5      Q    Can you tell me about it?

6      A    Precincts 620 and 621 are the two that

7  primarily serve the Bethune Cookman College campus,

8  and prior to 1995 we had the two precincts in two

9  different locations, one of them was the old Mount

Page 87

Deanie Lowe

10    Caramel Baptist Church, I think it is, and I've

11    forgotten -- I believe that the other one was in one

12    of the locations that we continue to use.  Anyway, in

13    '95, I believe it was, the old church was getting a

14    little bit too dilapidated, one of the places that we

15    had, the two precincts, was really deteriorating, and

16    so we moved them both into the Richard V. Moore

17    Community Center, and that served us well for a while,

18    until the two precincts kept increasing in size and

19    number of people who were registered in those

20    precincts, and in looking forward to how we were going

21    to handle a larger turnout for the 2000 election

22    season, we split them up and put them into two

23    different polling places again.  We couldn't go back

24    to the old dilapidated place, so we put them into the

25    New Mount Zion church.  So we had one in the Richard

                                                    107

1    V. Moore Center and one in New Mount Zion so that it

2    would be a larger, nicer polling place for them.  And

3    this change notice that goes out, we send out a change

4    notice two weeks prior to the election to let people

5    know about the change of polling place, so that's what

6    this would indicate here.

7          Q    So according to your records, the polling

8    place change notice was sent 10/20/2000?

9          A    No, this was 9/23/99, wasn't it?

10          Q    Oh, I'm sorry.  Is it 8/22/2000 for the 621?

11          A    That sounds right.  Let me find it on the

12    page here to make sure it's included in.  621 I think

13    is the one that we moved.  Yeah, that would have been

14    on August 22nd of 2000, prior to the September

15    primaries when we moved it.

                    Page 88

Deanie Lowe

16    Q    Thank you.  You can put this document away.

17    A    Okay.

18         MS. NELSON:  I'd like to mark as Plaintiff's

19    Exhibit Lowe 5 a Certificate of Service of

20    Answers and Objections to Interrogatories to

21    Defendant Deanie Lowe, Supervisor of Elections

22    Volusia County.

23         (Plaintiff's Exhibit Lowe No. 5 was marked

24    for identification.)

25    Q    Can you take a look at the document and tell

108

1     me if you've seen it before?

2     A    Yes, I have.

3     Q    When you saw it did you read it?

4     A    Yes.

5     Q    Did you understand its contents to be true?

6     A    Yes.

7     Q    Is there anything, sitting here today, that

8     you want to change about your responses to the

9     interrogatories?

10    A    No, I already pointed out that --

11    Q    Other than what we discussed at the outset?

12    A    No.

13    Q    If you can just turn to the next to last

14    page of the document and tell me if your signature is

15    on that page?

16    A    Yes.

17         MS. NELSON:  I'd like to mark as Plaintiff's

18    Exhibit Lowe 6 a document entitled Response to

19    Plaintiff's Request for Production by Defendant

20    Deanie Lowe Volusia County Elections Supervisor.

Page 89

Deanie Lowe

21          (Plaintiff's Exhibit No. 6 was marked for

22     identification.)

23          Q    Tell me if you've seen this document before,

24     please.

25          A    Yes, I have seen it.

109

1          Q    When you saw it did you read it?

2          A    Yes.

3          Q    Did you understand it?

4          A    Yes.

5          Q    When did you first see this document?

6          A    When it was being developed helping to

7     provide the documents that we provided to you.

8          Q    Do you agree with the statements made

9     herein?

10          A    Yes, I do.

11               MS. NELSON:  I'd like to mark as Plaintiff's

12          Exhibit Lowe 7 a document entitled Certificate of

13          Service Answers to Plaintiff's Second Set of

14          Interrogatories and Document Requests to

15          Defendant Deanie Lowe, Supervisor of Elections,

16          Volusia County.

17               (Plaintiff's Exhibit No. 7 was marked for

18     identification.)

19          Q    Can you tell me if you've seen this document

20     before?

21          A    Yes, I have.

22          Q    When you saw it did you read it?

23          A    Yes.

24          Q    When did you first see it?

25          A    I helped develop it.

110

Page 90

Deanie Lowe

1      Q     When did you first see it in its completion,

2  in its form it's in now?

3      A     On the 22nd of March, 2002, in its final

4  form.

5      Q     Do you still have the document in front of

6  you there?

7      A     Yes.

8      Q     Turn to Paragraph 6, which begins on page

9  five and continues to page six.  Can you read that

10  paragraph and tell me when you're finished?

11      A     Okay.

12      Q     Have you finished taking a look at it?

13      A     Yes.

14      Q     Does Paragraph 6 describe the voter

15  registration list maintenance program of the

16  Supervisor of Elections Office of Volusia County from

17  1998 to the present?

18      A     Yes.

19      Q     Can you turn to page six, Paragraph 6A,

20  which talks about the odd year of list maintenance

21  procedures, and can you tell me, are voters who are

22  processed pursuant to this Paragraph 6A, are they

23  removed or listed as canceled in your files?

24      A     Okay, this is the process where we do the

25  two mailings, the address confirmation request form,

                                                111

1  followed by the final notice, if it's called for, and

2  then they're placed into the inactive status through

3  two federal general elections, and if we have not had

4  activity from that voter during that time period, then

5  they are canceled.

Page 91

Deanie Lowe

6      Q    And when you say they're canceled, do they

7    remain on the files?

8      A    Yes.

9      Q    So if such a person turns up at a precinct

10   during an election to vote, will that person be

11   permitted to vote?

12     A    Not if they're in the canceled status, no.

13          (Mr. Mac Innes left the room.)

14     Q    In order to vote will they need to fill out

15   a new voter registration form?

16     A    If they've been canceled, yes.  If it's

17   during that approximately four-year period while

18   they're in the inactive status, they'll be allowed to

19   fill out an affirmation and vote.

20     Q    If you can look at Paragraph 6B, which says

21   that voters placed in an inactive status thereafter

22   are canceled for a change of address outside

23   jurisdiction after two federal general elections in

24   which they do not vote.  In the first instance, where

25   you see registration has been canceled upon written

                                                    112

1    request direct from voter, is there any further

2    correspondence that you send before removing that --

3    before cancelling that voter to that voter?

4      A    No, we do not.

5      Q    What about the next instance where notice of

6    a voter's registration is received from another

7    jurisdiction?

8      A    No, we do not notify them when we cancel

9    them.

10     Q    In the second phrase of that sentence you

11   say:  So long as information on file matches that

                      Page 92

Deanie Lowe

12    received.  What do you mean by so long as the

13    information in the file matches?

14         A    Okay, where are we?

15         Q    I'm sorry, we're on the -- we're in

16    Paragraph 6B and we're in the second paragraph in that

17    describes the possible registration cancellation.

18         A    If the notification comes from another

19    supervisor to cancel a person by a certain name, if

20    that doesn't match, if the information doesn't match

21    what we have on file, then we don't cancel that

22    person.

23         Q    What information needs to match in order to

24    cancel a person?

25         A    First and last name, date of birth.  If we

                                                      113

1     receive an address from them that matches what we have

2     on file, we can verify that as someone we should

3     cancel.  If we do not receive an address from them and

4     there is a question about whether or not that is the

5     same person on our file, then we would contact the

6     Supervisor of Elections for further information.

7          Q    If all you receive is the first and last

8     name and the date of birth and those pieces of

9     information match, will the voter be canceled?

10         A    Unless we have more than one person by that

11    same name, and then we'll verify.  The address is

12    helpful to make sure we're cancelling the correct

13    person.

14         Q    When you say unless you have more than one

15    person by that name, do you mean in your voter

16    registration database?

Page 93

Deanie Lowe

17    A    Correct.

18    Q    When you say the first and last name match,

19  does the last name need to match in terms of suffixes,

20  like Junior or Senior or III?

21    A    Yes.

22    Q    So if there's a discrepancy, if there's Lowe

23  and then Lowe, II, would you cancel that voter if the

24  first name matched and the date of birth matched?

25    A    I don't know for certain because I'm not

114

1  dealing in the Registration Division on a daily basis,

2  but I would assume that that would be -- with the date

3  of birth, it would signify that that was either the

4  Junior or the Senior.  Compared to what we have on

5  file, if it matches what we have on file, I'm saying

6  that we would cancel that person.  For an example, to

7  make sure I'm understanding your question correctly,

8  if we had John Smith on our rolls as John Smith, Sr,

9  with a date of birth of 1918, and we also had a John

10  Smith, Jr., with a date of birth of 1938, that would

11  be a little young for Senior to have him, but -- '48,

12  then we would not cancel it if it didn't -- you know,

13  the suffix wouldn't have entered into the picture on

14  that because of a date of birth.

15    Q    Suppose you had a suffix in one name and no

16  suffix in the other name and the names otherwise were

17  identical?

18    A    And the date of birth matched?

19    Q    Yes.

20    A    Then we would -- I'm speaking out of school

21  here because I don't know what we've been doing in a

22  case like that.

Page 94

Deanie Lowe

23          (Mr. Mac Innes returned to the room.)

24      Q    So you don't know what the policy is

25  concerning removing of a voter if the first name

                                                115

1   matches and the last name's different in terms of

2   suffixes and the date of birth matches and you've

3   received information from another county concerning

4   duplicate registration?

5       A    I can't remember it.  I'm sure that we do

6   have something -- you know, a policy concerning that,

7   but I honestly cannot remember what it is.

8       Q    Do you know who would know?

9       A    Sandy Peloquin.

10      Q    Can you look at the following sentence:

11  Registration has been canceled upon voter's request or

12  a change of address outside jurisdiction utilizing

13  Central Voter File duplicate listings, as described in

14  C below.  Can you tell me whether a person whose

15  application is processed according to this statement

16  here would receive notification before it was

17  canceled?

18      A    No, they would not.

19      Q    Why not?

20      A    I'm thinking.  We consider this to be a

21  notification from another supervisor that that person

22  is registered there, and the law does not require us

23  to send a notice that we canceled them.

24      Q    Have you ever thought about sending notices

25  to such voters to confirm the accuracy of the data?

                                                116

1       A    No, we have not.  Well, can I take that

                        Page 95

Deanie Lowe

2      back?

3           Q      Sure.

4           A      Because certainly since this case has been

5      filed we have, and you know that we have given you

6      copies of our new procedures that we will be

7      following.

8           Q      But before that had you considered sending

9      notices out?

10          A      No, we had not.

11          Q      What about in the previous instance we

12     discussed where registration information from another

13     jurisdiction is received, had you considered sending

14     out notification to those voters before cancelling

15     them?

16          A      No, not if there was no question about it

17     being our voter, we did not send them a

18     verification --

19          Q      Not in the --

20          A      -- a notification.

21          Q      I'm sorry.  Not in the instance that we

22     discussed where there's a difference in the suffixes

23     and the example --

24          A      Well, see, that was when I was telling you

25     you really need to ask Sandy how she's handling those

                                                     117

1      because I don't know.

2           Q      Can you look at the paragraph that begins:

3      Registration has been canceled per death upon

4      information from obituaries, family members, and the

5      Florida Department of Health Bureau of Vital

6      Statistics.  Just a point of clarification, in order

7      for someone to be canceled for death, would you need

                          Page 96

Deanie Lowe

8        information from obituaries, family members, and the

9        Bureau of Vital Statistics?

10            A    No, that's or.

11            Q    And before cancelling that person based on

12       an obituary, information from a family member, or the

13       Department of Health Bureau of Vital Statistics, would

14       that person receive a notice from your office?

15            A    No.

16            Q    In the following sentence you say:  where

17       identity of a deceased voter is uncertain, defendant

18       sent letters, as described in her answer five to

19       interrogatories on October 23rd, 2001.  Can you tell

20       me what you mean by the term uncertain, perhaps give

21       me an example?

22            A    Perhaps on the list that we would get from

23       Bureau of Vital Statistics the address of the deceased

24       would not be the address that we have on our file.  In

25       such a case, we would send a letter to family or

                                                           118

1        friends of the deceased person at the last address

2        that we had.

3            Q    Are there any other examples of an instance

4        in which the identity of a deceased voter would be

5        uncertain?

6            A    I don't know.  Sandy may be able to give you

7        additional examples.

8            Q    Can you look at the following paragraph, the

9        following sentence there:  Registration has been

10       canceled for deaths ascertained from Central Voter

11       File listings, as described in C below.  Do those

12       persons receive notification before being canceled?

Page 97

Deanie Lowe

13      A    No.

14      Q    Why not?

15      A    Because the information is such that we feel

16   comfortable that that is our voter, we feel confident

17   before we cancel them that's our voter, and if they're

18   deceased, there's no reason to be sending that person

19   a notice saying that we're cancelling you from our

20   files.

21      Q    Do you know whether there was ever an

22   instance, in the time that you've been the Supervisor

23   of Elections for Volusia County, where a person was

24   canceled based on Central Voter File listings as being

25   dead -- on the basis of them being dead and they

119

1    actually weren't?

2            MR. RESTREPO:  Objection to form.

3       A    No, I don't know of any --

4            MR. EHRLICH:  Form, Jeff Ehrlich.

5       A    -- instances.

6       Q    Can you take a look at the following

7    paragraph:  Registration has been canceled for

8    incompetency based upon information received from the

9    Circuit Court clerk matched, if necessary, with prior

10   address information obtained from sources such as

11   attorneys and nursing homes.  Would an individual for

12   whom you've received such information receive any

13   notification from your office before being canceled?

14      A    No.

15      Q    And why not?

16      A    It's not required by law.

17      Q    Have you ever considered sending such

18   notification?

Page 98

Deanie Lowe

19    A    No.

20    Q    What about in the previous instance where

21    persons are canceled for deaths based on Central Voter

22    Files, have you ever considered sending notices to

23    those individuals?

24    A    No.

25    Q    Can you turn to what is Paragraph 6C, begins

                                                    120

1    on page six and goes to page seven, and my question is

2    as to a sentence on page seven where you state:  No

3    Central Voter File duplicate list was received during

4    2001.  Is that an accurate statement?

5    A    Yes.

6    Q    As far as you know, your office did not

7    receive a duplicate listing -- I'm sorry, a list of

8    alleged duplicates from the Central Voter File?

9    A    Correct.

10    Q    Let me return to the issue of the list that

11    alleged -- from the Central Voter File that alleged

12    that persons were felons, and we talked about a letter

13    that you sent to such individuals dated January 12th,

14    2001, earlier.  Did you do any individual check to

15    determine whether these persons were accurately listed

16    as felons?

17    A    Did I personally?  No.

18    Q    Did you, being the designated representative

19    of the Supervisor of Elections office?

20    A    I don't know what checking was done on that,

21    other than sending that out.  I don't believe on the

22    list that we sent out to -- of the 100 --

23    approximately 100 that we did any other checking

Page 99

Deanie Lowe

24    because we know of no other way to check it except to

25    get verification from the voter.

                                                     121

1         Q    Did you give anyone in your office any

2    instructions to check the accuracy of the list before

3    sending the January 12th, 2000, letter out?

4         A    Only as far as checking to see did we

5    believe that was the person in our file.

6         Q    And how did you perform that check?

7         A    By checking to see the matches on the names

8    and the date of birth and any other information that

9    was provided.

10        Q    And when you checked to see whether there

11   was a match on the name, what were you looking for?

12        A    The first and last name and middle initial.

13        Q    If the middle initial of a name is

14   different, do you consider that a match?

15        A    No.  I need to qualify that because of some

16   married names, but if we're talking about just

17   initials, then, no, if it's not a match, it's not.

18   But if it's a middle name and it appears to be a

19   woman's maiden name, as opposed to a middle name, then

20   we take that into consideration.

21        Q    How do you determine what appears to be a

22   maiden name versus a middle name?

23        A    It's just from having dealt with thousands

24   and thousands of names and what -- normally Smith is

25   not a middle name or Jones or things of that nature.

                                                     122

1         Q    Do you do anything to verify that -- do you

2    do anything to verify whether a name is, in fact, a

3    middle name or a maiden name?

Deanie Lowe

4     A     That could raise a question on whether or

5   not it's our voter and would start the process for

6   checking it further.

7     Q     What about if there's an initial in the

8   middle name, say it's W and the middle name is listed

9   as William, is that considered a match if every other

10  aspect of the name is identical?

11    A     Yes.

12    Q     What about in that instance if there is a

13  full name like William and there's a derivative name,

14  such as Will, and everything else about the name is

15  identical, is that considered a match?

16    A     I believe it is, but I'd feel better if you

17  asked that question of Sandy Peloquin.

18    Q     Who establishes the policy in the Supervisor

19  of Elections office concerning list maintenance?

20    A     The buck stops here.  It's always done in

21  conjunction with the head of my Registration Division.

22    Q     In the paragraph that begins:  Registration

23  has been canceled for deaths included, do you see that

24  in your document?

25    A     There is.

                                      123

1     Q     There's a sentence that reads:  However, for

2   instances of doubtful identity, the procedure was

3   modified to send an address confirmation request

4   instead of a letter.  When was that procedure

5   modified?

6     A     I don't remember.

7     Q     Do you know what occurs after the address

8   confirmation request is sent?

                    Page 101

Deanie Lowe

9      A     Depending upon whether it is returned or

10   not, the address confirmation request, if we don't

11   hear back from it, then we're assuming that everything

12   is the same with the person.  I don't know that this

13   is an address confirmation request if you're still

14   referring to that sentence, that paragraph.

15   Registration has been canceled for deaths included in

16   Central Voter File listings not previously known from

17   other sources based upon the furnished procedure;

18   however, for instances of doubtful identity, the

19   procedure was modified to send an address confirmation

20   request instead of a letter.  Okay, in that -- if we

21   were really doubtful about whether or not that was our

22   person and we send an address confirmation request and

23   we didn't hear back from it, we assume that was our

24   person and they were still there and everything was

25   fine.  If the Post Office were to return it as

124

1    undeliverable, then that would trigger us sending a

2    final notice with the instructions that they had to

3    respond to us within 30 days or we would place them

4    into what we call the inactive status, and that's the

5    procedure that would be followed.  But this would have

6    been done in an instance where we really couldn't be

7    sure that that was our voter, we didn't feel

8    comfortable with it being our voter.

9       Q     So in the event that you received no

10   response, you kept the voter on the list?

11      A     Right.

12      Q     If you received a return notice, did you

13   send a final notice before cancelling the voter?

14      A     If it was returned by the Post Office, which

Page 102

Deanie Lowe

15     normally is the only way it comes back on that address

16     confirmation request, because if everything's all

17     right, the voter just doesn't respond, but if it was

18     returned as undeliverable by the Post Office, if it

19     had a forwarding address, you know, that they had

20     left, then we would correspond with them that way, but

21     if it did not, and it was just returned as

22     undeliverable, then we -- then that triggered the

23     final notice to go out.

24         Q     So a final notice would be sent in that

25     instance?

                                                    125

1          A     Absolutely.

2          Q     Can you turn to Paragraph 14 on page nine.

3      When you're finished taking a look at it, please let

4      me know.

5          A     Okay.

6          Q     Does the procedure described here differ if

7      there was an absentee ballot drive?  Let me describe

8      what I mean.  If a person submits a number of absentee

9      ballot requests on behalf of other voters, are these

10     procedures followed?

11         A     Yes.

12         Q     Were there any applications that were

13     received after the October 10th deadline for

14     registration for the November 2000 election that were

15     processed in -- that were processed for the

16     November 2000 election?

17             MR. EHRLICH:  Object to the form, Jeff

18         Ehrlich.

19             MR. LITTLE:  Same objection, John Little.

Deanie Lowe

20      A      All applications received are processed, but

21   the process could be that we registered them and

22   mailed them an ID.  It could be that the process was

23   we notified them of an incomplete, or the process

24   could be that we notified them we had to deny it.

25   There were applications received after October 10th

126

1    that were considered timely because they were either

2    postmarked by the 10th or they were coming in from one

3    of the voter registration agencies that has five days

4    in which to refer them on to us.  So any of those that

5    were timely, you know, they were either postmarked or

6    if it's received within five days after the deadline

7    and you can't read the postmark, you consider it

8    timely, or they came in delivered after the 10th, but

9    stamped by the 10th at one of these agencies, and if

10   it was a complete application that we could accept, we

11   processed it and registered the voter.  All of those

12   were completed prior to the election and they were all

13   put onto the precinct registers.  We held off till the

14   last minute.  Those that were incomplete or denials,

15   we were not able to get to all of those prior to the

16   election, but they certainly were processed after the

17   deadline of October 10th.

18      Q      Did you process any voter registration

19   applications that came in that were not timely, that

20   were not either postmarked on or before October 10th

21   or otherwise deemed timely, did you process any of

22   those applications to enable persons to vote in the

23   November 2000 election?

24           MR. EHRLICH:  Object to the form, Jeff

25      Ehrlich.

Page 104

Deanie Lowe

127

1           MR. LITTLE:  Same objection, John Little.

2      A     If the application was not deemed in time to

3    meet the deadline, we did not process it and allow

4    them to vote; they were not registered for that

5    election.  We processed it -- you know, if it was a

6    completed application and it was acceptable, then we

7    processed it, but did not mail them an ID card to

8    mislead them into thinking they could vote in

9    November 7th.  We waited till after this to mail them

10   their identification card.

11     Q     Has your office ever considered imaging

12   voter registration applications?

13     A     We do that.

14     Q     What do you mean when you say you do that?

15     A     We scan all applications into our signature

16   retrieval system which images the entire face of the

17   application, as well as does a cutout of the signature

18   so that we can verify signatures on petitions and

19   absentee ballots.

20     Q     How long has that process been going on at

21   the Supervisor of Elections office?

22     A     I believe 1994 was when I first instituted

23   it.

24     Q     Can you turn to Paragraph 25 on page 12?

25     A     Okay.

128

1      Q     Can you tell me when you've taken a look at

2    that response?

3      A     Okay.

4      Q     The second paragraph says the precinct

Page 105

Deanie Lowe

5    registers do not contain the names of voters whose
6    registration has been canceled.  Why is that?
7         A    We don't want to take the chance that
8    someone with a canceled registration is allowed to
9    vote.
10        Q    And how would that opportunity be increased
11   by including that information on a poll register in a
12   precinct?
13        A    Because poll workers work 14-hour days on
14   election days and sometimes they get tired, sometimes
15   they get addled because of the crowds of people, and I
16   am afraid that if we had the name of a canceled voter
17   on there, they may overlook the fact that it's a
18   canceled voter and allow that person to vote, and
19   they're not eligible to vote if they're canceled.
20        Q    Have you done any analysis to see whether
21   that is, in fact, a likelihood?
22        A    No.
23             MR. EHRLICH:  Object to the form, Jeff
24        Ehrlich.
25        Q    Can you look at Paragraph 20, your response
                                              129
1    to Paragraph 26, the statement -- the second sentence
2    in that says:  Information -- Florida law prescribes
3    precinct register content.  Information beyond that
4    listed on the precinct register which may be in the
5    supervisor's files was not maintained at the precinct
6    either at the discretion of the supervisor or due to
7    system technical limitations.  What do you mean by
8    technical limitations?
9         A    We used landscape style paper, it's laid out
10   landscape style on the precinct registers, and I
                    Page 106

Deanie Lowe

11      believe those are legal size pieces of paper, and we

12      have columns going across that head up the column for

13      the voter's name and address and their date of birth

14      and their -- certain items.  And our page -- we're

15      limited by the number of columns that we put on there

16      as to the length of the page.  We place all the

17      information that we're required by law to place on

18      there, and beyond that, I don't put it on there simply

19      because of the format that we use to produce those

20      precinct registers in-house.

21          Q    Have you considered changing the format to

22      permit more information?

23          A    No.

24          Q    Have you done any analyses to see whether

25      that would be feasible?

                                                    130

1           A    No, I have not seen a reason to include more

2       information than what we include on the register.

3       We're now talking about things such as name and

4       address and sex and race and whether or not the person

5       has said that they have a disability, what their voter

6       ID number is, a place for their signature, a place for

7       the poll worker to sign to give their initial that

8       they compared the signatures.  We're talking about

9       that, not as far as what types of categories of

10      registered voters I'm listing or whether they're

11      active or inactive or canceled; is that correct?  I

12      have not seen a need to provide any other information.

13      I don't know that any other information would be

14      helpful to the poll workers.

15          Q    So you don't think it would be helpful to

                        Page 107

Deanie Lowe

16    have information concerning a voter status or the

17    category that a voter falls into according to your

18    terms?

19         A     We have a way of notifying the poll workers

20    about that.  If a person is in the inactive status, in

21    their signature block it says must complete

22    affirmation, so that serves two purposes; number one,

23    it tells the poll worker this person is inactive, and

24    it directs them as to what that person must do in

25    order to be able to vote.  And so it -- you know, that

                                              131

1    information is there, it just doesn't say it in so

2    many words.

3         MS. NELSON:  I think we ought to break for

4              lunch now.  We'll break for an hour.  We'll

5              rejoin the call when we get back on the record

6              after lunch.

7              (Luncheon recess had.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Deanie Lowe

22

23

24

25

132

1                    CERTIFICATE OF OATH

2

3      STATE OF FLORIDA

4      COUNTY OF VOLUSIA

5

6

7              I, the undersigned authority, certify that

8      DEANIE LOWE personally appeared before me and was duly

9      sworn.

10

11

12             WITNESS my hand and official seal this 29th day

13      of April, 2002.

14

15

16                        _____

17                        Christine Sammaro, RMR, CRR

18                        Notary Public - State of Florida

19                        My Commission Expires:  8-13-04

20

21

22

23

24

25

133

Deanie Lowe

1              CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA  )

4                   )

5     COUNTY OF VOLUSIA )

6          I, Christine Sammaro, Registered Merit

7     Reporter, certify that I was authorized to and did

8     stenographically report the deposition of DEANIE LOWE;

9     that a review of the transcript was requested; and

10    that the transcript is a true and complete record of

11    my stenographic notes.

12

13         I further certify that I am not a relative,

14    employee, attorney, or counsel of any of the parties,

15    nor am I a relative or employee of any of the parties'

16    attorney or counsel connected with the action, nor am

17    I financially interested in the action.

18

19         DATED this 29th day of April, 2002.

20

21

22              _____

23              Christine Sammaro, RMR, CRR

24

25

**PLAINTIFFS' EXHIBIT 30**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 01-0120-CIV-GOLD

------------------------------------------------X

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE PANNELL, JULIA
STONER, NATALIE CARNEGIE, JOHN L. CHEEVER,
JAMES MARSHALL, LILLIE Q. ODOM, WILLIE STEEN,
WALLACE MCDONALD, JERMAINE TERRY, LORINE
WALDEN, EMERY TIMBERLAKE, VALERIE
BUFORD-WELLS, MICHELLE FLOYD, CONSUELO MARIA
GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA
CLARK, JANICE KELLY, PLACIDE DOSSOUS, RONDRICK
ROSE, URSULA HARVEY and ADMANTHA ISRAEL in
their own right and as representatives of all
similarly situated citizens and residents of
the State of Florida,

    Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida;
CLAY ROBERTS, Director of Florida Division of
Elections; DAVID C. LEAHY, Miami-Dade County
Election Supervisor; MIRIAM OLIPHANT, Broward
County Election Supervisor, JOHN STAFFORD,
Duval County Election Supervisor; PAM IORIO,
Hillsborough County Election Supervisor,
WILLIAM COWLES, Orange County Election
Supervisor; and DEANIE LOWE, Volusia County
Election Supervisor (all in their official
capacities); and CHOICEPOINT, INC., a Georgia
corporation d/b/a DATABASE TECHNOLOGIES, INC.,

    Defendants.

------------------------------------------------X

**DEPOSITION OF:**         **PAM IORIO**

                  **VOLUME I**

# ORIGINAL



## BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE  •  TAMPA, FLORIDA 33602
401 EAST JACKSON STREET  •  (813) 229-7207
SUITE 2320          FAX (813) 229-8498

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF FLORIDA
 3         CASE NO. 01-0120-CIV-GOLD
 4   -----------------------------------x
 5   NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
 6   COLORED PEOPLE, INC., by its FLORIDA STATE
 6   CONFERENCE OF BRANCHES, JIMMIE PARNELL, JULIA
 6   STONER, NATALIE CARSECIA, JOHN L. CASEVER,
 7   JAMES MARSHALL, LILLIE C. JOOM, WILLIE STEIN,
     WALLACE MCDONALD, JERMAINE TERRY, LORENE
 8   WALDEN, EMERY TIMBERLAKE, VALERIE
     BUROUM-WELLS, MICHELLE FLOYD, CONSUELO MARIA
 9   GRAHAM, SHERRA EDWARDS, RANDY WELLS, SHAWN
     CLARK, JANICE BELLE, PLACIDO LOSSOLS, KENDRICA
10   ROSE, URSULA HARVEY and ADRIANNA ISRAEL in
     their own right and as representatives of all
11   similarly situated citizens and residents of
     the State of Florida,
12
               Plaintiffs,
13
14         vs
15   KATHERINE HARRIS, Secretary of State of Florida;
     CLAY ROBERTS, Director of Florida Division of
15   Elections; DAVID C. LEAHL, Miami-Dade County
     Election Supervisor, MIRIAM OLIPHANT, Broward
16   County Election Supervisor, JOHN STAFFORD,
     Duval County Election Supervisor; PAM IORIO,
17   Hillsborough County Election Supervisor,
18   WILLIAM COWLES, Orange County Election
     Supervisor; and DEANIE LOWE, Volusia County
19   Election Supervisor (all in their official
     capacities) and CHOICEPOINT, INC., a Georgia
20   corporation d/b/a DATABASE TECHNOLOGIES, INC.,
21          Defendants.
22   -----------------------------------x
23
24   DEPOSITION OF         PAM IORIO
25                         VOLUME  I
26
```

Page 2

```
 1           UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF FLORIDA
 3         CASE NO. 01-0120-CIV-GOLD
 4
     NATIONAL ASSOCIATION FOR THE
 5   ADVANCEMENT OF COLORED PEOPLE
     INC., et al.,
 6
 7          Plaintiffs,
 8          vs
 9   KATHERINE HARRIS, Secretary of State of
     Florida, et al.,
10          Defendants
11
12   _____/
13
     DEPOSITION OF        PAM IORIO
14   DATE                 Monday, May 6, 2002
15   TIME                 9:05 a.m. - 12:21 p.m.
16   LOCATION             Hillsborough County Attorney's Ofc
                          601 East Kennedy Boulevard
                          27th Floor Conference Room
                          Tampa, Florida 33602
17
18   REPORTED BY          JUANITA BUTLER
19                        Stenographic Reporter
20                        and Notary Public -
                          State of Florida at Large
21
22
                         VOLUME  I
23
24
25
26
```

Page 3

```
 1   APPEARANCES
 2
 3   LORI OUTES BORGEN, ESQUIRE
     CARA J. FINEMAN, ESQUIRE
 4   Lawyers' Committee for Civil Rights Under Law
     1401 New York Avenue, N.W., Suite 400
 5   Washington, D.C. 20005-2124
 6        Attorneys for Plaintiffs
 7   H. RAY ALLEN II, ESQUIRE
     KENNETH A. STAHLER, ESQUIRE
 8   REBECCA A. KERT, ESQUIRE
     Hillsborough County Attorney's Office
 9   601 East Kennedy Boulevard, 27th Floor
     Tampa, Florida 33602
     813 272-5670
10
11        Attorneys for Hillsborough County
          Supervisor of Elections Pam Iorio
12   DOUGLAS B. MAC INNES, ESQUIRE
     Office of the Attorney General
13   PL-01, The Capitol
     Tallahassee, Florida 32399-1050
14   850 414-3602
15        Attorney for Fred Dickinson, Executive Director,
          Florida Department of Highway Safety and
16        Motor Vehicles and
          Kathleen Kearney, Secretary of the Florida
17        Department of Children & Families
18   JOHN W. LITTLE, III, ESQUIRE
     Steel Hector & Davis, LLP
19   1900 Phillips Point West
     777 South Flagler Drive
20   West Palm Beach, Florida 33401-6198
     561 650-7270
21        - and -
     WALTER JAMES HARVEY, ESQUIRE (via Conference Call)
22   Steel Hector & Davis, LLP
     200 South Biscayne Boulevard, 41st Floor
23   Miami, Florida 33131-2398
     305 577-2934
24
25        Attorneys for Katherine Harris, Secretary of
          State of Florida, and Clay Roberts,
          Director of the Florida Division of Elections
```

Page 4

```
 1   DANIEL A. RESTREPO, ESQUIRE
 2   Williams & Connolly, LLP
 3   725 12th Street, N.W.
     Washington, D.C. 20005
     202-434-5000
 4
 5        Attorney for ChoicePoint, Inc.
          d/b/a Database Technologies, Inc.
 6
 7   WILLIAM J. BOSCH, ESQUIRE (via Conference Call)
     Volusia County Attorney's Office
 8   123 W. Indiana Avenue
     DeLand, Florida 32720-4613
 9   386.736.5950
10        Attorney for Volusia County
          Supervisor of Elections Deanie Lowe
11
12        - and -
13   JEFFREY P. EHRLICH, ESQUIRE (via Conference Call)
     SUSAN TORRES, ESQUIRE (via Conference Call)
     Dade County Attorney's Office
14   Metro Dade Center
15   111 NW 1st Street, Suite 2810
     Miami, Florida 33128
     305 375-5151
16
17        Attorneys for Miami-Dade County
          Supervisor of Elections David Leahy
18
```

Page 5

1      I N D E X
2 VOLUME I         PAGE
3 Direct Examination by Ms. Borgen ... ... 9
4 Stipulation ... ... 174
5 Certificate of Reporter ... 175
6 Signature Page ... 176
7 Errata Sheet ... ... 177
8
9
10      I N D E X
11 VOLUME II       PAGE
12 Direct Examination (cont'd) by Ms. Borgen .... 185
13 Cross-Examination by Mr. Wetherell .... 355
14 Cross-Examination by Mr. Little . .... 367
15 Redirect Examination by Ms. Borgen ... 373
16 Recross-Examination by Mr. Little . ... 376
17 Stipulation ... ... 378
18 Certificate of Reporter ... ... 380
19 Signature Page ... .... 381
20 Errata Sheet ... ... 382
21
22
23
24
25
26

Page 7

1      E X H I B I T S
2 (continued)
3 PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION
4     DESCRIPTION      PAGE
5 P - Documents Relating to Plaintiff Randy Wells ... 164
6 Q - Phone Bank Precincts, November 7, 2000 ... 196
7 R - Documents Relating to Plaintiff Kendrick Rose ... 212
8 S - Document Entitled Black.txt ... 223
9 T - Expert Witness Summary of Supervisor of Elections Pam Iorio ... 223
10
11 U - Defendant Iorio's Objections and Responses To Plaintiffs' First Set of Document Requests and Interrogatories ... 330
12
13 V - Defendant Iorio's Objections and Responses To Plaintiffs' Second Set of Document Requests and Interrogatories ... 330
14
15 W - Transcript of Hillsborough County NAACP Public Hearing on Election Irregularities ... 330
16
17 DEFENDANTS' EXHIBITS MARKED FOR IDENTIFICATION
18 1 - Division of Elections Memorandum to Supervisors of Elections and Staff from Bucky McDonell, Dated June 30, 2000, Regarding Consent Voter File Verification Process ... 370
19
20
21
22
23
24
25

Page 6

1      E X H I B I T S
2 PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION
3     DESCRIPTION      PAGE
4 A - Plaintiffs' Notice of Deposition (Hillsborough County) ... 9
5
6 B - Plaintiffs' Notice of Rule 30(b)(6) Deposition (Hillsborough County) ... 10
7
8 C - Plaintiffs' Second Amended Complaint ... 23
9
10 D - Answer and Affirmative Defenses to Second Amended Complaint of Defendant Pam Iorio, Supervisor of Elections of Hillsborough County ... 25
11
12 E - Processing of Felon Registrations ... 44, 362
13 F - ISNL Central Voter File Committee Memorandum to All Supervisors of Elections Dated May 8, 2000, Subject, Recommended Procedures. ... 52, 359
14
15 G - Letter to Ed Kast from Janet Keels dated September 18, 2000 ... 97
16 H - Letter to Janet Keels from Emmett Mitchell, IV Dated August 10, 2000 ... 97
17
18 I - Letter to Ed Kast from Janet Keels dated February 22, 2001 ... 98
19 J - Documents Relating to Plaintiff Willie Steen ... 118, 355
20 K - Documents Relating to Plaintiff Wallace McDonald ... 126, 356
21 L - Documents Regarding Voter Roosevelt Lawrence ... 159, 356
22 M - Documents Relating to Plaintiff Jermaine Jeffy ... 152, 356
23
24 N - (No Document Identified or Marked) ... 164
25 O - Documents Relating to Plaintiff Sherry Edwards ... 164
26

Page 8

1      The deposition, upon oral examination, of
2 PAM IORIO, taken on Monday, May 6, 2002, at Hillsborough
3 County Attorney's Office, 601 East Kennedy Boulevard,
4 27th Floor, Tampa, Florida 33602, beginning at
5 9:03 a.m., before Juanita Butler, Notary Public in and
6 for the State of Florida at Large.
7
8      PAM IORIO,
9 being first duly sworn to testify the truth, the whole
10 truth and nothing but the truth, was examined and
11 testified as follows:
12
13      MR. ALLEN: Lori, before we get started,
14 Pam has told me she needs to leave at 5:15
15 today.
16      MS. BORGEN: Okay.
17      MR. ALLEN: So if we can -- if we need to
18 work through lunch or whatever we need to do to
19 try to get her through today, if at all
20 possible --
21      MS. BORGEN: Okay.
22      MR. ALLEN: -- I would appreciate it.
23      MS. BORGEN: That certainly sounds fine.
24 We can take a look at lunch and I'll see how
25 we're doing on questions.

Page 37

1 Q. In terms of your use of the -- in the
2 layman's context of denying that allegation, would you
3 say that's not accurate, if you use it in layman's
4 terms?
5 MR. LITTLE. Object to the form.
6 BY THE DEPONENT
7 A. Well, in layman's terms, I speak to any
8 issue. I believe that within the legal context that's
9 sometimes not the case.
10 Q. If you could turn to paragraph 80 of the
11 second amended complaint. Plaintiffs allege that prior
12 to the November 7, 2000 election, Defendants Harris and
13 Roberts failed to require that all county supervisors
14 adopt effective measures to ensure accurate purging of
15 names of registered voters on the list, and to prevent
16 county election supervisors from purging voters without
17 verifying the information provided in the list.
18 What requirements, if any, did Defendants
19 Harris and Roberts give to you, as a county supervisor
20 of elections, for how to remove voters from the central
21 voter file?
22 MR. LITTLE. Object to the form.
23 BY THE DEPONENT.
24 A. I first have to question the use of "purge,"
25 and it's one of the words throughout the complaint that

Page 38

1 I think needs to be cleared up.
2 Q. Okay.
3 A. There is no purge under current state law or
4 under NVRA. And that is a term that is consistently
5 used by the plaintiffs which, I think, is incorrect.
6 Q. Okay. In what way do you think the term is
7 incorrect?
8 A. You cannot find it in state or federal law.
9 Q. What term would you use instead?
10 A. List maintenance removal under NVRA. And,
11 under state law, there are specific steps that a person
12 should take with regards to removal of deceased names
13 from the Office of Vital Statistics, if an individual
14 is mentally incompetent, or if a person is an alleged
15 ex-felon who has not had his or her civil rights
16 restored.
17 And purged -- the term "purge" was pre-NVRA,
18 when supervisors did conduct a purge of the voter rolls
19 in odd numbered years. But that has not been in
20 existence since the implementation of the NVRA, which
21 went into effect in January of 1995.
22 And so I have to say that every time there is
23 a paragraph that includes that terminology, I have to
24 clear that up for the record because I think it creates
25 a false impression.

Page 39

1 Q. Okay. What would be the difference in result
2 between using the world purge and removal? How do you
3 differentiate what -- ultimately, isn't the voter
4 removed from the voter rolls?
5 A. It depends.
6 Q. And how would it be different?
7 A. Well, it depends on the list maintenance
8 removal process. There is a multi-step process dealing
9 with -- would you like me to step through that process?
10 Q. We can come back to that later.
11 A. Okay
12 Q. But ultimately, after you go through the
13 steps of the list maintenance removal process, at the
14 end, when you're removed from the voter process
15 pursuant to list maintenance rules, then you're taken
16 off the voter list, you are --
17 A. Eventually
18 Q. Eventually. As you go through that process,
19 you may be deemed inactive along the way?
20 A. That's correct
21 Q. Is that correct?
22 A. That's correct.
23 Q. But if someone is in inactive status, would
24 you consider them to be removed from the voter rolls?
25 A. Not at all.

Page 40

1 Q. Okay. And so when they're removed from the
2 voter rolls, pursuant to list maintenance, is that only
3 at the end, after all those different steps?
4 A. Correct.
5 Q. And so, after all those steps, they're
6 removed and they're not on the voter rolls, and they
7 can't vote?
8 A. Correct.
9 Q. And if somebody is purged, would you agree
10 that if you're purged, then you're taken off the voter
11 roll and you can't vote?
12 A. Well, my argument against the use of the word
13 "purge" is that it harkens back to an earlier time when
14 different rules were in place, and thus, it confuses
15 the issue. I mean, I think we want as much clarity as
16 possible as we go through this process. And if you use
17 a term that's pre-NVRA in an NVRA environment, you
18 confuse the process.
19 The old purge procedures are quite different
20 than they are today. And so I would just caution the
21 plaintiffs, though it may not be my place to do so,
22 that use of the term "purge" only confuses the process
23 that is really in place today.
24 Q. To the extent, though, that removal from
25 the -- could you use interchangeably, given the end

## Page 41

1 result, "removal pursuant to list maintenance
2 procedures" and "purge"? Would you agree that both of
3 those ultimately mean that the voter is taken off the
4 voter rolls and not allowed to vote?
5    A I think you can make an argument for that,
6 but I won't do that.
7    Q. Okay. And do you think the use -- your
8 objection to the use of "purge" is within the context
9 of, I guess, an election official who knows how it was
10 used in the past?
11    A That's correct. And the connotation of purge
12 is, I think, a removal -- almost a removal from the
13 rolls without a specific due process. Now that may be
14 my own bias coming into play here, but I don't think it
15 is an accurate reflection of how people are currently
16 removed from the rolls today.
17    And so, again, I just will not use the word
18 "purge". And as it comes up in these various
19 paragraphs, I'm going to continue to bring it up that
20 the use of the word "purge" harkens back to an earlier
21 time and does not reflect today's procedures.
22    Q Absent the connotation that purge has to
23 you --
24    A Yes.
25    Q -- if you use "purge" in layman's term, do

## Page 42

1 you think it accurately reflects what happens, that if
2 someone is purged, they are removed from the voter
3 roll?
4    MR. RESTREPO. Object to form.
5    MR. LITTLE. Object to the form.
6 BY THE DEPONENT.
7    A I would use list maintenance removal process.
8    Q Okay Going back, then, to paragraph 80 --
9    A Yes
10    Q -- I had asked you about whether you had
11 received any written requirements from Defendants
12 Harris and Roberts about how you would conduct removal
13 of individuals from the voter rolls?
14    A When we received the list in the summertime
15 of 2000 from the state, the supervisors, at that time,
16 did not receive information from the state as to how we
17 were to proceed And so the supervisors did what we
18 often do, which was that we informally contacted one
19 another, informally contacted like counties of similar
20 size and decided what we thought would be the best
21 process to use And that is how many of us decided on
22 using the administrative hearing process Pinellas,
23 Pasco, Miami-Dade, Hillsborough, we decided that the
24 use of the administrative hearing process was a process
25 that made sense It was already in the law with

## Page 43

1 regards to the county list that came to us on a regular
2 basis, and thus would make sense to extend it in this
3 particular case.
4    But we did not receive that directive nor was
5 there a directive sent out to all 67 counties saying,
6 now that you've received the central voter file, this
7 is how you will now implement it.
8    Q When you stated at the beginning, actually,
9 that you received the list in the summer of 2000, which
10 lists were those?
11    A Well, in that process, I would like to step
12 through regarding how we process the central voter file
13 felon registrations. And although I think you already
14 have this, this we will make part of the record.
15    Q. Okay.
16    A This is a memo called Processing CVF Felon
17 Registrations.
18    Q Okay. Can I take a look at that?
19    A Absolutely.
20    Q Make sure we're on the same page.
21    And do you consider all these pages to be
22 part of one document?
23    A Yes, even though they certainly do cover
24 different letters that we wrote at different times, but
25 I think it all encompasses one topic.

## Page 44

1    Q Okay This is a package of materials about
2 how you conducted the --
3    A Right.
4    Q Is this for the --
5    A It deals with the --
6    Q -- felons only?
7    A -- correct. Correct, the central voter file
8 felon issue.
9    Q Okay. And who prepared these documents?
10    A My staff, probably Darrell Smith. He will be
11 part of the deposition tomorrow. It may be something
12 you might want to ask him if he specifically produced
13 that.
14    MS BORGEN Okay. I will go ahead and
15 mark this as Exhibit E.
16    (Plaintiffs' Exhibit E was marked for
17 identification.)
18 BY MS. BORGEN
19    Q. Okay. Go ahead, please.
20    A And so, stepping through this process,
21 because I know that this whole felon issue -- ex-felon
22 issue is the heart of many of these complaints, I think
23 you first have to go back to the list that we received
24 in 1998. And, at that time, we returned that list to
25 then Secretary of State Sandra Mortham. And included

Page 45

1 in this exhibit is a letter I sent on August 21st,
2 1998, to Secretary Mortham, saying that because the
3 list at that time had not gone through the necessary
4 procedures of making sure that each name had been gone
5 through to ascertain that they were an ex-felon who had
6 not had their civil rights restored, and that's what
7 specifically the law called for, I was sending it back
8 until they could get us that kind of list.
9    Q  Before you go on to another list then --
10   A  Uh-huh.
11   Q  -- for the 1998 list, what did the state send
12 to you?
13   A  They sent supervisors a list that I would
14 have to say, at least I felt, and probably all the
15 other supervisors felt too, had not gone through the
16 kind of scrutiny that it needed to go through in order
17 to first reach us.
18   Q  And do you know, did the list include only
19 alleged felons or did it also include duplicates and
20 deaths?
21   A  It had deaths also.
22   Q  Duplicates, do you recall?
23   A  I cannot answer that.
24   Q  And do you know who assisted the state in
25 preparing that list?  Did the State prepare the list on

Page 46

1 its own?  Did it work with an outside contractor to
2 prepare that -- the 1998 list?
3    A  Well, this memo indicates Database
4 Technologies was to provide a report to DOE.  Whether
5 or not Database Technologies helped with that in 1998,
6 I'm not equipped to say.
7    Q  You received one list from the State that
8 included felons, probably deaths, and you're not sure
9 about duplicates?
10   A  Correct.
11   Q  And the state was telling you these
12 individuals -- what do they say to you, these
13 individuals should be removed from your voter rolls?
14        MR. LITTLE  Objection to form.
15 BY MS. BORGEN
16   Q  Do you remember what instructions the state
17 provided to you?
18   A  I cannot recall that.
19   Q  Do you recall if you have documents in your
20 files that would -- perhaps a copy of what the state
21 sent to you saying, here's the list and here's what to
22 do with it?
23   A  We may.  We may.  And my staff members, I
24 think, tomorrow would be better equipped to answer
25 those questions

Page 47

1    Q  Okay.  Go ahead.
2    A  So my point with 1998 is that we didn't
3 process the ex-felons.  The list was considered too
4 unreliable.
5       Now, "In April of 2000, we received the CVF
6 Felon List.  The list contained in-state felons
7 provided by DOE and in-state and out-of-state felons
8 provided by DBT.  The first DBT list received had
9 errors because persons on the list from Texas files had
10 misdemeanor, not felony convictions "
11   Q  May I stop you just a moment.  Are you
12 reading from a document?
13   A  Yes
14   Q  Okay, go ahead.
15   A  Well, I want to make sure I get this correct
16 on the record because there's a lot of -- I mean, I
17 think a lot of the case deals with this whole ex-felon
18 issue.
19   Q  Okay.  But for the record, you're reading
20 from Exhibit E?
21   A  Right.
22   Q  Which paragraph on that first page?
23   A  Third.
24   Q  Third paragraph, okay.
25   A  "This glitch did not affect our process

Page 48

1 because it was discovered before we began processing
2 the names.  The second DBT list received around 2 weeks
3 later was amended to reflect the corrections."
4       So "In accordance with Florida law, upon
5 receiving the CVF list, the supervisor must attempt to
6 verify the information provided."  And "if the
7 supervisor does not determine that information provided
8 by DOE is incorrect, the supervisor must remove from
9 the registration books by the next subsequent election
10 the name of any person who is convicted of a felony
11 with respect to voting."
12   Q  I just think we're going too fast for the
13 court reporter.
14   A  Sorry
15   Q  It happens when you read.
16        MS. BORGEN  Do you need her to read it
17 back on there?
18        COURT REPORTER  Yeah, if she can.
19 BY THE DEPONENT
20   A  "In accordance with Florida law upon
21 receiving the CVF list.  The supervisor must attempt to
22 verify the information provided.  If the supervisor
23 does not determine that the information provided by DOE
24 is incorrect, the supervisor must remove from the
25 registration books by the next subsequent election, the

Jun-28-02 07:53pm From-L C F C R L +2027830823 T-551 P 08/35 F-421
NAACP vs HARRIS, ROBERT et al
Case 1:01-cv-09162-FSR Document 410 Entered on FLSD Docket 07/02/2002 Page 196 of 280

Page 49

1 name of any person who is convicted of a felony with
2 respect to voting.
3        "Our office initially used a certified mail
4 approach to verify the accuracy of the CVF
5 information." As I mentioned to you before, we had
6 decided in conjunction with other like counties, Pasco,
7 Pinellas, Miami-Dade, to utilize the administrative
8 hearing process.
9        "In June 2000, we sent out over 3,200 alleged
10 felon certified letters to persons identified on the
11 most current list. We sent a certified letter that
12 stated DOE identified them on list of voters as felons
13 and they would be removed unless their voting rights
14 have been restored or if we have incorrect information.
15        "The letter included a Voter Eligibility
16 Status form and a postage paid envelope with
17 instructions to complete and return the VES form if the
18 CVF information was incorrect. The letter also
19 mentioned that they could attend an administrative
20 hearing on August 8, 2000 to contest our information or
21 to complete a VES form to be sent to FDLE or Office of
22 Executive Clemency, only of clemency is involved."
23    Q. Before you continue, let's go over some of
24 those pieces --
25    A. Sure.

Page 50

1    Q -- in those paragraphs.
2        First of all, you indicated you received a
3 list, first, in April of 2000, that was the one with
4 the Texas --
5    A  Correct.
6    Q -- misdemeanors and then you received a
7 corrected one a few weeks later?
8    A  Right.
9    Q  Did you receive any lists from the State in
10 1999?
11    A  Not to my knowledge. Again, my staff
12 tomorrow may be able to speak to that and might have
13 information that I just don't have today.
14    Q  Okay. And for the list that you received in
15 2000, in late April, May, something like that, that you
16 received that --
17    A  Uh-huh.
18    Q -- did you receive any instructions from the
19 State in terms of how to use that list?
20    A  No.
21    Q  Had anyone from your staff attended any
22 trainings sponsored by the State or that were organized
23 by the Division of Elections in terms of how to use the
24 list provided by the State?
25    A  The supervisors of elections meet twice a

Page 51

1 year, every January and June, in conferences. And the
2 topic of the central voter file was often a topic at
3 these conferences. The meeting prior to this election
4 was in Key West in June of 2000. And I do believe that
5 the topic of the central voter file came up, although
6 there certainly was no conclusion reached as to how all
7 67 counties were to deal with the list and maintenance
8 removal. Information was shared at the conference that
9 certain counties were using the administrative hearing
10 process.
11    Q. And did the supervisors work together to form
12 a committee to deal with these issues?
13    A  I'm not sure that they did. I pause because
14 I believe that David Leahy might have headed up some
15 effort. But I'm concerned that I might be getting that
16 confused with an effort that he's currently heading up
17 dealing with the central voter file and not one prior
18 to 2000, so I'm not sure I can answer that.
19    Q  Okay. Are you familiar with a group that's
20 been called the Central Voter File Committee?
21    A  The current one.
22    Q  That was chaired -- according to some
23 documents that have been produced in litigation, there
24 was a Central Voter File Committee that was formed at
25 some point in time that was existence prior to the 2000

Page 52

1 election.
2        I'm going to show you one --
3        MS BORGEN  Mark this as Exhibit F.
4    (Plaintiffs' Exhibit F was marked for
5        identification.)
6 BY MS. BORGEN.
7    Q. This is a document that was produced in
8 litigation by your office. And at the top of this
9 document --
10    A. Oh, Yes. Yes.
11    Q -- there is FSASE, Central Voter File
12 Committee and it lists --
13    A  Absolutely
14    Q -- has information at the top.
15    MR RESTREPO  Lori, what's the Bates
16 range on this document, unless you have copies
17 for the rest of us?
18        MS. BORGEN  It has not been Bates
19 stamped. I believe Cara is going to have
20 copies of these documents when she arrives.
21 BY THE DEPONENT
22    A. And I apologize for not -- I mean, I didn't
23 want to answer yes, but now that you've jogged my
24 memory, yes, there was this committee. And the
25 rationale for the committee was to try to adopt some

Page 53

1 standardized statewide procedures for the removal of
2 these individuals from the rolls based on information
3 coming from the state and adopting this voter
4 eligibility status form that all supervisors could use.
5 Yes.
6    MS. BORGEN: Okay, I'll pause for just a
7 moment. Do you want to take a look at the
8 document before we continue?
9    MR. RESTREPO: Yeah, that'd be great.
10    THE DEPONENT: Yeah, and let me --
11    MS. BORGEN: Please, go over it. Take
12 your time and look through that.
13    MR. RESTREPO: All right.
14    MS. BORGEN: And let me take a look at
15 this. We may not -- some of this overlaps,
16 actually, with what she has and may not belong
17 to this document.
18    Off the record for just a moment.
19    (There was a recess.)
20       DIRECT EXAMINATION
          (continued)
21 BY MS BORGEN:
22    Q. So you're familiar with the FSASE, that's the
23 Florida Supervisors -- Florida --
24    A. Florida State Association of Supervisors of
25 Elections.

Page 54

1    Q. Okay. And do you call it -- how do you
2 pronounce the acronym? Do people have a short form for
3 that?
4    A. No.
5    Q. They just say FSASE?
6    A. Yes.
7    Q. FSASE?
8    A. No, no, no.
9    Q. Okay, let's stick with the FSASE
10    A. FSASE
11    Q. Do you know when the Central Voter File
12 Committee was formed by the FSASE?
13    A. I don't. It was likely formed -- well, I
14 don't want to speculate. I don't know.
15    Q. Okay. Prior to 2000, do you think?
16    A. I don't know.
17    Q. Okay. Do you know what the impetus was for
18 formation of that committee?
19    A. Trying to get some standardization amongst
20 the 67 counties of how we were to deal with the list
21 once we received it from the State since state law did
22 not speak to what we were to do
23    And there was a sense that the Division of
24 Elections had not provided specific guidance, so the
25 supervisors had to come up with something?

Page 55

1    MR. LITTLE: Object to the form.
2 BY THE DEPONENT:
3    A. I think there was more of a sense that we had
4 the ultimate responsibility and were ultimately going
5 to be held accountable, and so we had to have a process
6 in place.
7    Q. But the Division of Elections or the
8 Secretary of State had not identified a process to be
9 followed by the supervisors of elections?
10    A. Correct.
11    Q. Did you contact the Division of Elections at
12 any point in time to ask for guidance on what process
13 should be followed?
14    A. I don't believe I could answer that for a
15 deposition in terms of saying with complete -- I mean,
16 whether or not I spoke over the phone to the director
17 or -- you know, if I can't remember with complete
18 clarity, I'd rather not say
19    Q. So you have no specific recollection --
20    A. No.
21    Q. -- either way? Okay.
22    And do you recall contacting anyone else at
23 the Secretary of State's office regarding your request
24 for some guidance on how to -- what to what do with the
25 list provided?

Page 56

1    A. I cannot recall that.
2    Q. Okay And do you recall any other
3 information about the FSASE Central Voter File
4 Committee process? When they met? Who was involved?
5    A. Well, these are the members that were
6 involved And David Leahy, from Miami-Dade,
7 particularly took the lead because he was one of the
8 first supervisors to step out and actually mail to his
9 list, and so he became the most experienced supervisor
10 And he developed this -- or helped developed the form,
11 actually had experience in using it, actually had
12 experience in sharing with the rest of the supervisors
13 the inaccuracy of the list, and so he really was our
14 pioneer supervisor
15    Q And do you recall what he said, if anything,
16 about the inaccuracies of the list? What some of his
17 concerns were with the list?
18    A. That the list --
19    MR RESTREPO: Object to form
20 BY THE DEPONENT
21    A. Yes That the list had inaccuracies
22    Q And do you recall what types of inaccuracies?
23    MR. RESTREPO: Object to form
24 BY THE DEPONENT
25    A. Inaccuracies to the degree that people were

Page 57

```
 1  tagged as ex-felons who had not had their civil rights
 2  restored, when indeed they were either not ex-felons at
 3  all or they were ex-felons who had their civil rights
 4  restored.
 5     Q. And were there any inaccuracies identified by
 6  David Leahy regarding duplicates on the list?
 7        MR RESTREPO  Object to the form.
 8  BY THE DEPONENT.
 9     A  I can't recall that specifically.
10     Q  The primary thing that you recall is the
11  felons who were on the list?
12        MR RESTREPO  Object to the form.
13  BY THE DEPONENT
14     A  What I recall is a discussion of people in
15  two categories; either mistaken identity all together,
16  where the person was not the individual tagged by FDLE,
17  or the person was correctly identified as an ex-felon,
18  but they had had their civil rights restored.
19     Q  Okay.
20     A  Or we also got into another category of
21  people who had not committed felonies in the first
22  place, or had committed crimes in other states where
23  they had already had their civil rights restored, and
24  so there were various complications that arose.
25     Q  You said that David Leahy was the first one
```

Page 58

```
 1  to come up with the system of sending letters to the
 2  individuals.
 3     A  Yes.
 4     Q  Was that the process he developed to verify
 5  the list or what was the purpose of sending the
 6  letters?
 7        MR RESTREPO  Object to the form.
 8        MR LITTLE  Same.
 9  BY THE DEPONENT.
10     A  Mr. Leahy, Supervisor Leahy, was a member of
11  the Central Voter File Committee. And because he, as I
12  mentioned -- and I may be incorrect in that he was the
13  first supervisor to do it. But in my recollection, he
14  was the first supervisor in certainly the largest
15  county in the State of Florida to actually send letters
16  out to these individuals named on the central voter
17  file
18        And David is a very detailed and careful
19  supervisor who is very procedurally oriented and does
20  an excellent job. And he developed a specific
21  procedure and a form, this VES form, that, as I
22  mentioned, Pasco and Pinellas and Hillsborough all
23  copied.
24     Q  Prior to David Leahy's suggestion of sending
25  letters to everyone on the list, had anyone at the
```

Page 59

```
 1  State Division of Elections suggested that the
 2  supervisors send a letter to everyone on the list
 3  telling them that they had been placed on this list?
 4     A  Well, I believe that the law calls for the
 5  supervisors to mail something to everyone on the list
 6  indicating -- I would have to have that law in front of
 7  me, but I believe there is language that specifically
 8  says that there is to be some follow up by the
 9  supervisor with some letter.
10     Q  Is it your recollection that the law requires
11  the supervisors to do some kind of verification of the
12  individuals on the list?
13     A  Well -- and I don't have the law in front me,
14  but therein lies the problem in terms of how do you
15  verify, as the supervisor, and that was the problem
16  that we were faced with. Is it verification to send a
17  certified letter?  Does that constitute verification?
18  Or is verification that we receive additional
19  information back from the individual via this voter
20  eligibility form or status form of some sort?  What if
21  the certified letter is returned undeliverable?  What
22  if we never hear from the person?
23        Those were some of the questions that we
24  attempted to grabble with.
25     Q  And what verdicts did you come to in terms of
```

Page 60

```
 1  what is verification?
 2     A  Well, I could pick up on what I was reading.
 3     Q  Okay.
 4     A  If the reading doesn't get too tough.  I'll
 5  read slowly.  But I think it is important to at least
 6  get the Hillsborough process on the table.
 7     Q  Okay
 8     A  "All returned VES forms were forwarded to
 9  FDLE or EOC," which is Office of Executive Clemency
10  So if a voter sent back a completed VES form
11  indicating, You've got this wrong, I'm not the person,
12  or yes, I had a felony conviction, but I had my rights
13  restored, or whatever information, we then really tried
14  to be the middleman in the process attempting to help
15  the voter figure out their situation and we forwarded
16  that information to FDLE or OEC.
17        "If FDLE or OEC responded with paperwork
18  indicating the person was not a felon, we left the
19  person as he/she was in the voter file," so nothing
20  occurred
21        "If we we're notified by FDLE or OEC, via the
22  VES form, that the person was a felon without rights
23  restoration, the person was flagged for removal as a
24  felon. Whenever we received a response on the VES
25  form, whether positive or negative, from FDLE or OEC
```

## Page 61

1 we forwarded a letter to the person in question to
2 inform him/her of their status.
3 "We published --" and I do want to emphasize
4 how much time we spent working on behalf of these
5 individuals. I had one full-time staff person who
6 worked on this because many of these individuals, if
7 they didn't have us to help them, would have to deal
8 directly with Tallahassee.
9 Q And what was this person doing? What was
10 this employee doing?
11 A They were the ones on the phone trying to get
12 to the bottom of the situation on behalf of the voter.
13 Q Contacting FDLE or OEC?
14 A OEC and trying to research individual cases
15 to help these people out.
16 Q Okay.
17 A We found that individuals had had felony
18 convictions and did not have their rights restored and
19 didn't know that they had to have their rights
20 restored. Our office, and my approach and philosophy,
21 is to try to help these individuals and we do that even
22 today. We try to get the word out in the community
23 about this rights restoration process. And I have a
24 person on my staff that helps individuals in the
25 community work their way through process. It's easier

## Page 62

1 for them to deal with an individual from Tampa than it
2 is long distance.
3 Q. Would you send individuals copies of --
4 A. Oh, yes.
5 Q -- the clemency application?
6 A We do everything we can to help people get
7 their civil rights restored and we'll continue to do
8 that.
9 MS. BORGEN· Okay. If we could just pause
10 for just a moment. I apologize. My colleague
11 Cara Fineman has arrived with extra copies of
12 documents for those at the end of the table
13 that have been requesting them. So we can get
14 situated, we'll go off the record for just a
15 minute.
16 (There was a recess )
17 MS BORGEN Plaintiffs have been joined
18 by Cara Fineman who is also an attorney on
19 behalf of plaintiffs.
20 BY MS. BORGEN.
21 Q Ms. Iorio, we were discussing the central
22 voter file process, how Hillsborough had used the list
23 provided by the state in 2000. And I think you were in
24 the middle of reading a paragraph, right?
25 A. Do you want me continue that?

## Page 63

1 Q Sure, go ahead, continue and pick up where
2 you left off.
3 A "We published a legal ad -- newspaper ad in
4 the Tampa Tribune on July 28, 2000, with a list of
5 names of the alleged felons with their date of birth,
6 who did not return the certified mail receipt green
7 card. The ad stated that the listed names on our voter
8 rolls were allegedly invalid and the Elections Office
9 was giving them an opportunity to show cause why their
10 names should not be removed from the voter registration
11 books by attending the administrative hearing on August
12 8th, 2000. Approximately ten persons attended the
13 hearing.
14 "On August 4, 2000, we sent a letter to FDLE
15 asking them to research their felon files for some 300
16 names of alleged felons on our CVF list that were
17 returned as undeliverable in our June 2000 mailout.
18 The names forward were not exact matches and we asked
19 FDLE to verify whether the persons shown on our list
20 had a felony conviction and had not had their rights
21 restored.
22 "FDLE returned a letter dated August 15,
23 2000," which is part of the packet, "saying they were
24 not able to research our listing because they had
25 already provided all the information that they had

## Page 64

1 available to DOE for the CVF list. Additionally, we
2 sent a similar letter to DBT on August 7, 2000, looking
3 for the same information for the out-of-state felons.
4 We received a telephone call from a representative of
5 DBT saying they could not verify the felony conviction
6 or rights restoration. In both cases," and this is my
7 staff speaking, "I believe," and you might be a able to
8 determine tomorrow whether this was Darrell Smith or
9 perhaps Gary Klunk of my staff who says this -- that
10 "the people listed on the CVS list are felons, it is up
11 to us to determine if our voter names match their
12 files.
13 "On August 18, 2000, all names of voters who
14 exact matches (Last Name, First Name, Middle Name or
15 Initial, Suffix, Date of Birth, Race and Gender) and
16 did not respond to our certified mailout in June 2000,
17 or found by FDLE/OEC to be convicted felons," without
18 having their civil rights restored, "were removed from
19 the active voter rolls."
20 We took the initial step of mailing a regular
21 letter to those individuals. It was my belief that
22 some people don't like certified letters, perhaps,
23 particularly if they've gotten in trouble with the law
24 before. And so we just mailed them a regular letter
25 informing them about this felon status and that we were

1 removing them from our voter file.

2 "No removal action was taken on those voters
3 who were mailed a certified letter, but there was no
4 indication that they received the certified
5 correspondence (no certified mail receipt returned) and
6 who were not a perfect match with the CVF data. In
7 addition, those names on the CVF list that did not have
8 a conviction date, or had a future conviction date,
9 were not removed pending verification of the accuracy
10 of the conviction dates. A few names on the CVF list
11 without a conviction date were verified by the VES form
12 process as felons through FDLE or OEC and removed."
13 To summarize what occurred in Hillsborough
14 County, the initial certified mail felon notification
15 letters numbered 3,258. We had a total of 549 VES
16 forms processed. Of those 548 (sic), 238 were found to
17 be non-felons or they had their civil rights restored.
18 Pending cases, derived matches, 279. CVF
19 felons without conviction dates, 342. DBT felons
20 without conviction dates or future conviction dates,
21 126. And so of the 3,258 names that we started with,
22 we removed, prior to the fall elections, 2,273 names.
23 Q Okay. Going back over some of the issues
24 that came up then that you mentioned there.
25 A Uh-huh.

1 Q First of all, one of the things that we
2 started discussing before is that your office had had
3 discussions on how do you verify --
4 A Correct
5 Q. -- what is verification. Did you come up
6 with some basic standards on what would be sufficient
7 verification, that we must get X, Y or Z, before we can
8 feel that we have verified that information?
9 A Yes And as you can tell from the numbers
10 that I just gave in the narrative, we were not
11 comfortable with names that were not exact matches, nor
12 were we comfortable with data that did not have a
13 conviction date or had a future conviction date. And
14 so, we did not remove all of the names that possibly
15 another county might have removed if they took a
16 different approach
17 Q So individuals that were less than 100
18 percent name match were not removed; is that correct?
19 A And people who had the -- without a
20 conviction date or who had a future conviction date
21 Q. Now, there was a reference there, I think in
22 the end numbers, something about a pending -- something
23 regarding a conviction date I think you were trying
24 to figure out some information about the conviction
25 date?

1 A Right
2 Q That's what it sounded like And if you
3 received information about the conviction date from --
4 were you trying to get that information from FDLE?
5 A That's correct
6 Q And if you received that information, then
7 that individual might have been removed from the rolls?
8 A Is says a few names on the CVS list, without
9 a conviction date, were verified by the VES form
10 process as felons through FDLE or OEC and removed
11 Q Okay, so those individuals were. But if you
12 weren't able to actually get information that --
13 A. Then we did not
14 Q. They were not removed?
15 A Do you know how you came up with -- how your
16 office came up with those standards for what was deemed
17 a good enough match or sufficient verification?
18 A Part of it had to do with my own philosophy
19 that you have a fundamental right to vote, and this
20 list had known inaccuracies, and that I was not
21 comfortable with the process that removed people if it
22 was not an exact match or the list didn't even have a
23 conviction date or a future conviction date And that
24 is why I followed up with a letter asking for
25 additional information from FDLE

1 And when they respond back and say, Sorry, we
2 can't give you any additional information beyond what
3 you've already been given, then I don't have a high
4 comfort level that those are individuals that should be
5 removed from the voter rolls.
6 Q And the information you were seeking from
7 FDLE, was that only for individuals who had either no
8 conviction date or a future conviction date?
9 A Or were not exact matches.
10 Q Or not exact matches. Also the ones that
11 were not a 100 percent name match?
12 A That's correct.
13 Q All of those individuals you asked FDLE to
14 check their records --
15 A Correct.
16 Q. -- and see if -- okay.
17 You mentioned, as well, you were seeking
18 assistance from DBT with the list?
19 A. That's correct.
20 Q What were you asking them to help you with?
21 A We sent a letter on August 7th to DBT and
22 it's part of the exhibit. "The attached listed
23 individuals appear on our central voter file felon list
24 received from the Division of Elections as out-of-state
25 felons. The verification notices we forwarded to these

Page 69

1 alleged felons concerning their felony status were
2 returned as undeliverable.
3      "The names on the attached list are not exact
4 matches with the individuals on our voter file.
5 Therefore, we need more information pertaining to each
6 record before we can make a decision regarding removal
7 from the voter rolls. We are asking your cooperation
8 to verify whether or not the" individuals "identified
9 on the attached list have a felony conviction and have
10 not had their rights restored.
11      "A prompt response to our request would be
12 appreciated, so we can resolve the status of each
13 person prior to the First Primary election on September
14 5, 2000."
15      Q And did you receive any response to that
16 letter from DBT?
17      A There is a notation on this letter dated
18 8/7/2000, "Letter to DBT. We received telephone call
19 saying they could not provide us the information we
20 requested."
21      Q. And is that your handwriting on that
22 petition?
23      A No, it is not.
24      Q. Do you know whose handwriting that is?
25      A This could -- I think you could clarify that

Page 70

1 in tomorrow's deposition. But I suspect it's Gary
2 Klunk's, who is my voter services manager.
3      Q. Okay At this point in time, though, you
4 have not identified Gary Klunk as one of individuals to
5 testify pursuant to the 30(b)(6)?
6      A. He is not going to be giving a deposition
7 He works under Darrell Smith, so I think Darrell Smith,
8 tomorrow, who is my Director of Operations and Support,
9 will be well qualified to answer any questions.
10      Q. Okay. But if Mr Smith is not able to, then
11 you suggest that Gary Klunk might be the one who's --
12      A He could, but I feel very confident that
13 Mr. Smith will be able to
14      Q. Okay And so those individuals with the
15 out-of-state convictions, where the letter -- the
16 certified letter had come back, they were not exact
17 matches, those individuals were not removed from the
18 voter list?
19      A That's correct
20      Q The individuals where there was 100 percent
21 name match, but the certified letters came back, were
22 those individuals removed from the voter list?
23           MR RESTREPO Objection to form
24           MR MAC INNES Object to the form.
25

Page 71

1 BY THE DEPONENT
2      A Could you repeat that again?
3      Q. Sure. If there is an individual who was on
4 the list that was provided by the state to Hillsborough
5 County, and it was 100 percent name match, you sent
6 them a letter by certified mail telling them they were
7 on the list, asking them to respond?
8      A Yes.
9      Q. If that individual did not respond, would
10 they be removed from the voter list?
11      A After going through that administrative
12 hearing process that we went through.
13      Q So they would be --
14      A The ad in the newspaper, administrative
15 hearing that was held on August 8th, 2000.
16      Q So the individuals in that category, other
17 than the letter that was sent to them, and then giving
18 them the opportunity for a hearing, were there any
19 efforts made to verify the accuracy of the information
20 on that list?
21      A. If the person was an exact match and we
22 mailed them a certified letter, then we proceeded -- if
23 they sent back a VES form, then we worked on their
24 behalf to clear up the information. And as our
25 statistics show, of the people who sent back VES forms,

Page 72

1 44 percent in that particular group, the information
2 was in error.
3      But if we did not hear from the person at
4 all, then we proceeded with the administrative hearing
5 process, and then ultimately sent them a regular piece
6 of mail to indicate to them that they had been removed from the
7 rolls.
8      Q And that was to say that you have been
9 removed?
10      A That's correct.
11      Q Not, you are about to be removed, but you
12 have been removed?
13      Would they have an opportunity, at that point
14 in time, to respond or come into the office and say,
15 Hey, I shouldn't have been removed --
16      A Absolutely.
17      Q -- put me back on? Okay.
18      And earlier when we were talking, you said
19 that your office -- it sounds like you and your staff
20 had sat down and were discussing what is proper
21 verification, what do you do with this list, and is it
22 enough to send a letter, does that qualify for
23 verification under the statute?
24      A. Yes.
25      Q How did you come to the decision that

Page 73

1 ultimately that was enough?
2     MR. MAC INNES· Objection to form.
3     MR LITTLE· Objection, form.
4     MR ALLEN· Objection to form.
5 BY THE DEPONENT·
6     A. As I mentioned, with the central voter file,
7 that when the supervisors had to come up with and
8 recommend procedures, we -- and when I say, we -- our
9 staff, as well as some of the other supervisors,
10 Miami-Dade, Pinellas, Pasco, Hillsborough, we had
11 concluded that the administrative hearing process was
12 the best process to follow absent any other direction.
13     (A discussion was held off the record.)
14 BY MS. BORGEN·
15     Q. Was there a specific discussion among the
16 supervisors of election about whether it would be
17 sufficient to send a letter and then the notice of the
18 administrative hearing process? Was there concern that
19 that might not be enough to verify?
20     MR. RESTREPO· Objection to form.
21     MR. ALLEN· Objection to form.
22     MR. LITTLE· Objection.
23 BY THE DEPONENT·
24     A I'll put this back in the context of prior to
25 November of 2000. The supervisors, absent any other

Page 74

1 direction in state law as to how to proceed, and given
2 that the administrative hearing process is the one used
3 for the removal of county felons, people who are
4 identified by our clerks of the circuit courts as
5 county felons, we thought it was an appropriate way to
6 deal with this list.
7     Q. Okay. Do you believe the county felon lists
8 that you received -- that was received from the county
9 are more reliable than the list received from the state
10 in 2000?
11     MR ALLEN· Objection.
12     MR LITTLE· Objection to form.
13     MR RESTREPO· Objection to form.
14 BY THE DEPONENT·
15     A. That is a difficult question for me to
16 answer. And I also think that in some respects it is
17 comparing two different databases, two different
18 situations.
19     Q If they're two different situations, why did
20 it seem to you that the process for one would apply for
21 the other?
22     A Well, let me go back as to why I think
23 they're slightly different situations. One is a list
24 that comes with great frequency from your Clerk of the
25 Circuit Court dealing only with people who have felony

Page 75

1 convictions within your own county. Now, even with
2 that list, you can get inaccuracies. And I think one
3 of the keys to the inaccuracies is that many people
4 have aliases. And so you're dealing with a group of
5 individuals where it might be difficult to pin down
6 their exact name and get exact matches. And that's a
7 problem even with our county list on a monthly basis.
8     Your question was really, did I feel they
9 both have the same kind of inaccuracies? I think that
10 was your original question. The central voter file in
11 the year 2000, when you take out the attempt that was
12 made in 1998, because that attempt didn't stick, it
13 didn't work, it wasn't followed through with, this was
14 a first. And given that, it was the accumulation of
15 names, some of them going back 40 years.
16     And so, that's why I say it is difficult, I
17 think, to compare accuracy levels of the two. But
18 though it might be difficult to compare accuracy
19 levels, I don't think it's unfair to say that an
20 administrative hearing process could have logically
21 been applied to that process prior to 2000.
22     Q. The information you received from the county
23 clerk, those are all pretty recent convictions; is that
24 correct?
25     A Correct.

Page 76

1     Q They're sent to you on an ongoing basis, so
2 the individuals convicted here in Hillsborough County
3 this month of a felony are forwarded to you?
4     A Correct.
5     Q And the information that was on the list that
6 was provided by the Division of Elections to you in
7 2000, included, as you indicated, old conviction
8 information?
9     A Correct.
10     Q Sometimes going back 40 years --
11     A Correct.
12     Q -- or maybe more than that even?
13     Was it a concern, or just perhaps discussed
14 in your office, how reliable some of that old data
15 might be for convictions?
16     A Absolutely.
17     Q And what kind of discussions -- did you
18 discuss different ways to address that, how you might
19 be able to deal with that?
20     A I believe that what I have read into the
21 record, and our summary of how our county dealt with
22 it, and what I indicated earlier in terms of my own
23 philosophy in devoting the kind of staff resources that
24 we devoted should paint the picture of a county
25 elections office that was very concerned about the

Page 77

1 inaccuracies
2     I mean, on the one hand, the law was saying,
3 You must do something with list. And on the other
4 hand, you have a list that has known inaccuracies and
5 you have to protect a person's right to vote. I was
6 very concerned with that.
7       And I think that all the procedures that my
8 office put into place, and the track record that I've
9 laid out today in deposition, and the other documents
10 can show you that we tried to be as careful as, I
11 think, any county could be and only removing names of
12 individuals that appeared to be exact matches and not
13 removing names of individuals that didn't fall -- that
14 fell into other categories that I've already named.
15 And we had tremendous sensitivity to that and I -- it
16 was a key issue for us as a staff.
17     Q  You mentioned that you tried to be as careful
18 as you could be?
19     A  Yes.
20     Q  Did you feel like there were limitations
21 within the state law, or what the Division of Elections
22 had informed you, that limited what you could do, that
23 you could only have so much, I guess, parameter of
24 safety in terms of removing voters?
25     MR. LITTLE: Objection.

Page 78

1     MR. ALLEN: Objection.
2     MR. RESTREPO: Object to form.
3 BY THE DEPONENT:
4     A  The law says -- and I'm sorry, I don't have
5 the law in front of me. I shouldn't start off by
6 saying the law says. I don't have it in front of me to
7 quote it. So I could be wrong on this, but it would be
8 better if I had it to quote.
9       But I believe that the law puts the onus on a
10 supervisor to follow up with this list, that you shall
11 send, that you will follow up on this and remove names
12 of individuals who, you know, are former felons who
13 have not had their rights restored. So I think there
14 is an obligation under what was even the current
15 language of the law in 2000, prior to it being amended
16 in the Election Reform Act of 2001. I think even the
17 law, as it existed in 2000, did put responsibility on
18 the supervisor to follow up with the information in the
19 central voter file given to us by the state.
20     Q  Do you think in 2000 that you could have
21 interpreted the law as -- or you could have run the
22 process so that you did not remove a voter unless you
23 heard back from them confirming that they had a felony
24 conviction?
25     MR. ALLEN: Objection.

Page 79

1     MR. LITTLE: Objection.
2     MR. RESTREPO: Object to the form
3 BY THE DEPONENT:
4     A  I do not believe that we had that kind of
5 flexibility. I mean, I think we exercised what
6 flexibility I felt comfortable with exercising in terms
7 of not removing people who were not exact matches, not
8 removing individuals who did not have conviction dates
9 and so forth.
10    Q  Do you think under the new law, as amended in
11 the Florida Election Reform Act, that you have more
12 flexibility?
13    A  Well, I think it really remains to be seen
14 how this is going to unfold prior to the 2002 elections
15 and I think we are at a very important point in all of
16 that, as I mentioned before, with the pre-clearance of
17 493 and how I think that conflicts with the Election
18 Reform Act of 2001.
19       And we need to ensure that what comes out of
20 this legislation that passes in 493, if it is
21 pre-cleared by the Justice Department, then that
22 administrative hearing process is codified for all 67
23 counties. And from our experience in 2000, we know
24 that the end result of that is that some people will be
25 erroneously removed from the rolls.

Page 80

1     It is my belief that we should not go down
2 that road again because of that experience that we had.
3 And that, rather, the onus should now be on government
4 to prove beyond a shadow of a doubt that the person is
5 indeed a convicted felon who has not had his civil
6 rights restored before they are removed from the law
7 (sic).
8       That was a position that was enunciated by
9 Attorney General Bob Butterworth in a January letter to
10 the Justice Department with regards to the
11 pre-clearance of the Election Reform Act of 2001. I
12 agree with his reasoning in that letter, that there
13 should no longer be a presumption that the database is
14 correct, that the presumption should now be that,
15 absent additional information on top of what the
16 database says, that the supervisor should not remove an
17 individual.
18    Q  So if 493 is not pre-cleared and the conduct
19 of list maintenance removal is carried out for November
20 2002, under the Florida Election Reform Act, under the
21 current language, do you foresee how your office will
22 conduct those list maintenance removals for felons?
23    A  Preliminarily, I will say this, that if 493
24 is not pre-cleared and we're to go simply on the basis
25 of the Election Reform Act of 2001 and the

JUN 28 2002 20:33                              +2027830823        PAGE. 15

Page 81

1 interpretation given to us by Attorney General Bob
2 Butterworth, we would mail certified letters to the
3 list of names. And unless someone were to write us
4 back and indicate yes, this information is correct, I
5 am a former felon who has not had my civil rights
6 restored, in the absence of that kind verification, we
7 would not remove names.
8   Q  Do you believe your office would have the
9 responsibility to try to do independent verification,
10 other than sending letters, to try to get copies of
11 convictions from FDLE records, from county records?
12   A  No.
13   Q  It would just be by letters to the voters?
14   A  No. And one of the points I've tried to make
15 throughout this process was that the supervisors of
16 elections are not involved in the criminal justice
17 system. And part of the problem with this whole
18 process in 2000 is that it places the supervisor of
19 elections, who is in the voter registration business,
20 trying to get people on the rolls and getting them to
21 vote, putting them in the criminal justice system
22 trying to figure out if someone had a felony conviction
23 in 1973. We're not equipped to do that.
24      And I also discovered through this process
25 that the State of Florida does not, between FDLE and

Page 82

1 the Office of Executive Clemency, have an adequate and
2 totally accurate database of individuals who have gone
3 through the criminal justice system. And I cannot
4 speak to why they don't have that, but I think that is
5 a considerable problem that someone at some point
6 should pay attention to
7   Q  And so assuming that 493 --
8   A  Uh-huh
9   Q  -- is not pre-cleared and you're able to take
10 this -- your anticipated approach, what changed between
11 the law that was in place in 2000 and the Florida
12 Election Reform Act of 2001, where you feel comfortable
13 using this different verification process?
14   A  Well, in 2000, we used the administrative
15 hearing approach absent any other direction and because
16 we thought it was in keeping with how felons were being
17 removed from the county level
18      However, again, given the passage of the
19 Election Reform Act of 2001 and the opinion of Bob
20 Butterworth in his letter to the Justice Department
21 that the onus was now on government to prove beyond a
22 shadow of a doubt that the individual was a former
23 felon who did not have his civil rights restored and
24 that the database would no longer be presumed correct,
25 we would change our procedures in Hillsborough and we

Page 83

1 would simply notify the individual that they are on
2 this list, that absent any other information that would
3 bolster the case of the central voter file, we would
4 not remove anyone from the rolls.
5      We would no longer use the administrative
6 hearing process for the central voter file. We would
7 continue to use the administrative hearing process for
8 the monthly removals of the county circuit courts
9 because that is a separate issue in the law.
10   Q  And does the law require you to use the
11 administrative hearing process for those individuals?
12   A  Correct.
13   Q  Has the Division of Elections provided you
14 with any letter or memo, since November 2000, talking
15 about what process you should use regarding removal of
16 felons?
17   A  Not to my knowledge. But if you have some
18 letter, then I stand corrected
19   Q  I'm not aware of any at this moment
20      You provided some statistics about how many
21 individuals were removed from the voter rolls. I
22 believe you said 2,273 --
23   A  That's correct
24   Q  -- were ultimately removed as felons in 2000?
25   A  Yes.

Page 84

1   Q  Do you know the last date by which those
2 individuals were removed, during what time period they
3 were removed?
4   A  No, but my staff can speak to that tomorrow
5 in deposition.
6   Q  Do you know the racial breakdown of those who
7 were ultimately removed?
8   A  We do know that and I don't know if I have
9 that statistic for today, but I believe that my staff
10 will have that for tomorrow.
11   Q  Okay, we can cover that tomorrow then.
12 That's fine.
13   A  Okay.
14   Q  Since November 7, 2000, have you contacted
15 FDLE to try to get additional assistance in dealing
16 with felon records?
17   A  Well, to my knowledge, unless I stand
18 corrected by my staff tomorrow, we have not received
19 another file to remove people. I think that that file
20 is expected to arrive sometime this summer.
21   Q  Speaking of files, receiving files, you said
22 that you received a file approximately April/May,
23 something like that, of 2000 --
24   A  Uh-huh.
25   Q  -- from the Division of Elections?

Page 85

1 Do you think the timing of your receipt of
2 that gave you sufficient time to be able to review the
3 list, verify it, and process the list?
4 MR. ALLEN· Objection.
5 MR. LITTLE· Objection.
6 MR RESTREPO· Objection to the form.
7 BY THE DEPONENT·
8 A. I don't think that any supervisor feels that
9 they have enough time to prepare once you get into the
10 springtime. This was a major list and we had to create
11 procedures for it. But, in fact, we did get it all
12 done prior to the fall elections, so we must have had
13 enough time for it.
14 Q You found a way to make it happen?
15 A Yes.
16 Q Okay. If we could turn back to the
17 complaint, we started going through the complaint
18 before.
19 A Uh-huh.
20 Q If you can turn to paragraph 81 of the
21 amended complaint.
22 In paragraph 81, plaintiffs allege that many
23 Defendant county supervisors failed to verify at all or
24 to verify adequately the information provided by the
25 state, and, as a result, wrongfully purged numerous

Page 86

1 voters from their official lists of registered voters.
2 Now, we've talked extensively about the
3 procedures that Hillsborough County used for verifying
4 voters. Do you believe that with that process, in the
5 end, you incorrectly purged some voters?
6 MR. ALLEN. Objection.
7 MR LITTLE· Objection.
8 MR RESTREPO· Objection to the form.
9 BY THE DEPONENT·
10 A. First, let me just say, without being
11 redundant, whenever you start going down the "purge"
12 road, I must refer back to my earlier comments about
13 how I really do not agree with the use of the word
14 "purge".
15 Q Okay, then we can say removed pursuant to
16 list maintenance procedures?
17 A Well, this was not list maintenance. This
18 was removed pursuant to central voter file.
19 Q Okay.
20 A Okay, which is different.
21 Now, I will say this, too, though this may
22 not be appropriate in this deposition, that one of the
23 issues that I have with being a defendant in this suit
24 is arbitrarily choosing seven counties when you have 67
25 counties that all used different procedures. And to

Page 87

1 simply select seven counties when you have 60 others
2 that may or may not have used various procedures, I
3 find problematic and something that is hard to deal
4 with.
5 So are you asking me here whether the seven
6 counties that have been chosen for this lawsuit, did
7 they have different procedures?
8 Q We can start with that question.
9 A I don't know.
10 Q To your knowledge, do the seven counties who
11 are defendants in this lawsuit --
12 A. I cannot speak to that.
13 Q -- have different procedures?
14 Are you familiar with the procedures of any
15 specific counties other than Hillsborough?
16 A I will say this, that I believe that
17 Hillsborough and Pinellas and Pasco used the same
18 procedures and Pinellas and Pasco are not part of this
19 lawsuit.
20 Now whether they used the same procedure when
21 it got down to the real level of detail that I outlined
22 here, I can't speak to that.
23 For example, I don't whether Pinellas and
24 Pasco gave the same benefit of the doubt that I gave.
25 In fact, they may have been more strict than I was.

Page 88

1 In other words, this lawsuit may be focusing
2 on a county -- in fact, it probably is focusing on a
3 county, in Hillsborough, that did more to try to
4 protect voters and make sure that people were not
5 removed if they were not specific matches or conviction
6 dates, and letters were written to try to obtain this
7 information than perhaps, and I can only speculate on
8 this, than other counties that are not named in the
9 suit.
10 However, not being able to do anything about
11 that, I will only say that it would not surprise me if
12 67 counties used different procedures because there
13 were no statewide procedures to be used.
14 Q Do you think it would have been more helpful
15 if there were statewide procedures established?
16 MR RESTREPO Object to the form.
17 MR ALLEN· Objection.
18 MR. LITTLE. Objection.
19 BY THE DEPONENT
20 A I think that, with regards to election
21 administration, it is always more helpful if there are
22 statewide procedures adopted.
23 Q And do you think it's the role of the
24 Division of Elections to help establish those
25 procedures?

Page 89

1    MR. RESTREPO: Object to the form
2 BY THE DEPONENT:
3    A. I think there are two avenues there. One is
4 the Florida legislature should have laws that establish
5 statewide procedures that are very clear. And we found
6 in the 2000 election, with recounts and what occurred
7 there, that even the Florida election law was not
8 particularly clear.
9        But, two, it is the role, I believe, of the
10 Division of Elections to promulgate rules and issue
11 directives and legal opinions that will put all the
12 supervisors on the same sheet of music.
13    Q. And do you think it would have been more
14 helpful -- specifically looking at 2000 and how county
15 supervisors of elections used the list provided by the
16 state for individuals to be removed from the voter
17 rolls, if we're looking specifically just at that time
18 period, do you think it would have been helpful to have
19 procedures from the Division of Elections about how to
20 use that list?
21    MR. ALLEN: Objection.
22    MR. LITTLE: Objection.
23 BY THE DEPONENT:
24    A. Yes, it would have been. It would have been
25 helpful if the Division of Elections had notified all

Page 90

1 67 supervisors that they thought that we should use a
2 specific procedure and that this is how we should
3 proceed with the process.
4    Q. Are you familiar with how any other
5 counties -- I thought you said Pasco and Pinellas, you
6 believe, used procedures similar to yours?
7    A. Yes.
8    Q. But you're not sure when it comes down to
9 some of the smaller details of what they did?
10    A. Yes.
11    Q. Are you familiar with how any other counties
12 used the central voter file list from the state?
13    A. Some didn't send it out at all. Palm Beach
14 I don't think Volusia did at all and I think Volusia is
15 one of the named defendants.
16    Q. Do you think that counties could be correct
17 in not using the list at all?
18    A. That wouldn't be for me to say.
19    Q. Did you consider at any point in time not
20 using the list at all?
21    A. The thought may have crossed my mind.
22    Q. Do you remember having discussion with anyone
23 on your staff about, you know, we think this list has
24 problems, maybe we should just not use it?
25    A. We discussed it.

Page 91

1    Q. And do you recall -- do you recall who you
2 discussed it with?
3    A. Well, I would have discussed it with my
4 senior staff, which is Darrell Smith and Chuck Smith,
5 two people who will be deposed tomorrow.
6    Q. Do you recall when you discussed it?
7    A. Well, prior to us reaching conclusions on how
8 we were going to ultimately deal with the list.
9    Q. And do you remember, in the end, why you
10 ultimately decided that you should use the list?
11    A. We felt the law compelled us to. We thought
12 that the language in the law was unambiguous in that it
13 required the supervisor to do something with the list.
14    Q. And what concerns with the list prompted that
15 discussion, you know, Do we even have to use it, or did
16 you have a discussion, We think there are problems with
17 it?
18    MR. ALLEN: Objection.
19    MR. LITTLE: Objection.
20    MR. RESTREPO: Objection.
21 BY THE DEPONENT:
22    A. Yes
23    Q. What were those problems?
24    A. Well, we knew -- and the timing of this, I
25 don't have clear for this deposition. But I can tell

Page 92

1 you from what I said earlier that Supervisor Leahy in
2 Miami-Dade was the first supervisor to use the list and
3 to send out letters, that he informed his fellow
4 supervisors that there are inaccuracies. So we knew
5 going into the process that we were dealing with
6 inaccuracies and this was of concern to us.
7    Q. Do you have information regarding whether or
8 not Hillsborough County ultimately removed from the
9 list any individuals who should not have been removed?
10    MR. RESTREPO: Objection.
11    MR. LITTLE: Objection.
12    MR. ALLEN: Objection.
13 BY MS. BORGEN:
14    Q. And I should clarify that, as I see, looking
15 through some documents -- removed individuals who
16 appeared on the central voter file list provided by the
17 state, who, then, you used these procedures we've
18 discussed to remove them from the list?
19    A. Yes. We found that there were 13 CVF felons
20 who ultimately, after the election date, were found to
21 be non-felons.
22    Q. And do you know how they were found to be
23 non-felons after the election date?
24    A. No. I can speculate that they either
25 attempted to vote -- now, two of them went ahead -- two

**Page 93**

1 of them voted in the election. 10 did not vote. Of
2 the 13 total, 8 were white, 4 were black, 1 was Asian
3 Pacific. Two went ahead and voted on election day, 10
4 did not.
5          And I suspect that the way we found out was
6 these were individuals who likely went to vote and
7 discovered that they could not, and then followed up
8 with our office. And after the fact, we followed up
9 and ultimately, well after the 2000 election, received
10 verification that they had had their civil rights
11 restored.
12     Q Do you believe that there may be other voters
13 who were removed, pursuant to the central voter file
14 procedures, who did not try to vote in 2000, so you did
15 not find out about the wrongful removal, who were
16 wrongfully removed and you just don't know about them
17 yet?
18          MR ALLEN. Objection.
19          MR. LITTLE Objection.
20          MR. TINKLER Objection.
21          MR RESTREPO. Object to the form.
22 BY THE DEPONENT
23     A That's so speculative. I will point out that
24 we had a 74 percent voter turnout in the year 2000, in
25 a very high-profile election And I would think that

**Page 94**

1 if you were out there and -- I think that individuals
2 who are still in this community who had an interest in
3 voting, went out and voted.
4          And also there has certainly been a lot in
5 the news about the felon issue subsequent to the 2000
6 election. And I would suspect that individuals who
7 might have fallen in that category that you described,
8 would have, by now, come forward.
9     Q. What if there are individuals who have no
10 felony records and don't even think that they might be
11 in that category? They don't associate all this
12 discussion of felony records with themselves because
13 they never had a felony conviction? Are you concerned
14 that there may be individuals in that category who
15 couldn't make it to vote, didn't go to vote for some
16 reason, and who were wrongfully removed?
17          MR. RESTREPO Object to the form.
18          MR. LITTLE Objection.
19          MR. ALLEN Objection.
20 BY THE DEPONENT
21     A That's hard to say. It's very speculative.
22     Q Has anyone in your office made any attempts
23 to go back through the list of individuals who were
24 removed to check over those in some way to see if they
25 were correct removals?

**Page 95**

1     A I mean, you have to bear in mind that before
2 we removed these people, we sent them a regular letter
3 in addition to the certified. So either we have
4 already gotten in touch with them or you can't get in
5 touch with them.
6     Q Did anyone try to make phone calls or
7 anything like that to these individuals? Try to, you
8 know, see if you have -- I don't know if you have phone
9 numbers on file for some of them or call information to
10 get phone numbers?
11     A No We only were in that level of contact
12 with someone who returned a VRS form.
13     Q Have you tried to do anything to check over
14 the criminal conviction information that you have for
15 the individuals who were removed?
16     A Well, I think you can see by our exhibit that
17 when we sent information to the law enforcement agency
18 asking for additional information, the response we got
19 back from them was the information is correct.
20     Q But those individuals then -- the ones who
21 you couldn't confirm were not removed?
22     A. Right. That's right.
23     Q Okay We may come back to that a bit more
24 later.
25          In paragraph 82 of the second amended

**Page 96**

1 complaint, turn to that. Plaintiffs allege that the
2 Defendant county supervisors wrongly purged, from the
3 voter rolls, ex-felons who had their rights restored in
4 the states in which they committed their felonies.
5          Do you know if among the list of individuals
6 who were removed from your voter list, pursuant to the
7 central voter file, if there were individuals who had
8 convictions out of state and who might have received
9 their -- had their rights restored out of state, but
10 not in Florida?
11     A My staff members tomorrow would have to
12 answer that.
13     Q Do you recall ever receiving information from
14 either the Division of Elections or the Office of
15 Executive Clemency about what the state policy was
16 regarding individuals with convictions out of state and
17 whether they had to get their rights restored in
18 Florida or only out of state?
19          MR RESTREPO Object to the form.
20          MR LITTLE Object to the form.
21 BY THE DEPONENT
22     A. Well, that became a bit of a complicated
23 issue kind of after the fact and I'm not sure that I
24 have the paperwork in front me to speak to it as I
25 should in a deposition. I would have to review my

Page 97

1 letters on that because we actually had correspondence
2 from the Division of Elections -- unless you happen to
3 have it and can jog my memory with that correspondence
4 and then I could speak to it.
5     (Plaintiffs' Exhibit G was marked for
6     identification.)
7 BY MS BORGEN
8     Q What's marked as Exhibit G, a letter dated
9 September 18, 2000, to Mr. Ed Kast from Janet Keels.
10 Could you just take a look at that and see if that
11 looks familiar to you.
12     A Okay.
13         MR RESTREPO You said Ed Kast to Janet
14     Keels.
15         MS BORGEN It's from Janet Keels to Ed
16     Kast.
17         MR RESTREPO Okay.
18 BY THE DEPONENT.
19     A And there should be another letter too.
20 Aren't there other letters?
21     Q There are other letters I can show you.
22         MS BORGEN Mark as Exhibit H --
23     (Plaintiffs' Exhibit H was marked for
24     identification.)
25 BY MS BORGEN

Page 98

1     Q I believe this is actually the letter that
2 should probably have come first. This is an August
3 10th, 2000, letter to Janet Keels from Emmett Mitchell
4 asking for clarification, I think, for the president of
5 Florida State Association Supervisors of Elections.
6     A That was me.
7     Q That's what I thought.
8     A Then there should be a letter after 2000 that
9 changes this a bit.
10         MS BORGEN Exhibit I
11     (Plaintiffs' Exhibit I was marked for
12     identification.)
13 BY MS BORGEN
14     Q Exhibit I, this is a letter dated
15 February 23rd
16     A Right
17     Q Is that the one --
18     A You've got it.
19     Q -- you're thinking of?
20     A Okay.
21         MR. RESTREPO Excuse me, was that last
22     one marked something?
23         MS BORGEN February 23rd, it was marked
24     Exhibit I.
25         MR RESTREPO I've got it.

Page 99

1 BY THE DEPONENT.
2     A So just stepping through these, I had asked
3 the Division of Elections in August, or maybe it was
4 late July, what about an individual who has had their
5 civil rights restored outside the State of Florida.
6 And then they wrote back September 18th, or rather
7 Janet Keels, that says, an individual whose civil
8 rights were restored automatically by statute in the
9 state of conviction and does not have a written
10 certificate or order, would be required to make
11 application for restoration of civil rights
12     So even if you had your civil rights restored
13 in another state, if you didn't have that in writing,
14 you'd have to go through the civil rights process --
15 restoration process in Florida.
16     And then after, February 23, 2001, they wrote
17 and indicated, My office will attempt to confirm the
18 individual's claim by contacting the state that
19 assertedly restored the individual's civil rights. If
20 possession of civil rights is confirmed, the individual
21 does not need to apply for restoration of civil rights,
22 et cetera.
23     Q It seems the policy changed after the
24 November 7th, 2000, election?
25         MR ALLEN Objection

Page 100

1         MR LITTLE. Objection
2 BY THE DEPONENT
3     A I wouldn't know if I would say that their
4 policy changed I would say that I'm not sure that
5 they -- maybe they didn't know what their policy was
6     Q What prompted you to make the original
7 inquiry of the Division of Elections regarding how the
8 state would treat --
9     A Confusion about procedures We were trying
10 to understand how to proceed And bearing in mind that
11 we're getting all of these, as I went through, you
12 know, when you think about here, our office is dealing
13 with 549 ves forms that have come back to us And each
14 one of those is an investigation. It's something that
15 we're trying to help that person through the process
16     And so through the process, you get
17 individuals who have had their civil rights restored in
18 other states and they're coming to us and saying, yes,
19 but I've already had my civil rights restored. And so,
20 then we're trying to deal with the Office of Executive
21 Clemency and the Division or FDLE, or all parties, and
22 asking the question, what do you do with these
23 individuals? Is there some kind of policy statement?
24 Are all the supervisors being given the same
25 information?

Page 101

1 At that time, I was president of the State
2 Association of Supervisors and thought it was an
3 important question to ask.
4 Q. And do you feel like the supervisors of
5 elections were getting different answers when they
6 contacted the Office of Executive Clemency directly?
7 MR. ALLEN: Objection.
8 MR LITTLE: Objection.
9 MR. RESTREPO: Object to form.
10 BY THE DEPONENT:
11 A I don't know.
12 Q And have you had any interaction, yourself,
13 with the Office of Executive Clemency?
14 A I really didn't directly deal with them. My
15 staff did.
16 Q And would you say you dealt directly with --
17 did you deal directly with the Division of Elections on
18 this issue?
19 A Sometimes.
20 Q And who would you deal with at the Division
21 of Elections?
22 A Clay Roberts.
23 Q And would you call him or send him a letter?
24 A Usually, I just called and talked to him. I
25 mean, I was president of the Association, so we talked

Page 102

1 about various issues, though I couldn't say I called
2 him on any specific date or could tell you in a
3 deposition exactly what we talked about on a particular
4 date.
5 Q. Do you recall speaking to him, though, about
6 the issue of what to do with out-of-state felons and
7 clemency?
8 A I cannot recall that.
9 Q. Do you recall what policy your office used,
10 then, prior to the November 7th, 2000 election,
11 regarding out-of-state felons and whether they've had
12 their rights restored in the state of conviction?
13 A We would have been relying on the
14 September 18, 2000 letters from Janet Keels that would
15 have said that "a certificate of restoration of civil
16 rights, relief of disabilities, or pardon order issued
17 by a court, agency, clemency board, or governor of
18 another state is recognized by the Office of Executive
19 Clemency as restoring civil rights in the State of
20 Florida. These individuals do not need to make
21 application with the Office of Executive Clemency.
22 "Any individual whose civil rights were
23 restored automatically by statute in the state of
24 conviction, and does not have a written certificate or
25 order, would be required to make application for

Page 103

1 restoration of civil rights in the State of Florida.
2 That's the information that we would have
3 been passing onto individuals who likely fell into that
4 category of the 549 people who returned their VES
5 forms.
6 Q And to the best of your knowledge, that's the
7 policy applied by your office, at least as of
8 September 18th, 2000, the date of the letter?
9 A. It would have likely been the information
10 that we would have passed on to those individuals, yes.
11 Q And when you say passed on to those
12 individuals, would you have applied the policy if one
13 of those individuals came to you and said, I received
14 this letter, but I live -- I came from New York.
15 That's where I had my felony conviction. My rights
16 have automatically been restored. Would someone in
17 your office have said, Okay, that's sufficient, we
18 won't remove you, or would you have said, You have to
19 talk to the Office of Executive Clemency and they have
20 to tell us it's okay?
21 MR. ALLEN: Object to form.
22 MR. TINKLER: Object to form.
23 MR LITTLE: Object to form.
24 MR RESTREPO: Object to form.
25

Page 104

1 BY THE DEPONENT
2 A. Okay. If an individual fell into the
3 category of one of the 549 individuals who returned the
4 VES form and stated on the VES form that they should
5 not have their voting rights removed for whatever
6 reason, we take that information, and we were just the
7 middle man, then supplying it to the Office of
8 Executive Clemency or FDLE.
9 Q Would you say that every ultimate decision on
10 whether or not someone's rights had been restored was
11 made by the Office of Executive Clemency?
12 A That's correct. It was not our place to make
13 that determination.
14 Q Okay. So you did not do any ultimate
15 evaluations of clemency files, be they in state or out
16 of state?
17 A No.
18 Q So your office relied on whatever the Office
19 of Clemency told you regarding restoration for those
20 specific individuals?
21 A That's correct.
22 Q And prior to September 2000, when you
23 received this letter, a copy of this letter -- first of
24 all, I should say, do you recall a copy of that letter
25 being sent to your office? It says it's from --

Case 1:01-cv-01028-SH Document 410 Entered on FLSD Docket 07/02/2002 Page 210 of 280

**Page 105**

1 A Yes
2 Q -- Janet Keels to Ed Kast.
3 That was circulated to your office?
4 A Yes.
5 Q. Do you recall who circulated it to you?
6 A Likely, Ed Kast.
7 Q And do you recall, prior to that date,
8 September 2000, what policy your office was using or
9 was operating under?
10 A Well, again, in terms of policy our office
11 was using, I want to make sure that this is clear,
12 regardless of what policy was in place, we still
13 followed the same procedure of taking the information
14 that the voter gave us on the VES form and supplying it
15 to the Office of Executive Clemency or FDLE, so that
16 the information could be clarified and we could figure
17 out whether or not the person should remain on the
18 rolls or not.
19 Q So prior to September 2000 and after, any
20 decisions on whether someone had clemency restored were
21 made by the Office of Executive Clemency?
22 A Correct. We needed this information because,
23 as supervisors, we needed to be able to answer that
24 question.
25 Q Okay So you needed that information as an

**Page 106**

1 information source for voters, but not to make ultimate
2 determinations --
3 A Correct
4 Q -- on clemency?
5 A. Because it really was not our place to really
6 determine whether someone had their civil rights
7 restored
8 Q And in your capacity as president of the
9 Association of Supervisors, do you know if other
10 counties were using the information the same way? Were
11 they making -- other counties making decisions about
12 clemency or were they all referring voters to the
13 Office of Executive Clemency and letting them decide?
14 A I don't know the answer to that
15 Q Okay. In regards to paragraph 82 of the
16 complaint, in your answer to that paragraph -- and that
17 was the paragraph saying that county supervisors had
18 wrongly purged ex-felons who had their rights restored
19 in states where they committed their felonies
20 A Uh-huh
21 Q And you have denied that allegation
22 Is it possible that you -- that Hillsborough
23 County ultimately removed from the list individuals who
24 had their rights restored in another state because the
25 Office of Executive Clemency told them that that

**Page 107**

1 restoration was not valid?
2 MR ALLEN Objection.
3 BY THE DEPONENT
4 A I can't answer that.
5 Q If the Office of Executive Clemency -- if
6 there were an individual -- let me give you a
7 hypothetical, and if you have any questions about it as
8 we go, let me know.
9 If we had an individual who had a conviction
10 in New York State, and that individual received a
11 letter from you, sent in a VES form. Is that how it
12 would be likely to occur? You'd send them a letter.
13 They'd send in a VES form saying, I have clemency?
14 A Yes.
15 Q You would then take that VES form and forward
16 that to the Office of Executive Clemency; is that
17 correct?
18 A Or FDLE or both.
19 Q To ask them, Do you have any information on
20 clemency for this individual?
21 A Correct.
22 Q And if that individual had automatically
23 received clemency, but did not have any paperwork to
24 show it, the Office of Executive Clemency would make
25 the determination on clemency; is that correct?

**Page 108**

1 A Correct
2 Q So if they sent something back to you saying,
3 no, this person does not have clemency, would you ask
4 them any details about that or about how they arrived
5 at that decision, or would you just say, you know, they
6 told us they don't have clemency, we'll accept that and
7 move forward?
8 MR ALLEN. Objection to form.
9 MR LITTLE Objection to form.
10 BY THE DEPONENT.
11 A. Well, I don't know how much more detail a
12 supervisor could ask. If you go to the Office of
13 Executive Clemency, which, under the state
14 organizational structure, is the office for determining
15 whether or not an individual has had their civil rights
16 restored, and they write back to a supervisor of
17 elections and indicate that John Doe, clearly
18 identified as this individual, has not had their civil
19 rights restored, other than going back and saying, Are
20 you sure --
21 Q Right
22 A -- I'm not so sure what a supervisor can do
23 at that point.
24 Q Okay So you would take what the Office of
25 Executive Clemency told you. And if they say no, they

**Page 109**

1 didn't have their rights restored, that individual
2 would be removed from the voter rolls?
3    A. And if the individual felt that the Office of
4 Executive Clemency was in error, then I would assume
5 that they would be following up with it, hopefully,
6 either on their own or through help of a counsel.
7    Q Do you recall if there is a situation where
8 that arose in Hillsborough County, where you told
9 voters that you were going to remove them because the
10 Office of Executive Clemency said they did not have
11 clemency and the individual said that's not right and
12 I'm going to deal with this?
13    MR. TINKLER Objection to form.
14 BY MS. BORGEN.
15    Q Do you recall situations like that that
16 arose?
17    A I cannot recall a specific example. Perhaps
18 my staff member tomorrow will be able to do so. I can
19 recall a specific example where FDLE had it wrong.
20    Q And what was that case?
21    A Well, here was a very interesting case of
22 Roosevelt Lawrence who had been -- who was an
23 African-American gentleman who had been tagged as an
24 ex-felon for a crime he allegedly committed in 1960.
25 And we really worked to be his advocate because as we

**Page 110**

1 discovered, FDLE had no court records at all, and there
2 was absolutely no record at all of any court
3 proceeding, and ultimately we got that fixed for them.
4 But for 40 years this man had on his record a felony
5 conviction. That he was not even aware of.
6     But we were his advocates. And that's the
7 role that our office played on behalf of all of these
8 people who sent in a form and said, hey, there's an
9 error here. I mean, my role was to try to help keep
10 them on the rolls because I feel very strongly that a
11 person should not be removed from the rolls unless the
12 information is correct.
13     And so, there is an example of what our
14 office did on behalf of one individual where FDLE just
15 had it wrong.
16    Q And FDLE records showed a felony conviction?
17    A And there was no court record, whatsoever, of
18 any felony conviction going back to 1960.
19    Q And did your office then search court records
20 for --
21    A No, we were his --
22    Q What efforts did you take?
23    A -- and Mr. Smith could speak to it tomorrow
24 because we spent a great deal of time on Mr. Lawrence's
25 situation.

**Page 111**

1    Q I'm sorry, which Mr. Smith tomorrow?
2    A. Darrell Smith. Going back and forth with
3 FDLE And they would write back and say, Well, he's on
4 our list as a felon. We'd say, Can we see some
5 documentation? Let's see, where is the court record?
6     I mean, otherwise, the individual is put in a
7 situation of having to advocate for themselves and deal
8 with an agency in Tallahassee, a very difficult
9 situation for a lot of people.
10    Q And you said, ultimately, FDLE was not able
11 to produce copies of any court records?
12    A. That's correct.
13    Q And then did you take that as sufficient --
14 since the FDLE didn't have anything, was that
15 sufficient for you --
16    A Yes.
17    Q -- to not remove him then from the list?
18    A. That's correct.
19    Q And do you know -- this may very well be
20 beyond as far as your office went -- whether the FDLE
21 records still reflect that he has a felony conviction?
22    A I think we cleared it up for him.
23    Q You worked with FDLE then?
24    A. Right.
25    Q It cleared it up, so that if there were

**Page 112**

1 another matching done with the FDLE records, he would
2 not show up again?
3    A I hope not.
4    Q You have a file on him now if he does?
5    A Right. That's right.
6    Q Do you recall any other individuals in a
7 similar situation where they did show up on the FDLE
8 records, but then they told you they did not have a
9 felony conviction?
10    A Well, we know from the statistics that of the
11 549 who returned the VES forms, 238 of those 549 were
12 found to be either non-felons or have their civil
13 rights restored. So 44 percent of the people who
14 returned the VES forms were okay and should not -- you
15 know, they were either non-felons or they had had their
16 rights restored.
17    Q And do you know what the breakdown is between
18 those two categories; how many of them had their rights
19 restored, how many were non-felons?
20    A That, I don't know.
21    Q Do you know if your staff would have that
22 information?
23    A I don't know.
24    Q Would Chuck Smith be the right person to ask
25 about that?

**Page 113**

```
1      A  Darrell Smith.
2      Q  Darrell Smith, okay.
3          In paragraph 85 of the amended complaint,
4  plaintiffs alleged that Defendants Harris and Roberts
5  failed to provide adequate time and resources for
6  county supervisors to verify the list of ineligible
7  voters provided by the state.  We've discussed the
8  verification issue and the time issue.
9          Did the Division of Elections or Secretary of
10 State's office provide your office with any resources
11 to verify the list that they had provided to you in
12 2000?
13     A  What resources would they have provided us?
14 Are you talking about money?
15     Q  Perhaps money, staff time, that someone,
16 perhaps, at Division of Elections would be able to
17 assist you if there were any questions?
18     A  No.  It was a county responsibility to follow
19 up on the list and we utilized county resources to do
20 that.
21     Q  Were you familiar with a tracking system,
22 DBT's Auto Track XP system?
23     A  No, I am not familiar with that.
24     Q  Okay.  Is there someone on your staff who
25 would have been dealing most directly with verification
```

**Page 114**

```
1  of the records who might be more familiar with that?
2      A  Darrell Smith.
3      Q  Darrell Smith.
4          In paragraph 86 of the complaint, plaintiffs
5  allege that Defendants' administration of the voter
6  roll purging process -- and we could change that for
7  purposes of your answering the question -- the process
8  of list --
9      A  Central voter file.
10     Q  -- removing voters pursuant to the central
11 voter file had a disproportionate adverse impact on
12 black voters and resulted in a larger percentage of
13 black voters, than white voters, being wrongfully
14 removed from the official list of registered voters.
15         Do you have an opinion on that?
16     A  We probably have a statistic on that, that I
17 just don't have with me right now during this
18 deposition.  But I guess the question would be, of the
19 2,273 individuals who were removed through the central
20 voter file process, how many were African American?
21 And I believe that we will be able to answer that in
22 deposition tomorrow.
23     Q  Okay.
24     A  Now, to the extent that it might be a higher
25 number than is represented in the total population of
```

**Page 115**

```
1  registered voters in Hillsborough County, then I think
2  that, yes, then one would conclude that the removal of
3  ex-felons, who have not had their civil rights
4  restored, from the voter files -- if statistics bear
5  out that a greater proportion of those individuals are
6  African American in relationship to their total
7  proportion of individuals on the voter registration
8  rolls -- then I think that is going to be a conclusion
9  that one can reach, that it does disproportionately
10 affect African Americans.
11     Q  And would Darrell Smith be the one who would
12 have the most information on that?
13     A  He likely -- or Chuck Smith --
14     Q  Either one, okay.
15     A  Both Smiths, I think, would have that
16 information --
17     Q  Okay.
18     A  -- have those statistics.
19     Q  And in your answer to that paragraph,
20 paragraph 86, you had denied that allegation as to
21 Hillsborough County.  Do you know the basis for that
22 denial?
23     A  Again, as I said before, any time it says
24 here that I am without knowledge or that I deny
25 information, that is all attorney language.  That's not
```

**Page 116**

```
1  language that I would have come up with on my own.
2      Q  Okay.  In paragraph 87 of the complaint,
3  plaintiffs have allegations regarding a registered
4  voter in Hillsborough County, Willie Steen, an
5  individual.  And plaintiffs allege that Willie Steen
6  was a properly registered voter living in Hillsborough
7  County since he was honorably discharged from the
8  military in 1993.  He's lived at his current address
9  since December 1999.  On November 7th, 2000, Mr. Steen
10 went to vote for the first time.  When he arrived at
11 his polling place, he was told that he could not vote
12 because he had a felony conviction.  Mr. Steen has
13 never been arrested or convicted of any crime.
14 Mr. Steen was improperly denied the right to vote.
15         In your answer you have responded that you're
16 without knowledge as to what happened.  Do you have
17 knowledge --
18         MR. TINKLER:  Objection to form.
19 BY MS. BORGEN:
20     Q  -- about what happened to Mr. Steen?
21     A  "Willie B. Steen.  This may be an
22 alias/stolen identity problem.  In mid 1997, we
23 received a report from the Clerk of the Circuit Court,
24 Circuit Criminal Division, with a list of recent
25 Hillsborough County felons.  This report indicated that
```

Page 178

```
1            UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF FLORIDA

3           CASE NO.  01-0120-CIV-COLD

4  -----------------------------------------A

5  NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
   COLORED PEOPLE, INC., by its FLORIDA STATE
6  CONFERENCE OF BRANCHES, JIMMIE CANNELL, JULIA
   STOMER, NATALIE CARNEGIE, JOHN L. CHIEVER,
7  JAMES MARSHALL, LILLIE O ODOM, WILLIE STEEN,
   WALLACE MCDONALD, JERMAINE TERRY, LORINE
8  WALDEN, EMERI TIMBERLAKE, VALERIE
   BUFORD-WELLS, MICHELLE FLOYD, CONSUELO MARIA
9  CRAHAM, SHERRI EDWARDS, NANCI WELLS, JOANNA
   CLARK, JANICE KELLS, BLANCHE LOSSOMS, MAVDRICK
10 ROSE, URSULA HARVEY and ADMARINA ISRAEL in
   their own right and as representatives of all
11 similarly situated citizens and residents of
   the State of Florida,
12
13            Plaintiffs,

     vs
14
   KATHERINE HARRIS, Secretary of State of Florida;
15 CLAY ROBERTS, Director of Florida Division of
   Elections, DAVID C. LEANZ, Miami-Dade County
16 Election Supervisor, MIRIAM OLIPHANT, Broward
   County Election Supervisor, JOHN STAFFORD,
17 Duval County Election Supervisor; PAM IORIO,
   Hillsborough County Election Supervisor,
18 WILLIAM COWLES, Orange County Election
   Supervisor; and DEANIE LOWE, Volusia County
19 Election Supervisor (all in their official
   capacities), and CHOICEPOINT, INC., a Georgia
20 corporation a/b/a DATABASE TECHNOLOGIES, INC.,

21            Defendants.

22 -----------------------------------------A

23
   DEPOSITION OF:        PAM IORIO
24
                      VOLUME  II
25

26
```

Page 179

```
1            UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF FLORIDA

3           CASE NO  01-0120-CIV-COLD

4  NATIONAL ASSOCIATION FOR THE
   ADVANCEMENT OF COLORED PEOPLE
5  INC., et al.,

6           Plaintiffs,

7           vs.

8  KATHERINE HARRIS, Secretary of State of
9  Florida, et al,

10          Defendants

11 _____/

12

13
   DEPOSITION OF        PAM IORIO
14
   DATE               Monday, May 6, 2002
15
   TIME               1:09 p.m. - 5:09 p.m
16
   LOCATION           Hillsborough County Attorney's Ofc
17                     601 East Kennedy Boulevard
                       27th Floor Conference Room
18                     Tampa, Florida 33602

19 REPORTED BY        JUANITA BUTLER
                       Stenographic Reporter
20                     and Notary Public -
                       State of Florida at Large
21

22

23                     VOLUME  II

24

25
```

Page 180

```
1  APPEARANCES

2
   LORI OUTZS BORGEN, ESQUIRE
3  CARA J. FINEMAN, ESQUIRE
   Lawyers Committee for Civil Rights Under Law
4  1401 New York Avenue, N W., Suite 400
   Washington, D.C. 20005-2124
5
   Attorneys for Plaintiffs
6
   H. RAY ALLEN, II, ESQUIRE
7  ELIZABETH A TINKLER, ESQUIRE
   REBECCA M KERT, ESQUIRE
8  Hillsborough County Attorney's Office
   601 East Kennedy Boulevard, 27th Floor
9  Tampa, Florida 33602
   813.272.5670
10
   Attorneys for Hillsborough County
11 Supervisor of Elections Pam Iorio

12 DOUGLAS B. MAC INNES, ESQUIRE
   Office of the Attorney General
13 PL-01, The Capitol
   Tallahassee, Florida 32395-1050
14 850.414.3662

15 Attorney for Fred Dickinson, Executive Director
   Florida Department of Highway Safety and
16 Motor Vehicles and
   Kathleen Kearney, Secretary of the Florida
17 Department of Children & Families

18 JOHN W. LITTLE, III, ESQUIRE
   Steel Hector & Davis, LLP
19 1900 Phillips Point West
   777 South Flagler Drive
20 West Palm Beach, Florida 33401-6198
   561 650 7200
21       - and -
22 WALTER JAMES HARVEY, ESQUIRE (via Conference Call)
   Steel Hector & Davis, LLP
23 200 South Biscayne Boulevard, 41st Floor
   Miami, Florida 33131-2398
24 305.577.2834
25 Attorneys for Katherine Harris, Secretary of
   State of Florida, and Clay Roberts,
   Director of the Florida Division of Elections
```

Page 181

```
1  DANIEL A RESTREPO, ESQUIRE

2  Williams & Connolly, LLP
3  725 12th Street, N W
   Washington, D C  20005
4  202 434 5000

5  Attorney for ChoicePoint, Inc
   d/b/a Database Technologies, Inc.
6
7  WILLIAM J BOSCH, ESQUIRE (via Conference Call)
   Volusia County Attorney's Office
8  123 W Indiana Avenue
   DeLand, Florida 32720-4613
9  386 736 5950

10 Attorney for Volusia County
   Supervisor of Elections Deanie Lowe
11
12 JEFFREY P EHRLICH, ESQUIRE (via Conference Call)
        - and -
13 SUSAN TORRES, ESQUIRE (via Conference Call)
   Dade County Attorney's Office
14 Metro Dade Center
   111 NW 1st Street, Suite 2810
15 Miami, Florida 33128
   305 375 5151
16
   Attorneys for Miami-Dade County
17 Supervisor of Elections David Leahy

18

19

20

21

22

23

24

25
```

Jun-28-02 08:03pm From-L C F C R L +2027830823 T-651 P.26/35 F-431
Case 1:01-cv-00120-ASG Document 410 Entered on FLSD Docket 07/02/2003 Page 214 of 280

NAACP vs HARRIS, ROBERT, et al PAM IORIO - 5/6/02

Page 182

I N D E X

2 VOLUME I PAGE
3 Direct Examination by Ms. Borgen ..... 9
4 Stipulation ..... 174
5 Certificate of Reporter ..... 175
6 Signature Page ..... 176
7 Errata Sheet ..... 177
8
9
10 I N D E X
11 VOLUME II PAGE
12 Direct Examination (con't) by Ms. Borgen ..... 185
13 Cross-Examination by Mr. Restrepo ..... 355
14 Cross-Examination by Mr. Little ..... 367
15 Redirect Examination by Ms. Borgen ..... 373
16 Recross-Examination by Mr. Little ..... 376
17 Stipulation ..... 378
18 Certificate of Reporter ..... 380
19 Signature Page ..... 381
20 Errata Sheet ..... 382
21
22
23
24
25
26

Page 184

E X H I B I T S
(continued)

PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION

DESCRIPTION PAGE
5 P - Documents Relating to Plaintiff Randy Wells ..... 164
6 Q - Phone Bank Precincts, November 7, 2000 ..... 196
7 R - Documents Relating to Plaintiff Roderick Rose ..... 212
8 S - Document Entitled Black Cat ..... 223
9 T - Expert Witness Summary of Supervisor of
10 Elections Pam Iorio ..... 222
11 U - Defendant Iorio's Objections and Responses
12 To Plaintiffs' First Set of Document
Requests and Interrogatories ..... 330
13 V - Defendant Iorio's Objections and Responses
14 To Plaintiffs' Second Set of Document
Requests and Interrogatories ..... 330
15 W - Transcript of Hillsborough County NAACP
16 Public Hearing on Election Irregularities ..... 336
17
18 DEFENDANTS' EXHIBITS MARKED FOR IDENTIFICATION
19 1 - Division of Elections Memorandum to Supervisors
of Elections and Staff from Ducky McDermott,
20 Dated June 30, 2000, Regarding Central Voter
File Verification Process ..... 370
21
22
23
24
25
26

Page 183

E X H I B I T S

PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION

DESCRIPTION PAGE
A - Plaintiffs' Notice of Deposition (Hillsborough County) ..... 9
B - Plaintiffs' Notice of Rule 30(b)(6) Deposition
(Hillsborough County) ..... 10
C - Plaintiffs' Second Amended Complaint ..... 23
D - Answer and Affirmative Defenses to Second
Amended Complaint of Defendant Pam Iorio,
Supervisor of Elections of Hillsborough County ..... 23
E - Processing CVF Felon Registrations ..... 44, 362
F - FSASE Central Voter File Committee Memorandum to
All Supervisors of Elections Dated May 8, 2000,
Subject, Recommended Procedures ..... 52, 369
G - Letter to Ed Kast from Janet Keels Dated
September 18, 2000 ..... 97
H - Letter to Janet Keels from Emmett Mitchell, IV
Dated August 10, 2000 ..... 97
I - Letter to Ed Kast from Janet Keels Dated
February 23, 2001 ..... 98
J - Documents Relating to Plaintiff Willie Steen ..... 118, 356
K - Documents Relating to Plaintiff Wallace McDonald ..... 126, 356
L - Documents Regarding Voter Roosevelt Lawrence ..... 139, 356
M - Documents Relating to Plaintiff Jermaine Ivery ..... 152, 358
N - (No Document Identified or Marked) ..... 164
O - Documents Relating to Plaintiff Sherry Lazarus ..... 164

Page 185

1 The deposition, upon oral examination, of
2 PAM IORIO, taken on Monday, May 6, 2002, at Hillsborough
3 County Attorney's Office, 601 East Kennedy Boulevard,
4 27th Floor, Tampa, Florida 33602, continued at
5 1:09 p.m., before Juanita Butler, Notary Public in and
6 for the State of Florida at Large.
7
8 PAM IORIO,
9 being previously duly sworn to testify the truth, the
10 whole truth and nothing but the truth, was examined and
11 testified as follows:
12
13 DIRECT EXAMINATION
(continued)
14 BY MS. BORGEN:
15 Q. I'm going to turn back to the second amended
16 complaint and ask you a couple more questions about
17 that complaint.
18 In paragraph 110 of the complaint, plaintiffs
19 allege that many of the telephone lines were busy for
20 long periods of time on election day and were still
21 busy as of 7 p.m., the poll closing time.
22 Now, your answer to the complaint, you denied
23 this allegation as to Hillsborough County. Do you
24 continue to deny that allegation today?
25 A. I cannot speak to the first thing where you

**Page 186**

1 said I denied it, whether that was just a basic
2 response that we gave to everything without getting
3 into any specificity. But we had busy phone lines all
4 day. And undoubtedly, we had them also after 7 p.m.
5 also.
6    Q  And have you done, you or anyone else in your
7 office, done any kind of assessment of the phone lines
8 since the November 7th, 2000 election?
9    A  What do you mean by that?
10    Q  Have you done an analysis of the number of
11 complaints received about the phone lines, we'll start
12 there, perhaps from individual voters?
13    A  I don't know what kind of analysis. In terms
14 of quantitative, more anecdotal.
15    Q  What about reviewing any complaints from poll
16 workers? Am I correct that after each election, you
17 ask the poll workers to complete a form and talk about
18 problems that they may have had at the precinct?
19    A  Yes.
20    Q  And does every poll worker complete that
21 or --
22    A  The clerk --
23    Q  For each --
24    A  -- of each precinct does.
25    Q  So, ideally, you have one of those forms from

**Page 187**

1 each precinct?
2    A  Correct.
3    Q  And have you reviewed those forms?
4    A  My staff has
5    Q  And do you know if there are many problems
6 identified in those forms with the phone lines?
7    A  I can't speak to that. Darrell Smith should
8 be able to tomorrow.
9    Q  Do you have any sense of the types of
10 problems people said they had with the phone lines
11 during the November 7th, 2000 election?
12    A  Difficult to get through, high volume.
13    Q  Always busy?
14    A  High volume.
15    Q  How many individuals did you have staffing
16 the phone lines for Hillsborough County.
17    A  I believe we had 50 of our 50-person phone
18 bank. Again, Darrell Smith, who is over that, could
19 talk with greater specificity whether we had 48 people
20 or 50. But we have a 50-person phone bank, each person
21 with their own computer and phone line.
22       We know that in every general election the
23 phone lines get overloaded. And so, knowing that we
24 would have a very large turnout November 7th, 2000, we
25 did a couple of things in advance.

**Page 188**

1       One, Chuck Smith of my staff, and he can
2 speak to this in deposition tomorrow, rewrote the
3 program for looking up individuals and considerably
4 shortened the time that a phone bank member would have
5 to look up each inquiry. And what he did, I think --
6 it's hard to say, quantitively, whether or not it saved
7 30 percent or 20 percent or 15 percent on every phone
8 call, but I think it saved considerably on every phone
9 call, making it much easier for the phone bank operator
10 to get to the crux of the issue and ascertain whether
11 or not the person is eligible to vote, or where they
12 need to go, and then get them off the line as quickly
13 as possible
14       Additionally, we tried, as a pilot program,
15 we chose ten precincts that had the largest number of
16 registered voters, and/or the largest number of
17 affirmations in past elections and we supplied them, as
18 part of a pilot program, a laptop computer and an
19 individual at that precinct to work that laptop
20 computer, so that we could take the ten heaviest
21 precincts off of the phone lines  And in doing so,
22 making it easier for the other 309 precincts to get
23 through
24       Based on the experience after November 7th,
25 2000, and realizing that in spite of those efforts to

**Page 189**

1 have, what I think is probably one of the very best
2 phone banks in the state, in terms of just our training
3 and our hardware and our software, clearly, we're going
4 to have to do more to help with this problem
5       And in the 2002 election, we are designating
6 75 precincts that will have their own laptop computer
7 operators  And we will make sure that those top 75
8 precincts will be taken out of the phone bank line and
9 I think that that should help.
10       I think it's also going to help that we are
11 doing a mailing of the voter I D cards, a mass
12 mailing, because that helps clear up problems. Along
13 with that mailing, when you send out information about
14 the need to change your address
15       Of course, we won't have that same kind of
16 turnout in November of 2002 as we in November of 2004
17 (sic), but communications on election day I think is a
18 chronic problem across the nation, particularly at any
19 large urban county  Although, I can tell you, that
20 even talking to supervisors from some of the small
21 counties, that their phone lines get overwhelmed even
22 in a small rural county.
23    Q  Let's go back to that point then and start
24 there
25       In 1996, for the general election, did you

Jun-28-02 08:04pm From-L C F C R L +2027830823 T-651 P.28/35 F-481

NAACP vs HARRIS, ROBER , et al
Case 1:01-cv-00120-ASG Document 410 Entered on FLSD Docket 07/02/2002 Page 216 of 280
PAM/URIO, VOL II. 3.3/2

Page 190

1 have difficulties with communications with the phone
2 bank?
3      A  Every general election since I have been a
4 supervisor, there is always difficulty, during peak
5 times, with communications between the phone bank, or
6 whatever system of communications you have set up, and
7 your precincts
8      Q  What changes did you make between 1996 and
9 2000 to try to address some of those communications
10 problems?
11         MR. ALLEN  Objection to the form of the
12         question
13 BY THE DEPONENT.
14      A  What I just spoke to, without being too
15 repetitive. One, we made the software changes  Two,
16 we really worked on the training of our phone bank
17 operators, because it's really the quality of a lot of
18 these operators and the quality of the training that
19 they're receiving, so they can quickly get to the crux
20 of the issue and resolve it, and how much time they
21 spend with each person on the other end  And,
22 additionally, our pilot program with the laptops, to
23 see how that would work, to see if that was a viable
24 thing to use in the future.
25      Q  How did the training for the phone bank

Page 191

1 operators change between 1996 and 2000?
2      A  I think Darrell Smith could speak to that
3 with greater specificity.
4      Q  And you indicated you had a pilot program
5 with the computers. November 7, 2000, is that the
6 first time you used computers in the precincts?
7         MR. ALLEN. Objection to the form.
8         MR. TINKLER  Objection to form.
9 BY THE DEPONENT
10      A  Correct.
11      Q  They were not used in any primary election or
12 any election prior to that time?
13      A  Not to my knowledge. I believe we used them
14 for the first time in November.
15      Q  And how did you choose -- exactly did you
16 choose the ten precincts where those computers would be
17 placed?
18      A  Well, we started with the premise that you
19 wanted to do two things. You wanted to -- well, just
20 basic thought. Every time you could take a large
21 precinct off the phone bank lines, then you were
22 freeing up the lines for the other precincts.
23      So if you take a precinct that was extremely
24 large or had a lot of affirmations -- a history of a
25 lot of affirmations, then if you take them out of the

Page 192

1 cube, it's freeing it up for others.
2      And so we chose 10 precincts that either --
3 for example, we chose precinct 341, who had a lot
4 apartments and the most affirmations during the
5 presidential preference primary.  We had one precinct,
6 361, with 4,493 voters, extremely large, large and
7 growing.  Another precinct of 4,606 voters, another
8 with 4,448, 4,129, 3,687, 3,981, and so forth.
9      So the two that were the lowest number -- or
10 the three that had the lowest (sic) number of
11 registered voters, had apartments and a lot of
12 affirmations  One in an area that's somewhat called --
13 nicknamed Suitcase City because it's very transient,
14 had 2,642 voters, and, 2,242, and 1,196, but it was
15 known as a fairly transient area.
16      And so we select them based on that, that
17 you're looking for these large precincts, large number
18 of voters, very transient, large number of
19 affirmations, large number of calls to the phone bank.
20      Q  So are they the ten largest precincts?
21      A  I cannot say that they are the ten largest.
22 I think that the criteria would have been a combination
23 of large precincts and tendency towards a large number
24 of affirmations.
25      Q  So would it be accurate to say that --

Page 193

1      A  If you're getting up to 4,000, those are our
2 largest, when you have over 4,000.
3      Q  Are they the ten precincts that have the
4 largest number of affirmations in a particular
5 election?
6      A  I believe that our criteria was that we
7 looked at those too.  You're looking at a large
8 population and a large number of affirmations.
9      If you're looking at the ones that only had
10 2000 registered voters, 2200, they were transient
11 areas, a lot of apartments, a lot of affirmations.
12      Q  So it's a combination of these factors --
13      A  Correct.
14      Q  -- not a particular one factor and doing the
15 top ten within that?
16      A  Yes.
17      Q  And who made the decision on which precincts
18 were to be -- where the laptops would be placed?
19      A  It was a staff decision, that they analyzed
20 it and --
21      Q  Do you know who was involved in that decision
22 on your staff?
23      A  Darrell Smith and Chuck Smith, who will be
24 giving the depositions tomorrow.
25      Q  And do you know who identified the factors to

BAY AREA REPORTING SERVICE, INC. 813.229.7207          Page 190 - Page 19.

JUN 28 2002 20:40                    +2027830823          PAGE.28

Page 194

1 consider in choosing where to place the laptops?

2 A We discussed it in staff meetings, that it

3 would make sense that you take the highest users off of

4 the system.

5 Q. And do you recall being part of those

6 discussions?

7 A. I likely was. I've been in all staff

8 meetings and this was likely one of the subjects that

9 came up. And I concurred with their reasoning that you

10 take the highest users off the system.

11 Q. Was there any analysis of the precincts with

12 the largest number of newly registered voters?

13 A. I don't know if that was a criteria or not.

14 And, of course, a new registered voter isn't likely to

15 be your affirmation. That person is not likely to be

16 the problem.

17 Q Was there any analysis of mobility rates in

18 the different precincts?

19 A Well, inasmuch as a number of affirmations

20 leads to high mobility rate, then I would think that

21 that would have been a factor. For example, Suitcase

22 City, those precincts in that area were chosen because

23 there are a lot of apartments there and a lot of

24 transitions there in terms of living.

25 Q So it would suggest to you, if there's a

Page 195

1 precinct with a lot of affirmations, there's probably a

2 higher mobility rate in that precinct?

3 A. Yes.

4 Q Do you know if any of the precincts with

5 laptops had majority minority of registered voters in

6 the precinct?

7 A Majority minority?

8 Q Either a predominantly black precinct, or a

9 predominantly Hispanic, or a combination?

10 A We did not take race into consideration when

11 we came up with this pilot program. Race first became

12 an issue when a New York Times reporter inquired and

13 considered it to be an issue and questioned me about

14 it.

15 Of the precincts that we chose, precinct 559

16 is 47.6 percent African American, and precinct 563 is

17 31 percent African American. But otherwise, the other

18 precincts did not have large African-American

19 populations. And as I mentioned, that was not a

20 criteria for selection.

21 Q And were you looking at some numbers on the

22 sheet you have there to answer that question?

23 A Yes. This is information, I believe, that's

24 been supplied to the plaintiffs. It's phone bank

25 precincts, November 7th, 2000, the ones that we chose.

Page 196

1 Q Am I correct that there are handwritten

2 numbers at the bottom of that?

3 A Correct.

4 Q Do you know who wrote those numbers?

5 A Darrell Smith.

6 MS. BORGEN. I'd like to go ahead and mark

7 that as Exhibit Q.

8 (Plaintiffs' Exhibit M was marked for

9 identification.)

10 BY MS. BORGEN.

11 Q Have you decided which 75 precincts will have

12 computers in the November 2002 election?

13 A Well, we have not decided with any degree of

14 specificity. But I can say from a general standpoint,

15 any precinct in Hillsborough County that has a sizable

16 African-American population will be included I will

17 make sure that all African-American populated precincts

18 have that. We have 26 of our 319 precincts have

19 50 percent or more black voters and I will likely cover

20 even more than that in terms of going down in

21 percentage.

22 One, because since November 7th, 2000, some

23 of the -- a couple of factors. One has been the

24 indication, even from some of your expert testimony,

25 although I don't agree with it all, but the study of

Page 197

1 affirmations and showing this high correlation between

2 high number of affirmations in many black precincts,

3 which might indicate a more transitory population, in

4 given that, we want to make sure that we take all those

5 precincts off-line, in terms of having to call the

6 phone bank, and they will all receive laptop computers.

7 I hate to say that the felon issue could in

8 any way be helped by a laptop. I think it's a wrong

9 impression to give to say that the felon issue is

10 helped in any way by the presence of a laptop computer

11 at a precinct. It is not.

12 A laptop computer may be able to say to an

13 individual, you have been taken off the rolls because

14 of your felon status, but all that does is point to the

15 need for a phone call. And there's not a person that

16 is going stop at that level and say, thank you for that

17 information, and walk away. That's not the way the

18 process works.

19 So whether or not you have a laptop computer

20 in a precinct, is not going to address the felon issue.

21 I do think it can help address the issue, though, of

22 areas of town that have a high transitory population.

23 And based on the experience of November 7th, 2000, and

24 the aftermath of that, and the analysis that has

25 appeared to come forth that we were not privy to prior

Page 198

1 to this that apparently there are areas that have this
2 high transitory population that needs to be addressed.
3 I'm willing to make sure that all precincts that have
4 any sizable African-American population, does have a
5 laptop computer.
6    Q. Are you doing similar analyses to see if
7 there are other populations, perhaps a Latino community
8 or Asian Pacific community, or other communities that
9 might have similar transitory --
10    A. We will certainly look at that. It is much
11 more difficult for us to track that in terms of looking
12 at those statistics, because on the voter registration
13 rolls, the number of Hispanic voters is so terribly
14 understated. And so you can really -- it's tough to
15 look at that. You can look at census data and try to
16 overlay that with your precinct data, but it's not as
17 exact or precise as it is in looking at the
18 African-American population.
19    Q. Did you consider placing laptops in every
20 precinct?
21    A. No, and I think that -- and I realize that in
22 your lawsuit that's one thing that is asked for. And I
23 really think that your organization, or whoever, the
24 individuals that you're representing needs to take a
25 step back and think a little bit about the

Page 199

1 administration of this
2    First of all, any supervisor can say, I'm
3 going put a laptop in every precinct, that doesn't mean
4 there's going to be someone to man it. So that's the
5 first thing
6    The second, so what you need is not only an
7 individual at a laptop that contains the voter record,
8 but you need someone qualified to run it. So in our
9 county with 350 precincts, you need 350 qualified
10 people Now, Miami-Dade, you might be asking him to go
11 out -- if he ends up with 800 precincts for this fall,
12 to have 800 people, one at every precinct who is going
13 to operate this laptop computer and be able to bring up
14 the files.
15    Simply because someone has a laptop doesn't
16 mean that they've resolved an issue I can tell you
17 that when you have a database -- and we have 516,000
18 registered voters, and then you have a large number of
19 inactive voters, and then you have a large number of
20 names that are deleted. I mean, we have a database of
21 well over a million names.
22    Even our permanent staff can have difficulty
23 connecting with the right person, McDonald, M-c-d --
24 hyphenated names And Darrell Smith and Chuck Smith
25 tomorrow could give you many examples of how difficult

Page 200

1 it is to look up a name.
2    Further, simply because you've looked up a
3 name and ascertained a situation, doesn't mean that the
4 person at the polls is in any position to make a
5 determination as to what to do with the person. That's
6 why we like to centralize this approach to a phone bank
7 where we have supervisors who are trained and capable
8 of offering direction.
9    It is not enough simply to look up a name and
10 say, oh, this is what your record says. Sometimes it
11 takes someone of a supervisory nature to say, Based on
12 this and based on our knowledge of office procedures,
13 and as I've put some things in evidence to show you
14 those -- something that looks like this, you need
15 someone of a supervisory nature who can say, I can get
16 on the computer and see that this person's record dates
17 back from 1993 and this is what happened, they were
18 sent this, then this is what happened, and this is part
19 of the law. That takes a supervisor who can do that.
20    Q. Let me interrupt you a moment. You're
21 referring to exhibit -- which exhibit?
22    A. Well, I was using that as an example. I just
23 pulled one --
24    Q. Exhibit P, one of the voter histories?
25    A. That's right.

Page 201

1    Q. Okay.
2    A. To say that having an individual, a poll
3 worker, at a polling site with a laptop computer to
4 bring up Ms. Well's situation and start going back to
5 19 -- and knowing what was sent to her, and what it
6 meant, and whether or not -- what part of the law it
7 complied with, and what the analysis is, it's not going
8 to work.
9    You're going to end up still having to
10 have -- if a person rises to the level where their
11 qualifications to vote are in question, that is a call
12 to a phone bank, where, at some central location,
13 somebody is making a determination that has far
14 reaching ramifications.
15    And so, I just point this out because I note
16 in the settlement agreements where these laptops seem
17 to be part of it. And I can tell you that is just, in
18 my view, a superficial approach to how to resolve some
19 of the problems that have come up from the 2000
20 election.
21    Every supervisor has to make a determination
22 as to how you best handle things in your own county,
23 how you best administer them. And simply throwing
24 laptop computers out at precincts, does not resolve the
25 issue.

## Page 202

1 Now, targeting laptop computers in certain
2 precincts with well-trained individuals and still
3 having a central phone bank with well-trained
4 individuals and supervisors is a good approach, but
5 that may differ from some colleagues in other countries
6 who prefer another approach.
7 Q The laptops that will be available in
8 Hillsborough County, will those have the complete voter
9 database?
10 A Yes.
11 Q So if someone looked up, for example, Kandy
12 Wells, they would get that complete voter history?
13 Would they get the whole history or just the last
14 entry?
15 MR. TINKLER. Objection to form.
16 BY THE DEPONENT
17 A I'm not sure of the answer to that. I mean,
18 I would think that it would be the entire database.
19 But, again, Chuck and Darrell Smith would be able to
20 answer that with greater specificity.
21 Q And given that, in your opinion, putting
22 laptops in the precincts only partially addresses the
23 problem, do you have any changes planned for the phone
24 bank for the November 2002 election?
25 A I think that if we are able to take 75

## Page 203

1 precincts off of the line, of most of the calls --
2 again, it won't resolve all the calls -- and depending
3 on what happens with this felon issue, again, going
4 back to that whole discussion I had earlier this
5 morning about 493 and whether the onus is going to be
6 on the voter or on the supervisor to prove their guilt,
7 it really depends on how many people are going to be
8 taken off with that. It could be that we either have a
9 repeat of the 2000 election or we have a situation in
10 2002 where very few people are taken off the central
11 voter file.
12 So if you have a situation where very few
13 people are taken off the central voter file due to
14 their probable ex-felon status; and, of course, you're
15 going to have a much lower turnout in 2002 than you had
16 in 2000, simply because of a gubernatorial versus a
17 presidential year, and you've been able to beef up your
18 number of laptops; and you've targeted specific
19 precincts where there were specific problems, either in
20 2002 or perhaps in historical data that you now have
21 that you weren't privy to before, I think we're going
22 to have very good situation in terms of communication
23 on election day.
24 Q Do you plan to have the same number of phone
25 lines available at the phone bank --

## Page 204

1 A Yes.
2 Q -- in November 2002?
3 A Yes.
4 Q So somewhere -- approximately 50?
5 A Correct. Now we also have all of our phone
6 lines downtown, but that's for voters to get through.
7 We have a segregated approach between clerks and phone
8 bank and voters. Although some clerks are able to get
9 through to supervisors here downtown if they have a
10 heavy duty problem at the polls.
11 Q But the way it's set up is that the precincts
12 will call the phone bank?
13 A Correct.
14 Q And individual voters with problems will not
15 call the phone bank?
16 A That's right. They don't even know about the
17 phone bank. They call downtown.
18 Q They call down to your office?
19 A To another bank of phones that we have.
20 Q And you set up additional phone lines
21 surrounding the election to assist with those calls?
22 A Yes We have a -- and I can't speak to how
23 many we have, but we have a number of phone lines set
24 up and the Smiths could talk about that.
25 Q Turn to paragraph 116 of the complaint. In

## Page 205

1 that paragraph, plaintiffs have allegations regarding
2 Plaintiff Rondrick Rose. And in your answer you state
3 that you are without knowledge as to Mr. Rose.
4 Do you have knowledge today about the facts
5 surrounding Mr. Rose?
6 A Yes. I have -- this would probably be
7 Exhibit R, right?
8 "Mr. Rose initially registered to vote on
9 April 5th, '95." I'll just read the whole thing. I'm
10 not sure it's all relevant.
11 "Prior to the '98 general election he was
12 sent a sample ballot. It was returned as
13 undeliverable. After not responding to our address
14 confirmation final notice sent on 12/28/98, he was
15 placed on inactive status "
16 Being placed on inactive status has no affect
17 on the person's voting privileges, but does identify a
18 person who hasn't responded to an address change notice
19 or who hasn't voted for a prescribed period of time.
20 "A check with the Hillsborough driver's
21 license office indicates that Mr. Rose went to the DLO
22 at Bay Plaza Branch in Brandon on 1/31/2000 to be
23 issued a duplicate license. Our check of the
24 transmittal shows that we did not receive a voter
25 registration application from that office."

Jun-28-02 08:06pm From-L C F C R L +2027830823 T-551 P 32/35 F-441
Case 1:01-cv-00120-ASG Document 410 Entered on FLSD Docket 07/02/2002 Page 220 of 280
NAACP vs HARRIS, ROBERT, et al FAM IORIO VOL 2

Page 206

1 He was already registered to vote. We didn't
2 need to receive anything from him. He was inactive,
3 but that's okay.
4 "He went to his new address precinct --" so
5 apparently he moved and he went ahead and went to his
6 new precinct 869 to vote, but his name was not on the
7 precinct register. His name was on the precinct
8 register at his other precinct where he was registered
9 "He completed an affirmation at 869, which is
10 what you're supposed to do. He was waiting for
11 verification to vote. And although procedures were in
12 place to verify his voting eligibility for precinct
13 869, the precinct was unable to get through to the
14 clerk's phone bank during peak hours, so he was unable
15 to vote."
16 Now, this is a situation where -- and I'm
17 going beyond the question that you're asking about
18 Rondrick Rose. This is a situation where the new
19 provisional ballot that the legislature passed in 2001
20 would have taken care of this situation. He would have
21 been able to vote.
22 He went to his correct precinct. It was a
23 new address. He was not in the precinct register
24 because he was in the precinct register at his old
25 address. But he did the right thing by going to his

Page 207

1 new precinct. That's better than going to the old, I
2 suppose.
3 And then, he had an affirmation filled out on
4 him, but he couldn't get through -- the clerk could not
5 get through to the phone bank, so he ended up not
6 voting. Now, under the new law, can't get through to
7 the phone bank, hand the voter a provisional ballot,
8 his vote would have counted. He was in the correct
9 precinct, he was an eligible voter. The canvassing
10 board would have looked at that after the election and
11 he would be allowed to vote. So here's an example
12 where the Election Reform Act of 2001 would have
13 resolved this particular situation.
14 Q Would you agree that for November 7, 2000, he
15 was denied his right to vote?
16 MR LITTLE: Objection to form.
17 MR ALLEN: Objection to the form.
18 BY THE DEPONENT:
19 A Well, let me answer this way, on November
20 7th, 2000, this is a case of an individual who was
21 unable to vote because he changed his address and chose
22 election day to change his address and could not get
23 through to the phone bank. Now, the area of the
24 lawsuit that I take issue with is apparently -- is
25 Mr. Rose African American?

Page 208

1 Q Yes, he is.
2 A -- is the insinuation that this was
3 discriminatory. And that, I must disagree with quite
4 strongly. If there was any African-American voter who
5 was unable -- or a clerk at any precinct who was unable
6 to get through to the phone bank on behalf an
7 African-American voter, they were unable to get through
8 to the phone bank on behalf of a white voter, or
9 Hispanic voter, or any other voter. I mean, the phone
10 bank did not discriminate in terms of being a busy
11 phone line.
12 And so, that is the part of the lawsuit that
13 I must vehemently disagree with, that there was any
14 discrimination intentional or unintentional.
15 Q Are you familiar with the concept of
16 disparate impact from your historical studies that you
17 testified about earlier?
18 A I would hate to say that I am and then I'll
19 have to explain it.
20 Q We won't ask you any further questions on
21 that.
22 Regarding Mr. Rose, when you were reading
23 this summary -- was this a summary prepared by your
24 office?
25 A Yes.

Page 209

1 Q It shows that he had requested a duplicate
2 driver's license on January 31, 2000; is that correct?
3 A Right
4 Q Now, is it possible that he tried to update
5 his address with the Department of Motor Vehicles at
6 that time?
7 MR LITTLE: Objection to form.
8 BY THE DEPONENT:
9 A That would be speculation on my part I
10 don't know
11 Q If he had updated his address with the
12 Department of Motor Vehicles at that time, would he
13 then -- do you believe he would have then appeared on
14 the precinct register for his new precinct?
15 MR ALLEN: Objection to form
16 MR TINKLER: Objection to form
17 MR RESTREPO: Objection to form
18 MR LITTLE: Objection to form
19 BY THE DEPONENT:
20 A You have to update your address for voter
21 registration purposes. He'd have to say, I want to
22 update my address for voter registration purposes and
23 we would have gotten the change of address from him and
24 we would have made the change
25 Q If someone updates their address at the

### CERTIFICATE OF REPORTER

1

STATE OF FLORIDA
2    COUNTY OF HILLSBOROUGH

3

           I, the undersigned authority, certify that
4    **PAM IORIO** personally appeared before me and was duly
     sworn.
5

           Witness my hand and official seal this 9th day
6    of May, 2002.

7

8



9                              Juanita Butler, Court Reporter
10                             Notary Public, State of Florida
                               Commission No. CC 897395
11                             Expires:  December 21, 2003

12

STATE OF FLORIDA
13   COUNTY OF HILLSBOROUGH

14

           I, JUANITA BUTLER, Court Reporter, certify that
15   I was authorized to and did stenographically report the
     foregoing deposition; and that the transcript is a true
16   record of the testimony given by the witness.

17         I FURTHER CERTIFY that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor
18   am I a relative or employee of the parties' attorneys or
     counsel connected with the action, nor am I financially
19   interested in the action.

20         Dated this 9th day of May, 2002.

21

22



23                             Juanita Butler, Court Reporter
                               Notary Public, State of Florida
24                             Commission No. CC 897395
                               Expires:  December 21, 2003

25



## BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE    •    TAMPA, FLORIDA 33602
401 EAST JACKSON STREET              (813) 229-7207
SUITE 2320                  •    FAX (813) 229-8498

## CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that
**PAM IORIO** personally appeared before me and was duly
sworn.

Witness my hand and official seal this 9th day
of May, 2002.



Juanita Butler, Court Reporter
Notary Public, State of Florida
Commission No. CC 897395
Expires: December 21, 2003

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, JUANITA BUTLER, Court Reporter, certify that
I was authorized to and did stenographically report the
foregoing deposition; and that the transcript is a true
record of the testimony given by the witness.

I FURTHER CERTIFY that I am not a relative,
employee, attorney, or counsel of any of the parties, nor
am I a relative or employee of the parties' attorneys or
counsel connected with the action, nor am I financially
interested in the action.

Dated this 9th day of May, 2002.



Juanita Butler, Court Reporter
Notary Public, State of Florida
Commission No. CC 897395
Expires: December 21, 2003

 **BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE • TAMPA, FLORIDA 33602
401 EAST JACKSON STREET • (813) 229-7207
SUITE 2320 FAX (813) 229-8498

FORM 2

1

2

3  I HAVE READ THE FOREGOING TRANSCRIPTION OF MY

4  DEPOSITION AND EXCEPT FOR ANY CORRECTIONS AND/OR

5  AMENDMENTS APPENDED HERETO, I HEREBY SUBSCRIBE TO THE

6  TRANSCRIPT AS AN ACCURATE RECORD OF THE TESTIMONY GIVEN

7  BY ME.

8

9

10

11  _____
    PAM IORIO

12  My hand and official seal this the _____ day
13  of _____, 2002.

14

15                          _____
                            Notary Public
                            State of              at Large
16                          My Commission Expires:

17

18

19

20

21

22  STYLE:    NAACP, ET AL  vs.  HARRIS, ROBERTS, ET AL
    DEPONENT: PAM IORIO  -  VOLUME II -
23  REPORTER: JUANITA BUTLER         TAKEN: MAY 6, 2002

24

25



# BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE  •  TAMPA FLORIDA 33602
401 EAST JACKSON STREET        (813) 229 7207
SUITE 2320            •      FAX (813) 229-8498

**PLAINTIFFS' EXHIBIT 31**

**Page 1**

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                           MIAMI DIVISION
              CASE NO.: 01-120-CIV-GOLD/SIMONTON


  NATIONAL ASSOCIATION FOR THE
  ADVANCEMENT OF COLORED PEOPLE, INC. by
  its FLORIDA STATE CONFERENCE OF
  BRANCHES, et al.,

              Plaintiffs,

  VS.

  KATHERINE HARRIS, Secretary of State
  of Florida, et al.,

              Defendants.

  _____/


                    80 Southwest 8 Street
                    Miami, Florida
                    May 23, 2002
                    Thursday, Noon


            30(B)(6) DEPOSITION OF ADORA OBI NWIZE
```

**Page 2**

APPEARANCES:

LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
BY: LORI OUTIS BORGEN, ESQ.
On behalf of the Plaintiff.

NAACP LEGAL DEPARTMENT
BY: ANGELA CICCOLO, ESQ.
On behalf of the Plaintiff.

STEEL HECTOR & DAVIS, LLP
BY: JOHN W. LITTLE, III, ESQ.
On behalf of Katherine Harris.

MIAMI-DADE COUNTY ATTORNEY
BY: JEFFREY EHRLICH, ESQ. And
SUSAN TORRES, ESQ.
On behalf of Supervisor Leahy.

WILLIAMS & CONNOLLY, LLP
BY: DANIEL RESTREPO, ESQ.
On behalf of Choicepoint/DBT

OFFICE OF GENERAL COUNSEL, JACKSONVILLE
BY: TRACY ARPEN, ESQ.
On behalf of Supervisor Stafford.

VOLUSIA COUNTY ATTORNEY
BY: WILLIAM BOSCH, ESQ. (By Phone)
On behalf of Supervisor Lowe.

OFFICE OF THE ATTORNEY GENERAL
BY: GEORGE WAAS, ESQ. (By Phone)
On behalf of Dickinson and Kearney.

JOSIAS, GOREN, CHEROF, DOODY & EZROL, PA
BY: MICHAEL CIRULLO, ESQ. (By Phone)
On behalf of Defendant Cowles)

**Page 3**

HILLSBOROUGH COUNTY ATTORNEY
BY: KENNETH A. TINKLER, ESQ.
On behalf of Supervisor Iorio.

The deposition of ADORA OBI NWIZE taken by the Defendant for the purpose of discovery and for use as evidence in the above-entitled cause, pending in District Court of the Southern District of Florida, before KAY ROSENFELD Shorthand Reporter and Notary Public, State of Florida at Large, at the time and place aforesaid.

DIRECT EXAMINATION
  BY MR. LITTLE...........................4
CROSS EXAMINATION
  BY MS. BORGEN...........................200
REDIRECT EXAMINATION
  BY MR. LITTLE...........................204
DIRECT EXAMINATION
  BY MR. ARPEN............................45
DIRECT EXAMINATION (RESUMED)
  BY MR. LITTLE...........................49
DIRECT EXAMINATION
  BY MR. WAAS.............................81
DIRECT EXAMINATION
  BY MR. EHRLICH..........................115
DIRECT EXAMINATION
  BY MR. TINKLER..........................189
DIRECT EXAMINATION
  BY MR. RESTREPO.........................193

Defendant's Exhibit No. 1.....................8
Defendant's Exhibit No. 3.....................11
Defendant's Exhibit No. 4.....................12

**Page 4**

1  Therefore:
2        ADORA OBI NWIZE
3  was called as a witness and, having been first duly sworn,
4  was examined and testified through the interpreter as
5  follows:
6        DIRECT EXAMINATION
7  BY MR. LITTLE:
8     Q. Good morning. I am John Little. I represent,
9  along with our law firm, Steel Hector & Davis, the
10 Department of State of Florida and the Director of the
11 Division of Elections in the lawsuit styled NAACP versus
12 Harris et al.
13    Would you please state your name and address for
14 the record.
15    A. My name is Adora Obi Nwize. My address is 2545
16 Northeast 214 Street, Miami, Florida 33180.
17    (Discussion off the record.)
18    MR. LITTLE: There has been a request that we
19 state on the record who is on the phone.
20    MS. SCHAEFFER: Constance Schaeffer for the
21 City of Jacksonville sitting in for Tracy Arpen.
22    MR. WAAS: George Waas, Attorney General's
23 office in Tallahassee.
24    MR. BOSCH: Bill Bosch for Deanie Lowe.
25    MR. ECKERT: Daniel Eckert for Deanie Lowe for a

**Page 5**

1  portion of the deposition.
2     MR. CIRULLO: Michael Cirullo for William
3  Cowles.
4     MR. ALLEN: Ray Allen on behalf of Pam Iorio.
5     MS. BORGEN: Can we go around the room for the
6  record and state who is present in the room.
7     MR. RESTREPO: Dan Restrepo.
8     MR. LITTLE: John Little.
9     MR. EHRLICH: Jeff Ehrlich.
10    MR. TINKLER: Ken Tinkler.
11    MS. CICCOLO: Angela Ciccolo.
12    MS. BORGEN: Lori Borgen.
13    THE WITNESS: Adora Obi Nwize, defendant.
14    Q. You gave your address before. What city is
15 that?
16    A. Miami, Florida.
17    Q. Have you ever had your deposition taken before?
18    A. Regarding this case?
19    Q. No, ma'am, for any matter.
20    A. Sometime ago, yes.
21    Q. This is a relatively small room that we are in
22 and I am speaking louder than I normally would if you and
23 I were in this size room but I am doing it for the people
24 on the phone so please don't take the higher volume of my
25 voice as anything other than trying to make sure that the

**Page 6**

1  people on the phone hear us.
2     If you could do the same thing and speak a
3  little louder, it helps those that are on the phone.
4     A. Can you hear me better now?
5     Q. Thank you.
6     MS. BORGEN: To the extent it is comfortable
7  for the witness to do so, certainly she will try to
8  accommodate those on the phone. If it is not comfortable
9  for the witness to speak louder she might not be able to.
10    Q. Sure, that is certainly understood.
11    In the deposition, you know, I will be asking
12 some questions and these other folks that are here in the
13 room will probably have some questions and those on the
14 phone.
15    The court reporter is taking down the questions
16 and your answers. Accordingly, I will try not to start
17 another question until you finish your answer and likewise
18 if you could wait until I finish my question before you
19 start your answer, that helps our court reporter keep an
20 accurate record; okay?
21    A. Okay.
22    Q. And also to help her, any question that I ask, I
23 need to get a verbal response because she has trouble
24 noting the head shakes or the other gestures that normally
25 we use to indicate yes or no. So if you will a verbal

Case 1:01-cv-00120-ASG   Document 410   Entered on FLSD Docket 07/02/2002   Page 226 of
30(b)(6) OF NAACP                    Condensed!t                          MAY 23, 2002
239

Page 7

1  response, that will be helpful.
2      If I ask you a question that you do not
3  understand, please stop and tell me you don't understand
4  the question and I will rephrase; okay?
5      A. Okay.
6      Q. And if you need to take a break at any time,
7  just let us know and we will take a break at the earliest
8  opportunity and do that at your request.
9      A. Okay.
10     Q. It is my understanding that you are appearing here
11 today on behalf of the NAACP through the Florida State
12 Conference of Branches; is that correct?
13     A. That is correct.
14     Q. So that I use the right terminology, is there a
15 distinction between the NAACP, Inc. and the NAACP, Inc.
16 through the Florida State Conference of Branches?
17     A. NAACP incorporated is the national body that
18 encompasses all of the units throughout the country and
19 outside of the United States.
20     Q. And the Florida State Conference of Branches is
21 what?
22     A. It is one of the units
23         (Discussion off the record.)
24     Q. I want to get an understanding of what terms I
25 should use.

Page 8

1         If I use the term NAACP then you will be
2  thinking of the entire organization?
3      A. Right.
4      Q. If I use the term Florida State Conference of
5  Branches, you will be thinking of the Florida unit?
6      A. Exactly right.
7      Q. In that regard, just so I'm clear because I
8  don't really know the organizational structure, is the
9  plaintiff in this lawsuit the Florida unit or the national
10 organization?
11        MS. BORGEN: Objection.
12     Q. If you know.
13     A. I would refer to my lawyer for that.
14        (Thereupon, Defendant's Exhibit No. 1 was marked
15 for identification.)
16     Q. The 30(b)(6) Notice of Deposition for today is
17 already marked as Exhibit number 1 and I would give you an
18 opportunity to look at that document.
19        Have you seen a copy of Exhibit Number 1 before
20 today?
21     A. I believe my lawyers have shown me this.
22     Q. This notice requests the NAACP through the
23 Florida State Conference of Branches, which is the
24 plaintiff designate in the case, shall designate one or
25 more persons to testify on behalf of the subject matters

Page 9

1  that are listed in paragraphs 1 through 9 of that notice.
2         Your lawyer had indicated that she wants to say
3  something as to which topics she would be responding to.
4         MS. BORGEN: I would like to note for the
5  record that the plaintiff received a copy of the 30(b)(6)
6  notice, received a copy of it via mail. I think it was
7  sent to me Monday evening at about 9:45 p.m. We did not
8  actually receive it until Tuesday morning, just two days
9  ago.
10        Plaintiff reserves the right to name additional
11 individuals from the NAACP to respond to this deposition
12 notice.
13        At this point in time Ms. Nwize is prepared to
14 address any of the topics in the notice to the extent she
15 is able. She may not be able to give a complete answer on
16 every part but each topic is something, at least in part,
17 that she can cover in her deposition.
18        MR. LITTLE: Do you know who else you would
19 designate in response to this notice?
20        MS. BORGEN: We do not. At this point in time,
21 having just received it two days ago, we have not had time
22 to review that question and give a complete answer.
23        MR. LITTLE: I would also just note on the
24 several occasions that we have spoken since Monday I was
25 not aware there may be a question about whether there

Page 10

1  needed to be additional witnesses.
2         But I understand the statement that you're
3  making. I don't, you know, concur with it but I will move
4  on for purposes of today.
5         MS. CICCOLO: There is another person that
6  entered the room that we have not identified.
7         MS. TORRES: Susan Torres with Miami-Dade
8  County representing Supervisor Leahy.
9      Q. So, Ms. Nwize, I understand that subject to the
10 comments your counsel has made that you are appearing here
11 today to testify on behalf of the plaintiff, NAACP,
12 through the Florida State Conference of Branches in
13 response to the subject matters 1 through 9 in the
14 30(b)(6) notice which is marked as Exhibit number 1; is
15 that correct?
16     A. To the extent that I can.
17     Q. Other than your attorneys have you spoken with
18 anyone in preparation for your deposition today?
19     A. No.
20     Q. Have you reviewed any depositions that have been
21 taken in this case?
22     A. No, I have not.
23     Q. Have you had any depositions that were taken in
24 this case summarized to you either verbally or in writing?
25     A. No, I have not.

Page 11

1      Q. Have you reviewed any documents in preparation
2  for today's deposition?
3      A. Yes, I have.
4      Q. What type of depositions have you reviewed?
5      A. Just a moment. I have to look.
6         MS. BORGEN: To the extent that you remember
7  the type of documents you reviewed you can describe them
8  for the record.
9      A. My own statement that was made is one.
10     Q. That was a declaration that you executed on
11 April 16, 2002?
12     A. May I see?
13        (Thereupon, Defendant's Exhibit No. 2 was marked
14 for identification.)
15     Q. Yes. I will show the witness now what we have
16 marked as Defendant's Exhibit Number 2.
17     A. Yes.
18     Q. So you reviewed Exhibit No. 2.
19     A. I think you also told us earlier you had seen
20 the notice that is Exhibit 1?
21     A. Right.
22     Q. Anything else that you have looked at, any other
23 documents?
24     A. I think one other document. I don't remember.
25 It's the second amendment.

Page 12

1         (Thereupon, Defendant's Exhibit No. 4 was marked
2  for identification.)
3      Q. Is it the second amended complaint for class
4  action?
5      A. I am showing the witness now what I have marked
6  as Exhibit number 4 to this deposition.
7      A. Yes, I have seen it.
8      Q. Did you review Exhibit number 4 prior to today's
9  deposition?
10     A. I have seen it. To say review it would be
11 another issue but I have seen it.
12     Q. In connection with the November 2000 general
13 election in Florida have you previously given any sworn
14 testimony about that election?
15     A. No, I have not.
16     Q. Have you appeared in front of any bodies or
17 organizations to discuss or talk about the November 2000
18 general election in Florida?
19     A. Yes, I have.
20     Q. What organizations have you appeared in front of
21 or what groups of people?
22        MS. BORGEN: Object to the form.
23     Q. I will break it down.
24        Have you appeared in front of any commission or
25 governmental bodies to talk about the November 2000

Page 13

1 general election in Florida?
2    A. No, I have not personally appeared before any.
3    Q. Did you appear before the United States Civil
4 Rights Commission when it was taking testimony in Florida?
5    A. I did not personally appear.
6    Q. Did you appear on behalf of or representing some
7 organization?
8    A. I did not appear in person, which is what I
9 thought your question was.
10    Q. When you say you did not personally, I don't ---
11    A. My body, I was talking about my body.
12    Q. Them we are on the same page.
13       How about in front of some other group of people
14 to discuss the November 2000 election, have you appeared
15 or talked to any other group?
16    A. Yes.
17    Q. What would those groups be?
18    A. Various community groups.
19    Q. Where would those various community groups be
20 located, here in Miami Dade?
21    A. Some were; some were in other parts of the
22 state.
23    Q. What other parts of the state?
24    A. Jacksonville, Orlando, Tallahassee, Tampa.
25    Q. When did you appear in front of those groups to

Page 14

1 speak?
2    A. If you don't mind, let's go to your first
3 question, when you asked the question.
4    Q. What I was asking is, in connection with the
5 November 2 general election in Florida, what groups you
6 have spoken in front of about that election.
7       You indicated community groups and I was asking
8 where.
9       You told me Jacksonville, Orlando, Tallahassee
10 and Tampa?
11    A. Right.
12    Q. What I am asking then is when was it that you
13 appeared in front of those groups?
14    A. What was in your question was subsequent to
15 November 7, 2000.
16    Q. Was it a matter of weeks afterwards, were those
17 in connection with the hearings that the NAACP conducted
18 in Florida after the November 7 election?
19    A. Right.
20    Q. When you went to Jacksonville, Orlando,
21 Tallahassee and Tampa, were those the hearings that the
22 NAACP was conducting after the November 7 election?
23    A. Some of these were; some were not.
24    Q. Which ones were not?
25    A. What I spoke in Orlando and Tampa, they were

Page 15

1 not.
2    Q. Who did you speak in front of in Orlando?
3    A. Just community groups that came out to talk
4 about their concerns.
5    Q. Do you remember approximately when that
6 occurred?
7    A. Subsequent to November 7. I can't gave you a
8 specific date.
9    Q. How about Tampa, do you recall the organization
10 there?
11    A. All the organizations were sponsored, activities
12 were sponsored by the branch in that city.
13    Q. Have you written any articles or publications
14 about the November 2000 general election in Florida since
15 November 7, 2000?
16    A. I was trying to remember whether any the things
17 I wrote got published. I'm not real sure as I am thinking
18 about it.
19    Q. So you cannot recall one way or the other?
20    A. Not any publishing of them I don't recall, no.
21    Q. Would you tell us briefly about your educational
22 background.
23    A. Okay. My formal educational background, I
24 graduated with a bachelor of science in elementary
25 education.

Page 16

1    I have a master's degrees in counseling and
2 guidance.
3    I have part -- have graduate certifications in
4 areas such as administration supervision, psychology,
5 mental retardation, learning disabilities and social
6 studies.
7    Q. Would you briefly describe for us your
8 occupational background starting with your present
9 position?
10    A. Presently I am District Director for the Office
11 of Alternative Education and Drop Out Prevention for
12 Miami-Dade Public Schools.
13       Prior to that time I was district director for
14 Title One programs.
15       Prior to that time I was director and
16 coordinator of exceptional students education and prior to
17 that time I was a classroom teacher at many levels.
18       Occupationally I also have worked at various
19 colleges and universities.
20    Q. In a teaching capacity?
21    A. A teaching capacity, yes.
22    Q. Apart from the NAACP are you involved in other
23 community organizations here in Miami-Dade?
24    A. Yes, I am.
25    Q. Can you tell us briefly what those organizations

Page 17

1 are?
2    A. Yes. I am chairperson of the Community
3 Relations Board for Miami-Dade County.
4    I am part of MOTAP, the chair of the minority
5 organ tissue and transplant educational program.
6    I am a member of Alpha Kappa Alpha sorority and
7 a member of the baptist church.
8    Those are just a few of the main ones.
9    Q. I am going to turn now to the NAACP through the
10 Florida State Conference of Branches.  Does the NAACP have
11 its own headquarters in an office building here in the
12 state?
13    A. Well, we have an office that is used, not really
14 a building that is owned by the organization or an office
15 is not owned. This is in someone's home. We don't really
16 have a freestanding office.
17    Q. So if I understand you correctly, the Florida
18 State Conference of Branches has its office in someone's
19 home?
20    A. Right.
21    Q. Where is that located?
22    A. In the Tri-City -- Eustis, Florida, to be
23 specific.
24    Q. Does the Florida State Conference of Branches
25 have a separate set of officers from the national

Page 18

1 organization?
2    A. Yes, it does.
3    Q. Are you an officer in that organization?
4    A. Yes, I am.
5    Q. What position do you hold?
6    A. President.
7    Q. How long have you been the president?
8    A. This is my second term and a term is two years
9 so I am into what would be my third year.
10    Q. How long have you held a position as an officer
11 in the organization where you held a position other than
12 president?
13    A. Yes, when you ask about an organization are you
14 still talking about Florida State Conference of Branches?
15    Q. Florida State Conference of Branches.
16    A. Florida State Conference of Branches?
17    Q. Yes.
18    A. Yes, I have had other positions with the Florida
19 State Conference of Branches.  I was first vice president
20 for two terms and I was the -- I have held offices such as
21 membership chair and education chair.
22    Q. How long have you been a member of the Florida
23 State Conference of Branches?
24    A. Since 1980.
25    Q. Let me go back to that question and ask it one

1   more time.
2        My question was how long had you been a member
3   of the Florida State Conference of Branches and I may be
4   confused. It may be of the Florida State Conference of
5   Branches and not of the national organization.  Is that
6   the problem?
7        A. The Florida State Conference does not
8   necessarily have members.  Membership is generally
9   generated at the local level so people who are part of the
10  Florida State Conference of Branches come from a local
11  unit.  Membership is here in Miami-Dade.
12       Q. It is my understanding that NAACP, Inc. is a
13  national organization and its headquarters are in
14  Baltimore, Maryland; is that correct?
15       A. That's correct.
16       Q. It has units around the United States and I
17  think you said also outside of the country?
18       A. Yes.
19       Q. One of those units is the Florida State
20  Conference of Branches here in the State of Florida?
21       A. Yes.
22       Q. Is there any other unit that comprises any part
23  of the Florida -- in other words, is there a panhandle
24  unit that is separate from the Florida State Conference of
25  Branches?

1        A. The Florida State Conference of Branches is made
2   up of sub units and those sub units are adult branches,
3   youth councils and college chapters.
4        Q. All of those youth councils, college chapters
5   and adult branches that are part of the Florida State
6   Conference of Branches are located within the geographic
7   limits of the State of Florida?
8        A. Yes.
9        Q. Are there any youth councils, college units --
10       A. Chapters.
11       Q. -- chapters or adult branches that are within
12  the geographic confines of the State of Florida that are
13  not part of the Florida State Conference of Branches?
14       A. No.
15       Q. To go back to the question that I asked earlier,
16  how long have you been a member of the NAACP, the answer
17  would be 1980 and you joined through the Miami-Dade
18  chapter?
19       MS. BORGEN:  Object to the form.
20       A. No.
21       Q. I was trying to move us along more quickly.  I
22  obviously jumped too far ahead.
23       Tell me how long you have been a member of the
24  NAACP?
25       A. I have been a member of the NAACP since college

1   days in the '60's.
2        Q. Then did you move from the college chapter to
3   the adult branch?
4        A. Yes.
5        Q. Where was that adult branch?
6        A. Miami.
7        Q. When did you join the adult branch in Miami?
8        A. 1978.
9        Q. I asked you a question which elicited a response
10  of 1978.
11       A. Right.
12       Q. Tell me what piece I am missing here.
13       A. I became active in the Florida State Conference
14  of Branches unit in 1980.
15       Q. Do you hold any positions in the national
16  organization?
17       A. Yes.
18       Q. What positions do you hold?
19       A. I am a member of the national board of directors
20  and I am a member of the special contribution fund board of
21  trustees and I am the vice chair of the education
22  committee.
23       Q. How long have you been active at the national
24  level of the NAACP?
25       A. This is my second term as a member of the

1   special contribution board of trustees, which is a three
2   year term, and in terms of years this would be my fourth
3   year.
4        I am in my first term as a national board of
5   directors member and that term ends in December, which
6   will be a three year period.
7        Q. If I understood your answer previously, in order
8   to be a member of the NAACP, you join at either the youth
9   council, college chapter or adult branch level; is that
10  correct?
11       A. There is one other way to join.  You can join at
12  large at the national level.
13       Q. So someone could live in the State of Florida
14  and join the NAACP, Inc. at the national level by being an
15  at large member?
16       A. Right.
17       Q. Being an at large member you would not be a
18  member of the Florida State Conference of Branches; is
19  that correct?
20       A. Correct.
21       Q. In the second amended complaint there is
22  reference, I believe, to a statement that the NAACP has
23  more than 500,000 members nationwide?
24       A. Right.
25       Q. This statement refers to the national

1   organization, NAACP, Inc.?
2        A. Yes, it does.
3        Q. Do you know how many members of the NAACP, Inc.
4   were in the Florida State Conference of Branches in
5   November of 2,000?
6        A. No.
7        Q. Your affidavit tells us there were approximately
8   77 youth councils, college chapters or adult branches
9   throughout the state; correct?
10       A. Right.
11       Q. And you don't know though what the number of
12  members within those 77, that comprise those 77 entities
13  are?
14       A. I believe your question was November?
15       Q. Yes, ma'am.
16       A. That is why I answered that way.
17       Q. November 2000 you don't know?
18       A. I can't tell you exactly in November but if you
19  ask me approximately how many members I can tell you that.
20       Q. Approximately how many members were in the
21  Florida State Conference of Branches in November of 2,000?
22       A. I would say approximately 20,000.
23       Q. Can you give me a number of members in the
24  Florida State Conference of Branches as we sit here today?
25       A. Not really because the membership fluctuates.

1   Probably hovering around that number.
2        Q. That number being 20,000?
3        A. 20,000, yes.  Could be more; obviously could
4   be --
5        Q. Did the Florida State Conference of Branches
6   have members in all 67 Florida counties on November 7,
7   2000?
8        A. I can't answer that.
9        Q. Do you know whether there is a youth council,
10  college chapter or adult branch, one of the three, in each
11  of the 67 counties in the State of Florida as of November
12  2000?
13       A. I will answer you this way because that is the
14  way we are structured:  There are branches, units
15  accessible in each of the counties.  Some are what we call
16  active and some are inactive.
17       So when you ask me a number it just depends but
18  there is accessibility to everyone who lives in the 67
19  counties for people to be a part of the NAACP.
20       Q. When you use the term accessible, I'm not sure I
21  understand what you mean.
22       A. I mean by that that branch may be not active, a
23  unit may be not active.  The Florida State Conference of
24  Branches moves in and provides NAACP support into that
25  community if the unit is not active.

Page 25

1    Q. Now you used the terms branch and unit in your
2  answer to me. Is there a distinction between branch and
3  unit? The reason I ask is I want to be precise in my
4  questions and be correct in my questions.
5    A. I use it interchangeably but branch, sometimes
6  when I am talking about the adult branch, I will say
7  branch. If I am talking about youth council or college
8  division, I will interchange it with unit because they all
9  are called units. Every entity is called a unit so it is
10  used interchangeably.
11    Q. So if I have it right, let me just repeat it
12  back: Adult branches, youth councils or college chapters
13  can be described as the units?
14    A. Right.
15    Q. Adult branch or branch really refers to an adult
16  branch?
17    A. Right.
18    Q. Now, is it fair to say there are not active
19  units in each of the 67 counties in Florida as we sit here
20  today?
21    A. That would be fair to say, yes.
22    Q. Would it also be fair to say as of November 7,
23  2000 there were not active units in each of the 67
24  counties in the State of Florida?
25    A. I would say probably not.

Page 26

1    But see, when you ask the question, the reason
2  -- let me go back -- when you ask a question about
3  units in each county, every county within this state is
4  covered by the NAACP whether the unit is active or not.
5  We have an obligation to cover that area if an issue
6  arises and we are called to do so.
7    Q. When you say every county is covered by the
8  NAACP, you're speaking of the Florida State Conference of
9  Branches?
10    A. Right.
11    Q. In order to join the NAACP through the Florida
12  State Conference of Branches does one have to pay dues?
13    A. In terms of through the Florida State Conference
14  of Branches, when I talked to you earlier I mentioned to
15  you that the Florida State Conference of Branches was made
16  up of units.
17    Q. Correct.
18    A. People join at the units.
19    Q. What I was trying to inartfully ask you, if they
20  join an unit here in the State of Florida, do they have to
21  pay dues in order to join the unit?
22    A. Yes.
23    Q. Are those dues on an annual basis?
24    A. They could be except that we have a category
25  that is considered a life membership and there are various

Page 27

1  categories of those particular memberships.
2    Q. In other words, if you pay a certain amount you
3  become a life member and you don't have to pay annual dues
4  every year?
5    A. Right.
6    Q. Is there an application that someone fills out
7  to become a number of a unit?
8    A. Yes.
9    Q. Is there a term of membership at the most basic
10  level, in other words, if you were to come in to fill out
11  the application, is that application, at the most basic
12  level, for a one year term from the time you join?
13    A. You can join for one year, yes.
14    Q. Is that the shortest period of time you can join
15  for?
16    A. Yes.
17    Q. Does the Florida State Conference of Branches
18  keep membership records or do the membership records
19  reside at each unit?
20    MS. BORGEN: Object to the form.
21    Q. Does every unit keep a membership record of who
22  has joined the organization and whether they are active
23  members or not?
24    A. Every unit is asked to keep the records.
25    Q. Does each unit in turn provide membership

Page 28

1  records to the Florida State Conference of Branches?
2    A. No.
3    Q. So the Florida State Conference of Branches does
4  not maintain any membership rolls in and of itself?
5    A. No.
6    Q. Does the national organization, NAACP, Inc., get
7  the membership rolls from the local unit?
8    A. Yes.
9    Q. Do members who join a unit in the State of
10  Florida receive some form of a membership card or ID card?
11    A. Yes.
12    Q. Does that card show on it the beginning date of
13  your membership and expiration date of the membership?
14    A. Yes, it does.
15    Q. Does the Florida State Conference of Branches
16  have a mission statement or organizational statement?
17    A. Yes, all state conferences do and it is the same
18  mission statement as it for the NAACP as a whole.
19    Q. If I understand correctly then, the mission
20  statement of the national organization is the same mission
21  statement as the Florida State Conference of Branches and
22  all the other states conference of branches?
23    A. Yes.
24    Q. Do the local units maintain separate mission
25  statements?

Page 29

1    A. Not separate ones, no, we all have the same
2  mission.
3    Q. Can you either tell me what the mission
4  statement is or paraphrase the mission statement?
5    A. Well, the essence of the mission statement is
6  that we, it is our goal and the objective of the NAACP to
7  eradicate all vestiges of discrimination in education,
8  economics and political action, and that it is our
9  obligation to do that and to support and advocate on
10  behalf of social justice for those who are left out and
11  disenfranchised.
12    That is the essence of it. It is not paraphrased
13  to the letter.
14    Q. If I could direct your attention to the
15  declaration which we have previously marked as Exhibit No.
16  2, did you prepare the document?
17    A. Certainly I will give you a moment to go through
18  it.
19    Q. Did you prepare Exhibit No. 2?
20    A. My lawyers prepared it.
21    Q. Did you edit or change the document when you
22  reviewed it?
23    A. I don't recall whether I changed anything on
24  here. I don't remember whether I did.
25    Q. Have you had an opportunity to review Exhibit 2?

Page 30

1    A. Yes.
2    Q. In paragraph number one, the second sentence
3  states, "NAACP understands its role and responsibilities
4  as class representatives."
5    Do you see that statement?
6    A. Yes.
7    Q. What is the NAACP's role as class
8  representative?
9    A. Well, as a class representative our role would --
10  be to represent persons, individuals whether they be --
11  who have complained to us.
12    One of the things that the NAACP does is to
13  accept complaints. That is one of our big
14  responsibilities and those complaints, we attempt to
15  address resolutions for the complaints. As such, we
16  represent them regarding those issues that they bring to
17  us.
18    Q. So that is one, that is the role that you
19  understand the NAACP plays as class representative here?
20    A. Yes.
21    Q. You also say any other role that the NAACP
22  serves as class representative?
23    A. You're speaking of this particular instance or
24  in general?
25    Q. In this particular instance.

Case 1:01-cv-00120-ASG   Document 410   Entered on FLSD Docket 07/02/2002   Page 230 of

30(B)(6) OF NAACP                    Condenseit!                    MAY 23, 2002

Page 31

1    A. In this particular instance?
2    Q. Yes, ma'am, focusing on your affidavit.
3    A. We certainly -- I am answering that we seek to
4 get redress for those people who have complained.
5    Q. You also say that the NAACP understands its
6 responsibilities as class representatives. What are those
7 responsibilities?
8    A. We have several responsibilities; that is to
9 utilize various efforts to seek redress for the concerns
10 expressed, answers to the questions, as well as advocate
11 for redress.
12    Q. Any other responsibilities that you understand
13 the NAACP has as class representatives?
14    A. My understanding is that we would want to work
15 to help insure that what occurred in this particular
16 instance does not occur again and people who feel that
17 they are disenfranchised will not have that problem.
18    Q. When you say this particular instance, you are
19 referring to the ---
20    A. The case. That is what you referred to.
21    Q. I was being more specific when I said this
22 particular instance.
23      Are you referring to the November 7, 2000
24 election?
25    A. Yes.

Page 32

1    Q. The next sentence says that, "It will represent
2 the concerns of its fellow class members and its
3 constituency."
4    A. Competently.
5    Q. Yes; I am sorry, competently.
6      "That it will competently and adequately
7 represent the concerns of fellow class members and
8 constituents."
9      Do you know what the concerns of your fellow
10 class members are? I am using the term "you" being the
11 NAACP.
12    A. Yes, we know them as they have been addressed to
13 us.
14    Q. What are those concerns?
15    A. Those concerns revolved around the issues of why
16 we are here and that is that the voting that took place on
17 November 7, the process disenfranchised many people.
18    Q. When you used the term constituents in your
19 affidavit in that sentence we just quoted, who are the
20 NAACP's constituents? Does that mean members?
21    MS. BORGEN: Objection.
22    Q. Well, let me ask you this: What do you mean in
23 your affidavit what you use the term constituents in
24 paragraph one?
25    MS. BORGEN: Just to be clear, you called it an

Page 33

1 affidavit. It is a declaration, so we are clear on the
2 record.
3    Q. Since they are both under penalty of perjury, I
4 am perhaps legally using them interchangeably. I will
5 refer to it as Exhibit 2. We will just leave it there.
6      When you use the term constituents in your
7 declaration marked as Exhibit 2, what do you mean by
8 constituents?
9    A. Well, first of all, the NAACP is a national
10 organization and as it addresses and advocates for social
11 justice and addresses issues related to various aspects of
12 life where people are impacted and are in need of
13 assistance, we as an organization or the organization
14 provides assistance whether you're a member or not.
15      So the term constituent really includes everyone
16 who finds a need to come to the NAACP.
17    Q. In the preamble there at the beginning of
18 Exhibit number 2 it says that you are designated as
19 plaintiff NAACP by the Florida State Conference of
20 Branches and then in parenthesis (NAACP), so as I
21 understand it, when you use that term NAACP in your
22 declaration that you made as Exhibit 2 you're referring to
23 the Florida State Conference of Branches; right?
24    A. Right.
25    Q. And so when I ask you about the Florida State

Page 34

1 Conference of Branches constituents they would be anyone
2 who finds a need to come to the Florida State Conference
3 of Branches to redress its complaints?
4    A. Right.
5    Q. That could be a person who is a member of one of
6 the units here in the State of Florida or it might be
7 someone who is not a member?
8    A. That's correct.
9    Q. In paragraph 2 of Exhibit number 2, the third
10 sentence states, "NAACP constituency includes blacks and
11 other minorities."
12      Is the term constituency that you're using in
13 this sentence of paragraph 2 the same as what you have
14 told us in paragraph 1?
15    A. It includes, does not mean excludes, others.
16 Just includes. It give us a example of blacks and other
17 minorities, people belonging to a category that may not
18 fall in any of those two categories. So that is why it
19 says includes.
20    Q. And is it my understanding NAACP membership is
21 open to all people of all races?
22    A. Right.
23    Q. And so when you say the constituency here in
24 that paragraph number 2, you simply used that to
25 illustrate two groups of that constituency?

Page 35

1    A. Right, that is right. That is why it says
2 includes.
3    Q. On that point, it is my understanding that the
4 class that the NAACP through the Florida State Conference
5 of Branches seeks to represent in this lawsuit, which is
6 referenced in Exhibit number 4, are the portion of the
7 members who are black voters in the State of Florida who
8 registered or sought to register and tried to vote on
9 November 7 and were unable to do so; is that correct?
10    A. And other minorities. Not just blacks, but
11 other minorities also.
12    Q. It is your understanding that the class would be
13 blacks and any other minorities who registered or sought
14 to register to vote in the State of Florida and were
15 unable to vote on November 7, 2000?
16    A. Yes.
17      I am saying that slowly because that question
18 -- and I know the way it is written here, it is based
19 on the ones who are listed, that that is who they are.
20      But the truth of the matter is there were people
21 that came who were not black or minorities, they were not
22 listed and they were not formally listed but we did have
23 complaints from people what did not fall in either one of
24 those categories.
25    Q. If I understand you correctly, there were

Page 36

1 hearings that the local units held here in the State of
2 Florida following the November 2000 election; correct?
3    A. That's right.
4    Q. And what you're telling us is that during those
5 hearings there were persons who appeared and spoke or
6 testified in front of the local units who complained about
7 their inability to have their vote counted in the November
8 2000 general election who were not blacks or minorities?
9    A. That's correct.
10    Q. And in this lawsuit does the NAACP through the
11 Florida State Conference of Branches seek to represent the
12 interests of those people?
13    A. Well, through our statement we are trying to
14 represent the persons that we have listed. We are not
15 talking about the whole state. We are expressing this on
16 behalf of the people that are listed here and I believe
17 they fall into those categories that we have listed,
18 blacks and minorities.
19    Q. You are pointing back to the first page of
20 Exhibit Number 4. You were pointing to the individual
21 named plaintiffs in the caption of the case shown on the
22 first page of Exhibit 4?
23    A. Right.
24    Q. And it is your understanding that all of those
25 named plaintiffs are either black or another minority?

Page 37

1    A. It is my understanding, yes.
2    Q. In this lawsuit is the NAACP through the Florida
3  State Conference of Branches seeking to represent the
4  interests of anyone other than the individuals named in
5  the caption shown on the first page of Exhibit 4?
6    MS. BORGEN: Objection as to form.
7    MR. LITTLE: She is not instructing you not to
8  answer. You may answer.
9    MS. BORGEN: I am not instructing you not to
10  answer but I am objecting to the form. To the extent you
11  understand the question, you can answer it.
12    A. I'm not really sure what you're referring to but
13  I am trying to understand what you're trying to say.
14    Q. Well, let me break it down into pieces because I
15  want to make sure we are clearly communicating.
16      The NAACP through the Florida State Conference
17  of Branches is a plaintiff in this lawsuit that is marked
18  as Exhibit number 4; correct?
19    A. Right.
20    Q. And I was trying to understand who the NAACP
21  through the Florida State Conference of Branches is
22  seeking to represent in this lawsuit as a class
23  representative.
24    A. Yes, it is the people who are listed.
25    Q. And when you say it is the people who are

Page 38

1  listed, you're pointing to the many people who are listed
2  in the caption of the case on Exhibit 4?
3    A. Well, yes.
4      Well, they are representative of the others who
5  complained. They are just a representative group. They
6  are not the only people who complained.
7    Q. Are those individuals, to your knowledge, who
8  are named in the caption of Exhibit number 4 seeking to
9  represent any group of persons other than blacks who were
10  registered or attempted to register to vote and were
11  unable to vote in the November 7, 2000 general election in
12  Florida?
13    MS. BORGEN: Object to the form.
14    A. I think the people who are listed are, number
15  one, representing themselves and others who found
16  themselves in the situation they were in.
17    Q. Are you aware that one of the claims in this
18  case is that persons who were otherwise eligible to vote
19  in the November 2000 general election were improperly or
20  wrongfully removed from the list of eligible voters?
21    A. Please repeat the first part of your question.
22    Q. Are you aware that one of the claims in this
23  lawsuit is that persons who were otherwise eligible to
24  vote were wrongfully removed from the voter registration
25  rolls in his or her respective counties and were unable

Page 39

1  therefore to vote in the November 2000 general election?
2    A. Yes.
3    Q. Is it your understanding that on behalf of the
4  NAACP through the Florida State Conference of Branches
5  that one of the remedies that the organization seeks in
6  this lawsuit is to restore those persons to the voter
7  rolls they were removed from?
8    A. Yes.
9    Q. If a person was, according to the plaintiffs,
10  improperly removed from the voter registration rolls and
11  therefore unable to vote in the November 2000 general
12  election, and that person was Hispanic, is the NAACP
13  through the Florida State Conference of Branches seeking
14  to restore that person to the voter rolls in this lawsuit?
15    MS. BORGEN: Object to the form.
16    A. We are seeking to represent the persons listed,
17  who are representing people who were similarly situated.
18  If the person was Hispanic or any other group, then they
19  certainly would fall in that category mentioned and yes
20  would be the answer.
21    Q. One of the communications that I think we are
22  struggling with, you keep referring to the organization
23  seeking to represent the individuals listed on the first
24  page of Exhibit number 4 who you say are in turn seeking
25  to represent other people?

Page 40

1    A. That is what it says, yes.
2    Q. What I am trying to understand from you is does
3  the organization, apart from the people who are named in
4  the caption on Exhibit Number 4, seek to represent people
5  in the State of Florida?
6    MS. BORGEN: Object to the form. Asked and
7  answered.
8    MR. LITTLE: You can answer the question.
9    MS. BORGEN: If you understand the question.
10    A. I answered it already and that is why -- you
11  want me to answer it again?
12    Q. Please.
13    A. Essentially what I have said is the NAACP seeks
14  to represent persons who came to the NAACP with the
15  complaints and all other representatives of similarly
16  situated citizens and residents of the State of Florida.
17    Q. Without regard to their race?
18    A. Right.
19    Q. And you're seeking relief as the NAACP through
20  the Florida State Conference of Branches in this lawsuit
21  for all of those persons regardless of their race?
22    MS. BORGEN: Object as to form.
23    A. Similarly situated. That is what it says on the
24  front of the lawsuit.
25    Q. Going back to your example of persons who were

Page 41

1  removed from the voter rolls improperly according to the
2  plaintiff, is that someone you are trying to represent in
3  this case?
4    MS. BORGEN: Object to the form.
5    A. Yes.
6    Q. It is also a claim in this lawsuit that the
7  voter registration applications were improperly handled;
8  is that correct?
9      In other words, when people filled out a voter
10  registration application, that application was not
11  properly processed and therefore, some were unable to vote
12  during the November 2000 general election in Florida.
13  That is one of the claims; correct?
14    A. Yes.
15    Q. And if someone's voter registration application
16  was not properly processed and therefore they were unable
17  to vote in the November 2000 general election because of
18  that activity, the NAACP through the Florida State
19  Conference of Branches is seeking to represent those
20  individuals regardless of their race?
21    MS. BORGEN: Object to the form.
22    A. Yes.
23    Q. In paragraph number 3 of your declaration which
24  is Exhibit No. 2, you indicated that there are three named
25  plaintiffs in this lawsuit who were members of the NAACP

Page 42

1  at the time of the November 2000 general election;
2  correct?
3    A. Or have been past members.
4    Q. Well, I am focusing on the first reference where
5  you're referring to Mrs. Odum, Mr. Cheever and Ms.
6  Carnegie.
7      You are saying in your affidavit, your
8  declaration, that those individuals were members of the
9  NAACP at the time of the November 2000 election; correct?
10    A. Right.
11    Q. You used the term, "On information and belief."
12  Do you know that to be a fact as you sit here today?
13    A. Based on membership cards, yes.
14    Q. So you reviewed the membership cards to identify
15  those three individuals as of November 2000?
16    MS. BORGEN: Object to the form.
17    A. I have seen the membership card of one of them
18  at least.
19    Q. And who is that?
20    A. John Cheever.
21    Q. Have you seen the membership cards for Ms. Odum
22  or Ms. Carnegie?
23    A. I don't recall seeing them but I believe them to
24  be.
25    Q. What do you base that belief upon?

Page 43

```
1        A. Because they are persons who did come to the
2   NAACP and, if I recall correctly, they were members. I
3   cannot declare that but I believe that I remember them
4   being members.
5        Q. Are there any other individuals who are listed
6   on the first page of Exhibit number 4 as plaintiffs who
7   were members of the NAACP at the time of the November 2000
8   election?
9        A. I don't know that.
10       Q. You also say in paragraph three, Exhibit 2, that
11  there are at least three other named plaintiffs who are or
12  had been members, Mr. MacDonald, Mr. Rose and Mr. Nisgram?
13       A. Right.
14       Q. What do you base that statement on?
15       A. Based on their statements that were given.
16       Q. You did not see any membership cards for any of
17  those individuals?
18       A. No, I did not.
19       Q. The last sentence, paragraph 13, states to
20  information and belief the putative class includes other
21  individuals who were members of the NAACP at the time of
22  the 2,000 election meaning many of them who are current
23  NAACP members ---
24       A. I don't understand what you are saying.
25       Q. I was trying to get an exact quote from the
```

Page 44

```
1   declaration.
2        A. Your question?
3        Q. My first question is do you know what classes
4   the NAACP seeks to represent in this action?
5        A. It is seeking to represent the classes that
6   include individuals who feel that they were
7   disenfranchised from the voting process for the November
8   7, 2000 election.
9        Q. Regardless of race?
10       A. Right.
11       Q. Do you know how many classes the NAACP through
12  the Florida State Conference of Branches is seeking to
13  represent in this case, do you have any knowledge of that?
14       A. In terms of number?
15       Q. Number of classes?
16       A. I understand. Number of closes, no, I don't
17  know how many classes.
18       Q. Or subclasses for that matter?
19       MS. BORGEN: Object to the form.
20       A. Not in term of numbers. I have to think about
21  that.
22       Q. When you say that the putative classes include
23  other individuals who were members of the NAACP at the
24  time of the November 2000 election, what do you base that
25  statement on?
```

Page 45

```
1        A. The complaints that were presented to the
2   various branches both orally and written.
3        (Discussion off the record.)
4        MR. LITTLE: Just identify yourself for the
5   court reporter, please.
6        MR. ARPEN: I am Tracy Arpen representing
7   Supervisor of Elections Stafford from Duval County.
8        I've just got a few questions with respect to
9   Duval County.
10       DIRECT EXAMINATION
11  BY MR. ARPEN:
12       Q. Specifically there was some information
13  contained in interrogatory answers concerning a witness
14  having knowledge of persons, of voters in Duval County and
15  that witness was Richard Haywood.
16       My question is who is Mr. Haywood and what
17  knowledge does he have with regard to removal of voters
18  from the rolls in Duval County?
19       MS. BORGEN: Object to the form.
20       A. I really don't know the answer to that. I would
21  have to review the statement.
22       Q. Okay. Well, in fact, you mean his statement?
23       A. Right.
24       Q. Okay. Has his statement been included among the
25  documents produced previously?
```

Page 46

```
1        MS. BORGEN: Object to the form.
2        Q. To your knowledge?
3        A. I don't know. I did not pay particular
4   attention to his statement.
5        It very well could have been. I don't know. I
6   can't remember all the words on this paper.
7        Q. Do you personally have any knowledge with regard
8   to removal of voters from the rolls in Duval County,
9   Florida?
10       A. In terms of personal knowledge, I would say no,
11  I would not know other than what I was told when I came to
12  Duval County by the people that live there and indicated
13  that their names had been removed.
14       Q. Do you recall the names of any of those people
15  with whom you spoke in Duval County?
16       A. No, certainly I don't know the names. They were
17  not maintained by me.
18       Q. By whom are they maintained?
19       A. They were all given to the national office.
20       Q. As best you can recall, what were the examples
21  given to you of circumstances in which voters may have had
22  their names removed here in Duval County?
23       MS. BORGEN: Object to the form.
24       A. One of the ways, one of the things that came out
25  in the hearings in Duval County was that people indicated
```

Page 47

```
1   when they went to vote they had a voter's registration
2   card and did not find their names listed. They were
3   unable to vote.
4        As a matter of fact, I recall distinctly that a
5   few people indicated that.
6        Q. Do you know whether they were unable to find
7   their names on a particular precinct register or whether
8   they were unable to find their names as registered voters
9   in Duval County?
10       A. I think that it is very critical the way you put
11  that, but as I recall very vividly, one of the complaints
12  was that their names were not on the precinct roll but the
13  precincts were unable to get to the Elections Department
14  to determine if their names were indeed validated.
15       Q. Thanks.
16       Next question: Do you know of any circumstances
17  in which persons at the hearings testified that they
18  believe they had been wrongfully removed from the roll as
19  felons?
20       MS. BORGEN: Object to the form.
21       A. Had been removed as felons?
22       Q. Yes.
23       A. I don't remember that but I do remember
24  distinctly someone indicating, one of the persons who
25  testified, indicating that their name was determined to
```

Page 48

```
1   have been a felon, they were not allowed to vote and this
2   person indicated they had never been arrested.
3        Q. Now, do you know whether the person was or was
4   not allowed to vote?
5        A. He was not allowed to vote.
6        The person indicated he had not been arrested
7   before and yet it was declared he was a felon and could
8   not vote.
9        Q. Any other examples that you can recall at those
10  hearings regarding removal of voters from the rolls in
11  Duval County?
12       A. Not at this point I can't recall. There were
13  different situations but I don't exactly remember at this
14  point.
15       Q. One final question, hopefully one final
16  question, did you have any interviews with anyone in Duval
17  County other than, at your hearings up here, other than
18  those persons who spoke and identified themselves at the
19  hearing?
20       MS. BORGEN: Object to the form.
21       A. No, it was only through the hearings that I had
22  any interaction with them.
23       MR. ARPEN: Thank you. That is all I have.
24       I appreciate your allowing me to step in out of
25  turn.
```

Page 49

DIRECT EXAMINATION (RESUMED)

1   BY MR. LITTLE:
3   Q. Finishing up on paragraph 3 of Exhibit No. 2, at
4   it very end you state that on information and belief the
5   putative class will include other individuals who were
6   members of the NAACP at the time of the 2,000 elections
7   who are current NAACP members.
8        You told me that you based that statement on
9   persons who made complaints to the various branches or
10  units either orally or in writing after the November 2000
11  election; correct?
12  A. Right.
13  Q. You're basing that statement on what they told
14  you about their membership in the NAACP as opposed to your
15  looking at the full membership records; is that right?
16      MS. BORGEN: Object to the form.
17  A. Yes.
18  Q. So the only person for whom you have actually
19  looked at a membership card is Mr. Cheever, if I
20  understand?
21  A. Yes.
22      (Recess taken.)
23      MS. CICCOLO: I want to put on the record that
24  I am extremely offended by the -- I think that it was
25  uncalled for and I really am very angry that you would

Page 50

1   make that suggestion or insinuation or inference and I
2   very, very much resent that.
3       MR. EHRLICH: What I said, for the record, to
4   Angela is that during the questioning of the witness, I
5   saw the witness turn to her as if to look for some sort of
6   question as to how to answer and I perceived Angela
7   shaking her head slightly in a yes motion.
8        I did not tell her. I thought I might be reading
9   more into it than there was. I did not accuse her of
10  anything but just cautioned her to be careful not to coach
11  the witness or suggest an answer to the witness when the
12  witness might naturally look to her lawyers for some sort
13  of guidelines as to how to respond to a question when
14  there's an objection made or whatever.
15      MS. CICCOLO: I would put on the record that
16  there is no reflection in the record as to how the seating
17  is in this room. There is at least one other person beside
18  me and other people on this side.
19       I think that if you have that kind of suggestion
20  that you want to make, that I repeat is offensive, you
21  need to make it at the time and not wait.
22       I think that you are totally out of line here
23  and I am seriously offended by it.
24       The witness has not requested any information.
25  The witness could have been looking out the window for all

Page 51

1   you know.
2       MR. EHRLICH: I agree.
3       MS. CICCOLO: In my entire practice I have not
4   never been asked or accused of coaching a witness. I find
5   it reprehensible.
6       THE WITNESS: I don't need it. I'm quite
7   competent.
8       MR. EHRLICH: I don't mean to read anything
9   into it. I saw it and I just waited until we were off the
10  record and not in front of other people because I did not
11  want to insinuate or suggest that you were doing anything
12  inappropriate.
13      MS. CICCOLO: If you want to do something like
14  that you need to do it on the record and in front of the
15  other lawyers.
16      I am not going to put on the record what I
17  suggest we -- oh, go ahead.
18      We don't need to coach our witnesses.
19      MR. EHRLICH: I did not suggest you did.
20      MS. CICCOLO: I thought you did.
21      I'm the very last person that you need to make
22  that accusation to.
23      MR. EHRLICH: We should move on.
24      MR. LITTLE: I am not going to join in this
25  fray.

Page 52

1       MS. CICCOLO: I was going to say that I am
2   offended and angry at that accusation.
3       MR. LITTLE: We will return to the deposition
4   now.
5       MS. CICCOLO: Let me just say here for the
6   record, if you have any more comments, if you have some
7   restrictions you want to place on people about how they
8   can look around the room or any gestures or
9   interpretations of gestures, I suggest you get those rules
10  on the table right now because I am not going to be
11  governed by you as to whether I am going to lean back or
12  whether I'm going to pick up my pad or where and when I am
13  going to look.
14      That goes for everyone in this room.
15      MR. LITTLE: And presumably those on the
16  telephone.
17      MS. CICCOLO: Yes.
18      THE WITNESS: Let's move on.
19      MR. LITTLE: I would agree with you on that.
20  Q. Going back to your declaration which we have
21  marked as Exhibit number 2, you said earlier that when you
22  used the phrase, for example, in paragraph number 3 "on
23  information and belief," you were using that term where
24  you could not personally declare your own knowledge a
25  fact; is that right?

Page 53

1   A. Right.
2   Q. Going back to my question about who the NAACP
3   through the Florida State Conference of Branches seeks to
4   represent in this lawsuit --
5   A. Yes.
6   Q. -- which we have been referring to as Exhibit
7   number 4, does the NAACP through the Florida State
8   Conference of Branches seek to represent itself in this
9   lawsuit?
10      MS. BORGEN: Object to the form.
11  A. That is a good question.
12      The NAACP is seeking to represent by the Florida
13  State Conference of Branches on behalf of all of the
14  constituents that we have named as well as those in
15  similarly situated circumstances.
16      Obviously, our complainants are those who are
17  black and minorities and we hope that will benefit all
18  others who are not black and minorities as a result of
19  what is happening here.
20  Q. My question is apart from those individuals who
21  you have just identified in your answer, does the NAACP
22  through the Florida State Conference of Branches seek to
23  represent the organization in this case?
24      MS. BORGEN: Object to the form.
25  A. Yes. The organization has been hurt in the

Page 54

1   process, yes.
2   Q. We have looked at Exhibit number 4, which is the
3   second amended complaint. Did the NAACP through the
4   Florida State Conference of Branches participate in the
5   preparation of the original complaint and in the amendment
6   that has been subsequently filed?
7       MS. BORGEN: Object to the form.
8   A. The lawyers did.
9       No, did I participate in developing this, I did
10  not.
11  Q. Do you know why the NAACP through the Florida
12  State Conference of Branches decided to sue the Secretary
13  of State of Florida or the Director of the Division of
14  Elections?
15      MS. BORGEN: Object to the form.
16  A. In conference with our attorney.
17      You would have to check with them about that.
18  Q. I am not asking for you to divulge conferences
19  or information that you had between you and your
20  attorneys. That is privileged and I am not asking about
21  that.
22      What I am asking is as the representative today
23  of the NAACP who is testifying on its behalf, can you tell
24  me why the NAACP decided to sue the Secretary of State and
25  the Director of Elections for the State of Florida.

Case 1:01-cv-00120-ASG    Document 410    Entered on FLSD Docket 07/02/2002    Page 234 of 2002

30(B)(6) OF NAACP    Condensed!    MAY 23, 2002

Page 55

```
 1        MS. BORGEN:  Object to the form.
 2     A.  Out of conferences with the attorneys I can tell
 3  you what my understanding is.
 4     Q.  Okay.
 5     A.  That is basically all I can say.
 6        The persons who we have filed against are the
 7  persons responsible for the voting process and voting
 8  procedures here in Florida, to execute them.
 9     Q.  Do you know why the NAACP through the Florida
10  State Conference of Branches decided to sue the seven
11  county supervisors who are named in this lawsuit?
12        MS. BORGEN:  Object to the form.
13     A.  Those specific counties are where the majority
14  of our complaints came from.
15     Q.  Can you tell me why the NAACP through the
16  Florida State Conference of Branches decided not to sue
17  the other 60 counties in the State of Florida?
18        MS. BORGEN:  Object to the form.
19     A.  I was not privy to that conversation as to why
20  we did not do it.
21        I only know that those are the places that have
22  been named, that I am familiar with where the complaints,
23  the majority of complaints came from.
24        I am not familiar with larger numbers coming
25  from other places.
```

Page 56

```
 1        If you would make note, those are the larger
 2  cities in the state population wise.
 3     Q.  If I could direct your attention to the second
 4  paragraph of Exhibit number 4 and give you a chance to
 5  read it, I am going to focus on the sentence that starts
 6  right here where I've got my pen pointing.  I want to give
 7  you a chance to read the paragraph.
 8     A.  Okay.
 9     Q.  Going back for a moment, do you know how the
10  NAACP through the Florida State Conference of Branches
11  decided who to sue?
12        MS. BORGEN:  Object to the form.
13     A.  In discussion with our lawyers and the people.
14     Q.  I am sorry.  Again, I am not trying to get into
15  your conversations with your attorneys and the substance
16  of that.
17     A.  Oh, no, I was going to give you what I thought,
18  which may or may not be completely accurate but is what I
19  think.
20        I was involved in this whole process and I am
21  answering you based on my own experience and what I
22  encountered and the interaction that I had with the other
23  presidents and officers and members of the branches in
24  those areas because I traveled extensively during that
25  time too and had an opportunity to talk to them.
```

Page 57

```
 1        That is how I answered you when you asked those
 2  questions.
 3     Q.  And the question was how did the NAACP through
 4  the Florida State Conference of Branches decide who to sue
 5  in that action that is marked Exhibit number 4?
 6        MS. BORGEN:  Object to the form.
 7     A.  Based on my experience with them, those were the
 8  places, you know, as president, the calls that came in,
 9  the majority of the calls came from those units that are
10  listed here, those cities that are listed here.  They were
11  the branches that had, you know, the most complaints.
12        That does not mean the others did not but the
13  larger areas seem to have had, you know, more problems,
14  more issues on election day.
15        You know, the operation that I have as president
16  here in Miami, I was able to receive those complaints from
17  those units.
18     Q.  So that was the process that was used by the
19  NAACP through the Florida State Conference of Branches to
20  decide who to sue; is that right?
21        MS. BORGEN:  Object to the form.
22     A.  We made a recommendation where the problems were
23  and obviously where the problems were would be the persons
24  that you would use to file against, I should say the mass
25  of the problems.
```

Page 58

```
 1     Q.  Looking at paragraph 2, about the middle of the
 2  paragraph, it says, "In particular as a result of
 3  practices complained of in this action, in precincts with
 4  substantial numbers of black voters where there were a
 5  disproportionate number of all ballots with no votes
 6  counted for the office of president of the United States,
 7  black voters were wrongfully purged from electoral lists of
 8  eligible voters."
 9        Do you know where that term "wrongfully purged"
10  is used in this complaint what that term means or what
11  that term is intended to mean?
12        MS. BORGEN:  Object to the form.
13     A.  Well, if you ask based on my understanding of
14  wrongfully purged, meaning that they should not have been
15  taken off the list.
16     Q.  Did you as the representative of the NAACP
17  review the second amended complaint before it was filed?
18     A.  If you use the word review loosely I did see it.
19     Q.  Did you read it in part?
20     A.  I read it.
21     Q.  The whole thing?
22     A.  I read most of it.  I would not say the whole
23  thing, but most of it.
24     Q.  Any part in particular that you can recall that
25  you did not read?
```

Page 59

```
 1     A.  I would not know that if I did not read it.
 2     Q.  Well, what I was trying to get at, did you read
 3  say half of it and then stop?
 4     A.  I did a scanning process, you know, I skimmed
 5  it.  That is what I do when I get documents this thick.
 6     Q.  It is your understanding when the term
 7  wrongfully purged is used it means should not have been
 8  taken off the voter roll; is that right?
 9     A.  Right, people who were eligible, whose
10  registrations reflected they should have be able to vote,
11  their names were taken off when they should not have been
12  removed because they were still active voters, eligible
13  voters, I should say.
14     Q.  Do you know what official places a person on a
15  voter roll or voter registration roll?
16        MS. BORGEN:  Object to the form.
17     A.  I am sorry?
18     Q.  In the State of Florida if someone is registered
19  to vote, do you know who actually puts that person on the
20  official roll, do you know what official in the state does
21  that?
22     A.  I don't know what entity does it.  I know what
23  entity is responsible for it.
24     Q.  Let's start with an example.  Let's say someone
25  here in Miami-Dade County goes to register to vote.
```

Page 60

```
 1        Is it your understanding there is an official
 2  voter's registration roll here in Miami-Dade County?
 3     A.  Yes.
 4     Q.  Do you know who is responsible for maintaining
 5  that roll?
 6     A.  Yes.
 7     Q.  And the accuracy of that roll?
 8     A.  Yes.
 9     Q.  Who is that?
10     A.  Mr. Leahy.
11     Q.  He is?
12     A.  Supervisor of elections.
13        I should have said that position.
14     Q.  Likewise in Florida, do you know who has the
15  official responsibility, when someone is removed from the
16  voter rolls, in other words, what official office has the
17  responsibility to see that people who are ineligible are
18  removed from the voter rolls?
19        MS. BORGEN:  Object to the form.
20     A.  My understanding, I am thinking -- and this is
21  based on something that I thought I heard explained -- but
22  statewide they are responsible.  In other words, out of
23  the office in Tallahassee they would determine which
24  voters should come off and they would then inform the
25  counties of which voters should not be on the list.
```

Page 61

1    I don't know that an individual county would
2 have that kind of authority without some sort of check and
3 balance.
4    Q. So you have told us that you understand that if
5 someone registered here in Miami-Dade County, it is the
6 Supervisor of Elections who puts that person on to the
7 official voter's roll; correct?
8    A. No, what I said was the Supervisor of Elections
9 was responsible for maintaining the list. That is what
10 you eventually asked. It started out one way, you know,
11 maintenance of the list.
12    So the Supervisor of Elections is responsible
13 for that list. That is why you can call down there to
14 determine whether someone is eligible to vote or not
15 because they do have that list.
16    Where the names come off the list is another
17 issue.
18    Q. Do you know who actually puts the name on the
19 list, what official in the state system puts the name on
20 the list?
21    A. I do not know the process. I can only conclude
22 what I think I know but I am not sure about that.
23    Q. Do you know who takes the names off the list?
24    A. No, no, I don't know. I can just give you an
25 assumption.

Page 62

1    Q. Would you agree that under current Florida law a
2 person who has been convicted of a felony in Florida and
3 has not had his or her civil rights restored is ineligible
4 to vote?
5    MS. BORGEN:  Objection.
6    A. That is my understanding.
7    Q. Would you agree that a person who was
8 convicted of a felony and had not had his or her civil
9 rights restored would not be wrongfully purged if they
10 were removed from the list of eligible voters?
11    MS. BORGEN:  Object to the form.
12    A. If, in fact, that definition is as you say,
13 meaning that if -- and the reason I say it that way is
14 because one of the issues that we had was we had some
15 people whose rights had been restored and they were listed
16 as not having been restored -- so if what the belief is is
17 that that person's rights had not been restored, even
18 though it were not true, you then need to make sure before
19 you make that statement that it is clarified that person
20 really never had their rights restored because we did run
21 into people who had their letters and papers of having
22 their rights restored and yet they were listed as not
23 having their rights restored.
24    Q. Do you know if any of those persons had received
25 letters from the Supervisor of Elections inquiring about

Page 63

1 whether their rights had or had not been restored?
2    MS. BORGEN:  Object to the form.
3    A. In some instances I know that people had
4 received letters from the Supervisor of Elections. That
5 is what made it so absolutely absurd to us.
6    I recall distinctly in Jacksonville that someone
7 did bring -- as a matter of fact, more than one person had
8 brought letters they had received and could not understand
9 why they could not vote.
10    Q. Had they responded to the letters according to
11 what they·were told?
12    A. One person had followed up all the way and
13 described at that hearing about what she had to go through
14 to try to get that clarified. It was not only a paper
15 nightmare but also, I mean, being referred from one person
16 to the other and not really getting to the bottom of how
17 they could get their name back on the rolls.
18    One I recall was successful and one was not.
19    Q. Prior to the election?
20    A. Right.
21    Q. Successful prior to the election?
22    A. Prior to the election, right.
23    Q. Where we got off a moment ago, I asked you if
24 someone were convicted of a felony and had not had his or
25 her civil rights restored, would you agree that person had

Page 64

1 not been wrongfully purged from the list of eligible
2 voters?
3    MS. BORGEN:  Object to the form.
4    A. That's correct but the reason I went through
5 that explanation was obviously because of what did occur.
6    Q. If there is a dispute about whether this person
7 had their civil rights restored or not?
8    A. Right.
9    Q. Are you aware of the claims of Mr. MacDonald in
10 this lawsuit? He's one of the named plaintiffs in this
11 case.
12    A. I would have to refer specifically to his piece.
13    MS. BORGEN:  Page 23, paragraph 88.
14    (Discussion off the record.)
15    THE WITNESS:    Your question was?
16    Q. My question is are you familiar with the claims
17 of Mr. MacDonald in this lawsuit who is one of the named
18 plaintiffs?
19    A. Yes, I do recall hearing about this gentleman.
20    Q. Have you heard the term 100 percent match used
21 in connection with removing the people from the list of
22 eligible voters?
23    A. Yes, I have heard that.
24    Q. What did you understand that term to mean?
25    MS. BORGEN:  Object to the form.

Page 65

1    A. 100 percent to me means 100 percent, all.
2    Q. 100 percent match?
3    A. Yes.
4    Q. That would be a match between the list of say
5 possible or probable felons and the voter roll?
6    A. Right.
7    Q. Do you know what type of match has occurred
8 between the records of Mr. MacDonald and the voter rolls
9 in Hillsborough County?
10    A. Not more than what I have been told by his
11 complaint.
12    Q. You don't know if there was a match between
13 William MacDonald who shared the same birthdate and social
14 security number on the FDLE reports and the Hillsborough
15 County voter registration rolls?
16    A. No, I don't.
17    Q. We are going back to what you told us before on
18 what you heard about people who said they had their civil
19 rights restored.
20    Would you agree that in order to determine
21 whether someone was or was not eligible to vote because
22 perhaps it was less than a 100 percent match or because he
23 or she had had their civil rights restored you would need
24 to have information from that individual?
25    MS. BORGEN:  Object to the form.

Page 66

1    A. Well, there is information we would have to have
2 from that individual, yes.
3    Q. Let me ask you if you would look at paragraph 7
4 on page 4 of Exhibit 4. The sentence reads in paragraph
5 7, "NAACP members were also among those voters whose names
6 were randomly purged from the voter registration list".
7    Do you see that?
8    A. Yes, I do.
9    Q. Are you aware of any members of the NAACP at the
10 time of the November 2000 general election who sought to
11 vote in that election and were unable to do so because he
12 or she had been wrongfully removed from the voter
13 registration lists?
14    A. No more than those that are mentioned here,
15 anyone who is mentioned in this suit.
16    Q. You need to understand that I did not and would
17 not know everyone who came to complain at the individual
18 branch level. Those presidents and officers informed us
19 but I would not know everyone by name so that just would
20 not be possible for me to name for you individually.
21    Q. My question was are you aware of any members of
22 the NAACP as of November 7, 2000 who sought to vote in
23 that election but was unable to do so because he or she
24 had been wrongfully removed from the voter registration
25 rolls?

Page 67

1    A. Based on what I was informed, yes.
2    Q. What does based on what you were informed mean?
3    A. It means that when I visited the areas, when I
4  took the complaints from the presidents, they indicated
5  that there were persons who had indicated they were
6  wrongfully purged and that through the hearings that we
7  had people testified to that.
8    Q. So your testimony is based on what people told
9  the unit presidents who in turn told you; is that correct?
10   A. Right.
11   Q. How do you know those people who were speaking
12  to the unit presidents were members of the NAACP as
13  opposed to members of the public at large?
14     MS. BORGEN:  Object to the form.
15   A. Because of what I was told. Remember now, I am
16  relying on what the officers have said to me and what I
17  have heard in the letters, that some were members and some
18  were not.
19   Q. Do you know in what counties those members were
20  allegedly wrongfully removed from the voter rolls?
21   A. Complaints came from Hillsborough County,
22  Jacksonville, Miami-Dade, Leon County and Orange County.
23   Q. Were there other counties who allegedly removed
24  people wrongfully from the voter rolls?
25   A. Broward and I know we got some complaints out of

Page 68

1  Palm Beach.
2    Q. Any other counties?
3    A. I don't recollect the counties but that does not
4  mean they did not do it. It is just that I don't recall
5  them at this point.
6      If you would understand the conditions under
7  which I found myself on November 7, 2000 and subsequent to
8  that time, it was a very difficult time for me and for all
9  of us because we had worked so very hard to help make that
10  one of the highest turnouts, voter turnouts in history.
11     The organization had sought and received
12  donations to help units around the country to register
13  voters, to educate voters about the voting process and
14  ultimately to get them out.
15     When I personally started out that morning and I
16  ran into a problem myself it was devastating because I was
17  not expecting it.
18     So I am going through this -- and you did not
19  ask me -- but I am going through it because you asked the
20  question about the names. That is very difficult for me to
21  give you a specific name because of the strain that I was
22  under and those who had worked hard to make that happen.
23   Q. Let me go ahead and ask since you have raised
24  the issue, in your affidavit or your declaration at
25  paragraph 11 you have referenced the personal problem that

Page 69

1  you encountered on Election Day November 2000.
2      Would you please tell me what problems you
3  encountered?
4    A. Yes. First of all, I had filled out the Friday
5  before the Tuesday elections in the early voting process
6  an absentee ballot and I did not receive it in the mail by
7  Election Day.
8      So I went to my precinct and attempted to vote.
9  I went to see the supervisor of the precinct and when I
10  proceeded to explain to him that I had filled this form
11  out but had not gotten it, could I please vote, of course
12  they said no.
13     I said, "Why not?"
14     They said, "Because our records show that you
15  were sent an absentee ballot."
16     I said, "Well, your records may show it, but I
17  never received it and I want to vote today. I'm not going
18  to leave here until I vote."
19     So it was very embarrassing for me. The
20  precinct was filled with people. There was an elevation
21  of voices between the two of us because it was that kind
22  of day starting out.
23     I was told to sit down and wait.
24     I waited two hours. Then I went to him and I
25  said, "I'm still waiting here. I am determined I'm going

Page 70

1  to vote. You need to get in touch with the elections
2  department."
3      He said, "I cannot get in touch with them."
4      I again told him I was tired of waiting, I had
5  to go because I was volunteering myself that day to take
6  people to the polls.
7      And I called our lawyer at the national office
8  and told him what was happening to me and he indicated
9  that I should ---
10   Q. I don't want to get into that conversation.
11   A. You just asked me what happened that day.
12     I called my lawyers and then I sat there and I
13  waited and it was exactly three hours that I sat there
14  before the supervisor of the poll came back and said that
15  I could vote.
16     I said, "Why did you not allow me to vote
17  anyway?"
18     After that process that I went through, I left
19  the precinct and immediately called several radio stations
20  and started telling people, "If you have any problems,
21  don't get discouraged. Don't let people run you away."
22     I said, "If you know you have registered, be
23  sure and stand your ground."
24     So the day was started off for me, you know, in
25  a very, very bad way.

Page 71

1      All during the day phone calls started coming in
2  to our command center about people having problems from
3  one issue to the other.
4      Some precincts were moved and people said they
5  had not been informed.
6      You know, it was one thing and then another. I
7  started taking, getting calls from across the state from
8  other presidents saying they were getting complaints from
9  people about what had happened to them, people that had
10  registered and had not received their registration cards,
11  people who had registered or attempted to register with
12  the motor vehicle, Florida motor vehicle system and had
13  not gotten a response.
14     Quite a few of our students from Tallahassee
15  complained that particular day.
16     It was a very difficult day. A lot of calls
17  came in. People were very upset.
18     On that evening between 6:00 and 6:30 I started
19  to get calls from several precincts within the black
20  community indicating that the polls, the precincts where
21  they went, they were told that they had to go to another
22  precinct and they said by the time they got to the other
23  precinct it would be closed.
24     So I started trying to get in touch with the
25  elections department here in Miami.

Page 72

1      It was just a really, really rough day
2  subsequent to the whole debacle, yes.
3    Q. I'm sorry. I have tried, wanted to give you a
4  lot of latitude to focus on Paragraph 11.
5      When you ultimately voted did you sign any form
6  of affidavit or affirmation that you had not previously
7  voted?
8    A. Yes.
9    Q. And do you believe that any of the difficulties
10  that you encountered that you have just described were
11  because of your race?
12   A. I sure do, I sure do and the reason I do is
13  because I wondered why nobody else was having a problem.
14  In my particular precinct blacks were not in the
15  majority.
16   Q. Were you aware of anyone else in your precinct
17  who had requested an absentee ballot to vote on the Friday
18  before the Tuesday election?
19   A. Yes, my husband.
20   Q. Did he receive his ballot?
21   A. No.
22   Q. Was he with you at the time you were trying to
23  vote?
24   A. No.
25   Q. Did he ultimately vote?

Page 73

1 A. He did ultimately vote.
2 Q. Did he sign the same affirmation?
3 A. Yes.
4 Q. Again, so that I am clear, I understand the
5 basis that you believe that the difficulty you encountered
6 was because of your race?
7 A. Well, I got real suspicious mainly because I was
8 in the minority. Nobody else seemed to be having a problem
9 of sitting there for three hours. Nobody seemed to have
10 complained but me and I thought, "What is going on here?"
11 Q. Did any of the other people who you saw going
12 through the polls, my question is did any of those other
13 people, to your knowledge, request absentee ballots like
14 you had shortly before the election?
15 A. I was not aware of that.
16 Q. Other than observing that no one had problems as
17 you were sitting there as you have described, is there any
18 other basis for you to say that you believed that the
19 difficulties you encountered were racially based?
20 A. Yes, by the treatment that I received. Nobody
21 else was talked to that way.
22 Q. You used the term elevation of voices. Did you
23 get upset during this time frame?
24 A. I sure did, after he hollered at me.
25 Q. So what you're telling us there was elevation of

Page 74

1 voices on both sides?
2 A. Yes.
3 Q. What precinct did you vote in?
4 A. I have to look at my card but it was right near
5 my house.
6 Q. Can you give me the number?
7 A. I don't know it from memory.
8 Q. Do you recall the approximate location of the
9 precinct?
10 A. Sure, it's on Ives Dairy Road, 199 Street.
11 Q. Go back to paragraph number 2 in Exhibit number
12 4. The statement that we were looking at a moment ago is
13 that black voters was wrongfully purged from the official
14 list of eligible voters.
15 Is it the claim of the NAACP in this case that
16 the only group of voters wrongfully purged from the
17 official list of eligible voters were black?
18 MS. BORGEN: Object to the form.
19 A. The NAACP is claiming based on the complaints
20 that came to it in a formal way.
21 Q. That is to say that the only complaints you
22 received were from black voters?
23 A. Formally. No, no, but in a formal way those who
24 actually followed up with the written complaints were
25 black.

Page 75

1 Q. The next phrase is the voter registration
2 applications of the Florida voters were processed
3 improperly.
4 What is the nature of that claim?
5 MS. BORGEN: Object to the form.
6 A. I am sorry. Would you repeat that.
7 Q. The next sentence in paragraph 2 of Exhibit 4
8 refers, states that the voter registration applications of
9 black voters were not processed properly.
10 My question is what is your understanding of the
11 basis for that assertion?
12 MS. BORGEN: Object to the form.
13 A. Well, the basis is that when the applications
14 were completed, they were not processed like they should
15 have been, meaning that the persons did not receive their
16 voter registration cards as they should have.
17 Q. Is it the claim of the NAACP in this lawsuit
18 that the voter registrations of black voters were handled
19 differently than other ethnic groups?
20 MS. BORGEN: Object to the form.
21 A. We certainly believe that.
22 Q. What is the basis for that belief?
23 A. Based on the disproportionate number that, not
24 only the number of people who complained, but also the
25 number of votes that were thrown out.

Page 76

1 Q. Well, if someone's voter registration
2 application was not processed their vote would not be
3 thrown out because they would not be able to vote; right?
4 A. On the voter registration form itself?
5 Q. My question is, the NAACP claiming in this
6 lawsuit that the applications of black voters in Florida
7 were handled differently than other ethnic groups?
8 MS. BORGEN: Object to the form.
9 A. Yes.
10 Q. I am asking you what is the basis for that
11 contention.
12 A. Based on the complaints that came there, based
13 on the evidence of their registration forms not being
14 received, cards not being received, large numbers,
15 disproportionate numbers of people complaining about that
16 of all ages.
17 I mentioned college students previously. We had
18 students in Jacksonville and Tallahassee, large numbers of
19 them talking about having registered and their cards were
20 not given to them and they were unable to vote.
21 Q. Does the NAACP claim that the voter registration
22 applications of NAACP members were handled differently
23 then other persons?
24 MS. BORGEN: Object to the form.
25 A. Yes, members and non members, it was a

Page 77

1 combination.
2 When you ask the question about the members, the
3 same thing happened to non members that complained. We
4 had both groups come to us.
5 Q. But my question is specifically does the NAACP
6 claim that its member voter applications were handled
7 differently than other people?
8 A. Yes.
9 Q. Was that because of their membership or was it
10 because of their race?
11 A. Well, race, it was based on their race.
12 I don't know, I don't think anyone would know if
13 they are a member or not.
14 Q. To your knowledge were some of the voter
15 registration applications that were being processed
16 missing information on them that was required in order to
17 process the application?
18 A. I am not aware of that.
19 Q. Would you agree if the voter registration
20 applications required missing information from the voter
21 in order for them to be properly registered you would need
22 to have that input from the particular voter?
23 MS. BORGEN: Object to the form.
24 A. I certainly would not like to believe that only
25 black people have that problem. This is what we are

Page 78

1 saying because I think that we register just like everyone
2 else does. Anything missing would not be missing just
3 from black people's registrations.
4 Q. The question is not with regard to race.
5 My question is would you agree if the voter
6 registration applications are incomplete and missing
7 information that you would need to have that information
8 from the persons who were attempting to register to vote?
9 MS. BORGEN: Object to the form.
10 A. Yes, that should be the rule for all
11 registrations regardless of race.
12 Q. Are you aware of any specific members of the
13 NAACP in the November 2000 election who sought to vote in
14 that election and were unable to do so because their voter
15 registration applications had not been processed?
16 A. The people that I mentioned to you earlier, they
17 were just the tip of the iceberg. The college students
18 come to mind first because they were the first groups that
19 I remember complaints about it and then others subsequent
20 to that time.
21 Q. My question is do you know of any specific
22 member of the NAACP who made that complaint?
23 A. I can't give you specific names.
24 Q. You're aware of college students complaining?
25 A. Yes. They were not the only ones but I remember

**Page 79**

1  them.
2      The first thing was, the first complaint that we
3  got was about voter registration cards not being processed
4  and not received. I don't know really know whether they
5  were processed or not but they were not received. Very
6  possibly that means they were not processed but that is an
7  assumption or conclusion based on the fact they did not
8  get them.
9      Q. In paragraph 2 of Exhibit 4 you also stated as
10  an organization there was failure to provide a complete
11  official list of eligible voters at each polling place;
12  do you see that?
13      A. Right.
14      Q. What is your understanding of that claim?
15      MS. BORGEN:  Object to the form.
16      A. That is just what it says, I mean an official
17  list of eligible voters did not exist at each polling
18  place. Some people did not -- their names were not
19  listed.
20      Q. Is it the claim of NAACP that the list was
21  incomplete based on race?
22      MS. BORGEN:  Objection as to form.
23      A. The disproportionate people who ultimately were
24  impacted would suggest that it was race.
25      Q. You based that statement on what, that it was a

**Page 80**

1  disproportionate number?
2      A. Based on the information provided after the
3  election process and then research being done by various
4  entities.
5      That is not based on what I saw. It's just based
6  on what I read.
7      Q. That is not your personal knowledge, simply what
8  you read?
9      A. What I read, uhm uhm.
10      Q. In paragraph 7 of Exhibit 4 you make reference
11  as an organization to the statement right here, that a
12  significant number of the membership were unable to vote
13  or were impeded in voting on election day.
14      Do you know how many that is?
15      A. No, I have no idea. Many people.
16      Q. But you don't know what the number is?
17      MS. BORGEN:  Objection as to form.
18      A. I gave you the counties before that complaints
19  originated ---
20      Q. Do you know how many in each county?
21      A. Yes, there were other counties but I don't have
22  the number.
23      Q. You don't know the total number in the State of
24  Florida?
25      A. No, I don't.

**Page 81**

1      Q. You don't know of a particular number in any
2  given county either; correct?
3      A. No, I don't know
4      (Discussion off the record.)
5      MR. LITTLE:  George, do you need to ask your
6  questions?
7      MR. WAAS:  I will not be very long.
8      DIRECT EXAMINATION
9  BY MR. WAAS:
10      Q. Ma'am, my name is George Waas. I am with the
11  Attorney General's Office all the way up here in
12  Tallahassee. I represent, along with others, the
13  Department of Children and Families and Department of
14  Highway Safety and Motor Vehicles.
15      Can you hear me all right?
16      A. Yes, sir.
17      Q. If you don't understand a question I ask you,
18  please let me know because occasionally the phone lines
19  can be interrupted. I will repeat or reask the question.
20      A. All right.
21      Q. I assume that you're familiar with the
22  allegations contained in the complaint in this lawsuit; is
23  that correct?
24      A. I am familiar with them, yes.
25      Q. I assume you're familiar with the claims in the

**Page 82**

1  lawsuit regarding the Department of Highway Safety and
2  Motor Vehicles; is that correct?
3      A. Yes.
4      Q. And you're also familiar with the allegations in
5  the complaint regarding the Department of Children and
6  Families?
7      A. Yes.
8      Q. From your own personal observation and knowledge
9  gained through that observation, what facts do you have to
10  support the claims in your lawsuit against the Department
11  of Highway Safety and Motor Vehicles?
12      A. The claims that I have that I can express are
13  those that came through the complaints made to the
14  organization.
15      Q. I see. So your knowledge with respect to the
16  allegations in this complaint regarding the Department of
17  Highway Safety and Motor Vehicles and those that were
18  brought to your attention by other people; is that
19  correct?
20      A. That's correct.
21      Q. Would your answer also be the same with regard
22  to the Department of Children and Families?
23      A. Yes, it would be.
24      Q. Would regard to the allegations concerning the
25  violations of the National Voter Registration Act, do you

**Page 83**

1  have any facts from your personal knowledge based on your
2  own observations and experiences to support those
3  allegations?
4      A. The allegations that I have made here are not
5  personal except for the experience that I have shared.
6      Q. Okay.
7      A. They all come from complaints that were brought
8  to us.
9      Q. Do you have any facts that members of the NAACP
10  were treated any differently from other members of the
11  public generally?
12      MS. BORGEN:  Object to the form.
13      A. Numbers of the NAACP were hurt and injured by
14  this process.
15      Q. My question is do you have any facts that
16  members of the NAACP were treated any differently or hurt
17  to any different degree from other members of the public
18  generally?
19      A. I was about to tell you.
20      Q. I am sorry. Go ahead.
21      A. Okay. I was going to say that the members of
22  the NAACP were hurt differently from the public because of
23  the injury that was placed upon the organization which
24  caused the members to be hurt differently.
25      By that I mean the fact that the organization

**Page 84**

1  had gone through quite a bit to make sure that individuals
2  received an opportunity to vote.
3      We had worked very hard through doing voter
4  registration drives. We had made sure that we had done
5  voter education sessions with people around the state.
6      The organization was forced after the election
7  to hire additional people to try to go out and find out
8  what the problems were.
9      We were supposed to try to encourage people,
10  because people were very, very -- and I talked about how
11  the membership felt impacted as well as others but our
12  membership felt very disenfranchised, they no longer knew
13  whether or not their vote would count. People felt they
14  were just really dissatisfied with what they felt occurred
15  on the 7th.
16      Therefore we have had a very difficult time as
17  an organization trying to convince people that they must
18  hang in there and have their vote to count and make sure
19  their vote counted by continuing to vote.
20      So it has been very injurious to the
21  organization and to those of us in the organization
22  because of what we had to go through and what it cost us,
23  you know, financially and what it cost us in terms of the
24  volunteerism, that we took time off our jobs, time away
25  from our families.

Page 85

```
 1       It has been injurious tremendously and I think
 2  our injury is quite a bit different from that of the
 3  public because the public perhaps were, obviously were not
 4  involved in what our organization was involved in terms of
 5  what we tried to do as members to impact the voter
 6  process.
 7       Q. As I understand your testimony, the injury that
 8  you're talking about is based on all of the information
 9  that was gathered and presented to you; is that correct?
10       MS. BORGEN:  Object to the form.
11       A. That is a part of what I am saying, yes,
12  information that was gathered and presented to us but I am
13  also saying to you what we went through as an organization
14  in order to have November 7, 2000 be a successful day.
15       Q. What facts do you have from your own personal
16  experience that the Department of Highway Safety and Motor
17  Vehicles in any way contributed to the concerns you have
18  just expressed?
19       A. In terms of the injury, as I told you before,
20  whether you're talking about Motor Vehicles or DCF, I
21  thought information was brought to us but your ---
22       Q. My question ---
23       A. Your latter question was different from that
24  one.
25       Q. I am asking what information did you gather from
```

Page 86

```
 1  your own observation to support the claims in the lawsuit
 2  regarding Highway Safety and Children and Families?
 3       A. Specifically people stated they had problems
 4  when they attempted to register for the vote and did not
 5  get their voter registration cards.
 6       Q. This is personal information you had?
 7       A. Yes.
 8       Q. You got from other sources; is that your answer?
 9       A. Excuse me?
10       Q. Information you had that was obtained from other
11  sources?
12       A. That would be the only way because I did not
13  register that way personally, either one of those ways I
14  did not use.
15       Q. So that when I asked you what facts you have
16  that members of the NAACP were treated differently, your
17  answer is, as I understand it -- and correct me if I'm
18  wrong -- based on the information that you received from
19  other sources or other individuals; is that correct?
20       MS. BORGEN:  Object to the form.
21       A. Yes.
22       Q. Now, what facts do you have that members of the
23  NAACP were treated differently based on race alone?
24       MS. BORGEN:  Object to the form.
25       A. Related to that same question?
```

Page 87

```
 1       Q. Excuse me?
 2       A. You're still relating back to the same question,
 3  the question previously, as it relates to Motor Vehicles
 4  and DCF?
 5       Q. Exactly.  What facts do you have that Motor
 6  Vehicles and Children and Families treated NAACP members
 7  differently based on their race?
 8       MS. BORGEN:  Object to the form.
 9       A. The information that was gathered after the
10  election process, not only the complaints but the reports
11  that came out in written reports that were obtained from
12  other sources definitely indicated that, you know, blacks
13  were treated differently and many of the blacks that were
14  treated differently were members.
15       Q. Did those reports indicate how Hispanics were
16  treated, how Caucasians were treated, how Asians were
17  treated as well?
18       MS. BORGEN:  Object to the form.
19       A. Those reports did but said disproportionate
20  black voters is what it said.
21       Q. Your testimony today is with reliance on those
22  reports; is that correct?
23       A. Those reports along with the complaints.  That
24  is all I would have because I did not experience it
25  myself.
```

Page 88

```
 1       Q. You did not have any personal experience
 2  regarding any matters involving the Department of Highway
 3  Safety and Motor Vehicles?
 4       A. I did not register that way, no.
 5       Q. You did not have any personal experiences
 6  regarding your lawsuit directed to the Department of
 7  Children and Families; is that correct?
 8       MS. BORGEN:  Object to the form.  Asked and
 9  answered.
10       A. I have already told you that.
11       Q. Go ahead.  What was your answer?
12       A. The answer was I did not have a personal
13  experience but you've got to recall I am speaking on
14  behalf of those who came and complained as well as the
15  information that I have read.
16       Q. By way of summary, would it be correct to say
17  that the information to which you're testifying today, at
18  least with respect to Department of Highway Safety and
19  Motor Vehicles and Department of Children and Families is
20  based on what you were told or what you read; is that
21  correct?
22       A. Exactly.
23       MR. WAAS:  I have no further questions.  Thank
24  you.
25       Q. (By Mr. Little) I am going to have a few more
```

Page 89

```
 1  questions.
 2       When you refer to the term those reports that
 3  you reviewed, what reports are those?
 4       A. Reports that were documented in various
 5  periodicals such as newspapers.
 6       Q. Can you specifically identify a report you were
 7  referring to when you were answering those questions, is
 8  there a specific report that came to mind?
 9       A. Well, the report that was done by reporters,
10  surveys, the research that was done by papers such as the
11  Miami Herald where they indicated a disproportionate
12  number of blacks.
13       Q. So you're referring to a survey done by the
14  Miami Herald newspaper?
15       A. One of them.
16       Q. Any other specific reports or surveys that you
17  can recall when you used the term those reports?
18       A. Well, there was a series of them, a series of
19  reports that were done.  The New York Times had
20  information.  The Washington Post carried information.
21  You know, various companies and periodicals did.
22       Q. So the reports you are referring are by
23  different news publications, either newspapers or
24  magazines?
25       A. And now a book because I do have the book.
```

Page 90

```
 1       Q. What book is that?
 2       A. The complete investigation done by the Miami
 3  Herald.
 4       (Recess taken.)
 5       Q. Back on the record.
 6       Looking again at Exhibit number 4, paragraph
 7  number 2, there is also inadequate processing for
 8  verifying registrations and voters not appearing on
 9  precinct lists.
10       Do you know what the nature of that claim is?
11       A. I'm looking down here.
12       Yes, it is based significantly, as is stated
13  here, that obviously they were not able to verify the
14  voters on their list because they could not get to the
15  elections department, you know, the lines were busy, other
16  things were happening, there was no backup system for them
17  to utilize.
18       You know, many persons who complained indicated
19  that, you know, they should have had some way of
20  determining they had been registered even though they did
21  not have cards.
22       That was one of the things that came out of that
23  particular one.
24       Q. Is it your understanding that the problem was
25  that the people were at the polls but did not have their
```

Page 91

1  registration cards?
2      A. Some people had registration cards. Some people
3  had not received them but went anyway. Some people had
4  registration cards but their names were not listed on the
5  poll lists for the people having been purged.
6      Q. The inadequate processes that you have just
7  described, does the NAACP through the Florida State
8  Conference of Branches claim that those processes were
9  tied to race?
10     A. Well, yes, obviously because of the people that
11 we are representing and the complaints coming from
12 blacks. That is who the people were, the majority of
13 people that came to us.
14     Q. Your answers are based upon the people that
15 appeared at the hearings, the hearings that the NAACP
16 conducted; correct?
17     A. And the complaints that went into our branch
18 offices, people that complained.
19     Q. Are you aware of other people of different
20 ethnic backgrounds who had different organizations other
21 than the NAACP who they may have complained to about the
22 November of 2,000 election?
23     A. I do not know the answer to that question, not
24 really, no. I would just have to say not really.
25     Q. You don't know if there were other

Page 92

1  organizations?
2      A. There were a couple, yes, that were not NAACP
3  and people representing people that were not necessarily
4  black.
5      Q. Do you know what organizations you're thinking
6  of?
7      A. People like Voter Leagues.
8      Q. And the race of the people complaining to the
9  Voters Leagues would have been other than ---
10     A. Combination.
11     Q. Combination?
12     A. Yes.
13     Q. Any other organizations that were complained to
14 after the November 2000 election?
15     A. Many of the people that assisted with the voting
16 process were made up of coalitions, not only the NAACP but
17 many other community based organizations such as churches,
18 sororities and fraternities. All those groups get involved
19 in voter empowerment, voter registration, getting the vote
20 out and voter education.
21     Q. Were the complaints to those organizations that
22 you have heard of, were they predominantly ethnic groups
23 other than black?
24     A. Not predominantly, no, the groups that work with
25 the NAACP were predominantly black, yes, so complaints

Page 93

1  would have gone to them also because they were a part of
2  what we were all trying to get done.
3      Q. Any other organizations that you know of that
4  received complaints after the November 2000 election?
5      A. I'm not aware of other than what I have
6  mentioned.
7      Q. Do you know who in our system of government in
8  Florida operates the polling places?
9          MS. BORGEN: Object to the form.
10     A. When you say operates you mean ---
11     Q. Responsible for.
12     A. Well, ultimately the top person is the position
13 of Ms. Harris that is responsible, Secretary of State,
14 that position.
15     Q. Do you know who operates the polling places?
16     A. Volunteers operate them, you mean from that
17 standpoint?
18     Q. Right.
19     A. Poll workers.
20     Q. Is it your understanding that poll workers are
21 volunteers?
22     A. No, I think they are paid.
23     Q. They are paid volunteers?
24     A. They are paid volunteers.
25     Q. Do you know whether at the polls there are also

Page 94

1  members of the Supervisor of Elections staff?
2      A. I don't know. I don't know if they have that
3  many staff people to put at all the precincts. Maybe so.
4  I don't know.
5      Q. Do you know who trains the poll workers at the
6  precincts?
7          MS. BORGEN: Object to the form.
8      A. The elections department is responsible for
9  that.
10     Q. Do you know who operates the phone lines at the
11 precincts?
12         MS. BORGEN: Object to the form.
13     Q. Between the precinct and the central office?
14         MS. BORGEN: Object to the form.
15     A. The man who did not let me vote, that's the
16 position he was in, the head person at that precinct,
17 whatever that position is called.
18         He was obviously a poll worker.
19     Q. Do you know who installs the phone lines between
20 the precinct and the central office?
21         MS. BORGEN: Objection as to form.
22     A. No, outside of the phone company I would not
23 know.
24         You mean who is responsible, is that what you
25 mean?

Page 95

1      Q. I'm trying to find out who ordered the phone
2  company to install that line.
3      A. Well, I would imagine the elections department.
4  They are responsible for the voting process.
5      Q. How does the NAACP intend to seek relief for the
6  members, if any, in counties other than the ones who are
7  listed as defendants in this lawsuit by way of having
8  better communications installed between the precinct and
9  the central office in those counties that are not
10 defendants in this case?
11         MS. BORGEN: Object to the form.
12     A. Well, if the systems are corrected in those
13 counties, the hope is that they will be corrected
14 everywhere. I would hope whatever system is put in place
15 is not isolated to just those that I identified and that
16 the whole state would be hopefully reformed.
17     Q. Would you agree that the supervisor here in
18 Miami-Dade cannot direct the supervisor in Broward County
19 what to do about her communication systems between the
20 precincts in her county?
21     A. Am I aware?
22         MS. BORGEN: Object to the form.
23     Q. Yes, are you aware of that fact?
24     A. Yes.
25     Q. Are you aware that every Supervisor of Elections

Page 96

1  is a constitutional officer in the State of Florida?
2      A. Yes.
3      Q. Let me ask ou a question which I am sure will
4  seem to be incredibly obvious: NAACP does not register to
5  vote? The organization NAACP as an organization does not
6  register to vote; correct?
7      A. As an entity, you mean like you can go and cast
8  a ballot for the NAACP?
9      Q. Correct.
10     A. No.
11     Q. And the NAACP as an organization does not vote;
12 is that correct?
13     A. Not as an organization.
14     Q. As an organization the NAACP has never been
15 placed on the voter rolls or been removed from the voter
16 rolls?
17     A. As an entity, no.
18     Q. In paragraph number two of Exhibit 4 at the very
19 end, the last practice that is identified, the failure to
20 offer voters that move within the county the opportunity
21 to vote by affirmation or affidavit; do you see that?
22     A. Yes.
23     Q. What is your understanding of that claim?
24     A. Well, it is pretty straight forward, these
25 persons coming within an area, they need to be able to

Case 0:00-cv-00120-ASG   Document 410   Entered on FLSD Docket 07/02/2002   Page 241 of 280

**Page 97**

1  vote by either affirmation or affidavit because we move,
2  as people do, we are highly migratory.
3  Q. We being?
4  A. We being the people in the state of Florida.
5  Q. Is it the claim of the NAACP through the Florida
6  State Conference of Branches that the failure to offer
7  voters who moved in the county the opportunity to vote by
8  affirmation or affidavit was racially directed?
9  MS. BORGEN: Object to the form.
10  A. Well, quite frankly, all of irregularities that
11  were itemized disproportionately impacted blacks.
12  We just did not hear the complaints coming from
13  other areas proportionately and the reports bore out what
14  was written.
15  Q. Again, the reports are the ones you identified
16  previous, the Miami Herald, the New York Times?
17  A. Yes.
18  Q. Is the NAACP claiming in this lawsuit that any
19  of those activities complained of in the complaint that
20  were directed to race were intentional?
21  MS. BORGEN: Object to the form.
22  A. Intentional by who?
23  Q. By the persons who are being sued?
24  A. I don't believe I say that anywhere.
25  Did you see that somewhere?

**Page 98**

1  Q. My question is your understanding. You have
2  used the term disproportionate impact previously.
3  A. Uhm uhm.
4  Q. And my question was to your knowledge has the
5  NAACP claimed in this lawsuit that any of the conduct
6  complained of against the defendants named, was that
7  intentional conduct?
8  A. When you say has the NAACP in the lawsuit
9  claimed, I would have to say I have not read the part
10  where it claims it but if you ask me what my opinion is,
11  that is another issue. But I do not recall seeing that in
12  our writing.
13  Q. Are you aware of legislation being passed after
14  the November 2000 general election that made changes to
15  Florida's election code?
16  A. Yes.
17  Q. Was the NAACP involved in any legislative
18  activities after the November 2000 election to bring about
19  changes to the Florida election code?
20  MS. BORGEN: Object to the form.
21  A. We were involved in that we asked for changes to
22  be made as we do when we deal with the legislative
23  process.
24  But to say that we were involved as it relates
25  to helping the legislature to do their changes, no, we

**Page 99**

1  were not involved in that process.
2  Q. Let me be specific. Do you know if anyone from
3  the NAACP appeared in front of any legislative committee
4  that was conducting hearings about changes to the Florida
5  election code following the November 2000 election?
6  MS. BORGEN: Object to the form.
7  A. I believe so. I believe we did have somebody. I
8  am saying I believe. I am not real sure.
9  The reason is we have a branch in the
10  Tallahassee area that often goes before committees when
11  issues are up of concern and they might have gone to speak
12  on behalf of the unit.
13  Q. But you don't know for sure?
14  A. No, I don't know for sure.
15  Q. Do you know if the NAACP —
16  A. I know I did not. I was just speaking for
17  myself.
18  Q. But today we are talking about these subjects on
19  behalf of the organization. Even if you don't have
20  personal knowledge, that you might have some knowledge.
21  We are try to gather that on behalf of the organization.
22  A. I understand.
23  Q. To your knowledge did the NAACP offer any
24  proposed legislation following the November 2000 election?
25  MS. BORGEN: Object to the form.

**Page 100**

1  A. No.
2  Q. And the proposed legislation would be to the
3  Florida Legislature?
4  A. Not to my knowledge.
5  Q. After the legislation passed, are you aware of
6  whether rule making occurred, that is rules were being
7  drafted to implement the legislation?
8  MS. BORGEN: Object to the form.
9  A. Yes.
10  Q. Are you aware of the fact that there were
11  workshops held at various point places in the state to
12  receive comments about the proposed rules that were being
13  proposed as part of this new statutory scheme?
14  MS. BORGEN: Object to the form.
15  A. Yes, and I was aware that they were not, we were
16  not given proper notice.
17  Many of the workshops were given at times that
18  were not convenient, were not user friendly for those of
19  us who work and many times we just plain did not know,
20  until they were over, they had occurred.
21  Q. Let me be more specific then.
22  When was the first time you heard there were
23  rule making workshop efforts as an organization?
24  A. I think it was the first one we missed. I don't
25  remember the date on it. It seems to me the first one --

**Page 101**

1  I am not sure real sure what city it was in. It seems like
2  it was in Tallahassee.
3  Q. Do you recall the subject matter of the
4  workshop, what particular rule was being considered?
5  A. No, I don't. I would have to look back at that
6  on the rule making piece.
7  Q. To your knowledge did the NAACP participate in
8  any of the rule making that occurred following the passage
9  of the Florida Election Reform Act of 2001?
10  A. Yes.
11  Q. When did the organization participate?
12  A. In Miami. I don't remember. I would have to go
13  back and check the other places but I know Miami.
14  Q. Did you personally participate in Miami?
15  A. No, the local branch did.
16  Q. What do you base your prior statement on, that
17  NAACP did not receive proper notice of the rule making
18  sessions?
19  A. Well, not only the NAACP but other people also
20  did not receive it. It was not publicized until, you
21  know, it was late. You know, it's something to bring to
22  your attention. If they did not, we missed it.
23  Many times, as I mentioned before, it was not
24  user friendly for many of us who worked.
25  Q. What is a user friendly time, that you consider

**Page 102**

1  to be a user friendly time?
2  A. Any time after 5:00, give people an opportunity
3  to go by after work.
4  Q. Do you know if the NAACP contacted the Division
5  of Elections and asked to be specifically notified of the
6  rule making workshops after this first instance you have
7  described?
8  A. I would not know that. I can say I did not call
9  them. They may have been called by NAACP units.
10  Q. Do you know how many rule making workshops the
11  NAACP as an organization has participated in since the
12  Florida Election Reform Act was passed?
13  A. I mentioned to you earlier I was only aware of
14  Miami.
15  Q. Personally?
16  A. Personally.
17  Q. What I am saying is have you seen any reports
18  summarizing the number of workshops that were attended by
19  the organization?
20  A. No, not unless it is in one of my documents that
21  I have not read. I want to emphasize that.
22  Q. Are you aware of additional legislation being
23  passed in 2002 that makes changes to the Florida election
24  code?
25  A. Yes.

Page 103

1   Q. Did the NAACP participate in that legislative
2 process by either appearing at hearings or offering
3 proposed legislation?
4      MS. BORGEN: Object to the form.
5   A. Again, I am not aware.
6      That does not mean it did not happen. I can
7 tell you that I did not participate in the process.
8   Q. To your knowledge has the NAACP offered any
9 proposed rules or revisions to rules that had been drafted
10 in response to the Election Reform Act following the
11 November 2000 election?
12   A. To my knowledge, no, other than as I mentioned
13 earlier, during the legislative process the NAACP always
14 identifies areas.
15      I did not go into an explanation but what I was
16 referring to was the fact we always identify areas that
17 the legislative session will take up that we have concerns
18 about and that helps to make up our legislative agenda.
19      So the voting irregularities was the legislative
20 item we were concerned about.
21      We certainly expressed that concern and shared
22 the agenda, you know, with members of the legislature but
23 to say that we actually participated in terms of making
24 changes, that is not accurate.
25   Q. Did the Florida Election Reform Act that was

Page 104

1 passed in the 2001 session address some of the issues that
2 were raised in the lawsuit that was marked as Exhibit 4?
3      MS. BORGEN: Object to the form.
4   A. Some of the issues that were in the Election
5 Reform Act were some of the issues in the lawsuit but
6 others were not addressed.
7      One of the major ones that comes to mind is the
8 disenfranchisement of felons, a process that would
9 certainly reduce the amount of time and give access to
10 felons being restored their rights, was not, you know,
11 dealt with in a way that it should have been in my
12 opinion.
13      One of the other things that I am concerned
14 about has to do with the manuals, the new election manuals
15 that have been developed.
16      On one page of the manual in particular it had a
17 caricature and the issue on that page -- I don't have it
18 with me -- but the issue on that page -- very serious
19 issue, I felt -- there is a caricature of this
20 animal-like person that is displayed there.
21      I thought, "This is ridiculous. Why in the
22 world would someone develop something of this nature. As
23 serious as the matter was, I would have thought it would
24 be dealt with in a serious manner."
25      There were issues like that that concerned me

Page 105

1 overall.
2      But in terms of the reform itself, I thought
3 that some key issues were not dealt with while others were
4 dealt with.
5   Q. The manual you were talking about, is this the
6 poll workers training manual, is that what you're
7 referring to?
8   A. Yes.
9   Q. The section you're referring to involved how a
10 poll worker is to deal with an upset or --
11   A. Irate voter.
12   Q. -- irate voter?
13   A. Uhm uhm.
14   Q. And the caricature that you referred to is a
15 person who is hollering; is that right?
16   A. Yes, like I was doing.
17      But I am not an animal.
18   Q. And your testimony is that looking at that
19 picture it was your belief that made the person look like
20 an animal?
21   A. It was offensive, yes, to me.
22   Q. My question is specifically is it your opinion
23 that that caricature made the person look like an animal?
24   A. Yes.
25   Q. Returning to the areas where you believe the

Page 106

1 legislature has not addressed issues raised in this
2 lawsuit, you have indicated the disenfranchisement of
3 felons.
4      What other areas do you believe the legislation
5 had not addressed issues raised in this lawsuit?
6   A. That was the major one with all of its
7 components, various tentacles that feed into
8 disenfranchisement of felons. I would have to -- I don't
9 have those listed but there were others.
10   Q. You cannot recall them as you sit here?
11   A. No, I don't recall, I don't recall.
12   Q. Going back to your personal situation in voting
13 on November 7, is it your claim that the Division of
14 Elections was responsible for any of the activity you
15 described to us earlier?
16      MS. BORGEN: Object to the form.
17   A. Yes.
18   Q. What is the basis for that claim?
19   A. Well, the basis is the fact that, you know, I
20 had to stay for the length of time that I did, that
21 obviously the poll workers, in my opinion, needed, number
22 one, sensitizing to people that came in with maybe a
23 different situation as I had.
24      The way in which I was spoken to was
25 inappropriate. From the first time I approached the poll

Page 107

1 worker at the desk, the way I was dealt with by the
2 supervisor was not appropriate.
3      There was no effort to make me feel that my
4 issue was going to be taken seriously.
5      I just felt that it is the responsibility of the
6 Elections Department to work with their poll workers and
7 to train them properly. I felt they obviously need, needed
8 then and still need obviously additional training further
9 to understand each of the issues that could arise and how
10 to deal with them.
11      If the person has applied for an absentee
12 ballot, it was not the responsibility of the poll worker
13 to play judge and jury and to tell me that I could not
14 vote.
15      It was their ultimate responsibility to give me
16 alternatives and that decision would be made higher than
17 the poll worker and the precinct as to whether or not I
18 should vote.
19   Q. When you say give you alternatives, what do you
20 mean by that?
21   A. Well, I ended up signing a form anyway. That
22 form, he could have drawn that up immediately. It should
23 not have taken three hours to give me a form to sign.
24   Q. With respect to the claims that are being
25 brought by the NAACP through the Florida State Conference

Page 108

1 of Branches against the Secretary of State, the office,
2 and the Division of Elections in Tallahassee, is the claim
3 that those offices have failed to supervise the elections
4 properly, is that the nature of the NAACP claim against
5 the Secretary of State's office and the Division of
6 Elections?
7      MS. BORGEN: Object to the form.
8   A. Essentially it is very clear to us that the
9 Secretary of State had the responsibility of the entire
10 process. She -- in this case she, but I mean the
11 office -- has the responsibility of insisting on
12 uniformity throughout the state. Everyone should have
13 been receiving the same information, the same process,
14 should not have been inconsistent.
15      All of the things that we found as
16 irregularities pointed back to the responsibility of the
17 Secretary of State's office.
18   Q. Tell me on what facts you base the statement
19 that they clearly point back to the Secretary of State's
20 office?
21   A. Because one of the questions that you asked
22 earlier in terms of who was responsible for the voting
23 process essentially, and I responded to you about the
24 Elections Department, well, when you talk about the
25 Elections Department, the organizational structure in our

**Page 109**

1 state, the Elections Department responds directly to the
2 Secretary of State's office.
3     Q. When you identify the Elections Department, you
4 are referring to the supervisor of elections in each
5 county?
6     A. Right.
7     Q. It is your understanding that the Elections
8 Department in each of the 67 counties reports to the
9 Division of Elections?
10     MS. BORGEN: Object to the form.
11     A. Perhaps report is too strong, perhaps interface
12 with the Secretary of State's office is proper for the
13 information that the Division of Elections has and has the
14 responsibility of insuring what they have is uniform,
15 accurate and essentially accessible.
16     Also that problem that we ran into should not
17 have occurred had that office done, in our opinion, what
18 it should have done to insure those things did not occur.
19     Q. In the NAACP's opinion what should those things
20 have been to prevent those problems from occurring?
21     A. Well, there are a number of things that could
22 have happened. I can't sit here and give one blanket
23 answer. There are so many tentacles to this whole debacle
24 that any one piece certainly would generate a lot of
25 discussions.

**Page 110**

1     But just on a broad base stroke, essentially it
2 would have been that every voter would have had an
3 opportunity to vote on November 7, 2000, that people who
4 were eligible to vote should have been allowed to vote,
5 that the process that was in place with machines being
6 inadequate, machines, older machines being found in black
7 and poor and minority municipalities should not have
8 existed.
9     I mean, I am only using examples obviously but,
10 as I said before, there are so many pieces to this but it
11 all lies at the doorstep of the Secretary of State and in
12 this state it is the Secretary of State's responsibility,
13 at least that office's responsibility, in addition to the
14 Elections Department, to carry it out.
15     Q. So the position of the NAACP is that all
16 activity with respect to voting or difficulties in voting
17 are the responsibility of the Secretary of State of
18 Florida?
19     MS. BORGEN: Object to the form.
20     A. Your question suggests that that is the role of
21 the Secretary of State of this state and the answer is yes
22 to that.
23     But I am aware of the fact that there is a
24 legislature that does pass legislation that guides much of
25 what occurs so that I also contend you've got this whole

**Page 111**

1 thing going on for accounting to everyone in this state
2 and certainly when it comes to elections, that is where it
3 rests.
4     Q. The organization's view is that ultimately there
5 needs to be one official office that is responsible for
6 those type of problems with voting, is that what you're
7 saying?
8     MS. BORGEN: Object to the form.
9     A. Well, I'm not saying we are suggesting that it
10 happen.
11     You asked me what my knowledge is.
12     My knowledge is that because of who we have
13 named in this lawsuit, all of the individuals we have
14 named are responsible but the ultimate responsibility
15 rests in Tallahassee.
16     But that does not preclude the individual
17 elections departments from being accountable. They are
18 individually. I understand that each has their own
19 licenses, if you will -- that is not the proper term --
20 but the term means they are each independent in their own
21 right, but the independence only goes as far as the law
22 allows it to go.
23     There is still a reporting process for that
24 process of legal channels so you cannot just isolate an
25 Elections Department and not connect it to the rest of the

**Page 112**

1 state, i.e., Tallahassee,.
2     Q. To your knowledge are the rolls of eligible
3 voters for the State of Florida maintained at each of the
4 67 counties?
5     MS. BORGEN: Object to the form.
6     Q. The official rolls?
7     A. To my knowledge they are.
8     Q. They are under the control of the Supervisor of
9 Elections in each of those 67 counties; correct?
10     MS. BORGEN: Object to the form.
11     A. To my knowledge.
12     Q. To your knowledge is the training of poll
13 workers done by the 67 Supervisors of Elections with
14 respect to the poll workers in their counties?
15     MS. BORGEN: Object to the form.
16     A. To my knowledge, yes.
17     Q. Is the relief that the NAACP is seeking in this
18 lawsuit described in the complaint.
19     MS. BORGEN: Object to the form.
20     Q. I am showing the witness the paragraphs under
21 the prayer for relief starting on page 37 of Exhibit 4.
22     (Discussion off the record.)
23     A. Okay.
24     Q. You have taken several minutes to review the
25 prayer for relief in Exhibit 4; is that correct?

**Page 113**

1     A. Yes.
2     Q. Is this the relief that the NAACP as a class
3 representative is seeking in this action?
4     A. Yes.
5     Q. Are you aware of any other relief that the NAACP
6 as a class representative is seeking in this action other
7 than in the prayer for relief?
8     A. Your question is am I aware and I am not aware.
9     Q. Specifically is the NAACP claiming any other
10 relief as a class representative in this litigation other
11 than what is included in the prayer for relief in Exhibit
12 number 4?
13     MS. BORGEN: Object to the form.
14     A. I have to speak to my lawyer about that. I
15 don't know. I am not aware is the best I can give you.
16     Q. As you sit here you know of no other relief that
17 is being sought; correct?
18     MS. BORGEN: Object to the form. Asked and
19 answered.
20     A. I still have to talk to my lawyer. I'm not sure
21 other than what it says. I don't know. The answer is I
22 don't know.
23     Q. Does the NAACP claim in this case that any of
24 the class members it is seeking to represent and who were
25 allegedly wrongfully removed from the voter rolls resides

**Page 114**

1 in Collier County?
2     MS. BORGEN: Object to the form.
3     A. I am not aware.
4     Q. Does the NAACP claim in this lawsuit that any
5 black voters were wrongfully purged from the official list
6 of eligible voters in any county in Florida other than the
7 seven that are named as defendants in Exhibit 4?
8     MS. BORGEN: Object to the form.
9     A. I am not aware.
10     Q. You don't know whether there are or there are
11 not any?
12     A. I don't know. I don't know. Could be; could
13 not be.
14     As I stated to you before, those were the
15 counties that came forward. Although the others did have
16 complaints, the numbers were not of such that we went back
17 to work with them on that as we dealt with those others.
18     So I would not want to say that they did not
19 exist because that may not be true either. I want to say
20 that they did exist but I don't know. It may not be true
21 either. When something is pervasive it is still possible
22 that it could be; a possibility it could not be.
23     Q. As a class representative in this lawsuit, I am
24 speaking to you as the representative of the NAACP, can a
25 person be restored to the voter rolls in the State of

Page 115

1　Florida by any official other than the Supervisor of
2　Elections that controls the voter roll in the particular
3　county involved?
4　　　MS. BORGEN: Object to the form.
5　A. I don't know. I don't know.
6　　　(Recess taken.)
7　　　DIRECT EXAMINATION
8　BY MR. EHRLICH:
9　Q. Good morning. I am Jeff Ehrlich. I represent
10 the Supervisor of Elections for Miami-Dade County, David
11 Leahy.
12　　　I want to begin with your personal experiences
13 on November 7, 2000. You have talked about it but I just
14 want to focus on it a little bit.
15　　　MS. BORGEN: You are aware this is a 30(b)(6)
16 deposition. To the extent her declaration covers that
17 paragraph that would be, I suppose, part of the
18 deposition.
19　Q. In your declaration you stated there was one
20 person at the poll who you have identified as being rude
21 at best and at worst I believe you said that person had
22 discriminated against you based on your race.
23　　　Was that the person who you interacted with or
24 was it the supervisor that you met?
25　　　MS. BORGEN: Object to the form.

Page 116

1　A. Supervisor.
2　Q. First you went to the poll and you got in line
3　with everyone, I imagine?
4　A. Right.
5　Q. And this person, this clerk, looked you up and
6　said you had requested am absentee ballot?
7　A. She said, "You cannot vote," and I said, "Why?"
8　　　She called over a supervisor.
9　Q. And what did the supervisor say to you?
10　A. He was the one who told me, "You were sent an
11 absentee ballot."
12　Q. Do you know how he knew that?
13　　　MS. BORGEN: Object to the form.
14　Q. Did he look your name up on some list or
15 something?
16　　　MS. BORGEN: Object to the form.
17　A. I don't remember that because of the way he
18 spoke to me. I don't remember whether he looked.
19　Q. When you say by the way he spoke to you, I
20 imagine at that point he was starting to behave ---
21　A. He came over with an attitude.
22　Q. Do you know this person's name?
23　A. No, no, I don't get familiar with the people at
24 the polls. I don't know.
25　Q. I think you stated that he said you could not

Page 117

1　vote because you had been sent an absentee ballot, had
2　requested an absentee ballot?
3　A. Uhm uhm.
4　Q. Do you know what at the time was the proper
5　procedure when a voter arrived at the polls but had been
6　sent an absentee ballot?
7　　　MS. BORGEN: Object to the form.
8　A. The process is the process.
9　Q. From the poll worker's perspective?
10　A. From the poll worker's perspective, I did not
11 believe that the poll worker should determine that I had
12 received an absentee ballot and then deny me an
13 opportunity to vote because I was telling them I had not
14 received it.
15　Q. Putting aside whether you received it or not, do
16 you know what the procedure was for someone who simply was
17 sent one?
18　A. Uhm uhm.
19　Q. In other words ---
20　A. You asked me if I know what the procedure is.
21　　　No, the answer is no, I don't know the procedure
22 except I felt that day and still feel that whatever I said
23 should have prevailed with the poll worker. I did not
24 think the poll worker should be the one to deny me when I
25 am standing up there saying that it is not true.

Page 118

1　Q. Right.
2　A. A system has to be in place to give me the right
3　to do it and the decision would be made later by whoever
4　was in charge.
5　Q. The electoral process should not stop a person
6　from coming in -- and not for a second am I talking about
7　you -- but a person that came in and said, "I requested an
8　absentee ballot but I never got one," when, in fact, that
9　person did get one and sent in a vote and now shows up at
10 the poll wanting to vote again?
11　　　How is a poll worker to distinguish a person
12 like that who is lying from a person like you who came in
13 and was truthful and did not get to vote?
14　　　MS. BORGEN: Objection.
15　A. Poll workers should not do it. That is why they
16 have what is known as fraud and I don't think the poll
17 worker is capable of calling that question.
18　Q. Do you know whether a procedure was in place at
19 the time regarding poll workers having to call the
20 Elections Department to verify whether the person had
21 returned their absentee ballot yet?
22　　　MS. BORGEN: Object to the form.
23　A. I assume that it should have been. I do not
24 know but there should have been a process of calling the
25 elections department and that should be for anything that

Page 119

1　came up that you're not clear about.
2　Q. What was happening while you were waiting these
3　two hours or so?
4　　　MS. BORGEN: Objection as to form.
5　A. It was three hours because I timed it. People
6　were coming in and voting and I was so upset because they
7　were not being treated like I was.
8　Q. I understand that.
9　　　MS. BORGEN: Let the witness finish her answer,
10 please.
11　Q. I am sorry if I interrupted you.
12　　　My question, what I meant was do you know what
13 they were doing with regard to your problem while you were
14 waiting?
15　A. Not much with my problem. You know, I had to
16 keep reminding the person that I was still sitting
17 waiting.
18　Q. Did they tell you, "We're going call in while
19 you wait"?
20　A. As I said before, we had got into a shouting
21 match. He was not promising anything to me other than just
22 sit and wait. He just kept saying, "Sit and wait." That
23 was all he said about that.
24　Q. So nobody told you, "Well, you sit and wait.
25 We're going to call in" and so on?

Page 120

1　A. He did not give me any procedure or anything. He
2　was nasty.
3　Q. Did I hear you correctly earlier, you testified
4　that you thought that he acted the way he did towards you
5　because of your race?
6　A. Yes.
7　Q. Do you think there is an amount of poll worker
8　training that could stop a poll worker from acting in a
9　racist way?
10　　　MS. BORGEN: Object to the form.
11　A. Yes, because I'm in that business of training
12 and it can happen.
13　Q. I mean, this is a poll worker and you said
14 earlier ---
15　A. People, not just poll workers, but anyone that
16 ---
17　Q. People can be trained not to be racists?
18　A. I say it myself, that racist is a definition
19 that you place on someone but you cannot ever say whether
20 or not a person is a racist.
21　　　What you look at is the behavior of a person.
22　　　So I was not accusing anyone of being a racist.
23 I was saying they had acted in a racist manner because of
24 the way I was treated because of my race. That is what I
25 perceived it to be and believe it to be.

**Page 121**

1  Q. I understand the distinction you just made.
2      If there is a poll worker out there who makes it
3  his objective when he wakes up in the morning and does
4  his "civic duty" and says, "Today I am not going to let
5  any African-Americans vote in my precinct," do you think
6  there is an amount of poll worker training that the
7  Supervisor of Elections could give that person to dissuade
8  that person --
9      MS. BORGEN:  Object to the form.
10     Q. -- from acting in a way that prohibits
11 African-Americans from voting?
12     A. Yes.
13     Q. How much poll worker training would be required
14 to do that?
15     MS. BORGEN:  Objection as to form.
16     A. I could not tell you but I can tell you that,
17 being in the training business that I am in, ongoing
18 training has to occur and that is exactly what poll
19 workers need, ongoing training.
20     Q. When you say ongoing training ---
21     A. Not a one shot deal, not 30 minutes before the
22 elections process, not a half a day either.
23     It ought to be that people who are going to be
24 poll workers ought to have intermittent training between
25 the elections process.

**Page 122**

1      For example, for the 2002 elections if you are
2  going to be a poll worker, you ought to have some sort of
3  training every year because you do have elections that are
4  not at the end of a four year term but in between terms.
5      Q. So every year if someone is going to be a poll
6  worker they should have to have training?
7      A. In depth training.
8      Q. I think you testified they are paid volunteers.
9  Did you mean poll workers are paid volunteers?
10     A. I did not say paid volunteers.
11     When I responded to a question that the attorney
12 asked me I said volunteers.
13     He said, "Paid volunteers?"
14     I said, "Yes, I guess so."
15     Q. What does that mean to you?
16     A. A volunteer generally does not get paid but if
17 you use the term paid volunteers it suggests a minimal
18 amount of money.
19     Q. It just sounded to me like one of those terms
20 that is contradictory.
21     A. Right.
22     Q. Do you believe paid volunteers ought to have
23 intermittent training?
24     A. Sure.
25     Q. Throughout the years, I suppose?

**Page 123**

1      A. Yes.
2      MS. BORGEN:  Object to the form.
3      A. Sure, because the election process is more than
4  just every four years.
5      Q. Right.
6      A. They go to the polls more often than that.
7      Q. In fact, it is more than every two years?
8      A. Yes.
9      Q. Do you know the amount of poll worker training
10 Supervisor Leahy gave his poll workers leading up to the
11 November 2 election?
12     A. No, I don't.
13     Q. Do you know whether a certain amount of poll
14 worker training is required by the new Florida Election
15 Reform Act?
16     A. I am not sure. I understand that it is supposed
17 to have happened but it is one of the things that we have
18 talked about. I have not seen it. I just heard that it
19 was.
20     Q. The Florida Election Reform Act requires a
21 specific number of hours of poll worker training.
22     Do you believe that all of the Supervisors of
23 Elections in the State of Florida should give that amount
24 of training, in other words, a uniform amount of poll
25 worker training all over the state?

**Page 124**

1      MS. BORGEN:  object to the form.
2      A. Things should be uniform throughout the state.
3  They should be uniform, should be adequate, enough hours
4  so that it could be made to be uniform.
5      Just like with any other job, just because you
6  don't make any money or just because I am a paid volunteer
7  for the NAACP, my training is not reduced because I don't
8  make any money.  Anyway we don't get a penny.  We pay into
9  it but you've still got to go through in depth training.
10     That takes an awful long time and we continue
11 gradually. It is not a one shot deal.  You go over and
12 over and over again.  You're being trained.
13     Q. If the Florida Election Reform Act requires the
14 Supervisor of Elections to provide six hours of training
15 leading up to every federal election, is it your testimony
16 that the supervisor should provide more than that if more
17 than that is required to stop people from acting in a
18 discriminatory way?
19     A. I think if you have reason to believe any poll
20 workers are acting in a discriminatory way, they should
21 provide that opportunity or not have them there. That is
22 an option they have, not to hire them.
23     Q. Do you believe that Supervisor Leahy knew the
24 poll worker that you encountered on November 7 or had
25 reason to believe that person was likely to discriminate

**Page 125**

1  on the basis of race?
2      MS. BORGEN:  Objection as to form.
3      A. I did not really think about Mr. Leahy and I
4  know him personally. I did not think about him.  I mean, I
5  could have picked up the phone and called him myself.
6      He did not know anything about what was
7  happening to me at that moment.
8      He should have trained the person. He may have
9  given the person some training -- I am assuming he
10 did -- because they are supposed to go through some
11 training.
12     In this particular instance it was clear that
13 whatever training he had was not enough or was not --
14 certainly did not sink in.
15     When you are in a situation like I was in, in a
16 particular neighborhood where I am a minority there and
17 the number of blacks who vote at that particular precinct
18 is not very large, I have been enough times to be able to
19 tell that you I noticed the difference in the treatment.
20 I mean, it was pretty obvious even if anybody was just
21 standing around looking and I did feel it was because of
22 my color.
23     Q. Do you vote regularly?
24     A. Yes, you can check the rolls.
25     Q. I'll take your word for it.

**Page 126**

1      Have you ever had an experience like this in the
2  past where you thought a poll worker was discriminating
3  against you on the basis of your race?
4      A. No.
5      Q. And I take you have voted in Miami-Dade County
6  for sometime?
7      A. Yes.
8      Q. You mentioned you know Supervisor Leahy?
9      A. Yes.
10     Q. Do you have occasion to meet with him from time
11 to time?
12     A. Yes.
13     Q. What are the things you discuss when you meet?
14     A. We discuss mainly voter registration.  Usually I
15 am asking for some help to either get cards or help me get
16 some volunteers or something, whatever my needs are.
17     Q. Do you feel that Supervisor Leahy is responsive
18 to your needs?
19     A. Yes, he is.
20     Q. Does the NAACP contend that Supervisor Leahy
21 discriminated against anyone on the basis of race?
22     MS. BORGEN:  Object to the form.
23     A. Our response says that Supervisor Leahy has a
24 responsibility for -- you know, it's not a personal
25 thing.  It is about who is under your supervision and what

Page 127

1  occurred under your watch.
2      Q. My question is does the NAACP contend that
3  Supervisor Leahy apparently discriminated against anyone
4  on the basis of their race?
5      MS. BORGEN:  Object to the form.
6      A. The position -- let me go at it this way --
7  the position that Supervisor Leahy holds affords him
8  several opportunities just as anyone who is in a working
9  position.
10     If things go well, you are honored.
11     If things don't go well, you get it all blamed
12  on you too.
13     So he had to carry that based on the people who
14  are carrying out the electoral process under his
15  supervision.
16     Q. I understand what you have just told me but my
17  question was -- and you can elaborate if you feel it's
18  justified -- my question is simply does the NAACP contend
19  that Supervisor Leahy personally discriminated against
20  anyone regarding the events surrounding the November 2000
21  elections based on that person's race?
22     MS. BORGEN:  Object to the form. Asked and
23  answered.
24     A. Supervisor Leahy is responsible for anything
25  that happened, be it racist or non racist around that

Page 128

1  election and any other elections. That is the position he
2  holds.
3      Q. I understand your theory that Supervisor Leahy
4  ultimately should be held responsible for the act.
5      A. He is responsible.
6      Q. Should be held responsible. I understand that.
7      Is he held responsible for the acts of all of
8  the employees and poll workers working for Miami-Dade
9  County on election day?
10     I want you to understand that I understand what
11  you have said to me about that but I just need an answer
12  to my question, which is, my question is specific to the
13  man, David Leahy, the man who you meet with occasionally,
14  that you told me you know: Does the NAACP in this lawsuit
15  contend that David Leahy discriminated against any person
16  based on that person's race?
17     MS. BORGEN:  Object to the form.
18     A. I have to separate the man I know from the man
19  in the position.
20     NAACP alleges that the things occurred that we
21  have outlined under Supervisor Leahy. It does not say
22  that -- it says basically in his position, his formal
23  position, just as anyone else in a position like that.
24     It does not say that ---
25     Q. What?

Page 129

1      A. Does not say that he was out of his role, that
2  he was in -- when I talk about Supervisor Leahy, I am
3  talking about him as the person that I deal with and I
4  have told you I have no problem with Supervisor Leahy.
5      But with the issue that we have at hand, he is
6  responsible for those things that occurred on November 7
7  under his supervision.
8      Q. Can you indicate a specific instance where
9  Supervisor Leahy, the man, as you made the distinction,
10  discriminated, personally discriminated against anyone
11  because of their race?
12     MS. BORGEN:  Object to the form.
13     A. That is very difficult to say that he has done
14  that. I am not aware of him having done that.
15     Q. The NAACP contends in this lawsuit that he had
16  done that?
17     MS. BORGEN: Objection as to form.
18     A. Whatever we said -- can you point me to a page?
19     Q. I am not on a page.
20     A. Did we say that?
21     Q. But feel free to review whatever you need to
22  review to answer that question. If you want to take a
23  break now ---
24     A. Let me find whatever you're talking about.
25     Q. While you're reviewing that I'm ---

Page 130

1      MS. BORGEN:  You can go ahead.
2      (Discussion off the record.)
3      A. I am trying to answer you.
4      Q. I'm sure you are.
5      A. But I just happened to flip to this. The way it
6  reads, I am looking at 128 -- and maybe it's the wrong
7  thing but I just happened to flip to it -- defendant
8  Leahy's method of administering the November 7, 2000
9  general election denied black voters -- that's what I was
10  trying to say to you.
11     You were talking about the man but I was talking
12  about the man in his role and what he holds responsibility
13  for.
14     Maybe we are at an impasse. Do you understand
15  some of what I am trying to tell you?
16     Q. We will get there.
17     I understand that some of the allegations in
18  this complaint allege that actions taken by the defendants
19  including Supervisor Leahy had a disparate impact on
20  African-American voters?
21     A. Right.
22     Q. What I am getting at is whether you are aware of
23  any act of intentional discrimination, intentional as
24  distinct from any effect that it may have had, by
25  Supervisor Leahy?

Page 131

1      MS. BORGEN:  Object to the form.
2      Q. Distinguished from the effect that an act may
3  have had by Supervisor Leahy?
4      MS. BORGEN:  Objection as to form.
5      A. There is that question again, intent. I heard
6  that earlier, intent.
7      Q. I can clarify that.
8      A. Go right ahead.
9      Q. What I mean is purposefully discriminating.
10  When I say intentionally discriminating, I means
11  purposefully based on someone's race.
12     A. I am not sure how we are going to get past this.
13  I am trying to work with you to do this.
14     Clearly I'm not quite understanding. What I am
15  not quite understanding is you say -- I guess I have a
16  block about -- you're asking me about the facts, saying
17  that I know Supervisor Leahy.
18     Yes, I know Supervisor Leahy but it's separate
19  from that. That is out of the context because he and I
20  have worked together for years.
21     So that is not what I am talking about here in
22  this lawsuit. You know, what I know about him, what I
23  have seen him do, what I have not seen him do, is not what
24  I'm talking about.
25     I am talking about him in his role and what

Page 132

1  happened under his supervision.
2      Therefore, he is responsible. I keep repeating
3  that but that is all I know.
4      If it's something else you'll have to help me
5  here.
6      Q. I don't see how but why don't we move on, just
7  turn your attention to something else.
8      A. I'll think about it tonight.
9      Q. Who makes the decision for the NAACP with regard
10  to whether to file suit and who to sue?
11     I know you were asked questions about that but I
12  never fully understood the process of decision making.
13     MS. BORGEN:  Objection as to form.
14     Q. Go ahead.
15     A. First of all, we have to get -- we meaning the
16  unit, in this case the Florida State Conference of
17  Branches -- after all the complaints that we had received
18  and the desire to have hearings, we had to get permission
19  from our president and CEO, Mr. Kweisi Mfume. Only he can
20  make that decision. He has responsibility for the day to
21  day operation of the organization.
22     Q. Do you know whether he makes that decision by
23  himself or does he have a panel, a board of directors vote
24  to authorize a lawsuit, do you know?
25     A. He makes the decision for the lawsuit to occur

---

**Page 133**

1 and the board of directors, because I am on it, we ratify
2 his decision.
3     Q. Okay. Who then would make, for example, a
4 decision to settle this lawsuit, would it be you as
5 president of the unit that is bringing the suit or Mr.
6 Mfume?
7     A. I wish it was my recommendation. I would like
8 that. No, no.
9     Q. The same process?
10     A. Same process, yes.
11     Q. You stated earlier that your declaration was
12 revised and, of course, signed but was prepared by an
13 attorney?
14     A. Right.
15     Q. You have lots of attorneys. Which attorneys
16 wrote that declaration to your knowledge?
17     MS. BORGEN: Object to the form.
18     A. I don't remember, honestly don't remember.
19     That may have to do with how many lawsuits I
20 have got.
21     Q. How many lawsuits are you involved with right
22 now?
23     A. Four.
24     Q. What are they?
25     MS. BORGEN: Object to the form. Beyond the

**Page 134**

1 scope of the 30(b)(6) notice.
2     MR. EHRLICH: You may answer.
3     A. There is one that deals obviously with this, one
4 that deals with school vouchers. There is one that deals
5 with the One Florida Initiative and one with the Board of
6 Corrections.
7     Q. Do any of the other lawsuits in any way involve
8 elections or voting?
9     A. No.
10     Q. Did you mention One Florida?
11     A. Yes.
12     Q. Is that an educational --
13     A. Yes.
14     Q. -- program, that is Jeb Bush's program?
15     A. Yes.
16     Q. I am going to get to that in a minute.
17     I imagine you have some strong feelings about
18 that.
19     MS. BORGEN: Objection as to form. It is beyond
20 the scope of the 30(b)(6).
21     A. Yes.
22     Q. Back to the 30 (b)(6) notice.
23     Before the November 7, 2000 election what types
24 of activities was the NAACP engaged in with regard to
25 voter education and registration?

**Page 135**

1     A. The NAACP was engaged very heavily in voter
2 registration through our state prior to November 7, 2000.
3     In addition to organized volunteers, building a
4 coalition with other groups who were interested and
5 involved in the voting process, we applied for and secured
6 grants to assist us in expanding this process for our
7 individual units to help them to provide services to their
8 communities and we spent countless hours, days, weeks,
9 months in mobilizing communities throughout the state.
10     Q. When I refer to the NAACP I am referring to you,
11 meaning the Florida State Conference of Branches.
12     Would you agree that the NAACP's efforts leading
13 up to the 2,000 election were unprecedented with regard to
14 their attempts to get out the vote and to register voters?
15     MS. BORGEN: Object to the form.
16     A. Only to the extent that the work was not
17 unprecedented because we always did that. Even in the
18 lawsuit we mentioned to you that a couple of years before
19 2,000 we had registered here in Miami over 30,000
20 something new voters so, you know, aggressively we had
21 always been out there doing it.
22     The difference for 2,000 was that we had some
23 financial resources to assist us. That was the only
24 difference that we had not had before.
25     Q. You mean leading up to 2000 you had financial

**Page 136**

1 resources you had not had in the past?
2     A. Yes.
3     Q. The source of those resources, you mentioned
4 grants?
5     A. Grants.
6     Q. Who were the grants from?
7     A. From various organizations, varied, no one
8 place.
9     Q. Was there one grant that sticks out in your
10 mind?
11     A. I did not work that end. I was on the ground so
12 I don't know.
13     Q. I know there are certainly other aspects of the
14 2,000 election that I know you personally found upsetting
15 but would you characterize the NAACP's efforts as far as
16 getting out the vote and registering new voters as being
17 successful compared to the past?
18     MS. BORGEN: Object to the form.
19     A. Yes, because -- well, you know, one of the
20 reasons, I was not state president before and so when I
21 came-- I mean, I have obviously been very successful here
22 in Miami. If you look at what happened under my
23 leadership as president of the branch here, you would know
24 that there was an improved voter empowerment effort.
25     So I took that same energy to the state. That

**Page 137**

1 was not, in my mind was not unusual. If you look at my
2 record, it is pretty consistent.
3     Q. Not unusual for you?
4     A. Not unusual for me.
5     Q. When were you president of the Miami-Dade
6 branch?
7     A. I organized the Miami-Dade branch from four
8 pre-existing branches. I started that process in 1986.
9     In 1988 I spearheaded the organization of the
10 Miami-Dade branch so I was president in 1998 for 11
11 years.
12     Then I became state president.
13     Q. Do you know what the voter turnout for
14 African-Americans for the State of Florida was in November
15 2000?
16     A. I think it is in the report here. I did not pull
17 it out but it was relatively high.
18     Q. It was relatively high?
19     A. Did you want specifics?
20     Q. If you know.
21     A. Not right off the top of my head I don't.
22     Q. Do you remember how it compared to voter turnout
23 for African-Americans compared to previous elections?
24     A. It was higher that any previous years.
25     Q. Was it the highest ever?

**Page 138**

1     A. I don't recall but it was reported that it was.
2     Q. Do you believe that your success was due in part
3 to the amount of work and resources you poured into voter
4 registration and education efforts leading up to the 2,000
5 elections?
6     A. I think I said we were not the only people doing
7 voter registration and that made a tremendous difference.
8     Q. There were other organizations besides the NAACP
9 that were engaged in that same effort?
10     A. Exactly.
11     Q. Similar efforts?
12     A. But I think we certainly did have a significant
13 impact, made a significant impact.
14     Q. What is Arrive with Five?
15     A. Arrive with Five?
16     Q. You're familiar with that term?
17     A. Yes.
18     Q. What is that?
19     A. Arrive with Five is a program that is aligned
20 with People For The American Way and it was created to
21 help bring in groups of organizations to work with the
22 election process.
23     Q. Bring in groups?
24     A. Together we formed coalitions. You know, it is
25 very difficult for any one organization to go out there

Page 139

1  and do this kind of work.
2  Q. Right.
3  A. Mobilization.
4     We worked in coalition with People From The
5  American Way, pulled together various groups.
6  Q. What does Arrive with Five, what does that mean,
7  the title Arrive with Five?
8  A. It just means go to the polls with five people.
9  Q. And is that the program that --
10 A. Yes.
11 Q. -- you think was run by People For The American
12 Way?
13 A. Yes.
14 Q. The NAACP participated in?
15 A. We supported the effort, yes.
16 Q. You supported that program?
17 A. We supported that effort but it was not the only
18 effort that we supported. We still did our own, yes.
19 Q. That is the definition of Arrive With Five?
20 A. Yes.
21 Q. You participated?
22 A. We supported it.
23 Q. Supported it and that was something that was
24 going on before the 2000 election?
25 A. Yes.

Page 140

1  Q. That is ongoing?
2  A. Yes.
3  Q. So as you sit here today is there an Arrive with
4  Five program?
5  A. There is one.
6  Q. For the 2002 elections?
7  A. Yes, there is.
8  Q. What is the race to race, is that a program with
9  which you are familiar?
10 A. I have heard of that but I do not-- I heard
11 about it in one conference in Tallahassee recently, a
12 right to vote conference. I heard about it but I was not
13 involved in it.
14 Q. Your declaration at great length talked about
15 the history of the NAACP and, for example, you note that
16 in 1994-95 the NAACP had its largest voting drive that
17 increased black voter registration in the State of Florida
18 five percent to 37 percent.
19    Then five years later, the NAACP initiated a
20 massive voter registration drive that successfully
21 registered 75,000 new black voters in the State of
22 Florida?
23 A. That is true.
24 Q. Later in your declaration you talk about your
25 efforts leading up to the 2,000 elections.

Page 141

1  A. Uhm uhm.
2  Q. Is it fair to say that the voter education and
3  voter registration efforts that you engaged in leading up
4  to the 2,000 election were typical of the history of the
5  NAACP?
6  A. Yes.
7  Q. Are those the type of activities that the NAACP
8  has engaged in historically and traditionally?
9  A. Yes, since the organization's inception.
10 Q. And are those also the same activities that
11 you're engaged in now with regard to preparing for the
12 2002 election?
13 A. Yes. As soon as I can leave this session, I am
14 going to register voters on Miami Beach. We are going
15 over there. There are 300,000 people arriving and we are
16 struggling to try to get through so we can get.
17    (Discussion off the record.)
18 Q. By the way, when you were just talking about a
19 voter registration drive on Miami Beach, is that one that
20 is coming up?
21 A. Well, this is the one that I developed when I
22 found out -- I knew already from last year's Memorial Day
23 that we were going to have another Memorial Day and I am
24 the chair of the community relations board so in working
25 with the City of Miami Beach, I asked them if they would

Page 142

1  have a problem with me doing voter registration this
2  weekend with all the people coming.
3     They said no.
4     That's all I had to hear, I was in Supervisor
5  Leahy's office trying to find volunteers to help me do it.
6  Q. Was Supervisor Leahy able to help you?
7  A. Oh, yes, he gave me some suggestions and
8  everything.
9  Q. Is this voter registration that is going to
10 happen, is that something that you're involved with as
11 part of the NAACP effort?
12 A. Yes, it is the NAACP, yes.
13 Q. You work for the community relations board?
14 A. Yes.
15 Q. Chairperson?
16 A. Yes.
17 Q. The county board?
18 A. Yes.
19 Q. You work with the same people?
20 A. Yes.
21 Q. Did the Miami-Dade County Board of County
22 Commissioners provide any funds to assist you with voter
23 registration at the Memorial Day event?
24 A. No. I did not ask.
25 Q. Did they provide any funds to assist in any way

Page 143

1  for that event to the best of your knowledge?
2  A. They agreed to support through the police
3  department and they also agreed to the support that is
4  being given by the goodwill ambassadors. The goodwill
5  ambassadors are county employees from your department that
6  are helping.
7  Q. Those are called in kind services?
8  A. In kind.
9  Q. It means the services are provided for free?
10 A. Right, for free.
11 Q. Does NAACP engage in litigation for the purpose
12 of challenging actions that infringe on civil liberties?
13 A. Yes.
14 Q. And that is an example you gave earlier, I
15 suppose, of the type of litigation that you engage in?
16 A. Yes.
17 Q. Is that also a part of the NAACP's history and
18 tradition?
19 A. Yes, since its inception.
20 Q. When was the NAACP incorporated?
21 A. 1909.
22 Q. And when ---
23 A. February 12.
24 Q. When did it first have a presence in Florida, if
25 you know?

Page 144

1  A. Yes, we were one of the first state conferences
2  to be organized. It was back in the 1930's, around 1938,
3  if I recall correctly.
4  Q. We talked a lot about voting and registering and
5  educating voters.
6     I would like to talk a little bit about other
7  activities the NAACP is engaged in.
8     There was some discussion about One Florida, the
9  One Florida initiative.
10    MS. BORGEN: I would like to have a continuing
11 objection that this is outside the scope of the 30(b)(6).
12    MR. EHRLICH: You may answer.
13 A. One Florida is an initiative that was started by
14 Governor Jeb Bush that deals with looking at public
15 education, public contracts and basically the part that we
16 had concerns with deals with education and contracts.
17 Q. I am unfamiliar with One Florida so you have to
18 help me. Is this an ongoing controversy, still something
19 you are still fighting?
20 A. Yes.
21    All those cases are open that I gave you, they
22 are open.
23 Q. I kind of knew what it was but I don't know
24 where we stand in the process. Is this something the
25 NAACP is currently engaged in activity to actively oppose?

Page 145

1 . A. Yes.
2 Q. When did you begin your active opposition to One
3 Florida?
4 A. Immediately after it was initiated.
5 Q. When was that?
6 A. Let's see. January 2,000 I think is when they
7 came out with it.
8 Q. Was it before the November of 2000 election?
9 A. Yes, yes.
10 Q. So the NAACP was actively opposed to it before
11 the election?
12 A. Yes.
13 Q. And you are still opposed to it after the
14 election?
15 A. Right.
16 Q. What type of resources did the NAACP spend in
17 fighting that battle against the One Florida initiative?
18 A. Lots of money, well over $150,000 so far.
19 Q. I might have missed the first part of your
20 answer.
21 A. You asked what kind of resources and I said we
22 . have spent $150,000 so far.
23 Q. We have talked about your personal experience on
24 Election Day.
25 I want to talk about the NAACP on Election Day.

Page 146

1 Did the NAACP have a plan for Election Day --
2 A. Yes.
3 Q. -- on how to get voters out?
4 A. Yes.
5 Q. Can you tell me about that, please?
6 A. Each of the units through the state developed
7 their own individual plan based on who they would be
8 working with, based on what precincts they wanted to first
9 target, based on the resources they had available to them
10 to get the vote out. Various plans.
11 Q. I think you said units. You mean local branches?
12 A. Branches, yes.
13 Q. Well, let's talk about the complaints that the
14 NAACP received on Election Day.
15 I think you talked about them in your
16 declaration?
17 A. Right.
18 Q. You stated that the national office of the NAACP
19 received calls from individuals across the country
20 reporting the problems they encountered in their attempts
21 to vote.
22 The national office, is that in Baltimore?
23 A. Yes.
24 Q. Then you stated that the majority of calls
25 received were from voters in the State of Florida.

Page 147

1 Do you know how many calls the national office
2 received all together on November 7, 2000?
3 A. No, I don't.
4 Q. Do you know how many of those calls were from
5 the State of Florida?
6 A. No, I don't.
7 Q. On what also do you base your statement that the
8 majority of calls received were from the State of Florida?
9 A. Based on my discussions with the national
10 office.
11 Q. Who from the national office, did someone from
12 the national office tell you that?
13 A. Yes, some people did tell me that.
14 Q. Who?
15 A. Well, the department that I work with --
16 Q. What department is that?
17 A. -- gave me information.
18 That is the Department of Field Services.
19 Q. Field services?
20 A. Uhm uhm.
21 Q. Do you know the name of the person who told you
22 that the majority of calls came from Florida?
23 A. It was the staff. A group of us were trying to
24 get together on what was happening and we were informed
25 they were getting more complaints from down here.

Page 148

1 Q. Do you know as you sit here today first hand,
2 personally, that the majority of the complaints were from
3 Florida?
4 MS. BORGEN: Object to the form.
5 MR. EHRLICH: What's wrong with the form?
6 MS. BORGEN: You are asking her things in her
7 personal capacity. She is here on a 30(b)(6) as the NAACP
8 representative.
9 MR. EHRLICH: Okay. Go ahead.
10 A. I know because of the hearings we had. In
11 addition to the hearings that moved around the state we
12 had a national hearing that was here in Miami and during
13 that time there was testimony to that effect.
14 Q. From who?
15 A. From a lot of people who spoke.
16 Q. I mean did someone say, "The majority of the
17 people came from the State of Florida"?
18 A. Yes, it was stated that. I don't remember
19 whether it was on CNN but it was public knowledge all over
20 the world.
21 Q. Are you familiar with -- I imagine you know the
22 type complaints that came from Florida even though those
23 complaints, some of them went to the national office; is
24 that right?
25 A. Yes.

Page 149

1 Q. What was the nature of the complaints that the
2 NAACP received from Florida?
3 A. You mean the national office?
4 Q. Well, in your declaration you talk about the
5 national office. Let's talk about that first.
6 If you know, what were the type of complaints
7 the national office received from people in the State of
8 Florida?
9 A. The national office received the same complaints
10 that I received and the branches received because we told
11 people to call the national office and give them that
12 information.
13 Q. When you received the complaints ---
14 A. We told them to call the national office.
15 Q. When you received complaints did you record the
16 complaints or you did tell the persons to call the
17 national office?
18 MS. BORGEN: Object to the form.
19 A. The branches did both, they recorded and
20 submitted.
21 Q. So the nature of the complaints was the same to
22 the national office and the ones that the branches here
23 received?
24 A. Right.
25 Q. Tell me the types of complaints that you

Page 150

1 received from Florida.
2 A. Well, as you know, they are all outlined here
3 but the issues dealt with everything from people who
4 registered to vote and then their name was not on the
5 voting list when they went to vote; people whose names had
6 been purged, you know, who felt they should not have been
7 purged, who were not felons; people who attempted to or
8 did register with the Department of Motor Vehicles,
9 through that process, and their names were not listed.
10 I summarized all those categories.
11 People whose polls closed too early on them;
12 people's precincts had been moved and they were not
13 informed.
14 The list goes on and on.
15 Q. You mentioned earlier people who registered but
16 did not receive cards?
17 A. Right.
18 Q. Are there any others that you recall?
19 A. So many types. We heard complaints about the
20 ballots, different kind of ballots that were out there.
21 Q. Just to follow up on that one, by different
22 ballots do you mean, for example, multi page ballots --
23 A. Yes.
24 Q. -- in Duval County or butterfly ballots in Palm
25 Beach County?

Page 151

1  A. Exactly.
2  Q. Does the NAACP contend that butterfly ballots, the
3  the use of butterfly ballots had disparate impact for
4  African-Americans?
5      MS. BORGEN:  Object to the form.
6  A. Yes.
7  Q. Do you know what counties in Florida used
8  butterfly ballots in the November 2000 elections?
9  A. I don't know all of them, no.
10  Q. Do you know any?
11  A. It was Palm Beach, I believe, one was.  There
12  were some smaller counties too that I heard about outside
13  of Orlando.
14      I am trying to recall.  I don't remember the
15  names.  I am sure there were others too but I don't
16  remember the names.
17  Q. If the use of those ballots had disparate impact
18  for African-Americans, why did the NAACP not sue the local
19  supervisors of elections from those counties?
20      MS. BORGEN:  Object to the form.
21  A. I can't tell you that, why they decided to not
22  sue.  The decision to sue was not mine to make.
23  Q. It was Mfume's?
24  A. Yes.  I made the recommendation.
25  Q. You made the recommendation?

Page 152

1  A. Of course I would recommend it.
2  Q. Did you recommend that the NAACP sue Palm Beach
3  County?
4  A. I did not recommend that specifically.
5  Q. You just recommended the lawsuit?
6  A. We looked at what was going on.
7      That decision was not made by me alone.
8  Q. Mr. Mfume would know why certain counties were
9  sued but not others?
10      MS. BORGEN:  Object to the form.
11  A. I can't tell you he would know.  That is
12  very hard for me to sit here and attempt to tell you what
13  he would know.
14  Q. I understand.
15      Is there someone other than you in the NAACP who
16  would know the answer to that question, why some counties
17  were sued but not others?
18      MS. BORGEN:  Object to the form.  Attorney
19  client privilege.
20  Q. Excluding attorneys are there other officers or
21  leaders of the NAACP?
22  A. I don't know that answer.
23  Q. You mentioned that Florida's Election Reform Act
24  did not solve many of the problems that came out of this?
25  A. Not all of them.

Page 153

1  Q. It did solve some of them?
2  A. Yes.
3  Q. Which ones?
4  A. We have gotten rid of paper ballots, got new
5  machines hopefully.
6      We now are more sensitized, we hope, to the poll
7  workers and what their needs are.
8  Q. Well, one aspect of Florida's Election Reform
9  Act mandated poll worker training?
10  A. That is why I am saying that.  Hopefully that
11  will address it.
12  Q. Are you familiar with provisional ballots?
13  A. Yes.
14  Q. Do you know how they work?
15      MS. BORGEN:  Object to the form.
16  A. I don't know how they work.  I know how they are
17  supposed to work.
18  Q. Do you know if they have been used already in
19  Miami-Dade County?
20  A. Yes, I hope so.  I think so.  I am almost
21  positive they have been.
22  Q. What is your understanding of how they are
23  supposed to work?
24  A. That is what I should have been given, a
25  provisional ballot, when I went to the polls.  I said that

Page 154

1  you have to challenge the right to vote.  If you challenge
2  -- I hate to use the word challenge --  but it is almost
3  like a challenge ballot in definition because you actually
4  go ahead and vote and the decision is not made on you at
5  that moment.
6  Q. It is made later at the elections department?
7  A. Right.
8  Q. When you have all the records there and
9  everything?
10      MS. BORGEN:  Object to the form.
11  Q. And can make a informed decision?
12  A. That's right.
13  Q. Do you consider yourself to be a member,
14  consider yourself personally to be a member of the class
15  that the NAACP seeks to have certified?
16      MS. BORGEN:  Object to the form.
17  A. I am because I was injured too.
18  Q. How were you personally injured?
19  A. First of all, my rights were violated in the way
20  I was spoken to, the way I was dealt with and it took me
21  three hours to vote.  That is a shame.  That was
22  discriminatory, the way I was treated and, you know, it
23  was horrible, I had a horrible experience and think that
24  no one should have to go through that to vote.
25  Q. You testified that your husband also applied for

Page 155

1  an absentee ballot?
2  A. Right.
3  Q. Did not receive it by Election Day?
4  A. Yes.
5  Q. He also, like you, went to the polls?
6  A. Right.
7  Q. Was he permitted to vote?
8  A. Oh, yes.  By the time I got through acting up,
9  they let him vote.
10  Q. You greased the wheel, so to speak?
11      MS. BORGEN:  Objection as to form.
12  A. I believe so.
13  Q. But you were allowed to vote ultimately?
14  A. Ultimately, yes.
15  Q. What did the NAACP do in response to the
16  complaints they received after Election Day?
17  A. Well, the first thing that we did was to respond
18  immediately to the complaints by holding a hearing three
19  days afterwards.  That's the one I was talking about with
20  CNN here in Miami.
21      We invited people from across the state to come
22  and to testify and share their concerns about what
23  happened to them on that Tuesday.  It happened on that
24  Saturday.
25      Another thing the NAACP did, they had to really

Page 156

1  spend a lot of money to try to put people on the ground to
2  help voters not become discouraged by the voting process.
3      We were getting a lot of feedback that people
4  felt their vote did not count, why bother to go to the
5  polls.  We heard that an awful lot throughout the hearing
6  process.
7      The NAACP just had to really speed up and
8  enhance our efforts on the ground to get people to, you
9  know, understand that they have to stand up and fight this
10  by continuing to go to the polls, not by not going to the
11  polls.
12      So we had to do lots of voter education.  You
13  know, a lot more time was spent by those of us who were
14  election volunteers in covering the state.
15      It has been a real, real tough road that NAACP
16  has hoed to make this whole issue, this feeling about
17  voter empowerment be real to the people.
18      You know, it still exists out there but it's a
19  lot better than what happened immediately after the
20  election.
21      We are hoping that and believe that what
22  happened to us on November 7, we are hoping that will
23  energize us to go back to the polls and to continue to go
24  to the polls and not just vote in November but all through
25  the year when it is appropriate in our individual

Page 157

1  municipalities.
2  Q. Given all the publicity that followed the
3  November 2000 election and how close the presidential
4  election was, do you think your constituents are more
5  likely to vote in the 2002 elections involving Jeb Bush
6  and the democratic nominees?
7  A. I don't know but I certainly hope so. I remain
8  optimistic. I am certainly working hard.
9  Q. What type of additional resources are you
10 pouring into the 2002 election in registering and
11 educating voters that you have not done for the last 50
12 years in the State of Florida?
13 I mean, your declaration goes into detail about
14 all the efforts that the NAACP has traditionally done.
15 What are you doing differently than what the
16 NAACP has done for 100 years nationally and 50 years at
17 least in the State of Florida?
18 A. It's not anything different. We are just doing
19 it, you know, like more often.
20 Memorial Day weekend was not something we had in
21 the plans.
22 Q. Would you not have engaged in voter registration
23 for Memorial Day weekend had it not been for the 2000
24 election?
25 MS. BORGEN: Object to the form.

Page 158

1  A. We would have engaged in it, oh, yes. If I had
2  known last year, for example, we would have engaged in it
3  last year. We did not realize that many people were
4  coming.
5  Q. Memorial Day?
6  A. Memorial Day.
7  You never, as an NAACP unit, allow a crowd to
8  come to your town and don't access them. You just don't do
9  that, not if you know there is going to be an election in
10 2002.
11 Q. That is sort of my question. If 350,000 people
12 are coming to your back yard, you're going to do a voter
13 registration drive?
14 A. Oh, yes, sir, absolutely.
15 Q. That is not something different than the NAACP
16 has done for 50 years?
17 A. Exactly, exactly.
18 Q. You're familiar with the allegations in the law
19 suit?
20 MS. BORGEN: Object to the form.
21 Q. Did you say yes?
22 A. Yes.
23 Q. And you have testified that the NAACP was
24 injured by the actions that are the subject of this
25 lawsuit?

Page 159

1  A. Yes.
2  Q. How was the NAACP injured?
3  A. As an organization, because instead of us being
4  able to spend the time that we have spent having to deal
5  with the November 7th election, it has taken away the time
6  that we should have been spending on other issues that we
7  really need to address. The amount of time and resources
8  has really caused us to divert away from the overall
9  mission of what we should be doing.
10 Q. When you say resources, what do you mean?
11 A. Financial as well as human resources.
12 Q. Let's talk about financial first.
13 How much money have you spent because of what
14 happened in November of 2000 that you would not have spent
15 if it had not been for the actions complained of in this
16 lawsuit?
17 A. First of all, that total would be absolutely
18 immeasurable. By that I mean you are talking about time
19 that people have spent away from their jobs, volunteering,
20 whether in kind. You are talking about the amount of
21 money staff has to spend in coming down to provide
22 support, you're talking about the amount of time that has
23 to be spent in organizing volunteers, running those
24 hearings, interviewing people, asking the questions,
25 trying to develop those voter education forums. We have

Page 160

1  had large numbers of them throughout the state.
2  We have just spent a lot of time in trying to
3  deal with the November 7 debacle.
4  Q. Can you give me a concrete number?
5  A. Oh, heavens no, I can't, I don't know how to
6  calculate that. I don't know how to calculate somebody's
7  time.
8  You know, professionals like myself, how do you
9  calculate. Forget about anyone else, I can't tell you how
10 much money I have been worth in this whole process. I
11 have been trying to stay with what happened here,
12 including the time I am spending here now.
13 Q. I understand
14 Has the NAACP spent a lot of resources and
15 monies in this litigation, in this lawsuit, litigating
16 this lawsuit?
17 A. I don't know how much money. I have not seen
18 the records on the amount of money.
19 But the amount of time that our lawyers have
20 spent, again I cannot add up what the cost of that is, but
21 it certainly has taken their time away from other issues
22 that we obviously still need to address.
23 Q. What issues are those?
24 A. Well, issues on various fronts, whether it's
25 employment discrimination, whether it is education issues,

Page 161

1  whether economic development issues, issues dealing with
2  health care. I mean there is a whole gamut of issues that
3  exist. Criminal justice issues.
4  Q. Can you name a specific activity that the NAACP
5  has not engaged in because resources were diverted to
6  things having to do with the elections?
7  A. I can tell you this, not an issue that we have
8  not engaged in, but the degree to which we have engaged in
9  them. There is not one of them that has been dealt with
10 as they could and should have been engaged in based on the
11 amount of resources it has taken to deal with this issue.
12 Q. Can you give me an example of how that is?
13 A. Well, for example, if you're talking about
14 legislative issues, for example, that we normally spend a
15 lot of time on, we have not been able to do that, you
16 know, because of this issue.
17 We normally would go and spend time in
18 Tallahassee here in Florida. We in the past spent time
19 visiting with our legislative officials, visiting with the
20 Governor, but we will have to be on the ground doing this
21 work. We really just did not have time to deal with that.
22 Q. How many times has the NAACP met with the
23 governor since the November 2000 election, do you know, do
24 you have a rough idea?
25 A. Well, I would have a rough idea. I'm the one

Page 162

1  dealing with him.
2  Q. More than five times?
3  A. Oh, no, no.
4  Q. Did you meet with him to discuss One Florida?
5  A. Yes, yes, we did discuss One Florida.
6  What is this, 2002? I would say maybe three
7  times.
8  Q. You personally have met with the governor of the
9  State of Florida three times?
10 A. Yes.
11 Q. What about other persons from the NAACP?
12 A. Well, I obviously would not know.
13 Q. Some of the people that have met with him are
14 not in any sort of official capacity on behalf of the
15 NAACP, that met with the governor or members of the
16 legislature?
17 A. I would not know about that but when there is an
18 interface with elected officials including the governor it
19 would have to go through us.
20 Q. Can they do it?
21 A. They have the right to do it, sure.
22 Q. Are you aware of whether they have done that?
23 A. No, I don't know everything they do.
24 Q. You testified earlier that the NAACP
25 constituents were dissatisfied and disillusioned as a

**Page 163**

1 result of the November 7, 2000 election?
2   A. Yes.
3   Q. And I think that is what you have heard at the
4 hearings you held?
5   A. Yes.
6     MS. BORGEN: Object to the form.
7   Q. Is that right?
8   A. Yes.
9   Q. Do you know whether the NAACP constituents were
10 dissatisfied and disillusioned with the Miami-Dade County
11 canvassing board's decision to stop the vote recount it
12 had begun around the time of the November election?
13   A. Yes.
14   Q. They were?
15   A. Yes.
16   Q. And that after Miami-Dade County halted the
17 recount, the Florida Supreme Court ordered that a recount
18 begin statewide; do you recall that?
19   A. Yes, I do.
20   Q. After that, the U.S. Supreme Court said stop the
21 recount?
22   A. Exactly.
23   Q. Do you remember that?
24   A. Yes.
25   Q. Were your constituents dissatisfied with the

**Page 164**

1 Supreme Court's decision to stop the recount?
2   A. Yes, disillusioned.
3   Q. Do you think people became disillusioned before
4 that?
5   A. Yes.
6   Q. Do you think people became disillusioned with
7 the electoral process because of that?
8     MS. BORGEN: Object to the form.
9   A. I am hoping we turned that around.
10   Q. My question is you make certain statements that
11 your constituents have became dissatisfied and
12 disillusioned as a result of the election?
13   A. Yes.
14   Q. What is the basis for that knowledge, what is it
15 that you're ---
16   A. Based on what they have said. I listen to the
17 radio, I mean, I attend meetings, I interact in the
18 community.
19   Q. From those same sources have you formed an
20 opinion as to whether the NAACP constituents were
21 dissatisfied and disillusioned by the U.S. Supreme Court
22 telling Florida to stop counting?
23     MS. BORGEN: Objection as to form.
24   A. Yes.
25   Q. I did not hear the answer.

**Page 165**

1   A. I said yes.
2   Q. Do you think the NAACP constituents were
3 dissatisfied and disillusioned because Bush won the
4 presidency?
5   A. Oh, that is a loaded question. I have no idea
6 whether they are dissatisfied because he's the president.
7 What they were dissatisfied with is because they
8 felt their vote did not count.
9 I have no idea.
10   Q. You would not know which of those two?
11   A. No, I don't know how they feel about him.
12   Q. You referred to lots of reports and newspaper
13 articles done. Based on those sources of information, what
14 is the percentage of African-American voters in the State
15 of Florida that voted for Al Gore?
16     MS. BORGEN: Object to the form.
17   A. It was in the report. I don't remember but it
18 is in the report.
19   Q. Do you recall it being greater than 80 percent?
20   A. Yes.
21   Q. What percentage of the NAACP members are
22 African-American?
23   A. Most of them.
24   Q. Can you be any more precise than that?
25   A. What do you want to hear?

**Page 166**

1   Q. The truthful answer.
2   A. I don't know the truthful answer. I am assuming
3 it is probably better than 80 percent, I would imagine.
4   Q. That being the case, do you have any opinion as
5 to whether the NAACP members might have been dissatisfied
6 or disillusioned about the fact that George Bush won that
7 election?
8   A. Let me tell you why I can't answer that. Maybe I
9 would have answered you differently if I did not just
10 leave Harvard University where we had a survey done to
11 NAACP'ers and surprisingly quite a few of them are
12 Republicans.
13 So you don't know how they voted.
14 And while quite a few NAACP'ers are Democrats,
15 you don't know how they vote. It is difficult to tell
16 about our members.
17 That is a loaded question.
18   Q. Was there a perception among many people that
19 you heard at that hearing and in your other interaction
20 with your member constituents that somehow the election
21 was stolen?
22     MS. BORGEN: Object to the form.
23   A. That was all over the country, that was not here
24 in Florida only. That was talked about in many states.
25   Q. Here in Florida I think there may have active

**Page 167**

1 aspects of that. Did you hear from people in the hearings
2 the idea that the election was stolen?
3   A. Absolutely, yes.
4   Q. Did you hear from those people at the hearings
5 that you interacted with, that because they were in
6 Florida somehow maybe Katherine Harris and Jeb Bush acted
7 together to get George Bush elected, did you hear that
8 type of expression?
9     MS. BORGEN: Object to the form.
10   A. I did not hear that personally, no.
11 I heard people saying that that was stated but I
12 never heard anything at that time.
13   Q. Was that being stated more in the south or the
14 north or throughout the entire state?
15   A. I don't know. I have no idea.
16   Q. You think that that was a common feeling that
17 some of your constituents might have had?
18     MS. BORGEN: Objection as to form.
19   A. I don't know, I don't know what percentage of my
20 constituents even voted for Jeb or Bush but it did not
21 matter.
22   Q. They are all the same to you?
23   A. All the same.
24   Q. Do you think that the idea that because
25 Katherine Harris was the Secretary of State and Jeb Bush

**Page 168**

1 was the governor of Florida and the way the recount
2 stopped and everything happened with the November
3 election, do you think that might have caused your
4 constituents to become disillusioned?
5     MS. BORGEN: Object to the form.
6   Q. You may answer.
7   A. Yes. Run that by me one more time because
8 you're using personalities.
9   Q. You want me to use personalities or not?
10   A. It's not what I want. I want to be sure that
11 I'm answering the question because I don't want to deal
12 with personalities. I want to deal with the issues and to
13 deal with the issues requires that you deal with perhaps
14 the office that they represent, but not the individual.
15   Q. You see, I am asking you to consider the
16 question and I not asking what you think. I am asking
17 about the people that you heard at the hearings and I am
18 talking about personalities because I think personalities
19 might have played an important role with regard to those
20 people.
21 So I am asking you whether you heard from those
22 people a certain disillusionment, dissatisfaction with the
23 way things turned out and that part of that was because
24 Secretary Harris is a Republican appointed by Jeb Bush,
25 Jeb Bush is the governor and his brother is the

## Page 169

1 presidential candidate.
2    Do you think that played a role in the
3 dissatisfaction and disillusionment that you heard,
4 talking about personalities?
5    MS. BORGEN: Object to the form.
6    A. I think that I answered you earlier by saying to
7 you that people were disillusioned, that they were
8 concerned about what happened at the hearings.
9    So we are very clear that we separate what
10 you're talking about, what we are talking about here is
11 people focused mainly on what had happened to them to
12 November 7.
13    There was not a lot of discussions -- I was
14 trying to recall if there were discussions and I can't
15 tell there were not -- but I can tell you the predominant
16 discussion was not on Katherine Harris or Jeb Bush. That
17 is not true. That is a fact.
18    Those hearings were for public consumption.
19 Q. Public ---
20 A. The hearings.
21 Q. I don't know how we got limited to the hearings.
22 I guess it's my fault for failing to properly ask the
23 question.
24    I don't mean to limit you to only what you heard
25 at the hearings. I want to get at the source of

## Page 170

1 dissatisfaction and disillusionment of your constituents.
2 It does not matter whether they were at the hearings or
3 sitting in their living rooms.
4    Do you understand what I am saying?
5    A. Yes, we do need to make that distinction here.
6    What I'm trying to say to you, people after
7 November 7 were disillusioned not because -- people at
8 that time were not talking about the stolen election.
9    They were talking about the fact they did not
10 have the opportunity to vote. They were concerned their
11 vote did not count.
12    That was the first issue.
13    You know, the fact that the election was stolen
14 came later after the initial phase that we went through.
15 That was sort of evolving as people talked more about it,
16 as the process started to snowball, you know, going back
17 and forth about what happened in the electoral process.
18 Q. Can you put a time frame on that process when
19 you heard that from your constituents?
20 A. Well, not only from my constituents, just
21 globally. I could not pinpoint my constituents.
22 Q. When was that?
23 A. Let's see. The election was on the 7. Probably
24 somewhere around the third or fourth week, whenever the
25 time frame was that a recount was being asked for and I

## Page 171

1 don't recall when that was.
2    The NAACP was on the ground much earlier than
3 the recount requests and all of those requests. We were
4 out there before any of that happened.
5 Q. Right, and you talked about money and resources
6 spent at that time?
7 A. Right.
8 Q. What I read from your declaration is you have a
9 fear that your constituents are less likely to vote?
10 A. Right.
11 Q. And that fear is -- you still have that fear
12 right now?
13 A. Sure.
14 Q. And, of course, that is after this dialogue that
15 you were conducting?
16 A. Right, yes.
17 Q. So the question is do you think that dialogue,
18 does that contribute to your fear that people will be less
19 likely to vote because they feel they were cheated out of
20 having their vote or because they feel the election was
21 stolen?
22    MS. BORGEN: Object to the form.
23    A. I think it is all part and parcel. I don't
24 think any piece of it can be separated from the other.
25 Because of the process that took place over a period of

## Page 172

1 time, it combined itself to become a problem for people.
2    So not only were they saying, you know, my vote
3 does not count anyway because of what happened to me on
4 election day, but that there is a perception that the
5 election was stolen and my vote did not count.
6 Q. It is hard to separate the two?
7    MS. BORGEN: Object to the form.
8 A. It could be.
9 Q. I'm sorry. I did not finish the question.
10 You've got to let me finish the question.
11    Would you agree that it's not possible to
12 separate and isolate what might have motivated someone to
13 be more or less likely to vote in the future?
14    MS. BORGEN: Object to the form.
15 A. Yes, that is true.
16    (Recess taken.)
17 Q. I want to talk to you about allegations that the
18 NAACP has with regard to Supervisor Leahy and here we can
19 use your definition, that Supervisor Leahy should be held
20 responsible.
21    What acts surrounding the November 2000 election
22 do you believe Supervisor Leahy committed that denied
23 people the right to vote?
24 A. The acts that -- not that he committed.
25 Q. Understood. That his office was responsible

## Page 173

1 for.
2 A. The acts which I have described previously in
3 terms of polls closing earlier.
4 Q. Go ahead. Why don't you list the ones that you
5 know of and we will address them one at a time.
6    Polls closing early?
7 A. Yes.
8    Complaints -- I am going by the complaints that
9 came in.
10 Q. Yes.
11 A. People whose precincts had been changed without
12 due notification.
13    You know, people not receiving assistance at the
14 polls, people who speak a second language not receiving
15 assistance. We had some complaints from the elderly.
16    There were just a series of things here in
17 Miami.
18 Q. Well, I want to cover each one that you believe
19 is an issue in this lawsuit.
20    You have mentioned the polls closing early,
21 precincts moving without notice to the voter, not
22 providing appropriate language assistance and not
23 providing assistance to the elderly?
24 A. Right.
25 Q. Anything else that you contend Supervisor Leahy

## Page 174

1 did wrong?
2 A. Not here in Miami.
3    I would have to go back to my notes. I was
4 speaking from the top of my head as we spoke.
5 Q. If you need to refer to something, please do so.
6 I want to make this complete.
7    So is there something else?
8 A. Sure. No problem.
9    There was information, I believe, that laptop
10 computers were available in 18 precincts but only one
11 majority black precinct was so equipped.
12 Q. Maybe I can help you by the process of
13 elimination.
14    Does the NAACP contend that any voters were
15 wrongfully removed from the voter rolls in Miami-Dade
16 County?
17    MS. BORGEN: Object to the form.
18    MR. EHRLICH: What is the objection?
19    MS. BORGEN: Calls for a legal conclusion.
20 A. I really don't know that answer.
21 Q. Does the NAACP have any evidence that any voter
22 was wrongfully removed from the voter rolls in Miami-Dade
23 County that you're aware of?
24 A. I would have go back to this: I don't know about
25 Miami-Dade County specifically.

**Page 175**

1 When you're asking about the State of Florida,
2 that is a different question.
3 Q. Right, and I thank you for clarifying. I am
4 asking only about Miami-Dade County for right now. I don't
5 know what happened anywhere else in the State of Florida.
6 A. Okay. I don't know the answer to that question,
7 I really don't.
8 Q. I will rephrase.
9 Are you aware, as you sit here, of any evidence
10 that Supervisor Leahy's office wrongfully removed voters
11 from the voting rolls in Miami-Dade County?
12 A. I am going to say that I have not reviewed
13 Miami-Dade County separate from the rest of the state. I
14 cannot give you an answer, period.
15 Q. So you are right now not aware of ---
16 A. Don't put words in my mouth. What I am saying
17 is you asked a question I cannot answer.
18 Q. Well, maybe I can be more clear.
19 A. If you found it in here, I would ask you ---
20 Q. I don't believe it is in there.
21 A. Oh.
22 Q. You can look until you are satisfied you are
23 able to answer the question.
24 Just to be clear, my question is as you sit here
25 right now, right at this very moment, are you aware of any

**Page 176**

1 evidence that Supervisor Leahy wrongfully removed voters
2 from the voters' list in Miami-Dade County?
3 A. I am saying to you I don't know the answer to
4 that question, period.
5 Q. Does the NAACP contend in this lawsuit that
6 Supervisor Leahy's office did not process voter
7 registration applications on a timely basis?
8 MS. BORGEN: Object to the form.
9 A. Yes, there were complaints about that.
10 Q. What evidence do you have?
11 A. I don't have evidence. I am telling you that
12 complaints came in. You are asking me about evidence. I
13 am saying these are the complaints that came in. The
14 evidence came from the complaints and came from the
15 hearings. That's it.
16 Q. Can you, within the second amended complaint,
17 can you point to me the paragraph that alleges that
18 Supervisor Leahy did not process voter registration
19 applications on a timely basis; is there is such a
20 paragraph?
21 MS. BORGEN: Object to the form.
22 A. Well, if the paragraph is here or not, what I
23 have said to you is that I am aware, based on the
24 complaints that came to us. Whether it is in this
25 document or not, they did not come in and they were

**Page 177**

1 highlighted at the hearing.
2 Q. My question is in this lawsuit does the NAACP
3 contend ---
4 A. That we'll have to see. I don't know.
5 Q. Take your time. Just let me finish the
6 question.
7 Does the NAACP contend in this lawsuit that
8 Supervisor Leahy did not process voter registration
9 applications on a timely basis such that some were denied
10 the right to vote?
11 MS. BORGEN: Object to the form.
12 A. I don't know the answer to that question.
13 Q. Are you aware of any person -- and I mean a
14 specific person whose name you can tell me --
15 A. No.
16 Q. Who is saying Miami-Dade County -- let me ask
17 the full question.
18 A. I might not necessarily do that.
19 Q. You might not let me ask the full question?
20 A. May not.
21 Q. I will try.
22 Do you know any person by name whose application
23 was not processed on time such that they were denied the
24 right to vote?
25 A. I don't know the answer to that question.

**Page 178**

1 Q. You don't know whether you know someone by name?
2 A. No, I do not.
3 Q. You mentioned laptops. Do you know how
4 Supervisor Leahy decided to place the laptops that he had
5 on Election Day?
6 A. I do not work for him. I have no idea how he
7 decided anything.
8 Q. You allege that his placement of the laptops was
9 discriminatory?
10 A. That is outlined in the case.
11 Q. How was that discriminatory?
12 MS. BORGEN: Object to the form.
13 Q. You may answer.
14 A. It was discriminatory because the percentage of
15 laptops that were based in other precincts that were not
16 black were more and disproportionately less in the black
17 precincts.
18 Q. Do you know of the precincts that got laptop
19 computers how many were predominantly white?
20 MS. BORGEN: Object to the form.
21 A. I think there were 18 out there and only one in
22 the black precincts.
23 Q. My question was do you know, of the polling
24 places that got laptop computers, how many of them were
25 comprised of predominantly white voters?

**Page 179**

1 A. I don't know that answer.
2 MS. BORGEN: Object to the form.
3 Q. Do you know what purpose the laptops served on
4 Election Day at the precincts?
5 MS. BORGEN: Object to the form.
6 A. No, I don't have that answer either other than
7 what is outlined here.
8 Q. Do you know that the presence of laptops at even
9 a few precincts helped all voters countywide?
10 MS. BORGEN: Object to the form.
11 A. I think it is outlined in here. It is not
12 something I have personal knowledge of.
13 Q. You don't know?
14 A. Not other than what is listed here.
15 Q. Let me clarify. You are saying you don't have
16 any personal knowledge.
17 I am asking as a representative of the NAACP.
18 Is your answer still the same?
19 A. My answer is as listed, no more than is listed
20 here. That is what I have to go by.
21 Q. By here you're referring to Exhibit 4?
22 A. Yes.
23 Q. Other than the second amended complaint do you
24 have any evidence that Supervisor Leahy's use of laptop
25 computers in the 2000 election denied some voters the

**Page 180**

1 right to vote?
2 MS. BORGEN: Object to the form.
3 A. I don't know the answer. I don't know if it is
4 in this other document or not. I have not memorized
5 everything that is here.
6 Q. You mentioned polls closing early. In
7 Miami-Dade County do you know what policy places closed
8 early?
9 A. There were complaints that came to us about
10 that. I can't tell you.
11 Q. That was not my question.
12 A. I know but that is my answer.
13 Q. How about my question?
14 A. No.
15 Q. Do you know of any polls that closed early?
16 A. No.
17 Q. You stated some precincts moved. Do you know of
18 any polling places or precincts that moved?
19 A. People complained about their precincts being
20 moved and they were not notified.
21 Q. What precincts?
22 A. I don't know the precinct numbers.
23 Q. You talked earlier about the disillusionment and
24 dissatisfaction that the NAACP constituents felt as a
25 result of the November 2000 election.

**Page 181**

```
1        Do you believe the constituents of the -- well,
2  let's stop for a second.
3        You have also testified that there were other
4  organizations that, like the NAACP, are engaged in
5  activities centering around registering and educating
6  voters; is that right?
7     A. Yes.
8     Q. Some of those organizations target
9  African-American voters?
10    A. Yes.
11    Q. And other organizations target voters in
12 general; is that right?
13    A. Yes.
14    Q. I think you mentioned like the Voter Leagues?
15    A. Yes.
16    Q. Do you know whether the constituents of the
17 Voter Leagues might be dissatisfied and disillusioned as a
18 result of the 2,000 election?
19    A. I don't know that.
20    Q. Do you know whether the constituents or members
21 of the other organizations whose goal it is to register
22 and educate voters might have been dissatisfied and
23 disillusioned as a result of the November elections?
24        MS. BORGEN:  Object to the form. Beyond the
25 scope of the 30(b)(6).
```

**Page 182**

```
1        MR. EHRLICH:  You may answer.
2     A. I think I mentioned earlier I had heard they
3  were.
4     Q. Do you allege that the actions alleged in this
5  second amended complaint by Supervisor Leahy caused the
6  injuries that you described earlier?
7        MS. BORGEN:  Object to the form.
8     A. Yes.
9     Q. Did you allege the actions of other defendants
10 in this lawsuit other than Supervisor Leahy caused the
11 type of injuries that you described earlier?
12        MS. BORGEN:  Object to the form.
13    A. Yes.
14    Q. Do you believe that the type of problems you
15 described in Miami-Dade County, that you just described a
16 minute ago, do you believe they occurred elsewhere in the
17 State of Florida?
18        MS. BORGEN:  Object to the form.
19    A. They did according to the complaints.
20    Q. You are relying on the complaints for the basis
21 of your knowledge?
22    A. The only reason I am here is based on the
23 complaints.
24    Q. Will you agree that the injuries that you
25 described to me have resulted from the general conduct of
```

**Page 183**

```
1  multiple parties?
2        MS. BORGEN:  Object to the form.
3        MR. EHRLICH:  What is the objection?
4        MS. BORGEN:  Asking for a legal conclusion
5  about who is responsible for what action.
6        MR. EHRLICH:  You may answer.
7     A. I don't know.
8     Q. Don't know what?
9     A. Who it is. I don't know. It could be any number
10 of people.
11    Q. Could it be people that are not defendants in
12 this lawsuit?
13    A. Oh, that I don't know. I don't know other than
14 what is listed here.
15    Q. Well, for example, if there was a voter in Palm
16 Beach County who felt that their vote was not counted
17 because their voter registration application was not
18 processed in time and they never got their card in the
19 mail and so could not vote, would not that person, who
20 also might have been a constituent of the NAACP, be
21 disillusioned?
22        MS. BORGEN:  Object to the form.
23        MR. EHRLICH:  You may answer.
24    A. The person could be.
25    Q. You would not allege that person is
```

**Page 184**

```
1  disillusioned because of something Supervisor Leahy did,
2  would you?
3        You testified earlier Supervisor Leahy has no
4  control over what happened in Palm Beach County.
5        MS. BORGEN:  Object to the form.
6     A. I was not talking about Palm Beach County. We
7  talked about Miami-Dade County. That is what you asked me.
8     Q. Now I am asking, because you have testified
9  throughout your deposition that in other parts of the
10 state you got complaints --
11    A. Yes.
12    Q. -- and my question is you have stated that there
13 was disillusionment in the election as a result of the
14 actions of the defendants?
15    A. Uhm uhm.
16    Q. My question is how are you distinguishing
17 between the acts of the defendants and other acts that
18 also may have caused your constituents to be disillusioned
19 and dissatisfied?
20        MS. BORGEN:  Object to the form.
21    A. I am not certain I understand your question.
22    Q. I understand your testimony to be that the
23 reason the NAACP was injured were the actions of the
24 defendants in this case; is that not right?
25        MS. BORGEN:  Object to the form.
```

**Page 185**

```
1     A. Yes.
2     Q. That's right?
3     A. Right, one of them.
4     Q. One of the reasons?
5        What are the other reasons?
6     A. Well, actually it goes back to when you say
7  defendants, you're talking about all of those persons that
8  we have filed against, right, this list?
9     Q. All the people you sued.
10    A. Yes.
11    Q. Are there other reasons that you're saying your
12 constituents are disillusioned and dissatisfied besides
13 the actions of the people you sued in this lawsuit?
14    A. That would actually go back to those persons.
15    Q. What about complaints you received from voters
16 that lived in counties other than the ones that are
17 included in this lawsuit?
18    A. We only took -- I think I started this whole
19 process today by saying to you that we only took the
20 complaints from the counties that had the majority of the
21 complaints presented. I think I said that.
22    Q. I think you did too.
23    A. I think I said it was a disproportionate number
24 based on the size of the people that voted in those other
25 areas.
```

**Page 186**

```
1     Q. You understood that most of the complaints came
2  from the people living in the area of the counties you
3  sued?
4     A. Exactly.
5     Q. But there were other complaints, you received
6  other complaints that were not included in the lawsuit?
7     A. Yes, but the numbers were not anywhere near what
8  I received from the others.
9     Q. There were fewer of them?
10    A. Sure.
11    Q. But you did receive complaints from people
12 living in counties other than that the ones in this
13 lawsuit?
14        MS. BORGEN:  Object to the form. Asked and
15 answered.
16    Q. Right?
17    A. Yes.
18    Q. Of the named plaintiffs in this lawsuit, who, if
19 any, are members of the NAACP who live in Miami-Dade
20 County?
21        MS. BORGEN:  Object to the form. If you know.
22    A. I think I mentioned earlier that the person who
23 was a member that I know of and had seen their membership
24 card was John Cheever.
25    Q. He's from Miami-Dade County?
```

Page 187

1   A. Yes.
2   Q. Other than John Cheever were there any named
3   plaintiffs in this lawsuit what were members of the NAACP
4   from Miami-Dade County?
5       The names, of course, are on the front of the
6   lawsuit, if that helps.
7   A. I have to check. You asked if there are any
8   from Miami-Dade County. I have to go back and find out if
9   there were..
10  Q. Right.
11  A. Mr. Israel.
12  Q. Keep in mind there were two parts to my
13  question: Whether they are from Miami-Dade County and
14  whether they are members of the NAACP.
15  A. You asked about the membership.
16      I told you I only know one person that I saw the
17  membership card.
18      We spoke earlier about the fact some of the
19  people have indicated they were and some were not.
20  Q. So you might ---
21  A. So I am going through and trying to answer your
22  question who was from Miami-Dade County, who were the
23  people from Miami-Dade County. You asked me to go through
24  to find out who they are.
25  Q. You might have already answered my question.

Page 188

1       My question is who are the named plaintiffs that
2   are both NAACP members and people who live in Miami-Dade
3   County?
4   A. I answered that earlier.
5   Q. Then we are on the same page.
6       Please name the members of the NAACP from
7   Miami-Dade County who were injured by the actions of
8   Supervisor Leahy, by something he did or failed to do?
9       MS. BORGEN: Object to the form.
10  A. We have at the start Mr. Israel, Mr. Cheever,
11  Mr. Marshall, Mrs. Odum.
12  Q. I would just interrupt you because I think we
13  are misunderstanding each other.
14      Please name the members the NAACP who have been
15  injured by the actions of Supervisor Leahy.
16      MS. BORGEN: Object to the form.
17  A. Let's go back again.
18  Q. Okay.
19  A. I don't know if all of the other people are
20  members of the NAACP other than John Cheever that I can
21  testify to what membership cards I had seen. So if you
22  are asking me who could be members ---
23  Q. What I am asking to you to do now -- and I
24  think you have done it -- is to name all the members of
25  the NAACP who had been injured by the actions of

Page 189

1   Supervisor Leahy.
2       I understand you told me Mr. Cheever.
3       Is there anyone else that you know about as you
4   sit here now?
5       MS. BORGEN: Object to the form.
6   A. I don't know the membership status of other
7   persons from Miami-Dade County.
8   Q. That is no other specific person's name you can
9   name right now?
10  A. That does not mean they are not members. It
11  simply means I can't name them at this point. I did not
12  check membership cards.
13      MR. EHRLICH: Give me one minute.
14      (Recess taken.)
15      I have no further questions.
16      DIRECT EXAMINATION
17  BY MR. TINKLER:
18  Q. Good morning, ma'am.
19      My name is Kenneth Tinkler, an assistant county
20  attorney for Hillsborough County representing Pam Iorio,
21  county elections supervisor.
22      I have a few questions related to that.
23      You are aware of the facts related to
24  Hillsborough County in this lawsuit?
25  A. In the lawsuit, yes.

Page 190

1   Q. Are you aware that plaintiff Natalie Carnegie
2   was asserted as a plaintiff in this issue related to
3   purged cards?
4   A. If your question is the issue related to purged
5   cards, I would have to go in and review what her issues
6   were.
7       MS. BORGEN: Would you object to my pointing
8   out to my client the section in the complaint that relates
9   to Natalie Carnegie?
10      MR. TINKLER: Sure.
11      MS. BORGEN: Page 18, 64.
12  A. Okay. Yes.
13  Q. Are you aware that the purged card issue is now
14  moot?
15  A. Yes.
16  Q. Are you aware that plaintiff Candy Wells did not
17  go to the polls on election day?
18      MS. BORGEN: Do you have any objection to my
19  pointing out to the witness ---
20      MR. TINKLER: No objection.
21      MS. BORGEN: Paragraph 101, 47.
22  A. Okay. Was I aware she did not go to the polls?
23      It does not say she did not, she went to the
24  polls. It does not say, we do not say she went to the
25  polls on that day.

Page 191

1   Q. You are aware she did not go to the polls?
2   A. Right.
3   Q. Are you aware that plaintiff Sherry Edwards had
4   moved out of the State of Florida?
5   A. No, I was not aware.
6   Q. Are you aware that plaintiff Willie Stein is no
7   longer being put forward as a class representative?
8       MS. BORGEN: Object to the form.
9       MR. TINKLER: What is the objection?
10      MS. BORGEN: Calls for a legal conclusion.
11  A. I don't know a thing about that.
12  Q. Do you know anything about that paragraph?
13  A. I don't know anything about that. You state he
14  is no longer. When you say no longer ---
15  Q. I said are you aware that plaintiff Willie Stein
16  is no longer being put forward as a class representative?
17  A. No, I'm not aware.
18  Q. Are you aware that plaintiff Germaine Terry
19  failed to respond to police maintenance and notices?
20      MS. BORGEN: Object to the form.
21  A. I am not aware.
22  Q. Are you aware that the Florida Department of Law
23  Enforcement informed the Hillsborough County supervisor
24  that Wallace MacDonald was convicted of a felony and did
25  not have his rights restored?

Page 192

1       MS. BORGEN: Object to the form. Assumes facts
2   not in evidence.
3   A. I was not aware if that is your question.
4   Q. Are you aware that plaintiff Ron Dishrode's
5   issue in this matter has been rendered moot by provisional
6   ballots?
7       MS. BORGEN: Objection as to form. Calls for a
8   legal conclusion.
9   A. I don't know that. I am not aware of what you
10  asked.
11  Q. Is plaintiff Candy Wells a member of the NAACP?
12  A. I don't know that.
13  Q. Is plaintiff Sherry Edwards a member of the
14  NAACP?
15  A. I don't know.
16  Q. Is Germaine Terry a member of the NAACP?
17  A. I don't know.
18  Q. Is Ron Dishrode a member of the NAACP?
19  A. I don't know.
20  Q. Is plaintiff Wallace MacDonald a member of the NAACP?
21  A. I don't know.
22  Q. Is plaintiff Willie Stein a member of the NAACP?
23  A. I don't know.
24  Q. This was a question like this asked by counsel
25  for Miami-Dade County. Can you name the members of the

Page 193

1 NAACP who were injured by the Hillsborough County
2 supervisor?
3     A. I am not aware of the members. That is not to
4 say there are not members. I just don't know if there
5 are.
6     Q. You do not know any specific names of the NAACP
7 members?
8     A. From my knowledge, no.
9     Q. On behalf of the NAACP are you aware of any
10 NAACP members injured by the Hillsborough County
11 supervisor?
12     A. I am not aware.
13        That does not mean there are not. I am not
14 aware.
15        I mean the answer is no. I am not saying they
16 are not members. I just don't know all the members in the
17 various branches.
18     Q. But that is you personally.
19        You as a representative of the NAACP, you are
20 not aware of the names of any members who were injured by
21 the Hillsborough County supervisor?
22        MS. BORGEN: Object to the form.
23        A. No.
24        MR. TINKLER: Object to the form.
25        . DIRECT EXAMINATION

Page 194

1 BY MR. RESTREPO:
2     Q. My name is Dan Restrepo. I represent
3 Choiceprint/DBT, Data Base Technology.
4        Do you have any knowledge as to what, if any,
5 role Choiceprint or DBT or Data Base Technology played in
6 the events that are at issue in this case?
7        MS. BORGEN: Object to the form.
8        MR. RESTREPO: What is wrong with the form?
9        MS. BORGEN: Vagueness.
10     Q. Do you understand the matters that are at issue
11 in this case?
12     A. Oh, yes, I am aware of issues that would be
13 related not to your company but to the issue of purged
14 lists. Is that what you are talking about?
15     Q. I am asking your knowledge about what role, if
16 any, you're aware of Choiceprint/DBT playing in the events
17 that are at issue in this case?
18     A. My knowledge is that Choiceprint/DBT was
19 responsible for purging the voter registration list of, I
20 guess, felons.
21        I am not sure. Let me look at what we say here
22 so I can talk to you from the document exactly.
23     Q. Perhaps I can simplify this. Other than what is
24 stated in Exhibit 4, do you have any knowledge concerning
25 anything Choiceprint did related to the November 7, 2000

Page 195

1 election?
2     A. First of all, I've got to establish what was
3 said. That is what I am trying to look up to be sure.
4     Q. Okay.
5        MS. BORGEN: Counsel, do you have any objection
6 to my directing my client to the sections of the
7 complaint?
8        MR. RESTREPO: My concern is there is a serious
9 question as to where in the complaint we are.
10        MS. BORGEN: I direct you to page 20, paragraph
11 76.
12        MR. RESTREPO: Given that you just did ---
13     A. Okay, I have it now.
14        No, I don't have any knowledge beyond this, if
15 that is your question.
16     Q. How did you acquire the knowledge that you do
17 have?
18        MS. BORGEN: Object to the form.
19        MR. RESTREPO: What is wrong with the form?
20        MS. BORGEN: About what, as to what?
21        Vagueness.
22     Q. The knowledge that we have been talking about. As to
23 the knowledge that you have about what, if any, role
24 Choiceprint played in relationship to the November 7, 2000
25 election, how did you come about that, how did you acquire

Page 196

1 that knowledge?
2     A. That is a very good question. I am just
3 thinking back. It would be consultation with my lawyers
4 that I would have found out about this because we just had
5 the issue, you know, of the rolls being purged.
6     Q. When you say the rolls being purged, is it your
7 understanding that Choiceprint itself removed names from
8 Florida's officials voter rolls?
9     A. According to what it says here ---
10     Q. By here you mean ---
11     A. In the document.
12     Q. Exhibit 4?
13     A. Yes, second amended complaint, Defendant's
14 Exhibit 4, yes, that you were contracted with to compare
15 the state's central voter file with information available
16 in other computer databases and prepare a list of
17 registered voters who were ineligible to vote.
18     Q. Is that paragraph ---
19     A. Under section C, and it is paragraph 2.
20     Q. What is the overall number, paragraph 77?
21     A. 77. I'm sorry.
22     Q. Okay. Before speaking with your attorneys about
23 those issues did you know that and do you know the facts
24 that may or may not support that allegation?
25     A. Did I know facts, no, I did not know facts about

Page 197

1 DBT.
2        I knew that people were complaining.
3     Q. Do you know if Choiceprint has the authority to
4 remove names from Florida's official voters rolls?
5        MS. BORGEN: Object to the form.
6     A. I am not aware of that.
7     Q. Let me ask you the flip side of that question:
8 Do you know if Choiceprint has the authority to restore
9 voters to Florida's official voter rolls?
10        MS. BORGEN: Object to the form.
11     A. I am not aware of that.
12     Q. I believe I heard you testify that the Florida
13 Election Reform Act of 2001 failed to address the issue of
14 felon disenfranchisement; is that correct?
15     A. To the degree that I thought ---
16     Q. To the degree you thought it should?
17     A. Yes.
18     Q. Does the Florida State Conference of Branches
19 ever adopt positions with respect to matters of public
20 policy?
21     A. Yes.
22     Q. Does the Florida State Conference of Branches
23 have a position with respect to whether ex-felons should
24 have the right to vote in Florida?
25     A. Yes.

Page 198

1     Q. What is that position?
2     A. That ex-felons should have access to having
3 their rights restored.
4     Q. Is it your understanding that ex-felons do not
5 have access to having their rights restored in Florida
6 today?
7     A. No, that is not my understanding.
8        We do have a process that your rights can be
9 restored but the process is very technical, not user
10 friendly. So certainly when you compare it to rights
11 being restored in other places, it's much more difficult
12 in Florida.
13     Q. Is it the position of the Florida State
14 Conference of Branches that the restoration process should
15 be made easier?
16     A. Yes.
17     Q. Why is that?
18     A. Well, so that those persons who are eligible to
19 have their rights restored could do that without having
20 to, number one, take so long and number two, to enjoy the
21 same rights as the rest of us enjoy who have our rights.
22     Q. Is that an issue that has been of particular
23 concern or is it a peripheral issue for the state
24 conference?
25     A. Well, it is an issue for the NAACP at large. It

Page 199

1 is something that we are not only talking about in Florida
2 but throughout the country, not isolated to Florida.
3       So I would say that it is a very important issue
4 to the organization.
5   Q. Is there any particular reason that it is an
6 important issue to the organization?
7   A. Yes, it is one of those issues completely in
8 line with our mission, which deals with advocating on
9 behalf of those that are disenfranchised.
10       Certainly when you talk about the vote, we have
11 a long history of working towards insuring that everyone
12 who is eligible does secure that right.
13       We have a long history of having being through
14 the issue of being tested and taken through all the hoops
15 that we were taken through as a people in order to vote in
16 years past and this currently, the issue with ex-felons
17 who are eligible to have their rights restored, certainly
18 flies in the face of everything that we have worked to
19 move beyond.
20   Q. That changes you were talking about, you
21 said "we as a people." Are you referring to black
22 Americans?
23   A. I am referring to the NAACP.
24   Q. One final area: I believe you may have touched
25 on this but do you receive a salary for any of your NAACP

Page 200

1 capacities, whether as a member of the national Board of
2 Directors or as president of the Florida State Conference
3 of Branches?
4   A. Not a penny. I pay into the organization.
5   Q. Do you get reimbursed in any way for your time
6 or expenses incurred?
7   A. I do get assistance with some expenses in travel
8 from the state conference but not from the national and
9 not from the local, not from anyone.
10       This is all service.
11   Q. Thank you very much. I have no further
12 questions.
13       (Discussion off the record.)
14       MS. BORGEN: I have just a few questions.
15       CROSS EXAMINATION
16 BY MS. BORGEN.
17   Q. A few hours ago you mentioned that there was a
18 distinction between active and inactive units with the
19 NAACP.
20       Would you please tell us what an inactive unit
21 is in the Florida State Conference of Branches?
22   A. Units can become inactive immediately if their
23 membership roll drops below the required threshold. For
24 college chapters and youth councils that number is 25 and
25 for the adult branches the number is 50.

Page 201

1       So if the unit drops below that it becomes
2 inactive.
3   Q. So an inactive unit might still have members;
4 would that be correct?
5   A. Yes, that would be correct.
6   Q. And you also mentioned earlier the category of
7 membership called a lifetime membership?
8   A. Yes.
9   Q. How goes that work if someone is a lifetime
10 member?
11   A. The life members don't have to pay any more in
12 life.
13   Q. So you pay once or do they pay over several
14 years?
15   A. There are choices. Some people may write just
16 one check for the entire amount or they may pay it in
17 increments.
18       For example, we have various categories within
19 life too. The minimum life fee is $750. You can pay that
20 at $75 over ten years or you can choose to do that in any
21 increments thereof.
22   Q. When someone has paid for a life membership they
23 don't pay again?
24       MR. EHRLICH: Objection to form.
25   A. No, unless they choose to go to another

Page 202

1 category.
2   Q. You testified earlier about some voter
3 registration activity that the NAACP carries out. Are
4 those activities limited only to NAACP members?
5       MR. EHRLICH: Object to the form.
6   A. What did you say?
7   Q. Does the NAACP engage in voter registration
8 activity?
9   A. Yes.
10   Q. Is that activity limited only to NAACP members?
11       MR. EHRLICH: Objection to form.
12   A. Other people do participate. I think we talked
13 about a coalition where the people may not be NAACP
14 members so, you know, we cover a wide range of people
15 within a given community.
16   Q. Does the NAACP through the State Conference of
17 Branches in Florida organize various voter registration
18 activities?
19       MR. EHRLICH: Objection to form.
20   A. Yes.
21   Q. Are those limited to NAACP members?
22       MR. EHRLICH: Objection as to form.
23   A. No. Whenever we have either voter empowerment
24 activity forums, voter training sessions on how to vote,
25 everyone is invited. We advertise publically. Everything

Page 203

1 is open.
2       We have to do that. We don't have any closed
3 door sessions.
4   Q. You spoke earlier about the activity of the
5 NAACP through the Florida State Conference of Branches
6 since the November 7, 2000 election or how that election
7 affected the NAACP's activity.
8       Please can you describe how your role as
9 president of the chapter of the Florida State Conference
10 of Branches has been affected by the November 7, 2,000
11 election?
12       MR. EHRLICH: Objection to form.
13   A. Well, one of the things that I mentioned earlier
14 is the increased amount of travel I have to do, increased
15 amount of work trying to encourage people to stay in the
16 voter empowerment process.
17       It has just raised a lot more work focused in on
18 voter empowerment and taken away the time that we need to
19 be addressing other issues.
20       That is one of the real problems that has
21 existed for me.
22   Q. Would you say that those problems have existed
23 not just for you but for the NAACP?
24       MR. EHRLICH: Objection as to form.
25       MR. LITTLE: Objection to form.

Page 204

1   Q. For November 7, 2000 where did you vote, in what
2 county in Florida?
3   A. Miami-Dade County.
4   Q. And I just want to clarify one issue. You talked
5 about trying to get an absentee ballot for the election?
6   A. Yes.
7   Q. You submitted an actual absentee ballot or a
8 request for an absentee ballot?
9   A. It was a request.
10   Q. So you never received an absentee ballot?
11   A. No.
12   Q. There was some discussion earlier as well about
13 the rule making that is going on in Florida.
14       Do you recall whether you, with the assistance
15 of counsel, have prepared or submitted testimony regarding
16 some of the rules being followed with the Florida Election
17 Reform Act of 2001?
18   A. Yes.
19       MR. TINKLER: Objection as to form.
20   Q. Do you recall on how many occasions you
21 submitted testimony about the rule making?
22       MR. TINKLER: Objection.
23       MR. LITTLE: Objection.
24       MR. EHRLICH: Objection.
25   A. I am not sure.

Page 205

1    Q. Is the NAACP affiliated with a particular
2 political party?
3    A. Not, not at all. We are non-partisan.
4    Q. With regard to this lawsuit has the NAACP spoken
5 to other attorneys as a result of the 2,000 election,
6 general election?
7    MR. EHRLICH: Objection to form?
8    A. No, I am not aware.
9    MS. BORGEN: No further questions at this
10 time.
11    REDIRECT EXAMINATION
12 BY MR. LITTLE:
13    Q. Do you know whether in November 2000 there were
14 either active or inactive units of the NAACP Florida State
15 Conference of Branches in each of the 67 counties?
16    A. You asked me that question earlier when we first
17 started and I think I told you I did not know which ones
18 were active or inactive because that fluctuates, the
19 numbers, you know.
20    Q. My question is can you tell me as you sit here
21 today that as of November 2000 there was either an active
22 or inactive unit of the NAACP Florida State Conference of
23 Branches in each of the 67 counties in Florida?
24    A. Okay. The way I answered before, just going
25 back because I recall the question earlier and I want to

Page 206

1 be sure you understood what I said, the opportunity was
2 there.
3    Some of them may not have been active based on
4 their numbers but there were members there in every
5 place. In every county there are members.
6    A unit may not be active -- as of November 7,
7 2000, an unit might not have been active in every county
8 because they rarely are units active in all 67. I mean,
9 we have points where that has occurred but I would venture
10 to say that on November 7 every unit was not active. But
11 there were active members in every one of the 67 counties.
12    Q. As you sit here today can you testify that as of
13 November 7, 2000 there was an NAACP member ---
14    A. At least one.
15    Q. At least one?
16    A. Yes.
17    Q. In every county?
18    A. Yes.
19    Q. In the State of Florida?
20    A. Right, I would say that, yes.
21    Q. What do you base that on?
22    A. Based on our list that we get from the national
23 because that is who keeps membership rolls and links up
24 with the 67 counties.
25    Q. Is it broken down by the county in the

Page 207

1 membership rolls that the national maintains?
2    A. Yes, they do break it down.
3    Q. How far back does the Florida State Conference
4 of Branches maintain the membership rolls of each year's
5 membership in the State of Florida?
6    A. The state conference does not maintain that
7 list.
8    Q. You have told me you get a list down from
9 national?
10    A. Right.
11    Q. What I am asking is for how many years back into
12 the past does the Florida State Conference of Branches
13 keep copies of those membership lists you have just
14 described coming down from national?
15    A. Oh, yes, and the reason that is hard for me to
16 say is because this is my third year as president. How
17 presidents coming before me did it, I don't know.
18    Q. While you have been president you have kept all
19 the lists?
20    A. Yes.
21    Q. So at least going back to 2,000?
22    A. At least.
23    Q. When the NAACP through the Florida State
24 Conference of Branches does the voter registration drives,
25 are those drives focused on any particular ethnic group?

Page 208

1    A. No.
2    Actually, because we are predominantly a black
3 organization and most of our members live in predominantly
4 black communities, drives are usually held within the
5 communities.
6    But it does not preclude other communities from
7 our registering voters.
8    Q. Your voter registration campaign is race
9 neutral, not directed to any ethnic group?
10    A. Yes.
11    Q. In your affidavit which has been marked as
12 Exhibit 2 you reference an effort when you were president
13 here in Miami-Dade County and you oversaw a drive that you
14 believe registered 36,000 new black voters; is that
15 correct?
16    A. Right.
17    Q. Do you know how many total voters were
18 registered during that 1998 drive referenced in your
19 affidavit in paragraph 7?
20    A. No, I don't know. Only my department people may
21 know.
22    Q. If I understand your testimony about your
23 personal role in the Florida State Conference of Branches,
24 since November 2000, your testimony is that you have spent
25 more time on issues of voter empowerment than you

Page 209

1 otherwise would have spent and that kept you from working
2 on other subject matters that you would have normally
3 addressed; is that correct?
4    A. That is correct.
5    MR. LITTLE: No further questions.
6    MS. BORGEN: Just for the end of the record,
7 plaintiff reserves the right to, you know, upon
8 consideration of the 30(b)(6) notice possibly to provide
9 other witnesses pursuant to that.
10    We just received the notice two days ago.
11    MR. EHRLICH: Miami-Dade County objects to
12 that.
13    MR. LITTLE: Let me put on the record clearly
14 that we have not heard anything of that nature prior to
15 coming in here today and we have all been working on
16 compressed time frames. So we don't -- we understand and
17 hear what you're saying but we do not concur with the
18 Statement.
19    MS. CICCOLO: As far as the witness may
20 identify areas she cannot address, if some person comes to
21 our attention that could fulfill that obligation, we
22 certainly will let you know but I think Lori put that on
23 the record but due to the time frame -- that speaks for
24 itself.
25    MR. LITTLE: There is no Exhibit number 3

Page 210

1 because that was the original complaint which we did not
2 show to the witness.
3    (Thereupon, the taking of the deposition was
4 concluded at 6:15 p.m.)

Page 211

```
 1
 2                ACKNOWLEDGMENT
 3
 4                  - - - - -
 5
 6   STATE OF _____
 7
 8   COUNTY OF _____
 9       I, _____, hereby certify
10   that I have read the foregoing transcript of my deposition
11   and that the statements contained therein, together with
12   any additions or corrections made on the attached Errata
13   Sheet, are true and correct.
14
15       Dated this_____day of_____, 2002.
16
17
18       _____
19
20
21              .
22       The foregoing certificate was subscribed to before me
23   this_____day of_____, 2002 by
24   _____ who has produced a
25   _____ as identification and who
```

Page 212

```
 1   did not take an additional oath.
 2
 3
 4       _____
 5
 6       Notary Public-State of _____
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 213

```
 1          CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA
 4   COUNTY OF DADE
 5
 6       I, the undersigned Notary Public, in and for the
 7   State of Florida, hereby certify that ADORA OBI NWIZE
 8   personally appeared before me and was duly sworn.
 9
10       WITNESS my hand and official seal this _____ day
11   of _____, 2002.
12
13
14       _____
15       KAY S. ROSENFELD
16       Notary Public-State of Florida
17
18
19
20
21
22
23
24
25
```

Page 214

```
 1          REPORTER'S DEPOSITION CERTIFICATE
 2
 3   STATE OF FLORIDA
 4   COUNTY OF DADE
 5
 6       I, KAY S. ROSENFELD, do hereby certify
 7   that I was authorized to and did stenographically report the
 8   foregoing deposition; and that the transcript is a true
 9   and correct transcription of the testimony given by the
10   witness; and that the reading and signing of the
11   deposition were not waived.
12
13       I further certify that I am not a relative,
14   employee, attorney or counsel of any of the parties, nor
15   am I a relative or employee of any of the parties'
16   attorney or counsel connected with the action, nor am I
17   financially interested in the action.
18
19
20       Dated this _____ day of_____, 2002.
21
22
23       _____
24       KAY S. ROSENFELD
25
```

**$150,000** [2]    145:18
145:22
**$75** [1]    201:20
**$750** [1]    201:19
**'60's** [1] 21:1
**/** [1]    1:12
**00** [2]    71:18    102:2
**01-120-CIV-GOLD/SIMONTON**
[1]    1:2
**1** [9]    3:22    8:14
8:17    8:19    9:1
10:13    10:14    11:20
34:14
**100** [6]    64:20    65:1
65:1    65:2    65:22
157:16
**101** [1]    190:21
**11** [4]    3:22    68:25
72:4    137:10
**115** [1]    3:18
**12** [2]    3:23    143:23
**128** [1]    130:6
**13** [1]    43:19
**15** [1]    210:4
**16** [1]    11:11
**18** [3]    174:10    178:21
190:11
**189** [1]    3:19
**1909** [1] 143:21
**193** [1]    3:20
**1930's** [1]    144:2
**1938** [1] 144:2
**1978** [2] 21:8    21:10
**1980** [3] 18:24    20:17
21:14
**1986** [1] 137:8
**1988** [1] 137:9
**199** [1] 74:10
**1994-95** [1]    140:16
**1998** [2] 137:10    208:18
**2** [28]    3:22    11:13
11:16    11:18    14:5
29:16    29:19    29:25
33:5    33:7    33:18
33:22    34:9    34:9
34:13    34:24    41:24
43:10    49:3    52:21
58:1    74:11    75:7
79:9    90:7    123:11
196:19    208:12
**2,000** [17]    23:5
23:21    43:22    49:6
91:22    135:13    135:19
135:22    136:14    138:4
140:25    141:4    145:6
181:18    203:10    205:5
207:21
**20** [1]    195:10
**20,000** [3]    23:22
24:2    24:3
**200** [1]    3:12
**2000** [70]    12:12
12:17    12:25    13:14
14:15    15:14    15:15
23:17    24:7    24:12

**25:23    31:23    35:15**
36:2    36:8    38:11
38:19    39:1    39:11
41:12    41:17    42:1
42:9    42:15    43:7
44:8    44:24    49:10
66:10    66:22    68:7
69:1    78:13    85:14
92:14    93:4    98:14
98:18    99:5    99:24
103:11    110:3    115:13
127:20    130:8    134:23
135:2    135:25    137:15
139:24    145:8    147:2
151:8    157:3    157:23
159:14    161:23    163:1
172:21    179:25    180:25
194:25    195:24    203:6
204:1    205:13    205:21
206:7    206:13    208:24
**2001** [4]    101:9    104:1
197:13    204:17
**2002** [14]    1:15
11:11    102:23    122:1
140:6    141:12    157:5
157:10    158:10    162:6
211:15    211:23    213:11
214:20
**204** [1]    3:13
**214** [1]    4:16
**23** [2]    1:15    64:13
**25** [1]    200:24
**2545** [1] 4:15
**3** [4]    41:23    49:3
52:22    209:25
**30** [14]    1:17    8:16
9:5    10:14    71:18
115:15    121:21    134:1
134:20    134:22    141:11
148:7    181:25    209:8
**30,000** [1]    135:19
**300,000** [1]    141:15
**33180** [1]    4:16
**350,000** [1]    158:11
**36,000** [1]    208:14
**37** [2]    112:21    140:18
**4** [36]    3:11    12:8
12:1    12:6    12:8
35:6    36:20    36:22
37:5    37:18    38:2
38:8    39:24    40:4
43:6    53:7    54:2
56:4    57:5    66:4
66:4    74:12    75:7
79:9    80:10    90:6
96:18    104:2    112:21
112:25    113:12    114:7
179:21    194:24    196:12
196:14
**45** [2]    3:14    9:7
**47** [1]    190:21
**49** [1]    3:15
**5** [1]    102:2
**50** [4]    157:11    157:16
158:16    200:25
**500,000** [1]    22:23
**6** [15]    1:17    8:16
9:5    10:14    71:18

**71:18    115:15    134:1**
134:20    134:22    144:11
148:7    181:25    209:8
210:4
**60** [1]    55:17
**64** [1]    190:11
**67** [14]    24:6    24:11
24:18    25:19    25:23
109:8    112:4    112:9
112:13    205:15    205:23
206:8    206:11    206:24
**7** [43]    14:15    14:18
14:22    15:7    15:15
24:6    25:22    31:23
32:17    35:9    35:15
38:11    44:8    66:3
66:5    66:22    68:7
80:10    85:14    106:13
110:3    115:13    124:24
129:6    130:8    134:23
135:2    147:2    156:22
160:3    163:1    169:12
170:7    170:23    194:25
195:24    203:6    203:10
204:1    206:6    206:10
206:13    208:19
**75,000** [1]    140:21
**76** [1]    195:11
**77** [5]    23:8    23:12
23:12    196:20    196:21
**7th** [2]    84:15    159:5
**8** [2]    1:14    3:22
**80** [3]    1:14    165:19
166:3
**81** [1]    3:17
**88** [1]    64:13
**9** [3]    9:1    9:7
10:13
**able** [13] 6:9    9:15
9:15    57:16    59:10
76:3    90:13    96:25
125:18    142:6    159:4
161:15    175:23
**above-entitled** [1]
3:6
**absentee** [18]    69:6
69:15    72:17    73:13
107:11    116:6    116:11
117:1    117:2    117:6
117:12    118:8    118:21
155:1    204:5    204:7
204:8    204:10
**absolutely** [4]    63:5
158:14    159:17    167:3
**absurd** [1]    63:5
**accept** [1]    30:13
**access** [4]    104:9
158:8    198:2    198:5
**accessibility** [1]
24:18
**accessible** [3]    24:15
24:20    109:15
**accommodate** [1]
6:8
**according** [5]    39:9
41:1    63:10    182:19
196:9

**Accordingly** [1]
6:16
**accountable** [1] 111:17
**accounting** [1]    111:1
**accuracy** [1]    60:7
**accurate** [4]    6:20
56:18    103:24    109:15
**accusation** [2]    51:22
52:2
**accuse** [1]    50:9
**accused** [1]    51:4
**accusing** [1]    120:22
**ACKNOWLEDGMENT**
[1]    211:2
**acquire** [2]    195:16
195:25
**act** [16]    82:25    101:9
102:12    103:10    103:25
104:5    123:15    123:20
124:13    128:4    130:23
131:2    152:23    153:9
197:13    204:17
**acted** [3] 120:4    120:23
167:6
**acting** [5]    120:8
121:10    124:17    124:20
155:8
**action** [10]    12:4
29:8    44:4    57:5
58:3    113:3    113:6
183:5    214:16    214:17
**actions** [12]    130:18
143:12    158:24    159:15
182:4    182:9    184:14
184:23    185:13    188:7
188:15    188:25
**active** [23]    21:13
21:23    24:16    24:22
24:23    24:25    25:18
25:23    26:4    27:22
59:12    145:2    166:25
200:18    205:14    205:18
205:21    206:3    206:6
206:7    206:8    206:10
206:11
**actively** [1]    144:25
145:10
**activities** [10]    15:11
97:19    98:18    134:24
141:7    141:10    144:7
181:5    202:4    202:18
**activity** [11]    41:18
106:14    110:16    144:25
161:4    202:3    202:8
202:10    202:24    203:4
203:7
**acts** [6]    128:7    172:21
172:24    173:2    184:17
184:17
**actual** [1]    204:7
**add** [1]    160:20
**addition** [3]    110:13
135:3    148:11
**additional** [7]    9:10
10:1    84:7    102:22
107:8    157:9    212:1
**additions** [1]    211:12

**address** [12]    4:13
4:15    5:14    9:14
30:15    104:1    153:11
159:7    160:22    173:5
197:13    209:20
**addressed** [5]    32:12
104:6    106:1    106:5
209:3
**addresses** [2]    33:10
33:11
**addressing** [1]    203:19
**adequate** [1]    124:3
**adequately** [1]    32:6
**administering** [1]
130:8
**administration** [1]
16:4
**adopt** [1]    197:19
**Adora** [6]    1:17
3:5    4:2    4:15
5:13    213:7
**adult** [14]    20:2
20:5    20:11    21:3
21:5    21:7    22:9
23:8    24:10    25:6
25:12    25:15    25:15
200:25
**ADVANCEMENT**
[1]    1:5
**advertise** [1]    202:25
**advocate** [2]    29:9
31:10
**advocates** [1]    33:10
**advocating** [1] 199:8
**affected** [2]    203:7
203:10
**affidavit** [13]    23:7
31:2    32:19    32:23
33:1    42:7    68:24
72:6    96:21    97:1
97:8    208:11    208:19
**affiliated** [1]    205:1
**affirmation** [5] 72:6
73:2    96:21    97:1
97:8
**affords** [1]    127:7
**aforesaid** [1]    3:8
**African-American** [4]
130:20    165:14    165:22
181:9
**African-Americans**
[6]    121:5    121:11
137:14    137:23    151:4
151:18
**afterwards** [2]    14:16
155:19
**again** [14]    31:16
40:11    56:14    70:4
73:4    90:6    97:15
103:5    118:10    124:12
131:5    160:20    188:17
201:23
**against** [15]    55:6
57:24    82:10    98:6
108:1    108:4    115:22
126:3    126:21    127:3
127:19    128:15    129:10

145:17  185:8

**agenda** [2]          103:18
103:22

**ages** [1]  76:16

**aggressively** [1]
135:20

**ago** [8]    5:20    9:9
9:21    63:23    74:12
182:16  200:17  209:10

**agree** [12]              51:2
52:19   62:1    62:7
63:25   65:20    77:19
78:5    95:17  135:12
172:11  182:24

**agreed** [2]          143:2
143:3

**ahead** [11]          20:22
51:17   68:23   83:20
88:11   130:1   131:8
132:14  148:9   154:4
173:4

**al** [4]      1:6      1:10
4:12    165:15

**aligned** [1]        138:19

**allegation** [1]  196:24

**allegations** [9]  81:22
82:4    82:16   82:24
83:3    83:4   130:17
158:18  172:17

**allege** [5]        130:18
178:8   182:4   182:9
183:25

**alleged** [1]        182:4

**allegedly** [3]    67:20
67:23   113:25

**alleges** [1]       128:20
176:17

**Allen** [2]            5:4
5:4

**allow** [2]          70:16
158:7

**allowed** [5]        48:1
48:4    48:5    110:4
155:13

**allowing** [1]     48:24

**allows** [1]       111:22

**almost** [2]       153:20
154:2

**alone** [2]         86:23
152:7

**along** [4]          4:9
20:21   81:12   87:23

**Alpha** [2]          17:6
17:6

**Alternative** [1]  16:11

**alternatives** [2] 107:16
107:19

**always** [4]       103:13
103:16  135:17  135:21

**ambassadors** [2]
143:4   143:5

**amended** [8]       12:3
22:21   54:3   58:17
176:16  179:23  182:5
196:13

**amendment** [2]   11:25

---

54:5

**American** [3]     138:20
139:5   139:11

**Americans** [1]  199:22

**among** [3]         45:24
66:5   166:18

**amount** [19]        27:2
104:9   120:7   121:6
122:18  123:9   123:13
123:23  123:24  138:3
159:7   159:20  159:22
160:18  160:19  161:11
201:16  203:14  203:15

**Angela** [4]          2:5
5:11    50:4    50:6

**angry** [2]          49:25
52:2

**animal** [1]       105:17
105:20  105:23

**animal-like** [1] 104:20

**annual** [2]        26:23
27:3

**answer** [64]         6:17
6:19    9:15    9:22
20:16   22:7    24:8
24:13   25:2    37:8
37:8    37:10   37:11
39:20   40:8    40:11
45:20   50:6    50:11
53:21   82:21   86:8
86:17   88:11   88:12
91:23   109:23  110:21
113:21  117:21  119:9
128:11  129:22  130:3
134:2   144:12  145:20
152:16  152:22  164:25
166:1   166:2   166:8
168:6   174:20  175:6
175:14  175:17  175:23
176:3   177:12  177:25
178:13  179:1   179:6
179:18  179:19  180:3
180:12  182:1   183:6
183:23  187:21  193:15

**answered** [13]     23:16
40:7    40:10   57:1
88:9    113:19  127:23
166:9   169:6   186:15
187:25  188:4   205:24

**answering** [4]      31:3
56:21   89:7   168:11

**answers** [4]        6:16
31:10   45:13   91:14

**anyway** [5]         70:17
91:3    107:21  124:8
172:3

**apart** [3] 16:22    40:3
53:20

**appear** [2]         13:3
13:5    13:6    13:8
13:25

**APPEARANCES** [1]
2:1

**appeared** [10]     12:16
12:20   12:24   13:2
13:14   14:13   36:5
91:15   99:3   213:8

**appearing** [4]      7:10
10:10   90:8   103:2

---

**application** [10] 27:6
27:11   27:11   41:10
41:10   41:15   76:2
77:17   177:22  183:17

**applications** [14]
41:7    75:2    75:8
75:13   76:6    76:22
77:6    77:15   77:20
78:6    78:15   176:7
176:19  177:9

**applied** [3]       107:11
135:5   154:25

**appointed** [1]    168:24

**appreciate** [1]   48:24

**approached** [1] 106:25

**appropriate** [3]  107:2
156:25  173:22

**approximate** [1]
74:8

**April** [1]          11:11

**area** [5]   26:5    96:25
99:10   186:2   199:24

**areas** [11]          6:17
56:24   57:13   67:3
97:13   103:14  103:16
105:25  106:4   185:25
209:20

**arise** [1] 107:9

**arises** [1]         26:6

**Arpen** [7]          2:16
3:14    4:21    45:6
45:6    45:11   48:23

**arrested** [1]       48:2
48:6

**Arrive** [7]        138:14
138:15  138:19  139:6
139:7   139:19  140:3

**arrived** [1]       117:5

**arriving** [1]     141:15

**articles** [2]      15:13
165:13

**Asians** [1]        87:16

**aside** [1] 117:15

**aspect** [1]        153:8

**aspects** [3]       33:11
136:13  167:1

**asserted** [1]      190:2

**assertion** [1]     75:11

**assist** [4]        135:6
135:23  142:22  142:25

**assistance** [8]    33:13
33:14   173:13  173:15
173:22  173:23  200:7
204:14

**assistant** [1]    189:19

**assisted** [1]      92:15

**ASSOCIATION** [1]
1:5

**assume** [3]        81:21
81:25   118:23

**Assumes** [1]      192:1

**assuming** [1]     125:9
166:2

**assumption** [2] 61:25
79:7

---

**attached** [1]     211:12

**attempt** [2]       30:14
152:12

**attempted** [5]     38:10
69:8    71:11   86:4
150:7

**attempting** [1]    78:8

**attempts** [2]     135:14
146:20

**attend** [1]       164:17

**attended** [1]     102:18

**attention** [7]     29:14
46:4    56:3    82:18
101:22  132:7   209:21

**attitude** [1]     116:21

**attorney** [13]      2:10
2:18    2:20    3:1
4:22    54:16   81:11
122:11  133:13  152:18
189:20  214:14  214:16

**attorneys** [9]     10:17
54:20   55:2    56:15
133:15  133:15  152:20
196:22  205:5

**authority** [3]     61:2
197:3   197:8

**authorize** [1]    132:24

**authorized** [1]   214:7

**available** [3]    146:9
174:10  196:15

**aware** [67]          9:25
38:17   38:22   64:9
66:9    66:21   72:16
73:15   77:18   78:12
78:24   91:19   93:5
95:21   95:23   95:25
98:13   100:5   100:10
100:15  102:13  102:22
103:5   110:23  113:5
113:8   113:8   113:15
114:3   114:9   115:15
129:14  130:22  162:22
174:23  175:9   175:15
175:25  176:23  177:13
189:23  190:1   190:13
190:16  190:22  191:1
191:3   191:5   191:6
191:15  191:17  191:18
191:21  191:22  192:3
192:4   192:9   193:3
193:9   193:12  193:14
193:20  194:12  194:16
197:6   197:11  205:8

**away** [7] 70:21   84:24
159:5   159:8   159:19
160:21  203:18

**awful** [2]         124:10
156:5

**b** [12]   1:17    8:16
9:5    10:14   115:15
134:1   134:20  134:22
144:11  148:7   181:25
209:8

**bachelor** [1]      15:24

**background** [3]   15:22
15:23   16:8

**backgrounds** [1]
91:20

---

**backup** [1]        90:16

**bad** [1]  70:25

**balance** [1]       61:3

**ballot** [21]        69:6
69:15   72:17   72:20
96:8    107:12  116:6
116:11  117:1   117:2
117:6   117:12  118:8
118:21  153:25  154:3
155:1   204:5   204:7
204:8   204:10

**ballots** [14]       58:5
73:13   150:20  150:20
150:22  150:22  150:24
151:2   151:3   151:8
151:17  153:4   153:12
192:6

**Baltimore** [2]    19:14
146:22

**baptist** [1]       17:7

**base** [10] 42:25   43:14
44:24   101:16  108:18
110:1   147:7   194:3
194:5   206:21

**based** [50]         35:18
42:13   43:15   49:8
56:21   57:7    58:13
60:21   67:1    67:2
67:8    73:19   74:19
75:23   76:12   76:12
77:11   79:7    79:21
79:25   80:2    80:5
80:5    83:1    85:8
86:18   86:23   87:7
88:20   90:12   91:14
92:17   115:22  127:13
127:21  128:16  131:11
146:7   146:8   146:9
147:9   161:10  164:16
165:13  176:23  178:15
182:22  185:24  206:3
206:22

**basic** [2] 27:9    27:11

**basing** [1]        49:13

**basis** [18]         26:23
73:5    73:18   75:11
75:13   75:22   76:10
106:18  106:19  125:1
126:3   126:21  127:4
164:14  176:7   176:19
177:9   182:20

**battle** [1]        145:17

**Beach** [10]         68:1
141:14  141:19  141:25
150:25  151:11  152:2
183:16  184:4   184:6

**became** [5]         21:13
137:12  164:3   164:6
164:11

**become** [6]         27:3
27:7    156:2   168:4
172:1   200:22

**becomes** [1]       201:1

**begin** [3]         115:12
145:2   163:18

**beginning** [1]     28:12
33:17

**begun** [1]         163:12

**behalf** [27]         2:3

30(B)(6) OF NAACP vs. Document 410 Entered on FLSD Docket 07/02/2002 Page 263 of 280

CondensIt Cheever

2:6   2:8   2:11
2:14   2:16   2:19
2:21   2:24   3:2
5:4   7:11   8:25
10:11   13:6   29:10
36:16   39:3   53:13
54:23   88:14   99:12
99:19   99:21   162:14
193:9   199:9

**behave** [1]
116:20

**behavior** [1]   120:21

**belief** [8]   42:11
42:25   43:20   49:4
52:23   62:16   75:22
105:19

**belonging** [1]   34:17

**below** [2]   200:23
201:1

**benefit** [1]   53:17

**beside** [1]   50:17

**best** [4]   46:20   113:15
115:21   143:1

**better** [4]   6:4
95:8   156:19   166:3

**between** [16]   7:15
25:2   54:19   65:4
65:8   65:12   69:21
71:18   94:13   94:19
95:8   95:19   121:24
122:4   184:17   200:18

**beyond** [5]   133:25
134:19   181:24   195:14
199:19

**big** [1]   30:13

**Bill** [1]   4:24

**birthdate** [1]   65:13

**bit** [4]   84:1   85:2
115:14   144:6

**black** [34]   35:7
35:21   36:25   53:17
53:18   58:4   58:7
71:19   74:13   74:17
74:22   74:25   75:9
75:18   76:6   77:25
78:3   87:20   92:4
92:23   92:25   110:6
114:5   130:9   140:17
140:21   174:11   178:16
178:16   178:22   199:21
208:2   208:4   208:14

**blacks** [14]   34:10
34:16   35:10   35:13
36:8   36:18   38:9
72:14   87:12   87:13
89:12   91:12   97:11
125:17

**blamed** [1]   127:11

**blanket** [1]   109:22

**block** [1]   131:16

**board** [13]   17:3
21:19   21:20   22:1
22:4   132:23   133:1
134:5   141:24   142:13
142:17   142:21   200:1

**board's** [1]   163:11

**bodies** [2]   12:16
12:25

**body** [3] 7:17   13:11

13:11

**book** [3] 89:25   89:25
90:1

**bore** [1] 97:13

**Borgen** [205]   2:3
3:12   5:5   5:12
5:12   6:6   8:11
9:4   9:20   11:6
12:22   20:19   27:20
32:21   32:25   37:6
37:9   38:13   39:15
40:6   40:9   40:22
41:4   41:21   42:16
44:19   45:19   46:1
46:23   47:20   48:20
49:16   53:10   53:24
54:7   54:15   55:1
55:12   55:18   56:12
57:6   57:21   58:12
59:16   60:19   62:5
62:11   63:2   64:3
64:13   64:25   65:25
67:14   74:18   75:5
75:12   75:20   76:8
76:24   77:23   78:9
79:15   79:22   80:17
83:12   85:10   86:20
86:24   87:8   87:18
88:8   93:9   94:7
94:12   94:14   94:21
95:11   95:22   97:9
97:21   98:20   99:6
99:25   100:8   100:14
103:4   104:3   106:16
108:7   109:10   110:19
111:8   112:5   112:10
112:15   112:19   113:13
113:18   114:2   114:8
115:4   115:15   115:25
116:13   116:16   117:7
118:14   118:22   119:4
119:9   120:10   121:9
121:15   123:2   124:1
125:2   126:22   127:5
127:22   128:17   129:12
129:17   130:1   131:1
131:4   132:13   133:17
133:25   134:19   135:15
136:18   144:10   148:4
148:6   149:18   151:5
151:20   152:10   152:18
153:15   154:10   154:16
155:11   157:25   158:20
163:6   164:8   164:23
165:16   166:22   167:9
167:18   168:5   169:5
171:22   172:7   172:14
174:17   174:19   176:8
176:21   177:11   178:12
179:5   178:20   179:2
179:10   180:2   181:24
182:7   182:12   182:18
183:2   183:4   183:22
184:5   184:20   184:25
186:14   186:21   188:9
188:16   189:5   190:7
190:11   190:18   190:21
191:8   191:10   191:20
192:1   192:7   193:22
194:7   194:9   195:5
195:10   195:18   195:20
197:5   197:10   200:14
200:18   205:9   209:6

**Bosch** [1]   2:18
4:24   4:24

**bother** [1]   156:4

**bottom** [1]   63:16

**branch** [23]   15:12
21:3   21:5   21:7
22:9   24:10   24:22
25:1   25:2   25:5
25:6   25:7   25:15
25:15   25:16   66:18
91:17   99:9   101:15
136:23   137:6   137:7
137:10

**branches** [102]   1:6
7:12   7:16   7:20
8:5   8:23   10:12
17:10   17:18   17:24
18:14   18:15   18:16
18:19   18:23   19:3
19:5   19:10   19:20
19:25   20:1   20:2
20:5   20:6   20:11
20:13   21:14   22:18
23:4   23:8   23:21
23:24   24:5   24:14
24:24   25:12   26:9
26:12   26:14   26:15
27:17   28:1   28:3
28:15   28:21   28:21
33:20   33:23   34:1
34:3   35:5   36:11
37:3   37:17   37:21
39:4   39:13   40:20
41:19   44:12   45:2
49:9   53:3   53:8
53:13   53:22   54:4
54:12   55:10   55:16
56:10   56:23   57:4
57:11   57:19   91:8
97:6   108:1   132:17
135:11   137:8   146:11
146:12   149:10   149:19
149:22   193:17   197:18
197:22   198:14   200:3
200:21   200:25   202:17
203:5   203:10   205:15
205:23   207:4   207:12
207:24   208:23

**break** [6]   7:6
7:7   12:23   37:14
129:23   207:2

**briefly** [3]   15:21
16:7   16:25

**bring** [6] 30:16   63:7
98:18   101:21   138:21
138:23

**bringing** [1]   133:5

**broad** [1]   110:1

**broken** [1]   206:25

**brother** [1]   168:25

**brought** [5]   63:8
82:18   83:7   85:21
107:25

**Broward** [2]   67:25
95:18

**building** [3]   17:11
17:14   135:3

**Bush** [1]   144:14
157:5   165:3   166:6
167:6   167:7   167:20

167:23   168:24   168:25
169:16

**Bush's** [1]   134:14

**business** [2]   120:11
121:17

**busy** [1] 90:15

**butterfly** [4]   150:24
151:2   151:3   151:8

**C** [1]   196:19

**calculate** [3]   160:6
160:6   160:9

**calls** [15]   57:8
57:9   71:1   71:7
71:16   71:19   146:19
146:24   147:1   147:4
147:8   147:22   174:19
191:10   192:7

**campaign** [1]   208:8

**candidate** [1]   169:1

**Candy** [2]   190:16
192:11

**cannot** [12]   15:19
43:3   70:3   95:18
106:10   111:24   116:7
120:19   160:20   175:14
175:17   209:20

**canvassing** [1]   163:11

**capable** [1]   118:17

**capacities** [1]   200:1

**capacity** [4]   16:20
16:21   148:7   162:14

**caption** [5]   36:21
37:5   38:2   38:8
40:4

**card** [11] 28:10   28:10
28:12   42:17   47:2
49:19   74:4   183:18
186:24   187:17   190:13

**cards** [20]   42:13
42:14   42:21   43:16
71:10   75:16   76:14
76:19   79:3   86:5
90:21   91:1   91:2
91:4   126:15   150:16
188:21   189:12   190:3
190:5

**care** [1]   161:2

**careful** [1]   50:10

**caricature** [4]   104:17
104:19   105:14   105:23

**Carnegie** [4]   42:6
42:22   190:1   190:9

**carried** [1]   89:20

**carries** [1]   202:3

**carry** [2] 110:14   127:13

**carrying** [1]   127:14

**case** [24] 1:2   5:18
8:24   10:21   10:24
31:20   36:21   38:2
38:18   41:3   44:13
53:23   64:11   74:15
95:10   108:10   113:23
132:16   166:4   178:10
184:24   194:6   194:11

**cases** [1] 144:21

**cast** [1]   96:7

**categories** [6]
34:18   35:24   36:17
150:10   201:18

**category** [5]   26:24
34:17   39:19   201:6
202:1

**Caucasians** [1]   87:16

**caused** [6]   83:24
159:8   168:3   182:5
182:10   184:18

**cautioned** [1]   50:10

**center** [1]   71:2

**centering** [1]   181:5

**central** [4]   94:13
94:20   95:9   196:15

**CEO** [1]   132:19

**certain** [6]   27:2
123:13   152:8   164:10
168:22   184:21

**certainly** [22]   6:7
6:10   29:17   31:3
39:19   46:16   75:21
77:24   103:21   104:9
109:24   111:2   125:14
136:13   138:12   157:7
157:8   160:21   198:10
199:10   199:17   209:22

**certificate** [3]   211:22
213:1   214:1

**certifications** [1]
16:3

**certified** [1]   154:15

**certify** [4]   211:9
213:7   214:6   214:13

**chair** [5] 17:4   18:21
18:21   21:21   141:24

**chairperson** [2]   17:2
142:15

**challenge** [3]   154:1
154:1   154:2   154:3

**challenging** [1]   143:12

**chance** [2]   56:4
56:7

**change** [1]   29:21

**changed** [2]   29:23
173:11

**changes** [8]   98:14
98:19   98:21   98:25
99:4   102:23   103:24
199:20

**channels** [1]   111:24

**chapter** [5]   20:18
21:2   22:9   24:10
203:9

**chapters** [7]   20:3
20:4   20:10   20:11
23:8   25:12   200:24

**characterize** [1] 136:15

**charge** [1]   118:4

**cheated** [1]   171:19

**check** [7]   54:17
61:2   101:13   125:24
187:7   189:12   201:6

**Cheever** [8]   42:5
42:20   49:19   186:24
187:2   188:10   188:20

189:2

CHEROF [1]   2:23
Children [7]   81:13
82:5   82:22   86:2
87:6   88:7   88:19
Choicepoint [6]
194:5   194:25   195:24
196:7   197:3   197:8
Choicepoint/DBT [4]
2:14   194:3   194:16
194:18
choices [1]   201:15
choose [2]   201:20
201:25
church [1]   17:7
churches [1]   92:17
Ciccolo [13]   2:5
5:11   5:11   10:5
49:23   50:15   51:3
51:13   51:20   52:1
52:5   52:17   209:19
circumstances [3]
46:21   47:16   53:15
Cirullo [3]   2:23
5:2   5:2
cities [2]   56:2
57:10
citizens [1]   40:16
city [5]   4:21   5:14
15:12   101:1   141:25
civic [1] 121:4
civil [9] 2:2   13:3
62:3   62:8   63:25
64:7   65:18   65:23
143:12
claim [18]   41:6
74:15   75:4   75:17
76:21   77:6   79:14
79:20   90:10   91:8
96:23   97:5   106:13
106:18   108:2   108:4
113:23   114:4
claimed [2]   98:5
98:9
claiming [4]   74:19
76:5   97:18   113:9
claims [11]   38:17
38:22   41:13   64:9
64:16   81:25   82:10
82:12   86:1   98:10
107:24
clarified [2]   62:19
63:14
clarify [3]   131:7
179:15   204:4
clarifying [1]   175:3
class [24]   12:3
30:4   30:7   30:9
30:19   30:22   31:6
31:13   32:2   32:7
32:10   35:4   35:12
37:22   43:20   49:5
113:2   113:6   113:10
113:24   114:23   154:14
191:7   191:16
classes [6]   44:13
44:5   44:11   44:15
44:17   44:22

classroom [1]   16:17
clear [10]   8:7
32:25   33:1   73:4
108:8   119:1   125:12
169:9   175:18   175:24
clearly [4]   37:15
108:19   131:14   209:13
clerk [1] 116:5
client [3]   152:19
190:8   195:6
close [1] 157:3
closed [5]   71:23
150:11   180:7   180:15
203:2
closes [1]   44:16
closing [4]   173:3
173:6   173:20   180:6
CNN [2] 148:19   155:20
coach [2]   50:10
51:18
coaching [1]   51:4
coalition [3]   135:4
139:4   202:13
coalitions [2]   92:16
138:24
code [4] 98:15   98:19
99:5   102:24
college [14]   20:3
20:4   20:9   20:25
21:2   22:9   23:8
24:10   25:7   25:12
76:17   78:17   78:24
200:24
colleges [1]   16:19
Collier [1]   114:1
color [1] 125:22
COLORED [1] 1:5
combination [3]
77:1   92:10   92:11
combined [2]   172:1
comfortable [2] 6:6
6:8
coming [15]   55:24
71:1   91:11   96:25
97:12   118:6   119:6
141:20   142:2   158:4
158:12   159:21   207:14
207:17   209:15
command [1]   71:2
comments [3]   10:10
52:6   100:12
commission [2] 12:24
13:4
Commissioners [1]
142:22
committed [2]   172:22
172:24
committee [3]   2:2
21:22   99:3
committees [1] 99:10
common [1]   167:16
communicating [1]
37:15
communication [2]
70:10   95:19

communications [2]
39:21   95:8
communities [5]
135:8   135:9   208:4
208:5   208:6
community [13] 13:18
13:19   14:7   15:3
16:23   17:2   24:5
71:20   92:17   141:24
142:13   164:18   202:15
companies [1]   89:21
company [3]   94:22
95:2   194:13
compare [2]   196:14
198:10
compared [3]   136:17
137:22   137:23
competent [1]   51:7
competently [3]
32:4   32:5   32:6
complain [1]   66:17
complainants [1]
53:16
complained [19]
30:11   31:4   36:6
38:5   38:6   58:3
71:15   73:10   75:24
77:3   88:14   90:18
91:18   91:21   92:13
97:19   98:6   159:15
180:19
complaining [4]
76:15   78:24   92:8
197:2
complaint [23]   12:3
22:21   54:3   54:5
58:10   58:17   65:11
78:22   79:2   81:22
82:5   82:16   97:19
112:18   130:18   176:16
179:23   182:5   190:8
195:7   195:9   196:13
210:1
complaints [72] 30:13
30:14   30:15   34:3
35:23   40:15   45:1
47:11   49:9   55:14
55:22   55:23   57:11
57:16   67:4   67:21
67:25   71:8   74:19
74:21   74:24   76:12
78:19   80:18   82:13
83:7   87:10   87:23
91:11   91:17   92:21
92:25   93:4   97:12
114:16   132:17   146:13
147:25   148:2   148:22
148:23   149:1   149:6
149:9   149:13   149:15
149:16   149:21   149:25
150:19   155:16   155:18
173:8   173:8   173:15
176:9   176:12   176:13
176:14   176:24   180:9
182:19   182:20   182:23
184:10   185:15   185:20
185:21   186:1   186:5
186:6   186:11
complete [5]   9:15
9:22   79:10   90:2

174:6
completed [1]   75:14
completely [2]   56:18
199:7
components [1] 106:7
compressed [1] 209:16
comprise [1]   23:12
comprised [1]   178:25
comprises [1]   19:22
computer [1]   196:16
computers [4]   174:10
178:19   178:24   179:25
concern [4]   99:11
103:21   195:8   198:23
concerned [5]   103:20
104:13   104:25   169:8
170:10
concerning [3]   45:13
82:24   194:24
concerns [11]   15:4
31:9   32:2   32:7
32:9   32:14   32:15
85:17   103:17   144:16
155:22
conclude [1]   61:21
concluded [1]   210:4
conclusion [5]   79:7
174:19   183:4   191:10
192:8
concrete [1]   160:4
concur [2]   10:3
209:17
conditions [1]   68:6
conduct [2]   98:5
98:7   182:25
conducted [2]   14:17
91:16
conducting [3]   14:22
99:4   171:15
conference [91] 1:6
7:12   7:16   7:20
8:4   8:23   10:12
17:10   17:18   17:24
18:14   18:15   18:16
18:19   18:23   19:3
19:4   19:7   19:10
19:20   19:24   20:1
20:6   20:13   21:13
22:18   23:4   23:21
23:24   24:5   24:23
26:8   26:12   26:13
26:15   27:17   28:1
28:3   28:15   28:21
28:22   33:19   33:23
34:1   34:2   35:4
36:11   37:3   37:16
37:21   39:4   39:13
40:20   41:19   44:12
53:3   53:8   53:13
53:22   54:4   54:12
54:16   55:10   55:16
56:10   57:4   57:19
91:8   97:6   107:25
132:16   135:11   140:11
140:12   197:18   197:22
198:14   198:24   200:2
200:8   200:21   202:16
203:2   203:9   205:15

205:22   207:3   207:6
207:12   207:24   208:23
conferences [4] 28:17
54:18   55:2   144:1
confines [1]   20:12
confused [1]   19:4
connect [1]   111:25
connected [1]   214:16
connection [4]   12:12
14:4   14:17   64:21
CONNOLLY [1]
2:13
consider [4]   101:25
154:13   154:14   168:15
consideration [1]
209:8
considered [2]   26:25
101:4
consistent [1]   137:2
Constance [1]   4:20
constituency [5]
32:3   34:10   34:12
34:23   34:25
constituent [2]   33:15
183:20
constituents [29]
32:8   32:18   32:20
32:23   33:6   33:8
34:1   53:14   157:4
162:25   163:9   163:25
164:11   164:20   165:2
166:20   167:17   168:4
170:1   170:19   170:20
170:21   171:9   180:24
181:1   181:16   181:20
184:18   185:12
constitutional [1]
96:1
constituents [1]
167:20
consultation [1]
196:3
consumption [1]
169:18
contacted [1]   102:4
contained [3]   45:13
81:22   211:11
contend [11]   110:25
126:20   127:2   127:18
128:15   151:2   173:25
174:14   176:5   177:3
177:7
contends [1]   129:15
contention [1]   76:11
context [1]   131:19
continue [1]   124:10
156:23
continuing [3]   84:19
144:10   156:10
contracted [1]   196:14
contracts [2]   144:15
144:16
contradictory [1]
122:20
contribute [1]   171:18
contributed [1] 85:17

**contribution** [2]
21:20   22:1

**control** [2]       112:8
184:4

**controls** [1]     115:2

**controversy** [1] 144:18

**convenient** [1]   100:18

**conversation** [1]
55:19

**conversations** [1]
56:15

**convicted** [4]    62:2
62:8   63:24   191:24

**convince** [1]     84:17

**coordinator** [1] 16:16

**copies** [1]       207:13

**copy** [3] 8:19    9:5
9:6

**correct** [51]     7:12
7:13   10:15   19:14
19:15   22:10   22:19
22:20   23:9   25:4
26:17   34:8   35:9
36:2   36:9   37:18
41:8   41:13   42:2
42:9   49:11   61:7
64:4   67:9   81:2
81:23   82:2   82:19
82:20   85:9   86:17
86:19   87:22   88:7
88:16   88:21   91:16
96:6   96:9   96:12
112:9   112:25   113:17
197:14   201:4   201:5
208:15   209:3   209:4
211:13   214:9

**corrected** [2]    95:12
95:13

**corrections** [2] 134:6
211:12

**correctly** [6]    17:17
28:19   35:25   43:2
120:3   144:3

**cost** [3] 84:22   84:23
160:20

**council** [3]       22:9
24:9   25:7

**councils** [6]      20:3
20:4   20:9   23:8
25:12   200:24

**counsel** [7]       2:15
10:10   192:24   195:5
204:15   214:14   214:16

**counseling** [1] 16:1

**count** [7]         84:13
84:18   156:4   165:8
170:11   172:3   172:5

**counted** [4]       36:7
58:6   84:19   158:8

**counties** [37]     24:6
24:11   24:15   24:19
25:19   25:24   38:25
55:13   55:17   60:25
67:19   67:23   68:2
68:3   80:18   80:21
95:6   95:9   95:13
109:8   112:4   112:9
112:14   114:15   151:7

**counting** [1]      164:22

**countless** [1]     135:8

**country** [6]       7:18
19:17   68:12   146:19
166:23   199:2

**county** [97]        2:10
2:18   3:1   10:8
17:3   26:3   26:3
26:7   45:7   45:9
45:14   45:18   46:8
46:12   46:15   46:22
46:25   47:9   48:11
48:17   55:11   59:25
60:2   61:1   61:5
65:9   65:15   67:21
67:22   67:22   80:20
81:2   95:18   95:20
96:20   97:7   109:5
114:1   114:6   115:3
115:10   126:5   128:9
142:17   142:21   142:21
143:5   150:24   150:25
152:3   153:19   163:10
163:16   174:16   174:23
174:25   175:4   175:11
175:13   176:2   177:16
180:7   182:15   183:16
184:4   184:6   184:7
186:20   186:25   187:4
187:8   187:13   187:22
187:23   188:3   188:7
189:7   189:19   189:20
189:21   189:24   191:23
192:25   193:1   193:10
193:21   204:2   204:3
206:5   206:7   206:17
206:25   208:13   209:11
211:8   213:4   214:4

**countywide** [1]  179:9

**couple** [2]         92:2
135:18

**course** [5]        69:11
133:12   152:1   171:14
187:5

**court** [8] 1:1     3:7
6:15   6:19   45:5
163:17   163:20   164:21

**Court's** [1]      164:1

**cover** [4]         9:17
26:5   173:18   202:14

**covered** [2]       26:4
26:7

**covering** [1]    156:14

**covers** [1]       115:16

**Cowles** [2]        2:1
5:3

**created** [1]      138:20

**Criminal** [1]     161:3

**critical** [1]     47:10

**CROSS** [2]         3:11
200:15

**crowd** [1]        158:7

**current** [3]      43:22
49:7   62:1

**Dade** [3] 13:20    213:4

**Dairy** [1]        74:10

**Dan** [2]  5:7     194:2

**Daniel** [2]        2:13
4:25

**Data** [2] 194:3   194:5

**databases** [1]    196:16

**date** [4]  15:8    28:12
28:13   100:25

**Dated** [1]       211:15
214:20

**David** [3]        115:10
128:13   128:15

**Davis** [2]          2:7
4:9

**days** [6]  9:8     9:21
21:1   135:8   155:19
209:10

**DBT** [2] 194:5     197:1

**DCF** [2] 85:20     87:4

**deal** [14] 98:22   105:10
107:10   121:21   124:11
129:3   159:4   160:3
161:11   161:21   168:11
168:12   168:13   168:13

**dealing** [2]      161:1
162:1

**deals** [6] 134:3   134:4
134:4   144:14   144:16
199:8

**dealt** [9] 104:11  104:24
105:3   105:4   107:1
114:17   150:3   154:20
161:9

**Deanie** [2]        4:24
4:25

**debacle** [1]       72:2
109:23   160:3

**December** [1]      22:5

**decide** [2]        57:4
57:20

**decided** [8]      54:12
54:24   55:10   55:16
56:11   151:21   178:4
178:7

**decision** [15]    107:16
118:3   132:9   132:12
132:20   132:22   132:25
133:2   133:4   151:22
152:7   154:4   154:11
163:11   164:1

**declaration** [20] 11:10
29:15   33:1   33:7
33:22   41:23   42:8
44:1   52:20   68:24
115:16   115:19   133:11
133:16   140:14   140:24
146:16   149:4   157:13
171:8

**declare** [1]       43:3
52:24

**declared** [1]      48:7

**defendant** [4]     2:24
3:6   5:13   130:7

**Defendant's** [8]
3:22   3:22   3:23
8:14   11:13   11:16
12:1   196:13

**defendants** [12]   1:11
95:7   95:10   98:6
114:7   130:18   182:9
183:11   184:14   184:17
184:24   185:7

**definitely** [1]   87:12

**definition** [5]   62:12
120:18   139:19   154:3
172:19

**degree** [4]        83:17
161:8   197:15   197:16

**degrees** [1]       16:1

**democratic** [1]   157:6

**Democrats** [1]   166:14

**denied** [5]       130:9
172:22   177:9   177:23
179:25

**deny** [2] 117:12   117:24

**department** [39]   2:5
4:10   47:13   70:2
71:25   81:13   81:13
82:1   82:5   82:10
82:16   82:22   85:16
88:2   88:6   88:18
88:19   90:15   94:8
95:3   107:6   108:24
108:25   109:1   109:3
109:8   110:14   111:25
118:20   118:25   143:3
143:5   147:15   147:16
147:18   150:8   154:6
191:22   208:20

**departments** [1]
111:17

**deposition** [21]  1:17
3:5   5:1   5:17
6:11   8:16   9:11
9:17   10:18   11:2
12:6   12:9   52:3
115:16   115:18   184:9
210:3   211:10   214:1
214:8   214:11

**depositions** [3] 10:20
10:23   11:4

**depth** [2]        122:7
124:9

**describe** [3]      11:7
16:7   203:8

**described** [15]   25:13
63:13   72:10   73:17
91:7   102:7   106:15
112:18   173:2   182:6
182:11   182:15   182:15
182:25   207:14

**designate** [3]     8:24
8:24   9:19

**desire** [1]       132:18

**desk** [1] 107:1

**detail** [1]       157:13

**determine** [5]    47:14
60:23   61:14   65:20
117:11

**determined** [2]   47:25
69:25

**determining** [1] 90:20

**devastating** [1] 68:16

**develop** [2]      104:22

**developed** [3]    104:15
141:21   146:6

**developing** [1]   54:9

**development** [1]
161:1

**dialogue** [2]     171:14
171:17

**Dickinson** [1]     2:21

**difference** [4]   125:15
135:22   135:24   138:7

**different** [13]    48:13
83:17   85:2   85:23
89:23   91:19   91:20
106:23   150:20   150:21
157:18   158:15   175:2

**differently** [15] 75:19
76:7   76:22   77:7
83:10   83:16   83:22
83:24   86:16   86:23
87:7   87:13   87:14
157:15   166:9

**difficult** [8]     68:8
68:20   71:16   84:16
129:13   138:25   166:15
198:11

**difficulties** [2] 72:9
73:19   110:16

**difficulty** [1]   73:5

**direct** [18]       3:10
3:14   3:15   3:16
3:17   3:18   3:19
4:6   29:14   45:10
49:1   56:3   81:8
95:18   115:7   189:16
193:25   195:10

**directed** [4]      88:6
97:8   97:20   208:9

**directing** [1]    195:6

**directly** [1]     109:1

**director** [6]      4:10
16:10   16:13   16:15
54:13   54:25

**directors** [5]    21:19
22:5   132:23   133:1
200:2

**disabilities** [1] 16:5

**discouraged** [2] 70:21
156:2

**discovery** [1]     3:6

**discriminate** [1]
124:25

**discriminated** [7]
115:22   126:21   127:3
127:19   128:15   129:10
129:10

**discriminating** [3]
126:2   131:9   131:10

**discrimination** [3]
29:7   130:23   160:25

**discriminatory** [6]
124:18   124:20   154:22
178:9   178:11   178:14

**discuss** [6]       12:17
13:14   126:13   126:14
162:4   162:5

**discussion** [13]   4:17

| | | |
|---|---|---|
| 7:23 45:3 56:13 | 176:25 180:4 194:22 | 92:20 134:25 138:4 |
| 64:14 81:4 112:22 | 196:11 | 141:2 144:15 144:16 |
| 130:2 141:17 144:8 | **documented** [1] 189:4 | 156:12 159:25 160:25 |
| 169:16 200:13 204:12 | **documents** [6] 11:1 | **educational** [4] 15:21 |
| **discussions** [4] 109:25 | 11:7 11:23 45:25 | 15:23 17:5 134:12 |
| 147:9 169:13 169:14 | 59:5 102:20 | **Edwards** [2] 191:3 |
| **disenfranchised** [6] | **donations** [1] 68:12 | 192:13 |
| 29:11 31:17 32:17 | **done** [22] 80:3 | **effect** [3] 130:24 |
| 44:7 84:12 199:9 | 84:4 89:9 89:10 | 131:2 148:13 |
| **disenfranchisement** | 89:13 89:19 90:2 | **effort** [8] 107:3 |
| [4] 104:8 106:2 | 93:2 109:17 109:18 | 136:24 138:9 139:15 |
| 106:8 197:14 | 112:13 129:13 129:14 | 139:17 139:18 142:11 |
| **Dishrode** [1] 192:18 | 129:16 157:11 157:14 | 208:12 |
| **Dishrode's** [1] 192:4 | 157:16 158:16 162:22 | **efforts** [10] 31:9 |
| **disillusioned** [18] | 165:13 166:10 188:24 | 100:23 135:12 136:15 |
| 162:25 163:10 164:2 | **DOODY** [1] 2:23 | 138:4 138:11 140:25 |
| 164:3 164:6 164:12 | **door** [1] 203:3 | 141:3 156:8 157:14 |
| 164:21 165:3 166:6 | **doorstep** [1] 110:11 | **Ehrlich** [31] 2:10 |
| 168:4 169:7 170:7 | **down** [12] 6:15 | 3:18 5:9 5:9 |
| 181:17 181:23 183:21 | 12:23 37:14 61:13 | 50:3 51:2 51:8 |
| 184:1 184:18 185:12 | 69:23 90:11 147:25 | 51:19 51:23 115:8 |
| **disillusionment** [5] | 159:21 206:25 207:2 | 115:9 134:2 144:12 |
| 168:22 169:3 170:1 | 207:8 207:14 | 148:5 148:9 174:18 |
| 180:23 184:13 | **drafted** [2] 100:7 | 182:1 183:3 183:6 |
| **disparate** [3] 130:19 | 103:9 | 183:23 189:13 201:24 |
| 151:3 151:17 | **drawn** [1] 107:22 | 202:5 202:11 202:19 |
| **displayed** [1] 104:20 | **drive** [6] 140:16 140:20 | 202:22 203:12 203:24 |
| **disproportionate** [9] | 141:19 158:13 208:13 | 204:24 205:7 209:11 |
| 58:5 75:23 76:15 | 208:18 | **either** [19] 10:24 |
| 79:23 80:1 87:19 | **drives** [4] 84:4 | 22:8 29:3 35:23 |
| 89:11 98:2 185:23 | 207:24 207:25 208:4 | 36:25 49:10 81:2 |
| **disproportionately** [2] | **Drop** [1] 16:11 | 86:13 89:23 97:1 |
| 97:11 178:16 | **drops** [2] 200:23 | 103:2 114:19 114:21 |
| **dispute** [1] 64:6 | 201:1 | 121:22 126:15 179:6 |
| **dissatisfaction** [4] | **due** [3] 138:2 173:12 | 202:23 205:14 205:21 |
| 168:22 169:3 170:1 | 209:23 | **elaborate** [1] 127:17 |
| 180:24 | **dues** [4] 26:12 26:21 | **elderly** [2] 173:15 |
| **dissatisfied** [14] | 26:23 27:3 | 173:23 |
| 84:14 162:25 163:10 | **duly** [2] 4:3 213:8 | **elected** [2] 162:18 |
| 163:25 164:11 164:21 | **during** [9] 36:4 | 167:7 |
| 165:3 165:6 165:7 | 41:12 50:4 56:24 | **election** [128] 12:13 |
| 166:5 181:17 181:22 | 71:1 73:23 103:13 | 12:14 12:18 13:1 |
| 184:19 185:12 | 148:12 208:18 | 13:14 14:5 14:6 |
| **dissuade** [1] 121:7 | **duty** [1] 121:4 | 14:18 14:22 15:14 |
| **distinct** [1] 130:24 | **Duval** [13] 45:7 | 31:24 36:2 36:8 |
| **distinction** [6] 7:15 | 45:9 45:14 45:18 | 38:11 38:19 39:1 |
| 25:2 121:1 129:9 | 46:8 46:12 46:15 | 39:12 41:12 41:17 |
| 170:5 200:18 | 46:22 46:25 47:9 | 42:1 42:9 43:8 |
| **distinctly** [3] 47:4 | 48:11 48:16 150:24 | 43:22 44:8 44:24 |
| 47:24 63:6 | **earliest** [1] 7:7 | 49:11 57:14 63:19 |
| **distinguish** [1] 118:11 | **early** [7] 69:5 150:11 | 63:21 63:22 66:10 |
| **Distinguished** [1] | 173:6 173:20 180:6 | 66:11 66:23 69:1 |
| 131:2 | 180:8 180:15 | 69:7 72:18 73:14 |
| **distinguishing** [1] | **easier** [1] 198:15 | 78:13 78:14 80:3 |
| 184:16 | **Eckert** [2] 4:25 | 80:13 84:6 87:10 |
| **district** [6] 1:1 | 4:25 | 91:22 92:14 93:4 |
| 1:1 3:6 3:7 | **economic** [1] 161:1 | 98:14 98:15 98:18 |
| 16:10 16:13 | **economics** [1] 29:8 | 98:19 99:5 99:5 |
| **divert** [1] 159:8 | **edit** [1] 29:21 | 99:24 101:9 102:12 |
| **diverted** [1] 161:5 | **educate** [2] 68:13 | 102:23 103:10 103:11 |
| **division** [10] 1:2 | 181:22 | 103:25 104:4 104:14 |
| 4:11 25:8 54:13 | **educating** [3] 144:5 | 123:3 123:11 123:14 |
| 102:4 106:13 108:2 | 157:11 181:5 | 123:20 124:13 124:15 |
| 108:5 109:9 109:13 | **education** [16] 15:25 | 128:1 128:9 130:9 |
| **divulge** [1] 54:18 | 16:11 16:16 18:21 | 134:23 135:13 136:14 |
| **document** [8] 8:18 | 21:21 29:7 84:5 | 138:22 139:24 141:4 |
| 11:24 29:16 29:21 | | 141:12 145:8 145:11 |
| | | 145:14 145:24 145:25 |
| | | 146:1 146:14 152:23 |
| | | 153:8 155:3 155:16 |
| | | 156:14 156:20 157:3 |

| | | |
|---|---|---|
| 157:4 157:10 157:24 | 146:20 | |
| 158:9 159:5 161:23 | **encourage** [2] 84:9 | |
| 163:1 163:12 164:12 | 203:15 | |
| 166:7 166:20 167:2 | **end** [5] 49:4 96:19 | |
| 168:3 170:8 170:13 | 122:4 136:11 209:6 | |
| 170:23 171:20 172:4 | **ended** [1] 107:21 | |
| 172:5 172:21 178:5 | **ends** [1] 22:5 | |
| 179:4 179:25 180:25 | **energize** [1] 156:23 | |
| 181:18 184:13 190:17 | **energy** [1] 136:25 | |
| 195:1 195:25 197:13 | **Enforcement** [1] | |
| 203:6 203:6 203:11 | 191:23 | |
| 204:5 204:16 205:5 | **engage** [3] 143:11 | |
| 205:6 | 143:15 202:7 | |
| **elections** [65] 4:11 | **engaged** [6] 134:24 | |
| 45:7 47:13 49:6 | 135:1 138:9 141:3 | |
| 54:14 54:25 60:12 | 141:8 141:11 144:7 | |
| 61:6 61:8 61:12 | 144:25 157:22 158:1 | |
| 62:25 63:4 69:5 | 158:2 161:5 161:8 | |
| 70:1 71:25 90:15 | 161:8 161:10 181:4 | |
| 94:1 94:8 95:3 | **enhance** [1] 156:8 | |
| 95:25 102:5 106:14 | **enjoy** [1] 198:20 | |
| 107:6 108:2 108:3 | 198:21 | |
| 108:6 108:24 108:25 | **entered** [1] 10:6 | |
| 109:1 109:3 109:4 | **entire** [5] 8:2 | |
| 109:7 109:9 109:13 | 51:3 108:9 167:14 | |
| 110:14 111:2 111:17 | 201:16 | |
| 111:25 112:9 112:13 | **entities** [2] 23:12 | |
| 115:2 115:10 118:20 | 80:4 | |
| 118:25 121:7 121:22 | **entity** [5] 25:9 | |
| 121:25 122:1 122:3 | 59:22 59:23 96:7 | |
| 123:23 124:14 127:21 | 96:17 | |
| 128:1 134:8 137:23 | **equipped** [1] 174:11 | |
| 138:5 140:6 140:25 | **eradicate** [1] 29:7 | |
| 151:8 151:19 154:6 | **Errata** [1] 211:12 | |
| 157:5 161:6 181:23 | **ESQ** [11] 2:3 | |
| 189:21 | 2:5 2:8 2:10 | |
| **electoral** [4] 118:5 | 2:11 2:13 2:16 | |
| 127:14 164:7 170:17 | 2:18 2:21 2:23 | |
| **elementary** [1] 15:24 | 3:1 | |
| **elevation** [3] 69:20 | **essence** [1] 29:5 | |
| 73:22 73:25 | 29:12 | |
| **elicited** [1] 21:9 | **essentially** [5] 40:13 | |
| **eligible** [21] 38:18 | 108:8 108:23 109:15 | |
| 38:20 38:23 58:8 | 110:1 | |
| 59:9 59:12 61:14 | **establish** [1] 195:2 | |
| 62:10 64:1 64:22 | **et** [3] 1:6 1:10 | |
| 65:21 74:14 74:17 | 4:12 | |
| 79:11 79:17 110:4 | **ethnic** [6] 75:19 | |
| 112:2 114:6 198:18 | 76:7 91:20 92:22 | |
| 199:12 199:17 | 207:25 208:9 | |
| **elimination** [1] 174:13 | **Eustis** [1] 17:22 | |
| **elsewhere** [1] 182:16 | **evening** [2] 9:7 | |
| **embarrassing** [1] | 71:18 | |
| 69:19 | **event** [2] 142:23 | |
| **emphasize** [1] 102:21 | 143:1 | |
| **employee** [2] 214:14 | **events** [3] 127:20 | |
| 214:15 | 194:6 194:16 | |
| **employees** [2] 128:8 | **eventually** [1] 61:10 | |
| 143:5 | **everywhere** [1] 95:14 | |
| **employment** [1] | **evidence** [11] 3:6 | |
| 160:25 | 76:13 174:21 175:9 | |
| **empowerment** [7] | 176:1 176:10 176:11 | |
| 92:19 136:24 156:17 | 176:12 176:14 179:24 | |
| 202:23 203:16 203:18 | 192:2 | |
| 208:25 | **evolving** [1] 170:15 | |
| **encompasses** [1] | **ex-felons** [4] 197:23 | |
| 7:18 | | |
| **encountered** [8] 56:22 | | |
| 69:1 69:3 72:10 | | |
| 73:5 73:19 124:24 | | |

198:2    198:4    199:16

**exact** [1] 43:25

**exactly** [14]                     8:6
  23:18    48:13    70:13
  87:5     88:22    121:18
  138:10   151:1    158:17
  158:17   163:22   186:4
  194:22

**EXAMINATION** [18]
  3:10     3:11     3:12
  3:14     3:15     3:16
  3:17     3:18     3:19
  4:6      45:10    49:1
  81:8     115:7    189:16
  193:25   200:15   205:11

**examined** [1]      4:4

**example** [15]          34:16
  40:25    52:22    59:24
  122:1    133:3    140:15
  143:14   150:22   158:2
  161:12   161:13   161:14
  183:15   201:18

**examples** [3]          46:20
  48:9     110:9

**except** [3]            26:24
  83:5     117:22

**exceptional** [1] 16:16

**excludes** [1]      34:15

**Excluding** [1]     152:20

**Excuse** [2]        86:9
  87:1

**execute** [1]       55:8

**executed** [1]      11:10

**Exhibit** [58]          3:22
  3:22     3:23     8:14
  8:17     8:19     10:14
  11:13    11:16    11:18
  11:20    12:1     12:6
  12:8     29:15    29:19
  29:25    33:5     33:7
  33:18    33:22    34:9
  35:6     36:20    36:22
  37:5     37:18    38:2
  38:8     39:24    40:4
  41:24    43:6     43:10
  49:3     52:21    53:6
  54:2     56:4     57:5
  66:4     74:11    75:7
  79:9     80:10    90:6
  96:18    104:2    112:21
  112:25   113:11   114:7
  179:21   194:24   196:12
  196:14   208:12   209:25

**exist** [4] 79:17       114:19
  114:20   161:3

**existed** [3]           110:8
  203:21   203:22

**exists** [1]            156:18

**expanding** [1]     135:6

**expecting** [1]     68:17

**expenses** [2]      200:6
  200:7

**experience** [10] 56:21
  57:7     83:5     85:16
  87:24    88:1     88:13
  126:1    145:23   154:23

**experiences** [3] 83:2
  88:5     115:12

**expiration** [1]    28:13

**explain** [1]           69:10

**explained** [1]     60:21

**explanation** [2] 64:5
  103:15

**express** [1]       82:12

**expressed** [3]     31:10
  85:18    103:21

**expressing** [1]    36:15

**expression** [1]    167:8

**extensively** [1] 56:24

**extent** [7]            6:6
  9:14     10:16    11:6
  37:10    115:16   135:16

**extremely** [1]     49:24

**EZROL** [1]         2:23

**face** [1] 199:18

**fact** [20] 42:12       45:22
  47:4     52:25    62:12
  63:7     79:7     83:25
  95:23    100:10   103:16
  106:19   110:23   118:8
  123:7    166:6    169:17
  170:9    170:13   187:18

**facts** [15]            82:9
  83:1     83:9     83:15
  85:15    86:15    86:22
  87:5     108:18   131:16
  189:23   192:1    196:23
  196:25   196:25

**failed** [4]            48:15
  188:8    191:19   197:13

**failing** [1]       169:22

**failure** [1]           79:10
  96:19    97:6

**fair** [4] 25:18       25:21
  25:22    141:2

**fall** [4] 34:18       35:23
  36:17    39:19

**familiar** [13]         55:22
  55:24    64:16    81:21
  81:24    81:25    82:4
  116:23   138:16   140:9
  148:21   153:12   158:18

**families** [8]          81:13
  82:6     82:22    84:25
  86:2     87:6     88:7
  88:19

**far** [7]   20:22       111:21
  136:15   145:18   145:22
  207:3    209:19

**fault** [1] 169:22

**FDLE** [1]              65:14

**fear** [4] 171:9       171:11
  171:11   171:18

**February** [1]      143:23

**federal** [1]       124:15

**fee** [1]   201:19

**feed** [1] 106:7

**feedback** [1]          156:3

**feeling** [2]           156:16
  167:16

**feelings** [1]      134:17

**fellow** [3]            32:2
  32:7     32:9

**felon** [3] 48:1       48:7
  197:14

**felons** [9]            47:19
  47:21    65:5     104:8
  104:10   106:3    106:8
  150:7    194:20

**felony** [4]            62:2
  62:8     63:24    191:24

**felt** [13] 84:11      84:12
  84:13    84:14    104:19
  107:5    107:7    117:22
  150:6    156:4    165:8
  180:24   183:16

**few** [11] 17:8        45:8
  47:5     71:14    88:25
  166:11   166:14   179:9
  189:22   200:14   200:17

**fewer** [1]             186:9

**Field** [2] 147:18     147:19

**fight** [1] 156:9

**fighting** [2]          144:19
  145:17

**file** [3]   57:24     132:10
  196:15

**filed** [4] 54:6       55:6
  58:17    185:8

**fill** [1]   27:10

**filled** [4]            41:9
  69:4     69:10    69:20

**fills** [1]  27:6

**final** [3] 48:15      48:15
  199:24

**financial** [4]         135:23
  135:25   159:11   159:12

**financially** [2] 84:23
  214:17

**finds** [2] 33:16      34:2

**finish** [6]            6:17
  6:18     119:9    172:9
  172:10   177:5

**Finishing** [1]     49:3

**firm** [1]   4:9

**first** [38] 4:3       14:2
  18:19    22:4     33:9
  36:19    36:22    37:5
  38:21    39:23    42:4
  43:6     44:3     69:4
  78:18    78:18    79:2
  79:2     100:22   100:24
  100:25   102:6    106:25
  116:2    132:15   143:24
  144:1    145:19   146:8
  148:1    149:5    154:19
  155:17   159:12   159:17
  170:12   195:2    205:16

**five** [11] 138:14     138:15
  138:19   139:6    139:7
  139:8    139:19   140:4
  140:18   140:19   162:2

**flies** [1] 199:18

**flip** [3]   130:5     130:7
  197:7

**Florida** [209]         1:1
  1:6      1:10     1:14
  3:7      3:8      4:10
  4:16     5:16     7:11
  7:16     7:20     8:4
  8:5      8:9      8:23

10:12    12:13    12:18
  13:1     13:4     14:5
  14:18    15:14    17:10
  17:17    17:22    17:24
  18:14    18:15    18:16
  18:18    18:22    19:3
  19:4     19:7     19:10
  19:19    19:20    19:23
  19:24    20:1     20:5
  20:7     20:12    20:13
  21:13    22:13    22:18
  23:4     23:21    23:24
  24:5     24:6     24:11
  24:23    25:19    25:24
  26:8     26:11    26:13
  26:15    26:20    27:17
  28:1     28:3     28:10
  28:15    28:21    33:19
  33:23    33:25    34:2
  34:6     35:4     35:7
  35:14    36:2     36:11
  37:2     37:16    37:21
  38:12    39:4     39:13
  40:5     40:16    40:20
  41:12    41:18    44:12
  46:9     53:3     53:7
  53:12    53:22    54:4
  54:11    54:13    54:25
  55:8     55:9     55:16
  55:17    56:10    57:4
  57:19    59:18    60:14
  62:1     62:2     71:12
  75:2     76:6     80:24
  91:7     93:8     96:1
  97:4     97:5     98:19
  99:4     100:3    101:9
  102:12   102:23   103:25
  107:25   110:18   112:3
  114:6    115:1    123:14
  123:20   123:23   124:13
  132:16   134:5    134:10
  135:11   137:14   140:17
  140:22   143:24   144:8
  144:9    144:13   144:17
  145:3    145:17   146:25
  147:5    147:8    147:22
  148:3    148:17   148:22
  149:2    149:8    150:1
  151:7    157:12   157:17
  161:18   162:4    162:5
  162:9    163:17   164:22
  165:15   166:24   166:25
  167:6    168:1    175:1
  175:5    182:17   191:4
  191:22   197:12   197:18
  197:22   197:24   198:5
  198:12   198:13   199:1
  199:2    200:2    200:21
  202:17   203:5    203:9
  204:2    204:13   204:16
  205:14   205:22   205:23
  206:19   207:3    207:5
  207:12   207:23   208:23
  213:3    213:7    213:16
  214:3

**Florida's** [6]         98:15
  152:23   153:8    196:8
  197:4    197:19

**fluctuates** [2]    23:25
  205:18

**focus** [3]             56:5
  72:4     115:14

**focused** [3]       169:11

203:17   207:25

**focusing** [2]          31:2
  42:4

**folks** [1] 6:12

**follow** [1]            150:21

**followed** [1]      63:12
  74:24    157:2    204:16

**following** [5]         36:2
  99:5     99:24    101:8
  103:10

**follows** [1]           4:5

**forced** [1]            84:6

**foregoing** [3]     211:10
  211:22   214:8

**Forget** [1]            160:9

**form** [189]            12:22
  20:19    27:20    28:10
  37:6     37:10    38:13
  39:15    40:6     40:22
  41:4     41:21    42:16
  44:19    45:19    46:1
  46:23    47:20    48:20
  49:16    53:10    53:24
  54:7     54:15    55:1
  55:12    55:18    56:12
  57:6     57:21    58:12
  59:16    60:19    62:11
  63:2     64:3     64:25
  65:25    67:14    69:10
  72:5     74:18    75:5
  75:12    75:20    76:4
  76:8     76:24    77:23
  78:9     79:15    79:22
  80:17    83:12    85:10
  86:20    86:24    87:8
  87:18    88:8     93:9
  94:7     94:12    94:14
  94:21    95:11    95:22
  97:9     97:21    98:20
  99:6     99:25    100:8
  100:14   103:4    104:3
  106:16   107:21   107:22
  107:23   108:7    109:10
  110:19   111:8    112:5
  112:10   112:15   112:19
  113:13   113:18   114:2
  114:8    115:4    115:25
  116:13   116:16   117:7
  118:22   119:4    120:10
  121:9    121:15   123:2
  124:1    125:2    126:22
  127:5    127:22   128:17
  129:12   129:17   131:1
  131:4    132:13   133:17
  133:25   134:19   135:15
  136:18   148:4    148:5
  149:18   151:5    151:20
  152:10   152:18   153:15
  154:10   154:16   155:11
  157:25   158:20   163:6
  164:8    164:23   165:16
  166:22   167:9    167:18
  168:5    169:5    171:22
  172:7    172:14   174:17
  176:8    176:21   177:11
  178:12   178:20   179:2
  179:5    179:10   180:2
  181:24   182:7    182:12
  182:18   183:2    183:22
  184:5    184:20   184:25
  186:14   186:21   188:9

188:16   189:5
191:20   192:1   192:7
193:22   194:7   194:8
195:18   195:19   197:5
197:10   201:24   202:5
202:11   202:19   202:22
203:12   203:24   203:25
204:19   205:7

**formal** [4]   15:23
74:20   74:23   128:22

**formally** [2] .   35:22
74:23

**formed** [2]   138:24
164:19

**forms** [1]   76:13

**forth** [1] 170:17

**forums** [2]   159:25
202:24

**forward** [4]   96:24
114:15   191:7   191:16

**found** [8]   38:15
68:7   108:15   110:6
136:14   141:22   175:19
196:4

**four** [4] 122:4   123:4
133:23   137:7

**fourth** [2]   22:2
170:24

**frame** [4]   73:23
170:18   170:25   209:23

**frames** [1]   209:16

**frankly** [1]   97:10

**fraternities** [1]   92:18

**fraud** [1]   118:16

**fray** [1]   51:25

**free** [3] 129:21   143:9
143:10

**freestanding** [1]
17:16

**Friday** [2]   69:4
72:17

**friendly** [5]   100:18
101:24   101:25   102:1
198:10

**front** [14]   12:16
12:20   12:24   13:13
13:25   14:6   14:13
15:2   36:6   40:24
51:10   51:14   99:3
187:5

**fronts** [1]   160:24

**fulfil** [1]   209:21

**full** [3]   49:15   177:17
177:19

**fully** [1] 132:12

**fund** [1] 21:20

**funds** [2]   142:22
142:25

**future** [1]   172:13

**gained** [1]   82:9

**gamut** [1]   161:2

**gather** [2]   85:25
99:21

**gathered** [3]   85:9
85:12   87:9

**general** [22]   2:15

**2:20   2:12   12:18
13:1   14:5   15:14
30:24   36:8   38:11
38:19   39:1   39:11
41:12   41:17   42:1
66:10   98:14   130:9
181:12   182:25   205:6

**General's** [2]   4:22
81:11

**generally** [4]   19:8
83:11   83:18   122:16

**generate** [1]   109:24

**generated** [1]   19:9

**gentleman** [1]   64:19

**geographic** [2]   20:6
20:12

**George** [6]   2:21
4:22   81:5   81:10
166:6   167:7

**Germaine** [2]   191:18
192:16

**gestures** [3]   6:24
52:8   52:9

**given** [15]   12:13
43:15   46:19   46:21
76:20   81:2   100:16
100:17   125:9   143:4
153:24   157:2   195:12
202:15   214:9

**globally** [1]   170:21

**goal** [2]   29:6   181:21

**goes** [8]   52:14   59:25
99:10   111:21   150:14
157:13   185:6   201:9

**gone** [3]   84:1   93:1
99:11

**good** [5]   4:8   53:11
115:9   189:18   196:2

**goodwill** [2]   143:4
143:4

**Gore** [1]   165:15

**GOREN** [1]   2:23

**governed** [1]   52:11

**government** [1]   93:7

**governmental** [1]
12:25

**governor** [8]   144:14
161:20   161:23   162:8
162:15   162:18   168:1
168:25

**gradually** [1]   124:11

**graduate** [1]   16:3

**graduated** [1]   15:24

**grant** [1] 136:9

**grants** [4]   135:6
136:4   136:5   136:6

**greased** [1]   155:10

**great** [1] 140:14

**greater** [1]   165:19

**ground** [6]   70:23
136:11   156:1   156:8
161:20   171:2

**group** [9]   13:13
13:15   38:5   38:9
39:18   74:16   147:23
207:25   208:9

**groups** [1]   12:21
13:17   13:18   13:19
13:25   14:5   14:7
14:13   15:3   34:25
75:19   76:7   77:4
78:18   92:18   92:22
92:24   135:4   138:21
138:23   139:5

**guess** [4]   122:14
131:15   169:22   194:20

**guidance** [1]   16:2

**guidelines** [1]   50:13

**guides** [1]   110:24

**half** [2]   59:3   121:22

**halted** [1]   163:16

**hand** [3] 129:5   148:1
213:10

**handled** [5]   41:7
75:18   76:7   76:22

**hang** [1] 84:18

**happening** [6]   53:19
70:8   90:16   119:2
125:7   147:24

**hard** [7]   68:9   68:22
84:3   152:12   157:8
172:6   207:15

**Harris** [1]   1:9
2:8   4:12   93:13
167:6   167:25   168:24
169:16

**Harvard** [1]   166:10

**hate** [1]   154:2

**Haywood** [2]   45:15
45:16

**head** [5]   6:24   50:7
94:16   137:21   174:4

**headquarters** [2]
17:11   19:13

**health** [1]   161:2

**hear** [13]   6:1   6:4
81:15   97:12   120:3
142:4   164:25   165:25
167:1   167:4   167:7
167:10   209:17

**heard** [27]   60:21
64:20   64:23   65:18
67:17   92:22   100:22
123:18   131:5   140:10
140:10   140:12   150:19
151:12   156:5   163:3
166:19   167:11   167:12
168:17   168:21   169:3
169:24   170:19   182:2
197:12   209:14

**hearing** [8]   49:1
63:13   64:19   148:12
155:18   156:5   166:19
177:1

**hearings** [29]   14:17
14:21   36:1   36:5
46:25   47:17   48:10
48:17   48:21   67:6
91:15   91:15   99:4
103:2   132:18   148:10
148:11   159:24   163:4
167:1   167:4   168:17
169:8   169:18   169:20

**169:21   169:25   170:2
176:15

**heavens** [1]   160:5

**heavily** [1]   135:1

**Hector** [2]   2:7
4:9

**held** [11] 18:10   18:11
18:20   36:1   100:11
128:4   128:6   128:7
163:4   172:19   208:4

**help** [14] 6:22   31:15
68:9   68:12   126:15
126:15   132:4   135:7
138:21   142:5   142:6
144:18   156:2   174:12

**helped** [1]   179:9

**helpful** [1]   7:1

**helping** [1]   98:25
143:6

**helps** [4]6:3   6:19
103:18   187:6

**Herald** [4]   89:11
89:14   90:3   97:16

**hereby** [3]   211:9
213:7   214:6

**high** [2] 137:17   137:18

**higher** [3]   5:24
107:16   137:24

**highest** [2]   68:10
137:25

**highlighted** [1]   177:1

**highly** [1]   97:2

**Highway** [8]   81:14
82:1   82:11   82:17
85:16   86:2   88:2
88:18

**Hillsborough** [10]
3:1   65:9   65:14
67:21   189:20   189:24
191:23   193:1   193:10
193:21

**himself** [1]   132:23

**hire** [2]   84:7   124:22

**Hispanic** [2]   39:12
39:18

**Hispanics** [1]   87:15

**historically** [1] 141:8

**history** [6]   68:10
140:15   141:4   143:17
199:11   199:13

**hoed** [1] 156:16

**hold** [3]   18:5   21:15
21:18

**holding** [1]   155:18

**holds** [3]   127:7
128:2   130:12

**hollered** [1]   73:24

**hollering** [1]   105:15

**home** [2]   17:15
17:19

**honestly** [1]   133:18

**honored** [1]   127:10

**hoops** [1]   199:14

**hope** [6] 53:17   95:13
95:14   153:6   153:20

157:7

**hopefully** [4]   48:15
95:16   153:5   153:10

**hoping** [3]   156:21
156:22   164:9

**horrible** [1]   154:23
154:23

**hours** [12]   69:24
70:13   73:9   107:23
119:3   119:5   123:21
124:3   124:14   135:8
154:21   200:17

**house** [1]   74:5

**hovering** [1]   24:1

**human** [1]   159:11

**hurt** [5]   53:25   83:13
83:16   83:22   83:24

**husband** [2]   72:19
154:25

**i.e** [1]   112:1

**iceberg** [1]   78:17

**ID** [1]   28:10

**idea** [6]   80:15   161:24
161:25   165:5   165:9
167:2   167:15   167:24
178:6

**identification** [4]
8:15   11:14   12:2
211:25

**identified** [7]   10:6
48:18   53:21   95:15
96:19   97:15   115:20

**identifies** [1]   103:14

**identify** [6]   42:14
45:4   89:6   103:16
109:3   209:20

**III** [1]   2:8

**illustrate** [1]   34:25

**imagine** [6]   95:3
116:3   116:20   134:17
148:21   166:3

**immeasurable** [1]
159:18

**immediately** [6]
70:19   107:22   145:4
155:18   156:19   200:22

**impact** [7]   85:5
98:2   130:19   138:13
138:13   151:3   151:17

**impacted** [4]   33:12
79:24   84:11   97:11

**impasse** [1]   130:14

**impeded** [1]   80:13

**implement** [1]   100:7

**important** [3]   168:19
199:3   199:6

**improperly** [5]   38:19
39:10   41:1   41:7
75:3

**improved** [1]   136:24

**inability** [1]   36:7

**inactive** [9]   24:16
200:18   200:20   200:22
201:2   201:3   205:14
205:18   205:22

**inadequate** [1]   90:7

91:6    110:6

**inappropriate** [2]
51:12    106:25

**inartfully** [1]    26:19

**Inc** [7]    1:5    7:15
7:15    19:12    22:14
23:3    28:6

**Inc.** [1]    23:1

**inception** [2]    141:9
143:19

**include** [3]    44:6
44:22    49:5

**included** [4]    45:24
113:11    185:17    186:6

**includes** [7]    33:15
34:10    34:15    34:16
34:19    35:2    43:20

**including** [3]    130:19
160:12    162:18

**incomplete** [1]    78:6
79:21

**inconsistent** [1]
108:14

**incorporated** [2]
7:17    143:20

**increased** [3]    140:17
203:14    203:14

**incredibly** [1]    96:4

**increments** [2]    201:17
201:21

**incurred** [1]    200:6

**indeed** [1]    47:14

**independence** [1]
111:21

**independent** [1]
111:20

**indicate** [3]    6:25
87:15    129:8

**indicated** [16]    9:2
14:7    41:24    46:12
46:25    47:5    48:2
48:6    67:4    67:5
70:8    87:12    89:11
90:18    106:2    187:19

**indicating** [3]    47:24
47:25    71:20

**individual** [10]    36:20
61:1    65:24    66:2
66:17    111:16    135:7
146:7    156:25    168:14

**individually** [2]
66:20    111:18

**individuals** [19]
9:11    30:10    37:4
38:7    39:23    41:20
42:8    42:15    43:5
43:17    43:21    44:6
44:23    49:5    53:20
84:1    86:19    111:13
146:19

**ineligible** [3]    60:17
62:3    196:17

**inference** [1]    50:1

**inform** [1]    60:24

**information** [33]
42:11    43:20    45:12
49:4    50:24    52:23

54:19    65:24    66:1
77:16    77:20    78:7
78:7    80:2    85:8
85:12    85:21    85:25
86:6    86:10    86:18
87:9    88:15    88:17
89:20    89:20    108:13
109:13    147:17    149:12
165:13    174:9    196:15

**informed** [8]    66:18
67:1    67:2    71:5
147:24    150:13    154:11
191:23

**infringe** [1]    143:12

**initial** [1]    170:14

**initiated** [2]    140:19
145:4

**initiative** [4]    134:5
144:9    144:13    145:17

**injured** [12]    83:13
154:17    154:18    158:24
159:2    184:23    188:7
188:15    188:25    193:1
193:10    193:20

**injuries** [3]    182:6
182:11    182:24

**injurious** [2]    84:20
85:1

**injury** [4]    83:23
85:2    85:7    85:19

**input** [1] 77:22

**inquiring** [1]    62:25

**insinuate** [1]    51:11

**insinuation** [1] 50:1

**insisting** [1]    108:11

**install** [1]    95:2

**installed** [1]    95:8

**installs** [1]    94:19

**instance** [3]    30:23
30:25    31:1    31:16
31:18    31:22    102:6
125:12    129:8

**instances** [1]    63:3

**instead** [1]    159:3

**instructing** [2]    37:7
37:9

**insure** [2]    31:15
109:18

**insuring** [1]    109:14
199:11

**intend** [1]    95:5

**intended** [1]    58:11

**intent** [2]    131:5
131:6

**intentional** [5]    97:20
97:22    98:7    130:23
130:23

**intentionally** [1]

**interact** [1]    164:17

**interacted** [2]    115:23
167:5

**interaction** [3]    48:22
56:22    166:19

**interchange** [1] 25:8

**interchangeably** [3]
25:5    25:10    33:4

**interested** [2]    135:4
214:17

**interests** [2]    36:12
37:4

**interface** [2]    109:11
162:18

**intermittent** [1] 121:24
122:23

**interpretations** [1]
52:9

**interpreter** [1]    4:4

**interrogatory** [1]
45:13

**interrupt** [1]    188:12

**interrupted** [2]    81:19
119:11

**interviewing** [1]
159:24

**interviews** [1]    48:16

**investigation** [1]
90:2

**invited** [1]    155:21
202:25

**involve** [1]    134:7

**involved** [15]    16:22
56:20    85:4    85:4
92:18    98:17    98:21
98:24    99:1    105:9
115:3    133:21    135:5
140:13    142:10

**involving** [2]    88:2
157:5

**Iorio** [3] 3:2    5:4
189:20

**irate** [2] 105:11    105:12

**irregularities** [3]
97:10    103:19    108:16

**isolate** [2]    111:24
172:12

**isolated** [1]    95:15
199:2

**Israel** [1]    187:11
188:10

**issue** [35]    12:11
26:5    61:17    68:24
71:3    98:11    104:17
104:18    104:19    107:4
129:5    156:16    161:7
161:11    161:16    170:12
173:19    190:2    190:4
190:13    192:5    194:6
194:10    194:13    194:17
196:5    197:13    198:22
198:23    198:25    199:3
199:6    199:14    199:16
204:4

**issues** [33]    30:16
32:15    33:11    57:14
62:14    99:11    104:1
104:4    104:5    104:25
105:3    106:1    106:5
107:9    150:3    159:6
160:21    160:23    160:24
160:25    161:1    161:1
161:2    161:3    161:14
168:12    168:13    190:5

194:12    196:23    199:7
203:19    208:25

**item** [1]    103:20

**itemized** [1]    97:11

**itself** [7] 28:4    53:8
76:4    105:2    172:1
196:7    209:24

**Ives** [1]    74:10

**Jacksonville** [8]
2:15    4:21    13:24
14:9    14:20    63:6
67:22    76:18

**January** [1]    145:6

**Jeb** [9]    134:14    144:14
157:5    167:6    167:20
167:25    168:24    168:25
169:16

**Jeff** [2]    5:9    115:9

**JEFFREY** [1]    2:10

**job** [1]    124:5

**jobs** [2]    84:24    159:19

**John** [7]    2:8    4:8
5:8    42:20    186:24
187:2    188:20

**join** [14]    21:7    22:8
22:11    22:11    22:14
26:11    26:18    26:20
26:21    27:12    27:13
27:14    28:9    51:24

**joined** [2]    20:17
27:22

**JOSIAS** [1]    2:23

**judge** [1]    107:13

**jumped** [1]    20:22

**jury** [1]    107:13

**justice** [3]    29:10
33:11    161:3

**justified** [1]    127:18

**Kappa** [1]    17:6

**Katherine** [5]    1:9
2:8    167:6    167:25
169:16

**KAY** [4] 3:7    213:15
214:6    214:24

**Kearney** [1]    2:21

**keep** [9] 6:19    27:18
27:21    27:24    39:22
119:16    132:2    187:12
207:13

**keeps** [1]    206:23

**Ken** [1]    5:10

**Kenneth** [2]    3:1
189:19

**kept** [2] 119:22    207:18
209:1

**key** [1]    105:3

**kind** [10] 50:19    61:2
69:21    139:1    143:7
143:8    144:23    145:21
150:20    159:20

**knew** [6]    84:12
116:12    124:23    141:22
144:23    197:2

**knowledge** [46] 38:7
44:13    45:14    45:17
46:2    46:7    46:10

52:24    73:13    77:14
80:7    82:8    82:15
83:1    98:4    99:20
99:20    99:23    100:4
101:7    103:8    103:12
111:11    111:12    112:2
112:7    112:11    112:12
112:16    133:16    143:1
148:19    164:14    179:12
179:16    182:21    193:8
194:4    194:15    194:18
194:24    195:14    195:16
195:22    195:23    196:1

**known** [2]    118:16
158:2

**Kweisi** [1]    132:19

**language** [2]    173:14
173:22

**laptop** [4]    174:9
178:18    178:24    179:24

**laptops** [6]    178:3
178:4    178:8    178:15
179:3    179:8

**large** [10]    3:8
22:12    22:15    22:17
67:13    76:14    76:18
125:18    160:1    198:25

**larger** [3]    55:24
56:1    57:13

**largest** [1]    140:16

**last** [7]    43:19    51:21
96:19    141:22    157:11
158:2    158:3

**late** [1]    101:21

**latitude** [1]    72:4

**latter** [1] 85:23

**law** [6]    2:2    4:9
62:1    111:21    158:18
191:22

**lawsuit** [66]    4:11
8:9    35:5    36:10
37:2    37:17    37:22
38:23    39:6    39:14
40:20    40:24    41:6
41:25    53:4    53:9
55:11    64:10    64:17
82:1    82:10    86:1
88:6    95:7    97:18
98:5    98:8    104:2
104:5    106:2    106:5
111:13    112:18    114:4
114:23    128:14    129:15
131:22    132:24    132:25
133:4    135:18    152:5
158:25    159:16    160:15
160:16    173:19    176:5
177:2    177:7    182:10
183:12    185:13    185:17
186:6    186:13    186:18
187:3    187:6    189:24
189:25    205:4

**lawsuits** [3]    133:19
133:21    134:7

**lawyer** [5]    8:13
9:2    70:7    113:14
113:20

**lawyers** [10]    2:2
8:21    29:20    50:12
51:15    54:8    56:13

70:12   160:19   196:3

**leaders** [1]                    152:21
**leadership** [1]   136:23
**leading** [7]                    123:10
124:15   135:12   135:25
138:4   140:25   141:3
**Leagues** [4]               92:7
92:9   181:14   181:17
**Leahy** [43]            2:11
10:8   60:10   115:11
123:10   124:23   125:3
126:8   126:17   126:20
126:23   127:3   127:7
127:19   127:24   128:3
128:13   128:15   128:21
129:2   129:4   129:9
130:19   130:25   131:3
131:17   131:18   142:6
172:18   172:19   172:22
173:25   176:1   176:18
177:8   178:4   182:5
182:10   184:1   184:3
188:8   188:15   189:1
**Leahy's** [5]            130:8
142:5   175:10   176:6
179:24
**lcan** [1]   52:11
**learning** [1]           16:5
**least** [11]               9:16
42:18   43:11   50:17
88:18   110:13   157:17
206:14   206:15   207:21
207:22
**leave** [4] 33:5         69:18
141:13   166:10
**left** [2]   29:10   70:18
**legal** [6] 2:5            111:24
174:19   183:4   191:10
192:8
**legally** [1]            33:4
**legislation** [9]   98:13
99:24   100:2   100:5
100:7   102:22   103:3
106:4   110:24
**legislative** [10] 98:17
98:22   99:3   103:11
103:13   103:17   103:18
103:19   161:14   161:19
**legislature** [6]   98:25
100:3   103:22   106:1
110:24   162:16
**length** [2]            106:20
140:14
**Leon** [1] 67:22
**less** [5]   65:22   171:9
171:18   172:13   178:16
**letter** [1]129:13
**letters** [6]            62:21
62:25   63:4   63:8
63:10   67:17
**level** [8] 19:9      21:24
22:9   22:12   22:14
27:10   27:12   66:18
**levels** [1]            16:17
**liberties** [1]   143:12
**licenses** [1]   111:19
**lies** [1]   110:11

**life** [8]   26:25        27:3
33:12   201:11   201:12
201:19   201:19   201:21
**lifetime** [2]            201:7
201:9
**likely** [5]               124:25
157:5   171:9   171:19
172:13
**likewise** [2]       6:17
60:14
**limit** [1] 169:24
**limited** [4]               169:21
202:4   202:10   202:21
**limits** [1]           20:7
**line** [4]   50:22      95:2
116:2   199:8
**lines** [4] 81:18       90:15
94:10   94:19
**links** [1] 206:23
**list** [34]   38:20      58:15
60:25   61:9   61:11
61:13   61:15   61:16
61:19   61:20   61:23
62:10   64:1   64:21
65:4   66:6   74:14
74:17   79:11   79:17
79:20   90:14   114:5
116:14   150:5   150:14
173:4   176:2   185:8
194:19   196:16   206:22
207:7   207:8
**listed** [28]            9:1
35:19   35:22   35:22
36:14   36:16   36:17
37:24   38:1   38:1
38:14   39:16   39:23
43:5   47:2   57:10
57:10   62:15   62:22
79:19   91:4   95:7
106:9   150:9   179:14
179:19   179:19   183:14
**listen** [1]            164:16
**lists** [7] 58:7      66:13
90:9   91:5   194:14
207:13   207:19
**litigating** [1]   160:15
**litigation** [4]           113:10
143:11   143:15   160:15
**live** [5]   22:13     46:12
186:19   188:2   208:3
**lived** [1] 185:16
**lives** [1] 24:18
**living** [1]            170:3
186:2   186:12
**LLP** [2] 2:7      2:13
**loaded** [2]            165:5
166:17
**local** [10]            19:9
19:10   28:7   28:24
36:1   36:6   101:15
146:11   151:18   200:9
**located** [3]            13:20
17:21   20:6
**location** [1]   74:8
**longer** [5]            84:12
191:7   191:14   191:14
191:16

**look** [18] 8:18      11:5
50:5   50:12   52:8
52:13   66:3   74:4
101:5   105:19   105:23
116:14   120:21   136:22
137:1   175:22   194:21
195:3
**looked** [6]            11:22
49:19   54:2   116:5
116:18   152:6
**looking** [10]            49:15
50:25   58:1   74:12
90:6   90:11   105:18
125:21   130:6   144:14
**loosely** [1]   58:18
**Lori** [3]   2:3      5:12
209:22
**lots** [4]   133:15   145:18
156:12   165:12
**louder** [3]            5:22
6:3   6:9
**Lowe** [3]            2:19
4:24   4:25
**lying** [1] 118:12
**ma'am** [5]            5:19
23:15   31:2   81:10
189:18
**MacDonald** [7] 43:12
64:9   64:17   65:8
65:13   191:24   192:20
**machines** [4]            110:5
110:6   110:6   153:5
**magazines** [1]   89:24
**mail** [3] 9:6      69:6
183:19
**main** [1] 17:8
**maintain** [4]       28:4
28:24   207:4   207:6
**maintained** [3] 46:17
46:18   112:3
**maintaining** [2] 60:4
61:9
**maintains** [1]   207:1
**maintenance** [2]
61:11   191:19
**major** [2]            104:7
106:6
**majority** [12]   55:13
55:23   57:9   72:15
91:12   146:24   147:8
147:22   148:2   148:16
174:11   185:20
**makes** [5]            102:23
121:2   132:9   132:22
132:25
**man** [8] 94:15   128:13
128:13   128:18   128:18
129:9   130:11   130:12
**mandated** [1]   153:9
**manner** [2]            104:24
120:23
**manual** [1]            104:16
105:5   105:6
**manuals** [2]            104:14
22:19   21:20   21:25
22:5   22:8   22:15
**marked** [14]            8:14
8:17   10:14   11:13

11:16   12:1   12:5
29:15   33:7   37:17
52:21   57:5   104:2
208:11
**Marshall** [1]            188:11
**Maryland** [1]   19:14
**mass** [1] 57:24
**massive** [1]            140:20
**master's** [1]            16:1
**match** [7]            64:20
65:2   65:4   65:7
65:12   65:22   119:21
**matter** [11]            5:19
14:16   35:20   44:18
47:4   63:7   101:3
104:23   167:21   170:2
192:5
**matters** [6]            8:25
10:13   88:2   194:10
197:19   209:2
**may** [42] 1:15      9:15
9:25   11:12   19:3
19:4   24:22   24:23
34:17   37:8   46:21
56:18   56:18   69:16
91:21   102:9   114:19
114:20   125:8   130:24
131:2   133:19   134:2
144:12   166:25   168:6
177:20   178:13   182:1
183:6   183:23   184:18
196:24   196:24   199:24
201:15   201:16   202:13
206:3   206:6   208:20
209:19
**mean** [50]            24:21
24:22   32:20   32:22
33:7   34:15   45:22
51:8   57:12   58:11
63:15   64:24   67:2
68:4   79:16   83:25
93:10   93:16   94:24
94:25   96:7   103:6
107:20   108:10   110:9
120:13   122:9   122:15
125:4   125:20   131:9
135:25   136:21   139:6
146:11   148:16   149:3
150:22   157:13   159:10
159:18   161:2   164:17
169:24   177:13   189:10
193:13   193:15   196:10
206:8
**meaning** [6]            43:22
58:14   62:13   75:15
132:15   135:11
**means** [10]            58:10
59:7   65:5   67:3
79:6   111:20   131:10
139:8   143:9   189:11
**meant** [1]            119:12
**meet** [4] 126:10   126:13
128:13   162:4
**meetings** [1]            164:17
**member** [35]            17:6
17:7   18:22   19:2
20:16   20:23   20:25
21:19   21:20   21:25
22:5   22:8   22:15
22:17   22:18   27:3

33:14   34:5   34:7
77:6   77:13   78:22
154:13   154:14   166:20
186:23   192:11   192:13
192:16   192:18   192:20
192:22   200:1   201:10
206:13
**members** [89]            19:8
22:23   23:3   23:12
23:19   23:20   23:23
24:6   27:23   28:9
32:2   32:7   32:10
32:20   35:7   41:25
42:3   42:8   43:2
43:4   43:7   43:12
43:21   43:23   44:23
49:6   49:7   56:23
66:5   66:9   66:21
67:12   67:13   67:17
67:19   76:22   76:25
76:25   77:2   77:3
78:12   83:9   83:10
83:16   83:17   83:21
83:24   85:5   86:16
86:22   87:6   87:14
94:1   95:6   103:22
113:24   162:15   165:21
166:5   166:16   181:20
186:19   187:3   187:14
188:2   188:6   188:14
188:20   188:22   188:24
189:10   192:25   193:3
193:4   193:7   193:10
193:16   193:16   193:20
201:3   201:11   202:4
202:10   202:14   202:21
206:4   206:5   206:11
208:3
**membership** [43]
18:21   19:8   19:11
23:25   26:25   27:9
27:18   27:18   27:21
27:25   28:4   28:7
28:10   28:13   28:13
34:20   42:13   42:14
42:17   42:21   43:16
49:14   49:15   49:19
77:9   80:12   84:11
84:12   186:23   187:15
187:17   188:21   189:6
189:12   200:23   201:7
201:7   201:22   206:23
207:1   207:4   207:5
207:13
**memberships** [1]
27:1
**Memorial** [7]            141:22
141:23   142:23   157:20
157:23   158:5   158:6
**memorized** [1]   180:4
**memory** [1]            74:7
**mental** [1]            16:5
**mention** [1]            134:10
**mentioned** [24]   26:14
39:19   66:14   66:15
76:17   78:16   93:6
101:23   102:13   103:12
126:8   135:18   136:3
150:15   152:23   173:20
178:3   180:6   181:14
182:1   186:22   200:17
201:6   203:13

**met** [5]  115:24  161:22
162:8  162:13  162:15

**method** [1]  130:8

**Mfume** [3]  132:19
133:6  152:8

**Mfume's** [1]  151:23

**Miami** [26]  1:2
1:14  4:16  5:16
13:20  21:6  21:7
57:16  71:25  89:11
89:14  90:2  97:16
101:12  101:13  101:14
102:14  135:19  136:22
141:14  141:19  141:25
148:12  155:20  173:17
174:2

**Miami-Dade** [47]
2:10  10:7  16:12
16:23  17:3  19:11
20:17  59:25  60:2
61:5  67:22  95:18
115:10  126:5  128:8
137:5  137:7  137:10
142:21  153:19  163:10
163:16  174:15  174:22
174:25  175:4  175:11
175:13  176:2  177:16
180:7  182:15  184:7
186:19  186:25  187:4
187:8  187:13  187:22
187:23  188:2  188:7
189:7  192:25  204:3
208:13  209:11

**Michael** [2]  2:23
5:2

**middle** [1]  58:1

**might** [21]  6:9
34:6  50:8  50:12
99:11  99:20  145:19
166:5  167:17  168:3
168:19  172:12  177:18
177:19  181:17  181:22
183:20  187:20  187:25
201:3  206:7

**migratory** [1]  97:2

**mind** [7] 14:2  78:18
89:8  104:7  136:10
137:1  187:12

**mine** [1] 151:22

**minimal** [1]  122:17

**minimum** [1]  201:19

**minorities** [10]  34:11
34:17  35:10  35:11
35:13  35:21  36:8
36:18  53:17  53:18

**minority** [5]  17:4
36:25  73:8  110:7
125:16

**minute** [3]  134:16
182:16  189:13

**minutes** [2]  112:24
121:21

**missed** [3]  100:24
101:22  145:19

**missing** [6]  21:12
77:16  77:20  78:2
78:2  78:6

**mission** [11]  28:16
28:18  28:19  28:20

**28:24  29:2  29:3
29:4  29:5  159:9
199:8

**misunderstanding** [1]
188:13

**Mobilization** [1]
139:3

**mobilizing** [1]  135:9

**moment** [8]  11:5
29:17  56:9  63:23
74:12  125:7  154:5
175:25

**Monday** [2]  9:7
9:24

**money** [11]  122:18
124:6  124:8  145:18
156:1  159:13  159:21
160:10  160:17  160:18
171:5

**monies** [1]  160:15

**months** [1]  135:9

**moot** [2] 190:14  192:5

**morning** [6]  4:8
9:8  68:15  115:9
121:3  189:18

**most** [8] 27:9  27:11
57:11  58:22  58:23
165:23  186:1  208:3

**MOTAP** [1]  17:4

**motion** [1]  50:7

**motivated** [1]  172:12

**motor** [13]  71:12
71:12  81:14  82:2
82:11  82:17  85:16
85:20  87:3  87:5
88:3  88:19  150:8

**mouth** [1]  175:16

**move** [9]  10:3
20:21  21:2  51:23
52:18  96:20  97:1
132:6  199:19

**moved** [8]  71:4
97:7  148:11  150:12
180:17  180:18  180:20
191:4

**moves** [1]  24:24

**moving** [1]  173:21

**Mrs** [2]  42:5  188:11

**Ms** [222] 3:12  4:20
5:5  5:11  5:12
6:6  8:11  9:4
9:13  9:20  10:5
10:7  10:9  11:6
12:22  20:19  27:20
32:21  32:25  37:6
37:9  38:13  39:15
40:6  40:9  40:22
41:4  41:21  42:5
42:16  42:21  42:22
44:19  45:19  46:1
46:23  47:20  48:20
49:16  49:23  50:15
51:3  51:13  51:20
52:1  52:5  52:17
53:10  53:24  54:7
54:15  55:1  55:12
55:18  56:12  57:6
57:21  58:12  59:16

60:19  62:5  62:11
63:2  64:3  64:13
64:25  65:25  67:14
74:18  75:5  75:12
75:20  76:8  76:24
77:23  78:9  79:15
79:22  80:17  83:12
85:10  86:20  86:24
87:8  87:18  88:8
93:9  93:13  94:7
94:12  94:14  94:21
95:11  95:22  97:9
97:21  98:20  99:6
99:25  100:8  100:14
103:4  104:3  106:16
108:7  109:10  110:19
111:8  112:5  112:10
112:15  112:19  113:13
113:18  114:2  114:8
115:4  115:15  115:25
116:13  116:16  117:7
118:14  118:22  119:4
119:9  120:10  121:9
121:15  123:2  124:1
125:2  126:22  127:5
127:22  128:17  129:12
129:17  130:1  131:1
131:4  132:13  133:17
133:25  134:19  135:15
136:18  140:10  148:4
148:6  149:18  151:5
151:20  152:10  152:18
153:15  154:10  154:16
155:11  157:25  158:20
163:6  164:8  164:23
165:16  166:22  167:9
167:18  168:5  169:5
171:22  172:7  172:14
174:17  174:19  176:8
176:21  177:11  178:12
178:20  179:2  179:5
179:10  180:2  181:24
182:7  182:12  182:18
183:2  183:4  183:22
184:5  184:20  184:25
186:14  186:21  188:9
188:16  189:5  190:7
190:11  190:18  190:21
191:8  191:10  191:20
192:1  192:7  193:22
194:7  194:9  195:5
195:10  195:18  195:20
197:5  197:10  200:14
200:16  205:9  209:6

**multi** [1]  150:22

**multiple** [1]  183:1

**municipalities** [2]
110:7  157:1

**must** [1] 84:17

**NAACP** [253]  2:5
4:11  7:11  7:15
7:15  7:17  8:1
8:22  9:11  10:11
14:17  14:22  16:22
17:9  17:10  19:12
20:16  20:24  20:25
21:24  22:8  22:14
22:22  23:1  23:3
24:19  24:24  26:4
26:8  26:11  28:6
28:18  29:6  30:3
30:12  30:19  30:21

31:5  31:13  32:11
33:9  33:16  33:19
33:20  33:21  34:10
34:20  35:4  36:10
37:2  37:16  37:20
39:4  39:12  40:13
40:14  40:19  41:18
41:25  42:9  43:2
43:7  43:21  43:23
44:4  44:11  44:23
49:6  49:7  49:14
53:2  53:7  53:12
53:21  54:3  54:11
54:23  54:24  55:9
55:15  56:10  57:3
57:19  58:16  66:5
66:9  66:22  67:12
74:15  74:19  75:17
76:5  76:21  76:22
77:5  78:13  78:22
79:20  83:9  83:13
83:16  83:22  86:16
86:23  87:6  91:7
91:15  91:21  92:2
92:16  92:25  95:5
96:4  96:5  96:8
96:11  96:14  97:5
97:18  98:5  98:8
98:17  99:3  99:15
99:23  101:7  101:17
101:19  102:4  102:9
102:11  103:1  103:8
103:13  107:25  108:4
110:15  112:17  113:2
113:5  113:9  113:23
114:4  114:24  124:7
126:20  127:2  127:18
128:14  128:20  129:15
132:9  134:24  135:1
135:10  138:8  139:14
140:15  140:16  140:19
141:5  141:7  142:11
142:12  143:11  143:20
144:7  144:25  145:10
145:16  145:25  146:1
146:14  146:18  148:7
149:2  151:2  151:18
152:2  152:15  152:21
154:15  155:15  155:25
156:7  156:15  157:14
157:16  158:7  158:15
158:23  159:2  160:14
161:4  161:22  162:11
162:15  162:24  163:9
164:20  165:2  165:21
166:5  171:2  172:18
174:14  174:21  176:5
177:2  177:7  179:17
180:24  181:4  183:20
184:23  186:19  187:3
187:14  188:2  188:6
188:14  188:20  188:25
192:11  192:14  192:16
192:18  192:20  192:22
193:1  193:6  193:9
193:10  193:19  198:25
199:23  199:25  200:19
202:3  202:4  202:7
202:10  202:13  202:16
202:21  203:5  203:23
205:1  205:4  205:14
205:22  206:13  207:23

**NAACP'ers** [2] 166:11
166:14

**NAACP's** [7]  30:7
32:20  109:19  135:12
136:15  143:17  203:7

**name** [28]  4:13
4:15  9:10  47:25
61:18  61:19  63:17
66:19  66:20  68:21
81:10  116:14  116:22
147:21  150:4  161:4
177:14  177:22  178:1
188:6  188:14  188:24
189:8  189:9  189:11
189:19  192:25  194:2

**named** [19]  36:21
36:25  37:4  38:8
40:3  41:24  43:11
53:14  55:11  55:22
64:10  64:17  98:6
111:13  111:14  114:7
186:18  187:2  188:1

**names** [26]  46:13
46:14  46:16  46:22
47:2  47:7  47:8
47:12  47:14  59:11
61:16  61:23  66:5
68:20  78:23  79:18
91:4  150:5  150:9
151:15  151:16  187:5
193:6  193:20  196:7
197:4

**nasty** [1]  120:2

**Natalie** [2]  190:1
190:9

**national** [41]  1:5
7:17  8:9  17:25
19:5  19:13  21:15
21:19  21:23  22:4
22:12  22:14  22:25
28:6  28:20  33:9
46:19  70:7  82:25
146:18  146:22  147:1
147:9  147:11  147:12
148:12  148:23  149:3
149:5  149:7  149:9
149:11  149:14  149:17
149:22  200:1  200:8
206:22  207:1  207:9
207:14

**nationally** [1]  157:16

**nationwide** [1]  22:23

**naturally** [1]  50:12

**nature** [7]  75:4
90:10  104:22  108:4
149:1  149:21  209:14

**near** [2]  74:4  186:7

**necessarily** [3]  19:8
92:3  177:18

**need** [28]  6:23
7:6  33:12  33:16
34:2  50:21  51:6
51:14  51:18  51:21
62:18  65:23  66:16
70:1  77:21  78:7
81:5  96:25  107:7
107:8  121:19  128:11
129:21  159:7  160:22
170:5  174:5  203:18

**needed** [3]  10:1
106:21  107:7

**needs** [4]  111:5

30(B)(6) OF NAACP

Case 1:01-cv-00120-ASG   Document 410   Entered on FLSD Docket 07/02/2002   neighborhood - open   Condensed!!

Page 280

126:16  126:18  153:7

**neighborhood** [1]
125:16

**neutral** [1]       208:9

**never** [11]                    48:2
51:4     62:20    69:17
96:14    118:8    132:12
158:7    167:12   183:18
204:10

**new** [10] 89:19     97:16
100:13   104:14  123:14
135:20   136:16  140:21
153:4    208:14

**news** [1] 89:23

**newspaper** [2]      89:14
165:12

**newspapers** [2] 89:5
89:23

**next** [4]  32:1     47:16
75:1     75:7

**nightmare** [1]      63:15

**Nisgram** [1]        43:12

**NO.** [1]  1:2

**nobody** [5]         72:13
73:8     73:9     73:20
119:24

**nominees** [1]       157:6

**non** [3]  76:25    77:3
127:25

**non-partisan** [1]
205:3

**Noon** [1]           1:15

**nor** [2]  214:14  214:16

**normally** [5]       5:22
6:24     161:14  161:17
209:2

**north** [1] 167:14

**Northeast** [1]      4:16

**Notary** [4]
212:6    213:6    213:16

**note** [4]  9:4     9:23
56:1     140:15

**notes** [1] 174:3

**notice** [16]        8:16
8:22     9:1     9:6
9:12     9:14    9:19
10:14    11:20   100:16
101:17   134:1   134:22
173:21   209:8   209:10

**noticed** [1]        125:19

**notices** [1]        191:19

**notification** [1] 173:12

**notified** [2]       102:5
180:20

**noting** [1]         6:24

**November** [92] 12:12
12:17    12:25   13:14
14:5     14:15   14:18
14:22    15:7    15:14
15:15    23:5    23:14
23:17    23:18   23:21
24:6     24:11   25:22
31:23    32:17   35:9
35:15    36:2    36:7
38:11    38:19   39:1
39:11    41:12   41:17

42:1     42:9    42:15
43:7     44:7    44:24
49:10    66:10   66:22
68:7     69:1    78:13
85:14    91:22   92:14
93:4     98:14   98:18
99:5     99:24   103:11
106:13   110:3   115:13
123:11   124:24  127:20
129:6    130:8   134:23
135:2    137:14  145:8
147:2    151:8   156:22
156:24   157:3   159:5
159:14   160:3   161:23
163:1    163:12  168:2
169:12   170:7   172:21
180:25   181:23  194:25
195:24   203:6   203:10
204:1    205:13  205:21
206:6    206:10  206:13
208:24

**now** [28] 6:4      11:15
12:5     17:9    25:1
25:18    48:3    52:4
52:10    67:15   86:22
89:25    118:9   129:23
133:22   141:11  153:6
160:12   171:12  175:4
175:15   175:25  184:8
188:23   189:4   189:9
190:13   195:13

**number** [67]        8:17
8:19     10:14   11:16
12:6     12:8    23:11
23:23    24:1    24:2
24:17    27:7    30:2
33:18    34:9    34:24
35:6     36:20   37:18
38:8     38:14   39:24
40:4     41:23   43:6
44:14    44:15   44:16
52:21    52:22   53:7
54:2     56:4    57:5
58:5     65:14   74:6
74:11    74:11   75:23
75:24    75:25   80:1
80:12    80:16   80:22
80:23    81:1    89:12
90:6     90:7    96:18
102:18   106:21  109:21
113:12   123:21  125:17
160:4    183:9   185:23
196:20   198:20  198:20
200:24   200:25  209:25

**numbers** [13]      44:20
55:24    58:4    76:14
76:15    76:18   83:13
114:16   160:1   180:22
186:7    205:19  206:4

**Nwize** [8]          1:17
3:5      4:2     4:15
5:13     9:13    10:9
213:7

**oath** [2] 212:1   213:1

**Obi** [6]  1:17    3:5
4:2      4:15    5:13
213:7

**object** [155]       12:22
20:19    27:20   38:13
39:15    40:6    40:22
41:4     41:21   42:16
44:19    45:19   46:1

46:23    47:20   48:20
49:16    53:10   53:24
54:7     54:15   55:1
55:12    55:18   56:12
57:6     57:21   58:12
59:16    60:19   62:11
63:2     64:3    64:25
65:25    67:14   74:18
75:5     75:12   75:20
76:8     76:24   77:23
78:9     79:15   83:12
85:10    86:20   86:24
87:8     87:18   88:8
93:9     94:7    94:12
94:14    95:11   95:22
97:9     97:21   98:20
99:6     99:25   100:8
100:14   103:4   104:3
106:16   108:7   109:10
110:19   111:8   112:5
112:10   112:15  112:19
113:13   113:18  114:2
114:8    115:4   115:25
116:13   116:16  117:7
118:22   120:10  121:9
123:2    124:1   126:22
127:5    127:22  128:17
129:12   131:1   133:17
133:25   135:15  136:18
148:4    149:18  151:5
151:20   152:10  152:18
153:15   154:10  154:16
157:25   158:20  163:6
164:8    165:16  166:22
167:9    168:5   169:5
171:22   172:7   172:14
174:17   176:8   176:21
177:11   178:12  178:20
179:2    179:5   179:10
180:2    181:24  182:7
182:12   182:18  183:2
184:25   186:14  186:21
188:9    188:16  189:5
190:7    191:8   191:20
192:1    193:22  194:7
195:18   197:5   197:10
202:5

**objecting** [1]      37:10

**objection** [39]     8:11
32:21    37:6    50:14
62:5     79:22   80:17
94:21    118:14  119:4
121:15   125:2   129:17
131:4    132:13  134:19
144:11   155:11  164:23
167:18   174:18  183:3
190:18   190:20  191:9
192:7    195:5   201:24
202:11   202:19  202:22
203:12   203:24  203:25
204:19   204:22  204:23
204:24   205:7

**objective** [2]      29:6
121:3

**objects** [1]        209:11

**obligation** [3]     26:5
29:9     209:21

**observation** [3] 82:8
82:9     86:1

**observations** [1]
83:2

**observing** [1]      73:16

**obtained** [2]       86:10
87:11

**obvious** [2]        96:4
125:20

**obviously** [17]     20:22
24:3     53:16   57:23
64:5     85:3    90:13
91:10    94:18   106:21
107:7    107:8   110:9
134:3    136:21  160:22
162:12

**occasion** [1]       126:10

**occasionally** [2]
81:18    128:13

**occasions** [2]      9:24
204:20

**occupational** [1]
16:8

**Occupationally** [1]
16:18

**occur** [5]          31:16
64:5     109:18  121:18
132:25

**occurred** [13]      15:6
31:15    65:7    84:14
100:6    100:20  101:8
109:17   127:1   128:20
129:6    182:16  206:9

**occurring** [1]      109:20

**occurs** [1]         110:25

**Odum** [3]           42:5
42:21    188:11

**off** [20]  4:17    7:23
45:3     51:9    58:15
59:8     59:11   60:24
61:16    61:23   63:23
64:14    70:24   81:4
84:24    112:22  130:2
137:21   141:17  200:13

**offended** [3]       49:24
50:23    52:2

**offensive** [2]      50:20
105:21

**offer** [3] 96:20   97:6
99:23

**offered** [1]        103:8

**offering** [1]       103:2

**office** [47]        2:15
2:20     4:23    16:10
17:11    17:13   17:14
17:16    17:18   46:19
58:6     60:16   60:23
70:7     81:11   94:13
94:20    95:9    108:1
108:5    108:11  108:17
108:20   109:2   109:12
109:17   111:5   142:5
146:18   146:22  147:1
147:10   147:11  147:12
148:23   149:3   149:5
149:7    149:9   149:11
149:14   149:17  149:22
168:14   172:25  175:10
176:6

**office's** [1]       110:13

**officer** [3]        18:3
18:10    96:1

**officers** [5]       17:25
56:23    66:18   67:16
152:20

**offices** [3]        18:20
91:18    108:3

**official** [21]      58:7
59:14    59:20   59:20
60:1     60:15   60:16
61:7     61:19   74:13
74:17    79:11   79:16
111:5    112:6   114:5
115:1    162:14  197:4
197:9    213:10

**officials** [3]      161:19
162:18   196:8

**often** [3] 99:10   123:6
157:19

**older** [1] 110:6

**once** [1] 201:13

**one** [123] 7:22    8:24
11:9     11:24   15:19
16:14    18:25   19:19
22:11    24:10   26:12
27:12    27:13   30:2
30:12    30:13   30:18
32:24    34:5    35:23
38:15    38:17   38:22
39:5     39:21   41:13
42:17    46:24   46:24
47:11    47:24   48:15
48:15    50:17   61:10
62:14    63:7    63:12
63:15    63:18   63:18
64:10    64:17   68:10
71:3     71:6    73:16
85:24    86:13   89:15
90:22    90:23   100:24
100:25   102:20  104:7
104:13   104:16  106:6
106:22   108:21  109:22
109:24   111:5   115:19
116:10   117:17  117:24
118:8    118:9   121:21
122:19   123:17  124:11
134:3    134:3   134:4
134:5    134:5   134:10
136:7    136:9   136:19
138:25   140:5   140:11
141:19   141:21  144:1
144:8    144:9   144:13
144:17   145:2   145:17
150:21   151:11  153:8
154:24   155:19  161:9
161:25   162:4   162:5
168:7    173:5   173:18
174:10   178:21  185:3
185:4    187:16  189:13
198:20   199:7   199:24
201:16   203:13  203:20
204:4    206:11  206:14
206:15

**ones** [14] 14:24   17:8
29:1     35:19   78:25
95:6     97:15   104:7
149:22   153:3   173:4
185:16   186:12  205:17

**ongoing** [5]        121:17
121:19   121:20  140:1
144:18

**open** [4] 34:21    144:21
144:22   203:1

**30(B)(6) OF NAACP**                                                                                      **operate - piece**

| | |
|---|---|
| **operate** [1] 93:16 | |
| **operates** [4] 93:8 | |
| 93:10   93:15   94:10 | |
| **operation** [2] 57:15 | |
| 132:21 | |
| **opinion** [8] 98:10 | |
| 104:12   105:22   106:21 | |
| 109:17   109:19   164:20 | |
| 166:4 | |
| **opportunities** [1] | |
| 127:8 | |
| **opportunity** [13] | |
| 7:8   8:18   29:25 | |
| 56:25   84:2   96:20 | |
| 97:7   102:2   110:3 | |
| 117:13   124:21   170:10 | |
| 206:1 | |
| **oppose** [1] 144:25 | |
| **opposed** [4] 49:14 | |
| 67:13   145:10   145:13 | |
| **opposition** [1] 145:2 | |
| **optimistic** [1] 157:8 | |
| **option** [1] 124:22 | |
| **orally** [2] 45:2 | |
| 49:10 | |
| **Orange** [1] 67:22 | |
| **order** [8] 22:7   26:11 | |
| 26:21   65:20   77:16 | |
| 77:21   85:14   199:15 | |
| **ordered** [1] 95:1 | |
| 163:17 | |
| **organ** [1] 17:5 | |
| **organization** [55] | |
| 8:2   8:10   13:7 | |
| 15:9   17:14   18:1 | |
| 18:3   18:11   18:13 | |
| 19:5   19:13   21:16 | |
| 23:1   27:22   28:6 | |
| 28:20   33:10   33:13 | |
| 33:13   39:5   39:22 | |
| 40:3   53:23   53:25 | |
| 68:11   79:10   80:11 | |
| 82:14   83:23   83:25 | |
| 84:6   84:17   84:21 | |
| 84:21   85:4   85:13 | |
| 96:5   96:5   96:11 | |
| 96:13   96:14   99:19 | |
| 99:21   100:23   101:11 | |
| 102:11   102:19   132:21 | |
| 137:9   138:25   159:3 | |
| 199:4   199:6   200:4 | |
| 208:3 | |
| **organization's** [2] | |
| 111:4   141:9 | |
| **organizational** [3] | |
| 8:8   28:16   108:25 | |
| **organizations** [19] | |
| 12:17   12:20   15:11 | |
| 16:23   16:25   92:1 | |
| 92:1   92:5   92:13 | |
| 92:17   92:21   93:3 | |
| 136:7   138:8   138:21 | |
| 181:4   181:8   181:11 | |
| 181:21 | |
| **organize** [1] 202:17 | |
| **organized** [3] 135:3 | |
| 137:7   144:2 | |
| **organizing** [1] 159:23 | |

| | |
|---|---|
| **original** [2] 54:5 | |
| 210:1 | |
| **originated** [1] 80:19 | |
| **Orlando** [6] 13:24 | |
| 14:9   14:20   14:25 | |
| 15:2   151:13 | |
| **otherwise** [3] 38:18 | |
| 38:23   209:1 | |
| **ou** [1] 96:3 | |
| **ought** [4] 121:23 | |
| 121:24   122:2   122:22 | |
| **outlined** [5] 128:21 | |
| 150:2   178:10   179:7 | |
| 179:11 | |
| **outside** [5] 7:19 | |
| 19:17   94:22   144:11 | |
| 151:12 | |
| **OUTZS** [1] 2:3 | |
| **overall** [3] 105:1 | |
| 159:8   196:20 | |
| **oversaw** [1] 208:13 | |
| **own** [12] 11:9   17:11 | |
| 52:24   56:21   82:8 | |
| 83:2   85:15   86:1 | |
| 111:18   111:20   139:18 | |
| 146:7 | |
| **owned** [2] 17:14 | |
| 17:15 | |

| | |
|---|---|
| **p.m** [2] 9:7   210:4 | |
| **pad** [1] 52:12 | |
| **page** [18] 13:12 | |
| 36:19   36:22   37:5 | |
| 39:24   43:6   64:13 | |
| 66:4   104:16   104:17 | |
| 104:18   112:21   129:18 | |
| 129:19   150:22   188:5 | |
| 190:11   195:10 | |
| **paid** [12] 93:22   93:23 | |
| 93:24   122:8   122:9 | |
| 122:10   122:13   122:16 | |
| 122:17   122:22   124:6 | |
| 201:22 | |
| **Palm** [7] 68:1   150:24 | |
| 151:11   152:2   183:15 | |
| 184:4   184:6 | |
| **Pam** [2] 5:4   189:20 | |
| **panel** [1] 132:23 | |
| **panhandle** [1] 19:23 | |
| **paper** [3] 46:6 | |
| 63:14   153:4 | |
| **papers** [2] 62:21 | |
| 89:10 | |
| **paragraph** [37] 30:2 | |
| 32:24   34:9   34:13 | |
| 34:14   34:24   41:23 | |
| 43:10   43:19   49:3 | |
| 52:22   56:4   56:7 | |
| 58:1   58:2   64:13 | |
| 66:3   66:4   68:25 | |
| 72:4   74:11   75:7 | |
| 79:9   80:10   90:6 | |
| 96:18   115:17   176:17 | |
| 176:20   176:22   190:21 | |
| 191:12   195:10   196:18 | |
| 196:19   196:20   208:19 | |
| **paragraphs** [2] 9:1 | |
| 122:20 | |
| **paraphrase** [1] 29:4 | |

| | |
|---|---|
| **paraphrased** [1] 29:12 | |
| **parcel** [1] 171:23 | |
| **parenthesis** [1] 33:20 | |
| **part** [24] 9:16   9:16 | |
| 16:3   17:4   19:9 | |
| 19:22   20:5   20:13 | |
| 24:19   38:21   58:19 | |
| 58:24   85:11   93:1 | |
| 98:9   100:13   115:17 | |
| 138:2   142:11   143:17 | |
| 144:15   145:19   168:23 | |
| 171:23 | |
| **participate** [8] 54:4 | |
| 54:9   101:7   101:11 | |
| 101:14   103:1   103:7 | |
| 202:12 | |
| **participated** [4] 102:11 | |
| 103:23   139:14   139:21 | |
| **particular** [26] 27:1 | |
| 30:23   30:25   31:1 | |
| 31:15   31:18   31:22 | |
| 46:3   47:7   58:2 | |
| 58:24   71:15   72:14 | |
| 77:22   81:1   90:23 | |
| 101:4   104:16   115:2 | |
| 125:12   125:16   125:17 | |
| 198:22   199:5   205:1 | |
| 207:25 | |
| **parties** [2] 183:1 | |
| 214:14 | |
| **parties'** [1] 214:15 | |
| **parts** [4] 13:21   13:23 | |
| 184:9   187:12 | |
| **party** [1] 205:2 | |
| **pass** [1] 110:24 | |
| **passage** [1] 101:8 | |
| **passed** [5] 98:13 | |
| 100:5   102:12   102:23 | |
| 104:1 | |
| **past** [8] 42:3   126:2 | |
| 131:12   136:1   136:17 | |
| 161:18   199:16   207:12 | |
| **pay** [13] 26:12   26:21 | |
| 27:2   27:3   46:3 | |
| 124:8   200:4   201:11 | |
| 201:13   201:13   201:16 | |
| 201:19   201:23 | |
| **pen** [1] 56:6 | |
| **penalty** [1] 33:3 | |
| **pending** [1] 3:6 | |
| **penny** [2] 124:8 | |
| 200:4 | |
| **people** [174] 1:5 | |
| 5:23   6:1   12:21 | |
| 13:13   19:9   24:19 | |
| 26:18   31:4   31:16 | |
| 32:17   33:12   34:17 | |
| 34:21   35:20   35:23 | |
| 36:12   36:16   37:24 | |
| 37:25   38:1   38:6 | |
| 38:14   39:17   39:25 | |
| 40:3   40:4   41:9 | |
| 46:12   46:14   46:25 | |
| 47:5   50:18   51:10 | |
| 52:7   56:13   59:9 | |
| 60:17   62:15   62:22 | |
| 63:3   64:21   65:18 | |
| 67:7   67:8   67:11 | |
| 67:24   69:20   70:6 | |

| | |
|---|---|
| 70:20   70:21   71:2 | |
| 71:4   71:9   71:9 | |
| 71:11   71:17   73:11 | |
| 73:13   75:24   76:15 | |
| 77:7   77:25   78:16 | |
| 79:18   79:23   80:15 | |
| 82:18   84:5   84:7 | |
| 84:9   84:10   84:13 | |
| 84:17   86:3   90:25 | |
| 91:2   91:2   91:3 | |
| 91:5   91:10   91:12 | |
| 91:13   91:14   91:18 | |
| 91:19   92:3   92:3 | |
| 92:7   92:8   92:15 | |
| 94:3   97:2   97:4 | |
| 101:19   102:2   106:22 | |
| 110:3   116:23   119:5 | |
| 120:15   120:17   121:23 | |
| 124:17   127:13   138:6 | |
| 138:20   139:4   139:8 | |
| 139:11   141:15   142:2 | |
| 142:19   147:13   148:15 | |
| 148:17   149:7   149:11 | |
| 150:3   150:5   150:7 | |
| 150:11   150:15   155:21 | |
| 156:1   156:3   156:8 | |
| 156:17   158:3   158:11 | |
| 159:19   159:24   162:13 | |
| 164:3   164:6   166:18 | |
| 167:1   167:4   167:11 | |
| 168:17   168:20   168:22 | |
| 169:7   169:11   170:6 | |
| 170:7   170:15   171:18 | |
| 172:1   172:23   173:11 | |
| 173:13   173:14   180:19 | |
| 183:10   183:11   185:9 | |
| 185:13   185:24   186:2 | |
| 186:11   187:19   187:23 | |
| 188:2   188:19   197:2 | |
| 199:15   199:21   201:15 | |
| 202:12   202:13   202:14 | |
| 203:15   208:20 | |
| **people's** [2] 78:3 | |
| 150:12 | |
| **perceived** [2] 50:6 | |
| 120:25 | |
| **percent** [9] 64:20 | |
| 65:1   65:1   65:2 | |
| 65:22   140:18   140:18 | |
| 165:19   166:3 | |
| **percentage** [4] 165:14 | |
| 165:21   167:19   178:14 | |
| 198:18 | |
| **perception** [2] 166:18 | |
| 172:4 | |
| **perhaps** [7] 33:4 | |
| 65:22   85:3   109:11 | |
| 109:11   168:13   194:23 | |
| **period** [5] 22:6 | |
| 27:14   171:25   175:14 | |
| 176:4 | |
| **periodicals** [2] 89:5 | |
| 89:21 | |
| **peripheral** [1] 198:23 | |
| **perjury** [1] 33:3 | |
| **permission** [1] 132:18 | |
| **permitted** [1] 155:7 | |
| **person** [62] 10:5 | |
| 13:8   34:5   39:9 | |
| 39:12   39:14   39:18 | |
| 48:2   48:3   48:6 | |
| 49:18   50:17   51:21 | |

| | |
|---|---|
| 59:14   59:19   61:6 | |
| 62:2   62:7   62:19 | |
| 63:7   63:12   63:15 | |
| 63:25   64:6   93:12 | |
| 94:16   104:20   105:15 | |
| 105:19   105:23   107:11 | |
| 114:25   115:20   115:21 | |
| 115:23   116:5   118:5 | |
| 118:7   118:9   118:11 | |
| 118:12   118:20   119:16 | |
| 120:20   120:21   121:7 | |
| 121:8   124:25   125:8 | |
| 125:9   128:15   129:3 | |
| 147:21   177:13   177:14 | |
| 177:22   183:19   183:24 | |
| 183:25   186:22   187:16 | |
| 209:20 | |
| **person's** [5] 62:17 | |
| 116:22   127:21   128:16 | |
| 189:8 | |
| **personal** [20] 46:10 | |
| 68:25   80:7   82:8 | |
| 83:1   83:5   85:15 | |
| 86:6   88:1   88:5 | |
| 88:12   99:20   106:12 | |
| 115:12   126:24   145:23 | |
| 148:7   179:12   179:16 | |
| 208:23 | |
| **personalities** [6] | |
| 168:8   168:9   168:12 | |
| 168:18   168:18   169:4 | |
| **personally** [21] 13:2 | |
| 13:5   13:10   46:7 | |
| 52:24   68:15   86:13 | |
| 101:14   102:15   102:16 | |
| 125:4   127:19   129:10 | |
| 136:14   148:2   154:14 | |
| 154:18   162:8   167:10 | |
| 193:18   213:8 | |
| **persons** [35] 8:25 | |
| 30:10   36:5   36:14 | |
| 38:9   38:18   38:23 | |
| 39:6   39:16   40:14 | |
| 40:21   40:25   43:1 | |
| 45:14   47:17   47:24 | |
| 48:18   49:9   55:6 | |
| 55:7   57:23   62:24 | |
| 67:5   75:15   76:23 | |
| 78:8   90:18   96:25 | |
| 97:23   149:16   162:11 | |
| 185:7   185:14   189:7 | |
| **perspective** [2] 117:9 | |
| 117:10 | |
| **pervasive** [1] 114:21 | |
| **phase** [1] 170:14 | |
| **phone** [17] 2:16 | |
| 2:18   2:21   2:23 | |
| 4:19   5:24   6:1 | |
| 6:3   6:8   6:14 | |
| 71:1   81:18   94:10 | |
| 94:19   94:22   95:1 | |
| 125:5 | |
| **phrase** [2] 52:22 | |
| 75:1 | |
| **pick** [1] 52:12 | |
| **picked** [1] 125:5 | |
| **picture** [1] 105:19 | |
| **piece** [5] 21:12   64:12 | |
| 101:6   109:24   171:24 | |

**pieces [1]** 37:14
110:10

**pinpoint [1]** 170:21

**place [14]** 3:8
32:16    52:7    79:11
79:18    95:14    110:5
118:2    118:18    120:19
136:8    171:25    178:4
206:5

**placed [2]** 83:23
96:15

**placement [1]** 178:8

**places [12]** 55:21
55:25    57:8    59:14
93:8    93:15    100:11
101:13    178:24    180:7
180:18    198:11

**plain [1]** 100:19

**plaintiff [22]** 2:3
2:6    8:9    8:24
9:5    9:10    10:11
33:19    37:17    41:2
190:1    190:2    190:16
191:3    191:6    191:15
191:18    192:4    192:11
192:13    192:22    209:7

**plaintiffs [12]** 1:7
36:21    36:25    39:9
41:25    43:6    43:11
64:10    64:18    186:18
187:3    188:1

**plan [2]** 146:1    146:7

**plans [2]** 146:10
157:21

**play [1]** 107:13

**played [4]** 168:19
169:2    194:5    195:24

**playing [1]** 194:16

**plays [1]** 30:19

**point [12]** 9:13
9:20    35:3    48:12
48:14    68:5    100:11
108:19    116:20    129:18
176:17    189:11

**pointed [1]** 108:16

**pointing [6]** 89:12
36:20    38:1    56:6
190:7    190:19

**points [1]** 206:9

**police [2]** 143:2
191:19

**policy [1]** 180:7
197:20

**political [2]** 29:8
205:2

**poll [50]** 70:14    91:5
93:19    93:20    94:5
94:18    105:6    105:10
106:21    106:25    107:6
107:12    107:17    112:12
112:14    115:20    116:2
117:9    117:10    117:11
117:23    117:24    118:10
118:11    118:15    118:16
118:19    120:7    120:8
120:13    120:15    121:2
121:6    121:13    121:18
121:24    122:2    122:5

**polling [6]** 79:11
79:17    93:8    93:15
178:23    180:18

**polls [28]** 70:6
71:20    73:12    90:25
93:25    116:24    117:5
123:6    139:8    150:11
153:25    155:5    156:5
156:10    156:11    156:23
156:24    173:3    173:6
173:14    173:20    180:6
180:15    190:17    190:22
190:24    190:25    191:1

**poor [1]** 110:7

**population [1]** 56:2

**portion [2]** 5:1
35:6

**position [21]** 16:9
18:5    18:11    18:11
60:13    93:12    93:14
94:16    94:17    110:15
127:6    127:7    127:9
128:1    128:19    128:22
128:23    128:23    197:23
198:1    198:13

**positions [4]** 18:18
21:15    21:18    197:19

**positive [1]** 153:21

**possibility [1]** 114:22

**possible [4]** 65:5
66:20    114:21    172:11

**possibly [1]** 79:6
209:8

**Post [1]** 89:20

**poured [1]** 138:3

**pouring [1]** 157:10

**practice [1]** 51:3
96:19

**practices [1]** 58:3

**prayer [4]** 112:2
112:25    113:7    113:11

**pre-existing [1]** 137:8

**preamble [1]** 33:17

**precinct [22]** 47:7
47:12    69:8    69:9
69:20    70:19    71:22
71:23    72:14    72:16
74:3    74:14    90:9
94:13    94:16    94:20
95:8    107:17    121:5
125:17    174:11    180:22

**precincts [24]** 47:13
58:3    71:4    71:19
71:20    94:3    94:6
94:11    95:20    146:8
150:12    173:11    173:21
174:10    178:15    178:17
178:18    178:22    179:4
179:9    180:17    180:18
180:19    180:21

**precise [2]** 25:3
165:24

**preclude [2]** 111:16
208:6

**predominant [1]**
169:19

**predominantly [7]**
92:22    92:24    92:25
178:19    178:25    208:2
208:3

**preparation [3]** 10:18
11:1    14:5

**prepare [3]** 29:16
29:19    196:16

**prepared [4]** 9:13
29:20    133:12    204:15

**preparing [1]** 141:11

**presence [2]** 143:24
179:8

**present [1]** 5:6
16:8

**presented [4]** 45:1
85:9    85:12    185:21

**Presently [1]** 16:10

**presidency [1]** 165:4

**president [21]** 18:6
18:7    18:12    18:19
33:18    57:8    57:15
58:6    132:19    133:5
136:20    136:23    137:5
137:10    137:12    165:6
200:2    203:9    207:16
207:18    208:12

**presidential [2]** 157:3
169:1

**presidents [7]** 56:23
66:18    67:4    67:9
67:12    71:8    207:17

**presumably [2]** 52:15

**pretty [3]** 96:24
125:20    137:2

**prevailed [1]** 117:23

**prevent [1]** 109:20

**Prevention [1]** 16:11

**previous [3]** 97:16
137:23    137:24

**previously [9]** 12:13
22:7    29:15    45:25
72:6    76:17    87:3
98:2    173:2

**privilege [1]** 152:19

**privileged [1]** 54:20

**privy [1]** 55:19

**probable [1]** 65:5

**problem [15]** 19:6
31:17    68:16    68:25
72:13    73:8    77:25
90:24    109:16    119:13
119:15    129:4    142:1
172:1    174:8

**problems [17]** 57:13
57:22    57:23    57:25
69:2    70:20    71:2
73:16    84:8    86:3
109:20    111:6    146:20
152:24    182:14    203:20
203:22

**procedure [6]** 117:5
117:16    117:20    117:21
118:18    120:1

**procedures [1]** 55:8

**proceeded [1]** 69:10

**process [64]** 32:17
44:7    54:1    55:7
56:20    57:18    59:4
61:21    68:13    69:5
70:18    77:17    80:3
83:14    85:6    87:10
92:16    95:4    98:23
99:1    103:2    103:7
103:13    104:8    108:10
108:13    108:23    110:5
111:23    111:24    117:8
117:8    118:5    118:24
121:22    121:25    123:3
127:14    132:12    133:9
133:10    135:5    135:6
137:8    138:22    144:24
150:9    156:2    156:6
160:10    164:7    170:16
170:17    170:18    171:25
174:12    176:6    176:18
177:8    185:19    198:8
198:9    198:14    203:16

**processed [13]** 41:11
41:16    75:2    75:9
75:14    76:2    77:15
78:15    79:3    79:5
79:6    177:23    183:18

**processes [2]** 91:6
91:8

**processing [1]** 90:7

**produced [2]** 45:25
211:24

**professionals [1]**
160:8

**program [8]** 17:5
134:14    134:14    138:19
139:9    139:16    140:4
140:8

**programs [1]** 16:14

**prohibits [1]** 121:10

**promising [1]** 119:21

**proper [5]** 100:16
101:17    109:12    111:19
117:4

**properly [7]** 41:11
41:16    75:9    77:21
107:7    108:4    169:22

**proportionately [1]**
97:13

**proposed [6]** 99:24
100:2    100:12    100:13
103:3    103:9

**provide [10]** 27:25
79:10    124:14    124:16
124:21    135:7    142:22
142:25    159:21    209:8

**provided [2]** 80:2
143:9

**provides [2]** 24:24
33:14

**providing [2]** 173:22
173:23

**provisional [3]** 153:12
153:25    192:5

**psychology [1]** 16:4

**public [15]** 3:7
16:12    67:13    83:11
83:17    83:22    85:3

**publically [1]** 202:25

**publications [2]**
15:13    89:23

**publicity [1]** 157:2

**publicized [1]** 101:20

**published [1]** 15:17

**publishing [1]** 15:20

**pull [1]** 137:16

**pulled [1]** 139:5

**purged [20]** 58:7
58:9    58:14    59:7
62:9    64:1    66:6
67:6    74:13    74:16
91:5    114:5    150:6
150:7    190:3    190:4
190:13    194:13    196:5
196:6

**purging [1]** 194:19

**purpose [3]** 3:6
143:11    179:3

**purposefully [2]**
131:9    131:11

**purposes [1]** 10:4

**pursuant [1]** 209:9

**put [33]** 47:10    49:23
50:15    51:16    94:3
95:14    156:1    170:18
175:16    191:7    191:16
209:13    209:22

**putative [1]** 43:20
44:22    49:5

**puts [4]** 59:19    61:6
61:18    61:19

**Putting [1]** 117:15

**questioning [1]** 50:4

**questions [21]** 6:12
6:13    6:15    25:4
25:4    31:10    45:8
57:2    81:6    88:23
89:1    89:7    108:21
132:11    159:24    189:15
189:22    200:12    200:14
205:9    209:5

**quickly [1]** 20:21

**quite [9]** 51:6    71:14
84:1    85:2    97:10
131:14    131:15    166:11
166:14

**quote [1]** 43:25

**quoted [1]** 32:19

**race [32]** 40:17    40:21
41:20    44:9    72:11
73:6    77:10    77:11
77:11    78:4    78:11
79:21    79:24    86:23
87:7    91:9    92:8
97:20    115:22    120:5
120:24    125:1    126:3
126:21    127:4    127:21
128:16    129:11    131:11
140:8    140:8    208:8

**races [1]** 34:21

**Public-State [2]**
212:6    213:16

**racially** [2]        73:19
97:8

**racist** [7]          120:9
120:18  120:20  120:22
120:23  127:25  127:25

**racists** [1]         120:17

**radio** [2] 70:19     164:17

**raised** [5]          68:23
104:2   106:1   106:5
203:17

**ran** [2]  68:16      109:16

**randomly** [1]        66:6

**range** [1]           202:14

**rarely** [1]          206:8

**ratify** [1]          133:1

**Ray** [1]  5:4

**read** [18] 51:8      56:5
56:7    58:19   58:20
58:22   58:25   59:1
59:2    80:6    80:8
80:9    88:15   88:20
98:9    102:21  171:8
211:10

**reading** [2]         50:8
214:10

**reads** [2] 66:4      130:6

**real** [8]  15:17     73:7
99:8    101:1   156:15
156:15  156:17  203:20

**realize** [1]         158:3

**really** [25]         8:8
17:13   17:15   23:25
25:15   33:15   37:12
45:20   49:25   62:20
63:16   72:1    72:1
79:4    84:14   91:24
91:24   125:3   155:25
156:7   159:7   159:8
161:21  174:20  175:7

**reask** [1] 81:19

**reason** [12]         25:3
26:1    62:13   64:4
72:12   99:9    124:19
124:25  182:22  184:23
199:5   207:15

**reasons** [4]         136:20
185:4   185:5   185:11

**receive** [13]        9:8
28:10   57:16   69:6
72:20   75:15   100:12
101:17  101:20  150:16
155:3   186:11  199:25

**received** [43]       9:5
9:6     9:21    62:24
63:4    63:8    68:11
69:17   71:10   73:20
74:22   76:14   76:14
79:4    79:5    84:2
86:18   91:3    93:4
117:12  117:14  117:15
132:17  146:14  146:19
146:25  147:2   147:8
149:2   149:7   149:13
149:10  149:11  149:13
149:15  149:23  150:1
155:16  185:15  186:5
186:8   204:10  209:10

**receiving** [3]       108:13

**173:13** 173:14

**recently** [1]        140:11

**Recess** [5]          49:22
90:4    115:6   172:16
189:14

**recollect** [1]       68:3

**recommend** [1] 152:1
152:2   152:4

**recommendation** [1]
57:22   133:7   151:24
151:25

**recommended** [1]
152:5

**record** [31]         4:14
4:17    4:19    5:6
6:20    7:23    9:5
11:8    27:21   33:2
45:3    49:23   50:3
50:15   50:16   51:10
51:14   51:16   52:6
64:14   81:4    90:5
112:22  130:2   137:2
141:17  149:15  200:13
209:6   209:13  209:23

**recorded** [1]        149:19

**records** [10]        27:18
27:18   27:24   28:1
49:15   65:8    69:14
69:16   154:8   160:18

**recount** [8]         163:11
163:17  163:17  163:21
164:1   168:1   170:25
171:3

**REDIRECT** [2] 3:12
205:11

**redress** [4]         31:4
31:9    31:11   34:3

**reduce** [1]          104:9

**reduced** [1]         124:7

**refer** [6] 8:13      33:5
64:12   89:2    135:10
174:5

**reference** [4]       22:22
42:4    80:10   208:12

**referenced** [3]      35:6
68:25   208:18

**referred** [4]        31:20
63:15   105:14  165:12

**referring** [18]      31:19
31:23   33:22   37:12
39:22   42:5    53:6
89:7    89:13   89:22
103:16  105:7   105:9
109:4   135:10  179:21
199:21  199:23

**refers** [3]          22:25
25:15   75:8

**reflected** [1]       59:10

**reflection** [1]      50:16

**reform** [13]         101:9
102:12  103:10  103:25
104:5   105:2   123:15
123:20  124:13  152:23
153:8   197:13  204:17

**reformed** [1]        95:16

**regard** [15]         8:7
40:17   45:17   46:7
78:4    82:21   124:24

**119:13** 132:9   134:24
135:13  141:11  168:19
172:18  205:4

**regarding** [12]      5:18
30:16   48:10   82:1
82:5    82:16   86:2
88:2    88:6    118:19
127:20  204:15

**regardless** [4]      40:21
41:20   44:9    78:11

**register** [18]       35:8
35:14   38:10   47:7
59:25   68:12   71:11
78:1    78:8    86:4
86:13   88:4    96:4
96:6    135:14  141:14
150:8   181:21

**registered** [19]     35:8
35:13   38:10   47:8
59:18   61:5    70:22
71:10   71:11   76:19
77:21   90:20   135:19
140:21  150:4   150:15
196:17  208:14  208:18

**registering** [5] 136:16
144:4   157:10  181:5
208:7

**registration** [56]
38:24   39:10   41:7
41:10   41:15   47:1
59:15   60:2    65:15
66:6    66:13   66:24
71:10   75:1    75:8
75:16   76:1    76:4
76:13   76:21   77:15
77:19   78:6    78:15
79:3    82:25   84:4
86:5    91:1    91:2
91:4    92:19   126:14
134:25  135:2   138:4
138:7   140:17  140:20
141:3   141:19  142:1
142:9   142:23  157:22
158:13  176:7   176:18
177:8   183:17  194:19
202:3   202:7   202:17
207:24  208:8

**registrations** [5]
59:10   75:18   78:3
78:11   90:8

**regularly** [1]       125:23

**reimbursed** [1] 200:5

**related** [8]         33:11
86:25   189:22  189:23
190:2   190:4   194:13
194:25

**relates** [3]         87:3
98:24   190:8

**relating** [1]        87:2

**relations** [2]       17:3
141:24  142:13

**relationship** [1] 195:24

**relative** [2]        214:13
214:15

**relatively** [3]      5:21
137:17  137:18

**reliance** [1]        87:21

**relief** [11]         40:19
95:5    112:17  112:21

**112:25** 113:2    113:5
113:7   113:10  113:11
113:16

**relying** [2]         67:16
182:20

**remain** [1]          157:7

**remedies** [1]        39:5

**remember** [25]       11:6
11:24   15:5    15:16
29:24   43:3    46:6
47:23   47:23   48:13
67:15   78:19   78:25
100:25  101:12  116:17
116:18  133:18  133:18
137:22  148:18  151:14
151:16  163:23  165:17

**reminding** [1]       119:16

**removal** [2]         45:17
46:8    48:10

**remove** [1]          197:4

**removed** [24]        38:20
38:24   39:7    39:10
41:1    46:13   46:22
47:18   47:21   59:12
60:15   60:18   62:10
66:12   66:24   67:20
67:23   96:15   113:25
174:15  174:22  175:10
176:1   196:7

**removing** [1]        64:21

**rendered** [1]        192:5

**repeat** [5]          25:11
38:21   50:20   75:6
81:19

**repeating** [1]       132:2

**rephrase** [2]        7:4
175:8

**report** [8]          89:6
89:8    89:9    109:11
137:16  165:17  165:18
214:7

**reported** [1]        138:1

**reporter** [4]        3:7
6:15    6:19    45:5

**REPORTER'S** [1]
214:1

**reporters** [1]       89:9

**reporting** [2]       111:23
146:20

**reports** [19]        65:14
87:10   87:11   87:15
87:19   87:22   87:23
89:2    89:3    89:4
89:16   89:17  89:19
89:22   97:13   97:15
102:17  109:8   165:12

**reprehensible** [1]
51:5

**represent** [30]      4:8
30:10   30:16   32:1
32:7    35:5    36:11
36:14   37:3    37:22
38:9    39:16   39:23
39:25   40:4    40:14
41:2    41:19   44:4
44:5    44:13   53:4
53:8    53:12   53:23
81:12   113:24  115:9

**168:14** 194:2

**representative** [19]
30:8    30:9    30:19
30:22   37:23   38:4
38:5    54:22   58:16
113:3   113:6   113:10
114:23  114:24  148:8
179:17  191:7   191:16
193:19

**representatives** [4]
30:4    31:6    31:13
40:15

**representing** [8]
10:8    13:6    38:15
39:17   45:6    91:11
92:3    189:20

**Republican** [1] 168:24

**Republicans** [1]
166:12

**request** [5]         4:18
7:8     73:13   204:8
204:9

**requested** [5]       50:24
72:17   116:6   117:2
118:7

**requests** [3]        8:22
171:3   171:3

**required** [4]        77:16
77:20   121:13  123:14
124:17  200:23

**requires** [3]        123:20
124:13  168:13

**research** [2]        80:3
89:10

**resent** [1]          50:2

**reserves** [2]        9:10
209:7

**reside** [1]          27:19

**residents** [1]       40:16

**resides** [1]         113:25

**resolutions** [1] 30:15

**resources** [15]      135:23
136:1   136:3   138:3
145:16  145:21  146:9
157:9   159:7   159:10
159:11  160:14  161:5
161:11  171:5

**respect** [8]         45:8
82:15   88:18   107:24
110:16  112:14  197:19
197:23

**respective** [1]      38:25

**respond** [4]         9:11
50:13   155:17  191:19

**responded** [2]       63:10
108:23  122:11

**responding** [1]  9:3

**responds** [1]        109:1

**response** [9]        6:23
7:1     9:19    10:13
21:9    71:13   103:10
126:23  155:15

**responsibilities** [6]
30:3    30:14   31:6
31:7    31:8    31:12

**responsibility** [16]
60:15   60:17   107:5

| | | |
|---|---|---|
| 107:12 | 107:15 | 108:9 |
| 108:11 | 108:16 | 109:14 |
| 110:12 | 110:13 | 110:17 |
| 111:14 | 126:24 | 130:12 |
| 132:20 | | |

**responsible** [26]
| | | |
|---|---|---|
| 55:7 | 59:23 | 60:4 |
| 60:22 | 61:9 | 61:12 |
| 93:11 | 93:13 | 94:8 |
| 94:24 | 95:4 | 106:14 |
| 108:22 | 111:5 | 111:14 |
| 127:24 | 128:4 | 128:5 |
| 128:6 | 128:7 | 129:6 |
| 132:2 | 172:20 | 172:25 |
| 183:5 | 194:19 | |

**responsive** [1] 126:17
**rest** [3] 111:25 175:13 198:21
**restoration** [1] 180:14
**restore** [3] 39:6 39:14 197:8

**restored** [22]
| | | |
|---|---|---|
| 62:9 | 62:15 | 62:16 |
| 62:17 | 62:20 | 62:22 |
| 62:23 | 63:1 | 63:25 |
| 64:7 | 65:19 | 65:23 |
| 104:10 | 114:25 | 191:25 |
| 198:3 | 198:5 | 198:9 |
| 198:11 | 198:19 | 199:17 |

first line: 62:3

**Restrepo** [10] 2:13
| | | |
|---|---|---|
| 3:20 | 5:7 | 5:7 |
| 194:1 | 194:2 | 194:8 |
| 195:8 | 195:12 | 195:19 |

**restrictions** [1] 52:7
**rests** [2] 111:3 111:15
**result** [9] 53:18
| | | |
|---|---|---|
| 58:2 | 163:1 | 164:12 |
| 180:25 | 181:18 | 181:23 |
| 184:13 | 205:5 | |

**resulted** [1] 182:25
**RESUMED** [2] 3:15 49:1
**retardation** [1] 16:5
**return** [1] 52:3
**returned** [1] 118:21
**Returning** [1] 105:25
**review** [11] 9:22
| | | |
|---|---|---|
| 12:8 | 12:10 | 29:25 |
| 45:21 | 58:17 | 58:18 |
| 112:24 | 129:21 | 129:22 |
| 190:5 | | |

**reviewed** [9] 10:20
| | | |
|---|---|---|
| 11:1 | 11:4 | 11:7 |
| 11:18 | 29:22 | 42:14 |
| 89:3 | 175:12 | |

**reviewing** [1] 129:25
**revised** [1] 133:12
**revisions** [1] 103:9
**revolved** [1] 32:15
**Richard** [1] 45:15
**rid** [1] 153:4
**ridiculous** [1] 104:21
**right** [111] 7:14
| | | |
|---|---|---|
| 8:3 | 8:6 | 9:10 |
| 11:21 | 14:11 | 14:19 |
| 17:20 | 21:11 | 22:16 |
| 22:24 | 23:10 | 25:11 |
| 25:14 | 25:17 | 26:10 |
| 27:5 | 33:23 | 33:24 |
| 34:4 | 34:22 | 35:1 |
| 35:1 | 36:3 | 36:23 |
| 37:19 | 40:18 | 42:10 |
| 43:13 | 44:10 | 45:23 |
| 49:12 | 49:15 | 52:10 |
| 52:25 | 53:1 | 56:6 |
| 57:20 | 59:8 | 59:9 |
| 63:20 | 63:22 | 64:8 |
| 65:6 | 67:10 | 74:4 |
| 76:3 | 79:13 | 80:11 |
| 81:15 | 81:20 | 93:18 |
| 105:15 | 109:6 | 111:21 |
| 116:4 | 118:1 | 118:2 |
| 122:21 | 123:5 | 130:21 |
| 131:8 | 133:14 | 133:21 |
| 137:21 | 139:2 | 140:12 |
| 143:10 | 145:15 | 146:17 |
| 148:24 | 149:24 | 150:17 |
| 154:1 | 154:7 | 154:12 |
| 155:2 | 155:6 | 162:21 |
| 163:7 | 171:5 | 171:7 |
| 171:10 | 171:12 | 171:16 |
| 172:23 | 173:24 | 175:3 |
| 175:4 | 175:15 | 175:25 |
| 175:25 | 177:10 | 177:24 |
| 180:1 | 181:6 | 181:12 |
| 184:24 | 185:2 | 185:3 |
| 185:8 | 186:16 | 187:10 |
| 189:9 | 191:2 | 197:24 |
| 199:12 | 206:20 | 207:10 |
| 208:16 | 209:7 | |

**rights** [25] 2:2
| | | |
|---|---|---|
| 13:4 | 62:3 | 62:9 |
| 62:15 | 62:17 | 62:20 |
| 62:22 | 62:23 | 63:1 |
| 63:25 | 64:7 | 65:19 |
| 65:23 | 104:10 | 154:19 |
| 191:25 | 198:3 | 198:5 |
| 198:8 | 198:10 | 198:19 |
| 198:21 | 198:21 | 199:17 |

**road** [2] 74:10 156:15
**role** [16] 30:3 30:7
| | | |
|---|---|---|
| 30:9 | 30:18 | 30:21 |
| 110:20 | 129:1 | 130:12 |
| 131:25 | 168:19 | 169:2 |
| 194:5 | 194:15 | 195:23 |
| 203:8 | 208:23 | |

**roll** [13] 47:12 47:18
| | | |
|---|---|---|
| 59:8 | 59:15 | 59:15 |
| 59:20 | 60:2 | 60:5 |
| 60:7 | 61:7 | 65:5 |
| 115:2 | 200:23 | |

**rolls** [36] 28:4
| | | |
|---|---|---|
| 28:7 | 38:25 | 39:7 |
| 39:10 | 39:14 | 41:1 |
| 45:18 | 46:8 | 48:10 |
| 60:16 | 60:18 | 63:17 |
| 65:8 | 65:15 | 66:25 |
| 67:20 | 67:24 | 96:15 |
| 96:16 | 112:2 | 112:6 |
| 113:25 | 114:25 | 125:24 |
| 174:15 | 174:22 | 175:11 |
| 196:5 | 196:6 | 196:8 |
| 197:4 | 197:9 | 206:23 |
| 207:1 | 207:4 | |

**Ron** [2] 192:4 192:18
**room** [9] 5:5 5:6
| | | |
|---|---|---|
| 5:21 | 5:23 | 6:13 |
| 10:6 | 50:17 | 52:8 |
| 52:14 | | |

**rooms** [1] 170:3
**Rose** [1] 43:12
**ROSENFELD** [4]
3:7 213:15 214:6 214:24
**rough** [3] 72:1 161:24 161:25
**rude** [1] 115:20
**rule** [11] 78:10 100:6
| | | |
|---|---|---|
| 100:23 | 101:4 | 101:6 |
| 101:8 | 101:17 | 102:6 |
| 102:10 | 204:13 | 204:21 |

**rules** [6] 52:9 100:6
100:12 103:9 103:9 204:16
**run** [4] 62:20 70:21 139:11 168:7
**running** [1] 159:23
**S** [3] 213:15 214:6 214:24
**Safety** [8] 81:14
| | | |
|---|---|---|
| 82:1 | 82:11 | 82:17 |
| 85:16 | 86:2 | 88:3 |
| 88:18 | | |

**salary** [1] 199:25
**sat** [2] 70:12 70:13
**satisfied** [1] 175:22
**Saturday** [1] 155:24
**saw** [5] 50:5 51:9
73:11 80:5 187:16
**says** [13] 32:1 33:18
| | | |
|---|---|---|
| 34:19 | 35:1 | 40:1 |
| 40:23 | 58:2 | 79:16 |
| 113:21 | 121:4 | 126:23 |
| 128:22 | 196:9 | |

**scanning** [1] 59:4
**Schaeffer** [2] 4:20 4:20
**scheme** [1] 100:13
**school** [1] 134:4
**Schools** [1] 16:12
**science** [1] 15:24
**scope** [4] 134:1
134:20 144:11 181:25
**seal** [1] 213:10
**seating** [1] 50:16
**second** [16] 11:25
| | | |
|---|---|---|
| 12:3 | 18:8 | 21:25 |
| 22:21 | 30:2 | 54:3 |
| 56:3 | 58:17 | 118:6 |
| 173:14 | 176:16 | 179:23 |
| 181:2 | 182:5 | 196:13 |

**Secretary** [17] 1:9
| | | |
|---|---|---|
| 54:12 | 54:24 | 93:13 |
| 108:1 | 108:5 | 108:9 |
| 108:17 | 108:19 | 109:2 |
| 109:12 | 110:11 | 110:12 |
| 110:17 | 110:21 | 167:25 |
| 168:24 | | |

**section** [3] 105:9 190:8 196:19
**sections** [1] 195:6
**secure** [1] 199:12
**secured** [1] 135:5
**security** [1] 65:14
**see** [17] 11:12 26:1

| | | |
|---|---|---|
| 30:5 | 43:16 | 58:18 |
| 60:17 | 66:7 | 69:9 |
| 79:12 | 82:15 | 96:21 |
| 97:25 | 132:6 | 145:6 |
| 168:15 | 170:23 | 177:4 |

**seeing** [2] 42:23 98:11
**seek** [7] 31:3 31:9
| | | |
|---|---|---|
| 36:11 | 40:4 | 53:8 |
| 53:22 | 95:5 | |

**seeking** [16] 37:3
| | | |
|---|---|---|
| 37:22 | 38:8 | 39:13 |
| 39:16 | 39:23 | 39:24 |
| 40:19 | 41:19 | 44:5 |
| 44:12 | 53:12 | 112:17 |
| 113:3 | 113:6 | 113:24 |

**seeks** [6] 35:5
| | | |
|---|---|---|
| 39:5 | 40:13 | 44:4 |
| 53:3 | 154:15 | |

**seem** [2] 57:13 96:4
**sensitized** [1] 153:6
**sensitizing** [1] 106:22
**sent** [7] 9:7 69:15
| | | |
|---|---|---|
| 116:10 | 117:1 | 117:6 |
| 117:17 | 118:9 | |

**sentence** [9] 30:2
| | | |
|---|---|---|
| 32:1 | 32:19 | 34:10 |
| 34:13 | 43:19 | 56:5 |
| 66:4 | 75:7 | |

**separate** [10] 17:25
| | | |
|---|---|---|
| 19:24 | 28:24 | 29:1 |
| 128:18 | 131:18 | 169:9 |
| 172:6 | 172:12 | 175:13 |

**separated** [1] 171:24
**series** [3] 89:18
89:18 173:16
**serious** [4] 104:18
104:23 104:24 195:8
**seriously** [1] 50:23 107:4
**served** [1] 179:3
**serves** [1] 30:22
**service** [1] 200:10
**services** [5] 135:7
143:7 143:9 147:18 147:19
**session** [2] 103:17
104:1 141:13
**sessions** [2] 84:5
101:18 202:24 203:3
**set** [1] 17:25
**settle** [1] 133:4
**seven** [2] 55:10 114:7
**several** [7] 9:24
| | | |
|---|---|---|
| 31:8 | 70:19 | 71:19 |
| 112:24 | 127:8 | 201:13 |

**shakes** [1] 6:24
**shaking** [1] 50:7
**shall** [1] 8:24
**shame** [1] 154:21
**share** [1] 155:22
**shared** [3] 65:13
83:5 103:21
**Sheet** [1] 211:13
**Sherry** [2] 191:3

**192:13**
**shortest** [1] 27:14
**Shorthand** [1] 3:7
**shortly** [1] 73:14
**shot** [2] 121:21 124:11
**shouting** [1] 119:20
**show** [5] 11:15 28:12
69:14 69:16 210:2
**showing** [2] 12:5 112:20
**shown** [3] 8:21
36:21 37:5
**shows** [1] 118:9
**side** [2] 50:18 197:7
**sides** [1] 74:1
**sign** [2] 72:5 73:2 107:23
**signed** [1] 133:12
**significant** [3] 80:12
138:12 138:13
**significantly** [1] 90:12
**signing** [1] 107:21 214:10
**Similar** [1] 138:11
**similarly** [4] 39:17
40:15 40:23 53:15
**simplify** [1] 194:23
**simply** [5] 34:24
80:7 117:16 127:18 189:11
**sink** [1] 125:14
**sit** [18] 24:25 25:19
| | | |
|---|---|---|
| 42:12 | 69:23 | 106:10 |
| 109:22 | 113:16 | 119:22 |
| 119:22 | 119:24 | 140:3 |
| 148:1 | 152:12 | 175:9 |
| 175:24 | 189:4 | 205:20 |
| 206:12 | | |

**sitting** [5] 4:21
73:9 73:17 119:16 170:3
**situated** [4] 39:17
40:16 40:23 53:15
**situation** [2] 38:16
106:12 106:23 125:15
**situations** [1] 48:13
**six** [1] 124:14
**size** [2] 5:23 185:24
**skimmed** [1] 59:4
**slightly** [1] 50:7
**slowly** [1] 35:17
**small** [1] 5:21
**smaller** [1] 151:12
**snowball** [1] 170:16
**social** [4] 16:5
29:10 33:10 65:13
**solve** [2] 152:24 153:1
**someone** [2] 22:13
| | | |
|---|---|---|
| 27:6 | 34:7 | 41:2 |
| 47:24 | 59:18 | 59:24 |
| 60:15 | 61:5 | 61:14 |
| 63:6 | 63:24 | 65:21 |
| 104:22 | 117:16 | 120:19 |
| 122:5 | 147:11 | 148:16 |

152:15  172:12  178:1
201:9  201:22
**sometime** [2]      5:20
126:6
**sometimes** [1]  25:5
**somewhere** [2]  97:25
170:24
**soon** [1] 141:13
**sororities** [1]      92:18
**sorority** [1]  17:6
**sorry** [7] 32:5      56:14
59:17   72:3      75:6
83:20   119:11   172:9
196:21
**sort** [7]  50:5      50:12
61:2   122:2     158:11
162:14  170:15
**sought** [7]      35:8
35:13   66:10    66:22
68:11   78:13    113:17
**sounded** [1]      122:19
**source** [2]      136:3
169:25
**sources** [6]      86:8
86:11   86:19    87:12
164:19  165:13
**south** [1]      167:13
**Southern** [2]  1:1
3:7
**Southwest** [1]  1:14
**speak** [8]      6:2
6:9    14:1      15:2
99:11   113:14   155:10
173:14
**speaking** [9]      5:22
26:8   30:23     67:11
88:13   99:16    114:24
174:4   196:22
**speaks** [1]      209:23
**spearheaded** [1]
137:9
**special** [2]      21:20
22:1
**specific** [19]      15:8
17:23   31:21    55:13
68:21   78:12    78:21
78:23   89:8     89:16
99:2   100:21    123:21
128:12  129:8    161:4
177:14  189:8    193:6
**specifically** [10]
45:12   64:12    77:5
86:3   89:6      102:5
105:22  113:9    152:4
174:25
**specifics** [1]  137:19
**speed** [1]      156:7
**spend** [6]      145:16
156:1   159:4    159:21
161:14  161:17
**spending** [2]      159:6
160:12
**spent** [15]      135:8
145:22  156:13   159:4
159:13  159:14   159:19
159:23  160:2    160:14
160:20  161:18   171:6

208:24  209:1
**spoke** [10]      14:25
36:5   46:15     48:18
116:18  116:19   148:15
174:4   187:18   203:4
**spoken** [6]      9:24
10:17   14:6     106:24
154:20  205:4
**sponsored** [2]      15:11
15:12
**staff** [4] 94:1      94:3
147:23  159:21
**Stafford** [2]      2:16
45:7
**stand** [3]      70:23
144:24  156:9
**standing** [2]      117:25
125:21
**standpoint** [1]  93:17
**start** [4]  6:16      6:19
59:24  188:10
**started** [13]      61:10
68:15   70:20    70:24
71:1   71:7      71:18
71:24  137:8     144:13
170:16  185:18   205:17
**starting** [4]      16:8
69:22  112:21    116:20
**starts** [1]      56:5
**state** [185]      1:6
1:9    3:7       4:10
4:13   4:19      5:6
7:11   7:16      7:20
8:4    8:23      10:12
13:22   13:23    17:10
17:12   17:18    17:24
18:14   18:15    18:16
18:19   18:23    19:3
19:4   19:7      19:10
19:19   19:20    19:24
20:1   20:5      20:7
20:12   20:13    21:13
22:13   22:18    23:4
23:9   23:21     23:24
24:5   24:11     24:23
25:24   26:3     26:8
26:12   26:13    26:15
26:20   27:17    28:1
28:3   28:9      28:15
28:17   28:21    33:19
33:23   33:25    34:2
34:6   35:4      35:7
35:14   36:1     36:11
36:15   37:3     37:16
37:21   39:4     39:13
40:5   40:16     40:20
41:18   44:12    49:4
53:3   53:7      53:13
53:22   54:4     54:12
54:13   54:24    54:25
55:10   55:16    55:17
56:2   56:10     57:4
57:19   59:18    59:20
61:19   71:7     80:23
84:5   91:7      93:13
95:16   96:1     97:4
97:6   100:11    107:25
108:1   108:9    108:12
109:1   110:11   110:12
110:17  110:21   110:21
111:1   112:1    112:3

114:23  23:23    123:25
124:2   132:16   135:2
135:9   135:11   136:20
136:25  137:12   137:14
140:17  140:21   144:1
146:6   146:25   147:5
147:8   148:11   148:17
149:7   155:21   156:14
157:12  157:17   160:1
162:9   165:14   167:14
167:25  175:1    175:5
175:13  182:17   184:10
191:4   191:13   197:18
197:22  198:13   198:23
200:2   200:8    200:21
202:16  203:5    203:9
205:14  205:22   206:19
207:3   207:5    207:6
207:12  207:23   208:23
211:6   213:3    213:7
214:3
**state's** [7]      108:5
108:17  108:19   109:2
109:12  110:12   196:15
**statement** [30]      10:2
11:9   22:12     22:25
28:16   28:16    28:18
28:20   28:21    29:4
29:4   29:5      30:5
36:13   43:14    44:25
45:21   45:22    45:24
46:4   49:8      49:13
62:19   74:12    79:25
80:11   101:16   108:18
147:7   209:18
**statements** [4]      28:25
43:15   164:10   211:11
**states** [11]      1:1
7:19   13:3      19:16
28:22   30:3     34:10
43:19   58:6     75:8
166:24
**statewide** [2]      60:22
163:18
**stations** [1]      70:19
**status** [1]      189:6
**statutory** [1]  100:13
**stay** [3] 106:20   160:11
203:15
**Steel** [2] 2:7      4:9
**Stein** [3] 191:6   191:15
192:22
**stenographically** [1]
214:7
**step** [1] 48:24
**sticks** [1]      136:9
**still** [20] 18:14   59:12
69:25   87:2     107:8
111:23  113:20   114:21
117:22  119:16   124:9
139:18  144:18   144:19
145:13  156:18   160:22
171:11  179:18   201:3
**stolen** [6]      166:21
167:2   170:8    170:13
171:21  172:5
**stop** [10] 7:3      59:3
118:5   120:8    124:17
163:11  163:20   164:1
164:22  181:2

**stopped** [1]      168:2
**straight** [1]  96:24
**strain** [1]      68:21
**Street** [3]      1:14
4:16   74:10
**stroke** [1]      110:1
**strong** [2]      109:11
134:17
**structure** [2]  8:8
108:25
**structured** [1]      24:14
**struggling** [2]      39:22
141:16
**students** [6]      16:16
71:14   76:17    76:18
78:17   78:24
**studies** [1]      16:6
**styled** [1]      4:11
**sub** [2] 20:2      20:22
**subclasses** [1]      44:18
**subject** [6]      8:25
10:9   10:13     101:3
158:24  209:2
**subjects** [1]      99:18
**submitted** [4]      149:20
204:7   204:15   204:21
**subscribed** [1]  211:22
**subsequent** [5]      14:14
15:7   68:7      72:2
78:19
**subsequently** [1]
54:6
**substance** [1]      56:15
**substantial** [1]  58:4
**success** [1]      138:2
**successful** [5]      63:18
63:21   85:14    136:17
136:21
**successfully** [1]
140:20
**such** [10]      16:4
18:20   30:15    89:5
89:10   92:17    114:16
176:19  177:9    177:23
**sue** [12] 54:12   54:24
55:10   55:16    56:11
57:4   57:20     132:10
151:18  151:22   151:22
152:2
**sued** [6] 97:23   152:9
152:17  185:9    185:13
186:3
**suggest** [6]      50:11
51:11   51:17    51:19
52:9   79:24
**suggesting** [1]  111:9
**suggestion** [1]  50:1
50:19
**suggestions** [1] 142:7
**suggests** [2]      110:20
122:17
**suit** [4] 66:15   132:10
133:5   158:19
**summarized** [2] 10:24
150:10

**summarizing** [1]
102:18
**summary** [1]      88:16
**supervise** [1]  108:3
**supervision** [5] 16:4
126:25  127:15   129:7
132:1
**supervisor** [75]  2:11
2:16   2:19      3:2
10:8   45:7      60:12
61:6   61:8      61:12
62:25   63:4     69:9
70:14   94:1     95:17
95:18   95:25    107:2
109:4   112:8    115:1
115:10  115:24   116:1
116:8   116:9    121:7
123:10  124:14   124:16
124:23  126:8    126:17
126:20  126:23   127:3
127:7   127:19   127:24
128:3   128:21   129:2
129:4   129:9    130:19
130:25  131:3    131:17
131:18  142:4    142:6
172:18  172:19   172:22
173:25  175:10   176:1
176:6   176:18   177:8
178:4   179:24   182:5
182:10  184:1    184:3
188:8   188:15   189:1
189:21  191:23   193:2
193:11  193:21
**supervisors** [4] 55:11
112:13  123:22   151:19
**support** [9]      24:24
29:9   82:10     83:2
86:1   143:2     143:3
159:22  196:24
**supported** [6]      139:15
139:16  139:17   139:18
139:22  139:23
**suppose** [3]      115:17
122:25  143:15
**supposed** [5]      84:9
123:16  125:10   153:17
153:23
**Supreme** [4]      163:17
163:20  164:1    164:21
**surprisingly** [1]
166:11
**surrounding** [2] 127:20
172:21
**survey** [2]      89:13
166:10
**surveys** [2]      89:10
89:16
**Susan** [2]      2:11
10:7
**suspicious** [1]  73:7
**sworn** [3]      4:3
12:13   213:8
**system** [6]      61:19
71:12   90:16    93:7
95:14   118:2
**systems** [2]      95:12
95:19
**table** [1] 52:10
**takes** [2] 61:23   124:10

**taking [4]**  6:15
13:4   71:7   210:3

**Tallahassee [15]**
4:23   13:24   14:9
14:21   60:23   71:14
76:18   81:12   99:10
101:2   108:2   111:15
112:1   140:11   161:18

**Tampa [5]**   13:24
14:10   14:21   14:25
15:9

**target [1]**   146:9
181:8   181:11

**teacher [1]**   16:17

**teaching [1]**   16:20
16:21

**technical [1]**   198:9

**Technology [2]** 194:3
194:5

**telephone [1]**   52:16

**telling [6]**   36:4
70:20   73:25   117:13
164:22   176:11

**tells [1]** 23:7

**ten [1]**   201:20

**tentacles [2]**   106:7
109:23

**term [36]** 8:1   8:4
18:8   18:8   21:25
22:2   22:4   22:5
24:20   27:9   27:12
32:10   32:18   32:23
33:6   33:15   33:21
34:12   42:11   44:20
52:23   58:9   58:10
58:11   59:6   64:20
64:24   73:22   89:2
89:17   98:2   111:19
111:20   122:4   122:17
138:16

**terminology [1]** 7:14

**terms [16]**   7:24
18:20   22:2   25:1
26:13   44:14   46:10
84:23   85:4   85:19
103:23   105:2   108:22
122:4   122:19   173:3

**Terry [2]**   191:18
192:16

**tested [1]**   199:14

**testified [14]**   4:4
36:6   47:17   47:25
67:7   120:3   122:8
154:25   158:23   162:24
181:3   184:3   184:8
202:2

**testify [6]**   8:25
10:11   155:22   188:21
197:12   206:12

**testifying [2]**   54:23
88:17

**testimony [14]**   12:14
13:4   68:7   85:7
87:21   105:18   124:15
148:13   184:22   204:15
204:21   208:22   208:24
214:9

**thank [6]**   6:5

**Thanks [1]**   47:15

**themselves [3]**   38:15
38:16   48:18

**theory [1]**   128:3

**therefore [7]**   4:1
39:1   39:11   41:11
41:16   84:16   132:2

**therein [1]**   211:11

**thereof [1]**   201:21

**Thereupon [4]**   8:14
11:13   12:1   210:3

**thick [1]** 59:5

**thinking [6]**   8:2
8:5   15:17   60:20
92:5   196:3

**third [4]** 18:9   34:9
170:24   207:16

**thought [14]**   13:9
50:8   51:20   56:17
60:21   73:10   85:21
104:21   104:23   105:2
120:4   126:2   197:15
197:16

**three [15]**   22:1
22:6   24:10   41:24
42:15   43:10   43:11
70:13   73:9   107:23
119:5   154:21   155:18
162:6   162:9

**threshold [1]**   200:23

**through [70]**   4:4
7:11   7:16   8:22
9:1   10:12   10:13
17:9   20:17   26:11
26:13   29:17   35:4
36:10   36:13   37:2
37:16   37:21   39:4
39:13   40:19   41:18
44:11   48:21   53:3
53:7   53:22   54:3
54:11   55:9   55:15
56:10   57:3   57:19
63:13   64:4   67:6
68:18   68:19   70:18
73:12   82:9   82:13
84:1   84:3   84:22
85:13   91:7   97:5
107:25   124:9   125:10
135:2   141:16   143:2
146:6   150:9   154:24
155:8   156:24   162:19
170:14   187:21   187:23
199:13   199:14   199:15
202:16   203:5   207:23

**throughout [11]** 7:18
23:9   108:12   122:25
124:2   135:9   156:5
160:1   167:14   184:9
199:2

**thrown [2]**   75:25
76:3

**Thursday [1]**   1:15

**tied [1]** 91:9

**timed [1]**   119:5

**timely [3]**   176:7
176:19   177:9

**times [10]**   89:19

**97:16   100:17   100:19
101:23   125:18   161:22
162:2   162:7   162:9

**Tinkler [12]**   3:1
3:19   5:10   5:10
189:17   189:19   190:10
190:20   191:9   193:24
204:19   204:22

**tip [1]**   78:17

**tired [1]** 70:4

**tissue [1]**   17:5

**title [2]**   16:14   139:7

**today [22]**   7:11
8:16   8:20   10:4
10:11   10:18   23:24
25:20   42:12   54:22
69:17   87:21   88:17
99:18   121:4   140:3
148:1   185:19   198:6
205:21   206:12   209:15

**today's [2]**   11:2
12:8

**together [7]**   131:20
138:24   139:5   147:2
147:24   167:7   211:11

**tonight [1]**   132:8

**too [10]**   20:22   56:25
109:11   127:12   150:11
151:12   151:15   154:17
185:22   201:19

**took [8]**   32:16   67:4
84:24   136:25   154:20
171:25   185:18   185:19

**top [3]**   93:12   137:21
174:4

**topic [1]** 9:16

**topics [2]**   9:3
9:14

**Torres [3]**   2:11
10:7   10:7

**total [3]**   80:23   159:17
208:17

**totally [1]**   50:22

**touch [3]**   70:1
70:3   71:24

**touched [1]**   199:24

**tough [1]**   156:15

**towards [2]**   120:4
199:11

**town [1]** 158:8

**Tracy [3]**   2:16
4:21   45:6

**tradition [1]**   143:18

**traditionally [2]**
141:8   157:14

**train [1]** 107:7

**trained [3]**   120:17
124:12   125:8

**training [29]**   105:6
107:8   112:12   120:8
120:11   121:6   121:13
121:17   121:18   121:19
121:20   121:24   122:3
122:6   122:7   122:23
123:9   123:14   123:21
123:24   123:25   124:7
124:9   124:14   125:9

**125:1   125:13   153:9
202:24

**trains [1]**   94:5

**transcript [2]**   211:10
214:8

**transcription [1]**
214:9

**transplant [1]**   17:5

**travel [2]**   200:7
203:14

**traveled [1]**   56:24

**treated [13]**   83:10
83:16   86:16   86:23
87:6   87:13   87:14
87:16   87:16   87:17
119:7   120:24   154:22

**treatment [2]**   73:20
125:19

**tremendous [1]** 138:7

**tremendously [1]**
85:1

**Tri-City [1]**   17:22

**tried [3]**  35:8   72:3
85:5

**trouble [1]**   6:23

**true [9]**   62:18   114:19
114:20   117:25   140:23
169:17   172:15   211:13
214:8

**trustees [2]**   21:21
22:1

**truth [1]** 35:20

**truthful [3]**   118:13
166:1   166:2

**try [9]**   6:7   6:16
63:14   84:7   84:9
99:21   141:16   156:1
177:21

**trying [34]**   5:25
15:16   20:21   26:19
36:13   37:13   37:13
37:20   40:2   41:2
43:25   56:14   59:2
71:24   72:22   84:17
93:2   95:1   130:3
130:10   130:15   131:13
142:5   147:23   151:14
159:25   160:2   160:11
169:14   170:6   187:21
195:3   203:15   204:5

**Tuesday [4]**   9:8
69:5   72:18   155:23

**turn [7]**   17:9   27:25
39:24   48:25   50:5
67:9   132:7

**turned [2]**   164:9
168:23

**turnout [1]**   137:13
137:22

**turnouts [2]**   68:10
68:10

**two [16]**   9:8   9:21
18:8   18:20   34:18
34:25   69:21   69:24
96:18   119:3   123:7
165:10   172:6   187:12
198:20   209:10

**type [13]**   11:4   11:7
65:7   111:6   141:7
143:15   145:16   148:22
149:6   157:9   167:8
182:11   182:14

**types [3]**   134:23
149:25   150:19

**typical [1]**   141:4

**U.S [2]**   163:20   164:21

**uhm [16]** 80:9   80:9
98:3   98:3   105:13
105:13   117:3   117:3
117:18   117:18   141:1
141:1   147:20   147:20
184:15   184:15

**ultimate [2]**   107:15
111:14

**ultimately [10]** 68:14
72:5   72:25   73:1
79:23   93:12   111:4
128:4   155:13   155:14

**unable [16]**   35:9
35:15   38:11   38:25
39:11   41:11   41:16
47:3   47:6   47:8
47:13   66:11   66:23
76:20   78:14   80:12

**uncalled [1]**   49:25

**under [15]**   2:2
33:3   62:1   68:6
68:22   112:8   112:20
126:25   127:1   127:14
128:21   129:7   132:1
136:22   196:19

**undersigned [1]**
213:6

**understand [51]** 7:3
7:3   10:2   10:9
17:17   24:21   28:19
30:19   31:12   33:21
35:25   37:11   37:13
37:20   40:2   40:9
43:24   44:16   49:20
61:4   63:8   64:24
66:16   68:6   73:4
81:17   85:7   86:17
99:22   107:9   111:18
119:8   121:1   123:16
127:16   128:3   128:6
128:10   128:10   130:14
130:17   152:14   156:9
160:13   170:4   184:21
184:22   189:2   194:10
208:22   209:16

**understands [2]** 30:3
31:5

**understood [6]**   6:10
22:7   132:12   172:25
186:1   206:1

**unfamiliar [1]**   144:17

**uniform [5]**   109:14
123:24   124:2   124:3
124:4

**uniformity [1]** 108:12

**unit [35]**   8:5   8:9
19:11   19:22   19:24
21:14   24:23   24:25
25:1   25:3   25:8
25:9   26:4   26:20
26:21   27:7   27:19

27:21  27:24  27:25
28:7  28:9  67:9
67:12  99:12  132:16
133:5  158:7  200:20
201:1  201:3  205:22
206:6  206:7  206:10

**United** [5]  1:1
7:19  13:3  19:16
58:6

**units** [31]  7:18
7:22  19:16  19:19
20:2  20:2  20:9
24:14  25:9  25:13
25:19  25:23  26:3
26:16  26:18  28:24
34:6  36:1  36:6
49:10  57:9  57:17
68:12  102:9  135:7
146:6  146:11  200:18
200:22  205:14  206:8

**universities** [1] 16:19
**University** [1] 166:10
**unless** [2]  102:20
201:25

**unprecedented** [2]
135:13  135:17

**unusual** [3]  137:1
137:3  137:4

**up** [36]  20:2  26:16
48:17  49:3  52:12
63:12  74:24  81:11
92:16  99:11  103:17
103:18  107:21  107:22
116:5  116:14  117:25
118:9  119:1  121:3
123:10  124:15  125:5
135:13  135:25  138:4
140:25  141:3  141:20
150:21  155:8  156:7
156:9  160:20  195:3
206:23

**upset** [4]  71:17
73:23  105:10  119:6

**upsetting** [1] 136:14

**used** [16]  17:13
25:1  25:10  32:18
34:24  42:11  52:22
57:18  58:10  59:7
64:20  73:22  89:17
98:2  151:7  153:18

**user** [5]  100:18  101:24
101:25  102:1  198:9

**using** [6]  32:10
33:4  34:12  52:23
110:9  168:8

**usually** [2]  126:14
208:4

**utilize** [2]  31:9
90:17

**Vagueness** [2] 194:9
195:21

**validated** [1]  47:14

**varied** [1]  136:7

**various** [20]  13:18
13:19  16:18  26:25
31:9  33:11  45:2
49:9  80:3  89:4
89:21  100:11  106:7
136:7  139:5  146:10

**vehicle** [2]  71:12
71:12

**Vehicles** [11]  81:14
82:2  82:11  82:17
85:17  85:20  87:3
87:6  88:3  88:19
150:8

**venture** [1]  206:9

**verbal** [2]  6:23
6:25

**verbally** [1]  10:24

**verify** [2]  90:13
118:20

**verifying** [1]  90:8

**versus** [1]  4:11

**vestiges** [1]  29:7

**via** [1]  9:6

**vice** [2]  18:19  21:21

**view** [1] 111:4

**violated** [1]  154:19

**violations** [1] 82:25

**visited** [1]  67:3

**visiting** [2]  161:19
161:19

**vividly** [1]  47:11

**voice** [1]  5:25

**voices** [3]  69:21
73:22  74:1

**volume** [1]  5:24

**volunteer** [2]  122:16
124:6

**volunteering** [2]
70:5  159:19

**volunteerism** [1]
84:24

**volunteers** [16]  93:16
93:21  93:23  93:24
122:8  122:9  122:10
122:12  122:13  122:17
122:22  126:16  135:3
142:5  156:14  159:23

**VOLUSIA** [1]  2:18

**vote** [114]  35:8
35:14  35:15  36:7
38:10  38:11  38:18
38:24  39:1  39:11
41:11  41:17  47:1
47:3  48:1  48:4
48:5  48:8  59:10
59:19  59:25  61:14
62:4  63:9  65:21
66:11  66:22  69:8
69:11  69:17  69:18
70:1  70:15  70:16
72:17  72:23  72:25
73:1  74:3  76:2
76:3  76:20  78:8
78:13  80:12  84:2
84:13  84:18  84:19
84:16  86:4  92:19
94:15  96:5  96:6
96:11  96:21  97:1
97:7  107:14  107:18
110:3  110:4  110:4
116:7  117:1  117:13

118:7  118:10  118:13
121:5  125:17  125:23
132:23  135:14  136:16
140:12  146:10  146:21
150:4  150:5  154:1
154:4  154:21  154:24
155:7  155:9  155:13
156:4  156:24  157:5
163:11  165:8  166:15
170:10  170:11  171:9
171:19  171:20  172:2
172:5  172:13  172:23
177:10  177:24  180:1
183:16  183:19  196:17
197:24  199:10  199:15
202:24  204:1

**voted** [7]  72:5
72:7  126:5  165:15
166:13  167:20  185:24

**voter** [101]  38:24
39:6  39:10  39:14
41:1  41:7  41:9
41:15  59:8  59:15
59:15  60:16  60:18
65:5  65:8  65:15
66:6  66:12  66:24
67:20  67:24  68:10
75:1  75:8  75:16
75:18  76:1  76:4
76:21  77:6  77:14
77:19  77:20  77:22
78:5  78:14  79:3
82:25  84:3  84:5
85:5  86:5  92:7
92:19  92:19  92:20
96:15  96:15  105:11
105:12  110:2  113:25
114:25  115:2  117:5
126:14  134:25  135:1
128:3  137:13  137:22
138:3  138:7  140:17
140:20  141:2  141:3
141:19  142:1  142:9
142:22  156:12  156:17
157:22  158:12  159:25
173:21  174:15  174:21
174:22  176:6  176:18
177:8  181:14  181:17
183:15  183:17  194:19
196:8  196:15  197:9
202:2  202:7  202:17
202:23  202:24  203:16
203:18  207:24  208:8
208:25

**voter's** [3]  47:1
60:2  61:7

**voters** [71]  35:7
38:20  45:14  45:17
46:8  46:21  47:8
48:10  58:4  58:7
58:8  59:12  59:13
60:24  60:25  62:10
64:2  64:22  66:5
68:13  68:13  74:13
74:14  74:16  74:17
74:22  75:2  75:9
75:18  76:6  79:11
79:17  87:20  90:8
90:14  92:9  96:20
97:7  112:3  114:5
114:6  130:9  130:20
135:14  135:20  136:16
140:21  141:14  144:5

**voters'** [1]  176:2
**votes** [2] 58:5  75:25
**voting** [24]  32:16
44:7  55:7  55:7
68:13  69:5  80:13
92:15  95:4  103:19
106:12  108:22  110:16
110:16  111:6  119:6
121:11  134:8  135:5
140:16  144:4  150:5
156:2  175:11

**vouchers** [1]  134:4
**VS** [1]  1:8
**W** [1]  2:8
**Waas** [8]  2:21
3:17  4:22  4:22
81:7  81:9  81:10
88:23

**wait** [7]  6:18  50:21
69:23  119:19  119:22
119:22  119:24
**waited** [3]  51:9
69:24  70:13
**waiting** [3]  69:25
70:4  119:2  119:14
119:17
**waived** [1]  214:11
**wakes** [1]  121:3
**Wallace** [2]  191:24
192:20
**wanting** [1]  118:10
**wants** [1]  9:2
**Washington** [1] 89:20
**watch** [1]  127:1
**ways** [2] 46:24  86:13
**week** [2] 170:24
**weekend** [2]  142:2
157:20  157:23
**weeks** [2]  14:16
135:8
**Wells** [2]  190:16
192:11
**wheel** [1]  155:10
**white** [1]  178:19
178:25
**whole** [13]  28:18
36:15  56:20  58:21
58:22  72:2  95:16
109:23  110:25  156:16
160:10  161:2  185:18
**wide** [1] 202:14
**William** [2]  2:18
5:2  65:13
**WILLIAMS** [1]
2:13
**Willie** [3]  191:6
191:15  192:22
**window** [1]  50:25

**wise** [1]  56:2
**wish** [1]  133:7
**within** [11]  20:6
20:11  23:12  26:3
71:19  96:20  96:25
176:16  201:18  202:15
208:4
**without** [5]  40:17
61:2  173:11  173:21
198:19
**witness** [26]  4:3
5:13  6:7  6:9
11:15  12:5  45:13
45:15  50:4  50:5
50:11  50:11  50:12
50:24  50:25  51:4
51:6  52:18  64:15
112:20  119:9  190:19
209:19  210:2  213:10
214:10
**witnesses** [3]  10:1
51:18  209:9
**won** [2]  165:3  166:6
**wondered** [1]  72:13
**word** [3] 58:18  125:25
154:2
**words** [10]  19:23
27:2  27:10  41:9
46:6  60:16  60:22
117:19  123:24  175:16
**worked** [8]  16:18
68:9  68:22  84:3
101:24  131:20  139:4
199:18
**worker** [25]  94:18
105:10  107:1  107:12
107:17  117:11  117:23
117:24  118:11  118:17
120:7  120:8  120:13
121:2  121:6  121:13
122:2  122:6  123:9
123:14  123:21  123:25
124:24  126:2  153:9
**worker's** [2]  117:9
117:10
**workers** [18]  93:19
93:20  94:5  105:6
106:21  107:6  112:13
112:14  118:15  118:19
120:15  121:19  121:24
122:9  123:10  124:20
128:8  153:7
**workshop** [2]  100:23
101:4
**workshops** [5]  100:11
100:17  102:6  102:10
102:18
**world** [2]  104:22
148:20
**worst** [1]  115:21
**worth** [1]  160:10
**write** [1] 201:15
**writing** [3]  10:24
49:10  98:12
**written** [6]  15:13
35:18  45:2  74:24
87:11  97:14
**wrong** [6]  86:18

130:6    148:5    174:1
194:8    195:19

**wrongfully [22]** 38:20
38:24    47:18    58:7
58:9     58:14    59:7
62:9     64:1     66:12
66:24    67:6     67:20
67:24    74:13    74:16
113:25   114:5    174:15
174:22   175:10   176:1

**wrote [2]**            15:17
133:16

**yard [1]** 158:12

**year [14]** 18:9      22:2
22:3     22:6     27:4
27:12    27:13    122:3
122:4    122:5    156:25
158:2    158:3    207:16

**year's [2]**          141:22
207:4

**years [18]**          18:8
22:2     122:25   123:4
123:7    131:20   135:18
137:11   137:24   140:19
157:12   157:16   157:16
158:16   199:16   201:14
201:20   207:11

**yet [3]**    48:7     62:22
118:21

**York [2]** 89:19     97:16

**yourself [3]**        45:4
154:13   154:14

**youth [9]**           20:3
20:4     20:9     22:8
23:8     24:9     25:7
25:12    200:24