UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 01-120-CIV-GOLD/SIMONTON

**NIGHT BOX**
**FILED**

JUL - 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

--------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

        Plaintiffs,

   vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

--------------------------------------------------x


EXHIBITS TO DECLARATION OF ANGELA CICCOLO, ESQ.
IN SUPPORT OF PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT


**VOLUME VI**

**EXHIBITS 32-47**



<u>**NAACP v. Harris, 01-120-Civ-Gold/Simonton**</u>

**Exhibits to Declaration of Angela Ciccolo, Esq. in Support of its Motion for Summary Judgment**

<u>**Table of Exhibits**</u>

<u>**Declarations & Affidavits**</u>

1. Declaration of Noni Jones
2. Declaration of Dr. Henry Flores
3. Affidavit of Ursula Y. Harvey
4. Affidavit of Dr. Ronald Hayduk
5. Declaration of Joanna Clark
6. Declaration of Lorine Walden
7. Declaration of Wallace McDonald
8. Declaration of Ronald Ketterer
9. Declaration of Luis Figueroa
10. Declaration of Theresa James
11. Declaration of Jakelin Green

<u>**Deposition Transcripts and Excerpts**</u>

12. Deposition of George Bruder
13. Deposition of Dick Carlberg
14. Deposition of Julia Stoner
15. Deposition of John Stafford
16. Deposition of Linda Tanko, Volume I
17. Deposition of William Cowles
18. Deposition of Sandra E. Peloquin, Volume I
19. Deposition of Sandra E. Peloquin, Volume II
20. Deposition of Dr. Henry Flores
21. Deposition of Emmett Mitchell, IV (May 20, 2002)
22. Deposition of Janet Modrow (October 22, 2001)
23. Deposition of Janet Modrow in *Johnson v. Bush,* Case No. *00-3542-CIV-King* (December 3, 2001)
24. Deposition of Marlene Thorogood (October 18, 2001)
25. Deposition of Janice Kelly (March 25, 2002)
26. Deposition of Joanna Clark (January 28, 2002)
27. Deposition of Gary E. McIntosh (June 4, 2002)
28. Deposition of Edward C. Kast (May 21, 2001)
29. Deposition of Deanie Lowe
30. Deposition of Pam Iorio (May 6, 2002)
31. Deposition of Adora Nweze
32. Deposition of Deborah Sue Berlinger

33. Deposition of Kandy Wells
34. Deposition of Shirley Rivers-Edwards (May 23, 2002)
35. Deposition of Rondrick Rose
36. Deposition of John Bowman (May 21, 2002)
37. Deposition of Admatha Israel
38. Deposition of David Leahy (May 24, 2002)
39. Deposition of Placide Dossous (January 28, 2002)
40. Deposition of Jermaine Terry (February 1, 2002)

## Responses to Requests for Production of Documents & Interrogatories

41. Defendant's Secretary of State Katherine Harris and Clay Roberts' Objections and Answers to Plaintiff's First Set of Interrogatories
42. Defendant Choicepoint's Responses to Plaintiffs' First Set of Interrogatories
43. Defendant John Stafford's Response to Plaintiff's First Request for Production of Documents
44. Defendant Iorio's Objections and Responses to Plaintiffs' First Set of Document Requests and Interrogatories
45. Defendant Iorio's Objections and Responses to Plaintiffs' Second Set of Document Requests and Interrogatories
46. Defendant David Leahy's Response to Plaintiffs' First Set of Interrogatories
47. Defendant David Leahy's Response to Plaintiffs' Second Set of Interrogatories
48. Defendant Miriam Oliphant's Responses to Plaintiffs' First Set of Interrogatories
49. Defendant Deanie Lowe's Answers and Objections to Interrogatories
50. Defendant Deanie Lowe's Answers to Plaintiffs' Second Set of Interrogatories and Document Request
51. Defendant William Cowles' Response to Plaintiffs' First Set of Document Requests and Interrogatories
52. Defendant William Cowles' Responses to Plaintiffs' Second Set of Interrogatories
53. Defendant Kearney's Response to Plaintiffs' First Set of Interrogatories
54. Defendant Kearney's Response to Plaintiffs' Documents Requests
55. Defendant Kearney's Response to Plaintiffs' Second Set of Requests for Documents
56. Defendant Kearney's Response to Plaintiffs' Second Set of Interrogatories
57. Defendant Kearney's Second Supplemental Response to Plaintiffs' First Set of Interrogatories
58. Defendant Dickinson's Responses to Plaintiffs' First Set of Interrogatories and Request for Production of Documents

## Expert Witness Reports

59. Expert Witness Report of Gary McIntosh
60. Expert Witness Report of David Klausner
61. Expert Witness Report of Dr. Henry Flores
62. Supplementary Expert Witness Report of Dr. Henry Flores
63. Rebuttal Expert Witness Report of Ronald Hayduk

## Memoranda

64. Memorandum from Ethel Baxter, Division Director, Florida Department of State to All Supervisors of Elections dated June 4, 1999 re: Central Voter File
65. Memorandum from Bill Hanson, Acting Chief, Benefit and Recovery and Special Programs, to Michael Spellman, Office of the Governor, dated February 9, 1995.
66. Memorandum from Carol Canady, Senior Human Service Program Specialist to Operational Program Administrators, Public Assistance Specialist supervisors, Clerical Supervisors dated January 8, 2002

## Tables, Charts & Other Relevant Information

67. Select Consent Judgments from Voting Rights Litigation Involving Florida Counties
68. Certified Copy of Wallace McDonald's Criminal History from the Florida Department of Law Enforcement
69. Select Historic Racial Discrimination in Florida, Post-1864 State Statutory Provisions
70. Senate Report No. 103-6, Establishing National Voter Registration Procedures for Federal Elections, and for Other Purposes
71. Florida Voter Registration Application Form (Nazyle Rios)
72. DCF Voter Registration Preference Form  (A039569)
73. DCF Voter Registration Preference Form (A039122)
74. E-mail Janet DeChristopher, 4/29/02 (A045949)
75. E-mail from Donna Miller to Greg Ferguson, 10/30/2001 (A040811)
76. E-mail from Robert Baker to Carol Canady (A040618-A040619)
77. E-mail from Janice Miller to Norene Moore dated 8/29/01 (A045943-A045944)
78. E-mail from Roseann Liriano to Carol Canady dated 1/09/02 (A040620)
79. E-mail from Norene Moore to Greg Ferguson dated 8/29/2001 (A039027)
80. Letter to Greg Ferguson from Donna Miller dated September 19, 2002 ( A039025-A039026)

## Miscellaneous

81. Data Processing Services Agreement between Database Technologies ("DBT") & the State of Florida, Department of State, Division of Elections (the "Division")
82. Central Voter File Data Processing Services Agreement between the Division and DBT
83. Clerk Feedback Forms, Hillsborough County, 2000
84. 2000 General Questionnaires, Volusia  County
85. Michael T. Lavin's Voter Registration Complaint filed November 10, 2000
86. Letter from Veronica Koval to DCF dated October 30, 2001
87. Letter from Scott Petullo to Ms. Carroll dated November 9, 2000
88. Letter from Veronica Koval to Ed Kast dated September 10, 2001

**PLAINTIFFS' EXHIBIT 32**

3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 01-0120-CIV-GOLD

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
by its FLORIDA STATE CONFERENCE OF
BRANCHES, JIMMIE PANNELL, JULIA STONER,
NATALIE CARNEGIE, JOHN L. CHEEVER,
JAMES MARSHALL, LILLIE Q. ODOM,
WILLIE STEEN, WALLACE MCDONALD,
JERMAINE TERRY, LORINE WALDEN, EMERY
TIMBERLAKE, VALERIE BUFORD, MICHELLE
FLOYD, CONSUELO MARIA GRAHAM, SHERRY
EDWARDS, KANDY WELLS, JOANNA CLARK,
JANICE KELLY, PLACIDE DOSSOUS,
RONDRICK ROSE, URSULA HARVEY and
ADMATHA ISRAEL, in their own right
and as representatives of all
similarly situated citizens and
residents of the State of Florida
                Plaintiffs,
vs.
KATHERINE HARRIS, Secretary of
State of Florida; CLAY
ROBERTS, Director of Florida
Division of Elections; DAVID
C. LEAHY, Miami-Dade County
Election Supervisor; MIRIAM
OLIPHANT, Broward County
Election Supervisor; JOHN
STAFFORD, Duval County
Election Supervisor; PAM
IORIO, Hillsborough County
Election Supervisor; WILLIAM
COWLES, Orange County Election
Supervisor; and DEANIE LOWE,
Volusia County Election
Supervisor (all in their
official capacities); and
CHOICEPOINT, INC., a Georgia
corporation, d/b/a DATABASE
TECHNOLOGIES, INC.,,
                Defendants.
_____/

DEPOSITION OF:          DEBORAH SUE BERLINGER



APPEARANCES:

REPRESENTING PLAINTIFFS:

JUDITH A. BROWNE, ESQUIRE
MONIQUE L. DIXON, ESQUIRE
ADVANCEMENT PROJECT
1730 M Street, NW, #401
Washington, D.C. 20036

REPRESENTING DEFENDANT DMV, DICKINSON,
KEARNEY, DEPARTMENT OF CHILDREN & FAMILIES:

DOUGLAS B. MacINNES, ESQUIRE
ATTORNEY GENERAL'S OFFICE
107 W. Gaines Street
Tallahassee, FL 32399
REPRESENTING DEFENDANT CHOICEPOINT, INC.:

THOMAS W. WHITE, ESQUIRE
ADORNO & ZEDER
2601 S. Bayshore Drive, #1600
Miami, FL 33133
305-858-5555

REPRESENTING DEFENDANT HARRIS, ROBERTS:

ALVIN F. LINDSAY, III, ESQUIRE
STEEL HECTOR DAVIS
200 S. Biscayne Blvd.
Miami, FL 33131
305-577-7000

REPRESENTING DEFENDANT DAVID LEAHY:
(by phone)
JEFFREY P. EHRLICH, ESQUIRE
Dade County Attorney's Office
111 NW 1st Street, #2810
Miami, FL 33128
305-375-5151

4

APPEARANCES (continued)

REPRESENTING DEFENDANT JOHN STAFFORD:
(by phone)
TRACEY I. ARPEN, JR., ESQUIRE
General Counsel
City of Jacksonville
117 W. Duval Street, #480
Jacksonville, FL 32202

DEPOSITION OF:          DEBORAH SUE BERLINGER

TAKEN AT THE INSTANCE:  The Plaintiffs

DATE:                   May 20, 2002

TIME:                   Commenced at 9:00 a.m.
                        Concluded at 12:25 p.m.

LOCATION:               107 West Gaines Street,
                        #435
                        Tallahassee, FL

REPORTED BY:            SANDRA L. NARGIZ
                        Certified Realtime Reporter

17

1  Elections, Division of Elections was involved?
2     A   I can remember a couple of people. One would
3  be Dot Joyce who was the division director of Division
4  of Elections at the time.
5        And the other person was Sam Chavers. I
6  believe he was an attorney for the Division of
7  Elections. Those are the only two that I remember. I
8  am sure there were others.
9     Q   Were there certain supervisors of elections
10 that were on this task force?
11    A   Yes, there were.
12    Q   Do you remember any?
13    A   I can remember three of them; that would be
14 David Leahy of Miami-Dade County; Jackie Winchester,
15 former Supervisor of Elections in Palm Beach County; and
16 the Pasco County supervisor which I believe is Kurt
17 Browning.
18       MS. ARPEN: Joining, Tracy Arpen,
19       representing Duval County supervisor, John
20       Stafford.
21 BY MS. BROWNE:
22    Q   I am sorry, so you said Kurt Browning from
23 Pasco County?
24    A   Uh-huh. K-u-r-t.
25       MS. BROWNE: For you all, we have another

18

1     person who entered the room.
2        MR. LINDSAY: Alvin Lindsay, I represent the
3        Secretary/Director, Steel Hector and Davis.
4  BY MS. BROWNE:
5     Q   Okay. Can we talk some about the
6  implementation. You said you designed the process. Tell
7  me the process that you designed to implement.
8     A   Very much similar, if not like the current
9  process in that customers are questioned, we inquire
10 what their needs are. Those needs are anything from a
11 type of license to advising them what type of test they
12 have to take, verifying documents of identification.
13       And once the process -- the application is
14 actually going to become a driver's license or
15 identification card, we then ask if they would like to
16 make an application to vote or make a change to an
17 application. And with an affirmative answer of some
18 sort, then simultaneously we produce the license and a
19 voter registration card.
20    Q   Okay. I am going to be tedious about this.
21    A   That's all right. I don't know what -- how
22 much you want.
23    Q   Okay. Now this is pre-2000, this is back when
24 you were designing the process?
25    A   Uh-huh.

19

1     Q   Walk me through the process. I walk into a
2  motor vehicle office to get a license and what happens?
3     A   I was wondering if I have any documents here
4  to show you the screens.
5     Q   Tell me first.
6     A   We verify your eligibility. And you are
7  asking everything?
8        We verify your eligibility on a computer
9  check through our database to find out if your driving
10 privilege is valid or invalid.
11       Assuming it's valid, we confirm you have all
12 the documents you need to identify yourself, and
13 certainly ask if you are prepared to take any of the
14 exams that might be required.
15       Once all of that is established as to what
16 type of license you are applying for and what exam is
17 required, and you are affirmative that you are ready to
18 do that, we start the process with an eligibility
19 inquiry on our field program known as the Florida
20 Driver's License Information System. Acronym or
21 initials or FDLIS, you may see that in some of the
22 documentation, that we just call it FDLIS to be easier.
23       Through this process of checking vision
24 acuity, asking questions about prior licensing, have
25 you ever been revoked, suspended, denied; asking

20

1  questions about mental competency, medical competency
2  including whether you are addicted to drugs, alcohol,
3  or ever suffered from epileptic seizures or fainting
4  spells. We ask if you are a citizen of the United
5  States, and we ask if you are a resident of Florida.
6        Getting a positive answer to all those, we
7  continue to the next screen; those being then we
8  document what you presented, what you have said. And
9  just before the final phase of the examiner finishing
10 the licensing screen, their Motor/Voter phase is now on
11 their screen for them, of which then they must inquire
12 of the customers if they would like to make an
13 application to vote or make changes to the voter
14 registration.
15    Q   Let me ask you, back in '94 when you are
16 designing this, did the screen that popped up actually
17 have the question for the examiner to ask?
18    A   I don't believe it did. I would have to look
19 at the screen. I don't think it's on the current screen
20 that there is a -- they cannot leave that screen without
21 making a choice. You could try to go forward to the
22 next phase, clicking okay, all day, it will not let you
23 do that until you make a vote registration choice.
24 That's their prompt and the reason we did not put a
25 question.

SHEET

**21**

1  Q  So it's the examiner, I take it, that that's
2  the title of the person who is doing it?
3  A  Yes, it's driver's license examiner.
4  Q  So that person then asks if you would like to
5  make an application to vote or make changes.  And then
6  what happens after that?  If I say yes, what happens
7  after that?
8  A  We select, we find out first off if you
9  currently are registered in that county and if you are
10  not registered in that county, we would select new, or
11  else we would probably make a change, choose a change.
12  If you had not registered in that county, it
13  would be a new registration.
14  The electronic process then produces the
15  screen version of the voter registration application
16  with everything that it already knows about me, filled
17  in, prefilled.  There are various pieces of data that
18  are required in addition to what is needed for a
19  driver's license the examiner must capture.
20  If they are required and absolutely required
21  to be on that form, there is an edit that you cannot
22  continue unless you complete that field.
23  Q  If I had said to the person no, that I don't
24  want to register, then what would happen?
25  A  One of two choices would be selected off of

**22**

1  the screen.  One is currently registered, which is still
2  a decline or just an outright decline.  No, I don't want
3  to do that, period.
4  Some people will say they are already
5  registered, so we'll mark it.
6  Q  And does already "registered show" up, is it in
7  the box called "already registered" or in a box called
8  "decline?"
9  A  It's in a box called "currently registered."
10  We lump those together as declines.
11  Q  This has been the case since prior to -- back
12  in '94 when you designed it?
13  A  Yes, sir.
14  Q  And if I said yes and we filled out these other
15  questions, then what happens to complete the whole
16  process?
17  A  From that point, once I filled out the
18  requirements of the voter registration screen, those
19  requirements again are -- any mandatory fields, those
20  are completed, we click on the okay, we finish the
21  licensing question process.
22  Then we do one of two things.  We either do a
23  one-step process that allows me to update the person's
24  record and cause the voter registration application to
25  be printed, I can do that at my station if I am a

**23**

1  one-step operation.
2  But from a two-step operation, I would then
3  send the person to station number 2, which would finish
4  the process, cause the record to be updated, collect
5  the money and that particular action causes the voter
6  registration form to be printed.
7  Q  The payment you are saying causes it to be
8  printed?
9  A  The update to the record, which is the
10  payment, the update to the record and queue the
11  application to be printed, those all happen at the same
12  time when they hit the final okay button.
13  Q  In the case of the one-step operation, do you
14  know back in '94 how many offices would have been
15  one-step versus two-step operations?
16  A  I would almost venture to say none were
17  one-step back then, even though the ability was there.
18  I don't know the exact date and time that our management
19  implemented or asked that the one-step be tried in our
20  offices for efficiency.  That's '95, '96, or '97.  I
21  don't know.  I don't remember.  Both options were there
22  in '94 as are there in 2002.
23  Q  I am sorry.  So you were saying that the
24  one-step, more of them have become one-step operations
25  than prior to '94?

**24**

1  A  It would be a guess to say that.
2  Q  If it was a one-step operation, the license,
3  both the license and the application would print at that
4  station?
5  A  No.
6  Q  What would happen?
7  A  The only way to get the license finished is to
8  have your image and signature captured at a system
9  called the Digital Imaging System, a DIS.  That's at the
10  end of the process.  Whether I am a one-step or
11  two-step, I must be referred to that person or that
12  station to have those two items captured and then the
13  production of a driver's license would take place from
14  there.
15  Q  Okay.
16  A  Voter registration form, understand offices
17  have set it up two ways.
18  One is where I am being processed prior to
19  having the cashier work and update and image capture,
20  that a printer is in that vicinity, which I can then
21  get the card, bring it back and administer the oath and
22  obtain the person's signature.
23  Q  Okay.
24  A  Other offices put their printer at the end of
25  the process, which is when you get your image captured

**PLAINTIFFS' EXHIBIT 33**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-CIV-120-GOLD
Magistrate Judge Simonton

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE PANNELL, JULIA
STONER, NATALIE CARNEGIE, ERMA J. KELLY, JOHN L.
CHEEVER, JAMES MARSHALL, LILLIE Q. ODOM, WILLIE
STEEN, WALLACE McDONALD, JERMAINE TERRY,
LORINE WALDEN, EMERY TIMBERLAKE, VALERIE
BUFORD-WELLS, MICHELLE FLOYD, CONSUELO MARIA
GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA
CLARK, JANICE KELLY, PLACIDE DOSSOUS, RONDRICK
ROSE, and URSULA HARVEY, in their own right and as
representatives of all similarly situated citizens
and residents of the State of Florida,

　　　　　Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY
ROBERTS, Director of the Florida Division of Elections;
FRED DICKINSON, Executive Director of the Florida
Department of Highway Safety and Motor Vehicles; KATHLEEN
A. KEARNEY, Secretary of the Department of Children and
Families; DAVID C. LEAHY, Miami-Dade County Election
Supervisor; MIRIAM OLIPHANT, Broward County Election
Supervisor; JOHN STAFFORD, Duval County Election
Supervisor; PAM IORIO, Hillsborough County Election
Supervisor; ION SANCHO, Leon County Election Supervisor;
and DEANIE LOWE, Volusia County Election Supervisor (all
in their official capacities); and CHOICEPOINT, INC., a
Georgia corporation d/b/a DATABASE TECHNOLOGIES, INC.,

　　　　　Defendants.
_____/

**DEPOSITION OF:**　　　　　**KANDY WELLS**





**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE　　　TAMPA, FLORIDA 33602
401 EAST JACKSON STREET　　　　　(813) 229-7207
SUITE 2220

of the tags?

A.      Brandon.  The Brandon tag office.

Q.      Okay.  And have you ever had experience trying to register to vote at the Department of Children and Families?

A.      I've been to the Department of Children and Families a couple times and I don't ever recall anyone asking me if I was a registered voter or if I would be interested.  I don't even recall seeing any paper work because I was just there the 28th of January of 2002.  I wasn't asked.  I had an appointment.  I wasn't asked.  I wasn't shown any paper work, nothing.

MS. BORGEN:  Okay.  No further questions.

MR. MAC INNES:  I have some.

RECROSS-EXAMINATION

BY MR. MAC INNES:

Q.      When did your husband go to update the tags on the vehicles?

A.      January of 2002.

Q.      So this month?

A.      This month.

Q.      Where did he go?

A.      Brandon tag office.

Q.      You didn't go with him, did you?

A.      No.



## BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE  •  TAMPA, FLORIDA 33602
401 EAST JACKSON STREET        (813) 229-7207
SUITE 2320                     FAX (813) 229-7107

1    Q.    And when did you visit a DCF office?

2    A.    I just had an appointment the 28th January of

3    2002.

4    Q.    And where did you go?

5    A.    Brandon.

6    Q.    Can you give me an address?

7    A.    Ware Boulevard.  I don't know the physical

8    address.

9    Q.    And what did you go there for?

10   A.    We have-- my husband and I have parental

11   guardianship of my nine-years-old niece and she's receiving

12   Medicaid and a monthly check.  And we were having the file

13   transferred from Plant City to Brandon.

14   Q.    Do you recall who you saw there?

15   A.    There were two ladies sitting in the front when

16   I filled out the initial application.  And my caseworker

17   is-- I can't recall her name.  She has a strange spelling

18   to her name.  But i will be on file and my caseworker's

19   name will been on the file also.

20            MR. MAC INNES:  No further questions.

21            MR. TINKLER:  Okay.  Do you want to explain

22       read or waive?

23            MS. BORGEN:  We'll read.

24            (WHEREUPON, THE TAKING OF THE DEPOSITION

25   WAS CONCLUDED AT 12:07 P.M.)



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   •    TAMPA, FLORIDA 33602
401 EAST JACKSON STREET                (813) 229-7207
                              •      FAX (813) 229-9498

FORM 2

# PLAINTIFFS' EXHIBIT 34

2002

- - - - -

DEPOSITION
OF

SHIRLEY RIVERS-EDWARDS


- - - - -

Fort Lauderdale, Florida
May 23,
9:30 o'clock A.M.

APPEARANCES:
ADVANCEMENT PROJECT
By:  MONIQUE L. DIXON, ESQ.
and JUDITH A. BROWNE, ESQ.
Appearing on behalf of the Plaintiffs

OFFICE OF THE ATTORNEY GENERAL
By:  DOUGLAS B. MACINNES, ESQ.
Appearing on behalf of the Defendants/
Fred Dickinson, Executive Director of
the Florida Department of Highway
Safety and Motor Vehicles and
Kathleen A. Kearney, Secretary of the
Department of Children and Families
STEEL, HECTOR & DAVIS, LLP
By:  WALTER JAMES HARVEY, ESQ.
Appearing on behalf of the Defendants/
Katherine Harris, Secretary of State
of Florida, and Clay Roberts,
Director of the Florida Division
of Elections

ESQUIRE REPORTING SERVICES

34

1     Q     Do you know how many others were held?

2     A     No, I would be guessing if I told you.

3     Q     So you said this was about three months

4  ago; correct?

5     A     Yes.

6     Q     And do you remember whether there was any

7  other training that you received from that first

8  training where you don't recall the dates, maybe

9  '95, maybe '96, until the briefing that you received

10  three months ago?

11     A     Not to my knowledge.

12     Q     Prior to this training that you received

13  three months ago, had you been offering clients

14  voter registration?

15     A     Yes.

16     Q     And what did you do to offer them voter

17  registration?

18     A     I asked them if they was interested in

19  registering to vote.

20     Q     And then?

21     A     Give them the form.

22     Q     Give them the voter registration form?

23     A     Give them -- if they decline they check

24  no.

25     Q     And where would you get this form from?

ESQUIRE REPORTING SERVICES

35

1   A    We have them in our office.

2   Q    Where do you keep yours, in your office?

3   A    On my book shelf.

4   Q    So from 1999 when you went to the Sample

5   Road office to the present have you always had those

6   forms on your book shelf?

7   A    Not on my book shelf but, you know, within

8   whenever we interview because I don't interview at

9   all times.  Whenever the seniors are required to

10  interview we set up all forms on a table and as we

11  need them we get them.

12  Q    So from 1999 through the present you have

13  always had that form available when you interviewed

14  clients?

15  A    Yes.

16  Q    And let me ask you this.  Have you given

17  that form to every client that you have met with

18  from 1999 through the present?

19  A    To my knowledge.

20  Q    And what do you do with that form once

21  it's been filled out?

22  A    Put it in my supervisor's office.

23  Q    Do you put that in the supervisor's office

24  with all other forms?

25  A    Those particular forms?

ESQUIRE REPORTING SERVICES

**PLAINTIFFS' EXHIBIT 35**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-CIV-120-GOLD
Magistrate Judge Simonton

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE PANNELL, JULIA
STONER, NATALIE CARNEGIE, ERMA J. KELLY, JOHN L.
CHEEVER, JAMES MARSHALL, LILLIE Q. ODOM, WILLIE
STEEN, WALLACE McDONALD, JERMAINE TERRY,
LORINE WALDEN, EMERY TIMBERLAKE, VALERIE
BUFORD-WELLS, MICHELLE FLOYD, CONSUELO MARIA
GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA
CLARK, JANICE KELLY, PLACIDE DOSSOUS, RONDRICK
ROSE, and URSULA HARVEY, in their own right and as
representatives of all similarly situated citizens
and residents of the State of Florida,

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY
ROBERTS, Director of the Florida Division of Elections;
FRED DICKINSON, Executive Director of the Florida
Department of Highway Safety and Motor Vehicles; KATHLEEN
A. KEARNEY, Secretary of the Department of Children and
Families; DAVID C. LEAHY, Miami-Dade County Election
Supervisor; MIRIAM OLIPHANT, Broward County Election
Supervisor; JOHN STAFFORD, Duval County Election
Supervisor; PAM IORIO, Hillsborough County Election
Supervisor; ION SANCHO, Leon County Election Supervisor;
and DEANIE LOWE, Volusia County Election Supervisor (all
in their official capacities); and CHOICEPOINT, INC., a
Georgia corporation d/b/a DATABASE TECHNOLOGIES, INC.,

        Defendants.

_____/

            **DEPOSITION OF:**        **RONDRICK ROSE**





**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   ●   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET         (813) 229-7207
SUITE 2320     ●   FAX (813) 229-8498

TAKEN:                    Pursuant to Notice by
                           Counsel for Defendant
                           Hillsborough County

DATE:                     January 31, 2002

TIME:                     2:02 - 3:29 p.m.

PLACE:                    OFFICE OF COUNTY ATTORNEY
                          Main Conference Room
                          27th Floor
                          601 East Kennedy Boulevard
                          Tampa, Florida

REPORTED BY:              DEBBIE E. ASKINS
                          Court Reporter
                          Notary Public



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET              (813) 229-7207
SUITE 2320                     •    FAX (813) 229-8498

FORM 2

1    Complaint was being filed, that it was going to be filed

2    and on what date.  But I don't remember exactly on what

3    date before that.

4         Q.     Would that have been a month after the

5    election, two months?  Can you give me an approximate?

6         A.     It was probably-- I would think it was more--

7    about a month.

8         Q.     Okay.  Why are you suing the Supervisor of

9    Elections of Hillsborough County?

10        A.     Well, because that's where it took place, here

11    in Hillsborough County.

12        Q.     Okay.  What took place?

13        A.     I wasn't allowed to vote.

14        Q.     Okay.  Can you walk me through how that

15    happened?

16        A.     Well, I'm a registered voter.

17        Q.     Okay.  When did you register to vote?

18        A.     I've always been registered to vote.  But here

19    in Hillsborough County, I would assume that I registered

20    when I got here some time in '95 or so.  I voted in this

21    county before.  And so I knew I was registered to vote, so

22    I assumed that it wouldn't be a problem.  So when I wasn't

23    allowed to vote and my wife got to vote and I wasn't

24    allowed to vote and I was told that I would be allowed to

25    vote, you know, because I asked should I go to another



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET       (813) 229-7207
SUITE 2320    •   FAX (813) 229-8498

FORM 2

1    Q.    Uh-huh. (Indicating affirmatively)

2    A.    I don't believe so.

3    Q.    Okay.  Did you vote in the primaries in 2000?

4    A.    No.

5    Q.    Okay.  So the first time you had--  Since the

6    presidential election in '96, the first time you had gone

7    to vote was the 2000 presidential election in November?

8    A.    Yes.

9    Q.    Okay.

10   A.    I believe.

11   Q.    Yes, or are you sure?

12   A.    I'm almost positive, yes.

13   Q.    What happened when you got to the precinct?

14   A.    Well, me and my wife went up to vote.  My wife
     was in the books.

15   Q.    What is your wife's name?

16   A.    Jacqueline.

17   Q.    Can you spell that?

18   A.    J-A-C-Q-U-E-L-I-N-E.

19   Q.    Okay.  So you and your wife went to vote and

20   what happened?

21   A.    Her name was in the books.

22   Q.    Her name was listed on the register?

23   A.    Yes.

24   Q.    Okay.

25



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE  •  TAMPA, FLORIDA 33602
401 EAST JACKSON STREET          (813) 229-7207

FORM 2

1    A.    Mine was not.  She didn't call the Supervisor

2  of Elections.  So you know, I didn't understand why mine

3  wasn't and hers was.  But anyway, they told me that because

4  my name wasn't in the books that they had-- I had to sit

5  over, fill out a form.  And after I filled out the form,

6  they said that they had to make a phone call to affirm and

7  it would only take a few minutes.  And I sat there while

8  they called and called.

9    Q.    When you first got there, do you remember who

10  you talked to?

11    A.    The person there?

12    Q.    Uh-huh.  (Indicating affirmatively)

13    A.    By name?

14    Q.    Uh-huh.  (Indicating affirmatively)

15    A.    No.

16    Q.    Okay.  Do you remember what they looked like?

17    A.    Vaguely.  It was a man, kind of middle or to

18  older-aged gentleman, you know.

19    Q.    What do you consider middle to older age?

20    A.    Yeah.  That's kind of-- I would say--

21          MR. ALLEN:  We're using Doug as a gauge here.

22          DEPONENT:  Yeah.  Can I like pick somebody

23  at the table?

24    A.    I guess he was in-- maybe he was in his 50's,

25  '60s, you know.  I'm getting older now so I call all that



## BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET             (813) 229-7207
SUITE 2320              •       FAX (813) 229-8498

FORM 2

1    A.      Right.  It has DMV workers in it.

2    Q.      Okay.  And when did you change your address on

3  your driver's license?

4    A.      Exact date, I don't remember.

5    Q.      January of 2000?

6    A.      It could have been.

7    Q.      Okay.  When you went into this tax collector's

8  office on-- to change your address on your driver's

9  license, do you remember who waited on you?

10   A.      No.

11   Q.      Do you remember if it was a male or female?

12   A.      It was a female.

13   Q.      Female.  Do you remember the race of the

14  female?

15   A.      No.

16   Q.      Old, young?

17   A.      Middle age.

18   Q.      Can you remember anything else about a

19  distinguishing characteristic about this person?

20   A.      To tell you the truth, no.

21   Q.      Are you certain it was a female?

22   A.      It was a female.

23   Q.      And I believe you testified-- let me check my

24  notes-- this person asked you if you wanted to register to

25  vote; is that correct?



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   •    TAMPA, FLORIDA 33602
401 EAST JACKSON STREET             (813) 229-7207
SUITE 2320                                      FAX (813) 229-8498

FORM 2

**PLAINTIFFS' EXHIBIT 36**

1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 01-0120-CIV-GOLD**

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE
PANNELL, JULIA STOKER, NATALIE
CARNEGIE, JOHN L. CHEEVER,
JAMES MARSHALL, LILLIE Q. ODOM,
WILLIE STERN, WALLACE MCDONALD,
JERMAINE TERRY, LORINE WALDEN,
EMERT TIMBERLAKE, VALERIE BUFORD,
MICHELLE FLOYD, CONSUELO MARIA
GRAHAM, SHERRY EDWARDS, RANDY
WELLS, JOANNA CLARK, JANICE
KELLI, PLACIDE DOSSOUS, RONDRICK
ROSE, URSULA HARVEY and ADMATHA
ISRAEL, in their own right and
as representatives of all
similarly situated citizens and
residents of the State of Florida,

Plaintiffs,
vs.

KATHERINE HARRIS, Secretary of
State of Florida; CLAY ROBERTS,
Director of Florida Division of
Elections; DAVID C. LEAHY,
Miami-Dade County Election
Supervisor; MIRIAM OLIPHANT,
Broward County Election Supervisor,
JOHN STAFFORD, Duval County
Election Supervisor; PAM IORIO,
Hillsborough County Election
Supervisor; WILLIAM COWLES,
Orange County Election Supervisor;
and DEANIE LOWE, Volusia County
Election Supervisor (all in their
official capacities); and
CHOICEPOINT, INC., a Georgia
corporation, d/b/a DATABASE
TECHNOLOGIES, INC.,

Defendants.



---

2

DEPOSITION OF: JOHN BOWMAN

TAKEN AT THE
INSTANCE OF: The Plaintiffs

DATE: Tuesday, May 21, 2002

TIME: Commenced at 9:00 a.m.
Concluded at 2:30 p.m.

LOCATION: 107 West Gaines Street
Tallahassee, Florida

REPORTED BY: Nancy McDonnell, RPR

ACCURATE STENOTYPE REPORTERS, INC.
100 SALEM COURT
TALLAHASSEE, FL 32301
(850) 878-2221

---

3

APPEARANCES:

REPRESENTING THE PLAINTIFFS:

JUDITH A. BROWNE, ESQUIRE
MONIQUE L. DIXON, ESQUIRE
ADVANCEMENT PROJECT
1730 M Street, NW, Suite 401
Washington, DC 20036

REPRESENTING DEFENDANT DMV, DICKINSON,
KEARNEY, DEPARTMENT OF CHILDREN & FAMILIES:

DOUGLAS B. MAC INNES, ESQUIRE
ATTORNEY GENERAL'S OFFICE
107 West Gaines Street
Tallahassee, Florida 32399

REPRESENTING DEFENDANT KEARNEY,
DEPARTMENT OF CHILDREN & OFAMILIES:

HERSCHEL C. MINNIS, ASSISTANT GENERAL COUNSEL
OFFICE OF GENERAL COUNSEL
1323 Winewood Boulevard
Building 2, Room 204
Tallahassee, Florida 32399

REPRESENTING DEFENDANT CHOICEPOINT, INC.:

THOMAS W. WHITE, ESQUIRE
ADORNO & ZEDER, P.A.
2601 South Bayshore Drive
Suite 1600
Miami, Florida 33133

REPRESENTING DEFENDANT CHOICEPOINT, INC.:

DANIEL A. RESTREPO, ESQUIRE
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005

REPRESENTING DEFENDANT HARRIS, ROBERTS,

WALTER J. HARVEY, ESQUIRE
STEEL, HECTOR, DAVIS
200 South Biscayne Boulevard
Miami, Florida 33131

---

4

REPRESENTING DEFENDANT DAVID LEAHY:
(by telephone)
JEFFREY P. EHRLICH, ESQUIRE
Dade /County Attorney's Office
111 Northwest 1st Street
Suite 2810
Miami, Florida 33128

REPRESENTING DEFENDANT VOLUSIA COUNTY
SUPERVISOR OF ELECTIONS, DEANIE LOWE:
(by telephone)
WILLIAM BOSCH, ESQUIRE
COUNTY ATTORNEY'S OFFICE
123 West Indiana Avenue
Deland, Florida 32720

**21**

1    A    No.

2    Q    Is there a person at DCF whose sole

3  responsibility is to implement the National Voter

4  Registration Act?

5    A    In all of DCF?

6    Q    Yes.

7    A    Districts included?

8    Q    No, at headquarters level.

9    A    Headquarters?  No.

10    Q    To your knowledge, was there ever anyone

11  that had that as their sole responsibility?

12    A    No.

13    Q    When I just asked the question about

14  someone whose sole responsibility it is to

15  implement, you mentioned the district.  Is there

16  anyone in the district whose sole responsibility is

17  to implement NVRA?

18    A    We have coordinators in the district but I

19  would not know if that's their sole responsibility

20  or not, only their administrators.  I would not know

21  that.

22    Q    Do you know if there are anyone -- any

23  employees at office levels whose sole responsibility

24  it is to implement NVRA?

25    A    I don't know.

**22**

1    Q    How many districts are there?

2    A    We have -- what do we have now?  Seems

3  like we have 13 districts and one region.  Used to

4  be 15 districts until about a year and a half ago.

5    Q    And what is the difference between a

6  district and a region?

7    A    The legislature mandated that we turn a

8  couple of our districts into a region.

9    Q    Okay.  So that's why there was a reduction

10  in the districts because you created a region also?

11    A    That was part of the result but --

12    Q    Okay.  Can you tell me the region -- that

13  one region, what counties fall into that one region?

14    A    I don't believe I can name them all, but

15  it would be Pasco, Hillsborough, Manatee, Sarasota.

16  I believe there's two more basically who live in the

17  Tampa, St. Pete area.

18    Q    And the districts are divided by county?

19  Let me ask it this way:  Are there a certain number

20  of counties that are assigned to each district?

21    A    Yes, there are but they're not equal

22  number of counties in each district.

23    Q    And how are they divided up then, if it's

24  not an equal number of counties to each district?

25  What is the rhyme or reason behind it?

**23**

1    A    I wasn't a part of that.  I don't know how

2  the name of the region --

3    Q    Is there a name for it?

4    A    Yes.

5    Q    Okay.  What is it called?

6    A    Sun Coast.

7    Q    Sun Coast.

8        (Walter J. Harvey, Esq. enters the

9  deposition room.)

10    Q    Let me ask you, was DCF once known by

11  another name?

12    A    Yes.

13    Q    What was the name?

14    A    Health and Rehabilitative Services.

15    Q    Do you know about when the change was made

16  in the name?

17    A    From what?

18    Q    The change from HRS to DCF?

19    A    Approximately two years ago.

20    Q    Let me ask you, what type of public

21  assistance is provided by DCF?

22    A    ESS, economic self-sufficiency services.

23  We would deal with food stamps, Medicaid and cash

24  assistance.

25    Q    Does WIC fall under another program?

**24**

1    A    WIC is now with the Department of Health.

2    Q    And when did -- was WIC at one time at

3  DCF?

4    A    It was.

5    Q    And when was that moved?

6    A    I would guess -- and that's all I can

7  do -- four years -- four years ago.

8    Q    About four years ago.  Do you know if

9  there is someone there that deals with the WIC

10  program that deals with voter registration?

11    A    I have no idea what they do with voter

12  registration.

13    Q    Do you know if prior to the move from DCF

14  to the Department of Health whether WIC programs did

15  voter registration?

16    A    I have no personal knowledge of what they

17  did.

18    Q    And the economic self-sufficiency program

19  falls under your purview?

20    A    No.  I'm within it.

21    Q    You're within it?

22    A    Yes.

23    Q    I'm trying to figure out the structure.

24  Okay.  You're within it.  And for each of the

25  programs that you mentioned that come under economic

ACCURATE STENOTYPE REPORTERS, INC. - 850/878-2221

SHEET 7

**25**

1  self-sufficiency services, food stamps, Medicaid and
2  cash assistance, are all of those services provided
3  through the same offices or are they broken out into
4  different offices?
5      A   I don't follow that.
6      Q   For example, if I were to apply for
7  Medicaid, for example, would I go to the same office
8  that I would apply for food stamps in?
9      A   Yes.
10     Q   Is there ever a situation where they're
11 broken out -- those types of services are broken out
12 between different offices?
13     A   No.
14     Q   Would you know what the voter registration
15 process was at DCF offices prior to November 2000?
16     A   Do I know --
17     Q   What the voter registration process was at
18 DCF offices prior to November of 2000?
19         MR. EHRLICH:  Object to the form.
20     Q   You can answer.
21     A   Would I know?
22     Q   Yes.
23     A   Firsthand, no.
24     Q   Do you know from review of documents?
25     A   I have an idea from review of documents

**27**

1  each district would have their own implementation
2  plan.  That implementation plan would be what they
3  would use for a guide on their process, how they
4  unfold a process to comply with the act.
5      Q   When you say a bottoms up -- bottoms up
6  approach, what exactly do you mean by that?
7      A   I believe that the governor's philosophy
8  has been to work in cooperation with the agency and
9  our districts and the other personnel and not a
10 direct line authority type of arrangements,
11 decentralization's what we call it overall.
12         So the people in the districts, the
13 administrators know best how to serve the customers
14 and how to use their staff to implement various
15 procedures, so we let them determine how to roll
16 these types of implementations in place, who will be
17 in charge of what, those sorts of things.
18     Q   And do you know whether or not at the
19 early phases of the implementation of NVRA there
20 were district coordinators who were appointed to
21 handle voter registration?
22     A   From what I've read, it appears that
23 sometime probably in late '94, early '95 there was a
24 decision, yes, to have each district have a
25 representative which was -- they called voter

**26**

1  how it works.
2      Q   Why don't you tell me what you know about
3  that process prior to November 2000?
4          MR. EHRLICH:  Object to the form.
5      A   Where do you want me to start?
6      Q   I want you to walk me through the whole
7  process.
8      A   From what I understand, from what I've
9  read, after the National Voter Registration Act came
10 out, there was a task force developed that consisted
11 of employees from the Division -- Department of
12 Children and Families, then HRS, members from the
13 Governor's Office, members from the Department of
14 State, and they worked together to develop how
15 state -- Department of Children & Families was going
16 to implement National Voter Registration Act.
17     Q   Do you know who from DCF was on that task
18 force?
19     A   Bill Hanson.
20     Q   And do you know how DCF decided to
21 implement the NVRA?
22     A   What came of those meetings was a decision
23 that a bottoms up approach would be taken; that the
24 National Voter Registration Act and the Florida
25 Voter Registration Act would be our policy and that

**28**

1  registration coordinator.
2      Q   Do you know how those people were chosen?
3      A   No, I do not.
4      Q   Do you know prior to November 2000 what
5  would be the voter registration process if I were
6  walking into a public assistance office to apply as
7  a new applicant for services?
8      A   I know what our expectations would be.
9      Q   Do you know what the actual process was
10 prior to November 2000?
11     A   I know what to expect them to do.  They
12 would be following exactly what the agency had asked
13 them to do.
14     Q   But do you know exactly what the process
15 was supposed to do, if I walked in applying for new
16 services?  I know you have expectations but I mean
17 do you know --
18     A   What I would expect them to do based on
19 the pro -- what should be.
20     Q   Why don't you tell me what you expect
21 them --
22     A   Okay.  That when someone comes in to apply
23 or reapply or change of address, that at that time
24 they would offer them the opportunity to complete a
25 voter -- fill out a voter preference form and if on

SHEET 10

37

1   A   The Florida System.

2   Q   And that would be eligibility information

3   that goes into that system?

4   A   Yes.

5   Q   Is there other information that goes into

6   that system?

7   A   Only what is relative to eligibility.

8   Q   And then what happens next after I've gone

9   through this interview about eligibility?  Then what

10  happens?

11  A   Well, then a determination needs to be

12  made if there are -- for example, you talk about

13  income you have.  We may have to ask you to verify

14  that amount of money; and if that cannot be done at

15  the office at that time, then you would need to take

16  a form.  Usually we give someone a verification

17  form, and they would take it out to their employer

18  to be completed, rent forms, different forms that

19  you may or may not be able to determine eligible

20  right there and you have a period of time in which

21  to do that.

22  Q   And is it possible that in some offices

23  that the eligibility specialist may be responsible

24  for the voter registration?

25  A   I do not know how the districts role the

38

1   function out exactly.

2   Q   Who would know?

3   A   The districts.

4   Q   Mr. Ferguson would know what happens in

5   each district?

6   A   He doesn't work in a district.

7   Q   So there is no central repository of

8   information about what happens in the districts?

9   A   Generalization of what occurs in the

10  districts and we know they follow procedures and

11  policies but how their day-to-day running of their

12  staff, what their staff might do on a daily basis, I

13  cannot tell you exactly how that --

14  Q   Who's ultimately responsible for whether

15  or not they are doing the voter registration

16  requirements?

17  A   Who is ultimately responsible?

18  Q   Yes.

19  A   Where does the buck stop?

20  Q   That's right.

21  A   I would assume with my secretary --

22  Q   With your secretary?

23  A   -- of the department.

24  Q   With the secretary of the --

25  A   Department of Children.

39

1   Q   Children and Families?  Is voter

2   registration responsibilities part of Mr. Ferguson's

3   appraisal process?

4   A   Yes.

5   Q   Is it part of your appraisal process when

6   you're evaluated?

7   A   We just re-did our position descriptions.

8   It may or may not be in mine at this point because

9   I'm acting.

10  Q   Okay.

11  A   And I'm not sure if it is or not.

12  Q   Do you know whether or not it has been at

13  any time from June 2001 until now?

14  A   Listed as part of my duties?

15  Q   Well, do you get evaluated on it?  Is it

16  like --

17  A   I do get evaluated, yes.

18  Q   Do you get evaluated specifically on how

19  the voter registration program has been carried out?

20  A   The last evaluation I had was in March, so

21  it would have -- I assume it included some of those

22  duties.

23  Q   So you said that the buck stops with the

24  secretary of DCF.  Has the secretary of DCF ever

25  asked you for a report on how the voter registration

40

1   programs are being carried out?

2   A   She wouldn't ask me.

3   Q   Who would she ask?

4   A   She may ask my director.

5   Q   And who is your director?

6   A   Linda Dillworth.

7   Q   And has Miss Dillworth ever indicated to

8   you that the secretary of DCF has asked how the

9   voter registration programs are being implemented?

10  A   Indicated to me?

11  Q   Yes.

12  A   I'm trying to recall.  I'm sure she has

13  said something that they have had conversations

14  about voter registration.

15  Q   Have you ever had to supply some report to

16  Miss Dillworth about the voter registration process

17  and procedures?

18  A   No, no report.

19  Q   Have you had discussions with Miss

20  Dillworth about whether the voter registration

21  process has been effective at DCF?

22  A   That's kind of a broad question.  I mean

23  there's a lot of different phases to it.

24  Q   Have you had discussions with her about

25  the effectiveness of voter registration programs?

**41**

1      A    Yes, I guess I have.

2      Q    Have you had discussions with her about

3    this particular lawsuit?

4      A    Yes.

5      Q    And have you had any discussions with the

6    secretary of DCF about this lawsuit?

7      A    No, I have not.

8      Q    Do you know whether or not Miss Dillworth

9    has had discussions with the secretary of DCF about

10    this lawsuit?

11         MR. MAC INNES:  Objection as to form.

12      A    I'm not sure.  I would assume.

13      Q    What were your discussions with Miss

14    Dillworth about this lawsuit?

15      A    There have been many discussions talking

16    about voter registration and trying to understand

17    the process because without our lead man, Bill

18    Hanson, we really didn't have a lot of knowledge

19    base to rely on.

20         So there's been a lot of research and

21    looking at documentation that went out to try to

22    understand.  So most of our discussions had been a

23    part understanding the process, how it got started,

24    what the process, expectations are in the districts,

25    those kinds of talks about the program.

**42**

1      Q    And do you feel that you have an

2    understanding of what goes on in the districts?

3      A    I have an expectation of what they should

4    be doing and that they have a plan to work off of

5    and that we have given them the guidance that tells

6    them they are to comply with the laws.  We have

7    given them copies of the laws.  We have made sure

8    they've attended training.  We have set up newer

9    training.  We have asked them to do monitoring

10    within their own districts.

11      Q    Let me ask you this:  But do you have an

12    understanding of whether or not they are, in fact,

13    carrying out the requirements of NVR --

14      A    The only way I know whether they're

15    carrying out their duties is if I had any feedback

16    such as any complaints from the Division of

17    Elections.  That's what the liaison is about.  On

18    the voter preference form I believe is one of the

19    places where it states that if you, the recipient,

20    have a problem, then you should contact the Division

21    of Elections.

22         If there were problems within that

23    program, I would expect to hear from the Division of

24    Elections what those problems are.

25      Q    Now, but if I as the person who's applying

**43**

1    for public assistance never got a voter preference

2    form, then I wouldn't have that information about

3    calling the Division of Elections; isn't that right?

4      A    Sounds reasonable.

5      Q    And during the time in which you've taken

6    to kind of get up to speed on what's going on with

7    voter registration programs, is it your

8    understanding that there have been any problems with

9    regard to implementation of NVRA?

10      A    I received two complaints from the

11    Division of Elections.

12      Q    And have you received --

13         MR. HARVEY:  I'm sorry.  How many did

14    you say?

15         THE WITNESS:  Two.

16         MR. HARVEY:  Two.

17    BY MS. BROWNE:

18      Q    Have you received any information from

19    anyone else about problems with the implementation

20    of NVRA.

21      A    No.

22      Q    Has anyone in your office received

23    information about problems with implementation of

24    NVRA?

25         MR. MAC INNES:  Objection as to form.

**44**

1      A    I won't know unless they told me.

2      Q    Do you have conversations with

3    Mr. Ferguson about implementation of NVRA?

4      A    Yes.

5      Q    Do you know whether or not he has received

6    any indication that there were problems with the

7    implementation of NVRA?

8      A    Only the two complaints I spoke of.

9      Q    Did you review the documents that were

10    produced in this lawsuit?

11      A    Yes.

12      Q    Okay.  Let's go back to the Florida

13    System.  You said that only information about

14    eligibility goes into that system; is that correct?

15      A    Correct.

16      Q    And after I as the applicant has come back

17    with verification of income and the rent forms, et

18    cetera, then what is the next step?

19      A    To determine eligibility.

20      Q    Okay.  And once -- let's say eligibility

21    has been determined and I am eligible for public

22    assistance, then what happens?

23      A    Then what happens?

24      Q    Yes.

25      A    Well, you receive an EBT card in the mail

SHEET 13

49

1   in registering to vote or updating their
2   registration.
3       Q   But couldn't you just ask me if I wanted
4   to register to vote and give me a voter registration
5   application if I said yes?
6       A   From what I understand, the Florida Voter
7   Registration Act, no, there's a form that should be
8   in place to get in writing what your preference is.
9       Q   Is the voter preference form a good way of
10  monitoring whether voter registration is actually
11  being offered in DCF offices?
12      MR. MAC INNES:  Objection as to form.
13      A   Would you ask that again?
14      MS. BROWNE:  Can you repeat the
15  question?
16      (The question referred to was read back by
17  the reporter as above recorded.)
18      A   I don't know.
19      Q   The Florida Computer System, is that a
20  case management system also?  Let me rephrase the
21  question just so I'm not miscommunicating and using
22  terms I don't know anything about.
23          Does the Florida System have information
24  about all DCF clients?
25      A   It has information of clients who applied

50

1   for food stamps, Medicaid and cash assistance.
2       Q   And does it have information about
3   recertification of those clients?
4       A   Yes.
5       Q   And does it have information regarding
6   change of address?
7       A   Yes.
8       Q   Does it have any information regarding
9   voter preference?
10      A   No.
11      Q   And why is that?
12      A   I believe that by law we are not supposed
13  to record such information.
14      Q   What law would that be?
15      A   National Voter Registration Act.
16      Q   Does the Florida System have different
17  computer screens that prompt the eligibility
18  specialist to ask certain questions?
19      A   Yes.
20      Q   And those certain questions are with
21  regard to eligibility issues?
22      A   Yes.
23      Q   Does it have a prompt in it for — to
24  remind the eligibility specialist to ask about voter
25  registration?

51

1       A   Not to my knowledge.
2       Q   You said that the keeping the information
3   about voter registration on the computer, that you
4   believe that the law does not allow that.  Where did
5   you get that understanding from?
6       A   I just remember reading a couple items
7   about confidentiality, so that's where I drew that
8   conclusion.
9       Q   Is there a way to know how many people
10  have registered to vote in DCF offices?
11      A   Not that I'm aware of.  The voter
12  registration application, we do not hold that, so
13  the Division of Elections would have that
14  information.
15      Q   How would they get that information if you
16  don't have that information?
17      A   They have the voter application forms and
18  they could tell us how many recipients completed
19  voter registration applications.
20      Q   And that would be based on how many the
21  Supervisors of Elections may have received from your
22  offices?
23      A   Yes.
24      Q   Is there any way of knowing how many
25  people declined to register to vote in DCF offices?

52

1       A   Possibly.
2       Q   How would you do that?
3       A   The voter preference forms with the
4   declinations.
5       Q   Does DCF now keep a tally of how many
6   people have declined to register to vote in DCF
7   offices?
8       A   Not to my knowledge.
9       Q   Who would know about something like that?
10      A   The districts.
11      Q   And there is no central reporting system
12  where they would report to you as the person who
13  heads up the voter registration programs?
14      A   The number of people who applied or
15  declined, no.
16      Q   Declined.  And have you ever received --
17  well, let me ask this:  Have you ever asked the
18  district coordinators for the number of people who
19  have declined to register to vote in their
20  districts?
21      A   No, I have not.
22      Q   Have you ever asked the Supervisor of
23  Elections for the number of applications, voter
24  registration application also they have received
25  from your offices?

JUN 28 2002 15:37

PAGE.07

SHEET 14

**53**

1    A    They do supply that to us each month, yes.

2    Q    Did you request it?

3    A    No, I did not request it. It's been

4    ongoing for some time.

5    Q    And so is this the Division of Elections

6    that reports it to you or Supervisors of Elections?

7    A    It's the Division of Elections.

8    Q    Do you know who is responsible for

9    collecting the voter registration applications in

10   the DCF offices?

11   A    No.

12   Q    What happens with -- if I have filled out

13   voter registration application --

14   A    Uh-huh.

15   Q    -- at the DCF office, what happens to that

16   application?

17   A    Normally we would ask if anybody fills out

18   an application to bring it back to the person at the

19   front desk, clerk, receptionist.

20   Q    And then what happens to it from the

21   receptionist?

22   A    He or she would date stamp it and place it

23   in whatever receptacle they put them in.

24   Q    And what happens with it from the

25   receptacle?

**54**

1    A    Each district works out their own -- each

2    district works out their own arrangement with the

3    Supervisor of Elections on how they're going to

4    transmit those forms back and forth.

5    Q    Each district you said?

6    A    Yes, works out with the local Supervisor

7    of Elections the transmittal process.

8    Q    And do the DCF staff -- let's say the

9    person who receives the application, does that

10   person check to make sure that the form is

11   completed?

12   A    I would expect them to. That's part of

13   the normal routine was when you turn in a request

14   for assistance is to look over the thing trying to

15   make sure all the pertinent questions are answered.

16   Q    Do you know exactly what they check for on

17   that voter registration application?

18   A    No, I do not specifically know. I don't

19   know for sure what they check for.

20   Q    You need to take a break, okay. I

21   understand you need to go feed a meter, so we have

22   to.

23   A    Absolutely.

24        MS. BROWNE: We are going to go off

25   the record for about five minutes?

**55**

1        THE WITNESS: Five minutes?

2        (Brief recess taken.)

3    BY MS. BROWNE:

4    Q    Can you tell me do you know how many

5    people the -- what is it called self -- is it call

6    economics.

7    A    Economic self-sufficiency.

8    Q    Economic self-sufficiency program, do you

9    know how many people are served by those programs in

10   the state?

11   A    Over what period of time?

12   Q    Over a year's time, the past year.

13   A    No, I can't say exactly how many are

14   served. I've seen some documentation.

15   Q    Are statistics kept with regard to how

16   many people are served in a year?

17   A    I'm sure we can figure how many were

18   served in a year, yes.

19   Q    And do you know if those statistics

20   include the number of people who recertified in a

21   year?

22   A    Sure.

23   Q    And does DCF keep data regarding the

24   racial breakdown of its clients?

25   A    I'm not certain if it's a question in

**56**

1    Florida or not.

2    Q    Have you ever seen data that did a

3    breakdown of DCF clients by race?

4    A    Yes.

5    Q    Yes. And do you know what percentage of

6    the clients of DCF are black?

7    A    No.

8        MR. MAC INNES: Objection as to form.

9    A    No idea.

10   Q    Do you know what percentage are white?

11   A    No idea.

12   Q    Do you know if the DCF client base is

13   disproportionately black --

14       MR. MAC INNES: Objection as to form.

15   Q    -- in relation to the number of African

16   Americans in the population of America?

17       MR. MAC INNES: Objection to form.

18   A    I have no idea.

19   Q    Is there a particular office that keeps

20   this kind of data about the demographics of DCF

21   client base?

22   A    I don't know what office that would be.

23   I'm sure somebody keeps demographics.

24   Q    If you wanted to get the demographic data

25   for the programs that you run, where would you go?

101

1    Q   Did you discuss this with Miss Dillworth?

2    A   Those particular e-mails, I don't know.  I

3  don't recall.

4    Q   Well, did you discuss with her that you

5  felt that there were no implementation problems at

6  DCF?

7    A   I discussed with her to the best of my

8  knowledge that it appears that implementation is in

9  place and we are in compliance.

10    Q   So is it your opinion that the lawsuit

11  against DCF was just unfounded?

12    A   I did not know in that one particular

13  instance if that's true or not.

14    Q   Are you satisfied at all that the

15  allegations raised specifically by Joanna Clark are

16  baseless?

17    A   Are they baseless?

18    Q   Baseless.

19    A   I wouldn't.

20    Q   As in have no basis in fact?

21    A   I can't confirm or refute that.  I don't

22  know.

23    Q   What did you do, if anything, to

24  specifically investigate Miss Clark's allegations?

25    A   I asked that there be a review for the

102

1  period of time that she -- and the dates she said

2  she was in our office to see if we could confirm

3  that she was there.

4        I asked if we had any voter registration

5  preference forms related to those dates.  I asked if

6  the specific center she was in had voter

7  registration applications laying out in those

8  centers for anyone to pick up.

9        I asked if they had procedures in place to

10  ensure that the voter preference forms were going to

11  be part of the process for applications,

12  reapplications and changes of address.

13        I asked if they had in place a methodology

14  to transfer the voter registration applications to a

15  Supervisor of Elections in a timely manner.

16    Q   Anything else?

17    A   That's my recollection what I asked.

18    Q   Let me back up to your review of the

19  period of time of her allegations.  What did you

20  conclude about the period of time that are covered

21  by the allegations?

22    A   The districts are the ones that have that

23  data.  All I can tell you is what they had told me

24  about the period of time.

25    Q   What were you told?

103

1    A   Our records -- I was told our records

2  showed that -- I believe the dates may be a day or

3  two off, I don't know -- but in January of '99, our

4  records show that Miss Clark came into our office to

5  apply for some sort of assistance; that she returned

6  again in I believe it was May of 2000 to be

7  recertified or new application, I don't recall

8  which, and those were the dates I believe I was

9  given as far as we had contact.

10    Q   And were you satisfied that she had, in

11  fact, been offered a voter preference form?

12    A   I did not know whether she was offered a

13  voter preference form or not.

14    Q   And did you inquire about that?

15    A   I asked for a copy if they had one.

16    Q   And that's the forms that were never

17  produced, correct?

18    A   That's correct, but they're only kept for

19  two years.  I'm not sure.  If she filled one out in

20  January of '99, I wouldn't have one in possibly

21  January of 2001.

22    Q   Let me ask you this:  When the lawsuit was

23  filed back in January of 2001, did you instruct the

24  offices not to destroy or discard voter preference

25  forms from that date forward?

104

1        MR. MAC INNES:  Objection as to form.

2    A   I didn't take over until June 2001.

3  You're saying January?

4    Q   Yes.  Okay.  So you started in June of

5  2001?

6    A   Correct.

7    Q   Do you know whether or not there was put

8  in place any policy to not destroy the voter

9  preference forms because of pending litigation?

10        MR. MAC INNES:  Objection as to form.

11    A   I don't recall any such discussion.

12    Q   So then for Joanna Clark, you didn't

13  receive voter preference forms for any dates for

14  her, correct?

15    A   No, I don't believe so.

16    Q   Even those that might have fallen within

17  the two-year period?

18    A   Correct.

19    Q   Okay.  You also said that you asked if the

20  centers had -- I guess the center that was

21  involved -- had voter registration applications

22  available for anyone to pick up?

23    A   Correct.

24    Q   And what was your conclusion about that?

25    A   They said they do leave them out for the

105

```
 1   common public or general public to provide them an
 2   opportunity to register.
 3      Q   Did you go visit any of these offices?
 4      A   No.
 5      Q   Did you have Mr. Ferguson visit the
 6   offices that Joanna Clark went into?
 7      A   No.
 8      Q   Did you have a meeting with the person who
 9   might be in charge of the offices that Joanna Clark
10   went to?
11      A   Yes.
12      Q   And who is that person?
13      A   Elizabeth Massey.
14      Q   And is she in a particular office?
15      A   I do not know where her office is.
16      Q   What is her title?
17      A   I believe she's a program office
18   administrator.
19      Q   Is she in the Fort Lauderdale area?
20      A   Yes.
21      Q   And she's -- is she actually in a service
22   center?
23      A   I believe she's at a program office and I
24   don't believe they're the same place.
25      Q   Did you go down there to meet with her?
```

106

```
 1      A   No.
 2      Q   How did you meet with her?
 3      A   Telephonically.
 4      Q   And what did you discuss during that
 5   conversation?
 6      A   The same things I just talked about,
 7   asking her to provide for me --
 8      Q   She is the person who responded to your
 9   inquiries?
10      A   Yes.
11      Q   And what were you told about the
12   procedures in place to ensure that voter preference
13   forms were being used?
14      A   She assured me that was in place and that
15   they had training in place.
16      Q   Okay.  She assured you that the procedures
17   for using the voter preference form were in place.
18   Did she tell you what the procedures were?
19      A   I believe we did discuss what instances
20   they should be provided in, and she agreed that
21   that's when they were being provided.
22      Q   Did you tell her what you expected and
23   then she said yes, that's what we are doing?
24      A   I don't recall if that's it or not.
25      Q   Did you just ask her what are the
```

107

```
 1   procedures in place in those offices to ensure that
 2   the voter preference forms are being used?
 3      A   That would be normal for me to do it that
 4   way, to try to find out.
 5      Q   And what exactly was her response?
 6      A   That they have implemented and that's in
 7   place.
 8      Q   But what did she tell you about the
 9   specific procedures?
10      A   We didn't discuss who hands out what
11   forms.
12      Q   Well, if you didn't discuss that, what did
13   you discuss?
14      A   I think I just told you what we discussed.
15      Q   Okay.  I'm not clear, so I need to be
16   clear for the record.  What did you discuss?  If
17   you're saying that you didn't discuss who hands them
18   out but you say you discussed the procedures, what
19   exactly did you discuss about the procedures for
20   using the voter preference form?
21      A   Were they providing them to clients at
22   application, reapplication and change of address.
23      Q   Did she tell you where these voter
24   preference forms were kept in the office?
25      A   No.
```

108

```
 1      Q   Okay.  You said that you discussed the
 2   method of transferring voter registration
 3   applications to the Supervisors of Elections.  What
 4   did she tell you about that?
 5      A   She told me that at the end of each day,
 6   they batched the voter registration application
 7   forms and placed them in I believe a satchel or a
 8   bag of some sort that's provided, if I recall
 9   correctly, by the Supervisor of Elections office.
10      Q   Let me ask you, when did you have this
11   conversation with Miss Massey?
12      A   I don't recall when we began the
13   communications actually.
14      Q   Do you think it was prior to sending out
15   this memorandum dated October 16, 2001?
16      A   I don't know.  I really don't.
17      Q   Do you think it was way back when you
18   started in June 2001 with the voter registration?
19      A   No, I don't believe it was in June.
20      Q   So --
21          MR. EHRLICH:  Are we going to be
22      taking a lunch break?
23          MS. BROWNE:  Yes.  What time is it
24      now?
25          MR. MAC INNES:  12:20.
```

SHEET 23

**87**

```
 1   in the above-described action, the Department
 2   inquired of any contacts involving Joanna Clark."
 3       A   Uh-huh.
 4       Q   If you turn to, I guess it's the next
 5   page, paragraph nine, "A review of the department's
 6   records failed to confirm any contact between the
 7   Department and Miss Clark during the time alleged in
 8   the amended complaint."
 9       A   Uh-huh.
10       Q   Do you know what Mr. Ferguson did to
11   confirm that?
12       A   First of all, I don't recall exactly what
13   dates he might have been looking for.
14       Q   But what did he do to actually verify that
15   information?
16       A   Probably asked the district, either he
17   looked -- I'm not positive what he did.
18       Q   Is there a computer system that he could
19   have gone into?
20       A   He could have worked on the Florida System
21   to look at some dates.
22       Q   Does he have access to the Florida System?
23       A   Yes, he does.
24       Q   Do you have access to the Florida System
25   also?
```

```
 1       Q   Now, if you go down to three, Joanna
 2   Clark --
 3       A   Uh-huh.
 4       Q   If you look down at -- on the date of
 5   service column, it says 5/3/01 and then there's an
 6   RC next to it.  Do you see where I'm pointing to?
 7       A   Uh-huh.
 8       Q   RC I believe means recertification; is
 9   that right?
10       A   That's what I believe it means.
11       Q   And I actually got that information from
12   looking at a page 2 of the document that has the
13   codes, so RC.  And at that time at 5/3/01,
14   recertification, would you expect that Joanna Clark
15   would have been offered a voter preference form?
16           MR. EHRLICH:  Object to the form.
17       A   If she was in for a reapplication, this is
18   what a recertification is, I would expect that she
19   would be offered.
20       Q   And then on the date prior to that,
21   9/20/2000, it says an RC.  Would you expect that she
22   would have been offered a voter preference form
23   then?
24           MR. EHRLICH:  Object to the form.
25           MR. HARVEY:  Object to the form.
```

**86**

```
 1       A   Do I?
 2       Q   Not that you use it.  I'm just asking do
 3   you have access to it?
 4       A   I do.
 5       Q   Okay.  Did you have a discussion with
 6   Mr. Ferguson about plaintiff Joanna Clark at all?
 7       A   There were some discussions, yes.
 8       Q   What was your discussion about?
 9       A   I believe I asked him to see if he could
10   ascertain if she was a client, what dates she may
11   have been in our service centers.
12           (Exhibit 3 marked for identification.)
13       Q   Okay.  I'm giving you what's been marked
14   as exhibit three, and that is the document entitled
15   Defendant Kearney's second supplemental response to
16   plaintiffs' first set of interrogatories.  Have you
17   seen this document before?
18       A   Yes.
19       Q   Can I get you to look at the chart that is
20   attached in the back, the first page?
21       A   This chart?
22       Q   Yes.  And it has columns.  It says,
23   "Plaintiff, DCF's district/region, DCF's employee,
24   DCF's street address and date of service."
25       A   Uh-huh.
```

**88**

```
 1       A   Yes.
 2       Q   On the date prior to that, 7/25/00, it
 3   says RC/CA.  The CA, according to the responses,
 4   means change of address?
 5       A   Uh-huh.
 6       Q   Would you expect that she should have been
 7   offered a voter's preference form on that date also?
 8           MR. EHRLICH:  Object to the form.
 9           MR. HARVEY:  Same objection.
10       A   I would expect that, yes.
11       Q   And one more.  On May 30, 2000, it says NA
12   which the code says -- means new application.  Would
13   you expect that she would have gotten -- been
14   offered a voter preference form on that occasion?
15           MR. HARVEY:  Object to the form.
16       A   Yes, I would expect so.
17       Q   Who actually put this chart together?
18       A   I believe counsel put this chart together.
19   I'm not sure.
20       Q   Counsel as in DCF counsel?
21       A   Yes.
22       Q   Did you or Mr. Ferguson go back and
23   attempt to find the voter preference forms for Miss
24   Clark on those occasions that she visited DCF
25   offices?
```

89

```
 1      A    To the best of my memory, I think we may
 2   have asked the district if they did have copies of
 3   it.
 4      Q    And did you get copies of those?
 5      A    No, I did not get copies.
 6      Q    Do you know why you didn't get copies of
 7   those?
 8      A    No, I wouldn't know why they couldn't
 9   provide those copies.
10      Q    Did anyone do follow-up to ask why the
11   forms were not provided?
12      A    I don't recall if I asked that question or
13   not.
14      Q    And that form is a requirement, correct?
15      A    At the time of application, reapplication
16   and change of address it is.
17      Q    Do you remember seeing in the documents
18   that were produced to the plaintiffs in this case
19   voter preference forms for Miss Clark?
20      A    I don't recall seeing voter preference
21   forms for anybody.
22      Q    I just want to make sure I got this right.
23   You never received the voter preference forms,
24   correct --
25      A    Not that I recall.
```

90

```
 1      Q    -- on Joanna Clark?
 2      A    No.
 3      Q    And you never did a follow-up to make sure
 4   that you got the forms; is that correct?
 5      A    If they had them, they would have provided
 6   me a copy I'm sure.
 7           (Exhibit 4 marked for identification.)
 8           (Daniel A. Restrepo, Esq. enters the
 9   deposition room.)
10   BY MS. BROWNE:
11      Q    I'm going to show you what's been marked
12   as exhibit 4 which says National Voter Registration
13   Act Training Outline.  Have you seen this document
14   before?
15      A    I possibly saw this in some of the
16   documentation, yes.
17      Q    The documentation that was provided to the
18   plaintiffs in this case; is that right?
19      A    Yes.
20      Q    Let me get you to look at the second page
21   which says -- at the top it says procedures:
22   Application or reapplication.  Under filing it
23   says -- down at the bottom it says "filing" and
24   there's a note that says, "no notation on CLRC."
25   What does CLRC stand for?
```

91

```
 1      A    I can't tell you for sure what CLRC stands
 2   for.  It's a sign in which you can make notes and
 3   notate information.
 4      Q    And is that part of the Florida System you
 5   talked about earlier?
 6      A    Yes, it is.
 7      Q    And then on the next page, page 3, on the
 8   second line it says "issues and answers applicable
 9   to ES."  What does ES stand for?
10      A    Economic services.  Where do you see that?
11      Q    Up at the top, the second line, the title
12   of the document?
13      A    Oh, the title?
14      Q    Yes.
15      A    Yes.  That would be -- I'm assuming that's
16   what that is, economic social -- we have been a
17   number of different names.
18      Q    Okay.  Do you know if this document which
19   is exhibit 4 is currently being used for training
20   purposes?
21      A    I do not.  I do not know.
22      Q    You don't know?
23      A    No.
24      Q    Let me get you to look at the last page of
25   that document that says under number 29 on page 8 --
```

92

```
 1   it says, "It is our understanding that the state
 2   Division of Elections officials will conduct
 3   periodic random sampling monitoring at voter
 4   registration sites.  We don't know about Federal
 5   Election Commission staff."
 6           Do you know whether or not the Division of
 7   Elections currently does that periodic random
 8   sampling monitoring of DCF offices?
 9           MR. HARVEY:  Object to the form.
10      A    I do not know.
11           (Exhibit 5 marked for identification.)
12   BY MS. BROWNE:
13      Q    I'm showing you what's been marked as
14   exhibit 5.  It says at the top, "public assistance
15   forms guidebook, voter registration preference form
16   CF-ES 2627."
17      A    Uh-huh.
18      Q    Have you seen this document before?
19      A    Put together like this, I don't recall a
20   cover sheet.  I have seen these forms before.
21      Q    Okay.  Do you know what the public
22   assistance forms guidebook is?
23      A    No.
24      Q    So then you wouldn't know who actually
25   receives this guidebook?
```

SHEET 26

101

1    Q  Did you discuss this with Miss Dillworth?

2    A  Those particular e-mails, I don't know. I

3 don't recall.

4    Q  Well, did you discuss with her that you

5 felt that there were no implementation problems at

6 DCF?

7    A  I discussed with her to the best of my

8 knowledge that it appears that implementation is in

9 place and we are in compliance.

10    Q  So is it your opinion that the lawsuit

11 against DCF was just unfounded?

12    A  I don't know in that one particular

13 instance if that's true or not.

14    Q  Are you satisfied at all that the

15 allegations raised specifically by Joanna Clark are

16 baseless?

17    A  Are they baseless?

18    Q  Baseless.

19    A  I wouldn't.

20    Q  As in have no basis in fact?

21    A  I can't confirm or refute that. I don't

22 know.

23    Q  What did you do, if anything, to

24 specifically investigate Miss Clark's allegations?

25    A  I asked that there be a review for the

102

1 period of time that she -- and the dates she said

2 she was in our office to see if we could confirm

3 that she was there.

4    I asked if we had any voter registration

5 preference forms related to those dates. I asked if

6 the specific center she was in had voter

7 registration applications laying out in those

8 centers for anyone to pick up.

9    I asked if they had procedures in place to

10 ensure that the voter preference forms were going to

11 be part of the process for applications,

12 reapplications and changes of address.

13    I asked if they had in place a methodology

14 to transfer the voter registration applications to a

15 Supervisor of Elections in a timely manner.

16    Q  Anything else?

17    A  That's my recollection what I asked.

18    Q  Let me back up to your review of the

19 period of time of her allegations. What did you

20 conclude about the period of time that are covered

21 by the allegations?

22    A  The districts are the ones that have that

23 data. All I can tell you is what they had told me

24 about the period of time.

25    Q  What were you told?

103

1    A  Our records -- I was told our records

2 showed that -- I believe the dates may be a day or

3 two off, I don't know -- but in January of '99, our

4 records show that Miss Clark came into our office to

5 apply for some sort of assistance; that she returned

6 again in I believe it was May of 2000 to be

7 recertified or new application, I don't recall

8 which, and those were the dates I believe I was

9 given as far as we had contact.

10    Q  And were you satisfied that she had, in

11 fact, been offered a voter preference form?

12    A  I did not know whether she was offered a

13 voter preference form or not.

14    Q  And did you inquire about that?

15    A  I asked for a copy if they had one.

16    Q  And that's the forms that were never

17 produced, correct?

18    A  That's correct, but they're only kept for

19 two years. I'm not sure. If she filled one out in

20 January of '99, I wouldn't have one in possibly

21 January of 2001.

22    Q  Let me ask you this: When the lawsuit was

23 filed back in January of 2001, did you instruct the

24 offices not to destroy or discard voter preference

25 forms from that date forward?

104

1    MR. MAC INNES:  Objection as to form.

2    A  I didn't take over until June 2001.

3 You're saying January?

4    Q  Yes. Okay. So you started in June of

5 2001?

6    A  Correct.

7    Q  Do you know whether or not there was put

8 in place any policy to not destroy the voter

9 preference forms because of pending litigation?

10    MR. MAC INNES:  Objection as to form.

11    A  I don't recall any such discussion.

12    Q  So then for Joanna Clark, you didn't

13 receive voter preference forms for any dates for

14 her, correct?

15    A  No, I don't believe so.

16    Q  Even those that might have fallen within

17 the two-year period?

18    A  Correct.

19    Q  Okay. You also said that you asked if the

20 centers had -- I guess the center that was

21 involved -- had voter registration applications

22 available for anyone to pick up?

23    A  Correct.

24    Q  And what was your conclusion about that?

25    A  They said they do leave them out for the

105

1    common public or general public to provide them an
2    opportunity to register.
3        Q    Did you go visit any of these offices?
4        A    No.
5        Q    Did you have Mr. Ferguson visit the
6    offices that Joanna Clark went into?
7        A    No.
8        Q    Did you have a meeting with the person who
9    might be in charge of the offices that Joanna Clark
10   went to?
11       A    Yes.
12       Q    And who is that person?
13       A    Elizabeth Massey.
14       Q    And is she in a particular office?
15       A    I do not know where her office is.
16       Q    What is her title?
17       A    I believe she's a program office
18   administrator.
19       Q    Is she in the Fort Lauderdale area?
20       A    Yes.
21       Q    And she's -- is she actually in a service
22   center?
23       A    I believe she's at a program office and I
24   don't believe they're the same place.
25       Q    Did you go down there to meet with her?

107

1    procedures in place in those offices to ensure that
2    the voter preference forms are being used?
3        A    That would be normal for me to do it that
4    way, to try to find out.
5        Q    And what exactly was her response?
6        A    That they have implemented and that's in
7    place.
8        Q    But what did she tell you about the
9    specific procedures?
10       A    We didn't discuss who hands out what
11   forms.
12       Q    Well, if you didn't discuss that, what did
13   you discuss?
14       A    I think I just told you what we discussed.
15       Q    Okay. I'm not clear, so I need to be
16   clear for the record. What did you discuss? If
17   you're saying that you didn't discuss who hands them
18   out but you say you discussed the procedures, what
19   exactly did you discuss about the procedures for
20   using the voter preference form?
21       A    Were they providing them to clients at
22   application, reapplication and change of address.
23       Q    Did she tell you where these voter
24   preference forms were kept in the office?
25       A    No.

106

1        A    No.
2        Q    How did you meet with her?
3        A    Telephonically.
4        Q    And what did you discuss during that
5    conversation?
6        A    The same things I just talked about,
7    asking her to provide for me --
8        Q    She is the person who responded to your
9    inquiries?
10       A    Yes.
11       Q    And what were you told about the
12   procedures in place to ensure that voter preference
13   forms were being used?
14       A    She assured me that was in place and that
15   they had training in place.
16       Q    Okay. She assured you that the procedures
17   for using the voter preference form were in place.
18   Did she tell you what the procedures were?
19       A    I believe we did discuss what instances
20   they should be provided in, and she agreed that
21   that's when they were being provided.
22       Q    Did you tell her what you expected and
23   then she said yes, that's what we are doing?
24       A    I don't recall if that's it or not.
25       Q    Did you just ask her what are the

108

1        Q    Okay. You said that you discussed the
2    method of transferring voter registration
3    applications to the Supervisors of Elections. What
4    did she tell you about that?
5        A    She told me that at the end of each day,
6    they batched the voter registration application
7    forms and placed them in I believe a satchel or a
8    bag of some sort that's provided, if I recall
9    correctly, by the Supervisor of Elections office.
10       Q    Let me ask you, when did you have this
11   conversation with Miss Massey?
12       A    I don't recall when we began the
13   communications actually.
14       Q    Do you think it was prior to sending out
15   this memorandum dated October 16, 2001?
16       A    I don't know. I really don't.
17       Q    Do you think it was way back when you
18   started in June 2001 with the voter registration?
19       A    No, I don't believe it was in June.
20       Q    So --
21            MR. EHRLICH:  Are we going to be
22       taking a lunch break?
23            MS. BROWNE:  Yes. What time is it
24       now?
25            MR. MAC INNES:  12:20.

SHEET 32

**125**

1    which was the memo from you to the district
2    volunteer coordinators.  That memo asks the district
3    coordinators to read the attached memorandum and
4    advise your office if the district uses the process
5    described in the memorandum.
6        A    Uh-huh.
7        Q    If it is not, please explain.  I would
8    like to know if you received any responses to that
9    inquiry?
10       A    Yes, I did.  Yes, I did.
11       Q    Were those sent by e-mail to Mr. Ferguson
12   as people are directed to do?
13       A    Yes, they were.
14       Q    And what was -- what were the responses in
15   those e-mails?
16       A    They all said they were complying.
17       Q    And does Mr. Ferguson have those e-mails
18   as documents?
19       A    Does he still?
20       Q    Does he still have them?
21       A    I would suspect he has them in his files.
22   I can't answer that for sure.
23       Q    And did you ask Mr. Ferguson to compile a
24   summary of those responses?
25       A    I don't recall if I did on that one or

**126**

1    not, but I recall seeing some responses and all were
2    positive.
3        Q    Okay.  Let me get you to look at exhibit
4    11 which is in front of you.  Are you familiar this
5    series of e-mails?
6        A    I'm not sure if I have seen all of these
7    exchanges or not.  I've gone through some of the
8    documentation we have provided; but whether I recall
9    each and every one, I don't remember specifically
10   something in Plant City but --
11       Q    Let me ask you, did you ask Mr. Ferguson
12   to send out this inquiry?
13       A    Yes, I did.
14       Q    And he was to ask about the voter
15   preference forms, how they are being stored and how
16   easily accessible they are?
17       A    I believe this was in relation to
18   completed voter preference forms.
19       Q    Let me get you to look at the fourth page
20   back which is a response of Robert Baker to Carol
21   Canady.  Do you know what district Robert Baker is
22   in?
23       A    No.
24       Q    What about Carol Canady?
25       A    Region 23 which is Sun Coast.

**127**

1        Q    And that's where we only have one region,
2    correct?
3        A    That's the only one we have at this time.
4        Q    And Mr. Baker says that the voter
5    registration forms are in short supply.  Do you know
6    what was done to resolve that issue, if anything?
7        A    That would be the district's
8    responsibility.  Hopefully they got some more forms.
9        Q    And then down a few lines, the fourth line
10   it says, "Honestly, most staff I asked were not
11   aware of the form."
12            Do you know what was done to resolve that
13   issue?
14       A    I don't know who all staff -- the staff
15   are.  These people he was talking to may not even be
16   involved in this process.
17       Q    Okay.  It says most staff, right?
18       A    Well, where is that at?
19       Q    It says, "Honestly, most staff I asked
20   were not aware of the form."
21       A    I don't know who he asked.
22       Q    But I'm not asking you that.
23       A    I don't know if.
24       Q    I'm asking --
25       A    Okay.

**128**

1        Q    I am asking do you know what was done to
2    resolve that issue?
3        A    No.
4        Q    Do you know if anything was done to
5    resolve that issue?
6        A    No.
7        Q    And the sentence before that says, "The
8    two family track units did not have the form
9    available."
10           Do you know if anything was done to
11   resolve that problem?
12       A    No.
13       Q    And this e-mail, in fact, is dated
14   January 8, 2002, correct?
15       A    It is.
16       Q    And you all, as in DCF, were already the
17   subject of litigation at this point, correct?
18       A    Correct.
19       Q    And, in fact, the e-mail that was sent
20   from Mr. Ferguson indicated that he wanted these
21   responses because of the litigation, correct?  If
22   you look back to the second page --
23       A    He's saying as part of it -- yes, part of
24   the inquiry.
25       Q    And then the second to last line of

SHEET 33

129

1   Mr. Baker's e-mail says, "Anyway, this appears to be

2   something that has not been happening here at

3   Brandon.  Is there a memo from the past that has the

4   procedure and is there a newer version of the form

5   we should be using?"

6        Do you know if anything was done to

7   resolve that issue?

8    A   No.  I don't have firsthand knowledge at

9   all.

10    Q   Would you expect the people in this office

11   to have been trained about the voter preference

12   form?

13    A   Those related to the program, yes, they

14   should be provided the procedures, yes.

15    Q   And would you expect that in January of

16   2002 that a person that has responsibilities for

17   voter registration would be asking if there's a memo

18   about the procedure for these forms?

19    A   I don't know that Robert Baker has any

20   responsibilities related to --

21    Q   I didn't ask you that.

22    A   That's who it's from.

23        MS. BROWNE:  Can you repeat my

24   question?

25        (The question referred to was read back by

130

1   the reporter as above recorded.)

2    A   No.  I would expect them to know the

3   procedures.

4    Q   Do you know if Mr. Ferguson ever followed

5   up to resolve this issue with Robert Baker?

6    A   No.

7    Q   Do you know if Carol Canady ever followed

8   up to make sure that this issue was resolved?

9    A   No, I do not.

10    Q   So who's responsibility is it to make sure

11   that voter registration is happening at DCF?

12    A   In the districts, they have the

13   responsibility to follow their plan --

14   implementation plans related to -- as we talked

15   earlier -- to National Voter Registration Act.

16    Q   And who's supposed to be making sure that

17   they do their job with regard to those

18   responsibilities?

19    A   In the district?

20    Q   For DCF?  Who is supposed to make sure

21   that the district coordinators are doing their job

22   with regard to NVRA?

23    A   I'm responsible for the program at this

24   point.

25    Q   Can you look at page -- let's -- if you

131

1   look at the bottom in the corner it says 39440 down

2   at the bottom.

3    A   Of what?

4    Q   It's like about two pages back.  At the

5   top this is an e-mail from Roseann L-i-r-i-a-n-o to

6   Carol Canady regarding voter preference forms,

7   storage and retrieval.  And it says, "Honestly, they

8   are in boxes in Room 160 of our office.  They are

9   accessible to everyone and are not identified by

10   title or form number on box.  Form supply staff

11   (clerk) advise very few staff use them and they have

12   been overstocked for a very long time."

13        First, do you know who Roseann Liriano is?

14    A   No.

15    Q   And Carol Canady, again, is in the Sun

16   Coast region?

17    A   That's correct.

18    Q   And is she the district coordinator for

19   NVRA from that region?

20    A   I'm not sure.  I'm not sure.

21    Q   When she indicates that very few staff use

22   these preference forms, does that give you some

23   concern?

24    A   Not on the face of it it doesn't.  I have

25   no idea how many they should use --

132

1    Q   No.  It's not about --

2    A   -- or how many people.  I don't know how

3   many people would be involved, if she's speaking of

4   one center.  I don't know what she's talking about

5   here exactly.

6    Q   If she were referring to very few staff

7   who should be using them do not use them, would that

8   give you concern?

9    A   Yes, absolutely.

10        MR. MAC INNES:  Objection as to form.

11    Q   And the fact that she says in the next

12   part of that sentence that they've been overstocked

13   for a long time, does that give you concern?

14    A   No.

15    Q   The fact that they're not using them and

16   they're overstocked for a long time, that doesn't

17   give you concern about whether or not they're

18   meeting the requirements?

19        MR. MAC INNES:  Objection as to form.

20    A   Overstocked doesn't concern me.

21    Q   No.  I'm putting the two together as she

22   did, the fact that the staff is not using them and

23   the fact that the forms have been overstocked for a

24   long period of time, that does not give you concern?

25    A   If you relate them together, that would

SHEET 34

134

1  give me concern.

2     Q   The next page, please, and this is an

3  e-mail from Nivaldo, N-i-v-a-l-d-o Cruz, C-r-u-z, to

4  Sandra Stubbs, and that D11, does that stand for

5  district 11?

6     A   Yes.

7     Q   Where is that located?

8     A   Miami.

9     Q   Okay.  And she says in this e-mail that --

10  I mean he -- Nivaldo says, "Sandra, I consulted with

11  three service centers in our district in regards to

12  this issue."

13        And at the end of that paragraph, it says,

14  "The preference form is not/rarely being used."

15        Do you know what steps were taken to

16  resolve that problem, if any?

17     A   No.

18     Q   Did your office follow up to make sure

19  that it was resolved?

20     A   I don't know.

21     Q   Now, this e-mail that was sent by

22  Mr. Ferguson, again you directed him to send out

23  this inquiry, correct?

24     A   I did.

25     Q   And it was done in connection with this

135

1     Q   Did you see any documents that indicated

2  to you that Mr. Hanson had made such an inquiry of

3  the DCF offices?

4        MR. MAC INNES:  Objection as to form.

5     A   I don't recall any.

6        (Exhibit 12 marked for identification.)

7  BY MS. BROWNE:

8     Q   I'm giving you what's been marked as

9  exhibit 12 and that is a memo dated January 8, 2002

10  to operational program administrators, public

11  assistance specialist supervisors and clerical

12  supervisors from Carol Canady, subject:  Voter

13  registration procedures.  Are you familiar with this

14  document?

15     A   I've seen this recently.

16     Q   And Carol Canady is the same person who

17  received several responses in the last exhibit,

18  correct, e-mail responses?

19     A   Yes.

20     Q   And the first sentence says, "It has come

21  to our attention·that not all service centers are

22  following the correct procedures for voter

23  registration requirements.  Please inform staff that

24  all clients must be offered the opportunity to

25  register to vote."

136

1        Do you know if Miss Canady required

2  training of the employees in Sun Coast region after

3  she found out that they were not following the

4  correct procedures for voter registration?

5     A   No, I do not know.

6     Q   And was any corrective action taken by

7  your office with regard to these findings?

8     A   I just saw this last week and no.

9     Q   Do you plan to take any corrective action?

10     A   We already are working on the process.

11     Q   And what are you doing to work on it?

12     A   As I said a little earlier, preservice

13  training is being beefed up so we can ensure

14  training is in the districts.  Monitoring is being

15  beefed up.  We have a work group put together so we

16  can begin to work on a monitoring tool so we know

17  monitoring is going on with our requirement to make

18  sure corrective action plan is put together, any

19  discrepancies noted.

20        I've met with the program administrators

21  and asked them to go back and review the program and

22  make sure they were in compliance, plan on

23  discussing these topics once a month in phone

24  conversation.  We have put together -- asked the

25  districts to put together batch log that --

1  lawsuit, correct?

2     A   It was.

3     Q   And without this lawsuit existing, you

4  would not have known that these problems existed; is

5  that correct?

6        MR. MAC INNES:  Objection as to form.

7     A   I don't know if that's true or not.

8     Q   Well, had you done this --

9     A   As a new supervisor --

10     Q   Had you done this as soon as you started

11  in 2001 in this position?

12     A   This isn't my only duty and as a new

13  supervisor.

14     Q   Excuse me.  That's not what I asked.  I

15  asked whether or not you had sent out this kind of

16  inquiry in June of 2001 when you took over voter

17  registration responsibilities?

18     A   Did I, is that the question?

19     Q   Yes.  Did you undertake this type of

20  inquiry when you started the voter registration

21  responsibilities in June of 2001?

22     A   This type of inquiry, no.

23     Q   Do you know whether or not Mr. Hanson had

24  taken this kind of inquiry?

25     A   No, I do not know.

SHEET 36

141

1  guess.

2      Q   Okay.  You can give me a guess.

3          MR. MAC INNES:  Object as to form.

4      A   A quarter of my time perhaps.

5      Q   Really, 25 percent of your time?

6      A   At this point.

7      Q   And is that -- has that been true since

8  June of 2001?

9      A   That's hard to say.  I don't know.  It's

10  hard to say.

11     Q   Have you spent more time recently on voter

12  registration programs, and recently I mean within

13  the past six months?

14     A   Yes.

15     Q   What about Mr. Ferguson, what percentage

16  of his time is spent on voter registration projects?

17         MR. MAC INNES:  Object as to form.

18     A   Gosh, perhaps an eighth.

19     Q   Let me go back to your time, the 25

20  percent.  If I were to subtract time spent related

21  to this lawsuit --

22     A   Uh-huh.

23     Q   -- what percentage of your time would you

24  say you spend on voter registration?

25         MS. BROWNE:  Objection as to form.

142

1      A   Of all the programs, maybe one-eighth of

2  time also.

3          MS. BROWNE:  I don't have anything

4      further.

5          MR. MAC INNES:  Can we take a short

6      break?

7          MS. BROWNE:  Sure.

8          MR. MAC INNES:  Five minutes.

9          MS. BROWNE:  Five minutes.

10         (Brief recess taken.)

11         MR. MAC INNES:  We are back on the

12     record.

13             CROSS EXAMINATION

14  BY MR. MAC INNES:

15     Q   Mr. Bowman, I'm handing you deposition

16  exhibit number 11 which was the series of e-mails

17  that Miss Browne asked you about.

18         Would you turn to the last page of that

19  compilation of documents, please?

20     A   Sure.

21     Q   There's an e-mail from Nivaldo Cruz to

22  Sandra Stubbs.  Do you see that?

23     A   Yes.

24     Q   What is the date of that e-mail?

25     A   August the 22nd of 2001.

143

1      Q   How many months after you took your new

2  position with NVRA responsibilities is this e-mail?

3      A   About two months.

4      Q   Did you have anything to do with directing

5  or initiating this question that resorted in this

6  answer?

7      A   Greg Ferguson is the one who sent this

8  out.

9      Q   Did you direct Greg Ferguson to send it

10  out?

11     A   Is this the question related to -- no.

12     Q   Do you know when the Department of

13  Children & Families got sued in this case?

14     A   I believe it was around September,

15  October.

16     Q   Of what year?

17     A   2001.

18     Q   So does this e-mail predate the

19  institution of this suit with regard to DCF?

20     A   Yes, it does.

21     Q   Earlier on in your testimony today you

22  said or made reference to the buck stops with

23  secretary Kearney.

24         With regard to NVRA, who within the

25  department do you think is actually responsible for

144

1  NVRA compliance?

2      A   Myself.

3      Q   Who's your boss?

4      A   Paul Bartlett.

5      Q   Who's his boss?

6      A   Kim Brock.

7      Q   Who's Kim Brock's boss?

8      A   Linda Dillworth.

9      Q   Who's Linda Dillworth's boss?

10     A   They recently changed that position, but

11  there is someone over programs that she reports to

12  under the secretary.

13     Q   So are there several layers of

14  administration between you and Secretary Kearney?

15     A   Absolutely.

16     Q   If a DCF client out in the field somewhere

17  had a complaint about the way the department was

18  handling the NVRA responsibilities, to whom could

19  the customer complain?

20     A   Anybody in one of our officers could

21  accept a complaint.

22     Q   And what would the office do who received

23  the complaint?  What -- how would the office handle

24  that complaint?

25     A   It would be handled locally in the

**PLAINTIFFS' EXHIBIT 37**

010802AI

```
0001
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION
 3              CASE NO. 01-120-CIV-GOLD
 4
    NATIONAL ASSOCIATION FOR THE ADVANCEMENT
 5  OF COLORED PEOPLE, INC., by its FLORIDA
    STATE CONFERENCE OF BRANCHES, et al.,
 6
            Plaintiffs,
 7
    vs.
 8
    KATHERINE HARRIS, Secretary of State of
 9  Florida, et al.,
10          Defendants.
11
12
13
14
15                    DEPOSITION
16
                          of
17
18                  ADMATHA ISRAEL
19
20
21            111 Northwest First Street
                    Suite 2810
22                Miami, Florida
23
              Monday, Januray 7, 2002
24            11:14 a.m. - 12:20 p.m.
25
0002
 1                   APPEARANCES
 2
    For the NAACP:
 3
                    THOMASINA H. WILLIAMS, ESQ.
 4              Law Offices of
                Williams & Associates, P.A.
 5              Brickell Bayview Center
                Suite 1830
 6              80 SW Eighth Street
                Miami, Fl 33130
 7
 8  For Broward County:
 9                  BURNADETTE NORRIS-WEEKS, ESQ.
                Law offices of
10              Burnadette Norris-Weeks, P.A.
                100 Southeast 6th Street
11              Fort Lauderdale, Fl 33301
12
    For People for the American Way Foundation:
13
                    ALMA HENDERSON, ESQ.
14              People for the American Way Foundation
                2000 M Street Northwest
15              Suite 400
                Washington, DC 20036
16
```

Page 1

```
                              010802AI
17   For Miami-Dade County:
18                SUSAN TORRES, ESQ.
                  JEFFREY EHRLICH, ESQ.
19                Assistant County Attorneys
                  111 Northwest First Street
20                Suite 2810
                  Miami, Florida 33128
21
22   For Fred Dickinson and Kathleen Kearney:
23                VERONICA E. DONNELLY, ESQ.
                  Assistant Attorney General
24                Office of the Attorney General
                  PL-01, The Capitol
25                Tallahasse, Florida 32399
0003
 1   For Pam Iorio, Hillsborough County:
 2                KENNETH A. TINKLER, ESQ.
                  Assistant County Attorney
 3                County Center, 27th Floor
                  P.O. Box 1110
 4                Tampa, Fl 33601
 5   For ChoicePoint, Inc.:
 6                OMAR ORTEGA, ESQ.
                  Adorno & Zeder, P.A.
 7                2601 South Bayshore Drive
                  Suite 1600
 8                Miami, Florida 33133
 9   For Lowe, Volusia County:
     (via telephone)
10
                  DANIEL ECKERT, ESQ.
11                Assistant County Attorney
                  Volusia County Attorney's Office
12                123 West Indiana Avenue
                  DeLand, Florida 32720
13
     For Katherine Harris and Clay Roberts:
14
                  WALTER J. HARVEY, ESQ.
15                Steel Hector & Davis, LLP
                  200 South Biscayne Boulevard
16                Miami, Fl 33131
17   Also Present:
18                Earnest Burnes
19                Mabel Brown
20                Brad Brown,
                  President, Miami-Dade NAACP
21
22
23
24
25
0004
 1
                      I N D E X
 2
      Witness              Direct        Cross
 3
      ADMATHA ISRAEL
 4       (By Ms. Torres)         6
         (By Ms. Donnelly)                  45
 5       (By Mr. Ortega)                    51
         (By Ms. Norris-Weeks)             54
                              Page 2
```

010802AI

```
20          Q.     And where did that conversation take
21   place?
22          A.     In a building off Biscayne and about
23   33rd Street.  I think it's next to an old police
24   department building or something.
25          Q.     In addition to Miss Dixon and the woman
0014
1    that was with her, the other attorney, is there
2    anyone else that you've spoken to about this
3    lawsuit relating to the November 2000 election?
4          A.     No, not that I can recall.
5          Q.     Are you a member of the NAACP,
6    Mr. Israel?
7          A.     No.
8          Q.     Are you currently registered to vote in
9    Miami-Dade County?
10         A.     Yes.
11         Q.     When did you first register to vote?
12         A.     I first registered to vote about -- I
13   think it was January 1996.
14         Q.     And where did you register to vote at
15   that time?
16         A.     At Joseph Caleb Center.
17         Q.     And where is that located?
18         A.     It's 5400 Northwest 22nd Avenue.
19         Q.     Can you describe to me the process by
20   which you registered to vote in January 1996?
21         A.     Not in detail.  I had just turned 18
22   years old a little while ago, and I was just
23   a_____
24   getting your voter's registration card was just
25   p_____.  It wasn't anything I was
0015
1    actively getting into.  It was just basically a
2    means to an end, trying to get my driver's
3    license.
4          Q.     So you went to the Caleb Center that
5    day to get your driver's license?
6          A.     Yes.
7          Q.     And do you remember whether you filled
8    out any separate forms regarding voters
9    registration?
10         A.     I don't recall.  I know I filled them
11   out.  I just don't recall that because_____
12   _____ eventually, so
13   I had to have filled out something.
14         Q.     When did you receive your voter
15   registration card?
16         A.     I don't remember.
17         Q.     You received it after your visit to the
18   Joseph Caleb Center?
19         A.     Yes.
20         Q.     And do you remember approximately
21   months or weeks after that?
22         A.     No, I don't.
23         Q.     Sometime thereafter?
24         A.     Yes.
25         Q.     Do you have a copy of that voter ID
0016
1    card with you?
2          A.     No, I don't.
3          Q.     Do you still have a copy somewhere?
4          A.     Probably not.  I've looked for it.  I
```

Page 7

010802AI

```
 1          A.    No, I didn't.
 2          Q.    Now, when you moved from the 7302
 3    address to the 2932 address, which you stated was
 4    approximately April of 1996, did you notify the
 5    post office of your change of address?
 6          A.    Not really sure.  By that time I was
 7    just turning 18.  I wasn't really getting any
 8    mail.  And by the time I moved into the new
 9    apartment, I was starting to get bills there, so I
10    ██████████████████████████████████████████████
11    ██████████████████████████████
12          Q.    Because you didn't think at the time
13    that there was a need to have your mail forwarded;
14    is that right?
15          A.    Exactly.
16          Q.    How long did you live at the 2932
17    Northwest 59th Street address?
18          A.    From April '96 until August 2000.
19          Q.    And then where did you move to at that
20    time?
21          A.    After that I moved to 4740 Northwest
22    25th Avenue.
23          Q.    And at that time ████████████████████
24    ████████████████████████████████████████████████
25    ████████████████████
0022
 1          A.    ██████████████████
 2          Q.    ████████████████████████████████
 3          A.    ███████
 4          Q.    And where did you do that?
 5          A.    I believe it was at the same location,
 6    the Joseph Caleb Center location.
 7          Q.    And when you visited the Joseph Caleb
 8    Center to update your address in approximately
 9    August of 2000, did you ask about updating your
10    voter registration information?
11          A.    No, I didn't.
12          Q.    ████████████████████████████████████
13    ████████████████████████████████████████████████
14          A.    ███████████████████
15          Q.    ███████████████████████████████████
16    ████████████████████████████ in the mail.
17          A.    ███████████████████
18          Q.    Did you make any inquiries after that
19    move of the Miami-Dade County Elections Department
20    about whether you should be receiving a new voter
21    ID card?
22          A.    I didn't.
23          Q.    ████████████ify the post office of your
24    ch████████████ approximately August of 2000?
25          A.    ████████████
0023
 1          Q.    And where did you do that?
 2          A.    At -- it's a location in Allapattah.  I
 3    believe it's off 29th Street and maybe 18th
 4    Avenue.  I'm not sure exactly what the address is.
 5          Q.    And you went there in person?
 6          A.    Yes, I did.
 7          Q.    And what did you do to change your
 8    address there?
 9          A.    I filled out the change of address
10    form.
11          Q.    And was your mail forwarded to your new
```

Page 10

010802AI

```
23    about that conversation.
24         A.    She told me that ████████████████
25    ████ but if I went there, they would be able to
0026
 1    make some type of provision where I could vote.
 2         Q.    And by there you mean precinct 261?
 3         A.    Exactly.
 4         Q.    Which was what she mentioned to you
 5    that was the precinct you had to go to?
 6         A.    Yes.
 7         Q.    Did she explain to you what the
 8    inactive list was?
 9         A.    No, she didn't.
10         Q.    Did you ask her what that was?
11         A.    No, I didn't.
12         Q.    Did you ask her why you were on an
13    inactive list?
14         A.    I didn't.
15         Q.    After that phone conversation, what did
16    you do?
17         A.    I went to my professor, and we rode up
18    to the precinct.  And after so many -- after
19    trying to vote, standing in line and speaking to
20    one of the supervisors there, I kept getting
21    turned down.  I asked her if I can vote -- I told
22    her that I wasn't on the list, but I spoke to
23    someone, they told me I can vote here.  And the
24    lady told me I couldn't.  This was the supervisor.
25         Q.    That was the supervisor at the
0027
 1    precinct, precinct 261?
 2         A.    Yes.
 3         Q.    And do you remember what her name is?
 4         A.    No, I don't.
 5         Q.    Did you wait in line when you first got
 6    to the precinct?
 7         A.    Yes.
 8         Q.    And then after that you spoke to the
 9    supervisor?
10         A.    Yes.
11         Q.    What is it that she told you again?
12         A.    Not in these exact words, but she told
13    me that ████████████████ ██ the list, she was
14    not able to help me.  And I told her that I spoke
15    to someone through the voter registration line,
16    and they told me I can just come up here, and if
17    they had any problems, then they can just call the
18    supervisor, the supervisor can call the
19    registration line, and they would be able to get
20    information.
21               And they said I'm sorry.  I still can't
22    help you.  We can't get through.  And I told her,
23    well, let me try.  I can get through for you.  She
24    said no, we are waiting for incoming calls.
25         Q.    Did someone actually look for your name
0028
 1    on the voter rolls that day or did you tell them
 2    that your name was not on the rolls?
 3         A.    Well, they looked for my name on the
 4    rolls.  I told her that my name was -- might be on
 5    the rolls, but it might not be.  I'm not sure.
 6    And they checked for my name.  They couldn't find
 7    it.
```

Page 12

010802AI

```
 8          Q.      And you stated that they couldn't get
 9   through on the telephone lines.  Did they actually
10   call to verify your registration status?
11          A.      No.
12          Q.      They never made a phone call?  Did you
13   ask that a phone call be made?
14          A.      Yes, I did.
15          Q.      And what was their response?
16          A.      She said I'm sorry, I can't help you.
17          Q.      Did she tell you why?
18          A.      She told me that she was expecting
19   incoming calls and the lines were busy to the
20   voter registration line.
21          Q.      What did you do after that?
22          A.      I spoke to my professor, and we just
23   went back to school.
24          Q.      Did you provide the supervisor or any
25   other poll worker that day with your voter
0029
 1   identification card?
 2          A.      No, I didn't.
 3          Q.      Did you have it with you that day?
 4          A.      No, I didn't.
 5          Q.      Do you know whether precinct 261 is a
 6   predominantly black precinct?
 7          A.      Yes, it is.
 8          Q.      Did you make any attempts to call the
 9   voter hot line number that you had called earlier
10   in the day after you left precinct 261?
11          A.      No, I didn't.  After that I figured
12   there was nothing else I could do.
13          Q.      And did you go back to the polls later
14   that day?
15          A.      By the time we got there to the polls,
16   it was about six, and after waiting and going
17   through that ordeal, it would have been useless to
18   try going back.  I mean, because they were about
19   to close anyway.
20          Q.      Do you know, Mr. Israel, whether the
21   Miami-Dade County Elections Department ever
22   received notification that you had changed your
23   address in April of 1996?
24          A.      I'm sorry.  Repeat that.
25          Q.      Sure.  Do you know whether the
0030
 1   Miami-Dade County Elections Department ever
 2   received notification of your change of address in
 3   April of 1996?
 4          A.      No, I can't say I do.
 5          Q.      And do you know whether the Miami-Dade
 6   County Elections Department ever received
 7   notification of your change of address in
 8   September of 2000?
 9          A.      No, I can't say.
10          Q.      Would you agree with me that if the
11   Miami-Dade County Elections Department had sent
12   mail to your first address that you mentioned
13   today at 7302 Northwest 19th Avenue where you
14   lived when you first registered to vote, that you
15   wouldn't have received that?
16          A.      I probably would have.
17          Q.      Why is that?
18          A.      My mother still stayed at that address.
```

Page 13

010802AI

```
10        made.  If you have any corrections, they will
11        be attached as an errata sheet or you can
12        waive that right.  It's up to you.  The
13        deposition -- the transcript of what happened
14        today is what I'm referring to.
15              THE WITNESS:  Oh, okay.  What was that
16        again?
17              MS. WILLIAMS:  You have the right to
18        read it before it's finalized before the
19        court reporter certifies that this is it to
20        make any technical corrections.  For example,
21        if there's a misspelling or something like
22        that, an errata sheet would be attached to it
23        saying you made those corrections.  You have
24        a right to read it before it's finalized or
25        you can waive that right.  It's up to you.
0058
1              THE WITNESS:  I'll waive that right.
2              MS. TORRES:  Thank you very much,
3        Mr. Israel.
4              MS. DONNELLY:  I'll take a copy.
5              MR. HARVEY:  Copy.
6              MR. ORTEGA:  We will order a copy.
7              MR. TINKLER:  Yes, copy.
8              MS. HENDERSON: Copy.
9              MS. NORRIS-WEEKS:  No copy.
10             MR. ECKERT:  No copy.
11
12        (Thereupon, the deposition was concluded)
13
14
15
16
17
18
19
20
21
22
23
24
25
0059
1                  CERTIFICATE OF NOTARY
2        STATE OF FLORIDA:
3                          SS.
4        COUNTY OF DADE:
5              I, JANET BALDAUF, Registered Professional
6        Reporter and Notary Public in and for the State of
7        Florida at Large, do hereby certify that I
8        reported in shorthand the deposition of ADMATHA
9        ISRAEL, a witness called by the defendant in the
10       above styled cause; that the witness was first
11       duly sworn by me; that the reading and signing of
12       the deposition were waived by the witness; that
13       the foregoing pages, numbered from 1 to 59,
14       inclusive, constitute a true record.
15             I further certify that I am not an
16       attorney or counsel of any of the parties, nor
17       related to any of the parties, nor financially
18       interested in the action.
19             WITNESS my Hand and Official Seal this
20       14th day of January, 2002.
```

Page 25

010802AI

21
22
        _____
        JANET BALDAUF, RPR
23      Notary Public - State of Florida
        Commission No. CC822036
24      Expires 3-31-2003
25

010802AI

0001
```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2                   MIAMI DIVISION
 3            CASE NO. 01-120-CIV-GOLD
 4
   NATIONAL ASSOCIATION FOR THE ADVANCEMENT
 5 OF COLORED PEOPLE, INC., by its FLORIDA
   STATE CONFERENCE OF BRANCHES, et al.,
 6
 7        Plaintiffs,

 8 vs.

 9 KATHERINE HARRIS, Secretary of State of
   Florida, et al.,
10        Defendants.
11
12
13
14
15                   DEPOSITION
16
                         of
17
18                 ADMATHA ISRAEL
19
20
21           111 Northwest First Street
                   Suite 2810
22                 Miami, Florida
23
             Monday, Januray 7, 2002
24           11:14 a.m. - 12:20 p.m.
25
```
0002
```
 1                   APPEARANCES
 2
   For the NAACP:
 3
                   THOMASINA H. WILLIAMS, ESQ.
 4                 Law Offices of
                   Williams & Associates, P.A.
 5                 Brickell Bayview Center
                   Suite 1830
 6                 80 SW Eighth Street
                   Miami, Fl 33130
 7
 8 For Broward County:
 9                 BURNADETTE NORRIS-WEEKS, ESQ.
                   Law offices of
10                 Burnadette Norris-Weeks, P.A.
                   100 Southeast 6th Street
11                 Fort Lauderdale, Fl 33301
12
   For People for the American Way Foundation:
13
                   ALMA HENDERSON, ESQ.
14                 People for the American Way Foundation
                   2000 M Street Northwest
15                 Suite 400
                   Washington, DC 20036
16
```
Page 1

```
                                    010802AI
17    For Miami-Dade County:
18                   SUSAN TORRES, ESQ.
                     JEFFREY EHRLICH, ESQ.
19                   Assistant County Attorneys
                     111 Northwest First Street
20                   Suite 2810
                     Miami, Florida 33128
21
22    For Fred Dickinson and Kathleen Kearney:
23                   VERONICA E. DONNELLY, ESQ.
                     Assistant Attorney General
24                   Office of the Attorney General
                     PL-01, The Capitol
25                   Tallahasse, Florida 32399
0003
1     For Pam Iorio, Hillsborough County:
2                    KENNETH A. TINKLER, ESQ.
                     Assistant County Attorney
3                    County Center, 27th Floor
                     P.O. Box 1110
4                    Tampa, Fl 33601
5     For ChoicePoint, Inc.:
6                    OMAR ORTEGA, ESQ.
                     Adorno & Zeder, P.A.
7                    2601 South Bayshore Drive
                     Suite 1600
8                    Miami, Florida 33133
9     For Lowe, Volusia County:
      (via telephone)
10
                     DANIEL ECKERT, ESQ.
11                   Assistant County Attorney
                     Volusia County Attorney's Office
12                   123 West Indiana Avenue
                     DeLand, Florida 32720
13
      For Katherine Harris and Clay Roberts:
14
                     WALTER J. HARVEY, ESQ.
15                   Steel Hector & Davis, LLP
                     200 South Biscayne Boulevard
16                   Miami, Fl 33131
17    Also Present:
18                   Earnest Burnes
19                   Mabel Brown
20                   Brad Brown,
                     President, Miami-Dade NAACP
21
22
23
24
25
0004
1                        I N D E X
2
      Witness              Direct         Cross
3
      ADMATHA ISRAEL
4       (By Ms. Torres)        6
        (By Ms. Donnelly)                   45
5       (By Mr. Ortega)                     51
        (By Ms. Norris-Weeks)               54
                                  Page 2
```

010802AI

```
20      Q.    And where did that conversation take
21 place?
22      A.    In a building off Biscayne and about
23 33rd Street.  I think it's next to an old police
24 department building or something.
25      Q.    In addition to Miss Dixon and the woman
0014
1  that was with her, the other attorney, is there
2  anyone else that you've spoken to about this
3  lawsuit relating to the November 2000 election?
4       A.    No, not that I can recall.
5       Q.    Are you a member of the NAACP,
6  Mr. Israel?
7       A.    No.
8       Q.    Are you currently registered to vote in
9  Miami-Dade County?
10      A.    Yes.
11      Q.    When did you first register to vote?
12      A.    I first registered to vote about -- I
13 think it was January 1996.
14      Q.    And where did you register to vote at
15 that time?
16      A.    At Joseph Caleb Center.
17      Q.    And where is that located?
18      A.    It's 5400 Northwest 22nd Avenue.
19      Q.    Can you describe to me the process by
20 which you registered to vote in January 1996?
21      A.    Not in detail.  I had just turned 18
22 years old a little while ago, and I was just
23 a▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24 getting your voter's registration card was just a
25 p▓▓▓▓▓▓▓▓▓▓▓.  It wasn't anything I was
0015
1  actively getting into.  It was just basically a
2  means to an end, trying to get my driver's
3  license.
4       Q.    So you went to the Caleb Center that
5  day to get your driver's license?
6       A.    Yes.
7       Q.    And do you remember whether you filled
8  out any separate forms regarding voters
9  registration?
10      A.    I don't recall.  I know I filled them
11 out.  I just don't recall that, because▓▓▓▓▓▓▓
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ eventually, so
13 I had to have filled out something.
14      Q.    When did you receive your voter
15 registration card?
16      A.    I don't remember.
17      Q.    You received it after your visit to the
18 Joseph Caleb Center?
19      A.    Yes.
20      Q.    And do you remember approximately
21 months or weeks after that?
22      A.    No, I don't.
23      Q.    Sometime thereafter?
24      A.    Yes.
25      Q.    Do you have a copy of that voter ID
0016
1  card with you?
2       A.    No, I don't.
3       Q.    Do you still have a copy somewhere?
4       A.    Probably not.  I've looked for it.  I
```
                        Page 7

010802AI

```
 1        A.    No, I didn't.
 2        Q.    Now, when you moved from the 7302
 3  address to the 2932 address, which you stated was
 4  approximately April of 1996, did you notify the
 5  post office of your change of address?
 6        A.    Not really sure.  By that time I was
 7  just turning 18.  I wasn't really getting any
 8  mail.  And by the time I moved into the new
 9  apartment, I was starting to get bills there, so I
10  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12        Q.    Because you didn't think at the time
13  that there was a need to have your mail forwarded;
14  is that right?
15        A.    Exactly.
16        Q.    How long did you live at the 2932
17  Northwest 59th Street address?
18        A.    From April `96 until August 2000.
19        Q.    And then where did you move to at that
20  time?
21        A.    After that I moved to 4740 Northwest
22  25th Avenue.
23        Q.    And at that time ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25
0022
 1        A.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
 2        Q.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
 3        A.    ▓▓▓▓▓▓▓▓
 4        Q.    And where did you do that?
 5        A.    I believe it was at the same location,
 6  the Joseph Caleb Center location.
 7        Q.    And when you visited the Joseph Caleb
 8  Center to update your address in approximately
 9  August of 2000, did you ask about updating your
10  voter registration information?
11        A.    No, I didn't.
12        Q.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14        A.    ▓▓▓▓▓▓▓▓▓▓▓▓▓
15        Q.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in the mail?
17        A.    ▓▓▓▓▓▓▓▓▓▓▓▓▓
18        Q.    Did you make any inquiries after that
19  move of the Miami-Dade County Elections Department
20  about whether you should be receiving a new voter
21  ID card?
22        A.    I didn't.
23        Q.    ▓▓▓▓▓▓▓▓▓▓▓ the post office of your
24  ch▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ August of 2000?
25        A.    Y▓▓▓▓▓▓▓▓
0023
 1        Q.    And where did you do that?
 2        A.    At -- it's a location in Allapattah.  I
 3  believe it's off 29th Street and maybe 18th
 4  Avenue.  I'm not sure exactly what the address is.
 5        Q.    And you went there in person?
 6        A.    Yes, I did.
 7        Q.    And what did you do to change your
 8  address there?
 9        A.    I filled out the change of address
10  form.
11        Q.    And was your mail forwarded to your new
```

Page 10

010802AI

```
23    about that conversation.
24         A.    She told me that ████████████████
25    ████ but if I went there, they would be able to
0026
1     make some type of provision where I could vote.
2          Q.    And by there you mean precinct 261?
3          A.    Exactly.
4          Q.    Which was what she mentioned to you
5     that was the precinct you had to go to?
6          A.    Yes.
7          Q.    Did she explain to you what the
8     inactive list was?
9          A.    No, she didn't.
10         Q.    Did you ask her what that was?
11         A.    No, I didn't.
12         Q.    Did you ask her why you were on an
13    inactive list?
14         A.    I didn't.
15         Q.    After that phone conversation, what did
16    you do?
17         A.    I went to my professor, and we rode up
18    to the precinct.  And after so many -- after
19    trying to vote, standing in line and speaking to
20    one of the supervisors there, I kept getting
21    turned down.  I asked her if I can vote -- I told
22    her that I wasn't on the list, but I spoke to
23    someone, they told me I can vote here.  And the
24    lady told me I couldn't.  This was the supervisor.
25         Q.    That was the supervisor at the
0027
1     precinct, precinct 261?
2          A.    Yes.
3          Q.    And do you remember what her name is?
4          A.    No, I don't.
5          Q.    Did you wait in line when you first got
6     to the precinct?
7          A.    Yes.
8          Q.    And then after that you spoke to the
9     supervisor?
10         A.    Yes.
11         Q.    What is it that she told you again?
12         A.    Not in these exact words, but she told
13    me that ██████████████████ on the list, she was
14    not able to help me.  And I told her that I spoke
15    to someone through the voter registration line,
16    and they told me I can just come up here, and if
17    they had any problems, then they can just call the
18    supervisor, the supervisor can call the
19    registration line, and they would be able to get
20    information.
21              And they said I'm sorry.  I still can't
22    help you.  We can't get through.  And I told her,
23    well, let me try.  I can get through for you.  She
24    said no, we are waiting for incoming calls.
25         Q.    Did someone actually look for your name
0028
1     on the voter rolls that day or did you tell them
2     that your name was not on the rolls?
3          A.    Well, they looked for my name on the
4     rolls.  I told her that my name was -- might be on
5     the rolls, but it might not be.  I'm not sure.
6     And they checked for my name.  They couldn't find
7     it.
```

Page 12

010802AI

```
 8          Q.    And you stated that they couldn't get
 9   through on the telephone lines.  Did they actually
10   call to verify your registration status?
11          A.    No.
12          Q.    They never made a phone call?  Did you
13   ask that a phone call be made?
14          A.    Yes, I did.
15          Q.    And what was their response?
16          A.    She said I'm sorry, I can't help you.
17          Q.    Did she tell you why?
18          A.    She told me that she was expecting
19   incoming calls and the lines were busy to the
20   voter registration line.
21          Q.    What did you do after that?
22          A.    I spoke to my professor, and we just
23   went back to school.
24          Q.    Did you provide the supervisor or any
25   other poll worker that day with your voter
0029
 1   identification card?
 2          A.    No, I didn't.
 3          Q.    Did you have it with you that day?
 4          A.    No, I didn't.
 5          Q.    Do you know whether precinct 261 is a
 6   predominantly black precinct?
 7          A.    Yes, it is.
 8          Q.    Did you make any attempts to call the
 9   voter hot line number that you had called earlier
10   in the day after you left precinct 261?
11          A.    No, I didn't.  After that I figured
12   there was nothing else I could do.
13          Q.    And did you go back to the polls later
14   that day?
15          A.    By the time we got there to the polls,
16   it was about six, and after waiting and going
17   through that ordeal, it would have been useless to
18   try going back.  I mean, because they were about
19   to close anyway.
20          Q.    Do you know, Mr. Israel, whether the
21   Miami-Dade County Elections Department ever
22   received notification that you had changed your
23   address in April of 1996?
24          A.    I'm sorry.  Repeat that.
25          Q.    Sure.  Do you know whether the
0030
 1   Miami-Dade County Elections Department ever
 2   received notification of your change of address in
 3   April of 1996?
 4          A.    No, I can't say I do.
 5          Q.    And do you know whether the Miami-Dade
 6   County Elections Department ever received
 7   notification of your change of address in
 8   September of 2000?
 9          A.    No, I can't say.
10          Q.    Would you agree with me that if the
11   Miami-Dade County Elections Department had sent
12   mail to your first address that you mentioned
13   today at 7302 Northwest 19th Avenue where you
14   lived when you first registered to vote, that you
15   wouldn't have received that?
16          A.    I probably would have.
17          Q.    Why is that?
18          A.    My mother still stayed at that address.
```

Page 13

010802AI

10      made.  If you have any corrections, they will
11      be attached as an errata sheet or you can
12      waive that right.  It's up to you.  The
13      deposition -- the transcript of what happened
14      today is what I'm referring to.
15              THE WITNESS:  Oh, okay.  What was that
16      again?
17              MS. WILLIAMS:  You have the right to
18      read it before it's finalized before the
19      court reporter certifies that this is it to
20      make any technical corrections.  For example,
21      if there's a misspelling or something like
22      that, an errata sheet would be attached to it
23      saying you made those corrections.  You have
24      a right to read it before it's finalized or
25      you can waive that right.  It's up to you.
0058
1               THE WITNESS:  I'll waive that right.
2               MS. TORRES:  Thank you very much,
3       Mr. Israel.
4               MS. DONNELLY:  I'll take a copy.
5               MR. HARVEY:  Copy.
6               MR. ORTEGA:  We will order a copy.
7               MR. TINKLER:  Yes, copy.
8               MS. HENDERSON: Copy.
9               MS. NORRIS-WEEKS:  No copy.
10              MR. ECKERT:  No copy.
11
12      (Thereupon, the deposition was concluded)
13
14
15
16
17
18
19
20
21
22
23
24
25
0059
1                     CERTIFICATE OF NOTARY
2       STATE OF FLORIDA:
3                         SS.
4       COUNTY OF DADE:
5               I, JANET BALDAUF, Registered Professional
6       Reporter and Notary Public in and for the State of
7       Florida at Large, do hereby certify that I
8       reported in shorthand the deposition of ADMATHA
9       ISRAEL, a witness called by the defendant in the
10      above styled cause; that the witness was first
11      duly sworn by me; that the reading and signing of
12      the deposition were waived by the witness; that
13      the foregoing pages, numbered from 1 to 59,
14      inclusive, constitute a true record.
15              I further certify that I am not an
16      attorney or counsel of any of the parties, nor
17      related to any of the parties, nor financially
18      interested in the action.
19              WITNESS my Hand and Official Seal this
20      14th day of January, 2002.
                              Page 25

010802AI

```
21
22    _____
      JANET BALDAUF, RPR
23    Notary Public - State of Florida
      Commission No. CC822036
24    Expires 3-31-2003
25
```

# PLAINTIFFS' EXHIBIT 38

1

1   .     UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF FLORIDA

3       CASE NO. 01-0120 CIV/GOLD/SIMONTON

4 NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. ET AL
5

6       Plaintiff,

7 vs.

8 KATHERINE HARRIS, ET AL

9

10       Defendant.

11 _____

12

13

14

15         DEPOSITION

16

17          OF

18

19        DAVID LEAHY

20

21

22              111 Northwest 1st Street
                Miami, Florida 33128

23

24              Friday May 24, 2002
                9:30 a.m. - 6:00 p.m.

25

052402DL

8          MR. MINCBERG:  Margins, I will say, for the
9      record, the marking on the margins are mine.  I
10     hope we did not put those in when we filed those
11     in court.
12         Q.   I will first ask you questions without
13     getting into the specific accuracy of the facts
14     alleged, but more in procedures should have been under
15     certain circumstances, see if we were clear.
16     Mr. Israel alleged on November 7, 2000, he called the
17     supervisor's office to determine where he should go
18     vote.  Do you see that?
19         A.   Yes.
20         Q.   Assuming he gave the address that he lived
21     at, someone would have told him which precinct to go
22     to, is that correct?
23         A.   Correct.
24         Q.   Now, the complaint alleges he was told to go
25     to precinct 261 at Olinda Elementary School.

215

1          A.   Yes.
2          Q.   This further states he was told he was listed
3      as inactive, but he was able to vote after the precinct
4      officer verified his voting status?
5          A.   Correct.
6          Q.   Assume he had been listed as inactive, did
7      the person who talked to him do the right thing in
8      mentioning that to him?
9          A.   Yes.
10         Q.   He could have been listed as inactive because

Page 194

052402DL

11    mail had been sent to him and was returned. Would that
12    be one way he could have been listed as inactive?
13              MS. TORRES: Objection to the form.
14         A.   That is the only way he would be listed.
15         Q.   Let me ask it again. For what reasons could
16    he have been listed as inactive?
17         A.   We place people in inactive if we receive
18    returned mail from the post office and sent out a final
19    address confirmation notice. if that notice is not
20    returned within 30 days.
21         Q.   For example. if you had sent him a voter
22    registration card at that address. and it did not get
23    to him, and was returned. that would have triggered a
24    procedure?
25         A.   Yes.


216

1              MR. MINCBERG: For the record, the person on
2         the telephone has left us. so we are going to
3         disconnect it.
4         Q.   The complaint then recites that he went to
5    precinct 261, that the poll worker could not find his
6    name on the rolls, that she could not get through to
7    the Miami Dade County Supervisor of Elections. Do you
8    see that?
9         A.   Yes.
10        Q.   If those facts are true. that would be
11    another instance of what you referred to as a
12    communications problems between the precinct and your
13    office, is that correct?

Page 195

05240ZDL

14       A.   Based on what is written here, it doesn't
15   sound like the co-worker even tried to call.  I don't
16   know whether or not that, in fact, happened, but there
17   were instances where people could not get through.
18       Q.   Now, do you recall looking into the facts, as
19   best you could determine them, with respect to
20   Mr. Israel?
21       A.   Yes.
22       Q.   Could you tell us what you found?
23       A.   I think I reviewed an affidavit where this
24   information was spelled out, there were several types
25   of movements, and so forth.  Without that document, it

                                                         217

1    is difficult to go through the history.  I don't know
2    if that document is available for me to look at.  I
3    know there was a certain movement made, but I don't
4    have those in my head.
5            MR. MINCBERG:  Well, as a matter of fact, it
6        is available.  This is a declaration of David C.
7        Leahy and this will be one more Exhibit, which we
8        will mark as Exhibit 24.
9            (Thereupon, the Document was marked as
10   Exhibit No. 24.)
11           (Recess in Proceedings).
12       Q.   Mr. Leahy, I asked to you look at what has
13   been marked as Exhibit 24.  Is that the declaration to
14   which you were referring to a few moments ago?
15       A.   Yes.
16       Q.   Directing your attention to Page 2,

052402DL

17    paragraphs numbers three and four, does that state the

18    results of what your office determined, with respect to

19    Mr. Israel?

20        A.  Yes, I did this personally.  This is what I

21    determined.

22        Q.  Since the date of the declaration, has there

23    been there any additional information that has come up

24    related to this issue?

25        A.  I don't believe.


                                                        218

1         Q.  Now, you stated in the declaration, that

2    Mr. Israel's current address of 4740 Northwest 25th

3    Street is within precinct 261, the precinct where it

4    was alleged that he was told to vote in by the person

5    on the phone, is that correct?

6         A.  Yes.

7         Q.  You further state that your office did not

8    get notification of him living at that address until

9    after this controversy arose, when he submitted a new

10   form of registration of that address?

11        A.  That is correct.

12        Q.  You don't know one way or the other on

13   election day, on November 7, 2000, if he was living at

14   that address?

15        A.  No.

16        Q.  Do you know of any reason if a voter were to

17   call and ask your office, where do I vote on election

18   day.  They would not give them an incorrect address?

19            MS. TORRES:  Objection to the form.

Page 197

052402DL

20          THE WITNESS:  My assumption is that people

21     would give the address where they lived.

22          Q.   And again, without going through all the

23     details, your paragraph recites a number of address

24     changes of Mr. Israel, correct?

25          A.   Yes.

219

1          Q.   Again, if, in part, as a result of those

2     address changes, the mail from your office had come

3     back as, not having been delivered, and you sent an

4     address form, and it was not returned, then Mr. Israel

5     would, in fact, have been placed on inactive status,

6     correct?

7          A.   Correct.

8          Q.   He would have been placed on inactive?

9          A.   On inactive status.

10          Q.   Not in precinct 261, but whatever precinct

11     your records indicated he was last registered to vote,

12     is that correct?

13          A.   Correct.

14          Q.   Your records would indicate it was not 261

15     but a different precinct?

16          A.   Yes.

17          Q.   So that your investigation would be

18     consistent with a situation in which Mr. Israel had

19     called your office, asked what precinct they should go

20     to, he was told precinct 261, he went to that precinct,

21     tried to vote, but his name was not on the active or

22     inactive list at that precinct, is that correct?

Page 198

052402DL

23        A.    That is correct.

24        Q.    Again, assuming that had happened, if

25   communications were working properly, if the poll

                                                        220

1    worker had tried to call or had successfully been able

2    to reach your office, you would have been able to

3    verify, in fact, that he was a registered voter, is

4    that correct?

5              MS. TORRES:  Objection to the form.

6              THE WITNESS:  Yes, I believe that would have

7         been the case, based on information that I know.

8         He would have been determined to be a registered

9         voter, given the address that he provided, he

10        would have been allowed to vote in precinct 261.

11        Q.    We have already talked a little bit about

12   some of the changes in the election day operation that

13   you made.  I want to establish a few other ones for the

14   record.  As I understand it, in Miami Dade, you are no

15   longer using the punch card system as was used in

16   November 2000, is that correct?

17        A.    We still have the punch card system.  We

18   can't use it after September 1 of 2002.  I can't say it

19   won't be used between now and then.  I doubt if it

20   will.  It will not be used after September 1 of this

21   year.

22        Q.    What will be used after that time?

23        A.    We have -- this County has purchased a touch

24   screen system for polling places and in person absentee

25   ballot voting, and an optical scan for mail absentee

                        Page 199

052402DL

17
18
19
20
21
22
23
24
25

1                    CERTIFICATE OF NOTARY

2

3     STATE OF FLORIDA:
                        SS.
4     COUNTY OF DADE:

5

6                    I, ILENE J. POMERANZ, a shorthand

7     Reporter and Notary Public in and for the State of

8     Florida at Large, do hereby certify that I

9     reported in shorthand the deposition of

10    David Leahy, a witness called by the

11    in the above-styled cause; that the witness was first

12    duly sworn by me; that the reading and signing

13    of the deposition were waived by the witness; that

14    the foregoing pages, numbered 1 to 239, inclusive,

15    constitute a true record.

16                    I further certify that I am not an

17    attorney or counsel of any of the parties, nor

18    related to any of the parties, nor financially

19    interested in the action.

Page 216

052402DL

20          WITNESS my Hand and official seal this 10th

21     day of June 2002.

22

23     _____
       ILENE POMERANZ
24     Notary Public - State of Florida
       My Commission No. CC 825724
25     Expires:  May 30, 2003

□

**PLAINTIFFS' EXHIBIT 39**

**Page 1**

```
  1            IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
  2
               CASE NO.  01-120-CIV-GOLD/SIMONTON
  3
  4   NATIONAL ASSOCIATION FOR THE
      ADVANCEMENT OF COLORED PEOPLE, INC.,
  5   by its FLORIDA STATE CONFERENCE OF
      BRANCHES, et al.,
  6
               Plaintiffs,
  7   vs.
  8   KATHERINE HARRIS, Secretary of
      Florida, et al.,
  9
               Defendants,
 10   _____/
 11
 12
 13
 14        DEPOSITION OF PLACIDE DOSSOUS
 15
 16
 17
          MONDAY, JANUARY 28TH, 2002
 18       600 SOUTH ANDREWS AVENUE, SUITE 200
          FORT LAUDERDALE, FLORIDA
 19            4:30 p.m. - 6:20 p.m.
 20
 21
 22
 23
 24
 25
```

**Page 2**

```
  1   APPEARANCES:
  2   THE ADVANCEMENT PROJECT.
      BY: MONIQUE L. DIXON, ESQUIRE.
  3   APPEARING ON BEHALF OF THE PLAINTIFFS.

  4   LAW OFFICES OF BURNADETTE NORRIS-WEEKS, ESQUIRE.
  5   BY: BURNADETTE NORRIS-WEEKS, ESQUIRE.
      APPEARING ON BEHALF OF BROWARD COUNTY SUPERVISOR
  6   OF ELECTIONS.
  7
      STEEL, HECTOR & DAVIS, LLP.
  8   BY: WALTER JAMES HARVEY, ESQUIRE.
      APPEARING ON BEHALF OF KATHERINE HARRIS and
  9   CLAY ROBERTS, DIRECTOR OF FLORIDA DIVISION OF
      ELECTIONS.
 10
 11   DADE COUNTY ATTORNEY'S OFFICE.
      BY: JEFFREY P. EHRLICH, ESQUIRE.
 12   APPEARING ON BEHALF OF MIAMI-DADE COUNTY, SUPERVISOR
      OF ELECTIONS, DAVID LEAHY.
 13
 14   GOREN, CHEROF, DOODY & EZROL, P.A.
      BY: MICHAEL CIRULLO, ESQUIRE.
 15   APPEARING ON BEHALF OF ORANGE COUNTY, SUPERVISOR
      OF ELECTIONS, WILLIAM COWLES.
 16
 17   ADORNO & ZEDER, P.A.
      BY: THOMAS W. WHITE, ESQUIRE.
 18   APPEARING ON BEHALF OF CHOICEPOINT, INC.

 19   ATTORNEY GENERAL'S OFFICE.
 20   BY: DOUGLAS B. MAC INNIS, ESQUIRE.
      APPEARING ON BEHALF OF FRED DICKINSON.
 21   FLORIDA DEPARTMENT OF HIGHWAY SAFETY & MOTOR
      VEHICLES and KATHLEEN KEARNEY, SECRETARY
 22   OF THE FLORIDA DEPARTMENT OF CHILDREN & FAMILIES.
 23
      HILLSBOROUGH COUNTY ATTORNEY'S OFFICE.
 24   BY: KENNETH TINKLER, ESQUIRE.
      APPEARING ON BEHALF OF HILLSBOROUGH
 25   COUNTY, SUPERVISOR OF ELECTIONS, PAM IORIO.
```

**Page 3**

```
  1
  2               INDEX
  3   WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
      PLACIDE DOSSOUS
  4
      BY MS. NORRIS-WEEKS     4          92
  5   MR. MAC INNES          49
      BY MR. EHRLICH         67
  6   BY MR. CIRULLO         78
      BY MR. TINKLER         81
  7   BY MR. HARVEY          82
      BY MR. WHITE           91
  8   BY MS. DIXON           97
  9
 10
 11
 12
 13
 14              EXHIBITS
 15   DEFENDANT'S            FOR IDENTIFICATION
 16   A     DRIVER'S LICENCE       PAGE 100
      B     VOTER'S REGISTRATION CARD  PAGE 100
 17   C     DECLARATION            PAGE 100
 18
 19
 20
 21
 22
 23
 24
 25
```

**Page 4**

```
  1           Deposition of PLACIDE DOSSOUS, taken
  2   before VALERIE LEHTO, Court Reporter/Registered
  3   Professional Reporter and Notary Public in and
  4   for the State of Florida at Large, in the above
  5   cause.
  6
  7           -----------
  8
  9   Thereupon,
 10
 11           PLACIDE DOSSOUS
 12   having been first duly sworn or affirmed, was
 13   examined and testified as follows:
 14
 15           DIRECT EXAMINATION
 16
 17   BY MS. NORRIS-WEEKS:
 18       Q.  Please state your name for the record.
 19       A.  My name is Placide Dossous.
 20       Q.  Placide Dossous?
 21       A.  Yes.
 22       Q.  Mr. Dossous, I am Burnadette
 23   Norris-Weeks.  I represent the Broward County
 24   Supervisor of Elections.
 25           This is a deposition to gain
```

21

1   hours. I left there, it was after 12:00 when I
2   left there. There was like forty people was
3   standing next to me waiting for the same thing
4   that I was waiting for, this guy to get through
5   to the supervisor. He said don't worry about it,
6   once I get through to the supervisor the
7   supervisor will give us a number which we can put
8   down for you and allow you to vote, and I said,
9   okay, even though my name wasn't on the list, but
10  since the guy told me that he's waiting for one
11  number I said I had a chance to vote, and I
12  wanted to vote so bad.
13      Q.  Now, why would you think that you could
14  have gone to a place in Broward? Had you
15  registered to vote in Broward at that time?
16      A.  When I went and changed my license.
17      Q.  Five to six months prior to, you said?
18      A.  Yes.
19          As a matter of fact, when I went there
20  I had an operator's license at that time because
21  I didn't feel like going and voting and doing my
22  CDL at the time and plus I didn't have money to
23  come up with the CDL license. The money I had
24  was for an operator's license, so when I went to
25  upgrade the operator's license to that CDL,

22

1   that's when I told them also that I want to
2   register to vote. I looked at the sign that said
3   you can register to vote at that place.
4       Q.  Let me stop you for a second.
5       I see that this license says it was
6   issued in September of 2000, September 26th,
7   2000. Is that the date that you would have gone
8   in to register to vote?
9       A.  I think so, yes. It might have been.
10      Q.  Are you sure about that?
11      A.  Because what happened is since I don't
12  have the operator's license to tell you exactly,
13  but I can remember when I went there to change my
14  operator's license to this license, I make sure I
15  tell these people again that I want to register
16  to vote.
17      Q.  Okay.
18      A.  So when they was giving me the license,
19  at the same time I feel like the guy already
20  registered me to vote, also.
21      Q.  Now, this says it was issued on
22  September 26th of 2000. Would that have been the
23  date that you would have told them that you
24  wanted to update or register to vote?
25      A.  To vote, right. Right.

23

1       Q.  Now you're sure about that?
2       A.  I'm quite sure, yes.
3       Q.  Would that have been the first time
4   that you would have registered to vote in Broward
5   County?
6       A.  Yes.
7       Q.  Now, let's talk about when you went to
8   Sheridan Vocational. You mentioned that you went
9   in to Sheridan and you waited for awhile; is that
10  right?
11      A.  Okay, when I went to Sheridan there was
12  a line in front of me, but I didn't mind.
13      Q.  How long was the line?
14      A.  It wasn't quite long. It was maybe -
15  maybe about fifty people.
16      Q.  And what time was this? What time of
17  day?
18      A.  It was like maybe quarter after 10:00,
19  because I left my house around 10:00, so around
20  ten, fifteen minutes to get there.
21      Q.  So it sounds like you would have left
22  sometime shortly after you had the conversation
23  with the lady on the phone?
24      A.  Exactly, because I was so glad, you
25  know, to find out somebody said your name is

24

1   there, just go there.
2       Q.  But you hadn't received anything in the
3   mail at this point --
4       A.  No.
5       Q.  -- telling you that Sheridan Vocational
6   was the place that you needed to go vote?
7       A.  That's the lady that gave me the
8   address, that's how come I went there. I didn't
9   even know there was a voting place there.
10      Q.  When you went to Sheridan Vocational
11  you said you waited for awhile. Who was the
12  person that you spoke with there who would have
13  been getting this number for you?
14      A.  Okay, there was an old man there, an
15  old man, because there was some of the ladies but
16  I think it was the only old man that was there
17  working.
18      Q.  Can you describe him?
19      A.  I think he would probably be somewhere
20  like I would say early sixties, probably.
21      Q.  And you said he was the only man?
22      A.  The only old man.
23      Q.  The only old man?
24      A.  He was the only old man that was there
25  besides there was some ladies, maybe about three

6 (Pages 21 to 24)

37

1    you knew of anyone by name other than your wife
2    and son who wasn't able to vote on November 7th,
3    2000. Do you know of anyone by name, anyone that
4    you can tell me about right now?
5        A.  I know some of them by name but not
6    their full names.
7        Q.  Well, who are the people that you know?
8        A.  Okay, most of them I know are Haitians,
9    but I know them by their one name or the last
10   name or the first name.
11       Q.  Do they live near you?
12       A.  Not really, because most of them live
13   in Broward - live in Miami and I live in Broward.
14   I live in Miramar.
15       Q.  Do you know of anyone in Broward that
16   you know?
17       A.  In Broward I don't know physically
18   anyone, but I heard of some people that the same
19   thing happened to me happened to them also in
20   Broward.
21       Q.  Did you hear of anybody by name that
22   you can recall?
23       A.  I didn't really look for a name or even
24   go look for the name because I had enough for
25   myself, because this is something that I had

38

1    already feel not too happy about it because since
2    I've been in this country I always -- As far as
3    I'm concerned, I feel like when I want to do
4    something and I'm qualified to do it, I always
5    want to do it.
6        For some reason I didn't get to vote
7    and I didn't feel like happy or even want to do
8    anything until I become involved in this thing.
9        Q.  Do you have any evidence to support
10   your belief that someone or some group tried to
11   prevent from voting because you're Black?
12       A.  I don't have any evidence of that, that
13   any group in particular was trying to prevent me
14   from voting except, you know, from my experience.
15   Like I said how can this be? Because that was
16   the first time I was going to vote when I went to
17   vote in November of 2000. I've been voting so
18   long before.
19       The first President I vote was Richard
20   Nixon. Even though he was a Republican and I was
21   a Democrat, but I kind of liked this guy so I
22   voted for him.
23       Q.  Who do you feel is responsible for your
24   not being able to vote on November the 7th, 2000,
25   or who or what? Was there an agency or is there

39

1    a Supervisor's office?
2        A.  For some reason I have a feeling it
3    might have been in some kind of division
4    somewhere, whether it's from the election, the
5    county of election or Motor Vehicles, because the
6    guy at Motor Vehicles, first of all he let me
7    think that I was, you know, registered but how
8    come I didn't receive the card?
9        Q.  He let you think that you were
10   registered when you went?
11       A.  No.  To me it's like --
12       Q.  No.  When did he make you think that
13   you were registered?
14       A.  When he told me to sign at the same
15   time I was signing for my license.
16       Q.  Okay, is that in September of 2000?
17       A.  Yes.
18       Q.  And how did he make you think you were
19   registered?
20       A.  Because that's the last thing I was
21   talking to him and he said, okay, no problem.
22       The question that he was asking me, he
23   was questioning me regarding to vote. He was on
24   the computer.
25       Q.  What did he say to you?

40

1        A.  First he asked me which party I would
2    like to register. I told him Democrat. So why
3    somebody would be asking me that when I'm
4    applying not only for my license but if I was
5    applying to get my voting thing, why would he
6    know which party I would represent? When he
7    asked which one I was, I said I'm a Democrat.
8        Q.  Was this person a White person?
9        A.  He was a Black guy, a young guy.
10       Q.  And you believe the young Black guy was
11   trying to prevent you from voting because of your
12   race?
13       A.  No.  No, I didn't think so but I said
14   to myself -- When I be thinking how come time for
15   me to vote and I don't get my voter's card I said
16   to myself, you know, what happened?
17       Q.  Do you think he neglected to report
18   your information?
19       A.  It might have been him or it might have
20   been the computer error, because there was a time
21   I went to the place to upgrade this license, it
22   would have been before September and I had to
23   come back because the computer went down.
24       Q.  Was that in July or was that some other
25   time?

10 (Pages 37 to 40)

57

1  was suspended for that DUI, and when I tell him
2  that I need to have a license to go to work, at
3  that time I used to work as a professional
4  driver, so they allowed me to go to a DMV
5  somewhere in Hialeah, in Miami, I had to go one
6  time, and that was the only time that I went to
7  conduct any business with DMV, it was about
8  getting that license back.
9      Q.  Well, then anytime, is this correct,
10  that anytime you visited a DMV office other than
11  September 26th, 2000, you did not attempt to
12  vote, attempt to register to vote; is that
13  correct?
14      A.  If I can understand you correctly, is
15  that you want me to tell you if I ever registered
16  at any DMV before?
17      Q.  Yes.
18      A.  No, I didn't.
19      Q.  Now, the DMV office that you went to on
20  September 26th, 2000, was that the Pembroke Pines
21  office?
22      A.  Yes.  That's the same as I got my
23  license from.
24      Q.  And do you recall who waited on you
25  that day?

58

1      A.  Who waited on me?
2      Q.  Yes.
3      A.  I don't understand what you mean
4  waiting on me.
5          Who served me?
6      Q.  Who served you?
7      A.  A young guy, a young Black man.
8      Q.  A young Black man?
9      A.  About 5'3 or 5'4.
10      Q.  Could he have been Hispanic?
11      A.  No.  He looked more like an American.
12      Q.  Did he ask you if you wanted to vote,
13  register to vote?
14      A.  I was the one that asked him.
15      Q.  And did you indicate to him whether you
16  were already registered or not?
17      A.  No.
18      Q.  Did you get a voter registration card
19  in the mail from the Supervisor of Elections
20  following your September 26th, 2000 visit to the
21  DMV office?
22      A.  No, I never did.
23      Q.  Did you contact the Supervisor of
24  Elections and ask why you did not get a voter
25  registration card?

59

1      A.  No, I didn't.
2      Q.  Why didn't you?
3      A.  Well, because at the time I was mostly
4  looking for my voting card was before the
5  election.  Since the election passed I didn't get
6  it, so to me if I was going to get it later it
7  didn't mean that much to me anymore since I
8  missed the big thing.
9      Q.  Tell me about your discussion with the
10  young Black man at the Pembroke Pines DMV office
11  on September 26th, 2000.  What do you recall
12  about that discussion?
13      A.  There wasn't really a discussion.  It
14  was like something it was time for him to serve
15  me for when I come, so not only is he going to
16  serve me with my license but at the same time I
17  told him that I want to use this opportunity to
18  register to vote and he said, okay, no problem.
19  All the questions he was asking me, he wasn't
20  writing, he was just tapping.
21      Q.  Did he have you sign anything?
22      A.  Yes.
23      Q.  What did you sign?
24      A.  On some pad.  He just said make an X,
25  he said sign there on the pad, and when I signed

60

1  that's how come my signature get on that thing
2  from the computer.
3      Q.  All right, so it was an electronic
4  computer pad that you signed on?
5      A.  Yes.
6      Q.  Did he print out a piece of paper for
7  you to sign as well?
8      A.  I think he was - I think it was some
9  kind of receipt, a receipt that I paid for
10  everything.
11          I remember it well.
12      Q.  How many times did you sign there, once
13  or twice?
14      A.  One time.
15      Q.  You don't remember signing a piece of
16  paper?
17      A.  I think that was the one time.  It was
18  like a piece of paper that wide, it was about
19  that long and that's the only thing I signed.
20      Q.  And that's when your signature also
21  appeared on the computer screen?
22      A.  Yes.
23      Q.  Did you say that your son also
24  attempted to apply to register to vote at a DMV
25  office?

101

1
2    FEBRUARY 7TH, 2002
    MR. PLACIDE DOSSOUS
3    7686 PLANTATION BOULEVARD
    MIRAMAR, FL.  33023
4
    IN RE:  NAACP vs. KATHERINE HARRIS
5        CASE NO. 01-0120 CIV
6
    Please take notice that on Monday, the
7 28th day of January, 2002, you your deposition
  in the above referred matter.  At that time, you
8 did not waive signature.  It is now necessary that
  you sign your deposition.
9
    Please call our office at the below-listed
10 number to schedule an appointment between the hours
  of 9:00 a.m. and 4:30 p.m., Monday through Friday
11 at the Esquire office located nearest you.
12    If you do not read and sign the
  deposition within thirty days, the original, which
13 has already been forwarded to the ordering
  attorney, may be filed with the Clerk of the Court.
14 If you wish to waive your signature, sign your name
  in the blank at the bottom of this letter and
15 return it to us.
16
    Very truly yours,
17
18    VALERIE LEHTO, Notary Public
    ESQUIRE DEPOSITION SERVICES
19    1218 Southeast Third Avenue
    Fort Lauderdale, FL  33301
20    954-463-9507
21 I do hereby waive my signature:
22
23 PLACIDE DOSSOUS
  cc via transcript:
24
25

---

102

1
2    CERTIFICATE
3 The State of Florida,  )
4 County of Broward    )
5
    I hereby certify that I have read the
6
 foregoing deposition by me given, and that the
7
 statements contained herein are true and correct
8
 to the best of my knowledge and belief, with the
9
 exception of any corrections or notations made
10
 on the errata sheet, if one was executed.
11
12
13    Dated this _____ day of _____,
14 2002.
15
16
17    _____
18
19
20
21
22
23
24
25

---

103

1
2    CERTIFICATE
3 STATE OF FLORIDA
4 COUNTY OF BROWARD
5    I, VALERIE LEHTO, Registered Professional
6 Reporter, do hereby certify that I was authorized
7 to and did stenographically report the foregoing
8 deposition as hereinabove shown, and the testimony
9 of said witness was reduced to computer
10 transcription under my personal supervision and that
11 the record is a true record of the testimony given
12 by the witness.
13    I further certify that I am not a
14 relative, employee, attorney, or counsel of any of
15 the parties, nor am I a relative or employee of any
16 of the parties' attorney or counsel connected with
17 the action, nor am I financially interested in the
18 action.
19    Dated this 7th day of February, 2002.
20
21
22
    _____
23    VALERIE LEHTO
    Registered Professional Reporter
    COMMISSION NO. CC759583
24    MY COMMISSION EXPIRES 8/22/2002
25

26 (Pages 101 to 103)

**PLAINTIFFS' EXHIBIT 40**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-CIV-120-GOLD
Magistrate Judge Simonton

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE PANNELL, JULIA
STONER, NATALIE CARNEGIE, ERMA J. KELLY, JOHN L.
CHEEVER, JAMES MARSHALL, LILLIE Q. ODOM, WILLIE
STEEN, WALLACE McDONALD, JERMAINE TERRY,
LORINE WALDEN, EMERY TIMBERLAKE, VALERIE
BUFORD-WELLS, MICHELLE FLOYD, CONSUELO MARIA
GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA
CLARK, JANICE KELLY, PLACIDE DOSSOUS, RONDRICK
ROSE, and URSULA HARVEY, in their own right and as
representatives of all similarly situated citizens
and residents of the State of Florida,

          Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY
ROBERTS, Director of the Florida Division of Elections;
FRED DICKINSON, Executive Director of the Florida
Department of Highway Safety and Motor Vehicles; KATHLEEN
A. KEARNEY, Secretary of the Department of Children and
Families; DAVID C. LEAHY, Miami-Dade County Election
Supervisor; MIRIAM OLIPHANT, Broward County Election
Supervisor; JOHN STAFFORD, Duval County Election
Supervisor; PAM IORIO, Hillsborough County Election
Supervisor; ION SANCHO, Leon County Election Supervisor;
and DEANIE LOWE, Volusia County Election Supervisor (all
in their official capacities); and CHOICEPOINT, INC., a
Georgia corporation d/b/a DATABASE TECHNOLOGIES, INC.,

          Defendants.

_____ /

**DEPOSITION OF:**    **JERMAINE TERRY**





# BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET            (813) 229-7207
SUITE 2200

1

2

3

4

5

6

TAKEN:                     Pursuant to Notice by
                           Counsel for Defendant
                           Hillsborough County

7

DATE:                      February 1, 2002

8

TIME:                      2:18 - 2:51 p.m.

9

PLACE:                     OFFICE OF COUNTY ATTORNEY
                           Main Conference Room
10                         27th Floor
                           601 East Kennedy Boulevard
11                         Tampa, Florida

REPORTED BY:               DEBBIE E. ASKINS
12                         Court Reporter
                           Notary Public

13

14

15

16

17

18

19

20

21

22

23

24

25



# BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE  •  TAMPA, FLORIDA 33602
401 EAST JACKSON STREET            (813) 229-7207
SUITE 2220

1    Q.    Did you review any documents prior to the

2    deposition?

3    A.    I went over a few.

4    Q.    Do you remember what you reviewed?

5    A.    My deposition-- my declaration and some others.

6    I can't remember.

7    Q.    You don't remember specifically what else?

8    A.    No.

9    Q.    Okay.  But there were other documents?

10   A.    Yeah.

11   Q.    Why are you suing the Supervisor of Elections

12   of Hillsborough County?

13   A.    Because I was denied the right to vote for

14   reasons unknown to myself and I don't want to see it happen

15   to me again.

16   Q.    Do you know who the Supervisor is for

17   Hillsborough County?

18   A.    Pam Iorio.

19   Q.    Okay.  Have you met her before?

20   A.    No.

21   Q.    Have you seen her on TV?

22   A.    No.

23   Q.    So you wouldn't recognize Pam Iorio?

24   A.    No.

25   Q.    How were you denied the right to vote?



# BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE  •  TAMPA, FLORIDA 33602
401 EAST JACKSON STREET          (813) 229-7207
SUITE 2200                            •

1    you go to driver's license office in '93?

2         A.    No.

3         Q.    Okay.  Have you gone to a driver's license

4    office since '93?

5         A.    Yes.

6         Q.    When?

7         A.    2000, I believe.

8         Q.    Do you have your license?

9         A.    Yes.

10             MS. BORGEN:  I've got a copy of it here.

11        A.    Yes.  It was '99.  Yeah, '99.

12        Q.    Okay.  That copy is a current copy of your

13   current license?

14        A.    Yes.

15        Q.    That will be Exhibit 2.

16        A.    If you want take a look at the license.

17        Q.    Okay.  So you visited a driver's license office

18   on February 23rd of '99?

19        A.    Uh-huh.  (Indicating affirmatively)

20        Q.    I need you to say "yes".

21        A.    Yes.  Sorry.

22        Q.    Is that your first license or is that a renewal

23   license?

24        A.    Renewal.

25        Q.    Were you asked if you wanted to register to



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE  •  TAMPA, FLORIDA 33602
401 EAST JACKSON STREET          (813) 229-7207

1    vote at that driver's license office?

2        A.      No.

3        Q.      Have you ever voted before?

4        A.      Yes.

5        Q.      When?

6        A.      '96.

7        Q.      You voted in the '96 presidential race?

8        A.      Uh-huh.  (Indicating affirmatively)

9        Q.      Okay.  Did you vote at the precinct that's on

10   your voter registration card?

11       A.      No.

12       Q.      Which precinct did you vote at?

13       A.      I don't remember the name.  It was on Himes

14   between Waters and Hillsborough.

15       Q.      Okay.  Did you have any problems at that

16   precinct?

17       A.      No.

18       Q.      Do you remember what happened that day?

19       A.      Which day?

20       Q.      In the '96 election when you went to vote.

21       A.      Other than the fact that I got to vote, no.

22       Q.      Were you listed on the list of voters at that

23   precinct?

24       A.      Yes.

25       Q.      Had you done a change of address with the



## BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET     •        (813) 229-7207

CERTIFICATE OF OATH

STATE OF FLORIDA           :

COUNTY OF HILLSBOROUGH   :

        I, Debbie E. Askins, do hereby certify that the deponent herein, known to me through personal knowledge, appeared before me and was duly sworn.

        Witness my official seal this 15 day of February, 2002.



DEBBIE E. ASKINS

Notary Public, State of Florida

My Commission No. DD018255

Expires:  05/13/2005



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET              (813) 229-7207

PAGE 37

CERTIFICATE OF REPORTER

STATE OF FLORIDA         :

COUNTY OF HILLSBOROUGH   :

          I, DEBBIE E. ASKINS, Court Reporter,

          DO HEREBY CERTIFY that I stenographically
reported the foregoing proceedings at the time and place so
designated and that the foregoing pages are a true and
correct, verbatim record of the proceedings.

          I FURTHER CERTIFY that I am not a
relative, employee attorney or counsel of any of the
parties, nor relative or employee of any attorney or
counsel connected with the action, nor am I financially
interested in the action.

          Dated this 15th day of February , 2002.

DEBBIE E. ASKINS
Notary Public, State of Florida

My Commission No. DD018255
Expires:  05/13/2005



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET         •         (813) 229-7207

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-CIV-120-GOLD
Magistrate Judge Simonton


NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE PANNELL, JULIA
STONER, NATALIE CARNEGIE, ERMA J. KELLY, JOHN L.
CHEEVER, JAMES MARSHALL, LILLIE Q. ODOM, WILLIE
STEEN, WALLACE McDONALD, JERMAINE TERRY,
LORINE WALDEN, EMERY TIMBERLAKE, VALERIE
BUFORD-WELLS, MICHELLE FLOYD, CONSUELO MARIA
GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA
CLARK, JANICE KELLY, PLACIDE DOSSOUS, RONDRICK
ROSE, and URSULA HARVEY, in their own right and as
representatives of all similarly situated citizens
and residents of the State of Florida,

          Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY
ROBERTS, Director of the Florida Division of Elections;
FRED DICKINSON, Executive Director of the Florida
Department of Highway Safety and Motor Vehicles; KATHLEEN
A. KEARNEY, Secretary of the Department of Children and
Families; DAVID C. LEAHY, Miami-Dade County Election
Supervisor; MIRIAM OLIPHANT, Broward County Election
Supervisor; JOHN STAFFORD, Duval County Election
Supervisor; PAM IORIO, Hillsborough County Election
Supervisor; ION SANCHO, Leon County Election Supervisor;
and DEANIE LOWE, Volusia County Election Supervisor (all
in their official capacities); and CHOICEPOINT, INC., a
Georgia corporation d/b/a DATABASE TECHNOLOGIES, INC.,

          Defendants.

_____/


          DEPOSITION OF:          JERMAINE TERRY





**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET     •            (813) 229-7207
SUITE 2220

1

2

3

4

5  TAKEN:                    Pursuant to Notice by
                            Counsel for Defendant
6                           Hillsborough County

7  DATE:                     February 1, 2002

8  TIME:                     2:18 - 2:51 p.m.

9  PLACE:                    OFFICE OF COUNTY ATTORNEY
                            Main Conference Room
10                           27th Floor
                            601 East Kennedy Boulevard
11                           Tampa, Florida

12 REPORTED BY:              DEBBIE E. ASKINS
                            Court Reporter
13                           Notary Public

14

15

16

17

18

19

20

21

22

23

24

25



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET                (813) 229-7207
SUITE 2220              •       FAX (813) 229-8468

2

1    Q.    Did you review any documents prior to the

2    deposition?

3    A.    I went over a few.

4    Q.    Do you remember what you reviewed?

5    A.    My deposition-- my declaration and some others.

6    I can't remember.

7    Q.    You don't remember specifically what else?

8    A.    No.

9    Q.    Okay.  But there were other documents?

10   A.    Yeah.

11   Q.    Why are you suing the Supervisor of Elections

12   of Hillsborough County?

13   A.    Because I was denied the right to vote for

14   reasons unknown to myself and I don't want to see it happen

15   to me again.

16   Q.    Do you know who the Supervisor is for

17   Hillsborough County?

18   A.    Pam Iorio.

19   Q.    Okay.  Have you met her before?

20   A.    No.

21   Q.    Have you seen her on TV?

22   A.    No.

23   Q.    So you wouldn't recognize Pam Iorio?

24   A.    No.

25   Q.    How were you denied the right to vote?



# BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET                    (813) 229-7207

1    you go to driver's license office in '93?

2        A.    No.

3        Q.    Okay.  Have you gone to a driver's license

4    office since '93?

5        A.    Yes.

6        Q.    When?

7        A.    2000, I believe.

8        Q.    Do you have your license?

9        A.    Yes.

10            MS. BORGEN:  I've got a copy of it here.

11       A.    Yes.  It was '99.  Yeah, '99.

12       Q.    Okay.  That copy is a current copy of your

13   current license?

14       A.    Yes.

15       Q.    That will be Exhibit 2.

16       A.    If you want take a look at the license.

17       Q.    Okay.  So you visited a driver's license office

18   on February 23rd of '99?

19       A.    Uh-huh.  (Indicating affirmatively)

20       Q.    I need you to say "yes".

21       A.    Yes.  Sorry.

22       Q.    Is that your first license or is that a renewal

23   license?

24       A.    Renewal.

25       Q.    Were you asked if you wanted to register to



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE   ●   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET     ●        (813) 229-7207

1    vote at that driver's license office?

2         A.      No.

3         Q.      Have you ever voted before?

4         A.      Yes.

5         Q.      When?

6         A.      '96.

7         Q.      You voted in the '96 presidential race?

8         A.      Uh-huh.  (Indicating affirmatively)

9         Q.      Okay.  Did you vote at the precinct that's on

10   your voter registration card?

11        A.      No.

12        Q.      Which precinct did you vote at?

13        A.      I don't remember the name.  It was on Himes

14   between Waters and Hillsborough.

15        Q.      Okay.  Did you have any problems at that

16   precinct?

17        A.      No.

18        Q.      Do you remember what happened that day?

19        A.      Which day?

20        Q.      In the '96 election when you went to vote.

21        A.      Other than the fact that I got to vote, no.

22        Q.      Were you listed on the list of voters at that

23   precinct?

24        A.      Yes.

25        Q.      Had you done a change of address with the



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE  •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET              (813) 229-7207

PAGE 37

1                    CERTIFICATE OF REPORTER

2

3

   STATE OF FLORIDA          :
4
   COUNTY OF HILLSBOROUGH   :
5
                  I, DEBBIE E. ASKINS, Court Reporter,
6
                  DO HEREBY CERTIFY that I stenographically
7  reported the foregoing proceedings at the time and place so
   designated and that the foregoing pages are a true and
8  correct, verbatim record of the proceedings.
                  I FURTHER CERTIFY that I am not a
9  relative, employee attorney or counsel of any of the
   parties, nor relative or employee of any attorney or
10 counsel connected with the action, nor am I financially
   interested in the action.
11
              Dated this  15th  day of February      , 2002.
12

13

14 DEBBIE E. ASKINS
   Notary Public, State of Florida
15
   My Commission No. DD018255
16 Expires:  05/13/2005

17

18

19

20

21

22

23

24

25



## BAY AREA REPORTING, INC.

SUNTRUST FINANCIAL CENTRE   •   TAMPA, FLORIDA 33602
401 EAST JACKSON STREET                (813) 229-7207

**PLAINTIFFS' EXHIBIT 41**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.01-120-CIV-GOLD

NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its
FLORIDA STATE
CONFERENCE OF BRANCHES,

    Plaintiffs,

  –vs–

KATHERINE HARRIS,
Secretary of State of Florida, et al,

    Defendants.

---

### DEFENDANTS SECRETARY OF STATE KATHERINE HARRIS'S AND DIRECTOR OF ELECTIONS L. CLAYTON ROBERTS'S OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Southern District Court of Florida Local Rule 26.1(g) and Federal Rule of Civil Procedure 33, the defendants Secretary of State Katherine Harris and Director of Elections L. Clayton Roberts respond to the Plaintiffs' First Set of Interrogatories dated September 21, 2001 as follows:

### GENERAL OBJECTIONS

A. Harris and Roberts object to the Plaintiffs' First Set of Interrogatories to the extent they seek to impose obligations which differ from or exceed the obligations imposed by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Southern District of Florida.

B. Harris and Roberts object to the Plaintiffs' First Set of Interrogatories to the extent

NOV 7 2001

they seek to obtain information that is beyond the scope of the issue of "class-related fact[s]" as indicated by the Scheduling Order dated August 14, 2001.

      C.     Harris and Roberts object to each Interrogatory that seeks disclosure of information or documents containing information protected by any constitutional, statutory, or common-law rights of privacy or confidentiality, or confidentiality that the defendants Harris and Roberts owe to others. The defendants Harris and Roberts reserve the right to withhold such information and/or documents containing such information until an appropriate stipulation and order is entered to protect the confidential nature of such documents and/or information.

      D.     Harris and Roberts object to each Interrogatory to the extent it seeks material protected from disclosure by the attorney-client privilege, attorney work-product doctrine, or any other privilege and/or immunity from disclosure. Harris and Roberts will comply with Local Rule 26.1(G), but in the event any protected document is produced by the defendants Harris and Roberts in response to the plaintiffs' Interrogatory, such disclosure is inadvertent and does not constitute a waiver of any privilege, immunity, or exemption.

      E.     Harris and Roberts reserve their rights to revise and supplement any and all of the following responses upon receipt and review of the plaintiffs' Supplemental Motion for Class Certification, and any subsequent responses to class-related discovery.

      Subject to, and without waiver of the above-stated general objections and the specific objections that follow, Harris and Roberts, produce under cover of this filing their Answers to the plaintiffs' First Set of Interrogatories:

## SPECIFIC OBJECTIONS AND ANSWERS OF HARRIS AND ROBERTS

2

1.   Please identify the number of complaints you received in regard to the November 7, 2000 election in Florida, whether received prior to the election, election day, or after the election, by category of complaint if available, including, but not limited to, complaints regarding:

    a.   Punch card voting machines;

    b.   Voter registration;

    c.   Failure to appear on voter roll;

    d.   Inability to contact the Supervisor of Elections office;

    e.   Busy phone lines at the polling site; and

    f.   Poll workers

**Answer:**

**The Department of State and the Division of Elections do not log or count the complaints regarding the November 2000 general elections, but have maintained copies of all complaints received.  Copies of complaints regarding the November 2000 general election that are in the possession of the Department of State and the Division of Elections were provided to parties during Harris and Roberts Rule 26 initial disclosures, are also being produced pursuant to Plaintiff's Document Request 1 and pursuant to Rule 33(d) and Rule 26.1G(5) of the Local Rules.**

3

2.   Please identify all individuals who have determined were improperly denied the
right to vote in the November 7, 2000 election, as well as any memoranda,
correspondence, and other documents relating to these individuals and the fact
that these individuals were improperly denied the right to vote.

**Answer:**

**Harris and Roberts object to this Interrogatory to the extent that it is vague,
ambiguous, and calls for a legal conclusion.   Subject to the above specific
and general objections, and without waiver hereof, Harris and Roberts state
as follows:**

**The Department of State and the Division of Elections have provided all
documented complaints, memoranda, and other non privileged documents
related to the November 2000 general election in their Rule 26 initial
disclosures.**

3.   For the county defendants, please identify the number of affirmatives/affidavits
completed at all of the polling sites in your county on November 7, 2000 in
relation to voters who were not allowed to vote, as well as the name and address
of those voters who completed an affirmation/affidavit and were not allowed to
vote, and the reason why these voters were not allowed to vote.

4

Answer:

4.  Please identify all voters purged from January 1, 1999 through November 7, 2000 pursuant to list maintenance procedures, including but not limited to purges based on alleged felony conviction, death, and duplicate registration, and for each voter, please specify (a) the basis for the purge, (b) the date of the purge, and (c) whether the voter received notification of the purge.

Answer:

**Harris and Roberts object to this Interrogatory in that it relies on the vague and ambiguous terminology, "purge," in that it seeks information not within the possession of Harris and Roberts, and in that it seeks information regarding activities not performed by Harris and Roberts. Subject to the above specific and general objections, and without waiver hereto, Harris and Roberts state:**

**This Interrogatory is not applicable to Harris and Roberts because the Department of State and the Division of Elections do not have responsibility or authority under the Florida Election Code to remove ineligible names from the counties' voter registration lists.**

5.  For the county defendants, please identify the process used by your office to verify whether the individuals who were identified by the State and its agents as probably or possibly ineligible to vote were in fact ineligible.

5

For the state defendants, please identify the process used by your office to verify whether the individuals whose names you forwarded to the county defendants as probably or possibly ineligible to vote were in fact ineligible.

**Answer:**

**Harris and Roberts object to this Interrogatory on the basis that it is vague and ambiguous, seeks information not within the possession of Harris and Roberts, seeks information regarding activities not performed by Harris and Roberts, and makes legal conclusions. Subject to the above specific and general objections and without waiver hereof, Harris and Roberts state: This Interrogatory is not applicable to Harris and Roberts because the Department of State and the Division of Elections are not responsible for verifying ineligible-voter data under the Florida Election Code.**

6.    For the county defendants, please state whether, during the period from January 1, 1999 to November 7, 2000, you purged from the voter rolls ex-felons whose right to vote was not restored in Florida, even if such individuals were not convicted of a felony in Florida and had not lost their right to vote in the state in which they were convicted or had their right to vote restored in the state in which they were convicted. If you answer in the affirmative, please identify the name, address, and date of purge for each such individual purged from your voter roll.

6

For the state defendants, please state whether, during the period from January, 1999 to November 7, 2000, you identified as possibly or probably ineligible to vote, or instructed defendant DBT to identify as possibly or probably ineligible to vote, those voters who were ex-felons whose right to vote was not restored in Florida, even if such voters were not convicted of a felony in Florida and had not lost their right to vote in the state in which they were convicted or had their right to vote restored in the state in which they were convicted.

**Answer:**

**Harris and Roberts object to this Interrogatory to the extent that it is vague, ambiguous, and draws certain legal conclusions.  Subject to the specific and general objections above, and without waiver thereof, Harris and Roberts state:**

**Pursuant to the Florida Election Code and its contract with Database Technologies, the Division of Elections forwarded to the various county elections supervisors those names listed in the Central Voter File that were "probable" and "possible" matches with the names in different data bases indicating prior felony convictions during the period January 1999 through November 7, 2000.  During the verification process that followed, most were determined by the various county elections supervisors to be ineligible, and some were later determined by them to  be eligible.**

7

7.      For the county defendants, please state whether you permitted a voter to vote on
        November 7, 2000 if the voter was purged from the voter roll based on an address
        changed, but that voter appeared at the poll to vote and stated that his or her
        address had not, in fact, changed, and if you answer in the affirmative, please
        describe the procedure by which such voters were permitted to vote.

        For the state defendants, please state whether you directed the county defendants
        to permit a voter to vote on November 7, 2000 if the voter was purged from the
        voter roll based on an address change, but that voter appeared at the poll to vote
        and stated that his or her address had not, in fact, changed.

**Answer:**

   **Harris and Roberts object to this Interrogatory in that it relies on the vague
   and ambiguous terminology, "purge," in that it seeks information not within
   the possession of Harris and Roberts, and in that it seeks information
   regarding activities not performed by Harris and Roberts under the Florida
   Election Code.  Subject to the above specific and general objections, and
   without waiver hereof, Harris and Roberts state:**

   **The are not aware of this specific question bearing raised during the Division
   of Elections' training sessions in 1999-2000, but the Division has advised that
   if, in the course of verifying the felon-matches list, mail is returned, the**

8

supervisor should proceed under the procedures in Section 98.065 of the

Florida Statutes regarding change-of-address information.

8.      Please state whether you removed any voters from the voter rolls from January 1,

1999 to November 7, 2000 based on an alleged change of residence without

confirming in writing directly from the voter that the voter had changed residence

to a place outside the registrar's jurisdiction, and if you answer in the affirmative,

please state the name, address, phone number, and date of removal from the voter

roll for each voter.

**Answer:**

Harris and Roberts object to this Interrogatory in that it is vague and

ambiguous, in that it seeks information not within the possession of Harris

and Roberts, and in that it seeks information regarding activities not

performed by Harris and Roberts under the Florida Election Code.  Subject

to the above specific and general elections, and without waiver hereof, Harris

and Roberts state as follows:

This Interrogatory is not applicable to Harris or Roberts because the

Department of State and the Division of Elections do not have the authority

or the obligation to remove names from the county voter registration lists

under the Florida Election Code.

9

9.    Please indicate whether you notified all individuals who registered to vote in 2000 of the status of their applications at least 10 days prior to the November 7, 2000 election, and if you answer in the negative, please identify the number of individuals who were not so notified as well as the name, address, phone number, date registration application received, and date voter notified of status of application for each individual.

**Answer:**

**Harris and Roberts object to this Interrogatory in that it is vague and ambiguous, in that it seeks information not within the possession of Harris and Roberts, and in that it seeks information regarding activities not performed by Harris and Roberts under the Florida Election Code. Subject to the above specific and general elections, and without waiver hereto, Harris and Roberts state as follows:**

**This interrogatory is not applicable to Harris or Roberts because under the Florida Election Code, the Department of State and the Division of Elections do not register or remove voters from the voter registration rolls, and do not review or determine the status of individual voter registration applications.**

10.    For the county defendants, please describe the process by which poll workers at individual polling sites on November 7, 2000 could determine a voter's eligibility if he voter did not appear on the precinct register, including whether the poll

10

worker was required to call off-site to check eligibility records or whether access to such data was provided at the polling site.

**Answer:**

    **Not applicable.**

11.    For the county defendants, please identify whether those voters who were in "inactive" status as of the book closing date for the November 7, 2000 election were included in the precinct registers in your county.

**Answer:**

    **Not applicable.**

12.    For the county defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you received voter registration applications from the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families and the number of applications received from each department, broken down by month.

    For the state defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you supervised the voter registration

11

duties carried out by the Florida Department of Highway Safety and Motor

Vehicles and the Florida Department of Children and Families.

**Answer:**

> **In Florida, the Department of State does not and cannot supervise the**
>
> **operations of the Florida Department of Highway Safety and Motor Vehicles**
>
> **("DMV"), the Florida Department of Children and Families ("DCF") or any**
>
> **other executive agency.** *See* **Art. IV, Sect. 6, Fla. Const.  The Secretary of**
>
> **State has the duty to coordinate the state's responsibilities under the**
>
> **National Voter Registration Act and the Florida Voter Registration Act.**
>
> **Coordination is accomplished through training programs conducted by the**
>
> **Division of Elections and through contact with a liaison from DMV and DCF.**

13.     Please identify any problems or barriers that you experienced in regard to the

voter registration functions to be carried out by the Florida Department of

Highway Safety and Motor Vehicle and the Florida Department of Children and

Families.

**Answer:**

12

Harris and Roberts object to this Interrogatory in that it relies on the vague, ambiguous, and conclusory terms, "problems" and "barriers." Subject to the above specific and general objections, and without waiver hereof, Harris and Roberts state:

This Interrogatory is inapplicable to Harris and Roberts because the Department of State and the Division of Elections does not participate in voter registration functions under the Florida Election Code.

14.     Please identify each person who has, claims to have knowledge or information pertaining to any fact related to class certification alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this action.

**Answer**:

The following individuals may have knowledge or information pertaining to class certification: All parties involved in this lawsuit, all persons identified in the parties' Rule 26 initial disclosures, all persons listed as having information on class certification in the plaintiffs' pleadings, and all persons listed in all other defendants' responses to this Interrogatory. Defendants reserve the right to supplement this answer as necessary.

13

15.     Please state the specific nature and substance of the knowledge that you believe

the person(s) identified in your response to interrogatory number 14 above may

have.

**Answer**:

**All individuals listed above may have knowledge as to their own**

**circumstances and his or her own actions relating to the allegations in the**

**Amended Complaint.**

16.     For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles,

please state the basis for your Answer to the Amended Complaint denying that

"[t]he number of black citizens of Florida who were denied the right to vote in the

November 7, 2000 election, or whose right to vote was abridged or impeded . . . is

so numerous that joinder of all members is impracticable." *See Amended*

*Complaints*, ¶ 39.

**Answer**:

**Harris and Roberts object to this Interrogatory on the grounds that it calls**

**for a legal conclusion regarding the "numerosity" requirement for class**

**actions and violates the work product privilege.  Further, the interrogatory**

**fails to quote the entire section or the remainder of the paragraph, all of**

**which were considered in the denial of Paragraph 39 by Harris and Roberts.**

14

17.     For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for our Answer to the Amended Complaint denying that "[t]here are question of law and fact common" to the proposed class. *See Amended Complaint,* ¶ 40.

**Answer**:

**Harris and Roberts object to this Interrogatory on the grounds that it calls for a legal conclusion regarding the "commonality" requirement for class actions and violates the work produce privilege.   Further, the interrogatory fails to quote the entire sentence or the remainder of the paragraph, all of which were considered in the denial of Paragraph 40 by Harris and Roberts**

18.     For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]he claims of the representative plaintiffs are typical of the claims of the class as a whole." *See Amended Complaint,  ¶ 41.*

**Answer**:

**Harris and Roberts Object to this Interrogatory on the grounds that it calls for a legal conclusion regarding the "typicality" requirement for class actions**

15

and violates the work product privilege.   This paragraph is a bear legal assertion and Harris and Roberts have denied the general underlying allegations that they denied the rights of these Florida voters during the November 2000 general election.

19.     For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that class certification is appropriate because "the Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." *See Amended Complaint, ¶ 44.*

**Answer**:

Harris and Roberts Object to this Interrogatory on the grounds that it calls for a legal conclusion and violates the work product privilege.  It is Plaintiffs' burden to establish each of the elements and Rule 23.  This paragraph is a bear legal assertion and Harris and Roberts have denied the general underlying allegations that they denied the rights of these Florida voters during the November 2000 general election.

16

L. Clayton Roberts

**STATE OF FLORIDA**

**COUNTY OF** Leon

I hereby certify that on this 31st day of October, 01, before me an officer duly authorized in the State and County aforesaid to take acknowledgments, personally appeared L. Clayton Roberts (who is personally known to me) or (who produced the following identification _____) and who acknowledged before me that he/she executed the same as his/her free act and deed and who did _____ did not take an oath.

In Witness Whereof, I have hereunto set my hand and seal in the State and County aforesaid as of this 31st day of October, 2001.



**(Print, Type, or Stamp Commissioned Name of Notary Public)**

SUELLEN B. CONE
MY COMMISSION # DD 027940
EXPIRES: May 22, 2005
Bonded Thru Notary Public Underwriters

17

Respectfully submitted,

STEEL HECTOR & DAVIS
Counsel for Florida Secretary of State
777 South Flagler Drive
West Palm Beach, Florida 33401-6161
Telephone: (561) 650-7270
Fax: (561) 655-1509

By: _____
        John W. Little, III
        Florida Bar No.:384798
        Walter J.  Harvey
        Florida Bar No.: 074144

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served by U.S. mail this *31* day

of October, 2001 upon: See attached service list.

By: _____
        Walter J. Harvey

18

## SERVICE LIST

Anita Hodgkiss, Esq.
Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Lori Outzs Borgen, Esq.
Lawyers' Committee for Civil Rights Under
Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005-2124
**Lawyers' Committee for Civil Rights Under
Law**

Daniel D. Eckert, Esq
Frank B. Gummey, III, Esq
Volusia County Attorney's Office
123 W. Indiana Avenue
DeLand, Florida 32720-4613
**Attorneys for Deanie Lowe, Volusia County
Supervisor**

Burnadette Norris-Weeks, Esq.
100 S.E. Sixth Street
Fort Lauderdale, Florida 33301
**Attorney for Broward County Supervisor of
Elections Miriam Oliphant**

Tracy I. Arpen, Jr., Esq.
Office of General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, Florida 32202-3700
**Attorneys for Duval County Supervisor of
Elections John Stafford**

Jeffrey Ehrlich, Esq.
Assistant County Attorney
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
**Attorneys for Miami-Dade County
Supervisor of Elections David C. Leahy**

Thomasina Williams, Esq.
WILLIAMS & ASSOCIATES, P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
**Attorneys for Plaintiffs**

Christopher R. Haughee, Esq.
The Bentley Law Group
P.O. Box 108
690 E. Davidson
Bartow, Florida 33830
**Attorneys for Leon County Supervisor of
Elections Ion Sancho**

Raymond W. Bergan, Esq.
Daniel Restrepo, Esq.
Williams & Connolly LLP
725 12th Street NW
Washington, DC 20005
**Attorneys for Choicepoint, Inc./DBT**

19

David V. Kornreich, Esq.
Muller, Mintz, Kornreich, Caldwell, Casey,
Crosland & Bramnick, P.A.
First Union Financial Center
200 S. Biscayne Boulevard, Suite 3600
Miami, Florid a 33131
**Attorneys for Volusia County Supervisor
of Elections Deanie Lowe**

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Hillsborough County Attorney's Office
601 E. Kennedy Boulevard, 27th Floor
Tampa, Florida 33602
**Attorney for Defendant Hillsborough
County Election Supervisor Pam Iorio**

George Waas, Esq.
Office of the Attorney General
The Capitol - Suite PL-01
Tallahassee, Florida 32399-1050
**Attorney for Fred Dickinson and Kathleen
Kearney**

Mitchell Bloomberg, Esq.
Stephanie Gail Kolman, Esq.
Adorno & Zeder
d/b/a Database Technologies, Inc.
2601 South Bayshore Drive, Suite 1600
Miami, Florida 33133
**Attorneys for ChoicePoint, Inc.**

James A. Cherof, Esq.
Kerry L. Ezrol, Esq.
Josias, Goren, Cherof, Doody and Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Fort Lauderdale, Florida 33308
**Attorney for Defendant Cowles**

20

**PLAINTIFFS' EXHIBIT 42**

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 01-CIV-120-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE ADVANCMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

   Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

   Defendants.

_____/

### DEFENDANT CHOICEPOINT, INC.'S RESPONSES TO PLAINTIFFS'
### FIRST SET OF INTERROGATORIES

   Defendant ChoicePoint, Inc., d/b/a Database Technologies Inc. ("DBT")

hereby responds and/or objects to Plaintiffs' First Set of Interrogatories.

### General Objections

   1.  DBT objects to each and every definition, instruction, or

interrogatory to the extent they call for the production of documents or the

disclosure of information protected by the attorney-client privilege, the attorney

work product doctrine, and/or any other applicable privilege, and has read all

interrogatories to exclude such privileged information.

   2.  DBT objects to each and every definition, instruction, or

interrogatory to the extent they call for information that constitutes a trade secret,

that is deemed sensitive and propriety financial information, or that otherwise is

deemed confidential.

3.   DBT objects to each and every definition, instruction, or interrogatory to the extent they purport to impose on DBT any obligations other than those mandated by the Federal Rules of Civil Procedure or the Local Rules of this Court.

4.   The foregoing general objections are incorporated into each of the responses that follow.  The stating of a response shall not be construed as a waiver of DBT's general objections.

<u>Responses To Interrogatories</u>

<u>Interrogatory No. 1</u>:

In regard to your work for the State of Florida in 1998 to 2000 regarding the Central Voter File and identifying voters who might be ineligible, please identify how matches were made between Florida voters and other lists of individuals used by DBT to carry out its work.

<u>Response</u>:

The matching criteria used in DBT's data processing work for the Division of Elections is detailed in the "Requirements Document" approved by the Division for each year's processing, i.e. for 1999 and 2000.  The Requirement Document for 1999 can be found among DBT's initial disclosures at C02391 through C02425.  The 2000 Requirements Document can be found among DBT's initial disclosures at C02552 through C02598.  In addition to the 2000 Requirements Document, the 2000 matching process is further described in the "Project Document" found in DBT's initial disclosures at C02114 through C02135.

- 2 -

Marlene Thorogood has personal knowledge of the information provided in this response and communicated that information for the preparation of this response. Nick Hindle has personal knowledge of information provided in this response.

Request No. 2:

In regard to your work for the State of Florida in 1998 to 2000 regarding the Central Voter File and identifying voters who might be ineligible, please identify how many matches were based on how many factors (e.g., the number of matches based on two factors, the number of matches based on three factors, etc.), and specify the type of factor matched (e.g., date of birth, social security number, name, etc.).

Response:

The breakdown of matches identified in the 2000 processing conducted by DBT for the Florida Division of Elections is provided in the table attached hereto. Similar information is not available for the 1999 processing. DBT did not deliver final exceptions reports to the Division of Elections in 1998.

DBT notes that the attached table identifies merely how many matches were made based on how many criteria during DBT's phase of the 2000 list maintenance process. DBT has no knowledge as to whether and to what degree the individuals noted on the exceptions reports it delivered to the Division of Elections were actually removed from Florida's registration rolls by Florida's 67 Supervisors

- 3 -

of Elections. DBT does not know all the possible changes made to the lists it provided to the Division of Elections by Division personnel. DBT does not know the extent to which Florida's Supervisors of Elections acted upon the lists they received from the Division, nor does it know if and how the different Supervisors utilized the lists.

Marlene Thorgood has personal knowledge of the information included in this response and communicated that information for the preparation of this response.

Request No. 3:

Please identify each person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact related to class certification as alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this action.

Response:

DBT has no knowledge of individuals who may have knowledge or information pertaining to class certification related facts aside from the named plaintiffs, Florida's 67 Supervisors of Elections (during the period covered by the Amended Complaint), Secretary of State Katherine Harris, Clay Roberts, Emmitt Mitchell, Janet Modrow, former Director of the Division of Elections Ethel Baxter, the Executive Director of the Department of Highway Safety and Motor Vehicles

- 4 -

Fred Dickinson, and the Secretary of the Department of Children and Families Kathleen A. Kearney.

**Request No. 4:**

Please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response to interrogatory number 3 above may have.

**Response:**

The individuals who served as Supervisors of Election in each of Florida's 67 counties, as well as those involved in the Division of Elections, during the relevant period, are likely to have information regarding their election practices and procedures which may bear on the statewide nature of the injuries alleged in the Amended Complaint.

2000 Match Criteria - FL DOE

| Matches "Based on at Least 3 Factors" | Matches "Based on at Least 2 Factors" | Matches "Based on at Least 1 Factor" |
|---|---|---|
| **Duplicates** | **Duplicates** | **Duplicates** |
| Last Name, First Name, DOB: 34,676 | SSN, DOB: 2,306 | Social Security Number: 19 |
| Last Name (80%), SSN, and either First Name or DOB: 3,403 | SSN, Last Name: 4 | |
| **Deaths** | **Deaths** | **Deaths** |
| Last Name, First Name, DOB: 64,330 | Derived SSN, DOB: 122 | |
| Last Name (80%), Derived SSN, and either First Name or DOB: 732 | Derived SSN, Last Name: 59 | |
| **Felons** | **Felons** | **Felons** |
| Last Name, First Name, DOB: 45,587 | Derived SSN, DOB: 1,617 | Social Security Number: 6,932 |
| Last Name (80%), Derived SSN, and either First Name or DOB: 1,457 | Derived SSN, Last Name: 111 | |
| Last Name (80%), SSN, and either First Name or DOB: 2,146 | SSN, DOB: 2,226 | |
| | SSN, Last Name: 121 | |
| **Clemency** | **Clemency** | **Clemency** |
| Last Name, First Name, DOB: 10,497 | Derived SSN, DOB: 9 | |
| Last Name (80%), Derived SSN, and either First Name or DOB: 18 | SSN, DOB: 15 | |
| Last Name (80%), SSN, and either First Name or DOB: 42 | SSN, Last Name: 3 | |
| **Total: 162,888** | **Total: 6,593** | **Total: 6,951** |
| | | Exception: 40 matches were manually made by various state contacts. |

_(signature)_

George Bruder

_(please print name)_

STATE OF _Florida_ }
}  ss:
COUNTY OF _Palm Beach_ }

BEFORE ME, the undersigned authority, personally appeared _____, who is personally known to me or who produced a driver's license as identification, and who after first being duly sworn, deposes and states that the foregoing Answers to Interrogatories are true and correct.

SWORN TO AND SUBSCRIBED before me this _22nd_ day of _October_, 2001.

NOTARY PUBLIC, STATE OF

Print Name: _Carrie C. Packo_

My Commission Expires: _11-21-2004_

CARRIE C. PACKO
MY COMMISSION # CC 962123
EXPIRES: Nov 21, 2004
1-800-3-NOTARY   FL Notary Service & Bonding, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2001, I caused true and correct

copies of the foregoing Defendant DBT's Responses to Plaintiff's First Set of

Interrogatories to be sent by first class mail, postage prepaid, to:

Lori Outzs Borgen
Lawyer's Committee for Civil Rights Under Law
1401 New York Ave., N.W., Suite 400
Washington, DC 20005-2124
Tel. 202-662-8600
Fax 202-783-5130

Walter James Harvey, Esq.
Steel Hector & Davis, LLP
200 S. Biscayne Boulevard
41st Floor
Miami, FL 33131-2398
phone: 305-577-7001
fax:      305-577-7001
Attorneys for Katherine Harris,
Secretary of State of Florida, and
Clay Roberts, Director of the
Florida Division of Elections

John W. Little, III, Esq.
Steel Hector & Davis, LLP
1900 Phillips Point West
777 South Flager Drive, Suite 1900
West Palm Beach, FL 33401
phone: 561-650-7270
fax:      561-655-1509
Attorneys for Katherine Harris,
Secretary of State of Florida, and
Clay Roberts, Director of the
Florida Division of Elections

H. Ray Allen, II, Esq.
Sr. Assistant County Attorney
Rebecca M. Kert, Esq.
Assistant County Attorney
Hillsborough County Attorney's Office
601 E. Kennedy Blvd., 27th Floor
Tampa, FL 33602
phone: 813-272-5670
fax:      813-272-5846
Attorneys for Hillsborough County
Supervisor of Elections Pam Iorio

Burnadette Norris-Weeks, Esq.
Burnadette Norris-Weeks, PA
100 S.E. 6th Street
Ft. Lauderdale, FL 33301
phone: 954-768-9770
fax:      954-768-9790
Attorney for Broward County Supervisor of
Elections Miriam Oliphant

James A. Cherof, Esq.
Kerry L. Ezrol, Esq.
Josias, Goren, Cherof, Doody & Ezrol, PA
3099 East Commercial Boulevard
Suite 200
Ft. Lauderdale, FL 33308
phone: 954-771-4500
fax:      954-771-4923
Attorneys for Broward County Supervisor of
Elections Miriam Oliphant

Tracey I. Arpen, Jr., Esq.
Office of General Counsel
City of Jacksonville
117 W. Duval St., Suite 480
Jacksonville, FL 32202
phone: 904-630-1835
fax:      904-630-1316
Attorney for Duval County Supervisor
of Elections John Stafford

Christopher R. Haughee, Esq.
The Bentley Law Group
PO Box 1608
690 E. Davidson
Bartow, FL 33831
phone: 863-519-9820
fax:      863-519-0720
Attorney for Leon County
Supervisor of Elections Ion Sancho

Jeff Ehrlich, Esq.
Susan Torres, Esq.
Assistant County Attorneys
Dade County Attorney's Office
Metro Dade Center
111 NW 1st Street, Suite 2810
Miami, FL 33128
phone: 305-375-5151
fax:    305-375-5634
Attorney for Miami-Dade County
Supervisor of Elections David Leahy

Michael Cirullo, Jr., Esq.
Josias Goren Cherof Doody & Ezrol, PA
3099 E. Commercial Blvd., Suite 200
Ft. Lauderdale, FL 33308-4311
phone: 954-771-4500
fax:    954-771-4923
Attorney for Orange County
Supervisor for Elections William Cowles

Mitchell Bloomberg, Esq.
Stephanie Gail Kolman, Esq.
Adorno & Zeder
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133
phone: 305-858-555
fax:    305-858-4777
Attorney for ChoicePoint, Inc.
d/b/a Database Technologies, Inc.

Daniel D. Eckert, Esq.
Frank B. Gummey, III, Esq.
Volusia County Attorney's Office
123 W. Indiana Ave.
DeLand, FL 32720-4613
phone: 386-736-5950
fax:    386-736-5990
Attorneys for Volusia County
Supervisor of Elections Deanie Lowe

David V. Kornreich, Esq.
Muller, Mintz, Kornreich, Caldwell, Casey,
  Crosland & Bramnick, PA
First Union Financial Center
200 South Biscayne, Boulevard, Suite 3600
Miami, FL 33131
phone: 305-358-5500
fax:    305-379-3802
Attorneys for Volusia County
Supervisor of Elections Deanie Lowe

George Waas, Esq.
Assistant Attorney General
Douglas B. Mac Innis
Assistant Attorney General
Office of the Attorney General
The Capitol – Suite PL-01
Tallahassee, FL 32399-1050
Attorneys for Fred Dickinson,
Executive Director
Florida Department of Highway Safety and
Motor Vehicles
And
Kathleen Kearney, Secretary of the Florida
Department of Children and Families

Daniel A. Restrepo

**PLAINTIFFS' EXHIBIT 43**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 01-0120-Civ-Gold



NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE PANNELL,
JULIA STONER, NATALIE CARNEGIE, ERMA J. KELLY,
JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q.
ODOM, WILLIE STEEN, WALLACE MCDONALD,
JERMAINE TERRY, LORINE WALDEN, EMERY
TIMBERLAKE, VALERIE BUFORD-WELLS, MICHELLE
FLOYD, CONSUELO MARIA GRAHAM, SHERRY
EDWARDS, KANDY WELLS, JOANNA CLARK, JANICE
KELLY, PLACIDE DOSSOUS and RONDRICK ROSE in
their own right and as representatives of all similarly situated
citizens and residents of the State of Florida,

                    Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY
ROBERTS, Director of Florida Division of Elections; DAVID
C. LEAHY, Miami-Dade County Election Supervisor;
MIRIAM OLIPHANT, Broward County Election Supervisor;
JOHN STAFFORD, Duval County Election Supervisor, PAM
IORIO, Hillsborough County Election Supervisor; ION
SANCHO, Leon County Election Supervisor, WILLIAM
COWLES, Orange County Election Supervisor; and DEANIE
LOWE, Volusia County Election Supervisor (all in their
official capacities); and CHOICEPOINT, INC., a Georgia
corporation d/b/a DATABASE TECHNOLOGIES, INC.,

                    Defendants.

---

## DEFENDANT JOHN STAFFORD'S RESPONSE TO
## PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant John Stafford responds to Plaintiffs' First Request for Production of Documents

numbers 1 through 8 as follows:

   A.      Defendant Stafford objects to Plaintiffs' First Set of Document Requests to the extent

they seek to impose obligations which differ from or exceed the obligations set forth in the Federal Rules of Civil Procedure and/or the Local Rules of the United States District Court for the Southern District of Florida.

   B.      Defendant Stafford objects to this Plaintiffs' First Set of Document Requests to the extent they seek to obtain information that is beyond the scope of the issue of "class-related fact[s]" as indicated by the Scheduling Order of U.S. District Court Judge Gold dated August 14, 2001.

   C.      Defendant Stafford objects to each Document Request which seeks disclosure of information or documents containing information protected by any constitutional, statutory, or common-law rights of privacy or confidentiality, or confidentiality that Defendant Stafford owes to others. Defendant Stafford reserves the right to withhold such information and/or documents containing such information until an appropriate stipulation and order is entered to protect the confidential nature of such documents and/or information.

   D.      Defendant Stafford objects to each Document Request to the extent it seeks material protected from disclosure by the attorney-client privilege, attorney work-product immunity, or any other privilege and/or immunity. Defendant Stafford will comply with Local Rule 26.1(G), but in the event any protected document is produced by Defendant Stafford in response to Plaintiff's Requests, such disclosure is inadvertent and does not constitute a waiver of any privilege, immunity, or exemption.

   E.      Defendant Stafford objects to each Document Request as overly broad, unduly burdensome, and to the extent that it is not reasonably calculated to lead to the discovery of "class-related" facts and/or admissible evidence.

-2-

F.      Defendant Stafford reserves the right to revise and supplement any and all of the following responses upon receipt and review of Plaintiffs' Supplemental Motion for Class Certification, and any subsequent responses to class-related discovery.

Defendant Stafford, subject to, and without waiver of, these objections and the specific objections that follow, produces under cover of this filing the documents requested by Plaintiffs' First Set of Document Requests and provides the following responses:

1.      Defendant Stafford has previously furnished a copy of the Final Report of the Duval County Election Reform Task Force, dated June 12, 2001.

2.      None.

3.      Furnished.

4.      Defendant Stafford has previously furnished a copy of the Final Report of the Duval County Election Reform Task Force, dated June 12, 2001.

5.      None, as voters completing affirmations/affidavits were allowed to vote.

6.      Furnished.

7.      Furnished.

8.      Furnished.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished by U.S. Mail to

the attached Service List on this _2 4_ day of October, 2001.

RICHARD A. MULLANEY
GENERAL COUNSEL

TRACEY I. ARPEN, JR.
DEPUTY GENERAL COUNSEL
Florida Bar I.D. #154493
117 West Duval Street, Suite 480
Jacksonville, FL 32202
(904) 630-1835

-4-

SERVICE LIST:    AS OF 10/11/01
NAACP et al v. HARRIS et al
Case No.: 01-120-CIV-
Gold/Simonton

**ATTORNEYS FOR PLAINTIFFS:**

Thomasina H. Williams, Esq.
Brickell Bay View Centre
80 S.W. Eighth Street, Ste. 1830
Miami, Florida 33130

Dennis Hayes, Esq., et al
NAACP Legal Dept.
4805 Mount Hope Dr., 5th Floor
Baltimore, MD 21215-3297

Barbara Arnwine, Esq., et al.
1401 New York Ave, NW, Ste 400
Washington, DC 20005-2124

Todd A. Cox, Esq.
1444 Eye Street, NW, 10th Floor
Washington, DC 20005

Penda Hair, Esq., et al.
1730 "M" Street, NW, Ste 401
Washington, DC 20036

Elaine R. Jones, Esq.
Norman Chacklin, Esq., et al.
99 Hudson Street, Suite 1600
New York, NY 10013

Laughlin McDonald, Esq.
2725 Harris Tower
233 Peachtree St., NE
Atlanta, GA 30303

Louis M. Bograd, Esq.
733 15th Street, NW, Ste 620
Washington, DC 20005

Elliot M. Mincberg, Esq., et al.
2000 "M" Street, NW, Ste 400
Washington, DC 20036

Steven Shapiro, Esq.
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004

**ATTORNEYS FOR
DEFENDANTS:**

John W. Little, III, Esq., et al.
200 S. Biscayne Blvd
Miami, FL 33131-2398

Jim Cheroff, Esq., et al.
3099 E. Commercial Blvd, Ste 200
Ft. Lauderdale, FL 33308-4311

Christopher R. Haughee, Esq.
Bently Law Group
P.O. Box 1608
Bartow, FL 33831-1608

Tucker Ronzetti, Esq.
Stephen P. Clark Center
111 NW 1st Street, Ste 2810
Miami, FL 33128-1930

H. Ray Allen, II, Esq., et al.
P.O. Box 1110
Tampa, FL 33601

Mitchell Bloomberg, Esq.
Adorno & Zeder
2601 S. Bayshore Dr., Ste 1600
Miami, FL 33133-5413

Raymond W. Bergan, Esq., et al
Williams & Connolly, LLP
725 Twelfth St, NW
Washington, DC 20005-5901

Burnadette Norris Weeks, Esq.
100 S.E. 6th Street
Fort Lauderdale, Florida 33301

David V. Kornreich, Esq.
200 S. Biscayne Blvd.
First Union Financial Center
Suite 3600
Miami, FL 33131

Daniel D. Eckert, Esq.
123 W. Indiana Avenue
DeLand, Florida 32720-4613

Michael D. Cirullo, Jr., Esq., et al.
3099 E. Commercial Blvd, #200
Ft. Lauderdale, FL 33308

George Waas, Esq.
Attorney General's Office
The Capitol - Suite PL-01
Tallahassee, FL 32399-1050

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  01-0120-Civ-Gold

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE PANNELL,
JULIA STONER, NATALIE CARNEGIE, ERMA J. KELLY,
JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q.
ODOM, WILLIE STEEN, WALLACE MCDONALD,
JERMAINE TERRY, LORINE WALDEN, EMERY
TIMBERLAKE, VALERIE BUFORD-WELLS, MICHELLE
FLOYD, CONSUELO MARIA GRAHAM, SHERRY
EDWARDS, KANDY WELLS, JOANNA CLARK, JANICE
KELLY, PLACIDE DOSSOUS and RONDRICK ROSE in
their own right and as representatives of all similarly situated
citizens and residents of the State of Florida,

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY
ROBERTS, Director of Florida Division of Elections; DAVID
C. LEAHY, Miami-Dade County Election Supervisor;
MIRIAM OLIPHANT, Broward County Election Supervisor;
JOHN STAFFORD, Duval County Election Supervisor; PAM
IORIO, Hillsborough County Election Supervisor; ION
SANCHO, Leon County Election Supervisor, WILLIAM
COWLES, Orange County Election Supervisor; and DEANIE
LOWE, Volusia County Election Supervisor (all in their
official capacities); and CHOICEPOINT, INC., a Georgia
corporation d/b/a DATABASE TECHNOLOGIES, INC.,

Defendants.

---

**DEFENDANT JOHN STAFFORD'S**
**RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Defendant John Stafford's answers to Plaintiffs' First Set of Interrogatories numbered 1

through 20:

## GENERAL OBJECTIONS

A.      Defendant Stafford objects to Plaintiffs' First Set of Interrogatories to the extent they seek to impose obligations which differ from or exceed the obligations set forth in the Federal Rules of Civil Procedure and/or the Local Rules of the United States District Court for the Southern District of Florida.

B.      Defendant Stafford objects to Plaintiffs' First Set of Interrogatories to the extent they seek to obtain information that is beyond the scope of the issue of "class-related fact[s]" as indicated by the Scheduling Order of U.S. District Court Judge Gold dated August 14, 2001.

C.      Defendant Stafford objects to Interrogatory which seeks disclosure of information or documents containing information protected by any constitutional, statutory, or common-law rights of privacy or confidentiality, or confidentiality that Defendant Stafford owes to others.  Defendant Stafford reserves the right to withhold such information and/or documents containing such information until an appropriate stipulation and order is entered to protect the confidential nature of such documents and/or information.

D.      Defendant Stafford objects to each Interrogatory to the extent they seek material protected from disclosure by the attorney-client privilege, attorney work-product immunity, or any other privilege and/or immunity.

E.      Defendant Stafford objects to each Interrogatory as overly broad, unduly burdensome, and to the extent that it is not reasonably calculated to lead to the discovery of "class-related" facts and/or admissible evidence.

F.      Defendant Stafford reserves the right to revise and supplement any and all of the

-2-

following responses upon receipt and review of Plaintiffs' Supplemental Motion for Class

Certification, and any subsequent responses to class-related discovery.

Defendant Stafford, subject to, and without waiver of, these objections and the specific

objections that follow, and provides the following responses to Plaintiffs' First Set of Interrogatories:

1.   Please identify the number of complaints you received in regard to the November 7, 2000
     election in Florida, whether received prior to the election, on election day, or after the
     election, by category of complaint if available, including, but not limited to, complaints
     regarding:

     a.   Punch card voting machines;
     b.   Voter registration;
     c.   Failure to appear on voter roll;
     d.   Inability to contact the Supervisor of Elections office;
     e.   Busy phone lines at the polling site; and
     f.   Poll workers.

**Response to Interrogatory No. 1**

     **Prior to election: None.**

     **On election day:  On November 7, 2000, the Supervisor of Elections' Office became
aware of complaints that some precinct workers were having difficulty contacting the
Supervisor of Elections' Office because of the unanticipated number of telephone calls to that
location.  The office has no record of the number of such occurrences.**

     **After election:  Despite several requests made to the community for any complaints
concerning the election, the Supervisor of Elections' Office received no such written
complaints.  A number of persons appeared before the Duval County Election Reform Task
Force, some of whom spoke on one or more of the topics identified in this interrogatory.**

2.   Please identify all individuals who you have determined were improperly denied the right to
     vote in the November 7, 2000 election, as well as any memoranda, correspondence, and other
     documents relating to these individuals and the fact that these individuals were improperly
     denied the right to vote.

**Response to Interrogatory No. 2**

Defendant Stafford objects to the question on the grounds it calls for a legal conclusion. Defendant Stafford, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response: None.

3.    For the county defendants, please identify the number of affirmations/affidavits completed at all of the polling sites in your county on November 7, 2000 in relation to voters who were not allowed to vote, as well as the name and address of those voters who completed an affirmational affidavit and were not allowed to vote, and the reason why these voters were not allowed to vote.

**Response to Interrogatory No. 3**

    None.

4.    Please identify all voters purged from January 1, 1999 through November 7, 2000 pursuant to list maintenance procedures, including but not limited to purges based on alleged felony conviction, death, and duplicate registration, and for each voter, please specify (a) the basis for the purge, (b) the date of the purge, and (c) whether the voter received notification of the purge.

**Response to Interrogatory No. 4**

    A purge of voters was conducted in January 1999 according to NVRA List Maintenance Requirements. A list of voters purged according to those requirements is available at http://duvalelections.coj.net/downloads/Duval_Purge_jan99.zip. Voters purged through this process received no additional notification, inasmuch as those voters were purged because they had failed to respond to prior address confirmation notices.

    Death Notice Lists and State Felony Lists are attached. Felons are notified by mail when they are being deleted from the voter registration rolls.

5.      For the county defendants, please identify the process used by your office to verify whether the individuals who were identified by the State and its agents as probably or possibly ineligible to vote were in fact ineligible.

For the state defendants, please identify the process used by your office to verify whether the individuals whose names you forwarded to the county defendants as probably or possibly ineligible to vote were in fact ineligible.

## Response to Interrogatory No. 5

**We mailed letters to all individuals on the lists. In those letters, we asked the voters to call the office and verify whether they were felons, duplicate registrations, or deceased. If the voters confirmed they were felons or duplicate registrations, they were deleted, as were voters identified by family members as being deceased. Voters who did not respond to the letters were maintained on the voter registration lists at the time of the November 7, 2000 election.**

6.      For the county defendants, please state whether, during the period from January 1, 1999 to November 7, 2000, you purged from the voter rolls ex-felons whose right to vote was not restored in Florida, even if such individuals were not convicted of a felony in Florida and had not lost their right to vote in the state in which they were convicted or had their right to vote restored in the state in which they were convicted. If you answer in the affirmative, please identify the name, address, and date of purge for each such individual purged from your voter roll.

For the state defendants, please state whether, during the period from January 1, 1999 to November 7, 2000, you identified as possibly or probably ineligible to vote, or instructed defendant DBT to identify as possibly or probably ineligible to vote, those voters who were ex-felons whose right to vote was not restored in Florida, even if such voters were not convicted of a felony in Florida and had not lost their right to vote in the state in which they were convicted or had their right to vote restored in the state in which they were convicted.

## Response to Interrogatory No. 6

**This office did not purge from the voter rolls persons convicted of felonies based upon the list provided by the State of Florida. The only felons purged from the voter rolls were those identified in lists provided by the local State Attorneys' Office. Therefore, all felony convictions were convictions in the state of Florida, not in other states.**

7.     For the county defendants, please state whether you permitted a voter to vote on November 7, 2000 if the voter was purged from the voter roll based on an address change, but that voter appeared at the poll to vote and stated that his or her address had not, in fact, changed, and if you answer in the affirmative, please describe the procedure by which such voters were permitted to vote.

       For the state defendants, please state whether you directed the county defendants to permit a voter to vote on November 7, 2000 if the voter was purged from the voter roll based on an address change, but that voter appeared at the poll to vote and stated that his or her address had not, in fact, changed.

**Response to Interrogatory No. 7**

       **This office has no record as to whether any voters identified in this interrogatory presented themselves at polling places under the circumstances described in this interrogatory.**

8.     Please state whether you removed any voters from the voter rolls from January 1, 1999 to November 7, 2000 based on an alleged change of residence without confirming in writing directly from the voter that the voter had changed residence to a place outside the registrar's jurisdiction, and if you answer in the affirmative, please state the name, address, phone number, and date of removal from the voter roll for each voter.

**Response to Interrogatory No. 8**

       **No.**

9.     Please indicate whether you notified all individuals who registered to vote in 2000 of the status of their applications at least 10 days prior to the November 7, 2000 election, and if you answer in the negative, please identify the number of individuals who were not so notified as well as the name, address, phone number, date registration application received, and date voter notified of status of application for each individual.

**Response to Interrogatory No. 9**

       **Yes, all new registrants are mailed a voter identification card.**

10.     For the county defendants, please describe the process by which poll workers at individual polling sites on November 7, 2000 could determine a voter's eligibility if the voter did not appear on the precinct register, including whether the poll worker was required to call off-site to check eligibility records or whether access to such data was provided at the polling site.

**Response to Interrogatory No. 10**

**Poll workers were instructed to contact the main office for verification of registration.**

11.     For the county defendants, please identify whether those voters who were in inactive" status as of the book closing date for the November 7, 2000 election were included in the precinct registers in your county.

**Response to Interrogatory No. 11**

**Inactive voters were included in the precinct registers.**

12.     For the county defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you received voter registration applications from the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families and the number of applications received from each department, broken down by month.

        For the state defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you supervised the voter registration duties carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

**Response to Interrogatory No. 12**

**Applications for voter registration described in this interrogatory were received through the mail. This office did not track the number of these applications.**

13.     Please identify any problems or barriers that you experienced in regard to the voter registration functions to be carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

**Response to Interrogatory No. 13**

**Problems encountered in regard to the voter registration functions described in this interrogatory included, incomplete applications, invalid addresses, and missing applications.**

-7-

14.   Please identify each person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact related to class certification alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this action.

**Response to Interrogatory No. 14**

John Stafford Duval County Supervisor of Elections' Office, 105 E. Monroe Street, Jacksonville, Florida 32202

Richard Carlberg    Duval County Supervisor of Elections' Office, 105 E. Monroe Street, Jacksonville, Florida 32202

Robert Phillips     Duval County Supervisor of Elections' Office, 105 E. Monroe Street, Jacksonville, Florida 32202

15.   Please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response to interrogatory number 14 above may have.

**Response to Interrogatory No. 15**

The individuals named in response to interrogatory 14, above, have knowledge concerning voter file maintenance, and telephone systems and voting equipment in use in the November 2000 election.

16.   For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded.., is so numerous that joinder of all members is impracticable." See Amended Complaint, ¶ 39.

**Response to Interrogatory No. 16**

Defendant Stafford objects to the question on the grounds it calls for a legal conclusion. Defendant Stafford, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

As plaintiffs are aware, the complete sentence referenced in *Amended Complaint*, ¶ 39 is "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded, because of Defendants' practices complained of herein, is so numerous that joinder of all members is impracticable." I have denied any allegations that my practices abridged or impeded any right to vote. If there is no individual that was aggrieved by my practice, there can not be so many individuals that joinder is impracticable. Further, all claims by Plaintiffs are related to individual incidents,

-8-

all of which are isolated from each other and based on disparate facts. Since each case must be analyzed separately, the requirement of numerosity is left unsatisfied.

17.     For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]here are question of law and fact common" to the proposed class. See Amended Complaint, ¶ 40.

## Response to Interrogatory No. 17

Defendant Stafford objects to the question on the grounds it calls for a legal conclusion. Defendant Stafford, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

I have denied each and every sentence in ¶ 40 for the reason that the allegations therein are untrue. As evidenced by the depositions of Plaintiffs taken as of this date, and by the allegations in the Amended Complaint, each plaintiff has an alleged claim based upon facts and circumstances applicable solely to that individual. I and other County Supervisors of Elections make local determinations as to practices and procedures not specifically mandated by state law, therefore any allegations concerning my decisions would not relate to other County Supervisors of Elections.

18.     For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]he claims of the representative plaintiffs are typical of the claims of the class as a whole." See Amended Complaint, ¶ 41.

## Response to Interrogatory No. 18

Defendant Stafford objects to the question on the grounds it calls for a legal conclusion. Defendant Stafford, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

-9-

The basis for my answer in ¶ 41 is: I have not seen any evidence that the named plaintiffs represent anyone besides themselves. I have denied that the named Duval County Plaintiff has suffered any alleged wrong and therefore, the plaintiff cannot represent any unknown and unnamed plaintiffs. Discovery up to this point has shown that each plaintiff only has knowledge of their own circumstances and there has been no evidence that any of the claims made are typical of any other individual or group.

19.    For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "Plaintiffs can and will fairly and adequately protect the interest of the members of the class." See Amended Complaint, ¶ 42.

Response to Interrogatory No. 19

Defendant Stafford objects to the question on the grounds it calls for a legal conclusion. Defendant Stafford, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

I have denied that the named Duval County Plaintiff has suffered any alleged wrong and therefore these Plaintiff cannot adequately represent unnamed plaintiffs who may or may not have suffered some kind of wrong. In addition, each plaintiff deposed, at this time, has had varying goals for resolution of the issues in this complaint.

The Amended Complaint and discovery conducted so far has demonstrated that Plaintiff has varying goals in this case. The issues of individual named Plaintiffs can be redressed on an individual basis, separately from other Plaintiffs and without the involvement of all Defendants. Once these individuals have their grievances redressed, the Plaintiff would have no interest in the outcome of the lawsuit. The interests of the Plaintiffs are as varied as their claims and alleged facts and circumstances. The named Plaintiff from Duval County will not fairly and adequately protect the members of the class. The named Plaintiffs from other counties cannot protect the interests of members of the alleged class in Duval County, as the named Plaintiffs from other counties that have been deposed thus far have had no knowledge of the election process and practices in Duval County.

20.    For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that class certification is appropriate because "the Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." See Amended Complaint, ¶ 44.

-10-

**Response to Interrogatory No. 20**

Defendant Stafford objects to the question on the grounds it calls for a legal conclusion. Defendant Stafford, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Plaintiffs have not taken action that would benefit the supposed class as a whole since they have only sued seven individual Supervisors of Election, leaving sixty counties unaffected by this litigation. Therefore, any final relief can not benefit the supposed class as a whole. In addition, each of the seven named Supervisors of Elections acts locally to conduct elections. The actions of Duval County's Supervisor of Elections have no impact on other counties and therefore the relief the Plaintiffs have requested is inappropriate.

John Stafford

STATE OF FLORIDA          }
                          } ss:
COUNTY OF _Duval_         }

BEFORE ME, the undersigned authority, personally appeared John Stafford who is personally known to me or who produced a driver's license as identification, and who after first being duly sworn, deposes and states that the foregoing Answers to Interrogatories are true and correct.

SWORN TO AND SUBSCRIBED before me this 24th day of October, 2001.

NOTARY PUBLIC, STATE OF FLORIDA

Betty A. Taylor

Print Name: _BETTY A TAYLOR_
My Commission Expires: _3-12-2003_

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was furnished by U.S. Mail to the attached Service List on this 24th day of October, 2001.

RICHARD A. MULLANEY
GENERAL COUNSEL

-11-

TRACEY I. ARPEN, JR.
DEPUTY GENERAL COUNSEL
Florida Bar I.D. #154493
117 West Duval Street, Suite 480
Jacksonville, FL  32202
(904) 630-1835

RVICE LIST:    AS OF 10/11/01
ACP et al v. HARRIS et al
se No.:  01-120-CIV-
ld/Simonton

ATTORNEYS FOR PLAINTIFFS:

Thomasina H. Williams, Esq.
Brickell Bay View Centre
80 S.W. Eighth Street, Ste. 1830
Miami, Florida 33130

:nnis Hayes, Esq., et al
AACP Legal Dept.
305 Mount Hope Dr., 5th Floor
altimore, MD 21215-3297

Barbara Arnwine, Esq., et al
1401 New York Ave, NW, Ste 400
Washington, DC 20005-2124

Todd A. Cox, Esq.
1444 Eye Street, NW, 10th Floor
Washington, DC 20005

:nda Hair, Esq., et al.
730 "M" Street, NW, Ste 401
/ashington, DC 20036

Elaine R. Jones, Esq.
Norman Chacklin, Esq., et al.
99 Hudson Street, Suite 1600
New York, NY 10013

Laughlin McDonald, Esq.
2725 Harris Tower
233 Peachtree St., NE
Atlanta, GA 30303

:ouis M. Bograd, Esq.
33 15th Street, NW, Ste 620
Vashington, DC 20005

Elliot M. Mincberg, Esq., et al.
2000 "M" Street, NW, Ste 400
Washington, DC 20036

Steven Shapiro, Esq.
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004

.TTORNEYS FOR
)EFENDANTS:

John W. Little, III, Esq., et al.
200 S. Biscayne Blvd
Miami, FL 33131-2398

Jim Cheroff, Esq., et al.
3099 E. Commercial Blvd, Ste 200
Ft. Lauderdale, FL 33308-4311

:hristopher R. Haughee, Esq.
3ently Law Group
?.O. Box 1608
3artow, FL 33831-1608

Tucker Ronzetti, Esq.
Stephen P. Clark Center
111 NW 1st Street, Ste 2810
Miami, FL 33128-1930

H. Ray Allen, II, Esq., et al.
P.O. Box 1110
Tampa, FL 33601

Mitchell Bloomberg, Esq.
Adorno & Zeder
2601 S. Bayshore Dr., Ste 1600
Miami, FL 33133-5413

Raymond W. Bergan, Esq., et al
Williams & Connolly, LLP
725 Twelfth St, NW
Washington, DC 20005-5901

Burnadette Norris Weeks, Esq.
100 S.E. 6th Street
Fort Lauderdale, Florida 33301

David V. Kornreich, Esq.
200 S. Biscayne Blvd.
First Union Financial Center
Suite 3600
Miami, FL 33131

Daniel D. Eckert, Esq.
123 W. Indiana Avenue
DeLand, Florida 32720-4613

Michael D. Cirullo, Jr., Esq., et al.
3099 E. Commercial Blvd, #200
Ft. Lauderdale, FL 33308

George Waas, Esq.
Attorney General's Office
The Capitol - Suite PL-01
Tallahassee, FL 32399-1050

**PLAINTIFFS' EXHIBIT 44**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-CIV-120-GOLD
Magistrate Judge Simonton

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

_____/

## DEFENDANT IORIO'S OBJECTIONS AND RESPONSES
## TO PLAINTIFFS' FIRST SET OF DOCUMENT REQUESTS
## AND INTERROGATORIES

Pursuant to Local Rule 26.1(g) of the United States District Court for the Southern

District of Florida and Rule 34 of the Federal Rules of Civil Procedure, Defendant Iorio, by and

through their undersigned attorneys, hereby state their objections and responses to Plaintiff's

First Set of Document Requests and Interrogatories dated September 21, 2001.

## GENERAL OBJECTIONS

    A.      Defendant Iorio objects to Plaintiffs' First Set of Document Requests and

Plaintiffs' First Set of Interrogatories to the extent they seek to impose obligations which differ

from or exceed the obligations set forth in the Federal Rules of Civil Procedure and/or the Local

Rules of the United States District Court for the Southern District of Florida.

    B.      Defendant Iorio objects to this Plaintiffs' First Set of Document Requests and

Plaintiffs' First Set of Interrogatories to the extent they seek to obtain information that is beyond

1

the scope of the issue of "class-related fact[s]" as indicated by the Scheduling Order of U.S. District Court Judge Gold dated August 14, 2001.

      C.     Defendant Iorio objects to each Document Request and each Interrogatory which seek disclosure of information or documents containing information protected by any constitutional, statutory, or common-law rights of privacy or confidentiality, or confidentiality that Defendant Iorio owes to others. Defendant Iorio reserves the right to withhold such information and/or documents containing such information until an appropriate stipulation and order is entered to protect the confidential nature of such documents and/or information.

      D.     Defendant Iorio objects to each Document Request and each Interrogatory to the extent they seek material protected from disclosure by the attorney-client privilege, attorney work-product immunity, or any other privilege and/or immunity. Defendant Iorio will comply with Local Rule 26.1(G), but in the event any protected document is produced by Defendant Iorio in response to Plaintiff's Requests, such disclosure is inadvertent and does not constitute a waiver of any privilege, immunity, or exemption.

      E.     Defendant Iorio objects to each Document Request and each Interrogatory as overly broad, unduly burdensome, and to the extent that it is not reasonably calculated to lead to the discovery of "class-related" facts and/or admissible evidence.

      F.     Defendant Iorio reserves the right to revise and supplement any and all of the following responses upon receipt and review of Plaintiffs' Supplemental Motion for Class Certification, and any subsequent responses to class-related discovery.

      Defendant Iorio, subject to, and without waiver of, these objections and the specific objections that follow, produces under cover of this filing the documents requested by Plaintiffs'

2

First Set of Document Requests and provides the following responses to Plaintiffs' First Set of

Interrogatories:

### RESPONSES OF DEFENDANT IORIO AND SPECIFIC OBJECTIONS

1.    Please identify the number of complaints you received in regard to the November 7, 2000 election in Florida, whether received prior to the election, on election day, or after the election, by category of complaint if available, including, but not limited to, complaints regarding:
    a.        Punch card voting machines:
    b.        Voter Registration;
    c.        Failure to appear on voter roll;
    d.        Inability to contact the Supervisor of Elections office;
    e.        Busy phone lines at the polling site; and
    f.        Poll workers

**Answer:**

**Hillsborough County had 499,257 registered voters for the 2000 General Election. Complaints related to the November 7, 2000 election are categorized as follows:**

| Category | # Complaints |
|---|---|
| **Punch Card Voting Machines \*** | 78 |
| **Voter Registration** | 55 |
| **Failure to Appear on Voter Rolls** | 38 |
| **Inability to Contact the Supervisor of Elections Office (Clerks Phone Bank)** | 94 |
| **Busy Phone Lines at Polling Site** | 0 |
| **Poll Workers** | 63 |
| **Polling Site** | 77 |
| **Election Procedures** | 54 |
| **Military Overseas Absentee Ballots \*\*** | 235 |
| **Investigate Florida Voting Irregularities \*\*** | 287 |
| **Recount/Revote/Hand Count Election \*\*** | 54 |
| **Absentee Voting \*\*** | 17 |

3

**\* = Punch card voting systems were decertified by the Florida Election Reform Act of 2001. The Hillsborough County Board of County Commissioners has funded acquisition of a "touch screen" voting system. Requests for Proposal (RFP) responses are due October 25, 2001 with choice of vendor expected in December 2001.**
**\*\* = These issues are not mentioned in the Amended Complaint but are provided as a courtesy & to ensure completeness. Many complaints received in these and other categories came from out of county and out of state individuals who responded to the intense media coverage.**

2.    Please identify all individuals who you have determined were improperly denied the right to vote in the November 7, 2000 election, as well as any memoranda, correspondence, and other documents relating to these individuals and the fact that these individuals were improperly denied the right to vote.

**Answer:**

**Defendant Iorio objects to the question on the grounds it calls for a legal conclusion. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:**

**Please see the 16 Records provided in Document Request #2, as that request answers this interrogatory.**

3.    For the county defendants, please identify the number of affirmations/affidavits completed at all of the polling sites in your county on November 7, 2000 in relation to voters who were not allowed to vote, as well as the name and address of those voters who completed an affirmation/affidavit and were not allowed to vote, and the reason why these voters were not allowed to vote.

**Answer:**

**Please see the 600 Records provided in Document Request #5, as that request answers this interrogatory.**

4.    Please identify all voters purged from January 1, 1999 through November 7, 2000 pursuant to list maintenance procedures, including but not limited to purges based on alleged felony conviction, death, and duplicate registration, and for each voter, please specify (a) the basis for the purge, (b) the date of the purge, and (c) whether the voter received notification of the purge.

4

**Answer:**

Defendant Iorio objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.   Defendant Iorio consistently strives to exceed the minimal procedural requirements imposed on her.  Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Please see CD-ROM File: "No4.lst" for the answer to this interrogatory.

The CD-ROM File is organized as follows:
  (a) Basis for removal -  Characters 1-40
  (b) Date of removal -  Characters 81-90
  (c) See explanations below
  (d) Name of individual  -  Characters 41-80

**Explanations for reasons in (c):**

Final Address Confirmation Removal:
Upon return of non-deliverable first class mail, a forwardable first class mail notice was sent to the last known address of the voter.  The status for those voters for whom that piece was also returned undeliverable was changed to "Inactive" (I).  After these records showed no activity, changes or voting through two (2) federal general elections (1996, 1998) their status was changed to deleted by this process (F).  While in the inactive status, all such voters appeared in the precinct registers in the same manner as all other voters.  As all mail to their address had been returned undeliverable, no notice of deletion was sent.

Moved out of County:
Voter submitted a signed statement acknowledging they were no longer residents of Hillsborough County. No notification sent.

Registered Elsewhere:
Voter signed an oath on a voter registration application submitted to another county listing Hillsborough County as the previous jurisdiction and the other county as the current jurisdiction.  The other county notified Hillsborough County in writing of this. No notification sent.

Felony Conviction:
Voter was sent a notification of removal with instructions on appeal.  All 2000 Central Voter File notifications were made by certified mail and normal mail.

Removed at voters request:
Voter submitted a signed statement requesting they be removed from the voter rolls.  No notification sent.

5

Deceased:
Based on Vital Statistics listings.  No notification sent.

Adjudicated Mentally Incompetent:
Notification sent by first class mail.  No record maintained if received by voter.

5.     For the county defendants, please identify the process used by your office to verify
       whether the individuals who were identified by the State and its agents as probably or
       possibly ineligible to vote were in fact ineligible.

**Answer:**

    **The process used by the office is as follows:**

    **a.**    **All felon records, excluding those indicated as out of state misdemeanors,
those without a conviction date, and those with a conviction date in the
future, were mailed a notice by certified mail.  Those not mailed a notice
were not subject to removal.**

    **b.**    **A newspaper advertisement for an administrative hearing was placed for all
those voters in section (a) above for whom a certified mail return slip was not
received by my office.**

    **c.**    **A file was prepared and sent to Florida Department of Law Enforcement
(FDLE) and Choicepoint, Inc./DBT for investigation on all those in the
advertisement who had any inconsistency in match between name, birth date,
sex, or race.  Neither agency was able to provide any further information.
Those individuals without a 100% match of all information were not subject
to removal.**

    **d.**    **Duplicate records were put through an additional screening requiring a
match of 100% on name, birth date, race and sex and whose last activity was
earlier than the registration date in the other jurisdiction.  Requests for
signatures were made of the other jurisdiction involved for close matches on
name (example: female middle name different, no middle name) before
determination of removal.  Notice of removal was mailed to each voter.  No
record was maintained on receipt of notice sent out.**

    **e.**    **Removal due to a death notice required a 100% match on name, birth date,
race and sex.  Notices to the individual were not sent by mail.**

6.     For the county defendants, please state whether, during the period from January 1, 1999
       to November 7, 2000, you purged from the voter rolls ex-felons whose right to vote was
       not restored in Florida, even if such individuals were not convicted of a felony in Florida
       and had not lost their right to vote in the state in which they were convicted or had their
       right to vote restored in the state in which they were convicted. If you answer in the

affirmative, please identify the name, address, and date of purge for each such individual purged from your voter roll.

**Answer:**

> **Defendant Iorio objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.   Defendant Iorio consistently strives to exceed the minimal procedural requirements imposed on her.  Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:**

> **Defendant assumes the Plaintiffs are referring to the Central Voter File procedures. If so, the answer is yes and information provided on CD-ROM, file name nonflfel.txt.**

> **Voters identified in this file are voters with a felony conviction out of state on the Central Voter File list which were removed for that felony conviction.  The office has no knowledge as to whether the individual had their rights restored in their previous jurisdiction.  Please see the answer to Interrogatory #5 for the process used by the office.**

7.      For the county defendants, please state whether you permitted a voter to vote on November 7, 2000 if the voter was purged from the voter roll based on an address change, but that voter appeared at the poll to vote and stated that his or her address had not, in fact, changed, and if you answer in the affirmative, please describe the procedure by which such voters were permitted to vote.

**Answer:**

> **Defendant Iorio objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.   Defendant Iorio consistently strives to exceed the minimal procedural requirements imposed on her.  Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:**

> **Yes.  If the voter informed the poll worker that he or she had been erroneously removed from the rolls and their address had not changed, the action would be forwarded to a supervisor in the Phone Bank who would substantiate the facts and obtain approval from a manager, or the Supervisor of Elections if necessary, to allow the voter to vote.**

> **If the person's name was not in the precinct register, the poll worker would complete an Affirmation Form and ask the voter to read and sign the document.**

The Clerks Phone Bank would be called to determine the voter's eligibility. Upon the assertion that the voter had not moved and was erroneously removed from the rolls, the Clerks Phone Bank operator would have brought the situation to the attention of a supervisor. The supervisor would research the facts and address the issue with a manager for a decision. If the facts indicated that the voter had not moved, the poll worker would be informed to allow the person to vote after ensuring that the voter had completed an affirmation form.

8.   Please state whether you removed any voters from the voter rolls from January 1, 1999 to November 7, 2000 based on an alleged change of residence without confirming in writing directly from the voter that the voter had changed residence to a place outside the registrar's jurisdiction, and if you answer in the affirmative, please state the name, address, phone number, and date of removal from the voter roll for each voter.

Answer:

Defendant Iorio objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.   Defendant Iorio consistently strives to exceed the minimal procedural requirements imposed on her.  Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Yes, there is no requirement of a written confirmation directly from the voter prior to removing the voter from the voter rolls based upon a change of residence outside the registrar's jurisdiction if our action is based upon compliance with list maintenance criteria or a cancellation notice indicating that the voter has registered to vote in another jurisdiction.

Attached on CD-ROM is file NO8.lst in the following format:

a.   Reason Characters 1-50 (Please see Interrogatory # 4 for explanations of each of these reason codes)
b.   Name Characters 51-90
c.   Date Removed Characters 91-100
d.   Address line 1 Characters 102-146
e.   Address line 2 Characters 147-191
f.   Address line 3 Characters 192-215

My office does not maintain phone numbers of these individuals.

Individuals on this list were sent a minimum of 2 first class mail pieces, with at least the last to be forwarded by the United States Postal Service, if they were returned undeliverable prior to November 5, 1996 and who had no voter activity during the time period covering the two federal general

8

elections.  As we were unable to contact the voter in all of these instances, no confirmation in writing was available from the voter.

9.      Please indicate whether you notified all individuals who registered to vote in 2000 of the status of their applications at least 10 days prior to the November 7, 2000 election, and if you answer in the negative, please identify the number of individuals who were not so notified as well as the name, address, phone number, date registration application received, and date voter notified of status of application for each individual.

**Answer:**

Defendant Iorio objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.   Defendant Iorio consistently strives to exceed the minimal procedural requirements imposed on her.  Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

A total of 240 voters who registered prior to the close of registration for the general election in 2000 were not notified as to the status of their application at least 10 days prior to the election.  The file of those not notified is attached on CD-ROM as file NO9.lst.

This file includes all registered voters who have a registration date on or before the close of registration for the 2000 General Election and whose processing date is on or later than 10 days prior to the election.  Our records indicate that the last mailing prior to the election occurred on November 2, 2000.  Individuals with a processing date later than this would not have received a standard notification before the election.

Subsequent mailing dates, for those processed by that time are as follows: 12/06/2000 (dates 11/03/2000-11/16/2000); 12/08/2000 (dates 11/17/2000-11/30/2000); 12/28/2000 (dates 12/01/2000-12/12/2000).  This office made an administrative decision to process registration applications returned in response to notification of incomplete application using the original application registration date, provided the fully completed application was returned before the day of the election.  Many of the names on this list may be individuals whose completed application was not received from these individuals until the processing date.  There is no way to determine which of the individuals on this list were beneficiaries of this decision.

9

The format of file N09.lst is:

    a.      Certnum (voter ID#) Characters 1-8
    b.      Name Characters 10-38
    c.      Address Number Characters 40-46
    d.      Address Direction  Characters 48-49
    e.      Street Name Characters 51-74
    f.      Street Type Characters 76-79
    g.      Post Direction Characters 81-82
    h.      Apartment, Lot, Etc. Characters 84-117
    i.      Zip Code Characters 109-113
    j.      Processed Date Characters 115-124 (MM/DD/YYYY)
    k.      Last Voted Date Characters 126-134 (MM/DD/YYYY)

10.     For the county defendants, please describe the process by which poll workers at individual polling sites on November 7, 2000 could determine a voter's eligibility if the voter did not appear on the precinct register, including whether the poll worker was required to call off-site to check eligibility records or whether access to such data was provided at the polling site.

**Answer:**

**Defendant Iorio objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.   Defendant Iorio consistently strives to exceed the minimal procedural requirements imposed on her.  Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:**

**If a voter's name did not appear in the precinct register, the poll worker was instructed to complete an Affirmation Form and contact the Clerks Phone Bank to determine the voter's eligibility.  The Clerks Phone Bank operators had computerized access to the entire voter registration file and responded with the voter's eligibility.  Three hundred and nine (309) precincts were instructed to call the main Clerks Phone Bank that included approximately 50 operators at our Elections Service Center.  In addition, on site Clerks Phone Bank operators with stand alone computer terminals were assigned to ten (10) of the larger precincts which typically had a large numbers of affirmations.**

11.     For the county defendants, please identify whether those voters who were in "inactive" status as of the book closing date for the November 7, 2000 election were included in the precinct registers in your county.

Answer:

> All "Inactive" voters were included in the precinct registers without notation as to their "Inactive" status.

12.     For the county defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you received voter registration applications from the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families and the number of applications received from each department, broken down by month.

Answer:

> **Hillsborough County has eight (8) Department of Highway Safety and Motor Vehicles (DHSMV) Drivers License Offices. Three (3) of the eight offices are combination Tax Collector/Drivers License Offices. The five offices that are Drivers License Offices forward their voter registration applications by courier to our Election Service Center, who in turn, delivers them to our main office for processing. The three offices that are combination Tax Collector/Drivers License Office forward completed voter registration applications to the main Elections Office through our County Mail Distribution Center.**

> **The Department of Children and Families branches forward completed voter registration applications in envelopes to the main Elections Office through our County Mail Distribution Center.**

> **Attached on CD-ROM file No12.txt is a breakdown by month of the number of voter registration applications received from DHSMV and Children and Families from 1/1/99 to 11/7/00.**

> **The format of the file No12.txt is:**
> **Column 1: Year**
> **Column 2: Month**
> **Column 3: DMV (Department of Highway Safety and Motor Vehicles)**
> **Column 4: PAA (Public Assistance Agencies)**

13.     Please identify any problems or barriers that you experienced in regard to the voter registration functions to be carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

11

**Answer:**

    a.    **Department of Highway Safety and Motor Vehicles – There were three problem areas of note with the Drivers License Offices (DLO's).**

        **(1) Receiving applications with no signatures. The average number received without signatures for the County's eight DLO's was 3.3% in 1999, and 2.1% in 2000.**

        **(2) Completed voting registration application(s) that are missing from the Transmittal batch. The average number for which the office encountered this problem for the eight DLO's for 1999 and 2000 was under 1%.**

        **(3) Incorrect registration date or failing to put a registration date on the voter application that was handed in (not processed) at the DLO. During the November 2000 election, we had one DLO where this problem occurred on less than five voter registration applications.**

    b.    **Department of Children and Families (DC&F) - There were two problem areas of note with the Department of Children and Families offices (DC&F).**

        **(1) State DC&F subordinate units that produce voter registration applications which have not been adequately reviewed for completeness. In some cases, we receive applications with a 30-40% error rate because of incomplete or illegible items on the applications.**

        **(2) There has also been a problem receiving the voter applications from some offices within five days of receipt of application.**

**In both instances (a) & (b), my Office has contacted individual office(s) and, in some cases, the home office concerning the above mentioned problems.**

14.    Please identify each person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact related to class certification alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this action.

**Answer:**

**I am aware of the following individuals with knowledge or information pertaining to class certification: All parties involved in this lawsuit, all persons identified in the parties' initial disclosures, all persons listed as having information on class certification in Plaintiffs' pleadings, all persons listed in my answer to Interrogatory #1, and all persons listed in all other defendants' responses to this interrogatory. Defendant reserves the right to supplement this answer as necessary.**

15.    Please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response to interrogatory number 14 above may have.

**Answer:**

**All individuals listed above may have knowledge as to their own circumstances and his or her own actions relating to the Amended Complaint.**

16.    For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded. . is so numerous that joinder of all members is impracticable." *See Amended Complaint,* ¶ 39.

**Answer:**

**Defendant Iorio objects to the question on the grounds it calls for a legal conclusion. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:**

**As plaintiffs are aware, the complete sentence referenced in _Amended Complaint,_ ¶ 39 is "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded, <u>because of Defendants' practices complained of herein,</u> is so numerous that joinder of all members is impracticable." I have denied any allegations that my practices abridged or impeded any right to vote. If there is no individual that was aggrieved by my practice, there can not be so many individuals that joinder is impracticable. Further, all claims by Plaintiffs are related to individual incidents, all of which are isolated from each other and based on disparate facts. Since each case must be analyzed separately, the requirement of numerousity is left unsatisfied.**

17.    For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]here are question of law and fact common" to the proposed class. *See Amended Complaint,* ¶ 40.

**Answer:**

**Defendant Iorio objects to the question on the grounds it calls for a legal conclusion. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new**

13

information becomes available, provides the following response:

I have denied each and every sentence in ¶ 40 for the reason that the allegations therein are untrue.  As evidenced by the depositions of Plaintiffs taken as of this date, and by the allegations in the Amended Complaint, each plaintiff has an alleged claim based upon facts and circumstances applicable solely to that individual.  I and other County Supervisors of Elections make local determinations as to practices and procedures not specifically mandated by state law, therefore any allegations concerning my decisions would not relate to other County Supervisors of Elections.

18.   For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]he claims of the representative plaintiffs are typical of the claims of the class as a whole." *See Amended Complaint,* ¶ 41.

Answer:

Defendant Iorio objects to the question on the grounds it calls for a legal conclusion. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

The basis for my answer in  ¶ 41 is: I have not seen any evidence that the named plaintiffs represent anyone besides themselves.  I have denied that the named Hillsborough County Plaintiffs have suffered any alleged wrong and therefore, those plaintiffs cannot represent any unknown and unnamed plaintiffs.   Discovery up to this point has shown that each plaintiff only has knowledge of their own circumstances and there has been no evidence that any of the claims made are typical of any other individual or group.

19.   For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "Plaintiffs can and will fairly and adequately protect the interest of the members of the class." *See Amended Complaint,* ¶ 42.

Answer:

Defendant Iorio objects to the question on the grounds it calls for a legal conclusion. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

I have denied that the named Hillsborough County Plaintiffs have suffered any alleged wrong and therefore these Plaintiffs cannot adequately represent unnamed

plaintiffs who may or may not have suffered some kind of wrong. In addition, each plaintiff deposed, at this time, has had varying goals for resolution of the issues in this complaint.

The Amended Complaint and discovery conducted so far has demonstrated that Plaintiffs have varying goals in this case. The issues of individual named Plaintiffs can be redressed on an individual basis, separately from other Plaintiffs and without the involvement of all Defendants. Once these individuals have their grievances redressed, the Plaintiff would have no interest in the outcome of the lawsuit. The interests of the Plaintiffs are as varied as their claims and alleged facts and circumstances. The named Plaintiffs from Hillsborough County will not fairly and adequately protect the members of the class. The named Plaintiffs from other counties cannot protect the interests of members of the alleged class in Hillsborough County, as the named Plaintiffs from other counties that have been deposed thus far have had no knowledge of the election process and practices in Hillsborough County.

20.     For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that class certification is appropriate because "the Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." *See Amended Complaint, ¶ 44.*

**Answer:**

Defendant Iorio objects to the question on the grounds it calls for a legal conclusion. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Plaintiffs have not taken action that would benefit the supposed class as a whole since they have only sued seven individual Supervisors of Election, leaving sixty counties unaffected by this litigation. Therefore, any final relief can not benefit the supposed class as a whole. In addition, each of the seven named Supervisors of Elections acts locally to conduct elections. The actions of Hillsborough County's Supervisor of Elections have no impact on other counties and therefore the relief the Plaintiffs have requested is inappropriate.

_____
(signature) PAM IORIO

_____
(please print name)

15

STATE OF FLORIDA                                 }
                                                 } ss:
COUNTY OF HILLSBOROUGH                            }


     **BEFORE ME**, the undersigned authority, personally appeared **PAM IORIO,** who is personally known to me or who produced a driver's license as identification, and who after first being duly sworn, deposes and states that the foregoing Answers to Interrogatories are true and correct.

     **SWORN TO AND SUBSCRIBED** before me this _____24_____ day of October, 2001.


                      _____

                      NOTARY PUBLIC, STATE OF FLORIDA

                      Print Name: _Julie M. Gaul_

                      My Commission Expires: _Jan. 26, 2005_


                      Respectfully submitted,


                      _____

                      **H. Ray Allen, II**
                      Florida Bar No. 255890
                      Sr. Assistant County Attorney
                      Post Office Box 1110
                      Tampa, Florida 33601
                      (813) 272-5670 (phone)
                      (813) 272-5846 (facsimile)
                      allenh@hillsboroughcounty.org
                      Attorney for Pam Iorio, Supervisor
                      of Elections of Hillsborough County

**PLAINTIFFS' EXHIBIT 45**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-CIV-120-GOLD
Magistrate Judge Simonton

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

_____/

## DEFENDANT IORIO'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' SECOND SET OF DOCUMENT REQUESTS AND INTERROGATORIES

Pursuant to Local Rule 26.1(g) of the United States District Court for the Southern District of Florida and Rule 34 of the Federal Rules of Civil Procedure, Defendant Iorio, by and through her undersigned attorneys, hereby state her objections and responses to Plaintiff's Second Set of Document Requests and Interrogatories dated February 1, 2002.

## GENERAL OBJECTIONS

A.     Defendant Iorio objects to Plaintiffs' Second Set of Document Requests and Interrogatories to the extent they seek to impose obligations which differ from or exceed the obligations set forth in the Federal Rules of Civil Procedure and/or the Local Rules of the United States District Court for the Southern District of Florida.

B.     Defendant Iorio objects to each Document Request and each Interrogatory which seeks disclosure of information or documents containing information protected by any constitutional, statutory, or common-law rights of privacy or confidentiality, or confidentiality

1

that Defendant Iorio owes to others.  Defendant Iorio reserves the right to withhold such information and/or documents containing such information until an appropriate stipulation and order is entered to protect the confidential nature of such documents and/or information.

D.      Defendant Iorio objects to each Document Request and each Interrogatory to the extent they seek material protected from disclosure by the attorney-client privilege, attorney work-product immunity, or any other privilege and/or immunity.  Defendant Iorio will comply with Local Rule 26.1(G), but in the event any protected document is produced by Defendant Iorio in response to Plaintiff's Requests, such disclosure is inadvertent and does not constitute a waiver of any privilege, immunity, or exemption.

E.      Defendant Iorio objects to each Document Request and each Interrogatory as overly broad, unduly burdensome, and to the extent that it is not reasonably calculated to lead to the discovery of relevant facts and/or admissible evidence.

F.      Defendant Iorio objects to each Interrogatory on the grounds that Plaintiffs have failed to meet the requirement of U.S.D.C. for the Southern Dist. of Fla. Local Rule 26.1(G)(4) requiring sufficient blank space be provided for a response to interrogatories.

G.      Defendant Iorio reserves the right to revise and supplement any and all of the following responses upon receipt and review of Plaintiff Willie Steen's Answers to Defendant Iorio's Interrogatories, and any other subsequent responses to discovery.

Defendant Iorio, subject to, and without waiver of, these objections and the specific objections that follow, produces the following responses to Plaintiffs' Second Set of Interrogatories & Document Requests:

## RESPONSES OF DEFENDANT IORIO AND SPECIFIC OBJECTIONS

## INTERROGATORIES

**Interrogatory No. 1:**

Describe the training provided to election administration officials, including poll workers, election judges, and others employed on election day, in Hillsborough County from January 1998 to November 7, 2000.

**Answer:**

Defendant Iorio objects to the undefined term "Election Judges," on the grounds that the question assumes a position not in Federal or Florida Law. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above, provides the following response:

**Poll Worker Training**

All first-time poll workers completed a three and one half hour in depth training class before they worked at the polls. Poll workers with previous experience completed one and one half-hours of refresher training that was personally conducted by the Supervisor of Elections prior to each primary election series and repeated again prior to the general election.

The primary focus of the training was on providing a working knowledge of applicable election laws from the Florida Election Code and processes/procedures from the locally developed Poll Worker Manual. Training included instruction on voter eligibility requirements, opening the polls, processing voters, referral of problems, counting ballots, and closing the polls.

**Clerks and Assistant Clerks Training**

All clerks and assistant clerks completed a one and one half hour refresher training class that was personally conducted by the Supervisor of Elections prior to each primary election series and repeated again prior to the general election. In 2000, new clerks and assistant clerks who had not previously served in these positions completed a three and one half hour new clerk/assistant clerk training class prior to attending the usual training and one half hour refresher training class before working in these positions during an election. Training included instruction on voter eligibility requirements, opening the polls, processing voters, referral of problems, resolving problems, counting ballots, closing the polls, and returning the ballots for tabulation.

**Poll Deputies**

All poll deputies attended a one-hour training class prior to each primary election series plus an additional hour of training prior to the general election. Training included

instruction on duties/responsibilities, opening/closing the polls, and maintaining order outside the polling place.

**Phone Bank Operators**

Phone bank operators with previous phone bank experience received six hours of training prior to each primary election series plus an additional six hours of training prior to the general election. Phone bank operators with no previous experience completed twelve hours of training prior to working their first election on the phone bank. The training focus was on efficiently responding to calls from the precincts and accurately determining voter eligibility and the correct voting precinct.

**Interrogatory No. 2:**

Describe the procedures used to process voter registration applications from January 1998 to the present.

**Answer:**

Plaintiffs are referred to Attachment 1, Voter Services Operating Procedures.

**Interrogatory No. 3:**

Describe the procedures used from January 1998 to the present for receiving voter registration applications from the Department of Children and Families ("DCF") and the Department of Highway Safety and Motor Vehicles ("DHSMV") offices in Hillsborough County.

**Answer:**

Hillsborough County has eight DHSMV-Drivers License Offices. Three of the eight offices are combination Tax Collector/Drivers License Offices. The five offices that are Drivers License Offices forward their voter registration applications twice a week by courier to our Elections Service Center, who in turn, delivers them to our main office for processing. The three offices that are combination Tax Collector/Drivers License Offices forward voter registration applications to the main Supervisor of Elections office through the County's Interdepartmental Mail Distribution Center.

4

The DCF branches forward voter registration applications in transmittal envelopes to the main office of the Supervisor of Elections through the County's Interdepartmental Mail Distribution Center.

**Interrogatory No. 4:**

Describe the voter registration list maintenance program used by your office from January 1998 to the present, including, but not limited to, a) procedures followed to place voter names in an inactive" status, b) procedures used to purge voters, c) your use of lists of probable or possible ineligible voters provided to you by the Division of Elections, d) any requirements or guidance provided by the Division of Elections regarding how to check the accuracy of the lists or to verify them, and e) any actions taken by your office to verify or check the accuracy of the lists.

**Answer:**

**General Response to Question 4:**

**List Maintenance Removal Process**

**Step 1.** The list maintenance removal process begins with undeliverable mail or National Change of Address (NCOA) information in every case. This includes mass mailings of address confirmation cards which are periodically (normally during the odd years) sent to all registered voters who have not voted in the last 2 years and who did not make a written request that their registration records be updated during that time.

**Step 2.** If voter has moved within the county, the Supervisor changes the registration records to show the new address and sends the voter a notice of the change along with a new voter ID card by forwardable mail including a postage paid preaddressed return form with which the voter may verify or correct the address information.

**Step 3.** If voter has moved outside the county or no forwarding address is available, the supervisor sends an address confirmation final notice by forwardable mail.

**Response to Question 4(a):**

The Supervisor must designate as inactive all voters who have been sent an address confirmation final notice and who have not returned the postage paid preaddressed return form within 30 days. While in the inactive status, the voter's name appears on the precinct

5

register and the voter is allowed to change his or her name and address of legal residence at the polls and vote.

<u>Response to Question 4(b):</u>

Defendant Iorio objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.  Defendant Iorio, subject to, and without waiver of, this objection and the general objections above, provides the following response:

The Supervisor must remove the name of the voter from the registration record if that voter does not either return the postage prepaid preaddressed return form, appear to vote, change the voter's registration, or request an absentee ballot during the period beginning on the date when the address confirmation final notice was sent and ending on the day after the date of the second general election thereafter.

The office uses the following removal categories:

Final Address Confirmation Removal

> As per the National Voter Registration Act (NVRA), upon return of non-deliverable first class mail item, a forwardable first class mail notice was sent to the last known address of the individual.  The status for those individuals for whom that piece was also returned undeliverable was changed to "Inactive".  After these records showed no activity, changes or voting through two (2) federal general elections (1996, 1998) the individual's status was changed to deleted by this process.  During this time, all such individuals appeared in the precinct registers in the same manner as all other voters.  As all mail to the individual's address had been returned undeliverable, no notice of change of status was sent.

Moved out of County:

> Voter submitted a signed statement acknowledging they were no longer residents of Hillsborough County.  No notification is sent.

Registered Elsewhere:

> Voter signed an oath on a voter registration application submitted to another county listing Hillsborough County as the previous jurisdiction and the other county as the current jurisdiction.  The other county notified Hillsborough County in writing of this change.  No notification is sent.

Felony Conviction:

> Voter was sent a notification of removal with instructions on appeal.  All 2000 Central Voter File (CVF) and post-2000 CVF notifications were sent by certified mail.

Removed at voters request:

Voter submitted a signed statement requesting they be removed from the voter rolls. No notification is sent.

Deceased:

Based on Vital Statistics listings.  No notification is sent.

Adjudicated Mentally Incompetent:

Notification is sent by first class mail.

**Response to Question 4(c):**

Hillsborough County took no actions to remove any voters from the voter rolls in response to the initial CVF Felon List that was provided in 1998.  In a letter dated August 21, 1998, Supervisor Iorio informed the Secretary of State that Hillsborough County could not proceed with taking the names of registrants off of the rolls who had been convicted of a felony until the Division of Elections provided a new list that did not include those registrants whose civil rights had been restored.  The Secretary of State response indicated that the Division of Elections would be providing a more current and up to date listing in the future.  These letters have previously been provided to Plaintiffs by Defendant Iorio.

Hillsborough County processed the CFV List of duplicates, deceased and felons provided by the Division of Elections in the summer of 2000.  Names on each list were processed in accordance with Florida Statutes, Division of Elections/Florida State Association of Supervisors of Elections (DOE/FSASE) procedures and the guidance of the Supervisor of Elections.

**Response to Question 4(d):**

In the summer of 1999 the Division of Elections (DOE) conducted a statewide workshop in Orlando to provide training on the CFV processes and how to use the CFV lists. Subsequently the CFV Committee of the Florida State Association of Supervisors of Elections developed recommended procedures and forms for processing names on the CFV Felon List.  The information was approved by the DOE, Florida Department of Law Enfocement (FDLE) and the Office of Executive Clemency.  Plaintiffs are referred to Attachment 2, the DOE workshop training packet.  The DOE provided subsequent guidance and direction upon request as the lists were processed.

**Response to Question 4(e):**

All felon records identified on the CVF, excluding those indicated as out of state misdemeanors, those without a conviction date, and those with a conviction date in the future, were mailed a notice by certified mail. Those individuals who were not mailed a notice were not subject to removal.

The certified mail package including a letter from the Supervisor of Elections advising the addressee that he or she had been identified as having a felony conviction by the Division of Elections. The addressee was provided with a response form and a postage-paid envelope to notify the Supervisor of Elections if the DOE information was incorrect. An additional letter was mailed via first class mail to every individual for whom there were indications that the certified mail was not delivered.

A newspaper advertisement for an administrative hearing was placed for all those individuals for whom a certified mail return card was not received. A file was prepared and sent to the FDLE and Database Technologies (DBT) for investigation on the individuals listed in the advertisement who had any inconsistency in match between name, birth date, sex, or race. Neither agency was able to provide further information.

Individuals who were perfect matches with regard to name, date of birth, gender, and sex who either did not contest the information provided by DOE or were unsuccessful in their appeal to FDLE were removed from the voter registration rolls.

Duplicate records were put through an additional screening matching 100% on name, birth date, race and sex and whose last activity was earlier than the registration date in the other jurisdiction. Requests for signatures were made of the other jurisdiction for close matches on name (female middle name different, no middle name) before determination of removal. Notice of removal was mailed to each voter.

Death notices were subject to a 100% match on name, birth date, race and sex.

**Interrogatory No. 5:**

Describe the process by which your office was supervised by, coordinated with, or otherwise cooperated with the Division of Elections on election administration issues from January 1998 to present.

**Answer:**

Defendant Iorio objects to the interrogatory on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above, provides the following response:

8

The Division of Elections (DOE) has no formal supervisory authority over the Supervisor of Elections. However, the Supervisor of Elections and her staff maintained a cooperative relationship with the DOE throughout this time period. The Supervisor of Elections relied upon the DOE for authoritative information and clarification pertaining to new laws, elections administration, opinions and rules.

The DOE provided guidance on election administration issues that were statewide in nature such as candidates, petitions, voter registration, election results and the administration of the statewide central voter registration file. The DOE also provided regional training workshops to disseminate information regarding election administration topics such as the CFV, candidate workshops and voter registration workshops. In addition, the DOE conducted a two-day workshop for all Supervisors of Elections and their key staff on a semi-annual basis in conjunction with the FSASE. The DOE responded to requests for information, clarification and guidance from the Supervisor of Elections and her staff.

**Interrogatory No. 6:**

State the number of voter registration applications received by your office each month

from January 1998 to the present from the DHSMV and the DCF, disaggregated by race.

**Answer:**

Defendant Iorio objects to the interrogatory on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant Iorio further objects on the grounds the question requests Defendant Iorio violate Federal law. Defendant Iorio, subject to, and without waiver of, this objection and the general objections above, provides the following response:

Voter registrations received from the DCF are combined with registrations from all public assistance agencies for statistical reporting purposes in our voter registration system. As a result, it is not possible to identify the number of voter registrations that were received solely from DCF during the requested period.

As Plaintiffs are aware, the National Voter Registration Act (NVRA) prohibits identifying voters by the source of their registration. Therefore, there is no method of disaggregating the registration from specific sources by race.

Plaintiffs are referred to Attachment 3, which shows the total number of applications processed from the DHSMV and from all public assistance offices for the period requested.

**Interrogatory No. 7:**

9

State the number of voter registration applications referred to in Interrogatory No. 6 that were not processed, disaggregated by race and reason why those applications were not processed.

**Answer:**

**All applications referred to in Interrogatory No. 6 were processed. If the applicant was eligible to vote and the application was complete, he or she was sent a voter ID card that is mailed to each voter to acknowledge his or her voter registration.**

**If the application was incomplete because it did not include all of the required information, the voter was notified via a letter that his or her voter registration could not be completed because of missing information. The letter included a new voter registration application form in which all of the information previously provided was included so that the applicant only had to fill in the missing information and return the application in the enclosed, self-addressed, postage paid envelope in order to complete his or her voter registration.**

**During the processing of the voter registration application, if the applicant was determined to be not eligible to vote, a denial letter was sent to the person indicating the reason for his or her voter registration application was denied.**

**Interrogatory No. 8:**

Describe the procedures followed in the administration of the elections that occurred on November 7, 2000 in your county, including, but not limited to, the assignment of pollworkers, election judges, phone lines, voting machines and laptop computers.

**Answer:**

**In preparation for the 2000 election cycle, 319 separate precincts were established and none of the precincts divided political districts except in those instances where there was an overlapping Special Tax or Community Development District election. This was done in order to minimize the potential for voters to seek to vote in the wrong precinct. Every precinct had a land-based telephone line that was dedicated to support of the election or a cell phone was issued. All phones and lines were verified as operational prior to and on election day.**

**A qualified precinct Clerk and Assistant Clerk was recruited and properly trained to support each of the 319 voting precincts in Hillsborough County for the 2000 general**

10

election.  The number of Poll workers that were recruited, trained, and assigned to each precinct was based upon the size of the precinct and the expected turnout of voters.  Poll workers were assigned by the Supervisor of Elections office to precincts based upon their individual preferences, prior election experience, individual qualifications, and the number of voters in the precinct.

Votomatic machines were distributed based upon previous experiences by the office during presidential general elections.  Every votomatic was operationally checked at our warehouse facility before it was delivered to a voting precinct.  This involved a test punch of every race on the ballot of every votomatic and a verification of the correct ballot style for each votomatic as evidenced by test cards that were produced and verified prior to the election.

One week prior to the election, a customized sample ballot that included the specific races/candidates, the assigned precinct, a map showing the location of the voter's polling place, and general election information was mailed to every registered voter in Hillsborough County except those who had already requested an absentee ballot.

In the main office of the Supervisor of Elections, an Automatic Call Director System was installed to efficiently distribute calls from the public to full-time and temporary employees on and prior to election day.  A total of 18 additional telephone lines were installed in the main office and manned by temporary employees who were trained to respond to calls from the public.

At the Elections Service Center, a modern phone bank facility was constructed specifically for the presidential election year and a sophisticated computer software system was installed to support 46 phone bank operators whose responsibility was to respond to calls from the precincts regarding voter eligibility and precinct location.  A Uniform Call Director system was installed to direct incoming calls in a systematic manner to the next available operator.

In order to reduce the number of calls coming into the Clerks Phone Bank, 10 highly experienced Clerks Phone Bank operators were deployed to work on site at 10 designated precincts for the general election.  The 10 precincts were selected based upon their large number of registered voters and traditionally high number of affirmations that required phone bank resolution.  The on-site clerks phone bank operators used desktop computers and the same sophisticated software system as the main phone bank operators.  The on-site phone bank operators were also provided with a cell phone in order to contact a supervisor at the Clerks Phone Bank if necessary.

**Interrogatory No. 9:**

Identify each person who has, claims to have, or whom you believe may have knowledge

11

or information pertaining to any fact alleged in the Amended Complaint filed in this Action.

**Answer:**

**Defendant Iorio objects to this interrogatory on the grounds that is overly broad and unduly burdensome.  Defendant Iorio further objects on the grounds that Defendant is unaware of which Amended Complaint Plaintiff is referring to.  Subject to, and without waiver of this objection and the general objections set forth above, Defendant Iorio responds:**

**The information sought in this interrogatory is contained in Plaintiffs' and Defendants' Initial Disclosures and Plaintiffs' and Defendants' Answers to Interrogatories and Document Requests.**

**Interrogatory No. 10:**

State the specific nature and substance of the knowledge that you believe the person(s) identified in your response to Interrogatory No. 10 may have.

**Answer:**

**N/A – the question refers to itself.**


## DOCUMENT REQUESTS

Defendant Iorio reasserts her objection to each Document Request as overly broad, unduly burdensome, and to the extent that each request is not reasonably calculated to lead to the discovery of relevant facts and/or admissible evidence.  All documents requested have either been disclosed either through the above Answers to Interrogatories, have been previously disclosed, or are available as they are kept in the usual course of business, pursuant to Fed. R. Civ. P. Rule 34(b), at the locations disclosed below.

**Document Request No. 1:**

Please produce any and all documents relating to efforts by Defendants Harris and Roberts to ensure and/or verify the reliability and accuracy of the lists of possible or probable ineligible voters ("purge lists") received by your county since January 1998 from the Division of Elections.

**Answer:**

**Documents requested are filed in the offices of Pam Iorio, Supervisor of Elections, Darrell Smith, Director of Operations & Support, and Gary Klunk, Manager, Voter Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 2:**

Please produce any and all documents relating to the list maintenance activities of the Division of Elections since January 1998 and their implementation in Hillsborough County.

**Answer:**

**Documents requested are filed in the offices of Pam Iorio, Supervisor of Elections, Darrell Smith, Director of Operations & Support, and Sharon Smith, Manager, Absentee & List Maintenance Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**All returned mail processed through the list maintenance section is stored at the Elections Service Center located at 2514 North Falkenburg Road, Tampa, FL. 33619. Document review at this location is available during normal business hours, Monday-Friday from 8:00 a.m.-5:00 p.m.**

**Document Request No. 3:**

In regard to voter registration list maintenance activities since January 1998, please produce any and all documents relating to the efforts of Defendants Harris and/or Roberts to require the Hillsborough County Supervisor of Elections to adopt measures to ensure accurate

13

purging and/or verification of listed information, including, but not limited to, any and all documents relating to or evidencing any standards issued by Defendants Harris and/or Roberts to be used by county supervisors in the process of verifying information provided by the State.

**Answer:**

**Defendant Iorio is not aware of any documents relating to the efforts of Defendants Harris and/or Roberts to require Hillsborough County to adopt measures to ensure accurate purging and/or verification of listed information.**

**Procedural guidance provided by the Division of Elections pertaining to the CFV is addressed in Answer to Interrogatory No. 4 .**

**Correspondence received from Defendants Harris and/or Roberts pertaining to the administration of the CFV can be reviewed in the offices of Pam Iorio, Supervisor of Elections, Darrell Smith, Director of Operations & Support, and Sharon Smith, Manager, Absentee & List Maintenance Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 4:**

In regard to voter registration list maintenance activities since January 1998, please produce any and all documents relating to the Hillsborough County Supervisor of Elections' verification of the accuracy of information provided by the State to be used in the removal of names from the lists of eligible voters, including, but not limited to, documents reflecting any standards and/or procedures in place to be followed in the verification and removal process and/or the actual practices that you employed in the verification and removal process.

**Answer:**

**Please refer to the information provided in the Answer to Interrogatory No. 4 and the Answer to Document Request No. 1.**

14

**Document Request No. 5:**

In regard to voter registration list maintenance activities since January 1998, please produce any and all documents relating to any efforts of Defendants Harris and/or Roberts to ensure the standards issued to you to be followed in the verification process were followed by the county supervisors.

**Answer:**

**Defendant Iorio is not aware of any documents of this nature.**

**Document Request No. 6:**

Please produce any and all documents relating to, or evidencing, the number of purge lists that the Florida Division of Elections provided you in 1998, 1999 and 2000, when you received those lists, and the number of names on each of the lists, including demographic information about the voters whose names were included on the lists.

**Answer:**

**Available documents are filed in the office of Gary Klunk, Manager, Voter Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 7:**

Please produce any and all documents relating to or evidencing how much time you were given to verify the purge lists provided by the Florida Division of Elections since January 1998.

**Answer:**

**Defendant Iorio is not aware of any documents of this nature.**

15

**Document Request No. 8**:

Please produce any and all documents relating to the type and/or amount of resources that were given to you by the Florida Division of Elections, or any other entity, to assist you in verifying the purge lists provided by the Florida Division of Elections.

**Answer:**

**Defendant Iorio is not aware of any documents of this nature.**

**Document Request No. 9:**

Please provide any and all documents relating to the Hillsborough County Supervisor of Elections' attempt to verify the accuracy of the purge lists provided by the Florida Division of Elections.

**Answer:**

**Available documents are filed in the office of Gary Klunk, Manager, Voter Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 10:**

Please produce any and all documents relating to the following named plaintiffs: Wallace McDonald, Kandy Wells, Natalie Carnegie, Willie Steen, Sherry Edwards, Rondrick Rose, and Jermaine Terry.

**Answer:**

**Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602.  Document review is**

available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.

**Document Request No. 11:**
Please produce any and all documents, manuals, or policies provided by the Florida Division of Elections since January 1998 for the purpose of training you on how to use the purge lists.

**Answer:**

**Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 12:**

Please provide any and all documents relating to the process by which you used each of

the purge lists provided to you by the Florida Division of Elections in 1998, 1999 and 2000.

**Answer:**

**Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.4.**

**Document Request No. 13:**

Please produce any and all documents, including, but not limited to, minutes relating to

any and all meetings of the Hillsborough County Supervisor of Elections regarding the

administration of the November 7, 2000 election.

**Answer:**

**Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.. Audio tapes of the Canvassing Board Meetings held in support of the 2000 general election are**

17

available for review in the office of Julie Gaul, Administrative Assistant, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.

## Document Request No. 14:

Please produce any and all documents relating to or evidencing a list of voters affected by incorrect removal of voters from the voter rolls since January 1998, including the number of names on each of the purge lists that the Florida Division of Elections provided to you in 1998, 1999 and 2000 that were found to have been included on the purge lists incorrectly and demographic information about the voters affected.

**Answer:**

The Hillsborough County Supervisor of Elections Office did not process the Florida Division of Election CVF lists for 1998 or 1999. During the processing of the 2000 CVF, 242 voters were identified as being incorrectly placed on the felon list. Documents on file in the office of Gary Klunk, Manager, Voter Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.

## Document Request No. 15:

Please produce any and all documents relating to the Florida Division of Elections' policy concerning the voting rights of individuals convicted of felonies in states other than Florida.

**Answer:**

Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.

## Document Request No. 16:

Please produce any and all documents identifying the names and positions of all individuals employed by you who were responsible for voter registration list maintenance since 1998.

**Answer:**

**Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 17:**

Please produce any and all documents relating to the Hillsborough County Supervisor of Elections' notification of voters that they had been identified as ineligible to vote, including any communications (or documents referencing any communications) between you and such voters since 1998.

**Answer:**

**Documents related to this request are on file in the office of Gary Klunk, Manager, Voter Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 18:**

Please produce any and all documents relating to the denial of the opportunity to vote of persons who completed affirmations on November 7, 2000.

**Answer:**

**Documents related to this request are on file in the office of Gary Klunk, Manager, Voter Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 19:**

Please produce any and all documents, including, but not limited to, minutes of any and all meetings of the Hillsborough County Supervisor of Elections evidencing the discussion of voter irregularities related to the November 7, 2000 election.

**Answer:**

**Documents related to this request are on file in the offices of Pam Iorio, Supervisor of Elections, Darrell Smith, Director of Operations & Support, and Gary Klunk, Manager, Voter Services, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, at 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 20:**

Please produce any and all documents, including, but not limited to, position papers, administrative records, or similar documents given to you or your staff for consideration in deliberating on the adoption of the administrative procedures pertaining to the November 7, 2000 election.

**Answer:**

**Defendant Iorio is not aware of any documents of this nature.**

**Document Request No. 21:**

Please produce any and all documents, including, but not limited to, communications between you and your staff concerning complaints regarding the November 7, 2000 election.

**Answer:**

**Documents related to this request are on file in the offices of Pam Iorio, Supervisor of Elections, Darrell Smith, Director of Operations & Support, and Gary Klunk, Voter Services, Hillsborough County Supervisor of Elections Office, 16th floor of the**

20

County Center, at 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.

**Document Request No. 22:**

Please produce any and all documents, included, but not limited to, advertisements and position descriptions for poll workers, election judges, and other election day workers for Hillsborough County for the November 7, 2000 election.

Answer:

**Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 23:**

Please produce any and all financial and or line item budget information pertaining to the administration of the November 7, 2000 election for Hillsborough County.

Answer:

**Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, and Donna Schomer, Purchasing Clerk, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, at 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 24:**

Please produce any and all documents related to the process by which you received voter registration applications, including, but not limited to, documents that establish policies or procedures in your office for receiving and processing these applications, from the DHSMV and the DCF from January 1998 to the present.

Answer:

21

Please refer to the Answer to Interrogatory No. 2.

**Document Request No. 25**:

Please produce any and all documents related to any problems experienced in regard to the voter registration functions carried out by the DHSMV and the DCF from January 1998 to the present.

Answer:

**Documents related to this request are on file in the office of Darrell Smith, Director of Operations & Support, Gary Klunk, Manager, Voter Services and Milagros Vega, Preprocessing Clerk, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 26**:

Please produce any and all documents relating to the acceptance and processing of voter registration applications at state agencies, including the DCF and the DHSMV, from January 1998 to the present.

Answer:

**Documents related to this request are on file in the office of Gary Klunk, Manager, Voter Services and Milagros Vega, Preprocessing Clerk, Hillsborough County Supervisor of Elections Office, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m.**

**Document Request No. 27**:

Please produce any and all documents identified in response to Plaintiffs' Second Set of

Interrogatories.

**Answer:**

**Documents related to this request are available at the main office of the Hillsborough County Supervisor of Elections, 16th floor of the County Center, 601 East Kennedy Blvd, Tampa, FL 33602. Document review is available during normal business hours, Monday-Friday from 8:00 a.m.-5:15 p.m. Additional documents related to this request are available at the Elections Service Center, 2514 North Falkenburg Road, Tampa, FL. 33619. Document review at this location is available during normal business hours, Monday-Friday from 8:00 a.m.-5:00 p.m.**

(signature) PAM IORIO

(please print name)

**STATE OF FLORIDA**                    }
                                        } ss:
**COUNTY OF HILLSBOROUGH**              }


**BEFORE ME,** the undersigned authority, personally appeared  **PAM IORIO,** who is personally known to me or who produced a driver's license as identification, and who after first being duly sworn, deposes and states that the foregoing Answers to Interrogatories are true and correct.

**SWORN TO AND SUBSCRIBED** before me this ___ day of March 2002.

DOROTHY L BENOIT
MY COMMISSION # CC 901733
EXPIRES: February 13, 2004
Bonded Thru Notary Public Underwriters

NOTARY PUBLIC, STATE OF FLORIDA

23

Print Name: _Dorothy L. Benoit_

My Commission Expires: _February 13, 2004_

Respectfully submitted,

H. Ray Allen, II
Florida Bar No. 255890
Sr. Assistant County Attorney
Kenneth A. Tinkler
Florida Bar No. 0163392
Assistant County Attorney
Post Office Box 1110
Tampa, Florida 33601
(813) 272-5670 (phone)
(813) 272-5846 (facsimile)
allenh@hillsboroughcounty.org
Attorneys for Pam Iorio, Supervisor
of Elections of Hillsborough County

24

# PLAINTIFFS' EXHIBIT 46

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-120-CIV-GOLD/SIMONTON

NAACP, by its FLORIDA STATE
CONFERENCE OF BRANCHES. et al.,

       Plaintiffs.

vs.

KATHERINE HARRIS, Secretary of State
of Florida, et al.,

       Defendants.

_____/

## DEFENDANT DAVID C. LEAHY'S RESPONSE
## TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and Rule 26.1 of the Local Rules for the Southern District of Florida. Defendant David C. Leahy. Supervisor of Elections for Miami-Dade County ("Leahy"). responds to Plaintiffs' First Set of Interrogatories as follows.

## GENERAL OBJECTIONS

1.     Leahy objects to Plaintiffs' Definitions and Instructions and to their First Set of Interrogatories to the extent they seek to impose obligations that differ from or exceed the obligations set forth in the Federal Rules of Civil Procedure and the Local Rules for the Southern District of Florida.

2.     Leahy objects to the various definitions used by Plaintiffs for the term "identify" in paragraphs 7 through 13 of their Definitions and Instructions on the grounds that such definitions seek information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. and are overbroad. unduly burdensome. and harassing.

3.    Leahy objects to paragraph 15 of Plaintiffs' Definitions and Instructions on the grounds that it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and is overbroad, unduly burdensome, and harassing.

4.    Leahy objects to the First Set of Interrogatories to the extent it seeks information protected by any constitutional, statutory, or common-law right of privacy or confidentiality, or confidentiality that Leahy owes to others.

5.    Leahy objects to the First Set of Interrogatories to the extent that it seeks information that is protected by the attorney-client privilege, attorney work-product doctrine, or any other privilege or immunity under applicable law.  In the event that any privileged or protected documents are produced in response to the First Set of Interrogatories, such disclosure is inadvertent and does not constitute a waiver of any privilege or immunity.

6.    Leahy objects to the First Set of Interrogatories on the ground that they were served untimely, causing Leahy's response to be due beyond the close of class-related discovery.

7.    These general objections are incorporated into each of the responses to specific interrogatories below.

8.    Leahy reserves the right to amend and/or supplement these responses upon review of Plaintiffs' Supplemental Motion for Class Certification and upon receipt of Plaintiffs' outstanding responses to Leahy's discovery requests.

## RESPONSES AND SPECIFIC OBJECTIONS

## INTERROGATORY NO. 1

Please identify the number of complaints you received in regard to the November 7, 2000 election in Florida, whether received prior to the election, on election day, or after the election, by category of complaint if available, including, but not limited to, complaints regarding:
a.    Punch card voting machines;
b.    Voter registration;
c.    Failure to appear on voter roll;

2

      d.      Inability to contact the Supervisor of Elections office;

      e.      Busy phone lines at the polling site; and

      f.      Poll workers.

## RESPONSE

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure and Rule 26.1.G(5) of the Local Rules for the Southern District of Florida. Leahy responds to this interrogatory by referring Plaintiffs to the documents Leahy is producing in response to request number 1 of Plaintiffs' First Set of Document Requests.  Leahy further responds that the complaints being produced were never counted or categorized.

## INTERROGATORY NO. 2

Please identify all individuals who you have determined were improperly denied the right to vote in the November 7. 2000 election. as well as any memoranda. correspondence. and other documents relating to these individuals and the fact that these individuals were improperly denied the right to vote.

## RESPONSE

Leahy objects to this interrogatory on the ground that it is vague to the extent that it refers to individuals who were "improperly denied the right to vote." Subject to and without waiver of this objection and the general objections noted above. Leahy responds that Donnise A. DeSouza was a registered voter in Miami-Dade County at the time of the November 7. 2000 election and should have been able to vote.  Ms. DeSouza has stated. in a letter dated November 8. 2000. a copy of which is attached hereto. that she was not permitted to vote on November 7. 2000.  Also attached is Leahy's February 13. 2001 letter responding to Ms. DeSouza.

Leahy does not know of any other persons who were not permitted to vote on November 7. 2000 but should have been able to vote on that day.

3

## INTERROGATORY NO. 3

For the county defendants, please identify the number of affirmations/affidavits completed at all of the polling sites in your county on November 7. 2000 in relation to voters who were not allowed to vote, as well as the name and address of those voters who completed an affirmation/affidavit and were not allowed to vote, and the reason why these voters were not allowed to vote.

## RESPONSE

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure and Rule 26.1.G(5) of the Local Rules for the Southern District of Florida. Leahy responds to this interrogatory by referring Plaintiffs to the documents Leahy is producing in response to request number 5 of Plaintiffs' First Set of Document Requests.

## INTERROGATORY NO. 4

Please identify all voters purged from January 1. 1999 through November 7. 2000 pursuant to list maintenance procedures. including but not limited to purges based on alleged felony conviction. death. and duplicate registration. and for each voter. please specify (a) the basis for the purge. (b) the date of the purge. and (c) whether the voter received notification of the purge.

## RESPONSE

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure and Rule 26.1.G(5) of the Local Rules for the Southern District of Florida. Leahy responds to this interrogatory by referring Plaintiffs to a compact disc ("CD") containing information that is responsive to this interrogatory and that Leahy is producing together with these responses.

## INTERROGATORY NO. 5

For the county defendants. please identify the process used by your office to verify whether the individuals who were identified by the State and its agents as probably or possibly ineligible to vote were in fact ineligible.

**RESPONSE**

The State provided Leahy's office with three lists.  The process used to verify the information on each of those lists is as follows.

Deceased Lists: The information listed for the deceased individual was compared against the information maintained on the registered voter by Elections Department staff.  Based on that comparison, if it appeared that it was the same individual, that voter was placed in "deceased" status and removed from the registration rolls.  If such a voter appeared at a polling place to vote, that voter was permitted to vote upon the showing of proper identification and was reinstated as an active voter.

Duplicate Lists: The information listed for an individual who registered to vote in another Florida County was compared against the information maintained on the Miami-Dade registered voter by Elections Department Staff.  Based on that comparison, if it appeared that it was the same individual, that voter was placed in "registered to vote elsewhere" status and removed from the registration rolls.  If such a voter appeared at a polling place to vote, that voter was permitted to vote upon stating that he or she had not registered to vote in another county and was reinstated as an active voter.

Felony Lists: The administrative hearing process provided for in Section 98.075 of the Florida Statutes was used for voters identified on State lists as alleged felons who had not had their rights restored.  All individuals identified on those lists were sent an administrative hearing notice by certified mail.  Publication notice was also given for those on the lists who did not pick up the certified mailing sent to them.  As part of the administrative hearing process, individuals could submit an appeal form.  Those individuals who appealed and were determined by FDLE to be convicted felons who had not had their rights restored were placed in "felony" status,

removed from the registration rolls. and notified by mail.  Those individuals who appealed and

were determined by FDLE not to have been convicted of a felony or who had their rights

restored remained registered voters and were notified by mail.  Those individuals who did not

respond to the administrative hearing notices were placed in "administrative cancel" status and

were removed from the registration rolls.

**INTERROGATORY NO. 6**

For the county defendants, please state whether, during the period from January 1. 1999
to November 7, 2000. you purged from the voter rolls ex-felons whose right to vote was not
restored in Florida, even if such individuals were not convicted of a felony in Florida and had not
lost their right to vote in the state in which they were convicted or had their right to vote restored
in the state in which they were convicted.  If you answer in the affirmative. please identify the
name, address. and date of purge for each such individual purged from your voter roll.

**RESPONSE**

Leahy does not know whether any individuals described in this interrogatory were

removed from the registration rolls.  Information pertaining to out-of-state ex-felons whose right

to vote was not restored in Florida can be found in the documents Leahy is producing in response

to request number 3 of Plaintiffs' First Set of Document Requests.

**INTERROGATORY NO. 7**

For the county defendants. please state whether you permitted a voter to vote on
November 7. 2000 if the voter was purged from the voter roll based on an address change. but
that voter appeared at the poll to vote and stated that his or her address had not. in fact. changed.
and if you answer in the affirmative. please describe the procedure by which such voters were
permitted to vote.

**RESPONSE**

Yes.  Please see the procedure described under the heading of duplicate lists in the

response to interrogatory number 5.

## INTERROGATORY NO. 8

Please state whether you removed any voters from the voter rolls from January 1. 1999 to November 7, 2000 based on an alleged change of residence without confirming in writing directly from the voter that the voter had changed residence to a place outside the registrar's jurisdiction, and if you answer in the affirmative, please state the name, address, phone number, and date of removal from the voter roll for each voter.

## RESPONSE

Yes. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure and Rule 26.1.G(5) of the Local Rules for the Southern District of Florida. Leahy responds to the latter part of this interrogatory by referring Plaintiffs to the CD produced in response to interrogatory number 4.

## INTERROGATORY NO. 9

Please indicate whether you notified all individuals who registered to vote in 2000 of the status of their applications at least 10 days prior to the November 7. 2000 election. and if you answer in the negative, please identify the number of individuals who were not so notified as well as the name, address, phone number, date registration application received, and date voter notified of status of application for each individual.

## RESPONSE

Yes. for all registrations received before 10 days prior to the November 7, 2000 election.

## INTERROGATORY NO. 10

For the county defendants, please describe the process by which poll workers at individual polling sites on November 7. 2000 could determine a voter's eligibility if the voter did not appear on the precinct register, including whether the poll worker was required to call off-site to check eligibility records or whether access to such data was provided at the polling site.

## RESPONSE

Precinct clerks were provided with street indices for their precinct and precincts within the same 100 series. For example, precinct 125 would receive street indices for all the precincts starting with a "1". A voter who was not on the precinct register was allowed to vote by signing an affidavit if the voter had a current voter ID card and the voter's current address was on the street index. If an individual whose name was not on the precinct register either did not have a

current voter ID card or that individual's current address was not on the street index, the precinct clerk had to call the voter problem network to determine if the individual was eligible to vote and, if so, in which precinct. In the eighteen largest precincts, laptop personal computers loaded with the registration rolls were provided so that an eligibility determination could be made without having to call the voter problem network.

## INTERROGATORY NO. 11

For the county defendants, please identify whether those voters who were in "inactive" status as of the book closing date for the November 7, 2000 election were included in the precinct registers in your county.

## RESPONSE

Yes.

## INTERROGATORY NO. 12

For the county defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you received voter registration applications from the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families and the number of applications received from each department, broken down by month.

## RESPONSE

Voter registration applications are received by mail from the Florida Department of Highway Safety and Motor Vehicles. An Elections Department employee picks up voter registration applications from the State for all the public service agencies twice a week. The number of such applications received in each month between January 1, 1999 and November 7, 2000 is listed below.

| Month/Year | Driver License Offices | State Public Assistance Offices |
|---|---|---|
| January 1999 | 2299 | 30 |
| February 1999 | 2264 | 40 |
| March 1999 | 2339 | 30 |
| April 1999 | 1823 | 21 |

| | | |
|---|---|---|
| May 1999 | 1818 | 28 |
| June 1999 | 3133 | 54 |
| July 1999 | 2122 | 43 |
| August 1999 | 2401 | 47 |
| September 1999 | 2459 | 124 |
| October 1999 | 2832 | 65 |
| November 1999 | 2542 | 53 |
| December 1999 | 2369 | 69 |
| January 2000 | 3302 | 49 |
| February 2000 | 3984 | 33 |
| March 2000 | 3018 | 22 |
| April 2000 | 3225 | 98 |
| May 2000 | 3824 | 35 |
| June 2000 | 2560 | 38 |
| July 2000 | 4007 | 65 |
| August 2000 | 4881 | 95 |
| September 2000 | 5356 | 106 |
| October 2000 | 4101 | 126 |
| November 2000 | 2420 | 22 |

## INTERROGATORY NO. 13

Please identify any problems or barriers that you experienced in regard to the voter registration functions to be carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

## RESPONSE

The Offices of the Florida Department of Highway Safety and Motor Vehicles provide registration applications along with a listing of those registration applications. Occasionally, there are names on the list for which there are no applications. Applications are occasionally received that are either incomplete in regard to the required information or were printed in a way that rendered the information missing or unreadable.

## INTERROGATORY NO. 14

Please identify each person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact related to class certification alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this action.

9

**RESPONSE**

At this time, Leahy is aware of the following individuals who have, claim to have, or may have information pertaining to any fact related to class certification alleged in the pleadings filed in this action: all plaintiffs; all defendants; all persons listed on the parties' initial disclosures; all persons identified by Plaintiffs in response to interrogatory number 1 of Leahy's First Set of Rule 26.1.G Interrogatories; all persons listed on the complaints that Leahy is producing in response to request number 1 of Plaintiffs' First Set of Document Requests; and all persons listed on the complaints that have been produced by Plaintiffs.

**INTERROGATORY NO. 15**

Please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response to interrogatory number 14 may have.

**RESPONSE**

Plaintiffs have knowledge of their claims, and the bases for their claims, in this action. Defendants have knowledge of the bases for their answers to Plaintiffs' claims. Persons who made complaints regarding the November 7, 2000 election to Miami-Dade County or to another entity have knowledge regarding the circumstances surrounding and the bases for their complaint.

**INTERROGATORY NO. 16**

For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded . . . is so numerous that joinder of all members is impracticable." *See Amended Complaint*, ¶ 39.

**RESPONSE**

Not applicable to Leahy.

10

## INTERROGATORY NO. 17

For defendants Harris, Roberts. Leahy, Oliphant. Stafford. Iorio. Sancho. Cowles. and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]here are questions of law and fact common" to the proposed class.  *See Amended Complaint.* ¶ 40.

## RESPONSE

Leahy objects to this interrogatory on the ground that it calls for a legal opinion.  Leahy further objects to this interrogatory on the ground that. pursuant to Rule 33(c) of the Federal Rules of Civil Procedure. this interrogatory should not be answered until at least the completion of class-related discovery.  Subject to and without waiver of these objections and the general objections noted above, and reserving the right to amend and/or supplement this response upon receipt of Plaintiffs' Supplemental Motion for Class Certification. Leahy responds to this interrogatory as follows.

As the Amended Complaint itself reveals. the factual circumstances of each plaintiff. and of each member of the proposed class. are distinct.  The legal issues framed by those dissimilar facts are also distinct.  This lack of commonality is compounded in this action by the presence of varying procedures. chosen and implemented at the county level. that are employed by the different Supervisors of Elections.

## INTERROGATORY NO. 18

For defendants Harris. Roberts. Leahy. Oliphant. Stafford. Iorio. Sancho. Cowles, and Lowe. please state the basis for your Answer to the Amended Complaint denying that "[t]he claims of the representative plaintiffs are typical of the claims of the class as a whole." *See Amended Complaint.* ¶ 41.

## RESPONSE

Leahy objects to this interrogatory on the ground that it calls for a legal opinion.  Leahy further objects to this interrogatory on the ground that. pursuant to Rule 33(c) of the Federal Rules of Civil Procedure. this interrogatory should not be answered until at least the completion

of class-related discovery. Subject to and without waiver of these objections and the general objections noted above, and reserving the right to amend and/or supplement this response upon receipt of Plaintiffs' Supplemental Motion for Class Certification, Leahy responds to this interrogatory as follows.

Because of the varying factual and legal issues that pertain to each proposed class member, the named plaintiffs cannot and do not assert claims that are typical of the claims of the class as a whole.

**INTERROGATORY NO. 19**

For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "Plaintiffs can and will fairly and adequately protect the interest of the members of the class." *See Amended Complaint,* ¶ 42.

**RESPONSE**

Not applicable to Leahy.

**INTERROGATORY NO. 20**

For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that class certification is appropriate because "the Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." *See Amended Complaint,* ¶ 44.

**RESPONSE**

Leahy objects to this interrogatory on the ground that it calls for a legal opinion. Leahy further objects to this interrogatory on the ground that, pursuant to Rule 33(c) of the Federal Rules of Civil Procedure, this interrogatory should not be answered until at least the completion of class-related discovery. Subject to and without waiver of these objections and the general objections noted above, and reserving the right to amend and/or supplement this response upon

receipt of Plaintiffs' Supplemental Motion for Class Certification. Leahy responds to this interrogatory as follows.

Leahy has authority only within Miami-Dade County. As a result, he could not have acted or failed to act on grounds generally applicable to the state-wide class that Plaintiffs request the Court to certify.

**PLAINTIFFS' EXHIBIT 47**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-120-CIV-GOLD/SIMONTON

NAACP, by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

  Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State
of Florida, et al.,

  Defendants.

_____/

### DEFENDANT DAVID C. LEAHY'S RESPONSE
### TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

  Pursuant to Rule 33 of the Federal Rules of Civil Procedure and Rule 26.1 of the Local Rules for the Southern District of Florida, Defendant David C. Leahy, Supervisor of Elections for Miami-Dade County ("Leahy"), responds to Plaintiffs' Second Set of Interrogatories as follows.

### GENERAL OBJECTIONS

  1. Leahy objects to the Second Set of Interrogatories to the extent that it duplicates, in whole or in part, prior interrogatories served on Leahy on the ground that such duplication is unduly burdensome and harassing.

  2. Leahy objects to Plaintiffs' Definitions and Instructions and to their Second Set of Interrogatories to the extent they seek to impose obligations that differ from or exceed the obligations set forth in the Federal Rules of Civil Procedure and the Local Rules for the Southern District of Florida.

APR 29 2002

3.     Leahy objects to the various definitions used by Plaintiffs for the term "identify" in paragraphs I through O of their Definitions on the grounds that such definitions seek information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and are overbroad, unduly burdensome, and harassing.

4.     Leahy objects to the Second Set of Interrogatories to the extent it seeks information protected by any constitutional, statutory, or common-law right of privacy or confidentiality, or confidentiality that Leahy owes to others.

5.     Leahy objects to the Second Set of Interrogatories to the extent it seeks information that is protected by the attorney-client privilege, attorney work product doctrine, or any other privilege or immunity under applicable law.  In the event that any privileged or protected information is produced in response to the Second Set of Interrogatories, such disclosure is inadvertent and does not constitute a waiver of any privilege or immunity.

6.     These general objections are incorporated into each of the responses to specific interrogatories below.

7.     Leahy reserves the right to amend and or supplement these responses if necessary as discovery proceeds.

2

## RESPONSES AND SPECIFIC
## OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 1

Describe the procedures followed by your office to remove ("purge") voters from the list of eligible voters from January 1998 to the present.

### RESPONSE

For the procedures used to process the deceased, duplicate, or felony lists that are generated through the State's central voter file and received from the State Division of Elections, see Leahy's answer to interrogatory number 5 of Plaintiffs' First Set of Interrogatories.

When mail that was sent to voters at their registration address is returned by the Post Office as undeliverable, a Forwardable Address Confirmation Final notice, attached as Exhibit A, is mailed to them. Voters who do not return the notice within 30 days are placed in inactive status for a period that extends through the next two general, federal elections. During the time that voters are in inactive status, their registration status is changed back to active status if they make a change to their registration record, request a duplicate ID card, or vote by absentee ballot or at the polls. Voters who remain in inactive status through the next two general, federal elections are removed from the registration rolls after the second general, federal election and must then reregister in order to vote again.

When it is believed that a voter is not at least 18 years of age, is not a citizen of the United States, is a fictitious person, or has listed a residence that is not his or her legal residence, the administration hearing process provided in section 98.075 of the Florida Statutes is followed. If the voter does not satisfactorily respond either in writing or at the administrative hearing, he or she is removed from the voter registration rolls.

3

When information is received from another election official that a Miami-Dade registered voter has registered to vote in that other jurisdiction, the name of that voter is removed from the Miami-Dade registration rolls.

When information is received from the Florida State Office of Vital Statistics that a Miami-Dade registered voter has died, the name of that voter is removed from the Miami-Dade registration rolls.

When information is received from the Miami-Dade Clerk of the Circuit Court or the United States Attorney General's office that a Miami-Dade registered voter has been convicted of a felony, the name of that voter is removed from the Miami-Dade registration rolls. A form letter, attached as Exhibit B, is mailed to the voter.

## INTERROGATORY NO. 2

Describe the guidance or assistance given to your office by the Division of Elections ("Division") regarding verifying the accuracy of the lists of probable or possible ineligible voters ("purge lists") provided by the Division from January 1998 to the present.

## RESPONSE

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure and Rule 26.1.G(5) of the Local Rules for the Southern District of Florida, Leahy responds to this interrogatory by referring Plaintiffs to the documents Leahy produced in response to request number 3 of Plaintiffs' First Set of Document Requests.

Leahy further responds by stating that the Miami-Dade Elections Department complies with the Department of State rules and its opinions, both binding and advisory, regarding State elections laws.

4

## INTERROGATORY NO. 3

Describe the process by which your office determined the number of poll workers that would be assigned to each precinct in Miami-Dade County on November 7, 2000.

## RESPONSE

Each precinct or "same board precinct" was assigned a Clerk, an Assistant Clerk, Inspectors, and a Deputy Sheriff. (A "same board precinct" is where one election board is given the responsibility for operating two precincts, usually one middle size precinct and one small precinct.) Inspectors either worked at the ballot table or ballot box. The number of ballot table inspectors, who checked in the voters and provided demonstrations on how to vote, was determined by the number of registered voters in the precinct. The average number of inspectors assigned to the ballot table in a precinct for the November 2000 general election was determined by dividing the precinct's registration by 350.

One inspector was assigned to the ballot box in each precinct. In a very small precinct, one inspector may have handled both the ballot table and ballot box or that function may have been handled by the Clerk and Assistant Clerk.

## INTERROGATORY NO. 4

Describe any and all training provided for poll workers employed by your office from January 1998 through November 7, 2000.

## RESPONSE

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure and Rule 26.1.G(5) of the Local Rules for the Southern District of Florida, Leahy responds to this interrogatory by referring Plaintiffs to the documents Leahy produced in response to request number 6 of Plaintiffs' First Set of Document Requests.

Leahy further states that, prior to an election, pollworkers were required to attend a training class of approximately two hours in duration which covered their duties on election day. The size of each class was normally twenty-five pollworkers or less. The trainers were seasonal employees who were provided a course outline and training materials. The trainers received training and conducted a mock training class before they began training pollworkers. Trainers were assisted by clerks who helped them with demonstrations, handouts, and class attendance. Precinct clerks were provided with a clerks' procedures manual for election day reference. A phone network was established on election day for pollworkers to use when they had procedural questions. Trainers staffed that network.

Personnel that were assigned to either the public or voter problem networks received training prior to election day on their duties. Those that were assigned to computer terminals were trained on the use of the PCs, how to access the various registration screens, how to interpret the information on the screens, and how to respond to the types of questions they received. Elections Department personnel supervised the individuals on those networks and were available to answer questions and provide assistance.

County administrators were trained and assigned to troubleshoot on election day. The training they received lasted between 1 and 2 hours and covered the types of problems they may have been sent to resolve. Troubleshooters were provided with a manual, a beeper, and a County car.

**INTERROGATORY NO. 5**

Describe the process by which your office determined the number of phone lines that would be in operation at each precinct in Miami-Dade County on November 7, 2000.

**RESPONSE**

Phone lines were installed in each polling place in which there was not an existing facility phone available for use by the pollworkers.  The Elections Department had cellular phones available in case the polling place phone was not operational on the morning of the election.  A voter problem phone network was established on the 18th floor of the County Administration Building to handle calls solely from the precinct officials.  There were 100 phone lines available for use in those 18th floor conference rooms.  All 100 phone lines were operational and in use during the November 2000 general election.

7

DAVID C. LEAHY

STATE OF FLORIDA        )
                        ) ss:
COUNTY OF MIAMI-DADE    )

The foregoing instrument was acknowledged before me this 8th day of _April_,
2002 by _David C. Leahy_. He is personally known to me ~~or has produced~~
_____ ~~as identification~~.

Print Name: _Zeida Reyes_

Notary Public, State of _Florida_

My Commission Expires:

ZEIDA E. REYES
MY COMMISSION # CC 940979
EXPIRES: Oct 25, 2003
1-800-3-NOTARY   FL Notary Service & Bonding, Inc.

8

Respectfully submitted,

ROBERT A. GINSBURG
Miami-Dade County Attorney
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
Telephone:     (305) 375-5151
Facsimile:     (305) 375-5611

By:   _____
Susan Torres
Jeffrey P. Ehrlich
Assistant County Attorneys
Fla. Bar Nos. 133590 & 51561

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. mail this 22nd day of April, 2002 on the parties on the attached service list.

By:   _____
Assistant County Attorney

9

# SERVICE LIST

Thomasina H. Williams, Esq.
Law Offices Williams & Assoc., P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, Florida 33130
**Attorneys for Plaintiff**

Michael D. Cirullo, Jr.
JOSIAS, GOEN, CHEROF,
   DOODY AND EZROL, P.A.
3099 E. Commercial Blvd., No. 200
Ft. Lauderdale, FL 33308
**Attorney for Defendant, William Cowles**
**Supervisor of Elections for Orange County**

Burnadette Norris-Weeks, Esq.
100 S.E. 6th Street
Ft. Lauderdale, FL 33301
**Attorney for Def, Miriam Oliphant**
**Broward County Elections Supervisor**

John W. Little, III, Esquire
Steel Hector & Davis, LLP
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
**Attorneys for Hon. Katherine Harris,**
**Secretary of State and Clay Roberts,**
**Director of Florida Division of Elections**

Tracy I. Arpen, Esquire
Office of General Counsel
117 W. Duval Street, Suite 480
Jacksonville, FL 32202-3700
**Attorneys for Stafford, Duval County**

Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Anita Hodgkiss, Esq.
Lori Outzs Borgen, Esq.
**Lawyers' Committee for Civil**
   **Rights Under Law**
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

H. Ray Allen, II, Esquire
Senior Assistant County Attorney
P.O. Box 1110
Tampa, Florida 33601
**Attorneys for Iorio, Hillsborough County**

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
725 Twelfth Street, NW
Washington, D.C. 2005-5901
**Attorneys for ChoicePoint, Inc.**

Chris Haughee, Esquire
Bentley Law Group
690 East Davidson St
P.O. Box 1608
Bartow, Florida 33830-1608
Attorneys for Sancho, Leon County

Dan Eckert, Esquire
Frank Gummey, Esquire
County Attorney's Office
123 W. Indiana Avenue
DeLand, FL 32720-4613
**Attorneys for Lowe, Volusia County**

Mitchell Bloomberg, Esquire
Adorno & Zeder, P.A.
2601 South Bayshore Drive, Suite 1600
Miami, Florida 33133-5413
**Attorneys for ChoicePoint, Inc.**

Dennis Hayes, Esq.
Angela Ciccolo, Esq.
**NAACP Legal Department**
4805 Mt. Hope Drive, Fifth Floor
Baltimore, MD 21215-3297

10

Louis M. Bograd, Esq.
**American Civil Liberties Union Foundation**
**National Legal Department**
733 15th Street, NW, Suite 620
Washington, D.C. 20005

David V. Kornreich, Esq.
Muller Mintz, P.A.
Suite 1525, Citrus Center
255 South Orange Avenue
Orlando, Florida 32801-3415

Norman Chachkin, Esq.
Ted Shaw, Esq.
Jacqueline A. Berrien, Esq.
Janai Nelson, Esq.
**NAACP Legal Defense &**
    **Educational Fund, Inc.**
99 Hudson Street, Suite 1600
New York, NY 10013

Penda D. Hair, Esq.
Judith A. Browne, Esq.
Monique L. Dixon, Esq.
**The Advancement Project**
1730 M Street, N.W., Ste. 401
Washington, D.C. 20036

Elliot Mincberg, Esq.
Larry Ottinger, Esq.
Alma C. Henderson, Esq.
**People for the American Way Foundation**
2000 M Street, Suite 400
Washington, D.C. 20036

James A. Cherof, Esq.
Kerry L. Ezrol, Esq.
Josias, Goren, Cherof, Doody
    & Exrol, P.A.
3099 East Commercial Blvd., Suite 200
Ft. Lauderdale, Florida 33308

Todd A. Cox, Esq.
**NAACP Legal Defense &**
    **Educational Fund, Inc.**
1444 Eye Street, N.W., 10th Floor
Washington, D.C. 20005

Steven Shapiro, Esq.
**ACLU Foundation**
125 Broad Street, 18th Floor
New York, NY 10004

Laughlin McDonald, Esq.
**ACLU Foundation Southern**
Regional Office
2725 Harris Tower
233 Peachtree Street, N.E.
Atlanta, GA 30303

11

Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
200 South Biscayne Blvd.
Miami, FL 33131-2398
**Attorneys for Hon. Katherine Harris,**
**Secretary of State and Clay Roberts,**
**Director of Florida Division of Elections**

George L. Waas, Esq.
Douglas B. Mac Innes
**Office of the Attorney General**
Department of Legal Affairs
PL-01 The Capital
Tallahassee, FL 32399-1050
**Attorneys for Fred Dickinson**
**Executive Director**
**Florida Dept. of Highway Safety and**
**Motor Vehicles and**
**Kathleen Kearney, Secretary of the**
**Florida Department of Children and Families**

12