UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 01-120-CIV-GOLD/SIMONTON

NIGHT BOX
FILED

JUL ~ 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

-------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

-------------------------------------------------x


EXHIBITS TO DECLARATION OF ANGELA CICCOLO, ESQ.
IN SUPPORT OF PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT


VOLUME VII

EXHIBITS 48-62

4(2A

<u>**NAACP v. Harris, 01-120-Civ-Gold/Simonton**</u>

**Exhibits to Declaration of Angela Ciccolo, Esq. in Support of its Motion for Summary Judgment**

<u>**Table of Exhibits**</u>

<u>**Declarations & Affidavits**</u>

1. Declaration of Noni Jones
2. Declaration of Dr. Henry Flores
3. Affidavit of Ursula Y. Harvey
4. Affidavit of Dr. Ronald Hayduk
5. Declaration of Joanna Clark
6. Declaration of Lorine Walden
7. Declaration of Wallace McDonald
8. Declaration of Ronald Ketterer
9. Declaration of Luis Figueroa
10. Declaration of Theresa James
11. Declaration of Jakelin Green

<u>**Deposition Transcripts and Excerpts**</u>

12. Deposition of George Bruder
13. Deposition of Dick Carlberg
14. Deposition of Julia Stoner
15. Deposition of John Stafford
16. Deposition of Linda Tanko, Volume I
17. Deposition of William Cowles
18. Deposition of Sandra E. Peloquin, Volume I
19. Deposition of Sandra E. Peloquin, Volume II
20. Deposition of Dr. Henry Flores
21. Deposition of Emmett Mitchell, IV (May 20, 2002)
22. Deposition of Janet Modrow (October 22, 2001)
23. Deposition of Janet Modrow in *Johnson v. Bush,* Case No. *00-3542-CIV-King* (December 3, 2001)
24. Deposition of Marlene Thorogood (October 18, 2001)
25. Deposition of Janice Kelly (March 25, 2002)
26. Deposition of Joanna Clark (January 28, 2002)
27. Deposition of Gary E. McIntosh (June 4, 2002)
28. Deposition of Edward C. Kast (May 21, 2001)
29. Deposition of Deanie Lowe
30. Deposition of Pam Iorio (May 6, 2002)
31. Deposition of Adora Nweze
32. Deposition of Deborah Sue Berlinger

33. Deposition of Kandy Wells
34. Deposition of Shirley Rivers-Edwards (May 23, 2002)
35. Deposition of Rondrick Rose
36. Deposition of John Bowman (May 21, 2002)
37. Deposition of Admatha Israel
38. Deposition of David Leahy (May 24, 2002)
39. Deposition of Placide Dossous (January 28, 2002)
40. Deposition of Jermaine Terry (February 1, 2002)

## Responses to Requests for Production of Documents & Interrogatories

41. Defendant's Secretary of State Katherine Harris and Clay Roberts' Objections and Answers to Plaintiff's First Set of Interrogatories
42. Defendant Choicepoint's Responses to Plaintiffs' First Set of Interrogatories
43. Defendant John Stafford's Response to Plaintiff's First Request for Production of Documents
44. Defendant Iorio's Objections and Responses to Plaintiffs' First Set of Document Requests and Interrogatories
45. Defendant Iorio's Objections and Responses to Plaintiffs' Second Set of Document Requests and Interrogatories
46. Defendant David Leahy's Response to Plaintiffs' First Set of Interrogatories
47. Defendant David Leahy's Response to Plaintiffs' Second Set of Interrogatories
48. Defendant Miriam Oliphant's Responses to Plaintiffs' First Set of Interrogatories
49. Defendant Deanie Lowe's Answers and Objections to Interrogatories
50. Defendant Deanie Lowe's Answers to Plaintiffs' Second Set of Interrogatories and Document Request
51. Defendant William Cowles' Response to Plaintiffs' First Set of Document Requests and Interrogatories
52. Defendant William Cowles' Responses to Plaintiffs' Second Set of Interrogatories
53. Defendant Kearney's Response to Plaintiffs' First Set of Interrogatories
54. Defendant Kearney's Response to Plaintiffs' Documents Requests
55. Defendant Kearney's Response to Plaintiffs' Second Set of Requests for Documents
56. Defendant Kearney's Response to Plaintiffs' Second Set of Interrogatories
57. Defendant Kearney's Second Supplemental Response to Plaintiffs' First Set of Interrogatories
58. Defendant Dickinson's Responses to Plaintiffs' First Set of Interrogatories and Request for Production of Documents

## Expert Witness Reports

59. Expert Witness Report of Gary McIntosh
60. Expert Witness Report of David Klausner
61. Expert Witness Report of Dr. Henry Flores
62. Supplementary Expert Witness Report of Dr. Henry Flores
63. Rebuttal Expert Witness Report of Ronald Hayduk

**Memoranda**

64. Memorandum from Ethel Baxter, Division Director, Florida Department of State to All Supervisors of Elections dated June 4, 1999 re: Central Voter File
65. Memorandum from Bill Hanson, Acting Chief, Benefit and Recovery and Special Programs, to Michael Spellman, Office of the Governor, dated February 9, 1995.
66. Memorandum from Carol Canady, Senior Human Service Program Specialist to Operational Program Administrators, Public Assistance Specialist supervisors, Clerical Supervisors dated January 8, 2002

**Tables, Charts & Other Relevant Information**

67. Select Consent Judgments from Voting Rights Litigation Involving Florida Counties
68. Certified Copy of Wallace McDonald's Criminal History from the Florida Department of Law Enforcement
69. Select Historic Racial Discrimination in Florida, Post-1864 State Statutory Provisions
70. Senate Report No. 103-6, Establishing National Voter Registration Procedures for Federal Elections, and for Other Purposes
71. Florida Voter Registration Application Form (Nazyle Rios)
72. DCF Voter Registration Preference Form (A039569)
73. DCF Voter Registration Preference Form (A039122)
74. E-mail Janet DeChristopher, 4/29/02 (A045949)
75. E-mail from Donna Miller to Greg Ferguson, 10/30/2001 (A040811)
76. E-mail from Robert Baker to Carol Canady (A040618-A040619)
77. E-mail from Janice Miller to Norene Moore dated 8/29/01 (A045943-A045944)
78. E-mail from Roseann Liriano to Carol Canady dated 1/09/02 (A040620)
79. E-mail from Norene Moore to Greg Ferguson dated 8/29/2001 (A039027)
80. Letter to Greg Ferguson from Donna Miller dated September 19, 2002 ( A039025-A039026)

**Miscellaneous**

81. Data Processing Services Agreement between Database Technologies ("DBT") & the State of Florida, Department of State, Division of Elections (the "Division")
82. Central Voter File Data Processing Services Agreement between the Division and DBT
83. Clerk Feedback Forms, Hillsborough County, 2000
84. 2000 General Questionnaires, Volusia County
85. Michael T. Lavin's Voter Registration Complaint filed November 10, 2000
86. Letter from Veronica Koval to DCF dated October 30, 2001
87. Letter from Scott Petullo to Ms. Carroll dated November 9, 2000
88. Letter from Veronica Koval to Ed Kast dated September 10, 2001

# PLAINTIFFS' EXHIBIT 48

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case N. 01-0120-CIV-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., by its FLORIDA STATE CONFERENCE OF
BRANCHES, JIMMIE PANNELL, JULIA STONER,
NATALIE CARNEGIE, ERMA J. KELLY, JOHN L.
CHEEVER, JAMES MARSHALL, LILLIE Q. ODOM,
WILLIE STEEN, WALLACE MCDONALD, JERMAINE
TERRY, LORINE WALDEN, EMERY TIMERLAKE,
VALERIE BUFORD-WELLS, MICHELLE FLOYD,
CONSUELO MARIA GRAHAM, SHERRY EDWARDS,
KANDY WELLS, JOANNA CLARK, JANICE KELLY,
PLACIDE DOSSOUS and RONDRICK ROSE in their own
right and as representatives of all similarly situated citizens
and residents of the State of Florida,

                                        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of
Florida; CLAY ROBERTS, Director of the Florida
Divisions of Elections; DAVID LEAHY, Miami-
Dade County Election Supervisor; MIRIAM OLIPHANT,
Broward County Election Supervisor; JOHN STAFFORD,
Duval County Election Supervisor; PAM IORIO, Hillsborough
County Election Supervisor; ION SANCHO, Leon County
Election Supervisor, WILLIAM COWLES, Orange County
Election Supervisor and DEANIE LOWE, Volusia County
Election Supervisor (all in their official capacities); and
CHOICE POINT, INC., a Georgia corporation d/b/a
DATABASE TECHNOLOGIES, INC.,

                                        Defendants.
_____/

## DEFENDANT MIRIAM OLIPHANT'S RESPONSES TO
## PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Local Rule 26.1 (g) of the United States District Court for the Southern

District of Florida and Rule 34 of the Federal Rules fo Civil Procedure, Defendant Oliphant, by

and through their undersigned attorneys, hereby state their objections and responses to Plaintiff's

First Set of Document Request and Interrogatories dated September 21, 2001.

## GENERAL OBJECTIONS

A. Defendant Oliphant objects to Plaintiff's First Set of Document Requests and Plaintiffs' First Set of Interrogatories to the extent they seek to impose obligations which differ from or exceed the obligations set forth in the Federal Rules of Civil Procedure and/or the Local Rules of the United States District Court for the Southern District of Florida.

B. Defendant Oliphant objects to each Document Request and each Interrogatory which seek disclosure of information or documents containing information protected by any constitutional, statutory, or common-law rights of privacy or confidentiality, or confidentiality that Defendant Oliphant owes to others. Defendant Oliphant reserves the right to withhold such information and/or documents containing such information until an appropriate stipulation and order is entered to protect the confidential nature of such documents and/or information.

C. Defendant Oliphant objects to each Document Request and each Interrogatory to the extent they seek material protected from disclosure by the attorney-client privilege, attorney work-product immunity, or any other privilege and/or immunity. Defendant Oliphant will comply with Local Rule 26.1(G), but in the event any protected document is produced by Defendant Oliphant in response to Plaintiff's Requests, such as disclosure is inadvertent and does not constitute a waiver of any privilege, immunity, or exemption.

D. Defendant Oliphant objects to each Document Request and each Interrogatory as overly broad, unduly burdensome, and to the extent that it is not reasonably calculated to lead to the discovery of facts and/or admissible evidence.

E. Defendant Oliphant reserves that right to revise and supplement any and all of the following responses upon receipt and review of Plaintiffs' Supplemental Motion for Class Certification, and any subsequent responses to class-related discovery.

Defendant Oliphant, subject to, and without waiver of, these objections and the specific objections that follow, produces under cover of this filing the documents requested by Plaintiffs' First Set of Document Requests and provides the following responses to Plaintiffs' First Set of Interrogatories:

1.    Please identify the number of complaints you received in regard to the November 7, 2000 election in Florida, whether received prior to the election, on election day, or after the election, by category of complaint if available, including, but not limited to, complaints regarding:

      a.    Punch card voting machines;
      b.    Voter registration;
      c.    Failure to appear on voter roll;
      d.    Inability to contact the Supervisor of Elections office;
      e.    Busy phone lines at the polling site; and
      f.    Poll workers.

### Response to Interrogatory No. 1

**Defendant Miriam Oliphant used a broad interpretation of the definition of "complaints" as defined in Paragraph 14 of Plaintiffs' definitions section. Pursuant to Rule 26 disclosure, Defendant has previously provided information received by Defendant from the Office of the Attorney General. Plaintiffs' have previously reviewed in Defendant's office and were provided with copies in response to public records request information which included: voter affirmations and telephone logs recorded on election day. Additionally, see copies of documents attached as Tab 1 of Defendant Oliphant's Response to Plaintiffs' First Set of Document Requests, as such documents may be responsive to this Interrogatory.**

2.  Please identify all individuals who you have determined where improperly denied the right to vote in the November 7, 2000 election, as well as any memoranda, correspondence, and other documents relating to these individuals and the fact that these individuals were improperly denied the right to vote.

### Response to Interrogatory No. 2

**Defendant Oliphant objects to the question on the grounds that it calls for a legal conclusion. Defendant Oliphant, subject to and without waiver of the general objections above and reserving the right to supplement this answer as new information becomes available provides the following response.**

**None.**

3.  For the county defendants, please identify the number of affirmations/affidavits completed at all of the polling sites in your county on November 7, 2000 in relation to voters who were not allowed to vote, as well as the name and address of those voters who completed an affirmation/affidavit and were not allowed to vote, and the reason why these voters were not allowed to vote.

### Response to Interrogatory No. 3

**There were 5,333 affirmations/affidavits completed. See attached Exhibit 1 to these interrogatories. See also code sheet for a description of the general nature of the affirmations/affidavits which is contained within Tab 4 of Defendant Oliphant's Response to Plaintiffs' First Set of Document Requests. There were no affirmations completed by voters who were not allowed to vote.**

4.  Please identify all voters purged from January 1, 1999 through November 7, 2000 pursuant to list maintenance procedures, including but not limited to purges based on alleged felony conviction, death, and duplicate registration, and for each voter, please specify (a) the basis for the purge, (b) the date of the purge, and (c) whether the voter received notification of the purge.

**Response to Interrogatory No. 4**

**Please see documents provided in response to this interrogatory as Exhibit 2.**

5.      For the county defendants, please identify the process used by your office to verify whether the individuals who were identified by the State and its agents as probably or possibly ineligible to vote were in fact ineligible

For the state defendants, please identify the process used by your office to verify whether the individuals whose names you forwarded to the county defendants as probably or possibly ineligible to vote were in fact ineligible.

**Response to Interrogatory No. 5**

**Defendant Oliphant objects to the questions on the grounds that the questions assumes a requirement not in Federal or Florida Law.  Defendant Oliphant, subject to, and without waiver of this objection and the general objections above in reserving the right to supplement this answer as new information becomes available, provides the following response:**

**Because the word "purge" was not defined in the Definitions of the Interrogatories, Defendant Oliphant defined "purge" to mean that a voter has been given a status of "cancel" on the voter registration system and is thus not eligible to vote.  (Exception: Any voter who was cancelled in error would be restored to active status immediately if he or she showed up to vote).**

**During the stated period, Defendant cancelled the felony convictions of only those persons whose record was received from the Florida Circuit Court or United States District Court Clerks office.  Defendant did not cancel for felony conviction during the stated period on the basis of central voter file listing.  Limited verification was performed for other categories which were provided by the state.  These categories included deaths and duplicate registrations.**

6.      For the county defendants, please state whether, during the period form January 1, 1999 to November 7, 2000, you purged from the voter rolls ex-felons whose right to vote was not restored in Florida, even if such individuals were not convicted of a felony in Florida and had not lost their right to vote in the state in which they were convicted or had their right to vote restored in the state in which they were convicted.  If you answer in the affirmative, please identify the name, address, and date of purge for each such individual purged from your voter roll.

**Response to Interrogatory No. 6**

**Defendant is unaware of persons purged who would have fallen under circumstances**

specified in this interrogatory.

7. For the county defendants, please state whether you permitted a voter to vote on November 7, 2000 if the voter was purged from the voter roll based on an address change, but that voter appeared at the poll to vote and stated that his or her address had not, in fact, changed, and if you answer in the affirmative, please describe the procedure by which such voters were permitted to vote.

For the state defendants, please state whether you directed the county defendants to permit a voter to vote on November 7, 2000 if the voter was purged from the voter roll based on an address change, but that voter appeared at the poll to vote and stated that his or her address had not, in fact, changed.

**Response to Interrogatory No. 7**

**Defendant Oliphant objects to the question on the grounds that the question assumes a requirement not in Federal or Florida law. Defendant Oliphant, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:**

**Yes. The Broward County Supervisor of Elections Office followed all state requirements. If a voter was in removal status, that person would have been permitted to vote. The precinct clerk was required to call the Broward County Supervisor of Elections Office and the trained operator on the call would have determined the eligibility of the voter after a historical review of the voter's record.**

8. Please state whether you removed any voters from the voter rolls from January 1, 1999 to November 7, 2000 based on an alleged change of residence without confirming in writing directly from the voter that the voter had changed residence to a place outside the registrar's jurisdiction, and if you answer in the affirmative, please state the name, address, phone number, and date of removal from the voter roll for each voter.

**Response to Interrogatory No. 8**

**Defendant objects to this question on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant's office at all times exceeded the minimal procedural requirements imposed by law. Defendant Oliphant, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as the new information becomes available, provides the following response:**

**Yes, in November 2000, there was no requirement of a written confirmation directly from the voter prior to removing the voter from the voter rolls based on a change of residence**

outside the registrar's jurisdiction if the action was based on compliance with list maintenance criteria or a cancellation notice indicating that the voter had registered to vote in another jurisdiction.

9.     Please indicate whether you notified all individuals who registered to vote in 2000 of the status of their applications at least 10 days prior to the November 7, 2000 election, and if you answer in the negative, please identify the number of individuals who were not so notified as well as the name, address, phone number, date registration application received, and date voter notified of status of application for each individual.

**Response to Interrogatory No. 9**

**The Broward County Supervisor of Elections Office is unaware of any voter who registered to vote in 2000 and was not notified of the status of their application at least ten (10) days prior to November 7, 2000.**

10.     For the county defendants, please describe the process by which poll workers at individual polling sites on November 7, 2000 could determine a voter's eligibility if the voter did not appear on the precinct register, including whether the poll worker was required to call off-site to check eligibility records or whether access to such data was provided at the polling site.

**Response to Interrogatory No. 10**

**Defendant's office objects to this question on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant's office has consistently strived to exceed the minimal procedural requirements imposed by law. Defendant's office, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:**

**Poll workers were instructed to call the elections office to verify persons not listed on the register. The larger precincts were provided with laptop computers and were able to determine a voter's eligibility if that voter did not appear on the precinct register. Poll worker manuals and training outlines have been furnished pursuant to Request for Production document responses.**

11.     For the county defendants, please identify whether those voters who were in "inactive" status as of the book closing date for the November 7, 2000 election were included in the precinct registers in your county.

**Response to Interrogatory No. 11**

**Yes.**

12.     For the county defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you received voter registration applications from the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families and the number of applications received from each department, broken down by month.

   For the state defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you supervised the voter registration duties carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

**Response to Interrogatory No. 12**

**The Broward Supervisor of Elections Office established a courier service between the Department of Highway Safety and Motor Vehicles, and the Department of Children and Family Services. Each site maintained a canvass bag wherein documents to be processed by the Broward County Supervisor's Office were placed for pick-up. This procedure was not required by law but was implemented to facilitate timely submission of applications for processing.**

**At no time has this office supervised the registration duties of the Florida Department of Highway Safety and Motor Vehicles or the Florida Department of Children and Families.**

**See also documents attached as Exhibit 3 in response to this interrogatory.**

13.     Please identify any problems of barriers that you experienced in regard to the voter registration functions to be carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

**Response to Interrogatory No. 13**

**Problems encountered in regard to the voter registration functions described in this Interrogatory included, incomplete applications, missing signatures, and the printers sometimes cut off the top and/or bottom of documents.**

14.     Please identify each person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact related to class certification alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this action.

**Response to Interrogatory No. 14**

**All parties to the lawsuit;**
**All persons inclusive in response to Interrogatory 1;**
**All persons listed in the parties' initial disclosure;**
**All persons listed in all other defendants' responses to this Interrogatory.**

15. Please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response to interrogatory number 14 above may have.

**Response to Interrogatory No. 15**

**Each plaintiff has knowledge of the facts and circumstances of his or her alleged claim. Each person inclusive in response to Interrogatory 1 has knowledge of his or her actions relating to the November 7, 2000 election. Each defendant has knowledge of his or her actions relating to the November 7, 2000 election.**

16. For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded ... is so numerous that joinder of all members is impracticable." See Amended Complaint, ¶ 39.

**Response to Interrogatory No. 16**

**Defendant Oliphant objects to the question on the grounds it calls for a legal conclusion. Defendant Oliphant , subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:**

**The complete sentence referenced in Amended Compliant, paragraph 39 is "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded, because of Defendant's practices complained of herein, is so numerous that joinder of all members is impracticable." All claims by Plaintiffs are related to individual incidents, all of which are isolated from each other and based on disparate facts. Since each case must be analyzed separately, the requirement of numerosity is left unsatisfied.**

17. For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]here are question of law and fact common" to the proposed class. See Amended Complaint, ¶ 40.

**Response to Interrogatory No. 17**

Defendant Oliphant objects to the question on the grounds it calls for a legal conclusion. Defendant Oliphant, subject to, and without waiver of this objection and the general objections above and reserving the right to supplement this answer as a new information becomes available, provides the following response:

As evidenced by the depositions of the Plaintiffs and other witnesses taken as of this date, and by the allegations of the Second Amended Complaint, each Plaintiff has an alleged claim based upon facts and circumstances applicable solely to that individual. The County Supervisors make local determinations as to practices and procedures not specifically mandated by state law, therefore any allegations concerning decisions of various supervisors do not relate to each other.

The incidents alleged within the compliant do not set forth any basis for a numerous class of individuals. The incidents alleged to have occurred are isolated in nature, and based on widely disparate and independent facts.

18. For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]he claims of the representative plaintiffs are typical of the claims of the class as a whole." See Amended Complaint, ¶ 41.

**Response to Interrogatory No. 18**

Defendant Oliphant objects to the question on the grounds it calls for a legal conclusion. Defendant Oliphant, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

There is no evidence that any of the named Plaintiffs represent anyone besides themselves. The named Broward County Plaintiffs have not suffered any alleged wrong and therefore, those Plaintiffs cannot represent any unknown and unnamed Plaintiffs. Discovery up to this point has shown that each Plaintiff only has knowledge of their own circumstances and there has been no evidence that any of the claims made are typical of any other individual or group.

19. For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "Plaintiffs can and will fairly and adequately protect the interest of the members of the class." See Amended Complaint, ¶ 42.

**Response to Interrogatory No. 19**

Defendant Oliphant objects to the question on the grounds it calls for legal conclusion.

Defendant Oliphant, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

It is denied that the named Broward County Plaintiffs have suffered any alleged wrong and therefore these Plaintiffs cannot adequately represent unnamed Plaintiffs who may or may not have suffered some kind of wrong. In addition, each Plaintiff deposed, at this time, has had varying goals for resolution of the issues in this complaint.

The Amended Complaint and discovery conducted so far has demonstrated that Plaintiffs have varying goals in this case. The issues of individual named Plaintiffs can be redressed on an individual basis, separately from other Plaintiffs and without the involvement of all Defendants. Once these individuals have their grievances redressed, the Plaintiff would have no interest in the outcome of the lawsuit. The interests of the Plaintiffs are as varied as their claims and alleged facts and circumstances. The named Plaintiffs from Broward County will not fairly and adequately protect the members of the class. The named Plaintiffs from other counties cannot protect the interest of members of the alleged class in Broward County, as the named Plaintiffs from other counties that have been deposed thus far have had no knowledge of the election process and practices in Broward County.

20.    For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that class certification is appropriate because "the Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." See Amended Complaint, ¶ 44.

Response to Interrogatory No. 20

Defendant Oliphant objects to the question on the grounds it calls for a legal conclusion. Defendant Oliphant, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Plaintiffs have not taken action that would benefit the supposed class as a whole since they have only sued seven individual Supervisors of Election, leaving sixty counties unaffected by this litigation. Therefore, any final relief cannot benefit the supposed class as a whole. In addition, each of the seven named Supervisors of Elections acts locally to conduct elections. The actions of Broward County's Supervisor of Elections have no impact on other counties and therefore the relief the Plaintiffs have requested is inappropriate.

Has knowkedge of Interrogatories 1-11

_(signature)_

_(please print name)_

STATE OF FLORIDA          }

COUNTY OF Broward         } ss:
                          }

    BEFORE ME, the undersigned authority, personally appeared Bruce Eldridge

who is personally known to me or who produced a driver's license as identification, and who

after first being duly sworn, deposes and states that the foregoing Answers to Interrogatories are

true and correct.

    SWORN TO AND SUBSCRIBED before me this 27th day of February 2002

NOTARY PUBLIC, STATE OF FLORIDA

Print Name: Mary Cooney

My Commission Expires: _____

Mary Cooney
Commission # CC 828155
Expires May 3, 2003
Bonded Thru
Atlantic Bonding Co., Inc.

Has knowledge of Interrogatories 12-13.

_____
(signature)

EVAN D. KOLODNY
(please print name)

STATE OF FLORIDA        }
                        } ss:
COUNTY OF Broward       }

    BEFORE ME, the undersigned authority, personally appeared Evan D. Kolodny

who is personally known to me or ~~who produced a driver's license as identification~~, and who

after first being duly sworn, deposes and states that the foregoing Answers to Interrogatories are

true and correct.

    SWORN TO AND SUBSCRIBED before me this 27th day of February, 2001

_____
NOTARY PUBLIC, STATE OF FLORIDA

Print Name: Mary Cooney

My Commission Expires: _____

Mary Cooney
Commission # CC 828155
Expires May 3, 2003
Bonded Thru
Atlantic Bonding Co., Inc.

**PLAINTIFFS' EXHIBIT 49**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 01-0120-C.V.-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.
by its FLORIDA STATE CONFERENCE
OF BRANCHES, JIMMIE PANNELL, JULIA
STONER, NATALIE CARNEGIE, ERMA J. KELLY,
JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q.
ODOM, WILLIE STEEN, WALLACE MCDONALD,
JERMAINE TERRY, LORINE WALDEN, EMERY
TIMBERLAKE, VALERIE BUFORD-WELLS,
MICHELLE FLOYD, CONSUELO MARIA GRAHAM,
SHERRY EDWARDS, KANDY WELLS, JOANNA
CLARK, JANICE KELLY, PLACIDE DOSSOUS and
RONDRICK ROSE in their own right and as representatives
of all similarly situated citizens and residents of
the State of Florida,

                **Plaintiffs,**

vs.

KATHERINE HARRIS, Secretary of State of Florida;
CLAY ROBERTS, Director of the Florida Division of
Elections; DAVID C. LEAHY, Miami-Dade County Election
Supervisor; MIRIAM OLIPHANT, Broward County Election
Supervisor; JOHN STAFFORD, Duval County Election
Supervisor; PAM IORIO, Hillsborough County Election
Supervisor; ION SANCHO, Leon County Election Supervisor;
WILLIAM COWLES, Orange County Election Supervisor;
and DEANIE LOWE, Volusia County Election Supervisor
(all in their official capacities); and CHOICEPOINT, INC.,
a Georgia corporation d/b/a DATABASE TECHNOLOGIES, INC.

                **Defendants.**

_____/

CERTIFICATE OF SERVICE OF ANSWERS
AND OBJECTIONS TO INTERROGATORIES TO DEFENDANT
DEANIE LOWE, Supervisor of Elections, Volusia County

Defendant, Deanie Lowe, Supervisor of Elections, Volusia County,  hereby certifies

that her Answers to interrogatories numbered 1-15 and objections to interrogatories numbered 17, 18, and 20 of Plaintiffs' Interrogatories to Defendant, Deanie Lowe, have been served this 24th day of October, 2001, by U.S. Mail, on the Plaintiffs, c/o: Lori Outzs Borgen, Lawyers' Committee for Civil Rights Under Law, 1401 New York Avenue, N.W., Suite 400, Washington, D.C. 20005-2124, and a copy to Thomasina H. Williams, Esquire, Brickell Bay View Centre, Suite 1830, 80 S.W. Eighth Street, Miami, Florida 33130; Dennis Hayes, Esq., Angela Ciccolo, Esq., Bruce Gear, Esq., NAACP Legal Department, 4805 Mount Hope Dr., Fifth Floor, Baltimore, MD 21215-3297; Barbara Arnwine, Esq., Thomas J. Henderson, Esq., Edward Still, Esq., Anita Hodgkiss, Esq., 1401 New York Ave., NW, Suite 400, Washington, DC 20005-2124; Todd A. Cox, Esq., 1444 Eye Street, NW, 10th Floor, Washington, DC 20005; Penda Hair, Esq., Judith Browne, Esq., Monique Dixon, Esq., 1730 "M" Street, NW, Suite 401, Washington, DC 20036; Elaine R. Jones, Esq., Theodore M. Shaw, Esq., Norman Chachkin, Esq., Jacqueline A. Berrien, Esq., 99 Hudson Street, Suite 1600, New York, NY 10013; Laughlin McDonald, Esq., 2725 Harris Tower, 233 Peachtree Street, NE, Atlanta, GA 30303; Louis M. Bograd, Esq., 733 15th Street, NW, Suite 620, Washington, DC 20005; Elliot M. Mincberg, Esq., Lawrence S. Ottinger, Esq., Alma C. Henderson, Esq., 2000 "M" Street, NW, Suite 400, Washington, DC 20036; John W. Little, III, Esquire, Walter J. Harvey. Esquire, Steel Hector & Davis, 200 S. Biscayne Boulevard, Miami, FL 33131-2398; Jim Cheroff, Esq., Michael Cirullo, Esq., 3099 E. Commercial Blvd., #200, Ft. Lauderdale, FL 33308-4311; Tracy I. Arpen, Esq., Office of General Counsel, 117 W. Duval Street, Suite 480, Jacksonville, FL 32202-3700; Christopher R. Haughee, Esq., Bentley Law Group, P. O. Box 1608, Bartow, FL 33831-

1608; Jeffrey P. Ehrlich, Esq., Assistant County Attorney, Stephen P. Clark Center, 111

NW 1st Street, #2810, Miami, FL 33128-1930; H. Ray Allen, II, Esq., Sr. Assistant County

Attorney, and Rebecca M. Kert, Esq., Assistant County Attorney, P. O. Box 1110, Tampa,

FL 33601; Mitchell Bloomberg, Esq., Adorno & Zeder, 2601 South Bayshore Drive, Suite

1600, Miami, FL 33133-5413; Raymond W. Bergan, Esq., Daniel A. Restrepo, Esq.,

Williams & Connolly, LLP, 725 Twelfth Street, N.W., Washington, D.C. 2005-5901; and

Burnadette Norris-Weeks, Esq., 100 S.E. 6th Street, Fort Lauderdale, FL 33301; George

Waas, Esq., Assistant Attorney General, PL-01 The Capitol, Tallahassee, FL 32399-1050.

DAVID V. KORNREICH
Florida Bar No.098576
Muller, Mintz, Kornreich, Caldwell,
Casey, Crosland & Bramnick, P.A.
Suite 3600, First Union Financial Center
Miami, Florida 33131
Telephone: 305-358-0800
Facsimile: 305-379-3802
Attorney for Defendant Lowe

DANIEL D. ECKERT
Florida Bar No. 180083
Volusia County Attorney
123 West Indiana Avenue
DeLand, Florida 32720-4613
Telephone: 904-736-5950
Facsimile: 904-736-5990
Attorney for Defendant Lowe

## INTERROGATORIES

1.  Please identify the number of complaints you received in regard to the November 7, 2000, election in Florida, whether received prior to the election, on election day, or after the election, by category of complaint if available, including, but not limited to, complaints regarding:
    a.   Punch card voting machines;
    b.   Voter registration;
    c.   Failure to appear on voter roll;
    d.   Inability to contact the Supervisor of Elections office;
    e.   Busy phone lines at the polling site; and
    f.   Poll workers.

    Defendant received no complaints on punch card machines because Volusia did not use them.  Defendant is unable to furnish a certain number for other categories.  Defendant previously has furnished phone logs, and furnishes additional documents including 2000 General Election Questionnaire completed by poll workers, which do or may include complaints.

2.  Please identify all individuals who you have determined were improperly denied the right to vote in the November 7, 2000 election, as well as any memoranda, correspondence, and other documents relating to these individuals and the fact that these individuals were improperly denied the right to vote.

    Plaintiff Ursula Harvey's registration was canceled improperly according to office procedures.  Defendant concludes that she was denied the right to vote.

    Defendant has identified four other persons whose registration also was canceled improperly for  similar clerical error as that for plaintiff, Harvey, and who were or may have been denied the right to vote.  They are Darlene Martin Allen, Margarita Rodriguez, Lucille Anderson, and  Roy E.  Bennett, Jr.  The registration of these persons was restored prior to the filing of this action after complaint directly from the voter.

    Linda Gilfedder was precluded from voting after a name error in the registration process involving a family member.

    Seven persons, Joe Brimhall, Luigi Lomoriello, James Davern, Sheila Brennan, Carolyn Robinson, George Smith, Jr., and Wendell Thornton, left the polls before their registration status was verified by poll workers.  For the purpose of this question, subject to any later information, defendant concludes they were denied the right to vote.   Willard Smith was precluded from voting for reasons not apparent on the face of his affirmation.  These eight voters are included in the response to question 3 below.

Defendant previously has furnished documents regarding plaintiff Harvey. Defendant also furnishes a note resulting from a press inquiry regarding precinct 620 in the days immediately following the election.  At the time of the press inquiry, defendant checked her records which showed Ms. Harvey's cancellation. Defendant did not receive complaint directly from Ms. Harvey, and did not discover the cancellation error until after receipt of her affidavit in this action. Defendant furnishes records regarding the other persons named in this response.

3.      For the county defendants, please identify the number of affirmations/affidavits completed at all of the polling sites in your county on November 7, 2000 in relation to voters who were not allowed to vote, as well as the name and address of those voters who completed an affirmation/affidavit and were not allowed to vote, and the reason why these voters were not allowed to vote.

Defendant understands the question to pertain to multi-purpose affirmations/affidavits, and not to absentee ballot affidavits. As so understood, there were 6152 affirmations/affidavits completed at the polls. Defendant previously furnished the number at each precinct. Among those completed by persons who did not vote, there were: (a) 15 persons who never had registered in Volusia County; (b) 1 by a person whose registration had been canceled pursuant to 42 U.S.C. §1973gg-6(d)(B), Fla. Stat. §98.065(4)(b), and who had not re-registered; (c) 7 by persons who went to a precinct other than where they were on the register and left without poll workers verifying their registration status; and (d) 1 for no reason apparent except human error who should have been allowed since he was on the precinct register. The corresponding names are as follows:

| a | b | c | d |
|---|---|---|---|
| 1.  Wells | 1.  Bortle | 1.  Robinson | 1.  Smith, Willard |
| 2.  McAleer | | 2.  Brimhall | |
| 3.  Riley | | 3.  Lomoriello | |
| 4.  Rushing | | 4.  Davern | |
| 5.  Armstrong | | 5.  Brennan | |
| 6.  Dillard | | 6.  Smith, George | |
| 7.  Salgado | | 7.  Thornton | |
| 8.  Ellis | | | |
| 9.  Hawley | | | |
| 10.  Justin | | | |
| 11.  Keator | | | |
| 12.  Reed | | | |
| 13.  Roberson | | | |
| 14.  Rudolph | | | |
| 15.  Schott | | | |

A copy of the affirmations/affidavits of the listed voters is furnished with these answers. Signatures have been redacted.

4.      Please identify all voters purged from January 1, 1999 through November 7, 2000 pursuant to list maintenance procedures, including but not limited to purges based on alleged felony conviction, death, and duplicate registration, and for each voter, please specify (a) the basis for the purge, (b) the date of the purge, and (c) whether the voter received notification of the purge.

Attached is a listing of all cancellations during the stated period.   The heading "other source" includes all cancellations other than those resulting from death, incompetency, felony conviction, central voter file duplicates, address change list maintenance under Fla. Stat. §98.065(4)(b).  "Other source" therefore includes registration information received directly from another election official, or from out of state election officials through the Florida Division of Elections.

Whether listed under CVF or other source, cancellations based upon information received from another election official, including through the state, that a voter has registered in another location are based as a matter of law upon both voter request and change of address outside jurisdiction.

The names of voters, such as plaintiff Timberlake,  who were canceled during the stated period, and who subsequently re-registered on their own (as distinguished from reinstatement by the supervisor) are not shown on the listing furnished.  In such cases, new registration numbers are assigned and the voting history is merged.  The identity of any other such person is not retrievable within the time limit for response.

In most cases, the voter was not notified of the cancellation.  Under defendant's procedure for CVF duplicates, which has been furnished to plaintiffs, voters with a duplicate registration having maintenance activity in Volusia subsequent to the other reported registration should have been sent a written inquiry.  Defendant has identified instances where this did not occur, and restored such persons to the Volusia registration   roll.  Written inquiries were made regarding the death of a voter to family members/friends of that voter where either the source of information was regarded as uncertain or the detail of information on hand did not match exactly.

5.    For the county defendants, please identify the process used by your office to
      verify whether the individuals who were identified by the State and its agents as
      probably or possibly ineligible to vote were in fact ineligible.

      For the state defendants, please identify the process used by your office to verify
      whether the individuals whose names you forwarded to the county defendants as
      probably or possibly ineligible to vote were in fact ineligible.

      As noted in response to 6 below, defendant did not use information from the
      state as a reason for cancellation of convicted felons.  The verification procedure
      for deaths was essentially  that where defendant was not satisfied of the identity,
      she made inquiry by letter to family members/friends at the voter's residence
      address.  The verification procedure used for central voter file duplicates is
      essentially stated in an undated document bearing the title "Central Voter File -
      Potential Duplicate Registrations," a copy of which is included in defendant's
      response to request to produce.

6.    For the county defendants, please state whether, during the period from
      January 1, 1999 to November 7, 2000, you purged from the voter rolls ex-felons
      whose right to vote was not restored in Florida, even if such individuals were not
      convicted of a felony in Florida and had not lost their right to vote in the state in
      which they were convicted or had their right to vote restored in the state in which
      they were convicted.  If you answer in the affirmative, please identify the name,
      address, and date of purge for each such individual purged from your voter roll.

      For the state defendants, please state whether, during the period from
      January 1, 1999 to November 7, 2000, you identified as possibly or probably
      ineligible to vote, or instructed defendant DBT to identify as possibly or probably
      ineligible to vote, those voters who were ex-felons whose right to vote was not
      restored in Florida, even if such voters were not convicted of a felony in Florida
      and had not lost their right to vote in the state in which they were convicted or
      had their right to vote restored in the state in which they were convicted.

      The question is unclear to defendant.  However, during  the stated period,
      defendant canceled for felony conviction only those persons whose record was
      received from Florida Circuit Court or United States District Court clerks.
      Defendant did not cancel for felony conviction during the stated period on the
      basis of central voter file listing.  Defendant did not cancel ex-felons.

7.   For the county defendants, please state whether you permitted a voter to vote on November 7, 2000 if the voter was purged from the voter roll based on an address change, but that voter appeared at the poll to vote and stated that his or her address had not, in fact, changed, and if you answer in the affirmative, please describe the procedure by which such voters were permitted to vote.

For the state defendants, please state whether you directed the county defendants to permit a voter to vote on November 7, 2000 if the voter was purged from the voter roll based on an address change, but that voter appeared at the poll to vote and stated that his or her address had not, in fact, changed.

Yes.  Poll workers were directed to contact the elections office and the voter was permitted to vote if they informed the supervisor that they had not changed their address.

8.   Please state whether you removed any voters from the voter rolls from January 1, 1999 to November 7, 2000 based on an alleged change of residence without confirming in writing directly from the voter that the voter had changed residence to a place outside the registrar's jurisdiction, and if you answer in the affirmative, please state the name, address, phone number, and date of removal from the voter roll for each voter.

Yes.  Records of all cancellations during the stated period are furnished, except for re-registrations as noted in 4 above.  Included among those are address changes where written confirmation from the voter was obtained otherwise through central voter file duplicate listings are noted under the heading "CVF." Address changes where written confirmation from the voter was obtained through  another election official are included under the heading "other sources." Also under "other sources" are those cancellations where written confirmation was obtained directly from the voter.   Under the  heading "canceled per FS" are those cancellations without written confirmation from the voter but after address confirmation procedures and two federal general elections without voting.  The note screen for such cases shows "cancel per FS 98.065 reg list maint."

9.      Please indicate whether you notified all individuals who registered to vote in 2000 of the status of their applications at least 10 days prior to the November 7, 2000 election, and if you answer in the negative, please identify the number of individuals who were not so notified as well as the name, address, phone number, date registration application received, and date voter notified of status of application for each individual.

All qualified applicants who submitted a timely and complete registration application were listed on the precinct register which was printed on October 27, 2000. Handwritten additions were made until the precinct registers were distributed on the Thursday, Friday, and Saturday prior to election day.

There is no particular requirement for time of notification. For the purpose of this question, defendant counts 10 days notice if given by mail on Saturday, October 28, 2000, or before. Attached are listings falling within such 10 days. (Those listed with print date of 10/26/00 or later were mailed within 10 days of the election). In the case of denials, defendant is unable to say exactly when mailing occurred.

10.     For the county defendants, please describe the process by which poll workers at individual polling sites on November 7, 2000 could determine a voter's eligibility if the voter did not appear on the precinct register, including whether the poll worker was required to call off-site to check eligibility records or whether access to such data was provided at the polling site.

Precinct registers listed inactive voters. Poll workers were instructed to call the elections office for persons not listed on the register. Poll worker manuals and training outlines previously have been furnished.

11.     For the county defendants, please identify whether those voters who where in "inactive" status as of the book closing date for the November 7, 2000 election were included in the precinct registers in your county.

        Yes

12.     For the county defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you received voter registration applications from the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families and the number of applications received from each department, broken down by month.

        For the state defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you supervised the voter registration duties carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

        DeLand DHSMV office hand delivers applications.  Daytona Beach DHSMV office sends applications by mail.  New Smyrna Beach DHSMV are received through County courier.   DHSMV sends log sheets with applications.  Where a log sheet lists a name without an accompanying application, defendant calls DHSMV to obtain the address and sends an application with a letter explaining why another application is being requested.  Daytona Beach DHSMV office sends negative reports when there are no applications.

        Daytona Beach and Deltona DCF offices mail applications.   DeLand and New Smyrna Beach DCF offices each use the County courier system.

        Monthly registration reports to the state are attached.  There is no separate DCF compilation.  The report for October, 2000, under item 3 includes all those timely and complete applications for the November 7 election, and most of the October denials and incompletes.  The report for November, 2000, includes under item 3 October applications untimely for registrations not effective for  the November 7 election, and the remainder of the October denials and incompletes.

13.   Please identify any problems or barriers that you experienced in regard to the voter registration functions to be carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

Defendant described her perception of a potential problem in the Daytona Beach DHSMV office in paragraph 15 of her April 13, 2001, affidavit.  The circumstances giving rise to such perception appear to be improved.  Defendant has experienced with DHSMV instances of applications unsigned or signed by the wrong party, or missing applications for persons listed on log as having registered.  Defendant recalls  problems with delay in DCF forwarding of applications  during the first six months of 1995, which seem no longer to exist. Since that time, defendant has occasionally received applications from DCF applications that are missing required information.

14.   Please identify each person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact related to class certification alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this action.

The names and addresses of defendant's employees, temporary workers, and poll workers have been furnished previously.

15.   Please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response to interrogatory number 14 above may have.

Defendant each of her employees, temporary workers, and poll workers has knowledge regarding their duties as they may be related to class certification.

16.   For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded . . . is so numerous that joinder of all members is impracticable." *See Amended Complaint, ¶ 39.*

N/A

17.   For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]here are question of law and fact common" to the proposed class. *See Amended Complaint, ¶ 40.*

Defendant objects to  questions 17, 18, and 20 as they call for a response essentially involving only a legal question.  However, without waiver of her objection, defendant summarizes her position based upon her understanding of the plaintiffs' contentions,  reserving the right to expand, revise and supplement as may appear necessary upon the filing of her response to plaintiffs' motion and in argument before the Court.

No individual plaintiff or member of the putative class outside Volusia County has standing against defendant Lowe, so there are no questions of law or fact common to them with regard to this defendant.  The two named Volusia residents have in common only that their registrations were canceled.  Their circumstances differ significantly in detail.

Plaintiffs appear to contend there are common questions of law under the National Voter Registration Act, 42 U.S.C. §1973gg, et seq. regarding registration cancellations.  However, plaintiffs do not show that there is a class which has been denied the right to vote as the result of any NVRA procedural violation which may be found by the Court.

18.   For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]he claims of the representative plaintiffs are typical of the claims of the class as a whole." *See Amended Complaint, ¶ 41.*

Defendant restates her objection  to 17 above, and without waiver of its objection, the summary of her position.  In addition, defendant states that there is no nexus shown between the individual claims of plaintiffs Timberlake and Harvey and those set forth in the amended complaint of the putative class.

19. For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "Plaintiffs can and will fairly and adequately protect the interest of the members of the class." *See Amended Complaint, ¶ 42.*

   N/A

20. For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that class certification is appropriate because "the Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." *See Amended Complaint, ¶ 44.*

   Defendant restates its objection in 17 above.   Without waiver of her position, defendant summarizes her position as follows: Defendant has not acted or failed to act with regard to any putative non-Volusia class member.  Plaintiff Harvey's registration was canceled as the result of clerical error in violation of office procedure.  Her registration has been restored.  Plaintiff Timberlake has re-registered.  Plaintiffs apparently contend that defendant has committed NVRA procedural error in registration cancellations.  However, plaintiffs do not show that there is a class which has been denied the right to vote as the result of any NVRA procedural violation which may be found by the Court.  Upon preclearance, the Florida Election Reform Act of 2001 will address plaintiffs' contentions.

_Deanie Lowe_
Deanie Lowe
Supervisor of Elections, Volusia County

STATE OF FLORIDA
COUNTY OF VOLUSIA

BEFORE ME, the undersigned authority, personally appeared  Deanie Lowe who
is  personally known to me or who produced a driver's license as identification, and who
after first being duly sworn, deposes and states that the foregoing Answers to
Interrogatories numbered 1-15 are true and correct.

SWORN TO AND SUBSCRIBED before me this _23rd_ day of October, 2001.

_Margie E. Helton_
NOTARY PUBLIC, STATE OF FLORIDA

Print Name: _Margie E. Helton_
My Commission Expires: _____



MARGIE E. HELTON
MY COMMISSION # CC 710926
EXPIRES: January 28, 2002
1-800-3-NOTARY   Fla. Notary Service & Bonding Co.

## DEFENDANT LOWE'S INDEX
## ANSWERS TO INTERROGATORIES

Interog.#          Documentation provided in response
(Tab #)

1.          • 2000 General Election Questionnaire completed by poll workers
            • Complaints re: Registration
            • Complaints re: Telephones
            • Complaints re: Poll watchers & solicitors
            • Complaints re: Poll workers
            • Complaints re: Multiple subjects
            • Complaints forwarded by Attorney General's office

2.          • Voters denied right to vote

3.          • Multi-purpose Affirmation/Affidavit

4.          • Computer printout of canceled voters

8.          • Computer printout of canceled voters

9.          • ID Cards printed between 10/26/00 and 11/06/00
            • Denied or Incomplete Applications

10.         • Review of the Elections Office (Internal Auditing)

12.         • Motor Voter registration

L:\LIT\NAACP\INTER.IND

# PLAINTIFFS' EXHIBIT 50

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 01-0120-C.V.-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.
by its FLORIDA STATE CONFERENCE
OF BRANCHES, *et al.*

     Plaintiffs,

vs.

KATHERINE HARRIS,
Secretary of State of Florida, *et al.*

     Defendants.
_____/

**CERTIFICATE OF SERVICE OF ANSWERS TO
PLAINTIFFS' SECOND SET OF INTERROGATORIES
AND DOCUMENT REQUESTS TO DEFENDANT,
DEANIE LOWE, SUPERVISOR OF ELECTIONS, VOLUSIA COUNTY**

   Defendant, Deanie Lowe, Supervisor of Elections, Volusia County, hereby certifies

that her answers to interrogatories numbered 1-39 of Plaintiffs' Second Set of

Interrogatories and Document Requests to Defendant, Deanie Lowe, have been served

this 22nd day of March, 2002, by U.S. Mail, on the Plaintiffs, c/o: Janai Nelson, Esq.,

Elaine R. Jones, Esq., Theodore M. Shaw, Esq., Norman Chachkin, Esq., Jacqueline A.

Berrien, Esq., NAACP Legal Defense and Educational Fund, Inc., 99 Hudson Street, Suite

1600, New York, NY 10013; Lori Outzs Borgen, Esq., Anita Hodgkiss, Esq., Barbara

Arnwine, Esq., Thomas J. Henderson, Esq., Edward Still, Esq., Lawyers' Committee for

Civil Rights Under Law, 1401 New York Avenue, N.W., Suite 400, Washington, D.C.

MAR 27 2002

20005-2124; Thomasina H. Williams, Esquire, Brickell Bay View Centre, Suite 1830, 80 S.W. Eighth Street, Miami, Florida 33130; Dennis Hayes, Esq., Angela Ciccolo, Esq., Bruce Gear, Esq., NAACP Legal Department, 4805 Mount Hope Dr., Fifth Floor, Baltimore, MD 21215-3297; Todd A. Cox, Esq., 1444 Eye Street, NW, 10th Floor, Washington, DC 20005; Penda Hair, Esq., Judith Browne, Esq., Monique Dixon, Esq., 1730 "M" Street, NW, Suite 401, Washington, DC 20036; Laughlin McDonald, Esq., 2725 Harris Tower, 233 Peachtree Street, NE, Atlanta, GA 30303; Louis M. Bograd, Esq., 733 15th Street, NW, Suite 620, Washington, DC 20005; Elliot M. Mincberg, Esq., Lawrence S. Ottinger, Esq., Alma C. Henderson, Esq., 2000 "M" Street, NW, Suite 400, Washington, DC 20036; John W. Little, III, Esquire, Walter J. Harvey. Esquire, Steel Hector & Davis, 200 S. Biscayne Boulevard, Miami, FL 33131-2398; Michael Cirullo, Esq., 3099 E. Commercial Blvd., #200, Ft. Lauderdale, FL 33308-4311; Tracy I. Arpen, Esq., Office of General Counsel, 117 W. Duval Street, Suite 480, Jacksonville, FL 32202-3700; Christopher R. Haughee, Esq., Bentley Law Group, P. O. Box 1608, Bartow, FL 33831-1608; Jeffrey P. Ehrlich, Esq., Assistant County Attorney, Stephen P. Clark Center, 111 NW 1st Street, #2810, Miami, FL 33128-1930; H. Ray Allen, II, Esq., Sr. Assistant County Attorney, and Rebecca M. Kert, Esq., Assistant County Attorney, P. O. Box 1110, Tampa, FL 33601; Mitchell Bloomberg, Esq., Adorno & Zeder, 2601 South Bayshore Drive, Suite 1600, Miami, FL 33133-5413; Raymond W. Bergan, Esq., Daniel A. Restrepo, Esq., Williams & Connolly, LLP, 725 Twelfth Street, N.W., Washington, D.C. 2005-5901; Burnadette Norris-Weeks,

Esq., 100 S.E. 6th Street, Fort Lauderdale, FL 33301; and George Waas, Esq., Assistant

Attorney General, PL-01 The Capitol, Tallahassee, FL 32399-1050.


DAVID V. KORNREICH
Florida Bar No.098576
Muller, Mintz, P.A.
Suite 1525, Citrus Center
255 South Orange Avenue
Orlando, Florida 32801-3415
Telephone: 407-843-1400
Facsimile: 407-843-1410
Attorney for Defendant Lowe

DANIEL D. ECKERT
Florida Bar No. 180083
123 West Indiana Avenue
DeLand, Florida  32720-4613
Telephone: 904-736-5950
Facsimile: 904-736-5990
Attorney for Defendant Lowe

## DEFENDANT DEANIE LOWE'S ANSWERS TO SECOND
## SET OF INTERROGATORIES AND DOCUMENT REQUESTS

1.　　Describe for each election the training provided to election administration officials in Volusia County, including, but not limited to, poll workers, election judges, and others employed on election day, for the primary and general elections from 1998 to the present.

Each poll worker received 2 hours of instruction prior to each first primary and general election. The precinct clerk, assistant clerk and accu-vote inspector received 3 hours of additional instruction. The training provided was that printed in manuals for poll workers, poll deputies and accu-vote inspectors, and newsletters ("Poll Worker Pipe Line") issued three to four times a year. Training was given to permanent and temporary staff on filling absentee ballot requests and verifying signatures, as set out in the document "Absentee Ballot Policies and Procedures," previously furnished (A008971-A009016). Training was given on opening and duplicating absentee ballots as shown on the attached sheets, entitled "Instructions for Opening and Processing Absentee Ballots and Preparing Them for Tabulation," and "Instructions for Duplicating Ballots." Training on counting write-in ballots was given based on the sample attached.

2.　　Identify all locations in your county where voter registration applications were/are available to the public from 1998 to the present.

See attached lists for those in addition to DHSMV and DCF offices. Each location shown was used during the stated period, but not necessarily for all the stated period, depending upon individual business practices.

3.　　Describe the voter registration process at each location identified in response to Interrogatory No. 2, including, but not limited to: (a) where, how, and in what form the applications are made available, and (b) the processing of voter registration applications received from voter registration drives, direct mail, the Department of Highway Safety and Motor Vehicles, the Department of Children and Family, IMF, and in-person drop offs.

a.　　See locations list furnished. The registration form, provided by the Division of Elections, is available in English, Spanish, or both, at locations shown on the list.

b.　　See NVRA manual previously furnished, A009018-A009073, which describes the processing of all applications.

-4-

4.    Identify all persons responsible for voter registration at each location identified in Interrogatory No. 2.

At main elections office:
Pam Childress (employed January, 2002)
Orsolina Flynn
Barbara Francisco (employed 2001)
Charlene Kovarovic (occasionally assists, employed 2001)
Deanie Lowe
Eva Meyers
Sandy Norris
Betsy O'Kane
Sandra Peloquin (registration division director)
Sharon Pinkney
Claudette Payer
Nancy Prodoehl (during 1999 and part of 2000)
Ann Romines
Olga Soto
Barbara Swaggerty (during part of 2001)
Jane Wilkinson

Applications are furnished at all private locations for return by mail. Known contact persons are listed. DHSMV and DCF contact persons are listed on an attached sheet. Defendant has no further knowledge of the identity of state employees involved.

5.    Describe the changes, if any, in the procedure by which you received voter registration applications from the Department of Children and Families ("DCF") and the Department of Highway Safety and Motor Vehicles ("DHSMV") offices in your county, from 1998 to present.

The procedure described in number 12 of defendant's answers to plaintiffs' first interrogatories, dated October 23, 2001, has been applicable from 1998 to present.

6.    Describe the voter registration list maintenance program used by your office from 1998 to the present, including, but not limited to: a) the procedures followed to place voter names in an "inactive" status; b) procedures used to purge voters; c) the use of lists of probable or possible ineligible voters provided to you by the Division of Elections, including, but not limited to, lists based on information provided, directed or indirectly, by defendant Choicepoint, Inc., a Georgia Corporation d/b/a Database Technologies, Inc.; d) any requirements, guidelines, or guidance provided by the Division of Elections regarding how to check the accuracy of the lists or to verify them; and e) any actions taken by your office to verify or

check the accuracy of the lists.

a.      The list maintenance procedures prescribed in Fla. Stat. § 98.065 are initiated in each odd year for voters who have had no activity for the prior two years; and at any time when first class mail is returned as undeliverable, except during the last 90 days prior to a federal election.

b.      Voters placed in an inactive status thereafter are canceled for change of address outside jurisdiction after two federal general elections in which they do not vote.

Registration has been  canceled upon written request direct from the voter.

Registration has been canceled where notice of a voter's registration is received from another jurisdiction, so long as information on file matches that received.

Registration has been canceled upon voter's request or change of address outside jurisdiction utilizing central voter file duplicate listings as described in c below.

Registration has been  canceled for death upon information from obituaries, family members and the Florida Department of Health, Bureau of Vital Statistics.  Where identity of a deceased voter is uncertain, defendant sent letters as described in her answer 5 to interrogatories served October 23, 2001.

Registration has been canceled for deaths ascertained from central voter file listings as described in c below.

Registration has been canceled for incompetency based upon information received from the circuit court clerk matched if necessary with prior address information obtained from sources such as attorneys and nursing homes.  Registration has been canceled for felony conviction upon receipt of information from Florida Circuit Court Clerks and U.S. District Court Clerks.

Registration was canceled for felony conviction based upon central voter file listing and only during 2001 as described in c. below.

Registration has been canceled pursuant to Fla. Stat. §98.075(3) under the circumstances and procedures provided.

c.      Defendant used central voter file duplicate lists during 1998-2000 as has been described in her previous answers to interrogatories.  The verification procedure  was that set forth in an undated document "Central Voter File - Potential Duplicate Registrations," referred to in her previous answers to interrogatories,

furnished with defendant's initial disclosures and prior document production response, and included again here for ease of identification.   Defendant has restored to the roll those persons whom she has determined were canceled erroneously according to that procedure not otherwise reinstated or re-registered. Defendant is unaware of other 1998-2000 errors. No central voter file duplicate list was received during 2001. Defendant is developing a revised procedure to utilize for the October, 2001, central voter file duplicate list, received in January, 2002. Defendant has determined to restore to the roll those canceled central voter file duplicate registrations not previously restored, and apply the revised procedure to all except those also canceled on some other basis. Defendant intends to utilize the revised procedure, subject to change in law or circumstances.  Defendant notes the pendency of bills in the Florida legislative session scheduled to conclude today, without limiting the possibility of other pertinent change. Among relevant possible information or technology changes would be timeliness of subsequent registration information from an on-line database; availability of the last four digits of social security numbers; ease of signature review; or the like.

Defendant did not utilize the central voter file felon list prior to the 2000 election.  In January 2001, defendant sent letters to those on a corrected list from the Secretary of State dated January 2000, which has defendant's date stamp, June 19, 2000. The letters are attached to defendant's April 13, 2001, affidavit.  The response of those who contended that they had no Florida conviction, or that their rights had been restored, was forwarded to FDLE whose determination was relied upon by defendant.  The response of those who contested an out-of-state conviction was relied upon by defendant. In July, 2001, defendant restored to the rolls registrants with convictions from states identified as automatically restoring rights, whether or not such persons had responded to defendant's letter.

Registration has been canceled for deaths included in central voter file listings, not previously known from other sources based upon the furnished procedure. However, for instances of doubtful identity, the procedure was modified to send an address confirmation request instead of a letter.

       d.      See documents referred to in 1 above.

       e.      Written procedures for verification of duplicate list previously have been furnished and are described in c above.  Verification of felon and deceased lists described in c above.  See also 12 below.

7.      Describe the process by which your office was supervised by, coordinated with, cooperated with, or otherwise worked with the Division of Elections on election administration issues from 1998 to present.

-7-

The duties of the Department of State, Division of Elections are provided by law. Defendant furnishes to the division a NVRA statistical report on a monthly basis, and active and inactive voter data on a quarterly basis. Defendant receives central voter file lists from the Division. The Division issues opinions periodically.

8.   Identify the number of voter registration applications received by your office each month from January 1999 to the present from the DHSMV and the DCF, disaggregated by race and voting age population.

Monthly NVRA reports are furnished. Defendant is precluded by law from identifying the location of a voter's registration and unable to furnish the additional detail.

9.   Describe the procedures followed in the administration of the 2000 general elections in Volusia County, including but not limited to the assignment of poll workers, election judges, phone lines, voting machines, and laptops.

Each precinct had a clerk, assistant clerk, an accu-vote inspector and a poll deputy. In addition, there were precinct register inspectors depending upon the number of voters per precinct (1:500-600). There was one phone per precinct, either a land line, if available, or cell phone. There was one accu-vote optical scan unit per precinct. During the stated period there were no laptops.

10.  State the number of poll workers, election judges, phone lines, laptops, and voting machines used on November 7, 2000 by precinct and the number of registered voters in each of those precincts.

Copies of payroll sheets indicating the number of poll workers have been previously furnished. (A009442-A009721). Number of registered voters per precinct previously furnished (A008962-A008970). 1 phone line per precinct. There were no laptops. There was one accu-vote optical scan unit per precinct.

11.  Identify for each election all persons responsible for determining voter eligibility with respect to the primary and general elections from 1998 to the present.

See persons listed in response to question 4 above, as any registration division employee can process a registration form.

12.  Describe for each election the criteria used to determine voter eligibility, including the eligibility of persons who have been convicted of felonies in Florida or in other states, in the primary and general elections from 1998 to the present, including how such criteria changed over time.

-8-

Fla. Stat. § 97.041, establishes qualifications to register to vote.  A complete application meeting the requirements of Fla. Stat. § 97.053 must be submitted.

The voter's application statement with regard to felony conviction status is relied upon to determine eligibility.  Once on the rolls, no voter was removed for felony conviction during 1998-2000, except upon receipt of a record from a Florida Circuit Court or United States District Court clerk.  Such persons were removed if there was a match between name, date of birth and address.  If there was a variance, defendant attempted to obtain the signature of the felon, and canceled the registration if there was a match with the file signature.  During 2001, defendant utilized the central voter file felony list referred to in 6 above and sent letters.  The response of those who disputed a Florida conviction was referred to the Florida Department of Law Enforcement for further verification.  Defendant relied upon the FDLE determination, which was furnished to the voter, and gave corresponding notice.  The affidavit of those who disputed an out-of-state felony conviction was relied upon.  Voters who did not respond were removed from the rolls.  In July, 2001, defendant returned to the rolls those voters whose convictions determined to be from states which automatically restore rights.

Fla. Stat. §98.0977, when effective, will provide procedures with which defendant will comply.

13.    Identify for each election all persons responsible for processing voter registration applications in the primary and general elections from 1998 to the present.

Members of the registration division staff listed in 4 above.  During 2000,  Donna Jean Harris and Marilyn Miles, who normally are employed in other county departments, also processed applications on an after hours basis.

14.    Describe for each election the procedure used to process absentee ballot requests for primary and general elections from 1998 to the present.

Orders are taken by mail, fax, e-mail, phone, and at the counter; recorded on an absentee ballot request form; keyed into the computer system; and proofed by a second person.  Orders are taken beginning in January of the year the ballot may be used.  All orders received prior to the time of ballot printing are filled beginning with the first mailing.  After that time, ballots are issued generally within 24 to 48 hours of receipt of a request.  See also pp 6-10 in "Absentee Ballot Policies and Procedures."

15.    Identify for each election all individuals responsible for processing absentee ballot requests the primary and general election from 1998 to the present.

Any permanent and temporary employee could have taken an order.  Defendant previously furnished a list of her permanent employees.  Defendant now furnishes lists of 1998 and 2000  temporary employees.

16.    State for each election the official date on which Volusia County closed its voter registration rolls for the primary and general elections from 1998 to present.

1998 book closing dates were August 3 for the first primary, August 31 for the second primary, and November 3 for the general election. 2000 book closing dates were August 5 for the first primary, September 5 for the second primary, and October 10 for the general election.  There were no 2001 primary or general elections.

17.    State the number of voter registration applications if any, that were processed subsequent to the official date on which Volusia County closed its voter registration rolls for the primary and general elections from 1998 to the present, disaggregated by race.

All timely and complete applications from otherwise eligible voters have been processed for each election.  Defendant's response to number 9 of plaintiffs' first interrogatories may bear upon this question which is unclear to defendant.

18.    Describe for each election your policy regarding the processing of incomplete voter registration applications for the primary and general elections from 1998 to the present.

A notification letter has been sent to each person who submitted an incomplete application which includes a listing of items necessary for a complete application. A  new application is enclosed with the letter.  Incomplete applications are maintained on file.  During 1998, 1999 and part of 2000, defendant sent an application partially completed with information furnished by the applicant and highlighted to indicate missing information.  The 2000 registration volume precluded, for the entirety of that year, the practice of partially completing an application so for the latter part of 2000 and 2001, only the letter and a blank registration form were furnished to applicants.  The earlier practice has been reinstituted  as of January 1, 2002, to conform with a statutory change.

19.    Describe for each election your policy regarding the processing of untimely voter registration applications for the primary and general elections from 1998 to the present.

Untimely applications are processed for the next election for which the registrant is eligible.  Paragraph 9 of defendant's April 13, 2001 affidavit states office policy

applicable to all elections for timely applications.

20. Describe for each election your policy regarding notification to persons whose voter registration applications were not processed for the primary and general elections from 1998 to the present, including what documentation, if any, was sent to such persons.

Paragraph 10 of defendant's April 13, 2000 affidavit states office policy applicable to all elections.

21. Describe for each election what safeguards, if any, existed to prevent valid and timely voter registration applications from not being processed for the primary and general elections from 1998 to the present.

It has been consistent office policy to expend whatever effort has been necessary to process timely and complete applications. Precinct registers have been printed as late as possible to include all registrants. Handwritten additions to the precinct register have been made for applications submitted to other counties or where otherwise necessary, such as in the case of a mailing delay. In isolated instances letters have been distributed election morning to precincts to deal with individual circumstances.

22. Identify for each election all persons responsible for the maintenance of the voter registration rolls for the primary and general elections from 1998 to the present.

All registration staff identified in answer to 4 above and William Fyfe, an information technology analyst.

23. Describe for each election what safeguards, if any, existed to prevent the removal from the voter registration rolls of validly registered voters for the primary and general elections from 1998 to the present.

Answers to 6 and 12 above outline safeguards and their intended revision for central voter file duplicates. An intended backup for the 2000 general election was telephone contact with the elections office.

24. Identify for each election the name and race of any and all validly registered voters who were removed from the voter registration rolls for the primary and general elections from 1998 to the present, including, but not limited to, (a) the basis for each removal and (b) the person(s) responsible for each removal.

See list, including supplement, furnished for those canceled from January 1, 1998 to present. The list utilizes the same headings as for defendant's answer to

-11-

plaintiffs' first interrogatories, with the addition "Not in Comp File." Such heading includes all cancellations of voters with a previous voting history who subsequently have re-registered on their own (i.e. not a reinstatement by supervisor), and some cancellations of now re-registered voters with no prior voting history. The listed records of re-registered voters with no prior voting history were retrieved through manual research of certain applications which had not yet been filed. The balance of this group is not retrievable without unduly burdensome extensive manual research of all voter records. Defendant is unable to list the persons responsible for each respective removal.

25.   Describe for each election what information, if any, is contained in the voter registration rolls maintained at the Volusia County Supervisor's of Elections Office but not contained in the voter registration rolls used at voting precincts during the primary and general elections of 2000 and 2001.

The precinct registers do not contain the names of voters whose registration has been canceled. The precinct register lists of active and inactive voters do not include the following information maintained in the elections office files: the voter mailing address; telephone number, if given; date of registration; voter history; and last four digits of social security number, if available.

26.   Identify for each election the persons responsible for determining what information, if any, is contained in the voter registration rolls maintained at the County Supervisor's of Elections Office, but not contained in the voter registration rolls used at voting precincts during the primary and general elections from 1998 to the present.

Florida law prescribes precinct register content. Information beyond that listed on the precinct register which may be in the supervisor's files was not maintained at the precinct either at the discretion of the supervisor or due to system technical limitations. Beginning with the 2002 primary election, most information available within computer files will be accessible through a laptop computer at each polling place.

27.   Describe for each election the kind of computers (e.g., laptop or desktop) Volusia County used computers at precincts in the primary and general elections from 1998 to the present, the number of computers used at each precinct, and the number of registered voters at each precinct at which computers were used.

Computers previously were not available at the precincts. A laptop computer will be available at each precinct beginning with the 2002 primary election.

28.   Describe for criteria used to determine at which precincts computers would be used

-12-

and identify all persons responsible for determining at which precincts computers would used in the primary and general elections from 1998 to the present.

N/A

29.    Describe for each election the means of communication used between election officials at the voting precincts and election officials at the Volusia County Supervisor's of Elections Office during the primary and general elections from 1998 to the present, including, but not limited to, the specific apparatus used and the number of such instruments.

Each polling place had one telephone, either land line or cell phone. Each runner had a cell phone. The number of runners varied from 6 to 16, depending on election size. Each permanent employee has a phone. There were eight lines into the elections office. The internal audit which defendant has furnished provides further detail. The lines for the citizen phone bank described in that report rolled over into the elections office when fully occupied.

30.    Identify for each election all persons responsible for deciding the means of communication used between elections officials at the precincts and election officials at the Volusia County Supervisor's of Elections Office during the primary and general elections from 1998 to the present.

Deanie Lowe, Supervisor of Elections, and Lana Hires, Elections Division Director, in consultation with the county's information technology staff.

31.    Describe for each election the criteria used to determine what means of communication would be used between the election officials at the precincts and election officials at voting machines during the primary and general elections of 2000 and 2001.

In person communication was determined to be appropriate since such persons are in close proximity.

32.    State for each election whether Volusia County Supervisor's of Elections office received complaints concerning inadequate means of communication used between elections officials at the precincts and election officials at the Volusia County Supervisor's of Elections office during the primary and general elections of 2000 and 2001.

Yes, for the 2000 general election. No complaints for the 2000 primary election, except that sometimes more than one call attempt was necessary. The only 2001 elections were municipal in October and November, and a county wide sales tax

referendum in October. New telephone hardware and software had been installed by the time of such elections, and there were no complaints.

33.   If the response to Interrogatory No. 32 is in the affirmative, please state for each election: (a) the nature of such complaints, (b) who made them, and (c) what, if anything, the Volusia County Supervisor's of Elections office did in response to such complaints.

Defendant previously has furnished a copy of all written general election complaints, and a copy of an internal auditor report descriptive of the phone situation. The county information technology department in 2001 developed software which allows each public call to be answered in order by the phone bank and each county address to be located in the correct precinct. The software will facilitate the placement of leased laptop computers in each precinct beginning with the 2002 primary election. Defendant will utilize the provisional ballot and will feed absentee ballots into machines at the earlier authorized time (to free up staff on election day for answering calls), each in accordance with the Florida Election Reform Act of 2001. Defendant plans an educational campaign to remind voters to update their records.

34.   Identify for each election all persons responsible for the collection of election ballots, including, but not limited to, absentee ballots, with respect to the primary and general elections of 2000 and 2001.

Volusia uses an optical scan precinct based tabulation system. After poll closing, the machine counted ballots are taken to the main elections office or 4 other regional collection sites for delivery to the main elections office. The precinct clerk, accompanied by an additional person (normally the assistant clerk) deliver to the collection site. The names of precinct clerks and the second person are listed on payroll sheets previously furnished (A009442-A009721). A list of collection site personnel is furnished. Any election department staff member could have received an absentee ballot delivered at the counter. Defendant Lowe or Roy Schleicher, a temporary employee, collected from shut-ins, hospital patients and nursing home residents during the last few days prior to the general election. Supervisor's employees in the elections division generally received voted absentee ballots. These are Lana Hires, Karen Harris, Pete Stone, and temporary employees. Absentee ballots were also issued by the cities of Orange City and Pierson which conduct elections concurrent with primary elections. The clerks respectively were Patricia Lee and Deborah LeBlanc.

35.   Identify for each election all persons responsible for the counting of election ballots with respect to the primary and general elections from 2000 and 2001.

-14-

A ballot is machine counted at the time it is placed into the accu-vote unit. Volusia conducted a full manual recount for the 2000 general election. Counting teams consisted of two county employees observed by party representatives. Questioned ballots were presented to the canvassing board for final determination. The canvassing board consisted of the Honorable Michael McDermott, County Judge and the Honorable Patricia Northey and Ann McFall, County Council members.

36.    Describe for each election the criteria used to determine whether a ballot was "spoiled" or otherwise deemed invalid in the 2000 general elections.

A "spoiled" ballot is one within the meaning of Fla. Stat. § 101.5608. Volusia uses an optical scan precinct based tabulation system. A voter who spoiled a ballot was furnished a new ballot upon request, and essentially makes his or her own determination.

37.    State for each election the number of ballots that were deemed "spoiled" or were not otherwise counted toward the election results in the 2000 general elections, disaggregated by race of the voter.

Volusia conducted a full manual recount of presidential votes in the 2000 general election, including replacement ballots for those spoiled where the voter requested a new ballot. It is impossible to determine the race of a voter who cast any given ballot. A report of such spoiled ballots (i.e. those turned in by the voter) per precinct is furnished.

38.    State for each election the number of "non-votes" cast in the 2000 general elections, disaggregated by race of the voter.

Assuming that the question refers to the 2000 general election presidential race, there is no available official undervote count because of the method by which Volusia conducted a full manual recount of all ballots. It would be impossible due to ballot secrecy to disaggregate by race if such a count were available.

39.    Please identify by name and race for each election and any and all persons who completed affirmations/affidavits, but were not permitted to cast a ballot in the 2000 general elections and state reasons for such denials.

See response to question 3 in Answers to Interrogatories served October 23, 2001. The race of those in category b, c, and d are as follows:

b.    Bortle, Katherine - White
c.    Robinson, Carolyn - Black
      Brimhall, Joe L. - White

-15-

Lomoviello, Liugi S. - White
Davern, Sheila C. - White
Smith, Jr., George C. - Unknown
Thornton, Wendell Hollis - White
d.    Smith, Jr., Willard - White

The race of those listed under a who still have not registered is unknown, since the affirmation does not include that information.   The race of those who have registered since the November 7, 2000, general election is as follows:

a.    McAleer, James J. - White
Riley, Linda - White
Rushing, Clair, Mitchell - Black
Dillard, Jimmie Mae - Black
Keator, Jr., Irving - White
Rudolph, Lisa S. - White
Schott, Christian W. - White

Deanie Lowe
Supervisor of Elections, Volusia County

STATE OF FLORIDA
COUNTY OF VOLUSIA

BEFORE ME, the undersigned authority, personally appeared  Deanie Lowe who is  personally known to me or who produced a driver's license as identification, and who after first being duly sworn, deposes and states that the foregoing Answers to Interrogatories numbered 1-39 are true and correct.

SWORN TO AND SUBSCRIBED before me this 22nd day of March, 2002.

NOTARY PUBLIC, STATE OF FLORIDA

Print Name: CAROL S DILL
My Commission Expires: July 22 2004

-16-

CAROL S. DILL
MY COMMISSION # CC 926529
EXPIRES: July 22, 2004
Bonded Thru Notary Public Underwriters

**PLAINTIFFS' EXHIBIT 51**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-CIV-120-GOLD
Magistrate Judge Simonton

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

_____/

## DEFENDANT, WILLIAM COWLES RESPONSES TO PLAINTIFFS' FIRST SET OF DOCUMENT REQUESTS AND INTERROGATORIES

Pursuant to Local Rule 26.1(g) of the United States District Court for the Southern District of

Florida and Rule 34 of the Federal Rules of Civil Procedure, Defendant Cowles, by and through their

undersigned attorneys, hereby state their objections and responses to Plaintiff's First Set of Document

Request and Interrogatories dated September 21, 2001.

## GENERAL OBJECTIONS

    A.    Defendant Cowles objects to Plaintiffs' First Set of Document Requests and Plaintiffs' First Set of Interrogatories to the extent they seek to impose obligations which differ from or exceed the obligations set forth in the Federal Rules of Civil Procedure and/or the Local Rules of the United States District Court for the Southern District of Florida.

    B.    Defendant Cowles objects to this Plaintiffs' First Set of Document Requests and Plaintiffs' First Set of Interrogatories to the extent they seek to obtain information that is beyond the scope of the issue of "class-related fact[s]" as indicated by the Scheduling Order of U.S. District Court Judge Gold dated August 14, 2001.

    C.    Defendant Cowles objects to each Document Request and each Interrogatory which seek disclosure of information or documents containing information protected by any constitutional, statutory, or common-law rights of privacy or confidentiality, or confidentiality that Defendant Cowles owes to others. Defendant Cowles reserves the right to withhold such information and/or documents

1

containing such information until an appropriate stipulation and order is entered to protect the confidential nature of such documents and/or information.

     D.    Defendant Cowles objects to each Document Request and each Interrogatory to the extent they seek material protected from disclosure by the attorney-client privilege, attorney work-product immunity, or any other privilege and/or immunity. Defendant Cowles will comply with Local Rule 26.1(G), but in the event any protected document is produced by Defendant Cowles in response to Plaintiff's Requests, such disclosure is inadvertent and does not constitute a waiver of any privilege, immunity, or exemption.

     E.    Defendant Cowles objects to each Document Request and each Interrogatory as overly broad, unduly burdensome, and to the extent that it is not reasonably calculated to lead to the discovery of "class-related" facts and/or admissible evidence.

     F.    Defendant Cowles reserves the right to revise and supplement any and all of the following responses upon receipt and review of Plaintiffs' Supplemental Motion for Class Certification, and any subsequent responses to class-related discovery.

     Defendant Cowles, subject to, and without waiver of, these objections and the specific objections that follow, produces under cover of this filing the documents requested by Plaintiffs' First Set of Document Requests and provides the following responses to Plaintiffs' First Set of Interrogatories:

## RESPONSES OF DEFENDANT, WILLIAM COWLES, AND SPECIFIC OBJECTIONS

1.    Please identify the number of complaints you received in regard to the November 7, 2000 election in Florida, whether received prior to the election, on election day, or after the election, by category of complaint if available, including, but not limited to, complaints regarding:

    a.      Punch card voting machines;

    b.      Voter Registration;

    c.      Failure to appear on voter roll;

    d.      Inability to contact the Supervisor of Elections office;

    e.      Busy phone lines at the polling site; and

    f.      Poll workers

**Response:**

    Defendant, William Cowles, used a very broad interpretation to the definition of "complaints" in Definitions/Item F. In response to Request for Production, # 1, Defendant has furnished all documents relating to any opinion, question or comment about the election. The documents produced include clerk's comment sheets, correspondence, affirmations, poll workers lists, newspaper articles and phone logs. Most of the documents, such as but not limited to, the telephone logs, make reference to more than one of the categories listed above. Within these documents, the number of complaints, types of complaints, and data received can be ascertained.

2.  Please identify all individuals who you have determined were improperly denied the right to vote in the November 7, 2000 election, as well as any memoranda, correspondence, and other documents relating to these individuals and the fact that these individuals were improperly denied the right to vote.

**Response:**

Defendant Cowles objects to the question on the grounds it calls for a legal conclusion. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

See Documents provided in response to Request for Production #2.

3.  For the county defendants, please identify the number of affirmations/affidavits completed at all of the polling sites in your county on November 7, 2000 in relation to voters who were not allowed to vote, as well as the name and address of those voters who completed an affirmation/affidavit and were not allowed to vote, and the reason why these voters were not allowed to vote.

**Response:**

Please see responses to Request for Production #2 and #5. There were 121 affirmations from voters who had been canceled, 298 from voters who had registered after the books closed for the election, and 776 who were not registered to vote.

4.  Please identify all voters purged from January 1, 1999 through November 7, 2000 pursuant to list maintenance procedures, including but not limited to purges based on alleged felony conviction, death, and duplicate registration, and for each voter, please specify (a) the basis for the purge, (b) the date of the purge, and (c) whether the voter received notification of the purge.

**Response:**

Defendant Cowles objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Because the word "purge" was not defined in the Definitions of the Interrogatories, Defendant Cowles defined "purge" to mean that a voter has been given a status of "cancel" on the voter registration system and is thus not eligible to vote. (Exception: Any voter who was cancelled in error would be restored to active status immediately if he or she showed up to vote).

We have provided the list of voters purged from January 1, 1999 through November 7, 2000 on CD Rom, forwarded with the documents responsive to Request for Production #3, the file name is "VO_cncl_NAACP_all.pdf." By reviewing the audit history and using the chart provided, it can be determined why the voter was purged.

The procedures we follow, including indication of whether or not the voter was notified, are included within the documents responsive to the Request for Production #6.

5.      For the county defendants, please identify the process used by your office to verify whether the individuals who were identified by the State and its agents as probably or possibly ineligible to vote were in fact ineligible.

**Response:**

Please see Responses to Interrogatories #4 and #6.

6.      For the county defendants, please state whether, during the period from January 1, 1999 to November 7, 2000, you purged from the voter rolls ex-felons whose right to vote was not restored in Florida, even if such individuals were not convicted of a felony in Florida and had not lost their right to vote in the state in which they were convicted or had their right to vote restored in the state in which they were convicted. If you answer in the affirmative, please identify the name, address, and date of purge for each such individual purged from your voter roll.

**Response:**

Defendant Cowles objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Because the word "purge" was not defined in the Definitions of the Interrogatories, Defendant Cowles defined "purge" to mean that a voter has been given a status of "cancel" on the voter registration system and is thus not eligible to vote. (Exception: Any voter who was cancelled in error would be restored to active status immediately if he or she showed up to vote).

Yes. Information relating to this Interrogatory is contained on the CD-Rom and a written list of felons provided within the documents responsive to Request for Production #3. The felon lists received and used for purging were from states that have automatic clemency restoration. (See Memorandum from the Department of State dated May 1, 2000). The procedure for processing the felon list is provided in the documents responsive to Request for Production #6. The office has no knowledge as to whether the individual had their rights restored in their previous jurisdiction.

7.      For the county defendants, please state whether you permitted a voter to vote on November 7, 2000 if the voter was purged from the voter roll based on an address change, but that voter

appeared at the poll to vote and stated that his or her address had not, in fact, changed, and if you answer in the affirmative, please describe the procedure by which such voters were permitted to vote.

**Response:**

Defendant Cowles objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Yes. Defendant, Cowles, assumes that the Plaintiffs are aware of the following statutory requirement:

First class mail returned with an in-county address would result in the voter's record being updated to that address and a voter ID card being sent. The voter remains in "active" status. If the voter ID card is returned undeliverable, another follow up mailing is done. In this second mailing, the voter is given 30 days to respond. Failure to respond then changes the voter's status from "active" to "inactive." Someone in inactive status is still eligible to vote. If such a voter shows up at the polls, he or she merely completes an affirmation and does not have to show proof of address. He or she was then permitted to vote.

After two federal elections, a person who had been inactivated due to the above process would move from "inactive" to "cancel" status. This voter could still vote on Election Day after completing an affirmation.

The procedures followed by the poll workers are outlined in the Clerk's Manual provided in Document Request #6.

8.    Please state whether you removed any voters from the voter rolls from January 1, 1999 to November 7, 2000 based on an alleged change of residence without confirming in writing directly from the voter that the voter had changed residence to a place outside the registrar's jurisdiction, and if you answer in the affirmative, please state the name, address, phone number, and date of removal from the voter roll for each voter.

**Response:**

Defendant Cowles objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Because the word "remove" was not defined in the definitions of the Interrogatories, Defendant Cowles defined "remove" to mean not eligible to vote on election day.

Yes. There is no requirement of a written confirmation directly from the voter prior to removing the voter from the voter rolls based upon a change of residence outside the registrar's jurisdiction if our action is based upon compliance with list maintenance criteria or a cancellation notice indicating that the voter has registered to vote in another jurisdiction.

There are several ways that voter records are removed from the rolls:

1.      Central Voter File – See procedures furnished in Request to Produce, #6.

2.      List Maintenance – F.S. 98.065 outlines three methods by which the Supervisor may conduct a list maintenance project during odd-numbered years. Orange County mails an Address Confirmation Notice (we call it an AC) to voters who haven't voted or contacted the elections office in two years. If the notice is not returned, the voter record remains Active. If the voter returns the notice, the voter record is updated and remains in an Active status. If the notice is returned as undeliverable by the Post Office, an Address Confirmation Final Notice (we call it an FA) is mailed to the same address. The voter has 30 days to reply to the FA or the record becomes inactive.  See copy of the Address Confirmation Mailing dated October 1999 in Document Request #6.

3.      Cancellation Notices From Other Supervisors – F.S. 98.045(2) states that notices from other election officials to cancel a voter due to a new registration in their jurisdiction are to be considered written notification from the voter to remove their name from our rolls.  These notices are processed, the registration status becomes cancelled with a "CO – Cancelled/Out of County" notation made in the audit history, and no further correspondence is sent. All out of county cancellations are indicated "CO/OOC" and it is not possible to distinguish those voters who notified us directly and those voters where another County Supervisor of Elections notified our office.  This list is on the CD-Rom provided with the documents responsive Request for Production #3.

4.      Correspondence from the voter – When a voter notifies us that they have moved from the county and need their registration cancelled, or if they simply ask us to cancel their registration, the document is processed and the registration status becomes cancelled with a "CO – Cancelled/Out of County" notation made in the audit history. No further correspondence is sent. If they are unaware that they've moved into another county, we notify them with a "CA – Non-application move from county" letter which instructs them to re-register in the new county. These would be cases where the voter's letter says something to the effect of "I've moved; please update my address and send me a new id card."

On election day, poll workers were instructed to contact the office if the voter disputed their registration having been cancelled.  Election staff would review records and pull documentation to try and resolve the issue.  If errors were made, the staff member would then authorize the poll workers to issue a ballot to the voter.

See documents produced pursuant to Request for Production # 6.

9.   Please indicate whether you notified all individuals who registered to vote in 2000 of the status of their applications at least 10 days prior to the November 7, 2000 election, and if you answer in the negative, please identify the number of individuals who were not so notified as well as the name, address, phone number, date registration application received, and date voter notified of status of application for each individual.

**Response:**

Defendant Cowles objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.  Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Yes.  We are unaware of any voter who registered to vote in 2000 who was not notified of the status of his or her application at least ten days prior to the November 7, 2000 election.

10.  For the county defendants, please describe the process by which poll workers at individual polling sites on November 7, 2000 could determine a voter's eligibility if the voter did not appear on the precinct register, including whether the poll worker was required to call off-site to check eligibility records or whether access to such data was provided at the polling site.

**Response:**

Defendant Cowles objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law.  Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

See pages 11 and 14 of the Precinct Register/Poll List (PR/PL) Inspector's Manual and page 12 of the Oath Person's Manual.  See page 9 of 20 of the Laptop manual provided in Request for Production, #6.  See page entitled "PR/PL Inspector – Exception B" and the two pages entitled "Oath Person – Exception B" for both eligible and ineligible voters in the hardcopy of the power point presentation used for poll worker training also provided in Request for Production #6.  See list of precincts that had laptop computers, forwarded along with documents responsive to Request for Production. (Those with laptop computers are highlighted in either yellow or blue).

11.  For the county defendants, please identify whether those voters who were in "inactive" status as of the book closing date for the November 7, 2000 election were included in the precinct registers in your county.

**Response:**

Defendant Cowles objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Voters who were "inactive" at the time of book closing and who did not contact the Orange County Supervisor of Elections Office between book closing and election day were not listed on the Precinct Register/Poll List (PL/PR). Any voter who was "inactive" at book closing, but who made written contact with the Supervisor of Elections' office prior to the day of the election or who, after book closing, made telephone contact to ask for an absentee ballot, had his or her name printed on the PL/PR or on the updates to the PL/PR which included contacts made up to election eve. At precincts with lap-top computers, the poll worker operating the lap-top computer was able to view the "inactive voters." Paper lists of inactive voters were not available in the PL/PRs in precincts without lap-top computers.

12. For the county defendants, for the period from January 1, 1999 to November 7, 2000, please identify the process by which you received voter registration applications from the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families and the number of applications received from each department, broken down by month.

**Response:**

Applications from the Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families were picked up by Supervisor of Elections' employees referred to as "couriers." A handwritten receipt was issued to the departments for those applications. The Lawyer's Committee previously received copies of all the courier receipts from their public records request dated December 15, 2000. Monthly reports filed with the Department of State as to DMV for the period January 1, 1999 through November, 2000 are being produced pursuant to Request to Produce #8. As for the number of applications received from the Division of Children and Families, Orange County categorizes these applications under the "Public Assistance Category," and they are combined with totals from food stamps, Aid to Families with Dependant Children (AFDC); Woman, Infants and Children (WIC); and, medicaid totals.

13. Please identify any problems or barriers that you experienced in regard to the voter registration functions to be carried out by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Children and Families.

**Response:**

Both of these mandated sites are the responsibility of the Division of Elections. The issues experienced by the Orange County Supervisor of Elections Office include poor communication between our office and agency managers and staff regarding voter registration, and an apparent negative attitude by staff for these agencies towards voter registration duties. Requests by our office staff to participate in training programs were rejected.

Since the problems experienced in November 2000, DMV has created a new position for a seasoned employee named Helen Howard. She serves as our liaison and works with us to correct the problems we may experience. Also, DMV has been far more receptive to allowing us to participate in their training sessions. We have experienced better cooperation from DMV since the November 7, 2000 election.

As to DCF, we have had no dialog with them since NVRA was first implemented in 1995. We receive very few applications from DCF.

14.   Please identify each person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact related to class certification alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this action.

**Response:**

All parties to the lawsuit;
All persons inclusive in response to Interrogatory 1;
All persons listed in the parties' initial disclosure;
All persons listed in NAACP's response to Cowles' Interrogatories as having information on class certification; and,
All persons listed in all other defendants' response to this interrogatory.

Defendant, Cowles, reserves the right to supplement this answer.

15.   Please state the specific nature and substance of the knowledge that you believe the person(s) identified in your response to interrogatory number 14 above may have.

**Response:**

Each plaintiff has knowledge of the facts and circumstances of his or her alleged claim.
Each person inclusive in response to Interrogatory 1 has knowledge of his or her actions relating to the November 7, 2000 election.
Each defendant has knowledge of his or her actions relating to the November 7, 2000 election.
Reference will be made to the NAACP response to Cowles' Interrogatories as to the nature of the information of the individuals listed by the NAACP.
Reference will be made to the other defendants' responses as to the nature and substance of knowledge.

16.   For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded. . is so numerous that joinder of all members is impracticable." *See Amended Complaint, ¶ 39.*

9

**Response:**

Defendant Cowles objects to the question on the grounds it calls for a legal conclusion. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Initially, the complete sentence referenced in paragraph 39 of the Amended Complaint is "[t]he number of black citizens of Florida who were denied the right to vote in the November 7, 2000 election, or whose right to vote was abridged or impeded, because of Defendants' practices complained of herein, is so numerous that joinder of all members is impracticable." (emphasis added). Defendant Cowles has denied any allegations that his practices abridged or impeded any right to vote. If there is no individual that was aggrieved by his practice, there can not be so many individuals that joinder is impracticable.

The incidents alleged within the complaint do not set forth any basis for a numerous class of individuals. The incidents alleged to have occurred are isolated in nature, and based on widely disparate and independent facts. To Orange County's knowledge, there is only one incident alleged to have occurred within Orange County. Consistent with Appendix "A" to the Local Rules for the United States District Court, entitled "Discovery Practices Handbook," counsel for Cowles has, on more than one occasion, informally requested information and documents relating to allegedly affected individuals in Orange County, Florida (See, III(A)(4), Discovery Handbook). Plaintiffs have not been able to, or have declined to, produce information relating to any other allegedly affected individuals in Orange County, Florida – leaving the number of individuals pled by plaintiffs as adversely affected in Orange County as one. Moreover, since each case alleged in the Amended Complaint must be analyzed separately, the requirement of numerosity is left unsatisfied.

Reference is made to Cowles' Motion to Sever and Transfer for the basis for Cowles' denial of the allegation in paragraph 39 of the Amended Complaint.

17. For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]here are question of law and fact common" to the proposed class. *See Amended Complaint*, ¶ 40.

**Response:**

Defendant Cowles objects to the question on the grounds it calls for a legal conclusion. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

As evidenced by the depositions taken so far of some of the named plaintiffs, and by the allegations in the Amended Complaint, each plaintiff has an alleged claim based upon facts and

circumstances applicable solely to that individual. The named plaintiff as to Orange County, as indicated in her deposition, alleged facts that could not be applicable to any other named class representative, or to any other County Supervisor. The named plaintiffs from other counties alleged facts that are not applicable to Orange County. Local County Supervisors make local determinations as to practices and procedures not specifically mandated by state law. Plaintiffs admit that questions of law and fact are not common (see, paragraph 81 of Amended Complaint).

Reference is made to Cowles' Motion to Sever and Transfer for the basis for Cowles' denial of the allegation in paragraph 40 of the Amended Complaint.

18.    For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that "[t]he claims of the representative plaintiffs are typical of the claims of the class as a whole." *See Amended Complaint,* ¶ 41.

**Response:**

Defendant Cowles objects to the question on the grounds it calls for a legal conclusion. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

The plaintiffs' claims are not typical in that each plaintiff has an alleged claim based upon facts and circumstances applicable solely to that individual. The named plaintiff as to Orange County, as indicated in her deposition, alleged facts that could not be typical of any other named plaintiff, or member of a class sought to be established. The named plaintiffs from other counties allege facts not typical to alleged class members in Orange County. Named plaintiffs in depositions repeatedly stated that they knew nothing of allegations in the Amended Complaint except for those of their particular situation. In fact, counsel for plaintiffs, during the depositions in Miami-Dade County, objected to questions to named plaintiffs about issues other than their own particular facts.

Reference is made to Cowles' Motion to Sever and Transfer for the basis for Cowles' denial of the allegation in paragraph 41 of the Amended Complaint.

19.    For defendants Harris, Roberts, Oliphant, Stafford, Iorio, Sancho, and Cowles, please state the basis for your Answer to the Amended Complaint denying that "Plaintiffs can and will fairly and adequately protect the interest of the members of the class." *See Amended Complaint,* ¶ 42.

**Response:**

Defendant Cowles objects to the question on the grounds it calls for a legal conclusion. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available,

provides the following response:

The plaintiffs have varying goals in this case. For example, one named plaintiff said in deposition he would be satisfied if he could meet with the Miami-Dade County Supervisor of Elections in a town hall setting. The issues of individual named plaintiffs can be redressed on an individual basis, separately from other plaintiffs and without the involvement of all defendants. Once these individuals have their grievances redressed, the plaintiff would have no interest in the outcome of the lawsuit. The interests of the plaintiffs are as varied as their claims and alleged facts and circumstances.

The named plaintiff from Orange County will not fairly and adequately protect the members of the class. Although she knows she was not registered as of November 7, 2000, she has taken no steps since then to become a registered voter and participate in the electoral process in Orange County. The named plaintiffs from other counties cannot protect the interests of members of the alleged class in Orange County, as the named plaintiffs from other counties that have been deposed had no knowledge of the election process and practices in Orange County.

Reference is made to Cowles' Motion to Sever and Transfer for the basis for Cowles' denial of the allegation in paragraph 42 of the Amended Complaint.

20. For defendants Harris, Roberts, Leahy, Oliphant, Stafford, Iorio, Sancho, Cowles, and Lowe, please state the basis for your Answer to the Amended Complaint denying that class certification is appropriate because "the Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." *See Amended Complaint,* ¶ 44.

**Response:**

Defendant Cowles objects to the question on the grounds it calls for a legal conclusion. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Each defendant had different and unique responsibilities as to the conduct of November 7, 2000 election. The state defendants acted consistent with state law as to their state-wide responsibilities. Each county Supervisor of Elections acted locally to conduct the election in his or her county. Plaintiffs have not taken action that would benefit the supposed class as a whole since they have only sued seven individual Supervisors of Election, leaving sixty counties unaffected by this litigation. The actions of one Supervisor had no impact or affect on the conduct of the election in other counties. The actions taken by William Cowles affected solely Orange County, and those voters within Orange County. Other allegations in Plaintiffs' Amended Complaint belie this paragraph of the Amended Complaint, such as paragraph 81, wherein plaintiffs admit that Supervisors use "widely varying" procedures for purging. Any final relief can not benefit the supposed class as a whole.

Reference is made to Cowles' Motion to Sever and Transfer for the basis for Cowles' denial of the allegation in paragraph 44 of the Amended Complaint.


Counsel for William Cowles provided the responses to Interrogatories 14-20

Respectfully submitted,

Michael D. Cirullo, Jr.
Florida Bar No. 973180

H:\2001\010041\pleadings\Response to NAACP roggs.doc

13

For purposes of this Affirmation, the following people are attesting to matters relating to:

Linda Tanko – Matters pertaining to voter registration, list maintenance, central voter file, Florida Department of Highway Safety and Motor Vehicles, Florida Department of Children and Family Services, busy phone lines, inability to contact the Supervisor of Elections office, laptop computers at the polling place, training of laptop operators.

Nancy Lord – Matters pertaining to poll workers, poll worker training, busy phone lines, inability to contact the Supervisor of Elections office.

June Condron – Matters pertaining to the processing of lists received from the Department of State from the Central Voter File, list maintenance.

Patricia Fletcher – Matters pertaining to voter registration, failure to appear on the rolls, voters being denied the right to vote, voter affirmations, list maintenance, busy phone lines, complaints.

Veronica Koval – Matters relating to voter registration, voters being denied the right to vote, busy phone lines, voter affirmations, complaints, Florida Department of Highway Safety and Motor Vehicles, Florida Department of Children and Family Services.

Margaret Dunn – Compiled the materials in response to this request. Matters pertaining to busy phone lines, correspondence, emails, complaints.

_____
Signature of Linda Tanko

_____
Signature of Nancy Lord

_____
Signature of June Condron

_____
Signature of Patricia Fletcher

_____
Signature of Veronica Koval

_____
Signature of Margaret Dunn

STATE OF FLORIDA

COUNTY OF ORANGE

BEFORE ME, the undersigned authority, personally appeared Linda Tanko, Nancy Lord, June Condron, Patricia Fletcher, Veronica Koval, and Margaret Dunn, who are personally known to me, and who after first being duly sworn, depose and state that the foregoing Answers to Interrogatories are true and correct.

SWORN TO AND SUBSCRIBED before me this 24th day of October, 2001.

CYNTHIA CLARK FLETCHER
MY COMMISSION # CC 885991
EXPIRES: December 5, 2003
Bonded Thru Notary Public Underwriters

_____
NOTARY PUBLIC, STATE OF FLORIDA

Print Name: Cynthia Clark Fletcher

My Commission Expires: 12/5/03

**PLAINTIFFS' EXHIBIT 52**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-CIV-120-GOLD
Magistrate Judge Simonton

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, JIMMIE PANNELL,
JULIA STONER, NATALIE CARNEGIE, JOHN L. CHEEVER,
JAMES MARSHALL, LILLIE Q. ODOM, WILLIE STEEN,
WALLACE MCDONALD, JERMAINE TERRY, LORINE WALDEN,
EMERY TIMBERLAKE, VALERIE BUFORD, MICHELLE FLOYD,
CONSUELO MARIA GRAHAM, SHERRY EDWARDS,
KANDY WELLS, JOANNA CLERK, JANICE KELLY, PLACID
DOSSOUS, RONDRICK ROSE, URSULA HARVEY, and ADMATHA
ISRAEL in their own right and as representatives of all similarly situated
citizens and residents of the State of Florida,

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY ROBERTS,
Director of the Florida Division of Elections; FRED DICKINSON,
Executive Director of the Florida Department of Highway Safety and
Motor Vehicles; KATHLEEN A. KEARNEY, Secretary of the Department
of Children and Families; DAVID C. LEAHY, Miami-Dade County Election
Supervisor; MIRIAM OLIPHANT, Broward County Election Supervisor;
JOHN STAFFORD, Duval County Election Supervisor; PAM IORIO,
Hillsborough County Election Supervisor; ION SANCHO, Leon County Election
Supervisor; WILLIAM COWLES, Orange County Election Supervisor; and
DEANIE LOWE, Volusia County Election Supervisor (all in their official
capacities); and CHOICEPOINT, INC., a Georgia corporation d/b/a DATABASE
TECHNOLOGIES, INC.,

        Defendants.

_____/

## DEFENDANT, WILLIAM COWLES RESPONSES
## TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

Pursuant to Local Rule 26.1(g) of the United States District Court for the Southern

District of Florida and Rule 34 of the Federal Rules of Civil Procedure, Defendant Cowles, by

and through their undersigned attorneys, hereby state their objections and responses to Plaintiff's

Second Set of Interrogatories dated February 5, 2002.

1

APR 1 2 2002

A.      Defendant Cowles objects to Plaintiffs' Second Set of Interrogatories to the extent they seek to impose obligations which differ from or exceed the obligations set forth in the Federal Rules of Civil Procedure and/or the Local Rules of the United States District Court for the Southern District of Florida.

B.      Defendant Cowles objects to each Interrogatory which seeks disclosure of information or documents containing information protected by any constitutional, statutory, or common-law rights of privacy or confidentiality, or confidentiality that Defendant Cowles owes to others. Defendant Cowles reserves the right to withhold such information and/or documents containing such information until an appropriate stipulation and order is entered to protect the confidential nature of such documents and/or information.

C.      Defendant Cowles objects to each Interrogatory to the extent they seek material protected from disclosure by the attorney-client privilege, attorney work-product immunity, or any other privilege and/or immunity. Defendant Cowles will comply with Local Rule 26.1(G), but in the event any protected document is produced by Defendant Cowles in response to Plaintiff's Requests, such disclosure is inadvertent and does not constitute a waiver of any privilege, immunity, or exemption.

D.      Defendant Cowles objects to each Interrogatory as overly broad, unduly burdensome.

E.      Defendant Cowles objects to the Document Requests to the extent they seek documents already produced by Defendant Cowles, and as a result are in the possession of Plaintiffs.

F.      Defendant Cowles reserves the right to revise and supplement any and all of the following responses upon receipt and review of Plaintiffs' Supplemental Motion for Class Certification, and any subsequent responses to class-related discovery.

2

G.       Defendant Cowles, subject to, and without waiver of, these objections and the specific objections that follow provides the following responses to Plaintiffs' Second Set of Interrogatories:

## INTERROGATORIES

**Interrogatory No. 1:**

Describe for each election the training provided to election administration officials in Orange County, including, but not limited to, poll workers, election judges, and others employed on election day, for the primary and general elections from 1998 to the present.

**RESPONSE:**

Poll workers attend a class, are provided with a manual, and watch a power point presentation. Copies of all of the above have been provided to Plaintiffs as indicated below.

The parties have agreed that the term "election judges" shall mean the "canvassing board." The Canvassing Board has an orientation session prior to the election in which they are briefed on election laws and given a manual which was produced by the Florida State Association of Supervisors of Elections. Copies of the manual have been included in the response to Document Request 19.

Regular staff and temporary staff ("temps") are trained in-house. All written procedures have already been provided to plaintiffs as documented below. All other election temps are trained by regular staff with oral instruction. Some of the forms used by these temps have some instructions on them.

Poll worker manuals, collection site training 2000, poll worker power point 2000, IOP 2000 manual, procedures for those doing data entry for list maintenance/registrations were provided to Plaintiffs in response to item 9 in the December 15, 2000, Public Records Request and item 6 in the September 21, 2001, Request to Produce.

**Interrogatory No. 2:**

Identify all locations in your county where voter registration applications were/are available to the public from 1998 to the present.

**RESPONSE:**

F.S. 97.053 states that voter registration applications must be accepted in the office of any Supervisor of Elections, the Division of Elections, all Florida Driver License office, all voter registration agencies (defined as offices that provide public assistance or serve persons with disabilities, any center for independent living, or any public library), or an armed forces recruitment office. A current list of mandated sites is included in response to Second Request to Produce No. 32. Defendant Cowles has no historical listing of mandated registration sites.

In addition to our mandated registration sites, voter registration applications are available to the public in several additional ways:

1.    Volunteer Sites: Defendant Cowles requests businesses in our community to offer registration applications in "Take One" type brochure racks. A current listing of these volunteer sites is included in response to Second Request to Produce No. 32.

2.    Registration Drives: Various civic and political groups offer voter registration applications at their events. These groups do not necessarily get their registration application forms from our office, so Defendant Cowles has no way of providing a complete listing of these sites. As groups and individuals came into the office of the Orange County Supervisor of Elections to pick-up voter registration materials, their names are entered in a log. Copies of this log from January 1998 to December 2000 are included in Response to Second Request to Produce No. 32. No log exists for the period of December 2000 to present, as Defendant Cowles ceased keeping the log.

3.    Internet: Although one cannot register to vote on-line, one can obtain a voter registration application via the Internet. Defendant Cowles' website has a link to the Division of Elections on-line voter registration application.

**Interrogatory No. 3:**

Describe the voter registration process at each location identified in response to Interrogatory No. 2, including, but not limited to: (a) where, how, and in what form the applications are made available, and (b) the processing of voter registration applications received from voter registration drives, direct mail, the Department of Highway Safety and Motor Vehicles, the Department of Children and Family, IMF, and in-person drop offs.

4

**RESPONSE:**

Mandated Agencies:

Supervisor of Elections Offices

Registration applications are available through our Customer Service Department for any person visiting our office.   Our normal office hours are Monday-Friday 8:00 a.m. to 5:00 p.m. As major registration deadlines approach, we extend our office hours – usually to Monday-Friday 7:30 a.m. to 6:00 p.m. and Saturday 9:00 a.m. to 12:00 p.m.

Florida Division of Elections

Defendant Cowles has no knowledge of how it offers voter registration.

Driver Licenses Offices

When the NVRA was first implemented, Defendant Cowles' office was informed that mandated agencies must offer voter registration when a person applies for services or updates their records with that agency.  It is our understanding that the agency is to provide the same level of assistance to the registration applicant as they would normally provide.  We interpret this to mean that, at the Driver License Offices, the Florida Drivers License Examiner keys the information into a computer as they would regular license information.  A printed version of the application is then printed and the applicant signs the form.   It is our understanding that, when drivers are sent renewal notices by mail, the Driver License Office should include a voter registration application in that mailing.  It is our understanding that, extra applications are kept on-hand for people visiting an office but not applying for a license.  It is our understanding that, at the end of the day, the FDL computer system generates a report listing the people who applied for voter registration via an Examiner.  It is our understanding that, this report and the completed applications are secured until an Orange County Elections office staff member collects them.

Orange County Supervisor of Elections' staff members reconcile the report with the applications, marking those names where applications are missing.  These names are then researched for a mailing address, and the Orange County Supervisor of Elections Office sends them a letter and registration application. After completion of the reconciliation, our staff member then prepares a receipt that lists all applications – computer generated and hand-written.  A receipt, signed by both our staff member and a FDL staff member, records the transfer of these completed registration applications.  Copies of the receipts are produced in response to Item 23 in the Second Request for Production.

Public Assistance Offices, Offices Serving People with Disabilities, Center for Independent Living, and Public Libraries:

As required by NVRA, these agencies offer voter registration applications when someone applies for services, or when they update their record. These agencies, with the exception of public libraries, must use Voter Preference forms each time they serve a potential client.

Armed Forces Recruitment Offices:

Defendant Cowles has no knowledge of how they offer voter registration.

Volunteer Sites:

Banks and other businesses around the county volunteer to display voter registration applications in their offices. The Orange County Supervisor of Elections provides them with application forms and brochure racks so the public can "take one," complete it, and mail it back to our office.

Registration Drives:

Civic and political groups often hold registration drives. Defendant Cowles has no knowledge of how they offer voter registration.

Internet:

Our web site links directly to the Division of Elections "On-line" application. On-line voter registration is a misnomer in Florida. The State Division of Elections prescribes the format of voter registration application. Since we must have an original signature on each new registration form, a person using the Division of Elections on-line form will complete the data fields required, the form will print in Tallahassee, and be mailed to the applicant. The applicant should then sign the form and mail it to the appropriate Supervisor of Elections. There are many outside organizations that post on-line voter registration applications on their site. As we find them, we contact the Division of Elections.

All in-coming registration work is taken to our Imaging Department. It is clocked-in (date and time-stamped) and batched into groups of similar work. These batches of work are assigned a Batch Number, imaged, and entered into our Work Assignments systems. Our Voter Service Clerks then electronically select batches of work to process according to the departmental priorities.

**Interrogatory No. 4:**

Identify all persons responsible for voter registration at each location identified in

Interrogatory No. 2.

6

**RESPONSE:**

Defendant Cowles has no knowledge as to who works at the various sites.

**Interrogatory No. 5:**

Describe the voter registration list maintenance program used by your office from 1998 to the present, including, but not limited to: a) the procedures followed to place voter names in an "inactive" status; b) procedures used to purge voters; c) the use of lists of probable or possible ineligible voters provided to you by the Division of Elections, including, but not limited to, lists based on information provided, directed or indirectly, by defendant Choicepoint, Inc., a Georgia Corporation d/b/a Database Technologies, Inc.; d) any requirements, guidelines, or guidance provided by the Division of Elections regarding how to check the accuracy of the lists or to verify them; and e) any actions taken by your office to verify or check the accuracy of the lists.

**RESPONSE:**

All procedures were provided to Plaintiffs in response to item 6 in Plaintiffs' First Request for Production.

See Responses to Second Requests for Documents 1 through 5 for additional documents responsive to this Interrogatory.

**Interrogatory No. 6:**

Describe the process by which your office was supervised by, coordinated with, cooperated with, or otherwise worked with the Division of Elections on election administration issues from 1998 to present.

**RESPONSE:**

Defendant Cowles is not supervised by the Division of Elections. Defendant Cowles and members of his staff have attended Division of Elections sponsored workshops at Florida State Association of Supervisors of Elections conferences, has received opinions and correspondence from the Division, and have received the Central Voter File database. Defendant Cowles is on the advisory team developing the new Central Voter File. Defendant Cowles has hosted workshops for the Division of Elections and hosted NVRA workshops and

7

participated in them.   Defendant Cowles received ballot language from the Division of Elections as well as materials to post at the polling place, law books, candidate handbooks, etc.   Defendant Cowles reports election results to the Division of Elections. Defendant Cowles submitted a voter education plan to the Division of Elections and received money via the Division of Elections from the Legislature.

**Interrogatory No. 7:**

Identify the number of voter registration applications received by your office each month from January 1999 to the present from the DHSMV and the DCF, disaggregated by race and voting age population.

**RESPONSE:**

A report containing information responsive to this Interrogatory, with the exception of a breakdown by age, is included within the documents produced in response to Item 32 of the Second Request for Production.   It is unclear what Plaintiffs mean by disaggregated by age, so Defendant Cowles states that with few exceptions, all information relates to individuals 18 years old or older.

**Interrogatory No. 8:**

Describe the procedures followed in the administration of the 2000 general elections in Orange County, including but not limited to the assignment of poll workers, election judges, phone lines, voting machines, and laptops.

**RESPONSE:**

Procedures of the administration of elections is set forth in Florida Statutes.   Defendant Cowles has produced documents relating to the administration of the 2000 general elections pursuant to items 1, 3, 9, 10, 11, 12, 13, 15, 16, and 24 in the December 15, 2000, public records request.   Additional documents responsive to this interrogatory are included in responses to items 13 and 19 of the Second Request to Produce.

8

**Interrogatory No. 9:**

State the number of poll workers, election judges, phone lines, laptops, and voting machines used on November 7, 2000 by precinct and the number of registered voters in each of those precincts.

**RESPONSE:**

Registration statistics for November 7, 2000, election by precinct was provided in response to item 3 in the December 15, 2000, Public Records Request.

Number of poll workers at each precinct (entire list of poll workers), was provided pursuant to item 10 of December 15, 2000, Public Records Request.

Statistics on phone lines was provided pursuant to item 12 of December 15, 2000, Public Records Request.

Number of voting machines by precinct (1 in every precinct) was provided pursuant to item 11 of December 15, 2000, Public Records Request.

Indication of which precincts had laptops were provided pursuant to item 13 of December 15, 2000, Public Records Request.

As "election judges" equals "canvassing board," then three members. See Section 102.141, Florida Statutes.

**Interrogatory No. 10:**

Identify by name and race all persons who completed affirmations/affidavits, but were not permitted to cast a ballot in the 2000 general elections and state the reasons for such denials.

**RESPONSE:**

This information was provided in Response to Item 5 in the First Set of Document Requests. Race is not a piece of information gathered during the affirmation process.

**Interrogatory No. 11:**

Identify for each election all persons responsible for determining voter eligibility with respect to the primary and general elections from 1998 to the present.

**RESPONSE:**

The "computer system" at the Orange County Supervisor of Elections plays the key role in determining eligibility. Many people were hired to answer phones and relay the information on the computer system such as where somebody votes, etc. This would include relaying information from the computer that a person registered too late, was too young, etc. Florida Statutes determine whether or not someone is eligible to vote. Certain information has to be provided by the potential voter before one becomes eligible. Our software is written to determine eligibility based on whether or not required information is keyed from the voter's application.

See Response to Interrogatory 13 below for list of persons responsible.

**Interrogatory No. 12:**

Describe for each election the criteria used to determine voter eligibility, including the eligibility of persons who have been convicted of felonies in Florida or in other states, in the primary and general elections from 1998 to the present, including how such criteria changed over time.

**RESPONSE:**

Defendant Cowles objects to the question on the grounds that the question assumes a requirement not in Federal or Florida Law. Defendant Cowles, subject to, and without waiver of, this objection and the general objections above and reserving the right to supplement this answer as new information becomes available, provides the following response:

Because the word "purge" was not defined in the Definitions of the Interrogatories, Defendant Cowles defined "purge" to mean that a voter has been given a status of "cancel" on the voter registration system and is thus not eligible to vote. (Exception: Any voter who was cancelled in error would be restored to active status immediately if he or she showed up to vote).

The procedure for processing the felon list is provided in the documents responsive to Item 12 in the Second Request for Production. The Office of the Orange County Supervisor of Elections has no knowledge as to whether the individual had their rights restored in their previous jurisdiction.

**Interrogatory No. 13:**

Identify for each election all persons responsible for processing voter registration applications in the primary and general elections from 1998 to the present.

10

**RESPONSE:**

The actual persons responsible are:
William Cowles, Orange County Supervisor of Elections
June Condron, Senior Deputy Supervisor
Linda Tanko, Senior Deputy Supervisor
These individuals had overall supervisory responsibility for this work.

Address for each: 119 W. Kaley Street, Orlando, Florida, 32806. Phone (407) 836-2070, Fax (407) 317-7633.

**Interrogatory No. 14:**

Describe for each election the procedure used to process absentee ballot requests for

primary & general elections from 1998 to the present.

**RESPONSE:**

Information and documents responsive to this Interrogatory were provided in response to Items 25 and 26 in the December 15, 2000, Public Records Request. Additional documents responsive to this Interrogatory are provided in response to Item 19 in the Second Request for Production.

**Interrogatory No. 15:**

Identify for each election all individuals responsible for processing absentee ballot

requests for the primary and general elections from 1998 to the present.

**RESPONSE:**

The actual persons responsible are
William Cowles, Orange County Supervisor of Elections
June Condron, Senior Deputy Supervisor
Linda Tanko, Senior Deputy Supervisor
Patricia Fletcher, Absentee Ballot Coordinator

**Interrogatory No. 16:**

State for each election the official date on which Orange County closed its voter

registration rolls for the primary and general elections from 1998 to the present.

11

**RESPONSE:**

> 1998 Book closing dates:
> First Primary – Aug 3
> Second Primary – Aug 31
> General – October 5
>
> 2000 Book closing dates:
> Presidential Preference Primary – Feb 14
> First Primary – Aug 7
> Second Primary – Sept 5
> General – October 10

**Interrogatory No. 17:**

State the number of voter registration applications if any, that were processed subsequent to the official date on which Orange County closed its voter registration rolls for the primary and general elections from 1998 to the present, disaggregated by race.

**RESPONSE:**

> Defendant Cowles objects to this Interrogatory as it is vague and ambiguous. Voter Registration Applications are processed year around. However, in an attempt to provide a response, Defendant Cowles provides statistics reflecting the number of registered voters on the book cut-off dates for each election. NVRA monthly reports forwarded to the State Division of Elections would show the number of applications. The NVRA Reports are posted on the website for the Orange County Supervisor of Elections: www.ocfelections.com.
>
> Book Closing Statistics are as follows:
>
> For the First Primary of 1998 (Sept 1)
> White - 258,378
> Black - 42,379
> Other - 38,259
> Unknown - 9,268
>
> For the Second Primary in 1998 (Oct 1)
> White - 258,564
> Black - 42,538
> Other - 39,772
> Unknown - 8570
>
> For the General Election (Nov 3) 1998
> White - 261,238

Black - 43,274
Other - 39,344
Unknown - 10,314

For the Presidential Preference Primary (March 14) 2000
White - 258,849
Black - 44,381
Other - 44,135
Unknown - 12,333

For the First Primary (Sept 5) 2000
White - 265,266
Black - 47,008
Other - 48,297
Unknown - 15,897

For the Second Primary (Oct 3) 2000
White - 268,994
Black - 48,029
Other - 49,893
Unknown - 16,642

For the General Election (Nov 7) 2000
White  - 279,687
Black - 51,364
Other - 54, 238
Unknown - 19,759

**Interrogatory No. 18:**

Describe for each election your policy regarding the processing of incomplete voter

registration applications for the primary and general elections from 1998 to the present.

**RESPONSE:**

Every voter registration document received is processed even if it is obviously
incomplete. It is linked to the voter's record for information purposes. If an
application is incomplete, the computer system automatically generates a letter
asking for the required registration information and the letter is forwarded to the
applicant, and a second application is mailed.

**Interrogatory No. 19:**

Describe for each election your policy regarding the processing of untimely voter

registration applications for the primary and general elections from 1998 to the present.

**RESPONSE:**

> If "untimely" means received after book closing deadline, it is still processed. Defendant Cowles recognizes three deadlines (1) the deadline for sending statistics to the Division of Elections--15 days after book closing. Defendant Cowles processes all received applications prior to this date. Applications received after this date are processed prior to (2) the date the precinct register/poll lists are printed, about one week prior to the election. Applications received after the date register/poll lists are printed are processed by (3) election day and an update is given to every precinct that has changes on election morning. By election day there are no applications that have not been processed. Applications from voters whose registration date is too late for the election (after book closing date) are still processed, but the voter ID card is not mailed until after the election is over.

**Interrogatory No. 20:**

Describe for each election your policy regarding notification to persons whose voter registration applications were not processed for the primary and general elections from 1998 to the present, including what documentation, if any, was sent to such persons.

**RESPONSE:**

> All applications were processed.

**Interrogatory No. 21:**

Describe for each election what safeguards, if any, existed to prevent valid and timely voter registration applications from not being processed for the primary and general elections from 1998 to the present.

**RESPONSE:**

> Applications are picked up from the mandated registration sites by Orange County Supervisor of Elections staff. Applications received in the mail or in the office are processed daily in a secured area. Once the poll list is printed, any new changes to the list of voters is printed on an update and delivered to the polls on election morning. All available staffing resources are utilized to ensure that all applications are processed prior to election day including overtime.

14

**Interrogatory No. 22:**

Identify for each election all persons responsible for the maintenance of the voter registration rolls for the primary and general elections from 1998 to the present.

**RESPONSE:**

1998 to January 2002 – William Cowles, Orange County Supervisor of Elections, and June Condron, Senior Supervisor.

January 2002 to present – William Cowles, Orange County Supervisor of Elections, and Linda Tanko, Senior Supervisor.

**Interrogatory No. 23:**

Describe for each election what safeguards, if any, existed to prevent the removal from the voter registration rolls of validly registered voters for the primary and general elections from 1998 to the present.

**RESPONSE:**

At the end of the calendar year, our Senior Staff currently comprised of William Cowles, Margaret Dunn, June Condron, Linda Tanko, and Lonn Fluke meet to determine which records should be removed from the active computer system and stored on CD Rom. (Nancy Lord and Claude Mann were part of Senior Staff prior to their departures in 2001). This is done to save computer storage space. Typically, Cancelled and Not Registered status records remain on the computer through a Presidential election cycle. The reason for this is that it aids in the researching of election day questions. If a record has been removed from the system, and the voter appears at the polls on election day, we would turn to old records on CD Rom, microfiche or microfilm to research the situation. In all cases where an error has been made, we work to restore the record and authorize the person to vote.

**Interrogatory No. 24:**

Identify for each election the name and race of any and all validly registered voters who were removed from the voter registration rolls for the primary and general elections from 1998 to the present, including, but not limited to (a) the basis for each removal and (b) the person(s) responsible for each removal.

**RESPONSE:**

No validly registered voters were removed from the voter registration rolls. To the extent Plaintiffs mean persons cancelled for any reason then, reference is made to the list for the period January 1, 1999 and November 7, 2000, provided in Plaintiffs' response to Item 3 in the First Request for Production. A list for the period of January 1, 1998 through January 1, 1999, and then from November 7, 2000, to present is produced in response to Item 32 to a Second Request to Produce.

**Interrogatory No. 25:**

Describe for each election what information, if any, is contained in the voter registration rolls maintained at the Orange County Supervisor's of Elections Office but not contained in the voter registration rolls used at voting precincts during the primary and general elections of 2000 and 2001.

**RESPONSE:**

We define "voter registration rolls" to be the Precinct Register/Poll List (PR/PL) used in each polling place. Florida Statutes mandate what information is printed on the PR/PL, specifically, section 98.461, Florida Statutes. In addition, the Orange County Supervisor of Elections Office prints the voter's signature into the PR/PL. In the precincts with laptop computers, more information was accessible such as the list of inactive voters.

The laptop additionally displays:

(1) the status of a voter not otherwise listed on the PR/PL (i.e. active, inactive, cancelled, pre-registered, not registered) (2) voter's eligibility to vote in the election (3) such as whether or not a voter not otherwise in the PR/PL has requested assistance in voting. The laptop system provides the Oath Person at the precinct several ways to search for a voter record, such as by name, voter ID number, or address. If a voter has moved, it allows the operator to enter the new

16

address and give the voter the new precinct location and directions how to get there.

The only other information not provided at the precincts but available at the SOE office is all the backup documentation used to update a voter record such as the original voter registration application, etc.

**Interrogatory No. 26:**

Identify for each election the persons responsible for determining what information, if any, is contained in the voter registration rolls maintained at the County Supervisor's of Elections Office, but not contained in the voter registration rolls used at voting precincts during the primary and general elections from 1998 to the present.

**RESPONSE:**

Information in the voter registration rolls is governed by section 98.461, Florida Statutes. The Supervisor of Elections is responsible for determining what additional information is sent to the polling places.

**Interrogatory No. 27:**

Describe for each election the kind of computers (e.g., laptop or desktop) Orange County used computers at precincts in the primary and general elections from 1998 to the present, the number of computers (sic) used at each precinct, and the number of registered voters at each precinct at which computers were used.

**RESPONSE:**

All in-precinct computers were laptop computers. Precincts with laptops had one each. Information relative to the use of computers at precincts for the 1998 general election and the 2000 general election were previously provided in response to Item 3 in the December 15, 2000, Public Records Request. The list of precincts that had laptops on November 7, 2000, was previously provided in response to Item 13 in the December 15, 2000, Public Records Request, and was furnished again, in part, in response to Item 6 in the First Request to Produce. There were no laptops in the precincts for the runoff elections or second primaries for 1998 or 2000.

**Interrogatory No. 28:**

Describe the criteria used to determine at which precincts computers would be used and identify all persons responsible for determining at which precincts computers would used in the primary and general elections from 1998 to the present.

**RESPONSE:**

The person responsible for determining precincts for computers were Supervisor of Elections, Bill Cowles and June Condron.

The response and referenced documents in response to interrogatory #8 are responsive to this interrogatory.

**Interrogatory No. 29:**

Describe for each election the means of communication used between election officials at the voting precincts and election officials at the Orange County Supervisor's of Elections Office during the primary and general elections from 1998 to the present, including, but not limited to, the specific apparatus used and the number of such instruments.

**RESPONSE:**

Every precinct for every election had a telephone either installed or the clerk was issued a cell phone. In addition, some precincts had laptop computers as described in response to interrogatory 27.

**Interrogatory No. 30:**

Identify for each election all persons responsible for deciding the means of communication used between election officials at the precincts and election officials at the Orange County Supervisor's of Elections Office during the primary and general elections from 1998 to the present.

**RESPONSE:**

The Orange County Supervisor of Elections, William Cowles, has this responsibility.

**Interrogatory No. 31:**

Describe for each election the criteria used to determine what means of communication would be used between election officials at the precincts and election officials at voting machines during the primary end general elections of 2000 and 2001.

**RESPONSE:**

The voting system used in Orange County provides for the voting machines to be at the precinct. All the poll workers and officials at the precinct are in the same room as the machines. As a result, they generally speak to each other.

**Interrogatory No. 32:**

State for each election whether the Orange County Supervisor's of Elections office received complaints concerning inadequate means of communication used between election officials at the precincts and election officials at the Orange County Supervisor's of Elections office during the primary and general elections of 2000 and 2001.

**RESPONSE:**

Yes. See response to Items 1 and 4 in the First Request for Production and in response to Item 1 in the First Set of Interrogatories.

**Interrogatory No. 33:**

If the response to Interrogatory No. 32 is in the affirmative, please state for each election: (a) the nature of such complaints, (b) who made them, and (c) what, if anything, the Orange County Supervisor's of Elections office did in response to such complaints.

**RESPONSE:**

See response to interrogatory 32 above.

19

**Interrogatory No. 34:**

Identify for each election all persons responsible for the collection of election ballots, including, but not limited to, absentee ballots, with respect to the primary and general elections of 2000 and 2001.

**RESPONSE:**

Persons responsible for collection of ballots: Orange County Supervisor of Elections, William Cowles, Linda Tanko, June Condron, Patricia Fletcher. Ms. Fletcher's title is Voter Services Manager and her contact information is the same as set forth in response to Interrogatory 13 above.

**Interrogatory No. 35:**

Identify for each election all persons responsible for the counting of election ballots with respect to the primary and general elections of 2000 and 2001.

**RESPONSE:**

Precinct ballots were counted in the precincts by the poll workers. The list of such people was provided to Plaintiffs in response to Item 10 in the December 15, 2000, public records.

Persons responsible were: William Cowles, June Condron, Lonn Fluke. Mr. Fluke's title is Deputy Supervisor/Information Services and his contact information is the same as set forth in response to Interrogatory 13 above.

**Interrogatory No. 36:**

Describe for each election the criteria used to determine whether a ballot was "spoiled" or otherwise deemed invalid in the 2000 general elections.

**RESPONSE:**

Two entries in the Tabulator Troubleshooters Guide, produced in response to Item 32 in the Second Request for Production, describe the situation where a ballot may be deemed "spoiled." The machine reads an overvote because the voter marked for more than one choice or the machine reads a "blank ballot" because the voter marked it incorrectly or with a pen that the machine could not read. The only other instance would be if the voter reports that he or she marked the ballot for the wrong candidate and asks for a new one. In all three instances the voter is offered a new ballot.

Canvassing Board criteria is provided in response to Item 32 in the Second Request for Production. It generally provides information as to which absentee ballots would be accepted and which would be rejected.

**Interrogatory No. 37:**

State for each election the number of ballots that were deemed "spoiled" or were not otherwise counted toward the election results in the 2000 general elections, disaggregated by race of the voter.

**RESPONSE:**

Absentee ballot rejects for November 7, 2000, general election by race:

| | |
|---|---|
| American Indian | 7 |
| Asian/Pacific | 11 |
| Black | 213 |
| Hispanic | 117 |
| White | 442 |
| Not Given | 36 |
| Other | 4 |

As to non-votes at the polls, the election results, produced in response to Item 32 in the Second Request for Production show the total ballots cast county-wide and ballots cast by congressional district. Defendant Cowles is unable to show ballots cast by state house or state senate district.

Defendant Cowles defines as "spoiled" ballots that are either rejected by the voting machines because the votes are undiscernable, or ballots returned by the voter because the voter mismarked them. A spoiled ballot results in a replacement ballot provided to the voter, then once the voter completes the replacement ballot, it is then counted. Therefore, a spoiled ballot is not a "not otherwise counted towards the election results" ballot, as the vote is counted. The number of spoiled ballots in the general election is still provided since the Interrogatory specifically asked for "spoiled" ballots. Information regarding race cannot be ascertained without reviewing signatures for each "spoiled" ballot (where requested), discerning a name from the signature, then reviewing voter records to see if race is information contained in that voter's file. This is extremely burdensome, oppressive to Defendant Cowles, particularly since no claim is made against Cowles relating to ballots. Therefore, Cowles objects to this Interrogatory as to the request to disaggregate by race.

Spoiled and subsequently replaced ballots for Nov 7, 2000, general election: 10,120.

**Interrogatory No. 38:**

State for each election the number of "non-votes" cast in the 2000 general elections, disaggregated by race of the voter.

**RESPONSE:**

See response to interrogatory #37, above. Defendant Cowles can only show absentee rejects by race of voter. As to election results, the number of ballots cast minus the total votes for all candidates equals the "non-votes." The "non-votes" are comprised of two categories: the voter chose not to vote in the race, or the tabulator could not discern the voter's choice. Defendant Cowles cannot show these by race because the ballot is a secret ballot.

**Interrogatory No. 39:**

Please state for each election the number of persons who voted by affirmation/affidavit in the primary and general elections of 2000 and 2001 disaggregated by race of the voter.

**RESPONSE:**

First Primary, September 5, 2000:

| | |
|---|---|
| American Indian | 7 |
| Asian/Pacific | 24 |
| Black | 311 |
| Hispanic | 246 |
| White | 948 |
| Not Given | 61 |
| Other | 2 |

Second Primary October 3, 2000:

| | |
|---|---|
| American Indian | 0 |
| Asian/Pacific | 2 |
| Black | 46 |
| Hispanic | 11 |
| White | 119 |
| Not Given | 4 |

22

General Election November 7, 2000:

| | |
|---|---|
| American Indian | 29 |
| Asian/Pacific | 141 |
| Black | 1819 |
| Hispanic | 1310 |
| Not Given | 499 |
| Other | 39 |
| White | 5307 |

JGCDE_FS\LIBRARY\2001\010041\pleadings\Response to 2nd set of roggs.doc

23

For purposes of this Affirmation, the following people are attesting to matters relating to:

Linda Tanko – Matters pertaining to voter registration, list maintenance, central voter file, Florida Department of Highway Safety and Motor Vehicles, Florida Department of Children and Family Services, busy phone lines, inability to contact the Supervisor of Elections office, laptop computers at the polling place, training of laptop operators, absentee ballot procedures, processing of voter applications.

June Condron – Matters pertaining to the processing of lists received from the Department of State from the Central Voter File, list maintenance, voter eligibility, procedures at the polling place, processing of voter applications, election results, ballot processing.

Margaret Dunn – Compiled the materials in response to this request. Matters pertaining to busy phone lines, correspondence, emails, complaints.

Lonn Fluke – Created special reports to answer interrogatories 37 and 39.

_____      _____      _____
Signature of Linda Tanko            Signature of June Condron            Signature of Margaret Dunn

_____
Signature of Lonn Fluke


STATE OF FLORIDA

COUNTY OF ORANGE

BEFORE ME, the undersigned authority, personally appeared Linda Tanko, June Condron, Margaret Dunn, Lonn Fluke, who are personally known to me, and who, after first being duly sworn, depose and state that the foregoing answers to Interrogatories are true and correct.

SWORN TO AND SUBSCRIBED before me this 4th day of April, 2002.

_____
NOTARY PUBLIC, STATE OF FLORIDA

Print Name: Bea L Meeks

My Commission Expires:



Bea L Meeks
My Commission CC937822
Expires February 11 2005

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Appearance was furnished to the following persons by U. S. Mail.

Thomasina H. Williams
Williams & Associates, P.A.
Brickell BayView Centre, Suite 1830
80 SW Eighth Street
Miami, FL. 33130
Attorneys for Plaintiff

Anita S. Hodgkiss, Esq.
Lawyers' Committee for Civil Rights
Under Law
1401 New York Avenue, Suite 400
Washington, DC 20005-2124
Attorneys for Plaintiff

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly LLP
725 12th Street, N. W.
Washington, DC 20005-5901
Attorneys for ChoicePoint,Inc.

John W. Little, III, Esq.
Steel Hector & Davis, LLP
1900 Phillips Point West
777 S. Flagler Drive
West Palm Beach, FL 33401-6198
Attorney for Hon. Katherine Harris,
Secretary of State of Florida and
Clay Roberts, Director of the
Florida Division of Elections

Jeffrey Ehrlich, Esq.
Assistant County Attorney
111 N.W. First St., Suite 2810
Miami, FL 33128
Miami-Dade County, Florida
Attorney for Miami-Dade County
Supervisor of Elections, David Leahy

Christopher R. Haughee, Esq.
The Bentley Law Group
P. O. Box 1608
Bartow, FL 33831
690 East Davidson Street
Bartow, FL 33830-4051
Attorneys for the Leon County
Supervisor of Elections, Ion Sancho

Daniel D. Eckert, Esq.
County Attorneys Office
123 West Indiana Avenue
Deland, FL 32720-4613
Attorney for Volusia County
Supervisor of Elections, Deanie Lowe

Burnadette Norris-Weeks, Esq.
Burnadette Norris-Weeks, P.A.
100 S.E. 6th Street
Fort Lauderdale, FL 33301
Attorney for Broward County
Supervisor of Elections, Miriam Oliphant

Tracey I. Arpen, Esq.
Office of the General Counsel
117 W. Duval Street, Ste. 480
Jacksonville, FL 32202-3700
Attorneys for Duval County
Supervisor of Elections John Stafford

H. Ray Allen, II, Esq.
Sr. Assistant County Attorney
P. O. Box 1110
Tampa, FL 33601
Attorneys for Hillsborough
County Supervisor of Elections, Pam Iorio

George Waas, Esq.
Assistant Attorney General
Douglas B. Mac Innis
Assistant Attorney General
Office of the Attorney General
The Capitol – Suite PL-01
Tallahassee, FL 32399-1050
Attorneys for Fred Dickinson,
Executive Director
Florida of High Safety and Motor Vehicles
and
Kathleen Kearney, Secretary of the
Florida Department of Children and Families

Janai S. Nelson, Esq.
NAACP Legal Defense and
Educational fund, Inc.
99 Hudson Street, Suite 1600
New York, NY 10013

DATED: April 8, 2002

MICHAEL D. CIRULLO, JR.
Florida Bar No. 973180

**PLAINTIFFS' EXHIBIT 53**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
by its FLORIDA STATE CONFERENCE OF BRANCHES, et al.,**

Plaintiffs,

v.

        **CASE NO.:01-CIV-120-GOLD
MAGISTRATE JUDGE: SIMONTON**

**KATHERINE HARRIS**, Secretary of State, et al.,

Defendants.

_____/

## DEFENDANT KEARNEY'S RESPONSE TO
## PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant Kearney responds as follows to Plaintiffs' First Set of Interrogatories:

### INTERROGATORY NUMBER 1:

OBJECTION: Relevancy. The interrogatory is overbroad to the extent that it seeks information on DCF clients that are not on public assistance or have disabilities, and thus are outside the scope of the National Voter Registration Act, 42 U.S.C. section 1973gg-5. To the extent the interrogatory seeks information on persons outside the scope of the National voter Registration Act, 42 U.S.C. section 1973gg-5, Defendant objects on the grounds that the interrogatory is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection, Defendant responds as follows:

The Florida Department of Children and Family Services does not maintain information that identifies the number of clients served by month, from 1998 to June

2000. However, from July 2000 to February 25, 2002, the total number of public assistance clients served for the state is 3,028,908. This number is segregated by service center for public assistance clients. See attached document marked, "Interrogatory Number 1(a)." The total number of clients served with disabilities is 1,609,540. This number is segregated by districts. See attached document marked, "Interrogatory Number 1(b)".

## INTERROGATORY NUMBER 2:

The Florida Department of Children and Family Services does not track or maintain this information.

## INTERROGATORY NUMBER 3:

See response to Document Request Number 3.

## INTERROGATORY NUMBER 4:

See response to Document Request Number 3.

## INTERROGATORY NUMBER 5:

See response to Document Request Number 3.

## INTERROGATORY NUMBER 6:

The Department does not prescribe a uniform practice for transmitting completed voter registration applications to the county Supervisor of Elections offices, so long as the applications are forwarded to the appropriate county Supervisor of Elections office within five (5) days. Transmittal of voter registration applications is done by mail or hand delivery, or a Supervisor of Elections official comes to the Department's offices to pick up completed voter registration applications.

## INTERROGATORY NUMBER 7: (There is no Interrogatory Number 7.)

## INTERROGATORY NUMBER 8:

The State of Florida, Department of State, Division of Elections, offers training for the Department's employees involved in the voter registration process throughout the year at various sites. The Florida Department of Children and Family Services sends a number of its employees involved in the voter registration process to the Division of Elections training sessions when notified of such training opportunities by the Division of Elections. In some instances, individual district program offices have incorporated the Division of Elections' voter registration training into the Department's pre-service and in-service training sessions conducted for new hires.

## INTERROGATORY NUMBER 9:

OBJECTION. (1) Relevancy. The interrogatory is overbroad to the extent that it seeks information on DCF clients that are not on public assistance or have disabilities, and thus are outside the scope of the National Voter Registration Act, 42 U.S.C. section 1973gg-5. To the extent the interrogatory seeks information on persons outside the scope of the National voter Registration Act, 42 U.S.C. section 1973gg-5, Defendant objects on the grounds that the interrogatory is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence

(2) Confidentiality.  The identity of persons applying for or receiving public assistance benefits and services is deemed confidential pursuant to Title 7 USC section 2020(e)(8), 7 Code of Federal Regulations subpart 272.1(c), section 414.295, Florida Statutes (2001) (Food Stamps Program): Title 42 USC section 602(a)(1)(A)(iv), 45 Code of Federal Regulations subpart 205.50(a)(1), section 414.295, Florida Statutes (2001) (Cash Assistance Program): Title 42 USC section 1396a(a)(7), 42 Code of Federal

3

Regulations subparts 431.300 through 431.307, inclusive, section 414.295, Florida Statutes (2001) (Medicaid Program). Subject to and without waiving this objection, Defendant responds as follows:

As to Plaintiff Joanna Clark, see attached documents marked, "Interrogatory Numbers 9(a)." As to Plaintiff Emery Timberlake, see attached documents marked, "Interrogatory Number 9(b)." As for the remaining twenty (20) individually named plaintiffs, Defendant cannot respond without their full name, date of birth, and social security number. Our attorney, Douglas MacInnes, Assistant Attorney General, requested this information from Cara Fineman, Esquire, one of plaintiffs' attorneys, on February 25, 2002. As of March 7, 2002, Mr. MacInnes advised us that he had not received this information from plaintiffs' attorneys.

**INTERROGATORY NUMBER 10:**

As to Plaintiff Joanna Clark, see response to Interrogatory Numbers 5 and 9, above. As to Plaintiff Emery Timberlake, see response to Interrogatory Number 3, above, as well as Defendant's Response to Document Request Number 3. As for the remaining twenty (20) individually named plaintiffs, Defendant cannot respond without their full name, date of birth, and social security number. Our attorney, Douglas MacInnes, Assistant Attorney General, requested this information from Cara Fineman, Esquire, one of plaintiffs' attorneys, on February 25, 2002. As of March 7, 2002, Mr. MacInnes advised us that he had not received this information from plaintiffs' attorneys.

4

**INTERROGATORY NUMBER 11:**

The number of complaints received by the Florida Department of Children and Family Services, either formally or informally, regarding the voter registration functions carried out by the Department between January 1997 and February 2002 is two (2).

**INTERROGATORY NUMBER 12:**

OBJECTION: Relevancy. Overbroad to the extent that this interrogatory requests information of the Department's employees who are not involved with the voter registration process. To the extent this interrogatory seeks information on persons outside the scope of the National Voter Registration Act, 42 U.S.C. section 1973gg-5, Defendant objects on the grounds that this interrogatory is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection, the Defendant responds as follows:

As to Plaintiff Joanna Clark, see attached document marked, "Interrogatory Number 12(a)." As to Plaintiff Emery Timberlake, see attached document marked, "Interrogatory Number 12(b)." As for the remaining twenty (20) individually named plaintiffs, Defendant cannot respond without their full name, date of birth, and social security number. Our attorney, Douglas MacInnes, Assistant Attorney General, requested this information from Cara Fineman, Esquire, one of plaintiffs' attorneys, on February 25, 2002. As of March 7, 2002, Mr. MacInnes advised us that he had not received this information from plaintiffs' attorneys.

Respectfully submitted,
ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

_GEORGE WAAS_
Assistant Attorney General
Fla. Bar No. 129967

Douglas Macinnes
Assistant Attorney General
Fla. Bar No. 255629
PL-01 The Capitol
Tallahassee, FL 32399-1050
(850)414-3662 or 3672
(850) 488-4872 (fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by United States Mail to the counsel whose names appear on the attached list as Appendix A, this _11th_ day of March, 2002.

George Waas

6

# SERVICE LIST

Anita S. Hodgkiss, Esq.
Lori Outzs Borgen, Esq.
Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, Suite 400
Washington, D.C. 20005-2124
Telephone # (202) 662-8315 (A. S. Hodgkiss Direct Line)
Main Telephone # (202) 622-8600
Fax # (202) 783-5130
E-mail: ahodgkiss@lawyerscomm.org
**Attorney for all of the Plaintiffs**

Thomasina H. Williams, Esq.
Law Office Williams and Associates, P.A.
Brickell Bay View Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Telephone # (305) 379-6676
Fax # (305) 379-4541
E-mail: wmslaw@winstarmail.com
**Attorney for all of the Plaintiffs**

John W. Little, III, Esq.
Steel Hector & Davis, LLP
1900 Phillips Point West
777 S. Flagler Drive, Suite 1900
West Palm Beach, FL 33401-6198
Telephone # (561) 650-7270
Fax # (561) 655-1509
E-mail: jlittle@steelhector.com
**Attorney for Katherine Harris, Secretary of State of Florida and Clay Roberts, Director of the Florida Division of Elections**

Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
200 S. Biscayne Boulevard
41st Floor
Miami, FL 33131-2398
Telephone # (305) 577-7027
Fax # (305) 577-7001
E-mail: wharvey@steelhector.com
**Attorney for Katherine Harris, Secretary of State of Florida, and Clay Roberts, Director of the Florida Division of Elections**

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Julia Mandell, Esq.
Ken Tinkler, Esq.
Assistant County Attorneys
Hillsborough County Attorney's Office
601 E. Kennedy Boulevard, 27th Floor
Tampa, FL 33602
Telephone # (813) 272-5670
Fax # (813) 272-5846
E-mail: allenr@hillsboroughcounty.org
**Attorneys for Hillsborough County Supervisor of Elections Pam Iorio**

Tracy I. Arpen, Jr., Esq.
Office of the General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, FL 32202
Telephone # (904) 630-1835
Fax # (904) 630-2388
E-mail: tarpen@coj.net
**Attorney for Duval County Supervisor of Elections John Stafford**

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone # (202) 434-5013
Fax # (202) 434-5029
E-mail: rbergan@wc.com
**Attorneys for ChoicePoint, Inc.
d/b/a Database Technologies, Inc.**

Mitchell Bloomberg, Esq.
Stephanie Gail Kolman, Esq.
Adorno & Zeder
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133
Telephone # (305) 858-5555
Fax # (305) 858-4777
E-mail: mrb@adorno.com
**Attorney for ChoicePoint, Inc.
d/b/a/ Database Technologies**

Michael D. Cirullo, Jr., Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Ft. Lauderdale, FL 33308-4311
Telephone # (954) 771-4500
Fax # (954) 771-4923
E-mail: mcirullo@cityatty.com
**Attorney for Orange County Supervisor of
Elections William Cowles**

Daniel D. Eckert, Esq.
County Attorney's Office
123 West Indiana Avenue
Deland, FL 32720-4613
Telephone # (386) 736-5950
Fax# (386) 736-5990
E-mail: deckert@co.volusia.fl.us
**Attorney for Volusia County Supervisor
of Elections, Deanie Lowe**

Christopher R. Haughee, Esq. "Hoy"
The Bentley Law Group
Post Office Box 1608
Bartow, FL 33830-4832
690 East Davidson Street
Bartow, FL 33830-4051
Telephone # (863) 519-9820
Fax # (863) 519-0720
E-mail: chaughee@hotmail.com
**Attorney for the Leon County Supervisor of
Elections, Ion Sancho**

David V. Kornreich, Esq.
Muller, Mintz, Kornreich, Caldwell, Casey
255 S. Orange Avenue
Citrus Center, Suite 1525
Orlando, FL 32801-3462
Telephone # (407) 843-1400
Fax (407) 843-1410
E-mail: NA
**Attorney for the Volusia County
Supervisor of Elections, Deanie Lowe**

Burnadette Norris-Weeks, Esq.
100 S.E. 6th Street
Ft. Lauderdale, FL 33301
Telephone # (954) 768-9770
Fax # (954) 768-9790
E-mail: bnorris199@aol.com
**Attorney for the Broward County Supervisor
of Elections, Miriam Oliphant**

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Dade County Attorney's Office
Metro Dade Center
111 N.W. 1st Street, Suite 2810
Miami, FL 33128
Telephone # (305) 375-5744
Fax # (305) 375-5611
E-mail: ehrlich@miamidade.gov
**Attorney for the Miami-Dade County
Supervisor of Elections David Leahy**

# PLAINTIFFS' EXHIBIT 54

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
by its FLORIDA STATE CONFERENCE OF BRANCHES, et al.,

Plaintiffs,

v.                                         CASE NO.:01-CIV-120-GOLD
                                           MAGISTRATE JUDGE: SIMONTON

KATHERINE HARRIS, Secretary of State, et al.,

Defendants.

_____/

## DEFENDANT KEARNEY'S RESPONSE
## TO PLAINTIFFS' DOCUMENT REQUESTS

Defendant Kearney responds as follows to Plaintiffs' Document Requests dated February 4, 2002:

### DOCUMENT REQUEST NUMBER 1:

See attached composite documents marked, "Document Request Number 1."

### DOCUMENT REQUEST NUMBER 2:

(a)  The Florida Department of Children and Family Services does not maintain information concerning the number of voter registration applications submitted to the Department by its clients. (We note that the Secretary of State, Division of Elections' office maintains a web page that purports to show the number of voter registration applications received from public assistance offices.)

(b)  The Department has located roughly 13,000 voter preference forms. The forms may show voter preferences other than the registrant's declination. The forms can

**PLAINTIFFS' EXHIBIT 55**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**NATIONAL ASSOCIATION FOR THE**
**ADVANCEMENT OF COLORED PEOPLE, INC.,**
**by its FLORIDA STATE CONFERENCE OF BRANCHES, et al.,**

Plaintiffs,

v.

**CASE NO.**:01-CIV-120-GOLD
**MAGISTRATE JUDGE:** SIMONTON

**KATHERINE HARRIS**, Secretary of State, et al.,

Defendants.

_____/

### DEFENDANT KEARNEY'S RESPONSE TO
### PLAINTIFFS' SECOND SET OF REQUESTS FOR DOCUMENTS

Defendant, KATHLEEN A. KEARNEY, Secretary of the Department of Children
and Families, responds as follows to Plaintiffs' Second Set of Requests for Documents:

**DOCUMENT REQUEST NUMBER 1:**

The Florida Department of Children and Family Services has not retained the services of
an expert witness for purposes of this lawsuit.

**DOCUMENT REQUEST NUMBER 2:**

The Florida Department of Children and Family Services has not retained the services of
an expert witness for purposes of this lawsuit.

A042424

**DOCUMENT REQUEST NUMBER 3:**

The Florida Department of Children and Family Services has not retained the services of an expert witness for purposes of this lawsuit.

**DOCUMENT REQUEST NUMBER 4:**

The Florida Department of Children and Family Services has not retained the services of an expert witness for purposes of this lawsuit.

**DOCUMENT REQUEST NUMBER 5:**

Defendant Kearney has no voter registration applications relating to any plaintiff from 1996 to the present. Defendant Kearney has no voter's preference forms relating to any named plaintiff from 1996 to the present.

**DOCUMENT REQUEST NUMBER 6:**

OBJECTION. (1) CONFIDENTIALITY. The documents requested are deemed to be confidential pursuant to state and federal law. (2) OVERBROAD. As written, the request seeks copies of voter's preference forms completed and submitted by department clients that are not, and can never be, a member of a class sought to be represented by the plaintiffs in this case. Subject to, and without waving these objections, the department does not have any voter's preference forms in its possession, custody, or control pertaining to Plaintiff Joanna Clark, the only named plaintiff that is a present or former client of the department.

2

**DOCUMENT REQUEST NUMBER 7:**

See attached documents.

**DOCUMENT REQUEST NUMBER 8:**

See Response to Document Request Number 7.

**DOCUMENT REQUEST NUMBER 9:**

See attached documents and Defendant Kearney's Response to Plaintiffs' First Set of Requests for Documents Number 3, dated March 11, 2002.

**DOCUMENT REQUEST NUMBER 10:**

See Defendant Kearney's Response to Plaintiffs' Second Set of Interrogatories Number 9, dated June 6, 2002.

**DOCUMENT REQUEST NUMBER 11:**

See Defendant Kearney's Responses to Plaintiffs' First Set of Document Requests Numbers 3, 4, 5, 6, and 7, dated March 11, 2002.

**DOCUMENT REQUEST NUMBER 12:**

See Defendant Kearney's Responses to Plaintiffs' First Set of Document Requests Numbers 3, 4, 5, 6, and 7, dated March 11, 2002.

A042426

**DOCUMENT REQUEST NUMBER 13:**

OBJECTION:   Attorney/Client Privileged communications and/or Attorney Work Product.   DCF is currently compiling a privilege log, under the provisions of Rule 26.1.G.3.(b)(ii)(A), Local Rules for the Southern District of Florida.   The privilege log will be provided under separate cover as soon as it is completed.

**DOCUMENT REQUEST NUMBER 14:**

See attached documents.

Respectfully submitted,
ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

DOUGLAS B. MACINNES
Assistant Attorney General
Fla. Bar No. 255629

George Waas
Assistant Attorney General
Fla. Bar No. 129967
PL-01 The Capitol
Tallahassee, FL 32399-1050
(850)414-3662 or 3672
(850) 488-4872 (fax)

<u>CERTIFICATE OF SERVICE</u>
I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by United States Mail to the counsel whose names appear on the attached list as Appendix A, this _____ day of June, 2002.

Douglas B. MacInnes

4

A042427

*Monique O. Poll*
~~Anita S. Hodgkiss, Esq.~~
Lori Outzs Borgen, Esq.
Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, Suite 400 Washington,
D.C. 20005-2124
Telephone # (202) 662-8315 (A. S. Hodgkiss
Direct Line)
Main Telephone # (202) 622-8600
Fax # (202) 783-5130
E-mail: ahodgkiss@lawyerscomm.org
**Attorney for all of the Plaintiffs**

Thomasina H. Williams, Esq.
Law Office Williams and Associates, P.A.
Brickell Bay View Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Telephone # (305) 379-6676
Fax # (305) 379-4541
E-mail: wmslaw@winstarmail.com
**Attorney for all of the Plaintiffs**

John W. Little, III, Esq.
Steel Hector & Davis, LLP
1900 Phillips Point West
777 S. Flagler Drive, Suite 1900
West Palm Beach, FL 33401-6198
Telephone # (561) 650-7270
Fax # (561) 655-1509
E-mail: jlittle@steelhector.com
**Attorney for Katherine Harris, Secretary of
State of Florida and Clay Roberts, Director of
the Florida Division of Elections**

Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
200 S. Biscayne Boulevard
41st Floor
Miami, FL 33131-2398
Telephone # (305) 577-7027
Fax # (305) 577-7001
E-mail: wharvey@steelhector.com
**Attorney for Katherine Harris, Secretary of
State of Florida, and
Clay Roberts, Director of the Florida
Division of Elections**

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Julia Mandell, Esq.
Ken Tinkler, Esq.
Assistant County Attorneys
Hillsborough County Attorney's Office
601 E. Kennedy Boulevard, 27th Floor
Tampa, FL 33602
Telephone # (813) 272-5670
Fax # (813) 272-5846
E-mail: allenr@hillsboroughcounty.org
**Attorneys for Hillsborough County
Supervisor of Elections Pam Iorio**

Tracy I. Arpen, Jr., Esq.
Office of the General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, FL 32202
Telephone # (904) 630-1835
Fax # (904) 630-2388
E-mail: tarpen@coj.net
**Attorney for Duval County Supervisor of
Elections John Stafford**

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone # (202) 434-5013
Fax # (202) 434-5029
E-mail: rbergan@wc.com
**Attorneys for ChoicePoint, Inc.
d/b/a Database Technologies, Inc.**

Mitchell Bloomberg, Esq.
Stephanie Gail Kolman, Esq.
Adorno & Zeder
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133
Telephone # (305) 858-5555
Fax # (305) 858-4777
E-mail: mrb@adorno.com
**Attorney for ChoicePoint, Inc.
d/b/a/ Database Technologies**

A042428

Michael D. Cirullo, ASC. Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Ft. Lauderdale, FL 33308-4311
Telephone # (954) 771-4500
Fax # (954) 771-4923
E-mail: mcirullo@cityatty.com
**Attorney for Orange County Supervisor of Elections William Cowles**

David V. Kornreich, Esq.
Muller, Mintz, Kornreich, Caldwell, Casey
255 S. Orange Avenue
Citrus Center, Suite 1525
Orlando, FL 32801-3462
Telephone # (407) 843-1400
Fax (407) 843-1410
E-mail: ncoughlin@mullermintz
**Attorney for the Volusia County Supervisor of Elections, Deanie Lowe**

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Dade County Attorney's Office
Metro Dade Center
111 N.W. 1st Street, Suite 2810
Miami, FL 33128
Telephone # (305) 375-5744
Fax # (305) 375-5611
E-mail: ehrlich@miamidade.gov
**Attorney for the Miami-Dade County Supervisor of Elections David Leahy**

Daniel D. Eckert
County Attorney's Office
123 West Indiana Avenue
Deland, FL 32720-4613
Telephone # (386) 736-5950
Fax# (386) 736-5990
E-mail: deckert@co.volusia.fl.us
**Attorney for Volusia County Supervisor of Elections, Deanie Lowe**

Burnadette Norris-Weeks, Esq.
100 S.E. 6th Street
Ft. Lauderdale, FL 33301
Telephone # (954) 768-9770
Fax # (954) 768-9790
E-mail: bnorris199@aol.com
**Attorney for the Broward County Supervisor of Elections, Miriam Oliphant**

William J. Bosch
Assistant County Attorney For Volusia county
123 West Indiana Avenue
Deland, FL 32720-4613
Telephone # (386) 736-5950
Fax# (386) 736-5990
E-mail: wbosch@co.volusia.fl.us
**Attorney for Volusia County Supervisor of Elections, Deanie Lowe**

A042429

be inspected or examined and photocopied on a date and time agreed to by the parties. Visits can be arranged by contacting Herschel C. Minnis, Assistant General Counsel, at 1317 Winewood Boulevard, Building 2, Room 204-N, Tallahassee, Florida 32399-0700, (850) 488-2381.

**DOCUMENT REQUEST NUMBER 3:**

See attached composite documents marked, "Document Request Number 3."

**DOCUMENT REQUEST NUMBER 4:**

See attached composite documents marked, "Document Request Number 4."

**DOCUMENT REQUEST NUMBER 5:**

See attached composite documents marked, "Document Request Number 5."

**DOCUMENT REQUEST NUMBER 6:**

See attached composite documents marked, "Document Request Number 6."

**DOCUMENT REQUEST NUMBER 7:**

To the extent that any plaintiff may be a client of the Department, the procedures carried out by the Department in relation to each plaintiff, from 1995 to the present, are set forth in the responses to Document Requests 4, 5, and 6.

**DOCUMENT REQUEST NUMBER 8:**

The Department has no records relating to any voter registration applications deposited in the drop box at the North Lauderdale Service Center, from January 1998 to December 2000.

**DOCUMENT REQUEST NUMBER 9:**

We found two (2). One was dated November 30, 2001, and the other was dated December 3, 2001. The original voter registration applications were forwarded to the

2

appropriate county Supervisor of Elections office for processing. Copies of both voter

registration applications are attached and marked. "Document Request Number 9."

**DOCUMENT REQUEST NUMBER 10**:

See responses to Document Request Numbers 4, 5, 6, and 7 above.

Respectfully submitted,
ROBERT A. BUTTERWORTH
ATTORNEY GENERAL


GEORGE WAAS
Assistant Attorney General
Fla. Bar No. 129967

Douglas MacInnes
Assistant Attorney General
Fla. Bar No. 255629
PL-01 The Capitol
Tallahassee, FL 32399-1050
(850)414-3662 or 3672
(850) 488-4872 (fax)

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been
furnished by United States Mail to the counsel whose names appear on the attached list
as Appendix A, this 11th day of March, 2002.


George Waas

3

**PLAINTIFFS' EXHIBIT 56**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
by its FLORIDA STATE CONFERENCE OF BRANCHES, et al.,

Plaintiffs,

v.

CASE NO.:01-CIV-120-GOLD
MAGISTRATE JUDGE: SIMONTON

KATHERINE HARRIS, Secretary of State, et al.,

Defendants.

_____/

## DEFENDANT KEARNEY'S RESPONSE TO
## PLAINTIFFS' SECOND SET OF INTERROGATORIES

Defendant, KATHLEEN A. KEARNEY, Secretary of the Department of Children

and Families, responds as follows to Plaintiffs' Second Set of Interrogatories:

**INTERROGATORY NUMBER 1**

Dorothy Meikle – 2061 North West 190th Terrace, Miami, Florida   33056, (305)625-

6736.

**INTERROGATORY NUMBER 2**

Carol Watkins – 3972 North West 176th Terrace, Carol City, Florida   33055, (305)620-

4163.

A042525

**INTERROGATORY NUMBER 3**

District 15, 337 North 4th Street, Fort Pierce, Florida 34950.

**INTERROGATORY NUMBER 4**

March 6, 2002

**INTERROGATORY NUMBER 5**

After several detailed searches for information indicating whether Plaintiff Joanna Clark submitted a completed voter registration application to the department during the time alleged in the Second Amended Complaint, no information was found indicating that Plaintiff Clark had done so. Ms. Clark testified in her deposition that she came in the DCF office, picked up a voter registration application, filled it out, and dropped it in a box for completed voter registration applications. She further testified that she did not ask for assistance in completing the application.

**INTERROGATORY NUMBER 6**

See response to interrogatory number 5.

**INTERROGATORY NUMBER 7**

Information available to the department indicates that voter registration training was provided by the Secretary of State, Division of Elections, to employees of the Florida Department of Children and Family Services, on: November 3, 1997,The Pensacola Center, Pensacola, Florida; November 5, 1997, R.A. Gray Building, 500 South Bronough

2

A042526

Street, Tallahassee, Florida; November 6, 1997, City Hall of Jacksonville, 220 East Bay Street, 15th Floor, Jacksonville, Florida; November 12, 1997, Supervisor of Elections, 119 West Kaley Street, Orlando, Florida; November 13, 1997, Election Service Center, 9220 Palm River Road, Suite 101, Tampa, Florida; November 14, 1997, Constitutional Complex, 2480 Thompson Street, Ft. Myers, Florida; November 18, 1997, North Miami Beach Performing Arts Theatre, 17011 North East 19th Avenue, North Miami Beach, Florida; June 29, 2001, Supervisor of Elections Office, 119 W. Kaley Street, Orlando, Florida; July 10, 2001, Terrace Building, 10th Floor, 101 South Washington Boulevard, Sarasota, Florida; July 20, 2001, Palm Beach County Government Center, 301 North Olive Avenue, Room #106, West Palm Beach, Florida; July 31, 2001, Amelia Island Plantation; August 10, 2001, Crestview Holiday Inn, Crestview, Florida; Department of State Records Center, 4319 Shelfer Road, Tallahassee, Florida; August 17, 2001, Knott Building, Room 116, 409 West St. Augustine Street, Tallahassee, Florida; February 27, 2002, State Records Center, 4319 Shelfer Road, Tallahassee, Florida; March 6, 2002, Pensacola Civic Center, 201 East Gregory Street, Pensacola, Florida; March 12, 2002, Jacksonville Marriott, 4670 Salisbury Road, Jacksonville, Florida; April 3, 2002, Supervisor of Elections Office, 119 West Kaley Street, Orlando, Florida; April 4, 2002, Marion County Board of County Commissioners Auditorium, 601 South East 25th Avenue, Ocala, Florida; April 9, 2002, Terrace Building, 101 South Washington Boulevard, Room 1004, Sarasota, Florida; Constitutional Complex Auditorium, 2480 Thompson Street, Ft. Myers, Florida; April 17, 2002, Performing Arts Theatre, 17011 North East 19th Avenue, North Miami Beach, Florida; April 22, 2002, Palm Beach Supervisor of Elections Office, 240 South Military Trail, West Palm Beach, Florida.

3

## INTERROGATORY NUMBER 8

See Defendant Kearney's Responses to Plaintiffs' First Set of Interrogatories Numbered

3, 4, 5, and 8, and Defendant Kearney's Responses to Plaintiffs' First Document Request

Numbered 3, 4, 5, 6, and 7 dated March 11, 2002.

## INTERROGATORY NUMBER 9

See attached documents.

Respectfully submitted,
ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

DOUGLAS MACINNES
Assistant Attorney General
Fla. Bar No. 255629

George Waas
Assistant Attorney General
Fla. Bar No. 129967
PL-01 The Capitol
Tallahassee, FL  32399-1050
(850)414-3662 or 3672
(850) 488-4872 (fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by
United States Mail to the counsel whose names appear on the attached list as Appendix
A, this 6th day of June, 2002.

Doug MacInnes

4

## JURAT

**STATE OF FLORIDA**

**COUNTY OF LEON**

BEFORE ME, the undersigned authority, personally appeared **Minor John Bowman,** who is personally known to me or has produced a driver's license as identification, and who, after being first duly sworn, deposes and state that the foregoing Answers to the Second Set of Interrogatories are true and correct.

Minor John Bowman
Acing Program Administrator
Florida Department of Children and Family Services
1317 Winewood Boulevard, Bldg. 3, Room 417
Tallahassee, Florida  32399-0700
(850)488-3271

SWORN AND SUBSCRIBED before me this 6th day of June, 2002.

(Name of Notary Public)

J. K. Redemann
MY COMMISSION # DD020613 EXPIRES
May 22, 2005
BONDED THRU TROY FAIN INSURANCE, INC.

My Commission Expires: _____

Jurat.doc060602

*Monique Dixon*
~~Anita S. Hodgkiss~~, Esq.
Lori Outzs Borgen, Esq.
Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, Suite 400 Washington,
D.C. 20005-2124
Telephone # (202) 662-8315 (A. S. Hodgkiss
Direct Line)
Main Telephone # (202) 622-8600
Fax # (202) 783-5130
E-mail: ahodgkiss@lawyerscomm.org
**Attorney for all of the Plaintiffs**

Thomasina H. Williams, Esq.
Law Office Williams and Associates, P.A.
Brickell Bay View Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Telephone # (305) 379-6676
Fax # (305) 379-4541
E-mail: wmslaw@winstarmail.com
**Attorney for all of the Plaintiffs**

John W. Little, III, Esq.
Steel Hector & Davis, LLP
1900 Phillips Point West
777 S. Flagler Drive, Suite 1900
West Palm Beach, FL 33401-6198
Telephone # (561) 650-7270
Fax # (561) 655-1509
E-mail: jlittle@steelhector.com
**Attorney for Katherine Harris, Secretary of
State of Florida and Clay Roberts, Director of
the Florida Division of Elections**

Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
200 S. Biscayne Boulevard
41st Floor
Miami, FL 33131-2398
Telephone # (305) 577-7027
Fax # (305) 577-7001
E-mail: wharvey@steelhector.com
**Attorney for Katherine Harris, Secretary of
State of Florida, and
Clay Roberts, Director of the Florida
Division of Elections**

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Julia Mandell, Esq.
Ken Tinkler, Esq.
Assistant County Attorneys
Hillsborough County Attorney's Office
601 E. Kennedy Boulevard, 27th Floor
Tampa, FL 33602
Telephone # (813) 272-5670
Fax # (813) 272-5846
E-mail: allenr@hillsboroughcounty.org
**Attorneys for Hillsborough County
Supervisor of Elections Pam Iorio**

Tracy I. Arpen, Jr., Esq.
Office of the General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, FL 32202
Telephone # (904) 630-1835
Fax # (904) 630-2388
E-mail: tarpen@coj.net
**Attorney for Duval County Supervisor of
Elections John Stafford**

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone # (202) 434-5013
Fax # (202) 434-5029
E-mail: rbergan@wc.com
**Attorneys for ChoicePoint, Inc.
d/b/a Database Technologies, Inc.**

Mitchell Bloomberg, Esq.
Stephanie Gail Kolman, Esq.
Adorno & Zeder
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133
Telephone # (305) 858-5555
Fax # (305) 858-4777
E-mail: mrb@adorno.com
**Attorney for ChoicePoint, Inc.
d/b/a/ Database Technologies**

A042530

Josias, Goren, Cherof, Doody & Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Ft. Lauderdale, FL 33308-4311
Telephone # (954) 771-4500
Fax # (954) 771-4923
E-mail: mcirullo@cityatty.com
**Attorney for Orange County Supervisor of Elections William Cowles**

David V. Kornreich, Esq.
Muller, Mintz, Kornreich, Caldwell, Casey
255 S. Orange Avenue
Citrus Center, Suite 1525
Orlando, FL 32801-3462
Telephone # (407) 843-1400
Fax (407) 843-1410
E-mail: ncoughlin@mullermintz
**Attorney for the Volusia County Supervisor of Elections, Deanie Lowe**

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Dade County Attorney's Office
Metro Dade Center
111 N.W. 1st Street, Suite 2810
Miami, FL 33128
Telephone # (305) 375-5744
Fax # (305) 375-5611
E-mail: ehrlich@miamidade.gov
**Attorney for the Miami-Dade County Supervisor of Elections David Leahy**

County Attorney's Office
123 West Indiana Avenue
Deland, FL 32720-4613
Telephone # (386) 736-5950
Fax# (386) 736-5990
E-mail: deckert@co.volusia.fl.us
**Attorney for Volusia County Supervisor of Elections, Deanie Lowe**

Burnadette Norris-Weeks, Esq.
100 S.E. 6th Street
Ft. Lauderdale, FL 33301
Telephone # (954) 768-9770
Fax # (954) 768-9790
E-mail: bnorris199@aol.com
**Attorney for the Broward County Supervisor of Elections, Miriam Oliphant**

William J. Bosch
Assistant County Attorney For Volusia county
123 West Indiana Avenue
Deland, FL  32720-4613
Telephone # (386) 736-5950
Fax# (386) 736-5990
E-mail: wbosch@co.volusia.fl.us
**Attorney for Volusia County Supervisor of Elections, Deanie Lowe**

A042531

**PLAINTIFFS' EXHIBIT 57**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**NATIONAL ASSOCIATION FOR THE**
**ADVANCEMENT OF COLORED PEOPLE, INC.,**
**by its FLORIDA STATE CONFERENCE OF BRANCHES, et al.,**

Plaintiffs,

v.

**CASE NO.:01-CIV-120-GOLD**
**MAGISTRATE JUDGE: SIMONTON**

**KATHERINE HARRIS,** Secretary of State, et al.,

Defendants.

_____/

### DEFENDANT KEARNEY'S SECOND SUPPLEMENTAL RESPONSE TO
### PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant, KATHLEEN A. KEARNEY, Secretary of the Department of Children
and Families, by and through undersigned counsel, supplements her responses to
Plaintiffs' First Set of Interrogatories as follows:

### INTERROGATORY NUMBER 9:

OBJECTION. (1) Relevancy. The interrogatory is overbroad to the extent that it
seeks information on DCF clients that are not on public assistance or have disabilities,
and thus are outside the scope of the National Voter Registration Act, 42 U.S.C. section
1973gg-5. To the extent the interrogatory seeks information on persons outside the scope
of the National voter Registration Act, 42 U.S.C. section 1973gg-5, Defendant objects on
the grounds that the interrogatory is irrelevant and not reasonably calculated to lead to
the discovery of admissible evidence

APR-30-2002 03:34

202 783 5130 P.03

JUN 28 2002 15:49

850+921+6097

VOTING RTS PROJECT

93%

P.02

MAY-02-2002 04:06

PAGE.35

(2) Confidentiality. The identity of persons applying for or receiving public assistance benefits and services is deemed confidential pursuant to Title 7 USC section 2020(e)(8), 7 Code of Federal Regulations subpart 272.1(c), section 414.295, Florida Statutes (2001) (Food Stamps Program); Title 42 USC section 602(a)(1)(A)(iv), 45 Code of Federal Regulations subpart 205.50(a)(1), section 414.295, Florida Statutes (2001) (Cash Assistance Program); Title 42 USC section 1396a(a)(7), 42 Code of Federal Regulations subparts 431.300 through 431.307, inclusive, section 414.295, Florida Statutes (2001) (Medicaid Program). Subject to and without waiving this objection, Defendant supplements her response as follows:

Please see attached table entitled *Defendant Kearney's Amended Response to Plaintiffs' Interrogatory Number 9*, which shows the dates of service to named plaintiffs who are DCF clients. Next to the dates of service are the letters "CR," "NA," "CA," or "RC." "CR" means "Client Registration;" "NA" means "New Application;" "CA" means "Change of Address;" and "RC" means "Recertification."

Respectfully submitted,

ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

Douglas B. MacInnes
Assistant Attorney General
Fla. Bar No. 255629
PL-01 The Capitol
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 488-4872 (fax)
Douglas_MacInnes@oag.state.fl.us

2

## NAACP v. KATHERINE HARRIS, Secretary, Florida Secretary of State, et al
## US DISTRICT COURT, SO. DISTRICT OF FLORIDA, MIAMI DIV., CASE No. 01-102-CV-GOLD/SIMONTON
## SECRETARY KEARNEY'S AMENDED RESPONSE TO PLAINTIFF'S INTERROGATORY NUMBER 9

| PLAINTIFF (A) | DCFS DISTRICT/REGION (B) | DCFS EMPLOYEE (C) | DCFS STREET ADDRESS (D) | DATE OF SERVICE (E) |
|---|---|---|---|---|
| (1) Carnegie, Nettie R. | 23 | Cynthia J. Munroe (D23) | 1100 Cleveland St., Clearwater | 7/14/92 – CR<br>4/21/93 – CR<br>11/23/93 – CR |
| | | Kim Munroe-George (D23) | 9309 N. Florida Ave., Tampa | 8/2/94 – CR<br>3/8/95 – CR<br>5/17/96 – CR |
| | | Ramus Tobias (23) | 397 N. Michigan Ave., Plant City | 8/16/99 – CR<br>5/24/00 – CR<br>10/02/01 – CR |
| (2) Chasner, John | NOT A DCFS CLIENT | NOT APPLICABLE | NOT APPLICABLE | NOT APPLICABLE |
| (3) Clark, Jeanne L. | 10 | Carol Shoen (D10) | 1801 W. Sample Rd., Pompano Beach | 3/2/92 |
| | | Lori Corti (D10) | 1801 W. Sample Rd., Pompano Beach | 11/3/94 – CA |
| | | Teresa Yoder-Trau (D10) | 311 N. State Road 7, Plantation | 1/6/95 – RC<br>11/9/95 – RC<br>11/29/95 – RC |
| | | Roy Kesselbaum (D10) | 1801 W. Sample Rd., Pompano Beach | 7/8/96 – RC<br>12/17/96 – RC<br>5/27/97 – NA |
| | | Cendelia Navigne (D10) | 1801 W. Sample Rd., Pompano Beach | 11/2/97 – NA<br>2/9/98 – RC |
| | | Willardo Fortier (D10) | 1601 W. Sample Rd., Pompano Beach | 7/22/98 – NA/RC<br>1/29/99 – RC |
| | | Hamilton Teshira (D10) | 1401 W. Sample Rd., Pompano Beach | 5/10/00 – NA<br>7/25/00 – RC/CA |
| | | Jane Andersen (D10) | 1801 W. Sample Rd., Pompano Beach | 9/20/00 – RC<br>3/3/01 – RC |
| | | Shirley Rivera-Edwards (D10) | 1804 W. Sample Rd., Pompano Beach | 1/14/01 – RC/NA<br>3/25/02 – RC/NA |

| Name | # | Contact | Address | Date/Status |
|---|---|---|---|---|
| (4) Dosseau, Placide | 11 | V. Lee (D11), Phanidé Vienus (D11) | 5400-A NW 22nd Ave., Miami / 18301 N. Miami Ave., Miami | 7/9/93 - NA |
| (5) Edwards, Sherry D. | NOT A DCFS CLIENT | NOT APPLICABLE | NOT APPLICABLE | NOT APPLICABLE |
| (6) Grahms, Consuelo | 7 | Sylvia Perez (D7) | (No Current Street Address Available (b/k/a) | 4/1/93 - NA / 8/23/93 - NA |
| (7) Harvey, Ursula Y. | 9 | Yvette Kutner (D9) | 821 Martin Luther King, Jr. Blvd., Stuart | 2/23/99 - RC / 11/23/93 - CA |
| | | Gary W. Carson (D9) | 821 Martin Luther King, Jr. Blvd., Stuart | |
| (8) Israel, Ashmuthi | 11 | Morris Taylor (D11) | 945 Pennsylvania 3rd Ave., Miami Bld | 7/3/93 - RC / 12/5/93 - RC/CA / 5/1/95 - Removed from Case |
| | | Cynthia Moore (D11) | 7900 NE 2nd Ave., Miami | 7/31/98 - NA |
| | | Kihandolah Four (D11) | 3750 S. Dixie Hwy., Coconut Grove | |
| (9) Kelly, James Bentley | NOT A DCFS CLIENT | NOT APPLICABLE | NOT APPLICABLE | NOT APPLICABLE |
| (10) Marshal, James L. | NOT A DCFS CLIENT | NOT APPLICABLE | NOT APPLICABLE | NOT APPLICABLE |
| (11) McDonald, Wallace | 23 | Amart Manipodum (D23) | 1313 N Tampa St., Ste., 220, Tampa | 7/1/93 - RC / 2/12/96 - NA |
| | | Lisa Riterbuck (D23) | 1313 N Tampa St., Ste.,220, Tampa | 6/26/96 - RC |
| (12) Odom, Lillie O. | 11 | Ardam C. Colmer (D11) | 11301 N. Miami Ave., Miami | 12/10/97 - NA |
| | | Carlos Gaston (D11) | 11301 N. Miami Ave., Miami | 10/30/01 NA/WDA |
| | | Helen Ogogue (D11) | 200 Opa Locka Blvd., Opa Locke | |
| | | Felix Hernandez (D10) | 7261 Sheridan St., Hollywood | |
| (13) Pannell, Harold L. | 4 | Julia Jones (D11) | 200 Opa Locka Blvd., Opa Locke | |
| | | Judy Belcher (D4) | 7574-5 103rd St., Jacksonville | 3/19/01 - NA |
| (14) Rose, Roedrick N. | 3 | Edoardo Sanchez (D___) | 1000 N.E. 10th Ave., Bldg. D., Gainesville | 7/21/93 |
| | | Laura Ward (D23) | 9330 Day Pizza Blvd., Ste. 120 Tampa | 8/23/94 |

| Name | | Client | Address | Date/Status |
|---|---|---|---|---|
| (15) Shorez, Jeffe | 4 | Denise Mann (D4) | 5801-1 Norwood Ave., Jacksonville | 11/19/99 – NA |
| | | Lewis M. Brabham, Jr. (D4) | 7379-4 103rd St., Jacksonville | 2/23/01 – NA |
| | | Thiep Johnson (D4) | 7379-6 103rd St., Jacksonville | 7/27/01 – CA |
| | | Philecia Cotto (D4) | 7379-103rd St., Jacksonville | 2/1/x02 – RC |
| (16) Terry, Jermaine | NOT A DCFS CLIENT | NOT APPLICABLE | NOT APPLICABLE | NOT APPLICABLE |
| (17) Timberlake, Emory | DISMISSED | NOT APPLICABLE | NOT APPLICABLE | NOT APPLICABLE |
| (18) Walden, Latrine | 10 | Terry Ripard (D10) | 7261 Sheridan St., Hollywood | 5/12/95 – KC |
| | | Dana Smith (D10) | 7261 Sheridan St., Hollywood | 6/30/95 – NA |
| | | Vivian Osana (D10) | 7261 Sheridan St., Hollywood | 7/21/95 – NA |
| | | Vivian Manciso (D10) | 7261 Sheridan St., Hollywood | 10/31/97 – NA |
| | | Norma J. Cascado (D10) | 7261 Sheridan St., Hollywood | 3/11/98 – RC |
| | | Ava Rivera (D10) | 7261 Sheridan St., Hollywood | 1/29/98 – RC |
| | | Corazo Puclio (D10) | 7261 Sheridan St., Hollywood | 11/20/98 – RC |
| | | | | 5/8/00 – RC |
| | | | | 9/7/00 – RC |
| | | | | 2/1/2002 - RC |
| (19) Wells, Kandy Marie | NOT A DCFS CLIENT | NOT APPLICABLE | NOT APPLICABLE | NOT APPLICABLE |
| (20) Wells, Valorie | 10 | Michael Gewirtz (D10) | 1101 W. Sample Rd., Pompano Beach | 9/6/95 – NA |
| | | Jane Anderson (D10) | 1101 W. Sample Rd., Pompano Beach | 11/13/95 – NA |
| | | Willedra Fowler (D10) | 1101 W. Sample Rd., Pompano Beach | 2/2/96 - NA |
| | | Gloria Rios (D10) | 1101 W. Sample Rd., Pompano Beach | |

William J. Bosch
Assistant County Attorney For Volusia county
123 West Indiana Avenue
Deland, FL 32720-4613
Telephone # (386) 736-5950
Fax# (386) 736-5990
E-mail: wbosch@co.volusia.fl.us
Attorney for Volusia County Supervisor of
Elections, Deanie Lowe

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone # (202) 434-5013
Fax # (202) 434-5029
E-mail: rbergan@wc.com
**Attorneys for ChoicePoint, Inc.**
**d/b/a Database Technologies, Inc.**

Michael D. Cirullo, Jr., Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Ft. Lauderdale, FL 33308-4311
Telephone # (954) 771-4500
Fax # (954) 771-4923
E-mail: mcirullo@cityatty.com
**Attorney for Orange County Supervisor of**
**Elections William Cowles**

Christopher R. Haughee, Esq. "Hoy"
The Bentley Law Group
Post Office Box 1608
Bartow, FL 33830-4832
690 East Davidson Street
Bartow, FL 33830-4051
Telephone # (863) 519-9820
Fax # (863) 519-0720
E-mail: chaughee@hotmail.com
**Attorney for the Leon County Supervisor of**
**Elections, Ion Sancho**

Burnadette Norris-Weeks, Esq.
100 S.E. 6th Street
Ft. Lauderdale, FL 33301
Telephone # (954) 768-9770
Fax # (954) 768-9790
E-mail: bnorris199@aol.com
**Attorney for the Broward County Supervisor**
**of Elections, Miriam Oliphant**

Mitchell Bloomberg, Esq.
Stephanie Gail Kolman, Esq.
Adorno & Zeder
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133
Telephone # (305) 858-5555
Fax # (305) 858-4777
E-mail: mrb@adorno.com
**Attorney for ChoicePoint, Inc.**
**d/b/a/ Database Technologies**

Daniel D. Eckert, Esq.
County Attorney's Office
123 West Indiana Avenue
Deland, FL 32720-4613
Telephone # (386) 736-5950
Fax# (386) 736-5990
E-mail: deckert@co.volusia.fl.us
**Attorney for Volusia County Supervisor**
**of Elections, Deanie Lowe**

David V. Kornreich, Esq.
Muller, Mintz, Kornreich, Caldwell, Casey
255 S. Orange Avenue
Citrus Center, Suite 1525
Orlando, FL 32801-3462
Telephone # (407) 843-1400
Fax (407) 843-1410
E-mail: NA
**Attorney for the Volusia County**
**Supervisor of Elections, Deanie Lowe**

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Dade County Attorney's Office
Metro Dade Center
111 N.W. 1st Street, Suite 2810
Miami, FL 33128
Telephone # (305) 375-5744
Fax # (305) 375-5611
E-mail: ehrlich@miamidade.gov
**Attorney for the Miami-Dade County**
**Supervisor of Elections David Leahy**

## SERVICE LIST

Anita S. Hodgkiss, Esq
Lori Outzs Borgen, Esq.
Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, Suite 400 Washington,
D.C. 20005-2124
Telephone # (202) 662-8315 (A. S. Hodgkiss
Direct Line)
Main Telephone # (202) 622-8600
Fax # (202) 783-5130
E-mail: ahodgkiss@lawyerscomm.org
**Attorney for all of the Plaintiffs**

John W. Little, III, Esq.
Steel Hector & Davis, LLP
1900 Phillips Point West
777 S. Flagler Drive, Suite 1900
West Palm Beach, FL 33401-6198
Telephone # (561) 650-7270
Fax # (561) 655-1509
E-mail: jlittle@steelhector.com
**Attorney for Katherine Harris, Secretary of
State of Florida and
Clay Roberts, Director of the Florida Division
of Elections**

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Julia Mandell, Esq.
Ken Tinkler, Esq.
Assistant County Attorneys
Hillsborough County Attorney's Office
601 E. Kennedy Boulevard, 27th Floor
Tampa, FL 33602
Telephone # (813) 272-5670
Fax # (813) 272-5846
E-mail: allenr@hillsboroughcounty.org
**Attorneys for Hillsborough County
Supervisor of Elections Pam Iorio**

Thomasina H. Williams, Esq.
Law Office Williams and Associates, P.A.
Brickell Bay View Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Telephone # (305) 379-6676
Fax # (305) 379-4541
E-mail: wmslaw@winstarmail.com
**Attorney for all of the Plaintiffs**

Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
200 S. Biscayne Boulevard
41st Floor
Miami, FL 33131-2398
Telephone # (305) 577-7027
Fax # (305) 577-7001
E-mail: wharvey@steelhector.com
**Attorney for Katherine Harris, Secretary
of State of Florida, and
Clay Roberts, Director of the Florida
Division of Elections**

Tracy I. Arpen, Jr., Esq.
Office of the General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, FL 32202
Telephone # (904) 630-1835
Fax # (904) 630-2388
E-mail: tarpen@coj.net
**Attorney for Duval County Supervisor of
Elections John Stafford**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U. S. Mail to the counsel whose names appear on the attached Service List this _____ day of April, 2002.

Douglas B. MacInnes

**PLAINTIFFS' EXHIBIT 58**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 01-0120-CIV-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
etc., et al.,

     Plaintiffs,

vs.

KATHERINE HARRIS, etc., et al.,

     Defendants.

_____/

## DEFENDANT DICKINSON'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant, FRED DICKINSON, Executive Director of the Florida Department

of Highway Safety and Motor Vehicles, by and through undersigned counsel, hereby

responds to Plaintiffs' First Set of Interrogatories and Request for Production of

Documents as follows:

### RESPONSES TO INTERROGATORIES

**Interrogatory No. 1:**

Please provide statistical information on the Department of Highway Safety and Motor
Vehicles' ("DHSMV") customer population, disaggregated by service office, service provided and
race, from 1998 to the present.

**Response**:

See statistical report labeled:  Department of Highway Safety & Motor Vehicles
Division of Driver Licenses
NAACP vs. Harris, et al
Interrogatory No. 1

**Interrogatory No. 2:**

Please identify the number of voter registration applications submitted to the DHSMV each month, by type of application and by service office, from January 1998 to present.

**Response**:

See statistical report labeled:  Department of Highway Safety & Motor Vehicles
Division of Driver Licenses
NAACP vs. Harris, et al
Interrogatory No. 2

**Interrogatories numbers 3, 4, 5 and 6.**

See Tab 1 to 3-ring binder:  The process is described in the enclosed brochure, "Process of Motor Voter."  The Department of Highway Safety and Motor Vehicles provides the <u>same opportunity</u> to register to vote or to update a voter registration record to each individual who comes to an office of that department to:

(a) Apply for or renew a driver's license;

(b) Apply for or renew an identification card pursuant to chapter 322; or

(c) Change an address on an existing driver's license or identification card.

(d) Each of the above customers for a driver license or identification card is asked "Are you interested in applying for voter registration or changing your present voter registration?"

1. Changes prior to 2000 are documented in Tab 7.

2. Changes since 2000:

    a.   Upgraded printers.

    b.   Established a full time liaison with the Supervisor of Elections Offices.

    c.   Scheduled regular meetings regarding training and public information.

    d.   Enhanced our Quality Assurance Program as it relates to Voter Registration.

    ● Required all office managers to keep a second copy of the transmittal report in secure file in the driver license office to enhance our accountability.  Prior to this change, only one copy of this report was generated and sent to the County Supervisor of Elections Office, to assure confidential information regarding where a person made application for voter registration.

2

● Reduced retrieval time from the transaction file if a customer subsequently has a question about his/her voter registration choice at the time of license or identification card issuance.

● Created a central tracking system and method of receiving complaints and questions: Notice given to Supervisors of Elections at the 2001 Conference in Orlando. Notice given to DHSMV examiners via the DDL Intranet. Complaints and questions are to be submitted to motor-voter@hsmv.state.fl.us

3. Proposed changes in 2002 (tentatively set for release in Spring 2002):

a.    Receipt for driver license or identification card services will include a statement regarding the customer's motor-voter choice.

b.    Declines, currently registered, and not eligible motor-voter choices will be included, by customer name, in the transmittal report for the Supervisors of Elections (requested by the Supervisors of Elections).

4. "Motor-Voter" to display in red letters on specific driver license and identification card processing screens of the Florida Driver License Information System (FDLIS) to remind DHSMV examiners and agents that the customer has a voter registration application to be submitted to the supervisor of elections office.  This is designed to eliminate voter registration applications not being signed.

### Interrogatory No. 7:
Please describe the procedure used for transmitting voter registration applications form DHSMV offices to the county supervisors or elections, from 1998 to the present, including identifying local variations used by any offices.

### Response:
See Tab 2 for method used to transmit applications.

Pursuant to section 97.057(4), Florida Statutes: The Department of Highway Safety and Motor Vehicles forwards completed voter registration applications within 5 days after receipt to the supervisor of the county where the office that processed or received that application is located.

### Interrogatory No. 8:
Please describe training for DHSMV employees regarding the voter registration functions carried out by the DHSMV, from January 1999 to present.

3

**Response:**

See Tab 3 documents used in training. Division of Elections provided the initial training at program implementation. All new employees since are given appropriate training during basic Examiner Training classes and on-the-job training. All employees receive refresher training annually, which may include Division of Elections regional training sessions (depends on Division of Elections locations, dates and times).

**Interrogatory No. 9:**

Please identify all employees working at DHSMV branch offices where any Plaintiff applied for a driver's license, renewed his/her driver's license or changed his/her address on his/her driver's license, from January 1997 to the present.

**Response:**

Objection. Overboard to the extent that it requests information on DHSMV employees who are not involved with the motor voter registration process. To the extent the question seeks information on persons outside the scope of the National Voter Registration Act, 42 U.S.C § 1973gg-5, Defendant objects on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection, Defendant responds as follows:

See Tab 4 as to those Plaintiffs who made allegations against the Executive Director of the DHSMV. To the extent this interrogatory seeks information about *other* named Plaintiffs, this office will need the full name, date or birth, gender, and driver license number or social security number.

**Interrogatory No. 10:**

Please provide information on the number of complaints you received or that came to your attention, either formally or informally, regarding the voter registration functions carried out by the DHSMV from January 1997 to the present.

**Response:**

| | |
|---|---|
| Complaints/Inquiries from customers = | 15 |
| Complaints/Inquiries from supervisors of elections = | 14 |

**Interrogatory No. 11:**

Please indicate which Plaintiffs the DHSMV has a record of receiving services from the DHSMV, from 1995 to the present. (See response below)

**Interrogatory No. 12:**

Please provide the dates and locations of the services provided to Plaintiff's identified in

4

response to Interrogatory No. 11, and identify which employee(s) waited on the Plaintiff involved on each occasion.

**Responses for No. 11 and 12:**   See Tab 4 as to those Plaintiffs who made allegations against the Executive Director of the DHSMV. To the extent this interrogatory seeks information about *other* named Plaintiffs, this office will need the full name, date or birth, gender, and driver license number or social security number.

**Interrogatory No. 13:**
Please describe how the DHSMV complies with the National Voter Registration Act, 42 U.S.C. § 1973gg-3(d).

**Response:**
See Tab 5.

## RESPONSES TO DOCUMENT REQUESTS

**Document Request No. 1:**
Please produce any and all documents relating to complaints you identified in response to Interrogatory No. 10.

**Response:**
For complaints following the November 2000 general election, this information has previously been provided to Plaintiffs in Exhibit "E" of Defendant Kearney's and Dickinson's Motion to Abate or Dismiss, filed October 22, 2001. For additional complaints/inquiry documents, see Tab 6.

**Document Request No. 2:**
Please produce any and all documents relating to the number of voter registration applications submitted to the DHSMV, from January 1999 to November 7, 2000.

**Response:**
DHSMV does not publish or produce any reports or documents relating to the number of voter registration applications. DHSMV uses the "Voter Registration Report" published by the Division of Elections. Driver license and identification card transaction data are stored electronically, which includes the customers' voter registration choices (see reports submitted for Interrogatories 1 and 2). This electronic file is used to produce ad hoc reports for interested parties outside of the department and to respond to bill analysis regarding issuance activities. This electronic file is also the voter registration declination file.

### Document Request No. 3:

Please produce any and all documents relating to the process by which an individual may complete a voter registration application at the DHSMV, from January 1999 to the present.

### Response:

See Tabs 1 and 3.

### Document Request No. 4:

Please produce any and all documents relating to the process by which an individual may change his/her address for voter registration purposes at the DHSMV, from January 1999 to the present.

### Response:

See Tabs 1 and 3.

### Document Request No. 5:

Please produce any and all documents relating to training DHSMV employees in registering its customers to vote, from January 1999 to the present.

### Response:

See Tab 3.

### Document Request No. 6:

Please produce any and all documents that establish the DHSMV's policies or procedures in regard to its voter registration functions, from January 1999 to the present.

### Response:

See Tab 3.

### Document Request No. 7:

Please produce any and all documents related to driver's license and voter registration applications for all Plaintiff's, as well as Admatha Israel, from January 1995 to the present.

### Response:

See Tab 4 as to those Plaintiffs who made allegations against the Executive Director of the DHSMV. To the extent this interrogatory seeks information about *other* named Plaintiffs, this office will need the full name, date or birth, gender, and driver license number or social security number.

6

**Document Request No. 8:**

Please produce any and all voter registration applications received by DHSMV but not transmitted to or processed by county supervisors of elections' offices, from January 1995 to the present.

**Response:**

DHSMV does not have any voter registrations received, but not transmitted to the county supervisors of elections' office. The DHSMV has no information of voter registration applications that were transmitted to county supervisor of elections but not processed.

**Document Request No. 9:**

Please produce any and all copies of the voter registration application as it currently appears on the computer screens viewed by DHSMV employees and as it is presented to DHSMV customers for their signature.

**Response:**

See Tab 3. These computer screens will be improved when changes are implemented in the Spring of 2002. See answers to Interrogatory No. 3

**Document Request No. 10:**

Please produce any and all documents, including but not limited to memoranda, regarding the voter registration functions carried out by DHSMV offices, from January 1999 to the present.

**Response:**

See Tab 7.

**Document Request No. 11:**

Please produce any and all documents regarding changes made to the voter registration procedures of the DHSMV since November 7, 2000, including but not limited to memoranda and minutes of any and all meetings regarding these changes.

**Response:**

See Tabs 3 and 7. See Tab 6 - meeting notes from Helen Howard.

**Document Request No. 12:**

Please produce any and all forms relating to the voter registration procedures of the DHSMV, including but not limited to voter registration declination forms.

7

**Response:**
See Tabs 3 and 4.

**Document Request No. 13:**
Please produce any and all documents relating to the voter registration functions carried out by the Brandon DHSMV office, including but not limited to memoranda and training of DCF employees in that office, from January 1995 to the present.

**Response:**
See Tab 8. Personnel in the DHSMV office in Brandon and DHSMV agent's office in Brandon do not train DCF employees.

Respectfully submitted,

ROBERT A. BUTTERWORTH
ATTORNEY GENERAL

GEORGE WAAS
Senior Assistant Attorney General
Fla. Bar No. 129967

Douglas MacInnes
Senior Assistant Attorney General
Fla. Bar No. 255629
PL-01 The Capitol
Tallahassee, Florida 32399-1050
(850) 414-3662 (or 3672)
(850) 488-4872 (fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U. S. Mail to the counsel whose names appear on the attached list as Appendix A this 17 day of March, 2002.

George Waas

## SERVICE LIST

ta S. Hodgkiss, Esq.
i Outzs Borgen, Esq.
bara Arnwine, Esq.
mas J. Henderson, Esq.
yers' Committee for Civil Rights Under Law
l New York Avenue, Suite 400
shington, D.C. 20005-2124
ephone # (202) 662-8315 (A. S. Hodgkiss
ct Line)
n Telephone # (202) 622-8600
# (202) 783-5130
ail: ahodgkiss@lawyerscomm.org
rney for all of the Plaintiffs

Thomasina H. Williams, Esq.
Law Office Williams and Associates, P.A.
Brickell Bay View Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Telephone # (305) 379-6676
Fax # (305) 379-4541
E-mail: wmslaw@winstarmail.com
**Attorney for all of the Plaintiffs**

a W. Little, III, Esq.
l Hector & Davis, LLP
l Phillips Point West
S. Flagler Drive, Suite 1900
t Palm Beach, FL 33401-6198
phone # (561) 650-7270
# (561) 655-1509
ail: jlittle@steelhector.com
rney for Katherine Harris, Secretary of
e of Florida and
y Roberts, Director of the Florida Division
ections

Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
200 S. Biscayne Boulevard
41st Floor
Miami, FL 33131-2398
Telephone # (305) 577-7027
Fax # (305) 577-7001
E-mail: wharvey@steelhector.com
**Attorney for Katherine Harris, Secretary**
**of State of Florida, and**
**Clay Roberts, Director of the Florida**
**Division of Elections**

ry Allen, II, Esq.
or Assistant County Attorney
Mandell, Esq.
Tinkler, Esq.
stant County Attorneys
sborough County Attorney's Office
E. Kennedy Boulevard, 27th Floor
pa, FL 33602
phone # (813) 272-5670
# (813) 272-5846
il: allenr@hillsboroughcounty.org
rneys for Hillsborough County Supervisor
ections Pam Iorio

Tracy I. Arpen, Jr., Esq.
Office of the General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, FL 32202
Telephone # (904) 630-1835
Fax # (904) 630-2388
E-mail: tarpen@coj.net
**Attorney for Duval County Supervisor of**
**Elections John Stafford**

Raymond W. Bergan. Esq.
Daniel A. Restrepo. Esq.
Williams & Connolly, LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone # (202) 434-5013
Fax # (202) 434-5029
E-mail: rbergan@wc.com
**Attorneys for ChoicePoint. Inc.
d/b/a Database Technologies, Inc.**

Michael D. Cirullo, Jr., Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Ft. Lauderdale, FL 33308-4311
Telephone # (954) 771-4500
Fax # (954) 771-4923
E-mail: mcirullo@cityatty.com
**Attorney for Orange County Supervisor of
Elections William Cowles**

Christopher R. Haughee, Esq. "Hoy"
The Bentley Law Group
Post Office Box 1608
Bartow, FL 33830-4832
690 East Davidson Street
Bartow, FL 33830-4051
Telephone # (863) 519-9820
Fax # (863) 519-0720
E-mail: chaughee@hotmail.com
**Attorney for the Leon County Supervisor of
Elections, Ion Sancho**

Burnadette Norris-Weeks, Esq.
100 S.E. 6th Street
Ft. Lauderdale, FL 33301
Telephone # (954) 768-9770
Fax # (954) 768-9790
E-mail: bnorris199@aol.com
**Attorney for the Broward County Supervisor
of Elections, Miriam Oliphant**

Mitchell Bloomberg, Esq.
Stephanie Gail Kolman, Esq.
Adorno & Zeder
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133
Telephone # (305) 858-5555
Fax # (305) 858-4777
E-mail: mrb@adorno.com
**Attorney for ChoicePoint, Inc.
d/b/a/ Database Technologies**

Daniel D. Eckert, Esq.
County Attorney's Office
123 West Indiana Avenue
Deland, FL 32720-4613
Telephone # (386) 736-5950
Fax# (386) 736-5990
E-mail: deckert@co.volusia.fl.us
**Attorney for Volusia County Supervisor
of Elections, Deanie Lowe**

David V. Kornreich, Esq.
Muller, Mintz, Kornreich, Caldwell, Casey
255 S. Orange Avenue
Citrus Center, Suite 1525
Orlando, FL 32801-3462
Telephone # (407) 843-1400
Fax (407) 843-1410
E-mail: NA
**Attorney for the Volusia County
Supervisor of Elections, Deanie Lowe**

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Dade County Attorney's Office
Metro Dade Center
111 N.W. 1st Street, Suite 2810
Miami, FL 33128
Telephone # (305) 375-5744
Fax # (305) 375-5611
E-mail: ehrlich@miamidade.gov
**Attorney for the Miami-Dade County
Supervisor of Elections David Leahy**

**PLAINTIFFS' EXHIBIT 59**

# EXPERT WITNESS REPORT OF GARY McINTOSH

Gary McIntosh, President
McIntosh Election Services
606 Sherman St. SW
Olympia, Washington 98502

Case:  NAACP v. Harris
       01-120-CIV
       U.S. District Court
       Southern District of Florida
       Judge Alan S. Gold

## SECTION 1   Introduction

I have been retained by the Plaintiffs in the above-captioned matter to render an expert opinion regarding recommended practices in implementing agency based voter registration programs required under the National Voter Registration Act (NVRA) and to comment on such practices as they relate to the State of Florida's implementation of the National Voter Registration Act both prior to and following the 2000 election.

## SECTION 2  Professional Qualifications

I received my Bachelor of Arts degree in political science from Washington State University in 1972.  I have over 23 years of election experience.  I am currently the President of McIntosh Election Services, a private consulting firm specializing in election management and consulting services for governmental and private clients.  I have worked as the Director of Elections for the State of Washington and as the Supervisor of Elections and Voter Registration for Thurston County (Olympia), Washington.  I was

in charge of overseeing the successful implementation of the National Voter Registration Act (NVRA) in Washington State.

I have assisted the Federal Elections Commission (FEC) in the implementation of the National Voter Registration Act.

I worked for the U.S. State Department on the development of a voter registration and election system in Bosnia. I have served on the Federal Election Commission Advisory Panel and was a founding member and past President of the National Association of State Election Directors. My qualifications and experience are summarized in my resume which is attached hereto.

## SECTION 3 Data and Other Information Considered in Forming Opinion

I have reviewed the following documents from the state of Florida and other documents related to the administration of the National Voter Registration Act:

- "On Top of Motor Voter" 1 page pamphlet
- Dickinson's Answers to interrogatories 3 to 6, describing changes in system since 2000, and proposed changes in 2002
- Defendants' Responses to DMV/DCF - related Interrogatories 12 and 13
- "Motor Voter Training Application Procedures," Jan. 2001
- "Motor Voter Questions and Answers"
- Balancing and Verifying of End of Day Reports, Jan. 2001
- "Florida Examiners Manual"
- "Motor Voter Application Procedures," 2002 draft
- "Would You Be a 'Motor Voter' Survivor?"
- Letter and internet page re: DHSMV Supervisor of Elections Liaison, March 23, 2001
- DHSMV Presentation to U.S. Commission on Civil Rights, 2/26/01

2

- AFDC Info Memo, ACF-IM-96-2, with section on Florida, 2/20/96
- Kearney's Responses to Doc Request 1, including letter and e-mail
- Kearney's Responses to Doc Request 3, including training material
- Module 04:Intake and Applications Processing, apps 10.doc,04-10-4
- District III Voter Registration Procedures
- Training Presentation from Secretary of State Katherine Harris on Florida Voter Registration Procedures
- January 8, 2002 memo to Operational Program Administrators from Carol Canady, re: Voter Registration Procedures
- "Implementing the National Voter Registration Act of 1993: Requirements, Issues, and Examples" Prepared by The National Clearinghouse on Election Administration, Federal Election Commission, January 1, 1994
- U.S. House of Representatives, Committee on House Administration, Report 103-9, "National Voter Registration Act of 1993"
- U.S. Senate, Committee on Rules and Administration, Report 103-6, "Establishing National Voter Registration Procedures for Federal Elections, and for Other Purposes"

Based on my review of the above referenced material and my experience at both the state and national levels, I render the following opinions.

## SECTION 4  Summary of Opinions

1. The National Voter Registration Act requires that a voter registration application process be an integral part of an application process for services at various agencies designated under the National Voter Registration Act. It appears that in Florida some offices providing services through the

Department of Children and Families (DCF) were not always offering the opportunity to register to vote to all clients, as prescribed in the National Voter Registration Act.

2. Agency based voter registration programs will work best in those situations where the chief State election official designated for coordinating "State responsibilities" under the National Voter Registration Act assumes the responsibility for providing statewide leadership in the development and implementation of all activities related to the State's compliance with the Act. In Florida it appears that no one was granted statewide authority or exercised statewide leadership in the development of various programs established by the National Voter Registration Act.

3. Agency based voter registration programs will operate more efficiently when there is a greater reliance on the electronic transfer of voter registration data. Florida's agency based voter registration programs may be hampered by its reliance on paper forms.

4. At the statewide level, it is essential that someone, preferably the State's chief elections official, be responsible for monitoring the performance levels of state agencies that have designated responsibilities under the National Voter Registration Act. Florida would be able to more efficiently operate its agency based voter registration programs if monitoring programs were in place.

## Section 5   Basis and Reasons for Opinions

**The National Voter Registration Act requires that a voter registration application process be an integral part of an application process for services at various agencies designated under the National Voter Registration Act. It appears that in Florida some offices providing services through the Department of Children and Families (DCF) were not always offering the opportunity to register to vote to all clients, as prescribed in the National Voter Registration Act.**

The National Voter Registration Act requires that individuals be given an opportunity to register to vote (or to change their voter registration data) in elections for federal office when applying for or renewing a driver's license or other personal identification document issued by a State motor vehicle authority; applying for public assistance; applying for disability services under State-funded programs; and applying for services at other offices designated by the State.[1]

A voter registration agency, other than a driver's license agency, is required to distribute with each application for service or assistance, and with each recertification, renewal, or change of address, a mail voter registration application form.[2]  These agencies must also provide assistance and acceptance of voter registration applications.[3]

In addition these agencies must provide each applicant a "declination" form whereby an applicant may accept or reject an offer to register to vote based on their current residence.  The Federal Election Commission  has suggested that a declination

---

[1] "FEC Guide to Implementing the NVRA," pages 1-1 and 4-1, January 1, 1994.
[2] 42 USC 1973gg-5 (a)(6)(A).
[3] 42 USC 1973gg-5(a)(4)(A)ii and iii.

form "lends itself, then, to being included in the other forms being completed by applicants – as an integral part of the agency's own form(s), or as a separate form."[4]

It appears that Florida in their Department of Children and Families (DCF) uses a separate "preference form." However, it is important to note that when using a separate form, it is still important that such a form be used as an "integral" part of the agency's application process.  For example, it would not suffice for an agency to simply have declination forms and voter registration applications made available on a counter for public distribution.

It also appears that in some cases DCF offices were not always providing an opportunity for clients to register.   Reasons given were budgetary constraints or a general policy of only providing voter registration "if client (sic) asks about it."[5]

**Agency based voter registration programs will work best in those situations where the chief State election official designated for coordinating "State responsibilities" under the National Voter Registration Act assumes the responsibility for providing statewide leadership in the development and implementation of all activities related to a State's compliance with the Act. In Florida it appears that no one was granted statewide authority or exercised statewide leadership in the development of various programs established by the National Voter Registration Act.**

The NVRA requires that each State "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this Act."[6]

---

[4] "FEC Guide to Implementing the NVRA," page 4-7, January 1, 1994.
[5] Kearney's Response to Doc Request 1, e-mail and January 8, 2002 memo to Operational Program Administrators from Carol Canady, re: Voter Registration Procedures.
[6] 42 USC 1973gg-8.

6

As a practical matter, some States have chosen to assign this official the responsibility of carrying out other duties assigned under the Act.  In fact the FEC suggested shortly after enactment of the NVRA that States consider "assigning the chief State election official related responsibilities."[7]  These responsibilities included receiving and forwarding various forms and notices; receiving and compiling reports; "designing all forms and procedures requisite under the NVRA; and training of all local election officials regarding the forms and procedures."[8]

It should be noted that based on my review of documents from the State of Florida, it appears that prior to 2001, the chief State elections official designated under the NVRA, was either not given the authority or did not exercise the responsibility of performing the functions described above.

From my experience in the State of Washington, I found that even though my office did not have legal supervisory authority over either our county election officials or the State's designated state agencies, this lack of authority did not preclude us from working with local election officials and state agency directors on reaching agreement on certain procedural items and seeking legislative authority to design public notices and forms.[9]

The Secretary of State in Washington also sought and was given the authority to receive all applications for voter registration.

---

[7] "FEC Guide to Implementing the NVRA," page 1-6, January 1, 1994.
[8] Ibid. (emphasis added)
[9] Revised Code of Washington, 29.07.025.

**Agency based voter registration programs will operate more efficiently when there is a greater reliance on the electronic transfer of voter registration data. Florida's agency based voter registration programs may be hampered by its reliance on paper forms.**

One of the reasons for the initial success of the implementation of the NVRA in Washington was the recognition that the process would operate more efficiently if there was less reliance on paper forms.

In Washington, the simultaneous application process at driver's license agencies requires the Washington State Department of Licensing to "produce and transmit a machine-readable file" containing the data elements needed for processing the voter registration application.[10] These machine readable files along with the applicant's original signature are first transmitted to the Secretary of State. The Secretary of State is responsible for sorting the records by county, producing a file of voter registration transactions for each county, and transmitting the electronic data to each county on "whatever medium the county determines will best facilitate the incorporation of these records into the existing voter registration files of that county."[11]

Most counties simply take the electronic data and download the information into their existing voter registration file. Although counties must still keep track of the original signature, this process does enable them to directly download information electronically, without having to manually enter the information from a separate paper document. This process reduces the chance of input error and the potential loss of a paper form.

---

[10] Revised Code of Washington, 29.07.270.
[11] Revised Code of Washington, 29.07.290.

The State of Florida through their Department of Highway Safety and Motor Vehicles (DHSMV) and the Department of Children and Families (DCF) still relies heavily on paper forms. To an extent, this reliance may cause them to experience many of the problems described in this section of the Report.

> **At the statewide level, it is essential that someone, preferably the State's chief elections official, be responsible for monitoring the performance levels of state agencies that have designated responsibilities under the National Voter Registration Act. Florida would be able to more efficiently operate its agency based voter registration programs if monitoring programs were in place.**

In assisting States with the implementation of the National Voter Registration Act, the Federal Elections Commission urged that consideration be given to the administration of the agency based programs (including driver's license agencies) prescribed in the Act. In particular, the Commission stressed responsibility and training.

In terms of responsibility, the FEC suggested that "a principle ingredient of a successful agency registration program is the appointment of someone in each agency office to be in charge of, responsible for, and enthusiastic about all voter registration activities - ensuring an adequate supply of forms, monitoring voter registration activities, training new employees, resolving questions and problems that arise in coordination with State or local election officials, and the like. Such a task need not be full time, but it must be ongoing."[12]

The FEC recommendations also included a specific provision on the training of "all agency employees involved with voter

---

[12] "FEC Guide to Implementing the NVRA," pages 2-7 and 4-9, January 1, 1994.

registration – how to ensure that voter registration forms are completed and signed correctly, how to offer and provide assistance to registrants, and the like."[13]

In addition, my experience in Washington would indicate that another necessary ingredient of a successful agency based voter registration process is the designation of an individual at the State level, preferably the chief elections officer, being responsible for the monitoring of all voter registration activity at each agency office, including the assessment of the levels of voter registration activity.

In terms of assessing the levels of voter registration, it is important to determine the total number of customers for each agency office. In other words, how many customers does each office serve in terms of processing applications for whatever particular service the office provides?  It then becomes important to determine the total number of voter transactions for each office.  Once these figures are determined, then it is fairly easy to compare offices of similar size based on total customers and then make a reasonable determination of the number of voter registration transactions an agency office should be generating.  This analysis is most effective when it is done statewide.  States should also consider providing for agency site visits by the chief elections officer.

In addition it is important that the chief elections officer monitor the quality of the application process at each agency office.  This monitoring would include the completeness of the forms and the accuracy of the data contained on the forms.

If there are anomalies, then the person responsible for the implementation of the Act at the State level should work with the individual agency's personnel in terms of resolving whatever

---

[13] "FEC Guide to Implementing the NVRA," pages 2-7 and 4-9, January 1, 1994.

10

problems may exist, including the refusal or inability by an office to offer voter registration services to each applicant.

This becomes particularly important in those social service agencies required to provide voter registration application services. In these agencies an end of day balancing and verification process is necessary in order to ensure that all clients are being given an opportunity to register to vote, as required by the NVRA. This can be accomplished by simply providing for a log that shows the total number of clients served; the total number of declination forms; and the total number of voter registration forms distributed to clients. At the end of each day the total number of declination forms and the total number of voter registration applications distributed should equal the total number of clients served.

In summary, it does not appear from my review of various documents from the State of Florida that the programs described in this section of the Report are currently established. In particular the State of Florida through their Department of Children and Families does not appear to provide a log which contains all of the information necessary to ensure that each applicant is being given the opportunity to register to vote.

In my opinion the State of Florida would more efficiently implement the provisions of the NVRA if such monitoring programs as described in this section of the Report were in place.

## SECTION 6  Compensation

I am being compensated at the rate of $125 an hour for the preparation of this Report.

## SECTION 7  Other Expert Testimony in the Last Four Years

I was deposed as an expert witness in Olympia, Washington on November 6, 2001 regarding <u>Washington State Democratic Party, et al. v. The State of Washington et al.</u>, No.C00-5419 FDB, (W.D.Washington).

I was deposed as an expert witness in Philadelphia, Pennsylvania on April 5, 2002 regarding <u>National Organization on Disability, et al. v. City of Philadelphia et al.</u>, No. 01-C1923, (E.D.Pennsylvania).

_____

Gary McIntosh, President
McIntosh Election Services
April 26, 2002

12

**VITA**

**GARY EDWARD MCINTOSH**

**CONTACT:**

606 Sherman Street SW
Olympia, Washington 98502-5455
(360) 709-0603
smythmcintosh@attbi.com

**EDUCATION:**

B.A., 1972, Political Science, Washington State University (With Distinction, Phi Beta Kappa)

**PROFESSIONAL PROFILE:**

2001-Present: Founder and President of McIntosh Election Services, Olympia, Washington
McIntosh Election Services is a company providing expert elections management assistance and advice to private companies, law firms, and government. The company specializes in the preparation of expert witness reports, including reports covering descriptions of the national qualification process for voting systems, analysis of state laws on certification of voting systems, and studies of existing voting systems currently made available to states and localities.

1988-2001: Washington State Election Director, Office of the Secretary of State, Olympia, Washington
This position was responsible for maximizing human, monetary, and technological resources while providing a secure and accurate elections environment. The purpose of the position was to direct the administration of federal and state elections and to assist local election officials with the administration of city, county, and district elections held in the state. This position was responsible for supervising 17 full-time personnel and 12 temporary personnel while administering a $5.3 million budget. The position was also expected to supervise personnel in the printing and distribution of the official state voters pamphlet, the maintaining of the state voter registration file, the verification of initiative signatures, the canvassing of state election returns, the training and certification of county election officials, the review of county election practices and procedures, and the drafting of elections legislation. The position was also responsible for evaluating all voting systems marketed in the state. Evaluations included the design of a testing process to insure that voting systems marketed in the state met Federal Voting System standards and were capable of meeting state election requirements. The position was responsible for the preparation of voting system certification reports and made recommendations to the

Secretary of State as to whether specific systems should be certified. Certification reports also contained information on the management of specific systems, including requirements for counties in the use electronic voting systems. The position was also responsible for conducting tests of voting systems prior to elections to insure that electronic voting systems had been programmed and were performing accurately.

1979-1988: Thurston County Supervisor of Elections and Voter Registration, Office of the Thurston County Auditor, Olympia, Washington.
This position was responsible for supervising 20 temporary full-time personnel and five permanent full-time personnel, while administering a $500,000 budget. The position was also responsible for recruiting and training 540 election board workers. The purpose of the position was to maintain an accurate voter registration system and to obtain accurate election results. This included the management, programming, ballot preparation, proofing and testing of the county's electronic voting system. The position was expected to supervise personnel in the planning, accounting for and controlling of costs, to train polling place personnel, to administer election laws, to coordinate computer activities, including personal computers and mainframe operations, and to assist the Auditor in drafting legislation and testifying before legislative committees.

**PROFESSIONAL ACTIVITIES**:

- Founding Member of the National Association of State Election Directors
- President of the National Association of State Election Directors, 2000
- Appointed by the U.S. State Department to assist the Office of Security and Cooperation in Europe in the development of an elections process in Bosnia, 1997
- Appointed member of the Federal Election Commission's Advisory Panel on Elections Administration, 1999
- Chairman of the Washington State Ad-Hoc Legislative Committee on Primary Elections, 1999
- Worked on implementing a program for establishing a national testing process for electronic voting systems, 1992
- Assisted the Federal Elections Commission in a national program to assist states, counties, and social service agencies in the implementation of the National Voter Registration Act, 1994
- Received National Association of County Officials' Achievement Award for the development of an elementary school education program and for the establishment of a polling accessibility program for the disabled.

**PROFESSIONAL PRESENTATIONS:**

- United States Senate Committee on Governmental Affairs, Washington D.C., 2001, "Motor Voter in Washington State"

14

- Washington State Government Lawyers Bar Association Continuing Legal Education Seminar, Olympia, 2001, "A Primer on Election Administration"

- California Clerks Association, Palm Springs, 1999, "Blanket Primary Process"

- Council of State Governments, Quebec City, Quebec, 1999, "Voting System Standards"

- Oklahoma Election Officials Conference, Oklahoma City, 1995, "Voting by Mail"

- Kentucky Election Officials Conference, Frankfort, 1994, "Motor Voter and the National Voter Registration Act"

- Arkansas Election Officials Conference, Little Rock, 1994, "Implementing the National Voter Registration Act"

- Oklahoma Election Officials Conference, Oklahoma City, 1993, "Motor Voter in Washington State"

**PERSONAL ACTIVITIES:**

- Volunteer and Member of the Juvenile Diabetes Foundation

- Volunteer and Member of the American Diabetes Association

- Past President of the Thurston County Retired Volunteer Program

- Past part-time faculty member of South Puget Sound Community College

## SECTION 7  Other Expert Testimony in the Last Four Years

I was deposed as an expert witness in Olympia, Washington on November 6, 2001 regarding <u>Washington State Democratic Party, et al. v. The State of Washington et al.</u>, No.C00-5419 FDB, (W.D.Washington).

I was deposed as an expert witness in Philadelphia, Pennsylvania on April 5, 2002 regarding <u>National Organization on Disability, et al. v. City of Philadelphia et al.</u>, No. 01-C1923, (E.D.Pennsylvania).


Gary McIntosh, President
McIntosh Election Services
April 26, 2002

**PLAINTIFFS' EXHIBIT 60**

## Expert Report

by

David Klausner

Case:  **NAACP v. Harris**

No. 01-120-CIV

U.S. District Court

Southern District of Florida

Judge Alan S. Gold

## I.      Introduction

I have been retained as an expert by counsel for the Plaintiffs in the above captioned litigation. I have prepared this report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

I have been asked to express opinions on

    A. Industry Standard for matching.

    B. Quality of the data used for matching.

    C. Matching methods used.

    D. Estimated number of individuals erroneously identified as felons in the year 2000 election in Florida.

    E. Verification of individuals identified as felons.

    F. Racial composition of the Florida Central Voter File ("CVF") and the final year 2000 Felon Exception List.

    G. Remedies should the Court find for the plaintiffs.

## II.      Professional Qualifications

1

I have over thirty-five years of experience working in the computer industry. I began computer programming in 1967 while still an undergraduate. In 1968, I received a B.A. in Mathematics from Brooklyn College in New York. In 1974, I received a Masters Degree in the Science of Electrical Engineering from the PolyTechnic Institute of Brooklyn in New York.

I have had experience in the computing industry as an engineer, software developer, supervisor, project manager, department manager, upper-level manager, and company executive. I have extensive experience working with various types of hardware, operating systems, databases, database languages, networking, and more. I have worked on computer projects for IBM, Hewlett-Packard, and Amdahl, as well as for startup companies in a variety of capacities. I have personally designed and implemented large and small systems and programs. I have also done extensive computer-related forensic work, which involves doing an after-the-fact investigation of the development or modification of computer programs.

I am now self-employed as a private consultant. I continue to work on computer projects for various companies as well as provide expert testimony in computer-related litigation.

Attached is a resume setting forth my professional background. I have not published in the last ten years.

### III.   Opinions

I have reached the following opinions:

#### A. Industry Standard for Matching

The Industry Standard for matching individuals in databases is not primarily by using the names of the individuals. In my experience, most matching applications make use of other available criteria, such as Social Security numbers, various identification numbers, dates-of-birth, locations, etc., while the individuals' names may be used as secondary criteria to further eliminate erroneous matches. The primary reason for the above is that names are notoriously unreliable in their spelling and content (first versus middle name, initials, nicknames/shortnames, punctuation [hyphenations,

2

apostrophes, periods], etc.), compared to the other criteria. For the year 2000 election, DBT and Florida used the altered names of the individuals as the primary criteria for matching individuals for felony convictions. They should not have done so. They should have used some of the other criteria I have listed as the primary criteria, such as, Social Security numbers, addresses, and dates of birth. When they are reliable, the actual, rather than the derived Social Security numbers should be used as the primary criteria. In this case, as I discuss later, these Social Security numbers were not reliable. Dates of birth alone should not be used as the sole criteria. My opinion is the same to the extent that DBT and Florida did the same thing for the pre-2000 election files, including for duplicates.

The bases of my opinions include my experience in programming database record matching since 1967. This experience includes: University Application Processing Center (1967-1974) - student University Application databases for the City University of New York – using Social Security Number and High School ID: Plus Development Corporation (1984-1986) - Customer Warranty Database using Product Serial Number: Intel Corporation (1991-1992) – Processor Availability databases using Processor ID designation: various consultations I have performed, including work on an automobile recall program.

The Industry Standard for matches (lookups) performed by telephone companies, health providers, Internet Service Providers, and various local and countrywide public and private organizations, is not to use individuals' names as the primary criteria.

The strategies and tactics used in matching individuals are determined by the purpose of the matching. That purpose will dictate whether one wants to be broadly inclusive and capture as many potential matches as possible or to be selective and exclusive by eliminating questionable matches. The purpose is usually determined by looking

at the harm that can result from an individual being **included** as well as the harm that can result from an individual being **excluded**. For example, in the case of an automobile manufacturer attempting to recall vehicles belonging to various individuals, the purpose is one of broad inclusion. This purpose results in more notifications of recall being sent out, erring on the side of caution. Some notices go to former owners, individuals who have moved and left no forwarding address, etc., as well as to invalid matches for vehicles and their owners. The downside of excluding an individual is that the individual may suffer severe harm or death if they fail to be notified. The consequence of erroneously including someone is next to nothing. An example of a selective or exclusionary purpose is determining whether an individual should have access to a bank account. Banks will typically not permit access to accounts with merely a name. They require identification in the form of other information, typically identification numbers. They err on the side of caution and assume that no one is eligible to access their account. The banks do this by excluding all but those individuals who fully match their criteria. The consequence of permitting the wrong individual to access the account is potential liability and loss of money for the bank. Because of the risk, the goal is not to cast a wide net, but to make sure that only the right person is permitted to access the account.

DBT and Florida decided to cast a wide net in the matching process. This fact is clear from the requirements documents, various e-mails, and testimony of Ms. Thorogood, Ms. Modrow, and Mr. Bruder. (For example, see Testimony of George Bruder before U. S. Civil Rights Commission, February 16, 2001, pages 212-215.) The result of doing the matching in this way was the disenfranchisement of otherwise eligible voters. DBT and Florida should not have cast this wide net.

B. **Quality of Data Used for Matching**

The quality of the data used by DBT for matching felons was poor. It is also my opinion that dirty input leads to dirty output. This is the case with the matching

4

process performed by DBT at the direction of, and as an agent of, the State of Florida. In addition, since the dirty input caused dirty output, it was necessary for the Division of Elections and individual Supervisors of Elections to do a detailed verification involving a direct person-to-person contact with the individual on the CVF who was identified by DBT as a felon. They did not do so. In practice, an onerous and time consuming burden was placed on the individual Supervisors of Elections, and ultimately on the voters themselves both prior to and on Election Day to verify and correct the results of the DBT and Florida processing. Apparently, such person-to-person verification did not occur in most cases. (See Voting Irregularities In Florida During The 2000 Presidential Election, U.S. Civil Rights Commission Report, Chapter 5, June 2001.)

The bases of my opinion follow. I examined and performed experiments using the Felon Exception File, that is a file named "FelonReport.XLS" containing 60,197 names, found on the CD labeled "DBT-DOE_Delivery_Data" in the subdirectory "DOE_DELIVERY_DATA_03092001 \ Exception Files" as provided by DBT. I chose this file because I was told that it was the final exception file for felons that DBT delivered to the State of Florida for the year 2000 election. I was so informed in a conference call on 04/10/2002 starting at 10:00am with Chris Knowles from DBT technical support, and with Dan Restrepo, attorney for DBT. Similarly, I also used a "ClemencyReport.CSV" file with source data that had been supplied to DBT by the State of Florida. This clemency file was located in the same directory on the CD-ROM as the Felon Exception File. I examined both files, in the form of spreadsheets, and I performed various calculations and sums on these files. Some of my results are detailed in the rest of this report.

The first problem with the quality of the data used for matching was that a significant quantity of Social Security numbers was missing. The Felon Exception File provided by DBT to DOE in 2000 consisted of 60,197 individuals who were identified as

5

potential felons. This file reflected the comparison of 60,197 individuals from Florida's Central Voter File with individuals identified by DBT as felons from various sources. 34,525 of 60,197 CVF individuals found in the Felon Exception File were missing Social Security numbers. 12,135 of 60,197 individuals identified by DBT as felons in the Felon Exception File were missing Social Security numbers. In the Clemency File provided by DBT to Florida, 9,624 of 10,181 individuals identified by DBT as felons with clemency were missing Social Security numbers, and only 484 of the 10,181 individuals in the Clemency File were matched on the full 9 digits of their Social Security numbers. These facts made it impossible to use Social Security numbers as criteria for matching felons or for determining whether individuals who had been identified as felons had had their rights restored. Without reliable Social Security numbers, or similar reliable data as primary matching criteria, any matching performed will not meet Industry Standard.

A second problem with the quality of the data was that DBT manipulated the data (for example, eliminating periods, the splitting of first and middle names from the same field in the Felon Exception File, eliminating apostrophes in the names, converting nicknames and shortnames to other names, etc.) before matching the names. In the Felon Exception File, the first and middle names of felons gathered from various sources by DBT were combined together in a single field. In order to compare these felons' first names with the first names in the CVF (in which first and middle names were kept in separate fields), DBT programmers split these felons' first names into first and middle names. In the process, DBT increased the possibility that matches would occur and also increased the possibility of erroneously identifying voters as felons. I used a document produced by DBT (Bates# C03005) to determine the match categories DBT used for comparing data in the Felon Exception File and in the Clemency File. I compared the entries and totaled the numbers in each match category in these files. I found that only 19,697 of 45,587 individuals identified in the Felon Exception File as "NAM" matched-felons (defined as matches based on

6

last name, first name, and date of birth) were actually 100% matched on these bases. The names of 25,890 of these 45,587 individuals had been manipulated or changed in some manner by DBT (under the direction of the State of Florida) so as to match with only 80% of the letters in their names.

Another problem with the quality of the data used by DBT was that the electronic files contained information about individuals believed to have been convicted of felonies in States other than Florida, but did not contain any information with respect to any clemencies or restitutions of rights for the out-of-State felons. Despite receiving information in electronic formats about 60,197 individuals identified as felons from 11 States (CT, FL, IL, KY, NJ, OH, SC, TX, VA, WA, WI), information about individuals granted clemency or having been reinstated was available in electronic format only from the State of Florida. Information from the State of Florida was used to identify 10,181 ex-felons as having received clemency and therefore as being eligible to vote. This meant that, for out-of-State data, there was an electronic method of identifying "out-of-State" individuals as felons, but no corresponding electronic method of reversing the felon status of those same individuals who had been granted clemency or restitution. Every individual convicted of a felony from one of the States reporting on felonies to DBT would **always** appear as a felon without clemency on the DBT-generated Felon Exception File. In addition, assuming that all of these 10,181 individuals appeared within the 60,197 identified as felons by DBT (an assumption that has not been tested), 50,016 individuals remained identified as felons. There was no way to determine electronically which of the 50,016 individuals may have received clemency from a State other than Florida. I am informed that only approximately 60 individuals identified as felons by a State other than Florida were verified by DBT, using faxes, as having received clemency from a State other than Florida. The use of electronic felon data without corresponding clemency data does not meet Industry Standard for this matching process.

7

An additional problem with the source of the felon data was that it included the names of individuals who had only been convicted of misdemeanors and of individuals who had been convicted of felonies in States other than Florida and whose rights had been automatically restored.  (See Transcript of George Bruder Testimony Before U.S. Commission On Civil Rights, February 16, 2001, pages 211-213; Janet Modrow Deposition in NAACP v. Harris, October 22, 2001, pages 56-58; DBT e-mails (Bates# C00607-608, C00817, C00936, C00962, C01183-1185, and C06378); Marlene Thorogood Deposition in NAACP v. Harris, October 18, 2001, pages 46 and 56-60.) This data was invalid felon data.  With such invalid data on the Felon Exception File, even a 100% match on all available criteria would have resulted in erroneous identification of individuals as felons, and would have increased the probability of false positives.

## C.  Matching Methods Used

As I have previously stated, the method of matching using names, and matching names using less than 100% of the name, was not Industry Standard.  Every operation performed by DBT and Florida to "clean up" the individual names and data broadened the criteria for matching and produced more erroneous identifications and false positives.  Such operations on names included the elimination of periods, the splitting of first and middle names from the same field in the Felon Exception File, the elimination of apostrophes in the names, matching on only 80% of the letters in the names, etc.  Each time a name was altered by DBT or Florida it was made to look like another name to which it was not originally identical.  Names and other data were derived from motor vehicle data for the State of Florida and were introduced into the original CVF data for matching to the Felon Exception File.  Through this process, individuals who had been convicted of felonies in States other than Florida and who had received clemency or restitution, or even eligible voters within the State of Florida whose names (but not Social Security numbers) matched those of felons,

8

were likely to be incorrectly matched and identified as felons by DBT. The result was certain to have broadened the criteria for matching and to have produced more erroneous identifications and false positives. This is particularly the case when the Felon Exception File names were matched to only 80% and large numbers of Social Security numbers (57%) were also missing.

D. **Estimated Number of Individuals Erroneously Identified As Felons in the Year 2000 Election in Florida**

The number of persons erroneously identified as felons by DBT and Florida in the year 2000 election in Florida was over 20,000. I calculated this number by taking the number of individuals identified as felons by DBT in the Felon Exception File (60,197), subtracting the number of individuals purportedly matched on the bases of Social Security number combined with other criteria (9,278) (matching categories SSB, SSL, ESS), and subtracting the number of names that matched at 100% on the bases of full name and date of birth (19,697). (See Bates# C03005.)

E. **Verification of Individuals Identified As Felons**

Given the dirty data and overly broad match criteria, verification of the results on the Felon Exception File by way of direct person-to-person contact between State or County officials and the affected voter would have been necessary. Such a verification task would have been practically impossible. Although some Florida SOEs sent letters to DBT-identified felons for verification, it is well known in the mail and solicitation industry that response rates to mailings are low. The latter is borne out by the response rates experienced by some of the SOEs for the year 2000 election. (See U.S. Civil Rights Commission Report, Chapter 5; and Miami Dade Election Department, January 2000 Felon List, Bates# 33964.)

F. **Racial Composition of the Florida Central Voter File ("CVF") and the Final Year 2000 Felon Exception List**

9

The racial composition of the Florida Department Of Elections (DOE) Central Voter File (CVF) is significantly different from that of the file of identified so-called felons (Felons Exception File). I derived the following data from the (CVF) tblVoterRecord database of 8,117,293 individuals found on the DBT Data Tape – DOE 2000 Database tape (DLTtape III) provided to me, along with the Felon Exception File cited previously.

| Breakdown on Race | CVF | Felon Exception File |
|---|---|---|
| WHIte | 79.07% | 53.21% |
| UNKnown | 01.72% | 04.07% |
| HISpanic | 06.53% | 03.33% |
| BLAck | 10.40% | 38.46% |
| AsianPacificislanders | 00.62% | 00.22% |
| AmericanIndiAn | 00.19% | 00.31% |
| OTHer | 01.46% | 00.40% |

It is my opinion that by altering the criteria to (erroneously) increase the number of matches for the Felon Exception File, DBT and Florida significantly discriminated against black voters.

## G.  Remedies Should the Court Find for the Plaintiffs

I believe that the appropriate remedies for the erroneous results of the matching of felons to the CVF should include:

- restoration of all individuals who were identified as felons by DBT and Florida on the Felon Exception File based on out-of-State felon electronic data, with the possible exception of the approximately 60 individuals whose clemency status was purportedly independently verified by DBT, and with the possible exception of individuals whose status was independently verified by direct person-to-person contact by a State or County official.  I believe the number of individuals who were identified as felons by DBT and Florida on

10

the Felon Exception File based on out-of-State felon electronic data numbers in the thousands. There is no indication in the Felon Exception File of the source State for the felon electronic information. However, I was provided with two other files that contain identification of source States for some felon electronic information. (2,397 from Florida Department of State file "200001felons.tsv" in a CD-ROM dated 12-18-2000 and provided by Florida Department of State, and 9,074 from DBT file "Felons.TXT" in the DBT_Original_2000_Exception_List CD-ROM.) However, I am not informed as to how the information from the latter two files affected the contents of the Felon Exception File.

- restoration of all individuals erroneously identified as felons, including as described above. (See III.A. through III.D., above.) The number of individuals erroneously identified is over 20,000. (See III.D., above.)

- looking forward in time, guarantee that all data that is used to represent and match voters in Florida be validated, corrected, and verified before use. In addition, guarantee that matching criteria and methods will be primarily based on 100% matches of appropriate and reliable criteria, such as Social Security numbers. (See I.A., I.B., and I.C., above.) Verification should be performed on both the State and County levels after the matching process and should be completed well in advance of the upcoming election. Direct person-to-person contact is the preferred and most accurate method of verification. As stated above, in the absence of a highly selective and extremely accurate matching process, person-to-person verification should be required, and removal of an individual from the voter rolls for failure to respond to a mailed notice should not be acceptable. Even with the most accurate matching process, registered voters should be given an opportunity to appeal and to correct potentially erroneous information about them. Any notice sent to individual voters of their potential ineligibility should also inform the individual voters that they can cast a Provisional Ballot and that

11

they can correct erroneous information on Election Day.

- Florida should conform with U.S. Constitution, Article 4, Section 1 (Each State to give credit to the public acts, etc., of every other State), "Full faith and credit shall be given in each State to the public act, records, and judicial proceedings of every other State. And the Congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof." This means that individuals granted clemency in any State of the Union should not be required to prove their clemency for eligibility to vote in Florida.

## IV.    Data and Other Information Considered in Forming Opinions

In forming my opinions, I have also considered the following:

1. U.S. Constitution, Article 4, Section 1.
2. Amended Complaint in NAACP v. Harris, Case #01-120-CIV-GOLD/SIMONTON, July 6, 2001.
3. Deposition of George Bruder, by U.S. Commission On Civil Rights, March 21, 2001.
4. Data Processing Services Agreements (between DBT and the Division Of Elections), November 1998 and December 1999.
5. DBT Requirements Document, January 20, 2000 (Bates# C02552-C02598).
6. Memos from the DOE to County SOEs, August 1998 and October through November 1999.
7. E-mails produced by DBT containing internal DBT communications, and communications between DBT and DOE and various County SOEs (throughout Bates# C00001 and C08008).

## V.    Exhibits

Exhibit 1 is the CD-ROM enclosed and labeled "Klausner Exhibit 1" containing a

12

spreadsheet with compared entries and number totals in various columns and match categories of the Felon Exception File.

Exhibit 4 is a printout of a spreadsheet showing the breakdown by race and by Florida County using the data from the Florida CVF.

## VI.    Compensation

I am being compensated $200 per hour for my work in connection with this litigation.

## VII.    Expert Testimony Given in Last Four Years, and Current Resume

Attached as Exhibits 2 and 3 are Expert Testimony I have provided in the past four years, and my current Resume.

Date:    April 26, 2002

David Klausner

## LITIGATION TESTIMONY EXPERIENCE of David Klausner

2000 - Designated as testimonial expert for plaintiff in Globetrotter v. Elan for Irell & Manella in Los Angeles, CA, in a patent infringement case. Testified at deposition. Matter ongoing.

2000 - Designated as testimonial expert for plaintiff in ABB v. Alstom for Orrick Herrington in Menlo Park, CA, in a theft of trade secrets case. Testified at deposition. Matter ongoing.

2000 - Designated as testimonial expert for plaintiff in Konrad v. GM, et. Al. for Zelle, Hoffman, Voelbel & Gette in Dallas, TX, in a patent infringement case. Testified at deposition. Matter ongoing.

2000 - Designated as testimonial expert for plaintiff in ATD v. Ceridian for William Hanley in Irvine, CA, in a breach of contract case. Testified at deposition. Matter settled before trial.

2000 - Designated as testimonial expert for plaintiff in BAX v. CA for Payne & Fears in Irvine, CA, in a breach of contract case. Testified at deposition. Matter settled before trial.

2000 - Designated as testimonial expert for plaintiff in Budgetel v. Micros/Fidelio for Spolin & Silverman in Santa Monica, CA, in a breach of contract case. Testified at deposition. Matter ongoing.

2000 - Designated as testimonial expert for plaintiff in Guzik Technical Enterprises v. KMY Instruments for Ruby & Schofield in San Jose, CA, in a trade secret theft case. Testified at deposition. Matter settled before trial.

1999 - Designated as testimonial expert for plaintiff in Tumbleweed v. docSpace for Skadden Arps in Palo Alto, CA, in a patent infringement case. Testified at deposition and Markman hearing for Claims Construction. Plaintiff prevailed at Markman hearing. Matter ongoing.

1999 - Designated as testimonial expert for plaintiff in Tradescape v. Shivaram for Orrick Herrington in New York, NY, in a theft of trade secrets case. Testified at deposition. Matter ongoing.

1999 - Designated as testimonial expert for plaintiff in Dynacs Engineering v. Juno Pix for Lentz & Fair in Palm Harbor, FL, in a breach of contract case. Testified at deposition and at arbitration. Matter settled before trial.

1999 - Designated as testimonial expert for defense in DemCo v. Public Storage for Kendig & Ross in Los Angeles, CA, in a breach of contract case. Testified at deposition. Matter settled before trial.

KLAUSNER EXH. 2

PAGE 1

**Resume of David Klausner**

**David Klausner (david@klausner.com)**
218 Sylvan Way
Redwood City, CA 94062-3953
tel: (650) 367-9138
fax: (650) 367-9139

## SUMMARY OF SKILLS

Over 34 years of software development, consulting, and expert testimony experience in all aspects of the computer field, from micros to mainframes, and in all areas of programming. Experience as an engineer, developer, supervisor, project manager, department manager, middle manager, and company executive.

### Operating Systems Experience

MS-Windows 2000, MS-WinNT, MS-Win95, MS-Windows, MS/DOS, PC/DOS, UNIX, Solaris, MVS, VM, TSO, RTE, JES2, DOS/VSE, WYLBUR, XT/370, RTOS, VMS, and system generations (SYSGENs).

### Hardware

IBM PCs/Mainframes and compatibles. Peripherals. Workstations (IBM, Apollo, HP, Sun), RS-6000, HP 1000, HP 2100, HP 150, DEC PDP, IBM 8100, IBM S/23, more.

### Software Applications, Packages and Libraries

EDI, Networks, FoxBase, Clipper, 4-GL, X-Windows X11R4 and 3, MOTIF, IMAGE, FrameMaker, PARADOX, DBASE (all), Q&A, LOTUS-123, MS-Office, Quattro, SAS, VSAM, ISPF, KEDIT, XEDIT, VTAM, Revelation, Knowledgeman, WordStar, and more.

### Software Development

Large and small applications for businesses, data management, database design, client/server, 3-tier, compilers and programming languages, user interfaces, quality assurance, real-time applications, artificial intelligence, utility programs, diagnostics, machine simulators, performance analyzers, EDI applications, general ledger, inventory control, software auditing, manufacturing process, insurance, financial, and statistical process control.

### Languages

C, C++, Java, Assembler, COBOL, FORTRAN, BASIC, PL/I, PLS, REXX, EXEC2, JCL, Prolog.

## EDUCATION:

M.S.E.E. Polytechnic Institute of Brooklyn, N.Y., 1974
B.A. Mathematics Brooklyn College, N.Y. 1968

KLAUSNER EXH. 3

## FRAME TECHNOLOGY, Milpitas, CA
01/90 - 03/90 -- Consultant

Tested the latest X-windows versions of the FrameMaker document production system on various platforms and X-terminals. Suggested user interface changes for usability and readability for various X-Windows environments (MWM, HPWM, TWM, UWM).

## AMDAHL CORPORATION, Sunnyvale, CA
06/89 - 11/89 Diagnostics/Macrocode Test

Developed, modified/created tools and tests for the Macrocode of Amdahl mainframes. Results validated test coverage of Macrocode through monitoring and mapping of Macrocode execution. Scheduling and tracking tests and diagnostics. Sparse matrix compression.

02/87 - 06/89 Diagnostic Development

Responsible for development of over 40 tests, tools, and diagnostics under Amdahl UNIX (UTS) and other operating systems. These included emulators, system-to-system communication links, simulators, system-level diagnostics, etc.

## HEWLETT-PACKARD, Cupertino, CA
07/86 - 02/87 -- Consultant

Planned and implemented tests of a new version of the HP-1000 Operating System, RTE-A. Wrote many tests in Assembler and Fortran to confirm proper system function and return values.

## HARRISON and EAKIN, Inc., San Mateo, CA
07/86 - 09/86 -- Consultant

Expert witness for analysis of the BIOSs of PC/286-type machines for a large manufacturer and retailer with respect to BIOS producer. Results confirmed original authorship of producer work product for purposes of copyright and patent infringement protection.

## LOBOB LABORATORIES, San Jose, CA
05/85 - 09/85 -- Consultant

Modified IBM's general Ledger/accounting software in BASIC on the System/23.

## PLUS DEVELOPMENT CORPORATION, Milpitas, CA
08/84 - 07/86 -- Diagnostics, Software Development and Manufacturing Test

Produced the hard disk drive product -- HardCard. Established requirements and project-managed the diagnostics, test equipment hardware and software development for use in-house and on the manufacturing line at Matsushita in Japan. This included software to interface to, and track, the manufacturing process. RLL technology. Responsible for compatibility testing company products on a wide variety of IBM-PCs and compatibles, including the HP Vectra. Worked with European distributors as Technical Representative for marketing and technical issues. Familiar with Japanese and several European languages and marketplaces.

KLAUSNER EXH. 4

| County/WHI | Percentage of County | UNK | Percentage of County | HIS | Percentage of County | BLA | Percentage Total of County | ASP | Percentage AA Total of County | AA | Percentage of County | UIH | Percentage Total of County | Percentage of County | Percentage Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALA | 80.54% | 2259 | 2.61% | 1290 | 1.49% | 12469 | 14.39% | 649 | 0.75% | 188 | 0.22% | | 0.00% | 0.00% | |
| BAK | 87.73% | 190 | 1.70% | 26 | 0.23% | 1109 | 9.94% | 31 | 0.28% | 31 | 0.28% | | 0.00% | 0.00% | |
| BAY | 88.55% | | 0.94% | 547 | 0.63% | 6967 | 8.08% | 625 | 0.72% | 347 | 0.40% | 1381 | 0.00% | 0.00% | |
| BRA | 84.68% | 175 | 1.30% | 49 | 0.37% | 1791 | 13.41% | 15 | 0.11% | 10 | 0.08% | | 0.00% | 0.00% | |
| BRE | 87.25% | 2581 | 2.64% | 3246 | 3.32% | 5290 | 5.42% | 1503 | 1.37% | 1248 | 0.82% | 8596 | 1.08% | 0.11% | |
| BRO | 77.41% | 15571 | 1.87% | 458112 | 5.51% | 111455 | 13.41% | 6821 | 0.82% | 1248 | 0.15% | 8596 | 1.08% | 0.11% | |
| CAL | 88.00% | 21 | 0.00% | 694 | 0.32% | | 0.55% | | 1.37% | 49 | 0.75% | 430 | 0.47% | 0.15% | |
| CHA | 92.79% | 2236 | 2.43% | 957 | 1.04% | 2467 | 2.68% | 400 | 0.43% | 144 | 0.16% | | 0.00% | 0.00% | |
| CIT | 94.90% | 1651 | 2.16% | 1240 | 0.71% | 1240 | 1.62% | 254 | 0.33% | 189 | 0.25% | | 0.00% | 0.00% | |
| CLA | 90.18% | 1580 | 2.01% | 1106 | 1.41% | 3841 | 4.88% | 393 | 0.50% | 158 | 0.20% | 30 | 0.03% | 0.01% | |
| CLL | 81.94% | 1903 | 1.75% | 4792 | 4.43% | 1723 | 1.60% | 347 | 0.32% | 160 | 0.14% | | 0.00% | 0.00% | |
| DAD | 33.09% | 18050 | 2.94% | 312987 | 43.46% | 142215 | 19.75% | 4375 | 0.61% | 645 | 0.09% | 3632 | 0.04% | |
| DES | 70.58% | | 2.51% | 235 | 0.82% | 2514 | 34.34% | | 0.18% | 101 | 0.35% | | 0.07% | |
| DIX | 95.39% | 100 | 1.17% | 45 | 0.53% | 209 | 2.45% | | 0.09% | 11 | 0.13% | | 0.01% | |
| DUV | 71.02% | 8963 | 2.65% | 979 | 1.53% | 104281 | 23.98% | 5282 | 1.21% | 652 | 0.20% | 785 | 0.05% | |
| ESC | 79.16% | 2963 | 1.75% | 1188 | 0.65% | 28371 | 15.67% | 1317 | 0.73% | 333 | 0.14% | | 0.01% | |
| FLA | 89.31% | 645 | 1.28% | 626 | 3.47% | 3329 | 6.59% | 268 | 0.31% | 173 | 1.12% | | 0.05% | |
| FRA | 87.36% | | 1.05% | | 7.70% | 2660 | 7.82% | 44 | 0.27% | | 4.74% | | 0.07% | |
| GAD | 52.93% | 134 | 0.13% | | 0.55% | 13342 | 43.46% | 45 | 0.16% | 37 | 0.15% | | 0.04% | |
| GIL | 95.39% | 100 | 1.17% | 45 | 0.53% | 209 | 2.45% | 12 | 0.09% | 14 | 0.14% | 10 | 0.01% | |
| GLA | 86.18% | 27 | 1.36% | 19 | 0.91% | 1231 | 13.06% | 297 | 0.24% | 183 | 0.15% | | 0.01% | |
| GUL | 85.39% | 969 | 0.29% | | 0.20% | | 5.55% | | 0.33% | 652 | 0.20% | 7865 | 4.74% | |
| HAM | 66.70% | | 3.80% | 337 | 0.55% | 2158 | 32.30% | 12 | 0.08% | 404 | 0.23% | 16 | 0.05% | |
| HAR | 86.86% | 86 | 2.05% | 979 | 1.99% | | 5.44% | 641 | 0.50% | 297 | 0.22% | | 0.05% | |
| HEN | 92.91% | 433 | 1.75% | 1188 | 2.91% | 2015 | 6.78% | 173 | 0.31% | 173 | 1.12% | 1784 | 1.95% | |
| HER | 92.31% | | 1.05% | 1596 | 7.70% | 2660 | 7.82% | 268 | 0.31% | | 0.19% | 367 | 0.73% | |
| HIG | 73.30% | 645 | 1.28% | 1755 | 3.47% | 3329 | 6.59% | 268 | 0.31% | | 0.19% | 607 | 0.73% | |
| HIL | 67.80% | 6555 | 1.41% | 24373 | 5.25% | 53284 | 11.48% | 3367 | 0.73% | 784 | 0.17% | 4229 | 0.91% | |
| HOL | 86.69% | 26 | 0.23% | 19 | 0.20% | | 1.74% | | 0.18% | | 0.17% | | 0.05% | |
| IND | 80.05% | 1290 | 1.50% | | 0.44% | 3964 | 7.91% | 130 | 0.13% | | 0.34% | 45 | 1.07% | |
| JAC | 76.42% | | 0.52% | 783 | 0.48% | 10774 | 21.53% | 44 | 0.19% | 84 | 0.13% | 333 | 1.35% | |
| JEF | 64.15% | 118 | 0.36% | | 0.55% | 5529 | 34.37% | 13 | 0.07% | 84 | 0.34% | | 0.07% | |
| LAF | 93.22% | 45 | 1.17% | 17 | 0.23% | 250 | 6.52% | | 0.03% | 13 | 0.18% | 10 | 0.14% | |
| LAK | 88.59% | 969 | 0.91% | | 1.16% | 6639 | 5.55% | 297 | 0.24% | 852 | 0.20% | | 0.01% | |
| LEE | 88.34% | 222 | 1.35% | 543 | 3.31% | 3794 | 5.44% | 656 | 0.50% | 464 | 0.22% | 3665 | 2.92% | |
| LEO | 66.70% | 66 | 2.18% | 4883 | 1.99% | 30699 | 22.98% | 999 | 0.37% | 251 | 0.05% | | 0.05% | |
| LEV | 91.46% | 5383 | 2.77% | | 0.07% | | 6.78% | 44 | 0.27% | 173 | 0.22% | 3665 | 2.92% | |
| LIB | 89.72% | | 0.04% | 149 | 0.78% | 1118 | 13.07% | 268 | 0.31% | | 0.19% | 174 | 0.21% | |
| MAD | 63.41% | 254 | 2.64% | | 0.42% | 3200 | 33.13% | 550 | 0.41% | 172 | 0.16% | | 0.00% | |
| MAN | 91.76% | 1892 | 1.81% | 2230 | 1.39% | 8234 | 5.13% | | 0.04% | | 0.19% | 259 | 0.16% | |
| MON | 88.81% | 2040 | 1.18% | 1755 | 3.47% | 3329 | 6.59% | 268 | 0.31% | | 0.19% | | 0.10% | |
| NAS | 95.89% | 434 | 0.52% | | 0.25% | 2048 | 6.75% | | 0.20% | 219 | 0.13% | 10 | 0.01% | |
| OKA | 88.59% | 1541 | 1.47% | 1149 | 1.08% | 6934 | 6.53% | 1421 | 1.34% | 342 | 0.32% | 711 | 0.71% | |
| OKE | 80.34% | | 1.16% | 543 | 3.31% | | 5.44% | 80 | 0.49% | | 0.08% | | 0.01% | |
| ORA | 72.69% | 2508 | 2.18% | 15582 | 18.79% | 43390 | 11.36% | 998 | 1.20% | 251 | 0.05% | 1084 | 1.10% | |
| OSC | 72.43% | 2808 | 2.62% | 12235 | 2.53% | | 4.58% | 539 | 0.30% | | 0.22% | 174 | 0.21% | |
| PAL | 86.58% | 4304 | 1.96% | 3344 | 1.81% | 51526 | 13.98% | 663 | 0.32% | 539 | 0.25% | 172 | 0.03% | |
| PAS | 94.37% | 5578 | 2.42% | 7866 | 1.61% | 2878 | 1.38% | | 0.32% | | 0.30% | | 0.03% | |
| PIN | 90.31% | 5472 | 0.96% | 5425 | 1.36% | 30685 | 6.33% | 1488 | 0.75% | 426 | 0.17% | 177 | 0.02% | |
| POL | 84.39% | | 2.17% | | 2.15% | 27210 | 10.80% | 795 | 0.34% | | 0.17% | 278 | 0.03% | |
| PUT | 82.73% | 1024 | 2.62% | 3752 | 0.87% | 4685 | 2.94% | 488 | 0.69% | 242 | 0.13% | 11 | 0.39% | |
| SAN | 80.50% | 2608 | 1.25% | 1143 | 0.55% | 5480 | 2.62% | 653 | 0.31% | 275 | 0.13% | 1294 | 0.71% | |
| SAR | 95.14% | 5169 | 2.85% | 8830 | 4.88% | 12409 | 6.85% | 1396 | 0.77% | 468 | 0.26% | 82800 | 100.00% | |
| SEM | 87.29% | | 1.87% | | 2.45% | | 2.34% | | 0.32% | | 0.13% | | 1.02% | |
| STJ | 0.00% | 312 | 0.25% | 2247 | 1.84% | 13461 | 2.94% | | 0.17% | 215 | 0.05% | 1348 | 1.10% | |
| STL | 82.28% | | 2.26% | | 0.03% | 2024 | 4.97% | 242 | 0.17% | | 0.08% | 22 | 0.03% | |
| SUM | 88.57% | 437 | 2.26% | | 0.39% | | 10.53% | 19 | 0.10% | 26 | 0.13% | 1084 | 0.21% | |
| SUW | 83.68% | 84 | 0.70% | 76 | 0.20% | 1724 | 14.34% | 27 | 0.22% | 94 | 0.78% | | 0.13% | |
| TAY | 0.00% | 27 | 0.44% | 23 | 0.38% | 737 | 12.13% | | 0.12% | 509 | 0.06% | 271 | 0.05% | |
| UNI | 86.85% | 4794 | 1.98% | 5310 | 2.19% | 16918 | 6.98% | 720 | 0.30% | | 0.21% | | 0.11% | |
| VOL | 84.24% | 14 | 0.14% | 44 | 0.35% | 1072 | 8.84% | 26 | 0.21% | | 0.14% | 93 | 0.31% | |
| WAK | 90.44% | 11221 | 0.11% | | 0.00% | 5480 | 6.85% | 653 | 0.31% | 242 | 0.13% | | 0.01% | |
| WAL | 88.24% | 27 | 0.06% | 23 | 0.38% | 737 | 2.54% | | 0.12% | 509 | 0.06% | | 0.30% | |
| WAS | 86.22% | 416 | 0.14% | 51 | 0.38% | 1489 | 11.14% | 8 | 0.05% | 72 | 0.54% | | 0.00% | |
| TOT | 64118209 | | 79.07% | 139770 | 1.72% | 529682 | 6.53% | 844429 | 10.40% | 50683 | 0.62% | 15731 | 0.19% | 116655 | 1.45% |

| IND | Percentage of County | Percentage of Total of County 8117293 | IAI | Percentage of County | Percentage of Total of County 8117293 | County TOTAL 8117293 |
|---|---|---|---|---|---|---|
| | 0.00% | | | | 0.00% | 86824 |
| | 0.00% | | | | 0.00% | 11153 |
| | 0.00% | | | | 0.00% | 86233 |
| | 0.00% | | | | 0.00% | 13420 |
| | 0.00% | | | | 0.00% | 290035 |
| | 0.00% | | | | 0.00% | 830835 |
| | 0.00% | | | | 0.00% | 6515 |
| | 0.00% | | | | 0.00% | 91955 |
| | 0.00% | | | | 0.00% | 78448 |
| | 0.00% | | | | 0.00% | 78712 |
| | 0.00% | | | | 0.00% | 11513 |
| | 0.00% | | | | 0.00% | 28552 |
| | 0.00% | | | | 0.00% | 720172 |
| | 0.00% | | | | 0.00% | 10021 |
| | 0.00% | | | | 0.00% | 434865 |
| | 0.00% | | | | 0.00% | 169531 |
| | 0.00% | | | | 0.00% | 30539 |
| | 0.00% | | | | 0.00% | 7152 |
| | 0.00% | | | | 0.00% | 24551 |
| | 0.36% | | | | 0.00% | 8521 |
| | 0.00% | | | | 0.00% | 9425 |
| | 0.00% | | | | 0.00% | 5691 |
| | 0.00% | | 5 | | 0.00% | 517 |
| | 0.00% | | | | 0.00% | 15421 |
| | 0.00% | | | | 0.00% | 91384 |
| | 0.00% | | | | 0.00% | 50513 |
| | 0.00% | | | | 0.00% | 464121 |
| | 0.00% | | | | 0.00% | 9640 |
| | 0.00% | | | | 0.00% | 6567 |
| | 0.00% | | | | 0.00% | 24685 |
| | 0.00% | | | | 0.00% | 7314 |
| | 0.00% | | | | 0.00% | 3836 |
| | 0.00% | | | | 0.00% | 119623 |
| | 0.00% | | | | 0.00% | 245761 |
| | 0.00% | | | | 0.00% | 132304 |
| | 0.00% | | | | 0.00% | 16487 |
| | 0.00% | | | | 0.00% | 3442 |
| | 0.00% | | | | 0.00% | 9610 |
| | 0.00% | | | | 0.00% | 160371 |
| | 0.00% | | | | 0.00% | 48039 |
| | 0.00% | | | | 0.00% | 156056 |
| | 0.00% | | | | 0.00% | 82844 |
| | 0.00% | | | | 0.00% | 30362 |
| | 0.00% | | | | 0.00% | 106185 |
| | 0.00% | | | | 0.00% | 16424 |
| | 0.00% | | | | 0.00% | 382365 |
| | 0.00% | | | | 0.00% | 82618 |
| | 0.00% | | | | 0.00% | 625799 |
| | 0.00% | | | | 0.00% | 208319 |
| | 0.00% | | | | 0.00% | 579568 |
| | 0.00% | | | | 0.00% | 250212 |
| | 0.00% | | | | 0.00% | 309931 |
| | 0.00% | | | | 0.00% | 70686 |
| | 0.00% | | | | 0.00% | 27940 |
| | 0.00% | | | | 0.00% | 16956 |
| | 0.00% | | | | 0.00% | 12019 |
| | 0.00% | | | | 0.00% | 242518 |
| | 0.00% | | | | 0.00% | 82800 |
| | 0.00% | | | | 0.00% | 181082 |
| | 0.00% | | | | 0.00% | 259342 |
| | 0.00% | | | | 0.00% | 122386 |
| | 0.00% | | | | 0.00% | 6074 |
| | 0.00% | | | | 0.00% | 12407 |
| | 0.00% | | | | 0.00% | 27430 |
| | 0.00% | | | | 0.00% | 13372 |

| 31 | 0.00% | 8117293 | 5 | 0.00% | 8117293 | CHECKSUM 8117293 |

# PLAINTIFFS' EXHIBIT 61

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 01-0120-CIV-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE, INC. by its FLORIDA STATE CONFERENCES OF BRANCHES,
JIMMIE PANNELL, JULIA STONER, NATALIE CARNEGIE, JOHN L.
CHEEVER, JAMES MARSHALL, LILLIE Q. ODOM, WILLIE STEEN,
WALLACE MCDONALD, JERMAINE TERRY, LORINE WALDEN, EMERY
TIMBERLAKE, VALERIE BUFORD, MICHELLE FLOYD, CONSUELO MARIA
GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA CLARK, JANICE
KELLY, PLACIDE DOSSUS and RONDRICK ROSE, URSULA HARVEY, and
AMATHA ISRAEL in their own right and as representatives of all similarly situated
citizens and residents of the State of Florida,

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY ROBERTS, Director of
the Florida Division of Elections; FRED DICKINSON, Executive Director of the
Florida Department of Highway Safety and Motor Vehicles: KATHLEEN A.
KEARNEY, Secretary of the Department of Children and Families; DAVID C.
LEAHY, Miami-Dade County Election Supervisor, MIRIAM OLIPHANT, Broward
County Election Supervisor, JOHN STAFFORD, Duval County Election Supervisor,
PAM IORIO, Hillsborough County Election Supervisor, ION SANCHO, Leon
County Election Supervisor, WILLIAM COWLES, Orange County Election
Supervisor, and DEANIE LOWE, Volusia County Election Supervisor (all in their
official capacities); and CHOICEPOINT , INC., a Georgia corporation d/b/a
DATABASE TECHNOLOGIES INC.,

Defendants.

**Expert Report
of
Dr. Henry Flores**

## Introduction

1.  My name is Henry Flores. I am a Full Professor with Tenure in the

Department of Political Science at St. Mary's University in San Antonio, Texas. I

teach and conduct research in Voting Rights, Campaigns and Elections, and Research

Methods and Statistics at both the graduate and undergraduate levels. Currently, I

1

also direct the Graduate Program in Public Administration. I have been employed at St. Mary's for 19 years and have testified as an expert witness in racially polarized elections and racial discrimination law suits since 1986 in federal courts. Attached is a copy of my résumé for the court's edification as Exhibit 10.

2. I have been retained by the Lawyers' Committee for Civil Rights Under Law, the National Association for the Advancement of Colored People (NAACP), the NAACP Legal Defense and Educational Fund, the American Civil Liberties Union, People for the American Way Foundation, the Advancement Project, and Williams and Associates, P.A. in the above cited case as a statistical consultant as per the rule of Fed. R. Civ. P. 26(a)(2)(B).

**Object of Report**

3. I was asked to investigate and report on the following:

a. Whether there is a relationship between the percentage of inactive voters and the percentage of African American Registered Voters on a precinct-level basis in the defendant counties and the State of Florida as a whole;

b. Whether there is a relationship between the percentage of "affirmation/affidavit applications" and the percentage of African American Registered Voters on a precinct-level in the defendant counties and the State of Florida as a whole;

c. Whether there is a relationship between the percentage of purged voters by race and the percentage of those racial groups in the defendant counties and the State of Florida as a whole; and

d. Whether there is a relationship between the percentage of poll workers assigned on a per precinct basis and the percentage of African American Registered Voters in those precincts in the defendant counties and the State of Florida as a whole.

4. After due analyses I reached the following conclusions:

a. There is a statistically significant and positive relationship between the percentage of African American Registered Voters and the percentage of individuals identified as "inactive voters" on a precinct-level in Miami-Dade County. Given the history of racial discrimination throughout the State of Florida generally

2

toward African Americans and given that the defendant counties share similar racial population percentages as Miami-Dade I surmise that similar statistical findings may exist in the defendant counties and in the state as a whole.  If this is the case then an additional burden is placed on the shoulders of African Americans to verify their registration every time they cast a ballot.  The burden becomes even heavier in those counties that do not maintain lists of inactive voters at the polls which is the case in Alachua, Charlotte, Desoto, Hernando, Martin, and Union Counties.

b.  There is a statistically significant and positive relationship between the percentage of African American Registered Voters and the percentage of individuals signing "affirmation/affidavits" in Hillsborough County during the 2000 General Election.  Given the history of racial discrimination throughout the State of Florida generally toward African Americans and given that the defendant counties share similar racial population percentages as Hillsborough County I surmise that similar statistical findings may exist in the defendant counties and in the state as a whole.  This contention is born out additionally by the data from Orange County where I found that the percentage of African Americans signing affirmation/affidavits during the 2000 General Election was higher than the proportion of African Americans residing in the county.

c.  The percentage of voters purged from the registered voting roles in both Duval (1999 and 2000) and Hillsborough (2000) Counties by race and whether or not they were purged because the individuals were identified as felons was compared to the percentage of African Americans by race in those counties.  I concluded that the percentage of individuals identified as African Americans and felons purged from the voter registration lists in both Duval and Hillsborough Counties was higher than the percentage of African Americans residing in both counties.  In short, individuals purged for reasons of being identified as felons and African Americans were overrepresented amongst all voters purged in comparison to their population percentage in both counties.

d.  In Broward, Hillsborough, and Pinellas Counties a statistically significant and negative relationship was found between the percentage of African American Registered Voters and the percentage of poll workers assigned to

3

the precincts having higher percentages of African American Registered Voters. Additionally, data provided by Broward County indicated that it was most likely, in over 80% of the cases, that laptops to verify voter registrations were supplied to those precincts having higher percentages of NonHispanic White Registered Voters than to those having higher percentages of African American Registered Voters. There was no statistically significant relationship found between these two variables in Miami-Dade County.

      e.  A thorough and complete analysis of each of the above relationships mentioned in paragraphs 4(a) through 4(d) above was not completed because each of the defendant counties did not make available or made available in an unusable format the necessary data. Nevertheless, the overwhelming preponderance of findings in each of the categories leads me to conclude that similar results would be forthcoming for each of the defendant counties if the data had been available. Additionally, given the long history of discrimination that African Americans have experienced in the State of Florida, I also surmise that similar patterns can be found throughout the state as a whole.

      f.  My final conclusion is that African Americans are overrepresented on inactive voting lists, overrepresented in submissions of affirmation affidavits, overrepresented among the voters purged because they are identified as felons and are underserved at the polls. Taking each and every one of these issues and in conjunction with one another only leads me to conclude that, in "the totality of their circumstances," they deny African Americans an equal opportunity to participate in the electoral processes in the defendant counties specifically and throughout the State of Florida generally.

    5. My above opinion, expressed in 4(a) through 4(f) is based upon a review of the following documents and datasets and analyses of various datasets that were constructed from the following documents and datasets.

>  ➤  *NAACP, Inc, et al v Katherine Harris, Secretary, et al,* CO. 01-0120-CIV-GOLD/SIMONTON, Feb. 14, 2002. (2[nd] Amended Complaint)

>  ➤  Jason Schacter. 2001. "Geographical Mobility: Population Characteristics, March 1999 to March 2000." <u>Current Population Reports.</u>

4

USCENSUSBUREAU, U.S. Department of Commerce, Economics and Statistics Administration. Washington, D.C.

➢ David Lublin and D. Stephen Voss. 2001. "Federal Elections Project." American University, Washington, D.C. and University of Kentucky, Lexington, KY.

➢ Richard L. Forstall. "Population by Counties by Decennial Census: 1900 – 1990, Florida." Population Division, U.S. Bureau of the Census, Washington, D.C.

➢ "Population 1999, 2000." Florida Vital Statistics Annual Report.

➢ "Affirmation Summary for the 2000 General Election." Hillsborough County.

➢ "Registered Voter List : 2000 General Election." Miami-Dade County.

➢ Kurt Schlicting, Peter Tuckel, and Richard Maisel. 1998. "Racial Segregation and Voter Turnout in Urban America." American Politics Quarterly. Vol. 26, No. 2.

➢ FREDS 2000. Florida Redistricting System. Office of Economic and Demographic Research. Senate, State of Florida.

➢ "Response to Interrogatory # 39 From Defendant, William Cowles: Affirmation/Affidavit From the Primary and General Elections of 2000."

➢ "Count of Poll Workers For Broward, Miami-Dade, and Pinellas Counties for the 2000 General Elections."

➢ Raymond E. Wolfinger and Steven J. Rosenstone, Who Votes?, (New Haven, CN: Yale University Press, 1980).

➢ G. Bingham Powell, "American Turnout in Comparative Perspective," American Political Science Review, 80(March, 1986): 17-43.

➢ Ruy Teixeira, The Disappearing American Voter, (Washington, DC: Brookings, 1992).

6. My conclusions are based upon the following analyses:

    a. To derive the statistically significant relationship between the percentage of African American Registered Voters and the percentage of inactive voters in each voting precinct in Miami-Dade County I constructed a

5

database derived from FREDS 2000 which is the demographic database the State of Florida utilized in their redistricting process and the list of inactive voters provided by Miami-Dade County. A precinct-by-precinct percentage of African American Registered Voters was extracted from the FREDS 2000 database and this was entered in a bivariate regression equation as the independent variable and the percentage of inactive voters per precinct was entered as the dependent variable. These data were then submitted to analysis by SPSS, v. 10 (The Statistical Package for the Social Sciences, version 10) which is the traditional statistical software package utilized in most social science research and is also the software the federal courts have recognized for use in voting rights cases. The relationship between the two variables was found to be statistically significant at the **.008** level and the relationship was positive. (The regression technique is explicated at Appendix A of this report.) In other words, in those voting precincts of Miami-Dade County where there were a high percentage of African American Registered Voters one also found a high percentage of inactive voters. And, there are only **eight chances out of 1000** where this pattern could possibly be explained as occurring due to pure chance. Therefore, having high percentages of inactive voters residing in those precincts having high percentages of African American Registered Voters is the norm in Miami-Dade County. The results of this statistical analysis are attached as Exhibit 1.

b. To derive the statistically significant relationship between the percentage of African American Registered Voters and the percentage of affirmation/ affidavits in each voting precinct in Hillsborough County I constructed a database derived from FREDS 2000 and the list of affirmations/affidavits for the General Election of 2000 provided by Hillsborough County. A precinct-by-precinct percentage of African American Registered Voters was extracted from the FREDS 2000 database and this was entered in a bivariate regression equation as the independent variable and the percentage of affirmations/affidavits per precinct was entered as the independent variable. These data were then submitted to analysis by SPSS, v. 10 (The Statistical Package for the Social Sciences, version 10). The relationship between the two variables was found to be statistically significant at the **.006** level and was positive. In other words, in those voting precincts of Hillsborough

6

County where there were a high percentage of African American Registered Voters one also finds a high percentage of affirmations/affidavits submitted during the General Election of 2000. And, there are only **six chances out of 1000** where this pattern could possibly be explained as occurring due to pure chance. Therefore, having high percentages of affirmations/affidavits submitted in those precincts having high percentages of African American Registered Voters is the norm in Hillsborough County. The statistical results of this analysis are attached as Exhibit 2.

c.   To reach the conclusion that the percentage of individuals identified as African Americans and felons purged from the voter registration lists in both Duval and Hillsborough Counties was higher than the percentage of African Americans residing in both counties was based upon a comparison of percentages of those purged voters supplied by both counties and simply compared against the percentage of African Americans residing in those counties as reported by the United States Bureau of the Census. The resulting comparison found that for Duval County in 1999 57.5% of purged felons were identified as African American while only 36.5% of purged felons were identified as white. The corresponding percentages for 2000 were 62.8% for African Americans and 32.1% for white. The percentage of African Americans residing in Duval County as of the 2000 census was reported at 27.8% while that of whites was 63.5%. One can easily discern that the percentage of purged felons over the two year period identified as African American was twice the percentage of African Americans residing in Duval County.

The same analysis was performed on similar data for Hillsborough County for the year 2000 (these were the only data available) and patterns similar to those found in Duval County resulted. Of those individuals purged for being felons 41.9% were identified as African American while 47% were identified as white. This compares to 15% of the Hillsborough County population identifying as African American and 63.3% as white. One can easily observe that the percentage of those identified as felons and African Americans who were purged was almost three times higher than the African American percentage of Hillsborough's population. Data for these analyses appear as Exhibit 3.

d.   In reaching the conclusion that in Broward,

7

Hillsborough and Pinellas Counties a statistically significant and negative relationship was found between the percentage of African American Registered Voters and the percentage of poll workers assigned to the precincts having higher percentages of African American Registered Voters, I utilized the percentage of individuals assigned as poll workers in each precinct in both counties as the dependent variable and the percentage of African American Registered Voters in each precinct as the independent variable. The data for the African American Registered Voters was derived from the FREDS 2000 database. These data were then subjected to a bivariate regression analysis using SPSS, v. 10. The relationship between the two variables for Broward County were statistically significant at the **.022**, the same relationship in Hillsborough County was statistically significant at the **.096** level, and the relationship between the two variables for Pinellas County were found to be statistically significant at the **.000** level. The relationships in all three counties were negative. This led me to conclude that in those precincts having higher percentages of African American Registered Voters one found lower percentages of poll workers. There was no statistically significant relationship found between the same two variables in Miami-Dade County. The statistical findings of the regression analyses appear as Exhibits 4 and 5.

      7. The final social characteristic that must be superimposed over all of the above electoral structural factors that tend to act in their totality to deny of African Americans the equal opportunity to participate in the electoral process is the fact that this racial group tends to have a higher propensity of populating the ranks of renters, as opposed to homeowners, than other racial groups in the defendant counties. This makes the mobility of African Americans a major cause as to why they tend to populate the lists of inactive voters and are required to complete affirmation affidavits on election days. Data in Exhibit 8 also underline this contention in that African Americans moved more often than nonwhites in Florida since 1995. Essentially, renting and frequent mobility make it extremely burdensome for African Americans to maintain consistently their voter registration status. A long line of political science research in the most learned journals of the discipline and various books have concluded that the single most prohibitive barrier to the exercise

8

of the franchise is the voter registration process (Wolfinger and Rosenstone, 1980; Powell, 1986; and, Texixeira, 1992). However, if the mobility of the voter causes the voter to constantly reregister then it places a heavier burden on this voter to cast a ballot. What I found in the defendant counties was that the higher the percentage of African American voters per precinct the higher the percentage of renters. These data can be found at Exhibits 6, 7, and 8.

8. I expect to supplement this report as data becomes available, at a later date, from the defendant counties and the State of Florida. Nevertheless, I do not expect to change my opinion as I have stated it in this report due to the consistent patterns evidenced in the analyses already performed.

9. I have signed a compensation agreement with The Lawyers' Committee for Civil Rights Under the Law where they agreed to retain my services as an expert witness for $1,500 and pay me $125.00 per hour.

Respectfully submitted by:

Henry Flores, Ph.D.
Consultant

o

## APPENDIX A

### Research Methodology

**Introduction**

The research underlying the above report included both the compilation of simple descriptive statistics and the derivation probability estimates. The methodology possessed three stages or phases. The data gathering, database construction, and analyses phases.

**Data Gathering**

The data gathering consisted of web searches of federal, state, and county level government sites and downloading population, voter registration and election result data where available. Data were also obtained from FREDS 2000, the State of Florida's Legislative Redistricting Service, and the Federal Election Study at American University in Washington, D.C. and the University of Kentucky at Lexington.

**Database Construction**

I personally extracted from all of the data sources data on registered voters by race by precinct for every county in Florida and merged them with the inactive voter numbers, poll worker counts and counts of renters supplied by each respective county clerk. This process included the use of Microsoft Access, Excel and ended in a constructed SPSS (Statistical Package for the Social Sciences, V. 10) database. SPSS is the standard statistical software package utilized in social science research generally and political science specifically. It is also the software I have used in most of the voting rights cases where I have been either a consulting or testifying expert.

**Data Analysis**

Ecological regression or ordinary least squares analysis was performed on the various databases. This statistical technique is also known as simple bivariate regression analysis and is the statistical technique utilized to determine whether there is a statistically significant relationship between two variables. More specifically, one variable is identified as an independent variable while the other variable is deemed the dependent variable. The variable chosen as dependent is said to be dependent because fluctuations in its value are the direct result of fluctuations in the

10

independent variable. Which variable is dependent and which is independent is the result of logical deduction. In the case here plaintiffs claim that the manner of how the inactive voter list is maintained in election precincts having higher percentages of African American registered voters results in denial of an equal opportunity to participate in the electoral process by African American voters. In this instance, then, the percentage of inactive voters is dependent upon the percentage of African American registered voters that is the independent variable. So that the percentage of inactive voters is high where the percentage of African American registered voters is also high and vice-versa. In other words, the value of the percentage of inactive voters will fluctuate dependent upon the value of the percentage of African American registered voters.

The next step was to regress the dependent variable on the independent variable in order to predict the value of the dependent variable from the value of the independent variable. This analysis allows for a determination as to whether the relationship is statistically significant or not. A relationship is deemed statistically significant if the *p-value* equals .05 or less. So, if *p = .05 to .0000* then the relationship between the dependent and independent variable is said to be statistically significant and one can predict, to a great degree of accuracy, that the relationship between the two variables should hold consistently wherever and whenever the relationship is measured again. On occasion a level of **.10** is acceptable in that this indicates that chance can only explain the pattern reflected in the analysis less than 10% of the time. In other words, in 90% of the times that one would conduct an identical analysis the statistical outcomes will be approximately the same.

The sign, preceding the Standardized Beta Coefficient, indicates the direction of the relationship between the two variables. If the sign is **"-" (negative)**, then the two variables are behaving opposite of each other, in other words, when the independent variable's value increases that of the dependent variable will decrease and vice-versa. If the Beta Coefficient is **positive** (no sign is indicated in this instance) then both variables are increasing or decreasing in value simultaneously. So, if the independent variable is increasing in value so is the dependent variable.

11

Likewise, if the independent variable is decreasing in value then the dependent variable is also decreasing in value.

**Exhibit 1**
**Statistical Relationship Between**
**Percent African American Registered Voters & Percent Inactive Voters**
**Miami-Dade County**
**2000 General Election**
**(Dep. Var: Ratio inactive voters)**

| County | Beta | St. Error | Std. Beta | t | Sig. |
|---|---|---|---|---|---|
| Miami-Dade | 2.739E-02 | .01 | .108 | 2.676 | .008 |

**Exhibit 2**
**Statistical Relationship Between**
**Percent African American Registered Voters**
**And**
**Percent Affirmations/Affidavits**
**Hillsborough County**
**2000 General Election**
**(Dep. Var.: Percent Affirmations)**

| County | Beta | St. Error | Std. Beta | t | Sig. |
|---|---|---|---|---|---|
| Hillsborough | 1.809E-02 | .007 | .154 | 2.746 | .006 |

### EXHIBIT 3
### FELONS PURGED FROM VOTER REGISTRATION LISTS
### BY
### RACE
### DUVAL AND HILLSBOROUGH COUNTIES
### 1999 - 2000

| County | Total Purged | Black Felons (%) | White Felons (%) |
|---|---|---|---|
| Duval (1999) | 5759 | 3311 (57.5) | 2104 (36.5) |
| Duval (2000) | 3799 | 2384 (62.8) | 1220 (32.1) |
| Hillsborough (2000) | 4013 | 1682 (41.9) | 1885 (47) |

**Exhibit 4**
**Statistical Relationship Between**
**Percent Poll Workers**
**And**
**Percent African American Registered Voters**
**Broward, Miami-Dade and Pinellas Counties**
**2000 General Election**

| County | Beta | Std. Error | Std Beta | t | Sig. |
|---|---|---|---|---|---|
| Broward | -1.978E-06 | .000 | -.096 | -2.305 | .022 |
| Miami-Dade | 1.263E-04 | .000 | .072 | 1.685 | .093 |
| Pinellas | -6.490E-04 | .000 | -.200 | -3.749 | .000 |

**Exhibit 5**

**Statistical Relationship Between**

**Percent of Poll Workers and Percent of African American Registered Voters**

**Hillsborough County**

**2000 General Election**

| Dep. Var. | Beta | Std. Error | Std. Beta | T | Sig. |
|---|---|---|---|---|---|
| % Poll Workers | -4.897E-04 | .000 | -.093 | -1.668 | .096 |

**Exhibit 6**
**Statistical Relationship Between**
**Renters and the Percent of African American Registered Voters**
**In**
**Defendant Counties**
**(Census 2000)**

| Dependent Variable | Beta | Std. Error | Std. Beta | t | Sig. |
|---|---|---|---|---|---|
| Renters | .531 | .313 | .604 | 1.694 | .151 |

### Exhibit 7
### Percent Renters Percent Population by Race
### Per County All Florida

| COUNTY | POP2000 | PCTWHT | PCTAFA | PCTNHWHT | PCTRENT |
|---|---|---|---|---|---|
| Alachua | 217955 | .735 | .193 | .697 | .455 |
| Baker | 22259 | .840 | .139 | .826 | .196 |
| Bay | 148217 | .842 | .106 | .828 | .344 |
| Bradford | 26088 | .763 | .206 | .750 | .216 |
| Brevard | 476230 | .868 | .084 | .837 | .306 |
| Broward | 1623018 | .706 | .205 | .580 | .319 |
| Calhoun | 13017 | .799 | .158 | .776 | .186 |
| Charlotte | 141627 | .926 | .044 | .904 | .203 |
| Citrus | 118085 | .950 | .024 | .930 | .167 |
| Clay | 140814 | .874 | .067 | .849 | .263 |
| Collier | 251377 | .861 | .045 | .738 | .296 |
| Columbia | 56513 | .797 | .170 | .780 | .259 |
| Desoto | 32209 | .733 | .127 | .612 | .253 |
| Dixie | 13827 | .888 | .090 | .877 | .169 |
| Duval | 778879 | .658 | .278 | .635 | .378 |
| Escambia | 294410 | .724 | .214 | .709 | .349 |
| Flagler | 49832 | .873 | .088 | .836 | .229 |
| Franklin | 11057 | .812 | .163 | .798 | .189 |
| Gadsden | 45087 | .387 | .571 | .359 | .232 |
| Gilchrist | 14437 | .905 | .070 | .887 | .130 |
| Glades | 10576 | .770 | .105 | .686 | .209 |
| Gulf | 13332 | .799 | .169 | .787 | .206 |
| Hamilton | 13327 | .588 | .377 | .550 | .219 |
| Hardee | 26938 | .707 | .083 | .546 | .225 |
| Hendry | 36210 | .661 | .147 | .439 | .284 |
| Hernando | 130802 | .929 | .041 | .892 | .152 |
| Highlands | 87366 | .835 | .093 | .765 | .215 |
| Hillsborough | 998948 | .752 | .150 | .633 | .367 |
| Holmes | 18564 | .898 | .065 | .889 | .169 |
| Indian River | 12947 | .874 | .082 | .834 | .247 |
| Jackson | 46755 | .702 | .266 | .686 | .213 |
| Jefferson | 12902 | .593 | .383 | .583 | .211 |
| Lafayette | 7022 | .793 | .144 | .753 | .180 |
| Lake | 210528 | .875 | .083 | .842 | .212 |
| Lee | 440888 | .877 | .066 | .820 | .277 |
| Leon | 239452 | .664 | .291 | .641 | .428 |
| Levy | 34450 | .859 | .110 | .832 | .173 |
| Liberty | 7021 | .764 | .184 | .745 | .185 |
| Madison | 18733 | .575 | .403 | .554 | .224 |

## Exhibit 7 (cont)

| | | | | |
|---|---|---|---|---|
| Manatee | 264002 | .864 | .082 | .806 | .288 |
| Marion | 258916 | .842 | .115 | .804 | .239 |
| Martin | 126731 | .899 | .053 | .858 | .229 |
| Miami-Dade | 2253362 | .697 | .203 | .207 | .454 |
| Monroe | 79589 | .907 | .048 | .772 | .374 |
| Nassau | 57663 | .900 | .077 | .890 | .212 |
| Okaloosa | 170498 | .834 | .091 | .810 | .374 |
| Okeechobee | 35910 | .793 | .079 | .716 | .253 |
| Orange | 896344 | .686 | .182 | .575 | .401 |
| Osceola | 172493 | .772 | .074 | .294 | .339 |
| Palm Beach | 1131184 | .791 | .138 | .706 | .280 |
| Pasco | 344765 | .937 | .021 | .899 | .189 |
| Pinellas | 921482 | .859 | .090 | .828 | .307 |
| Polk | 483924 | .796 | .135 | .747 | .292 |
| Putnam | 70423 | .779 | .170 | .754 | .206 |
| Santa Rosa | 117743 | .907 | .042 | .891 | .242 |
| Sarasota | 325957 | .926 | .042 | .898 | .237 |
| Seminole | 365196 | .824 | .095 | .752 | .330 |
| St Johns | 123135 | .909 | .063 | .890 | .293 |
| St Lucie | 192695 | .791 | .154 | .741 | .275 |
| Sumter | 53345 | .826 | .138 | .784 | .192 |
| Suwanee | 34844 | .845 | .121 | .811 | .188 |
| Taylor | 19256 | .778 | .190 | .769 | .208 |
| Union | 13442 | .736 | .228 | .719 | .285 |
| Volusia | 443343 | .861 | .093 | .819 | .279 |
| Wakulla | 22863 | .861 | .115 | .848 | .158 |
| Walton | 40601 | .884 | .070 | .873 | .191 |
| Washington | 20973 | .817 | .137 | .805 | .180 |
| State | 15982378 | .780 | .146 | .654 | .325 |

Legend:

| | | |
|---|---|---|
| POP2000 | - | Total Population 2000 Census |
| PCTWHT | - | Percent Total White Population |
| PCTAFA | - | Percent Total African American |
| PCTNHWHT | - | Percent Total NonHispanic White |
| PCTRENT | - | Percent Total Renters in County or State |

Exhibit 8

Percentage of Black and Nonblack Movers and Nonmovers in Florida

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|
| **Blacks** | | | | | | | |
| Percent not moving | .79 | .71 | .71 | .80 | .71 | .75 | .75 |
| Percent moving | .21 | .29 | .29 | .20 | .29 | .25 | .25 |
| Percent within same county | .66 | .78 | .69 | .74 | .65 | .43 | .71 |
| Percent from different cou | .27 | .10 | .19 | .12 | .20 | .33 | .07 |
| Percent from different sta | .05 | .07 | .11 | .13 | .11 | .21 | .15 |
| Percent from abroad | .01 | .05 | .00 | .01 | .04 | .04 | .07 |
| **Nonblacks** | | | | | | | |
| Percent not moving | .82 | .82 | .81 | .82 | .83 | .81 | .84 |
| Percent moving | .18 | .18 | .19 | .18 | .17 | .19 | .16 |
| Percent within same county | .61 | .60 | .61 | .60 | .56 | .47 | .50 |
| Percent from different cou | .21 | .15 | .17 | .16 | .16 | .25 | .17 |
| Percent from different sta | .15 | .19 | .18 | .19 | .22 | .20 | .26 |
| Percent from abroad | .02 | .06 | .04 | .05 | .05 | .08 | .06 |

**Exhibit 9**

**Selected Racial/Ethnic Demographics**
**Of**
**Defendant Counties**
**State of Florida**
(2000 Census)

| County | %African American | %NonHispanic White* |
|--------|-------------------|---------------------|
| Broward | 20.5 | 58 |
| Duval | 27.8 | 63.5 |
| Hillsborough | 15 | 63.3 |
| Leon | 29.1 | 64.1 |
| Orange | 18.2 | 57.5 |
| Miami-Dade | 20.3 | 20.7 |
| Volusia | 9.3 | 81.9 |
| Florida | 14.6 | 65.4 |

*The NonHispanic White category also includes some Hispanics who self-identified in this group.

Exhibit 10

**HENRY FLORES**
Professor, Political Science
St. Mary's University


Address:            3111 Alamo Creek Circle
                    San Antonio, TX 78230

Phone:              (210) 436-3110 (O)
                    (210) 525-1330 (H)

Date of Birth: July 24, 1944

Place of Birth: San Antonio, TX

## EDUCATION

B.A.; St. Mary's University; San Antonio, TX;
        May 1974.
        Major: Political Science
        Minor: English

M.A.; University of California, Santa Barbara; Santa Barbara, CA;
        December 1975.
        Major: Political Science

Ph.D.; University of California, Santa Barbara; Santa Barbara, CA; December 1981.
        Major: Political Science
        Examination Fields:        Public Administration,
                                   American Politics,
                                   Political Philosophy,
                                   Multivariate Statistical Analysis.

## DISSERTATION

"The Politics of Urban Land Use Decisions Underlying Industrial Development in
Los Angeles, California: An Exegesis of Systemic Weakness."

1

## AWARDS AND DISTINCTIONS

Chancellor's Fellow, University of California at Santa Barbara, Santa Barbara, California, 1974 – 1977.

Ford Foundation Dissertation Fellow, 1977 – 1979.

"Best Paper in Chicano Politics," Western Political Science Association, 1986.

Fullbright Fellow, Argentina, *La Universidad Catolica de Buenos Aires*, 1992.

Distinguish Faculty Award, St. Mary's University Alumni Association, 2000 – 2001

## PROFESSIONAL ASSOCIATIONS

American Political Science Association - September 1975 - present.
Chair, Dissertation Award Committee, Section on Race and Ethnicity, 2000-2001.
Nominations Committee, Member, Section on Urban Politics, 1998-1999.
Nominations Committee, member, Section of Representation and Electoral Systems, 1999-2000.
Program Committee, Head, Section on Representation and Electoral Systems, 1997-1998.
Committee for the Status of Latinos in the Profession - January 1994 - December 1996.
Governing Council, Pi Sigma Alpha - September 1994 - August 1997.
Editor, Urban Politics Section Newsletter - January 1996 – June 2000.
Book Review Editor, Representation and Electoral Systems Newsletter, 2000-Unknown.
Member, Byran O. Jackson Memorial Award Committee - 1996.
Chair, Hallet Award Committee - 1996-1997.
Member, Ralph Bunche Memorial Award Committee-2000.
Member, Dissertation Award Committee-2000.

American Society of Public Administration - June 1990 - present.

Southwestern Political Science Association - March 1985 - present.
Executive Committee - March 1986 - April 1988.
Nominations Committee - March 1995 - April 1998. March 1999 – April 2002
Section Head, Mass Political Behavior - March 1995 - February 1996

Western Political Science Association - March 1976 - present.
Chair, Dissertation Award Committee, 1997-1998.
Committee for the Status of Chicanos in the Profession - March 1984 - February 1987.

Committee for Ethics in the Profession - March 1990 - February 1991.
Executive Committee - March 1987 - February 1991.
Pi Sigma Alpha Committee - March 1995 - February 1998.

Associate Editor, Urban Affairs Review, 1995-1998.

Associate Editor, American Review of Politics, 1996-Present.

Editorial Board, Texas Journal of Political Studies, 1996-1999.

## COMMUNITY - PUBLIC SERVICE ACTIVITIES

Presenter, US House Committee Hearings on Irregularities in the Voting Process,
    San Antonio, Texas. Apr. 2001.
Presenter, The Texas Forum on Civil Liberties and Civil Rights and The Hispanic
    Journal of Law and Policy of the University of Texas School of Law's Symposium
    "Drawing Line in the Sand: Te Texas Latino Community and Redistricting
    2001." Apr. 2001.
Presenter, Joint Senate-House Redistricting Committee, State of Texas, Apr. 2001.
Presenter, Texas Senate Redistricting Committee, Mar. 2001.
Presenter, Texas House Redistricting Committee, Mar. 2001.
Presenter, Redistricting Symposium, Willie C. Velasquez Institute, League of United
    Latin American Citizens, Mexican American Legal Defense and Educational
    Fund, and National Association of Latino Elected Officials, Feb. 2001, Austin, TX.
Presenter, Summit of the States, Center for Policy Alternatives, Dec. 2000, Washington,
    D.C.
Presenter, Latino Issues Conference, Willie C. Velasquez Institute, Nov. 2000, Menger
    Hotel, San Antonio, Texas.
Presenter, Latino Academy, Willie C. Velasquez Institute, Oct. 2000, Kerrville, TX.
Presenter, Willie C. Velasquez Institute Redistricting Conference, Aug. 2000, Houston,
    Texas.
Presenter, Southwest Voter Registration and Educational Project Conference, Feb.
    2000, Palm Springs, CA.
Member, Henry B. Gonzalez Congressional Library Fundraising Committee, 1997.
Member, Pastor – Parish Relations Committee, Colonial Hills United Methodist Church,
    1997-2000.
Member, San Antonio/Bexar County, City/County Consolidation Committee, 1996.
    Chair, Subcommittee on Voting Rights.
Presenter, Hispanic Chamber of Commerce, 1995.
Volunteer Administrator, Colonial Hills United Methodist Church - 1995.
Teacher, Finding Life's Purposes, Colonial Hills United Methodist Church, 1995 -1996.
Member, Church Finance Committee, Colonial Hills United Methodist Church,
    1994 - present. Secretary, 1995-1996.
Member, Metro Alliance, Colonial Hills United Methodist Church,
    Chair, Fundraising Committee, June 1993 - September 1993.
Member, Board of Directors, Hemispheric Institute for Public Service (HIPS), San
    Antonio, Texas, January 1988 - present.

**PLAINTIFFS' EXHIBIT 62**

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
Case No. 01-0120-CIV-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE, INC. et al,

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida, et al

Defendants.

### Supplementary Expert Report
### of
### Dr. Henry Flores

**Introduction**

1. This report supplements the Expert Report I submitted on behalf of
Plaintiffs in the above-captioned case on April 26, 2002.

2. This supplementary report is based upon additional data I received
after I completed my initial report. I may conduct further analyses
pursuant to the receipt of information previously requested from Defendants through
Plaintiffs' Attorneys.

**Conclusions**

3. After receiving additional data from Volusia County on the number of
inactive voters by race on the election precinct level, the data were submitted to
regression analysis utilizing SPSS, v. 10 (Statistical Package for Social Sciences).
The dependent variable in this equation was the percentage of African American
Inactive Voters in each precinct as of 2000, while the independent variable was the
percentage of African American Registered Voters in each precinct according to the
2000 U.S. Census reports. The dependent variable was regressed on the independent
variable which resulted in the following outcomes:

$B = .885$    $Std.Err. = .017$    $Std\ Beta = .972$    $t = 51.091$    $Sig. = .000$

1

These findings indicate that there is a statistically significant and positive relationship between the percentage of African American Inactive Voters and the percentage of African American Registered Voters in Volusia County election precincts. Thus, the higher the percentage of African American Registered Voters in a precinct in the November 7, 2000 election, the higher the percentage of African American Inactive Voters.

After receiving additional data from Volusia County on affirmation/affidavits by election precinct and race for the November 7, 2000 election, the data were submitted to regression analysis utilizing SPSS, v.10. The percentage of affirmations per election precinct was the dependent variable and it was regressed on the percentage of African American Registered Voters per election precinct. The regression analysis yielded the following findings:

**B=-1.616E-03 Std.Err.=.001 Std Beta=-.094 r=-1.156 Sig.=.25**

As the statistics indicate, there appears to be no statistically significant relationship between the percentage of affirmations submitted on a precinct level basis and the percentage of African American Registered Voters in those precincts.

5. Additional information was received from Miami-Dade County on the number of individuals purged from the rolls of registered voters. As of the year 2000, the percentage of African Americans, as a function of all purged voters, who were purged because they had been identified as felons was determined to be 55.9%. That is, 55.9% of all purged voters because they were identified as felons were African Americans. It is clear that the high percentage of African Americans purged because they were identified as felons was much higher than the proportion of African Americans residing in Miami Dade County (20.3%).

6. I received additional information on the number of poll workers assigned to each election precinct on November 7, 2000 in Volusia County. These data were submitted to regression analysis as the dependent variable and regressed on the percentage of African American Registered Voters in each precinct as of the November 7, 2000 election. Below are the results of the regression analysis:

**Beta=-1.251E-03 StdErr=.000 StdBeta=-.228 r=-2.878 Sig.=.005**

2

As the statistics indicate, there is a statistically significant and negative relationship between the percentage of poll workers assigned to an election precinct and the percentage of African American Registered Voters in those precincts. Thus the higher the percentage of African American Registered Voters the lower the number of poll workers assigned to those polls.

     7. The research that I have conducted with the additional information provided to me. The research I have conducted with the information provided to me substantiates the conclusions I reached in my initial report.

     8. My conclusions are based upon the following analyses:

          a. To derive the statistically significant relationship between the percentage of African American Registered Voters and the percentage of inactive voters in each voting precinct in Volusia County, I constructed a database derived from FREDS 2000 which is the demographic database the State of Florida utilized in their redistricting process and the list of inactive voters provided by Volusia County. A precinct-by-precinct percentage of African American Registered Voters based on 2000 U.S. Census data was extracted from the FREDS 2000 database and this was entered in a bivariate regression equation as the independent variable and the percentage of inactive voters per precinct was entered as the dependent variable. These data were then submitted to analysis by SPSS, v. 10 which is the traditional statistical software package utilized in most social science research and is also the software federal courts have recognized for use in voting rights cases. The relationship between the two variables was found to be statistically significant at the .000 level and the relationship was positive. (The regression technique is explicated at Appendix A of the initial report.) In other words, in those voting precincts of Volusia County where there was a high percentage of African American Registered Voters one also found a high percentage of inactive voters. There are **no chances out of 1000** where this pattern could possibly be explained as occurring due to pure chance. Therefore, high percentages of inactive voters residing in precincts with high percentages of African American Registered Voters is the norm in Volusia County.

          b. To derive the statistically significant relationship between the percentage of African American Registered Voters and the percentage of affirmation/

3

affidavits in each voting precinct in Volusia County, I constructed a database derived from FREDS 2000 and the list of affirmations/affidavits for the General Election of 2000 provided by Volusia County. A precinct-by-precinct percentage of African American Registered Voters was extracted from the FREDS 2000 database and this was entered in a bivariate regression equation as the independent variable and the percentage of affirmations/affidavits per precinct was entered as the dependent variable. These data were then submitted to analysis by SPSS, v. 10. The relationship between the two variables was found not to be statistically significant at the **.25** level and was positive. In other words, in those voting precincts of Volusia County where there was a high percentage of African American Registered Voters one also finds a high percentage of affirmations/affidavits submitted during the General Election of 2000. However, this pattern could be produced by chance **25%** of the times.

    c. To reach the conclusion that the percentage of individuals identified as African Americans felons purged from the voter registration lists in Miami-Dade County in 2000 was higher than the percentage of African Americans residing in the county in the same year was based upon a comparison of percentages of those purged voters supplied by the county compared to the percentage of African Americans residing in Miami-Dade county as reported by the United States Bureau of the Census. The resulting comparison found that in 2000 in Miami-Dade County, 55.9% of voters purged because they were identified as felons were African Americans. The percentage of African Americans residing in Miami-Dade County as of the 2000 census was reported at 20.3%. One can easily discern that the percentage of purged African American felons was more than twice the percentage of African Americans residing in Miami-Dade County.

    d. In reaching the conclusion that in Volusia County a statistically significant and negative relationship was found between the percentage of African American Registered Voters and the percentage of poll workers assigned to the precincts having higher percentages of African American Registered Voters, I utilized the percentage of individuals assigned as poll workers in each precinct as the dependent variable and the percentage of African American Registered Voters in each

4

precinct as the independent variable. The data for the African American Registered Voters was derived from the FREDS 2000 database. These data were then subjected to a bivariate regression analysis using SPSS, v. 10. The relationship between the two variables for Volusia County was statistically significant at the .005 level. Additionally, the relationship between the two variables was negative. This led me to conclude that in precincts having higher percentages of African American Registered Voters one found lower percentages of poll workers.

9. In the course of preparing this supplementary report the following works were consulted:

➤ Colburn, David R. and Lance deHaven-Smith. 1999. Government in the Sunshine State. Gainesville, FL: The University Press of Florida.

➤ Gannon, Michael, ed. 1996. The New History of Florida. Gainesville, FL: The University Press of Florida.

➤ Kousser, J. Morgan. 1999. Colorblind Justice : Minority Voting Rights and The Undoing of the Second Reconstruction. Chapel Hill, NC: University of North Carolina Press.

10. I expect to further supplement my conclusions at trial concerning inactive voters as additional data becomes available from defendant counties and the State of Florida.

Respectfully submitted by:

Henry Flores, Ph.D.
Consultant
June 27, 2002

5