UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 01-120-CIV-GOLD/SIMONTON

—————————————————————x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

        Plaintiffs,

   vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

        Defendants.

—————————————————————x

**NIGHT BOX
FILED**

ЮI   ⅢⅢ − 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

EXHIBITS TO DECLARATION OF ANGELA CICCOLO, ESQ.
IN SUPPORT OF PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

VOLUME VIII

EXHIBITS 63-70

413A

<u>**NAACP v. Harris, 01-120-Civ-Gold/Simonton**</u>

**Exhibits to Declaration of Angela Ciccolo, Esq. in Support of its Motion for Summary Judgment**

<u>**Table of Exhibits**</u>

<u>**Declarations & Affidavits**</u>

1. Declaration of Noni Jones
2. Declaration of Dr. Henry Flores
3. Affidavit of Ursula Y. Harvey
4. Affidavit of Dr. Ronald Hayduk
5. Declaration of Joanna Clark
6. Declaration of Lorine Walden
7. Declaration of Wallace McDonald
8. Declaration of Ronald Ketterer
9. Declaration of Luis Figueroa
10. Declaration of Theresa James
11. Declaration of Jakelin Green

<u>**Deposition Transcripts and Excerpts**</u>

12. Deposition of George Bruder
13. Deposition of Dick Carlberg
14. Deposition of Julia Stoner
15. Deposition of John Stafford
16. Deposition of Linda Tanko, Volume I
17. Deposition of William Cowles
18. Deposition of Sandra E. Peloquin, Volume I
19. Deposition of Sandra E. Peloquin, Volume II
20. Deposition of Dr. Henry Flores
21. Deposition of Emmett Mitchell, IV (May 20, 2002)
22. Deposition of Janet Modrow (October 22, 2001)
23. Deposition of Janet Modrow in *Johnson v. Bush,* Case No. *00-3542-CIV-King* (December 3, 2001)
24. Deposition of Marlene Thorogood (October 18, 2001)
25. Deposition of Janice Kelly (March 25, 2002)
26. Deposition of Joanna Clark (January 28, 2002)
27. Deposition of Gary E. McIntosh (June 4, 2002)
28. Deposition of Edward C. Kast (May 21, 2001)
29. Deposition of Deanie Lowe
30. Deposition of Pam Iorio (May 6, 2002)
31. Deposition of Adora Nweze
32. Deposition of Deborah Sue Berlinger

33. Deposition of Kandy Wells
34. Deposition of Shirley Rivers-Edwards (May 23, 2002)
35. Deposition of Rondrick Rose
36. Deposition of John Bowman (May 21, 2002)
37. Deposition of Admatha Israel
38. Deposition of David Leahy (May 24, 2002)
39. Deposition of Placide Dossous (January 28, 2002)
40. Deposition of Jermaine Terry (February 1, 2002)

## Responses to Requests for Production of Documents & Interrogatories

41. Defendant's Secretary of State Katherine Harris and Clay Roberts' Objections and Answers to Plaintiff's First Set of Interrogatories
42. Defendant Choicepoint's Responses to Plaintiffs' First Set of Interrogatories
43. Defendant John Stafford's Response to Plaintiff's First Request for Production of Documents
44. Defendant Iorio's Objections and Responses to Plaintiffs' First Set of Document Requests and Interrogatories
45. Defendant Iorio's Objections and Responses to Plaintiffs' Second Set of Document Requests and Interrogatories
46. Defendant David Leahy's Response to Plaintiffs' First Set of Interrogatories
47. Defendant David Leahy's Response to Plaintiffs' Second Set of Interrogatories
48. Defendant Miriam Oliphant's Responses to Plaintiffs' First Set of Interrogatories
49. Defendant Deanie Lowe's Answers and Objections to Interrogatories
50. Defendant Deanie Lowe's Answers to Plaintiffs' Second Set of Interrogatories and Document Request
51. Defendant William Cowles' Response to Plaintiffs' First Set of Document Requests and Interrogatories
52. Defendant William Cowles' Responses to Plaintiffs' Second Set of Interrogatories
53. Defendant Kearney's Response to Plaintiffs' First Set of Interrogatories
54. Defendant Kearney's Response to Plaintiffs' Documents Requests
55. Defendant Kearney's Response to Plaintiffs' Second Set of Requests for Documents
56. Defendant Kearney's Response to Plaintiffs' Second Set of Interrogatories
57. Defendant Kearney's Second Supplemental Response to Plaintiffs' First Set of Interrogatories
58. Defendant Dickinson's Responses to Plaintiffs' First Set of Interrogatories and Request for Production of Documents

## Expert Witness Reports

59. Expert Witness Report of Gary McIntosh
60. Expert Witness Report of David Klausner
61. Expert Witness Report of Dr. Henry Flores
62. Supplementary Expert Witness Report of Dr. Henry Flores
63. Rebuttal Expert Witness Report of Ronald Hayduk

**Memoranda**

64. Memorandum from Ethel Baxter, Division Director, Florida Department of State to All Supervisors of Elections dated June 4, 1999 re: Central Voter File
65. Memorandum from Bill Hanson, Acting Chief, Benefit and Recovery and Special Programs, to Michael Spellman, Office of the Governor, dated February 9, 1995.
66. Memorandum from Carol Canady, Senior Human Service Program Specialist to Operational Program Administrators, Public Assistance Specialist supervisors, Clerical Supervisors dated January 8, 2002

**Tables, Charts & Other Relevant Information**

67. Select Consent Judgments from Voting Rights Litigation Involving Florida Counties
68. Certified Copy of Wallace McDonald's Criminal History from the Florida Department of Law Enforcement
69. Select Historic Racial Discrimination in Florida, Post-1864 State Statutory Provisions
70. Senate Report No. 103-6, Establishing National Voter Registration Procedures for Federal Elections, and for Other Purposes
71. Florida Voter Registration Application Form (Nazyle Rios)
72. DCF Voter Registration Preference Form (A039569)
73. DCF Voter Registration Preference Form (A039122)
74. E-mail Janet DeChristopher, 4/29/02 (A045949)
75. E-mail from Donna Miller to Greg Ferguson, 10/30/2001 (A040811)
76. E-mail from Robert Baker to Carol Canady (A040618-A040619)
77. E-mail from Janice Miller to Norene Moore dated 8/29/01 (A045943-A045944)
78. E-mail from Roseann Liriano to Carol Canady dated 1/09/02 (A040620)
79. E-mail from Norene Moore to Greg Ferguson dated 8/29/2001 (A039027)
80. Letter to Greg Ferguson from Donna Miller dated September 19, 2002 ( A039025-A039026)

**Miscellaneous**

81. Data Processing Services Agreement between Database Technologies ("DBT") & the State of Florida, Department of State, Division of Elections (the "Division")
82. Central Voter File Data Processing Services Agreement between the Division and DBT
83. Clerk Feedback Forms, Hillsborough County, 2000
84. 2000 General Questionnaires, Volusia County
85. Michael T. Lavin's Voter Registration Complaint filed November 10, 2000
86. Letter from Veronica Koval to DCF dated October 30, 2001
87. Letter from Scott Petullo to Ms. Carroll dated November 9, 2000
88. Letter from Veronica Koval to Ed Kast dated September 10, 2001

**PLAINTIFFS' EXHIBIT 63**

### REBUTTAL EXPERT WITNESS REPORT OF RONALD HAYDUK

**CASE: NAACP v. HARRIS**
**Case No. 01-120-CIV**
**U.S. District Court for the**
**Southern District of Florida**
**Judge Alan S. Gold**

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC. by its FLORIDA STATE CONFERENCE OF BRANCHES, JIMMIE PANNELL, JULIA STONER, NATALIE CARNEGIE, JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q. ODOM, WILLIE STEEN, WALLACE MCDONALD, JERMAINE TERRY, LORINE WALDEN, EMERY TIMBERLAKE, VALERIE BUFORD, MICHELLE FLOYD, CONSUELO MARIA GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA CLARK, JANICE KELLY, PLACIDE DOSSOUS and, RONDRICK ROSE, URSULA HARVEY, and ADMATHA ISRAEL in their own right and as representatives of all similarly situated citizens and residents of the State of Florida,

        Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; CLAY ROBERTS, Director of the Florida Division of Elections; FRED DICKINSON, Executive Director of the Florida Department of Highway Safety and Motor Vehicles; KATHLEEN A. KEARNEY, Secretary of the Department of Children and Families; DAVID C. LEAHY, Miami-Dade County Election Supervisor; MIRIAM OLIPHANT, Broward County Election Supervisor; JOHN STAFFORD, Duval County Election Supervisor; PAM IORIO, Hillsborough County Election Supervisor; ION SANCHO, Leon County Election Supervisor; WILLIAM COWLES, Orange County Election Supervisor; and DEANIE LOWE, Volusia County Election Supervisor (all in their official capacities); and CHOICEPOINT, INC., a Georgia corporation d/b/a DATABASE TECHNOLOGIES INC.,

        Defendants.

1

## SECTION 1

## INTRODUCTION

My name is Ron Hayduk.   I have been retained by the Plaintiffs in the above-captioned litigation to render an expert opinion regarding election administration in Florida during and leading up to the November 2000 general election and in particular to prepare a rebuttal report.   I was asked to prepare a report to rebut the conclusions and findings as set forth in reports, testimony, and depositions of the defendants Pam Iorio, Dr. Susan MacManus, and John Stafford.  If and when their full reports regarding election administration (and any others) are subsequently provided, I will supplement this report with further rebuttal. Specifically, I have been asked to examine documents (listed below) to ascertain:

- How the elections were conducted;
- What specific election practices had impacts on the voter participation by eligible citizens;
- What, if any, limitations and/or failures in election administration led to the disenfranchisement of eligible voters;
- Whether there are any patterns of such election administrative practices that affected particular constituencies, and;
- What recommendations might remedy such failures, and what "best practices" are known to be effective in other jurisdictions.

I have prepared this report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

## SECTION 2

## PROFESSSIONAL QUALIFICATIONS

As you can see from my attached C.V., I received my Ph.D. from the City University of New York (CUNY) in 1996, where I wrote my dissertation on election administration and its impacts on voter participation.  I have expanded upon this research, some of which has been published in several venues.  I reviewed the literature on election administration and election law and practices in the U.S., including Florida.  I have also interviewed and discussed the merits and shortcomings of different components of election administration and particular election practices with elections officials and experts throughout the country, including presenting my findings at several national conferences.

I was the Coordinator of the New York City Voter Assistance Commission, a nonpartisan City Charter agency mandated to facilitate voter participation in New York, from 1993 to 1996.  There, I worked with elections officials and elected officials at the national, state and local levels to craft and implement New York's motor voter programs at both the state and city levels.  I also worked with these officials—as well as a broad range of community and civic organizations—to monitor New York's election administration (the

New York City and State Boards of Elections). I have presented testimony about election practices before the New York State Legislature, New York City Council, New York State Board of Elections and New York City Board of Elections. These activities led to the production of several reports about the City and State Board's election practices and procedures as well as to forging successful improvements in such practices. I have also worked as a consultant to several national organizations (including The Century Foundation and Demos) and served as a member of working groups that produced national reports (such as the Constitution Project and the Coalition for Black Civic Participation) to achieve similar goals at the national level and in other jurisdictions.

## SECTION 3

## SUMMARY OF OPINIONS AND FINDINGS

I have studied the documents and data produced by the State of Florida and defendant Counties, including voter complaints, poll worker report forms, precinct data, poll worker manuals, depositions transcripts, requests for and answers to Interrogatories, and other sources[1] cited in Section 5. This report documents several kinds of election problems and election practices that led to significant numbers of eligible voters being disenfranchised in the 2000 elections in Florida. Moreover, I found that a disproportionate number of such voters were Black. These findings are detailed below.

This report documents specific failures of the election administration system in Florida. I present specific cases of voter disenfranchisement and also highlight the far-reaching nature of such disenfranchisement. That is, the data show that many more like individuals were similarly deprived of their voting rights within the specific categories of election problems and practices in the defendant counties. Evidence from other sources suggests that these specific findings likely hold true for all the defendant counties, as well as for the state as a whole. Indeed, several prominent national studies that examine Florida and other jurisdictions corroborate my findings.[2]

This conclusion—that voter disenfranchisement was widespread in Florida during the 2000 elections—is inescapable when the findings of these other studies are also considered. The broad range of disenfranchising election administration practices that I have reviewed—which are substantiated in my analysis of a broad range of data and in the plaintiffs' depositions—are further documented and corroborated in dozens of studies conducted by national organizations, election experts, academics as well as congressional and other government agency staff (ibid.). These studies are discussed below regarding

[1] These studies include, The Constitution Project, 2001; The CALTECH-MIT Voting Technology Project, 2001; The National Commission on Federal Election Reform, 2001; The Election Center, 2001; The National Association of Secretaries of State, 2001; The National Conference of State Legislators Election Reform Task Force, 2001; The Congressional Research Service, 2001; The US Civil Rights Commission, 2001; Lichtman, 2001; The House of Representatives Committee on Government Reform, 2001; Report House Committee on the Judiciary, Democratic Investigative Staff. August 20, 2001; Merzer, 2001; Rakove, 2001; Traugott, 2001; Roth, 2001; Alverez et. al., 2002; Hayduk, 2002b. See Section 5 for full citations.

[2] See footnote number one and other works cited in section 5.

specific election problems that demonstrate that a significant number of eligible citizens—disproportionately minority voters—were deprived of their voting rights in the 2000 elections in Florida. These outcomes occurred because of a broad variety of problems in the administration of the elections. Many of these studies reveal how particular practices of election administration can lead to voter disenfranchisement. Some of these studies show a long pattern of racial discrimination in the administration of elections that corroborate my findings.[3]

The patterns of voter disenfranchisement I found in Florida are consistent with the findings of my research and review of the social science literature on the impacts of election administration on voter participation in other jurisdictions. This assessment is further corroborated by my own personal observations of election practices and workers over the past decade in New York and in other jurisdictions, as well as from the dozens of interviews and discussions I have had with experts on elections and elections officials in the United States.

Poor election administration performance in general—whether because of poor planning, inadequate training, insufficient staffing, over-crowded and confusing poll site conditions, lack of effective means to communicate with election officials (by both poll workers and voters), or prejudicial treatment—all appear to have led to a significant number of eligible voters being disenfranchised in the defendant counties and the State of Florida as a whole during the 2000 general election.  The evidence demonstrates that there was a lack of sufficient planning on the front end, before the election. This lack of planning includes providing an insufficient number of precincts to service the number of registered voters; an insufficient number of poll workers to handle the number of voters per precinct; a lack of capacity to communicate between precincts and with supervisors of elections (SOE) personnel regarding questions about a voter's registration status (both via telephone and laptops); a lack of sufficient poll worker recruitment and ineffective training of poll workers; and a lack of uniform standards and procedures established by the State of Florida and followed by the defendant counties. In fact, what is evident is the opposite from uniform election practices: there are disparities in how counties planned and prepared for the election, and also in how they performed. In addition, there are glaring differences in how voters were treated on election day—both within and among counties—as well as conditions conducive to effectively conducting an election to ensure all voters were afforded an equal opportunity to cast ballots.

Based upon the above (and below) cited data sources I found evidence that counters and rebuts statements and claims made by County Supervisors and defendant expert witnesses, particularly regarding particular types of election problems as detailed in this report.

Finally, this report presents a set of specific recommendations to remedy election administration failures identified in this study. Some of these recommendations are

---

[3] Merriam and Gosnell, 1924; Key, 1949; Gosnell and Smolka, 1973; Kousser, 1974; National Municipal League, 1974.

presented in the sections that discuss particular election problems and practices, with the majority being presented at the end of this report.

## ELECTION PROBLEMS AND FAILURES OF ELECTION ADMINISTRATION IN THE DEFENDANT COUNTIES IN THE 2000 ELECTIONS

I identified five main kinds of problems:

1. **Voter Registration Problems/Voter Notification Failures**
2. **Poll Site Problems**
3. **Poll Worker Problems – Errors of Commission and Omission**
4. **Administrative Problems**
5. **Lack of Uniform Standards and Practices**

The 2000 elections generated a plethora of studies and recommendations for election reform. One study was produced by Duval County. Duval County created a Task Force in February 2001 to address the problems and issues that arose from the November 7, 2000 general election in that county. The Task Force's analysis of election practices and proposals for reform also has applicability to other defendant counties with similar characteristics, as well as to the state of Florida as a whole. After several months of meetings and hearing testimony from expert witnesses and other individuals in public hearings, the Task Force produced a "Final Report" dated June 12, 2001. The central goals of the Task Force were to (a) create voting procedures and practices that are "fair, inclusive, and effective" and (b) "restore public confidence in the election process" (Duval County Election Reform Task Force Final Report, June 12, 2001).

The Task Force described patterns and trends that occurred during the 2000 general election to identify "broad observations, not detailed investigations" with the goal of improving the electoral process at the local level—not place blame. However, despite this stated goal there are several specific findings of the report that are consistent with problems that occurred in other counties (including Hillsborough, Orange, Volusia), and that are documented in this report.

Indeed, by the very act of publishing their report, Duval County essentially produced a statement of acknowledgment of serious problems that occurred during the November 7, 2000 elections. Moreover, the report states various election problems disproportionately affected the Black population in Duval County. The Task Force report states, "Two groups were affected most adversely by the November 2000 elections: those whose votes did not count, and those who attempted to vote but were turned away.... Lesser but still significant numbers of voters were told that they were not registered, were sent elsewhere to vote, or gave up entirely. The cumulative effect of these failures fell disproportionately upon our African-American population, leading to a concentrated loss of confidence in the system within this important segment of our community. These occurrences were not isolated, random or unrelated. They resulted from widespread error, multilevel mismanagement, obsolete systems and flawed practices" (page 6).

5

This statement not only rebuts statements made by County Supervisors and defendant expert witnesses, but sums up what the evidence shows to be true about other defendant counties.

## 1.   VOTER REGISTRATION PROBLEMS/VOTER NOTIFICATION FAILURES

The failure of a voter's name to appear on the voter rolls is the single most cited problem found in the plaintiffs' claims and in my review of the documents reviewed for this report. How such voters were handled, and why their names were missing, varied substantially. In many cases, such voters were not permitted to vote.[4] All too often, it appears that many of these voters were wrongfully denied the right to cast a ballot. Many such instances appear to have occurred in large part because of: (1) registration problems related to failures of NVRA agencies; (2) errors at SOE offices by election personnel; and (3) at the precinct level by poll worker errors. All of these problems lead to poll site conditions that were frequently overcrowded and chaotic. It is these latter two types of problems that are the main focus of this report.

One factor that may contribute to such problems that can result from the improper and timely processing of voter registration applications and notifications is the fact that a significant proportion of people move every year, which necessitates that voters re-register or update their registration status. According to the U.S. Census Bureau and other studies, nearly one out of five Americans (18%) moves every year. (U.S. Census Bureau, "Geographic Mobility: Population Characteristics."  See also Rosenstone and Wolfinger, 1980; and Demos, February 2002).

Moreover, a higher proportion of Blacks move than Whites.  A report by Demos compiled the following information: The U.S. Census Bureau reported that 43.4 million Americans moved between March 1999 and March 2000, or 16% of the population. Over half of these moves were in the same county and 20% were between counties in the same state. Only 20% of moves were to a different state. Recent movers also tend to be disproportionately younger (the majority are in their twenties), non White, and poor (U.S. Census Bureau, "Geographic Mobility: Population Characteristics, March 1999 to March 2000," May 2001).

The high mobility rate of Americans—particularly among these groups—is well known (Wolfinger and Rosenstone, 1980; Rosenstone and Hansen, 1993; Piven and Cloward, 2000).  It is because of such high mobility rates that elections officials must contact millions of voters by mail each year (FEC, 2001 and FEC website).

Given these facts about mobility rates, the Supervisors of Elections in Florida did not effectively plan for the likely consequences of these circumstances that usually accompany them on election day—such as a large number of voters calling for information about their registration status and poll site information, and the need for poll

---

[4] Some such instances may be because a voter failed to properly register to vote. For example, a voter may have not fully completed a registration form with all the required information, or a voter registration organization or government office may have failed to submit a registration form.

workers to contact an SOE office to verify voters' status—even though the SOEs had means to know and prepare for such instances. As the data presented below demonstrates, such instances were numerous and characterized the elections on November 7, 2000 in the defendant counties and throughout Florida.

High mobility rates can result in registration and election problems. The Federal Election Commission (FEC) found that the 2000 election produced a record number of complaints about registrations that were not added to the voter lists in a timely fashion (FEC, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office*, p. 17). Similarly, Caltech/MIT (2001) estimated that between one-and-a-half and three million votes were lost or not cast in 2000 because of problems with the registration process and voter lists. (Caltech-MIT Voting Technology Project, *Voting - What Is, What Could Be*, July 2001, p. 8.)

These patterns appear to have been particularly acute in Florida in the November 2000 elections. As data on Florida below shows, one in four Blacks moved every year (20 to 29% from 1995 through 2001) compared to just over one in six Whites (16% to 19% during the same period). Using the Current Population Surveys from the March Supplement each year conducted by The U.S. Census Bureau, Nicole Bramstedt of the Population Reference Bureau in Washington D.C. calculated figures for Florida from 1995 through 2001 and prepared the below tables.

**Number of Black and NonBlack Movers and Nonmovers in Florida**
(Numbers in thousands)

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|
| Blacks | 2,310 | 2,117 | 1,922 | 2,074 | 2,294 | 2,207 | 2,294 |
| Total over 1 year | 1,815 | 1,502 | 1,368 | 1,657 | 1,639 | 1,662 | 1,721 |
| Total movers | 495 | 615 | 554 | 417 | 655 | 545 | 573 |
| Within same county | 328 | 480 | 384 | 308 | 426 | 233 | 406 |
| From different county | 133 | 60 | 105 | 51 | 131 | 178 | 40 |
| From different state | 27 | 45 | 62 | 54 | 72 | 114 | 88 |
| From abroad | 7 | 29 | 2 | 4 | 26 | 19 | 39 |
|  |  |  |  |  |  |  |  |
| NonBlacks | 11,798 | 12,002 | 12,302 | 12,148 | 12,183 | 12,694 | 13,002 |
| Total over 1 year | 9,644 | 9,849 | 9,991 | 9,974 | 10,125 | 10,227 | 10,888 |
| Total movers | 2,154 | 2,154 | 2,311 | 2,174 | 2,058 | 2,467 | 2,114 |
| Within same county | 1,317 | 1,290 | 1,418 | 1,307 | 1,159 | 1,159 | 1,054 |
| From different county | 461 | 332 | 385 | 338 | 330 | 609 | 369 |
| From different state | 332 | 404 | 422 | 423 | 456 | 499 | 554 |
| From abroad | 45 | 127 | 86 | 105 | 112 | 201 | 137 |

7

**Percentage of Black and NonBlack Movers and Nonmovers in Florida**

|                                | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|--------------------------------|------|------|------|------|------|------|------|
| **Blacks**                     |      |      |      |      |      |      |      |
| Percent not moving             | 0.79 | 0.71 | 0.71 | 0.80 | 0.71 | 0.75 | 0.75 |
| Percent moving                 | 0.21 | 0.29 | 0.29 | 0.20 | 0.29 | 0.25 | 0.25 |
| Percent within same county     | 0.66 | 0.78 | 0.69 | 0.74 | 0.65 | 0.43 | 0.71 |
| Percent from different county  | 0.27 | 0.10 | 0.19 | 0.12 | 0.20 | 0.33 | 0.07 |
| Percent from different state   | 0.05 | 0.07 | 0.11 | 0.13 | 0.11 | 0.21 | 0.15 |
| Percent from abroad            | 0.01 | 0.05 | 0.00 | 0.01 | 0.04 | 0.04 | 0.07 |
|                                |      |      |      |      |      |      |      |
| **NonBlacks**                  |      |      |      |      |      |      |      |
| Percent not moving             | 0.82 | 0.82 | 0.81 | 0.82 | 0.83 | 0.81 | 0.84 |
| Percent moving                 | 0.18 | 0.18 | 0.19 | 0.18 | 0.17 | 0.19 | 0.16 |
| Percent within same county     | 0.61 | 0.60 | 0.61 | 0.60 | 0.56 | 0.47 | 0.50 |
| Percent from different county  | 0.21 | 0.15 | 0.17 | 0.16 | 0.16 | 0.25 | 0.17 |
| Percent from different state   | 0.15 | 0.19 | 0.18 | 0.19 | 0.22 | 0.20 | 0.26 |
| Percent from abroad            | 0.02 | 0.06 | 0.04 | 0.05 | 0.05 | 0.08 | 0.06 |

The fact that a higher proportion of Blacks move more frequently means that, when they re-register or update their registration status, a greater number of steps are required by elections officials and other agency staff (including agencies that fall under the auspices of the National Voter Registration Act—NVRA—such as Department of Safety and Motor Vehicles). The higher the proportion of actions required by SOE office personnel, poll workers and NVRA agency staff to process these registration transactions, the greater the likelihood that errors will be made by these staff people, and thus will disproportionately adversely affect Blacks. Many such cases are described below. This may be why, for example, a high number of students at Bethune-Cookman College (BCC) accounts for a high proportion of cancellation of Black' registrations in Volusia County.

Because the above require a greater number of actions by SOE office personnel, better planning by SOEs would have produced greater efficiency and effective administration of the elections, including reducing or eliminating racially disparate treatment of voters.

### A. Specific Cases of Registration Problems

**Christine Barrett** from Precinct 107 in Orange County apparently was not in the county's voter registration system, although she says she registered in 1998 and again online in 2000. In an email voicing her complaint to Valerie Brown of the Orange County Supervisor of Elections Office (Bates Number J001205), she reports that 3 poll workers "gave up as they had waited for so long while trying to help her because they waited so long for a response to the Oath Person from the Orange County Election Department." She also reports 10 other voters at the same site were turned away for the same reason. Sixteen percent of the total number of all registered voters in this precinct are Black (Bates Number J00740001).

**Willie Lee Dennison**, a Black man living at 13 Sterling Brown Street in Apopka, Florida in Orange County, went to his polling site, Precinct 226. The poll worker told him that his name was not on the rolls, the phone lines were down, the precinct staff could not get through to the Supervisor of Elections to confirm that he was a valid registered voter. He sent a letter (Bates Number J001185) to Bill Cowles, Supervisor of Elections in Orange County, lodging a formal complaint that he was denied the right to vote.

In a memo to Willie L. Dennison dated December 18, 2000 (Bates Number J001184), Supervisor of Elections of Orange County Bill Cowles admits, "We have researched your voter registration record and found that a data entry error has been made. Your voter registration record was canceled in error after we found an obituary in the Orlando Sentinel for a Willie Dennison at 13 Sterling Brown Street, Apopka. Unfortunately, the date entry operator did not catch the difference in middle name and date of birth.… . As a result of this error, your name was not listed on the poll register on Election Day. Our poll worker was following proper procedures in trying to call our office for authorization to issue you a ballot. A voter identification card is not automatic authorization to vote." As a result, because the phone lines were down, and because Willie Dennison was wrongfully purged from the voter rolls, he was denied his right to vote. According to Election Statistics of Registered Voters, Willie Dennison resides in Precinct 226 of which 87% of all registered voters are Black (Bates Number J007401).

In the Certificate of Service and Answers and Objections to Interrogatories to Defendant Deanie Lowe, Supervisor of Elections for Volusia County, dated October 24th 2001, Ms. Lowe was asked to identify individuals who were improperly denied the right to vote on November 7, 2000 due to the fact that their voter registration was improperly canceled by clerical error prior to Election Day (item number 2). She identifies six individuals whose voter registration was improperly cancelled due to clerical error, including one of the Plaintiffs, Ursula Harvey. Furthermore, as documented below, there are additional individuals (Susan Keeny, and a group of Black BCC students) who were denied their right to vote but not mentioned in Ms. Lowe's Answers to Interrogatories.

In a summary of findings from Linda F. Tanko, Voting Services Coordinator of Orange County, dated April 25, 2001, Ms. Tanko addresses the complaints of 7 voters, one of whom is Laurie Hursh.[5] (Bates Numbers J001155-J001173). **Laurie Hursh** was denied her right to vote because the OCSOE sent her an absentee ballot by mistake. According to a memo (Bates Number A018789) from Bill Cowles, Supervisor of Elections in Orange County, to Kathleen Burgener, Assistant Attorney General, "A data entry error when adding the ID number incorrectly caused an absentee ballot to be issued for Ms. Laurie Hursh. This in turn caused her record at the polling place to indicate that she had received an absentee ballot. The correct procedure at that point should have been to verify that the absentee ballot had not been voted and returned and then permit her to vote. We cannot find why this didn't happen." (Bates Number A018791). Reports show that Laurie Hursh ended up voting at the county's central office. This story ended with a happy ending. But this failure of the election administration process suggests that others may not have had a

---

[5] Tanko's report responded to a request made by Bill Cowles, Supervisor of Elections, Orange County, to Kathleen Burgener, Assistant Attorney General, Office of Civil Rights, Florida.

similar outcome. Indeed, this appears to be the exception to the rule. (U.S. Civil Rights Commission, 2001; Merzer, 2001; House Reports and Testimony, 2001.)

Ms. Tanko acknowledges in her Deposition of April 25, 2002, that sometimes personnel in the SOE office "have cancelled someone by mistake…" (page 60), even while they may employ mechanisms to try to rectify such errors when they are discovered. However, many such registrations cancelled in error may not be discovered by elections officials unless a voter takes some action that highlights such an error was originally committed (such as contesting their registration status). Certainly SOE should not rely on voters to take such action. Moreover, when a voter does contest their registration status (whether over the phone, at a SOE office, or at a poll site), the procedures followed by elections personnel may not always rectify a voter's registration in a timely manner. According to Ms. Tanko, "If we're dealing with a person, who, as we're talking with them, we're discovering that we need to explore whether we've cancelled them in error, we would then go over to the Records Department and pull those records and research it." (page 61). But if such a situation occurs on Election Day—as the vast majority of such situations do occur and did occur on November 7, 2000—then logistical constraints of whether elections personnel are able to obtain these records at all or in a timely manner come into play. In fact, even when a poll worker contacts the SOE office about a voter whose registration may have been erroneously deleted or cancelled, whether by laptop or phone (assuming they successfully get through to the SOE office), neither elections official would be readily able to answer all such inquiries because they would need to be addressed and answered by a "Voter Service" clerk, a special group of "experienced" workers "who would then do the research" (page 63). The number of personnel and steps involved in this process indicates that, in the best case scenarios, voters would have to wait a significant amount of time before their situation was definitively resolved.

There were numerous other voter complaints (Orange County, Bates Numbers A018789-A018792, J001155-J001173; J000165-J001316; Hillsborough County, Bates Numbers A012007-A012173; G000001-G000506; G002918-G002919; Volusia County, Bates Numbers K003001; K000001-K000052; K000490-K000509; K002941-K003070; Miami Dade County, Bates Numbers 31572-31702.)   One memo from Bill Cowles, Supervisor of Elections, Orange County, to Kathleen Burgener, Assistant Attorney General, Office of Civil Rights, Florida, dated April 6, 2001 (Bates Numbers J001151-J001154), listed complaints from 34 voters. In addition, the depositions and other materials also indicate failures of SOE to properly notify voters of the registration status and/or correct poll site information (U.S. Civil Rights Commission, 2001; House Reports and Testimony, 2001; NAACP Hearings, 2001). This was the case regarding Consuelo Maria Graham, one of the plaintiffs. In fact, Volusia County recently produced voter registration applications which were not processed. (See deposition of Sandy Peloquin.)

Each of these cases indicates various failures on the part of SOE personnel. Some show that SOEs did not properly process a voter's registration application effectively or in a timely manner. These individuals were denied the right to vote apparently because of some error on the part of the election board or its personnel—not because of some action or inaction of the individual in question. As several studies have demonstrated, these are

10

not isolated incidents.[6] In fact, these other reports have documented numerous similar cases in Florida. Rather, they are part of a growing literature that has documented similar cases and presents evidence that such problems are examples of a much larger pattern of problems. These studies document similar cases and patterns that show thousands of individuals experienced similar disenfranchising practices and/or failures of election administration. (ibid.)

## B.   Timely and Proper Notification of Registration Status and Voting Information

Supervisors of Elections appear to have not always properly and timely mailed voters notification about their registration status. For example, take the case of Volusia County. According to their own records, they failed to mail out any address confirmation notifications for nearly a year. Between December 1999 and November 2000, their records indicate that no address confirmation notices were mailed (see table below). Surely some voters' addresses changed, as the U.S. Bureau of the Census data on mobility rates above indicates, thereby warranting mail confirmations (unless there are other additional mailings made by Volusia County to confirm changes of addresses). Failure to provide such notification may have contributed to voters' names not appearing on the rolls, long lines at poll sites, and so on. If a voter does not receive notification of their registration status and correct poll site information—and/or notification of a problem with their registration status so they can rectify it—these failures to follow such procedures will inevitably lead to a greater number of voters showing up to vote but who experience problems being permitted to cast ballots, which contributes to longer lines to contact SOE offices to verify a person's registration status, a greater volume of work and time to deal with such matters, greater frustration on the part of voters and poll workers, and, sometimes, voters leaving without casting ballots.[7] Kandy Wells, a plaintiff, falls into this category.

---

[6] U.S. Civil Rights Commission, 2001; Merzer, 2001; CalTech/MIT, The Constitution Project, 2001; The National Commission on Federal Election Reform, 2001; House Committee Reports and Testimony, 2001; and others listed below and in Section 5.

[7] U.S. Civil Rights Commission, 2001; Merzer, 2001; CalTech/MIT, 2001; The Constitution Project, 2001; The National Commission on Federal Election Reform, 2001; House Reports and Testimony, 2001.

## VOLUSIA VOTER REGISTRATION MONTHLY REPORTING FORMS

| Reporting Forms | No. of New Reg. Accepted | No. of Address Confirmation Notices Mailed |
|---|---|---|
| January 1999 | 1,227 | 0 |
| February 1999 | 1,377 | 2,017 |
| March 1999 | 1,331 | 0 |
| April 1999 | 1,131 | 0 |
| May 1999 | 1,222 | 0 |
| June 1999 | 453 | 0 |
| July 1999 | 839 | 0 |
| August 1999 | 1,990 | 0 |
| September 1999 | 1,226 | blank |
| October 1999 | 443 | 0 |
| November 1999 | 882 | 19,762 |
| December 1999 | 2,267 | 0 |
| January 2000 | 1,965 | 0 |
| February 2000 | 1,699 | 0 |
| March 2000 | 2,365 | 0 |
| April 2000 | 1,312 | 0 |
| June 2000 | 915 | 0 |
| July 2000 | 1,805 | 0 |
| August 2000 | 2,282 | 0 |
| September 2000 | 3,286 | 0 |
| October 2000 | 7,038 | 0 |
| November 2000 | 666 | 0 |

(Source: Volusia County "Voter Registration Monthly Reporting Forms." Bates numbers K003249 - K003270)

**C.  Problems in Processing Registration Forms and Absentee Ballot Applications: The Timely and Accurate Mailing of Voter Notifications, Voter Identification Cards, Absentee Ballots, and Poll Site Information**

There were examples in the documents I examined that reveal these kinds of problems which manifested in the 2000 elections in Florida. For example, a complaint was made by an election worker who states, "On election day and the next day, a number of calls were received reporting that BCC (Bethune Cookman College) students with registration cards were being turned away from Precincts 620 and 621. [Ms.] Long provided the factual information after talking to these students. The Black students were being told that they were not on the voter roll books despite having registration cards for those precincts. Subsequent to Election Day there were reports from the DOE office that students had given an administration building address rather than their dormitory, which was the reason for their names not appearing in the roll books. The question remains, 'Were they misled by being given registration cards, and not contacted regarding their address? The only question was whether their dorm was in precinct 620 or 621?'" (Nancy Long, Bates number K003025).

Another exchange is recorded regarding this same case. On November 8, 2000, Ms. Long writes to Lowe's office staff person, "I have heard of students at precinct 621 who had their cards but were told they were not on the list and not allowed to vote. No one mentioned affidavit to these students. We do have some major problems there and I am trying to get names of individuals who were possibly denied their right to vote" (Bates number K003012).

This evidence suggests that these voters were wrongfully denied their right to vote.

In another case, a memo to a voter from Pam Iorio of Hillsborough County, there was an admission of an administrative error. In this case, a man was denied the right to vote on Election Day because his name wrongfully did not appear on the register rolls. The election board confused **Mr. Herbert F. Courtney** with his son (Herbert F. Courtney Jr.), purging Mr. Courtney Sr. from the rolls. Pam Iorio states in her letter to Mr. Courtney, "You and your son both have the same names. As a result, it appears that many years ago, someone in this office incorrectly concluded that the voter registration records for you and your son were duplicate records. Therefore, your record was deleted and your son's voter registration record remained active until he moved to Lake County Florida…Unfortunately, we did not discover that your name had been erroneously deleted from the voter rolls until you went to vote during the General Election and the poll worker could not find your name in the precinct register. I apologize for this mistake and for any inconvenience that resulted" (Bates Number G000463). This case illustrates how other similar instances likely also occur.

Another voter was denied the right to vote because his name did not appear on the precinct registration rolls due to another admitted administration error in the office of Pam Iorio of Hillsborough County. Iorio states, "A review of our actions pertaining to this situation indicates that a clerical error delayed the entry of your husband's voter

registration application into the computer system. I also deeply regret that he was not able to vote on Election Day because the phone lines to the precinct phone bank were busy while he was at the polling place" (Bates Number G000471).

**Hope Miller** arrived at her precinct in Hillsborough on Election Day yet was denied the right to vote because her name did not appear on the voter registration rolls. Her husband wrote an email to Pam Iorio's office stating they had both registered at the Driver's License Office and he was able to vote on Election Day. In an internal memo (Bates Number G000243) from Gary to Darrell, Gary states, "Based on the transmittal from Bay Plaza DLO, it looks like we received Hope Miller's VRA. It has never been input (assumed lost). It may have been one of Alonzo's goofs. How do you want to proceed?"

**Liz Maria Chacko** emailed Valerie Brown of the Orange County SOE on November 14, 2000, complaining that she never received her absentee ballot in Massachusetts allowing her to vote in Orange County. A hand-written note on the bottom of the email reveals that the absentee ballot "was mailed to home address instead of mailing address....Why not mailed to temporary address to begin with – do not know" (Bates Number J001221). This reveals yet another example of an error at the Orange County Elections Office that disenfranchised a voter. While Chacko admits "I realize it is too late to do anything about this now," she also recognizes that "for future elections, you should be aware of problems that some of us experienced in getting our absentee ballots. I have heard similar stories from other Orange County residents" (Bates Number J001221).

Another documented incident concerns a voter who requires a wheelchair accessible precinct in Hillsborough County. The voter was assigned to precinct 808. Peter Fylak, Jr. reports in an email to Pam Iorio that the voter is a veteran who uses a wheelchair and the facilities at this precinct were not handicap accessible. Ms. Iorio responded with an email stating, "We were aware of the need for a ramp at the precinct. Unfortunately, a delivery error resulted in the ramp going to another precinct" (Bates Number G000183 – G000185).

The above analysis provides evidence to rebut specific conclusions and findings contained in the defendant Expert Witness reports, depositions, and testimony, as well as Answers to Interrogatories. For example, Ms. Iorio states in her Expert Witness Summary that she will testify regarding "the procedural mechanisms of a decentralized election system... and how Hillsborough County tailors its approach to elections in order to best serve its population" (page 2), and does so in her deposition. Dr. MacManus makes similar statements in her deposition. As discussed above, however, the documented cases of election problems that beset Hillsborough belies the value of a decentralized system as one that best serves its population, particularly Blacks. First, a decentralized system allows for the kinds of broad variation in election practices by SOE personnel and poll workers who possess discretionary capacity for improper actions or inactions that separately and collectively led to voter disenfranchisement. Moreover, not all of Hillsborough's population was equally well served. In fact, the evidence points to the disproportionate outcomes that can result from a lack of uniform standards and adequate planning (in a decentralized system), including data presented above and below regarding

14

the malaportionment of registered voters per precinct, the lack of sufficient telephone lines and elections personnel to handle the volume of incoming calls on election day, and lack of sufficient number of poll workers and quality of performance (perhaps due to insufficient recruitment, training, pay, oversight, management, etc.).

While no doubt some election problems were due to voter error, the evidence presented here, nevertheless, shows that many errors of commission or omission were made by SOE office personnel, NVRA agencies, and poll workers—all of which disenfranchised eligible voters many of whom were Black.

In sum, the evidence presented in this report rebuts the conclusions and findings as set forth in reports, testimony, and depositions of the defendants Pam Iorio and Dr. Susan MacManus, as well as in the depositions and Answers to Interrogatories of other defendants (as outlined above and below). The evidence presented in this report shows that—whether due to poor planning or failures of the election administration in the defendant counties—separately and collectively hundreds if not thousands of voters were not properly handled and/or disenfranchised on November 7, 2000.

## 2. POLL SITE PROBLEMS

The data show that poor poll site/precinct conditions often contributed to voter disenfranchisement. Many poll sites/precincts were comprised of uneven numbers of registered voters (contributing to overcrowding); some precincts and poll sites experienced shortages of poll workers who were assigned and/or who worked on election day; and some precincts ran out of necessary materials.

For example, in the Certificate of Service and Answers and Objections to Interrogatories to Defendant Deanie Lowe, Supervisor of Elections for Volusia County, dated October 24th 2001, Ms. Lowe responded to election problems as requested by the Plaintiffs in five areas:
- Voter registration
- Failure to appear on voter roll
- Inability to contact the Supervisor of Elections office
- Busy Phone lines at the polling site
- Poll workers

While Ms. Lowe could not provide a specific number of voters affected by problems in each of these areas, my examination of the documents provided by the Volusia County SOE allowed me to obtain some of this information. I was able to calculate data about the five problem areas identified above. The first one is discussed above, the others are specifically addressed below. While not comprehensive—partly because no mechanisms existed to capture all complaints and document all cases of election problems—this report shows there were widespread problems in these and other areas that led to voter disenfranchisement.

15

## A. Communication Breakdowns: Laptop Distribution and Computer Crashes

**Orange County**

In Orange County for the November 1998 general election, there were 348,606 registered voters in 231 precincts.[8] 120 out of 231 precincts received laptop computers to research voter problems, (Bates Numbers J001157, J007391-J007393) such as a voter's name not appearing on the voter rolls, or a voter's identification having a different address than the one on the rolls. Elections Statistics broken down by racial categories from 1998 (Bates Numbers J007400-J007401) reveal that of the 120 precincts receiving laptops, 105, or 87.5%, were White majority precinct listings. 14 out of the 120 precincts, or 11.7 % were majority Black precincts.[9] If the same analysis were conducted in precincts where a plurality of registered voters was Black, the percentage would be higher. An even larger percentage would result if the analysis was conducted on the basis of precincts that had a predominant number of Blacks.

Similar problems and racial disparities appeared again in the 2000 elections (described below). This is another example how uniform standards and proper planning could have prevented such disparate treatment and outcomes, especially given the data and knowledge about the elections in 1998.

Although it is important for the distribution of laptops to be equitable, when the system goes down—as it did in Orange County during the morning hours on Election Day in 2000—laptops become useless. Poll workers reported that the system crashed for several hours—from 7am to noon or 1pm—as reported in the following precincts: 104, 131, 137, 214, 216, 317, 326, 403, and 504 (Election Board Comments, Bates Numbers J000192 to J000216). For some precincts both computers and phone lines were down for a period of up to four to five hours.

According to a poll worker from Precinct 316: "Affirmation support via internet or phone was non-existent from 7am to noon. Nothing could be done for the voter during that time. One voter waited two hours to find out he was incorrectly listed as deceased" (Bates Number J000195).

An email complaint on November 7th from **Rip Haskins** to Bill Cowles and Valerie Brown in the office of the Supervisor of Elections reports that "due to the slow speed or crash of the Orange County elections computer server, my wife was unable to vote today. We both simply needed to confirm our address change, but after waiting for over one hour, we had to leave before voting so that my wife could get to work. At the time we left, we were told that the server was down and it was unknown how long it would

---

[8] Data regarding registered voters for the 2000 election was incomplete.
[9] Throughout this report I use several ways of characterizing the racial composition of precincts. Majority means over 50%; in other instances I use "plurality" which means the most of all groups; and in other cases I use "predominantly" to mean a precinct where Blacks predominated in number (*i.e.* where Blacks constitute a number larger than the average for the state as a whole and/or in comparison to other groups in that precinct).

take.... Therefore, due to technical problems, [my wife] has been denied her constitutional right to vote. We are both in the 25-34 age group, and relatively knowledgeable about the internet, network servers, etc. It makes us wonder 1) Why a backup method of handling things is not in place in the event of computer failure, and 2) How were these matters handled 10 years ago before the advent of the internet? We sincerely hope that my wife is one of the very few who have been denied the opportunity to vote today. I know it is quite implausible, but it would be a travesty if the outcome of any contested election is affected by situations like this." (Bates Number J001232)

Indeed, the fact that there was no back up plan for such a crash—such as the use of a CD ROM or other means—is another indication of a lack of sufficient planning by the SOEs. Yet, despite the fact that the computer system crash in Orange County made using laptops ineffective, still their use when working was beneficial in increasing capacity for poll workers to verify a voter's registration status, which thus facilitated the voting process, if not unequally distributed. Counties without laptops did not have this capacity and therefore had even greater limitations to communicate with SOE to verify voters' registration status, etc.

**Broward County**

Based upon my review of the data provided by Broward County, I found that laptop computers were unequally distributed in Broward County in the 2000 general election.[10] Precincts in which Blacks predominated in number among registered voters were disproportionately left without laptops, compared with other precincts. Although the racial breakdown of every precinct could not be ascertained (because not all the precincts were identified by race), I nevertheless was able to identify a significant number (majority) of the 616 total number of precincts by race. Of these precincts that were identified, 27 received a laptop. Again, I used the 1996 data and calculated the racial composition of each precinct that received a laptop with the aggregate percentage of Black voters in such precincts. In 1996, the total of registered voters for the 27 precincts receiving laptops was 64,499.[11]

The total number of registered voters was 797,103 in 1996, and the total number of registered Black voters was 91,701 or 11.5%. But the percentage of Black voters that voted in a precinct with a laptop was only 4.68%, less than half the total percentage of Black voters in Broward County. Only one precinct where Black predominated in number—14L—had a laptop.

---

[10] I used 1996 demographic data to determine the racial composition of precincts, which was not available for 2000, and then used 2000 election data to produce the following calculations.

[11] The average number of registered voters who were Black in these precincts was 3,018. There were 870,104 registered voters in the fall of 2000. Broward has 616 precincts with an average of approximately 1,400 voters per precinct. These precincts were relatively large—the smallest one had 2,018 registered voters.

**Broward Precincts Assigned Laptops**

| Laptop No. | Precinct No. | 2000 Voters | 1996 Percent Black Voters |
|---|---|---|---|
| 27 | 32C | 2,960 | 2.94 % |
| 28 | 7D | 2,631 | 5.54 % |
| 6 | 12E | 2,759 | 2.48 % |
| 7 | 18E | 2,782 | 3.60 % |
| 8 | 22E | 5,131 | 4.26 % |
| 14 | 2G | 3,204 | 1.94 % |
| 15 | 14L | 2,862 | 21.50 % |
| 1 | 26M | 3,465 | 4.59 % |
| 2 | 30M | 2,934 | 6.52 % |
| 26 | 28N | 2,879 | 2.54 % |
| 9 | 41Q | 2,998 | 1.13 % |
| 29 | 48R | 2,325 | 1.51 % |
| 30 | 65R | 2,018 | 4.37 % |
| 3 | 18T | 2,913 | 0.94 % |
| 16 | 6U | 3,206 | 3.09 % |
| 17 | 7U | 2,876 | 2.86 % |
| 18 | 14W | 3,647 | 6.66 % |
| 19 | 19W | 5,656 | 10.30 % |
| 20 | 20X | 4,389 | 3.67 % |
| 21 | 22X | 3,302 | 0.88 % |
| 22 | 30X | 3,116 | 3.45 % |
| 23 | 32X | 3,937 | 8.68 % |
| 24 | 35X | 7,427 | 8.31 % |
| 25 | 36X | 3,810 | 8.54 % |
| 4 | 60Z | 5,434 | 0.94 % |
| 5 | 66Z | 3,272 | 1.83 % |
| unavailable | 69Z | 7,612 | 2.21 % |

(Election data and data about precincts that were assigned laptops for the different years were drawn from Bates Numbers A001539-A001586; A001757-1769; Bates Numbers A001770-A001881; A001882-2003; and Bates Numbers A002057-A002065; I also used election data from a CD Rom provided by NAACP, which conforms to the relevant above Bates Numbers.)

Even though precincts Blacks predominated in number among registrants in the county, several were large enough to merit receiving a laptop computer, based upon population figures of precincts that did receive laptops. It would have been possible to assign laptops equitably, but this was not done in 2000. The below table shows how a more equitable distribution could have been made. Fourteen Black precincts have more than 1,400 voters, which was not equal to other precincts.

**Black Precincts**[12]

| Precinct No. | 2000 Voters | 1996 Percent Black Voters |
|---|---|---|
| 6C | 1,946 | 97.4 % |
| 7C | 2,020 | 70.1 % |
| 16C | 1,818 | 81.7 % |
| 6L | 1,920 | 62.1 % |
| 4M | 1,755 | 26.3 % |
| 1N | 1,627 | 49.0 % |
| 38R | 1,753 | 96.9 % |
| 9X | 1,812 | 15.4 % |
| 26X | 1,636 | 18.1 % |
| 15Y | 1,772 | 86.1 % |
| 7Z | 1,617 | 98.0 % |
| 8Z | 1,617 | 44.7 % |
| 31Z | 1,712 | 95.4 % |
| 34Z | 1,506 | 96.0 % |
| 26X | 1,636 | 18.1 % |

The above data show the 15 precincts with laptops. Therefore these precincts had greater capacity to communicate with the Supervisor of Elections office to verify a voter's registration status and facilitate the voting process at poll sites. Moreover, the counties that did not have laptop computers at all would have benefited from their use by increasing communication mechanisms and avenues to verify voters' registration status that would have reduced long lines and voter disenfranchisement (discussed below).[13]

**Hillsborough County**

In Hillsborough County, 10 precincts were provided with laptops, none of which went to majority black precincts. The following 10 precincts were provided with laptops: Precinct 341, 361, 527, 559, 562, 563, 587, 751, 817, 829, 949. According to documents provided by the defendant (Exhibit Q, Deposition of Pam Iorio, May 6, 2002), the stated reason for giving those precincts laptops was primarily because they were "large and growing." Yet, of the 10 precincts that were provided with laptops, 4 of them had fewer voters in the precinct than many other larger precincts. For instance, precinct 341 had 2,280 voters, precinct 559 had 2,642 voters, 562 had 2,242 and 563 had 1,196. These precincts contain numbers of voters that are relatively low compared to many other precincts that had much larger numbers of voters. For example, precinct 139 had 3,885 voters, precinct 457 had 3,733, 761 had 3,734, and 817 had 3,709 voters—yet none of these precinct were provided laptops.

---

[12] Black precincts are defined as Blacks predominated in the average number of Blacks in precincts and the county as a whole.
[13] Other defendant counties that used laptops did not provide sufficient data to make any definitive assessments about the distribution of laptops and whether these patterns appear in those counties.

19

Many of the majority black precincts contained a larger number of voters than precincts that were provided with laptops. Precinct 563 (which did receive a laptop) had 1,196 voters, yet 14 of the 26 black majority precincts had a greater number of voters than precinct 563, but none received a laptop. Thus, this data suggests poor planning by the SOE to equally distribute laptops, and shows that disparate outcomes occurred in this regard—that no black precinct received a laptop in Hillsborough County.

## B. Other Poll Site Problems Identified by Voters and Poll Workers

In addition to the maldistribution of laptop computers, problems with the processing of voter registration applications and communication with voters about their status described above, I identified other problems in the election administration systems in several of the defendant counties that had a negative impact on voters' ability to cast ballots.

### Hillsborough and Volusia Counties

The tables below list the most commonly occurring problems reported by poll workers in both Hillsborough and Volusia Counties. It is not a comprehensive or exhaustive list of problems, but rather the most commonly cited ones by election workers.

| Clerk Feedback Forms - Hillsborough County (Bates Numbers G000507 – G000702; reviewed 195 reports) |
|---|
| *Reported Problem* |
| • Trouble with Clerks' Phone Bank/ Could not get through to Phone Bank |
| • Poll workers lack of adequate training |
| • Long Lines |
| • Department of Motor Vehicles failure to Process registration documents |
| • Lack of enough votomatics |
| • Lack of handicap parking/facilities |
| • Voters had registration card with correct Precinct, but did not appear on voter rolls |
| • Too few poll workers |
| • Could not operate Votomatics |
| • Disorganized poll sites |
| • Voting Machine Breakage |
| • Ran out of Affirmation forms |
| • Poll sites should be open later |

| General Election Questionnaire by Poll Workers – Volusia County  (Bates number K002613 – K002940; reviewed 327 reports) |
|---|
| *Reported Problem* |
| • Trouble with Clerks' Phone Bank/ Could not get through to Phone Bank |

- Long lines to vote
- Lack of supplies (Lack of Affirmation Ballots,
  lack of sufficient # of Voting Machines,
  lack of supplies, lack of telephones, and
  lack of enough poll worker manuals)
- Problems with DMV registration processing
- Problems communicating with Elections
  Office prior to Elections Day
- Equipment failure/Machine Breakage
- Lack of poll workers
- Accu-Vote not properly working
- Parking problems
- Lack of handicap facilities

The Clerk Feedback Forms from Hillsborough County and the General Election
Questionnaire from Volusia County reveal that the most often cited problem of poll
workers in both counties was trouble getting through to the Supervisor of Elections
Office for voter registration verification. 69.2% of Clerk Feedback Forms in
Hillsborough and 40.4% of General Election Questionnaires site this common problem.
Thus, in both of these counties, this problem was severe. Another high frequency
problem was long lines to vote, 5.6% in Hillsborough and 25.7% in Volusia.

*Volusia*

In the Certificate of Service and Answers and Objections to Interrogatories to Defendant
Deanie Lowe, dated October 24th 2001, Ms. Lowe identifies seven persons who left the
polls before poll workers verified their registration status (in item number 2). The
problem of busy phone lines and long waits apparently was what led these persons to
leave without voting. In addition, a poll worker from Precinct 326 in Volusia County
stated, "We lost twelve voters because we could not tell them where to vote. We need a
map/precinct guide" (Bates Number J000207).

*Hillsborough*

There were numerous cases in Hillsborough where voters were wrongfully denied the
right to cast a ballot even though they were registered to vote (Bates Number G002918
and G002919). While Dr. Susan MacManus acknowledges such instances in her
deposition on June 12, 2001, she does not acknowledge the severity of this problem; nor
does she acknowledge that other kinds of elections problems beset Hillsborough County
and other counties during the November 2000 elections. Dr. MacManus suggests in her
deposition that Clerk Feedback forms are unreliable and that poll workers focus on
problems, not positive aspects of election administration. This is an overgeneralization. In
my experience analyzing election administration generally and reviewing poll worker
forms, poll workers report a whole range of things—both positive and negative—
including electioneering, ignorant or disruptive voters, intervention by police officers,

and so on. Indeed, the fact that so many clerks—who are employed by the SOEs—admitted there were severe problems in the administration of elections speaks to their validity.

According to her deposition, Dr. MacManus appeared to have reviewed a smaller universe of documents and/or did not identify problems, such as poll worker complaint forms, which point to a wide range and extent of election problems. Dr. MacManus states she examined "Comment Cards" that voters filled out at polling places in Hillsborough County to measure the performance of election administration and poll workers at precincts on November 7, 2000. She contends that three quarters of these comment cards gave a "good" or "excellent" rating, and that there was little difference by race (i.e. that the comments did not differ between Black voters and White voters, although she notes the cards do not identify the voter by race. The best one can do, she suggests, is examine the comment cards "in heavily minority precincts versus precincts at large." See page 36). However, she did not present any other evidence of other evaluations of the Hillsborough election administration, as the above cited sources provide.  The total of 195 complaint forms filled out by poll workers themselves identify a broad range of election problems in Hillsborough County, and other data cited below show the extent of such problems was significant—all of which Dr. MacManus fails to adequately address. Although Dr. MacManus claims to have looked at "problems with registrations not getting recorded; poll worker problems; problems with transferring information from one agency to another—state agency to another; long lines; things like phone lines being jammed; and fraud," she does not provide any data about the extent of these problems in Hillsborough and other counties (other than to say that Hillsborough experienced similar problems that other jurisdictions in the country experienced, as outlined in several national studies she examined).

Moreover, Dr. MacManus does not explain:  the number of comment cards she examined; how these comment cards were distributed to voters (did poll workers offer them, were they on tables, were there signs posted notifying voters of such comment cards, etc.); how many were actually distributed to voters, and were they widely distributed to a sizable and random sample of voters.

Instead, according to Dr. MacManus, she primarily measures the "impact" of Hillsborough's election administration practices (and whether there was any discriminatory impact) in terms of "voter registration and turnout," which she claims was high and therefore proves the system performed well (pages 33-36). However, again, this methodology is flawed. First, increased registration and turnout rates would not discount any election problems that this report as well as other studies and reports identify. In fact, as noted above, voter registration and turnout rates could have been even higher if it were not because of the extent of such election problems. Second, Dr. MacManus does not compare the voter registration and turnout rates in the 2000 elections to other elections in Hillsborough or elsewhere (to provide a comparative context). It is hard to know if registration and turnout rates in 2000 were higher in Hillsborough than in the 1992 elections, for example, when voter turnout increased in the presidential elections in many jurisdictions and in the country as a whole (as opposed to 1996 when turnout in much of

the country declined). Most importantly, registration and turnout rates are not the only or most important indicators of election performance. Rather, according to most of the political science literature, registration and turnout rates are often a function of other factors (such as the particular election laws and practices, the degree of party competition, issue salience, evaluation of candidates, level of voter mobilization or demobilization by various organizations and the media, and other factors. See, for example, Schattschneider, 1960; Burnham, 1970; Rosenstone and Hanson, 1993; Piven and Cloward, 2000; and .) High voter registration and turnout may instead be viewed as a testimony to the fact that voters were highly mobilized in the 2000 elections, even in the face of flaws and inadequacies of the election system. Finally, Dr. MacManus did not examine whether the increase in voter registration was reflected in a concomitant increase in the number of precincts and poll workers to service the increase in registered voters. As this report demonstrates (below), such considerations were woefully lacking and resulted in over-crowded polling places with an insufficient number of poll workers and left many voters (and poll workers) frustrated and too many voters disenfranchised.

The national studies and reports cited above (and in section 5) suggest the conditions and disparate outcomes found in Hillsborough and Volusia are not particular to these counties, and that other defendant counties were likely to experience similar patterns and problems.[14] (See also Complaint information: Orange County, Bates Numbers A018789-A018792, J001155-J001173; J000165-J001316; Hillsborough County, Bates Numbers A012007-A012173; G000001-G000506; G002918-G002919; Volusia County, Bates Numbers K003001; K000001-K000052; K000490-K000509; K002941-K003070; Miami Dade County, Bates Numbers 31572-31702.)

## Orange County

An examination of emails, memos and other documentation of voters in Orange County reveal the following list of most commonly cited voter complaints. (I was not able to tabulate the frequency of each case as above because there was not a sufficient kind and amount of data available to analyze.)

## Most Frequently Cited Complaints by Voters in Orange County

(Bates Numbers A018789-A018792, J001155-J001173)
- Did not receive voter card, could not vote
- Name not in voter's register, could not vote
- Confusing Ballot
- Registered to vote online, no card, could not vote
- Poll worker said voted absentee – Not True
- Absentee Ballot did not arrive, could not vote
- Not allowed to Vote
- Sent in absentee ballot – election office has no record
- Voters standing in line were asked to leave

---

[14] U.S. Civil Commission on Rights Report, 2001; House of Representatives reports and testimony, 2001; CalTech/MIT. 2001; Constitution Project. 2001.

- Inactive status: Cannot vote
- The inclusion of a middle name resulted in my name not being found
- One county's DMV office did not forward voter registrations applications to appropriate county
- People have registered to vote at the DMV, but have left off 'mandatory information,' thus leaving them officially unregistered, and unknowingly disenfranchised
- Wrongfully listed as Felon Voting Status
- Officials not processing Incomplete Applications in Timely Fashion

Other problems reported by voters via email to Orange County Elections Officials include (Bates Numbers J000165-J001316):

- The most often cited complaint by voters denied the right to vote was needing to wait for address change verification were they were unable to receive due to technical difficulties or busy phone lines;
- trouble voting;
- lack of adequate help from poll workers;
- language barriers;
- poll site location changed without notice;
- parking lots closed at poll sites
- voters with disabilities having difficult access to polls
- computer server down or crashed.

## C. Busy Telephone Lines

The largest number of voter complaints reflected in reports of poll workers and/or supervisors was busy phone lines. As a result, many voters were told they could not vote. Numerous reports of this kind were found in voter complaint forms from Hillsborough, Volusia, Orange, and Broward counties.[15] More importantly, many voters were not told about the possibility of voting by affirmation or affidavit. (U.S. Civil Rights Commission, 2001; Merzer, 2001; House of Representatives Reports and Testimony, 2001.) Both such occurrences led to voters being disenfranchised, as described below.

Voter disenfranchisement can occur due to a lack of the capacity to communicate between precincts and SOE offices. In many counties, this capacity was extremely limited on Election Day in 2000 (whether by malfunctioning and/or insufficient number, or maldistribution of laptop computers, or by insufficient number of telephone lines and/or operators, and insufficient number or poorly trained poll workers or voters who called), and this limited capacity frequently broke down. As the above data demonstrate, the lack of telephone availability and laptop functioning or laptop coverage was widespread. Most importantly, these communication breakdowns disproportionately

---

[15] No documents or data were provided to ascertain whether such problems existed in Duval, Leon, and Miami-Dade counties. In fact, these latter counties provided few documents to study their election administration systems in general. Nevertheless, as indicated in the above-cited studies, similar communication problems apparently also existed in these counties, and in the state of Florida as a whole.

24

affected people of color. (U.S. Commission on Civil Rights, 2001; Merzer, 2001; House of Representative Reports and Testimony, 2001; Constitution Project, 2001; U.S. Civil Rights Commission, 2001.)

Even several elections officials themselves acknowledge this problem. For example, the Hillsborough Supervisor of Elections, Pam Iorio, told the Governor's Select Task Force about Hillsborough County's lack of capacity to handle the volume of telephone calls: "But regardless of the reason [why a voter's name is not on the voter rolls], the voter is frustrated and believes that he/she should be able to vote, the poll worker is following procedures and calling the phone bank, and in a large county, the crush of phone calls overwhelms whatever size phone bank the supervisor has provided. In large urban counties, where people move frequently, there will always be more calls made to the elections phone bank than can be accomodated." (Iorio, 2001: 14)

### Hillsborough County

In Hillsborough County poll workers were asked at the end of their work shift to complete a "Clerk Feedback Form." Two questions in particular received the highest frequency of response from poll workers. The first question asked the worker to describe any problems they encountered with the Clerks' Phone Bank, while the second question addressed the three most common complaints made by voters. The response to the first question was the largest number of reported problems, which was trouble getting through the telephone lines when attempting to verify a voter's status. "Busy-Busy-Busy Long waits after getting through – longest wait about 1 ½ hours. Poor connections – Voters don't like to wait!" stated one poll worker (Bates Numbers G000507-G000702). Another worker describes, "We have never had such delays - some of the voters gave up and left." (Bates Numbers G000507-G000702) There were a variety of answers to this particular question, yet each had in common the length of time it took to get through to the Clerks' Phone Bank. As repeatedly stated on the forms, many voters did not vote because of the time it took to verify status with the Phone Bank. (Bates Numbers G000507-G000702.) Responses to the second question confirmed that voters were forced to wait an extremely long time for phone verification. (Bates Numbers G000507-G000702.) Thus, this data demonstrates there were significant voter problems, such as long lines and an inability to verify voters' status, which resulted in voter disenfranchisement.

### Volusia County

We see similar acknowledgement of limited and insufficient capacity in Volusia County. In a memo from Deanie Lowe's office, she documents that the number of phone clerks for the entire county of Volusia was a mere 30 on Election Day. She states, "We had a total of thirty people taking calls just as fast as they could, but (as with every other large county in the state) our phone lines were still jammed. I seriously doubt we could have handled the volume of calls had we been able to have 100 operators on duty!" (Bates Number K003029). The total number of registered voters countywide was 262,809. As Supervisor Lowe's above remarks state explicitly, ensuring a proper number of phone

bank workers that could handle the number of calls from voters and poll workers would be essential to adequately field all such calls.

Volusia County, much like Hillsborough County, revealed the serious problems with telephone lines, which for many individuals meant that they were unable to vote. As one poll worker from precinct 203 stated, "It normally took 45 – 55 minutes of continual dialing to finally get through to the office. Because of this I had a number of disgruntled people leave without voting" (Thomas E. Schmidt, Bates Numbers K002613-K002940). Based upon my years of experience studying the communication systems of election administration—particularly in New York—the length of time it took to get through in Volusia was exceptionally long. "I spent hours (no exaggeration) trying to get through. Some of the voters were much more patient than I might have been in their situation" (Precinct 202, Donald Strait. Bates Numbers K002613-K002940).

In Precinct 217, where 49 percent of the registered voters are Black and 43 percent of those that voted are Black, we hear from a poll worker that there was an "extensive wait and inability to connect with elections office regarding voter's right to vote. Some left without voting due to the long wait" (Stephanie Krawczynski, Bates Number K002613-K002940). Another poll worker from a precinct in which Blacks predominated in number states, "I had to assign one person to constantly redial the phone until we could get someone. It finally took about 40 minutes to reach someone. As you can imagine, it was very frustrating for both the election worker and the voter who sat for 40 minutes or so watching the phone being dialed, redialed, etc. In a couple of instances voters decided finally they didn't want to wait any longer and left without our being able to let them vote" (Gary Adams, Precinct 223, Bates Number K002613-K002940). In addition, taking a poll worker away from their assigned duties to only make calls contributes to longer lines for registered voters. This in turn creates the conditions for the increased likelihood that voters would leave the poll site without voting because these voters become frustrated, must get to work, get home to attend to children and so on. (Merzer, 2001; CalTech/MIT, 2001; Constitution Project, 2001; House of Representatives reports and Testimony, 2001; U.S. Commission on Civil Rights.)

### Orange County

The above findings are consistent with comments made by Orange County Poll workers in the "Election Board Comments" forms where similar problems were documented regarding the length of time it took to get through to the Phone Bank. In Orange County, the busy phone lines were only one of the many reported problems that were very serious in nature and scope. As noted in the previous section in this paper, many different precincts in Orange were unable to access the Internet on the laptops, therefore, making it difficult to verify voter information.

Poll workers corroborated that telephone access was quite limited in Orange County, too. A poll worker from Precinct 230 wrote in his Election Board comments: "Dear Bill, It is now shortly after noon. We have attempted for five hours to reach anybody on the phone list. We have had at least a dozen people we have had to turn away with much

dissatisfaction. Some were assured through phone calls or even a few by letter who were positively told they were eligible to vote at Precinct 230, yet their names were not in the PR/PL" (Bates Number J000216). According to another poll worker from Precinct 137, "our cell phone battery died well before 7pm, resulting in individuals using their own phones" (Bates Number J000210).

Moreover, in Orange County, numerous emails were received from voters on November 7th who were trying to get through on busy phone lines to get correct information regarding polling location, change in poll site, verification for change of address of eligible registered voters, etc.

Commissioner Betty T. Wyman called and emailed the Supervisor of Elections Office "extremely upset over a situation that occurred" on Election Day "at the precinct in Ventura when she took her 91-year old mother, Pauline Ruth Bolch to vote" (Email Communication with Grace Chewning, Office of Elections. Bates Number J001214). The situation involved a question about voting in person versus by absentee ballot. According to email communication with Grace Chewning, Commissioner Wyman said "the workers were unable to get through on the phone" to the Orange County office "for any direction, which they advised had been the problem all day and also involved calls about similar cases." (Bates Number J001214)

These conditions created larger communication problems, in part, because paper printouts of inactive voters were not available in any of the precincts in Orange County. The PR/PL lists contain only active voters. Therefore, the voter affirmation process requires the one oath person at each precinct to access the complete voter list by laptop (in laptop precincts) or by telephone (in all other precincts) by calling into the SOE in order to determine if a voter not on the active PR/PL list is eligible to voter.

William Cowles appears to acknowledge the scope of such problems in Orange County. He suggests there were an insufficient number of phone lines and phone operators to serve all the voters and poll workers who called during the 2000 general election. (Deposition of William Cowles, dated April 12, 2002, page 254). He states: "From midnight election eve to midnight election day we received 15,460 incoming phone calls, between the hours of noon and 6:00 p.m., we averaged 1,350 calls per hour" (ibid., page 257). Mr. Cowles further states that "at the precinct the person would determine on the affirmation whether they were eligible to vote or not eligible to vote. So, if it was determined by contact with our office that they were not eligible to vote, then they wouldn't have been eligible to vote" (page 211). However, in the cases identified in this report—and in other counties—the inability of oath persons to contact the central office was prevalent. This conclusion is further evident in William Cowles admission that "the system [computer] crashed twice, which I have referred to on numerous occasions here about the server that supported the laptops that crashed" (Deposition dated April 12, 2002, page 283). In fact, Mr. Cowles goes on to explain how the server crash exacerbated the already inadequate phone supply: "I stated earlier that our file server that supported the laptops went down, but the laptop operators then had their cell phones, or if there was a land phone in their precinct to use, which then put an additional burden on our phone

system in those hours early in the morning before the file server was brought back up on election morning" (ibid., page 260). While Mr. Cowles reports that there was never a point at which any of the phone lines were not working (page 255) and that the computer server was fixed, the evidence presented in this report indicates that poll workers and voters complained in Orange County that phone lines were down for five hours causing dozens of potentially eligible voters to being turned away (Bates Number J000216) and that the computer server was down for 5-6 hours as reported in the following precincts: 104, 131, 137, 214, 216, 317, 326, 403, and 504 (Election Board Comments, Bates Numbers J000192 to J000216).

### *Duval County*

Duval's Election Reform Task Force states in its Final Report that, "Among the most prevalent grievances which the Task Force heard regarding the November 2000 election was the inability of precinct workers to communicate with the central office of the Supervisor of Elections, particularly to verify registration. Accordingly, a number of registrants were denied the right to vote, and others voted who were not registered" (June 12, 2001, page 28). The Task Force recommends not only the purchase of laptop computers for every precinct to aid in rectifying this problem, but the telephone bank staff must be increased greatly to be able to deal with the number of calls that are made. "The number of phone lines, and systems and procedures, should be adequate to deal with the potential demands upon it, ensuring that every citizen needing to get through does so" (page 28).

As the U.S. Civil Rights Commission (2001) documented from first-hand accounts of voters, many poll workers confirmed such widespread voter disenfranchisement issued from these conditions. Despite the fact that many voters had updated registration cards, often their names did not appear on the rolls, forcing the Clerk to call the Phone Bank. "Many of these voters, however, were not permitted to vote because the poll workers could not get through on the phone line to the supervisor's office" (2001, p. 3). This type of problem is one the most frequently cited in their report that occurred at the polls on Election Day.

Based on the volume and nature of the complaints and feedback from poll workers and voters, the capacity of Supervisor of Elections offices to handle the volume of inquiries— whether by voters or poll workers—was far below the demand and need. Such cases and circumstances suggest these failures to communicate effectively with SOE offices, poor planning, insufficient staffing and resources, and a lack of state-established uniform standards to take necessary and proper measures to ensure effective and efficient election administration resulted in these voters' inability to cast a ballot.

Instead of election systems that produced "high performance, efficiency, and effectiveness," as Dr. MacManus claimed was the case in Hillsborough and other defendant counties in Florida, I found evidence of significant inefficiencies and ineffectiveness.

## 3.  POLL WORKER PROBLEMS

In addition to the range of poll site problems and institutional failures described and documented above, there was a host of problems related poll workers in the 2000 general election that also produced voter disenfranchisement. Poll workers were not equally distributed by precinct. In fact, the evidence points to a maldistribution of poll workers by precinct by race. In addition, poll workers made errors that resulted in voter disenfranchisement.

### A.  Allocation of Poll Workers

On top of the problems identified thus far is another factor which contributed to voter disenfranchisement: the maldistribution of poll workers by precinct. I reviewed election data for both the 1998 elections and the 2000 elections in Orange County that revealed a significant variation by racial composition of the precinct.

*Orange County—1998*

Election data from 1998 in Orange County (Bates Numbers J007400-J007404) reveals that there are 18 Black plurality districts in Orange County. The table below describes the precinct number, the total registered voters and percentage of Black registered voters in each, and the number of poll workers assigned to each precinct according to the Supervisor of Elections Poll Worker Election Master List (Bates Numbers J000464-J000612):

| African American Plurality Precincts in Orange County | | | |
|---|---|---|---|
| **Precinct #** | **% Black Reg Voters** | **Total Reg** | **# of Poll Workers** |
| 204 | 95% | 1,041 | 8 |
| 216 | 40% | 1,610 | 7 |
| 225 | 55% | 982 | 5 |
| 226 | 87% | 1,479 | 10 |
| 601 | 77% | 1,825 | 6 |
| 602 | 66% | 1,768 | 6 |
| 603 | 76% | 1,330 | 10 |
| 604 | 88% | 2,021 | 9 |
| 605 | 49% | 1,881 | 6 |
| 610 | 86% | 1,031 | 5 |
| 611 | 92% | 1,810 | 8 |
| 613 | 42% | 1,694 | 8 |
| 612 | 94% | 1,765 | 5 |
| 615 | 72% | 2,330 | 10 |
| 616 | 96% | 2,072 | 9 |
| 617 | 94% | 1,360 | 7 |
| 620 | 44% | 2,326 | 10 |
| 622 | 40% | 789 | 6 |

The table below compares the average number of poll workers per precinct in Orange County as a whole with the average number of poll workers in the Black Plurality precincts:

| Poll Worker Distribution in Black Precincts in Orange County | |
|---|---|
| Total # of Poll Workers in Orange County: | 2394 |
| Total # of Precincts: | 216 |
| Average # of Poll Workers per Precinct: | 10 |
| | |
| Total # of Poll Workers in Black Plurality Precincts: | 135 |
| Total # of Black Plurality Precincts: | 18 |
| Average # of Poll Workers in Black Majority Precincts: | 7 |

These data show that the average number of poll workers per precinct in Orange County was 10, the average number of poll workers in Black plurality precincts was significantly lower, at 7. As discussed above, lower numbers of poll workers per precinct results in a more limited capacity to assist voters, check voter rolls, answer questions, call the central office or use the laptop for voter registration verification in a timely manner.

*Orange County—2000*

When I examined the data from the 2000 elections, I found further evidence of mal-distribution of poll workers by precinct. Black plurality precincts still had only seven poll workers compared with ten poll workers (on average) for the county as a whole. Furthermore, the number of Black Plurality precincts grew from 18 in 1998 to 22 in 2000, which affected a larger number of people.

I used similar methods to obtain this finding. I reviewed election data for the September 2000 Primary Election in Orange County (total registered voters by race for each precinct, Bates Numbers J007425-J007443) and compared these figures with the number of poll workers assigned to each precinct in order to discern if there was any disparity between Black and White precincts (Bates Numbers J000464-J000612).

Orange County Elections Statistics broken down by race and precinct were only provided for the September, 2000 Primary Election (Bates Numbers J007425-J007443). However, in Orange County for the November 2000 General Election, total registered voters and actual voters broken down by race were provided (Bates Numbers J000113-J000118):

**November 7, 2000 General Election**

| | Total | White | Black |
|---|---|---|---|
| Total Registered: | 405, 048 | 279,687 | 51,364 |
| Total Voters: | 282,277 | 202,035 | 34,910 |
| % of Registered Voters: | 70% | 72% | 68% |

These documents reveal that there were twenty two Black plurality districts in Orange County. The table below details the precinct number, the percentage Black voters in each precinct, the total registered voters, and the number of poll workers assigned to each

precinct for the 2000 General Election, according to the Supervisor of Elections Poll Worker Election Master List (Bates Numbers J000464-J000612):

| African American Plurality Precincts in Orange County in 2000 | | | |
|---|---|---|---|
| Precinct # | % Black Voters | Total Reg | # of Poll Workers |
| 204 | 94% | 948 | 8 |
| 216 | 43% | 1,730 | 7 |
| 225 | 53% | 925 | 5 |
| 226 | 86% | 1,517 | 10 |
| 510 | 46% | 1,659 | 5 |
| 601 | 72% | 1,768 | 6 |
| 602 | 63% | 1,787 | 6 |
| 603 | 74% | 1,434 | 10 |
| 604 | 86% | 1,998 | 9 |
| 605 | 51% | 1,941 | 6 |
| 610 | 86% | 1,068 | 5 |
| 611 | 91% | 1,865 | 8 |
| 612 | 92% | 1,742 | 5 |
| 613 | 48% | 1,847 | 8 |
| 615 | 70% | 2,569 | 10 |
| 616 | 95% | 2,083 | 9 |
| 617 | 92% | 1,373 | 7 |
| 618 | 44% | 1,626 | 9 |
| 619 | 44% | 1,357 | 9 |
| 620 | 47% | 2,560 | 10 |
| 622 | 40% | 1,010 | 6 |
| 623 | 32% | 1,650 | 6 |

Although I was unable to analyze these data for the 2000 General Election—because it was not provided by the Orange County SOE in sufficient time to include in this report—it is likely that the number of registered voters was even higher by the time of the 2000 General Election. While this is probably true for both Blacks and Whites, the number of registered Blacks might have been higher than for Whites given the level of registration activity and increased rate of registered voters between the Primary and General Elections (Merzer, 2001; Various news articles; and reports by the NAACP and the AFL-CIO, who conducted massive voter registration and mobilization efforts during 2000.) Moreover, if one were to calculate the racial disparities at a lower threshold—rather than majority Black precincts (50%), using plurality proportions (the highest percentage of all groups), or a predominant number of Blacks per precinct (where Blacks constitute a larger than average number for the county as a whole—then the disparity among poll workers assigned to Black and White precincts would have been even higher.

The table below compares the average number of poll workers per precinct in Orange County as a whole with the average number of poll workers in the Black Plurality precincts in 2000:

| Poll Worker Distribution in Black Precincts in Orange County | |
|---|---|
| Total # of Poll Workers in Orange County: | 2394 |
| Total # of Precincts: | 232 |
| Average # of Poll Workers per Precinct: | 10 |
| | |
| Total # of Poll Workers in Black Plurality Precincts: | 164 |
| Total # of Black Plurality Precincts: | 22 |
| Average # of Poll Workers in Black Majority Precincts: | 7 |

Thus, we find the same results: the average number of poll workers per precinct in Orange County was 10, the average number of poll workers in Black plurality precincts was significantly lower, at 7. Again, such disparities are important because a lower number of poll workers in such precincts result in a diminished capacity of poll workers to assist voters, check voter rolls, answer questions, and call the central office or use the laptop for voter registration verification in a timely manner—all of which can lead to voter disenfranchisement.

As the number of registered voters increased in all precincts including Black precincts, the OCSOE should have adjusted accordingly, but it did not. In William Cowles' deposition dated April 12, 2002, he states that the minimum number of poll workers per precinct is "probably seven," because there are five people to cover the five basic jobs, and at least two PR/PL books to be covered by one poll worker each: "There is never less than two books" (page 232). However, the poll worker data (Bates Numbers J00464-J00612) reveals that the average number of poll workers in Black plurality precincts during the 2000 General Election was 7, with 5 precincts containing only 6 poll workers and  4 precincts containing only 5 poll workers, below the minimum number cited as necessary by Mr. Cowles (pages 231-232).

*Volusia County*

I reviewed similar data in Volusia County. I took a representative sample of 26 total precincts, matched in terms of the number of registered voters per precinct: 13 of which were plurality Black precincts and 13 plurality White precincts in Volusia County. The average number of poll workers in both sets was 8 per precinct.  The two different sets of precincts were matched by the number of registered voters in a selected precinct. In each case, with one exception, the difference in the number of registered voters was never greater than 43. The logic in using this method is that by comparing precincts extremely close in size and differing in only racial composition would reveal whether resources were allocated equally. No disparity was found between these two sets of precincts regarding the number of poll workers alloted by Volusia County. (Bates numbers A008591 – A008763.)

But the data show that Volusia County did not sufficiently apportion polls workers according to precinct size. That is, fewer poll workers were assigned and worked than needed for the number of registered voters per precinct, according to the SOE threshold for splitting a precinct into two.  For example, Volusia County apportioned approximately

the same number of poll workers to nearly every precinct regardless of precinct size, as measured by the number of registered voters. Yet, as has been shown in the numerous cited studies, the greater the number of registered voters in a precinct, the greater the need for poll workers to handle the volume. Precincts that have a higher number of voters on election day—with limited capacity by poll workers to facilitate their casting of ballots—experienced the kinds of problems described and documented above.

According to the Deposition of Deanie Lowe dated April 24, 2002, she states, "When a precinct reaches approximately 2,000, we start carefully watching it to see – make sure that we're not having lines on elections day…" (pages 68-69). She goes on to clarify that she is referring to the number of registered voters in the precinct, and in the event there are 3,000 registered voters in a precinct, the SOE office will split up that particular precinct into two. Ms. Lowe refers to three thousand registered voters as the "threshold" that would trigger splitting a precinct.

However, according to documents provided by the defendant, in Volusia County there were four precincts that contained over 3000 registered voters in the November 7, 2000 elections. They were: precinct numbers 307, 403, 413, and 304, the later of which had 4,213 registered voters. (Bates numbers A008591 – A008763.) Moreover, there was a total of 172 precincts, 46 of which had 2,000 or more registered voters (Bates numbers A008591 – A008763). This means that 27 percent of the precincts in Volusia County had the number of registered voters that Ms. Lowe referred to as those that required special monitoring. If you also count the number of precincts that actually had between 1,800 registered voters and 1,999, an additional 17 precincts fall into this category of large size precincts. Thus, 37% of all precincts were large size precincts.

In addition to the significant number of precincts in Volusia County that had high numbers of registered voters per precinct, the number of poll workers was not proportionate to the number of registered voters per precinct. Specifically, the average number of poll workers per precinct in Volusia County was 8. In the 46 precincts that had 2,000 or more registered voters, the greatest number of precincts had a mere 9 poll workers. Below is a breakdown of the number of poll workers in the 46 precincts.

**Precincts in Volusia County that had 2,000 or more registered voters and the number of poll workers in those 46 precincts** (Bates Numbers A009442 – A009721)
- 2 of the precincts had 8 poll workers
- 24 of the precincts had 9 poll workers
- 14 of the precincts had 10 poll workers
- 1 precinct had 11 poll workers
- 1 precinct had 12 poll workers
- 1 precinct had 13 poll workers
  (3 of the precincts were missing from the list.)

In conclusion, as Deanie Lowe suggests, precinct size correlates with potential poll site problems, such as, but not limited to, long lines for voters, long waits to vote and/or to communicate with the SOE office—essentially a lack of sufficient number of poll workers to properly service the volume of voters in large precincts. As described above,

these particular types of problems led individuals identified (and other individuals not identified) to leave a poll site without voting, thereby, contributing to the disenfranchisement of these voters.

### Hillsborough County

The data show Hillsborough County is closer to Volusia County than to Orange County regarding the average number of poll workers pre precinct per voter.[16] After reviewing documents provided by the Hillsborough County (Bates number A011307 – A011315), I found that there were 319 precincts in Hillsborough County and the total number of poll workers for the entire county was 2,830. That yields an average of 8.9, or approximately 9, poll workers per precinct. A more accurate method of assessing the distribution of poll workers is to count the mode, or the most number of occurrences in a distribution. In this case, the mode turned out to be similar to the average—most precincts had either 8 or 9 poll workers.

Nevertheless, important differences existed between precincts in terms of the number of poll workers per voter in Hillsborough County during the November 2000 elections. Essentially, many precincts had fewer numbers of poll workers per voters. Moreover, the number of voters by precinct varied greatly in Hillsborough from few voters at certain precincts (for example, precinct numbers 200, 342, 354, 516) up to 3,000, 4,000 and even close to 5,000 voters in a single precinct (precinct numbers: 139, 361, 457, 500, 527, 587, 751, 949).

The following displays the modal distribution of poll workers per precinct in Hillsborough County (Bates numbers A011307 – A011315)

41 precincts had 8 poll workers
38 precincts had 9 poll workers
33 precincts had 10 poll workers
28 precincts had 7 poll workers

The remaining number of poll workers per precinct varied from a low of 2 (13 precincts) to a high of 21 (1 precinct).

Twenty-six of the 319 precincts in Hillsborough County are Black majority precincts (meaning that 50% or more of the actual voters are Black). When reviewing the twenty-six black precincts, the average number of poll workers was 7 – less than the average number of poll workers county-wide, which was 8.9 poll workers per precinct.[17]

---

[16] Hillsborough County did not provide data on the number of registered voters per precinct—only the number of actual voters per precinct, and the number of poll workers in those precincts. Nor was any of the above data available by race.

[17] The document that contained the number of poll workers according to precincts did not specify race (Bates number A011307 – A011315). However, another document did identify the Hillsborough precincts by the number and percentage of black voters (Plaintiff exhibit S, Iorio, dated, 5-6-02). Because no other data was provided by the County that offered a further breakdown of racial categories within precincts, all precincts that were not identified as black majority were considered non-black for this analysis.

34

Such disparities can contribute to a lack of capacity to adequately handle the volume of voters. The variation in number of poll workers per voter identified in this analysis suggests that a significant number of precincts were better served while others were poorly served in Hillsborough County in the November 2000 general election.

**Other Counties**

Unfortuately, because similar data were not made available by the other defendant counties, including Miami-Dade, Leon and Duval Counties, no analysis was conducted about this issue for these other counties.

**B. Poll Worker Errors**

I analyzed data and documents that show different kinds of poll worker errors—whether errors of commission or of omission—that led to voters being denied their right to cast a ballot. The following chart lists the kinds of poll worker problems that affected voters' rights to cast a ballot.

Pollworker actions and omissions that disenfranchised eligible voters

- Affirmation Ballot Problems
- Providing Misinformation and Misdirecting Voters
- Lack of Materials
- Not offering Affirmation/Affidavit Ballots to Voters
- Committing Errors of Omission
- Voter Intimidation/Harassment
- Not Permitting Voters that were in Line Before or at 7pm to Cast Ballots

While some of these problems are discussed below in greater detail than others—because of variances in the availability (or unavailability) of data—they, nevertheless, separately and collectively converge to produce delays, chaotic conditions, frustration, and voter disenfranchisement.

**1. Affirmation Ballots and Problems that Occurred During the Verification Process**

Given the findings stated above, it is likely that the large number of Affirmation Ballots that were cast in Hillsborough County contributed to the disenfranchisement of voters. Hillsborough County alone had a total number of 10,306 affirmation forms completed. When a voter completes an affirmation form, prior to voting, the Clerk must call the Phone Bank to verify voting status. The length of time it took poll workers to get through to the phone bank made it more likely that a voter would walk away without casting a ballot due to the lengthy time of waiting. In such cases, the voter becomes a victim of circumstance and loses his or her right to vote.

According to Florida Election Law, an individual can vote in their precinct without identification if certain proper procedures are followed. However, as the evidence cited in this report demonstrates, in many instances this was not the case. This practice was

35

often not followed in many counties and resulted in the disenfranchisement of otherwise eligible voters. A possible reason for of this specific problem is the failure of poll workers to follow proper procedures. According to the Phone Bank Handbook for Election 2000 from Volusia (Bates Number K003377 – K003473) and the Poll Worker, Oath Person and Self-Study Manuals from Orange County, (Bates Numbers J003945-J004013 and J004132-J004184) phone clerks and poll workers were instructed on how to handle particular situations when voters did not have proper identification. Phone Bank Clerks would utilize the computer system and Oath Persons would call the central office to check the voter's status. This presupposes and assumes that (a) poll workers made the required call to the Phone Bank when a voter would arrive without identification, (b) poll workers could reach and get a hold of the Phone Bank, and (c) voters were being given the opportunity, by the poll worker, to complete an affirmation form. However, in many instances this was not the case.

**Specific Cases**

One of the plaintiffs, **Joanna Clark**, states, "From my understanding I could have filled out an affidavit that allowed me to vote, but she didn't offer me that. The only thing she told me that if I voted it's a felony, she could have me arrested" (Deposition of Joanna Clark, Monday, January 28th, 2002, page 42).

**Dedrana McCray**, an 18 year-old witness was asked during her deposition by Susan Torres, Assistant County Attorney for Miami-Dade County about her inability to vote because her name did not appear on the PR/PL. Ms. Torres asks, "And you didn't ask on November 7th, 2000 to fill out an affidavit?" Ms. McCray responds, "No. I didn't know I was able to get one of those" (Deposition of Dedrana McCray, Monday, January 7th, 2002, page 21). In this and similar cases, what poll workers should do is to offer such voters an affidavit or affirmation. If this voter—and many other similar voters—were properly offered such ballots, they could have cast a legitimate vote, if they were eligible to vote.

In the allowable time I had, I reviewed a sampling of Affirmations from three counties: Volusia, Hillsborough and Orange. While I did not have sufficient data to discern the extent and patterns of voter affirmations/affidavits cast in each county, based on my preliminary analysis there appeared to be a significant number of affidavits cast in Black precincts.

## 2.   Providing Misinformation and Taking Improper Action

Mr. Earl L. Grimes, a clerk from Precinct 947 in Hillsborough County, filed a complaint to the office of Pam Iorio regarding three major complaints and problems that happened on Election Day (1) problems with busy telephone lines to Clerks phone bank, (2) "alleged key errors," and (3) the lack of affirmation forms. Ms. Iorio responds to Mr. Grimes by stating, "A review of the affirmations indicated that quite a few voters moved into your precinct without notifying us of their new address, therefore they are not in your

precinct registers. We did note that four affirmations were completed and calls were made to the phone bank; however, the voters were in the precinct registers and the precinct register inspectors did not locate them. That's one of the areas we will be providing more emphasis on during poll worker training" (Bates number G000310).

In an email from **Jeanette Grnya** to Deanie Lowe dated November 7, 2000 at 8:46 AM, Ms. Grnya states, "I went to vote at Glenwood Presbyterian Church. The lady taking verification for voting for letters D-J REFUSED to accept my COUNTY PICTURE ID WITH SIGNATURE and demanded my fla driver's license. Your sign in the lobby of the polling place that you even accept Sams Club cards and she could not accept my OFFICAL [sic] County ID" (Bates number K003001. Emphasis in the original).

Specific poll worker errors are evident in these examples. But poll worker errors are likely to be much more widespread in the defendant counties than indicated here. In fact, this is one of the main areas nearly all election experts and studies agree (besides the need for upgrading voting technology)—is the need to improve poll worker performance, whether through broader recruitment, better training or other means.[18]

### 3.  Closing Polls Early/Not Allowing Voters in Line to Cast a Ballot

During the November 2000 general elections in Florida, poll sites were required to be open from 7am to 7pm. Yet, a voter from Hillsborough County, precinct 563, reports that the clerks closed the polling site doors at 6:50PM, despite loud protests from those in line waiting to vote (Bates number G000254).

In a memo from Bill Cowles, Supervisor of Elections, Orange County, to Kathleen Burgener, Assistant Attorney General, Office of Civil Rights, Florida, dated February 26, 2001 (Bates Numbers J001147-J001150), Cowles addresses the complaints of 10 voters. One of those voters is Mavis Starke. Mavis Starke (Bates Number A018792) issued a formal complaint that voters standing in line at Precinct 615 were being asked to leave before the closing of the polls. Of all registered voters in precinct 615, 72% are Black. (Bates Number J007403)

Similar cases in other counties in Florida are described elsewhere (U.S. Civil Rights Commission, 2001; House of Representatives Reports and Testimony, 2001).

### 4.  Factors that Contribute to Problems and Disenfranchisement

---

[18] The Election Center, 2001; The Constitution Project, 2001; The National Commission on Election Reform, 2001; The National Association of Secretaries of State, 2001; The National Association of State Election Directors; 2001; The Duval County Election Reform Task Force Final Report, 2001; CalTech/MIT, 2001; Hayduk, 2002b; These issues are further discussed in the section below, and are also addressed in the Section 4, "Recommendations."

The data I reviewed that document the above kinds of problems produce challenging and problematic poll site conditions, which can lead to voter disenfranchisement. Several macro-level factors contribute to such conditions. These include:

- ***Low Poll Worker Pay***
- ***Lack of Broad Recruitment to Ensure Diverse and Competent Poll Workers***
- ***Poor Poll Worker Training***

The Election Center's Task Force on Election Reform sums it up nicely in it's report, "*Election 2000: Review and Recommendations by the Nation's Elections Administrators*": "The vast majority of these poll workers received little training, worked 14 hour or more hours on the job and were paid minimum wage or less. While the dedication and commitment of these citizens is unquestionable, the reality is that they are plucked from their daily lives and jobs to perform a task a few times a year for which they have little expertise." (2001, p. 6).

The Miami Herald Report stated, "Poll workers overseeing the ballot boxes received four or fewer hours of training and were paid $95 to $125 for a fourteen-hour day. Election supervisors throughout the state complained that they had trouble recruiting such workers—low pay and long hours are not alluring enticements.... [They] are primarily an army of elderly, subject to all the frailties that come with age, and supervisors are forced to recruit new battalions of workers each year as many of the last season's soldiers fade away" (Merzer, 2001:99-100).

What is implied here—and stated more explicitly in interviews with elections experts and elections officials—is that these conditions produce a lower caliber of worker who make errors. These errors can be significant in number and kind, and contribute to a large number of voters being disenfranchised. (CalTech/MIT, 2001; The National Commission on Election Reform, 2001; Constitution Project, 2001; Hayduk, 2002b.)

### *Diversity and Ability*

While many poll workers are hard working and capable individuals, some are not well-trained, effective, efficient, courteous, or responsive to or representative of the voting population they serve. Broader recruitment efforts and more rigorous training methods would better ensure a diverse and competent group of poll workers that could effectively run poll sites well during the long 14-hour work day. (Constitution Project, 2001; Also see Recommendations below.)

### E.  Voter Intimidation

There is a long history of discriminatory treatment of Blacks and other minorities in Florida elections, and elsewhere in the U.S. (Merriam and Gossnell, 1929; Key 1949; Kousser, 1974; National Municipal League, 1974; Piven and Cloward, 2000; Keyssar, 2000; 2001; Hayduk, 2002a).  One such example in the 2000 election in Volusia County

is the story of **Hazel Manning** (from precinct 531 – where 19 percent of the precincts registered voters are Black). "According to Ms. Manning, she went to vote on the morning of November 7[th] and was approached by a man passing out literature. She accepted the literature and proceeded to the door of the polling place. As she entered the polling place, the poll worker told her that she could not bring any material with her into the building. When Ms. Manning argues about this she says that the poll worker pointed to a police car that was parked in the parking lot and then told her that it was against the law. She felt very intimidated and claims that she forgot to vote the back of her ballot because of this" (Bates Number K000496).

In a follow-up response memo from Deanie Lowe's office to Kathleen M. Burgener, Ms. Lowe states, "It seems that Ms. Manning was not allowed to bring literature with her into the polling place facility. The clerk advised her that it was against the law. Ms. Manning also states that she was worried about being arrested because there was a police officer in the parking lot of the polling place facility. She felt very intimidated and felt she was being treated this way because she was Black. I apologized to Ms. Manning and explained that the clerk had made a mistake. Ms. Manning should have been allowed to bring material into the building. In fact, we received at least two complaints on election morning from other voters who were also told they could not bring sample ballot materials into the polling rooms. Our office immediately called the clerk on election morning and corrected the problem. The clerk had misinterpreted our instructions in training and assured us that it would not happen again. As far as the police is concerned, he was called to the facility because of a solicitor who was causing trouble" (Bates number K003058).

As noted above, Joanna Clark was told that she would be arrested if she voted, although she was not given an affidavit ballot, which she was apparently eligible to receive (Deposition of Joanna Clark, Monday, January 28th, 2002, page 42).

Thus, voter intimidation is another example of both the broad discretionary capacity poll workers possess and problems that Blacks faced in the 2000 general elections in Florida.

---

## 4.  ADMINISTRATIVE PROBLEMS/FAILURES
- NVRA agencies (motor vehicle, social service, and other offices)
- The allocation of registered voters by precinct broken down by race
- Timely and accurate processing of voter registration applications and mailing voter ID card
- Timely and accurate mailing of absentee ballots
- Timely and accurate mailing about poll site changes or postings in newspapers

A review of the available data—including information from the other NAACP expert reports and national studies (cited above and below)—indicates that various administrative failures/errors did in fact occur in the above areas during 2000. Each of these can lead to the broad range of problems voters faced on election day at poll sites in

Florida described earlier in this report, which all too often led to voter disenfranchisement.

All told, I found approximately 600 of the above kinds of complaints that were detailed in the documents I reviewed (complaints by both voters and poll workers). Again, these complaints are likely to be more widespread in all the defendant counties than documented herein, based upon the findings of other studies. (U.S. Civil Rights Commission, 2001; Merzer, 2001; The National Commission on Election Reform, 2001; The Constitution Project, 2001, House Reports and Testimony, 2001.) Below is a sample of such problems and resultant voter disenfranchisement.

## A. The National Voter Registration Act (NVRA)

Voters reported registering to vote at the DMV, only to discover that their name was not on the voter rolls on Election Day. For example, **J.J. Harris** registered to vote at a Seminole County DMV. Supervisor of Elections Bill Cowles, states in a memo to Assistant Attorney General Kathleen Burgener dated February 26, 2001 that "presumably, completed applications from that office would have been forwarded to Seminole County and should then have been forwarded to this office once they discovered he was registering using an Orange County address" On November 7, 2000, Orange County did not have a record of J.J. Harris, and he was denied his right to vote. (Bates Number A018791.)

Another example is that of **Pamela Chaiboub**. Chaiboub registered to vote at the Orange County Department of Motor Vehicles. However, the DMV failed to date the registration, so according to Bill Cowles, the Supervisor of Elections, there was no way of knowing that it had actually been completed by the closing date (A018790). These kinds of errors can easily be fixed. DMV employees can be instructed to make sure that a voter completes all mandatory information before accepting the application for registration. Yet it is this type of situation that leads voters to assume that they are registered after submitting an application to the DMV, only to find out on Election Day that they are not on the voter rolls. SOE offices similarly could establish procedures to verify registration applications are accurately completed and timely transmitted by working closely with DMV agencies.

In a memo from Deanie Lowe, Supervisor of Elections of Volusia County, to Kathleen M. Burgener's Office dated May 22, 2001, re: **Susan Keeney** (registered to vote but not on roster, unable to vote), Ms. Lowe states, "We contacted Ms. Keeney and she explained that in December of 1999, she had registered to vote at the Drivers' License office. In reviewing our records, we found that we had not received a voter registration application from Ms. Keeney. Our office has experienced many problems in working with the Division of Drivers Licenses. Since the November 7, 2000 election, they have appointed a liaison to work between our office and the various Drivers' License offices in our county, to ensure that these types of problems are corrected" (Bates number K003052-K003053).

William Cowles states in his deposition of April 12, 2002 that the SOE office experienced difficulties coordinating the voter registration process with agencies like the DMV and the DCF. In Plaintiff's Exhibit 3, page 9, paragraph 13, William Cowles states "The issues experienced by the Orange County Supervisor of Elections Office include poor communication between our office and agency managers and staff regarding voter registration, and an apparent negative attitude by staff for these agencies toward voter registration duties" (Deposition, page 49). According to Cowles' deposition, after the election of 2000, an employee of the DMV, Helen Howard, has become a liaison between all of the Supervisor of Elections offices in the state, the Elections Office and the DMV (page 53). Cowles reports that "we have seen some improvements with the relationship with DMV and in some instances improvement in the work" (page 53). He continues, "Our wish is still to be able to come in and do some local training of their workers, because I do believe that they need to understand a little bit more about Florida election law and also the fact that we still continue to have applications that are without signature by the voter or there are no applications as related to the report that our courier sees that should be there" (page 54).

Linda Tanko, of the Orange County SOE office, states in her Deposition on April 25, 2002, that several kinds of problems occurred with NVRA agencies, particularly the Department of Highway Safety and Motor Vehicles. She lists several kinds of problems and failures including: lapses with the courier service, inadequately trained personnel, "poor communication" with Motor Vehicle staff, and a lack of improvement of practices by their staff, which resulted in numerous incomplete voter registration forms (pages 76-86). These kinds of problems separately and collectively can lead to registrants' forms not being properly and timely processed, and, despite their desire and effort to register and voter, being disenfranchised.

Volusia County also conceded that there was poor communication between the SOE office and various NVRA agencies in depositions.

Similarly, like other defendant counties, Duval County had problems receiving accurate and timely voter registration applications from NVRA agencies, such as the Division of Drivers Licenses (DDL), which ultimately meant that voters were not being properly registered and were disenfranchised on Election Day. The Election Reform Task Force of Duval County reports, "Prior to and following the November 2000 elections, chronic system failures were found with regard to transmittal of completed motor voter registration applications from the DDL offices to the Supervisor of Elections Offices…One witness testified, not entirely facetiously, 'If you think you're registered to vote, think again'" (June 12, 2001, page 12).

Referring to why voter registration problems occur due to problems/violations of the NVRA, the Election Center reports: "Multiple agency involvement is a major factor outside of the control of election administrators and results in compounding the instances of errors in elections. This problem is especially acute with regard to the role of states' Motor Vehicle Departments in voter registration and the United States Postal Service in absentee ballot delivery." (2001, p 27) While such instances where a voter's registration

application or absentee ballot may be the fault of another government agency, election personnel also can make errors in processing and mailing such forms (Hayduk, 2002b).

The number of complaints and volume of these incidences indicate that voter questions and voter confusion contributed to the larger systemic problems of long lines and busy phone lines, which ultimately caused the disenfranchisement of other voters who left or were unable to get validation from the central office.

## B.  Maldistribution of Registered Voters Per Precinct by Race: Orange County

Election Statistics from 1998 (Bates Numbers J007400-J007404) reveal that there were 348,606 registered voters in Orange County divided into 231 precincts. Therefore, the average number of voters per precinct is 1,509. The average number of voters in Black plurality precincts is 1,617 voters, higher than the average. The average number of voters in White plurality precincts is 1,500, below the average. Thus, the larger average number of registered Black voters per precinct can lead to longer lines and more people being turned away from the polls. The more voters and fewer poll workers to deal with them, the greater the likelihood that any of the range of problems cited above that can lead to voter disenfranchisement might manifest.

Precinct size in Orange County ranges from 322 (Precinct 999) to 2483 (Precinct 444). Of the 231 precincts in Orange County, 18 precincts contain 2,000 or more registered voters. The data below reveals the racial breakdown of registered voters in the most populous precincts in Orange County in 1998:

Total Registered Voters in Precincts with 2,000 or more Voters:    45, 606
Total Registered White Voters:    32, 733
Total Registered Black Voters:    10,723

These data reveal that Blacks constitute 23% of the voters in the largest precincts in Orange County, even though Blacks are only 12% of registered voters in the county. In other words, Black voters are disproportionately represented in large precincts in Orange County. As a result, Black voters in Orange County are more likely than White voters to live in the largest precincts, and thus are disproportionately impacted by longer lines, more questions, often more confusion, and more people being turned away from the polls. Larger precincts are more problematic in general—even if they are fully staffed and well organized, there is greater possibility for voters to experience a problem such as going to the wrong voting station (Constitution Project, 2001; Even Deanie Lowe, Supervisor of Elections from Volusia, acknowledged that larger poll sites can lead to a greater number of potential problems in her interrogatory.)

Elections Statistics data from 1998 in Orange County (Bates Numbers J007400-J007404) reveal that there are 18 African American plurality districts in Orange County. The table below lists them in terms of percentage Black and total registered voters. In order to make comparisons, I examined a representative sample of White plurality precincts chosen for their comparability in size as well as racial breakdown:

**Representative Sample of Comparable Black and White Plurality Precincts in Orange County**

| Precinct # | % Black Voters | Total Reg Voters | Precinct # | % White Voters | Total Reg Vote |
|---|---|---|---|---|---|
| 204 | 95% | 1,041 | 133 | 90% | 1,014 |
| 216 | 40% | 1,610 | 618 | 52% | 1,618 |
| 225 | 55% | 982 | 330 | 58% | 955 |
| 226 | 87% | 1,479 | 327 | 87% | 1,507 |
| 601 | 77% | 1,825 | 412 | 75% | 1,807 |
| 602 | 66% | 1,768 | 207 | 63% | 1,310 |
| 603 | 76% | 1,330 | 101 | 74% | 1,373 |
| 604 | 88% | 2,021 | 136 | 83% | 2,015 |
| 605 | 49% | 1,881 | 323 | 65% | 1,960 |
| 610 | 86% | 1,031 | 401 | 89% | 1,088 |
| 611 | 92% | 1,810 | 304 | 93% | 1,380 |
| 612 | 94% | 1,765 | 523 | 94% | 1,022 |
| 613 | 42% | 1,694 | 314 | 59% | 1,663 |
| 615 | 72% | 2,330 | 120 | 76% | 2,378 |
| 616 | 96% | 2,072 | 503 | 96% | 1,183 |
| 617 | 94% | 1,360 | 504 | 94% | 1,608 |
| 620 | 44% | 2,326 | 434 | 67% | 2,177 |
| 622 | 40% | 789 | 535 | 76% | 724 |
| TOTAL REGISTERED: | | 29,114 | TOTAL VOTERS: | | 26,782 |

It is interesting to note that even when a representative sample was selected based on comparable precinct size and plurality percentage, the results show that the average number of voters per precinct still varies by race. White plurality precincts from the sample have an average of 1,487 voters, while Black plurality precincts have an average of 1,617. The larger average number of registered Black voters per precinct can lead to longer lines and more people being turned away from the polls, given this smaller ratio between poll workers and voters. (U.S. Civil Rights Commission, 2001; Constitution Project, 2001; The National Commission on Election Reform, 2001.)

## 5.  LACK OF UNIFORM STANDARDS AND PRACTICES

In the November 2000 elections there were no uniform standards, procedures and practices set by the state or followed by the defendant counties. In fact, there were significant disparities within and among counties.  While these circumstances are not dissimilar to other states and jurisdictions,[19] they appear to have contributed to the variations in how the elections were conducted in the defendant counties and to have produced a negative impact on voter registration, turnout, and participation in the 2000

---

[19] Duval County Election Reform Task Force, June 12, 2001; Iorio, 2001; Election Center, 2001; The National Commission on Federal Election Reform, 2001; The Constitution Project, 2001; and The U.S. Civil Rights Commission, 2001.

elections, including the degree to which voters were disenfranchised and racial disparities existed.

According to Pam Iorio, Supervisor of Elections of Hillsborough County, "Election laws were inconsistent and lacked clarity. Ambiguity in the law led to numerous court challenges. A lack of uniformity in the implementation of policies and procedures reflected the county-based tradition of control that has dominated Florida government since its inception as a frontier territory." (Iorio, 2001.)  Ironically, both Supervisor Iorio and Expert Witness Dr. Susan MacManus nonetheless testified in support of such a decentralized election structure.

However, the evidence presented in this report shows that such institutional failures and a lack of uniform standards and practices to prevent them—including the maldistribution of laptop computers, busy phone lines, and poll site problems—all led to overcrowded poll conditions, and frustrated poll workers and voters within and among counties. As described herein, many of these problems occurred in precincts with large numbers of Blacks. These failures of the election administration contributed to numerous voters leaving poll sites without being permited to cast their votes. There were basic elements of election administration that received disparate treatment in the defendant counties. In short, all these kinds of problems separately and collectively produced widespread voter disenfranchisement.

---

## SECTION 4

## RECOMMENDATIONS AND "BEST PRACTICES"

Based on the above findings—and studies cited above and below—I recommend several changes to Florida's election administration and specific election practices that would remedy the problems, failures and shortcomings identified herein.

Moreover, a common set of recommendations—many particular to Florida—emerges from the studies reviewed, which point to and correspond with problems voters encountered in the 2000 elections in Florida. In fact, these recommendations reflect an explicit or implicit acknowledgment that, not only did a range of election problems befall citizens in Florida during the 2000 general elections, but that there are workable solutions to these problems as demonstrated a growing body of literature. In fact, these studies reflect a emerging consensus about workable reforms and solutions. Why else would these commissions, government reports, academic studies, voting rights organizations, and civic government groups make these recommendations to begin with, if it were not because they address specific failures and shortcomings?  The specific problems and recommendations identified in these studies provide further evidence that these problems are not isolated instances; but rather they reflect an understanding that such election barriers are large in scope and number and are systemic within and among counties in Florida. Regarding the latter point, a growing list of remedies exists—some of which are

currently proven to be effective in jurisdictions where they have been and are in effect. Based on this other studies, several specific recommendations might help solve problems identified and documented herein.[20]

Finally, the Duval County Election Reform Task Force made several recommendations that coincide with my own recommendations, including, for example uniform state standards. Importantly, the Task Force states clearly that the shortcomings are correctable, showing how with sufficient attention, seriousness, and funding, many of the problems found in the defendant counties in Florida could be remedied with greater planning.

### Increase Funding to Supervisors of Elections for Operations and Pay for Poll Workers

Election administration is like the "step-child" of government, according to many elections officials. Indeed, budgets reflect the low priority elections receive. For example, many obvious measures that would improve performance such as increasing the stipend for poll workers not only helps attract more workers to fill slots, but also will attract better qualified workers. A training video would be a very effective and cost efficient way of ensuring that poll workers get critical information.

Similarly, increased expenditures on automating systems to improve their effectiveness, hiring qualified technical experts to reduce breakdowns in processing voter registration applications and keeping voter's status current, upgrading voting technology, provide adequate number of laptop computers to poll sites, increase means of communicating effectively and in a timely manner—by expanding telephone capacity—and especially increase the number of staff at election board offices.

Many studies point to the fundamental problem discussed above: a lack of adequate funding to properly conduct elections to ensure all voters have equal access to voting. The steps would help reduce disparate treatment, if the funds were used to equalize unequally funded jurisdictions, which would reduce the disproportionate rates of voter disenfranchisement for people of color (The Constitution Project, 2001; The U.S. Commission on Election Reform, 2001; The U.S. Commission on Civil Rights, 2001; House Reports and Testimony, 2001).

The Duval County Election Reform Task Force Report (2001) makes it clear that the entire electoral process has suffered from a lack of funding: "egregious underfunding in recent years" and states that the condition must change (page 19). They offer several

---

[20] Several contemporary studies include, The Constitution Project, 2001; The CALTECH-MIT Voting Technology Project, 2001; The National Commission on Federal Election Reform, 2001; The Election Center, 2001; The National Association of Secretaries of State, 2001; The National Conference of State Legislators Election Reform Task Force, 2001; The Congressional Research Service, 2001; The US Civil Rights Commission, 2001; Lichtman, 2001; The House of Representatives Committee on Government Reform, 2001; Report House Committee on the Judiciary, Democratic Investigative Staff, August 20, 2001; Merzer, 2001; Traugott, 2001; Roth, 2001; Duval County Election Reform Task Force Report, 2001; Alverez et. al., 2002; Hayduk, 2002b. See Section 5 for full citations.

recommendations for organizational and budgetary improvement for the SOE offices: hire additional senior management positions, create new level of management (one step above precinct Clerk), increase poll worker pay, enhance budget for voter education purposes, upgrade poll workers training, and increase funding for new voting technology and its continued upgrade.

Another important recommendation that came out of the Duval County Election Reform Task Force's Final Report suggests that the "Supervisor should establish a telephone line dedicated to disseminating polling location information. Again, perhaps modeled after JEA, such a telephone system would enable the voter to punch in his or her address, and be automatically told the precinct number and location" (Final Report, dated, June 12, 2001, page 21).

All in all, increased funding is critical to make necessary improvements in the administration of elections in Florida.

**Expand Recruitment of Election Personnel and Equally distribute Poll Workers to Precincts**

Supervisors of Elections too often rely on the two main political parties to locate election and poll workers. Not only does this exclude minor party members and independents, but it also makes the staff more responsive and accountable to party leadership rather than to the voters of the State of Florida. If staff positions were filled on the basis of nonpartisan and civil service mechanisms, they could base hiring and firing on technical expertise and job skills rather than party loyalty. These basic features are so integral to most other governmental agencies that the current partisan arrangements are strikingly anachronistic and archaic. Indeed, they are a relic of the bygone era of political machines. Most importantly, more efficient and effective election administration would be the likely outcome of such a shift.

Equalizing the number of registrants at each precinct, distributing poll workers according to precinct size and in a nondiscriminatory manner would go a long way to rectify the problems identified in this report.

Similarly, the distribution of laptop computers should follow the above precepts. All precincts should be provided with laptops computers. Disparities in their distribution based on racial and socio-economic demographic characteristics of a county's population should be eliminated.

In addition, SOEs should consider the mobility rates in the allocation of these and other resources.

Finally, both the number of poll workers and laptops per precinct should be increased to handle the volume of voters, particularly in presidential elections when turnout is normally higher.

46

**Improve Training Methods and Materials for Election Workers**

As many studies suggest, Supervisors of Elections should adopt uniform standards and materials to ensure workers are adequately prepared to serve the voting public. These should include:

- Increase standards for and expectations of poll workers. A new vision is needed as to how poll workers should perform, how they are recruited and selected, and how they are trained and compensated;
- Expand the pool of qualified potential elections officials and poll workers.
- Diversify the age, race, gender, and political party within all precincts to ensure efforts to deliberately provide greater diversity. Not only should poll workers be representative of the precincts in which they work, Supervisors of Elections Offices should mandate diversity within and among all precincts.
- Create split shifts so poll workers are not required to work long days that produce fatigue and errors. This will increase the pool of workers, the quality of applicants and their attentiveness;
- Develop a training video;
- Increase the number and quality of materials for training classes, as well as the quality of trainers;
- More hands-on training should be implemented in training sessions and tests used to ensure workers are qualified;
- The training sessions should focus on special situations (such as when a voter's name is not on the list of registered voters, when voting technology breaks down and when provisional ballots are needed) and implement role-play;
- Class sizes should be reduced and locations should be expanded;
- Training manuals need to be re-written in clearer language and covering more procedures and situations. It should be posted on the election board's websites;
- The standards for poll worker examination should be established and/or raised. Poll workers who fail to pass a test should be prohibited from working an election
- Create more standby poll worker positions and utilize them more readily.

**Establish Uniform Standards**

Uniform standards and procedures would help settle some of the problems and disputes highlighted in the many depositions of plaintiffs and in the documents produced by the defendants in *NAACP v. Harris*. For example, clear and uniform standards and practices handling affirmation/affidavit ballots would reduce poll site problems and disputes. Similarly, uniform criteria for allocating poll workers and laptops, for designating voters to precincts and to poll sites, providing provisional ballots, and a host of other practical changes would reduce poll site problems and disparate treatment.

Distribute a Voter Bill of Rights to all voters by directly placing them into the hands of voters as they enter a poll site.

47

Implement electronic transfer of registration data from NVRA agencies to reduce errors and delays. Increased reporting requirements, training of all agency staff, and monitoring of these agencies and their contact with Supervisor of Elections should be instituted. Agency staff should be required to check each voter application to make sure that all mandatory information has been properly filled out before accepting the application.

Supervisor of Elections Offices and all NVRA agencies should streamline the processing of voter registration forms through increased use of automation and technology and provide a voter with a copy and/or receipt of their voter registration application.

Similarly, Supervisor of Elections should greatly streamline and expand Election Day communications by equipping ALL precincts with laptops, cell phones and phone lines at poll sites. They should also vastly increase the number of telephone lines and election workers at Supervisor of Elections to answer phones—including developing an automated toll free system where a voter can obtain critical election information (such as their registration status, poll site, accessibility, and so on.)

Expand the kind and availability of required voter identification, or eliminate the requirement all together (unless adopt Election Day voter registration – see below). Many of these recommendations are proposed in the numerous national studies referenced in this report.

**Adopt a Statewide Voter Registration System**

Establishing a statewide registration system is a critical step in safeguarding the franchise. At the same time, statewide registration provides the basis for moving towards Election Day registration, which would ultimately be the best way to eliminate problems with affirmation/affidavit ballots. Moreover, establishing a statewide voter registration system would permit local jurisdictions to more rapidly verify a voter's status, and thus allow the state to shorten its registration deadline, with the ultimate goal of providing Election Day registration. Election Day registration has proven to be the most effective system to facilitate voter participation, and reduce racial and class disparities. It is currently in use in six states, which have among the highest voter participation rates in the country (Demos, 2002). This is also true of other election innovations some states have been experimenting with and have used effectively, such as early voting, mail voting, and internet voting—all of which Florida should explore. The National Commission on Federal Election Reform ("Carter-Ford Commission") report from August, 2001 entitled, "To Assure Pride and Confidence in the Electoral Process" also makes this recommendation.

**Move Toward Election Day Registration by Shortening the Registration Deadline**

Election Day registration has proven to be the most effective system to facilitate voter participation, and to reduce racial and income disparities. Implementing an Election Day registration system that provides wide accessibility while at the same time ensures the

security and safeguards the ballot will make tremendous strides in eliminating racial and class disparities in voting See "Expanding the Vote: The Practice and Promise of Election Day Registration," a report by Demos, 2002 (http://www.demos-usa.org). Finally, as is the case in many advanced democratic countries, making Election Day a holiday would help boost recruitment of poll workers and increase voter participation of all eligible voters.

**Establish a Process and Structure to Obtain New Election Technology with Broad Input by Voting Rights and Civic Organizations**

Florida—like most jurisdictions—sorely needs new technology, and not just for voting. Florida should adopt a process that can serve as a model for other states. The process should ensure that their voter's concerns and needs are central. The acquisition of laptop computers in every precinct to immediately verify current registration would greatly improve the current process. Each laptop computer should be continuously connected to the central registration data bank which would allow poll workers to verify a voter whose name does not appear on voter rolls. This would indeed assist in reducing the heavy number of calls that the phone bank received and could not adequately deal with, which meant that numbers of voters left their poll sites before casting their ballot.

This can only be if representatives from voting rights and civic groups are intimately involved in the process from the start. The acquisition of new technology should not be contracted out to private vendors without public input. Independent experts should review the possibilities for tampering, whether by computer programmers, elections personnel, and voters. Technological failures should be considered and back up plans integrated into the planning. Building in means for audits—especially in contested races—is critical. New voting machines should be accessible to Florida's diverse population, including people with disabilities and foreign language speakers. Finally, voting technology that can provide a receipt to voters would also ensure them a way to verify if their vote was properly counted, and if not, a means to rectify it.

However, in his recommendations from a study commissioned by the United States Commission on Civil Rights, Allan Lichtman examined whether the rejection of ballots as invalid for the 2000 presidential election in Florida had a disparate impact on the votes cast by Blacks. He states, "Technology alone is not the answer to racial discrepancies in ballot rejection. The results of these analyses demonstrate that technological change must be accompanied in all counties by effective programs of education for voters, for election officials, and for poll workers. Obviously sufficient resources must be devoted to the maintenance of voting technology and steps must be taken to assure clear and comprehensive voter instructions, easily understandable ballots, and adequate resources to assist voters at all polling places." (Lichtman, 2001:17)

Based upon my research and experience, I concur with Dr. Lichtman on this point.

**Improve and Expand Voter Educational Materials and Outreach Programs**

Voter education needs to be vastly expanded. Critical information—from who is running for office, responsibilities of offices to how to register to vote, cast a ballot, and use a voting machine—should be widely disseminated. Voter guides and pamphlets should be printed and mailed to every household; materials should be available at government offices and integrated into procedures, much like the motor voter program; all media—print, radio, television and the internet—should be used more extensively to convey critical voting information.

**Establish an Outside Monitor to Professionalize Election Administration**

The State of Florida should establish an outside oversight monitor of its elections offices. Such a monitor could produce measures of performance, and also help implement procedural, technological and managerial improvements. Such an agency, staffed by technical experts outside the election and party apparatus, is the best way to ensure a more effective and efficient election administration.

**Consider Nonpartisan Election Administration: Decrease the Political and Partisan Dimensions to Election Procedures**

There has always been considerable debate and political conflict over the rules and procedures governing how elections are conducted.  And for good reason: shaping the rules of the game often influences electoral outcomes. If you can manipulate election practices, you can often determine the winners and losers. Because the stakes can be so high, the battles over these electoral changes can be quite bitter and, they are almost always highly partisan. While scholars have debated the degree to which election rules can affect the participation of particular constituents, politicians clearly believe that election rules can shape outcomes as evidenced in the pitched battles they wage over election law and practice. Because the administration of elections in Florida (like most of the U.S.) is decentralized, with effectively little or no federal or state oversight, there is considerable latitude for discretionary actions by local board officials and the influence of dominant politicians. Moreover, election practices of Florida's Supervisor of Elections appear to reflect the influence of the leaders of the dominant parties. Both elected officials and elections officials from both parties tend to have incumbency interests in maintaining a stable electorate and party system; they mutually resist outsiders, whether as new and unpredictable voters or insurgent candidates. Instituting non partisan election administration should diminish such dynamics.

**CONCLUSION**

As this and the above cited reports show, disenfranchising election practices were prevalent in the November 2000 elections in the defendant counties in Florida. While these conditions are not unique to Florida, election administration across the U.S.—including Florida—has not changed enough to address these shortcomings. And while state and local election agencies and officials are highly variegated in their structures and levels of performance, they continue to have wide latitude in how they conduct elections

and can have significant impacts on voter participation and electoral outcomes (Hayduk, 1996; 2002a; 2002b).

The evidence presented in this report rebuts the conclusions and findings as set forth in reports, testimony, and depositions of the defendants Pam Iorio, Dr. Susan MacManus, and John Stafford, as well as in the depositions and responses to Interrogatories of other defendants (as outlined above). The evidence presented in this report demonstrates that the administration of the general elections in November 2000 by the defendant counties was rife with failures that, separately and collectively, led to hundreds if not thousands of voters being improperly treated and/or disenfranchised. Such impacts are unacceptable in a democracy, whether due to accident, indifference or negligence. Thus, this evidence should compel the defendant counties and the State of Florida to change the way they conduct their elections. It is the opinion of this witness that the changes outlined above are needed if the defendant counties are to improve their election administration and reduce or eliminate voter disenfranchisement.

## SECTION 5

## DATA SOURCES

Iorio, Pam, Supervisor of Elections Hillsborough County, Florida. January 8, 2001. "Election Reform in the Aftermath of Florida's 2000 Presidential Election." Remarks to the Governor's Select Task Force on Election Procedures, Standards and Technology.

Letter from Pam Iorio to Earl L. Grimes, dated February 14, 2001. Bates number G000310.

Letter from Pam Iorio to Herbert F. Courtney, dated November 21, 2000. Bates number G000463.

Letter from Pam Iorio to Velma Ball, dated January 9, 2001. Bates number G000471.

Memo's from Pam Iorio's office re: Hope Miller. Bates numbers G000241 - G000243.

Email correspondence between Pam Iorio and Peter Fylak, Jr., dated November 8, 2000. Bates number G000183 – G000185.

Email from Julie Gaul to Supervisor Iorio's office, dated November 8, 2000. Bates number G000254.

Letter from Pam Iorio's office to Sam Horton, President NAACP Hillsborough Branch re: Jermaine J. Terry, dated December 15, 2000. No Bates number written on record.

Age of Poll Workers.   Hillsborough County. Fax to 813-272-7043 dated January 22, 2001 at 16:08 (No cover sheet, no information about who sent the document to whom.)

Election Board Comments – Orange County (Bates Number, J000192-J000216).

Email Communication between Christine Barrett and Valerie Brown, November 7, 2000, (Bates Number, J001205).

51

Email Communication between Rip Haskins, Bill Cowles and Valerie Brown in the Office of Elections, November 7, 2000 (Bates Number, J001232).

Email Communication between Bill Cowles, Grace Chewning and Commissioner Betty T. Wyman, November 8, 2000, (Bates Number, J001214-J001215).

Email Communication between Bill Cowles and Tilly Hood, February 10, 2001 (Bates Number, J001206-J001207).

Internet Oath Person Laptop Supply Item Return List – November 7, 2000 (Bates Number, J007391-J007393).

Memo from Bill Cowles to Willie Dennison, December 18, 2000, (Bates Number J001184-J001190).

Memo from Bill Cowles to Kathleen Burgener: Responses to Voter Complaints, February 26, 2001, (Bates Number J001151-J001154).

Memo from Bill Cowles to Kathleen Burgener: Responses to Voter Complaints, April 6, 2001, (Bates Number J001151-J001154).

Memo from Linda Tanko to Kathleen Burgener: Responses to Voter Complaints, April 25, 2001, (Bates Number J001155-J001173).

Oath Person Pollworker Manual – Orange County (Bates Number J004132-J004156).

Poll Worker Training Start on Self-Study Guide – Orange County (Bates Number J003945-J004013)

Supervisor of Elections – Orange County Election Statistics – September 1, 1998 (Bates Number, J007400-J007404).

Supervisor of Elections Poll Worker Election Master List (Bates Number J000464-J000612).

Broward County Election data about precincts that were assigned laptops by race—and election data for various years—was derived from Bates Numbers A001539-A001586; A001757-1769; Bates Numbers A001770-A001881; A001882-2003; and Bates Numbers A002057-A002065; I also used election data from a CD Rom provided by NAACP, which conforms to the relevant above Bates Numbers.

**Books and Reports**

Alverez, Michael, D.E. Betsy Sinclair, and Catherine H. Wilson. February 22, 2002. "Counting Ballots and the 2000 Election: What Went Wrong?" Paper delivered at the Midwest Political Science Association meetings. Chicago, IL. April 26-28, 2002.

Burnham, Walter Dean. 1970. *Critical Elections and the Mainsprings of American Politics*. New York: W.W. Norton.

52

CalTech/MIT, Voting Technology Project. 2001. "Voting: What Is, What Could Be."
www.vote.caltech.edu

Demos: A Network for Ideas and Action. "Expanding the Vote: The Practice and Promise of
Election Day Registration," February 2002. http://www.demos-usa.org/Pubs/EDR

Duval County Election Reform Task Force. June 12, 2001. "Final Report."

Election Center. July 2001. "Election 2000: Review and Recommendations by the Nation's
Election Administrators" The Election Center 12543 Westella, Suite 100 Houston, TX 77079
Phone: 281-293-0101 E-mail: electioncent@pdq.net

Federal Election Commission. 2001. *The Impact of the National Voter Registration Act of 1993
on the Administration of Elections for Federal Office.* Washington D.C.

Gosnell, Harold G. 1927. *Getting out the Vote.* Chicago: University of Chicago Press.
-------- with Richard Smolka. 1973. *American Parties and Elections.* Chicago: University of
Chicago Press.

Hayduk, Ronald. 1996. "Gatekeepers to the Franchise: Election Administration and Voter
Participation in New York." Ph.D. dissertation, City University of New York.
-----------------Hayduk, Ronald. "The Weight of History: Election Reform During the Progressive
Era and Today." 2002a. *Democracy's Moment: Reforming the American Political System in the
21st Century.* Co-edited by Ronald Hayduk and Kevin Mattson. Colorado: Roman and Littlefield.
-----------------Hayduk, Ronald. 2002b. "Florida is Everywhere: Election Administration and
Voter Participation in New York. Paper delivered at the Midwest Political Science Association
meetings. Chicago, IL. April 26-28, 2002. (The Century Foundation will also publish these
findings in 2002.)

Hill, Kim Quaile, and Jan E. Leighley, "The Policy Consequences of Class Bias in State
Electorates." *American Journal of Political Science*, Vol. 36. No. 2, May 1992.

House Committee on the Judiciary, Democratic Investigative Staff. August 20, 2001. "How to
Make Over One Million Votes Disappear: Electoral Sleight of Hand in the 2000 Presidential
Election." <http://www.house.gov/judiciary_democrats/electionreport.pdf>

House of Representatives Committee on Government Reform, Minority Office. "Income and
Racial Disparities in the Undercount in the 2000 Presidential Election" August 20, 2001.
<http://www.house.gov/reform/min/pdfs/pdf_inves/pdf_elec_nat_study.pdf>

Key, V. O. Jr. 1949. Southern Politics. New York:Vintage Books.

Keyssar, Alexander. 2000. *The Right to Vote.* New York: Basic Books.
---------------Keyssar. 2001. "The Right to Vote and Election 2000." In The Unfinished Election
of 2000. Edited by Jack N. Rakove. New York: Basic Books.

Kousser, J. Morgan. 1974. The Shaping of Southern Politics: Suffrage Restrictions and the
Establishment of the One-Party South. New Haven, Conn.:Yale University Press.

League of Women Voters Education Fund. 1972. "Administrative Obstacles to Voting."   Mimeo

Merriam, Charles E. and Harold Gosnell. 1924. *Non-Voting: Causes and Methods of Control*. Chicago: University of Chicago Press.

Merzer, Martin and the staff of the Miami Herald. 2001. <u>The Miami Herald Report: Democracy Held Hostage</u>. New York: St. Martin's Press

National Commission on Federal Election Reform, August, 2001. Co-Chaired by Jimmy Carter and Gerald Ford. The Century Foundation & Miller Center for Public Affairs. http://www.tcf.org

National Municipal League. Carlson, Richard J. Editor. 1974. <u>Issues of Electoral Reform</u>, New York: National Municipal League. Ann Arbor: University Microfilms International.

Piven, Frances Fox, and Richard A. Cloward. 2000. *Why Americans Still Don't Vote: And Why Politicians Want It That Way*. Boston, Massachusetts: Beacon Press.

Rakove, Jack N., Editor. 2001. *The Unfinished Election of 2000*. New York: Basic Books.

Rosenstone, Steven and Ray Wolfinger, *Who Votes?* 1980. New Haven: Yale University Press.

Rosenstone, Steven and John Mark Hansen. 1993. *Mobilization, Participation, and Democracy in America*. New York: MacMillian Publishing Company.

Roth, Susan King. 2001. "*Disenfranchised by design: Voting systems and the election process*." A joint project of the American Political Science Association, the American Psychological Association and Consortium of Social Science Associations. <ttp://www.apsanet.org/new/briefing.cfm>

Schattschneider, E. E. 1960. *The Semisovereign People*. New York: Holt, Rinehart & Winston.

Traugott, Michael. 2001. "Why Electoral Reform Has Failed: If You Build It, Will They Come? A joint project of the American Political Science Association, the American Psychological Association and Consortium of Social Science Associations. <http://www.apsanet.org/new/briefing.cfm>.

U.S. Commission on Civil Rights. "The 2000 Presidential Election." <www.usccr.gov>

Woods David and Peter Hancock. 2001. "Ballot Disaster Reveals Machines Do Not Accurately Recognize and Tabulate Our Votes." A joint project of the American Political Science Association, the American Psychological Association and Consortium of Social Science Associations. (<http://www.apsanet.org/new/briefing.cfm>)

## SECTION 6

## Compensation

I have signed an agreement with the NAACP that will compensate me at $100 per hour.

_____
Professor Ronald Hayduk

# ATTACHMENT

# RONALD HAYDUK

Assistant Professor of Political Science
Department of Social Science
Borough of Manhattan Community College, (CUNY)
199 Chambers Street
New York, N.Y. 10007
(212) 346-8227

20 E. 8th Street, Apt. #5B
New York, N.Y. 10003-5918
(212) 477-6749
e-mail: rhayduk@igc.org

## EDUCATION
**Ph.D.,** Political Science, October 1996. Graduate Center, City University of New York, (CUNY)
      *Major*: American Politics. *Minor*: Political Theory.
*Dissertation*: "Gatekeepers to the Franchise: Election Administration and Voter Participation in New York."
**MA.** City University of New York (CUNY), February 1990. Thesis: "Theories of the State."
**BA.** *Cum laude*, Rutgers University, New Brunswick, New Jersey, 1981.

## PUBLICATIONS
Gatekeepers to the Franchise: Election Administration and Voter Participation. Book manuscript in preparation. Forthcoming, State University of New York Press.

Democracy's Moment: Reforming the American Political System for the 21st Century. Co-Editor and contributing author of book anthology. Rowman & Littlefield Publishers, Inc. Spring, 2002.

"The 2001 Elections in New York City: A Post Florida Examination" Summer, 2002. The Century Foundation.

From Act Up to the Seattle: Urban Activism and Community Building in Era of Globalization Co-Editor and contributing author of book anthology. Verso. Summer, 2002.

*"The Political Participation of Immigrants in New York,"* co-author of this chapter for In Defense of the Alien, edited by Lydio F. Tomasi. Center for Migration Studies, 2001.

*"Immigration, Race and Community Building,"* The Aspen Institute Roundtable on Comprehensive Community Initiatives. 2000. (<www.aspenroundtable.org>)

Democracy in Crisis: Annual Report of the New York City Voter Assistance Commission. 1994. Published by the Office of the Mayor of the City of New York.

*"From Anti-Globalization to Global Justice: A Twenty First Century Movement,"* essay for Left Movements in the United States, edited by John Berg. Rowman & Littlefield Publishers, Inc. Forthcoming, 2002.

*"Spatial Dimensions of Racial Disparities and the Promise of Democratic Regionalism,"* for book, Structural Racism and Community Building. Forthcoming, 2003.

Book Review of David Reynold's Democracy Unbound: Progressive Challenges to the Two Party System, published in the journal Mobilization: The International Journal of Research and Theory about Social Movements, Protest, and Collective Behavior, 1998. Author of several articles and opinion pieces for local public affairs magazines and newspapers.

*Immigrant Voting Rights: Pipedream or Possibility?* (Article in preparation)

## PROFESSIONAL PAPERS

*American Political Science Association*, Boston, MA, August/September, 2002. "Noncitizen Voting Rights: Shifts in Immigrant Political Status During the Progressive Era."

*Midwest Political Science Association*, Chicago, IL, April 2002. "Florida is Everywhere: Election Administration and Elections in New York City."

*American Political Science Association,* San Francisco, CA. August/September, 2001. "Gatekeepers to the Franchise: Election Administration and Voter Participation."

*CUNY Center for Urban Research and The International Center for Migration, Ethnicity and Citizenship, New School University.* CUNY Graduate Center, New York City, June, 2000. "Who Naturalizes, Who Votes and Why?: Qualitative and Quantitative Perspectives."

*Center For Migration Studies,* Washington D.C. February, 2000. Co-author, "Political Participation of Immigrants in New York."

*American Political Science Association.* August, 1997. Washington D.C. Presented paper, "The Struggle Continues: The Politics of Motor Voter in New York."

*Caribbean Studies Association.* May, 1997. Barranquilla, Colombia. Presented paper, "The Two Worlds of Disney: The Haitian Dystopia Behind the U.S. Utopia."

## TEACHING EXPERIENCE

**Assistant Professor, Borough of Manhattan Community College, (CUNY)** 2000 to present.
 *Courses:* American Government; Urban Politics. Faculty Coordinator of CUNY Internship Program on Government and Politics.

**Assistant Professor, Touro College.** Department of Political Science. Fall, 1997 to Spring, 2000.
 *Courses Taught:* Political Parties & Elections; State & Local Politics; Political Theory; Congress; The Presidency; American Government; and Advanced Topics.

**Adjunct Instructor, Columbia University.** Department of Political Science. Spring, 1999.
 *Course Taught:* American Urban Politics.

**Adjunct Instructor, Baruch College, CUNY.** School of Public Affairs, Masters in Public Administration Program. Fall, 1997 & Fall, 1998.
 *Course Taught:* Select Topics in Public Administration: State and Local Politics.

**Adjunct Instructor, City College, CUNY.** Department of Political Science. 1990 to 1996.
Faculty Coordinator City College Internship Program in Government and Politics.
 *Courses Taught:* Political Parties and Interest Groups; Public Policy; American Government; and Seminar on New York State and Local Government and Politics

**Adjunct Instructor at New York University (1995), Hunter College (1991-1992), John Jay College** (1989), **BMCC** (1989), and at **Baruch College** as a Graduate Teaching Fellow, (1986-1989).
 *Courses Taught:* Urban Politics; State and Local Politics; Internship in Government and Politics; Political Parties and Interest Groups; Public Policy; and American Government.

## RELATED WORK EXPERIENCE

*Coordinator*, New York City Voter Assistance Commission, (VAC), January, 1993 to January, 1996. Responsible for this nonpartisan city charter agency—comprised of mayoral appointees, City Council representatives, and agency commissioners—mandated to facilitate voter participation through government agencies and community based organizations. Designed voter registration and education programs for thirty city agencies and dozens of community-based non-profit organizations. Wrote New York City's "motor voter" law, conducted focus groups and training workshops for agency personnel and non-profit groups, produced public service announcements for television and radio networks, and produced periodic and annual reports for the Commission.

*Consultant, The Century Foundation.* Fall, 2001 to date. Commissioned to research and write a report on the 2001 New York City Elections. Forthcoming (July, 2002). www.tcf.org

*Consultant, Demos: A Network of Ideas and Action.* September 1999 to date. Conduct research on democracy in the U.S., with special focus on state level political processes and institutions. Participated in organizing conferences, workshops, and in writing reports and several publications which focus on the health of democracy in the states as measured by a broad set of indicators and data. Also assist in formation of a network of academics, policy makers at all levels of government, and community-based organizations who are engaged in democracy building. www.demos-usa.org

*Consultant, The Aspen Institute Roundtable on Race and Community Revitalization.* May, 1998 to date. Wrote critical analysis of two sets of literatures: one on immigration, and a second on regionalism. Papers on both subject areas will be published by the Aspen Institute in 2001 and 2002. Member of project team and of scholars and practitioners that examine four areas: regionalism, employment, education, and criminal justice. Present findings to the Aspen Roundtable Board of Directors, and at several conferences of scholars and practitioners working in the community building field. The project also includes convening groups of researchers and practitioners to formulate further research and to develop strategic plans and pilot programs in several sites in the country. www.aspenroundtable.org

*Consultant,* Gubernatorial Campaign of Peter Vallone, New York City Council Speaker. 12/97 to 3/98. Coordinated advisory boards of scholars and policy experts and conducted research into several policy issue areas—education, health care, and economic development—for a briefing book for candidate Vallone.

*Consultant*, 1199 Hospital and Health Care Workers Union. Spring, 2000. Wrote a critical review of the voter participation literature and provided an analysis of the main models of voter registration and get-out-the-vote efforts in the U.S. Produced a model program of best practices that the union could implement.

*Director*, Public Service Internship Program, Touro College, Fall, 1997 to 2000. Develop and promote the internship program within Touro College, identify and establish internships in the public and private sectors, and supervise students and placements.

*Consultant*, Educational Testing Service (ETS), 2/97 to 8/97. Participated in all phases of the development, coordination and assessment of test exams, including Graduate Record Examinations (GRE's) and Advanced Placement (AP), in the fields of U.S. politics, comparative politics, political theory, and methodology.

**PLAINTIFFS' EXHIBIT 64**

DIVISIONS OF FLORIDA DEPARTMENT OF STATE
* Office of the Secretary
* Office of International Relations
  Division of Elections
  Division of Corporations
  Division of Cultural Affairs
  Division of Historical Resources
  Division of Library and Information Services
  Division of Licensing
  Division of Administrative Services

MEMBER OF THE FLORIDA CA
State Board of Ec
Trustees of the Internal Improvement Tru
Administration Com
Florida Land and Water Adjudicatory Con
Sittin
Division of Bond
Department of R
Department of Law Enfor
Department of Highway Safety and Motor
Department of Veterans'



FLORIDA DEPARTMENT OF STATE
**Katherine Harris**
Secretary of State
DIVISION OF ELECTIONS

# MEMORANDUM

**TO:**      All Supervisors of Elections

**FROM:**   Ethel Baxter, Division Director

**DATE:**   June 4, 1999

**RE:**      Central Voter File

Regrettably, the Division of Elections (Division) must release new central voter file reports after receivin reprocessed files from our vendor, Database Technologies, Inc. (DBT). Yesterday, the Division asked DBT to check into the possibility that the Department of Corrections (DOC) data they used with regard t felony convictions might be inaccurate. DBT informed us this morning that in fact, over 60,000 records in the DOC file were incorrectly marked as felony convictions. This mishap, along with other DBT problems indicated in the first memo, certainly require that the Division rerun and produce new reports.

Also, the Division would like to apologize for making a page heading error on the "duplicate" report. As was the case on the "felony" report, it was incorrectly listed as a "death" report rather than a "duplicate" report. If the information on the reports was not complex enough, this mistake certainly did not help matters. For the past month, the Division has focused its attention on the accuracy and completeness of the data provided by DBT. Thus far, the Division has received three different sets of data from DBT. Th first two sets contained numerous errors and omissions. We expect the fourth round to be correct.

The Division knows this week has been confusing and frustrating for everyone. At the elections workshop next week, a discussion on the central voter file is scheduled. You may bring your reports for discussion purposes to the workshop. Afterward, you should destroy the reports given that they contain erroneous information and confidential social security data. The Division has received numerous calls this week regarding the reports; and, hopefully, all concerns will be addressed at the meeting. Please be assured that representatives from the Florida Department of Law Enforcement and DBT will be attending next week's workshop, as well as, Janet Modrow, Systems Project Administrator, from the Division.

We are attaching a letter from DBT regarding the Felony Exception Report for your information. Please call if you have any questions.

EB/blm

Attachment

B005136



**DBT.®**
Database Technologies, Inc.

June 4, 1999

Ms. Ethel Baxter, Director
The Division of Elections
The Capitol, Room 1801
Tallahassee, FL 32399

Re:     Felony Exception Report

Dear Ms. Baxter:

In reviewing DBT's method of processing of the Felony Exception Report, our programming design was not to consider aspects of the Department of Corrections file containing probation records that included "withheld adjudication" dispositions. Regretfully, these records were considered in the processing of this file as they are contained in the publicly available Florida Department of Corrections Incarceration/Probation/Parole data set. This lead to a much larger set of "false positives" than was expected or intended.

Through the efforts of the Supervisors of Elections, upon their receipt of the Exception Reports, they were able to identify these "false positives" due to their familiarity with their county voter rolls. We apologize for the inclusion of these particular records in the Felony Exception Report and are currently reprocessing those records that were identified as being associated with a felony conviction. Of course, this reprocessing will be done at no charge to the Division of Elections. We will deliver this reprocessed segment of the Felony Exception Report immediately upon its completion. We expect to be completed by the close of business on June 7, 1999.

Due to the nature of these "false positives," DBT would like to request that the Division of Elections immediately recall all Felony Exception Reports from the counties. DBT will reimburse the Division of Elections for all costs associated with the retraction, reprinting, and disbursement of the new Felony Exception Report to the counties.

Again, please accept my apology for the inclusion of these records and the resulting inconvenience to the Division of Elections.

Sincerely,

George A. Bruder, Jr.
Senior Vice President, Operations

Cc:     William R. Pfeiffer, Asst. Secretary of State
        Emmett Mitchell, IV, Asst. General Counsel

B005137A

4530 Blue Lake Drive, Boca Raton, FL 33431 / (800) 279-7710 / FAX (888) 580-9337

**PLAINTIFFS' EXHIBIT 65**

# HRS

STATE OF FLORIDA
## DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

**DATE**     February 9, 1995

**TO:**     Michael Spellman, Office of the Governor

**FROM:**     Bill Hanson, Acting Chief, *Bill Hanson*
Benefit Recovery and Special Programs

**SUBJECT:**     Voter Registration

---

Pursuant to our recent conversation, the following presents information on voter registration activities of the Department of Health and Rehabilitive Services. The National Voter Registration Act of 1993 and HB 2325 require the department to offer new applicants for services or benefits and existing consumers the opportunity to apply for voter registration in public assistance WIC, developmental services and aging and adult services offices. State hospital residents who have not had their voting rights withdrawn through court action are also eligible

The opportunity to apply for voter registration must be extended upon initial application, recertification of eligibility for services or benefits, and changes of address. Contracted providers of the department are not required to participate in voter registration activities, although they may on a voluntary basis.

The department has a statewide voter registration coordinator and a designated voter registration coordinator in each of its 15 districts. The district voter registration coordinators are responsible for the development of district specific voter registration implementation and operational plans, training of all staff who will be responsible for accepting and processing voter registration applications, and monitoring voter registration practices to ensure compliance with federal and state laws.

Unlike some state agencies, HRS has met with little local opposition to implementation of the voter registration act, even though it has meant increased workload for staff who are already overburdened. We believe there are several reasons for this, They are as follows:

- We have utilized a "bottoms-up" approach to the development of the voter registration program in HRS in which each district has been allowed to develop its own plan for voter registration within the confines of federal and state laws.

- We developed a statewide task force comprised of all district voter registration coordinators and selected others. The task force met several times with an emphasis on consensus decision making regarding how the voter registration program could best be implemented within the department. With over 40 hours devoted to this task, consensus was indeed reached on virtually all issues.

1317 WINEWOOD BOULEVARD • TALLAHASSEE, FLORIDA 32399-0700

LAWTON CHILES, GOVERNOR

A039847

- From the beginning we have stressed that increased voter registration among the poor and disabled would benefit them, particularly given the current voting trend in this state and the nation.

- In cooperation with the state Division of Elections, the department developed a training package for staff responsible for processing voter registration applications. The package included an excellent training video produced by the Division of Elections and specifically designed for HRS staff, an issues and answers paper that addressed frequently asked questions that had been surfaced by HRS staff respective to voter registration, the most innovative concepts for voter registration drawn from the 15 district plans as identified by the statewide voter registration task force, and a copy of both the federal and state laws governing voter registration. Using this package, the training conducted by district voter registration coordinators was widely considered to be comprehensive and excellent.

- Where possible, the department has used trained volunteers to process voter registration applications. This has helped reduce the workload on staff. With over 1.5 million voting age consumers in HRS, the Division of Elections has only received two complaints in HRS for registration practices. We consider this a major accomplishment.

- The acceptance of this program by rank and file HRS workers wholly confirms the Governor's view that when local staff have the opportunity to help plan and implement a program, there is a much greater acceptance of that program due to the opportunity for local input. This reaffirms the Governor's perspective that "bottoms-up" planning is far superior to "tops-down" dictates.

- The U.S. Department of Health and Human Services, and the American Public Welfare Association, have asked for descriptions of how HRS has implemented the National Voter Registration Act of 1993 in order to help other states that are having far more difficulty implementing the act, particularly in the area of staff resistance at the local level.

- The major issue associated with the National Voter Registration Act of 1993 is that yet another unfunded federal mandate is being imposed on the state. Complicating the matter is that state agencies are receiving no state appropriations to implement the act. Current departmental estimates indicate that it costs at least $1 million a year to operate this program, all of which is unfunded.

I hope that this material provides you with the information you are seeking. If you have questions, please call me at 922-8001.

Thank you for your interest in our efforts to implement the National Voter Registration Act of 1993.

cc:    H. James Towey, Secretary

        Albertine McDaniel, Assistant Secretary for
        Economic Services

A039848

# PLAINTIFFS' EXHIBIT 66



FLORIDA DEPARTMENT OF
# CHILDREN
# & FAMILIES

Jeb Bush
Governor

Kathleen A. Kearney
Secretary

02-01

DATE:  January 8, 2002

TO:  Operational Program Administrators, Public Assistance Specialist Supervisors, Clerical Supervisors

FROM: Carol Canady, Senior Human Service Program Specialist

SUBJECT: Voter Registration Procedures

---

It has come to our attention that not all service centers are following the correct procedures for Voter Registration requirements. Please inform staff that all clients must be offered the opportunity to register to vote. I have attached the Voter Registration Plan for the Suncoast Region.

The Voter Preference form and Voter Registration application can be ordered from PRIDE. The Voter Registration application form number is F3CF99044 in English and F3CF99045 for Spanish. The Voter Preference form number is 3CF00132 in English and 3CF00297 in Spanish.

If you have any questions please call me at 558-5691 or SC 514-5691.

CC: Sue McPhee, Cynthia Fox, Pennie Paulik, Mona McFadden, Margaret Fender, Adrienne Holderith, Terri Balzer, Myrna Laborda, Marilyn Mofford, Klaudia Raprager, Tom Steck, Angela Benjamin, Linda Konstantinidis, Glenn Peters, Nancy Sandlebeck, Mary Simmons, Dolores Carbo, Marilyn Drake, Sherry Pierce Carol Gardiner, Bill Hepe.

SunCoast Region
9393 N. Florida Avenue, Suite 700, Tampa, Florida 33612-7236

*The Department of Children and Families is committed to working in partnership with local communities to ensure safety, well-being and self-sufficiency for the people we serve.*

A040772

# Voter Registration Plan for the Suncoast Region

1. The Voter Registration Preference form will be explained by either front desk or receptionist, interviewing clerks or Public Assistance Specialist to the following clients:

   A. Applicants applying for assistance (at client registration or at the time of the application appointment or when the RFA's is dropped off.)

   B. Active clients in the office for complete eligibility reviews.

   C. Active clients who report a change of address in person, over the telephone or by mail.

**Note**: We are required to offer voter registration assistance in both English and Spanish. Voter registration **must** be discussed and questions asked (**see below**):

- The client must be advised that voter registration does not affect their eligibility for benefits.
- Are you a registed voter?
- Would you like to register to vote?
- Would you like to report a change of address?

The client **must** complete the voter registration preference form each time they apply, come to a complete eligibility review or report a change of address even though it has been discussed with them and the client has completed forms in the past.

2. The appropriate staff will give the client the Voter Registration Preference form to complete and retum to the clerical supervisor for filing.

**Note**: If the client refuses to sign the preference form, the person will annotate the form "Client refused to sign".

3. If the client is reporting a change of address over the telephone, the employee who talks to the client will explain voter registration and complete the voter registration preference form for the client. Annotate the top of the form "via telephone". Give the preference form to the Sr. Clerical Supervisor and mail the voter registration form to the client if they wish to register to vote or to change their address.

A040773

4. The client will be given the voter registration application from if they indicate on the preference form that they wish to register to vote. The client may complete the application form in the office or may take it home to complete. Assistance will be given in completing the form if the client requested. We must explain to the client mandatory items 1A, 1B, 1C, 3, 5, 8 and that boxes must be complete for the form to be valid.

   **NOTE: DCF staff is not responsible for screening applications to determine if the client is eligible to vote.**

   If you think the client is ineligible to vote (i.e. underage, not a citizen, etc.) You may tell them that it is a criminal offense to submit false voter registration information, however, if the client chooses to register, you cannot be held responsible. The Supervisor of Election is responsible to determine the applicant's eligibility to vote.

5. Forms which are completed in the office will be turned in to the front desk and date stamped. This is the effective date of the client's voter registration.

   **NOTE: Do not use a date stamp that has our department name on it**

   Applications cannot be identified as coming from a public assistance office. Clients who take the form home will be responsible for postage, however they may choose to return the form to our office for routing to the Supervisor of Election.

6. Completed voter registration applications will be batched and forwarded in white envelopes with red printing to the local Supervisor of Election daily. If more forms are needed, please contact Carol Canady at 558-5691, or SC 514-5691

## GENERAL INFORMATION

1. The client must be advised that voter registration does not affect their eligibility for benefits.

2. If the authorized representative comes to the office to apply or keep a scheduled eligibility interview for the client, the preference form can be completed for the authorized representative. The authorized representative **cannot** register the client to vote; however they may take home an application for the client to complete.

3. Minors who are 17 years of age may pre register to vote.

A040774

**PROHIBITIONS**

1. There can be no displays of party affiliations, campaign buttons, etc. in offices.

2. Employees cannot in any way influence client's choice of party affiliation.

A040775

**PLAINTIFFS' EXHIBIT 67**

# SELECT CONSENT JUDGMENTS FROM VOTING RIGHTS LITIGATION INVOLVING FLORIDA COUNTIES

| Case Name | Final Judgment Date | District/Challenge | Racial Polarization or other VRA Finding in Approving Settlement |
|---|---|---|---|
| Bellamy v. City of Perry, No. TCA 83-7125-MMP | 12/05/83, N.D. Fl. | City of Perry in Taylor County; at-large city council | The Court found racial polarization and history of official racial discrimination in both the city and the state. |
| Bellamy v. Taylor County Sch. Bd., No. TCA 83-7124-MMP | 12/07/83, N.D. Fl. | Taylor County; at-large county commission | The Court found racial polarization and history of official racial discrimination in both the county and the state. |
| Bradford County Branch of the NAACP v. Bradford County Sch. Bd., No. 86-4-CIV-J-12 | 07/18/84, N.D. Fl. | Taylor County; at-large school board | The Court found racial polarization and history of official racial discrimination in both the county and the state. |
| Bradford County Branch of the NAACP v. Bradford County Comm'rs, No. 86-6-CIV-J-14 | 07/11/86, M.D. Fl. | Bradford County; at-large school board | The Court found vote dilution in violation of §2 due to a series of factors though not racial polarization. |
| Columbia County Branch of the NAACP v. Columbia County, No. 84-609-CIV-J-12 | 12/19/85, M.D. Fl. | Columbia County; at-large county commission | The Court found racial polarization, history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |

| | | | |
|---|---|---|---|
| Columbia County Branch of the NAACP v. Columbia County Sch. Bd., No. 84-610-CIV-J-12 | 03/20/86, M.D. Fl. | Columbia County; at-large school board | The Court found racial polarization, history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |
| Hamilton County Branch of the NAACP v. Hamilton County, No. 840644-CIV-J-14 | 06/25/85, M.D. Fl. | Hamilton County; at-large county commission | The Court found racial polarization, history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |
| Hamilton County Branch of the NAACP v. City of Jasper, No. 84-645-CIV-J-16 | 12/24/85, M.D. Fl. | City of Jasper; at-large city council | The Court found racial polarization and history of official racial discrimination in both the city and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |
| Madison County Chapter of the NAACP v. City of Madison, No. TCA-84-7232-WS | 06/10/85, N.D. Fl. | City of Madison; at-large county commission | The Court found racial polarization in the city and lingering effects of official racial discrimination in the city and state. |
| Madison County Chapter of the NAACP v. Madison County, No. TCA-84-7234-WS | 05/30/85, N.D. Fl. | Madison County; at-large county commission | The Court found racial polarization in the county and lingering effects of official racial discrimination in the county and state. |

| | | | |
|---|---|---|---|
| *Mayhue v. Suwanee County*, No. 84-1103-Civ-J-16 | 09/09/85, M.D. Fl. | Suwanee County; at-large county commission | The Court found vote dilution in violation of §2 due to a series of factors but does not specify racial polarization. |
| *Parrish v. Jefferson County*, No. TCA-83-7481-MMP | 12/18/85, N.D. Fl. | Jefferson County; at-large county commission | The Court found history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |
| *Parrish v. Jefferson County Sch. Bd.*, No. TCA-84-7351-MMP | 02/28/86, N.D. Fl. | Jefferson County; at-large school board | The Court found history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |

**PLAINTIFFS' EXHIBIT 68**



**Florida Department of
Law Enforcement**

**Criminal Justice Information Services**

Post Office Box 1489
Tallahassee, Florida 32302-1489
www.fdle.state.fl.us

James T. "Tim" Moore
Commissioner

## FACSIMILE COVER SHEET

DATE _5-5-02_    FAX # _202-783-5130_

### PLEASE DELIVER THE FOLLOWING TO:

ATTN: _Lori Borgen_

AGENCY: _Lawyers Comm. for Civil Rights_

FROM: SANDY ZAHURAK   FDLE QUALITY CONTROL
    PHONE: 850-410-7889    FAX: 850-410-7899

REF: _McDonald, Wallace_

_Following is a corrected certified
copy of Mr. McDonald's crim. history_

_Sandy_

_Original is in the mail._

Total number of pages including this one _5_

Committed to
Service • Integrity • Respect • Quality

A043573

FLORIDA   DEPARTMENT   OF   LAW   ENFORCEMENT
Pursuant to federal regulation (28 CFR 20) this record may be used only for
stated purpose for which it was requested. Charges and dispositions as coded
herein reflect standardized uniform offense and disposition classifications
for computerized criminal history records. More detailed and specific informa-
tion may be available from contributors. The department does not warrant that
these records are comprehensive or accurate, only that this record contains
all information on the subject that the department has received and is pre-
sently authorized by law to disseminate.

=================================================================================

SID NBR:    28043    PURPOSE CODE:R              PAGE NBR:    1

BECAUSE ADDITIONS OR DELETIONS MAY BE MADE AT ANY TIME,
A NEW COPY SHOULD BE REQUESTED WHEN NEEDED FOR FUTURE USE

- FLORIDA   CRIMINAL   HISTORY -

NAME                      STATE ID NO.    FBI NO.      DATE REQUESTED
MCDONALD, WALLACE         FL-00028043                  06/05/2002

SEX   RACE   BIRTH DATE   HEIGHT   WEIGHT   EYES   HAIR   BIRTH PLACE   SKIN
M     B      02/11/1937   6'03''   175      BRO    BLK    FL            DRK

FINGERPRINT CLASS    SOCIAL SECURITY NO.    MISCELLANEOUS NO.    SCR/MRK/TAT
PM 17 14 PO 17       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
PI PI 15 CI 14

OCCUPATION              ADDRESS                 CITY/STATE
SHRIMP BOAT             3101 11 AVE             TAMPA, FL
------------------------------------------------------------------------
ARREST- 1   06/08/1959      OBTS NO.-
     ARREST AGENCY-TAMPA POLICE DEPARTMENT                    (FL0290200)
       AGENCY CASE-63593                      OFFENSE DATE-
       CHARGE 001-ASSLT-
       CHARGE 002-ESCAPE-
     JUDICIAL-
       AGENCY-TAMPA POLICE DEPARTMENT                         (FL0290200)
       CHARGE 001 -COURT SEQ               COURT NO.-
         COURT DATA-ASSLT-
             DISP DATE-06/12/1959              DISP-CONVICTED
             CONFINEMENT-50D
             FINE- $100                     COURT COST-


             ===    DLE1Q          ===

**A043574**

SID NBR:    28043    PURPOSE CODE:R          PAGE NBR:    2

        CRT PROVISIONS- CONF OR FINE
    CHARGE 002 -COURT SEQ                  COURT NO.-
        COURT DATA-ESCAPE-
            STATUTE/ORDINANCE-                LEVEL-MISDEMEANOR
            DISP DATE-06/15/1959              DISP-CONVICTED
            CONFINEMENT-30D
            FINE-    $30                     COURT COST-
        CRT PROVISIONS- CONF OR FINE
-----------------------------------------------------------------
ARREST-   2 | 12/16/1960     OBTS NO.-
    ARREST AGENCY-TAMPA POLICE DEPARTMENT                (FL0290200)
        AGENCY CASE-63593                   OFFENSE DATE-
        CHARGE 001-ASSLT-
    JUDICIAL-
        AGENCY-TAMPA POLICE DEPARTMENT                   (FL0290200)
        CHARGE 001 -COURT SEQ               COURT NO.-
            COURT DATA-ASSLT-
            DISP DATE-12/19/1960             DISP-DISMISSED
-----------------------------------------------------------------
ARREST-   3 | 12/09/1967     OBTS NO.-
    ARREST AGENCY-TAMPA POLICE DEPARTMENT                (FL0290200)
        AGENCY CASE-63593                   OFFENSE DATE-
        CHARGE 001-GAMBLING-
-----------------------------------------------------------------
ARREST-   4 | 09/08/1972     OBTS NO.-
    ARREST AGENCY-TAMPA POLICE DEPARTMENT                (FL0290200)
        AGENCY CASE-63593                   OFFENSE DATE-09/02/1972
        CHARGE 001-ASSLT-
            AND BATTERY
            STATUTE/ORDINANCE FL784-03       LEVEL-
    JUDICIAL-
        AGENCY-TAMPA POLICE DEPARTMENT                   (FL0290200)
        CHARGE 001 -COURT SEQ               COURT NO.-
            COURT DATA-ASSLT-
                        AND BATTERY
            STATUTE/ORDINANCE-FL784-03       LEVEL-
            DISP DATE-10/10/1972             DISP-CONVICTED
            CONFINEMENT-10D
            FINE-    $100                    COURT COST-
        CRT PROVISIONS- SUSPENDED SENTENCE PROBATION


            ===    DLE1Q       ===

A043575

```
SID NBR:    28043    PURPOSE CODE:R              PAGE NBR:    3

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ARREST-  5   08/29/1983     OBTS NO.-
   ARREST AGENCY-TAMPA POLICE DEPARTMENT                    (FL0290200)
      AGENCY CASE-63593                    OFFENSE DATE-
      CHARGE 001-AGGRAV ASSLT-
            STATUTE/ORDINANCE FL784-021      LEVEL-FELONY
            DISP-TURNED OVER TO COUNTY AUTHORITIES
               FL0290000 NO 68185
   JUDICIAL-
      AGENCY-STATE ATTORNEY OFFICE - TAMPA          (FL029015A)
      CHARGE 001 -COURT SEQ             COURT NO.-8310427
         COURT DATA-AGGRAV ASSLT-
            STATUTE/ORDINANCE-              LEVEL-FELONY
            DISP DATE-11/22/1983            DISP-DISMISSED
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ARREST-  6   07/07/1986     OBTS NO.-
   ARREST AGENCY-HILLSBOROUGH COUNTY SHERIFF'S OFFICE     (FL0290000)
      AGENCY CASE-68185                    OFFENSE DATE-
      CHARGE 001-AGGRAV ASSLT-
            FIREARM
            STATUTE/ORDINANCE              LEVEL-FELONY
      CHARGE 002-BATTERY-
            STATUTE/ORDINANCE              LEVEL-MISDEMEANOR
   JUDICIAL-
      AGENCY-13TH JUDICIAL CIRCUIT COURT- TAMPA        (FL029015J)
      CHARGE 001 -COURT SEQ         COURT NO.-291986CF008737D001TA
         COURT DATA-AGGRAV ASSLT-
            STATUTE/ORDINANCE-             LEVEL-FELONY
            DISP DATE-08/18/1986           DISP-DISMISSED
      CHARGE 002 -COURT SEQ         COURT NO.-291986CF008737D001TA
         COURT DATA-BATTERY-
            STATUTE/ORDINANCE-             LEVEL-MISDEMEANOR
            DISP DATE-08/18/1986           DISP-ADJ WITHHELD
            PROBATION-1Y
         CRT PROVISION-  GUILTY PLEA
      SPECIAL SENTENCE PROVISIONS-NOT APPLICABLE
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
THIS RECORD CONTAINS FLORIDA INFORMATION ONLY. WHEN EXPLANATION OF A CHARGE
OR DISPOSITION IS NEEDED, COMMUNICATE DIRECTLY WITH THE AGENCY THAT CONTRI-
BUTED THE RECORD INFORMATION. THE USE OF THIS RECORD IS CONTROLLED BY


               ===      DLE1Q          ===
```

A043576

SID NBR:     28043    PURPOSE CODE:R              PAGE NBR:     4

FEDERAL REGULATIONS. IT IS PROVIDED FOR THE PURPOSE OF PERSONAL REVIEW AND
MAY ONLY BE USED FOR THE PURPOSE REQUESTED. THIS RECORD MAY ONLY BE USED FOR
REVIEW AND CHALLENGE AS DEFINED BY THE CODE OF FEDERAL REGULATIONS.
UNKNOWN AS TO NATIONAL RECORD STATUS.
END OF RECORD

=== DLE1Q

_Sandra Zahurek_

Administrator, FCIC

Florida Dept. of Law Enforcement

Sworn and Subscribed before me this
5 day of June, 20 02
by Sandra Zahurak who is
personally know to me.

_Andrea Bullough_

Andrea Bullough
MY COMMISSION # DD09400 EXPIRES
November 15, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

A043577

**PLAINTIFFS' EXHIBIT 69**

## SELECT HISTORIC RACIAL DISCRIMINATION IN FLORIDA
### Post-1864 State Statutory Provisions

Plaintiffs request that the Court take judicial notice of the following evidence[1] pursuant to Rule 201, F.R.E.:

1.    1865 Fla. Laws ch. 1466, sec. 12, pp. 23, 25 (making it a crime for "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind").

2.    1865 Fla. Laws ch. 1468, p. 30 (making it a crime for a white female to "intermarry [or] live in a state of adultery, or fornication with any negro, mulatto, or other person of color," defining "person of color" as any person having "one-eighth or more of negro blood", and setting out the penalty for both white women and "person of color" convicted of crime).

3.    1865 Fla. Laws ch. 1469, p. 31 (requiring all "colored inhabitants of this State claiming to be living together in the relation of husband and wife, and who have not been joined as such . . . be regularly joined in the bonds of matrimony").

4.    1865 Fla. Laws ch. 1470, p. 32 (requiring all contracts with "persons of color" to be in writing and fully explained before two credible witnesses).

5.    1865 Fla. Laws ch. 1474, p. 37 (repealing all laws previously passed referring to "slaves, free negroes and mulattoes, except the law to prevent their migration into the State, and the act prohibiting the sale of fire-arms and ammunition to them" and making all criminal laws previously applicable to white persons applicable to "all

---

[1] Copies of these statutes are available from Plaintiffs' counsel upon request.

inhabitants . . . without distinction of color").

6.  1865 Fla. Laws ch. 1475, p. 37 (establishing "schools for freedmen" and providing for a tax "upon all male persons of color between the ages of twenty-one years and fifty-five" to fund such schools).

7.  1865 Fla. Laws, Res. No. 18, p. 113 (requesting that "the colored troops [be] removed from the State of Florida, at the earliest date possible").

8.  1865 Fla. Laws, Res. No. 20, p. 114 (requesting "to have removed if possible the colored troops from the State and at any rate from the interior" and noting that "[t]he experience of the people of Florida has been that the demoralization of labor has been in almost exact proportion to the proximity of the freedmen to the colored troops").

9.  1865 Fla. Laws, Res. No. 1, p. 101 (Joint Resolution ratifying the Thirteenth Amendment abolishing slavery but with the caveat that the amendment does not authorize Congress to legislate regarding "Freedmen in this state").

10. 1866 Fla. Laws, ch. 1468, sec. 5 (holding marriages between white persons and persons of color, contracted and solemnized prior to January 12, 1866 valid). Codified at 1892 Rev. St. sec. 2062; 1906 Gen. St. sec. 2585; 1920 Rev. Gen. St. sec. 3944; 1927 Comp. Gen. Laws sec. 5863; 1941 Fla. Stats. sec. 741.19.

11. 1866 Fla. Laws, ch. 1469 (laws regulating marriages for white persons are to apply to "colored persons").  Codified at 1892 Rev. St. sec. 2067; 1906 Gen. St. sec. 2583; 1920 Rev. Gen. St. sec. 3942; 1927 Comp. Gen. Laws sec. 5861; 1941 Fla. Stat. sec. 741.17.  Repealed by 1969 Fla. Laws ch. 69-195.

12. 1866 Fla. Laws ch. 1551, p. 21 (extending requirement that contracts with persons of

color be in writing to contracts between all persons).

13. 1866 Fla. Laws ch. 1552, p. 22 ("An Act Legalizing the Marriage of Persons of Color"). Codified at 1892 Rev. St. sec. 2068.

14. 1866 Fla. Laws ch. 1537, p. 12 (qualifications for jurors being limited to "all white males...").

15. 1866 Fla. Laws ch. 1566, p. 30 (providing that persons of color previously unable to inherit property due to legal incapacity to contract marriage in a state of slavery are allowed to inherit). Codified at 1892 Rev. St. sec. 1829; 1906 Gen. St. sec. 2305; 1920 Rev. St. sec. 3628; and 1927 Gen. St. sec. 5492.

16. 1868 Fla. Laws ch. 1628, p. 16 (providing that all qualified electors of state are liable to be drawn as jurors, requiring board of county commissioners to make a list every year from list of registered voters, and imposing an "integrity, fair character, sound judgment and intelligence" test).

17. 1873 Fla. Laws ch. 1947, p. 25 (anti-discrimination statute for public accommodations, removes race qualification for jury duty).

18. 1881 Fla. Laws ch. 3282, p. 85 (making it a misdemeanor for any white woman and "colored" man or white man and "colored" woman, who are not married to each other, to habitually occupy the same room in the nighttime). Codified at 1892 Rev. St. secs. 2612, 2613; 1906 Gen. St. sec. 3533; 1920 Rev. St. sec. 5423; 1927 Gen. Laws sec. 7566; 1941 Fla. Stats. sec. 798.05. Repealed by 1969 Fla. Laws ch. 69-195.

19. 1881 Fla. Laws ch. 3283, p. 86 (making it a felony for "any white man . . . [to] intermarry with a negro, mulatto or any person who has one-eighth of negro blood in

-3-

her, or . . . any white woman . . . [to] intermarry with a negro, mulatto or any person who has one-eighth negro blood in him" and making it a felony for anyone to perform the marriage ceremony for such couples).  Codified at 1892 Rev. St. secs. 2606, 2607, 2608; 1906 Gen. St. secs. 3529, 3530, 3531; 1920 Rev. St. secs. 5419, 5420, 5421; 1927 Gen. Laws secs. 7562, 7563, 7564; 1941 Fla. Stat. secs. 741.12, 741.14, 741.16. Repealed by 1969 Fla. Laws ch. 69-195.

20.    1887 Fla. Laws ch. 3743, p. 116 (requiring railroad companies to provide a separate car for "persons of color" who buy a first class ticket).  Codified at 1892 Rev. St. secs. 2268, 2686; 1906 Gen. secs. 2860, 3632; 1920 Rev. Gen. St. secs. 4554, 5565; 1927 Gen. Comp. Laws secs. 6617, 7751; 1941 Fla. Stat. secs. 352.03, 352.18.  Repealed by 1969 Fla. Laws ch. 69-195.

21.    1887 Fla. Laws ch. 3809, sec. 7, p. 256 (limiting enrollment at the "Normal School and Business Institute" to whites).

22.    1887 Fla. Laws ch. 3692, p. 36 (establishing separate schools for white and "colored" teachers).

23.    1889 Fla. Laws ch. 3883, sec. 32, pp. 116, 122 (requiring separate apartments for white and "colored" prisoners).

24.    1889 Fla. Laws ch. 3872, sec. 19, pp. 73, 76 (limiting voting in school bond elections to freeholders).

25.    1889 Fla. Laws ch. 3879, secs. 22, 25 & 26, pp. 88, 101-102 (requiring federal offices to be voted for at a polling place separate from state and local offices, requiring separate ballots and ballot boxes for each state and local office at the polls, requiring

voter to place ballot for each office in correct box, and prohibiting anyone but
Inspectors of Election from talking to voter while in polling place).

26. 1889 Fla. Laws ch. 3850, p. 13 ("An Act to Provide for the Payment of a Capitation
or Poll Tax as a Prerequisite for Voting and Prescribing the Duties of Tax Collectors
and Supervisors of Registration in Relation Thereto").

27. 1891 Fla. Laws ch. 4072, p. 114 ("An Act to Confer Police Powers on all Conductors
in Charge of Passenger Trains on the Railroads in this State").

28. 1892 Rev. St. sec. 1 (defining "'negro' [to] include[] every person having one-eighth
or more negro blood" and providing that "the terms 'colored person', or 'person of
color', or 'colored', as applied to any person, have the same signification as is herein
attached to 'negro', as aforesaid").  Recodified, 1941 Fla. Stat. sec. 1.01(6).

29. 1892 Rev. St. sec. 2064 (defining "colored person" as "every person who shall have
one-eighth or more of negro blood...").  Recodified at 1906 Gen. St. sec. 2580, p.
1019; 1920 Rev. Gen. St. sec. 3939; 1927 Comp. Gen. Laws sec. 5858.

30. 1892 Rev. St. sec. 2609 (providing that "[a]ny white person who shall hereafter live in
a state of adultery or fornication with any negro, mulatto, or other person of color,
shall be punished by imprisonment not exceeding twelve months, or by fine not
exceeding one thousand dollars").  Recodified at 1906 Gen. St. sec. 3532; 1920 Rev.
Gen. St. sec. 5422; 1927 Comp. Gen. Laws sec. 7565; 1941 Fla. Stat. sec. 798.04.
Repealed by 1969 Fla. Laws ch. 69-195.

31. 1892 Rev. St. sec. 2610 (providing that "[a]ny negro, mulatto, or other person of color
who shall hereafter live in a state of adultery or fornication with any white person,

-5-

shall be punished by imprisonment not exceeding twelve months, or by fine not exceeding one thousand dollars"). Recodified at 1906 Gen. St. sec. 3532; 1920 Rev. Gen. St. sec. 5422; 1927 Comp. Gen. Laws sec. 7565; 1941 Fla. Stat. sec. 798.04.

32.    1892 Rev. St. sec. 2611 (defining "a person of color" as "[e]very person who shall have one-eighth or more of negro blood"). Recodified at 1906 Gen. St. sec. 3532; 1920 Rev. Gen. St. sec. 5422; 1927 Comp. Gen. Laws sec. 7565.

33.    1895 Fla. Laws ch. 4328, secs. 1, 44, pp. 56, 77 (establishing the qualifications for voters, including payment of a poll tax for two years prior to election, and providing that "[n]o elector while receiving, preparing and casting his ballot, shall occupy a booth or compartment for a longer time than five minutes"). Codified at 1906 Gen. St. secs. 170, 208, 226, 228, 229, 231; 1920 Rev. Gen. St. secs. 215, 252, 271, 273, 274, 276; 1927 Comp. Gen. Laws secs. 248, 308, 327, 329, 330, 332; 1941 Fla. Stat. secs. 99.06, 99.25, 99.27, 99.28, 99.30.

34.    1895 Fla. Laws ch. 4335, p. 96 (making it a crime for any "individual, body of individuals, corporation or association to conduct within this State any school of any grade, public, private or parochial wherein white persons and negroes shall be instructed or boarded within the same building, or taught in the same class, or at the same time by the same teachers.") Codified at 1920 Rev. Gen. St. sec. 5866; 1927 Comp. Gen. Laws sec. 8107; 1941 Fla. Stat. sec. 242.25. Repealed by 1943 Fla. Laws ch. 21989.

35.    1895 Fla. Laws ch. 4336, p. 97 (limiting who may petition for referendum election on establishing school sub-districts to "tax payers on real or personal property").

36. 1897 Fla. Laws ch. 4565, sec, 3, p. 107 (providing for the construction of a state reform school and requiring construction of "two separate buildings, not nearer than one-half mile to each other, one for white and one for colored; and provided further, that the colored and white convicts shall not be in any manner associated together, or worked together, or instructed in same building").  Codified at 1906 Gen. St. sec. 4169; 1920 Rev. Gen. St. sec. 6310; 1927 Comp. Gen. Laws sec. 8636; 1941 Fla. Stat. sec. 955.12.  Repealed by 1969 Fla. Laws ch. 69-195 and 69-365.

37. 1897 Fla. Laws ch. 4536, p. 65 (limiting amount of time a voter may stay in voting booth).

38. 1897 Fla. Laws ch. 4535, p. 62 (requiring poll tax for voting in primaries).

39. 1897 Fla. Laws ch. 4565, sec. 3, pp. 107-108 (providing for different buildings separated by one-half mile for white and "colored" convicts and prohibiting convicts of different races from associating or being worked together).  Codified at 1941 Fla. Stat. sec. 955.12.  Repealed by 1969 Fla. Laws ch. 69-195 and 69-365.

40. 1899 Fla. Laws ch. 4749, sec. 1, p. 135 ("An Act to legalize the Marriages and Offspring of Persons of African Descent").  Codified at 1906 Gen. St. sec. 2586; 1920 Rev. Gen. St. sec. 3945; 1927 Comp. Gen. Laws sec. 5864; 1941 Fla. Stat. sec. 741.20.  Repealed by 1969 Fla. Laws ch. 69-195.

41. 1901 Fla. Laws ch. 5014, secs. 2, 3, p. 160 (regulating holding of primary elections; authorizing Executive Committee to "declare terms and conditions" of voting; making payment of poll tax a qualification of voting).

42. 1902 Fla. Laws ch. 4997, p. 147 (establishing scholarships at the white "State Normal

-7-

School").

43.   1903 Fla. Laws ch. 5140, p. 76 (prohibiting marriages between white person and any person with "one-eighth negro blood").

44.   1905 Fla. Laws ch. 5384, secs. 11, 21, 23, p. 37 (creating the University of the State of Florida and consolidating institutions within new system but maintaining racial segregation). Codified at 1920 Rev. Gen. St. sec. 606-610, 622-623, 632, 642; 1927 Comp. Gen. Laws sec. 762-766, 789-790, 804, 814; 1941 Fla. Stat. secs. 241.01, 241.03, 241.39, 241.41. Repealed by 1965 Fla. Laws ch. 65-130.

45.   1905 Fla. Laws ch. 5420, p. 99 (requiring street car companies to separate white and "colored" passengers).

46.   1905 Fla. Laws ch. 5447, p. 133 (prohibiting the chaining or handcuffing of white prisoners to "colored" prisoners). Codified at 1920 Rev. Gen. St. sec. 5369; 1927 Comp. Gen. Laws sec. 7503; 1941 Fla. Stat. sec. 952.15. Repealed by 1957 Fla. Laws ch. 57-121.

47.   1907 Fla. Laws ch. 5602, p. 79 (appropriating money for schools, including the "Colored Normal School").

48.   1907 Fla. Laws ch. 5617, p. 99 (requiring separate accommodations for white and "negro" passengers). Codified at 1920 Rev. Gen. St. secs. 4557-4561, 5600-5603; 1927 Comp. Gen. Laws secs. 6620-6624, 7787-7790; 1941 Fla. Stat. secs. 352.07, 352.08, 352.09, 352.10, 352.11, 352.12, 352.13, 352.14, 352.15. Repealed by 1969 Fla. Laws ch. 69-195.

49.     1907 Fla. Laws ch. 5619, p. 103 (requiring railroad and terminal companies to

provide separate waiting rooms and ticket windows for white and "colored"

passengers).  Codified at 1920 Rev. Gen. St. secs. 4562-4563, 4626; 1927 Comp.

Gen. Laws secs. 6625-6626, 6712; 1941 Fla. Stat. secs. 350.21, 352.16, 352.17.

Repealed by 1969 Fla. Laws ch. 69-195.

50.     1907 Fla. Laws Res. No. 2, p. 767 (proposing constitutional amendment providing for

a special tax for the support and maintenance of the University of the State of Florida,

the Florida Female College, the Institute for the Blind, Deaf and Dumb, and the

"Colored Normal School").

51.     1909 Fla. Laws ch. 5893, p. 39 (requiring railroad companies and common carriers to

provide separate accommodations for white and "colored" passengers).  Codified at

1920 Rev. Gen. St. secs. 4555-4556, 4625, 5566; 1927 Comp. Gen. Laws secs. 6618-

6619, 6711, 7752; 1941 Fla. Stat. secs. 350.20, 352.04, 352.05, 352.06.  Repealed by

1969 Fla. Laws ch. 69-195, and 1971 Fla. Laws ch. 71-355, sec. 102, p. 1643.

52.     1909 Fla. Laws ch. 5925, p. 69 (changing the name of the "Colored Normal School"

to the "Florida Agricultural and Mechanical College for Negroes").  Codified at 1920

Rev. Gen. St. sec. 643; 1927 Comp. Gen. Laws sec. 815; 1941 Fla. Stat. sec. 241.41.

Repealed by 1965 Fla. Laws, ch. 65-130.

53.     1909 Fla. Laws ch. 5928, p. 70 (making it unlawful for "any person or corporation in

this State to pay the poll tax for any other person, or furnish the money to any other

person's poll tax").

54.     1909 Fla. Laws ch. 5961, p. 161 (appropriating funds to state universities, including

"Florida Agricultural and Mechanical College for Negroes").

55.    1909 Fla. Laws ch. 5967, p. 171 (requiring the separation of white and "negro"

prisoners).  Codified at 1920 Rev. Gen. St. secs. 6213-6216; 1927 Comp. Gen. Laws

secs. 8545-8548; 1941 Fla. Stats. secs. 950.05, 950.06, 950.07, 950.08.  Repealed by

1965 Fla. Laws, ch. 65-172, sec. 2.

56.    1909 Fla. Laws Res. No. 26, p. 704 (requesting "Senators and Representatives in the

Congress of the United States to exert their influence at Washington against the

appointment, and the confirmation of any such appointment, of negroes to Federal

offices and appointments in the State of Florida").

57.    1911 Fla. Laws ch. 6125, p. 31 (appropriating funds for segregated universities).

58.    1913 Fla. Laws ch. 6438, p. 106 (appropriating funds for segregated universities).

59.    1913 Fla. Laws ch. 6469, sec. 11, pp. 242, 246 (requiriing poll tax for voting in

primary).  Codified at 1920 Rev. Gen. St. sec. 314; 1927 Comp. Gen. Laws sec. 371.

60.    1913 Fla. Laws ch. 6490, p. 311 ("An Act Prohibiting White Persons From Teaching

Negroes in Negro Schools, and Prohibiting Negro Teachers From Teaching White

Children in White Schools in the State of Florida, and Providing for the Penalty

Therefor").  Codified at 1920 Rev. Gen. St. sec. 5870; 1927 Comp. Gen. Laws sec.

8112; 1941 Fla. Stat. sec. 242.26.  Repealed by 1943 Fla. Laws ch. 21989, sec. 17.

61.    1915 Fla. Laws ch. 6827, p. 55 (appropriating funds for segregated universities).

62.    1915 Fla. Laws ch. 6830, p. 60 (providing for a teacher training department in one

high school in each county).  Codified at 1920 Rev. Gen. St. sec. 604; 1927 Comp.

Gen. Laws sec. 759 (providing for segregated programs).

-10-

63.   1915 Fla. Laws ch. 6835, p. 72 (providing for maintenance of three segregated summer schools for teachers).  Codified at 1920 Rev. Gen. St. sec. 634, 637; 1927 Comp. Gen. Laws sec. 806, 809; 1941 Fla. Stat. secs. 239.11 & 239.14.  Repealed by 1963 Fla. Laws ch. 63-572, sec. 20.

64.   1915 Fla. Laws, ch. 6840, p. 79 (providing that school for girls operate in same manner as school for boys, which requires segregated facilities).  Codified at 1920 Rev. Gen. St. sec. 6326; 1927 Comp. Gen. Laws sec. 8652; 1941 Fla. Stat. sec. 956.02.  Repealed by 1969 Fla. Laws ch. 69-365.

65.   1915 Fla. Laws ch. 6874, secs. 3, 8, p. 149, 152, 158 (requiring poll tax for voting in primary elections and requiring that candidates be nominated from groups when "more than one candidate is to be nominated for the same office and there are more candidates than should be nominated therefor").  Codified at 1920 Rev. Gen. St. secs. 314, 344, 348, 356; 1927 Comp. Gen. Laws secs. 371, 405, 413; 1941 Fla. Stat. sec. 102.49.

66.   1915 Fla. Laws Res. 82, p. 497 (proposing amendment to the state constitution providing for literacy test and freeholder requirement for voting and making an exception for any "person or lineal descendants of any such persons who was on January first, 1867, or prior thereto, entitled to vote").

67.   1917 Fla. Laws ch. 7279, p. 60 (appropriating funds for segregated universities).  See also 1919 Fla. Laws ch. 7797.

68.   1921 Fla. Laws ch. 8583, p. 401 (requiring poll tax for voting).  Codified at 1927 Comp. Gen. Laws sec. 371.

69.   1923 Fla. Laws ch. 9134, p. 130 (providing for the annual appropriation of funds for scholarships for students to attend the two state white universities).  Codified at 1927 Comp. Gen. Laws secs. 769, 771-774; 1941 Fla. Stat. sec. 239.19.

70.   1923 Fla. Laws ch. 9294, p. 326 (freeholder requirement for voting in all bond elections).  Codified at 1927 Gen. Comp. Laws sec. 250; 1941 Fla. Stat. sec. 98.03.

71.   1925 Fla. Laws ch. 10248, p. 467 (providing for the maintenance of three segregated summer schools for teachers).  Codified at 1927 Comp. Gen. Laws secs. 806-808, 810, 813; 1941 Fla. Stat. secs. 239.11 & 239.14.  Repealed by 1963 Fla. Laws ch. 63-572, sec. 20.

72.   1927 Fla. Laws ch. 12261, p. 1153 (providing for scholarships for attendance at the two state white universities).  Codified at 1927 Comp. Gen. Laws secs. 769-770; 1941 Fla. Stat. sec. 239.19.

73.   1927 Fla. Laws ch. 12416, p. 1339 (providing for separate teacher-training departments for whites and "negroes").  Codified at 1927 Comp. Gen. Laws secs. 759-760.

74.   1927 Fla. Laws Res. 27, p. 1599 (authorizing levying of a school tax "whenever a majority of the qualified electors thereof that pay a tax on real or personal property, shall vote in favor of such levy").

75.   1929 Fla. Laws ch. 13761, secs. 9, 14, 16, pp. 480, 485, 488, 491 (abolishing second choice voting and requiring poll tax for voting).

76.   1929 Fla. Laws.ch. 14567, p. 1090 (providing for separate teacher-training departments for whites and "negroes").

77.   1933 Fla. Laws ch. 16181, p. 744 (providing that "[w]hite and negro convicts worked upon the public roads of the State, or of any County of this State, shall be worked in separate squads and confined in separate vans, stockades or other structures"). Repealed, 1957 Fla. Laws ch. 121.

78.   1933 Fla. Laws ch. 16013, p. 300 (limiting voting in special tax school districts to those who "paid a tax on real or personal property and voted in the General Election next preceding the date of holding any election pertaining to such Special Tax School District"). Codified at 1941 Fla. Stat. secs. 227.13, 236.32. Fla. Stat. sec. 227.13. Repealed by 1955 Fla. Laws, ch. 29764, sec. 1.

79.   1933 Fla. Laws ch. 16103, sec. 33, pp. 544, 552 (regarding "inheritance from persons of color"). Codified at 1941 Fla. Stat. sec. 731.32. Repealed by 1969 Fla. Laws ch. 69-195.

80.   1939 Fla. Laws ch. 19355, secs. 118, 209, 210, pp. 730, 734-735, 741 (limiting school bond elections to freeholders; providing for segregated schools; prohibiting white teachers from teaching at "negro schools"; and prohibiting "negro teacher" from teaching in white schools). Codified at 1941 Fla. Stat. secs. 227.13, 228.09, 228.10. Fla. Stat. sec. 227.13 repealed by 1955 Fla. Laws ch. 29764. Fla. Stat. sec. 228.09 repealed by 1965 Fla. Laws ch. 65-239. Fla. Stat. sec. 228.10 repealed by 1941 Fla. Laws ch. 20970.

81.   1941 Fla. Stat. sec. 239.10 (providing for the salaries of the Presidents of the state segregated universities). Repealed by 1965 Fla. Laws ch. 65-130.

82.   1941 Fla. Laws ch. 20986, sec. 1 (abolishing poll tax requirement for voting).

-13-

Codified at 1941 Fla. Stat. sec. 193.75.

83. 1945 Fla. Laws ch. 22944, p. 1055 (appropriating funds for scholarships and
providing for attendance at segregated universities).

84. 1947 Fla. Laws ch. 23669, p. 112 (providing for a segregated university system).
Codified at 1963 Fla. Stat. sec. 239.01.  Repealed by 1965 Fla. Laws ch. 65-130.

85. 1947 Fla. Laws ch. 23726, secs. 7, 9, pp. 185, 189 and 190 (providing that
nominations in primary elections for school board are to be at-large from residency
districts).  Currently codified at Fla. Stat. secs. 230.08, 230.10.

86. 1947 Fla. Laws ch. 23957, p. 704 (requiring candidates to run in groups whenever
there are two or more similar offices are to be filled).  Amended, 1977 Fla. Laws ch.
77-175.  Currently codified at Fla. Stat. sec. 100.071.

87. 1951 Fla. Laws ch. 26906, p. 1052 (defining persons entitled to pensions for "military
or naval service of the confederate states during the war between the states of the
United States").  Codified at 1989 Fla. Stat. ch. 291.  Repealed by 1991 Fla. Laws ch.
91-50.

88. 1955 Fla. Laws ch. 29746, p. 302 (granting county boards of public instruction "full
and complete" authority regarding the enrollment of pupils in public schools.  "[T]he
purpose of this act [is] to ease the impact of [the United States Supreme Court
desegregation] decisions and to avoid tensions and disruptions in the public school
system").

89. 1955 Fla. Laws ch. 29937, p. 905 (requiring the grouping of candidates to numbered
posts whenever two or more similar offices to be filled in one election). Currently

codified at Fla. Stat. sec. 100.071.

90.   1956 Fla. Laws ch. 31404, p. 62 (authorizing county commissioners to call for a
reregistration of freeholder electors for county elections).

91.   1957 Fla. Laws ch. 57-315, p. 617 (establishing the "Governor's Advisory
Commission on Race Relations" to render assistance to the governor because "as a
result of certain decisions of the supreme court [sic] of the United States relating to
segregation of the white and colored races [] serious social tensions have developed").

92.   1959 Fla. Laws, ch. 59-158, p. 291 (authorizing county commissioners, or governing
body of any municipality, to call for a reregistration of freeholder electors).

93.   1959 Fla. Laws, ch. 59-412, p. 1402 (providing for the withdrawal of a child from a
school where the races are "commingled" upon a parent's request).

94.   1961 Fla. Laws ch. 61-115, p. 181 ("prohibiting any person from mutilating, defacing,
defying, trampling upon, defiling or casting contempt upon the flags of the
Confederacy or replicas thereof"). Currently codified at Fla. Stat. sec. 256.10.

95.   1961 Fla. Laws, ch. 61-332, p. 648 (defining "freeholder" as it relates to elections).

96.   1965 Fla. Laws, ch. 65-130, secs. 1 & 4, pp. 238-240 (changing the name of the
"Florida Agricultural & Mechanical College for Negroes" to "Florida Agricultural &
Mechanical University," amending sec. 239.34 of the Fla. Statutes relating to
scholarship funds for lineal descendants of confederate soldiers or sailors, and
providing further for the erection of "a permanent memorial to the confederate
soldiers and sailors").

97.   1965 Fla. Laws, ch. 65-131, p. 245 (authorizing owners of public accommodations to

-15-

refuse service to patrons with undesirable conduct).

98. 1969 Fla. Laws, ch. 69-117, p. 604 (prohibiting district school boards from prohibiting school band to play "Dixie").  Codified at 1989 Fla. Stat. sec. 230.222. Repealed by 1991 Fla. Laws ch. 91-105, sec. 81.

99. 1969 Fla. Laws, ch. 69-377, p. 1328 (redefining "freeholder"; requiring voters in all county and municipal bond elections to be "freeholders" and making it unlawful for non-freeholders to vote in bond elections; and establishing a permanent single registration system).

100. 1970 Fla. Laws, ch. 70-95, sec. 30, p. 226, 346 (requiring that "[n]o moneys appropriated in this act or by any county shall be used, directly or indirectly, to assign, transport or compel attendance of any student to any school based solely upon considerations of race, creed, color, or national origin, or for the purpose of achieving equality in attendance or increased attendance or reduced attendance at any school at which persons of one or more particular races, creeds, colors or national origins are enrolled").

101. 1972 Fla. Laws, ch. 72-3, p. 114 (providing for a straw ballot referendum on whether, *inter alia*, voters are in favor of an amendment to the U.S. Constitution that would prohibit forced busing).

**PLAINTIFFS' EXHIBIT 70**

| 103d Congress<br>1st Session | SENATE | Calendar No. 8 |
|---|---|---|
| | | Report<br>103–6 |

## ESTABLISHING NATIONAL VOTER REGISTRATION PROCEDURES FOR FEDERAL ELECTIONS, AND FOR OTHER PURPOSES

February 25 (legislative day, January 5), 1993.—Ordered to be printed

Mr. Ford, from the Committee on Rules and Administration, submitted the following

### REPORT

together with

### MINORITY AND ADDITIONAL VIEWS

[To accompany S. 460]

The Committee on Rules and Administration, having considered S. 460, an original bill to establish national voter registration procedures for Federal elections, and for other purposes, reports favorably thereon and recommends that the bill do pass.

### Purposes

The purposes of the bill are to establish procedures which will increase registration of eligible citizens in elections for Federal office; to make it possible for Federal, State, and local governments to implement the Act in a manner that enhance the participation of eligible citizens as voters in elections for Federal office; to protect the integrity of the political process; and to assure an accurate and current voter registration roll.

To increase registration of eligible citizens, this bill would require States that require voter registration to vote in elections for Federal office, to permit voter registration by the following means, in addition to any other method provided by State law: (a) by application simultaneous with an application for a motor vehicle driver's license—so-called "motor-voter" registration; (b) by use of a uniform mail application; and (c) by application in person at an

(1)

2

agency designated to process registration applications in each State.

The bill would provide procedures and standards regarding the maintenance and confirmation of voter rolls so as to assure that voters' names are maintained on the rolls so long as they remain eligible to vote in their current jurisdiction and to assure that voters are not required to re-register except upon a change of voting address to one outside their current jurisdiction. The bill would not require a specific mandatory procedure for verifying or confirming voter rolls, but would establish standards for any such procedure a State might employ.

## BACKGROUND

The declining numbers of voters who participate in Federal elections (only about half of the voting age population went to the polls in the 1988 Presidential election) are the impetus to the Committee's search for possible remedies to this situation. It was noted that the nationwide voter turnout in the 1990 Congressional elections was only 36 percent. Members were encouraged by the fact that the 1992 Presidential election turnout increased 4 percentage points over the 1988 election. Nevertheless, there are almost 70 million eligible citizens who did not participate in the election because they were not registered to vote. The Members are aware that there are multiple and complex factors that contribute to the decline in voter participation in Federal elections. While most contributing factors may not be affected by legislation, one—difficulties in registration to vote—is susceptible to correction by legislation.

The Committee found that:

(1) The right of citizens of the United States to vote is a fundamental right;

(2) It is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3) Discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

While there may be no conclusive proof that an increase in the voter rolls will automatically or necessarily result in an increase in voter turnout, it is indisputable that it will increase the number of persons eligible to vote. There are also significant indications that most of those who are eligible to do so. The most common excuse given by individuals for not voting is that they are not registered. The Congressional Research Service has indicated that only approximately 61 percent of those eligible to vote are registered, so that even with an enthusiastic electorate the participation rate by eligible voters would be unimpressive. It has been found, however, that over three-quarters of those who do register do actually vote, at least in Presidential elections. The Bureau of the Census puts the figure for voter turnout of registered voters in Presidential elections at between 85 percent and 90 percent.

3

Several witnesses at the Committee's hearings in the 102d Congress testified that registration procedures in the United States are not uniform and that discriminatory and restrictive practices that deter potential voters are employed by some States. Throughout the history of this country there have been attempts to keep certain groups of citizens from registering to vote—which specifically depending on the decade and the locale. Among the techniques developed in the various localities to inhibit or exclude potential voters were annual registration, selective purging of the voter rolls, literacy tests and poll taxes. The Voting Rights Act of 1965 made most of these restrictive practices illegal, yet discriminatory and unfair practices still exist and deprive some citizens of their right to vote. This legislation will provide uniform national voter registration procedures for Federal elections and thereby further the procedural reform intended by the Voting Rights Act.

Some restrictive practices in the voting process arise from the attempts of States to respond to the legitimate administrative concerns of election officials, such as the necessity to prevent fraud, the maintenance of accurate and up-to-date voter rolls, and the removal of the names of ineligible persons from the rolls. These tasks are made particularly difficult by the mobility of our population.

In fashioning this bill, the Committee has been concerned with the impact of a regulation or practice on the exercise of the right to vote and not with the question of whether its impact was intentional or inadvertent. It must be remembered that the purpose of our election process is not to test the fortitude and determination of the voter, but to discern the will of the majority. Every effort has been made to produce a bill that balances the legitimate administrative concerns of the election administrators and the objectives of this legislation.

The Committee was also aware that some have questioned the Congress' constitutional authority to enact a measure on voter registration. This Act seeks to remove the barriers to voter registration and participation under Congress' power to enforce the equal protection guarantees of the 14th Amendment to the Constitution. Nevertheless, these critics argue that traditionally, it has been the role of the States to regulate the manner in which elections are conducted. Contrary to this view, the States do not have exclusive authority over elections. Article I, Section 4, clause 1 of the United States Constitution states:

The Times, Places and Manner of holding elections for Senators and Representatives, shall be prescribed in each State, by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

In *United States* v. *Classic*, 313 U.S. 299 (1941), the Supreme Court clearly held that the right of the people to choose representatives in Congress is a right established and guaranteed by the Constitution. Id. at 314. It is a right derived from the States, only in the sense that the Constitution authorizes States to legislate on the subject under Article 1, Section 2. The Court said, however, that this power of the States only exists to the extent that Con-

gress has not restricted State action by exercising its authority to regulate elections. Id. at 316. Moreover, in Oregon v. Mitchell, 400 U.S. 112 (1970), the Court supported the constitutional authority of Congress to enact election laws regulating Federal elections. In this case, the Court upheld the constitutionality of a Federal statute barring a State from denying the right to vote in any election because of a literacy test and of a Federal statute banning durational residency requirements. Justice Stewart wrote: "These cases and others establish that Congress brings to the protection and facilitation of the exercise of privilege of United States citizenship all of its powers under the Necessary and Proper Clause." Id. at 286. Justice Stewart concluded that the Constitution permits Congress to enact statutes protecting the fundamental right to vote.

Congress has the power to regulate Federal elections, including the establishment of national voter registration procedures for Presidential and congressional elections. Congress' power has been clearly established under the Times, Places and Manner Clause and the Necessary and Proper Clause of the Constitution. These provisions, as interpreted by the Supreme court, belie assertions to regulate the manner in which Federal elections are conducted.

## COMMITTEE ACTION

On January 21, 1993, Senator Ford and Senator Hatfield introduced S. 2, the National Voter Registration Act of 1993. S. 2 was referred to the Committee on Rules and Administration. On February 17, 1993, H.R. 2, the companion bill in the House of Representatives, was received in the Senate and referred to the Committee. H.R. 2 passed the House of Representatives on February 4, 1993.

The substance of both S. 2 and H.R. 2 as based on S. 250, which passed both Houses of Congress in the 102nd Congress and which was subsequently vetoed. In the 102nd Congress, the Committee held hearings on the measure and heard from several witnesses representing State and local governments, civic and civil rights organizations, and the U.S. Postal Service. Because the text of both S. 2 and H.R. 2 were identical to a similar measure on which there was need to consider this legislation without further hearings. Consequently, reference to testimony in this report correspond to the Committee's hearings from the 102nd Congress.

On February 18, 1993, the Committee considered these bills at a mark-up session of pending legislation. During the consideration of these measures, the Chairman noted that both S. 2 and H.R. 2 presented procedural considerations relating to possible point of order. After consideration of the measures and the procedural circumstances, the Chairman proposed for himself and for Senator Hatfield, that the Committee report an original bill.

After a brief discussion, the roll was called on the motion to approve and report the original bill. That motion was passed by a record vote of 7-5 and the bill was ordered reported favorably by the Committee. Senator Stevens requested that the report include minority views.

## NATIONAL VOTER REGISTRATION PROCEDURES FOR ELECTIONS FOR FEDERAL OFFICE

### 1. "MOTOR-VOTER" REGISTRATION

Two points made in testimony before the Committee are central to the Committee's consideration of this legislation, and to the "motor-voter" provision in particular. First, voter turnout of registered voters in Presidential elections, then has been high. Census Bureau figures indicate a range from a high of 91.2 percent in 1968 to a low of 86.2 percent in 1988. While figures from election officials put the totals somewhat lower (from a high in 1968 of 82.5 percent to a low in 1988 of 70.6 percent) they are not adjusted for ineligible and duplicate names on the registration rolls. In any case it is clear that more than three quarters of those who are registered to vote, do vote, at least in Presidential elections. And in all but a few States, a person must be registered before election day in order to vote.

Second, between 85 percent and 90 percent of people of voting age nationwide have driver's licenses or identification cards issued by State motor vehicle offices. A voter registration system tied to the application for or the renewal of a motor vehicle driver's license would be an ideal way to register most people of voting age throughout the country.

The driver's license procedure appears to be ideally suited to the purpose of registering voters. A procedure for licensing motor vehicle drivers is in place in every State. The States have developed exacting procedures to assure proper and correct identification of all licensees and to assure that a person has but a single license. Driver license applications require most of the information needed to determine the eligibility of a voting registration applicant, and include the additional protection of a photograph. This provision for simultaneous motor-voter applications permit the voter registration to piggyback on the identification techniques developed to assure accuracy in the licensing process.

Washington Secretary of State Ralph Munro, one of the first proponents of the motor-voter concept, observed during his testimony before the Committee that incorporating voter registration into the driven licensing process provides a secure and convenient method for registering a voter; an effective means of reaching groups of individuals generally considered hard-to-reach for voting purposes, such as the youngest voting age population who generally have driven licenses; and a procedure for keeping rolls current through contact with licensees who change addresses, both within a State and from one State to another, and are required to report such changes to the motor vehicle department.

Also, most States already have moved into centralized record keeping, with their driver's license application as the key document. This provision of the bill affords the States the opportunity to build on that process and to include the registration of voters. Although the bill does provide a procedure for registration that is ideally suited for automation in conjunction with the drivers license records, it does, however, permit each State some discretion as to how to administer this process and how to integrate it with

6

its drivers license process. That discretion would range from a fully integrated, automated process, a single application form for use by both agencies requiring minimal duplication of information, or separate application forms to be completed as part of a single, simultaneous application process at the driver's license agency.

While the bill permits this discretion to States as to how the two systems may be related, ideally the system should be so designed that the voter registration application as a simultaneous, automatic part of the overall process with the duplication of information requested and forms to be completed held to an absolute minimum. The system now in place in the District of Columbia accomplishes this goal by a single application format in which information entered on that portion of the form dealing with licensing application, prints through to the voting registration form so that only a few questions pertaining to voting eligibility remain in that portion of the form dealing with completion of the license portion.

It would not be sufficient under the terms of this legislation for a State to make its voter registration application available upon request to a license applicant, or to simply put some forms on a table in the agency. Likewise, it would not be sufficient to provide a voter registration application separate from the license application. Although this bill permits separate forms, it stresses that there must be a single application process and that the license application process of eligibility to vote, shall be interpreted as an oath or attestation of eligibility to vote, shall be interpreted as an applicant's decision to decline the opportunity to vote.

To assure that the voter registration process is incorporated into the licensing application process so as to make it simultaneous and as automatic as possible, it is the Committee's intent that all applicants for motor vehicle drivers licenses or renewal thereof receive an application that includes both forms, and that all applicants complete the voter registration form as part of the application procedure, unless they decline in writing to register. In this way, that officer shall receive a completed voter registration form to forward to the voting registrar or a written declination to register. Other than the requirement that it be in writing, the bill does not specify any particular form for this declination. So long as it produces a written record of the declination, any format would be sufficient, such as a check-off box on the license application form or a separate form signed by the applicant.

The Committee recognizes that in some jurisdictions, the application process is fully computerized. In such cases, any form signed by an applicant during that process shall contain an attestation to the questions on the application, including any declination question. It will be sufficient for purposes of the requirement of a written declination if the signature of the applicant on the final document produced during the transaction incorporates by reference all

7

questions which are asked of the applicant, including any declination question.

The Committee is aware that some concern has been expressed that that provision of the bill transfers voting registration authority from State voting registrars to State drivers licensing officers. That is not the intent of this bill and a close reading of its provisions should make that very clear. Under this bill, the role of the motor vehicle registrar is to provide forms to applicants and to receive completed voter applications for transmittal to the appropriate State voting registration official. It cannot be the intent of this bill to determine whether or not to accept the application and place the name on the voting roll for the appropriate voting registration official. Nowhere does the bill suggest that that determination be made by anyone each applicant for the appropriate voting registrar under State law. Also requires that the appropriate voting registration official notify other than the appropriate voting registrar under State law. Also this bill does not give any authority to the motor vehicle agency with regard to the design of the voting registration application form. Although some cooperation would be required to integrate the two application forms to be processed by the motor vehicle agency, the bill leaves it to State law as to the officer who is responsible for the design, layout and contents of the voting registration application form, subject to the requirements of this bill.

Twenty-seven States and the District of Columbia now have a system of registration through the State's Department of Motor Vehicles. In some States, the voter registration process is done on the same form as the application for a drivers license. In other States, employees of the motor vehicle bureau are deputized to register voters. And in some states, the Department of Motor Vehicles will accept the mail registration application and forward the form on to the appropriate election official. Many of the motor-voter programs are part of a larger State agency-based system whereby voter registration applications are available at a State agency, and the agency will accept the completed forms and forward them to the appropriate election official. The type and degree of assistance given or required to complete and process the forms does vary.

States in which the Department of Motor Vehicles accepts applications for voter registration (either directly or through deputy registrars employed by the DMV office) and a brief description of their programs are as follows:

Alaska. Although the program was not formalized until 1989, informally Alaska's Department of Motor Vehicles (DMV) has been accepting voter registration applications since 1983. A separate voter registration form is available at the State's DMV offices and must be filled out in front of and witnessed by DMV personnel. DMV will then forward the form to the State Election Office.

Arizona. The motor-voter program was established in 1982. A separate form is available in each DMV office and is accepted by a deputy registrar associated with the DMV office.

Colorado. The motor-voter program has first established in 1994. The single application form for both voter registration and driver's license was developed by April 1985.

8

*Idaho.* Legislation has recently been passed that as of July 1, 1991, DMV offices in buildings not adjacent to county clerk's offices will accept voter registration applications and forward them to the appropriate county clerk. This affects approximately 6 counties in the State.

*Illinois.* As of September 1990, at least one employee in each DMV office is designated to become a deputy voter registrar. As such, the employee can register voters and witness applications within the DMV offices. However, it is a separate application process.

*Iowa.* The motor-voter program was established in 1987. At that time, voters were allowed to register through the State's DMV using a separate form for voter registration. As of 1989, Iowa began implementation of a unified form for both registering to vote and applying for a driver's license.

*Louisiana.* In 1989, the State legislature authorized a pilot project that would allow employees of the State's DMV office to volunteer to become deputy registrars and register persons to vote from within the DMV offices. However, few persons have volunteered for the program. In January 1991, the pilot project became law.

*Maine.* As of April 1990, Maine's DMV will accept applications for voter registration and forward them to the Secretary of State's office for further distribution. DMV employees are encouraged to act as applicant solicitors. Disclosure forms are required to vote and then sent to the deputy registrar in the DMV if they wish to register. The program also covers drivers license renewals and changes of address.

*Michigan.* The motor-voter program was established in 1975. Voter registration requires completion of a separate form. DMV employees are trained to assist in voter registration.

*Minnesota.* The motor-voter program was established in 1987. While a separate form is required for voter registration, the application is joined with the drivers license application. The DMV personnel need only separate the two forms at a perforated line before sending the voter registration form to the appropriate voter registrar.

*Montana.* As of October 1, 1991, the State's DMV office began accepting voter registration applications and forwarding them to the appropriate election officials. In the future, a single combined drivers license/voter registration application form is planned.

*Nevada.* The motor-voter program was established in 1987. Persons desiring to register to vote must complete a separate form from that required to apply for a driver's license. DMV personnel will accept the voter registration application and forward it to the appropriate county registrar.

*New Jersey.* Motor-voter was established in 1989 by executive order. Employees of the State's DMV offices and other State agencies accept and forward on voter registration applications to the appropriate election officials. In 1991, legislation passed to implement parts of the executive order. Employees of the Department of Motor Vehicles and of Human Services of the

9

New Jersey Transit Corporation, and the Office of Disabilities, are required under the legislation to accept and forward applications for voter registration to appropriate election officials. In addition, other State agencies, originally covered by the executive order, are still required because of that executive order, to process voter registration applications.

*New Mexico.* As of June 1991, the State's DMV offices will have at least one deputy registrar available to register persons to vote when they come in to apply for a driver's license. The program covers new drivers license applicants as well as renewals and changes of address.

*North Carolina.* The motor-voter program was established in 1983. Persons desiring to register to vote must complete a separate form. DMV personnel will accept the voter registration application and forward it to the State Board of Elections, which will then forward it to the appropriate county registrar.

*Ohio.* The motor-voter program was established in 1977, but not implemented until 1982 when a statewide voter registration form was authorized and developed. Persons desiring to register to vote must complete a separate form from the DMV application and forward it to the appropriate county registrar.

*Oregon.* In 1989, the State legislature enacted motor-voter provisions into law, conditional on the passage of Federal legislation. However, in 1991, it was decided to proceed and implement a motor-voter registration system. Persons who are applying for a drivers license are asked if they are registered to vote, and if they wish to be registered to vote. If they respond "yes", a combined form is printed, part for the DMV application and part for the voter registration application. The forms are accepted by the DMV and picked up by the registration election officials at regular intervals.

*Rhode Island.* In January 1990, the legislature established a pilot project in the DMV to have a table occupied by a deputy registrar to register persons to vote. In 1991, this program was made permanent and the DMV where certain employees of the DMV were made deputy registrars. In 1992, the program was extended to several other State agencies. In all cases, selected employees of the agency are trained as deputy voter registrars, a separate voter registration form is used by the agency and the deputy registrar takes a sworn statement relating to the veracity of the information provided.

*Texas.* In 1991, the State legislature passed a bill to implement a motor-voter registration program. The program automatically produces two forms if persons applying for a drivers license wish to be registered to vote. Both forms will be signed and the DMV will forward the voter registration forms to the appropriate election official.

*Vermont.* The motor-voter program was established in 1986. Persons desiring to register to vote must complete a separate form from that required to apply for a driver's license. DMV personnel will then administer an oath to the registrant, accept the voter registration application and forward it to the appropriate county registrar.

*Washington.* In January 1992, motor-voter registration became available in the State. DMV employees will accept voter registration applications.

*West Virginia.* As of July 1, 1991, employees of the State's DMV office will ask all applicants and persons renewing their drivers licenses if they would like to register to vote. If the person wishes to register, they will be sent to the DMV's deputy voter registrar who will accept the voter registration application and administer the oath.

*District of Columbia.* The motor-voter program was established in 1989. A single combined form is used to both register voters and apply for a driver's license. The section of the form containing information required for Federal processing has a tear off-line. The form contains only registration information required by the Department of Elections has no carbon. A license applicant who wishes to register to vote must complete and sign both application sections of the form.

It has been reported that in the first month of operation of the motor-voter registration program in the District of Columbia, voter registrations were four times the usual monthly rate and that increase was achieved with one-half of the license applicants declining to register to vote. According to Emmett H. Fremaux, Executive Director of the D.C. Board of Elections and Ethics, who administers the program, during the first 20 months the program has been in operation, 32,000 persons have been registered to vote through the motor-voter program. That program accounted for 45 percent of all registrations during that period. Mr. Fremaux concluded, based on the experience in the District of Columbia, that "motor-voter is so immediately and dramatically productive in putting new registrants on the roll that implementing this program nationally will produce a quantum leap in the level of voter registration in this country in a surprisingly short period of time.

[I]t would mean adding more than 20 million persons to the national voter rolls from one presidential election to the next."

In addition to the States that accept or plan to accept voter registration applications and forward them to the appropriate election officials, a number of the States with mail registration make the form available at the office of public agencies, including the DMV office, and some (New York and Pennsylvania) specifically direct the persons visiting the office to where the forms are located. However, citizens still have to fill the forms out and mail them in themselves.

Although not the direct purpose of this bill, a side effect of its motor-voter and agency provisions will likely be to even out the work of registration offices throughout the year. Pre-election rushes of registrations caused by registration drives associated with an upcoming election will be minimized. The continuous flow of drivers license applications throughout the year will result in a similar pattern of activity in the voting registration offices. Also, the voter rolls will be updated continuously throughout the year from renewals of licenses, notices of change of address and new applications by persons who move into the State and are required to obtain a State license within a prescribed period of time. All of these activities by a State license with the motor vehicle agency to comply with motor

10

vehicle drivers license requirements and assure accurate and current information on drivers license and identification cards will result in the transfer of information to the voting registrar to help keep the voting rolls current and correct, as well.

Some concern has been expressed concerning the issue of fraud in the application process as a result of it being tied to the drivers license application process. This concern centers on the possibility of the registration of license applicants who are under age or not citizens since the requirements for a drivers license are not the same as for voting registration. Two things should be noted in this regard. First, most drivers license agencies require proof of the applicant's date of birth in order to apply for a license. Therefore, although the age requirement may differ, that information will be readily available to the clerk processing the application. Second, the bill requires that the application include a statement as to voting eligibility requirements, including age and citizenship, which must be attested to by the applicant when signing the application. Thus, the processing of voting registration applications at the motor vehicles agency would lessen the likelihood of such fraud and certainly would not make it greater than it is now. As noted during the Committee's hearings in the 102nd Congress by Ralph Munro, Secretary of State of Washington, if the same scrutiny of driver's license applications is applied to voting registrations, the likelihood of registering ineligible people is severely diminished.

In addition to these safeguards, the bill provides for Federal criminal penalties for knowing and willful offenses, including the submission of voter registration applications containing materially false information. This is a broader provision than current law. Under the "false information" provision of the Voting Rights Act, the false information must relate to one of three items that are listed in the statute, that is, the name, address, and/or period of residence in the voting district. Under the provisions of this bill, prosecution for false information would be expanded beyond these three items.

With regard to the registration of noncitizens, current law at 18 U.S.C. § 911 prohibits the knowing and false assertion of United States citizenship by an alien. Under the provisions of this bill, every application for voter registration must include a statement that sets forth all the requirements for eligibility, including citizenship, and require that the applicant sign an attestation clause, under penalty of perjury, that the applicant meets those requirements. Together with the criminal penalties section of the bill, the Committee is confident that this Act provides sufficient safeguards to prevent noncitizens from registering to vote.

II. UNIFORM MAIL REGISTRATION

The second approach of the bill is the development of uniform mail registration. Under the provisions of the bill, the Federal Election Commission, in conjunction with the chief election officials of the 50 States, will develop a universal mail registration form. The form may only require such identifying information (including the signature of the applicant) as is necessary for election officials to determine the eligibility of the applicant. The form

11

must include a statement that specifies each eligibility requirement (including citizenship), contain an attestation that the applicant meets each such requirement, and require the signature of the applicant under penalty of perjury. The form may not include any requirement for notarization or other formal means of authentication.

The bill provides flexibility by permitting States to develop and use their own mail registration form, as long as it meets the requirement of the Act. A registrant is permitted to use either the Federal form or the appropriate State form and the States would be required to accept either form.

Texas was one of the first States to institute a system of registration by mail—the person desiring to register must obtain information in all pertinent information to a voter registrar.¹ Now, twenty-seven States and the District of Columbia have some form of mail registration program. Mail registration is an effective means of increasing, because it relieves the voter of the need to appear in person at one central registration office during prescribed hours and it permits organizations to go to the voter with the organized registration drives. Mail registration is convenient for the voter, for registration drive organizers and for voter registrars as well.

Some have expressed concern that mail registration would increase the potential for fraud. This concern was expressed by the Department of Justice in a letter to the Chairman of the Committee, in the 102nd Congress.² The letter states, in part, "because some of the registration techniques mandated by the bill are fraught with the potential for fraud if adequate * * * the bill would not eliminate traditional conditions, electoral and electoral corruption." In an accompanying memorandum, the Justice Department stated that "[r]egistration by mail is much more susceptible to misuse because a would-be registrant never has to appear in person before a registrar for verification of identity and eligibility."

A study by the Congressional Research Service of States having mail registration procedures in 1994, found that "of voter registration officials in all eighteen States for which data are available reported ... they have had little or no fraud with post card registration. Several said they have had no more fraud with post card registration than with in-person registration." In fact, Governor Barbara Roberts of Oregon testified that her State instituted mail registration in 1975, and that although Oregon does not have a notarization or witness requirement, Oregon has not experienced any cases of fraud or fraudulent voting with mail registration. Governor Roberts stated that there was "literally no abuse of the system."

¹ The procedure adopted by Texas was limited to military personnel. The first State to adopt such a procedure universally as a principal method of registering voters was Alaska, the Committee received a letter dated April 17, 1991 to the Chairman and signed by W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs, U.S. Department of Justice. Throughout the report, where there is a reference to this letter and the Committee's response to this letter serves as the basis for much of the arguments raised by opponents to this legislation. The Committee is inclined to include a reference of the letter in the report as a matter of interest. However, it should be noted that the views expressed in the April 17, 1991 letter may not accurately reflect the views of the current Department of Justice.

12

The Governor stated that, when Oregon adopted mail registration, opponents raised the issue of fraud. As a result, the mail registration form includes detailed information to the registrant and lettering that abuse of the registration process is punishable by a substantial fine and prison sentence. Moreover, despite Oregon's large migrant worker population, there has not been any indication of non-citizens registering in the State.

In addition to Oregon, it is significant to note that the States with a mail registration procedure include the most populous ones of California, New York, Texas, Ohio, New Jersey and Pennsylvania. Less than half of those States that have mail registration require a witness to the applicant's signature and, of the more populous States, only New Jersey requires a witness. The most commonly used method of confirming information on mail registration applications are a non-forwardable or forwardable mailing to the applicant after receipt of the application, and warnings of penalties for fraud on the application form. This bill requires a notice to each applicant as to the disposition of his or her application. Thus, it permits a State to use either a non-forwardable mailing to confirm a registration. With regard to the notice requirement, States should be aware that such a notice should be drafted with regard to the purge provisions of this bill.

To address these concerns regarding fraud, the bill includes a provision which would permit the States to require by law that a first time voter who registered to vote by mail, and was not previously registered in that jurisdiction, make a personal appearance to vote.⁴ This section of the bill again demonstrates the concern of the Committee that each State should develop mechanisms to ensure the integrity of the voting rolls. Because this provision is based on their own circumstances, that a personal appearance for mail registrants is necessary to ensure the integrity of the voting rolls. Other States, based on their own experience may determine that such a requirement is not necessary. Oregon is one such State which has mail registration and does not require a personal appearance to vote.

In addition, this bill requires that mail applications include a statement of voting qualifications and an attestation, which must be signed by the applicant under penalty of perjury, that the applicant meets all those requirements. All applicants must be informed of the penalties provided by law for submission of a false voter registration application, and in the case of mail applications such notice would be on the form itself.

Mail registration provides a convenient method for reaching out to eligible voters. But while it makes registration convenient, the bill also provides that there will be sufficient safeguards to prevent an abuse of the system with fraudulent registrations.

⁴ The bill provides certain exemptions from the personal appearance to vote, including those who are entitled to vote through other means as provided by the Uniformed and Overseas Citizens Absentee Voting Act, or those who are provided a right to vote otherwise than in person under the Voting Accessibility for the Elderly and Handicapped Act, or as provided by any other Federal law.

13

## 14

### III. AGENCY REGISTRATION

Agency-based voter registration provides a useful supplement to motor-voter registration systems, enables more low income and minority citizens to become registered, and is cost effective. Under the provisions of the bill, States will be required to designate agencies to serve as voter registration offices. The program of registering voters at various agency locations mirrors the registration program of the "motor-voter" provisions of the bill, but does not require the same integration of the voter registration application form with the agency forms. The agency-based registration program is designed to reach out to those sectors of the population which are not likely to have a driver's licenses or other identification cards issued by a motor vehicle agency.

The agency-based program of the Act is a two tiered program. In the first tier, the States are required to designate all offices in the State which provide public assistance, unemployment compensation and related services, and all offices which provide State-funded programs primarily engaged in providing services to persons with disabilities. Such programs would include vocational rehabilitation but would also include other programs which provide assistance or services to physically challenged persons. The second tier of the agency-based registration program compliments the first and although each State must have such agencies will be included, as well as though each State must have such agencies will be included, as well as cretion in determining which agencies will be included, as well as This second tier may be comprised of Federal, State, local government agencies or private sector agencies. In the case of city and county clerk (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, and any office that provides services to persons with disabilities which are not included in the mandatory agency-based program. Within this second tier, a State has discretion to designate some or all of these offices, whichever is in the judgment of the State will serve the purposes of ensuring widespread voter registration opportunities.

Many persons will visit a public office or facility—a public assistance office, an unemployment office, a tax office, a library—in the course of a year. Agency-based voter registration provides a method whereby citizens may easily register to vote and fulfills the requirement that government should do all it can to make registration widely and easily available. Agency-based voter registration means that registration will be made routine and assistance in completing such forms will be available routinely and year round in many government and private sector offices.

As noted during the Committee's hearings last Congress, one of the advantages of the agency-based program is that it is an interactive registration. That is, there are individuals to assist registrants in completing the information on the registration application. Birgil Seifert of the Mexican American Legal Defense Fund noted that "mail registration is important, but perhaps more important are the agency registration procedures because [it is] . . . an interactive form of registration. If you have a stack of mail registration

## 16

cards available, that does not necessarily mean that people are going to pick them up and them in."

While mail registration procedures make registration convenient, in some cases where resources are limited, it has been demonstrated to be ineffective in registering those who have historically been left out of the registration process. Thus, in some instances, mail registration is inferior to agency-based registration. As Ms. Seifert noted in her testimony:

If you couple placing the burden on community leaders to register people, you have you have them affirmatively purging people, you've got them putting all their resources into getting something that is not getting them very far. They are having to marshal all their resources just to maintain the status quo . . . [i]n a country which prides itself on a representative form of government, it is crucial that the government task affirmative steps to register the citizenry and that the burden not fall on communities . . . which lack resources.

The experience in many States with registration at schools, at libraries, or in motor vehicle offices provided the precedents for agency voter registration programs. Five States (Alaska, Iowa, Minnesota, New Jersey, and Ohio) have, either through executive order or law, established some form of public agency voter registration system other than motor-voter registration procedures, often as an adjunct to other voter registration procedures. In addition, nine States either through smaller voter registration within offices of State agencies or have added language to agency application forms asking if the applicant would like to register to vote. In these States, an applicant is given a mail voter registration form or is directed to the appropriate office for the burden.

An agency registration program may also include private offices and locations throughout a State. An agency program that includes private places at which persons may register to vote may be organized through cooperative arrangements and agreements between the sponsoring agency and appropriate local or State election officials. A comprehensive agency-based program should include private locations and offices, as well as public agencies, in order to make registration available on as broad a basis as possible in a State and to make registration readily available in areas that experience low registration.

To make the agency-based program as comprehensive as possible, the bill requires all entities and agencies of the Federal government to cooperate as much as practicable with the States in carrying out this program by participating as designated voter registration agencies. No specific Federal agencies are designated in this bill, but rather, it is left to the States to negotiate such arrangement with appropriate Federal agencies.

A Department of Transportation study noted that almost 50 percent of those persons who do not have a driver's license have annual incomes of less than $10,000. As a result, motor-voter registration programs may not adequately reach low income citizens and minorities. Active public and private agency-based voter registration programs available through such public agencies as State

tice which some believe tends to disproportionately affect persons of low incomes, and blacks and other minorities.

Such purging for non-voting tends to be highly inefficient and costly. It not only require eligible citizens to re-register when they have chosen not to exercise their vote, but it also unnecessarily places additional burdens on the registration system because persons who are legitimately registered must be processed all over again.

Although purge systems may be inefficient and costly, the Committee and other participants are well aware of fact and of the States to maintain accurate voting rolls. An important goal of this bill is to open, but to maintain the integrity of the election process by updating the voting rolls on a continual basis. The maintenance of accurate and up-to-date voter registration lists is the hallmark of a national system seeking to prevent voter fraud. These processes, however, must be scrutinized to prevent poor and illiterate voters from being caught in a purge system which will require them to needlessly re-register. Such processes must be structured to prevent abuse which has a disparate impact on minority communities. Unfortunately, there is a long history of such list cleaning mechanisms which have been used to violate the basic rights of citizens.

One of the advantages of the bill is the fact that the motor-voter and agency-based programs are ongoing and that applications and renewals may serve as updating the addresses of registered voters. Thus, the need for large scale purges and list cleaning systems becomes superficial. Nevertheless, the bill requires States to conduct a program or activity to maintain the integrity of the rolls. The Act requires that any program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll must be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965. Merely because a program was conducted under the National Voter Registration Act would not be a defense to any claim which might be asserted under the Voting Rights Act. The requirement of the two acts are complementary. The States must comply with the National Voter Registration Act in a manner which does not violate the Voting Rights Act.

These programs may not remove the name of a voter from the list of eligible voters by reason of a person's failure to vote. States are permitted to remove the names of eligible voters from the rolls at the request of the voter or as provided by State law by reason of mental incapacity or criminal conviction.[4]

In addition, States are required to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists by reason of death or of a change in residence. Any program which the States undertake to verify addresses must be completed no later than 90 days before a primary or general election. It is intended by this requirement that the State out-

[4] The bill also includes a provision which requires the U.S. Attorney to give notice to the chief State election official information regarding the criminal convictions of any person. This notice requirement will permit States to make a determination if such criminal conviction is reason for the removal of the person's name from the list of eligible voters.

18

reach activity, such as the mailing of list verification notices or conducting a canvass, must be concluded not later than 90 days before an election, however, this would not prevent a State from making the appropriate changes to the official lists pursuant to the Act during the 90 day pre-election period.

A State or local subdivision may satisfy this requirement by licensees of the National Change of Address program available through the U.S. Postal Service. The Committee strongly encourages all States to implement the NCOA program, which is efficient, is cost-effective once the start-up costs of corporations are absorbed, and properly implemented, is uniform and objective. Jurisdictions which choose not to use the NCOA program should implement another reasonable program which is designed to meet the requirements of the bill, i.e. that it will be uniform, non-discriminatory and in conformance with the Voting Rights Act of 1965.

If in the course of using the NCOA program, it is determined that a voter has changed addresses within the jurisdiction of the same voting registrar, the registrar is directed to make the change on the official list of eligible voters and notify the voter of the change by forwarding mail with a postage pre-paid return card for the registrant to verify or correct the information.

The Act allows the removal of a person's name from the official list by reason of a change of residence outside the jurisdiction of the registrar, only if the voter notifies the registrar of such a change or has failed to respond to a notice sent by the registrar and has failed to vote or appear to vote in two Federal general elections following date of the notice.[5] Under this notice requirement, the notice must be sent by forwardable mail, with a return postage prepaid and preaddressed card, on which the registrant may state his or her current address. This mailing must include a notice to the registrant that if he or she has not changed residence, or changed residence within the jurisdiction of the registrar, that the card should be returned no later than the date of the next first-class mailing for registration by mail. Further, if the card is not returned, confirmation or attestation may be required before the registrant is permitted to vote in the Federal election during the period between the date of the notice and ending after the date of the notice. If the registrant does not vote or appear to vote, his or her name will be removed from the list of eligible voters. This mailing must also give information to the registrant concerning how the registrant can continue to vote if he or she has moved outside the jurisdiction of the registrar. A voting registrar shall correct the roll based on information obtained through this program.

As previously noted, one of the guiding principles of this legislation to ensure that once registered, a voter remains on the rolls so long as he or she is eligible to vote in that jurisdiction. Thus, when a registrant fails to return a card in the voting registrar, the voter must be permitted to vote if he or she appears at the polls within

[5] A "request" by a registrant would include actions that result in the registrant being registered at a new address, such as registering in another jurisdiction or providing a change of address notice through the drivers license process that updates the voter registration

19

public assistance offices, State unemployment offices, or programs primarily engaged in providing service to persons with disabilities, as well as armed forces recruitment offices and locations in areas of low voter registration, are more likely to reach these eligible citizens, who are likely to have contact with a number of these agencies. Currently, most registration systems make it difficult for the low income citizen to qualify to participate in our nation's elections. Agency voter registration programs provide an institutional solution to the problem of unequal access to the voting booth.

Agency-based registration on a year-round basis may also indirectly minimize the necessity for periodic, large scale purge of voter registration lists by election officials. With an effective agency voter registration program, States have an effective way to update a voter's registration each time they sought services at the government agency. Persons who receive social services—welfare, unemployment checks—must keep their addresses up-to-date in order to receive the benefit. Similarly, public housing recipients must keep their address information up-to-date. Like the motor-voter program, any application for recertification, or change of address would serve as an update for that person's registration to vote unless the applicant declines in writing.

The bill has a broad scope with regard to agency-based registration. An agency-based registration is noted by a number of organizations representing the disabled community, particularly Disabled AND Able to Vote, there is no one agency which provides services to all, or even a large percentage of the disabled population. Vocational rehabilitation services, for example, reach no more than one disabled person out of 15 at any one time during their entire life. Independent living centers are overwhelmingly located in large cities and do not serve those persons with disabilities who live in suburbs, small towns, or rural areas. Thirty-seven percent of all persons with disability acquire the disability after the age of 55.

As a result, employment, education and training programs merely provide services to these individuals in order to access this isolated population, the organizations offer as many locations as possible which provide services to disabled Americans offer voter registration services; by making voter registration available, providing assistance with filling out the forms, and collecting and forwarding the registration forms to the appropriate election official.

Because many of these services may be offered by home visitation, the bill includes a provision which requires that any agency which provides services to persons with disabilities at the person's home must provide the same degree of assistance for voter registration in the home as an agency provide in the office.

Concerns have also been expressed that the agency-based registration programs may have various forms of intimidation of the public. However, this bill explicitly prohibits those engaged in registering voters from seeking to influence an applicant's political preference or party registration, displaying any political preference or party affiliation, or making any statement to an applicant the purpose of which is to discourage the applicant from voting. Agency personnel are also prohibited from intimidating a person to register who does not want to register, for fear of not receiving benefits. Moreover,

16

under the criminal penalties section of the bill, it is a Federal offense to intimidate any person who attempts to register to vote. The Committee believes that these provisions are a sufficient deterrent to any person who would seek to intimidate any person who is entitled to register through the agency-based registration program, or any other registration program established by this bill or any other law.

Like the motor-voter provisions of the bill, the Committee is aware that some concern has been expressed that this provision of the bill transfers voting registration authority from State voting registrars to agencies. That is not the intent of this bill. This bill provides only that the role of the agency-based registration program is to provide forms to applicant and receive completed voter applications for transmittal to the appropriate State voting registration official. It is the voter registration official who determines whether or not to accept the application and place the new voting roll for the appropriate voting jurisdiction. The bill require that the appropriate voting registration office notify each applicant of the disposition of the application. There is no provision in this bill which would require that determination be made by anyone other than the appropriate voting registrar under State law.

In addition, this bill does not give any authority to the agencies with regard to the design of the voting registration application form. In fact, the bill encourages agencies to incorporate their forms to provide one form for their applicant, an application for services and voter registration. Ideally, the agency-based program would work efficiently if one form were created. In that instance, some cooperation would be required to integrate the two application forms to be processed by the agencies. The bill leaves it to State law as to the officer who is responsible for the design, layout and contents of the voting registration application form, subject to the requirements of this bill.

IV. VOTING LIST CONFIRMATION PROCEDURES AND STANDARDS

One of the purposes of this bill is to ensure that once a citizen is registered to vote, he or she should remain on the voting list so long as he or she remains eligible to vote in that jurisdiction. The Committee recognizes that while voting is a right, people have an equal right not to vote, for whatever reason. However, many States continue to penalize such non-voters by removing their names from the voter registration rolls merely because they have failed to cast a ballot in a recent election. Such citizens "may" not have moved or died or committed a felony. Their only "crime" was not to have voted in a recent election. As the Reverend Jesse Jackson stated during the House hearings on voter registration reform in the 101st Congress: "No other rights guaranteed to citizens are bound by the constant exercise of that right. We do not lose our right to free speech because we do not speak out on every issue."

While most States use the procedure of removal for non-voting merely as an inexpensive method for eliminating persons believed to have moved or died, many persons may be removed from the election rolls merely for exercising their right not to vote, a prac-

17

20

two general Federal elections after the date of the notice. While the bill secures the right of the voter to vote, it does not dictate the way in which the person is to vote. The State may establish its own requirements regarding the means of voting.

In response to the concerns of various witnesses representing civil rights organizations, these requirements of the bill were added to prevent the discriminatory effect of periodic voter purges, which they assert appear to affect blacks and minorities more than others. It should be noted that the bill does not mandate any reelection. While these provisions have been included to insure that voting rolls will be free from "deadwood", there will be less need for these mailing because the programs of voter registration include provisions for automatic updating of addresses. Thus, the process of updating registration rolls is an ongoing and continuous process.

## V. ENFORCEMENT AND REGULATION

### A. The Federal Election Commission

The Federal Election Commission (FEC) was created to oversee the campaign finance law authorized under the Federal Election Campaign Act and its amendments. The FEC officially became operative in 1975. Although known mostly for its regulatory activities in the area of Federal election campaign finance, the FEC is the only Federal agency uniquely set up to deal with Federal elections. Due to the politically sensitive nature of its role, the FEC was organized as an independent agency with members appointed with consideration of their political affiliations, but under restrictions on specific political party control of its deliberations. Further, through its National Clearinghouse on Election Administration, the FEC has maintained an advisory role in election administration and has developed model election administration programs and information to assist States in conducting their elections. Given its composition and independent status, its experience in developing rules and regulations in the area of campaign finance, its unique position within the Federal government as the principal agency dealing with election administration, and its experience in developing model procedures for States, the Federal regulation of any national voter registration could best be administered from the FEC.

### B. Enforcement

Many State and local election administrators expressed concern about the potential for an increase in voter fraud as a possible result of voter registration reform, and especially that registration by mail would make it easier for persons to vote fraudulently. This bill not only attempts to make voter registration convenient, but is also designed to prevent fraud and abuse of the electoral process.

The Committee is aware of the concerns regarding the potential for fraud in registrations. Throughout the bill, each registration program has been developed to assure the integrity of the voting rolls. One of the principle concerns expressed by critics of this bill is the use of mail registration. Based on the Congressional Re-

---

21

search Service's study, however, the experience of the States with mail registration appears to be that voter fraud is no more prevalent under a mail registration system than under other types of voter registration systems. Moreover, where States have investigated fraudulent registration and voting, there has never been a recommendation to repeal mail registration.¹ As previously noted elsewhere in this report, the provisions relating to mail registration permit the States to require by law that a person make a personal appearance to vote if that person registered by mail and had not previously voted in that jurisdiction.

Nevertheless, a uniform national voter registration system should make it a Federal offense to fraudulently register to vote. Voter fraud is a crime against the legitimate electoral process. On the other hand, others expressed concern that legitimate voters should be able to go to the polls without fear of intimidation or threat by either officials or other citizens. As much as it is a crime to attempt to fraudulently cast a ballot, it is equally a crime to try to prevent an eligible citizen from casting a ballot in an election.

Any national voter registration measure should discourage equally both of these activities. Language was added to the criminal penalties section to make clear that the person charged must have actual knowledge that the registration forms contain materially false information and were submitted with the specific intent to fraudulently affect the outcome of an election.

In addition to criminal enforcement, an effective national voter registration program must also include private civil enforcement. Such private initiative can encourage action to assure that reasonable effort is undertaken to achieve its objectives in all States and, indeed, it may be essential to the success of such a program in some areas. Private civil enforcement should be designed to assure and to encourage, to the fullest extent possible, the cooperation of local and State election officials responsible for implementation of the voter registration programs. An essential element of an effective civil enforcement program is a requirement for notice of any complaint regarding its implementation to the appropriate election officials together with a process for its administrative resolution before legal action may be commenced.

### SECTION-BY-SECTION DESCRIPTION AND DISCUSSION

#### SECTION 1. SHORT TITLE

This Act may be cited as the "National Voter Registration Act of 1993."

---

¹ Opponents to the legislation have often referred to a footnote reference in the April 17, 1991 Justice Department letter, which refers to an Illinois Grand Jury investigation of voter fraud. However, it should be noted that the Grand Jury never recommended that mail registration should be repealed. In addition, a Grand Jury investigation in Kings County, New York which found substantial incidents of voting fraud never recommended a repeal of New York's mail registration system. The Grand Jury did not conclude that mail registration was the cause or a significant contributing cause to the specific incidence of fraud it investigated. It should be further noted that during the Committee's consideration of S. 250 in the last Congress, the New York's State Assembly passed legislation revising its registration laws. Part of the legislation sought to maintain and repeal the mail registration system. Clearly, if the State of New York believed that the mail registration system, enabled in fraudulent registrations, it would have sought to limit or abandon mail registration.

## SECTION 2. FINDINGS AND PURPOSES

Section (a) sets forth the findings of the Committee that the right to vote is a fundamental right of citizens, that it is the duty of Federal, State, and local governments to promote the exercise of that right; and that discriminatory and unfair registration laws and procedures have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

Section (b) sets forth the purposes of this Act, which are to increase the registration of eligible citizens to vote for Federal office, to make it possible for Federal, State and local governments to implement this Act in a manner that enhances the participation of eligible citizens, to protect the integrity of the electoral process, and guarantee accurate and current voter registration rolls.

## SECTION 3. DEFINITIONS

Section 3 defines the term "motor vehicle driver's license" to include any personal identification document issued by a State motor vehicle authority, and applies the definitions of Section 301 of the Federal Election Campaign Act of 1971 to election terms used in this Act. "State" is defined to be a State of the United States or the District of Columbia. A "voter registration agency" is any office designated under this Act's agency-based registration provisions as performing functions which include distributing registration forms simultaneously with applications for services or benefits, providing assistance to applicants similar to that provided in the completion of the office's own forms, and receipt and transmittal of such forms to the appropriate voter registration office.

## SECTION 4. NATIONAL PROCEDURES FOR VOTER REGISTRATION FOR ELECTIONS FOR FEDERAL OFFICE

Section 4(a) requires that the States, in addition to any other methods provided for under State law, establish four voter registration procedures in elections for Federal office: simultaneously with voter registration for a driver's license; by application, in person, either at an appropriate registration office; by mail application, or at a Federal, State or private sector location ("Federal Form").

Section 4(b) provides that this Act is not applicable to a State where either or both of the following apply: a State in which there is no voter registration requirement for any voter in the State with respect to a Federal election; or, a State in which all voters may register to vote at the polling place at the time of voting in a Federal general election.

The language of this section is specific as it relates to the exceptions. It is the intent of the Committee that these exceptions be narrowly drawn to assure that only those States in which any voter may vote in either State registration or by registering at the polling place on election day would be exempt. A State would be exempt from the requirements of the bill if it meets either or both of these requirements. It is not the intent of this legislation to encourage the adoption of election day registration. Rather, the Committee believes that States which have implemented one or both of

three exceptions have lessened the impediments to registration which goes significantly beyond the requirements of the bill. A State would not be exempt if it merely granted local jurisdictions the option of providing for election day registration or no registration if local jurisdictions also had the option of requiring any other form of registration. The Committee does not believe such an option results in a significant reduction in registration barriers.

## SECTION 5. SIMULTANEOUS APPLICATION FOR VOTER REGISTRATION AND APPLICATION FOR MOTOR VEHICLE DRIVER'S LICENSE

Subsections (a) and (b) require that each State motor vehicle driver's license application, including a renewal application, shall also serve as an application for voter registration for Federal elections. In addition, such an application will also serve as updating any previous voter registration by the applicant. An applicant for a motor vehicle driver's license may decline to register to vote and such information may not be used for any purpose other than voter registration.

Although the declaration to register must be in writing, no particular format is required so long as a record of the declination is created and retained. The Committee recognizes that in some jurisdictions, the application process is fully computerized. In such cases, it would be sufficient to satisfy the requirement of a written declination if the form signed by an applicant at the conclusion of the process contains an attestation to all questions in the application, including any declination question. It is the intent of the Committee that the application procedure should require the affirmative act of an applicant but only after the applicant has received a complete application that includes both the drivers license and voter registration application forms. States are afforded latitude in this section to develop an application which will meet the needs of their particular jurisdiction. In some instances, a State may determine that the application should include a declaration form for a registrant to check if he or she declines to register in that particular jurisdiction. In other instances where the driver's license and voting registration are combined into a single form, the failure of an applicant to sign the voting registration application portion could serve as a declination to register, if the drivers license portion contains a notice to the applicant that the failure to complete and sign the voter registration application portion of that form is a declination to register.

This requirement that there be a written declination to register serves two purposes: first, to prevent unnecessary paperwork where a person is already properly registered; and, two, to prevent the registration of ineligible persons. It is not the intent of this bill to generate needless paperwork, for either the registry of motor vehicles or the voter registrar. The Committee would expect that the registry of motor vehicles staff to instruct applicants who are already properly registered or those who are otherwise ineligible to vote and decline to register. Such instructions should also be included in any written materials provided to applicants as well as in any instructions posted in motor vehicle agency offices. Some have claimed that the failure to decline to register will result in the automatic

24

registration of such individuals. This is simply not true. This bill provides for simultaneous applications procedures, but still requires the intervening act of a review of the registration application by the appropriate State or local election official.

Some have noted that the requirements for obtaining a driver's license are not the same as those for eligibility to vote, specifically age and citizenship. The Committee would expect that any driver's license applicant who does not meet the requirements for eligibility to vote would decline to do so. It is important, therefore, that such applicant be advised of the voting requirements and the need to decline to register if he or she does not meet the requirements. The bill provides that all registration requirements should be set forth in the application to register to vote so that they will be readily available for each applicant to review during the application process. The applicant may be advised that there is no obligation to register for choosing to decline to register.

Since some of the reasons for declining to register to vote may involve matters of personal privacy, such as ineligibility under State law due to mental incompetence or a criminal conviction, an individual who declines to register to vote shall not be questioned as to the reasons for such action. If an individual reveals such information, it must be treated as confidential and may not be used for any other purpose. As discussed later, the Act contains a general prohibition against a State or entity from revealing any information relating to a declination to register or to the particular location or agency where a person is registered.

Subsection (c)(2) provides that the State shall include a voter registration application form as part of an application for a State motor vehicle driver's license. The voter registration application form may not require any information that duplicates information required in the driver's license portion of the form, other than a second signature and the minimum amount of information necessary to prevent duplicate voter registration and enable State election officials to assess the eligibility of the applicant for voter registration and other parts of the election process, and must include a means by which an applicant may decline to register to vote. The voter registration application form must include a statement that states each eligibility requirement, and attestation that the applicant meets each such requirement, and the signature of the applicant, under penalty of perjury. In addition, where appropriate, such forms should include information requesting the applicant's mail address if it differs from the applicant's residence. Each completed voter registration application form must be made available to the appropriate State election official as provided by State law.

The terms "State election officials" and "appropriate State election official" refer to whatever election official under State law has the appropriate responsibility for the administration of voter registration and elections. In some cases, this may be a local election official.

Although the application for voting registration is simultaneous with an application for a driver's license, it is not the intent of the bill to supplant the traditional role of voting registrars over the registration procedures. The bill makes it very clear that the motor

25

vehicle agency is responsible for forwarding voting registration applications to the appropriate State election official. It should be made very clear to any applicant in a driver's license bureau that the application for voter registration is an application which must be reviewed by the appropriate election official. Only the election officials designated and authorized under State law are charged with the responsibility to enroll eligible voters on the list of voters. This bill should not be interpreted in any way to supplant that authority. Election officials continue to make determinations as to an applicant's eligibility, such as citizenship, as are made under current law and practice. Applications should be sent to the appropriate election official for the applicant's address in accordance with the regulations and laws of each State.

Although the Committee would encourage States to adopt a single form for a voter registration application and a motor vehicle driver's license application in order to expedite the process, to minimize the duplication of information, and to establish a truly simultaneous application process, it recognizes that administrative and funding considerations pose a serious problem in some States. Thus, Section (c) is drafted to describe an application process that permits the use of two forms, one for the motor vehicle driver's license application and one for the voting registration application process, thereby avoiding any cost associated with revamping current procedures of computer programs. Where two forms are used, it is expected and intended that such forms will be used simultaneously as part of a single, integrated application process. All applicants appearing at the motor vehicle office must be given an application that include both forms. If such an applicant does not wish to register to vote and so indicated that by declining in writing to do so, such an applicant should not complete the voter registration portion of the application.

Subsection (d) provides that any change of address form submitted in accordance with State law for purposes of a motor vehicle driver's license shall serve as notification of a change of address for voter registration unless the registrant states on the form that the change of address is not for voter registration purposes. The requirement of residency pertaining to driver's licenses may vary from those pertaining to voting; therefore, this provision will permit a person to indicate that a change of address notification to the motor vehicle agency is not intended to effect a change in the address for voting purposes and should not be forwarded to the voting registrar.

SECTION 6. MAIL REGISTRATION

Subsection (a) requires that all States accept and use the mail voter registration form prescribed by the Federal Election Commission. In addition, States are permitted to develop and use their own mail registration form, provided it meets the requirements of this Act. Mail registration forms may also be used for voter registration change of address.

The Federal Election Commission, in consultation with the chief election officials of the States, is required pursuant to Section 9 to promulgate a mail registration application form. That form shall

include a statement that specifies each eligibility requirement for voting, contain an attestation that the applicant meets each such requirement, including citizenship, and require the signature of the applicant, under penalty of perjury. Where appropriate, the application form should include information requesting the applicant's mail address if it differs from the applicant's residence. The form may not include any requirement for notarization or other formal authentication, such as witnessing. If a State chooses to develop and use its own form, that form must comply with the same criteria that applies to the Federal form promulgated by the Federal Election Commission.

The requirements that States use a uniform mail registration application form serves to augment the extensive outreach features of the "motor-voter," and agency-based registration procedures. Uniform mail forms will permit voter registration drives through a regional or national mailing, or for more than one State at a central location, such as a city where persons from a number of neighboring States work, shop or attend events. By permitting States to develop and use their own forms as well, the bill provides flexibility for the States. In those States that develop their own mail voter registration application, an applicant may use, and the State must accept, either the national form developed by the FEC or the State's own.

Subsection (b) requires the chief State election official to make the mail registration forms available for distribution through governmental and private entities, with a particular emphasis on making such forms available to organized voter registration programs. Broad dissemination of mail registration forms, when coupled with the other procedures of this bill, should reach most persons eligible to register to vote, and is, therefore, a key element of the voter outreach feature of the bill. Such forms may also be disseminated to agencies designated under the agency-based registration procedures for use by those agencies in their registration programs.

States that use mail registration application procedures generally employ a number of means to prevent fraud, such as including on the form a statement of voter qualification requirements or penalties for fraud, or a follow-up mailing. The form to be developed by the FEC is to include a statement setting forth the requirements to vote (including age and citizenship) and an attestation to be signed by the applicant under penalty of perjury. Mail registration forms developed by any State should contain the same statement and attestation.

or the application. This requirement could be met by a follow-up mailing by any State that wishes to employ that procedure as a means of protecting against possible fraud in the mail registration process. With regard to this notice requirement, States should be aware that such a notice should be drafted with regard to the purge provisions of this bill.

The Committee believes that these provisions are sufficient to deter fraudulent registrations. Nevertheless, the bill includes an additional provision relating to first time voters which has been added to address the concerns that this process may be subject to

26

misuse. Subsection (c) provides that a State may require by law that a person who registers to vote by mail and has not previously voted in that jurisdiction, vote in person. This requirement would not be applicable to any person who is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act, or who is provided the right to vote otherwise than in person by the Voting Accessibility for the Elderly and Handicapped Act, or who is entitled to vote otherwise than in person by any other Federal law. States are permitted to employ any other fraud protection procedures which are not inconsistent with this bill.

SECTION 7. VOTER REGISTRATION AGENCIES

Subsection (a) requires that each State establish an agency-based registration program by designating various public and private agencies or offices for the registration of voters for Federal elections. The Act requires that certain agencies must be included in such a program. Thus, each State must designate all offices in the State that provide public assistance and all offices that provide State-funded programs primarily engaged in providing services to persons with disabilities. In addition the State must designate additional Federal, State or local government agencies as well as private sector offices as registration agencies, but each State is given discretion as to which agencies and which offices of those agencies to include. The Act provides that such discretionary agency programs may include public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license services bureaus, government revenue offices, and any agency or office in the mandatory agency based voter registration program. Federal, State and private sector offices could also be included in this program.

A voter registration agency that provides service or assistance in addition to conducting voter registration shall distribute simultaneously with each application for service or assistance, and with each recertification, renewal, or change of address, a mail voter registration application form promulgated by the Federal Election Commission as provided for in the Act or its own form, if the agency has devised its own form in compliance with the requirements of this Act. The offices should to the greatest extent practicable, incorporate in application forms and other forms used for purposes other than voter registration, a means by which an applicant may decline in writing to register to vote. With this "application form," the bill attempts to provide flexibility to the agencies to develop a program such as unemployment compensation, where eligibility must be recertified on a frequent (i.e., weekly or biweekly) basis, the Committee intends that the agency be required to provide voter registration materials and assistance at the time of initial application, upon any change in the address or eligibility status of the applicant, and upon any extension in the eligibility status of the applicant. If an applicant does not decline to register, the office is

27

28

to provide the same type and degree of assistance in completing the registration application as it usually provide its applicants with regard to the completion of the offices own forms. Costs for registration application assistance for those offices should be considered matchable under the current Federal match rate for those programs.

Each agency who provides those voter registration services at an agency voter registration office shall not influence an applicant's political preference or party registration, display any political preference or party affiliation, or make any statement to an applicant or take any action the purpose or effect of which is to discourage the applicant from registering to vote.

While concerns have been raised that applicants will be coerced to affiliate with a particular political party or that the receipt of benefits is contingent upon the act of registering to vote, the Committee believes that these provisions, together with the criminal penalties provisions of the bill, are sufficient to deter any such activities. Further, no evidence has been presented that such actions have occurred in a State which has implemented an agency-based registration program.

The mandatory portion of the agency-based registration program, which includes offices providing public assistance, unemployment compensation or related services and services primarily to persons with disabilities, is intended to supplement the motor-voter provisions of the bill by reaching out to those citizens who are likely not to benefit from the State motor-voter registration program. These agencies are included in the mandatory agency registration program because they are considered most likely to serve persons of voting age who may not have driver's licenses. The bill provides a service to these voters. This mandatory portion provides a necessary balance to the motor-voter program, without unduly burdening State resources.

The second portion of a State's agency-based registration program includes other agencies and offices which the State may designate to extend its outreach to as many citizens of voting age as possible. While the States are required to have a discretionary agency registration program in addition to the mandatory one, the State is given latitude to determine which agencies, as well as which of their offices, should be included.

Previous versions of this legislation included in the mandatory agency voter registration program an office or greater office to follow the registration office to provide the registration form (for the agency's own form), assistance to applicants in completing voter registration application forms, acceptance of completed voter registration application forms for transmittal to the appropriate State election official. The term "appropriate State election official" shall be interpreted in accordance with State law or practice and is intended to mean that official who is authorized under State law to register voters in the jurisdiction where the registrant resides.

29

abilities made it clear that vocational rehabilitation offices would not have extensive contact with such persons and that a broader designation of office would be necessary if a State's agency programs was to include a sufficient number of persons with disabilities. The Act now includes a definition that is intended to have more extensive outreach to persons with disabilities. While it would include vocational rehabilitation offices, it would also extend to many other agencies that have more contact on a regular basis with persons with disabilities, such as, but not limited to, those agencies which provide transportation, job training, education counseling, rehabilitation or independent living services.

The Committee also recognize that many persons with disabilities are less likely to visit offices in order to obtain services or benefits. As a result, the bill require that if a voter registration agency designated by the State provides services or assistance at the person's home, the agency shall provide the voter registration services at the person's home, as well. The Committee believes that the provisions referring to persons with disabilities are not intended to reach any persons who otherwise are ineligible to register, but only persons who by reason of a current judicial determination of mental incapacity to vote.

Since the requirements for services or assistance at agency offices may differ significantly from those for voting registration purposes, the Committee would expect that any applicant for services or assistance from such an agency who does not meet the requirements for eligibility to register to vote would decline to do so. It is important, therefore, that each applicant be advised of the voting requirements and the need to decline to register if he or she does not meet the requirements. The bill provides that if registration is declined, the requirement set forth in the application to vote so that they will be readily available for each applicant to review during the application process. These requirements must include a statement of citizenship, an attestation that the applicant meets each such requirement, and the signature of the applicant under penalty of perjury. The applicant should be advised that there is no obligation to specify the particular reason for choosing to decline to register.

Since some of the reasons for declining to register to vote may involve matters of personal privacy, such as ineligibility to vote in a State due to mental incompetence or a criminal conviction, an individual voter registration application will not require an individual to disclose as to the reasons for such action. If an individual does volunteer information, it must be treated as confidential and may not be used for any purpose other than voter registration. As discussed later, the Act contains a general prohibition against a State or other entity, including an agency designated under this provision, from revealing any information relating to a declination to register or to the identification of the agency where a person registered.

Subsection (b) requires all entities of the Federal government to cooperate as much as possible with the States in carrying out this program by participating as designated voter registration agencies. The Federal agency participation requirement is subject to an agency agreeing to participate pursuant to subsection (a). No specific Federal agencies are designated in this bill to participate, it being left

30

to the State to negotiate such arrangements with the appropriate Federal agencies. It is the Committee's intention that any agency or organization providing assistance under the terms of this Act, whether or not it is under contract with the voter registrar's office, could include, where appropriate or required, reimbursement for services provided.

Subsection (c) require that a completed registration application shall be transmitted to the appropriate State election official no later than 10 days after the date of acceptance. If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application must be transmitted to the appropriate State election official no later than 5 days after the date of acceptance. An applicant may, if he or she chooses, mail the voter registration application directly to the appropriate State election official rather than returning it to the agency for transmittal. The agency providing voter registration services is prohibited from requiring a registrant to make the form and must accept such form. The agency providing the registration registration official if turned in by the applicant. Thus, the agency has an affirmative obligation to actively collect completed registration applications.

SECTION 8. REQUIREMENTS WITH RESPECT TO ADMINISTRATION OF VOTER REGISTRATION

Subsection (a) provide that any person registered to vote not later than 30 days, or a lesser period as provided by State law, before a Federal election shall be permitted to vote. For these purposes, registration is complete upon submitting the form to the voting official, motor vehicle office, designated agency or office, or on date of postmark, if mailed. While the Act is clear with regard to the motor-voter and agency-based registration deadline requirement, the mail situation may be in need of some clarification. The reference, "or a lesser period as provided by State law" is meant to apply only if the registration application, that registration application shorter. State law would apply only if it referenced the "date of postmark". If the shorter period provided by State law refers to the date of receipt in the registrar's office, the thirty day period provided for here would apply. It is not intended to penalize a registration applicant; thus, if the application is postmarked after thirty days, but is received before the deadline specified by State law, it should be accepted. Also, one postmarked before thirty days but received after the deadline under State law, should also be accepted as timely.

Each State election official is required to give notice to each applicant regarding the disposition of his or her voter registration application. The means of notifying each applicant is not specified, so that each State may continue to use whatever means is required or permitted by State law or regulation. States should be aware that such notices should be drafted with regard to the purge provisions of the bill. States may adopt whichever procedure they deem best suited to provide notice to the applicant and to provide the registrar with verification of the accuracy of the information provided by the applicant. The Committee recognizes that such notices are sent by most States as a means of detecting the possibility of fraud

31

in voting registration and intends to give each State discretion to adopt a means of notification best suited to accomplish that purpose as well as providing a means for notifying an applicant, who has had direct contact with the voter registrar's office. The Committee believes that accurate and current voter registration lists are essential to the integrity of the election process and for the protection of the individual.

This section also provides that the name of a registered voter may not be removed from the official list of eligible voters except: at the request of the registrant; as provided by State law, by reason of criminal conviction or mental incapacity; or, in accordance with the requirements of the Act, by reason of the death or a change in the residence of the registrant, recognizing the essential listed in the requirements of the Act, the Committee believes the reasonable effort to maintain the integrity of the voter registration lists makes a reasonable effort to remove the name of ineligible voters from the official lists of eligible voters by reason of death or by a change of residence.

A "request" by a registrant would include actions that result in the registrant being registered at a new address, such as registering in another jurisdiction or providing a change-of-address notice through the drivers license process that changes the voter registration.

States are required to inform applicants of voter eligibility requirements, the penalties provided by law for the submission of a false voter registration application, and where that the identity of the voter registration agency through which any particular voter is registered is not publicly disclosed.

Subsection (b) sets forth the standards for the confirmation of voter registration. Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current registration roll for Federal elections shall be (1) uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965; and (2) shall not result in the removal of the name of any person from the official list because of a failure to vote.

The purpose of this requirement is to prohibit selective or discriminatory purge programs. This requirement may not be avoided by a registrar conducting a purge program or activity based on lists provided by other parties where such lists were compiled as the result of a selective, non-uniform, or discriminatory program or activity. The term "non-discriminatory" is intended to mean that the procedure complies with the requirements of the Voting Rights Act of 1965.

The term "uniform" is intended to mean that any purge program or activity must be applied to an entire jurisdiction.

It is the intent of this section to impose the uniform, nondiscriminatory and conforming with the Voting Rights Act standards on any activity that is used to start, or has the effect of starting, or to purge of the voter rolls, without regard to how it is described or to whether it also may have some other purpose. For example, the mailing of sample ballots is clearly a program that has another purpose but might provide the basis for a purge of voter rolls. It is

is to be used for that purpose and the registrar uses it to serve as his or her reason to send notices under subsection (d), that sample ballot mailing program must meet the standards of this section.

The Committee is mindful of the need to keep accurate and current voter rolls. The Committee is concerned that such programs can be abused and may result in the elimination of names of voters from the rolls solely due to their failure to respond to a mailing. Abuses may be found in the design of a program as well as in its implementation. In order to provide some guidance to the States, subsection (d) provides that a State may meet the requirements of conducting a general nonforwardable mailing and a comprehensive follow-up keep voting program by establishing a program which uses the National Change of Address ("NCOA") program which uses the U.S. Postal Service. Use of the NCOA program by a State or any of its registration jurisdictions could be deemed to be in compliance with the requirements that the program be uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965.

By using the NCOA, a State may use change of address information to identify registrants whose addresses may have changed. If it appears from the information provided that a registrant has moved to a different address within the jurisdiction, the registrar must automatically and send the registrant a notice by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information. If the registrant appears to have moved to an address outside of the jurisdiction of the registrar, the registrar may not remove the name of the voter until the registrar has sent a notice to the voter as provided in subsection (d).

The section requires that a State complete any program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters at least 90 days before a primary or general election for Federal office. This requirement applies to the State outreach activity such as a mailing or a door to door canvass and requires that such activity be completed by the 90-day deadline. This section does not prohibit a State during that 90-day pre-election period from removing names from the official list of eligible voters on the basis of the request of the registrant, as provided by State law for criminal conviction or mental incapacity, death, or any other correction of registration record pursuant to this Act.

Subsection (d) prohibits a State from removing the name of a registered voter by provision of a change in residence, unless the registrant confirms in writing that he or she has changed residence outside the jurisdiction in which registered; or has failed to respond to a notice sent by the State and has not voted or appeared to vote within two general elections for Federal office since the date of the notice.

If a State determines that a registrant may have changed residence, the State may send by forwardable mail a postage prepaid return card on which the registrant may state his or her current address, together with a notice which states that: If the registrant has not changed residence within the

32

same jurisdiction, the registrant should return the card before the time for closing registrations for the next Federal election; 30 days before an election, or such lesser period as may be provided by State law. If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant would be permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the second general Federal election that occurs after the date of the notice. If the registrant's name will be removed from the list. If the registrant has moved to a residence outside the jurisdiction, the notice will include information concerning how the registrant may continue to be eligible to vote.

Within the official list of eligible voters, notations (such as an asterisk or "i" for inactive status) may be made of those eligible voters who have failed to respond to a notice under Section 8(d)(2). The requirement that names with notations be maintained on the official list of eligible voters permits the State to decline to use those names in performing the type of routine, administrative responsibilities that do not impair the right of such voters to vote as set forth in the Act and as protected by the Voting Rights Act. For example, those who have failed to respond to a Section 8(d)(2) notice need not be included for purposes in determining the number of signatures that may have purposes in determining the number of precincts that may be needed for ballot access, the number of precincts that may be needed to service voters, or the number of ballots or voting machines that may be required in the administration in the voting process.

The term "registrar's jurisdiction", as used in connection with the NCOA program and with regard to the "affirmation" or "confirmation" requirements, is a term of art for the purpose of this Act and is not intended to dictate to the States their actual administrative structure for the purpose of registering voters. The Committee intends that a "registrar's jurisdiction" for the purposes of the Act be no smaller than a county, parish, city, town, township, or current practice. A State would be free, for example, to divide a very large county or city into 2 or more administrative units for registering voters as long as the county continued to be treated as the "registrar's jurisdiction" for those purposes of the Act hereinafter specified. First, that provision pertaining to a person who returns the postcard described in section 8(d) indicating that the registrant has moved to another residence within the jurisdiction that the registrant has moved to another residence within the jurisdiction corrected to reflect the new address. Second, the provision that requires that person who has not moved, is then entitled to vote after affirming or confirming that his or her new residence within the same congressional district and the same registrar's jurisdiction as that of his or her former residence. And third, the provision that use of the national change of address program could be considered to be in compliance with the requirements of the Act that pertain to list maintenance programs could protect the State if used State-wide or a registrar if used within the registrar's jurisdiction. As long as these protections are maintained a State would be free to alter its administrative structure and jurisdiction for the purpose of registering voters for Federal elections.

33

Subsection (e) establishes the procedure for voting in a Federal election where the registrant fails to return the card in accordance with the procedures outlined in subsection (d). If a registrant has moved from one residence to another within the jurisdiction the same polling place, the person shall be permitted to vote at that polling place upon oral or written affirmation of the registrant's change of address, before an election official at the polling place. If a registrant has moved from a residence in one polling place to a residence in another polling place within the jurisdiction, the registrant (1) shall be permitted to vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the registrant's change of address to an election official at that polling place; (2) shall be permitted to correct the voting records and vote at the former polling place upon oral or written affirmation of the new address; or (3) be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction where a list of eligible voters is maintained upon written affirmation of the new address, or (3) be permitted to correct the voting polling place for the current address, and, if permitted by State law, shall be permitted to vote in the present address, upon confirmation of the new address by such means as are required by State law. If the State does permit the registrant to vote in the current election upon affirmation of the registrant's change of residence at the appropriate polling place and the central location do not have to be provided as alternative options.

If the registration records incorrectly indicate that a registrant has changed his or her residence, the registrant shall be permitted to vote upon oral or written affirmation that the registrant continues to reside at the same address.

This section of the bill attempts to incorporate an underlying purpose of the Act, that once registered, a voter should remain on the list of voters as long as the individual remains eligible to vote in that jurisdiction. The section ensures that if a registrant moves within the same jurisdiction of the same registrar, he or she should be permitted to vote. However, while this section sets out where an individual may vote, it is silent as to how that individual may be permitted to vote. Under certain circumstances it would be appropriate, and in compliance with the requirements of this Act, to require that such a person vote by some form of challenge ballot. It is not the intent of this provision to pre-empt any State requirement that a person whose eligibility to vote is challenged may be required to vote by a special ballot that is subject to post election rejection, where the challenge is sustained.

Subsection (f) provides that in the case of a change of residence within the jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not be removed from the official list of eligible voters, nor may a registrant be required to re-register as a result of such a change of residence. The obligation to re-register is triggered by notice to the registrar of such change, not the date of such change. The intent of this requirement is that it is the responsibility of a registrar, upon notification of a change of residence by a voter to another residence within the registrant's

34

jurisdiction, to make the necessary correction of the records. A registrar may not impose requirements, such as re-registration, upon such a voter. Although such notice of change of address might be made by the voter through the use of the motor-voter or agency-based registration process, the registrar's responsibility to make the correction is not dependent on the voter giving such notice; such notice may come through the Postal Service change of address program or other means conducted in conformance with the requirements of the Act, subject to verification by the voter.

Some State election officials expressed concern to the Committee that they had experience with convictions from the Federal courts regarding convictions for Federal offenses from the Federal courts which is needed to remove the names of persons convicted of certain offenses from the voter rolls under State law. Subsection (g) requires a United States Attorney to inform the appropriate State election official of the felony conviction of any person. Such notice must give the name, age, and address of the offender, the entry date of judgment; a description of the offenses on which the person was convicted; and the sentence imposed. Additional information may be provided at the request of the election official if necessary to determine whether a conviction affects the person's eligibility to vote. If such a conviction is overturned, the United States Attorney shall give notice to the appropriate election official.

Subsection (h) provides that lower postal rates to a State or local voting registration official for any mailing which is required by the Act. This lower postal rate is the rate required for any class of mail which is made available to a qualified non-profit organization.

Subsection (i) provides that each State shall maintain for two years all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of addresses on the official list of eligible voters. The records must be made available for public inspection and, where available, photocopying at reasonable costs. The records shall include lists of names and addresses of all persons to whom notices were sent and information concerning whether or not each person has responded to the notice as of the date of inspection.

Provisions of this Act pertaining to voter registration programs require that information regarding a person's declination to register not be used for any purpose other than registration. There was also concern that information not be made public as to what voters registered at a particularly agency, such as a welfare or unemployment office. Therefore, these records may not contain any information relating to a declination to register or the identity of a voter registration agency through which any particular voter is registered, or a list of those persons registered through a particular agency.

SECTION 9. FEDERAL COORDINATION AND REGULATIONS

Subsection (a) provides that the Federal Election Commission shall prescribe appropriate regulations necessary to carry out this Act, consult with chief election officers of the States to develop a mail voter registration application form for Federal elections, and

35

36

submit by June 30 of each odd-numbered year, a report to the Congress assessing the impact of the Act on the administration of elections for Federal office and recommendations for improvements in Federal and State procedures, forms, and other matters, and provide information to the States with respect to the responsibilities of the States under this Act.

It is the Committee's intent that the Commission should carefully determine which regulations are necessary and appropriate. In addition making the regulations in regulations under the Act prohibit the Federal Election Commission from following the appropriate statistics necessary to meet its reporting requirements under the Act.

Subsection (b) sets forth the requirements of the mail registration form to be developed by the FEC. This form may only require such identifying information (including the signature of the applicant) and other information (including data relating to previous registrations) as is necessary to enable the appropriate State election official to assess the applicant's eligibility. The form must also include a statement that specifies each eligibility requirement (including, citizenship); contain an attestation that the applicant meets each such requirement under penalty of perjury; and require the signature of the applicant under penalty of perjury. The form may not include any requirement for notarization or other formal authentication, i.e., a witness requirement.

### SECTION 10. DESIGNATION OF CHIEF STATE ELECTION OFFICIAL

Each State shall designate a State officer or employee as the chief State election official to be responsible for the coordination of State responsibilities under this Act. Various provisions of this Act assign to this official certain responsibilities regarding the promulgation of regulations, the design of the Federal mail registration form, the receipt of notice of civil suits, and the distribution of mail registration forms.

### SECTION 11. CIVIL ENFORCEMENT AND PRIVATE RIGHT OF ACTION

Subsection (a) provides that the Attorney General may bring a civil action for declaratory or injunctive relief as is necessary to carry out this Act.

Subsection (b) provides a private right of action to any person who is aggrieved by a violation of this Act by providing written notice of the violation to the chief State election official. If the violation is not corrected within 90 days after receipt of the notice, or within 20 days if the violation occurs within 120 days before the date of an election for Federal office, the aggrieved individual may bring a civil action in Federal court for declaratory or injunctive relief. If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved individual may proceed to file a civil suit without notice to the chief State election official.

Section (c) permits a prevailing party (other than the United States) in a civil action to seek reasonable attorney fees, including litigation costs and expenses.

It should be noted that this section does not authorize the award of monetary damages. Rather, the civil remedies that are authorized are corrective action in the form of declaratory and injunctive

37

relief, plus reasonable attorney fees. The Committee does not believe that reasonable attorney fees will result in excessive awards in civil actions brought under this Act.

Subsection (c) provides that the right and remedies established by this Act are in addition to all other rights and remedies established by this section nor any other provision of this Act shall supersede, restrict, or limit the application of the Voting Rights Act of 1965. Nothing in this Act authorizes or requires conduct that is prohibited by the Voting Rights Act of 1965.

### SECTION 12. CRIMINAL PENALTIES

This section would make a Federal offense, punishable by a fine and/or imprisonment for not more than 5 years, for any person, including an election official, who in any election for Federal office: (1) knowingly and willfully intimidates, threatens, or coerces, any person for registering to vote, or voting, or attempting to register or vote, urging or aiding any person to register to vote, to vote, or to attempt to register or vote; or exercising any right under this Act; or (2) knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process by the procurement or submission of voter registrations that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held; or the procurement, casting, or tabulation of ballots that are materially false, fictitious, or fraudulent under the laws of the State in which the election is held.

Concern has been expressed that these criminal provisions may be used to impede lawful political activities, such as distributing campaign literature, poll watching, and registration drives. Careful attention has been given to these concerns and this section has been specifically written to refer to acts which are "knowing and willful" and does not refer to inadvertent omissions or inaccuracies on voter registration forms or absentee ballots.

The second addresses the Federal criminal code only, and would not limit or restrict the availability of criminal penalties under State law.

### SECTION 13. EFFECTIVE DATE

That Act will take effect on January 1, 1995. While this Act applies only to Federal elections and States are free to apply other regulations to State elections, many States will prefer to have the same requirements for both Federal and State elections. To accommodate those States that have constitutional obstacles to conforming State requirements to the Act, the effective date for such States will be January 1, 1996.

### COST ESTIMATE

In compliance with paragraph 11(a) of rule XXVI of the Standing Rules of the Senate, the estimate of costs of this measure prepared by the Congressional Budget Office pursuant to section 403 of the Congressional Budget Act, is as follows:

38

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
Washington, DC, February 25, 1993.

Hon. WENDELL H. FORD,
Chairman, Committee on Rules and Administration,
U.S. Senate, Washington, DC.

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the cost estimate for the National Voter Registration Act of 1993. Because enactment of the legislation could affect revenue, pay-as-you-go procedures would apply to the bill.

If you want further details on this estimate, we will be pleased to provide them.

Sincerely,

ROBERT D. REISCHAUER,
Director.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: Not yet assigned.
2. Bill title: National Voter Registration Act of 1993.
3. Bill status: As ordered reported by the Senate Committee on Rules and Administration on February 18, 1993.
4. Bill purpose: The bill would create a national system of voter registration procedures for elections for federal office. Responsibility for implementing the system would fall largely to the states, with the federal government responsible for enforcement, as well as some financial and technical assistance.

REQUIREMENTS FOR STATES

Under the national system of voter registration, most states (except those with election day registration and those with no registration requirement at all) would be required to provide the following methods of registration:

Motor/voter.—When someone applies for a driver's license (new, renewal, or change of address) at the state motor vehicle authority, the application procedure would have to include the opportunity to register to vote. An individual would have to decline in writing or on an application form to avoid registering by that means, or would have to sign an attestation, under penalty of perjury, that the individual is eligible to register to vote.

Mail registration.—Each state would make available through various sources a form, prescribed by the Federal Election Commission (FEC), that applicants could complete and mail to the election official to register for federal elections.

Agency registration.—Each state would have to designate some state and federal offices as well as private sector locations (such as public libraries, unemployment offices, banks, fishing and hunting license bureaus, or post offices) to distribute and collect applications for voter registration. Such locations would then forward the applications to the appropriate election official.

Currently, the federal government has little involvement with voter registration. Each state has its own laws governing registration, and in practice, registration practices vary widely even among

39

local election jurisdictions within a state. The bill would mandate that states provide the specific registration methods consistently in all jurisdictions.

In addition, the bill would mandate that any state programs used to update voter registration lists shall be uniform and nondiscriminatory and may not remove someone from the list for not voting. The bill would permit a state, if it determines a voter has moved, to remove the voter from the list only after sending a forwardable notice with a return card that would allow the voter to confirm the correct address.

Finally, each state would have to designate a chief state official responsible for implementing the state's functions under the bill.

REQUIREMENTS FOR THE FEDERAL GOVERNMENT

The legislation would require the U.S. Postal Service to provide election officials with a postal rate subsidy for any mailings that it require the officials to conduct, such as the registration confirmation notice and the registration update notice. The bill authorizes the appropriation of funds sufficient to reimburse the Postal Service for its losses in providing the subsidy. If the Congress does not appropriate the necessary amounts, then the Postal Service would no longer offer the subsidy.

The bill would require the FEC to provide information to the states regarding their responsibilities and to report to the Congress once every two years on the impact of the registration procedures required by the bill. The FEC also would have to develop a uniform application form to be used by states for mail registration.

In addition, the bill would authorize the Attorney General to bring civil actions in court to enforce its provisions. Individuals also would be allowed to ask the court for relief from any violations of the bill's provisions.

Finally, the bill would establish criminal penalties for persons who, in any election for federal office, interfere or seek to interfere with voting or voter registration, falsify voter registration applications, or knowingly cast or tabulate false or fraudulent ballots.

5. Estimated cost to the Federal Government:

[By fiscal years, in millions of dollars]

| | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| Spending subject to appropriation action | | | | | |
| Payment to the Postal Service for reduced postage charges: | | | | | |
| Estimated authorization level | 34 | 35 | 35 | 35 | 35 |
| Estimated outlays | 34 | 35 | 35 | 35 | 35 |
| Federal Election Commission: | | | | | |
| Estimated authorization level | 22 | 22 | 22 | 22 | 22 |
| Estimated outlays | 22 | 22 | 22 | 22 | 22 |
| Bill total: | | | | | |
| Estimated authorization level | | | | | |
| Estimated outlays | | | | | |
| Revenues | | | | | |
| Estimated receipts less fees | (1) | (1) | (1) | (1) | (1) |

40

The costs of this bill fall within budget functions 370 and 800.

Basis of estimate: The subsidized postal rates would be used primarily to update voter registration applications. Based on the total number of voter registration actions filed with the Postal Service, CBO expects that the postal subsidy would amount to no more than $3 million annually—probably in the vicinity of $2 million—to cover a portion of the cost of mailing registration update notices. In addition, CBO estimates that officials would mail about 25 million voter confirmation notices, based on election officials' reports that the number of registration applications typically amounts to 20 percent of the total number of registered voters in the jurisdiction. (There are about 130 million registered voters nationwide.) Assuming an average subsidy of 7.3 cents per piece of mail, subsidizing the mailing of these confirmation notices would cost about $2 million annually at current rates. The postal subsidy would first be available in January 1995, a year in which CBO assumes that an increase in postal rates will occur. Assuming rates rise as much as 15 percent, CBO estimates that the subsidy would total about $4.5 million annually. The subsidy for fiscal year 1995 would be less because the subsidized rates would become available three months into the fiscal year.

Based on information from the FEC, CBO estimates that the additional staff and associated expenses necessary to develop a mail registration form and to provide assistance to the states would cost approximately $200,000 annually, beginning in 1994. The requirements imposed on states and localities would become effective beginning January 1, 1995, unless provisions in a state's constitution conflict with implementing the bill. In such cases, a state would not have to comply with the bill until January 1, 1996.

The imposition of criminal penalties could cause an increase in governmental receipts from penalty collection, but CBO cannot estimate the amount of such an increase. Any increase would be deposited in the General Fund of the Treasury as miscellaneous receipts.

6. Pay-as-you-go considerations: The Budget Enforcement Act of 1990 sets up pay-as-you-go procedures for legislation affecting direct spending or receipts through 1995. Enactment of the bill could result in greater receipts from penalty collections, but CBO cannot estimate the amount of any such increase.

7. Estimated cost to State and local governments: The bill would require most states to provide three types of voter registration for federal elections beginning in 1995: motor/voter, mail-in, and agency registration. The bill also would mandate that states use a uniform elections program for maintaining accurate lists of eligible voters.

Consistent with CBO's usual procedures for estimating the cost effects of legislation, this estimate compares the cost to states of complying with the bill's provisions to the cost of their current practices under existing law. Few state and local governments currently employ all the methods required by the bill for registering and maintaining voters on the rolls. In addition, without the bill, states and localities are unlikely to replace their existing practices with those outlined in the legislation. Therefore, the costs states

41

would incur in changing their registration procedures would be directly attributable to enactment of the bill.

SUMMARY OF COSTS

Direct costs.—If the bill is enacted, state and local governments would have to pay for the cost of complying with the bill's registration provisions. For the additional staff, postage, and printing expenses associated with the expected increase in applications, especially through motor/voter, CBO estimates that it would cost states and localities an average of about $20 million a year for the first five years of the program. Added costs would be somewhat lower than the average in federal election years, and above the average in other years, since the procedures required by the bill would have the effect of smoothing the election-year peaks in registration costs. Some of these expenses would begin in 1994, the year before the bill's provisions take effect, as the states prepare to offer the new registration methods.

Although the bill would not directly require it, some states may decide to upgrade their computer systems to facilitate implementation of the bill. To the extent that state and local governments make such changes in computer technology, their costs could increase further. For example, we estimate that some one-time costs to computerize the registration lists of all the jurisdictions that currently do not have computers would amount to less than $25 million. We cannot predict how many jurisdictions would do so, or how many that now have computers would choose to change their system.

Another provision that would require most states to make a change from current practices affects the polling place where a registrant may be permitted to vote. Under the bill, if a registrant has changed addresses within a jurisdiction without notifying the registrar, but the new and old addresses have different polling places, the registrant would have the option of voting at the old or new polling place, or some polling place that has a list of registered voters. Election officials have indicated that this requirement would be quite difficult to implement without computerized registration list. Without such a capability, it might not be possible to fully meet this requirement, so the cost to election officials of this provision cannot be estimated at this time.

Offsets to costs.—Because the bill would authorize the Postal Service to provide a rate subsidy to election officials for mailings it requires, state and local governments would be able to shift some of the costs they now incur to the federal government. The bill would require election officials to notify registrants as to the outcome of their application and to contact those whom the officials plan to drop from the rolls because of a change in address. (Most officials already take both of these actions.) CBO estimates that the postal subsidy for these mailings would total about $4 million annually. Thus, upon enactment of the bill, state and local election officials would save approximately $4 million annually in postage costs.

Other costs.—To the extent that the legislation is successful in increasing the number of registered voters in all jurisdictions, state and local governments likely would face other costs that are not di-

rectly associated with implementing the bill's provisions. For example, if more people are registered, then presumably voter turnout during elections would increase. Because election officials try to maintain a certain ratio of voters per polling place, officials might have to add new polling places, voting machines, and poll workers. However, these officials would take similar steps because of growth or migration patterns, and it would be difficult to separate the bill's effect on increased turnout from other contributing factors.

Certain states with specialized election laws would encounter some secondary effects of the bill. California law, for example, requires state and local officials to mail all voters on the registration list an explanation of all ballot initiative issues before each election. If an initiative appears on the ballot, the cost of such special mailings will be greater. On the other hand, the cost of such special mailings would result in more accurate voter registration lists, and election officials would save money by not having to mail voting materials to or prepare polling places for people who no longer would be on the lists. Such costs and savings would depend in part on how successful this legislation would be in accomplishing its goals. California, which has some of the most extensive requirements relating to communications with registered voters, has estimated that it costs between $4 and $6 per registered voter to print ballots, print labels, mail sample ballots, and provide polling places. Most other states have lower costs, because they do not have all these requirements required by law.

Because the legislation would allow individuals to sue for relief from violation of the bill's provisions, state and local governments and officials are potentially liable to pay fines and court and attorney fees if they lose a lawsuit. Such costs would not result directly from the bill, but rather from court cases that CBO cannot predict.

## CURRENT LAW

Under current law, each state sets its own rules or guidelines for registering to vote in federal elections, and many states allow a wide range in registration practices among decentralized local jurisdictions (usually counties or cities and towns). About thirty states already have mail-in registration and about one-half of the states have some form of motor/voter registration. State and local jurisdictions pay the costs of registering voters, and the federal government does not currently assist them with these costs.

## DATA COLLECTION

Because voting registration practices vary so widely with the incremental cost of implementing new procedures in the nation's 18,000 election jurisdictions is difficult to determine. In preparing this estimate, CBO assumed that local jurisdictions within a state generally follow registration guidelines set out by the state (even though there are some variations). We then compared the states' current guidelines with the requirements in the bill. (CBO relied on state-by-state summaries of registration practices prepared by various election information clearinghouses)

In so doing, CBO surveyed the election officials in just over half of the states (as well as about two dozen counties of varying sizes). We collected cost information from some states that already provide one or more of the registration procedures mandated in the bill. In addition, some states provided CBO with the fiscal notes prepared for their state legislatures when they were considering one of these options. We also contacted about half of the 12 states that currently do not offer any of the bill's registration methods for their assessment of the bill's likely impact.

## ASSUMPTIONS

Based on this information about the general registration practices in each state and the steps each state would have to take under the bill, CBO made certain assumptions about the implementation of those costs to state and local governments.

In most states, motor/voter would become the primary method of registering voters. Because most people have a driver's license and are required to renew it periodically, a motor/voter system would provide most people with a convenient opportunity to register, especially after a change of address.

Although completing a driver's license application at the state department of motor vehicles (DMV) would be the most common way people would apply for registration, local election officials would remain largely responsible for maintaining accurate voter lists.

Because states with constitutional provisions that would conflict with the bill such as requiring voters to sign an oath in person in front of a registrar, would change their laws to be consistent with the bill. Otherwise, those states would have to maintain separate registration rolls and conduct federal elections separately from other elections. This estimate does not include any cost for such separate elections.

## COSTS OF REGISTRATION PROVISIONS

*Motor/voter.*—The bill would require states to include a voter registration application form as part of an application for a state driver's license. The bill language suggests that states use a consolidated form, but also allows them the flexibility of using two forms. CBO assumes that states could provide the voter registration application, and the two forms if they desire, because the committee's report language indicates the committee's intent to allow this option to states. Thus, states that already have a two-form motor/voter process would not have to change, and states that would have to decide how to set up a motor/voter process could have a choice.

Based on the experience of the states that already have motor/voter, it appears that the additional cost to states of implementing motor/voter registration would result mainly from hiring additional staff to handle the extra paperwork. For example, state DMVs would need more employees at high traffic locations to continue to process applicants in the same amount of time as they currently do. For the 25 states that do not now have some form of motor/

voter, the cost of such additional employees and related expenses would probably be about $20 million annually during the first five years of implementation. Since most states require renewal of a driver's license every four years, costs would decrease in later years, because most people would have had an opportunity to register and only those who move would have to update their registration.

*Motor/voter, Election official costs.*—Once the DMV receives an application, it probably would forward a copy to the local election official to process the registration, as is current practice in the states that have motor/voter. While CBO expects that officials in sparsely populated jurisdictions would be able to absorb small increases in the number of applications, others would face increased costs. In especially populous jurisdictions, election officials would have to hire more staff to handle the likely increase in applications and to check for duplicate registrations (although some states with motor/voter report these are less than they had originally anticipated). Counties we contacted report that the number of registrations they handle annually amounts to about 20 percent of the number of registered voters in the county (there are about 130 million registered voters nationwide). Based on information from counties in states that currently have motor/voter, it appears that the workload could increase by 20 percent, because of people registering who otherwise would not have registered, duplicate registrations, and ineligible applications.

Assuming the incremental cost for a county election office of handling an additional application is $1.50, then local jurisdictions, in aggregate, would have to pay an additional $3 million to $10 million annually. Some of these costs would only be incurred during the first few years. Once most counties are on the rolls and the number of unregistered voters decreases, use of the motor/voter system would decrease as voters would only register if they have moved.

Such costs, however, would be somewhat offset by a reduction in the cost of part-time employees hired to handle the increased workload around each registration deadline. Officials in some states with motor/voter, such as Colorado and Michigan, report that receiving forms from the DMV evenly over the year rather than in a last-minute pre-election rush has allowed them to reduce their part-time hires and use their full-time staff more efficiently. Based on information from several localities that hire part-time staff during election years, we expect local officials nationwide could save about $10 million in a presidential election year and about $7 million in non-presidential election years by reducing part-time help. (There would be no savings in non-election years because no part-time help is necessary.)

The total costs that election officials would face would be offset further by the postal rate subsidy authorized by the bill. While the legislation requires election officials to notify applicants of the outcome of their registration application, it also would provide a discount of about 43 percent for notices mailed by third class. Because most states already mail such notices to applicants, the notification requirement would not result in additional costs, but the subsidy

44

would shift about $2 million of postage costs currently incurred by election officials to the federal government.

*Motor/voter, Computer costs.*—Rather than forwarding an application from the DMV to a county registrar, a possible alternative, untested thus far, would be to transmit the voter information electronically. The cost of adding registrants to a jurisdiction's list would be lower if the voter data were transferred to a computer by tape or other device rather than entered by hand. Some states have indicated that they would probably implement the motor/voter requirement by switching their record-keeping from paper to computers, and arranging for electronic transfer of data from the DMV system to the voter registration system. Some state officials have suggested that record-keeping would be improved if the election official used registration data stored in the DMV's computer, but this would cost extra. Although the bill would not mandate states to computerize, in some instances states or counties might decide computerization would be the best action, even though it would require a significant one-time investment in equipment.

CBO has no information on which to base an estimate of how many counties would computerize or how many more states would create a statewide registration system. (Currently, 21 states have one.) Based on data from Election Data Services, it appears that jurisdictions or states that currently use computers to maintain lists for at least 70 percent to 80 percent of the registered voters account for about 80 percent of the registered voters nationwide. Therefore, computerizing the records for the 25 million to 35 million people in jurisdictions that might wish to change their existing computer systems, jurisdictions could potentially purchase new equipment to computerize the remaining one-fourth of the nation's voters.

We have examined the costs of existing registration and election systems and have determined that it costs less than one dollar per voter record for a computer system. Therefore, computerizing the registration lists for the 25 million to 35 million people in jurisdictions currently without computers would probably cost less than $25 million.

*Mail in an agency registration.*—Because most voters (we assume 80 percent to 90 percent) eventually would register through the motor/voter system, mail-in and agency registration would serve as alternate means for those few remaining voters who do not have a driver's license. In those states that currently provide one or both of these methods, the number of registrations received from these sources would decrease over time as voters register instead through the DMV, and would, after the first few years, eventually generate from $5 million to $10 million in annual savings, which would partially offset increased costs of motor/voter. If all states that currently do not have mail-in registration were to implement it, along with the other two methods, it would cost them $1 million to $2 million annually because they would not use mail-in registration as much as states that currently have mail-in registration as much.

Almost all states report that they have some form of agency or satellite registration, which in some instances means a voter has to swear an oath in front of a deputy registrar at one of several county offices. The bill envisions a somewhat expanded type of agency registration in which forms are available at a variety of locations where voters can complete and submit them (or else take

45

them home and mail them in). Again, this would not be a major source of registering voters, and the costs are not expected to be significant in aggregate, although some additional training costs might be necessary to expand the pool of people able to assist voters in completing the forms. Only those states that currently have just a deputy registrar system would have to print extra forms to be available throughout the jurisdiction, but these costs probably would be offset by the reduced amount of work for the registrars and clerks who would not have to register as many voters in persons.

COSTS OF VOTER CONFIRMATION PROVISIONS

Because voters usually do not notify election officials of address changes, the names and addresses of outdated registrants often accumulate on the rolls. Election officials revise registration lists to clean out those who have moved, died, or are otherwise ineligible to vote in that jurisdiction. The bill would prescribe that whatever method a state uses to maintain accurate registration rolls, it should be uniform and nondiscriminatory. Further, the bill would prohibit states from removing registrants from the list simply for not voting.

Overall Law.—Almost all states now employ some procedure for changes, the voters at least once every two years, though practices may vary somewhat from county to county. About one-fifth of the state canvass all voters on the list, but instead target only those who did not vote in the most recent election (using not voting as an indication that an individual might have moved). Of these, only a handful of states simply drop the non-voters from the list without notice. These states could not continue this practice under the bill.

Whether states canvass all those on the list or just the non-voters, most send a notice to assess whether the person has moved. In a majority of states, election officials also provide voters with a way to update or prevent removal from the registration list.

National change of address system.—The bill suggests, but does not require, an approach, election officials can make sure that their list cleaning method is uniform and nondiscriminatory. Instead of using non-voting as an indication that a voter has changed addresses, an election official could contact only those who have actually moved, and at their new addresses. But using the National Change of Address (NCOA) system of the U.S. Postal Service, election officials could directly identify those who have moved and would send those people a forwardable notice with a pre-addressed, postage paid card that outlines the registration options available and allows people to respond to the officials. While an elections jurisdiction would have to pay a vendor licensed by the Postal Service to do a computer match of the registration list and the NCOA list (costing from $2 to $3 per 1,000 addresses matched), these costs probably would be offset by reducing the postage and printing costs that officials currently pay for less-focused canvassing. Several pilot studies of this system in California and Oregon, sometimes called Project MAIL, report that counties would save money by significantly reducing the number of notices sent out.

46

Postal rate subsidy.—Whether election officials decide to use this NCOA approach or choose their current or other method for list cleaning (as long as it is uniform, nondiscriminatory, and does not drop the nonvoting), their postal costs associated with this process would decrease if the legislation is enacted. The bill authorizes a postal rate subsidy for mailings associated with the list cleaning requirement, thereby shifting costs from the states to the federal government. The ultimate amount of this shift would depend on the number of notices mailed. We have no data on the amount of mail election officials currently send out to update their lists. However, if most state adopt the NCOA approach, the number of changes of address, about 40 million annually, would represent the maximum possible number of matches between the registration rolls and the NCOA list. With an average third class mailing subsidy of about 7.3 cents per piece of mail at current rates, the cost of this subsidy is unlikely to exceed $3 million annually. In fact, it is likely to be less—probably in the vicinity of $2 million—because not everyone on the NCOA list will be on a registration list, some changes of address are temporary only, and officials will update their lists through other methods such as motor voter. When voters move within a state and get a new driver's license, they also have a method of updating their voting registration, thereby reducing the number of people that officials will have to contact to determine whether they are recorded on the rolls accurately.

8. Estimate comparison: None.

9. Previous CBO estimate: On February 1, 1993, CBO prepared an estimate for H.R. 2, the National Voter Registration Act of 1993, as ordered reported by the Committee on House Administration on January 27, 1993. That estimate showed direct spending from the Crime Victims Fund because fines mandated by the bill would result in greater deposits into the fund. The estimate for this bill does not include any direct spending because income from fines would go into the general fund of the Treasury. The cost estimates for the two bills are otherwise identical.

10. Estimate prepared by: James Hearn, Mickey Buhl, and John Stell.

11. Estimate approved by: C.G. Nuckols, Assistant Director for Budget Analysis.

REGULATORY IMPACT

Pursuant to paragraph 11(b) of rule XXVI of the Standing Rules of the Senate, the Committee received the following information from the Federal Election Commission as to the regulatory impact of the bill, as reported by the Committee:

FEDERAL ELECTION COMMISSION,
Washington, DC, February 25, 1993.

Hon. WENDELL H. FORD,
Chairman, Committee on Rules and Administration,
U.S. Senate, Washington, DC.

DEAR MR. CHAIRMAN: This letter responds to your inquiry of February 22, 1993, regarding the probable impact of regulatory and reporting responsibilities assigned to the Federal Election Commis-

47

sion (FEC) under the terms of the National Voter Registration Act of 1993, as reported out of Committee.

At this time, we anticipate that the regulations will be limited to specifying the contents of the national mail voter registration form and the data to be collected and reported by State and local election authorities, pursuant to the reporting requirements set out in Section 9.

In response to the individual items you specified:

1. An estimate of the numbers and classes of individuals and groups who would be regulated.—The Commission anticipates that its regulations and reporting requirements would, like other provisions of the bill itself, have a direct impact on approximately 8,000 State and local election officials throughout the nation who are responsible for conducting voter registration for federal elections. Tangentially affected would be the 189,000,000 persons of voting age in the United States who might come in contact with the registration process.

2. The economic impact of the regulations.—We foresee regulations pertaining only to the contents of the mail registration forms and State reporting required by the bill. The latter would have associated costs beyond that inherent in the bill itself. This is addressed under item 4 below.

3. The impact on the personal privacy of the individuals involved.—The Commission's regulations would have no impact on the personal privacy of the election officials themselves. However, certain items that might have to appear on the proposed national mail registration application form could be perceived by some members of the public as an invasion of personal privacy. Three such items are the Social Security number (required by 13 States, optional in 14 States), political party preference (required by the 26 States that conduct closed primaries) and race (required by some States in carrying out the purposes of the Voting Rights Act). These questions could be viewed as especially intrusive in States that do not require this information for voter registration purposes.

4. An estimate of the time, additional paperwork, and financial costs of recordkeeping requirements.—The Commission anticipates that minimum reporting requirements may necessitate the collection of the following data from State and local election authorities:

The number, method, source, and disposition of registration applications received;

The method, frequency, and consequences of confirming the voter registration lists;

The number and reasons for other deletions from the voter registration lists;

The number of persons of voting age and the percentage of those that are registered;

The number and types of the various mailings required under the bill; and

Cost of implementing the legislation, to include producing registration forms and other necessary materials, training, and maintaining records.

Although several jurisdictions, notably the large ones, routinely collect some or all of the data, a universal mandate to do so would

48

unquestionably placed some additional burden or many election offices. This burden would fall unevenly or local jurisdictions dependent on both the size of their populations and the extent of their computerization. We can estimate costs of such a reporting mechanism based on the model devised for the Voting Accessibility for the Elderly and Handicapped Act wherein local jurisdictions report to the State, States to the FEC, and the FEC to the Congress.

Our assumption is that such reporting would require one-half (0.5) a staff month (on average) per local jurisdiction and two staff months per State. At $2,000 salary per person, the approximate 350 staff years would cost about $8,000,000 per year, to be borne by State and local governments. This figure would likely decrease over time with increased computerization. Furthermore, such data would prove useful to the State and local offices as well as to political parties, the Postal Service, and the Department of Justice.

Should you or your staff require any further information regarding these or other related matters, please do not hesitate to contact me.

Sincerely,

Scott E. Thomas, Chairman.

Committee Rollcall Vote

In compliance with paragraph 7 (b) and (c) of rule XXVI of the Standing Rules of the Senate, the record of the rollcall vote in the Committee on Rules and Administration during its consideration of the original bill, to report it favorably, was:

| Yeas—7 | Nays—5 |
|---|---|
| Mr. Pell | Mr. Stevens |
| Mr. Byrd | Mr. Helms |
| Mr. Moynihan | Mr. Warner |
| Mr. Dodd | Mr. McConnell |
| Mrs. Feinstein | Mr. Cochran |
| Mr. Mathews | |
| Mr. Ford | |

Senator Stevens presented the proxy of Senator Hatfield in favor of the bill.

49

MINORITY VIEWS OF SENATORS STEVENS, HELMS, WARNER, DOLE, McCONNELL, AND COCHRAN ON THE NATIONAL VOTER REGISTRATION ACT OF 1993

Since this issue was last debated before the full Senate, two significant developments have occurred: (1) in the 1992 general election, voter turnout increased 5 percent over 1988; and (2) the financial condition of the Federal and State governments has worsened.

The first point clearly indicates that the National Voter Registration Act is not necessary to increase voter turnout. The key to increasing turnout is an electorate that feels they have something at stake and that there is a compelling reason to vote. Those elements were present in 1992.

On the second point, States, the vast majority of whom must balance their budgets, have their backs against the financial wall. The unfunded mandates established by this bill will exacerbate the situation and force many States to resort to offsets in the form of program cuts or tax increases. For them, deficit spending is not an option.

If, as the majority report contends, the costs of this bill are relatively modest, then it should not be difficult for the bill's proponents to provide funding to implement its provisions. Regardless of whose cost estimates are the most accurate, Congress should not impose this bill on the states as the latest in a long line of unfunded Federal mandates.

The National Voter Registration Act of 1903 would require State and local governments to register voters in three ways: (a) by simultaneous applications when applying for motor vehicle drivers' licenses; (b) by applications received through the mail; and (c) by applications through all public assistance, unemployment and vocational rehabilitation offices.

No hearings were held on this bill in the 103d Congress, but the Rules Committee hearings held in 1991 afforded an opportunity for both the proponents and opponents of this legislation to be heard.

The enthusiasm of the bill's supporters for registering people to vote when applying for a driver's license is shared at the state level. In fact, fully 27 States plus the District of Columbia now provide citizens who want to register to vote while visiting a Department of Motor Vehicles office an opportunity to do so. In 1991, legislation was introduced in the statehouses of an additional 17 States to establish some form of motor voter or agency based systems.[1]

While the enthusiasm for such programs at the State level continues to grow, it has not translated into enthusiasm for the strictures of this legislation. This reluctance is partly because States

[1] 100 percent Vote, A Project of Human Serve, Memorandum, May 1, 1991.

are experiencing severe fiscal pressure and simply cannot afford the expensive and unnecessary costs this bill imposes.

State after State has insisted that the costs of motor voter will be substantial and they will have to curtail other programs such as education or child nutrition to come up with the funds needed to meet the unfunded mandates in the bill.

In fact, officials in 13 States with over 36 percent of the Nation's population are so concerned about the financial impact of this proposal they have taken the time to inform the committee of their objections to it. Ten of these States prepared cost estimates of the bill for their jurisdictions.

STATE ESTIMATES OF THE COSTS OF THE PROGRAMS MANDATED BY THE NATIONAL VOTER REGISTRATION ACT

(In millions of dollars)

| | | |
|---|---|---|
| States: | | |
| Alaska | 0.4 | |
| California | 20.0 | |
| (Independent estimate Los Angeles County, CA—4.5) | | |
| Florida | 6.4 | |
| Illinois | 30.4 | |
| (Independent estimate Dupage County, IL—.15) | | |
| Kansas | .5 | |
| New York | | .045 |
| New Jersey | 20.3 | |
| Oklahoma | 1.3 | |
| South Carolina | | 2.0 |
| Virginia | 5.0 | |
| Total | 87.55 | |

Alabama, Minnesota, Missouri and South Dakota also expressed concern over the impact of the requirements contained in motor voter.

Furthermore, the following organizations have criticized the National Voter Registration Act for the unfunded mandates it would impose on state and local governments:

American Association of Motor Vehicle Administrators National Association of Counties.
National Governors Association.
National Association of Secretaries of State.
National Association of Towns and Townships.
National League of Cities.

Imposing these additional costs on state and local governments is particularly hard to justify when one considers that any causal link between the registration programs required by the bill and increased voter turnout is tenuous. The Congressional Research Service studied motor voter programs in states that have adopted them and produced the following findings.

## Page 52

**PERCENTAGE OF THE VOTING AGE POPULATION THAT TURNED OUT FOR RESIDENTIAL ELECTIONS**

(Rate at plus the higher of then two Voter Programs 1977–90 )

| | Before voter program | After voter program |
|---|---|---|

*(state-by-state figures in table are not legibly readable)*

Note that voter turnout dropped, after the adoption of motor voter programs in 7 of these 10 states. Collectively, voter turnout declined in states that adopted motor voter programs by 2.68 percent. For the states that practice the active form of motor voter registration (similar to the requirements of this bill), turnout went down 6.21 percent in Presidential elections. For non-Presidential elections, turnout increased by just over half of one percent.

Given this lackluster effect at the state level, motor voter is a surprising prescription for arresting the decline in voter turnout nationally.

It should also be noted that this bill provide states with a way to escape the expenses and rigors of the bill adoption of election day registration. The Department of Justice has said that election day registration "... would greatly impair the ability of the ... Department and the states to combat voting and election fraud. [and] would totally preclude meaningful verification of voter eligibility, and thus allow easy corruption of the election process by the unscrupulous."

### Mail Registration

Permitting registration on the day of the vote eliminates the ability of election officials to confirm the identity, address and eligibility of a prospective voter. Congress should be reluctant to provide economic incentive to states to adopt a procedure that undermine the very basis of democracy.

For the first time, this bill would subject voter registration systems to the regulatory control of the Federal Elections Commission—an entity many have criticized for being unable to satisfactorily carry out its current federally mandated duties.

The National Voter Registration Act mandates unsupervised registration by mail for all states and forbids precautions states may take to reduce the chance of the unscrupulous taking advantage of the system. The Department of Justice wrote in 1991:

W. Lee Rawls, Assistant Attorney General, U.S. Department of Justice, Letter to the Honorable Wendell H. Ford, Chairman, U.S. Senate Committee on Rules and Administration, April 17, 1991, p. 10-11.

## Page 53

[This proposal] would impose a sweeping requirement to allow mail-in registration while simultaneously limiting significantly the ability of the states to use a variety of techniques to verify the applicant's identity and eligibility. For this reason [the bill's] provision for registration by mail would entail a substantial and perhaps prohibitive risk of enhancing the opportunities for fraudulent registration and voting.

Section 90b(8) of the bill states that a mail registration form "may, not include any requirement or other formal authentication." Alaska requires registration applications received through the mail to be authenticated by the signatures of two adults. Other states require notarization of these applications. All of these precautions would be prohibited under the bill.

Mail registration also prohibits a requirement that registration applications be made in-person. By implication, states would be prohibited from asking prospective voters to supply identification to determine that persons registering or who claim to be voters are who they say they are. Currently, Connecticut requires proof of birth certificate, driver's license, or Social Security card to be shown at the time of registration. New Hampshire officials have the authority to require similar identification from applicants who are naturalized citizens.

In 1982, a New York Grand Jury reviewed widespread vote fraud charges in Kings County from 1968 to 1982. It observed:

The advent of mail-in registration in 1976 made the creation of bogus registration cards even easier and less subject to detection. ... According to testimony, mail-in registration has become the principal means of perpetrating election fraud and has apparently resulted in the abandonment of the pre-1976 election fraud methods.

As a District Attorney in New York, Elizabeth Holtzman wrote the New York Times lamenting "how easy it is to vote illegally" there and called for implementation of the recommendations contained in this Grand Jury Report. Under motor voter New York would be prevented from ending what the Grand Jury said had now become "the principal means of perpetrating election fraud."

The Justice Department pointed out that verification of mail registration applications in states that now have it may be inadequate. Many states rely upon the mailing of non-forwardable letters to mail registration applicants when the application is received by the election office. The assumption is that the Postal Service will return notices if an individual does not actually live at the address. This assumption is false. The Federal Election Commission's Advisory Committee on Election Administration pointed out that such non-forwardable notices are only returned to the sender if the addressee files a change of address with the Postal Service. The Postal Service never inquires whether an addressee actually lives

Ibid., p. 8.

Supreme Court of the State of New York, County of Kings: Criminal Term, "In the Matter of Confidential Investigation N84-11", pp. 11-12.

64

at an address. If no change of address form has been filed with the Post Office, the mail is delivered no matter who lives at an address.

The Department of Justice pointed out that because of this underlying assumption for verifying the authenticity of a mail registration application is false: "... there may in fact be a great deal of fraudulent registration by mail that, simply has gone undetected." Nevertheless, this bill mandates this suspect system of registration for all states while forbidding even modest verification procedure for it.

In an effort to reduce the fraud associated with mail registration, the bill has been changed to permit states to require that new voters who have registered by mail must vote in person the first time they vote. States could ask for identification at that time. However, the effectiveness of this requirement is greatly undermined by an exception in the bill that voids the provision if it conflicts with another law. Most states now have absentee balloting. Laying mail registration on top of absentee balloting would in effect, complete mailbox voting which appears particularly susceptible to fraud.

The State of Illinois requires signatures on voter registration applications to be made in front of a registrar. On election day, the signature on the registration form is compared with the signature of the person seeking to vote under that registration form to guard against "ghost voting."

By implication, this bill would prohibit this verification procedure. The Chairman of the Illinois Board of Elections told the Committee that a mail registration program would prevent verification of the original voter application and "would destroy the signature verification process—a key factor in the prevention of vote fraud."[1]

Even with Chicago's signature verification system, this case was based on the work of FBI handwriting experts who compared the signatures on authenticated voter registration cards with signatures made at the polling booths. Such detection would have been impossible if mail registration, as mandated by this bill, were in place.

This verification system helped a Grand Jury examining voter fraud in the 1982 Chicago election secure sixty-two indictments resulting in at least fifty-six convictions.[2] Much of the evidence in this case was based on the work of FBI handwriting experts who compared the signatures on authenticated voter registration cards with signatures made at the polling booths. Such detection would have been impossible if mail registration, as mandated by this bill, were in place.

With mail registration, the perpetrators could have easily escaped detection by simply sending in bogus registration forms, and on polling day, having the same person sign to cast a fraudulent ballot. The signatures would then have been identical. A U.S. attorney has estimated that up to one hundred thousand fraudulent ballots were cast in each of the Chicago elections of 1982 and 1986.[3] It is difficult to imagine what the extent of the vote fraud problem in that city would be if the signature verification procedures were prohibited by this bill.

[1] Thomas M. Petrone, Chairman, State Board of Elections, State of Illinois Testimony to Special Committee on Rules and Administration May, 1990 p. 2

[2] U.S. District Court, Northern District of Illinois, Eastern Division: "Report of the Special January 1982 Grand Jury", pp. 2-4.

[3] Maria J. Donna, "Massive Fraud Found in Mayoral Primary", Chicago Tribune, March 3, 1988, p. 1, Section 1.

65

In California, mail registration led to fraudulent filings with a phenomenon called "creative writing". This state experienced fake registrations and duplicate registrations because of registration drives in which registrations were filled, often without knowledge of the "applicant," simply to fill a quota. The problem led this state to hire an investigator to guard against this kind of fraud.

Nationwide mail registration, as proposed by this bill, raises the very real specter of adding to America's illegal immigration problems. Illegal aliens have used easy availability of voter registration cards as a means to gain entry into the United States. Voter registration cards have also been used to obtain access to federal and state benefits and even to obtain jobs with the federal government. The Grand Jury sitting in Chicago reported:

Another pool of potential votes for the unscrupulous precinct captain was that of aliens who were illegally registered. Many aliens register to vote so that they can obtain documents identifying them as U.S. citizens; however, the number of aliens who actually voted is undocumented. We have learned that these aliens used their voters' cards to obtain a myriad of benefits, from Social Security to jobs with the Defense Department.[1]

Although this Grand Jury did not document aliens actually voting, a survey* by the Immigration and Naturalization Service of ballots cast in a 1989 U.S. House of Representatives special election in Florida did. In that election, it was confirmed that fully 11 percent of all ballots of foreign born voters sampled were cast by non-citizens. Furthermore, the Immigration and Naturalization Service reported that there is reason to believe that in this federal election, the incidence of illegal alien voting among all ballot examined was as high as 24 percent.[2]

This bill would mandate that voter registration cards be accepted by states through the mail from any location in the U.S. (and even around the world for that matter). Therefore, there is the potential for citizens of one state to use mail registration to gain access to another state's benefits.

Alaska, in addition to witnessed signatures, requires an out-of-state mail registration applicants to provide "identification, or other documentation that supports . . . a claim to Alaska residency."* This precaution would be prohibited under this legislation.

The bill would require all mail registration applications to be processed if postmarked up to thirty days before an election. The Alaska Division of Elections has reviewed absentee mail ballots and found that almost thirty percent of them had illegible postmarks. This would be a problem around the nation and could unintentionally disenfranchise many voters.

* "Report of the Special January 1982 Grand Jury" op. cit., p. 8-9

* Richard Wallace, "INS, Noncitizens Voted in 1989 Election, State Doesn't Require Proof of Citizenship to Register to Vote", Miami Herald, March 5, 1991, p. 1B, Section Local.

** Alaska Administrative Code 2 AAC etc.

56

Election fraud disenfranchises voters. It erodes confidence in our democratic traditions. Unfortunately, it is not a problem confined to the past and, in some areas of the nation, it will continue to be a problem in the future. The mail registration provisions of this bill would strip our states of their ability to deal with these election fraud problems.

## AGENCY BASED REGISTRATION

This bill would require all public assistance, unemployment, and vocational rehabilitation offices to register those who receive benefits from those offices.

The Department's experience demonstrates that public officials sometimes use their power to dispense or withhold benefits in order to pressure citizens into voting a particular way or registering for a particular party. This bill would increase substantially the opportunities for such intimidation and coercion of the public.[?]

The Justice Department was not engaging in mere speculation. The St. Louis Post-Dispatch reported on an investigation into allegations that public assistance employees were routinely registering public assistance applicants, "suggesting" who they should vote for and taking them to the polls.[?]

Such exploitation of vulnerable public assistance recipients is not a new phenomena and continues today. This bill would require public assistance employees across the nation to become actively involved in the administration of elections and we think the results will mean more political manipulation and abuse of public recipients.

The threat of public employee misconduct is not the sole objection to the agency registration provisions of this bill. Even the appearance that a person's public assistance benefits are linked to registering to vote violates the American tradition of voluntary participation in the political system. It should not be required by the federal government.

## CONCLUSION

Although greater voter participation is a goal shared by all Members of the Committee, state experience with motor voter programs demonstrate that such programs do not increase voter turnout. What will increase are the costs to state and local governments and opportunities for election fraud.

The lion's share of any new registration under this bill is expected to be done at Departments of Motor Vehicles. The supporters of the bill assume that both mail registration and agency based registration under this bill will account for only a small portion of the new registrations. The bill as written, therefore, risks significant

[?] Rawls, op. cit., p. 8.
[?] St. Louis Post-Dispatch, "State Investigating Centerville Township", August 28, 1990, p. 4a.

---

57

new opportunities for vote fraud and improprieties by governmental agencies for no significant increase in voter participation. Rather than assisting state efforts to implement innovative voter registration program, this legislation will impose obligations that are impractical, ineffective and an expensive burden for states.

TED STEVENS.
JESSE HELMS.
JOHN WARNER.
BOB DOLE.
MITCH McCONNELL.
THAD COCHRAN.

## ADDITIONAL VIEWS OF SENATOR HATFIELD

The bill we report today is substantially similar to S. 250 of the 102nd Congress, the National Voter Registration Act. I supported this legislation last year after the Committee Chairman and I worked to improve its provisions related to protection of the electoral process from registration fraud.

During consideration of the bill last year, the Chairman and I worked to mandate an address verification system which would be a "reasonable" attempt to clean the voting rolls, as well as provisions to allow states to require that registrants to vote in person the first time.

The goal embodied in this legislation, to improve accessibility to the voting process, deserves our careful consideration at the federal level. The National Voter Registration Act sets a national standard through a national system to provide equal access to the process for all Americans.

My own state's experience with "motor-voter" legislation attests to the merits of a national standard. Oregon enacted its own law in 1991 and from all accounts, its effect on voting habits are quite positive. The number of registered voters in Oregon jumped by 15 percent between the 1990 and 1992 general election. Of all the transactions that have occurred at offices of the Oregon Motor Vehicles Division (DMV) across the state since the "motor-voter" law took effect in October of 1991, 24 percent involved some sort of voter registration activity.

I have remaining concerns about the cost which may be borne by the states in implementing this legislation. The bill now includes a postal rate reduction for state registrars which will be a helpful tool for offsetting the cost to the states of mail registration. My state reports that from the onset of Oregon's law in late 1991 to January 1 of this year, the DMV has spent $86,135 on voter registration activities. The Division's 1991–1993 biennial budget for "motor-voter" services if $122,693. These are not exorbitant expenditures, because my state has actively sought methods to cut costs. For example, county clerks in several Oregon counties save postage by going to the local DMV offices in person to pick up the new registration cards. Clearly, the postal rate reduction will be a supportive addition, but it does not compensate for the total additional costs of "motor-voter" procedures. This rate reduction suggests the value we win in the federal government place on opening access to the electoral process.

I support the National Voter Registration Act and encourage its swift passage by the Senate.

Mark O. Hatfield.

---

In compliance with paragraph 12 of rule XXVI of the Standing rules of the senate, changes in existing law made by the bill, as reported by the Committee on Rules and Administration, are shown as follows (existing law proposed to be omitted is enclosed in [bold brackets], new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

# TITLE 39, UNITED STATES CODE

# POSTAL SERVICE

# PART I—GENERAL

## CHAPTER 1—POSTAL POLICY AND DEFINITIONS

## CHAPTER 24—APPROPRIATIONS AND ANNUAL REPORT

Sec.
2401. Appropriations.
2402. Annual report.

### § 2401. Appropriations

(a) There are appropriated to the Postal Service all revenues received by the Postal Service.

*   *   *   *   *   *   *

(c) There are authorized to be appropriated to the Postal Service each year a sum determined by the Postal Service to be equal to the difference between the revenue the Postal Service would have received if sections 3217, 3403–3406, [and 3626(a)-(h) and (j)-(k) of this title,] *3626(a)-(h), 3626(j)-(k), and 3629 of this title* had not been enacted and the estimated revenues to be received on mail carried under such sections and Acts. In requesting an appropriation under this subsection for a fiscal year, the Postal Service shall—

(i) include an amount to reconcile sums authorized to be appropriated for prior fiscal years on the basis of estimated mail volume with sums which would have been authorized to be appropriated if based on the final audited mail volume; and (ii) calculate the sums requested in respect of mail under former sections 4452(b) and 4452(c) of this title as though all such mail consisted of letter-shaped pieces, as such pieces are defined in the then effective classification and rate schedules.

60

# CHAPTER 36—POSTAL RATES, CLASSES, AND SERVICES

## SUBCHAPTER I—POSTAL RATE COMMISSION

Sec.
3601. Establishment.
3602. Terms of office.
3603. Salary regulations; procedures.
3604. Administration.

## SUBCHAPTER II—PERMANENT RATES AND CLASSES OF MAIL

3621. Authority to fix rates and classes.
3622. Rates and fees.
3623. Mail classification.
3624. Recommended decisions of Commission.
3625. Action of the Governors.
3626. Reduced rates.
3627. Adjusting free and reduced rates.
3628. Appellate review.
3629. Reduced rates for voter registration purposes.

**§ 3627. Adjusting free and reduced rates**

If Congress fails to appropriate an amount authorized under section 2401(c) of this title for any class of mail sent at a free or reduced rate under section 3217, 3403–3406, [or 3626 of this title,] 3626, or 3629 of this title, the rate for that class may be adjusted in accordance with the provisions of this subchapter so that the increased revenue received from the users of such class will equal the amount for that class that the Congress was to appropriate.

**§ 3629. Reduced rates for voter registration purposes**

The Postal Service shall make available to a State or local voting registration official the rate for any class of mail that is available to a qualified nonprofit organization under section 3626 for the purpose of mailing a mailing that the official certifies is required or authorized by the National Voter Registration Act of 1993.

○