UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA



CASE NO. 01-120-CIV-GOLD/SIMONTON

NAACP, by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

      Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State
of Florida, et al.,

      Defendants.

_____/

## DEFENDANT DAVID C. LEAHY'S MOTION FOR
## SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

      This Court does not have jurisdiction to hear the claims asserted against Defendant David C. Leahy ("Supervisor Leahy") in this action. And, even if it did, Plaintiffs could not prevail on any of those claims as a matter of law. Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7.5 of the Local Rules for the Southern District of Florida, Supervisor Leahy moves for summary judgment on all claims asserted against him.

## BACKGROUND

      This purported class action arose from the tumult and emotion of the November 2000 presidential election. Plaintiffs—the NAACP and twenty-two individuals scattered throughout Florida—filed suit in January 2001 asserting that certain public officials in Florida discriminated against African-American voters through the use of punch-card voting machines, voter registration procedures, list maintenance or "purging" of voters from the voter rolls, and varied election-day practices. Plaintiffs directed their accusations at the Florida Secretary of State, the Division of Elections, the Department of Highway Safety and Motor Vehicles, the Department of Children and Families, and a private corporation that worked with the State in identifying ineligible voters. Contradicting their own calls for statewide uniformity, Plaintiffs also named as Defendants the Supervisors of Elections for only seven of Florida's sixty-seven counties. It is undisputed that each Supervisor has authority only within his or her own county. See Leahy's



Statement of Undisputed, Material Facts in Support of Mot. for Summ. J. ("Statement of Facts") ¶ 1.[1]

Not long after Plaintiffs filed suit, the Florida Legislature, responding to widespread demand for election reform, enacted the Florida Election Reform Act of 2001 ("FERA"), 2001 Fla. Laws Ch. 2001-40. FERA revamped Florida's electoral system by, among other things, prohibiting the use of punch-cards, recreating the framework for list maintenance, and mandating further pollworker training. Believing they could do better, Plaintiffs persisted with all of their claims.[2] Indeed, this case has become about what Plaintiffs and their lawyers believe FERA should have been.

Although Plaintiffs have throughout the course of this litigation purposefully merged all of their claims against all Defendants, the actual case against Supervisor Leahy is strikingly thin. Plaintiffs, who assert that they sued the counties from which they received the most complaints, see Statement of Facts ¶ 3, have unearthed only three individuals from Miami-Dade County who allegedly have claims against Supervisor Leahy.

First, Admatha Israel, the only named Plaintiff from Miami-Dade County, was unable to vote on election day because he had not updated his address with the Elections Department and thus did not appear on the register at his precinct. See id. ¶¶ 14-18. A call to the Elections Department to verify his eligibility to vote could not be made because the phone lines were busy. See id. ¶ 20. Second, Donnise DeSouza was unable to vote on election day because her last name, spelled with a space between the "De" and "Souza" on the register, could not be located by a pollworker. See id. ¶¶ 22-25. Third, Dedrana McCray was unable to vote on election day because a pollworker she had known all her life could not locate her name on the register even though it was there. See id. ¶ 26. This is the sum total of what Plaintiffs ascribe to Supervisor Leahy as discriminatory conduct.

Although Plaintiffs have moved for class action certification, the Court has yet to rule on that request. In this memorandum, Supervisor Leahy addresses what he perceives to be the

---

[1] Leahy's Statement of Facts provides further factual detail and citation to all relevant sources in the record, which are compiled in Leahy's Appendix in Support of Motion for Summary Judgment ("App."). The Statement of Facts and Appendix are being filed together with this memorandum.

[2] They finally let go of their punch-card claim, at the Court's prodding, on May 3, 2002. See Tr. of Hr'g at 6-12 (App. Ex. K).

claims asserted against him. Because a class order may radically alter the extent and nature of those claims, he respectfully reserves the right to supplement this memorandum if the need arises.[3]

## **ARGUMENT**

**I.    This Court Lacks Jurisdiction Because No Plaintiff Has Standing To Sue Supervisor Leahy**

As Supervisor Leahy has repeatedly demonstrated, the case against him must be dismissed for lack of jurisdiction because no Plaintiff has suffered a legally cognizable injury that is fairly traceable to Supervisor Leahy's actions. See generally Leahy's Resp. to Pls.' Mem. Addressing Subclasses [D.E. 335] at 2-14; Leahy's Surreply in Opp'n to Pls.' Mot. for Class Action Certification [D.E. 302] at 1-3; Leahy's Resp. to Pls.' Mot. for Class Action Certification [D.E. 290] at 7-12. No Plaintiff, therefore, has standing to sue him.

**II.    This Court Lacks Jurisdiction Because Plaintiffs' Claims Are Moot**

Even if this Court were to find that a Plaintiff has standing to sue Supervisor Leahy, it would still be required to dismiss this action because it is moot in light of FERA.

"The doctrine of mootness derives directly from the case-or-controversy limitation [of Article III of the Constitution] because 'an action that is moot cannot be characterized as an active case or controversy.'" Al Najjar v. Ashcroft, 273 F.3d 1330, 1335 (11th Cir. 2001) (quoting Adler v. Duval County Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997)). "A case is moot when events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief." Jews for Jesus, Inc. v. Hillsborough County Aviation Auth., Inc., 162 F.3d 627, 629 (11th Cir. 1998); see also Al Najjar, 273 F.3d at 1336. When a legislature repeals or significantly amends the practice being challenged in court, it renders the court unable to provide "meaningful relief" by giving the plaintiff all the relief it

---

[3] The Rules require that a determination regarding class be made "[a]s soon as practicable after the commencement of an action." Fed. R. Civ. P. 23(c)(1). There is a sound basis for this Rule, as the claims that may be maintained by a class depend on the class definition and the extent to which the class representatives have standing. Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996) (holding that plaintiff cannot litigate conduct different than conduct causing his injury); Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1340 (11th Cir. 2000) ("A party with standing to advance one claim may lack standing to advance other claims."). Because Plaintiffs have been unable to articulate a class definition that can be certified, Supervisor Leahy still does not know, with trial less than sixty days away, whether any class will be certified against him and, if so, the nature of the claims that class would assert.

could possibly obtain in court.  Jews for Jesus, Inc., 162 F.3d at 629 ("In this case, the airport's change of policy has already given Jews for Jesus the relief they seek . . . and there is therefore no meaningful relief left for the court to give.").  Accordingly, in cases where the challenged policy or statutory scheme is repealed or significantly amended, federal courts dismiss for lack of jurisdiction.  See, e.g., Princeton Univ. v. Schmid, 455 U.S. 100, 103 (1982) (dismissing case because plaintiff was challenging regulations that had been "substantially amended"); Hall v. Beals, 396 U.S. 45, 48 (1969) (ordering dismissal where voters alleged denial of their right to vote in 1968 presidential election because, under statute enacted after that election, "appellants could have voted"); Pugh v. Rainwater, 572 F.2d 1053, 1058 (5th Cir. 1978) ("The record before the Court contains only evidence of practices under criminal procedures which predate the adoption of the current Florida rule. . . . As an attack on the Florida procedures which [no longer exist], the case has lost its character as a present, live controversy and is therefore moot.").

In this case, Plaintiffs challenge Supervisor Leahy's practices as they existed at the time of the November 2000 election.  After the 2000 election the Florida Legislature, following several months of legislative factfinding and deliberation, enacted FERA.  This substantial revision to the Florida Election Code radically altered the way the Supervisors of Elections administer elections in Florida.  Among other changes, FERA permanently ended the practices Plaintiffs challenge in this action, leaving this Court unable to give "meaningful relief" and requiring dismissal.  See Hall, 396 U.S. at 48-50 (directing dismissal of moot case); Al Najjar, 273 F.3d at 1336 ("Indeed, dismissal is required because mootness is jurisdictional.").

Plaintiffs appear to assert two types of claims against Supervisor Leahy.  First, Plaintiffs allege that Supervisor Leahy "wrongfully purged" voters, including those mistakenly believed to be felons, from his official list of registered voters.  See Second Am. Compl. ¶¶ 81-83.  Second, Plaintiffs challenge Supervisor Leahy's election day administration practices as they existed in November 2000, alleging that he failed to maintain adequate communications between polling places and his office, id. ¶¶ 110, 113, and "failed to provide adequate training and supervision to poll workers in regard to the November 7, 2000 election," id. ¶ 120.  Each of these challenges to Supervisor Leahy's pre-FERA practices is moot.

**A.    Plaintiffs' "List Maintenance" Claim Is Moot**

Plaintiffs' "List Maintenance" claim is based on a statute that was repealed by FERA. See Fla. Stat. § 98.0975 (2000). Former section 98.0975 of the Florida Statutes provided, in relevant part:

**98.0975        Central voter file; periodic list maintenance.—**

(1)    By August 15, 1998, the division shall provide to each county supervisor of elections a list containing the name, address, date of birth, race, gender, and any other available information identifying the voter of each person included in the central voter file as a registered voter in the supervisor's county who:

  (a)    Is deceased;

  (b)    Has been convicted of a felony and has not had his or her civil rights restored; or

  (c)    Has been adjudicated mentally incompetent and whose mental capacity with respect to voting has not been restored.

                                                  * * * *

(4)    Upon receiving the list from the division, the supervisor must attempt to verify the information provided. If the supervisor does not determine that the information provided by the division is incorrect, the supervisor must remove from the registration books by the next subsequent election the name of any person who is deceased, convicted of a felony, or adjudicated mentally incapacitated with respect to voting.

Id. Prior to FERA, Supervisor Leahy followed this law to the letter. Upon receiving the State's lists of possible felons, for example, he attempted to verify whether each person listed was in fact a felon. See Statement of Facts ¶ 11. To do so, Supervisor Leahy sent certified mail to each person listed, informing them that they had been identified by the State as alleged felons, and inviting them to submit evidence if they believed the State was mistaken. See id. Those persons who Supervisor Leahy could not determine to be eligible voters were removed from the rolls, as former section 98.0975(4) required. See id.

In this lawsuit, Plaintiffs do not allege that Supervisor Leahy deviated from the strictures of former section 98.0975. Rather, they allege that his procedure for removing felons—which followed the prevailing state law—violated federal law because it required voters to prove their eligibility after it was called into question by the State. Whether former section 98.0975 did or did not violate federal law, however, no longer matters. With the enactment of FERA, former section 98.0975 was repealed and replaced with a new list maintenance provision. See Fla. Stat. § 98.0977 (2001). That section provides, in relevant part:

**98.0977**      **Statewide voter registration database; development and maintenance.—**

\* \* \* \*

(3)      In administering the database, each supervisor of elections shall compare registration information provided by a voter with information held by the Department of Law Enforcement, the Board of Executive Clemency, the Office of Vital Statistics, and other relevant sources.  If the supervisor of elections finds information that suggests that a voter is ineligible to register to vote, the supervisor shall notify the voter by certified United States mail.  The notification shall contain a statement as to the reason for the voter's potential ineligibility to register to vote and shall request information from the voter on forms provided by the supervisor of elections in order to make a final determination on the voter's eligibility.  After reviewing the information requested by the supervisor of elections and provided by the voter, if the supervisor of elections determines that the voter is not eligible to vote under the laws of this state, the supervisor of elections shall notify the voter by certified United States mail that he or she has been found ineligible to register to vote in this state, shall state the reason for the ineligibility, and shall inform the voter that he or she will be removed from the voter registration rolls.

Id.

The differences between former section 98.0975 and current section 98.0977 are striking. Most significantly, under the former statute, voters who appeared on the State's list were presumed to be ineligible, and Supervisors were required to remove them unless the voters could prove otherwise.  See Fla. Stat. § 98.0975(4).  Under the current statute, by contrast, voters are presumed to be eligible unless the Supervisor determines that they are not.  Because of this dramatic change in State law, Supervisors will necessarily be forced to changed their practices. Accordingly, Plaintiffs' objections to Supervisor Leahy's former practices are moot.

Plaintiffs cannot overcome mootness by claiming, without evidence, that some voters were mistakenly removed before the November 2000 election by Supervisor Leahy's practices at that time.  Despite a year and a half of discovery, Plaintiffs still are unable to point to a single person who was wrongfully removed from the rolls in Miami-Dade County.  See infra Part III.A. Although Plaintiffs name specific persons from other counties who they contend were wrongfully removed from the rolls, that is not enough to confer standing on them to sue Supervisor Leahy.  See In re Taxable Mun. Bonds Litig., Civ. A. No. MDL 863, 1993 WL 302619, at \*4 (E.D. La. Aug. 5, 1993) ("It is settled law that a single plaintiff lacks standing to assert class claims against defendants with whom the plaintiff has not dealt, even though

unnamed individuals that the plaintiff seeks to represent may have direct claims against those defendants."). Plaintiffs' list maintenance claim is moot and must be dismissed.

### A. Plaintiffs' "Election Day Administration" Claims Are Moot

Plaintiffs present two "Election Day Administration" claims against Supervisor Leahy. First, they allege that Supervisor Leahy failed to maintain adequate communications between polling places and his office, making it more difficult to confirm voters' eligibility on election day. See Second Am. Compl. ¶¶ 110, 113. Second, Plaintiffs maintain that Supervisor Leahy did not properly train his pollworkers leading up to the 2000 election, causing them to make mistakes that resulted in voters being turned away without being permitted to vote. Id. ¶ 120. Each of these claims is moot in light of FERA.

### 1. Plaintiffs' Claim Regarding Supervisor Leahy's Communication System on Election Day Is Moot

Plaintiffs' claim that Supervisor Leahy failed to maintain adequate communications between polling places and his office is moot in light of FERA's mandated use of provisional ballots, which allow voters to cast their ballots even when their eligibility cannot be confirmed on election day. A perfect example of how provisional ballots moot this claim is the experience of Plaintiff Admatha Israel. Mr. Israel claims that he went to his proper precinct but was not allowed to vote "because his name was not on the rolls." See Second Am. Compl. ¶ 118. He claims further that a pollworker told him that she could not call Supervisor Leahy's office to confirm Mr. Israel's eligibility to vote because the phone lines were busy. See id.

Under FERA, a voter like Mr. Israel, whose name does not appear on the register at his proper precinct, will be permitted to cast a provisional ballot. If the canvassing board later determines that the voter was in fact eligible to vote, the provisional ballot will be counted. See Fla. Stat. § 101.048 (2001).[4] The use of provisional ballots makes it impossible for voters to suffer the same injury claimed by Mr. Israel.[5] Mr. Israel's moot claim must therefore be dismissed. See Hall, 396 U.S. at 48.

---

[4] Other provisions of FERA ensure that voters know they may cast provisional ballots when their eligibility is in question. See Fla. Stat. § 101.031(2) (2001) (requiring Supervisors to post signs at every precinct informing voters that if their registration "is in question," they may "cast a provisional ballot"); id. § 102.014(5)(j) (2001) (requiring Supervisors to train their pollworkers on "[t]he handling and processing of provisional ballots").

[5] Even without provisional ballots, Mr. Israel's claim would be moot in light of Supervisor Leahy's planned use of laptop computers at every polling place during the Fall 2002 elections.

## 2.    Plaintiffs' Pollworker Training Claims Are Moot

Without specificity, Plaintiffs allege that, prior to the 2000 election, Supervisor Leahy failed to train adequately his pollworkers, causing them to make mistakes that led to voters being turned away without being allowed to vote.  See Second Am. Compl. ¶ 120.  At the time of the 2000 election, Supervisors were not required to provide any specific training to their pollworkers.  As a result of FERA, Supervisors must change their pollworker training practices.

FERA now requires Supervisors to provide training to clerks and inspectors leading up to each election.  See Fla. Stat. § 102.014(4) (2001).  Additionally, FERA mandates that all Supervisors use a "uniform polling place procedures manual" provided by the Secretary of State. See id. § 102.014(5) (2001).  By statute, that manual must cover the following topics:

  (a)  Regulations governing solicitation by individuals and groups
    at the polling place;
  (b)  Procedures to be followed with respect to voters whose names
    are not on the precinct register;
  (c)  Proper operation of the voting system;
  (d)  Ballot handling procedures;
  (e)  Procedures governing spoiled ballots;
  (f)  Procedures to be followed after the polls close;
  (g)  Rights of voters at the polls;
  (h)  Procedures for handling emergency situations;
  (i)  Procedures for dealing with irate voters;
  (j)  The handling and processing of provisional ballots; and
  (k)  Security procedures.

Id.  The Secretary of State has already developed the manual that will be used for the 2002 elections.  See Statement of Facts ¶ 29.

The topics covered in the manual are even broader than those FERA requires Supervisors to teach their pollworkers.  The manual covers how to determine whether a voter is eligible; what to do if a voter's name is not on the precinct register; what to do if a voter has changed his or her name, address, or signature; how to handle a voter with no identification; how to handle provisional ballots; how to handle voters who need assistance; what to do if the precinct register indicates a voter has received an absentee ballot but the voter wants to vote at the polling place; what to do if a voter is taking a long time to vote; what to do if a voter leaves the booth without

---

These computers will allow pollworkers to confirm a voter's registration status even when his or her name does not appear on the precinct register.  See generally Leahy's Resp. to Pls.' Mot. for Class Certification [D.E. 290] at 9-10.

casting a ballot; how to deal with irate voters; and how to deal with voters with special needs, such as those who are visually impaired, mobility impaired, or hard of hearing.  Id.

The topics that will be covered in Supervisor Leahy's pollworker training sessions will cover all of the problems that allegedly occurred in November 2000.  Because FERA has already provided Plaintiffs all the relief to which they would be entitled should they prevail, this Court is unable to provide "meaningful relief," and must dismiss this claim as moot.  See Hall, 396 U.S. at 48; Jews for Jesus, Inc., 162 F.3d at 629.

### III.   Even If the Court Has Jurisdiction, Supervisor Leahy Is Entitled to Summary Judgment on All of Plaintiffs' Claims

As noted above, Plaintiffs appear to assert two categories of claims against Supervisor Leahy: claims related to (1) list maintenance and (2) election day administration.  See Second Am. Compl. ¶¶ 76-93, 106-23.[6]  Plaintiffs cannot prevail on these claims as a matter of law.

#### A.   Supervisor Leahy Is Entitled to Summary Judgment on Plaintiffs' Claim Relating to List Maintenance

Plaintiffs allege that Supervisor Leahy, along with a number of other Defendants, improperly removed, or "purged," voters from the voter rolls and failed to maintain properly voter registration information.  See Second Am. Compl. ¶¶ 76-93.  Yet they do not support this allegation against Supervisor Leahy with any evidence.  Not one piece of evidence in the record demonstrates that any voter in Miami-Dade County was removed improperly from the voter rolls.

In fact, the evidence is decidedly to the contrary.  Abundant record evidence illuminates the steps that Supervisor Leahy took to verify the lists of possible and probable felons and duplicates that he received from the Division of Elections.  See Statement of Facts ¶¶ 10-11.

For example, for those the State identified as duplicates (meaning that they had subsequently registered in another county), Supervisor Leahy's staff compared each name listed against the information contained in Miami-Dade County Elections Department records.  See id. ¶ 10.  Only if the information matched was the voter placed in "registered to vote elsewhere"

---

[6]  Plaintiffs do not assert any claims related to voter registration against Supervisor Leahy.  See id. ¶¶ 94-105.  Significantly, in their Second Amended Complaint, Plaintiffs fail to mention Supervisor Leahy among the Defendants they charge with having failed to process properly voter registration applications.  See id. (listing State Defendants and Defendant counties except Miami-Dade).  Because no claim in this category is alleged against him, Supervisor Leahy is entitled to summary judgment on any claim related to voter registration.

status and removed from the registration rolls.  See id.  As an additional cautionary step, any voter placed in this status who attempted to vote on election day was permitted to vote, and reinstated as an active voter, if the voter stated that he or she had not registered to vote in another county.  See id.

For individuals listed as felons, Supervisor Leahy employed the administrative hearing process set forth in section 98.075 of the Florida Statues.  See id. ¶ 11.  Accordingly, all individuals on the felon list were sent notice by certified mail, advising them that they had been identified by the State as felons who had not had their rights restored and informing them of their right to appear at an administrative hearing if they wished to contest their designation.  See id.  Publication notice also was given for those who did not pick up the certified mail sent to them.  See id.  Any individual who appealed their felon status and was cleared by FDLE remained as a registered voter and was notified by mail.  See id.  Those who appealed and were confirmed by FDLE to be felons who had not had their rights restored, and those who did not respond to the two notices provided to them, were removed from the registration rolls as required by former section 98.0975(4).  See id.

These efforts more than satisfied State law, which required that Supervisors "attempt to verify" the information on the lists provided to them by the Division of Elections.  Fla. Stat. § 98.0975(4) (2000).  Again, Plaintiffs have not identified even one voter who was improperly "purged" from the voter rolls in Miami-Dade County.  Because the record is devoid of any evidence that would support a claim against Supervisor Leahy relating to list maintenance, he is entitled to summary judgment on this claim.[7]

### B.   Supervisor Leahy Is Entitled to Summary Judgment on Plaintiffs' Claims Relating to Election Day Administration

Plaintiffs' claims relating to election day administration appear to fall into two groups. Plaintiffs allege that Supervisor Leahy failed to maintain adequate communication systems

---

[7]   Plaintiffs have gone to great lengths in their attempts to find even a single person who Supervisor Leahy "purged."  Four days before discovery closed, Plaintiffs identified Sharon Frazier as a putative member of their Vote Denial Class.  As it turns out, Ms. Frazier was convicted on a felony charge of public assistance fraud in August 2000.  Supervisor Leahy was notified of the felony conviction in September 2000 and removed Ms. Frazier from the registration books that same month.  When her conviction was vacated the following year because she complied with the terms of her probation, Supervisor Leahy promptly restored her to the rolls.  See Statement of Facts ¶ 27.  Once they learned of these facts, Plaintiffs abandoned their reliance on Ms. Frazier.

between polling places and the Elections Department on election day, see Second Am. Compl. ¶¶ 109-119; and that he failed to train properly his pollworkers, see id. ¶¶ 120-123.

Even if Plaintiffs could get past their jurisdictional problems, see supra Parts I-II, they would still be unable to establish that any of their perceived election day administration deficiencies violated applicable law.  Each of Plaintiffs' legal theories is addressed below.

### 1.      The Voting Rights Act of 1965

Plaintiffs' Second Claim for Relief is predicated on section 2 of the Voting Rights Act of 1965.[8]  Supervisor Leahy is entitled to summary judgment on this claim because, first, the conduct challenged by Plaintiffs does not constitute a "standard, practice, or procedure," and so cannot form the basis for a claim under section 2.  Second, even if Supervisor Leahy's election day conduct were covered by section 2, it did not result in discrimination on account of race.  Summary judgment must therefore be granted.

### a.      The Voting Rights Act Does Not Apply Because Plaintiffs Do Not Challenge a "Standard, Practice, or Procedure"

"Vote denial" under section 2 occurs when officials employ a "standard, practice, or procedure" that results in the denial of the right to vote on account of race.  42 U.S.C. § 1973(a).  "The Voting Rights Act does not define standard, practice or procedure."  United States v. Jones, 57 F.3d 1020, 1024 n.7 (11th Cir. 1995).  The Eleventh Circuit, however, has held that for conduct to be covered by the "standard, practice, or procedure" language of section 2, it must be the result of a "deliberate act" by the defendant.  Id. at 1023.

In Jones, it was undisputed that fifty-two out-of-district white voters were improperly permitted to cast ballots in an election for county commissioner between a white candidate and a black candidate.  Id. at 1022 & n.2.  The white candidate won by ten votes, and the Government brought suit against county elections officials under the Voting Rights Act, alleging that the officials' unintentional misallocation of the fifty-two white voters violated section 2.  Id. at 1022.

The district court rejected the Government's section 2 claim, holding that "unwitting mistakes are [not] covered" by the terms "standard," "practice," or "procedure" as they are used in section 2.  United States v. Jones, 846 F. Supp. 955, 964 (S.D. Ala. 1994).  Specifically, the court held that "[t]he normal definition of all those terms implies some willful act on the part of

---

[8]   Plaintiffs do not direct their First Claim for Relief at Supervisor Leahy.  See Second Am. Compl. ¶¶ 125-26.

election officials, albeit no willfully <u>discriminatory</u> act." <u>Id.</u>  To read the statute otherwise, the court realized, would expand its reach to virtually <u>every</u> mistake in <u>every</u> election:

> Given that mistakes no doubt occur in every close election held in this nation, the government's interpretation of the Voting Rights Act would offer relief through that statute to every aggrieved minority candidate in each of these instances, despite the existence of state procedures specifically designed to handle such garden-variety election disputes.  In the absence of specific language from either Congress or another court, this reading of the Voting Rights Act is highly questionable.

<u>Id.</u> at 965.

On appeal, the Eleventh Circuit affirmed the district court's decision.  <u>Jones</u>, 57 F.3d at 1023-24.  The court agreed "with the district court's conclusion that the misallocations were 'run-of-the-mill mistakes' and 'are no more than the type of errors one would expect in the normal course of any election.'"  <u>Id.</u> at 1023 (quoting <u>Jones</u>, 846 F. Supp. at 959).  Because the "misallocation of voters was not the result of any deliberate act by defendants," <u>id.</u>, the court held that "the challenged errors did not constitute a Section 2 standard, practice, or procedure." <u>Id.</u> at 1024.  The Eleventh Circuit reached this conclusion "[e]ven in light of the Supreme Court's mandate that we construe the Voting Rights Act broadly and consistent with its purpose and historical experience." <u>Jones</u>, 57 F.3d at 1024.

Like the Eleventh Circuit in <u>Jones</u>, other courts have similarly held that a "standard, practice, or procedure" must be more than a "run-of-the-mill mistake" that one would expect in the normal course of an election.  <u>See, e.g.</u>, <u>Coleman v. Bd. of Ed.</u>, 990 F. Supp. 221, 227 (S.D.N.Y. 1997); <u>Welch v. McKenzie</u>, 592 F. Supp. 1549, 1558 (S.D. Miss. 1984), <u>aff'd</u>, 765 F.2d 1311 (5th Cir. 1985).  In <u>Coleman</u>, for example, the plaintiffs alleged that "harassing" behavior towards minorities by pollworkers violated section 2.  The court rejected this claim: "At most, this evidence reflects the unacceptable and regrettable behavior of particular individuals at a polling place.  It does not rise to the level of a 'practice or procedure' implemented by the School Board." <u>Id.</u> at 231.  The court also rejected the plaintiffs' claim "that the School Board's practices result[ed] in longer lines and greater confusion at southside polling sites, resulting in the loss of minority votes." <u>Id.</u> at 232.  "As an initial matter," the court noted, "long lines, delays and confusion—in and of themselves—do not constitute any 'practice or procedure' of the School Board.  Indeed, they may reflect nothing more than the ineffectiveness or inefficiency of individual election workers." <u>Id.</u>

The lawsuit in <u>Welch</u> stemmed from an election in which a white candidate defeated a black candidate by nineteen votes. <u>Welch</u>, 592 F. Supp. at 1550-51. The plaintiffs, including several African-American voters, alleged that pollworkers, because they "had not been adequately trained," used improper absentee ballot procedures that resulted in at least fifty-eight invalid ballots being cast for the white candidate. <u>Id.</u> at 1557-58. The plaintiffs claimed that these errors violated section 2 because they "resulted in discrimination against Blacks." <u>Id.</u> at 1551. The court rejected the plaintiffs' pollworker training claim, holding that "[w]hile irregularities were apparent . . . these were isolated and singular incidences of misconduct and improper administration." <u>Id.</u> at 1558. The court concluded that the defendants' "isolated actions . . . are simply not the type of 'standard, practice, or procedure' which was contemplated as the evil at which the Voting Rights Act was aimed." <u>Id.</u>

As these cases make clear, Plaintiffs' election day administration claims, which amount to nothing more than pollworker errors and "run-of-the-mill" mishaps, are not covered by section 2's reference to standards, practices, or procedures. Plaintiffs' allegations relate to many different, and oftentimes isolated, instances of voters being unable to vote on election day. Plaintiff Admatha Israel, for example, was unable to vote because he had not updated his address with the Elections Department and the phones were too busy to confirm his eligibility to vote. <u>See</u> Statement of Facts ¶¶ 14-21. Putative class member Donnise DeSouza was not allowed to vote because a pollworker looked up her name under the precinct register as "De Souza" (with a space), rather than "DeSouza" (with no space). <u>See</u> <u>id.</u> ¶¶ 22-25. Another voter, Dedrana McCray could not vote because a pollworker whom she knew could not locate her name on the precinct register. <u>See</u> <u>id.</u> ¶ 26. These are the <u>only</u> instances of alleged vote denial in Miami-Dade County identified by Plaintiffs in this lawsuit.

These random and unrelated events are fundamentally distinct from the traditionally challenged "practices"—like literacy tests and poll taxes—that precluded entire classes of persons from exercising the franchise. The varied mistakes of the 2000 election do not, even in combination, make out a section 2 claim. Although they may evidence "the ineffectiveness or inefficiency of individual election workers," <u>Coleman</u>, 990 F. Supp. at 232, or "the unacceptable and regrettable behavior of particular individuals at a polling place," <u>id.</u> at 231, they are not the ingredients of a section 2 claim. As the Eleventh Circuit has already opined, "Section 2 of the

Voting Rights Act does not provide a forum for garden-variety election disputes such as this." Jones, 57 F.3d at 1025. Summary judgment for Supervisor Leahy is therefore mandated.

> **b.    The Voting Rights Act Does Not Apply Because the Conduct Plaintiffs Challenge Did Not Result in the Denial of the Right to Vote on Account of Race**

Even if Supervisor Leahy's election day conduct were a "standard, practice, or procedure" under section 2, summary judgment should still be granted, as Supervisor Leahy's conduct did not result in discrimination on account of race. As stated above, "vote denial" under section 2(a) occurs only when election officials employ a "standard, practice, or procedure" that results in the denial of the right to vote on account of race. 42 U.S.C. § 1973(a). Section 2(b) describes when such a "result" takes place: "if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b); see also Smith v. Salt River Project Agric. Improvement & Power Dist., 109 F.3d 586, 594 (9th Cir. 1997) ("Section 2(b) guides the courts in applying the 'results test'").

Section 2 was directed at practices—like the poll tax, literacy tests, grandfather clauses, and good character provisos—that, although race-neutral on their face, effectively "resulted" in the denial of African-Americans' right to vote. It "was designed as a means of eradicating voting practices that 'minimize or cancel out the voting strength and political effectiveness of minority groups.'" Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 479 (1997) (quoting S. Rep. No. 97-417, at 28 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 205). In construing section 2, therefore, courts have held that although plaintiffs are not required to show discriminatory intent, they must still show a causal connection between the challenged practice and the denial of a group's right to vote on account of race. See Smith, 109 F.3d at 595 (holding that § 2 plaintiffs must show causal connection between challenged voting practice and prohibited discriminatory result); Ortiz v. City of Phila., 28 F.3d 306, 310 (3rd Cir. 1994) (recognizing that courts "have required Section 2 plaintiffs to demonstrate a causal connection between asserted indicia of discrimination and the challenged electoral procedure at issue").

To determine "whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their

choice,' . . . a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" Thornburg v. Gingles, 478 U.S. 30, 44 (1986) (quoting S. Rep. No. 97-417, at 27 (1982)). In Gingles, the Supreme Court, borrowing from a Senate Report that accompanied the 1982 amendments to the Voting Rights Act, identified "objective factors" (the "Senate factors") that courts should consider in assessing the "impact of the contested . . . practice":

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Gingles, 478 U.S. at 44-45; see also Burton v. City of Belle Glade, 178 F.3d 1175, 1196-98 & n.20 (11th Cir. 1999) (applying Senate factors to assess impact of alleged § 2 vote denial). Although there is no requirement that any particular number of factors be proved, Gingles, 478 U.S. at 45, the Eleventh Circuit has relied heavily on these factors in its "vote denial" jurisprudence.

In Burton, the appellants alleged that "the City's failure to annex the Okeechobee Center violated section 2 of the Voting Rights Act of 1965." Id. at 1196. Despite the appellants' showing that the challenged practice had a disparate impact on African-Americans, the Eleventh Circuit held that because there was no evidence tending to establish the Senate factors, "Appellants failed to meet their burden of proving vote denial under section 2 of the Voting Rights Act." Id. at 1198; see also Smith, 109 F.3d at 595-96 (rejecting § 2 challenge to "landowner-only voting" because Senate factors were not established); Ortiz, 28 F.3d at 315 (rejecting § 2 claim based on district court's finding that "Philadelphia's minority population has not had difficulty electing minority representatives").[9]

Here, the Court should enter summary judgment for Supervisor Leahy because Plaintiffs have failed to show that any of Supervisor Leahy's practices had a disparate impact on African-Americans. But even if Plaintiffs could show that Supervisor Leahy's practices had a disparate impact, the Court still should enter summary judgment in his favor because Plaintiffs have failed to produce any evidence that those practices resulted in African-Americans having less opportunity "to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b); see also Ortiz, 28 F.3d at 310 & n.4 (holding that where "Section 2 plaintiff seeks to abolish or invalidate a particular election practice . . . and pinpoints the particular practice in its complaint, the plaintiff necessarily must demonstrate and establish by evidence that the particular practice causes the alleged discrimination").

Like the appellants in Burton, Plaintiffs have failed to raise a genuine issue of material fact with respect to a section 2 violation because there is no evidence tending to establish any of the Senate factors in Miami-Dade County. Most significantly, Plaintiffs have not offered any evidence of a "history of official discrimination in [Miami-Dade County] that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the

---

[9] Other courts have similarly recognized that "a bare statistical showing of disproportionate impact on a racial minority does not satisfy the § 2 'results' inquiry." Smith, 109 F.3d at 595; see also, e.g., Salas v. Southwest Tex. Junior Coll. Dist., 964 F.2d 1542, 1556 (5th Cir. 1992) (rejecting § 2 challenge to at-large voting system based exclusively on statistical difference between Hispanic and white voter turnout); Irby v. Va. State Bd. of Elections, 889 F.2d 1352, 1358-59 (4th Cir. 1989) (upholding Virginia's appointment-based school board system against § 2 challenge despite statistical disparity between percentage of blacks in population and percentage of blacks on school board); Wesley v. Collins, 791 F.2d 1255, 1261 (6th Cir. 1986) ("It is well settled . . . that a showing of disproportionate racial impact alone does not establish a per se violation of the Voting Rights Act.").

democratic process." Gingles, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417, at 28 (1982)); Burton, 178 F.3d at 1198 (affirming summary judgment for city because plaintiffs failed to show "history of official discrimination"). Plaintiffs' voting rights expert, Dr. Henry Flores, testified to what he believed was a history of discrimination in the State of Florida but candidly admitted that he knew of no official discrimination against African-Americans in Miami-Dade County. Flores Dep. at 22-23 (App. Ex. L).[10] This fact is of critical importance, as the Eleventh Circuit has recognized that "the section 2 inquiry 'is particularly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" Solomon v. Liberty County Comm'rs, 221 F.3d 1218, 1226 (11th Cir. 2000) (en banc) (quoting Gingles, 478 U.S. at 79) (emphasis added).

Similarly, Appellants have provided no evidence that Supervisor Leahy used "voting practices or procedures that tend to enhance the opportunity for discrimination against [African-Americans]," no evidence that African-Americans in Miami-Dade County "bear the effects of past discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the political process," and no evidence of any significant lack of responsiveness on the part of elected officials "to the particularized needs of [African-Americans]." Gingles, 478 U.S. at 45.

Indeed, to the extent there is any record evidence relating to the Senate factors, it indicates that, at least in Miami-Dade County, African-Americans have an equal opportunity "to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). For example, although African-Americans make up only 19.7% of the registered voters in Miami-Dade County, they comprise:

- 30.8% of the Miami-Dade County Board of County Commissioners;

---

[10] Indeed, Dr. Flores could not justify his conclusion that there is a history of discrimination in the State of Florida generally. When pressed to give the basis for his conclusion, all Dr. Flores could say was that he was "relating to a broad history of discrimination of African-Americans in the South generally, and Florida being a part of that South, I'm including that as part of the history." Flores Dep. at 22 (App. Ex. L). The only specific instance of discrimination that Dr. Flores could give was the Rosewood massacre, which occurred in 1923 in Levy County in North Florida. Id. at 20-21. That incident, alone—even if it somehow could be attributed to officials in Miami-Dade County—is not enough to defeat summary judgment because it was not "voting-related discrimination." Gingles, 478 U.S. at 44; see also Burton, 178 F.3d at 1198 ("Although Appellants have presented evidence of housing segregation in Belle Glade and in the two centers, we can find no evidence of any discrimination with respect to voting.").

- 22.2% of the School Board of Miami-Dade County;

- 20.0% of the Miami City Commission;

- 60.0% of the Miami-Dade County Fire Board;

- 25.0% (including one Haitian-American) of the State Representatives whose districts fall, in whole or in part, in Miami-Dade County;

- 28.5% of the State Senators whose districts fall, in whole or in part, in Miami-Dade County; and

- 33.3% of the Members of Congress whose districts fall, in whole or in part, in Miami-Dade County.

Statement of Facts ¶ 30.

Additionally, the Mayors of Opa Locka, Homestead, Florida City, and El Portal are all African-American, and, in the City of North Miami, the fourth largest city in Miami-Dade County, the Mayor is Haitian-American. Finally, in the Fall 2000 elections, Miami-Dade County Commissioner Dennis C. Moss, an African-American, was re-elected from District 9, where the registered voters were majority White and Hispanic. Id. ¶¶ 31-32.

As these facts make plain, African-Americans "have been elected to public office" in Miami-Dade County to a significant extent, a fact that completely undermines Plaintiffs' claim that Supervisor Leahy's practices deny African-Americans the right to vote. Gingles, 478 U.S. at 45; Ortiz, 28 F.3d at 315 (rejecting "vote denial" claim in part because "the Philadelphia City Council consistently has had a strong minority presence, including seven of the seventeen council seats at the time the district court issued its opinion"); Coleman, 990 F. Supp. at 233 (rejecting § 2 claim in part because "African-Americans in Mount Vernon have been elected to numerous positions of political significance").[11]  Whatever can be said of Supervisor Leahy's election administration "practices," they certainly do not "minimize or cancel out the voting strength and political effectiveness of" African-Americans in Miami-Dade County. See Bossier Parish Sch. Bd., 520 U.S. at 479 (internal quotations omitted).

Simply put, this is not a section 2 case. Nothing in the record indicates that Supervisor Leahy's "practices" had a disparate impact on African-Americans. And, more significantly,

---

[11] This factor should be accorded the greatest weight of all, as the Voting Rights Act itself, as opposed to the Senate Report accompanying the 1982 amendments to it, counsels courts to consider "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision." 42 U.S.C. § 1973(b).

nothing indicates that the challenged "practices" resulted in African-Americans having less opportunity to participate in the electoral process or to elect candidates of their choice. This Court must enter summary judgment for Supervisor Leahy on Plaintiffs' section 2 claim.

## 2.       Constitutional Claims

Plaintiffs' Third Claim for Relief alleges, very generally, a violation of their Fourteenth Amendment rights, which Plaintiffs seek to vindicate via 42 U.S.C. § 1983. Although this Claim for Relief, like all others, lacks specificity, Plaintiffs seem to articulate a violation of their fundamental right to vote. Plaintiffs face two hurdles in their quest to state a constitutional claim, and they can overcome neither. First, Plaintiffs do not challenge a law, regulation, or practice that allegedly burdens the right to vote. Such a challenged law, regulation, or practice is at the core of cases dealing with the right to vote. See, e.g., Burdick v. Takushi, 504 U.S. 428, 430 (1992) (examining Hawaii's ban on write-in voting); Anderson v. Celebrezze, 460 U.S. 780, 782 (1983) (examining Ohio's early filing deadline for candidates); Harper v. Va. State Bd. of Elections, 383 U.S. 663, 664 (1963) (examining poll tax); Green Party v. Weiner, No. 00-Civ-6639, 2002 WL 221590, at *1 (S.D.N.Y. Feb. 11, 2002) (examining practice of conducting Green Party primaries on paper ballots); see also supra Part III.B.1(a) (discussing Plaintiffs' failure to point to "standard, practice, or procedure" that could be challenged under Voting Rights Act).

Here, by contrast, Plaintiffs challenge neither a law, regulation, nor a practice. Rather, they challenge the adequacy of Supervisor Leahy's communication system between polling places and the Elections Department on November 7, 2000, and the adequacy of his pollworker training. These are simply not proper objects of constitutional scrutiny.

Second, even if they were, they would easily pass constitutional muster. Federal courts have long held that the right to vote is a fundamental interest protected by the Constitution. See Reynolds v. Sims, 377 U.S. 533, 554-55 (1964). Courts also have recognized, however, that states have the power to regulate the manner in which the right to vote will be exercised. In fact, the Constitution expressly authorizes the states to regulate the "Times, Places and Manner of holding elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. Because virtually every regulation of the electoral process imposes some burden on the right to vote, federal courts have applied differing levels of scrutiny depending on the nature of the challenged practice. The Supreme Court's analysis in Burdick provides the proper framework. In that case,

the Court considered whether Hawaii's prohibition on write-in voting "unreasonably infring[ed]" the right to vote. Burdick, 504 U.S. at 430. The Court began its legal analysis by reaffirming that the States have significant regulatory power over their own elections. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." Id. at 433.[12]

The Burdick Court then explained the equally common-sense proposition that every law regulating an election, including those relating to the voting process itself, will impose some sort of burden on voters. Id. Therefore, a court facing a challenge to an election law must "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" Id. at 434 (quoting Anderson, 460 U.S. at 789).

A district court must therefore first determine the extent to which the challenged practice or rule burdens an individual's right to vote. See Green Party, 2002 WL 221590, at *8 ("Challenges to state electoral regulations based directly on First Amendment and Fourteenth Amendment associational rights and the right to vote are analyzed under a balancing test that modulates the degree of scrutiny to the severity of the burden imposed."). If the burden is not significant, the State's regulatory interests will generally prevail. Burdick, 504 U.S. at 434; see also Rosario v. Rockefeller, 410 U.S. 752 (1973) (upholding time limitation for registering to vote in primaries); Donatelli v. Mitchell, 2 F.3d 508, 513-14 (3d Cir. 1993) (following Burdick and applying rational basis review to reapportionment plan); Green Party, 2002 WL 221590, at *8 (noting that lesser restrictions regulating "the mechanics of the electoral process" are subject to less exacting review) (citation omitted). In Burdick, the Court found that, because Hawaii's election code provided adequate ballot access, the State's ban on write-in voting imposed "only a limited burden on voters' rights to make free choices." Burdick, 504 U.S. at 438-39.[13]

---

[12] The Eleventh Circuit has both traditionally and recently echoed the importance of applying a deferential standard of review in cases challenging local regulation of an election: "Our Circuit's precedent addressing constitutional challenges to state election processes has reflected comparable deference to state regulation of elections." Siegel v. Lepore, 234 F.3d 1163, 1181 (11th Cir. 2000) (Anderson, C.J., concurring).

[13] Although Burdick could be described as a ballot access case, the Court "minimized the extent to which voting rights cases are distinguishable from ballot access cases." Id. at 438.

Proceeding to the second step of the analysis, the Court further found that the State's interest in preventing "unrestrained factionalism at the general election" and guarding against "party raiding" were more than sufficient to outweigh the limited burden imposed on Hawaii's voters. See id. at 439-40.

Here, Supervisor Leahy's communication system and pollworker training, at most, regulate "the mechanics of the electoral process" and are therefore due considerable deference. Green Party, 2002 WL 221590, at *8. To the extent they can be said to burden the right to vote at all, they satisfy the Constitution because they resulted from rational administrative decisionmaking. Based on his extensive experience of over twenty years administering elections and allocating limited government resources, Supervisor Leahy believed that the 100 phone lines available on election day to receive calls solely from precincts would be sufficient. Similarly, he believed that the training he provided to his pollworkers was adequate to prepare them for their election day duties. See Statement of Facts ¶ 13. Plaintiffs do not state a constitutional claim merely by arguing that, in hindsight, things might have been done differently. The U.S. Constitution is not a vehicle for second-guessing every aspect of local government regulation of elections.[14]

### 3.    The Civil Rights Acts of 1957 & 1960 and Fla. Stat. § 104.0515

In typical fashion, Plaintiffs' Fourth Claim for Relief alleges indeterminate and unspecified violations of 42 U.S.C. § 1971(a)(2)(A) & (B): "All Defendants, by their actions as described in this Complaint, have, acting under color of law, applied different standards, practices or procedures in determining whether some voters were qualified to vote than were applied to other voters within the same county who have been found by State officials to be qualified to vote and denied individuals the right to vote because of immaterial errors and omissions in registration and ballot applications." Second Am. Compl. ¶ 133.

This claim fails for two reasons. First, there is no private right of action under section 1971. See McKay v. Thompson, 226 F.3d 752, 756 (6th Cir. 2000), cert. denied, 532 U.S. 906 (2001); Spivey v. Ohio, 999 F. Supp. 987, 996 (N.D. Ohio 1996); Willing v. Lake Orion Cmty.

---

[14]    To the extent that Plaintiffs assert an independent equal protection claim, that claim also would fail. "It is axiomatic that the Equal Protection clause prohibits only 'invidious' discrimination, and does not call into question 'every minor difference in the application of laws to different groups.'" Green Party, 2002 WL 221590, at *8 (citation omitted). Absent affirmative evidence of an intent to discriminate, there can be no equal protection violation.

Schs. Bd. of Trs., 924 F. Supp. 815, 820 (E.D. Mich. 1996); McKay v. Altobello, No. 96-3458, 1996 WL 635987, at *1-*2 (E.D. La. Oct. 31, 1996).  By expressly providing for enforcement by the Attorney General, 42 U.S.C § 1971(c), Congress indicated its intent that the statute not provide an implied right of action.  See Thompson v. Thompson, 484 U.S. 174, 179 (1988) ("In determining whether to infer a private cause of action from a federal statute, our focal point is Congress' intent in enacting the statute.").

Second, even if section 1971 were enforceable in this action by Plaintiffs, they have failed to produce any evidence that would support such a claim. Section 1971(a)(2)(A) prohibits, "in determining whether any individual is qualified under State law or laws to vote," that voters be subjected to "any standard, practice, or procedure different from the standards, practices, or procedures applied . . . to other individuals within the same county." Plaintiffs have produced absolutely no evidence that different standards, practices, or procedures are used in Miami-Dade County to determine whether an individual is qualified to vote.  The identical standards, practices, and procedures are applied to all voters.  Moreover, binding precedent establishes that a violation of section 1971 does not occur merely because one voter's eligibility to vote is determined more quickly than another's, if the same ultimate standard and overall procedures are applied to all voters. See Ballas v. Symm, 494 F.2d 1167, 1171-72 (5th Cir. 1974) (holding that requiring some voters to fill out questionnaire to establish residency did not violate § 1971).

Plaintiffs have similarly failed to come forward with any evidence of a violation of section 1971(a)(2)(B), which prohibits denying a voter the right to vote "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  Again, the record is devoid of any evidence that Supervisor Leahy denied anyone the right to vote because of an immaterial "error or omission" on a voter's registration application.  Moreover, courts considering such claims have rejected them if the challenged practice furthers valid public concerns. See Hoyle v. Priest, 265 F.3d 699, 704-05 (8th Cir. 2001) (holding that requiring petition signers to be qualified electors did not violate section 1971); Howlette v. City of Richmond, 485 F. Supp. 17, 22 (E.D. Va.) (holding that requiring signatures be notarized on petitions for bond referendums did not violate section 1971), aff'd, 580 F.2d 704 (4th Cir. 1978).  Supervisor Leahy is entitled to summary judgment on Plaintiffs' Fourth Claim for Relief.

Plaintiffs' Fifth Claim for Relief alleges a violation of section 104.0515 of the Florida Statutes. That section is patterned on, and contains language virtually identical to, the Civil Rights Acts of 1957 and 1960, as codified in 42 U.S.C. § 1971(a)(2)(A)-(B). Accordingly, for the same reasons expressed above, Supervisor Leahy is entitled to summary judgment on Plaintiffs' Fifth Claim for Relief.

### 4.    The National Voter Registration Act

Plaintiffs' Sixth Claim for relief alleges violations of the National Voter Registration Act (the "NVRA"), 42 U.S.C. § 1973gg to 1973gg-10. Lumping all of their claims against all Defendants together again, Plaintiffs generally allege:

> All Defendants, by their actions described in this Complaint, including failure to properly and timely process voter registration applications and changes of address, failure to timely notify applicants of the disposition of their applications, failure to carry out voter deletions and transfers to inactive status in an appropriate manner, and failure to permit voters who have moved with the same political subdivision to vote even if they have not updated their registration to indicate their new address, have acted in a manner that violates the [NVRA].

Second Am. Compl. ¶ 137.

The NVRA, however, directs only <u>States</u> to take certain actions to ensure that voter registration activities comply with federal law. <u>See, e.g.</u>, 42 U.S.C. § 1973gg-6 ("In the administration of voter registration for elections for Federal office, each <u>State</u> shall . . . .") (emphasis added). And the term "State" is defined only as "a State of the United States and the District of Columbia." 42 U.S.C. § 1973gg-1(4). The NVRA does not impose any obligations on individual counties. <u>Compare id.</u> (defining "State" to include only States and D.C.) <u>with</u> 42 U.S.C. § 1973(a) (Voting Rights Act) (proscribing any "standard, practice or procedure" by any "State <u>or political subdivision</u> that results in" denial of right to vote on account of race) (emphasis added). Plaintiffs' NVRA claims, therefore, are not properly directed at Supervisor Leahy, who is not an officer of the State of Florida.

Even if Supervisor Leahy could be sued under the NVRA, Plaintiffs cannot create an issue of fact regarding his alleged noncompliance with the NVRA. As a preliminary matter, Plaintiffs do not specify which provision of the NVRA Supervisor Leahy is alleged to have violated. Nevertheless, the case of the only named Plaintiff from Miami-Dade County, Mr. Israel, establishes that Supervisor Leahy fully complied with the NVRA. Mr. Israel had been placed in inactive status in September 1999 because he failed to respond to an address

confirmation notice sent to him from the Elections Department.  See Statement of Facts ¶ 17. Like all inactive voters, however, Mr. Israel had the ability to vote simply by going to his proper polling place on election day.  See id.  Mr. Israel's difficulty on November 7, 2000 arose because he had never updated his address with the Elections Department.[15]  See id. 14-21.  He was therefore listed on the precinct register that corresponded to his old address.  See id. ¶ 18.  When he went to the precinct that corresponded to his current address on election day, he was not listed on the register for that precinct.  See id.  As a result, a call to the Elections Department was necessary to confirm his eligibility to vote.[16]  See id. ¶ 19.  Because the phone lines were busy, that call could not be made.  See id. ¶ 20.  Mr. Israel's experience does not demonstrate any violation of the NVRA.  Supervisor Leahy is entitled to summary judgment on Plaintiffs' Sixth Claim for Relief.

## CONCLUSION

Supervisor Leahy respectfully requests that the Court enter summary judgment in his favor on all claims asserted against him in this action.

<div style="margin-left:40%">

Respectfully submitted,

ROBERT A. GINSBURG
Miami-Dade County Attorney
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida  33128
Telephone:     (305) 375-5151
Facsimile:     (305) 375-5611
Email: ehrlich@miamidade.gov
      storres@miamidade.gov

By: _Jeffrey P. Ehrlich_

Jeffrey P. Ehrlich
Susan Torres
Assistant County Attorneys
Fla. Bar Nos. 51561 & 133590

</div>

---

[15]  Interestingly, the Elections Department had already once saved Mr. Israel from his own lack of diligence.  In May 1997, the Elections Department received notice from the U.S. Postal Service that Mr. Israel had moved.  See id. ¶ 15.  The Elections Department thus updated his information accordingly.  See id.  When Mr. Israel moved again, however, he did not forward his mail with the Post Office and did not contact the Elections Department.  See id. ¶ 16.  That time, therefore, there was no way for the Elections Department to know that he had moved.

[16]  A call would not have been necessary had Mr. Israel taken his voter registration card, which evidenced that he was a registered voter, to his polling place.  See id. ¶ 19.  Mr. Israel did not have his registration card with him on election day.  See id. ¶ 20.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. mail on this 1st day of July, 2002 on the parties on the attached Service List.

Assistant County Attorney

## SERVICE LIST

Thomasina H. Williams, Esq.
Law Offices Williams & Assoc., P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, Florida 33130
**Attorneys for Plaintiff**

H. Ray Allen, II, Esquire
Senior Assistant County Attorney
P.O. Box 1110
Tampa, Florida 33601
**Attorneys for Iorio, Hillsborough County**

Michael D. Cirullo, Jr.
JOSIAS, GOEN, CHEROF,
 DOODY AND EZROL, P.A.
3099 E. Commercial Blvd., No. 200
Ft. Lauderdale, FL 33308
**Attorney for Defendant, William Cowles**
**Supervisor of Elections for Orange County**

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
725 Twelfth Street, NW
Washington, D.C. 2005-5901
**Attorneys for ChoicePoint, Inc.**

John W. Little, III, Esquire
Steel Hector & Davis, LLP
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
**Attorneys for Hon. Katherine Harris,**
**Secretary of State and Clay Roberts,**
**Director of Florida Division of Elections**

Dan Eckert, Esquire
Frank Gummey, Esquire
County Attorney's Office
123 W. Indiana Avenue
DeLand, FL 32720-4613
**Attorneys for Lowe, Volusia County**

Tracy I. Arpen, Esquire
Office of General Counsel
117 W. Duval Street, Suite 480
Jacksonville, FL 32202-3700
**Attorneys for Stafford, Duval County**

Mitchell Bloomberg, Esquire
Adorno & Zeder, P.A.
2601 South Bayshore Drive, Suite 1600
Miami, Florida 33133-5413
**Attorneys for ChoicePoint, Inc.**

Anita Hodgkiss, Esq.
Lori Outzs Borgen, Esq.
Cara J. Fineman, Esq.
**Lawyers' Committee for Civil**
**Rights Under Law**
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005

Dennis Hayes, Esq.
Angela Ciccolo, Esq.
**NAACP Legal Department**
4805 Mt. Hope Drive, Fifth Floor
Baltimore, MD 21215-3297

Elliot Mincberg, Esq.
Larry Ottinger, Esq.
Alma C. Henderson, Esq.
**People for the American Way Foundation**
2000 M Street, Suite 400
Washington, D.C. 20036

26

David V. Kornreich, Esq.
Muller Mintz, P.A.
Suite 1525, Citrus Center
255 South Orange Avenue
Orlando, Florida 32801-3415

Norman Chachkin, Esq.
Ted Shaw, Esq.
Jacqueline A. Berrien, Esq.
Janai Nelson, Esq.
**NAACP Legal Defense &**
    **Educational Fund, Inc.**
99 Hudson Street, Suite 1600
New York, NY 10013

Penda D. Hair, Esq.
Judith A. Browne, Esq.
Monique L. Dixon, Esq.
**The Advancement Project**
1730 M Street, N.W., Ste. 401
Washington, D.C. 20036

Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
200 South Biscayne Blvd.
Miami, FL 33131-2398
**Attorneys for Hon. Katherine Harris,**
**Secretary of State and Clay Roberts,**
**Director of Florida Division of Elections**

Todd A. Cox, Esq.
**NAACP Legal Defense &**
    **Educational Fund, Inc**.
1444 Eye Street, N.W., 10th Floor
Washington, D.C. 20005

Steven Shapiro, Esq.
**ACLU Foundation**
125 Broad Street, 18th Floor
New York, NY 10004

George L. Waas, Esq
Douglas B. Mac Innes
Office of the Attorney General
Department of Legal Affairs
PL-01 The Capital
Tallahassee, FL 32399-1050
Attorneys for Fred Dickinson
**Executive Director**
**Florida Dept. of Highway Safety and**
**Motor Vehicles and**
**Kathleen Kearney, Secretary of the**
**Florida Department of Children &**
**Families**

27