UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

Case No. 01-CIV-120-GOLD

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
by its FLORIDA STATE CONFERENCE OF
BRANCHES, et al.,

       Plaintiffs,

vs.

KATHERINE HARRIS,
Secretary of State of Florida, et al.,

       Defendants.

_____/

## SECRETARY OF STATE KATHERINE HARRIS AND DIRECTOR OF THE DIVISION OF ELECTIONS L. CLAYTON ROBERTS' MOTION FOR SUMMARY JUDGMENT WITH MEMORANDUM OF LAW

As previously argued and set forth herein, the Court lacks jurisdiction over the claims against the Florida Secretary of State, Katherine Harris (the "Secretary" or "Harris") and the Director of the Division of Elections, L. Clayton Roberts (the "Director" or "Roberts"). Assuming jurisdiction, however, the plaintiffs could not prevail on their claims as a matter of law. Harris and Roberts hereby move for summary judgment on all counts pursuant to Local Rule 7.5 and Federal Rule of Civil Procedure 56.

**I.**
## INTRODUCTION

In the aftermath of the November 2000 election controversy, the organizational plaintiff NAACP and several named plaintiffs, initiated this action asserting that an array of alleged practices and procedures discriminated against Black Florida voters. After this case was filed, and during a jointly agreed stay that was entered by the Court, the Florida Legislature passed the Florida Election Reform Act of 2001, 2001 Fla. Laws ch. 2001-40, ("FERA"), bringing about the most comprehensive election reform in Florida history. See Statement of Facts ("Facts") at ___.

This historic, and even innovative legislation, has substantially modified election administration in Florida, ranging from the revision of long-established election laws related to voter registration, pollworker training, and nonpartisan voter education, to new laws that permit voting by provisional ballot, and that de-certify the use of punch-card and central-count voting systems. Id. Undoubtedly, the impact of FERA, coupled with the voluntary acts of certain named county elections officials in Duval, Volusia, Orange, Hillsborough and Miami-Dade, has transformed the landscape upon which Florida elections are being conducted, and as such, should have narrowed if not eliminated the issues under dispute in this lawsuit.

Rather than acknowledging that Florida's election reforms have dramatically changed Florida's voting laws, procedures and practices, the plaintiffs persist in pressing forward with claims seeking relief that has been mooted by post-November 2000 election reform, goes beyond what these defendants or this Court can award, seeks judicial legislation and in some instances, actually seeks more relief than what the plaintiffs sought before FERA.

The plaintiffs pursue their claims on behalf of a putative class or subclasses of Black Florida voters who allegedly were registered to vote or who took proper steps to register to vote, but were unable to vote in the November 7, 2000 election due to the actions, policies, practices or procedures of the defendants.  They articulate and pursue three broadly defined categories of claims based on the defendants' alleged errors in:  (1) voter-list maintenance; (2) voter-registration processing; and (3) election-day administration.

They allege six "claims for relief," titled:  (1) Fourteenth Amendment Equal Protection and Due Process Clause ("Equal Protection"); (2) Section 2 of the Voting Rights Act of 1965 ("Section 2"); (3) 42 U.S.C. §1983; (4) Civil Rights Acts of 1957 and 1960 ("Civil Rights"); (5) Fla. Stat. §104.0515 ("Fla. Civil Rights"); and (6) National Voter Registration Act ("NVRA").  They seek a four-page list of demanded redress in their "Prayer for Relief" that is either addressed by FERA, not required by law, or contrary to the law.

As demonstrated herein, the plaintiffs have not established that the Court has jurisdiction over the claims against Harris and Roberts.  Further, Harris and Roberts are entitled to summary judgment as a matter of law because "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact." Fed. R. Civ. P. 56 (c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[1]  Specifically, the plaintiffs:

(i)     pursue claims that have been mooted by FERA, the rules promulgated thereunder, and the voluntary actions of the named defendants;

(ii)    pursue claims that are not yet ripe given that there has been no showing of harm under the new law;

(iii)   lack standing to sue because they cannot show an injury fairly traceable to Harris and Roberts and the alleged injuries could not be redressed with a favorable decision against Harris and Roberts;

(iv)    have no evidence of any violation of the National Voter Registration Act as to Harris and Roberts;

(v)     do not have a claim under the Fourteenth and Fifteenth Amendments or 42 U.S.C. §1983 because there is no evidence of intentional voting rights discrimination or invidiousness;

(vi)    assert claims under 42 U.S.C. §1971, and §104.051, Florida Statutes that have no private right of action; and

(vii)   otherwise fail to provide any evidence of a violation of federal or state voting rights laws.

---

[1]     The burden of demonstrating the absence of a genuine issue of material fact is on the moving parties who begin their task by informing the Court of the basis of their motion. Gonzalez v. Lee Housing Authority, 161 F.3d 1290, 1294 (11th Cir. 1998); Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1414 (10th Cir. 1993); see also Celotex, 477 U.S. at 323. Their burden is limited to making the required showing only as to those issues raised by the pleadings. Celotex, 477 U.S. at 323 (1986).

If Harris and Roberts successfully meet their initial burden, the burden shifts to the plaintiffs, who must then demonstrate the existence of a material fact. See id. Evidentiary matters offered by the plaintiffs must be both relevant and competent as to the issues raised in this case. Muck v. United States, 3 F.3d 1378, 1380 (10th Cir. 1993); Thrasher v. B&B Chem. Co., 2 F.3d 995, 998 (10th Cir. 1993). If the nonmoving parties cannot sustain their burden by establishing those material elements essential to their claims, then Rule 56 directs the entry of summary judgment.

Steel Hector & Davis LLP

**II.**
**THE PLAINTIFFS' CLAIMS ARE MOOT**

**A.      Subsequent Legislation May Moot Prior Causes of Action**

The case or controversy requirement of Article III requires that a case be viable at all stages of the litigation.  See Florida Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehabilitative Servs., 225 F.3d 1208, 1216-17 (11th Cir. 2000); Jordahl v. Democratic Party, 122 F.3d 192, 198 (4th Cir. 1997).  Because "the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction," the Court must determine whether a case is moot before proceeding to the merits.  McClendon v. City of Albuquerque, 100 F.3d 863, 867 (10th Cir. 1996) (citing Beattie v. United States, 949 F.2d 1092, 1093 (10th Cir. 1991)).

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."[2]  City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citation omitted)).  The crucial question is whether "granting a present determination of the issues offered . . . will have some effect in the real world."  Kennecott Utah Copper Corp. v. Becker, 186 F.3d 1261, 1266 (10th Cir. 1999) (quotations and citations omitted).  "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) (quotations and citations omitted).  A legally cognizable interest in the outcome will be extinguished if "events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief," the claim is moot.  Al Najjar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001).

In general, legislative enactments can deprive a court of the ability to provide meaningful relief in a case, and thereby render the underlying claims moot.  Jordahl, 122 F.3d at 197-99 (challenge based on the statutes in effect at the time of plaintiffs' alleged injury would be moot

---

[2]      The relationship between mootness and standing is discussed in greater detail in Harris and Roberts', ChoicePoint's and Leahy's responses to the Plaintiffs' Motion for Class Certification.

because those statutes no longer exist in the same form); <u>Rindley v. Gallagher</u>, 890 F. Supp.

1540, 1553 (S.D. Fla. 1995) (claim rendered moot by revision in statute).[3]  This happened here.

### B.    The Florida Election Reform Act Has Mooted the Plaintiffs' Claims for Relief

The enactment of the Florida Elections Reform Act ("FERA") has substantially modified

an array of election laws that are the subject of this case. Facts at ¶¶ 9, (Tabs 1,2).  FERA, thus,

makes it "absolutely clear that the allegedly wrongful behavior," here, the threat of being harmed

by certain practices and procedures that have been repealed or substantially modified by FERA,

"could not reasonably be expected to recur."  <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,</u>

<u>Inc.</u>, 528 U.S. 167, 170 (2000) (quoting <u>United States v. Concentrated Phosphate Exp. Ass'n,</u>

393 U.S. 199, 203 (1968)).  The plaintiffs recently acknowledged that FERA's impact has at

least, in part, mooted their claims when at a May 3, 2002 oral argument, they agreed that they

could no longer pursue the punch-card voting systems claim.  Tab 16 at 10-12 (5/3/02 Oral

Arg.).[4]  Yet, with regard to the other claims, they continue to press forward.

A paragraph-by-paragraph and section-by-section comparison of the plaintiffs' claims

with the provisions of FERA reveal that Florida's legislature has already addressed the plaintiffs'

concerns and thereby mooted their claims.  <u>See</u> Tab 1 (chart comparing Plaintiffs' "Prayer for

Relief" with FERA).  Indeed, a declaratory judgment regarding wholly different or substantially

modified voting devices, practices, and procedures is "a textbook example of advising what the

law would be upon a hypothetical state of facts."  <u>Nat'l Adver. Co. v. City & County of Denver,</u>

912 F.2d 405, 412 (10th Cir. 1990) (quotations and citations omitted).  The parties have no

legally cognizable interest in the validity of an obsolete voting device or election practice.  The

challenges to the manner in which voter-lists are maintained, felons are removed, and elections

are administered, therefore, are moot.  <u>See</u> FERA.  Accordingly, the plaintiffs' claims must be

dismissed.

---

[3]      <u>Cf. Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta</u>, 219 F.3d
1301, 1310 (11th Cir. 2000) ("[A] superseding statute or regulation moots a case only to the
extent that it removes challenged features of the prior law") (quotations and citation omitted);
<u>Rosenstiel v. Rodriguez</u>, 101 F.3d 1544, 1548 (8th Cir. 1996).
[4]      Citations herein to "Tab" refer to tab numbers included in Harris and Roberts' Appendix
filed herewith in support of this motion for summary judgment.

## III.
## THE PLAINTIFFS' CLAIMS ARE NOT YET RIPE

Although, with the exception of the punch-card voting systems claims, the plaintiffs deny that FERA moots their claims, they do admit that their concerns related to voters' change of address, the removal of voters from the rolls, unequal access to voter lists, insufficient staffing and equipping of polling precincts, and inadequate communications to supervisors offices, have at least been addressed by FERA. 2nd Am. Comp. ¶¶ 93, 119. FERA's attention to these concerns, continued in its new removal notification, provisional balloting and the central voter database provisions, will materially effect those claims. 2nd Am. Comp. ¶¶ 93, 119.

The plaintiffs nevertheless argue that it is "not clear how the new provisions of the law will operate and to what extent the Act will address the concerns raised." 2nd Am. Comp. ¶¶ 93, 119. The plaintiffs' admissions in their pleading regarding their uncertainty as it relates to future, contingent, uncertain events that will take place under the new law, demonstrate precisely why such claims are not "ripe" for this Court's consideration.

The plaintiffs cannot claim to suffer actual or threatened injury from election laws not yet applied. Claims contingent upon future events are not ripe because they are too abstract and nebulous to form the object of a federal court inquiry. See Jordahl, 122 F.3d at 197 ("a challenge based on the current [amended] statutes is premature because they have not yet been applied").

It is well-settled that speculation is not enough for standing purposes. See Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 44 ("unadorned speculation will not suffice to invoke the federal judicial power"). As the Supreme Court explained, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (internal quotations omitted). Indeed, to conclude that the plaintiffs' claims are ripe for adjudication would require the speculative assumption that FERA will not be applied, or that it will be applied in an illegal or discriminatory fashion. The reason federal courts do not enmesh themselves in the quagmire of speculative, uncertain and nebulous claims is highlighted in the context of a request for declaratory and injunctive relief, where, as here, plaintiffs are limited to asking the court to award forward-looking, prospective relief. Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 244 (1952). Where such declaratory and forward-seeking relief relate only to newly prescribed

election practices, methods, and procedures not yet implemented, such claims are not ripe for adjudication, and too speculative to justify standing [5]

## IV.
## PLAINTIFFS LACK INJURY-IN-FACT STANDING AS TO HARRIS AND ROBERTS

The plaintiffs not only lack standing because of mootness and ripeness, they also fail to satisfy the second and third prongs of the Lujan v. Defenders of Wildlife standing analysis as to Harris and Roberts.[6] See 504 U.S. 555, 560-61 (1992). That is, the plaintiffs have failed to demonstrate that they have suffered a real injury that is attributable to the actions of Harris and Roberts, and that this Court is able to supply an adequate remedy, or to correct the alleged wrong. See Lujan, 504 U.S. at 560-61; Church v. City of Huntsville, 30 F.3d 1332, 1335 (11th Cir. 1994). See also Loggerhead Turtle v. County Council of Volusia County, Fla., 148 F.3d 1231, 1247 (11th Cir. 1998) ("Essentially, 'this requirement focuses on whether the line of causation between the illegal conduct and injury is too attenuated.'") (citations omitted). In Lujan, the Supreme Court explained that a party seeking to invoke a federal court's jurisdiction must show the following: (1) that they have suffered an injury in fact, that is (a) concrete and particularized, and (b) actual or imminent and not conjectural or hypothetical; (2) that the asserted injury is fairly traceable to the actions of the defendant; and (3) that the injury will likely be redressed by a favorable decision. Id.

Plaintiffs do not meet the second "injury-in-fact" prong under Lujan, to establish standing. See 504 U.S. at 560-61. First, Harris and Roberts do not conduct list-maintenance

---

[5]     Texas, 523 U.S. at 301-02 (dismissing action seeking declaratory judgment that preclearance provisions of Section 5 of the Voting Rights Act did not apply to amendments to Texas Education Code where implementation of those provisions was contingent on several factors); O'Shea v. Littleton, 414 U.S. 488, 496-97 (1974) (dismissing challenge to pattern or practice of allegedly discriminatory conduct where prospect of future injury was contingent). presents a controversy ripe for judicial action.

[6]     Whether asserting the rights of others or on behalf of a class or subclass under Rule 23, plaintiffs must demonstrate that they meet Article III's case or controversy requirement. See General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982) (class representatives must possess same interests and suffer same injuries as other class members). Even if the plaintiffs could articulate a certifiable class or subclass, they still must produce a named plaintiff that has standing to pursue the claim on behalf of that class or subclass. Lewis v. Casey, 518 U.S. 343, 357 (1996); Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir. 1987).

activities, register voters or conduct elections under Florida election law.[7]  Second, many named plaintiffs themselves do not suffer from a real threat of future injury at all.  List-maintenance and election-day administration complainants, Urusula Harvey of Volusia County and Admatha Israel of Miami-Dade, illustrate this point.  Although no relief by this Court can turn back the clock so that these complainants can vote in the November 2000 election, FERA's new provisional ballot provisions now permit them to cast their votes under the same factual circumstances.[8]  Compare (Harvey Dep. at 11-25); Tab 28,  (Israel Dep.) at 24-29 with (Leahy Dep).  As such, plaintiffs like Harvey and Israel can show no real threat of future injury, a prerequisite for them to seek an award of prospective injunctive relief.  See Church, 30 F.3d at 1337.

Under Lujan's third prong, "redressiblility," the plaintiffs' alleged injuries could not be redressed with a favorable decision against Harris and Roberts.  See 504 U.S. at 561.  In the Second Amended Complaint, the plaintiffs seek relief against the Secretary and Director in connection with voter registration, list-maintenance, and election-administration activities.  This is not possible for one of the reasons that they similarly cannot show an injury fairly traceable to the actions of the Secretary or Director — Harris and Roberts do not conduct these complained of activities under Florida law.[9]  Those activities are the province of the State's sixty-seven independently elected and selected constitutional officers — the supervisors of election.  Fla. Const. Art. VIII, § 1 (d).  See, also, § 98.015 Fla. Stat. (2001).[10]  Realizing that they failed to join all sixty-seven supervisors, the plaintiffs attempt to secure statewide relief by advancing a theory of an "all-powerful" Secretary and Director, with wide-ranging powers and state-wide responsibilities to micromanage minute details of each election, and (without a specific grant of

---

[7] See, e.g., §§ 98.015 (general authority and duties), 98.045, (voter registration) 98.065 (list maintenance), 98.075, 98.471 (other list maintenance activities), 101.71 (polling place), 102.012(inspectors and clerks), 102, 014 (recruitment and training) Fla. Stat. (2001).

[8]  At the May 3 hearing, plaintiffs' counsel argued that provisional ballots would not solve these types of problems if the voter attempted to vote at someplace other than their own precinct. While plaintiffs may think that a laudible goal, Florida law is expressly to the contrary.  See § 101.045(1) Fla. Stat. (2001) ("No person shall be permitted to vote in any election precinct or district other than the one in which the person has his or her legal residence and in which the person is registered").

[9]  See, e.g., §§ 98.015, 98.045, 98.065, 98.075, 98.471, 101.012, 102, 014 Fla. Stat. (2001).

[10]  See Loggerhead Turtle v. County Council of Volusia County, Florida, 148 F.3d 1231, 150 (11th Cir. 1998) (Plaintffs did not have standing to assert claim against County for failure of individual municipalities to adequately enforce environmental regulations).

Steel Hector & Davis LLP

authority) to issue rules by administrative fiat,[11] to boldly pronounce what election law is or should be and enforce it.[12]

No election official has such unbridled power and authority under Florida statutory framework. Instead, the Florida legislature, like certain other legislatures across the country,[13] opted for a more decentralized system of registering voters, maintaining voter registries and administering elections. Thus, the far-reaching, statewide relief the plaintiffs are seeking from Secretary Harris and Director Roberts simply cannot be provided. The plaintiffs therefore lack standing under the third prong of the Lujan analysis, and judgment should be entered against them. See 504 U.S. at 561.

## V.
### HARRIS AND ROBERTS ARE ENTITLED TO
### SUMMARY JUDGMENT ON PLAINTIFFS' NVRA CLAIM

The record contains no issue of material fact sufficient to support the plaintiffs' claim that the Secretary and Director violated the National Voter Registration Act, 48 U.S.C. § 1977gg et seq., ("NVRA"). The NVRA was properly implemented by the Florida legislature, and has been followed by the Secretary and Director. The plaintiffs may attempt to point to certain events that transpired at the agency or supervisor level, but there is no evidence that the Secretary or Director have violated the Act in any way.[14] This is best demonstrated by the fact that the plaintiffs' own NVRA expert admitted that, after reviewing all of the relevant records, he has no opinion that any such violation occurred.

### A.      Plaintiffs' NVRA Claim

---

[11]      § 120.536(1), Fla. Stat.(2001) ("[A]grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a special law to be implemented is also required."); see § 120.54, Fla. Stat. (2001).

[12]      See also Ass'n of Com. Orgs. for Reform Now (ACORN) v. Edgar, 56 F.3d 791 (7th Cir. 1995) (no duty of Secretary to enforce the act) (see discussion below at Part V).

[13]      See MacManus Depo at __. Elections: A Framework for Evaluating Reform Proposals, GAO-02-90, at 11.

[14]      The Secretary and Director understand that each of the voter-specific problems complained of at the agency or supervisor level were either resolved at the time, resolved by FERA, or the result of statutorily inadequate information provided by the voter. The Secretary and Director defer to the party agencies and supervisors to address those issues.

The plaintiffs' Sixth Claim for Relief states that "[a]ll Defendants," thereby including the Secretary and Director, violated the NVRA for "their actions described in th[e] complaint" including:

> [1] failure to properly and timely process voter registration applications and changes of address, [2] failure to timely notify applicants of the disposition of their applications, [3] failure to carry out voter deletions and transfers to inactive status in an appropriate manner, and [4] failure to permit voters who have moved within the same political subdivision to vote even if they have not updated their registration to indicate their new address, have acted in a manner that violates the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg et seq.

2nd Am. Compl. at ¶ 137.

These specific allegations, 1 through 4, each relate solely to the maintenance of voter rolls, which is exclusively the province of the supervisors of elections pursuant to Florida Statute. § 98.015(c), Fla. Stat. (2001). Thus, none of the enumerated claims in the NVRA count itself even relate to the Secretary or Director.

The only other statements described in the complaint that appear to attempt to relate to the NVRA and the Secretary or Director are set forth at page 8, paragraph 31 ("[The Secretary] is also responsible for . . . coordinating the state's responsibilities under the [NVRA]."); page 22, paragraph 85 ("Upon information and belief, Defendants Harris and Roberts have failed to provide, require, or enforce uniform standards, and have failed to provide adequate time or resources for county supervisors to verify the lists of ineligible voters that the state forwards to the counties so as to ensure that eligible voters are not wrongly purged from the official lists of registered voters."); pages 25-26, paragraphs 95 & 97 ("Upon information and belief, Defendants Harris and Roberts have failed to provide, require, or enforce uniform standards and procedures for the timely, accurate and proper processing of voter registration applications, the registration of voters, and updating of voter registrations, including changes of address."); and page 33, paragraph 120 ("Defendants and Harris failed to establish uniform training and election day procedures in regard to the November 7, 2000 election.").

**B.      The NVRA Does Not Impose the Duties Upon the Director
          and Secretary that the Plaintiffs Suggest**

-10-

The NVRA was signed into law in 1993 and applies to all states that do not have election-day voter registration. 42 U.S.C. § 1973gg-2(b). One of the purposes of the NVRA is "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 42 USC 1973gg (b)(1). As Florida's Division of Elections notes on its Web page, the NVRA "enhances voting opportunities for every American [and] helps remove the vestiges of discrimination." See http://election.dos.state.fl.us/nvra/index.shtml. The Act does not, however, create the responsibilities and bestow the power alleged by the plaintiffs.[15]

With regard to duties actually related to the Secretary and Director, most significantly, the NVRA instructs states to "designate a State officer or employee as the chief State election official to be responsible for the coordination of State responsibilities under this chapter." 42 U.S.C. § 1973gg-8.[16] Pursuant to the NVRA, in 1995 the Florida legislature imparted upon Florida's Secretary of State the responsibility to "[c]oordinate the state's responsibilities under

---

[15]   Known as the "Motor-Voter Act," the NVRA provides that states shall establish procedures to register voters for federal elections by application made simultaneously with applications for state driver's licenses. 42 U.S.C. § 1997gg-3. In addition to the "motor-voter" element, the NVRA provides that states shall accept applications by U.S. mail (42 U.S.C. § 1997gg-4, and provides that all state offices providing public assistance, and all offices providing state-funded services to persons with disabilities, are to be designated by the states as voter-registration agencies. Id. 1973gg-5. They are to use certain NVRA-defined procedures and transmittal deadlines in offering the opportunity to register to vote each time there is an application for services, or a renewal or change of address relating to such services. Id. § 1997gg-5.

   The Act further sets forth requirements regarding administration of voter registration and provides for pre-election deadlines for the submission of completed applications and other requirements. Id. § 1997gg-6. This section also details procedures to be followed by those maintaining the rolls for removal of names due to change of address, failure to respond, or failure to appear to vote in two federal elections after notice. Id.

[16]   The NVRA also provides that the chief state elections official shall format and make available the required "mail" application forms. Id. § 1973gg-4; see also id. § 1973gg-7 (Federal Election Commission duties and form requirements). In addition, the Act provides that the states' chief State Election officers shall receive and forward to local registration officials notification of felony convictions (and overturned felony convictions) reported by U.S. attorneys with regard to state residents. Id. § 1973gg-7. Finally, with regard to duties specific to the state chief election officer, the Act contemplates coordination with the Federal Election Commission ("FEC") with regard to reporting necessary for the FEC to create bi-annual reports. See id. The plaintiffs do not complain under these provisions.

the National Voter Registration Act of 1993." § 97.0102(7), Fla. Stat. (2001).[17]  This "coordination" responsibility, however, does not, and cannot, change Florida's constitutional and statutory scheme providing that the voter rolls are to be maintained at the county level.  Fla. Stat. § 98.015 (2001).[18]

C.   **Secretary Harris and Director Roberts Comply with the NVRA**

The record evidence is that the Secretary, through the Division of Elections, complies fully with the Secretary's obligations under the NVRA.  As Mr. Kast, Assistant Director of the Division of Elections testified, "administration of the NVRA" is done "on a continuous basis."[19] Tab 17, at 17:16-21 (Kast Dep.).

In complying with its duty to "coordinate" the State's responsibilities under the NVRA, the Division provides uniform training to all the Supervisors of Elections and voter-registration agencies on their duties under the Act.  Id. at 11:3-8.  As Mr. Kast testified:  "We've been training under NVRA since 1994."  Id. at 24:11.  This includes training to "all" the agencies "identified as responsible" under the NVRA, including "Department of Highway Safety, Children and Families, Elder Affairs, Department of Health, Division of Blind Services under the Department of Education . . . portions of the Department of Labor and Employment Security," as

---

[17]    After enactment of the NVRA in 1993, Florida's legislature implemented the Act in 1995 through revisions to the election code and the enactment of the Florida Voter Registration Act. See, e.g., Fla. Stat. § 97.023 (2001) (procedures on complaints of violations of NVRA); § 97.052(b) (Department of State responsible for printing and distributing uniform statewide voter register application prescribed by NVRA); § 97.021(34) ("'Voter registration agency' means any office that provides public assistance, any office that serves persons with disabilities, any center for independent living, or any public library."); § 97.053(1) (voter registration applications must be accepted by any supervisor, the division, a driver license office, and voter registration agencies or an armed forces recruitment office); § 97.057 (voter registration by the Department of Highway Safety and Motor Vehicles; § 97.058 (voter registration by the voter registration agencies).

[18]    In Florida, Supervisors of Elections are constitutionally mandated officers elected in each county.  Fla. Const. art. VIII § 1(d) ("There shall be elected by the electors of each county . . . a supervisor of elections.").  By statute, each supervisor is the official custodian of the voter rolls and is given "exclusive control" of maters pertaining to voter registration.  Fla. Stat. § 98.015(3) (2001).  Thus, the Supervisors are the election officials who actually maintain, exclusively, the voter rolls and are the election officials to whom the drivers' license and other voter-registration agencies transmit completed voter-registration applications after acceptance.  See 42 U.S.C. § 1973gg-5(d)(1) & (2), gg-6.

[19]    The Division of Elections has a designated "NVRA administrator."  Tab 17 at 20:9-16 The Division's NVRA administrator was formerly Mr. Kast and is now Ms. Donna Miller, whose "primary role" is to "coordinate the State's responsibilities."

Steel Hector & Davis LLP

well as the Supervisors of Elections.  Id. at 23:5-15 & 24:5-7.  The NVRA training is "a uniform training session that covers all the agencies and the Supervisors of Elections' responsibilities under the NVRA." Id. at 24:23-25.  Separate workshops are provided for the Supervisors in areas for which the agencies have no responsibilities.  Id. at 25:4-7.

Thus, although "list maintenance activities are the responsibility of the Supervisor of Elections," Id. at 27:21-25; 40:24-25; see also § 98.015(3), Fla. Stat. (2001), the Division of Elections does coordinate "state responsibilities" under the NVRA by training the Supervisors of Elections on the requirements "as listed in the statute" on maintaining the integrity of the voter roll, including their responsibilities "as far as time frames that list maintenance activities are taking place, their responsibilities as far as notification to the individuals, who can be removed from the rolls, things of that nature."  Tab 17 at 35:3-36:6; see also 42 U.S.C. § 1973gg-6.[20]

Moreover, the Division coordinates with designated agency coordinators regarding their responsibilities under NVRA.  Id. at 27:21-25.  As Mr. Kast testified:

> We explain to them that there's primarily three different places they must offer the voter the opportunity to apply to register to vote, and that's on the person's initial request for services, their renewal of those services or if they come in for change of address of those services.  We also tell them they must provide the same level of assistance to them that they would provide in their normal operation or day-to-day handling of that individual. . . .  We identify to them that Florida statute requires that they forward the applications to the Supervisor of Elections in the county in which their office is located within five days.

Id. at 30:6-14 & 31:12-16.[21]

---

[20]     In providing the training of NVRA responsibilities, the Division uses a PowerPoint program that is consistently used at all training sessions and, since May 2002, has been publicly posted on the Division's website.  See Tab 17 at 62:17-25; see also Tab 15 (PowerPoint training materials); http://election.dos.state.fl.us/nvra/index.shtml.  Indeed, the Website includes an entire section on the NVRA.  See http://election.dos.state.fl.us/nvra/index.shtml.

[21]     The Division's NVRA-specific responsibilities are in addition to the public-education services the Division performs on an ongoing basis including:  providing billboards all across the state that identify a toll-free number to report voter fraud; providing to the public and the Supervisors for public distribution a voter-registration guide that identifies when the elections are going to be held, what offices are up for election, when you have to be registered, information on absentee ballots, names and addresses and phone numbers of all Supervisors of Elections; providing a Web site including voter registration information as well as the ability to apply to register to vote; providing posters to agencies to advise the public the agency is a place where

The Division further coordinates with the Supervisors of Elections to compile data that would be required by the Federal Elections Commission under the NVRA, Id. at 12:22-13:2, and the Division provides that data to the Federal Election Commission "on an every-other-year basis" under the NVRA. Id. at 22:6-22. In addition, the Division acts "as the coordinator on the State's responsibilities of NVRA by . . . provid[ing the agencies] posters to inform their clients or the public that they can register to vote in those agencies." Further, if questions or problems arise, the Division "coordinate[s] that to the agency, or at least forward[s] that over to the agency for their resolution." Id. at 36:25-37:10.[22] It is also uncontroverted that the Division develops and distributes the required uniform statewide registration application forms. Id. at 22:6-22; 36:26-37:10. In sum, "the Division of Elections is in compliance with the NVRA." Id. at 52:12-16; 55:2-12.

### D.   The *Plaintiffs'* NVRA "Expert" Also Finds No NVRA Violation

The plaintiffs designated Gary McIntosh as their putative "NVRA expert" in this litigation.[23] Tab 18, at 25:15-19 (McIntosh Dep.). Mr. McIntosh testified that in this litigation he reviewed "lots of documents," including documents produced by the defendants, the defendants' interrogatory responses, depositions of Mr. Kast and representatives of the Department of Children and Families and Department of Highway Safety and Motor Vehicles,

---

they may register to vote, as well as posters to the Supervisors to place in their polling places that give voting instructions and voter fraud information, and a universal primary poster that is placed in the polls; and providing to organizations upon request speakers on the topic of voter registration. Kast Dep. at 57:15-60:12; 63:1-14.

[22]   Mr. Kast explained that "say the Supervisor were to call and want to talk about a particular field office, we would forward that and coordinate with the agency involved so that the Supervisor's information would flow over to them and get a resolution." As an example, Mr. Kast noted that at one time there was a problem with the printers in Highway Safety "it was identified to us, we identified it to Highway Safety and they resolved the problem, they fixed it." Id. at 37:11-38:2.

[23]   Mr. McIntosh is currently president of "McIntosh Election Services," a private consulting firm in Washington State. Previously, he was Washington's Director of Elections and Supervisor of Elections and Voter Registration for Thurston County (Olympia), Washington. His report notes that he was "in charge of overseeing the successful implementation of the National Voter Registration Act (NVRA) in Washington State." Tab 19 (McIntosh Report). He testified that he "worked with a member of Congress who was one of the major sponsors of the Act." Tab 19, at 28:10-14. He "was asked by Congressional staff to review various drafts of the Act," and would travel to Washington D.C. "quite often to meet with Congressional staff regarding the Act." Id. at 27:10-28:2. In addition, Mr. McIntosh notes that he "assisted" the Federal Elections Commission in the implementation of the Act. Id.

Steel Hector & Davis LLP

the PowerPoint training provided by the Division of Elections, as well as committee reports, legislative history and Federal Election Commission publications regarding the NVRA.  See Tab 19 at 2-3 (McIntosh Report); Tab 18, at 34:15-17, 46:6-49:19, 51:9-52:12 (McIntosh Dep.).

After spending hours reviewing all these documents at the plaintiffs' expense Mr. McIntosh explained in his report that he had developed four "opinions" and detailed them in his report.  Tab 19 (McIntosh Report).  Mr. McIntosh, however, advances no opinion that the Department of State or Division of Elections in any way violated the NVRA.  Tab 18 at 32:4-12 (McIntosh Dep.).  He further admits that he found nothing in the Division of Elections' uniform statewide training presentation, "improper or incorrect."  Id. at 45:11-24.

He concedes that the first sentence of his first opinion is simply his summary of what the NVRA requires.  Id. at 67:11; Tab 18 at 3-4 (McIntosh Report).  ("The National Voter Registration Act requires that a voter registration application process be an integral part of an application process for services at various agencies under the National Voter Registration Act.").  The second sentence of his first opinion states that:  "It appears that in Florida some offices providing services through the Department of Children and Families (DCF) were not always offering the opportunity to register to vote to all clients."  Tab 19 at 3-4.  Obviously, this does not relate to the Secretary or Director, and Mr. McIntosh admitted that he is not opining here that Florida's Secretary of State or Director of the Division of Elections were not in compliance with the NVRA.  Tab 18 at 76:1-6.

Mr. McIntosh's second opinion is that agency-based voter-registration programs "will work best" in those situations where the chief State election official assumes the responsibility for "providing statewide leadership" in the development and implementation "of all activities related to a State's compliance with the Act."  Tab 19 at 4 (McIntosh Report).  He was again unequivocal, however, that he is "not" opining "in this opinion that there is any violation of the NVRA," or that the "secretary or the director in any way violated the NVRA."  Tab 18 at 93:2-5; 99:17-24.

His third opinion is that agency-based voter-registration programs will be more efficient when there is "greater reliance on the electronic transfer of data," and that Florida's programs "may be hampered" by its reliance on paper forms.  Tab 19 at 4.  Again, he admits that he is "not opining here on No. 3, that there was any violation of the NVRA."  Tab 18 at 99:14-16.

Finally, with regard to Mr. McIntosh's fourth opinion that Florida would be able to "more efficiently operate" its agency based voter registration programs if monitoring programs were in place, and that "preferably" the state's chief elections official would be responsible for monitoring performance levels of states agencies (Tab 19 at 4; Tab 18 at 102:15-105:21); here again, Mr. McIntosh specifically does <u>not</u> opine that such monitoring is a requirement of the NVRA, or that "Florida's doing anything illegal or not in compliance with the NVRA, with regard to monitoring programs." Tab 18 at 103:18-23; 105:15-21.

Mr. McIntosh—designated as an expert on the NVRA—was unwaivering that nothing he reviewed led him to any opinion that there was an NVRA violation by the Department or Division:

> Q.     And, again, with regard to your conclusions in this matter, nothing you have reviewed in this case, nothing provided to you by counsel, or nothing you've reviewed outside in any other context has led you to come to any opinion that -- either the Director of the Division of Elections or the Secretary of State of Florida violated either the NVRA or any other law; isn't that correct, sir?
>
> Ms. FINEMAN:  Objection.  Objection to form.
>
> A.     I have not made any conclusions, as I stated earlier, as to compliance with the National Voter Registration Act.  I just merely stated the opinions that I have -- have here.
>
> Q.     So that's a correct statement, then?
>
> A.     Yes.

McIntosh Dep. at 107:14-108:4.

### E.     The Plaintiffs May Not Attempt to Judicially Legislate Through the NVRA

The plaintiffs here attempt to impose more upon the defendants than the NVRA requires, much like the trial court in <u>Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar</u>, 56 F.3d 791 (7th Cir. 1995).  There, in overruling a constitutional challenge to the NVRA by the state of Illinois, the trial judge ordered the State:  to designate a chief election official

> to be responsible for coordinating the state's responsibilities under the 'motor voter' law; to delegate to that official 'all necessary powers to achieve such compliance'; to take all necessary steps to enable people to register when they apply for a driver's license; to take all necessary steps to ensure that no one's registration to vote

Steel Hector & Davis LLP

> in federal elections is cancelled for failure to vote and that Illinois complies with the 'motor voter' law before canceling any individual's registration to vote . . . .

Id. at 797.

The Seventh circuit upheld the constitutionality of the Act in its decision, but overturned the trial judge's mandatory injunction with regard to the chief election official.  Id. at 797-98. The court noted that, while many of the requirements of the injunction merely restate provisions of the law, "differences in wording" between the provisions of the law and the provisions of the judge's order "invite[] interpretive disputes," and by ordering a legislative delegation to the chief election official of "all necessary powers to ensure compliance with the law" the order went "well beyond the 'motor voter' law."  Id. at 797-98.  This, the Seventh Circuit found was "an even greater intrusion" upon the operations of state government than the NVRA itself, thus there is "no occasion" for entry of an order that requires the state to do "even more than the 'motor voter' law requires."  Id. at 798.

To the extent that the plaintiffs complain that, through the NVRA, the Secretary or Director are responsible for every violation of Florida election law, or that they are responsible for enforcement of that law, such claims go further than the law requires and must, therefore, be summarily denied.  See id.

## VI.
## HARRIS AND ROBERTS ARE ENTITLED TO
## SUMMARY JUDGMENT ON THE EQUAL PROTECTION CLAIM

### A.     The Plaintiffs' Equal Protection Claim

In their First Claim for Relief, the plaintiffs attempt to assert a cause of action under the Equal Protection and Due Process Clauses of the Fourteenth Amendment against Harris and Roberts. 2nd Am. Compl. at ¶ 126.  Specifically, they allege that Harris and Roberts "maintained and administered non-uniform methods and practices of administering elections and counting ballots in violation of" the Fourteenth Amendment and 42 U.S.C. § 1983.  Id.

With respect to Harris, the plaintiffs allege, among other things, that the Secretary has the responsibility to obtain and maintain uniformity in election law, and to provide uniform standards for compliance with the NVRA.  Id. at ¶ 31.  They also allege that Harris has the responsibility to "adopt rules to achieve and maintain the maximum degree of correctness,

impartiality, and efficiency of the procedures for voting." Id. at ¶¶ 31-32.  Similarly, the plaintiffs allege that Roberts had the responsibility to provide technical support to county supervisors. Id. at 9.  Finally, they allege that Roberts was responsible for the administration of the central voter file, among other things.  Id.

As a threshold issue, in addition to mischaracterizing Florida election law, the above quoted language from the plaintiffs' First Claim for Relief appears to seek redress for violations associated with use of the punch-card voting system.  As the punch-card claims are moot, Harris and Roberts are entitled to summary judgment on the plaintiffs' First Claim for this reason alone. However, to the extent the plaintiffs allege that this claim is directed at alleged practices or procedures other than use of the punch-card system, their claim nevertheless fails for the reasons described below.  Accordingly, summary judgment should be granted against the plaintiffs' First Claim for Relief.

**B.      There is No Evidence of an Invidious Discriminatory Purpose to Maintain and Administer the Challenged Methods and Practices**

It is well settled that an "invidious discriminatory purpose" must be proved in order to show a violation of the Equal Protection Clause of the Fourteenth Amendment.  See Washington v. Davis, 426 U.S. 229, 239-42 (1976); Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979); Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977); Rogers v. Lodge, 458 U.S. 613, 617 (1982).  Indeed, the touchstone of an equal protection violation is an "invidious discriminatory purpose."  Davis, 426 U.S. at 239-42.  In upholding a facially neutral law alleged to have a disparate impact on minorities, the Supreme Court in Davis announced "the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose."  Id. at 240.  The plain language of the decision mandates that both intent and invidiousness are required to prove an equal protection claim.  Id.; see Feeney, 442 U.S. at 279 (holding that the conduct challenged as violative of the Equal Protection Clause must have been selected or enforced not "in spite of" but "because of" its adverse impact on a group).

**1.      The Burden to Prove An Invidious Discriminatory Purpose is Not Excused Merely Because a Violation of the Right to Vote Has Been Alleged**

The same burden to prove an invidious discriminatory purpose that applied in Davis, Feeney, and Village of Arlington also applies with equal force in the context of cases involving

the right to vote. See, e.g., Burton v. City of Belle Glade, 178 F.3d at 1175, 1188-90 (11th Cir. 1999); Clark v. Putnam County, ___ F.3d ___, 2002 WL 1274045, 15 Fla. L. Weekly Fed. C668 (11th Cir. June 10, 2002) ("In order to state a racial vote dilution claim under the Constitution, intent to racially discriminate must be shown."). In Burton, a black housing project and its residents brought suit against the city, alleging that their right to vote had been denied by the city's decision not to annex the housing project into municipal (from unincorporated) boundaries. Id. at 1183. A similar white housing project had been annexed some years before. Id. at 1184. Historically, the housing projects were required to be segregated by race, pursuant to "Jim Crow" laws, and city residential segregation law. Id. Summary judgment was granted in favor of the city, and the plaintiffs appealed. Id. at 1186.

The Eleventh Circuit held that "vote dilution, vote denial, and traditional race discrimination claims arising under the Fourteenth . . . Amendment . . . . all require proof of intentional discrimination." Id. at 1188 n.8 (emphasis in original). After considering direct and circumstantial evidence of discriminatory purpose, the court nevertheless affirmed summary judgment in the city's favor: "there is simply no evidence that residential segregation laws dictated which center the City annexed, or indeed, that race played any role in the process." Id. at 1205, 1190-91.

Burton demonstrates that alleging a violation of the right to vote does not end the invidiousness inquiry. See Clark, 2002 WL 1274045; see also Rogers, 459 U.S. at 617 ("in both [Davis and Village of Arlington] the Court observed that the requirement that racially discriminatory purpose or intent be proved applies to voting cases by relying upon, among others, Wright v. Rockefeller, a districting case, to illustrate that a showing of discriminatory intent has long been required in all types of equal protection cases charging racial discrimination" (citations omitted) (emphasis in original)).

Nevertheless, at the February 15, 2002 hearing on DBT's motion to dismiss Claim Three, the plaintiffs argued that they are not required to prove discriminatory intent by virtue of the fact that they have alleged a violation of the fundamental right to vote, as opposed to intentional discrimination. However, the two cannot be so nearly separated in this case. Indeed, right to vote claims necessarily involve unequal treatment of discrete groups of people on the basis of some personal characteristic. See e.g., Harper v. Virginia Bd. of Elections, 383 U.S. 663, 668-69 (1966) (poll tax impermissibly introduced "wealth or payment of a fee as a measure of a voter's

qualifications"); <u>Kramer v. Union Free School Dist.</u>, 395 U.S. 621 (1969) (state statute limiting franchise in certain areas to owners or lessees of taxable property). Here, that characteristic is allegedly race.

Although the plaintiffs' First Claim is not a model of clarity, when read together with the balance of the Second Amended Complaint, it appears to seek redress of a violation of the right to vote based on race. The plaintiffs certainly do not point to some other potentially impermissible characteristic other than race as the basis for decisions or practices which allegedly burdened their voting rights. Therefore, this case is like <u>Burton</u> and <u>Clark</u>, which both involved equal protection claims in the context of the right to vote, and which both require proof of intent to discriminate.

### 2.      Plaintiffs Have Not Proven Intent to Discriminate

<u>Davis</u>, <u>Feeney</u>, <u>Burton</u>, and <u>Clark</u>, among other cases, require that the plaintiffs prove the list maintenance, voter registration, and election day administration at issue were "practices" selected and maintained because of, not in spite of, their purported discriminatory effect on blacks. This they cannot do. Tellingly, the plaintiffs vaguely assert nothing more than that Harris and Roberts failed to maintain and administer uniform methods and practices of administering elections in contravention of their obligation to do so under Florida law. Compl. at 8, 9, 35. But an equal-protection claim cannot rest solely on disparity alone, much less mere non-uniformity. <u>See</u> <u>City of Mobile v. Bolden</u>, 446 U.S. 55, 70 (1979) ("where the character of a law is readily explainable on grounds apart from race, as would nearly always be true where, as here, an entire system of local governance is brought into question, disproportionate impact alone cannot be decisive, and courts must look to other evidence to support a finding of discriminatory purpose").

Of the countless decisions made by Harris and Roberts, the supervisors, pollworkers and others involved in election administration during the 2000 Presidential election, the plaintiffs fail to identify a single decision that had anything to do with the race. See generally 2nd Am. Compl.; cf. Burton, 178 F.3d at 1190-96 (granting summary judgment despite presentation of direct and circumstantial evidence of discriminatory purpose). Because the plaintiffs have failed

Steel Hector & Davis LLP

to adduce any proof of discriminatory purpose as is required in this Circuit, summary judgment should be granted as to the plaintiffs' equal protection and due process claim.[24]

### C.   The Plaintiffs Have Not Proved Harris and Roberts Used Non-Uniform Methods and Practices in Administering the 2000 Presidential Election

Furthermore, because the punch-card claims are moot, the only possible question remaining under the plaintiffs' First Claim is whether Harris and Roberts maintained "non-uniform methods and practices of administering elections" in violation of the Equal Protection Clause. 2nd Amend. Compl. at ¶ 126. However, there is absolutely no record evidence of non-uniform standards being used by Harris or Roberts in the 2000 presidential election; to the contrary, under the Florida statutory framework, elections are administered by the counties under these uniform statutes.

With respect to the plaintiffs' list maintenance claims, under Chapter 98, "the supervisor is the official custodian of the registration books and has exclusive control of matters pertaining to the registration of electors." § 98.015(3), Fla. Stat. (2001). Likewise, list maintenance programs are placed in the hands of the county elections supervisors, not Harris or Roberts. See §§ 98.065, 98.075, 98.093 Fla. Stat. (2001). Only the supervisors have authority to remove names determined to be ineligible. See §§ 98.065, 98.075, 98.081, 98.093, Fla. Stat. (2001).

Similarly, with respect to their voter registration claims, sections 97.057 and 97.058 provide for the duties of voter registration agencies, not the Department, to process applications. The agencies then "must forward completed voter registration applications within 5 days after receipt to the supervisor of the county where the office that processed or received that

---

[24]   In his deposition, the plaintiffs' own expert, Dr. Henry Flores, agreed that his conclusion that certain aspects of Florida elections practices were traceable to intentional discrimination was based solely upon the history of the South, not any particular instances of conduct by Harris and Roberts demonstrating an intent to discriminate. Tab 23 at 104-05, Ex. 3 (Flores Dep.). Indeed, the basis for Dr. Flores' opinion on that particular question, he agreed, could be summarized as follows: "Florida is part of the southern part of the United States. You're aware of a history of racial discrimination in the southern part of the United States, and therefore, that's the basis for your statement of the history of racial discrimination throughout the State of Florida generally toward African Americans." Id. Despite its sheer lack of probative value in this case, Dr. Flores' testimony falls well short of the standard for proving a discriminatory invidious purpose, as articulated in the cases discussed, supra. Indeed, the Burton court rejected a very similar argument. See Burton, 178 F.3d at 1188-96 (rejecting argument that Jim Crow and historical city residential segregation law played any role in the challenged decision, which occurred many years later).

application is located." §§ 97.057(4) and 97.058(6), Fla. Stat. (2001). There is simply no statutory grant of authority, much less duty, in connection with the Department processing, registering or updating information of any plaintiff.

Finally, Harris and Roberts do not have the legal authority or responsibility to select, train, or otherwise staff pollworkers for election day and therefore could not have caused any alleged election-day "problems" experienced by Harvey, Buford or Floyd, or any other potential subclass member. See §§ 102.012, 102.021, 102.031, Fla. Stat. (2001) (county elections supervisors' equipping, appointing and compensating inspectors, clerks and other pollworkers). See also FERA § 64, 74 (creating §102.014, Fla. Stat.) (election supervisors' responsibilities regarding pollworker recruitment and training).

The plaintiffs fail to identify a single non-uniform practice which Harris or Roberts performed or failed to perform in violation of their statutory duties in administering the 2000 election, much less such a practice that arguably denied a plaintiff his or her right to vote. Accordingly, summary judgment should be granted as to the plaintiffs' First Claim for relief.

## VII.
## HARRIS AND ROBERTS ARE ENTITLED TO
## SUMMARY JUDGMENT ON CLAIMS UNDER 42 U.S.C. § 1983

In their Third Claim for Relief, the plaintiffs again attempt to assert a cause of action under the Fourteenth Amendment and the NVRA. 2nd Am. Compl. ¶¶ 130-131. Specifically, they allege that the defendants "deprived Plaintiffs of the rights, privileges, and immunities secured to them under the Fourteenth Amendment to the United States Constitution, the National Voter Registration Act, and 42 U.S.C. § 1983 to participate in the electoral process." Id. This claim appears to combine the plaintiffs' First (the Equal Protection and Due Process) and Sixth (the NVRA) Claims for Relief.

This pleading overlap of the Third Claim with Claims One and Six appears to derive from requirement that the plaintiffs allege a violation of their "federal rights," those being Equal Protection, Due Process and NVRA rights.[25]  It follows, therefore, that if the plaintiffs cannot

---

[25]      42 U.S.C. § 1983 (Any "person who . . . subjects, or causes to be subjected, any . . . [other person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."). See also Daniels v. Williams, 474 U.S. 327, 330 (1986); Baker v. McCollan, 443 U.S. 137, 140 (1979); Willing v. Lake Orion Community Schools Board of Trustees, 924 F.Supp. 815, 820 (E.D. Mich. 1996).

Steel Hector & Davis LLP

demonstrate a violation of a federal right under claims One and Six, summary judgment should be entered against them on their Third Claim for Relief as well. See id.

Therefore, to the extent that the Third Claim for Relief alleges a violation of the plaintiffs' rights under the Fourteenth Amendment, summary judgment should be granted against the plaintiffs for the same reasons set forth in Part VI, which apply to the plaintiffs' First Claim for Relief alleging Equal Protection and Due Process violations. Likewise, to the extent the section 1983 claim alleges a violation of the plaintiffs federal rights under the NVRA, summary judgment should also be granted against the plaintiffs for the reasons set forth in Part V.[26]

## VIII.
## HARRIS AND ROBERTS ARE ENTITLED TO SUMMARY SUMMARY JUDGMENT ON CLAIMS UNDER 42 U.S.C. § 1971

In their Fourth Claim for Relief, the plaintiffs allege that all defendants "acting under color of law, applied different standards, practices or procedures in determining whether some voters were qualified to vote than were applied to voters within the same county who have been found by State officials to be qualified to vote and denied individuals the right to vote because of immaterial errors and omissions in registration and ballot applications, in violation of 42 U.S.C. §§ 1971(a)(2)(A) and 1971(a)(2)(B)." See 2nd Am. Compl. ¶133. Although they assert this claim as private parties under what is also known as the Civil Rights Act of 1957 and 1960, the defendants are entitled to judgment as a matter of law because there is no private right of action under the statute, because the plaintiffs have not shown a violation of these laws, and even if they had, Secretary Harris and Director Roberts could not have performed the offending act because this claim relates to functions and activities that they do not perform under Florida law. See Fed. R. Civ. P. 56(b).

First, there is no private right of action under the Civil Rights Act of 1957 and 1960. 42 U.S.C. § 1971. Under the express language of the statute, the only party that may properly initiate an action under these laws is United States Attorney General. See 42 U.S.C. § 1971(c) ("the Attorney General may institute . . . ."). Although some courts have found a private right of

---

[26]     In addition, where section 1983 is involved, additional considerations may also inform the Court's analysis. In order to assert a section 1983 claim for a violation of any federal right, the plaintiffs must look to the right involved to determine whether intent must be proven. Daniels, 474 U.S. at 330. As explained in part VI, among other reasons, there is no such proof of intent with regard to the First Claim for Relief, so judgment should be entered in the Secretary and Director's favor.

action under § 1971 ,[27] a number of more recent federal court decisions have found no private right of action under § 1971.[28]

Even with a private right of action, the plaintiffs have not demonstrated that any of the county elections supervisors in carrying out their voter registration, list-maintenance and election day activities, "applied different standards, practices or procedures in determining whether some voters were qualified to vote than were applied to other voters within the same county who have been found by State officials to be qualified to vote" or "denied individuals the right to vote because of immaterial errors and omissions in registration and ballot applications," in violation of § 1971. Ballas v. Symm, 494 F.2d 1167, 1171-72 (5th Cir. 1974).[29] Absent any record that the named counties treated black voters differently than other voters, the defendants are entitled to summary judgment on this claim.

Moreover, with regard to the unspecified discriminatory practices, section 1971 requires a showing of intentional discrimination, and the plaintiffs have not demonstrated any intentional discrimination or invidiousness on the part of the elections officials, much less alleged it.[30] Without the existence of a material fact with respect to intent, summary judgment should be entered against the plaintiffs. 42 U.S.C. § 1971.

---

[27] See, e.g., Brooks v. Nacrelli, 331 F. Supp. 1350 (E.D. Pa. 1971). But see Reddix v. Lucky, 252 F.2d 930 (5th Cir. 1958) (Although it did not expressly hold that the statute is enforceable through a private cause of action).

[28] See, e.g., See McKay v. Thompson, 226 F.3d 752, 756 (6th Cir. 2000); Spivey v. Ohio, 999 F. Supp. 987, 996 (N.D. Ohio 1996) ("An individual does not have a private right of action under § 1971."); Willing v. Lake Orion Cmty. Schs. Bd. of Trs., 924 F. Supp. 815, 820 (E.D. Mich. 1996) ("[T]his court finds that section 1971 does not afford [plaintiff] a private right of action."); McKay v. Altobello, No. 96-3458, 1996 WL 635987, at *1-*2 (E.D. La. Oct. 31, 1996) (noting section 1971 "is enforceable only by the Attorney General, not impliedly, by private persons"). See Thompson v. Thompson, 484 U.S. 174, 516 (1988) ("In determining whether to infer a private cause of action from a federal statute, our focal point is Congress' intent in enacting the statute.").

[29] Decisions of the former Fifth Circuit issued on or before September 30, 1981, are binding precedent in the Eleventh Circuit. See Bonner v. Cite of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

[30] Cases involving discriminatory practices under 42 U.S.C. § 1971 and similar laws, involve a showing of intentional discrimination. In addition, legislative intent and history for these provisions, enacted pursuant to 15th Amendment, which prohibit discrimination on account of race, support the position that a challenged voting practice must have discriminatory purpose or intent. See, Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252 (1977); Burton v. City of Belle Glade, 178 F.3d 1175, 1188-89 (11th Cir. 1999). Compare Mobile v. Bolden, 446 U.S. 55, 66 (1980) (pre-§ 2 amendments required proof of intent to discriminate).

Further, assuming *arguendo* that plaintiffs could create an issue of fact with regard to a claim under these Civil Rights Acts, by virtue of the statutory powers and duties conferred on the Secretary and Director (and conversely those not given them), Harris and Roberts could not have been violators because the Department of State and the Division of Elections do not register voters, maintain voter registries, or determine who is qualified to cast ballots on election day. That is the responsibility of the 67 Elections Supervisors, who have been granted under Florida law, the sole authority, responsibility and discretion in qualifying voters and administering elections within their respective counties.[31]  As such, even with a private right of action under these laws, Secretary Harris and Director Roberts are still entitled to summary judgment because the plaintiffs have produced no record evidence of a violation by them of section 1971.

## IX.
## HARRIS AND ROBERTS ARE ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFFS' § 104.0515, FLA. STAT. CLAIM

The language employed by the plaintiffs in stating the Fifth Claim for Relief is strikingly similar to language used by Congress in drafting subsection (a) of Section 2 of the Voting Rights Act.  The Fifth Claim alleges that the defendants "have applied prerequisites to voting, employed certain voting methods, and administered elections using standards, practices and procedures in a manner which *results* in denial or abridgement of the rights of citizens in Florida to vote on account of race or color in violation of Florida Statutes § 104.0515."  See 2nd Am. Compl. ¶135 (emphasis supplied).  This is misleading.[32]  The language they use, i.e., "results," is found in current version of section 2, but found nowhere in the statute of which they allege a violation, namely section 104.0515(4).  The Florida voting rights law they cite covers intentional voting

---

[31]     See, e.g., Fla. Stat. §§ 98.015-98.491 (2000).  See Art. VIII, Sect. 1 (d) Fla. Const.; § 98.015-98.491, Fla. Stat. (2001).

[32]     Although in stating the Third Claim for Relief, plaintiffs employ the term, "results," and rely heavily on language similar to the current subsection (a) of section 2 of the Voting Rights Act, section 104.0515, Florida Statutes, was enacted by the Florida legislature, and signed into law on March, 29, 1982 (1982 Fla. Laws Ch. 82-59), several months before Congress passed the 1982 amendments to section 2, inserting the "results" test.  See Thornburg v. Gingles, 478 U.S. 30, 35 (1986) (discussing 1982 amendments, 96 Stat. 134).  Contrast 42 U.S.C. §§ 1973(a) ("results" inquiry) and 1973(b) ("totality of the circumstances" test) with § 104.0515(4) Fla. Stat. (no mention of "results") and § 104.0515(4) Fla. Stat. (tracks language in 42 U.S.C. § 1971(2)).  See 2nd Am. Compl. ¶135.  After the 1982 amendments to the federal act, the Florida legislature never changed § 104.0515, to include a "results" test.  See Fla. Laws, § 1, ch. 82-59, § 26, Ch. 83-217, ch. 91-224, § 615, ch. 95-147, § 28, ch. 98-129.

Steel Hector & Davis LLP

rights violations, and violations similar to those captured by the Civil Rights Acts of 1957 and 1960 — the purported basis for the plaintiffs' Fourth Claim for Relief.  Compare 42 U.S.C. § 1971(a)(2) with § 104.0515(2) Fla. Stat.  Summary judgment therefore should be granted in favor of Harris and Roberts on the Fifth Claim for Relief for the same reasons that judgment should be granted in their favor on the Fourth Claim — there is no private right of action under the statute, no evidence of a violation of the Act, intentional or otherwise, and even if there was a private right of action and evidence of an intentional violation, no violation could be attributed to the Secretary or Director who do not register and qualify voters or conduct elections.  See Fed. R. Civ. P. 56(b).

First, like the federal voting rights laws, Florida Statute, section 104.0515 prohibits the deprivation of, or interference with, the right to vote on account of race or color.  See 2nd Am. Compl. ¶134, § 104.0515, Fla. Stat. (2001).  Unlike the federal laws, however, the Florida statute speaks only to criminal penalties.  See § 104.0515(5), Fla. Stat. (2001) ("any person who violates the provisions of this section is guilty of a felony of the third degree").  In determining whether there is an implied right of action, Florida courts, like federal courts, focus primarily on the intent of the Legislature.[33]  The Legislature did not expressly provide a private right of action in the statute.  Id.[34]  This legislative omission, weighed against all others considerations, indicates the legislature did not intend to provide a private cause of action.

Second, also like Claim Four, plaintiffs must prove the defendants violated the substantive provisions of the statute.  The plaintiffs have not produced any evidence of a violation.  Moreover, because the Florida provisions were drafted to track the language of the pre-1982 Federal Voting Rights Act, the plaintiffs must also prove an intentional violation of the statute, which they have failed to do.  Mobile v. Bolden, 446 U.S. 55, 66-67 (1980).

---

[33]     See, e.g., Shurgard Income Properties Fund 16-Limited Partnership v. Muns, 761 So.2d 340 (Fla. 4th DCA 1999); Murthy v. N. Sinha Com., 644 So. 2d 983, 985 (Fla. 1994); Fischer v. Metcalf, 543 So. 2d 785, 790 (1989).  See also Central Bank v. First Interstate Bank, 511 U.S. 164, 190 (1994); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979).
[34]     The legislative history related to section 104.0515 shows no indication the Florida Legislature desired to create an implied right of action.  Cf. Murthy, 644 So. 2d at 986 (examining statute's legislative history to determine whether legislature intended to create implied cause of action).  Indeed, the only enforcement change enacted by the legislature was its 1998 stiffening of subsection 5's criminal penalties.  See 1998 Fla. Laws ch. 98-129, § 28.

Third, even if the plaintiffs could prove the statute was violated, the Secretary and Director could not be held responsible because they do not perform the voter-related functions at issue. Secretary Harris and Director Roberts, therefore, are entitled to summary judgment as a matter of law.

## X.
## HARRIS AND ROBERTS ARE ENTITLED TO SUMMARY JUDGMENT ON CLAIMS UNDER SECTION 2 OF THE VOTING RIGHTS ACT

In the Second Claim for Relief, plaintiffs allege that three broadly defined categories of election devices or practices implemented by the defendants "denied black voters an equal opportunity to participate in the Presidential election in violation of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973." See 2nd Am. Compl. ¶ 129. Those alleged election practices are: (1) their failure to adopt and implement "uniform standards of reliability and accuracy for voting machines or systems"; (2) their "purging of voters from official lists of eligible voters"; and (3) "their maintenance and administration of 'inactive' lists and the unequal availability of access to complete voter rolls." See 2nd Am. Compl. ¶ 129.[35] Secretary Harris and Director Roberts are entitled to summary judgment on the Second Claim for Relief because they are no genuine issues of material facts demonstrating that section 2 was violated by the Secretary or Director. First, they have produced no evidence of the purposeful denial of a right to vote by the Secretary or Director. Second, the plaintiffs have not pointed to an election device or practice that the Secretary or Director has implemented which causes the voting strength of black voters to be diluted and thereby prohibits black voters' opportunity of participating in elections on the same footing as other voters. Third, there is no showing of the presence of the requisite discriminatory factors needed to support a section 2 claim. Due to a lack of evidence showing of any of these necessary elements of their claim, Secretary Harris and Director Roberts are entitled to judgment as a matter of law.

### A.    No Proof of Vote-Denial

---

[35]    With the mooting of the punch-card voting system claims, the factual allegations that relate to the section 2 claim can be boiled down to the following: (1) the wrongful "purging" from official lists of eligible voters, 2nd Am. Compl. ¶¶ 76-93; (2) the use of improper procedures for change of residence and unequal access to inactive voter lists, including the difficulties encountered by poll-workers and voters in communicating with the supervisors of elections main offices on election day, id. ¶¶ 106-118; and (3) the errors of poll-workers, id. ¶¶ 119-122.

There is no evidence that Secretary Harris or Director Roberts violated section 2 of the Voting Rights Act because, among other things, of elements that are not present. There is no record evidence that blacks were intentionally prevented from voting, or that the votes of African-Americans were weighted less than those of other voters (as in a reapportionment challenge.). Nor is there any assertion, much less proof, that the Secretary or the Division of Elections (or any other Florida elections official) treated black voters differently than other voters. See Orvitz v. City of Philadelphia Office of City Comrs Voter Reg. Div, 28 F.3d 306, 316 n.20 (3rd Cir. 1994). ("Here, there is no allegation, no implication, no imputation, and, of greatest importance, no evidence, that the purge statute was enacted, or is being employed, by the City of Philadelphia for anything but nondiscriminatory reasons."). Plaintiffs cannot make this showing because all voters within the various named Florida counties (and presumably within the other election jurisdictions within Florida) voted under substantially identical voting conditions and accordingly received the same "opportunity" to participate in the election process.[36]

The plaintiffs attempt to fashion a new right out of the Voting Rights Act:  the right of Florida voters to participate in a wholly uniform and mistake-free election. 2nd Am. Cmpl. ¶¶ 1-3, 31-32, 76-123, 129. Although there is no such right under federal and state law,[37] through recent legislation, administrative rulemaking, and voluntary acts of the county elections supervisors, Florida has taken steps to minimize human error, and this Court should defer to those legislative and administrative judgments as the State moves forward toward a new system of election administration. Katzenbach v. Morgan, 384 U.S. 641, 657 (1966) ("reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind" (quoting Williamson v. Lee Optical, 348 U.S. 483, 489 (1955)).

**B.      No Proof That Election Device or Practice Violates Section 2**

---

[36]      See (MacManus Dep., Leahy Dep., Iorio Dep.)

[37]      "Myriad random human and mechanical errors which occur inevitably in an election of any magnitude do not necessarily constitute "conduct which is discriminatory by reason of its effect or inherent nature and do not, in and of themselves, give rise to a § 1983 claim under this subchapter [--]" Hill v. Travers, 602 S.W.2d 856, ___. (Mo. App. E.D. 1980).

Summary judgment should be granted in favor of Secretary Harris and Director Roberts because the plaintiffs have not demonstrated that any election device or practice implemented by the Secretary or Director causes the voting strength of black voters to be diluted.[38]

### 1.    Lack of a Showing of a Causal Connection

As part of their burden in demonstrating that the "election processes are not equally open" to black citizens, the plaintiffs must demonstrate that there is a causal connection between the challenged electoral practice and the alleged discrimination that results in a denial or abridgement of the right to vote.  See Thornburg v. Gingles, 478 U.S. 30, 47 (1986);[39] see also Irby v. Virginia State Bd. of Elections, 889 F.2d 1352, 1358 (4th Cir. 1989) (No section 2 violation found where the challenged appointive process for selection of school board members in five counties was not the cause of disparity between percentage of blacks appointed and blacks in general population).  Thus, the Voting Rights Act seeks to ensure that electoral practices or procedures will not deprive individual voters of an equal opportunity to participate in electoral processes, regardless of their race or color.

There is no causal connection established between any actions taken by the Secretary of State or the Division of Elections and the alleged harm, because the Secretary and the Division do not have the responsibility (legal or otherwise), to remove registrants from the voter rolls, to maintain voter rolls, to put voters in inactive status, to accept affirmations of address or name changes from voters, and to carry out the election-day administration functions; such is the responsibility of the Supervisors of Election. §§ 98.045, 98.065, 98.075, 98.093, 98.0977, 98.471, Fla. Stat. (2001).  Summary judgment, therefore, should be granted in favor of Harris and Roberts on the section 2 claims because the plaintiffs have not and cannot demonstrate that they are the cause of any alleged section 2 violation.

---

[38]    With regard to the first group of practices or devices complained of—the claims related to the defendants' use of punch-card and central-count voting systems—the plaintiffs have since acknowledged at the May 3, 2002 oral argument on class certification that FERA's prohibition on the use of punch-card voting machines, coupled with the voluntary actions of the named county elections supervisors, have  rendered the voting systems claims moot.

[39]    "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  Gingles, 478 U.S. at 47 (emphasis added).

##### 2.    Statistical Disparity Alone Is An Insufficient Basis For Section 2 Claim

Due in part to the lack of demonstrable harm relating to the named plaintiffs' claims, the plaintiffs hang their entire section 2 claim on purported statistical correlations between higher rates of black voters falling into the categories of those identified as felons, as inactive voters, and as filing affirmation affidavits.  See Tab 23, at 13:1-23, 854:24-92:9 (Flores Dep.).  The plaintiffs rely wholly on the existence of these purported disparities.  They do not attribute such disparities to a voting device or practice in a manner that would indicate black Florida voters' rights are being denied, much less demonstrate how such statistical disparities add up to a violation of the Voting Rights Act.

This failure is fatal to their claim, as a statistical disparity standing alone is insufficient to state a claim under the Voting Rights Act.[40]  The law is clear that when plaintiffs fail to "show a causal connection between the challenged voting practice and [a] prohibited discriminatory result," that claim cannot survive under section 2.  Smith, 109 F.3d at 595 (9th Cir. 1997) (citations omitted ).[41]  For these reasons, Secretary Harris and Director Roberts are entitled to summary judgment on the Second Claim for Relief.

---

[40]    See Smith v. Salt River Project Agric. Improvement and Power Dist., 109 F.3d 586, 595-96 (9th Cir. 1997) (holding land ownership requirement did not violate Voting Rights Act despite statistical disparity in land-ownership between African-Americans and whites); Ortiz, 28 F.3d at 315 (voter-purge law did not violate Voting Rights Act simply because more minority than white voters were purged as inactive); Salas v. Southwest Texas Junior College Dist., 964 F.2d 1542, 1556 (5th Cir. 1992) (statistical difference between white and Hispanic voter turnout insufficient basis for § 2 claim); Irby v. Virginia State Bd. of Elec., 889 F.2d 1352, 1358-59 (4th Cir. 1989) (appointment-based school board system did not violate § 2 despite statistical disparity between percentage of African-Americans in the population and on the school board), cert. denied, 496 U.S. 906 (1990); Wesley v. Collins, 791 F.2d 1255, 1262 (6th Cir. 1986) (statistical difference between minority and white felony-conviction rates insufficient basis to successfully mount § 2 challenge to felon disenfranchisement law).  But see Miss. State Chapter, Operation PUSH v. Allain, 674 F. Supp. 1245 (N.D. Miss. 1987) (statistical difference of 25 percent in African-American versus white voter registration rates constituted § 2 violation where challenged pre-NVRA registration laws were originally enacted as part of state plan to deny African-Americans the right to vote and state had a long, well-documented history of discriminatory practices in voting and registration), aff'd, 932 F.2d 400 (5th Cir. 1991).

[41]    Rather, "section 2 plaintiffs must show a causal connection between the challenged voting practice and the prohibited discriminatory result."  Ortiz, 28 F.3d at 312.  In Ortiz, for example, the plaintiffs challenged Pennsylvania's voter purge statute, which required the City of Philadelphia to purge from the registration rolls all registered voters who had failed to vote for

Steel Hector & Davis LLP

## C.   The Lack of Proof of Other Factors Necessary to Show Section 2 Violation

The third reason summary judgment should be granted in favor of Secretary Harris and Director Roberts on the Second Claim for Relief is that the plaintiffs have failed to demonstrate the presence of the requisite discriminatory factors needed to support a section 2 claim. [42]   Yet they somehow want the Court to conclude that black voters were denied the opportunity "to participate in the election on the same basis as other voters." 2nd Am. Cmpl. ¶ 106. [43]

---

two years. Id. at 307. The plaintiffs demonstrated, and the district court found, that African-American and Latino voters were being purged at disproportionately higher rates than white voters. Id. at 308. Nevertheless, the district court held the voter purge law did not violate section 2 because it was not the cause of minority voters' unequal access to the political process.

[42]   The "typical" factors bearing on challenges under section 2 of the Voting Rights Act in the context of "vote-dilution" and "vote-denial" claims are:  (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. Thornburg v. Gingles, 478 U.S. 30, 36-37 (1986). Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a section 2 violation are: (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group, and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. Thornburg v. Gingles, 478 U.S. at  47 (Senate Judiciary Committee's Majority Report accompanying the bill amending, Voting Rights Act of 1965, § 2, elaborates on the circumstances that might be probative) (S.Rep. at 28-29, U.S. Code Cong. & Admin. News 1982, at 206-07. ). Smith, 109 F.3d 586, 594, n.6 & 8 (9th Cir. 1997). See also White v. Register, 412 U.S. 755 (1973); Zimmer v. McKeithen, 485 F.2d 1297 (1973) (en banc), aff'd sub nom. East Carroll Parish Board v. Marshall, 424 U.S. 636 (1976).

[43]   Courts have traditionally recognized certain categories of election laws, practices and devices that, if improperly employed, could have potential dilutive effects on racial, ethnic and language minorities. These include: (1) a poll tax; (2) a literacy test; (3) a prohibition against bullet (single-shot) voting; (4) designated (or numbered) seat plans for multimember districts; (5) an at-large election scheme; (6) redistricting plans and racial gerrymandering; (7) unusually large election districts; (7) majority vote requirements; and the exclusion of members of the minority

Even if the plaintiffs could demonstrate the presence of one or more of the discriminatory factors needed to make out a section 2 claim, that is not sufficient to demonstrate a "denial or abridgement of the right . . . to vote on account of race or color." 42 U.S.C. § 1973(a).  In order to establish a violation of section 2, plaintiffs must also show that certain discriminatory factors viewed in light of the "the totality of the circumstances," demonstrate that the nomination and election processes "are not equally open" to black citizens because they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. §1973(b).

Section 2's totality of the circumstances test is also result-oriented.  Smith v. Salt River Project Agric. Improvement and Power Dist., 109 F.3d 586, 594 (9th Cir. 1997) (section 2 prohibits voting qualifications "which result in discrimination on account of race or color."). The gravamen of any claim under the statute is that when weighing these factors in light of the totality of the circumstances, they demonstrate that a challenged election law, device or practice produces a result such that that minority voters have been or will be prevented from participating in the election process on an equal footing and thereby are unable to elect candidates of their choice.  See, e.g., Ortiz v. City of Philadelphia Office of the Site Comm'rs Voter Registration, 28 F.3d 306, 314 (3d Cir. 1994) ("Section 2 plaintiffs must demonstrate that they had less opportunity both (1) to participate in the electoral process, and (2) to elect representatives of their choice.").  The plaintiffs have produced no evidence of any of these factors, much less, given the Court something to weigh and evaluate under the totality of the circumstances test.

In contrast to the plaintiffs' showing here, a prototypical section 2 violation is shown where an election device or practice, like the drawing of election districts, is implemented such that the voting strength of minority groups is diluted because minority voters are either dispersed among districts ("fragmentation") or concentrated within a few districts ("packing").  See Voinovich v. Quilter, 507 U.S. 146, 153 (1993); Thornburg v. Gingles, 478 U.S. 30, 46 (1986). In either case, members of the minority group are denied an equal opportunity to elect

---

group from the candidate slating processes, such as "white primaries." See Gingles, 478 U.S. at 39.  Here, the plaintiffs challenge many election devices or practices, like the maintenance of inactive voter lists or inadvertent poll-worker error—devices or practices that have never been successfully challenged in federal court before.

representatives of their choice because the electoral districts are structured in such a fashion that their voting strength is minimized.[44]

---

[44]     Even where the election device has been recognized as having potentially dilutive effects, the Gingles court in a similar context explained electoral devices such as at-large elections may not be considered per se violative of section 2 of the Voting Rights Act; parties challenging electoral devices must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process.  Voting Rights Act of 1965, § 2.  478 U.S. at 46.

Steel Hector & Davis LLP

## XI.
## <u>CONCLUSION</u>

The Florida Election Reform Act addressed the plaintiffs concerns, thus making their claims either moot or not yet ripe.  Further, the claims against the Secretary and Director must be dismissed for lack of standing.  Finally, Harris and Roberts are entitled to summary judgment in their favor on all counts of this action.

Respectfully submitted,

By:_____

John W. Little III, P.A.
Florida Bar No. 384798
Joseph P. Klock, Jr.
Florida Bar No. 156678
Alvin F. Lindsay III
Florida Bar No. 939056
Walter J. Harvey
Florida Bar No. 074144
STEEL HECTOR & DAVIS LLP
Counsel for Secretary of State
 Katherine Harris and the
 Director of the Division of Elections
 L. Clayton Roberts
1900 Phillips Point West
777 South Flagler Drive, Suite 1900
West Palm Beach, Florida 33401
Tel:  (561) 650-7270
Fax:  (561) 655-1509

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing notice was served via U.S. Mail this _1_ day of July, 2002, on counsel on the attached Service List.

John W. Little III

Steel Hector & Davis LLP

## SERVICE LIST

Anita Hodgkiss, Esq.
Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Lori Outzs Borgen, Esq.
Lawyers' Committee for Civil Rights Under
Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005-2124
**Lawyers' Committee for Civil Rights
Under Law**

George Waas, Esq.
Douglas B. MacInnes, Esq.
Office of the Attorney General
The Capitol - Suite PL-01
Tallahassee, Florida 32399-1050
**Attorney for Fred Dickinson and Kathleen
Kearney**

Jeffrey Ehrlich, Esq.
Susan Torres, Esq.
Assistant County Attorney
Miami-Dade County Attorney's Office
111 N.W. 1ˢᵗ Street, Suite 2810
Miami, Florida 33128
**Attorneys for Miami-Dade County
Supervisor of Elections David C. Leahy**

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Hillsborough County Attorney's Office
601 E. Kennedy Boulevard, 27ᵗʰ Floor
Tampa, Florida 33602
**Attorney for Defendant Hillsborough
County Election Supervisor Pam Iorio**

Raymond W. Bergan, Esq.
Daniel Restrepo, Esq.
Williams & Connolly LLP
725 12ᵗʰ Street NW
Washington, DC 20005
**Attorneys for Choicepoint, Inc./DBT**

Daniel D. Eckert, Esq
Frank B. Gummey, III, Esq
Volusia County Attorney's Office
123 W. Indiana Avenue
DeLand, Florida 32720-4613
**Attorneys for Deanie Lowe, Volusia
County Supervisor**

Tracy I. Arpen, Jr., Esq.
Office of General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, Florida 32202-3700
**Attorneys for Duval County Supervisor of
Elections John Stafford**

Thomasina Williams, Esq.
WILLIAMS & ASSOCIATES, P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
**Attorneys for Plaintiffs**

Michael Cirullo, Esq.
Josias, Goren, Cherof, Doody and Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Fort Lauderdale, Florida 33308
**Attorney for Defendant Cowles**

Steel Hector & Davis LLP