UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

CASE NO. 01-CIV-120-GOLD

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., by its FLORIDA STATE CONFERENCE
OF BRANCHES, et al.,

        Plaintiffs,

vs.

KATHERINE HARRIS,
Secretary of State of Florida, et al.,

        Defendants.

_____/

**SECRETARY OF STATE KATHERINE HARRIS AND
DIRECTOR OF THE DIVISION OF ELECTIONS
L. CLAYTON ROBERTS' STATEMENT OF FACTS IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

### I.
### PROCEDURAL BACKGROUND[1]

**A.   The Defendants Secretary Harris and Director Roberts**

1.   In Florida, the Secretary of State is, among other things, the "chief election officer" of the State of Florida with certain administrative responsibilities under the election laws. 97.012 Fla. Stat. (2001). Secretary of State has "responsibility to obtain and maintain uniformity in the application, operation, and interpretation of the election laws . . . [and to] provide technical assistance to the supervisors of elections on voting systems" within the Constitutional and statutory framework of the State of Florida. Id. The Secretary of State also has responsibility for coordination of the state's responsibilities under the National Voter

---

[1]   The documents outside the pleadings that Harris and Roberts rely on are attached in the Appendix, Tabs 1 through 30, in exhibits relied upon by the other defendants in their memoranda, and in certain of the plaintiffs' filings.



Registration Act of 1993 ("NVRA"), again within the Constitutional and statutory framework of the State of Florida. On November 3, 1998, Katherine Harris was elected Florida's 23rd Secretary of State, and she has served in that capacity since that time.

2.     Within the Florida Department of State is the Division of Elections, and the Division's chief official is the Director of the Division of Elections, who is appointed by the Secretary of State. § 97.012 Fla. Stat. (2001). The Division of Elections is responsible for adopting uniform rules for the purchase, use, and sale of voting equipment in the state under Fla. Stat. § 101.294. Within the Division of Elections is the Bureau of Voting Systems Certification. Fla. Stat. § 101.017. Prior to the enactment of the Election Reform Act of 2001, the Division of Elections was responsible for administration of the statewide central voter file and for contracting with a private entity to compare voter registration lists with other computer databases. Fla. Stat. § 98.0975. On October 18, 1999, Secretary Harris appointed L. Clayton Roberts as the Director of the Division of Elections, and he has served in that capacity since she was sworn in on January 5, 1999.

**B.     The Lawsuit**

3.     On January 12, 2002, the plaintiffs National Association for the Advancement of Colored People, Inc., by its Florida State Branches (NAACP), and twenty-one individual plaintiffs filed the original class action complaint, alleging violations of the federal and state voting rights laws, and seeking redress for a variety of complaints that grew out of the November 2000 election controversy. (doc. 1).

4.     The plaintiffs pursue claims that are based on three broadly defined categories of complaints, described in the 137-paragraph Second Amended Complaint. The first category of complaints surround the numerous processes by which 67 supervisors identify and remove the names of ineligible voters from the voter registration lists. Am. Compl. ¶¶ 76-93. The second category questions the methods by which numerous agencies and constitutional officers process voter-registration applications. Second Am. Compl. ¶¶ 94-105. The third category relates to the provision of open telephone lines to the county supervisors' central offices and a variety of alleged pollworker error and general polling place complaints. Second Am. Compl. ¶¶ 106-123. The plaintiffs allege that the methods and practices associated with the defendants' administration of elections violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment (Count I); Section 2 of the Voting Rights Act of 1965 (Count II); 42

Case No. 01-CIV-120-GOLD

U.S.C. § 1983 (Count III); the Civil Rights Acts of 1957 and 1960 (Count IV); the Florida Voting Rights Act (Count V); and the NVRA (Count VI). Second Am. Compl. ¶¶ 3, 124-137. For these alleged violations, the plaintiffs seek twenty-five separate forms of redress, ranging from declaratory and injunctive relief, to claims for attorneys' fees and costs. In their claims for redress, the plaintiffs seek a variety of voter registration and election administration-related reforms including, among other things, statewide changes in the processing of incomplete voter registration applications, in the manner that voter-registration lists are maintained, precincts are staffed, poll workers are trained and recruited, voter eligibility is determined, and other equipment, like cellular telephone lines and computer laptops, are distributed at the polling places on election day. See "Prayer for Relief," Second Am. Compl.

5.   Although the plaintiffs seek statewide relief, they only joined as defendants seven of the 67 county supervisors of elections — Williams Cowles of Orange, John Stafford of Duval, Ian Sancho of Leon, Deanne Lowe of Volusia, Pam Iorio of Hillsborough, Miriam Oliphant of Broward and David Leahy of Miami-Dade. They also joined four State officials — Harris, Roberts, Director of the Department of Children and Families Kathleen Kearney and Director of the Department of Highway Safety and Motor Vehicles Fred Dickinson — and a private entity that contracted with the Division of Elections' ChoicePoint, Inc. d/b/a/ Database Technologies ("Choicepoint"). Second Am. Compl. ¶¶ 31-36. Two of the defendant county supervisors, Sancho and Oliphant, have since settled with the plaintiffs, and their agreements were submitted to the Court and approved in May 2002. See e.g. Motions and Hearing (Tab 16) (2/13/02, 2/21/02, 5/2/02, 5/7/02) (docs. 226, 237, 314, 321).[2]

C.   **The Class Allegations**

6.   In the original complaint and the plaintiffs initial June 17, 2001 class-certification motion, plaintiffs sought certification of only one "Vote Denial" — a class of "Black citizens of the State of Florida eligible to vote, who were registered voters or who took timely and appropriate steps to register as voters, who sought to vote in the November 7, 2000 election, and who were denied an opportunity to vote and have their votes counted in that election, by the actions, policies and practices of the Defendants." See Complaint and Motion (docs. 1, 101)

---

[2]   Earlier in June 2002, the defendant Choicepoint, Inc informed the Court that it reached a settlement with the plaintiffs, and that a settlement agreement will be submitted for Court approval in short order.

3

(1/12/01, 6/17/01). In the first and second amended complaints, and the plaintiffs' supplemental and additional supplemental class-certification memoranda, they continued to pursue certification of the "Vote Denial" class, but also added a request for a second putative "Punch-Card Voting System Class," which they describe as a "class comprised of all black citizens of the State of Florida who voted in counties that used the punch-card voting system, and thus were denied an equal opportunity to have their vote counted in the November 7, 2000 election ". See Pls. Supp. Memo at 13. (doc. 187) (11/5/01).

7.  Then, at the May 3, 2002 oral argument on class certification, the plaintiffs dropped the Punch-Card class in light of the de-certification and the discontinuance of punch-card and precinct-count voting systems. Oral Arg. at 10-12 (Tab 16). At that same May 3 hearing, the plaintiffs suggested that the Court could certify three subclasses of the original Vote-Denial class and, over the objection of the defendants, asked the Court for an opportunity to brief the subclass issue.

8.  Pursuant to this new request to define three subclasses, the plaintiffs argued in their memorandum and reply memorandum regarding subclasses that the Vote-Denial class could be further subdivided into three, broadly defined subclasses of Black Florida citizens "who were eligible to vote, and who sought to vote in the November 7, 2000 election, but were unable to vote" because: (1) "their names had been removed from the voter rolls" (List Maintenance subclass); (2) "their voter registration application or update was not properly processed" (Voter Registration subclass), and (3) "of problems that occurred on election day at the polling places" (Election Day Administration subclass). Subclass Memo at 2.

### D.  The Election Reform Act of 2001 ("FERA")

9.  Following the November 2000 election controversy in Florida, state officials conducted a number of election studies and formed a number of groups and official committees to investigate the complaints that grew out of the election, and, if needed, to make policy recommendations to address certain election-related issues that were raised. See Tab 22, (MacManus Dep. at 7-9, 12). Among those official post-election groups that were formed was Governor's Election Task Force.[3] After a series of meetings and studies, on March 1, 2001, this bipartisan group of state legislators, judges, and other concerned Floridians, issued a series of

---

[3]   Revitalizing Democracy in Florida, The Governor's Select Task Force on Election Procedures, Standards and Technology (3/1/01). (Tab 14).

Case No. 01-CIV-120-GOLD

policy recommendations and suggested legislative reforms, which were then forwarded to various Florida elections officials and policy-makers. This report, and others, helped spur election reform in Florida.

10.    After this lawsuit was filed, but before a jointly-agreed-to stay expired,[4] the Florida Legislature passed Florida Election Reform Act of 2001, 2001 Fla. Laws Ch. 2001-40, ("FERA") on May 4, 2001, and it was signed into law on May 10, 2001.[5] This legislation broadly amends and revises numerous aspects of Florida election law, including certain voter-registration processing requirements, election-day administration procedures, and voting systems, including requirement to de-certify punch card and precinct-count voting systems.

11.    Since the May 2001 passage of FERA, two processes required to give full and complete effect to this law were initiated and are nearly completed. First, since FERA must be "precleared" by the United States Attorney General before it becomes final and enforceable, the State submitted FERA to the Department for Justice for preclearance. See 42 U.S.C. § 1973c (1975). Second, since the Division of Elections is required to draft, approve and obtain preclearance for new administrative rules to accompany FERA.

### E.    Preclearance of FERA

12.    The preclearance requirement that governs Florida's election laws stems from Section 5 of the Federal Voting Rights Act of 1965. Section 5 requires that whenever states or political subdivisions that are "covered jurisdictions" under the Act seek to enact any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," they must obtain preclearance with the Department of Justice. Since the Department of Justice has identified five Florida counties as subject to this "preclearance" requirement, FERA, which affects these counties, was submitted by the Florida Attorney General to the Department of Justice for review and determination as to whether any of its sections has a discriminatory

---

[4]    On March 20, 2001, the plaintiffs joined the majority of the defendants and moved for a stay of these proceedings pending the outcome of the 2001 legislative session, stating that it would be prudent to suspend the proceedings during the legislative session so that the parties did not waste significant resources litigating issues that would either be altered or mooted by legislative enactments. (3/20/01) (doc. 46). The Court granted the parties' joint request on April 18, 2001 with the stay set to dissolve ten days after the legislative session concluded. (4/23/01) (doc. 68).

[5]    Chapter 2001-40, Laws of Florida (2001) (Tab 2).

motive or effect.[6]

13.   In a first letter dated August 17, 2001, Chief of the United States Department of Justice's Voting Section Joseph Rich, confirmed that the Department of Justice precleared 70 of FERA's 78 sections. In a subsequent December 17, 2001 letter, Rich indicated that the Department precleared another five sections, which relate to the institution of provisional ballots and the posting of "voter responsibilities" at polling places, leaving only three unprecleared sections, all relating to the new statewide voter registration database. See §§ 70-72 (statewide voter database). Then, by letter dated March 28, 2002, Rich precleared the remaining three sections related to the voter database. Accordingly, all sections, covering a wide range issues related to the administration of elections, from the poll worker training and voter education programs, to the new voter registration database, are now precleared. [7]

### F.   Rulemaking under FERA

14.   In specific instances, the legislature directed the Division of Elections to draft administrative rules to accompany FERA. See e.g., FERA § 59 (enacting § 98.255 Fla. Stat.) (specific statutory grant of authority for Division of Elections to draft rules regarding voter education), and FERA § 64 (enacting § 102.014(5) Fla. Stat.) (statutory authority granted to draft polling place procedures manual by rule). After FERA was signed into law in May 2001, the Division initiated the rulemaking process to draft and implement new administrative rules where required to give full complete effect to those new sections of the new law that specify it. .In so doing, the Division has promulgated rules that relate to voter intent, overseas voters, recount procedures, uniform ballots, non-partisan voter education and the polling place procedures manual. See (Tab 13). Some of the new rules that the Division has filed for adoption also relate to issues raised in this lawsuit. See e.g. proposed rule 1S-2.033 (nonpartisan voter education), and 1S-2.034 (polling place procedures manual) Fla. Admin. Weekly (2002) (Tabs 13, 14).

### G.   Election Acts of March 2002

15.   In March 2002, the Florida legislature passed additional election reform legislation in order to, among other things, further revise and clarify several of FERA's

---

[6]   42 U.S.C. § 1973c. (2000); 28 C.F.R. Pt. 51 (July 1, 2000) http://www.access.gpo.gov/nara/cfr/cfr-retrieve.html#page1.

[7]   See attached letters from Rich to Fla. Attorney General (Tabs 6-8).

provisions relating to the statewide voter database, the use of the provisional ballot, the layout and processing of voter-registration applications, the standards for accessible voting systems and polling places, and to clarify certain procedures under FERA relating to list maintenance programs. ballot.[8] Like FERA, these laws require preclearance by the Department of Justice in order to be given effect. With regard to these new election laws, by way of a letter dated June 24, 2002, the Department of Justice precleared all but section 6 of Chapter 2002-189, Laws of Florida. Those provisions relate to the procedures of notifying and removing the names of the deceased, felons and those adjudicated incompetents. See J. Rich Letter to R. A. Butterworth (Tab 9) (6/24/02). The Justice Department has requested additional information related to section 6 of Chapter 2002-189, but the remainder of that Chapter and Chapter 2002-17 are now fully enforceable, and they also bring additional new statutorily mandated, statewide uniformity as to the election-related procedures they address. Id.

### H. Florida Election Laws and Their Implementation

16. The Florida legislature, like certain other legislatures across the Country, has established a decentralized election system for registering voters, maintaining voter registries and administrating elections. See MacManus Depo at 91-92. Elections: A Framework for Evidentiary Reform Proposals, GAO-02-90 at 11. (Tabs 10, 22.)

17. The Secretary, through the Division of Elections, complies fully with the Secretary's obligations under the NVRA. Administration of the NVRA is done on a continuous basis. Tab 17, at 17:16-21 (Kast Dep.). In complying with its duty to "coordinate" the State's responsibilities under the NVRA, the Division provides uniform training to all the Supervisors of Elections and voter-registration agencies on their duties under the Act. Id. at 11:3-8, 24:11. This includes training to "all" the agencies "identified as responsible" under the NVRA, including

---

[8] See General Law Chapters 2002-17 (Senate Bill 618), and 2002-189 (House Bill 493) Leg. (Fla. 2002). Chapter 2002-17 (SB 618) revises, among other things, the requirements for poll workers' training (section 19), the posting of the Voter's Bill of Rights and Responsibilities (section 5), the procedure for canvassing provisional ballots (section 6), and the specifications for ballots (section 7) (Tab 3).

Chapter 2002-189 (HB 493) requires, among other things, the Department of Highway Safety and Motor Vehicles and other voter registration agencies to forward unsigned voter registration applications to the county elections supervisors (sections 2 and 3). It removes the county election supervisor's signature requirement for a voter registration card (section 4), allows a voter to notify a county election supervisor by phone of an address change (section 5), and also allows a voter to provide signature updates with the supervisor (section 8) (Tab 4).

7

Steel Hector & Davis LLP

Case No. 01-CIV-120-GOLD

"Department of Highway Safety, Children and Families, Elder Affairs, Department of Health, Division of Blind Services under the Department of Education . . . portions of the Department of Labor and Employment Security," as well as the Supervisors of Elections. Id. at 23:5-15 and 24:5-&. The NVRA training is "a uniform training session that covers all the agencies and the Supervisors of Elections' responsibilities under the NVRA." Id. at 24:23-25. Separate workshops are provided for the Supervisors in areas for which the agencies have no responsibilities. Id. at 25:4-7. Moreover, the Division coordinates with the designated agency coordinates regarding their responsibilities under NVRA. Id. at 27:21-25. The Division further coordinates with the Supervisions of Elections to compile data that would be required by the Federal Elections Commission under the NVRA, Id. at 12:22-13:2, and the Division provides that data to the Federal Election Commission "on an every-other-year basis" under the NVRA. Id. at 22:6-22.

       18.    In addition, the Division acts "as the coordinator on the State's responsibilities of NVRA by . . . provid[ing the agencies] posters to inform their clients or the public that they can register to vote in those agencies." Further, if questions or problems arise, the Division "coordinate[s] that to the agency, or at least forward[s] that over to the agency for their resolution." Id. at 36:25-37:10. The Division develops and distributes the required uniform statewide registration application forms. Id. at 22:6-22; 36:26-37:10. In sum, "the Division of Elections is in compliance with the NVRA." Id. at 52:12-16; 55:2-12.

       19.    Plaintiffs designated Gary McIntosh as their "NVRA expert" in this litigation. Tab 18, at 25:15-19 (McIntosh Dep.). He developed four "opinions" which he detailed in his report. He advances no opinion, however, that the Secretary of State or Division of Elections in any way violated the NVRA nor does he find anything in the Division's uniform statewide training presentation, "improper or incorrect." Tabs 18, 19 at 32:4-12; 45:11-24 (McIntosh Dep.). Nothing he reviewed led him to any opinion that there was an NVRA violation by the Director of the Division of Elections or the Secretary of State. Id. at 107:14-108:4.

       20.    Secretary Harris and Director Roberts hereby adopt the statements of fact filed by the other defendants, Iorio, Cowles, Leahy, Lowe, Stafford, Dickson and Kearney to the extent that they support the Secretary and Director's defenses, or relate or apply to the claims of the named plaintiffs.

8

Case No. 01-CIV-120-GOLD

Dated: July 1, 2002                  Respectfully submitted,

STEEL HECTOR & DAVIS LLP
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
561.650.7200; 561.655.1509 Facsimile

By: _____
John W. Little, III, P.A.
Florida Bar No. 384798
Joseph P. Klock, Jr.
Florida Bar No. 156678
Walter J. Harvey
Florida Bar No. 074144
C. Cory Mauro
Florida Bar No. 384739

Attorneys for Katherine Harris, Secretary of State, and L. Clayton Roberts, Director of Division of Elections

Case No. 01-CIV-120-GOLD

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served by U.S. Mail on July 1, 2002 to the following:

George Waas, Esq.
Douglas B. MacInnes, Esq.
Office of the Attorney General
The Capitol - Suite PL-01
Tallahassee, Florida 32399-1050
Attorney for Fred Dickson, Executive
Director of the Department of Highway
Safety and Motor Vehicles and Kathleen
Kearney, Executive Director of the
  Department of Children and Families

Anita Hodgkiss, Esq.
Todd A. Cox
Angela Ciccolo
Lori Outzs Borgen, Esq.
Laughlin McDonald
Louis M. Bograd
Alma C. Henderson
Judith Browne
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005-2124
Lawyers' Committee for Civil Rights Under Law

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Hillsborough County Attorney's Office
601 E. Kennedy Boulevard, 27th Floor
Tampa, Florida 33602
Attorney for Defendant Hillsborough County
Election Supervisor Pam Iorio

Thomasina Williams, Esq.
WILLIAMS & ASSOCIATES, P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Attorneys for Plaintiffs

Tracy I. Arpen, Jr., Esq.
Office of General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, Florida 32202-3700
Attorneys for Duval County Supervisor of
Elections John Stafford

Daniel D. Eckert, Esq
William J. Bosche III, Esq
Volusia County Attorney's Office
123 W. Indiana Avenue
DeLand, Florida 32720-4613
Attorneys for Deanie Lowe, Volusia County
Supervisor

Michael Cirullo, Esq.
Josias, Goren, Cherof, Doody and Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Fort Lauderdale, Florida 33308
Attorney for Defendant Cowles, Orange
  County Supervisor of Elections

Jeffrey Ehrlich, Esq.
Assistant County Attorney
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
Attorneys for Miami-Dade County Supervisor of
Elections David C. Leahy

Steel Hector & Davis LLP

Case No. 01-CIV-120-GOLD

> Raymond W. Bergan, Esq.
> Daniel Restrepo, Esq.
> Williams & Connolly LLP
> 725 12th Street NW
> Washington, DC 20005
> Attorneys for Choicepoint, Inc./DBT

_____
Walter J. Harvey

WPB_1998 396853v1  80993.1745