UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

Case No. 01-CIV-120-GOLD

FILED BY _____ D.C.

2002 JUL -1  PM 5: 07

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA- MIA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
by its FLORIDA STATE CONFERENCE OF
BRANCHES, et al.,

      Plaintiffs,

vs.

KATHERINE HARRIS,
Secretary of State of Florida, et al.,

      Defendants.

_____/

### NOTICE OF FILING APPENDIX TO
### SECRETARY OF STATE KATHERINE HARRIS AND DIRECTOR
### OF THE DIVISION OF ELECTIONS L. CLAYTON ROBERTS'
### MOTION FOR SUMMARY JUDGMENT WITH MEMORANDUM OF LAW

Defendants, Secretary of State Katherine Harris and Director of the Division of Elections

L. Clayton Roberts, file the attached appendix in support of their motion for summary judgment.

Dated:  July 1, 2002

Respectfully submitted,

By: _____

John W. Little III, P.A.
Florida Bar No. 384798
Alvin F. Lindsay III
Florida Bar No. 939056
Walter J. Harvey
Florida Bar No. 074144
Cory Mauro
Florida Bar No. 384739
STEEL HECTOR & DAVIS LLP
Counsel for Secretary of State
 Katherine Harris and the
 Director of the Division of Elections
 L. Clayton Roberts
1900 Phillips Point West
777 South Flagler Drive, Suite 1900
West Palm Beach, Florida 33401
Tel:  (561) 650-7270
Fax:  (561) 655-1509

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing notice was served via

U.S. Mail this ___1___ day of July, 2002, on counsel on the attached Service List.

_____
Walter J. Harvey

-2-

## SERVICE LIST

Anita Hodgkiss, Esq.
Barbara Arnwine, Esq.
Thomas J. Henderson, Esq.
Lori Outzs Borgen, Esq.
Lawyers' Committee for Civil Rights Under
    Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005-2124
**Lawyers' Committee for Civil Rights Under Law**

George Waas, Esq.
Douglas B. MacInnes, Esq.
Office of the Attorney General
The Capitol - Suite PL-01
Tallahassee, Florida 32399-1050
**Attorney for Fred Dickinson and Kathleen Kearney**

Jeffrey Ehrlich, Esq.
Susan Torres, Esq.
Assistant County Attorney
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
**Attorneys for Miami-Dade County Supervisor of Elections David C. Leahy**

H. Ray Allen, II, Esq.
Senior Assistant County Attorney
Hillsborough County Attorney's Office
601 E. Kennedy Boulevard, 27th Floor
Tampa, Florida 33602
**Attorney for Defendant Hillsborough County Election Supervisor Pam Iorio**

Raymond W. Bergan, Esq.
Daniel Restrepo, Esq.
Williams & Connolly LLP
725 12th Street NW
Washington, DC 20005
**Attorneys for Choicepoint, Inc./DBT**

Daniel D. Eckert, Esq
Frank B. Gummey, III, Esq
Volusia County Attorney's Office
123 W. Indiana Avenue
DeLand, Florida 32720-4613
**Attorneys for Deanie Lowe, Volusia County Supervisor**

Tracy I. Arpen, Jr., Esq.
Office of General Counsel
City of Jacksonville
117 W. Duval Street, Suite 480
Jacksonville, Florida 32202-3700
**Attorneys for Duval County Supervisor of Elections John Stafford**

Thomasina Williams, Esq.
WILLIAMS & ASSOCIATES, P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
**Attorneys for Plaintiffs**

Michael Cirullo, Esq.
Josias, Goren, Cherof, Doody and Ezrol, P.A.
3099 E. Commercial Boulevard, Suite 200
Fort Lauderdale, Florida 33308
**Attorney for Defendant Cowles**

Steel Hector & Davis LLP

**No.**

| | |
|---|---|
| 1 | Comparison of Original Prayer for Relief and Florida Election Reform Act |
| 2 | Federal Election Reform Act ("FERA") |
| 3 | Florida Laws, ch. 2002-17 |
| 4 | Florida Laws, ch. 2002-189 |
| 5 | Excerpt from Revitalizing Democracy in Florida, The Governor's Select Task Force on Election Procedures, Standards and Technology |
| 6 | Letter to Honorable Robert A. Butterworth dated  August 17, 2001 |
| 7 | Letter to Honorable Robert A. Butterworth dated December 17, 2001 |
| 8 | Letter to Honorable Robert A. Butterworth dated March 28, 2002 |
| 9 | Letter to Honorable Robert A. Butterworth dated June 24, 2002 |
| 10 | Excerpt from Elections: A Framework for Evaluating Reform Proposals |
| 11 | Section 2, Voting Rights Act before 1982 amendments |
| 12 | Section 2, Voting Rights Act after 1982 amendments |
| 13 | Index to Propose Rules |
| 14 | Polling Place Procedures Manual |
| 15 | Powerpoint Training Presentation |
| 16 | May 3, 2002 Oral Argument |
| 17 | Deposition of Edward Kast |
| 18 | Deposition of Gary E. McIntosh |
| 19 | Gary McIntosh Report |
| 20 | Deposition of David Leahy |
| 21 | Deposition of Pam Iorio |

22      Deposition of Susan MacManus

23      Deposition of Henry Flores

24      Deposition of David Klausner

25      Deposition of Placide Dossous

26      Deposition of Joanna Clark

27      Deposition of Admatha Israel

28      Deposition of Ursula Harvey

29      Deposition of Consuelo Maria Graham

30      Deposition of Valerie Buford with Exhibits

-4-

MIA2001/119505.1

# TAB 1

NAACP v. Harris
Case No. 01-CIV-120-GOLD

**Tab 1**
**ADDENDUM, TAB 1 - COMPARISON OF ORIGINAL PRAYER FOR RELIEF**
**AND FLORIDA ELECTION REFORM ACT[1]**

1.   Certification and use of "punch-card" voting machines or systems, as well as other unreliable voting systems.

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, 2001 Fla. Laws Ch. 2001-40, ("FERA") | (Additional) Reasons Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To decertify all "punch-card" voting methods and other unreliable voting methods as acceptable voting methods under Florida law. ¶ 4(a) | Effective September 2, 2002, a voting system that uses an apparatus or device for the piercing of ballots by the voter may not be used in this state. § 17. | The plaintiffs have dropped this claim as per May 3, 2002 oral argument. See Oral Arg., at 10-12; P. Craft's May 16, 2002 letter to A. Hodgkiss |

---

[1] Florida Election Reform Act ("FERA"), Division of Elections ("DOE"), Supervisors of Election ("SOE"), Department of Highway, Safety and Motor Vehicles ("DHSMV"), and Department of Children and Families ("DCF") are abbreviated herein.

2. **Maintenance and administration of voting systems.**

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To adopt standards and implement training designed to insure that voting systems and procedures at polling places within their jurisdiction are equal, accurate and reliable, and are uniformly administered. ¶ 4(b). | Pre-election procedures established for testing voting systems, and for training elections officials in order to increase the reliability and accuracy of vote tabulation and administration. § 21. | Under FERA, SOEs now get additional , supplemental funding through state. §§ 64, 66, 74. They only get this funding once. |
| To develop and implement training for all personnel involved in the administration of the electoral process to ensure compliance with this order and all laws related to the non-discriminatory operation of the political process. ¶ 4(i) | Division of Elections drafted polling place procedures manual, and county elections supervisors must have one at every polling place on election day.  § 64.<br><br>Pursuant to § 102.014(5) Fla. Stat., a polling place procedures manual has been published (effective 6/25/02). Rule 1S-2.034 F.A.C. Fla. Admin. Code.  See Tab 14  Poll worker training and recruitment are mandated.  §§ 64, 66, 74. | SOE's duty and responsibility to recruit, train, equip and compensate its poll workers.  §§ 101.012, 102.014, 102.021 Fla. Stat.<br><br>Counties must also continue to assess their polling place needs and fund election-day activities as they did pre-FERA, including the funding for polling place staff and equipment. |

2

3. Voter registration procedures.

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To provide a receipt to each voter who registers to vote in person at a designated registration site, including a SOE office, a DHSMV office, or a DFC office ¶ 4(c). | Neither the Florida Voter Registration Act nor the NVRA require receipt. | DOE does not register voters, and has no authority to require supervisors, DHSMV, DCF, or any other state agency for that matter, to issue receipts.<br><br>§§ 2, 3, Fla. Laws Ch. 2002-189, (HB493) - ("Supervisors' Bill") - (amending §§ 97.057, 97.058 Fla. Stat.) Requires all complete and incomplete applications, to be forwarded by DHSMV (and other voter registration agencies) to SOEs within 5 days (see attached).<br><br>DHSMV has already implemented a procedure of providing receipts to applicants. |

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To process all incomplete voter registrations initially received by the book closing date from an election; if it is possible to obtain missing information prior to the election date. ¶ 4(d). | If Supervisor of Elections receives incomplete voter registration application, supervisor must send letter requesting applicant to supply missing information in writing. § 62 (amending § 97.073 Fla.Stat.) | SOE's responsibility to register voters. |
| | | Book-closing date under Florida law is 29 days before an election. |
| | | Voter Registration Statutes are applied by SOEs, who have responsibility to allow only those who are properly registered before book closing date to vote in a given election |
| To mail new voter registration card 10 days before scheduled elections. ¶ 4(e) | Florida Statues sets forth the procedures for supervisors to follow in handling applications. § 97.073 Fla. Stat. (2001) | SOEs have responsibility to register voters.<br><br>SOEs are independent constitutional officers. |

4

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To develop and implement procedures that will ensure that voter registration applications are processed in a timely manner. ¶ 4(f). | Same as above. If Supervisor of Elections receives incomplete voter registration application, supervisor must send letter requesting applicant to supply missing information. § 62 (amending § 97.073 Fla.Stat.) | Same as above. §§ 2, 3, Fla. Laws Ch. 2002-189, (HB493) - ("Supervisors' Bill") - (amending §§ 97.057, 97.058 Fla. Stat.) Requires all complete and incomplete applications, to be forwarded by DHSMV to SOEs within 5 days (see attached). |
| To develop and implement procedures that will ensure that all customers at DHSMV have an equal opportunity to register to vote or update a voter registration. ¶ 4(g), 4(h). | Except as noted above, FERA does not address this issue | DOE has no authority over DHSMV or DCF. DOE trains their liaison, and provides training materials. DOE has no rulemaking authority as it relates to DHSMV, DFC. |

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To develop and implement training for all personnel involved in the administration of the electoral process to ensure compliance with this order and all laws related to the non-discriminatory operation of the political process. ¶ 4(s). | New pre-election procedures established for testing voting systems, and for training elections officials in order to increase the reliability and accuracy of vote tabulation and administration. § 21. Division of Elections must draft polling place procedures manual, and county elections supervisors must maintain a copy at every polling place on election day (to the extent this request for relief relates to voter registration, this only refers to a change-of-address forms and affirmations given by poll-worker to voter). § 64. Poll worker training and recruitment are mandated. §§ 64, 74. | FVRA requires DOE to conduct semi-annual training sessions for and with SOEs.<br><br>New central voter registration database is accessible for SOEs.<br><br>§§ 2, 3, Fla. Laws Ch. 2002-189, (HB493) - ("Supervisors' Bill") - (amending §§ 97.057, 97.058 Fla. Stat.) Requires all complete and incomplete applications, to be forwarded by DHSMV to SOEs within 5 days (see attached). |

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To provide equitable, accurate equipment, facilities and resources for the administration of the electoral process statewide. ¶ 4(t). | Provisional balloting is established. §§ 34, 35. Statewide voter registration database is established. §§ 70-72. | SOE's responsibility to man, equip, train and manage polling sites and precincts on election day. *See e.g.*, §§ 102.012, 102.014 Fla. Stat. |
| | Poll worker training and recruitment are mandated. §§ 64, 74 (amending § 102.014, Fla. Stat.) requires pollworkers to have a "working knowledge" of various aspects of election-day administration. | Some counties have taken voluntary measures to provide additional funding and certain communication equipment and resources to poll-workers at polling places, like laptop computers and cellular phones. |
| | Training is prescribed and funded. SOE may replace or retrain pollworkers who do not perform as required. | SOES conducts training sessions regularly. |
| | Detailed training guides, like the polling place procedures manual, are provided. 1S-2.034. | |
| | Training for poll workers requires at least six hours for clerks and at least four hours for inspectors before a federal election, and a certificate of completion is issued at end of session. § 64. | |

7

4.   List maintenance procedures and purging.

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To accurately determine and restore to appropriate status all persons wrongfully purged based on the DBT list and all other persons purged in violation of state and federal law. ¶ 4(N). | Provisional balloting is established. §§ 34, 35. Notification and verification of ineligibility are required before an individual is removed from voter registration list (i.e., felons). § 70. State-wide voter registration data-base is established. §§ 70-72. | DOE does not have authority to put voters back on the rolls. §§ 98.065, 98.075, 98.081 Fla. Stat. (2001). |
| To discontinue all voter purges of the voter registration rolls until the development of procedures to ensure uniform, non-discriminatory application of the law. ¶ 4(o). | Provisional balloting is established. §§ 34, 35. Verification of ineligibility required before removing registrant. § 70. State-wide voter registration data-base is established. §§ 70-72. | See above.<br><br>Statewide voter registration database went into effect and became fully operational on June 1, 2002 |
| (Continued) | Voter education programs are established. § 59. Election procedures manual must be kept at each election-day polling place. § 64." | No plaintiff has standing to pursue this claim. |
| To prohibit the removal of the name of any person from the official voter registration lists on account of death, felony conviction or adjudication of mental incapacity based on information that has not been | Provisional balloting is established. §§ 34, 35 (creating § 101.048 Fla. Stat). Notification and verification of ineligibility required before removing registrant. § 70. State-wide voter registration data-base is | Removal of names from the county voter rolls is the duty of SOEs. "Purge" is not a correct or accurate term. Refers to old law (see Iorio Dep. at 37-41). Refers to several procedures for removing ineligible |

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| verified and determined to be a correct match for that person. ¶ 4 (p). | established. §§ 70-72. | names. See, e.g., §§98.065, 98.075, 98.093, 98.0975, Fla. Stat.<br><br>No plaintiff in lawsuit has standing on this claim<br><br>Notice, hearing and appeal procedure for felons and incompetents provides adequate measures to verify or challenge accuracy of source data (i.e., FDLE, court clerks).<br><br>Felons and incompetents - notice and hearing appeal to review procedure - Appeal for removal of felons F.S. 98.075. |
| To complete all purges not later than 90 days before any election. ¶ 4(q). | FERA impacts this claim, but only to the extent listed above.<br><br>Defendants comply with NVRA, which distinguishes systematic list maintenance from removing ineligible voters, like felons and incompetents. 42 U.S.C. §1973 gg-6(c)(2)(a). | "Purge" is vague in that it refers to several possible procedures conducted by SOEs, including procedures that are no longer the law in Florida.<br><br>The procedure of removing felons, for example, is different from the general list maintenance procedure, conducted in odd years, in which persons are sent letters, and the letters are returned as non-deliverable. |
| To extend, by at least four years, the | The Florida law determines inactive | No such plaintiffs have been |

9

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| time that voters identified as those who may have moved, who did not vote in November 2000, remain on the active list before they are purged, to remedy the situation of inactive voters who were denied the right to vote in the November 2000 election. ¶ 4 (r). | voter status. | identified. |
| | Duties and responsibilities of SOEs to remove registrants or to place them in active or inactive status. See, e.g., §§ 98.065, 98.045, Fla. Stat. | NVRA requires Florida's "inactive" voters, or those who the NVRA describes as not having cast a vote in two federal elections after mail is returned as non-deliverable, to be removed from the voter rolls. 42 U.S.C. § 1973gg-6(d)(2)(A). |
| | Statute requires duplicates, and those who moved to be removed from list. See, e.g., §§ 98.045, 98.075, Fla. Stat. | |

10

5.   Use of inactive voter lists and accessibility to those lists.

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To maintain any list of inactive voters at polling places as part of the official list of eligible voters and as accessible to precinct officials as are the active lists. ¶ 4(c). | State-wide, on-line voter registration database and website. §§ 70-72. | Inactive lists are maintained by SOEs prior to and during election day. SOEs determine active and inactive status, and they maintain voter lists at polling sites. *See, e.g.* §§ 98.065, 98.075, 102.012, 102.021, 102.031, Fla. Stat. |
| | DOE must draft polling place procedures manual § 64; 1S-2.034 Fla. Admin. Code. | Lists are provided by SOEs and poll worker and has updated list on election day. |
| | Poll worker training and recruitment are mandated §§ 64, 74. | Voters can check the database at any time leading up to the election. |
| Plaintiffs claim full relief at ¶ 3, Sec. Adm. Compl. ¶ 95. | There is no conflict in these laws. Plaintiffs attempt to conflate wholly separate procedures. | Many SOEs, like Miami-Dade, do not distinguish active from inactive voters on voter registers maintained at the precinct on election day. |
| Alleged conflict between: F.S. § 97.057, 98.045(2) and NVRA, 42 § 1973gg-3(d). | Florida voter registration act, passed by the Florida Legislature in 1993 to implement the NVRA, is consistent with the NVRA | SOEs conduct list maintenance programs. §§ 98.065, 98.075, 98.045 Fla. Stat. (2001). |
| | | In odd-numbered years, certain broad-based list maintenance programs are conducted by SOEs. |

11

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| | with the NVRA. | and they are completed not later than 90 days before an election.; voters who do not respond are not necessarily removed from rolls, but placed in inactive status. § 98.065, Fla. Stat. The NVRA's 90-day rule does not prohibit the removal of ineligible voters due certain disqualifying reasons, i.e., felony convictions. 42 U.S.C. § 1973gg-6(2)(B) |

6. Maintenance and administration of polling places.

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|

12

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To provide a mechanism for persons whose names do not appear on the list of registered voters at the polling place to vote in as timely a fashion as those whose names do appear on the list, subject to challenge if they are shown not to be qualified to vote. ¶ 3(d). | "Provisional balloting" is established so that persons whose names do not appear on the list of registered voters at the polling place may vote subject to challenge if they are shown not to be qualified to vote. §§ 34, 35, 36 (creating and amending, §§ 97.021, 101.045, 101.048 Fla. Stat.). | Pollworker manual has been published by rule pursuant to FERA, §64 (creating § 102.014 Fla. Stat.). Pollworker recruitment and training are set forth. Id., § 74.<br><br>See polling place procedures manual at 7.<br><br>If given voter's proper address, poll-workers can assist voter in locating proper precinct for voter to cast provisional ballot.  See polling place procedures manual at 6.  "Each supervisor of elections must provide each precinct with information which will enable the poll workers to direct voters to the proper precinct."<br><br>Poll workers shall have current lists of eligible voters.<br><br>Some SOEs, like Miami-Dade, will have new precinct-based equipment, labtops and cellular phone lines, available at every precinct polling place |

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| | | SOEs' responsibilities and duties to administer elections. |
| | | SOEs maintain precinct registers. § 98.471, F.S. |
| To develop and implement training for all personnel involved in the administration of the electoral process. ¶ 3(j). | New pre-election procedures established for testing voting systems, and for training elections officials in order to increase the reliability and accuracy of vote tabulation and administration. § 21, 22. DOE must draft elections-procedure manual, and county elections supervisors must maintain a copy at every polling place on election day. § 64. Poll worker training and recruitment are mandated. §§ 64, 74. | Same as above. |

14

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| To provide equitable, accurate equipment, facilities and resources for the administration of the electoral process statewide, including, but not limited to, the technology to facilitate verification of voter registration in all polling sites. ¶ 3(k). | Punch card voting systems are eliminated. § 17. Provisional balloting is established. §§ 34, 35. Statewide voter registration database is established. §§ 70-72. Poll worker training and recruitment are mandated. §§ 64, 74. Voter education programs are established. § 59. Election procedures manual must be kept at each election-day polling place. § 64. | Same as above. |
| To affirmatively notify voters of their rights at polling places, by posted notice or otherwise, including their rights to assistance, to correct their ballots if they believe they have made an error, to alternative identification procedures if they do not have a photo ID and to vote even if they have changed address, including the steps to follow to assert these rights. ¶ 3(l). | A Notice of "Voter's Bill of Rights" and "Voter Responsibilities" must be posted at each polling place. § 60. Voter education programs are established. § 59. Poll worker training and recruitment are mandated. §§ 64, 74. | This "Bill of Rights" itself is not enforceable, but its substantive provisions are found in other sections of the Florida Election Code and are enforceable. Plaintiffs' relief requested does not seek a Voters' Bill of Rights that is "enforceable," but one that informs voters of their substantive rights under Florida Law. FERA accomplishes this. |

15

7.   Monitoring.

| Prayer for Relief in Second Amended Complaint | FERA | (Additional) Reason Why Relief Cannot be Granted as to Harris and Roberts |
|---|---|---|
| Appointing, pursuant to Section 3(a) of the Voting Rights Act, 42 U.S.C. § 1973a, federal examiners in each of the Defendant counties for the next ten years. ¶ 4. | The plaintiffs must demonstrate a violation of voting rights laws. | Harris and Roberts have not violated any voting rights laws. |

MIA200 I/I 18241

16

# TAB 2

## CHAPTER 2001-40

### Committee Substitute for Senate Bill No. 1118

An act relating to elections; creating the Florida Election Reform Act
of 2001; amending s. 97.021, F.S.; revising definitions; amending ss.
98.471, 100.341, 100.361, F.S.; removing provisions relating to vot-
ing systems that use voting machines or paper ballots; amending s.
101.015, F.S.; requiring the Division of Elections to review the vot-
ing systems certification standards to ensure that new technologies
are available and appropriately certified for use; amending s.
101.151, F.S.; modifying specifications for ballots; requiring the De-
partment of State to adopt rules prescribing uniform ballots; amend-
ing ss. 101.21, 101.24, 101.292, 101.34, 101.341, 101.43, 101.49,
101.58, 101.71, 101.75, 104.30, 138.05, F.S.; removing provisions
relating to voting machines and updating references, to conform;
amending s. 101.5603, F.S.; deleting references to punchcard mark-
ing and voting devices; amending s. 101.5604, F.S.; requiring the use
of precinct tabulation electronic or electromechanical voting systems
in each county; amending s. 101.5606, F.S.; providing additional
requirements for electronic and electromechanical voting systems;
prohibiting the use of punchcard voting systems; amending s.
101.5607, F.S.; to correct a cross-reference; amending s. 101.5608,
F.S.; providing procedures for ballots rejected by the vote tabulation
device; amending s. 101.5612, F.S.; provide standards for logic and
accuracy testing of vote tabulating equipment; amending s.
101.5614, F.S.; removing references to canvassing returns at central
or regional locations, to conform; creating s. 101.595, F.S.; requiring
supervisors of elections and the Department of State to report on
voter errors following the general election; amending s. 102.012,
F.S.; prescribing additional duties for election boards; deleting refer-
ences to voting machines, to conform; amending s. 103.101, F.S.,
relating to the form of the presidential preference primary, to con-
form; amending s. 582.18, F.S., relating to the election of district
supervisors; conforming a cross-reference; repealing ss. 100.071,
101.141, 101.181, 101.191, 101.251, 101.5609, F.S., relating to the
specification and form of ballots, to conform; repealing ss. 101.011,
101.27, 101.28, 101.29, 101.32, 101.33, 101.35, 101.36, 101.37,
101.38, 101.39, 101.40, 101.445, 101.45, 101.46, 101.47, 101.54,
101.55, 101.56, F.S., relating to voting machines, to conform; amend-
ing s. 97.021, F.S.; revising the definitions of the terms "absent
elector" and "primary election"; providing additional definitions; cre-
ating s. 101.048, F.S.; providing procedures for voting and counting
provisional ballots; amending s. 101.045, F.S.; requiring verification
of an elector's eligibility if the elector's name is not on the precinct
register; amending s. 101.5614, F.S.; providing for the return of
provisional ballots to the supervisor of elections; providing for the
canvass of provisional ballots; clarifying the standard for counting
votes on spoiled ballots; amending s. 101.69, F.S.; allowing a voter
who has requested an absentee ballot and who decides to vote at the
polls on election day to vote a provisional ballot, if the absentee

**1**

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

ballot is not returned; amending s. 102.111, F.S.; changing the composition of the Elections Canvassing Commission; revising deadlines for county returns; amending s. 102.112, F.S.; revising deadlines for certification of election results; directing the Department of State to ignore late-filed election returns except in the case of a statutory emergency; amending s. 102.141, F.S.; requiring the county canvassing board to provide public notice of time and place of the canvass of provisional ballots; modifying deadlines for submitting unofficial returns; revising requirements for an automatic machine recount; amending s. 102.166, F.S.; substantially modifying standards and procedures for manual recounts; repealing s. 102.167, F.S.; eliminating a form for protests; amending s. 102.168, F.S.; revising the grounds for an election contest; amending s. 99.063, F.S.; adjusting the date to designate a Lieutenant Governor running mate; revising the primary date in 2002 and providing for only one primary until 2004; providing dates for Lieutenant Governor candidates to be designated and qualified; providing campaign finance reporting dates and contribution limits for the 2002 elections; creating s. 97.0555, F.S.; providing for registration of certain military and overseas persons; requiring the Department of State to adopt rules specifying eligibility; creating s. 101.6951, F.S.; providing for a state write-in absentee ballot for overseas voters; creating s. 101.6952, F.S.; providing for absentee ballots for overseas voters; creating s. 101.697, F.S.; providing for absentee ballot requests and voting via electronic transmission by overseas voters under certain circumstances; creating s. 101.698, F.S.; authorizing the Elections Canvassing Commission to adopt emergency rules during crises to facilitate absentee voting; amending s. 101.62, F.S.; modifying information on absentee ballot requests; amending s. 101.64, F.S.; modifying absentee ballot certificates; amending s. 101.65, F.S.; modifying instructions to absent electors; amending s. 101.657, F.S.; relating to voting absentee ballots; conforming provisions; amending s. 101.68, F.S.; modifying information that must be included on an absentee ballot; authorizing the processing of absentee ballots through tabulations for a specified period before the election; amending s. 104.047, F.S.; deleting a prohibition against persons witnessing more than five ballots in an election and a prohibition against returning more than two ballots in an election, and the penalties therefor; repealing ss. 101.647, 101.685, F.S., relating to returning absentee ballots and absentee ballot coordinators; amending s. 98.255, F.S.; providing for voter education; amending s. 101.031, F.S.; providing for a Voter's Bill of Rights and Responsibilities; providing responsibilities of supervisors of elections; amending s. 101.131, F.S.; eliminating a requirement to call out names of voters; creating s. 102.014, F.S.; providing for pollworker recruitment and training; repealing s. 102.012(8) and (9), F.S., relating to pollworker training, to conform; amending s. 102.021, F.S.; to correct a cross-reference; amending s. 97.073, F.S.; revising procedures to be followed when a voter registration application is incomplete; amending s. 106.31, F.S.; providing legislative intent with respect to campaign financing; amending s. 106.33, F.S.; prohibiting the use of contributions from individuals who are not

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

state residents to meet the eligibility threshold for receiving election campaign financing; amending s. 106.35, F.S.; providing that contributions from individuals who are not state residents may not be used as qualifying matching contributions; creating s. 98.0977, F.S.; providing for development of a statewide voter registration database; providing for update of information in the database; requiring quarterly progress reports to the Legislature until fully implemented; providing for an operational date; providing for the use and distribution of an appropriation for the design of a statewide voter registration database; creating s. 98.0979, F.S.; prescribing requirements for copying information in the statewide voter registration database; repealing s. 98.0975, F.S., relating to the central voter file maintained by the Division of Elections; providing for the use and distribution of an appropriation for voter education and pollworker training; requiring the Division of Elections to provide a progress report on the upgrading of voting systems; providing for the distribution of an appropriation from the General Appropriations Act to counties; providing for study of elections process in multiple time zones; containing a severability clause; providing effective dates.

Be It Enacted by the Legislature of the State of Florida:

Section 1.    This act shall be known as the "Florida Election Reform Act of 2001."

Section 2.    Effective September 2, 2002, subsections (2), (35), and (36) of section 97.021, Florida Statutes, as amended by this act, are amended to read:

97.021    Definitions.—For the purposes of this code, except where the context clearly indicates otherwise, the term:

(2)    "Ballot" or "official ballot" when used in reference to:

(a)    "Voting machines," except when reference is made to write-in ballots, means that portion of the printed strips of cardboard, paper, or other material that is within the ballot frames containing the names of candidates, or a statement of a proposed constitutional amendment or other question or proposition submitted to the electorate at any election.

(a)(b)    "Paper ballots" means that printed sheet of paper, used in conjunction with an electronic or electromechanical vote tabulation voting system, containing the names of candidates, or a statement of proposed constitutional amendments or other questions or propositions submitted to the electorate at any election, on which sheet of paper an elector casts his or her vote.

(b)(c)    "Electronic or electromechanical devices" means a ballot that which is voted by the process of electronically designating, including by touchscreen, punching or marking with a marking device for tabulation by automatic tabulating equipment or data processing equipment.

CODING:  Words stricken are deletions; words underlined are additions.

(35) "Voting booth" or "booth" means that booth or enclosure wherein an elector casts his or her ballot, ~~be it a paper ballot, a voting machine ballot, or a ballot cast~~ for tabulation by an electronic or electromechanical device.

(36) "Voting system" means a method of casting and processing votes that functions wholly or partly by use of ~~mechanical,~~ electromechanical, or electronic apparatus or by use of paper ballots and includes, but is not limited to, the procedures for casting and processing votes and the programs, operating manuals, tabulating cards, printouts, and other software necessary for the system's operation.

Section 3.  Effective September 2, 2002, section 98.471, Florida Statutes, is amended to read:

98.471  Use of precinct register at polls.—The precinct register, as prescribed in s. 98.461, may be used at the polls in lieu of the registration books for the purpose of identifying the elector at the polls prior to allowing him or her to vote. The clerk or inspector shall require each elector, upon entering the polling place, to present a Florida driver's license, a Florida identification card issued under s. 322.051, or another form of picture identification approved by the Department of State. The elector shall sign his or her name in the space provided, and the clerk or inspector shall compare the signature with that on the identification provided by the elector and enter his or her initials in the space provided and allow the elector to vote if the clerk or inspector is satisfied as to the identity of the elector. If the elector fails to furnish the required identification, or if the clerk or inspector is in doubt as to the identity of the elector, such clerk or inspector shall follow the procedure prescribed in s. 101.49. ~~The precinct register may also contain the information set forth in s. 101.47(8) and, if so, the inspector shall follow the procedure required in s. 101.47, except that the identification provided by the elector shall be used for the signature comparison.~~

Section 4.  Section 100.341, Florida Statutes, is amended to read:

100.341  Bond referendum ballot.—The ballots used in bond referenda shall include a ~~be on plain white paper with~~ printed description of the issuance of bonds to be voted on as prescribed by the authority calling the referendum. A separate statement of each issue of bonds to be approved, giving the amount of the bonds and interest rate thereon, together with other details necessary to inform the electors, shall be printed on the ballots in connection with the question "For Bonds" and "Against Bonds."

Section 5.  Effective September 2, 2002, subsection (3) of section 100.361, Florida Statutes, is amended to read:

100.361  Municipal recall.—

(3)  BALLOTS.—The ballots at the recall election shall conform to the following: With respect to each person whose removal is sought, the question shall be submitted: "Shall .... be removed from the office of .... by recall?" Immediately following each question there shall be printed on the ballots the two propositions in the order here set forth:

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

"...(name of person)... should be removed from office."

"...(name of person)... should not be removed from office."

~~Immediately to the right of each of the propositions shall be placed a square on which the electors, by making a crossmark (X), may vote either of the propositions. Voting machines or electronic or electromechanical equipment may be used.~~

Section 6.    Effective upon this act becoming a law, subsection (7) is added to section 101.015, Florida Statutes, to read:

101.015    Standards for voting systems.—

(7)    The Division of Elections shall review the voting systems certification standards and ensure that new technologies are available for selection by boards of county commissioners which meet the requirements for voting systems and meet user standards. The Division of Elections shall continuously review the voting systems certification standards to ensure that new technologies are appropriately certified for all elections in a timely manner. The division shall also develop methods to determine the will of the public with respect to voting systems.

Section 7.    Section 101.151, Florida Statutes, is amended to read:

101.151    Specifications for ballots ~~general election ballot.~~ —~~In counties in which voting machines are not used, and in other counties for use as absentee ballots not designed for tabulation by an electronic or electromechanical voting system, the general election ballot shall conform to the following specifications:~~

(1)    Paper ballots ~~The ballot~~ shall be printed on paper of such thickness that the printing cannot be distinguished from the back.

~~(2)    Across the top of the ballot shall be printed "Official Ballot, General Election," beneath which shall be printed the county, the precinct number, and the date of the election. The precinct number, however, shall not be required for absentee ballots. Above the caption of the ballot shall be two stubs with a perforated line between the stubs and between the lower stub and the top of the ballot. The top stub shall be stub No. 1 and shall have printed thereon, "General Election, Official Ballot," and then shall appear the name of the county, the precinct number, and the date of the election. On the left side shall be a blank line under which shall be printed "Signature of Voter." On the right side shall be "Initials of Issuing Official," above which there shall be a blank line. The second stub shall be the same, except there shall not be a space for signature of the elector. Both stubs No. 1 and No. 2 on ballots for each precinct shall be prenumbered consecutively, beginning with "No. 1." However, a second stub shall not be required for absentee ballots.~~

(2)~~(3)~~(a)    ~~Beneath the caption and preceding the names of candidates shall be the following words: "To vote for a candidate whose name is printed on the ballot, place a cross (X) mark in the blank space at the right of the~~

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

~~name of the candidate for whom you desire to vote. To vote for a write-in candidate, write the name of the candidate in the blank space provided for that purpose.~~" The ballot shall have headings under which shall appear the names of the offices and names of duly nominated candidates for the respective offices in the following order: the heading "~~Electors for~~ President and Vice President" and thereunder the names of the candidates for President and Vice President of the United States nominated by the political party that ~~which~~ received the highest vote for Governor in the last general election of the Governor in this state~~, above which shall appear the name of said party~~. Then shall appear the names of other candidates for President and Vice President of the United States who have been properly nominated. Votes cast for write-in candidates for President and Vice President shall be counted as votes cast for the presidential electors supporting such candidates. Then shall follow the heading "Congressional" and thereunder the offices of United States Senator and Representative in Congress; then the heading "State" and thereunder the offices of Governor and Lieutenant Governor, Secretary of State, Attorney General, Comptroller, Treasurer, Commissioner of Education, Commissioner of Agriculture, state attorney, and public defender, together with the names of the candidates for each office and the title of the office which they seek; then the heading "Legislative" and thereunder the offices of state senator and state representative; then the heading "County" and thereunder clerk of the circuit court, clerk of the county court (when authorized by law), sheriff, property appraiser, tax collector, district superintendent of schools, and supervisor of elections. Thereafter follows: members of the board of county commissioners, and such other county and district offices as are involved in the general election, in the order fixed by the Department of State, followed, in the year of their election, by "Party Offices," and thereunder the offices of state and county party executive committee members. ~~When a write-in candidate has qualified for any office, a subheading "Write-in Candidate for ...(name of office)..." shall be provided followed by a blank space in which to write the name of the candidate.~~ In addition to the names printed on the ballot, a blank space shall be provided under each heading for an office for which a write-in candidate has qualified. With respect to write-in candidates, if two or more candidates are seeking election to one office, only one blank space shall be provided.

(b)  ~~Immediately following the name of each office on the ballot shall be printed, "Vote for One."~~ When more than one candidate is nominated for office, the candidates for such office shall qualify and run in a group or district, and the group or district number shall be printed beneath the name of the office. Each nominee of a political party chosen in a primary shall appear on the general election ballot in the same numbered group or district as on the primary election ballot. ~~The name of the office shall be printed over each numbered group or district and each numbered group or district shall be clearly separated from the next numbered group or district, the same as in the case of single offices. Following the group or district number shall be printed the words, "Vote for One," and the names of the candidates in the respective groups or districts shall be arranged thereunder.~~

(c)  If in any election all the offices as set forth in paragraph (a) are not involved, those offices to be filled shall be arranged on the ballot in the order named.

CODING:  Words ~~stricken~~ are deletions; words underlined are additions.

(3)(a)(4)   The names of the candidates of the party that which received the highest number of votes for Governor in the last election in which a Governor was elected shall be placed first under the heading for each office on the general election ballot, together with an appropriate abbreviation of party name; the names of the candidates of the party that which received the second highest vote for Governor shall be second under the heading for each office, together with an appropriate abbreviation of the party name.

(b)(5)   Minor political party candidates and candidates with no party affiliation shall have their names appear on the general election ballot following the names of recognized political parties, in the same order as they were certified.

(4)(a)   The names of candidates for each office shall be arranged alphabetically as to surnames on a primary election ballot.

(b)   When two or more candidates running for the same office on a primary election ballot have the same or a similar surname, the word "incumbent" shall appear next to the incumbent's name.

(5)   The primary election ballot shall be arranged so that the offices of Governor and Lieutenant Governor are joined in a single voting space to allow each elector to cast a single vote for the joint candidacies for Governor and Lieutenant Governor, if applicable.

(6)   The general election ballot shall be arranged so that the offices of President and Vice President are joined in a single voting space to allow each elector to cast a single vote for the joint candidacies for President and Vice President and so that the offices of Governor and Lieutenant Governor are joined in a single voting space to allow each elector to cast a single vote for the joint candidacies for Governor and Lieutenant Governor.

(7)(6)   Except for justices or judges seeking retention, the names of unopposed candidates shall not appear on the general election ballot. Each unopposed candidate shall be deemed to have voted for himself or herself.

(8)(a)   The Department of State shall adopt rules prescribing a uniform primary and general election ballot for each certified voting system. The rules shall incorporate the requirements set forth in this section and shall prescribe additional matters and forms that include, without limitation:

1.   Clear and unambiguous ballot instructions and directions;

2.   Individual race layout; and

3.   Overall ballot layout.

(b)   The department rules shall graphically depict a sample uniform primary and general election ballot form for each certified voting system.

(7)   The same requirement as to the type, size, and kind of printing of official ballots in primary elections as provided in s. 101.141(5) shall govern the printing of official ballots in general elections.

**7**

CODING:  Words stricken are deletions; words underlined are additions.

~~(8)   Should the above directions for complete preparation of the ballot be insufficient, the Department of State shall determine and prescribe any additional matter or form. Not less than 60 days prior to a general election, the Department of State shall mail to each supervisor of elections the format of the ballot to be used for the general election.~~

~~(9)   The provisions of s. 101.141(7) shall be applicable in printing of said ballot.~~

Section 8.   Effective September 2, 2002, section 101.21, Florida Statutes, is amended to read:

101.21   Official ballots; number; printing; payment.—

(1)   Where applicable ~~In any county in which voting machines are not used~~, the supervisor of elections shall determine the actual number of ballots to be printed. The printing and delivery of ballots and cards of instruction shall, in a municipal election, be paid for by the municipality, and in all other elections by the county.

~~(2)   In any county in which voting machines are used, one set of official ballots shall be provided for each machine plus a number of sets equal to 5 percent of the total number of machines; one set shall be inserted or placed in or upon each machine, and the remainder of the sets shall be retained in the custody of the supervisor, unless it shall become necessary during the election to make use of same upon or in the machines.~~

Section 9.   Effective September 2, 2002, section 101.24, Florida Statutes, is amended to read:

101.24   Ballot boxes and ballots.—The supervisor of elections~~, except where voting machines are used,~~ shall prepare for each polling place one ballot box of sufficient size to contain all the ballots of the particular precinct, and the ballot box shall be plainly marked with the name of the precinct for which it is intended. An additional ballot box, if necessary, may be supplied to any precinct. Before each election, the supervisor shall place in the ballot box or ballot transfer container as many ballots as are required in s. 101.21. After securely sealing the ballot box or ballot transfer container, the supervisor shall send the ballot box or ballot transfer container to the clerk or inspector of election of the precinct in which it is to be used. The clerk or inspector shall be placed under oath or affirmation to perform his or her duties faithfully and without favor or prejudice to any political party.

Section 10.   Effective September 2, 2002, section 101.292, Florida Statutes, is amended to read:

101.292   Definitions; ss. 101.292-101.295.—As used in ss. 101.292-101.295, the following terms shall have the following meanings:

(1)   "Governing body" means the board of county commissioners of a county or any other governing body empowered by general or special act or local ordinance to purchase or sell voting equipment.

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(2) "Voting equipment" means ~~new or used voting machines and materials, parts, or other equipment necessary for the maintenance or improvement of voting machines, the individual or combined retail value of which is in excess of the threshold amount for CATEGORY TWO purchases provided in s. 287.017. The term "voting equipment" also includes~~ electronic or electromechanical voting systems, voting devices, and automatic tabulating equipment as defined in s. 101.5603, as well as materials, parts, or other equipment necessary for the operation and maintenance of such systems and devices, <u>the individual or combined retail value of which is in excess of the threshold amount for CATEGORY TWO purchases provided in s. 287.017</u>.

(3) "Purchase" means a contract for the purchase, lease, rental, or other acquisition of voting equipment.

Section 11.  Effective September 2, 2002, section 101.34, Florida Statutes, is amended to read:

101.34  Custody of voting <u>system</u> ~~machines~~.—The supervisor of elections shall be the custodian of <u>the</u> voting <u>system</u> ~~machines~~ in the county ~~using them~~, and he or she shall appoint deputies necessary to prepare and supervise the <u>voting system</u> ~~machines~~ prior to and during elections. The compensation for such deputies shall be paid by the supervisor of elections.

Section 12.  Effective September 2, 2002, section 101.341, Florida Statutes, is amended to read:

101.341  Prohibited activities by voting <u>system</u> ~~machine~~ custodians and deputy custodians.—

(1) No voting <u>system</u> ~~machine~~ custodian or deputy custodian or other employee of the supervisor of elections, which employee's duties are primarily involved with the preparation, maintenance, or repair of voting equipment, <u>may</u> ~~shall~~ accept employment or any form of consideration from any person or business entity involved in the purchase, repair, or sale of voting equipment unless such employment has the prior written approval of the supervisor of elections of the county by which such person is employed.

(2) Any person violating the provisions of this section is guilty of a misdemeanor of the first degree, punishable as provided by s. 775.082 or s. 775.083. Such person shall also be subject to immediate discharge from his or her position.

Section 13.  Effective September 2, 2002, section 101.43, Florida Statutes, is amended to read:

101.43  Substitute ballot.—When ~~voting machines are used and~~ the required official ballots for a precinct are not delivered in time to be used on election day, or after delivery, are lost, destroyed or stolen, the clerk or other officials whose duty it is to provide ballots for use at such election, in lieu of the official ballots, shall have substitute ballots prepared, conforming as nearly as possible to the official ballots, and the board of election shall substitute these ballots to be used in the same manner as the official ballots would have been used at the election.

**9**

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 14. Effective September 2, 2002, section 101.49, Florida Statutes, is amended to read:

101.49 Procedure of election officers where signatures differ.—

(1) Whenever any clerk or inspector, upon a just comparison of the <u>signatures</u> ~~signature~~, <u>doubts</u> ~~shall doubt~~ that the <u>signature</u> ~~handwriting affixed to a signature identification slip~~ of any elector who presents himself or herself at the polls to vote is the same as the signature of the elector affixed in the registration book, the clerk or inspector shall deliver to the person an affidavit which shall be in substantially the following form:

STATE OF FLORIDA,
COUNTY OF .....

I do solemnly swear (or affirm) that my name is ....; that I am .... years old; that I was born in the State of ....; that I am registered to vote, and at the time I registered I resided on .... Street, in the municipality of ...., County of ...., State of Florida; that I am a qualified voter of the county and state aforesaid and have not voted in this election.

...(Signature of voter)...

Sworn to and subscribed before me this .... day of ...., A. D. ...(year)....

...(Clerk or inspector of election)...
Precinct No. .....
County of .....

(2) The person shall fill out, in his or her own handwriting or with assistance from a member of the election board, the form and make an affidavit *to the facts stated in the filled-in form; such affidavit shall then be sworn* to and subscribed before one of the inspectors or clerks of the election who is authorized to administer the oath. Whenever the affidavit is made and filed with the clerk or inspector, the person shall then be admitted ~~to the voting machine~~ to cast his or her vote, but if the person fails or refuses to make out or file such affidavit, then he or she shall not be permitted to vote.

Section 15. Effective September 2, 2002, subsections (4), (5), and (8) of section 101.5603, Florida Statutes, are amended to read:

101.5603 Definitions relating to Electronic Voting Systems Act.—As used in this act, the term:

(4) "Electronic or electromechanical voting system" means a system of casting votes by use of voting devices or marking devices and counting ballots by employing automatic tabulating equipment or data processing equipment<u>, and the term includes touchscreen systems</u>.

(5) "Marking device" means ~~either an approved apparatus used for the piercing of ballots by the voter or~~ any approved device for marking a ballot with ink or other substance which will enable the ballot to be tabulated by means of automatic tabulating equipment.

(8) "Voting device" means ~~either an apparatus in which ballots are inserted and used in connection with a marking device for the piercing of~~

**10**

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

~~ballots by the voter or~~ an apparatus by which votes are registered electronically.

Section 16.  Effective September 2, 2002, section 101.5604, Florida Statutes, is amended to read:

101.5604  Adoption of system; procurement of equipment; commercial tabulations.—The board of county commissioners of any county, at any regular meeting or a special meeting called for the purpose, may, upon consultation with the supervisor of elections, adopt, purchase or otherwise procure, and provide for the use of any electronic or electromechanical voting system approved by the Department of State in all or a portion of the election precincts of that county. Thereafter the electronic or electromechanical voting system may be used for voting at all elections for public and party offices and on all measures and for receiving, registering, and counting the votes thereof in such election precincts as the governing body directs. <u>A county must use an electronic or electromechanical precinct-count tabulation voting system.</u> ~~Any such board may contract for the tabulation of votes at a location within the county when there is no suitable tabulating equipment available which is owned by the county.~~

Section 17.  <u>Effective September 2, 2002, a voting system that uses an apparatus or device for the piercing of ballots by the voter may not be used in this state.</u>

Section 18.  Effective September 2, 2002, section 101.5606, Florida Statutes, is amended to read:

101.5606  Requirements for approval of systems.—No electronic or electromechanical voting system shall be approved by the Department of State unless it is so constructed that:

(1)  It permits and requires voting in secrecy.

(2)  It permits each elector to vote at any election for all persons and offices for whom and for which the elector is lawfully entitled to vote, and no others; to vote for as many persons for an office as the elector is entitled to vote for; and to vote for or against any question upon which the elector is entitled to vote.

<u>(3)  The automatic tabulating equipment shall be set to reject a ballot and provide the elector an opportunity to correct the ballot where the number of votes for an office or measure exceeds the number which the voter is entitled to cast or where the tabulating equipment reads the ballot as a ballot with no votes cast.</u>

<u>(4)</u>~~(3)~~  <u>For rejected ballots that voters choose to cast,</u> the automatic tabulating equipment will be set to <u>accept the ballot and</u> reject all votes for any office or measure when the number of votes therefor exceeds the number which the voter is entitled to cast or when the voter is not entitled to cast a vote for the office or measure.

<u>(5)</u>~~(4)~~  It is capable of correctly counting votes.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(6)(5)  It permits each voter at a primary election to vote only for the candidates seeking nomination by the political party in which such voter is registered, for any candidate for nonpartisan office, and for any question upon which the voter is entitled to vote.

(7)(6)  At presidential elections it permits each elector, by one operation, to vote for all presidential electors of a party or for all presidential electors of candidates for President and Vice President with no party affiliation.

(8)(7)  It provides a method for write-in voting.

(9)(8)  It is capable of accumulating a count of the specific number of ballots tallied for a precinct, accumulating total votes by candidate for each office, and accumulating total votes for and against each question and issue of the ballots tallied for a precinct.

(10)(9)  It is capable of tallying votes from ballots of different political parties from the same precinct, in the case of a primary election.

(11)(10)  It is capable of automatically producing precinct totals in printed, marked, or punched form, or a combination thereof.

(12)(11)  If it is of a type which registers votes electronically, it will permit each voter to change his or her vote for any candidate or upon any question appearing on the official ballot up to the time that the voter takes the final step to register his or her vote and to have the vote computed.

(13)(12)  It is capable of providing records from which the operation of the voting system may be audited.

(14)  It uses a precinct-count tabulation system.

(15)  It does not use an apparatus or device for the piercing of ballots by the voter.

Section 19.  Paragraph (b) of subsection (1) of section 101.5607, Florida Statutes, is amended to read:

101.5607  Department of State to maintain voting system information; prepare software.—

(1)

(b)  Within 24 hours after the completion of any logic and accuracy test conducted pursuant to s. 101.5612(1), the supervisor of elections shall send by certified mail to the Department of State a copy of the tabulation program which was used in the logic and accuracy testing.

Section 20.  Paragraph (b) of subsection (2) of section 101.5608, Florida Statutes, is amended to read:

101.5608  Voting by electronic or electromechanical method; procedures.—

**12**

CODING: Words stricken are deletions; words underlined are additions.

(2)   When an electronic or electromechanical voting system utilizes a ballot card or paper ballot, the following procedures shall be followed:

(b)   Any voter who spoils his or her ballot or makes an error may return the ballot to the election official and secure another ballot, except that in no case shall a voter be furnished more than three ballots. If the vote tabulation device has rejected a ballot, the ballot shall be considered spoiled and a new ballot shall be provided to the voter unless the voter chooses to cast the rejected ballot. The election official, without examining the original ballot, shall state the possible reasons for the rejection and direct the voter to the instruction model provided at the precinct pursuant to s. 101.5611. A spoiled ballot shall be preserved, without examination, in an envelope provided for that purpose. The stub shall be removed from the ballot and placed in an envelope.

Section 21.   Section 101.5612, Florida Statutes, is amended to read:

101.5612   Testing of tabulating equipment.—

(1)   All electronic or electromechanical voting systems shall be thoroughly tested at the conclusion of maintenance and programming. Tests shall be sufficient to determine that the voting system is properly programmed, the election is correctly defined on the voting system, and all of the voting system input, output, and communication devices are working properly.

(2)(1)   On any day not more than 10 days prior to the election day, the supervisor of elections shall have the automatic tabulating equipment publicly tested to ascertain that the equipment will correctly count the votes cast for all offices and on all measures. Public notice of the time and place of the test shall be given at least 48 hours prior thereto by publication once in one or more newspapers of general circulation in the county or, if there is no newspaper of general circulation in the county, by posting such notice in at least four conspicuous places in the county. The supervisor or the municipal elections official may, at the time of qualifying, give written notice of the time and location of such public the preelection test to each candidate qualifying with that office and obtain a signed receipt that such notice has been given. The Department of State shall give written notice to each statewide candidate at the time of qualifying, or immediately at the end of qualifying, that the voting equipment will be tested and advise each such candidate to contact the county supervisor of elections as to the time and location of the public preelection test pretest. The supervisor or the municipal elections official shall, at least 15 days prior to an election, send written notice by certified mail to the county party chair of each political party and to all candidates for other than statewide office whose names appear on the ballot in the county and who did not receive written notification from the supervisor or municipal elections official at the time of qualifying, stating the time and location of the public preelection test of the automatic tabulating equipment. The canvassing board shall convene, and each member of the canvassing board shall certify to the accuracy of the test. For the test, the canvassing board may designate one member to represent it. The test shall be open to representatives of the political parties, the press, and the public. Each political party may designate one person with expertise in the computer field who shall be allowed in the central counting room when all tests

**13**

CODING:  Words stricken are deletions; words underlined are additions.

are being conducted and when the official votes are being counted. Such designee shall not interfere with the normal operation of the canvassing board.

(3)   For electronic or electromechanical voting systems configured to tabulate absentee ballots at a central or regional site, the public testing shall be conducted by processing a preaudited group of ballots so produced as to record a predetermined number of valid votes for each candidate and on each measure and to include one or more ballots for each office which have activated voting positions in excess of the number allowed by law in order to test the ability of the automatic tabulating equipment to reject such votes. If any error is detected, the cause therefor shall be corrected and an errorless count shall be made before the automatic tabulating equipment is approved. The test shall be repeated and errorless results achieved immediately before the start of the official count of the ballots and again after the completion of the official count. The programs and ballots used for testing shall be sealed and retained under the custody of the county canvassing board.

(4)(a)1.   For electronic or electromechanical voting systems configured to include electronic or electromechanical tabulation devices which are distributed to the precincts, all or a sample of the devices to be used in the election shall be publicly tested. If a sample is to be tested, the sample shall consist of a random selection of at least 5 percent or 10 of the devices, whichever is greater. The test shall be conducted by processing a group of ballots, causing the device to output results for the ballots processed, and comparing the output of results to the results expected for the ballots processed. The group of ballots shall be produced so as to record a predetermined number of valid votes for each candidate and on each measure and to include for each office one or more ballots which have activated voting positions in excess of the number allowed by law in order to test the ability of the tabulating device to reject such votes.

2.   If any tested tabulating device is found to have an error in tabulation, it shall be deemed unsatisfactory. For each device deemed unsatisfactory, the canvassing board shall take steps to determine the cause of the error, shall attempt to identify and test other devices that could reasonably be expected to have the same error, and shall test a number of additional devices sufficient to determine that all devices are satisfactory. Upon deeming any device unsatisfactory, the canvassing board may require all devices to be tested or may declare that all devices are unsatisfactory.

3.   If the operation or output of any tested tabulation device, such as spelling or the order of candidates on a report, is in error, such problem shall be reported to the canvassing board. The canvassing board shall then determine if the reported problem warrants its deeming the device unsatisfactory.

(b)   At the completion of testing under this subsection, the canvassing board or its representative, the representatives of the political parties, and the candidates or their representatives who attended the test shall witness the resetting of each device that passed to a preelection state of readiness and the sealing of each device that passed in such a manner as to secure its state of readiness until the opening of the polls.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

(c)  The canvassing board or its representative shall execute a written statement setting forth the tabulation devices tested, the results of the testing, the protective counter numbers, if applicable, of each tabulation device, the number of the seal securing each tabulation device at the conclusion of testing, any problems reported to the board as a result of the testing, and whether each device tested is satisfactory or unsatisfactory.

(d)  Any tabulating device deemed unsatisfactory shall be reprogrammed, repaired, or replaced and shall be made available for retesting. Such device must be determined by the canvassing board or its representative to be satisfactory before it may be used in any election. The canvassing board or its representative shall announce at the close of the first testing the date, place, and time that any unsatisfactory device will be retested or may, at the option of the board, notify by telephone each person who was present at the first testing as to the date, place, and time that the retesting will occur.

(e)  Records must be kept of all preelection testing of electronic or electromechanical tabulation devices used in any election. Such records are to be present and available for inspection and reference during public preelection testing by any person in attendance during such testing. The need of the canvassing board for access to such records during the testing shall take precedence over the need of other attendees to access such records so that the work of the canvassing board will not be delayed or hindered. Records of testing must include, for each device, the name of each person who tested the device and the date, place, time, and results of each test. Records of testing shall be retained as part of the official records of the election in which any device was used.

~~(2)  The test shall be conducted by processing a preaudited group of ballots so produced as to record a predetermined number of valid votes for each candidate and on each measure and shall include for each office one or more ballots which have votes in excess of the number allowed by law in order to test the ability of the automatic tabulating equipment to reject such votes. If any error is detected, the cause therefor shall be ascertained and corrected and an errorless count shall be made before the automatic tabulating equipment is approved. The test shall be repeated immediately before the start of the official count of the ballots in the same manner as set forth above. After the completion of the count, the test shall be repeated. The programs and ballots used shall be sealed and retained under the custody of the county canvassing board.~~

Section 22.   Effective September 2, 2002, subsections (1), (2), (3), and (7) of section 101.5614, Florida Statutes, as amended by this act, are amended to read:

101.5614   Canvass of returns.—

(1)~~(a)~~  In precincts in which an electronic or electromechanical voting system is used, as soon as the polls are closed, the election board shall secure the voting devices against further voting. The election board shall thereafter open the ballot box in the presence of members of the public desiring to witness the proceedings and count the number of voted ballots, unused ballots, provisional ballots, and spoiled ballots to ascertain whether such

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

number corresponds with the number of ballots issued by the supervisor. If there is a difference, this fact shall be reported in writing to the county canvassing board with the reasons therefor if known. The total number of voted ballots shall be entered on the forms provided. The proceedings of the election board at the precinct after the polls have closed shall be open to the public; however, no person except a member of the election board shall touch any ballot or ballot container or interfere with or obstruct the orderly count of the ballots.

(b)   In lieu of opening the ballot box at the precinct, the supervisor may direct the election board to keep the ballot box sealed and deliver it to a central or regional counting location. In this case, the election board shall count the stubs removed from the ballots to determine the number of voted ballots.

(2)(a)   If the ballots are to be tallied at a central location or at no more than three regional locations, the election board shall place all ballots that have been cast and the unused, void, provisional, and defective ballots in the container or containers provided for this purpose, which shall be sealed and delivered forthwith to the central or regional counting location or other designated location by two inspectors who shall not, whenever possible, be of the same political party. The election board shall certify that the ballots were placed in such container or containers and each container was sealed in its presence and under its supervision, and it shall further certify to the number of ballots of each type placed in the container or containers.

(2)(b)   If ballots are to be counted at the precincts, such ballots shall be counted pursuant to rules adopted by The Department of State, which rules shall, in accordance with s. 101.015, adopt rules that provide safeguards which conform as nearly as practicable to the safeguards provided in the procedures for the counting of votes at a precinct and at a central or regional location.

(3)(a)   All proceedings at the central or regional counting location or other designated location shall be under the direction of the county canvassing board and shall be open to the public, but no person except a person employed and authorized for the purpose shall touch any ballot or ballot container, any item of automatic tabulating equipment, or any return prior to its release. If the ballots are tabulated at regional locations, one member of the canvassing board or a person designated by the board to represent it shall be present at each location during the testing of the counting equipment and the tabulation of the ballots.

(3)(b)   The results of If ballots are tabulated at precinct regional locations, the results of such election may be transmitted via dedicated teleprocessing lines to the main computer system for the purpose of compilation of complete returns. The security guidelines for transmission of returns by dedicated teleprocessing lines shall conform to rules adopted by the Department of State pursuant to s. 101.015.

(7)   Absentee ballots may be counted by automatic tabulating equipment if they have been punched or marked in a manner which will enable them to be properly counted by such equipment.

**16**

CODING: Words stricken are deletions; words underlined are additions.

Section 23.   Effective September 2, 2002, section 101.58, Florida Statutes, is amended to read:

101.58  Supervising and observing registration and election processes.—
The Department of State may, at any time it deems fit, upon the petition of 5 percent of the registered electors, or upon the petition of any candidate, county executive committee chair, state committeeman or committee-woman, or state executive committee chair, appoint one or more deputies whose duties shall be to observe and examine the registration and election processes and the condition, custody, and operation of voting <u>systems and equipment</u> machines in any county or municipality. The deputy shall have access to all registration books and records as well as any other records or procedures relating to the voting process. The deputy may supervise preparation of the <u>voting equipment</u> election machines and procedures for election, and it shall be unlawful for any person to obstruct the deputy in the performance of his or her duty. The deputy shall file with the Department of State a report of his or her findings and observations of the registration and election processes in the county or municipality, and a copy of the report shall also be filed with the clerk of the circuit court of said county. The compensation of such deputies shall be fixed by the Department of State; and costs incurred under this section shall be paid from the annual operating appropriation made to the Department of State.

Section 24.   Section 101.595, Florida Statutes, is created to read:

101.595  Analysis and reports of voter error.—

(1)  No later than December 15 of each general election year, the supervisor of elections in each county shall report on voter errors to the Department of State, along with the likely reasons for the errors and other information as may be useful in evaluating the performance of the voting system and identifying problems with ballot design and instructions which may have contributed to voter confusion.

(2)  The Department of State, upon receipt of such information, shall prepare a public report on the performance of each type of voting system. The report must contain, but is not limited to, the following information:

(a)  An identification of problems with the ballot design or instructions which may have contributed to voter confusion;

(b)  An identification of voting system design problems; and

(c)  Recommendations for correcting any problems identified.

(3)  The Department of State shall submit the report to the Governor, the President of the Senate, and the Speaker of the House of Representatives by January 31 of each year following a general election.

Section 25.   Effective September 2, 2002, subsection (2) of section 101.71, Florida Statutes, is amended to read:

101.71  Polling place.—

**17**

CODING:  Words stricken are deletions; words <u>underlined</u> are additions.

(2)   Notwithstanding the provisions of subsection (1), whenever the supervisor of elections of any county determines that the accommodations for holding any election at a polling place designated for any precinct in the county are unavailable or are inadequate for the expeditious and efficient housing and handling of voting and voting paraphernalia, ~~including voting machines where used,~~ the supervisor may provide, not less than 30 days prior to the holding of an election, that the voting place for such precinct shall be moved to another site which shall be accessible to the public on election day in said precinct or, if such is not available, to another site which shall be accessible to the public on election day in a contiguous precinct. If such action of the supervisor results in the voting place for two or more precincts being located for the purposes of an election in one building, the voting places for the several precincts involved shall be established and maintained separate from each other in said building. When any supervisor moves any polling place pursuant to this subsection, the supervisor shall, not more than 30 days or fewer than 7 days prior to the holding of an election, give notice of the change of the polling place for the precinct involved, with clear description of the voting place to which changed, at least once in a newspaper of general circulation in said county. A notice of the change of the polling place involved shall be mailed, at least 14 days prior to an election, to each registered elector or to each household in which there is a registered elector.

Section 26.   Subsection (1) of section 101.75, Florida Statutes, is amended to read:

101.75   Municipal elections; change of dates for cause.—

(1)   In any municipality, when the date of the municipal election falls on the same date as any statewide or county election and <u>the</u> voting <u>devices of the voting system used in the county</u> ~~machines~~ are not available for both elections, the municipality may provide that the municipal election may be held within 30 days prior to or subsequent to the statewide or county election.

Section 27.   Effective September 2, 2002, subsections (4) and (7) of section 102.012, Florida Statutes, are amended to read:

102.012   Inspectors and clerks to conduct elections.—

(4)<u>(a)   The election board of each precinct shall attend the polling place by 6 a.m. of the day of the election and shall arrange the furniture, stationery, and voting equipment.</u>

<u>(b)</u>   An election board shall conduct the voting, beginning and closing at the time set forth in s. 100.011. If more than one board has been appointed, the second board shall, upon the closing of the polls, come on duty and count the votes cast. In such case, the first board shall turn over to the second board all closed ballot boxes, registration books, and other records of the election at the time the boards change. The second board shall continue counting until the count is complete or until 7 a.m. the next morning, and, if the count is not completed at that time, the first board that conducted the election shall again report for duty and complete the count. The second

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

board shall turn over to the first board all ballots counted, all ballots not counted, and all registration books and other records and shall advise the first board as to what has transpired in tabulating the results of the election.

(7)   For any precinct using voting machines, there shall be one election board appointed, plus an additional inspector for each machine in excess of one; however, the supervisor of elections may appoint a greater number of additional inspectors than required by this subsection.

Section 28.   Subsections (8) and (9) of section 103.101, Florida Statutes, are amended to read:

103.101   Presidential preference primary.—

(8)   All names of candidates or delegates shall be listed as directed by the Department of State. The ballot as prescribed in this section shall be used.

(9)   The presidential preference primary ballot shall be in substantially the following form:

OFFICIAL PRESIDENTIAL PREFERENCE
PRIMARY BALLOT

No. ... .... Party

....COUNTY, FLORIDA

Precinct No. ....

...(Date)...

...(Signature of Voter)...                    ...(Initials of Issuing Official)...

Stub No. 1

OFFICIAL PRESIDENTIAL PREFERENCE
PRIMARY BALLOT

No. ... .... Party

....COUNTY, FLORIDA

Precinct No. ....

...(Date)...

                                  ...(Initials of Issuing Official)...

Stub No. 2

OFFICIAL PRESIDENTIAL PREFERENCE
PRIMARY BALLOT

.... Party

....COUNTY, FLORIDA

Precinct No. ....

...(Date)...

Place a cross (X) in the blank space to the right of the name of the presidential candidate for whom you wish to vote,

CODING:  Words stricken are deletions; words underlined are additions.

~~For President~~

~~...(Name of Candidate)...~~

~~...(Name of Candidate)...~~

~~or place a cross (X) in the blank space to the right of the name of the delegate(s) for whom you wish to vote.~~

~~...(Name of Delegate)...~~          ~~...(Name of Candidate)...~~

Section 29.  Section 104.30, Florida Statutes, is amended to read:

104.30  Voting <u>system</u> ~~machine~~; unlawful possession; tampering.—

(1)  Any unauthorized person who unlawfully has possession of any voting <u>system, components,</u> ~~machine~~ or key thereof is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

(2)  Any person who tampers or attempts to tamper with or destroy any voting <u>system or equipment</u> ~~machine~~ with the intention of interfering with the election process or the results thereof is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Section 30.  Effective September 2, 2002, section 138.05, Florida Statutes, is amended to read:

138.05  Form of ballot.—The clerk of the circuit court of any county in this state, when the names of the towns, villages, and cities required in s. 138.04 have been furnished him or her, shall have printed, at the expense of the county, a suitable ballot to be used in <u>the</u> ~~said~~ election, <u>the</u> ~~said~~ ballot to contain, in alphabetical order, the names of all such towns, villages, and cities, and no other places shall be printed on the ~~said~~ ballots; ~~provided, that in counties where the use of voting machines is now or may hereafter be authorized by law, the requirements of this section shall, insofar as practicable, be adapted to the use of said voting machines~~.

Section 31.  Paragraph (c) of subsection (1) of section 582.18, Florida Statutes, is amended to read:

582.18  Election of supervisors of each district.—

(1)

(c)  The names of all nominees on behalf of whom such nominating petitions have been filed shall appear upon ballots in accordance with the general election laws. All qualified electors residing within the district shall be eligible to vote in such election. The candidates who receive the largest number of the votes cast from each group of candidates, ~~as provided in s. 100.071,~~ in such election shall be the elected supervisors from such group for such district. In the case of a newly created district participating in a regular election for the first time, three groups of candidates shall be elected for terms of 4 years, and two groups shall be elected for initial terms of 2 years. Each candidate elected shall assume office on the first Tuesday after the first Monday in January following the election.

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 32.  Sections 100.071, 101.141, 101.181, 101.191, 101.251, and 101.5609, Florida Statutes, are repealed.

Section 33.  Effective September 2, 2002, sections 101.011, 101.27, 101.28, 101.29, 101.32, 101.33, 101.35, 101.36, 101.37, 101.38, 101.39, 101.40, 101.445, 101.45, 101.46, 101.47, 101.54, 101.55, and 101.56, Florida Statutes, are repealed.

Section 34.  Section 97.021, Florida Statutes, is amended to read:

97.021  Definitions.—For the purposes of this code, except where the context clearly indicates otherwise, the term:

(1)  "Absent elector" means any registered and qualified voter who casts an absentee ballot.:

(a)  Is unable without another's assistance to attend the polls.

(b)  Is an inspector, a poll worker, a deputy voting machine custodian, a deputy sheriff, a supervisor of elections, or a deputy supervisor who is assigned to a different precinct than that in which he or she is registered to vote.

(c)  On account of the tenets of his or her religion, cannot attend the polls on the day of the general, special, or primary election.

(d)  May not be in the precinct of his or her residence during the hours the polls are open for voting on the day of the election.

(e)  Has changed his or her residency to another county in this state within the time period during which the registration books are closed for the election for which the ballot is requested.

(f)  Has changed his or her residency to another state and is ineligible under the laws of that state to vote in the general election; however, this pertains only to presidential ballots.

(2)  "Ballot" or "official ballot" when used in reference to:

(a)  "Voting machines," except when reference is made to write-in ballots, means that portion of the printed strips of cardboard, paper, or other material that is within the ballot frames containing the names of candidates, or a statement of a proposed constitutional amendment or other question or proposition submitted to the electorate at any election.

(b)  "Paper ballots" means that printed sheet of paper containing the names of candidates, or a statement of proposed constitutional amendments or other questions or propositions submitted to the electorate at any election, on which sheet of paper an elector casts his or her vote.

(c)  "Electronic or electromechanical devices" means a ballot which is voted by the process of punching or marking with a marking device for tabulation by automatic tabulating equipment or data processing equipment.

CODING:  Words stricken are deletions; words underlined are additions.

(3)  "Candidate" means any person to whom any one or more of the following applies:

(a)  Any person who seeks to qualify for nomination or election by means of the petitioning process.

(b)  Any person who seeks to qualify for election as a write-in candidate.

(c)  Any person who receives contributions or makes expenditures, or gives his or her consent for any other person to receive contributions or make expenditures, with a view to bringing about his or her nomination or election to, or retention in, public office.

(d)  Any person who appoints a treasurer and designates a primary depository.

(e)  Any person who files qualification papers and subscribes to a candidate's oath as required by law.

However, this definition does not include any candidate for a political party executive committee.

(4)  "Central voter file" means a statewide, centrally maintained database containing voter registration information of all counties in this state.

(5)  "Department" means the Department of State.

(6)  "Division" means the Division of Elections of the Department of State.

(7)  "Election" means any primary election, special primary election, special election, general election, or presidential preference primary election.

(8)  "Election board" means the clerk and inspectors appointed to conduct an election.

(9)  "Election costs" shall include, but not be limited to, expenditures for all paper supplies such as envelopes, instructions to voters, affidavits, reports, ballot cards, ballot booklets for absentee voters, postage, notices to voters; advertisements for registration book closings, testing of voting equipment, sample ballots, and polling places; forms used to qualify candidates; polling site rental and equipment delivery and pickup; data processing time and supplies; election records retention; and labor costs, including those costs uniquely associated with absentee ballot preparation, poll workers, and election night canvass.

(10)  "Elector" is synonymous with the word "voter" or "qualified elector or voter," except where the word is used to describe presidential electors.

(11)  "General election" means an election held on the first Tuesday after the first Monday in November in the even-numbered years, for the purpose of filling national, state, county, and district offices and for voting on constitutional amendments not otherwise provided for by law.

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(12) "Lists of registered electors" means copies of printed lists of registered electors, computer tapes or disks, or any other device used by the supervisor of elections to maintain voter records.

(13) "Member of the Merchant Marine" means an individual, other than a member of a uniformed service or an individual employed, enrolled, or maintained on the Great Lakes for the inland waterways, who is:

(a) Employed as an officer or crew member of a vessel documented under the laws of the United States, a vessel owned by the United States, or a vessel of foreign-flag registry under charter to or control of the United States; or

(b) Enrolled with the United States for employment or training for employment, or maintained by the United States for emergency relief service, as an officer or crew member of such vessel.

(14)(13) "Minor political party" is any group as defined in this subsection which on January 1 preceding a primary election does not have registered as members 5 percent of the total registered electors of the state. Any group of citizens organized for the general purposes of electing to office qualified persons and determining public issues under the democratic processes of the United States may become a minor political party of this state by filing with the department a certificate showing the name of the organization, the names of its current officers, including the members of its executive committee, and a copy of its constitution or bylaws. It shall be the duty of the minor political party to notify the department of any changes in the filing certificate within 5 days of such changes.

(15)(14) "Newspaper of general circulation" means a newspaper printed in the language most commonly spoken in the area within which it circulates and which is readily available for purchase by all inhabitants in the area of circulation, but does not include a newspaper intended primarily for members of a particular professional or occupational group, a newspaper the primary function of which is to carry legal notices, or a newspaper that is given away primarily to distribute advertising.

(16)(15) "Nominal value" means having a retail value of $10 or less.

(17)(16) "Nonpartisan office" means an office for which a candidate is prohibited from campaigning or qualifying for election or retention in office based on party affiliation.

(18)(17) "Office that serves persons with disabilities" means any state office that takes applications either in person or over the telephone from persons with disabilities for any program, service, or benefit primarily related to their disabilities.

(19) "Overseas voter" means:

(a) Members of the uniformed services while in the active service who are permanent residents of the state and are temporarily residing outside the territorial limits of the United States and the District of Columbia;

CODING: Words stricken are deletions; words underlined are additions.

(b)  Members of the Merchant Marine of the United States who are permanent residents of the state and are temporarily residing outside the territorial limits of the United States and the District of Columbia; and

(c)  Other citizens of the United States who are permanent residents of the state and are temporarily residing outside the territorial limits of the United States and the District of Columbia,

who are qualified and registered to vote as provided by law.

(20)  "Overvote" means that the elector marks or designates more names than there are persons to be elected to an office or designates more than one answer to a ballot question, and the tabulator records no vote for the office or question.

(21)(18)  "Persons with disabilities" means individuals who have a physical or mental impairment that substantially limits one or more major life activities.

(22)(19)  "Polling place" is the building which contains the polling room where ballots are cast.

(23)(20)  "Polling room" means the actual room in which ballots are cast.

(24)(21)  "Primary election" means an election held preceding the general election for the purpose of nominating a party nominee to be voted for in the general election to fill a national, state, county, or district office. The first primary is a nomination or elimination election; the second primary is a nominating election only.

(25)  "Provisional ballot" means a ballot issued to a voter by the election board at the polling place on election day for one of the following reasons:

(a)  The voter's name does not appear on the precinct register and verification of the voter's eligibility cannot be determined; or

(b)  There is an indication on the precinct register that the voter has requested an absentee ballot and there is no indication whether the voter has returned the absentee ballot.

(26)(22)  "Public assistance" means assistance provided through the food stamp program; the Medicaid program; the Special Supplemental Food Program for Women, Infants, and Children; and the WAGES Program.

(27)(23)  "Public office" means any federal, state, county, municipal, school, or other district office or position which is filled by vote of the electors.

(28)(24)  "Qualifying educational institution" means any public or private educational institution receiving state financial assistance which has, as its primary mission, the provision of education or training to students who are at least 18 years of age, provided such institution has more than 200 students enrolled in classes with the institution and provided that the recognized student government organization has requested this designation in

CODING:  Words ~~stricken~~ are deletions; words underlined are additions.

writing and has filed the request with the office of the supervisor of elections in the county in which the institution is located.

(29)(25)  "Special election" is a special election called for the purpose of voting on a party nominee to fill a vacancy in the national, state, county, or district office.

(30)(26)  "Special primary election" is a special nomination election designated by the Governor, called for the purpose of nominating a party nominee to be voted on in a general or special election.

(31)(27)  "Supervisor" means the supervisor of elections.

(32)  "Undervote" means that the elector does not properly designate any choice for an office or ballot question, and the tabulator records no vote for the office or question.

(33)  "Uniformed services" means the Army, Navy, Air Force, Marine Corps, and Coast Guard, the commissioned corps of the Public Health Service, and the commissioned corps of the National Oceanic and Atmospheric Administration.

(34)(28)  "Voter registration agency" means any office that provides public assistance, any office that serves persons with disabilities, any center for independent living, or any public library.

(35)(29)  "Voting booth" or "booth" means that booth or enclosure wherein an elector casts his or her ballot, be it a paper ballot, a voting machine ballot, or a ballot cast for tabulation by an electronic or electromechanical device.

(36)(30)  "Voting system" means a method of casting and processing votes that functions wholly or partly by use of mechanical, electromechanical, or electronic apparatus or by use of paper ballots and includes, but is not limited to, the procedures for casting and processing votes and the programs, operating manuals, tabulating cards, printouts, and other software necessary for the system's operation.

Section 35.    Section 101.048, Florida Statutes, is created to read:

101.048   Provisional ballots.—

(1)   At all elections, a voter claiming to be properly registered in the county and eligible to vote at the precinct in the election, but whose eligibility cannot be determined, shall be entitled to vote a provisional ballot. Once voted, the provisional ballot shall be placed in a secrecy envelope and thereafter sealed in a provisional ballot envelope. The provisional ballot shall be deposited in a ballot box. All provisional ballots shall remain sealed in their envelopes for return to the supervisor of elections.

(2)(a)   The county canvassing board shall examine each provisional ballot to determine if the person voting that ballot was entitled to vote at the precinct in the election and that the person had not already cast a ballot in the election.

CODING: Words stricken are deletions; words underlined are additions.

(b)1. If it is determined that the person was registered and entitled to vote at the precinct in the election, the canvassing board shall compare the signature on the provisional ballot envelope with the signature on the voter's registration and, if it matches, shall count the ballot.

2. If it is determined that the person voting the provisional ballot was not registered or entitled to vote at the precinct in the election, the provisional ballot shall not be counted and the ballot shall remain in the envelope containing the Provisional Ballot Voter's Certificate and the envelope marked "Rejected as Illegal."

(3) The Provisional Ballot Voter's Certificate shall be in substantially the following form:

STATE OF FLORIDA
COUNTY OF ....

I do solemnly swear (or affirm) that my name is ....; that my date of birth is ....; that I am registered to vote and at the time I registered I resided at ...., in the municipality of ...., in .... County, Florida; that I am a qualified voter of the county and have not voted in this election.

<div align="right">

...(Signature of Voter)...
...(Current Address)...

</div>

Sworn to and subscribed before me this .... day of ........, ...(year)....
...(Clerk or Inspector of Election)...

Additional information may be provided to further assist the supervisor of elections in determining eligibility. If known, please provide the place and date that you registered to vote.

(4) In counties where the voting system does not utilize a paper ballot, the supervisor of elections shall provide the appropriate provisional ballots to each polling place.

Section 36. Subsections (2) and (3) of section 101.045, Florida Statutes, are amended to read:

101.045 Electors must be registered in precinct; provisions for residence or name change.—

(2)(a) An elector who moves from the precinct within the county in which the elector is registered may be permitted to vote in the precinct to which he or she has moved his or her legal residence, provided such elector completes an affirmation in substantially the following form:

<div align="center">

Change of Legal Residence of Registered
Voter

</div>

Under penalties for false swearing, I, ...(Name of voter)..., swear (or affirm) that the former address of my legal residence was ...(Address of legal residence)... in the municipality of ...., in .... County, Florida, and I was registered to vote in the .... precinct of .... County, Florida; that I have not voted in the precinct of my former registration in this election; that I now reside

CODING: Words stricken are deletions; words underlined are additions.

at ...(Address of legal residence)... in the Municipality of ...., in .... County, Florida, and am therefore eligible to vote in the .... precinct of .... County, Florida; and I further swear (or affirm) that I am otherwise legally registered and entitled to vote.

...(Signature of voter whose address of legal residence has changed)...

(b) An elector whose name changes because of marriage or other legal process may be permitted to vote, provided such elector completes an affirmation in substantially the following form:

<div align="center">

Change of Name of Registered
Voter

</div>

Under penalties for false swearing, I, ...(New name of voter)..., swear (or affirm) that my name has been changed because of marriage or other legal process. My former name and address of legal residence appear on the registration books of precinct .... as follows:

Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Municipality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Florida, Zip . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
My present name and address of legal residence are as follows:
Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Municipality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Florida, Zip . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
and I further swear (or affirm) that I am otherwise legally registered and entitled to vote.

...(Signature of voter whose name has changed)...

(c) Such affirmation, when completed and presented at the precinct in which such elector is entitled to vote, <u>and upon verification of the elector's registration,</u> shall entitle such elector to vote as provided in this subsection. <u>If the elector's eligibility to vote cannot be determined, he or she shall be entitled to vote a provisional ballot, subject to the requirements and procedures in s. 101.048.</u> Upon receipt of an affirmation certifying a change in address of legal residence or name, the supervisor shall as soon as practicable make the necessary changes in the registration records of the county to indicate the change in address of legal residence or name of such elector.

(d) Instead of the affirmation contained in paragraph (a) or paragraph (b), an elector may complete a voter registration application that indicates the change of name or change of address of legal residence.

(e) A request for an absentee ballot pursuant to s. 101.62 which indicates that the elector has had a change of address of legal residence from that in the supervisor's records shall be sufficient as the notice to the supervisor of change of address of legal residence required by this section. Upon receipt of such request for an absentee ballot from an elector who has changed his or her address of legal residence, the supervisor shall provide the elector

<div align="center">

27

</div>

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

with the proper ballot for the precinct in which the elector then has his or her legal residence.

(3)   When an elector's name does not appear on the registration books of the election precinct in which the elector is registered ~~and when the elector cannot present a valid registration identification card~~, the elector may have his or her name restored if the supervisor is otherwise satisfied that the elector is validly registered, that the elector's name has been erroneously omitted from the books, and that the elector is entitled to have his or her name restored. The supervisor, if he or she is satisfied as to the elector's previous registration, shall allow such person to vote and shall thereafter issue a duplicate registration identification card.

Section 37.   Subsections (1), (2), (5), (6), and (8) of section 101.5614, Florida Statutes, are amended, and subsection (9) is added to said section to read:

101.5614   Canvass of returns.—

(1)(a)   In precincts in which an electronic or electromechanical voting system is used, as soon as the polls are closed, the election board shall secure the voting devices against further voting. The election board shall thereafter open the ballot box in the presence of members of the public desiring to witness the proceedings and count the number of voted ballots, unused ballots, <u>provisional ballots,</u> and spoiled ballots to ascertain whether such number corresponds with the number of ballots issued by the supervisor. If there is a difference, this fact shall be reported in writing to the county canvassing board with the reasons therefor if known. The total number of voted ballots shall be entered on the forms provided. The proceedings of the election board at the precinct after the polls have closed shall be open to the public; however, no person except a member of the election board shall touch any ballot or ballot container or interfere with or obstruct the orderly count of the ballots.

(b)   In lieu of opening the ballot box at the precinct, the supervisor may direct the election board to keep the ballot box sealed and deliver it to a central or regional counting location. In this case, the election board shall count the stubs removed from the ballots to determine the number of voted ballots.

(2)(a)   If the ballots are to be tallied at a central location or at no more than three regional locations, the election board shall place all ballots that have been cast and the unused, void, <u>provisional,</u> and defective ballots in the container or containers provided for this purpose, which shall be sealed and delivered forthwith to the central or regional counting location or other designated location by two inspectors who shall not, whenever possible, be of the same political party. The election board shall certify that the ballots were placed in such container or containers and each container was sealed in its presence and under its supervision, and it shall further certify to the number of ballots of each type placed in the container or containers.

(b)   If ballots are to be counted at the precincts, such ballots shall be counted pursuant to rules adopted by the Department of State, which rules

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

shall provide safeguards which conform as nearly as practicable to the safe-guards provided in the procedures for the counting of votes at a central location.

(5)  If any ballot card of the type for which the offices and measures are not printed directly on the card is damaged or defective so that it cannot properly be counted by the automatic tabulating equipment, a true duplicate copy shall be made of the damaged ballot card in the presence of witnesses and substituted for the damaged ballot. Likewise, a duplicate ballot card shall be made of a defective ballot which shall not include the invalid votes. All duplicate ballot cards shall be clearly labeled "duplicate," bear a serial number which shall be recorded on the damaged or defective ballot card, and be counted in lieu of the damaged or defective ballot. If any ballot card of the type for which offices and measures are printed directly on the card is damaged or defective so that it cannot properly be counted by the automatic tabulating equipment, a true duplicate copy may be made of the damaged ballot card in the presence of witnesses and in the manner set forth above, or the valid votes on the damaged ballot card may be manually counted at the counting center by the canvassing board, whichever procedure is best suited to the system used. If any paper ballot is damaged or defective so that it cannot be counted properly by the automatic tabulating equipment, the ballot shall be counted manually at the counting center by the canvassing board. The totals for all such ballots or ballot cards counted manually shall be added to the totals for the several precincts or election districts. No vote shall be declared invalid or void if there is a clear indication on the ballot that the voter has made a definite choice of the intent of the voter as determined by the canvassing board. After duplicating a ballot, the defective ballot shall be placed in an envelope provided for that purpose, and the duplicate ballot shall be tallied with the other ballots for that precinct.

(6)  If there is no clear indication on the ballot that the voter has made a definite choice for an office or ballot measure If an elector marks more names than there are persons to be elected to an office or if it is impossible to determine the elector's choice, the elector's ballot shall not be counted for that office or measure, but the ballot shall not be invalidated as to those names or measures which are properly marked.

(8)  The return printed by the automatic tabulating equipment, to which has been added the return of write-in, absentee, and manually counted votes and votes from provisional ballots, shall constitute the official return of the election upon certification by the canvassing board. Upon completion of the count, the returns shall be open to the public. A copy of the returns may be posted at the central counting place or at the office of the supervisor of elections in lieu of the posting of returns at individual precincts.

(9)  Any supervisor of elections, deputy supervisor of elections, canvass-ing board member, election board member, or election employee who re-leases the results of any election prior to the closing of the polls on election day commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Section 38.  Section 101.69, Florida Statutes, is amended to read:

CODING:  Words stricken are deletions; words underlined are additions.

101.69   Voting in person; return of absentee ballot.—The provisions of this code shall not be construed to prohibit any elector from voting in person at the elector's precinct on the day of an election notwithstanding that the elector has requested an absentee ballot for that election. An elector who has received an absentee ballot, but desires to vote in person, shall return the ballot, whether voted or not, to the election board in the elector's precinct. The returned ballot shall be marked "canceled" by the board and placed with other canceled ballots. However, if the elector is unable to return the ballot, the elector may <u>vote a provisional ballot as provided in s. 101.048</u> ~~execute an affidavit stating that the absentee ballot has not been voted and the elector may then vote at the precinct~~.

Section 39.   Section 102.111, Florida Statutes, is amended to read:

102.111   Elections Canvassing Commission.—

(1)   ~~Immediately after certification of any election by the county canvassing board, the results shall be forwarded to the Department of State concerning the election of any federal or state officer. The Governor, the Secretary of State, and the Director of the Division of Elections shall be the Elections Canvassing Commission.~~ <u>The Elections Canvassing Commission shall consist of the Governor and two members of the Cabinet selected by the Governor. If a member of the Elections Canvassing Commission is unable to serve for any reason, the Governor shall appoint a remaining member of the Cabinet. If there is a further vacancy, the remaining members of the commission shall agree on another elected official to fill the vacancy.</u> The Elections Canvassing Commission shall, as soon as the official results are compiled from all counties, certify the returns of the election and determine and declare who has been elected for each <u>federal, state, and multi-county</u> office. ~~In the event that any member of the Elections Canvassing Commission is unavailable to certify the returns of any election, such member shall be replaced by a substitute member of the Cabinet as determined by the Director of the Division of Elections. If the county returns are not received by the Department of State by 5 p.m. of the seventh day following an election, all missing counties shall be ignored, and the results shown by the returns on file shall be certified.~~

(2)   The Division of Elections shall provide the staff services required by the Elections Canvassing Commission.

Section 40.   Section 102.112, Florida Statutes, is amended to read:

102.112   Deadline for submission of county returns to the Department of State~~; penalties~~.—

(1)   The county canvassing board or a majority thereof shall file the county returns for the election of a federal or state officer with the Department of State immediately after certification of the election results.

<u>(2)</u>   Returns must be filed by 5 p.m. on the 7th day following <u>a</u> ~~the first~~ primary <u>election and by 5 p.m. on the 11th day following the</u> ~~and~~ general election ~~and by 3 p.m. on the 3rd day following the second primary~~.

**30**

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(3) If the returns are not received by the department by the time specified, such returns shall ~~may~~ be ignored and the results on file at that time shall ~~may~~ be certified by the department.

(4) If the returns are not received by the department due to an emergency, as defined in s. 101.732, the Elections Canvassing Commission shall determine the deadline by which the returns must be received.

~~(2) The department shall fine each board member $200 for each day such returns are late, the fine to be paid only from the board member's personal funds. Such fines shall be deposited into the Election Campaign Financing Trust Fund, created by s. 106.32.~~

~~(3) Members of the county canvassing board may appeal such fines to the Florida Elections Commission, which shall adopt rules for such appeals.~~

Section 41. Present subsections (5) and (6) of section 102.141, Florida Statutes, are redesignated as subsections (7) and (8), respectively, present subsection (4) is amended and redesignated as subsection (6), subsections (2) and (3) are amended, and new subsections (4) and (5) are added to that section to read:

102.141 County canvassing board; duties.—

(2) The county canvassing board shall meet in a building accessible to the public in the county where the election occurred at a time and place to be designated by the supervisor of elections to publicly canvass the absentee electors' ballots as provided for in s. 101.68 and provisional ballots as provided by s. 101.048. Public notice of the time and place at which the county canvassing board shall meet to canvass the absentee electors' ballots and provisional ballots shall be given at least 48 hours prior thereto by publication once in one or more newspapers of general circulation in the county or, if there is no newspaper of general circulation in the county, by posting such notice in at least four conspicuous places in the county. As soon as the absentee electors' ballots and the provisional ballots are canvassed, the board shall proceed to publicly canvass the vote given each candidate, nominee, constitutional amendment, or other measure submitted to the electorate of the county, as shown by the returns then on file in the office of the supervisor of elections and the office of the county court judge.

(3) The canvass, except the canvass of absentee electors' returns and the canvass of provisional ballots, shall be made from the returns and certificates of the inspectors as signed and filed by them with the county court judge and supervisor, respectively, and the county canvassing board shall not change the number of votes cast for a candidate, nominee, constitutional amendment, or other measure submitted to the electorate of the county, respectively, in any polling place, as shown by the returns. All returns shall be made to the board on or before 2 a.m. ~~noon~~ of the day following any primary, general, special, or other election. If the returns from any precinct are missing, if there are any omissions on the returns from any precinct, or if there is an obvious error on any such returns, the canvassing board shall order a recount of the returns from such precinct. Before canvassing such returns, the canvassing board shall examine the ~~counters on the machines~~

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

~~or the~~ tabulation of the ballots cast in such precinct and determine whether the returns correctly reflect the votes cast. If there is a discrepancy between the returns and the ~~counters of the machines or the~~ tabulation of the ballots cast, the ~~counters of such machines or the~~ tabulation of the ballots cast shall be presumed correct and such votes shall be canvassed accordingly.

(4)  The canvassing board shall submit unofficial returns to the Department of State for each federal, statewide, state, or multi-county office or ballot measure no later than noon on the day after any primary, general, special, or other election.

(5)  If the county canvassing board determines that the unofficial returns may contain a counting error in which the vote tabulation system failed to count votes that were properly marked in accordance with the instructions on the ballot, the county canvassing board shall:

(a)  Correct the error and recount the affected ballots with the vote tabulation system; or

(b)  Request that the Department of State verify the tabulation software. When the Department of State verifies such software, the department shall compare the software used to tabulate the votes with the software filed with the department pursuant to s. 101.5607 and check the election parameters.

(6)(4)  If the unofficial returns ~~for any office~~ reflect that a candidate for any office was defeated or eliminated by one-half of a percent or less of the votes cast for such office, that a candidate for retention to a judicial office was retained or not retained by one-half of a percent or less of the votes cast on the question of retention, or that a measure appearing on the ballot was approved or rejected by one-half of a percent or less of the votes cast on such measure, the board responsible for certifying the results of the vote on such race or measure shall order a recount of the votes cast with respect to such office or measure. A recount need not be ordered with respect to the returns for any office, however, if the candidate or candidates defeated or eliminated from contention for such office by one-half of a percent or less of the votes cast for such office request in writing that a recount not be made.

(a)  In counties with voting systems that use ballot cards or paper ballots, each canvassing board responsible for conducting a recount shall put each ballot through the automatic tabulating equipment for each precinct in which the office or issue appeared on the ballot and determine whether the returns correctly reflect the votes cast. Immediately before the start of the recount and after completion of the count, a test of the tabulating equipment shall be conducted as provided in s. 101.5612. If the test indicates no error, the recount tabulation of the ballots cast shall be presumed correct and such votes shall be canvassed accordingly. If an error is detected, the cause therefor shall be ascertained and corrected and the recount repeated, as necessary. The canvassing board shall immediately report the error, along with the cause of the error and the corrective measures being taken, to the Department of State. No later than 11 days after the election, the canvassing board shall file a separate incident report with the Department of State, detailing the resolution of the matter and identifying any measures that will avoid a future recurrence of the error.

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(b)   In counties with voting systems that do not use ballot cards or paper ballots, each canvassing board responsible for conducting a recount shall examine the counters on the precinct tabulators to ensure that the total of the returns on the precinct tabulators equals the overall election return machines or the tabulation of the ballots cast in each precinct in which the office or issue appeared on the ballot and determine whether the returns correctly reflect the votes cast. If there is a discrepancy between the overall election return returns and the counters of the precinct tabulators machines or the tabulation of the ballots cast, the counters of the precinct tabulators of such machines or the tabulation of the ballots cast shall be presumed correct and such votes shall be canvassed accordingly.

(c)   The canvassing board shall submit a second set of unofficial returns to the Department of State for each federal, statewide, state, or multi-county office or ballot measure no later than noon on the second day after any election in which a recount was conducted pursuant to this subsection. If the canvassing board is unable to complete the recount prescribed in this subsection by the deadline, the second set of unofficial returns submitted by the canvassing board shall be identical to the initial unofficial returns and the submission shall also include a detailed explanation of why it was unable to timely complete the recount. However, the canvassing board shall complete the recount prescribed in this subsection, along with any manual recount prescribed in s. 102.166, and certify election returns in accordance with the requirements of this chapter.

Section 42.   Section 102.166, Florida Statutes, is amended to read:

102.166   Manual recounts Protest of election returns; procedure.—

(1)   If the second set of unofficial returns pursuant to s. 102.141 indicates that a candidate for any office was defeated or eliminated by one-quarter of a percent or less of the votes cast for such office, that a candidate for retention to a judicial office was retained or not retained by one-quarter of a percent or less of the votes cast on the question of retention, or that a measure appearing on the ballot was approved or rejected by one-quarter of a percent or less of the votes cast on such measure, the board responsible for certifying the results of the vote on such race or ballot measure shall order a manual recount of the overvotes and undervotes cast in the entire geographic jurisdiction of such office or ballot measure.

(2)(a)   If the second set of unofficial returns pursuant to s. 102.141 indicates that a candidate for any office was defeated or eliminated by between one-quarter and one-half of a percent of the votes cast for such office, that a candidate for retention to judicial office was retained or not retained by between one-quarter and one-half of a percent of the votes cast on the question of retention, or that a measure appearing on the ballot was approved or rejected by between one-quarter and one-half of a percent of the votes cast on such measure, any such candidate, the political party of such candidate, or any political committee that supports or opposes such ballot measure is entitled to a manual recount of the overvotes and undervotes cast in the entire geographic jurisdiction of such office or ballot measure, provided that a request for a manual recount is made by 5 p.m. on the second day after the election.

CODING: Words stricken are deletions; words underlined are additions.

(b)  For federal, statewide, state, and multi-county races and ballot issues, requests for a manual recount shall be made in writing to the state Elections Canvassing Commission. For all other races and ballot issues, requests for a manual recount shall be made in writing to the county canvassing board.

(c)  Upon receipt of a proper and timely request, the Elections Canvassing Commission or county canvassing board shall immediately order a manual recount of overvotes and undervotes in all affected jurisdictions.

(3)(a)  Any hardware or software used to identify and sort overvotes and undervotes for a given race or ballot measure must be certified by the Department of State as part of the voting system pursuant to s. 101.015. Any such hardware or software must be capable of simultaneously counting votes. For certified voting systems, the department shall certify such hardware or software by July 1, 2002. If the department is unable to certify such hardware or software for a certified voting system by July 1, 2002, the department shall adopt rules prescribing procedures for identifying and sorting such overvotes and undervotes. The department's rules may provide for the temporary use of hardware or software whose sole function is identifying and sorting overvotes and undervotes.

(b)  This subsection does not preclude the department from certifying hardware or software after July 1, 2002.

(c)  Overvotes and undervotes shall be identified and sorted while recounting ballots pursuant to s. 102.141, if the hardware or software for this purpose has been certified or the department's rules so provide.

(1)  Any candidate for nomination or election, or any elector qualified to vote in the election related to such candidacy, shall have the right to protest the returns of the election as being erroneous by filing with the appropriate canvassing board a sworn, written protest.

(2)  Such protest shall be filed with the canvassing board prior to the time the canvassing board certifies the results for the office being protested or within 5 days after midnight of the date the election is held, whichever occurs later.

(3)  Before canvassing the returns of the election, the canvassing board shall:

(a)  When paper ballots are used, examine the tabulation of the paper ballots cast.

(b)  When voting machines are used, examine the counters on the machines of nonprinter machines or the printer-pac on printer machines. If there is a discrepancy between the returns and the counters of the machines or the printer-pac, the counters of such machines or the printer-pac shall be presumed correct.

(c)  When electronic or electromechanical equipment is used, the canvassing board shall examine precinct records and election returns. If there is a

CODING: Words stricken are deletions; words underlined are additions.

~~clerical error, such error shall be corrected by the county canvassing board.
If there is a discrepancy which could affect the outcome of an election, the
canvassing board may recount the ballots on the automatic tabulating
equipment.~~

~~(4)(a)  Any candidate whose name appeared on the ballot, any political
committee that supports or opposes an issue which appeared on the ballot,
or any political party whose candidates' names appeared on the ballot may
file a written request with the county canvassing board for a manual re-
count. The written request shall contain a statement of the reason the
manual recount is being requested.~~

~~(b)  Such request must be filed with the canvassing board prior to the time
the canvassing board certifies the results for the office being protested or
within 72 hours after midnight of the date the election was held, whichever
occurs later.~~

~~(c)  The county canvassing board may authorize a manual recount. If a
manual recount is authorized, the county canvassing board shall make a
reasonable effort to notify each candidate whose race is being recounted of
the time and place of such recount.~~

~~(d)  The manual recount must include at least three precincts and at least
1 percent of the total votes cast for such candidate or issue. In the event
there are less than three precincts involved in the election, all precincts shall
be counted. The person who requested the recount shall choose three pre-
cincts to be recounted, and, if other precincts are recounted, the county
canvassing board shall select the additional precincts.~~

~~(5)  If the manual recount indicates an error in the vote tabulation which
could affect the outcome of the election, the county canvassing board shall:~~

~~(a)  Correct the error and recount the remaining precincts with the vote
tabulation system;~~

~~(b)  Request the Department of State to verify the tabulation software; or~~

~~(c)  Manually recount all ballots.~~

(4)(6)  Any manual recount shall be open to the public.

(5)(a)  A vote for a candidate or ballot measure shall be counted if there
is a clear indication on the ballot that the voter has made a definite choice.

(b)  The Department of State shall adopt specific rules for each certified
voting system prescribing what constitutes a "clear indication on the ballot
that the voter has made a definite choice." The rules may not:

1.  Exclusively provide that the voter must properly mark or designate his
or her choice on the ballot; or

2.  Contain a catch-all provision that fails to identify specific standards,
such as "any other mark or indication clearly indicating that the voter has
made a definite choice."

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(6)(7) Procedures for a manual recount are as follows:

(a) The county canvassing board shall appoint as many counting teams of at least two electors as is necessary to manually recount the ballots. A counting team must have, when possible, members of at least two political parties. A candidate involved in the race shall not be a member of the counting team.

(b) If a counting team is unable to determine whether the ballot contains a clear indication that the voter has made a definite choice a voter's intent in casting a ballot, the ballot shall be presented to the county canvassing board for a determination it to determine the voter's intent.

(c) The Department of State shall adopt detailed rules prescribing additional recount procedures for each certified voting system which shall be uniform to the extent practicable. The rules shall address, at a minimum, the following areas:

1. Security of ballots during the recount process;

2. Time and place of recounts;

3. Public observance of recounts;

4. Objections to ballot determinations;

5. Record of recount proceedings; and

6. Procedures relating to candidate and petitioner representatives.

(8) If the county canvassing board determines the need to verify the tabulation software, the county canvassing board shall request in writing that the Department of State verify the software.

(9) When the Department of State verifies such software, the department shall:

(a) Compare the software used to tabulate the votes with the software filed with the Department of State pursuant to s. 101.5607; and

(b) Check the election parameters.

(10) The Department of State shall respond to the county canvassing board within 3 working days.

Section 43. Section 102.167, Florida Statutes, is repealed.

Section 44. Section 102.168, Florida Statutes, is amended to read:

102.168 Contest of election.—

(1) Except as provided in s. 102.171, the certification of election or nomination of any person to office, or of the result on any question submitted by referendum, may be contested in the circuit court by any unsuccessful candi-

CODING: Words stricken are deletions; words underlined are additions.

date for such office or nomination thereto or by any elector qualified to vote in the election related to such candidacy, or by any taxpayer, respectively.

(2)   Such contestant shall file a complaint, together with the fees prescribed in chapter 28, with the clerk of the circuit court within 10 days after midnight of the date the last county canvassing board empowered to canvass the returns certifies the results of the election being contested ~~or within 5 days after midnight of the date the last county canvassing board empowered to canvass the returns certifies the results of that particular election following a protest pursuant to s. 102.166(1), whichever occurs later~~.

(3)   The complaint shall set forth the grounds on which the contestant intends to establish his or her right to such office or set aside the result of the election on a submitted referendum. The grounds for contesting an election under this section are:

(a)   Misconduct, fraud, or corruption on the part of any election official or any member of the canvassing board sufficient to change or place in doubt the result of the election.

(b)   Ineligibility of the successful candidate for the nomination or office in dispute.

(c)   Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election.

(d)   Proof that any elector, election official, or canvassing board member was given or offered a bribe or reward in money, property, or any other thing of value for the purpose of procuring the successful candidate's nomination or election or determining the result on any question submitted by referendum.

~~(e)   Any other cause or allegation which, if sustained, would show that a person other than the successful candidate was the person duly nominated or elected to the office in question or that the outcome of the election on a question submitted by referendum was contrary to the result declared by the canvassing board or election board~~.

(4)   The canvassing board or <u>Elections Canvassing Commission</u> ~~election board~~ shall be the proper party defendant, and the successful candidate shall be an indispensable party to any action brought to contest the election or nomination of a candidate.

(5)   A statement of the grounds of contest may not be rejected, nor the proceedings dismissed, by the court for any want of form if the grounds of contest provided in the statement are sufficient to clearly inform the defendant of the particular proceeding or cause for which the nomination or election is contested.

(6)   A copy of the complaint shall be served upon the defendant and any other person named therein in the same manner as in other civil cases under the laws of this state. Within 10 days after the complaint has been served, the defendant must file an answer admitting or denying the allegations on

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

which the contestant relies or stating that the defendant has no knowledge or information concerning the allegations, which shall be deemed a denial of the allegations, and must state any other defenses, in law or fact, on which the defendant relies. If an answer is not filed within the time prescribed, the defendant may not be granted a hearing in court to assert any claim or objection that is required by this subsection to be stated in an answer.

(7)  Any candidate, qualified elector, or taxpayer presenting such a contest to a circuit judge is entitled to an immediate hearing. However, the court in its discretion may limit the time to be consumed in taking testimony, with a view therein to the circumstances of the matter and to the proximity of any succeeding ~~primary or other~~ election.

~~(8)  The circuit judge to whom the contest is presented may fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, examined, or checked, to prevent or correct any alleged wrong, and to provide any relief appropriate under such circumstances.~~

Section 45.   Subsections (1) and (2) of section 99.063, Florida Statutes, are amended to read:

99.063   Candidates for Governor and Lieutenant Governor.—

(1)   No later than 5 p.m. of the <u>9th</u> ~~6th~~ day following the second primary election, each candidate for Governor shall designate a Lieutenant Governor as a running mate. Such designation must be made in writing to the Department of State.

(2)   No later than 5 p.m. of the <u>9th</u> ~~6th~~ day following the second primary election, each designated candidate for Lieutenant Governor shall file with the Department of State:

(a)   The candidate's oath required by s. 99.021, which must contain the name of the candidate as it is to appear on the ballot; the office sought; and the signature of the candidate, duly acknowledged.

(b)   The loyalty oath required by s. 876.05, signed by the candidate and duly acknowledged.

(c)   If the office sought is partisan, the written statement of political party affiliation required by s. 99.021(1)(b).

(d)   The full and public disclosure of financial interests pursuant to s. 8, Art. II of the State Constitution.

Section 46.   <u>(1)   Notwithstanding s. 100.061, Florida Statutes, for the year 2002, a primary election for nomination of candidates of political parties shall be held on the second Tuesday in September. The candidate receiving the highest number of the votes cast in each contest in the primary election shall be declared nominated for such office. If two or more persons receive an equal and highest number of votes for the same office, such persons shall draw lots to determine who shall receive the nomination.</u>

**38**

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(2)   Notwithstanding s. 100.091, Florida Statutes, or any other provision of the Florida Election Code to the contrary, there shall be no second primary election between the effective date of this act and January 1, 2004.

(3)(a)   No later than 5 p.m. of the 9th day following the primary election in 2002, each candidate for Governor shall designate a Lieutenant Governor as a running mate. Such designation must be made in writing to the Department of State.

(b)   No later than the time specified in paragraph (a), each designated candidate for Lieutenant Governor shall file with the Department of State the qualifying papers specified in s. 99.063, Florida Statutes.

(4)(a)   For the 2002 elections, following the last day of qualifying for office, reports pursuant to s. 106.07, Florida Statutes, shall be filed on the 32nd, 18th, and 4th days immediately preceding the primary election and on the 46th, 32nd, 18th, and 4th days immediately preceding the general election.

(b)   Following the last day of qualifying for office, any statewide candidate who has requested to receive contributions from the Election Campaign Financing Trust Fund or any statewide candidate in a race with a candidate who has requested to receive contributions from the trust fund shall file reports on the 4th, 11th, 18th, 25th, 32nd, 39th, 46th, and 53rd days prior to the general election.

(5)   For the 2002 elections, there shall be two elections for purposes of the contribution limits in s. 106.08, Florida Statutes.

Section 47.   Section 97.0555, Florida Statutes, is created to read:

97.0555   Late registration.—An individual or accompanying family member who has been discharged or separated from the uniformed services, Merchant Marine, or from employment outside the territorial limits of the United States, after the book closing for an election pursuant to s. 97.055 who is otherwise qualified, may register to vote in such election until 5 p.m. on the Friday before that election. Such persons must produce sufficient documentation showing evidence of qualifying for late registration pursuant to this section. The Department of State shall adopt rules specifying documentation that is sufficient to determine eligibility.

Section 48.   Section 101.6951, Florida Statutes, is created to read:

101.6951   State write-in ballot.—

(1)   An overseas voter may request, not earlier than 180 days before a general election, a state write-in absentee ballot from the supervisor of elections in the county of registration. In order to receive a state write-in ballot, the voter shall state that due to military or other contingencies that preclude normal mail delivery, the voter cannot vote an absentee ballot during the normal absentee voting period. State write-in absentee ballots shall be made available to voters 90 to 180 days prior to a general election. The Department of State shall prescribe by rule the form of the state write-in ballot.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(2)   In completing the ballot, the overseas voter may designate his or her choice by writing in the name of the candidate or by writing in the name of a political party, in which case the ballot must be counted for the candidate of that political party, if there is such a party candidate on the ballot.

(3)   Any abbreviation, misspelling, or other minor variation in the form of the name of a candidate or a political party must be disregarded in determining the validity of the ballot if there is a clear indication on the ballot that the voter has made a definite choice.

(4)   The state write-in ballot shall contain all offices, federal, state, and local, for which the voter would otherwise be entitled to vote.

Section 49.   Section 101.6952, Florida Statutes, is created to read:

101.6952   Absentee ballots for overseas voters.—

(1)   If an overseas voter's request for an absentee ballot includes an e-mail address, the supervisor of elections shall inform the voter of the names of candidates who will be on the ballots via electronic transmission. The supervisor of elections shall e-mail the voter the list of candidates for the primary and general election not later than 30 days before each election.

(2)   For absentee ballots received from overseas voters, there is a presumption that the envelope was mailed on the date stated and witnessed on the outside of the return envelope, regardless of the absence of a postmark on the mailed envelope or the existence of a postmark date that is later than the date of the election.

Section 50.   Section 101.697, Florida Statutes, is created to read:

101.697   Electronic transmission of election materials.—The Department of State shall adopt rules to authorize a supervisor of elections to accept a request for an absentee ballot and a voted absentee ballot by facsimile machine or other electronic means from overseas voters. The rules must provide that in order to accept a voted ballot, the verification of the voter must be established, the security of the transmission must be established, and each ballot received must be recorded.

Section 51.   Section 101.698, Florida Statutes, is created to read:

101.698   Absentee voting in emergency situations.—If a national or local emergency or other situation arises which makes substantial compliance with the provisions of state or federal law relating to the methods of voting for overseas voters impossible or unreasonable, such as an armed conflict involving United States Armed Forces or mobilization of those forces, including state National Guard and reserve components, the Elections Canvassing Commission may adopt by emergency rules, such special procedures or requirements necessary to facilitate absentee voting by those persons directly affected who are otherwise eligible to vote in the election.

Section 52.   Paragraph (b) of subsection (1), and subsection (7) of section 101.62, Florida Statutes, are amended to read:

**40**

101.62   Request for absentee ballots.—

(1)

(b)   The supervisor may accept a written or telephonic request for an absentee ballot from the elector, or, if directly instructed by the elector, a member of the elector's immediate family, or the elector's legal guardian. For purposes of this section, the term "immediate family" has the same meaning as specified in paragraph (4)(b). The person making the request must disclose:

1.   The name of the elector for whom the ballot is requested;

2.   The elector's address;

3.   ~~The last four digits of the elector's social security number;~~

3.~~4.~~   The ~~registration number on the~~ elector's <u>date of birth</u> ~~registration identification card~~;

4.~~5.~~   The requester's name;

5.~~6.~~   The requester's address;

6.~~7.~~   The requester's ~~social security number and, if available,~~ driver's license number<u>, if available</u>;

7.~~8.~~   The requester's relationship to the elector; and

8.~~9.~~   The requester's signature (written requests only).

~~(7)(a)   For the purposes of this section, "absent qualified elector overseas" means:~~

~~1.   Members of the Armed Forces while in the active service who are permanent residents of the state and are temporarily residing outside the territorial limits of the United States and the District of Columbia;~~

~~2.   Members of the Merchant Marine of the United States who are permanent residents of the state and are temporarily residing outside the territorial limits of the United States and the District of Columbia; and~~

~~3.   Other citizens of the United States who are permanent residents of the state and are temporarily residing outside the territorial limits of the United States and the District of Columbia,~~

~~who are qualified and registered as provided by law.~~

~~(b)   Notwithstanding any other provision of law to the contrary, there shall appear on the ballots sent to absent qualified electors overseas, in addition to the names of the candidates for each office, the political party affiliation of each candidate for each office, other than a nonpartisan office.~~

~~(c)   With respect to marked ballots mailed by absent qualified electors overseas, only those ballots mailed with an APO, FPO, or foreign postmark shall be considered valid.~~

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 53.   Section 101.64, Florida Statutes, is amended to read:

101.64   Delivery of absentee ballots; envelopes; form.—

(1)   The supervisor shall enclose with each absentee ballot two envelopes: a secrecy envelope, into which the absent elector shall enclose his or her marked ballot; and a mailing envelope, into which the absent elector shall then place the secrecy envelope, which shall be addressed to the supervisor and also bear on the back side a certificate in substantially the following form:

Note: Please Read Instructions Carefully Before
Marking Ballot and Completing Voter's Certificate.
VOTER'S CERTIFICATE

I, ...., <u>do solemnly swear or affirm that I</u> am a qualified and registered voter of .... County, Florida <u>and that I have not and will not vote more than one ballot in this election</u>. I understand that if I commit or attempt to commit any fraud in connection with voting, vote a fraudulent ballot, or vote more than once in an election, I can be convicted of a felony of the third degree and fined up to $5,000 and/or imprisoned for up to 5 years. I also understand that failure to sign this certificate and have my signature <u>properly</u> witnessed will invalidate my ballot. ~~I am entitled to vote an absentee ballot for one of the following reasons:~~

~~1.   I am unable without another's assistance to attend the polls.~~

~~2.   I may not be in the precinct of my residence during the hours the polls are open for voting on election day.~~

~~3.   I am an inspector, a poll worker, a deputy voting machine custodian, a deputy sheriff, a supervisor of elections, or a deputy supervisor who is assigned to a different precinct than that in which I am registered.~~

~~4.   On account of the tenets of my religion, I cannot attend the polls on the day of the general, special, or primary election.~~

~~5.   I have changed my permanent residency to another county in Florida within the time period during which the registration books are closed for the election. I understand that I am allowed to vote only for national and statewide offices and on statewide issues.~~

~~6.   I have changed my permanent residency to another state and am unable under the laws of such state to vote in the general election. I understand that I am allowed to vote only for President and Vice President.~~

~~7.   I am unable to attend the polls on election day and am voting this ballot in person at the office of, and under the supervision of, the county supervisor of elections.~~

...(Date)...                                        ...(Voter's Signature)...

...~~(Last four digits of voter's social security number)~~...
Note: Your Signature Must Be Witnessed By ~~Either:~~

~~a.   A Notary or Officer Defined in Item 6.b. of the Instruction Sheet.~~

**42**

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

~~Sworn to (or affirmed) and subscribed before me this .... day of .........,~~
~~...(year)..., by ...(name of person making statement).... My commission ex-~~
~~pires this .... day of ........, ...(year)....~~

~~...(Signature of Official)...~~
~~...(Print, Type, or Stamp Name)...~~
~~...(State or Country of Commission)...~~

~~Personally Known ........ OR Produced Identification ........~~

~~Type of Identification Produced . . . . . . . . . . . . . . . . . . . . . .~~

~~OR~~

~~b.~~  One Witness <u>18 Years of Age or Older as provided in item 8 of the</u>
<u>Instruction Sheet</u>~~, who is a registered voter in the State~~.

I swear or affirm that the voter signed this Voter's Certificate in my presence
~~and that, unless certified as an absentee ballot coordinator, I have not~~
~~witnessed more than 5 ballots for this election~~.

~~WITNESS:~~

...(Signature of Witness)...

~~...(Printed Name of Witness)...~~

~~...(Voter I.D. Number of Witness and County of Registration)...~~

...(Address)...

...(City/State)...

(2)  The certificate shall be arranged on the back of the mailing envelope
so that the lines for the signatures of the absent elector and the attesting
witness are across the seal of the envelope; however, no statement shall
appear on the envelope which indicates that a signature of the voter or
witness must cross the seal of the envelope. The absent elector and the
attesting witness shall execute the certificate on the envelope.

Section 54.  Section 101.65, Florida Statutes, is amended to read:

101.65  Instructions to absent electors.—The supervisor shall enclose
with each absentee ballot separate printed instructions in substantially the
following form:

READ THESE INSTRUCTIONS CAREFULLY BEFORE MARKING BAL-
LOT.

1.  VERY IMPORTANT. In order to ensure that your absentee ballot will
be counted, it should be completed and returned as soon as possible so that
it can reach the supervisor of elections of the county in which your precinct
is located no later than 7 p.m. on the day of the election.

2.  Mark your ballot in secret as instructed on the ballot. You must mark
your own ballot unless you are unable to do so because of blindness, disabil-
ity, or inability to read or write.

3.  Place your marked ballot in the enclosed secrecy envelope.

4.  Insert the secrecy envelope into the enclosed mailing envelope which
is addressed to the supervisor.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

5.   Seal the mailing envelope and completely fill out the Voter's Certificate on the back of the mailing envelope.

6.   VERY IMPORTANT. In order for your absentee ballot to be counted, you must sign your name on the line above (Voter's Signature).

7.   VERY IMPORTANT. If you are an overseas voter, you must include the date you signed the Voter's Certificate on the line above (Date) or your ballot may not be counted., place the last four digits of your Social Security number in the space provided, and your ballot must be witnessed in either of the following manners:

a.   One witness, who is a registered voter in the state, must affix his or her signature, printed name, address, voter identification number, and county of registration on the voter's certificate. Each witness is limited to witnessing five ballots per election unless certified as an absentee ballot coordinator. A candidate may not serve as an attesting witness.

b.   Any notary or other officer entitled to administer oaths or any Florida supervisor of elections or deputy supervisor of elections, other than a candidate, may serve as an attesting witness.

8.   VERY IMPORTANT. In order for your absentee ballot to be counted, it must include the signature and address of a witness 18 years of age or older affixed to the Voter's Certificate. No candidate may serve as an attesting witness.

9.7.   Mail, deliver, or have delivered the completed mailing envelope. Be sure there is sufficient postage if mailed.

10.8.   FELONY NOTICE. It is a felony under Florida law to accept any gift, payment, or gratuity in exchange for your vote for a candidate. It is also a felony under Florida law to vote in an election using a false identity or false address, or under any other circumstances making your ballot false or fraudulent.

Section 55.   Section 101.657, Florida Statutes, is amended to read:

101.657   Voting absentee ballots in person.—

(1)   Notwithstanding s. 97.021(1), Any qualified and registered elector who is unable to attend the polls on election day may pick up and vote an absentee ballot in person at the office of, and under the supervision of, the supervisor of elections. Before receiving the ballot, the elector must present a Florida driver's license, a Florida identification card issued under s. 322.051, or another form of picture identification approved by the Department of State. If the elector fails to furnish the required identification, or if the supervisor is in doubt as to the identity of the elector, the supervisor must follow the procedure prescribed in s. 101.49.

(2)   As an alternative to the provisions of ss. 101.64, 101.647, and 101.65, the supervisor of elections may allow an elector to cast an absentee ballot in the main or branch office of the supervisor by depositing the voted ballot in a voting device used by the supervisor to collect or tabulate ballots. The

CODING:  Words stricken are deletions; words underlined are additions.

results or tabulation may not be made before the close of the polls on election day.

<u>(a)</u><s>(3)</s>   The elector must provide picture identification and must complete an In-Office Voter Certificate in substantially the following form:

### IN-OFFICE VOTER CERTIFICATE

I, ...., am a qualified elector in this election and registered voter of .... County, Florida. I do solemnly swear or affirm that I am the person so listed on the voter registration rolls of .... County and that I reside at the listed address. I understand that if I commit or attempt to commit fraud in connection with voting, vote a fraudulent ballot, or vote more than once in an election I could be convicted of a felony of the third degree and both fined up to $5,000 and imprisoned for up to 5 years. I understand that my failure to sign this certificate and have my signature witnessed invalidates my ballot. <s>I am entitled to vote an absentee ballot because I am unable to attend the polls on election day.</s>

...(Voter's Signature)...

...(Address)...

...(City/State)...

...(Name of Witness)...

...(Signature of Witness)...

...(Type of identification provided)...

<u>(b)</u><s>(4)</s>   Any elector may challenge an elector seeking to cast an absentee ballot under the provisions of s. 101.111. Any challenged ballot must be placed in a regular absentee ballot envelope. The canvassing board shall review the ballot and decide the validity of the ballot by majority vote.

<u>(c)</u><s>(5)</s>   The canvass of returns for ballots cast under this <u>subsection</u> <s>section</s> shall be substantially the same as votes cast by electors in precincts, as provided in s. 101.5614.

Section 56.   Paragraphs (a) and (c) of subsection (2) of section 101.68, Florida Statutes, are amended to read:

101.68   Canvassing of absentee ballot.—

(2)(a)   The county canvassing board may begin the canvassing of absentee ballots at 7 a.m. on the fourth day before the election, but not later than noon on the day following the election. In addition, for any county using electronic tabulating equipment, the processing of absentee ballots through such tabulating equipment may begin <u>at 7 a.m. on the fourth day before the election</u> <s>upon the opening of the polls on election day</s>. However, notwithstanding any such authorization to begin canvassing or otherwise processing absentee ballots early, no result <s>or tabulation of absentee ballots</s> shall be <u>released made</u> until after the <u>closing</u> <s>close</s> of the polls on election day. <u>Any supervisor of elections, deputy supervisor of elections, canvassing board member, election board member, or election employee who releases the results of a can-</u>

CODING:  Words <s>stricken</s> are deletions; words <u>underlined</u> are additions.

vassing or processing of absentee ballots prior to the closing of the polls on election day commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(c)1. The canvassing board shall, if the supervisor has not already done so, compare the signature of the elector on the voter's certificate with the signature of the elector in the registration books to see that the elector is duly registered in the county and to determine the legality of that absentee ballot. An absentee ballot shall be considered illegal if it does not include the signature and the last four digits of the social security number of the elector, as shown by the registration records, and the signature and address of an attesting witness. either:

a. The subscription of a notary or officer defined in Item 6.b. of the instruction sheet, or

b. The signature, printed name, address, voter identification number, and county of registration of one attesting witness, who is a registered voter in the state.

However, an absentee ballot shall not be considered illegal if the signature of the elector or attesting witness does not cross the seal of the mailing envelope or if the person witnessing the ballot is in violation of s. 104.047(3). If the canvassing board determines that any ballot is illegal, a member of the board shall, without opening the envelope, mark across the face of the envelope: "rejected as illegal." The envelope and the ballot contained therein shall be preserved in the manner that official ballots voted are preserved.

2. If any elector or candidate present believes that an absentee ballot is illegal due to a defect apparent on the voter's certificate, he or she may, at any time before the ballot is removed from the envelope, file with the canvassing board a protest against the canvass of that ballot, specifying the precinct, the ballot, and the reason he or she believes the ballot to be illegal. A challenge based upon a defect in the voter's certificate may not be accepted after the ballot has been removed from the mailing envelope.

Section 57. Section 104.047, Florida Statutes, is amended to read:

104.047 Absentee ballots and voting; violations.—

(1) Any person who provides or offers to provide, and any person who accepts, a pecuniary or other benefit in exchange for distributing, ordering, requesting, collecting, delivering, or otherwise physically possessing absentee ballots, except as provided in ss. 101.6105-101.694, is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2) Except as provided in s. 101.62 or s. 101.655, any person who requests an absentee ballot on behalf of an elector is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(3) Any person, other than a notary or other officer entitled to administer oaths or an absentee ballot coordinator as provided by s. 101.685, who

CODING: Words stricken are deletions; words underlined are additions.

~~witnesses more than five ballots in any single election, is guilty of a misde-~~
~~meanor of the first degree, punishable as provided in s. 775.082 or s.~~
~~775.083.~~

(3)(4)  Any person who marks or designates a choice on the ballot of another person, except as provided in s. 101.051, s. 101.655, or s. 101.661, is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

~~(5)  Any person who returns more than two absentee ballots to the super-~~
~~visors of elections in violation of s. 101.647 is guilty of a misdemeanor of the~~
~~first degree, punishable as provided in s. 775.082 or s. 775.083.~~

Section 58.    Sections 101.647 and 101.685, Florida Statutes, are repealed.

Section 59.    Section 98.255, Florida Statutes, is amended to read:

(Substantial rewording of section. See
s. 98.255, F.S., for present text.)

98.255   Voter education programs.—

(1)   By March 1, 2002, the Department of State shall adopt rules prescrib-ing minimum standards for nonpartisan voter education. In developing the rules, the department shall review current voter-education programs within each county of the state. The standards shall address, but are not limited to, the following subjects:

(a)   Voter registration;

(b)   Balloting procedures, absentee and polling place;

(c)   Voter rights and responsibilities;

(d)   Distribution of sample ballots; and

(e)   Public service announcements.

(2)   Each county supervisor shall implement the minimum voter educa-tion standards, and shall conduct additional nonpartisan education efforts as necessary to ensure that voters have a working knowledge of the voting process.

(3)(a)   By December 15 of each general election year, each supervisor of elections shall report to the Department of State a detailed description of the voter-education programs implemented and any other information that may be useful in evaluating the effectiveness of voter-education efforts.

(b)   The Department of State, upon receipt of such information, shall prepare a public report on the effectiveness of voter-education programs and shall submit the report to the Governor, the President of the Senate, and the Speaker of the House of Representatives by January 31 of each year follow-ing a general election.

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(c)  The Department of State shall reexamine the rules adopted pursuant to subsection (1) and consider the findings in the report as a basis for adopting modified rules that incorporate successful voter-education programs and techniques, as necessary.

Section 60.  Section 101.031, Florida Statutes, is amended to read:

101.031  Instructions for electors.—

(1)  The Department of State, or in case of municipal elections the governing body of the municipality, shall print, in large type on cards, instructions for the electors to use in voting. It shall provide not less than two cards for each voting precinct for each election and furnish such cards to each supervisor upon requisition. Each supervisor of elections shall send a sufficient number of these cards to the precincts prior to an election. The election inspectors shall display the cards in the polling places as information for electors. The cards shall contain information about how to vote and such other information as the Department of State may deem necessary. The cards must also include the list of rights and responsibilities afforded to Florida voters, as described in subsection (2).

(2)  The supervisor of elections in each county shall have posted at each polling place in the county the Voter's Bill of Rights and Responsibilities in the following form:

## VOTER'S BILL OF RIGHTS

Each registered voter in this state has the right to:

1.  Vote and have his or her vote accurately counted.

2.  Cast a vote if he or she is in line when the polls are closing.

3.  Ask for and receive assistance in voting.

4.  Receive up to two replacement ballots if he or she makes a mistake prior to the ballot being cast.

5.  An explanation if his or her registration is in question.

6.  If his or her registration is in question, cast a provisional ballot.

7.  Prove his or her identity by signing an affidavit if election officials doubt the voter's identity.

8.  Written instructions to use when voting, and, upon request, oral instructions in voting from elections officers.

9.  Vote free from coercion or intimidation by elections officers or any other person.

10.  Vote on a voting system that is in working condition and that will allow votes to be accurately cast.

CODING:  Words stricken are deletions; words underlined are additions.

VOTER RESPONSIBILITIES

Each registered voter in this state has the responsibility to:

1.   Study and know candidates and issues.

2.   Keep his or her voter address current.

3.   Know his or her precinct and its hours of operation.

4.   Bring proper identification to the polling station.

5.   Know how to operate voting equipment properly.

6.   Treat precinct workers with courtesy.

7.   Respect the privacy of other voters.

8.   Report problems or violations of election law.

9.   Ask questions when confused.

10.   Check his or her completed ballot for accuracy.

(3)   Nothing in this section shall give rise to a legal cause of action.

(4)(2)   In case any elector, after entering the voting booth, shall ask for further instructions concerning the manner of voting, two election officers who are not both members of the same political party, if present, or, if not, two election officers who are members of the same political party, shall give such instructions to such elector, but no officer or person assisting an elector shall in any manner request, suggest, or seek to persuade or induce any elector to vote for or against any particular ticket, candidate, amendment, question, or proposition. After giving the elector instructions and before the elector has voted, the officers or persons assisting the elector shall retire, and such elector shall vote in secret.

Section 61.   Subsection (1) of section 101.131, Florida Statutes, is amended to read:

101.131   Watchers at polls.—

(1)   Each political party and each candidate may have one watcher in each polling room at any one time during the election. No watcher shall be permitted to come closer to the officials' table or the voting booths than is reasonably necessary to properly perform his or her functions, but each shall be allowed within the polling room to watch and observe the conduct of electors and officials. The watchers shall furnish their own materials and necessities and shall not obstruct the orderly conduct of any election. Each watcher shall be a qualified and registered elector of the county in which he or she serves. ~~During the elections the officials shall call out the names of electors loudly enough to be heard by the watchers.~~

Section 62.   Subsection (1) of section 97.073, Florida Statutes, is amended to read:

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

97.073  Disposition of voter registration applications; cancellation notice.—

(1)  The supervisor must notify each applicant of the disposition of the applicant's voter registration application. The notice must inform the applicant that the application has been approved, is incomplete, has been denied, or is a duplicate of a current registration. A registration identification card sent to an applicant constitutes notice of approval of registration. If the application is incomplete, the supervisor must request that ~~notice must instruct~~ the applicant supply the missing information in writing and sign a statement that the additional information is true and correct ~~to complete another voter registration application, which the supervisor must provide~~. A notice of denial must inform the applicant of the reason the application was denied.

Section 63.  Effective upon this act becoming a law, the Division of Elections, in conjunction with the Florida State Association of Supervisors of Elections, shall, from existing funds, study the benefits and drawbacks of having uniform poll opening and closing times throughout the state. A written report shall be presented to the the President of the Senate and the Speaker of the House of Representatives no later than January 1, 2002. This report must include, but is not limited to, a discussion of the circumstances surrounding the 2000 Presidential election; changing the state to one time zone; changing polling times to coincide in both time zones; and having the Central Time Zone not recognize Daylight Saving Time.

Section 64.  Section 102.014, Florida Statutes, is created to read:

102.014  Pollworker recruitment and training.—

(1)  The supervisor of elections shall conduct training for inspectors, clerks, and deputy sheriffs prior to each primary, general, and special election for the purpose of instructing such persons in their duties and responsibilities as election officials. A certificate may be issued by the supervisor of elections to each person completing such training. No person shall serve as an inspector, clerk, or deputy sheriff for an election unless such person has completed the training as required. A clerk may not work at the polls unless he or she demonstrates a working knowledge of the laws and procedures relating to voter registration, voting system operation, balloting and polling place procedures, and problem-solving and conflict-resolution skills.

(2)  A person who has attended previous training conducted within 2 years before the election may be appointed by the supervisor to fill a vacancy on election day. If no person with prior training is available to fill such vacancy, the supervisor of elections may fill such vacancy in accordance with the provisions of subsection (3) from among persons who have not received the training required by this section.

(3)  In the case of absence or refusal to act on the part of any inspector or clerk at any precinct on the day of an election, the supervisor shall appoint a replacement who meets the qualifications prescribed in section 102.012(2). The inspector or clerk so appointed shall be a member of the same political party as the clerk or inspector whom he or she replaces.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

(4)   Each supervisor of elections shall be responsible for training inspectors and clerks, subject to the following minimum requirements:

(a)   No clerk shall be entitled to work at the polls unless he or she has had a minimum of six hours of training during a general election year, at least two hours of which must occur after June 1 of that year.

(b)   No inspector shall work at the polls unless he or she has had a minimum of three hours of training during a general election year, at least one hour of which must occur after June 1 of that year.

(5)   The Department of State shall create a uniform polling place procedures manual and adopt the manual by rule. Each supervisor of elections shall insure that the manual is available in hard copy or electronic form in every precinct in the supervisor's jurisdiction on election day. The manual shall guide inspectors, clerks, and deputy sheriffs in the proper implementation of election procedures and laws. The manual shall be indexed by subject, and written in plain, clear, unambiguous language. The manual shall provide specific examples of common problems encountered at the polls on election day, and detail specific procedures for resolving those problems. The manual shall include, without limitation:

(a)   Regulations governing solicitation by individuals and groups at the polling place;

(b)   Procedures to be followed with respect to voters whose names are not on the precinct register;

(c)   Proper operation of the voting system;

(d)   Ballot handling procedures;

(e)   Procedures governing spoiled ballots;

(f)   Procedures to be followed after the polls close;

(g)   Rights of voters at the polls;

(h)   Procedures for handling emergency situations;

(i)   Procedures for dealing with irate voters;

(j)   The handling and processing of provisional ballots; and

(k)   Security procedures.

The Department of State shall revise the manual as necessary to address new procedures in law or problems encountered by voters and pollworkers at the precincts.

(6)   Supervisors of elections shall work with the business and local community to develop public-private programs to ensure the recruitment of skilled inspectors and clerks.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 65.  Subsections (8) and (9) of section 102.012, Florida Statutes, are repealed.

Section 66.  Subsection (2) of section 102.021, Florida Statutes, is amended to read:

102.021  Compensation of inspectors, clerks, and deputy sheriffs.—

(2)  Inspectors and clerks of election and deputy sheriffs serving at the precincts may receive compensation and travel expenses, as provided in s. 112.061, for attending the pollworker training required by s. 102.014 102.012(8).

Section 67.  Section 106.31, Florida Statutes, is amended to read:

106.31  Legislative intent.—The Legislature finds that the costs of running an effective campaign for statewide office have reached a level which tends to discourage persons from becoming candidates and to limit the persons who run for such office to those who are independently wealthy, who are supported by political committees representing special interests which are able to generate substantial campaign contributions, or who must appeal to special interest groups for campaign contributions. The Legislature further finds that campaign contributions generated by such political committees are having a disproportionate impact vis-a-vis contributions from unaffiliated individuals, which leads to the misperception of government officials unduly influenced by those special interests to the detriment of the public interest. Furthermore, it is the intent of the Legislature that the purpose of public campaign financing is to make candidates more responsive to the voters of the State of Florida and as insulated as possible from special interest groups. The Legislature intends ss. 106.30-106.36 to alleviate these factors, dispel the misperception, and encourage qualified persons to seek statewide elective office who would not, or could not otherwise do so and to protect the effective competition by a candidate who uses public funding.

Section 68.  Section 106.33, Florida Statutes, is amended to read:

106.33  Election campaign financing; eligibility.—Each candidate for the office of Governor or member of the Cabinet who desires to receive contributions from the Election Campaign Financing Trust Fund shall, upon qualifying for office, file a request for such contributions with the filing officer on forms provided by the Division of Elections. If a candidate requesting contributions from the fund desires to have such funds distributed by electronic fund transfers, the request shall include information necessary to implement that procedure. For the purposes of ss. 106.30-106.36, candidates for Governor and Lieutenant Governor on the same ticket shall be considered as a single candidate. To be eligible to receive contributions from the fund, a candidate may shall not be an unopposed candidate as defined in s. 106.011(15) and must shall:

(1)  Agree to abide by the expenditure limits provided in s. 106.34.

(2)(a)  Raise contributions as follows:

CODING: Words stricken are deletions; words underlined are additions.

1.(a)   One hundred fifty thousand dollars for a candidate for Governor.

2.(b)   One hundred thousand dollars for a candidate for Cabinet office.

(b)   Contributions from individuals who at the time of contributing are not state residents may not be used to meet the threshold amounts in paragraph (a). For purposes of this paragraph, any person validly registered to vote in this state shall be considered a state resident.

(3)   Limit loans or contributions from the candidate's personal funds to $25,000 and contributions from national, state, and county executive committees of a political party to $25,000 in the aggregate, which loans or contributions shall not qualify for meeting the threshold amounts in subsection (2).

(4)   Submit to a postelection audit of the campaign account by the division.

Section 69.   Subsection (2) of section 106.35, Florida Statutes, is amended to read:

106.35   Distribution of funds.—

(2)(a)   Each candidate who has been certified to receive contributions from the Election Campaign Financing Trust Fund shall be entitled to distribution of funds as follows:

1.   For qualifying matching contributions making up all or any portion of the threshold amounts specified in s. 106.33(2), distribution shall be on a two-to-one basis.

2.   For all other qualifying matching contributions, distribution shall be on a one-to-one basis.

(b)   Qualifying matching contributions are those of $250 or less from an individual, made after September 1 of the calendar year prior to the election. Any contribution received from an individual who is not a state resident at the time the contribution is made shall not be considered a qualifying matching contribution. For purposes of this paragraph, any person validly registered to vote in this state shall be considered a state resident. Aggregate contributions from an individual in excess of $250 will be matched only up to $250. A contribution from an individual, if made by check, must be drawn on the personal bank account of the individual making the contribution, as opposed to any form of business account, regardless of whether the business account is for a corporation, partnership, sole proprietorship, trust, or other form of business arrangement. For contributions made by check from a personal joint account, the match shall only be for the individual who actually signs the check.

Section 70.   Effective July 1, 2001, section 98.0977, Florida Statutes, is created to read:

98.0977   Statewide voter registration database; development and maintenance.—

CODING: Words stricken are deletions; words underlined are additions.

(1)  From the funds appropriated, the department may contract with the Florida Association of Court Clerks to analyze, design, develop, operate, and maintain a statewide, on-line voter registration database and associated web site, to be fully operational statewide by June 1, 2002. The database shall contain voter registration information from each of the 67 supervisors of elections in this state, and shall be accessible through an Internet web site. The system shall provide functionality for ensuring that the database is updated on a daily basis to determine if a registered voter is ineligible to vote for any of the following reasons, including, but not limited to:

(a)  The voter is deceased;

(b)  The voter has been convicted of a felony and has not had his or her civil rights restored; or

(c)  The voter has been adjudicated mentally incompetent and his or her mental capacity with respect to voting has not been restored.

The database shall also allow for duplicate voter registrations to be identified.

(2)  The Department of State shall not contract with any private entity other than the Florida Association of Court Clerks for the operation or maintenance of the statewide voter registration database.

(3)  In administering the database, each supervisor of elections shall compare registration information provided by a voter with information held by the Department of Law Enforcement, the Board of Executive Clemency, the Office of Vital Statistics, and other relevant sources. If the supervisor of elections finds information that suggests that a voter is ineligible to register to vote, the supervisor of elections shall notify the voter by certified United States mail. The notification shall contain a statement as to the reason for the voter's potential ineligibility to register to vote and shall request information from the voter on forms provided by the supervisor of elections in order to make a final determination on the voter's eligibility. After reviewing the information requested by the supervisor of elections and provided by the voter, if the supervisor of elections determines that the voter is not eligible to vote under the laws of this state, the supervisor of elections shall notify the voter by certified United States mail that he or she has been found ineligible to register to vote in this state, shall state the reason for the ineligibility, and shall inform the voter that he or she will be removed from the voter registration rolls.

(4)  To the maximum extent feasible, state and local government entities shall facilitate provision of information and access to data to the Florida Association of Court Clerks in order to compare information in the statewide voter registration database with available information in other computer databases, including, but not limited to, databases that contain reliable criminal records and records of deceased persons. State and local governmental agencies that provide such data shall do so without charge if the direct cost incurred by those agencies is not significant.

CODING:  Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(5)   The Division of Elections shall provide written quarterly progress reports on each phase of development of the voter registration database to the President of the Senate and the Speaker of the House of Representatives beginning July 1, 2001, and continuing until the database is fully implemented.

(6)   The duties of the supervisors of elections under this section shall be considered part of their regular registration list maintenance duties under this chapter, and any supervisor of elections who willfully refuses or willfully neglects to perform his or her duties under this section shall be in violation of s. 104.051(2).

Section 71.   The Department of State may use up to $2 million, from funds provided in specific appropriation 2898B of the 2001-2002 General Appropriations Act, notwithstanding the proviso language to that specific appropriation, for the analysis, design, development, operation, and maintenance of the statewide voter registration database as provided in s. 98.0977(1), Florida Statutes. This section shall take effect July 1, 2001.

Section 72.   Section 98.0979, Florida Statutes, is created to read:

98.0979   Statewide voter registration database open to inspection; copies.—

(1)(a)   The voter registration information of the state constitutes public records. Any citizen shall be allowed to examine the voter registration records, but may not make any copies or extract therefrom except as provided by this section.

(b)   Within 15 days after a request for voter registration information, the division or supervisor of elections shall furnish any requested information, excluding only a voter's signature, social security number, and such other information that is by statute specifically made confidential or is exempt from public records requirements.

(c)   Actual costs of duplication of information authorized by this section for release to the public shall be charged in accordance with the provisions of s. 119.07.

(2)   The information provided by the division or supervisor of elections pursuant to this section shall be furnished only to:

(a)   Municipalities;

(b)   Other governmental agencies;

(c)   Political candidates, for the purpose of furthering their candidacies;

(d)   Registered political committees, certified committees of continuous existence, and political parties or officials thereof, for political purposes only; and

(e)   Incumbent officeholders, for the purpose of reporting to their constituents.

CODING:  Words ~~stricken~~ are deletions; words underlined are additions.

(3)   Such information shall not be used for commercial purposes. No person to whom a list of registered voters is made available pursuant to this section, and no person who acquires such a list, shall use any information contained therein for purposes which are not related to elections, political or governmental activities, voter registration, or law enforcement.

(4)   Any person who acquires a list of registered voters from the division or supervisor of elections shall take and subscribe to an oath which shall be in substantially the following form:

I hereby swear (or affirm) that I am a person authorized by s. 98.0979, Florida Statutes, to acquire information on the registered voters of Florida; that the information acquired will be used only for the purposes prescribed in that section and for no other purpose; and that I will not permit the use or copying of such information by persons not authorized by the Election Code of the State of Florida.

...(Signature of person acquiring list)...

Sworn and subscribed before me this .... day of ........, ...(year)....
...(Name of person providing list)...

Section 73.   Effective June 30, 2001, section 98.0975, Florida Statutes, is repealed.

Section 74.   (1)   From funds appropriated from the General Revenue Fund to the Division of Elections of the Department of State in specific appropriation 2898B of the 2001-2002 General Appropriations Act, notwithstanding the proviso language to that specific appropriation, the division shall distribute the sum of $5,949,375 in fiscal year 2001-2002 to the counties to fund comprehensive voter education programs and pollworker recruitment and training programs provided in this act. The Division shall divide the total amount of funds appropriated by the total number of registered voters in the state for the 2000 General Election to establish a funding level per individual voter. Each county shall receive an amount equal to the funding level per individual voter multiplied by the number of registered voters in the county, as certified by the Department of State for the 2000 General Election.

(2)   No county shall receive any funds pursuant to subsection (1) until the county supervisor of elections provides to the Department of State a detailed description of the voter-education programs to be implemented pursuant to s. 98.255, Florida Statutes, for the 2002 election cycle.

(3)   This section shall take effect July 1, 2001.

Section 75.   The Division of Elections of the Department of State shall provide a report to the Governor, the President of the Senate, and the Speaker of the House of Representatives by November 15, 2001, detailing the progress that each county required by this act to upgrade a voting system has made toward the implementation of such system. This section shall take effect July 1, 2001.

CODING:  Words ~~stricken~~ are deletions; words underlined are additions.

Section 76.   Effective July 1, 2001, funds appropriated to the Division of Elections of the Department of State in the 2001-2002 General Appropriations Act for Voting Systems Assistance shall be distributed to the counties in the following manner:

(1)   Counties having a population of 75,000 or fewer based on the 2000 census shall receive a total of $7,500 per precinct based on the number of precincts as certified by the Department of State for the 2000 General Election, to be distributed in two equal installments on July 1, 2001, and July 1, 2002.

(2)   All other counties shall receive a total of $3,750 per precinct based on the number of precincts as certified by the Department of State for the 2000 General Election, to be distributed in two equal installments on July 1, 2001, and July 1, 2002.

Section 77.   If any provision of this act or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared severable.

Section 78.   Except as otherwise provided herein, this act shall take effect January 1, 2002.

Approved by the Governor May 10, 2001.

Filed in Office Secretary of State May 10, 2001.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

# TAB 3

CHAPTER 2002-17

Committee Substitute for Senate Bill No. 618

An act relating to elections; amending s. 97.0555, F.S.; requiring late registration to be done in the office of the supervisor of elections; amending s. 98.045, F.S.; including the statewide voter registration database in provisions governing the administration of voter registration; amending s. 98.0977, F.S.; revising provisions relating to accessing agency data for the statewide voter registration database; amending s. 98.0979, F.S.; revising provisions for requesting and furnishing voter registration information from the statewide voter registration database; amending s. 101.031, F.S.; revising the Voter's Bill of Rights and Responsibilities; amending s. 101.048, F.S.; revising the procedure for canvassing provisional ballots; revising the Provisional Ballot Voter's Certificate; amending s. 101.151, F.S.; revising specifications for ballots; creating s. 101.2512, F.S.; providing requirements for the printing of candidates' names on general election ballots; amending s. 101.5601, F.S.; revising a reference; amending s. 101.5606, F.S.; revising requirements for voting systems with respect to overvoted and undervoted ballots; amending s. 101.5608, F.S.; revising a reference; amending s. 101.5611, F.S.; requiring direct voting instruction instead of provision of a voting instruction model; amending s. 101.5612, F.S.; revising requirements for sample testing of electronic or electromechanical tabulation devices; correcting terminology; amending s. 101.5614, F.S.; revising provisions for duplicating defective ballots for purposes of tallying valid votes; clarifying the prohibition against releasing the results of an election prior to the closing of the polls; eliminating obsolete provisions; amending s. 101.595, F.S.; limiting the information on voting problems that supervisors of elections are required to report to the Department of State following a general election; amending s. 101.68, F.S.; clarifying the prohibition against releasing the results of a canvassing or processing of absentee ballots prior to the closing of the polls; amending s. 101.69, F.S.; revising requirements for electors who have received absentee ballots but desire to vote in person; amending s. 102.014, F.S.; revising minimum training requirements for poll workers; amending s. 102.141, F.S.; revising times for canvassing boards to submit unofficial returns to the Department of State, including those submitted after a recount has been conducted; providing for the duplication of ballots that are damaged and cannot be counted by the automatic tabulating equipment during a recount; eliminating obsolete provisions; amending s. 102.166, F.S.; revising the date by which a request for a manual recount must be made; requiring comparison of duplicate ballots with their original ballots during a manual recount; amending s. 46, ch. 2001-40, Laws of Florida; providing campaign finance reporting requirements preceding the 2002 primary election for candidates involved in public campaign financing races; amending s. 105.031, F.S.; providing an earlier qualifying period for candidates for judicial office; repealing s. 101.22, F.S., relating to the voting procedure for paper ballots; repealing s. 101.5615, F.S., relating to recounts

1

CODING: Words stricken are deletions; words underlined are additions.

and election contests under the "Electronic Voting Systems Act"; repealing s. 101.72, F.S., relating to voting booths and compartments; amending s. 106.11, F.S.; defining the term "sufficient funds on deposit in the primary depository account of the candidate or political committee"; amending s. 101.635, F.S.; prohibiting denial of local political party requests for absentee ballots; reenacting and amending s. 106.08(5), F.S., to clarify requirements for soliciting and accepting charitable contributions and to reenact a prohibition against indirect campaign contributions; providing penalties; amending s. 106.021, F.S.; providing for candidate reimbursement for certain expenses; providing for retroactive application; amending s. 106.07, F.S.; providing for reporting of candidate reimbursement for certain expenses; providing for retroactive application; providing effective dates.

Be It Enacted by the Legislature of the State of Florida:

Section 1.  Section 97.0555, Florida Statutes, is amended to read:

97.0555  Late registration.—An individual or accompanying family member who has been discharged or separated from the uniformed services or the, Merchant Marine, or from employment outside the territorial limits of the United States, after the book-closing date for an election pursuant to s. 97.055 and who is otherwise qualified, may register to vote in such election until 5 p.m. on the Friday before that election in the office of the supervisor of elections. Such persons must produce sufficient documentation showing evidence of qualifying for late registration pursuant to this section. The Department of State shall adopt rules specifying documentation that is sufficient to determine eligibility.

Section 2.  Subsections (1) and (3) of section 98.045, Florida Statutes, are amended to read:

98.045  Administration of voter registration.—

(1)  Each supervisor must ensure that any eligible applicant for voter registration is registered to vote. Once a voter is registered, the name of that voter may not be removed from the registration books except at the written request of the voter, by reason of the voter's conviction of a felony or adjudication as mentally incapacitated with respect to voting, by death of the voter, or pursuant to a registration list maintenance program or other registration list maintenance activity conducted pursuant to s. 98.065, or s. 98.075, or s. 98.0977.

(3)  Notwithstanding the provisions of ss. 98.095, and 98.097, and 98.0977 each supervisor shall maintain for at least 2 years, and make available for public inspection and copying, all records concerning implementation of registration list maintenance programs and activities conducted pursuant to ss. 98.065, and 98.075, and 98.0977. The records must include lists of the name and address of each person to whom an address confirmation final notice was sent and information as to whether each such person responded to the mailing, but may not include any information that is confidential or exempt from public record requirements under this code.

**2**

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 3. Subsection (4) of section 98.0977, Florida Statutes, is amended to read:

98.0977 Statewide voter registration database; development and maintenance.—

(4) To the maximum extent feasible, state and local government entities shall facilitate provision of information and access to data to the <u>department</u> <s>Florida Association of Court Clerks</s> in order to compare information in the statewide voter registration database with available information in other computer databases, including, but not limited to, databases that contain reliable criminal records and records of deceased persons. State and local governmental agencies that provide such data shall do so without charge if the direct cost incurred by those agencies is not significant.

Section 4. Paragraph (b) of subsection (1) of section 98.0979, Florida Statutes, is amended to read:

98.0979 Statewide voter registration database open to inspection; copies.—

(1)

(b) Within 15 days after a request for voter registration information, the division or supervisor of elections shall furnish any requested information, excluding only a voter's signature, social security number, and such other information that is by statute specifically made confidential or is exempt from public records requirements. <u>A request for county information must be made to the supervisor of elections of that county, and a request for multicounty or statewide information must be made to the division. A supervisor of elections is not responsible for providing any information other than information from the supervisor's own county.</u>

Section 5. Subsection (2) of section 101.031, Florida Statutes, is amended to read:

101.031 Instructions for electors.—

(2) The supervisor of elections in each county shall have posted at each polling place in the county the Voter's Bill of Rights and Responsibilities in the following form:

<div align="center">VOTER'S BILL OF RIGHTS</div>

Each registered voter in this state has the right to:

1. Vote and have his or her vote accurately counted.

2. Cast a vote if he or she is in line <u>at the official closing of</u> <s>when</s> the polls <u>in that county</u> <s>are closing</s>.

3. Ask for and receive assistance in voting.

4. Receive up to two replacement ballots if he or she makes a mistake prior to the ballot being cast.

<div align="center">3</div>

<div align="center">CODING: Words <s>stricken</s> are deletions; words <u>underlined</u> are additions.</div>

5. An explanation if his or her registration is in question.

6. If his or her registration is in question, cast a provisional ballot.

7. Prove his or her identity by signing an affidavit if election officials doubt the voter's identity.

8. Written instructions to use when voting, and, upon request, oral instructions in voting from elections officers.

9. Vote free from coercion or intimidation by elections officers or any other person.

10. Vote on a voting system that is in working condition and that will allow votes to be accurately cast.

### VOTER RESPONSIBILITIES

Each registered voter in this state should has the responsibility to:

1. Familiarize himself or herself with the Study and know candidates and issues.

2. Maintain with the office of the supervisor of elections a Keep his or her voter address current address.

3. Know the location of his or her polling place precinct and its hours of operation.

4. Bring proper identification to the polling station.

5. Familiarize himself or herself with the operation of the Know how to operate voting equipment in his or her precinct properly.

6. Treat precinct workers with courtesy.

7. Respect the privacy of other voters.

8. Report any problems or violations of election laws to the supervisor of elections law.

9. Ask questions, if needed when confused.

10. Make sure that Check his or her completed ballot is correct before leaving the polling station for accuracy.

NOTE TO VOTER: Failure to perform any of these responsibilities does not prohibit a voter from voting.

Section 6.   Subsections (2) and (3) of section 101.048, Florida Statutes, are amended to read:

101.048   Provisional ballots.—

(2)(a)   The county canvassing board shall examine each provisional ballot envelope to determine if the person voting that ballot was entitled to vote at the precinct where the person cast a vote in the election and that the person had not already cast a ballot in the election.

**4**

CODING:  Words stricken are deletions; words underlined are additions.

(b)1.  If it is determined that the person was registered and entitled to vote at the precinct <u>where the person cast a vote</u> in the election, the canvassing board shall compare the signature on the provisional ballot envelope with the signature on the voter's registration and, if it matches, shall count the ballot.

2.  If it is determined that the person voting the provisional ballot was not registered or entitled to vote at the precinct <u>where the person cast a vote</u> in the election, the provisional ballot shall not be counted and the ballot shall remain in the envelope containing the Provisional Ballot Voter's Certificate <u>and Affirmation</u> and the envelope <u>shall be</u> marked "Rejected as Illegal."

(3)  The Provisional Ballot Voter's Certificate <u>and Affirmation</u> shall be in substantially the following form:

STATE OF FLORIDA
COUNTY OF ....

I do solemnly swear (or affirm) that my name is ....; that my date of birth is ....; that I am registered to vote and at the time I registered I resided at ...., in the municipality of ...., in .... County, Florida; <u>that I am registered in the .... Party;</u> that I am a qualified voter of the county; <u>and</u> <u>that I</u> have not voted in this election. <u>I understand that if I commit any fraud in connection with voting, vote a fraudulent ballot, or vote more than once in an election, I can be convicted of a felony of the third degree and fined up to $5,000 and/or imprisoned for up to 5 years.</u>

<div align="right">

...(Signature of Voter)...
...(Current <u>Residence</u> Address)...
<u>...(Current Mailing Address)...</u>
<u>...(City, State, Zip Code)...</u>
</div>

Sworn to and subscribed before me this .... day of ........, ...(year)....
...(~~Clerk or Inspector of~~ Election <u>Official</u>)...

Precinct # ....                              <u>Ballot Style/Party Issued:</u> ....

Additional information may be provided to further assist the supervisor of elections in determining eligibility. ~~If known, please provide the place and date that you registered to vote.~~

Section 7.  Paragraphs (a) and (c) of subsection (2) of section 101.151, Florida Statutes, are amended to read:

101.151  Specifications for ballots.—

(2)(a)  The ballot shall have headings under which shall appear the names of the offices and <u>the</u> names of <u>the</u> ~~duly nominated~~ candidates for the respective offices in the following order: the heading "President and Vice President" and thereunder the names of the candidates for President and Vice President of the United States nominated by the political party that received the highest vote for Governor in the last general election of the Governor in this state. Then shall appear the names of other candidates for President and Vice President of the United States who have been properly nominated. ~~Votes cast for write-in candidates for President and Vice President shall be counted as votes cast for the presidential electors supporting~~

**5**

~~such candidates.~~ Then shall follow the heading "Congressional" and thereunder the offices of United States Senator and Representative in Congress; then the heading "State" and thereunder the offices of Governor and Lieutenant Governor, ~~Secretary of State,~~ Attorney General, <u>Chief Financial Officer</u> ~~Comptroller, Treasurer, Commissioner of Education,~~ Commissioner of Agriculture, state attorney, and public defender, together with the names of the candidates for each office and the title of the office which they seek; then the heading "Legislative" and thereunder the offices of state senator and state representative; then the heading "County" and thereunder clerk of the circuit court, clerk of the county court (when authorized by law), sheriff, property appraiser, tax collector, district superintendent of schools, and supervisor of elections. Thereafter follows: members of the board of county commissioners, and such other county and district offices as are involved in the ~~general~~ election, in the order fixed by the Department of State, followed, in the year of their election, by "Party Offices," and thereunder the offices of state and county party executive committee members. <u>In a general election,</u> in addition to the names printed on the ballot, a blank space shall be provided under each heading for an office for which a write-in candidate has qualified. With respect to write-in candidates, if two or more candidates are seeking election to one office, only one blank space shall be provided.

(c) If in any election all the offices as set forth in paragraph (a) are not involved, those offices <u>not</u> to be filled shall be <u>omitted and the remaining offices shall be</u> arranged on the ballot in the order named.

Section 8. Section 101.2512, Florida Statutes, is created to read:

<u>101.2512 Candidates' names on general election ballots.—</u>

<u>(1) The supervisor of elections shall print on the general election ballot the names of candidates nominated by primary election or special primary election or the names of candidates selected by the appropriate executive committee of any political party pursuant to the requirements of this code.</u>

<u>(2) In addition to the names printed on the ballot as provided in subsection (1), the supervisor of elections shall print on the general election ballot the names of each nonpartisan candidate, minor party candidate, or candidate with no party affiliation who has obtained a position on the general election ballot in compliance with the requirements of this code.</u>

Section 9. Section 101.5601, Florida Statutes, is amended to read:

101.5601 Short title.—Sections <u>101.5601-101.5614 may be cited</u> ~~101.5601 through 101.5615 shall be known~~ as the "Electronic Voting Systems Act."

Section 10. Effective September 2, 2002, subsections (3) and (4) of section 101.5606, Florida Statutes, as amended by section 18 of chapter 2001-40, Laws of Florida, are amended to read:

101.5606 Requirements for approval of systems.—No electronic or electromechanical voting system shall be approved by the Department of State unless it is so constructed that:

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(3) It immediately rejects ~~The automatic tabulating equipment shall be set to reject~~ a ballot ~~and provide the elector an opportunity to correct the ballot~~ where the number of votes for an office or measure exceeds the number which the voter is entitled to cast or where the tabulating equipment reads the ballot as a ballot with no votes cast.

(4) For systems using paper ballots, it accepts a rejected ballot pursuant to subsection (3) if a voter chooses to cast the ballot, but records no vote for any office that has been overvoted or undervoted. ~~For rejected ballots that voters choose to cast, the automatic tabulating equipment will be set to accept the ballot and reject all votes for any office or measure when the number of votes therefor exceeds the number which the voter is entitled to cast or when the voter is not entitled to cast a vote for the office or measure.~~

Section 11.  Paragraph (b) of subsection (2) of section 101.5608, Florida Statutes, is amended to read:

101.5608  Voting by electronic or electromechanical method; procedures.—

(2)  When an electronic or electromechanical voting system utilizes a ballot card or paper ballot, the following procedures shall be followed:

(b)  Any voter who spoils his or her ballot or makes an error may return the ballot to the election official and secure another ballot, except that in no case shall a voter be furnished more than three ballots. If the vote tabulation device has rejected a ballot, the ballot shall be considered spoiled and a new ballot shall be provided to the voter unless the voter chooses to cast the rejected ballot. The election official, without examining the original ballot, shall state the possible reasons for the rejection and shall provide instruction to ~~direct~~ the voter ~~to the instruction model provided at the precinct~~ pursuant to s. 101.5611. A spoiled ballot shall be preserved, without examination, in an envelope provided for that purpose. The stub shall be removed from the ballot and placed in an envelope.

Section 12.  Section 101.5611, Florida Statutes, is amended to read:

101.5611  Instructions to electors.—

(1)  ~~For the instruction of voters on election day,~~ The supervisor of elections shall provide instruction at each polling place regarding ~~one instruction model illustrating~~ the manner of voting with the system. In instructing voters, no precinct official may favor any political party, candidate, or issue. Such instruction ~~Each such instruction model~~ shall show the arrangement of candidates ~~party rows, office columns,~~ and questions to be voted on. Additionally, the supervisor of elections shall provide instruction on the proper method of casting a ballot for the specific voting system utilized in that jurisdiction. Such instruction ~~model~~ shall be provided ~~located~~ at a place which voters must pass to reach the official voting booth.

(2)  ~~Before entering the voting booth each voter shall be offered instruction in voting by use of the instruction model, and the voter shall be given ample opportunity to operate the model by himself or herself. In instructing~~

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

~~voters, no precinct official may show partiality to any political party or candidate.~~

(2)(3) The supervisor of elections shall have posted at each polling place a notice that reads: "A person who commits or attempts to commit any fraud in connection with voting, votes a fraudulent ballot, or votes more than once in an election can be convicted of a felony of the third degree and fined up to $5,000 and/or imprisoned for up to 5 years."

Section 13. Paragraphs (a) and (d) of subsection (4) of section 101.5612, Florida Statutes, are amended to read:

101.5612 Testing of tabulating equipment.—

(4)(a)1. For electronic or electromechanical voting systems configured to include electronic or electromechanical tabulation devices which are distributed to the precincts, all or a sample of the devices to be used in the election shall be publicly tested. If a sample is to be tested, the sample shall consist of a random selection of at least 5 percent of the devices for an optical scan system or 2 percent of the devices for a touchscreen system or 10 of the devices for either system, as applicable, whichever is greater. The test shall be conducted by processing a group of ballots, causing the device to output results for the ballots processed, and comparing the output of results to the results expected for the ballots processed. The group of ballots shall be produced so as to record a predetermined number of valid votes for each candidate and on each measure and to include for each office one or more ballots which have activated voting positions in excess of the number allowed by law in order to test the ability of the tabulating device to reject such votes.

2. If any tested tabulating device is found to have an error in tabulation, it shall be deemed unsatisfactory. For each device deemed unsatisfactory, the canvassing board shall take steps to determine the cause of the error, shall attempt to identify and test other devices that could reasonably be expected to have the same error, and shall test a number of additional devices sufficient to determine that all devices are satisfactory. Upon deeming any device unsatisfactory, the canvassing board may require all devices to be tested or may declare that all devices are unsatisfactory.

3. If the operation or output of any tested tabulation device, such as spelling or the order of candidates on a report, is in error, such problem shall be reported to the canvassing board. The canvassing board shall then determine if the reported problem warrants its deeming the device unsatisfactory.

(d) Any tabulating device deemed unsatisfactory shall be recoded ~~reprogrammed~~, repaired, or replaced and shall be made available for retesting. Such device must be determined by the canvassing board or its representative to be satisfactory before it may be used in any election. The canvassing board or its representative shall announce at the close of the first testing the date, place, and time that any unsatisfactory device will be retested or may, at the option of the board, notify by telephone each person who was present

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

at the first testing as to the date, place, and time that the retesting will occur.

Section 14.   Subsections (5) and (9) of section 101.5614, Florida Statutes, are amended to read:

101.5614   Canvass of returns.—

(5)   If any absentee ballot ~~card of the type for which the offices and measures are not printed directly on the card~~ is physically damaged ~~or defective~~ so that it cannot properly be counted by the automatic tabulating equipment, a true duplicate copy shall be made of the damaged ballot ~~card~~ in the presence of witnesses and substituted for the damaged ballot. Likewise, a duplicate ballot ~~card~~ shall be made of an absentee ballot containing an overvoted race or a marked absentee ballot in which every race is undervoted which shall include all valid votes as determined by the canvassing board based on rules adopted by the division pursuant to s. 102.166(5). All duplicate ballots shall be clearly labeled "duplicate," bear a serial number which shall be recorded on the defective ballot, and be counted in lieu of the defective ballot ~~a defective ballot which shall not include the invalid votes. All duplicate ballot cards shall be clearly labeled "duplicate," bear a serial number which shall be recorded on the damaged or defective ballot card, and be counted in lieu of the damaged or defective ballot. If any ballot card of the type for which offices and measures are printed directly on the card is damaged or defective so that it cannot properly be counted by the automatic tabulating equipment, a true duplicate copy may be made of the damaged ballot card in the presence of witnesses and in the manner set forth above, or the valid votes on the damaged ballot card may be manually counted at the counting center by the canvassing board, whichever procedure is best suited to the system used. If any paper ballot is damaged or defective so that it cannot be counted properly by the automatic tabulating equipment, the ballot shall be counted manually at the counting center by the canvassing board. The totals for all such ballots or ballot cards counted manually shall be added to the totals for the several precincts or election districts. No vote shall be declared invalid or void if there is a clear indication on the ballot that the voter has made a definite choice as determined by the canvassing board.~~ After ~~duplicating~~ a ballot has been duplicated, the defective ballot shall be placed in an envelope provided for that purpose, and the duplicate ballot shall be tallied with the other ballots for that precinct.

(9)   Any supervisor of elections, deputy supervisor of elections, canvassing board member, election board member, or election employee who releases the results of any election prior to the closing of the polls in that county on election day commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Section 15.   Effective September 2, 2002, subsection (1) of section 101.5614, Florida Statutes, as amended by section 22 of chapter 2001-40, Laws of Florida, is amended to read:

101.5614   Canvass of returns.—

(1)   ~~In precincts in which an electronic or electromechanical voting system is used,~~ As soon as the polls are closed, the election board shall secure

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

the voting devices against further voting. The election board shall thereafter, ~~open the ballot box~~ in the presence of members of the public desiring to witness the proceedings, verify ~~and count~~ the number of voted ballots, unused ballots, provisional ballots, and spoiled ballots to ascertain whether such number corresponds with the number of ballots issued by the supervisor. If there is a difference, this fact shall be reported in writing to the county canvassing board with the reasons therefor if known. The total number of voted ballots shall be entered on the forms provided. The proceedings of the election board at the precinct after the polls have closed shall be open to the public; however, no person except a member of the election board shall touch any ballot or ballot container or interfere with or obstruct the orderly count of the ballots.

Section 16.   Section 101.595, Florida Statutes, is amended to read:

101.595   Analysis and reports of <u>voting problems</u> ~~voter error~~.—

(1)   No later than December 15 of each general election year, the supervisor of elections in each county shall report ~~on voter errors~~ to the Department of State <u>the total number of overvotes and undervotes in the first race appearing on the ballot pursuant to s. 101.151(2)</u>, along with the likely reasons for <u>such overvotes and undervotes</u> ~~the errors~~ and other information as may be useful in evaluating the performance of the voting system and identifying problems with ballot design and instructions which may have contributed to voter confusion.

(2)   The Department of State, upon receipt of such information, shall prepare a public report on the performance of each type of voting system. The report must contain, but is not limited to, the following information:

(a)   An identification of problems with the ballot design or instructions which may have contributed to voter confusion;

(b)   An identification of voting system design problems; and

(c)   Recommendations for correcting any problems identified.

(3)   The Department of State shall submit the report to the Governor, the President of the Senate, and the Speaker of the House of Representatives by January 31 of each year following a general election.

Section 17.   Paragraph (a) of subsection (2) of section 101.68, Florida Statutes, is amended to read:

101.68   Canvassing of absentee ballot.—

(2)(a)   The county canvassing board may begin the canvassing of absentee ballots at 7 a.m. on the fourth day before the election, but not later than noon on the day following the election. In addition, for any county using electronic tabulating equipment, the processing of absentee ballots through such tabulating equipment may begin at 7 a.m. on the fourth day before the election. However, notwithstanding any such authorization to begin canvassing or otherwise processing absentee ballots early, no result shall be released until

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

after the closing of the polls <u>in that county</u> on election day. Any supervisor of elections, deputy supervisor of elections, canvassing board member, election board member, or election employee who releases the results of a canvassing or processing of absentee ballots prior to the closing of the polls <u>in that county</u> on election day commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Section 18.   Section 101.69, Florida Statutes, is amended to read:

101.69   Voting in person; return of absentee ballot.—The provisions of this code shall not be construed to prohibit any elector from voting in person at the elector's precinct on the day of an election notwithstanding that the elector has requested an absentee ballot for that election. An elector who has received an absentee ballot, but desires to vote in person, shall return the ballot, whether voted or not, to the election board in the elector's precinct. The returned ballot shall be marked "canceled" by the board and placed with other canceled ballots. However, if the elector <u>does not</u> <s>is unable to</s> return the ballot <u>and the election official</u>:

<u>(1)   Confirms that the supervisor has received the elector's absentee ballot, the elector shall not be allowed to vote in person.</u>

<u>(2)   Confirms that the supervisor has not received the elector's absentee ballot, the elector shall be allowed to vote in person as provided in this code. The elector's absentee ballot, if subsequently received, shall not be counted and shall remain in the mailing envelope, and the envelope shall be marked "Rejected as Illegal."</u>

<u>(3)   Cannot determine whether the supervisor has received the elector's absentee ballot, the elector may vote a provisional ballot as provided in s. 101.048.</u>

Section 19.   Subsection (4) of section 102.014, Florida Statutes, is amended to read:

102.014   Poll worker recruitment and training.—

(4)   Each supervisor of elections shall be responsible for training inspectors and clerks, subject to the following minimum requirements:

(a)   No clerk shall be entitled to work at the polls unless he or she has had a minimum of <u>3</u> <s>6</s> hours of training <u>prior to each election</u> <s>during a general election year, at least 2 hours of which must occur after June 1 of that year</s>.

(b)   No inspector shall work at the polls unless he or she has had a minimum of <u>2</u> <s>3</s> hours of training <u>prior to each election</u> <s>during a general election year, at least 1 hour of which must occur after June 1 of that year</s>.

<u>(c)   For the purposes of this subsection, the first and second primary elections shall be considered one election.</u>

Section 20.   Subsection (2) of section 102.141, Florida Statutes, reads, and subsections (4) and (6) of said section are amended to read:

CODING: Words <s>stricken</s> are deletions; words <u>underlined</u> are additions.

102.141   County canvassing board; duties.—

(2)   The county canvassing board shall meet in a building accessible to the public in the county where the election occurred at a time and place to be designated by the supervisor of elections to publicly canvass the absentee electors' ballots as provided for in s. 101.68 and provisional ballots as provided by s. 101.048. Public notice of the time and place at which the county canvassing board shall meet to canvass the absentee electors' ballots and provisional ballots shall be given at least 48 hours prior thereto by publication once in one or more newspapers of general circulation in the county or, if there is no newspaper of general circulation in the county, by posting such notice in at least four conspicuous places in the county. As soon as the absentee electors' ballots and the provisional ballots are canvassed, the board shall proceed to publicly canvass the vote given each candidate, nominee, constitutional amendment, or other measure submitted to the electorate of the county, as shown by the returns then on file in the office of the supervisor of elections and the office of the county court judge.

(4)   The canvassing board shall submit unofficial returns to the Department of State for each federal, statewide, state, or multicounty office or ballot measure no later than noon on the second day after any primary, general, special, or other election. Such returns shall include the canvass of all ballots as required by subsection (2).

(6)   If the unofficial returns reflect that a candidate for any office was defeated or eliminated by one-half of a percent or less of the votes cast for such office, that a candidate for retention to a judicial office was retained or not retained by one-half of a percent or less of the votes cast on the question of retention, or that a measure appearing on the ballot was approved or rejected by one-half of a percent or less of the votes cast on such measure, the board responsible for certifying the results of the vote on such race or measure shall order a recount of the votes cast with respect to such office or measure. A recount need not be ordered with respect to the returns for any office, however, if the candidate or candidates defeated or eliminated from contention for such office by one-half of a percent or less of the votes cast for such office request in writing that a recount not be made.

(a)   In counties with voting systems that use ballot cards or paper ballots, each canvassing board responsible for conducting a recount shall put each ballot through the automatic tabulating equipment for each precinct in which the office or issue appeared on the ballot and determine whether the returns correctly reflect the votes cast. If any paper ballot is physically damaged so that it cannot be properly counted by the automatic tabulating equipment during the recount, a true duplicate shall be made of the damaged ballot pursuant to the procedures in s. 101.5614(5). Immediately before the start of the recount and after completion of the count, a test of the tabulating equipment shall be conducted as provided in s. 101.5612. If the test indicates no error, the recount tabulation of the ballots cast shall be presumed correct and such votes shall be canvassed accordingly. If an error is detected, the cause therefor shall be ascertained and corrected and the recount repeated, as necessary. The canvassing board shall immediately report the error, along with the cause of the error and the corrective measures being taken, to the Department of State. No later than 11 days after

**12**

CODING:  Words stricken are deletions; words underlined are additions.

the election, the canvassing board shall file a separate incident report with the Department of State, detailing the resolution of the matter and identifying any measures that will avoid a future recurrence of the error.

(b) In counties with voting systems that do not use ~~ballot cards or~~ paper ballots, each canvassing board responsible for conducting a recount shall examine the counters on the precinct tabulators to ensure that the total of the returns on the precinct tabulators equals the overall election return. If there is a discrepancy between the overall election return and the counters of the precinct tabulators, the counters of the precinct tabulators shall be presumed correct and such votes shall be canvassed accordingly.

(c) The canvassing board shall submit a second set of unofficial returns to the Department of State for each federal, statewide, state, or multicounty office or ballot measure no later than noon on the <u>third</u> ~~second~~ day after any election in which a recount was conducted pursuant to this subsection. If the canvassing board is unable to complete the recount prescribed in this subsection by the deadline, the second set of unofficial returns submitted by the canvassing board shall be identical to the initial unofficial returns and the submission shall also include a detailed explanation of why it was unable to timely complete the recount. However, the canvassing board shall complete the recount prescribed in this subsection, along with any manual recount prescribed in s. 102.166, and certify election returns in accordance with the requirements of this chapter.

Section 21. Paragraph (a) of subsection (2) and subsection (6) of section 102.166, Florida Statutes, are amended to read:

102.166 Manual recounts.—

(2)(a) If the second set of unofficial returns pursuant to s. 102.141 indicates that a candidate for any office was defeated or eliminated by between one-quarter and one-half of a percent of the votes cast for such office, that a candidate for retention to judicial office was retained or not retained by between one-quarter and one-half of a percent of the votes cast on the question of retention, or that a measure appearing on the ballot was approved or rejected by between one-quarter and one-half of a percent of the votes cast on such measure, any such candidate, the political party of such candidate, or any political committee that supports or opposes such ballot measure is entitled to a manual recount of the overvotes and undervotes cast in the entire geographic jurisdiction of such office or ballot measure, provided that a request for a manual recount is made by 5 p.m. on the <u>third</u> ~~second~~ day after the election.

(6) Procedures for a manual recount are as follows:

(a) The county canvassing board shall appoint as many counting teams of at least two electors as is necessary to manually recount the ballots. A counting team must have, when possible, members of at least two political parties. A candidate involved in the race shall not be a member of the counting team.

<div align="center">

**13**

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

</div>

(b)  Each duplicate ballot prepared pursuant to s. 101.5614(5) or s. 102.141(6) shall be compared with the original ballot to ensure the correctness of the duplicate.

(c)(b)  If a counting team is unable to determine whether the ballot contains a clear indication that the voter has made a definite choice, the ballot shall be presented to the county canvassing board for a determination.

(d)(c)  The Department of State shall adopt detailed rules prescribing additional recount procedures for each certified voting system which shall be uniform to the extent practicable. The rules shall address, at a minimum, the following areas:

1. Security of ballots during the recount process;

2. Time and place of recounts;

3. Public observance of recounts;

4. Objections to ballot determinations;

5. Record of recount proceedings; and

6. Procedures relating to candidate and petitioner representatives.

Section 22.  Paragraph (b) of subsection (4) of section 46 of chapter 2001-40, Laws of Florida, is amended to read:

Section 46.

(4)

(b)  For the 2002 elections, following the last day of qualifying for office, any statewide candidate who has requested to receive contributions from the Election Campaign Financing Trust Fund or any statewide candidate in a race with a candidate who has requested to receive contributions from the trust fund shall file reports on the 4th, 11th, 18th, 25th, and 32nd days immediately preceding the primary election and on the 4th, 11th, 18th, 25th, 32nd, 39th, 46th, and 53rd days prior to the general election.

Section 23.  Subsection (1) of section 105.031, Florida Statutes, is amended to read:

105.031  Qualification; filing fee; candidate's oath; items required to be filed.—

(1)  TIME OF QUALIFYING.—Except for candidates for judicial office, nonpartisan candidates for multicounty office shall qualify with the Division of Elections of the Department of State and nonpartisan candidates for countywide or less than countywide office shall qualify with the supervisor of elections. Candidates for judicial office other than the office of county court judge shall qualify with the Division of Elections of the Department of State, and candidates for the office of county court judge shall qualify with the supervisor of elections of the county. Candidates for judicial office shall

CODING: Words stricken are deletions; words underlined are additions.

qualify no earlier than noon of the 120th day, and no later than noon of the 116th day, before the first primary election. Candidates for the office of school board member shall qualify no earlier than noon of the 50th day, and no later than noon of the 46th day, before the first primary election. Filing shall be on forms provided for that purpose by the Division of Elections and furnished by the appropriate qualifying officer. Any person seeking to qualify by the alternative method, as set forth in s. 105.035, if the person has submitted the necessary petitions by the required deadline and is notified after the fifth day prior to the last day for qualifying that the required number of signatures has been obtained, shall be entitled to subscribe to the candidate's oath and file the qualifying papers at any time within 5 days from the date he or she is notified that the necessary number of signatures has been obtained. Any person other than a write-in candidate who qualifies within the time prescribed in this subsection shall be entitled to have his or her name printed on the ballot.

Section 24.   Sections 101.22, 101.5615, and 101.72, Florida Statutes, are repealed.

Section 25.   Subsection (3) of section 106.11, Florida Statutes, is amended to read:

106.11   Expenses of and expenditures by candidates and political committees.—Each candidate and each political committee which designates a primary campaign depository pursuant to s. 106.021(1) shall make expenditures from funds on deposit in such primary campaign depository only in the following manner, with the exception of expenditures made from petty cash funds provided by s. 106.12:

(3)   No candidate, campaign manager, treasurer, deputy treasurer, or political committee or any officer or agent thereof, or any person acting on behalf of any of the foregoing, shall authorize any expenses, nor shall any campaign treasurer or deputy treasurer sign a check drawn on the primary campaign account for any purpose, unless there are sufficient funds on deposit in the primary depository account of the candidate or political committee to pay the full amount of the authorized expense, to honor all other checks drawn on such account, which checks are outstanding, and to meet all expenses previously authorized but not yet paid. However, an expense may be incurred for the purchase of goods or services if there are sufficient funds on deposit in the primary depository account to pay the full amount of the incurred expense, to honor all checks drawn on such account, which checks are outstanding, and to meet all other expenses previously authorized but not yet paid, provided that payment for such goods or services is made upon final delivery and acceptance of the goods or services; and an expenditure from petty cash pursuant to the provisions of s. 106.12 may be authorized, if there is a sufficient amount of money in the petty cash fund to pay for such expenditure. Payment for credit card purchases shall be made pursuant to s. 106.125. Any expense incurred or authorized in excess of such funds on deposit shall, in addition to other penalties provided by law, constitute a violation of this chapter. As used in this subsection, the term "sufficient funds on deposit in the primary depository account of the candidate or political committee" means that the funds at issue have been deliv-

**15**

CODING:  Words ~~stricken~~ are deletions; words underlined are additions.

ered for deposit to the financial institution at which such account is maintained. The term shall not be construed to mean that such funds are available for withdrawal in accordance with the deposit rules or the funds availability policies of such financial institution.

Section 26. Section 101.635, Florida Statutes, is amended to read:

101.635 Distribution of blocks of printed ballots.—In any county in which the supervisor of elections maintains deputies in a municipality other than the county seat and such municipality has a population in excess of 90,000, blocks of numbered ballots shall be made available as required and as the supervisor may direct, in order to comply with the provisions of s. 98.181. All ballots made available in any such municipality shall be fully accounted for to the supervisor. This section does not permit the supervisor to deny a local political party's requests for absentee ballots.

Section 27. Subsection (5) of section 106.08, Florida Statutes, is reenacted and amended to read:

106.08 Contributions; limitations on.—

(5)(a) A person may not make any contribution through or in the name of another, directly or indirectly, in any election.

(b) Candidates, political committees, and political parties may not solicit contributions from or make contributions to any religious, charitable, civic, or other causes or organizations established primarily for the public good.

(c) Candidates, political committees, and political parties may not make contributions, in exchange for political support, to any religious, charitable, civic, or other cause or organization established primarily for the public good. However, It is not a violation of this paragraph subsection for:

1. A candidate, political committee, or political party executive committee to make gifts of money in lieu of flowers in memory of a deceased person; or for

2. A candidate to continue membership in, or make regular donations from personal or business funds to, religious, political party, civic, or charitable groups of which the candidate is a member or to which the candidate has been a regular donor for more than 6 months; or.

3. A candidate to may purchase, with campaign funds, tickets, admission to events, or advertisements from religious, civic, political party, or charitable groups.

Section 28. Applicable retroactively, subsection (3) of section 106.021, Florida Statutes, is amended to read:

106.021 Campaign treasurers; deputies; primary and secondary depositories.—

(3) Except for independent expenditures, no contribution or expenditure, including contributions or expenditures of a candidate or of the candidate's

CODING: Words stricken are deletions; words underlined are additions.

family, shall be directly or indirectly made or received in furtherance of the candidacy of any person for nomination or election to political office in the state or on behalf of any political committee except through the duly appointed campaign treasurer of the candidate or political committee; however, a candidate or any other individual may be reimbursed for expenses incurred for travel, food and beverage, office supplies, and mementos expressing gratitude to campaign supporters by a check drawn upon the campaign account and reported pursuant to s. 106.07(4). In addition However, expenditures may be made directly by any political committee or political party regulated by chapter 103 for obtaining time, space, or services in or by any communications medium for the purpose of jointly endorsing three or more candidates, and any such expenditure shall not be considered a contribution or expenditure to or on behalf of any such candidates for the purposes of this chapter.

Section 29.   Applicable retroactively, paragraph (a) of subsection (4) of section 106.07, Florida Statutes, is amended to read:

106.07   Reports; certification and filing.—

(4)(a)   Each report required by this section shall contain:

1.   The full name, address, and occupation, if any of each person who has made one or more contributions to or for such committee or candidate within the reporting period, together with the amount and date of such contributions. For corporations, the report must provide as clear a description as practicable of the principal type of business conducted by the corporation. However, if the contribution is $100 or less or is from a relative, as defined in s. 112.312, provided that the relationship is reported, the occupation of the contributor or the principal type of business need not be listed.

2.   The name and address of each political committee from which the reporting committee or the candidate received, or to which the reporting committee or candidate made, any transfer of funds, together with the amounts and dates of all transfers.

3.   Each loan for campaign purposes to or from any person or political committee within the reporting period, together with the full names, addresses, and occupations, and principal places of business, if any, of the lender and endorsers, if any, and the date and amount of such loans.

4.   A statement of each contribution, rebate, refund, or other receipt not otherwise listed under subparagraphs 1. through 3.

5.   The total sums of all loans, in-kind contributions, and other receipts by or for such committee or candidate during the reporting period. The reporting forms shall be designed to elicit separate totals for in-kind contributions, loans, and other receipts.

6.   The full name and address of each person to whom expenditures have been made by or on behalf of the committee or candidate within the reporting period; the amount, date, and purpose of each such expenditure; and the name and address of, and office sought by, each candidate on whose behalf

CODING:  Words stricken are deletions; words underlined are additions.

such expenditure was made. However, expenditures made from the petty cash fund provided by s. 106.12 need not be reported individually.

7.   The full name and address of each person to whom an expenditure for personal services, salary, or reimbursement for authorized expenses as provided in s. 106.021(3) has been made and which is not otherwise reported, including the amount, date, and purpose of such expenditure. However, expenditures made from the petty cash fund provided for in s. 106.12 need not be reported individually.

8.   The total amount withdrawn and the total amount spent for petty cash purposes pursuant to this chapter during the reporting period.

9.   The total sum of expenditures made by such committee or candidate during the reporting period.

10.   The amount and nature of debts and obligations owed by or to the committee or candidate, which relate to the conduct of any political campaign.

11.   A copy of each credit card statement which shall be included in the next report following receipt thereof by the candidate or political committee. Receipts for each credit card purchase shall be retained by the treasurer with the records for the campaign account.

12.   The amount and nature of any separate interest-bearing accounts or certificates of deposit and identification of the financial institution in which such accounts or certificates of deposit are located.

Section 30.   Except as otherwise provided herein, this act shall take effect upon becoming a law.

Approved by the Governor April 11, 2002.

Filed in Office Secretary of State April 11, 2002.

CODING: Words stricken are deletions; words underlined are additions.

# TAB 4

# CHAPTER 2002-189

## House Bill No. 493

An act relating to voter registration; amending s. 97.052, F.S.; authorizing private individuals and groups to reproduce voter registration applications under certain conditions; amending s. 97.057, F.S.; requiring the Department of Highway Safety and Motor Vehicles to forward copies of unsigned voter registration applications within a specified period to the appropriate supervisors of elections; amending s. 97.058, F.S.; requiring voter registration agencies to forward copies of incompleted voter registration applications within a specified period to the appropriate supervisors of elections; amending s. 97.071, F.S.; requiring voter registration identification cards to have the name, rather than the signature, of the supervisor of elections; amending s. 97.1031, F.S.; revising notice requirements for change of residence within the same county; amending s. 98.0977, F.S.; revising duties of the supervisor of elections relating to maintenance of the voter registration rolls; providing for a hearing, as an alternative to notice, to determine the eligibility of voters convicted of a felony or adjudicated mentally incapacitated with respect to voting; requiring removal of a person's name from the registration books upon a determination of sufficient evidence; providing for appeal and for payment of the costs thereof; amending s. 97.052, F.S.; modifying information requested on the voter registration application; creating s. 98.077, F.S.; providing for update of voter signatures; providing for publication of notice of procedures for doing so at least once each general election year; providing an effective date.

Be It Enacted by the Legislature of the State of Florida:

Section 1.  Paragraph (c) of subsection (1) of section 97.052, Florida Statutes, is amended to read:

97.052  Uniform statewide voter registration application.—

(1)  The department shall prescribe a uniform statewide voter registration application for use in this state.

(c)  The uniform statewide voter registration application may ~~not~~ be reproduced by any private individual or group, provided the reproduced application is in the same format as the application prescribed under this section.

Section 2.  Paragraph (b) of subsection (2) of section 97.057, Florida Statutes, is amended to read:

97.057  Voter registration by the Department of Highway Safety and Motor Vehicles.—

(2)  The Department of Highway Safety and Motor Vehicles shall:

(b)  Require a driver's license examiner to inquire orally, or inquire in writing if the applicant is hearing impaired, and whether the applicant

CODING: Words ~~stricken~~ are  deletions; words <u>underlined</u> are additions.

wishes to register to vote or update a voter registration record during the completion of a driver's license or identification card application, renewal, or change of address.

1.   If the applicant chooses to register to vote or to update a voter registration record:

a.   All applicable information received by the Department of Highway Safety and Motor Vehicles in the course of filling out the forms necessary under subsection (1) must be transferred to a voter registration application;

b.   The additional necessary information must be obtained by the driver's license examiner and must not duplicate any information already obtained while completing the forms required under subsection (1); and

c.   A voter registration application with all of the applicant's voter registration information must be presented to the applicant to sign.

2.   If the applicant declines to register to vote, update the applicant's voter registration record, or change the applicant's address by either orally declining or by failing to sign the voter registration application, the Department of Highway Safety and Motor Vehicles must keep the declination for 2 years <u>but must forward a copy of the unsigned voter registration application within 5 days after receipt to the appropriate supervisor of elections</u>.

Section 3.   Subsection (7) of of section 97.058, Florida Statutes, is amended to read:

97.058   Voter registration agencies.—

(7)   A voter registration agency must retain declinations for a period of 2 years, during which time the declinations are not considered a record of the client pursuant to the laws governing the agency's records. <u>However, a voter registration agency must forward a copy of each incompleted voter registration application within 5 days after receipt to the appropriate supervisor of elections.</u>

Section 4.   Paragraph (j) of subsection (1) of section 97.071, Florida Statutes, is amended to read:

97.071   Registration identification card.—

(1)   A registration identification card must be furnished to all voters registering under the permanent single registration system and must contain:

(j)   <u>Name</u> ~~Signature~~ of supervisor.

Section 5.   Subsection (1) of section 97.1031, Florida Statutes, is amended to read:

97.1031   Notice of change of residence within the same county, change of name, or change of party.—

(1)   When an elector moves from the address named on that person's voter registration record to another address within the same county, the elector

**2**

CODING: Words ~~stricken~~ are  deletions; words <u>underlined</u> are additions.

must provide a signed, written notification of such move to the supervisor of elections of that county. The elector may provide the supervisor a signed, written notice or may notify the supervisor by telephone or electronic means. However, notification of such move other than by signed, written notice must include the elector's date of birth. and obtain A registration identification card reflecting the new address of legal residence shall be issued to the elector as provided in subsection (4).

Section 6.    Subsection (3) of section 98.0977, Florida Statutes, is amended to read:

98.0977    Statewide voter registration database; development and maintenance.—

(3)(a)  In administering the database, each supervisor of elections shall compare registration information provided by a voter with information held by the Department of Law Enforcement, the Board of Executive Clemency, the Office of Vital Statistics, and other relevant sources.

(b)  The supervisor of elections shall remove from the voter registration rolls the name of any person who is listed in the database as deceased.

(c)  Information in the database indicating that a person registered to vote in a given county has subsequently registered to vote in another jurisdiction shall be considered as a written request from that voter to have his or her name removed from the voter registration rolls of that county, and the supervisor of elections of that county shall remove that voter's name from the county's voter registration rolls.

(d)  When If the supervisor of elections finds information through the database that suggests that a voter has been convicted of a felony and has not had his or her civil rights restored or has been adjudicated mentally incompetent and his or her mental capacity with respect to voting has not been restored is ineligible to register to vote, the supervisor of elections shall notify the voter by certified United States mail. The notification shall contain a statement as to the reason for the voter's potential ineligibility to be registered register to vote and shall request information from the voter on forms provided by the supervisor of elections in order to make a final determination on the voter's eligibility. As an alternative, the voter may attend a hearing at a time and place specified in the notice. If there is evidence that the notice was not received, notice must be given once by publication in a newspaper of general circulation in the county. The notice must plainly state that the voter is potentially ineligible to be registered to vote and must state a time and place for the person to appear before the supervisor of elections to show cause why his or her name should not be removed from the voter registration rolls. After reviewing the information requested by the supervisor of elections and provided by the voter, if the supervisor of elections determines that the voter is not eligible to vote under the laws of this state, the supervisor of elections shall notify the voter by certified United States mail that he or she has been found ineligible to be registered register to vote in this state, shall state the reason for the ineligibility, and shall inform the voter that he or she has been will be removed from the voter registration rolls. The supervisor of elections shall remove from the voter registration

CODING:  Words stricken are  deletions; words underlined are additions.

rolls the name of any voter who fails either to respond within 30 days to the notice sent by certified mail or to attend the hearing.

(e)   Upon hearing all evidence in a hearing, the supervisor of elections must determine whether there is sufficient evidence to strike the person's name from the registration books. If the supervisor determines that there is sufficient evidence, he or she must strike the name.

(f)   Appeal may be taken to the circuit court in and for the county where the person was registered. Notice of appeal must be filed within the time and in the manner provided by the Florida Rules of Appellate Procedure and acts as supersedeas. Trial in the circuit court is de novo and governed by the rules of that court. Unless the person can show that his or her name was erroneously or illegally stricken from the registration books or that he or she is indigent, the person must bear the costs of the trial in the circuit court. Otherwise, the cost of the appeal must be paid by the board of county commissioners.

Section 7.   Subsection (2) of section 97.052, Florida Statutes, is amended to read:

97.052   Uniform statewide voter registration application.—

(2)   The uniform statewide voter registration application must be designed to elicit the following information from the applicant:

(a)   Full name.

(b)   Date of birth.

(c)   Address of legal residence.

(d)   Mailing address, if different.

(e)   County of legal residence.

(f)   Address of property for which the applicant has been granted a homestead exemption, if any.

(g)   Race or ethnicity that best describes the applicant:

1.   American Indian or Alaskan Native.

2.   Asian or Pacific Islander.

3.   Black, not Hispanic.

4.   White, not Hispanic.

5.   Hispanic.

(h)   State or country of birth.

(i)(h)   Sex.

CODING: Words stricken are deletions; words underlined are additions.

(j)(i)  Party affiliation.

(k)(j)  Whether the applicant needs assistance in voting.

(l)(k)  Name and address where last registered.

(m)(l)  Last four digits of the applicant's social security number.

(n)(m)  Florida driver's license number or the identification number from a Florida identification card issued under s. 322.051.

(o)(n)  Telephone number (optional).

(p)(o)  Signature of applicant under penalty for false swearing pursuant to s. 104.011, by which the person subscribes to the oath required by s. 3, Art. VI of the State Constitution and s. 97.051, and swears or affirms that the information contained in the registration application is true.

(q)(p)  Whether the application is being used for initial registration, to update a voter registration record, or to request a replacement registration identification card.

(r)(q)  Whether the applicant is a citizen of the United States.

(s)(r)  That the applicant has not been convicted of a felony or, if convicted, has had his or her civil rights restored.

(t)(s)  That the applicant has not been adjudicated mentally incapacitated with respect to voting or, if so adjudicated, has had his or her right to vote restored.

The registration form must be in plain language and designed so that convicted felons whose civil rights have been restored and persons who have been adjudicated mentally incapacitated and have had their voting rights restored are not required to reveal their prior conviction or adjudication.

Section 8.  Section 98.077, Florida Statutes, is created to read:

98.077  Update of voter signature.—The supervisor of elections shall provide to each registered voter of the county the opportunity to update his or her signature on file at the supervisor's office by providing notification of the ability to do so in any correspondence, other than postcard notifications, sent to the voter. The notice shall advise when, where, and how to update the signature and shall provide the voter information on how to obtain a form from the supervisor that can be returned to update the signature. In addition, at least once during each general election year, the supervisor shall publish in a newspaper of general circulation or other newspaper in the county deemed appropriate by the supervisor a notice specifying when, where, or how a voter can update his or her signature that is on file or how a voter can obtain a form from the supervisor to do so.

Section 9.  This act shall take effect upon becoming a law.

**5**

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Approved by the Governor April 25, 2002.

Filed in Office Secretary of State April 25, 2002.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Approved by the Governor April 25, 2002.

Filed in Office Secretary of State April 25, 2002.

CODING:  Words ~~stricken~~ are  deletions; words <u>underlined</u> are additions.

# TAB 5

# *Revitalizing Democracy in Florida*

## *The Governor÷s Select Task Force on Election Procedures, Standards and Technology*



### *March 1, 2001*

1

**The Governor's Select Task Force On Election Procedures, Standards and Technology**

**March 1, 2001**

*Table of Contents*

Letter from the Co-Chairmen ................................................ 3

Executive Order ................................................................. 4

Select Task Force Members ................................................ 6

Select Task Force Staff ...................................................... 7

Introduction ..................................................................... 8

Florida's Decentralized Elections System ............................ 12

Findings and Recommendations ......................................... 15

   Putting People First ............................................... 16
    Citizens as Voters ......................................... 16
    Poll-Workers as Helpers ................................. 22
    Elections Officials ......................................... 26

   Encouraging Reliable Technology .......................... 30

   Improving Procedures and Law ............................. 48
    Voter Registration ........................................ 48
    Election Dates and Times ............................... 53
    Ballots ........................................................ 55
    Absentee Ballots .......................................... 57
    Recounts, Contests, and Certification .............. 62

Recommended Future Studies ............................................. 69

Complete List of Recommendations ..................................... 70

# Governor's Select Task Force on Election Procedures, Standards and Technology

March 1, 2001

The Honorable Jeb Bush
Governor
State of Florida
Tallahassee, FL

Dear Governor Bush:

We are pleased to present the final report of the Governor's Select Task Force on Elections Procedures, Standards and Technology.

For the past two months, the 21 members of your Select Task Force have worked tirelessly, meeting six times in four cities, hearing testimony from the experts and the good citizens of Florida. The recommendations made here are a result of careful deliberation and thoughtful discussion. Most of the recommendations were made unanimously.

It has been heartening to work with this bi-partisan group, so committed to making our State the nation's model for elections. This is democracy at its best.

On behalf of our colleagues on the Select Task Force, it has been our privilege to serve the State of Florida. We look forward to your and the Legislature's consideration of these vital issues.

Sincerely,

Edward T. Foote II                                      Jim Smith
Co-Chairman                                            Co-Chairman

3

# EXECUTIVE ORDER NUMBER 00-349

**WHEREAS,**the Year 2000 Presidential Election was extremely close and concerns were raised regarding the election procedures, standards and technology employed in each of the 67 counties of the State of Florida, and

**WHEREAS,**regardless of the outcome of the election, all Floridians would benefit from an immediate review of the State's election procedures, standards and technology, and

**WHEREAS,**any review of the State's election procedures, standards and technology should be conducted on a non-partisan basis in an effort to ensure the highest level of public confidence in Florida's system for conducting elections;

**NOW, THEREFORE, I, JEB BUSH,** , Governor of the State of Florida, by the powers vested in me by the Constitution and laws of the State of Florida, do hereby promulgate the following executive order, effective immediately:

**Section 1.**

    **A.**There is hereby created the Select Task Force on Election Procedures, Standards and Technology.

    **B.** The Select Task Force shall be comprised of no more than 21 members, ten of whom shall be Republicans, ten of whom shall be Democrats and one of whom shall be affiliated with neither party. At least two of the members shall be representatives from a county Supervisor of Elections Office, and four members shall be legislators, a Republican and Democrat from the Florida House of Representatives and a Republican and Democrat from the Florida Senate. The Governor shall designate two members, of different parties, to serve as Co-Chairs. Select Task Force members shall receive no compensation, but shall be entitled to per diem and travel expenses while attending meetings of the Select Task Force, to the extent allowed by Section 112.061, Florida Statutes. Per diem and travel expenses shall be paid by the Secretary of State's Office in accordance with Chapter 112, Florida Statutes. The Select Task Force may include an executive director who shall serve at the pleasure of the Co-Chairs and the Secretary of State's Division of Elections will provide technical assistance. The Select Task Force may also call upon experts to testify, and such experts shall be reimbursed for reasonable and necessary expenses of attending Select Task Force meetings.

    **C.** The Select Task Force shall act by a vote of the majority of its members. A quorum of at least eleven members shall be required for an act of the Select Task Force to have effect. No member may grant a proxy for his or her vote to any other member except with the prior approval of the Co-Chairs.

    **D.** The first meeting of the Select Task Force shall be held no later than January 3, 2001.

**Section 2.**
The Select Task Force shall study and make written policy recommendations and/or propose legislation to improve the election procedures, standards and technology employed in each of Florida's 67 counties. Such recommendations and/or proposed legislation shall be submitted by March 1, 2001, to the Governor, the President of the Florida Senate, the Speaker of the House of Representatives, and the Secretary of State. In the interest of facilitating immediate action during the 2001 Legislative Session, the two Co-Chairs shall limit the scope of the Select Task Force's study and written policy recommendations to those issues which can, in the opinion of both Co-Chairs, be manageably addressed by the entire Select Task Force within the time limits set herein. The Co-Chairs shall, in addition, identify any issues raised by Select Task Force members which cannot be manageably addressed, but which may merit further study or examination in an alternative forum at a later time.

**Section 3.**
All agencies under the control of the Governor are directed, and all other agencies are requested, to render full assistance and cooperation to the Select Task Force.

**Section 4.**
The Select Task Force shall continue in existence only until its objectives are achieved, but not later than March 1, 2001.

**IN TESTIMONY WHEREOF**, I have hereunto set my hand and have caused the Great Seal of the State of Florida to be affixed at Tallahassee, the Capitol, this 14th day of December, 2000.

## Select Task Force Members

The Honorable James C. Smith
Co-Chairman
Former Attorney General
Former Secretary of State
Tallahassee

Mr. Edward T. Foote II
Co-Chairman
President, University of Miami
Miami

The Honorable Cecilia Altonaga
Circuit Court Judge
Miami

The Honorable Kurt S. Browning
Supervisor of Elections, Pasco County
Dade City

Ms. Anne Jolley Thomas Byrd
Governmental Consultant
Tallahassee

Mr. Carl N. Cannon
Publisher, *Florida Times Union*
Jacksonville

The Honorable Jane Carroll
Former Supervisor of Elections, Broward County
Plantation

Dr. David R. Colburn
Provost, University of Florida
Gainesville

The Honorable Earl Hutto
Former U.S. Congressman
Pensacola

The Honorable Daryl Jones
State Senator, District 40
Miami

The Honorable Phillip D. Lewis
Former State Senator
Riviera Beach

The Honorable Warren Newell
County Commissioner, Palm Beach County
West Palm Beach

The Honorable Joe Peavy
Sheriff, Madison County
Madison

The Honorable Marco Rubio
State Representative, District 111
Miami

Mr. E. Thom Rumberger
Attorney
Tallahassee

The Honorable Jim Sebesta
State Senator, District 20
St. Petersburg

The Honorable Barbara Sheen-Todd
County Commissioner, Pinellas County
Clearwater

The Honorable Chris Smith
State Representative, District 93
Ft. Lauderdale

Mr. H. Kenza van Assensderp
Attorney
Tallahassee

The Honorable Gertrude Walker
Supervisor of Elections, St. Lucie County
Ft. Pierce

Reverend Joseph T. Wright
Pastor, Tallahassee

Staff to the Select Task Force Provided By:



## COLLINS CENTER
### FOR PUBLIC POLICY

**Roderick N. Petrey, President**

**Dr. Mark Pritchett, Executive Vice President
and
Select Task Force Executive Director**

**Karla Ebenbach
Ana Garcia
Chris Dudley
Dana Knox
Ted Rozier
Nancy Gonzalez
Tonya Mills
Pat Gregory**

The Collins Center for Public Policy, Inc.
P.O. Box 1658
Tallahassee, Florida 32302-1658
(850) 219-0308
Fax: (850) 219-0491

The Collins Center for Public Policy, Inc.
150 S.E. Second Avenue, Suite 709
Miami, Florida 33131
(305) 377-4484
Fax: (305) 377-4485

www.collinscenter.org

7

## Governor's Select Task Force on
## Election Procedures, Standards and Technology

America's grand and noble experiment with democracy is just that – an experiment. Through trial and error, we Americans have learned a great deal about voting and elections and have mounted an increasingly open and fair system for determining the will of the people. Florida's experiences with the 2000 presidential election were a very visible part of learning how to do better. That task continues.

The Governor's Select Task Force on Election Procedures, Standards and Technology was established by Executive Order 00-349 by Governor Jeb Bush on December 14, 2000. The Governor called for a non-partisan review by appointing 10 Democrats, 10 Republicans, and one unaffiliated member; by naming Edward T. Foote II, a registered Democrat, and James "Jim" C. Smith, a registered Republican, as Co-Chairs; and by engaging the non-partisan and independent Collins Center for Public Policy, Inc., to serve as staff.

The Governor recognized that Florida's experiences with the 2000 presidential election required immediate review and action. He charged the Task Force with completing its work and submitting a final report by March 1, 2001, so that the Florida Legislature could consider recommendations during its Regular Session in March and April 2001.

The Task Force has been very serious about its assignment and responsibility and has kept very busy. It has held five meetings in four Florida locations within a month: January 8 and January 9 in Tallahassee, January 23 in Orlando, February 1 in Davie near Ft. Lauderdale, and February 6 in Jacksonville. During its short life, it has heard 16 invited speakers, listened to 83 members of the public who chose to testify, received thousands of inquiries at its Internet site, and responded to hundreds of E-mails, phone calls, proposals and recommendations. Its deliberations have been broadcast and publicized widely.

More than 90% of the members of the Task Force attended all of its meetings and most stayed through all of its deliberations to hear public testimony early in the evenings in Orlando, Davie, and Jacksonville.

This Final Report is an important step along the way of continuing to improve Florida's elections system.

The goal is perfection: *__every registered voter should have the opportunity to vote and every vote should count__*. To reach that goal, we must persist in learning more, experimenting, and changing old ways of thinking to encourage new ideas and new technologies.  But new ideas and new technologies should be based on old, enduring principles:

8

## Enduring Principles of Elections

- **Elections are first and foremost acts of millions of individual <u>people</u>: citizens who register and vote, candidates who offer themselves and their platforms for public judgment, poll-workers who put in long days at precincts, and elections officials who supervise the process. Honest, responsible, intelligent people will make most systems of technology work well.**

- **Voting should be a simple, convenient and friendly process that encourages each responsible citizen to express his or her choices.**

- **Voting systems should be designed to determine voter intent, to the extent that is humanly possible.**

- **Voting methods for statewide and national elections should meet uniform statewide and national standards for fairness, reliability and equal protection of voting opportunity.**

- **Elections must achieve two competing goals: certainty (making every vote count accurately) and finality (ending elections so that governing can begin).**

- **While voting should be individual and private, procedures for counting and challenging votes should be open, transparent, and easily documented to ensure public confidence in the results.**

The Governor's Select Task Force on Election Procedures, Standards and Technology affirms its faith in these basic principles and believes that its recommendations will help to achieve them.

During the November 2000 general election, Florida's extremely close presidential vote exposed some frailties in our democratic experiment. This election was decided by less than 537 votes out of a total presidential vote count of 5,963,110, resulting in a 0.009% margin of victory. There was no room for error and yet there were errors. These errors, translated into "lessons learned" for the Governor's Select Task Force, enabled the group to focus on the most important aspects of improving Florida's election process:

## Lessons Learned from November 2000

- Florida will always have voters who will mark ballots incorrectly or voters who will choose not to mark their ballots, making their intent difficult to determine.

- Florida has a decentralized and imperfect system of choosing and operating voting machines with widely varying overvote and undervote percentage rates that can cast doubt on the results of a very close election.

- Florida's lack of consistent and clear standards for recounting ballots in close statewide and regional elections raises serious equal protection issues under the Florida Constitution and the United States Constitution.

- Florida's inconsistent processes for counting absentee ballots of overseas military personnel and nonmilitary voters prevent some absentee ballots from being counted properly.

- Florida's voter education programs are decentralized and funded (if at all) by individual counties.

- Florida's decentralized voter registration data base is not complete or accurate and in some instances allows unregistered voters to vote while denying the right vote to qualified registered voters.

- Florida's voter registration process does not guarantee that applicants will know in advance if they are registered to vote in a particular election.

- Florida's poll-workers become one of the State's largest work forces on election day and their abilities and skills are critical to a flawless election.

- Florida's election officials who actively participate in political campaigns sometimes hurt the perceived independence and credibility of the election process.

This report will focus on how Florida can learn from these well-publicized drawbacks in our election process and make improvements to our democratic experiment.

The report is organized into three parts. The *first part* describes Florida's decentralized organizational structure for elections, mandated by its Constitution. The *second part* focuses the Task Force's findings and recommendations on **Putting People First, Encouraging Reliable Technology**, and **Improving Procedures and Law.** The *third part* outlines future work that needs attention and that the Task Force could not undertake because of its mandate or because of the very limited time available to it.

10

The findings and recommendations of this report will not be the final chapter in Florida's quest to improve its representative democracy. The Governor's Select Task Force hopes that Florida's recommendations will lead the way to more reliable elections and stronger credibility in our great democratic experiment.

# TAB 6

Civil Rights Division

JDR:GS:AHN:DCM:pat
DJ 166-012 3
2001-1693

Voting Section
P.O. Box 66128
Washington, DC 20035-6128

August 17, 2001

The Honorable Robert A. Butterworth
Attorney General
State of Florida
The Capitol
Tallahassee, Florida  32399-1050

Dear Mr. Attorney General:

This refers to Chapter 2001-40, the "Florida Election Reform Act of 2001," which makes numerous changes to the election code of the State of Florida, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. The changes made pursuant to Chapter 40 include, but are not limited to, the following:

(a)  changing the membership of the State Elections Canvassing Commission;

(b)  creating new and revised procedures governing absentee voting by overseas and in-state voters;

(c)  revising ballot format requirements;

(d)  revising the time period for a gubernatorial candidate to designate a running mate for lieutenant governor, and the qualifying procedures for the lieutenant governor;

(e)  creating the availability and form of state write-in ballots;

(f)  establishing the requirement that ballots be counted if there is a clear indication on the ballot that the voter has made a definite choice, including the requirement that the Department of State adopt rules prescribing what constitutes "a clear indication on the ballot that the voter has made a definite choice";

(g)  requiring the Department of State to adopt rules prescribing a uniform primary and general election ballot for each certified voting system;

(h)  changing public campaign finance laws for the 2002 primary and general elections;

(i)  establishing an entitlement to provisional ballots for voters whose eligibility cannot be determined, and establishing the procedures for canvassing provisional ballots;

(j)  establishing procedures to be followed when a voting device rejects a ballot;

(k)  revising the duties of precinct election boards;

(l)  revising training requirements for election officials and employees;

(m)  revising canvassing and recount procedures;

(n)  authorizing the Department of State to appoint deputies to observe or examine registration and election processes, voting systems and equipment;

(o)  requiring county supervisors of elections to report voter errors to the Department of State, and the Department of State to prepare reports on voting systems;

(p)  changing the schedule for sending precinct vote totals to county canvassing boards and for filing election returns with the Department of State, including requiring the Department of State to ignore returns filed late;

(q)  requiring the Department of State to certify software and hardware to sort undervotes and overvotes;

(r)  requiring the Department of State to prescribe minimum standards for nonpartisan voter education;

(s)  requiring the Department of State to print, and county supervisors of elections to post in all polling places a "Voter's Bill of Rights and Responsibilities";

(t)  revising the qualifications and appointment of poll workers;

-3-

(u)  requiring the Department of State to create a uniform polling place procedures manual;

(v)  authorizing a change in municipal election dates, if necessary, to permit municipal use of county election systems;

(w)  scheduling the primary election for September 10, 2002, and eliminating the second primary for 2002;

(x)  repealing existing voter purge procedures and adopting new voter purge procedures;

(y)  authorizing the Department of State to contract with the Florida Association of Court Clerks to design and maintain a statewide on-line voter registration database;

(z)  requiring the use of electronic or electromagnetic voting systems and precinct count tabulation systems and tabulating equipment that will reject ballots containing undervotes or overvotes, and allow voters to correct ballots;

(aa) prohibiting the use of punch card voting machines and any voting system which requires a device to pierce a ballot;

(bb) establishing procedures for the certification and testing of voting systems;

(cc) redefining certain voting-related terms;

(dd) requiring the Division of Elections to develop methods of determining the public's preference in voting systems;

(ee) permitting voters to cast ballots rejected by tabulation equipment;

(ff) creating penalties for tampering with voting equipment;

(gg) creating a felony for election officials or employees who release the results from the canvassing or processing of absentee ballots prior to poll closing on election day;

(hh) requiring the Division of Elections to study the benefits and drawbacks of having statewide uniform poll opening and closing times;

(ii) appropriating funds for voting system upgrades, and requiring the Division of Elections to report to the Governor on the status of upgrades;

-4-

(jj) establishing testing procedures for automatic vote tabulation equipment;

(kk) eliminating the requirement that election officials call out voter names loud enough for poll watchers to hear; and

(ll) eliminating fines for county election boards that file late returns.

We received your submission on June 15 and 19, 2001; supplemental information was received on July 16, 2001.

We further note that Sections 52-55 and 57 of Chapter 40 repeal prior amendments concerning absentee voting procedures that were included in Chapter 129 (1998), and objected to by the Attorney General on August 14, 1998.

With regard to Sections 1-34, 37, 39, 40, 42-59, 61 69, and 73-78 of Chapter 40, the Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

Certain sections of Chapter 40 include provisions that are enabling in nature. Therefore, any changes affecting voting that are adopted pursuant to this legislation will be subject to Section 5 review (e.g., adoption of a uniform polling place procedures manual; special emergency procedures adopted by the elections canvassing commission relating to methods of voting for overseas voters, or any extension of the deadline for the receipt of election returns; and the following rules to be developed by the Department of State: the form of the state's write-in ballot; procedures authorizing election supervisors to accept requests for absentee ballots and voted ballots by electronic means from overseas voters; a uniform primary and general election ballot for each certified voting system; additional manual recount procedures for each certified voting system; safeguards for counting ballots at a precinct or centralized location; standards for each voting system for what constitutes a clear indication that the voter has made a definite choice; minimum standards for nonpartisan voter education; and specifications on what documentation is sufficient to determine eligibility for late registration under Fla. Stat. § 97.0555). Sec 28 C.F.R. 51.15.

-5-

With regard to all or parts of Sections 35, 36, 38, 41, 60, and 70-72 (hereinafter referred to as the "outstanding changes") of Chapter 40, our analysis indicates that the information sent is insufficient to enable us to determine that these changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, as required under Section 5. The following information is necessary so that we may complete our review of these portions of the submission:

1. A detailed description of (a) the reason(s) for the adoption of each outstanding voting change and (b) the specific way(s) in which the proposed change will satisfy the stated goals of the legislation.

2. A detailed, chronological explanation of the process leading to the legislative adoption of each outstanding change, including: (a) identification of the person(s) who initiated, suggested, and/or proposed each change; (b) the legislative history of the change, including all amendments or alternatives that were proposed; and (c) all events, meetings, hearings, discussions, and legislative deliberations and debates, whether formal or informal, involving any state or local official, legislator, committee or staff member, or any other individual(s) regarding the relative merits and demerits of each proposed change and any alternatives to it.

3. Copies of all documents relating to each outstanding change, including: (a) notes, summaries, memoranda, video and/or audio tapes, minutes, and transcripts of all events, meetings, hearings, discussions, and legislative deliberations and debates, whether formal or informal; (b) correspondence with or between state or local officials, legislators, committee or staff members, or any other individual(s); (c) copies of public notices that describe the proposed change and/or that invite public comment or participation in the legislative process, and a description of where such notices appeared (e.g., newspaper, radio, television, posted in public buildings, or sent to individuals or groups; (d) copies of comments from the general public; (e) any reports, studies, analyses, summaries, or other documents or publications, prepared by or for any state or local official, legislator, committee or staff member, or any other individual(s) in connection with the adoption of each change.

4. A description of all efforts, including any advertising or community outreach, by the state, the legislators or their staff members, etc. to solicit the views of the minority community regarding the proposed changes, the duration of the

-6-

period for accepting such comments, if any, on the changes, and all formal or informal comments received from minority persons, committees, or organizations representing the interests of minority persons. Provide the name, telephone number, and organizational affiliation, if any, of any racial or ethnic minority individual, committee, group member, or organization who has been active in the political process generally and/or who has specifically commented on the proposed changes. If any of these persons have specifically commented on the proposed changes, provide a copy of those comments, and describe the circumstances in which the comments were provided, and the action, if any, that was taken in response. If no action was taken, please provide an explanation.

5.   With respect to Sections 70-72 of Chapter 40, please also provide the information set forth below. In your response, please include a comparison of the requirements and procedures provided under prior Florida law (i.e., Fla. Stat. § 98.0975) with those established by the new law (i.e., Fla. Stat. § 98.0977). If you find it helpful, you may provide your comparison in a chart form:

(a)   whether the statewide voter registration database will contain the names and voter registration status of all registered voters in the State of Florida, or only those residents of Florida who have been identified as having lost their right to vote or whose continuing eligibility to vote has been questioned; and indicate the categories of information to be provided for each voter in the database;

(b)   the sources of information from which a voter's potential ineligibility to vote may be determined, including a description of the role, if any, that county and local election officials will have in providing information for such determinations and in making such determinations;

(c)   the title of the state, county, or local official who will make the determination about an individual voter's potential and final ineligibility status;

(d)   the standard of proof required, and the nature and degree of evidence necessary to determine that a voter is potentially ineligible such that he or she is or will be identified as such in the database for any of the specified reasons;

-7-

(e)   the standard of proof required, and the nature and degree of evidence necessary to make a final determination that a voter is ineligible for any of the specified reasons;

(f)   the procedures that will be required of county supervisors of elections pertaining to voters who fail to respond to the mailing required pursuant to Fla. Stat. § 98.0977(3) (e.g., whether the supervisor is required to purge any voter who fails to respond or is required to wait for more information);

(g)   the procedures that may be followed by a voter who wishes to contest his or her designation as a potentially ineligible voter;

(h)   whether the burden to prove eligibility falls on the voter, or whether the burden to prove ineligibility falls on the supervisor of elections;

(i)   whether the Division of Elections is permitted under the statute to operate and maintain this database, or whether the Florida Association of Court Clerks is the only entity permitted under Fla. Stat. § 98.0977(1)-(2) to do so;

(j)   whether the database will be publically available to any individual with access to the Internet, or whether it will require a password or other restriction on access, and, if the latter, to whom and in what manner will access be restricted; and

(k)   what criteria will be used to initially identify and/or confirm the identity of a potentially ineligible voter (e.g., first and last name, sex, race, ethnic background, Social Security number, date of birth, etc.), and whether the match for each criterion must be exact or may be approximate.

6.   With respect to Sections 35 and 36, please provide:

(a)   a detailed description of those procedures, if any, required of poll workers to verify the eligibility and precinct assignment of persons whose names do not appear on precinct registers prior to the distribution of a provisional ballot; and

-8-

    (b)   a detailed description of any alternative provisional
          balloting measures or systems proposed by members of
          the Governor's Select Task Force on Election
          Procedures, Standards and Technology, or by any member
          or caucus of the Florida Legislature, as set forth in
          request numbers 2-4 above, with a focus on the basis
          for rejection of any proposal(s) that would have
          permitted the acceptance of provisional ballots cast
          by eligible voters legally registered within the
          county but outside their precinct.

    7.   With respect to Section 60, which contains the "Voter's
Bill of Rights and Responsibilities," please provide:

    (a)   the origin and basis for inclusion of each of the
          enumerated items under the "Responsibility" portion of
          the section, and provide a description of any
          alternatives or amendments proposed thereto including
          the reasons for their rejection;

    (b)   a description of the extent, if any, to which election
          officials or poll workers are authorized to enforce
          compliance with any of the "Responsibilities" and how
          any such enforcement would be effectuated; and

    (c)   whether the "Voter's Bill of Rights and
          Responsibilities" will be printed in any languages
          other than English.

    The Attorney General has sixty days to consider a completed
submission pursuant to Section 5.  This sixty-day review period
will begin when we receive the information specified above.  See
the Procedures for the Administration of Section 5 (28 C.F.R.
51.37).  However, if no response is received within sixty days of
this request, the Attorney General may object to the proposed
changes consistent with the burden of proof placed upon the
submitting authority.  See also 28 C.F.R. 51.40 and 51.52(a) and
(c).  Changes which affect voting are legally unenforceable
unless Section 5 preclearance has been obtained.  <u>Clark</u> v.
<u>Roemer</u>, 500 U.S. 646 (1991); 28 C.F.R. 51.10.  Therefore, please
inform us of the action the State of Florida plans to take to
comply with this request.

-9-

If you have any questions concerning this letter, or if we can assist you in obtaining the requested information, please contact Amy Nemko (202-514-3232) regarding Request Nos. 1-5 and 7, or Diana Mayer (202-307-2244) regarding Request No. 6.  Refer to File No. 2001-1693 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Joseph D. Rich
Acting Chief
Voting Section

# TAB 7



U.S. Department of Justice

Civil Rights Division

JDR:GS:AHN:par
DJ 166-012-3
2001-1693

*Voting Section - GSt.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC. 20530*

December 17, 2001

The Honorable Robert A. Butterworth
Attorney General
State of Florida
The Capitol
Tallahassee, Florida 32399-1050

Dear Mr. Attorney General:

This letter regards your submission under Section 5 of the
Voting Rights Act of the "Florida Election Reform Act of 2001." In
our initial response to your submission, sent August 17, 2001, we
requested additional information on, among other provisions, those
addressing use of provisional ballots; posting of a voter's bill of
rights; posting of voter responsibilities; and new voter purging
procedures. We received additional information most recently on
October 16, which by statute required our further response by the
date of this letter.

As discussed below, the material the State has sent us in its
initial submission and in response to our letter of August 17 has
been extremely helpful in clarifying the provisions of the Act, and
it has enabled us to now preclear the State's proposed procedures
for provisional ballots (Sections 35, 36, 38, 41) and a voter bill
of rights (Section 60). To round out our review, however, we renew
our August 17 request for technical information regarding proposed
voter purge procedures (Sections 70-72).

I.   Provisional Ballots

With respect to Sections 35, 36, 38, and 41 of the Reform Act,
which establish an entitlement to provisional ballots for voters
whose eligibility cannot be readily determined and procedures for
canvassing provisional ballots, the Attorney General does not
interpose any objection to the specified changes.

This determination is expressly based on your representations
on behalf of the State that, notwithstanding the availability of
provisional ballots, poll workers will continue to first attempt to

-2-

verify a person's eligibility and correct precinct assignment, and that if the poll worker can determine that a person is in the wrong precinct, the poll worker will direct the person to the correct precinct. See Letter, Oct. 15, 2001 at p.7. Modification of these procedures (i.e., poll workers' failure to first try to verify precinct eligibility, at precinct, prior to distribution of a provisional ballot) would constitute an unprecleared voting change.

## II.  Voter Bill of Rights

With respect to the portion of Section 60 of the Reform Act that amends Fla. Stat. § 101.031 to require posting of a Voter's Bill of Rights, the Attorney General does not interpose any objection.

## III.  Statewide Database and Purge Procedures

With respect to Sections 70-72 of the Reform Act, which authorize the Department of State to contract with the Florida Association of Court Clerks to design and maintain a statewide on-line voter registration database, and which create new voter purge procedures, we still need additional information in order to make the comparison required by Section 5 of the Voting Rights Act between the purge procedures implemented pursuant to Section 8 of the 1998 Anti-Voter Fraud Act and the purge procedures mandated by Sections 70-72 of the Election Reform Act.  Set forth below is additional information necessary for us to complete our review of Sections 70-72, identified by the number of the request in our August 17, 2001 letter.

5(a)  Please identify whether the statewide voter registration database/list created pursuant to § 98.0975 contained the names and voter registration status of all registered voters in the State of Florida, or only those Florida residents identified as having lost their right to vote or whose continuing eligibility to vote was questioned.  In addition, please also provide the categories of information provided in the database/list.

5(b)  Please identify with specificity the "other computer databases" that were utilized pursuant to § 98.0975, and the "other relevant sources" available to the State pursuant to § 98.0977.  If the sources of information are not prescribed and/or limited by law, please indicate this for both sections.  Please also provide information for both sections regarding the role of elections supervisors in identifying ineligible and potentially ineligible voters, specifically any mandatory procedures to be followed.

-3-

5(d)  Please identify or describe for both sections the standard of proof required, and the nature and degree of evidence necessary, for state officials and county supervisors of elections to determine that a voter is potentially ineligible so that he or she was or will be identified as such in the database for any of the specified reasons.  For § 98.0977, please clarify the evidence necessary to establish the "suggestion" of ineligibility denoted in § 98.0977(3), and whether or not that language changes the procedure for identifying potentially ineligible voters set forth in 98.075.

5(e)  Please identify or describe for both sections the standard of proof required, and the nature and degree of evidence necessary, to make a final determination that a voter is ineligible for any of the specified reasons.  In other words, please clarify the quantity and type of evidence that a voter would be required to produce to establish that he or she remains eligible against any of the enumerated challenges.  In addition, please complete your answer with regard to § 98.0977, which appears to be incomplete.

5(f)  Please provide the procedures that will be required of supervisors of elections pertaining to voters who fail to respond to the required mailing pursuant to § 98.0977, and specifically, indicate whether supervisors must purge voters who fail to respond to the mailing, or wait for more information.  As the question sought a comparison of those practices required by county supervisors of elections prior to purging voters pursuant to § 98.0975 and § 98.0977, please address whether these practices and/or the discretion afforded to elections supervisors under § 98.0977 have changed from prior practice.

5(g)  Please identify the procedures that could have been utilized by a voter who wished to contest his or her designation as a potentially ineligible voter with respect to § 98.0975, and please complete your answer with respect to § 98.0977.

5(j)  Please complete your answer with respect to § 98.0977.

5(k)  For both § 98.0975 or § 98.0977, please provide the criteria that were or will be used by state and county election officials to initially identify and/or confirm the identity of a potentially ineligible voter (e.g., first and last name, sex, race, ethnic background, Social Security number, date of birth, etc.), and whether the match for each criterion must be exact or may be approximate.

-4-

The chart format in which you provided your initial responses to Request numbers 5(a)-(k) was particularly clear and helpful. If possible, please continue to use this form by adding the remainder of the information identified above into one revised chart.

Finally, note that if the State plans to issue implementing regulations for Section 70, those regulations would be subject to Section 5 review. See 28 C.F.R. 51.15.

If you have any questions concerning this letter, of if we can assist you in obtaining the requested information, please contact Amy Nemko (202-514-3232), an attorney on our staff. Refer to File No. 2001-1693 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

*Joseph D. Rich*

Joseph D. Rich
Chief, Voting Section

# TAB 8



**U.S. Department of Justice**

Civil Rights Division

JDR:GS:AHN:jdh
DJ 166-012-3
2001-1693

*Voting Section - NWR.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

March 28, 2002

The Honorable Robert A. Butterworth
Attorney General
State of Florida
The Capitol
Tallahassee, Florida  32399-1050

Dear Mr. Attorney General:

This refers to your submission under Section 5 of the Voting Rights Act, 42 U.S.C. 1973, of the "Florida Election Reform Act of 2001." In our previous responses to your submission, the Attorney General precleared all but Sections 70, 71, and 72, which create a new statewide voter registration database and voter purge procedures, authorize State funds to do so, and designate State voter registration information as public record. In our initial response to your submission, sent August 17, 2001, we requested additional information on these three sections, among other provisions. We received additional information from you regarding Sections 70, 71, and 72 of the Act most recently on January 30, 2002.

The Attorney General does not interpose any objection to Sections 70, 71, and 72 of the Election Reform Act. However, we note that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.14).

This determination is expressly based on the State's entire Section 5 submission, including the representations and clarifications in your January, 29, 2002, letter [hearafter "Jan. 29 letter"] regarding the State's implementation of the aforementioned sections. The State represented, for example:

- that there is no longer a presumption favoring the accuracy of any computer database and that the presumption now favors the voter; Jan. 29 letter at 3;

- 2 -

- that the appearance of a voter's name on the State's list
of potentially ineligible voters does not, by itself,
confirm that voter's ineligibility; Jan. 29 letter at 4;

- that verification by county election officials may not be
satisfied merely by confirming that names of potentially
ineligible voters provided by state officials match names on
counties' lists of registered voters; Jan. 29 letter at 4;

- that through implementation of Fla. Stat. § 98.0977, the
burden of proof is shifted from the voter to the supervisor
of elections to establish ineligibility by the highest
degree of proof consistent with the fact that the
fundamental right to vote is at stake; Jan. 29 letter at 5;
and

- that if a voter fails to contest the suggestion of
ineligibility indicated by state records, the final decision
is no longer based on a presumption created by the record-
keeping system but is based on a fair evaluation of all
available information relevant to the voter's continued
eligibility; Jan 29 letter  at 6.

Modification of the implementing procedures set forth in
your Jan. 29 letter would likely constitute voting changes
requiring preclearance under Section 5.  Further, we understand
that the implementing procedures, like the Election Reform Act
itself, will apply to the State of Florida as a whole and not
just the Section 5 covered counties, and that the State will
inform county supervisors of elections of the implementing
procedures discussed in the January 29 letter as summarized in
this letter.

Finally, as we noted in our December 17, 2001, letter,
Section 5 preclearance should be sought if the State plans to
issue implementing regulations or administrative procedures for
Section 70.  See 28 C.F.R. 51.15.

- 3 -

If you have any questions concerning this letter, please contact Amy Nemko (202-514-3232), an attorney on our staff. Refer to File No. 2001-1693 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Joseph D. Rich
Chief, Voting Section

# TAB 9

Civil Rights Division

JDR:GS:AHN:par:jdh
DJ 166-012-3
2002-2520

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

June 24, 2002

The Honorable Robert A. Butterworth
Attorney General
State of Florida
The Capitol
Tallahassee, Florida  32399-1050

Dear Mr. Attorney General:

This refers to Chapters 2002-189 and 2002-281, which make changes to the election code of the State of Florida, and Department of State, Division of Elections Proposed Rule 1S-2.028, which prescribes the form of the state write-in ballot, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your submission on April 24, 2002.

The Attorney General does not interpose any objection to Sections 1-5 and 7-9 of Chapter 2002-189, all of Chapter 2002-281, and Proposed Rule 1S-2.028.  However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

Certain sections of Chapter 2002-281 include provisions that are enabling in nature (Division of Elections authorized to make rules regarding the use of closed captioning and descriptive narrative in television broadcasts, standards for accessible voting systems, and accessibility of polling places to persons with disabilities).  Therefore, any changes affecting voting that are adopted pursuant to this legislation will be subject to Section 5 review.  See 28 C.F.R. 51.15.

- 2 -

With regard to Section 6 of Chapter 2002-189, particularly parts (d)-(f), our analysis indicates that the information sent is insufficient to enable us to determine that these changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, as required under Section 5. The following information is necessary so that we may complete our review of this portion of the submission:

1. A detailed description of the reason(s) for the adoption of Section 6 of Chapter 2002-189.

2. A detailed, chronological explanation of the process leading to the legislative adoption of Section 6 of Chapter 2002-189, including: (a) identification of the person(s) who initiated, suggested, and/or proposed the changes; (b) the legislative history of the changes, including all amendments or alternatives that were proposed; and (c) all events, meetings, hearings, discussions, and legislative deliberations and debates, whether formal or informal, involving any state or local official, legislator, committee or staff member, or any other individual(s) regarding the relative merits and demerits of the proposed changes and any alternatives to them.

3. Copies of all documents relating to Section 6 of Chapter 2002-189, including: (a) notes, summaries, memoranda, video and/or audio tapes, minutes, and transcripts of all events, meetings, hearings, discussions, and legislative deliberations and debates, whether formal or informal; (b) correspondence with or between state or local officials, legislators, committee or staff members, or any other individual(s); (c) copies of public notices that describe the proposed changes and/or that invite public comment or participation in the legislative process, and a description of where such notices appeared (e.g., newspaper, radio, television, posted in public buildings, or sent to individuals or groups; (d) copies of comments from the general public; (e) any reports, studies, analyses, summaries, or other documents or publications, prepared by or for any state or local official, legislator, committee or staff member, or any other individual(s) in connection with the adoption of the changes.

4. A description of all efforts, including any advertising or community outreach, by the state, the legislators or their staff members, etc., to solicit the views of the minority community regarding the proposed changes, the duration of the period for accepting such comments, if any, on the changes, and all formal or informal comments received from minority persons, committees, or organizations representing the interests of minority persons. Provide the name, telephone number, and organizational affiliation, if any, of any racial or ethnic minority individual, committee, group member, or organization who has been active in the political process generally and/or who has specifically commented on the proposed changes. If any of these persons have specifically commented on the proposed changes, provide a copy of those comments, and describe the circumstances in which the comments were provided, and the action, if any, that was taken in response. If no action was taken, please provide an explanation.

5. A copy of any instructions or training materials provided to supervisors of elections pertaining to implementation of the voter registration database, including the proposed changes enacted by Section 6 of Chapter 2002-189.

6. To the extent that the statute requires supervisors of elections to provide "forms" to those voters whose eligibility is questioned for the voters' response, please indicate if a standard form is utilized. If so, please provide a copy. If not, please indicate what guidance or instructions are provided to supervisors of elections to devise the contents of the form.

7. Please provide a detailed explanation of how the requirements and procedures established by Section 6 of Chapter 2002-189 compare with those established by Fla. Stat. § 98.0977 as it was precleared on March 28, 2002. In particular, please address whether and how the new requirements and procedures are consistent with the State's prior representations in its letter dated January 29, 2002, and upon which preclearance was based, that:

* there is no longer a presumption favoring the accuracy of the computer database and that the presumption now favors the voter;

* the appearance of a voter's name on the State's list does not, by itself, confirm that voter's ineligibility;

- 4 -

- verification by county election officials may not be satisfied merely by confirming that the names of potentially ineligible voters on the State's list match names on counties' lists of registered voters;

- through implementation of Fla. Stat. § 98.0977, the burden of proof is shifted to the supervisor of elections to establish ineligibility by the highest degree of proof consistent with the fact that the fundamental right to vote is at stake; and

- if a voter fails to contest the suggestion of ineligibility indicated by State records, the final decision is no longer based on a presumption created by the record-keeping system but is based on a fair evaluation of all available information relevant to the voter's continued eligibility.

Concerns have been raised that the new procedures enacted by Section 6 of Chapter 2002-189 rely on a presumption that the database is correct, permit voters to be removed from the voter rolls without actual notice and an opportunity to respond, and value process over substantive rights. Any information addressing these concerns would assist us in our review of your submission.

The Attorney General has sixty days to consider a completed submission pursuant to Section 5. This sixty-day review period will begin when we receive the information specified above. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.37). However, if no response is received within sixty days of this request, the Attorney General may object to the proposed changes consistent with the burden of proof placed upon the submitting authority. See 28 C.F.R. 51.40 and 51.52(a) and (c). Changes which affect voting are legally unenforceable unless Section 5 preclearance has been obtained. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10. Therefore, please inform us of the action the State of Florida plans to take to comply with this request.

- 5 -

If you have any questions concerning this letter, or if we can assist you in obtaining the requested information, please contact Ms. Amy H. Nemko (202-514-3232), an attorney on our staff.  Refer to File No. 2002-2520 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Joseph D. Rich
Chief, Voting Section

# TAB 10



# ELECTIONS

## A Framework for Evaluating Reform Proposals

**GAO**
Accountability • Integrity • Reliability

GAO-02-90

# Contents

| **Letter** | | 1 |
| --- | --- | --- |
| | Introduction | 4 |
| | Results in Brief | 6 |
| | Section 1: States and Local Jurisdictions Indicated the Desire for Reasonable Flexibility and Time to Implement Reforms | 9 |
| | Section 2: Challenges Exist to All Parts of Election Systems: People, Process, and Technology | 18 |
| | Section 3: Framework for Assessing Election Reform Proposals | 43 |
| | Section 4: Conclusion | 53 |

| **Appendixes** | | |
| --- | --- | --- |
| Appendix I: | **Results of Our Election Work** | 56 |
| | The Scope of Congressional Authority in Election Administration | 56 |
| | Elections: Perspectives on Activities and Challenges Across the Nation | 58 |
| | Voting Accessibility for Voters with Disabilities | 61 |
| | Improving Voting Assistance for Military and Overseas Voters | 63 |
| | Status and Use of Federal Voting Equipment Standards | 65 |
| | Statistical Analysis of Factors Affecting Uncounted Votes in the 2000 Presidential Election | 66 |
| Appendix II: | **List of Recently Issued Election Reports** | 69 |
| | GAO Reports | 69 |
| | Other Recent National Reports | 69 |
| | State Commission and Task Force Reports | 70 |

| **Tables** | | |
| --- | --- | --- |
| | Table 1: Percentage of Jurisdictions That Collected Data on Accuracy, by Type of Voting Equipment | 40 |
| | Table 2: Election Issues and GAO Reports | 56 |

| **Figures** | | |
| --- | --- | --- |
| | Figure 1: Oklahoma and Pennsylvania Illustrate Differences Between Statewide Election Systems and Locally Autonomous Jurisdictions | 11 |
| | Figure 2: Size of Jurisdiction Affects Magnitude of Key Tasks for Election Officials | 12 |
| | Figure 3: Some States Require An Excuse Before Allowing Voters to Cast An Absentee Ballot, But Others Do Not | 14 |
| | Figure 4: Voting Methods Used In November 2000 Election by Registered Voters | 16 |

Figure 5: Jurisdictions Offer Various Types of Voter Education
Materials                                                                                23

Figure 6: Prevalence of Potential Impediments at Polling Places
and Availability of Curbside Voting                                         25

Figure 7: Persons Voting Absentee in the November 2000 Election
Cast Ballots Both by Mail-in and In-Person Absentee
Voting                                                                                    28

Figure 8: Example of An Absentee Ballot Secrecy Envelope That
Must Be Completed Correctly in Order For the Absentee
Ballot to be Counted                                                            30

Figure 9: Optical Scan Ballots Can Be Mismarked in a Variety of
Ways                                                                                      33

Figure 10: Voting Technologies Perform Roughly on Par With Each
Other                                                                                      37

Figure 11: Percentage of Total Variation in Uncounted Presidential
Votes Explained By County Demographics, Voting
Equipment, State Differences, and Unknown Factors          38

- **Criterion II:  The Balance Between Accessibility and Integrity.**[4]
  How are the goals of providing citizens broad access to the voting process balanced against the public's interest in ensuring the integrity of our election systems?

- **Criterion III:  Coordination and Integration of People, Processes, and Technology.**
  How does the proposed change affect both the discrete problem it is intended to resolve and the election system as a whole?

- **Criterion IV:  The Affordability and Sustainability of Proposed Election Reforms.**
  Have the necessary resources been identified to institute the change and to continually  monitor and re-evaluate it over time?

# Section 1:  States and Local Jurisdictions Indicated the Desire for Reasonable Flexibility and Time to Implement Reforms

Election administration in the U.S. is guided by federal and state laws, regulations and policies. Within the broad framework established by the Constitution and federal statutes, each state sets its own requirements for conducting local, state, and federal elections within the state. Consequently, state requirements and processes vary considerably, and the U.S. election system comprises 51 separate election systems. In turn, states typically have decentralized this process so the responsibility for administering and funding elections resides in thousands of local government election jurisdictions, creating even more variability among our nation's election systems. Thus, in adopting federal election reforms, the degree of flexibility and the timeframes for implementing new initiatives need to be given careful consideration during deliberation and execution of related reforms.

---

[4]As used in this criterion, accessibility refers to voters' access to the political process rather than the access of a voter with disabilities to the polling place.

## The Federal Government Establishes a General Framework for Elections, but Elections Are Primarily the Responsibility of State and Local Governments

The constitutional framework for elections contemplates both state and federal roles. With regard to the administration of federal elections, Congress has certain constitutional authorities over both congressional and presidential elections.[5] Congress has passed legislation relating to the administration of federal elections, under its various constitutional authorities in certain areas, including the timing of federal elections, voter registration, accessibility provisions for the elderly and persons with disabilities, and absentee voting. Congress has, however, been most active with respect to enacting prohibitions against discriminatory voting practices, which apply in the context of both federal and state elections. The Voting Rights Act of 1965, for example, established the constitutional guarantee that no person be denied the right to vote on account of race or color. In addition, subsequent amendments to the Act expanded it to include protections for members of language minority groups, as well as other matters regarding voting registration and procedures.

Within the broad framework established by the Constitution and federal statutes, each state sets the requirements for conducting local, state, and federal elections within the state. For example, states regulate such aspects of elections as ballot access, registration procedures, absentee voting requirements, establishment of voting places, provision of election day workers, and counting and certifying the vote. The states, in turn have typically delegated responsibility for administering and funding state election systems to the thousands of local election jurisdictions—more than 10,000 nationwide—creating even more variability among our nation's election systems.

State election codes and regulations may be very specific or very general. In particular, some states have mandated statewide election administration guidelines and procedures that foster uniformity in the way local jurisdictions conduct elections. It is common for state provisions to furnish some guidance regarding voter registration requirements and procedures, absentee voting requirements and procedures, performance requirements for voting methods used within the state, establishment of polling places, provision of election day workers, and the count and certification of the vote. Other states have guidelines that generally permit local election

---

[5]For additional details, see *Elections: The Scope of Congressional Authority in Election Administration* (GAO-01-470, Mar. 13, 2001).

jurisdictions considerable autonomy and discretion in the way they run elections (see figure 1).

**Figure 1: Oklahoma and Pennsylvania Illustrate Differences Between Statewide Election Systems and Locally Autonomous Jurisdictions**



Source: GAO analysis based on information from local election officials.

## Great Variability Exists in the Ways Various Local Elections Are Conducted

The variability from state to state becomes even more pronounced at the local level, as local jurisdictions have used the flexibility afforded in state provisions to create local elections systems that vary from county to county, and even, in some cases, within counties. This variation stems from several factors. One factor can be a consequence of the size of local election jurisdictions, which varies considerably. For example, one rural county has 208 registered voters in contrast with a large, urban county, such as Los Angeles County, whose total number of registered voters exceeds that of 41 states. The complexity of preparing for and conducting an election in large jurisdictions is generally greater than in smaller jurisdictions. For example, a rural county, with a few thousand voters who share the same language, prints its ballot in one language. In contrast, in a large, urban jurisdiction with a diverse population of 4 million registered voters prints its ballots in 7 different languages. This can also have an effect on the processes and type of voting equipment used. As illustrated in figure 2, the magnitude of other key administrative tasks in this large, urban jurisdiction is a thousand times larger than for the small jurisdiction.

**Figure 2: Size of Jurisdiction Affects Magnitude of Key Tasks for Election Officials**



Source: GAO analysis based on information from local election officials.

Variability can also be a consequence of local needs. For example, a jurisdiction with a large population segment that moves out of the location each year might opt for certain voter registration and voter education processes that reflect the need to address a large voter turnover. As a second example, a jurisdiction might use a certain type of voting equipment based on financial resource availability. More wealthy jurisdictions have had the resources necessary to modernize equipment, while others need to make do with what they have.

Finally, variability can be a consequence of a jurisdiction's perceived need to maintain voting traditions that have been in place for a long time. In two jurisdictions we visited, election officials opted to replace lever machines with full-screen electronic voting machines because this machine uses a ballot that most closely resembles the type of ballot voters were used to seeing on lever machines. This choice was possible because ballots did not

have to be printed in more than two languages in either jurisdiction so the ballots could fit on a single page.

Variability among states and local jurisdictions was evident in each major stage of an election—voter registration, absentee and early voting, preparing for and conducting election day activities, and vote counting and certification. Some examples follow.

**Who Could Vote Varied**

For the November 2000 election, the FEC reported that nearly 168 million people, or about 82 percent of the voting age population,[6] were registered to vote. Registering to vote is not a federal requirement, but in November 2000, all states except North Dakota required citizens to register before voting. At a minimum, every state and the District of Columbia required that a voter be a U.S. citizen, at least 18 years of age, and a resident. Additional requirements to vote, such as time in residence, varied. Due to variations in voter eligibility requirements, different citizens with the same qualifications would be eligible to vote in some states but not in others including (1) those that had completed their sentence after a felony conviction; (2) those who had been adjudged mentally incompetent; and (3) those who met all of the qualifications to vote but who had not registered in accordance with prescribed timeframes.

**When People Could Vote Varied**

In November 2000, citizens had different opportunities for obtaining and successfully casting absentee ballots due to the differences in absentee and early voting requirements, administration, and procedures. All states allow some provision for absentee balloting; some, however, require a reason to vote absentee as indicated in the figure below.

---

[6]This number includes active and inactive voters. FEC defines inactive voters as those who remain on the registration list but who have moved, according to information provided by the Postal Service, have been mailed a registration confirmation notice, but have neither responded nor offered to vote in the subsequent federal election. All other persons on the registration list are considered to be active voters. In *The Impact of The National Voter Registration Act of 1993 on the Administration of Elections for Federal Office, 1999-2000,* the FEC reported that for the November 2000 general elections, there were 149,476,705 active registered voters, about 73 percent of the voting age population.

**Figure 3:  Some States Require An Excuse Before Allowing Voters to Cast An Absentee Ballot, But Others Do Not**



Source:  GAO review of state statutes.

**Who Conducted the Election Varied**

For the November 2000 election, about 1.4 million poll workers staffed polling places across the country on election day.  Although poll workers are usually employed for only one day, the success of election administration largely hinges upon their ability to perform their jobs well. Depending on state law and the organization and traditions of the local jurisdiction, poll workers have different titles, levels of pay, training

requirements, and responsibilities. Some poll workers are elected, some are appointed, and some volunteer. Levels of authority and responsibility that jurisdictions grant to poll workers also ranged from significant autonomy over the operation of the polling place with final authority to interpret improper ballot markings to having limited discretion, functioning primarily as clerks and facilitators who refer issues and problems back to elections headquarters.

**How Elections Were Conducted Varied**

Jurisdictions followed various procedures on election day that created differences in the way elections were conducted. For example, to determine whether a citizen who appeared at the polls was eligible to vote, some jurisdictions required voters to identify themselves by stating their names and addresses to the poll workers, who also matched the signature on the voter application with the voter registration records. Other jurisdictions also required voters to present a valid photo identification card. In other jurisdictions, a hunting or fishing license was sufficient to verify one's identity. Still other jurisdictions required no identification other than the voter stating his or her name. If a voter's name did not appear on the list of registered voters, some jurisdictions accommodated these individuals by automatically giving them a provisional ballot which may have been counted if the voter's eligibility was verified at a later time. Others did not.

**How the Votes Were Cast Varied**

Registered voters cast their ballots using one of five voting methods in the November 2000 election: hand-counted paper ballots and lever, punch card, optical scan, and Direct Recording Electronic (DRE) voting equipment. Punch card and optical scan equipment was most widely used by registered voters, as figure 4 shows.

# TAB 11

after the word "reimbursement" and inserting in lieu thereof "(with necessary adjustments on account of underpayments or overpayments),".

### MIGRATORY WORKERS HEALTH SERVICES

Sec. 3. (a) Section 310 of the Public Health Service Act [19] is amended by striking out "for the fiscal year ending June 30, 1963, the fiscal year ending June 30, 1964, and the fiscal year ending June 30, 1965, such sums, not to exceed $3,000,000 for any year, as may be necessary" and inserting in lieu thereof "not to exceed $7,000,000 for the fiscal year ending June 30, 1966, $8,000,000 for the fiscal year ending June 30, 1967, and $9,000,000 for the fiscal year ending June 30, 1968".

(b) Such section is further amended by inserting "including necessary hospital care, and" immediately after "agricultural migratory workers and their families," in clause (1) (ii) of such section.

### GENERAL PUBLIC HEALTH SERVICES

Sec. 4. (a) The first sentence of subsection (c) of section 314 of such Act [20] is amended by striking out "first five fiscal years ending after June 30, 1961" and inserting in lieu thereof "first six fiscal years ending after June 30, 1961".

(b) The third sentence of subsection (c) of section 314 of such Act [21] is amended by striking out "$2,500,000" and inserting in lieu thereof "$5,000,000".

### SPECIAL PROJECT GRANTS FOR COMMUNITY HEALTH SERVICES

Sec. 5. The first sentence of subsection (a) of section 316 of such Act [22] is amended by striking out "first five fiscal years ending after June 30, 1961" and inserting in lieu thereof "first six fiscal years ending after June 30, 1961".

Approved August 5, 1965.

## VOTING RIGHTS ACT OF 1965

*For Legislative History of Act, see p. 2437*

### PUBLIC LAW 89–110; 79 STAT. 437

[S. 1564]

**An Act to enforce the fifteenth amendment to the Constitution of the United States, and for other purposes.**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

This Act shall be known as the "Voting Rights Act of 1965".

Sec. 2. No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State

---

**19.** 42 U.S.C.A. § 242h.   **21.** 42 U.S.C.A. § 246(c).
**20.** 42 U.S.C.A. § 246(c).   **22.** 42 U.S.C.A. § 247a.



or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

Sec. 3. (a) Whenever the Attorney General institutes a proceeding under any statute to enforce the guarantees of the fifteenth amendment in any State or political subdivision the court shall authorize the appointment of Federal examiners by the United States Civil Service Commission in accordance with section 6 to serve for such period of time and for such political subdivisions as the court shall determine is appropriate to enforce the guarantees of the fifteenth amendment (1) as part of any interlocutory order if the court determines that the appointment of such examiners is necessary to enforce such guarantees or (2) as part of any final judgment if the court finds that violations of the fifteenth amendment justifying equitable relief have occurred in such State or subdivision: *Provided*, That the court need not authorize the appointment of examiners if any incidents of denial or abridgement of the right to vote on account of race or color (1) have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

(b) If in a proceeding instituted by the Attorney General under any statute to enforce the guarantees of the fifteenth amendment in any State or political subdivision the court finds that a test or device has been used for the purpose or with the effect of denying or abridging the right of any citizen of the United States to vote on account of race or color, it shall suspend the use of tests and devices in such State or political subdivision as the court shall determine is appropriate and for such period as it deems necessary.

(c) If in any proceeding instituted by the Attorney General under any statute to enforce the guarantees of the fifteenth amendment in any State or political subdivision the court finds that violations of the fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

# TAB 12

PUBLIC LAW 97-205 [H.R. 3112];  June 29, 1982

## VOTING RIGHTS ACT AMENDMENTS OF 1982

*For Legislative History of Act, see p. 177*

An Act to amend the Voting Rights Act of 1965 to extend the effect of certain provisions, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Voting Rights Act Amendments of 1982".

SEC. 2. (a) Subsection (a) of section 4 of the Voting Rights Act of 1965 is amended by striking out "seventeen years" each place it appears and inserting in lieu thereof "nineteen years".

(b) Effective on and after August 5, 1984, subsection (a) of section 4 of the Voting Rights Act of 1965 is amended—

(1) by inserting "(1)" after "(a)";

(2) by inserting "or in any political subdivision of such State (as such subdivision existed on the date such determinations were made with respect to such State), though such determinations were not made with respect to such subdivision as a separate unit," before "or in any political subdivision with respect to which" each place it appears;

(3) by striking out "in an action for a declaratory judgment" the first place it appears and all that follows through "color through the use of such tests or devices have occurred anywhere in the territory of such plaintiff.", and inserting in lieu thereof "issues a declaratory judgment under this section.";

(4) by striking out "in an action for a declaratory judgment" the second place it appears and all that follows through "section 4(f)(2) through the use of tests or devices have occurred anywhere in the territory of such plaintiff.", and inserting in lieu thereof the following:

"issues a declaratory judgment under this section. A declaratory judgment under this section shall issue only if such court determines that during the ten years preceding the filing of the action, and during the pendency of such action—

"(A) no such test or device has been used within such State or political subdivision for the purpose or with the effect of denying or abridging the right to vote on account of race or color or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) in contravention of the guarantees of subsection (f)(2);

"(B) no final judgment of any court of the United States, other than the denial of declaratory judgment under this section, has determined that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of such State or political subdivision or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) that denials or abridgements of the right to vote in contravention of the guarantees of subsection (f)(2) have occurred anywhere in the territory of such State or subdivision and no consent decree, settlement, or agreement has

Voting Rights Act Amendments of 1982. 42 USC 1971 note, 1973 note. 42 USC 1973b.

Declaratory judgment proceedings.

96 STAT. 131

been entered into resulting in any abandonment of a voting practice challenged on such grounds; and no declaratory judgment under this section shall be entered during the pendency of an action commenced before the filing of an action under this section and alleging such denials or abridgements of the right to vote;

"(C) no Federal examiners under this Act have been assigned to such State or political subdivision;

42 USC 1973c.

"(D) such State or political subdivision and all governmental units within its territory have complied with section 5 of this Act, including compliance with the requirement that no change covered by section 5 has been enforced without preclearance under section 5, and have repealed all changes covered by section 5 to which the Attorney General has successfully objected or as to which the United States District Court for the District of Columbia has denied a declaratory judgment;

"(E) the Attorney General has not interposed any objection (that has not been overturned by a final judgment of a court) and no declaratory judgment has been denied under section 5, with respect to any submission by or on behalf of the plaintiff or any governmental unit within its territory under section 5, and no such submissions or declaratory judgment actions are pending; and

"(F) such State or political subdivision and all governmental units within its territory—

"(i) have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process;

"(ii) have engaged in constructive efforts to eliminate intimidation and harassment of persons exercising rights protected under this Act; and

"(iii) have engaged in other constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process.

"(2) To assist the court in determining whether to issue a declaratory judgment under this subsection, the plaintiff shall present evidence of minority participation, including evidence of the levels of minority group registration and voting, changes in such levels over time, and disparities between minority-group and non-minority-group participation.

"(3) No declaratory judgment shall issue under this subsection with respect to such State or political subdivision if such plaintiff and governmental units within its territory have, during the period beginning ten years before the date the judgment is issued, engaged in violations of any provision of the Constitution or laws of the United States or any State or political subdivision with respect to discrimination in voting on account of race or color or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) in contravention of the guarantees of subsection (f)(2) unless the plaintiff establishes that any such violations were trivial, were promptly corrected, and were not repeated.

"(4) The State or political subdivision bringing such action shall publicize the intended commencement and any proposed settlement

of such action in the media serving such State or political subdivision and in appropriate United States post offices. Any aggrieved party may as of right intervene at any stage in such action.";

(5) in the second paragraph—

(A) by inserting "(5)" before "An action"; and

(B) by striking out "five" and all that follows through "section 4(f)(2).", and inserting in lieu thereof "ten years after judgment and shall reopen the action upon motion of the Attorney General or any aggrieved person alleging that conduct has occurred which, had that conduct occurred during the ten-year periods referred to in this subsection, would have precluded the issuance of a declaratory judgment under this subsection. The court, upon such reopening, shall vacate the declaratory judgment issued under this section if, after the issuance of such declaratory judgment, a final judgment against the State or subdivision with respect to which such declaratory judgment was issued, or against any governmental unit within that State or subdivision, determines that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of such State or political subdivision or (in the case of a State or subdivision which sought a declaratory judgment under the second sentence of this subsection) that denials or abridgements of the right to vote in contravention of the guarantees of subsection (f)(2) have occurred anywhere in the territory of such State or subdivision, or if, after the issuance of such declaratory judgment, a consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds."; and

(6) by striking out "If the Attorney General" the first place it appears and all that follows through the end of such subsection and inserting in lieu thereof the following:

"(6) If, after two years from the date of the filing of a declaratory judgment under this subsection, no date has been set for a hearing in such action, and that delay has not been the result of an avoidable delay on the part of counsel for any party, the chief judge of the United States District Court for the District of Columbia may request the Judicial Council for the Circuit of the District of Columbia to provide the necessary judicial resources to expedite any action filed under this section. If such resources are unavailable within the circuit, the chief judge shall file a certificate of necessity in accordance with section 292(d) of title 28 of the United States Code.

"(7) The Congress shall reconsider the provisions of this section at the end of the fifteen-year period following the effective date of the amendments made by the Voting Rights Act Amendments of 1982. <span style="float:right">Congressional reconsideration.</span>

"(8) The provisions of this section shall expire at the end of the twenty-five-year period following the effective date of the amendments made by the Voting Rights Act Amendments of 1982. <span style="float:right">Expiration date.</span>

"(9) Nothing in this section shall prohibit the Attorney General from consenting to an entry of judgment if based upon a showing of objective and compelling evidence by the plaintiff, and upon investigation, he is satisfied that the State or political subdivision has complied with the requirements of section 4(a)(1). Any aggrieved party may as of right intervene at any stage in such action.".

(c) Section 4(f)(4) of the Voting Rights Act of 1965 is amended by inserting after "unwritten" in the proviso the following: "or in the <span style="float:right">42 USC 1973b.</span>

96 STAT. 133

case of Alaskan Natives and American Indians, if the predominate language is historically unwritten".

42 USC 1973aa–1a.

(d) Section 203(c) of such Act is amended by inserting after "Natives" in the proviso the following: "and American Indians".

42 USC 1973.

SEC. 3. Section 2 of the Voting Rights Act of 1965 is amended to read as follows:

"SEC. 2. (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guaran-

42 USC 1973b.

tees set forth in section 4(f)(2), as provided in subsection (b).

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.".

42 USC 1973aa–1a.

42 USC 1973aa–1a note.

SEC. 4. Section 203(b) of the Voting Rights Act of 1965 is amended by striking out "August 6, 1985" and inserting in lieu thereof "August 6, 1992", and the extension made by this section shall apply only to determinations made by the Director of the Census under clause (i) of section 203(b) for members of a single language minority who do not speak or understand English adequately enough to participate in the electoral process when such a determination can be made by the Director of the Census based on the 1980 and subsequent census data.

SEC. 5. Effective January 1, 1984, title II of the Voting Rights Act of 1965 is amended by adding at the end the following section:

## "VOTING ASSISTANCE

"**SEC. 208.** Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.". — 42 USC 1973aa-6.

**SEC. 6.** Except as otherwise provided in this Act, the amendments made by this Act shall take effect on the date of the enactment of this Act. — Effective Date. 42 USC 1973 note.

Approved June 29, 1982.

LEGISLATIVE HISTORY—H.R. 3112 (S. 1992):

HOUSE REPORTS No. 97-227 and Pt. 2 (Comm. on the Judiciary).
SENATE REPORT No. 97-417 accompanying S. 1992 (Comm. on the Judiciary).
CONGRESSIONAL RECORD:
    Vol. 127 (1981): Oct. 2, 5, considered and passed House.
    Vol. 128 (1982): June 9, 10, 14-17. S. 1992 considered in Senate.
           June 18, considered and passed Senate, amended, in lieu of S. 1992.
           June 23, House concurred in Senate amendment.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 18, No. 26 (1982):
    June 29, 1982, Presidential statement.

# TAB 13

Case 1:01-cv-00120-ASG    Document 420    Entered on FLSD Docket 07/02/2002    Page 168 of 945

 Division of Elections - Florida Department of State | Total Site Index ▾

## Laws & Procedures



- **Index of Proposed Rules**
- **Division of Elections Home**
- **Press Releases**
- **About Us**
- **Amendments/ Revisions for 2002 Ballot**
- **Election Results**
- **Election Information**
- **Federal Tax Regulations**
- **Filing Campaign Reports**
- **Florida Administrative Code**
- **Florida Administrative Weekly**
- **Telecommunication Ordinances**
- **Forms & Publications**
- **General Laws**
- **Laws and Procedures / Opinions**
- **Supervisors of Elections**
- **NVRA**
- **Voter Fraud**
- **Voter Registration**
- **Voting Systems**
- **Related Government Links**
- **Contact Us**

### DEPARTMENT OF STATE
### Index of Proposed Rules

| Rule Title: | Rule No.: |
|---|---|
| Clarifying Form of Write-in Slot and Write-in Candidates on Ballots | 1S-2.003 |
| Write-in Procedures Governing Electronic Voting Systems | 1S-2.0031 |
| Requirements of Counties Before Approval of Electronic or Electromechanical Voting Systems | 1S-2.007 |
| Testing of Voting Systems | 1S-2.012 |
| Clear Indication of Voter's Choice on a Ballot<br>Notice of Change<br>Notice of Change<br>Notice of Change | 1S-2.027 |
| State Write-in Ballot | 1S-2.028 |
| Eligibility for Late Registration for Overseas Citizens<br>Notice of Change<br>Notice of Change | 1S-2.029 |
| Electronic Transmission of Absentee Ballots<br>Notice of Change | 1S-2.030 |
| Recount Procedures<br>Notice of Change<br>Notice of Change | 1S-2.031 |
| Uniform Primary and General Election Ballot<br>Notice of Change<br>Notice of Hearing<br>Notice of Change | 1S-2.032 |
| Standards for Nonpartisan Voter Education<br>Notice of Change | 1S-2.033 |
| Polling Place Procedures Manual<br>Notice of Change | 1S-2.034 |
| Voting System Equipment Regulations | 1S-5.001 |

B005717

<u>Notice of Change</u>

Experiencing problems or have questions? <u>email us</u>.
Copyright ©, 2001. State of Florida, Department of State. All Rights Reserved and <u>other copyrights apply</u>.

B005718

# TAB 14



**Florida Department of State
Division of Elections**

# Polling Place Procedures Manual

DS-DE 11
4/02

B005721

**Polling Place Procedures Manual Table of Contents**

**The Election Team**                                                                1
    Terminology                                                  1

**The Polling Place**                                                                2
    Who is allowed in the polling room                           2
    Solicitation Restrictions                                    2
    The Election Team                                            4
    Voters                                                       4

**The Voting Process**                                                               4
    Determining if a voter is eligible                           4
    What if the voter's name is not on the precinct register     5
    Change of Name                                               6
    Voter's Address Differs                                      6
    Voter with No ID                                             6
    Voter Whose Signature Differs                                7
    Provisional Ballots                                          7
    Voters Who Need Assistance                                   8
        Voter requesting assistance on how to use the voting equipment   8
    What to do if the precinct register indicates a voter has received an
        absentee ballot but the voter wants to vote at the polling place   8
    What if a voter needs more than five minutes to vote         9
    Challenges                                                   9
    If a voter needs another ballot                              10
    What to do if a voter leaves the booth without casting his or her ballot   10
    What to do if a voter attempts to take his or her ballot from
        the polling place                                     10
    Primary elections                                            10



B005722

**Polling Place Procedures Manual Table of Contents**

**Voting Systems Operation**     **11**
    Optical Scan Voting Systems     11
    Touchscreen Voting Systems     12

**Closing the Polls**     **12**

**Ballot Accounting**     **13**
    In counties using optical scan voting systems     13
    In counties using touchscreen voting systems     13

**Other Important Information**     **13**
    Pollwatchers     13
    When the unexpected happens     14
    Dealing with irate voters     14
    Voter's Bill of Rights and Responsibilities     15
    Voters with Special needs     16
       General     16
       Mobility Impaired     17
       Blind or Visually Impaired     17
       Deaf and Hard of Hearing     18

**Notes**     **19**
**Index**     **20**



| Polling Place Procedures Manual |
| --- |

# The Election Team

The Election Team consists of the Election Board and the Deputy.

The Election Board, which includes clerks and inspectors, focuses on election issues inside the polling room. Outside the polling room, a deputy organizes the process on election day.

The election team must arrive at their assigned polling place no later than 6 a.m. in order to set up the room and have everything ready when the polls open at 7 a.m.

### Terminology

Poll Workers: We classify clerks and inspectors under the general category of poll workers.

Special Inspectors: As election needs dictate, the role of some inspectors may be expanded to accommodate special needs, technological developments, etc., which may facilitate the election process. These individuals are still inspectors and are still part of the Election Board.

### Polling Room Diagram

The following diagram will assist you in setting up your polling place. We realize that all polling places are not designed such as the one pictured, but this will give you a general idea of the basic set-up. Set up the voting booths in such a manner that it is impossible for one voter to see another voter's ballot.

1. Deputy
2. Check-in/inspector table
3. Clerk's table
4. Provisional ballot booth
5. Voting areas
6. Ballot Box for optical scan counties

TV displaying endless loop video of voting system operation/demonstration area

Voting Terminal

ADA: Special needs terminal

Floater    Floater

Sample layout of polling room

TV/demo area

1

B005724

| Polling Place Procedures Manual |
| --- |

# The Polling Place

### Who is allowed in the polling room?

While the polls are open, only the following persons are allowed in the polling room:

❑ Inspectors

❑ Clerks

❑ The supervisor of elections or deputy supervisor of elections

❑ Poll watchers approved by the supervisor of elections

❑ Voters

❑ A person in the care of a voter (for example, a child or an elderly person)

❑ Persons caring for a voter or assisting a voter (for example, someone assisting a voter who cannot read or does not speak English or assisting an elderly person or disabled person, but not someone accompanying a voter who is not caring for or assisting the voter)

❑ Law enforcement officers or emergency service personnel, with the permission of the clerk or a majority of the inspectors

❑ A person who is helping with or participating in a simulated election for minors which has been approved by the supervisor of elections (for example, the Kids Voting Program)

❑ Election observers appointed by the Department of State.

**Law enforcement officers** are **not allowed** in the polling room except to vote or except with permission of the election board.

Members of the **media** are **not allowed** in the polling room except to vote. No cameras are allowed in the polling room.

**Candidates** are **not allowed** in the polling room except to vote.

If the polling room is in a location commonly used by the public to gain access to businesses or homes (such as the lobby of a condominium) or in an area traditionally used as public area for discussion (such as a mall), there may be other people traveling through the polling area. However, care should be taken that these people do not interfere with the voting process.

Before the polls open and after the polls close and all voters have cast their ballots, anyone from the public is allowed to enter the polling room and watch the procedures.

### Solicitation Restrictions

The word "solicitation" includes such things as:

❑ asking someone for his or her vote;

❑ asking for someone's opinion;

❑ asking for a contribution;

❑ distributing any political or campaign material or handout;

❑ conducting a poll;

❑ asking someone for his or her signature on a petition; and

❑ selling any type of item.



**2**

B005725

**Polling Place Procedures Manual**

The supervisor of elections should have told the clerk prior to the election which areas around the polling place are allowed for solicitation.  However, the general rule is that there is a "no-solicitation zone" that prohibits  solicitation within 50 feet of the entrance to the polling place.  The supervisor of elections or the clerk is authorized to take any reasonable action to ensure order at the polling place, which includes having disruptive and unruly persons removed by law enforcement officers from either the polling room or from the no-solicitation zone. There are some exceptions to this rule.

### Solicitation Exceptions

Solicitation *can occur* within the 50-foot zone as long as it  is conducted from a *separate area* marked by the supervisor of elections which does not interfere with voter access to the polling room,

**and**

the activity is clearly and easily identifiable to the voters as being something that they can voluntarily participate in;

**or**

it is being done on property which is a residence, business, private property, sidewalk, park or any area traditionally used as a public area for discussion as long as it is not interfering with voter access to the polling room or polling place.



## Miscellaneous

You can restrict 50 feet from door of polling place except for parking area, sidewalk, etc., but solicitation cannot interfere with voter access and disruptive and unruly persons may be removed from 50-foot area.

☐  You cannot restrict solicitation in the shaded areas

## Church

You can restrict 50 feet from door of polling place except for parking area, sidewalk, etc., but solicitation cannot interfere with voter access and disruptive and unruly persons may be removed from 50-foot area.

☐  You cannot restrict solicitation in the shaded areas



**3**

B005726

| Polling Place Procedures Manual |
| --- |

### The Election Team

Poll workers must remain nonpartisan on election day. You must not discuss any candidate, issue, or any related topic with other poll workers or with voters. DO NOT wear campaign buttons, t-shirts, or any other items which are politically oriented.

### Voters

Voters may bring pre-marked sample ballots or campaign literature for their personal use. They may NOT use these for campaigning purposes.

Poll workers must remove and discard any sample ballots or campaign materials left behind in the polling place.

Voters wearing shirts or campaign buttons may enter the polling place to vote; however, they may not campaign there.

A poll worker should be assigned to periodically check the voting booths to make sure that no literature or other materials have been left.

# The Voting Process

### Determining if a voter is eligible

1. Locate the voter's name in the precinct register. Be careful of multiple forms of one name. For example, you should look for "Mary Smith-Collins" under "Smith Collins," "Smith-Collins" and "Collins." Also be careful of voters who have titles on their names such as Sr., Jr., III, etc.

2. Ask the voter to give his or her residence address. If the voter has moved from the address listed on the precinct register, follow the procedure for **Voter's Address Differs** on page 6.

---

### *It is illegal to vote in a precinct where you no longer live.*

---

Certain groups of people (law enforcement officers, judges, state attorney investigators, etc.) are allowed to have their residence addresses restricted from public viewing and marked "**Confidential**."

When a voter with "Confidential" (or similar indication) marked in the precinct register comes to vote, the poll worker may only ask the voter if the voter's residence has changed. If it hasn't, the voter presents photo and signature ID and is allowed to vote.

If this voter's address has changed, call the supervisor and let the voter talk directly to someone in the office. The voter should advise the office of his or her new address to find out where the voter should go to vote.

3. If the voter's address has not changed, ask for a photo ID with signature. Both the signature and photo may be on one ID or they may be on two separate IDs. A driver's license would be an example of one form of ID with both requirements.



B005727

| **Polling Place Procedures Manual** |
| --- |

Some voters will present two forms of identification, one with a photo on it and another with a signature. For example, a credit card with the voter's signature, along with an employee badge showing the voter's photograph, would be acceptable.

The following forms of identification have been approved by the Department of State:

❑ Florida Driver's license

❑ Florida ID card issued by the Department of Highway Safety and Motor Vehicles

❑ U.S. Passport

❑ Employee badge or ID

❑ Buyer's Club ID card (such as Costco, Sam's Club or Price Club)

❑ Debit/credit card

❑ Military ID

❑ Student ID

❑ Retirement Center ID

❑ Neighborhood Association ID

❑ Entertainment ID (theme park annual pass and bingo)

❑ Public assistance ID (Social Security or other social services)

If the voter does not have the proper identification showing his or her photograph and signature, follow the process for **Voter With No ID** on page 6.

4. Have the voter sign the precinct register. Compare the signature of the voter to the signature on the identification and compare the photograph of the voter to the person who signed the precinct register.   If there is a discrepancy in the signatures or photo,

follow the process for **Voter Whose Signature Differs** on page 7.

5. If the voter is in the proper precinct, has the proper identification, and the inspector is satisfied that the person is entitled to vote, the voter may continue.

If any of these things are missing, do not let the person vote until the issues are resolved.



**What if the voter's name is not on the precinct register?**

If the voter's name is not on the precinct register and the inspector has rechecked the precinct register for name variations, the inspector should ask the voter if the voter's name or address has changed.

If the voter's name has changed,  follow the procedure for **Change of Name** on page 6.

If the voter's address has changed, follow the procedure for **Voter's  Address Differs** on page 6.

5

## Polling Place Procedures Manual

If the voter indicates no change of name or legal residence, contact the supervisor's office or, if available at the precinct, check the master list of registered voters in the county to determine if the voter is eligible.

If the voter is eligible, he or she may continue with the voting process.

If the supervisor or master list indicates the voter is not eligible but the voter believes he or she is eligible, or if you cannot get in contact with the supervisor's office, the voter is allowed to vote a provisional ballot. See **Provisional Ballots** on page 7.

### Change of Name

If the voter's former name appears in the precinct register, the voter will need to complete a change of name affirmation, included in your election materials, indicating his or her new name. (Instead of the affirmation, the voter may complete a voter registration application that indicates the name change.) Once completed, the voter is allowed to vote.

If the voter's former name is not on the precinct register, the voter will need to complete a change of name affirmation indicating his or her new name. The clerk or other designated person will then call the supervisor of elections or access a master list of registered voters to determine if the person is registered to vote in the precinct.

If it is determined that the person is eligible, the voter is allowed to vote.

### Voter's Address Differs

If the voter's name appears on the precinct register but the voter indicates a different address than the address listed, the voter must complete a change of address affirmation included in your election materials. (Instead of the affirmation, the voter may complete a voter registration application that indicates the address change.) If the voter's new address is in the same precinct, the voter is allowed to vote.

**If the voter's new address is in another precinct, the voter must be directed to the appropriate precinct.**

Each supervisor of elections must provide each precinct with information which will enable the poll workers to direct voters to the proper precinct. This may be in the form of a county map showing precinct boundaries and polling place locations, a street index of the county with a polling place list, or any other means, other than a contact with the supervisor's office, providing information indicating where a voter should vote based on his or her address.

### Voter With No ID

If a voter's name is on the precinct register but the voter does not have the proper identification, the voter must sign an affirmation, included in your election materials, prior to being allowed to vote. Once completed, the voter is allowed to vote.



6

**Polling Place Procedures Manual**

### Voter Whose Signature Differs

After comparing the signature of the voter on the precinct register with that on the identification provided by the voter, if the inspector doubts the identity of the voter, the voter is required to file an affidavit as provided by law and included in your election materials.

This affidavit serves as a statement from the voter affirming that the voter is who the voter says he or she is. It is a sworn, legal document and falsifying this document is punishable by law. Once completed and filed with the clerk or inspector, the voter is allowed to vote.

If the person does not complete the affidavit, he or she shall not be permitted to vote.



### Provisional ballots

The following people are entitled to vote a provisional ballot:

❑ A person whose name is not on the precinct register and the poll worker is unable to verify whether or not the person is a registered voter of the county.

❑ A person whose name is not on the precinct register and the poll worker verifies that the person is not registered in the county, but the person maintains that he or she is entitled to vote.

❑ A voter whose name is on the precinct register with an indication that he or she has received an absentee ballot and the poll worker is unable to verify whether the absentee ballot has been returned to the supervisor of elections.

❑ A voter whose name is on the precinct register with an indication that he or she has received an absentee ballot and the poll worker confirms that the supervisor has received the voted absentee ballot, but the voter maintains that he or she has not returned the absentee ballot.

❑ A person whose name is not on the precinct register but who has completed either the change of name or change of residence affirmation and the poll worker is unable to verify whether the person is a registered voter of the county.

> **Do not allow a voter to vote a provisional ballot if you have determined the voter is registered in another precinct.**
>
> **Direct the voter to the proper precinct.**

If, in any case, you are unable to get through to the supervisor's office to determine whether or not a person is eligible to vote, allow the voter to vote a provisional ballot.

Once the provisional ballot is voted, the voter must place the provisional ballot into a secrecy envelope, place the secrecy envelope in a provisional ballot envelope, and seal it. The voter must then complete the Provisional Ballot Voter's Certificate on the back of the provisional ballot envelope. The voter will place the provisional ballot envelope into a ballot box.

All provisional ballots must remain sealed

7

B005730

---

**Polling Place Procedures Manual**

---

in their envelopes and must be returned to the supervisor of elections at the close of the polls.

> **Care should be taken that a voter is not allowed to put the provisional ballot through the tabulating equipment.**

### Voters Who Need Assistance

A voter who needs assistance in voting because of blindness, disability, or inability to read or write is allowed to receive assistance in voting.

The voter is allowed to receive the assistance of two election officials or some other person of the voter's choice (except the voter's employer, an agent of the voter's employer, or an officer or agent of the voter's union).

If there is a notation on the precinct register that the person is eligible to receive assistance, the voter should be allowed to proceed to vote. The voter does not need to complete any additional paperwork to receive assistance.

If there is no notation on the precinct register, the voter must complete the Declaration to Secure Assistance, included in your election materials.

If the voter is unable to fill out the form, the clerk or inspector should complete the form and have the voter sign it. After completing the form, the voter is allowed to vote with assistance.

For voters with special needs due to a disability, see **Voters with Special Needs**, page 16.

*Voter requesting assistance on how to use the voting equipment*

If after entering the voting booth, a voter asks for assistance on how to use the

voting equipment, two election officials of different party affiliations should provide the voter with information on how to properly vote.

**An election official may not request, suggest or seek to persuade any voter to vote for any particular candidate or question.**

After the poll workers have provided the instruction to the voter, they shall leave the voting booth so the voter can vote in secret.



**What to do if the precinct register indicates a voter has received an absentee ballot but the voter wants to vote at the polling place**

If the voter returns the absentee ballot to the poll worker, whether voted or not, the voter shall be allowed to vote. The returned absentee ballot shall be marked "Canceled" by the poll worker on the certificate side of the ballot envelope and returned to the supervisor of elections after the polls close.

If the voter does not return the absentee ballot, the poll worker must call the office of the supervisor of elections to determine if the supervisor has received the voter's absentee ballot.

If the absentee ballot has not been received, notify the supervisor that the voter will be voting at the polling place and allow

**8**

B005731

---

**Polling Place Procedures Manual**

the voter to proceed with the voting process.

If the voter does not return the absentee ballot and the poll worker is unable to determine whether the voter's absentee ballot has been returned to the supervisor, the voter shall be allowed to vote a provisional ballot.

If the voter does not return the absentee ballot and the poll worker verifies with the supervisor that the absentee ballot has been returned but the voter maintains that he or she did not return the ballot, the voter shall be allowed to vote a provisional ballot.

**If a voter comes to the polling place to drop off an absentee ballot and does not want to vote at the polling place, do not accept it.   Instruct the voter to take the absentee ballot to the office of the supervisor before 7 p.m. In order for an absentee ballot to be counted, the ballot must be received *by the supervisor of elections* by 7 p.m.**

### What if a voter needs more than five minutes to vote?

Florida law provides that a voter be allowed five minutes to vote.  If a voter needs more than five minutes and has a sufficient reason



for needing longer, he or she may be granted extra time by the poll workers.  For example, a voter who has a disability or is unable to read or speak English may require additional time. Also, the length of the ballot may cause some voters to need longer to complete the ballot.

### Challenges

Occasionally someone may challenge a voter's right to vote.  This challenge must be in writing.  The challenger completes the Oath of Person Entering Challenge form included in your election materials.

The voter being challenged must answer the challenge in writing by completing the Oath of Challenged Voter included in your election materials.

If the voter refuses to complete the form, he or she is not allowed to vote.  If the voter completes the form, the clerk and poll workers review the information given and decide by a majority vote whether or not this individual may vote.

B005732

| Polling Place Procedures Manual |
| --- |



### If a Voter Needs Another Ballot

If a voter makes a mistake on his or her ballot, the voter may receive another ballot. The ballot that has a mistake on it is referred to as a "spoiled ballot."

Place the voter's spoiled ballot in a spoiled ballot envelope.   If the voter spoils a second ballot, he or she may be issued another ballot.  A voter is allowed up to three ballots total, including the original ballot.

> **A voter may not receive another ballot after the ballot has been counted by the tabulating equipment, even if the voter indicates he or she made a mistake on the ballot.**

### What to do if a voter leaves the booth without casting his or her ballot

In touchscreen counties, if a voter leaves the polling room without casting his or her ballot, two poll workers shall vote the ballot pursuant to the instructions for the particular voting system.

In optical scan counties, if a voter leaves the polling room and leaves his or her ballot in the voting booth without placing it in the tabulating equipment, a poll worker shall put the ballot through the tabulating equipment.

### What to do if a voter attempts to take his or her ballot from the polling place

If a voter attempts to take his or her ballot from the polling place, advise the voter that this is against the law.

Explain to the voter that the ballot may be spoiled if the voter does not wish to have it counted.  Make a notification on the Ballot Accounting Form if the voter insists on taking the ballot.

### Primary Elections

Make sure you give the voter the proper ballot based on his or her party affiliation.

No changes in party affiliation may be made at the polls on election day.

Generally, in a primary election, a voter may only vote for candidates of the party in which he or she is registered.  However, if only one party has candidates qualified for an office and there will be no general



B005733

| Polling Place Procedures Manual |
| --- |

election opposition, all voters may vote in that primary election contest. Such contests will be labeled on the ballot as "Universal Primary Contest."

# Voting Systems Operation

There are two general types of voting systems used in the state – optical scan and touchscreen. The procedures for voting using these two types of systems are different. However, with both systems, th voter is required to check-in, present identification (or sign the affidavit as described on page 6), and sign the precinct register to determine eligibility.

**Optical Scan Voting Systems**

In a county using an optical scan voting system, the voter is given a paper ballot which he or she takes to the voting booth. After marking the ballot, the voter takes the ballot to the precinct tabulator and puts the ballot in the tabulator.

If there is a race on the ballot that is overvoted (the voter has marked more candidates than there are persons to be elected or has marked more than one issue choice) or if the tabulator reads the ballot as completely blank, the ballot will be rejected by the tabulator.

The tabulator will display a message to the inspector manning the tabulator. The inspector should inform the voter, without looking at the ballot, the likely cause of the ballot being rejected. The ballot should be spoiled by placing it in an envelope designated for ballots that contain mistakes or errors. The voter is to be given another ballot, with instructions on how to properly mark the ballot.

If the voter wishes to vote the rejected

ballot, after being informed that his or her ballot may not be counted, the clerk or poll worker designated by the supervisor of elections should override the rejection mechanism and the tabulator will take the ballot. (See specific instructions for overriding the rejection mechanism in the separate instruction manual for your voting system).

> **The election official should never override the rejection mechanism without the voter specifically indicating that he or she wishes to vote the rejected ballot.**

The supervisor of elections must provide each precinct with a Voting System Operation Manual indicating how the precinct tabulator is to be set up, instructions on how to operate the specific voting equipment used in the county, instructions for troubleshooting, instructions on how to lock the tabulator against further voting after the polls have closed, and instructions on how to relay vote totals, the ballots, and voting equipment back to the supervisor after the polls have closed.



**11**

B005734

**Polling Place Procedures Manual**



### Touchscreen Voting Systems

Touchscreen voting systems do not use paper ballots. The voter votes his or her ballot on a screen similar to a computer screen.

Depending on the system used in the county, the voter will either receive a voter card or other device to bring up the correct ballot on the screen, or the poll worker will accompany the voter to the booth, place the device in the system, and then leave the voter once the display appears on the screen.

After the voter has completed voting the ballot and casting the ballot, the voter leaves the voting booth.

Touchscreen voting systems do not allow a voter to overvote a ballot. However, a voter can undervote the ballot. When the selections are being reviewed by the voter, the system will alert the voter that a race or races have been undervoted, giving the voter the opportunity to select a choice, if he or she wishes to do so.

The supervisor of elections shall provide each precinct with a Voting System Operation Manual for the voting system used in that county, indicating how the voting system is to be set up in the polling place, instructions on how to operate the

voting system, instructions for troubleshooting, instructions on how to lock the voting system against further voting after the polls have closed, and instructions on how to relay vote totals and voting equipment back to the supervisor after the polls have closed.

## Closing the Polls

At 7 p.m. the clerk or other designated official shall announce that the polls are closed. All eligible voters at the polling place at 7 p.m. are allowed to vote. The deputy shall stand in line behind the last person to establish a cut-off point.

No one is allowed to vote who was not in line at the time of the announcement. **No Exceptions.**

Once all voters have voted, the election board must secure the voting device so that no more ballots may be cast.

Then the board should follow the procedures outlined in Voting System Operation Manual for the voting system used in the county and the security procedures approved for the county.



B005735

**Polling Place Procedures Manual**

# Ballot Accounting

Anyone in the public may watch the proceedings of the election board after all voters have finished voting.

Do not allow anyone to pressure you for results, interfere in any manner, or touch any ballot or ballot container or interfere with the counting of the ballots.

Take your time because accuracy is extremely important in the completion of your duties.

**In counties using optical scan voting systems**

After the polls have closed, the election board will then verify the number of voted ballots, unused ballots, provisional ballots and spoiled ballots to make sure that the number of those ballots corresponds with the number of ballots issued by the supervisor of elections.

If there is a difference, the clerk shall report such difference in writing to the county canvassing board, with the reasons for the difference, if known.



**In counties using touchscreen voting systems**

After the voting devices have been locked against further voting, the election board will verify the number of provisional ballots, spoiled ballots, and unused provisional ballots to make sure that the number of those ballots corresponds with the number of ballots issued by the supervisor of elections.

If there is a difference, the clerk shall report such difference in writing to the county canvassing board, with the reasons for the difference, if known.

# Other Important Information



**Poll Watchers**

Each political party and each candidate may have one watcher in each polling room during the election. These watchers have to be approved by the supervisor of elections prior to the election. The supervisor will provide you with a list of the names of persons and their approved times for being in your polling place.

Poll watchers are allowed within the polling room to watch and observe the conduct of the election.

13

B005736

**Polling Place Procedures Manual**

Poll watchers may inspect precinct registers; however, that process may not interfere with the orderly operation of the polling place.

Poll watchers cannot come closer to the officials' table or the voting booths than is reasonably necessary to perform the poll watcher's functions.

Poll watchers cannot obstruct the orderly conduct of any election. Poll watchers may enter challenges to voters.



**When The Unexpected Happens**

In the event of a medical emergency or other emergency requiring assistance from the Police, Fire Department or Medical Personnel, the poll worker should first call 911, then call the Supervisor of Elections to report the incident.

If there is a power outage, check your Voting System Operation Manual on how to deal with ballots cast during the outage.

**Dealing With Irate Voters**

Voters who come to the polling place to vote and are told that they must go elsewhere or that their registration is in question may become frustrated. To deal with these voters there are some things that you should keep in mind.

Stay calm.

Keep your voice down.

Watch your body language.

Listen to what the voter is telling you.

Let the voter know that you want to help him or her. Try to find a solution to the problem.

Be polite. Treat the voter like you would like to be treated.

If necessary, ask the clerk or deputy to assist you if the voter becomes very angry or is threatening you.



**14**

B005737

**Polling Place Procedures Manual**

# Voter's Bill of Rights and Responsibilities

A Voter's Bill of Rights and Responsibilities is posted at your polling place.

## Voter Rights

Each registered voter in this state has the right to:

- ☒ Vote and have his or her vote accurately counted.
- ☒ Cast a vote if he or she is in line at the official closing of the polls in that county.
- ☒ Ask for and receive assistance in voting.
- ☒ Receive up to two replacement ballots if he or she makes a mistake prior to the ballot being cast.
- ☒ An explanation if his or her registration is in question.
- ☒ If his or her registration is in question, cast a provisional ballot.
- ☒ Prove his or her identity by signing an affidavit if election officials doubt the voter's identity.
- ☒ Written instructions to use when voting, and, upon request, oral instructions in voting from election officers.
- ☒ Vote free from coercion or intimidation by election officers or any other person.
- ☒ Vote on a voting system that is in working condition and that will allow votes to be accurately cast.

## Voter Responsibilities

Each registered voter in this state should:

- ☒ Familiarize himself or herself with the candidates and issues.
- ☒ Maintain with the office of the supervisor of elections a current address.
- ☒ Know the location of his or her polling place and its hours of operation.
- ☒ Bring proper identification to the polling station.
- ☒ Familiarize himself or herself with the operation of the voting equipment in his or her precinct.
- ☒ Treat precinct workers with courtesy.
- ☒ Respect the privacy of others.
- ☒ Report any problems or violations of election laws to the supervisor of elections.
- ☒ Ask questions, if needed.
- ☒ Make sure that his or her completed ballot is correct before leaving the polling station.

Failure to perform any of these responsibilities
does not prohibit a voter from voting.

**15**

B005738

**Polling Place Procedures Manual**



## Voters with Special Needs

A large segment of the voting-age population of our county has special needs—perhaps because of hearing, sight, or mobility impairment.

A significant portion of that group does not vote because they may be concerned that their special needs will not be met in the voting process.

*General*

Sensitivity toward people with special needs makes good sense whether in business or in public life. When you practice disability etiquette everyone wins—the person with the special need feels comfortable and you don't feel awkward interacting with him or her.

If unsure of what to do for a person with a special need, just ask him or her. This person will appreciate the interest in being helpful.

People who have a special need should be thought of as individuals—your friends, your family members or your neighbors. Don't use the amorphous group terms "they" or "them" for people with special needs. That term tends to separate rather than include.

Avoid politically correct euphemisms such as "differently able" or "physically challenged." They sound just as contrived and are just as offensive to people with special needs as they are to anyone else.

People who happen to have special needs are people first and foremost. For example, a person who cannot see would rather not be called a blind person but a person who is blind.

People who cannot see at all usually prefer being described as being blind while those who have some vision prefer being described as being visually impaired.

People who communicate with sign language prefer being described as being deaf while people who have difficulty hearing but who use spoken language prefer being described as being hard of hearing.

Avoid outdated terms such as "handicapped" or "crippled." The acceptable terms are "disabled" and "mobility impaired."

Don't say that someone is "wheelchair bound" or "confined to a wheelchair" but say the person is a "wheelchair user." Remember that to a wheelchair user, the wheelchair is not confining but liberating.

Feel free to use idiomatic expressions when talking with people who have special needs. For example, don't be uncomfortable

B005739

| Polling Place Procedures Manual |
| --- |

if a person who is blind says, "It was good to see you."

If a companion accompanies a person with special needs, don't ask the companion what the person with special needs wants to do. Address questions to the person with special needs directly.

*Mobility Impaired*

People who use wheelchairs may have varying abilities. Some can get out of them and walk a short distance. Some can use their hands and arms. Remember that wheelchair users are people and not equipment.



Don't lean across a wheelchair user to talk to someone else or to shake another person's hand.

Don't pull or touch a person's wheelchair. The chair is part of the user's personal space.

Make sure ramps provide the closest accessibility to the polling place. This is important not only for people who may be using wheelchairs but for people who may be using canes, crutches or walkers.

Make sure ramps are not obstructed so they can be used without difficulty.

Keep doorways clear of obstacles so wheelchairs can be maneuvered through them.

Make sure there is a clear path of travel in the polling area. Be aware of the reach limits of people in wheelchairs.

When talking with a person in a wheelchair, sit in a chair so you are at his or her level. If that isn't possible, stand at a slight distance so the person isn't straining his or her neck to make eye contact with you.

If your counter is too high for a wheelchair user to see over it, step around it to conduct your business with the person. Don't grab a cane or crutch. People who use them rely on them for balance.

If you offer a seat to a mobility-impaired person, remember that a chair with arms will be easier for him or her.

A person with respiratory or heart trouble may not appear to be mobility impaired, but he or she may need to sit down.

*Blind or Visually Impaired*

A person who is blind or visually impaired may travel with a guide dog, a cane, a sighted guide or alone. He or she may have a visual impairment that is not obvious. Be prepared to offer assistance in orientation and reading.



**17**

B005740

**Polling Place Procedures Manual**

Identify yourself before making contact with a person who is blind or visually impaired. Give your name and your role. For example, "I'm Mary Green, the precinct clerk."

Do not shout when speaking to a person who is blind or visually impaired.

Do not grab, push or pull a person who is blind or visually impaired. To guide a person, let him or her take your arm.

If the person is using a guide dog, walk on the person's right side -- the side opposite the side the dog is on.

Do not touch the dog, its harness or its leash. Do not talk to the dog. These distractions could be dangerous to the person's safety.

Do not touch a person's white cane. If the person puts down the cane in an unsafe place, do not move it. Tell the person to move it. That way, the person will know where the cane is.

Describe the setting including any partly open doors, steps or ramps.

Be specific with warnings. Hollering, "Look out!" will not work. The person will wonder if he or she should stop, swerve, duck or jump.

Be specific and non-visual with directions. Do not tell someone to turn left at the end of the desk. It would be better to say, "Take five steps and turn left."

If you leave a person who is blind, let him or her know.

Read informational signs that appear in print on the walls of the polling place.

Offer magnifying sheets for visually impaired voters.

Offer assistance in voting to a voter who is blind or visually impaired or allow him or her to be accompanied in the voting booth by someone of his or her choosing.

*Deaf and Hard of Hearing*

Many people who are hard of hearing have not acknowledged as yet the hearing loss. You may have to be sensitive to this, especially dealing with older voters. Speak clearly with your face unobstructed. If you must communicate with a person who is deaf through an interpreter, remember to face the person who is deaf.



If you have difficulty understanding the speech of a person, let him or her know. You may find it helpful to communicate with gestures and/or in writing.

To get attention of a person who is deaf or hard of hearing, tap the person on the shoulder.

A person who is hard of hearing, has a speech impediment, or has had a stroke, for example, may be hard to understand. Give him or her your full attention.

Do not finish sentences for the person. If you cannot understand what the person is saying, ask him or her to write it down.

18

B005741

**Polling Place Procedures Manual**

## Notes

19

B005742

# Polling Place Procedures Manual Index

Absentee Ballots
  Receipt of supervisor of elections, deadline, 9
  Returning voted ballot to polling place, 9
  Voting in person after requesting, 8
Address
  Confidential, 4
  Differs from precinct register, 4, 5, 6
Ballots
  Accounting, 13
  Provisional ballots, 6, 7-8
  Rejected, 11
  Removal from polling place, 10
  Spoiled, 10, 11
  Voter leaves without casting, 10
Bill of Rights and Responsibilities, Voter's, 15
Campaign related clothing and items, 4
Candidates, presence in polling room, 2
Challenging voters, 9
Closing the polls, 12
Disabilities, persons with, 8, 16-18
Election Officials
  Arrival at polls, 1
  Assisting voters, 8
  Election board, members, 1
  Maintaining order at polls, 3
  Poll closing procedures, 12-13
  Rejected ballots, duties, 11
  Signature of prospective voter in question, 5, 7
Emergencies, 14
Identification required, 4-5
Irate voters, 14
Polling places
  Candidates, presence, 2
  Closing procedure, 12
  Distributing political or campaign material near polls, 2-3
  Election board arrival at polls, 1

Law enforcement officers, presence, 2
Maintenance of order, 3
Media, presence, 2
Polling rooms, admission, 2
Soliciting votes, opinions, contributions, or petition signatures near polls, 2-3
Voting booth location, 1
Polling room, who is allowed in, 2
Pollwatchers, 13-14
Primary elections, 10-11
Provisional ballots, 6, 7
Solicitation restrictions, 2-3
Spoiled ballots, 10, 11
Time allowed to vote, 9
Voters
  Assistance in voting, 8
  Challenge procedures, 9
  Change of address, 4, 5, 6
  Change of name, 5, 6
  Determining if eligible to vote, 4-5
  Disabilities, voter with, 8, 16-18
  Identification at polls, 4-5
  Irate, 14
  Must be in proper precinct, 6
  Name not on precinct register, 5
  No identification, 5, 6
  Signature differs, 5, 7
  Special needs, 8, 16-18
Voter's Bill of Rights and Responsibilities, 15
Voting Systems
  Optical scan, 11
  Touchscreen, 12

**20**

B005743

# TAB 15

# DEPARTMENT OF STATE



# Katherine Harris
## Secretary of State

B004775

# Florida Voter Registration Procedures

**Department of State
Division of Elections
Room 240, The Collins Building
Tallahassee, Florida 32399-0250**

**Presented by Donna S. Miller
NVRA Administrator
Bureau of Voting Systems Certification
850-245-6220**

B004776

# Introduction/Overview

- ☐ History of the NVRA
- ☐ History of the FVRA
- ☐ Accomplishments
- ☐ General Procedures Review
- ☐ Educational Institutions
- ☐ Obligations of Voter Registration Agencies
- ☐ Points to Remember
- ☐ Other Things to Consider
- ☐ Things to Look For
- ☐ Election Year 2002
- ☐ Communication
- ☐ Questions/Conclusion



B004777

# History of NVRA

- ☐ The National Voter Registration Act, "NVRA," was established by Congress and signed into law by President Clinton in 1993.

- ☐ **The Act enhances voting opportunities for every American.**

- ☐ It helps remove the vestiges of discrimination which have historically resulted in lower voter registration rates among minorities and persons with disabilities.



B004778

# History of NVRA



❑ The NVRA has brought new voices to the political process by making it easier for all Americans to exercise their fundamental right to vote.

❑ The NVRA is also known as the "Motor Voter Act."

B004779

# History of NVRA

☐ One of the purposes of the NVRA is:

  ☐ **"to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office"** 42 U.S.C. 1973gg (b)(1)

☐ The Act greatly expands the number of locations where eligible citizens may apply to register to vote.

☐ It protects the integrity of the electoral process.

B004780

# History of FVRA

☐ The Florida Voter Registration Act, "FVRA," was signed into law by Gov. Lawton Chiles and became effective January 1995.

☐ The law identified the required agencies that were mandatory voter registration sites.



B004781

# History of FVRA

- The **Florida Voter Registration Act** significantly amended Florida Law regarding registration, making it easier to register to vote.

- Applicants may pick up an application, fill it out and leave it with the agency or mail it to their county supervisor of elections. Application forms are available at no charge for public and private distribution.



B004782

# History of FVRA

## Designated agencies include:

- ☐ Public assistance offices (food stamps - DCF, Medicaid - AHCA, WIC - DOH)

- ☐ Offices serving persons with disabilities (Blind Services - DOE, Vocational Rehabilitation - DOE, universities and community colleges)

- ☐ Centers for independent living

- ☐ Public libraries



B004783



# Accomplishments

## Registered Voters Since Implementation

There has been a steady increase in the number of registered voters since the implementation of the NVRA. In January 2002, there were 9,005,016 registered voters in the state of Florida.

B004784

# Accomplishments
## Sources of Applications



B004785

# General Procedures

## Offering Voter Registration Assistance



☐ Section 97.058, Florida Statutes, requires each voter registration agency to provide each applicant the opportunity to register to vote or to update a voter registration record at the time the applicant applies for services or assistance from that agency, for renewal of such services or assistance, or for a change of address required with respect to the services or assistance.

☐ **This includes the offices that serve persons with disabilities at universities and community colleges.**

B004786

# General Procedures

## Offering Voter Registration Assistance

❑ When an individual comes to your office, how do you decide who to offer the opportunity to apply to register to vote?

❑ **WHO – According to the statute, the agency must provide <u>each applicant the opportunity to register to vote. If in doubt, offer the opportunity.</u>**

B004787

# General Procedures

## Offering Voter Registration Assistance

☐ **WHAT** - Provide the individual a preference form, and if they want to apply to register to vote, then provide a voter registration application form.

☐ **WHEN** - Provide each applicant the opportunity to apply to register to vote or to update a voter registration record at the time the applicant:

B004788

# General Procedures

## Offering Voter Registration Assistance



Agency personnel must provide the same level of assistance in offering the opportunity to vote as they would provide in offering their agency services to a client.

B004789

# General Procedures

## Offering Voter Registration Assistance

☐ **WHY** - Pursuant to the Florida Statutes, each voter registration agency must provide their clients the opportunity to apply to register to vote. One of the purposes of the National Voter Registration Act is to increase the number of registered voters.



B004790

# General Procedures

## Offering Voter Registration Assistance

The Division of Elections encourages the agencies to notify their clients that the opportunity to apply to register to vote is available at that agency. The agencies can incorporate this information with their normal office correspondence.

- ☐ Explain in the correspondence that the applicant has the right to apply to register to vote and assistance is available at the agency.



B004791

# Educational Institutions



Educational institutions, such as universities and community colleges, are addressed under three separate laws:

☐ **Higher Education Act** - a federal law which added voter registration requirements in 1998. The institutions of higher education are to make a good faith effort to distribute a mail voter registration form to each student enrolled and to make these forms widely available to the students.

B004792

# Educational Institutions

❑ **NVRA** - also a federal law. This law requires the <u>offices serving persons with disabilities</u> at universities and community colleges to offer the opportunity to apply to register to vote at the time the applicant:

  ❑ <u>applies for services or assistance</u>

  ❑ <u>applies for renewal of such services or assistance</u>

  ❑ <u>applies for a change of address</u>



B004793

# Educational Institutions

**Qualifying Educational Institutions - Section 97.021,** Florida Statutes defines a "qualifying educational institution" as any public or private educational institution receiving state financial assistance which has, as its primary mission, the provision of education or training to students who are at least 18 years of age, provided the institution has more than 200 students enrolled in classes with the institution and provided that the recognized student government organization has requested this designation in writing and has filed the request with the office of the supervisor of elections in the county in which the institution is located. Each qualifying educational institution shall provide each student enrolled in that institution the opportunity to apply to register to vote or to update a voter registration record on each campus at least once a year.

B004794

# Educational Institutions

The supervisors of elections should consider the source of the voter registration applications from educational institutions. When submitting the voter registration monthly report to the Division of Elections, the applications from the offices that serve persons with disabilities from the educational institutions should be recorded as applications received from disability offices. They should not be recorded as "other" or "mail" on the voter registration monthly report.

B004795

# Obligations of Voter Registration Agencies

## Offering Voter Registration Assistance

☐ Provide the individual a preference form and if they want to apply to register to vote, provide them a voter registration application form.

☐ Agencies must provide the same level of assistance in offering the opportunity to apply to register to vote as they would provide in offering their agency services to a client. If you assist the applicant with completing the form, do not sign the voter registration application form for the applicant.

**<u>No one except the applicant can sign the voter registration application form.</u>**

B004796

# The Application

☐ All red areas of the application must be answered to be complete.



# The Application

Please print using a black ballpoint pen.

Official Use Only

| Revised 7/00 | | | | |
|---|---|---|---|---|
| 1 | | 2 | 3 | |
| 4 Check boxes that apply: | ☐ New Registration | ☐ Address Change | ☐ Party Change | ☐ Name Change | ☐ Replacement |
| 9 Address Where You Get Your Mail (if different from #8) | | | City | Zip Code | 10 County Where You Live (legal residence) | Zip Code | 7 Sex (circle) M   F |
| 11 Address of property for which you have been granted homestead exemption | | 13 Race/Ethnicity - (see instructions) | 14 Daytime Phone Number | 15 Fl. Driver License/Fl. ID Card number |

## To register, you must:

☐ Be a U.S. citizen

☐ Be a Florida resident

☐ Be 18 years old (you may pre-register if you are 17)

☐ Not now be adjudicated mentally incapacitated with respect to voting in Florida or any other state

☐ Not have been convicted of a felony in Florida or any other state without your civil rights having been restored

☐ Not claim the right to vote in another county or state

☐ Complete boxes 1,2,3,5,6,8,12 and 20 on the application form

B004798

# The Application

SIGNATURE - Sign or mark on line in box below. (Invalid without signature)

□ **The Oath:** "All information on this form is true. I understand that if it is not true, I can be convicted of a felony of the third degree and fined up to $5,000 and/or imprisoned for up to five years."

B004799

# Obligations of
# Voter Registration Agencies

## Offering Voter Registration Assistance

- ❑ Agencies should have the current voter registration applications dated July 1999 available in the office. Discard any previous versions of the voter applications.

- ❑ Reassure the applicant that applying to register or declining to register to vote will not affect the amount of assistance provided by the agency.

- ❑ If a voter registration agency provides services at the person's home, the agency must also provide voter registration services at the person's home.



B004800

# Obligations of
# Voter Registration Agencies

## Offering Voter Registration Assistance

☐ An agency must also establish procedures for providing voter registration services to the applicants who apply <u>by telephone</u>.

☐ Each state agency that contracts with <u>a private provider</u> that is also a voter registration agency is responsible for contracting for voter registration services with that provider and for ensuring that the private provider complies with the Florida Statutes.

B004801

# Obligations of
# Voter Registration Agencies

## Offering Voter Registration Assistance

□ Agencies must forward completed applications within five days after receipt to the county supervisor of elections in the county where the agency is located.

□ Each application should be date stamped as to date received but must not reflect the agency name or location.

□ Mail the applications in an envelope with the name and address of the agency, so the county supervisor of elections can maintain adequate records of the agencies that are offering the opportunity to apply to register to vote.

B004802

# Obligations of
# Voter Registration Agencies
## Offering Voter Registration Assistance

□ Universities and community colleges should also use a date stamp without the office name and should mail the applications to the supervisor of elections in an envelope with the office name and address.

□ Agencies must retain all preference forms, which should remain confidential, for a period of at least two years.



B004803

# Points to Remember

☐ A person providing voter registration services for a voter registration agency may not:

☐ Seek to influence an applicant's political preference or party registration

☐ Display any political preference or party allegiance

☐ Make any statement to an applicant or take any action that would lead the applicant to believe that a decision to register or not to register has any bearing on the availability of services or benefits

☐ Make any statement to an applicant or take any action that would discourage the applicant from registering to vote

B004804

# Other Things to Consider

- ❑ If the application is complete and the individual is qualified as a voter, a registration identification card will be mailed to that person by the county supervisor of elections.

- ❑ An individual must be registered for at least 29 days before voting in an election.



B004805

# Other Things to Consider

☐ On a new voter registration application form, the date it is postmarked or hand delivered to the county supervisor of elections will be the registration date.

☐ The generic date stamp, used by the agency, will be the date of registration on a completed application.

☐ If the application is incomplete, then the official date will be the date when it is completed. The agency is not responsible if an applicant has left some areas blank on the application, but do review the application.

B004806

# Other Things to Consider



- ☐ A person may change an address by writing a letter to the county supervisor of elections without using an application. Also, the supervisor may contact an applicant if an area of the application is incomplete, and then the applicant can submit the information in writing.

- ☐ Preference forms may be photocopied.

- ☐ Public libraries are not required to use preference forms.

- ☐ All offices that serve persons with disabilities, including educational institutions, are required to use preference forms and to retain them for at least two years.

B004807

# Other Things to Consider

❑  A legal address is where that person lives, even if it is a homeless person.

❑  A legal residence can be the home of a parent or a university address.

❑  There must be an original signature on the application.  No Power of Attorney may be used.

❑  Florida is a closed primary state, so if a person selects "No Party Affiliation," that person cannot vote in the Primary Election.



B004808

# Other Things to Consider

- ❑ The agency does not determine if a person is qualified to be a registered voter. That will be determined by the county supervisor of elections. If a person does not want to give information on the application, you are not required to question or press for more information, nor should you.

- ❑ The application must meet minimum requirements to be considered complete.

B004809

# Things to Look For

□ Review the voter application and ensure it includes the following information:

□ The applicant's legal address (a post office box is not a legal residence)

□ The original signature of the applicant, even if it is an mark

□ A designated party affiliation (this is optional information, but Florida is a closed primary state)

□ The address where the individual was previously registered to vote

B0004810

# Things to Look For



☐ Date stamp the application but do not include the agency name or location on the date stamp -- put the address on the envelope.

☐ If there is a former name, please include on the application to help the supervisors of elections.

B004811

# Election Year 2002



## When can you register?

☐ You can apply to register to vote at any time. However, the registration books will be closed on the 29th day before each election and will remain closed until after that election. You must be registered for at least 29 days before you can vote in an election.

B004812

# Election Year 2002

## Dates registration will close:

- Primary Election ........................ Aug. 12, 2002
- General Election ........................ Oct. 7, 2002

## 2002 Election Dates:

- Primary Election: Sept. 10, 2002
- General Election: Nov. 5, 2002



B004813

# Communication



- ❑ Maintain open communication between the county supervisors of elections and you.

- ❑ The Division of Elections is always available.

- ❑ Website:
  **http://election.dos.state.fl.us**

- ❑ Our PowerPoint presentation will be available online in May.

B004814

# HAVE QUESTIONS?

Department of State

Division of Elections

Room 240, The Collins Bldg.

Tallahassee, Fl. 32399-0250

SUNCOM: 298-7690

Telephone: (850) 245-6220

Fax: (850) 245-6236 or

(850) 245-6237



B004815

# Evaluation



Please take a moment to complete the workshop evaluation.

This will help us to provide more informative workshops in the future.

Thank you for your attention and input.

B004816



# What are your questions?

B0004817

# DEPARTMENT OF STATE

# DIVISION OF ELECTIONS



B004818

# TAB 16

**Page 1**

```
 1
 2
 3            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 3                  MIAMI DIVISION
 4
 5  NAACP,              Case No. 01-0120-CIV-
                                GOLD/SIMONTON
 6        Plaintiff,
    vs.
 6
 7                      MIAMI, FLORIDA
                        May 3, 2002
 8  KATHERINE HARRIS,
 9        Defendant.
10
11  TRANSCRIPT OF SECOND AMENDED COMPLAINT - CLASS ACTION
       BEFORE THE HONORABLE ALAN S. GOLD,
12         UNITED STATES DISTRICT JUDGE
13
14  APPEARANCES:
15
16  FOR THE PLAINTIFF:   THOMASINA WILLIAMS, ESQ.
17
     FOR THE DEFENDANT:   WALTER J. HARVEY, ESQ.
18
19
20  COURT REPORTER:   Paul Haferling
21
22
23
24
25
```

**Page 2**

1    (Call to order of the Court.)
2    THE COURT: I will start by asking appearances
3 on behalf of the plaintiffs. If you would be kind
4 enough to use the podium, speak into the microphone,
5 announce your name, and that would be true for everybody
6 who speaks today for the Court Reporter as well as those
7 who are appearing by telephone.
8    MS. HODGKISS: Good afternoon, Your Honor. I
9 am Anita Hodgkiss for the plaintiffs and with me is Lori
10 Borgen.
11    THE COURT: Thank you. May I have other
12 appearances on behalf of plaintiff by telephone?
13    MS. FEINMAN: This is Karen Feinman for the
14 plaintiff,
15    THE COURT: Thank you. May I have appearances
16 in any order as you wish.
17    MR. LITTLE: Good afternoon, Your Honor. John
18 Little and with me Joe Clock and Walter Harvey from
19 Steel Hector & Davis representing the Secretary of State
20 and the Division of Elections.
21    THE COURT: Thank you. Next, please.
22    MR. MAC INNES: Good afternoon, Your Honor. I
23 am Doug Mac Innes. I am from the Attorney General's
24 office and with me is George Wass from the Attorney
25 General's Office. We represent the Department of

**Page 3**

1 Highway Safety and Motor Vehicles and the Department of
2 Children and Families.
3    THE COURT: Thank you.
4    MS. TORRES: Good afternoon, Your Honor.
5 Susan Torres and Jeff Ehrlich on behalf of David Lahey,
6 the Miami-Dade County supervisor of elections.
7    THE COURT: Thank you.
8    MR. TINKLER: Good afternoon, Your Honor.
9 Kenneth Tinkler and Ray Allen for the Hillsborough
10 County Attorney's Office, representing supervisor Ken
11 Arroyo.
12    THE COURT: Thank you. Next, please.
13    MR. ECKERT: Good afternoon, Your Honor. I am
14 Daniel Eckert. With me is William Bash representing
15 supervisor of elections Denny Lo of Volusia County.
16    THE COURT: Thank you.
17    MR. BERGAN: Good afternoon, Your Honor.
18 Raymond Bergan from Williams and Connolly from
19 Washington for Choice Point. I am accompanied by Daniel
20 Restrepo from my firm and Mitchell Bloomberg.
21    THE COURT: Thank you.
22    MR. CIRULLO: Good afternoon, Your Honor. My
23 name is Michael Cirullo with the law firm of Goren,
24 Cherof, Doody & Ezrol, representing William Powers, the
25 Orange County supervisor of elections.

**Page 4**

1    THE COURT: Thank you.
2    MR. ARPIN: Good afternoon, Your Honor. Tracy
3 Arpin from the City of Jacksonville and general counsel
4 also appearing on behalf of the Duval County supervisor
5 of elections, John Stafford.
6    THE COURT: Thank you.
7    Any other appearances that I need to take?
8    Let me discuss briefly with you procedures.
9    Of course I will start by hearing from the
10 plaintiffs on their motion for class certification.
11    Have you discussed among the various
12 defendants how you wish to proceed? I have allocated
13 until 4:00.
14    I need about 20 minutes of that time at the
15 end of the arguments to discuss other matters with you.
16    Have you decided how to divide it up?
17    MR. LITTLE: Yes, Your Honor.
18    THE COURT: Please restate your name,
19    MR. LITTLE: Again, John Little.
20    Judge, I will start and principally deal with
21 Rule 23 issues. I will then be followed by the Attorney
22 General's Office who will argue on behalf of the other
23 two state defendants.
24    Counsel for Miami-Dade will then address the
25 NAACP standing issues and other issues that relate to

1 their supervisor, and then we would briefly have
2 Volusia, Hillsborough, Orange and Duval address the
3 issues that are related to their Counties and closing
4 with Mr. Bergan on behalf of Choice Point.
5     We have tried to coordinate, Judge, so that if
6 we all argue efficiently, we will be done in less at or
7 less than the hour allocated to us.
8     THE COURT: Thank you. I appreciate
9 everyone's taking the time to go through this so we can
10 go smoothly.
11     Alright. On behalf of the plaintiffs then,
12 and what I would ask as you proceed, is to, as part of
13 your argument address as many of the issues raised by
14 the various defendants as you feel would be appropriate.
15     Again, if you would not mind using the podium.
16     MS. HODGKISS: Thank you, Your Honor. This is
17 Anita Hodgkiss.
18     The plaintiffs' burden on class certification
19 here is not one of meeting a summary judgment standard.
20     This is also not another motion to dismiss for
21 mootness. I think those two general principals go
22 through many of the issues raised by the defendants on
23 class certification.
24     I do want to try to respond directly to their
25 arguments. I am not going to follow the same

1 organization that they have. I was not aware of that
2 prior to now, but I will try to address most of their
3 concerns.
4     I do want to start with laying out for you who
5 we believe the classes, why we think they have standing,
6 and why they meet Rule 23A and Rule 23B2.
7     THE COURT: I would also appreciate your
8 comments on request for subclasses and clarify your
9 position on that.
10     MS. HODGKISS: Thank you, Your Honor.
11     We have in our memorandum our argument is that
12 the class that should be certified is two classes, one
13 ballot voters and what we call denial class voters who
14 were not able to cast a ballot at all in the election.
15     I really will focus on the vote denial class
16 throughout the rest of my initial argument.
17     THE COURT: Let me go back to that for a
18 moment.
19     There has been various settlements that have
20 come in and also motions for mootness; one by Miami,
21 Dade County, saying either we already have the
22 replacement system for the November elections or even
23 the primary elections and that punch card ballot issue
24 does not pertain to us anymore.
25     How many remaining defendants are you

1 asserting still would be subject to that first tier of
2 argument essentially mooted now as a result of the act
3 and its approval?
4     MS. HODGKISS: Essentially our position has
5 been consistently with all of the County defendants and
6 there are now five remaining County defendants, the
7 supervisors of elections for individual Counties.
8     Our position has been as long as they can
9 provide us some documentation and we have accepted a
10 letter, does not have to be formal but some documentation
11 of the fact that they have adopted and how the funds to
12 buy or have already been put in place a new system, then
13 we agreed that the claim is likely moot and we would not
14 pursue it further.
15     THE COURT: Let me ask. Name the five, just
16 for the record that are still outstanding.
17     MS. HODGKISS: Miami-Dade County, Duval County,
18 Volusia County, Orange County and Hillsborough County.
19     THE COURT: Miami-Dade has already filed a
20 motion saying it's moot because we intend to do it. So
21 it is really four left.
22     MS. HODGKISS: Yes. There is another county
23 that we have been in discussions with.
24     THE COURT: I am not asking for your
25 settlement progress yet. I'll get to that later at the

1 end of the day, but out of the remaining Counties,
2 Duval, Volusia, Orange and Hillsborough, as to this
3 issue, is there anybody who feels -- let me ask for an
4 update on that.
5     Have you adopted a new system or had funding
6 for it, any kind of commitment? What is the status?
7     Is this still an issue as far as you are
8 concerned. I know there are issues as to class
9 certification, but as to this subclass of it, what is
10 the status? If you don't mind, tell me who you
11 represent again.
12     MR. CIRULLO: Michael Cirullo on behalf of
13 Orange County supervisor of elections. We are not a
14 punch card County. We never were. We use optical scan.
15 As I understand it, we are not a defendant in the punch
16 card class.
17     I just wanted to make you aware of that, Your
18 Honor.
19     THE COURT: Is that correct?
20     MS. HODGKISS: Yes.
21     THE COURT: We are down to Duval, Volusia and
22 Hillsborough, is that correct?
23     MR. ALLEN: Ray Allen representing
24 Hillsborough County supervisor of elections. Your
25 Honor, we have filed a motion for mootness about ten

1  days ago and the plaintiffs have agreed to that motion I
2  believe and I don't want to misrepresent because there
3  were some caveats in the letter, but we think that that
4  motion is appropriate and we think the Court should
5  grant it, so we think we are out of it.
6      THE COURT: On that issue?
7      MR. ALLEN: Yes, Your Honor.
8      THE COURT: What about Duval and Volusia?
9      MR. ECKERT: Your Honor, I am Dan Eckert for
10  Volusia which used a precinct based optical scan in the
11  2000 election. We were not a punch card defendant as I
12  understand it.
13      THE COURT: May I hear from plaintiffs on
14  that? Are you in agreement or not?
15      MS. HODGKISS: Yes.
16      THE COURT: Volusia is out of that issue?
17      MS. HODGKISS: Yes.
18      THE COURT: That leaves Duval.
19      What is your status?
20      MR. ARPIN: Tracy Arpin for Duval County. We
21  have switched to precinct based optical scan system. We
22  provided plaintiffs with information that the city
23  council has approved an award of the contract, the
24  machines are being delivered now and, in fact, the last
25  five elections we had in Duval County since the November

1  2000 election have all been conducted, used in a
2  precinct based optical scan voting technology.
3      THE COURT: Thank you, sir. With that update
4  and stipulation is there really an issue of creating a
5  subclass on that category?
6      MS. HODGKISS: No, Your Honor.
7      THE COURT: For purposes of your motion then I
8  understand that aspect is being withdrawn; that is,
9  to ask for class certification on that basis due to the
10  fact that everybody else that you named either has
11  indicated that they are going ahead with it or has it in
12  place. Fair enough?
13      MS. HODGKISS: The only remaining issue on that
14  claim is the question of the state defendants monitoring
15  the implementation of the elimination of punch card
16  ballots in the rest of the state.
17      THE COURT: I understand that but as to the
18  supervisors, that has now been addressed.
19      MS. HODGKISS: Correct.
20      THE COURT: So you have one remaining aspect
21  of that and that is only to the state defendants.
22      MS. HODGKISS: Correct.
23      THE COURT: On behalf of the state defendants
24  what is the position as far as monitoring is concerned?
25  Is there an issue there or is everybody in agreement?

1      MR. LITTLE: Judge, I think we should be in
2  agreement and I have spoken to plaintiffs' counsel about
3  providing information again -- I'm sorry -- John Little
4  for the Secretary of State.
5      What has occurred, Judge, is the different
6  County boards of commissioners or councils appropriate
7  funds for new voting systems.
8      There were also monies made available by the
9  state legislature under the Reform Act and they come and
10  sign a memorandum of agreement with the state to get
11  that funding, which I believe and understand has
12  occurred in all the Counties that previously used punch
13  cards.
14      They are acquiring the systems just as you
15  heard from the different Counties who have been brought
16  before you today, and they will come to the state I
17  believe 90 days before the first primary, making clear
18  that they can do the security of their new system and
19  interface with the state when they do their tabulations
20  of votes at the primary.
21      So the answer is, Judge, we don't oversee the
22  new systems. That is done at the County level, but it
23  is my understanding and we are working with plaintiffs
24  to provide them with information to satisfy them to this
25  effect, given the statute that says no punch cards can

1  be used in Florida and given the fact that there are six
2  named plaintiffs are in these Counties that the
3  plaintiffs have now conceded have been mooted, they
4  don't have a viable punch card claim any more.
5      Nonetheless in an effort to assist the Court,
6  we are willing to provide information to them to make
7  clear what I believe is obvious; that is, no County
8  would try to proceed with punch cards until November
9  2002.
10      THE COURT: The status of the Reform Act as
11  far as Federal approval everybody is in agreement that
12  has been approved to this point?
13      MR. LITTLE: Yes.
14      MS. HODGKISS: Yes.
15      THE COURT: May I have that of record?
16      MS. HODGKISS: Your Honor, that is correct with
17  regard to the Florida election Reform Act of 2001.
18      I am not certain about additional measures that
19  we passed in 2002.
20      THE COURT: Well, is there any reason from
21  plaintiffs' standpoint why you would not assume this
22  subclass issue to just go away?
23      MS. HODGKISS: No.
24      THE COURT: Your complaint.
25      MS. HODGKISS: That's correct, Your Honor.

1    THE COURT: Okay. We are essentially left
2 with the voting denial class issues?
3    MS. HODGKISS: Right.
4    THE COURT: That is where you are?
5    MS. HODGKISS: Yes.
6    THE COURT: I am going the to give everybody
7 the time you need as you prepare to address these
8 issues, but if you don't mind my being a little
9 practical in the beginning, I would rather just get
10 these answers out so I understand the direction
11 everybody is headed on these issues.
12    The real making is at what stage?
13    MS. HODGKISS: I believe, and I am sure that
14 the defendants can be more precise on this, but I believe
15 that certain rules have been written and I don't know
16 whether they have been finally approved, and I think
17 other rules are in the process of being drafted.
18    THE COURT: Let me ask it this way so we can
19 all focus on this.
20    In terms of your request for relief, leaving
21 aside the settlements that you have entered in already
22 or propose to enter into with some of the defendants,
23 but in terms of your request for relief, have you
24 actually done and analysis of your request versus what
25 is in the rules and what might ultimately be covered,

1 and if so is the issue that we are looking at the
2 interim issue for the upcoming election; that is, the
3 primary in November election?
4    And if it is not, then have you made an
5 analysis of what is left in terms of your request for
6 relief on these voter denial class matters.
7    MS. HODGKISS: With regard to the rules that
8 already been put into the public realm -- and again I
9 don't know if they have finally been concluded or not,
10 but yes, we have been examining how those relate to our
11 relief and likewise any rules that have been drafted and
12 published that we have been able to see even though they
13 are still having hearings on them, we have looked at
14 those, we have participated in those hearings and we are
15 analyzing how they relate to our complaint, but I would
16 say that we do not, even though there is some overlap, we
17 certainly don't anticipate that the rules could
18 completely resolve all of the items we are requesting for
19 relief, but I can at least point out a couple of areas
20 where they may impact it.
21    The whole worker training is a rule that I
22 think is under development at the moment.
23    Development of procedures for central voter
24 data base list maintenance I believe is a rule that is
25 under development, would have some impact on the relief

1 we are seeking but would not completely solve the
2 problem.
3    THE COURT: How are you proceeding with your
4 mediation? Have you picked an outside mediator or
5 suggesting negotiations among counsel?
6    MS. HODGKISS: To date it has been negotiations
7 among counsel.
8    THE COURT: Have the parties discussed whether
9 it would make sense to have a mediator to mediate some
10 of the global issues on this -- on these questions now
11 that you have some settlements in place that at least
12 for some of the defendants would establish a series of
13 objectives and goals to be achieved that fall within the
14 ambit of the requested relief?
15    MS. HODGKISS: For the plaintiffs, Your Honor,
16 we have suggested that from time to time.
17    THE COURT: What has been done?
18    MS. HODGKISS: In the negotiations.
19    MR. LITTLE: Judge, John Little again. I would
20 welcome any other defendant to come up here. We
21 selected, Judge, a mediator back when you issued an order
22 to that effect.
23    The parties did agree on a mediator. I
24 understand there is a question about a possible conflict
25 that we were just advised of this week and we're trying

1 to work with plaintiffs on that.
2    I believe under your direction we are required
3 to complete that mediation before June 17 and it is our
4 intention to do so.
5    THE COURT: But you don't have somebody in
6 place yet?
7    MR. LITTLE: We did and I have been told
8 informally that that person might now have a conflict
9 and so that is something we were trying to work on,
10 Judge, and in fact we'll pick it up after today's
11 hearing.
12    THE COURT: Independent of today's hearing,
13 and we will get to that in a minute, I would ask the
14 parties to make it a priority to get your mediator or
15 mediators, however you choose to do it, in place.
16    I would suggest that you pick very
17 knowledgeable people in there who have the prestige that
18 all sides would trust, to see if you can work through
19 and resolve any of these issues, or as many as possible
20 and to treat that as a priority before we all lineup on
21 the scheduled trial date.
22    It seems to me that there has been enough
23 movement in certain of these areas to at least put on the
24 table some basis for discussion.
25    As I analyze it, there may be interim issues

1 and more long run issues that have to be considered.
2    I have heard that rule making may address some
3 but not all of these matters and that is something that
4 we will have to see.
5    It may make a difference as to whether we're
6 looking at ultimate relief that is only on an interim
7 basis for this upcoming election.
8    There would then be taken care of through the
9 rule making process or if this is something not covered
10 by rule making that would have to be enforced.
11    So I am not sure yet how that all works
12 through, but it seems to me that it would be a desirable
13 effort on everybody's behalf to focus on that aspect of
14 the case now and pay attention to whether that is
15 something that is desirable.
16    I would like to have a report back on that. I
17 know I have a date for you but I would like you to move
18 it up and tell me within the next 10 days who you picked
19 as a mediator and how you will undertake mediation and
20 get it done timely.
21    Anybody have a problem with that or objection?
22    Hearing none, I will issue an order to that
23 effect and then setup a status conference to monitor
24 everybody and make sure you are moving ahead.
25    I am getting more proactive on these issues,

1 Mr. Clark, since I have been successful with one of your
2 cases.
3    I have taken my time. Now let me hear from
4 you.
5    MS. HODGKISS: Thank you, Your Honor. I wanted
6 to start by addressing the vote denial class and why we
7 believe it makes sense to have one class, but then I will
8 also talk about possible subclasses.
9    THE COURT: Would it be subclasses of the
10 voter denial class?
11    MS. HODGKISS: That's correct.
12    THE COURT: If you would help me understand
13 how that would sort out, I would appreciate it. Go
14 ahead.
15    MS. HODGKISS: Just briefly, it seems to us to
16 make sense to have one class because all of the voters
17 that we are dealing with in this vote denial class are
18 persons who were either registered or had made
19 appropriate attempts to register.
20    They were persons who attempted to vote on
21 November -- on the election day. They were persons who
22 were not allowed to vote.
23    More significantly, there are links among the
24 defendants sometimes with regard to one plaintiff; for
25 example, I think it's **Placee Tosus who had issues with

1 what the Miami-Dade County did with regard to his
2 registration as well as what the Department of Highway
3 Safety and Motor Vehicles did.
4    There are also links among the defendants in
5 the sense that the Counties, while it's true they have
6 statutory independent authority they certainly worked
7 together, they are on committees and commissions to
8 develop policies together and the ways in which they are
9 operating is increasingly being linked, what is done in
10 one County should be followed in another County.
11    But if that does not seem to make the most
12 sense for progression of the case, we would submit that
13 possibly there would be three subclasses.
14    The first would be a list maintenance subclass
15 and that refers to all of the purged issues under the
16 NVRA.
17    Persons who were wrongfully purged for being
18 duplicate persons who were wrongfully identified as
19 felons, matches that were not actually matches. That
20 would be a list maintenance subclass and that would be
21 against all defendants except for the Department of
22 Highway Safety and Motor Vehicle and the Department of
23 Children and Families. They do not play a role in the
24 list maintenance process.
25    The second subclass would be a registrations

1 subclass. This would deal with the issues pertaining to
2 problems with processing new voter registrations and in
3 our view that would involve all the defendants except
4 DBT. They don't have a role in processing voter
5 registrations.
6    Then, finally the third subclass would be an
7 election day subclass. This would be composed of
8 plaintiffs who encountered a variety of problems at the
9 polling place on election day.
10    This claim would be against all the -- this
11 class would be against all of the defendants except data
12 base technologies, the Department of Highway Safety and
13 Motor Vehicles and the Department of Children and
14 Families.
15    There would be some named plaintiffs who would
16 fall into one or more of the subclasses and certainly the
17 NAACP with associational standing would be in all three
18 subclasses.
19    THE COURT: Go ahead.
20    MS. HODGKISS: I am prepared to move on now and
21 talk about standing unless you have further questions
22 about who the class should be.
23    THE COURT: Could you remind me if there has
24 been an itemization somewhere in your papers as to which
25 plaintiffs would fall within which of the three

Page 21

1  subclasses.
2      MS. HODGKISS: There has not because we did not
3  develop the possibility of subclasses very extensively in
4  our briefs.
5      THE COURT: You are asking to supplement that
6  with that information.
7      MS. HODGKISS: We would be happy to if that
8  would be of assistance to the Court.
9      THE COURT: If you are going to request
10 consideration of that it certainly would have to be
11 something that I would need to know more about,
12 including which named plaintiffs fall within each of
13 these subclasses and any further development of that
14 theory. But we will get back to that. Go ahead.
15     MS. HODGKISS: On the standing issue I want to
16 start with the question of what our burden is at this
17 stage of the proceedings to establish standing.
18     It's plaintiffs' contention that we have to
19 come forward with evidence which tends to show that at
20 least one named class representative has standing to
21 raise each class claim, each class subclaim.
22     But that is different from the kind of weighing
23 of evidence that you would do in a summary judgment
24 motion. We have not finished discovery. There are more
25 facts that we are likely to develop relating to standing

Page 22

1  and we think that the defendants in many of their briefs
2  are in essence arguing facts the way you would on summary
3  judgment and not addressing the way in which we have
4  evidence of the ways in which these plaintiffs have
5  standing.
6      I guess the best support for that is the case
7  that both parties have cited a lot. The Prado Simon
8  versus Bush and in particular I refer you to pages 35 and
9  36 of that opinion, where the Court talks about how the
10 standing issue, it is part of the class certification
11 question, but not all the facts are developed at the time
12 because you are making the class certification decision
13 early in the process of the litigation.
14     The Court also points out there that even if
15 defendants' argument they are referring here to the
16 argument on standing, even if defendants' arguments were
17 completely correct, at worst several new named
18 representatives would have to be added to the class or
19 several of the class subclaims would have to be amended
20 or dropped.
21     The defendants' standing argument does not end
22 the case and given the fluid nature of class
23 certification rulings and the ability of the District
24 Court to alter or amend the certified class at any point
25 prior to a ruling on the merits, they are then saying it

Page 23

1  makes sense to raise those standing challenges initially.
2      We think that certainly is relevant to the way
3  in which the defendants made the arguments here. But
4  absent that opinion, the Court points out that what
5  plaintiffs have to establish is that at least one named
6  class representative has Article Three standing to raise
7  each class subclaim.
8      Then let me at this point go through the
9  standing question regarding each of the defendants. So
10 starting then with Harrison Roberts. It is our position
11 that all of the individual named class representatives in
12 the vote denial class and as well as the NAACP have been
13 injured by decisions that the Secretary of State and the
14 Division of Elections made as well as by ways in which
15 they failed to act.
16     The state's position on here is that everything
17 has been fixed because we have passed new laws and that
18 is not a problem anymore.
19     Here they are resurrecting mootness as a
20 standing argument. They also talk a lot about the
21 provisional ballot solving the problems and I think it is
22 important to understand why the provisional ballot does
23 not solve all the problems identified by our plaintiffs.
24     Essentially it solves the problem of persons
25 who came to the polling place, the name was on the list

Page 24

1  and for whatever reason the poll worker could not find
2  it. A provisional ballot takes care of that problem.
3      But if you have a person whose name was removed
4  from the voter registration rolls because they were
5  inaccurately matched to someone who had a felony or
6  because they were listed as moved from another County and
7  they had not, then they can come to the precinct. They
8  will vote their provisional ballot.
9      When the supervisor of elections goes back to
10 check whether that person is registered, they will find
11 that person is not registered. The provisional ballot
12 won't count.
13     So it does not solve the problems of list
14 maintenance. It does not solve the problems of voter
15 registration applications not being processed properly.
16     In essence Harrison Roberts are trying to give
17 us a wolf in sheep's clothing but raising the maintenance
18 argument as a standing argument.
19     Database Technologies. It's our contention
20 that plaintiffs, Ersa Harvey and Wallace McDonald, as
21 well as the NAACP in both its associational capacity and
22 acting on behalf of its members, have standing against
23 Database Technologies.
24     These are plaintiffs who were harmed by the way
25 in which the database matching occurred and persons

1 illustrative of members in the class who would be
2 remedied if those mistakes occurred.
3        Against the Department of Highway Safety and
4 Motor Vehicles, Germaine Terry, Prado Simon, Rhonda Rose,
5 Sherry Edwards and the NAACP in its associational
6 capacity are all plaintiffs who have a claim against the
7 Department of Highway Safety and Motor Vehicles.
8        They have standing to raise that claim. They
9 either came to the department and tried to register to
10 vote, they came and indicated that they had moved and
11 that information was not provided to the supervisor of
12 elections, so their registration either lapsed or they
13 were removed from the list.
14        Those persons still had standing. To the
15 extent that the defendants want again to bring forward
16 all their evidence and essentially have a summary
17 judgment hearing about who is right as to what happened
18 to these individual plaintiffs, we would submit that as
19 long as we come forward with credible, reasonable
20 evidence that they did, in fact, suffer the harms that we
21 indicate, they have standing to eventually get to a trial
22 or to a summary judgment stage at the minimum and proceed
23 with all of the evidence that we will be able to develop
24 in the case.
25        Turning to the Department of Children and

1 Family Services, there are conditions that Kandy Wells
2 and Joanna Clark, as well as the NAACP have standing to
3 bring the claims against the Department of Children and
4 Family Services.
5        They visited those offices. They were not
6 offered the opportunity to register to vote.
7        Against the five Counties remaining in the
8 case, it is our contention that the NAACP has standing
9 against all five and that the individual named
10 representatives, as well as the class members who are not
11 named in the case, but they have standing against the
12 County that they live in.
13        I want to and I can rush through that. But I
14 would like to move on to the question of associational
15 standing because many of the defendants argued that the
16 NAACP does not have associational standing.
17        Basically our argument is that the affidavit
18 that we submitted by the NAACP representative Adora
19 Waisay is very specific about how the organization
20 engages and it is not simply that they engage in voter
21 registration around the country or that they do it from
22 time to time. There is specific evidence about the
23 unique efforts they engaged in in Florida prior to the
24 November election, November 2000 elections, and those
25 efforts and their ability to achieve their non partisan

1 goals of increasing the numbers of registered voters are
2 frustrated when the problems occur that keep voters from
3 either being put on rolls or being able to vote on
4 election day.
5        Probably the best authority for our condition
6 here is the Church of Scientology case. This is the
7 Fifth Circuit case cited in our reply brief, where they
8 make clear that we do not have to name every member of
9 the organization. We do not have to name specific
10 members of the organization in order for the organization
11 to have standing to represent its members in the action.
12        That is made clear in that opinion where the
13 Court says it's as clear that the requisite for
14 representational standing in this circuit is not
15 necessarily an explicit statement of representation, but
16 a close nexus between the organization and its members
17 and it's that close nexus that we have demonstrated in
18 this case and that the defendants have ignored.
19        It is our position that the NAACP does have
20 association standing and has that standing against all of
21 the defendants.
22        Those are essentially my comments on standing.
23 I would like to move to Rule 23A.
24        THE COURT: Go ahead.
25        MS. HODGKISS: We contend we have met all four

1 requirements of Rule 23A.
2        On the first requirement numerosity it was
3 mainly the Department of Children and Family Services
4 that argued that we had not demonstrated numerosity and
5 again they are arguing about whether our evidence is
6 correct and the weight our evidence should be given but
7 it is our contention we came forward with sufficient
8 evidence to show that there are numerous persons who
9 attempted, who either received services of the Department
10 of Children and Family Services or had gone to the office
11 and were not offered opportunities to register.
12        The second Rule 23A requirement, commonality.
13 This is certainly an issue that I think almost all the
14 defendants raised.
15        And basically our argument there is that these
16 plaintiffs do have significant factors in common. The
17 precise details of what happened to each person are
18 different, but in terms of this involving elections, this
19 involving the November 2000 elections, these are all
20 people who were denied the ability to vote.
21        The claims are based essentially on two
22 statutes now at this point. The NVRA and Section Two of
23 the Voting Rights Act. There is certainly sufficient
24 commonality for a class to be certified and that argument
25 becomes even more forceful if you divided to subclasses.

Page 29

1    Turning then to the totality, the question
2  there is whether the plaintiffs' claims are typical of
3  those of the class members and again this is an issue
4  raised by many defendants, but our answer to most of them
5  is the same, that we have demonstrated that the named
6  class representatives are typical of the types of
7  problems that were experienced by the class members that
8  we are asserting.
9    And again this argument becomes more forceful
10 if you are looking at subclasses.
11   The final Rule 23A requirement, adequacy of
12 representation, most of the objections on that point came
13 on the issue of whether these plaintiffs can adequately
14 represent the entire class because we have not named all
15 of the Counties in the State of Florida and plaintiffs in
16 one County, cannot adequately represent the interest of
17 class members in another County and the problem with that
18 argument is that there they are confusing or they are
19 merging the different defendants that we have in this
20 case and arguing -- our argument is that there are
21 certainly problems that the state is responsible for,
22 there are problems that DBT is responsible for and
23 problems that the various supervisors of elections are
24 responsible for, and a plaintiff in Volusia County, the
25 part of the claim that was the responsibility of the

Page 30

1  State of Florida can fairly represent any other voter in
2  the class against the State of Florida; likewise against
3  the defendant DBT and the Department of Highway Safety
4  and Motor Vehicles.
5    The failure to name all of the Counties in this
6  case does not defeat adequacy of representation and does
7  not defeat totality which I think some defendants argued.
8    That brings me to Rule 23B2. This case is
9  precisely the type of case where class action makes
10 sense.
11   A number of the defendants argued that the
12 problems can be solved voter by voter without systemic
13 relief in essence. They say it does not need to be a
14 class because they have solved the problems of the class
15 representatives and anything that they do -- other
16 defendants argue that anything they do they would
17 necessarily do for every class member.
18   Our analysis is that that is not necessarily
19 the case. Surely the remedy, it will be tailored to the
20 evidence that we present of the violation.
21   If we do not have a class action at all, even
22 with regard to the NAACP plaintiffs, then our remedy
23 would relate only to the individual plaintiffs that we
24 prove their rights were violated.
25   It does not necessarily follow. A good

Page 31

1  contrast is the redistricting case. A single plaintiff
2  can bring a redistricting case and if you have the to
3  redraw the districts, it's obviously going to affect
4  every voter in the district. You don't need to have a
5  class action.
6    Here with regard to all of the plaintiffs,
7  named plaintiffs it certainly is possible and the
8  defendants have argued they already have, take steps to
9  register that person.
10   That leaves us with the only possible way to
11 achieve the relief we are seeking, statewide relief that
12 remedies all of the problems that occur for all voters
13 would be to bring voters in individually, 20 at a time or
14 something, because it does not necessarily follow that if
15 we are limited to individual plaintiffs in this case that
16 we would get relief that affects the entire class.
17   So, in summary then, it is our argument that
18 this case that we have provided the requirements that
19 meet standing, we have shown that we meet Rule 23A and
20 that we meet the requirements of Rule 23B2. A class
21 action is necessary and we ask the Court to certify class
22 in this case.
23   THE COURT: Thank you.
24   MR. LITTLE: John Little representing,
25 Secretary of State, Division of Elections.

Page 32

1    If I might quickly begin with this issue of
2  subclasses and then I will turn to Rule 23 and then I
3  will conclude very briefly on the standing issues as
4  related to my clients.
5    Judge, on subclasses the plaintiffs initially
6  identified this one class, the vote denial class, in
7  their first moving papers.
8    As you know, Judge, they filed three sets of
9  moving papers and then a reply. So they briefed 90
10 pages thus far before Your Honor.
11   They made a passing reference in that first
12 brief to the possibility of subclasses and they actually
13 even mentioned one, which was the punch card class.
14   In their second submission they came on out
15 and said we need two classes, Judge, these two classes.
16   There were no subclasses identified in the
17 additional supplemental response or in the reply brief
18 that they filed. They did not define, they didn't try
19 to brief for Your Honor how they comply with Rule 23
20 requirements.
21   We are 120 days from Your Honor's trial date at
22 this point. The case has been going on for a good while
23 and I would respectfully suggest that if plaintiffs
24 wanted to proceed with subclasses they should have
25 proceeded before this time and while their offer to

1 provide information to Your Honor is laudable, it puts
2 the defendants in a situation where we are now going to
3 have to come forward and do what we believe would be
4 extensive briefings on issues of both standing and the
5 compliance under Rule 23 with these three defined
6 subclasses which I just heard about for the first time
7 and I was not good at taking down notes to make sure I'd
8 captured the full essence of it.
9      THE COURT: I inquired about that.  The
10 argument is you're a little late to raise this issue.
11      Why was it is not raised earlier?  And what
12 the implications of what you are asking me to consider
13 without having the briefing and the like?
14      How do I begin to address those issues?
15      MS. HODGKISS: Your Honor, we did not seek
16 subclasses specifically prior to this point because it is
17 our contention that it's possible to have one class.
18      I think the defendants' concern about their
19 need to respond on timeliness, I do want to point out the
20 reason we did file three briefs is because we had three
21 deadlines and each time the defendants asked for more
22 discovery on class related issues.
23      So it is their request for more discovery that
24 has us here in May rather than much earlier in the year.
25      The other thing that is clear with regard to

1 class action is that the Courts have said repeatedly this
2 is an evolving issue and as more discovery comes forward
3 the Court may want to modify its rulings.
4      So the procedure that the defendants seem to
5 contemplate should occur is not what the case law tells
6 us should happen.
7      MR. LITTLE: Judge, I will reply quickly on
8 that one point.  The reason the new discovery was sought
9 is that they added new defendants when they amended the
10 pleadings and that is what occurred.
11      Also, these subclasses that they now describe
12 to Your Honor, did you intend to try to track the
13 categories of the claims they have been arguing as
14 part of this vote denial class which of course is one of
15 the objections that the defendants have both on
16 commonality and typicality, but again we are in a
17 situation where Your Honor has made clear to all parties
18 your intent to do the trial date.
19      One of the significant concerns that exists is
20 with any relief that might be fashioned, the impact it
21 would have on the five supervisors who were remaining
22 plus if somehow the Court would have jurisdiction over
23 these other supervisors who are not before Your Honor
24 making any changes to the election system literally days
25 before the first primary and less than 60 days before the

1 second primary.
2      So one the problems we have is we are caught
3 with this trial date situation and they are coming in now
4 and I don't know if they are uncomfortable with the vote
5 denial class or not but the fact is that if they will go
6 with subclasses we strongly urge the opportunity to
7 fully brief and respond to that issue.
8      Onto Rule 23.  I will just very quickly touch
9 on the numerosity requirement as Your Honor has seen in
10 the papers some of the defendants addressed it, some did
11 not because they did not believe the plaintiffs had
12 reached the other threshold issues.
13      I think it's fair to say that numerosity cannot
14 be fairly analyzed until you have a proper class
15 definition and issues of standing are decided.
16      On the one hand if you take this sort of
17 amalgamated series of practices and procedures against
18 all the defendants that they are trying to put into this
19 vote denial class.
20      They may be well able to satisfy a numerosity
21 requirement of being over 40 people possible, but they
22 run square in typicality and commonality.  On the other
23 hand, if you followed what we believe Prado Simon would
24 require in an analysis of commonality and typicality we
25 believe numerosity could run into the question and we

1 briefed that as an example on wrongful removal because of
2 alleged felon convictions and the evidence has been
3 brought before Your Honor as to those numbers as just an
4 example and that is briefed in the papers.
5      Going to the issue, if I could, Judge, of
6 commonality and typicality, as you know, the focus is on
7 the sufficiency of the class itself and the requirement
8 that there be a legal issue or factual issue common to
9 the class.
10      And plaintiffs are arguing initially that where
11 there is broad discriminary practices of policies that
12 is the gravamen of the class claim.
13      The common questions of law and fact are
14 necessarily presented and they are citing the Georgia
15 State conference of branches versus Georgia cases which
16 they rely upon heavily.
17      In the very next breath that Court goes on to
18 say that the commonality requirement cannot be assumed to
19 have been met merely because there are allegations of
20 discrimination.
21      Now here they are asking you to look at
22 commonality and typicality for what we believe to be a
23 very unwieldy and over broad vote denial class on a level
24 of generality that is not warranted under Prado Simon
25 which is one of the more recent pronouncements from the

1  Eleventh Circuit as Your Honor knows on commonality and
2  typicality.
3       They very simplistically argue in their papers
4  and they did it again here today, that basically it is
5  satisfied on both fronts because the alleged policies and
6  practices of all the various defendants in administering
7  elections injured the class of black voters.
8       As they acknowledge in their papers, Judge, and
9  as we have even seen from these loosely defined
10 subclasses they talked about today, they are actually
11 challenging a multitude of practices and policies that
12 are administered by multiple parties, many of whom are
13 not even parties to this lawsuit, which I will come to in
14 a moment.
15      They challenge through one group of class
16 members the wrongful removal of voters from voter rolls
17 on the basis of alleged felony convictions.
18      You have another that challenges the voter
19 registration applications not being allegedly timely
20 processed.
21      Another group claims that there were problems
22 with procedures on address changes and there were
23 inadequate communications between precincts and the home
24 office of the supervisor and yet another group goes in
25 and talks about whole worker error and how that plays in

1  and they are trying to lump these uncommon claims into
2  one overly broad class on the grounds that all of their
3  members suffered the same ultimate injury; that is, they
4  were denied the right to vote and that is what they are
5  doing.
6       And whether some defendants properly maintained
7  their voter rolls has no common factual or legal issue
8  with how defendants carried out their operations on an
9  election day.  And similarly a determination of these
10 issues and whether other defendants properly took
11 applications for the registration of voters and processed
12 those, does not turn on common questions of law an fact
13 as to either.
14      As we have argued in our papers, the cases
15 relied upon by the plaintiffs in of their commonality
16 argument tend to look at a single entity defendant or a
17 class of defendants, neither of which are present here.
18      We would suggest, Your Honor, that this case is
19 closer to the Eleventh Circuit decision in Love versus
20 Turlington.
21      Also the Lumkin versus Dupont case, and Liberty
22 Lincoln, all of which decline to certify classes because
23 there was a lack of commonality looking at the unique
24 factual circumstances that were involved, the different
25 decision makers who were involved and the alleged

1  wrongful conduct.
2       In the Liberty Lincoln case, for example, the
3  Court ultimately concluded the resolution of the claims
4  had to be on a fact specific basis, not on a non specific
5  classwide basis which is really what they are trying to
6  do here when they get sort of up to 40,000 feet and say,
7  look, here is a group of class members who were denied
8  the right to vote.
9       But when you get closer, when you get down to
10 10,000 feet you see it's this multitude of practices.
11      Flipping over to typicality and again Prado
12 Simon gives the Court great guidance on this, they are
13 proposing this overbroad vote denial class by
14 amalgamating and accumulating these different claims
15 against the different decision makers.
16      You really need look no further than the Prado
17 Simon case to see that this argument does not establish
18 typicality in the Eleventh Circuit because were it
19 otherwise, Judge, the Eleventh Circuit would have
20 accepted the certification in that case, because that
21 class as certified and ultimately reversed was all
22 persons with developmental disabilities who were
23 receiving, were eligible to receive or would receive in
24 the future services from the home and county based waiver
25 services, that was the class put together.

1       I would suggest that is very analogous to what
2  they are trying to do here of a vote denial class.
3       Looking at it at the most general level we were
4  denied the right to vote.
5       In Prado Simon what they were doing there was
6  seeking to establish typicality by pointing to the class'
7  entitlement to services under this program and the
8  defendants' action with respect to the plaintiffs seeking
9  those services.
10      Conversely here, the plaintiffs are saying to
11 Your Honor, we established typicality because the class
12 members were not able to vote in the November 2000
13 election and you need look no further, nor should you.
14      Prado Simon went on in the Eleventh Circuit
15 opinions and note that the plaintiff who has been
16 subjected to injurious conduct of one kind does not
17 possess by virtue of that injury the necessary stake in
18 litigating conduct of another kind although similar to
19 which he or she has not been subjected.
20      And as would be the case here, Judge, the Court
21 noted that the necessity of a fact specific determination
22 and observe that the class as defined by the District
23 Court appeared to encompass too many subwords with
24 disparate legal claims to warrant certification.
25      They went on to note one other thing that is

1 very applicable to this case here. They noted that in
2 one sweeping and overbroad class that had been certified
3 by the District Court the plaintiffs were trying to
4 redress different bad acts of the different defendants.
5     The Eleventh Circuit stated that each of the
6 groups of plaintiffs in that case were targeting a
7 different bad act of the defendant and whether it was
8 they did not approve the services in a timely manner,
9 they denied them, some cases they failed to adjudicate the claim
10 within a prompt manner or give the right to hearing, it
11 was all the denial of the services and the Court noted
12 that because these injuries target different defendant
13 conduct, the type of proof for each claim will
14 necessarily differ and for that reason the Court found
15 typicality was not satisfied.
16     Again, because of time constraints, Your Honor,
17 I would point to some cases; the Reyes versus Walt
18 Disneyworld, Jackson versus City of Belle Glade, and
19 again the Love versus Turlington case which we think very
20 well address this issue of typicality and why it is not
21 met herd.
22     I want to turn to at adequacy, if I could and
23 make this point, because this is a central point that I
24 think the Court can fairly recognize on class
25 certification and it is certainly one that will have to

1 be grappled with.
2     We have raised in the paper a number of
3 deficiencies under the question of class representation,
4 Judge, and I know that this is a bit different than the
5 question of are these competent counsel or some of the
6 other typical things that you see.
7     But in this case, despite trying to certify
8 statewide class they have brought suit only against a
9 handful of the parties necessary to provide the statewide
10 relief that they are purportedly seeking.
11     As is very clear from a review of the Florida
12 election code, under our decentralized election system
13 each supervisor of election is afforded significant
14 statutory authority in the administration of elections
15 here in Florida.
16     Now plaintiffs I think have acknowledged the
17 need to have supervisors in the suit by virtue of the
18 fact that they have sued seven of them and they settled
19 with two of them and they still have five of them here.
20     I think it's likewise apparent that the
21 plaintiffs -- and I have not had time to study fully the
22 new submission -- but the plaintiffs apparently recognize
23 the fact there will be some differences between Counties
24 as well as practices and procedures because otherwise the
25 settlement with one County could not different by one

1 period from the settlement with another County.
2     So what we have here is the if the plaintiffs
3 are trying to seek full statewide relief for all members
4 of the class there would need to be other parties in this
5 case and look to the prayer for relief which is what they
6 cite to in Subsection M of prayer for relief they are
7 asking Your Honor to establish a mechanism for the timely
8 communication between each precinct and the central
9 office.
10     I would suggest, Your Honor, that if that type
11 of relief with afforded by this Court if it chose to
12 afford such relief, we don't think it's required and
13 necessary, you would necessarily need 60 other
14 supervisors herd because they are the constitutional
15 officers who are charged with the duty of administering
16 elections in their particular County.
17     If you look to the subsections N, O and P of
18 the request for relief they are seeking, they are asking
19 about putting people onto voter registration rolls or
20 taking them off of voter registration rolls.
21     Section 98.015, Subsection Three of the Florida
22 Statutes makes it veery clear that it is the supervisor
23 of elections who is the official custodian of the
24 registration voter book and it has exclusive control over
25 manners pertaining to those voter registration rolls.

1     But nevertheless in this particular area they
2 have 5 of the 67 supervisor before Your Honor. Our point
3 is that they are on the one hand saying they are seeking
4 classwide, statewide relief but on the other hand they
5 have not brought before Your Honor the parties necessary
6 to achieve the prayers for relief which they are moving
7 on in this case.
8     There are additional arguments on adequacy that
9 have been raised in Duval County, papers they quote from
10 the deposition testimony of one of the named reps that
11 testified that she did not believe that her inability to
12 vote in November of 2000 was attributable to race.
13     We have also raised in the papers why the NAACP
14 is not an adequate class representative. It's my
15 recollection from a pretty close reading of their reply
16 they don't even pick that argument up.
17     In their reply, indeed one of the case
18 plaintiffs rely on, the Georgia Conference of Branches
19 versus the State of Georgia, in that case the NAACP was
20 found not to be an adequate class representative. It did
21 proceed on class certification as to other class members,
22 but based on that case and the other cases we cited,
23 Judge, we think there are significant adequacy of
24 representation issues that are here before you.
25     Onto B2, again, given how broadly they define

Page 45

1 the class and the multitude of activities that exist
2 here, we don't believe that this is an appropriate B2
3 class, where you are looking at the defendants have acted
4 or on grounds that are generally applicable to the class
5 thereby making it an appropriate filing of injunctive
6 relief.
7       And again we are missing many of the chairs
8 that we need to be filled in order to grant the kinds of
9 relief they were seeking in their prayer for relief.
10      Because the 67 election supervisors are
11 separate independently elected or selected constitutional
12 officers here in Florida, and they have brought
13 authority, one supervisor cannot tell another supervisor
14 what to do and nor can the Secretary of State or the
15 Division of Elections usurp statutory duties that are
16 afforded to another constitutional officer.
17      And they made some reference earlier to this
18 fact that supervisors worked together and the like,
19 well, the fact is I think the governors of the states
20 and the president of the United States work together but
21 the governor of Georgia does not tell the governor of
22 Florida what do, nor generally in certain matters does
23 the president tell the governor what to do.
24      My point is, Judge, in this situation we don't
25 think B2 is appropriate and we do note in their reply

Page 46

1 they slip in the idea of possibly B1 if B2 does not work.
2      Well again, they simply quoted it in the
3 footnote. They did not demonstrate to Your Honor how B1
4 would apply so we don't think they demonstrate how it
5 would fall under one of the two categories.
6      Lastly, on standing we have talked about the
7 different practices in our papers and I think this is
8 very important, Judge, to focus on as you try to get your
9 hands around this case.
10      You have a series of causes of action that they
11 identify for you. Then over here you have the five
12 categories of practices and procedures that they claim
13 constitute the things they are attacking in this lawsuit.
14      And over here you have their 20 some odd
15 prayers for relief. These prayers for relief have to tie
16 back to the practices that they are seeking and have to
17 tie back to the cause of action before ultimately Your
18 Honor can afford them these prayers for relief.
19      So I would suggest in looking to the issue of
20 mootness look at the practices and procedures that they
21 are talking about.
22      Poll worker error, other communications between
23 the precincts in the home office, failure to process
24 address changes, the issue of processing of voter
25 registration applications. The punch card class which we

Page 47

1 have already talked about and disposed of.
2      Those are the practices and procedures they are
3 point to so I would respectfully suggest the appropriate
4 analysis is not let's look at what we are asking for on
5 our wish list over here on prayers for relief because
6 unless they tie into one of the practices and procedures
7 and tie into a cause of action, that is not a remedy they
8 will be able to get and we can't use that to avoid the
9 mootness problem.
10      On that issue, you see, Judge, you did rule on
11 that issue on a motion to dismiss. We looked at your
12 order, we don't presume to put words in Your Honor's
13 mouth but it looked like when Your Honor was ruling on
14 that you were ruling on a motion to dismiss standard.
15      Standing is a prerequisite to Rule 23
16 determination. We do think the plaintiffs have to come
17 forward. If a claim is moot, that is it will not occur
18 just like in the punch card class.
19      It's a proper consideration on a standing
20 analysis. It is not a wolf in sheep's clothing and we
21 would respectfully suggest that for the reasons we said
22 in our papers, the provisional balloting that does
23 provide under the statute that if a voter is not on the
24 roll of a vote, they put it in an envelope and it goes to
25 the County commission canvassing board to determine if

Page 48

1 that original vote should be counted and their
2 characterization that that does not solve any of the
3 issues that had been raised we would refer the Court to
4 our papers where we have I believe squarely addressed how
5 the new legislation applies to the practices and
6 procedures they are suing on. Thank you.
7      THE COURT: Alright, sir. Thank you.
8      MR. MACINNES: Good afternoon, Your Honor. My
9 name is Dough MacInnes from the Attorney General's
10 Office representing the Department of Highway Safety and
11 Motor Vehicles and the Department of Children and
12 Families.
13      I have two points I want to raise in the few
14 minutes allotted to me today.
15      In the case of MacArthur versus Firestone, 690
16 Fed. Supp., 1018 right here in the Southern District of
17 Florida, Chief Judge James Lawrence King who was the
18 namesake of this building, Your Honor,
19      THE COURT: It is the one down the street.
20 But he may claim this, too.
21      MR. MACINNES: Your Honor, Judge King denied
22 class certification in an elections case, brought
23 against the Secretary of State and the Division of
24 Elections just like in this case, saying that the Court
25 finds there is no need for class certification in this

1 action.

2     The Court's review of the case law indicates
3 that in addition to the requirements set forth in
4 Federal Rules of Civil Procedure 23A and B, a District
5 Court should ask itself whether the need for a class
6 exists to offset the concomitant expense and complexity
7 associated with class action suits.

8     Judge King further stated that should the
9 plaintiffs prevail the Court's injunction would apply to
10 the plaintiffs and that putative class members.

11     There is no benefit to having a class when
12 there is no reason to doubt the defendants would accord
13 to all members of the proposed class the benefits of any
14 judgment accorded the plaintiffs and that is exactly the
15 situation we have here, Your Honor.

16     Now in another elections case the Ninth
17 Circuit held in a decision written by now United States
18 Supreme Court Judge Anthony Kennedy, that when the
19 relief sought by individual plaintiffs will as a
20 practical matter produce the same result as formal
21 classwide relief, denial of class certification is
22 appropriate.

23     That case is James v. Ball, 613, F.2d, 180.
24 The James court held that where it is clear the
25 classwide relief in a case would be an inevitable result

1 of injunctive or declaratory relief granted to the named
2 plaintiffs, class certification should be denied.

3     Now in the reply brief, the plaintiffs have
4 said that this is a minority view, that view being
5 denying class certification for lack of need and yet this
6 view has been followed in the Second Circuit, the Third
7 Circuit, the Sixth circuit, the Eighth Circuit, Tenth
8 Circuit and most importantly in the Eleventh Circuit.

9     In a case named Ray versus United States
10 Department of Justice at 908, F.2d, 1549. It's a 1990
11 case.

12     In that case the Eleventh Circuit recognized
13 that there would be no purpose served where there is no
14 purpose served a class should not be certified.

15     I've provided copies of those cases to counsel
16 and the Court.

17     While the determination of class action status
18 is within the sound discretion of the district Court, the
19 cases that I have cited here are very persuasive
20 authority for the proposition that there is simply no
21 need to certify a class as to the Department of Highway
22 Safety or the Department of Children and Families because
23 any relief that this Court may grant will be applied
24 statewide.

25     I might also add that any statewide relief that

1 this Court may grant as to the Department of State or
2 Division of Elections will also necessarily accrue to the
3 plaintiffs and to those similarly situated.

4     Accordingly, no useful purpose would be served
5 by permitting the case to proceed as a class action as to
6 these defendants.

7     My second point, Your Honor, is that the
8 plaintiffs have failed in the numerosity test with regard
9 to the Department of Children and Families, and because I
10 have I only have a few minutes allotted to me this
11 afternoon I must refer the Court to Defendant Carney's
12 brief in opposition to plaintiffs supplemental memorandum
13 in support of their motion for class action
14 certification.

15     Your Honor, stated simply, the plaintiffs have
16 not met the numerosity prerequisites with regard to the
17 Department of Children and Families. They have only one
18 named plaintiff, Joanna Clark, who makes any reference to
19 DCF in the second amended complaint and by her own
20 admission Ms. Clark is certain that she fully and
21 correctly completed a voter registration application at
22 the Broward County DCF office and left it in a box with
23 the other completed applications.

24     Now notably absent from the allegations is
25 whether the DCF employee who waited on her did or did not

1 know that Ms. Clark had just dropped a completed
2 application into the box that was awaiting pickup by the
3 Broward County supervisor of elections.

4     The plaintiffs' attempt to bolster their case
5 against DCF in their additional supplemental memorandum
6 of law in support of motion for class action
7 certification.

8     But, Your Honor, close inspection of that
9 document reveals that it too is insufficient to justify
10 class certification as to DCF based on numerosity.

11     For example, the plaintiffs' supplemental
12 memorandum alleges a Kandy Wells, whose name you heard
13 earlier today from Ms. Hodgkiss who visited a DCF office
14 to inquire about guardianship of her nine year old niece
15 was not asked if she wanted to apply to register to vote
16 and yet the plaintiffs are well aware, Your Honor, that
17 visits to DCF offices for guardianship purposes do not
18 trigger any motor voter registration responsibilities
19 either under the NVRA or the Florida Registration Act.

20     Under the law DCF is required to offer the
21 opportunity to apply to register to vote only to public
22 assistance clients, or to disability services clients and
23 the plaintiffs have made no showing that Ms. Wells was
24 receiving DCF payments on behalf of her niece.

25     The plaintiffs implication that DCF must offer

Page 53

1 voter registration services to every person who walks
2 through the door of the DCF office for any services is
3 simply not supported by the law.
4       Thus, plaintiffs' reference to Kandy Wells is a
5 red herring and must be disregarded by the Court in its
6 class certification analysis.
7       The remainder of plaintiffs' supplemental
8 memoranda makes vague references to some problems DCF may
9 have had in the distant past but it has since been
10 corrected or they may raise isolated incidents that have
11 also been corrected.
12      I asked the Court -- for example, Ms. Hodgkiss
13 said today that there are numerous persons that came to
14 DCF office and were not offered the opportunity to
15 register.
16      Your Honor, that statement is simply not
17 supported by the evidence.
18      I would ask the Court due to the limitations
19 of time today to closely examine defendant Carney's
20 brief in opposition to plaintiffs' supplemental
21 memorandum.
22      The Court I believe will conclude that
23 plaintiffs have failed to satisfy the numerosity
24 requirement as to DCF. Thank you.
25      THE COURT: Next, please.

Page 54

1       MS. TORRES: Your Honor, I am Susan Torres for
2 David Lahey, the Miami-Dade supervisor of elections.
3       I would like to focus only on one issue and
4 that is the issue of standing, in particular standing as
5 it relates to supervisor Lahey.
6       Before I do that I would like to digress for
7 just a moment to address the issue of subclasses which
8 was raised today.
9       Apart from the timeliness issues that
10 Mr. Little discussed we would also request that if the
11 Court is considering subclasses that supervisor Lahey
12 also be given the opportunity to brief that issue.
13      We believe it will be irrelevant in the end
14 because as I will turn to now, the issue of standing, we
15 believe precludes any certification of a class against
16 supervisor Lahey.
17      For purpose of analyzing standing, it is very
18 important to note that certification in this case is
19 being decided well into the litigation.
20      As a result of that, plaintiffs have had the
21 opportunity to file three separate pleadings. They have
22 had months of formal discovery and even more time than
23 that to investigate their claims, and they have
24 submitted to this Court approximately 90 pages of
25 briefing on issues of class.

Page 55

1       Plaintiffs can't simply satisfy their burden to
2 establish standing by saying, well, we are not at summary
3 judgment yet. There is more discovery to be taken.
4       We may be one month away from summary judgment
5 but we have been in this case for a year and a half.
6       Plaintiffs therefore have the obligation to
7 come forward with evidence now to substantiate their
8 allegations of standing.
9       Plaintiffs cited to the Prado Simon case. I
10 would also like the Court to analyze the Court's decision
11 in that case at page 1282 of the Prado Simon decision.
12      The Eleventh Circuit notes the slenderness of
13 the factual record before the Court at that time and
14 because of that it remanded the case to the District
15 Court to conduct a fact intensive inquiry into standing.
16      We believe the very rich record before the
17 Court today provides ample evidence that standing has not
18 been met.
19      Finally, standing of course is an issue of
20 jurisdiction. Therefore plaintiffs' implication that it
21 can just be left to be decided another day is
22 insufficient.
23      Whenever a court determines, as it has to, that
24 there is not jurisdiction in the case, it must decide
25 that issue and if there is no jurisdiction dismiss the

Page 56

1 claims brought by plaintiffs who do not have standing.
2       Despite all the time this case has been
3 pending, plaintiffs still have been unable to point to
4 even one plaintiff in this action who has standing to
5 assert any claim against supervisor Lahey.
6       I would like to address three separate
7 plaintiffs who could raise claims against supervisor
8 Lahey and the other defendants in this action and I will
9 take each one in turn.
10      First, there are individual plaintiffs who are
11 bringing claims against the supervisors of elections in
12 Counties where they reside.
13      From Miami-Dade County Mr. Matthew Israel.
14 Mr. Israel is the only named plaintiff in this action who
15 attempted to vote in Miami-Dade County on November 7,
16 2000.
17      The parties basically agreed as to the
18 circumstances surrounding his experience on election day
19 and they detailed at length in our papers.
20      I just want to go over the key points here.
21 Mr. Israel went to vote at the precinct that corresponded
22 with his current address on election day. He was
23 therefore at the right place but he never updated his
24 address with the elections department and because of that
25 the elections department had him listed under voter rolls

1 at his old precinct.  So when he arrived to vote on
2 election day the poll worker could not locate his name on
3 the list of voters registered to vote there.
4        She therefore had to call into the elections
5 department to verify that he was a registered voter.  She
6 could not do that because the phone lines were busy and
7 she could not get through.
8        Therefore Mr. Israel was not able to vote.
9 Today Mr. Israel's injury on election today could not
10 recur.  Pursuant to the Florida elections format
11 supervisor Lahey, along with other supervisors in this
12 action have started using provisional ballots, which have
13 referred to today, earlier today.
14        Provisional ballots allow a voter who goes to
15 his or her correct precinct on election day but whose
16 eligibility to vote is for some reason in question to
17 fill out a provisional ballot and if after the election
18 that voter's eligibility is confirmed, the provisional
19 ballot is counted along with every other ballot cast on
20 election day.
21        If provisional ballots had been is in place on
22 November 7, 2000 Mr. Israel would have been able to vote.
23 Because his injury cannot recur, his claim is moot and he
24 does not have standing to represent a class.
25        And again to respond to an issue raised by

1 plaintiffs' counsel, mootness is an issue that this Court
2 must consider at this time.  It is inextricably
3 intertwined with part of the standing analysis and that
4 is something the Eleventh Circuit and all other Courts
5 have emphasized that must be considered prior to any
6 certification.
7        I would also like to mention the provisional
8 ballots, the section in the Florida election Reform Act
9 relating to that is final and effective.  There is no
10 further preclearance needed or roll making.  Therefore
11 that provision is completely effective.
12        One other thing, I mentioned Mr. Israel is the
13 only named plaintiff who has a claim against supervisor
14 Lahey.
15        Plaintiffs' counsel referred to Mr. Placee
16 Tosus, another named plaintiff in this action and I must
17 tell the Court this is the first time I have heard that
18 Mr. Tosus has any claim against supervisor Lahey and this
19 again raises the frustration of dealing with what is in
20 essence a moving target.
21        We deal with the claims we believe have been
22 asserted against only to hear later on there is something
23 else.
24        I urge the Court to review the pleadings and
25 our papers.  Mr. Tosus has not made a claim against

1 supervisor Lahey.
2        There was mention made of other class members
3 that have standing, even if the named plaintiffs do not
4 and I would like to emphasize again that is irrelevant.
5        As the Courts have held, it's the named
6 plaintiff who must have standing and if in fact the
7 plaintiff does not have standing he or she cannot rely on
8 the purported standing of other members of the putative
9 class.
10        The second set of plaintiffs that could assert
11 claims against supervisor Lahey and others in this case
12 are the individual plaintiffs from other counties.
13        From Miami-Dade or supervisor Lahey that would
14 be all the individual named plaintiffs who attempted to
15 vote in Counties outside of Miami-Dade County on November
16 7, 2000.
17        They do not have standing against supervisor
18 Lahey for a very simple reason:  Supervisor Lahey took no
19 action against them.
20        The parties also agree in this case that the
21 supervisors of elections have authority only within their
22 respective Counties and because of that they cannot take
23 any action with respect to voters outside of their
24 County.
25        Therefore, any injury suffered by those other

1 individual plaintiffs cannot be in the words of Luhan
2 fairly traceable to the actions of supervisor Lahey.
3        Therefore, they too do not have standing and
4 this of course would apply to the other defendants in
5 this action as well.
6        Standing must be analyzed and on a defendant by
7 defendant basis and unless at least one plaintiff can be
8 found who has standing against each of those defendants,
9 they cannot serve as a class representative.
10        Finally, the third plaintiff that could assert
11 claims in this action is the NAACP.  As an organization
12 the NAACP can establish standing in one of two ways:
13 First it can establish an injury to itself, with the
14 parties referred to here as associational standing.
15        Or, number two, it can seek to remedy the
16 injuries suffered by its members serving as their
17 representatives and that's that the parties have referred
18 to in this case as representational standing.
19        NAACP has established neither in this case.
20        As to the first associational standing, which
21 was briefed for the very first time and without any
22 citations to authority in plaintiffs' reply, the
23 pleadings in this case and the arguments made by
24 plaintiffs demonstrate what they are seeking to vindicate
25 in this action are the rights of individual voters who

1  had a right to vote on November 7, 2000 and who
2  allegedly were denied that right and properly by the
3  defendants.
4       Therefore, it's those individuals who are
5  asserting claims under the Voting Rights Act, NVRA and
6  the other statutes invoked in this action.
7       The NAACP by contrast obviously did not have a
8  right to vote on election day and it could not have had
9  its right to vote denied. It cannot assert the violation
10 of any rights under the statutes that have been invoked.
11      I believe this is further confirmed by
12 Ms. Nueva's declaration also referred to by plaintiffs'
13 counsel.
14      I urge the Court to examine that declaration
15 closely because it further confirms that what the NAACP
16 is seeking to vindicate in this action are the rights of
17 individual voters who encounter barriers to exercise
18 their right to vote on election day and fear that they
19 will encounter the same barriers in the future.
20      Ms. Nueva's declaration says that the NAACP has
21 been aggrieved by the actions of defendants but she never
22 goes on to explain how and when she attempts to provide
23 substance to that assertion, she states that the NAACP
24 fears that its constituents may face further barriers to
25 the right to vote in future elections.

1       Therefore, I think it is pretty clear by the
2  only evidence submitted in this case on this point, which
3  is Ms. Nueva's declaration and by the pleadings that the
4  association has not suffered an injury in this case.
5       Its individual members and the individual
6  plaintiffs who are proceeding in this action.
7       Secondly the NAACP can establish standing as a
8  representative of its members which has been called
9  representational standing, but a very basic requirement
10 of establishing standing in that way is that the
11 organization point to members who otherwise would have
12 had standing to sue; i.e., they were injured.
13      Even though we have been in this case again for
14 a year and a half, the plaintiffs have not pointed to
15 even one member of the NAACP who was injured by
16 supervisor Lahey.
17      For the first time in their reply they assert
18 they don't have to do that. They can simply allege that
19 such members exist.
20      That is absolutely not sufficient to satisfy
21 their burden of proof of standing.
22      The Eleventh Circuit's decision in Doe versus
23 Stinser, which is cited by plaintiffs in their reply and
24 also by supervisor Lahey in the surreply demonstrates
25 this point.

1       In that case, the Eleventh Circuit relying and
2  interpreting the Church of Scientology cited by
3  plaintiffs' counsel held that the organization in that
4  case did not have standing because it had not
5  identified any members who were injured by the actions of
6  the defendants.
7       And in addition to that the Court rejected as
8  insufficient a declaration, a sworn statement that was
9  submitted by plaintiff saying, well, we had information,
10 we had members who were injured.
11      That is precisely what plaintiffs are
12 attempting to do here to the declaration of Ms. Nueva as
13 the 11th Circuit has held that is simply insufficient.
14      The NAACP therefore, like the other two
15 categories that I have mentioned, also does not have
16 standing in this action.
17      Of course, this applies to other defendants as
18 well. I note that in Ms. Nueva's declaration she points
19 to only three named plaintiffs in this action who are
20 current members of the NAACP. All three of those
21 individuals were in the punch card class, not in the
22 voter denial class.
23      The NAACP basically has not identified any
24 members as to any defendants who were injured in this
25 action.

1       At the end of the day, Your Honor, there is
2  simply no plaintiff in this action who has standing to
3  sue supervisor Lahey.
4       On this point the Eleventh Circuit has been
5  emphatic. In the absence of a named plaintiff with
6  standing a class cannot be certified.
7       In addition to that the claims asserted by
8  those defendants must be dismissed and that is what we
9  ask this Court to do with regard to the claims asserted
10 against supervisor Lahey. Thank you.
11      MR. ECKERT: Again, my name is Daniel Eckert,
12 representing supervisor of elections Denny Lo from
13 Volusia County.
14      Volusia would agree and would adopt the
15 argument that has just been made with regard to standing,
16 and the argument by the previous defendants and that is
17 what would follow that pertains to its circumstances.
18      There are a few situations that I would like to
19 highlight with regard to Volusia.
20      First, the proposed individual class
21 representative in Volusia had no standing at the time of
22 her entry into this case.
23      She had no standing with respect to relief.
24 Her circumstance had already been taken care of.
25      Prior to today, prior to the time that she

1  entered into the case, within shortly after her claim was
2  brought to our attention.
3       Second, that plaintiff, Ursula Hardy, is
4  typical only of human data entry error.  She was
5  cancelled by reason of a debt that she owed which has
6  been explained.
7       Third, to emphasize the point that Ms. Torres
8  has just made, the NAACP shows no Volusia standing
9  whatsoever.  No individual plaintiff, no individual in
10 Volusia is shown to have been harmed.
11      Now we have in our papers there is a different
12 terminology than Ms. Torres just made but the same
13 principles are apropo.
14      We referred to associational representational
15 standing, being that for third parties and then referring
16 to the NAACP's own organization standing.  They have
17 shown neither.  No Volusia plaintiff.
18      Now, in addition to the lack of qualification
19 of the proposed class representative, the provisional
20 ballot meets the duplicate issue, that if someone comes
21 in today and says they have been cancelled wrongfully,
22 there is a procedure in place for that to be remedied.
23 There is no class issue the Court to address on this
24 point.
25      We have indicated how our own procedures have

1  been altered.  However, what ultimately moots it is the
2  provisional ballot.
3       Likewise, the provisional ballot moots the
4  telephone issue, the issue which where the lines where
5  people walked away in frustration because that doesn't
6  supposed to have walked away and we conceded there was a
7  number in Volusia did walk away, seven or so, which might
8  fall into the election day issue.
9       As of today that circumstance would not be
10 reoccurring as Ms. Torres has just explained but there is
11 no requirement to verify the eligibility before a person
12 would walk away.
13      It's important I think to say that there is a
14 live controversy on the Court's part today because while
15 I think the plaintiffs failed to rebut any showing, that
16 there is that.
17      Candidly, Your Honor, this case, the discovery
18 has been extensive.  It is very time consuming and the
19 trial is set just before another election.
20      So if there is no live controversy, the
21 respective defendants supervisor's attention is best
22 directed to the election upcoming.
23      We have filed papers with the Court indicating
24 the procedures which have been revised.
25      Without objection from the plaintiffs Ms. Lo

1  has revised the procedures even more slightly in favor of
2  the voter and that has been we have notified plaintiffs
3  to that effect and it has been covered in deposition so
4  at the conclusion the of the hearing we would just like
5  the record to be complete and correct on that point.
6  Thank you.
7       MR. TINKLER:  Thank you, Your Honor.  Kenneth
8  Tinkler again for Hillsborough County.
9       Again, ion the interest of time we would adopt
10 the arguments that have come before us.  There is only a
11 few Hillsborough issues I would want to bring up.
12      One issue that the plaintiff brought in in
13 reply brief, the plaintiffs cited essentially the
14 Georgia State Conference Branches versus the State of
15 Georgia.
16      Your Honor, I think that case is very helpful
17 in respect to the Counties in that the classes that were
18 sought to be certified there, the local plaintiffs only
19 asserted a class against the local supervisor in which
20 they live.
21      It was not this broad class that is seeking
22 certified people who live outside of Hillsborough County
23 against the supervisor of elections.
24      In that case the Court cited the extensive
25 data that had been put forward to the allegations that

1  have been made here, despite the fact they have been in
2  this case for more than a year and a half.
3       On the claims of Hillsborough County,
4  apparently we now have gone from seven plaintiffs to
5  five.  Two of them, one Natalie Carnahey was only
6  asserted as part of the punch card class.
7       The other is Willie Steen who has apparently
8  been removed from case on the order of the Court.
9       Of the five Sherry Edwards has an issue
10 apparently with the Department of Highway Safety and
11 Motor Vehicles and that is in Hillsborough County.  That
12 is the only place she registered to vote.
13      Hillsborough County did find out that the
14 application was not forwarded from Highway Safety to
15 Hillsborough County.  Her name was still on a list.
16 Hillsborough County went out of its way to send her a
17 voter application that she did not return.
18      Kandy Wells does not apparently fit their class
19 definition.  Wells did not go to vote on election day.
20 She has been registered in the County since 1992.  She
21 assumed on her own that she cannot vote after doing a
22 change of address and not getting her card as fast as she
23 would like it, but if she had gone to vote on that day,
24 she could have.
25      Rhonda Rose.  Provisional ballot would help a

1 lot here, Your Honor. He had only waited two hours. He
2 obviously did not want to wait any longer than that and
3 he left the polls.
4       The provisional ballot would have allowed him
5 to vote and the verification would happen later. His
6 claim is moot at this point given the provisional ballot.
7       Wallace McDonald, the dispute at this point is
8 whether or not he is a felon. The Florida Department of
9 Law Enforcement has informed Hillsborough County he is a
10 felon. Mr. McDonald refuses to appeal to the FDLE. He
11 does not want to spend any more money dealing with them.
12       Plaintiffs are asking you to assume he is not a
13 felon and that Hillsborough County must put him back on
14 the rolls.
15       Germaine Terry was deleted by list maintenance.
16 Your Honor the law requires Hillsborough County to do
17 list maintenance. We have to go through it and send
18 people forms.
19       When they do not respond we have to take them
20 off the list by statute. The plaintiffs are simply
21 saying he was taken off because of his race and they are
22 ignoring the fact he is deleted by the same procedures
23 anybody would face.
24       Thank you.
25       Good afternoon, Your Honor. My name is Mike

1 Cirullo on behalf of Bill Cowles, the Orange County
2 supervisor of elections. I will try to be extremely
3 brief. I will rely on the arguments of co-counsel and
4 the submission of myself on behalf of Bill Cowles to Your
5 Honor.
6       I think what I want to point out on behalf
7 local County supervisors and what I can say is so
8 disconcerting to my client is the possibility, the way
9 the class is being requested will require Bill Cowles to
10 answer for acts and circumstances that are beyond his
11 control and require other defendants to answer for acts
12 that are uniquely within Bill Cowles control.
13       Bill Cowles is the supervisor of elections for
14 Orange County. His jurisdictional authority does not
15 spill beyond the County borders.
16       There is a city in Orange County that straddles
17 across the Seminole County called Winter Park I believe
18 and along Winter Park the division line is Citrus Avenue.
19 The odd numbers addresses are in Seminole County.
20       The even number addresses on Citrus Avenue are
21 in Orange County. Bill Cowles can help those people on
22 the even side of Citrus Avenue, but not on the odd side
23 of Citrus Avenue.
24       Now, I point that out because in the most
25 recent submission the plaintiffs have incurred an E-mail

1 of concern of a potential voter who may or may not have
2 been registered and they wrote, I guess the Division of
3 Elections.
4       They were told to contact the Seminole County
5 supervisor of elections.
6       Whether that is a local issue or state issue,
7 the bottom line is it appears that what the plaintiffs
8 have done is they will take a mish-mash of issues and
9 have our individual defendants answer for them all.
10       The subclasses they requested of Your Honor
11 does not resolve that issue. That is the most
12 disconcerting thing to Bill Cowles. I am sure the other
13 defendants here today. We are confused as to what we are
14 being asked to answer for.
15       The only difference between Citrus County an
16 this inquiry about voter registration. In Orange County,
17 and a voter registration issue is the single named
18 plaintiff from Orange County, which is Maria Consuela
19 Graham.
20       The plaintiffs are asking you to consider the
21 allegations. That she alleged she submitted things and
22 she submitted her post card and she alleged that as a
23 result of something that happened in Bill Cowles' office
24 she was not on the voter roll.
25       I am asking Your Honor to take a look at the

1 facts that are established to the extensive discovery we
2 have all been undertaking in the last 18 months in this
3 case. Under her own words where she has no evidence that
4 it was ever received by Bill Cowles' office.
5       She admits and the exhibit is in the deposition
6 that she did not sign the one application that she
7 submitted by mail. It was incomplete.
8       So how is her claim typical of a voter
9 registration class whether it be in Orange County or
10 statewide when she did not do what she was supposed to do
11 and she can't show that definitively the other end of
12 that connection that a supervisor or the state or DCF or
13 DMV did not do something.
14       Her claim is atypical. She has conflict with
15 people who did the right thing.
16       And in closing I just want to point out that
17 this is one single plaintiff against the Orange County
18 supervisor of elections.
19       She could only represent the set of facts that
20 she stands for. That set of facts is voter registration
21 and perhaps what she experienced at the polls.
22       But as far as list maintenance she does not
23 have standing to represent that set of facts for example
24       The plaintiffs have said that she is the only
25 named individual plaintiff with standing against Bill

1 Cowles, that the other individuals, the plaintiffs would
2 not have standing against Bill Cowles. They have
3 admitted that.
4          In closing I would ask Your Honor to take a
5 close look at the Georgia state case because I think it
6 helps the defendant. I think it helps the Counties.
7          The court did a county by county analysis based
8 on extensive facts that showed the four elements,
9 including numerosity and declined the NAACP's request to
10 be a plaintiff based on the same arguments they are
11 advancing here and we would ask that you deny the class
12 certification motion and I thank you for your time.
13          THE COURT: Thank you.
14          MR. ARPIN: May it please the Court, Tracy
15 Arpin again for Duval County supervisor of elections John
16 Stafford.
17          Your Honor, what I would like to do if I could
18 is begin by stating for the Court what I understand the
19 current status to be as far as Duval County is concerned
20 and the named plaintiffs and the classes for which they
21 were offered.
22          There were three named plaintiffs from Duval
23 County. The plaintiffs have represented in their
24 previous pleadings that plaintiffs Stoner and Penel were
25 being offered for the punch card voter class, which as

1 Your Honor heard this afternoon has now been resolved.
2          That leaves one named plaintiff, one named
3 individual plaintiff, Janice Kelly, who is being offered
4 as a representative of the vote denial class in Duval
5 County.
6          What I would like to do is briefly to highlight
7 the individual facts unique to her end of Duval County.
8          The circumstances surrounding Ms. Kelly is hers
9 is a rather unique combination of facts where she
10 indicated she has claimed that she at an earlier election
11 reported to a poll worker that she had changed her
12 address, thought that had been taken care of.
13          On the next election day in November 2000, she
14 went back to her old precinct which in fact had been
15 moved, was no longer a precinct. She went to another
16 precinct closer to her new address and was directed her
17 name was on the rolls and she was directed to the correct
18 precinct.
19          She indicates she thinks she got there before
20 the polls closed. The poll workers -- all the poll
21 workers indicated it was after 7:00 p.m. and the polls
22 had closed.
23          Let me address Ms. Kelly from the standpoint of
24 typicality and standing. We would submit that her
25 circumstances are so unique combining the circumstances

1 of having turned it in in an earlier election, going to
2 the wrong precinct -- not the wrong precinct, a precinct
3 that was no longer there and arriving at the correct
4 precinct at closing time, is so unique it is not really
5 to be typical of all the claims that are raised and
6 certainly would not be typical of any claims that could
7 be asserted against Mr. Stafford arising out of any
8 issues concerning the thing such as wrongful removal from
9 the voter registration rolls, based on alleged felony
10 conviction.
11          Also no issues so far as improper processing of
12 a voter registration application and we would submit that
13 she would not have standing to raise those sorts of
14 claims on behalf of any other voters because she was not
15 in a factual circumstance.
16          As far as the commonality issue I would point
17 out that so far there is not a single voter in Duval
18 County who has been identified in this lawsuit as having
19 any problems with respect to being wrongfully removed
20 from the voter rolls because of the purged list and no
21 claims of anyone who has come forward with any
22 information of having had a voter registration
23 application improperly processed and that gets you to the
24 issue of the problem with plaintiffs' asserted class from
25 a commonality standpoint. We have got supervisor

1 Stafford who is being asked to be kept in this lawsuit as
2 a part of a class action suit which involved issues of
3 list maintenance of voter registration, of election day
4 issues and that he simply has no claims against him
5 relating to most of those categories.
6          So that we would submit that particularly as to
7 supervisor Stafford that plaintiffs' proposed class lacks
8 the commonality necessary to be certified.
9          The one final point I would raise is respect to
10 the NAACP and the claim that that organization may have
11 standing as to supervisor Stafford.
12          I would just point out that as plaintiffs
13 reflect in their filing with the Court, the NAACP in fact
14 had several days of hearings in Duval County has not
15 presented to the Court a single individual member of the
16 NAACP who came forward and stated that he or she was
17 denied a right to vote in Duval County on election day
18 and with respect to the claims that the NAACP may have
19 associational standing we would simply adopt the
20 arguments made by previous counsel. Thank you.
21          THE COURT: Thank you.
22          MR. BERGAN: Good afternoon again, Your Honor.
23 Raymond Bergan for Choice Point. I can do this I believe
24 in three or four minutes and bring this in well within
25 the hour you allotted to the defense side.

1    I refer the Court to pages 2 and 3 of our brief
2  in opposition where we cited Wooden versus Board of
3  Regents, Glicken versus Dugger and the Prado Simon case
4  for the proposition which I believe to be unassailable
5  that a nominal plaintiff must have standing to pursue a
6  Rule 23 claim against each defendant and I underscore
7  each.
8    In this case in order to meet that burden the
9  plaintiffs point at pages 13 and 14 of their brief, to
10 Wallace McDonald and Ursula Harvey. The evidence with
11 respect to Wallace McDonald is not really in dispute.
12   Choice Point regarded Wallace McDonald as a
13 match to Hillsborough County based on information which
14 is found on Exhibit D to our moving papers.
15   Wallace McDonald's name matched, social
16 security matched, date of birth matched, the Florida
17 Division of Law Enforcement reported him as a felon.
18   It's important to understand that the
19 plaintiffs are not saying and then it's important to
20 understand what we are not saying.
21   Plaintiffs are not saying we got the wrong guy.
22 Plaintiffs are not saying we have the wrong Wallace
23 McDonald.
24   What they are saying is that the Wallace
25 McDonald who was convicted was not convicted of a.

1  Felony. I am not asking to you resolve that at
2  this stage. What I am saying to you, however, is that
3  this demonstrates how fact bound the inquiry is with
4  respect to every single one of the plaintiffs in this
5  case, everyone of the gentlemen and lady sitting over
6  here can make that same assertion with respect to the
7  individual plaintiffs who are asserted as representatives
8  against them.
9    Because it is such a fact bound inquiry with
10 respect to each of these plaintiffs is not appropriate
11 for class determination. Ursula Harvey is the other one
12 asserted by the plaintiffs as representing a class
13 against us.
14   But Volusia County has admitted it was their
15 mistake. They did it in their answering papers. They
16 did it again here today.
17   The plaintiffs take us to task because they say
18 perhaps we should have picked up the fact that she voted
19 in Volusia County and then Volusia County would not have
20 made that mistake.
21   The fact of the matter is if they read the
22 discovery that was made available to them by Volusia
23 County they would know that we did report that to the
24 County.
25   It is very difficult for me to see how either

1  of these two folks could be a representative plaintiff
2  against Choice Point.
3    If you were to ask me to give you my best case,
4  it would be the one that Mr. Little cited to you, Love
5  versus Turlington, Eleventh Circuit case, 1984.
6    The language in Love at page 1564, each
7  district is responsible for its own remedial program,
8  each student's situation differs, diplomas are denied on
9  unique situations.
10   Class certification was denied. Change that
11 language to this case.
12   Each supervisor of elections is responsible for
13 the voter list within his or her County. Each voter's
14 situation differs. Voters are kept on the list or
15 removed because of unique circumstances.
16   I suggest to Your Honor that that is a
17 paradigmatic case to cover our situation and that at
18 least as to Choice Point based upon the representative
19 plaintiffs in the current complaint that class
20 certification should be denied. Thank you for your
21 patience.
22   THE COURT: Yes, sir. Thank you. Anybody
23 else?
24   MR. TINKLER: Judge, I am not going to argue
25 but I want to say two quick things.

1    We wanted to be clear that the defendants were
2  dividing their arguments in adopting each other's
3  arguments as they applied and I want to be clear on the
4  record.
5    And secondly, you asked the plaintiffs about
6  application of the rule making or the new statute to
7  claims that were being raised.
8    I did want to say that if it would assist Your
9  Honor if you would like the state to provide you with a
10 charter and analysis of the practices and procedures and
11 what the views are as to the statutes or the rules, we
12 stand ready at any time to provide that to Your Honor if
13 it would help.
14   THE COURT: I thank you for that and I am
15 going to comment on that in a moment.
16   I have limited time for rebuttal so I need to
17 figure out how best to get rebuttal.
18   What is your thought on that? There are many
19 of these issues that have been addressed today.
20   MS. HODGKISS: Well, Your Honor I had selected
21 one or two because I know time was short. However, if
22 there are ones that stand out in your mind I will be
23 happy to answer questions.
24   THE COURT: It is not quite as simple as that.
25 Let me try to do it this way.

Page 81

1    I have tried to give everybody the opportunity
2  to say as much as everybody wants to about all issues.
3    This is an important case and it deserves the
4  time. A lot of paper has been filed. Briefing has been
5  filed. I am not rushing to any conclusion on this.
6    Here is what I would like to do, because I
7  have a sentencing at 4:00, and there is no way I can
8  begin to work through all these issues prior to that
9  time.
10    Remind me again. Your mediation deadline is
11  mid June?
12    DEFENSE COUNSEL: Yes, Your Honor.
13    THE COURT: So here's what I want to do as a
14  priority and I will get to rebuttal on this in a moment.
15    It seems to me we are at that point where I
16  need to have some orders issued as to how this mediation
17  will go and what I want of plaintiffs initially and what
18  would be helpful to the mediator.
19    First you have to get the mediator. Who you
20  choose and how you setup the mediation is crucial in my
21  opinion and I am a little impatient with you for not
22  moving ahead faster on that, because we are pushing now
23  up to that point and anyone who comes into the shoes as
24  a mediator will not have all that time necessary to do
25  the job.

Page 82

1    So I am telling you I am impatient with you. I
2  am putting a priority on mediation here and I want it
3  done within 10 days.
4    This is what plaintiffs will do. You are to --
5  as to each named defendant you are to itemize the relief
6  requested and I am asking --this is not for the Court at
7  this point. This is under seal as part of settlement.
8    I want you to be realistic in setting out what
9  it is that you will you will ask as relief for mediation
10  purposes.
11    I want you then to analyze how the new
12  legislation and new rule making affects that request for
13  relief both on the interim basis and long term basis.
14    In other words is there a gap here because the
15  rule won't be in effect for the 2002 election but would
16  be after? So it is just a short period of time we are
17  dealing with? Or is it a longer term issue which would
18  require supervision enforcement?
19    You can get that to the defendants in 10 days.
20    Likewise, I want the defendants to do that same
21  analysis from their standpoint for the mediator.
22    What relief is being requested as to them, how
23  they see the new legislation, new rules applying and
24  essentially for mediation purposes and settlement
25  purposes, not for this Court and not for anybody else to

Page 83

1  look at.
2    What it is that you would be willing to do with
3  respect to that request that plaintiff has made.
4    What is at issue and why.
5    So when the mediator gets this package, at
6  least there is something in hand that would be of some
7  use and help.
8    If anybody can think of anything else that
9  would be helpful to the mediator putting yourself in that
10  place, speak now.
11    Anybody have any other suggestions how we can
12  make this a meaningful process?
13    MR. CLOCK: Your Honor, if I might. Joe Clock,
14  Secretary of State.
15    As I am listening to the Court what you are
16  asking people to do at this point is to set aside various
17  legal attacks and arguments and just simply look at the
18  relief as if all the relief was extant, see if matters
19  can be resolved whether or not people believe that there
20  is a legitimacy there and then just see what is left
21  over. Would that be correct?
22    THE COURT: That's correct.
23    I am not asking you to by doing this
24  acknowledge anything. This is the nature of settlement.
25  It's that type of discussion.

Page 84

1    MS. HODGKISS: Responding to your question
2  about what else would be helpful for the mediator, we
3  would like the opportunity to prepare some kind of
4  summary of the facts and similarly of what legal standard
5  we believe would apply.
6    This is a unique area of the law and that is at
7  least somewhat relevant to what the mediator would be
8  considering.
9    THE COURT: I am not limiting anybody in terms
10  of what you think would be useful to the mediator what
11  you would like to give the mediator or mediators.
12    But this is where I would like to start from.
13  I would like you to go to the bottom line and work
14  backwards.
15    What is it you're asking of each defendant
16  realistically?
17    How is it affected by the new act and/or new
18  rules that are in process or at various stages?
19    What is left that you have on the table?
20    And I want each defendant to be able to
21  respond in kind, saying this is our analysis of it. We
22  agree, we disagree. This is what we think is workable.
23  This is not. These are the issues and why.
24    So the mediator can have this package from both
25  sides, all sides and start with that.

Page 85

1    Frankly, if I was sitting as a mediator I would
2  be less concerned with everybody's legal theory of what
3  is it that you are fighting about.
4    Is it something you will do anyway?
5    And is it something that makes sense to do for
6  all voters?
7    If it does, then what are we doing practically
8  in our efforts here, other than to have very fine
9  arguments on very esoteric issues involving class actions
10 for which I think you are, to deal with the Eleventh
11 Circuit on.
12    This is what I want as a priority now as we get
13 closer. I know but this is work. There is more work to
14 do.
15    But I think that without but this and letting
16 you go your own direction, which frankly has not been too
17 impressive on mediation so far, we are going to be off
18 the mark and rather than see you gear up a lot of time
19 and expense that may be avoidable in whole or in part, it
20 may makes make sense to consider these issues.
21    Others have and come up with settlements which
22 I don't profess to make any opinion on other than they
23 are of record.
24    Whether anybody deems them to be good, bad or
25 indifferent in the public interest for which we all have

Page 86

1  to be concerned, I leave to you to ponder.
2    But we are at that point now. So let's focus
3  on this case in a slightly different way, which I am not
4  going to see.
5    Everybody understand this is under seal.
6    Give me an. Order I will seal it.
7    This is for settlement purposes only. This is
8  not meant to be -- and I am specifically ordering that
9  this is not meant to be paraded around for other
10 purposes, for any purposes relating to any side to take
11 advantage of this for a public relations standpoint.
12    This is just to see whether there are a meeting
13 of the minds in terms of the remedy requested, whether
14 that makes sense in the public interest as to all voters,
15 including those who are included in the plaintiffs'
16 complaint.
17    A LAWYER: Your Honor, may I make an inquiry?
18 Are you asking for sequential filings or asking that they
19 are made simultaneously?
20    THE COURT: No, sir. Ten days for the
21 plaintiff to submit this to each defendant individually
22 and for each defendant to have submission back to the
23 plaintiff.
24    Then this is to be given to the mediator.
25 This seems to me to make some sense. I am not

Page 87

1  precluding defendants to talk among themselves to see if
2  it makes sense to do this, but I am not asking for cross
3  servings.
4    If anybody has a different point of view, I
5  would like to hear that now.
6    It's sealed as to any non party. Anybody have
7  any thoughts on that?
8    From plaintiffs side, would it be helpful to
9  serve everybody or just individuals?
10    MS. HODGKISS: Your Honor, it does not seem to
11 matter. If they can share, we can send out twelve
12 instead of one.
13    THE COURT: You will send it individually to
14 each and copies to everybody else?
15    MS. HODGKISS: Yes.
16    THE COURT: Fair enough?
17    MR. LITTLE: Yes, Judge, the defendants concur.
18 I believe that would be the appropriate procedure and we
19 would respond within 10 days of receiving their
20 supplement.
21    THE COURT: I want that mediator in place by
22 the end of that 20 day period, ready to go and back
23 sides are going to be submitting to me when we get back
24 into a status conference, how you will make that
25 mediation work.

Page 88

1    You will tell me who the mediator is and the
2  procedures you are hoping to suggest to the mediator to
3  deal with these issues.
4    I hope I am clear on that as a priority to this
5  Court.
6    Now, regarding these other issues, it is
7  somewhat regrettable that it is a bit of a moving target
8  as to exactly what it is being requested and how the
9  Court should consider these things.
10    But again, these are important issues. So I am
11 not going to dwell on where we have been, but where we
12 need to go.
13    I will give plaintiff 10 days to file any
14 supplemental position relative to the subclasses, three
15 subclasses suggested on the remaining matter of voter
16 denial class.
17    You will have to do an abbreviated analysis of
18 the criteria for class certification as to those
19 subclasses.
20    Ten days for response and five days for reply.
21    We will have to move along on this now so I can
22 understand how it really works, if at all.
23    I cannot do this in the abstract.
24    Within that 10 day period I will also take from
25 plaintiffs any written response to the arguments here by

Page 85 - Page 88

1  way of rebuttal.

2      Some of these arguments require some more

3  attention.  They are very important arguments.

4      Just as an example, do you really need a class

5  action?

6      Given the nature of the relief that you are

7  requesting.

8      The issues about how you will deal with all the

9  missing Counties as far as implementation of your relief

10 by class and any number of other matters that have been

11 addressed.

12     I will hear from you on that since I have run

13 out of time.

14     (Proceedings adjourned.)

15

16

17

18     I CERTIFY THIS IS A TRUE
       AND CORRECT TRANSCRIPT

19

20   ——————  ————————————

21     Date    Court Reporter

22

23

24

25

# TAB 17

PAGE 1   SHEET 1

1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF FLORIDA

3

4   CASE NO. 01-120-CIV-GOLD

5

6

7   NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF

8   COLORED PEOPLE, INC., by its FLORIDA STATE

9   CONFERENCE OF BRANCHES, et al.,

10      Plaintiffs,

11   vs.

12   KATHERINE HARRIS, Secretary of State of Florida;

13   et al.,

14      Defendants.

15   _____/

16

17   DEPOSITION OF EDWARD C. KAST

18   Taken in the above-styled cause, pursuant to notice, .

19   at the offices of Steel, Hector & Davis, 215 South Monroe

20   Street, Suite 601, Tallahassee, Florida, on May 21, 2001,

21   commencing at 9:18 a.m.

22      Reported by:

23      MARLO D. FARNSWORTH

24      CERTIFIED SHORTHAND REPORTER

25

---

PAGE 2

2

1   APPEARANCES OF COUNSEL:

2

3   On behalf of the Plaintiffs:

4   ANITA S. HODGKISS, ESQ.

5   CARA FINEMAN, Esq.   (via telephone)

6   Lawyers' Committee for Civil Rights Under Law

7   1401 New York Avenue, NW, Suite 400

8   Washington, DC  20005

9   (202) 662-8600

10

11   On behalf of Katherine Harris, Secretary of State of

12   Florida, and Clay Roberts, Director of the Florida Division

13   of Elections:

14   ALVIN F. LINDSAY, III, ESQ.

15   Steel, Hector & Davis, LLP

16   200 South Biscayne Boulevard

17   41st Floor

18   Miami, FL 33131-2398

19   (305) 577-2934

20

21

22

23

24

25

---

PAGE 3

3

1   APPEARANCES OF COUNSEL CONTINUED:

2

3   On behalf of Fred Dickinson, Executive Director, Florida

4   Department of Highway Safety and Motor Vehicles, and

5   Kathleen Kearney, Secretary of the Florida Department of

6   Children and Families:

7   DENIS DEAN, ESQ.

8   Assistant Attorney General

9   Department of Legal Affairs

10   PL-01, The Capitol

11   Tallahassee, FL  32399-1050

12   (850) 414-3662

13

14   On behalf of Miami-Dade County Supervisor of Elections

15   David Leahy:

16   SUSAN TORRES, ESQ.  (via telephone)

17   Assistant County Attorney

18   Dade County Attorney's Office

19   Metro Dade Center

20   111 NW 1st Street, Suite 2810

21   Miami, FL  33128

22   (305) 375-5151

23

24

25

---

PAGE 4

4

1   APPEARANCES OF COUNSEL CONTINUED:

2

3   On behalf of ChoicePoint, Inc., d/b/a Database

4   Technologies, Inc.:

5   DANIEL A. RESTREPO, ESQ.

6   Williams & Connolly, LLP

7   725 12th Street, NW

8   Washington, DC  20005

9   (202) 434-5000

10

11   On behalf of Orange County Supervisor of Elections William

12   Cowles:

13   MICHAEL CIRULLO, JR., ESQ.  (via telephone)

14   Josias, Goren, Cherof, Doody & Ezrol, P.A.

15   3099 East Commercial Boulevard, Suite 200

16   Ft. Lauderdale, FL  33308-4311

17   (954) 771-4500

18

19   On behalf of People for the American Way:

20   ALMA HENDERSON, ESQ.  (via telephone)

21   People for the American Way

22   2000 M Street, NW

23   Suite 400

24   Washington, DC  20036

25   (202) 467-4999

5

1    APPEARANCES OF COUNSEL CONTINUED:

2

3    On behalf of Hillsborough County Supervisor of Elections

4    Pam Iorio:

5    KENNETH A. TINKLER, ESQ.  (via telephone)

6    Assistant County Attorney

7    Hillsborough County Attorney's Office

8    601 East Kennedy Boulevard, 27th floor

9    Tampa, FL  33602

10    (813) 272-5670

11

12    On behalf of Volusia County Supervisor of Elections

13    Deanie Lowe:

14    DANIEL D. ECKERT, ESQ.  (via telephone)

15    Volusia County Attorney's Office

16    123 West Indiana Avenue

17    Deland, FL  32720-4613

18    (386) 736-5950

19

20

21

22

23

24

25

6

1            INDEX TO WITNESS

2    EDWARD C. KAST                    PAGE

3      Examination by Ms. Hodgkiss          09

4      Examination by Mr. Restrepo          46

5      Further Examination by Ms. Hodgkiss     47

6

7

8            INDEX TO EXHIBITS

9    NO.                        PAGE

10    1                          09

11    2                          38

12    3                          42

13    4                          44

14    5                          45

15    6                          65

16

17

18

19

20

21

22

23

24

25

7

1            D E P O S I T I O N

2        MS. HODGKISS:  This is Anita Hodgkiss, and I'll

3    let everyone tell you who's here.

4        MR. RESTREPO:  Dan Restrepo.

5        MR. DEAN:  Denis Dean.

6        MR. LINDSAY:  Alvin Lindsay.

7        MR. KAST:  Ed Kast.

8        MS. HODGKISS:  Can those of you on the phone let

9    us know who you are?

10        MS. FINEMAN:  Cara Fineman.

11        MS. TORRES:  Susan Torres for Supervisor Leahy.

12        MR. TINKLER:  Ken Tinkler for Supervisor Iorio.

13        MR. ECKERT:  This is Daniel Eckert for Deanie

14    Lowe, Supervisor of Elections for Volusia County.

15        MS. HODGKISS:  Maybe we should start by putting

16    on the record our -- what I believe is agreed

17    procedure this morning that this witness has been

18    designated as a 30(b)(6) witness, and so we'll start

19    the deposition with his testimony regarding the

20    matters that he's been identified as having the

21    ability to answer under that notice, and then we'll

22    take -- we'll give everyone, apparently, a chance to

23    ask their questions and then break and begin with the

24    questions relating to this witness's designation as an

25    expert witness.

8

1        MR. LINDSAY:  Correct, and just to clarify, on

2    the 30(b)(6) notices dated May 16th to the Director

3    and Secretary --

4        MR. LINDSAY:  Can I make that -- I would like to

5    make that an exhibit to the deposition just so that we

6    have in the record what we requested.

7        MR. LINDSAY:  I have no objection.  I have no

8    objection.  Let me just note that we have here Mr.

9    Kast, and he is -- Mr. Ed Kast is going to be

10    responsive to a portion of number 1 regarding list

11    maintenance.

12        Now, it says "list maintenance including use of

13    central voter file."  He is not the central voter file

14    30(b)(6) designee, that will be Mr. Clay Roberts, but

15    he does have knowledge and can speak to list

16    maintenance pursuant to the NVRA.

17        In addition, he will speak to category 2,

18    National Voter Registration Act compliance; category

19    number 4, voter registration and registration

20    processing; and category number 6, relationship

21    between the Secretary of State and Division of

22    Elections, and the A, Supervisors of Elections; B,

23    Department of Highway Safety and Motor Vehicles; and

24    C, the Department of Children and Families.

25        And after we -- again, I believe as you stated,

9

1   Ms. Hodgkiss, after we are concluded with his 30(b)(6)
2   deposition, we've agreed to make Mr. Kast available to
3   testify about the opinion testimony that we have
4   designated that he may offer in this action, and that
5   will be done as a separate proceeding.
6       Thank you.  You may proceed.
7   Whereupon,
8           EDWARD C. KAST
9   was called as a witness, having been first duly sworn to
10  speak the truth, the whole truth, and nothing but the
11  truth, was examined and testified as follows:
12          EXAMINATION
13  BY MS. HODGKISS:
14      Q   Now that you're under oath, would you state your
15  full name, please?
16      A   Edward C. Kast.
17      Q   Mr. Kast, how are you employed?
18      A   I'm employed by the Department of State as the
19  Assistant Director for the Division of Elections.
20          MS. HODGKISS:  Could you mark this as Exhibit 1,
21  please?
22          (Whereupon, Exhibit No. 1 was marked for
23  identification.)
24  BY MS. HODGKISS:
25      Q   I'm handing you what's been marked as Exhibit 1.

10

1   Have you seen that document before today, before now?
2       A   Yes.
3       Q   And have you had a chance to review the matters
4   listed on the second page, items 1 through 7?
5       A   Yes.
6       Q   You just heard counsel outline the areas in which
7   you are being offered as a designee of Defendant Katherine
8   Harris.  Are you willing to testify on her behalf in those
9   areas?
10      A   With respect to those areas, yes.
11          MR. LINDSAY:  Those areas that I discussed
12  earlier are not all the areas that are listed in
13  Exhibit 1.
14          MS. HODGKISS:  Correct.  I understand.
15  BY MS. HODGKISS:
16      Q   Okay.  How long have you worked for the Division
17  of Elections?
18      A   I started work for the Division of Elections in
19  1994, October of 1994.
20      Q   What was your position when you first started?
21      A   When I first started, I was an Administrative
22  Assistant II working for the Legal Section, for one of the
23  attorneys.
24      Q   And what were your duties as an administrative
25  assistant to working for one of the attorneys?

11

1       A   To assist the attorney in the Legal Section
2   primarily on the implementation of the National Voter
3   Registration Act and responsibilities in the state.
4       Q   Can you describe for me what your activities were
5   in assisting the attorney?
6       A   It was administrative in nature in that I
7   gathered -- compiled data, if you will, from the counties
8   on a monthly basis and provided coordination for the
9   responsibilities of the Department of State under NVRA.
10      Q   And how long were you in that position as an
11  Administrative Assistant II?
12      A   Well, the position -- I was promoted out of the
13  position sometime the latter part of '95 or '96, I'm not
14  sure exactly when it was.
15      Q   And what position were you promoted to?
16      A   It's -- it was called an Operational Management
17  Consultant II.  Actually, it was -- it was a budget
18  specialist position that converted to an operational -- it
19  was the same position, it was just upgraded.
20      Q   What were your duties as an operation management
21  consultant?
22      A   As the consultant, I was -- assisted the Director
23  and Assistant Director and Division staff members on a
24  variety of things to include the budget -- performance-
25  based budgeting that the State uses, again administering

12

1   and coordinating the National Voter Registration Act
2   responsibilities for the State.
3       Q   What activities generally did you perform in the
4   duty of administering NVRA activities for the State?
5       A   We, under our responsibilities, provide training
6   to the agencies and to the Supervisors of Elections of
7   their responsibilities to be filled for NVRA and coordinate
8   the State's responsibilities.
9       Q   How long did you have that position?
10      A   I was in that position for the most part until
11  June of 2000.
12      Q   And what position did you take in June of 2000?
13      A   I was promoted to the Assistant Division
14  Director.
15      Q   What are your duties as Assistant Division
16  Director?
17      A   I assist the Director in the overall
18  administration of the Division; again, coordinate our
19  responsibilities under NVRA with staff members; provide
20  just general administration of the Division itself,
21  personnel, budget and things of that nature.
22      Q   Going back to 1994, when you were compiling data
23  from the Supervisors' offices, what kind of data were you
24  compiling about them?
25      A   Well, at that particular time, we were just

13

1  building how we were going to compile the data that would
2  be required by the Federal Elections Commission under NVRA.
3      Q   Did you have -- when you were an Operations
4  Management Consultant II and you were providing training to
5  agencies, training to Supervisors and coordinating the
6  State's NVRA responsibilities, were there other employees
7  of the Division who either assisted you with those
8  responsibilities or had additional responsibilities
9  relating to that?
10     A   Well, I had -- during the time that I was the
11  OMC-II, there were -- I had staff members that, or
12  subordinates that I was the supervisor of that provided
13  assistance to me in providing, just helping me compile
14  whatever I needed to do.
15     Q   And how many assistants did you have during that
16  period?
17     A   Off and on, one to two.
18     Q   Did they also assist you with your other
19  responsibilities relating to budget and budget planning?
20     A   Not so much budget.
21     Q   So you had one to two staff persons who -- did
22  they have any responsibilities other than assisting you
23  with the administration of the State's NVRA
24  responsibilities?
25     A   Yes, there were other assigned duties to them.

---

14

1      Q   What other duties?
2      A   Well, for example, one of the individuals that
3  helped me was a receptionist as far as telephones were
4  concerned, directing all the telephone calls.
5          MR. LINDSAY:  Just let her finish her question
6      before you --
7  BY MS. HODGKISS:
8      Q   And what other duties did your staff have outside
9  of the area of administering the NVRA?
10     A   For example, they would assist in the gathering
11  of the book-closing figures during an election cycle,
12  making copies of different things and assisting in just
13  general administrative procedures.
14     Q   In your position as Assistant Division Director,
15  in your responsibility to assist with the overall
16  administration of the Division, how many different types of
17  major functions does the Division carry out?
18         MR. LINDSAY:  How many major types?
19  BY MS. HODGKISS:
20     Q   I'm sorry.  For example, I'm just trying to get
21  an understanding of, obviously the Division is
22  administering the NVRA, but what else does the Division do,
23  what else does the Division of Elections do?
24     A   We have three bureaus.  We have the Bureau of
25  Voting Systems, the Bureau of Election Records and the

---

15

1  Bureau of Administrative Laws and Code.
2      Q   And, Mr. Kast, I apologize that I didn't say
3  earlier, have you had your deposition taken before?
4      A   No.
5      Q   I should have explained.  First let me say if at
6  any point you want to take a break, please just let me
7  know.
8      A   Okay.
9      Q   And in addition, if I ask any question that's not
10  clear to you, please let me know --
11     A   Sure.
12     Q   -- and I'll try to clarify it for you.
13     A   Okay.
14     Q   That's important.
15         Going back to the three main responsibilities or
16  -- that you outlined, that the Division of Elections
17  carries out, do you assist in the administration of all
18  three of those functions?
19     A   I am the supervisor of the bureau chiefs.  The
20  bureau chiefs are responsible for their bureaus.
21     Q   How many people overall are under your
22  supervision?
23     A   The three bureau chiefs are under my direct
24  supervision, and with one budget person, for a total of
25  four.

---

16

1      Q   Do you have any support staff that you directly
2  supervise?
3      A   We have an executive assistant, but the
4  supervisor for that assistant is Clay Roberts.  We share
5  her.
6      Q   And are there three bureau chiefs?
7      A   Yes.
8      Q   Are there any other assistant division --
9  assistant -- I'm sorry, your title is Assistant Division
10  Director?
11     A   That's correct.
12     Q   Are there any other Assistant Division Directors?
13     A   No.
14     Q   Okay.  And who's your immediate supervisor?
15     A   The Division Director, Clay Roberts.
16     Q   How much of your time, say, on a monthly basis
17  would you estimate you spend in the performance of your
18  responsibilities relating to the administration of the
19  NVRA?
20     A   I'm not real sure I could put a number to that
21  because it's the elections -- the elections operations is
22  cyclic, it would depend if we're in an election cycle.
23  Answering questions of the public and the Supervisors and
24  things like that would increase, so I don't know that I
25  could actually put a hard number to that.

17

1      Q  Well, can we divide it up, then, and say in the
2  part of the cycle where there's a lot of NVRA-related
3  activity, does it consume 90 percent of your time, 50
4  percent of your time, can you give us an estimate?
5      A  I could tell you it's less than 50 percent, but
6  again, it's kind of hard-pressed, I mean, it may be a day
7  that we get a question or two, and then, you know, we may
8  go a day or two with no questions or no requirement. And
9  it depends on whether we're in a training cycle or
10  something like that.
11      Q  At the point in time when you're not in a
12  training cycle, not in an election cycle, it's not the busy
13  period in terms of getting calls, can you estimate what
14  percentage of your time is involved in administering the
15  NVRA requirements for the State?
16      A  I mean, administration of the NVRA is kind of on
17  a continuous basis in that because we do provide
18  coordination and ensure uniform training, and so there's
19  something going on all the time, you know, we're updating
20  training or answering questions from the public, but it's
21  just hard to put a number on that.
22      Q  Okay. But would it be fair to say that it would
23  be not as much of your time as those responsibilities take
24  during a period of increased activity, whether it's
25  training --

18

1      UNIDENTIFIED SPEAKER: (Unintelligible.)
2  BY MS. HODGKISS:
3      Q  -- or election activity?
4      MR. LINDSAY: I couldn't make out what the lady
5  said on the phone, but I'm going to object to the form
6  of that question.
7      MS. HODGKISS: Let me repeat the question.
8  BY MS. HODGKISS:
9      Q  My question is -- I was asking you to estimate
10  what percentage of your time roughly you spend on NVRA-
11  related responsibilities at a time when you're not involved
12  in training and you're not getting a lot of calls for
13  assistance.
14      MR. LINDSAY: And that's been asked and answered.
15      MS. HODGKISS: No. No, excuse me, counsel, but
16  he answered the question during a peak period how much
17  time does he spend. I'm now asking him at the other
18  end of the spectrum.
19  BY MS. HODGKISS:
20      Q  When there are not a lot of demands relating to
21  NVRA, how much time did you spend, and you said it was hard
22  to estimate. My question now is, is it true that it's less
23  of your time than during a peak period. That's my
24  question.
25      MR. LINDSAY: Object to the form.

19

1  BY MS. HODGKISS:
2      Q  You can answer the question.
3      A  Yes, it would be less.
4      Q  Okay, thank you.
5      Is it your understanding that the -- as part of
6  the State's responsibilities in implementing the NVRA, the
7  State is to designate a chief state election official
8  responsible for coordinating the NVRA activities?
9      A  Yes.
10      Q  And who in Florida is the chief state elections
11  official?
12      A  In the Florida statute it's designated as the
13  Secretary of State.
14      Q  Do you work with the Secretary of State in your
15  work administering the NVRA?
16      A  You mean do I work with her directly?
17      Q  Yes.
18      A  Not normally. As I said, my immediate supervisor
19  is the Division Director.
20      Q  Is there anyone in the Division of Elections who
21  has full-time responsibilities for coordinating statewide
22  the State's activities in implementing the NVRA?
23      MR. LINDSAY: Object to the form.
24  BY MS. HODGKISS:
25      Q  Do you understand the question?

20

1      A  Well, I'm not sure if you're asking if that's my
2  responsibility or not.
3      Q  No. I'll restate the question.
4      Is there anyone -- is there any employee of the
5  Division of Elections whose full-time responsibilities,
6  they have no other job duties, their full-time
7  responsibility is to coordinate the State's NVRA
8  responsibilities?
9      A  We have an NVRA administrator whose primary role
10  is to coordinate the State's responsibilities, and that was
11  the position I held until promoted to Assistant Director
12  under the OMC-II. That's their primary responsibility, but
13  they have other duties just like everyone else in the
14  Division.
15      Q  And who is currently holding that position?
16      A  Currently it's Donna Miller.
17      Q  Do you have any supervisory role with regard to
18  Donna Miller?
19      A  Not direct supervision. I supervise her bureau
20  chief, and as the Assistant Director, I've got some
21  supervisory responsibilities or authority.
22      Q  Do you work directly with Donna Miller?
23      A  I have on NVRA because of the fact that she's
24  newly assigned.
25      Q  When was she assigned to this position?

21

1    A   I'm not sure of the date that she was assigned.
2    Q   Roughly, was it this year, last year?
3    A   I think she was assigned the summertime of last
4    year.
5    Q   Now, correct me if I'm wrong, but you left that
6    position as Operation Management Consultant II in June of
7    2000?
8    A   That's correct.
9    Q   Who was in that position between June of 2000 and
10   summer of last year?
11   A   That would be Martha Bohannon.
12   Q   Did she also have other responsibilities in
13   addition to her responsibility to coordinate statewide the
14   NVRA?
15   A   Martha didn't really coordinate statewide
16   responsibilities.  That was kind of something I kept as the
17   Assistant Director.
18   Q   Can you just explain, then, the process by which
19   Donna Miller has been newly assigned and begun to take on
20   some of those responsibilities?
21       MR. LINDSAY:  Object to the form.
22       Go ahead.
23       THE WITNESS:  As I got more into my job as the
24   Assistant Director, I found that my times were being
25   split in much more areas, and we had a position

22

1    available and we provided the job description that
2    would include the National Voter Registration Act.
3        And in hiring her, I've worked directly with
4    Donna on what the State's responsibilities are.
5    BY MS. HODGKISS:
6    Q   Okay.  What are the major responsibilities that
7    you have in relationship to administering the NVRA?
8        MR. LINDSAY:  Can I just ask for a
9    clarification --
10       MS. HODGKISS:  Yes.
11       MR. LINDSAY:  -- as to the term "you"?  The State
12   or Mr. Kast?
13       MS. HODGKISS:  I'm sorry, I'm asking specifically
14   about Mr. Kast.
15       THE WITNESS:  Providing coordination on the
16   responsibility of the State's -- or coordination on
17   the State's responsibilities of NVRA, providing
18   training to state agencies and Supervisors of
19   Elections, providing the statewide voter registration
20   application and providing the information required by
21   the Federal Elections Commission on an every-other-
22   year basis for reporting the information on NVRA.
23   BY MS. HODGKISS:
24   Q   And what are Donna Miller's responsibilities?
25   A   She shares those same responsibilities with me as

23

1    she's -- we're kind of in a training session, if you will.
2    As she grows along and goes, she will pick those up in a
3    more thorough manner.
4    Q   Which state agencies do you provide training to?
5    A   The agencies identified as responsible for NVRA.
6    There's several of them.  We provide training to all of
7    them, but -- or -- am I understanding you want like a list
8    of the agencies?
9    Q   Yes.
10   A   Department of Highway Safety, Children and
11   Families, Elder Affairs, Department of Health, Division of
12   Blind Services under the Department of Education I believe
13   they still are, and then portions of the Department of
14   Labor and Employment Security.  To the best of my
15   knowledge, that's all of them.  There may be others.
16   Q   When you -- what is your role, you, Mr. Kast, in
17   the training process?
18   A   Now, currently?
19   Q   Yes, yes.
20   A   Well, based on my past experiences of NVRA and
21   everything else and in the training process of Donna, I
22   have provided the training to the agencies, primarily it's
23   coordinating with the Supervisors of Elections at a
24   training site and, you know, the logistics of it is worked
25   out, as well as myself and several of us, we'll go over the

24

1    training material to make sure it's in compliance.
2    Q   Do you actually attend any of the training
3    sessions yourself?
4    A   Yes, I attend and, you know, have conducted it.
5    Q   Okay.  I believe you said earlier that you also
6    provide training to the Supervisors of Elections?
7    A   That's correct.
8    Q   And again, I just ask what your role is in that
9    training program.
10   A   The same thing, plus having conducted the
11   training.  We've been training under NVRA since 1994.
12   Q   Do you have a regular schedule that you provide
13   training to the state agencies?
14   A   You mean an actual set schedule?
15   Q   Right.
16   A   No, but we try to provide that on like an every-
17   other-year basis or if there's a change to the laws.
18   Q   And do you have a different training session for
19   each agency?
20   A   No, it's all combined.
21   Q   Do members of -- or employees of the various
22   agencies come to the same training session, or --
23   A   Our training session is -- it's a uniform
24   training session that covers all the agencies and the
25   Supervisors of Elections' responsibilities under NVRA.

25

1    Q   I see.  So do the Supervisors of Elections also
2  come to the same training program?
3    A   They do.
4    Q   There's not a separate --
5    A   We provide them with some separate training at
6  different workshops of those areas that the agencies have
7  no responsibilities in.
8    Q   Okay.  In addition to the activities that you've
9  outlined, do you have any -- do you have any responsibility
10  for monitoring how the state agencies implement their
11  responsibilities under the NVRA?
12    A   No, because we have no statutory authority for
13  oversight of NVRA.  Our responsibilities are coordination.
14    Q   Do you assist -- in your role as a coordinator,
15  do you assist the state agencies in developing ways that
16  they can monitor how well they are implementing NVRA?
17    A   If the question were asked, we would assist them
18  in coordinating what their responsibilities were under NVRA
19  so that they could develop that.  Again, the Department of
20  State has no statutory authority over them to direct how
21  they handle their responsibilities.
22    Q   Of course.  In your role as training, the fact
23  that you don't have -- in your training role, the fact that
24  you don't have statutory authority over them I presume does
25  not prevent you from providing training to them?

26

1    A   We provide them training on their
2  responsibilities of NVRA.  It's kind of a uniform training
3  to the specifics of NVRA of, again, what their requirements
4  under NVRA are.
5    Q   Well, is there anything in the way that your
6  statutory responsibilities are laid out that would prevent
7  you from providing them training in how they might monitor
8  their activities?
9    A   The only thing that prevents us from doing that
10  is the fact that we don't have the statutory authority over
11  those agencies.
12    Q   Right, but understand, I'm not asking you do you
13  actually monitor them, but is there anything in the -- or
14  let me ask it this way:  Can you be more specific about how
15  the fact that you don't have statutory -- you say statutory
16  authority over that agency.  How does that prevent you from
17  providing them training on ways in which they could monitor
18  how well they're implementing the NVRA?
19    A   We do that by providing the uniform training of
20  their requirements in a uniform manner of what their
21  requirements of responsibilities are of NVRA and meeting
22  those requirements.
23    Q   Has any state agency raised with you the question
24  of how can we monitor the extent to which we're complying
25  with our responsibilities under the NVRA?

27

1    A   Not to my knowledge.
2    Q   Now, among the agencies that you listed, can you
3  identify for me which agencies in your experience register
4  or receive the most voter registration applications, state
5  agencies, now?
6    A   Department of Highway Safety.
7    Q   And is there any agency that comes close to
8  equaling that Department in terms of the number of voter
9  registration applications they receive?
10    A   There's no agency, but applications received via
11  the mail are probably the second highest.
12    Q   Do you work -- have you worked directly with the
13  Department of Highway Safety and Motor Vehicles in their
14  administering of their responsibilities under the NVRA?
15    A   By providing them the training about what their
16  responsibilities are.
17    Q   Right.  In addition to training, do you speak --
18  do you ever have occasion to work with their managers in
19  developing the business processes that they would follow to
20  carry out their responsibilities?
21    A   We coordinate -- each agency has their own voter
22  registration coordinator, and we coordinate with that
23  coordinator their responsibilities under NVRA.  Their
24  internal procedures are a responsibility of the agency of
25  which we don't have any authority over.

28

1    Q   I understand that you don't have any authority,
2  but do you offer them any suggestions or advice as to how
3  they might best design their processes?
4    A   Only to the extent of what their requirements are
5  under NVRA.
6    Q   Can you outline for me generally what the -- what
7  the state agencies' requirements are under the NVRA?
8    A   You mean to -- as far as voter registration
9  offered to individuals?
10    Q   Just anything that comes under the National Voter
11  Registration Act.
12    A   Well, the agencies are responsible for offering
13  voter registration assistance to the individuals that come
14  in their office, or clients, for lack of a better term.
15  They're responsible overall for, upon their application for
16  services, their renewal of services or request for change
17  of address, with those services the agencies are
18  responsible to provide a voter registration declamation
19  statement for the individual to decide whether they want to
20  apply to register to vote or not, or make the changes
21  appropriate to their voter registration.
22      We identify their responsibilities in providing
23  the voter registration application and ensuring that the
24  applications are provided to the Supervisor of Elections in
25  the county in which the office is located, and there are --

29

1   there's several other pieces in there that just kind of
2   slip right now, but there are other responsibilities they
3   have.
4      Q   But these are the major responsibilities that
5   they have?
6      A   Yes.
7         MR. LINDSAY:  Object to the form.  It calls for a
8   legal conclusion.
9         MS. HODGKISS:  Well, I'm asking this witness in
10   his capacity as coordinating the State's
11   responsibilities under the NVRA.
12   BY MS. HODGKISS:
13      Q   I'm only trying to find out if there are any
14   other major responsibilities that state agencies have to
15   carry out beyond the ones that you've identified.
16      A   I don't know if you would call them major or not.
17   I mean, there are other responsibilities that they have.
18   Those are the ones that just come to mind right now.
19      Q   What are the other responsibilities that you're
20   referring to?
21      A   Well, I mean, they have the responsibility of --
22   through the declamation form of ensuring that an individual
23   knows that their decision not to register to vote or to
24   register to vote has no bearing on their receiving
25   services.  And there's other -- just things like that that

30

1   come along.
2      Q   Going back to the first responsibility that you
3   outlined, that they must offer voter registration
4   assistance, what specifically do you train agencies they
5   need to do in order to provide that assistance?
6      A   Oh, we explain to them that there's primarily
7   three different places they must offer the voter the
8   opportunity to apply to register to vote, and that's on the
9   person's initial request for services, their renewal of
10   those services or if they come in for change of address of
11   those services.  We also tell them they must provide the
12   same level of assistance to them that they would provide in
13   their normal operation or day-to-day handling of that
14   individual.
15         Again, as I said, they offer the declamation form
16   that is to be provided for the individual to decide whether
17   they want to register to vote or if they want to make those
18   changes to their application or if they decide not to.
19      Q   If an individual declines, what's the agencies'
20   responsibility with regard to that declamation statement?
21      A   With regard to the declamation form?
22      Q   Correct.
23      A   It's maintained at the agency for two years.
24      Q   And in providing the -- giving the completed
25   voter registration applications to the Supervisor of

31

1   Elections, what are the specifics of the agencies'
2   responsibilities in that regard?
3      A   If I understand your question, you're asking what
4   the agency does as far as when they get the application
5   turned in to them?
6      Q   I'm asking what do you train agencies are the
7   details of their requirements in terms of providing the
8   application?  In other words, are there time limits within
9   which they must provide it, are there methods they have to
10   use to get it over there, that kind of thing, the mechanics
11   of it?
12      A   We do.  We identify to them that Florida statute
13   requires that they forward the applications to the
14   Supervisor of Elections in the county in which their office
15   is located within five days.
16      Q   In your responsibilities as administering the
17   State's compliance with the NVRA, have you ever had
18   occasion to consider whether it would be possible to have
19   those voter registration applications provided to the
20   Supervisor of Elections' offices in an electronic format?
21         MR. LINDSAY:  I'm sorry, would you read back the
22   question, please?
23         (Whereupon, the court reporter read the pending
24   question.)
25         MR. LINDSAY:  Okay.

32

1         THE WITNESS:  To my knowledge, that hasn't been
2   considered.  One of the statutory requirements is that
3   we have a signature on the application, and I don't
4   know that the agencies -- nor am I aware if agencies
5   have the capability of providing that to the
6   Supervisors of Elections.  That's not an area of my
7   expertise when it comes to electronics and computers.
8   BY MS. HODGKISS:
9      Q   What are the responsibilities of the Supervisors
10   of Elections with regard to the implementation of the NVRA?
11      A   Well, the Supervisors of Elections are
12   responsible for -- as elected constitutional officers are
13   responsible for the elections within their county and the
14   entire voter registration function within their county, to
15   include maintaining voter rolls and -- as well as
16   registering individuals and maintaining the entire
17   electoral process.
18      Q   When you -- you discussed earlier the way in
19   which the Supervisors of Elections' offices receive
20   training from your office, and as I understand, they do
21   come to the general training that you have, but you also
22   have additional information that you provide them relating
23   to their specific duties that the state agencies don't
24   have.  Do you provide -- is that correct?
25      A   That's correct.

33

1    Q   Do you provide that specific training to
2  Supervisors of Elections with any written materials?
3    A   Other than providing them copies of the
4  requirements under the statute, you know, at times there's
5  probably been handouts that we've given them.  I'm not real
6  sure.  I have not been the only provider of training in
7  that area.
8    Q   And basically I was just asking -- or let me just
9  be clear.  Then as far as you know, there's not a manual or
10  a -- that -- there's not a manual that you provide to the
11  Supervisors of Elections relating to their responsibilities
12  under the NVRA?
13    A   We provide copies of the Florida Election Code.
14    Q   Do you provide the Supervisors of Elections any
15  training with regard to list maintenance functions?
16    A   We have, yes.
17    Q   Are there any -- and what -- how would you define
18  list maintenance?
19    MR. LINDSAY:  Object to the form.
20    MS. HODGKISS:  Do you understand -- is the
21  question -- I'm sorry, what's the problem with the
22  form of the question?
23    MR. LINDSAY:  It's vague, calls for a legal
24  conclusion.
25  /////

34

1  BY MS. HODGKISS:
2    Q   Well, Mr. Kast, when I say list maintenance, does
3  that term have any meaning for you?
4    A   I mean, list maintenance is a -- I'm not sure the
5  right term is procedure, but is a procedure by what
6  Supervisors of Elections are responsible for at the county
7  level.
8    Q   Okay.  I'm only trying to make sure that we're
9  talking about the same thing.
10    When a Supervisor of Elections engages in a list
11  maintenance activity, what are they doing?
12    MR. LINDSAY:  Object to the form; calls for
13  speculation.
14    MS. TORRES:  Susan Torres, and I join the
15  objection.
16  BY MS. HODGKISS:
17    Q   Well, I'll rephrase the question then.  And I
18  believe I asked -- I know that I asked you do you provide
19  the Supervisor of Elections with training in list
20  maintenance activities, and my recollection is you said
21  yes.  Is that --
22    A   We have in the past, yes.
23    Q   Yes.  What training -- what do you instruct the
24  Supervisors of Elections when you provide them training in
25  list maintenance activities?

35

1    A   We provide them uniform training on their
2  responsibilities under NVRA and the Florida statutes.
3    Q   And with regard to list maintenance, what are
4  their responsibilities?
5    MS. TORRES:  Object to form; Susan Torres.
6    MR. LINDSAY:  Same objection.
7  BY MS. HODGKISS:
8    Q   You provide training to the Supervisors of
9  Elections on list maintenance activities?
10    A   We have in the past, yes.
11    Q   And you just said that you instruct them on what
12  their responsibilities are.  What instruction do you
13  provide them on what their responsibilities are?
14    A   Those requirements as listed in the statute on
15  list -- maintaining the integrity of the voter roll.
16    Q   What do you train them regarding what they need
17  to do to maintain the integrity of the voter roll?
18    A   The responsibilities as outlined in the statutes.
19  I'm not sure what you're looking for, I apologize, I just
20  -- I mean, we just provide them the training as it's
21  outlined in the statute of -- that they're responsible for
22  list maintenance, and again, I'm not sure what you're
23  asking.
24    Q   I'm asking, can you explain any additional
25  details regarding what you train the Supervisors to do when

36

1  they're engaging in list maintenance activities to comply
2  with the NVRA?
3    A   Their responsibilities as far as time frames that
4  list maintenance activities are taking place, their
5  responsibilities as far as notification to the individuals,
6  who can be removed from rolls, things of that nature.
7    Q   Okay.  Do you have -- and I just want to be clear
8  because sometimes these -- this seems to me sometimes, or
9  at least in my mind, I will apologize if this is
10  idiosyncratic, but sometimes the notions of list
11  maintenance and the central voter files seem to overlap,
12  but do you have any responsibilities at all with regard to
13  the central voter file?
14    A   Not really.  That comes out of the Bureau of
15  Voting Systems, and they run the voter file.
16    Q   With regard to voter registration and
17  registration processing, do you have any -- or what are
18  your responsibilities relating to registration processing?
19    A   Registration processing is actually done in the
20  counties.  The only other processing is at the state
21  agencies where they offer the opportunity for an individual
22  to apply to register to vote, and our responsibilities are
23  in the training of those agencies on their responsibilities
24  of NVRA.
25    Q   In addition to providing training, are there any

37

1   other ways in which you work with state agencies in
2   implementing the NVRA?
3       A   Yes.  We act as the coordinator on the State's
4   responsibilities of NVRA by -- we have -- we provide the
5   statewide voter registration application to all the
6   agencies.  We have provided them posters to inform their
7   clients or public that they can register to vote in those
8   agencies, and if there's -- if a question arises, or a
9   problem, we coordinate that to the agency, or at least
10  forward that over to the agency for their resolution.
11      Q   And when you say there's a problem, can you
12  explain that?
13      A   Well, if there's a question or if there's -- if
14  someone were to call one of the -- say the Supervisor were
15  to call and want to talk about a particular field office,
16  we would forward that and coordinate with the agency
17  involved so that the Supervisor's information would flow
18  over to them and get a resolution.
19      Q   Can you give me any examples of that type of
20  process occurring since the time that you've -- since June
21  of 2000 when you've been the Assistant Division Director?
22      MR. LINDSAY:  Object to form.  Go ahead.
23      THE WITNESS:  I'm not sure as far as June of
24  2000.  There was at one time a problem with the
25  printers in Highway Safety, and as it was identified

38

1   to us, we identified it to Highway Safety and they
2   resolved the problem, they fixed it.
3   BY MS. HODGKISS:
4       Q   How did -- do you know how they fixed the
5   problem?
6       A   I'm not exactly aware of all the intricacies,
7   other than the fact that I know they went out and bought
8   new printers.  The printers they originally had started in
9   '94 or '95 upon the implementation, so they were old and
10  they replaced the printers.
11      Q   Do you ever receive phone calls or requests for
12  assistance from members of the public?
13      A   Yes, we answer phone calls and e-mails and things
14  about questions on voter registration.
15      MS. HODGKISS:  Can you mark this as Kast Exhibit
16  No. 2, please?
17      (Whereupon, Exhibit No. 2 was marked for
18  identification.)
19      MS. HODGKISS:  For those of you on the phone, I'm
20  requesting that an exhibit with Bates stamp -- it's a
21  one-page exhibit, Bates stamp No. A027389, be marked
22  as Kast Exhibit No. 2.
23      MR. LINDSAY:  Okay.  I --
24      MS. HODGKISS:  I'd just like to ask the witness
25  about the document.

39

1       MR. LINDSAY:  Go ahead.  I would just note for
2   the record that this is a document apparently
3   regarding central voter files, but go ahead.
4   BY MS. HODGKISS:
5       Q   Have you had a chance to briefly -- or have you
6   had an opportunity to look at what has been marked as Kast
7   Exhibit No. 2?
8       A   Right now, yes, just for this second.
9       Q   Do you know what that document is?
10      MR. LINDSAY:  Why don't you take your time to
11  read it?
12      THE WITNESS:  (Examining document.)
13      MR. LINDSAY:  Are you ready?
14      THE WITNESS:  (Nods in the affirmative.)
15      MR. LINDSAY:  Okay.  Go ahead.
16  BY MS. HODGKISS:
17      Q   You've read that?
18      A   As the title indicates, it's "General Outline for
19  Central Voter File List Maintenance."
20      Q   And do you have any role with regard to any of
21  the responsibilities outlined there?
22      A   I'm sorry, could you --
23      Q   Well, I guess I'm trying to understand, do you do
24  anything related to the processes that are out there in
25  your role as Assistant Division Director?

40

1       A   No.  This is the responsibility of the Bureau of
2   Voting Systems under the current central voter registration
3   database.  This is actually an outline of the central voter
4   file of an older system.
5       MR. LINDSAY:  I'm sorry, I don't mean to be
6   difficult, but let me interject, this is a one-page
7   document, it is marked page number 1, there's a page
8   number at the bottom.  Also at the bottom it appears
9   to be the beginning of an outlined section that is not
10  finished.  There also appears to be a staple photocopy
11  at the top.  This is one page, and there may be other
12  pages, and for the record, we're dealing with this
13  first page of whatever this document is.
14      I'm sorry.  Thank you.
15      MS. HODGKISS:  Well, I think I stated earlier
16  that I have a one-page document.
17  BY MS. HODGKISS:
18      Q   I just want to be clear then, in your
19  responsibility as coordinating the state's implementation
20  of its responsibilities under the NVRA, do you have any
21  role whatsoever in working with Supervisors of Elections
22  with regard to their list maintenance activities?
23      A   Other than providing the uniform training of
24  their responsibilities of NVRA, list maintenance activities
25  are the responsibility of the Supervisor of Elections, the

41

1  elected constitutional officer of the county.
2      Q   Okay. I think I asked earlier whether you were
3  involved at all with the central voter file and the
4  development of that central voter file, and I don't want to
5  misstate what you said, but am I correct that your answer
6  was no?
7      A   As far as the development of the central voter
8  file, absolutely I do not. The only involvement that I
9  have of central voter file would be administrative in
10  nature, not the workings or the dealings of it. It's a
11  technical aspect that's handled by the Bureau of Voting
12  Systems.
13      Q   And when you say the administration of that file,
14  what do you mean by that?
15      A   If we needed to purchase something for the
16  central voter file, you know, some server or database or
17  something of that nature, I would be the -- between myself
18  and the budget person would be the one to approve the
19  requisition for it.
20      Q   I see. Did you have any dealings with Database
21  Technologies as they perform their contract with the State?
22      MR. LINDSAY: Again, I'm going to object. This
23  goes beyond the scope of the 30(b)(6) deposition.
24  We're talking about the central voter file, which we
25  said at the beginning is one area of list maintenance

42

1  that this is not our designee on. I'll let you answer
2  that question, but --
3      THE WITNESS: I'm sorry, what was the question?
4  BY MS. HODGKISS:
5      Q   The question was did you have any, did you work
6  with Database Technologies as they carried out their
7  contract.
8      A   Did I work directly? No, I did not work with
9  Database Technologies directly.
10      MS. HODGKISS: Okay. Can I have this marked as
11  Kast Exhibit No. 3, please?
12      (Whereupon, Exhibit 3 was marked for
13  identification.)
14      MS. HODGKISS: This is -- for those of you on the
15  phone, I have marked a one-page document that is Bates
16  stamp number 004921 as Kast Exhibit No. 3.
17  BY MS. HODGKISS:
18      Q   And, Mr. Kast, I want to hand that to you and ask
19  you to take a look at that.
20      MR. LINDSAY: And again, I'm going to assert the
21  same objection. This is about -- the central voter
22  file is not something that Mr. Kast is a 30(b)(6)
23  designee to discuss. I think I've been gracious in
24  allowing some preliminary, perhaps some background
25  questions, but I'm not going to let it continue. I

43

1  will terminate the deposition if it turns into a
2  central voter file inquiry, because we have somebody
3  else designated for that.
4      MS. HODGKISS: I understand that, counsel, but
5  your witness has testified that he has no
6  responsibilities in carrying out the NVRA, he has no
7  responsibility with regard to the central voter file.
8  I would now like to ask him regarding documents that I
9  think relate to that testimony, and I'm entitled to
10  ask that.
11      MR. LINDSAY: And that's an incorrect
12  characterization of his testimony. He said his
13  background was administration only and he said he
14  didn't work directly with DBT.
15      But be that as it may, that might be background,
16  but I'm not going to permit inquiry regarding central
17  voter file. It is not -- this is a 30(b)(6)
18  deposition, and he's not a 30(b)(6) designee on that
19  subject.
20      MS. HODGKISS: Counsel, I think you need to let
21  me ask my question before you object. I'm not asking
22  him about the operation of central voter file. I'm
23  showing him a document and I'll ask him a question
24  regarding that document.
25      MR. RESTREPO: You handed me the wrong thing.

44

1      MS. HODGKISS: I know, and I'm sorry, counselor.
2      MR. RESTREPO: Okay. Let me scratch this out. I
3  have now written on this, sorry, because I thought it
4  was a copy. That's not the memo that's in front of
5  him.
6      MS. HODGKISS: You're correct.
7  BY MS. HODGKISS:
8      Q   Mr. Kast, would you please read the Bates stamp
9  number at the bottom of the document that's marked as Kast
10  Exhibit No. 3?
11      MR. LINDSAY: The Bates number, yeah.
12      THE WITNESS: B004921.
13      MR. RESTREPO: Thanks.
14  BY MS. HODGKISS:
15      Q   And my question is, can you identify that
16  document?
17      A   Yes. It's a memo to the Supervisors of Elections
18  that I sent, obviously, on June 9, 2000.
19      MS. HODGKISS: I would ask that a one-page
20  document, Bates stamp number 004437, be marked as Kast
21  Deposition Exhibit No. 4.
22      (Whereupon, Exhibit 4 was marked for
23  identification.)
24  BY MS. HODGKISS:
25      Q   Mr. Kast, I'm handing you what's been marked as

45

1    Kast Exhibit No. 4. Would you please read that document
2    and let me know whether you can identify it?
3        A   This is a -- it's a memo addressed to me which --
4    from the Office of Executive Clemency.
5        Q   Did you receive that memo?
6        A   Well, yes, I did, actually. However, it wasn't
7    -- it really shouldn't have been addressed to me.
8        MS. HODGKISS: I would ask that a document --
9    one-page document, Bates stamp number B004932, be
10   marked as Kast Exhibit No. 5.
11       (Whereupon, Exhibit 5 was marked for
12   identification.)
13   BY MS. HODGKISS:
14       Q   Okay. I'm handing you what's been marked as Kast
15   Exhibit No. 5. Would you take a moment to read that
16   document, please?
17       A   (Examining document.)
18       MR. LINDSAY: Are you done?
19       THE WITNESS: This is a memo to the Supervisor of
20   Elections sent out by me on June 14, 2000.
21   BY MS. HODGKISS:
22       Q   Okay, thank you.
23       MS. HODGKISS: Those are all the questions I have
24   on the designation of Mr. Kast as a 30(b)(6) witness.
25       MR. DEAN: I don't have any questions.

46

1        MR. RESTREPO: I have one question.
2            EXAMINATION
3    BY MR. RESTREPO:
4        Q   Mr. Kast, again, my name is Dan Restrepo. I
5    represent ChoicePoint, DBT. You may have already answered
6    this question, and my apologies if you have.
7        Do you have responsibilities in the office of the
8    Division of Elections other than those related to the NVRA?
9        A   Yes.
10       Q   Thank you.
11       MR. LINDSAY: I have nothing.
12       MS. HODGKISS: Does anyone on the phone have any
13   questions?
14       MR. TINKLER: No questions from Hillsborough.
15       MR. ECKERT: Volusia has no questions.
16       MS. FINEMAN: Cara Fineman, I have no questions.
17       MS. HODGKISS: Why don't we take -- if it's all
18   right with all of you, I'd like to take a ten-minute
19   break and reconvene at 10:30.
20       MR. LINDSAY: That's fine.
21       (Brief recess.)
22       MS. HODGKISS: Okay. We're back on the record,
23   if everyone is ready, and we're now going to begin the
24   part of the deposition that relates to Mr. Kast's
25   expert testimony.

47

1            FURTHER EXAMINATION
2    BY MS. HODGKISS:
3        Q   Mr. Kast, what opinions have you formed in this
4    matter?
5        A   Pertaining to what?
6        Q   Well, that's what I'm asking you. What -- you've
7    been designated as a witness who may provide opinion
8    testimony, and I'm just asking what opinions have you
9    formed in this case that you will testify -- well, what
10   opinions have you formed in this case?
11       MR. LINDSAY: Object to the form.
12       THE WITNESS: I'm still not sure what you're
13   looking for.
14   BY MS. HODGKISS:
15       Q   Have you done any -- well, let me start back
16   here.
17       Did you review any documents to prepare for your
18   deposition today?
19       A   Yes.
20       Q   What did you review?
21       A   I reviewed various letters or memos and our
22   training materials, other documents that were found in the
23   Division and provided to the depositor.
24       Q   Which letters and memos did you review?
25       A   There were several of them. I don't remember

48

1    exactly specific ones other than, like I said, just memos
2    or items dealing with NVRA.
3        Q   Would it be possible for you to make a list of
4    what letters and memos you reviewed in preparation for this
5    deposition?
6        A   Make a list now?
7        Q   No, no.
8        MR. LINDSAY: The question is is it possible for
9    you to do that.
10       THE WITNESS: Well, I could go back through those
11   items that I've reviewed.
12   BY MS. HODGKISS:
13       Q   Okay. What training materials did you review?
14       A   The uniform training program that we use for
15   agencies and Supervisors of Elections.
16       Q   Does that -- we've -- as I'm sure you understand,
17   we have so many documents with so many different dates, is
18   there any possibility that you recall roughly what date
19   those -- the particular uniform training program materials
20   that you reviewed, what date is on that document?
21       A   No, because it was actually -- there's two
22   different copies of the training material, one when I was
23   the administrator of the NVRA and then the new one that
24   Donna has been working on.
25       Q   And which copy did you review?

49

1    A   I've looked at them both.

2    Q   And have both of them been provided to counsel?

3    A   I would say yes.

4    Q   Okay.  And then you said in addition to training

5  materials, you looked at other documents?

6    A   Yes.

7    Q   What other documents?

8    A   Just different memos, staff meeting notes.

9        MS. HODGKISS:  Counsel, I'm going to request that

10   you provide us with a list -- I understand that he

11   can't recollect at this point, but he's testified that

12   he can -- it's possible for him to go back and

13   reconstruct the list of what he's reviewed for his

14   deposition today.

15       MR. LINDSAY:  I object to providing that.  I

16   mean, he testified what he reviewed, he has testified

17   to the best of his ability what he's reviewed, we

18   produced to you the documents.

19       MS. HODGKISS:  He's not --

20       MR. LINDSAY:  We're not under any obligation in

21   deposition format to do anything further than that.

22       MS. HODGKISS:  Oh, counsel, the summary of his

23   expert testimony did not in any way identify the

24   documents that he relied on in coming to any of the

25   opinions that he plans to express in this case.  We're

50

1  entitled to know, if he's going to give expert

2  testimony, what materials he's relying on to form

3  those opinions.

4        MR. LINDSAY:  I think you're taking a little leap

5  here, because you asked him what documents did he

6  review to prepare for his deposition and he answered

7  truthfully.  You have not yet asked him what documents

8  he relied on in coming up with his expert opinions.

9        We still do not know what expert opinions, we

10   have not gone through the list we provided you stating

11   which opinions he made, what opinion testimony he may

12   offer, and I notice that there is no duces tecum

13   attachment to the 30(b)(6) notice, so we will be

14   pleased to comply with our obligations of discovery

15   pursuant to the federal rules.  Other than that, we

16   must respectfully object.

17       You may proceed.

18       MS. HODGKISS:  Well, counsel, all I'm asking you

19   to do is comply with the Rules of Civil Procedure.

20  BY MS. HODGKISS:

21   Q   Mr. Kast, the documents that you reviewed prior

22  to your deposition, are those documents that you relied

23  upon in coming to the opinions that you have in this case,

24  or any of them?

25   A   My opinion would probably be more based on the

51

1  NVRA and the Florida statutes and the uniform -- the way

2  that we've provided training and the implementation of it.

3    Q   So is it your testimony that the two uniform

4  training manuals are not, you did not rely on those in

5  coming to your opinions about the training?

6        MR. LINDSAY:  Object to the form.

7  BY MS. HODGKISS:

8    Q   Go ahead.  You can answer.

9    A   No, they're a part of that, as I said, the

10   uniform training that we provided to agencies and

11   Supervisors of Elections.

12   Q   Okay.  I'll ask you again, then, what opinions

13   have you formed in this matter?

14       MR. LINDSAY:  Object to the form.

15       THE WITNESS:  That the Division of Elections is

16   in compliance with the NVRA.

17  BY MS. HODGKISS:

18   Q   Okay, and what did you do in order to reach that

19   opinion?

20   A   I've reviewed the Florida statutes and the

21   National Voter Registration Act, our responsibilities.

22   Q   Are there any other opinions that you have formed

23  regarding this -- the subject matter of this litigation?

24       MR. LINDSAY:  Again, I'm going to object to the

25   form.  We've provided you with a list of several areas

52

1  that he may offer opinion testimony, if you want to

2  ask him about those lists.

3        MS. HODGKISS:  But, counsel, I'm just asking him

4  what opinions he has formed.  There's nothing

5  inappropriate about that question.

6        MR. LINDSAY:  And I'm not saying there's anything

7  inappropriate other than this is a big lawsuit, he's

8  not a lawyer, he's not -- you ask him what his

9  opinions are in connection with this case, calls for a

10   legal conclusion as to what this case is, to some

11   extent.  So if you want to ask him, go ahead and ask

12   him what you want, but I'm going to object to form as

13   overbroad and vague and overly burdensome and calls

14   for a narrative.

15       MS. HODGKISS:  But none of those are objections

16   to the form of the question.

17       MR. LINDSAY:  They all are, but that's all right.

18   I've made my objection and I'll remain silent.  You

19   can proceed.

20  BY MS. HODGKISS:

21   Q   Mr. Kast, were you asked to review any particular

22  subject matters in connection with this case?

23       MR. LINDSAY:  Object to the extent that invades

24   the attorney-client privilege.

25       MS. HODGKISS:  Well, you're offering him as an

53

1    expert witness. I'm entitled to know what you asked
2    him to do, what you asked him to provide opinions on.
3       MR. LINDSAY: We've set forth that he may offer
4    opinion testimony.
5       MS. HODGKISS: You certainly haven't set forth
6    what those opinions are. I'm simply asking him what
7    opinions has he formed in connection with the matters
8    you've asked him to form opinions on in this case.
9       MR. LINDSAY: We have --
10      MS. HODGKISS: I don't want to talk to you. I
11   want to depose the witness.
12      MR. LINDSAY: But to say we haven't set forth
13   what those opinions are, we've given you a whole list
14   of areas that he may offer expert testimony in.
15      MS. HODGKISS: You've identified subject areas;
16   you have not asked what the opinions are, and I'm
17   asking the witness what opinions -- I really want to
18   know what you have been asked to express opinions on
19   in this case.
20      MR. LINDSAY: Same objection.
21      MS. HODGKISS: We're entitled to know that.
22  BY MS. HODGKISS:
23     Q  I'd ask you to answer the question.
24     A  The opinions I've formulated are on the
25  Division's compliance with the National Voter Registration

54

1  Act and the Division's compliance with its responsibilities
2  under NVRA to both state agencies and Supervisors of
3  Elections and in the area of education to the public in the
4  administration of the NVRA.
5     Q  And what is your opinion -- let's take those one
6  by one.
7      MS. HODGKISS: If you could read back his answer
8  for me? Thank you.
9      MR. LINDSAY: And I'll join in that request.
10     (Whereupon, the court reporter read the requested
11  portion of the record.)
12  BY MS. HODGKISS:
13     Q  Are there any other areas in which you have
14  formed opinions?
15      MR. LINDSAY: Object to the form.
16  BY MS. HODGKISS:
17     Q  You can answer the question.
18     A  Those compliance with our statutory mandates, say
19  with the interaction between the Division and agencies and
20  Supervisor of Elections; again, the requirement of training
21  programs for agencies and Supervisors of Elections.
22     Q  Okay. Let me go back, then, to the first area
23  that you identified, the Division's compliance with the
24  NVRA.
25     What is your opinion regarding the Division's

55

1  compliance with the NVRA?
2     A  That the Division is in compliance with NVRA.
3     Q  What's the basis for that opinion?
4     A  The Division provides coordination and uniform
5  training to state agencies, the Supervisors of Elections,
6  provides for the statewide voter registration application
7  and coordination on the State's responsibilities of NVRA as
8  well as its responsibilities in reporting to the Federal
9  Elections Commission.
10     Q  What materials did you rely upon to reach that
11  conclusion?
12     A  The NVRA itself, and the Florida statutes.
13     Q  Anything else?
14     A  Not that I recall.
15     Q  Did you undertake any review or examination of
16  the Division of Elections specifically and only for the
17  purpose of formulating your opinion in this case on this
18  particular -- the opinion you just expressed?
19     A  I'm sorry, I don't understand the question.
20     Q  I'm asking you with regard to the opinion you
21  just expressed, did you conduct any reviews, examinations
22  or studies of the Division's operations?
23     A  Just the reviews, if you will, of our compliance
24  with the Division's responsibilities under NVRA and in
25  providing coordination for state responsibilities and in

56

1  providing the uniform training to the agencies and to the
2  Supervisors of Elections, and the actual training materials
3  that we use.
4     Q  And did you undertake that review specifically
5  for the purpose of coming to your opinion, the opinion you
6  just expressed?
7     A  I don't know that I would say I did it
8  specifically for my opinion to express. I have reviewed it
9  more as a refresher for my own memory. It's been my
10  opinion all along that the Division is in compliance with
11  NVRA.
12     Q  Let's -- I would like to go to the second area
13  that you identified.
14     You said the Division's compliance with its
15  responsibilities under the NVRA to state agencies and
16  Supervisors of Election. What opinion do you have with
17  regard to those matters?
18     A  That the Division is in compliance with those
19  responsibilities.
20     Q  And what's the basis for that opinion?
21     A  Because the Division -- or the Division complies
22  with its responsibilities by providing the training for
23  Supervisors of Elections and the uniform training for
24  agencies of their responsibilities under NVRA, and that the
25  Division complies by providing the voter -- standard voter

57

1    registration application form to the agencies and the

2    Supervisors.

3       Q  And is there any -- are there any materials that

4    you relied upon to come to that opinion?

5       A  Again, the NVRA and the state statutes and the

6    review of the training material.

7       Q  Is there any data that you reviewed in coming to

8    that opinion?

9       A  No.

10       Q  Okay.  Let's go to the third area that you

11    identified, the education of the public, I believe.  Can

12    you tell me what opinions -- I assume you're talking about

13    the Division's responsibility to provide education to the

14    public?

15       A  In that we do provide information and education

16    to the public, yes, on voter registration.

17       Q  Okay.  And what's your opinion about the

18    education that you provide to the public on voter

19    registration?

20       A  That we do provide it and it's informative.

21       Q  And did you rely on any material -- well, let me

22    ask you this way:  What's the basis for that opinion?

23       A  The basis is the information that we supply to

24    the public in general and the ways and the means in which

25    we do it.

58

1       Q  Can you identify for me what information you're

2    referring to?

3       A  Yes.  The Division on an ongoing basis provides

4    -- we have provided billboards all across the state that

5    identify a toll-free number that we have that individuals

6    can report voter fraud; we provide a voter registration

7    guide that identifies when the elections are going to be

8    held, what offices are up for election, when you have to be

9    registered, provides information on absentee ballots, gives

10    you the names and addresses and phone numbers of all the

11    Supervisors of Elections; we provide on our Web site voter

12    information registration as well as on our Web site we

13    provide a place where you can complete the voter

14    registration application for us to mail back to you; we

15    have provided posters to agencies so that the public would

16    know that that's a place that they can register to vote; we

17    provide posters to the Supervisors of Elections to place in

18    their polling places that inform the individuals of

19    Florida's primary procedures of voter fraud information and

20    instructions to voters; we've just recently contracted with

21    the Florida News Network, I think it's called, Florida

22    radio network on getting information out about the new

23    voting systems that may be in the counties and encouraging

24    them to contact their Supervisors of Elections to find out

25    what kind of voting system they have in their county, to

59

1    find out if they're registered, if they need to change

2    their registration and see where their precincts are.

3       And there may be some other things in there that

4    I can't recall off the top of my head.

5       Q  The voter registration guide and the information

6    regarding absentee ballots, how do those materials get to

7    the public?

8       A  We distribute them upon request from, like a

9    private organization, if they call and say, hey, we want to

10    do a voter education thing, we'll give them as many copies

11    as they want.  We also provide them to the Supervisors of

12    Elections for them to put them out around their counties.

13       Q  And does any of this informational material

14    include information about how a voter's name might be

15    removed from the voter registration rolls?

16       A  To the best of my knowledge, I don't think so.

17    The voter guide might, but I'm not sure.

18       Q  And what materials did you rely upon in coming to

19    this opinion?

20       A  That same information that I just gave you, the

21    posters that we provide and everything.

22       Q  Was there anything else that you reviewed in

23    connection with this area?

24       A  There may be something else that we're providing

25    that I'm just -- I can't think of at this point in time.

60

1    I'm not sure whether I mentioned the universal primary

2    poster that we provide that's placed in the polls.  If I

3    didn't, that may be one of the other ones, and there may be

4    some other ones.

5       Q  The next area I believe you identified, and

6    please correct me if I'm wrong, but in the administration

7    of the NVRA, you provide -- and I'm sorry I don't have this

8    writing as well as I can -- you provide information to the

9    public, but you also provide information to the state

10    agencies and the Supervisors of Elections?

11       A  As that's part of our responsibilities in the

12    administration, we provide the uniform training to the

13    agencies and the Supervisors of Elections.  We provide them

14    the voter registration application, statewide voter

15    registration application and --

16       Q  Do you also --

17       A  -- coordinate the State's responsibilities of the

18    NVRA.

19       Q  Do you also provide them with a declaration form?

20       A  We prescribe the form and have provided it to

21    them.

22       Q  And are the state agencies trained by you that

23    they are required under the NVRA to provide those

24    declaration forms to the people they serve?

25       A  Yes.

61

1    Q   What's your opinion regarding the administration
2  and coordination of the State's NVRA activities?
3    A   That the State is in compliance, at least the
4  Division of Elections is.
5    Q   And what's the basis for that opinion?
6    A   Based on the Florida statutes and the NVRA and
7  the training that we provide to the agencies and the
8  Supervisors of Elections.
9    Q   And were there any materials that you reviewed in
10  coming to that opinion?
11    A   The Florida statutes, the Voter Registration Act
12  and the training program or guide that we use.
13    Q   Now, you also identified as an area interaction
14  between the agencies and the Division.  What's your opinion
15  regarding that?
16    A   The interaction between the agencies and the
17  Division is that we comply with the NVRA through our
18  coordination under the State's responsibilities of NVRA.
19    Q   Okay.  And what's the basis for that opinion?
20    A   The requirements of the Florida statutes and the
21  NVRA.
22    Q   Okay.  In coming to your opinion regarding the
23  interaction between the agencies and the Division, did you
24  review any materials?
25    A   The Florida statutes and the National Voter

62

1  Registration Act and the training materials that we use.
2    Q   I have also as an area that you identified the
3  requirement of training programs for agencies and
4  Supervisors of Elections.  Have we already covered that?
5    A   We provide training to the Supervisors of
6  Elections and to the agencies on the requirements of NVRA
7  and Florida statutes.
8    Q   Have you formed -- or what opinions have you
9  formed regarding the training that you provide?
10    A   That the training is in compliance with the NVRA
11  and the Florida statutes.
12    Q   Okay.  And what's the basis for that opinion?
13    A   The review of the NVRA, the Florida statutes and
14  reviewing the training.
15    Q   Were there any materials that you reviewed or
16  relied upon in coming to that conclusion?
17    A   The Florida statutes, the NVRA, the training
18  guide -- or not training guide, the training Power Point
19  program, which, as I recall now, when you were asking about
20  like the billboards and everything --
21    Q   Yes.
22    A   -- the training Power Point that we use for
23  agencies is also on our Web site for any agency to go and
24  look at it in between when we're doing formal training
25  classes.

63

1    Q   I see.  Okay.  Are there any other -- or I should
2  ask it this way:  Are there any other opinions that you
3  have formed regarding the areas that you have identified
4  that you have not told me about?
5    MR. LINDSAY:  Object to the form.
6    THE WITNESS:  Not at this point that I recall,
7    other than part of the education as far as the public
8    is a -- we provide on -- kind of on request speakers
9    to organizations on voter registration.  I don't know
10    whether you'd consider that a different area or not.
11  BY MS. HODGKISS:
12    Q   The speakers that you provide, that's part of
13    your -- the education of the public?
14    A   Yes.
15    Q   Okay.  I'm looking at a document provided by
16  counsel and it states that you intend -- it states the
17  subject matter of your expert testimony would include
18  election administration?
19    A   As it pertains to NVRA.
20    Q   Are there any opinions that you have formed
21  concerning election administration as it pertains to the
22  NVRA?
23    A   Yes, that we're in compliance with the State's
24  responsibilities of administering the NVRA.
25    Q   And that's the -- that's the same as the first

64

1  opinion that you -- we discussed?
2    A   It's to provide the training to the agencies and
3  to the Supervisors of Elections, provide the statewide
4  voter registration database to coordinate the State's
5  responsibilities, but in addition to that, it's to provide
6  every two years to the Federal Election Commission the
7  reporting requirements of the Federal Election Commission
8  by the State.
9    Q   Are there any materials that form the basis of
10  that opinion that you have not already identified?
11    A   Not to my knowledge.
12    Q   Do you have any opinions regarding the impact of
13  the Florida Election Reform Act and administrative
14  rulemaking on voter registration -- I can read that again,
15  I'm sorry.
16    Any opinions regarding the impact of the Florida
17  Election Reform Act and administrative rulemaking on voter
18  registration?
19    A   The -- I'm sorry, the impact of the Florida --
20  what was that again?  I'm sorry.
21    Q   Sure.  Impact of the Florida Election Reform Act
22  and administrative rulemaking on voter registration,
23  training and administration -- oh, I should have read the
24  whole sentence.  I do apologize.  Let me read the whole
25  sentence to you.

65

1       Impact of the Florida Election Reform Act and
2   administrative rulemaking on voter, registration, training
3   and administration of elections.
4       A   To the best of my knowledge, what I recall,
5   that's a 1994 paper or something that was actually put out
6   -- I'm not sure whether it was put out before I was
7   employed or not, but as far as an opinion on it, no, I
8   haven't reviewed it.
9       MS. HODGKISS:  Okay.  I have a two-page document
10  that I would like to have marked as Kast Exhibit 6.
11      (Whereupon, Exhibit No. 6 was marked for
12  identification.)
13      MS. HODGKISS:  For those of you on the phone,
14  I've marked a two-page document that was provided as
15  Exhibit 3 to the -- I'm sorry, let me find my pleading
16  that was attached to -- to the -- I believe it's
17  Hillsborough County and Katherine Harris's Designation
18  of Expert Witnesses, but I'll let the witness identify
19  for you what the document is.
20  BY MS. HODGKISS:
21      Q   I'm handing you what's been marked as Kast
22  Exhibit No. 6.  Can you tell me what that document is?
23      A   Yes.  It's my resume.
24      Q   Okay.  Is that an accurate resume as of today?
25      A   Without sounding sarcastic, unless you know

66

1   something I don't know, yes.
2       Q   Okay, very good.  Can I just -- so I can read
3   it.  That's great.
4       Q   Prior to your work with the Division of
5   Elections, you worked for the Department of Environmental
6   Protection in the Bureau of General Services?
7       A   That's correct.
8       Q   What -- I guess I want to ask this way:  Did your
9   responsibilities in that position relate at all to the NVRA
10  or -- well, to the NVRA?
11      A   No.
12      Q   Did it relate at all to election administration?
13      A   No.
14      Q   Then prior to that, and I want to make sure I can
15  read the resume correctly, it says that you were in the
16  United States Air Force.  Was that July 1969 to May 1990?
17      A   (Nods in the affirmative.)
18      MR. LINDSAY:  Is that a yes?
19      THE WITNESS:  Yes.  I'm sorry.  Yes, 21 years
20  roughly.
21  BY MS. HODGKISS:
22      Q   Wow.  In that -- and it says you had various
23  assignments throughout the world.  In that work, did you
24  have any involvement with armed services voting?
25      A   Other than my own voting, no.

67

1       Q   And your educational experience, again I just
2   want to make sure I can read the dates here, you attended
3   the Community College of the Air Force in 1986?
4       A   Yes.
5       Q   Okay.  And the degree that you obtained there,
6   logistics management, did that -- would the information
7   that you -- or what you learned in obtaining that degree
8   relate in any way to your current duties as Assistant
9   Division Director?
10      A   Well, if I can explain in this way, logistics
11  management is the military degree and it's probably
12  equivalent to business management, so, yes, in a roundabout
13  way, I guess.  I'm not trying to be vague, but --
14      Q   Sure.
15      A   -- it's just because the degree in the Air Force
16  is obviously geared to the Air Force, but it's equivalent
17  to like a business management associates degree.
18      Q   Are there any -- to your knowledge, are there any
19  professional journals that are devoted to administration of
20  a state's responsibilities under the NVRA?
21      A   You mean are there journals that are devoted
22  solely to responsibilities?
23      Q   Correct.
24      A   Not to my knowledge.
25      Q   Are there any professional journals or regular

68

1   publications that, at least in part, have articles or
2   discussions regarding a state's compliance with the NVRA?
3       A   I have read, and it's been years, but I've read
4   some articles that have to do with NVRA, not a specific
5   state's compliance to it.
6       Q   And I'm sorry, I didn't mean a specific state's,
7   I meant general articles about best practices that states
8   might follow.
9       A   Not that I recall, no.
10      Q   Do you know if there are any recognized
11  authorities in the area of -- general area, not any
12  particular state --
13      A   Sure.
14      Q   -- but the general area of how to comply -- how a
15  state can comply with the NVRA?
16      A   Not that I recall.
17      Q   Okay.  Have you written any articles that relate
18  in any way to the subject matter of the opinions that you
19  have just reviewed?
20      A   I developed the training -- uniform training
21  guide that -- or presentation that the State uses to train
22  agencies and Supervisors of Elections.
23      Q   Okay.  Any other written -- any other written
24  materials that you've produced?
25      A   That I've produced?

69

1    Q   Yes.

2    A   No.

3    Q   Okay.  Have you published any articles relating

4    to any of the subject areas that we discussed?

5    A   No.

6    Q   Have you been following any of the election

7    reform bills that are currently pending in Congress?

8    A   To a slight extent.

9    Q   Do you have any sense of how that might affect

10   Florida's activities under the NVRA?

11       MR. LINDSAY:  Object to the form.

12   BY MS. HODGKISS:

13   Q   Whether, let me ask it this way:  Do you have any

14   opinion about whether those bills would affect Florida's

15   activities under the NVRA?

16   A   Not at this point in time.

17   Q   Now have you ever testified as an expert witness?

18   A   Ever?

19   Q   Yes.

20   A   No.

21       MS. HODGKISS:  If you give me just one moment.

22       MR. LINDSAY:  Take your time.

23       (Brief pause.)

24   BY MS. HODGKISS:

25   Q   Just one more question.

70

1        In the course of the carrying out your

2    responsibilities for the State relating to the NVRA -- and

3    so I'm talking not only about your current position, but in

4    the position you had immediately prior to this one where I

5    believe you testified you had a responsibility for

6    coordinating the State's activities, during that time, were

7    there any workshops or training programs that you attended

8    not as a trainer, but as a trainee where you were learning

9    about the State's administration of the NVRA?

10   A   I have attended training in Houston, and I can't

11   remember what the date was, but it was more on election, it

12   wasn't specifically on NVRA.  NVRA was part of it, but it

13   was a broader base of elections.

14   Q   And when was that, roughly?

15   A   It was shortly after being selected as the

16   Assistant Director, so it was sometime in the summer, I

17   think, of 2000.

18   Q   And --

19   A   I'm not sure exactly of the time frame.

20   Q   That's close enough.  Do you recall who sponsored

21   or conducted the training?

22   A   An organization called The Elections Center.

23   Q   And how -- was it a week-long program or a day

24   and a half, how long was it?

25   A   I don't think it was a full week.  I think it was

71

1    more like three or four days.

2    Q   Okay, I have no further questions.  Thank you.

3        MR. RESTREPO:  I have no questions.

4        MR. DEAN:  No questions.

5        MR. LINDSAY:  I don't think I have any, but can

6    we take a break for three or four minutes?

7        MS. HODGKISS:  Does anybody on the phone have

8    questions?

9        MS. TORRES:  Susan Torres, I have no questions.

10       MR. TINKLER:  This is Ken Tinkler, no questions.

11       MS. FINEMAN:  Cara Fineman, no questions.

12       MR. LINDSAY:  Can I have four minutes?

13       (Brief recess.)

14       MR. LINDSAY:  I have nothing further.

15       MS. HODGKISS:  Okay.  Thank you.

16       (Whereupon, the deposition was concluded at

17   11:25 a.m., and reading and signing by the witness was not

18   waived.)

19

20

21

22

23

24

25

72

1        C E R T I F I C A T E

2    STATE OF FLORIDA  )

3    COUNTY OF LEON    )

4        I, MARLO D. FARNSWORTH, Certified Shorthand

5    Reporter and Notary Public at Tallahassee, Florida, hereby

6    certify that the witness in the foregoing transcript was

7    first duly sworn, having identified himself to me;

8        That the foregoing transcript was taken down as

9    stated in the caption, and the questions and answers

10   thereto were reduced to typewriting under my direction;

11       That the foregoing pages 7 through 71 represent a

12   true, correct, and complete transcript of the evidence

13   given upon said hearing;

14       And I further certify that I am not of kin or

15   counsel to the parties in the case; am not in the regular

16   employ of counsel for any of said parties; nor am I in

17   anywise interested in the result of said case.

18       Dated this _____ day of _____, 2002.

19

20       _____

21       MARLO D. FARNSWORTH

22       Court Reporter and Notary Public

23       State of Florida at Large

24

25

73



1       C O R R E C T I O N S

2    Corrections to the deposition of EDWARD C. KAST, taken in
     the case of NAACP, et al., vs. Harris, et al., Case No.
3    01-0120-Civ-Gold, taken on May 21, 2002.

4    Page-Line                  Correction

5

6

7

8

9

10

11

12

13

14

15

16

17   ————————      ——————————————————
     Date              Signature
18

19              AS TO SIGNATURE ONLY

20          IN WITNESS WHEREOF, I have set my hand and affixed

21   my seal this _____ day of _____, 2002;

22   said instrument was acknowledged before me by EDWARD C.

23   KAST, who is personally known or identified himself to me.

24

25              ——————————————————
                Notary Public

# TAB 18

1                    IN THE UNITED STATES DISTRICT COURT

2                       SOUTHERN DISTRICT OF FLORIDA

3    _____

4

     NATIONAL ASSOCIATION FOR THE ADVANCEMENT          )
5    OF COLORED PEOPLE, INC., by its FLORIDA STATE      )
     CONFERENCE OF BRANCHES, et al.,                    )
6                                                       )
                                 Plaintiffs,            )
7                                                       ) No.
                    vs.                                 ) 01-120-CIV
8                                                       )
     KATHERINE HARRIS, Secretary of State of Florida,   )
9    et al.,                                            )
                                                        )
10                               Defendants.            )

11   _____

12

13            VIDEOTAPED DEPOSITION OF GARY E. McINTOSH
                            June 4, 2002
14                        Seattle, Washington

15

16

17

18

19

20

21

22            BYERS & ANDERSON - COURT REPORTERS & VIDEO
        2208 North 30th Street            One Union Square
23           Suite 202                  600 University Street
        Tacoma, WA  98403-3351               Suite 2300
24        (253) 627-6401             Seattle, WA  98101-4112
          Fax: (253) 383-4884               (206) 340-1316
25                         1 (800) 649-2034
                     scheduling@byersanderson.com

Byers Anderson Beach - Court Reporters & Video

**APPEARANCES**

For the Lawyers' Committee for Civil Rights
Under Law:

    Cara J. Fineman
    Lori Outzs Borgen (telephonically)
    Lawyers' Committee for Civil
    Rights Under Law
    1401 New York Avenue NW, Suite 400
    Washington, D.C.  20005
    (202) 662-8600
    (202) 783-5130 Fax
    cfineman@lawyerscomm.org

For Secretary of State Katherine Harris and the
Director of the Division of Elections L.
Clayton Roberts:

    Alvin F. Lindsay, III
    Steel Hector Davis
    200 South Biscayne Boulevard
    Miami, Florida  33131-2398
    (305) 577-7000
    (305) 577-7001 Fax
    afl@steelhector.com

For Fred Dickinson and Kathleen Kearney:

    Douglas B. MacInnes
    Assistant Attorney General
    PL-01 The Capitol
    Tallahassee, Florida  32399-1050
    (850) 414-3300
    (850) 488-4872 Fax
    Douglas_MacInnes@oag.state.fl.us

For Duval County Supervisor of Elections John
Stafford:

    Tracy I. Arpen, Jr. (Telephonically)
    Office of General Counsel
    City of Jacksonville
    117 W. Duval Street, Suite 480
    Jacksonville, Florida  32202-3700

2

Gary E. McIntosh, 6/4/02 - Appearances

---

Byers Anderson Beach - Court Reporters & Video

**APPEARANCES**

For Miami-Dade County Supervisor of Elections
David C. Leahy:

    Susan Torres (Telephonically)
    Assistant County Attorney
    Miami-Dade County Attorney's Office
    111 N.W. 1st Street, Suite 2810
    Miami, Florida  33128

For Deanie Lowe, Volusia County Supervisor:

    William Bosch (Telephonically)
    Volusia County Attorney's Office
    123 W. Indiana Avenue
    DeLand, Florida  32720-4613

For Choicepoint, Inc./DBT:

    Daniel Restrepo (Telephonically)
    Williams & Connolly, LLP
    725 12th Street N.W.
    Washington, D.C.  20005

For Hillsborough County Election Supervisor
Pam Iorio:

    Ken Tinkler (Telephonically)
    Hillsborough County Attorneys Office
    601 E. Kennedy Boulevard, 27th Floor
    Tampa, Florida  33602

For Orange County Election Supervisor William
Cowles:

    Michael Cirullo (Telephonically)
    Goren Cherof Doody & Ezrol
    3099 E. Commercial Boulevard
    Suite 200
    Fort Lauderdale, Florida  33308

Also Present:

    Stefani Nichols
    Videographer, Byers & Anderson
    Court Reporters & Video

3

Gary E. McIntosh, 6/4/02 - Appearances

---

Byers Anderson Beach - Court Reporters & Video

**EXAMINATION INDEX**

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Lindsay | 7, 202 |
| Mr. MacInnes | 110 |
| Ms. Fineman | 197, 205 |

**EXHIBIT INDEX**

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | 5-page Notice of Deposition of Gary McIntosh. | 7 |
| 2 | 14-page e-mail with attachment to Cara Fineman from Gary McIntosh dated April 25, 2002 Subject: Florida Expert Witness Report of Gary McIntosh A042282 - A042282. | 7 |
| 3 | 16-page Expert Witness Report of Gary McIntosh. | 7 |
| 4 | 169-page composite exhibits beginning with Plaintiff's First Set of Interrogatories and Document Requests to Defendant Fred Dickinson. | 7 |
| 5 | 3-page Web page printout from The Detroit News Complaints over Elections commonplace around country. | 109 |
| 6 | 2-page Web page printout from ABCnews.com Broken System? | 109 |
| 7 | 4-page Testimony of Gary McIntosh before the Committee on Governmental Affairs United States Senate dated Thursday, May 3, 2001. | 109 |

4

Gary E. McIntosh, 6/4/02 - Exhibit Index

---

Byers Anderson Beach - Court Reporters & Video

**EXHIBIT INDEX**

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 8 | 1-page memo to Operational Program Administrators from Carol Canaday dated January 8, 2002. | 109 |
| 9 | 1-page e-mail string to Greg Ferguson from Norene Moore dated 8/29/2001. | 145 |
| 10 | 5-page letter to Gary E. McIntosh from Cara Fineman dated April 15, 2002 A042264 - A042266 A042262 - A042263. | 205 |

5

Gary E. McIntosh, 6/4/02 - Exhibit Index

Byers Anderson Beach - Court Reporters & Video

1  BE IT REMEMBERED that on Tuesday,
2  June 4, 2002, at Hilton Hotel, Seattle, Washington, at
3  11:00 a.m., before Shauna L. Beach, CCR, RDR, CRR,
4  Notary Public in and for the State of Washington,
5  appeared GARY E. McINTOSH, the witness herein;
6  WHEREUPON, the following proceedings
7  were had, to wit:
8
9  <<<<<<  >>>>>>
10
11  THE VIDEOGRAPHER:  Good morning.  We
12  are now on the record.  My name is Stefani Nichols, the
13  videographer for Byers & Anderson Court Reporters &
14  Video.  We are located at 2208 North 30th Street, Suite
15  202, Tacoma, Washington, 98403.  Our telephone number is
16  (800) 649-2034.
17  Today is Tuesday, June 4th, 2002, and the time is
18  now 11:00 a.m. This is the videotaped deposition of
19  Gary McIntosh being taken on behalf of the defendant in
20  the case of NAACP vs Harris, et al., Southern District
21  of Florida.  The Cause No. is 01-120-CIV-GOLD/SIMONTON.
22  This deposition is being held at the Hilton Hotel, 17620
23  International Boulevard, SeaTac, Washington.
24  Will the attorneys please introduce themselves for
25  the record.

6

Gary E. McIntosh, 6/4/02

Byers Anderson Beach - Court Reporters & Video

1  MR. LINDSAY:  Good morning.  This is
2  Alvin Lindsay on behalf of the Secretary and Director.
3  MR. MacINNES:  This is Doug MacInnes
4  on behalf of the Florida Department of Highway Safety
5  and Motor Vehicles and the Florida Department of
6  Children and Families.
7  MS. FINEMAN:  Cara Fineman on behalf
8  of the plaintiffs.
9  MR. LINDSAY:  Would you swear in the
10  witness, please, madam court reporter.
11  THE VIDEOGRAPHER:  Our reporter
12  today is Shauna Beach.
13  (Exhibit Nos. 1-4 marked
14  for identification.)
15
16  GARY E. McINTOSH,      having been first duly sworn
17  by the Notary, deposed and
18  testified as follows:
19
20
21  EXAMINATION
22  BY MR. LINDSAY:
23  Q  Please state and spell your name.
24  A  My name is Gary McIntosh; G-a-r-y, M-c, capital I,
25  n-t-o-s-h.

7

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  Mr. McIntosh, I know you've been deposed before.  But to
2  refresh your memory, I'm -- I ask the questions.  You
3  understand you're under oath to answer truthfully, and
4  that oath carries the penalties with it -- and that oath
5  carries with it the penalties of perjury.  You
6  understand that, right, sir?
7  A  I do.
8  Q  At any time you don't understand a question, please let
9  me know and I'll do my best to rephrase so that it is
10  understandable; otherwise, I'll have to assume that you
11  do understand the question.  Do you understand that?
12  A  I do.
13  Q  And if at any time you want a break to have some of this
14  delicious coffee or for whatever reason, just let me
15  know, and I'm sure we'll be able to accommodate you.
16  A  Thank you.
17  Q  All right.  What is your current address?
18  A  My current address is 606 Sherman Street Southwest,
19  Olympia, Washington, 98502.
20  Q  Have you always lived in Washington State?
21  A  Except for a couple of years, yes.
22  Q  And those couple of years, where did you live?
23  A  I resided in Lake Oswego, Oregon.
24  Q  And when was that?  Many years ago?
25  A  Many years ago.

8

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  Okay.  Do you have any intent on moving your residence
2  in the near future?
3  A  No.
4  Q  Okay.  And what is your work address?
5  A  My work address is the same as my home address.
6  Q  Do you work out of your house?
7  A  Yes, I do.
8  Q  Do you have a separate office in your house?
9  A  Yes, I do.
10  Q  And what is your home telephone number?
11  A  My home telephone number is area code (360) 352-8408.
12  Q  And what is your work number?
13  A  Area code (360) 709-0603.
14  Q  What is your date of birth, sir.
15  A  12/16/49.
16  Q  Are you affiliated or registered with any political
17  party?
18  A  No, I'm not.
19  Q  Are you affiliated with any political organization?
20  A  No, I'm not.
21  Q  Have you taken any medication today or is there anything
22  else that would affect your ability to testify
23  truthfully in this matter?
24  A  No.
25  Q  Now, I understand that you have been deposed before.  Is

9

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  that correct?
2  A  Yes.
3  Q  How many times?
4  A  I have been deposed twice.
5  Q  And what were those cases?
6  A  Umm, the cases are noted in my report.  The first case
7     deals -- dealt with -- with a lawsuit here in the state
8     of Washington concerning the blanket primary.  The
9     second case involved a lawsuit involving a purchase of a
10    voting system in the state of Pennsylvania.
11 Q  The blanket primary case, is that the National
12    Organization on Disability versus -- I'm sorry.  Was
13    that the Washington State Democratic Party versus State
14    case?
15 A  Yes.
16 Q  That's the blanket primary case?
17 A  Yes.
18 Q  And in that case, were you retained to give an expert
19    opinion?
20 A  Yes.
21 Q  And did you provide that expert opinion?
22 A  Umm, I believe I did.  If I don't, I can certainly get
23    it for you.
24 Q  And I -- and I didn't mean did you provide it to us in
25    this case.

                                                        10

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  A  Oh, okay.  I'm sorry.
2  Q  I was unclear.
3        You gave an opinion in that case?
4  A  I did.
5  Q  And what was that opinion, the sum and substance -- the
6     sum and substance of that opinion?
7  A  These -- sorry.
8        The substance of the opinion dealt with a
9     comparison of California election law with Washington
10    State election law.
11 Q  With regard to primaries?
12 A  It focused on primaries, but it also focused -- focused
13    on some other issues that were related to the elections
14    process, such as voter registration and some of the
15    generic activities that you would have to carry out in
16    an -- in the elections process.
17 Q  What was your opinion in that case?
18 A  My opinion in that case was that there were significant
19    differences between Washington State law and California
20    state law.
21 Q  Is that your only opinion?
22 A  I believe so.
23 Q  Are you able to articulate that opinion with any greater
24    degree of specificity?
25 A  Yes.

                                                        11

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  Would you, please.
2  A  Umm, in that opinion I was asked to try to discern if
3     there were differences in California law and Washington
4     law that were substantial enough to affect the kind of
5     primary that would be conducted in -- in each of those
6     states.  The California primary system had been changed
7     as a result of an initiative.  The primary system that
8     was adopted by the State of California was a blanket
9     primary system similar to that here in Washington.
10    The -- what I was asked to do in that particular report
11    was, however, to look at other differences that would
12    affect how the primary would be conducted and what
13    effect those differences would have on the rights of
14    associations, the political parties in each state.
15 Q  When you say "look at other differences," are you
16    talking about differences in the -- in the various state
17    statutory schemes?
18 A  Yes.  Specifically, what the political parties in the
19    lawsuit were asserting were that the -- the rights of
20    the association were in a sense taken away from them
21    because they allowed -- it allowed -- our primary system
22    allowed for other party members to participate in their
23    primary process.  One of the key differences -- and --
24    and that was an argument that was made in the California
25    case that was eventually decided by the U.S. Supreme

                                                        12

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1     Court.
2        What I did in my report, however, was to look at
3     how the differences in election law might have different
4     kinds of effects on the rights of association of the
5     political parties.  For example, in Washington State, we
6     do not register by political party here.  In California,
7     they do.  So it was easy to demonstrate in California
8     when and where party members or at least registered
9     voters of political parties -- if and when they were
10    participating in the other parties' primaries.  That, of
11    course, was not as easy to do in Washington, because we
12    didn't have that -- that provision in our -- in our
13    state law.
14       That -- that is an example of the kinds of things
15    that were included in the report.  I also looked at how
16    political parties were treated under state law and what
17    the -- how the parties were governed under state law and
18    that kind of thing, as well.
19 Q  Who did you represent?
20 A  Umm, I was retained by --
21 Q  I'm sorry.  Let me clarify that statement.
22       Who were you retained by?
23 A  I was retained by the State of Washington.
24 Q  Were you in that case -- has that case gone to trial?
25 A  Yes, it has.

                                                        13

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 Q  Were you accepted as an expert by the Court in that
2    case?
3 A  Yes.
4 Q  And what was the expertise that you were accepted as
5    having in that case?
6 A  Umm, in the areas that -- that I reported on; that is,
7    the -- having the knowledge of both -- of Washington
8    State election law and a review of the California
9    statutes.
10 Q  Did you testify in the trial of that case?
11 A  Umm, no, it did not go to trial.  It was eventually
12    settled by summary judgment at the Federal District
13    Court level.
14 Q  I'm sorry.  You said it was settled by summary judgment?
15 A  Well, I mean -- I guess I shouldn't say it was settled.
16    There was a summary judgement so there was no trial.
17 Q  Was there ever in that case an expressed finding by the
18    judge that found that you were competent to provide
19    expert testimony?
20 A  Not that I'm aware of.  I don't -- no would be the
21    answer to that question.
22 Q  Did you -- did that case relate in any way to the
23    National Voter Registration Act, which I will refer to
24    as the NVRA from this point forward?
25 A  No.

14

---

Byers Anderson Beach - Court Reporters & Video

1 Q  Has there been a finding by the -- by the Court in that
2    case accepting you as an expert?
3 A  Not that I'm aware of.
4 Q  Are you currently involved in any other litigation as --
5    as a -- as a punitive expert?
6 A  No.
7 Q  Have you ever been?
8 A  No.
9 Q  So the -- the two cases that we just discussed, plus the
10    instant case, the case we're here about today, are the
11    only cases that you have been called upon to opine an
12    expert testimony -- strike that.  Horrible question.
13       These three cases -- the Washington State
14    Democratic Party versus State; The National Organization
15    on Disability versus City of Philadelphia; and the
16    National -- the NAACP versus Harris, et al. -- are the
17    only cases that you've ever been affiliated with and in
18    any way provided expert opinion; is that correct?
19 A  That's correct.
20 Q  All right.  Yeah, you're here today with Ms. Fineman.
21    Did you discuss this deposition with Ms. Fineman before
22    the -- before the deposition?
23 A  Yes.
24 Q  And -- and what did you and she discuss?
25 A  We discussed the witness report that I prepared for this

16

---

Byers Anderson Beach - Court Reporters & Video

1 Q  Okay.  And there's -- there was one other case that you
2    were deposed in; is that correct?
3 A  Yes.
4 Q  And that was the National Organization on Disability
5    versus City of Philadelphia?
6 A  Yes.
7 Q  And who did you represent in that case?
8 A  I was retained by an organization called The
9    Disabilities Law Project.
10 Q  Did you provide an expert -- did you provide an opinion
11    in that case?
12 A  Yes.
13 Q  And what was that opinion?
14 A  That opinion dealt with the current availability of
15    voting systems that are on the market, their ability to
16    provide audio devices for the visually impaired so that
17    the visually impaired could vote a secret ballot.
18 Q  And what -- and what did you opine?
19 A  I opined that in my report that there were voting
20    systems available on the market that did provide audio
21    devices for the visually impaired.
22 Q  Has that case been concluded?
23 A  No.
24 Q  Has it gone to trial?
25 A  No.

15

---

Byers Anderson Beach - Court Reporters & Video

1    case.  We discussed possible questions that could be
2    asked.  We went over some of the -- some of the material
3    that I used for -- in terms of preparing the report.
4    And I guess that was about -- about it.
5 Q  All right.  Now, when you say you discussed the witness
6    report, did you discuss the first draft of the witness
7    report that you prepared in any way?
8       MS. FINEMAN:  Objection to the
9    extent that it calls for him to --
10       MR. LINDSAY:  I'm sorry.
11       MS. FINEMAN:  Objection to the
12    extent that it will reveal any privileged information.
13       MR. LINDSAY:  Well, are you
14    asserting that there is an attorney-client relationship
15    between you two?
16       MS. FINEMAN:  No.  No.
17       MR. LINDSAY:  Okay.
18 Q  (By Mr. Lindsay)  All right, sir.  Did you -- did you
19    and Ms. Fineman discuss the first draft of the expert
20    report that you prepared?
21 A  Not specifically.  We discussed the fact that there were
22    drafts, the various drafts of the report that were
23    prepared, and we discussed what some of the changes were
24    generically between what the -- what were contained in
25    those drafts and what was finally contained in the final

17

Byers Anderson Beach - Court Reporters & Video

1 report.
2 Q And did you discuss how to handle questions today
3 concerning those changes?
4 A Yes.
5 Q And -- and what did she tell you with regard to that
6 and what did you tell her?
7 A She didn't really tell me anything. I told her what my
8 impression was of the -- of the various differences
9 between the final report and the -- the earlier drafts.
10 Q And what did you tell her?
11 A I told her that there were two areas that I thought
12 were -- were the fundamental differences between the
13 final draft and the earlier versions.
14 First area just dealt with punctuality (sic) and
15 grammar and spelling and those kinds of things.
16 The second dealt with a request on the part of --
17 on their part of -- of looking at specific -- let me
18 back up by saying -- by looking at the opinions, and
19 then applying those opinions to situations in Florida
20 that were described in the material that was -- that was
21 given -- supplied to me.
22 Q So in other words, you -- you prepared an initial expert
23 report in this case, correct?
24 A Yes.
25 Q And -- and you provided that to the parties that

18

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1 retained you, correct?
2 A Yes.
3 Q And who were those parties that retained you?
4 A Well, it was The Lawyers Committee for Civil Rights
5 Under Law. And the -- are you asking for the two
6 specific people that I worked with?
7 Q Well, the -- the corporate -- the organizational
8 entities and the individuals. If you want to go that
9 far, it's fine.
10 A The organization, as I said, was The Lawyers Committee
11 for Civil Rights Under Law, and the two individuals that
12 I had worked with there are Lori Borgen and Cara
13 Fineman.
14 Q Let me just -- let me provide you with what has been
15 previously marked and identified as McIntosh 2. And I'm
16 going to ask if you could share that with Ms. Fineman.
17 I apologize for not having enough copies.
18 MS. FINEMAN: That's fine.
19 Q (By Mr. Lindsay) Let me just show you the second page
20 of that, which is Bates No. A042270, through the end.
21 Is this the -- is the -- it says, "Working Draft
22 Document 2." Was there a prior draft that you created
23 before this draft?
24 A Umm, I believe there was.
25 Q Do you know if that was produced in this litigation?

19

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1 A I don't know.
2 Q Would it -- if -- would it still exist, the first draft,
3 if -- if there were a prior draft?
4 A It's possible that I may still have retained it on my
5 computer at home. That's about the only way -- think
6 that I could -- the only way I could answer that.
7 Q I -- I haven't seen it. And it may exist and I just
8 haven't seen it. But if it doesn't -- if we haven't
9 gotten it, I would request that -- that production be
10 supplemented with --
11 MS. FINEMAN: We can make sure you
12 get it.
13 MR. LINDSAY: -- with the first
14 draft.
15 Q (By Mr. Lindsay) Now, did you provide this draft to
16 Ms. Fineman and/or Ms. Borgen?
17 A Yes.
18 Q And before you provided this draft, what did they tell
19 you with regard to the expert opinions that they were
20 seeking?
21 A The only conversation that I recall between the first
22 and the second draft dealt with an opinion that I ended
23 up not including, that is referred to in the cover memo
24 to the E-mail that is on this particular document. I
25 had included the -- the first opinion. And in that

20

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1 particular opinion I talked a little bit more about the
2 differences between a simultaneous application required
3 under NVRA for the motor voter section of NVRA and the
4 opportunity or application procedure for the social
5 service agencies and the designated agencies that are
6 covered under the National Voter Registration Act.
7 In my discussion with Lori Borgen in particular,
8 we came to the conclusion that that was not really an
9 issue at issue in this case. And so essentially what I
10 did was I took -- I took that first opinion and rewrote
11 it so that it -- it now reflects what it is, I think,
12 pretty much currently in the current report.
13 Q Okay. And why don't we go back before then.
14 A Okay.
15 Q When were you first contacted by The Lawyers Committee
16 or anybody associated therewith?
17 A I don't recall the specific date. I would guess it was
18 probably sometime in late March or early April.
19 Something like that.
20 Q And what did they tell you in the first conversation?
21 A It was a phone conversation. They told me -- explained
22 a little bit to me about the case. I have to admit that
23 since I dabble a lot in elections professionally, I knew
24 a little bit about it already. They explained to me
25 what they were attempting to do and what kinds of --

21

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
 1   what information they were looking for.  And they
 2   described to me what they wanted in an expert -- not in
 3   an expert witness, but what they were looking for in
 4   terms of a resource to -- to assist them in this
 5   particular lawsuit.
 6 Q What did they tell you they were attempting to do?
 7 A I don't recall particularly what -- in terms of their
 8   complaint and relief and all of that kind of thing.  I
 9   didn't get specifically into that with them.  What they
10   were looking for was -- what they told me they were
11   looking for was someone who could prepare a report that
12   would look at the National Voter Registration Act and
13   would also entail a review of certain documents from the
14   State of Florida and looking for comment on Florida's
15   procedures as they related to the National Voters
16   Registration Act.
17 Q Now, I wrote down that you said that they -- in this
18   first conversation they told you what they were
19   attempting to do, No. 1; information that they were
20   looking for, No. 2; and what they were looking for in
21   terms of a resource, No. 3.  And I thought I asked you
22   what they were -- what they told you they were
23   attempting to do.  And then we -- and then you told me
24   what information they -- they told you they were looking
25   for.  Did they tell you anything about what they were
```
                                                          22

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
 1   attempting to do with this litigation?
 2 A Not that I can recall.
 3 Q But you do recall that they told you what -- what they
 4   were attempting to do?
 5 A Well, they -- they told me that they were representing
 6   the plaintiffs in the case, that -- that I recall.  And
 7   that they were looking, as I -- as I said, they were
 8   looking to produce a report with -- with the kind of
 9   analysis that -- that I described earlier.
10 Q Did they tell you that they were interested in an
11   opinion as to whether Florida and its various officials
12   and functionaries were in compliance with the NVRA?
13 A No.  They did not -- it was not that specific.
14   Generally, what they were looking for, in terms of my
15   involvement, they were looking for someone who had some
16   knowledge of the National Voters Registration Act.
17 Q And did they tell you at that time specifically what
18   sorts of opinions they were interested in with regard to
19   this litigation?
20 A No.
21 Q So is there anything else about that first conversation
22   that you can recall?
23 A Not -- not particularly, no.  We discussed the -- the
24   amount of time I would have to -- to make available to
25   them to produce a report like that.  We -- we discussed
```
                                                          23

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
 1   my -- a little bit about my expertise and my -- and my
 2   background and that kind of thing.  But it was -- all in
 3   all, it was a -- I would describe it as being a very
 4   brief conversation.
 5 Q Approximately how long?
 6 A Five, 10 minutes.
 7 Q Did you have any other -- any further conversations
 8   before you provided your first draft of an expert
 9   report?
10 A Yes.
11 Q How many?
12 A I don't recall specifically how many.  I would guess --
13   estimate three or four conversations after that.
14 Q And with whom were those conversations?
15 A Umm, most of them were with Cara.
16 Q And during the course of those conversations, did
17   Miss -- when you say Cara, it's Miss Fineman?
18 A I'm sorry.
19 Q That's fine.  Did she provide you with any greater
20   degree of specificity as to the type of expert report
21   that they were interested in?
22 A Well, let me back up by saying that my role in this
23   case, as we originally discussed, it was probably a
24   little sketchy.  What I had indicated to them and -- and
25   subsequently to the first conversation was that I didn't
```
                                                          24

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
 1   feel that I had a great deal of time to produce a very
 2   large report.  The other problem was that we were up
 3   very close to whatever deadline had been agreed to for
 4   the submission of those reports.  So most of the
 5   conversations that we had initially were about what I
 6   was going to do to help them in -- in terms of this
 7   particular case and whether or not I would even do a
 8   report.
 9      So the first couple of conversations were not
10   specific at all as to what the report contained.  It was
11   not clear at that point that I would even be doing a
12   report.  And I would say it was not until the third or
13   fourth conversation that it was agreed that I would --
14   that I would do a report at all.
15 Q What is your understanding as to what subject or area
16   you are being proffered as an expert in for purposes of
17   this litigation?
18 A I was -- I think I'm being -- my expertise is -- is with
19   the National Voter Registration Act.  I have a fairly
20   lengthy background in terms of the Act.  I worked for an
21   elected official who was highly supportive of the Act,
22   who worked with a -- a member of Congress from the --
23   from the state of Washington, who was instrumental in
24   drafting the Act.  So my expertise would the National
25   Voter Registration Act goes back quite a ways.  We had
```
                                                          25

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  in Washington State implemented a part of the Act, part
2  of the law, the NVRA, before it was enacted; that is,
3  the motor voter portion of the -- of the NVRA.  I had
4  participated and worked with the Federal Elections
5  Commission when they did their implementation and
6  training sessions for implementing the National Voter
7  Registration Act.  I had been asked by other states to
8  make presentations on the Act.  I had worked with some
9  of the -- what I would refer to as the coalition groups
10 who had worked on -- in support of the Act, as well.
11 So -- plus, as the state elections director, I had been
12 involved in the implementation of all of the provisions
13 of the Act here in -- here in this state.  So I was
14 familiar, I think, with some of those issues, as well.
15 Q  Umm, you say you worked with an elected official who was
16    supportive of the Act.  Did you work -- did your work
17    with that elected official involve the Act?
18 A  I'm sorry.  Maybe I don't understand the question.
19 Q  Well, I think you said that one of the things is that
20    you worked with an elected official who was supportive
21    of the NVRA.  In working with that elected official --
22    first of all, who was that elected official?
23 A  The elected official was Secretary of State -- Secretary
24    of State Ralph Monroe, who was at the time Secretary of
25    State.  There is a new one now.

26

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  Q  And he -- and Mr. Monroe was -- Secretary Monroe was
2     supportive of the Act?
3  A  Yes.
4  Q  And other than working with him, did you -- did -- and
5     other than the fact that he was supportive of the Act,
6     did you do anything with regard to that relationship
7     that related to the Act?
8  A  Yes.
9  Q  What?
10 A  I was asked by Congressional staff to review various
11    drafts of the Act.  We were asked -- I was asked by
12    Secretary Monroe -- first off, I should point out that I
13    was appointed by Secretary of State Monroe to a position
14    that I had at that time.
15 Q  And that position was director of elections?
16 A  Correct.  And I was asked to review drafts of the Act,
17    to note -- I monitored the Act daily.  He was -- he
18    testified in Congress a couple of times on the Act.  I
19    was involved in the preparation of that testimony.  We
20    monitored -- monitored the -- the Act almost daily as it
21    went through Congress.  Secretary Monroe was also active
22    in the National Association of Secretaries of State and
23    provided them with a lot of information regarding the
24    Act, as well.  And a lot of that material I was asked
25    to -- to work with him on.  We traveled to D.C. quite

27

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  often to meet with Congressional staff regarding the
2  Act.
3     So those are the kinds of activities that I was
4  involved in prior to the law being signed into law.
5  Q  And those activities you just described were all prior
6     to the law being enacted?
7  A  That's -- that's correct.
8  Q  And you say you worked with a member of Congress who
9     drafted portions of the Act?
10 A  Well, probably to be more specific, I worked for a
11    member of Congress who was one of the major sponsors of
12    the Act.  It was Congressman Al Swift from the Second
13    Congressional District in the state of Washington at the
14    time.
15 Q  Did that work with Congressman Swift involve the Act?
16 A  Yes.
17 Q  What type of work was that?
18 A  Again, it was the kind of work I described earlier.  It
19    was looking at drafts, coming up with suggestions,
20    setting up meetings with Congressman Swift and local
21    election officials here in this state regarding the Act.
22    I think Congressman Swift at the time was pretty
23    sensitive to the needs and desires of local -- state and
24    local election officials at the time and sought a lot of
25    their input.  So we arranged opportunities for him, at

28

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  least in this state, to be able to get that kind of
2  input in terms of the drafting of the -- of the Act.
3  Q  What did you do with the FEC regarding the Act?
4  A  Actually, a couple of things.  The FEC prior -- again,
5     when the Act was being drafted, did have a couple of
6     meetings where they brought together members of the
7     coalition group.  And what I mean by that are groups
8     that were supporting the passage of the Act.  We also
9     brought together state and local election officials to
10    sit down and to really -- we had a couple of meetings
11    that I recall where we sat down and talked about our
12    mutual concerns with the eventual adoption of the
13    National Voter Registration Act.  So I was involved in
14    those meetings.  And they actually paid my expenses
15    to -- to go back there and to -- to Washington, D.C., to
16    be involved in some of those meetings.
17    After the -- the Act was signed into law, they
18    asked me to participate with the -- with their -- with
19    their clearinghouse -- information clearinghouse section
20    of the FEC to do a series of regional -- I wouldn't call
21    them training sessions necessarily, but they were
22    educational seminars that were organized by the FEC that
23    involved representatives from the social service
24    agencies covered under the Act, representatives from the
25    motor vehicle departments involved with licensing

29

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1   duties, along with state and local election officials.
2   And we did a series of those regional seminars for about
3   two or three months.
4      Again, they -- they paid my expenses to go and --
5   and to take part in -- in the -- in those seminars.
6 Q  Am I correct that you are not, however, a member of the
7   Federal Elections Commission?
8 A  Oh, no. I was not -- not a member of the Federal
9   Elections Commission.
10 Q  Let me -- let me go back to your conversations with
11   Miss Fineman and Miss Borgen.
12      They -- and this is before -- before the first
13   draft. You testified there were approximately four
14   conversations, I guess, mostly with Miss Fineman. Is
15   that correct?
16 A  In terms of the draft -- the drafts, I -- I spoke
17   with -- with both Lori Borgen and Cara Fineman. Some--
18   I can't recall which ones I spoke with the most between
19   each individual draft, but Lori, I would say, near
20   the -- Lori Borgen near the end was the one that I spoke
21   with most often.
22 Q  Now, setting aside for -- for the moment the business
23   about the report. I want to talk about your opinion.
24   Did they, either of -- of them, Miss Borgen or
25   Miss Fineman, tell you what type of opinion they were

30

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1 A  No. We had no conversations specifically involving the
2   specific compliance or noncompliance of Florida with the
3   NVRA.
4 Q  And you've expressed no opinion in this litigation as to
5   Florida's compliance or noncompliance with the NVRA;
6   isn't that correct?
7 A  That's correct.
8 Q  And you've expressed no opinion in this litigation as to
9   the Secretary of State or the Director of the Division
10   of Elections of Florida's compliance or noncompliance
11   with the NVRA; isn't that correct?
12 A  That's correct.
13 Q  Now, at some point you gave a first draft that I don't
14   have and I'm not casting any aspersions, but there was
15   something -- there was an opinion in that first draft
16   that you said related to the simultaneous motor voter
17   and registration process. And that opinion was
18   determined to be irrelevant. Is that fair? And so it
19   was dropped?
20 A  Yes.
21 Q  Okay. And then you prepared at some point this draft
22   that we've marked and identified as McIntosh 2, correct?
23 A  Yes.
24 Q  Okay. Now, after providing this draft -- and please
25   take your time and look it over and become comfortable

32

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1   interested in?
2 A  No. They covered with me the specific-- actually, no.
3   I -- as I said, I -- I did the official set of -- I
4   mean, in my first couple of drafts, I did write my
5   opinions. I presented what my opinions were. But they
6   never specifically asked for a particular kind of
7   opinion at all.
8 Q  Did you ever give them an opinion as to whether Florida
9   was in compliance with the NVRA?
10 A  I gave them no other opinions other than what was --
11   what were contained in the opinions that were contained
12   in the drafts of my report.
13 Q  Were you ever asked to give them an opinion as to
14   whether Florida was in compliance with the NVRA?
15 A  Not specifically, no.
16 Q  Well, generally?
17 A  No. What they asked me to do was to -- after I had
18   formed the opinions, they asked me to comment on the
19   State of Florida's practices and procedures under the
20   National Voter Registration Act, as they related
21   specifically to those opinions. But that was the extent
22   of the conversation and the request.
23 Q  Did they ever ask you in any way as to whether those
24   procedures that were -- that were being used in Florida
25   were violative of the NVRA?

31

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1   with -- with which draft I'm talking about -- did you
2   then receive any comment from either Ms. Borgen or
3   Ms. Fineman regarding this draft?
4 A  I don't recall whether it was this draft or the next
5   draft, but I know that after a couple of the drafts and
6   a couple of the comments that we had, that we did
7   have -- other than grammatical and format changes and
8   things like that, the only -- in terms of the substance
9   of the report, the only conversations that we had
10   pertained to comments or views I might have regarding
11   practices and procedures in the state of Florida, as it
12   related to the opinions that I expressed in the report.
13 Q  And in fact, sir, they suggested that you include
14   opinions regarding practices and procedures in Florida
15   that were not in this report; isn't that correct?
16 A  They asked me to --
17 Q  You can answer "yes" or "no" and then explain.
18 A  Okay. Please restate your question.
19      MR. LINDSAY: Will you please read
20   back the question.
21      (Question on Page 33, Lines 13
22      through 15, read by the
23      reporter.)
24
25      THE WITNESS: Yes. And

33

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1    specifically, what they had asked me to comment on --
2    and I don't know that necessarily -- I suppose you could
3    call them opinions -- but what would be to tie the
4    opinions that I had in the report to specific practices
5    and procedures in the state of Florida.
6 Q  (By Mr. Lindsay)  Did they suggest with any specificity
7    which practices they wanted you to tie your opinions to?
8 A  No.  The only specificity I guess you would say would be
9    that other -- the fact that they did want them to be
10   tied to the opinions that I had expressed that I had in
11   there -- in the report.
12 Q After you provided this report that we're looking at
13   that's McIntosh 2, did they provide you with any further
14   documents to review?
15 A I don't recall.  Let me explain by saying that I
16   received lots of documents on various days throughout
17   a -- throughout this entire process.  I -- I would say
18   that whatever -- and so I can't recall specifically if
19   there were additional documents that were provided
20   between certain drafts or not.  I do know that I was
21   receiving documents throughout the -- the particular --
22   this particular process.  Some of which I had a chance
23   to review; some of which I didn't.  Again, I was working
24   under a very tight timeline in terms of getting this
25   done.  So I did list in the report the specific

34

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1    that I should anticipate those.
2 Q And did you and she discuss possible answers to those
3   questions?
4 A I expressed to her what my feelings were regarding what
5   those differences were, which are -- which are the --
6   essentially the statement that I made to the -- to the
7   point -- the responses to the questions that you had
8   earlier.
9 Q Did she say anything at all?
10 A No.
11 Q Okay.  You also testified that you discussed with her
12   possible questions and suggested -- and suggested
13   answers.  That's what my notes say.  Is that fair?
14   Strike that.  Let me strike that.
15      You also -- you testified that you discussed with
16   her in advance of this deposition possible questions
17   that I would ask.  Is that correct?
18 A That's correct.
19 Q Okay.  Did you discuss possible -- suggested answers?
20 A I gave her answers that I would give if -- if asked
21   those questions.  And she had very little comment on --
22   on any of those answers.
23 Q What questions did she suggest might be asked?
24 A She suggested there may be questions regarding my -- my
25   background, my knowledge of the case, the differences in

36

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1    documents that I relied on to express whatever opinions
2    I had about the State of Florida.
3 Q Now, you -- you did not in that section of your report
4   set forth any section of the Florida statutes; is that
5   correct?
6 A That's correct.
7 Q And that's because you did not review any section of the
8   Florida statutes in preparation for your report,
9   correct?
10 A That's correct.
11 Q Now, we got off on this whole section when I was asking
12   you about conversations you had with Miss Fineman
13   regarding the preparation for this deposition.  And
14   you -- you said that one of the areas you discussed was
15   the report.  And I asked you if you discussed the two
16   different reports, being the version that I've given you
17   as McIntosh 2 and the current -- and the current report
18   that was submitted.
19      Did you and she in preparation for this deposition
20   discuss any questions I would ask with regard to the
21   differences in those two reports, other than the grammar
22   and that kind of thing?
23 A No.  The only thing that Cara Fineman said in
24   preparation for the deposition is that there may be some
25   questions regarding the differences in the drafts and

35

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1    the drafts of the report.  I hate to use the phrase, but
2   things like that.  We went through the report very --
3   very briefly; spent some time looking at the -- at the
4   resume that I had in the report and my qualifications
5   and questions that I might be asked about that.
6 Q How long did you two spend together preparing for this
7   deposition?
8 A I would say a little over two and a half hours.
9 Q Did you do mock question and answers?
10 A Very briefly.
11 Q Do you remember -- when was this preparation?
12   Yesterday?
13 A This morning.
14 Q This morning?
15 A Sorry.
16 Q What mock questions did she ask you?
17 A Umm, well, I'm trying to recall already.  How soon we
18   forget, I guess.
19      She asked me, oh, questions about my background,
20   what knowledge I had of the NVRA, what my experience was
21   in working with the NVRA, what -- what I did with the
22   FEC, how -- my background in terms of my work with the
23   National Association of State Election Directors.  I
24   suppose those were the main -- the main things.
25 Q Did you touch on your experience or lack thereof with

37

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  regard to Florida and Florida law?
2  A  She indicated to me that I could be asked some questions
3     about that, yes.
4  Q  And it is true, you don't have any experience with
5     regard to Florida law; isn't that right, sir?
6  A  I don't have any experience with Florida law, no.
7  Q  Well, you -- you seem to emphasize the word "law" there.
8     What experience do you have with -- with Florida and the
9     NVRA?
10 A  Well, other than I -- I have reviewed the material,
11    obviously, presented to me in this particular case.  I
12    don't -- I mean, I have certainly been acquainted with
13    Florida election officials over the years, but I don't
14    know that there's any -- anything that -- about those
15    acquaintances that would give me any special knowledge
16    about the practices and procedures in the state of
17    Florida.
18 Q  And as we've discussed, you haven't reviewed Florida
19    election law, right?
20 A  That's correct.
21 Q  And you haven't therefore reviewed the -- the portions
22    of Florida election law that implement the NVRA,
23    correct?
24 A  That's correct.
25 Q  Did you discuss your testimony here today with anyone

38

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  other than Miss Fineman?
2  A  No.
3  Q  And you also stated that with Miss Fineman you went over
4     some --
5  A  Sorry.
6  Q  Sure.
7  A  I'm sorry, I didn't mean to interrupt.  I'd like to go
8     back.  I did have a very brief phone conversation
9     yesterday with Lori Borgen, which I should mention, in
10    which we touched upon some of the same issues that we --
11    that I've stated here earlier.  It was a very brief
12    phone conversation.
13 Q  Approximately, how long did it last?
14 A  Five minutes if it was even that long.
15 Q  And what did you two discuss?
16 A  We discussed, again, the -- the anticipation of
17    questions regarding my experience with the state --
18    specifically with the state of Florida.
19 Q  She told you to anticipate questions with regard to --
20    when you say your experience, you mean your lack of
21    experience with the state of Florida; isn't that right,
22    sir?
23 A  That's correct.
24 Q  What type of questions did she tell you to anticipate?
25 A  One question that I recall was whether or not I'd ever

39

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  been to the state of Florida.
2  Q  Have you ever been to the state of Florida?
3  A  Not professionally, no.
4  Q  When was the last time you were there personally?
5  A  Many years ago.  And even then, only very briefly.
6  Q  That was probably before the NVRA was even passed,
7     wasn't it?
8  A  Yes.
9  Q  Do you recall any other questions Miss Borgen told you
10    to anticipate yesterday during this conversation?
11 A  No.
12 Q  You said -- you stated that you went over some materials
13    in preparation for this deposition.  What materials did
14    you go over?
15 A  We went over -- actually, we went over just a couple of
16    the pieces of materials that I had listed in the report.
17    I don't even recall specifically which ones they were.
18    It was very brief.
19 Q  And this was this morning you went over these materials?
20 A  Yes.
21 Q  And you don't recall which ones they were?
22 A  Well, I think in fact I was the one that probably was
23    the one that pointed out a couple of things in -- in
24    the -- in the material that I had brought with me.  And
25    I think we looked at some of the material on training,

40

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  again, very -- very briefly.
2  Q  What material on training?
3  A  Umm, excuse me for just a moment.
4  Q  Sure.  Take your time.  Go ahead.  If you want to take a
5     break to look at those, you can.
6  A  No, I don't think I need a break.  I think -- I believe
7     that if we -- I looked -- I pointed out to her something
8     in regard to a point that I made in the report on the
9     role of the Secretary of State's Office under NVRA.  And
10    there was a slide -- there were a couple of slides in --
11    in this particular document, which is entitled
12    Department of State Katherine Harris.  And I think we
13    looked over --
14 Q  That's the PowerPoint presentation?  It appears to be a
15    Power Point --
16 A  It appears to be a Power Point presentation.  And sort
17    of looked at that in terms of what the role was of the
18    Secretary of State in carrying out the duties under the
19    National Voter Registration Act.  I think this was the
20    main document that we -- I just reviewed.
21 Q  What was your -- what was your comment with regard to
22    that role?
23 A  Umm, my comment is contained in the report, essentially;
24    that is, the -- what exactly -- excuse me -- what they
25    did -- what the Secretary of State's Office did in terms

41

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  of -- or how they viewed their responsibilities under
2  the Act.
3  Q  Your report opines on how the Secretary of State of
4     Florida viewed their responsibilities under the Act?
5  A  That's correct.
6  Q  Which one of your opinions sets forth what -- how they
7     viewed their responsibilities under the Act?
8  A  In reference to the report, it involves the second
9     opinion.  There were four opinions presented in the --
10    in the report.  The report is laid out where I present a
11    series of opinions and then go back and -- and take each
12    opinion separately.
13 Q  And the second opinion, what --
14 A  I'm not looking at the second opinion now.  I'm looking
15    at the final opinion.
16 Q  And I'm -- I'm looking at the final opinion, too.  No. 2
17    within the final opinion.
18 A  I'm sorry.  I'm sorry.  Yes, on Page 9, talked about --
19    the first couple of paragraphs in that -- in the report
20    -- dealing with the -- what the FEC stressed in terms of
21    responsibility in training.  And I also talked a little
22    -- and then I go on to talk about what responsibility
23    means as described by the FEC in their -- in their
24    implementation guidelines.
25 Q  What do you say that responsibility means as described

42

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  by the FEC in their guidelines?
2  A  There's a quote in the report.  Would you like me to
3     read it?
4  Q  Yeah, why don't you, please.
5  A  "A principal ingredient of a successful agency
6     registration program is the appointment of someone in
7     each agency office to be in charge of, responsible for,
8     and enthusiastic about all voter registration
9     activities, ensuring an adequate supply of forms,
10    monitoring voter registration activities, training new
11    employees, resolving questions and problems that arise
12    in coordination with state or local election officials
13    and the like.  Such a task may not be full time, but it
14    must be ongoing."
15 Q  And is it your testimony that that -- that that quote
16    relates to the Secretary of State versus the agencies
17    such as the Department of Motor Vehicles and the --
18 A  That quote obviously applies to specific agencies.  But
19    it is also tied in to how the FEC's -- it also -- it's
20    tied into the FEC's comments that someone -- and I think
21    it's what they -- in terms of -- in their language is
22    preferable to be the state chief elections official,
23    although that's -- it is a preference, it's not
24    certainly necessary -- but that someone at the state
25    level has designated responsibilities under the National

43

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Voter Registration Act statewide.
2  Q  Well, sir, is it your testimony that that quote says
3     that someone should have statewide responsibilities?
4  A  Not that particular quote, no.
5  Q  Okay.  Because that -- because that quote deals with the
6     -- at the agency level, correct?
7  A  Yes.
8  Q  In other words, the Department of Motor Vehicles and --
9     and Division of Children and Families and that kind of
10    thing, right, sir?
11 A  That's correct.
12 Q  All right.  So how did your review of that Power
13    Point -- that apparent Power Point presentation relate
14    to this opinion?  And as I see it, this is the last
15    opinion you present in your report.  What I call Opinion
16    No. 4.  How does that -- how did that --
17 A  Well --
18 Q  -- Power Point presentation relate to this, if any?
19 A  I'm sorry to interrupt you.
20 Q  That's all right.
21 A  First off, I would say that our conversation regarding
22    that particular training document was about 15 to 20
23    seconds, so I would not -- it was not an in-depth
24    conversation.  We were talking specifically about the
25    opinion that is expressed here.  And looking at what the

44

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  role was of the person who was designated under Section
2  10 of the Act; that is where each state is required to
3  designate a state official who is responsible for
4  coordinating activities of the National Voter
5  Registration Act.  And it was in relation to that
6  particular requirement and this particular opinion that
7  we had a very brief conversation regarding that -- that
8  requirement.
9  Q  And you talked about -- you just called that document a
10    training document, correct?
11 A  I believed it was a training document.  It appeared to
12    be a Power Point presentation, which would have
13    indicated to me that it was to be presented to a large
14    group of people.  The -- the information that was in
15    there would appear to be training material.
16 Q  And it would -- and that would appear to be training
17    material provided by the Secretary of State of Florida,
18    correct?
19 A  Correct.
20 Q  Regarding the NVRA, correct?
21 A  Correct.
22 Q  Was there anything that you found in that training
23    material that was improper or incorrect?
24 A  No.
25 Q  Why don't we deal with documents at this time.  You --

45

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1   let me place before you what's been previously marked as
2   McIntosh Exhibit 1, which is a Notice of Deposition.
3   And you saw -- you saw that -- that notice before today,
4   sir, right?
5 A Yes.
6 Q And you provided documents in response to the duces
7   tecum portion of that, correct? Or the portion
8   requesting documents?
9 A Yes.
10 Q Now, I -- I received before getting on a plane
11   yesterday, two packets of documents under cover letters,
12   the first from Miss Fineman dated May 30th and a second
13   from Miss Borgen dated May 31st. Additionally,
14   Miss Fineman has brought some documents that before the
15   deposition she informed me were documents that you
16   relied upon. Is that true? Are these documents that
17   you relied upon?
18 A They appear to be, yes. I was given these while I was
19   giving this testimony, but the -- from my thumbing
20   through them, they appear to be the documents that I
21   relied upon to prepare the report.
22 Q Okay. Now -- and let me hand you -- let me hand you
23   these two packets and ask you if you've seen those.
24 A (Examination of documents.)
25 Q That's the May 30 and May 31st letter that I received

46

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1   with documents attached.
2 A Oh, I was asked to produce these reports. I don't
3   recall particularly seeing the letter, but I did provide
4   the -- the -- these are copies of the House and Senate
5   reports and -- under NVRA.
6 Q And -- and -- and actually, with regard to those, I'll
7   just note for the record that my copy that I was given
8   only contains only every other page. And again, I don't
9   know which copy service or whose copy service made that
10   mistake. It also contains every other Bates number, so
11   I'm sure you Bates-labeled the pages correctly, but
12   we're going to have to get that resolved at some point,
13   also.
14   But my question to you, sir, is having reviewed
15   the Notice of Deposition, having reviewed the documents
16   that Miss Fineman is providing here today, and the two
17   packages that I've -- I've given you, to your knowledge,
18   are these all of the documents that were requested --
19   that were requested that exist that you are aware of --
20   and we did -- and I will caution you that we did talk
21   about the first draft that may or may not exist
22   somewhere on a computer -- but -- but are these all of
23   the documents that you are aware of responsive to the
24   notice of this deposition?
25 A Umm, they appear to be except for I did receive some

47

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1   documents yesterday that were some depositions that --
2   copies of depositions that were taken from three
3   individuals. I got them yesterday afternoon and I -- I
4   have them with me, but those I just reviewed briefly
5   yesterday afternoon before packing up and getting ready
6   to get here.
7 Q Other than those depositions and perhaps a first draft
8   of your expert report, are there any other documents
9   that you're aware of that is responsive to this
10   deposition notice that have not been produced?
11 A Let me answer by saying this, that these were the
12   documents that I used for the preparation of the report.
13   In terms of the preparation of the deposition, there
14   were -- there were other documents that I received -- I
15   shouldn't say even in terms of the preparation of the
16   deposition. There were other documents that I was asked
17   to review that I did not use for -- for the preparation
18   of the report in particular.
19 Q Okay. Well, what documents were those?
20 A I don't know. We may want to take a break, if that's
21   okay.
22 Q That's fine. Let me just -- before we do that, and
23   we'll do that, just a second. Let me just close out.
24   Whose depositions were you provided with
25   yesterday?

48

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 A I wish I could tell you what their names were. But
2   there was someone from Baldwin -- Mr. Baldwin, I
3   believe, that was from DCF. I may be butchering the
4   names there. But there was a Beringer deposition. And
5   there was one other, whose name I cannot recall.
6 Q Ed Kast?
7 A Ed Kast I received.
8 Q But that's not one of the three?
9 A That was not one of the three. There was a third one.
10 Q Did you review all of those documents?
11 A Very briefly.
12 Q Anything in those documents cause you in any way to
13   change the opinions that you've been asked to give?
14 A No. In fact they seemed to substantiate the opinions
15   that I've presented.
16 Q Nothing in any of those depositions causes you to --
17   causes any inquiry with regard to the opinions that
18   you've given?
19 A No.
20 Q Okay.
21     MR. LINDSAY: Why don't we take that
22   break. And as I understand it, we're taking this break
23   so that you can attempt to figure out which documents
24   you reviewed but did not rely on in providing your
25   opinions in this case.

49

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1    THE WITNESS:  Okay.  Thank you.
2    MR. LINDSAY:  Okay.  Thank you.
3    THE VIDEOGRAPHER:  We are going off
4  the record.  The time is 12:05.
5              (Recess 12:05 - 12:15 p.m.)
6
7    THE VIDEOGRAPHER:  We are now back
8  on the record.  The time is 12:15.
9    MR. LINDSAY:  All right, sir.
10  Before we continue, now would be a good time to get
11  everybody's appearances who are attending by telephone.
12    MS. BORGEN:  Lori Borgen
13  representing the plaintiffs.
14    MR. TINKLER:  This is Ken Tinkler of
15  the Hillsborough County Attorney's Office representing
16  Supervisor of Elections Pam Iorio.
17    MR. RESTREPO:  Dan Restrepo from the
18  law firm of Williams & Connolly representing Choicepoint
19  DBT.
20    MS. TORRES:  Susan Torres
21  representing David Leahy and the Miami-Dade County
22  Supervisor of Elections.
23    MR. CIRULLO:  Michael Cirullo
24  representing William Cowles, the Orange County
25  Supervisor of Elections.

50

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  Q  Would you just read the Bates numbers on those letters
2     that you're referring to.
3  A  A042262, A042263, A042264, A042265, and A042266.  I also
4     should add that there was also forwarded to me a copy
5     of -- although, which I did not review, was the Federal
6     Election Reform Act.  And that was E-mailed to me
7     covered by documents A042267 and A042268.
8  Q  Okay.  So other than those documents that were marked as
9     McIntosh 4, you did not rely on any other document in
10     the preparation of your opinion and report in this case,
11     correct?
12  A  That's correct.
13  Q  All right.  Now, let me -- let me digress a little to
14     your background.
15        What college did you go to, sir?
16  A  I attended Washington State University.
17  Q  When did you graduate?
18  A  I graduated in 1972.
19  Q  Did you obtain a degree?
20  A  Yes.  I have a bachelor's degree in political science.
21  Q  And I -- I assume, from the date of your graduation and
22     the date of the implementation of the NVRA, that in the
23     course of your studies at Washington State you did not
24     study the NVRA in any way.  Is that correct?
25  A  No.

52

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1    MR. BOSCH:  This is William Bosch
2  representing Deanie Lowe, the Volusia County Supervisor
3  of Elections.
4    MR. LINDSAY:  Okay.  Thank you.
5
6
7          EXAMINATION (Continuing)
8  BY MR. LINDSAY:
9  Q  I'm going to hand the witness this packet of documents
10     that -- that -- that Miss Fineman produced to us.  And
11     I've put a label on it, McIntosh 4.  It will be a
12     composite.  And again, I'm going to hand that to you,
13     have you look at it with the May 30th and 31st letters.
14     And I believe these are all the documents you say are
15     responsive to the notice of -- correct, sir?
16  A  That's correct.
17  Q  And you say there were other documents that you looked
18     at in this -- in -- with regard to this litigation that
19     you did not rely upon.  And we just took a break and --
20     are you prepared at this time to tell me or indicate
21     which documents those are?
22  A  Those would be the documents that were referred to in
23     the correspondence from March 29th, 2002; from April
24     15th, 2002.  And I think those were -- those were --
25     those were the documents.

51

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  Q  No, that I'm incorrect?
2  A  I did not study the NVRA while I was in college.
3  Q  Okay.  Did you attend any other institute of higher
4     learning?
5  A  No.
6  Q  Have you taken any seminars or other outside educational
7     endeavors?
8  A  No.
9  Q  Have you taught any seminars?
10  A  Yes.
11  Q  Why don't you tell us -- go through all of those
12     seminars that you have taught.
13  A  Well, I don't know specifically what you would refer to
14     as a seminar necessarily.  I would point out to make
15     reference to my resume, where I did talk about making a
16     presentation to a continuing legal education seminar in
17     Olympia, Washington, last year, which dealt with
18     election issues in Washington State, election
19     administration in Washington State.  And also for a
20     time, a very brief period of time, I was a part-time
21     faculty member at South Puget Sound Community College.
22     This was a number of years ago.
23  Q  What did you teach there?
24  A  I taught a night school course on external relationships
25     and public administration.

53

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  I assume because of the timing that that did not have
2     anything to do with the NVRA.
3  A  No, it did not.
4  Q  And going back to the CLE program in Olympia, did that
5     have anything to do with the NVRA?
6  A  No, it didn't.
7  Q  You -- you referred earlier to some -- something you did
8     for the FEC with regard to the NVRA.  Tell me about
9     that.
10 A  The FEC --
11 Q  And I'm specifically talking about the teaching aspect,
12    if there was any.
13 A  The only, I guess you would say, teaching aspect of it,
14    I was asked by the FEC, as I stated earlier, to conduct
15    -- or assist them in conducting some educational
16    meetings regarding NVRA shortly after the law was
17    enacted.  Specifically with those I discussed the
18    implementation of motor voter; that is, the simultaneous
19    application for voter registration at the Department of
20    Motor Vehicle offices or licensing offices.  We had
21    implemented that particular provision a year before the
22    law was adopted, so I -- I had some expertise in that
23    area.  And they asked me to make a presentation
24    regarding that implementation.
25 Q  And that is solely with regard to the simultaneous

                                                              54

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1     application at the DMV?
2  A  Yes, that's what I recall.  There may have been a few
3     other things, but I -- that was the specific reason why
4     I was asked to -- to participate.
5  Q  So you have not taught with regard to the NVRA in
6     general; is that correct?
7  A  That's true.
8  Q  And you have not written anything about the NVRA; is
9     that correct?
10 A  No.
11 Q  And I'm -- again, bad question.  That's, no, you have
12    not written anything?
13 A  No, I have not written anything.  No published papers or
14    anything like that regarding NVRA.
15 Q  And you have not taken any courses in higher education
16    regarding the NVRA?
17 A  No.
18 Q  And you've not studied Florida law with regard to the
19    NVRA?
20 A  No.
21 Q  All right.  Let's talk a little bit about your
22    employment history.
23      We discussed earlier that you were currently
24    working out of your home.  What is -- what is that
25    business?

                                                              55

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  A  Umm, the business that I'm currently involved in is
2     the -- the type -- the name of the business is McIntosh
3     Election Services.  It's a consulting business.  The
4     main focus right now of the business is working with a
5     company in Bellevue, Washington, that is -- will soon be
6     marketing touch screen voting systems and is also doing
7     research on the potential -- on the possibility, I
8     should say, of voting over the Internet.
9        I also have -- as described earlier -- done some
10    work with various groups on other election-related
11    issues, as well.
12 Q  Under the umbrella of the McIntosh Election Services?
13 A  Yes.
14 Q  Okay.  What -- what -- what have you done for those
15    other groups?
16 A  Well, those are the -- those are the clients that we
17    discussed earlier.  In addition to the case that I've
18    been working on here, again, I've worked on the case in
19    Pennsylvania.  I also worked as a -- on the case in the
20    state of Washington, the blanket primary.  I've also --
21    was asked to write a letter from -- by the state of --
22    the Secretary of State's Office in the state of Oregon
23    regarding an issue in -- in Oregon regarding the date of
24    their primary.  But most of the work that I have been
25    involved in has been working with the company entitled

                                                              56

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1     Vote Here.
2  Q  Other than Vote Here, how many clients does McIntosh
3     Election Services have, currently?
4  A  Currently, including the one here, three.
5  Q  And they all --
6  A  Oh, I'm sorry.  I should say in addition to Vote Here it
7     would be two.  It would be the Disabilities Law Project
8     in Philadelphia and the one in this case here that I'm
9     currently working on.
10 Q  All right.  So in -- in this case and The Disabilities
11    Law Project case, are you -- is it McIntosh Election
12    Services that is -- that is involved or is it you
13    individually?
14 A  Well, I am McIntosh Election Services, so both the
15    business, I guess, and me.  Obviously, I do the work
16    under the name of my business.  But I am the -- the sole
17    employee of that business.  I'm an LLC, so I do the work
18    under -- under the title of McIntosh Election Services.
19 Q  And you have never been asked to opine on the NVRA in
20    any lawsuit, have you, sir?
21 A  No, I have not.
22 Q  And you have never been asked to deal with the NVRA in
23    any -- in -- with regard to any client of McIntosh
24    Election Services; isn't that correct, sir?
25 A  Yes, that is correct.

                                                              57

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  Other than the -- the report that you provided in this
2     case, have you ever provided any sort of report
3     whatsoever regarding the NVRA or the NVRA
4     implementation?
5  A  No.
6  Q  How long has McIntosh Election Services been in -- in
7     existence?
8  A  McIntosh Election Services has been in business since
9     May of last year.
10 Q  May 2001?
11 A  Yes.
12 Q  Approximately a year?
13 A  A little over a year.
14 Q  Do you do any other -- strike that.
15    Other than the expert services and these
16    litigations we've discussed, and the -- and the Vote One
17    is the only other client, correct?
18 A  Vote Here --
19 Q  I'm sorry.
20 A  -- is the only other client.  That's -- that for
21    McIntosh Election Services is a pretty major -- major
22    client.  Most of the work I do is with -- with that
23    organization.
24 Q  How many hours a week would you estimate you spend
25    working on matters for Vote Here?

                                                    58

          Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  A  Well, under contract I'm to be available to them 16 days
2     a month.  Probably I don't work for them that -- to that
3     extent, at least in terms of an eight-hour day.  I would
4     say on average I work per week eight to 12 hours a
5     day -- or eight to 12 hours a week, I should say, on
6     their -- on their issues.  It's a little hard to
7     estimate because there are some months when I may be
8     involved, especially during the election season and
9     during the conference -- normally election conferences
10    occur in the summer.  There are times when I may be on
11    the road with them for weeks and then there may be other
12    months where I don't hardly do any work for them at all.
13 Q  Do you have any other source of outside employment -- or
14    strike the "outside."
15    Do you have any other source of employment?
16 A  No.
17 Q  So at this time, and for the last year, you've been
18    averaging approximately 10 hours a week working for Vote
19    Here, plus -- plus the services you've provided in these
20    litigations we've discussed?
21 A  That's correct.
22 Q  And you have not done any further employment?
23 A  That's correct.
24 Q  Okay.  What was your previous employment?
25 A  Previously I was employed as the state director of

                                                    59

          Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1     elections for the State of Washington.
2  Q  And for how long?
3  A  I was there for about a little over 12 years.
4  Q  How did that employment come to an end?
5  A  I resigned.  I had an offer -- the previous Secretary of
6     State I referred to earlier, Secretary of State Ralph
7     Monroe, did not choose to run for election in the year
8     2000.  He subsequently became a board member of the --
9     of the Vote Here company.  They asked me if I would
10    consider having a contractual relationship with them and
11    to do some work for them.  And I made the career
12    decision at that time to resign my position as a
13    director of elections and to enter into that contract.
14 Q  In Washington, how does it work?  Does a -- the
15    Secretary of State runs for office?
16 A  Yes.  The Secretary of State is an elected position.
17 Q  And is -- is -- was Mr. Monroe affiliated with any
18    political party?
19 A  Yes.
20 Q  What party?
21 A  He was a Republican.
22 Q  And when he left office, is it normal for the
23    administration to submit their resignation, people
24    of the Director of the Division of Elections level?
25 A  Well, it's hard to talk a little bit about what is

                                                    60

          Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1     normal.  I think we've had three Secretaries of State
2     since the early 1960s, so there is not a clear pattern
3     in terms of recent -- of recent years.  It was not done
4     in this particular case where the transfer of power took
5     place.  And my resignation didn't have really to do with
6     who the new Secretary of State was.
7  Q  Currently, do you have any prospects for other clients
8     or other employment?
9  A  No.
10 Q  What did you do prior to being the director of division
11    of elections for Washington State?
12 A  Prior to that, I was the county elections supervisor in
13    Thurston County, Olympia, Washington.
14 Q  Have you ever -- have you ever worked for any -- in a
15    government -- for any government other than the State of
16    Washington?
17 A  No.  I -- let me qualify that by saying that I was asked
18    by the Federal Government, as I said earlier, to do some
19    work for them.  I was also asked -- appointed by the
20    State Department, U.S. State Department, to do some work
21    overseas, as noted in my resume.  So I have done other
22    work with the -- with -- with this -- I would say a
23    couple of departments at the Federal level, although I
24    was not really what I would call a full-time employee of
25    those departments.

                                                    61

          Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 Q   And how long did you spend on the -- the -- I think it's
2     the Bosnia issue; isn't that right?  How long did you
3     spend working on that?
4 A   I was in Bosnia in 1997 for -- I did two stints over
5     there.  I was there initially for about two and a half
6     months.  And then I went back at the end of 1997 for
7     about two weeks.  So all total in that year, I was there
8     about three months.
9 Q   Other than those issues that you've just clarified,
10    you've not done any work for any other government
11    entity, correct?
12 A   No, I was not -- I have not been involved with any other
13    governmental entity.
14 Q   All right.  Let me hand you what we've previously marked
15    as McIntosh 3.  And I'd ask you to take a look at it and
16    tell me what it is.
17 A   (Examination of documents.)
18         This is the expert witness report that I prepared
19    for this case.
20 Q   And this is the -- final version, correct?
21 A   It appears to be.  Yes, it is.
22 Q   All right.  Now, directing your attention to Page 3, did
23    you read the NVRA before -- strike that.
24         Did you rely on the NVRA itself with regard to
25    your opinion in this case?

62

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1     state?
2 A   Yes.
3 Q   And the experience you have at the national level is
4     with regard to the work you did at Bosnia that you
5     testified -- well, that -- that work does not relate to
6     the NVRA -- did not relate to the NVRA, correct?
7 A   That is correct.
8 Q   So the only other work would be the -- the -- this --
9     this work that -- with regard to the FEC, correct?
10 A   Yes.  It would be with the work that I did with the FEC.
11    Also, I would -- to what extent this -- this is
12    appropriate, I was asked -- if you will note in my
13    resume, made presentations about Washington State to
14    other states.  But specifically, again, that was related
15    to Washington State.
16 Q   And, again, the FEC work only related to assisting and
17    conducting some educational meetings regarding the --
18    the implementation of the motor voter simultaneous
19    application process?
20 A   That was my -- that was one of the -- that was the
21    presentation, the focus of my presentation for that
22    particular seminar, yes.
23 Q   That's what you did.  That's your Federal experience
24    that relates to the NVRA, correct?
25 A   Umm, well, it's -- I guess to differentiate between

64

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1 A   It was certainly an element that I relied on for the
2     purpose of preparing this report.
3 Q   And I don't mean to be tricky.  I mean, you cite it in
4     several footnotes, I noticed.  And it just is not in
5     the -- it's not set forth as one of the documents that
6     you relied on, correct?
7 A   Well, it is contained within the requirements issues and
8     examples that the national clearinghouse -- at the time
9     which was entitled the National Clearinghouse Election
10    Administration Federal Election Commission January 1,
11    1994.  It is a part of that particular document.  But I
12    did not set it off as -- separately in the list of items
13    that I used in preparation for the report.
14 Q   All right.  Now, and you say -- you say -- on Page 3,
15    after the -- the list of documents that you reviewed,
16    you state that based on your review of that material,
17    and your experience at both the state and national
18    levels, you're rendering the following opinions.  And
19    then there's Section 4, which contains four opinions,
20    correct?
21 A   Yes.
22 Q   All right.  And again, to be clear, when you say your
23    experience at the state level, when you say your
24    experience at the state level that you have is with
25    regard to Washington State, correct, not any other

63

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1     the -- the Federal experience I had in terms of
2     drafting -- helping to assist in the drafting of the
3     original NVRA document, when I was at the state, I
4     guess, that's sort of a combination of state and Federal
5     experience.  Working with Congressional staff, a lot of
6     it I did in my capacity as the state elections director,
7     but it certainly did involve working with certain
8     groups, certain members of Congressional staff and that
9     kind of thing in terms of the original drafting of the
10    NVRA -- the Act.
11 Q   I'm sorry to interrupt.
12         Just so we're clear, you personally did not draft
13    any portion of the NVRA, correct?
14 A   Umm, no.  Although, there were -- I mean, I've not --
15    there were sections of it that we did -- when I say
16    "we," being me and a couple of other people offered and
17    suggested language to the NVRA that I can't say that
18    specifically was adopted.  But, yes, we actually did --
19    we certainly worked -- I participated as a team in
20    working with some of the election officials, as well as
21    Congressional staff on -- on certain pieces of the -- of
22    the NVRA.
23 Q   Other than what you've described, do you have any other
24    state or Federal experience that you used to base your
25    opinions upon?

65

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  A  Not other than what I've described in my previous
2     testimony here.
3  Q  All right. And you set forth in Section 4 a summary of
4     your opinions. Do you see that, sir?
5  A  Yes.
6  Q  And there are four paragraphs with opinions set forth
7     therein --
8  A  Yes.
9  Q  -- is that correct?
10        And you are not providing in this litigation any
11    other opinions, other than what is set forth in those
12    four paragraphs, correct?
13 A  That's correct.
14 Q  All right. I'm going to ask you to-- do you have with
15    you still what we've -- what we've identified, I believe
16    it was McIntosh 2, the second draft?
17 A  I did. Yes, I do.
18 Q  By the way, did you read the amended complaint in this
19    case before setting about to write your opinions?
20 A  Yes.
21 Q  Did that in any way influence your conclusions?
22 A  No.
23 Q  And let me just clarify. I believe I said amended
24    complaint. And there have been a number of complaints.
25    Did you review the second amended complaint?

66

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  A  That's what I attempted to do, yes.
2  Q  And by the way, you -- you -- and we discussed this, but
3     you have no legal education, correct?
4  A  That's -- that's correct. Not other than what I had at
5     the undergraduate level.
6  Q  You're not a lawyer?
7  A  No, I'm not.
8  Q  And you're not attempting to give any legal opinion in
9     this case or assist --
10 A  No. And I'm sorry.
11 Q  And you're not attempting to assist the judge in -- in
12    analysis of the law in this case; isn't that correct,
13    sir?
14 A  That is correct.
15 Q  All right. And in the second draft of the McIntosh 2,
16    that is your only -- that is all you set forth with
17    regard to Opinion No. 1 in Section 4; isn't that
18    correct?
19 A  Yes.
20 Q  And then on the final draft you add another sentence,
21    correct?
22 A  Yes.
23 Q  And the sentence that you add states, "It appears that
24    in Florida some offices providing services through the
25    Department of Children and Families (DCF) were not

68

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  A  Oh, yes.
2  Q  And -- and you wrote that -- you reviewed that before
3     drafting your -- the first draft of your opinion in this
4     case?
5  A  Yes.
6  Q  So you understood the issues that had been adjured in
7     this case -- or alleged in this case before you drafted
8     the first draft -- the first draft of your opinions in
9     this case, correct?
10 A  Yes.
11 Q  All right. Now let me have you take a look at the --
12    what I would -- which is the only -- the preliminary
13    draft that I have as McIntosh 2. And on Section 4 it
14    says Summary of Opinions. And you say there, as you say
15    in your final report, that "The National Voter
16    Registration Act requires that a voter registration
17    application process be an integral part of an
18    application process for services at various agencies
19    designated the National Voter Registration Act."
20        Now, that portion, that right there, that
21    sentence, is simply your summary of what the NVRA
22    requires; isn't that correct, sir?
23 A  Yes.
24 Q  So all you're saying there is you're summarizing the
25    actual statute itself in a short sentence, correct?

67

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1     always offering the opportunity to register to vote to
2     all clients, as prescribed" by "the National Voter
3     Registration Act."
4        And you see that, right, sir?
5  A  Yes, I do.
6  Q  Now, I want you to, you know, focus and be careful when
7     you answer this question.
8        Did Miss Fineman or Miss Borgen in any way suggest
9     that you add that language to this first opinion?
10 A  Not specifically, no, they didn't.
11 Q  Generally?
12 A  Generally, they did, as I testified earlier, ask me
13    to -- to look at this opinion and to look at the -- at
14    the documentation that I had listed in terms of what I
15    relied on in the report, and to offer any comment I
16    could on how this opinion applied to the practices and
17    procedures in the state of Florida.
18 Q  Did they suggest that you look at any particular
19    document?
20 A  No.
21 Q  Did --
22 A  Not other than the documents that they submitted to me.
23 Q  Well, did they suggest with peculiarity that you take a
24    look at the January 8th, 2002, memorandum from Carol
25    Canaday at the DCF?

69

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
1  A  No, they didn't.  I -- I selected that one in
2     particular, though, after looking at this opinion and
3     looking for some specific items from Florida that I
4     could use to make any kind of comment on that -- on that
5     particular opinion.
6  Q  With regard to that second and final sentence in Section
7     No. 1, tell me everything that you base that opinion on.
8  A  Well, again, it would be on the documentation in the --
9     I don't recall specifically.  I would have to go through
10    and look at all of the documentation that I listed, but
11    I think it was whatever was in that -- in that
12    particular set of documents was what I relied on to --
13    to offer that particular opinion.
14 Q  All right.  I'm going to -- you know, I'm going to have
15    to -- I need to know with specificity what you relied
16    on, and I'm just right now talking about where you say
17    it appears that in Florida some offices providing
18    services through the Department of Children and Families
19    were not always offering the opportunity to register to
20    vote to all clients, as prescribed in the NVRA.
21       Now, I need to know all of the documents that you
22    relied on for your opinion that it appears that some
23    offices were not providing --
24 A  Well, for that particular opinion, I did not, obviously,
25    rely on anything dealing with motor voter in this
                                                       70
```

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
1     particular matter.  I -- as you alluded to earlier, I --
2     the -- the documents that I have from the Department of
3     Children and Family Services in Florida are -- that are
4     listed in my report was, I believe, the AFDC Info Memo,
5     it was not in the trainings, and there -- it was the
6     AFDC memo -- let's see, the -- let me look at the --
7     the -- the Carol Canaday memo.
8        It may have been also one of the District 3 voter
9     registration procedures, although I don't specifically
10    recall what that was about.  And -- and it may have also
11    been one of the Kearney responses to the doc requests,
12    although I don't recall specifically what those were.  I
13    don't have them in front of me.  So I would have to go
14    back --
15 Q  We do have every document that you relied upon in front
16    of you.
17 A  I don't have them -- yeah, I have them -- in front of me
18    is a loose term right now.  So --
19 Q  And I need to know --
20 A  All right.
21 Q  -- every document that you base every -- everything you
22    base that opinion on.
23       MR. LINDSAY:  The videographer
24    informs me that now would be a good time to change the
25    tape, so while you're looking, why don't we change the
                                                       71
```

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
1     tape and go off the record for a moment.
2           THE WITNESS:  Okay.
3           THE VIDEOGRAPHER:  We are now going
4     off the record.  This concludes Tape 1.  The time is
5     12:50.
6           (Recess 12:50 - 1:01 p.m.)
7
8           THE WITNESS:  One of the documents
9     that I did rely on was the Defendant's Kearney response
10    to Documents Request No. 1, which takes up the issue
11    that you mentioned.  Also, there was, I believe,
12    something in the -- although I don't seem to have this
13    one in front of me at the moment for some reason -- but
14    the January 8th, 2002, memo from Carol Canaday, which I
15    don't -- for some reason I can't seem to locate here.
16    But I know that at least with the -- Kearney's response
17    to doc request No. 1, which is listed in my report, is
18    one of those documents that I did rely on in making that
19    particular opinion.
20
21
22           EXAMINATION (Continuing)
23 BY MR. LINDSAY:
24 Q  Could you show me which documents in that response
25    you -- you -- support that opinion?
                                                       72
```

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
1  A  It was a series of E-mails that were listed as an
2     attachment, which were -- the author is Norene Moore.
3     And it was a memo -- an E-mail message to Greg Ferguson.
4        Also there is on the same subject some
5     correspondence to Greg Ferguson who -- which references
6     a conversation with Donna Miller, which state --
7     states -- which states -- as I said, addresses the
8     issues that we were talking about earlier.
9  Q  All right.  So can you show me exactly which -- which
10    E-mails you're talking about?
11 A  (Indicating).
12 Q  Are these the only E-mails you're talking about?
13 A  Yes.
14 Q  This -- on this one page?
15 A  Uh-huh.  (Witness answers affirmatively.)
16 Q  And this is an E-mail dated August 29, 2001?
17 A  Uh-huh.  (Witness answers affirmatively.)
18 Q  So this -- this page that has that E-mail authored by
19    Norene Moore and then there is -- the original E-mail, I
20    guess, is authored by Greg Ferguson; and the January
21    8th, 2002, memorandum from Carol Canaday are the only
22    documents that you base -- or the only basis, whether
23    they are documents or not, for your opinion in that
24    second sentence -- sentence of Opinion No. 1.
25 A  Yes.
                                                       73
```

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  That's correct, right?
2  A  Yes, uh-huh.
3  Q  What Florida offices of DCF were not always providing
4     the opportunity to register?
5  A  Well, apparently at least the -- in this particular
6     instance, those at DO2 HQ, at least that is where this
7     is from.  And I -- I'm not familiar with the
8     organization of the DCF in Florida, but it would appear
9     that at least District 2 for a period of time was not
10    offering the opportunity to register to vote to those
11    who were making applications there.
12 Q  All offices in District 2?
13 A  I can't tell that from looking at this particular memo.
14 Q  In fact, you don't know with any particularity what, if
15    any, offices were not offering the opportunity to
16    register?
17 A  Not other than those that were listed in this particular
18    E-mail.  I think the opinion, as it states -- it states
19    -- it does not state that all offices were not doing it.
20    Just it states that some -- it appeared that some were
21    not always offering the opportunity to register to vote
22    to all clients.
23 Q  And you don't know for how long -- when you say "were
24    not always offering," you don't know what time frame
25    that entailed?

74

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  A  No, nor does the opinion express a time frame.
2  Q  In fact, it's not really an opinion, is it?  It's just
3     your summary of that E-mail and that memoranda --
4     memorandum that we've discussed; isn't that true, sir?
5  A  I think the opinion is -- is certainly accurate based on
6     the information that I had.  The information is, is that
7     not all -- that -- that some of the offices were not
8     always offering the opportunity to register to vote to
9     all clients as prescribed in the NVRA, which I think is
10    an opinion -- is an accurate one based on the
11    documentation that I reviewed.
12 Q  Which was two -- two pieces of paper, correct?
13 A  That's correct.
14 Q  And you did not review any studies regarding that,
15    correct?
16 A  No.
17 Q  And you did not review any learned treatise or any other
18    scholarly publication discussing that, did you?
19 A  No.
20 Q  And in fact, you're not aware of any scholarly
21    publication or learned document that discusses whether
22    or not the DCF was always offering the opportunity to
23    register to vote to all clients, are you, sir?
24 A  I'm not aware of one, no.
25 Q  And in this -- this first opinion of yours, you have no

75

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1     opinion as to -- you make no opinion in this first
2     Opinion No. 1 as to whether Florida's Secretary of State
3     or director of divisions of elections were doing
4     anything whether or not in compliance with the NVRA,
5     correct?
6  A  Not in regards to the first opinion, no.
7  Q  All right.  In -- in your -- in the section -- you
8     summarize the opinions in Section 4.  And then in
9     Section 5 you give the basis and reasons for your
10    opinions.  Right?  That's the way you have your report
11    laid out?
12 A  Yes.
13 Q  And is it fair to say that -- strike that.
14       In the Section 5, you give all the bases and all
15    the reasons for your opinions, right, sir?
16 A  Yes.
17 Q  There are no bases or reasons that support your opinions
18    that you have not set forth in Section 5, correct?
19 A  No, I -- I suppose other than any other sort of general
20    impressions that I got from reviewing any of the
21    documents that I relied on to make the report.  The
22    answer to your question would be these are specifically
23    the ones that I used to -- to -- to prepare the report
24    specifically.
25 Q  And when you in -- in the bases and reasons for your

76

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1     opinions section with regard to Opinion No. 1, which is
2     the opinion we've been talking about thus far, you state
3     on Page 6 and you -- last sentence of the first full
4     paragraph, you state that, "For example, it would not
5     suffice for an agency to simply have declination forms
6     and voter registration applications made available on a
7     counter for public distribution."  You're not implying
8     there that that's what the DCF did, are you, sir?
9  A  I've not cited that.  Although, in terms of the
10    preparation of the -- for this particular report, I
11    would have to refer back to the document that I relied
12    on; and specifically, the E-mail document that I had
13    earlier.  In that particular E-mail document it states,
14    and if you would allow me to quote from --
15 Q  Sure.
16 A  "According to the person at the DCF office they only
17    deal with voter registration if client asks about it.
18    As you know, that is not the way it works."
19       I don't know that it was in this document or
20    perhaps the Canaday document where they -- again, I
21    don't have that one particularly in front of me --
22    whether they had discussed the fact that -- that at
23    least at those offices they had made forms available on
24    the counter for public distribution.
25       I have to add I don't think there is anything

77

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  wrong with that, but --
2 Q  Here is the Canaday document.  That does not discuss it.
3 A  That may not either, so -- yeah.  Okay.
4 Q  So there is no document that discusses that anybody had
5     just left the voter registration applications --
6 A  Not in any of the documents that I used to prepare the
7     report.
8 Q  Well, not in any document that you've ever seen?
9 A  Oh, yes, there -- yes, absolutely.  There was
10    a reference in one of the documents that -- that I did
11    not rely on for the report that talked about the fact
12    that voter registration forms were available on the
13    counter for public distribution.  I -- again, I would
14    have to go back to all of the documents that I've
15    reviewed and see that particular area.  In fact, at --
16    one of the agencies seemed to -- listed in one of the
17    depositions that I reviewed yesterday quickly, they took
18    pride in the fact that they had those forms available
19    for -- for the general public to use.
20 Q  But there is a difference between having them available
21    on the counters and simply having them available on the
22    counters, right?
23 A  Yes.  I do believe that one of the documents did allude
24    to the fact that they did make voter registration
25    applications available in lieu of providing for the

78

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  services -- in lieu of -- of asking people to apply
2     to -- to register.  I did not specifically in this
3     report state that.  I used, as an example, of the fact
4     that you would not be in compliance with the Act if that
5     is all that you simply did.  But I did not for the
6     purposes of this particular report make any specific
7     reference to that particular practice in any office, if
8     that's the question you're asking.
9 Q  It's not your opinion and you have not set forth that it
10    is your opinion that that is all that the DCF did,
11    correct?
12 A  No.  I'm just saying that if that is what they did, that
13    would not suffice.
14 Q  And it is not your opinion that that is what they did,
15    correct?
16         MS. FINEMAN:  Objection to form.
17         THE WITNESS:  It was not my opinion
18    in terms of the preparation of this report that that is
19    what they did.
20 Q  (By Mr. Lindsay)  And I have to be clear.  You're not
21    going to be attempt to suggest that that is your
22    opinion, are you, sir?
23         MS. FINEMAN:  Objection to form.
24         THE WITNESS:  Not in terms of this
25    report, no.

79

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 Q  (By Mr. Lindsay)  Well, in terms of your testimony with
2     regards to this litigation.
3 A  Umm, I don't know.  I would have to -- in terms of this
4     litigation, I would have to go back and rereview the
5     material.  If I find items in the material that would
6     seem to suggest that, it could be, I suppose,
7     potentially part of my testimony.  I don't know that --
8     whether or not that will -- you know, will occur or not.
9 Q  And you haven't seen -- well, strike that.
10        Sir, you've already testified that these are your
11    opinions.  These are all of your opinions, correct?
12 A  That's correct.
13 Q  Now, you say here on Page 6, "It also appears that in
14    some cases DCF offices were not always providing an
15    opportunity for clients to register."
16        It's fair to say, sir, you don't know in how many
17    of those offices DCF -- in how many of those offices
18    clients were not always provided an opportunity to
19    register, do you?
20         MS. FINEMAN:  Objection to form.
21         MR. LINDSAY:  What's your form
22    objection?
23         MS. FINEMAN:  You already asked this
24    question.
25         MR. LINDSAY:  You can answer.

80

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1         THE WITNESS:  Restate -- I'm sorry.
2     Restate the question.
3 Q  (By Mr. Lindsay)  You didn't -- so we're clear.  You
4     don't know in how many DCF offices clients were not
5     always provided an opportunity to register, do you?
6 A  No.
7 Q  And you do not know when that occurred, if it occurred,
8     do you?
9 A  No.  Well, let me -- let me just say that not
10    specifically as to when it occurred.  I know that the
11    dates on the E-mails were August 2001, although, there
12    is no references to time.
13 Q  The fact is, with regard to this so-called opinion, you
14    don't bring any expertise to this opinion with regard to
15    this opinion.  All you are doing is reading two
16    documents and -- and -- and attempting to extract what
17    you believe those documents say.  Isn't that correct?
18 A  That's true.  But the documents are from the -- in one
19    case both from the Florida Department of Children and
20    Families.  I wouldn't have any reason to -- to -- to
21    doubt the -- the accuracy of those documents at all.
22 Q  But nothing about your background or -- or expertise
23    adds anything to the -- to the interpretation of those
24    documents, other than what the judge himself could
25    infer; isn't that true, sir?

81

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  A  Well, I think that based on my knowledge of the National
2     Voter Registration Act and based on my knowledge of what
3     the -- the work that went into the Act, I think that I
4     have enough expertise to be able to read a document from
5     a state agency, in any state, and determine from -- and
6     to make some conclusions from that document as to
7     whether or not that particular -- a particular practice
8     is -- at least have an opinion as to whether or not it
9     complies with the Act or not.
10             MR. LINDSAY:  Would you read back
11     the question, please.
12                (Question on Page 81, Line 23
13                 through Page 82, Line 1, read
14                 by the reporter.)
15
16  Q  (By Mr. Lindsay)  Yes or no?
17  A  In terms of what a judge could infer?
18  Q  Right.
19  A  I would not attempt to try to express an opinion that
20     would have -- infer something that would be up to a --
21     any --
22  Q  I mean --
23  A  -- judge to infer.
24  Q  My point is that the judge can read these documents,
25     correct?

82

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  A  Yes.
2  Q  And there is nothing -- you're not adding anything
3     because of your life experiences or expertise to the
4     interpretation of those documents that the judge could
5     not already determine for himself?
6  A  That may be true.
7  Q  Let's move on to your second opinion.  Your original --
8     in McIntosh 2, the second draft of your opinion, you
9     say, "Agency based voter registration programs will work
10     best in those situations where the chief State election
11     official designated for coordinating 'State
12     responsibilities' under the National Voter Registration
13     Act assumes the responsibility for providing statewide
14     leadership in the development and implementation of all
15     activities related to a State's compliance with the
16     Act."
17             You see that, right, sir?
18  A  Yes.
19  Q  And after your conversations with Miss Fineman and
20     Miss Borgen, you added in the -- in the final draft a
21     second sentence to that Opinion No. 2, correct, sir?
22  A  I would agree with the statement that the second
23     sentence was added subsequent to the conversation that I
24     had with those two.  I would not infer from that that
25     there was anything in that conversation that

83

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1     specifically talked about that specific language being
2     added to the opinion.
3  Q  But there was something in that conversation that
4     impressed upon you after two prior drafts, where you did
5     not have any further language, the notion that you were
6     going to add something more; isn't that correct?
7  A  The --
8  Q  Yes or no, and then you can explain.
9  A  Yes.  I was asked to -- again, to repeat myself -- I was
10     asked to look at the opinions and to make some comment
11     based on the material that I -- that I had, that the
12     State had not -- did not appear to have exercised the
13     kind of statewide authority or statewide leadership in
14     terms of carrying out the development of the programs
15     under NVRA.
16  Q  All right.  Just so we're clear.  After you had two
17     prior drafts of this expert report or this -- or this
18     report without any further language than what we just
19     read, on the final draft you added language, the second
20     sentence of Opinion No. 2, which states:  "In Florida it
21     appears that no one was granted statewide authority or
22     exercised statewide leadership in the development of
23     various programs established by the National Voter
24     Registration Act."  Correct?
25  A  Yes.

84

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1  Q  You added that sentence only in the last draft.  And
2     that sentence was not in either of the first two drafts,
3     correct?
4  A  That's -- that's correct.
5  Q  All right.  Now, going back to the first sentence, you
6     say, "Agency based voter registration programs will work
7     best in those situations where the chief State election
8     official" designates -- "designated for coordinating
9     'State responsibilities' under the" NVRA "assumes the
10     responsibility for providing statewide leadership in the
11     development and implementation of all activities related
12     to the State's compliance with the Act."
13             What do you base that?
14  A  I base that on two things:  One, I based it on my
15     reading and my understanding of the NVRA.  I also based
16     it on language that was contained in the Federal
17     Elections Commission document, the implementing
18     guidelines.
19  Q  And what language is that?
20  A  Do you want me to pull it out of the language of the --
21     of this document?
22  Q  Let me just clarify.
23  A  Okay.
24  Q  First you say you base it on the NVRA.  What portion of
25     the NVRA do you base that on?

85

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  A  Section 10.
2  Q  Stating what?
3  A  Of the original Act.  Section 10 of the original Act
4     states, "Each state shall designate a state officer or
5     employee as the chief state election official to be
6     responsible for coordination of State responsibilities
7     under this Act."
8  Q  Okay.  So all that says is that there should be someone
9     designated for coordinating State responsibilities,
10    correct?
11 A  Well, I -- yes.
12 Q  It does not say that it will work best, in your words,
13    in those situations where that person, the coordinating
14    person, assumes the responsibility for providing
15    statewide leadership in the development and
16    implementation of all activities related to the State's
17    compliance with the Act, right, sir?
18 A  Restate your question.
19 Q  Do you want me to restate it or read it back?
20 A  Read it back.  I don't care.  Either one is fine.
21            MR. LINDSAY:  Okay.  Could you read
22    it back, please.
23            (Question on Page 86, Lines 12
24            through 17, read by the
25            reporter.)
                                                        86
Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  I am going to get to that, but --
2  A  All right.  Would you like me to read both 1-5 and 1-6?
3  Q  I want you to read all of the language that you rely on
4     for that -- for that opinion.
5  A  The Act requires each State to designate a State officer
6     or employee as the chief State election official to be
7     responsible for coordination of State responsibilities
8     under this Act.  It is not, however, specified how or
9     even when this designation is to be made.  Most states
10    are likely to designate a responsible State official in
11    their conforming legislation.  In the interim, the
12    FEC -- I should say the Federal Elections Commission --
13    will continue working with the chief election officials
14    or chief registration officials of the state unless some
15    other state officer is designated.
16           The Act further assigns the chief State election
17    official the duty of making national and state mail
18    registration forms available for distribution through
19    governmental and private entities, with particular
20    emphasis on making them available for organized voter
21    registration programs.
22           Finally, the Act designates the chief State
23    election official as the recipient of notices from the
24    United States Attorneys regarding felony convictions in
25    Federal courts of any persons who claim residence in the
                                                        88
Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1            THE WITNESS:  The Act does not
2     specifically state that, no.
3  Q  (By Mr. Lindsay)  The Act does not say anything about
4     how agency-based voter registration programs might work
5     best, right, sir?
6  A  No.
7  Q  So the other thing that you base this on is the -- an
8     FEC report?
9  A  Yes.  I -- it was not an FEC report.  It was an FEC
10    guide to implementing the -- the NVRA.
11 Q  And what portion of that guide states that agency-based
12    voter registration programs will work best where the
13    coordinating person assumes the responsibility for
14    statewide leadership in the development and
15    implementation of all activities related to the State's
16    compliance with the Act?
17 A  Well, there are a couple of pages in that guide, both on
18    Page 1-5 and I believe I even cited some of the language
19    on 1-6.
20 Q  And by the way, this is the language that's -- that I
21    appear not to have in -- in the pages that were --
22    that -- where I got every other page in the report.  So
23    would you just please read the language that you rely on
24    from Section 1-5.
25 A  And 1-6.
                                                        87
Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1     state, and should such a conviction have a bearing on
2     the person's eligibility to be a registered voter in
3     that state, the Act requires the chief State election
4     official to notify the voter registration official of
5     the local jurisdiction in which the offender resides.
6            As a practical matter -- I'm now going over to
7     Page 1-6 -- although not addressed in the Act, states
8     might also want to consider assigning the chief State
9     election official related responsibilities including but
10    not limited to receiving and forwarding notices from
11    State courts regarding felony convictions, if
12    appropriate; as well as declarations of disqualifying
13    mental incapacity; receiving and forwarding notices from
14    State bureaus of vital statistics regarding deaths;
15    receiving and forwarding some or all voter registration
16    applications from voter -- from motor vehicle offices,
17    public assistance agencies and by mail, especially
18    national mail registration applications; receiving and
19    forwarding notices from local jurisdictions regarding
20    the cancellation of new registrant's prior registration;
21    designing all forms and procedures represented in the
22    NVRA; training all local election officials regarding
23    the forms and procedure; and receiving and compiling
24    reports from the local election officials pursuant to
25    the FEC's reporting regulations and in turn forwarding
                                                        89
Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

**Page 90**

Byers Anderson Beach - Court Reporters & Video

1  the compilations to the FEC.
2      And then the -- there's a part of Page 6 which
3  doesn't apply to this particular section.
4      MS. FINEMAN: Can we just note for
5  the record that Mr. McIntosh was just reading from a
6  document entitled Implementing the National Voter
7  Registration Act of 1993 Requirements, Issues and
8  Examples prepared by the FEC produced January 1, 1994.
9      MR. LINDSAY: And that is part of
10  the production in this case, right?
11      MS. FINEMAN: Yes.
12      MR. LINDSAY: That we reviewed
13  earlier?
14      MS. FINEMAN: That -- that is noted
15  in his list of documents that he relied upon.
16      MR. LINDSAY: Well, that was
17  actually produced as one of the documents he relied on
18  that you gave us earlier?
19      MS. FINEMAN: No. That was sent to
20  you by Lori --
21      MR. LINDSAY: That's when I thought.
22  I thought it was the May 31st letter. Right? It was
23  attached thereto?
24      MS. FINEMAN: Yes.
25      MR. LINDSAY: It was in a different

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

**Page 91**

Byers Anderson Beach - Court Reporters & Video

1  form and mine missed every other page.
2      MS. FINEMAN: Yes.
3      MR. LINDSAY: All right, sir.
4 Q  (By Mr. Lindsay) So with regard to the opinion in the
5  first sentence of Opinion No. 2, that is your only basis
6  for the opinion that agency-based voter registration
7  programs will work best in those situations where the
8  chief state election official designated for
9  coordinating state responsibilities under the Act
10  assumes the responsibility for providing statewide
11  leadership in the development and implementation of all
12  activities related to the state's compliance with the
13  Act?
14 A  I would also add that it was also based on my experience
15  in working -- in observing other states in my capacity;
16  for example, with the National Association of State
17  Election Directors, fielding inquiries from them
18  periodically, questions from them regarding
19  implementation of the Act, and my overall experience as
20  being a state elections director for 13 years and
21  implementing the Act, and having experience in
22  implementing the Act in our state.
23 Q  And you don't rely on any data that would tend to show
24  that these programs would work best where the
25  coordinating person assumes the responsibility for

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

**Page 92**

Byers Anderson Beach - Court Reporters & Video

1  providing statewide leadership in the development and
2  implementation of all activities related to the state's
3  compliance with the Act, right?
4 A  No.
5 Q  And you don't rely on any learned treatises that say
6  that, do you?
7 A  No.
8 Q  And you're not aware of any peer-reviewed publications
9  that -- that -- scholarly publications that say that in
10  any way, are you, sir?
11 A  I'm not aware of any, no.
12 Q  And in fact, the Act itself does not require that the
13  coordinating person assume responsibilities for
14  providing statewide leadership in the development and
15  implementation of all activities related to the state's
16  compliance with the Act, does it, sir?
17      MS. FINEMAN: Objection.
18      THE WITNESS: Well, the Act does --
19 Q  (By Mr. Lindsay) Yes or no, then you can explain.
20 A  No, the Act doesn't specifically contain that language,
21  but the Act does contain language that does refer to the
22  requirement that the activities be coordinated in some
23  way by whoever that official happens to be. And I mean,
24  it certainly would be my opinion that -- that that would
25  include coordinating the activities that are required

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

**Page 93**

Byers Anderson Beach - Court Reporters & Video

1  under the Act.
2 Q  Well, in fact, you're not opining in this -- in this
3  opinion that there is any violation of the NVRA, are
4  you?
5 A  No.
6 Q  Okay. And then in -- in the second sentence, you -- it
7  says, "In Florida it appears that no one was granted
8  statewide authority or exercised statewide leadership in
9  the development of various programs established by the"
10  NVRA.
11      What do you base that sentence on?
12 A  Umm, I base that sentence against -- again, on the
13  documents --
14 Q  You're going to have to be specific.
15 A  -- that I reviewed. Here we are. Sorry.
16 Q  First of all, we know that you did not base that on any
17  reading of the Florida statutes, correct?
18 A  That's correct.
19 Q  All right.
20 A  Umm, I have Interrogatory No. 12, Memorandum of Law,
21  that was -- that I received dealing with -- where the
22  question was asked for the State defendants for the
23  period from January 1, 1999, to November 7th, 2000.
24  Their response -- I don't know if you want me to read
25  the response or just reference that was a -- a document

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  that I used in the development of --
2  Q  You're referring to --
3  A  -- of that opinion.
4  Q  -- a March 2002 memorandum from Ms. Fineman that
5     summarizes -- or probably encapsulates is a better
6     word -- certain responses to certain interrogatories.
7     Is that correct?
8  A  That's correct.
9  Q  All right.
10 A  And I just want to make sure that this one also
11    contained -- this actually contained -- this particular
12    document contained a couple of references to that.
13    Also, Interrogatory No. 13, again, the responses from
14    Defendants Harris and Roberts.
15 Q  And that is where Harris and Roberts note that the
16    Department of State and Division of Elections do not
17    participate in voter registration functions under the
18    Florida election code?
19 A  That's correct.  And also I just would look at the
20    Department of State -- I have a document, Katherine
21    Harris, it appears to be the PowerPoint presentation
22    that I think we discussed earlier.  This is a
23    document -- the training appears to be to those involved
24    with carrying out the functions of NVRA at the agency --
25    state agency level.  There is a slide in that particular

94

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  presentation on communications, which I also looked at,
2  as well.
3  Q  The one that says -- that you circled -- "The division
4     of elections is always available"?
5  A  Correct.
6  Q  I'm just curious, sir --
7  A  Yeah, the first element -- the first element says that
8     communication is -- and this is, I believe, referencing
9     activities under NVRA.  The communication is between the
10    supervisors of elections.  I would believe that that
11    would be referring to counties -- and you, which is
12    referring to the state agencies.  It's talking about how
13    that is to be -- that communication is to take place.
14    The division of elections, which is part of the
15    Secretary of State's Office, is described as being,
16    quote, available.
17 Q  In fact, it says "always available," doesn't it?
18 A  It's always available.  Quote, always available.
19 Q  And so does that somehow support your opinion that no
20    one exercised statewide leadership?
21 A  I think that slide in conjunction with the other
22    documents that I relied on to form that opinion speak
23    for themselves, yes.
24 Q  When you -- when you -- is there anything else that --
25    that you -- other than this -- this slide from the

95

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  apparent Power Point presentation of -- of training
2  offered by the Department of State and the interrogatory
3  answer No. 13 of Defendants Harris and Roberts, and the
4  interrogatory answer to -- is it No. 12?
5  A  Yes.
6  Q  Other than those three items, does anything -- did you
7     use anything else as a basis for your opinion set forth
8     in the second sentence of Opinion No. 2?
9  A  No.  Not -- no, I did not.
10 Q  And when you say it appears that no one was granted
11    statewide authority, granted by whom?
12 A  In this particular case, I'm -- I'm referencing the law.
13 Q  The Florida law --
14 A  Either the -- the Florida legislature or any -- there
15    did not appear to be any of these documents --
16    any reference to any rule at all.
17    I should make note that there is a reference to a
18    constitutional provision in the response from Defendants
19    Harris and Roberts in the -- their response to
20    Interrogatory No. 12.
21 Q  And would you read that, please.
22 A  Just the response?
23 Q  The part -- the portion to which you are referring.
24 A  In response -- the response -- the response is --
25    states, "In Florida, the Department of State does not

96

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  and cannot supervise the operations of the DHSMV, the
2  DCF or any other executive agency."
3     So that would be the one that I would be
4  referring -- referring to.
5  Q  And do you have any reason to doubt the truthfulness of
6     that statement you just read?
7  A  No.
8  Q  And have you ever read the Florida constitution?
9  A  No.
10 Q  Do you understand how the supervisors of elections --
11    what role they play under the Florida constitution?
12 A  Not under the constitution, no.  I have not read the
13    constitution.
14 Q  Do you know whether they are constitutionally elected
15    officers?
16 A  I believe they are.  It seems that I -- that I have read
17    that in one of the documents, yes.
18 Q  All right.  So with regard to the second sentence of
19    Opinion No. 2, that sentence you've told me what you
20    based it on.  And I just want to clarify that you do not
21    base that opinion set forth in that second sentence on
22    any review of the Florida constitution, correct?
23 A  That's correct.
24 Q  On any review of the Florida statutes, correct?
25 A  That's correct.

97

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  On any published learned treatises, correct?
2  A  That's correct.
3  Q  Or on any type of compilation of data, other than the
4     interrogatory answers that we've discussed, correct,
5     sir?
6  A  That's correct.
7  Q  All right. Moving on to No. 3. Again, sir, I'm going
8     to -- I'm going to take you first to the -- to your
9     second iteration of your report that we've marked as
10    McIntosh 2, where the Opinion No. 3 says, "Agency based
11    voter registration programs will operate more
12    efficiently when there is a greater reliance on the
13    electronic transfer of...data."
14       And that is all you set forth in -- in the first
15    two iterations of your expert report, right, sir?
16 A  Yes.
17 Q  And -- but in the final version that you produced, you
18    add another sentence, which says, "Florida -- "Florida's
19    agency based voter registration programs may be hampered
20    by its reliance on paper forms." Right, sir?
21 A  Yes.
22 Q  And by the way, you don't opine that Florida's
23    agency-based voter registration programs are hampered by
24    its reliance on paperwork forms, do you, sir?
25 A  No.

98

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1     that the secretary or director violated the NVRA. And
2     you're not opining in -- in No. 2 that they violated the
3     NVRA. And you're not opining in No. 3 that they
4     violated the NVRA; isn't that correct, sir?
5  A  Yes. I have made no comment in the -- about the
6     compliance with the National Voter Registration Act.
7  Q  In any of your opinions?
8  A  That's correct.
9  Q  You do not set forth any opinion whatsoever alleging
10    that either the secretary or director violated the NVRA,
11    correct, sir?
12 A  Umm, I am not. I'm just presenting to you in my report
13    my conclusions based on the review of the data that I
14    looked at --
15 Q  All right.
16 A  -- or the reports that I looked at.
17 Q  And those conclusions specifically do not include a
18    conclusion that the secretary or director violated the
19    NVRA?
20 A  I have not stated that in the report. No, I have not.
21 Q  Going back to No. 3. You -- do you have any studies
22    that -- that backs up your conclusion that programs will
23    operate more effectively or efficiently when there is a
24    greater reliance on electronic transfer of election
25    data?

100

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  Q  Because you don't know, right, sir?
2  A  No, I just -- it's that I -- based on the material I --
3     I read that -- again, the material that I reviewed,
4     there seemed to be some problems with the processing of
5     the forms at the motor vehicle agencies and -- and the
6     paperwork that was going back and forth. And so to that
7     extent the -- we knew that there were -- I mean, I could
8     tell by just reading that -- those documents that there
9     were some problems with -- with the paper form in terms
10    of its overall effect, however, on the voter
11    registration programs. I've -- I've not -- it was
12    difficult for me to -- to ascertain what the overall
13    impact of that would be.
14 Q  And you're not opining here on No. 3, that there was any
15    violation of the NVRA, are you, sir?
16 A  Umm, no, I'm not -- no, I'm not.
17 Q  And just as -- and I'm sorry to do this to you. I don't
18    mean to jump around, but I didn't ask you so I'm going
19    to.
20       In No. 2 --
21 A  Sure.
22 Q  -- you're not opining that the secretary or the director
23    in any way violated the NVRA, are you, sir?
24 A  Not -- not in that opinion, no.
25 Q  Okay. So you're -- you're not opining in Opinion No. 1

99

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1  A  No.
2  Q  Any learned scholarship or treatises that say that?
3  A  No.
4  Q  Any studies that you've conducted that say that?
5  A  No.
6  Q  Do you know whether Florida does electronically transfer
7     any voter registration data?
8  A  It depends -- it appeared -- it did not appear to me
9     from my reading of the material that I had reviewed that
10    they provided what I would call a document -- a data in
11    a machine readable file. I'll stop at that, I guess.
12 Q  You're aware, sir, that in Florida, at least, for a
13    voter registration application to be valid, it needs a
14    signature, correct?
15 A  Yes. That -- that's true in our state, as well.
16 Q  And you're not talking about transferring those
17    signatures electronically, are you, sir?
18 A  Well, ideally that would be nice. But, no, I'm not --
19    I'm talking about the -- about the registration data
20    itself. We've -- we in our state are looking towards
21    doing something along that line eventually. I know
22    that's what -- what's certainly in the works here. But
23    specifically, I'm talking about the -- about the data
24    elements for voter registration.
25 Q  All right. The NVRA doesn't discuss at all electronic

101

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 transfer of voter -- voter registration data, does it,
2 sir?
3 A No.
4 Q All right. And the FEC report that you -- or the FEC
5 guide to implementation doesn't discuss that at all,
6 either, does it, sir?
7 A No.
8 Q All right. Let's --
9 A Let me just say, though, that the F -- the FEC guide --
10 sorry -- does talk about the desirability of having a
11 statewide voter registration base, but it doesn't
12 specifically talk about the electronic transfer of data
13 into that base from an agency voter registration -- a
14 voter registration agency.
15 Q All right. And let's move on to No. 4. And, again --
16 let's see here. I'm going to take you to McIntosh 2,
17 the second iteration of your draft, where the first
18 sentence reads -- well, strike that.
19 The only sentence reads, "At the statewide level,
20 it is essential that someone, preferably the State's
21 chief election official, be responsible for monitoring
22 the performance levels of state agencies that have
23 designated responsibilities under the National Voter
24 Registration Act."
25 And that was your only opinion -- the only

102

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 preferable; isn't that true, sir?
2 A The NVRA does require that certain statistical data --
3 and I'm talking generally now -- that certain
4 statistical data be made available in terms of the FEC
5 making its reports back to Congress at the time. And it
6 required, at least to that extent, that the state have
7 some program in place to have some sort of statistical
8 data available so that it could be determined how
9 effective various problems in the NVRA were in terms of
10 registering voters.
11 Q Are you aware, sir, that Florida has complied by
12 providing those reports to the FEC?
13 A I have no idea.
14 Q So you have not reviewed the FEC reports submitted by
15 Florida?
16 A No.
17 Q What do you -- what do you base the first sentence of
18 Opinion No. 4 on?
19 A Umm, I would base that based on my own experience at the
20 state level in terms of our implementation of the motor
21 voter program -- national voter -- in terms of our
22 implementing the responsibilities under the -- under the
23 National Voter Registration Act.
24 Q When you say "our," you mean Washington State?
25 A Washington State's. Sorry.

104

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 sentence in Opinion No. 4, as set forth in the -- in the
2 first two iterations of your report; isn't that correct,
3 sir?
4 A Umm, yes. Sorry. I was a page behind. I had to catch
5 up.
6 Q I understand.
7 And then subsequent to conversations with counsel,
8 you added another sentence to that opinion before
9 providing your final report. And that sentence reads --
10 well, strike that.
11 Isn't that true, sir?
12 A Yes.
13 Q And that sentence reads, "Florida would be able to more
14 efficiently operate its agency based voter registration
15 programs if monitoring programs were in place." Right,
16 sir?
17 A Yes.
18 Q And again -- and we've discussed this, I believe, but I
19 want to make sure -- you're not opining there that --
20 that Florida's doing anything illegal or not in
21 compliance with the NVRA, with regard to monitoring
22 programs; isn't that true, sir?
23 A Yes.
24 Q Because the NVRA does not require the monitoring
25 programs that you opine would be essential or

103

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 I would also state that this is -- opinion is one
2 held by me as a result of my work with certain coalition
3 groups that were responsible for the development of the
4 Act. It's also based upon my just overall observation
5 of what -- again, queries that I have gotten in from
6 other states about practices we've -- we have in place
7 and so forth. But I guess that's primarily why I would
8 stand behind that particular opinion.
9 Q So there is no document that you used to base that
10 opinion upon, correct?
11 A No, there is no -- no particular -- you know, particular
12 document, no.
13 Q There is no study or learned treatise?
14 A No.
15 Q And when you say it is essential that someone,
16 preferably the state's chief elections official, be
17 responsible for monitoring the performance levels of
18 state agencies, when you say it is essential, you're --
19 you're not opining that that is a requirement of the
20 NVRA, are you, sir?
21 A Umm, no.
22 Q And you're not opining that that is a requirement
23 of Florida election statutes, are you, sir?
24 A No. I have not read the Florida election statutes.
25 Q And you're not opining that it is -- when you say it's

105

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1   essential, you're not opining that that is a requirement
2   of any law, are you, sir?
3 A  No.  I'm -- I'm merely offering that opinion as -- from
4   an administrative point of view.
5 Q  And when you say in the second sentence that Florida
6   would be able to more efficiently operate its
7   agency-based voter registration programs if monitoring
8   programs were in place, again, you're not basing that on
9   any studies that have been done or that you've done,
10  correct?
11 A  Well, I wouldn't say studies that I have done in terms
12  of published studies or anything like that, no.
13 Q  You're not -- you're not basing that on any -- anything
14  that -- that is published and subject to peer review,
15  are you, sir?
16 A  No.
17 Q  You in fact know of no study or data that supports this
18  conclusion, other than your general feelings and
19  experience; isn't that true?
20 A  I know of no studies; no empirical data, no.
21 Q  All right.
22          MR. LINDSAY:  We've been going at it
23  for quite a while.  Why don't we take a few minutes.
24          THE VIDEOGRAPHER:  We are now going
25  off the record.  The time is 1:48.

                                                      106

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1           (Recess 1:48 - 2:12 p.m.)
2
3           THE VIDEOGRAPHER:  We are now back
4   on the record.  The time is 2:12.
5
6
7           EXAMINATION (Continuing)
8   BY MR. LINDSAY:
9 Q  Sir, when were you last in Florida?
10 A  I was in Florida -- I changed airplanes at the Miami
11  airport in 1970 -- approximately '77 or '78.
12 Q  Is that the only time you've ever been in Florida?
13 A  Yes.
14 Q  And, again, with regard to your conclusions in this
15  matter, nothing you have reviewed in this case, nothing
16  provided to you by counsel, or nothing you've reviewed
17  outside in any other context has led you to come to any
18  opinion that -- that either the Director of the Division
19  of Elections or the Secretary of State of Florida
20  violated either the NVRA or any other law; isn't that
21  correct, sir?
22          MS. FINEMAN:  Objection.  Objection
23  to form.
24          THE WITNESS:  I have not made any
25  conclusions, as I stated earlier, as to compliance with

                                                      107

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1   the National Voter Registration Act.  I just merely
2   stated the opinions that I have -- have here.
3 Q  (By Mr. Lindsay)  So that's a correct statement, then?
4 A  Yes.
5 Q  Who would you consider to be the foremost experts in the
6   country with regard to the NVRA?
7 A  Umm, you want me to list them by name, organization?
8       Oh, I would say Mr. Bill Kimberling, who is with
9   the Office of Elections Administration, Federal
10  Elections Commission.
11      Pennelope Bonzel, who is the director of the
12  Office of Election Administration at the Federal
13  Elections Commission.
14      Joanne Chasnow, who was with an organization
15  entitled Human Serve, which is an organization that no
16  longer exists.  But they were very active in the
17  enactment of -- of NVRA.
18      Probably a few state election directors who have
19  been around a long time and know a lot about NVRA and
20  about the issues regarding implementation.  Those that I
21  would mention would be Tom Wilkie, who is the executive
22  director for the New York State Board of Elections;
23  Chris Thomas, Mr. Chris Thomas, who is the Director of
24  Elections in the Michigan Secretary of State's Office.
25      I suppose those would be the ones that come

                                                      108

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

---

Byers Anderson Beach - Court Reporters & Video

1   immediately to mind.
2 Q  Where is Joanne Chasnow -- how do you spell her last
3   name, Chasnow?
4 A  C-h-a-s-n-o-w.
5 Q  Where does she live?  Do you know?
6 A  She lives in Weehawken, New Jersey.
7 Q  Do you know -- do you know whether she's employed,
8   currently?
9 A  I don't believe she is.
10 Q  Again, I am going to request that you take a look and I
11  would like to find --
12          MR. LINDSAY:  Yeah, the telephone is
13  on, correct?
14          UNIDENTIFIED SPEAKER:  Yeah.
15          MR. LINDSAY:  Counsel was inquiring.
16  It is on.
17      I'm going to request that you provide the first
18  iteration of your expert report that you provided in
19  this case.
20      And I have nothing further at this time.  I'm
21  going to turn it over to my colleague.
22          (Exhibit Nos. 5-8 marked
23           for identification.)
24  ////
25  ////

                                                      109

Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

```
 1                    EXAMINATION
 2   BY MR. MacINNES:
 3 Q  Good afternoon, Mr. McIntosh.  My name is Doug
 4   MacInnes.  I work in the Florida Attorney's General
 5   Office.  And I represent in this case the Florida
 6   Department of Highway Safety and Motor Vehicles and the
 7   Florida Department of Children and Families.  And just
 8   in case I forget to say this during my questions,
 9   anytime I refer to the Department of Highway Safety and
10   Motor Vehicles or the Department of Children and
11   Families, I, of course, am referring to the Florida
12   departments.
13        Mr. McIntosh, how much are you being compensated
14   for your testimony as an expert?
15 A  I have quoted to The Lawyers Committee for Civil Rights
16   Under Law a rate of $125, which is my normal rate for
17   preparing expert witnesses -- expert witness reports.  I
18   have verbally quoted to them a rate of $250 an hour for
19   my actual participation in the deposition itself.
20        UNIDENTIFIED SPEAKER:  Off the
21   record for a second.
22        MR. LINDSAY:  Hang on.
23        THE VIDEOGRAPHER:  We are going off
24   the record.  The time is 2:17.
25        (Discussion off the record.)
                                                    110
```

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

```
 1        THE VIDEOGRAPHER:  We are back on
 2   the record.  The time is 2:18.
 3
 4
 5             EXAMINATION (Continuing)
 6   BY MR. MacINNES:
 7 Q  Mr. McIntosh, when Mr. Lindsay was questioning you, you
 8   said you had received yesterday, I believe it was three
 9   transcripts of deposition.  One was from someone named
10   Baldwin from DCF; someone named Beringer from DCF.  And
11   by DCF I mean the Department of Children and Families.
12   Do you recall who the third one was from?
13 A  No, I don't, other than it was from somebody who was
14   with the motor vehicle division.
15 Q  Okay.
16 A  The only one that I had from DCF I believe was the one
17   from Mr. -- I think it was Mr. Baldwin.
18 Q  Okay.  When Mr. Lindsay was asking you about your
19   Opinion No. 1, your first opinion in Exhibit 3, your
20   expert report, he asked you on what documents you relied
21   on -- on what documents you relied in order to form this
22   opinion.  And at first you said there were four
23   documents.  One was an AFDC memo.  Next was the Carol
24   Canaday memo.  Next was maybe the District 3
25   registration procedures.  And last was Secretary
                                                    111
```

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

```
 1   Kearney's responses to interrogatories.  And then I
 2   believe after you had a chance to review all of the
 3   documents in front of you, you came back and said that
 4   you relied on the Carol Canaday memorandum of January
 5   8th, 19 -- or 2002, and a one-paged document that was
 6   contained in Secretary Kearney's responses to
 7   interrogatories.  And that was -- was an E-mail from
 8   Norene Moore to Greg Ferguson; is that correct?
 9 A  Yes.
10 Q  So when you clarified that for Mr. Lindsay, are you
11   saying that you did not rely on the AFDC information
12   memorandum?
13 A  I did not -- I don't believe I did -- I don't believe I
14   relied on that for that particular opinion.
15 Q  And are you saying that you did not rely on the District
16   3 registration procedures in giving your opinion to --
17   Opinion No. 1?
18 A  That's correct.
19 Q  All right.  Would you please describe for us the nature
20   of your work for the company called Vote Here with
21   regard to Internet voting.
22 A  With regard to Internet voting, Vote Here is a company
23   that has pursued the concept of Internet voting for
24   quite some time.  In fact, in Europe they are already
25   conducting some elections by using -- through the use of
                                                    112
```

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

```
 1   the Internet.  They are also involved in work in the
 2   private sector through the use of the Internet for --
 3   for voting; things such as student body elections, proxy
 4   voting for corporations, things like that.  They are
 5   also -- as I said, they are continuing to pursue and
 6   develop a market for Internet voting here in the United
 7   States for public elections.
 8 Q  Following -- immediately following the November 2000
 9   election, while you were the director of elections in
10   the state of Washington, were you asked your opinion by
11   members of the media on Internet voting?
12 A  Yes.
13 Q  And what was that opinion at that time?
14 A  My opinion at that time, and continues to be, that I
15   was -- I continue to be very cautious in terms of
16   Internet voting.  I do believe that eventually we will
17   have Internet voting, but I do believe that there are a
18   number of issues of perception that are going to have to
19   be dealt with along with various technical issues, as
20   well.
21 Q  What concerns, specifically, do you have with Internet
22   voting?
23 A  Umm, I think there are a couple.  One is certainly the
24   integrity of the voting process and how well we can
25   protect the integrity of the voting process through
                                                    113
```

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  Internet -- and still being -- still be able to conduct
2  elections via the Internet.  And certainly, as I said, I
3  think that there needs to be public confidence in the
4  elections process.  And to the degree that there are,
5  for whatever reason, many in our particular culture that
6  are concerned about Vote Here and those kinds of issues,
7  that it's important that those voices be heard, as well,
8  as we begin to -- to develop this.
9       As I stated earlier, I do think -- I am cautious.
10  I do think that Internet voting is something that's
11  going to have to be phased in over an extended period of
12  time before we are actually voting on the Internet at
13  home using our personal computers.
14 Q  And what fee arrangements do you have with Vote Here?
15 A  Actually, I have -- I have a contract with Vote Here.
16  It's a -- it's a yearly -- it's a yearly contract.  And
17  they pay me a certain amount of money a month and for
18  that I -- as I say, I make -- said earlier -- I make 16
19  days a month available to them to work.  And also I have
20  an exclusive relationship with them in terms of anyone
21  else in the vendor community for voting systems.
22 Q  Do you know how much they pay you annually?
23 A  $100,000.
24 Q  Is the creation of Internet voting in the United States
25  a potentially lucrative enterprise?

114

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1 A  Yes, it is.  Although I would place the emphasis on
2  "potentially."
3 Q  Is Vote Here competing to win the Internet voting
4  market?
5 A  Well, I think once there is an Internet voting market,
6  they will be competing for that market.  At least in
7  terms of the United States, I'm not sure that there is a
8  market currently for that, other than what is a, as I
9  stated earlier, market in the private sector.
10 Q  Do you have any idea -- do you have any idea what that
11  market is worth?
12     MS. FINEMAN:  Objection.
13     THE WITNESS:  No.
14 Q  (By Mr. MacInnes)  Could it be in the billions of
15  dollars?
16     MS. FINEMAN:  Objection.
17     THE WITNESS:  Let me -- let me
18  answer that question this way by saying I don't know of
19  any market for any voting system in the United States
20  that's probably worth in the billions of dollars.  I --
21  marketing voting systems in this country is a very, very
22  difficult proposition.  And it's highly competitive;
23  margins are very thin.  So it's difficult to, I think,
24  ascertain what -- what potential dollar value is in any
25  kind of voting system.

115

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1 Q  (By Mr. MacInnes)  Do you know approximately how many
2  registered voters there were in the state of Washington
3  in November 2000?
4 A  There were a little over 3 million.
5 Q  Now, Mr. McIntosh, I'm handing you what has been marked
6  as Exhibit 5.  Exhibit 5 was downloaded from the
7  Internet.  It purports to be from the Detroit News dated
8  Saturday, November 11, 2000.  And it purports to be a --
9  an article entitled "Complaints over elections
10  commonplace around country."  And in the center of the
11  first page I've put some brackets around several
12  sentences that read, "Glitches crop up in every election
13  and in every state, said Gary McIntosh, elections
14  supervisor in the state of Washington and president of
15  the National Association of State Election Directors.
16     "'Oh, man, there are billions of them,' he said.
17  'When you have this many people attempting to vote, and
18  human beings" are "in charge of the process, you're
19  going to have mistakes made.'"
20     Is that an accurate quote, Mr. McIntosh?
21 A  Yes.  Although, I would say that maybe the term
22  "billions" was obviously an exaggeration, but certainly
23  the gist of the quote and the accuracy of the verbiage
24  used in the quote is certainly accurate.
25 Q  And were you referring to the November 2000 election in

116

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  that article?
2 A  No.  I think I -- well, as the first paragraph says,
3  "Glitches crop up in every election."  So I guess to
4  some degree I was speaking generally.  Although, I was
5  certainly being asked the question because of the
6  circumstances surrounding the 2000 election.
7 Q  Is it your opinion that there were billions of mistakes
8  made in the November 2000 election?
9 A  I don't know.  I would not use the word "billions," no,
10  specifically.
11 Q  Did you use the word "billions" back on November 11th of
12  2000?
13 A  I probably did, yes.  I don't recall the quote
14  specifically, no.  But it's something I could have said,
15  yes.
16 Q  Would it be safe to say that there were a very large
17  number of mistakes made in the November 2000 election?
18 A  Yes.
19 Q  Is it your opinion that mistakes will be made in the
20  election process in every election in every state?
21 A  Yes.
22 Q  And what is the basis for that opinion?
23 A  My basis for that opinion is knowing what it takes to
24  put an election together and knowing how many people are
25  involved in the election; knowing how many -- the

117

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1   factors that as an election supervisor, the
2   circumstances that exist that you have very little
3   control over.  So certainly when you -- I'm not talking
4   here generally in terms of how large the mistakes are or
5   maybe somebody leaving the seal off of a ballot box or
6   not writing the number for -- the seal number that's
7   being used to seal a tray of ballots has been -- the
8   numbers have been transposed on the log-in sheet.  There
9   are all kinds of steps in the process where mistakes --
10  mistakes are made.
11 Q  Is it your opinion today that when you have human beings
12  in charge of the process, you're going to have mistakes
13  made?
14 A  Yes.
15 Q  Does your opinion about the number of mistakes made in
16  elections apply to the registration process, as well?
17 A  To -- to a degree.  Although, I have to admit that when
18  it comes to a registration process, I'm probably a
19  little less forgiving because in the registration
20  process, unlike what you have in an election -- in the
21  elections process, you have the opportunity to exercise
22  a little more control over that process than you do with
23  an election that's held on the day -- the day of the
24  election.
25 Q  But are mistakes made in the registration process

118

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1 Q  Now, if you knew there were mistakes being made by
2   humans in the elections process while you were the
3   supervisor of elections in Thurston County, and the --
4   while you were the director of elections in Washington
5   State, did you try to put a stop to the mistakes being
6   made?
7 A  Yes.
8 Q  Is it -- were you successful in putting a stop to
9   mistakes being made by humans?
10 A  To some degree there were certain kinds of mistakes that
11  were made that we did put a stop to.  Again, what we
12  did, and I think this -- I think this is fairly normal
13  for what other election officials do, is that following
14  an election we would -- essentially what we would do was
15  we would essentially conduct an autopsy of that
16  election.  We would look for common errors.  We would
17  look for breakdowns that we may have had during our
18  training sessions.  We would have had in -- we -- we
19  conducted an ongoing monitoring of the elections process
20  at both the county level and at the state level so that
21  we could identify as many of those breakdowns as we
22  could and so that we could make a -- the systemic
23  changes that we needed to make in order to at least
24  reduce the number of mistakes that were made.  And
25  that's why we had, as I said, an ongoing monitoring

120

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1   because there are humans involved?
2 A  Sure.
3 Q  How long have you held this opinion that there will be
4   mistakes made in every election and in every state?
5 A  Probably ever since I was responsible for conducting my
6   first election.
7 Q  And that goes back to what year?
8 A  I think the first election I ever conducted was in -- I
9   was at Thurston County and it was a school election in
10  February of 1979.
11 Q  How long were you the director of elections in
12  Washington State?
13 A  For about 12 years.
14 Q  Were there mistakes made by humans in the election
15  process in Washington while you were the director of
16  elections?
17 A  Are you referring to -- let me just answer that question
18  by saying yes.
19 Q  And how long were you the supervisor of elections in
20  Thurston County, Washington?
21 A  For about ten years.
22 Q  Were there mistakes made -- mistakes made by humans in
23  the election process while you were the supervisor of
24  elections in Thurston County, Washington?
25 A  Yes.  In fact, I made some of them.

119

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1   process of -- of everything that -- that happened during
2   that election.
3 Q  Is it possible to eliminate human error in the elections
4   process?
5 A  No.  Not all of human error, certainly.
6 Q  Does your answer include the voter registration
7   application process?
8 A  If you're asking if -- yes, it would include the voter
9   registration process in terms of eliminating all human
10  error.
11 Q  What entities or agencies are responsible for providing
12  the opportunity to apply to register to vote under the
13  NVRA?
14 A  Umm, social service agencies that are designated under
15  NVRA, plus any other designated agencies that the state
16  chooses to designate beyond those agencies that are
17  listed in -- in the NVRA.  And those would -- NVRA lists
18  the Medicaid and food stamps and those kinds of
19  agencies, as well.
20 Q  Driver's license offices?
21 A  Yes.
22 Q  Military recruiting offices?
23 A  Yes, military recruiting offices, driver's license
24  offices, as well.
25 Q  Public libraries?

121

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1 A  Umm, public libraries I -- are -- are optional.  I mean,
2     they can be designated by the -- by the state as a voter
3     registration agency.  I don't -- I don't believe that
4     they are designated under the -- specifically under the
5     National Voter Registration Act.
6 Q  If we poured millions of dollars into the -- into NVRA
7     training of all of these employees of these agencies,
8     could you ever eliminate human error in the voter
9     registration application process?
10 A  I think you could eliminate some human error, but
11     certainly not all of it.
12         But let me add that in order to -- to do that,
13     again, you would need to have a monitoring mechanism in
14     place in order to identify where those errors are
15     occurring, so that you could work towards eliminating
16     them.
17 Q  Well, even if you had a monitor, could you ever
18     eliminate human error in the elections process?
19 A  Well, let me -- the answer to that question -- let me
20     first off by saying no, you can't.  But let me also go
21     on by saying that human error covers a lot of different
22     things.  Human error can cover, as I say, transposing
23     numbers off a voter registration form.  It can involve
24     some fairly -- some errors that really have very little
25     impact on the -- on the registration process itself.  Or

122

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     it could be a series of errors that can have a fairly
2     significant impact on the elections process, depending
3     upon what the error happens to be.
4 Q  Do you know who Deborah Phillips of the Voting Integrity
5     Project is?
6 A  I have met Deborah Phillips.
7 Q  I'm handing you a document marked Exhibit 6.  Exhibit 6
8     is also taken from the Internet.  And it purports to be
9     a newspaper article entitled, "Broken System?," by
10     Geraldine Sealey, S-e-a-l-e-y, dated November 10, 2000.
11     And in the center of the page there's a quote that
12     purports to be from Deborah Phillips.  And the -- and
13     the Exhibit 6 has that quote as "'There's nothing
14     particularly unusual about the type or number of
15     complaints we have been getting,' said Deborah Phillips
16     of the Voting Integrity Project.  'What is unusual is
17     the level of hysteria, which is understandable given the
18     closeness of the vote and what is at stake.'
19         "'Most of the irregularities reported in Tuesday's
20     vote - and in most elections in recent times - can be
21     attributed to human error,' she said.  'We have a very
22     organic system of election in the United States,'
23     Phillips said, 'I think that is by design.'"
24         Do you agree with the quote that is attributed to
25     Miss Phillips in this article that says most of the

123

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     irregularities reported in Tuesday's vote and in most
2     elections in recent times can be attributed to human
3     error?
4 A  No.
5 Q  Why not?
6 A  Well, because I think that most of the irregularities
7     that came out of the -- and I want to point out that --
8     go back by saying most.  I'm not saying all.  Most of
9     the irregularities that occurred across the country went
10     far beyond human error, so I -- that would be my
11     opinion.
12 Q  What kind of errors are you talking about?
13 A  I'm talking about equipment that is outdated, voting
14     equipment that is outdated; a reliance on election
15     administrators who do not have the resources to carry
16     out properly their functions and requirements under
17     various Federal and state laws.  I'm talking about a lot
18     of reliance on people to work at the polls, who -- who
19     have to do so 12- to 14-hour days, who get paid a very
20     small wage.
21         I'm talking about states that are -- that -- that
22     do not properly carry out their duties at the state
23     level in order -- in terms of both voter registrations
24     and elections.  I'm talking about local election
25     officials who often are untrained, who have not been

124

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     tested as to their capability of carrying out election
2     functions at their level, what are required of them by
3     state and Federal law.
4         To -- to look at the elections process as a whole,
5     I think to attribute irregularities that were reported
6     in -- in the 2000 elections to just human error is -- is
7     not demonstrating much of an understanding of how the
8     elections process works in this country.
9 Q  Do you know what Miss Phillips means when she says we
10     have a very organic system of election in the United
11     States?
12         MS. FINEMAN:  Objection.
13         THE WITNESS:  No, I don't know what
14     she means.
15 Q  (By Mr. MacInnes)  Have you ever heard the term
16     "organic" used in relationship to elections?
17 A  No.
18 Q  Do you agree with the statement attributed to
19     Miss Phillips that says, "There is nothing particularly
20     unusual about the type or number of complaints we've
21     been getting," referring to the November 2000 election?
22 A  I have no idea about the number of complaints that --
23     that the Voting Integrity Project received.  I don't
24     know whether -- I don't know what types of complaints
25     they get normally and whether or not the complaints they

125

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  received in the 2000 election would be unusual or not.
2  Q  Do you agree with the statement attributed -- attributed
3     to Miss Phillips that says, "What is unusual is the
4     level of hysteria, which is understandable given the
5     closeness of the vote and what is at stake"?
6  A  Are you asking do I agree that there was a level of
7     hysteria?
8  Q  Yes, sir.
9  A  Well, "hysteria" is -- is a -- is a pretty strong word.
10    I don't know that "hysteria" would be the word that I
11    would have used, let's put it that way.
12 Q  What word would you use?
13 A  Well, I -- certainly there was a great deal of national
14    attention on the elections process that occurred
15    following the 2000 election.
16 Q  Do you think there was any hysteria following the
17    November 2000 election?
18 A  There were people who were upset about what happened in
19    the 2000 election.  Hysteria -- hysteria means to me
20    that they were hysterical.  And I'm not sure that --
21    while I talked to a lot of voters who were upset, I
22    don't know that I would describe them as being
23    hysterical.  I would -- I would guess it's a matter of
24    semantics.
25 Q  As a director of elections in the state of Washington,

126

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     ballot.  We are one of the states that has that process.
2     At which time the voter will make -- state their claim
3     that they should be entitled to vote in that particular
4     election.  Each of the -- every one of those ballots is
5     eventually investigated.  They are presented to a county
6     canvassing board and the decision is made as to whether
7     or not to count that ballot based on the information
8     that we received from the ballot and information that we
9     can ascertain from other records in that office.
10       So those are handled in that particular manner.
11       We always will get some complaints from people
12    that they were wrongfully directed to a different
13    polling location or something like that.  And that, too,
14    we will -- we will make an attempt to investigate what
15    had occurred there.  But our statewide -- our policy has
16    been to allow people to vote and to investigate any
17    problems or complaints or anything that they had -- and
18    to do that later.
19 Q  Were any of the complaints alleging denial of the right
20    to vote unfounded?
21 A  Umm, let me answer that this way:  Whenever we go
22    through that, that process, we will find mistakes made
23    and we will go ahead and count the ballot.  In fact, I
24    don't -- don't ask me a percentage of those -- but many
25    of them we do end up counting.

128

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     did you receive any complaints about the November 2000
2     election?
3  A  Personally I received very few complaints regarding
4     the -- the conducting of the November 2000 election.  We
5     always will have some complaints regarding the 2000
6     election -- or any election, I should say, not
7     referencing the 2000 election.
8  Q  Are you aware of any complaints that the supervisors of
9     elections in the state of Washington received following
10    the November 2000 elections?
11 A  Not specifically.  Although, I mean, that's been a
12    couple of years.  We -- we always receive some
13    complaints following an election.
14 Q  Did any of those complaints or complainants complain
15    that they were denied the right to vote?
16       MS. FINEMAN:  Objection to form.
17       THE WITNESS:  Yes.
18 Q  (By Mr. MacInnes)  Were those complaints investigated?
19 A  Umm, yes.  In -- in nearly all cases, the complaints
20    were investigated in our state.  If you'd like me to
21    explain that, I could.
22 Q  Sure.
23 A  In our state, if you -- if you come to the polling place
24    to vote and your name is not on the voter registration
25    list, you are given an opportunity to cast a provisional

127

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     Some of the complaints were unfounded.  We were
2     not able to locate a voter registration record or in
3     some -- when I'm saying "we," I should say I'm really
4     referring to our counties.  And there maybe was not a
5     record that could be found or it may have been -- be
6     that the voter had moved without notifying the proper
7     election official, what have you.
8  Q  I'm handing you a document that has been marked Exhibit
9     7.  Did you testify in -- on May 3rd of 2001, before the
10    Senate Committee on Governmental Affairs regarding
11    Federal election practices and procedures?
12 A  Yes.
13 Q  Is Exhibit 7 a copy of your testimony before that
14    committee?
15 A  Umm, it appears to be.
16 Q  Would you please turn to Page 2 of Exhibit 7.
17 A  Uh-huh.  (Witness answers affirmatively.)
18 Q  Am I correct that on Page 2 you are describing the way
19    driver licensing agencies in the state of Washington
20    conduct their responsibilities under the -- under the
21    NVRA?
22 A  Yes.
23 Q  In the first full paragraph on Page 2 you say, "Eligible
24    citizens are offered a near-automatic method of
25    registering to vote."  What do you mean by

129

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

"near-automatic"?

2 A  Well, we have a simultaneous application process in our
3     state.  We -- without reading verbatim off this
4     report -- have a computer link between -- that links the
5     voter registration -- or driver's licensing data with
6     the voter registration data.
7         We -- one of the things that we did when we
8     designed our system, we noted the fact that almost
9     everything that the driver's license examiner asked for
10    in terms of processing the driver's license application
11    was information that we could use to register that
12    applicant to vote.  We did not want to have to repeat
13    any of the questions that were asked of the voters.  We
14    did not want to have them fill out an additional form.
15    So what we tried to do was to capture the -- the
16    essential information electronically, as best we could,
17    and then simply have the applicant sign a form with what
18    contained an oath stating their qualifications to be a
19    registered voter.
20 Q  Does the State of Washington require an original
21    signature on a voter registration application?
22 A  Yes, we do.
23 Q  So if a person goes into a State of Washington driver's
24    license office, gets a driver's license and also
25    completes a voter registration application, do they

130

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     basically have to give two signatures:  One for the
2     driver's license and one for the motor voter
3     application?
4 A  I believe they have to give a separate one for the
5     driver's license one.  And as I mentioned earlier, is
6     what we are attempting -- will be -- I just want to
7     say -- that potentially is what we're going to be
8     looking for in terms of capturing a signature.  But
9     actually, there is an additional signature that is
10    required.  Washington State has a -- the initiative
11    process.  It's a little -- it's a little unusual.  I
12    suppose every state has its little idiosyncracies along
13    the way.  But we also require a signature on an
14    initiative card, which is a perforated card that is used
15    -- is kept separately at the state level for use in
16    capturing -- in identifying -- or comparing signatures,
17    I should say, that are contained on initiative
18    petitions.
19 Q  What is an initiative card or an initiative petition?
20 A  In Washington we have an initiative and referendum
21    process, which enables citizens to enact new legislation
22    or to attempt to amend existing law or can refer acts of
23    the legislature back to the people.  It's a petition
24    process.  The petitions come directly to the Secretary
25    of State's office and they are -- currently -- it's a

131

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     little difficult to explain, but it's a fairly manual
2     process.  Now, many counties have digitized their
3     signatures, and we make use of those signatures in terms
4     of making signatures -- signature comparisons to the
5     petition.
6         By the way, I should say "we" being the Secretary
7     of State's Office, who I'm technically no longer with,
8     but haven't gotten over the habit of using the term "we"
9     when talking about them.
10        But generically, the State of Washington uses
11    those -- those cards to make that signature -- signature
12    comparison.
13 Q  So when a person comes into a State of Washington
14    driver's license office, they're going to require three
15    signatures from them:  One for their driver's license,
16    one for their motor voter registration application, and
17    one for the initiative petition.  Is that correct?
18 A  When we were -- when I was nearing the end of my term,
19    we were getting away from asking for that third
20    signature because of the fact that we were looking at
21    having -- because many -- many of these signatures were
22    now digitized by the counties anyway.  And since it was
23    those -- it was -- the digitized signature that we were
24    using to make the signature comparison, I believe that
25    now they no longer require that third signature and they

132

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     just simply leave it -- if the county is already
2     digitizing it, then they don't need to worry about it
3     because that will always be captured in their voter
4     registration system.  And for those that don't have it,
5     they simply just make a -- usually these are in counties
6     that are fairly small and they just merely make a
7     photocopy of the signature and -- and send it -- and
8     forward that to us -- to the Secretary of State's
9     Office.
10 Q  Will a county supervisor of elections in the state of
11    Washington accept an electronic signature on a voter
12    registration application?
13 A  Yes, for the purpose -- for the purposes of what they're
14    going to use it for.  The original signature, even
15    today, in Washington State, is kept, but it's kept only
16    for the purpose of, as I -- and I'm not an expert in --
17    in criminal law, but it is my understanding that in --
18    in criminal law there is still a reliance on an original
19    signature in terms of bringing action against a
20    particular individual.
21        So for the -- the purpose of protecting the
22    integrity of the process, the -- the original signature
23    is kept.  Usually it is kept separately.  In those
24    counties where there -- they did digitize the
25    signatures, they keep them in a box.  They keep them

133

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  someplace they can find them if they need to have it.
2  But the -- the signature that is used to process
3  absentee applications, to compare signatures on local
4  petitions or any of those other kinds of actions, are --
5  are a digitized -- is a digitized signature.
6  Q  Where are these original signatures kept?
7  A  They are kept -- I -- they are kept separately, as I
8  said. They're usually kept in another file cabinet,
9  another box, depending on the county that that action --
10 Q  They are kept at the county level?
11 A  Yes.
12 Q  Oh, okay. So do I understand that when you apply for a
13 voter registration -- for voter registration, you still
14 do have to sign an original document? Is that correct?
15         MS. FINEMAN: Object to the form.
16         THE WITNESS: Yes.
17 Q  (By Mr. MacInnes) Do you know if the supervisors of
18 elections in Florida will accept an electronic signature
19 on a voter registration application?
20 A  I -- I do not know.
21 Q  Are you aware of any instances in the state of
22 Washington where a driver's license employee forgot to
23 get a customer's signature on a voter registration
24 application?
25         MS. FINEMAN: Object to the form.
                                                    134

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  THE WITNESS: Yes.
2  Q  (By Mr. MacInnes) Did that ever occur while you were
3  the director of elections?
4  A  Yes.
5  Q  Did you put a stop to that?
6  A  We certainly attempted to do so, yes.
7  Q  Did you put a stop to it?
8  A  I think to a large degree we have. One of the things
9  that came up in fact during -- I believe during the
10 questioning during the Senate hearing that we talked
11 about is the -- the fact that over time we were able to
12 minimize -- let me say this -- to reduce the number of
13 those kinds of errors. We did that in a couple of
14 different ways.
15     One is we had all of the voter registration
16 application forms come directly to the state office, to
17 a state central office. We examined those applications
18 for any potential error. If there was a missing
19 signature, a missing data record or something like that,
20 we were the ones at the state level acting under our
21 responsibilities under the NVRA. In terms of
22 coordinating the programs under NVRA, we were the ones
23 that assumed the responsibility for taking care of those
24 kinds of -- of identifying those kinds of errors and
25 doing everything we could to coordinate with the state
                                                    135

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  agencies in making sure that those errors, as best we
2  could, did not occur again.
3  Q  Okay. So when you -- so every voter registration
4  application comes to the Secretary of State's Office
5  for --
6  A  Absolutely.
7  Q  -- for review?
8  A  Again, that is part -- we viewed that as part of our
9  responsibility under NVRA, to make sure that we were --
10 we were carrying out our duties in terms of the
11 coordination responsibilities of NVRA.
12 Q  And when you found a form coming from a driver's license
13 office that was missing a signature or missing some
14 other required information, what did you do about that?
15 A  We contacted the office. We -- we were the ones that
16 attempted to contact the voters. We sent them another
17 form. We did whatever we could to get that signature
18 captured to make sure that that voter was registered.
19 Q  Do you know if -- if in the state of Florida, whether
20 the supervisors of elections are performing that
21 identical process?
22 A  It -- based on the documents that I received, there were
23 some that -- that it appeared from the documents that I
24 received that the supervisors of elections were doing
25 what had -- were doing that in relationship to the
                                                    136

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  offices that were in their particular county. There did
2  not seem to be any statewide program at all that
3  performed that particular function.
4  Q  Well, do you agree that in the information you looked
5  at, there were supervisors of the elections in the state
6  of Florida who were performing that same function of
7  checking applications and if they found mistakes,
8  coordinating or going back to both the agency that made
9  the mistake and going forward to the voter and asking
10 them to fill out a new application?
11 A  Let me -- let me answer that by saying of the
12 counties -- I -- obviously the documents that I received
13 were from some of the counties in Florida. As I stated
14 earlier, I didn't do an empirical study of this. I did
15 not look at every county, nor do I have documentation
16 from every county. It appeared to me from the
17 description, as I understand it from reading the
18 documentation and reading the -- some of the -- of the
19 depositions that I reviewed yesterday briefly, it
20 appeared that supervisors certainly were making attempts
21 to try to resolve problems with applications that they
22 received from driver's license offices within their
23 particular county.
24     It was not always clear to me that there was any,
25 you know, follow-up to those or anything like that. I
                                                    137

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  mean, I do know that they attempted to send registration
2  forms out. At least they stated that was a part of
3  their policy. But there seemed to be no statewide
4  policy as to what they were supposed to do. Maybe there
5  was one and I just didn't get it or didn't review it.
6  But there didn't seem to be any statewide program at all
7  in terms of coordinating how those various kinds of
8  problems that can occur, how they were to be resolved.
9  That was not clear to me from the documents that I
10 reviewed.
11 Q  Do you know how many registered voters there are in the
12    state of Florida?
13 A  No, I don't.
14 Q  Are you saying -- is it your testimony that the State of
15    Florida is doing it wrong by not following the process
16    that you described in the State of Washington?
17 A  Wrong in what respect? I don't want to be questioning
18    the questioner here.
19 Q  Okay. Are you saying that the system that the State of
20    Florida uses -- that being the supervisors of elections
21    conduct this checking process versus the Secretary of
22    State, that's the system I'm talking about -- does that
23    violate the NVRA?
24 A  No, I'm not making that assertion.
25 Q  Are you -- are you saying -- are you suggesting that the

138

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  Q  Why does there need to be uniformity throughout the
2     state of Florida?
3  A  Well, because I -- I -- I think that there -- there --
4     there needs to be some agreed-upon procedures, it seems
5     to me, as to how that process is going to work. And as
6     you alluded to earlier, that doesn't mean everybody is
7     going to follow it, but it certainly -- there -- there
8     needs to be some -- it seems to me, some statewide
9     coordination over how these various responsibilities are
10    carried out. That's my own -- my own personal opinion.
11    I think that it's not improper for the counties to do
12    that. It's not improper for the counties to have those
13    responsibilities.
14 Q  But doesn't your opinion suggest that at least some of
15    the supervisors of elections in counties in the state of
16    Florida are not doing their job?
17           MS. FINEMAN: Objection to form.
18           THE WITNESS: Umm, actually, no, I
19    don't -- I didn't -- to be honest, in my review of the
20    voter registrations -- documents that I had, the
21    problem, I guess, with your question is that I don't
22    know if they're doing their jobs.
23           And the reason I don't know that is because
24    there's nothing in place -- there is no structure in
25    place that has them report back to anybody as to what

140

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  State of Florida is doing something incorrect by having
2  the supervisors of elections versus the -- the
3  Department of State do that checking function?
4           MS. FINEMAN: Object to the form.
5           THE WITNESS: I'm -- let me answer
6  that this way, by saying that, no, I don't believe
7  they're doing anything incorrectly or that any state
8  would be doing it incorrectly by -- by relying on the
9  county officials to perform that function. I think as
10 long as -- I think that function will work as long as
11 there is a statewide official who is responsible for
12 coordinating all of those activities; if there is a set
13 of agreed-upon procedures for -- that govern that
14 activity; where there is, you know, someone at the state
15 level working with them in a -- in a broad way of
16 identifying what those problems are and how they're
17 being resolved, so that there is some uniformity in that
18 process.
19 Q  (By Mr. MacInnes) Well, if the -- at the county level
20    in the state of Florida, if the supervisor of elections
21    is that person that is responsible for coordinating --
22    coordinating all of the voter registration checks and
23    balances, if you will, in that county, would that be
24    proper?
25 A  That would be proper for that county.

139

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  those problems are and -- at least in the documentation
2  that I have. There may be something there, but I
3  don't -- I don't -- I couldn't make that conclusion
4  because I don't have any -- the information is not there
5  for anyone to -- to make that kind of conclusion,
6  unfortunately.
7           I think that if there was some sort of monitoring
8  process in place at the -- at the state level, you could
9  certainly demonstrate that they are or they aren't. I
10 don't -- I don't believe there is enough here to make
11 that -- to come to that particular conclusion.
12 Q  (By Mr. MacInnes) I believe you told Mr. Lindsay in
13    response to one of his questions that you understood
14    that in Florida the supervisors of elections are
15    constitutionally elected officers. Is that correct?
16 A  I believe I read that somewhere. And that -- that seems
17    to conform with my -- with my original understanding was
18    just from passing and being -- my work with elections
19    over the years.
20 Q  And do you know what that -- what impact that fact has
21    on the supervisors' relationship with the Secretary of
22    State and the Division of Elections in the state of
23    Florida?
24 A  I don't know -- no, I don't. I don't know what impact
25    that has on that particular relationship. I'm not sure

141

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

**Page 142**

Byers Anderson Beach - Court Reporters & Video

1 that it makes a lot of -- necessarily makes a lot of
2 difference in the National Voter Registration Act, but
3 it might.  I don't know.  But I don't know what their
4 relationship is, so... (Pause.)
5 Q If I told you that each supervisor of elections in the
6 state of Florida is an independent officer and makes his
7 or her decisions about the way they are going to run the
8 elections process in their respective county, would that
9 change your opinion about having to have a statewide
10 coordinator?
11 A No, it really wouldn't.  Because I don't think that that
12 particular fact, legal fact, has anything to do with
13 precluding -- would in any way -- let me put it this
14 way -- would in any way preclude the officer designated
15 under Section 10 of the National Voter Registration Act
16 from working with the local supervisors, developing a
17 set of agreed-upon procedures, asking for them to
18 provide reports to the State so that they could monitor
19 the activity, looking at -- making on-site visits to the
20 counties, doing, you know, all of these other kinds of
21 things, I don't think that that -- that that particular
22 fact, that they don't have any legal authority over
23 them, would preclude them from exercising those kinds of
24 responsibilities in terms of coordinating their duties
25 under the NVRA.

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

**Page 143**

Byers Anderson Beach - Court Reporters & Video

1 Q Well, let's take your opinion, then, to its logical
2 conclusion.  Let's say that you are the statewide
3 coordinator in the state of Florida and you have gone
4 around and looked at how each supervisor of elections is
5 conducting his business.  And you find one that you
6 don't like.  And you say, Change your procedures.  Can
7 you do that in Florida?
8 A Maybe not.  I'm not sure even in the state of Washington
9 that you could do that.  But that does not preclude you
10 from asking them to do it, nor does it -- nor does it,
11 it seems to me, to -- to at least reduce your
12 responsibility under NVRA to conduct that kind of
13 statewide -- to assume that kind of statewide
14 responsibility.
15 Q Well, are you suggesting, then, that there should be an
16 informal relationship between the statewide coordinator
17 and the supervisors of elections as opposed to a formal
18 relationship?
19 A I don't think that the inability to have a formal
20 relationship precludes in any way the ability to have an
21 informal relationship.
22 Q Do you know that there is not an informal relationship
23 currently between the supervisors of elections in
24 Florida and the Division of Elections in Florida?
25 A It appears there isn't.  As I said, I'm not -- I think

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

**Page 144**

Byers Anderson Beach - Court Reporters & Video

1 that's unfortunate.
2 Q I'm sorry.  I didn't hear your answer.
3 A I said, it does not appear that there is even an
4 informal relationship.
5 Q But you don't know that -- you don't know that for a
6 fact, right?
7 A Umm, no, I don't.
8 Q Okay.  Now, going back to the system that you had in
9 the -- in the state of Washington where you would review
10 -- or your office would review all of the applications
11 and if you found a mistake you would go to the offending
12 agency and talk to them about it.  By using that
13 process, were you able to eliminate mistakes made by
14 those agencies?
15 A Over the years we certainly have.  We've reduced them
16 greatly.  Obviously, we have not eliminated them.  I'm
17 not sure that anyone would suggest that that's probably
18 even possible.  But we certainly have reduced the number
19 of errors that we have had over the years just simply
20 because of the fact that we had that -- that statewide
21 coordination.
22 Q If a driver's license agency employee in the state of
23 Washington failed to get a signature on a voter
24 registration application, does that mean that the
25 customer has been denied his or her right to vote?

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

**Page 145**

Byers Anderson Beach - Court Reporters & Video

1 A No.
2                  MR. MacINNES:  The videographer is
3 telling me that we're at about the time for a break, so
4 why don't we change tapes.
5                  THE VIDEOGRAPHER:  We are going off
6 the record.  The time is 3:13.  This is the end of Tape
7 2.
8                  (Recess 3:13 - 3:21 p.m.)
9
10                  THE VIDEOGRAPHER:  This the
11 beginning of Tape 3.  We are back on the record.  The
12 time is 3:21.
13                  (Exhibit No. 9 marked
14                   for identification.)
15
16
17                  EXAMINATION (Continuing)
18 BY MR. MacINNES:
19 Q Mr. McIntosh, I'd now like to turn to your expert
20 opinion, which I believe is Exhibit 3.  And I apologize
21 if I replow some of the ground that Mr. Lindsay covered
22 with you, but I need to make sure that I covered all of
23 the questions that I need to ask on behalf of my two
24 clients.
25     Were you asked to render an expert opinion on

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  voter registration programs under the NVRA conducted in
2  Florida by the Department of Highway Safety and Motor
3  Vehicles or the Department of Children and Families?
4  A  Yes.
5  Q  What is your opinion as to how the Florida Department of
6  Highway Safety and Motor Vehicles conducted their
7  responsibilities under the NVRA?
8  A  I don't believe that I had any specific comments in the
9  report that I'm -- that I can recall that addressed
10  anything -- anything specifically with the motor vehicle
11  department, other than my comments on the electronic
12  transfer of data and the desirability to have that.
13  Q  Well, in your expert report, Exhibit 3, you do make some
14  negative comments about the Department of Children and
15  Families.  Can I assume from the absence of comments
16  about the Department of Highway Safety and Motor
17  Vehicles, that you are satisfied or pleased with their
18  performance under the NVRA; the Highway Safety, that is?
19  A  Based on the material that I had reviewed so far, I
20  would say that I was satisfied that -- with what they
21  had done.
22  Q  Are you going to be looking at more materials and
23  conducting further studies with regard to the Department
24  of Highway Safety and Motor Vehicles in this case?
25  A  I don't know.

146

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  Q  Did you review any Department of Highway Safety and
2  Motor Vehicle documents that describe that agency's
3  voter registration application procedures when you were
4  conducting your study?
5  A  Umm, I believe I did.  If you -- if you would like, I
6  could just take a moment to review --
7  Q  I don't need specifics.
8  A  Okay.  Yes, without getting into specifics, yes, I think
9  I had a fairly good understanding of how the process
10  worked based on my review of the material that I -- that
11  I had available.
12  Q  I'm sorry.
13     Do you recall if the Department of Highway Safety
14  and Motor Vehicles is doing anything -- with regard to
15  voter registration, that is -- that goes beyond what the
16  NVRA requires?
17  A  There was reference to a declination form that was used
18  in the Department of Licensing -- Department of
19  Licensing Office.  It was not clear to me exactly how
20  that part of the process worked.  But it appeared as if
21  there was some sort of a -- an opportunity similar to
22  what you would have in your social service -- within
23  your social service agencies that had the applicant fill
24  out or there was some record made of a -- of a -- of a
25  decline.

147

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     The only thing I would state here is that based on
2  my understanding of the NVRA, there is not a -- there is
3  no declination that is required under NVRA.  So if there
4  is something along that line that -- that has them go
5  through some sort of declination procedure, that would
6  certainly be something that would be beyond what would
7  be required under NVRA.
8  Q  Now, the documents that you did review on behalf of both
9  the Department of Highway Safety and Motor Vehicles and
10  the Department of Children and Families, were all of
11  those documents provided to you by your counsel?
12  A  Yes.
13  Q  Did you go out on your own and look for any other
14  documents, other than what was provided to you by your
15  counsel?
16  A  No.
17  Q  All right.  Do you recall if your counsel provided you
18  with any information on the receipt that the Department
19  of Highway Safety and Motor Vehicles gives to its
20  customers when they come in and apply to register for --
21  to vote?
22  A  Yeah, I believe there was reference to that.  I -- I
23  don't know if that was before 2000 or after or whatever.
24  That was another thing that was somewhat -- a little
25  confusing.  Some of the material I read was undated.

148

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  But I do recall reference to a receipt, yes.
2  Q  And now, was a receipt required by the NVRA?
3  A  My understanding would be that it is not.
4  Q  Now, did you render an opinion as to the Department of
5  Children and Families?
6  A  Yes.
7  Q  And is the entirety of that opinion contained in Exhibit
8  3?
9  A  Yes.
10  Q  What is the date of that opinion?
11  A  Of Exhibit 3?
12  Q  Yes, sir.
13  A  April 26th, 2002.
14  Q  Did you conduct a study into the Florida Department of
15  Children and Families' NVRA program in order to render
16  your opinion?
17  A  No.  I think "a study" is a strong word.  I reviewed
18  the -- the documents that -- that were made available to
19  me.
20  Q  Only those documents given to you by your counsel?
21  A  In terms of Florida's -- Florida agencies, yes.
22  Q  And once again, you didn't go outside those documents at
23  all in forming your opinion as to whether the Department
24  of Children and Families in Florida is satisfying its
25  obligations under -- strike that.

149

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1    You didn't -- in rendering -- strike that
2    question.
3        In rendering your opinion as to the Department of
4    Children and Families, you did not consult anything
5    other than the documents provided you by counsel?
6        MS. FINEMAN:  Object to the form.
7        THE WITNESS:  No.  No, I didn't.  I
8    did obviously already have things like copies of the Act
9    and the implementation guide, but those did not speak
10   specifically to Florida, obviously.
11 Q  (By Mr. MacInnes)  Now, with regard to your first
12   opinion on Page 3 of your expert opinion you say, "It
13   appears that in Florida some offices providing services
14   through the Department of Children and Families were not
15   always offering the opportunity to register to vote to
16   all clients, as prescribed in the National Voter
17   Registration Act."  Is that correct?
18 A  Yes.
19 Q  And I believe in response to Mr. Lindsay's line of
20   questioning, you said that in forming that opinion, you
21   relied on two documents.  One was a January 8th, 2002,
22   memorandum from Carol Canaday regarding voter
23   registration procedures, and the other -- well, let me
24   do it this way.
25        I'm handing you what has been marked as Exhibit 8.

150

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1    Tampa, Florida.
2 Q  Do you know if she has statewide responsibilities or
3    something less than statewide responsibilities?
4 A  I have no idea what this -- what this senior human
5    services program specialist responsibilities are in the
6    state of Florida.
7 Q  Did you interview Carol Canaday regarding this memo?
8 A  No, I did not.
9 Q  Do you know what office Carol Canaday works in?
10 A  The -- again, referring to the letterhead, it's from the
11   Florida Department of Children and Families.
12 Q  But you don't know which office within DCF she works?
13 A  No.  There -- the only thing that is at the bottom of
14   the page, it refers to a -- to a Sun Coast Region.
15 Q  Do you know where -- where the Sun Coast Region is?
16 A  No.
17 Q  Do you know how many service centers were not following
18   the correct procedures for voter registration
19   requirements in that memorandum?
20 A  How many there were?
21 Q  Yes, that's correct.
22 A  That were not following it?
23 Q  Right.
24 A  No.  I just know based on at least this memorandum that
25   one of them were.

152

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1    Did you rely on this document in forming your opinion on
2    Page 3?
3 A  Yes.
4 Q  And Exhibit 8 is, for the record, the January 8th, 2002,
5    Carol Canaday memorandum; is that correct?
6 A  Yes.
7 Q  I'm handing you what is Exhibit 9.  Do you recognize
8    that document?
9 A  Yes.
10 Q  And what is Exhibit 9?
11 A  Exhibit 9 is an attachment of some kind, titled
12   Attachment -- Attachment A.  It contains an E-mail
13   message from a Norene Moore to Greg Ferguson with a CC
14   to Janice Miller.  Following that there is a reply
15   separator and a message from Greg Ferguson.
16 Q  Now, are these the only two documents that you relied
17   upon in forming your opinion that appears on Page 3 of
18   Exhibit 3?
19 A  Yes.
20 Q  Do you know who Carol Canaday is?
21 A  On Exhibit -- in Exhibit 8, on Exhibit 8, she is
22   identified as the senior human service program
23   specialist.
24 Q  Do you know where she's located?
25 A  The letterhead seems to indicate that it came from

151

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1 Q  Do you know how many offices are in the Sun Coast
2    Region?
3 A  No, I do not.
4 Q  Do you know what voter registration procedures Carol
5    Canaday is talking about in that memorandum?
6 A  Well, I -- I did review a set of procedures that were
7    used to train DCF personnel.  I would presume without --
8    not having talked to Carol Canaday about the memo, that
9    she would be referring to those -- to those procedures
10   in some manner.
11 Q  But you don't know what procedures this document refers
12   to, do you?
13 A  If it's something other than the procedures that they
14   are to follow in terms of processing voter registration
15   applications, no.
16 Q  I mean, are you assuming from that memorandum that they
17   were not following any voter registration procedures?
18 A  No.  I would assume from this memorandum, based on
19   the -- what is referred -- based on what is stated in
20   the second sentence, that the particular issue that she
21   was speaking to was the fact that all clients were not
22   being offered the opportunity to register to vote.
23 Q  Do you know how long these procedures, whatever they
24   were, had not been followed?
25 A  No, I do not.

153

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1 Q  So you don't know if it was months, weeks, or days?
2 A  No, I don't.
3 Q  Do you know if the procedures were corrected?
4        MS. FINEMAN:  Objection to form.
5        THE WITNESS:  No, I don't.
6 Q  (By Mr. MacInnes)  Did you visit any of the DCF offices
7     in Florida when you were preparing your opinion?
8 A  No.
9 Q  Did you make any telephone calls to DCF offices in
10    Florida when you were arriving at your opinion?
11 A  No.
12 Q  Did you conduct any interviews of DCF employees when you
13    were arriving at your opinion?
14 A  No.
15 Q  Did you interview Joanna Clark in arriving at your
16    opinion?
17 A  No.
18 Q  Do you know who Joanna Clark is?
19 A  I believe she's one of the defendants.
20 Q  Defendants?
21 A  I -- I don't remember.  I -- I know that her -- the
22    question of her record came up in the -- in the
23    deposition yesterday.  There was some sort of a problem
24    with her registration.  I just happen to remember -- I
25    think that was her name.
154
Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1 Q  Did you interview Candy Walls in arriving at your
2     opinion?
3 A  No.
4 Q  Did you interview any of the named plaintiffs in
5     arriving at your opinion?
6 A  No.  And I'm sorry, I should have said plaintiff
7     earlier.
8 Q  Other than the documents provided to you by counsel --
9     strike that.
10       Other than the two pieces of paper I've handed
11    you, Exhibit 8 and Exhibit 9, did you rely on any other
12    source of information in reaching your conclusion or
13    your opinion as to DCF?
14 A  No.
15 Q  Do you know how the Florida Department of Children and
16    Families conducts its responsibilities under the NVRA?
17       MS. FINEMAN:  Objection to form.
18       THE WITNESS:  I have reviewed
19    training materials, various documents that, again, I
20    have listed in the report that I believe contained some
21    of the procedures that were to be followed in terms of
22    processing applicants for the purpose of giving them an
23    opportunity to register to vote under NVRA.
24 Q  (By Mr. MacInnes)  Did you see anything in those
25    training materials that was illegal?
155
Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1        MS. FINEMAN:  Objection to form.
2        THE WITNESS:  No.
3 Q  (By Mr. MacInnes)  Did you see anything in those
4     training materials that violated the NVRA?
5 A  No.
6 Q  Do you have -- do you understand how Florida Department
7     of Children and Families actually goes through the voter
8     registration application process with a client?
9 A  I think I have a fairly basic understanding -- good
10    understanding of that based on the -- on the way at
11    least they are supposed to under the -- under the
12    procedures, but the process would be for them to -- to
13    invite or to give the opportunity for a client to
14    register.
15 Q  Now, this is based upon the training materials?
16 A  Yeah, it's based on the training materials.  I believe
17    there were actually -- one of the documents actually had
18    some procedures in it that talked about what the
19    responsibilities were for these offices to conduct
20    their -- or to carry out the responsibilities under the
21    NVRA.
22 Q  Now, when you said in response to my question just a
23    moment ago you have a basic understanding of the way
24    they are supposed to do their obligations, are you
25    implying that they are not following the training
156
Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1     materials?
2 A  I don't know whether they're following them or not.
3 Q  Now, you told Mr. Lindsay this morning that you do
4     consider yourself an expert on the NVRA; is that
5     correct?
6 A  I consider -- I do think I have a -- a -- certainly a
7     very, very strong knowledge and background in NVRA and
8     would feel very comfortable in testifying to anything
9     that -- that would come under the -- that Act.
10 Q  Are you testifying here today as an expert on the NVRA?
11 A  Yes.
12 Q  Under the NVRA, to whom must the Florida Department of
13    Children and Families offer the opportunity to apply to
14    register to vote?
15 A  The applicants who apply for services in their -- in
16    their particular agencies, any recertification, change
17    of address, any contact that they would -- they would
18    have that would cause them to come into that office
19    to -- to seek whatever services that agency provides.
20 Q  "Whatever services that agency provides," is that what
21    you said?
22 A  Yes.
23 Q  So is it your testimony today that DCF has a
24    responsibility, under the NVRA, to offer the opportunity
25    to apply -- to register to vote to every client they
157
Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  have who comes in for any service they provide?  Is that
2  correct?
3 A  Well, not necessarily every client.  There are some
4  clients that would obviously need -- would -- would --
5  for one reason or another would not be qualified to be a
6  registered voter.  But the opportunity as -- I believe
7  under the Act is that they are to have a process in
8  place that is to be an integral part of the application
9  process for their services at whatever agency comes
10  under their purview.
11 Q  And that's -- that opinion is based upon the fact that
12  you're an expert in NVRA; is that correct?
13 A  Well, it's not entirely based on that.  It is based on
14  my understanding of the NVRA, as I said in -- not on my
15  knowledge of the NVRA, but also having been involved in
16  the implementation of the NVRA in a state.  I do believe
17  that I certainly have -- am in a position to offer
18  opinions, as I stated earlier, on the National Voter
19  Registration Act.
20 Q  So let me make sure I understand you correctly.  It's
21  your testimony today that DCF must offer an opportunity
22  to apply to register to vote to all of its customers for
23  all of its services?
24          MS. FINEMAN:  Objection to form.
25          THE WITNESS:  If there are services
                                                          158

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  that are not covered under the Act, then they would not
2  be, but in terms of those services that are required
3  under the Act, they would be required to give that
4  opportunity to register.
5      Now, in our state there are very few that offer
6  services outside of -- of what is in the Act.  But I
7  don't know about Florida.  There may be things that --
8  for example -- well, without getting into an example --
9  but there may be -- there may be a service that would be
10  offered by a particular agency that is not covered under
11  the Act.  The Act covers not just the agency, but it
12  covers the service that the agency provides so that if
13  there are people seeking those specific kinds of
14  services, then they would be required to be given an
15  opportunity to -- to register.
16 Q  (By Mr. MacInnes)  Thank you.  And that's what I'm
17  trying to get at.  Under the NVRA, what services require
18  or trigger motor voter responsibilities for DCF in
19  Florida?
20 A  I mean, I could go back and read them.  But I could tell
21  you off the top of my head:  Medicaid services, services
22  that are provided under the WIC program, food stamps,
23  disabilities.  Also we have military, as we alluded to
24  earlier.
25 Q  I'm only talking about DCF.
                                                          159

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1 A  Well, presuming if -- that's not under DCF, but those
2  are examples.  Medicaid, I guess, is another one where
3  they would be required to provide an opportunity to
4  register.
5 Q  Is it true that under the NVRA, all offices in the state
6  that provide public assistance, that would -- that would
7  trigger motor voter responsibilities?
8 A  Yes.
9 Q  Is it true that under the NVRA, offices that provide
10  services to persons with disabilities would have motor
11  voter responsibilities?
12 A  Yes.  Yes.
13 Q  Aside from those two things, public assistance and
14  persons with disabilities, does the NVRA require
15  services be provided to any other category of client?
16 A  Well, I mean, I could get the NVRA out and I could
17  review that, if you'd like.
18 Q  Please.  Turn to Section 1973gg-5.
19 A  (Witness complies.)  Yes.  Okay.  I have 1973gg-5 in
20  front of me.
21 Q  Have you had an opportunity to review it?
22 A  Sure.  I've read it many times.  But it says each state
23  shall designate -- would you like me to read it?  I'm
24  sorry.
25 Q  No, if you could just -- you can either read it or just
                                                          160

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  tell me in your own words to whom DCF has motor voter
2  responsibilities.
3 A  To those offices in the state that provide public
4  assistance and all offices in the state that provide
5  state-funded programs primarily engaged in providing
6  services to persons with disabilities.
7 Q  All right.  Now, public assistance means money, does it
8  not?
9 A  I think generally that is the interpretation that states
10  have given to that particular provision.
11 Q  Does the Florida Department of Children and Families
12  have any customers to whom it does not owe any
13  responsibilities under the NVRA?
14 A  I don't know because I don't know what all of the
15  responsibilities are for the Department of Children and
16  Family Services in Florida.  There may be -- there's a
17  possibility, I would suppose, that there are offices
18  that they have or services that they provide that are
19  not public assistance and would be considered public
20  assistance and I -- or would be offices that are not
21  engaged in providing state-funded programs, but
22  providing services to persons with disabilities.
23 Q  Well, if a person -- let me state it this way.
24      Does the NVRA require DCF to offer the opportunity
25  to register to vote to clients who come in to apply for
                                                          161

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1 foster care?

2 A  I would say probably under NVRA that they -- that they
3    don't. And there may a number of -- numerous other
4    examples of -- of those kinds of services.

5 Q  Does the NVRA require DCF to offer the opportunity to
6    register to vote to clients who come in to apply for
7    guardianship?

8 A  Umm, I know that in our state, we did not have a program
9    in place to do that. But I would not, you know, I
10   guess, form some sort of legal conclusion as to whether
11   or not -- I imagine there are going to be other examples
12   given here. I think each state has to first off decide
13   for itself what those agencies are. I don't think -- I
14   think there is a reason that NVRA specifically
15   designates what those offices are in more a general way.
16      But, again, I guess I would rely on the verbiage
17   of the Act. And I think each state has to make a
18   determination as to whether or not a service that is
19   provided by their state would be included in the
20   categories that are in the National Voter Registration
21   Act.

22 Q  Well, you're holding yourself out as an expert on NVRA
23   and I'm asking you the question, does the NVRA require
24   DCF to offer the opportunity to register to vote to
25   clients who come in to apply for guardianship?

162

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1      MS. FINEMAN:  Objection.

2      THE WITNESS:  I don't know what
3    kinds of services are included in providing
4    guardianship. But my answer to that would be, because
5    I'm -- while I might be familiar with the NVRA, I am not
6    purporting to be an expert on the guardianship program
7    in the state of Florida. I would say if the
8    guardianship program in the state of Florida is one that
9    involves providing public assistance or involves in some
10   way providing state-funded programs engaged in providing
11   services to persons with disabilities, then it would; if
12   it doesn't, then it would not.

13 Q  (By Mr. MacInnes)  Is there anything in the NVRA that
14   says if we provide -- if a person comes in for
15   guardianship, they must be offered the opportunity to
16   register to vote?

17 A  Guardianship is not a term that's used in that section
18   of NVRA.

19 Q  Well, since we've determined that foster care is not a
20   service for which the -- that triggers motor voter
21   responsibilities --

22 A  Well, let me clarify that, again, by stating that,
23   again, if there is -- if there is nothing in the foster
24   care program that would involve either providing public
25   assistance or services -- or the implementation of

163

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1    state-funded responsibilities for people with
2    disabilities, then it would not -- it would not be a --
3    it would not be required to offer those services.

4      Again, I am not a -- an expert on the foster care
5    program in the state of Florida.

6 Q  Well, your expert opinion says that -- and I'm talking
7    about the bottom of Page 3 and the top of Page 4, "It
8    appears that in Florida some offices providing services
9    through the Department of Children and Families were not
10   always offering the opportunity to register to vote to
11   all clients, as prescribed in the National Voter
12   Registration Act."

13      And yet I believe you've testified just recently
14   here that perhaps in Florida not all clients are -- are
15   required to be given voter registration application
16   forms. Is that correct?

17 A  That may be.

18 Q  So your opinion, then, at the top of Page 4 is
19   incorrect, is it not?

20 A  Well, I -- I -- again, I would not -- without getting
21   into the semantics of it, I think obviously I was
22   referring there to clients who were to be given the
23   opportunity to -- to vote under -- as prescribed by the
24   National Voter Registration Act. That is the language
25   that I used at the end of that sentence.

164

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1      If was not prescribed by the National Voter
2    Registration Act, then they would not be clients who
3    would be required to be given an opportunity to
4    register. If it was in an agency where they -- where
5    the activity was prescribed by the National Voter
6    Registration Act, then they would be required to be
7    given that opportunity.

8      And that would be my testimony that based on the
9    review of the documents, that the clients who were to be
10   given an opportunity were not always -- apparently were
11   not always given that opportunity.

12 Q  So you're not trying to tell the Court in -- in this
13   Exhibit 3 that all clients in the State of Florida
14   Department of Children and Families are required to
15   receive motor voter assistance?

16      MS. FINEMAN:  Objection to form.

17      THE WITNESS:  Again, I am not
18   purporting to be an expert on the programs that are
19   administered by the Department of Children and Family
20   Services -- Children and Families, I guess. I am
21   stating, however, that certainly with -- in terms of
22   those programs where it is required, it is required in
23   terms of public assistance agencies and, again, dealing
24   with agencies that deal with disabilities, that it would
25   be -- that those clients are -- are required to be given

165

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

```
 1  that opportunity.
 2  Q  (By Mr. MacInnes)  And only those clients, right?
 3  A  Yes.
 4  Q  Which -- which offices in Florida were not always
 5     offering the opportunity to register to vote to all
 6     clients?
 7              MS. FINEMAN:  Objection to form.
 8              THE WITNESS:  The only ones that
 9     I -- the ones that I get -- the only ones that I --
10     again have are the ones that are referenced in these
11     particular exhibits.  I do not know from reading these
12     exhibits which ones were specifically being referred to.
13     Although, it is -- it does refer to procedures for voter
14     registration requirements, which would indicate that
15     there was some sort of requirement that would carry out
16     the voter registration function.
17  Q  (By Mr. MacInnes)  Did you make any attempt to find out
18     which offices were not doing so before you rendered your
19     opinion?
20  A  No.
21  Q  Do you know how many DCF offices there are in Florida?
22  A  No.
23  Q  Do you know how many were not offering clients the
24     opportunity to register to vote?
25  A  No.
                                                        166
```

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

```
 1  Q  Do you know what percentage of all DCF offices in
 2     Florida were not offering clients the opportunity to
 3     register to vote?
 4  A  No.
 5  Q  So you don't know whether it was one percent or a tenth
 6     of a percent or even less than that, do you?
 7  A  No.  I think it would be difficult to -- to ascertain
 8     that basically because there was -- again, there were no
 9     statewide reporting requirements under the Act.  So it
10     was difficult to make any kind of a determination along
11     that -- along that line.
12  Q  When were those offices not offering the opportunity to
13     vote -- register to vote?
14  A  Well, at least it must have been sometime prior to
15     January -- January 8th, 2002, under the Canaday memo
16     or -- and also the dates of the other one -- other
17     E-mails that are referenced were August 27th and August
18     29th.
19  Q  And do you know for what period of time those offices
20     were not offering the opportunity to register to vote?
21  A  No, I do not.
22  Q  Did you make any attempt to find out when those offices
23     were not doing so before you rendered your opinion?
24  A  No.
25  Q  Did you do any statistical analyses before coming to
                                                        167
```

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

```
 1     your opinion that some DCF offices in Florida were not
 2     offering clients the opportunity to register to vote?
 3  A  No.
 4  Q  Would you please turn, now, to Page 4 of your report,
 5     which is Exhibit 3.
 6  A  Uh-huh.  (Witness answers affirmatively.)
 7  Q  You refer to the last sentence in Paragraph 2, which
 8     says, "In Florida it appears that no one was granted
 9     statewide authority or exercised statewide leadership in
10     the development of various programs established by the"
11     NVRA.  Do you see that language?
12  A  Yes.
13  Q  Does the NVRA require one person to have statewide
14     authority or to exercise statewide leadership in the
15     development of various programs established by the NVRA?
16  A  The language of the NVRA is that the states are required
17     to designate a state officer or the -- or employee as
18     the chief state election official to be responsible for
19     coordination and state responsibilities under the Act.
20  Q  And what's the cite to that?
21  A  1973gg-8.
22  Q  Does the NVRA require one person to have statewide
23     authority or to exercise statewide leadership over the
24     Department of Children and Families in the development
25     of various programs established by the NVRA?
                                                        168
```

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

```
 1              MS. FINEMAN:  Objection to form.
 2              THE WITNESS:  I think that -- that
 3     the Act would require that someone be responsible for
 4     coordinating the activities, not just of DCF, but of all
 5     activities required under the Act for that -- for that
 6     state.
 7  Q  (By Mr. MacInnes)  Well, within -- the question is:
 8     Within DCF, does the Act require someone to act as a
 9     statewide authority or exercise statewide leadership
10     over just DCF -- DCF?
11  A  No.
12  Q  Same question as to the Department of Highway Safety and
13     Motor Vehicles.
14  A  The Act does not require anybody specifically within
15     those agencies to perform that function.
16  Q  Could the Florida Department of Children and Families
17     use a decentralized approach to its NVRA
18     responsibilities, allowing its DCF districts to
19     establish their own respective NVRA programs and still
20     be in compliance with the NVRA?
21              MS. FINEMAN:  Objection.
22              THE WITNESS:  I would suppose they
23     could.
24  Q  (By Mr. MacInnes)  Would you please turn to Paragraph 3
25     on Page 4 of your report.  The last sentence says,
                                                        169
```

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1   "Florida's agency based voter registration programs may
2   be hampered by its reliance on paper forms."
3       Do you see that language?
4 A  Yes.
5 Q  Specifically, what Florida agencies were you referring
6   to in that sentence?
7 A  Umm, I was -- in that sentence I was -- I was referring
8   to all of them.  That would include agencies both under
9   DCF as well as the Department of Motor Vehicles --
10   Highway Safety and Motor Vehicles.  Sorry.
11 Q  Does the NVRA prohibit the use of paper forms by
12   agencies in carrying out their NVRA responsibilities?
13 A  No, it does not.
14 Q  Would you please refer to the first sentence on Page 9
15   of your report where you say, "The State of Florida
16   through their Department of Highway Safety and Motor
17   Vehicles and the Department of Children and Families
18   still relies heavily on paper forms."
19       Do you see that language?
20 A  Yes.
21 Q  Does the Florida Department of Highway Safety and Motor
22   Vehicles rely heavily on paper forms in
23   administrating -- in administering its NVRA
24   responsibilities?
25 A  In my opinion, it does because the electronic data is

170

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1 Q  The "piece of paper" being the voter registration
2   application?
3 A  Yes.
4 Q  Do you know --
5 A  The printed -- whatever the printed piece is that comes
6   off of the -- the printer.  I got a full description of
7   that process yesterday in one those depositions which
8   talked about that process.
9 Q  And do you know why the Florida Department of Highway
10   Safety and Motor Vehicles uses that procedure?
11 A  I would imagine it's based on a policy that they decided
12   to implement at some point in time after the enactment
13   of NVRA.
14 Q  That they decided to implement?
15       MS. FINEMAN:  Objection to form.
16       THE WITNESS:  I don't know who
17   decided to implement it.  It may have been them or it
18   may have been some -- I don't know.  It's not clear to
19   me.
20 Q  (By Mr. MacInnes)  Well, if an original signature is
21   required on a motor voter application --
22 A  Uh-huh.  (Witness answers affirmatively.)
23 Q  -- wouldn't they have to send a paper form to the
24   supervisor of elections?
25 A  They wouldn't have to send a paper form that contains

172

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1   printed out on a paper form, which then is forwarded to
2   the supervisor of elections.
3 Q  Is there anything improper about that?
4       MS. FINEMAN:  Objection.
5       THE WITNESS:  Maybe you could
6   define -- give me a little more clarification.  Is there
7   anything "improper"?
8 Q  (By Mr. MacInnes)  Okay.  Does the NVRA prohibit that?
9 A  No.
10 Q  When you say the Department of Highway Safety and Motor
11   Vehicles relies on paper forms, do you mean information
12   going to the respective supervisor of elections?
13 A  What I'm referring to there is -- it was my
14   understanding, from reading through this -- this
15   process, that the data elements for voter registration
16   are printed onto a -- onto a form which the applicant
17   signs.  That form is then sent on to the supervisor of
18   elections.  There seemed to be some sort of a batch
19   process by which that -- that took place.  I would --
20   what the county supervisor of elections does at that
21   point I would imagine would vary from county to county.
22   But that still is a piece of paper that is being
23   transmitted to the supervisor of elections, and that is
24   what I was referring to in -- in this particular
25   section -- this particular paragraph.

171

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1   all of the data elements of the -- that are needed to
2   register that particular applicant to vote.  They could,
3   for example, down -- download the data elements onto a
4   machine-readable format and then electronically transfer
5   that data, along with the signature, and that would give
6   the opportunity for the county to download that
7   information directly onto their voter registration
8   system; do whatever they wanted to do with the
9   signature; scan it, file it, do whatever.
10       And that would not preclude them from -- from
11   taking that electronic -- that -- the voter registration
12   data -- what I mean by that is the name, the address, in
13   your -- in your state, political party preference -- we
14   don't have that in Washington -- but date of birth,
15   residence, all of those things -- all of those things
16   that you need for voter registration.  They could still
17   capture that on -- electronically and forward it
18   electronically on to the county.
19 Q  So is what you're stating here just a nice-to-have
20   system or is it required by some law?
21       MS. FINEMAN:  Objection to form.
22       THE WITNESS:  It's not required,
23   certainly, under NVRA.
24 Q  (By Mr. MacInnes)  That's just the way they do it in
25   Washington, right?

173

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1      MS. FINEMAN: Objection to form.

2      THE WITNESS: Umm -- sorry -- umm,

3  that is how we do it here. It is my understanding

4  that -- I mean, there are -- let me answer it just by

5  saying that is how we do it here.

6 Q  (By Mr. MacInnes) But in the state of Washington, a

7  person applying at a driver's license office does have

8  to sign an original signature, correct?

9 A  Yes.

10 Q  In the state of Washington does a person applying to

11  register to vote in a public assistance office have to

12  sign a paper voter registration application?

13 A  Yes, they do.

14 Q  Why is that?

15 A  Because we do not have, in the state of Washington, a

16  means for electronically transmitting that data to -- to

17  the State. Again, our forms and our applications all

18  come through the State -- to the Secretary of State's

19  Office. The only state that I'm aware of that has a

20  system for electronically transferring data from social

21  service offices is the state of Kentucky.

22 Q  How many supervisors of elections are in the state of

23  Washington?

24 A  39.

25 Q  How many supervisors of elections are in the state of

174

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1 Q  Page 6.

2 A  I'm sorry. I was a page ahead of you

3 Q  Page 6, first paragraph.

4 A  I'm sorry.

5 Q  "It appears that Florida in their Department of Children

6  and Families (DCF) uses a separate 'preference form.'

7  However, it is important to note that when using a

8  separate form, it is still important that such a form be

9  used as an 'integral' part of the agency's application

10  process. For example, it would not suffice for an

11  agency to simply have declination forms and voter

12  registration applications made available on a counter

13  for public distribution."

14     Does the NVRA prohibit the use of a voter

15  preference form?

16      MS. FINEMAN: Objection to form.

17      THE WITNESS: It doesn't prohibit

18  it. In fact, I would argue that it would require some

19  sort of a declination form or preference form for social

20  service agencies and designated agencies under NVRA.

21 Q  (By Mr. MacInnes) Do you have any evidence that the

22  Florida Department of Children and Families does not use

23  the voter preference forms as an integral part of its

24  voter registration application process?

25 A  Based on my review of the documents, it is certainly a

176

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  Florida?

2 A  I don't know.

3 Q  How many driver's license offices are in the state of

4  Washington?

5 A  I don't know the answer to that either.

6 Q  How many driver's license offices are in the state of

7  Florida?

8 A  I don't know.

9 Q  How many public assistance offices are in the state of

10  Washington?

11 A  I don't know.

12 Q  How many public assistance offices are in the state of

13  Florida?

14 A  I don't know.

15 Q  Do you know if all of the supervisors of elections

16  offices in the state of Florida have computer systems

17  that are compatible with the Department of Children and

18  Families' computer systems?

19      MS. FINEMAN: Objection to form.

20      THE WITNESS: I don't know.

21 Q  (By Mr. MacInnes) Would you please turn to Page 6 of

22  your report. I'm referring to the first full paragraph

23  of that report, which reads, "It appears that Florida in

24  their Department of Children and Families" --

25 A  I'm sorry. I'm off. Page 6?

175

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1  form that is required to be filled out by a client when

2  they are seeking services that are covered under the

3  National Voter Registration Act.

4 Q  Well, that's not my question. My question is: Do you

5  have any evidence that the Florida DCF does not use the

6  voter preference form as an integral part of its voter

7  registration application process?

8 A  Well, as I stated earlier, there were occasions,

9  apparently, when they did not in -- invite clients to --

10  to -- to register, which I would -- I don't know how

11  that involved the preference form at all. If there were

12  not -- if those offices were not using -- or were not

13  giving an opportunity for clients to fill out a

14  preference form, then they would be in violation; if

15  they are, then they would not -- then they would be --

16  they would be in compliance if they were giving them

17  that opportunity.

18 Q  Now, the -- what evidence gave you that --

19 A  Again, the -- I'm sorry. It was the two documents that

20  I referred to earlier.

21 Q  Exhibits 8 and 9?

22 A  Yes, I believe those were the -- were the documents.

23 Q  Do you have any other evidence, other than Exhibits 8

24  and 9, that -- that lead you to believe that Florida

25  Department of Children and Families does not use the

177

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  voter preference form as an integral part of its voter
2  registration application process?
3  A  No.
4  Q  In the last sentence of the first full paragraph of Page
5     6 of your report, it says, "For example, it would not
6     suffice for an agency to simply have declination forms
7     and voter registration applications made available on a
8     counter for public distribution."
9        Do you see that language?
10 A  Yes.
11 Q  And what's your authority for saying that?
12 A  Again, my -- my knowledge of -- of NVRA and the
13    requirements of NVRA to -- to have the declination forms
14    and the voter registration -- the declination form and
15    the voter registration application process to be an
16    integral part of the application for services.
17 Q  Is there anything in NVRA that prohibits having
18    declination forms and applications sitting out in public
19    access?
20 A  It doesn't prohibit it, no.  But certainly merely doing
21    that would not put a -- an agency that is covered under
22    the Act in compliance with their responsibilities under
23    the Act.
24 Q  Well, isn't your assumption there that by having the
25    preference form and the application sitting out in a

                          178
              Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  public area, that the employees are not also using those
2  forms as an integral part of the application process?
3        MS. FINEMAN:  Objection to form.
4        THE WITNESS:  They may or they may
5  not be.  I don't know.
6  Q  (By Mr. MacInnes)  Do you have any evidence that Florida
7     DCF merely puts out voter preference forms and voter
8     registration applications and does not use them as an
9     integral part of their application process?
10 A  I don't -- as I stated earlier, I don't -- I don't -- I
11    didn't have anything in the -- in the original documents
12    that I had that would -- that -- that I used in
13    preparation for this report that would lead one to that
14    conclusion.
15 Q  Well, if you didn't have any evidence that would lead
16    one to that conclusion, why did you choose this language
17    at the end of the first full paragraph on Page 6 of your
18    report?  And by that I mean, "For example, it would not
19    suffice for an agency to simply have declination forms
20    and voter registration applications made available on a
21    counter for public distribution."
22 A  It was, I think, to -- to clarify the point that I was
23    making, that the application process needed to be an
24    integral part of the application process for the
25    services.  That -- that one *would not be able to* simply

                          179
              Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  comply with the Act by simply having the forms out on
2  the counter.  That -- that in contrast to that, the
3  application process for voter registration needed to be
4  an integral part of the application for -- for services.
5  Q  But you have no evidence that DCF merely puts those two
6     forms out on the counter and does nothing further?
7  A  I don't -- I don't see that the report actually makes
8     any reference to DCF offices in -- specifically in
9     Florida.
10 Q  The second full paragraph on Page 6 of your report says,
11    "It also appears that in some cases DCF offices were not
12    always providing an opportunity for clients to register.
13    Reasons given were budgetary constraints or a general
14    policy of...providing voter registration 'if client asks
15    about it.'"
16       Do you see that language?
17 A  Yes.
18 Q  And then this sentence that I just read to you is
19    followed by Footnote 5 --
20 A  Uh-huh.  (Witness answers affirmatively.)
21 Q  -- which refers to Exhibit 8, the Carol Canaday
22    memorandum of June 8th, 2002.  Is that correct?
23 A  It refers to two documents.  One is a doc request 1 from
24    Kearney and this quote comes from the Greg Ferguson
25    E-mail that was part of Exhibit 9.

                          180
              Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  Q  Okay.  Now, please refer to Exhibit 9.  So is it true
2     that your statement in the middle of Page 6 of your
3     report refers, once again, only to Exhibit 8 and Exhibit
4     9?
5  A  Yes.
6  Q  Refer to the Greg Ferguson E-mail on Exhibit 9.
7  A  Yes.
8  Q  Where -- which office is not offering the clients the
9     opportunity to register to vote?
10 A  DCF -- the DCF office on East Clinton is the one that's
11    specifically referred to here.
12 Q  Okay.  One office; is that correct?
13 A  That's correct.
14 Q  Does it refer to --
15 A  That is the reference to -- on this particular one.
16 Q  Does it refer to any other office?
17 A  No.
18 Q  Do you have any other evidence that any other office --
19    DCF offices, other than the one on East Clinton, were
20    not offering clients the opportunity to register to
21    vote?
22 A  Other than the E-mail above it, which -- which was from
23    Norene Moore, which says -- I don't know if you'd like
24    me to read that.
25 Q  Sure.  Go ahead.

                          181
              Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  A  "Due to a hard freeze, District 02 had to suspend some
2     activities.  The unit offices were given an option of
3     offering the voter registration on a request basis.  Two
4     of the offices chose this option with Jackson County
5     being one of them.  The regular voter registration
6     process is now being reinstated."
7  Q  Keep reading.
8  A  Oh, I'm sorry.  "All of our unit offices are aware of
9     the voter registration process and it is not felt that
10    retraining is necessary.  Please notify us if we may be
11    of further assistance."
12 Q  All right.  Other than Exhibit 9, do you have any other
13    evidence that DCF offices were not offering clients the
14    opportunity to register to vote?
15 A  Well, there was also Exhibit 8.
16 Q  Well, does -- where on Exhibit 8 does it say that people
17    were not --
18 A  The second sentence seems to indicate by the emphasis
19    there that the -- the emphasis needs to be to inform the
20    staff that all clients must be offered -- offered the
21    opportunity to register to vote.  I have assumed that
22    the reason that the senior human service program
23    specialist made that point was because that some clients
24    were not being offered the opportunity to register to
25    vote.

182

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  Q  Let's turn back to Exhibit 8.
2  A  Yes.
3  Q  Look at the -- at the top E-mail from Norene Moore.
4  A  Yes.
5  Q  Why did District 02 suspend some activities?
6  A  Due to a hard freeze.
7  Q  All right.  And which activities were suspended?
8  A  Some.
9  Q  Do you know which --
10 A  And then it goes on to clarify that by saying that some
11    activities were suspended.  And the offices were given
12    an option of offering a voter registration on a request
13    basis.
14 Q  So we're not saying that -- this E-mail is not saying
15    that no voter registration opportunities were given.
16    They were just somewhat reduced.  Is that correct?
17 A  Well, I -- I don't know that I would agree with
18    "somewhat reduced."  If one was only going to offer
19    voter registration on a request basis, that would seem
20    to me to be a fairly substantial reduction.  That's my
21    own opinion.
22 Q  All right.
23 A  "Substantial" being a relative term.
24 Q  What in this E-mail leads you to believe that it's
25    substantial?

183

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  A  Based on the fact that the unit option -- offices were
2     given an option of whether or not they were going to
3     follow the -- their responsibilities under the National
4     Voter Registration Act.
5  Q  And how many offices are we talking about?
6  A  It is plural.  The unit offices.  There is not a
7     clarification as to how many there are.
8  Q  Could that be two?
9  A  It would be more than one.
10 Q  Where did you get the information that people were not
11    being offered the opportunity to register to vote
12    because of budgetary constraints?
13 A  I don't know.  I'm not sure what was meant by "hard
14    freeze."  Maybe I was in -- my quick perusal of this was
15    thought they were referring to a freeze of -- of money
16    or something like that.  Hold on just a second, though.
17    Let me review that -- review that -- that particular
18    piece for just a moment.  I may have been mistaken in
19    that.  But either way it doesn't take away from the -- I
20    didn't know what the -- that she was referring to when
21    she said "hard freeze," whether that is a climatic term
22    or a budget term.
23 Q  If it were a climatic term, then your statement about
24    budgetary restraints would be incorrect; is that right?
25 A  In terms of the budget restraints would be incorrect.

184

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1     But the point is not why it took place.  The fact is
2     that it did take place, of course.
3  Q  Where is the -- where did you find the information that
4     there is a general policy of only providing voter
5     registration if a client asks about it?
6  A  I got that from the memo from Greg -- that was authored
7     by Greg Ferguson.
8  Q  And that's limited to one office; is that correct?  The
9     East Clinton office?
10 A  Well, it is limited to that office.  Although, I would
11    presume it would apply to the offices above, as well.
12    If in the Norene Moore memo they -- they make reference
13    to the fact that the services were being offered only if
14    it was being done on a request basis, I would presume
15    that that would only mean that -- would mean that it was
16    only done if the applicant asks about it.
17 Q  Where does it say that there was a general policy of
18    that or are those your words?
19 A  Those are my words that -- and again, I got that from
20    the first -- certainly from the first one, that -- that
21    it caused them to -- you know, there was a cause to
22    suspend certain activities and that the unit offices, I
23    would presume, as -- according to some policy, was given
24    the opportunity to offer voter registration on a -- on a
25    request basis.

185

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1 Q Would you please turn to Page 9 of your report.
2 A (Witness complies.)
3 Q And looking near the top at the bold print, which says
4   that "At the statewide level, it is essential that
5   someone, preferably the State's chief elections
6   official, be responsible for monitoring the performance
7   levels of state agencies that have designated
8   responsibilities under the" NVRA.  "Florida would be
9   able to more efficiently operate its agency based voter
10  registration programs if monitoring programs were in
11  place."
12      Do you see that language?
13 A Yes.
14 Q Does -- does that paragraph apply to the Department of
15  Highway Safety and Motor Vehicles and the Department of
16  Children and Families?
17 A No.  I -- again, I -- I would make reference to that as
18  a -- as something -- something I mentioned earlier in my
19  testimony today, that that would be something that would
20  be desirable at a statewide -- on a statewide basis for
21  all activities and programs in the -- in a state.
22 Q Do you know if the Department of Children and Families
23  has just such a person?
24 A Who is responsible for monitoring all activities of all
25  responsibilities in the -- that come under the National

186

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1   on total customers and then make a reasonable
2   determination of the number of voter registration
3   transactions an agency office should be generating.
4   This analysis is most effective when it is done
5   statewide."
6       Does that opinion apply to the Department of
7   Children and Families?
8 A That opinion would apply to all agencies covered under
9   the National Voter Registration Act.  And to the extent
10  that that would include Children and Families, then the
11  answer to your question would be yes.  However, it would
12  not be, certainly, exclusive to the Department of
13  Children and Families.
14 Q Well, the paragraph seems to imply or at least to me
15  that all you have to do to -- to assess the level of
16  compliance would be to take the total number of clients
17  served and compare it to the total number of people who
18  got -- who completed voter registration applications or
19  declinations.
20 A Declinations.  It seems that one of the things that we
21  have -- we have looked at doing in terms of monitoring
22  our program, particularly with -- with our licensing
23  function but certainly with the other agencies, as well,
24  is trying to make a reasonable determination upon how
25  many voter transactions -- registration transactions

188

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1   Voter Registration Act?
2 Q Right.
3 A No.  I know that there was a liaison in the Department
4   of Human Services -- or Department of Highway Safety and
5   Motor Vehicles that was acting as a liaison.  It was not
6   clear to me now whether they were responsible for DCF
7   offices and mail-in registration programs and designated
8   agencies and things like that.
9 Q Do you know whether the Department of Children and
10  Families has such a person?
11 A I do not.
12 Q Would you please turn to Page 10 of your report.
13 A (Witness complies.)
14 Q I'm looking at the large paragraph right in the center
15  of that page.
16 A Uh-huh.  (Witness answers affirmatively.)
17 Q It says, "In terms of assessing the levels of voter
18  registration, it is important to determine the total
19  number of customers for each agency office.  In other
20  words, how many customers does each office serve in
21  terms of processing applications for whatever particular
22  service the office provides?  It then becomes important
23  to determine the total number of voter transactions for
24  each office.  Once these figures are determined, then it
25  is fairly easy to compare offices of similar size based

187

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

---

Byers Anderson Beach - Court Reporters & Video

1   ought to be taking place in a certain office of Children
2   and Families or what have you.
3       And that should be done on a statewide level,
4   again, for all agencies -- not just for licensing
5   agencies or social service agencies, but those
6   designated agencies -- so that you could make -- you
7   could have some way of reasonably comparing whether or
8   not -- and by that, at least, maybe raise some questions
9   as to whether or not a particular agency is -- is
10  actually performing its responsibilities under the Act.
11 Q Well, I don't want to belabor this point, but a little
12  while ago we talked about whether DCF has a motor voter
13  responsibility to all of its clients versus only those
14  that are required under the Act.
15 A Uh-huh.  (Witness answers affirmatively.)
16 Q So is -- is your statement in this paragraph on Page 10
17  modified to the extent that you mean only those clients
18  to whom DCF motor voter responsibilities are owed?
19 A This paragraph refers to all offices --
20 Q I understand that.
21 A -- covered under NVRA.  If it is an office that is
22  covered -- if it's a public library that is not a
23  designated agency, it's an office of the state, but it
24  certainly would not be required to provide voter
25  registration services.  But it would -- what I'm trying

189

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  to get at is this would apply to all offices that are
2  covered -- that provide services that are covered under
3  the National Voter Registration Act.
4 Q  I understand that.  Of course, my only interest today is
5  in DCF and Highway Safety.  So here's all I'm trying to
6  get at; and that is, you've proposed a formula for
7  determining whether an agency -- let's use DCF as the
8  agency.  You've proposed a formula to determine whether
9  the agency is performing its motor voter functions.  And
10  as I understand it, that -- that formula is to take the
11  total number of clients served, compare it to the
12  combined number of motor voter declinations and
13  applications received.  Now, that'll give you a ratio;
14  is that correct?
15 A  That's correct.
16         MS. FINEMAN:  Objection to form.
17 Q  (By Mr. MacInnes)  Now, is your formula modified?  I
18  mean, if you use that formula that you -- that you
19  stated on Paragraph 10, you would get an overinflated
20  result as to DCF, wouldn't you, if you used all clients?
21 A  It would depend upon how the office kept its numbers.
22  If, for example, an office was performing two functions,
23  A and B.  A were clients that were being serviced under
24  a program that was covered by NVRA; and B, not.  I don't
25  know how -- what kind of record keeping would take place

                                                          190
         Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  in an office that was performing those kinds of
2  services.  But it seems to me that it is not
3  unreasonable to -- to try to find out how many clients
4  were provided services under A and how many were
5  provided services under B, taking the A applicant total
6  and determining based on that how many registration
7  applications were being distributed or how many
8  declination forms had been processed or whatever.
9         I mean, preferably it would seem to me that in
10  these kinds of cases that one would probably do that,
11  maybe, as an end-of-the-day function.  We had nine
12  people that came in and applied for services under
13  service A.  How many declination forms?  If we only have
14  two, then we know something is wrong.  If we had nine,
15  everything would seem to balance.  And having some sort
16  of a report mechanism that would go back to some office
17  who would be responsible for monitoring those kinds of
18  things, I guess that is what I'm trying to say.  Yes.
19         And to the extent that an office would be
20  providing services under that B classification, it would
21  not be covered, then we wouldn't worry about any of
22  those particular applicants, as to whether or not they
23  were being offered any kind of opportunity to vote -- or
24  register to vote.
25 Q  Let's turn for just a moment to the Department of

                                                          191
         Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1  Highway Safety and Motor Vehicles.
2 A  Uh-huh.  (Witness answers affirmatively.)
3 Q  Are you aware of what their end-of-day report contains
4  now?
5 A  Yes.  I'm sorry.  Yes.  And -- and for -- and for the
6  Department of -- of Licensing, and even that's true in
7  our state, as well, that's a lot easier because
8  you're -- you're -- there's a computer -- many of those
9  functions are computerized; whereas, in a lot of social
10  service agencies, I understand they are not.
11         But it would seem to me -- but that would still
12  not preclude them from some kind of accounting or some
13  sort of tally at the end of the day.  And that's the
14  only thing that I'm suggesting.
15 Q  Okay.  But the system you're proposing is not a
16  requirement under the NVRA, is it?
17 A  Umm, no, it is -- it is not required.  Again, there are
18  statistical -- there is statistical data -- excuse me --
19  that is required to be reported back to the FEC.  And
20  that I know has changed over the years in terms of what
21  they require, because they have -- the FEC has done a
22  lot of this stuff administratively.  But there is a
23  requirement for statistical information to be reported
24  back to the FEC, so that they can report back to
25  Congress as to the effectiveness of the program.

                                                          192
         Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

Byers Anderson Beach - Court Reporters & Video

1 Q  Have you been asked to assess the level of voter
2  registration at the Department of Children and Families
3  in Florida?
4 A  No.
5 Q  Would you turn to Page 11 of your report.  Look at the
6  first full paragraph.  The last sentence of the first
7  full paragraph says, "At the end of the day the total
8  number of declination forms" -- strike that question.
9  We've already covered that.
10 A  Okay.
11 Q  On Page 11 of your report, in the last sentence of
12  paragraph -- of the paragraph that begins with the words
13  "In summary," do you see that?
14 A  Yes.
15 Q  "In particular" it says -- or you state, "In particular
16  the State of Florida through their" DCF or "Department
17  of Children and Families does not appear to provide a
18  log which contains all of the information necessary to
19  ensure that each applicant is being given the
20  opportunity to register to vote."
21         Do you see that sentence?
22 A  Yes.
23 Q  What evidence do you have that DCF does not provide a
24  log which contains all of the information necessary to
25  ensure that each applicant is being given the

                                                          193
         Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

1  opportunity to register to vote?
2  A  I did not see that in -- in my review of the documents
3     that were presented to me.
4  Q  Does the NVRA require DCF to provide a log which
5     contains all of the information necessary to ensure that
6     each applicant is being given the opportunity to
7     register to vote?
8  A  No.
9  Q  Are you aware of any of the awards that DCF has won for
10    its NVRA implementation?
11               MS. FINEMAN:  Objection.
12               THE WITNESS:  Somewhat.
13 Q  (By Mr. MacInnes)  What are you aware of?
14 A  Umm, I recall human services -- not human services --
15    Human Serve, I'm sorry, which is a private organization,
16    nonprofit organization, made I know a number of awards
17    to states based on the implementation of the Act early
18    on.  We, in fact, I think, won one of those awards, as
19    well.  I know that Florida did for their work with DCF
20    offices, in particular.  I am somewhat aware of that,
21    anyway.
22 Q  I want you to know I'm near the end of my questioning.
23    Do you have any evidence that the Florida
24    Department of Children and Families has violated the
25    NVRA?

194

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

1  A  No.
2                MR. MacINNES:  I'm done.
3                MS. FINEMAN:  Does anyone on the
4  phone have questions?
5                UNIDENTIFIED SPEAKER:  No questions.
6                MS. FINEMAN:  Ready to go home for
7  the night?
8                UNIDENTIFIED SPEAKER:  No questions.
9                MS. FINEMAN:  Okay.  I have a few
10 questions.
11               MR. ARPEN:  Tracy Arpen.  No
12 questions.
13               MS. FINEMAN:  Can we take a
14 five-minute break before I ask my questions?
15               THE VIDEOGRAPHER:  We are going off
16 the record.  The time is 4:39.
17               (Recess 4:39 - 4:44 p.m.)
18
19               THE VIDEOGRAPHER:  We are back on
20 the record.  The time -- we are back on the record.  The
21 time is 4:44.
22 ////
23 ////
24 ////
25 ////

196

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

1  A  I -- that was not a part of my report, part of my paper,
2     part of my research.  I certainly have not purported to
3     have evidence to that -- to that effect.
4  Q  Do you have any evidence that the Florida Department of
5     Highway Safety and Motor Vehicles is violating -- or has
6     violated the NVRA?
7  A  No.
8  Q  Do you have any evidence that Highway Safety is
9     violating the NVRA now?
10 A  No.
11 Q  In preparing your expert opinion as to the Department of
12    Children and Families, did you find any evidence of
13    racially discriminatory practices by the Department of
14    Children and Families in conducting its responsibilities
15    under the NVRA?
16 A  No.
17 Q  In preparing your expert report or your expert opinions,
18    did you find any evidence of racially discriminatory
19    procedures by the Department of Children and Families in
20    conducting its responsibilities under the NVRA?
21 A  No.
22 Q  In preparing your opinion, did you find any evidence of
23    racially discriminatory practices or procedures by the
24    Department of Highway Safety and Motor Vehicles in
25    conducting its responsibilities under the NVRA?

195

Gary E. McIntosh, 6/4/02 - By Mr. MacInnes

1                    EXAMINATION
2  BY MS. FINEMAN:
3  Q  Okay.  Mr. McIntosh, I only have a few questions for
4     you.  Is it possible that you may elaborate on the
5     conclusions that you have noted in your report?
6  A  Yes.
7  Q  Okay.  And I just -- I just want to clear a few things
8     up.
9     You -- you noted that you reviewed documents in
10    addition to those noted in your report.  And those
11    documents are listed on -- listed in two letters
12    Bates-stamped A042262 through 2266.  What opinions did
13    you form in reviewing those additional documents?
14               MR. MacINNES:  Could we see those
15 documents so we know what you're talking about?
16               MS. FINEMAN:  Sure.
17 Q  (By Ms. Fineman)  Or rather, do those additional
18    documents substantiate the opinions that you have noted
19    in your report?
20               MR. LINDSAY:  Object to the form.
21               THE WITNESS:  Generally, yes.  Yes.
22 Q  (By Ms. Fineman)  Okay.  How many years of experience do
23    you have working with the NVRA in terms of both
24    assisting in its creation and implementing the Act?
25 A  Probably around -- close to 10, given the fact that

197

Gary E. McIntosh, 6/4/02 - By Ms. Fineman

Byers Anderson Beach - Court Reporters & Video

1 there were a number of years prior to the actual
2 enactment where there were various proposals and drafts
3 and so forth.  So probably dating back to about 1990 or
4 so.
5 Q  And -- I'm sorry.
6     And how many years of experience do you have
7 working as an elections administrator?
8 A  Probably around 23 years.
9 Q  And do you believe that that experience assisted you in
10 forming your conclusions in this report?
11 A  Yes.
12 Q  Okay.  Are all states required to comply with the NVRA?
13 A  No.  There are some states that were -- that have
14 election day registration that were granted exemptions
15 from the National Voter Registration Act.  I believe
16 Wyoming is one of them, Idaho is another, and I think
17 maybe Minnesota are -- are -- are three states that have
18 election day registration and they are -- they were --
19 do not come under the -- under the provision of the Act.
20 Q  Do you know whether the state of Florida is required to
21 comply with the National Voter Registration Act?
22 A  Yes.
23 Q  Have you read the National Voter Registration Act?
24 A  Yes.
25 Q  Okay.  You testified a while ago in response to
                                                        198
Gary E. McIntosh, 6/4/02 - By Ms. Fineman

Byers Anderson Beach - Court Reporters & Video

1 questions from Mr. MacInnes about human error and that
2 human error is found in all elections.  I would like to
3 draw your attention to Exhibit 9, which you have.  Okay.
4     Now, I know we've spent a lot of time talking
5 about this one exhibit.  Can you just quickly read the
6 first two sentences of -- of the first paragraph.
7 A  "Due to a hard freeze District 02 had to suspend some
8 activities.  The unit offices were given an option of
9 offering the voter registration on a request basis."
10 Q  Is -- now, would you consider that human error?
11 A  No.
12 Q  Okay.  Would you please read this sentence here,
13 beginning with the word "According."
14 A  "According to Supervisor the DCF office on East Clinton
15 (phone # 482-9584) is not offering the clients the
16 opportunity to register to vote."
17 Q  Would you consider that human error?
18 A  No.
19 Q  Okay.  I would like to draw your attention to
20 document -- part of the composite Exhibit No. 4.  And
21 it's Bates-stamped A042257.  And it is part of a
22 memorandum of law written by myself, Cara Fineman, March
23 2002, in regard to Defendants' Responses to
24 Interrogatory No. 13 by Plaintiffs.  And the
25 interrogatory asks:  "Please identify any problems or
                                                        199
Gary E. McIntosh, 6/4/02 - By Ms. Fineman

Byers Anderson Beach - Court Reporters & Video

1 barriers that you experienced in regard to the voter
2 registration functions to be carried out by the DHSMV
3 and the DCF."
4     Defendant Iorio responds:  "There were two problem
5 areas of note with the DCF offices.  No. 1, state DCF
6 subordinate units that produce voter registration
7 application which have not been adequately reviewed for
8 completeness.  In some cases we received application
9 with a 30 to 40 percent error rate because of incomplete
10 or illegible items on the application."
11     Would you consider a 30 to 40 percent error rate
12 simply human error?
13         MR. MacINNES:  Objection to form.
14         MR. LINDSAY:  Join.
15         THE WITNESS:  It would be hard to
16 know specifically without knowing exactly the pattern of
17 the incomplete or illegible items.  Human error can --
18 can involve someone just missing something on a form or
19 failing to -- to ask somebody for some specific
20 information or -- it's hard to apply to -- it's hard
21 to -- to adequately describe what human error would be.
22     If, for example -- but, you know, if -- if it was
23 the error rate applied to a -- the same item, for
24 example, all of the forms, one would think perhaps there
25 would be a pattern there which would suggest there may
                                                        200
Gary E. McIntosh, 6/4/02 - By Ms. Fineman

Byers Anderson Beach - Court Reporters & Video

1 be a policy or something that -- that is in place for
2 them not to fill out that particular section where they
3 haven't been trained properly or whatever.
4     So I think it's difficult -- I guess what I'm
5 saying, it's difficult to answer that question without
6 knowing specifically what the errors -- what the errors
7 were, but it would certainly seem with that high of an
8 error rate, there is something systemic with either the
9 form or the process that would lead to that kind of an
10 error rate.
11 Q  (By Ms. Fineman)  Would you consider a 30 to 40 percent
12 error rate an acceptable level -- level of human error?
13 A  No.
14 Q  Thank you.  One more question.
15     Drawing your attention to Defendant Cowles'
16 response to the same interrogatory.  He states, "As to
17 DCF, we have had no dialogue with them since the NVRA
18 was first implemented in 1995.  We received very few
19 applications from DCF."
20     Now, you testified before in response to some of
21 Doug MacInnes' questions about your opinion No. 4.  If I
22 could draw your attention to that Exhibit 3, Page 4,
23 Paragraph 4.  Could you please read your opinion there.
24 A  The entire opinion?
25 Q  Yes.
                                                        201
Gary E. McIntosh, 6/4/02 - By Ms. Fineman

Byers Anderson Beach - Court Reporters & Video

1 A "At the statewide level, it is essential that someone,
2   preferably the State's chief elections official, be
3   responsible for monitoring the performance levels of
4   state agencies that have designated responsibilities
5   under the National Voter Registration Act.  Florida
6   would be able to more efficiently operate its agency
7   based voter registration programs if monitoring programs
8   were in place."
9 Q Do you think that Defendant Cowles' response to
10  Interrogatory No. 13 supports your conclusion then --
11                    MR. LINDSAY:  Object --
12 Q (By Ms. Fineman)  -- to No. 4?
13                    MR. LINDSAY:  -- leading.
14                    THE WITNESS:  It would seem to me
15  that it would support that, yes.
16                    MS. FINEMAN:  No further questions.
17                    MR. LINDSAY:  Just a couple of
18  follow-up ones, sir.
19
20
21                    FURTHER EXAMINATION
22 BY MR. LINDSAY:
23 Q Did you discuss on the break we just had with
24  Miss Fineman -- did you have any discussions with
25  Miss Fineman on the break?

                    Gary E. McIntosh, 6/4/02 - By Mr. Lindsay
                                                          202

Byers Anderson Beach - Court Reporters & Video

1 Q If you could just hand that back to me.  I'm going to
2   mark these letters as composite McIntosh 10.  And I just
3   want to ask you straightforward.  We went through at
4   some length the documents and the basis for each one of
5   your opinions.  And you're not suggesting that there are
6   any other documents or bases for your opinions, other
7   than those that you indicated earlier, correct?
8 A I -- I would stand by what I said in the report.  There
9   was a list of documents that I relied on to prepare the
10  document -- to prepare the report.  I didn't review
11  other documents.  But the documents that I used to
12  prepare the report are the documents that I listed in
13  the report.
14 Q And with regard to each one of your opinions that we
15  discussed earlier, I asked you -- do you recall, I asked
16  you what documents or what are your bases for each one
17  of those opinions.  Do you recall that?
18 A Right.
19 Q And you provided me your bases for each opinion,
20  correct?
21 A Correct.
22 Q And there are no other bases for those specific
23  opinions, other than those that you indicated earlier --
24                    MS. FINEMAN:  Objection to form.
25 Q (By Mr. Lindsay)  -- correct, sir?

                    Gary E. McIntosh, 6/4/02 - By Mr. Lindsay
                                                          204

Byers Anderson Beach - Court Reporters & Video

1 A No.
2 Q When -- when you answered her question that you possibly
3   may elaborate on your conclusions in your report, what
4   was the basis for that answer?
5 A The fact that I don't know yet what's going to be
6   expected of me in terms of -- of anything else that they
7   may be asking me to do.
8 Q So in other words, anything is possible?
9 A I would presume so.
10 Q You have no present intention of elaborating on the
11  conclusions in your report?
12 A Not presently, no.
13 Q And you have, certainly, no intention of providing any
14  additional opinions, other than those four opinions set
15  forth in your report, correct?
16 A Not presently, no.
17 Q And directing your attention to these two documents that
18  I believe Miss Fineman referenced.  One of them is the
19  March 29th letter to you from Ms. Borgen and the other
20  is the April 15th letter to you from Miss Fineman
21  setting forth a list of documents.  I presume you
22  reviewed these documents.  Right?
23 A Umm, the -- the latter ones I -- I did review, although
24  I didn't have as much time to review the ones from the
25  April letter as I did from the first letter.

                                                          203
                    Gary E. McIntosh, 6/4/02 - By Mr. Lindsay

Byers Anderson Beach - Court Reporters & Video

1 A That's correct.
2                    MS. FINEMAN:  I have one further
3   question.
4                    MR. LINDSAY:  Nothing further at
5   this time.
6                    MS. FINEMAN:  Just one last
7   question.
8
9
10                    FURTHER EXAMINATION
11 BY MS. FINEMAN:
12 Q Is it possible that you may produce a supplemental or
13  rebuttal report?
14                    MR. MacINNES:  Objection to form.
15                    MR. LINDSAY:  Objection to form.
16                    MR. TINKLER:  Objection to form.
17  Ken Tinkler.
18                    THE WITNESS:  I suppose that that is
19  possible.
20                    MS. FINEMAN:  Thank you.
21                    MR. LINDSAY:  We're done.
22                    THE VIDEOGRAPHER:  This concludes
23  today's deposition.  We are now off the record.  The
24  time is 4:57.  This is the end of Tape 3.
25                    (Exhibit No. 10 marked
                                                          205
                    Gary E. McIntosh, 6/4/02 - By Ms. Fineman

Byers Anderson Beach - Court Reporters & Video

```
 1              for identification.)
 2           (Signature reserved.)
 3             (Deposition concluded
 4               at 4:59 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    206
```

Gary E. McIntosh, 6/4/02 - By Ms. Fineman

---

Byers Anderson Beach - Court Reporters & Video

```
 1   STATE OF WASHINGTON )    I, SHAUNA L. BEACH,
                         ) ss CCR #BE-AC-HS-L322DL a
 2   County of Pierce    )    duly authorized Notary
                              Public in and for the
 3                            State of Washington
                              residing at Tacoma,
 4                            do hereby certify:
 5
 6
 7           That the foregoing deposition of GARY E.
     McINTOSH was taken before me and completed on June 4,
 8   2002, and thereafter was transcribed under my direction;
     that the deposition is a full, true and complete
 9   transcript of the testimony of said witness, including
     all questions, answers, objections, motions and
10   exceptions;
11           That the witness, before examination, was by
     me duly sworn to testify the truth, the whole truth, and
12   nothing but the truth, and that the witness reserved the
     right of signature;
13           That I am not a relative, employee, attorney
     or counsel of any party to this action or relative or
14   employee of any such attorney or counsel and that I am
     not financially interested in the said action or the
15   outcome thereof;
16           That I am herewith securely sealing the said
     deposition and promptly delivering the same to Attorney
17   Alvin F. Lindsay, III.
18           IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my official seal this 6th day of
19   June, 2002.
20
21
22   _____
          Shauna L. Beach, CCR, RDR, CRR
23        Notary Public in and for the State
          of Washington, residing at Tacoma.
24
25
                                                    207
     Certificate
```

# TAB 19

## EXPERT WITNESS REPORT OF GARY McINTOSH

Gary McIntosh, President
McIntosh Election Services
606 Sherman St. SW
Olympia, Washington 98502

Case:  NAACP v. Harris
       01-120-CIV
       U.S. District Court
       Southern District of Florida
       Judge Alan S. Gold

## SECTION 1  Introduction

I have been retained by the Plaintiffs in the above-captioned matter to render an expert opinion regarding recommended practices in implementing agency based voter registration programs required under the National Voter Registration Act (NVRA) and to comment on such practices as they relate to the State of Florida's implementation of the National Voter Registration Act both prior to and following the 2000 election.

## SECTION 2  Professional Qualifications

I received my Bachelor of Arts degree in political science from Washington State University in 1972.  I have over 23 years of election experience.  I am currently the President of McIntosh Election Services, a private consulting firm specializing in election management and consulting services for governmental and private clients.  I have worked as the Director of Elections for the State of Washington and as the Supervisor of Elections and Voter Registration for Thurston County (Olympia), Washington.  I was

in charge of overseeing the successful implementation of the National Voter Registration Act (NVRA) in Washington State.

I have assisted the Federal Elections Commission (FEC) in the implementation of the National Voter Registration Act.

I worked for the U.S. State Department on the development of a voter registration and election system in Bosnia. I have served on the Federal Election Commission Advisory Panel and was a founding member and past President of the National Association of State Election Directors. My qualifications and experience are summarized in my resume which is attached hereto.

## <u>SECTION 3</u>  Data and Other Information Considered in Forming Opinion

I have reviewed the following documents from the state of Florida and other documents related to the administration of the National Voter Registration Act:

- "On Top of Motor Voter" 1 page pamphlet
- Dickinson's Answers to interrogatories 3 to 6, describing changes in system since 2000, and proposed changes in 2002
- Defendants' Responses to DMV/DCF - related Interrogatories 12 and 13
- "Motor Voter Training Application Procedures," Jan. 2001
- "Motor Voter Questions and Answers"
- Balancing and Verifying of End of Day Reports, Jan. 2001
- "Florida Examiners Manual"
- "Motor Voter Application Procedures," 2002 draft
- "Would You Be a 'Motor Voter' Survivor?"
- Letter and internet page re: DHSMV Supervisor of Elections Liaison, March 23, 2001
- DHSMV Presentation to U.S. Commission on Civil Rights, 2/26/01

- AFDC Info Memo, ACF-IM-96-2, with section on Florida, 2/20/96
- Kearney's Responses to Doc Request 1, including letter and e-mail
- Kearney's Responses to Doc Request 3, including training material
- Module 04:Intake and Applications Processing, apps 10.doc,04-10-4
- District III Voter Registration Procedures
- Training Presentation from Secretary of State Katherine Harris on Florida Voter Registration Procedures
- January 8, 2002 memo to Operational Program Administrators from Carol Canady, re: Voter Registration Procedures
- "Implementing the National Voter Registration Act of 1993: Requirements, Issues, and Examples" Prepared by The National Clearinghouse on Election Administration, Federal Election Commission, January 1, 1994
- U.S. House of Representatives, Committee on House Administration, Report 103-9, "National Voter Registration Act of 1993"
- U.S. Senate, Committee on Rules and Administration, Report 103-6, "Establishing National Voter Registration Procedures for Federal Elections, and for Other Purposes"

Based on my review of the above referenced material and my experience at both the state and national levels, I render the following opinions.

## SECTION 4  Summary of Opinions

1. The National Voter Registration Act requires that a voter registration application process be an integral part of an application process for services at various agencies designated under the National Voter Registration Act. It appears that in Florida some offices providing services through the

Department of Children and Families (DCF) were not always offering the opportunity to register to vote to all clients, as prescribed in the National Voter Registration Act.

2.  Agency based voter registration programs will work best in those situations where the chief State election official designated for coordinating "State responsibilities" under the National Voter Registration Act assumes the responsibility for providing statewide leadership in the development and implementation of all activities related to the State's compliance with the Act.  In Florida it appears that no one was granted statewide authority or exercised statewide leadership in the development of various programs established by the National Voter Registration Act.

3.  Agency based voter registration programs will operate more efficiently when there is a greater reliance on the electronic transfer of voter registration data.  Florida's agency based voter registration programs may be hampered by its reliance on paper forms.

4.  At the statewide level, it is essential that someone, preferably the State's chief elections official, be responsible for monitoring the performance levels of state agencies that have designated responsibilities under the National Voter Registration Act.  Florida would be able to more efficiently operate its agency based voter registration programs if monitoring programs were in place.

## Section 5  Basis and Reasons for Opinions

### The National Voter Registration Act requires that a voter registration application process be an integral part of an application process for services at various agencies designated under the National Voter Registration Act. It appears that in Florida some offices providing services through the Department of Children and Families (DCF) were not always offering the opportunity to register to vote to all clients, as prescribed in the National Voter Registration Act.

The National Voter Registration Act requires that individuals be given an opportunity to register to vote (or to change their voter registration data) in elections for federal office when applying for or renewing a driver's license or other personal identification document issued by a State motor vehicle authority; applying for public assistance; applying for disability services under State-funded programs; and applying for services at other offices designated by the State.[1]

A voter registration agency, other than a driver's license agency, is required to distribute with each application for service or assistance, and with each recertification, renewal, or change of address, a mail voter registration application form.[2]  These agencies must also provide assistance and acceptance of voter registration applications.[3]

In addition these agencies must provide each applicant a "declination" form whereby an applicant may accept or reject an offer to register to vote based on their current residence.  The Federal Election Commission  has suggested that a declination

---

[1] "FEC Guide to Implementing the NVRA," pages 1-1 and 4-1, January 1, 1994.
[2] 42 USC 1973gg-5 (a)(6)(A).
[3] 42 USC 1973gg-5(a)(4)(A)ii and iii.

form "lends itself, then, to being included in the other forms being completed by applicants – as an integral part of the agency's own form(s), or as a separate form."[4]

It appears that Florida in their Department of Children and Families (DCF) uses a separate "preference form." However, it is important to note that when using a separate form, it is still important that such a form be used as an "integral" part of the agency's application process.  For example, it would not suffice for an agency to simply have declination forms and voter registration applications made available on a counter for public distribution.

It also appears that in some cases DCF offices were not always providing an opportunity for clients to register.   Reasons given were budgetary constraints or a general policy of only providing voter registration "if client (sic) asks about it."[5]

> **Agency based voter registration programs will work best in those situations where the chief State election official designated for coordinating "State responsibilities" under the National Voter Registration Act assumes the responsibility for providing statewide leadership in the development and implementation of all activities related to a State's compliance with the Act. In Florida it appears that no one was granted statewide authority or exercised statewide leadership in the development of various programs established by the National Voter Registration Act.**

The NVRA requires that each State "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this Act."[6]

---

[4] "FEC Guide to Implementing the NVRA," page 4-7, January 1, 1994.
[5] Kearney's Response to Doc Request 1, e-mail and January 8, 2002 memo to Operational Program Administrators from Carol Canady, re: Voter Registration Procedures.
[6] 42 USC 1973gg-8.

As a practical matter, some States have chosen to assign this official the responsibility of carrying out other duties assigned under the Act.  In fact the FEC suggested shortly after enactment of the NVRA that States consider "assigning the chief State election official related responsibilities."[7]  These responsibilities included receiving and forwarding various forms and notices; receiving and compiling reports; "designing all forms and procedures requisite under the NVRA; and training of all local election officials regarding the forms and procedures."[8]

It should be noted that based on my review of documents from the State of Florida, it appears that prior to 2001, the chief State elections official designated under the NVRA, was either not given the authority or did not exercise the responsibility of performing the functions described above.

From my experience in the State of Washington, I found that even though my office did not have legal supervisory authority over either our county election officials or the State's designated state agencies, this lack of authority did not preclude us from working with local election officials and state agency directors on reaching agreement on certain procedural items and seeking legislative authority to design public notices and forms.[9]

The Secretary of State in Washington also sought and was given the authority to receive all applications for voter registration.

---

[7] "FEC Guide to Implementing the NVRA," page 1-6, January 1, 1994.
[8] Ibid. (emphasis added)
[9] Revised Code of Washington, 29.07.025.

**Agency based voter registration programs will operate more efficiently when there is a greater reliance on the electronic transfer of voter registration data. Florida's agency based voter registration programs may be hampered by its reliance on paper forms.**

One of the reasons for the initial success of the implementation of the NVRA in Washington was the recognition that the process would operate more efficiently if there was less reliance on paper forms.

In Washington, the simultaneous application process at driver's license agencies requires the Washington State Department of Licensing to "produce and transmit a machine-readable file" containing the data elements needed for processing the voter registration application.[10] These machine readable files along with the applicant's original signature are first transmitted to the Secretary of State. The Secretary of State is responsible for sorting the records by county, producing a file of voter registration transactions for each county, and transmitting the electronic data to each county on "whatever medium the county determines will best facilitate the incorporation of these records into the existing voter registration files of that county."[11]

Most counties simply take the electronic data and download the information into their existing voter registration file. Although counties must still keep track of the original signature, this process does enable them to directly download information electronically, without having to manually enter the information from a separate paper document. This process reduces the chance of input error and the potential loss of a paper form.

---

[10] Revised Code of Washington, 29.07.270.
[11] Revised Code of Washington, 29.07.290.

The State of Florida through their Department of Highway Safety and Motor Vehicles (DHSMV) and the Department of Children and Families (DCF) still relies heavily on paper forms. To an extent, this reliance may cause them to experience many of the problems described in this section of the Report.

**At the statewide level, it is essential that someone, preferably the State's chief elections official, be responsible for monitoring the performance levels of state agencies that have designated responsibilities under the National Voter Registration Act. Florida would be able to more efficiently operate its agency based voter registration programs if monitoring programs were in place.**

In assisting States with the implementation of the National Voter Registration Act, the Federal Elections Commission urged that consideration be given to the administration of the agency based programs (including driver's license agencies) prescribed in the Act. In particular, the Commission stressed responsibility and training.

In terms of responsibility, the FEC suggested that "a principle ingredient of a successful agency registration program is the appointment of someone in each agency office to be in charge of, responsible for, and enthusiastic about all voter registration activities - ensuring an adequate supply of forms, monitoring voter registration activities, training new employees, resolving questions and problems that arise in coordination with State or local election officials, and the like. Such a task need not be full time, but it must be ongoing."[12]

The FEC recommendations also included a specific provision on the training of "all agency employees involved with voter

---

[12] "FEC Guide to Implementing the NVRA," pages 2-7 and 4-9, January 1, 1994.

registration – how to ensure that voter registration forms are completed and signed correctly, how to offer and provide assistance to registrants, and the like."[13]

In addition, my experience in Washington would indicate that another necessary ingredient of a successful agency based voter registration process is the designation of an individual at the State level, preferably the chief elections officer, being responsible for the monitoring of all voter registration activity at each agency office, including the assessment of the levels of voter registration activity.

In terms of assessing the levels of voter registration, it is important to determine the total number of customers for each agency office. In other words, how many customers does each office serve in terms of processing applications for whatever particular service the office provides? It then becomes important to determine the total number of voter transactions for each office. Once these figures are determined, then it is fairly easy to compare offices of similar size based on total customers and then make a reasonable determination of the number of voter registration transactions an agency office should be generating. This analysis is most effective when it is done statewide. States should also consider providing for agency site visits by the chief elections officer.

In addition it is important that the chief elections officer monitor the quality of the application process at each agency office. This monitoring would include the completeness of the forms and the accuracy of the data contained on the forms.

If there are anomalies, then the person responsible for the implementation of the Act at the State level should work with the individual agency's personnel in terms of resolving whatever

---

[13] "FEC Guide to Implementing the NVRA," pages 2-7 and 4-9, January 1, 1994.

problems may exist, including the refusal or inability by an office to offer voter registration services to each applicant.

This becomes particularly important in those social service agencies required to provide voter registration application services. In these agencies an end of day balancing and verification process is necessary in order to ensure that all clients are being given an opportunity to register to vote, as required by the NVRA. This can be accomplished by simply providing for a log that shows the total number of clients served; the total number of declination forms; and the total number of voter registration forms distributed to clients. At the end of each day the total number of declination forms and the total number of voter registration applications distributed should equal the total number of clients served.

In summary, it does not appear from my review of various documents from the State of Florida that the programs described in this section of the Report are currently established. In particular the State of Florida through their Department of Children and Families does not appear to provide a log which contains all of the information necessary to ensure that each applicant is being given the opportunity to register to vote.

In my opinion the State of Florida would more efficiently implement the provisions of the NVRA if such monitoring programs as described in this section of the Report were in place.

## SECTION 6 Compensation

I am being compensated at the rate of $125 an hour for the preparation of this Report.

## <u>SECTION 7</u>  Other Expert Testimony in the Last Four Years

I was deposed as an expert witness in Olympia, Washington on November 6, 2001 regarding <u>Washington State Democratic Party, et al. v. The State of Washington et al.</u>, No.C00-5419 FDB, (W.D.Washington).

I was deposed as an expert witness in Philadelphia, Pennsylvania on April 5, 2002 regarding <u>National Organization on Disability, et al. v. City of Philadelphia et al.</u>, No. 01-C1923, (E.D.Pennsylvania).

_____

Gary McIntosh, President
McIntosh Election Services
April 26, 2002

## VITA

### GARY EDWARD MCINTOSH

**CONTACT:**

606 Sherman Street SW
Olympia, Washington 98502-5455
(360) 709-0603
smythmcintosh@attbi.com

**EDUCATION:**

B.A., 1972, Political Science, Washington State University (With Distinction, Phi Beta Kappa)

**PROFESSIONAL PROFILE:**

2001-Present: Founder and President of McIntosh Election Services, Olympia, Washington
McIntosh Election Services is a company providing expert elections management assistance and advice to private companies, law firms, and government. The company specializes in the preparation of expert witness reports, including reports covering descriptions of the national qualification process for voting systems, analysis of state laws on certification of voting systems, and studies of existing voting systems currently made available to states and localities.

1988-2001: Washington State Election Director, Office of the Secretary of State, Olympia, Washington
This position was responsible for maximizing human, monetary, and technological resources while providing a secure and accurate elections environment. The purpose of the position was to direct the administration of federal and state elections and to assist local election officials with the administration of city, county, and district elections held in the state. This position was responsible for supervising 17 full-time personnel and 12 temporary personnel while administering a $5.3 million budget. The position was also expected to supervise personnel in the printing and distribution of the official state voters pamphlet, the maintaining of the state voter registration file, the verification of initiative signatures, the canvassing of state election returns, the training and certification of county election officials, the review of county election practices and procedures, and the drafting of elections legislation. The position was also responsible for evaluating all voting systems marketed in the state. Evaluations included the design of a testing process to insure that voting systems marketed in the state met Federal Voting System standards and were capable of meeting state election requirements. The position was responsible for the preparation of voting system certification reports and made recommendations to the

Secretary of State as to whether specific systems should be certified. Certification reports also contained information on the management of specific systems, including requirements for counties in the use electronic voting systems. The position was also responsible for conducting tests of voting systems prior to elections to insure that electronic voting systems had been programmed and were performing accurately.

1979-1988: Thurston County Supervisor of Elections and Voter Registration, Office of the Thurston County Auditor, Olympia, Washington.
This position was responsible for supervising 20 temporary full-time personnel and five permanent full-time personnel, while administering a $500,000 budget. The position was also responsible for recruiting and training 540 election board workers. The purpose of the position was to maintain an accurate voter registration system and to obtain accurate election results. This included the management, programming, ballot preparation, proofing and testing of the county's electronic voting system. The position was expected to supervise personnel in the planning, accounting for and controlling of costs, to train polling place personnel, to administer election laws, to coordinate computer activities, including personal computers and mainframe operations, and to assist the Auditor in drafting legislation and testifying before legislative committees.

**PROFESSIONAL ACTIVITIES:**

- Founding Member of the National Association of State Election Directors
- President of the National Association of State Election Directors, 2000
- Appointed by the U.S. State Department to assist the Office of Security and Cooperation in Europe in the development of an elections process in Bosnia, 1997
- Appointed member of the Federal Election Commission's Advisory Panel on Elections Administration, 1999
- Chairman of the Washington State Ad-Hoc Legislative Committee on Primary Elections, 1999
- Worked on implementing a program for establishing a national testing process for electronic voting systems, 1992
- Assisted the Federal Elections Commission in a national program to assist states, counties, and social service agencies in the implementation of the National Voter Registration Act, 1994
- Received National Association of County Officials' Achievement Award for the development of an elementary school education program and for the establishment of a polling accessibility program for the disabled.

**PROFESSIONAL PRESENTATIONS:**

- United States Senate Committee on Governmental Affairs, Washington D.C., 2001, "Motor Voter in Washington State"

- Washington State Government Lawyers Bar Association Continuing Legal Education Seminar, Olympia, 2001, "A Primer on Election Administration"

- California Clerks Association, Palm Springs, 1999, "Blanket Primary Process"

- Council of State Governments, Quebec City, Quebec, 1999, "Voting System Standards"

- Oklahoma Election Officials Conference, Oklahoma City, 1995, "Voting by Mail"

- Kentucky Election Officials Conference, Frankfort, 1994, "Motor Voter and the National Voter Registration Act"

- Arkansas Election Officials Conference, Little Rock, 1994, "Implementing the National Voter Registration Act"

- Oklahoma Election Officials Conference, Oklahoma City, 1993, "Motor Voter in Washington State"

**PERSONAL ACTIVITIES:**

- Volunteer and Member of the Juvenile Diabetes Foundation

- Volunteer and Member of the American Diabetes Association

- Past President of the Thurston County Retired Volunteer Program

- Past part-time faculty member of South Puget Sound Community College

## SECTION 7  Other Expert Testimony in the Last Four Years

I was deposed as an expert witness in Olympia, Washington on November 6, 2001 regarding Washington State Democratic Party, et al. v. The State of Washington et al., No.C00-5419 FDB, (W.D.Washington).

I was deposed as an expert witness in Philadelphia, Pennsylvania on April 5, 2002 regarding National Organization on Disability, et al. v. City of Philadelphia et al., No. 01-C1923, (E.D.Pennsylvania).

Gary McIntosh, President
McIntosh Election Services
April 26, 2002

# TAB 20

```
 1   .              UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF FLORIDA

 3              CASE NO. 01-0120 CIV/GOLD/SIMONTON

 4   NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
     COLORED PEOPLE, INC. ET AL
 5

 6                      Plaintiff,

 7   vs.

 8   KATHERINE HARRIS, ET AL

 9

10                      Defendant.

11   _____

12              .

13

14

15                     DEPOSITION

16

17                        OF

18

19                    DAVID LEAHY

20

21

22            111 Northwest 1st Street
                Miami, Florida 33128
23

24              Friday May 24, 2002
                9:30 a.m. - 6:00 p.m.
25
```

Page 2

```
 1          APPEARANCES
 2   For the Plaintiff:
 3
 4      ELLIOT M. MINCBERG, ESQ.
        ALMA HENDERSON, ESQ.
 5      People of the American Way
        Foundation
 6      2000 M Street, NW.
        Suite 400
 7      Washington, DC 29936
 8   For the Deponent:
 9      SUSAN TORRES, ESQ.
        JEFFREY EHRLICH, ESQ.
10      Assistant County Attorney
        111 Northwest lst Street
11      Suite 2810
        Miami, Florida 33128
12
13   For the State:
        DOUGLAS B. MACINNES, ESQ.
14      Assistant Attorney General
        Office of the Attorney General
15      PL-01 The Capital
        Tallahassee, Florida 32399-1050
16
17   For the K. Harris
18      WALTER J. HARVEY, ESQ.
        Of the Law Office of
19      Steel, Hector and Davis, PA
        200 S. Biscayne Boulevard
20      Miami, Florida 33131-2398
21   For Volusia County
22      WILLIAM BOSCH, ESQ.
        Assistant County Attorney
23      Volusia County Attorney's Office
        123 W. Indiana Avenue
24      DeLand, Florida 32720-4613
25
```

Page 3

```
 1
 2   For Hillsborough County
 3      KENNETH A. TINKLER, ESQ.
        Assistant County Attorney
 4      Hillsborough County Attorney's Office
        601 East Kennedy Blvd.
 5      27th Floor
        Tampa, Florida 33602
 6
 7   For ChoicePoint, Inc.
 8      DANIEL A. RESTREPO, ESQ.
        Of the Law Offices of
 9      Williams and Connolly, PA
        725 12th Street, NW
10      Washington, DC 20005
11            I N D E X
12
13   Witness        Direct        Cross
14
15   DAVID LEAHY
16   (By Mr. Mincberg)    3/237
17   (By Mr. Harvey)      233
18   (By Mr. Restrepo)    237
19
20
21
22
23
24
25
```

Page 4

|   | E X H I B I T  I N D E X | |
|---|---|---|
| 1 | Plaintiff's        Description       Page No. | |
| 2 | EXH. 1    Response to Plaintiff's Interr.    23 |
| 3 | 2    End of Day Report Motor Voter    36 |
| 4 | 3    Response to 2nd Set of Interr.    58 |
| 5 | 4    Pollworker's Packet    67 |
| 6 | 5    Possible Duplicate Matches    101 |
| 7 | 6    Current Address Form    106 |
| 8 | 7    Testimony Civil Rights Commission   125 |
| 9 | 8    June 1999 Felon List    125 |
| 10 | 9    Jan. 2000 Felon List    126 |
| 11 | 10    Probable DBT Felon Match    132 |
| 12 | 11    FSASE CVF Committee    145 |
| 13 | 12    Letter 5/11/98    145 |
| 14 | 13    Memo 1/31/00    156 |
| 15 | 14    Suggestions Alacua County    158 |
| 16 | 15    Memo 2/23/00    160 |
| 17 | 16    Memo 5/17/00    165 |
| 18 | 17    Memo 9/21/00    170 |
| 19 | 18    Letter 2/23/00    177 |
| 20 | 19    Letter 2/13/01    204 |
| 21 | 20    Declaration Dedrana McCray    204 |
| 22 | 21    Letter 12/1/00    206 |
| 23 | 22    Letter 11/9/00 E. Frazier    213 |
| 24 | 23    2nd Amended Complaint    213 |
| 25 | 24    Declaration of D. Leahy    217 |

Page 5

```
 1   THEREUPON,
 2          DAVID LEAHY
 3   a witness named in the notice heretofore filed,
 4   having been first duly sworn, deposes and says as
 5   follows:
 6          DIRECT EXAMINATION
 7   BY MR. MINCBERG:
 8      Q. Please state your full name and address, for
 9   the record.
10      A. David C. Leahy, 11645 Southwest 99 Court,
11   Miami, Florida.
12      Q. Your business address?
13      A. 111 Northwest First Street, Suite 1910.
14      Q. Before we go further, I think your Counsel
15   wanted to put something on the record.
16      MS. TORRES: For the record, we had a problem
17   with our speakerphone. Therefore, Bill Bosch from
18   Volusia County will not be able to join us. We
19   will take a break as soon as we have that resolved
20   and get a conference.
21      MR. MINCBERG: Mr. Bosch understands that.
22      MS. TORRES: He said it was okay for us to
23   proceed.
24      Q. Mr. Leahy, first, any time I ask you any
25   questions that are unclear to you or you would like to
```

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

2 (Pages 2 to 5)

Page 6

1   have clarified, let me know. We want the record to be
2   as clear as possible, is that okay?
3       A. Yes.
4       Q. If at any point you want to take a break or
5   stretch your legs, let me know. I will finish up and
6   we will try to accommodate that, as well.
7       A. Yes.
8       Q. Good. One other housekeeping thing, for the
9   record, I understand Miami Dade County does not have
10  documents to produce at the moment in response to our
11  last document production request?
12      MS. TORRES: That is correct.
13  BY MR. MINCBERG:
14      Q. What is your current position?
15      A. Supervisor of Elections for Miami Dade
16  County.
17      Q. Elected or appointed?
18      A. Appointed.
19      Q. How long have you had that position?
20      A. I was appointed acting Supervisor of
21  Elections in January 1981, and I was made Supervisor of
22  Elections in June of 1981.
23      Q. It has been the same ever since?
24      A. Yes.
25      MR. MINCBERG: Yes.

Page 7

1       Q. Describe your job responsibilities in this
2   position.
3       A. I am responsible for voter registration in
4   Miami Dade County and conduct all of the County, State,
5   Federal and special elections conducted within Miami
6   Dade County. I assist in municipal elections with the
7   conducting of their elections.
8       Q. Do you have special responsibility for the
9   maintenance of voter lists?
10      A. Voter registration means the accepting of
11  registration forms, putting people on the registration
12  rolls, managing those registration rolls.
13      Q. That would include removing people from the
14  roll under some circumstances, is that correct?
15      A. Yes.
16      Q. Are you a member of any professional
17  associations?
18      A. I am a member of Florida State Association of
19  Supervisor of Elections and the Election Center.
20      Q. Describe to us briefly, first, what FSASE is.
21      A. It is a corporation that was formed, I guess,
22  back in the '60s, in the membership as Supervisor of
23  Elections in the State of Florida.
24      Q. All 67 of them?
25      A. If they pay dues, yes.

Page 8

1       Q. Out of curiosity, all members, to your
2   knowledge?
3       A. Right now, I think everyone is a member.
4   There were a couple of years, some of them had
5   difficulty coming up with dues.
6       Q. Do you have any official position with that
7   organization?
8       A. I have held various positions throughout the
9   years, including treasurer. I was president, I was
10  legislative chairperson, chairperson of various
11  committees. Currently, I am the chairperson of the
12  Advisory Committee and the State's new central
13  database.
14      Q. Before the central voter database, were you
15  involved with the committee related to the central
16  voter files?
17      A. Yes, I was.
18      Q. Can you describe that, please?
19      A. I was chairman of that committee, and that
20  committee was formed to work with the division on the
21  central voter files, as it was being developed, and to
22  recommend procedures to deal with information which
23  came out of that database.
24      Q. How long were you chair of the central
25  voter --

Page 9

1       A. For two years.
2       Q. That would have been which two years?
3       A. I am going to guess, probably '98 or 1999.
4       Q. Did you continue to serve on that committee
5   in 2000?
6       A. I don't recall.
7       Q. We will get a little more detail on that
8   later.
9          You mentioned, I think, it was election
10  center?
11      A. Yes.
12      Q. Can you describe that?
13      A. It is a national organization of election
14  officials, and through that organization, we get
15  updates on Federal legislation. The election center
16  holds different conventions where election items are
17  discussed. I attended several of those election center
18  conferences.
19      Q. Have you held any positions with that
20  organization?
21      A. No, I have not.
22      Q. Can you give us a description of your
23  education since graduation from high school?
24      A. I have a Bachelor of Arts in sociology from
25  Niagara University. I also have a Master in guidance

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

3 (Pages 6 to 9)

Page 10

1  and counselling from Niagara University.
2  Q.  Master's degree, when?
3  A.  1971.
4  Q.  Do you have any academic or other training
5  relating to elections and election administration?
6  A.  The only training I received, other than
7  on-the-job training, was I have attended numerous
8  workshops conducted by the election center, by the
9  State Division of Elections, by the clearinghouse for
10  the Federal Election Commission.  It is a national
11  organization called, IACREOT.
12  Q.  What is that organization?
13  A.  National Association of Clerks, Recorders and
14  Election Officials.
15  Q.  Got it.  Can you sketch for us your
16  occupational history since graduating college?
17  A.  From college, well, I went into the Army
18  right after college.  I went back for my Master's.  I
19  moved down to Florida, I worked for two years for the
20  County as an ombudsman in a program which was called
21  CIS.
22  Q.  What does that stand for?
23  A.  CIS, Citizens Information Service.
24  From there, I joined the Election Department
25  in 1974.

Page 11

1  Q.  When you joined the Election Department, what
2  was your position there?
3  A.  Assistant Supervisor of Elections.
4  Q.  You held that position until 1981, I assume?
5  A.  I was made Deputy Supervisor of Elections in
6  1978.
7  Q.  You held that position until 1981?
8  A.  Correct.
9  Q.  Did you review any documents in preparation
10  for today's deposition?
11  A.  Yes.
12  Q.  Can you tell us what those were?
13  A.  I reviewed my responses to the first and
14  second interrogatories and document requests and I
15  think it was the Second Amended --
16  Q.  Complaint?
17  A.  Yes.
18  Q.  Anything else?
19  A.  There was an affidavit, which I had signed
20  that I reviewed.
21  Q.  That you had signed?
22  A.  Correct.
23  Q.  We can do this at the break.  I want make
24  sure we know what that affidavit is.
25  While on the subject, you were the person

Page 12

1  that signed and, therefore, gave the actual answers to
2  the interrogatories, is that correct?
3  A.  That is correct.
4  Q.  Other than your attorneys, did you talk to
5  anyone in preparation for the deposition, or in
6  connection with the deposition?
7  A.  The only person -- I talked to several who
8  had depositions regarding this lawsuit.  Not in
9  preparation of the lawsuit, it was just discussions
10  which occurred.  I talked to Bill Kels also on the
11  Database Committee.  I talked with him.  During one of
12  our discussions, he mentioned he had his deposition
13  taken.
14  We recently had a meeting of the large County
15  Supervisor, and there were two supervisors from Volusia
16  and Hillsborough.  They mentioned they had been through
17  the depositions, but didn't go into detail as to what
18  the deposition --
19  Q.  I am sure they told you how much they enjoyed
20  it.
21  A.  They didn't mention how much they enjoyed it.
22  Q.  In your Department, how many people work for
23  the Division of Elections in Miami Dade County?
24  A.  Right now, 69, including myself.
25  MS. TORRES:  I want to clarify Department,

Page 13

1  Division of Elections.
2  MR. MINCBERG:  You are right.
3  Q.  Are those all full-time employees or
4  part-time?
5  A.  Those are full-time employees.
6  Q.  I assume, as elections come and go, you may
7  add to your staff temporarily?
8  A.  That is correct.
9  Q.  Do any of your employees have any academic
10  training related to election administration?
11  A.  Again, on-the-job training and some of my
12  administrative staff have attended the types of
13  workshops that I attended.
14  Q.  Do any of them have training in estimating
15  anticipated voter turnout?
16  A.  No.
17  Q.  How about in information systems?
18  A.  Yes.
19  Q.  What kind of training would that be?
20  A.  Well, the individual who is Assistant
21  Supervisor for Elections for the Systems Division has
22  training on various types of computer systems.
23  Q.  You mentioned meetings with the other
24  supervisor.  Are you familiar with the organization
25  which has the acronym ULCERS?

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

4 (Pages 10 to 13)

Page 14

1     A. Yes.
2     Q. Can you tell us what that is?
3     A. Yes.
4     Q. It is?
5     A. It is not an organization. It is a number of
6 large County Supervisors of Elections who meet two or
7 three or four times a year to discuss problems, like
8 different things we have tried within our own Counties
9 that have been successful, that other counties may want
10 to try, procedures.
11     Q. Do you happen to know what those initials
12 stand for?
13     A. Urban and Large County Elections and
14 Registration Supervisors.
15     Q. Very good.
16     A. I came up with the name.
17     Q. That may explain it.
18     Okay, which county election officials are
19 members of that organization?
20     A. To the best of my memory, you are testing my
21 memory, we have Duval, Orange, Volusia, Polk, Pinellas,
22 Hillsborough, Lee, Broward, Palm Beach, Brevard, and
23 Miami Dade, Sarasota and Pasco. I believe I have them
24 all.
25     Q. Are there any individuals that serve as staff

Page 15

1 of that organization?
2     A. No.
3     Q. Simply staffed among the supervisors that are
4 involved?
5     A. Doesn't need staff, it is not an
6 organization. It is a group of supervisors,
7 particularly the large registrations that meet
8 periodically to discuss issues and problems.
9     Q. Are there any records maintained for that
10 group, ULCER's records?
11     A. No.
12     Q. You simply would share information where you
13 might, for example, have a memo in Miami Dade that
14 talks about how you deal with a problem with the Miami
15 Dade records, and you might bring that to the meeting
16 and share it with people, that kind of thing?
17     A. It is possible. We don't share records. It
18 is mostly discussion, a free open discussion of
19 problems and solutions and ideas.
20     Q. Are there any records kept of those
21 discussions?
22     A. I don't know whether individual members keep
23 records or not. I don't.
24     Q. No official records?
25     A. No.

Page 16

1     Q. Or minutes?
2     A. Correct.
3     Q. I would like to talk about the voter
4 registration process, how people get onto the rolls in
5 Miami Dade County, can you describe that process,
6 generally?
7     A. We receive registration forms into our office
8 either by mail or hand delivered. They are time
9 stamped. We have a reception desk in front of our
10 office, all incoming mail or deliveries are time
11 stamped.
12     The registration forms then go to our intake
13 office in which it is determined, based on how and when
14 they were received, what the registration date is,
15 which would apply for new registrations. They are
16 sorted by the different ways that they are received and
17 who we received them from, the source of where those
18 documents come from.
19     We are required to keep track of the source
20 of each registration form that is received. And they
21 are bundled in with a notice on top of what the source
22 is. They go to our update section, which updates
23 information on our registration computer system or
24 enters the new registration onto that system. Then the
25 forms are merged. We send them to a section called

Page 17

1 storage, but it has various duties, and one is to image
2 the card, but that places the image of the signature of
3 the voter on our system. We have an image of the card
4 and image of the signature of that voter.
5     If it is other than a registration document,
6 we microfilm the document. If it is a letter, which
7 changes the registration information for a voter or the
8 back of the voter card with a change of address or
9 change of name or party, those documents are
10 microfilmed and not scanned. Then once all that is
11 done, the documents are stored in boxes. They are a
12 month's worth of documents stored in a box.
13 Registration forms are actually alphabetized and stored
14 in a monthly basis and sent out to election warehouse
15 in the City of Medley, where this information is
16 stored.
17     Q. Has anything about that process changed since
18 November 2000?
19     A. One of the things we have done recently, one
20 of the things we have done for new registration forms
21 that are incomplete, which, when a form is received --
22 all the information required the State law is not
23 contained within this form-- it's used to handle the
24 processing of incomplete forms when they reach the
25 update section.

Page 18

1    By processing, I mean determining that it is
2  incomplete and then sending out a letter notifying the
3  voter it is incomplete.  What we used to do, the law
4  has changed, we would send them a new registration
5  form.  We would let them know what information was
6  missing on the previous form and ask them to complete a
7  new form, containing all the information, including the
8  information they had previously neglected to put on the
9  form, and send it back to us.
10   There has been two changes in that process,
11  one, because of state law, we are now required to
12  provide them with a form that already contains all the
13  information that they previously provided to us.
14  Again, with a form letter, and tell them what
15  information they needed to include, plus a new
16  signature.  We have also moved up the identification of
17  those incomplete forms to the intake processing area.
18   So, we are identifying incomplete forms
19  earlier, prior to the closing, where we don't believe
20  there is enough time to mail the notice and get it back
21  by book closing, we will attempt to call the
22  individuals, where a phone number has been provided, to
23  advise them their form is incomplete and to go out and
24  get a new form and submit it before the book closing
25  date.

Page 19

1    Q.  So we are clear, by book closing date, the
2  date by which someone must be registered to vote in an
3  upcoming election?
4    A.  Correct.
5    Q.  So, for example, for the November 2000
6  election, that book closing date would have been
7  October 7, 2000?
8    A.  29 days before -- I am not sure of the date.
9  But State law, 29 days prior to an election.
10   Q.  That is fine.  We don't have to count.
11   Now, you said a few minutes ago, if I
12  understood this correctly, that part of the process is
13  determining the registration date, what date should be
14  assigned to a registration?
15   A.  Yes.
16   Q.  Is that process the same as it was prior to
17  the 2000 elections?
18   A.  Yes.
19   Q.  Again, explain to us more how that works.
20   A.  If a registration form, talking about
21  registration forms for people registering for the first
22  time, and not a change of address, is received through
23  the mail, then the postmarked date is the date of
24  registration.  If it is hand delivered, it is the date
25  that we receive the form.  So, in fact, that is how it

Page 20

1  is received, and the office actually stamps a
2  registration date on that form.
3    Q.  How about if somebody has registered for the
4  Department of Motor Vehicles or Department of Children
5  and Family Services?
6    A.  It is the date that they receive a complete
7  form.
8    Q.  They --
9    A.  Those offices, any voter registration
10  signatures, under State law, it is the date they
11  received it by law and they also stamp the date of
12  registration on those forms.
13   Q.  Other than those differences in the dates,
14  does the process of processing voter registration work
15  the same way, no matter the source or any differences?
16   A.  No.  No differences.
17   Q.  Just so we are clear on the different sources
18  of voter registration, we are talking about, in theory,
19  someone could register some person in your office, they
20  could register by mail, they could register with the
21  DMV or DCF, is that correct?
22   A.  Yes.
23   Q.  Any other sources?
24   A.  Yes.  There are a number of public assistance
25  offices.

Page 21

1    Q.  In addition to the DCF?
2    A.  Yes, there are State offices that handle
3  disabilities that have voter registration agencies. The
4  public libraries also are voter registration agencies,
5  and the Center For Independent Living is also a voter
6  registration agency.
7    Q.  Anybody else?
8    A.  I believe that covers it.
9    Q.  You talked about changes since the
10  November 2000 election under which you determined
11  earlier than you used to when an application is
12  incomplete.  Do you recall that a minute ago?
13   A.  Yes.
14   Q.  How much have you moved it up by?  Did you
15  prioritize it to October 2000?
16   A.  It varies, it was depending on the time of
17  year, and the number of applications we are receiving.
18   Q.  Well, focus in particular on the period, let
19  us say, within two to three months before the book
20  date.
21   A.  Book closing?
22   Q.  Let's focus two or three months before the
23  book closing date.  If you were to compare the process
24  as it exists in November of 2000, before October of
25  2000, and the process as it exists now, what are the

Page 22

1  differences in terms of timing?
2      A.  You may move it up, the notification, by at
3  least a week.
4      Q.  Obviously, for example, until 2000, did you
5  not have this procedure where if you received an
6  incomplete registration very close to the book closing
7  date, you would call people that did not exist?
8      A.  That did not exist.
9      Q.  In order for someone to be able to vote in an
10  upcoming election, I take it from your testimony, what
11  would have to happen by the book closing date is that
12  you would have to receive it or there would have to
13  have been deposited in the mail or one of the voter
14  registration agencies, a complete voter registration
15  application, is that correct?
16      A.  Yes.  By -- received by mail, postmarked by
17  the book closing date.
18      Q.  I did want to ask you in that connection one
19  specific thing relating to your -- one of your answers.
20  In your first set of interrogatories -- we will come
21  back to this.  We will ask the reporter to mark as
22  Leahy Exhibit 1, your response to the first set of
23  interrogatories?
24      (Thereupon, Interrogatory Response was marked as
25  Exhibit No. 1.)

Page 23

1      MR. MINCBERG:  There are marks that are mine.
2      MS. TORRES:  Through the document.
3      MR. MINCBERG:  Yes, I think so.
4      Q.  I will ask you to turn to Page 7 of Exhibit
5  1, particularly the focus on Interrogatory Number 9.
6  Let me state, as I did off the record, all of the
7  handwritten marks on that page and throughout the
8  document are mine, not put there by you.  This is, I
9  take it, a copy of your interrogatory answer, is that
10  correct?
11      A.  Yes.
12      Q.  Now, with respect to Interrogatory Number 9,
13  you state you "notified all individuals who registered
14  to vote in 2000, of the status of their application at
15  least ten days prior to the November 7 election for all
16  registrations received before ten days prior to the
17  November 7, 2000 election."
18      Is that a correct characterization of what
19  you said?
20      A.  Yes.
21      Q.  Now, what I would like you to explain to me
22  is the relationship between that and your statement a
23  few minutes ago about the book closing date, which is
24  earlier than the November 7, 2000 election.
25      A.  When we receive registration forms --

Page 24

1      Q.  When we--
2      A.  When we receive registration forms for a new
3  registration and for updating registration information
4  for previous registered voters, we make sure that
5  everything received by the book closing date is
6  processed at least ten days before an election so that
7  we can provide those voters with -- that are
8  appropriately registered with new voter ID cards so
9  they know where to go vote, what their districts are
10  and their polling place.  For those improperly
11  registered, did not provide the required information,
12  notice they are not registered and what additional
13  information is necessary for them to become registered.
14  Try to process everything received by the book closing
15  date, no later than ten days prior to that election.
16      Q.  So, if I understand what you are saying, then
17  the fact if somebody were to register to vote, let us
18  say, 15 days before the election, they would not be
19  able to vote in that election?
20      A.  That is correct.
21      Q.  I want to ask you a couple of different
22  questions about the process of following up the
23  incomplete voter registration application.  Focusing on
24  the period prior to the November 2000 election, does
25  the procedure for giving people an opportunity to or

Page 25

1  did the procedure for giving people an opportunity to
2  complete their registration vary by the source of the
3  registration, or anything of that nature?
4      A.  No.
5      Q.  No matter how you received it, your procedure
6  would be to recontact that person by mail, is that
7  correct?
8      A.  For an incomplete registration?
9      Q.  Yes.
10      A.  Yes.
11      Q.  In that period from, let us say, around
12  August of 2000 until the book closing date in October,
13  do you recall, in broad terms, how many incomplete
14  applications you received?
15      A.  No.
16      Q.  Typically, without focusing on that election,
17  but in broad terms, how many incomplete applications
18  would you receive in the period two to three months
19  before an election?
20      A.  I do not count the number of incompletes.  I
21  process them, send out notices.  I don't keep count.  I
22  am more concerned with making sure they are processed.
23      Q.  You are aware, I take it, there were some
24  extensive registration voter activities, particularly
25  focused on minority voters, undertaken in the summer

Page 26

1   and fall of 2000 in the Miami area, are you not?
2       A.  Yes, I was.
3       Q.  Did that result in an increase in the number
4   of voter registration applications that you got during
5   that period than in earlier elections?
6       A.  No.
7       Q.  Can you give us any idea of the differences
8   in terms of incomplete applications as between African
9   American voters, white voters. Hispanic voters?
10      A.  No.
11      Q.  No information?
12      A.  I don't have any information.
13      Q.  Let me go back to the interrogatory answers
14  Exhibit 1, Page 8. I want to ask you about your
15  response to Interrogatory Number 12, which has to do
16  with the voter registration application from the
17  Division of Motor Vehicles and Division of Family
18  Services. Do you see that?
19      A.  Yes.
20      Q.  You state applications from the DMV and DCF
21  are received by you by mail, is that correct?
22      A.  That is correct.
23      Q.  Where would they be mailed from, from the
24  individual DMV offices or one central place--
25  individual offices within Dade County?

Page 27

1       A.  Yes.
2       Q.  About how long did it take for you to get
3   them?
4       A.  I don't know.
5       Q.  But again, the date that counts for you is
6   the date that person actually registered at the DMV, is
7   that correct?
8       A.  Correct.
9       Q.  If a person had registered one day before the
10  book closing date, and you did not get it until four or
11  five days later, that person would still be considered
12  registered, is that correct?
13      A.  That is correct.
14      Q.  And going to number 12, one of your employees
15  picks up the voter registration applications for all
16  public service agencies twice a week. Do you see that?
17      A.  Yes.
18      Q.  Has that changed?
19      A.  Yes --not by all public service agencies,
20  not only the Department of Children and Family Service,
21  but all the other agencies we talked about before.
22  This is a public assistance agency.
23      Q.  So, what happened with the Division of Family
24  Services, the public library, and the disability
25  agency?

Page 28

1       A.  Public libraries, we have a central mail
2   system within their public library system where they
3   pick up from each library periodically, and we either
4   pick them up or they are delivered by the library
5   system to our office.  Disabilities -- I don't know how
6   we received those.  There would be another category for
7   all of those.  The date that counts is the date that
8   they registered in that office.  There is a date
9   printed on the form like the DMV, with the date the
10  person registered or completed a form, or from any
11  agency.  They stamp it to identify to us when this
12  person submitted the form to their office.
13      Q.  Now, further along in Interrogatory Number
14  12, you provided a table of voter registration
15  applications received, according to the Driver's
16  license Office and State Public Assistance Offices.
17      A.  Yes.
18      Q.  Do you see that, Page 8, and it extends to
19  Page 9?
20      A.  Yes.
21      Q.  Now, let me ask you, the State Public
22  Assistance Office, does that mean DCF and all other
23  State Public Assistance Offices?
24      A.  That is correct.
25      Q.  The numbers we find on Page 8 and 9, are

Page 29

1   those all completed applications, are these simply the
2   raw number of applications that you received, whether
3   or not they were completed?
4       A.  The raw number.  It is the number of
5   applications received.
6       Q.  Can you tell us how many of these were
7   complete, in broad terms?
8       A.  Not by looking at this information.
9       Q.  How could you determine that information?
10      A.  These would be included in the applications
11  that were not for registered voters.  We would include
12  the registration forms where people already are
13  registered and update their information on a duplicate
14  form.  We do a report to the State on a monthly basis,
15  which calls for the number of new registrations by
16  category each month.  That is where I would find that
17  information.
18      Q.  So, for example, let us take one of these
19  months on Page 9, August 2000, Driver's Applications
20  received, 4,881?
21      A.  Correct.
22      Q.  Would you go to this report that you
23  submitted to the State and find out how many actual new
24  registrations occurred during that month?
25      A.  Yes.

Page 30

1    Q. Some of the applications in Interrogatory 12,
2  might be a change of address, and other kinds of
3  things?
4    A. That is correct.
5    Q. Would you use your estimate of how many of
6  that category -- how many would be incomplete
7  applications?
8    A. I don't have estimates. I simply go look at
9  this information.
10   Q. Are there figures in addition to these for
11 applications received from the public library, the
12 Independent Living Center and other agencies?
13   A. Yes.
14   Q. Ballpark, how would these compare in terms of
15 category?
16   A. The highest category is application through
17 the mail. The Division of Motor Vehicles would be the
18 second highest category. We have another category,
19 hand delivery by individuals or groups, which can be
20 individual forms, or they can be a number of forms for
21 an individual or a group doing a registration drive
22 that hand delivered them to my office, the third
23 highest. The public library would be the fourth, and
24 disability and public agencies are probably similar and
25 there is one other area, the armed forces services are

Page 31

1  also a registration recruitment offices. They would
2  have the least amount of forms on a monthly basis.
3    MR. MINCBERG: Bill, sort of formally
4  announce your presence and give the court reporter
5  your information.
6    MR. BOSCH: William Bosch, Assistant County
7  Attorney for Volusia County, representing Deanie
8  Lowe. Dan Eckerd is sitting with me, he will be
9  in and out.
10 BY MR. MINCBERG:
11   Q. Mr. Leahy, I want to go back to the subject
12 that we were talking about, Interrogatory Number 12.
13 12, as I understood what you told us, the numbers that
14 are in Interrogatory Number 12 are voter registration
15 applications received from the Driver's License Office
16 and the State Public Assistance Office in the date
17 listed, is that correct?
18   A. That is correct.
19   Q. These may or may not have actually been
20 people who were successfully registered to vote?
21   A. That is correct.
22   Q. I think you also indicated that you do
23 produce and then send to the State a report that
24 discloses how many people actually get on the rolls as
25 a result of registrations through Division of Motor

Page 32

1  Vehicles and State Public Assistance Offices?
2    A. How many new registrations were processed
3  each month by source?
4    Q. By source. From that, we could determine how
5  many people, let's say, in August of 2000 actually made
6  it on the rolls as registered at DCF, DMV or the State
7  Public Assistance Offices?
8        How could one compare these two? Can you
9  give us copy? Do you have copies of those reports that
10 you sent to the State?
11   A. I know I have copies of the State report
12 which reflects what we provided to the State, I believe
13 we also have copies of what is sent to them.
14   Q. Again, in order to save your time, I would
15 request that Miami Dade provide us copies of those
16 reports for the Division of Motor Vehicles and DCF as I
17 think he explained.
18     MS. TORRES: We will take a look at the
19 documents and confer with you after the
20 deposition.
21     MR. MINCBERG: Very good.
22   Q. I want to ask you a few questions relating to
23 the process, in particular, at DMV and State Public
24 Assistance Offices. Does your office provide any
25 training to DMV employees relating to voter

Page 33

1  registration?
2    A. No.
3    Q. Does anyone, to your knowledge, provide such
4  training?
5    A. I believe that is the responsibility of the
6  State Division of Elections to provide that training.
7  I have attended training, which the State has conducted
8  on the registration process, where individuals from DMV
9  and state agencies have been invited to attend those
10 workshops.
11   Q. Do you know whether any training is provided
12 to DMV officials on what to do with respect to
13 incomplete applications as they receive them?
14   A. No, I do not.
15   Q. I take it from what you said, that neither
16 you or anyone from your office has actually
17 participated in such training for DMV officers, is that
18 correct?
19   A. Correct.
20   Q. Are mail-in applications available at DMV
21 offices?
22     MS. TORRES: Objection to the form.
23     MR. MINCBERG: Specify what you mean by your
24 objection.
25     MS. TORRES: To the extent he has knowledge

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

9 (Pages 30 to 33)

Page 34

1  concerning that.
2      MR. MINCBERG: I mean to the extent that you
3  have knowledge.
4      THE WITNESS: I don't know.
5      Q.  Prior to the 2000 general election, was there
6  ever a time when voter registration applications were
7  lost at a DMV office in Dade County?
8      MS. TORRES: Objection.
9      MR. MACINNES: Objection to the form.
10 BY MR. MINCBERG:
11     Q.  You can answer.
12     A.  We received from the DMV not only the
13 registration form, but a listing of those registration
14 forms, and occasionally and rarely, there is a listing
15 on -- a name listed on that list, for which no
16 registration form is received.  My office is to contact
17 that office, the DMV, and to try to identify that form,
18 and see if we can get a copy of the form and failing
19 that, if there is enough information, we will send them
20 a voter registration form to complete.
21     Q.  In a situation like that, what would the date
22 of the person's registration be considered to be?
23     A.  The date when a form is received by my office
24 or the postmark date of its mail.
25     Q.  So that if someone had registered --

Page 35

1  attempted to register to vote at a DMV office on a
2  particular date, and, as you described it, that
3  registration form never made it to you, as far as you
4  are concerned, that never occurred, they would have to
5  start all over again?
6      A.  That is correct.
7      Q.  Have you had occasion where you don't receive
8  an application from someone who DMV indicated has
9  registered and DMV has been able to locate the form?
10     A.  In my discussions with my staff, they have
11 indicated that there is not -- they don't receive forms
12 for those people that are on the list and where a form
13 is initially not received.  There is no form produced
14 by DMV in those situations.
15     Q.  So, therefore, when there is a situation
16 where there is no form received, as far as you know,
17 what has to happen is an attempt has to be made to get
18 back in touch with the voter to have them register
19 again, is that correct.
20     MS. TORRES: Objection to the form.
21     THE WITNESS: Yes.  Process, again, is to
22 send them a form so that the person can fill out
23 the form and become registered.
24     MR. MINCBERG: I want to mark as an Exhibit,
25 a document that I think can help us see how that

Page 36

1  works.  I will ask to have marked as Leahy 2, a
2  document that consists of four of the pages that
3  your office provided to us that are entitled End
4  Of Day Report, Motor Voter.
5      (Thereupon, the Report has been marked
6  as Deposition Exhibit No. 2 for identification.)
7      Q.  Do you recognize Exhibit 2?
8      A.  Yes.
9      Q.  Can you describe to us what it consists of?
10     A.  This is a listing of applications, voter
11 registration applications that were completed at the
12 DMV, and this list was provided to us in addition to
13 registration forms to my office.
14     Q.  Are similar lists of this type provided by
15 any of the other sources of voter registration or only
16 DMV?
17     A.  Only DMV.
18     Q.  Unlike the other Exhibit, I think the
19 handwriting on this document is not mine, but may be
20 other people.  I want to establish that, first, can you
21 tell us, Mr. Leahy, not necessarily the name of the
22 individual, but generally, who is responsible for the
23 handwritten marks that we see through the document?
24     A.  That would be our intake office where
25 registration forms are received.

Page 37

1      Q.  Next to a number of these names, we see check
2  marks.  What does a check mark signify?
3      A.  I will give you my opinion what it is, and
4  that would be that we have received a form for that
5  name that is checkmarked.
6      Q.  And I notice on the first page that Bates
7  statement 44572, next to the second from the bottom
8  name on V-E-R-N-A-C-E, there is the phrase "not
9  available," do you see that?
10     A.  Yes.
11     Q.  What does that mean?
12     A.  Going to make an assumption that the card was
13 not received.
14     Q.  The application was not received?
15     A.  The application was not received.
16     Q.  Keep that one in mind for a moment.  I want
17 you to turn to the next page of the document Bates
18 stamped 44577.  You will notice about midway down the
19 page, there is a name Maglylezcano,
20 M-A-G-L-Y-L-E-C-Z-C-A-N-O.  Do you see that?
21     A.  Yes.
22     Q.  Next to that missing form?
23     A.  Yes.
24     Q.  I assume that a form of -- voter registration
25 form was not provided for that person, is that correct?

Page 38

1    A.  I assume the same.
2    Q.  Next to that, the person's name is written
3    again, driver's license number and address, do you see
4    that?
5    A.  Yes.
6    Q.  I assume then, that in this instance, you are
7    able to locate a person's address, and then you would
8    have mailed them a voter registration form, would that
9    have been the process?
10   A.  I would assume the same.
11   Q.  Flipping back to the earlier page next to
12   Mr. Vernace, I don't see any reference to an address,
13   or anything for her, is that correct?
14   A.  That is correct.
15   Q.  What should we conclude, whether you were
16   able to send her a voter registration form?
17       MS. TORRES:  Objection to the form.
18       MR. MAC INNES:  Objection to the form.
19       THE WITNESS:  I cannot conclude anything.
20   Q.  You don't know whether or not might be some
21   other form, whether she got a voter registration form
22   or not?
23   A.  I can't conclude anything based on what is on
24   this piece of paper.
25   Q.  Based on this piece of paper, nothing to

Page 39

1    indicate that there was any ability to notify that
2    potential voter that a form was not processed?
3        MS. TORRES:  Objection.
4        MR. MAC INNES:  Objecting.
5        THE WITNESS:  That is correct.
6    Q.  Back again on the first page that we were
7    looking at, there are notations at the bottom, "not
8    listed, manual forms," then names under that.  Can you
9    explain what that means?
10   A.  Again, I will make an assumption, if you
11   like, being "not listed," form that we received, but
12   were not on the list, or "manual forms" would be forms
13   that are pre-printed, not generated through the DMV
14   system.
15   Q.  Under one of the names in that "not listed"
16   category, we see the phrase "not available."  Can you
17   interpret that?
18   A.  No, I cannot.
19   Q.  Let me ask you to turn to the third page of
20   this Exhibit, Bates stamped 44613, the phrase "missing
21   card" is used on that page, is, essentially, the same
22   as if you did not get an actual application?
23   A.  I assume that is what it means.
24   Q.  A little further down the page, next to one
25   name, "voided form," do you see that?

Page 40

1    A.  Yes.
2    Q.  Can you interpret that for us?
3    A.  It has the printed word void; I assume that
4    the form was not completed, they sent it to us anyway.
5    I don't know why they would have sent us a voided form.
6    Q.  What would you do in a situation like that?
7    A.  We would do nothing.
8    Q.  You would not treat that as an incomplete
9    application?
10   A.  Not if it had void on it.
11   Q.  Void form means voter decided, or potential
12   voter decided not to submit it?
13   A.  I am assuming that is what it means.
14   Q.  Again on this page, several of the potential
15   registrants have the words "not signed" next to them,
16   do you see that?
17   A.  Yes.
18   Q.  Would those be treated as incomplete
19   applications?
20   A.  Not signed application is an incomplete
21   application, pursuant to the State law.
22   Q.  Those would be processed in the way that you
23   described before for incomplete applications?
24   A.  Yes.
25   Q.  Finally, very quickly, on the last page,

Page 41

1    44520, several have the words "no card" next to them,
2    do you see that?
3    A.  Yes.
4    Q.  Again, I assume that means there was no
5    actual applications, even though, according to this DMV
6    list, they had attempted to register, is that correct?
7        MS. TORRES:  Objection.
8        MR. MAC INNES:  Objection to the form.
9        MS. TORRES:  Let me object in particular --
10   there is another notation printed next to what you
11   just read into the record, which says "void."
12       MR. MINCBERG:  That is a fair point.  Let me
13   back up.
14   Q.  On this particular page -- excellent point.
15   On this particular page, you have a couple of potential
16   registrants where the word "void" is printed and it
17   says "no card," do you see that?
18   A.  Yes.
19   Q.  How would those applications then be treated?
20   A.  My assumption is that the registration
21   application was voided at DMV, and they did not send us
22   those voided applications.
23   Q.  Good.  One other thing about that document
24   that confused me a little bit, on all four of these
25   pages, the word "void" appears at the top, above where

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

11 (Pages 38 to 41)

Page 42

1  the name exists above the line, do you see that?
2      A.  Yes.
3      Q.  Just to be sure I got this correctly, only
4  when the word "void" is printed next to a person's name
5  in that column would that particular application be
6  void, is that correct?
7      A.  I assume the same.
8      Q.  Now, does anyone in your office ever meet
9  with people at DMV to discuss the voter registration
10  process?
11     A.  The intact office, I believe, in discussions
12  held with DMV are held by phone. Again, this is where
13  there is a question regarding what has been received,
14  and my staff would contact by phone the DMV, people
15  responsible for submitting that form.
16     Q.  So, it would be on an ad hoc basis, that kind
17  of thing?
18     A.  Whenever it is necessary.
19     Q.  But are there any meetings to discuss, more
20  generally, issues about how things ought to be handled?
21     A.  Not with my intake staff. In many of the
22  workshops conducted by the State Division of Elections,
23  DMV officials are at those workshops and are, often
24  times, on the program so that they can discuss issues,
25  and the Supervisor of Elections attending those

Page 43

1  workshops can discuss issues with the DMV's role in the
2  registration process.
3      Q.  I know you told us that in individual
4  instances where a person is listed as having attempted
5  to register, but there are no applications, there will
6  be discussions back and forth between the DMV and your
7  office, is that correct?
8      A.  Correct.
9      Q.  Has that topic been discussed more generally,
10  for example, talking about ways to avoid that problem
11  or anything of that nature?
12     A.  Again, that would have been at these
13  workshops where supervisors are simply conveying to the
14  DMV officials that there are problems where we do not
15  get applications for names on a list, or they may have
16  been printing problems where we have a difficult time
17  reading what is on those applications. Those, again,
18  are discussions held with the Supervisors of Elections
19  and officials of the DMV on a State level during the
20  Division of Elections workshops.
21     Q.  Have you ever expressed concerns about those
22  kind of problems at those meetings?
23     A.  I don't believe. I believe that the other
24  Supervisor of Elections expressed those concerns, which
25  we generally all seem to have.

Page 44

1      Q.  Can you recall any action taken to address
2  any of those concerns?
3      A.  Well, the statements made that -- where a
4  problem exists, the DMV officials attending those
5  workshops, say they will work on those problems to try
6  to resolve it.
7      Q.  Have you noticed in DMV and Dade County, any
8  trend up or down on the number of those sort of
9  problems that you had?
10     A.  I don't keep track of that type of
11  information. So, no.
12     Q.  You do not know, at least in terms of Miami
13  Dade, if any of those discussion have improved the
14  situation?
15     A.  Not in terms of the missing application. I
16  know they have worked on their printers, and to the
17  best of my knowledge, that the forms that were
18  receiving that are printed by DMV, are a much better
19  quality of late than they were a number years ago.
20     Q.  When you say "of late," what would you pick
21  in terms of time frame?
22     A.  I would say the last three or four years. It
23  was much earlier, they were having printer problems.
24     Q.  So, for example, looking again at the
25  November 2000 election, printer problems were improved

Page 45

1  prior to that election?
2      A.  Yes.
3      Q.  Has there been any further improvement since
4  the November 2000 election as to the quality of the
5  print?
6      A.  They were good quality and have remained that
7  way.
8      Q.  Very good. To your knowledge, is there any
9  valuation of DMV employees in terms of their
10  performance with respect to voter registration or
11  discipline of them for failing to comply with the
12  responsibilities?
13         MR. MAC INNES:  Objection to the form.
14         THE WITNESS:  I have no information.
15     Q.  Indeed, I would assume you would not know
16  which individual DMV employees might have had anything
17  to do with missing forms, when that might have
18  occurred?
19     A.  No.
20     Q.  Now, I want to ask you similar questions with
21  respect to the registration process, as you described
22  it, at state public assistance agencies. So we are
23  clear, by State public assistance, Division of Family
24  Services, DCF, what else?
25     A.  I think the food stamp office and another

Page 46

1  category that escapes me now.
2      Q.  Prior to the general election, can you tell
3  us if the employees at the agencies were trained on
4  voter registration procedures?
5      MR. MAC INNES:  Objection to the form.
6      A.  My recollection is that the State holds
7  workshops approximately once every two years.  I don't
8  know what training took place within the agency.
9      Q.  If you know, are mail-in voter applications
10  available at State Public Assistance Offices in your
11  County?
12      A.  I don't know, but since they do not have
13  DMV's capabilities, at least, at this present time of
14  generating the forms, themselves, through a printer
15  system, that they would use the State form, which is
16  the mail-in registration form.
17      Q.  Do State public assistant agencies provide
18  voter registration opportunity to clients who receiver
19  service by phone, to your knowledge?
20      A.  I don't know.
21      Q.  In your County, do you have a general
22  understanding as to approximately what percentages of
23  clients at State public assistance agencies are African
24  American?
25      A.  No.

Page 47

1      Q.  Hispanic?
2      A.  No.
3      Q.  White?
4      A.  No.
5      Q.  We have gone through an Exhibit that
6  indicates from DMV, some information from them as to
7  whether or not a voter registration attempt was made by
8  someone at their agency.  Is there a kind of equivalent
9  form at the state public assistant agency?
10      A.  Not to my knowledge.
11      Q.  Do you know if any State Public Assistance
12  Agency keeps anything in a client file that indicates
13  whether the client was offered an opportunity to vote?
14      MR. MAC INNES:  Objection to the form.
15      THE WITNESS:  I don't know.
16      Q.  Do you know if any State Public Assistance
17  Agency clients were offered an opportunity to vote
18  prior to the general election?
19      MR. MAC INNES:  Objection to the form.
20      MS. TORRES:  Objection to the form.
21      THE WITNESS:  No.
22      Q.  Prior to the 2000 general election, are you
23  aware of whether any applications were lost at any
24  State Public Assistance Agency?
25      MS. TORRES:  Objection to the form.

Page 48

1      MR. MAC INNES:  No.
2      THE WITNESS:  No.
3      Q.  You don't know one way or the other?
4      A.  No, sir, that is correct.
5      Q.  Who at the State Public Assistance Agency is
6  responsible for handling the turnover of voter
7  registration forms to your office?
8      MS. TORRES:  Objection to the form.
9      MR. MAC INNES:  Objection to the form.
10      THE WITNESS:  I don't know.
11      Q.  Let me phrase it a different way, focusing on
12  State Public Assistance Offices.  How does the process
13  work, how does that application gets from them to you?
14      A.  My office picks up forms twice a week from
15  the State office nearby my office.
16      Q.  That answers, I think, one of my questions.
17  Is it one office or does it go -- or do people from
18  your office go to each individual Public Assistance
19  Office?
20      A.  My understanding, it is one office that we
21  collect these forms from.
22      Q.  So, is it your understanding then that the
23  central office to which you refer, collects all the
24  individual applications from individual offices?
25      A.  I assume that would be the case.

Page 49

1      Q.  What is the central office from which they
2  pick up these forms?
3      A.  It is the State office building, I believe,
4  400 -- I forget, two blocks from the building that we
5  are in.
6      Q.  Are you aware of any communications other
7  than picking up those forms between your office and
8  State Public Assistance Offices with respect to voter
9  registration?
10      A.  I am not aware of any.
11      Q.  Does your office ever assign employees to
12  assist folks in State public assistance with respect to
13  voter registration?
14      A.  No.
15      Q.  That answer would be the same with respect to
16  DMV?
17      A.  Correct.
18      Q.  To your knowledge, is there anywhere a person
19  could complain about the State voter registration at
20  the State Public Assistance Agency?
21      A.  I don't know.
22      Q.  Are you aware if someone would complain about
23  the voter registration process at the DMV office?
24      MR. MAC INNES:  Objection to the form.
25      THE WITNESS:  I don't know what the process

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

13 (Pages 46 to 49)

Page 50

1    is.
2         Q.  I would like to talk for a little bit about
3    what I know must be a very complicated subject for
4    election officials, changes of address by voters.  At
5    this point, I want to focus on the period up to the
6    November 2000 election.
7         Do you affirmatively seek to determine
8    whether voters have changed their addresses?
9         A.  I do not understand the question.
10        Q.  For example, do you make an effort to compare
11   the voter registration list with the U.S. Postal
12   Service computerized national change of address files?
13        A.  Yes, we do.
14        Q.  Describe how that works.
15        A.  Twice a year, we submit a registration roll
16   from Miami Dade County to one of the vendors, who has a
17   license to compare the rolls against post office rolls,
18   change of address rolls, and the comparison *is* done by
19   that vendor, and we receive information back,
20   basically, in two categories, those who have a change
21   of address, moved within the County, and those that
22   have changed their address and moved outside of the
23   County.
24        Q.  What do you do with those two lists?
25        A.  For persons who have moved within the County,

Page 51

1    we change their registration address.  We mail a new
2    card to their new address.  We mail a notice to their
3    old address informing them we have changed their
4    registration address and to inform us if that is
5    incorrect, if they have not moved.  For persons who
6    moved outside of the County, we send a final
7    confirmation notice to those individuals at the
8    registration address to confirm they have moved, to
9    advise them to notify us if they have not moved outside
10   the County, and if the notice *is not* returned within 30
11   days, those individuals are placed inactive status.
12        Q.  So, if someone, according to the post office,
13   has moved from, let's say, from Miami to Broward
14   County, you would initially place them on inactive
15   status rather than remove them from the rolls?
16        MS. TORRES:  Objection to the form.
17        THE WITNESS:  We would place them on inactive
18        status after mailing them a final confirmation
19        notice, which is formal notice.  And again, if we
20        did not receive a return on this notice within 30
21        days, at this point, they would be placed in
22        inactive status.
23        Q.  Where did you mail *that* to, to the new or old
24   address?
25        A.  We mail it to the registration address in our

Page 52

1    file.
2         Q.  We will get into a different status later on.
3    Very briefly, if a person is on an inactive status, and
4    doesn't vote in two election, they are removed from the
5    rolls?
6         MS. TORRES:  Objection to the form.
7         THE WITNESS:  That would be two general
8         Federal elections, at that point, they would be
9         removed from the rolls.
10        Q.  Let me go back to the process, for the
11   moment, within the County, somebody who moves within
12   the County that you described a minute ago.  If I
13   understand your testimony, if a person is moved within
14   the County and has notified the post office, and if the
15   process works the way it is supposed to, that person
16   should automatically get a new voter registration card
17   from you without having to do anything, is that
18   correct?
19        A.  That is correct.
20        Q.  How long does that process generally take?
21        A.  It is all automated, so it does not take
22   long.  I believe it takes a couple of weeks from the
23   time that we send a list of registered voters to that
24   vendor to get the information back from that vendor,
25   and it is all automated at that point, you don't have

Page 53

1    to have people filling out forms or mailing letters
2    except for stuffing the letter.
3         Q.  I don't think I was clear, from the time that
4    you get the information from the vendor that a single
5    voter has moved within the County to the time that
6    person gets a new card, how long does that process
7    take?
8         A.  I would estimate within two weeks.
9         Q.  Now, you said this happens twice a year, you
10   make this effort.  When, during the year, does that
11   occur?
12        A.  Normally, from the December, January time
13   frame, and then again in the June to July time frame.
14        Q.  Is that the case in all years, or does it
15   vary by election year, how does it work?
16        A.  That is pretty much the case in every year.
17        Q.  So, for example, if someone moved, let us
18   say, in August of 2000, and at that time indicated to
19   the post office they had moved, they would not be
20   picked up by your process until the following December,
21   is that correct?
22        MS. TORRES:  Objection to the form.
23        THE WITNESS:  Either December or January
24        through that particular process, yes.
25        Q.  Do you mail a nonforwardable return, if there

Page 54

1  is an undeliverable address, confirmation address to
2  all registered voters in the County?
3      A.  No.
4      Q.  Do you compare the entire list of registered
5  voters with a list of jury notices signed by voters and
6  returned to the courts?
7      A.  We used to do that years ago, but we did not
8  do it -- we have not done it for a number years.
9      Q.  Again, several years before the 2000
10  elections?
11      A.  I believe that is correct.
12      Q.  Do you compare the entire list of registered
13  voters with the list of drivers who have been removed
14  from the DMV driver's license database, because of a
15  driver's license in another state or county?
16      A.  The DMV provides us that information
17  periodically, it is nothing that we generate.  They
18  generate it themselves and provide us that information.
19      Q.  What do you do with this?
20      A.  The only information I use is office
21  information they provide which concerns the deceased.
22      Q.  We will come back to that a little later.  I
23  want to stick to a change of address.  You don't use
24  information you get from DMV with respect to change of
25  address?

Page 55

1      A.  That is correct, I do not.
2      Q.  If a voter moves within Dade County and fills
3  out a change of address card with the post office, you
4  explained it is -- will be picked up in this
5  twice-a-year process that you mentioned?
6      A.  Yes.
7      Q.  Is there any other way that a person who is
8  filling out a change of address card with the post
9  office will have that picked up by your office?
10      A.  If we mail something to that voter, and it is
11  returned by the post office with a forwarding address,
12  then we would, again, if the forwarding address is
13  within Miami Dade County, use the same procedure of
14  changing their address on the registration rolls,
15  mailing them a new voter ID card and notice their
16  previous address.  If the forwarding address is outside
17  of Miami County, we, again, use that same procedure of
18  mailing them a final address confirmation notice.
19      Q.  When you refer to -- if your office mails
20  something to that voter, once a person is a registered
21  voter, would they routinely receive mail from your
22  office?
23      A.  Not routinely.  There are situations, such as
24  if we change a polling place.  We mail either a
25  postcard or a new voter ID card, depending on whether

Page 56

1  it is a permanent change or temporary change in that
2  polling place.  If that ID card or postcard is returned
3  by the post office with a forwarding address, that is
4  one of the indications as to where we do a mailing to
5  voters.
6      Q.  Are there any other occasions where you would
7  mail to a registered voter, thereby picking up those
8  sorts of changing of address?
9      A.  We have used returns by elected officials or
10  candidates which have used our mailing labels or
11  labeling produced off the registration systems, which
12  they purchased from us.  We would work these returns
13  the same way.
14      Q.  In other words, the candidate would have to
15  -- let me withdraw that.
16          How would that work, would it happen
17  automatically or would the candidate need to let you
18  know some of the letters did not make it?
19      A.  The candidate would provide us with the
20  return envelopes from the post office.  This would be
21  only where the candidate or elected official is using
22  our voter registration information to do the mailing.
23  It would not be if they generated their other mailing
24  list and use that, we would not use that return mail to
25  update our record.  We would only use it where we,

Page 57

1  again, provide either labels or a CD, where they
2  generate labels from that CD.
3      Q.  How often does that occur?
4      A.  It doesn't happen often.  Occasionally, it
5  does where a candidate will call me or someone from my
6  office.  We have lots of return mail.  They are
7  successful in giving it to us, so we can process it and
8  update registration records.
9      Q.  Makes sense.  I want to ask you in that
10  regard about one of the answers that you gave to our
11  second set of interrogatories.  I will ask the reporter
12  to mark as Leahy 3, your response to our second set of
13  interrogatories.
14          (Thereupon, Interrogatory Response was marked
15  as Exhibit No. 3.)
16          MS. TORRES:  For the record, there are marks
17  on the margins.
18          MR. MINCBERG:  I missed those.  I will state,
19  for the record, the handwritten checkmarks on the
20  documents are mine.
21      Q.  Other than those handwritten checkmarks, is
22  this, in fact, the answer to our second set of
23  interrogatories that you provided?
24      A.  Yes.
25      Q.  I want to go to your answer to interrogatory

Page 58

1 number one on Page 3, to the second paragraph. You
2 refer there to what happens when mail was sent to a
3 voter and is returned by the post office as
4 undeliverable, do you see that?
5     A.  Yes.  Yes.
6     Q.  Is that the situation we have just been
7 discussing where mail sent by you is returned
8 undeliverable, or does it refer to something else?
9     A.  What we were discussing is where they provide
10 us with a forwardable address.  This would be another
11 -- be another category of return by the post office
12 where the mail is marked as undeliverable.  In that
13 instance, we mail the forwardable confirmation final
14 notice.
15     Q.  When you refer in the answer to when mail was
16 sent to voters at the registration address as being
17 returned and undeliverable, is that mail sent by your
18 office or that other mail to which you are referring?
19     A.  It would be mail sent by my office or, again,
20 any candidate or elected firm who is using our
21 registration data to mail information to a voter.
22     Q.  I want to clarify, you are not suggesting in
23 this answer that the post office routinely sends you a
24 lists of all voters who have mail returned as
25 undeliverable?

Page 59

1     A.  That is correct.
2     Q.  You are only referring here to mail sent by
3 your office, or when a candidate gives us that
4 information, a candidate who gives us that list to send
5 mail to voters?
6     A.  That is correct.
7     Q.  Now, further on this paragraph, you refer to
8 the fact that if a voter does not return forwardable
9 address confirmation final notice, they are put on
10 inactive status, do you see that?
11     A.  Yes.
12     Q.  Now, you told us a few minutes ago that
13 another way a voter can get on an active status, if you
14 learn from the post office that they moved to another
15 County, inactive status?
16         MS. TORRES:  Objection to the form.
17     Q.  Let me do it over.  In addition to the way in
18 which voters can get on inactive status, we referred to
19 an interrogatory one, what other way can a voter get on
20 an inactive status in Miami Dade?
21     A.  If we receive information from the post
22 office that is through return mail that they had a
23 forwardable address outside of Miami Dade County, a
24 final address confirmation notice is sent to those
25 individuals, as well.

Page 60

1     Q.  Is there any other way, other than those two
2 that a voter can get on inactive status in Miami Dade
3 County?
4         MS. TORRES:  Objection to the form.
5         MR. MINCBERG:  Go ahead.
6         THE WITNESS:  I believe those are the only
7 two methods of placing someone on inactive status.
8     Q.  As I understand what you said in the other
9 interrogatories, all precincts have lists of inactive
10 voters in their precincts on election day, is that
11 correct?
12     A.  Yes, they have a list of all inactive voters
13 for that precinct.
14     Q.  By that precinct, we mean whose last name and
15 registered address from your office is in that
16 precinct, is that correct?
17     A.  That is correct.
18     Q.  They would not, for example, have a list of
19 inactive voters whose last address was in some other
20 precinct?
21     A.  That is correct.
22     Q.  One of the other things on the process, as
23 you described, was to automatically send people new
24 registration cards when they move within the County,
25 when does it happen that their names are transferred

Page 61

1 from one precinct role to another?
2     A.  Can you go back over your question?
3     Q.  With respect to individuals who move within
4 Miami Dade County, you receive information about their
5 new address, and you automatically send them a new
6 registration card.  Is it correct that their names are
7 also moved to their new precinct rolls?
8     A.  Yes.
9     Q.  When does that happen, and how does that
10 happen?
11     A.  The registration system we have when we are
12 dealing with the process where we are comparing our
13 rolls through the change of address program of the post
14 office, that is done through the system, no one has to
15 sit there and individually input each individual whose
16 address we are changing.  It is a system process.  For
17 all other changes of address that we receive on an
18 individual basis, there would be someone in my office
19 who would go through the registration program, bring up
20 that registration record and make the change to their
21 address and then the system would assign them to their
22 proper precinct based on that address.
23     Q.  Other than the way we talked about, how long
24 do you get information of that change of address, the
25 change?

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

16 (Pages 58 to 61)

Page 62

```
 1      A.  Changes of address can come from the voters
 2  themselves, either through written correspondence,
 3  completing a registration form for change of address,
 4  completing the back of their voter ID card, has a
 5  provision for providing us updated information.  We
 6  receive information from people whose address changed
 7  to an address outside the County from election
 8  officials in our jurisdiction -- in our other
 9  jurisdiction.  Those are primary ways we receive a
10  changing of address.
11      Q.  What about through the Department of Motor
12  Vehicles?
13      A.  That would be an applicant changing their
14  registration address.  When I talk about receiving a
15  change of address on forms, it could be various ways
16  that it is done.  Complete form in our office,
17  completing form at any of the voter registration
18  agencies, completing a form as part of a registration
19  drive, we have forms available at various County
20  offices, at various municipal offices where somebody is
21  going to that office for any purpose, may see the form
22  and fill it out, if there is form of address.  Forms
23  are available in various ways.  Again, if it comes to
24  our office with a change of address, the process is to
25  make that change, send them a new voter ID.
```

Page 63

```
 1      Q.  If a person is changing their address with
 2  the Department of Motor Vehicles, do they need to fill
 3  out some kind of additional form to notify the voter
 4  registration office that their address is changed or
 5  does DMV forward to you all changes of address they
 6  receive?
 7      MS. TORRES:  Objection to the form.
 8      THE WITNESS:  The process is they would
 9  provide the information to the person they deal
10  with at DMV, and that individual, if there is a
11  change of address, will ask the individual if that
12  change is a change to their registration address
13  for registration purposes.  If they say yes, a
14  form is produced that reflects that change of
15  address, and the voter would sign the form, and
16  that form would be submitted to our office.
17      Q.  So, that process requires a person at DMV to
18  make that inquiry of someone as to whether or not the
19  change of address is for registration purposes, is that
20  correct?
21      A.  Yes.
22      MS. TORRES:  Objection to the form.
23      Q.  Going back for a minute to the process that
24  you used involving the post office, where you match up
25  where there is a change of address in the post office,
```

Page 64

```
 1  and it is matched up against your voter registration
 2  rolls, what criteria is used to make those matches?
 3      A.  I don't know.
 4      Q.  Who actually does that?
 5      A.  An authorized vendor that has that license
 6  from the post office to have their change of address
 7  program.
 8      Q.  Is this someone authorized specifically to
 9  work with the voter registration agency, or what?
10      A.  They are licensed through the post office.
11      Q.  Work with the voter registration agency?
12      A.  To work with -- administer this change of
13  address program for the post office.
14      Q.  Did you, at some point, select a vendor to
15  purchase that process?
16      A.  Yes.
17      Q.  Who is that vendor?
18      A.  I don't know the name of the one we use now.
19      Q.  Someone else in your office would have been
20  responsible for that?
21      A.  Yes.
22      Q.  Would that other person know anything more
23  about the match criteria than you would?
24      MS. TORRES:  Objection to the form.
25      THE WITNESS:  No.  No.
```

Page 65

```
 1      Q.  How long have you been using that process?
 2      A.  I would venture a guess, probably about six
 3  years.
 4      Q.  When you first decided to use it, were you
 5  involved in that decision?
 6      A.  Yes.
 7      Q.  Did you look at the time, or did you consider
 8  at the time, the question of whether or not the matches
 9  between the post office and your voter registration
10  office would be done accurately?
11      MS. TORRES:  Objection to the form.
12      A.  The decision was made by me, after attending
13  workshops where the program was discussed.  The program
14  had been used by others and they discussed how the
15  program worked.  I made my decision, and it was made
16  upon that type of information.
17      Q.  What was your evaluation of those kinds of
18  systems in terms of accuracy of matching, they did it
19  based on what you learned at these seminars?
20      A.  My evaluation was that this was a program
21  that was worth being involved in to keep our voter
22  registration up to date to the extent possible, to make
23  the voting process at the polling place smoother for
24  those people that change their address or moved, and
25  did not notify us.  This would streamline the process
```

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

17 (Pages 62 to 65)

Page 66

1  for the voting, we would not have to deal with changing
2  their address, at the polls. It would be changed
3  automatically. As long as -- we are not only changing
4  the address but we are mailing them a new voter ID at
5  that changed address, providing that from the
6  individual's old address. I was confident that this
7  was a program that we needed to use.
8      Q. So, when a voter changed an address within
9  Miami Dade County, if the process works, as you
10  described, they should have received, prior to election
11  day, a voter registration card, walk into their
12  precinct, find that new address listed on the precinct
13  rolls and be able to vote, is that correct?
14      MS. TORRES: Objection to the form.
15      THE WITNESS: Yes.
16      Q. Is it fair to say it doesn't always work that
17  way?
18      MS. TORRES: Objection to the form.
19      THE WITNESS: I can think of instances where
20  that would not work.
21      Q. Is there a process, for example, that you
22  used, at the polls on election day, if a person has
23  received a voter registration card at their new
24  address, but their name is not listed on -- new address
25  on the voter registration rolls?

Page 67

1      A. I think I need to go back over that question.
2      Q. I think it may be easier to use a document
3  that you produced for us, which I will mark as 4, poll
4  workers package, general poll worker packet.
5      (Thereupon, Poll Worker Packet was marked as
6  Exhibit No. 4.)
7      Q. Can you identify Exhibit 4?
8      A. Yes, it is a packet of information, which was
9  provided to poll workers for instructional purposes.
10      Q. Pursuant to Page 8 in Exhibit 4, marked
11  "affirmation" at the top of the page, do you see that?
12      A. Yes.
13      Q. I want to go down with you just below
14  midpoint page, there is a box that says "change of
15  legal residence address," do you see that?
16      A. Yes.
17      Q. That is divided into two, on the left side
18  there is a box that says, "no call required if elector
19  has a current voter's ID card and current legal
20  residence address is on street index." There is initial
21  information. Do you see that?
22      A. Yes.
23      Q. You can describe to us under what
24  circumstances a polling worker would follow the
25  procedures discussed in this box?

Page 68

1      A. This would be an instance when the voter was
2  asked what their address is, and the process that we
3  use when a voter goes into a polling place and goes to
4  -- we call it ballot table-- that poll worker would ask
5  the voter, what is your current address.
6      If the voter stated an address, which was
7  different from the address we had them registered, that
8  voter was sent to the precinct clerk who would fill out
9  this affidavit. If that voter had a current voter ID
10  card -- by current, where we change -- everytime, we do
11  that, change the color. If there is a correct color of
12  the voter ID card and address where they say they
13  currently live; it was on a street index where the
14  clerk could determine which precinct they lived, and
15  where they intended to vote, by calling down to my
16  office. They would simply allow that person to vote if
17  their current address was in their precinct or on both
18  forms, letting them know what polling place and
19  precinct they needed to go to based on that current
20  address.
21      Q. In the situation that you described, would
22  that apply whether or not the voter's ID card had the
23  address that the person said they now lived at, or
24  would they have to have that address on it?
25      A. One more time.

Page 69

1      Q. If the situation that you just described
2  where the person has a current voter ID card, would
3  that voter ID card need to have the same address on it
4  that the person said I now live at?
5      A. No. In that instance there, it would be a
6  different address.
7      Q. You referred to mass mailings of voter ID
8  cards. Do you recall a mass mailing of voter ID cards?
9
10      A. Three, four, ten times every ten years.
11      Q. Why do you do that?
12      A. This is what we call a major reprecincting
13  effort where a number of precincts are changed within
14  the County. We mailed new ID cards to every registered
15  voter.
16      Q. When was the last time you did that?
17      A. It was June of 1999.
18      Q. If you mailed a registered card in June of
19  1999 and some came back to you, you would have followed
20  the procedure we have discussed before dealing with
21  changes of address?
22      A. Yes.
23      Q. Going back then to Page 8 of Exhibit 4 --
24      A. On the right-hand side of that change of
25  legal address?

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

18 (Pages 66 to 69)

Page 70

1      Q.   There is a box that starts with the letters
2    "call required," do you see that?
3      A.   Yes.
4      Q.   Can you describe to us the circumstances
5    under which that box is triggered?
6      A.   A voter whose address has changed, and by
7    changing, they have verbally told us they live at a
8    different address than the address in the precinct
9    register, either they do not currently have a voter ID
10   card or their address is not contained within the
11   street index, such that the precinct clerk could not
12   tell you which precinct that address falls within, then
13   the precinct clerk would be referred to call my office
14   to determine where that voter would vote.
15     Q.   Now, because of the frequency with which
16   people may move, you are not physically able to update
17   the address, since it sometimes happen that someone on
18   election day has moved from where they are listed on
19   the voter registration rolls, is that correct?  In a
20   situation like that, where should that person try to
21   vote.
22     MS. TORRES:  Objection to the form.
23     A.   They should notify us of a change of address.
24     Q.   But --
25     A.   Failing that.

Page 71

1      Q.   Let us assume they did, but it did not get
2    processed, maybe it was one week ago, or it happens for
3    whatever reason.
4      A.   I don't have that information on their change
5    of information without ascribing to what caused that.
6      Q.   I want to find out what they should do in a
7    situation where they moved to a new place, you can not
8    do that?
9      A.   Prior to election day they should have
10   provided us with a new address.  We could have advised
11   them of where their new polling place was and advise
12   them to fill out an affidavits where, when he arrived,
13   when I get those calls, I tell these voters they do not
14   need to go to the book table or the ballot table but to
15   go to see the precinct clerk to save time and notify
16   the precinct clerk they have changed their address.  At
17   that point the precinct clerk can go through this
18   process of getting them to go to the proper precinct.
19   It would be a matter of completing the affidavit and
20   letting the people go.
21     Q.   Whether or not your office would have been
22   called in circumstances like this, it depends on
23   whether they had a voter registration card?
24     A.   Yes, if even if they were accepted by the
25   Clerk, they would call need to call my office once they

Page 72

1    arrived there or if they did not have a card.
2      Q.   What would happen if such an individual tried
3    to go to his old precinct?
4      MS. TORRES:  Objection to the form.
5      THE WITNESS:  If a voter at the ballot table
6    gives an address different than the address in the
7    precinct register, then the same process would
8    occur, then they would be sent to the clerk and in
9    this instance, where they had, in fact, another
10   card, and their address was in the index, the
11   clerk would determine which precinct they would
12   have to vote in and direct the voter to that new
13   polling place or in the instance where they had
14   called, the same thing occurs.  The voter would be
15   informed of their precinct by calling the polling
16   place.
17     Once they arrived at the new place, they
18   would hand the inspector the affirmation and their
19   name would be added to the book, and they would be
20   allowed to vote.  A second call would not have to
21   be made.
22     Q.   But they are allowed one call back to your
23   office to confirm that?
24     A.   Or if they have their voter ID and their
25   address, it would suffice.

Page 73

1      MS. TORRES:  This is the period up to the
2    November 2000 election.
3      MR. MINCBERG:  That is correct.
4      Q.   Indeed, let me know if there is any change in
5    any of that, as we look forward to the next election.
6      A.   There is the potential that many changes are
7    in the way that we can handle changes of address.  The
8    legislature in 2000 has a bill which will allow a
9    change of address to be taken by phone.  That bill has
10   been signed by the Governor.  It has not been cleared
11   by the Justice Department, as of this time.
12     Q.   Explain to us what that procedure would
13   provide.
14     A.   It would provide --
15     MS. TORRES:  Objection to the form.
16     A.   The voter could call my office, and by
17   identifying themselves and providing their birthday,
18   they could then notify us by phone that they have moved
19   and changed their address.  We would make a change as
20   to the registration records.
21     Q.   What improvements do you think you will make?
22     A.   Typically, the voter would have a greater
23   ability to provide us with a change of address.  We
24   would do that by requiring they provide a change of
25   address by writing, and also a number of changes.  Once

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

Page 74

1  we do receive it, there would be an increased amount of
2  changes of address my office would receive prior to an
3  election, so that there would be less we would have to
4  deal with concerning changes of address at the polling
5  place on election day.
6        (Recess in Proceedings)
7  BY MR. MINCBERG:
8        Q.  Mr. Leahy, I want to turn now to the subject
9  of the removal, or some of us like to say, purging of
10 voters from the election rolls prior to the
11 November 2000 election.
12       MR. TINKLER:  Objection to the form.
13       Q.  In this connection, I would like you to take
14 a look, if you would, at Exhibit 3, and interrogatory
15 one, the interrogatories which are asking you for the
16 procedure followed by your office to remove voters from
17 the polls.  Do you see that?
18       A.  Yes.
19       Q.  I want to skip for the moment to procedures
20 used with respect to information that you got from the
21 Division of Elections, which is referred to in the
22 first paragraph and go to the remainder of the
23 interrogatory, so we are clear.
24       We have talked already, I think, about the
25 second paragraph here, about what happens when mail

Page 75

1  that was sent to a voter at the registration address is
2  returned as undeliverable.  Directing your attention to
3  the third paragraph, where you refer to the procedures
4  followed when it is believed that the voter is not 18,
5  not a citizen of the United States, fictitious person,
6  or listed a residence that is not their legal
7  residence.  Did you see that?
8        A.  Yes.
9        Q.  What forms the basis for that belief?
10       A.  It would basically be in two forms, if we
11 received written information, a signed document that a
12 registered voter is not eligible to be registered,
13 because they are under age, because they are not a
14 citizen, because they are fictitious or because they do
15 not live where they say they live, then the procedure
16 in my office would be to follow this administrative
17 hearing procedure outlined in Florida Statute 98.075.
18       The other instance where it would be used is
19 primarily in the area of residence that is not his or
20 her legal residence, but apparently used where someone
21 registered to vote at a business address, which is not
22 a residence address.  We would use this administrative
23 hearing process to have the person provide us with
24 their residence address or remove them from the rolls,
25 since pursuant to Florida law a person is not allowed

Page 76

1  to vote from a business address, which is not a
2  residence address.
3        Q.  Let us talk about the second one.  How would
4  your office get information to suggest that someone had
5  registered a business address as opposed to his home
6  address?
7        A.  My staff, would use primarily, the property
8  appraisal office rolls, where addresses are listed as
9  business or residential, using that information, and
10 actually, on the voter registration rolls, address or
11 block of addresses are listed as business.  So, where
12 we have somebody registered at one of those addresses
13 that has now been identified as business, this
14 procedure is used.
15       Q.  So, someone could get on the rolls listing a
16 business address, but at some point, you would hope
17 that would be detected, is that how it would work?
18       MS. TORRES:  Objection to the form.
19       THE WITNESS:  You have a lot of new addresses
20 that come online all the time because again, the
21 County is growing, new streets are developed and
22 new businesses go up and the staff with try to
23 keep up with those new businesses.  Or, you have a
24 situation where one residence becomes a business.
25 In those instances, you may have somebody already

Page 77

1  registered at that address where you need to clean
2  that up or update the record by going through the
3  administrative hearing process.
4        Q.  Is there a regular process that is followed
5  to periodically to check whether addresses have
6  changed, business addresses, that kind of thing?
7        A.  Yes.  Yes, I have a Voter Fraud Unit, and
8  that is part of the responsibility to keep the
9  registration rolls up to date in terms of which
10 addresses are business.
11       Q.  How often do they do that kind of check?
12       A.  It is not something that is done like clock
13 work but when they have ability and the time to do
14 that.  They handle many special projects.  This is kind
15 of a routine maintenance project and it is probably low
16 priority in terms of what some of their other
17 responsibilities are.
18       Q.  How often does that happen, the business
19 address issue?
20       A.  I do not understand.
21       Q.  Let us put it in general figures, let us say,
22 in a given year, how many voters which have to go
23 through this process because of the suspicion of it
24 being a registered business address?
25       A.  It is a very low number at this point.  I

Page 78

1  can't tell you how many years ago, I will guess six or
2  eight, maybe ten years ago, where we first began
3  identifying addresses as a business address on the
4  voter registration rolls. We had a considerable number
5  of people that were put through an administrative
6  hearing process for that reason. Now, it is rather
7  because those addresses are already listed as
8  businesses unless, again, the situation where I talked
9  about an area becomes a new business area or changes to
10 business areas. Those are relatively limited. Except
11 for those small exceptions, if somebody registered to
12 vote as a new registered voter, and the address that
13 they are trying to register is already identified as a
14 business address, we will notify that individual that
15 they cannot register that address. Similar to
16 incomplete form.
17     Q. Let's go back to the first situation that you
18 talked about relating to where you indicated that the
19 process will be triggered if you received a signed
20 document indicating one of the things in this third
21 paragraph has occurred. What do you mean by a signed
22 document?
23     A. This happens -- it is extremely rare that
24 this situation happens, but I would get a call from a
25 voter or citizen or someone, that says, this individual

Page 79

1  is a registered voter at that address, but they do not
2  live there. I would not take any action based on a
3  phone call. What is important for me to begin this
4  administrative hearing process is something signed by
5  an individual.
6      Q. If that voter would have made that phone
7  call, wrote a letter to you alleging that person X did
8  not live at that address, would you trigger an
9  administrative hearing process?
10     A. That is correct.
11     Q. Any penalties if they send a letter like that
12 and it turns out not to be true?
13         MS. TORRES: Objection to the form.
14         THE WITNESS: No.
15     Q. How often does that happen?
16         MS. TORRES: Objection to the form.
17         MR. MINCBERG:
18     Q. How many years does a voter have to --
19     A. Maybe none, maybe two a year, or one.
20     Q. Good. Very good.
21         If you would flip to Page 4, the first
22 paragraph refers to the fact that when information is
23 received from another election official, that a Miami
24 Dade registered voter has registered to vote in another
25 jurisdiction, the name of that voter is removed from

Page 80

1  the Miami Dade registration rolls. Do you see that?
2      A. Yes. Yes.
3      Q. How many times a year does that happen,
4  typically?
5      A. We will get lists of voters that moved to
6  other Florida counties almost on a daily basis.
7      Q. How do you verify, if at all, that the person
8  whose name is listed in that other County, in fact, is
9  the same person at your registered address in Miami
10 Dade County?
11         MS. TORRES: Objection to the form.
12         THE WITNESS: This would be an individual,
13     when registering in the other County, advised the
14     election official they used to be registered in
15     Miami Dade, and they are asking that their
16     registration be voided in Miami Dade County, they
17     have moved.
18     Q. That is what you are referring to in this
19 paragraph?
20     A. Yes.
21     Q. In a situation like that, does any
22 notification go out from your office or removed from
23 the rolls?
24     A. They are removed from the rolls.
25         MS. TORRES: Objection to the form.

Page 81

1          THE WITNESS: Based on information from other
2      election officials.
3      Q. Now, let me go down to the next paragraph,
4  which states that when information is received from the
5  Florida State office of vital statistics, that Miami
6  Dade's name is removed from Miami Dade registration
7  rolls. Do you see that?
8      A. Yes. Yes.
9      Q. What are you referring to? Does that
10 information come directly from the Florida State office
11 to you, or go through some other agency?
12     A. Directly to me.
13     Q. How do you verify that it is the same person
14 on your voter registration roll?
15         MS. TORRES: Objection to the form.
16         THE WITNESS: They provide information in
17     addition to the name, Social Security number, date
18     of birth of that individual which is matched up
19     against a registered voter. When we have a match
20     we remove the individual.
21     Q. Of these things, name, date of birth and
22 Social Security number, do all of them have to match
23 for you to remove the person from the rolls under this
24 process?
25     A. If there is information where it does not

Page 82

1  match, we would not remove the individual. In any of
2  those names, it could be a similar name. We may have a
3  middle initial, they may not. If it is similar, where
4  we believe it is the same individual, other
5  identification matches, we --
6     Q. Let us go back. In a situation like that, if
7  the date of birth is different, you would not remove
8  the voter?
9     A. Correct.
10     Q. Social Security number is different, you
11  would not remove?
12     A. Yes.
13     Q. But it may be possible, as you just said,
14  that the name may be slightly different, but you might
15  still remove the voter, is that correct?
16     A. Correct.
17     Q. A definitive form of name would not prevent
18  a match?
19     A. That is correct.
20     Q. A middle initial would not?
21     A. Unless the middle initials were different.
22     Q. Any other variation in name that would not
23  prevent a match?
24     A. I think that pretty well covers it.
25     Q. Now, I want to go to the last paragraph on

Page 83

1  this interrogatory number one, where you referred to
2  what happened when you received information from the
3  Miami Dade Clerk of the Circuit Court or the United
4  States Attorney General's Office that a Miami Dade
5  registered voter has been convicted of a felony, do you
6  see that?
7     A. Yes.
8     Q. In these instances, the information comes
9  directly to you, and not through some other agency, is
10  that correct?
11     A. The information from the Miami Dade Clerk of
12  the Circuit Court comes directly to us. Information
13  from the United States Attorney General's Office could
14  come through the State Division of Elections.
15     Q. If it comes through the State Division of
16  Elections, there is another process that we will talk
17  -- you do not know, trust me, we will. Let me rephrase
18  that.
19        The process you referred to in this paragraph
20  is not the process that you would follow if the
21  information is from the Attorney General's Office and
22  it goes through the Division of Elections, is that
23  correct?
24     A. I don't understand what you just said, sorry.
25     Q. If information from the United States

Page 84

1  Attorney General's Office goes to the State Division of
2  Elections, then through them to you, and that person
3  has been convicted of a felony, will you follow the
4  process in this paragraph or follow a different
5  process?
6     A. Follow the process in this paragraph of what
7  we are talking about, this paragraph is information
8  sent from the United States Attorney General's Office
9  to the Division and the Division forwards that
10  information to us.
11     Q. I apologize, but a helpful clarification.
12  Just to be clear, is this the United States Attorney
13  General's Office that you are referring to or the
14  United States Attorney's Office?
15     A. I am not sure.
16        MS. TORRES: For the record, the response to
17  interrogatory number one, this is defendant
18  Leahy's response to plaintiff's set of
19  interrogatories, and we were just discussing the
20  last paragraph of that response, which is on Page
21  4, and concludes that the reference to the United
22  States Attorney General's Office is correctly
23  phrased as information from the United States
24  Attorney's office.
25        MR. MINCBERG: Thank you.

Page 85

1     Q. By the way that is the United States
2  Attorney's office in Miami, is that correct?
3     A. I don't know.
4     Q. With respect to this interrogatory answer,
5  you don't know which United States Attorney other than
6  the office that is referred to here?
7     A. No, I don't.
8     Q. Have you ever seen mail that you got from the
9  United States Attorney's Office within this paragraph?
10     A. I have seen it because the envelopes is
11  addressed to me. Sometimes they get to me instead of
12  going to the section that deals with these lists, but I
13  don't spend time looking at them.
14        MS. TORRES: I need to make another
15  clarification. I am not sure if what I stated
16  earlier is correct. So, I will confirm that after
17  the deposition or on break. To the extent that
18  needs to be amended further, I will do that.
19        MR. MINCBERG: Well, unfortunately, I have a
20  few more questions to clarify as to the extent he
21  has knowledge.
22     Q. The letter that you have seen come from the
23  United States Attorney's Office, from the United States
24  Attorney here in Miami, or from other places.
25     A. I don't know. Again, they are forwarded

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

22 (Pages 82 to 85)

Page 86

1 through the State Division of Elections to my office.
2 I forwarded them to -- when I receive them directly, to
3 the section that deals with these lists.
4     MR. MINCBERG: What the procedure Counsel has
5 suggested makes the most sense, if we can get a
6 little clarification on the answer as to exactly
7 what it should be -- it is now written, United
8 States's Attorney General's Office, and it would
9 be helpful to find out if it is the US Attorney's
10 office.
11     MS. TORRES: Like I said in my earlier
12 statement, this needs more clarification, and I
13 will provide it.
14     Q. Now, let us talk for the moment about a
15 similar situation. When you get information from the
16 Miami Dade Clerk of the Circuit Clerk's Office that a
17 registered voter is convicted of a felony, how do you
18 match up the names you get from the Circuit Court
19 Office and the name on the voter registration rolls?
20     MS. TORRES: Objection to the form.
21     THE WITNESS: We match information provided
22 by the Clerk of the Court with information on our
23 rolls. If it is a match, such as the identifying
24 items, such as date of birth, if provided, and the
25 Social Security number provided matches the what

Page 87

1 we have in our rolls, and the name is similar
2 enough, we believe it is the same individual, we
3 will place that individual in felony status and
4 mail them a notice.
5     Q. What -- again, let us go through the same
6 sort of policies as we did a minute ago. If the
7 information indicates that individuals have different
8 dates of birth, would you assume that is not a match?
9     A. Yes.
10     Q. If it indicates a different Social Security
11 number, would you assume that is not a match?
12     A. Yes.
13     Q. Other than those two in terms of information
14 and name, any other information that you get under this
15 paragraph in terms of felony notification?
16     A. I believe that is the information that we use
17 for the match.
18     Q. And in terms of matching names, would you use
19 the same criteria with respect to a deceased voter?
20     A. The same.
21     Q. Who in your office is responsible for making
22 that determination, whether or not it is the same
23 person?
24     A. We have a section within our registration
25 division called Cancellation Section. The individuals

Page 88

1 assigned to that Cancellation Section are the ones who
2 process these lists and make those determinations.
3     Q. You refer in your interrogatory and to the
4 fact that after the person is removed, you then mail a
5 form letter attached to Exhibit B to the voter. Did
6 you see that?
7     A. Yes.
8     Q. I will ask you to turn to Exhibit B, which is
9 at the very end. We will take a look at Page 44679,
10 the second page from the back, the English version of
11 that letter. Is that, in fact, the form letter that
12 you use with respect to people convicted of a felony
13 who are removed?
14     A. Yes.
15     Q. In this notice, you affirmatively state that
16 the voter -- sorry, that the Election Department,
17 quote, has been advised by the Clerk of the Circuit
18 Court of your felony conviction, end quote, is that
19 correct?
20     A. Correct.
21     Q. That is based on that you have removed the
22 person from the voter registration rolls, is that
23 correct?
24     A. Yes.
25     Q. You then state that the person may reregister

Page 89

1 to vote if their conviction is overturned or civil
2 rights are restored, is that correct?
3     A. Yes.
4     Q. Do you use the same form for information you
5 get from the United States Attorney, or the United
6 States Attorney General's Office, or do you use a
7 somewhat different form?
8     A. It is the same form that is used.
9     Q. Is there an opportunity for an individual
10 under this practice to claim that you made a mistake,
11 that you got the wrong person?
12     MS. TORRES: Objection to the form.
13     THE WITNESS: Yes, the phone number for the
14 Supervisor of the Cancellation Section is provided
15 to the voter. If the voter calls and says they
16 were not convicted of a felony, that Supervisor
17 would either, through talking to the Clerk of the
18 Circuit Court, or FDLE, or clemency or any other
19 agency, she would need to determine if the
20 information received was correct.
21     Q. But there is nothing on this form, on Exhibit
22 B, affirmatively telling the voter they have an
23 opportunity to call your office and claim that, in
24 fact, they were not convicted of a felony?
25     MS. TORRES: Objection to the form.

Page 90

1     MR. MINCBERG:
2     Q.  Is there?
3     A.  Nothing specific.  If you require further
4  information, they provide a phone number.
5     Q.  Now, about how many voters are removed a
6  year, pursuant to this part of the felony process that
7  we have been talking about?
8     A.  I don't know.
9     Q.  Would you say more than one hundred?
10    A.  I would not venture a guess, I have no idea.
11    Q.  How would you find out, if you wanted to find
12  out?
13    A.  By talking with the Supervisor of the
14  Cancellation Section.
15    MR. MINCBERG:  I would state since his
16    removal from the rolls is something that we would
17    want to cover, I would ask that this information,
18    in particular, be obtained.  You can leave
19    planning space in the deposition, and I am happy
20    to have an approximate number of people removed.
21    I am interested in their racial breakdown, if that
22    information is available from another individual
23    in the office.
24    MS. TORRES:  I don't believe it has been
25    established that it is available.  If it is, we

Page 91

1  can talk about it after the deposition.
2     MR. MINCBERG:  Fine.
3     Q.  Now, a few minutes ago, you said you have
4  sometimes received information from the Department of
5  Motor Vehicles with respect to deceased voters that you
6  sometimes use to remove a voter from the rolls.  Do you
7  recall that?
8     A.  Yes.
9     Q.  Can you explain that process little bit more?
10    A.  They provide a CD form at this point, a list
11  of those individuals who are registered voters.  I am
12  not sure if they have a registered list of deceased
13  persons on CD.  That is matched against my voter
14  registration rolls.  Where someone is an active
15  registered voter, inactive, who is deceased, we put
16  them in deceased status.
17    Q.  The method that you use to make the match the
18  same as the method we talked about, information from
19  the Office of Vital Statistics, whether or not you have
20  the right person?
21    A.  Yes.
22    Q.  Now, do you receive any information from DMV
23  about people who have applied for driver's licenses in
24  other States or municipalities?
25    A.  We receive information from DMV of people who

Page 92

1  have moved out of, I believe, it is Florida.  But I do
2  not use that information.
3     Q.  For this maintenance purpose?
4     A.  Correct.
5     Q.  Do you receive information from the DMV about
6  persons whose licenses have expired, and there is no
7  activity and with respect to those persons, there was
8  no ticket or attempt to renew the license?
9     A.  I do not believe we do.
10    Q.  Have you ever received that information, to
11  your knowledge?
12    A.  Not to my knowledge.
13    Q.  In particular, do you recall receiving any
14  such information in 1995 and 1996?
15    A.  I don't recall.
16    Q.  What I would like to do is have you pull out
17  -- and I need to do the same, the answer to the first
18  set of interrogatories.  This is marked Exhibit 1.
19    Before I do that, let me interrupt myself.
20  The processes that we just discussed from interrogatory
21  number one in the second set of interrogatories for
22  removing voters from the rolls, have any of those
23  changed since 1990, sorry, the 2000 elections?
24    A.  No.
25    Q.  Now, I would like to move to your answers to

Page 93

1  the first set of interrogatories, in particular to the
2  bottom of Page 4 and the top of Page 5, where we ask
3  about the process used by your office to verify whether
4  the individuals who are identified by the State and its
5  agents as probable or possibly ineligible to vote were
6  in fact ineligible?  Do you see that?
7     A.  Yes.
8     Q.  Right now, for all the questions, unless I
9  tell you otherwise on this, I want to talk about the
10  process as it existed, up until the time of the
11  November 2000 election, okay?
12    A.  Correct.
13    Q.  You say there that the State provided your
14  office with three lists, deceased, duplicate and felon,
15  is that correct?
16    A.  Correct.
17    Q.  Did they provide -- let me backup.  When
18  during 1999 or 2000 did they provide those lists?
19    A.  If you are looking for exact dates, I don't
20  remember.  The last list that we received in 2000 was
21  January.  In 1999, I believe it was June.
22    Q.  After those initial lists, there were, in
23  some instances, corrections made to those lists, is
24  that correct?
25    A.  I remember one instance where we did get

Page 94

1  corrections to a list.
2  Q. We will go back through some of the
3  specifics. I wanted to establish when you got that
4  information. I want to focus initially on the
5  procedure that you indicated that you followed with
6  respect to deceased lists. Do you see that?
7  A. Yes. Yes.
8  Q. You state that the information listed for the
9  deceased individuals was compared against the
10  information on the voter registration, registered voter
11  by Election Department staff, that based on that
12  comparison, if it appeared it was the same individual,
13  the voter was placed in a deceased status and removed
14  from the registration rolls, is that correct?
15  A. Yes.
16  Q. Who actually did that comparison?
17  A. The Cancellation Section, and not
18  necessarily -- the Assistant Supervisor for
19  registration, Milton Calens, and various members of
20  his staff to complete this process. We would have
21  procedures for them to follow, either Milton Calens,
22  myself, both of us would advise individuals to go over
23  the procedures to be used to work these lists.
24  Q. What procedures were used?
25  A. The procedures are that they would be looking

Page 95

1  for the same information in terms of date of birth,
2  and/or Social Security number. Also, I believe the
3  other criteria that we were looking at, if there was
4  any activity of that voter that was beyond the date of
5  the alleged death. If it was not a match at all, they
6  would mark that list in a certain way. If it was
7  questionable, they would put a question mark, and if it
8  was a match, they would put that person in deceased
9  status and put a checkmark, I believe, on the list.
10  They would submit the list to me after they worked on
11  them and I would take a look at the question marks to
12  determine whether or not I believe that person was, in
13  fact, deceased or in a match.
14  Q. Let us talk, first of all, how a voter would
15  have gotten within those three categories you just
16  talked about, a no match, a questionable match or
17  definite match. What would determine which of those
18  three they would get to?
19  A. I am not quite sure. Repeat the question.
20  Q. What criteria would you use to determine
21  whether the proposed match was a definite match,
22  questionable match or simply not a match, three
23  categories you talked about?
24  A. Where there was an exact match on the date of
25  birth and Social Security number provided, Social

Page 96

1  Security numbers were provided, and a name was similar,
2  that would be a match.
3  Where there was a different -- totally
4  different date of birth, totally different Social
5  Security number, a different name, that would be not a
6  match. Where there was a question, name was not a
7  perfect match and it is a question of whether it is the
8  same individual based on a name or where there might
9  have been a Social Security number match, but there was
10  what might appear to be transposition of two numbers,
11  that would be a question.
12  Q. When you used the term "similar name" in your
13  answer, were you using the same sort of criteria we
14  talked about before on the information that came
15  directly to you, and whether the name was sufficiently
16  similar?
17  A. Yes. I also -- I will amend my last
18  statement. If there was activity from the voter after
19  the date when they, apparently, were deceased, that
20  would, apparently, be a question.
21  Q. How did you go about resolving whether the
22  people in that questionable category were or were not
23  matched?
24  A. I would take a look at it, using common
25  sense, determine whether I believe it was the same

Page 97

1  individual or not. For instance, if there was some
2  activity, I would look and see what that activity was,
3  if it was activity by the voter or it may have been
4  some activity that my office had initiated, such as
5  mailing them a new ID card because of the polling place
6  change. That is not something that the voter would
7  have done, or we would have done in this instance,
8  again, assuming a match, would have placed that person
9  in deceased status. However, if the voter, in an
10  absentee ballot or voted at the polls after their
11  supposed demise, I would not have placed them in a
12  deceased status.
13  Q. How did you go about resolving the questions
14  relating to similarity of the name, date of birth and
15  Social Security number?
16  A. Again, using common sense, if it looked like
17  simply a transposition of numbers or something along
18  those lines, everything else matched. You also look at
19  the name, if it is an uncommon name, you are going to
20  give more weight to that fact then, you know,
21  transposition is exactly that, a transposition. If you
22  have a very common name and there are -- in Miami Dade,
23  I could give less weight and not be a person deceased.
24  When you are looking at all factors that you have
25  available, you make your best decision.

Page 98

1    Q.  Were any of those criteria that you used
2  within that questionable category, or that was used to
3  put people in one of these, people with any of that
4  criteria written down anywhere?
5    A.  Yes.
6    Q.  Where?
7    A.  There was one sheet that we handed to the
8  people, which is part of the document request.
9       MR. MINCBERG: I think you are right.  We
10  will come to that later on.
11    Q.  I take it for people in this category there
12  is no written notice that goes out to a voter who you
13  believe is deceased, is that correct?
14    A.  That is correct.
15    Q.  You do say if such a person actually appears,
16  they would be permitted to vote upon the showing of
17  proper identification?
18    A.  Correct.
19    Q.  How would that work?
20    A.  Yes, November 2000, the call would have to be
21  made to our office.
22    Q.  Did that occur in the November 2000, to your
23  knowledge?
24    A.  I can't be specific, but that has occurred in
25  the past.

Page 99

1    Q.  Good enough.  And focusing 'on 99/'00, of all
2  of the people that gave you possible or probable
3  matches with respect to people being deceased, about
4  how many of those did you, in fact, conclude were
5  deceased?
6    A.  The vast majority of the names we received on
7  the list, my office concluded or I concluded they were,
8  in fact, registered voters who had become deceased.  I
9  put them in deceased status.
10    Q.  You mentioned the term "possible" and
11  "probable."  I want to clarify.  Is it correct with
12  respect to all these of these categories, deceased,
13  duplicate and felons, you received nothing from the
14  State as to possible and probable matches separately?
15    A.  Yes.  That is correct.
16    Q.  What was your understanding of the
17  differences between possible and probable?
18    A.  It depended upon what criteria was available
19  to create those possible matches.  That probably had a
20  higher status, since there was more criteria used to
21  make that match than a possible.
22    Q.  Probably more likely to be a match?
23    A.  Correct.
24    Q.  When you dealt with them, did you deal with
25  possible and probable differently or did you merge them

Page 100

1  together?
2    A.  I did not deal with them differently.
3    Q.  You treated them all the same way?
4    A.  Yes.
5    Q.  And the process that you described with
6  respect to the dealing with deceased voters as of the
7  November 2000 election, how does that process, to your
8  knowledge, compare with what other Counties have done?
9    A.  I don't know what other Counties did.
10    Q.  From your discussion at meetings, you got no
11  information about how people dealt with the deceased
12  voters?
13    A.  No.
14    Q.  Let us talk about duplicates, the second
15  category.  How did the process for matching duplicates
16  differ from the process with respect to the deceased
17  voters in terms of lining people up?
18    A.  Virtually, the same process.  Again, for
19  voter activity, we were looking at any activity which
20  would have occurred in our County after the date of
21  registration in the other Florida County did.  But
22  other than that, it was similar matching process.
23    Q.  I want to have marked as our next, Exhibit 5,
24  a document I think was produced by you.  That begins at
25  Bates stamp 33935 to 33980, entitled January 2000 CVF

Page 101

1  for Dade County Possible Duplicate Matches.  Can you
2  identify Exhibit 5?
3    A.  This was a listing received from the State
4  Division of Elections dated January 2000 of possibly
5  duplicate matches that were identified through their
6  central database system.
7       (Thereupon, Document was marked as
8  Exhibit No. 5.)
9    Q.  I notice, for example, on the first page, on
10  the second line, there is a question mark next to what
11  appears to be a possible match, do you see that?
12    A.  Yes.
13    Q.  The first name listed in that, for
14  identification purposes, is Robinson, Lisa Yvette. What
15  is the significance of that question mark?
16       MS. TORRES: Objection to the form.
17       THE WITNESS: I can assume there is a
18       question mark because the last name of the voter
19       is different. You have Robinson and then
20       Brown-Robinson.
21    Q.  And can you tell from this list whether that
22  person was actually purged?  Can you tell from that
23  whether that person was actually removed?
24    A.  I don't believe the person was removed
25  because when I make -- when I receive a list with a

Page 102

1  question mark and I make a determination to remove that
2  person from the rolls, I believe they are the same
3  person registered somewhere else, I would change --
4  cross out that question mark and put a checkmark.
5      Q.  So, for example, if we go to the name above
6  that, which begins with Cuadrado, there is a check mark
7  and do you see that?
8      A.  Yes.
9      Q.  Does that indicate that the person was
10  removed from the rolls?
11      MS. TORRES:  Objection to the form.  For the
12  record, I see -- I don't know if it is a
13  checkmark.
14      Q.  Go ahead, you can answer the question.
15      A.  I am assuming that many individuals were
16  removed as duplicate voters.
17      Q.  Comparing those two individuals, the first
18  one and the second one, the voter who was removed, the
19  Cuadrado voter, it is true, is it not, that both that
20  voter and the second voter, Lisa Yvette Robinson's
21  names don't match precisely, is that correct?
22      MS. TORRES:  Objection to the form.
23      THE WITNESS:  That is correct.
24      Q.  Again, for both voters, the birth dates
25  appear to match, is that correct?

Page 103

1      A.  Yes.
2      Q.  Social Security numbers for both appear to
3  match, is that correct?
4      A.  Correct.
5      Q.  The race data listed appear to match for the
6  Robinson voter, who was not removed, is that correct?
7      A.  Correct.
8      Q.  The race for the Cuadrado voter, who was
9  removed, appears not to match, is that correct?
10      MS. TORRES:  Objection to the form.
11      THE WITNESS:  That is not necessarily a
12  correct statement.
13      Q.  Can you explain that?
14      A.  Prior to 1995, prior to the National Voter
15  Registration Act going into effect, we were probably
16  one of the only counties in the State, we may have been
17  the only County in the State to designate voters as
18  Hispanic.  We did it based on place of birth.  At that
19  time, prior to 1995, when someone registered, they were
20  registered white, black or other, those were the three
21  choices.  In most Counties, if not all, except for
22  Miami Dade, they list their voters white, black and
23  other.  Even if an individual was Hispanic, they would
24  not list that person as Hispanic, but white, black or
25  other.  Our County would leave them as Hispanic, so

Page 104

1  there are instances where a person may be Hispanic, but
2  because of the changing in registration process, they
3  were listed as white at one point, but now listed as
4  Hispanic.
5      Q.  Or would have been listed as other?
6      A.  Other or black.
7      Q.  You did not know precisely how other
8  counties -- it is on an individual basis?
9      A.  That is correct.
10      Q.  But again, the information listed on this
11  form on Exhibit 5, with respect to this first voter,
12  who was purged as a duplicate, Cuadrado, this
13  information was provided by the State, the one was
14  listed as white and the other listed as Hispanic.
15      MS. TORRES:  Objection to the form.
16      MR. HARVEY:  Objection to the form.
17      MR. MACINNES:  Objection to the form.
18      Q.  In fact, one name is listed as white and the
19  other name is listed as Hispanic.  Can you explain why
20  it was decided to remove the first voter, Cuadrado,
21  from the voter rolls, but not to remove the second
22  voter, Robinson, from the rolls?
23      MS. TORRES:  Objection to the form.
24      A.  No, I cannot, because what this information
25  does not reflect is if there are any activities for the

Page 105

1  voter after this date.
2      Q.  There might be a possible explanation but you
3  do not know that?
4      A.  That is correct.
5      MR. MINCBERG:  There is one more set of
6  documents, then we can take our lunch break.
7  I will ask the reporter to make as Exhibit 6,
8  a series of forms that bears the Bates number
9  44446 to 44450.  The couple of words on the first
10  page are Section 101.045 (1) Of the Florida
11  election laws.
12      (Thereupon, Forms were marked as
13  Exhibit No. 6.)
14      Q.  Let me ask you to identify, if you could, the
15  first page of Exhibit 6.
16      A.  This is a form which is used as part of the
17  administrative hearing process we talked about
18  previously dealing with Florida Statute 98075.
19      Q.  What part of that process or under what
20  circumstances would this particular form be used?
21      A.  This would be questioning their residency.
22      Q.  If the question comes up about whether
23  somebody is, in fact, living where they said they live,
24  or living at this business address, this form would be
25  used to notify them both?

Page 106

1    A.  Yes.
2    Q.  I take it the next page, 4447, is the Spanish
3    version of that form.
4    A.  I would assume so.
5    Q.  I assume they were mailed at the same time
6    when they go out?
7    A.  I assume -- they are back to back duplicate
8    copies.
9    Q.  The fourth page, 44448, would you identify
10   this form?
11   A.  This would have been a form that we received,
12   where it appeared they were registered in two Counties.
13   I guess this would be an instance where there was some
14   activities after the date where they registered in
15   whatever County.  It is apparent they were registered
16   in two counties, and we were trying to get them to pick
17   which County they were intending to live in, so their
18   registration in the county where they didn't live could
19   be cancelled.
20   Q.  This is concerning Miami Dade County and Leon
21   County?
22   A.  Yes.
23   Q.  Do you see that?
24   A.  Yes.
25   Q.  What about people who move back and forth

Page 107

1    sometime on a multiple basis?
2    A.  It would depend on where they are living and
3    the form that would be used in those two counties.
4    Q.  Does a voter have to register in the County
5    where they are going to school or do they have to
6    register to vote in the County where their parents
7    live?
8    A.  Residency is a state of mind backed up by
9    factual information.  So, yes, if a student was at the
10   college, during the time they were at college, they
11   could register, or they could remain registered at
12   their home.  They would have that choice.
13   Q.  Let me ask you to turn to the next page which
14   is entitled, Voters Who May Have Registered Elsewhere
15   Procedure. Do you see that?
16   A.  Yes.
17   Q.  This is an example of one of those pages you
18   were referring to before, where you provide
19   instructions on how they should deal with a voter who
20   might have voted elsewhere?
21   A.  Yes.
22   Q.  I ask you to translate the words for me or
23   the symbol on item number two, skip those voters that
24   have a question mark or an N in front of the name?
25   A.  Where I have time and ability, I would go

Page 108

1    through the forms before they went out to staff.  Where
2    there were, in my opinion, no match at all, I would put
3    the N on or where I had questions on, I would put the
4    question mark on it, and send it to the staff.
5    Q.  So we are clear, the process is to use the
6    forms that you received from the State indicating
7    possibly matches or voters who registered elsewhere?
8    A.  Yes.
9    Q.  Down to number three, 3c --if the voter is an
10   0,1,2,3,4,5,6,7 clear the screen and place a checkmark
11   in front of the name.  Do you see that?
12   A.  Yes.
13   Q.  What does that mean?
14   A.  Those numbers give voter status all the way
15   up to seven, where they are no longer registered
16   voters.
17   Q.  They are getting reviewed for being deceased
18   or being a felon, or have already received a notice
19   they moved elsewhere from the voter or from another
20   elected official--
21   A.  They are not just removed from the rolls.
22   Q.  Were there occasions where, in fact, you
23   would get information from the State people as to who
24   might be duplicates, and you had already removed them
25   from the rolls?

Page 109

1    A.  Yes.
2    Q.  Do you remember whether or not that happened
3    in the 1999 period of time?
4    A.  Quite frankly, I don't know the timeframes
5    but from the point in time when the State employees
6    begin to update their rolls, all the rolls have to be
7    entered.  I don't know how complete it is.
8        They have to take all this information, put
9    it on the State database and then we get these reports.
10   There was a time when we sent out the lists, and we
11   would get the lists back down from the State.  During
12   that period, we are getting information from the
13   different Counties and from the Bureau of Vital
14   Statistics for the deceased, and use those to update
15   the State list, and also as to the number of people
16   that have been removed.
17   Q.  Backing up a little bit under 3B, verify that
18   you have a correct voter?
19   A.  Yes.
20   Q.  This would be a point where you would
21   determine whether there are sufficient matches, as we
22   discussed few minutes ago, is that correct?
23   A.  To ensure they have keyed in the registration
24   number to bring up that voter, and that they did not
25   make a mistake in keying in that.

Page 110

1    Q.  Putting aside the issue of whether there was
2    subsequent activity, which is discussed in detail here,
3    and I do not want to take our time to go through, is
4    there any place on that form where you set down any of
5    the criteria for determining whether there is a match,
6    in terms of name, date of birth, or Social Security?
7    A.  No.  That was done verbally.
8    Q.  Would that same thing apply to the last page
9    4450, as to Voters Who May Be Deceased?
10   A.  I believe I had instances where I had worked
11   with each of those two types of lists.  Then I met with
12   the individuals who were going to undertake this
13   process, and I showed them exactly what I had done with
14   a page or two.  Where I did not believe that it was a
15   match, I wanted to follow the same procedure where I
16   believe the check was to be placed.
17   Q.  Did you save any of those?
18   A.  It would have been part of Exhibit 5.
19   Q.  Exhibit 5, is that your handwriting or
20   somebody else's, if you can tell?
21   A.  I don't see anyplace in the Exhibit where I
22   made any notations.
23   Q.  Others of your staff members?
24   A.  Yes.
25   MR. MINCBERG:  This would be a good time for

Page 111

1    a lunch break.  If we take 45 minutes it will keep
2    us close to schedule.
3    MS. TORRES:  Before we do, I would like to
4    state something, for the record.  On a couple of
5    instances, Mr. Mincberg, you requested certain
6    documents that have come up in the course of your
7    questioning and we will look into that and confer
8    on that during the break.  I wanted to clarify
9    that if the documents you are referring to were
10   previously requested, and not previously produced
11   MR. MINCBERG:  I understand.  Let us not take
12   up the time arguing about whether certain
13   documents were called for by earlier requests or
14   not.
15   MS. TORRES:  We can argue about that at
16   another time.  I want to make sure our position is
17   on the record.
18   MR. MINCBERG:  It is.
19   (Lunch Break)
20
21
22
23
24
25

Page 112

1    A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N
2    BY MR. MINCBERG:
3    Q.  Mr. Leahy, I want to resume with our
4    discussion of removal of voters from the rolls based on
5    information provided by the Division of Elections.  I
6    ask you to pull out again Exhibit 1, your response to
7    the first set of interrogatories.  Turn to Page 5, if
8    you would, to the paragraph that is entitled "felony
9    lists," do you see that?
10   A.  Yes.
11   Q.  Is that, in fact, an accurate description of
12   the process you used prior to November?
13   (BILL BOSCH is on the phone.)
14   Q.  Turning to Page 5 of Exhibit 1, in the
15   paragraph captioned "felony lists," is that, in fact, a
16   correct description of the processes you used with
17   respect to information provided by the State Division
18   of Elections to you on people who they believe had been
19   convicted of felonies within your jurisdiction?
20   A.  Yes.
21   Q.  As I understand that paragraph, in contrast
22   to the deceased and duplicate lists, you did not
23   undertake a process internally within the Department of
24   Elections to determine whether the people on the
25   State's list appear to be a match with the people on

Page 113

1    the registration rolls, is that correct?
2    MS. TORRES:  Objection to the form.
3    THE WITNESS:  When working on the 1999 list,
4    that is correct.  Prior to working the
5    January 2000 list, my staff crossed out the names
6    of individuals who clearly appeared and were not
7    the same individuals as registered voters as
8    alleged felons.
9    Q.  Describe how that process worked.
10   A.  Similar to the deceased and duplicate match
11   comparison, this was done by one individual in my
12   office.  They simply went through and given the
13   information provided on the felony match against
14   registered voters, if there was significant different
15   information, we crossed out the name and did not mail
16   them a certified mailing under the administrative
17   hearing procedure.
18   Q.  Based on the unwritten criteria we talked
19   about before lunch?
20   A.  Yes.  Yes.
21   Q.  What led you to decide to begin that with --
22   the process with the 2000 list when you did not have
23   the 1999 list?
24   A.  I had attended training by State Division of
25   Elections prior to receiving the 1999 list.  There were

Page 114

1    regional meetings set up to educate us on these lists
2    and to inform us or educate us in how to best work
3    these listings. During that workshop, the statement
4    was made, I can't tell you by whom, people from FDLE
5    there, people from the State Division of Elections
6    there, and other fellow supervisors, and we were
7    advised that information on felons or alleged felons
8    was not always accurate, because at the time of arrest,
9    they may give erroneous information.
10       In terms of names, there are a number of
11   aliases that some of these people have, so the fact
12   that it did not match didn't mean we were not dealing
13   with alleged felons who were also registered to vote.
14   Based on that information, based on 1999, we mailed
15   certified letters to everyone on that list.
16       Prior to January 2000, I made the decision
17   that since there were a number of people who we
18   processed in 1999, who it was determined were not
19   felons, through the process that we worked, that I was
20   not going to mail to people, who clearly did not show
21   as a reasonable match on the 2000 list.
22       Q.  Did you make any effort retroactively in
23   2000, to go back to the people that were removed in
24   1999, to determine whether there had been inaccuracies?
25       A.  No, I did not.

Page 115

1        Q.  Let us start with 1999. In 1999, whether
2    there was a name listed as a possible or a probable
3    match from the State, if I understand what you just
4    said, you would automatically mail to that registered
5    voter the forms to begin the administrative hearing
6    process that you described in interrogatory one, is
7    that correct?
8        A.  That is correct.
9        Q.  Under that process, if the person did not
10   respond or did not demonstrate that they were not a
11   convicted felon, they would be removed, is that
12   correct?
13       MS. TORRES: Objection to the form.
14       THE WITNESS: If they did not pick up the
15   certified mail, we published your name in numbers
16   of general circumstances, advising them their
17   registration may be determined to be ineligible to
18   register to vote, in that notice, provided a time
19   and date at which there would be an administrative
20   hearing. If we did not get a response from that
21   individual, either through certified mailing or
22   public notice, they did not either send us
23   something through the mail in an appeal form or
24   not attend the administrative hearing, then their
25   names were removed from the rolls for not

Page 116

1    responding.
2        Q.  In fact, you have been critical, have you
3    not, of what you referred to as reversing of the burden
4    of proof in that kind of situation.
5        MS. TORRES: Objection.
6        MR. HARVEY: Objection to the form.
7        THE WITNESS: I have been concerned the
8    number of non-responses that we did receive. That
9    first list had over 6,000 names in it. That was
10   the 1999 list, significant number did not respond.
11   That, in itself, does not mean much. If they were
12   felons, had rights restored, no reason for them to
13   respond, did not have their rights restored. I
14   was concerned that there may be people that were
15   not -- did not get notice, didn't have the
16   opportunity to respond, either through the
17   certified mailing or the public notice.
18       Q.  Why were you concerned about that? What led
19   you to be concerned about that?
20       A.  Just the sheer number potential of
21   approximately 6,000, then majority of which were placed
22   in canceled status because they did not respond.
23       Q.  The fact is that a lot of people don't
24   respond to the mail they get?
25       MS. TORRES: Objection to the form.

Page 117

1        MR. MINCBERG:
2        Q.  Is that correct?
3        A.  They don't respond to the mail they get, that
4    did not bother me. If they received mail, then they
5    got proper notice.
6        Q.  Did you ever determine whether they, in fact,
7    did receive the mail?
8        A.  Or picked up the mail, we don't know whether
9    they got notices and ignored the notice, didn't go to
10   get the certified mail, but in terms of the law that we
11   were using for this process, this was, again,
12   administrative hearing process. I don't know when it
13   first went in the books. I can't remember the time, it
14   was not -- pursuant to that law, reasonable public
15   notice is given, if you follow that procedure. So, I
16   felt good about the fact that we were giving people
17   proper notice. I was alarmed at the number of people
18   we did not hear from.
19       Q.  Just so we were clear, the notice you were
20   providing with respect to alleged felons, was to mail
21   them certified mail, is that correct?
22       A.  Correct.
23       MS. TORRES: Objection to the form.
24       Q.  What form of notice did you provide the
25   people that were alleged felons in 1999 and 2000?

Page 118

1    A.  They were sent certified mail procedure used
2  under State law.
3    Q.  Mandated by State law?
4    A.  Mandated by the administrative hearing
5  process, yes.  It was not mandated as part of this
6  process.
7    Q.  By "this process," you mean --
8    A.  By the process of dealing with the lists that
9  came out of the Central Voter File, State law said upon
10  receiving of the list, that supervisors shall verify.
11  They didn't tell us how to verify.  It is my decision
12  to use the existing administrative hearing process and
13  State law as a means of doing that verification.
14    Q.  Once you made that decision, the form of
15  notice was specified by State law?
16    A.  I used that procedure as spelled out in State
17  law.
18    Q.  Is that certified mail forwardable or not
19  forwardable?
20    A.  That is a Post Office question.  I don't know
21  the answer.
22    Q.  You did indicate a minute ago you had
23  information that a lot of people didn't pick up that
24  certified mail, is that correct?
25    A.  Correct.  We had to advertise a large number

Page 119

1  of names in a newspaper of general circulation.  We did
2  not have the notice they received certified mail.
3    Q.  How did you go about finding that out, they
4  did not receive it?
5    A.  You get a return card, if they pick up the
6  certified mail.  For those that we did not get a return
7  card from, those were the names that we advertised.
8    Q.  So, were the names that reached a conclusion
9  didn't receive the notice, is that correct?
10    A.  Well, they may have received a notice.  They
11  did not pick up the certified mail.
12    Q.  I wanted to ask you a little about previous
13  testimony that you had given on this subject in front
14  of the United States Civil Rights Commission.  Do you
15  recall testifying before the Civil Rights Commission in
16  February of 2001?
17    A.  Yes.
18    MR. MINCBERG:  I will mark as Exhibit 7, a
19  copy of a transcript, and on the top it says U.S.
20  Commission on Civil Rights, Hearing on Allegations
21  of Election Day Irregularities in Florida, Friday,
22  February 16, 2001, Miami, Florida.
23    Q.  I will ask you to turn to Page 315 on that
24  transcript.  I will direct your attention to the
25  questioning at the top of the page by Mr. Hall.  Do you

Page 120

1  see that?
2    A.  Yes.
3    Q.  Do you recall being questioned by Mr. Hail at
4  this hearing?
5    A.  Yes.  Yes.
6    Q.  Mr. Hall asked, "Mr. Leahy, it is, I believe,
7  your position that the Florida law, as written,
8  requires you to at best investigate whether individuals
9  who have been named as convicted felons are, in fact,
10  convicted felons, but in reality, it shifts the burden
11  on to the convicted felon to prove their innocence, is
12  that correct?"
13    Have I read that correctly?
14    A.  Yes.
15    Q.  Then your answer begins with "yes."
16    Do you recall giving that answer?
17    A.  Yes.
18    Q.  That was a correct answer?
19    A.  Yes.
20    Q.  Then you go to on to say, "if you do not have
21  any information that an alleged felon is not convicted,
22  or had the rights restored, then you are required to
23  remove them from the rolls, is that correct?"
24    A.  Yes.
25    Q.  That is, in fact, your understanding of what

Page 121

1  State law mandates you or mandated you to do, as of the
2  period prior to November 2000, is that correct?
3    A.  Yes.
4    Q.  Then you go on to explain that the persons on
5  that alleged felony list, who you sent notices to, are
6  responsible for giving you information they are not
7  convicted, which you then characterize as kind of a
8  reverse process, is that correct?
9    A.  Correct.
10    Q.  You explain that as meaning that they had to
11  prove they're not a convicted felon in order to retain
12  the right to vote, is that correct?
13    A.  That is correct.  They had to file an appeal
14  form or attend an administrative hearing.  We could
15  then know to check and see if they were a felon, if
16  they had initiated the appeal form for us to take that
17  determination.
18    Q.  Didn't you also indicate to the Civil Rights
19  Commission that you were concerned as a result of that
20  process, you may be or may have removed people who are
21  not convicted felons from the rolls?
22    MS. TORRES:  Objection to the form.
23    THE WITNESS:  Certainly, that potential
24  existed.
25    Q.  I ask you to turn, please, a couple of pages

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

31 (Pages 118 to 121)

Page 122

1  later, to Page 327, going on to 328, in the testimony
2  that is discussed here, you're discussing, are you not,
3  the same process where alleged convicted felons receive
4  notice from your office as to their situation, is that
5  correct?
6      A.  Yes.
7      Q.  I want to focus in particular on the last
8  paragraph on 327, that spills over to 328, you say, "I
9  am concerned mainly with the process, in that so many
10  of these people don't respond, and I don't know whether
11  it's because they don't get a notice, or they are
12  confused about what the problem is."
13      Did I read that accurately?
14      A.  Yes.
15      Q.  Is that a concern that you had over the
16  process at that time?
17      A.  Yes.
18      Q.  You go on to say, quote, "but we're removing
19  a lot of people from the rolls when I know for a fact,
20  based on the appeals forms that I get back this is not
21  a truly accurate list," end quote.
22      Did I read that accurately?
23      A.  Yes.
24      Q.  Is that your belief?
25      A.  Yes.

Page 123

1      Q.  You then go on to say, "it's drawn off the
2  Florida Department of Law's database, and that database
3  was never intended for this purpose, but it is being
4  used for this purpose."
5      Did I read that accurately?
6      A.  Yes.
7      Q.  Do you believe that to be correct?
8      A.  Yes.
9      Q.  Can you explain to me what you mean by "the
10  database was never intended for this purpose"?
11      A.  The database was in existence by Florida
12  Department of Law Enforcement for its own purposes.
13  When legislature, by law, required that this database
14  be used to identify registered voters who are felons,
15  who have not had their rights restored, it was in
16  existence for that purpose, not this purpose, and it
17  was used for this purpose for acts of the legislature.
18      Q.  Why were you concerned that could cause
19  problems?
20      MS. TORRES:  Objection to the form.
21      THE WITNESS:  Well, again, because --
22      MR. MINCBERG:  Let me rephrase.
23  Q.  Why were you concerned about that?
24      MS. TORRES:  Objection to the form.
25      MR. MINCBERG:  I have to do it over.

Page 124

1      Q.  Were you concerned about that?
2      A.  Yes.
3      Q.  Why were you concerned about that?
4      A.  Again, because we did receive a number of
5  appeal forms and once they were submitted to the
6  Florida Department of Law Enforcement after they
7  researched those appeal forms, there was a
8  determination on a number of those as to whether there
9  was a match that these people, in fact, who had not
10  been convicted of a felony or had the rights restored.
11      Q.  That led you to what conclusion?
12      A.  That the lists that were received were not a
13  one hundred percent list of convicted felons who had
14  not had their rights restored, but who were registered
15  voters.
16      Q.  Turning again to Exhibit 7, Page 328, you
17  conclude your answer, I quote, "so, I am concerned that
18  we may be removing people through the administrative
19  hearing process that are truly not convicted felons,
20  that will cause them a problem when they show up to
21  vote in the next election."
22      Did I read that correctly?
23      A.  Yes.
24      Q.  Is that a correct statement?
25      A.  Yes.

Page 125

1      MR. MINCBERG:  We referred to a number of
2  them in 1999 and 2000. I want to ask the reporter
3  to mark a couple of Exhibits that were provided by
4  you to us.
5      First will be Exhibit 8 that is entitled
6  Miami Dade Elections Department, June 19, '99
7  felon list; Exhibit 9, Miami Dade County Election
8  Department, 2000 Felon List.
9      (Thereupon, the documents were marked as
10  Exhibit Nos. 7 & 8.)
11      (Thereupon, the 2000 Felon List was marked as
12  Exhibit No. 9.)
13      Q.  Can you identify Exhibit 8 and 9 for us?
14      A.  It is a document produced by my office, which
15  talks about the June 1999 and January 2000, felon list,
16  the number on the list that we received broken down by
17  ethnicity and race, the number determined to be felons
18  by ethnicity and race, the number not to be determined
19  by felons by ethnicity and race, the number to be
20  determined to be the wrong person and number of people
21  who did not respond.
22      Q.  In looking briefly myself through the Civil
23  Rights Division testimony, looks to me like you were
24  referring to numbers off of these lists. Were these
25  documents produced to the Civil Rights Commission?

Page 126

1    A.  Yes.  To the best of my knowledge, I think
2  they were.
3    Q.  Let me start with Exhibit 8 for a moment.
4  June '99 felon list.  The number on list, 5,762, that
5  is the total number of possible and probable felons
6  that you got from the State Division of Elections in or
7  about June of '99?
8    A.  Yes.
9    Q.  Then there are numbers from other States,
10  717, can you explain what that is?
11    A.  These are where the felony occurred in a
12  State other than Florida.
13    Q.  That was reported to you by whom?
14    A.  That would have been on the list.  It
15  indicates on the list where the felony conviction
16  occurred.
17    Q.  List provided by the State Division of
18  Elections?
19    A.  That is correct.
20    Q.  Then, again, I think we established it
21  before, total 5762, both possible and probably matches,
22  is that correct?
23    A.  Correct.
24    Q.  Then third category number on the list, by
25  ethnicity slash race, that is a list from the State,

Page 127

1  7762, correct?
2    A.  Correct.
3    Q.  Racial breakdown, that was listed by the
4  State on that list?
5    A.  Yes.
6    Q.  Now, I noticed that occasionally, it lists
7  information provided on those lists from the States as
8  to race that did not always match the lists that you
9  had on your registration lists by race.  I want to find
10  out when you break them down, white, black, Hispanic,
11  as reported by the State, the number they thought were
12  white, black, Hispanic, respectively?
13    A.  That is correct.
14    Q.  Now, the next category, the number determined
15  to be a felon by ethnicity and race, by determined, do
16  you mean people who you made that determination on
17  having gone through the administrative hearing process?
18    A.  Yes.
19    Q.  And the number determined not to be a felon
20  by ethnicity and race, 327, do you see that?
21    A.  Yes.
22    Q.  Also, the number that were determined not to
23  be felon based on the administrative hearing process?
24    A.  Yes.
25    Q.  Then there is a list that is entitled or item

Page 128

1  or entry, the number determined to be the wrong person,
2  485.  As I understood it, from the Civil Rights
3  Commission testimony, these were instances where the
4  State subsequently notified you that there had been an
5  error, is that correct?
6    A.  Correct.
7    Q.  And then underneath that, we have the number
8  who did not respond, which is listed as 4255, correct?
9    A.  Correct.
10    Q.  By my math, somewhere around eighty percent
11  of the people on the list?
12    MS. TORRES:  Objection to the form.
13  BY MR. MINCBERG:
14    Q.  About what portion would you say that is of
15  the total number who came on the list?
16    A.  Without a calculator, I am not going to sit
17  here and guess.  It is certainly more than 50 percent.
18    Q.  We can -- record can establish that.  Among
19  other factors we talked about, was it that the large
20  number of people who did not respond, that was one of
21  the factors that led you to the concern that you talked
22  about in the Civil Rights Commission?
23    A.  Correct.
24    Q.  Again, there was no effort made by your
25  office in 2000, to do any retroactive checking about

Page 129

1  these 4255 people, is that correct?
2    A.  Correct.
3    Q.  All 4255 of these alleged felons were, in
4  fact, removed from the Miami Dade rolls in '99, is that
5  correct?
6    A.  That is correct.
7    Q.  Turn for a minute to Exhibit 9, if you would.
8  This is the same information as Exhibit 8 but for the
9  2000 felon list, is that correct?
10    A.  That is correct.
11    Q.  I take it, we can translate terms off Exhibit
12  9, in the same way we did on Exhibit 8, would that be
13  correct?
14    A.  Except in the second to bottom, the number
15  determined to be the wrong person, I believe those are
16  the ones that my staff determined not to be the same
17  individual based on the match criteria.
18    Q.  Eyeball matching?
19    A.  Yes.
20    Q.  I did notice one other difference on the
21  second line on number from other States, it says 601
22  minus names recalled (Texas) 501, equals one hundred?
23  Do you see that?
24    A.  Yes.
25    Q.  Can you explain that?

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

A. These were modified by the State Division of Elections and one individual on the list originally should not have been on that list. These were sometimes violations that occurred in Texas, which was determined not to be a felony.
Q. Did you get any further explanation of why that had happened?
A. I think that is the explanation I got.
Q. When were those names recalled?
A. Before we did the mailing.
Q. Now, in terms of racial breakdown, you don't have listed here on this form, the precise racial breakdown on this list; 1090, who did not respond; white, black, Hispanic, is that correct?
A. Correct.
Q. I am thinking that we maybe can deduce that by looking at the other numbers. I want to go through that process to make sure I am doing it correctly, as you understand it.
In the 2000 list, we start with the total number on the list, excluding those recalled by ethnicity/race, 1,388, is that correct?
A. Correct.
Q. We want to focus on African Americans. Of those, 834 were black, is that correct?



A. Yes.
Q. 69 were determined to be felons, through the administrative hearing, 84 determined not to be felons through that process, is that correct?
A. Correct.
Q. If you take me at my word, it is 153, does that look about right?
A. Yes.
Q. If we subtracted that from 884, by my math, that would leave us 731, assuming my math is correct, that is processed, right?
A. Yes.
Q. Now, let us make a further assumption, let me back up. With respect to the 43 determined to be wrong persons, we have no idea of their racial breakdown?
A. Correct.
Q. If we assume all 43 of those were African American for these purposes?
A. Okay.
Q. If you subtract 43, 688?
A. It sounds about right.
Q. I would assume I could follow a similar process with Exhibit 8?
A. Yes.
Q. I want to ask you about one of the examples



of one of the lists you were given by the State on possible or probably felon matches. I ask that the reporter mark this as Number 10, January 2000 CVF for Dade County, probably DBT felon matches beginning on Bates page, numbered 34311 and which extends to Bates Page 34326.
(Thereupon, the List was marked as Exhibit No. 10.)
Q. Can you identify Exhibit 10?
A. Yes, it is a list that we got that was produced from the central data file of probable felon matches.
MR. MINCBERG: I want to say, a few marks on this one that are mine again. If you look towards the bottom of each of the pages, you will see little tiny numbers, I will state, right after where the names are. I will state, for the record, those were added by me.
Q. Putting those little marks aside, are the other handwritten marks on these pages from your office?
A. Yes.
Q. Are these yours, or someone else?
A. Someone else.
Q. Now, for example, on the first page, which is



numbered Page 51, if you look at the fourth name down, Edward Gibb, there is a notation that says "not the same person," do you see that?
A. Yes.
Q. Would this be one of those 43 people that your office determined in 2000, were not the same person, therefore, they should not go through the administrative hearing process?
A. I don't know why that notation was made. I can't make that assumption.
Q. What else could that notation indicate, "not the same person" notation?
MS. TORRES: Objection to the form. It would be information received after we had done the mailing.
Q. Okay. Let me back up then. With respect to Mr. Gibbs, for example, the notation it is "not same person," would indicate either that you determined not to initiate the administrative hearing process for that individual, or that after initiating it, you learned it was not the same person, is that correct?
A. That is correct.
Q. I want to ask you to turn to Page 54.
Before you do that, go back to the first page. I apologize, I forgot one question. There's a

Page 134

1  notation that looks like it is next to Timothy Howard?
2  Can you tell us what that --
3      A.  No, I don't know.
4      Q.  If you turn to the second page, there are
5  several notations that say, A, and later on, it says
6  out of S-T-A-F-F provided.  Do you see those?
7      A.  Yes.
8      Q.  Can you explain that?
9      A.  Yes.  For those individuals who had out of
10  State convictions, there was no ability for the FDLE to
11  do the research if these people submitted an appeal
12  form, because the process used by FDLE was to research
13  their own records and other records, such as Court
14  records, to determine whether a felony had occurred and
15  rights were restored.  They would not have that same
16  ability on an out-of-State conviction.
17      We revised the form, which was an affidavit,
18  which was sent out to the out-of-State conviction
19  people so that they could sign, which says "I have not
20  been convicted" or "I had my rights restored."  It was
21  language similar to this -- if they sign the affidavits
22  and send it back to us, they remain an active voter.
23      Q.  Those would be people -- going back to
24  Exhibit 9, considered to be people determined not to be
25  felons, would that be correct?

Page 135

1      A.  Yes.
2      Q.  On Page 54 again, there is voter, the fourth
3  one from the top, listed as Willie Claude Davis.  Do
4  you see that?
5      A.  Yes.
6      Q.  That is slightly different than the way he is
7  listed, apparently, by the State on the list of alleged
8  felon, as William Davis.  Do you see that?
9      A.  Yes.
10      Q.  From what I could tell, the birth date seems
11  to match for that individual, is that correct?
12      A.  Yes.
13      Q.  And we can't tell about the race because the
14  race is listed in your file, but, apparently, not in
15  the alleged felon information, is that correct?
16      A.  That is correct.
17      Q.  This person is listed as "not same person,"
18  do you see that?
19      A.  Yes.
20      Q.  Based on your understanding of the
21  procedures, can you tell us how that determination
22  would have been made?
23      A.  It would have happened in one of two ways,
24  either my staff determined before the mailing that this
25  was not the same person, if the mailing had not gone

Page 136

1  out, or if it was determined not to be the same person
2  subsequent to the mailing.
3      Q.  Let me ask you to flip two pages ahead to
4  Page 56.  Focus with me for a moment on the last voter
5  listed on that page.  This was listed from your file as
6  Robert Lee William, do you see that?
7      A.  Yes.
8      Q.  That name does not match precisely, he is
9  listed as a felon, Robert Williams, is that correct?
10      A.  Yes.
11      Q.  The birth dates are the same, is that
12  correct?
13      A.  Yes.
14      Q.  Under race, in one record, this individual is
15  black; and the other, he is listed as white, is that
16  correct?
17      A.  That is correct.
18      Q.  I noticed that the race is circled, at least
19  on the first one of those two listings, do you see
20  that?
21      A.  Yes.
22      Q.  Other than that circling, there is no other
23  indication by that name, is that correct?
24      A.  That is correct.
25      Q.  Does that mean this person was, in fact,

Page 137

1  removed from the rolls?
2      A.  I can't tell, based on this sheet.
3      Q.  Is there any indication from this sheet that
4  the person was not removed from the rolls?
5      MS. TORRES:  Objection to the form.
6      THE WITNESS:  No, there is not.
7      Q.  In contrast, for example, on Page 54, with
8  respect to the Mr. Davis, there is the notation "not
9  same person" does that indicate to you that the person
10  was not removed from the rolls, is that correct?
11      A.  That is correct.
12      MS. TORRES:  Objection to the form.
13      Q.  Can you tell us why someone in your office
14  would have circled -- to Page 56, based on your
15  understanding of the procedures in your office, why
16  would someone have circled the race of Robert Lee
17  Williams, black and below that, was white?
18      MS. TORRES:  Objection to the form.
19      MR. RESTREPO:  Objection to the form.
20      Q.  Is there some indication these may not be the
21  same person?
22      MS. TORRES:  Objection.
23      MR. RESTREPO:  Objection to the form.
24      MR. HARVEY:  Objection to the form.
25      THE WITNESS:  There are certain

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

35 (Pages 134 to 137)

**Page 138**

1 characteristics that are there on that individual.
2   Q. If someone wanted to find out if this voter
3 had been removed from the rolls in 2000, to determine
4 that for certain, how would that be done?
5   A. We would go to our registration computer base
6 in my office and that would indicate whether the person
7 was active or removed.
8   Q. Other than all the lists we talked about so
9 far today, were there any other lists of potential
10 voters to be removed from the rolls that you were
11 provided by the State in 1999, 2000 period?
12   A. No.
13   Q. Do you recall in early -- sorry, were you a
14 member of something called Executive Board of the
15 Florida State Association of Supervisor of Elections in
16 '99 or Executive Committee or some other name?
17   A. I don't believe I was.
18   Q. Were you a member of the Central Voter File
19 Committee of FSASE in '99?
20   A. I believe I was.
21     MS. TORRES: Objection.
22   Q. Do you recall a meeting with representatives
23 of DBT Online, and were you interested in what they
24 were doing in terms of matching for felons?
25     MR. RESTREPO: Objection to the form.

**Page 139**

1     THE WITNESS: I recall a couple meetings that
2 I and other members of the Central Voter File
3 Committee attended in Tallahassee. To the best of
4 my recollection, there were people from DBT, as
5 well as people from the State Division of
6 Elections at those meetings. Those meetings were
7 primarily, and possibly solely, intended to look
8 at the format of the information that was going to
9 be provided to supervisors, to get our input as to
10 what format would be essential for us to work,
11 giving voter registration rolls.
12   Q. Do you recall attending any meeting where
13 Mr. Bruder of DBT, B-R-U-D-E-R, was present?
14   A. I don't recall the names of the individuals
15 from DBT.
16   Q. One way or the other?
17   A. No.
18   Q. Do you recall a meeting in which Supervisors
19 of Elections expressed to DBT their interest in DBT
20 being as exacting as possible on the matches?
21   A. I simply don't recall.
22   Q. One way or the other?
23   A. No.
24   Q. You mentioned that you also attended some
25 training sessions in the 1999 time frame?

**Page 140**

1     MR. RESTREPO: Objection to the form.
2   A. A training session?
3   Q. Do you recall when in '99, you attended
4 training sessions with respect to the information
5 provided by DBT?
6     MR. RESTREPO: Objection to the form.
7     THE WITNESS: No, I did not.
8   Q. Did you attend a meeting in 1999 in which the
9 subject of the information provided through DBT was
10 discussed?
11   A. Yes.
12   Q. Now, you mentioned, with respect to a list of
13 possible and probable felons, that you had made the
14 decision to initiate the administrative hearing process
15 with respect to those individuals. Do you recall that?
16   A. Yes.
17   Q. Did other Counties handle it the same way?
18     MS. TORRES: Objection to the form.
19     MR. TINKLER: Objection.
20     THE WITNESS: I am aware of at least two
21 counties that used the administrative hearing
22 procedure.
23   Q. Were there counties in Florida that handled
24 the list of possible and probable felons in '99 and
25 2000, in ways different than Miami Dade did?

**Page 141**

1     MS. TORRES: Objection to the form.
2     MR. MINCBERG: What is the objection?
3     MS. TORRES: To the extent that you know.
4   Q. To the extent that you know.
5   A. I am aware that one County did that, did not
6 work the lists at all.
7   Q. I think you said you knew of, how many was it
8 that used the administrative hearing process.
9   A. I don't know. I don't know what the other
10 ones did.
11   Q. You don't know one way or the other?
12   A. Correct.
13   Q. Are you familiar with something referred to
14 as Autotrack XP?
15   A. I am familiar with Autotrack. The XP does
16 not mean anything. I am familiar with the term
17 Autotrack.
18   Q. With respect in particular to the information
19 from DBT, in 1999/2000?
20     MR. RESTREPO: Objection to the form.
21   Q. Can you tell us your understanding of what it
22 is or was?
23   A. Autotrack is a program that provides a lot of
24 information about individuals, all types of
25 information, previous addresses, I think it provides

**KRESSE, VALDES-PRIETO & ASSOCIATES, INC**
**305-371-7692**

Page 142

1  where there are people with similar information -- I
2  ran it myself to see if somebody else had my name and
3  date of birth someplace else in this country. I forget
4  where. I remember it did have previous addresses down.
5  It would have Social Security information, it would
6  have information if they were deceased, or if they had
7  convictions, that type of information.
8      Q. Did you or any of your employees make use of
9  the Autotrack system during 1999 and 2000?
10     A. Yes.
11     Q. Can you describe what use you made of it?
12     A. It would be a system where there was more
13  information needed than was available, such as on these
14  lists that would actually go in and determine
15  additional information, using the Autotrack to try to
16  determine whether we were dealing with the same
17  individual or not.
18     Q. What I want to get at is, in the process we
19  talked about before, try to describe when and under
20  what circumstances you used Autotrack.
21     A. I am not clear as to what the staff member
22  who had access to Autotrack -- when she used that
23  information.
24     Q. Would it be used for the purpose of
25  determining -- sorry, let me back this up, and separate

Page 143

1  this a little bit. Along different kinds of removals
2  that occurred with respect to the deceased lists and
3  duplicate list, was that one of the methods that she
4  could use to determine whether you were dealing with
5  the same person?
6      A. It could have been for that purpose, but it
7  was not.
8      Q. Was it used for the purpose of matching the
9  alleged felon lists?
10     A. Yes, it may have been.
11     Q. When you say "it may have been," can you
12  elaborate on this a little bit?
13     A. Let us first talk about -- the person who I
14  am talking about, her name is Ivy Korman, she is the
15  head of the Absentee Ballot Section and Fraudulent
16  Section that looks for fraud in various types of
17  absentee ballots or petitions. She had Autotrack
18  available to her and used Autotrack to assist her in
19  her work. Part of the work she did was working with
20  these felon lists.
21     Q. What work did she do with Autotract?
22     A. She was the one who determined on the 2000
23  lists the ones that did not match and should not be
24  mailed a certified letter.
25     Q. Turn to Exhibit 9 for a minute. It is

Page 144

1  possible that the Autotrack system was used to help
2  determine some of the 43 persons listed as determined
3  to be the wrong person, is that correct?
4      A. That is possible, she could have used that
5  list. Possibly she may not have used the list.
6      Q. You don't know?
7      A. I don't know.
8      Q. She did not have any instructions as to
9  whether or not to use the list, it was up to her?
10     A. Whether or not or not to use Autotrack, that
11  is correct. That was a tool she was provided to use in
12  her work. She had the ability to use that list, if she
13  felt it was necessary.
14     Q. Did you ever have any conversation with her
15  whether she considered the Autotrack tool to be useful
16  or not?
17     A. She did find it useful.
18     Q. For what purpose?
19     A. Her responsibilities of trying to detect
20  fraud. She found it proved a tremendous amount of
21  information about the individuals, which was not
22  otherwise available.
23     Q. Did you ever have any conversation with her
24  whether she found it useful for the felon match
25  purposes?

Page 145

1      A. Again, when she used it for that particular
2  purpose, it was helpful.
3      MR. MINCBERG: I will ask the reporter to
4  mark as our next Exhibit Number 11, a document
5  entitled FSASE, Central Voter File Committee,
6  dated May 8, 2000, with Bates number 33916 to
7  33924.
8      (Thereupon, the Documents were marked as
9  Exhibit Nos. 11 & 12.)
10     Q. Could you identify Exhibit 11, Mr. Leahy?
11     A. It is a memorandum to all supervisors from
12  Central Voter File Committee, and the subject is
13  recommended procedure, Central File Voter list, dated
14  May 8, 2000.
15     Q. Do you recall receiving it around the date
16  that it bears?
17     A. Actually, I typed it -- it was typed in my
18  office.
19     Q. It appears to me as though this document,
20  although it says from the Central Voter File Committee,
21  they are -- in large measure, was written by you, is
22  that correct?
23     MS. TORRES: Objection to the form.
24     MR. RESTREPO: Objection to the form.
25     THE WITNESS: It was drafted by me and the

Page 146

1    committee approved it and sent out by my office.
2        Q.   Let me ask it again, to be sure we can get
3    that clearly, for the record.  What was your role in
4    the preparation of Exhibit 11?
5        A.   I drafted Exhibit 11.
6        Q.   What happened after you drafted it?
7        A.   I am assuming this would be the procedure to
8    circulate among members of the committee.  As you can
9    see, I was not Chair at the time, Jon Sancho was chair.
10   The process would have been circulated throughout
11   members of the committee to get their agreement that
12   this was the recommendation of the committee, then to
13   send it out to all of the Supervisors of Elections as a
14   committee recommendation.
15       Q.   As I understand it, as the memo states, the
16   procedures here were reviewed and approved by the
17   Division Of Elections, FDLE, and the Office of
18   Executive Clemency, is that correct?
19       A.   Correct.
20       Q.   I want to ask you to turn to Page 33920 on
21   the Bates numbers.  Can you identify that page?
22       A.   This is a suggested memo to be sent to
23   persons who were on the list received from the State
24   Division of Elections as alleged felons.
25       Q.   Is that a memo or letter that you used in

Page 147

1    Dade County in 2000?
2        A.   Either this letter or something similar to
3    this letter.  I would have to look at the letter we
4    used.
5        Q.   What I would like you to do for a moment --
6    the first sentence says, "your name has been submitted
7    to our office by the Florida Division of Elections on a
8    list of voters who have allegedly been convicted of a
9    felony, but have not had their civil rights restored."
10       A.   Yes.
11       Q.   Do you recall using that language in 1999 and
12   2000 in notifying alleged felons?
13       A.   It would have been that language or similar
14   language.
15       Q.   Keep that page open and turn, if you would,
16   to Exhibit 3, which was your response to the second set
17   of interrogatories, go to the Page 44679.  This the
18   second page from the end.  It says Exhibit B at the
19   top.
20            You identified this as the letter you used
21   in '99 and 2000 in notifying alleged felons where you
22   had been advised directly from the Circuit Court of
23   Miami Dade County of their felon status.
24       A.   Except I would not use word "alleged."  These
25   are people who were convicted of a felony and were

Page 148

1    notified directly by the Clerk of the Circuit Court as
2    opposed to names in the State list, which were alleged
3    felons.
4        Q.   I think you partly anticipated my next
5    question.  In the letter that you sent to people who
6    you were advised directly from the Circuit Court, they
7    were convicted, you did not refer to them as alleged
8    felons or having allegedly been convicted of a felony,
9    is that correct?
10       A.   That is correct.
11       Q.   The reason for that is what you just said to
12   us a moment ago, both you and they were informed
13   directly by the Circuit Court?
14       A.   Yes.
15       Q.   Turning to Page 33920, of Exhibit 11, there,
16   with respect to the notification to people that you
17   have information from Florida Division of Elections,
18   there, you do use the term -- you refer to people as
19   having allegedly been convicted of a felony, is that
20   correct?
21       A.   Yes.
22       Q.   Why did you use the alleged term there as
23   compared with the -- why did you use the term allegedly
24   there?
25       A.   For two reasons.  It was a matching process.

Page 149

1    There exists the potential that many -- that we were
2    not dealing with the same individual.  Or two, that the
3    potential that the information that was on FDLE's list,
4    was incorrect.  So, we did not know whether or not, in
5    fact, this individual had been convicted of a felony.
6        Q.   You were a little more confident that a
7    person was convicted of a felony with direction from
8    the Circuit Court?
9        A.   It was from information from the Circuit
10   Courts, yes.
11       Q.   Got it.  This same language that you used,
12   referring to people that had been allegedly convicted
13   of a felony, were you familiar with how other election
14   supervisors around the State referred to that issue,
15   who were not quite certain as to the status of the
16   person's felony conviction?
17            MR. TINKLER:  Objection to the form.
18            THE WITNESS:  No, I am not.
19       Q.   Were you aware, for example, that Mr. Sancho
20   in Leon County, when he sent letters like that, he said
21   specifically, we do not know if this list is accurate?
22       A.   I don't recall seeing his letter.
23       Q.   Did you consider using language like that in
24   your letter?
25       A.   No, because, again, I drafted what I felt was

Page 150

1  an appropriate letter, and then again, it was a
2  recommendation. The Supervisors could modify my letter
3  with their own words to be sent out.
4      Q. Were you aware, for example, in Mr. Sancho's
5  letter, it said, if you have never been convicted of a
6  felony, we want to help you clear that up?
7      A. I don't recall ever seeing Mr. Sancho's
8  letter.
9      Q. You did not put that kind of language in your
10  letter?
11      A. I don't recall doing it, no.
12      Q. Are you familiar with Patricia Hollarn?
13      A. Yes.
14      Q. Am I correct, she was Supervisor of Elections
15  for Ocaloosa County?
16      A. Still is, yes.
17      Q. She was also, as I understand, President of
18  FSASE in 1998, approximately?
19      A. Yes.
20      Q. Had you heard that in her notification
21  letter, she stated affirmatively that the list sent to
22  the State may contain errors?
23      A. I am not familiar with the letter.
24      (Recess in proceedings.)
25      Q. Mr. Leahy, I understand that after

Page 151

1  discussions with your counsel, you wanted to clarify a
2  previous answer?
3      MS. TORRES: Not right now but during the
4  break.
5      MR. MINCBERG: Whatever, I was informed by
6  your counsel that you wanted to clarify a previous
7  answer.
8      THE WITNESS: That was referring to one of
9  the interrogatories where I made reference to the
10  United States Attorney General Office, I pulled a
11  copy of Florida Statute 98.093 during the lunch
12  session, upon receipt of information from the
13  United States Attorney, listing persons convicted
14  of a felony in Federal Court by the Department,
15  the Department of the State shall immediately
16  forward such information to the Supervisors of
17  Elections for the County where the offender
18  resides.
19      Q. So, pull out Exhibit 3, that second set of
20  interrogatories, turn to Page 4, the third paragraph
21  where it says United States Attorney General's, it
22  should say United States State Attorney's, is that
23  correct?
24      A. That is correct.
25      Q. Based on your review of that, is it your

Page 152

1  understanding that the United States Attorney here in
2  the area, in Miami?
3      A. I don't know that, based on what the law
4  states.
5      Q. Thank you for that.
6      We were talking about Central Voter File
7  Committee. I wanted to ask you to look briefly -- I
8  think there is a memo relating to that, that refers to
9  you. I will ask it to be marked as Exhibit 12, a
10  memorandum of May 11, from Ethel Baxter, Central Voter
11  File Suggestions, Bates stamped B000494 to 496.
12      I want to ask you about the third -- second
13  and third pages of Exhibit 12, which appears to be a
14  letter from you, dated May 8, 1998, to Ms. Baxter. Is
15  that what those last two pages consist of?
16      A. Yes.
17      Q. In that letter, you refer to procedures used
18  back in 1998 to, as you put it, work duplicate list,
19  list of possible duplicates provided to you then by the
20  State, is that correct?
21      A. Correct.
22      Q. One of the procedures to which you refer to,
23  the second page of the memo, is item number three,
24  under which the name does not match, the last
25  registration is in the other County. Do you see that?

Page 153

1      A. Yes.
2      Q. As I understand, the information you were
3  given on duplicates, they would include in name and
4  date of birth?
5      A. Yes.
6      Q. Was there any other information you got on
7  duplicates at that time that you can recall?
8      A. Date of registration.
9      Q. Yes. What you say, referring to item number
10  three on the last page of the document, is that if the
11  name does not match, usually the middle names and/or
12  initials, and the last registration dates is in another
13  County, the assumption that you make is that we are
14  dealing with two different individuals, is that
15  correct?
16      A. Correct. With however, after that.
17      Q. However, if one middle name appears to be a
18  surname and the others a traditional middle name, we
19  will try to determine if it is the same individual,
20  correct?
21      A. Correct.
22      Q. How would you have done that at that point?
23      A. Here are really two ways that you can do it,
24  with sending the letter out, which we have seen
25  previously, a letter to Leon County to a voter who

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

39 (Pages 150 to 153)

Page 154

1  appears registered in Leon County. The other way is
2  getting -- asking the supervisor in another County to
3  send a copy of the registration form, or at least the
4  signature of that voter, and compare the signature to
5  see if they were the same individuals.
6      Q.  In 1998, in dealing with this information
7  from the State, you then drew the conclusion that if
8  the names did not match, including middle names or
9  initials, or the situation where one was a surname and
10 the other was a traditional middle name, you were
11 dealing with different individuals, is that correct?
12     A.  Yes.
13     Q.  Did you continue to operate under that basis,
14 going forward after '98?
15     A.  Yes.
16     Q.  Now, did Central Voter File Committee meet in
17 1999 that you recall?
18         MR. TINKLER:  Objection to the form.
19     Q.  Did the committee meet?
20     A.  I believe it did, yes.
21     Q.  I think we talked a little about some of the
22 discussions that you had relating to the information
23 getting from the State, during that time, et cetera?
24     A.  The format of the information we were getting
25 from the State, yes.

Page 155

1      Q.  Did it meet again in 2000 -- let me ask it,
2  did the Central Voter File Committee meet in 2000?
3      A.  I don't recall.  The last list that we
4  received from the State was January 2000. I don't know
5  if there was a provision for the committee to meet, but
6  I can't say whether it did or did not.
7      Q.  Do you recall there was concern about the
8  Central Voter File Committee meetings in 2000, because
9  some supervisors had suggested changes be made to any
10 of the forms that were being used?
11     A.  I don't recall.
12         MR. MINCBERG:  Why don't we mark this
13     document since it may help refresh your
14     recollection. We'll mark this as Exhibit 13, a
15     memo from Emmett Mitchell to Central Voter File
16     Committee members, January 31, 2000.
17         (Thereupon, the Memo was marked as
18     Exhibit No. 13.)
19     Q.  Were you a CVF member in 2000?
20     A.  I don't recall.
21     Q.  Whether you were or were not?
22     A.  Whether I was or was not.
23     Q.  Do you remember receiving this memo from the
24 Central Voter File Committee, Exhibit 13?
25     A.  Yes.

Page 156

1      Q.  In fact, actually, let me go back to that
2  again. We marked just a minute ago -- a couple of
3  minutes ago.
4          Does that refresh your recollection that you
5  would have been on the Central Voter File Committee in
6  2000?
7      A.  Yes, I am listed as a member of the Central
8  Voter File Committee.
9      Q.  Going back to Exhibit 13, the first paragraph
10 discusses various reasons that the committee asked to
11 be reconvened.  Do you see where I am referring to?
12     A.  Yes.
13     Q.  Some of the supervisors expressed interest in
14 taking a more active role in the verifications process
15 while others have not.  Do you see that?
16     A.  Yes.
17     Q.  Do you recall any discussions among
18 supervisors on that subject?
19     A.  Not in that time frame.
20     Q.  Can you recall any other time frame?
21     A.  Not in 1999 and 2000.
22     Q.  Do you recall them after 2000?
23     A.  We were in those discussions now.
24     Q.  I will get to that in a little bit -- pre
25 2000?

Page 157

1      A.  No, I did not.
2      Q.  You are not saying it did not happen, you
3  done recall one way or the other?
4      A.  Correct.
5      Q.  Do you recall looking at Exhibit 13 that the
6  committee was to meet to discuss some of the subjects
7  referred to in the memo?
8      A.  I don't remember.
9          MR. MINCBERG:  Let me ask the reporter to
10     mark as Exhibit 14, two page Bates number 33893 to
11     94, which reads, Roxanne Watkins, Alachua County.
12     Suggestions for the Next Mailing of the CVF Felon
13     and Duplicates Listings.
14         (Thereupon, the Document was marked as
15     Exhibit No. 14.)
16     Q.  Do you recall one way or the other seeing
17 Exhibit 14 before?
18     A.  Yes.
19     Q.  What do you recall?
20     A.  I recall seeing it. I don't know how I
21 received it, but I remember getting information from
22 her.
23     Q.  Unfortunately, it doesn't bear a date.  Do
24 you know when you would have received it?
25     A.  No.

Page 158

1    Q.  It had been some time prior to the
2  November 2000 election?
3    A.  That would be my assumption.
4    Q.  Relating to the process that was used in 1999
5  and 2000, to remove voters, does that appear to be the
6  subject of the meeting?
7    A.  Suggestions for the next mailing.  I don't
8  know if it was '99 or 2000, she was anticipating
9  another mailing.
10    Q.  I actually only want to ask about one thing
11  in this document.  In the nonnumbered paragraph under
12  the paragraph numbered one, Ms. Watson, says, I believe
13  that more counties use the possible match listing.
14  Because they can see that the probable match list
15  contains misinformation, they do not process this list.
16  I believe the probable listing makes offices feel
17  uncomfortable and would prefer not to receive this
18  list.  Did I read that correctly?
19    A.  Yes.
20    Q.  What do you recall about that?
21    A.  I don't recall anything about that.
22    Q.  Can you tell us what are you referring to?
23    MS. TORRES:  Objection to the form.
24    MR. MINCBERG:  To the best of your knowledge.
25    THE WITNESS:  I think probably this got these

Page 159

1  reversed.  The probable is one where there is a
2  higher level of match than the possible.  What she
3  intended to say is that the possible list is the
4  one that should not be used because it is not
5  reliable as a match; therefore, it may contain
6  more errors and should not be used to identify
7  felons.
8    Q.  Do you recall Ms. Watkins or other
9  supervisors expressing that concern, as you just
10  phrased it?
11    A.  Not specifically, no.
12    Q.  Did you have any concerns about relative
13  reliability of the possible versus the probably match
14  lists?
15    A.  Not specifically between the two lists.  I
16  already discussed concerns I had with the list, whether
17  they were probably or possible.
18    MR. MINCBERG:  Let me ask the reporter to
19  mark as Exhibit 15, a document with Bates stamps
20  33895 to 33900, the first page of which states a
21  memo from you, Mr. Leahy, to the Central Voter
22  File Committee and Chairperson and members, dated
23  February 23rd 2000, Central Voter File Committee,
24  felony removal procedures.
25    (Thereupon, the Memo was marked as

Page 160

1  Exhibit No. 15.)
2    Q.  Is Exhibit 15 a letter that you sent on or
3  about the date it appears?
4    A.  Yes.
5    Q.  The first sentence refers to a recommendation
6  by you that the committee meets to discuss -- the first
7  sentence refers, does it not, now that we have some
8  experience working with the Central Voter File
9  Committee felon list, is that correct?
10    A.  Yes.
11    Q.  Then it refers to, quote, "problems we
12  encountered and possible solutions," unquote, in
13  working with that list?
14    A.  Correct.
15    Q.  What problems were you referring to?
16    A.  My assumption is what I was referring to was
17  the number of individuals who appealed and were
18  determined not to be convicted felons.
19    Q.  As you said before, you had concerns that so
20  many people who did not respond at all, there may be
21  more people who, in fact, were not convicted felons, is
22  that correct?
23    MS. TORRES:  Objection to the form.
24    MR. RESTREPO:  Objection to the form.
25    THE WITNESS:  I don't know if that is what I

Page 161

1  was referring to in the memo.  That is a true
2  statement.
3    Q.  I want to ask you about a particular item
4  number three, in this memo on the first page.  Where
5  you refer to receiving conflicting information from
6  FDLE, which indicates one day, you would be faxed an
7  appeal form indicating the voter was a felon, and the
8  next day indicating the reverse or vice versa.  Let us
9  stop there.  Is that, in fact, something that occurred?
10    A.  Yes.
11    Q.  To you in Dade County?
12    A.  Yes.
13    Q.  Can you elaborate?
14    A.  It was very infrequent, it did occur, as the
15  memo states, we received a response to an appeal form
16  that we submitted to FDLE.  One responsible person was
17  a convicted felon and the next day or shortly
18  thereafter, we would get another response from FDLE
19  that they were not a convicted felon or vice versa.
20  Conflicting information on the same individual.
21    Q.  What did you do under those circumstances?
22    A.  In those circumstances, we left the person on
23  the rolls.
24    Q.  No matter which came first?
25    A.  Correct.  Because there was no definitive

Page 162

1  answer whether a person was a convicted felon or not. I
2  had no reason to believe which a certain belief they
3  had been convicted of a felony.
4     Q.  Do you know how other supervisors utilized
5  that?
6     A.  I don't know if others got the same copy of
7  it.
8     Q.  Do you know how any of that was handled?
9     A.  No.
10       MR. TINKLER:  Objection to the form.
11       MR. RESTREPO:  Form.
12     Q.  You referred to the situation where the FDLE
13  appeal form indicated voters had their rights restored
14  but clemency said they had not?
15     A.  Yes.
16     Q.  Can you explain that?
17     A.  It was a similar situation, often times we
18  went directly to clemency, where the person indicated
19  they had rights restored, but they also sent an appeal
20  form to FDLE and they were, again, very infrequent, but
21  there were cases.  We would get conflicting information
22  where one agency would say they had a right to restore
23  it, and the other agency would say they did not.
24     Q.  In this situation, you did what?
25     A.  From the information, if either one of those

Page 163

1  was, that they had rights restored, the person stayed
2  on the roll as an active voter.
3     Q.  Referring to the first part of that
4  paragraph, let me back up.  Just talking about conflict
5  of information from two different agencies, from FDLE
6  and clemency, but the previous information to which you
7  are referring, one day, you would get the appeal form
8  from Dade County indicating the voter was a felon and
9  the next, the opposite.  Both came from the same
10  agency, is that correct?
11     A.  That is correct.
12     Q.  Did you ever get an explanation as to why it
13  happened?
14     A.  I asked the question.  I don't recall whether
15  I got an answer or not.
16     Q.  Pull back Exhibit 11, if you would for a
17  moment that we marked, the May 8, 2000, memo from the
18  Central Voter File Committee.  Turn, if you would, to
19  33919, Recommended Procedures for Individuals Allegedly
20  Convicted in Another State.  Do you see that?
21     A.  Yes.
22     Q.  Did you draft that section, as well?
23     A.  Yes.
24     Q.  As I understand it, the procedure that you
25  recommended was that if someone on the Central Voter

Page 164

1  File Committee felon list from the State was indicated
2  as having been convicted in the State, you would then
3  mail them a letter telling them they needed to submit
4  one of two different kind of documents in order to
5  remain eligible to vote, is that correct?
6     A.  That is what this procedure in this document
7  recommended.
8     Q.  Did you, in fact, follow that procedure?
9     A.  No.  I believe, if memory serves me
10  correctly, that I amend that procedure to use the
11  affidavit.
12     Q.  That is a very good point.  I think we
13  might -- I will ask you to also have out, newly marked
14  Exhibit, which will be Exhibit 16, which is a memo from
15  you to Supervisors of Election, dated May 17, 2000
16  entitled Revised Procedures, Central Voter File Felon
17  List.
18       (Thereupon, the Memo was marked as
19  Exhibit No. 16.)
20     Q.  This Exhibit 16 is a memo that you sent on
21  the date it was prepared?
22     A.  Yes.
23     Q.  Now, does that document refer to what we were
24  talking about just a few minutes ago, the procedure to
25  permit affidavits under some circumstances for people

Page 165

1  allegedly convicted in other States?
2     A.  Yes.
3     Q.  Referring to the first paragraph on the first
4  page for a minute, you say to other supervisors, quote,
5  "if your list is like mine, you have a large number of
6  voters who allegedly were convicted of a felony in
7  another State.  In fact, it appears that convicted
8  felons in Texas are required to move to Florida after
9  completion of their sentence."
10     Do you see that?
11     A.  Yes, I do.
12     Q.  Can you explain to us what you mean by that
13  paragraph?
14     A.  That there were a large number of individuals
15  on the list, the 2000 list had been convicted in Texas.
16     Q.  Then, turning to the second page of Exhibit
17  16, Page 33905, is that a revised version of the
18  procedures for individuals allegedly convicted in
19  another State that we were looking at in Exhibit 11,
20  Page 33919?
21     A.  Yes.
22     Q.  That is the revised version that you used?
23     A.  Yes.
24     Q.  Let us use that one to go through.  When you
25  would mail in 2000 -- sorry, let me back up.

Page 166

1    This affidavit procedure that was used in
2  2000 was not used in '99, is that correct?
3    A.   That is correct.
4    Q.   Turn to Exhibit 8, it appears that Miami Dade
5  County received 717 people convicted in other States,
6  is that correct?
7    A.   Correct.
8    Q.   Those people were not affirmatively given the
9  affidavit option in 1999?
10   A.   Not by my office.
11   Q.   Back to the procedure in 2000, as I
12 understand what the procedure was with respect to
13 somebody who had been allegedly convicted of a felony
14 in another State, they had three options, looking now
15 at Exhibit 16.   One option is they could submit an
16 affidavit in which they stated under oath they had
17 never been convicted of a felony, is that correct?
18   A.   Yes.
19   Q.   The second option would be a document that
20 actually shows that their civil rights or right to vote
21 had been restored, is that correct?
22   A.   Correct.
23   Q.   By a document, talking about written
24 certificate or order?
25   MS. TORRES:   Objection to the form.

Page 167

1    Q.   What were you talking about when you were
2  referring to a document?
3    A.   It would be a document from either the Court
4  in that jurisdiction or some other official who could
5  attest to the fact they had received the right or
6  rights automatically restored.
7    Q.   A third option would have been if they
8  actually had a document from a law enforcement agency
9  or Court in another State, which said they were never a
10 convicted felon, to begin with.   That would have been
11 accepted as well, is that correct?
12   A.   This procedure doesn't call for it, I would
13 have considered it.
14   MR. MINCBERG:   I will state, for the record,
15   Exhibit 11, that actually was listed specifically
16   but why we have any dispute on that, with respect
17   to the people whose rights were restored
18   automatically in other States, sorry, let me back
19   up.
20   Q.   Do you understand that in some States, the
21 rights of felons to vote are restored automatically
22 without having to apply?
23   A.   Yes.
24   Q.   That happens as a matter of law?
25   A.   Yes.   Yes.

Page 168

1    Q.   That you can look it up in the Statute book
2  somewhere, and find out if in State X a person's right
3  to vote is automatically restored, correct?
4    MS. TORRES:   Objection to the form.
5    THE WITNESS:   Yes.
6    Q.   But at least in 2000, in order for such a
7  person to vote in Florida, they would have had to have
8  an official document of the type that you referred to
9  in order to vote, is that correct?
10   MS. TORRES:   Objection to the form.
11   THE WITNESS:   They would have to submit
12   something to us such that we knew that they have
13   rights restored, either automatically or through a
14   formal process.
15   Q.   Would it be sufficient for a felon to state
16 to you, gee, under the law in my State, my rights are
17 restored automatically, or do they have to have an
18 official document that says that, did they have to have
19 an official document that said that?
20   A.   I don't recall that situation ever coming up,
21 but if it did, it probably would have been presented to
22 me.   We could have had the ability to look up the
23 statutes in the State, and confirm if that situation
24 was true.   That situation never occurred.
25   Q.   In Dade County?

Page 169

1    A.   In my County.
2    Q.   Do you know what position the State Division
3  of Elections has taken, as to whether or not there
4  needs to be an official document, other than that
5  document?
6    MR. HARVEY:   Objection to the form.
7    THE WITNESS:   I am not aware of any
8    official -- I am not aware of any official
9    position that the State Division of Elections
10   took.
11   MR. MINCBERG:   I ask to be marked as Exhibit
12   17, and hang onto these, a memorandum from Edward
13   Kast, Assistant Director of the Division of
14   Elections, to all Supervisors of Elections, dated
15   September 21, 2000, Restoration of Civil Rights.
16   (Thereupon, Memo was marked as
17   Exhibit No. 17.)
18   Q.   Do you recall seeing Exhibit 17 before?
19   A.   Yes, it looks familiar.
20   Q.   I will ask you to look at the second page of
21 Exhibit 17, a letter dated September 18, 2000 to
22 Mr. Kast from a Ms. Janet Keels of the Office of
23 Executive Clemency.   Focusing on the second paragraph,
24 it states "any individual whose civil rights were
25 restored automatically by statute in the State of

Page 170

1  conviction, and does not have a written certificate or
2  order, would be required to make application for
3  restoration of civil rights in the State of Florida,"
4  do you see that?
5      A.  Yes.
6      Q.  I realize, again, it did not come up from
7  your County.  Based on that paragraph, would it have
8  been permissible for you to simply look at the STAT
9  books and determine if the person's rights were
10 restored or would they have had to make application for
11 restoration of rights, if they did not have a written
12 certificate or order?
13     MR. HARVEY:  Objection to the form.
14     MS. TORRES:  Objection to the form.
15     THE WITNESS:  I followed the advice of the
16 State Division of Elections.  Following receipt of
17 this letter, I would have to change my position.
18     Q.  Pursuant to this procedure, if an individual
19 was in a State where his rights were automatically
20 restored after a conviction, but did not have a written
21 certificate or order, you would not be able to keep
22 them on rolls unless that person made application for
23 it?
24     A.  Follow our procedure, that is correct.
25     Q.  As you understand it, how long does it take

Page 171

1  to make application for restoration of civil rights in
2  Florida?
3      A.  I have been told, I don't know how accurate
4  the information is, it takes approximately a year.
5      Q.  So, if there were people in January of 2000,
6  who fell into the category that we were talking about,
7  and they received notice from you that they were
8  allegedly a convicted felon sometime after January of
9  2000, and they did not have a written certificate or
10 order stating their rights were automatically restored,
11 in your view, as an Election Supervisor, with years of
12 experience, would it have been possible for them to
13 have gotten their restoration of civil rights before
14 the November 2000 election?
15     MR. HARVEY:  Objection to the form.
16     MR. RESTREPO:  Objection to the form.
17     MS. TORRES:  Objection.
18     THE WITNESS:  This letter was not received
19 until September 21.  If anyone received notice in
20 June or before September, and sent my office
21 information that their rights were restored
22 automatically, they would have been reinstated.
23 They would not have been removed from the rolls.
24     Q.  As I understand, that did not happen, as you
25 recall, in Miami Dade in 2000?

Page 172

1      A.  Correct, to the best of my knowledge.
2      Q.  Let us assume for the moment then, that in
3  another County, the situation we have talked about,
4  assuming for a moment that the procedure in this
5  September 2000 letter was followed throughout 2000,
6  based on your experience as an Election Supervisor, an
7  individual, in that circumstance, can you see any way
8  it would have been possible for them to have been
9  notified after January of 2000, they were not going to
10 be allowed to vote and not having a written search
11 order, can you see any way such a person could have had
12 their rights restored by November 2000.
13     MS. TORRES:  Objection to the form.
14     MR. HARVEY:  Objection to the form.
15     MR. RESTREPO:  Objection to the form.
16     MR. TINKLER:  Same.
17     MR. MAC INNES:  Same.
18     THE WITNESS:  I don't know.  I was told it
19 says -- I don't know what the actual time frame
20 is, whether it differs from individual to
21 individual, depending upon the circumstances of
22 their conviction and completing of the sentence, I
23 can't answer that question.  I don't have
24 knowledge to answer it.
25     MS. TORRES:  Objection.

Page 173

1      MR. HARVEY:  Objection.
2      MR. RESTREPO:  Objection.
3      MR. TINKLER:  Objection.
4      Q.  You referred to the September 2000, date of
5  the letter, as you understood it, was procedure,
6  different for the States with automatic restoration of
7  right before September 2000?
8      A.  If they were following the procedure, which I
9  drafted as a recommendation procedure, yes, it was.
10     Q.  In what respect?
11     A.  That we would accept information from a
12 person whose rights were automatically restored without
13 requiring them to get the rights restored through
14 Florida process.
15     Q.  In fairness, going to the Exhibit, it does
16 say that someone could get a written certificate or
17 order under those circumstances, does it not, referring
18 to Exhibit 17, second paragraph?
19     A.  That is correct.
20     Q.  So, really, it is consistent with what you
21 were talking about?
22     MR. TINKLER:  Objection to the form.
23 BY MR. MINCBERG:
24     Q.  Is that correct?
25     A.  In my drafting the procedure -- in my drafted

Page 174

1    recommended procedure, it simply asked for a document.
2    It did not ask for a written search order.  This is
3    more specific than my procedure that I drafted as a
4    recommendation.
5        Q.  But the part of this letter in Exhibit 17, it
6    is the suggestion that if they did not have a written
7    order or some other official document, they would have
8    to make application for restoration of civil rights in
9    the State of Florida, do you know whether that was a
10   different procedure than it was prior to September
11   2000?
12       MS. TORRES:  Objection to the form.
13       THE WITNESS:  I don't know that any
14       supervisors -- certainly, I did not know that this
15       procedure existed until this letter was previously
16       received.
17       Q.  Did you have any reaction when you received
18   this letter and saw that procedure listed?
19       A.  My reaction, if I remember correctly, I was
20   concerned about the learning curve that we were going
21   through as we were finding out information about the
22   felony clemency process as we are moving through this
23   process.  We were learning new information as time
24   passed that we did not have in the prior years.
25       Q.  Let us go back to Exhibit 16, people

Page 175

1    allegedly convicted in another State.  Do you see that?
2        A.  Yes.
3        Q.  I want to direct your attention to paragraph
4    labeled B, to the last sentence.  It says, I quote,
5    "even if they do not lose their right to vote upon
6    conviction of a felony, they must still apply to have
7    their rights restored in Florida."  Do you see that?
8        A.  Yes.
9        Q.  Can you explain that?
10       A.  Well, this is information which I received
11   from the Office of Executive Clemency.  That office or
12   a representative of that office was involved in several
13   of the meetings of Central Voter File Committee that we
14   had also in the Division and FDLE.  Certainly, I relied
15   upon the Office of Executive Clemency to provide
16   information on that process.
17       Q.  The information they provided you, just to be
18   sure I understand this, said that if an individual is
19   convicted in another State, State X, they don't lose
20   their right to vote in State X by virtue of that
21   conviction, they are in Florida, and they, nonetheless
22   would have to apply to have their right to vote in
23   Florida?
24       A.  At the time I drafted this procedure, that
25   was my understanding, based on information received

Page 176

1    from the Office of Executive Clemency.
2        Q.  Did there come a time where that changed,
3    where you received different instructions from the
4    Division of Elections of the Office of Executive
5    Clemency?
6        A.  Yes.
7        Q.  When was that?
8        A.  I don't recall.
9        Q.  Was it after the November 2000 elections?
10       A.  I don't recall again.
11       Q.  We will have to use one more document then.
12       MR. MINCBERG:  Mark this February 23, 2001,
13   letter, again, to Mr. Kast from Ms. Keels.  This
14   has a cc to the Supervisors of Elections.
15       (Thereupon, Document was marked as
16   Exhibit No. 18.)
17       Q.  Do you see that?
18       A.  Yes.
19       Q.  Do you recall getting that letter?
20       A.  Yes.
21       Q.  Referring to the second paragraph, it states,
22   among other things, that if a person's civil rights
23   were never lost after being convicted of a felony in
24   another State, the individual possesses his or her sole
25   right in Florida and need not apply for restoration of

Page 177

1    civil rights in Florida, is that correct?
2        A.  That is what that memo states, yes.
3        Q.  Was that the time that the change occurred in
4    the procedure we talked about a moment ago?
5        A.  This was our notification that the
6    information previously provided was sent out to
7    supervisors was incorrect.
8        Q.  So that in the year prior to the November
9    2000 election, if an individual never lost their civil
10   right in the State in which they were convicted, they
11   nonetheless would have had to apply to have their right
12   to vote restored in Florida, is that correct?
13       MS. TORRES:  Objection to the form.
14       MR. MAC INNES:  Objection to the form.
15       MR. TINKLER:  Objection to the form.
16       MR. RESTREPO:  Objection to the form.
17       MR. HARVEY:  Objection to the form.
18       THE WITNESS:  Based on my letters that went
19   out, that would have to be included, yes.
20       Q.  But after the November 2000 elections, that
21   was no longer the case, is that correct?
22       MS. TORRES:  Objection to the form.
23       THE WITNESS:  After the November 2000
24   elections, after February 23, I had new
25   information, which no longer required someone to

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

45 (Pages 174 to 177)

Page 178

1     apply to have the rights restore in Florida. If
2     their rights had been restored in another State,
3     or they never lost their rights.
4     Q.   You -- and part of the next question, the
5     same February 23 memo states that a person need not
6     apply if a former felon's civil rights were restored in
7     another State. Do you see that statement in that
8     paragraph?
9     A.   Repeat the question.
10    Q.   The February 23 letter says if a former
11    felon's civil rights were restored in another State,
12    they need not apply for restoration of civil rights in
13    Florida, is that correct?
14    A.   Yes.
15    Q.   As you understand it, did that apply to
16    people whose rights were automatically restored in
17    another State?
18    A.   If they were restored in other States,
19    whether automatic or through a process, that means the
20    same thing, they were restored.
21    Q.   I will try to do this without a document. We
22    will do the best we can.
23         Have you been involved in putting together
24    materials and information relating to what now is being
25    called the Central Voter Database in Florida?

Page 179

1     A.   Yes.
2     Q.   With respect to felons, in particular, is it
3     your understanding that you will be asked in advance of
4     the 2002 elections to remove voters based solely on
5     convictions in Florida or also with respect to
6     convictions outside of Florida?
7     A.   It is my understanding that a list or
8     information received of potential felons is only those
9     convicted in the State of Florida.
10    Q.   Can you tell us, to the best of your
11    understanding, why that change was made?
12    A.   In discussions with the Director of the State
13    Division of Elections, he wanted to ensure, to the best
14    of his ability, that we are only provided very
15    reliable information of people that were actually
16    convicted of felonies and had not had their rights
17    restored. To the best of his ability, he did not want
18    to provide us with information on people not convicted
19    of a felony.
20         He is relying on our ability, of FDLE's
21    ability to where there is challenge and appeal, that we
22    would be able to check the records or FDLE and would be
23    able to check the record to make a determination as to
24    whether a person had been convicted of a felony or not.
25    That is not something that can be done easily, if at

Page 180

1     all, from convictions committed in other States.
2          The Division Director wants to slowly move
3     into the process of identifying registered voters who
4     are felons. He wants to take a small bite of the apple
5     and he made a decision to start out slow.
6          By slow, not dealing with felons outside of
7     Florida. I don't know if he will make that decision or
8     whether that decision will be made the by Division of
9     Elections. Also, he set a very high criteria of
10    matches that are submitted to the supervisor as
11    potential matches.
12    Q.   By high criteria, you mean what?
13    A.   It has to be virtually a perfect match in
14    terms of Social Security information, date of birth,
15    name matches for us to receive that potential hit.
16    Q.   As I understand it, a higher or more exacting
17    criteria than used in 1999 and 2000?
18    A.   I don't know about criteria used in '99 and
19    2000.
20    Q.   By the State?
21    A.   By the State. I only -- he has stated a very
22    high level of criteria. I can't remember. We do not
23    get to the extent of the possible miss matches.
24    Q.   By he, who are you referring?
25    A.   Clay Roberts.

Page 181

1     Q.   With respect to people who were removed from
2     the rolls from 1999 and 2000 from out of State, has
3     Miami Dade County made any efforts to identify people
4     who may have been improperly removed?
5          MS. TORRES: Objection to the form.
6          THE WITNESS: We have not done any additional
7          mailings to these individuals. Certainly, if one
8          of the individuals who believes they were
9          improperly removed contacted my office, we do that
10         research.
11    Q.   You have not made any affirmative efforts in
12    that regard, is that a fair statement?
13    A.   That is a fair statement.
14    Q.   In terms of, as I understand it, what is
15    going to happen under this new system, the Central
16    Voter Database, will there be an Internet based system
17    under which all voter information will be available to
18    you in your office at the touch of several buttons?
19    A.   Yes.
20    Q.   As I further understand it, there will not be
21    discreet mailings at a particular period of time of
22    potential ineligible voter, but regular refreshing of
23    that database, is that correct?
24         MS. TORRES: Objection to the form. I did
25         not understand. If the witness did, that is fine.

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

46 (Pages 178 to 181)

Page 182

1    Q.  Did you understand the question?
2    A.  Yes.
3       MR. MINCBERG:  Can he answer without
4    objection?
5       MS. TORRES:  He can answer, if he understands
6    the question.
7       MR. MINCBERG:  Was that the only basis?
8       MS. TORRES:  Yes.
9       THE WITNESS:  The database will be refreshed
10   on a daily basis with information from the six, o
11   seven counties.  Where we have changes in
12   registration, new registered voters, that will be
13   updated on a daily basis, so that the database
14   will be refreshed for that purpose on a daily
15   basis.  The thing I don't know is how often
16   information from the FDLE will be updated from the
17   Supervisor of Elections on a daily basis.
18   Q.  If I were to suggest that the Department had
19   felony information on a monthly basis, would that sound
20   correct?
21   A.  Again, I don't know how often they would
22   download information from Vital Statistics.  From th
23   duplicate list, that would be basically each County
24   uploading their information.  That is where you get
25   duplicates from.  The deceased and felon information

Page 183

1    depends upon how often it is updated from those two
2    other databases.
3    Q.  Let us start with potential felony removals,
4    what is your understanding of what the criteria will
5    be?
6    A.  Again, other than a very high level of match,
7    we have not received our first pair of matches yet.  I
8    have been through training, I have seen the system work
9    as to how the information is received by us and in what
10   format.  But the level of what is used to determine a
11   match significant enough to send it to me to look at, I
12   don't know what that criteria is.
13   Q.  Now, as you understand the process, how often
14   should the supervisor be checking this database to
15   determine if there are people that should be removed?
16   A.  On a daily basis.
17   Q.  Is it up to them to decide, literally,
18   whether to do it on a daily or weekly or monthly basis
19   or is there some method of checking on it under the new
20   system?
21      MR. TINKLER:  Objection to the form.
22   A.  I don't think there was anything that
23   requires us to do it within a certain time frame, but
24   the information will be available to us on a daily
25   basis, new information.  I can't speak for other

Page 184

1    supervisors.  I intended to work on this on a daily
2    basis.
3       For example, with respect to felonies and
4    death information, you may not get new information on a
5    daily basis.  So, with respect to those matches, you
6    might nonetheless check it every day or based on when
7    new information is being provided.  We would check and
8    see what new information is provided on a daily basis.
9       It may be, although FDLE has not been updated
10   in three weeks.  If we have a new registered voter who
11   was in the existing system as a convicted felon, we
12   could get that hit on that individual.  We could be
13   getting felony information on a daily basis.  It is not
14   likely to get it on a daily basis, but if the FDLE
15   listed it on the database as deceased, ten it is likely
16   you would get a new registration for that individual.
17   If you do, you could go to the fraud section to check
18   that out.
19   Q.  Gotcha.  As I understand, there remains some
20   uncertainties in Florida about the process to be
21   followed after you determine that there is an alleged
22   felon and you send out notification of an
23   administrative hearing on that for this year?
24      MR. TINKLER:  Objection to the form.
25   Q.  Is that correct?

Page 185

1    A.  There is an existing law which was adopted by
2    the legislature, signed by the Governor in 2001 and pre
3    cleared by the Justice Department.  There is a revision
4    to that law, which was passed, by the way.  The
5    Governor signed it, but it has yet to be cleared by the
6    Justice Department.
7    Q.  As you understand it, under the existing law,
8    that has been pre cleared by the Justice Department
9    post November 2000, what is the process supposed to be
10   when you mail out an administrative notice to an
11   alleged felon that their rights may be removed to vote?
12   A.  If they respond with that appeal form or
13   attend an administrative hearing, at which time an
14   appeal form will be generated, and that appeal form
15   will be either worked by the Supervisor of Elections or
16   FDLE.  And the best way to determine, based on what I
17   have been told by FDLE, whether someone is a convicted
18   felon or not, is to go to the Clerk of the Circuit
19   Court's records to determine whether this person was
20   convicted of a felony, based on those records.  You
21   still have to go to clemency, if there was question
22   regarding whether they had their civil rights restored.
23      The process, as has been discussed, where it
24   is a single conviction in the County of the supervisor
25   who is working that hit, that the supervisor's office

Page 186

1  would be the one to work with the Clerk's Office, but
2  multiple convictions or convictions that occurred in
3  another County, that appeal form will be sent to the
4  FDLE.
5       If it is determined that the person is a
6  felon, has not had their rights restored, then another
7  certified letter would go to that individual with that
8  State informing them that they would be removed from
9  voter registration rolls.
10      The law is silent. My procedure would be if
11 they were determined to be not a felon or had their
12 rights restored, we would provide similar notification
13 to that individual. The law is silent, speaking about
14 current law on what happens if there is no response to
15 either the certified mailing or the administrative
16 hearing notice, the assumption being that there would
17 be no further action taken. Anybody that did not
18 respond would remain an active registered voter.
19      Q. Is it correct that you have supported the
20 change that was approved by the legislature, but not
21 yet approved by the Justice Department, that under
22 those circumstances, where a person does not respond,
23 they should be removed from the rolls?
24      MS. TORRES: Objection to the form.
25      THE WITNESS: Yes.

Page 187

1       MS. TORRES: Could you rephrase the question?
2  I misunderstood the question.
3       MR. MINCBERG: If you withdraw your objection
4  in light of the witness's answer, do I need to
5  work on rephrasing it?
6       MS. TORRES: Repeat it.
7       (The question referred to was read back by
8  the court reporter)
9       MS. TORRES: No objection.
10      Q. Is it also fair to say, Mr. Leahy, that some
11 of your fellow supervisors don't agree with your
12 position?
13      MR. TINKLER: Objection to the form.
14      THE WITNESS: Do I answer?
15      Q. Yes.
16      A. I am aware of one supervisor who has written
17 to the Justice Department recommending that new
18 provision of the law not be pre cleared.
19      Q. You are referring to Pam Iorio of
20 Hillsborough County?
21      A. Yes.
22      Q. What is your understanding of her position on
23 that?
24      A. My understanding is, she is concerned about
25 people that are sent certified mail or have their name

Page 188

1  public in the newspaper for not getting notice, and
2  their names would be removed from the rolls.
3       Q. And as you understand, does that also include
4  a concern that the new law would put a presumption or
5  the burden on the voter, in that respect?
6       MR. TINKLER: Objection to the form.
7       THE WITNESS: There would be a burden on the
8  voter to appeal if the information was not
9  correct, yes.
10      Q. In any event, as of the point until and
11 unless the Justice Department does pre clear the
12 statute, the procedure will be that if a person does
13 not respond to the notification with respect to the
14 felony conviction, their name would remain on the
15 rolls, is that correct?
16      MR. TINKLER: Objection to the form.
17      MR. MINCBERG: What is your objection?
18      MR. TINKLER: It is not solely a method of
19 pre clear.
20 BY MR. MINCBERG:
21      Q. Let me rephrase that.
22      Is it your understanding that unless and
23 until the new statute at that time is pre cleared, that
24 the procedure in Florida will be that if an individual
25 is notified of possible removal from the rolls because

Page 189

1  of a felony conviction and does not respond, that
2  person's name will remain on the rolls?
3       A. That is my understanding of the current law.
4       Q. The last area I want to cover with you, if I
5  could, Mr. Leahy, relates to election day
6  administration, some of which we talked about a little
7  bit before. About how many precincts all together?
8       A. 617, of which 614 have registered voters.
9       Q. Of those, can you tell us approximately how
10 many are more than 50 percent African American?
11      A. Not without looking at the data in my office.
12      Q. If I were to suggest, having looked, that the
13 number is in the vicinity of 120, would that sound
14 about right?
15      A. Approximately, twenty percent of the
16 registered voters in Miami Dade are black. My guess is
17 twenty percent of the precinct, probably, would be
18 black. That is all I would make an assumption along
19 those lines.
20      Q. On election day, how do poll workers at the
21 precincts verify that a person is entitled to vote?
22      A. They are provided with a precinct register,
23 which contained the names of all active and inactive
24 registered voters whose registered addresses falls
25 within that particular precinct.

Page 190

1    Q.  Focus on November 2000 elections.  What
2  identification, if any, did your staff require of
3  people attempting to vote in those elections?
4    A.  They are required, under statute at that
5  time, to show identification, which includes picture or
6  -- and signature.  We are allowed two different types
7  of IDs, if one had a picture, and the other had a
8  signature, as long as we had both, or there is a
9  requirement that the voter sign an affidavit, which we
10  call a Ballot Table Affidavit without identification.
11    Q.  Such an affidavit would state what?
12    A.  It is pursuant to State law, stating that I
13  am who I am stating I am.
14    Q.  Is that the only circumstance under which
15  people voted in 2000, by affirmation or affidavit when
16  they did not have ID?
17    A.  That is if they did -- the law is clear, if
18  they did not have a required picture ID with a
19  signature, they are required to sign a Ballot Table
20  Affirmation, we call it, in order for them to be
21  eligible to vote.
22    Q.  A person does not need to have their voter
23  registration card in order to vote?
24    A.  A registration card is not necessary at all
25  on election day in order to vote at the polling place.

Page 191

1    Q.  Were there people who voted by affirmation or
2  affidavit in November of 2000?
3    A.  Yes.
4    Q.  Can you tell us approximately, how many?
5    A.  I never counted the number of affidavits.  I
6  have seen them come in, so I know that process was
7  used.
8    Q.  Would it have been in the hundreds or
9  thousands?
10    A.  I can get it for you.
11    Q.  A best estimate would be useful.
12    A.  Certainly hundreds.
13    Q.  Do you have any information as to the racial
14  breakdown of the people that voted by affirmation and
15  affidavit?
16    A.  No.
17    Q.  Is such information available?
18    A.  Well, no, it is not available.  It could be
19  ascertained by taking each affirmation and going to the
20  registration rolls, finding out the ethnicity of those
21  individuals and adding them up.  That has not been
22  done.
23    Q.  Let us talk for a moment about training.  We
24  may be able to shorten this if I can find it by looking
25  at your interrogatory answer where you discussed poll

Page 192

1  worker training.  Set number two, which is Exhibit 3.
2    Am I correct that your response to
3  interrogatory four on Pages 5 to 6 discusses training
4  provided for poll workers prior to November 2000?
5    A.  Yes.
6    Q.  Who performs the training that is referred to
7  on Page 6 of Exhibit 3?
8    A.  These are seasonal employees that we bring in
9  that are trained on whatever the techniques are and the
10  law and procedures and then they, in turn, conduct
11  classes for poll workers, seasonal, two type routine
12  training.  One is a trainer, the other is assistant
13  trainer or clerk that assists the two that are involved
14  in training.  One is a considered a person who does the
15  training, the other one assists.
16    Q.  We all know hindsight is 20/20.  Looking back
17  now to the November 2000 elections, is there additional
18  training, in your view, that would have been useful to
19  poll workers in the November 2000 elections?
20    MS. TORRES:  Objection to the form.
21    THE WITNESS:  It is difficult to know whether
22  or not additional training would have changed
23  anything.  We did training on all the procedures
24  required at the polling place, all the law, all of
25  the affidavits, machinery, how to conduct

Page 193

1  elections in polling places.  That was covered
2  during that two hour period.  I can't sit here
3  today and tell you if we stretch it over a three
4  hour or four hour period, that the poll workers
5  would have learned anything additional.
6    Q.  Now, staying with our interrogatory here,
7  answer number three refers to the determination of the
8  number of poll workers assigned to each precinct on
9  November 7, 2000.
10    A.  Yes.
11    Q.  Do you see that?
12    A.  Yes.
13    Q.  In your view, if you had additional poll
14  workers available, would it have helped in November of
15  2000?
16    MS. TORRES:  Objection to the form.
17    THE WITNESS:  The only additional poll
18  workers, in hindsight, would have helped, there
19  would have been a demonstration inspector whose
20  sole job it would have been to demonstrate the
21  voting system.
22    Q.  There were some occasions in November of
23  2000, were there not, when poll workers needed to get
24  information that they did not have right at the
25  precincts in order to determine whether or where a

Page 194

1  person could vote, is that correct?
2      A.  That is correct.
3      Q.  For example, that would have happened if a
4  person's name was not on the list spelled the same way
5  that they, in fact, spelled it, correct?
6      A.  Well, if their name was not on the list as
7  determined by the poll worker, who was working that
8  list, then a call would have been made to my office to
9  determine whether or not that person was entitled to
10  work and where they were entitled to vote.
11      Q.  For purposes of making those calls, referring
12  to interrogatory five on Pages 6 to 7, as I understand
13  it, you had a hundred phone lines available for you to
14  receive calls from people at precincts, and was that
15  for any other purpose?
16      A.  Those one hundred phones were a network
17  designed solely to receive calls from precincts.  We
18  had another network to receive other types of calls.
19  These one hundred phones were not receiving calls other
20  than from the precincts.
21      Q.  Were these busy all day long?
22      A.  Yes.
23      Q.  As you understand it, there were times that
24  the precinct workers could not get through to Central
25  Headquarters?

Page 195

1      A.  Yes.
2      Q.  If they could not get through to Central
3  Headquarters, would there be any assistance that would
4  be provided to them from having a laptop computer?
5      A.  Yes, if there was a laptop computer with
6  registration records on it, a determination could be
7  made as to whether a person was eligible to vote, and
8  where they were without the necessity to call my
9  office.
10      Q.  18 precincts had those laptops, is that
11  correct?
12      A.  Yes.
13      Q.  Of those 18 precincts, one was predominately
14  black, is that correct?
15      A.  Correct.
16      Q.  I want to turn a minute to your testimony
17  before the Civil Rights Commission, again Exhibit
18  Number 7.  I ask you to turn to Pages 328 and 329.
19  You see your testimony begins at the bottom of 328?
20      A.  Yes.
21      Q.  It extends on to 329?
22      A.  Yes.
23      Q.  I want to ask you to take a look at the
24  second full paragraph on Page 329, do you see that?
25      A.  Yes.

Page 196

1      Q.  You are referring to the November 2000
2  election, is that correct?
3      A.  The second paragraph.
4      Q.  I see.  In the beginning "I found errors."
5  Getting the time frame set you are talking about in
6  this paragraph, about the November 2000 election?
7      A.  Yes.
8      Q.  You state, I quote, "I found errors that my
9  staff made and turned people away because there was
10  some communication problem.  They said the poll worker
11  said quote, this is the original.  Your name isn't on
12  the precinct register.  The name was spelled wrong,"
13  end quote.  "My staff looked it up.  The person was
14  turned away.  In fact, they were registered workers,"
15  end quote.
16      Did I read that accurately?
17      A.  Yes.
18      Q.  Is that what you testified to at the Civil
19  Rights Commission?
20      A.  Yes.
21      Q.  I realize it is something that you, as a
22  supervisor, can never get a complete answer to, but let
23  me, nonetheless, ask for your best estimate on this
24  question.  Do you have an estimate as to how many times
25  these kind of errors referred to in this paragraph

Page 197

1  occurred in Dade County in November of 2000?
2      A.  No.
3      Q.  Do you think it was more than one hundred?
4      A.  I don't have an estimate.
5      Q.  One way or the other?
6      A.  None.
7      Q.  I do want to ask you about one situation
8  where I think you indicated such an error may have
9  occurred.  I will ask it to be marked as Exhibit 19.  It
10  is Bates stamped 33889 to 33104.  This is a letter from
11  David C. Leahy to a Donnise DeSouza of February 13,
12  2001.
13      Do you recall looking into the situation with
14  Ms. DeSouza?
15      A.  Yes.
16      Q.  Is this one instance of one the of the errors
17  you were referring to in the Civil Rights Commission
18  testimony?
19      A.  It was not a communications problem.  It was
20  a problem where a poll worker was not looking in the
21  right part of the alphabet and had they done that, they
22  would have found her name.  This can occur where you
23  have a space in the last name, and it did occur in this
24  instance.
25      Q.  Because, as you say, the name DeSouza with a

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

Page 198

1   space between the De and the rest of the name is listed
2   alphabetically and it is that same things without the
3   space, correct?
4       A.  Correct.
5       Q.  Did you learn of other instances where
6   similar problems occurred in the November 2000
7   election?
8       A.  I don't recall right now any specific
9   instance.
10      Q.  I will get to one of those in a minute. There
11  are one or two of things, Ms. DeSouza's letter is one
12  of the things she complains about is that after a
13  person could not find her name on the register, she was
14  directed to a line of about 15 people, who she states
15  had a similar problem.  She states she got into that
16  line before 7:00 o'clock, correct?
17      A.  Yes, she does.
18      Q.  Then she states that when the clock struck
19  seven, she and others were told that, polls were
20  closed, she was not going to be able to vote.
21      A.  Yes.
22      Q.  She did not vote in November 2000, correct?
23      A.  No.
24      Q.  Now, did the poll worker handle that
25  situation correctly, should they have processed people

Page 199

1   that had gotten in line before 7:00 o'clock?
2       A.  There are two types of lines, one is a line
3   of people who are waiting to get into the polling
4   place.  That is not the line she is referring to here.
5   She is referring to a line of people that have voter
6   problems.
7       Q.  Who had been in line to get up to try to
8   vote?
9       A.  Correct.  It has been determined there is a
10  problem that needs to be resolved.  She was in that
11  line.  No, it was not handled properly.  The phone bank
12  operated well past 7:00 o'clock, until we no longer get
13  any calls.  So, there would have been the ability for
14  the precinct clerk to have gotten through at the later
15  time beyond 7:00 p.m.
16      Q.  Basically, all the 15 people that were in
17  line with her, who got in line before 7:00 o'clock,
18  should have been able to have had their problems
19  resolved?
20      A.  If there were 15 people.  Based on her
21  assertion, if her assertion is correct, yes.
22      Q.  How would that situation be handled in this
23  coming election in November of 2002?
24      A.  In November of 2002, there will be laptop
25  computers in each polling place.  They will be operated

Page 200

1   by a representative of me, which may be County
2   employees, municipal employees.  We are still working
3   on who these individuals are.  Working with the
4   municipalities and County Manager's Office to identify
5   these individuals, but we have already identified where
6   we are getting laptop computers from.
7           In this type of instance, where someone has a
8   voter problem, where a determination needs to be made,
9   one, if they are registered and where they vote, the
10  process will be for the information to be looked up on
11  that laptop computer.  We have used this system since
12  2000, November 2000 in small municipal elections.  For
13  the last year and one-half, it has worked extremely
14  well.  We are able to resolve 90 percent of the voter
15  problems using laptop computers.
16          One of the advantages is that it avoids
17  communication problems because you now have instant
18  voter identification in almost every instance, because
19  the person with the laptop can use it to actually type
20  in the name, and find that voter on the voter
21  registration rolls.  You are not dealing with different
22  people who have spelled this name somewhere along the
23  line, and may have spelled it incorrectly.
24          We will still have a network in my office as
25  a backup to the laptop, should the laptop not work or

Page 201

1   should there be a question that could not be resolved
2   using the laptops.  These will be staffed by my own
3   employees answering phones, and we'll have
4   computer terminals to look up the information.
5           Another backup will be provisional ballots.
6   The provisional ballots will still be available, should
7   a determination be made either by the laptop or by my
8   network staff.
9       Q.  To the provisional on the computers to which
10  you referred, will those be in precincts in 2003, and
11  the 2004 election?
12      A.  All I can tell you, that is my plan, my
13  desire to do so.  I don't control the County budget.  I
14  have a boss who will make decisions as to the budget
15  that I have to use in terms of sources.  I can tell you
16  my current boss, I assume -- there is no reason to
17  assume he wouldn't be fully supportive of having
18  laptops in polling places to the extent we were using
19  probably upwards of 500 County employees for this
20  purpose, taking them away from regular duties.  He is
21  fully supportive of that process.  I believe we will
22  have them in the future in all elections, but I don't
23  control those decisions.
24      Q.  They will be dependent on finances?
25      A.  That is certainly one of the conditions for

Page 202

1　having them out there. A determination has not yet
2　been made beyond this year where we will get laptops.
3　　　Q. These are not laptops that you are
4　purchasing?
5　　　A. The County is purchasing them, but they are
6　being purchased for the Police Department. They
7　accelerated the purchases of those computers. We would
8　have the use of 600 of them this fall. Speaking with
9　my budget office, a determination will be made whether
10　to lease or purchase laptops for our use in the future,
11　if economically feasible.
12　　　Q. For that November, you are, essentially,
13　borrowing the laptops from the Police Department?
14　　　A. Yes.
15　　　Q. Any reason that you have been indicating why
16　you could not continue to do that in the future?
17　　　A. Police officers, once they are assigned these
18　PCs, would like to continue to use them on a daily
19　basis. If we were to use them for elections, you are
20　talking about a good month, a couple of weeks before
21　and after, when these laptops would not be available to
22　them.
23　　　Q. Returning to Exhibit 19, your letter to
24　Ms. DeSouza, you referred to parking problems at many
25　polling places, do you see that?

Page 203

1　　　A. Yes.
2　　　Q. You indicate in many polling places, parking
3　is, in fact, inadequate, which creates problems, is
4　that correct?
5　　　A. Yes.
6　　　Q. Unfortunately, do you not expect the
7　situation to improve, is that correct?
8　　　A. That is correct.
9　　　Q. Is the parking problem a problem in -- you
10　mentioned here that it is a problem in the areas of
11　south and west Miami. What about in predominantly
12　African American areas, is it a problem there, a
13　problem in parking through the County?
14　　　A. Some facilities have adequate facilities,
15　other polling places do not or because of the type of
16　facility we were using, the parking available is used
17　not only by poll workers and workers, but other people
18　who use that facility on a daily basis. We do use more
19　churches, it appears, in black precincts. Normally,
20　churches, on Tuesday, are not used for other
21　activities, for service; therefore, you have more
22　likelihood that the parking would be available than at
23　other polling place locations, such as schools, which
24　are used on a more frequent basis in other parts of the
25　County.

Page 204

1　　　Q. We talked before with respect to
2　Ms. DeSouza's problem of the spelling of the name
3　because of the space, one part of the name on the
4　other, do you recall that?
5　　　A. Yes.
6　　　Q. Do you recall that problem coming up, for
7　example, with respect to a voter name Dedrana McCray?
8　　　A. The name's familiar.
9　　　MR. MINCBERG: Let me ask you to mark as
10　Exhibit 20, a document concerning Dedrana McCray.
11　　　MS. TORRES: For the record, it is a
12　declaration of Dedrana McCroy.
13　　　MR. MINCBERG: It is not clear to me. It
14　says McCroy, depending if that middle wiggle is an
15　O or an A. We will let the document speak for
16　itself on that.
17　　　MS. TORRES: Will do.
18　　　(Thereupon, Documents were marked as
19　Exhibit Nos. 19 & 20.)
20　　　MR. MINCBERG: I take it, we can agree when
21　she printed her name on the second page, it is
22　clear it is McCray.
23　　　MS. TORRES: As I stated earlier, on the
24　second page, it is printed by someone with an A.
25　　　Q. Do you recall whether you happen to have seen

Page 205

1　this particular declaration of complaint before?
2　　　A. The name is familiar. I don't recall -- I
3　don't remember if I saw this particular two pieces of
4　paper, but the name does ring a bell.
5　　　Q. Under item five, when she discusses the
6　difficulty she had, she states that she was not allowed
7　to vote, and she was not offered the opportunity to
8　sign an affidavit, although she furnished a voter ID
9　card and photo identification. Do you see that?
10　　　A. Yes.
11　　　Q. She states that the clerk did not allow her
12　to vote because her name was not on the voter roll. Do
13　you see that?
14　　　A. Yes. Yes.
15　　　Q. As you understand the procedures on election
16　day, in your experience, what could have been
17　responsible for that determination by the poll worker.
18　　　A. Could have been several. Her name may have
19　been in the precinct register, but the poll worker was
20　unable to find it, as in the case of Ms. DeSouza, if an
21　individual's name was not in the precinct register for
22　some reason. She had a voter ID card, and at some time
23　she was a registered voter. But we don't know whether
24　or not she was removed for some reason, she was not a
25　registered voter, or again, if the poll worker could

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

52 (Pages 202 to 205)

Page 206

1  not find her name.  Were the most likely scenarios.
2      Q.  I have a couple of other written complaints
3  that were produced by your attorneys to us.  Again, to
4  state for the record, we did not find it in the
5  records, you produced anything reflecting what, if any
6  action, the County took to investigate the claim?  That
7  is why I am asking you about them.  There are a lot of
8  others.  Did you make an attempt to investigate -- I am
9  not going to go through all of those.
10     MR. MINCBERG:  I will ask to mark as Exhibit
11  21, a letter dated December 1, 2000 to you,
12  Mr. Leahy, from a Susan J. Cheaney.
13     (Thereupon, the Letter was marked as
14  Exhibit No. 21.)
15     Q.  Do you recall receiving Exhibit 21?
16     A.  It looks familiar, yes.
17     MR. MINCBERG:  For the record, the letter is
18  written by someone who volunteered to work in a
19  polling place on election day in Dade County.
20     Q.  That is what it says, is that correct?
21     A.  Yes.
22     Q.  Do you have any reason to dispute this person
23  worked as a poll worker on that date?
24     A.  I don't have any information that she did
25  not.

Page 207

1      Q.  In the third paragraph, quote, "she states
2  people were deleted from the registration
3  records/books, even if they registered to vote in the
4  first three to six months of the year, mostly as new
5  Americans, but not necessarily so.  They were refused
6  their opportunity to vote even if they had Registration
7  cards with registration numbers on them, citizenship
8  papers and a valid driver's license, if they were not
9  in the book." end of quote.
10     Did I read that accurately?
11     A.  Yes.
12     Q.  Did you or anyone in your office investigate
13  this alleged problem in precinct 128?
14     A.  I don't remember investigating myself.  I
15  don't know if anyone in the office did.
16     Q.  Do you recall receiving anything back about
17  that issue?
18     A.  No, I don't.
19     Q.  She goes on to state the clerk told others
20  who had been dropped from the rolls that they are
21  automatically dropped if they have not voted in the
22  last three months.  Do you see that?
23     A.  Yes.
24     Q.  If a clerk had said that, that would be
25  incorrect?

Page 208

1      MS. TORRES:  Objection to the form.
2      Q.  Is that correct?
3      A.  That statement is incorrect.
4      Q.  In other words, it is incorrect, this person
5  is dropped if they don't vote in three months?
6      A.  That is correct.
7      Q.  Do you know whether anybody checked to see
8  whether, in fact, any such misinformation was being
9  given out by a clerk at that precinct?
10     A.  No, I don't.
11     Q.  Later on in the paragraph, she indicates
12  precinct 128, when people had difficulty and the clerk
13  tried to get through to the Central Office, they were
14  told the lines were too busy for the clerk to call, all
15  you was a busy signal.  Do you see that?
16     A.  Yes.
17     Q.  Was it looked into as to whether that was
18  looked into, what happened in precinct 128, by your
19  office?
20     A.  I don't know whether any of the allegations
21  were looked into from this letter.
22     MR. MINCBERG:  This, again, is one of those
23  areas where, under the 30 B 6 deposition, we would
24  like to have answers as to what happened with
25  respect to this.  We may be able to work it out

Page 209

1  with leaving a blank in the transcript.  I will
2  state that for the record.
3      MS. TORRES:  Do you want to make a list of
4  topics listed in your 30 B 6 notice where you
5  believe we have not produced a witness with the
6  most knowledge?
7      MR. MINCBERG:  I believe that Mr. Leahy does
8  have knowledge of the election administration.
9  This issue is covered by those.  I think we are
10  entitled to get some information as to what, if
11  anything, was done to investigate this.
12     I don't want to take any further time of the
13  witness to argue.  I am putting you on notice -- I
14  don't blame Mr. Leahy.  Given the fact he cannot
15  answer if anything was done about it, we would
16  like to at least leaning to know.  If we can work
17  on it informally, that would be great, with a
18  stipulation or otherwise.  If we can't, then maybe
19  we will discuss it at another time with a judicial
20  officer.
21     MS. TORRES:  I would be happy to conference
22  about it in the future.  We do not have to argue
23  about it on the record.  My position is clear, as
24  well.  I don't believe it has come to our
25  attention during today's deposition that there is

Page 210

1    any area or topic listed on the 30 B 6 notice for
2    which we have not produced a witness with the most
3    knowledge, which, I believe, is our burden under
4    the rules.
5        Q.   Before we leave that document, let me ask you
6    this.  What was the procedure, in general, following
7    the November 2000 for dealing with complaints like this
8    one?
9        MR. TINKLER:  Objection to the form.
10       THE WITNESS:  At that time, there really
11   wasn't a procedure.  Literally, because of the
12   chaos created, following the November 2000
13   election, our office was besieged with requests
14   and complaints, and the news media on through into
15   the New Year, in 2001.
16       Q.   And complaints from voters, too?
17       A.   There were complaints from voters, E-mails,
18   voters pro and cons, supporting and not supporting the
19   presidential election.  So that everyone in the
20   administrative staff was helping out the best they
21   could.
22       But in response to the document request, we
23   pulled every document received and responded to that we
24   could find.
25       Q.   I certainly appreciate that.  Let me ask you

Page 211

1    this question, if tomorrow morning, you wanted to find
2    out what, if anything was done with respect to Exhibit
3    21, within your office, what would you do?
4        A.   I would probably wait.  Tuesday is --
5        Q.   Okay.  Tuesday.
6        A.   Some people may be in my office tomorrow.  I
7    would call my administrative staff together, ask them
8    if anyone had seen this and worked on this particular
9    complaint.
10       Q.   Was there a particular person that had more
11   responsibility than others on dealing with these
12   complaints or was it shared, depending on who was
13   available at the time?
14       A.   There probably are two people that I could
15   sit here and narrow it down to.  One is Giselle
16   LaSalas.  Giselle is the head of Public Service
17   Distribution, who handled a lot of these types of
18   complaints.  She has to get all of the E-mails that
19   come to the office.  She did respond to some of this.
20       Another individual would be Milton Calens who
21   heads the Registration Division, who might have been
22   forwarded this complaint, and he might have worked on
23   it.  Those are the two that I would ask initially if
24   they had done any work on it.
25       Q.   Let me ask you to take a look at another one

Page 212

1    of those documents that you produced.  We will mark this
2    as Exhibit 22.  This is a letter from Eufaula Frazier,
3    to the attention of Rosie Gragphen.
4        Did I pronounce your employee's name
5    correctly?
6        A.   I don't know whose employee that is.
7        Q.   We do not know.  We do know, based on the
8    Bates number, this document was Bates numbered and
9    produced by you to us, do you know who, if anyone, in
10   your office looked at and answered this complaint?
11       A.   No, I don't.  I know EuFaula Frazier very
12   well.  I talked to her at least a couple of times a
13   month.  She is right now the head of a Better Education
14   Program for Democratic party.  She calls me up and
15   invites me to various functions.  She is not a person
16   you say no to.  I do attend many functions.  I talk to
17   her quite a bit.  I don't ever remember talking to her
18   about this memo or this issue.
19       Q.   Again, for the record, we are referring to a
20   complaint regarding Ms. Frazier's concern about
21   precinct 262.  Ms. Frazier's concern is that at
22   precinct 262 more than one hundred voters were
23   allegedly turned away from the poll, is that what that
24   says?
25       A.   Yes, that is what that says.

Page 213

1        Q.   Do you recall any review or investigation as
2    to whether or not there were voters turned away from
3    precinct 262?
4        MS. TORRES:  Objection, asked and answered.
5        THE WITNESS:  No, I am not aware of any.  I
6    did not work on this memoranda or discuss this
7    particular problem with Ms. Frazier, nor am I
8    required during that time frame, November 9, when
9    we were not into the recount yet.  I can only
10   speculate, a lot of these memos ended up in files,
11   and never got worked.
12       Q.   I know, from reading about it, you were
13   extraordinarily busy immediately past the November time
14   period.  I appreciate your candor in acknowledging that
15   some of these may not have got looked into.  If I
16   wanted to find out whether this one had been looked
17   into, would you talk to one of those two people we
18   talked about a minute ago?
19       A.   Yes.
20       Q.   I think the last individual who raised a
21   concern and I wanted to ask about, is referenced
22   specifically in our complaint, so what I will ask to be
23   marked as what may be our last Exhibit 23, which is an
24   excerpt from our second amended complaint.
25       (Thereupon, Documents were marked as

**KRESSE, VALDES-PRIETO & ASSOCIATES, INC**
305-371-7692

54 (Pages 210 to 213)

Page 214

1  Exhibit Nos. 22 & 23.)
2      Q.  Mr. Leahy, you testified that you have, in
3  fact, reviewed the Second Amended Complaint before.
4      A.  Yes.
5      Q.  I take it, you read the paragraph referring
6  to Mr. Israel?
7      A.  Yes.
8          MR. MINCBERG:  Margins, I will say, for the
9      record, the marking on the margins are mine.  I
10     hope we did not put those in when we filed those
11     in court.
12     Q.  I will first ask you questions without
13  getting into the specific accuracy of the facts
14  alleged, but more in procedures should have been under
15  certain circumstances, see if we were clear.
16  Mr. Israel alleged on November 7, 2000, he called the
17  Supervisor's Office to determine where he should go
18  vote.  Do you see that?
19     A.  Yes.
20     Q.  Assuming he gave the address that he lived
21  at, someone would have told him which precinct to go
22  to, is that correct?
23     A.  Correct.
24     Q.  Now, the complaint alleges he was told to go
25  to precinct 261 at Olinda Elementary School.

Page 215

1      A.  Yes.
2      Q.  This further states he was told he was listed
3  as inactive, but he was able to vote after the precinct
4  officer verified his voting status?
5      A.  Correct.
6      Q.  Assume he had been listed as inactive, did
7  the person who talked to him do the right thing in
8  mentioning that to him?
9      A.  Yes.
10     Q.  He could have been listed as inactive because
11  mail had been sent to him and was returned.  Would that
12  be one way he could have been listed as inactive?
13         MS. TORRES:  Objection to the form.
14     A.  That is the only way he would be listed.
15     Q.  Let me ask it again.  For what reasons could
16  he have been listed as inactive?
17     A.  We place people in inactive if we receive
18  returned mail from the post office and sent out a final
19  address confirmation notice, if that notice is not
20  returned within 30 days.
21     Q.  For example, if you had sent him a voter
22  registration card at that address, and it did not get
23  to him, and was returned, that would have triggered a
24  procedure?
25     A.  Yes.

Page 216

1          MR. MINCBERG:  For the record, the person on
2      the telephone has left us, so we are going to
3      disconnect it.
4      Q.  The complaint then recites that he went to
5  precinct 261, that the poll worker could not find his
6  name on the rolls, that she could not get through to
7  the Miami Dade County Supervisor of Elections.  Do you
8  see that?
9      A.  Yes.
10     Q.  If those facts are true, that would be
11  another instance of what you referred to as a
12  communications problems between the precinct and your
13  office, is that correct?
14     A.  Based on what is written here, it doesn't
15  sound like the co-worker even tried to call.  I don't
16  know whether or not that, in fact, happened, but there
17  were instances where people could not get through.
18     Q.  Now, do you recall looking into the facts, as
19  best you could determine them, with respect to
20  Mr. Israel?
21     A.  Yes.
22     Q.  Could you tell us what you found?
23     A.  I think I reviewed an affidavit where this
24  information was spelled out, there were several types
25  of movements, and so forth.  Without that document, it

Page 217

1  is difficult to go through the history.  I don't know
2  if that document is available for me to look at.  I
3  know there was a certain movement made, but I don't
4  have those in my head.
5          MR. MINCBERG:  Well, as a matter of fact, it
6      is available.  This is a declaration of David C.
7      Leahy and this will be one more Exhibit, which we
8      will mark as Exhibit 24.
9          (Thereupon, the Document was marked as
10     Exhibit No. 24.)
11         (Recess in Proceedings).
12     Q.  Mr. Leahy, I asked to you look at what has
13  been marked as Exhibit 24.  Is that the declaration to
14  which you were referring to a few moments ago?
15     A.  Yes.
16     Q.  Directing your attention to Page 2,
17  paragraphs numbers three and four, does that state the
18  results of what your office determined, with respect to
19  Mr. Israel?
20     A.  Yes, I did this personally.  This is what I
21  determined.
22     Q.  Since the date of the declaration, has there
23  been there any additional information that has come up
24  related to this issue?
25     A.  I don't believe.

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

55 (Pages 214 to 217)

Page 218

1    Q.  Now, you stated in the declaration, that
2  Mr. Israel's current address of 4740 Northwest 25th
3  Street is within precinct 261, the precinct where it
4  was alleged that he was told to vote in by the person
5  on the phone, is that correct?
6    A.  Yes.
7    Q.  You further state that your office did not
8  get notification of him living at that address until
9  after this controversy arose, when he submitted a new
10  form of registration of that address?
11    A.  That is correct.
12    Q.  You don't know one way or the other on
13  election day, on November 7, 2000, if he was living at
14  that address?
15    A.  No.
16    Q.  Do you know of any reason if a voter were to
17  call and ask your office, where do I vote on election
18  day.  They would not give them an incorrect address?
19    MS. TORRES:  Objection to the form.
20    THE WITNESS:  My assumption is that people
21  would give the address where they lived.
22    Q.  And again, without going through all the
23  details, your paragraph recites a number of address
24  changes of Mr. Israel, correct?
25    A.  Yes.

Page 219

1    Q.  Again, if, in part, as a result of those
2  address changes, the mail from your office had come
3  back as, not having been delivered, and you sent an
4  address form, and it was not returned, then Mr. Israel
5  would, in fact, have been placed on inactive status,
6  correct?
7    A.  Correct.
8    Q.  He would have been placed on inactive?
9    A.  On inactive status.
10    Q.  Not in precinct 261, but whatever precinct
11  your records indicated he was last registered to vote,
12  is that correct?
13    A.  Correct.
14    Q.  Your records would indicate it was not 261
15  but a different precinct?
16    A.  Yes.
17    Q.  So that your investigation would be
18  consistent with a situation in which Mr. Israel had
19  called your office, asked what precinct they should go
20  to, he was told precinct 261, he went to that precinct,
21  tried to vote, but his name was not on the active or
22  inactive list at that precinct, is that correct?
23    A.  That is correct.
24    Q.  Again, assuming that had happened, if
25  communications were working properly, if the poll

Page 220

1  worker had tried to call or had successfully been able
2  to reach your office, you would have been able to
3  verify, in fact, that he was a registered voter, is
4  that correct?
5    MS. TORRES:  Objection to the form.
6    THE WITNESS:  Yes, I believe that would have
7  been the case, based on information that I know.
8  He would have been determined to be a registered
9  voter, given the address that he provided, he
10  would have been allowed to vote in precinct 261.
11    Q.  We have already talked a little bit about
12  some of the changes in the election day operation that
13  you made.  I want to establish a few other ones for the
14  record.  As I understand it, in Miami Dade, you are no
15  longer using the punch card system as was used in
16  November 2000, is that correct?
17    A.  We still have the punch card system.  We
18  can't use it after September 1 of 2002.  I can't say it
19  won't be used between now and then.  I doubt if it
20  will.  It will not be used after September 1 of this
21  year.
22    Q.  What will be used after that time?
23    A.  We have -- this County has purchased a touch
24  screen system for polling places and in person absentee
25  ballot voting, and an optical scan for mail absentee

Page 221

1  ballot voting.
2    Q.  Can you tell us what training you have done
3  so far, if any, for election work on using this new
4  technology?
5    A.  The touch screen system has been used in
6  three municipal elections thus far.  Poll worker
7  training was provided to poll workers in those three
8  cities.  The training for clerks and assistant clerks
9  runs about four hours, and the training for inspectors
10  runs approximately three hours.
11    Q.  Has that occurred already or scheduled to
12  occur in the future?
13    A.  These have occurred already, training
14  occurred.
15    Q.  For those officials?
16    A.  Those officials.
17    Q.  What about the rest of the County?
18    A.  Training will begin on July 8, and extend
19  through the middle of August for those poll workers
20  that will be working the September 10 state primary.
21  Then we will retrain them prior to the November
22  election, as well, as we train additional people that
23  we don't need September 10, which will be November 5th.
24    Q.  And as I understand from newspaper accounts,
25  there were some difficulties in some areas where the

Page 222

1  touch system was used in those initial elections, is
2  that correct?
3       MS. TORRES:  Objection to the form.
4       THE WITNESS:  In the three municipal
5  elections, we had one problem.  This was in the
6  Town of Medley, and the problem occurred when we
7  attempted to use a program developed by the
8  company using their software, and we were
9  attempting to combine the touch screen results
10  with the optical scan results.  There was a copy
11  of a program just to add the two results together.
12  The tabulations of both type of systems worked
13  perfectly well, just combined the two results.
14       It was a coding error by a staff member of
15  the company, and that error caused a shift in the
16  names of the candidates.  That same shift did not
17  occur in the results, such that the name no longer
18  matched the results they received.  As the city
19  clerk was about to read the results, and did
20  actually start reading the results, it was caught
21  at that point.
22       The problem has since been resolved to the
23  point where virtually there is no way that
24  particular problem can happen again.
25       In the other two municipalities, as well the

Page 223

1  other process in Medley, we experienced no other
2  problems with the voting tabulations or combining
3  results.
4       Q.  Have you done any voter education on the use
5  of the new technology?
6       A.  Yes.
7       MS. TORRES:  I object to the topic of the
8  touch screen systems as being beyond the 30 B 6
9  notice and since that issue is moot by agreement
10  of the parties.
11       MR. MINCBERG:  Go ahead.
12       THE WITNESS:  Yes.
13       Q.  What have you done?
14       A.  We have undertaken a voter education program
15  whereby part-time employees that we hired for that
16  purpose or my own staff members go out to various
17  organizational meetings, various events, and conduct
18  voter education.  That can be in the form of simply
19  having booths available or equipment available so
20  people can learn on a one-by-one basis for presentation
21  by me or members of my administrative staff, or a
22  combination of both.
23       We have provided booths in every municipal
24  hall, to the City Clerks so they can train people as
25  they come in the facilities.  Booths are given to each

Page 224

1  Team Metro office.  A Team Metro office is a County
2  office in the unincorporated part of the County, to
3  every community agency office.  In addition to that, we
4  have provided equipment and training to various
5  organizations who have shown a desire to assist us in
6  educating voters, and that would include both major
7  political parties, the League of Women Voters and the
8  Bar Association.
9       Q.  Arrive With Five, do you know--
10       A.  I am not sure if Arrive With Five is still a
11  viable organization.  It may be, or not.  I have not
12  been dealing with them since November of 2000, but the
13  NAACP has it.  One or two labor unions have acquired
14  that information.  We are in the process of developing
15  a video, which will be available to cable stations and
16  municipal cable stations.  We have produced in paper
17  form the process to vote on the touch screen system in
18  three languages, Spanish and Creole.  And we plan on
19  doing some more advertising, and started advertising
20  for poll workers.  That advertisement has included a
21  description of how to vote under this system.  We will
22  continue our efforts on through September or November.
23       Q.  Again, I realize it is only in a very small
24  geographical area, did you learn of any difficulties
25  that voters had with the new system in the small

Page 225

1  election that occurred recently?
2       A.  If voters are familiar with the process, they
3  experienced no problems. Bay Harbor Island was one of
4  the first two cities to have the use of the touch
5  screen system for a municipal election.  As the day
6  started out, again, the equipment had been out in Bay
7  Harbor Island, and people had opportunities to see the
8  equipment, but, of course, not everybody had that. The
9  process in the morning was to, as people walked in and
10  went directly to the check-in table to sign in, they
11  were asked if they would like to have a demonstration.
12       And I heard several comments of people who
13  said, I don't need one, because I know computers.  They
14  were individuals, and once they got to the booth, they
15  would sit there, scratching their head.  We simply
16  changed the statement to voters, as they approached the
17  check-in, was to go to the demonstration, get one.
18  After that, that worked fine.
19       Our plans, the County purchased enough
20  equipment to have one of these devices actually at the
21  door or near the door of every polling place as voters
22  come in for those who had not had the opportunity to
23  try the system and have the opportunity.
24       Q.  Have you figured out any way of figuring out
25  whether one per precinct will be enough, or do you need

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

57 (Pages 222 to 225)

Page 226

1   more?
2        MS. TORRES: I restate my objection.
3        MR. MINCBERG: That objection --
4        MS. TORRES: I want to add, especially in
5   light of the lateness of the hour, we have a seven
6   hour limit.
7        Q. Go ahead.
8        A. I have not established a level yet, but there
9   are at least -- well, I don't know what side of my
10  precincts are -- we have redone them. I have 5,000
11  registered voters sitting here today, assuming that I
12  would put 21 units out in those cities. For instance,
13  we are doing an election for South Miami. For
14  municipal elections they combine all voters into one
15  polling place. For that election, we already
16  determined that we will have to have two demonstration
17  units at the door to handle that many people.
18       Q. Now, with respect to the provisional ballot
19  that you talked about a few minutes ago, what have you
20  done, if anything at all, to insure that the voter cast
21  a provisional ballot in the right precinct?
22       A. Through the use of laptops in every polling
23  place with the backup of the network in my office, we
24  believe that we have the capabilities of determining a
25  person's polling place before we send them to the

Page 227

1   booth. That is our goal. We are not simply saying go
2   ahead and go with a provisional ballot without
3   understanding which precinct they should be registered
4   to and allowed to vote.
5        Q. Indeed, if someone under the law were to cast
6   a provisional ballot in a precinct, other than the one
7   from which they, in fact, live, that provisional ballot
8   would not count, is that correct?
9        A. The canvassing board will make that decision,
10  that is the way the law is structured.
11       Q. How soon after the election will the
12  provisional ballots be processed as you understand it?
13       A. They have to be processed between a day and
14  one-half following the September 10 primary.
15       Q. Would that limit apply in November?
16       A. I am not sure, still working on September.
17  It is a very tight time frame.
18       Q. Do you have any plans to notify voters as to
19  the outcome of their provisional ballot, whether or not
20  it was counted?
21       A. I certainly have plans to notify those voters
22  whose ballots were rejected.
23       Q. What method do you plan to use for that mail?
24       A. Mail -- we have not developed that procedure
25  yet. If it is a situation where we simply have no

Page 228

1   record that they are registered, in order to provide
2   notice and time for them to be registered for November,
3   should this occur in September, then I would like to
4   set up a procedure similar to what we were doing for
5   incomplete registrations, to try to notify this person
6   by phone. They can also become voters in November
7   election.
8        Q. Any other plans that you have made with
9   respect to provisional ballots?
10       A. At this point, no.
11       Q. Now, you mentioned a few minutes ago,
12  providing information and assistance and ballot,
13  themselves, in three languages, English, Spanish and
14  Creole. Have you done anything else to try to make it
15  easier for people who speak Creole to vote in the
16  November elections?
17       A. Well, in the past, including November 2000,
18  Creole was only available in 60 precincts. We are
19  going to have Creole Countywide, as well as signs in
20  Creole Countywide. We are going to expand where Creole
21  is available.
22       Q. Instructions will available in this language,
23  and how to use the system--
24       A. There were brochures that we have, yes. That
25  has been produced in three languages and that is a

Page 229

1   notice that will go into each booth and all the notices
2   will be seen in those languages.
3        Q. What about personal assistance at the polls,
4   have you made any plans about that?
5        A. We are trying to recruit Haitian American
6   poll workers, bilingual in English and Creole. Try to
7   increase our efforts because our effort in the past
8   have indicated that only a small amount of people are
9   interested in doing that, and a smaller number actually
10  show up on election day. It is a difficult process to
11  try to find Haitian American poll workers. We are at a
12  festival this weekend with both demonstrating equipment
13  and attempting to get additional poll workers to
14  provide that service.
15       Q. You have decided to do that?
16       A. We are out there, yes. We are going to be at
17  a festival this weekend. We have been out in the
18  community and will continue to be.
19       Q. Do you have any numeral objectives that you
20  set for yourself as to how many precincts you are
21  trying to cover?
22       A. Again, I believe we have identifies that at
23  least 60 precincts, existing precincts, we are
24  changing boundaries, there is a significant amount of a
25  Haitian American voter population. Back in 1995, when

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

Page 230

```
 1   we were doing date of birth there were one hundred
 2   registered voters that were born in Haiti. Out goal is
 3   to make sure all those votes are covered by language
 4   assistance.
 5        Q.  Other than what you already talked to us
 6   about, is there anything else you are being asked to do
 7   with respect to Creole voters by the Justice
 8   Department?
 9        A.  Yes.
10        Q.  What is that?
11        A.  They want us not only to have regular poll
12   workers, to the extent it is possible, providing
13   assistance, but they would like, in these 60 precincts,
14   to have an additional bilingual person who is not tied
15   to a specific position, who is kind of floating through
16   that polling place to find or to identify someone who
17   may need assistance, to assist them through the
18   process, whether it be a check-in table or
19   demonstration or anywhere through the process.  This
20   would be something we have never had before.  They have
21   asked us to see if we can recruit enough people to
22   provide that additional service.
23        Q.  Again, your concern is whether you can
24   recruit these people?
25        A.  Correct.
```

Page 231

```
 1        MR. MINCBERG:  Mr. Leahy, I am happy to tell
 2   you, subject to the matters that your counsel and
 3   I still have some pending disagreements on,
 4   hopefully, we can resolve them, I have no further
 5   questions for you.
 6            CROSS EXAMINATION
 7   BY MR. HARVEY:
 8        Q.  My name is Walter Harvey.  I represent the
 9   Division of Elections and the Secretary of State in
10   this matter.  I just have a few questions.
11        I am not sure if this came out during the
12   course of your testimony, but earlier, plaintiff's
13   counsel showed you what was Exhibit 19, which referred
14   to a letter from Ms. DeSouza.  He asked you a series of
15   questions regarding Ms. DeSouza.  Do you recall that
16   earlier?
17        A.  Yes, I do.
18        Q.  After that, he asked you a series of
19   questions about changes since the November 7, 2000
20   election.
21        A.  Yes.
22        Q.  Then he moved on to Mr. Israel, and he talked
23   about his complaints, as well.  I am not sure if he
24   asked you about some of the changes that have occurred
25   since November 7, 2000.
```

Page 232

```
 1        I would like to ask you the same questions
 2   that he asked you about Ms. DeSouza, if you will tell
 3   us what changes have been made that would impact
 4   Mr. Israel's claim.
 5        A.  Mr. Israel was given proper advice when he
 6   called my office, based on the information that I have,
 7   and was sent to the proper precinct for him to vote.
 8   With the changes we have made, his name would not have
 9   been on the precinct register.  So, the new process
10   would be for him to -- his name had to be looked up on
11   the laptop computer, where it would have been
12   determined that he was a registered voter, and then
13   given the address where he says he resided, would have
14   been entitled to a vote in the polling place, the
15   opportunity to vote right then and there, at that
16   polling place, upon completion of an affidavit.
17        Q.  The safeguard with regard to the laptop
18   computer that you just mentioned, is one safeguard, is
19   that correct?
20        MR. MINCBERG:  Objection to the form.
21        A.  Yes, it is.  It is a safeguard that is now
22   available.
23        Q.  Are there any additional safeguards?
24        A.  The backup system, either in the form of a
25   network, where if the laptop doesn't work or the laptop
```

Page 233

```
 1   operator is not able to determine eligibility, or the
 2   polling place location, that the poll worker can call
 3   into the network, which should, in my opinion, be easy
 4   to access, but most problems should be handled through
 5   the laptops.  The other backup is the provisional
 6   ballot.
 7        Failing everything else under state law,
 8   Mr. Israel would be entitled to vote a provisional
 9   ballot.  Having been provided with correct information
10   from my office as to which polling place he was
11   entitled to vote at, if he voted a provisional ballot,
12   it would have been counted.
13        MR. HARVEY:  No further questions.
14            CROSS EXAMINATION
15   BY MR. RESTREPO:
16        Q.  My name is Dan Restrepo.  I represent
17   ChoicePoint and DBT in this action.  Take a look at
18   Exhibit Number 5, if you would.  I will return
19   Counsel's copy of Exhibit Number 5.
20        Can you first look at the bottom left-hand
21   corner of that document, do you see a date in the
22   bottom left-hand corner of the document?
23        A.  I assume you are referring to the top page?
24        Q.  The top page of that document.
25        A.  Yes, I do.
```

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

59 (Pages 230 to 233)

Page 234

1    Q. What is that date?
2    A. 4/27/00.
3    Q. Do you know what, if anything, is signified
4  by that date appearing on that page, it appears on
5  every page of that document?
6    A. I can only assume that is the date that the
7  report was run.
8    Q. You have been discussing the 2000 list
9  throughout. The lists that you received from the
10  Division of Elections is the January 2000 list, is that
11  correct?
12    A. Yes.
13    Q. Do you know whether that list is labeled
14  January 2000, CVF for Dade County based on January 2000
15  the CVF, or if you received it in January 2000?
16    A. That is what it was titled at the time. I
17  don't believe we received it in January 2000. In fact,
18  from my memory, we received it sometime after April or
19  May -- it may have been May 2000 that we received the
20  list.
21    Q. Earlier, when you were testifying about what
22  the procedures that your office used upon receiving a
23  duplicate list from the Division of Elections, did I
24  understand you correctly, that voter history was one of
25  the factors that you looked at to determine whether you

Page 235

1  were looking at an accurate match?
2    A. Voter activity, which would include voter
3  history, yes.
4    Q. Looking back at Exhibit Number 5, toward the
5  top of the package, do you see a series of column
6  headings on that page?
7    A. Yes.
8    Q. Directing your attention to the fifth column
9  heading written in the 1998 Election, and below that,
10  FP/SP/GE?
11    A. Yes.
12    Q. Do you know what, if anything, that label
13  means?
14    A. That label, to me, means the elections in
15  which these individuals listed on this form presumably
16  voted. If there is a V or P in the column next to the
17  name.
18    Q. You anticipated my next question. If you
19  look down that column to the first entry under GE,
20  what, if anything, does the V indicate, aligned with
21  Lisa Michelle Johnson, is the first V that you list?
22    A. Yes.
23    Q. Do you know -- you may have just answered
24  this, do you know what, if anything, that indicates?
25    A. I take it to mean that Lisa Michelle Johnson

Page 236

1  voted in the general election in 1998.
2    Q. Does it indicate that the person voted, do
3  you know what County it indicates that the person voted
4  in?
5    A. No. The County is actually blackened out. I
6  can't tell. It may be Dade County, but I can't tell.
7    Q. Am I correct, the entry for Lisa Michelle
8  Johnson matched with the entry for Lisa Michelle
9  Cuadrado?
10    A. Yes.
11    Q. Is there any voter history indicated for
12  Ms. Cuadrado in 1998?
13    A. Not from Miami Dade County, no.
14    Q. One final set of questions on Exhibit 5, do
15  you know what the basis of the matches on this
16  particular page on Page 1 of Exhibit 5 -- do you know
17  what the matches were based on?
18    A. At the top of the page, it indicates matched
19  on Social Security number and the date of birth. These
20  were possible name changes, which, to me, means that
21  there may have been a change in name, but there is a
22  match on date of birth and Social Security number.
23    Q. Moving to one last issue, when the Miami Dade
24  Supervisor of Elections office removes a voter from its
25  rolls, is that voter record gone forever or still

Page 237

1  present somehow in your records?
2    A. We still maintain those records of
3  individuals whose registration have been removed from
4  the rolls.
5    MR. RESTREPO: No further questions.
6    MR. TINKLER: Nothing.
7    MS. TORRES: Nothing.
8    MR. MINCBERG: One very brief redirect.
9    REDIRECT EXAMINATION
10    Q. You indicated to Mr. Restrepo, which is
11  consistent with my understanding, even though the 2000
12  list is entitled January 2000, that the lists you
13  received from the State, such as Exhibit 5, were
14  received in April or May of 2000, is that correct?
15    A. I am not sure, but it was my recollection it
16  was towards the middle of the year, not at the
17  beginning of the year.
18    Q. Is it correct, however, that all those names
19  went through the process that we discussed of
20  determining whether to remove them from the rolls and
21  removing them prior to the November 2000 election?
22    A. Yes.
23    MR. MINCBERG: I am done. Subject to what we
24  said.
25    MR. RESTREPO: No further questions.

Page 238

```
 1
 2              (Thereupon, the deposition was concluded.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 239

```
 1              CERTIFICATE OF NOTARY
 2
 3   STATE OF FLORIDA:
                    SS.
 4   COUNTY OF DADE:
 5
 6              I, ILENE J. POMERANZ, a Shorthand
 7   Reporter and Notary Public in and for the State of
 8   Florida at Large, do hereby certify that I
 9   reported in shorthand the deposition of
10   David Leahy, a witness called by the
11   in the above-styled cause; that the witness was first
12   duly sworn by me; that the reading and signing
13   of the deposition were waived by the witness; that
14   the foregoing pages, numbered 1 to 239, inclusive,
15   constitute a true record.
16              I further certify that I am not an
17   attorney or counsel of any of the parties, nor
18   related to any of the parties, nor financially
19   interested in the action.
20              WITNESS my Hand and Official seal this 10th
21   day of June 2002.
22
23   _____
     ILENE POMERANZ
24   Notary Public - State of Florida
     My Commission No. CC 825724
25   Expires:  May 30, 2003
```

# TAB 21

Page 1

```
 1         UNITED STATES DISTRICT COURT
 2     FOR THE SOUTHERN DISTRICT OF FLORIDA
 3         CASE NO.: 01-0120-CIV-GOLD
 4 -------------------------------------------x
 5 NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
   COLORED PEOPLE, INC., by its FLORIDA STATE
 6 CONFERENCE OF BRANCHES, JIMMIE PANNELL, JULIA
   STONER, NATALIE CARNEGIE, JOHN L. CHEEVER,
 7 JAMES MARSHALL, LILLIE Q. ODOM, WILLIE STEEN,
   WALLACE MCDONALD, JERMAINE TERRY, LORINE
 8 WALDEN, EMERY TIMBERLAKE, VALERIE
   BUFORD-WELLS, MICHELLE FLOYD, CONSUELO MARIA
 9 GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA
   CLARK, JANICE KELLY, PLACIDE DOSSOUS, RONDRICK
10 ROSE, URSULA HARVEY and ADMANTHA ISHALL in
   their own right and as representatives of all
11 similarly situated citizens and residents of
   the State of Florida,
12
         Plaintiffs,
13
   vs.
14
   KATHERINE HARRIS, Secretary of State of Florida;
15 CLAY ROBERTS, Director of Florida Division of
   Elections; DAVID C. LEAHY, Miami-Dade County
16 Election Supervisor; MIRIAM OLIPHANT, Broward
   County Election Supervisor, JOHN STAFFORD,
17 Duval County Election Supervisor; PAM IORIO,
   Hillsborough County Election Supervisor,
18 WILLIAM COWLES, Orange County Election
   Supervisor; and DEANIE LOWE, Volusia County
19 Election Supervisor (all in their official
   capacities); and CHOICEPOINT, INC., a Georgia
20 corporation d/b/a DATABASE TECHNOLOGIES, INC.,
21         Defendants.
22 -------------------------------------------x
23
   DEPOSITION OF:        PAM IORIO
24
                  VOLUME  I
25
26
```

Page 2

```
 1         UNITED STATES DISTRICT COURT
 2     FOR THE SOUTHERN DISTRICT OF FLORIDA
 3         CASE NO.: 01-0120-CIV-GOLD
 4
   NATIONAL ASSOCIATION FOR THE
 5 ADVANCEMENT OF COLORED PEOPLE
   INC., et al.,
 6
         Plaintiffs,
 7
   vs.
 8
   KATHERINE HARRIS, Secretary of State of
 9 Florida, et al.,
10         Defendants.
11 _____/
12
13
   DEPOSITION OF:        PAM IORIO
14
   DATE:           Monday, May 6, 2002
15
   TIME:           9:03 a.m. - 12:21 p.m.
16
   LOCATION:        Hillsborough County Attorney's Ofc
17                601 East Kennedy Boulevard
                  27th Floor Conference Room
18                Tampa, Florida 33602
19 REPORTED BY:     JUANITA BUTLER
                  Stenographic Reporter
20                and Notary Public -
                  State of Florida at Large
21
22
                  VOLUME  I
23
24
25
26
```

Page 3

```
 1 APPEARANCES:
 2
   LORI OUTZS BORGEN, ESQUIRE
 3 CARA J. FINEMAN, ESQUIRE
   Lawyers Committee for Civil Rights Under Law
 4 1401 New York Avenue, N.W., Suite 400
   Washington, D.C., 20005-2124
 5
         Attorneys for Plaintiffs
 6
   H. RAY ALLEN, II, ESQUIRE
 7 KENNETH A. TINKLER, ESQUIRE
   REBECCA M. KERT, ESQUIRE
 8 Hillsborough County Attorney's Office
   601 East Kennedy Boulevard, 27th Floor
 9 Tampa, Florida 33602
   813.272.5670
10
         Attorneys for Hillsborough County
11       Supervisor of Elections Pam Iorio
12 DOUGLAS B. MAC INNES, ESQUIRE
   Office of the Attorney General
13 PL-01, The Capitol
   Tallahassee, Florida 32399-1050
14 850.414.3662
15       Attorney for Fred Dickinson, Executive Director
         Florida Department of Highway Safety and
16       Motor Vehicles and
         Kathleen Kearney, Secretary of the Florida
17       Department of Children & Families
18 JOHN W. LITTLE, III, ESQUIRE
   Steel Hector & Davis, LLP
19 1900 Phillips Point West
   777 South Flagler Drive
20 West Palm Beach, Florida 33401-6198
   561.650.7270
21   and -
   WALTER JAMES HARVEY, ESQUIRE  (via Conference Call)
22 Steel Hector & Davis, LLP
   200 South Biscayne Boulevard, 41st Floor
23 Miami, Florida 33131-2398
   305.577.2934
24
         Attorneys for Katherine Harris, Secretary of
25       State of Florida, and Clay Roberts,
         Director of the Florida Division of Elections
```

Page 4

```
 1 DANIEL A. RESTREPO, ESQUIRE
 2 Williams & Connolly, LLP
   725 12th Street, N.W.
 3 Washington, D.C. 20005
   202.434.5000
 4
         Attorney for ChoicePoint, Inc.
 5       d/b/a Database Technologies, Inc.
 6
   WILLIAM J. BOSCH, ESQUIRE  (via Conference Call)
 7 Volusia County Attorney's Office
   123 W Indiana Avenue
 8 DeLand, Florida 32720-4613
   386.736.5950
 9
         Attorney for Volusia County
10       Supervisor of Elections Deanie Lowe
11
   JEFFREY P. EHRLICH, ESQUIRE  (via Conference Call)
12   and -
   SUSAN TORRES, ESQUIRE   (via Conference Call)
13 Dade County Attorney's Office
   Metro Dade Center
14 111 NW 1st Street, Suite 2810
   Miami, Florida 33128
15 305.375.5151
16       Attorneys for Miami-Dade County
17       Supervisor of Elections David Leahy
18
19
20
21
22
23
24
25
```

Page 5

I N D E X

VOLUME I                                                   PAGE

Direct Examination by Ms. Borgen.......................9

Stipulation..........................................174

Certificate of Reporter..............................175

Signature Page.......................................176

Errata Sheet.........................................177


I N D E X

VOLUME II                                                  PAGE

Direct Examination (con't) by Ms. Borgen.............185

Cross-Examination by Mr. Restrepo....................355

Cross-Examination by Mr. Little......................367

Redirect Examination by Ms. Borgen...................373

Recross-Examination by Mr. Little....................376

Stipulation..........................................378

Certificate of Reporter..............................380

Signature Page.......................................381

Errata Sheet.........................................382

Page 7

E X H I B I T S
(continued)

PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION

DESCRIPTION                                               PAGE

P - Documents Relating to Plaintiff Kandy Wells.......164

Q - Phone Bank Precincts, November 7, 2000...........196

R - Documents Relating to Plaintiff Rondrick Rose....212

S - Document Entitled Black.txt......................223

T - Expert Witness Summary of Supervisor of
    Elections Pam Iorio..............................223

U - Defendant Iorio's Objections and Responses
    To Plaintiffs' First Set of Document
    Requests and Interrogatories.....................330

V - Defendant Iorio's Objections and Responses
    To Plaintiffs' Second Set of Document
    Requests and Interrogatories.....................330

W - Transcript of Hillsborough County NAACP
    Public Hearing on Election Irregularities.......336

DEFENDANTS' EXHIBITS MARKED FOR IDENTIFICATION

1 - Division of Elections Memorandum to Supervisors
    of Elections and Staff from Bucky Mitchell,
    Dated June 30, 2000, Regarding Central Voter
    File Verification Process........................370

Page 6

E X H I B I T S

PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION

DESCRIPTION                                               PAGE

A - Plaintiffs' Notice of Deposition (Hillsborough
    County)..........................................9

B - Plaintiff' Notice of Rule 30(b)(6) Deposition
    (Hillsborough County)...........................10

C - Plaintiffs' Second Amended Complaint............23

D - Answer and Affirmative Defenses to Second
    Amended Complaint of Defendant Pam Iorio,
    Supervisor of Elections of Hillsborough County...25

E - Processing CVF Felon Registrations..........44, 362

F - FSASE Central Voter File Committee Memorandum to
    All Supervisors of Elections Dated May 8, 2000,
    Subject, Recommended Procedures............52, 369

G - Letter to Ed Kast from Janet Keels dated
    September 18, 2000...............................97

H - Letter to Janet Keels from Emmett Mitchell, IV
    Dated August 10, 2000...........................97

I - Letter to Ed Kast from Janet Keels dated
    February 23, 2001...............................98

J - Documents Relating to Plaintiff Willie Steen
    .............................................118, 355

K - Documents Relating to Plaintiff Wallace McDonald
    .............................................126, 356

L - Documents Regarding Voter Roosevelt Lawrence
    .............................................139, 356

M - Documents Relating to Plaintiff Jermaine Terry
    .............................................152, 358

N - (No Document Identified or Marked).............164

O - Documents Relating to Plaintiff Sherry Edwards...164

Page 8

1    The deposition, upon oral examination, of
2 PAM IORIO, taken on Monday, May 6, 2002, at Hillsborough
3 County Attorney's Office, 601 East Kennedy Boulevard,
4 27th Floor, Tampa, Florida 33602, beginning at
5 9:03 a.m., before Juanita Butler, Notary Public in and
6 for the State of Florida at Large.
7
8              PAM IORIO,
9 being first duly sworn to testify the truth, the whole
10 truth and nothing but the truth, was examined and
11 testified as follows:
12
13         MR. ALLEN: Lori, before we get started,
14    Pam has told me she needs to leave at 5:15
15    today.
16         MS. BORGEN: Okay.
17         MR. ALLEN: So if we can -- if we need to
18    work through lunch or whatever we need to do to
19    try to get her through today, if at all
20    possible --
21         MS. BORGEN: Okay.
22         MR. ALLEN: -- I would appreciate it.
23         MS. BORGEN: That certainly sounds fine.
24    We can take a look at lunch and I'll see how
25    we're doing on questions.

Page 9

| 1 | MR. ALLEN: Okay. |
| 2 | MS. BORGEN: And we can decide how long to |
| 3 | take from there. |
| 4 | MR. ALLEN: Great. Thank you. |
| 5 | DIRECT EXAMINATION |
| 6 | BY MS. BORGEN: |
| 7 | Q. Good morning, Ms. Iorio. |
| 8 | A. Good morning. |
| 9 | Q. Please state your name for the record. |
| 10 | A. Pam Iorio. |
| 11 | Q. And we're here today pursuant to a deposition |
| 12 | notice in the case of NAACP v. Harris, does that sound |
| 13 | correct to you? |
| 14 | A. Correct. |
| 15 | Q. And I'd like to show you a copy of that |
| 16 | notice. |
| 17 | MS. BORGEN: Can we mark this as |
| 18 | Exhibit A. |
| 19 | (Plaintiffs' Exhibit A was marked for |
| 20 | identification.) |
| 21 | BY MS. BORGEN: |
| 22 | Q. I'd like to show you what's been marked as |
| 23 | Exhibit A. Is this the deposition notice that you |
| 24 | received pursuant to which you are here today for the |
| 25 | deposition? |

Page 10

| 1 | THE DEPONENT: Is this the deposition |
| 2 | notice? |
| 3 | BY THE DEPONENT: |
| 4 | A. Yes. |
| 5 | Q. Okay. And did you receive another deposition |
| 6 | notice from plaintiffs in regard to this case? |
| 7 | THE DEPONENT: Did I receive another |
| 8 | deposition notice? |
| 9 | MR. ALLEN: I'm not aware of it. We need |
| 10 | to look at that. |
| 11 | MS. BORGEN: I would like to have this |
| 12 | marked as Exhibit B. |
| 13 | (Plaintiffs' Exhibit B was marked for |
| 14 | identification.) |
| 15 | BY MS. BORGEN: |
| 16 | Q. I'll show you this which is marked as |
| 17 | Exhibit B. |
| 18 | A. Yes. |
| 19 | Q. And that exhibit notice is called a |
| 20 | Plaintiffs' Notice of Rule 30(b)6 Deposition. And have |
| 21 | you appointed or designated certain officials from your |
| 22 | office to respond to that deposition notice? |
| 23 | A. Is that tomorrow's deposition? |
| 24 | Q. Yes, it is. |
| 25 | A. Yes. Chuck Smith and Darrell Smith of my |

Page 11

| 1 | staff. |
| 2 | Q. All right. So those individuals have been |
| 3 | designated by you to testify on your behalf on the |
| 4 | topics in the deposition notice? |
| 5 | A. Correct. |
| 6 | Q. In the deposition today, I will be asking you |
| 7 | questions about issues related to this litigation. If |
| 8 | there's ever a question that's not clear, please ask me |
| 9 | to clarify it, if a term is not clear, a question, you |
| 10 | just are not sure where I'm going. We want to make |
| 11 | sure we get a clear record, we all understand where |
| 12 | we're coming from. So please stop me if there's |
| 13 | anything that needs to be clarified. |
| 14 | Your counsel, of course, has the right to |
| 15 | object or other attorneys in the room may object. You |
| 16 | still have to answer the question unless you're |
| 17 | instructed not to answer by your counsel. |
| 18 | So if that comes up, we can clarify at the |
| 19 | time if your counsel is telling you not to answer. And |
| 20 | unless they are, then you'll have to go ahead and |
| 21 | answer. |
| 22 | If at some point in time you need to take a |
| 23 | break, just let me know and we can find a good point to |
| 24 | stop and take a break if we need to do that and figure |
| 25 | out what works best with your schedule so we can get |

Page 12

| 1 | you out of here at 5:15. I'm sure we can do that. |
| 2 | Now, have you ever been deposed before? |
| 3 | A. I may have as a county commissioner, yes. |
| 4 | Q. Do you remember approximately how many |
| 5 | occasions you've been deposed? |
| 6 | A. I think as a county commissioner I may have |
| 7 | been deposed in the Providence Venture Court Case and |
| 8 | that would have been about 11, 12 years ago. |
| 9 | Q. And that was in what regard? What topic was |
| 10 | that deposition -- |
| 11 | A. A waste water treatment plant. |
| 12 | Q. Nothing to do with elections? |
| 13 | A. No. |
| 14 | Q. And in your capacity then as supervisor of |
| 15 | elections, you have not been deposed? |
| 16 | A. Not to my recollection. |
| 17 | Q. Okay. |
| 18 | A. Unless my attorney -- the attorneys have a |
| 19 | different recollection. |
| 20 | Q. When you're answering questions, you have to |
| 21 | answer from your own knowledge. Your attorneys are not |
| 22 | allowed to answer for you. |
| 23 | A. Oh. |
| 24 | Q. So certainly, if you don't recall something, |
| 25 | you know, it's a sufficient answer to say, I don't |

Page 13

1 recall, my attorneys may be able to or may know
2 something else.
3     But I've had the same issue with clients
4 turning to me in deposition saying, what's going on?
5 And your attorney, you know, Ray Allen, sitting next to
6 you, looks like he's not responsive. It's just because
7 he's not allowed to answer for you so. I tried to get
8 that cleared up.
9     In answering questions, you need to respond
10 orally, yes, no, rather than shaking your head or
11 nodding, so that we can get a clear record for the
12 court reporter.
13     I ask the reporter now, too, if we ever get
14 going too fast, let me know and we'll slow down at any
15 point in time.
16     Any questions about the deposition --
17 A. No.
18 Q. -- and how it's going to work?
19     The other thing, too, we'll be looking at
20 several documents today. Please take your time going
21 through the documents. If something's not clear, take
22 your time and review it. Questions about it, we can
23 clear that up. The ultimate goal is to make sure we
24 all understand what's going on, are on the same page,
25 and have a clear record.

Page 14

1     Ms. Iorio, do you have any postsecondary
2 education?
3 A. Yes.
4 Q. And what is that education?
5 A. I have a B.S. in Political Science from the
6 American University in Washington D.C. I have a M.A.
7 in history from the University of South Florida.
8 Q. And when did you receive your B.S. from
9 American?
10 A. 1981.
11 Q. And your M.A.?
12 A. 2001.
13 Q. So your M.A., did you -- were you going back
14 to school full time, part time?
15 A. Part time.
16 Q. Part time. During what time period?
17 A. 1997 until my graduation in December of 2001.
18 Q. And that was in history?
19 A. American history, yes.
20 Q. Did you specialize in a particular period?
21 A. Yes, post World War II with an emphasis on
22 civil rights.
23 Q. And did you have to do a final paper or
24 thesis for that?
25 A. Yes, I did.

Page 15

1 Q. And what was the topic of that?
2 A. The 2000 election from the perspective of the
3 Florida supervisors of elections.
4 Q. And do have a copy of that paper with you?
5 A. No, I do not.
6 Q. Would you be able to produce a copy of that
7 paper?
8 A. Yes, or it could be found through the
9 University of South Florida. All of the thesis are
10 part of the University of South Florida library
11 collection.
12 Q. Okay. What's the title of that thesis?
13 A. The title of the thesis is called The Vote
14 Counters, Florida Supervisors of Elections, in the 2000
15 Presidential Election, something to that effect. I
16 ought to know the entire title since it was my thesis,
17 but something to that effect.
18 Q. And what topics are covered in the thesis?
19 Does it focus on the actual counting process?
20 A. I conducted a number of oral interviews with
21 supervisors of elections throughout the State and, from
22 their perspective, tried to look at issues of ballot
23 design; of inconsistent procedures throughout the State
24 of Florida during the 2000 election; of the structure
25 of elections in Florida; the nature of Florida

Page 16

1 counties, and a little bit of history in terms of how
2 elections are conducted and why they're conducted the
3 way they are in the State of Florida; and tried to take
4 a look at what happened during the 2000 election from
5 the perspective of the supervisors, touching a little
6 bit on the personal toll it took on some of them, the
7 intense media coverage and issues such as that.
8 Q. You mentioned one of things you looked at
9 were some of the inconsistencies between the counties?
10 A. Yes.
11 Q. What sorts of practices? What types of
12 inconsistencies?
13 A. Well, I think that when you look at the 2000
14 presidential election, one of the issues is that
15 elections are conducted locally and so you have a very
16 dispersed way of conducting -- each county and each
17 election official has their own way of administering to
18 a certain degree, I mean, there's -- where the
19 law does not speak to certain practices. And so, in my
20 thesis, for example, I examined ballot design and how
21 ballot design differed amongst the counties.
22     While the Palm Beach butterfly ballot design
23 is one of the better known issues, there certainly are
24 a lot of other issues of ballot design dealing with the
25 2000 election particularly among the optical scan

Page 17

1 counties and particularly among the central count
2 optical scan counties.
3      Some of the optical scan counties that had
4 presidential ballots, seven names in one column, three
5 names in the next column, eight names in one column,
6 two names in another, all which lead to a very high
7 number of overvotes.
8      You had issues such as in Escambia County and
9 in Manatee County, while they did have precinct-based
10 optical scan, which allowed a voter the ability to know
11 if their ballot had been overvoted, in those two
12 counties, those supervisors chose not to implement that
13 particular device on their optical scan machines. And
14 so while the machines had that capability, they were
15 not utilized in the presidential election and thus
16 there was a higher number of overvotes in those two
17 counties.
18      There were issues of how write-in ballots
19 were treated. And in the post 2000 election cycle,
20 when the media went in, both the consortium of the
21 Miami Herald and later the New York Times consortium
22 went through all the ballots throughout the State of
23 Florida. They found that counties had a different way
24 of approaching the write-in vote.
25      For example, in some counties, if a voter

Page 18

1 voted for Gore and wrote in the name of Gore, that was
2 considered an overvote and was rejected. Whereas, in
3 another county, a vote for Gore and a write in for Gore
4 would be considered a vote for Gore. And those were
5 inconsistent procedures amongst the counties and those
6 are some of the issues I tried to point out in my
7 thesis.
8     Q. Did your thesis address any of the issues
9 that are directly challenged by plaintiffs in this
10 lawsuit?
11     A. Not really. I mean, I think some of the
12 issues -- well, certainly the punch card issue, which
13 may be a moot issue to some degree now, I don't know.
14      The felony issue was one that I really did
15 not delve into to any great degree in my thesis. It's
16 a complicated issue. It could be a thesis unto itself.
17 And certainly did not get into list maintenance
18 removal. I did get into phone bank issues.
19     Q. And what did you address regarding phone bank
20 issues?
21     A. That I think every county in the State of
22 Florida has difficulty with voters getting through on
23 the phone lines on election day and I addressed that
24 and highlighted that communications was a problem on
25 election day throughout the State of Florida.

Page 19

1     Q. Did you make suggestions for how that should
2 be addressed in the future?
3     A. No, my thesis did not get into trying to
4 address what ought to be done. It was really trying to
5 create a snapshot of some of the problems that did
6 occur from a perspective of someone who administered
7 one part of the election.
8     Q. Did you find or conclude that there were
9 worse problems with communications in the 2000 election
10 than in past elections?
11     A. No, I did not conclude that.
12     Q. Did they seem to be about the same? It's an
13 ongoing problem for supervisors of elections?
14     A. I believe it's a problem across the United
15 States for any high turnout, any general election.
16     Q. Okay. I'm going to go back to some of the
17 foundation questions. We'll come back to your thesis
18 again later.
19      Do you have any other specific academic
20 training regarding elections? Have you studied
21 election administration, statistical analyses of
22 elections, anything like that?
23     A. No.
24     Q. During your master's, did you take any
25 courses that related to election procedures?

Page 20

1     A. No.
2     Q. Pretty much all history courses?
3     A. Correct.
4     Q. Did you review any documents in preparation
5 for this deposition today?
6     A. Staff documents. I reviewed the information
7 on the seven plaintiffs. I reviewed information on our
8 CVF felon procedures. And I reviewed information on
9 our responses to the NAACP on all concerns and
10 information on our list maintenance removal process.
11     Q. All right. If at some point in time you're
12 answering a question and there's a document that you've
13 reviewed to help you prepare for that, if you could let
14 me know and then we can perhaps take a look at that
15 document and mark it as an exhibit.
16     A. That will be fine.
17     Q. Once again, if there's something you want to
18 refer back to, if I ask you a question and you need to
19 look at a specific number and you know there's a
20 document in your materials that would help you answer
21 that, we can take a look at that and perhaps enter that
22 as an exhibit.
23     A. Okay.
24     Q. And how did you prepare for this
25 deposition?

Case 0:00-cv-06107-WJZ Document 420 Entered on FLSD Docket 07/02/2002 Page 1 of 5/6/02
NAACP vs HARRIS, ROBERT et al                     PAM IORIO VOL 1
945

Page 21

1    A. I read all the material that I just mentioned
2 to you, what the attorneys had prepared, just reviewing
3 what the complaint was and specifically looking at the
4 complaint of the seven plaintiffs.
5    Q. Okay. Did you meet with your attorneys to
6 prepare for the deposition?
7    A. Yes.
8    Q. On how many occasions?
9    A. Last week we met. But we have met several
10 times before that as they have updated me on the
11 progress of the case.
12    Q. Okay. Do you meet regularly with them to
13 discuss the case?
14    A. It certainly seems that way.
15    Q. What is your current occupation?
16    A. Supervisor of elections.
17    Q. And how long have you held that position?
18    A. I was sworn in in January of 1993.
19    Q. And is that an elected position?
20    A. It is.
21    Q. And when were you first elected?
22    A. I was elected in November of '92. Reelected
23 in -- well, first elected in '92, reelected in '96,
24 reelected again in 2000.
25    Q. And prior to becoming supervisor of

Page 22

1 elections, what position did you hold?
2    A. I was a Hillsborough County commissioner.
3    Q. And how long were you a county commissioner?
4    A. First elected in May of 1985, reelected in
5 November of 1988, served for seven and a half years.
6    Q. And were there any issues that you
7 specialized in as a county commissioner?
8    A. I think I specialized primarily in budget
9 issues and transportation.
10    Q. And prior to your election to the county
11 commission, what position did you hold?
12    A. Well, I graduated from college in 1981. I
13 came back to Tampa at that time. I worked at the
14 University of South Florida at the Small Business
15 Development Institute. And then I left that job in
16 1984 to run for the county commission.
17    Q. And why did you decide to run for supervisor
18 of elections? Did you have a particular interest in
19 elections?
20    A. Yes, I wanted to modernize the office and
21 make it the very best.
22    Q. In your opinion, were there problems with the
23 office that it needed to be modernized?
24    A. Well, I think anytime you embark on taking
25 over an administrative job, you think you can do

Page 23

1 better.
2    Q. But you'd indicated that your specialty on
3 the county commission was budget and transportation.
4    A. Yes.
5    Q. I was just wondering how you ended up doing
6 that transition to elections?
7    A. Well, I did it.
8    Q. Okay. Had you ever worked in an elections
9 office before becoming supervisor of elections?
10    A. No.
11    Q. Had you ever worked on a campaign before?
12    A. Yes.
13    Q. Had you worked in an elections office,
14 perhaps as a poll worker --
15    A. No.
16    Q. -- anything like that? Okay.
17       I'd like to show you a copy of Plaintiffs'
18 Second Amended Complaint and have this marked as
19 Exhibit C.
20       (Plaintiffs' Exhibit C was marked for
21       identification.)
22 BY MS. BORGEN:
23    Q. Have you seen a copy of this document before?
24       MR. RESTREPO: Lori, are we doing letters
25       or numbers?

Page 24

1       MS. BORGEN: Letters.
2       MR. RESTREPO: We're doing letters?
3       MS. BORGEN: That was C.
4       MR. RESTREPO: Okay. Thanks.
5       MS. BORGEN: Actually, while we're
6       pausing, did somebody else join us on the phone
7       other than Jeff and Susan?
8       MR. HARVEY: Walter Harvey.
9       MS. BORGEN: Hi, Walter. Good morning.
10       MR. ALLEN: Hi, Walter.
11       MR. HARVEY: Hi. How's it going?
12       MS. BORGEN: Walter Harvey represents
13       Katherine Harris and Clay Roberts.
14       MR. BOSCH: And also Bill Bosch with
15       Volusia County.
16 BY THE DEPONENT:
17    A. Right. This is the one that outlines each of
18 the plaintiffs and their complaints.
19    Q. Okay, so you've seen that document before?
20    A. Yes.
21       MS. BORGEN: And I would like to mark as
22       Exhibit D, the Answer and Affirmative Defenses
23       to Second Amended Complaint of Defendant
24       Pam Iorio.
25

1 (Plaintiffs' Exhibit D was marked for
2 identification.)
3 BY MS. BORGEN:
4 Q. And have you seen this document before that's
5 been marked as Exhibit D?
6 A. Yes.
7 Q. And did you assist in the preparation of that
8 document?
9 A. Yes.
10 Q. And you're familiar with it?
11 A. Yes.
12 Q. And it seems to be an accurate copy of the --
13 of your answer to the second amended complaint?
14 A. I mean, I will assume that what you're giving
15 me is what we sent to you.
16 Q. If you have any questions about the document
17 as we go, if there is anything that doesn't seem right,
18 please, let me know.
19 A. All right.
20 Q. I want to ask you questions about the second
21 amended complaint and your answer to that complaint.
22 So to the extent that you would like to refer to those
23 documents to help you in answering the questions,
24 follow along with those, please, feel free to flip
25 through them.

1 A. All right.
2 Q. When did you assist in the preparation of the
3 answers to the second amended complaint?
4 A. Well, if this is dated March 12th, 2002, it
5 has that stamp on it, then I will assume that I
6 assisted in it at least a month prior to its final
7 date.
8 Q. But you recall seeing that document before it
9 was finalized?
10 A. Oh, yes.
11 Q. In paragraph 46 of the complaint -- and if
12 you want to turn to that, it's on page 13 of the
13 complaint.
14 A. Uh-huh.
15 Q. In that paragraph, the plaintiffs allege that
16 pursuant to state that federal law, the supervisors of
17 elections are charged with administering and
18 maintaining the state's overall list maintenance
19 programs and the state's central voter file.
20 Do you agree with this statement?
21 MR. RESTREPO: Objection to the form of
22 the question.
23 BY MS. BORGEN:
24 Q. Do you agree with the statement in regard to
25 the supervisors of elections?

1 THE DEPONENT: Oh, I answer it in spite of
2 the fact that he objected to it?
3 MR. ALLEN: Yeah. Yeah, you can go ahead.
4 BY THE DEPONENT:
5 A. Well, under NVRA, the supervisors of
6 elections are involved with list maintenance, on-going
7 list maintenance of the voter file, a mandated approach
8 under NVRA. And then, we also have an obligation to
9 fulfill regarding the state central voter file.
10 Q. Okay. In answer you to paragraph 46, you
11 have stated that you are without knowledge as to the
12 allegations in paragraph 46. What was the basis for
13 your answer that you are without knowledge?
14 A. Well, I think that these statements, all of
15 them that say that Pam Iorio is without knowledge, is
16 upon advice of our attorney. I mean, that's not a
17 statement that I would come up with on my own.
18 Q. So, in fact, you have some knowledge about --
19 and you feel comfortable in providing that answer you
20 just did to paragraph 46?
21 A. Yes, I do.
22 Q. So other than the responsibilities that you
23 just identified, are there other ways that the
24 supervisors of elections are involved with list
25 maintenance or the central voter file?

1 A. You know, I think it's fairly well spelled
2 out in both state and federal law how we are to conduct
3 list maintenance programs. And under the central voter
4 file, it's spelled out a little bit more specifically
5 now than it was prior to the November 7, 2000 election.
6 Q. And how is it spelled out more specifically?
7 A. Well, in fact, that's an issue that's
8 currently still under some discussion because it's
9 going to the U.S. Justice Department, as we speak, for
10 pre-clearance as to how the new central voter file --
11 how individuals are to deal with that.
12 But when we really look at the central voter
13 file issue, I think one point that's very important to
14 bear in mind is that prior to November 7th, 2000, there
15 was not a specific criteria in place for the
16 supervisors to take the information from the state and
17 then deal with it and get it out to the people who were
18 probable ex-felons.
19 Many of the counties, including Hillsborough,
20 adopted the administrative hearing process. But that
21 was not a statewide process and it was not adopted by
22 all counties. And, in fact, as you know, some counties
23 chose not to do anything with the CVF file at all.
24 Now, since that time, there has been the
25 Election Reform Act of 2001 which has dealt with the

central voter file and has now required that the
counties send notices out to the people on that list.
        But at issue right now, which still needs to
be resolved, is the passage of House Bill 493, which
calls for the supervisors to utilize the administrative
hearing process in order to remove those individuals,
and that is currently before the Justice Department for
pre-clearance.  That is an important issue.
    Q.  Is that a process that you're supportive --
or a bill that you're supportive of, that you think
should --
    A.  No, I am not.  I just recently wrote a letter
to the U.S. Justice Department indicating that I
thought that the pre-clearance of 493 would be at odds
with their pre-clearance of the Election Reform Act of
2001.
    Q.  In what way do you think it would be at odds?
    A.  Well, the Election Reform Act of 2001
essentially had a different take on the central voter
file.  While it did say, on the one hand, that
supervisors must now send out the notices to the
probable ex-felons, it also does not create a
presumption that the computer file is correct.  And
there is now a presumption in favor of the voter, and
that, absent additional information from the voter that

Page 30

indeed they are an ex-felon whose rights have not been
restored, that they would remain on the voter rolls.
        Now that's a particular philosophy that has
been enunciated by Attorney General Bob Butterworth in
a letter that he has written to the U.S. Justice
Department regarding the impact of the Election Reform
Act of 2001, specifically with regard to the central
voter file and how the probable ex-felons will be
treated versus how they were treated in 2000.
        Now when we look at the passage of House Bill
493 and the implementation of the administrative
hearing process, that process does not presume the
innocence of the voter.  It presumes that the central
voter file information is correct and it puts in place
the administrative hearing process, that if the
individual does not respond to a certified letter, or
never receives the certified letter, that you then move
forward with the administrative hearing process, which
involves an ad, a legal notice in the newspaper.  And
if the person does to not respond to that, they are
removed from the voter file.
        That is, I believe, at odds with the Election
Reform Act of 2001 and the interpretation of Attorney
General Bob Butterworth.  And I think it is a pending
issue that is very important that it is cleared up

Page 31

prior to the 2002 elections and before the 67
supervisors receive the central voter file from the
Secretary of State's office.
    Q.  Do you have a copy of your letter to the
Department of Justice?
    A.  Yes, I do.
    Q.  Do you have that with you?
    A.  No, it's in my office.
    Q.  Okay.  Could we get a copy of that --
    A.  Yes.
    Q.  -- later and we'll mark that as an exhibit.
        What procedures is your office using now to
purge alleged felons?
        MR. RESTREPO:  Objection to form.
        MR. LITTLE:  Objection to form.
        MR. TINKLER:  Objection to form.
BY MS. BORGEN:
    Q.  You can go ahead.
    A.  First of all, I think we have to clarify when
you talk about ex-felons.
    Q.  Okay.
    A.  Are you referring to the ex -- probable
ex-felons that are identified with the central voter
file?
    Q.  Well, let's start with that list.  We can

Page 32

come back to ones that are identified by the
counties --
    A.  Okay.
    Q.  -- by the circuit clerk's office.  But if we
start with those who've been identified pursuant to a
central voter file process, since November 2000, have
you received lists from the state of probable or
possible felons?
    A.  I don't believe we have.  I mean, I could
stand to be corrected on that if information comes
later that indicates that we have.  If my staff
indicates that tomorrow in deposition, then I stand
corrected.
        But I will say today that I don't believe
that since the list prior to -- that occurred in the
summer of 2000, prior to the November 7th, 2000
election, I don't believe that the state has sent an
additional list.  Now, I can be quite wrong on that and
I want to make sure that that's clear, that that is
something that may be going on and I'm just not aware
of it.
    Q.  Since November 7th, 2000, have you removed
any alleged ex-felons from the voter rolls?
    A.  We receive, on a rather regular basis, from
our Clerk of the Circuit Court, individuals who have

had felony convictions in the State of Florida -- I'm
sorry, excuse me -- in Hillsborough County and we
follow the administrative hearing process with those
individuals.

Q. Do you receive information from U.S.
attorneys' offices with individuals who have been
convicted in other jurisdictions but who may be living
currently in Tampa?

A. I don't have knowledge of that.

Q. Is there any other category of alleged felon
who have been removed from the voter rolls since
November 7th, 2000?

A. Not to my knowledge.

Q. I would like to turn back to the complaint
and paragraphs 51 and 52 of the complaint. In these
paragraphs plaintiffs describe how they sent a letter
to the Secretary of State dated December 22, 2000,
regarding alleged violations of the NVRA. In paragraph
52, the complaint states that, according to the
Assistant General Counsel, that letter was forwarded to
various supervisors of elections, including
Hillsborough County. That was from Kristi Reid
Bronson, indicated that plaintiffs' letter of
December 22, 2000 was forwarded --
(There was an interruption.)

Page 34

MS. BORGEN: Excuse me just a minute. If
you want to, take a look at paragraphs 51 and
52 to get a little background.
THE DEPONENT: All right.
MS. BORGEN: I'll be back in just a
moment.
(There was a recess.)
MS. BORGEN: For the record, Plaintiff
Natalie Carnegie has joined us in the room for
the deposition.
BY MS. BORGEN:
Q. Ms. Iorio, turning back to the second amended
complaint, as we were discussing in paragraph 51 and
52, plaintiffs have allegations about a letter that was
sent to the Secretary of State about NVRA violations.
And according to counsel for the Secretary of State,
that letter was forwarded to Hillsborough County.
Do you recall seeing a copy of that letter?
A. May I see a copy of it?
Q. Unfortunately, I do not have that with me.
My co-counsel is bringing that --
A. Okay.
Q. We'll come back to that issue. I'll make a
note. But off the top of your head, you do not
recall --

Page 35

A. I would have to see a copy of it to respond.
Q. Okay. We'll come back to that letter then.
If you could turn to paragraph 76 of the
complaint. In that paragraph, plaintiffs state that
pursuant to state and federal law, Defendants Harris,
Roberts, and the supervisors of elections, are charged
with administering and maintaining the state's overall
list maintenance program and the state's central voter
file, very similar to one of the allegations we
discussed earlier.
Do you agree that the supervisors of
elections have some responsibility -- are charged with
administering and maintaining the list maintenance
programs?
A. Correct.
MR. LITTLE: Note an objection.
MR. ALLEN: Yeah.
MR. RESTREPO: Yeah, object to the form.
BY MS. BORGEN:
Q. Earlier you testified about the over -- the
supervisors of elections' involvement in the list
maintenance programs.
A. Uh-huh.
Q. Do you believe that you have some -- that you
were charged with administration of those programs to

Page 36

some degree?
A. Well, I think any reading of the NVRA law
will point to the responsibility of local election
officials across the United States to conduct a list
maintenance removal process.
Q. And similarly, you would say that -- would
you agree that you have some responsibility in
administering and maintaining the central voter file?
A. Under state law, the supervisors of elections
are given certain responsibilities with regards to the
central voter file.
Q. In the answer to the complaint, the answer to
paragraph 76 says that you deny the first sentence of
paragraph 76. What would be the basis for that denial?
A. These answers, wherever it says that I am
without knowledge or deny, they were on advice of
attorney. This is not language that I would have come
up with on my own.
Q. And do you agree with the use of that
language here today?
A. Well, given that I don't have the legal
background to say whether or not -- when that sort of
language is appropriate, it's difficult for me to say.
That language may have some meaning within the legal
context that it doesn't have in a layman's context.

1 Q. In terms of your use of the -- in the
2 layman's context of denying that allegation, would you
3 say that's not accurate, if you use it in layman's
4 terms?
5    MR. LITTLE: Object to the form.
6 BY THE DEPONENT:
7    A. Well, in layman's terms, I speak to any
8 issue. I believe that within the legal context that's
9 sometimes not the case.
10   Q. If you could turn to paragraph 80 of the
11 second amended complaint. Plaintiffs allege that prior
12 to the November 7, 2000 election, Defendants Harris and
13 Roberts failed to require that all county supervisors
14 adopt effective measures to ensure accurate purging of
15 names of registered voters on the list, and to prevent
16 county election supervisors from purging voters without
17 verifying the information provided in the list.
18       What requirements, if any, did Defendants
19 Harris and Roberts give to you, as a county supervisor
20 of elections, for how to remove voters from the central
21 voter file?
22    MR. LITTLE: Object to the form.
23 BY THE DEPONENT:
24    A. I first have to question the use of "purge,"
25 and it's one of the words throughout the complaint that

1 I think needs to be cleared up.
2    Q. Okay.
3    A. There is no purge under current state law or
4 under NVRA. And that is a term that is consistently
5 used by the plaintiffs which, I think, is incorrect.
6    Q. Okay. In what way do you think the term is
7 incorrect?
8    A. You cannot find it in state or federal law.
9    Q. What term would you use instead?
10   A. List maintenance removal under NVRA. And,
11 under state law, there are specific steps that a person
12 should take with regards to removal of deceased names
13 from the Office of Vital Statistics, if an individual
14 is mentally incompetent, or if a person is an alleged
15 ex-felon who has not had his or her civil rights
16 restored.
17       And purged -- the term "purge" was pre-NVRA,
18 when supervisors did conduct a purge of the voter rolls
19 in odd numbered years. But that has not been in
20 existence since the implementation of the NVRA, which
21 went into effect in January of 1995.
22       And so I have to say that every time there is
23 a paragraph that includes that terminology, I have to
24 clear that up for the record because I think it creates
25 a false impression.

1    Q. Okay. What would be the difference in result
2 between using the world purge and removal? How do you
3 differentiate what -- ultimately, isn't the voter
4 removed from the voter rolls?
5    A. It depends.
6    Q. And how would it be different?
7    A. Well, it depends on the list maintenance
8 removal process. There is a multi-step process dealing
9 with -- would you like me to step through that process?
10   Q. We can come back to that later.
11   A. Okay.
12   Q. But ultimately, after you go through the
13 steps of the list maintenance removal process, at the
14 end, when you're removed from the voter process
15 pursuant to list maintenance rules, then you're taken
16 off the vote list, you are --
17   A. Eventually.
18   Q. Eventually. As you go through that process,
19 you may be deemed inactive along the way?
20   A. That's correct.
21   Q. Is that correct?
22   A. That's correct.
23   Q. But if someone is in inactive status, would
24 you consider them to be removed from the voter rolls?
25   A. Not at all.

1    Q. Okay. And so when they're removed from the
2 voter rolls, pursuant to list maintenance, is that only
3 at the end, after all those different steps?
4    A. Correct.
5    Q. And so, after all those steps, they're
6 removed and they're not on the voter rolls, and they
7 can't vote?
8    A. Correct.
9    Q. And if somebody is purged, would you agree
10 that if you're purged, then you're taken off the voter
11 roll and you can't vote?
12   A. Well, my argument against the use of the word
13 "purge" is that it harkens back to an earlier time when
14 different rules were in place, and thus, it confuses
15 the issue. I mean, I think we want as much clarity as
16 possible as we go through this process. And if you use
17 a term that's pre-NVRA in an NVRA environment, you
18 confuse the process.
19       The old purge procedures are quite different
20 than they are today. And so I would just caution the
21 plaintiffs, though it may not be my place to do so,
22 that use of the term "purge" only confuses the process
23 that is really in place today.
24   Q. To the extent, though, that removal from
25 the -- could you use interchangeably, given the end

Case 0:00-cv-06846-ASG Document 420 Entered on FLSD Docket 05/06/02 Page 1 of 6

NAACP vs. HARRIS, ROBERTS PAM ORIO VOL. 18

Page 945

Page 41

```
1 result, "removal pursuant to list maintenance
2 procedures" and "purge"?  Would you agree that both of
3 those ultimately mean that the voter is taken off the
4 voter rolls and not allowed to vote?
5      A. I think you can make an argument for that,
6 but I won't do that.
7      Q. Okay.  And do you think the use -- your
8 objection to the use of "purge" is within the context
9 of, I guess, an election official who knows how it was
10 used in the past?
11     A. That's correct.  And the connotation of purge
12 is, I think, a removal -- almost a removal from the
13 rolls without a specific due process.  Now that may be
14 my own bias coming into play here, but I don't think it
15 is an accurate reflection of how people are currently
16 removed from the rolls today.
17         And so, again, I just will not use the word
18 "purge".  And as it comes up in these various
19 paragraphs, I'm going to continue to bring it up that
20 the use of the word "purge" harkens back to an earlier
21 time and does not reflect today's procedures.
22     Q. Absent the connotation that purge has to
23 you --
24     A. Yes.
25     Q. -- if you use "purge" in layman's term, do
```

Page 42

```
1 you think it accurately reflects what happens, that if
2 someone is purged, they are removed from the voter
3 roll?
4          MR. RESTREPO: Object to form.
5          MR. LITTLE: Object to the form.
6 BY THE DEPONENT:
7      A. I would use list maintenance removal process.
8      Q. Okay.  Going back, then, to paragraph 80 --
9      A. Yes.
10     Q. -- I had asked you about whether you had
11 received any written requirements from Defendants
12 Harris and Roberts about how you would conduct removal
13 of individuals from the voter rolls?
14     A. When we received the list in the summertime
15 of 2000 from the state, the supervisors, at that time,
16 did not receive information from the state as to how we
17 were to proceed.  And so the supervisors did what we
18 often do, which was that we informally contacted one
19 another, informally contacted like counties of similar
20 size and decided what we thought would be the best
21 process to use.  And that is how many of us decided on
22 using the administrative hearing process.  Pinellas,
23 Pasco, Miami-Dade, Hillsborough, we decided that the
24 use of the administrative hearing process was a process
25 that made sense.  It was already in the law with
```

Page 43

```
1 regards to the county list that came to us on a regular
2 basis, and thus would make sense to extend it in this
3 particular case.
4          But we did not receive that directive nor was
5 there a directive sent out to all 67 counties saying,
6 now that you've received the central voter file, this
7 is how you will now implement it.
8      Q. When you stated at the beginning, actually,
9 that you received the list in the summer of 2000, which
10 lists were those?
11     A. Well, in that process, I would like to step
12 through regarding how we process the central voter file
13 felon registrations.  And although I think you already
14 have this, this we will make part of the record.
15     Q. Okay.
16     A. This is a memo called Processing CVF Felon
17 Registrations.
18     Q. Okay.  Can I take a look at that?
19     A. Absolutely.
20     Q. Make sure we're on the same page.
21         And do you consider all these pages to be
22 part of one document?
23     A. Yes, even though they certainly do cover
24 different letters that we wrote at different times, but
25 I think it all encompasses one topic.
```

Page 44

```
1      Q. Okay.  This is a package of materials about
2 how you conducted the --
3      A. Right.
4      Q. Is this for the --
5      A. It deals with the --
6      Q. -- felons only?
7      A. -- correct.  Correct, the central voter file
8 felon issue.
9      Q. Okay.  And who prepared these documents?
10     A. My staff, probably Darrell Smith.  He will be
11 part of the deposition tomorrow.  It may be something
12 you might want to ask him if he specifically produced
13 that.
14         MS. BORGEN: Okay.  I will go ahead and
15     mark this as Exhibit E.
16     (Plaintiffs' Exhibit E was marked for
17     identification.)
18 BY MS. BORGEN:
19     Q. Okay.  Go ahead, please.
20     A. And so, stepping through this process,
21 because I know that this whole felon issue -- ex-felon
22 issue is the heart of many of these complaints, I think
23 you first have to go back to the list that we received
24 in 1998.  And, at that time, we returned that list to
25 then Secretary of State Sandra Mortham.  And included
```

Page 45

1 in this exhibit is a letter I sent on August 21st,
2 1998, to Secretary Mortham, saying that because the
3 list at that time had not gone through the necessary
4 procedures of making sure that each name had been gone
5 through to ascertain that they were an ex-felon who had
6 not had their civil rights restored, and that's what
7 specifically the law called for, I was sending it back
8 until they could get us that kind of list.
9　Q. Before you go on to another list then --
10　A. Uh-huh.
11　Q. -- for the 1998 list, what did the state send
12 to you?
13　A. They sent supervisors a list that I would
14 have to say, at least I felt, and probably all the
15 other supervisors felt too, had not gone through the
16 kind of scrutiny that it needed to go through in order
17 to first reach us.
18　Q. And do you know, did the list include only
19 alleged felons or did it also include duplicates and
20 deaths?
21　A. It had deaths also.
22　Q. Duplicates, do you recall?
23　A. I cannot answer that.
24　Q. And do you know who assisted the state in
25 preparing that list? Did the State prepare the list on

Page 46

1 its own? Did it work with an outside contractor to
2 prepare that -- the 1998 list?
3　A. Well, this memo indicates Database
4 Technologies was to provide a report to DOE. Whether
5 or not Database Technologies helped with that in 1998,
6 I'm not equipped to say.
7　Q. You received one list from the State that
8 included felons, probably deaths, and you're not sure
9 about duplicates?
10　A. Correct.
11　Q. And the state was telling you these
12 individuals -- what do they say to you, these
13 individuals should be removed from your voter rolls?
14　MR. LITTLE: Objection to form.
15 BY MS. BORGEN:
16　Q. Do you remember what instructions the state
17 provided to you?
18　A. I cannot recall that.
19　Q. Do you recall if you have documents in your
20 files that would -- perhaps a copy of what the state
21 sent to you saying, here's the list and here's what to
22 do with it?
23　A. We may. We may. And my staff members, I
24 think, tomorrow would be better equipped to answer
25 those questions.

Page 47

1　Q. Okay. Go ahead.
2　A. So my point with 1998 is that we didn't
3 process the ex-felons. The list was considered too
4 unreliable.
5　Now, "In April of 2000, we received the CVF
6 Felon List. The list contained in-state felons
7 provided by DOE and in-state and out-of-state felons
8 provided by DBT. The first DBT list received had
9 errors because persons on the list from Texas files had
10 misdemeanor, not felony convictions."
11　Q. May I stop you just a moment. Are you
12 reading from a document?
13　A. Yes.
14　Q. Okay, go ahead.
15　A. Well, I want to make sure I get this correct
16 on the record because there's a lot of -- I mean, I
17 think a lot of the case deals with this whole ex-felon
18 issue.
19　Q. Okay. But for the record, you're reading
20 from Exhibit E?
21　A. Right.
22　Q. Which paragraph on that first page?
23　A. Third.
24　Q. Third paragraph, okay.
25　A. "This glitch did not affect our process

Page 48

1 because it was discovered before we began processing
2 the names. The second DBT list received around 2 weeks
3 later was amended to reflect the corrections."
4　So "In accordance with Florida law, upon
5 receiving the CVF list, the supervisor must attempt to
6 verify the information provided." And "if the
7 supervisor does not determine that information provided
8 by DOE is incorrect, the supervisor must remove from
9 the registration books by the next subsequent election,
10 the name of any person who is convicted of a felony
11 with respect to voting."
12　Q. I just think we're going too fast for the
13 court reporter.
14　A. Sorry.
15　Q. It happens when you read.
16　MS. BORGEN: Do you need her to read it
17 back on there?
18　COURT REPORTER: Yeah, if she can.
19 BY THE DEPONENT:
20　A. "In accordance with Florida law upon
21 receiving the CVF list. The supervisor must attempt to
22 verify the information provided. If the supervisor
23 does not determine that the information provided by DOE
24 is incorrect, the supervisor must remove from the
25 registration books by the next subsequent election, the

Case 0:00-cv-06107-JIC Document 420 Entered on FLSD Docket 07/02/2002 Page 430 of 5/6/02
NAACP vs HARRIS, ROBERT et al.
945

Page 49

1 name of any person who is convicted of a felony with
2 respect to voting.
3        "Our office initially used a certified mail
4 approach to verify the accuracy of the CVF
5 information." As I mentioned to you before, we had
6 decided in conjunction with other like counties, Pasco,
7 Pinellas, Miami-Dade, to utilize the administrative
8 hearing process.
9        "In June 2000, we sent out over 3,200 alleged
10 felon certified letters to persons identified on the
11 most current list. We sent a certified letter that
12 stated DOE identified them on list of voters as felons
13 and they would be removed unless their voting rights
14 have been restored or if we have incorrect information.
15       "The letter included a Voter Eligibility
16 Status form and a postage paid envelope with
17 instructions to complete and return the VES form if the
18 CVF information was incorrect. The letter also
19 mentioned that they could attend an administrative
20 hearing on August 8, 2000 to contest our information or
21 to complete a VES form to be sent to FDLE or Office of
22 Executive Clemency, only of clemency is involved."
23    Q. Before you continue, let's go over some of
24 those pieces --
25    A. Sure.

Page 50

1    Q. -- in those paragraphs.
2        First of all, you indicated you received a
3 list, first, in April of 2000, that was the one with
4 the Texas --
5    A. Correct.
6    Q. -- misdemeanors and then you received a
7 corrected one a few weeks later?
8    A. Right.
9    Q. Did you receive any lists from the State in
10 1999?
11    A. Not to my knowledge. Again, my staff
12 tomorrow may be able to speak to that and might have
13 information that I just don't have today.
14    Q. Okay. And for the list that you received in
15 2000, in late April, May, something like that, that you
16 received that --
17    A. Uh-huh.
18    Q. -- did you receive any instructions from the
19 State in terms of how to use that list?
20    A. No.
21    Q. Had anyone from your staff attended any
22 trainings sponsored by the State or that were organized
23 by the Division of Elections in terms of how to use the
24 list provided by the State?
25    A. The supervisors of elections meet twice a

Page 51

1 year, every January and June, in conferences. And the
2 topic of the central voter file was often a topic at
3 these conferences. The meeting prior to this election
4 was in Key West in June of 2000. And I do believe that
5 the topic of the central voter file came up, although
6 there certainly was no conclusion reached as to how all
7 67 counties were to deal with the list and maintenance
8 removal. Information was shared at the conference that
9 certain counties were using the administrative hearing
10 process.
11    Q. And did the supervisors work together to form
12 a committee to deal with these issues?
13    A. I'm not sure that they did. I pause because
14 I believe that David Leahy might have headed up some
15 effort. But I'm concerned that I might be getting that
16 confused with an effort that he's currently heading up
17 dealing with the central voter file and not one prior
18 to 2000, so I'm not sure I can answer that.
19    Q. Okay. Are you familiar with a group that's
20 been called the Central Voter File Committee?
21    A. The current one.
22    Q. That was chaired -- according to some
23 documents that have been produced in litigation, there
24 was a Central Voter File Committee that was formed at
25 some point in time that was existence prior to the 2000

Page 52

1 election.
2        I'm going to show you one --
3        MS. BORGEN: Mark this as Exhibit F.
4    (Plaintiffs' Exhibit F was marked for
5    identification.)
6 BY MS. BORGEN:
7    Q. This is a document that was produced in
8 litigation by your office. And at the top of this
9 document --
10    A. Oh, Yes. Yes.
11    Q. -- there is FSASE, Central Voter File
12 Committee and it lists --
13    A. Absolutely.
14    Q. -- has information at the top.
15        MR. RESTREPO: Lori, what's the Bates
16    range on this document, unless you have copies
17    for the rest of us?
18        MS. BORGEN: It has not been Bates
19    stamped. I believe Cara is going to have
20    copies of these documents when she arrives.
21 BY THE DEPONENT:
22    A. And I apologize for not -- I mean, I didn't
23 want to answer yes, but now that you've jogged my
24 memory, yes, there was this committee. And the
25 rationale for the committee was to try to adopt some

1 standardized statewide procedures for the removal of
2 these individuals from the rolls based on information
3 coming from the state and adopting this voter
4 eligibility status form that all supervisors could use.
5 Yes.
6        MS. BORGEN: Okay, I'll pause for just a
7 moment. Do you want to take a look at the
8 document before we continue?
9        MR. RESTREPO: Yeah, that'd be great.
10        THE DEPONENT: Yeah, and let me --
11        MS. BORGEN: Please, go over it. Take
12 your time and look through that.
13        MR. RESTREPO: All right.
14        MS. BORGEN: And let me take a look at
15 this. We may not -- some of this overlaps,
16 actually, with what she has and may not belong
17 to this document.
18        Off the record for just a moment.
19        (There was a recess.)
20            DIRECT EXAMINATION
                  (continued)
21 BY MS BORGEN:
22    Q. So you're familiar with the FSASE, that's the
23 Florida Supervisors -- Florida --
24    A. Florida State Association of Supervisors of
25 Elections.

1    Q. Okay. And do you call it -- how do you
2 pronounce the acronym? Do people have a short form for
3 that?
4    A. No.
5    Q. They just say FSASE?
6    A. Yes.
7    Q. FSASE?
8    A. No, no, no.
9    Q. Okay, let's stick with the FSASE.
10    A. FSASE.
11    Q. Do you know when the Central Voter File
12 Committee was formed by the FSASE?
13    A. I don't. It was likely formed -- well, I
14 don't want to speculate. I don't know.
15    Q. Okay. Prior to 2000, do you think?
16    A. I don't know.
17    Q. Okay. Do you know what the impetus was for
18 formation of that committee?
19    A. Trying to get some standardization amongst
20 the 67 counties of how we were to deal with the list
21 once we received it from the State since state law did
22 not speak to what we were to do.
23    Q. And was there a sense that the Division of
24 Elections had not provided specific guidance, so the
25 supervisors had to come up with something?

1        MR. LITTLE: Object to the form.
2 BY THE DEPONENT:
3    A. I think there was more of a sense that we had
4 the ultimate responsibility and were ultimately going
5 to be held accountable, and so we had to have a process
6 in place.
7    Q. But the Division of Elections or the
8 Secretary of State had not identified a process to be
9 followed by the supervisors of elections?
10    A. Correct.
11    Q. Did you contact the Division of Elections at
12 any point in time to ask for guidance on what process
13 should be followed?
14    A. I don't believe I could answer that for a
15 deposition in terms of saying with complete -- I mean,
16 whether or not I spoke over the phone to the director
17 or -- you know, if I can't remember with complete
18 clarity, I'd rather not say.
19    Q. So you have no specific recollection --
20    A. No.
21    Q. -- either way? Okay.
22        And do you recall contacting anyone else at
23 the Secretary of State's office regarding your request
24 for some guidance on how to -- what to what do with the
25 list provided?

1    A. I cannot recall that.
2    Q. Okay. And do you recall any other
3 information about the FSASE Central Voter File
4 Committee process? When they met? Who was involved?
5    A. Well, these are the members that were
6 involved. And David Leahy, from Miami-Dade,
7 particularly took the lead because he was one of the
8 first supervisors to step out and actually mail to his
9 list, and so he became the most experienced supervisor.
10 And he developed this -- or helped developed the form,
11 actually had experience in using it, actually had
12 experience in sharing with the rest of the supervisors
13 the inaccuracy of the list, and so he really was our
14 pioneer supervisor.
15    Q. And do you recall what he said, if anything,
16 about the inaccuracies of the list? What some of his
17 concerns were with the list?
18    A. That the list --
19        MR. RESTREPO: Object to form.
20 BY THE DEPONENT:
21    A. Yes. That the list had inaccuracies.
22    Q. And do you recall what types of inaccuracies?
23        MR. RESTREPO: Object to form.
24 BY THE DEPONENT:
25    A. Inaccuracies to the degree that people were

1 tagged as ex-felons who had not had their civil rights
2 restored, when indeed they were either not ex-felons at
3 all or they were ex-felons who had their civil rights
4 restored.
5    Q. And were there any inaccuracies identified by
6 David Leahy regarding duplicates on the list?
7    MR. RESTREPO: Object to the form.
8 BY THE DEPONENT:
9    A. I can't recall that specifically.
10    Q. The primary thing that you recall is the
11 felons who were on the list?
12    MR. RESTREPO: Object to the form.
13 BY THE DEPONENT:
14    A. What I recall is a discussion of people in
15 two categories; either mistaken identity all together,
16 where the person was not the individual tagged by FDLE,
17 or the person was correctly identified as an ex-felon,
18 but they had had their civil rights restored.
19    Q. Okay.
20    A. Or we also got into another category of
21 people who had not committed felonies in the first
22 place, or had committed crimes in other states where
23 they had already had their civil rights restored, and
24 so there were various complications that arose.
25    Q. You said that David Leahy was the first one

1 to come up with the system of sending letters to the
2 individuals.
3    A. Yes.
4    Q. Was that the process he developed to verify
5 the list or what was the purpose of sending the
6 letters?
7    MR. RESTREPO: Object to the form.
8    MR. LITTLE: Same.
9 BY THE DEPONENT:
10    A. Mr. Leahy, Supervisor Leahy, was a member of
11 the Central Voter File Committee. And because he, as I
12 mentioned -- and I may be incorrect in that he was the
13 first supervisor to do it. But in my recollection, he
14 was the first supervisor in certainly the largest
15 county in the State of Florida to actually send letters
16 out to these individuals named on the central voter
17 file.
18    And David is a very detailed and careful
19 supervisor who is very procedurally oriented and does
20 an excellent job. And he developed a specific
21 procedure and a form, this VES form, that, as I
22 mentioned, Pasco and Pinellas and Hillsborough all
23 copied.
24    Q. Prior to David Leahy's suggestion of sending
25 letters to everyone on the list, had anyone at the

1 State Division of Elections suggested that the
2 supervisors send a letter to everyone on the list
3 telling them that they had been placed on this list?
4    A. Well, I believe that the law calls for the
5 supervisors to mail something to everyone on the list
6 indicating -- I would have to have that law in front of
7 me, but I believe there is language that specifically
8 says that there is to be some follow up by the
9 supervisor with some letter.
10    Q. Is it your recollection that the law requires
11 the supervisors to do some kind of verification of the
12 individuals on the list?
13    A. Well -- and I don't have the law in front me,
14 but therein lies the problem in terms of how do you
15 verify, as the supervisor, and that was the problem
16 that we were faced with. Is it verification to send a
17 certified letter? Does that constitute verification?
18 Or is verification that we receive additional
19 information back from the individual via this voter
20 eligibility form or status form of some sort? What if
21 the certified letter is returned undeliverable? What
22 if we never hear from the person?
23    Those were some of the questions that we
24 attempted to grabble with.
25    Q. And what verdicts did you come to in terms of

1 what is verification?
2    A. Well, I could pick up on what I was reading.
3    Q. Okay.
4    A. If the reading doesn't get too tough. I'll
5 read slowly. But I think it is important to at least
6 get the Hillsborough process on the table.
7    Q. Okay.
8    A. "All returned VES forms were forwarded to
9 FDLE or EOC," which is Office of Executive Clemency.
10 So if a voter sent back a completed VES form
11 indicating, You've got this wrong, I'm not the person,
12 or yes, I had a felony conviction, but I had my rights
13 restored, or whatever information, we then really tried
14 to be the middleman in the process attempting to help
15 the voter figure out their situation and we forwarded
16 that information to FDLE or OEC.
17    "If FDLE or OEC responded with paperwork
18 indicating the person was not a felon, we left the
19 person as he/she was in the voter file," so nothing
20 occurred.
21    "If we we're notified by FDLE or OEC, via the
22 VES form, that the person was a felon without rights
23 restoration, the person was flagged for removal as a
24 felon. Whenever we received a response on the VES
25 form, whether positive or negative, from FDLE or OEC,

1 we forwarded a letter to the person in question to
2 inform him/her of their status.
3      "We published --" and I do want to emphasize
4 how much time we spent working on behalf of these
5 individuals. I had one full-time staff person who
6 worked on this because many of these individuals, if
7 they didn't have us to help them, would have to deal
8 directly with Tallahassee.
9      Q. And what was this person doing? What was
10 this employee doing?
11     A. They were the ones on the phone trying to get
12 to the bottom of the situation on behalf of the voter.
13     Q. Contacting FDLE or OEC?
14     A. OEC and trying to research individual cases
15 to help these people out.
16     Q. Okay.
17     A. We found that individuals had had felony
18 convictions and did not have their rights restored and
19 didn't know that they had to have their rights
20 restored. Our office, and my approach and philosophy,
21 is to try to help these individuals and we do that even
22 today. We try to get the word out in the community
23 about this rights restoration process. And I have a
24 person on my staff that helps individuals in the
25 community work their way through process. It's easier

1 for them to deal with an individual from Tampa than it
2 is long distance.
3      Q. Would you send individuals copies of --
4      A. Oh, yes.
5      Q. -- the clemency application?
6      A. We do everything we can to help people get
7 their civil rights restored and we'll continue to do
8 that.
9         MS. BORGEN: Okay. If we could just pause
10 for just a moment. I apologize. My colleague
11 Cara Fineman has arrived with extra copies of
12 documents for those at the end of the table
13 that have been requesting them. So we can get
14 situated, we'll go off the record for just a
15 minute.
16         (There was a recess.)
17       MS. BORGEN: Plaintiffs have been joined
18 by Cara Fineman who is also an attorney on
19 behalf of plaintiffs.
20 BY MS. BORGEN:
21     Q. Ms. Iorio, we were discussing the central
22 voter file process, how Hillsborough had used the list
23 provided by the state in 2000. And I think you were in
24 the middle of reading a paragraph, right?
25     A. Do you want me continue that?

1      Q. Sure, go ahead, continue and pick up where
2 you left off.
3      A. "We published a legal ad -- newspaper ad in
4 the Tampa Tribune on July 28, 2000, with a list of
5 names of the alleged felons with their date of birth,
6 who did not return the certified mail receipt green
7 card. At that stated that the listed names on our voter
8 rolls were allegedly invalid and the Elections Office
9 was giving them an opportunity to show cause why their
10 names should not be removed from the voter registration
11 books by attending the administrative hearing on August
12 8th, 2000. Approximately ten persons attended the
13 hearing.
14      "On August 4, 2000, we sent a letter to FDLE
15 asking them to research their felon files over some 300
16 names of alleged felons on our CVF list that were
17 returned as undeliverable in our June 2000 mailout.
18 The names forward were not exact matches and we asked
19 FDLE to verify whether the persons shown on our list
20 had a felony conviction and had not had their rights
21 restored.
22      "FDLE returned a letter dated August 15,
23 2000," which is part of the packet, "saying they were
24 not able to research our listing because they had
25 already provided all the information that they had

1 available to DOE for the CVF list. Additionally, we
2 sent a similar letter to DBT on August 7, 2000, looking
3 for the same information for the out-of-state felons.
4 We received a telephone call from a representative of
5 DBT saying they could not verify the felony conviction
6 or rights restoration. In both cases," and this is my
7 staff speaking, "I believe," and you might be a able to
8 determine tomorrow whether this was Darrell Smith or
9 perhaps Gary Klunk of my staff who says this -- that
10 "the people listed on the CVS list are felons, it is up
11 to us to determine if our voter names match their
12 files.
13      "On August 18, 2000, all names of voters who
14 exact matches (Last Name, First Name, Middle Name or
15 Initial, Suffix, Date of Birth, Race and Gender) and
16 did not respond to our certified mailout in June 2000,
17 or found by FDLE/OEC to be convicted felons," without
18 having their civil rights restored, "were removed from
19 the active voter rolls."
20      We took the initial step of mailing a regular
21 letter to those individuals. It was my belief that
22 some people don't like certified letters, perhaps,
23 particularly if they've gotten in trouble with the law
24 before. And so we just mailed them a regular letter
25 informing them about this felon status and that we were

1 removing them from our voter file.

2    "No removal action was taken on those voters
3 who were mailed a certified letter, but there was no
4 indication that they received the certified
5 correspondence (no certified mail receipt returned) and
6 who were not a perfect match with the CVF data.  In
7 addition, those names on the CVF list that did not have
8 a conviction date, or had a future conviction date,
9 were not removed pending verification of the accuracy
10 of the conviction dates.  A few names on the CVF list
11 without a conviction date were verified by the VES form
12 process as felons through FDLE or OEC and removed."

13    To summarize what occurred in Hillsborough
14 County, the initial certified mail felon notification
15 letters numbered 3,258.  We had a total of 549 VES
16 forms processed.  Of those 548 (sic), 238 were found to
17 be non-felons or they had their civil rights restored.

18    Pending cases, derived matches, 279.  CVF
19 felons without conviction dates, 342.  DBT felons
20 without conviction dates or a future conviction dates,
21 126.  And so of the 3,258 names that we started with,
22 we removed, prior to the fall elections, 2,273 names.

23    Q.  Okay.  Going back over some of the issues
24 that came up then that you mentioned there.

25    A.  Uh-huh.

1    Q.  First of all, one of the things that we
2 started discussing before is that your office had had
3 discussions on how do you verify --

4    A.  Correct.

5    Q.  -- what is verification.  Did you come up
6 with some basic standards on what would be sufficient
7 verification, that we must get X, Y or Z, before we can
8 feel that we have verified that information?

9    A.  Yes.  And as you can tell from the numbers
10 that I just gave in the narrative, we were not
11 comfortable with names that were not exact matches, nor
12 were we comfortable with data that did not have a
13 conviction date or had a future conviction date.  And
14 so, we did not remove all of the names that possibly
15 another county might have removed if they took a
16 different approach.

17    Q.  So individuals that were less than 100
18 percent name match were not removed; is that correct?

19    A.  And people who had the -- without a
20 conviction date or who had a future conviction date.

21    Q.  Now, there was a reference there, I think in
22 the end numbers, something about a pending -- something
23 regarding a conviction date.  I think you were trying
24 to figure out some information about the conviction
25 date?

1    A.  Right.

2    Q.  That's what it sounded like.  And if you
3 received information about the conviction date from --
4 were you trying to get that information from FDLE?

5    A.  That's correct.

6    Q.  And if you received that information, then
7 that individual might have been removed from the rolls?

8    A.  Is says a few names on the CVS list, without
9 a conviction date, were verified by the VES form
10 process as felons through FDLE or OEC and removed.

11    Q.  Okay, so those individuals were.  But if you
12 weren't able to actually get information that --

13    A.  Then we did not.

14    Q.  They were not removed?

15    Do you know how you came up with -- how your
16 office came up with those standards for what was deemed
17 a good enough match or sufficient verification?

18    A.  Part of it had to do with my own philosophy
19 that you have a fundamental right to vote, and this
20 list had known inaccuracies, and that I was not
21 comfortable with the process that removed people if it
22 was not an exact match or the list didn't even have a
23 conviction date or a future conviction date.  And that
24 is why I followed up with a letter asking for
25 additional information from FDLE.

1    And when they respond back and say, Sorry, we
2 can't give you any additional information beyond what
3 you've already been given, then I don't have a high
4 comfort level that those are individuals that should be
5 removed from the voter rolls.

6    Q.  And the information you were seeking from
7 FDLE, was that only for individuals who had either no
8 conviction date or a future conviction date?

9    A.  Or were not exact matches.

10    Q.  Or not exact matches.  Also the ones that
11 were not a 100 percent name match?

12    A.  That's correct.

13    Q.  All of those individuals you asked FDLE to
14 check their records --

15    A.  Correct.

16    Q.  -- and see if -- okay.

17    You mentioned, as well, you were seeking
18 assistance from DBT with the list?

19    A.  That's correct.

20    Q.  What were you asking them to help you with?

21    A.  We sent a letter on August 7th to DBT and
22 it's part of the exhibit.  "The attached listed
23 individuals appear on our central voter file felon list
24 received from the Division of Elections as out-of-state
25 felons.  The verification notices we forwarded to these

Page 69

1 alleged felons concerning their felony status were
2 returned as undeliverable.
3     "The names on the attached list are not exact
4 matches with the individuals on our voter file.
5 Therefore, we need more information pertaining to each
6 record before we can make a decision regarding removal
7 from the voter rolls. We are asking your cooperation
8 to verify whether or not the" individuals "identified
9 on the attached list have a felony conviction and have
10 not had their rights restored.
11     "A prompt response to our request would be
12 appreciated, so we can resolve the status of each
13 person prior to the First Primary election on September
14 5, 2000."
15     Q. And did you receive any response to that
16 letter from DBT?
17     A. There is a notation on this letter dated
18 8/7/2000, "Letter to DBT. We received telephone call
19 saying they could not provide us the information we
20 requested."
21     Q. And is that your handwriting on that
22 petition?
23     A. No, it is not.
24     Q. Do you know whose handwriting that is?
25     A. This could -- I think you could clarify that

Page 70

1 in tomorrow's deposition. But I suspect it's Gary
2 Klunk's, who is my voter services manager.
3     Q. Okay. At this point in time, though, you
4 have not identified Gary Klunk as one of individuals to
5 testify pursuant to the 30(b)(6)?
6     A. He is not going to be giving a deposition.
7 He works under Darrell Smith, so I think Darrell Smith,
8 tomorrow, who is my Director of Operations and Support,
9 will be well qualified to answer any questions.
10     Q. Okay. But if Mr. Smith is not able to, then
11 you suggest that Gary Klunk might be the one who's --
12     A. He could, but I feel very confident that
13 Mr. Smith will be able to.
14     Q. Okay. And so those individuals with the
15 out-of-state convictions, where the letter -- the
16 certified letter had come back, they were not exact
17 matches, those individuals were not removed from the
18 voter list?
19     A. That's correct.
20     Q. The individuals where there was 100 percent
21 name match, but the certified letters came back, were
22 those individuals removed from the voter list?
23     MR. RESTREPO: Objection to form.
24     MR. MAC INNES: Object to the form.
25

Page 71

1 BY THE DEPONENT:
2     A. Could you repeat that again?
3     Q. Sure. If there is an individual who was on
4 the list that was provided by the state to Hillsborough
5 County, and it was 100 percent name match, you sent
6 them a letter by certified mail telling them they were
7 on the list, asking them to respond?
8     A. Yes.
9     Q. If that individual did not respond, would
10 they be removed from the voter list?
11     A. After going through that administrative
12 hearing process that went through.
13     Q. So they would be --
14     A. The ad in the newspaper, administrative
15 hearing that was held on August 8th, 2000.
16     Q. So the individuals in that category, other
17 than the letter that was sent to them, and then giving
18 them the opportunity for a hearing, were there any
19 efforts made to verify the accuracy of the information
20 on that list?
21     A. If the person was an exact match and we
22 mailed them a certified letter, then we proceeded -- if
23 they sent back a VES form, then we worked on their
24 behalf to clear up the information. And as our
25 statistics show, of the people who sent back VES forms,

Page 72

1 44 percent in that particular group, the information
2 was in error.
3     But if we did not hear from the person at
4 all, then we proceeded with the administrative hearing
5 process, and then ultimately sent them a regular piece
6 of mail to indicate that they had been removed from the
7 rolls.
8     Q. And that was to say that you have been
9 removed?
10     A. That's correct.
11     Q. Not, you are about to be removed, but you
12 have been removed?
13     Would they have an opportunity, at that point
14 in time, to respond or come into the office and say,
15 Hey, I shouldn't have been removed --
16     A. Absolutely.
17     Q. -- put me back on? Okay.
18     And earlier when we were talking, you said
19 that your office -- it sounds like you and your staff
20 had sat down and were discussing what is proper
21 verification, what do you do with this list, and is it
22 enough to send a letter, does that qualify for
23 verification under the statute?
24     A. Yes.
25     Q. How did you come to the decision that

1 ultimately that was enough?

2    MR. MAC INNES: Objection to form.

3    MR. LITTLE: Objection, form.

4    MR. ALLEN: Objection to form.

5 BY THE DEPONENT:

6    A. As I mentioned, with the central voter file,
7 that when the supervisors had to come up with and
8 recommend procedures, we -- and when I say, we -- our
9 staff, as well as some of the other supervisors,
10 Miami-Dade, Pinellas, Pasco, Hillsborough, we had
11 concluded that the administrative hearing process was
12 the best process to follow absent any other direction.
13    (A discussion was held off the record.)

14 BY MS. BORGEN:

15    Q. Was there a specific discussion among the
16 supervisors of election about whether it would be
17 sufficient to send a letter and then the notice of the
18 administrative hearing process? Was there concern that
19 that might not be enough to verify?

20    MR. RESTREPO: Objection to form.

21    MR. ALLEN: Objection to form.

22    MR. LITTLE: Objection.

23 BY THE DEPONENT:

24    A. I'll put this back in the context of prior to
25 November of 2000. The supervisors, absent any other

1 direction in state law as to how to proceed, and given
2 that the administrative hearing process is the one used
3 for the removal of county felons, people who are
4 identified by our clerks of the circuit courts as
5 county felons, we thought it was an appropriate way to
6 deal with this list.

7    Q. Okay. Do you believe the county felon lists
8 that you received -- that was received from the county
9 are more reliable than the list received from the state
10 in 2000?

11    MR. ALLEN: Objection.

12    MR. LITTLE: Objection to form.

13    MR. RESTREPO: Objection to form.

14 BY THE DEPONENT:

15    A. That is a difficult question for me to
16 answer. And I also think that in some respects it is
17 comparing two different databases, two different
18 situations.

19    Q. If they're two different situations, why did
20 it seem to you that the process for one would apply for
21 the other?

22    A. Well, let me go back as to why I think
23 they're slightly different situations. One is a list
24 that comes with great frequency from your Clerk of the
25 Circuit Court dealing only with people who have felony

1 convictions within your own county. Now, even with
2 that list, you can get inaccuracies. And I think one
3 of the keys to the inaccuracies is that many people
4 have aliases. And so you're dealing with a group of
5 individuals where it might be difficult to pin down
6 their exact name and get exact matches. And that's a
7 problem even with our county list on a monthly basis.

8    Your question was really, did I feel they
9 both have the same kind of inaccuracies? I think that
10 was your original question. The central voter file in
11 the year 2000, when you take out the attempt that was
12 made in 1998, because that attempt didn't stick, it
13 didn't work, it wasn't followed through with, this was
14 a first. And given that, it was the accumulation of
15 names, some of them going back 40 years.

16    And so, that's why I say it is difficult, I
17 think, to compare accuracy levels of the two. But
18 though it might be difficult to compare accuracy
19 levels, I don't think it's unfair to say that an
20 administrative hearing process could have logically
21 been applied to that process prior to 2000.

22    Q. The information you received from the county
23 clerk, those are all pretty recent convictions; is that
24 correct?

25    A. Correct.

1    Q. They're sent to you on an ongoing basis, so
2 the individuals convicted here in Hillsborough County
3 this month of a felony are forwarded to you?

4    A. Correct.

5    Q. And the information that was on the list that
6 was provided by the Division of Elections to you in
7 2000, included, as you indicated, old conviction
8 information?

9    A. Correct.

10    Q. Sometimes going back 40 years --

11    A. Correct.

12    Q. -- or maybe more than that even?

13    Was it a concern, or just perhaps discussed
14 in your office, how reliable some of that old data
15 might be for convictions?

16    A. Absolutely.

17    Q. And what kind of discussions -- did you
18 discuss different ways to address that, how you might
19 be able to deal with that?

20    A. I believe that what I have read into the
21 record, and our summary of how our county dealt with
22 it, and what I indicated earlier in terms of my own
23 philosophy in devoting the kind of staff resources that
24 we devoted should paint the picture of a county
25 elections office that was very concerned about the

Page 77

1 inaccuracies.
2      I mean, on the one hand, the law was saying,
3 You must do something with list. And on the other
4 hand, you have a list that has known inaccuracies and
5 you have to protect a person's right to vote. I was
6 very concerned with that.
7      And I think that all the procedures that my
8 office put into place, and the track record that I've
9 laid out today in deposition, and the other documents
10 can show you that we tried to be as careful as, I
11 think, any county could be and only removing names of
12 individuals that appeared to be exact matches and not
13 removing names of individuals that didn't fall -- that
14 fell into other categories that I've already named.
15 And we had tremendous sensitivity to that and I -- it
16 was a key issue for us as a staff.
17      Q. You mentioned that you tried to be as careful
18 as you could be?
19      A. Yes.
20      Q. Did you feel like there were limitations
21 within the state law, or what the Division of Elections
22 had informed you, that limited what you could do, that
23 you could only have so much, I guess, parameter of
24 safety in terms of removing voters?
25      MR. LITTLE: Objection.

Page 78

1      MR. ALLEN: Objection.
2      MR. RESTREPO: Object to form.
3 BY THE DEPONENT:
4      A. The law says -- and I'm sorry, I don't have
5 the law in front of me. I shouldn't start off by
6 saying the law says. I don't have it in front of me to
7 quote it. So I could be wrong on this, but it would be
8 better if I had it to quote.
9      But I believe that the law puts the onus on a
10 supervisor to follow up with this list, that you shall
11 send, that you will follow up on this and remove names
12 of individuals who, you know, are former felons who
13 have not had their rights restored. So I think there
14 is an obligation under what was even the current
15 language of the law in 2000, prior to it being amended
16 in the Election Reform Act of 2001. I think even the
17 law, as it existed in 2000, did put responsibility on
18 the supervisor to follow up with the information in the
19 central voter file given to us by the state.
20      Q. Do you think in 2000 that you could have
21 interpreted the law as -- or you could have run the
22 process so that you did not remove a voter unless you
23 heard back from them confirming that they had a felony
24 conviction?
25      MR. ALLEN: Objection.

Page 79

1      MR. LITTLE: Objection.
2      MR. RESTREPO: Object to the form.
3 BY THE DEPONENT:
4      A. I do not believe that we had that kind of
5 flexibility. I mean, I think we exercised what
6 flexibility I felt comfortable with exercising in terms
7 of not removing people who were not exact matches, not
8 removing individuals who did not have conviction dates
9 and so forth.
10      Q. Do you think under the new law, as amended in
11 the Florida Election Reform Act, that you have more
12 flexibility?
13      A. Well, I think it really remains to be seen
14 how this is going to unfold prior to the 2002 elections
15 and I think we are at a very important point in all of
16 that, as I mentioned before, with the pre-clearance of
17 493 and how I think that conflicts with the Election
18 Reform Act of 2001.
19      And we need to ensure that what comes out of
20 this legislation that passes in 493, if it is
21 pre-cleared by the Justice Department, then that
22 administrative hearing process is codified for all 67
23 counties. And from our experience in 2000, we know
24 that the end result of that is that some people will be
25 erroneously removed from the rolls.

Page 80

1      It is my belief that we should not go down
2 that road again because of that experience that we had.
3 And that, rather, the onus should now be on government
4 to prove beyond a shadow of a doubt that the person is
5 indeed a convicted felon who has not had his civil
6 rights restored before they are removed from the law
7 (sic).
8      That was a position that was enunciated by
9 Attorney General Bob Butterworth in a January letter to
10 the Justice Department with regards to the
11 pre-clearance of the Election Reform Act of 2001. I
12 agree with his reasoning in that letter, that there
13 should no longer be a presumption that the database is
14 correct, that the presumption should now be that,
15 absent additional information on top of what the
16 database says, that the supervisor should not remove an
17 individual.
18      Q. So if 493 is not pre-cleared and the conduct
19 of list maintenance removal is carried out for November
20 2002, under the Florida Election Reform Act, under the
21 current language, do you foresee how your office will
22 conduct those list maintenance removals for felons?
23      A. Preliminarily, I will say this, that if 493
24 is not pre-cleared and we're to go simply on the basis
25 of the Election Reform Act of 2001 and the

Page 81

1 interpretation given to us by Attorney General Bob
2 Butterworth, we would mail certified letters to the
3 list of names. And unless someone were to write us
4 back and indicate yes, this information is correct, I
5 am a former felon who has not had my civil rights
6 restored, in the absence of that kind verification, we
7 would not remove names.
8    Q. Do you believe your office would have the
9 responsibility to try to do independent verification,
10 other than sending letters, to try to get copies of
11 convictions from FDLE records, from county records?
12    A. No.
13    Q. It would just be by letters to the voters?
14    A. No. And one of the points I've tried to make
15 throughout this process was that the supervisors of
16 elections are not involved in the criminal justice
17 system. And part of the problem with this whole
18 process in 2000 is that it places the supervisor of
19 elections, who is in the voter registration business,
20 trying to get people on the rolls and getting them to
21 vote, putting them in the criminal justice system
22 trying to figure out if someone had a felony conviction
23 in 1973. We're not equipped to do that.
24        And I also discovered through this process
25 that the State of Florida does not, between FDLE and

Page 82

1 the Office of Executive Clemency, have an adequate and
2 totally accurate database of individuals who have gone
3 through the criminal justice system. And I cannot
4 speak to why they don't have that, but I think that is
5 a considerable problem that someone at some point
6 should pay attention to.
7    Q. And so assuming that 493 --
8    A. Uh-huh.
9    Q. -- is not pre-cleared and you're able to take
10 this -- your anticipated approach, what changed between
11 the law that was in place in 2000 and the Florida
12 Election Reform Act of 2001, where you feel comfortable
13 using this different verification process?
14    A. Well, in 2000, we used the administrative
15 hearing approach absent any other direction and because
16 we thought it was in keeping with how felons were being
17 removed from the county level.
18        However, again, given the passage of the
19 Election Reform Act of 2001 and the opinion of Bob
20 Butterworth in his letter to the Justice Department
21 that the onus was now on government to prove beyond a
22 shadow of a doubt that the individual was a former
23 felon who did not have his civil rights restored and
24 that the database would no longer be presumed correct,
25 we would change our procedures in Hillsborough and we

Page 83

1 would simply notify the individual that they are on
2 this list, that absent any other information that would
3 bolster the case of the central voter file, we would
4 not remove anyone from the rolls.
5        We would no longer use the administrative
6 hearing process for the central voter file. We would
7 continue to use the administrative hearing process for
8 the monthly removals of the county circuit courts
9 because that is a separate issue in the law.
10    Q. And does the law require you to use the
11 administrative hearing process for those individuals?
12    A. Correct.
13    Q. Has the Division of Elections provided you
14 with any letter or memo, since November 2000, talking
15 about what process you should use regarding removal of
16 felons?
17    A. Not to my knowledge. But if you have some
18 letter, then I stand corrected.
19    Q. I'm not aware of any at this moment.
20        You provided some statistics about how many
21 individuals were removed from the voter rolls. I
22 believe you said 2,273 --
23    A. That's correct.
24    Q. -- were ultimately removed as felons in 2000?
25    A. Yes.

Page 84

1    Q. Do you know the last date by which those
2 individuals were removed, during what time period they
3 were removed?
4    A. No, but my staff can speak to that tomorrow
5 in deposition.
6    Q. Do you know the racial breakdown of those who
7 were ultimately removed?
8    A. We do know that and I don't know if I have
9 that statistic for today, but I believe that my staff
10 will have that for tomorrow.
11    Q. Okay, we can cover that tomorrow then.
12 That's fine.
13    A. Okay.
14    Q. Since November 7, 2000, have you contacted
15 FDLE to try to get additional assistance in dealing
16 with felon records?
17    A. Well, to my knowledge, unless I stand
18 corrected by my staff tomorrow, we have not received
19 another file to remove people. I think that that file
20 is expected to arrive sometime this summer.
21    Q. Speaking of files, receiving files, you said
22 that you received a file approximately April/May,
23 something like that, of 2000 --
24    A. Uh-huh.
25    Q. -- from the Division of Elections?

Case 0:02-cv-08126-JORDAN Document 420    Entered on FLSD Docket 07/04/2002    Page 439 of 945

NAACP vs. HARRIS, ROBERT, et al.    PAM IORIO - VOL 1 - 5/6/02

Page 85

1    Do you think the timing of your receipt of
2 that gave you sufficient time to be able to review the
3 list, verify it, and process the list?
4    MR. ALLEN:  Objection.
5    MR. LITTLE:  Objection.
6    MR. RESTREPO:  Objection to the form.
7 BY THE DEPONENT:
8    A. I don't think that any supervisor feels that
9 they have enough time to prepare once you get into the
10 springtime.  This was a major list and we had to create
11 procedures for it.  But, in fact, we did get it all
12 done prior to the fall elections, so we must have had
13 enough time for it.
14    Q.  You found a way to make it happen?
15    A.  Yes.
16    Q.  Okay.  If we could turn back to the
17 complaint, we started going through the complaint
18 before.
19    A.  Uh-huh.
20    Q.  If you can turn to paragraph 81 of the
21 amended complaint.
22    In paragraph 81, plaintiffs allege that many
23 Defendant county supervisors failed to verify at all or
24 to verify adequately the information provided by the
25 state, and, as a result, wrongfully purged numerous

Page 86

1 voters from their official lists of registered voters.
2    Now, we've talked extensively about the
3 procedures that Hillsborough County used for verifying
4 voters.  Do you believe that with that process, in the
5 end, you incorrectly purged some voters?
6    MR. ALLEN:  Objection.
7    MR. LITTLE:  Objection.
8    MR. RESTREPO:  Objection to the form.
9 BY THE DEPONENT:
10    A. First, let me just say, without being
11 redundant, whenever you start going down the "purge"
12 road, I must refer back to my earlier comments about
13 how I really do not agree with the use of the word
14 "purge".
15    Q.  Okay, then we can say removed pursuant to
16 list maintenance procedures?
17    A.  Well, this was not list maintenance.  This
18 was removed pursuant to central voter file.
19    Q.  Okay.
20    A.  Okay, which is different.
21    Now, I will say this, too, though this may
22 not be appropriate in this deposition, that one of the
23 issues that I have with being a defendant in this suit
24 is arbitrarily choosing seven counties when you have 67
25 counties that all used different procedures.  And to

Page 87

1 simply select seven counties when you have 60 others
2 that may or may not have used various procedures, I
3 find problematic and something that is hard to deal
4 with.
5    So are you asking me here whether the seven
6 counties that have been chosen for this lawsuit, did
7 they have different procedures?
8    Q.  We can start with that question.
9    A.  I don't know.
10    Q.  To your knowledge, do the seven counties who
11 are defendants in this lawsuit --
12    A.  I cannot speak to that.
13    Q.  -- have different procedures?
14    Are you familiar with the procedures of any
15 specific counties other than Hillsborough?
16    A.  I will say this, that I believe that
17 Hillsborough and Pinellas and Pasco used the same
18 procedures and Pinellas and Pasco are not part of this
19 lawsuit.
20    Now whether they used the same procedure when
21 it got down to the real level of detail that I outlined
22 here, I can't speak to that.
23    For example, I don't whether Pinellas and
24 Pasco gave the same benefit of the doubt that I gave.
25 In fact, they may have been more strict than I was.

Page 88

1    In other words, this lawsuit may be focusing
2 on a county -- in fact, it probably is focusing on a
3 county, in Hillsborough, that did more to try to
4 protect voters and make sure that people were not
5 removed if they were not specific matches or conviction
6 dates, and letters were written to try to provide this
7 information than perhaps, and I can only speculate on
8 this, than other counties that are not named in the
9 suit.
10    However, not being able to do anything about
11 that, I will only say that it would not surprise me if
12 67 counties used different procedures because there
13 were no statewide procedures to be used.
14    Q.  Do you think it would have been more helpful
15 if there were statewide procedures established?
16    MR. RESTREPO:  Object to the form.
17    MR. ALLEN:  Objection.
18    MR. LITTLE:  Objection.
19 BY THE DEPONENT:
20    A.  I think that, with regards to election
21 administration, it is always more helpful if there are
22 statewide procedures adopted.
23    Q.  And do you think it's the role of the
24 Division of Elections to help establish those
25 procedures?

Page 89

1    MR. RESTREPO: Object to the form.
2 BY THE DEPONENT:
3    A. I think there are two avenues there. One is
4 the Florida legislature should have laws that establish
5 statewide procedures that are very clear. And we found
6 in the 2000 election, with recounts and what occurred
7 there, that even the Florida election law was not
8 particularly clear.
9        But, two, it is the role, I believe, of the
10 Division of Elections to promulgate rules and issue
11 directives and legal opinions that will put all the
12 supervisors on the same sheet of music.
13    Q. And do you think it would have been more
14 helpful -- specifically looking at 2000 and how county
15 supervisors of elections used the list provided by the
16 state for individuals to be removed from the voter
17 rolls, if we're looking specifically just at that time
18 period, do you think it would have been helpful to have
19 information from the Division of Elections about how to
20 use that list?
21    MR. ALLEN: Objection.
22    MR. LITTLE: Objection.
23 BY THE DEPONENT:
24    A. Yes, it would have been. It would have been
25 helpful if the Division of Elections had notified all

Page 90

1 67 supervisors that they thought that we should use a
2 specific procedure and that this is how we should
3 proceed with the process.
4    Q. Are you familiar with how any other
5 counties -- I thought you said Pasco and Pinellas, you
6 believe, used procedures similar to yours?
7    A. Yes.
8    Q. But you're not sure when it comes down to
9 some of the smaller details of what they did?
10    A. Yes.
11    Q. Are you familiar with how any other counties
12 used the central voter file list from the state?
13    A. Some didn't send it out at all. Palm Beach.
14 I don't think Volusia did at all and I think Volusia is
15 one of the named defendants.
16    Q. Do you think that counties could be correct
17 in not using the list at all?
18    A. That wouldn't be for me to say.
19    Q. Did you consider at any point in time not
20 using the list at all?
21    A. The thought may have crossed my mind.
22    Q. Do you remember having discussion with anyone
23 on your staff about, you know, we think this list has
24 problems, maybe we should just not use it?
25    A. We discussed it.

Page 91

1    Q. And do you recall -- do you recall who you
2 discussed it with?
3    A. Well, I would have discussed it with my
4 senior staff, which is Darrell Smith and Chuck Smith,
5 two people who will be deposed tomorrow.
6    Q. Do you recall when you discussed it?
7    A. Well, prior to us reaching conclusions on how
8 we were going to ultimately deal with the list.
9    Q. And do you remember, in the end, why you
10 ultimately decided that you should use the list?
11    A. We felt the law compelled us to. We thought
12 that the language in the law was unambiguous in that it
13 required the supervisor to do something with the list.
14    Q. And what concerns with the list prompted that
15 discussion, you know, Do we even have to use it, or did
16 you have a discussion, We think there are problems with
17 it?
18    MR. ALLEN: Objection.
19    MR. LITTLE: Objection.
20    MR. RESTREPO: Objection.
21 BY THE DEPONENT:
22    A. Yes.
23    Q. What were those problems?
24    A. Well, we knew -- and the timing of this, I
25 don't have clear for this deposition. But I can tell

Page 92

1 you from what I said earlier that Supervisor Leahy from
2 Miami-Dade was the first supervisor to use the list and
3 to send out letters, that he informed his fellow
4 supervisors that there are inaccuracies. So we knew
5 going into the process that we were dealing with
6 inaccuracies and this was of concern to us.
7    Q. Do you have information regarding whether or
8 not Hillsborough County ultimately removed from the
9 list any individuals who should not have been removed?
10    MR. RESTREPO: Objection.
11    MR. LITTLE: Objection.
12    MR. ALLEN: Objection.
13 BY MS. BORGEN:
14    Q. And I should clarify that, as I see, looking
15 through some documents -- removed individuals who
16 appeared on the central voter file list provided by the
17 state, who, then, you used these procedures we've
18 discussed to remove them from the list?
19    A. Yes. We found that there were 13 CVF felons
20 who ultimately, after the election date, were found to
21 be non-felons.
22    Q. And do you know how they were found to be
23 non-felons after the election date?
24    A. No. I can speculate that they either
25 attempted to vote -- now, two of them went ahead -- two

1 of them voted in the election. 10 did not vote. Of
2 the 13 total, 8 were white, 4 were black, 1 was Asian
3 Pacific. Two went ahead and voted on election day, 10
4 did not.
5        And I suspect that the way we found out was
6 these were individuals who likely went to vote and
7 discovered that they could not, and then followed up
8 with our office. And after the fact, we followed up
9 and ultimately, well after the 2000 election, received
10 verification that they had had their civil rights
11 restored.
12    Q. Do you believe that there may be other voters
13 who were removed, pursuant to the central voter file
14 procedures, who did not try to vote in 2000, so you did
15 not find out about the wrongful removal, who were
16 wrongfully removed and you just don't know about them
17 yet?
18        MR. ALLEN: Objection.
19        MR. LITTLE: Objection.
20        MR. TINKLER: Objection.
21        MR. RESTREPO: Object to the form.
22 BY THE DEPONENT:
23    A. That's so speculative. I will point out that
24 we had a 74 percent voter turnout in the year 2000, in
25 a very high-profile election. And I would think that

1    A. I mean, you have to bear in mind that before
2 we removed these people, we sent them a regular letter
3 in addition to the certified. So either we have
4 already gotten in touch with them or you can't get in
5 touch with them.
6    Q. Did anyone try to make phone calls or
7 anything like that to these individuals? Try to, you
8 know, see if you have -- I don't know if you have phone
9 numbers on file for some of them or call information to
10 get phone numbers?
11    A. No. We only were in that level of contact
12 with someone who returned a VES form.
13    Q. Have you tried to do anything to check over
14 the criminal conviction information that you have for
15 the individuals who were removed?
16    A. Well, I think you can see by our exhibit that
17 when we sent information to the law enforcement agency
18 asking for additional information, the response we got
19 back from them was the information is correct.
20    Q. But those individuals then -- the ones who
21 you couldn't confirm were not removed?
22    A. Right. That's right.
23    Q. Okay. We may come back to that a bit more
24 later.
25        In paragraph 82 of the second amended

1 if you were out there and -- I think that individuals
2 who are still in this community who had an interest in
3 voting, went out and voted.
4        And also there has certainly been a lot in
5 the news about the felon issue subsequent to the 2000
6 election. And I would suspect that individuals who
7 might have fallen in that category that you described,
8 would have, by now, come forward.
9    Q. What if there are individuals who have no
10 felony records and don't even think that they might be
11 in that category? They don't associate all this
12 discussion of felony records with themselves because
13 they never had a felony conviction? Are you concerned
14 that there may be individuals in that category who
15 couldn't make it to vote, didn't go to vote for some
16 reason, and who were wrongfully removed?
17        MR. RESTREPO: Object to the form.
18        MR. LITTLE: Objection.
19        MR. ALLEN: Objection.
20 BY THE DEPONENT:
21    A. That's hard to say. It's very speculative.
22    Q. Has anyone in your office made any attempts
23 to go back through the list of individuals who were
24 removed to check over those in some way to see if they
25 were correct removals?

1 complaint, turn to that. Plaintiffs allege that the
2 Defendant county supervisors wrongly purged, from the
3 voter rolls, ex-felons who had their rights restored in
4 the states in which they committed their felonies.
5        Do you know if among the list of individuals
6 who were removed from your voter list, pursuant to the
7 central voter file, if there were individuals who had
8 convictions out of state and who might have received
9 their -- had their rights restored out of state, but
10 not in Florida?
11    A. My staff members tomorrow would have to
12 answer that.
13    Q. Do you recall ever receiving information from
14 either the Division of Elections or the Office of
15 Executive Clemency about what the state policy was
16 regarding individuals with convictions out of state and
17 whether they had to get their rights restored in
18 Florida or only out of state?
19        MR. RESTREPO: Object to the form.
20        MR. LITTLE: Object to the form.
21 BY THE DEPONENT:
22    A. Well, that became a bit of a complicated
23 issue kind of after the fact and I'm not sure that I
24 have the paperwork in front me to speak to it as I
25 should in a deposition. I would have to review my

Page 97

1 letters on that because we actually had correspondence
2 from the Division of Elections -- unless you happen to
3 have it and can jog my memory with that correspondence
4 and then I could speak to it.
5     (Plaintiffs' Exhibit G was marked for
6     identification.)
7 BY MS. BORGEN:
8     Q. What's marked as Exhibit G, a letter dated
9 September 18, 2000, to Mr. Ed Kast from Janet Keels.
10 Could you just take a look at that and see if that
11 looks familiar to you.
12     A. Okay.
13     MR. RESTREPO: You said Ed Kast to Janet
14 Keels.
15     MS. BORGEN: It's from Janet Keels to Ed
16 Kast.
17     MR. RESTREPO: Okay.
18 BY THE DEPONENT:
19     A. And there should be another letter too.
20 Aren't there other letters?
21     Q. There are other letters I can show you.
22     MS. BORGEN: Mark as Exhibit H --
23     (Plaintiffs' Exhibit H was marked for
24     identification.)
25 BY MS. BORGEN:

Page 99

1 BY THE DEPONENT:
2     A. So just stepping through these, I had asked
3 the Division of Elections in August, or maybe it was
4 late July, what about an individual who has had their
5 civil rights restored outside the State of Florida.
6 And then they wrote back September 18th, or rather
7 Janet Keels, that says, an individual whose civil
8 rights were restored automatically by statute in the
9 state of conviction and does not have a written
10 certificate or order, would be required to make
11 application for restoration of civil rights.
12     So even if you had your civil rights restored
13 in another state, if you didn't have that in writing,
14 you'd have to go through the civil rights process --
15 restoration process in Florida.
16     And then after, February 23, 2001, they wrote
17 and indicated, My office will attempt to confirm the
18 individual's claim by contacting the state that
19 assertedly restored the individual's civil rights. If
20 possession of civil rights is confirmed, the individual
21 does not need to apply for restoration of civil rights,
22 et cetera.
23     Q. It seems the policy changed after the
24 November 7th, 2000, election?
25     MR. ALLEN: Objection.

Page 98

1     Q. I believe this is actually the letter that
2 should probably have come first. This is an August
3 10th, 2000, letter to Janet Keels from Emmett Mitchell
4 asking for clarification, I think, for the president of
5 Florida State Association Supervisors of Elections.
6     A. That was me.
7     Q. That's what I thought.
8     A. Then there should be a letter after 2000 that
9 changes this a bit.
10     MS. BORGEN: Exhibit I.
11     (Plaintiffs' Exhibit I was marked for
12     identification.)
13 BY MS. BORGEN:
14     Q. Exhibit I, this is a letter dated
15 February 23rd.
16     A. Right.
17     Q. Is that the one --
18     A. You've got it.
19     Q. -- you're thinking of?
20     A. Okay.
21     MR. RESTREPO: Excuse me, was that last
22 one marked something?
23     MS. BORGEN: February 23rd, it was marked
24 Exhibit I.
25     MR. RESTREPO: I've got it.

Page 100

1     MR. LITTLE: Objection.
2 BY THE DEPONENT:
3     A. I wouldn't know if I would say that their
4 policy changed. I would say that I'm not sure that
5 they -- maybe they didn't know what their policy was.
6     Q. What prompted you to make the original
7 inquiry of the Division of Elections regarding how the
8 state would treat --
9     A. Confusion about procedures. We were trying
10 to understand how to proceed. And bearing in mind that
11 we're getting all of these, as I went through, you
12 know, when you think about here, our office is dealing
13 with 549 VES forms that have come back to us. And each
14 one of those is an investigation. It's something that
15 we're trying to help that person through the process.
16     And so through the process, you get
17 individuals who have had their civil rights restored in
18 other states and they're coming to us and saying, yes,
19 but I've already had my civil rights restored. And so,
20 then we're trying to deal with the Office of Executive
21 Clemency and the Division or FDLE, or all parties, and
22 asking the question, what do you do with these
23 individuals? Is there some kind of policy statement?
24 Are all the supervisors being given the same
25 information?

1     At that time, I was president of the State
2 Association of Supervisors and thought it was an
3 important question to ask.
4     Q. And do you feel like the supervisors of
5 elections were getting different answers when they
6 contacted the Office of Executive Clemency directly?
7         MR. ALLEN: Objection.
8         MR. LITTLE: Objection.
9         MR. RESTREPO: Object to form.
10 BY THE DEPONENT:
11    A. I don't know.
12    Q. And have you had any interaction, yourself,
13 with the Office of Executive Clemency?
14    A. I really didn't directly deal with them. My
15 staff did.
16    Q. And would you say you dealt directly with --
17 did you deal directly with the Division of Elections on
18 this issue?
19    A. Sometimes.
20    Q. And who would you deal with at the Division
21 of Elections?
22    A. Clay Roberts.
23    Q. And would you call him or send him a letter?
24    A. Usually, I just called and talked to him. I
25 mean, I was president of the Association, so we talked

1 about various issues, though I couldn't say I called
2 him on any specific date or could tell you in a
3 deposition exactly what we talked about on a particular
4 date.
5     Q. Do you recall speaking to him, though, about
6 the issue of what to do with out-of-state felons and
7 clemency?
8     A. I cannot recall that.
9     Q. Do you recall what policy your office used,
10 then, prior to the November 7th, 2000 election,
11 regarding out-of-state felons and whether they've had
12 their rights restored in the state of conviction?
13    A. We would have been relying on the
14 September 18, 2000 letters from Janet Keels that would
15 have said that "a certificate of restoration of civil
16 rights, relief of disabilities, or pardon order issued
17 by a court, agency, clemency board, or governor of
18 another state is recognized by the Office of Executive
19 Clemency as restoring civil rights in the State of
20 Florida. These individuals do not need to make
21 application with the Office of Executive Clemency.
22    "Any individual whose civil rights were
23 restored automatically by statute in the state of
24 conviction, and does not have a written certificate or
25 order, would be required to make application for

1 restoration of civil rights in the State of Florida.
2     That's the information that we would have
3 been passing onto individuals who likely fell into that
4 category of the 549 people who returned their VES
5 forms.
6     Q. And to the best of your knowledge, that's the
7 policy applied by your office, at least as of
8 September 18th, 2000, the date of the letter?
9     A. It would have likely been the information
10 that we would have passed on to those individuals, yes.
11    Q. And when you say passed on to those
12 individuals, would you have applied the policy if one
13 of those individuals came to you and said, I received
14 this letter, but I live -- I came from New York. My rights
15 That's where I had my felony conviction. My rights
16 have automatically been restored. Would someone in
17 your office have said, Okay, that's sufficient, we
18 won't remove you, or would you have said, You have to
19 talk to the Office of Executive Clemency and they have
20 to tell us it's okay?
21        MR. ALLEN: Object to form.
22        MR. TINKLER: Object to form.
23        MR. LITTLE: Object to form.
24        MR. RESTREPO: Object to form.
25

1 BY THE DEPONENT:
2     A. Okay. If an individual fell into the
3 category of one of the 549 individuals who returned the
4 VES form and stated on the VES form that they should
5 not have their voting rights removed for whatever
6 reason, we take that information, and we were just the
7 middle man, then supplying it to the Office of
8 Executive Clemency or FDLE.
9     Q. Would you say that every ultimate decision on
10 whether or not someone's rights had been restored was
11 made by the Office of Executive Clemency?
12    A. That's correct. It was not our place to make
13 that determination.
14    Q. Okay. So you did not do any ultimate
15 evaluations of clemency files, be they in state or out
16 of state?
17    A. No.
18    Q. So your office relied on whatever the Office
19 of Clemency told you regarding restoration for those
20 specific individuals?
21    A. That's correct.
22    Q. And prior to September 2000, when you
23 received this letter, a copy of this letter -- first of
24 all, I should say, do you recall a copy of that letter
25 being sent to your office? It says it's from --

1    A. Yes.
2    Q. -- Janet Keels to Ed Kast.
3       That was circulated to your office?
4    A. Yes.
5    Q. Do you recall who circulated it to you?
6    A. Likely, Ed Kast.
7    Q. And do you recall, prior to that date,
8 September 2000, what policy your office was using or
9 was operating under?
10   A. Well, again, in terms of policy our office
11 was using, I want to make sure that this is clear,
12 regardless of what policy was in place, we still
13 followed the same procedure of taking the information
14 that the voter gave us on the VES form and supplying it
15 to the Office of Executive Clemency or FDLE, so that
16 the information could be clarified and we could figure
17 out whether or not the person should remain on the
18 rolls or not.
19   Q. So prior to September 2000 and after, any
20 decisions on whether someone had clemency restored were
21 made by the Office of Executive Clemency?
22   A. Correct. We needed this information because,
23 as supervisors, we needed to be able to answer that
24 question.
25   Q. Okay. So you needed that information as an

1 information source for voters, but not to make ultimate
2 determinations --
3    A. Correct.
4    Q. -- on clemency?
5    A. Because it really was not our place to really
6 determine whether someone had their civil rights
7 restored.
8    Q. And in your capacity as president of the
9 Association of Supervisors, do you know if other
10 counties were using the information the same way? Were
11 they making -- other counties making decisions about
12 clemency or were they all referring voters to the
13 Office of Executive Clemency and letting them decide?
14   A. I don't know the answer to that.
15   Q. Okay. In regards to paragraph 82 of the
16 complaint, in your answer to that paragraph -- and that
17 was the paragraph saying that county supervisors had
18 wrongly purged ex-felons who had their rights restored
19 in states where they committed their felonies.
20   A. Uh-huh.
21   Q. And you have denied that allegation.
22       Is it possible that you -- that Hillsborough
23 County ultimately removed from the list individuals who
24 had their rights restored in another state because the
25 Office of Executive Clemency told them that that

1 restoration was not valid?
2       MR. ALLEN: Objection.
3 BY THE DEPONENT:
4    A. I can't answer that.
5    Q. If the Office of Executive Clemency -- if
6 there were an individual -- let me give you a
7 hypothetical, and if you have any questions about it as
8 we go, let me know.
9       If we had an individual who had a conviction
10 in New York State, and that individual received a
11 letter from you, sent in a VES form. Is that how it
12 would be likely to occur? You'd send them a letter.
13 They'd send in a VES form saying, I have clemency?
14   A. Yes.
15   Q. You would then take that VES form and forward
16 that to the Office of Executive Clemency; is that
17 correct?
18   A. Or FDLE or both.
19   Q. To ask them, Do you have any information on
20 clemency for this individual?
21   A. Correct.
22   Q. And if that individual had automatically
23 received clemency, but did not have any paperwork to
24 show it, the Office of Executive Clemency would make
25 the determination on clemency; is that correct?

1    A. Correct.
2    Q. So if they sent something back to you saying,
3 no, this person does not have clemency, would you ask
4 them any details about that or about how they arrived
5 at that decision, or would you just say, you know, they
6 told us they don't have clemency, we'll accept that and
7 move forward?
8       MR. ALLEN: Objection to form.
9       MR. LITTLE: Objection to form.
10 BY THE DEPONENT:
11   A. Well, I don't know how much more detail a
12 supervisor could ask. If you go to the Office of
13 Executive Clemency, which, under the state
14 organizational structure, is the office for determining
15 whether or not an individual has had their civil rights
16 restored, and they write back to a supervisor of
17 elections and indicate that John Doe, clearly
18 identified as this individual, has not had their civil
19 rights restored, other than going back and saying, Are
20 you sure --
21   Q. Right.
22   A. -- I'm not so sure what a supervisor can do
23 at that point.
24   Q. Okay. So you would take what the Office of
25 Executive Clemency told you. And if they say no, they

Page 109

1 didn't have their rights restored, that individual
2 would be removed from the voter rolls?
3     A. And if the individual felt that the Office of
4 Executive Clemency was in error, then I would assume
5 that they would be following up with it, hopefully,
6 either on their own or through help of a counsel.
7     Q. Do you recall if there is a situation where
8 that arose in Hillsborough County, where you told
9 voters that you were going to remove them because the
10 Office of Executive Clemency said they did not have
11 clemency and the individual said that's not right and
12 I'm going to deal with this?
13         MR. TINKLER: Objection to form.
14 BY MS. BORGEN:
15     Q. Do you recall situations like that that
16 arose?
17     A. I cannot recall a specific example. Perhaps
18 my staff member tomorrow will be able to do so. I can
19 recall a specific example where FDLE had it wrong.
20     Q. And what was that case?
21     A. Well, here was a very interesting case of
22 Roosevelt Lawrence who had been -- who was an
23 African-American gentleman who had been tagged as an
24 ex-felon for a crime he allegedly committed in 1960.
25 And we really worked to be his advocate because as we

Page 110

1 discovered, FDLE had no court records at all, and there
2 was absolutely no record at all of any court
3 proceeding, and ultimately we got that fixed for him.
4 But for 40 years this man had on his record a felony
5 conviction that he was not even aware of.
6     But we were his advocates. And that's the
7 role that our office played on behalf of all of these
8 people who sent in a form and said, hey, there's an
9 error here. I mean, my role was to try to help keep
10 them on the rolls because I feel very strongly that a
11 person should not be removed from the rolls unless the
12 information is correct.
13     And so, there is an example of what our
14 office did on behalf of one individual where FDLE just
15 had it wrong.
16     Q. And FDLE records showed a felony conviction?
17     A. And there was no court record, whatsoever, of
18 any felony conviction going back to 1960.
19     Q. And did your office then search court records
20 for --
21     A. No, we were his --
22     Q. What efforts did you take?
23     A. -- and Mr. Smith could speak to it tomorrow
24 because we spent a great deal of time on Mr. Lawrence's
25 situation.

Page 111

1     Q. I'm sorry, which Mr. Smith tomorrow?
2     A. Darrell Smith. Going back and forth with
3 FDLE. And they would write back and say, Well, he's on
4 our list as a felon. We'd say, Can we see some
5 documentation? Let's see, where is the court record?
6     I mean, otherwise, the individual is put in a
7 situation of having to advocate for themselves and deal
8 with an agency in Tallahassee, a very difficult
9 situation for a lot of people.
10     Q. And you said, ultimately, FDLE was not able
11 to produce copies of any court records?
12     A. That's correct.
13     Q. And then did you take that as sufficient --
14 since the FDLE didn't have anything, was that
15 sufficient for you --
16     A. Yes.
17     Q. -- to not remove him then from the list?
18     A. That's correct.
19     Q. And do you know -- this may very well be
20 beyond as far as your office went -- whether the FDLE
21 records still reflect that he has a felony conviction?
22     A. I think we cleared it up for him.
23     Q. You worked with FDLE then?
24     A. Right.
25     Q. It cleared it up, so that if there were

Page 112

1 another matching done with the FDLE records, he would
2 not show up again?
3     A. I hope not.
4     Q. You have a file on him now if he does?
5     A. Right. That's right.
6     Q. Do you recall any other individuals in a
7 similar situation where they did show up on the FDLE
8 records, but then they told you they did not have a
9 felony conviction?
10     A. Well, we know from the statistics that of the
11 549 who returned the VES forms, 238 of those 549 were
12 found to be either non-felons or have their civil
13 rights restored. So 44 percent of the people who
14 returned the VES forms were okay and should not -- you
15 know, they were either non-felons or they had had their
16 rights restored.
17     Q. And do you know what the breakdown is between
18 those two categories; how many of them had their rights
19 restored, how many were non-felons?
20     A. That, I don't know.
21     Q. Do you know if your staff would have that
22 information?
23     A. I don't know.
24     Q. Would Chuck Smith be the right person to ask
25 about that?

Page 113

1  A. Darrell Smith.
2  Q. Darrell Smith, okay.
3     In paragraph 85 of the amended complaint,
4 plaintiffs alleged that Defendants Harris and Roberts
5 failed to provide adequate time and resources for
6 county supervisors to verify the list of ineligible
7 voters provided by the state. We've discussed the
8 verification issue and the time issue.
9     Did the Division of Elections or Secretary of
10 State's office provide your office with any resources
11 to verify the list that they had provided to you in
12 2000?
13  A. What resources would they have provided us?
14 Are you talking about money?
15  Q. Perhaps money, staff time, that someone,
16 perhaps, at Division of Elections would be able to
17 assist you if there were any questions?
18  A. No. It was a county responsibility to follow
19 up on the list and we utilized county resources to do
20 that.
21  Q. Were you familiar with a tracking system,
22 DBT's Auto Track XP system?
23  A. No, I am not familiar with that.
24  Q. Okay. Is there someone on your staff who
25 would have been dealing most directly with verification

Page 114

1 of the records who might be more familiar with that?
2  A. Darrell Smith.
3  Q. Darrell Smith.
4     In paragraph 86 of the complaint, plaintiffs
5 allege that Defendants' administration of the voter
6 roll purging process -- and we could change that for
7 purposes of your answering the question -- the process
8 of list --
9  A. Central voter file.
10  Q. -- removing voters pursuant to the central
11 voter file had a disproportionate adverse impact on
12 black voters and resulted in a larger percentage of
13 black voters, than white voters, being wrongfully
14 removed from the official list of registered voters.
15     Do you have an opinion on that?
16  A. We probably have a statistic on that, that I
17 just don't have with me right now during this
18 deposition. But I guess the question would be, of the
19 2,273 individuals who were removed through the central
20 voter file process, how many were African American?
21 And I believe that we will be able to answer that in
22 deposition tomorrow.
23  Q. Okay.
24  A. Now, to the extent that it might be a higher
25 number than is represented in the total population of

Page 115

1 registered voters in Hillsborough County, then I think
2 that, yes, then one would conclude that the removal of
3 ex-felons, who have not had their civil rights
4 restored, from the voter files -- if statistics bear
5 out that a greater proportion of those individuals are
6 African American in relationship to their total
7 proportion of individuals on the voter registration
8 rolls -- then I think that is going to be a conclusion
9 that one can reach, that it does disproportionately
10 affect African Americans.
11  Q. And would Darrell Smith be the one who would
12 have the most information on that?
13  A. He likely -- or Chuck Smith --
14  Q. Either one, okay.
15  A. Both Smiths, I think, would have that
16 information --
17  Q. Okay.
18  A. -- have those statistics.
19  Q. And in your answer to that paragraph,
20 paragraph 86, you had denied that allegation as to
21 Hillsborough County. Do you know the basis for that
22 denial?
23  A. Again, as I said before, any time it says
24 here that I am without knowledge or that I deny
25 information, that is all attorney language. That's not

Page 116

1 language that I would have come up with on my own.
2  Q. Okay. In paragraph 87 of the complaint,
3 plaintiffs have allegations regarding a registered
4 voter in Hillsborough County, Willie Steen, an
5 individual. And plaintiffs allege that Willie Steen
6 was a properly registered voter living in Hillsborough
7 County since he was honorably discharged from the
8 military in 1993. He's lived at his current address
9 since December 1999. On November 7th, 2000, Mr. Steen
10 went to vote for the first time. When he arrived at
11 his polling place, he was told that he could not vote
12 because he had a felony conviction. Mr. Steen has
13 never been arrested or convicted of any crime.
14 Mr. Steen was improperly denied the right to vote.
15     In your answer you have responded that you're
16 without knowledge as to what happened. Do you have
17 knowledge --
18     MR. TINKLER: Objection to form.
19 BY MS. BORGEN:
20  Q. -- about what happened to Mr. Steen?
21  A. "Willie B. Steen. This may be an
22 alias/stolen identity problem. In mid 1997, we
23 received a report from the Clerk of the Circuit Court,
24 Circuit Criminal Division, with a list of recent
25 Hillsborough County felons. This report indicated that

Page 117

1 an Alexander Wynn, who was also using an alias of
2 Willie Bert Steen, had been convicted of a felony. The
3 alias name, Willie B. Steen, was in our voter file, and
4 based on the information provided by the Clerk of the
5 Circuit Court was deleted from the voter rolls." And
6 this would have been used in the county process, not
7 the central voter file.
8      "According to internal procedures, a letter
9 is forwarded to the felon making him/her aware that
10 they are no longer eligible to vote, and if they think
11 our information is in error, they may contact us so we
12 may investigate. We have no record that Mr. Steen
13 replied to our letter.
14      "The Elections Office initiated a voter
15 eligibility status form to send our combined
16 information on an Alexander Wynn and Willie B. Steen to
17 the FDLE. Both FDLE forms showed Wynn and Steen as
18 felons with same date of birth, race and sex, but both
19 has different arrest dates. Wynn, 3/12/97 and Steen
20 12/19/91. A telephone conversation with FDLE confirms
21 that Willie B. Steen is an alias of Alexander Wynn. A
22 fingerprint analysis provided to FDLE would clear
23 Mr. Steen's record if Mr. Wynn is falsely using his
24 identity."
25      So, I think that's something Willie --

Page 118

1 Mr. Steen needs to do if indeed that's something he's
2 going to follow up on.
3    Q. Okay. Now, when you were stating that, you
4 were reading from the document; is that correct?
5    A. Yes, my staff report on Mr. Steen.
6      MS. BORGEN: Okay. Can we go ahead and
7 mark that as Exhibit J.
8    (Plaintiffs' Exhibit J was marked for
9    identification.)
10 BY MS. BORGEN:
11    Q. I'm sorry, who prepared that document?
12    A. My staff.
13    Q. And do you know when it was prepared?
14    A. I don't. It also will include our voter edit
15 screen, as well as our change screen to show his
16 history, that he was added as a voter on 10/11/95,
17 voter card sent, that he had a change of address on
18 6/3/97, as well as we sent this clerk's letter to him
19 indicating the felony status and changed his status
20 also at that time. So this indicates the changes to
21 his record.
22    Q. And when were those changes in his record?
23    A. 1997.
24    Q. In '97, he was deleted --
25    A. That's correct.

Page 119

1    Q. -- from the voter file?
2    A. That's right.
3      I mean, if this is a stolen identity issue, I
4 would think Mr. Steen should clear it up. If it's
5 not -- I mean, this is an issue that I think an
6 individual would want to clear up. Either he is a
7 felon and this is indeed his situation and should have
8 been removed, or someone is using his name as an alias,
9 which I think an individual would want to clear that up
10 as soon as possible.
11      And so, something is amiss. But one way or
12 another, I think that the voter should want to clear
13 this situation up.
14    Q. When you receive information like that
15 from -- that was based on information from the county
16 clerk's office?
17    A. Right. Correct.
18    Q. Do you ever check with the county sheriff to
19 see if anyone has tried to clear up their records and
20 have already been fingerprinted to show that it is a
21 mistaken identity issue?
22    A. Our records did not -- my records do not
23 reflect any interaction with the sheriff. It does
24 indicate interaction with FDLE.
25    Q. And that was -- the information with FDLE,

Page 120

1 was it after the complaint was filed you checked with
2 FDLE to see if there was a criminal conviction or when
3 was that --
4    A. That, I don't know.
5    Q. -- that you checked with FDLE?
6    A. It may have been -- I don't know that answer.
7    Q. Okay. If an individual comes to you with
8 what seems to be a mistaken identity issue, how do you
9 deal with that in the office?
10    A. We would work with them through FDLE to clear
11 it up.
12    Q. Do you ever work -- if it's based on
13 information from the county clerk, do you work with
14 anyone on the county level to clear up that information
15 or only with FDLE?
16    A. I think my staff member might be best
17 equipped to answer that tomorrow.
18    Q. Okay. Which staff member?
19    A. Darrell Smith.
20    Q. Darrell Smith, okay.
21      MR. ALLEN: Let me see this document.
22 Let's make sure there's nothing that's
23 privileged or confidential.
24      THE DEPONENT: And that is an extract of a
25 voter registration roll, so that may not be

Page 129

1 affect many aspects of your life, to be on a list as a
2 convicted felon, particularly if you don't think you
3 are. And I would think that then the voter would
4 follow up either by getting their own attorney or by
5 going directly to FDLE themselves and saying, I'd like
6 to see your paperwork here. I mean, this deals with my
7 reputation, this deals with a lot of other issues.
8 Whether or not Mr. McDonald did that, I do
9 not know. But I know that that from out perspective, we
10 followed up, received this, received it prior to 2000,
11 received it after 2000. If FDLE is in error, then I
12 would think this is something that, as you all are
13 defending this individual, maybe you could uncover for
14 him and help clear up.
15 Q. Now, you talked the about another individual
16 earlier by the name of Roosevelt --
17 A. Roosevelt Lawrence.
18 Q. Roosevelt Lawrence. Was Mr. Lawrence -- it
19 sounds like he was in a similar situation where the
20 FDLE said that he had records of a criminal conviction?
21 A. No. The differences there is that they could
22 not -- they could not tell us what -- the difference
23 there, although, I don't have his paperwork in front of
24 us, was that Mr. Lawrence, they could not pinpoint his
25 conviction. Here, they're checking that he is a

Page 130

1 convicted felon. They're giving a date of arrest and
2 all of that.
3 And also, Mr. Lawrence followed up.
4 Mr. Lawrence was very concerned that, for the first
5 time in 40 years, he was aware that suddenly he was on
6 a list of convicted felons. And he took the initiative
7 to keep saying you're wrong and I'm going to follow up
8 and do what's necessary to follow up, which, again, I
9 think is appropriate for any individual to do.
10 But FDLE could not really say, if I recall
11 from Mr. Lawrence's case, could not ever get to the
12 point to say that he really was a convicted felon. And
13 I could be wrong about that and there might be
14 paperwork that reflects that they sent a similar form.
15 Q. Let me take a quick look and see if I can --
16 Ms. Iorio, I'm going to show you parts of a
17 file for Roosevelt Lawrence that we received in the
18 discovery process of this litigation. And you may have
19 a better sense than I have about exactly what document
20 was processed when -- and we'll mark this pack of
21 materials as Exhibit L in a moment. But this was a
22 form that was completed -- a voter eligibility form
23 completed I believe -- is it June 1st?
24 A. 20th.
25 Q. June 20th, 2000?

Page 131

1 A. Uh-huh.
2 Q. Coming back from FDLE showing that there was
3 a conviction date.
4 A. No. This is Mr. Lawrence sending us
5 something saying, I was not charged or convicted.
6 Q. Okay. Is there information from -- okay, so
7 that's the form he sent to you --
8 A. Right.
9 Q. -- saying he was not convicted. Okay.
10 And then, this is a document, received date
11 on it, July 12th, 2000, from FDLE. Is that the form
12 then that you would send --
13 MR. TINKLER: Object to the form.
14 BY THE DEPONENT:
15 A. No, that's what they would send us back.
16 Q. Okay. So you would -- how would you send an
17 inquiry to FDLE?
18 MR. TINKLER: Objection to form.
19 MS. BORGEN: Okay.
20 BY MS. BORGEN:
21 Q. So you would take the form that's called
22 Voter Eligibility Status form --
23 A. Right.
24 Q. -- that an individual completed, they would
25 send that to you; is that right?

Page 132

1 A. That's correct.
2 Q. And then you would take that same form and
3 forward that to FDLE?
4 A. That's correct.
5 Q. And FDLE would send you back the form?
6 A. Right, and that's what they did.
7 Q. And what does that form show for --
8 A. Convicted felon.
9 MR. ALLEN: Objection to form.
10 MR. TINKLER: Objection to form.
11 BY MS. BORGEN:
12 Q. And this form is called the Florida
13 Department of Law Enforcement --
14 A. Right.
15 Q. -- Voter Eligibility Form?
16 A. Right.
17 Q. What's the date on that form?
18 A. 7/13/2000.
19 Q. And who is it in regard to, the individual
20 whose --
21 A. Roosevelt Lawrence --
22 Q. Okay.
23 A. -- who we're talking about.
24 Q. And it shows a felony conviction date?
25 A. Right.

**Page 133**

```
1    Q. Do you recall receiving that form in your
2 office?
3         MR. ALLEN: Objection to form.
4         MR. TINKLER: Objection to form.
5 BY THE DEPONENT:
6    A. I would not because I don't see any of these.
7    Q. Okay. Who, in your office, would see those
8 forms?
9    A. Gary Klunk.
10   Q. And do you recall what happened after your
11 office received that form?
12   A. You might just want to give me the whole
13 file, so that I can peruse it and get the whole picture
14 of it, so I can answer in the best way possible.
15   Q. Well, I'm trying to go through document by
16 document.
17   A. I know. But if I can look at the whole
18 picture, then I can give the best possible response.
19   Q. Well, let me show you this one first. This
20 document is a Florida Department of Law Enforcement
21 Voter Eligibility Form.
22   A. Uh-huh.
23   Q. And what's the date on that form?
24   A. 10/2/2000.
25   Q. Okay. And is it for Roosevelt Lawrence as
```

**Page 135**

```
1 of the election law, which I don't know that you need
2 to review, and a copy of the check for S75.
3         And we have one other document. This is
4 correspondence between your office and FDLE.
5         Does it seem to be accurate that originally
6 Mr. Lawrence had received a letter from you saying that
7 he was listed -- included on a list from the state as a
8 felon?
9    A. That's correct.
10        MR. ALLEN: Objection to form.
11        MR. TINKLER: Objection to form.
12 BY THE DEPONENT:
13   Q. Would you say that's how the process started?
14   A. Yes.
15   Q. And after that, Mr. Lawrence returned a form
16 to you saying that he did not have a felony conviction?
17        MR. TINKLER: Object to the form.
18 BY THE DEPONENT:
19   A. Correct.
20   Q. And then, your office sent a form to FDLE to
21 check those records?
22        MR. TINKLER: Objection to form.
23 BY THE DEPONENT:
24   A. Correct.
25   Q. And then, FDLE sent you a response showing
```

**Page 134**

```
1 well?
2    A. Yes.
3    Q. And to your knowledge was that received in
4 your office?
5    A. I can't speak to that.
6    Q. And what does that form show?
7    A. No felony convictions.
8    Q. And these --
9         MR. TINKLER: Are we going to be marking
10 these individually or as a packet?
11        MS. BORGEN: We're going to mark them as a
12 packet unless you would rather mark them
13 individually.
14        MR. TINKLER: I'm just trying to follow.
15 BY MS. BORGEN:
16   Q. I'm going to show you several other records
17 from your file regarding Roosevelt Lawrence. And if
18 you could take a look at those and tell me if you have
19 seen them before or have a sense of what happened
20 regarding Mr. Lawrence's case.
21        Actually, let me show you -- I have one more
22 document to that as well.
23   A. This is all the documents dealing with
24 Roosevelt Lawrence's case that you have?
25   Q. Yeah. Somehow, attached to that were copies
```

**Page 136**

```
1 that he did have a felony conviction.
2         MR. TINKLER: Objection to form.
3 BY MS. BORGEN:
4    Q. And do you know what happened at that point
5 in time in regard to how you office responded at that
6 point?
7         MR. ALLEN: Objection to form.
8         MR. TINKLER: Objection to form.
9 BY THE DEPONENT:
10   A. My staff could respond to that. I could not.
11 I know that I was briefed on this case after a certain
12 point when Darrell Smith alerted me that they thought
13 they really had a case where FDLE was making an error.
14 And that -- I believe that the voter, Mr. Roosevelt,
15 was -- I mean, Mr. Lawrence, was being very persistent
16 in his claim that he did not have a felony conviction.
17   Q. So would you say that this is a situation --
18 tell me if I accurately characterizing this.
19 Mr. Lawrence originally appeared on the list provided
20 to your office in the summer of 2000, by the state, of
21 probable or possible felons; is that correct?
22        MR. LITTLE: Objection to form.
23        MR. RESTREPO: Objection to form.
24        MR. TINKLER: Objection to form.
25
```

Page 137

1 BY THE DEPONENT:
2    A. Mr. Lawrence appeared on the central voter
3 file list. We sent him a certified letter. He
4 followed up with the voter status form. We sent that
5 to FDLE. They responded that he was a convicted felon.
6 But Mr. Lawrence was very persistent is my recollection
7 from the staff briefings and from my own personal
8 conversation with him. I talked to him on the phone a
9 couple of times -- that this information was absolutely
10 incorrect.
11       And so, as you can see from the documents,
12 our staff continued to follow up, until it finally got
13 to a form that was 10/2/00, indicating from FDLE, that
14 there was no felony conviction.
15    Q. So Roosevelt Lawrence -- let me take a step
16 back.
17       You received a list from the state in the
18 Summer of 2000 of individuals with possible or probable
19 felony convictions to be removed from your list after
20 verification; is that correct?
21       MR. LITTLE: Objection to the form.
22       MR. TINKLER: Objection to the form.
23 BY THE DEPONENT:
24    A. You're asking did we receive a central voter
25 file?

Page 138

1    Q. Yes, what we discussed earlier.
2    A. We received a central voter file list.
3    Q. In 2000?
4    A. Correct.
5    Q. And did Mr. Roosevelt Lawrence appear on that
6 list?
7    A. According to the information that you have
8 here, I believe he did. Yes, according to the
9 information you've given me, Roosevelt Lawrence, yes.
10    Q. Okay, appeared on that list.
11       And then you sent a letter to Mr. Lawrence
12 about his appearance on that list; is that correct?
13    A. Correct.
14    Q. And Mr. Lawrence responded saying he did not
15 have a felony conviction?
16    A. Correct.
17    Q. And prompted by that letter, you checked with
18 FDLE to see if he had a felony conviction?
19    A. Correct.
20    Q. And their first response was that yes, he
21 did, and they provided you with a conviction date?
22    A. Correct.
23    Q. And then upon further work between your
24 office and Mr. Lawrence, it was determined that he did
25 not have a felony conviction?

Page 139

1    A. Yes.
2    Q. And he, then, was not removed from the voter
3 list?
4    A. Yes.
5    Q. Okay. No further questions regarding
6 Mr. Lawrence then.
7       MS. BORGEN: This is Exhibit L.
8       (Plaintiffs' Exhibit L was marked for
9       identification.)
10 BY MS. BORGEN:
11    Q. Turn then to paragraph 89 of the second
12 amended complaint. Plaintiffs have included
13 allegations regarding Jermaine Terry. In your answer
14 you stated that you were without knowledge -- I'm
15 sorry, I think that you denied -- yes, denied the
16 allegations regarding Mr. Terry.
17       Do you know the basis for those denials or do
18 you have information regarding Mr. Terry's case?
19       MR. TINKLER: Objection to form.
20 BY MS. BORGEN:
21    Q. Let's start with the first question then. Do
22 you have information regarding Mr. Terry?
23    A. I do.
24    Q. Okay.
25    A. Let me go through it.

Page 140

1    Q. What is that information that you have?
2       Let the record reflect you've pulled out a
3 packet of information --
4    A. Yes --
5    Q. -- for Mr. Terry?
6    A. -- which will become an exhibit, I suspect.
7    Q. If you could go through and explain what each
8 of those pages is.
9    A. Okay. The first is from your lawsuit
10 indicating what he alleges. The second is a paragraph
11 prepared by my staff. And then we have his voter edit
12 screen and a screen from our voter registration system
13 indicating changes to his record.
14    Q. Okay.
15    A. This is an individual who was removed via the
16 list maintenance removal process, which is the process
17 specified in the National Voter Registration Act. He
18 was deleted from the voter rolls.
19       Now, I think it's important to step through
20 this list maintenance removal process. I mean, this is
21 something that is often referred to or it seems to be
22 referred to in the lawsuit as some purge. It is a list
23 maintenance removal process, which is specified in
24 federal law and is being followed by election officials
25 all across the 50 states.

Case 0:05-cv-00118-ASG Document 420   Entered on FLSD Docket 07/04/2002 Page 451 of 6/6/02
NAACP vs. HARRIS, ROBERT, et al

Page 945

Page 141

1 It begins with undeliverable mail or NCOA
2 change of address in every case.
3    Q. I'm sorry, NCOA stands for?
4    A. National change of address with the post
5 office. It looks like in 1996 -- let me just see. He
6 had a name signature return -- no. He had a
7 first-class piece of mail returned, at our office. We
8 followed the process of, we first send an address
9 confirmation notice and then we send an address
10 confirmation final notice. And this is all specified
11 in NVRA and this all occurred in 1996.
12    Then on June 4th, 1996, his status was
13 changed from active to inactive, because of no response
14 to address confirmation final notice under NVRA. When
15 a person is moved from active to inactive, they still
16 appear on the precinct register. And, in fact, there
17 is no difference in terms of how they're noted on the
18 precinct register. A poll worker or a voter would not
19 know the difference between an active or an inactive
20 voter.
21    He appeared on the precinct register in the
22 1996 federal election and then in the 1998 federal
23 election. And under NVRA, once you have gone through
24 two federal election cycles as an inactive voter, you
25 are then deleted from the rolls, 730 days after no

Page 143

1    A. Well, we send --
2    Q. -- it could be?
3    A. Let me go through this. Our mass mailing of
4 I.D. cards, sample ballots, address confirmation. We
5 do a mass mailing of address confirmation cards,
6 normally during odd numbered years. For example, in
7 October of '99, we mailed 126,658 address confirmations
8 to registered voters.
9    Q. And who do you send those to?
10    A. Well, here's an example -- and this can be
11 part of the record too, our list maintenance removal
12 process. Mass mailing of address confirmation cards
13 are periodically, normally during the odd years, sent
14 to all registered voters who have not voted in the last
15 two years and who did not make a written request that
16 their registration records be updated during that time.
17 For example, in October of 1999, we mailed 126,658
18 address confirmations to registered voters who met this
19 criteria.
20    And so, as you get the mail back that the
21 person no longer lives at this address, then that
22 triggers these address confirmation notices, final
23 address confirmation notice, no response to that, you
24 get on the inactive list two federal election cycles.
25    Q. The mailing of those notices was originally

Page 142

1 response to the address confirmation final notice.
2    He was removed from the rolls on January 1st,
3 1999. Again, this was all in keeping with the
4 federally mandated list maintenance removal process
5 that is specified in the National Voter Registration
6 Act. So Mr. Terry was dealt with in that way, as a
7 list maintenance issue.
8    Q. And that was removal based on a change of
9 address?
10    A. According to this, his change record, it
11 looks as though 4/30/1996, he had a name/signature
12 returned not known. So a piece of mail that we sent to
13 him was returned, first-class mail returned. And
14 that's how this list maintenance begins in all
15 circumstances, a first-class piece of mail that is
16 returned as not forwardable.
17    Q. And do you know what type of mail was
18 returned?
19    A. That's not part of this staff analysis, and
20 I'm sorry about that, but you can ask that question
21 tomorrow.
22    Q. Do you know what types of mail that would
23 include? Is that sample ballots?
24    A. Exactly.
25    Q. What sorts of things --

Page 144

1 prompted by not voting? People who did not vote for
2 two cycles were the ones who are targeted?
3    MR. ALLEN: Objection to form.
4    MR. RESTREPO: Objection to form.
5    MR. TINKLER: Objection to form.
6 BY THE DEPONENT:
7    A. I couldn't speak -- I have to say, in this
8 specific case, I don't know about the "name/signature
9 card returned not known".
10    Q. Okay. But for the procedures you were just
11 describing --
12    A. That's one procedure. I mean, there are
13 others. Others are sample ballots, we mail that to
14 every registered voter. For example, I always mail a
15 sample ballot to every registered voter prior to the
16 general election and that has nothing to do with
17 whether or not a person has voted or not. That just
18 goes out to every registered voter. We get a certain
19 percentage back as not deliverable, non-forwardable.
20 And then, that triggers --
21    Q. And that triggers the process?
22    A. This June, this July, we will mail every
23 registered voter in Hillsborough County a new voter
24 I.D. card. A certain percentage of those will come
25 back as nondeliverable and that will begin this list

1 maintenance process.
2   So that has nothing to do with a person's
3 voting record at all. We do some county-wide mailings
4 and those really form the basis for this. Because when
5 you do a county-wide mailing like that -- in fact, this
6 year, we're going to have two of those county-wide
7 mailings. We're going to have, in the summertime, this
8 new voter I'd card that's going to get to every voter.
9 And then, we're going to have the sample ballot in
10 October.
11   Q. Okay. And what is the new I.D. card that's
12 going to be sent to everybody? Is there a reason that
13 everybody is getting a new card this summer?
14   A. Yes. Because of redistricting by the
15 legislature and the districts, and thus new precincts
16 and, perhaps, new polling sites, we are going to be
17 mailing every registered voter a card with an
18 explanation that you're getting a new card, please look
19 at it, you might have new district representatives and
20 might have a new precinct, explain a little bit about
21 this reapportionment process that occurs every decade.
22   Q. Is that generally done every time there's
23 redistricting?
24   A. This my first time as the supervisor with
25 redistricting.

1   Q. Do you know if it was done in 1990 after the
2 1990 redistricting process?
3   A. It would have been done in 1992. I'm sure
4 that voters did receive a new voter I.D. card.
5   Q. And so for Mr. Terry, his removal, you said
6 was prompted by the return of a first-class piece of
7 mail, but you're not sure exactly what it was?
8   A. Correct.
9   Q. But it could have been a sample ballot? It
10 could have been --
11   A. Well, it's called a name/signature card.
12   MR. TINKLER: Objection to form.
13 BY THE DEPONENT:
14   A. And so, you could ask Mr. Smith tomorrow what
15 that means --
16   Q. Okay.
17   A. -- and he'll have the answer for you.
18   Q. Mr. Terry went to vote on November 7th, 2000,
19 and he was informed -- if he were informed by a poll
20 worker that he could not vote because he had been
21 removed from the voter list. If he were able to show
22 that he was still a resident of Hillsborough County and
23 should not have been removed from the voter roll, would
24 he have been allowed to vote?
25   MR. ALLEN: Objection.

1   MR. TINKLER: Objection.
2   MR. LITTLE: Objection.
3 BY THE DEPONENT:
4   A. That's just not the -- those aren't the
5 facts. I mean, that's not -- he got removed from the
6 voter roll because of a process that is federal in
7 nature. It is not a policy just of my office. It's
8 not a policy of any neighboring office. It is a
9 federal law. And that procedure was followed, and so
10 an individual cannot show new information at the polls,
11 on election day, and register to vote. He was no
12 longer a registered voter in Hillsborough County and
13 you cannot register to vote on election day.
14   Q. Pursuant to federal and state law, are there
15 any provisions for someone who has been deleted and it
16 turns out it's improper, that that individual did not
17 move --
18   MR. ALLEN: Objection to the form the
19   question.
20 BY THE DEPONENT:
21   Q. -- for that individual to vote that day at
22 the election?
23   A. Well, if there's something in the law, I need
24 to be made aware of it. Not that I'm aware of. And
25 from my knowledge of this particular case, we followed

1 the law and followed the procedure in the law.
2   Q. Let me give you a hypothetical to see how
3 this person would be treated in Hillsborough County.
4 If there was someone who were removed in, let's say,
5 July of 2000. Hillsborough County thought that that
6 individual had moved to a new address and had deleted
7 that individual. And that person showed up at the
8 polls in November 2000, and said, No, I didn't move,
9 that's my address, I still live there, I don't know why
10 you deleted me, and that individual could show a
11 driver's license or something saying that's still my
12 address, would you allow that individual to vote?
13   MR. ALLEN: Objection to the form of the
14   question.
15 BY THE DEPONENT:
16   A. Well, I'm not sure that that's the case here.
17 It's not a matter of whether or not the person moved.
18 It's a matter that we mailed them first-class mail and
19 it's returned to us that the individual is no longer at
20 that address. We then follow up with another piece of
21 mail and are not getting any response from the voter.
22   Now, if the voter still lives at that
23 address, then I think we have a problem. One, that the
24 post office is unaware of that and is telling us
25 something different; and that we are sending mail to

Page 149

1 that person indicating that they are about to have
2 something happen to their voter record and that they're
3 not responding to us. And then, even after all that
4 occurs, they stay on the voter file for two federal
5 elections as an inactive voter.
6      And so, I'm not sure that I can answer your
7 question just with that scenario you put forth because
8 it's not the situation here with Mr. Terry.
9   Q. Let me take just a moment to see if I can
10 skip ahead and find something that might help us
11 clarify that point.
12      In the first set of interrogatories that were
13 served on your office, plaintiffs had asked whether a
14 voter -- I'll read you the direct question that was
15 asked: Will the County defendants please state whether
16 you permitted a voter to vote on November 7th, 2000 if
17 voter was purged from the voter roll based on an
18 address change, but that voter appeared at the poll to
19 vote and stated that his or her address had not in fact
20 changed? And if you answer in the affirmative, please
21 describe the procedure by which such voters were
22 permitted to vote.
23      And, once again, knowing your concerns with
24 the use of "purged" and "removal," we accept that. The
25 response that had been provided was that, yes, if the

Page 150

1 voter informed the poll worker that he or she had been
2 erroneously removed from the rolls and their address
3 had not changed, the action would be forwarded to a
4 supervisor in the phone bank who would substantiate the
5 facts and obtain approval from a manager or the
6 supervisor of elections if necessary to allow the
7 person to vote.
8      Does that sound like an accurate statement of
9 the policy to you?
10   A. Well, obviously it is if my staff wrote that
11 up and it's part of this court record. Certainly, on
12 election day, we do everything we can to ensure that
13 someone can vote. And if -- we want a person to vote.
14 And many times you have an individual who has been
15 placed at a precinct and they claim that's not the
16 precinct they belong in, they never really moved and
17 situations like that, and that's where you have to have
18 your phone bank involved and your supervisors involved.
19      But I would think that once we have had
20 someone go through this list maintenance process and
21 they've actually been deleted from the rolls, I think
22 it would be an unusual circumstance that we would
23 reinstate someone and essentially reregister them on
24 election day. Now, perhaps my staff, in depositions
25 tomorrow, can speak of examples where this has occurred

Page 151

1 that I am unaware of.
2      You have people who show up on election day
3 who say, I never moved, even though we have evidence
4 that they registered in another county. You have all
5 kinds of situations that occur on election day. But we
6 are certainly going to hear that individual out. And
7 if we can get through to a supervisor on election day
8 and attempt to research a particular problem, we will
9 do that.
10      But, you know, in this particular case,
11 here's a history and here's documentation of a
12 particular list maintenance removal, and simply for the
13 person to say, I never moved, is not enough to negate a
14 record dating back from 1996.
15   Q. So you think you might qualify your answer to
16 the interrogatory that there may be some time
17 limitation?
18      MR. TINKLER: Objection to the form.
19 BY THE DEPONENT:
20   A. No, I'm not saying it's necessarily a time
21 limitation. It's an evidence situation. What evidence
22 do we have in our office?
23      I mean, certainly, if you ever got to the
24 point where it was a clerical error on the part of our
25 staff that someone was erroneously removed, then yes,

Page 152

1 we would fix that on election day. But in a case were
2 we followed the procedures outlined in the law, simply
3 to have someone show up on election day and say, I
4 never moved, no need to have the list maintenance
5 removal process then. There'd be no need to have it.
6   Q. In regard to Mr. Terry's situation, do you
7 have copies of any of the letters that were sent to
8 Mr. Terry?
9   A. I do not. Do you have them? I mean, is that
10 something that you have?
11   Q. I have not seen copies of those.
12   A. Okay. No, I don't.
13   Q. Do your offices maintain those?
14   A. No, but you can certainly ask my staff about
15 that tomorrow, if we have letters --
16   Q. Okay.
17   A. -- or whether we just make notations on our
18 voter file.
19      MS. BORGEN: Okay. We'll go ahead and
20   mark that as Exhibit M, the materials relating
21   to Mr. Terry.
22   (Plaintiffs' Exhibit M was marked for
23   identification.)
24 BY MS. BORGEN:
25   Q. Let's turn then to paragraph 97 of the

Page 153

1 amended complaint. If you turn to the last sentence of
2 paragraph 97, On information and belief, Defendants
3 Election Supervisors of Hillsborough County, Volusia,
4 Orange, Broward and Duval Counties failed or refused to
5 process many new voter registration applications that
6 were submitted to them prior to the deadline imposed by
7 state law.
8      In your answer to that paragraph, you state
9 that you deny that as to Hillsborough County. Do you
10 have any information regarding this allegation?
11     MR. TINKLER: Objection to form.
12 BY THE DEPONENT:
13     A. I can just say that we would never refuse to
14 process a new voter registration application.
15     Q. Is it possible that you would fail to process
16 a new voter --
17     A. The only time that we would fail to process
18 one is if we had a clerical error on the part of one of
19 our individuals doing the processing, if it was a human
20 error situation, if a person on staff misplaced an
21 application, thought that they had input it and did
22 not, misplaced it altogether. And I think in any
23 clerical office environment you're going to have some
24 of that occur over the years. But never would we
25 refuse to process a legitimate voter registration

Page 154

1 application.
2      Q. When you consider processing a voter
3 registration application, when is that process
4 complete?
5      A. What do you mean?
6      Q. Is it complete upon entering the information
7 into your system or sending the voter a voter
8 registration card to let them know that the application
9 has been processed?
10     MR. TINKLER: Objection to form.
11 BY THE DEPONENT:
12     A. When we complete the information and it has
13 all the required information by law.
14     Q. So once an individual's information has been
15 entered in your computer system, you consider that to
16 be a completed voter registration application?
17     MR. TINKLER: Objection to form.
18 BY THE DEPONENT:
19     A. Correct.
20     Q. Do you believe you have any requirement to
21 notify voters about the outcome of their voter
22 registration application?
23     A. Yes, we do.
24     Q. And what is your understanding of that
25 requirement?

Page 155

1      A. We send them a voter registration form. And
2 if it's incomplete, then we send them an incomplete --
3 in fact, we even take a voter registration form and
4 print all the complete information and then send that
5 to them and indicate, highlight, what is incomplete, so
6 it makes it very easy for them to send back the needed
7 information.
8      Q. So is the processing of a voter registration
9 application then complete upon mailing to a voter a
10 copy of the voter registration card?
11     A. No. It's complete when we enter the
12 information into our system and we have all the
13 required pieces of information by law.
14     Q. And then, the notification to the individual
15 you think of as a different -- different requirement?
16     A. Yes, because we can't control the mail. They
17 may never receive the voter card, but that doesn't mean
18 that they're not registered to vote.
19     Q. Well, I'm not asking about when they actually
20 receive it, but when you mail it?
21     MR. ALLEN: Objection to form.
22 BY THE DEPONENT:
23     A. No.
24     Q. You don't consider your mailing to be part of
25 the requirement for process the application?

Page 156

1      MR. ALLEN: Objection to form.
2      MR. TINKLER: Objection to form.
3 BY THE DEPONENT:
4      A. Oh, it is, but that wasn't the question you
5 asked. You asked when are they registered to vote.
6      Q. When do you consider the process for voter
7 registration to be complete? Is it upon your
8 entering --
9      A. When we enter the data, and we have all the
10 required pieces of information, that individual becomes
11 a registered voter and is eligible to vote.
12      When they may or may not receive the form --
13 the card is a different issue altogether. Because in
14 some cases, a person, if they register at book closing,
15 and we have thousands of registrations, and depending
16 on when we get that individual entered into the system,
17 and then when we can batch that and send it out, they
18 may or may not even receive their registration card
19 prior to election day in some very limited
20 circumstances. I don't think that's very common, but
21 that could conceivably occur.
22      Q. Do you think it's your -- that part of the
23 requirement though -- I understand that once somebody
24 is entered into your system, they can register to vote.
25 Regardless of whether they've received their card --

Page 157

1    A. Right.
2    Q. -- if you've entered them in the system,
3 they're deemed registered. Is that -- that's correct?
4        MR. ALLEN: Ojbection to the form.
5        MR. TINKLER: Objection to form.
6 BY THE DEPONENT:
7    A. Once we have received their application and
8 have entered all the information into the system, the
9 required information, then I considered them a
10 registered voter.
11   Q. And your voter registration process, how
12 would you define that process? Does it include simply
13 the entry of that information in the system or does the
14 process -- let me stop there. Does it include -- when
15 you say, we have a process for registering voters, is
16 that just the data entry into your system of the
17 applications?
18       MR. ALLEN: Objection to the form.
19       MR. TINKLER: Objection to form.
20 BY THE DEPONENT:
21   A. Well, there are other administrative things
22 that go along with it.
23   Q. Such as?
24   A. We have to batch those forms and mail them
25 out on a regular basis, the registration forms. We

Page 158

1 take each voter registration form and we image it and
2 we capture the signature, which then becomes an image
3 of the signature which is used for absentee ballots and
4 petitions and for, you know, identification. And so,
5 there's a process that the form goes through.
6        But I don't consider those elements as being
7 critical to the voter registration process. Those are
8 administrative elements.
9    Q. Okay. And when you said you have to mail
10 them out, what were you referring to?
11       MR. ALLEN: Object to the form.
12       MR. TINKLER: Objection to form.
13 BY THE DEPONENT:
14   A. Well, we enter so many into the system. And
15 on a regular basis, we capture those that have been
16 entered into the system for a particular period of time
17 and then those are mailed out in batches, the voter
18 registration cards.
19   Q. When you say, they're mailed out, the voter
20 registration cards are mailed out to the voters?
21   A. That's correct.
22   Q. And that's done in batches, so not on a
23 rolling basis?
24   A. Not one at a time.
25   Q. Okay. Do you know how often those batches

Page 159

1 are sent out?
2    A. My staff member Darrell Smith can speak to
3 that tomorrow.
4    Q. And do you know if all applications received
5 by October 10th, 2000, all of them that were properly
6 filled out, do you know if all those voter registration
7 cards were sent to voters prior to the November 7th
8 election?
9        MR. TINKLER: Objection to form.
10 BY THE DEPONENT:
11   A. I can't answer that, but I know Darrell Smith
12 will be able to answer that tomorrow.
13   Q. Okay. Let's turn to paragraph 100 of the
14 complaint, allegations as to Plaintiff Sherry Edwards.
15 In your answer you had stated that you were without
16 knowledge about Ms. Edwards' allegations. Do you have
17 any information about her allegations today?
18       MR. TINKLER: Objection to form.
19 BY THE DEPONENT:
20   A. Yes.
21   Q. Do you have information about Mr. Edwards
22 with you today?
23   A. Yes, I do.
24   Q. And what do you have with you?
25   A. I have a copy of your plaintiff's part of the

Page 160

1 lawsuit and the memo.
2        "The transmittal form from the driver's
3 license office on Adamo Drive in Brandon indicates that
4 is Ms. Edwards registered to vote on 9/28/2000.
5 However, her voter registration card was not in the
6 batch of 40 registrations which were sent to the
7 Elections Office for processing. At that time, we
8 called the Adamo Branch and received an address for
9 Ms. Edwards. We also asked them to search for her
10 registration. It is our practice to forward a letter
11 along with a voter registration application and
12 postage-paid envelope to the person when the
13 transmittal form indicates a person has registered, but
14 we did not receive the registration application from
15 the Driver's License Office. We do not show a response
16 to our letter because she is not currently in our voter
17 file." She not registered to vote.
18   Q. Do you have a copy -- do you know if a letter
19 was actually sent to Ms. Edwards?
20   A. Darrell Smith could answer that tomorrow.
21 Whether or not we keep a copy of all those letters or
22 not, I don't know. However, if we indicate that
23 something is a practice of our office, we do it.
24   Q. What's generally your practice with
25 applications received from the Department of Motor

Page 161

```
 1  Vehicles --
 2        MR. ALLEN:  Objection to form.
 3        MR. TINKLER:  Objection to form.
 4  BY MS. BORGEN:
 5     Q.  -- if you receive incomplete information?
 6        MR. ALLEN:  Objection to form.
 7        MR. TINKLER:  Objection to form.
 8  BY THE DEPONENT:
 9     A.  If we receive incomplete --
10        MS. BORGEN:  Excuse me just a moment.
11     When you do that, are you trying to indicate an
12     objection?
13        MR. TINKLER:  The objection is continuing.
14        MS. BORGEN:  Okay.  You need to state it,
15     so that I know that.  I don't know what your
16     gestures mean.  Thank you.
17        MR. TINKLER:  Objection to form.
18  BY THE DEPONENT:
19     A.  If we receive an incomplete application --
20  let's say, for example, we receive an application that
21  has everything but the date of birth and under the law,
22  you cannot be registered unless you have all this
23  information complete, the parts than are required under
24  NVRA state law.  We have set up a system in our office
25  whereby we print a voter application form all the
```

Page 162

```
 1  information that you did give us, so the voter doesn't
 2  have to start from scratch.
 3        Then we mail it to them, along with a letter
 4  indicating that here is something that's missing, date
 5  of birth.  Please fill this out and return it back to
 6  us.
 7        We instituted that years ago.  We used to
 8  just send a blank form and, of course, people don't
 9  want to start from scratch and register again.  And so,
10  we began to get a higher rate of return when we filled
11  out, you know, the information that they had given us,
12  and then they just had to fill in the blank.
13        Darrell Smith can probably speak tomorrow as
14  to what rate of return we get, but that's what we do.
15  We have incomplete registrations.  We keep them in
16  search/hold, they are not registered to vote under the
17  law, and we await their response.
18        Now, this particular case with Ms. Edwards,
19  it doesn't sound like she was in that category.  It
20  sounds like we didn't get anything at all from her, but
21  the transmittal form from the driver's license office
22  indicated that she should have been in the transmittal
23  batch.
24        And so, what we did is we sent her a letter,
25  along with a voter registration application, and
```

Page 163

```
 1  postage-paid envelope, saying, you need to register to
 2  vote, and we never received a response from her.
 3     Q.  Would you have sent her a letter saying, We
 4  know you tried to register at the DMV, but the
 5  application was incomplete, or do you know what the
 6  letter would say?
 7     A.  Darrell Smith could speak to that.  And it
 8  wouldn't be that the application was incomplete.  It
 9  would be that we never received an application.
10     Q.  How would you go about getting the
11  information to send her a new application?
12     A.  As this indicates from the staff report, my
13  staff actually called the Adamo branch and received an
14  address for Ms. Edwards.
15     Q.  Was that the standard procedure for DMV if
16  someone was listed on the transmittal form, but you
17  didn't get the application?
18     A.  You'll have to ask Darrell Smith that.  I
19  suspect that it is.  My staff is very concerned if we
20  get a transmittal form from any of the agencies
21  mandated under the law indicating that we should have a
22  form for someone and we don't.
23     Q.  Is that a problem that occurs often?
24     A.  I can't answer that.
25     Q.  And who would be best --
```

Page 164

```
 1     A.  Mr. Smith, Darrell Smith.
 2        MS. BORGEN:  Okay.  Go ahead and mark that
 3     as Exhibit O.
 4        (Exhibit N was not identified or marked.)
 5        (Plaintiffs' Exhibit O was marked for
 6        identification.)
 7  BY MS. BORGEN:
 8     Q.  If you turn to paragraph 101 of the
 9  complaint, plaintiffs have allegations regarding Kandy
10  Wells.  In your answer, you had stated you're without
11  knowledge as to Ms. Wells.  Do you have any knowledge
12  about Ms. Wells today?
13        MR. TINKLER:  Objection to form.
14  BY THE DEPONENT:
15     A.  Yes.
16     Q.  And what is that knowledge based on?
17     A.  Okay, I have a file here.
18     Q.  And this is a copy of the office file for
19  Ms. Wells?
20     A.  Yes, it is.
21        MS. BORGEN:  Let's go ahead and mark that
22     as Exhibit P.
23        (Plaintiffs' Exhibit P was marked for
24        identification.)
25
```

**Page 165**

1 BY MS. BORGEN:
2    Q. And this is the file you brought with you
3 today?
4    A. Correct.
5       Ms. Wells was registered to vote on 3/19/92.
6 We updated her name change and address change on
7 11/4/2000, which means she would not have received a
8 new voter I.D. card prior to the general election.
9 From the statement given in the lawsuit, it appears she
10 assumed she could not vote because she did not have a
11 new voter I.D. card.
12      If Ms. Wells would have called the Elections
13 Office or gone to the polls, she would have found that
14 she was eligible to vote and could have voted even if
15 she had not completed a name and address change prior
16 to election day.
17      It appears she did not vote because we do not
18 have an affirmation in her old precinct, Precinct 801,
19 or the new precinct, 968. Her signature does not
20 appear on either precinct register.
21      I believe what happened here was a
22 misunderstanding on the part of the voter. She was
23 registered to vote and her registration was never in
24 question. She sent in an address change.
25    Q. And do you know what date she sent in the

**Page 166**

1 address change?
2    A. It says here that it was serviced by our
3 staff on 11/4/2000. When she sent it in, I don't know.
4    Q. Would you have -- would your records include
5 somewhere a copy of the actual form that was received
6 by the office?
7    A. Yes, likely, we do have that somewhere. And
8 I think whether Mr. Smith will be bringing that with
9 him, unless he had prior notification that he's
10 supposed to have that, I don't think it's something he
11 would just have with him, so you might want to let him
12 know.
13    Q. Okay.
14    A. She was an inactive voter prior to this
15 address change. But, again, being an inactive voter
16 does not affect her status on the precinct register at
17 all. There's nothing on the precinct register that
18 would indicate that she was an inactive voter.
19      However, when we received her address and
20 name change, that automatically triggers you back to
21 active status, although the inactive didn't affect her
22 capacity to vote.
23      She may have felt that because she did not
24 get a new voter I.D. card in the mail indicating her
25 new address and name that she could vote, but that was

**Page 167**

1 incorrect.
2       She was in the precinct register, listed in
3 Precinct 801. And if she had gone to precinct 801, an
4 affirmation would have been filled out on her, and she
5 would have been sent to her new precinct, 968, or she
6 could have called the Elections Office and gone ahead
7 and showed up at Precinct 968 and then an affirmation
8 would have been completed on her and she could have
9 gone ahead and voted.
10    Q. Now, if she'd gone to her old precinct, if
11 she only had information about her old precinct --
12    A. Right.
13    Q. -- because, you agree, that she did not
14 receive a voter card before the election, is that
15 correct, showing her the new precinct?
16       MR. TINKLER: Objection to form.
17 BY THE DEPONENT:
18    A. Showing her the new address change, correct.
19 And apparently not, from the staff report that I have
20 here and from the fact that I can tell from our system
21 that her address was not changed until 11/4/2000 and
22 the election date was 11/7.
23    Q. Okay. So prior to the November 7th, 2000,
24 election, to the best of your knowledge, Kandy Wells
25 did not receive a new voter registration card telling

**Page 168**

1 her the new precinct to go to?
2    A. Right.
3    Q. So if she had gone to her old precinct, what
4 process would have been followed regarding Ms. Wells?
5    A. If she had gone to her old precinct, her name
6 would have been in the precinct register. If she
7 hadn't said anything, she would have just voted. But
8 if she's honest and says, I've moved, I have a change
9 of address, then she is sent to an affirmation table.
10      An affirmation is filled out on her. Because
11 her name was in the precinct register, it does not
12 necessitate a call to the phone bank, so this would not
13 have been a phone bank issue at all.
14      She would be sent to her new precinct, 968,
15 because they could have looked on a map to determine
16 that. I mean, they could have made a call to the phone
17 bank to say, Here's a new address, where does it place
18 her, but because her name was in the precinct register,
19 they could have used a precinct map to determine her
20 new address and figure out where she was to go. And
21 then, she would have been handed this affirmation and
22 sent to 968.
23    Q. Do all the precincts have maps so they can
24 look up addresses?
25    A. Yes, but only under certain circumstances.

1 The person's name has to appear in the precinct
2 register in order to use that -- to have the
3 flexibility to use that map.
4    Q. And is it the -- which poll worker at a
5 precinct would have that map?
6    A. The assistant clerk.
7    Q. Is it just a map of the county?
8    A. It's a set of two, a fold-out map, a street
9 level map.
10   Q. You can just look up someone's address on the
11 actual map and it --
12   A. Well, it's difficult. I mean, I think it's
13 rather difficult, to some extent, to use because it's a
14 fold out map that you have to find the exact address
15 on. And you really would need the help of the voter, I
16 think, to determine exactly where you live, and that's
17 why we really don't stress the use of it too much.
18       But in the case where the person is already
19 in the precinct register, we know that there are a
20 registered voter. That is not in question, as it was
21 not in question with Ms. Wells. So at this point, it
22 would have been a case of trying to determine where to
23 send her.
24       Now, the poll worker would have had two
25 options; call the phone bank to determine that, and

Page 170

1 that's, of course, the greatest accuracy. But if they
2 would've had any difficulty getting through to the
3 phone bank, they could have, in her case, just taken
4 the map out and said, Let's figure out where you
5 belong.
6    Q. In the training, how are assistant clerks
7 trained to look up this issue?
8    A. Just what I said, really. I mean, not to be
9 too repetitive, but exactly what I said. If you are in
10 the precinct register, the person is a registered
11 voter. And then it's your job now simply to figure out
12 where they go to vote, not their eligibility, but where
13 do they go to vote, and you have these two options for
14 them.
15   Q. And are they told to first try to call the
16 phone bank and see if you can get an answer?
17   A. Well, you know, it really depends on the
18 situation. I mean, the phone bank is very busy on
19 election day. If they can't get through, the important
20 thing is that we want the person to vote, pull out that
21 map and figure it out.
22       Some areas of the county might be easier than
23 others. You pull out a precinct map, particularly in
24 an area -- and I think in her case, it would have been
25 pretty easy because those district are -- those

Page 171

1 precincts are in, I think, large geographic areas where
2 it would have been easy for her to pinpoint her new
3 home and verify that with poll worker.
4    Q. And when someone files a registration
5 application, is it correct that they can indicate on
6 there whether it's a new application, a change of
7 address --
8    A. Right.
9    Q. -- change of name?
10   A. Correct.
11   Q. Are there other options on the application?
12   A. Party change, voter I.D. card replacement.
13   Q. Okay. But it's all the same form, you just
14 check off what you're using it for?
15   A. Right.
16   Q. Do you treat the applications differently
17 when they come into the office based on what's checked
18 off at the bottom?
19   A. Darrell Smith may be able to speak to that
20 better than I can in terms of initial segregation of
21 the forms. However, what the voter checks may or my
22 not be correct. For example, a voter -- it's not
23 uncommon, I think, for a voter to check new
24 registration when, in fact, it's a change of address.
25 And once we get into the application, we realize that.

Page 172

1    Q. And do you know the procedures for how that
2 happens or would that be better to ask Darrell Smith?
3    A. Darrell Smith could speak to that.
4    Q. In paragraph 104 of the second amended
5 complaint, plaintiffs allege that the failure of
6 defendants -- I'm sorry, it's the second part of that
7 sentence. The failure of Defendants Hillsborough,
8 Volusia, Orange, Broward and Duval County Election
9 Supervisors to properly and timely process voter
10 registration applications and voter's change of address
11 information submitted before the close of registration
12 for the 2000 general election violates state and
13 federal law and denied plaintiffs listed above in this
14 section the right to vote.
15       You've indicated there -- is it correct that
16 there may be individuals who filed a new registration
17 or change of -- we'll start with new registrations --
18 filed a new registration prior to October 10th, 2000,
19 who did not actually receive a voter registration card
20 by November 7, 2000?
21   A. I can't speak to that. Darrell Smith would
22 likely have statistics on whether or not there was
23 someone who -- that we received in our office a voter
24 registration form that was marked by book closing date.
25 We devote a great deal of resources to ensuring that

Case 0:01-cv-00120-ASG   Document 420   Entered on FLSD Docket 07/10/2002   Page 459 of 945

NAACP vs. HARRIS, ROBERT, et al   PAM IORIO - VOLUME I   5/6/02

**Page 173**

1 every person who filled out a voter registration form
2 by book closing date is registered. They all get
3 registered prior to the election.
4    Q. Okay.
5    A. I don't know of any evidence of anyone who
6 was not registered?
7    Q. Is it possible that voter registration cards
8 are not sent to those individuals, though?
9    A. If the issue is whether or not the card was
10 sent to them, then again, Mr. Smith would have to deal
11 with that, whether we had any timing issues.
12    Q. Okay. I'll follow up those questions with
13 him tomorrow then.
14       In paragraph 110 of the complaint, plaintiffs
15 allege that many of the telephone lines were busy for
16 long periods of time on election day and were still
17 busy as of 7 p.m., the poll closing time. In your
18 answer to that paragraph, I believe you denied those
19 allegations.
20    THE DEPONENT: May I just interject here?
21    MS. BORGEN: Certainly.
22    THE DEPONENT: Do you ever use the
23 restroom during depositions.
24    MS. BORGEN: You're certainly allowed to
25 whenever you'd like. Would you like to take a

**Page 174**

1 break, so we can discuss lunchtimes as well?
2    (A discussion was held off the record.)
3 (There was a lunch recess at 12:21 p.m. to 1:09 p.m.)
4       S T I P U L A T I O N
5
6       It was hereby STIPULATED and agreed by and
7 between counsel present and the deponent, that the
8 reading and signing of this deposition by the deponent IS
9 NOT waived.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Page 175**

1       CERTIFICATE OF REPORTER
2
  STATE OF FLORIDA
3 COUNTY OF HILLSBOROUGH
4
       I, the undersigned authority, certify that
5 PAM IORIO personally appeared before me and was duly
  sworn.
6
       Witness my hand and official seal this 9th day
7 of May, 2002.
8
9
10       Juanita Butler, Court Reporter
         Notary Public, State of Florida
11       Commission No. CC 897395
         Expires: December 21, 2003
12
13
  STATE OF FLORIDA
14 COUNTY OF HILLSBOROUGH
15
       I, JUANITA BUTLER, Court Reporter, certify that
16 I was authorized to and did stenographically report the
  foregoing deposition; and that the transcript is a true
17 record of the testimony given by the witness.
18       I FURTHER CERTIFY that I am not a relative,
  employee, attorney, or counsel of any of the parties, nor
19 am I a relative or employee of the parties' attorneys or
  counsel connected with the action, nor am I financially
20 interested in the action.
21    Dated this 9th day of May, 2002.
22
23
         Juanita Butler, Court Reporter
24       Notary Public, State of Florida
         Commission No. CC 897395
25       Expires: December 21, 2003

**Page 176**

1
2
3    I HAVE READ THE FOREGOING TRANSCRIPTION OF MY
4 DEPOSITION AND EXCEPT FOR ANY CORRECTIONS AND/OR
5 AMENDMENTS APPENDED HERETO, I HEREBY SUBSCRIBE TO THE
6 TRANSCRIPT AS AN ACCURATE RECORD OF THE TESTIMONY GIVEN
7 BY ME
8
9
10
11       PAM IORIO
12
13 My hand and official seal this the _____ day
   of _____, 2002.
14
15
16       Notary Public
         State of _____ at Large
17       My Commission Expires:
18
19
20
21
22
   STYLE:   NAACP, ET AL vs. HARRIS, ROBERTS, ET AL
23 DEPONENT: PAM IORIO - VOLUME I
   REPORTER: JUANITA BUTLER   TAKEN: MAY 6, 2002
24
25
26

NAACP vs. HARRIS, ROBERTS et al · PAM IORIO - VOL I 5/6/02

Page 177

```
 1         ERRATA SHEET
 2
   STYLE:   NAACP, ET AL  vs.  HARRIS, ROBERTS, ET AL
 3 DEPONENT: PAM IORIO  - VOLUME  I
   REPORTER: JUANITA BUTLER     TAKEN: MAY 6, 2002
 4
 5 PAGE NO :  LINE:    CORRECTION AND/OR AMENDMENT:
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

1 allowed.
2     MR. ALLEN: Yeah, that's what I'm
3 wondering.
4     THE DEPONENT: Right. Not so much this,
5 but I think that can be redacted.
6     MR. ALLEN: Yeah, it's been taken off.
7     MS. BORGEN: And I'm sorry, which
8 information had been redacted?
9     MR. ALLEN: The Social Security Number and
10 phone number.
11     THE DEPONENT: I don't have a paper clip
12 for this, but it's --
13 BY MS. BORGEN:
14     Q. So Exhibit J, then, will be the three pages
15 with, you said, your staff's summary of Willie Steen's
16 file --
17     A. Correct.
18     Q. -- voter edit screen prints and change
19 history report?
20     A. Right.
21     Q. And Mr. Steen, then, would have received --
22 you said received a letter from your office?
23     A. In 1997.
24     Q. Do you have a copy of that letter?
25     A. I don't know.

Page 122

1     Q. Mr. Darrell Smith would know?
2     A. He would know if we have a copy of it.
3     Q. And how would that letter have been sent?
4 Would it have been sent by regular mail, by certified
5 mail?
6     A. I don't know the answer to that.
7     Q. And if the letter were sent by certified mail
8 and the receipt was not returned to you, would the
9 procedure have gone forward with the administrative
10 hearing process and the posting in the paper,
11 regardless?
12     A. Correct.
13     Q. And would a letter have been sent then by
14 regular mail?
15     A. That's not part of the administrative hearing
16 process.
17     Q. The administrative hearing process is only
18 certified mail, and then regardless of whether or not
19 the returned receipt comes back, then you move forward
20 to the posting in the newspaper and establishing the
21 administrative hearing?
22     MR. TINKLER: Objection to form.
23 BY THE DEPONENT:
24     A. Correct. The addition of mailing a regular
25 letter was my idea in 2000 just to give those

Page 123

1 individuals extra notification that they were going to
2 be removed from the rolls --
3     Q. Okay.
4     A. -- the central voter file.
5     Q. All right. So that procedure was only used
6 for the central voter file --
7     A. Correct.
8     Q. -- removals in 2000? Okay.
9         In paragraph 88 of the complaint, plaintiffs
10 include allegations about what happened to Wallace --
11     A. Although, let me go back to that.
12     Q. Certainly.
13     A. Based on this, really, this is how we deal
14 with -- it says, according to internal procedures. So
15 this would not be the administrative hearing process.
16 A letter is forwarded to the felon making him or her
17 aware that they are no longer eligible to vote. So,
18 apparently, that is what we did for people even with
19 the Clerk of the Circuit Court.
20     Q. That would be after the entire process?
21 After the --
22     A. Yes.
23     Q. -- administrative hearing, if someone does
24 not show up to that --
25     A. Yes.

Page 124

1     Q. -- or there is a determination that they
2 should be removed?
3     A. Right.
4     Q. You send a letter by regular mail?
5     A. Right.
6     Q. Okay. Turn to paragraph 88 of the complaint.
7 Plaintiffs include allegations about what happened to
8 Wallace McDonald.
9     A. Uh-huh.
10     Q. And it says that in June 2000, he received a
11 letter from Hillsborough County informing him that he
12 would be removed from voter rolls because of a prior
13 felony conviction. And he said that he responded in
14 writing, informing the supervisor he had not been
15 convicted of a felony, and that the records, you know,
16 were inaccurate. In your answer you state that you are
17 without knowledge as to the situation of what happened
18 to Mr. McDonald.
19         Do you have knowledge here today about what
20 happened to Mr. McDonald?
21     MR. TINKLER: Objection to form.
22 BY THE DEPONENT:
23     A. Yes.
24     Q. And what is that knowledge?
25     A. "Mr. McDonald was not allowed to vote based

Page 125

1 on information that was provided in the central voter
2 file list that was provided to us by the Division of
3 Elections in early 2000. Mr. McDonald was sent an
4 alleged felon letter in June of 2000. He returned our
5 certified mail card and forwarded the completed
6 enclosed voter eligibility status form to us in late
7 August 2000. He indicated on the VES form that he had
8 a felony arrest that did not result in a conviction.
9 We, in turn, forwarded the VES form to FDLE for
10 verification of felony status. We received an FDLE
11 form on 9/7/2000 indicating that Mr. McDonald was a
12 convicted felon with an arrest date 6/8/59 in
13 Hillsborough County. They will not divulge the
14 criminal offense. The case has been checked twice by
15 FDLE. After receipt of the lawsuit, another VES form
16 was dispatched to FDLE for verification and FDLE
17 returned exactly the same information as previously.
18      "We also called the Office of Executive
19 Clemency on or about January 17, 2001, to check if
20 Mr. McDonald had his civil rights restored and we were
21 informed that they have no record of him having his
22 rights restored."
23      Q. Okay. Let me stop you there. You were
24 reading from a piece of paper from your files?
25      A. Correct.

Page 126

1      MS. BORGEN: Let's mark that as Exhibit K.
2 BY MS. BORGEN:
3      Q. I apologize, this is a document that was --
4 who prepared that document?
5      A. A staff member.
6      Q. A staff member. And do you know when it was
7 prepared?
8      A. Prior to today.
9      Q. And it was part of your regular -- the
10 records that you regularly keep as part of the office?
11      A. Yes.
12      MS. BORGEN: Let's go ahead and mark that
13 as K.
14      (Plaintiffs' Exhibit K was marked for
15 identification.)
16 BY MS. BORGEN:
17      Q. And you've got several documents here. Do
18 these constitute your office documents relating to
19 Mr. McDonald?
20      A. Yes. As you can see, this is the voter
21 eligibility form. Here is something coming from FDLE,
22 checked, Records indicate subject is a convicted felon
23 in Florida. Date of arrest, 6/8/59. Researched -- and
24 this is from FDLE.
25      Q. And what's the date on that document?

Page 127

1      A. This one is 1/26/01.
2      Q. Okay. So that was -- that search was done by
3 FDLE after the filing of the complaint?
4      A. But this one was done before, 9/5/00, same
5 thing, Records indicate subject is a convicted felon in
6 Florida, 6/8/59. That was the first one.
7      Q. Okay.
8      A. So this is the voter eligibility status forms
9 that we got back from Mr. McDonald and he's saying, I
10 had a felony arrest, but it did not result in a
11 conviction. This is FDLE saying, incorrect, you are a
12 convicted felon.
13      So at this point, the supervisor of elections
14 is getting information from the agency that is supposed
15 to have the information telling us that the person is a
16 convicted felon, and that's the way the process worked.
17      Q. When your office was in this kind of
18 situation, where the voter is telling you one thing,
19 FDLE is telling you something else, what efforts did
20 you make to try and reconcile those conflicting
21 reports?
22      A. Well, again, as I stated before, the
23 supervisor of elections is not in the criminal justice
24 field. We administer elections. We have to be able to
25 rely on another agency of government to provide correct

Page 128

1 information. In this case, we sent something out. The
2 voter comes back and says, this is incorrect. We
3 forward to the agency that is supposed to have correct
4 information. They send us back something saying, no,
5 they are correct, and so that is the way the process
6 works.
7      Q. Did the FDLE send you a copy of conviction
8 papers or court papers showing that there was a felony
9 conviction?
10      A. I don't have that in my possession.
11      Q. Do you know if they ever forwarded such
12 papers to you?
13      A. That is -- no, not to my knowledge. I think
14 they would have been part of this file.
15      Now, I would think that after this, then the
16 voter receives this back. And I would think then the
17 voter -- if the voter believes that this is an error,
18 then they need to take this a step further. I mean,
19 aside from the supervisor of elections, I think any
20 voter would be very concerned that in their mind they
21 don't have a felony conviction, but in the mind of the
22 state they are a convicted felon. I think that would
23 be a concern to any person.
24      So I would think that once they would receive
25 this form, voter registration aside, I think that would

Page 178

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF FLORIDA
 3            CASE NO.: 01-0120-CIV-GOLD
 4   --------------------------------------------x
 5   NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
     COLORED PEOPLE, INC., by its FLORIDA STATE
 6   CONFERENCE OF BRANCHES, JIMMIE PANNELL, JULIA
     STONER, NATALIE CARNEGIE, JOHN L. CHEEVER,
 7   JAMES MARSHALL, LILLIE Q. ODOM, WILLIE STEEN,
     WALLACE MCDONALD, JERMAINE TERRY, LORINE
 8   WALDEN, EMERY TIMBERLAKE, VALERIE
     BUFORD-WELLS, MICHELLE FLOYD, CONSUELO MARIA
 9   GRAHAM, SHERRY EDWARDS, KANDY WELLS, JOANNA
     CLARK, JANICE KELLY, PLACIDE DOSSOUS, RONDRICK
10   ROSE, URSULA HARVEY and ADMANTHA ISRAEL in
     their own right and as representatives of all
11   similarly situated citizens and residents of
     the State of Florida,
12
          Plaintiffs,
13
     vs.
14
     KATHERINE HARRIS, Secretary of State of Florida,
15   CLAY ROBERTS, Director of Florida Division of
     Elections; DAVID C. LEAHY, Miami-Dade County
16   Election Supervisor; MIRIAM OLIPHANT, Broward
     County Election Supervisor, JOHN STAFFORD,
17   Duval County Election Supervisor; PAM IORIO,
     Hillsborough County Election Supervisor,
18   WILLIAM COWLES, Orange County Election
     Supervisor; and DEANIE LOWE, Volusia County
19   Election Supervisor (all in their official
     capacities); and CHOICEPOINT, INC., a Georgia
20   corporation d/b/a DATABASE TECHNOLOGIES, INC.,
21        Defendants.
22   --------------------------------------------x
23
     DEPOSITION OF:        PAM IORIO
24
                      VOLUME  II
25
26
```

Page 179

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF FLORIDA
 3            CASE NO.: 01-0120-CIV-GOLD
 4
     NATIONAL ASSOCIATION FOR THE
 5   ADVANCEMENT OF COLORED PEOPLE
     INC., et al.,
 6
          Plaintiffs,
 7
     vs.
 8
     KATHERINE HARRIS, Secretary of State of
 9   Florida, et al.,
10        Defendants.
11   _____/
12
13
     DEPOSITION OF:        PAM IORIO
14
     DATE:        Monday, May 6, 2002
15
     TIME:        1:09 p.m. - 5:09 p.m.
16
     LOCATION:    Hillsborough County Attorney's Ofc
17                601 East Kennedy Boulevard
                  27th Floor Conference Room
18                Tampa, Florida 33602
19   REPORTED BY:     JUANITA BUTLER
                      Stenographic Reporter
20                    and Notary Public -
                      State of Florida at Large
21
22
                      VOLUME  II
23
24
25
26
```

Page 180

```
 1   APPEARANCES:
 2
 3   LORI OUTZS BORGEN, ESQUIRE
     CARA J. FINEMAN, ESQUIRE
     Lawyers Committee for Civil Rights Under Law
 4   1401 New York Avenue, N.W.,  Suite 400
     Washington, D.C., 20005-2124
 5
          Attorneys for Plaintiffs
 6
     H. RAY ALLEN, II, ESQUIRE
 7   KENNETH A. TINKLER, ESQUIRE
     REBECCA M. KERT, ESQUIRE
 8   Hillsborough County Attorney's Office
     601 East Kennedy Boulevard, 27th Floor
 9   Tampa, Florida 33602
     813.272.5670
10
          Attorneys for Hillsborough County
11        Supervisor of Elections Pam Iorio
12   DOUGLAS B. MAC INNES, ESQUIRE
     Office of the Attorney General
13   PL-01, The Capitol
     Tallahassee, Florida 32399-1050
14   850.414.3662
15        Attorney for Fred Dickinson, Executive Director
          Florida Department of Highway Safety and
16        Motor Vehicles and
          Kathleen Kearney, Secretary of the Florida
17        Department of Children & Families
18   JOHN W. LITTLE, III, ESQUIRE
     Steel Hector & Davis, LLP
19   1900 Phillips Point West
     777 South Flagler Drive
20   West Palm Beach, Florida  33401-6198
     561.650.7270
21          - and -
     WALTER JAMES HARVEY, ESQUIRE  (via Conference Call)
22   Steel Hector & Davis, LLP
     200 South Biscayne Boulevard, 41st Floor
23   Miami, Florida  33131-2398
     305.577.2934
24
          Attorneys for Katherine Harris, Secretary of
25        State of Florida, and Clay Roberts,
          Director of the Florida Division of Elections
```

Page 181

```
 1   DANIEL A. RESTREPO, ESQUIRE
 2   Williams & Connolly, LLP
     725 12th Street, N.W.
 3   Washington, D.C.  20005
     202.434.5000
 4
          Attorney for ChoicePoint, Inc.
 5        d/b/a Database Technologies, Inc.
 6
     WILLIAM J. BOSCH, ESQUIRE  (via Conference Call)
 7   Volusia County Attorney's Office
     123 W. Indiana Avenue
 8   DeLand, Florida  32720-4613
     386.736.5950
 9
          Attorney for Volusia County
10        Supervisor of Elections Deanie Lowe
11
     JEFFREY P. EHRLICH, ESQUIRE  (via Conference Call)
12          - and -
     SUSAN TORRES, ESQUIRE   (via Conference Call)
13   Dade County Attorney's Office
     Metro Dade Center
14   111 NW 1st Street, Suite 2810
     Miami, Florida  33128
15   305.375.5151
16        Attorneys for Miami-Dade County
          Supervisor of Elections David Leahy
17
18
19
20
21
22
23
24
25
```

Case 0:98-cv-08575-ASG Document 420 Entered on FLSD Docket 07/02/2002 Page 465 of 945

NAACP vs. HARRIS, ROBERT, et al.    PAM IORIO VOL. II 5/6/02

Page 182

1
2 VOLUME I                                    PAGE
3 Direct Examination by Ms. Borgen.....................9
4 Stipulation.......................................174
5 Certificate of Reporter...........................175
6 Signature Page....................................176
7 Errata Sheet......................................177
8
9
10              I N D E X
11 VOLUME II                                   PAGE
12 Direct Examination (con't) by Ms. Borgen..........185
13 Cross-Examination by Mr. Restrepo.................355
14 Cross-Examination by Mr. Little...................367
15 Redirect Examination by Ms. Borgen................373
16 Recross-Examination by Mr. Little.................376
17 Stipulation.......................................378
18 Certificate of Reporter...........................380
19 Signature Page....................................381
20 Errata Sheet......................................382
21
22
23
24
25
26

Page 184

E X H I B I T S
(continued)

PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION

DESCRIPTION                                   PAGE

P - Documents Relating to Plaintiff Kandy Wells......164
Q - Phone Bank Precincts, November 7, 2000..........196
R - Documents Relating to Plaintiff Rondrick Rose....212
S - Document Entitled Black.txt.....................223
T - Expert Witness Summary of Supervisor of
    Elections Pam Iorio............................223
U - Defendant Iorio's Objections and Responses
    To Plaintiffs' First Set of Document
    Requests and Interrogatories..................330
V - Defendant Iorio's Objections and Responses
    to Plaintiffs' Second Set of Document
    Requests and Interrogatories..................330
W - Transcript of Hillsborough County NAACP
    Public Hearing on Election Irregularities.......336

DEFENDANTS' EXHIBITS MARKED FOR IDENTIFICATION

1 - Division of Elections Memorandum to Supervisors
    of Elections and Staff from Bucky Mitchell,
    Dated June 30, 2000, Regarding Central Voter
    File Verification Process.....................370

Page 183

E X H I B I T S

PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION

DESCRIPTION                                   PAGE

A - Plaintiffs' Notice of Deposition (Hillsborough
    County)..........................................9
B - Plaintiffs' Notice of Rule 30(b)(6) Deposition
    (Hillsborough County)...........................10
C - Plaintiffs' Second Amended Complaint............23
D - Answer and Affirmative Defenses to Second
    Amended Complaint of Defendant Pam Iorio,
    Supervisor of Elections of Hillsborough County...25
E - Processing CVF Felon Registrations..........44, 362
F - FSASE Central Voter File Committee Memorandum to
    All Supervisors of Elections Dated May 8, 2000,
    Subject, Recommended Procedures..............52, 369
G - Letter to Ed Kast from Janet Keels dated
    September 18, 2000...............................97
H - Letter to Janet Keels from Emmett Mitchell, IV
    Dated August 10, 2000...........................97
I - Letter to Ed Kast from Janet Keels dated
    February 23, 2001...............................98
J - Documents Relating to Plaintiff Willie Steen
    ..........................................118, 356
K - Documents Relating to Plaintiff Wallace McDonald
    ..........................................126, 356
L - Documents Regarding Voter Roosevelt Lawrence
    ..........................................139, 356
M - Documents Relating to Plaintiff Jermaine Terry
    ..........................................152, 358
N - No Document Identified or Marked)..............164
O - Documents Relating to Plaintiff Sherry Edwards...164

Page 185

1        The deposition, upon oral examination, of
2 PAM IORIO, taken on Monday, May 6, 2002, at Hillsborough
3 County Attorney's Office, 601 East Kennedy Boulevard,
4 27th Floor, Tampa, Florida  33602, continued at
5 1:09 p.m., before Juanita Butler, Notary Public in and
6 for the State of Florida at Large.
7
8             PAM IORIO,
9 being previously duly sworn to testify the truth, the
10 whole truth and nothing but the truth, was examined and
11 testified as follows:
12
13        DIRECT EXAMINATION
14 BY MS. BORGEN:
        (continued)
15    Q.  I'm going to turn back to the second amended
16 complaint and ask you a couple more questions about
17 that complaint.
18        In paragraph 110 of the complaint, plaintiffs
19 allege that many of the telephone lines were busy for
20 long periods of time on election day and were still
21 busy as of 7 p.m., the poll closing time.
22        Now, your answer to the complaint, you denied
23 this allegation as to Hillsborough County.  Do you
24 continue to deny that allegation today?
25    A.  I cannot speak to the first thing where you

Page 186

1 said I denied it, whether that was just a basic
2 response that we gave to everything without getting
3 into any specificity. But we had busy phone lines all
4 day. And undoubtedly, we had them also after 7 p.m.
5 also.
6    Q. And have you done, you or anyone else in your
7 office, done any kind of assessment of the phone lines
8 since the November 7th, 2000 election?
9    A. What do you mean by that?
10   Q. Have you done an analysis of the number of
11 complaints received about the phone lines, we'll start
12 there, perhaps from individual voters?
13   A. I don't know what kind of analysis. In terms
14 of quantitative, more anecdotal.
15   Q. What about reviewing any complaints from poll
16 workers? Am I correct that after each election, you
17 ask the poll workers to complete a form and talk about
18 problems that they may have had at the precinct?
19   A. Yes.
20   Q. And does every poll worker complete that
21 or --
22   A. The clerk --
23   Q. For each --
24   A. -- of each precinct does.
25   Q. So, ideally, you have one of those forms from

Page 187

1 each precinct?
2    A. Correct.
3    Q. And have you reviewed those forms?
4    A. My staff has.
5    Q. And do you know if there were many problems
6 identified in those forms with the phone lines?
7    A. I can't speak to that. Darrell Smith should
8 be able to tomorrow.
9    Q. Do you have any sense of the types of
10 problems people said they had with the phone lines
11 during the November 7th, 2000 election?
12   A. Difficult to get through, high volume.
13   Q. Always busy?
14   A. High volume.
15   Q. How many individuals did you have staffing
16 the phone lines for Hillsborough County.
17   A. I believe we had 50 of our 50-person phone
18 bank. Again, Darrell Smith, who is over that, could
19 talk with greater specificity whether we had 48 people
20 or 50. But we have a 50-person phone bank, each person
21 with their own computer and phone line.
22       We know that in every general election the
23 phone lines get overloaded. And so, knowing that we
24 would have a very large turnout November 7th, 2000, we
25 did a couple of things in advance.

Page 188

1       One, Chuck Smith of my staff, and he can
2 speak to this in deposition tomorrow, rewrote the
3 program for looking up individuals and considerably
4 shortened the time that a phone bank member would have
5 to look up each inquiry. And what he did, I think --
6 it's hard to say, quantitively, whether or not it saved
7 30 percent or 20 percent or 15 percent on every phone
8 call, but I think it saved considerably on every phone
9 call, making it much easier for the phone bank operator
10 to get to the crux of the issue and ascertain whether
11 or not the person is eligible to vote, or where they
12 need to go, and then get them off the line as quickly
13 as possible.
14       Additionally, we tried, as a pilot program,
15 we chose ten precincts that had the largest number of
16 registered voters, and/or the largest number of
17 affirmations in past elections and we supplied them, as
18 part of a pilot program, a laptop computer and an
19 individual at that precinct to work that laptop
20 computer, so that we could take the ten heaviest
21 precincts off the phone lines. And in doing so,
22 making it easier for the other 309 precincts to get
23 through.
24       Based on the experience after November 7th,
25 2000, and realizing that in spite of those efforts to

Page 189

1 have, what I think is probably one of the very best
2 phone banks in the state, in terms of just our training
3 and our hardware and our software, clearly, we're going
4 to have to do more to help with this problem.
5       And in the 2002 election, we are designating
6 75 precincts that will have their own laptop computer
7 operators. And we will make sure that those top 75
8 precincts will be taken out of the phone bank line and
9 I think that that should help.
10      I think it's also going to help that we are
11 doing a mailing of the voter I.D. cards, a mass
12 mailing, because that helps clear up problems. Along
13 with that mailing, when you send out information about
14 the need to change your address.
15      Of course, we won't have that same kind of
16 turnout in November of 2002 as we in November of 2004
17 (sic), but communications on election day I think is a
18 chronic problem across the nation, particularly at any
19 large urban county. Although, I can tell you, that
20 even talking to supervisors from some of the small
21 counties, that their phone lines get overwhelmed even
22 in a small rural county.
23      Q. Let's go back to that point then and start
24 there.
25      In 1996, for the general election, did you

Case 0:00-cv-06855-ADB Document 420 Entered on FLSD Docket 07/02/2002 Page 467 of

NAACP vs. HARRIS, ROBERT, et al.                    RAM JOBO VOL II 5/6/02

Page 190

1 have difficulties with communications with the phone
2 bank?
3      A. Every general election since I have been a
4 supervisor, there is always difficulty, during peak
5 times, with communications between the phone bank, or
6 whatever system of communications you have set up, and
7 your precincts.
8      Q. What changes did you make between 1996 and
9 2000 to try to address some of those communications
10 problems?
11      MR. ALLEN: Objection to the form of the
12 question.
13 BY THE DEPONENT:
14      A. What I just spoke to, without being too
15 repetitive. One, we made the software changes. Two,
16 we really worked on the training of our phone bank
17 operators, because it's really the quality of a lot of
18 these operators and the quality of the training that
19 they're receiving, so they can quickly get to the crux
20 of the issue and resolve it, and how much time they
21 spend with each person on the other end. And,
22 additionally, our pilot program with the laptops, to
23 see how that would work, to see if that was a viable
24 thing to use in the future.
25      Q. How did the training for the phone bank

Page 191

1 operators change between 1996 and 2000?
2      A. I think Darrell Smith could speak to that
3 with greater specificity.
4      Q. And you indicated you had a pilot program
5 with the computers. November 7, 2000, is that the
6 first time you used computers in the precincts?
7      MR. ALLEN: Objection to the form.
8      MR. TINKLER: Objection to form.
9 BY THE DEPONENT:
10      A. Correct.
11      Q. They were not used in any primary election or
12 any election prior to that time?
13      A. Not to my knowledge. I believe we used them
14 for the first time in November.
15      Q. And how did you choose -- exactly did you
16 choose the ten precincts where those computers would be
17 placed?
18      A. Well, we started with the premise that you
19 wanted to do two things. You wanted to -- well, just
20 basic thought. Every time you could take a large
21 precinct off of the phone bank lines, then you were
22 freeing up the lines for the other precincts.
23      So if you had a precinct that was extremely
24 large or had a lot of affirmations -- a history of a
25 lot of affirmations, then if you take them out of the

Page 192

1 cube, it's freeing it up for others.
2      And so we chose 10 precincts that either --
3 for example, we chose precinct 341, who had a lot
4 apartments and the most affirmations during the
5 presidential preference primary. We had one precinct,
6 361, with 4,493 voters, extremely large, large and
7 growing. Another precinct of 4,606 voters, another
8 with 4,448, 4,129, 3,687, 3,981, and so forth.
9      So the two that were the lowest number -- or
10 the three that had the lowest (sic) number of
11 registered voters, had apartments and a lot of
12 affirmations. One in an area that's somewhat called --
13 nicknamed Suitcase City because it's very transient,
14 had 2,642 voters, and 2,242, and 1,196, but it was
15 known as a fairly transient area.
16      And so we select them based on that, that
17 you're looking for these large precincts, large number
18 of voters, very transient, large number of
19 affirmations, large number of calls to the phone bank.
20      Q. So are they the ten largest precincts?
21      A. I cannot say that they are the ten largest.
22 I think that the criteria would have been a combination
23 of large precincts and tendency towards a large number
24 of affirmations.
25      Q. So would it be accurate to say that --

Page 193

1      A. If you're getting up to 4,000, those are our
2 largest, when you have over 4,000.
3      Q. Are they the ten precincts that have the
4 largest number of affirmations in a particular
5 election?
6      A. I believe that our criteria was that we
7 looked at those too. You're looking at a large
8 population and a large number of affirmations.
9      If you're looking at the ones that only had
10 2000 registered voters, 2200, they were transient
11 areas, a lot of apartments, a lot of affirmations.
12      Q. So it's a combination of these factors --
13      A. Correct.
14      Q. -- not a particular one factor and doing the
15 top ten within that?
16      A. Yes.
17      Q. And who made the decision on which precincts
18 were to be -- where the laptops would be placed?
19      A. It was a staff decision, that they analyzed
20 it and --
21      Q. Do you know who was involved in that decision
22 on your staff?
23      A. Darrell Smith and Chuck Smith, who will be
24 giving the depositions tomorrow.
25      Q. And do you know who identified the factors to

Page 194

1 consider in choosing where to place the laptops?
2    A. We discussed it in staff meetings, that it
3 would make sense that you take the highest users off of
4 the system.
5    Q. And do you recall being part of those
6 discussions?
7    A. I likely was. I've been in all staff
8 meetings and this was likely one of the subjects that
9 came up. And I concurred with their reasoning that you
10 take the highest users off the system.
11    Q. Was there any analysis of the precincts with
12 the largest number of newly registered voters?
13    A. I don't know if that was a criteria or not.
14 And, of course, a new registered voter isn't likely to
15 be your affirmation. That person is not likely to be
16 the problem.
17    Q. Was there any analysis of mobility rates in
18 the different precincts?
19    A. Well, inasmuch as a number of affirmations
20 leads to high mobility rate, then I would think that
21 that would have been a factor. For example, Suitcase
22 City, those precincts in that area were chosen because
23 there are a lot of apartments there and a lot of
24 transitions there in terms of living.
25    Q. So it would suggest to you, if there's a

Page 195

1 precinct with a lot of affirmations, there's probably a
2 higher mobility rate in that precinct?
3    A. Yes.
4    Q. Do you know if any of the precincts with
5 laptops had majority minority of registered voters in
6 the precinct?
7    A. Majority minority?
8    Q. Either a predominantly black precinct, or a
9 predominantly Hispanic, or a combination?
10    A. We did not take race into consideration when
11 we came up with this pilot program. Race first became
12 an issue when a New York Times reporter inquired and
13 considered it to be an issue and questioned me about
14 it.
15    Of the precincts that we chose, precinct 559
16 is 47.6 percent African American, and precinct 563 is
17 31 percent African American. But otherwise, the other
18 precincts did not have large African-American
19 populations. And as I mentioned, that was not a
20 criteria for selection.
21    Q. And were you looking at some numbers on the
22 sheet you have there to answer that question?
23    A. Yes. This is information, I believe, that's
24 been supplied to the plaintiffs. It's phone bank
25 precincts, November 7th, 2000, the ones that we chose.

Page 196

1    Q. Am I correct that there are handwritten
2 numbers at the bottom of that?
3    A. Correct.
4    Q. Do you know who wrote those numbers?
5    A. Darrell Smith.
6    MS. BORGEN: I'd like to go ahead and mark
7 that as Exhibit Q.
8    (Plaintiffs' Exhibit M was marked for
9 identification.)
10 BY MS. BORGEN:
11    Q. Have you decided which 75 precincts will have
12 computers in the November 2002 election?
13    A. Well, we have not decided with any degree of
14 specificity. But I can say from a general standpoint,
15 any precinct in Hillsborough County that has a sizable
16 African-American population will be included. I will
17 make sure that all African-American populated precincts
18 have that. We have 26 of our 319 precincts have
19 50 percent or more black voters and I will likely cover
20 even more than that in terms of going down in
21 percentage.
22    One, because since November 7th, 2000, some
23 of the -- a couple of factors. One has been the
24 indication, even from some of your expert testimony,
25 although I don't agree with it all, but the study of

Page 197

1 affirmations and showing this high correlation between
2 high number of affirmations in many black precincts,
3 which might indicate a more transitory population, in
4 given that, we want to make sure that we take all those
5 precincts off-line, in terms of having to call the
6 phone bank, and they will all receive laptop computers.
7    I hate to say that the felon issue could in
8 any way be helped by a laptop. I think it's a wrong
9 impression to give to say that the felon issue is
10 helped in any way by the presence of a laptop computer
11 at a precinct. It is not.
12    A laptop computer may be able to say to an
13 individual, you have been taken off the rolls because
14 of your felon status, but all that does is point to the
15 need for a phone call. And there's not a person that
16 is going stop at that level and say, thank you for that
17 information, and walk away. That's not the way the
18 process works.
19    So whether or not you have a laptop computer
20 in a precinct, is not going to address the felon issue.
21 I do think it can help address the issue, though, of
22 areas of town that have a high transitory population.
23 And based on the experience of November 7th, 2000, and
24 the aftermath of that, and the analysis that has
25 appeared to come forth that we were not privy to prior

1 to this that apparently there are areas that have this
2 high transitory population that needs to be addressed.
3 I'm willing to make sure that all precincts that have
4 any sizable African-American population, does have a
5 laptop computer.
6    Q. Are you doing similar analyses to see if
7 there are other populations, perhaps a Latino community
8 or Asian Pacific community, or other communities that
9 might have similar transitory --
10   A. We will certainly look at that. It is much
11 more difficult for us to track that in terms of looking
12 at those statistics, because on the voter registration
13 rolls, the number of Hispanic voters is so terribly
14 understated. And so you can really -- it's tough to
15 look at that. You can look at census data and try to
16 overlay that with your precinct data, but it's not as
17 exact or precise as it is in looking at the
18 African-American population.
19   Q. Did you consider placing laptops in every
20 precinct?
21   A. No, and I think that -- and I realize that in
22 your lawsuit that's one thing that is asked for. And I
23 really think that your organization, or whoever, the
24 individuals that you're representing needs to take a
25 step back and think a little bit about the

1 administration of this.
2    First of all, any supervisor can say, I'm
3 going put a laptop in every precinct, that doesn't mean
4 there's going to be someone to man it. So that's the
5 first thing.
6    The second, so what you need is not only an
7 individual at a laptop that contains the voter record,
8 but you need someone qualified to run it. So in our
9 county with 350 precincts, you need 350 qualified
10 people. Now, Miami-Dade, you might be asking him to go
11 out -- if he ends up with 800 precincts for this fall,
12 to have 800 people, one at every precinct who is going
13 to operate this laptop computer and be able to bring up
14 the files.
15   Simply because someone has a laptop doesn't
16 mean that they've resolved an issue. I can tell you
17 that when you have a database -- and we have 516,000
18 registered voters, and then you have a large number of
19 inactive voters, and then you have a large number of
20 names that are deleted. I mean, we have a database of
21 well over a million names.
22   Even our permanent staff can have difficulty
23 connecting with the right person, McDonald, M-c-d --
24 hyphenated names. And Darrell Smith and Chuck Smith
25 tomorrow could give you many examples of how difficult

1 it is to look up a name.
2    Further, simply because you've looked up a
3 name and ascertained a situation, doesn't mean that the
4 person at the polls is in any position to make a
5 determination as to what to do with the person. That's
6 why we like to centralize this approach to a phone bank
7 where we have supervisors who are trained and capable
8 of offering direction.
9    It is not enough simply to look up a name and
10 say, oh, this is what your record says. Sometimes it
11 takes someone of a supervisory nature to say, Based on
12 this and based on our knowledge of office procedures,
13 and as I've put some things in evidence to show you
14 those -- something that looks like this, you need
15 someone of a supervisory nature who can say, I can get
16 on the computer and see that this person's record dates
17 back from 1993 and this is what happened, they were
18 sent this, then this is what happened, and this is part
19 of the law. That takes a supervisor who can do that.
20   Q. Let me interrupt you a moment. You're
21 referring to exhibit -- which exhibit?
22   A. Well, I was using that as an example. I just
23 pulled one --
24   Q. Exhibit P, one of the voter histories?
25   A. That's right.

1    Q. Okay.
2    A. To say that having an individual, a poll
3 worker, at a polling site with a laptop computer to
4 bring up Ms. Well's situation and start going back to
5 19 -- and knowing what was sent to her, and what it
6 meant, and whether or not -- what part of the law it
7 complied with, and what the analysis is, it's not going
8 to work.
9    You're going to end up still having to
10 have -- if a person rises to the level where their
11 qualifications to vote are in question, that is a call
12 to a phone bank, where, at some central location,
13 somebody is making a determination that has far
14 reaching ramifications.
15   And so, I just point this out because I note
16 in the settlement agreements where these laptops seem
17 to be part of it. And I can tell you that is just, in
18 my view, a superficial approach to how to resolve some
19 of the problems that have come up from the 2000
20 election.
21   Every supervisor has to make a determination
22 as to how you best handle things in your own county,
23 how you best administer them. And simply throwing
24 laptop computers out at precincts, does not resolve the
25 issue.

1    Now, targeting laptop computers in certain
2 precincts with well-trained individuals and still
3 having a central phone bank with well-trained
4 individuals and supervisors is a good approach, but
5 that may differ from some colleagues in other counties
6 who prefer another approach.
7    Q. The laptops that will be available in
8 Hillsborough County, will those have the complete voter
9 database?
10    A. Yes.
11    Q. So if someone looked up, for example, Kandy
12 Wells, they would get that complete voter history?
13 Would they get the whole history or just the last
14 entry?
15    MR. TINKLER: Objection to form.
16 BY THE DEPONENT:
17    A. I'm not sure of the answer to that. I mean,
18 I would think that it would be the entire database.
19 But, again, Chuck and Darrell Smith would be able to
20 answer that with greater specificity.
21    Q. And given that, in your opinion, putting
22 laptops in the precincts only partially addresses the
23 problem, do you have any changes planned for the phone
24 bank for the November 2002 election?
25    A. I think that if we are able to take 75

1 precincts off of the line, of most of the calls --
2 again, it won't resolve all the calls -- and depending
3 on what happens with this felon issue, again, going
4 back to that whole discussion I had earlier this
5 morning about 493 and whether the onus is going to be
6 on the voter or on the supervisor to prove their guilt,
7 it really depends on how many people are going to be
8 taken off with that. It could be that we either have a
9 repeat of the 2000 election or we have a situation in
10 2002 where very few people are taken off the central
11 voter file.
12    So if you have a situation where very few
13 people are taken off the central voter file due to
14 their probable ex-felon status; and, of course, you're
15 going to have a much lower turnout in 2002 than you had
16 in 2000, simply because of a gubernatorial versus a
17 presidential year; and you've been able to beef up your
18 number of laptops; and you've targeted specific
19 precincts where there were specific problems, either in
20 2002 or perhaps in historical data that you now have
21 that you weren't privy to before, I think we're going
22 to have very good situation in terms of communication
23 on election day.
24    Q. Do you plan to have the same number of phone
25 lines available at the phone bank --

1    A. Yes.
2    Q. -- in November 2002?
3    A. Yes.
4    Q. So somewhere -- approximately 50?
5    A. Correct. Now we also have all of our phone
6 lines downtown, but that's for voters to get through.
7 We have a segregated approach between clerks and phone
8 bank and voters. Although some clerks are able to get
9 through to supervisors here downtown if they have a
10 heavy duty problem at the polls.
11    Q. But the way it's set up is that the precincts
12 will call the phone bank?
13    A. Correct.
14    Q. And individual voters with problems will not
15 call the phone bank?
16    A. That's right. They don't even know about the
17 phone bank. They call downtown.
18    Q. They call down to your office?
19    A. To another bank of phones that we have.
20    Q. And you set up additional phone lines
21 surrounding the election to assist with those calls?
22    A. Yes. We have a -- and I can't speak to how
23 many we have, but we have a number of phone lines set
24 up and the Smiths could talk about that.
25    Q. Turn to paragraph 116 of the complaint. In

1 that paragraph, plaintiffs have allegations regarding
2 Plaintiff Rondrick Rose. And in your answer you state
3 that you are without knowledge as to Mr. Rose.
4    Do you have knowledge today about the facts
5 surrounding Mr. Rose?
6    A. Yes. I have -- this would probably be
7 Exhibit R, right?
8    "Mr. Rose initially registered to vote on
9 April 5th, '95." I'll just read the whole thing. I'm
10 not sure it's all relevant.
11    "Prior to the '98 general election he was
12 sent a sample ballot. It was returned as
13 undeliverable. After not responding to our address
14 confirmation final notice sent on 12/28/98, he was
15 placed on inactive status."
16    Being placed on inactive status has no affect
17 on the person's voting privileges, but does identify a
18 person who hasn't responded to an address change notice
19 or who hasn't voted for a prescribed period of time.
20    "A check with the Hillsborough driver's
21 license office indicates that Mr. Rose went to the DLO
22 at Bay Plaza Branch in Brandon on 1/31/2000 to be
23 issued a duplicate license. Our check of the
24 transmittal shows that we did not receive a voter
25 registration application from that office."

Page 206

1 He was already registered to vote. We didn't
2 need to receive anything from him. He was inactive,
3 but that's okay.
4 "He went to his new address precinct --" so
5 apparently he moved and he went ahead and went to his
6 new precinct 869 to vote, but his name was not on the
7 precinct register. His name was on the precinct
8 register at his other precinct where he was registered.
9 "He completed an affirmation at 869, which is
10 what you're supposed to do. He was waiting for
11 verification to vote. And although procedures were in
12 place to verify his voting eligibility for precinct
13 869, the precinct was unable to get through to the
14 clerk's phone bank during peak hours, so he was unable
15 to vote."
16 Now, this is a situation where -- and I'm
17 going beyond the question that you're asking about
18 Rondrick Rose. This is a situation where the new
19 provisional ballot that the legislature passed in 2001
20 would have taken care of this situation. He would have
21 been able to vote.
22 He went to his correct precinct. It was a
23 new address. He was not in the precinct register
24 because he was in the precinct register at his old
25 address. But he did the right thing by going to his

Page 207

1 new precinct. That's better than going to the old, I
2 suppose.
3 And then, he had an affirmation filled out on
4 him, but he couldn't get through -- the clerk could not
5 get through to the phone bank, so he ended up not
6 voting. Now, under the new law, can't get through to
7 the phone bank, hand the voter a provisional ballot,
8 his vote would have counted. He was in the correct
9 precinct, he was an eligible voter. The canvassing
10 board would have looked at that after the election and
11 he would be allowed to vote. So here's an example
12 where the Election Reform Act of 2001 would have
13 resolved this particular situation.
14 Q. Would you agree that for November 7, 2000, he
15 was denied his right to vote?
16 MR. LITTLE: Objection to form.
17 MR. ALLEN: Objection to the form.
18 BY THE DEPONENT:
19 A. Well, let me answer this way, on November
20 7th, 2000, this is a case of an individual who was
21 unable to vote because he changed his address and chose
22 election day to change his address and could not get
23 through to the phone bank. Now, the area of the
24 lawsuit that I take issue with is apparently -- is
25 Mr. Rose African American?

Page 208

1 Q. Yes, he is.
2 A. -- is the insinuation that this was
3 discriminatory. And that, I must disagree with quite
4 strongly. If there was any African-American voter who
5 was unable -- or a clerk at any precinct who was unable
6 to get through to the phone bank on behalf an
7 African-American voter, they were unable to get through
8 to the phone bank on behalf of a white voter, or
9 Hispanic voter, or any other voter. I mean, the phone
10 bank did not discriminate in terms of being a busy
11 phone line.
12 And so, that is the part of the lawsuit that
13 I must vehemently disagree with, that there was any
14 discrimination intentional or unintentional.
15 Q. Are you familiar with the concept of
16 disparate impact from your historical studies that you
17 testified about earlier?
18 A. I would hate to say that I am and then I'll
19 have to explain it.
20 Q. We won't ask you any further questions on
21 that.
22 Regarding Mr. Rose, when you were reading
23 this summary -- was this summary prepared by your
24 office?
25 A. Yes.

Page 209

1 Q. It shows that he had requested a duplicate
2 driver's license on January 31, 2000; is that correct?
3 A. Right.
4 Q. Now, is it possible that he tried to update
5 his address with the Department of Motor Vehicles at
6 that time?
7 MR. LITTLE: Objection to form.
8 BY THE DEPONENT:
9 A. That would be speculation on my part. I
10 don't know.
11 Q. If he had updated his address with the
12 Department of Motor Vehicles at that time, would he
13 then -- do you believe he would have then appeared on
14 the precinct register for his new precinct?
15 MR. ALLEN: Objection to form.
16 MR. TINKLER: Objection to form.
17 MR. RESTREPO: Objection to form.
18 MR. LITTLE: Objection to form.
19 BY THE DEPONENT:
20 A. You have to update your address for voter
21 registration purposes. He'd have to say, I want to
22 update my address for voter registration purposes and
23 we would have gotten the change of address from him and
24 we would have made the change.
25 Q. If someone updates their address at the

Page 210

1 Department of Motor Vehicles, how do you get those
2 address updates?
3    A. Well, they're on the same forms as the voter
4 registrations are. As you mentioned earlier, the voter
5 registration form is also a change of address form, a
6 change of name, a change of party. And so, they all
7 look alike. They're just checked differently.
8    Q. So it's the same form? You don't have a
9 separate transmittal list? Here are the new ones and
10 then here are all the changes of address?
11    A. No.
12    Q. Do you believe that if the phone lines were
13 not busy on November 7th, 2000, Mr. Rose would have
14 been able to vote?
15        MR. ALLEN: Objection as to form.
16 BY THE DEPONENT:
17    A. Well, given the facts as they have been
18 presented to me by my staff, it certainly appears that
19 the inability to get through to the phone lines and
20 verify that Mr. Rose was a registered voter did prevent
21 him from voting that day.
22    Q. You indicated that you believe the
23 provisional ballot that's part of the Florida Election
24 Reform Act of 2001, would have addressed Mr. Rose's
25 situation?

Page 211

1    A. Yes, it would.
2    Q. Would that address the situation of a voter
3 in a similar situation, but who went to his old
4 precinct?
5    A. No, not if he went to his incorrect precinct,
6 right, if his old precinct was incorrect.
7    Q. So you have to cast the provisional ballot in
8 the correct -- in your correct new precinct --
9    A. Correct.
10    Q. -- in order for it to be counted?
11        MR. TINKLER: Objection to form.
12 BY THE DEPONENT:
13    A. Correct.
14    Q. And is that the procedure that your office
15 plans to follow for the fall, that you only count a
16 provisional ballot if it's cast in that voter's correct
17 precinct?
18    A. My understanding is that is the law.
19    Q. What steps are being taken with the different
20 precincts to make sure the voter is casting a
21 provisional ballot in the correct precinct?
22    A. We will be going through a great deal of
23 training in ensuring that our clerks personally handle
24 the provisional ballots and are well trained on how to
25 do it.

Page 212

1    Q. And so that they make efforts to ascertain
2 the correct precinct for an individual before giving
3 them a provisional ballot?
4    A. Correct.
5        And you might want to make this R, Exhibit R.
6        MR. ALLEN: She seems pretty helpful.
7        MS. BORGEN: Extremely helpful.
8    (Plaintiffs' Exhibit R was marked for
9    identification.)
10 BY MS. BORGEN:
11    Q. Exhibit R is the information from your
12 office -- excuse me, copies of your office files
13 regarding --
14    A. That's right.
15    Q. -- Plaintiff Rondrick Rose?
16    A. Correct.
17    Q. Turning then in the complaint -- I'm sorry,
18 in your answer to the complaint to page 10. And this
19 is a list of affirmative defenses?
20    A. Uh-huh.
21    Q. And Number 8, paragraph 8 there, on page 10,
22 you assert an affirmative defense that plaintiffs'
23 claims are moot, and that Florida Legislature enacted
24 the Florida Election Reform Act of 2001, which
25 legislatively cured and provided the remedies sought by

Page 213

1 the plaintiffs in this action.
2    Could you please describe to me how the
3 claims are moot? We'll start with Rondrick Rose.
4        MR. TINKLER: Objection to form.
5 BY MS. BORGEN:
6    Q. What is your basis for saying that Plaintiff
7 Rondrick Rose's claims are moot?
8        MR. EHRLICH: Object to the form. This is
9    Jeff Ehrlich.
10 BY THE DEPONENT:
11    A. Well, in the case of Mr. Rose, as I
12 mentioned, his particular situation would have been
13 cured by the use of a provisional ballot, which is now
14 law.
15    Q. What about the case of Plaintiff Sherry
16 Edwards?
17        MR. TINKLER: Objection to form.
18        MR. EHRLICH: Object to the form.
19        MS. BORGEN: Basis of objection?
20    Explanation, please?
21        MR. EHRLICH: Calls for legal conclusion.
22 BY THE DEPONENT:
23    A. Sherry Edwards was the individual who is not
24 registered to vote.
25    Q. And how would her case -- how would her

Page 214

1 claims be addressed by the Florida Election Reform Act?
2      MR. EHRLICH: Same objection.
3 BY THE DEPONENT:
4      A. I do not know how the law could have -- in
5 this case it looks like she -- the transmittal form
6 from the driver's license office indicated that she
7 registered to vote. However, she was not in the batch
8 that was sent to us. And then we followed and sent her
9 a voter registration form and she never answered that.
10      I am not equipped to say how a change in law
11 can address if someone doesn't -- I mean, I guess there
12 are two ways of looking at this.
13      The first is, she didn't respond to what we
14 sent her. There is no law that can deal with that.
15 But the first, if you want to go to the root of the
16 problem with the Division of Driver's License, I do not
17 know of anything in the Election Reform Act that deals
18 with that. Was that a clerical error at the Division
19 of Drivers License? I don't know. I don't know what
20 kind of investigation the Division of Driver's License
21 has done in order to ascertain what happened to that
22 particular voter registration form and whether or not
23 anything in the law can change that.
24      But that certainly is not something that
25 deals with the individual county supervisors office. I

Page 215

1 think that is probably an administrative issue with the
2 driver's license offices across the state and how they
3 do their work, and how they train their front line
4 people, and how they deal with clerical errors that
5 inevitably will arise.
6      Q. And are you familiar with the Florida
7 Election Reform Act of 2001?
8      A. Yes.
9      Q. And do you feel like you're qualified today
10 to speak to the provisions of the law?
11      A. Yes, although I don't have it in front of me.
12 And I would feel more comfortable if I did, but I'll do
13 my best to speak to it without having it in front of
14 me.
15      Q. Okay. In what way does the Florida Election
16 Reform Act address the claims of Jermaine Terry?
17      MR. TINKLER: Objection to form.
18      MR. EHRLICH: Object to the form.
19 BY THE DEPONENT:
20      A. Now, Jermaine Terry was the discussion that
21 we had about the individual who was part of the list
22 maintenance removal process.
23      Now to my knowledge, although I stand to be
24 corrected if there's other information about the
25 Election Reform Act, I do not believe that the Election

Page 216

1 Reform Act of 2001 deals with the list maintenance
2 removal process.
3      Q. Okay.
4      A. Nor do I -- nor does it deal with the federal
5 law. Of course, the federal law has never been amended
6 since it was passed in May of 1993. And I do feel
7 quite strongly that there should not be -- if there are
8 going to be any changes to how supervisors deal with
9 either voter registration or the list maintenance
10 removal process, it must be statewide in nature. You
11 simply cannot have a handful of counties dealing with
12 voter registration applications or list maintenance
13 removal process in one way and have all the other
14 counties dealing with it another way.
15      Q. So you're suggesting it needs to be
16 uniformity in how these procedures --
17      A. Oh, absolutely.
18      Q. -- are carried out?
19      MR. LITTLE: Objection to form.
20 BY THE DEPONENT:
21      A. I mean, when we go back to the National Voter
22 Registration Act, the whole reason -- one of the main
23 reasons why the National Voter Registration Act was
24 passed was to provide nationwide uniformity in the
25 voter registration process. And then we ended up with

Page 217

1 the statewide law that went along with that that
2 conformed to NVRA. And that's why we now have the
3 standard statewide application for voter registration.
4 When I first became supervisor, every county created
5 their own voter registration form.
6      So during the decade of the '90s, we have
7 moved towards, what I consider to be, a very important
8 reform and that is standardization, standardization of
9 the voter registration process, standardization of list
10 removal, of keeping the rolls clean and determining the
11 validity of the individuals who are on the rolls.
12      And that is why it is important, in this
13 particular case, you've singled out a handful of
14 counties and are asking them to do something different
15 based on the last federal election that occurred. And
16 I'm must say that I can in no way agree with that, that
17 any changes to occur to the voter registration process
18 and how the Division of Motor Vehicles interacts with
19 us, or how any of us do list maintenance, must be
20 statewide in nature or else we're going to have
21 problems in future elections by having different
22 counties doing different procedures.
23      And do bear in mind that many counties have
24 overlapping jurisdictions in terms of races,
25 congressional races that overlap several counties,

1 senate races. It wouldn't make any sense for
2 Hillsborough County to have one particular procedure
3 when someone is running for office in Pinellas and
4 Hillsborough and Pasco, and every county does their own
5 thing. To me, this would be a tremendous step
6 backwards in terms of the administration of elections.
7    Q. And what do you think would be the best ways
8 to achieve that uniformity or the standardization that
9 you're suggesting?
10       MR. TINKLER: Objection to form.
11 BY THE DEPONENT:
12    A. Through the passage of legislation.
13    Q. Legislation by the state legislature?
14    A. Absolutely. I mean, I think you start with
15 the Election Reform Act of 2001 and you say, Look,
16 these are the improvements that have been made, no more
17 punch cards, we have state-of-the-art technology,
18 particularly in 15 counties that have touch screen, we
19 have provisional ballots. We've made these
20 improvements. Now, let's narrow it down and see what
21 improvements still need to be made.
22       And there's always another session of the
23 legislature. In some years there's numerous sessions.
24 And there are a lot of different times to go at it and
25 to make changes to election law. And that, I think, is

Page 219

1 just a much better -- I know that this is really not my
2 place to say it, in a deposition, but this is my first
3 opportunity to talk with you all. And I would say,
4 what a better use of resources than going after a
5 handful of counties and trying to bring about changes
6 that are not going to be statewide in nature.
7    Q. Do you think some of those changes could be
8 implemented through the Division of Elections?
9       MR. RESTREPO: Object to the form.
10 BY THE DEPONENT:
11    A. Some of them could through rule promulgation.
12 Yes, they could be.
13    Q. Turn then to the -- continuing with some of
14 the plaintiffs. In what way does the Florida Election
15 Reform Act of 2001 address the claims of Kandy Wells?
16       MR. EHRLICH: Object to the form.
17       MR. TINKLER: Same.
18       MR. LITTLE: Objection to form.
19 BY THE DEPONENT:
20    A. Kandy Wells is the individual who was
21 registered to vote and could have gone to vote. She
22 did not go to vote. She changed her name and address
23 with us. We did that, processed it on November 4th.
24 She did not receive her new voter ID card, so we
25 must -- I mean, we're assuming, I guess, she's part of

Page 220

1 this lawsuit because she thought that she had been
2 wronged to some degree because she had not received
3 this new voter I.D. card.
4       To my knowledge, the Election Reform Act of
5 2001 would not deal with this. She was registered to
6 vote. She could have gone to vote. She could have
7 called our office prior to election day. She could
8 have ascertained, I've not gotten my new card, I've
9 sent in a change of address, could you tell me where to
10 go to vote. We could have told her what her new
11 precinct was. She could have gone there. So, I mean,
12 this was -- I think her situation could have been
13 resolved.
14    Q. In what way does the Voter Election Reform
15 Act of 2001 address the claims of Plaintiff Wallace
16 McDonald?
17       MR. EHRLICH: Object to the form.
18       MR. RESTREPO: Object to the form.
19       MR. TINKLER: Same.
20       MR. LITTLE: Same.
21 BY THE DEPONENT:
22    A. You know, this one with Mr. McDonald is an
23 issue that we were talking about before about the felon
24 situation. I think it really depends on whether or not
25 493 gets pre-cleared.

Page 221

1       Otherwise, the Election Reform -- if 493 does
2 not get pre-cleared, then I believe that the Election
3 Reform Act would have put the onus on government to
4 prove to a larger degree that, indeed, Mr. McDonald was
5 a felon who had not had his civil rights restored and
6 he probably would have been kept on the rolls.
7    Q. Do you think in his situation, if the new --
8 the extra bill --
9    A. Right.
10    Q. -- 493 is not pre-cleared --
11    A. Right.
12    Q. -- the way the standards are under the
13 Florida Election Reform Act, if there's a situation
14 like Mr. McDonald's where it's his word against FDLE,
15 so to speak, that the benefit of the doubt would be
16 given to the voter in that situation?
17       MR. RESTREPO: Object to the form.
18       MR. LITTLE: Object to the form.
19       MR. TINKLER: Objection to the form.
20 BY THE DEPONENT:
21    A. Correct. Yes, I think so.
22    Q. One final question on your answer to the
23 second amended complaint. Would you say that this
24 answer accurately reflects your position in the case?
25    A. Which one are we talking about?

1    Q. We're talking about what's been marked as
2 Exhibit D, just generally this document.
3    A. You mean, do all these answers reflect my
4 view?
5    Q. Yes.
6    A. Well, as I stated from the beginning, this
7 was put together by attorneys and they don't
8 communicate the way I do. This is a piece of
9 litigation where the attorneys come -- and I don't mean
10 that in any sense in any derogatory way -- but they
11 indicate what they believe to be the proper way to
12 respond in a lawsuit, and so I followed their advice.
13 If it were up to me just to answer, I'd answer as I've
14 been answering in this deposition.
15    MS. BORGEN: Okay. Thank you.
16    I would like to turn to a different series
17 of questions, but before I do so, would you
18 like to take a short break?
19    (A discussion was held off the record.)
20    (There was a recess.)
21       DIRECT EXAMINATION
                (continued)
22 BY MS. BORGEN:
23    Q. Before we continue that, I just noticed there
24 is one exhibit that I think you referred to earlier
25 from your files. There's a document there in your file

1 that says at the top, BLACK.txt?
2    A. Okay.
3    Q. Is this a document you referred to when you
4 were discussing precincts that --
5    A. I indicated that 26 of 319 precincts have 50
6 percent or more black voters.
7    MS. BORGEN: Okay. Let's go ahead and
8 mark that as an exhibit, the document that you
9 referred to, which would be S.
10    (Plaintiffs' Exhibit S was marked for
11 identification.)
12 BY MS. BORGEN:
13    Q. And do you know who prepared that document?
14    A. Darrell Smith.
15    MS. BORGEN: If I can go ahead and mark
16 this document as Exhibit T.
17    (Plaintiffs' Exhibit T was marked for
18 identification.)
19 BY MS. BORGEN:
20    Q. Exhibit T is the Expert Witness Summary of
21 Supervisor of Elections Pam Iorio, which we have extra
22 copies of if you need them.
23    I'd like to show you what's been marked as
24 Plaintiffs' Exhibit T. If you could just take a minute
25 and look through that and see if you're familiar with

1 that document.
2    A. Right. Yes.
3    Q. Is it correct to say that you have designated
4 yourself as an expert to testify on your own behalf in
5 this litigation?
6    MR. TINKLER: Objection to form.
7 BY THE DEPONENT:
8    A. I think the attorneys have designated me as
9 an expert.
10    Q. And on whose behalf will you be testifying?
11    A. My office. My office; is that correct?
12    Q. You've been named as a defendant in this
13 litigation --
14    A. Okay.
15    Q. -- so?
16    A. Well, I've done what my attorneys have
17 thought appropriate. If it's not appropriate for me to
18 be an expert in my own case, then I won't be. I think
19 that I do have expertise and to go forward -- I mean,
20 if you're trying to improve the voting rights for
21 people in this state -- and I think that if you don't
22 want my expertise, that's fine. I think you'd benefit
23 from it, but it's perfectly fine with me if you don't.
24 It doesn't matter.
25    Q. Well, the question at issue today is not a

1 question of whether or not we want your expertise or
2 not.
3    A. Right.
4    Q. We're certainly happy to hear --
5    A. Yes.
6    Q. -- I think it's helpful to hear your opinions
7 in this case. The question is, under the Federal Rules
8 of Civil Procedure, whether you're qualified as an
9 expert --
10    A. Okay.
11    Q. -- under the court rules. So I have some
12 questions for you in that regard.
13    MR. TINKLER: Objection to form, if that
14 was a question.
15 BY THE DEPONENT:
16    A. If I'm not, then you can just take me out of
17 it and it's perfectly fine. I'm not wedded to being an
18 expert in this.
19    Q. Okay. Are you familiar with this summary?
20    A. Yes.
21    Q. Did you help prepare this summary?
22    A. I edited it, yes.
23    Q. Did you prepare any drafts of what you might
24 testify about as an expert?
25    A. No.

Page 226

```
 1   Q. Have you ever testified as an expert before
 2 in litigation?
 3   A. No, I have not.
 4   Q. Do you have any academic training in election
 5 administration?
 6   A. No.
 7   Q. What work have you done in this litigation in
 8 your capacity as an expert?
 9      MR. TINKLER: Objection to form.
10 BY THE DEPONENT:
11   A. Well, what do you mean, what have I done?
12   Q. It sounds like, after speaking to your
13 attorneys, that you've been designated as an expert in
14 this case.
15   A. Uh-huh.
16   Q. Have you conducted a particular analyses to
17 help you prepare to speak as an expert on the issues in
18 this case?
19   A. Well, I mean, as I said, I don't really -- it
20 does not matter to me whether I am an expert in this or
21 not. I think that our attorneys thought that I was --
22 I was president of the State Association of Supervisors
23 during the 2000 election. I was the point of contact
24 for hundreds of media during this and provided
25 information on everything regarding the felon issue to
```

Page 227

```
 1 punch card voting.
 2      Since the 2000 election, I've gone and went
 3 throughout the state and gave talks and testimony on
 4 how I thought the election process should be reformed
 5 and lobbied for the passage of the Election Reform Act
 6 of 2001.
 7      I wrote my master's thesis on the 2000
 8 election and went around the state interviewing a
 9 number of my colleagues and did oral interviews with
10 them to further understand it.
11      Whether it's good or not, I probably know
12 more about the 2000 election than most people in terms
13 of what happened. I also have a lot of ideas on how we
14 could fix things. I'm also now in my ninth -- tenth
15 year as a supervisor of elections of one of the largest
16 counties in the State of Florida and a very diverse
17 county.
18      And so I think if all that doesn't qualify me
19 as an expert, then that's fine. If it does, I'm glad
20 to add my expertise to the lawsuit.
21   Q. What materials would you say that you have
22 reviewed to help you testify as an expert in this case?
23   A. I reviewed and have read almost every report,
24 probably every report that has come out regarding the
25 2000 election from all of the various task forces and
```

Page 228

```
 1 committees on what has gone wrong and what people
 2 recommend.
 3   Q. And which reports and task forces?  If you
 4 could identify, specifically, which ones you've
 5 reviewed.
 6   A. If there is a task force that was formed on
 7 the 2000 election, I've read the report.  The
 8 Governor's task force, the Duval task force, the
 9 Senate -- the one that was produced by the Senate.
10 Groups that have formed to look at the technology
11 issues, the Cal-Tech studies, Berkley studies, the
12 Civil Rights Commission, their report.
13      So if you can name any task force or group
14 that has looked at the 2000 election, I have read their
15 report.
16   Q. So the ones you mentioned, the Governor's
17 Select Task Force?
18   A. Uh-huh.
19   Q. The Duval County -- I'm not quite sure what
20 the official name is, but the Duval County report --
21   A. Task force.
22   Q. -- task force, the Senate report, that would
23 be the Florida Senate?
24   A. Right.
25   Q. The Cal-Tech Study, the Berkley Study, and
```

Page 229

```
 1 the U.S. Commission on Civil Rights?
 2   A. Correct.
 3   Q. Were there any others that -- any reports or
 4 task forces?
 5   A. There may be, but I can't think of them right
 6 now.
 7   Q. And have you prepared any draft reports with
 8 your analysis of the 2000 election?
 9   A. No.  But I think that one thing that you
10 could turn to, if you were interested, was the
11 report that I gave to the Governor's Task Force on
12 January 8, 2001, which was testimony that kicked off
13 their deliberations, where I outlined what I thought
14 went wrong and some recommendations for change,
15 including the move to better technology, the move
16 towards provisional ballots, elimination of the second
17 primary, it is my belief that former felons should have
18 their rights automatically restored upon serving their
19 time, and various other proposals I put forth at that
20 time, some of which have become law and some have not.
21   Q. Would you say -- you discussed earlier that
22 you did a thesis --
23   A. Right.
24   Q. -- on the 2000 election.  Would you say that
25 thesis would properly reflect the positions you would
```

1 hold as an expert?
2       MR. TINKLER: Objection to form.
3 BY THE DEPONENT:
4    A. No, I wouldn't say that necessarily because I
5 tried to not offer up my opinions in the thesis. And I
6 really tried to write the thesis from the perspective
7 of a lot of other supervisors based on my oral
8 interviews.
9       And I tried to, I think, be as bland as
10 possible in the writing of my thesis and just trying to
11 lay out some facts about inconsistent procedures and
12 about ballot design. And I'm not so sure that I got
13 too far with my own sentiments about a lot of things or
14 whether I did at all.
15    Q. Did you rely upon your work with the thesis
16 in reaching any conclusions that you have as -- in your
17 capacity as an expert?
18       MR. TINKLER: Object to form.
19 BY THE DEPONENT:
20    A. It's hard to say. I think that the totality
21 of the experience of having lived through the 2000
22 election and everything, everything since 2000 --
23 November 7, 2000, has ended up qualifying me as an
24 expert whether I want to be one or not.
25    Q. And what materials did you review in

Page 231

1 preparation of your thesis?
2    A. Well, I've read the secondary material that's
3 come out on the 2000 election by the various reporters
4 that have written the Miami Herald book, and the
5 Jeffrey Toobin book, and New York Times book. I've
6 read probably every article from the 36-day period,
7 probably have read every newspaper article during that
8 36-day period from the Palm Beach Post, the New York
9 Times, the Washington Post, the Tampa Tribune and the
10 St. Pete Times. I have extensive files on all that
11 that I kept, not public files, but at home, which have
12 helped me to construct my thesis.
13       And then, as I've mentioned, I've conducted
14 oral interviews with a number of my fellow supervisors
15 and that has helped me understand what has gone on in a
16 number of other counties, and probably have some
17 insights into that that no one else has.
18    Q. Do you have copies of -- do you have
19 transcripts of the interviews with other supervisors?
20    A. Those are not public documents.
21    Q. Do you have copies of those?
22    A. Those are not public documents.
23    Q. I understand that, but that's not the
24 question. Do you have copies of those interviews?
25    A. Do I own copies of those interviews?

Page 232

1       MR. TINKLER: Objection, asked and
2 answered.
3       THE DEPONENT: What was that?
4       MS. BORGEN: Are you instructing the
5 witness not to answer?
6       MR. TINKLER: No, I'm not.
7 BY THE DEPONENT:
8    A. Yes, I do.
9    Q. And do you -- the interviews have been
10 transcribed?
11    A. Yes.
12    Q. Does your thesis include a bibliography of
13 sources?
14    A. Yes, it does.
15    Q. And, again, would you be willing to give us a
16 copy of the thesis? Do you have a copy here today?
17    A. I do not. And I think -- if you don't mind,
18 I think the best way to get that would be the
19 University of South Florida. They have a copy of all
20 the thesis there that they keep in the library and I
21 think they make copies for people.
22    Q. It sounds like that is something you have
23 reviewed and that is part of the basis of your
24 knowledge --
25       MR. TINKLER: Objection to form.

Page 233

1 BY THE DEPONENT:
2    A. Yes.
3    Q. -- as an expert; is that correct?
4    A. Well, you know, to the extent that I know a
5 lot about the 2000 election, and having written a
6 thesis on it, and having accumulated a great deal of
7 information about it from secondary and primary
8 sources, I think so.
9    Q. Okay. I can take this up with your counsel
10 in terms of how to get a copy of that --
11    A. Right.
12    Q. -- but I think we have a document request
13 outstanding that would cover that.
14    A. Okay.
15    Q. So other than the summary that has been
16 marked as Exhibit T, have you prepared any documents in
17 regard to what you will testify about as an expert?
18    A. I have not.
19    Q. And you said that you reviewed a draft of
20 this. And did you make edits to a draft that had been
21 prepared by your attorneys?
22    A. Yes.
23    Q. And do you have a copy of that draft with
24 your edits?
25    A. I don't believe I do. I gave it back to

Page 234

1  staff.  I gave it back to the attorney.
2      Q.  Your attorneys have it.
3          Do you recall the nature of the edits that
4  you made?
5      A.  They weren't substantial.  I just changed
6  some of the wording around.  I don't think it was
7  anything substantial.
8      Q.  Let me ask you about some of the specific
9  conclusions that you've reached as an expert.
10     A.  Okay.
11     Q.  If you turn to, let's see, page 2 of the
12 summary, the first full paragraph begins, Concerning
13 election day 2000?
14     A.  Yes.
15     Q.  You state that part of your expert testimony
16 will be an analysis to encompass a review of how state
17 and local officials in Florida dealt with such issues
18 as -- and then you identify various issues.  What
19 conclusions have you reached regarding voter error?
20     MR. TINKLER:  Objection to form.
21 BY THE DEPONENT:
22     A.  Well, I really think that the 2000 election
23 really does rest a great deal on the overvote, which,
24 you know, if you take a look at the New York Times
25 consortium analysis of the election, when they went in

Page 235

1  and looked at all the ballots after the election, here
2  you have an election won by 537 votes, but there were
3  118,000 overvotes.  And so you have 118,000 ballots
4  that were never counted because the voter voted for
5  more than one candidate for president.  And you can see
6  that there is this linkage between some unusual ballot
7  designs and overvoting.
8          For example, in Hillsborough County, where we
9  had no unusual ballot design at all, just all the names
10 straight in a row, straight in a line, one page,
11 English and Spanish requirement, we had 3600 overvotes.
12 We had one of the lowest overvote rates in the state, 1
13 percent.
14         Now, you contrast that with the butterfly
15 ballot in Palm Beach County that had 19,000 overvotes;
16 or you look at the Duval County experience where the
17 supervisor there made the decision to put the ballot on
18 two pages, five names on one page, and then you
19 actually had to turn for another five names, and you
20 had 22,000 overvotes.
21         The overvote problem was not just a punch
22 card problem, it was also a problem with central count
23 optical scan counties.  And in those counties that had
24 central count optical scan, all but one chose to design
25 their ballots on two columns.  And it was that two

Page 236

1  column design that lead to a huge number of overvotes.
2  In fact, Gadsden County had a 12 percent voter error
3  rate.
4          So what do we do about that?  And you really
5  don't get into that in the lawsuit.  I mean, I think
6  that is more the story of the 2000 election more than
7  anything else.
8          Well, first of all, you get rid of central
9  count systems and that's what the Florida legislature
10 has done in getting rid of the punch card and central
11 count optical scan, as well as the paper ballot that
12 was used in Union County.  And you mandate that all the
13 votes in Florida be counted by a precinct count system.
14         Fifteen counties have chosen touch screen
15 where it is absolutely impossible to overvote.  That
16 means that more votes are going to count.  We're not
17 going to have a 1 percent overvote error.  We're not
18 going to have a 12 percent overvote error.  We're going
19 to have zero at the precinct level.  You're still going
20 to have overvotes because of absentee ballots because
21 they're done on paper.  Voters make mistakes on paper
22 ballots.
23         The other 52 counties are going to have
24 precinct optical scan.  That precinct optical scan will
25 alert the voter when they have made an error on the --

Page 237

1  an overvote and at least give them an opportunity to
2  vote a new ballot.  That is of considerable importance
3  and I think it's going to make a huge difference in
4  future elections in terms of getting rid of the
5  overvote.
6      Q.  Have you reached any other conclusions
7  regarding voter error?
8      MR. TINKLER:  Objection to form.
9  BY THE DEPONENT:
10     A.  No.
11     Q.  So that is the total -- what you just
12 testified about are your total conclusions that you'll
13 testify about as an expert regarding voter error?
14     MR. TINKLER:  Objection to form.
15 BY THE DEPONENT:
16     A.  Does that mean that I can't think of
17 something between now and the court case?
18     Q.  Plaintiffs have a right, at this point in
19 time, to know what conclusions you have reached.
20     MR. TINKLER:  Objection to form.
21 BY THE DEPONENT:
22     A.  Okay.  I mean, I do think the issue of the
23 overvote is a key one.  And if, at this time, I have to
24 say everything that I'm going to testify to in the
25 court case in August, then there could be a discussion

Page 238

1 of the undervote, although I don't consider the
2 undervote to be voter error.
3    Q. So that would be all the conclusions that
4 you've reached at this point in time --
5    A. At this point, yes.
6    Q. -- certainly, that you anticipate testifying
7 about at trial?
8    MR. TINKLER: Objection to form.
9    MR. LITTLE: Objection to form.
10    MS. BORGEN: Can I ask you the nature of
11 your objection?
12    MR. TINKLER: You're putting words in my
13 client's mouth and not letting her answer. She
14 is interpreting your question as trying to
15 limit her and obviously she can think of other
16 things in the future.
17    MS. BORGEN: If you could, clarify your
18 objection. Objection to form is probably not a
19 proper objection to many of the questions.
20    MR. LITTLE: It's pursuant to the rules.
21    MR. TINKLER: I think we can do an
22 objection to form.
23    MS. BORGEN: Even though you're not
24 supposed to do speaking objections, but when
25 asked by counsel, you can clarify.

Page 239

1    MR. TINKLER: Do you want us to do that on
2 every single one? We'll be here --
3    MS. BORGEN: Sure.
4    MR. TINKLER: Your seven hours will run
5 out very quickly.
6    MS. BORGEN: Until I ask again, please do
7 so.
8    MR. LITTLE: It's also a compound
9 question.
10 BY MS. BORGEN:
11    Q. Have you reached any conclusions other than
12 the ones you've stated regarding voter error?
13    MR. TINKLER: Objection to form. The ones
14 you have stated, you're not particular on that.
15 BY THE DEPONENT:
16    A. I think really what I've said is probably as
17 about as complete as I'll get on voter error. I cannot
18 think, unless we start getting into absentee ballots,
19 and any -- well, no, let me just say, as long as I'm
20 thinking about absentee ballots, there are voter errors
21 that occur on absentee ballots in that voters don't put
22 their complete -- they don't get a witness. They don't
23 get a witness address. There are a certain number of
24 absentee ballots that are rejected by the canvassing
25 board because they have not completed the back of the

Page 240

1 envelope.
2    And if that should come up in the court case
3 and I'm asked about that, I can testify to the fact
4 that voters often do not complete the back of the
5 absentee ballot envelope correctly.
6    Q. You indicate in your summary that your
7 analysis will also include a review of voter
8 registration?
9    A. May I go back, there's one other thing.
10    Q. Sure.
11    A. There is another area of voter error that I
12 could testify to and that's what I spoke of earlier
13 with regards to -- in many of the optical scan
14 counties, or some of them, a person not only filled in
15 the person's name, but also wrote in that candidates
16 name. Now, how the different counties chose to deal
17 with that is one issue, but that is voter error. Now,
18 some counties counted that as a vote. Some counties
19 counted that as an overvote. But if I'm asked to
20 testify to that, I could speak to that.
21    Q. Okay.
22    A. Now, voter registration.
23    Q. Voter registration, what conclusions have you
24 reached regarding voter registration?
25    A. Well, one conclusion that I stated a little

Page 241

1 bit earlier was that no one county, or handful of
2 counties, should be made to do anything differently
3 with voter registration that the entire State of
4 Florida does not do. Because I will be glad to testify
5 as to the history of the NVRA and the standardization
6 and how important that standardization is. And if
7 there are going to be any changes in how we register
8 voters and how every county deals with a registered
9 voter, that those changes should be statewide in
10 nature.
11    I don't know what kinds of questions I would
12 be asked at trial dealing with voter registration, but
13 my knowledge as a supervisor, I could step through the
14 process. I could go over many of the things that we've
15 talked about today, in terms of how we deal with
16 incomplete voter registrations; what we mail to voters;
17 what items are on a voter registration form make a
18 complete registration; what happens when we do not get
19 a registration from the Department of Motor Vehicles or
20 from one of the other agencies charged with voter
21 registration under the law.
22    So I think there are a number of issues with
23 voter registration that I deal with on my job on a
24 regular basis that can I deal with in a court trial if
25 I were asked.

Page 242

1 Q. Okay, a number of issues, what would those
2 issues be that you could testify about on voter
3 registration?
4 A. All those that I just mentioned.
5 Q. Okay. So if we could enumerate them, what
6 would be the first one?
7 A. How voter registrations are processed; the
8 history of NVRA; the need for uniformity; how the
9 various state agencies deal with voter registration;
10 how they interact with county supervisors of elections;
11 what it takes to be a -- for a form to be a complete
12 registration; what we do with incomplete registrations;
13 how voters are notified of their registrations; what
14 happens when a voter does not complete their
15 registration and only has a partial -- has an
16 incomplete registration; how a person -- if voter
17 registration also includes how a person ends up -- of
18 course, maintenance is probably a different thing, list
19 maintenance.
20     So I think any issue like that, or those
21 issues that I named, dealing with voter registration, I
22 could answer.
23 Q. Okay. I want to ask you a little bit more
24 about the conclusions you've reached in each of these
25 areas. And to help you understand what I'm asking --

Page 243

1 A. Yes.
2 Q. -- I think I'll reference to another expert
3 report. It sounds like you've had an opportunity to
4 review the expert report submitted by plaintiffs from
5 Professor Henry Flores; is that correct?
6 A. Yes.
7 Q. And you may have noticed in there he reaches
8 some conclusions where he says, I've compared this and
9 this, and I conclude that --
10 A. Yes.
11 Q. -- there is a correlation between these
12 individuals; or I have looked at this and I have
13 concluded that this needs to be -- or that there is a
14 specific conclusion after reviewing specific evidence.
15 A. Uh-huh.
16 Q. So that's what we're trying to get a sense of
17 what you've reviewed and what conclusions you've
18 reached in these different areas, to give you a sense
19 of where I'm going with the questions and why I'm
20 asking this, that's what I'm trying to determine.
21     So if we go back on voter registration,
22 you've indicated, I believe, the first area that you
23 could testify about is how voter registrations are
24 processed. What conclusions have you reached regarding
25 how voter registrations are processed?

Page 244

1     MR. TINKLER: Objection to form, a long
2 and compound question.
3 BY THE DEPONENT:
4 A. I'm not sure what you mean by that, what
5 conclusions have I reached?
6 Q. Okay. Well, you stated that you were going
7 to talk about voter registration, that that's one area
8 that you know about. And when we enumerated that, I
9 believe, the first area that you identified was how
10 voter registrations are processed. Is that a correct
11 statement of your testimony?
12 A. Yes. I would say I know a great deal about
13 how voter registrations are processed. Now, in terms
14 of what conclusions I've reached, I suppose it means --
15 it depends on the court case, what does someone want to
16 know?
17 Q. What do you think -- seeing that you've been
18 named as an expert on your own behalf, what would you
19 want to testify about on your own behalf as an expert
20 regarding processing voter registration?
21 A. Well, since part of the court case is
22 alleging discrimination, I would testify that voter
23 registrations are processed by my office in a
24 nondiscriminatory manner without regard to race.
25 Q. And what would be the basis for that

Page 245

1 conclusion?
2     MR. TINKLER: Objection to the form, that
3     conclusion.
4 BY THE DEPONENT:
5 A. The evidence of all the voter registration
6 forms that are processed on a daily basis in my office.
7     COURT REPORTER: I'm sorry, I didn't get
8     the basis of your objection.
9     MR. TINKLER: Objection to the form, that
10     conclusion.
11     MS. BORGEN: That conclusion?
12     MR. TINKLER: Right. I have no idea what
13     "that" was going to.
14     MS. BORGEN: Thank you.
15 BY MS. BORGEN:
16 Q. So your conclusion that voter registration in
17 your office is not processed in a discriminatory
18 manner --
19 A. Not at all.
20 Q. -- is based on -- I'm sorry, if you can
21 clarify again. It's based on --
22 A. The fact that every day we process voter
23 registration forms from every single individual who
24 sends one in to us.
25 Q. Have you done any analyses about whether the

Page 246

1 voter registration process might have a disparate
2 impact on voter?
3     MR. TINKLER: Objection to form. Calls
4   for legal conclusion.
5 BY THE DEPONENT:
6   A. How would it?
7   Q. When I use the term "disparate impact," do
8 you understand what that terms means?
9   A. You explain it to me, please.
10   Q. Well, if you're not familiar with term, then
11 I'll use a different term.
12   A. Okay.
13   Q. Do think there's a chance that -- or have you
14 considered, as an expert, whether or not the way that
15 voter registrations are processed, might have a certain
16 impact on a greater number -- or disproportionate
17 number of black voters rather than white voters
18 compared to their representation in the population?
19   A. How would it?
20     You get a batch of 50 forms. You input them
21 all into the computer. How does that have a different
22 impact on any of those 50 individuals?
23   Q. That's not the question. Have you done an
24 analysis on how it might have a disparate impact?
25     MR. TINKLER: Object to the form.

Page 247

1 BY THE DEPONENT:
2   A. Why would we -- why would I do an analysis
3 of -- we take in a certain number of forms and we enter
4 the information into our computer system. How could
5 that possibly be discriminatory?
6   Q. The question is simply -- I'm trying to
7 determine what analyses you've done as an expert and
8 have you done any analyses of whether there's --
9   A. I don't even know how a person could do an
10 analysis of how -- I mean, I think it's ludicrous. How
11 could any supervisor do an analysis of whether or not
12 the inputting of voter registration forms had a
13 discriminatory impact?
14   Q. Would you say it's correct to say you have
15 not done an analysis?
16   A. I've have to challenge the validity of that
17 question. I mean, I just can't go down that road. I
18 mean, you know, unless this is just -- I question the
19 validity of it.
20   Q. Okay, but have you tried to do that kind of
21 analysis? If you have not because you don't think it's
22 valid to do so, that can be a fine answer. I'm just
23 trying to figure out if you have done that --
24   A. Not only would it not be valid --
25     MR. LITTLE: I'm sorry, excuse me. I'm

Page 248

1   going to object to the form of the question.
2     And I'm objecting because your question is
3   presuming the existence of the need for some
4   analysis. The witness has answered about four
5   times what she has done and why she believes
6   your premise, that an analysis is needed is, I
7   can't recall the exact words the witness used,
8   but unnecessary. And therefore, I do object to
9   this question as asked and answered. It
10   presumes the need for an analysis and frankly
11   it's argumentative.
12     That's a speaking objection. I'm doing it
13   because you asked for it.
14     MS. BORGEN: I appreciate that.
15     MS. TORRES: I'm sorry to interrupt. This
16   is Susan Torres on the phone. If the person
17   making an objection could speak up a little
18   bit. It's hard to hear them on the phone.
19     MR. LITTLE: Sorry, Susan.
20     MS. BORGEN: Plaintiffs have a right to
21   know what conclusions have been reached by any
22   expert, and how those conclusions have been
23   arrived at, what analyses have been done. And
24   we are trying to establish what analyses have
25   been done. That is the nature of the

Page 249

1   questions.
2     If you have no further objection, we'll
3   continue. Your objection can stand, but unless
4   you want to explain it any further, we'll
5   continue.
6     MR. LITTLE: Well, I'm not answering the
7   questions. I'm putting the objection on the
8   record you asked.
9     MS. BORGEN: Okay.
10     MR. LITTLE: Proceed as you will.
11 BY MS. BORGEN:
12   Q. Regarding voter registration, have you
13 conducted any analyses of any possible discriminatory
14 impact of those processes?
15   A. I just -- I do have to challenge that
16 particular question because it is a very
17 straightforward and nondiscriminatory process that any
18 supervisor would use to simply comply with the law.
19     If there are a thousand applications sent to
20 your office, you input a thousand applications without
21 regard to gender, race or any other criteria. And to
22 even pose that as a premise is wrong. I cannot go down
23 that road.
24   Q. Have you done any kind of analyses of the
25 racial breakdown of your applicants for voter

Page 250

1 registration?

2    A. I believe that our system would produce that
3 information where the voter gave it. As you know, that
4 information is voluntary. It is not a mandatory part
5 of the voter registration process.

6    Q. Have you looked at any information about
7 whether more individuals who self-identify as being
8 black register to vote closer to the book closing date,
9 than white voters, disproportionately?

10    A. To my knowledge, we do not do a breakdown of
11 the racial composition of the registered voters by week
12 or month. I think we can take an overall snapshot and
13 say that in any given year, and we may occasionally do
14 this, there's a certain number of new registered voters
15 and this their party breakdown, and this might be their
16 racial breakdown, gender breakdown. But we certainly
17 don't do that on a week or a monthly basis to say this
18 is a particular trend leading up to an election.

19    Q. And have you done any analyses of that sort
20 in your work as an expert in this case?

21    MR. TINKLER: Objection to the form of the
22 question.

23 BY THE DEPONENT:

24    A. My work as an expert in this case is my work
25 as supervisor of elections.

Page 251

1    Q. And as an expert, have you analyzed voter
2 registration based on when the registration came in,
3 that came in a certain week or a certain month? Have
4 you done any analysis like that?

5    A. Our office can give facts as to what the
6 voter registration figures were leading up to the 2000
7 presidential election.

8    Q. And have you done any of those types of
9 analyses yet of when voter registrations were received
10 and the breakdown of those voter registrations.

11    MR. TINKLER: Objection to the form of the
12 question.

13 BY THE DEPONENT:

14    A. When you say breakdown of voter
15 registrations, what do you mean?

16    Q. A breakdown by the race self-identified by
17 the voter?

18    A. I believe that we have a report -- not a
19 report, but I believe we have the statistic of what
20 kind of registration levels we had prior to the
21 November 7th, 2000 election after book closing.
22 Whether that is broken down by race or not, I cannot
23 say, and I doubt if it is.

24    Q. And have you done any of those analyses
25 yourself?

Page 252

1    A. Any of those analysis would be done by my
2 staff, particularly Chuck Smith, who will be testifying
3 tomorrow.

4    Q. And I'm asking you these specific questions
5 because at this point in time, you've been named
6 individually as an expert, not your office. So I'm
7 trying to figure out what analyses you, yourself, have
8 done as opposed to any members of your staff. So
9 that's why I'm asking some of these questions, to
10 determine what you have done.

11    One of the other areas you identify in voter
12 registration that you will be reaching conclusions on
13 is the history of the NVRA. What conclusions have you,
14 in your expert capacity, reached regarding history of
15 the NVRA?

16    A. Well, I think that the NVRA came about -- the
17 desire for two things. One, the desire to standardize
18 voter registration procedures across the country. Two,
19 to make it easier for people to register to vote.

20    Q. And have you reached a specific -- that's
21 your conclusion about -- have you reached any other
22 conclusion about the history of the NVRA?

23    A. Those are the two main conclusions about the
24 history of the NVRA that I would speak to, that's what
25 I think the NVRA -- how it came about.

Page 253

1    Q. And what are those conclusions based on?

2    A. My knowledge of the NVRA and when it was
3 passed. When I first became supervisor in
4 January 1993, the NVRA was one of the first laws passed
5 by President Clinton in May of 1993. I had just been
6 on the job for several months, but really got emersed
7 in that in terms of following the legislative process.

8    And so, I was there during that legislative
9 process in term of following it and being a supervisor
10 who kept on top of it. And then it was implemented in
11 January of 1995 and I think all the supervisors in the
12 state had to become experts on the new law. And we had
13 to work very hard to make sure that the State of
14 Florida passed a conforming piece of legislation, so
15 that we would not have two voter registration lists, a
16 federal and a state, which would have been very
17 cumbersome and expensive. And so, we set to work to
18 pass the conforming legislation, which passed, and I
19 think Florida did a very good job with that.

20    Q. You also indicated earlier that you have
21 reached a conclusion about voter registration and the
22 need for uniformity. What is your conclusion on this
23 area?

24    A. Well, I think that one of the lessons of
25 November 7, 2000, was the need for uniformity. As I

**Page 254**

1 mentioned earlier, I think one of the stories of the
2 2000 election was the lack of standardization from
3 county to county in everything from ballot design to
4 voting technology, to what was determined to be a vote.
5 What was determined to be a vote in one county was not
6 necessarily determined to be a vote in another county,
7 using that write-in as an example.
8     But I think it is extremely important that --
9 and I would testify to this, how important it is that
10 any voter registration procedures be kept uniform
11 throughout the state. And, again, I think that's in
12 keeping with the intent of the Federal NVRA, it was in
13 keeping with the intent of the conforming legislation
14 of the State of Florida. That's why we have a
15 statewide voter registration application. That's why
16 we have state agencies that are trained, on a statewide
17 basis, to conduct voter registration.
18     And it would be a grave mistake to have one
19 county go down a particular road with regards to voter
20 registration and having different procedures than they
21 had to comply with that was not done uniformly across
22 67 counties.
23     I think where you're going to particularly
24 get in trouble with that -- now, I'd be glad to testify
25 to this -- is where you have multi-county races. You

**Page 255**

1 have people running for congress or for state house or
2 state senate that cover a number of counties. And I
3 think unless you have your procedures that are the
4 same, if you have a court decree that tells one county
5 that they have to do something one way, but you don't
6 have it in another county, I think you're going to have
7 legal problems down the road.
8     Q. Would it be accurate to say that your
9 conclusion in this regard is that voter registration
10 needs to be uniform across the 67 counties in Florida;
11 is that accurate?
12     A. Absolutely, it should be.
13     Q. Is that a complete statement of your
14 conclusion on this point or would there be more that
15 you would add to that?
16     MR. TINKLER: Objection to the form of the
17 question.
18 BY THE DEPONENT:
19     A. If I have to say right now everything that
20 I'm going to testify to, and if that's my complete
21 statement, then I hope that it's worded broadly enough
22 so that it can encompass any aspect of voter
23 registration.
24     MR. TINKLER: And going back to that
25 objection, just to point out, rebuttal

**Page 256**

1 testimony, the deadline's not reached at this
2 point.
3     MS. BORGEN: For rebuttal testimony, it's
4 not.
5     MR. TINKLER: That's correct, we're still
6 reviewing all the reports that have been filed
7 by plaintiff.
8     MS. TORRES: I can't hear you at all.
9 BY MS. BORGEN:
10     Q. You had indicated that one of the areas of
11 voter registration that you have reached a conclusion
12 on at this point is the need for uniformity --
13     A. Absolutely.
14     Q. -- in regard to that, some point of voter
15 registration. Would it be accurate to state that your
16 conclusion is that there needs to be uniformity in
17 voter registration across the 67 counties of Florida?
18     A. Absolutely. For example, one county should
19 not give a receipt if another county does not. That
20 would be a big mistake.
21     Q. And what is the basis for your conclusion?
22     A. Because uniformity is very important in the
23 election -- in election administration. And I think
24 that a lot of the problems that came up on November 7,
25 2000, was because of that lack of uniformity.

**Page 257**

1     Q. Have you reviewed any materials or documents
2 in reaching that conclusion?
3     A. Any documents since -- that I came across in
4 my work on a regular basis? I don't know if I can name
5 them.
6     Q. Are they specific documents in regard to
7 uniformity in voter registration?
8     A. I can't speak to any specific documents. I
9 think it would come from my general knowledge of being
10 supervisor of elections and dealing with issues of
11 voter registration on a daily basis.
12     Q. Is there anything else that you've relied
13 upon in reaching the conclusion regarding uniformity in
14 voter registration?
15     A. No.
16     Q. You also testified under the category of
17 voter registration, one of other conclusions you had
18 reached is how counties deal with incomplete voter
19 registration applications.
20     A. Right.
21     Q. And what conclusion have you reached in
22 regard to incomplete voter registration applications?
23     A. That is very important that that be
24 standardized. It currently is not standardized.
25     Q. And standardized in -- have you reached a

1 conclusion in terms of how it should be standardized?
2     A. I think that you should always try to benefit
3 the voter in this -- in this regard and give them every
4 opportunity to register to vote.
5         And a couple things, as I mentioned before,
6 we send out a voter registration form with the
7 information already preprinted, giving them the
8 opportunity just to fill in the missing link. I think
9 that should be done across the state if it's not being
10 done currently.
11         But there is another very important area of
12 incomplete registrations and that is, what do you do
13 after book closing? If book closing is October 10th
14 and someone sends you a voter registration form and
15 omits the date of birth, that is an incomplete
16 registration. And some counties take the point of view
17 that that person is simply not registered, end of
18 story.
19         We used to take that point of view. And
20 then, prior to November 7th, we did not. And we
21 decided that we would allow that to be an incomplete
22 registration and that that person would have up through
23 election day, including election day, to come in with
24 that missing information and they would be registered
25 to vote.

1         But there is no statewide decree on that
2 point, and the law is ambiguous, and that is a point
3 that I think needs to be rectified.
4     Q. And have you reached a conclusion in terms of
5 what you think the statewide practice should be --
6     A. Yes.
7     Q. -- or that the statewide practice should be
8 the same?
9     A. The statewide practice should be that an
10 individual with an incomplete registration after book
11 closing is in a pending registration status, but that
12 they have the opportunity up through election day,
13 including election day, to satisfy the requirements of
14 that registration form and be registered to vote.
15     Q. And is that a change that you think could be
16 done by rule-making through the Division of Elections?
17         MR. TINKLER: Objection to the form.
18         MR. LITTLE: Object to the form, calls for
19     a legal conclusion.
20 BY THE DEPONENT:
21     A. I really don't know the answer to that. It
22 could possibly be satisfied by the Division of
23 Elections opining in a legal opinion that this is what
24 they think supervisors ought to do. And then
25 supervisors could have an idea that is what the

1 Division thinks they ought to do though a legal
2 opinion, and then they would follow suit, more than
3 likely. I don't know if a rule could deal with that or
4 whether this is something that has to be handled
5 legislatively.
6     Q. Have you reached any other conclusions
7 regarding incomplete voter registration applications?
8     A. Not that I can think of.
9     Q. And what is the basis for your conclusions
10 regarding incomplete voter registration applications?
11     A. My experience as a supervisor of elections.
12     Q. Have you relied on anything else in reaching
13 your conclusion about incomplete voter registrations?
14     A. No.
15     Q. You also indicated earlier in regard to voter
16 registrations that you've reached -- you also indicated
17 earlier that you reached a conclusion regarding various
18 state agencies' roles in voter registration. What
19 conclusion have you reached in terms of state agency
20 roles -- state agencies' roles in voter registration?
21     A. Well, I think that the various state agencies
22 that provide voter registration do a good job. There
23 are times when there are clerical errors that occur. I
24 think one of the problems with voter registration being
25 conducted in conjunction with the work of other state

1 agencies is that it is a secondary function compared to
2 what their primary function is, whether it's providing
3 public assistance, or providing a library card, or
4 providing a driver's license. The person who is at the
5 front line is not there to provide voter registration
6 as a primary function. It's secondary. So
7 consequently, I think it's perhaps a higher degree of
8 possibility for an error rate simply because of that.
9         But I think that there may be others who are
10 better equipped to speak to how voter registration is
11 conducted with these various agencies. I can say from
12 a county supervisor standpoint, we work with these
13 various agencies. I think in our work DMV, we found
14 them to be very receptive to our continual interaction
15 with them in terms of any error rates with
16 registrations or any problems that come up. And they
17 have been very receptive to trying to consistently make
18 improvements.
19         I would be testifying based on my experience
20 as a supervisor in working with these agencies since
21 the inception of NVRA in January of 1995, as to the
22 work that they do and how they work with us when errors
23 are brought to light.
24     Q. How would you summarize your conclusion
25 regarding voter registration and state agencies?

## Page 262

1    A. I think really what I just said would be my
2 summary.
3    Q. So in terms of -- that seems to be an opinion
4 about the state agencies, but I don't know if there is
5 a specific conclusion you've reached about the state
6 agencies?
7        MR. TINKLER: Objection to the form of the
8    question.
9 BY THE DEPONENT:
10    A. Well, I think it can be viewed as a
11 conclusion. And that is just what I said, that their
12 primary function is not voter registration, thus, I
13 think it might lead to errors that wouldn't otherwise
14 occur if the agency's primary function was simply to
15 obtain a voter registration.
16        But working primarily with DMV, since they
17 are responsible for roughly 50 percent of our voter
18 registrations, they have been very receptive to our
19 comments and concerns about any errors on voter
20 registration forms, incomplete registrations. And I
21 think that they have constantly tried to improve their
22 situation over the years in terms of making it better
23 for us as county supervisors.
24    Q. And have you reached any conclusions about
25 how the state agencies could change how they're doing

## Page 263

1 voter registration?
2    A. I think that the state agencies need to -- I
3 think training is a big part of it. I suspect that a
4 lot of these individuals who provide voter registration
5 are probably the areas of their departments that have
6 the greatest amount of turnover. And so I think that a
7 constant voter registration training is very important.
8 Exactly how much these agencies do, I don't know,
9 although I have interacted a great deal with the
10 Hillsborough County agencies and some of their
11 managers.
12        And I think it really comes down to how
13 motivated the manager is at every DMV office to make
14 voter registration work and work well. And if you have
15 a well run DMV office with a good manager who really
16 has a good team approach to things and really wants to
17 make things work, it'll work, and that's been our
18 experience in Hillsborough County.
19    Q. What is the basis for your conclusions about
20 state agencies involved in voter registration?
21    A. My experience as a supervisor of elections
22 since the inception of NVRA.
23    Q. Is it based on anything else other than your
24 experience as a supervisor?
25    A. And that experience as a supervisor involves

## Page 264

1 visiting DMV offices, visiting libraries, talking to
2 the employees involved, talking to the managers. It
3 involves interaction with the people involved with the
4 state agencies, attending conferences where they speak
5 and interactions with them.
6    Q. Does your conclusion regarding state agencies
7 and voter registration, is it based on anything other
8 than what you've already named?
9    A. I suspect that's the totality of it.
10    Q. You also stated that you reached a conclusion
11 on voter registration and how voters are notified about
12 their voter registration status. What is the nature of
13 your conclusion about notification to voters of their
14 voter registrations?
15    A. My conclusion would be that in our county we
16 notify voters when they have registered to vote or have
17 had a change of address by sending them the voter
18 identification card.
19    Q. Okay. And anything else -- any other
20 conclusion regarding notification to voters?
21    A. It's an approach that treats everyone the
22 same, and evenhanded, in a nondiscriminatory manner.
23    Q. And what is the basis for that conclusion
24 regarding notification of voters?
25    A. My experience as a supervisor of elections

## Page 265

1 and administering the office.
2    Q. And is your conclusion about notification to
3 voters about their registrations based on anything
4 else?
5    A. No. I think it's the totality of my
6 experience as a supervisor.
7    Q. You had listed several other items earlier
8 that you had reached conclusions on voter registration.
9 I covered everything that I had notes on, but is there
10 anything else regarding voter registration upon which
11 you have reached any conclusions?
12        MR. TINKLER: Objection to the form of the
13    question, vague.
14 BY THE DEPONENT:
15    A. Well, I think there are other areas of voter
16 registration and that is what you do in your community
17 in terms of outreach.
18    Q. And is that something that you have
19 considered as an expert in this litigation?
20    A. Yes. I think, in my county, I am an expert
21 on how we conduct voter registration efforts and what
22 we do out in the community, what works, what doesn't
23 work, how effective our outreach is.
24    Q. What conclusions have you reached about
25 outreach to voters?

Page 266

```
 1    A. I would conclude, in a court of law, that our
 2 county does an excellent job with voter registration
 3 outreach, that we pay particular attention to the
 4 African-American community and do a great deal of voter
 5 outreach in the African-American community. We,
 6 particularly with the advent of the touch screen
 7 machines and the kickoff that we've done there, I would
 8 say, have devoted a great deal of resources to the
 9 African-American community and will continue to.
10       And I will be able to testify that starting
11 from the time that I was first elected supervisor in
12 January of '93, and going through all my years as
13 supervisor, all the work that we have done in outreach,
14 we have been a very high profile office. We conduct a
15 lot of high profile voter registration drives. We do
16 everything we possibly can to get people registered to
17 vote. We have an excellent working relationship with
18 minority communities and enjoy a very good reputation.
19       And I come to these conclusions -- as my
20 experience as a supervisor of elections and would be
21 able to testify to that.
22    Q. Have you reached any other conclusions
23 regarding outreach to voters and voter registration?
24    A. Those would be my conclusions.
25    Q. And are your conclusions on outreach to
```

Page 267

```
 1 voters and voter registration based on anything other
 2 than what you've just testified about?
 3    A. They're based on the totality of my
 4 experience as the supervisor of elections. And when I
 5 say that, I mean any readings, and newsletters, and all
 6 the things that I receive and read in my job as the
 7 supervisor of elections.
 8    Q. Is there any other topic on voter
 9 registration upon which you've reached a conclusion?
10    A. I also would like to say that we have
11 implemented, since 1994, what, at that time, was
12 state-of-the-art, now it's more commonplace, our voter
13 registration system, which is a computerized system,
14 which produces the sort of reports that you can see
15 here. I'm holding up Exhibit R.
16       Prior to becoming supervisor, this office was
17 on a mainframe computer system that kept no record of a
18 voter's record. And so you were not able to go back
19 and produce this sort of documentation to show exactly
20 what had happened to that voter's record.
21       And we have modernized the office in many
22 other ways, including the imaging of every voter
23 registration form and the capturing of the signature.
24 And so, I can speak and be an expert on how we have
25 modernized the office, which has been beneficial to
```

Page 268

```
 1 voters, and certainly beneficial in court cases like
 2 this where you have to produce documents to show what
 3 your office has done with every individual voter.
 4    Q. Have you reached any other conclusions about
 5 modernization of the voter registration computer
 6 system?
 7    A. Well, I would be able to testify as to how
 8 I've modernized every aspect of the office from the
 9 voter registration system, to the signature, to the --
10 which includes our absentee balloting system, to our
11 mapping system, to the building of our 25,000 square
12 foot warehouse, to our poll worker training, to our
13 touch screen.
14       I would be able to testify to how we have
15 modernized every single aspect of our office and have
16 made it, I think, probably one of the very best in the
17 country. And I would be happy to testify to that and
18 supply that point of view based on my nine years of
19 experience as a supervisor of elections and my
20 interaction with other election officials.
21    Q. In your capacity as an expert, have you
22 reached any other conclusions regarding the voter
23 registration system?
24    A. I think that probably covers it.
25    Q. In the summary of your expert report, it's
```

Page 269

```
 1 also indicated that your testimony will include an
 2 analysis of poll worker training?
 3    A. Uh-uh.
 4    Q. What conclusions have you reached as an
 5 expert regarding poll worker training?
 6    A. I think poll worker training is one of the
 7 keys to a successful election. I would testify and
 8 conclude how important it is to train individuals on a
 9 variety of different levels, have a good poll worker
10 manual, have knowledgeable people teaching the classes,
11 how important it is to divide the classes up according
12 to the work that the people do at the precincts. The
13 clerks and assistant clerks have different jobs than
14 the inspectors.
15       I would conclude how important it is to do
16 hands-on training with your poll workers. I would
17 conclude how important it is to recruit poll workers
18 who understand the importance of being a poll worker
19 and how important it is to be impartial and fair during
20 the process, and how they represent your office and
21 must be at the highest level and the highest caliber.
22 And those would be some of my conclusions about poll
23 worker training.
24    Q. Have you reached any other conclusions about
25 poll worker training?
```

## Page 270

1   A. I think those would be the topics that I
2 would discuss. I personally teach most of the poll
3 worker training classes and I would use that knowledge
4 and my direct interaction with my 3000 plus poll
5 workers. I visit the polling places on election day
6 and get feedback on how things are going and I am able
7 to see whether or not the training that we have given
8 them is being implemented at the polls.
9        And the totality of all of that experience as
10 a supervisor, as the teacher of the classes, as a
11 person who visits polling places to follow up, as an
12 individual who follows up with the poll workers after
13 the election to find out what training worked and what
14 didn't, would be the basis for my testimony.
15   Q. Have you reached any specific conclusions
16 regarding a poll worker manual?
17   A. I have concluded that a poll worker manual
18 has to be well-written, as concise as possible, a
19 manual that's easy to read, a lot of visuals.
20   Q. Have you reached any other specific
21 conclusions on a poll worker manual?
22   A. Sometimes it's a good idea to mail a manual
23 in advance so that the individuals have an opportunity
24 to read it prior to your class teaching, but that's not
25 always possible.

## Page 271

1   Q. Have you reached any specific conclusions on
2 poll worker manuals?
3   A. That every poll worker should receive one.
4   Q. Have you reached any other conclusions on a
5 poll worker manual?
6        MR. TINKLER: Objection, asked and
7 answered.
8 BY THE DEPONENT:
9   A. Not that I can think of right now.
10       We, I'm sure, have in evidence our own poll
11 worker manual as part of the court proceedings, if we
12 speak to any aspect of that. I think we produce a
13 pretty good poll worker manual but, undoubtedly, the
14 other counties do too. I think that they all spend a
15 lot of time on poll worker manuals.
16   Q. And what is the basis for your conclusions on
17 poll worker manuals?
18   A. My experience as a supervisor of elections.
19   Q. Have you reached any specific conclusions on
20 poll worker -- I'm sorry, on hands-on training of poll
21 workers?
22   A. I would testify that I have concluded that
23 hands-on training is a very important aspect of poll
24 worker training, that having the poll worker actually
25 working with affirmations, actually working with ballot

## Page 272

1 report forms at the end of the night, setting up the
2 voting equipment, working with the precinct register,
3 are very important parts of preparing them for election
4 day.
5   Q. Have you reached any other conclusions that
6 we haven't discussed yet regarding poll worker
7 training?
8   A. I think that covers it.
9   Q. And any other bases for your conclusions on
10 poll worker training that we have not covered?
11   A. The totality of my experience as a
12 supervisor.
13   Q. You also indicate in your summary that you
14 have reached conclusions on maintenance of addresses?
15   A. Uh-huh.
16   Q. What specific conclusions have you reached as
17 an expert regarding maintenance of addresses?
18   A. As I mentioned before, and going back to one
19 of our exhibits, dealing with the list maintenance
20 removal process, that I've concluded that this is a
21 process that is uniform, nondiscriminatory, in
22 compliance with federal and state law; that it ought to
23 continue to be uniform; that one county should not be
24 doing something that another county doesn't do; that
25 list maintenance removal is an important way to keep

## Page 273

1 the rolls clean; that, otherwise, if you have a lot of
2 names on the rolls of people who really don't live
3 where they say they're going to live, or people who
4 don't even exist anymore, that you're opening an
5 opportunity for voter fraud, which would be a whole
6 other problem, separate and apart from what your court
7 case is about.
8        And so it is incumbent upon election
9 supervisors across the country to do their very best to
10 consistently check their rolls to make sure that the
11 people who are registered are at the address that they
12 say they live at. So that when they go to vote,
13 they're voting in the precinct in which they live,
14 which is Florida law, so that they're voting in the
15 single-member district races that they're eligible to
16 vote in.
17        It is very important that list maintenance --
18 I would conclude that it's very important that list
19 maintenance be applied in a consistent way, in an
20 organized way through a computerized system, such as
21 the one that we have, that can keep track of all the
22 mailings that we do to a particular voter, where you
23 can easily access their record and see what we mailed
24 and what was returned and what wasn't returned, and
25 when we moved someone to active and inactive, and that

Page 274

1 list maintenance is a very important part of running an
2 elections office.
3    Q. Have you reached any other conclusions
4 regarding maintenance of addresses in your capacity as
5 an expert?
6    A. I would testify that list maintenance occurs
7 in a nondiscriminatory fashion; that we treat all the
8 voters the same; that we deal with it as the law
9 specifies; that as information comes back to us that an
10 individual is no longer at the address from the post
11 office, that then triggers the list maintenance
12 procedure that is in the law, and that all voters are
13 treated the same in this process.
14    Q. Have you reached any other conclusions
15 regarding maintenance of addresses in your capacity as
16 an expert?
17    A. I think that would encompass any discussion
18 or conclusion that I would have about list maintenance
19 removal process.
20    Q. What is the basis for your conclusions
21 regarding list maintenance?
22    A. The totality of my experience as supervisor
23 of elections.
24    Q. Have you done any specific analyses as an
25 expert regarding maintenance of addresses?

Page 275

1    A. No. I think that my nine -- going on ten
2 years of experience as a supervisor is my analysis.
3    Q. You indicate in your summary that you would
4 also testify about the ex-felon central voter file
5 database issues?
6    A. Uh-huh.
7    Q. What conclusions have you reached regarding
8 the ex-felon central voter file database issues?
9    A. Well, first without me repeating everything
10 that I've said since early this morning, I wonder if
11 everything that I've said about the felon database
12 could be incorporated into what I may testify about in
13 August and is that possible?
14    Q. I think if we could summarize here in your
15 capacity as an expert, because you may also want to
16 differentiate between your earlier testimony and your
17 testimony as an expert. So if we could repeat
18 briefly --
19    MR. TINKLER: Now, objection to that. If
20 you have a question of Pam, please, state it.
21 Please don't direct my client how to answer the
22 question.
23    MS. BORGEN: I was responding to your
24 client's question.
25    MR. TINKLER: And you can certainly ask

Page 276

1 her a question about it.
2 BY THE DEPONENT:
3    A. I mean, I just want to make sure that since
4 this has been going on since 9, and I did say a great
5 deal about the central voter file, that everything that
6 I said, that is on the record, I would like to
7 incorporate it as part of my expert testimony because I
8 don't want to eliminate anything. I think a lot of
9 things that I've said up to this point are important
10 and I'm not sure I can repeat it all.
11    Q. Okay.
12    A. And I don't want to not include something
13 that I might have said at 9:00 this morning. And so,
14 what I would like to be able to do is take the totality
15 of the record that I've -- whenever I've mentioned the
16 central voter file, and incorporate that as part of my
17 expert testimony that I may or may not testify to in
18 the federal court case.
19    Now, having said that, I will go ahead and
20 attempt to summarize some of those issues. But I don't
21 want it to -- but my lack of -- but if I don't mention
22 a point that I mentioned earlier, I would like that
23 earlier point to become part of the record.
24    Q. Okay.
25    A. Okay.

Page 277

1    Q. So, please, to the extent you can,
2 recognizing that you would like to incorporate
3 everything you've said --
4    A. Yes.
5    Q. -- earlier today regarding ex-felon central
6 voter file database issues, the conclusions you
7 discussed earlier would be your conclusions as an
8 expert witness --
9    A. Correct.
10    Q. -- on that issue? So if you could attempt to
11 summarize those briefly understanding that everything
12 you've said today on that issue would fit into that
13 category.
14    A. I can give expert testimony on what occurred
15 with the central voter file in 1998 and the year 2000;
16 conclusions about how the supervisors set up a
17 committee to deal with having some uniform standards on
18 how we were going to deal with contacting people on the
19 central voter file list; how we set up those standards,
20 that some of the counties agreed to. I can't speak to
21 whether all of them did. I do not believe they all
22 did. But that can be -- perhaps some other information
23 could be put on the record with regards to that -- how
24 our office specifically dealt with the central voter
25 file issue, the procedure that I read into the record,

Case 0:00-cv-08908-ASG Document 420 Entered on FLSD Docket 07/02/2002 Page 489 of 945

NAACP vs. HARRIS, ROBERT, et al.                    SAMPLE VOL. I, 5/6/02

Page 278

1 as well as the numbers I read into the record, as to
2 how Hillsborough County specifically dealt with it.
3         I could offer testimony and conclusions about
4 how the issue was dealt with in 2000, in terms of
5 uniformity and lack of uniformity, and how important I
6 think uniformity is in the future in dealing with this.
7         I could offer up my opinions on House Bill
8 493 and how it conflicts, philosophically, with the
9 Election Reform Act of 2001, in terms of putting the
10 onus on the voter to prove his innocence rather than
11 the onus on government to prove that the person is
12 indeed an ex-felon who has not had his civil rights
13 restored.
14         I could certainly -- if the court was at all
15 interested in my personal view that a person ought to
16 have their civil rights restored at the completion of
17 their time that they've served in the criminal justice
18 system.
19         I could speak to how I think that one of the
20 problems of the felon issue has been placing the
21 supervisors in the criminal justice context when they
22 don't belong there.
23         And I could speak to the inaccuracies of the
24 list that was given to us in the summer of 2000. And I
25 could conclude what a difficult situation it was for

Page 279

1 supervisors to deal with a list that had inaccuracies;
2 and conclude how the difficulties of the supervisors,
3 and in our county, of trying to come up with a system
4 that we felt complied with the law and our requirement
5 to notify these voters and take them off the rolls if
6 indeed they were ex-felons who have not had their civil
7 rights restored.
8         And those are some of the issues I would
9 speak to with regards to the ex-felon issue.
10     Q. Other than the issues you just named and any
11 others you might have spoke about this morning, can you
12 recall, at this point in time, any other conclusions
13 about ex-felon central voter file database issues that
14 you would testify about as an expert?
15     A. Given that I can go back to everything that
16 I've spoken to this morning, I feel satisfied that,
17 given the totality of all of my testimony today, that I
18 have covered the ex-felon issue.
19     Q. What is basis for your conclusions on the
20 ex-felon central voter file database issues?
21     A. The totality of my experience as a supervisor
22 of elections and particularly having gone through the
23 November 7th election and its aftermath.
24     Q. Is your conclusion regarding ex-felon central
25 voter file database issues based on anything other than

Page 280

1 that experience?
2     A. No. But I want to reiterate that when I talk
3 about the totality of my experience as a supervisor, it
4 means totality of reading, of interacting with people,
5 of being out in the community, of attending felon
6 workshops, reading articles of -- I mean the totality
7 of my job.
8     Q. You also indicate in your summary that you
9 will be testifying as an expert about poll worker
10 error?
11     A. Uh-huh.
12     Q. What conclusions have you reached about poll
13 worker error?
14     A. I would conclude that poll workers do make
15 errors, that you as a supervisor try very hard to
16 minimize those errors through good training, through
17 good recruitment. But at any time you have a temporary
18 workforce, in our case it's a temporary workforce of
19 3,000 individuals. In other counties it's even higher
20 Miami-Dade, Palm Beach, Broward.
21         Anytime you have a temporary workforce that's
22 out for one day, or one day every two years, two days
23 every two years, three days every two years, that
24 you're going to have a certain number of individuals
25 who do not perform as trained.

Page 281

1         Over my years of experience as a supervisor,
2 we have concluded -- I have concluded that sometimes
3 poll workers make an error in not filling out
4 affirmation forms correctly. Sometimes they make an
5 error in not being able to find the person's name in
6 the precinct register, even though the person is there.
7 Sometimes they make an error in sending the individual
8 to a precinct where the person doesn't belong.
9 Sometimes they make an error in allowing a person to
10 vote who should not vote. Sometime they make an error
11 in not allowing a person to vote who should vote.
12         So our goal, as a supervisor, is to keep
13 those errors to a minimum through proper training and
14 proper recruitment.
15     Q. Have you reached any other conclusions
16 regarding poll worker error?
17     A. I would also conclude that in my time as
18 supervisor, I have not seen poll worker error that I
19 ever felt was intentional. I certainly have never seen
20 poll worker error that I have ever felt was
21 discriminatory.
22         I have seen poll worker error that has been
23 the result of lack of familiarity with procedures and
24 policies, perhaps the fact that the poll worker has not
25 read the poll worker manual, perhaps the poll worker

1 has not paid attention during poll worker training,
2 perhaps the poll worker became fatigued after a long
3 day, and those would be some of my conclusions.
4    Q. Have you reached any other conclusion about
5 poll worker error?
6    A. No. I think those are my -- those would be
7 my conclusions.
8    Q. And what is the basis for your conclusions on
9 poll worker error?
10   A. The totality of my experience as a supervisor
11 of elections.
12   Q. Are your conclusions on poll worker error
13 based on anything else?
14   A. No.
15   Q. What conclusions have you reached regarding
16 poll site equipment and information in your capacity as
17 an expert?
18   A. Well, I would conclude that it is very
19 important that every polling place have a communication
20 link. That is why we hook up every polling place with
21 their own telephone line. Where we cannot give them a
22 telephone line, they have their own cellphone.
23 Although, we started some years ago moving away from
24 cellphones and having their own telephone lines.
25     I would testify that -- I would conclude that

Page 283

1 it's very important that all polling sites have the
2 same level of equipment, and they do, the same quality
3 of all equipment, be it votamatics, ballot box,
4 everything, that they all be given the same
5 information, the same posters to hang up, the same
6 signage, and they do. There is complete uniformity.
7     And I would testify that it is my conclusion
8 that that's important in order to conduct an election
9 that is fair and accurate and provides uniformity
10 across the county.
11    Q. Okay. Have you reached any other conclusions
12 regarding poll site equipment and information?
13    A. I think that that would encompass it.
14    Q. What is the basis for your conclusions on
15 poll site equipment and information?
16    A. The totality of my experience as a supervisor
17 of elections.
18    Q. And are your conclusions on poll site
19 equipment and information based on anything else?
20    A. No.
21    Q. You also indicate in your expert summary that
22 you will be testifying about the impact and nature of
23 election reform in Florida. Specifically, that you
24 will be providing an analysis of the recommendations
25 put forth by the many reform commissions and study

Page 284

1 groups. We went through a list earlier of some of
2 those study groups. We discussed the Governor's task
3 force, the Duval County task force, Florida Senate
4 Report, Cal-Tech Report, Berkley, and the U.S.
5 Commission on Civil Rights.
6     Are those the reform commissions and study
7 groups to which you are referring in the summary?
8    A. Yes.
9    Q. Are there any others to which you are
10 referring in the summary?
11   A. Not that I can think of offhand, unless we
12 get into issues of technology. If we get further into
13 issues of technology and there's a discussion of touch
14 screen pros and cons, optical scan, then I can see
15 getting into the Cal-Tech and Berkley studies. But I
16 don't see that as really part of your lawsuit.
17   Q. Okay. So the Cal-Tech and Berkley Studies --
18   A. Deal with technology.
19   Q. Just on the technology issues?
20   A. Well, Cal-Tech does get into some other
21 issues, but I don't think that they were really taken
22 as part of the reform package for the State of Florida.
23   Q. And you stated that you will be analyzing the
24 recommendations put forth by these commissions and
25 study groups. What is your analysis of those

Page 285

1 recommendations?
2    A. Well, I have to say that to prepare for this
3 deposition, I've not gone back over those studies, but
4 I certainly will prior to our court date, and I will
5 make sure that I've reread them and will be able to
6 speak to them there.
7     I guess that now, at this point, though, you
8 want to know what my conclusions are, so you can be
9 prepared for that?
10   Q. Exactly.
11   A. Well, I have not gone back over those reports
12 in order speak specifically to them. So all I can
13 really say at this point is that all of the -- I will
14 be able to speak -- specifically, I think the key one
15 was the Governor's Select Task Force on Standards and
16 Technology. And that's the one that I gave the keynote
17 address to and the report that was done by Collins
18 Center was the basis for the 2001 Election Reform Act.
19 And some of their recommendations were put in the 2001
20 Reform Act and some were not.
21     I would be prepared at a court proceeding, in
22 preparation for that, to speak to that and to offer my
23 conclusions as to which items had been put in the
24 Election Reform Act, which items I still think need to
25 be worked on, which items I don't think are that

Page 286

1 important, but I'm not prepared to say that right now.
2     Q.  Are there any conclusions -- any other
3 conclusions, other than what you've mentioned, that you
4 are prepared to speak on today regarding the Reform
5 Commissions and study group conclusions?
6     A.  I've concluded about technology, that it was
7 very important that we move away from punch cards and
8 from any central count voting system.  That was a
9 recommendation that is part of the 2001 Reform Act.
10 The State of Florida will no longer have central count
11 technology.  In fact, the State of Florida will have
12 some of the very best technology in the nation in 2002.
13     I can speak and conclude about how I think
14 touch screen technology is going to greatly benefit the
15 voter by eliminating the overvote.  I will be able to
16 speak and conclude about how the provisional ballot
17 will help take care of some issues that have come up.
18     I will be able to conclude that the monies
19 that the legislature has given the counties for voter
20 education have been of tremendous help in reaching
21 voters about the new technology and assisting with poll
22 worker training.
23     But I have to, again, say that I did not
24 prepare, prior to this deposition, in reviewing all of
25 that, and so I want to be able to be as thorough in

Page 287

1 August with the court as I intend to be on that issue.
2 And I'm going to be very -- you know, if asked I will
3 be very comprehensive about how I see that law and what
4 still needs to be done.
5     Q.  Between March 8, 2002 and April 26 2002, did
6 you take any particular measures to become an expert on
7 the Florida Election Reform Act of 2001?
8     A.  Between March 8th of this year and April, did
9 I take any particular measures to become an expert on
10 it?
11     I already know what the Act says.  If I was
12 going to testify in a court of law, I would make sure
13 that I refresh my memory on every paragraph of the Act.
14 I didn't do that prior to this deposition.  But I think
15 that, given my knowledge that I currently have of the
16 Act and given the knowledge that I'm going to have
17 prior to testifying when I refresh my memory about it,
18 that that is -- I will be an expert on it.
19     Q.  So would you say that prior to March 8, 2002,
20 you had knowledge of the Florida Election Reform Act of
21 2001?
22     A.  Absolutely.  Because myself and some other
23 supervisors were working with legislatures in trying to
24 get the act passed.
25     Q.  In your capacity as an expert, have you

Page 288

1 reached any conclusions regarding possible
2 disproportionate impact of any election practices,
3 whether there were any practices that
4 disproportionately affected one group versus another?
5     MR. TINKLER:  Objection to the form of the
6 question, compound.
7 BY THE DEPONENT:
8     A.  Well, I've already indicated to you that I
9 very much disagree with the premise in the lawsuit that
10 the actions of myself and my county, and with my
11 knowledge -- well, I'll just stick to my county.  But I
12 completely reject the notion of any discriminatory
13 practice with regards to voter registration or the
14 voting process itself.
15     And I will state that in a court of law and
16 provide any information that I can to put that on the
17 record -- that point of view on the record.
18     Q.  Okay.
19     A.  Something I feel very strongly about.
20     Q.  Have you done any analyses regarding possible
21 disproportionate impact of central voter file removal
22 of felons from the voter list?
23     A.  I have not done a study myself, no.
24     Q.  Have you done a study like that in any other
25 area of election administration, a study on possible

Page 289

1 disproportionate impact of an election practice?
2     MR. TINKLER:  Objection to the form of the
3 question, compound.
4 BY THE DEPONENT:
5     A.  Such as?
6     Q.  Such as, for example, on affirmations, to
7 see if the number of affirmations presented suggest
8 that black voters disproportionately complete more
9 affirmations than white voters?
10     MR. TINKLER:  Objection to the form of the
11 question.
12 BY THE DEPONENT:
13     A.  We have not done that study.
14     Q.  You indicate in your -- actually, let me take
15 a step back.
16     You also indicate in your summary that your
17 testimony will include an analysis of how the Florida
18 system worked in the 2000 general election and how
19 Hillsborough County tailors its approach to elections
20 in order to best serve its population.
21     What conclusions have you reached in this
22 regard?
23     A.  Well, again, let me start off by saying that
24 I would like to have whatever I have said since 9:00
25 this morning be part of that record, so that I don't

Page 290

1 have to repeat, because I have already gone through
2 some of that analysis when you asked me about my
3 thesis, when I talked about the inconsistent
4 procedures, when I talked about ballot design.
5     And so, at the risk of being repetitive, and
6 also not remembering everything that I might have said
7 this morning, I would like all of that -- all my
8 references to the 2000 election to be something that I
9 could testify to later this summer in the court case.
10    Because I have done the analysis of how the
11 Florida system has worked and I think -- or did not
12 work and I think that my academic work would be a part
13 of that.
14    Q. When you say you have done analysis, are you
15 referring to your thesis --
16    A. Yes.
17    Q. -- when you say that? Okay.
18    Does your thesis focus on Hillsborough County
19 at all?
20    A. Not particularly, no. In fact, I did not
21 really focus on Hillsborough County.
22    Q. Have you done a particular analysis of what
23 happened in Hillsborough County in the 2000 General
24 Election?
25    A. I have not done a written analysis, but I've

Page 291

1 done a mental analysis.
2    Q. And have you reached specific conclusions in
3 doing that mental analysis?
4    A. Yes. I think Hillsborough County had one of
5 the most successful elections in the State of Florida.
6    Q. And what is your basis for that conclusion?
7    A. Well, we had one of the highest turnouts in
8 the State of Florida with a 74 percent turnout. We had
9 369,000 people go to the polls. We had one of the
10 lowest error rates, in terms of an overvote and
11 undervote. We had 2 and a half percent of both.
12    In terms of the number of complaints that we
13 received after the election, the numbers were extremely
14 small. And in terms of the numbers that we actually
15 looked at that were real problems, the numbers were
16 extremely small. I actually think we had one of the
17 smoothest general elections that we've ever had and I
18 think that my staff tomorrow can testify to that.
19    Of all the various counties that had problems
20 after the election in terms of litigation, say, for
21 this litigation, we've not had any nor did we have
22 problems that cropped up with people being unhappy with
23 the way that we administered the election.
24    We had a very good election. My poll workers
25 did very well. They handled a huge number of voters

Page 292

1 and did so extremely well.
2    Our review of affirmations and of all other
3 paperwork surrounding the election shows that people
4 did their jobs very well. And I will testify to that
5 and conclude that Hillsborough County had a very
6 successful election, November 7, 2000. If ever we
7 needed to have a successful election, that was the year
8 we did, and we did.
9    Q. Have you reached any specific conclusions
10 regarding how Hillsborough County tailors its
11 elections?
12    A. Well, I will speak to -- and I would like to
13 be able to incorporate any comments that I made earlier
14 today in my testimony which I will give at the court
15 proceedings, because I will make sure that I build a
16 very strong case and put on the record to the judge
17 just what Hillsborough County did do to ensure a
18 successful election; and I will talk about our phone
19 bank preparation; and I will speak to the pilot project
20 with the laptop computers; and I will speak to the
21 level of poll worker training and the specificity of
22 poll worker training, and my own personal involvement
23 in poll worker training; and I will speak to the
24 success of our election, yes, in my conclusions that it
25 was very successful.

Page 293

1    And I will also speak to and incorporate how
2 we handled the central voter file, and the numbers, and
3 how we went through it in a very methodical way, and
4 how many names we took off the rolls and how many we
5 did not take off the rolls. I will go through all of
6 that and offer conclusions on that.
7    Q. Do you differentiate, in any way, between
8 your testimony as an expert and as a defendant in this
9 case?
10    MR. TINKLER: Objection to the form of the
11 question, calls for a legal conclusion.
12 BY THE DEPONENT:
13    A. I think that's difficult to answer and that's
14 why I say, if I can't be an expert, that's perfectly
15 fine with me. I will testify one way or another and
16 get my views on the table. I feel very strongly about
17 this.
18    Whether or not I can differentiate as being
19 supervisor, my expertise comes from the totality of
20 myself experience as a supervisor. Where I might have
21 some additional expertise has been in my academic work,
22 and writing my thesis, and talking to my colleagues,
23 and interviewing them about their own election
24 experience, and I've been able to compare and contrast
25 some of their experiences to my own. However, that,

NAACP, et al. v. HARRIS, ROBERT, et al. Document 420 Entered on FLSD Docket 06/6/02 CANDIDO, PAUL VOL. 03 5/6/02

Page 294

Page 296

Page 294

1 too, comes into play as me being a supervisor and a
2 colleague of theirs.
3     And so, whether the two can be delineated to
4 any great degree, I don't know.
5     Q. In your expert summary, you discuss what your
6 expertise is based on, what your testimony is based on.
7 And the first thing you identify is your knowledge as
8 an elected county commissioner. What do you mean when
9 you say you're relying on your knowledge as elected
10 county commissioner?
11     A. Well, when you're a county commissioner, you
12 interact with the Supervisor of Elections Office. You
13 run for office as a candidate and you go through the
14 elections office. You approve the budget for the
15 Supervisor of Elections Office and you become
16 acquainted with what they're spending their money on.
17 And I did that for eight budget cycles prior to
18 becoming the supervisor of elections. And I also
19 served on the canvassing board while I was chairman of
20 the county commission, 1986-1987.
21     Q. Is there anything else specifically about
22 your experience as an elected county commissioner that
23 you're relying upon as an expert in this case?
24     A. No, I think that's the totality of it.
25     Q. You've also stated that you're relying on

Page 295

1 your knowledge as an elected supervisor of elections?
2     A. Right.
3     Q. What is the nature -- what are you relying on
4 as the elected supervisor of elections as an expert?
5     A. I don't think anyone understands election
6 administration as well as a supervisor of elections.
7 That's what your job is, to administer elections,
8 administer voter registration. Your knowledge and
9 detail of that makes you an expert, more so than anyone
10 else, more so than any academician that you hire to be
11 an expert.
12     Q. You also state that you are relying upon your
13 advanced studies in history. Is that your master's in
14 history that we discussed earlier?
15     A. Uh-huh. Uh-huh.
16     Q. And what about that master's are you relying
17 upon to -- in your capacity as an expert?
18     A. Well, first of all, I think we've already
19 covered, more than I wanted to, my thesis. And that
20 that ended up putting me in this position of putting
21 into play -- you know, of acquiring additional
22 knowledge about the 2000 election from my colleagues
23 across the state and from accumulating a great deal of
24 information from a number of primary and secondary
25 sources that I absorbed in order to put together a

Page 296

1 coherent thesis.
2     And now, just as an aside line, had the 2000
3 election not have occurred, if it had not occurred, I
4 would have written my thesis on the civil rights
5 movement in Hillsborough County and the historic
6 barriers to African Americans in getting the right to
7 vote. And I had written an article on the white
8 municipal party in the City of Tampa that had been in
9 place from 1908 until 1947, which was a device used to
10 prevent African Americans from voting in municipal
11 elections. It was also a device used in other southern
12 areas.
13     And I was going to talk about white municipal
14 party poll taxes, literacy tests, and other
15 intimidation at the polls, and other devices used
16 during the second half of the 20th century that
17 prevented African Americans from exercising their
18 franchise.
19     And that was going to be the basis for my
20 thesis and that was my work as a graduate student. I
21 had conducted oral interviews with African American
22 women who had been at the real forefront of the civil
23 rights movement here in Tampa and how their work had
24 gone unacknowledged.
25     It is something I feel very strongly about.

Page 297

1 I feel strongly about the history of the right to vote
2 for women and for African Americans. And it's
3 something I intend to do further research on throughout
4 my career and hopefully write more on. And it's why I
5 particularly take issue with this lawsuit that accuses
6 our office of discriminatory practices when I would
7 never allow discriminatory practices to occur. And if
8 I had any evidence of it, I would be the first person
9 to bring it to authorities.
10     And that is why I was going to convey that to
11 the court, that any problems that occurred in the 2000
12 election were not discriminatory in nature and I will
13 do all I can to make that point because it is
14 personally very, very important to me.
15     Q. You indicate in your summary that your
16 expertise is based on advanced studies in history?
17     A. Yes.
18     Q. We've discussed your thesis and the
19 background material for that. Is it also based on some
20 of your coursework in your advanced studies or
21 primarily your thesis and the research that you did?
22     A. Thesis and the research.
23     Q. You also indicate that your testimony is
24 based upon your active role in politics. In what way
25 is your expert testimony based on your active role in

Page 298

1 politics?

2    A. I am a politician.

3    Q. And how does that relate to your testimony as
4 an expert?

5    A. Well, you develop an expertise. You're out
6 in the community. I'm out in the community all the
7 time. I've given -- I can't tell you how many
8 speeches. I gave speeches before November 7th, since
9 November 7th. I give so many talks, I would have to --
10 it would be tough to tell you how many I give. And I
11 give them in all corners of the county. I give them in
12 all parts of every community.

13    And so I've talked to every kind of voter
14 that there is in Hillsborough County and I talk to them
15 on a regular basis. I am a supervisor that is out in
16 the community all the time. And so, from that comes a
17 particular expertise.

18    COURT REPORTER: I need to change paper.

19    MS. BORGEN: Okay. Would you like to take
20 a short break? Continue? It's up to you.

21    Does anyone have to go to the restroom?

22    Let's take a five-minute break. Does that
23 work for everybody?

24    (There was a recess.)

25

Page 299

1         DIRECT EXAMINATION
          (continued)
2 BY MS. BORGEN:

3    Q. I just want to follow up with a few more
4 questions on your expert witness summary.

5    A. Okay.

6    Q. You've indicated in that summary that your
7 testimony is also based on your review of scholarly
8 material, including election studies and journals --

9    A. Uh-huh.

10    Q. -- both academic and practical. Which
11 election studies?

12    A. I have read every election study that has
13 come out of the 2000 election, all the task forces that
14 I mentioned, and I've read -- and although I probably
15 cannot enumerate them -- any journal article. You
16 know, I've read various journal articles.

17    For example, the American Journal of American
18 History that had a special edition on the 2000
19 election. I read every publication, Election
20 Administration Report, which is a publication that
21 people in the election field receive, IFIS
22 publications.

23    And so without -- and I probably am suffering
24 from a lack of specificity here, but anything that
25 comes across my desk, or that I seek out, dealing with

Page 300

1 the 2000 election, I read and keep on file.

2    Q. And you mentioned IFIS. What is that?

3    A. International group of election officials
4 that puts out a publication.

5    Q. An international focus there?

6    A. International, yeah.

7    Q. You said you keep them on file?

8    A. Yes.

9    Q. Would you have a complete file of all the
10 articles that you've reviewed?

11    A. To some degree. I mean, some might be at
12 home that I read, some might be at the office. Some I
13 used to write my thesis, so those would be at home. So
14 they're both places.

15    But wherever I've had an opportunity to read
16 something about the 2000 election, if I thought it was
17 worthy of saving, if I thought it added to the body of
18 knowledge, I've kept it and digested it. And I think
19 the totality of that helps to make me an expert on the
20 2000 election.

21    Q. Would you be able to prepare a list for us of
22 all of the either journals, if there are some that you
23 generally read, and say, you rely on pretty much every
24 issue, list those out?

25    A. I suppose I can do the more --

Page 301

1    Q. The specific articles that you're reading and
2 relying on?

3    A. I can do my best to reconstruct that --

4    Q. Okay.

5    A. -- without expending too much time on it, I
6 would have to say that I could. Hopefully, it's not
7 the highest priority of the court case, to go back
8 through everything I've read, but I'll try to touch
9 upon some of the things I've read.

10    Q. To the extent that they are materials that
11 you're relying upon in reaching your conclusions as an
12 expert, that's what we would want to get a list of, to
13 get a sense of what you reviewed.

14    A. Okay.

15    Q. Have you published any articles regarding the
16 2000 election?

17    A. Not regarding the 2000 election, no. I have
18 published other articles on other aspects of history,
19 and as I mentioned, civil rights.

20    Q. What types of articles are those?

21    A. I have published three articles. One was in
22 the Florida Historical Quarterly on Tampa's white
23 municipal party. Another was on three African-American
24 women and the work that they did in the 1950s and '60s
25 for the right to vote and for African Americans in

Page 302

1 Hillsborough County. And the third article dealt with
2 the history of the City of Tampa in voting, and Bolita,
3 and gambling interests. And both of the latter two
4 articles were published in the Sunland Tribune.
5    Q. You said the Sunland Tribune?
6    A. Yes, which is a yearly publication journal --
7 history journal.
8    Q. Do you know who publishes that?
9    A. Tampa Historical Society. And I can give you
10 copies of those if you'd like them.
11   Q. Okay. And the Florida Historical Quarterly,
12 do you know if that is a peer review journal?
13   A. Yes, it is.
14   Q. And do you know if the Tampa Historical
15 Society Sunland Tribune is peer review?
16   A. I don't know. I don't believe it is.
17   Q. Have you published any other articles on
18 election administration?
19   A. No.
20   Q. You indicated earlier, you've spoken often on
21 the topic of election administration. Well, let's
22 start with the 2000 election. Have you given public
23 speeches on the 2000 election in which they were formal
24 enough that you would have a draft or a copy of the
25 speech?

Page 303

1    A. No. The only speech that I actually wrote
2 was the one that I gave to the Governor's Task Force
3 for Standards and Technology that I gave in January of
4 2001. That was being televised on C-Span, so I thought
5 I should be clear as to what I was saying.
6        But since that time -- and I may have written
7 down my comments for the Task Force in Duval County.
8 But other than that, I've been able to speak without
9 notes regarding the 2000 election simply because of the
10 amount of knowledge that I have accumulated about it.
11   Q. Where else have you spoken about the 2000
12 election?
13   A. Well, the attorneys had asked me to compile a
14 list, which I think I gave to you all, of just some of
15 the main interviews that I did. But I couldn't begin
16 to list everywhere. I have probably given two to three
17 speeches a week, except for perhaps holiday weeks,
18 since January of 2001.
19        I am constantly giving speeches regarding
20 either what happened during the 2000 election -- first
21 I gave speeches on what happened in the 2000 election.
22 Then I gave speeches on the need for reform. And then
23 I gave speeches on the 2001 Election Reform Act and
24 what it did.
25        And then I've given speeches on the need for

Page 304

1 new technology. And then I've given speeches on touch
2 screen technology. Now I give talks about touch screen
3 technology and the election of 2000 and how the two are
4 integrated to make for better elections in the future.
5        So I have to say that I don't write any of
6 these down, but they just come through the accumulation
7 of all this knowledge that I feel that I can stand up
8 in front of a group and give a talk on any one of those
9 topics and supply information to an audience.
10   Q. And you indicated that you provided to your
11 counsel a list of the main speeches or the main
12 interviews?
13   A. You know, I believe what the counsel wanted
14 to know was where I had appeared on national
15 television, on any big things like that, like Larry
16 King Live, or CNN, or CBS Morning Show, and all of
17 that. So my aid had compiled a list of the national
18 television shows that I had been on during that 36-day
19 period and some of the bigger talks that I'd given;
20 such as to the Governor's task force, to the committee
21 of -- the Business Committee of the State, the Chamber
22 group, the Duval task force, the Intergovernmental task
23 force, the House, my talk in front of the Florida
24 Senate. And so I gave counsel a list of those main
25 ones.

Page 305

1        But in terms of how many talks I give to
2 various groups on a weekly basis in Hillsborough
3 County, it is quite numerous and has been since January
4 of 2001.
5    Q. Would it be possible for us to get a copy of
6 that list?
7    A. The one that I gave the attorneys, yes.
8        THE DEPONENT: Ken, do you recall what I'm
9    referring to?
10        MR. TINKLER: I can't answer.
11        THE DEPONENT: Oh, you're not allowed to
12    answer.
13        MR. TINKLER: But I'll be happy to talk
14    with counsel after this.
15 BY MS. BORGEN:
16   Q. Are you being compensated in any way for your
17 work as an expert in this case?
18   A. No.
19   Q. Have you appointed any other experts or
20 retained any other experts to represent you in this
21 litigation.
22   A. Dr. Susan MacManus from the University of
23 South Florida.
24        MR. TINKLER: And going back to my
25    objection that the time for rebuttal has not

Page 306

1 run at this point.
2 BY MS. BORGEN:
3   Q. About what topic will Ms. MacManus testify?
4   A. I don't know if I can answer that. I mean, I
5 would have to have in front of me, in order to answer
6 that accurately, exactly what we retained her for.
7   Q. Have you spoken to her about her work as an
8 expert?
9   A. I did have one initial meeting with her and
10 the attorneys to talk broadly about the case and what
11 she would be doing.
12   Q. What do you recall from that meeting? What
13 did you discuss with Ms. MacManus?
14   A. We talked about the need to acquire certain
15 statistical information from our office, which I know
16 she has done, statistical information about how
17 Hillsborough County conducted the election, voter
18 turnout. And although I cannot speak completely to all
19 the information that she has requested, I cannot recall
20 it all. But we spoke in broad terms about the lawsuit
21 and the points in the lawsuit.
22   Q. Do you have copies of the information or a
23 list of what information was provided to her?
24   A. Yes.
25   Q. Would it be possible to get a copy of that?

Page 307

1   A. Yes.
2   Q. Would it be possible to get a copy of that
3 from you either today or tomorrow?
4   A. I'm sure you can, yes.
5   Q. And have you seen any draft reports from
6 Ms. MacManus about her work?
7   A. No.
8   Q. When was this meeting with her to discuss her
9 work?
10   A. I cannot recall the date.
11   Q. Do you recall if it was within the last three
12 months?
13   A. Yes.
14   Q. Do you recall if it was in the last two
15 months?
16   A. I believe so, yes.
17   Q. Okay. Last month?
18   A. Hard to say the way time flies. But it was
19 somewhere in the last month or six weeks, I would say.
20   Q. And do you recall any other details from what
21 you discussed at that meeting?
22   A. No, other than what I've said, that we talked
23 about the court case, and our defense of it, and the
24 need to defend it, and defend it vigorously, and I have
25 a lot of respect for the work that she does and feel

Page 308

1 very comfortable with her providing her expertise.
2   Q. And your understanding was that she would be
3 doing some statistical analyses?
4   A. But may not be limited to that.
5   Q. And were you familiar with Ms. MacManus
6 before you retained her as an expert?
7   A. Yes, I am.
8   Q. And how do you know Ms. MacManus?
9   A. By reputation. And we often -- not often,
10 but we have sometimes shared a speaking circuit
11 together.
12   Q. When did you first meet Ms. MacManus?
13   A. I've known Dr. MacManus for a number of
14 years, perhaps ten years.
15   Q. Did you first meet her in your capacity as a
16 supervisor of elections or when you were county
17 commissioner?
18   A. I may have known her when I was a county
19 commissioner.
20   Q. Do you recall how you first met?
21   A. No, I don't.
22   Q. Would you consider her a friend or a
23 colleague?
24     MR. TINKLER: Objection to the form of the
25   question.

Page 309

1 BY MS. BORGEN:
2   Q. Let me start with the first one then. Would
3 you consider her a friend?
4   A. I would consider her a friendly colleague.
5   Q. Prior to retaining her as an expert to
6 represent you in this litigation, had you discussed the
7 2000 election with Dr. MacManus?
8   A. Yes.
9   Q. And what did you discuss with her?
10   A. Many issues surrounding it. We have shared a
11 speaking platform on several occasions with various
12 groups where she has been a speaker and I have been a
13 speaker, and so we have discussed it.
14     I've gone to her classes that she teaches at
15 USF. And I was part of a panel discussion with some
16 other individuals talking about the 2000 election, what
17 happened, and various issues.
18     She's very knowledgeable about the 2000
19 election. And her work as a pollster and a professor,
20 she's extremely knowledgeable. I think she knows a
21 great deal about it.
22   Q. I believe I may have addressed this, but have
23 you received any written material from Dr. MacManus
24 about what she will be testifying about?
25   A. I don't believe I have, no. I mean, unless

1 my staff has received it and I have not received it
2 yet. But you could address that with them tomorrow,
3 but I have not received any report from her. I have
4 not read anything.
5    Q. Did you ask her to prepare a report in
6 preparation for litigation?
7    A. I cannot speak to that. I am not certain how
8 she is going to prepare her testimony as an expert
9 witness, whether it will be in report form or whether
10 it will be verbal at the court trial.
11    Q. Is there a particular individual on your
12 staff who is the point person in dealing with
13 Dr. MacManus?
14    A. Darrell Smith.
15    Q. Would you say that Darrell Smith is qualified
16 to talk about some of the work that Dr. MacManus is
17 doing in her capacity as an expert?
18    A. Yes.
19    Q. You indicated earlier that you used to be
20 president of the Florida State Association of
21 Supervisors of Elections?
22    A. Yes.
23    Q. When were you president?
24    A. I became president in June of -- well, I
25 actually became president in May of 2000, when the

Page 311

1 president passed away.
2    Q. And how long were you in that position?
3    A. Until June or rather July 30, 2001.
4    Q. Did you hold the position of president
5 elect --
6    A. Correct.
7    Q. -- before that?
8    A. I was president elect and would have taken
9 office in June of 2000.
10    Q. And how long were you president elect?
11    A. For a year.
12    Q. Did you hold any office with the Association
13 prior to the president and president elect?
14    A. I was the vice president.
15    Q. And during what time period?
16    A. The previous year.
17    Q. So that would have been --
18    A. And I was secretary the year before that.
19    Q. So you were vice president in 98-99?
20    A. And then secretary before that.
21    Q. 97-98, secretary?
22    A. (The deponent nods.)
23    Q. What did you do in your capacity as secretary
24 of the Association?
25    A. I mean, you know you took the -- I really

Page 312

1 can't recall doing too much as secretary or vice
2 president of the Association. I mean, I don't think
3 those were heavy-duty positions within the
4 organization.
5    So I can only say that I was part of the
6 executive committee of the organization. The executive
7 committee is made up of the treasurer, the secretary,
8 the vice president, the president elect, the president
9 and the immediate past president, and that we worked on
10 policy for the Association. And my area of interest
11 with the Association has always been with legislation
12 and working on legislation.
13    Q. So during your period of service as
14 president, what did you do with the Association?
15    A. Well, my year as president happened to
16 coincide with presidential election of 2000. So from
17 November 7th until the end of my term, I ended up
18 talking to media, and spoke to media, and probably
19 had -- I think that we -- as the president, I became
20 the spokesperson for the supervisors and spoke to
21 national and state and local media on a continual basis
22 from election day until really I ended my -- even well
23 after election day, even on to the summer because --
24 and then, even after that, became the person that the
25 media often went to talk about the Election Reform Act

Page 313

1 because they were already familiar with me having
2 worked with me through the presidential election.
3    And so really I think that my tenure of
4 president of the Association was marked by being a
5 spokesperson for the Association during the 2000
6 presidential election.
7    Q. When was the Association founded?
8    A. 1946.
9    Q. And what is the -- what is the mission of
10 this Association?
11    A. The mission of the Association is to provide
12 a collegial atmosphere where the supervisors can share
13 information and work on election administration
14 educational programs, and develop a legislative program
15 to lobby the legislature for legislative changes that
16 help the voters.
17    Q. And we discussed earlier that the Association
18 set up a central voter file committee --
19    A. Correct.
20    Q. -- to try to determine a uniform way to deal
21 with the central voter file list provided by the State;
22 is that correct?
23    A. Correct.
24    Q. Is that something that was often done by the
25 Association, to set up a substantive committee to deal

Page 314

1 with an issue, such as the central voter file
2 committee?
3     A. Yes. We would have ad hoc committees that
4 would be -- we had a committee that was formed when the
5 NVRA was being passed. We have a standing legislation
6 committee that works on a legislative agenda every
7 year. But whenever we had something come up -- right
8 now, we have a committee that works on the central
9 voter file and is working with the Division of
10 Elections in putting together -- well, working for a
11 smooth implementation of the central voter file. And
12 so we have that special committee even now.
13       But no, it has not been unusual for the
14 Association to develop special committees to deal with
15 certain issues that have come up.
16     Q. And are the committee members only
17 supervisors of elections or will there be staff members
18 from the various offices who will sit on those
19 committees?
20     A. No, I think they're just supervisors of
21 elections.
22     Q. Are you involved with central voter file
23 committee?
24     A. No, I'm not.
25     Q. Do you know what other committees are in

Page 315

1 existence right now for the Association?
2     A. I would have to look at our file to speak to
3 that accurately. I don't know.
4     Q. Would you have information in your file
5 showing the committees? For example, does the
6 Association ever circulate a newsletter saying, Here
7 are the committees that are operating?
8     A. We have a directory that lists these
9 committees.
10     Q. How often is that directory published?
11     A. Once a year.
12     Q. Do you recall the last time it was published?
13     A. It's published every January.
14     Q. Would you have copies of those directories
15 from, let's say, the last three years, January 2000,
16 2001 and 2002?
17     A. Yes, but they would not reflect the special
18 committees. They may not reflect the special
19 committees. It depends on when the special committees
20 were formed.
21     Q. And by "special committees," things like the
22 central voter file committee?
23     A. Correct. Although that one may have been in
24 existence long enough to be reflected in the directory.
25     Q. What purpose beyond -- well, you've talked

Page 316

1 about election administration training. Does the
2 Association try to establish uniform procedures and
3 encourage all the supervisors to use those procedures?
4     A. We do. We meet -- as I mentioned earlier, we
5 meet in conference twice a year, every January and
6 every June. The first two days of conference are
7 association business, committee meetings, and the
8 business meeting of the FSASE.
9       The next to days of conference are devoted to
10 Division of Election workshops, which are conducted in
11 conjunction with the FSASE. And we discuss issues such
12 absentee ballots, and voter registration, and central
13 voter file, and any national trends that we see
14 developing, and early voting, new technology,
15 conducting recounts.
16       Part of the goal of our organization is to
17 have as much standardization as possible. It is often
18 difficult in a state, such as Florida, that has such
19 diversity. You have a county, such as Miami-Dade,
20 which has a million voters, and then you have a county,
21 such as Liberty, with barely 4,000 voters; very rural
22 counties, very urban counties.
23       And so it sometimes been a real challenge
24 to have procedures in place that are uniform. But we
25 try as best we can, where the law does not speak to

Page 317

1 uniformity, or where the rules of the Division do not
2 speak to uniformity, we do try to raise issues so that,
3 at the very minimum, supervisors can see where there's
4 a lack of uniformity.
5     Q. Are all 67 supervisors involved with the
6 Association?
7     A. I believe that when I -- the year I was
8 president, I believe that all 67 were members, yes.
9     Q. And would you say that most -- what is the
10 reaction to recommendations for the Association? Do
11 you put out recommended procedures, circulate something
12 to all supervisors saying, the Association has
13 developed these recommended procedures, we encourage
14 you to follow them?
15       MR. RESTREPO: Object to the form of the
16 question.
17       MR. TINKLER: Object to the form of the
18 question, multiple compound.
19 BY MS. BORGEN:
20     Q. Explain the process that Association uses
21 regarding recommend procedures?
22     A. The Association will hold a workshop on a
23 particular topic. And out of that will come dialogue.
24 Sometimes out of that will come a motion that we pursue
25 a particular procedure. But many times, that's not the

**Page 318**

1 conclusion and it is because of what I referenced
2 earlier, and that is the tremendous diversity across
3 the State of Florida, and what might work in one county
4 doesn't work in another.
5     And so that is one of the issues that Florida
6 has to grapple with in terms of election
7 administration, that the attempt to standardize
8 election procedures butts up against the independence
9 and the diversity of Florida counties.
10     And the attempt to say, for example, in 1997,
11 in the passage of the Absentee Act that called for
12 various standards to be put in place, really because of
13 absentee fraud in Miami-Dade, had very little relevance
14 to the supervisor in Lafayette County who knows, almost
15 personally, every single voter, and feels that it is
16 being disrespectful to her neighbors to ask for the
17 last four digits of their Social Security Number or
18 other piece of identifying information. And therein
19 lies one of the difficulties in a state as diverse as
20 the State of Florida in getting that level of
21 standardization.
22     Although, given that difficulty, I think our
23 association does a good job of keeping together a
24 cohesive group who, at least, is very respectful of
25 each other and what each county has to deal with in

**Page 320**

1 members?
2     A. We can get you a list of which counties are
3 members.
4     Q. Okay.
5     A. The larger ones, Volusia -- the ones I
6 mentioned, in addition, Volusia, Lee, Pasco.
7     Q. How often do you meet?
8     A. I believe they meet every quarter.
9     Q. And who is involved in those meetings? Is
10 that supervisors or is that staff?
11     A. Just supervisors, not staff.
12     Q. And do you issue -- does ULCERS issue
13 recommendations?
14     A. No. It's a discussion forum. It's a way for
15 us to put issues on the table. Sometimes we're able to
16 raise an issue that we will then later bring to
17 conference.
18     Q. Bring to conference, what do you mean?
19     A. Our conferences in January and June?
20     Q. To the Association conferences?
21     A. To the entire association and not anything
22 formal. It's nothing formal. We've never come up with
23 anything where we've said ULCERS group has decided
24 something and makes the following recommendation. It
25 really is a forum for supervisors to talk about issues.

**Page 319**

1 terms of its own particularities and demographics.
2     Q. Are you familiar with a group called ULCERS?
3     A. Yes, I'm a member of it.
4     Q. Do you know what ULCERS stands for?
5     A. It stands for basically big counties that get
6 together and -- it has an unusual name and I ought to
7 know what it stands for, but it was a name derived to
8 come up with ULCERS and that's why I could never think
9 of it.
10     But the idea was to form a group of large
11 urban counties that had like interests that would meet
12 on a fairly regular basis and discuss issues of
13 concern. Again, so that you would be in a room with
14 Miami-Dade, or Orange, Duval, Pinellas, and you would
15 discuss issues that we've been discussing today about
16 voter registrations, and relationships with DMV. and
17 central voter file, and that our way of having to deal
18 with these issues might differ greatly than a room with
19 the supervisors from Liberty and Lafayette and so
20 forth. And so we recognize that and so we meet and
21 discuss issues.
22     Q. Do you know when ULCERS was formed?
23     A. It was formed several years ago, maybe four
24 years ago, perhaps, or so.
25     Q. Do you know which counties exactly are

**Page 321**

1     Q. Is it considered to be a subgroup of the
2 FSASE?
3     A. An informal subgroup. It is not recognized
4 by the FSASE.
5     Q. How is it structured? Are there officers?
6     A. No, it's very informal. Bill Cowles of
7 Orange County has really taken the lead and almost all
8 the meetings are conducted in Orange County and he
9 helps to organize them.
10     Q. Do you know who founded it or whose idea it
11 was?
12     A. The idea was Betty Carter's who was Bill's
13 predecessor in Orange County.
14     Q. Do you know if there was any particular event
15 that prompted its founding?
16     A. No.
17     Q. An issue that particularly came up for urban
18 counties or anything like that?
19     A. No. I don't think that there was one issue
20 that prompted it to be formed.
21     Q. How would you describe your relationship as a
22 supervisor of elections with the Division of Elections?
23     A. The Division, I call fairly regularly. I
24 usually talk to Clay Roberts. He's always there for me
25 to talk to. He's always available, always gets back in

Page 322

1 a very timely way. And I think that they try to be as
2 supportive as they can, given the resources that they
3 have.
4    Q. What types of questions do you call him
5 about?
6    A. I call him with legal questions that come up.
7 We have a candidate with a particular problem, could
8 you give me some particular advice in this area, issues
9 that just come up.
10    I tend to talk to Clay about issues that I
11 think need a standardized approach. I've talked to him
12 about, for example, recently this 493, and how I feel
13 it conflicts with the Election Act of 2001.
14    The Division has attorneys on the staff.
15 Also Connie Evans who works there, who really knows a
16 great deal about candidates, Chapter 106, very good on
17 that. We interact all the time with her.
18    Q. Do you call the Division of Elections with
19 voter registration questions?
20    A. Well, we really don't have voter registration
21 questions that I think they need to answer. I mean, I
22 can't think of one offhand.
23    Q. Have you ever contacted the Division of
24 Elections regarding problems regarding voter
25 registration at the Department of Motor Vehicles?

Page 323

1    A. Well, I think we have concluded some years
2 ago that the best way of dealing with problems with the
3 Division of Motor Vehicles, when they exist, is to deal
4 directly with the local offices. And so we have a
5 system set up whereby we give a monthly report to our
6 offices of the Division of Motor Vehicles letting them
7 know how many incomplete applications we receive on a
8 monthly basis. I give an award to the office that has
9 the fewest errors and my staff has an excellent
10 dialogue with the DMV offices. And I think any issues
11 we try to deal with on the local level.
12    Now, occasionally, we do have issues that I
13 deal with and attempt to go through the Division of
14 Election attorneys to see if they can give us some
15 guidance.
16    For example, the issue of incomplete
17 registrations that I referenced earlier, book closing,
18 a registration that might be lacking a particular piece
19 of information and how you deal with that. Sometimes
20 the Division feels that they can give guidance.
21 Sometimes they believe that that is up to the
22 individual supervisor of elections, and that they
23 cannot step on that supervisor's authority, so it
24 really depends on the issue.
25    Q. Does the Division provide you with materials

Page 324

1 regarding election administration?
2    A. The Division does provide a candidate
3 handbook. The Division provides various brochures
4 on -- regarding the election laws, election dates,
5 filing deadlines. They particularly provide a lot of
6 information dealing with candidate qualifying.
7    Q. Has anyone at the Division of Elections ever
8 sent you a sample poll worker's manual?
9    A. No, but they will be under the new law.
10    Q. Has anyone from Division of Elections asked
11 for your input regarding the poll worker manual being
12 developed under the new law?
13    A. They may have asked for the input of my staff
14 and I'm not aware of it.
15    Q. Have you received information ever in the
16 past from the Division of Elections regarding voter
17 registration, perhaps implementation of the NVRA?
18    A. I'm sure, over the years, we have. I would
19 have to say the answer to that is yes. I mean, we're
20 talking about the implementation of NVRA starting in
21 January of 1995. And Florida, as I mentioned earlier,
22 passed a conforming act, so that we would be in sync
23 with NVRA. And I suspect that there was quite a bit of
24 correspondence going back to that time that talked
25 about a lot of the implementation of NVRA.

Page 325

1    I mean, NVRA marked this tremendous
2 demarcation for many supervisors as the old way of
3 doing things and the new way of doing things. And
4 there were many, many procedures involved with NVRA
5 that signified a new way of doing things, and the
6 Division was involved in many of those new procedures.
7    Q. Do you maintain a file in the office or do
8 you know if any of your staff maintains a file -- we'll
9 start with you. Do you individually maintain a file
10 regarding materials forwarded to you by the Division of
11 Elections?
12    A. No.
13    Q. Do you know if anyone on your staff maintains
14 a file of materials forwarded by the Division of
15 Elections?
16    A. Anytime we receive anything from the Division
17 of Elections, after I've digested it, I send it on to
18 staff for review and file. So somewhere in my office
19 there is a file of all the various memos that anyone
20 has ever sent us. How they are kept or how they're
21 filed, I don't know.
22    Q. Do you think Darrell Smith or Chuck Smith may
23 be able to address that?
24    A. Darrell Smith might be able to. My
25 administrative assistant actually might be more

1 equipped to say how things are filed, but we can
2 certainly find out that information for you.
3    Q. You mentioned -- or we started discussing
4 briefly how your office deals with the Department of
5 Motor Vehicles. And you said that there is a procedure
6 now that you send them monthly reports?
7    A. We've been doing this for a number of years.
8    Q. When did you start doing that?
9    A. A number of years ago. I mean, I can't say
10 precisely, but Darrell Smith can speak to that
11 tomorrow. But I believe about three years ago we
12 started that level of interaction with the Division of
13 Motor Vehicles.
14    Q. Okay.
15    A. And I have given a talk before to the local
16 managers and, in fact, regional managers of the
17 Division of Motor Vehicles highlighting for them some
18 of the issues that supervisors have, so they can see
19 our point of view and for us to hear their point of
20 view.
21    Q. Do you recall, have you only spoken on one
22 occasion to regional managers or more than one?
23    A. I can recall one occasion.
24    Q. Do you recall what year that was?
25    A. It was prior to November 7th, if I recall.

1 If I recall. It's hard for me to -- and I could be
2 wrong on that. That one I'm not certain of, I'm sorry.
3    Q. Do you recall how that meeting came about,
4 whether your office asked to speak to managers or
5 someone at the DMV asked you to come to speak?
6    A. I believe they called us and asked us to --
7 asked me to speak. They were having a regional meeting
8 and they wanted me to address them.
9    Q. Do you have problems with the voter
10 registration applications received at DMV offices?
11    A. Well, we do have a --
12    MR. TINKLER: Object to the form of the
13 question.
14 BY THE DEPONENT:
15    A. We have a report that we produce every month
16 that we send to them indicating, of all the offices in
17 Hillsborough County, what is the error rate in terms of
18 the number of registration forms that are received that
19 are not complete. We had had a particular problem over
20 the years with a lack of signature. And without a
21 signature, we cannot complete a voter registration.
22 And so, we've been working on that.
23    DMV had a specific problem with printers in
24 their offices over the past number of years, which, I
25 believe, has been rectified. And so that -- we do keep

1 track of that error rate.
2    Q. Do you know if the error rate for those DMV
3 applications has been consistent over time, if it's
4 gotten better, or if it's gotten worse?
5    A. I believe it's gotten better, but Darrell
6 Smith could speak to that with greater specificity.
7    Q. Do you know if any of the problems that
8 you've had with DMV have improved since the November
9 7th, 2000 election?
10    A. I could not speak to whether or not they have
11 improved since November 7, 2000. I do think my staff
12 could possibly speak to that issue.
13    Q. Are you aware of any changes at the DMV
14 regarding how they handle voter registration
15 applications?
16    A. I am aware of a change that I became aware of
17 just last week and that is that they are now producing
18 on their receipt an indication that the person either
19 registered to vote, or declined to register to vote, or
20 is already registered, or just had a change of address.
21 There's, I believe, six different items that will now
22 be printed on a DMV receipt. And this apparently went
23 into effect on April the 1st.
24    Q. And are you familiar with an employee who has
25 been hired by DMV, I believe, by the name of Helen

1 Howard? Helen Howard, who is working with the DMV?
2    A. I have heard that name, but I have not had
3 interaction with her and perhaps my staff members have.
4    Q. We may have covered this to some degree
5 earlier, but what steps are taken when you receive an
6 incomplete voter registration application from DMV?
7    A. When we receive an incomplete voter
8 registration application, we enter the data that has
9 been completed into our system. We produce a printed
10 voter registration application with all of the
11 information that's been supplied to us.
12    We send it with a letter to the voter, or
13 soon-to-be voter, asking them to complete the missing
14 pieces of information and alerting them that until they
15 complete that missing information, they are not
16 registered to vote, and then we await their response.
17    Q. Are you familiar with the voter registration
18 functions at the Department of Children & Families?
19    A. Yes.
20    Q. Do you receive voter registration
21 applications from the Division of Children & Families?
22    A. Yes.
23    Q. And how do you receive those applications?
24    A. My staff members can speak to that with
25 greater specificity.

Page 330

1    MS. BORGEN: I would like to introduce --
2 to ask you briefly about two documents I would
3 like to mark as Exhibits U and V.
4    U is your answer to plaintiffs first set
5 of document requests and interrogatories.
6 (Plaintiffs' Exhibit U was marked for
7 identification.)
8    MS. BORGEN: And V is your objections and
9 responses to the plaintiffs second set of
10 document request and interrogatories.
11 (Plaintiffs' Exhibit U was marked for
12 identification.)
13 BY MS. BORGEN:
14   Q. And just to ask you to review these briefly
15 to see if they, as best you can tell, without doing a
16 close review, seem to be accurate copies of your
17 responses to the document requests and interrogatories.
18   A. Yes, I recall this.
19   Q. And to see if you have any specific -- have
20 you reviewed those documents prior to your deposition
21 today?
22   A. I didn't.
23   Q. Do you recall if there were any inaccuracies
24 or if there is anything you would want to change in
25 those answers to the interrogatories and document

Page 331

1 requests?
2    A. I did not review them prior to today. So if
3 there are inaccuracies, I'll have to note that at some
4 later date, I suppose.
5    Q. Would it be adequate if we were to review
6 those responses with your staff members who will be
7 deposed tomorrow, Darrell Smith and Chuck Smith?
8    A. Yes.
9    Q. Do you feel that there's anything that you
10 would like to add to those responses at this point in
11 time?
12   A. I have confidence that those two staff
13 members will be able to go through these documents and
14 clarify anything, or clear up any problems or
15 inconsistencies, or certainly if there is any erroneous
16 information -- I can't imagine there would be erroneous
17 information, but perhaps something needs further
18 clarification.
19   Q. But you're comfortable relying on the
20 testimony --
21   A. Yes.
22   Q. -- of Darrell Smith and Chuck Smith?
23   A. Yes, I am.
24   Q. I have no further questions on those
25 documents.

Page 332

1    A. Okay.
2    MR. RESTREPO: That was U and V?
3    MS. BORGEN: That was U and V, yes.
4 BY MS. BORGEN:
5    Q. You testified earlier that you've testified
6 as a witness at the Governor's Select Task Force on
7 January 8, 2001 --
8    A. Correct.
9    Q. -- is that correct?
10    At Page 105 of the transcript for that for
11 your appearance there, you were quoted as stating, But
12 I don't doubt at all that there were many names of
13 individuals who were removed statewide that were
14 incorrect, and some of those people may not even know
15 to this day that they have been taken off the rolls.
16 Does that sound like an accurate statement of your
17 testimony?
18   A. Well, if I was -- going back to what I was
19 saying about the central voter file system and how the
20 administrative hearing process works. If you start
21 with the assumption that the list had inaccuracies, and
22 then you overlay on top of those inaccuracies the
23 administrative hearing process, then it certainly is
24 conceivable that you had individuals who you mailed a
25 certified letter to who are no longer at that address,

Page 333

1 you then advertise in the newspaper, but they don't
2 read the advertisement, who you then mailed a regular
3 letter to, but they're no longer at that address, and
4 then, for whatever reason, also chose not to attempt to
5 go to the polls on November 7th, 2000. And so, they
6 are -- they could be unaware that they are no longer on
7 the voter registration rolls.
8    Now, whether they even still live in your
9 county is another issue. They could, at this point,
10 live somewhere else and they could even be registered
11 somewhere else. But undoubtedly there are a number of
12 people statewide who never received either the
13 certified letter or any other letter that was sent to
14 them.
15    Now, in that category are going to be some
16 individuals who are convicted felons who did not have
17 their civil rights restored. And so under the current
18 law, they were appropriately removed. Still, they may
19 not know that.
20    But also, it's not inconceivable that there
21 are some individuals who were convicted felons, but had
22 their civil rights restored, or fell into the category
23 of one of these individuals from another state that had
24 automatic restoration of rights, or it could be a case
25 of mistaken identity. And because it could be an

Page 334

1 individual who moves around a lot, they never received
2 notification and they still don't realize that they
3 were part of that entire process.
4        And I think that that is a logical conclusion
5 given the numbers that we're dealing with statewide.
6    Q. In your testimony, you had also stated,
7 quote, But I don't doubt at all that there were many
8 names of individuals who were removed statewide that
9 were incorrect. Do you believe today that that's a
10 correct statement?
11        MR. TINKLER: Objection to the form of the
12    question.
13 BY THE DEPONENT:
14    A. As I mentioned, I think I've already gone
15 over that central voter file and what we discovered in
16 our own county. I believe that I testified earlier, or
17 at least indicated, that in our own county, there were
18 13 people whom we identified as having tried to vote,
19 but were erroneously on the central voter file.
20        I do not know what the numbers were across
21 the state, but I think that we can assume, and I know
22 from what David Leahy has said with even just his one
23 county, and again, as I stress, he was our pioneer in
24 this effort, that there were errors made.
25        And then, of course, you contrast that to

Page 335

1 some counties that didn't mail out anything at all.
2 And so there you have the opposite situation of a
3 number of people who should have been taken off the
4 rolls, under the current law, and who weren't.
5        And so, I think you have both situations out
6 there. You have people who have yet to get off the
7 rolls who should have been. And then you have probably
8 a number of people, though I cannot quantify it, who
9 were erroneously tagged on that voter file and, perhaps
10 because they move quite a bit, have never received
11 notification.
12    Q. Have you spoken to David Leahy about -- or
13 has David Leahy said to you anything about whether he
14 thinks there were individuals who were removed from the
15 voter list incorrectly?
16        MR. RESTREPO: Object to the form of the
17    question.
18 BY THE DEPONENT:
19    A. As I mentioned, David was the one who told
20 all the other supervisors, prior to any of us embarking
21 on the process, that he had already embarked on the
22 process, and based on the results of that process
23 discovered that the list was inaccurate.
24    Q. Has he said anything to you, though, whether
25 ultimately he thinks that there might have been

Page 336

1 individuals who were removed from the list incorrectly?
2        MR. RESTREPO: Object to the form of the
3    question.
4 BY THE DEPONENT:
5    A. I cannot recall that specific conversation
6 with Mr. Leahy.
7    Q. At the Hillsborough -- do you recall speaking
8 at a hearing sponsored by the Hillsborough NAACP in
9 2001?
10    A. Yes. Here at the courthouse, I believe so.
11    Q. Okay. Do you recall that -- let me find a
12 copy of the testimony to make it easier.
13        MS. BORGEN: I'd like to mark this as
14    Exhibit W.
15    (Plaintiffs' Exhibit W was marked for
16    identification.)
17 BY MS. BORGEN:
18    Q. And this document is entitled -- this
19 document states on the front page that it is the
20 Hillsborough County Branch NAACP Public Hearing on
21 Election Irregularities. It's Bates stamped on the
22 first page A 011919.
23        I'll refer you to page 105 of the actual
24 transcript -- I'm sorry, page -- let me make sure I
25 refer you to the direct point.

Page 337

1        Look at pages 38 to 39 of the transcript. If
2 you want to take a look at the cover page to make sure
3 it looks like a copy of the hearing transcript that you
4 recall.
5    A. Okay.
6    Q. Do you recall testifying at this hearing?
7    A. Yes, I do.
8    Q. In your testimony there you state that you
9 received a list by the State from the Division of
10 Elections?
11    A. Correct.
12    Q. And that you did not have discretion, under
13 the law, as to whether or not to use that list?
14    A. Correct.
15    Q. What was the basis of whether or not you have
16 discretion to use that list?
17    A. State law. Fill in the blanks. I don't have
18 a copy of the state law in front of me. But the state
19 law, which I think we can have for the court, shows
20 clearly that the supervisors shall follow up with the
21 central voter file.
22    Q. And if I could borrow that back for just a
23 moment to direct you to another line.
24        Okay. Let me refer you to the top of page
25 39, the first paragraph there.

Page 338

1   A. Right.
2   Q. If you could just review that paragraph.
3   A. Right.
4   Q. You indicate there that "the supervisors
5 shall follow this procedure." When you state that, to
6 what are you referring to with "this procedure"?
7   A. Well, that's imprecise language on my part.
8 What I meant there was the state statute was clear that
9 when this was given to the supervisors that you shall
10 follow up with it.
11      Now, in terms of the actual procedures, as I
12 indicated earlier in the deposition, the procedures
13 were not specified. And the procedures were derived
14 from conversations with other supervisors in relying on
15 this administrative hearing process that was already in
16 the law for the other felon process. But that's
17 certainly not clear in reading this here.
18   Q. So the Division of Elections did not provide
19 you with specific procedures saying you should follow
20 these procedures?
21   A. As we have spoken about earlier, yes.
22   Q. No further questions on that exhibit.
23   A. Are we going to have copies of all this
24 ourselves? Do we get copies of these items?
25   Q. The court reporter certainly will make copies

Page 339

1 with the deposition transcript.
2   A. She will? Okay.
3   Q. And the complete copy of the transcript for
4 this hearing is part of the documents that have been
5 produced by defendants.
6   A. Okay, which my attorneys already have.
7   Q. They certainly have access to, whether or not
8 they have copied all of them, and someone at the end of
9 the table seems to be nodding their head.
10      I would like to ask you briefly about some of
11 the additional changes in Hillsborough County since
12 November 7, 2000.
13   A. Okay.
14   Q. We've touched on a number of them throughout
15 the course of the day, so I'll try not to be
16 repetitive.
17      Did your office conduct any internal audit of
18 the November 7, 2000 election?
19   A. No.
20   Q. Any written reports about the election?
21   A. No.
22   Q. Did you have meetings where the focus of the
23 staff meeting with the supervisor of elections staff
24 was to discuss the November 7, 2000 election and what
25 happened?

Page 340

1   A. Yes. But I think this has to be -- I mean,
2 for anyone reading this transcript, I would have to say
3 that the aftermath of the 2000 election was unlike the
4 aftermath of any other election. Typically, after an
5 election, we would meet regularly in staff meetings and
6 dissect all of the various things that had gone on,
7 then we would make recommendations for how to make
8 changes.
9      But the aftermath of the 2000 election was
10 like a hurricane and we were inundated with media
11 requests and public records requests, as many offices
12 were. And even when the media requests stopped, we
13 then had to continue to supply a huge number of public
14 records request. Then, we had two consortiums of media
15 representatives coming through to count the ballots.
16      And so the year following the 2000 election,
17 did not really provide that kind of reflection and
18 analysis that you often have in a post election
19 environment. It was busier after the election than it
20 was before the election.
21      So we have, however -- and then, we were on
22 the election reform road. And then we've been on a
23 technology change road. And, of course, all the
24 preparation for this litigation to boot.
25      So having said all that, I'll say this, that

Page 341

1 the kind of staff meetings that we would have normally
2 had after an election to analyze what we could improve
3 upon, I don't think we had that many formal meetings.
4 But there are tremendous changes underway because we
5 have an entirely different technology, and we have new
6 election laws, and so there are tremendous changes.
7 And those have come about regardless of -- those have
8 come about.
9   Q. Are you aware of any steps that have been
10 substantively taken since November 7th, 2000, to change
11 the voter registration process between your office and
12 DCF offices?
13   A. No.
14   Q. Do you know if there have been changes made?
15   A. No. My staff perhaps could speak to that
16 with greater specificity.
17   Q. Do you know if there have been any changes
18 between your office and local DMV offices since
19 November 7th, 2000?
20   A. No.
21   Q. Would your staff know if there have been
22 changes?
23   A. They would know. I mean, if there were
24 significant changes, I would know. But if there are
25 some smaller changes that they can speak to tomorrow --

Page 342

1 they might have some changes that I'm just not aware
2 of.
3    Q. But you're not aware of any significant
4 changes at DMV --
5    A. No.
6    Q. -- with the voter registration process at the
7 DMV?
8    A. No.
9    Q. Or with DCF?
10    A. No. The most significant change is the one I
11 learned of just last week, which has to do with this
12 receipt.
13    Q. Has your office taken any steps to try to
14 identify voters who might have been improperly
15 purged -- improperly removed from the voter list prior
16 to the November 7th, 2000 election?
17    A. Are you referring to the central voter file?
18    Q. Yes, we'll start there, the central voter
19 file list.
20    A. Well, those are -- and that was one of the
21 exhibits where we have gone through that analysis and
22 we came up with the analysis that there were 13
23 individuals, two of whom went ahead and voted, who
24 should have been able to vote, but were erroneously on
25 the central voter file, and that's on one of exhibits

Page 343

1 in here that we have previously spoken to.
2    Q. And do you know how -- what type of review
3 was done to arrive at that the list of 13 individuals?
4    A. Darrell Smith could speak to that with
5 greater specificity.
6    Q. And have any steps been taken to try to
7 identify voters who were improperly removed from the
8 voter list pursuant to any process other than the
9 central voter file process?
10    A. I don't know what other process -- how
11 someone else could be improperly removed. When you say
12 "improperly removed," what do you mean?
13    Q. Could someone be improperly removed pursuant
14 to the circuit court system, the list maintenance
15 procedures, the monthly reports?
16    A. Nothing like that has been brought to my
17 attention from our staff. I suppose someone could be
18 improperly removed from the death list. Nothing like
19 that has been brought to my attention.
20       I don't really know how someone is going to
21 be improperly removed from our list maintenance. We
22 follow a very specific procedure.
23       The only thing that I can think of would be
24 if somewhere down the line there was clerical error.
25 And if we ever found that clerical error, we would

Page 344

1 reinstate that person immediately.
2    Q. Do you know if the 13 individuals who were
3 identified as being improperly removed as part of the
4 central voter file process, would the individuals have
5 been restored to the voter register?
6    A. You would have to ask Darrell Smith that, but
7 I'm assuming that they would be. If we feel that
8 they -- if we received information that they had had
9 their civil rights restored, and should not have been
10 removed, then they would have been put back on the
11 rolls.
12    Q. Have any changes been made in the poll worker
13 training?
14    A. Poll worker is being totally revamped.
15 Although, I'd like to say for the record, that I think
16 we had excellent poll worker training prior to November
17 7th, 2000. I think our poll worker training is going
18 to get even better.
19       We're going to train everyone from scratch
20 because we're starting the touch screen technology.
21 And we'll have very comprehensive training, a lot of
22 hands-on training for our top level individuals. We're
23 even opening up every polling place on Saturday, August
24 3rd, to invite the public to come in to try touch
25 screen technology. And that also involves a training

Page 345

1 session for our poll workers to go in and set up the
2 machines.
3    Q. You indicated at the beginning of your answer
4 that poll worker training was changing completely. Is
5 that pursuant to the Florida Election Reform Act or
6 within your own office?
7    A. It's changing because of new technology,
8 going from 26 years of punch card voting to touch
9 screen technology, and so this is causing a total
10 revamp of procedures. And then, we have something new
11 also, such as the provisional ballots.
12    Q. I believe in the past, you're experienced
13 poll workers only had to do refresher training before
14 an election; is that correct?
15    A. Correct.
16    Q. Will all poll workers now have to do an
17 initial training or a lengthy -- will there be
18 refresher courses or will everybody have to do the same
19 type of course?
20    A. Well -- and Darrell Smith will be able to
21 talk about that with greater specificity. But we're in
22 the process right now of developing our poll worker
23 training. But every poll worker is going to have much
24 more in-depth training. And whether they're a
25 returning poll worker or not, everyone is being treated

1 as new to some extent because the technology is new.
2   Q. And you've adopted, as you indicated earlier,
3 the touch screen system; is that correct?
4   A. Correct.
5   Q. And you've been doing training on the touch
6 screen system in the community?
7   A. We have. We've conducted already 145
8 sessions out in the community, very well received. We
9 have a very aggressive voter education campaign
10 underway.
11   Q. Let me turn to that. You've submitted a
12 voter education program to the Division of Elections;
13 is that correct?
14   A. Yes.
15   Q. Was that to be eligible for a grant from the
16 state --
17   A. Correct.
18   Q. -- for funds to conduct voter education?
19   A. Correct.
20   Q. And pursuant to that grant, how much money
21 are you receiving from the State pursuant to that
22 grant?
23   A. $339,000.
24   Q. And do you know how that grant operates? Is
25 it a certain amount per voter, a certain amount?

1   A. Correct.
2   Q. Have you determined how soon after an
3 election you will process provisional ballots?
4   A. Well, I think the law speaks to that. I
5 don't want to misspeak here because I didn't prepare
6 for that for this deposition. But the law has a
7 specified time frame in which the canvassing board is
8 to analyze the provisional ballot and determine whether
9 or not to accept the provisional ballot.
10       And I believe that we have set up our
11 canvassing board meeting for 9 a.m. on the Thursday
12 after the election in order to finalize provisional
13 ballots and certify the results of the election.
14   Q. Do you know what procedure will be followed
15 for an individual who completed a provisional ballot,
16 and that individual is in a situation such as Plaintiff
17 Sherry Edwards, where that individual registered to
18 vote -- or attempted to register to vote at a DMV
19 office, but no registration was processed?
20       MR. TINKLER: Objection to the form of the
21    question.
22 BY MS. BORGEN:
23   Q. You don't need to refer to specific examples.
24   A. Well, I'm not sure that Sherry was an example
25 where a provisional ballot would be used. I believe

1   A. Yeah, it does.
2   Q. -- the counties?
3   A. Yeah, a certain amount per registered voter.
4   Q. And what areas of voter education are you
5 focusing on with that grant?
6   A. Well, the money has been allocated for two
7 purposes, for voter education and poll worker training,
8 in recognition to the fact that some of the counties
9 are moving to new technology and we're using it for
10 both.
11       A large sum of it will be used to open up the
12 350 polling places on Saturday, August the 3rd, which
13 is both voter education and poll worker training.
14       We've been using it to pay for all of this
15 outreach, all these demonstrations that we're having
16 throughout the county. And we will be paying for
17 brochures and a certain amount of newspaper
18 advertising, and if we can afford it, perhaps even some
19 television and radio.
20   Q. You indicated earlier that you do plan to use
21 provisional ballots pursuant to state law?
22   A. Yes.
23   Q. Starting in the November 2002 election?
24   A. September.
25   Q. September? In the primary?

1 that the other individual -- McDonald was it? There
2 was an example -- no, no. Mr. Rose, Rondrick Rose is
3 an example where a provisional ballot could have been
4 used, where he could not get -- he could not have his
5 voter registration verified because they couldn't get
6 through to the phone line. That's when a provisional
7 ballot would have been used.
8       Now, if a person is not registered to vote
9 and there is no voter registration form on record for
10 that individual, then no provisional ballot is going
11 make up for a lack of voter registration.
12   Q. Do you know if there are any plans for that
13 kind of situation, if someone did cast a provisional
14 ballot, then do some research on whether someone did
15 try to -- or did register to vote and it just wasn't
16 processed?
17   A. Well, if we have in hand a provisional ballot
18 and we come across a misplaced voter registration form,
19 that would be one thing. But in the absence of a voter
20 registration form, I don't think that we would want to
21 start accepting provisional ballots based on the notion
22 that someone says they did register to vote and there
23 is no evidence that they did. Because I think that
24 would set up a real equity problem with a number of
25 other people who didn't bother to vote a provisional

NAACP vs. HARRIS, ROBERT, et al    Document 420    Entered on FLSD Docket 06/12/2012    VOL. 07  5/6/02

Page 350

1 ballot thinking that they could have their vote cast if
2 only they said they registered to vote.
3    Q. So if someone completed a provisional ballot, I
4 indicated I registered to vote on September 3, 2002,
5 when I updated my drivers license, and then, when you
6 were reviewing that provisional ballot, there's no
7 record of that individual in your voter registration
8 system, do you know if your plans are that you would do
9 any research to see do you have a record on a
10 transmittal form that that individual registered at
11 DMV. do you research to see if you could substantiate
12 what that voter is saying?
13    MR. TINKLER: Objection to the form of the
14 question.
15 BY THE DEPONENT:
16    A. We could certainly do some research with, if
17 DMV is the example, with DMV to see if there's any
18 form. We can look at the transmittal form. We could
19 search to see if there's a form anywhere. But in the
20 absence of a voter registration form that has been
21 completed by the voter, I don't think that supervisors
22 would want to start a precedent of counting a ballot
23 for someone who simply says that they registered to
24 vote without the actual evidence.
25    Q. And what if it was not a fully completed

Page 351

1 voter registration form, such as one that had been
2 transmitted from DMV without a signature?
3    A. Well, I think that's a good question that we
4 don't have the answer for right now. And I think those
5 are some of the procedures or policy issues that we're
6 going to have to address prior to this fall election
7 cycle.
8    And that is, if you have a person on
9 search/hold, that is, they are an incomplete
10 registration, lacking a birth date, for example, and
11 had they come into our office and filled in the birth
12 date, they would have been registered on November 5,
13 2002. But they didn't do that, instead they voted a
14 provisional ballot. How are we going to deal with that
15 issue? I'm not sure that I'm equipped right now to
16 answer that.
17    Q. Do you know if there are attempts being made
18 on a statewide level for the purpose of uniform
19 policies on how to address those situations?
20    A. Well, I believe the state is working on rules
21 dealing with provisional ballots, but whether they get
22 to that degree of specificity, I don't know, or whether
23 that's going to be left to the determination of
24 individual canvassing boards. I don't have the answer
25 for that today.

Page 352

1    Q. Have there been any elections held since
2 November 7th, 2000, in Hillsborough County?
3    A. Yes. We had an annexation election in
4 December that was still conducted on punch cards. And
5 then we had our first touch screen election on April 2,
6 2002. And there was one provisional ballot cast.
7 There were two provisional ballots, one was accepted
8 and one was not.
9    Q. Were there any problems with the touch screen
10 system?
11    A. No. It worked beautifully.
12    Q. So every ballot that was cast, you were able
13 to count in that election?
14    A. Oh, yes.
15    Q. For the two provisional ballots, you said one
16 was denied and one was accepted. Do you know what the
17 situation was for those two?
18    A. The one that was accepted simply because they
19 did not bring their absentee ballot to the poll to be
20 voided, which is another one of the aspects of the
21 provisional ballot.
22    The one that was denied had to do with
23 verifying, I believe, their voter registration. And
24 Mr. Smith -- Darrell Smith could speak to that
25 tomorrow. I'm sorry, I can't recall the details right

Page 353

1 now.
2    Q. Are there any other major changes in
3 Hillsborough County in your office since November 7,
4 2000, that we haven't covered?
5    A. No. I mean, I think we've covered the major
6 changes. That is a complete change. When you change
7 technology, you're changing almost every aspect of the
8 way the election is conducted.
9    Q. Are there any employees in your office who
10 have academic training in election administration?
11    A. Not to my -- no, I don't believe so.
12    Q. Do you know if there are any that have
13 academic training in information systems?
14    A. I believe Chuck Smith does. He's my systems
15 administrator.
16    Q. How about in estimating voter turnout, are
17 there any individuals with academic training in how you
18 estimate voter turnout?
19    A. Not academic training, but Chuck Smith is as
20 good as anyone would be.
21    MS. BORGEN: No further questions at this
22 time. I would like to reserve the right to
23 continue the deposition at another date,
24 particularly to address the issues regarding
25 your role as an expert witness. You indicated

Page 354

1 earlier on the record you weren't prepared to
2 discuss, today, all of the issues identified in
3 the expert summary about which you might
4 testify as an expert, and it is plaintiffs'
5 position that we have not yet received a
6 complete summary that accurately states what
7 testimony and conclusions you have reached as
8 an expert.
9 So, just to put on the record, not for you
10 to have to respond to, that we reserve the
11 right to continue the deposition and to follow
12 up with any rebuttal and follow up with any
13 questions after defendants have had a chance to
14 ask you some.
15 Thank you.
16 MR. RESTREPO: Supervisor Iorio, to
17 reintroduce myself, I last mentioned my name at
18 9:00 this morning. I'm Dan Restrepo. I
19 represent Choicepoint/Database Technologies.
20 MR. EHRLICH: Dan, is there any way you
21 can move closer to the phone, please?
22 MR. RESTREPO: Sure and I'll also speak
23 up.
24 MR. EHRLICH: Thank you.
25 MR. RESTREPO: Jeff, can you hear me any

Page 355

1 better now?
2 MR. EHRLICH: Yeah, that's better. Thank
3 you.
4 CROSS-EXAMINATION
5 BY MR. RESTREPO:
6 Q. Needless to say, I'm going to be interested
7 in talking about the central voter file list procedures
8 used by the Hillsborough County office. And actually
9 I'm going to first start -- if you could go back to
10 Exhibit J. You discussed Plaintiff Willie Steen --
11 Willie B. Steen is the person mentioned on Exhibit J --
12 A. Yes.
13 Q. -- if I'm not mistaken.
14 A. Yes.
15 Q. Was Mr. Steen removed from the Hillsborough
16 County supervisor of elections voter rolls as a
17 function of his name appearing on a central voter file
18 list?
19 A. From the information I received from staff,
20 it doesn't appear that he had anything to do with the
21 central voter file issue. He was an individual tagged
22 by the regular reports that we received from the Clerk
23 of the Circuit Court. And, in fact, was removed in
24 1997 prior to the central voter file.
25 Q. You testified the first central voter file

Page 356

1 that you received was in 1998 --
2 A. Correct.
3 Q. -- is that correct?
4 A. Correct.
5 Q. If you could go to Exhibit K, regarding
6 Plaintiff Wallace McDonald. You may also want to have
7 Exhibit L, which discusses a gentleman named Roosevelt
8 Lawrence.
9 A. Correct.
10 Q. Do you know if Roosevelt Lawrence is a
11 plaintiff in this case?
12 A. He is not.
13 Q. Is it your testimony that in the case of
14 Wallace McDonald, your office contacted the Florida
15 Department of Law Enforcement, were informed that
16 Mr. McDonald was a felon, had a felony conviction, and
17 subsequently re-contacted the Department of Law
18 Enforcement and were, again, told that Mr. McDonald had
19 a felony conviction?
20 MS. BORGEN: Objection.
21 MR. TINKLER: Objection to the form of the
22 question.
23 BY THE DEPONENT:
24 A. Correct. We received two notifications from
25 FDLE. One, on 1/26/01, and one on 9/5/00.

Page 357

1 Q. If Wallace McDonald was, in fact, convicted
2 of a felony in 1959, how could it be that he apparently
3 voted in number of elections prior to the November 7,
4 2000 election?
5 A. Because supervisors, such as myself, have
6 never been privy before to a central voter file that
7 compiled the names of individuals of either long
8 standing felony convictions within our own county, or
9 felony convictions from around the State of Florida, or
10 felony convictions from out of the State of Florida.
11 And the central voter file was the first attempt on the
12 part of the State to give supervisors this information
13 that they may have individuals on their voter rolls who
14 should not be on the voter rolls because they have
15 felony convictions and have not had their civil rights
16 restored.
17 Prior to implementation of the central voter
18 file, supervisors only were privy to information from
19 their local Clerk of the Circuit Court based on new
20 felony convictions. And I cannot tell you in this
21 deposition when that practice began, and so it may not
22 have captured felony convictions going back many years,
23 even with your own county.
24 Q. If you can turn to Exhibit M, which are
25 documents, I believe, regarding Plaintiff Jermaine

1 Terry.

2    A. Okay.

3    Q. When you used the term "list maintenance,"
4 what are you describing?

5    A. You know I have tried to differentiate
6 throughout this deposition the work of list maintenance
7 procedures, which are ongoing in any supervisor's
8 office and bear no relationship to the work of the
9 central voter file. The two are distinctly different.
10    Jermaine Terry, and his deletions from the
11 rolls, was a result of list maintenance activities
12 under federal and state law.

13    Q. So does it follow that the central voter file
14 lists weren't used in the removal of Jermaine Terry --

15    A. Had nothing to do with his removal.

16    Q. Speaking of the term "removal." When you use
17 the term "removal," what do you mean? Does that
18 mean -- actually, I'm going to stop right there. What
19 does the term "removal" mean as you've used it today?

20    A. Well, through the list maintenance procedure,
21 and as I've stated before in the deposition, how we go
22 through this mail that comes back as undeliverable,
23 address confirmation notice is sent out, the voter is
24 ultimately put on the inactive file, which in no way
25 affects their ability to vote in an election.

Page 359

1    They remain on the inactive file for two
2 federal elections. And then, only following that
3 period of time, are they actually deleted. They are
4 put in a deleted status and are considered longer
5 registered to vote. If they want to register again,
6 they can, but it takes a re-registration process.

7    Q. When someone is placed in a deleted status in
8 the Hillsborough County Supervisor of Elections Office,
9 is that individual's voter records -- the information
10 about that individual lost forever from the
11 Hillsborough computer system?

12    A. Not at all. The computer system that we have
13 in place keeps a voter record of every action that
14 occurs on that file so we can indicate what's happened
15 to that individual. If that person, at a later date
16 re-registers, it would be attached to that file.
17 Unless they have had a change of name and we would not
18 know that that previous file was that person. Then you
19 could have two separate files that you would have to
20 match up at some point if you knew they were the same
21 individual.

22    Q. To your knowledge, is there any way to sort
23 those who are in the deleted status to determine when
24 and why they were deleted?

25    A. Chuck Smith of my staff could speak to that

Page 360

1 with greater specificity. He's our system
2 administrator and could speak to any reports that they
3 could run that could get at that sort of information.

4    Q. We spent a lot of time talking about the 2000
5 central voter file felon list today. Did your office
6 receive any other central voter file lists in the year
7 2000?

8    A. I believe that we also received a death list
9 and could very well also have received a duplicate
10 list. And I think that both of my staff members
11 tomorrow are best equipped to deal with both of those
12 lists. Those two lists received a lot less attention
13 than the felon list.

14    Q. Where do the central voter file lists come
15 from? Who delivered them to your office?

16    MR. TINKLER: Object to the form of the
17    question.

18 BY MR. RESTREPO:

19    Q. To any of the central voter files? Did all
20 the central voter file lists come from the same source?

21    A. I can't answer that.

22    Q. Do you know the source of any of the central
23 voter file lists?

24    A. Well, my answer, though may be it wrong,
25 would be that it was the Division of Election that

Page 361

1 forwarded the list to us.

2    Q. I believe you testified that you first
3 received a central voter file list in 1998; is that
4 correct?

5    A. Correct.

6    Q. Do you recall receiving a central voter file
7 list or any central voter file list in the year 1999?

8    A. I don't recall that. If we did, my staff
9 members tomorrow could speak directly to that.

10    Q. Do you recall any training sessions that may
11 have occurred specific to the central voter file lists
12 in 1999?

13    A. I do not.

14    Q. Would that be another question for --

15    A. For Chuck and Darrell Smith.

16    Q. The Smiths?

17    A. The Smiths.

18    Q. Who would you say in your office is the
19 person most knowledgeable about central voter file
20 lists?

21    A. Chuck and Darrell Smith.

22    Q. One more knowledgeable than the other?

23    A. Chuck from a systems standpoint, computer
24 standpoint. Darrell more from a process standpoint
25 within the office.

Page 362

1  Q. If you could turn to the last page of
2 Exhibit E which, I believe, it was first exhibit you
3 introduced today?
4  A. Yes.
5  Q. Do you recall this document?
6  A. Well, I recall it as part of preparation for
7 today.
8  Q. Is the handwriting on this document yours?
9  A. No.
10  Q. Do you know whose handwriting it is?
11  A. I believe I speculated in the deposition
12 earlier that it was that of Gary Klunk, who is the
13 voter services manager.
14  Q. Do you have any personal knowledge, other
15 than what is written in this note, as to what DBT said
16 in response to this letter?
17  A. No.
18  Q. The second paragraph of the letter states --
19 it begins by stating, The names on the attached list
20 are not exact matches with individuals on our voter
21 file. Do you know what is meant by "not exact matches"
22 in that sentence?
23  A. I suspect that that meant that either the
24 middle initial was not the same or that, in some cases,
25 gender and race were not the same, or you might have a

Page 363

1 situation where it's Robert and then you have Bob. I
2 mean, there were many instances and I think my staff
3 tomorrow can probably be more specific with regards to
4 the kind of lack of exact matches that made us feel
5 uncomfortable.
6  Q. Look at the first two pages of Exhibit E. Do
7 you know who prepared the text of those two pages?
8  A. This text was probably prepared by Gary Klunk
9 and Darrell Smith. You could verify that tomorrow.
10  Q. Do you know when this was compiled?
11  A. I don't know that, but they could answer that
12 tomorrow.
13  Q. On the second page in the first -- the second
14 full paragraph, and then again in the third full
15 paragraph, in the reference to exact matches or not
16 exact matches, I believe during your testimony when you
17 used the term "exact match," it seemed to be used
18 interchangeably by counsel with "a name 100 percent
19 match".
20  MR. TINKLER: Objection to the form of the
21 question.
22 BY MR. RESTREPO:
23  Q. What do you mean by exact match in this
24 document -- when it's used in this document?
25  A. Chuck Smith of my staff can answer that with

Page 364

1 greater specificity than I can.
2  Q. In the third full paragraph, the first
3 sentence, On August 18, 2000, all names of voters who
4 were exact matches (Last Name, First Name, Middle Name
5 or Initial, Suffix, DOB, Race and Gender).
6  A. That appears to be a definition of exact
7 match.
8  Q. That's something that Chuck Smith would be
9 better able to speak to?
10  A. Correct.
11  Q. Did the Hillsborough County Supervisor of
12 Elections Office rely on any information, aside from
13 the central voter file lists, prior to the
14 November 2000 election to delete voters?
15  A. The only other information we relied on was
16 the information we would receive from FDLE or the
17 Office of Executive Clemency after we followed up on
18 behalf of the voter.
19  Q. Did your office ever cancel a Hillsborough
20 County voter based on information received from a
21 county clerk's office.
22  MR. TINKLER: Objection to the form.
23 BY MR. RESTREPO:
24  Q. Did your office ever delete a voter based on
25 information received from the Hillsborough County

Page 365

1 clerk -- clerk of court, prior to the November 2000
2 election?
3  A. You're now referencing the process separate
4 from the central voter file process. You're now
5 referencing the regular process of felon names that we
6 receive on a regular basis from our Clerk of the
7 Circuit Court.
8  Yes, we regularly process those. And I
9 cannot speak to what names or how many we might have
10 removed during election year 2000, but my staff members
11 could provide that information.
12  Q. Did the Hillsborough County Supervisor of
13 Elections Office ever remove or delete any voter
14 because they were registered elsewhere in the State of
15 Florida based on information other than that contained
16 in the central voter file duplicate list?
17  A. We regularly removed people from the roles in
18 Hillsborough County when we received information that
19 they are registered somewhere else, either in the State
20 of Florida or another state. And that information
21 comes to us independent of the central voter file. It
22 comes to us from voters. It comes to us from election
23 officials across the country and across the State of
24 Florida.
25  Q. Did your office ever delete or remove a

**Page 366**

1 Hillsborough County voter from the voter rolls prior to
2 the November 7, 2000 election based upon information
3 that the voter had died, received from a source other
4 than the central voter file death list?
5   A. Yes, we regularly removed individuals from
6 our voter rolls based on death notifications from the
7 Office of Vital Statistics or family members.
8   Q. Do you know if your office has received any
9 central voter file lists subsequent to the November 7th
10 2000 election?
11   A. I do not know. My staff would be able to
12 answer that.
13   Q. Not that long ago, Ms. Borgen asked about
14 voters who may have been removed from the voter rolls
15 as a result of the central voter file felon list, who
16 might be out there and not know that they were removed.
17 Do you recall her asking you about that?
18   A. Yes.
19   Q. Do you have any personal knowledge that
20 there's any voter out there that fits that description?
21   A. No.
22   Q. Changing gears. Does the FSASE dictate the
23 policies and procedures used by any supervisor of
24 elections office?
25   A. No.

**Page 367**

1   Q. Are the decisions of the FSASE binding on all
2 its members in terms of how each supervisor runs his or
3 her office?
4   A. No.
5     MR. RESTREPO: That is it for me for now.
6   Thank you very much.
7     MR. LITTLE: Ms. Iorio, I have just a
8   quick handful and I'm going to speak louder
9   than I normally do because I'm trying to help
10   the folks on the phone.
11     As I said, I represent the Division of
12   Elections and the Office of Secretary of State.
13   And just have literally a handful of questions
14   to ask you if I could.
15     CROSS-EXAMINATION
16 BY MR. LITTLE:
17   Q. To get us back to a point of reference, in
18 your testimony earlier, you discussed a couple of areas
19 where you believe that statewide uniformity with regard
20 to election administration and voter registration would
21 be preferable, and that legislation and rule-making
22 might be helpful in this regard. Does that get us back
23 to a point in your testimony?
24   A. Yes.
25   Q. And as I understood it, you described an area

**Page 368**

1 where you thought it would be helpful for the Florida
2 legislature to enact clearer laws to help the
3 supervisors; is that right?
4   A. Correct.
5   Q. And you also said it would have been helpful
6 to have the Division of Elections issue rules as to how
7 to use the central voter file list that were sent to
8 the supervisors. Was that what I understood?
9   A. Yes.
10   Q. Do you know whether the Division of Elections
11 has to have specific statutory authorization from the
12 Florida Legislature before it can enact rules on a
13 particular subject matter?
14   A. I'm really not aware of the limits to their
15 authority.
16   Q. And so your earlier testimony was, if they
17 had that authority, you felt it would be helpful to
18 have rules in that area?
19   A. Yes, it would be very helpful.
20   Q. Do you recall ever hearing from the Division
21 of Elections whether they had rule-making authority in
22 the area of what to do with the central voter file list
23 beyond what was spelled out in the Florida statutes?
24   A. I don't recall that.
25   Q. Do you know whether the formation of the

**Page 369**

1 central voter file committee by the supervisor's
2 association was in response to the lack of rule-making
3 authority and the desire to create some uniformity
4 among the supervisors?
5   A. The formation of the committee was in
6 response to a lack of uniformity and procedures across
7 the state and the problems that we saw that were going
8 to arise from that lack of uniformity.
9   Q. The exhibit, I think it's F --
10   A. Central voter file committee.
11   Q. The document Exhibit F that's been previously
12 marked, that was dated May 8th, and it provides that
13 the procedures and forms had been reviewed by the
14 Division, and that's referencing the Division of
15 Elections, to your knowledge?
16   A. Yes.
17   Q. And then FDLE, that's Florida Department of
18 Law Enforcement?
19   A. Yes.
20   Q. And then the Office of Executive Clemency.
21     Were you involved in sending out Exhibit F?
22 Were you involved in that process because I know you
23 were in a leadership position?
24   A. I was, but I don't recall mailing this out.
25 I think that the chair of the committee would have been

1 the one to mail it out.

2    Q. Do you recall subsequently receiving in your
3 office a memorandum from the Division of Elections also
4 transmitting this information of the procedures and
5 forms that are marked as Exhibit F?

6    A. I don't recall it. But if you had it to show
7 me, I would likely say I've seen it if it looks
8 familiar.

9       MR. LITTLE: Why don't we mark this as
10 Defendants' 1.

11    (Defendants' Exhibit Number 1 was marked for
12    identification.)

13       MR. LITTLE: For the record that's G827
14    and 828.

15 BY MR. LITTLE:

16    Q. Do you recall receiving Defendants'
17 Exhibit 1?

18    A. Yes.

19    Q. And that document, for the record, is dated
20 June 30, 2000?

21       I'm sorry. Correct?

22    A. Oh, yes. I'm sorry, yes.

23    Q. The second paragraph references the central
24 voter file committee and a set of recommended
25 procedures for supervisors to use. To your knowledge

1 is that referencing the same set of procedures and
2 forms that we've just discussed, which has been marked
3 as Exhibit F?

4    A. I believe it does reference that.

5    Q. And as you received this Exhibit Number 1 in
6 your office, did you understand it to be the Division
7 of Elections sending to the supervisors of elections
8 across the state, information from the central voter
9 file committee on recommended procedures that might be
10 of use to those supervisors in creating some uniformity
11 in this area?

12    A. Are you asking me whether or not this memo
13 was an attempt to provide that uniformity that we were
14 seeking?

15    Q. Well, I was asking, if as a supervisor, when
16 you received that, if that's what you understood one of
17 the points of the memorandum to be?

18    A. Yes.

19    Q. You, also, when we were talking about voter
20 registration and dealing with applications and doing
21 voter registration, had discussed the fact that it
22 might be helpful from time to time to receive legal
23 opinions from the Division of Elections on certain
24 issues?

25    A. Yes.

1    Q. Do you know generally the procedure for
2 obtaining legal opinions from the Division? Have you
3 had occasion to obtain them?

4    A. Yes. Yes. And when you ask for a legal
5 opinion, it's only binding on supervisor who has
6 requested it.

7    Q. And so, in order -- just so we're clear on
8 the record, much like the Attorney General's Office,
9 the Division of Elections issues legal opinions in
10 response to requests for those opinions as opposed to
11 simply issuing opinions on their own measures; is that
12 correct?

13    A. Correct.

14    Q. Do you know whether any legal opinions were
15 sought by your office on any of the voter registration
16 issues which you were referring to earlier?

17    A. I cannot recall if I ever asked or someone
18 asked for a legal opinion on an incomplete registration
19 form after the book closing date. I either had an
20 informal conversation with Clay Roberts or could have
21 asked for something in writing. Although, it seems
22 like that would have shown up in our files in
23 preparation for this case, if we had. But if you don't
24 have it, if no one else has it, I assume we did not.

25    Q. And to your knowledge, do you know if any

1 other supervisors requested such a legal opinion?

2    A. Not to my knowledge.

3       MR. LITTLE: That's my handful of
4    questions. Thank you very much.

5       MR. ALLEN: No questions.

6       MS. BORGEN: Any questions from those on
7    the phone?

8       MR. EHRLICH: No.

9       MS. BORGEN: Susan?

10       MS. TORRES: No, no questions.

11       MS. BORGEN: One quick follow-up question,
12    Ms. Iorio.

13       REDIRECT EXAMINATION

14 BY MS. BORGEN:

15    Q. You were just speaking about how the Division
16 of Elections was involved and what sorts of procedures
17 they have. Is there any way that the Division of
18 Elections could provide guidance to supervisors of
19 elections to achieve statewide uniformity other than
20 formal rule-making?

21    A. Yes. I think that this memo of June 30th,
22 that you've handed out, is an example of that where
23 they are writing a memo to the supervisors and saying,
24 here is a procedure that you could use, and these are
25 some of our recommendations. The way it's couched in

**Page 374**

1 this memo, here are a few additional suggestions.
2    Again, a supervisor could decide to follow
3 their suggestions or a supervisor might say that
4 doesn't work in my county, or that doesn't apply and
5 I'm not going to follow that. But this type of memo is
6 an example of the division attempting to provide some
7 structure to a particular process.
8    Q. And you believe they can do that in areas
9 other than the central voter file?
10    MR. LITTLE: Objection to the form.
11 BY THE DEPONENT:
12    A. Absolutely. I think that the supervisors
13 look to the Division to provide that. Even if they
14 don't have the authority to provide it, I think they
15 look to them as a state agency that can provide some
16 direction to 67 different counties on issues that are
17 important in election administration.
18    Q. So just to clarify, you believe the Division
19 of Elections could provide guidance to supervisors of
20 elections similar to what's been marked as Defendants'
21 Exhibit 1 in other areas?
22    MR. ALLEN: Object to the form of the
23    question.
24    MR. LITTLE: Object to the form.
25

**Page 375**

1 BY THE DEPONENT:
2    A. Now, having said that, supervisors don't have
3 to follow that. And so the Division may be reluctant
4 to offer guidance where they don't feel it's going to
5 be uniformly accepted. But there's certainly nothing
6 to prohibit them from offering their suggestions and
7 guidance.
8    Q. Are there any other means, other than a memo
9 such as that, that the Division of Elections could use
10 to provide guidance to supervisors of elections?
11    A. I believe I've already touched on the legal
12 opinions, which have been clarified, it's only binding
13 on the supervisor who has requested it. And then you
14 have memos and you have -- I mean, I think that those
15 would be the methods by which they would communicate to
16 supervisors and indicate that they think they ought to
17 go in a particular direction.
18    Q. And those would be in addition to the
19 rule-making?
20    A. Correct.
21    MS. BORGEN: No further questions at this
22    time.
23    MR. LITTLE: Ms. Iorio, I just have one
24    follow up on the redirect.
25

**Page 376**

1    RECROSS-EXAMINATION
2 BY MR. LITTLE:
3    Q. When you talk about guidance, I want to be
4 very clear, this would be nonbinding on the supervisors
5 in the context you're discussing, right? In other
6 words, it's suggested, or a recommendation, or a
7 thought, but it's not something that the Division
8 issues that is binding on a supervisor that he or she
9 must follow?
10    MS. BORGEN: Objection as to form.
11 BY THE DEPONENT:
12    A. That's correct. I mean, the supervisors
13 understand that when they receive something like this
14 that it is not something that they necessarily have to
15 follow. In this case, in this memo, it may have even
16 come after the fact. For example, the supervisor may
17 have already embarked on a course of action before
18 receiving this.
19    However, I think, in my understanding of the
20 supervisors, I think that they, most of the time,
21 actually would look to the Division for some guidance
22 in the absence of any guidance on an issue of statewide
23 importance.
24    Q. Is it fair to say that in your dealings with
25 the Division -- and I'm talking about going back a

**Page 377**

1 number of years, that there is an effort to be
2 sensitive to the fact that the supervisors of elections
3 are also constitutional officers with their own
4 specified sets of duties, and that the Division and the
5 supervisors have to work together in that regard
6 recognizing that they each are given duties and
7 responsibilities under the Florida constitution and
8 Florida statutes?
9    MS. BORGEN: Objection as to form.
10 BY THE DEPONENT:
11    A. Yes. I think that the Division of Elections
12 is cognizant and sensitive to the way the State
13 constitution has structured constitutional officers in
14 the state.
15    Q. And that includes, as I think you've alluded
16 to in your testimony, that it is helpful at times for
17 the elected supervisor in a given county to know what
18 his or her constituents and situations mandate or
19 require in terms of serving their electorate and
20 ensuring that the elections are administered and run
21 smoothly?
22    A. That is the reality. It's not the utopia
23 that we want to achieve, as we saw with the 2000
24 election, that you run into problems when that occurs,
25 but that is how elections are administrated in the

1 State of Florida.

2    Q. And would you say that, in that vein, the one

3 size fits all really doesn't work in the State of

4 Florida given our form of government?

5    A. It depends on the issue. I think it's easy

6 to say that one size doesn't fit all because of the

7 diverse demographics of our state. However, I think we

8 also saw in the election of 2000 where we wished that

9 there had been more of a one size fit all, because we

10 would have had, I think, a fairer approach to the

11 election process.

12    Q. And those are the areas I think you

13 previously alluded to in your testimony, such as

14 machines, ballot design?

15    A. Write-in votes, issues such as that. Even

16 the recount, how the recounts were conducted on optical

17 scan machines.

18        MR. LITTLE: Thank you.

19        MR. TINKLER: Read.

20        (The deposition was concluded at 5:09 p.m.)

21

22

23

24

25

---

Page 379

1        S T I P U L A T I O N

2

3        It was hereby STIPULATED and agreed by and

4 between counsel present and the deponent, that the

5 reading and signing of this deposition by the deponent IS

6 NOT waived.

7

8
9

10

11

12

13        .

14

15

16

17

18

19

20

21

22

23

24

25

26

---

Page 380

1        CERTIFICATE OF REPORTER

2

STATE OF FLORIDA
3 COUNTY OF HILLSBOROUGH

4
        I, the undersigned authority, certify that
5 PAM IORIO personally appeared before me and was duly
sworn.
6
        Witness my hand and official seal this 9th day
7 of May, 2002.

8

9

10        _____
        Juanita Butler, Court Reporter
        Notary Public, State of Florida
11        Commission No. CC 897395
        Expires: December 21, 2003
12

13
STATE OF FLORIDA
14 COUNTY OF HILLSBOROUGH

15
        I, JUANITA BUTLER, Court Reporter, certify that
16 I was authorized to and did stenographically report the
        foregoing deposition; and that the transcript is a true
17 record of the testimony given by the witness.

18        I FURTHER CERTIFY that I am not a relative,
        employee, attorney, or counsel of any of the parties, nor
19 am I a relative or employee of the parties' attorneys or
        counsel connected with the action, nor am I financially
20 interested in the action.

21        Dated this 9th day of May, 2002.

22

23        _____
        Juanita Butler, Court Reporter
24        Notary Public, State of Florida
        Commission No. CC 897395
25        Expires: December 21, 2003

---

Page 381

1

2

3        I HAVE READ THE FOREGOING TRANSCRIPTION OF MY

4 DEPOSITION AND EXCEPT FOR ANY CORRECTIONS AND/OR

5 AMENDMENTS APPENDED HERETO, I HEREBY SUBSCRIBE TO THE

6 TRANSCRIPT AS AN ACCURATE RECORD OF THE TESTIMONY GIVEN

7 BY ME.

8

9
10

11        _____

12        PAM IORIO

13 My hand and official seal this the _____ day
        of _____, 2002.
14

15        _____
        Notary Public
16        State of _____ at Large
        My Commission Expires:

17

18

19

20

21

22
        STYLE:  NAACP, ET AL vs. HARRIS, ROBERTS, ET AL
23 DEPONENT: PAM IORIO · VOLUME II ·
        REPORTER: JUANITA BUTLER     TAKEN: MAY 6, 2002
24

25

26

---

Page 382

1
2     ERRATA SHEET

STYLE:   NAACP, ET AL  vs.  HARRIS, ROBERTS, ET AL
3 DEPONENT:  PAM IORIO   - VOLUME II -
   REPORTER:  JUANITA BUTLER      TAKEN:  MAY 6, 2002
4

5 PAGE NO.:  LINE:     CORRECTION AND/OR AMENDMENT:

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24
25
26

# TAB 22

Page 1

```
 1                UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2
       - - - - - - - - - - - - - - - - - - - x
 3   NATIONAL ASSOCIATION FOR THE          :
     ADVANCEMENT OF COLORED PEOPLE, INC.,:
 4   by its FLORIDA STATE CONFERENCE OF    :
     BRANCHES, JIMMIE PANNELL, JULIA       :
 5   STONER, NATALIE CARNEGIE, JOHN L.     :
     CHEEVER, JAMES MARSHALL, LILLIE Q.    :
 6   ODOM, WILLIE STEEN, WALLACE           :
     McDONALD, JERMAINE TERRY, LORINE      :
 7   WALDEN, EMERY TIMBERLAKE, VALERIE     :
     BUFORD-WELLS, MICHELLE FLOYD,         :   CASE NO.:
 8   CONSUELO MARIA GRAHAM, SHERRY         :   01-0120-Civ-Gold
     EDWARDS, KANDY WELLS, JOANNA CLARK,   :
 9   JANICE KELLY, PLACIDE DOSSOUS,        :
     RONDRICK ROSE, URSULA HARVEY, and     :
10   ADMANTHA ISRAEL, in their own right   :
     and as representatives of all         :
11   similarly situated citizens and       :
     residents of the State of Florida,    :
12                                         :
                  Plaintiffs,              :
13                                         :
     vs.                                   :
14                                         :
     KATHERINE HARRIS, Secretary of State:
15   of Florida; CLAY ROBERTS, Director    :
     of Florida Division of Elections;     :
16   DAVID C. LEAHY, Miami-Dade County     :
     Election Supervisor; MIRIAM OLIPHANT:
17   Broward County Election Supervisor; :
     JOHN STAFFORD, Duval County Election:
18   Supervisor; PAM IORIO, Hillsborough :
     County Election Supervisor; WILLIAM :
19   COWLES, Orange County Election        :
     Supervisor; and DEANIE LOWE, Volusia:
20   County Election Supervisor (all in    :
     their official capacities); and       :
21   CHOICEPOINT, INC., a Georgia          :
     corporation d/b/a DATABASE            :
22   TECHNOLOGIES, INC.,                   :
                                           :
23                  Defendants.            :
       - - - - - - - - - - - - - - - - - - - x
24
                    VOLUME 1, PAGES 1 - 140
25   DEPOSITION OF:        SUSAN MacMANUS
```

Page 2

```
1   TAKEN:              Pursuant to Notice by
                        Counsel for Plaintiffs
2
    DATE:               June 13, 2002
3
    PLACE:              Office of the County Attorney
4                       17th Floor
                        601 East Kennedy Boulevard
5                       Tampa, Florida
6   TIME:               Commencing at 9:15 a.m.
7   REPORTED BY:        ELIZABETH W. CHORRUSHI, RPR
                        Court Reporter
8                       Notary Public
                        State of Florida at Large
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        MURRAY GREENBERG, ESQUIRE
         (Via telephone)
2        Assistant County Attorney
         Suite 2810
3        111 NW 1st Street
         Miami, Florida 33128
4
              Attorney for Supervisor Leahy
5
6        GEORGE L. WAAS, ESQUIRE
         (Via telephone)
7        Assistant Attorney General
         Department of Legal Affairs
8        Suite PL-01
         The Capitol
9        Tallahassee, Florida 32399
10            Attorney for Department of Children
              and Families and Department of
11            Highway Safety and Motor Vehicles
12
    ALSO PRESENT:
13       Ron Hyduk
         Lisa Schiavinato
14
15            I N D E X
                                PAGE
16  Examination by Mr. Cox . . . . . . . . . . . . . .5
17  Certificate of Reporter . . . . . . . . . . . . . 139
18
19
    EXHIBITS MARKED FOR IDENTIFICATION:
20  NO.  DESCRIPTION                PAGE
21   1   Plaintiff's Notice of Deposition of Dr. Susan
         MacManus . . . . . . . . . . . . . . . . . . .6
22
     2   Expert Witness summary of Dr. Susan MacManus . 40
23
24
25
```

Page 3

```
1   APPEARANCES:
2        TODD A. COX, ESQUIRE
         NAACP Legal Defense and
3        Educational Fund, Inc.
         10th Floor
4        1444 Eye Street NW
         Washington, D.C. 20005
5
         -and-
6
         DEBO ADEGBILE, ESQUIRE
7        NAACP Legal Defense and
         Educational Fund, Inc.
8        Suite 1600
         99 Hudson Street
9        New York, New York 10013
10           Attorneys for Plaintiffs
11
         WALTER JAMES HARVEY, ESQUIRE
12       Steel, Hector & Davis, LLP
         41st Floor
13       200 South Biscayne Boulevard
         Miami, Florida 33131
14
             Attorney for Katherine Harris and
15           Division of Elections
16
         REBECCA M. KERT, ESQUIRE -and-
17       KEN TINKLER, ESQUIRE
         Assistant County Attorneys
18       27th Floor
         601 East Kennedy Boulevard
19       Tampa, Florida 33602
20           Attorneys for Supervisor Iorio
21
         THOMAS W. WHITE, ESQUIRE
22       Adorno & Yoss
         Suite 1600
23       2601 South Bayshore Drive
         Miami, Florida 33133
24
             Attorney for ChoicePoint, Inc.
25
```

Page 5

```
1        The deposition of SUSAN MacMANUS was taken
2   pursuant to notice by counsel for the Plaintiffs on the
3   13th day of June, 2002, commencing at 9:15 a.m., at the
4   17th Floor, 601 East Kennedy Boulevard, Tampa, Florida.
5   Said deposition was reported by Elizabeth W. Chorrushi,
6   RPR, Notary Public, State of Florida at Large.
7            - - - - -
8            SUSAN MacMANUS,
9   a witness, having first sworn or affirmed to tell the
10  truth, the whole truth and nothing but the truth, was
11  examined and testified as follows:
12           EXAMINATION
13  BY MR. COX:
14       Q   Good morning, Dr. MacManus.
15       A   Good morning.
16       Q   Would you please give me your name and
17  address for the record?
18       A   Susan MacManus, M-a-c capital M-a-n-u-s.
19  The address is 2506 Collier, C-o-l-l-i-e-r, Parkway.
20  Land O' Lakes, Florida, 34639.
21       Q   My name is Todd Cox, and I'm an attorney for
22  the plaintiffs in this case, NAACP versus Harris.
23           Have you ever had your deposition taken
24  before?
25       A   Yes, I have.
```

Page 6

1    Q   Okay. And so you're familiar with the rules?
2    A   I think so. It's been a while since I've
3  done one, but I think so.
4    Q   All right. I'm going to ask you a series of
5  questions, and if you don't understand a question, or
6  you want something clarified, please, just ask me. And
7  I'll do my best to do that.
8        I'm going to introduce your notice of
9  deposition as your first exhibit.
10       (Plaintiffs' Exhibit Number 1 was marked for
11       identification.)
12 BY MR. COX:
13   Q   Dr. MacManus, have you seen that before?
14   A   No, I have not.
15   Q   Do you understand that you are -- however,
16 that you are here pursuant to a notice of deposition in
17 this case?
18   A   This document indicates that.
19   Q   Okay. Dr. MacManus, have you reviewed any
20 documents --
21       MR. WAAS: Excuse me. But you are either
22       going to have to speak louder -- because I can't
23       hear anything above a whisper.
24       THE COURT REPORTER: And who was that,
25       please?

Page 7

1        MR. WAAS: This is George Waas.
2        THE COURT REPORTER: Thank you.
3        (Discussion off the record.)
4        MR. COX: We'll do our best.
5  BY MR. COX:
6    Q   Dr. MacManus, have you reviewed any
7  documents in preparation for your deposition?
8    A   Yes, I have.
9    Q   What have you reviewed?
10   A   I reviewed the various reports that have been
11 done by task forces on post-election analyses of
12 reforms and recommendations for improving the election
13 system.
14   Q   Anything else?
15   A   I've reviewed some exhibits that I prepared.
16 I have also looked at several of the plaintiffs' expert
17 reports, and reviewed as best as possible in a short
18 period of time, various books, post-election analyses
19 of Election 2000.
20       And I've reviewed materials that have been
21 provided to me by the Secretary of State's Division of
22 Elections office regarding various workshops that have
23 been held to train supervisors, various programs.
24       I've reviewed the Florida Election Reform
25 Act and the legislation passed in this past legislative

Page 8

1  session regarding election reform among others.
2        And I have also reviewed materials provided
3  to me by the Hillsborough County Supervisor of
4  Elections office.
5        MR. WAAS: I've lost contact. I'm hearing
6        nothing now.
7        THE WITNESS: Nothing's happening.
8        MR. COX: Nothing's being said.
9  BY MR. COX:
10   Q   Anything else, Dr. MacManus?
11   A   To the best of my recollection, that's a
12 pretty comprehensive list.
13   Q   You mentioned that you reviewed various
14 reports done by election reform task forces. Is that
15 correct?
16   A   Yes.
17   Q   Which task forces specifically?
18   A   I reviewed around 17 various reports, a wide
19 array of groups including, of course, the NAACP report,
20 the report to Congress by the -- for the -- by the
21 Democratic Caucus for Representative Conyers.
22       I reviewed reports by the National
23 Association of the Secretaries of State, the National
24 Conference of State Legislators, the League of Women
25 Voters, others as well. I just cannot remember the

Page 9

1  names, there were so many.
2    Q   But right here, these are the ones you
3  recall?
4    A   Yes. I know there were around 17 that I
5  looked at.
6    Q   You mentioned that you also reviewed exhibits
7  that you prepared?
8    A   Yes.
9    Q   Are these exhibits that are going to be part
10 of your testimony in this case?
11   A   Yes.
12   Q   And what exhibits have you prepared?
13   A   I don't have them before me, but I looked at
14 turnout rates in Hillsborough County, changes in
15 turnout rates, changes in registration rates; the
16 composition of the poll worker force for Hillsborough
17 County in Election 2000. I reviewed materials for the
18 way that poll workers are assigned and affirmations
19 and information regarding poll workers' age and
20 experience at the polls.
21   Q   And --
22   A   I also reviewed -- I should mention the voter
23 education plans for Florida counties and for
24 Hillsborough County.
25   Q   What you just listed here, are these going to

3 (Pages 6 to 9)

Page 10

1   be exhibits, or are these just things you reviewed?
2       A   The voter education plans?
3       Q   The list you just gave me in response to the
4   last question.
5       A   They were exhibits that I prepared for
6   testimony.
7       Q   And to your knowledge, have these exhibits
8   been provided to plaintiffs' counsel in this case?
9       A   To the best of my knowledge, they have.
10      MR. HARVEY:  Yes, they have.
11  BY MR. COX:
12      Q   You mentioned that you also reviewed several
13  plaintiffs' expert reports.  What reports did you
14  review specifically?
15      A   I reviewed -- and just casually -- the one by
16  Professor Flores and the one by Mr. McIntosh.
17      Q   You mentioned you also reviewed various
18  books --
19      MR. WAAS:  Excuse me.  This is George Waas
20  again.  I can hear the answers perfectly clear.
21  But I can't hear the questions at all.
22      MR. GREENBERG:  And I'm having the same
23  trouble.  This is Murray.
24      MR. COX:  We'll do our best.
25  BY MR. COX:

Page 11

1       Q   You mentioned that you reviewed various books
2   and election analyses.  Specifically, what books did
3   you review?
4       A   Well, in the course of being a political
5   science professor, I've read a lot of books.  But just
6   to mention some that I can recall right now would be
7   the book by "The New York Times" which was called, I
8   believe, "36 Days;" the book by the "Miami Herald" --
9   these are the consortium -- the election consortium
10  studies.
11      And I also, of course, have read a collection
12  of articles by political scientists in a book called
13  "Unfinished Business," I believe is the title, and one
14  by some legal scholars entitled "When Elections Go
15  Bad," and others as well.  Those are the ones that come
16  to mind.
17      Q   And you also mentioned that you reviewed
18  post-election analyses.  What analyses --
19      MR. WAAS:  This is George Waas again.  Same
20  problem.  We're just not getting the questions.
21  We're getting the answers.
22      MR. COX:  Can you hear that, George?
23      MR. WAAS:  Yes.  That I can hear.
24  BY MR. COX:
25      Q   You also mentioned that you reviewed various

Page 12

1   election analyses, Dr. MacManus.  What specific
2   election analyses did you review?
3       A   Well, I reviewed, as I mentioned, these
4   reports by the various task forces across the country
5   by scholars, the consortium reports and, of course,
6   various newspaper accounts that -- as part of my job, I
7   follow newspaper, you know, accounts of elections and
8   did during the 2000 election.
9       Q   Dr. MacManus, you were retained to give an
10  opinion in this case.  Is that correct?
11      A   Yes, I was.
12      Q   Who retained you?
13      A   The Secretary of State, Division of Elections
14  and Hillsborough County, Florida.
15      Q   And what were you asked to do?
16      A   I was asked to review various documents and
17  to give an opinion about whether there was any sort of
18  racial discrimination in the election or unusual
19  policies or procedures that would be discriminatory.
20      Q   When you say you were asked to review
21  documents, what documents were you asked to review?
22      A   The documents I reviewed, among others -- and
23  again, I reviewed a lot of documents.  So I hope I get
24  the list fairly comprehensive.
25      I reviewed the programs and the contents of

Page 13

1   workshops that were conducted for the Supervisors of
2   Elections involving the Division of Elections.  I
3   reviewed various descriptions of the structure of
4   elections administration in America, which would
5   include some of the books I've already mentioned and
6   the various task force reports.
7       I reviewed precinct data regarding poll
8   worker assignment and the age and experience and party
9   affiliation and gender of poll workers in Hillsborough
10  County.  I've reviewed the Florida Election Reform Act
11  and various summaries of that act in newspaper accounts
12  and in my own writing.  I reviewed turnout statistics.
13      MR. COX:  Let's go off the record.
14      (Discussion off the record.)
15      A   I believe I was talking about the various
16  documents that I reviewed.
17  BY MR. COX:
18      Q   Mmm-hmm.
19      A   And I looked at -- well, poll worker data, of
20  course, for Hillsborough County; turnout data;
21  registration data for Hillsborough County.
22      And, again, I reviewed the consortium reports
23  and newspaper accounts of those reports as well as the
24  actual books that were written by the consortium.
25      And there could be other things of expert

4 (Pages 10 to 13)

Page 14

1  reports I mentioned that I looked at.
2      Q    In deciding which documents to review, did
3  you request these documents or did your employers ask
4  you to look at those documents?
5      A    I requested to look at them.
6      Q    And you mentioned --
7          MS. KERT:  We're getting some feedback here.
8  BY MR. COX:
9      Q    And you mentioned you were asked to give an
10  opinion as to whether there -- racial discrimination
11  occurred.  Is that correct?
12      A    That's correct.
13      Q    What analysis did you conduct to make that
14  determination?
15      A    Well, as I mentioned, I reviewed the various
16  documents.
17          And with regards to Hillsborough County, I
18  was particularly attentive to what the consortium
19  accounts said about the conduct of elections in
20  Hillsborough County.
21      Q    And I'm sorry.  Let me interrupt you.  When
22  you say "consortium report," could you define what you
23  are talking about?
24      A    The consortium reports -- there were two
25  large consortium that recounted the undervotes and

Page 15

1  overvotes, depending on the group, in Florida.  One was
2  the consortium -- the "Miami Herald" and "USAToday" and
3  the other was the consortium that included, among
4  others, "The New York Times," the Associated Press, I
5  believe, "The Wall Street Journal," the "Chicago
6  Tribune," and other newspapers.
7      Q    Go ahead.  I interrupted you about your
8  analysis to determine if there was racial
9  discrimination.
10      A    Well, I looked at -- again, as I mentioned,
11  accounts of it.  And I was also looking for language in
12  those consortium which would -- which concluded that
13  there was racial discrimination in the various counties
14  and in the behavior of the Division of Elections.
15          I, of course, reviewed data on how
16  Hillsborough County assigns poll workers and also
17  looked at the racial and age and experience profiles of
18  Hillsborough County poll workers assigned to work at
19  precincts.
20          I looked at -- was looking, of course, for
21  evidence -- any evidence that Supervisor of Elections
22  Iorio was accused or was -- had purposefully and
23  intentionally discriminated against voters in Election
24  2000.
25          I, of course, looked at election returns in

Page 16

1  her election -- which she was up for election in 2000
2  and ran against an African-American candidate.  Looked
3  at how she performed and how the voting patterns went
4  in those -- the heavily black precincts for her versus
5  the African-American candidate.
6          Looked at changes in turnout and registration
7  for various racial and ethnic groups across the -- in
8  Hillsborough County and, of course, in the exit polls.
9          I may have missed something, but those are
10  the ones that come to mind.
11      Q    When you say "exit polls," would you describe
12  what you are talking about?
13      A    The Voter News Service, which is the exit
14  poll polling firm that's retained by all the major
15  networks and Associated Press to profile who votes on
16  election day.  It's done at the polls.
17      Q    And how did that inform your analysis?
18      A    Well, I was looking at it to confirm what
19  many newspaper accounts of the election had talked
20  about and what my own research as an analyst was
21  showing -- and that was a large increase in minority
22  turnout in Florida in Election 2000.
23      Q    You mentioned that you looked -- you reviewed
24  or took a look at any indications as to whether
25  Supervisor Iorio intended to discriminate.  Is that

Page 17

1  correct?
2      A    If that's -- I believe that's what I said.
3      Q    What specifically did you look at in order to
4  make that determination?
5      A    When I reviewed, of course, the assignment of
6  poll workers to precincts, I was also -- looked at the
7  way that she trains poll workers.  I looked at her
8  policies and procedures, her poll worker manuals.  I
9  looked at complaints or -- excuse me, comment
10  cards that voters filled out regarding the Election
11  2000 in the various precincts.
12          I looked at, again, how national task forces
13  and consortium described Pam's performance in the
14  election cycle.
15          I am familiar with her reputation among
16  Supervisors of Elections and among the media -- not
17  only in Florida, but across the country.  She's well
18  respected.
19          I looked at affirmation patterns.
20      Q    Again, affirmation patterns, would you
21  explain that?
22      A    Affirmations, as it's been described to me,
23  are forms that one fills out -- if you go to the poll
24  and you haven't told them of a change of name or you
25  haven't informed them of a change of address.  And you

All Florida Reporting, Inc.
(800) 898-7373

Page 18

1    can do that on -- at the polling place, and the county
2    keeps a record of those by precincts.
3        Q    You mentioned that you were familiar with the
4    reputation of Supervisor Iorio.
5            Did you have any personal involvement with
6    the election in 2000, with the conduct of the election
7    in 2000 in Hillsborough County?
8        A    No, I did not. I live in Pasco County.
9        Q    Have you been -- have you been personally
10   involved with the election process or election
11   administration in Hillsborough County ever?
12       A    No, I have not.
13       Q    You mentioned that you looked at election
14   returns and how election patterns -- or how voters
15   performed for her versus an African-American candidate.
16           Can you describe that election? What
17   election was that?
18       A    Well, the Supervisors of Elections races --
19       MR. WAAS: Excuse me. I cannot hear the
20   questions, and there's a fading in and out. And
21   there's got to be something done so that we can
22   hear the questions and then we know what questions
23   are being answered. Because we can hear the
24   answer.
25       Hello?

Page 19

1        MR. COX: We're here.
2        MR. WAAS: Yeah. This is not working out
3    right. We just simply cannot hear the questions
4    being asked.
5        MR. COX: Well, I mean, the equipment that
6    we're using here is --
7        MR. WAAS: And we're picking up static now
8    too.
9        MR. COX: Obviously, the equipment we're
10   using is not of the quality that we've had in the
11   past for depositions. We're here at the
12   Hillsborough County offices, attorney's office.
13   And this is the best we can do with this phone.
14   So we will do the best we can to speak up.
15   Unless --
16       MR. WAAS: Now I can hear you fine, Todd.
17   But when you start asking questions, the volume
18   drops.
19       MR. COX: Right. Well, we'll do the best we
20   can, unless those who secured this location can
21   suggest an equipment change.
22       So we'll do the best we can.
23       MR. TINKLER: Can we go off the record for a
24   second?
25       (Discussion off the record.)

Page 20

1        MR. COX: We're going to take a break and see
2    if we can get a different phone.
3        (A break was taken from 9:40 a.m. to
4    9:50 a.m.)
5    BY MR. COX:
6        Q    Dr. MacManus, before the break, you were
7    discussing what analysis you conducted regarding
8    election returns and patterns of elections,
9    particularly the election between Pam Iorio and an
10   African-American candidate. And I was asking you to
11   describe the election.
12       A    Right. Every four years, our Supervisors of
13   Elections in Florida must be up to reelection. We have
14   the election, and it falls in the same year as the
15   presidential elections. So Pam Iorio was a candidate
16   for Supervisors of Elections in Election 2000. She was
17   the Democratic nominee. She ran against an
18   African-American, Joe Robinson, a Republican.
19       Q    And what data did you look at in that
20   election?
21       A    I looked at the election returns by precinct.
22       Q    Did you look at it by race?
23       A    I identified homogenous precincts which are
24   precincts with 90 percent or more minority -- black --
25   African-American registrants. And I also looked at

Page 21

1    precincts that are a majority black registrants and
2    looked at the returns in those precincts versus the
3    overall election results.
4        Q    Did you conduct what experts -- or what
5    specialists call a homogeneous precinct analysis?
6        A    Yes, I did.
7        Q    So did you look at the majority white
8    precincts as well?
9        A    No, I did not.
10       Q    Is that typically part of a homogeneous
11   precinct analysis?
12       A    Yes, it is.
13       Q    To look at all the precincts?
14       A    Right. But in this particular instance, I
15   was focusing on the African-American precincts, the
16   heavily African-American precincts. Because the
17   heavily white precincts in Hillsborough County tend to
18   be heavily Republican as well.
19       Q    So your analysis doesn't indicate the number
20   of white crossover Mr. Robinson would have received in
21   that election?
22       A    No. I did not do an analysis of that nature.
23       Q    Did you do what political scientists
24   typically call a regression analysis?
25       A    No, I did not.

6 (Pages 18 to 21)

Page 22

1    Q   Why not?
2    A   I was not asked to do that.
3    Q   What year did this election occur?
4    A   2000.
5    Q   Did you look at any other elections?
6    A   No, I did not.
7    Q   Do you recall the amount of percentage of the
8  African-American vote that Pam Iorio received?
9    A   I can't recall.  I looked at the percentage
10  for Robinson.  And he got, in the heavily minority
11  precincts, around 10 or 11 percent.  And his countywide
12  percentage, I believe, was in -- around a third.
13      I can't recall the exact percentages, but I
14  think it's in those ranges.
15   Q   Did you look at any other factors in the
16  election, such as Mr. Robinson's political history?
17   A   I looked at his party -- you know, the
18  election results.  And, of course, what the results
19  suggest is that Pam Iorio is very popular around the
20  African-American electorate in Hillsborough County.
21   Q   I was asking about Mr. Robinson's.  Are you
22  aware of his political background?
23   A   Well, he is a Republican, and I know that
24  that's certainly one of the factors that was
25  unattractive to African-American voters.

Page 23

1    Q   Would you describe him, as political
2  scientists often do in these elections -- would you
3  describe him as a strong candidate or weak candidate?
4    A   I wouldn't have any way of measuring that.  I
5  didn't really look at that per se.  But viable
6  candidates usually don't get a third -- if you are
7  viable, you would be expected to have that kind of
8  percentages that he got.  An unviable candidate would
9  be a very minuscule support anywhere.  And he got
10  around a third of the votes.
11   Q   So you would consider him a viable
12  candidate?
13   A   Yes.
14   Q   Do you know if he ever ran for office before?
15   A   I do not -- I don't know.
16   Q   Would that be something that you would factor
17  into a candidate's viability?
18   A   Yes.  But the best is the election results
19  themselves.
20   Q   But you would factor in his political history
21  and his past experience running as a factor as well,
22  correct?
23   A   Right.  And his party, of course.
24   Q   Did you look into any elections of other
25  county supervisors?

Page 24

1    A   No, I did not.
2    Q   So this was the only election you analyzed
3  for this case?
4    A   That is correct.
5    Q   Was this analysis designed to look at whether
6  voting is racially-polarized in Florida?
7    A   It was designed to look at the support within
8  the black community for Pam Iorio.  She has a
9  reputation in this community of being very accessible
10  and very conscientious toward reaching out and outreach
11  to minority voters.
12   Q   So this wasn't an assessment of
13  racially-polarized voting?
14   A   No, it was not.
15   Q   You mentioned also that you looked into how
16  Hillsborough County assigns poll workers.  Is that
17  correct?
18   A   That is correct.
19   Q   What characteristics did you look at?
20   A   I looked at the procedures that are followed
21  by the county.  It was a list.  I believe it's in the
22  exhibits that were given to you -- and the methodology
23  that the county uses to assign poll workers.  It has to
24  do with projections of turnout, number of voters in
25  each precinct, things of that nature.

Page 25

1    Q   And, before, I believe you had mentioned that
2  you looked at precinct data regarding poll worker
3  assignments?
4    A   Yes.  I looked at the -- again, looking at
5  the majority black precincts and the homogenous black
6  precincts -- 90 percent plus -- looking at the profile
7  of the poll workers that were assigned to those
8  precincts in terms of their race, their party, their
9  age, their experience working as poll workers.
10   Q   On your election analysis of the 2000 race
11  between Joe Robinson and Pam Iorio, you mentioned you
12  looked at homogenous -- homogeneous African-American
13  precincts?
14   A   Mmm-hmm.
15   Q   But you didn't look at the homogeneous white
16  precincts.  Is that correct?
17   A   No.  I could have.
18   Q   Do we -- or do political scientists
19  typically describe that as a homogenous precinct
20  analysis?
21   A   Yes.
22   Q   Even though you didn't look at the white
23  precincts?
24   A   Right.
25   Q   Were you asked to perform this precinct

7 (Pages 22 to 25)

Page 26

1  analysis by Hillsborough County, or did you decide to
2  do it yourself?
3      A  I decided to do it myself.  I thought it was
4  important to look at patterns within the black
5  community.
6      Q  And did you also decide to not look at the
7  homogenous white precincts yourself?
8      A  I did not look at those, because my
9  professional knowledge of those precincts, from being a
10  political analyst, is that they are heavily Republican.
11      Q  But you made that decision yourself not to
12  look at those?
13      A  I did, yes.  They were included in the whole
14  analysis in terms of the total percentage.  But I
15  didn't do separate homogenous precinct analysis for the
16  white precincts.
17          My guess is the results would have been quite
18  different.  There would have been more strong support
19  for Mr. Robinson, because he's a Republican, which
20  suggests it's party more than race.
21      Q  And what would you base that assumption on?
22      A  Just that based on my look at the support for
23  Pam Iorio within the black precincts is very heavy and
24  much heavier than it was for the county at large.  And
25  she is a Democrat.

Page 27

1      Q  Dr. MacManus, have you been asked to do the
2  analysis that you did for this case in any other cases
3  that you've worked on?
4      A  I've done demographic analysis in other
5  cases.  I haven't specifically looked at precinct-level
6  data on poll workers, of course.  It's very hard to get
7  that.
8          And this, frankly, is the first election that
9  so much attention has been called to poll worker
10  problems.  In all the task force reports and in the
11  consortium reports, problems with poll workers are
12  identified as a contributing factor to votes not being
13  cast properly.
14      Q  So let me make sure I'm clear.  You were
15  asked to review documents and give an opinion as to
16  whether racial discrimination occurred in the 2000
17  election, and that was a focus on Hillsborough County.
18  Is that correct?
19      A  Yes.
20      Q  And that type of analysis you've not done
21  before this case.  Is that correct?
22      A  I've not done any poll worker analysis before
23  this case, no.
24      Q  Have you done any other aspect of what I've
25  just described in any other cases?

Page 28

1      A  I'm not sure I understand your question.
2      Q  Well, you say in this case you were asked to
3  give an opinion regarding whether or not the 2000
4  election was -- there was racial discrimination in the
5  2000 election.
6          The analysis that you did to reach a
7  conclusion on that question, have you done any of the
8  analysis -- not just poll worker analysis.  Have you
9  done any of the analyses that you had to do to reach
10  that conclusion in any other case?
11      A  Well, I've always looked at turnout figures
12  and registration figures, and so I've done that in
13  other cases.
14      Q  You also mentioned that you, in your creating
15  and developing an opinion in this case, you looked at
16  unusual policies or procedures that would be
17  discriminatory.
18          What did you mean by "unusual policy or
19  procedures"?
20      A  Something that would have been put in place
21  without a lot of publicity or wasn't covered in the
22  poll worker manuals or poll workers hadn't been trained
23  about.  Something that would be intentionally aimed at
24  doing one thing one place and another -- something else
25  in another.

Page 29

1      Q  Can you give me an example?
2      A  Well, in -- I can't, because I didn't see any
3  in Florida.
4      Q  Have you seen any of these unusual policies
5  or procedures anywhere else?
6      A  I have, of course, just a cursory knowledge
7  from based upon my professional reading.  There have
8  been places where there have been examples of language
9  issues, disabled issues, things of that nature.
10      Q  But what specific procedure would be unusual?
11      A  I can't think of one right offhand.
12      Q  You mentioned several times that --
13      A  Can I clarify that?
14          It would be, for example, if you had a policy
15  where you assign one kind of equipment to one precinct
16  based on some demographic characteristic but another in
17  another.  I think that would be an example.
18      Q  Of unusual procedures?
19      A  Right.
20      Q  You mentioned several times in our discussion
21  this morning that you looked into whether or not
22  Hillsborough County or Pam Iorio intended to racially
23  discriminate.
24          Did you look into whether or not, in the
25  conduct of the 2000 election, her behavior or the

8 (Pages 26 to 29)

Page 30

1  behavior of the Hillsborough County officials had a
2  discriminatory result?
3      A   I don't know what you mean by "discriminatory
4  result." Give me an example.
5      Q   Well, we'll get to this further down in your
6  deposition.
7          But have you worked on cases involving
8  Section 2 of the Voting Rights Act?
9      A   Yes, I have.
10     Q   To your knowledge, is intent required in
11 those cases?
12     A   I am not familiar. I haven't read that in
13 some time.
14     Q   Do you know the term under Section 2 of the
15 Voting Rights Act of "discriminatory result"? Are you
16 familiar with that term?
17     A   I am, but I don't know how it's
18 operationalized. So much has changed in the law and
19 court rulings are unclear.
20     Q   What was the last --
21     A   It's really hard to have a precise -- I don't
22 even think attorneys agree on that.
23     Q   When was the last Section 2 case you worked
24 on?
25     A   I think it was probably in the '70s. I'm

Page 31

1  not sure.
2      Q   City of Port Arthur versus United States?
3      A   I think it was a little more recent than
4  that.
5      Q   How about Davis versus Chiles?
6      A   I'm not familiar with that one.
7      Q   Was that a case involving judges, election of
8  judges in Tallahassee?
9      A   I was not involved in that case.
10     Q   So you were not involved in any Section 2
11 cases since the '70s?
12     A   To my recollection, I don't think so.
13     Q   Have you ever been involved in any cases
14 under the Voting Rights Act since the 1970s?
15     A   Yes, I have.
16     Q   Okay. What cases?
17     A   Again, I don't have the list. And I think
18 the last case that I was involved in was the DeGrandy
19 case. I was an expert witness for the Florida Senate.
20     Q   DeGrandy versus Wetherell?
21     A   Right. In the congressional --
22     Q   To your knowledge, was that a case brought
23 under Section 2 of the Voting Rights Act?
24     A   I'm not sure.
25     Q   What kind of work did you do in that case?

Page 32

1      A   I looked at the different -- for example, I
2  analyzed the media that it would take to campaign in
3  some of the districts that stretched over 30-some
4  counties, the impact that that would have on first-time
5  and minority candidates.
6      Q   In making that assessment, were you looking
7  at intent or result?
8      A   I'm sure I -- I was looking -- speculating
9  and forecasting, just looking at the actual
10 professional political science literature which points
11 out that first-time candidates, challengers to sitting
12 incumbents have a tough time getting their message out.
13         And if one of the assumptions of the plan was
14 that redistricting opens up spots for minority and
15 women candidates, I was looking at what the impact
16 would be in having to reach across one district that
17 has 30-some counties versus another that had a more
18 concentrated minority population of, say, 12 or 18
19 counties.
20     Q   So you were looking at the impact of those
21 procedures --
22     A   Right.
23     Q   -- on African-American and women voting?
24         MS. KERT: Object to form.
25     A   Women candidates.

Page 33

1  BY MR. COX:
2      Q   Women candidates?
3      A   But candidates really, not just those two.
4      Q   Well, did you do any analysis in this case
5  that allowed you to determine whether or not the
6  actions of Hillsborough County election officials had a
7  discriminatory impact in the 2000 election on
8  African-American voters?
9      A   If it has a legal meaning then, I did not.
10     Q   What do you mean?
11     A   Well, I'm not sure -- you keep using the
12 terms "impact" and "intent." And I'm not sure of the
13 legal definition, and I know that is a very gray area.
14 And it's hard for non-lawyers sometimes to accurately
15 understand what you are talking about, so that's my
16 reticence.
17     Q   Well, using the word "impact" in the way you
18 just used it describing your work in DeGrandy --
19     A   Mmm-hmm.
20     Q   -- did you analyze whether or not the action
21 of Hillsborough County or the officials in -- election
22 officials in Hillsborough County had a discriminatory
23 impact on minority voters during the 2000 election?
24     A   Well, in terms of turnout and registration --
25 I mean, each of those two statistics would affirm that

9 (Pages 30 to 33)

Page 34

```
 1   outreach was very strong in terms of minority
 2   registration went up, minority turnout went up
 3   considerably.
 4         And I, of course, looked at and know of
 5   Supervisor Iorio's constant presence -- not only in
 6   the minority communities, but in their minority
 7   newspapers, minority media, as well as the electronic
 8   and print and radio and television media. She has an
 9   omnipresence here that would suggest that her outreach
10   was anything but discriminatory in its intent or
11   impact.
12      Q   Aside from outreach regarding registration or
13   outreach in other areas, did you look at anything else
14   in order to assess impact?
15      A   Well, I certainly looked at her election
16   returns. If there had been some sort of perception
17   that she wasn't responsive to minority community needs,
18   she would not have gotten the support from the minority
19   electorate that she did.
20      Q   And what's your basis for that determination?
21      A   Well, minority voters, like all voters, are
22   very attune to people that are not responsive to them,
23   and they vote them out of office.
24         And she has consistently, in her political
25   career in Hillsborough County, been very favorably
```

Page 35

```
 1   viewed by the minority community. She is a Democrat.
 2   These are key constituents. They're an important part
 3   of her electoral base. She's not going to ignore them,
 4   and she hasn't.
 5      Q   So other than election returns of the
 6   election we've discussed, the outreach that was done
 7   prior to the election that resulted in the registration
 8   going up, did you look at anything else to assess
 9   impact?
10      A   It's -- I can't think of anything right
11   offhand. Because it seems to me that the two most
12   important things that you look at are whether people
13   registered and whether they voted.
14         And in both of those instances, these
15   statistics are very favorably -- they were very
16   favorable for Hillsborough County. And they
17   demonstrate -- you don't get those kind of numbers with
18   an insensitive, discriminatory Supervisors of
19   Elections.
20      Q   So you didn't look at anything else beside
21   the outreach and the election returns for that
22   election?
23      A   Well, on my own professional knowledge of how
24   she's respected -- I give an awful lot of speeches
25   throughout the community to all kinds of groups, all
```

Page 36

```
 1   partisan persuasions, minority groups, you know,
 2   whatever. And I just constantly hear very favorable
 3   things about her. She is well loved and respected
 4   within the minority community.
 5      Q   So aside from the outreach that resulted in
 6   the registration going up and the election returns for
 7   2000 and, I guess what we can call anecdotal
 8   information regarding her popularity, you didn't look
 9   at anything else to assess the impact of their behavior
10   during the 2000 election on minority voters?
11      A   Well, I did look at the comment cards that
12   are filled out by voters regarding election-day
13   activities at the polls or even preelection day.
14         And one would normally expect in such a
15   situation, you know -- it's just like going to a
16   restaurant. Usually you don't fill out a comment card
17   unless you're really irritated about the meal.
18         So one would have expected a very hostile
19   profile for these comment cards. But, in fact, you
20   know, around three-fourths of those who filled out
21   these forms gave a good or excellent overview.
22         And there wasn't any much difference between
23   the comment card profile in the minority precincts than
24   in the overall election precincts -- overall, I'm
25   sorry.
```

Page 37

```
 1      Q   Are the comment cards by race? Do people
 2   identify their race on the cards?
 3      A   To my knowledge they do not. Some people
 4   voluntarily signed their name. For example, I saw in
 5   looking at these comments, you know, certain Hispanic
 6   voters signed their name and you know that it's a
 7   Hispanic name. But some don't sign their names. They
 8   just send them in.
 9         So it's very difficult to assign any kind of
10   race or ethnic profile to them. All you can do -- the
11   best thing you can do is to take a look at where they
12   appear. Do they appear -- what are the comments like
13   that appear in heavily minority precincts versus
14   precincts at large.
15      Q   Do you know how the comment cards were
16   distributed?
17      A   They are at every polling place.
18      Q   Dr. MacManus, on these comment cards, you
19   said they are actually at every polling place?
20      A   Yes.
21      Q   In Hillsborough County?
22      A   Yes.
23      Q   How do you know that?
24      A   Well, I've talked to people in the elections
25   office.
```

10 (Pages 34 to 37)

Page 38

1    Q    So aside from the comment cards analyzing the
2  2000 election and Pam Iorio's outreach, as well as your
3  referring to anecdotal support for her, did you look at
4  anything else to assess whether or not the conduct of
5  the 2000 election had a discriminatory impact?
6    A    Well, of course, I looked at, as I mentioned
7  earlier, at the poll worker profile. Because in many
8  of the national task force reports, there's been
9  recommendations that there be sensitivity to
10  special-need populations, of which, of course, minority
11  populations are one.
12    And so I believe -- so I thought it was
13  important to look at what the profile of poll workers
14  in the heavily minority precincts looked like. And, of
15  course, once I analyzed that, it's very clear that
16  African-American -- the poll workers in heavily
17  minority precincts were African- -- largely
18  African-American and predominantly Democrat, which
19  would reflect the constituency in those precincts.
20    And that would, of course, be evidence of a
21  sensitivity to the special needs and the cultural
22  sensitivity and outreach of helpfulness of poll workers
23  and a comfort on the part of the voter to ask for
24  assistance or whatever else.
25    Q    So you draw a correlation between the race of

Page 39

1  a poll worker and the population that poll worker is
2  serving?
3    A    Yes.
4    Q    Did you look at anything else?
5    A    I'm trying -- running through things in my
6  mind. I think that's the major analysis that I did.
7    Q    Dr. MacManus, will you be doing a report in
8  this case?
9    A    No. Not unless asked to, which I have not
10  yet been asked to do.
11    Q    So you have not been asked to do a report in
12  this case?
13    A    No. Other than the report which I believe
14  was filed initially.
15    Q    Dr. MacManus, going back to the comment
16  cards, how are voters made aware of their right to fill
17  out the comment card?
18    A    I don't know precisely. But it's my
19  understanding that they are very visible and very
20  accessible at polling places. But I have not
21  personally viewed their presence in precincts.
22    Q    Well, is it -- to your knowledge, does it
23  require a poll worker to tell a voter about the card?
24    A    I'm not sure. You'd have to ask the polling
25  officials on that.

Page 40

1    Q    So you didn't analyze -- that wasn't part of
2  your analysis?
3    A    No, it was not.
4    Q    Do you know if there are signs telling poll
5  workers -- I'm sorry -- telling voters about the cards?
6    A    I don't know directly.
7    Q    Are you providing any other consulting
8  services to the state of Florida or Hillsborough
9  County?
10    A    I don't know what you mean by that.
11    Q    Consulting services?
12    A    Other contracts other than this case? Is
13  that what you are asking?
14    Q    Yes.
15    A    No.
16    Q    Are you employed by the state in any other
17  capacity?
18    A    As a university professor.
19    (Plaintiffs' Exhibit Number 2 was marked for
20  identification.)
21  BY MR. COX:
22    Q    Dr. MacManus, one other question about the
23  election returns you looked at. Is it your opinion
24  that they are relevant to whether or not Supervisor
25  Iorio's preparation for the 2000 election had a

Page 41

1  discriminatory impact --
2    A    Absolutely.
3    Q    -- on African-American voters?
4    A    Yes.
5    Q    And could you explain the relevance?
6    A    There's no more clear affirmation of a
7  voter's confidence in a public official than their
8  vote. And the minority community has a history, at
9  least in Hillsborough County, of being very sensitive
10  to politicians who are not sensitive to their concerns
11  and needs.
12    And if there had been a tremendous
13  dissatisfaction with the outreach of Iorio during the
14  preelection cycle and past election cycles, they would
15  have certainly expressed that at the ballot box and
16  they did not. They expressed strong support for her.
17    Q    Using that logic, have voters had a chance to
18  express satisfaction or dissatisfaction with Supervisor
19  Iorio since the 2000 election?
20    A    No. She will not be up for election again
21  until -- I believe it's the 2004 cycle.
22    I would say that when she was entertaining a
23  run for possible -- possible run for other offices,
24  that she had a lot of minority supporters onboard.
25    Q    What other offices?

11 (Pages 38 to 41)

Page 42

1    A   Well, there was speculation that she might
2  run for mayor, but she announced she would not.
3    Q   And when you say "minority supporter," what
4  do you mean?
5    A   African-Americans who were willing to endorse
6  her candidacy.
7    Q   And who are those?
8    A   I don't have the specific names. These come
9  from newspaper accounts and accounts of political
10 activists who attended various functions.
11   Q   Do you know why Supervisor Iorio decided not
12 to run?
13   A   I don't know. You'd have to ask her.
14       She basically publicly, in newspaper
15 accounts, said that she wanted to make sure that all of
16 the reforms that are put in place after Election 2000
17 were up and running smoothly and she wanted to see
18 Hillsborough County successfully and smoothly implement
19 the switch to the touch-screen voting machines.
20   Q   Dr. MacManus, I've handed you Exhibit 2 to
21 your deposition. Would you take a look at that,
22 please?
23   A   Yes, sir.
24   Q   Can you identify that for me?
25   A   This is the expert witness summary, my expert

Page 43

1  witness summary.
2    Q   And did you prepare this?
3    A   I helped in the preparation.
4    Q   Who did you help in preparing this?
5    A   The counsel for Hillsborough County and for
6  the state Division of Elections.
7    Q   Okay. Who was that?
8    A   I worked with Mr. Tinkler, Ms. Kert,
9  Mr. Allen --
10       MR. HARVEY: Harvey.
11   A   And Mr. Harvey.
12       MR. HARVEY: Mr. Little.
13   A   Mr. Little. Thank you.
14 BY MR. COX:
15   Q   So did you actually write this summary?
16   A   I did not.
17   Q   And what role did you play in preparing it?
18   A   I outlined the areas that I was able to
19 testify about as an expert.
20   Q   Attached to your summary --
21   A   This?
22   Q   Yes -- is a -- first of all --
23   A   Or this?
24   Q   Just a minute.
25       Do you have an Attachment A to your summary?

Page 44

1    A   I do not.
2        (Discussion off the record.)
3  BY MR. COX:
4    Q   Okay. Dr. MacManus, I'm adding -- there is a
5  mistake on the exhibit that I had marked as
6  Exhibit 2. There should be an Attachment A, which, I
7  believe, is a your curriculum vitae.
8    A   Yes.
9    Q   And I'm having that added as part of your
10 Exhibit 2, as Attachment A, as part of the original
11 exhibit.
12       Would you take a look at that curriculum
13 vitae?
14   A   Yes.
15   Q   Is that, to your knowledge, a current vitae?
16   A   I'd say, yes.
17   Q   Is there anything that needs to be updated?
18   A   Well, things change, you know, in terms of
19 media presentations and various conference papers and
20 all that. But this is, I think, a very good
21 representation.
22   Q   Where are you currently employed?
23   A   University of South Florida.
24   Q   And what is your position there?
25   A   Distinguished university professor of public

Page 45

1  administration and political science.
2    Q   And what is your primary area of
3  specialization?
4    A   Politics. I teach a variety of courses, but
5  state and local politics and do research in a number of
6  areas. But also teach budgeting and media relations
7  for public administrators and, occasionally, urban
8  politics and policy analysis -- whatever they need me
9  to teach.
10   Q   Within the area of specialization, do you
11 have a subspecialty?
12   A   Well, I'm a public policy person, which means
13 that every -- if you analyze public policy, you analyze
14 everything from budgeting to voting to media coverage
15 of things. And in that sense, I pretty much focus a
16 lot on state and local governments but also do a lot of
17 national work as well.
18   Q   And have you written in this area, your area
19 of specialty?
20   A   Yes.
21   Q   And are those reflected in your curriculum
22 vitae?
23   A   Yes, they are. The books are delineated by
24 name. And then the location of various journal
25 articles and book chapters is identified as well as the

12 (Pages 42 to 45)

Page 46

1  groups and both public and private entities that I have
2  written reports and monographs for.
3      Q    You mentioned that there might be some minor
4  changes to your vitae. Are any of those relevant to
5  this case, do you know?
6      A    It would primarily be in the area of media
7  appearances.
8      Q    Okay. On Page 1 of your expert summary --
9      A    Yes.
10     Q    -- you mentioned that -- where it says that
11 "Dr. MacManus will provide expert testimony as to the
12 conduct of elections throughout the state of Florida
13 and will contrast such conduct with examples of
14 jurisdictions beyond Florida's borders."
15         Do you see where I am?
16     A    Yes, I do.
17     Q    Can you explain what analysis that you did in
18 that area?
19     A    Well, of course, as an analyst, I look at
20 national patterns, read a lot of literature -- both
21 popular and professional -- on elections. And, of
22 course, read the consortium reports and the task force
23 reports, which concluded that Florida's problems were
24 just mirrored everywhere else in the nation as well.
25     Q    Did you conduct any other analysis on these

Page 47

1  points?
2      A    I've examined the voter education
3  recommendations that have been made by various task
4  forces across the country as well as general
5  recommendations that extend not just to Florida -- but
6  to all other states as well and to the U.S. Congress.
7      I also, I believe, did a spreadsheet --
8  which you should have, which I took one of the national
9  task force reports that was done by the Democratic
10 groups for Representative Conyers which did a
11 state-by-state sort of summary of problems, election
12 problems that were evident in the Election 2000 cycle.
13     Q    When you say you're going to look at the
14 "conduct of elections through the state of Florida,"
15 what does that mean? Does that mean you are looking at
16 particular jurisdictions?
17     A    Things such as turnout and training and
18 supervisor attendance at various training functions
19 conducted by the Division of Elections as well as the
20 supervisors themselves.
21     Q    Supervisors in all counties in Florida --
22     A    Yes.
23     Q    -- or just certain counties?
24     A    All counties.
25     Q    So you examined all counties in Florida?

Page 48

1      A    I tried to, yes.
2      Q    Okay. What counties did you examine in
3  Florida?
4      A    All 67 in terms of their voter education
5  plans. I looked at what they've done in the past and
6  what they are doing now.
7      Q    And how about other areas?
8      A    Well, I was focusing on, you know, in -- in
9  reading the various consortium reports and the task
10 force reports, obviously, they do single out certain
11 counties as having had a certain kind of problem
12 relative to others.
13         For example, Palm Beach County, the butterfly
14 ballot which everyone is well familiar with. So in
15 that sense, certain counties are singled-out as
16 exemplary of various kinds of problems which occurred
17 not just in Florida but across the country.
18     Q    And when you say you'll contrast such
19 conduct with examples of jurisdiction beyond Florida's
20 borders --
21     A    Right.
22     Q    -- what examples are you talking about?
23         (Ms. Kert left the deposition room.)
24     A    I believe it's -- I don't have the exhibit.
25 It included things like, you know, problems with

Page 49

1  registrations not getting recorded; poll worker
2  problems; problems with transferring of information
3  from one agency -- state agency to another; long lines;
4  things like phone lines being jammed and -- among
5  other -- fraud.
6         And those are some of the generic things that
7  I looked at across -- excuse me -- all of the states.
8  BY MR. COX:
9      Q    And what you mentioned are all exhibits you
10 said?
11     A    It was an exhibit that was a spreadsheet that
12 analyzed the report that was done by the Democratic
13 Caucus for Representative Conyers. It was a report --
14 a congressional report.
15     Q    Your statement says "example of
16 jurisdictions." What jurisdictions did you look at and
17 what decision rule did you employ to come up with that
18 list?
19     A    Well, as you know, the election systems are
20 different in every single state. That's a given about
21 elections in America.
22         And so I was looking at, obviously, whatever
23 was available. If the report was talking about states,
24 I was interested in that. If they were talking about
25 specific localities, I was interested in that.

13 (Pages 46 to 49)

Page 50

1      And if they were talking --
2      Q   I'm sorry.  When you say "reports," what
3   reports?
4      A   Various reports of the task forces and the
5   consortium reports.
6      Q   So your choice of jurisdictions to look into
7   beyond Florida's borders were driven by the reports --
8      A   Yes.
9      Q   -- and studies that you looked at?
10     A   I wanted to look at whatever level was
11  possible, whatever type of jurisdiction.  I was very
12  interested in that, obviously, because of the
13  decentralized nature of election systems across the
14  states.
15     Q   Did you independently look into any of these
16  states?
17     A   I did not have time to do that.
18         I did try to review all of them that I am
19  familiar with.  And I use websites -- like, for
20  example, Stanford University's Law School website --
21  that sort of list all these reports.  So I relied upon
22  legal kinds of listings of various reports, tried to be
23  comprehensive in my analysis and review of them.
24     Q   You mentioned that you've served as an expert
25  on election process issues in your summary?

Page 51

1      A   Yes.
2      Q   What -- can you define for me what you meant
3   by "election process issues"?
4      A   Well, of course, process involves -- the
5   process of elections involves all aspects from
6   registration to educating the voter to, you know,
7   selecting and training poll workers to publicity to the
8   equipment that's being used and people's awareness of
9   that.
10     Q   Does it include ensuring -- or does it
11  include analyzing whatever mechanisms the state or
12  jurisdiction has in place to comply with the Voting
13  Rights Act or state election law?
14         MR. TINKLER:  Objection to form.
15     A   I'm not quite sure I can answer that.
16  BY MR. COX:
17     Q   You said process included the list you gave
18  me.  Does it include anything else?
19     A   Possibly.  I'd have to hear the list again.
20     Q   Well, it's your list.  Why don't you just go
21  back and tell me what you mean by "election process
22  issues"?
23     A   Well, it would be things like the
24  registration process, the accessibility.
25     Q   When you say "accessibility," what do you

Page 52

1   mean?
2      A   Well, ease of registering or changing your
3   address or things of that nature.  It would be the
4   outreach of supervisors going to various parts of the
5   community with making registration easier -- nursing
6   homes, minority community, young people at college
7   campuses, for example, high school registration -- all
8   of which these things Pam does -- Pam Iorio does in
9   Hillsborough County.
10         It would include, of course -- the process
11  would be on election day how smoothly it works and, of
12  course --
13     Q   I'm sorry.
14     A   -- all of the reports basically acknowledge
15  that there's no perfect election, that you always have
16  some problems that are just because we have people
17  involved.  And when you have people, you have human
18  error.
19         But signage at election places.  Education
20  prior to the election.  Sample ballots available to --
21  for the public, public notices, training materials for
22  poll workers, among others.  I think that's -- those
23  are all processes that I would be looking at.
24     Q   And when you say election day, how smoothly
25  it works, what do you mean?

Page 53

1      A   Well, how many complaints you have; how many
2   affirmations you have and whether there are complaints
3   about those; complaints about, you know, how many
4   people -- well, turnout, of course, would be a key
5   thing to look at.
6          If it goes smoothly you have a higher
7   turnout, more people vote, that suggests that you've
8   got a system that's working pretty well.  And, of
9   course, the complaint cards would be -- comment cards
10  would be another way that you could look at problems
11  that came up on election day or, you know, the various
12  task forces that went around the state collecting
13  information from voters.
14         And sometimes, you know, how -- from the
15  media's perspective, they sometimes want you to be fast
16  in getting your returns out, but I think thoroughness
17  is another key issue.
18         And, of course, in the -- after the election,
19  the canvassing board's action and the certification and
20  the results.
21     Q   What would indicate that on election day
22  things didn't run smoothly?
23     A   Complaints.  You always have some
24  complaints.  There's no election, you know, perfect
25  day.

14 (Pages 50 to 53)

Page 54

1    But if you have complaints of -- an unusually
2  high number of complaints of people not being able to
3  vote, being turned away; if you had turnout decline, if
4  you had long lines, standing in lines after the polls
5  were closing that were being turned away from voting;
6  if you had an inordinate number of people claiming that
7  they were denied the right to vote.
8    Q   Dr. MacManus, would you look at Attachment A
9  to your summary and, I believe, there is a list of
10  cases that you've participated in.
11    I apologize. It's actually Attachment B to
12  the summary. There's also something on Attachment A,
13  but B, I think, is more comprehensive.
14    A   Yes, sir.
15    Q   Starting with the first case, Greater Houston
16  Civic Council versus Frank Mann, 1976 -- do you see
17  where I am?
18    A   Yes, I do.
19    Q   Can you describe the subject of that case,
20  what type of case that was?
21    A   Keep in mind these are 20 years ago, and I
22  really haven't looked at these. But to the best of my
23  recollection, it involved the way that local officials
24  were elected to city council.
25    Q   Was it a case brought under the Voting Rights

Page 55

1  Act?
2    A   I believe it was.
3    Q   And what kind of work did you do on that
4  case?
5    A   I'm sorry, sir. I can't recall directly. I
6  know that I testified, and I believe it involved some
7  analysis of voting patterns, but I -- and demographic
8  work, but I absolutely cannot recall explicitly what
9  was done.
10    Q   Do you recall who you were working for?
11    A   I was a witness for the City of Houston.
12    Q   Looking at the second case there, Overton
13  versus the City of Austin, 1977?
14    A   Yes, sir.
15    Q   Do you recall the subject matter of that
16  case?
17    A   To the best of my recollection, it was also a
18  case involving the method of electing city council
19  members.
20    Q   Was it also a case brought under the Voting
21  Rights Act, do you recall?
22    A   I don't recall.
23    Q   Do you recall what work you did on the case?
24    A   No. Probably the same as I did in the
25  first. I just can't recall. This is 20-some years

Page 56

1  ago, and a lot has happened in my life since then. I
2  just can't remember the explicit details, but I was
3  retained by the City of Austin.
4    Q   Okay. The third case, Mosely versus Sadler
5  in 1978?
6    A   Yes, sir.
7    Q   Do you recall the subject matter of that
8  case?
9    A   I don't. I don't even recall the
10  jurisdiction. I apologize.
11    Q   Do you recall what work you did on the case?
12    A   No.
13    Q   Roy Jones -- Reverend Roy Jones versus City
14  of Lubbock, Texas, do you recall any details in that
15  case?
16    A   No.
17    Q   A. Gene Gaines versus City of Lubbock, 1978,
18  do you recall what work you did on that case?
19    A   No.
20    Q   Do you recall the subject matter of that
21  case?
22    A   I don't expressly recall, but I presume it
23  was probably an at-large versus single-member
24  district-type case.
25    Q   And City of Port Arthur versus United States,

Page 57

1  Case Number 6, do you recall what the subject matter of
2  that case was?
3    A   I believe it also was -- involved the method
4  of electing city council members for Port Arthur.
5    Q   Do you recall what work you did on that case?
6    A   No, sir, I don't.
7    Q   Who were you working for in this case?
8    A   City of Port Arthur.
9    Q   And James versus City of Sarasota, do you
10  recall what the details of that case were?
11    A   Again, I believe it was over the method of
12  election of city council members.
13    Q   And do you recall who you worked for in that
14  case?
15    A   City of Sarasota.
16    Q   And what work did you do on that case?
17    A   Probably some demographic and election work,
18  but I can't recall expressly. It was almost 20 years
19  ago.
20    Q   Do you recall if you took depositions in that
21  case?
22    A   I'm sorry, I don't, sir.
23    Q   How about McCord versus City of Fort
24  Lauderdale, do you recall the details of that case?
25    A   I believe, again, it was over the method of

Page 58

1  electing city council members to Fort Lauderdale.
2      Q   And do you recall what work you did for them?
3      A   I believe it was demographic work, a lot of
4  demographic work and possibly some election analysis.
5  Again, almost 20 years ago.
6      Q   In City of Overton -- I'm sorry -- Overton
7  versus City of Austin, Texas, again, do you recall the
8  details of that case?
9      A   I believe it was another case involving the
10  method of electing city council members.
11      Q   Do you remember what work you did on that
12  case, what analysis you performed?
13      A   I don't, but I -- you know, it was probably
14  demographically- and election-oriented.
15      Q   And McNeil versus City of Springfield,
16  Illinois, do you recall the details of that case?
17      A   No, sir.
18      Q   Do you recall what work you did on that case?
19      A   I can't recall expressly, but I would -- it
20  was probably demographic and electoral analysis.
21      Q   I believe we discussed DeGrandy versus
22  Wetherell.  You worked for the state in that case?
23      A   That's correct, the state senate.
24      Q   And can you tell me again what work you did
25  on that case?

Page 59

1      A   I did a lot of demographic work and work
2  related to, as we mentioned earlier, about the
3  campaigning practicalities of districts that stretched
4  all over a large geography of Florida versus other
5  districts that were more compact.
6      Q   In Vera versus Richards, do you recall the
7  subject matter of that case?
8      A   To the best of my recollection, I believe
9  that might have been a congressional redistricting
10  case.  I was retained as a rebuttal witness.
11      Q   Do you recall what testimony you were
12  rebutting?
13      A   I do not.  I know that the work involved,
14  again, a lot of demographic analysis and analysis of
15  racial and minority demographics, especially in the
16  Hispanic community.
17      Q   And in this case, who were you working for?
18      A   Which?
19      Q   Vera versus Richards, the one we're talking
20  about.
21      A   I was working for Vera.
22      Q   In Burton versus Belle Glade, do you recall
23  who you were working for in this case?
24      A   City of Belle Glade.
25      Q   And do you recall the subject matter of the

Page 60

1  case?
2      A   I'm sorry, I don't.
3      Q   Do you recall what work you did on the case?
4      A   I don't, but I would presume that it was
5  demographic and election analysis.
6      Q   In Glasper versus City of Baton Rouge and
7  East Baton Rouge Parish, do you recall what work you
8  did on that case?
9      A   This case involved -- it's still ongoing.
10  It's in limbo, I guess.  It involves the consolidation
11  of governments.
12      Q   And what work are you performing in that
13  case?
14      A   I have reviewed a lot of literature on
15  consolidation of governments.
16      Q   And who retained you in this case?
17      A   The City of Baton Rouge and East Baton Rouge
18  Parish.
19      Q   And Florida Right to Life versus Mortham, do
20  you recall what the subject matter of that case was?
21      A   This -- the general subject matter had to do
22  with campaign contribution limitations.
23      Q   And what work were you performing there?
24      A   I reviewed various polls and election returns
25  involving the public support for campaign contribution

Page 61

1  limits in Florida.
2      Q   And who were you working for in that case?
3      A   I was working for the state.
4      Q   Do you have copies of your depositions or
5  trial testimony in these cases?
6      A   I'm sorry.  I don't.  Somehow they never send
7  those to us.
8      Q   Dr. MacManus, do you know what cases in this
9  list that you actually -- at which you testified at
10  trial?
11      A   I could try to recall.  I won't guarantee 100
12  percent accuracy, but it would be -- should I just list
13  the numbers?  Is that okay?
14      Q   That's fine.
15      A   Number 1, Number 2.  I'm not sure about 3, 4
16  and 5.  Number 7, 8, 9, 10, 11 -- and testified would
17  not include an expert -- I think in the Belle Glade
18  case, it was a report rather than personal trial
19  testimony.
20      Q   You can include that as well, if you -- if
21  they submitted a report that you signed.
22      A   Okay.  I believe so.
23          And, of course, Number 14 is still in
24  progress and Number 15.
25      Q   Dr. MacManus, on Page 2 of your report, of

16 (Pages 58 to 61)

Page 62

1   your summary --
2       A   Yes, sir.
3       Q   -- you mentioned that "in analyzing
4   elections" -- it's in the first paragraph of that
5   page -- "Dr. MacManus will testify as to the problems
6   facing all elections held in a
7   representative-democratic form of government."
8           Do you see where I am?
9       A   Yes, sir.
10      Q   Could you define for me what problems you're
11  talking about there?
12      A   Well, human error, equipment problems and
13  unforeseen events.  These are common kinds of problems
14  that have been identified by election analysts over the
15  years and have certainly been verified and reiterated
16  by the numerous task force reports and recommendations
17  and also the consortium reports.
18      Q   Are there any other problems?
19      A   Well, this probably includes -- these various
20  categories include many, many subcategories.
21          For example, human error can involve, you
22  know, the voter themselves.  Maybe they didn't sign an
23  absentee ballot or didn't align the ballot correctly in
24  the machine or didn't read the instructions, didn't
25  inform the appropriate officials of change of status,

Page 63

1   went to the wrong precinct -- I mean, there is a number
2   of human errors.
3           And there's errors on the part of poll
4   workers.  They make mistakes.  As you know, many of our
5   poll workers in Florida -- and this is true across the
6   country as verified in many of these reports -- is an
7   aging poll worker force.  And several of the consortium
8   reports mention that this sometimes was a problem with
9   elderly poll workers who made mistakes at the polls.
10  couldn't locate a person's name, got flustered, tired,
11  products of the aging process, things of that nature.
12          Equipment difficulties, we well know -- it's
13  been well established that punch-card ballots were a
14  nightmare in a lot of places.  And, you know, there
15  were your typical computer glitches; some places, disk
16  failures; you know, power failures or power surges in
17  some places.  This was true not just in Florida, but
18  across the country.
19          Sometimes the counters jammed on the central
20  counting system, the optical scan systems.  I think I
21  read in some places that some of the ballots weren't
22  really cut that well, so they didn't quite fit into the
23  machine properly, things of that nature.
24      Q   When you mention poll worker error and that
25  it's an aging population, what kind of errors were you

Page 64

1   talking about that poll workers might make?
2       A   Well, many of the ones we've just talked
3   about.  But just to review them, sometimes they
4   couldn't locate a name fast enough, they become
5   flustered with a long line behind them because they
6   really wanted to serve the public and they couldn't
7   quite react.
8           I think "The New York Times" consortium
9   report talked about the difference in the impact of age
10  on the performance at the polls.
11          Other times, they were sharp with people,
12  which somewhat intimidated voters with the way they
13  were reacted to in a perhaps less then courteous manner
14  than one would have expected from a poll worker.
15          Sometimes they didn't contact -- didn't go
16  through the proper procedures for verifying a person's
17  registration status or might have directed a person to
18  the wrong precinct, if they were in the wrong precinct
19  and sent them to another precinct which was inaccurate.
20  Didn't give the voter assistance that was required
21  under the law because they felt rushed.
22          And you have to keep in mind that these are
23  long hours.  Election day is a very, very long, arduous
24  process, and it was a very heavy turnout election.  And
25  so you have elderly people who have both health

Page 65

1   limitations and sometimes -- as one of the books
2   reported educational deficiencies, intelligence
3   deficiencies that are exacerbated in a heavy turnout
4   election and a long day.
5       Q   Would poll -- would human error also include
6   any error on the part of election officials other than
7   poll workers?
8       A   Yes, it would.
9       Q   What kind of errors?
10      A   Errors such as misspelling a person's name,
11  perhaps data entry problems in the actual registration
12  process prior to the election.  Sometimes
13  misinformation given out, perhaps, by phone bank
14  operators or people who weren't as well prepared as
15  they should have been and also got flustered by the
16  heavy traffic of a very high turnout election.
17          Election officials who maybe thought they
18  knew the processes and procedures, but when push came
19  to shove, maybe were not as up to speed as they should
20  have been and make mistakes.
21          Sometimes letting people vote that shouldn't
22  vote, that weren't eligible to vote and conversely,
23  letting people -- you know, keeping people from voting
24  who should have been allowed to vote.
25          All of those things are often what most of

17 (Pages 62 to 65)

Page 66

1  your legal scholars talk about as being just
2  irregularities that are part of the election process.
3      Q    And these problems that you are defining as
4  we're going along are problems that you observed in
5  Hillsborough County as well as other counties in
6  Florida?
7      A    No. I think I was just talking about the
8  fact that you asked me about what kind of problems.
9      Q    Well. what kinds of problems that's actually
10  referred in your report on Page 2, where it says,
11  "analyzing elections, Dr. MacManus will testify as to
12  the problems facing all elections held in a
13  representative-democratic form of government" -- does
14  that include problems that would be in Hillsborough
15  County as well as other counties in Florida?
16      A    Yes, it does.
17      Q    Have you sought to, through your analysis, to
18  quantify the magnitude of error by officials versus
19  errors of voters?
20      A    That's very hard. The closest -- the only
21  data that you have are really complaints from voters.
22  And that, of course, is often very difficult to get and
23  not very representative.
24          It's just -- the best you can do, though, are
25  the comment cards and testimony at commission hearings

Page 67

1  held around the state. Those are the two ways that you
2  most identify.
3      Q    So you have sought to quantify?
4      A    Well, quantify in that I've looked at those.
5  I haven't put a numeric count to them. I'm not sure
6  how accurate that would be or how -- because some
7  counties are better at having public hearings and
8  people are more educated and express themselves more
9  about things than other counties.
10          So it would be, I think, really hard to come
11  up with a standard measure of election personnel
12  mistakes that would be sound across all counties and
13  all states.
14      Q    You mentioned comment cards and ways of
15  quantifying poll -- voter error. Are there ways of
16  quantifying poll worker error or election official
17  error?
18          MR. TINKLER: Objection to form.
19  BY MR. COX:
20      Q    Do you understand the question?
21      A    Not totally.
22      Q    Okay.
23      A    But I will answer --
24      Q    I'll clarify it for you.
25          You mentioned that comment cards and

Page 68

1  complaints are one way of quantifying voter error. Is
2  that correct? Is that what you said?
3      A    Not so much voter error. I was talking about
4  the comment cards as verifying complaints about the
5  election personnel --
6      Q    Okay.
7      A    -- poll workers included. And sometimes in
8  the comment cards that I looked at, there was reference
9  to election personnel.
10      Q    Is that the only data available to make that
11  kind of assessment?
12      A    To my knowledge in Hillsborough County that
13  is.
14      Q    Is that the only data available in other
15  counties in Florida?
16      A    I'm not sure.
17      Q    Is that the only data available in other
18  jurisdictions that you looked at across the country?
19      A    I'm not sure about that. I've never seen,
20  in my professional experience, never seen a quantified
21  study that has come up with a percentage or, you know,
22  a rate of election personnel error.
23      Q    Versus voter error?
24      A    Versus voter error, yes.
25      Q    And you haven't attempted to do that in this

Page 69

1  case?
2      A    I have not attempted. But what I have done
3  in that regard is to review all of these major
4  post-election analyses, both by the consortium and by
5  various task forces, in which they do talk about some
6  of these problems that involved election personnel.
7      Q    But you've made no attempt to quantify the --
8  how much of that error or problems are poll workers or
9  election official problems and how much of those
10  problems are voter problems?
11      A    I am not aware of -- no, I have not. And I
12  am not aware of any methodology which currently exists
13  among political scientists to do that.
14      Q    Is there a way to do that in a qualitative
15  way other than quantitatively?
16      A    The qualitative way, I believe, has been
17  through the various consortium and task force reports.
18      Q    And have you --
19      A    And, for example, Hillsborough County -- both
20  of the major task force consortium talk about Iorio as
21  being a very civic-minded, very non-partisan acting,
22  highly-professional individual.
23      Q    Can you point to one of the reports that
24  actually does a qualitative analysis of how much of the
25  problems that you talk about were problems on behalf of

18 (Pages 66 to 69)

All Florida Reporting, Inc.
(800) 898-7373

Page 70

1 the poll workers and how much of those problems were on
2 behalf the voters?
3     MR. TINKLER: Objection to form.
4     A    Again, only in the sense of looking at,
5 again, what these major national task force reports and
6 their discussion of it and the consortium reports'
7 discussion of election official problems.
8     For example, Palm Beach County, the ballot
9 design, butterfly ballot design, well, that was, of
10 course. done by elected -- I mean, excuse me --
11 election personnel. Ballot designs in other places --
12 not just in Florida, but across the nation also, of
13 course, are done by election personnel. And sometimes
14 they have had unexpected and unintended consequences.
15 BY MR. COX:
16     Q    You also mentioned that -- on Page 2 of your
17 report -- human error was one comment. Equipment
18 difficulties.
19     When you mention -- when you described what
20 that meant before, would that include also allocation
21 of equipment, any problems in allocating equipment?
22     A    Equipment difficulties -- the allocation of
23 equipment would probably be more of a human error in
24 that it would be a decision made by election personnel.
25     Q    Would human error also encompass any problems

Page 71

1 in assessing the capacity of the poll site or the
2 workers to handle the voters who were coming in that
3 day?
4     A    Yes, it would. And, of course, many of these
5 analyses that we've been discussing all morning do
6 point to that fact that in many, many places, the
7 turnout was -- far exceeded expectations. Because
8 across the country, as you well know, presidential
9 turnout had been going down.
10     And this was the first jump up we'd seen in
11 quite some time. And so you had a lot of these
12 election supervisors basing their equipment allocation
13 on registrants -- number of registrants as well as
14 historical patterns of turnout.
15     And so, you know, they made a mistake. They
16 didn't predict very well. And that's -- the same is
17 true of political scientists. None of them got it
18 right that -- the election forecasters were wrong too.
19     Q    And the problems you just described, were
20 those problems that were in Hillsborough County as
21 well?
22     A    Not to my knowledge.
23     Q    So Hillsborough County didn't -- didn't
24 underestimate the turnout?
25     A    Not to my knowledge. They were very few --

Page 72

1 there were some complaints about -- in the comment
2 cards about not enough machines, but there wasn't any
3 kind of pattern to it. It was just kind of sporadic,
4 here, there. And some people complained about it.
5 Others complained about parking or no air-conditioning
6 or things of that nature.
7     Q    Did you look at anything else to determine
8 that?
9     A    No, I did not.
10     Q    So the comment cards is what you looked at?
11     A    Yes.
12     Q    The problems that you described in terms of
13 misscalling, so to speak, the amount of turnout, did
14 that occur at other places in Florida?
15     A    Yes, it did. And it occurred across the
16 nation as well.
17     Q    Where else did it occur in Florida?
18     A    It occurred in a lot of the metropolitan
19 areas with large urban population where there's been a
20 lot of media attention, which, of course, has sparked
21 interest in the election.
22     Q    Any counties in particular?
23     A    The urban counties, all the big counties in
24 the state. Jacksonville, Duval area; Orlando area,
25 Orange County; Volusia, in that area; the east coast,

Page 73

1 which is Broward, Palm Beach, Brevard, Miami-Dade. And
2 then, of course, the -- this part of the state, the
3 Tampa area and also Pensacola.
4     So you have your large -- large population
5 areas which are, you know, big media markets where
6 there's been a lot of attention to elections. Then you
7 had high turnout, because it was very -- it was a very
8 competitive election, as we know.
9     Q    You mentioned --
10     A    Some people call it a photo-finish election,
11 so.
12     Q    You mentioned that Hillsborough County,
13 however, was correct in assessing the turnout in your
14 estimation?
15     A    Well, they probably underestimated a little,
16 but I didn't see the consequences in terms of their
17 assignments of machinery to precincts. That wasn't a
18 problem that was identified as major here as in
19 other places.
20     Q    We'll do the comparison in a few minutes.
21 I'm just really asking whether or not in your opinion
22 Hillsborough County was correct in assessing the amount
23 of turnout that occurred in the last election,
24 accurately assessed it.
25     A    I would say it slightly underestimated

19 (Pages 70 to 73)

Page 74

1   turnout.
2       Q   And when you say "slightly," what do you
3   mean?
4       A   I'd have to look back. I can't recall
5   exactly what percentages. Pam -- as is typical, many
6   of your big county supervisors often give sort of, you
7   know, predictions about the expected turnout.
8           And I believe that hers was a little under,
9   but I can't recall expressly. She's usually very
10  accurate.
11      Q   In your experience, how should states predict
12  the extent of turnout? Or how should they be able to
13  assess that?
14      A   It's virtually impossible to accurately
15  assess turnout, but what you can do is look at past
16  patterns. But, of course, election uniquenesses affect
17  turnout -- the candidates themselves, the closeness of
18  the election, the situations in America, the economics.
19  And those often are extremely difficult to project,
20  which is why all of the major political science
21  election forecasters got it wrong.
22      Q   Is there a way that states could have done a
23  better job in your opinion in assessing the turnout for
24  these counties in Florida that you mentioned?
25      A   I don't have any way of really making -- I

Page 75

1   haven't studied that expressly.
2       Q   So you don't have any recommendations on how
3   they could have done a better job in predicting the
4   turnout?
5           MR. TINKLER: Objection to form.
6       A   Again, I have not studied this.
7   BY MR. COX:
8       Q   You also mentioned unforeseen errors or
9   unforeseen events in your summary. Could you describe
10  what that means, what you mean by that?
11      A   Well, again, based on the reviews of all
12  these consortium and task force reports, unforeseen
13  events can be things like weather, which is often, as
14  we know, unpredictable, especially in Florida.
15          It can be any kind of sudden illnesses or the
16  unexpected unavailability of poll workers who got ill
17  at the last minute and couldn't show up. I mean, you
18  can't predict that necessarily. Those are just a
19  couple.
20      Q   Are there any others that you can think of?
21      A   Probably, but I think those are the two that
22  probably most come to mind.
23      Q   And what kind of unforeseen errors do you
24  think were a factor in this election, the past election
25  that you studied?

Page 76

1           MR. HARVEY: Object to the form.
2   BY MR. COX:
3       Q   You can answer.
4       A   Well, I think I've pretty well stated that
5   these were -- some of these were more important factors
6   in some places than others, both within Florida and
7   outside of Florida. They had differential impact
8   depending upon the areas.
9       Q   For the unforeseen errors, you mentioned
10  weather and sudden unavailability of poll workers.
11      A   Right.
12      Q   Where did weather factor into -- as an
13  unforeseen error?
14          MR. HARVEY: Object to the form.
15      A   I can't recall the exact states, but there
16  were some that had weather problems that affected.
17  BY MR. COX:
18      Q   In Florida, did weather play a factor?
19      A   I don't recall.
20      Q   You mentioned also the sudden unavailability
21  of poll workers being an example of an unforeseen -- an
22  example of an unforeseen error --
23          MR. HARVEY: Just for the record, just
24      continuing objection to "unforeseen error." I
25      think she said "unforeseen event," so a continuing

Page 77

1       objection to the line of questioning.
2   BY MR. COX:
3       Q   Okay.
4       A   Would you restate your question?
5       Q   Sure. Unforeseen events, can you describe
6   what the unforeseen events were that you meant in your
7   summary?
8       A   Right. It would be things like weather
9   difficulties, which you couldn't predict. Or in some
10  cases, it would be examples of events where polls were
11  scheduled to open but poll workers couldn't get there
12  for one reason or another, or for some unforeseen
13  reason did not show up.
14          I believe some of the national consortium
15  reports pointed out that some places, polls opened but
16  there weren't enough workers. And, you know, the
17  election supervisors had no way of predicting that. It
18  was just personal situations. It's no different than
19  people calling in sick to work unexpectedly.
20      Q   In Florida, counties in Florida, was the
21  sudden unavailability of poll workers as you've
22  described an unforeseen event that occurred?
23      A   I can't recall any specific example of it.
24  There may have been. One doesn't come to mind
25  immediately.

20 (Pages 74 to 77)

Page 78

1      Q    Was it an unforeseen event in Hillsborough
2    County in the last election?
3      A    Not to my knowledge.
4      Q    You mentioned also in your report, on that
5    same page that we are discussing, that your "testimony
6    will encompass a review from a historical perspective
7    of elections, including an analysis of problems
8    encountered throughout the country during the 2000
9    election."
10          Can you explain what you mean by "review from
11   a historical perspective"?
12     A    Well, looking at what the various task force
13   reports and consortium reports say about how long some
14   of these problems have been evident but unattended to.
15          And, for example, looking at what many of
16   them have reported are common rates of errors with
17   regards to non-voting in presidential elections, things
18   of that nature.
19     Q    Does your analysis -- or will your
20   analysis include an analysis of Florida's history of
21   discrimination in that area of voting rights or the
22   area of voting?
23     A    No.
24     Q    And why not?
25     A    Because I was looking at Election 2000 and

Page 79

1    looking at -- the focus was on mistakes made and areas
2    where improvements could be made -- in other words,
3    looking at the analysis of what went wrong in Election
4    2000 and what remedies could be put in place to keep
5    those things from happening again.
6          And I think it's very common knowledge that,
7    in Florida, that there has -- we have evidence of
8    discrimination against minorities in our state's
9    history, which would be true of any southern state and
10   many other states as well.  But the focus here was on
11   Election 2000 and looking at how it impacted on the
12   voters.
13     Q    Does your analysis look at the lingering
14   effects, if any, of that history of discrimination in
15   the electoral process?
16     A    I did not do that kind of analysis.
17          I looked at the current situation which was
18   present in Election 2000, because Florida has made
19   great strides -- granted often pushed by federal
20   legislation and court rulings -- but we've made great
21   strides in our accessibility for minorities to our
22   electoral system.  And the state has had to because we
23   are a very diverse state.  We are one of the
24   most-diverse states in the country.
25     Q    Why did you not decide to look into the

Page 80

1    lingering effects of prior discrimination?
2      A    In a sense, I did in that.  If there had been
3    major lingering-effects problems, I would have seen
4    that in the data that I looked at for Hillsborough
5    County and in the reports that I looked at.  And I have
6    not seen any conclusion by the major national reports
7    and consortium reports -- which did go back and sort of
8    look at Florida -- that concluded there were lingering
9    effects.
10     Q    Independent of the studies that you reviewed,
11   what factors would you have looked at to determine
12   whether or not there were lingering effects?
13     A    I would have to go back and study the
14   literature on how to look at lingering effects.  I, as
15   I mentioned, was asked to look at Election 2000 and
16   looked at the impacts and how accessible the system was
17   in 2000 -- which in my judgment would have captured any
18   kind of lingering effects.
19          And, quite the contrary, we see an increase
20   in black registration and black turnout, which you
21   would not expect if you had major lingering effects of
22   a discriminatory nature.
23     Q    Was that increase larger than the increase of
24   white turnout?
25     A    Yes.

Page 81

1      Q    Proportionately?
2      A    Yes.
3      Q    And was it a larger increase across the
4    board, in all counties in Florida?
5      A    I'm not sure about all the counties.  I'm
6    sure about Hillsborough.
7      Q    What -- in looking at -- you've mentioned you
8    didn't see any evidence of lingering effects in what
9    you have reviewed, the reports you reviewed.
10          What did you look at in those reports that
11   would indicate that?
12     A    Well, there would have been that specific
13   language, and I did not see that specific language.
14     Q    Does your analysis in this area include any
15   examination of socioeconomic disparities that might
16   fall out along race lines?
17     A    I have looked at that in the context of
18   several of the national task force reports that did
19   talk about the impact of socioeconomic factors on
20   various aspects of Election 2000 -- specifically,
21   income, education, age, disability status, marital
22   status, things of that nature, mobility.
23     Q    And what did those reports say about those
24   factors?
25     A    They -- for example, on the age, they do

21 (Pages 78 to 81)

Page 82

1  conclude that -- and the undervote statistics -- I
2  think it was reported by "The New York Times"
3  consortium -- shows that undervotes or mistakes on
4  ballots in punch-card counties are highest in counties
5  that had large concentrations of elderly voters, for
6  example.
7      Q   What about the other socioeconomic factors?
8      A   Many of the consortium reports reported that
9  voter mistakes were most common among low-income and
10  lower-educated individuals.
11     Q   And would that be true in Florida as well?
12     A   Yes.
13     Q   Was that true in Hillsborough County?
14     A   I'm not sure about that. I've not seen any
15  statistical analysis of that.
16     Q   Do you have any reason to believe it wouldn't
17  be true in Hillsborough County?
18     A   Might possibly not be as true here as in
19  other places.
20     Q   But you have no reason to believe it wouldn't
21  be true at all?
22         MR. TINKLER: Objection to form.
23     A   Can't answer.
24  BY MR. COX:
25     Q   What, in your assessment, would indicate that

Page 83

1  would be less true in Hillsborough County?
2      A   Well, for example, with regards to just
3  looking at the statistics here, the increase in
4  minority participation among Hispanics and
5  African-Americans went up considerably.
6          And so -- and yet those populations tend to
7  be -- have larger concentrations of poorer and
8  lower-literacy, lower-education levels than the
9  white population.
10     Q   You mention also in that same page of your
11  report that you're going to analyze problems
12  encountered throughout the country during the 2000
13  election. What assessments did you make in order to
14  determine that or to do that analysis?
15     A   Again, I reviewed as many -- as comprehensive
16  a list of the various task force reports that I could
17  locate, you know, through professional venues and read
18  through those reports. And that's how I conducted that
19  analysis.
20     Q   And the problems that you analyzed that are
21  referenced in that, are those the problems we've been
22  discussing today?
23         MR. TINKLER: Objection to form.
24     A   The problems are a wide range of problems
25  including everything from recount standards not being

Page 84

1  clear to, you know, how to define votes to poll worker
2  problems to voter mistakes to election personnel
3  mistakes to unforeseen events to equipment failures,
4  all the things we've been talking about, yes, sir.
5  BY MR. COX:
6      Q   Okay. Just to be clear, then when you say
7  problems in the sentence that begin -- that has "an
8  analysis of problems during the 2000 election," what
9  problems are you talking about?
10     A   Talking about every problem related to
11  equipment failures, human error, unforeseen events, all
12  of those.
13     Q   And specifically what, in determining that,
14  what parts of the country did you assess or what
15  jurisdictions did you assess?
16     A   Many of these reports looked at a number of
17  jurisdictions. Some of them are, for example, the GAO
18  reports and the one I mentioned earlier for
19  Representative Conyers looked at all 50 states.
20         Some people have done -- if you read a
21  publication called "The Election Administration
22  Report," which is a newsletter for election
23  professionals, there were many -- I looked through
24  those -- I subscribe to that -- examples of problems
25  that occurred in specific localities across the

Page 85

1  country. But most of those were captured in the list
2  of problems that were delineated by the various task
3  force reports.
4      Q   And so you didn't do an independent study of
5  any particular states? You just read the reports?
6      A   Yes, sir.
7      Q   They informed you?
8      A   Right. These were more methodical and more
9  comprehensive and had the time and resources to do the
10  comparative analysis that I would not have had.
11     Q   You mentioned in that same sentence that --
12  "throughout the country during the 2000 election." Did
13  you review any other elections to do your analysis?
14     A   I was focusing on 2000, but in the course of
15  reading these summaries and delineations of problems
16  that have confronted the electoral system for quite
17  some time, obviously, there were comments about
18  previous elections.
19         For example, I think it was both the "Miami
20  Herald" and "The New York Times" studies talked about,
21  you know, undervote statistics. I believe they quoted
22  some that were in place in 1996. And in that sense, I
23  would have looked at what happened in previous
24  elections.
25         But in the course of focusing on 2000, the

22 (Pages 82 to 85)

All Florida Reporting, Inc.
(800) 898-7373

Page 86

1  major point that these consortium reports are making is
2  that many of these problems have been around for quite
3  some time and states have not dealt with them as they
4  should have.
5      Q   Going back to that -- the 1996 election, for
6  example, did they -- did the reports you read or did
7  your own independent assessment allow you to assess
8  whether or not election administration process had
9  improved over time, gotten worse or stayed the same?
10     MR. TINKLER: Objection to form.
11 BY MR. COX:
12     Q   You can answer.
13     A   There were examples of improvement.
14     Q   Where?
15     A   In Florida and elsewhere.
16         For example, I think there are a lot of
17 improvements that had been made in outreach to voters,
18 better publicity. Some places mailed out sample
19 ballots before it was required by law but --
20 Hillsborough County being one.
21     Q   Specifically, where did you see improvements
22 over -- since the last election, since the election
23 before the 2000 election?
24     A   I saw improvements in at least -- this is my
25 assessment from speaking with various supervisors and

Page 87

1  personnel and media personnel that there were
2  improvements of the availability of election officials
3  for interviews and public programs at the state level.
4      The Division of Elections' website improved
5  remarkably, and was a very important tool, not only for
6  voters and advocacy groups but for elections
7  professionals and average citizens across the state.
8      And I think the training programs improved.
9      Q   Training programs for who?
10     A   For supervisors and even for poll workers,
11 improved in a lot of places, including Hillsborough
12 County.
13     Q   Any other areas?
14     A   I think the registration process improved or
15 we wouldn't have had the increase in registration that
16 we did.
17     Q   When you say "registration process," you
18 mean?
19     A   Registering of voters.
20     Q   Registers of voters?
21     A   Right. You still always have mistakes,
22 because people can't remember their right address or
23 forget to call in something or somebody makes a data
24 entry problem.
25         But the statistics speak for themselves in

Page 88

1  that you had a vast improvement in the number of
2  participants in the electoral process between the -- in
3  the '96 presidential race and 2000.
4      Technology improvements as well, the website
5  being one. And many, many supervisors do have
6  websites.
7      Q   Did any of these improvements that you've
8  listed here indicate or signal to election officials
9  that turnout would be increased for the next election?
10     MR. TINKLER: Objection to form.
11     A   I can't speak. I have not surveyed them for
12 their opinions on that.
13 BY MR. COX:
14     Q   You mentioned that you talked to some
15 supervisors though?
16     A   That is correct.
17     Q   The supervisors and election officials that
18 you've talked to, as well as those reports you've read
19 and your opinion as a political scientist, would any of
20 these improvements be a signal or an indicator that
21 turnout would be increased in the 2000 election?
22     A   Possibly. But there were also a number of
23 predictions that turnout would be lower. There was --
24 polls prior to the election showed that the public
25 wasn't as interested in this election, debate

Page 89

1  interest -- you know, the number of viewers of debates
2  had gone down. And so they were getting crossed
3  signals.
4      Q   But the list that you gave me of these
5  improvements would have been a signal possibly of
6  increased in turnout?
7      A   Would have been a signal, yes.
8      But, again, as I mentioned there were crossed
9  signals that they were also aware of.
10     Q   What jurisdictions specifically did those
11 improvements occur in?
12     A   I don't have a list in front of me. I did
13 look at voter education plans and -- of all the 67
14 counties which, I believe, are -- are they in evidence?
15 Or the state Division of Elections has those, and they
16 are available to the public.
17     And I've looked at poll worker manuals across
18 a number of counties, poll worker training manuals. In
19 that sense, I couldn't identify, pick out specific
20 counties at this moment.
21     Q   So specifically, you can't identify counties
22 where these improvements occurred?
23     A   All I can testify to is that they occurred in
24 a number of counties or you wouldn't have had the
25 improvement in turnout and registration figures that

23 (Pages 86 to 89)

Page 90

1   you see. And I am definitely aware that they occurred
2   in Hillsborough County.
3       Q   Did they occur in Duval County?
4       A   I'm not sure.
5       Q   Volusia County?
6       A   I'm not sure. I do know that Duval County
7   had some technical difficulties with their election and
8   ballot-design problems that were not evident in
9   Hillsborough County.
10      Q   Did it occur in Volusia County?
11      A   I'm not sure.
12      Q   Did these improvements occur in Orange
13  County?
14      (Ms. Kert returned to the deposition.)
15      A   I believe some of them must have, because as
16  I recall from just reading, after the election,
17  analyses and not having the numbers in front of me,
18  that turnout and registration went up in Orange County
19  and really went up for minorities, particularly for
20  Hispanics, which were a new large voting group in
21  Orange County.
22      But I didn't expressly look at Orange County
23  other than in my normal role as an analyst to kind of
24  pay attention to what's happening all over the state.
25  BY MR. COX:

Page 91

1       Q   Did these improvements occur in Miami-Dade
2   County?
3       A   Again, I believe that some of them did,
4   because the registration and turnout went up in
5   Miami-Dade as well and more minorities voted.
6       Q   Still looking at Page 2 of your report, can
7   you explain what you meant by "decentralized system"
8   there?
9       A   Well, American elections -- the American
10  election system is described as a very decentralized
11  election system. And that's true if you pick up a
12  legal book such as the one I mentioned, "When Elections
13  Go Bad," by some legal scholars to state and local
14  textbooks to whatever, describe the American election
15  system as a highly-decentralized system.
16      And within that, some states are more
17  centralized than others, and that reflects the federal
18  structure that we have.
19      And Florida happens to be a state that would
20  be categorized as more decentralized than some, but not
21  as decentralized as others. The GAO report, I believe,
22  addresses the issue of decentralization.
23      Q   And, in Florida, what does that mean to
24  Florida in terms of being a decentralized system?
25      A   It means that much of the responsibility for

Page 92

1   the conduct of elections is delegated to the elected
2   county Supervisors of Elections -- to the Supervisors
3   of Elections. There's one that's not elected,
4   Miami-Dade supervisor.
5       Q   You mentioned also in terms of looking at the
6   decentralized election system that you're going to look
7   at an analysis of how the Florida system worked in the
8   2000 general election.
9       Did you look at any other election in terms
10  of analyzing decentralized systems?
11      A   No. I was focusing on the 2000 election.
12      Q   You say you are also going to focus on how
13  "Florida's unique population requires such a system and
14  how each county tailors their approach to elections in
15  order to best serve their population."
16      Could you describe what you mean by "unique
17  population"?
18      A   Well, as you know from reading many of the
19  national task force reports and election analyses and
20  recommendations in specific, most of these reports
21  recommended that states and counties tailor their
22  outreach programs and training programs and educational
23  programs to the population that they serve. And that,
24  of course, differs tremendously.
25      I think special-needs populations that have

Page 93

1   been identified by some of these national reports would
2   include young and the elderly and disabled, minority
3   voters, language minorities, people who move a lot.
4       I'm trying to think of other categories, but
5   special-needs categories are -- and the advice given in
6   recommendations is that governments need to be
7   sensitive to the configuration, the demographics of the
8   population that they serve and that not all counties or
9   all states have the same demographics. And so it
10  shouldn't be expected that they would all use the same
11  outreach mechanisms.
12      In other words, they are recommending that
13  election officials target special-needs populations
14  that I've just identified.
15      Q   And so when you say "unique population" here,
16  you're referring to these special-needs populations?
17      A   Yes. And the fact of the matter is that in
18  some counties, population size also makes a difference.
19      For example, a number of our counties in the
20  Panhandle are very small. And it wouldn't make a lot
21  of sense for them to spend money on television
22  campaigns as an outreach mechanism as it would for them
23  to spend money on other things. And that's an example
24  of population size.
25      Whereas for a big county, like Hillsborough,

24 (Pages 90 to 93)

Page 94

1  use of the electronic media makes a lot more sense. It
2  reaches a larger percentage of the people that you are
3  trying to reach than it would in a smaller county, for
4  example.
5      Q   In that context, would size of precinct
6  matter?
7      A   No. As long as -- I can't see how it relates
8  to the media, the size of the precinct, no.
9      Q   I'm sorry. I don't mean media. I'm talking
10 about in terms of serving these unique populations.
11 Would the size of the precinct be a factor?
12     A   It could. And the -- particularly, for
13 example, if you've got a very -- let's say you have a
14 very small precinct that has a number of nursing home
15 facilities or ALFs -- assisted living facilities in
16 that precinct, then it might be different in the way
17 that you assign -- you know, certain election officials
18 may themselves go and conduct registration and voting
19 in those homes, which would be sensitive to the
20 population.
21         And they would then assign perhaps fewer
22 people to actually work at the polls, because a larger
23 percentage of people who would be voting would be in
24 these homes. That's just one example.
25         And, of course, as you know, Florida is the

Page 95

1  grayest state in the America, and we have a number of
2  areas of the state with large concentrations of
3  seniors.
4      Q   You mentioned that minority voter and
5  language-minority voters are in a special-needs
6  population, and you mentioned that there are
7  recommendations that election officials tailor their
8  work or tailor their administration to these special
9  needs.
10         In what way do they tailor their
11 administration to these special needs?
12     A   In looking at and analyzing the voter
13 education plans for all of the counties, it's very
14 evident that, for example -- let me just mention one --
15 language minorities.
16         You know, several counties have special --
17 and are putting in place -- special programs where they
18 have -- they recruit more minority poll workers. They
19 recruit the assistance of minority advocacy groups in
20 helping design and word literature that reaches homes.
21         There's even interesting inter-generational
22 programs where in areas where there is a large, for
23 example, migrant population, with a lot of children in
24 the school system, that literature be sent through the
25 child to the parent that informs them about the voting

Page 96

1  process and registration and who to contact.
2          And in several other counties, community
3  colleges have been tapped to help devise literature and
4  outreach strategies that reach various populations.
5      Q   And how would -- the studies and the work
6  that you've done, how would -- based on that, how would
7  you -- or how would they recommend that election
8  administration be tailored toward minority voters?
9      A   Well, it's tailored in the way that you --
10 first of all, your preelection activities, the way you
11 go about reaching that particular population, whether
12 it be through churches, through families, through
13 various social service agencies, community groups -- as
14 I mentioned, through the schools, through the different
15 kinds of materials.
16         Maybe videos versus written materials, if
17 you've got a population with a sizable portion -- and
18 being sensitive to preparing materials that are in that
19 language, ballots in that -- in the language,
20 literature.
21         Reaching through specialized minority media,
22 minority newspapers, radio and in your bigger areas,
23 cable TV, which is a very segmented aud- -- segmented
24 media. So these are just a number of examples of how
25 you get out information to voters in a way that they

Page 97

1  are most able to assimilate it.
2      Q   And how is that tailoring done in
3  Hillsborough County?
4      A   There's a lot done here. For example,
5  Supervisor Iorio is constantly speaking before minority
6  groups. And she always takes with her a stack of
7  registration cards. I know her. She's come to my
8  class before, and she never goes anywhere without them.
9          And she is constantly being quoted and
10 interviewed by the minority newspapers in this
11 community. She's on television, public access
12 television. She's out giving speeches to minorities
13 groups constantly and demonstrating new equipment,
14 looking for new ways to reach them through development
15 of videos, schools, better training materials for poll
16 workers and aggressive recruitment of minority poll
17 workers.
18         There's just a vast array of ways that she
19 has tailored -- and, of course, this is a very diverse
20 county, because there is a sizeable Hispanic population
21 as well as an African-American population.
22     Q   These tailoring methods that you just
23 mentioned, over what period of time were you assessing?
24     A   I looked at them in terms of the
25 information -- the formal documents that were filed

25 (Pages 94 to 97)

Page 98

1  with the Division of Elections. I looked at what they
2  were putting in place -- new things after Election
3  2000.
4        Because voter education -- Florida is, to my
5  knowledge, the only state that's funded voter
6  education. They've put $6 million -- appropriated
7  $6 million which was distributed to the counties on a
8  formula basis, specifically for the purpose of voter
9  education.
10        And in the course of preparing the documents
11  to qualify for the funds, the counties had to outline
12  things that they were doing and things that they were
13  going to put into place after Election 2000.
14        So I've been focusing on what they have been
15  putting in place now that they have to have in place by
16  Election 2002.
17    Q   And these are reforms?
18    A   Yes.
19    Q   Did you assess any tailoring before Election
20  2000?
21    A   Not methodically, just in my course of
22  talking to supervisors and appearing on various forums
23  where election officials appeared.
24    Q   So there was no methodical examination of the
25  tailoring that you described before the 2000 election?

Page 99

1    A   No, only in a sense of looking at what
2  documents were filed by the various counties with the
3  state Division of Elections.
4    Q   Was that post-2000?
5    A   Yes.
6    Q   Okay. Post-2000 election. Okay.
7    A   But very post-2000, because as you know,
8  Florida was in the maelstrom. And our legislature and
9  our population were adamant that we had to fix the
10  problems that came to the forefront in Florida after
11  2000 -- in the 2000 election.
12    Q   You mentioned also on Page 2 that your
13  analysis "will include an analysis of the training and
14  procedures of the state and local levels and the voter
15  education plans submitted by the Supervisors of
16  Elections statewide and the minimum standards for
17  non-partisan voter education being prepared by the
18  division."
19        Do you see where I am?
20    A   Yes, I do, sir.
21    Q   Specifically, what training and procedures
22  did you analyze or look at?
23    A   I examined the programs -- twice a year, the
24  Florida -- I can never get the exact title right. The
25  Florida -- I think it's the State Association of

Page 100

1  Supervisors of Elections -- has two meetings a year.
2        And at those meetings, Division of Elections
3  personnel give presentations and bring the supervisors
4  up to date on various issues, from Motor Voter to
5  redistricting to new registration, new laws, new
6  procedures, new technologies. Various guests are
7  invited in.
8        The supervisors themselves sort of have
9  special subgroups in the past depending on whether they
10  are a big urban county or sometimes depending upon the
11  kind of equipment they used -- which, of course, will
12  change now.
13        But I examined those and I have personally
14  given several of those training sessions to the state
15  association, so I know they're well attended and the
16  supervisors are very attentive. So those were some of
17  the training things that I looked at.
18    Q   So these were trainings of Supervisors of
19  Elections?
20    A   Right.
21    Q   Did you look at any training or training
22  procedures regarding other election officials besides
23  Supervisors of Elections?
24    A   In addition to the supervisors -- many
25  supervisors bring other personnel with them. So this

Page 101

1  meeting would not just include the supervisors. There
2  are 67 supervisors, but often there's 2- or 300 people
3  at these meetings.
4        And in looking at some of the voter education
5  plans, a number of counties have said they are going to
6  bring even more of their officials now to these
7  training sessions.
8    Q   Who are included in these training sessions
9  besides Supervisors of Elections?
10    A   Well, it would be -- sometimes your data
11  management person, sometimes the person in charge of
12  your equipment, warehousing.
13        Depending on the topic, it might be your, as
14  I mentioned, data management person. It might be your
15  deputy. It might be your PR person.
16        It varies from county to county. And, of
17  course, the size of the county makes a lot of
18  difference. Small counties are only going to have --
19  supervisors' offices are only going to have two or
20  three or four people. Whereas, you know, there's I
21  don't know how many here, but a lot more than that.
22    Q   You mentioned that you conduct some of these
23  training procedures.
24    A   Yes, I do.
25    Q   Are you compensated for that?

26 (Pages 98 to 101)

Page 102

1    A  No, only to have my expenses paid.
2    Q  And how often do you do those?
3    A  I did two in 2000, prior to the 2000
4  election, because I've done a lot of research on issues
5  of elderly and disabled voters. In fact, I wrote a
6  textbook -- or a book titled, "Targeting Senior
7  Voters," and was asked by the association to come talk
8  to the supervisors about special needs of seniors and
9  disabled. And so I gave a presentation on that.
10     And then the second one I gave was as chair
11  of the Florida Elections Commission. The
12  supervisors -- I was asked to give an overview of the
13  areas of the law where candidates were making the most
14  mistakes to kind of help supervisors, when candidates
15  come in to file for office or file their expenditures
16  or whatever, that they would be attentive to the
17  mistake-prone areas.
18     And I think that Power Point presentation was
19  put up on the website, but I'm not absolutely certain.
20    Q  Are you aware if anyone does any trainings or
21  presentations regarding other special-need communities
22  besides elderly?
23    A  Yes. I believe in looking at those, there is
24  often talk of minority community -- and minority -- as
25  I recall, minority legislators have been invited to

Page 103

1  come in and talk to this group, you know, fairly often.
2  So in that sense, yes.
3    Q  Are you aware if anyone does training or
4  does presentations before this group regarding
5  responsibilities under the Voting Rights Act or the
6  National Voter Registration Act?
7    A  Yes, they do.
8    Q  Who does that?
9    A  I believe the Division of Elections is
10  responsible for that. And I do recall looking at
11  several Power Point presentations specifically on the
12  Motor Voter -- the National Voter Registration Act and
13  also, I believe, the Voting Rights Act.
14    Q  In your analysis of training and procedure,
15  are you looking at or have you looked at poll worker
16  training?
17    A  Yes, I have.
18    Q  What have you looked at in that area?
19    A  I've looked at the difference -- again, poll
20  worker training is part of the voter education -- the
21  $6 million program includes a mandate from the
22  legislature to -- you know, voter education includes
23  education of the voter as well as of poll workers.
24     And so in that sense, I've looked at what
25  counties said they were doing and the new things that

Page 104

1  they said they were doing with poll worker training.
2  And, of course, I've looked at the Florida Election
3  Reform Act and various other acts which have mandated
4  longer poll worker training.
5    Q  The $6 million that you're talking about,
6  that occurred post-2000 election, right?
7    A  Yes.
8    Q  Have you done any analysis of poll worker
9  training or procedures prior to the 2000?
10    A  I have only looked at some poll worker
11  training manuals, and I've looked at the one for
12  Hillsborough County in the most detail.
13    Q  Did you look at any others?
14    A  I looked at a number of others that were in
15  the files just -- that were -- you know, looked at the
16  ones and there's a variation in the degree of training
17  that counties gave their poll workers prior to Election
18  2000, which, of course, is one of the reasons that the
19  legislature was -- standardized poll worker training
20  requirements.
21    Q  When you say variation in training, what do
22  you mean?
23    A  There's different amounts of time and
24  emphasis that poll workers put -- and some of that's
25  due to --

Page 105

1    Q  I'm sorry. Can you back up? When you say
2  "time" --
3    A  Yes, sir.
4    Q  When you "differences in time and emphasis,"
5  what do you mean?
6    A  The amount of time they would have spent with
7  different poll workers, like clerks versus inspectors
8  versus whatever.
9     And emphasis -- some would emphasize more
10  the -- probably in small counties, you wouldn't need to
11  emphasize minority -- language-minority sensitivity to
12  the degree that you would in a large county like
13  Hillsborough which has a large, sizeable
14  language-minority population.
15     So in that sense, there was variation, but
16  that's part of the decentralized system. And in the
17  same manner that it's consistent with recommendations
18  that, you know, your outreach and your whole electoral
19  administration be targeted to the demographics of your
20  constituency.
21    Q  Have you done an assessment about how that
22  variation that you described impacted minority voters
23  during the last election -- during the 2000 election?
24    A  I have not done any analysis of that.
25    Q  The training that you described for the

27 (Pages 102 to 105)

Page 106

1 county supervisors, the State Association of
2 Supervisors of Elections, that training, is that
3 required for supervisors?
4    A   I'm not sure about that.
5    Q   Do you think it should be required?
6    A   Well, that's a subjective commentary.  But I
7 think, you know, anytime you can be better educated,
8 it's a good thing.
9    Q   In your opinion, should it be required?
10       MR. TINKLER:  Objection to form.
11    A   I think that's up to the individual
12 supervisor under the law.  They make their own
13 decisions.
14       But it's my experience that they come because
15 they want to do a good job and they voluntarily come,
16 whether they are mandated to or not.
17 BY MR. COX:
18    Q   Is it a mandate under the reform being
19 suggested by the state or suggested by some of the
20 commentators that you've read about?
21       MR. TINKLER:  Objection to form.
22    A   I haven't seen it expressly said, you know,
23 specific requirements for supervisors.  Most of the
24 specific training requirements come with regards to
25 poll workers.

Page 107

1 BY MR. COX:
2    Q   And in your analysis of the poll worker
3 training and procedures prior to the 2000 election, did
4 you -- are you aware -- or does that training or do
5 those procedures require attendance to these trainings?
6    A   I'm sorry.  Could you restate?
7    Q   I'll restate the question.
8       In your analysis of poll worker training
9 procedures prior to the 2000 election, did your
10 analysis indicate that poll worker training is actually
11 required for poll workers?
12    A   Yes.  Yes.
13    Q   Are they required to take some sort of test
14 to test or check their sufficiency?
15    A   Most counties did not have that in place.
16 However, several now in the post-election, part of
17 their voter education plans -- several counties are
18 planning now to do tests of poll workers.
19    Q   Prior to the 2000 election, what counties had
20 them in place?
21    A   I'm not sure.
22    Q   Did Hillsborough have it in place?
23    A   I don't think so.
24    Q   Did Orange County have it in place?
25    A   I don't know.

Page 108

1    Q   Volusia County?
2    A   I don't know.
3    Q   Miami-Dade?
4    A   Don't know.
5    Q   Duval County?
6    A   I don't know.
7    Q   Do you recall or do you know prior to the
8 2000 election how the counties assessed whether their
9 poll worker training was successful?
10    A   I do not.  I've not seen any assessment.
11 And, in fact, that's one of the important dimensions of
12 the Election Reform Act and the voter education now is
13 that supervisors will be required, in December,
14 following our general election, to turn in a report on
15 various and sundry of things under the law.
16       So it will -- and they are required to give
17 it to the governor and to both leadership -- leadership
18 of both houses.  And the division is required to take a
19 look at it to be sure how effective it was and if they
20 need to make new recommendations.
21       Because one thing Florida learned in Election
22 2000 is that training and outreach and all parts of the
23 election process are very fluid and dynamic and you
24 have to continually look at procedures and make sure
25 that they operate as anticipated and if they don't, to

Page 109

1 fix them.
2    Q   Under the reforms that you described
3 post-2000, are -- do those reforms require that poll
4 workers be tested?
5    A   No.
6    Q   On Page 2 of your report -- actually, let me
7 ask you one more question.
8    A   Sure.
9    Q   Regarding your -- you had mentioned the
10 impact of the election process and election
11 administration on seniors.
12       Does any of your analysis assess, within that
13 population, what the impact is on minority seniors or
14 seniors with disabilities -- seniors with language --
15 who are language minorities?
16    A   I do cover that in the book.  For example, a
17 larger percentage of seniors within the minority
18 community tend to be women and often elderly.  And so
19 in that sense, yes.
20    Q   Does your analysis impact -- does your
21 analysis assess whether or not there is a particular
22 impact the election administration has on minority
23 seniors with disabilities or minority seniors in
24 particular?
25    A   Not expressly, but we did do a survey -- "we"

28 (Pages 106 to 109)

1 meaning the University of South Florida, which funded
2 the research -- a survey of Florida seniors, a
3 statewide poll to identify what their special needs
4 were.
5 And I don't have the numbers in there, but we
6 did very carefully look at minority responses. And
7 that was part of the presentation that I made to the
8 election supervisors.
9 Q Do we have that information? Is that in the
10 exhibits anywhere?
11 A It's in a book called "Targeting Senior
12 Voters."
13 Q Is that in your vitae?
14 A Yes.
15 Q Thank you. You mentioned also in your
16 summary that you're going to look at the minimum
17 standards for non-partisan voter education being
18 prepared by the division.
19 What minimum standards are you talking about?
20 A Well, it's a rule that -- I believe is
21 just -- it's not been precleared by Justice. It's
22 still in that process.
23 But it was, of course, non-partisan -- it
24 directly impacts all of the things we've been talking
25 about about voter education and poll worker training

1 and requires that the supervisors do a post -- excuse
2 me -- post-election analysis of various aspects of the
3 election from error rates, I believe, on machines to
4 these other things.
5 I can't recall the specifics of the
6 legislation. I've, frankly, read so much
7 legislation -- but there was a lot of input from all
8 the supervisors. It was published in whatever -- "The
9 Florida Register," and there were comments and the rule
10 was adjusted. And there was some specific language as
11 I recall to the special-needs population.
12 Q These minimum standards then that you are
13 discussing on Page 2, they refer to minimum standards
14 post-2000 election?
15 A Yes.
16 Q Did you make any assessment of minimum
17 standards prior -- that would have been in existence
18 prior to the 2000 election?
19 A I did not, no.
20 Q Dr. MacManus, what role, if any, does the
21 state have in making sure that poll workers are
22 trained, making sure that Supervisors of Elections are
23 trained?
24 A Well, certainly the state legislature -- as
25 is evident by this rule that's being put in place by

1 the division -- the state legislature, you know
2 dictated this.
3 Q Is there any other role for the state?
4 A In terms of poll worker training?
5 Q In terms of election worker training,
6 election official training, including poll workers --
7 A Well, of course, now the Division of
8 Elections, as I understand it -- and I may not have
9 this 100 percent correct, but I think they are now
10 being required to prepare a poll worker training guide
11 for all counties and, I believe, a voter guide. And
12 there are certain requirements, I believe for -- those
13 two I know for sure. I'll stop at that.
14 Q Well, prior to the 2000 election, what, if
15 any, role did the state play in ensuring that poll
16 workers are trained and ensuring the Supervisors of
17 Elections are trained?
18 A Well, obviously, we mentioned the twice a
19 year meetings of the Florida State Association of
20 Supervisors of Elections.
21 And in addition to that, they were very
22 accessible, according to -- at least Pam's office. And
23 to my experience, any question that you have -- I've
24 found the Division of Elections to be very responsive
25 in returning phone calls, e-mails.

1 And, you know, in that sense, the division
2 personnel, you know, have a reputation for being
3 accessible. The website, as I mentioned earlier, is an
4 excellent example. It's won national awards for being
5 really user-friendly and comprehensive. Florida was
6 sort of ahead of the rest of the nation in creating a
7 site of this type.
8 So I think the availability of the election
9 personnel, the training sessions, the availability of
10 information online. It's my experience that if I go to
11 the Division of Elections, I can walk in. And if the
12 division director is there, I can see him. This is
13 true of any citizen.
14 So I think -- my professional conclusion is
15 that the Division of Elections has been very responsive
16 and very committed to training.
17 Q Under the decentralized system, does the
18 Division of Elections have an enforcement role with
19 regard to the state election officials -- sorry -- of
20 the county election officials?
21 A Well, under this new --
22 Q I'm sorry. Prior to the 2000 election, did
23 they have --
24 A I'm not sure. I'm not aware of that. I
25 didn't look at that.

29 (Pages 110 to 113)

Page 114

1   Q   You don't know sitting here prior to the 2000
2   election, if there was some enforcement role for
3   Division of Elections with regard to the county
4   election officials?
5       MR. TINKLER: Objection to form.
6   A   I'm not sure --
7   BY MR. COX:
8   Q   You don't know?
9   A   -- what you mean by enforcement.
10  Q   Well, do they have any enforcement -- well,
11  do you know what enforcement means in terms of
12  enforcing any state laws with regard to county election
13  officials, any responsibilities?
14      MR. TINKLER: Objection to form.
15  A   I'm not sure.
16  BY MR. COX:
17  Q   Okay. Do they have -- or did they have prior
18  to the 2000 presidential election any oversight role?
19  And I'll include in oversight budget oversight,
20  oversight of making -- ensuring that certain county
21  election laws were enforced? Any rules in those areas?
22      MR. TINKLER: Objection to form.
23      MR. HARVEY: Same objection.
24  A   I can't answer that as you pose it.
25  BY MR. COX:

Page 115

1   Q   Did you look at what the role of the Division
2   of Elections -- sorry -- role was prior to the 2000
3   presidential election?
4   A   Well, as I just mentioned, I'm very aware
5   that they have a role in training. They have a role,
6   of course, in transmitting information to the public at
7   large and to elected officials at the county level and
8   news media, through the website -- and their training
9   sessions are open.
10      And they are often responsible for the
11  collection of data and reporting. But in terms of
12  funding of county elections, that's more of a local
13  function.
14  Q   So those are the -- prior to 2000 election,
15  those are the roles that you are aware of that the
16  Division of Elections has?
17  A   They come to mind. There's probably others
18  if I had really looked at it carefully, which I did not
19  prior to the deposition.
20  Q   What role, if any, do other state agencies
21  have in the election process aside from the Division of
22  Elections?
23  A   Well, of course, under the National Voter
24  Registration Act, known as the Motor Voter, various
25  agencies do -- at the local level do play a role in

Page 116

1   registering voters. The common -- of course, the motor
2   vehicle agencies, social service agencies, agencies
3   serving the handicapped and disabled all have a
4   registration role.
5   Q   Do they have any other role that you are
6   aware of?
7   A   Well, the role of transmitting that
8   information to the elections officials.
9   Q   Do they have a role in training?
10      MR. TINKLER: Objection to form.
11  A   Training in what way?
12  BY MR. COX:
13  Q   Election officials.
14  A   The training of election officials?
15  Q   Yes.
16  A   Do these agencies have a role in training of
17  the election --
18  Q   The training of election officials?
19      MR. TINKLER: Objection.
20  A   I don't know of any formal role. It
21  probably works more in the reverse, that your
22  Supervisors of Elections deal with these agencies in
23  helping them understand registration -- I think it's
24  kind of a mutual thing that each of them informs the
25  other and informs the other.

Page 117

1   BY MR. COX:
2   Q   Do any of these agency officials attend
3   training that you know of, election official training?
4   A   I'm not sure.
5   Q   Are you aware of any of them that attend the
6   training for Supervisors of Elections that we've
7   referred to before?
8   A   I'm not sure, but I would suspect that there
9   probably are some through -- because several of these
10  training programs are explicitly dedicating to NVRA.
11  Q   And what's your basis for knowing that?
12  A   From looking at the programs and the
13  workshops and talking with the supervisors who go to
14  these meetings.
15  Q   That they have members of DCF --
16  A   Well, you know, I think so, but I couldn't
17  say definitively.
18  Q   Prior to the 2000 presidential election, what
19  role, if any, did the state have in addressing any
20  problems that occurred as a result of the variations
21  between the counties and their administration of their
22  election system?
23  A   I don't think they had a whole lot. I mean,
24  of course, that's laid down by the legislature. And,
25  you know, Florida is -- some of the reports I read

30 (Pages 114 to 117)

1 suggest that Florida is very, very decentralized and
2 leaves much of the authority to the local government,
3 local elections officials.
4     Q   On Page 2, continuing on, you mention
5 "Concerning Election Day 2000, Dr. MacManus, will
6 testify as to her analysis of the conduct of elections
7 on November 7, 2000, by Supervisor Iorio and generally
8 throughout the state."
9         Do you see where I am?
10    A   Yes, sir.
11    Q   When it says, "conduct of elections" there,
12 what areas are you assessing?
13        (Mr. White left the deposition.)
14    A   All aspects.  The preelection, you know,
15 selection of -- and training of poll workers; the
16 testing of equipment; the distribution of equipment and
17 poll workers, allocation; the publicity for the
18 election; the interface with the news media; counting,
19 counting of ballots on election night and then the
20 canvassing thereafter.
21        You know, supervisors play a huge role -- in
22 Florida, they play a huge role in the day-to-day
23 conduct both -- the day before, the day of and after
24 the election.
25    Q   Any other areas?

1     A   Probably.  But I think those are the ones
2 that come to mind most.
3     Q   Any others come to mind at all?
4     A   Let me think here.
5         Of course, on election day, the
6 accessibility.
7     Q   When you say "accessibility" --
8     A   To the office, to the election personnel, you
9 know, the phones, the phone bank operators, questions
10 that, you know, people have walking into the office.
11    Q   Would you include -- or have you included in
12 your assessment in the conduct of elections what we
13 discussed before regarding outreach or regarding
14 tailoring to special-needs communities?
15    A   Yes, I would, yes.
16    Q   Have you -- or did you look at the structure
17 of the office, the organizational structure of the
18 office?
19    A   I have looked at it, yes.
20    Q   And in what ways have you looked at it?
21    A   Just looked at the different -- how she has
22 it organized; the number of deputies she has and what
23 they do and then the other election personnel.
24 Several of my students volunteer on election night, USF
25 students in general watch the operations.

1         I personally am not here on election night
2 because I am a media analyst, so I have not witnessed
3 it myself personally.
4     Q   You mention that you are going to -- or you
5 looked at the conduct of elections on 2007 by
6 Supervisor Iorio and generally throughout the state.
7         Other than Hillsborough County, where else
8 have you looked at the conduct of elections?
9     A   Well, again, at the entire state through a
10 number of vehicles which would be, of course, these
11 various task force reports and the consortium overviews
12 of the election conduct.
13    Q   Did you make any independent assessments of
14 what happened in the various counties themselves?
15    A   No, I did not.  I relied upon these more
16 methodical, comprehensive studies that have been
17 published.
18        It's very hard for a professor to get access
19 to the level of detail that these national task force
20 groups are able to get at, because we just don't have
21 the time or the funding.
22    Q   As you sit here now, do you recall if -- what
23 level of expertise was involved in coming up with those
24 reports that you mentioned?  Were there political
25 scientists involved?  Were there historians involved?

1         MR. TINKLER:  Objection to form.
2     A   I'm not sure.  Many of these are just --
3 might list people as participants, but I can't recall.
4 BY MR. COX:
5     Q   For example, the consortium report, were
6 those reporters doing that -- doing that analysis?
7     A   Reporters were, yes.  They were involved.
8     Q   Are you aware if any political scientists
9 were involved?
10    A   Indirectly, they were involved, in that they
11 were quoted sometimes.  Work -- for example, the MIT,
12 Cal Tech studies on voting equipment and punch-card
13 ballots were widely cited by these consortium reports.
14 So, in that sense, yes.
15    Q   But other than the secondary reference, were
16 there any political scientists that had any direct
17 involvement in the creation and the content of that
18 consortium report?
19    A   I'm not sure.
20    Q   In assessing Supervisor Iorio's conduct of
21 2007 election --
22        MR. TINKLER:  Objection to form.
23 BY MR. COX:
24    Q   -- how did -- in your estimation, what
25 conclusions do you draw regarding how those elections

Page 122

1  were conducted?
2      A   Well, Hillsborough County was certainly --
3  the conduct of elections here was much better than in
4  some other counties in the state without question.
5      Q   Other than the comparative, what conclusion
6  can you draw regarding Hillsborough County's conduct of
7  the 2000 presidential election?
8      A   Well, in virtually every account where
9  Hillsborough County was mentioned --
10     Q   And, again, you're saying "mentioned"?
11         (Mr. White returned to the deposition.)
12     A   Hillsborough County was expressly mentioned
13  in the report or the consortium reports.
14         Repeatedly, Iorio was described as
15  civic-minded, smart, caring, non-partisan behavior.
16  Her canvassing board, in the heat of controversy, was
17  described as operating very businesslike and in a very
18  non-confrontational manner.
19         And, of course, other evidences of her
20  stature and how well elections worked here
21  comparatively were the immediate turning of the
22  national media to her as the spokesperson for describing
23  how elections work in Florida.
24  BY MR. COX:
25     Q   Other than those references, do you have any

Page 123

1  other conclusions regarding the conduct of elections in
2  Hillsborough County?
3      A   I certainly do.  As I mentioned earlier, the
4  comment cards were predominantly positive, when that's
5  the converse of what one normally expects with a
6  comment card scenario.  You expect the heavy naysayers
7  to come forward.  But they were mostly positive
8  assessments of the conduct of elections on election
9  day.
10         And, of course, the other aspects are a lower
11  error rate or lower undercount rate here than the state
12  average for punch-card counties.  That speaks well.
13         I saw no complaints about discrimination and
14  the type of equipment that was sent to various
15  precincts.  There seemed to be a methodical fashion for
16  assigning, allocating machines to polls, precincts, as
17  well as the attentiveness and sensitivity in the
18  assignment of poll workers to precincts.
19         So you put all these together, and
20  Hillsborough County functioned much, much better than
21  other -- some other Florida counties on Election Day
22  2000.
23     Q   Let's back up for a few minutes.  When you
24  mentioned the reports that you've read, did you review
25  the U.S. Commission -- U.S. Civil Rights Commission

Page 124

1  report?
2      A   I did.
3      Q   And what did that report indicate to you
4  regarding the conduct of elections?
5      A   Well, the report that I looked at was the one
6  that was done -- the national report --
7      Q   Mmm-hmm.
8      A   -- which looked at the entire nation, which
9  concluded many of the things we've talked about.
10         I can't expressly remember everything about
11  it, but I can recall that there were recommendations
12  that -- and acknowledgements that you had a very
13  successful minority registration move in Florida that
14  resulted in a lot more minorities going to the polls,
15  but also a recognition that voter education was not
16  what it should have been for new voters.  And many of
17  the African-Americans voters were new and inexperienced
18  voters.
19         And, of course, there were other claims about
20  issues related to felons and --
21     Q   What issues -- I'm sorry.  Issues related to
22  felons?
23     A   Felons in that the recommendation was that
24  there should be automatic restoration of felon rights
25  upon completion -- Florida is a state that doesn't have

Page 125

1  that.  But I really didn't look at the felon issue very
2  carefully.
3         There were, I think, commentary regarding the
4  feeling on the part of some minorities that -- well,
5  not feelings -- that their registration wasn't recorded
6  or they weren't allowed to vote.
7         But these were typical also for Anglo and
8  Hispanic and every other voter in Florida.  I mean,
9  there are just these common irregularities that occur
10  through the reasons we talked about earlier.
11     Q   You mentioned, in answering a question
12  regarding the conduct of elections in Hillsborough
13  County, that the allocation of resources was
14  methodical, methodical allocation of resources.
15         What did you mean by that?
16     A   There was a procedure that was followed in
17  terms of determining how many machines to send to the
18  precincts and also the number of poll workers to send.
19     Q   What was the procedure?
20     A   I don't have it in front of me.  I just
21  recall reading it.  It related to, as we mentioned
22  earlier, estimates of turnout, the size -- number of
23  voters in a precinct and, of course, the -- well, those
24  are the things that I remember.
25     Q   Do you recall where that procedure -- where

32 (Pages 122 to 125)

Page 126

1  you read that procedure?
2      A   I -- I believe it was shared with me by one
3  of Pam Iorio's deputies.
4      Q   And is that something that we've been
5  provided?
6      A   Yes, sir.
7      Q   This methodical allocation of resources, is
8  that -- are those procedures that were followed in
9  other counties to your knowledge?
10     A   I don't -- I don't know.
11     Q   You mentioned that Hillsborough County
12 functioned better than other counties in Florida.
13         In what ways did the other counties in
14 Florida function worse than Hillsborough County?
15     A   Well, of course, the infamous example is the
16 butterfly ballot in Palm Beach County, which in some
17 political science literature, some political scientists
18 attribute mistakes in Palm Beach County as the reason
19 Al Gore lost Florida. So that's probably the most
20 preimminent, is ballot design in Palm Beach.
21         But there were also accounts of problems in
22 other counties related to absentee ballots, requests
23 and also, in certain counties -- again, ballot design
24 was a problem, I believe, in Duval County.
25         And I think also there were more voter

Page 127

1  mistakes or undercounts and overcounts in counties that
2  have large concentrations of seniors.
3      Q   And what counties would those be?
4      A   Well, for the -- among punch-card counties
5  would be Sumter, I believe, and Marion, Palm Beach.
6          But some of the political science literature
7  that I've read, post-election analyses, point out that
8  you had the most mistakes and claims of problems where
9  you had lower-income, lower-educated and sometimes
10 illiterate populations and new, inexperienced voters.
11     Q   Does that also correlate with race?
12     A   Not 100 percent. There is some correlation.
13     Q   Do you have a sense of what the correlation
14 might be, if it's less than 100 percent?
15     A   I don't. I'd have to look at it. I don't
16 think anybody's done that kind of analysis.
17     Q   Okay. Again, you say Hillsborough functioned
18 better than other counties. In what ways did Volusia
19 County function worse than Hillsborough County? Do you
20 know?
21     A   I can't recall the specifics, even though I
22 do recall that Volusia was, of course, singled-out for
23 recount, and that there was controversy there. But I
24 can't recall the exact nature of it.
25     Q   In what ways did Miami-Dade function worse

Page 128

1  than Hillsborough County?
2      A   Again, they were not able to complete
3  recounts -- through no fault of their own somewhat, but
4  of time constraints. But Hillsborough County was able
5  to do that and then they did it in the allocated time.
6      Q   And in what ways was Duval County worse than
7  Hillsborough County?
8      A   Well, I think, they had, again, a higher
9  number of under- and overvotes which some attribute to
10 ballot design.
11         And to make the point, Florida had the most
12 presidential candidates on the ballot of any state in
13 the Union. I guess there were a couple others that had
14 the same number, but that meant ballot designs were
15 different this time around, and some weren't so
16 effective as we found out.
17     Q   When you say "weren't so effective as we
18 found out," could you explain that?
19     A   When we looked at -- the under- and overvotes
20 were huge in Palm Beach County. And, as I said,
21 political science analyses of the Palm Beach voting
22 patterns and post-election interviews and media
23 coverage and other anecdotal data suggests that the
24 design of the ballot was a huge problem, even though it
25 was done with the intent of trying to help senior

Page 129

1  voters.
2      Q   Also on Page 2 of your report, you mentioned
3  that your review will encompass such issues as voter
4  error, voter registration and poll-site equipment.
5          I'm going to ask you a few questions about
6  those.
7      A   Which page, sir?
8          MR. TINKLER: Where are you?
9  BY MR. COX:
10     Q   I'm sorry. It's Page 3. I apologize.
11         "This analysis will encompass a review of
12 how Supervisor Iorio dealt with such issues as voter
13 error, voter registration and poll worker training,
14 maintenance of addresses, poll worker error and
15 poll-site equipment and information."
16         It's the top of Page 3.
17     A   Yes, sir.
18     Q   I apologize. What do you mean by "voter
19 error" here?
20     A   Voter error can mean anything from signature
21 problems on absentee ballots to not putting the card in
22 the machine properly so it doesn't align properly. It
23 can mean a voter's confusion about where they should
24 vote, and so they get frustrated and angry when they
25 show up where they think they are registered and they

33 (Pages 126 to 129)

Page 130

1   are not.
2       It can be -- voter error can be separating
3   the ballots when they shouldn't be before they are put
4   into the box, not following instructions. Double --
5   double punching the same race, voting for more than one
6   candidate in the same race, which, of course, voids the
7   ballot. Those are common types of voter errors.
8       Q   And when you mention that you are looking at
9   the voters registration, what were you looking at in
10  that area?
11      A   Looking at outreach methods and successes,
12  the increase in voter registration among minority
13  voters in Hillsborough County since the '96
14  presidential race.
15      Looking at ways that Hillsborough County
16  makes it easier to correct a voter registration form,
17  the frequent mailings that they do. Once somebody is
18  registered, to inform them of where they are registered
19  and to correct information if something is wrong,
20  those -- things of that nature.
21      But voter outreach is, I think, one of Pam
22  Iorio's strong suits. She has a very aggressive
23  registration procedure in place which involves not only
24  her office, but engages various community groups,
25  churches, schools, family groups, advocacy groups, the

Page 131

1   media.
2       MR. TINKLER: Counsel, whenever you find a
3   logical point, I'm sure we would appreciate a
4   lunch break.
5       MR. COX: Off the record.
6       (Discussion off the record.)
7   BY MR. COX:
8       Q   When you talk about poll worker training,
9   what do you mean by that?
10      A   Well, Pam's office, she routinely trains and
11  retrains poll workers. They are required to come to
12  various sessions. And she has handbooks that she
13  passes out, exercises that she conducts. And that
14  would be examples of poll worker training -- reviews
15  with them processes and procedures, has them actually,
16  you know, try to open up a precinct and how to close
17  down.
18      Q   And when you mention poll worker error in
19  this section, can you define what errors you're talking
20  about?
21      A   Well, poll worker errors which are infrequent
22  but common in elections across the country would be
23  things like not being able to locate a person's name on
24  the registration list. And a lot of times that happens
25  with hyphenated names or because elderly poll workers

Page 132

1   get flustered and there's a long line.
2       So -- basically, the categories you have are,
3   you know, them letting people vote that really weren't
4   eligible to vote or keeping people from voting that are
5   eligible for mistaken reasons or not following the law
6   in terms of helping people that might come, the
7   special-needs populations.
8       Q   What poll worker errors occurred in
9   Hillsborough County during the 2000 election?
10      A   Well, based upon the comment cards and some
11  of the -- for example, the comments that were filed
12  with the NAACP hearings here in Hillsborough, would be
13  things like advising somebody to go to a poll that they
14  shouldn't have, perhaps, or not getting them to the
15  right place. These are -- these are what the
16  individual voters complained about. Now, of course,
17  the Hillsborough County supervisor's office has
18  responded.
19      I believe some of poll worker errors which --
20  there weren't a lot to tell you the truth.
21      Maybe --
22      MR. WAAS: Excuse me. Could I ask now
23  about -- it's about 12:30. Can I get a sense of
24  about how much more time?
25      MR. COX: I think we're going to take a break

Page 133

1   in about five or ten minutes.
2       MR. WAAS: Okay.
3   BY MR. COX:
4       Q   Go ahead.
5       A   I'm sorry. Would you repeat the question?
6       Q   Well, I was asking what poll worker errors
7   that occurred in Hillsborough County.
8       A   Right. Again, to the best of my
9   recollection, the comments were numerous so -- but I
10  recall that some complained about maybe they didn't
11  help a disabled person or could have done better at
12  doing that or giving a little bit better assistance or
13  advice in terms of -- whatever.
14      The point, I think, though, is that they
15  probably let more people vote that shouldn't have than
16  conversely, and that would fit a pattern that the
17  "Miami Herald" consortium came to the conclusion that
18  poll workers, in general, made errors that were more
19  inclusive of voters than less inclusive. And that
20  would certainly be the case in Hillsborough County.
21      Q   And with regard to Hillsborough County, what
22  are you basing that on?
23      A   I believe that it would be based upon lists
24  of people who voted that weren't eligible that live in
25  another county were allowed to vote by the poll worker,

34 (Pages 130 to 133)

Page 134

1  because they didn't have time or couldn't --
2  whatever -- didn't check through the main registry, and
3  erred on the side of the voter as opposed to, you know,
4  adhering to the law.
5      Q   Did you actually look at these lists and make
6  these assessments?
7      A   I did see those lists, yes.
8      Q   And you made these assessments?
9      A   Yes.
10     Q   Has that been produced to us?
11         MR. TINKLER: Objection to the point that she
12  knows what's been produced.
13         MR. COX: What's your objection?
14         MR. TINKLER: You're asking her whether it's
15  been produced. She's not responsible for
16  production of documents.
17         MR. COX: I'm asking if it was provided.
18  I've asked her that several times, and she's
19  indicated yes or no.
20         MR. TINKLER: To the extent that she has
21  knowledge.
22         MR. COX: Well, that goes without saying.
23  And I think that's pretty obvious, and she has
24  said yes or no based on that.
25  BY MR. COX:

Page 135

1      Q   So to your knowledge, do you know if that has
2  been produced to us?
3      A   I believe it has.
4      Q   Okay.
5          MR. HARVEY: By the way, just for the record,
6  the documents that she was provided, some of those
7  documents --
8          MR. COX: What you say "she," who?
9          MR. HARVEY: I'm sorry. Professor MacManus.
10  We've brought these documents here today,
11  some of these documents which we provided before
12  to the lawyers committee that are here today.
13         If you just want to look at them for whatever
14  reason, I just thought I would let you know.
15         MR. COX: Well, in preparing for this
16  deposition that was scheduled originally for
17  May 31st, we asked for documents that were -- that
18  underlied her analysis. And we thought we had
19  been given that universe.
20         Are you saying there are additional
21  documents?
22         MR. HARVEY: There was a list of documents.
23  There's a list of -- that I actually faxed to
24  Janai Nelson. There is a list of documents which
25  the plaintiffs had in their possession which was

Page 136

1  Bates-numbered based on the plaintiffs'
2  Bates-number system and those documents were
3  listed.
4      There are about maybe four or five -- I want
5  to say -- I'm sorry. Let me take that back.
6  There's about three boxes of documents here today
7  that she reviewed back in -- that this expert
8  reviewed back in, I would assume, back in March or
9  sometime.
10     Those documents have been provided to the
11  plaintiffs as early of August 2001. They also --
12  we've disclosed those documents to Janai and those
13  documents are here today.
14         MR. COX: Okay. These are not additional
15  documents?
16         MR. HARVEY: No, they are not additional.
17  They've been disclosed. I just wanted you to know
18  that they are here just for your convenience, if
19  you want to look at them.
20         MR. COX: Thank you.
21  BY MR. COX:
22     Q   Now, Dr. MacManus, you also mentioned
23  that -- well, backing up a little bit.
24     You mentioned -- I was asking you what poll
25  worker errors occurred in Hillsborough County, and you

Page 137

1  listed some.
2      Is the basis for your assumption that poll
3  worker errors were more on the side of inclusiveness in
4  HIllsborough County based on anything other than
5  your assessment of the registered voter list and those
6  who voted?
7      A   No, just these documents that I was referring
8  to.
9      Q   And, again, what was the methodology for
10  making that determination? What comparisons did you
11  make?
12     A   Well, to my recollection, there was a list of
13  people who wanted to vote that were not allowed to vote
14  for whatever reason. And then there was a list of
15  people who were allowed to vote but should not have
16  been allowed to vote and a comparison of those two
17  lists, the size. And I believe the latter was the
18  larger.
19     Q   And was any of this information broken down
20  by race?
21     A   One may have been, but I'm not absolutely
22  certain.
23     Q   When you say one of these lists may have
24  been --
25     A   One of these lists may have been. It might

35 (Pages 134 to 137)

Page 138

1  have been the one related to those who complained that
2  they were turned away at the polls, but I can't recall
3  it precisely.
4      Q   So this assessment is not based on any
5  analysis of race or any analysis what the racial impact
6  might be on the decision by the poll workers?
7      A   Not at this point, no.
8      Q   This list -- these lists, who generated these
9  lists?
10     A   I'm not sure.
11     Q   So you don't know if the County of
12  Hillsborough generated them?
13     A   I'm not sure.
14     Q   Did you do any independent analysis to assess
15  the accuracy of the lists?
16     A   I would not have the legal authority to do
17  that or the knowledge of how to do it, no.
18     Q   So, no.
19         MR. COX:  This a good point to break.
20         MR. TINKLER:  How long?
21         MR. COX:  An hour.
22         (At 12:30 p.m., a break was taken for lunch.)
23
24
25

Page 139

1  STATE OF FLORIDA
2  COUNTY OF HILLSBOROUGH
3
4      I, the undersigned authority, certify that SUSAN
5  MacMANUS personally appeared before me and was duly
6  sworn.
7
8      WITNESS my hand and official seal June 14, 2002.
9
10         -----------------------------
           Elizabeth W. Chorrushi, RPR
11         Notary Public - State of Florida
           My Commission Number:  CC764408
12         Expires:  10/17/02
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1  STATE OF FLORIDA
2  COUNTY OF HILLSBOROUGH
3
4      I, ELIZABETH W. CHORRUSHI. RPR. hereby certify
5  that I was authorized and did stenographically report
6  the deposition of SUSAN MacMANUS; that a review of the
7  transcript was requested; and that Pages 1 through 140
8  are a true record of the testimony given by the
9  witness.
10
11     I further certify that I am not a relative,
12  employee, attorney, or counsel of any of the parties,
13  nor am I a relative or employee of any of the parties'
14  attorneys nor interested in the action.
15
16     Dated June 14, 2002.
17
18         -----------------------------
           Elizabeth W. Chorrushi, RPR
19
20
21
22
23
24
25

36 (Pages 138 to 140)

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF FLORIDA
 2
              CASE NO.:  01-0120-CIV-GOLD
 3
      - - - - - - - - - - - - - - - - - -x
 4   NATIONAL ASSOCIATION FOR THE          :
     ADVANCEMENT OF COLORED PEOPLE, INC.,  :
 5   by its FLORIDA STATE CONFERENCE OF    :
     BRANCHES, JIMMIE PANNELL, JULIA       :
 6   STONER, NATALIE CARNEGIE, JOHN L.     :
     CHEEVER, JAMES MARSHALL, LILLIE Q.    :
 7   ODOM, WILLIE STEEN, WALLACE           :
     McDONALD, JERMAINE TERRY, LORINE      :
 8   WALDEN, EMERY TIMBERLAKE, VALERIE     :
     BUFORD-WELLS, MICHELLE FLOYD,         :
 9   CONSUELO MARIA GRAHAM, SHERRY         :
     EDWARDS, KANDY WELLS, JOANNA CLARK,   :
10   JANICE KELLY, PLACIDE DOSSOUS,        :
     RONDRICK ROSE, URSULA HARVEY, and     :
11   ADMANTHA ISRAEL, in their own right   :
     and as representatives of all         :
12   similarly situated citizens and       :
     residents of the State of Florida,    :
13              Plaintiffs,                 :
     vs.                                    :
14                                          :
     KATHERINE HARRIS, Secretary of State  :
15   of Florida; CLAY ROBERTS, Director    :
     of Florida Division of Elections;     :
16   DAVID C. LEAHY, Miami-Dade County     :
     Election Supervisor; MIRIAM OLIPHANT  :
17   Broward County Election Supervisor;   :
     JOHN STAFFORD, Duval County Election  :
18   Supervisor; PAM IORIO, Hillsborough   :
     County Election Supervisor; WILLIAM   :
19   COWLES, Orange County Election        :
     Supervisor; and DEANIE LOWE, Volusia  :
20   County Election Supervisor (all in    :
     their official capacities); and       :
21   CHOICEPOINT, INC., a Georgia          :
     corporation d/b/a DATABASE            :
22   TECHNOLOGIES, INC.,                   :
                Defendants.                :
23   - - - - - - - - - - - - - - - - - -x
24         VOLUME II, PAGES 141 - 220
25       DEPOSITION OF:   SUSAN MacMANUS
```

Page 142

```
 1   TAKEN:        Pursuant to Notice by
                   Counsel for Plaintiffs
 2
     DATE:         June 13, 2002
 3
     PLACE:        Office of the County Attorney
 4                 17th Floor
                   601 East Kennedy Boulevard
 5                 Tampa, Florida 33602
 6   TIME:         Commencing at 1:36 p.m.
 7   REPORTED BY:   KATHRYN BENTLEY
                   Court Reporter
 8                 Notary Public
                   State of Florida at Large
 9
10
11   APPEARANCES:
12      TODD A. COX, ESQUIRE
        NAACP Legal Defense and
13      Educational Fund, Inc.
        10th Floor
14      1444 Eye Street NW
        Washington, D.C. 20005
15          -and-
        DEBO ADEGBILE, ESQUIRE
16      NAACP Legal Defense and
        Educational Fund, Inc.
17      Suite 1600
        99 Hudson Street
18      New York, New York 10013
19
20          Attorneys for Plaintiffs
21
        WALTER JAMES HARVEY, ESQUIRE
22      Steel, Hector & Davis, LLP
        41st Floor
23      200 South Biscayne Boulevard
        Miami, Florida 33131
24
            Attorney for Katherine Harris and
25          Division of Elections
```

Page 143

```
 1   APPEARANCES (Cont'd)
 2      REBECCA M. KERT, ESQUIRE -and-
        KEN TINKLER, ESQUIRE
 3      Assistant County Attorneys
        27th Floor
 4      601 East Kennedy Boulevard
        Tampa, Florida 33602
 5
 6          Attorneys for Pam Iorio
 7
        THOMAS W. WHITE, ESQUIRE
 8      Adorno & Yoss
        Suite 1600
 9      2601 South Bayshore Drive
        Miami, Florida 33133
10
            Attorney for ChoicePoint, Inc.
11
        JEREMY LEATHE, ESQUIRE (telephonically)
12      Assistant County Attorney
        Suite 2810
13      111 NW 1st Street
        Miami, Florida 33128
14
            Attorney for Supervisor Leahy
15
16      GEORGE L. WAAS, ESQUIRE (telephonically)
        Assistant Attorney General
17      Department of Legal Affairs
        Suite PL-01
18      The Capitol
        Tallahassee, Florida 32399
19
20          Attorney for Department of Children
            and Families and Department of
21          Highway Safety and Motor Vehicles
22
     ALSO PRESENT:
23      Ron Hyduk
        Lisa Schiavinato
24
25
```

Page 144

```
 1              I N D E X
 2                       PAGE
     Examination by Mr. Cox . . . . . . . . . . 141
 3
 4   Certificate of Reporter. . . . . . . . . 220
 5
 6
          EXHIBITS MARKED FOR IDENTIFICATION
 7
     NO.  DESCRIPTION              PAGE
 8
 9   3    4/16/01 study, "Floridians Want
10        Reform of the Election System....Now!" 198
11
     4    Plaintiff's Third Set of Requests for
12        Documents to Defendants Katherine
        Harris, Clay Roberts, David Leahy,
13        John Stafford, Pam Iorio, William
        Cowles, Deanie Lowe, and Choicepoint,
14        d/b/a Database Technologies      203
15   5    Defendant John Stafford Supervisor
16        of Elections of Duval County's
17        Disclosure of Expert Witnesses    205
18
19   6    Expert Witness Summary of Supervisor
20        of Elections Pam Iorio        206
21
22   7    11/14/00 article from
23        The Washington Post           207
24
25
```

Page 145

```
 1        The deposition of SUSAN MacMANUS was taken
 2   pursuant to notice by counsel for the
 3   Plaintiffs on the 13th day of June, 2002,
 4   commencing at 1:36 p.m., at 17th Floor, 601
 5   East Kennedy Boulevard, Tampa, Florida. Said
 6   deposition was reported by Kathryn Bentley,
 7   Notary Public, State of Florida at Large.
 8        - - - - -
 9        SUSAN MacMANUS,
10   a witness, having been previously duly sworn or
11   affirmed to tell the truth, the whole truth and
12   nothing but the truth, was examined and
13   testified as follows:
14        EXAMINATION
15   BY MR. COX:
16   Q   Dr. MacManus, before our lunch break
17   we were looking at page 3 of your summary. At
18   the very top, it read, "This analysis will
19   encompass a review of how Supervisor Iorio
20   dealt with such issues as voter error, voter
21   registration, poll worker training, maintenance
22   of addresses, poll worker error, and poll site
23   equipment and information."
24        We had discussed a number of those
25   different areas. Let me ask you, what do you
```

2 (Pages 142 to 145)

Page 146

1  mean by "poll site equipment and information"?
2      A   Also, I don't have that report any
3  more.  Oh, this is it?  Sorry.  Page three?
4      Q   It's Exhibit 2.
5      A   Poll site equipment and information is
6  the question?
7      Q   Right.  What does that mean?  What
8  does that phrase mean in that sentence?
9      A   Well, poll site equipment would be the
10  voting machinery that's placed in each
11  precinct, the signage.  Any kind of equipment
12  could also be sample ballots posted, precinct's
13  maps posted.
14      Q   And what information specifically
15  would you be assessing there?
16      A   Looking at the methodology for
17  allocating various machines to -- and poll
18  workers to the sites, precincts.
19      Q   That sentence says you're going to
20  analyze -- or review Supervisor Iorio dealt
21  with such issues.  Are there other issues that
22  you're going to look at besides the ones listed
23  here?
24      A   Well, this is a very comprehensive
25  list.

Page 147

1      Q   So no?
2      A   No.
3      Q   Have you looked at or do you plan to
4  look at an assessment of what was done to
5  account for any growth in voter registration
6  before the 2000 presidential election?
7      A   Well, it's my understanding that
8  growth was taken into consideration -- growth
9  and the number of registrants, in the
10  consideration of how many voting machines to
11  put to various precincts and the number of poll
12  workers to assign.
13      Q   So you have made that assessment of
14  how they dealt with assessing -- how they dealt
15  with accommodating that growth?
16      A   Yes.  I have reviewed a statement by
17  Pam Iorio's deputy as to how the methodology
18  was used to do these kinds of things.
19      Q   Have you reviewed anything else?
20      A   Not to my recollection.
21      Q   Did you plan, in doing this
22  assessment, or have you looked at the
23  management structure of the Hillsborough County
24  election office?
25      A   Not in great detail, no.

Page 148

1      Q   Did you look at it at all?
2      A   I'm familiar with it because of
3  interfacing with Pam and calling here for
4  information as an analyst and from students of
5  mine being interns and election day workers in
6  the office and from Pam's descriptions when she
7  has made presentations at various public
8  forums.
9      Q   Do you plan to or have you looked at
10  the assignment of poll workers on election day
11  2000?
12      A   Yes, I have.
13      Q   What did you look at?
14      A   I looked at the race, the political
15  party affiliation, the age, the number of years
16  of experience of poll workers, and I believe
17  gender as well.
18      Q   Did you look at any allocation of the
19  number of poll workers per voter in the county?
20      A   I have not done a quantitative
21  analysis.  I have looked at the decision rules
22  that were used to make those assignments.
23      Q   Whose decision rules?
24      A   I believe they were the Supervisor of
25  Elections'.

Page 149

1      Q   And what decision rule does she
2  employ?
3      A   It relates to -- and I don't have it
4  in front of me.  It was on the same piece of
5  paper that the sending, I believe, of machines.
6  It deals with, again, the number of
7  registrants, the size of the precinct, the
8  number of registrants.  There was a formula
9  that she used.  At a minimum she had, I
10  believe, a clerk and an inspector, and then the
11  numbers would increase as the number of
12  registrants increased.
13      Q   Did you make any assessment about the
14  number of voters per precinct in Hillsborough
15  County?
16      A   Well, I've looked at that data.  I
17  mean, that's part of looking at -- yes, I have
18  looked at precinct level data on size of
19  precincts.
20      Q   And in looking at that -- first of
21  all, what did you look at in order to assess
22  the size of a precinct?
23      A   Number of registrants per precinct.
24      Q   And what information did you look at
25  to determine that?

3 (Pages 146 to 149)

Page 150

1    A    Information that was provided to me by
2  the Hillsborough County Supervisor of
3  Elections' office.
4    Q    Was there a particular document?
5    A    Yes, there was a document that listed
6  the -- I believe it was the total registrants
7  in each county -- I mean each precinct, excuse
8  me.
9    Q    Did you do any assessment -- first of
10  all, based on your analysis and based on what
11  you've looked at so far, do you think that
12  there are any variations regarding the size of
13  precincts in Hillsborough County?
14    A    Oh, sure.  That's commonplace
15  everywhere because a lot of it is driven by the
16  availability of facilities.
17    Q    When you say "facilities," what do you
18  mean?
19    A    Polling places.
20    Q    And did you or have you done or do you
21  plan to do any assessment of assessing what
22  impact that variation in size might have on the
23  conduct of elections?
24    A    I have not done any assessment of
25  that.

Page 151

1    Q    Do you plan to?
2    A    If asked, but I have not been asked.
3    Q    Have you looked at or analyzed the
4  decision rules associated when -- associated
5  with the decision to split precincts in
6  Hillsborough County?
7    A    No, I have not.
8    Q    Have you looked at --
9    A    I know that they've had to be
10  precleared by the U.S. Justice Department when
11  any changes are made in the precinct
12  configurations.
13    Q    But you haven't looked at when,
14  basically, the county decides it is time to
15  split a precinct?
16    A    No, I have not.
17    Q    Is it your understanding that that
18  standard or decision rule varies from county to
19  county?
20    A    I'm really not sure.  I didn't look at
21  that issue.
22    Q    Have you analyzed or assessed the
23  decision rules associated with allocating
24  resources on election day?
25    A    What do you mean by "resources" and

Page 152

1  whose allocation?
2    Q    Well, on election day, whatever
3  resources are used on election day by election
4  officials.
5    A    In Hillsborough County or generally?
6    Q    In the sense that we're talking about
7  at the top of page three, what -- that only
8  applies to Supervisor Iorio, does it not?
9    A    In terms of looking at the assignment
10  of equipment?
11    Q    Uh-huh.  All of these issues we've
12  been talking about.
13    A    This particular section, yes, that
14  deals with the operations in Hillsborough
15  County.
16    Q    So have you looked at -- have you
17  assessed the decision rules that were
18  associated with Hillsborough County deciding to
19  allocate resources in a certain way?
20    A    Not the decision rules.  I've looked
21  at the decisions made but not the decision
22  rules, other than for the assignment of poll
23  workers and the establishment of how many
24  machines go to each precinct.
25    Q    Farther down, Dr. MacManus, the second

Page 153

1  paragraph -- the first full paragraph of that
2  page, you mention that "Dr. MacManus will
3  testify as to her analysis of the role of state
4  agencies and officials in such issues."
5    A    Yes, sir.
6    Q    Do you see where I am?
7    A    Yes, sir.
8    Q    Can you explain what analysis you
9  employed here to assess the role of the state
10  agencies and officials?
11    A    Again, much of my assessment were
12  reviews of the various task force and
13  consortium reports, which varied in what
14  jurisdictions they focused on, but many of them
15  did focus on all the states.
16    Q    And what did you do to assess the role
17  of Florida state agencies and officials?
18    A    Certainly looked at the reforms that
19  Florida's put in place, the amount of money it
20  spent, the rapidity and speed with which it
21  implemented changes, and also looked at the
22  responsiveness of the legislature to the will
23  of the public regarding election reform by
24  analyzing various polls.
25    Q    When you say "polls," what polls did

4 (Pages 150 to 153)

Page 154

1  you analyze?
2      A   I was in charge of -- a project leader
3  for a major state-wide survey that was
4  conducted after the election, in the middle of
5  the legislative session which was engaging in
6  reform; and it was a project that was co-funded
7  by two think tanks, one liberal and one
8  conservative, the Collins Center for Public
9  Policy and the James Madison Institute.
10         That was done, as I said, in the
11  middle of the session and certainly made
12  legislators even more aware than they already
13  were of how important election reform was to
14  the people of Florida.
15     Q   Did you do any analysis of the role of
16  state agencies and officials on the issues that
17  you discuss in this paragraph before 2000 --
18  before the 2000 election?
19     A   No, I would say, other than through
20  the normal reading of these general task force
21  and consortia reports where they sometimes
22  reflect back on shortcomings of the election
23  system in prior elections.
24     Q   In this particular area, the role of
25  the state agencies and officials, what

Page 155

1  shortcomings, if any, did you find?
2      A   Well, the various task forces and
3  consortia report identified things like
4  statutes that aren't very clear in terms of
5  recounts procedures, the definitions of what
6  constitutes a legal vote, voter education.
7  There have been, of course, a number of the
8  consortia reports which surveyed election
9  officials who say they would like to have more
10  money to do more things but they haven't gotten
11  it. Those kinds of things.
12     Q   Dr. MacManus, regarding the assignment
13  of poll workers that we had been discussing
14  before the break, what, if anything, did you
15  find regarding whether there were equal numbers
16  of poll workers assigned to each precinct?
17     A   Well, one would not expect equal
18  numbers to be assigned to each precinct because
19  the precincts vary tremendously in the number
20  of voters that are in that precinct, so that
21  would not make much sense.
22     Q   And in discussing the issue of voter
23  error and poll worker error that you are
24  looking at here, are there any voter errors
25  that you think might be attributable to

Page 156

1  election officials or the actions of election
2  officials?
3      A   Well, it's possible that some voter
4  errors were a result of some election officials
5  not being as aggressive in informing them of
6  various aspects of the election as they might
7  have been.
8      Q   On election day, would there be any
9  situation that you can think of or an example
10  that you can think of where voter error might
11  be attributable to election officials?
12     A   Well, if an election official, for
13  example, sent -- gave bad advise to a voter
14  about their eligibility or sent them to an
15  incorrect precinct, something of that nature,
16  that could -- actually, that would not be a
17  voter error as much as it would be an election
18  official error.
19     Q   Can you think of any other examples?
20     A   No.
21     Q   We had talked before about
22  anticipating the turnout, the increase in
23  turnout, in various locations, Florida,
24  Hillsborough County, and how officials may or
25  may not have been able to successfully assess

Page 157

1  the turnout in the 2000 election.  Were there
2  factors in Florida, unique factors in Florida
3  that would have signalled that there would be a
4  larger turnout than perhaps other states?
5      A   Simply, of course, the increase in
6  registrations, which would be typical for
7  large states and high growth states like
8  Florida where you would have a major influx of
9  newcomers and new registrants.
10     Q   Well, as a political scientist, were
11  you aware if Florida received any special
12  attention from presidential candidates in the
13  2000 presidential election, more so than
14  perhaps other states?
15     A   Certainly the candidates were here
16  much more often.  And there were a lot of
17  reasons for it but, of course, it's because
18  Florida does have a large number of electoral
19  votes and polls that showed that it was a
20  fairly competitive election in Florida.
21     Q   In your opinion, would that be a
22  signal also as to perhaps increased voter
23  turnout?
24     A   The presence of candidates?
25     Q   What I just described, the large

5 (Pages 154 to 157)

1  number of -- the attention that Florida
2  received from the presidential candidates.
3      A    Well, the bulk of the attention came
4  after the election, as you well know, beginning
5  on election eve with the errors by the national
6  news media.  But certainly candidates were in
7  Florida more than other small states across the
8  country.  I don't know that they were here any
9  more than they were in some of the large
10 states.  But it's been true for other election
11 cycles too that candidates were in Florida.
12 That's not unique to this election cycle.
13     Q    My question was for the 2000
14 presidential election, would that fact, the
15 fact that Florida received a lot of attention
16 from the presidential candidates, be a signal
17 to Florida election officials that turnout
18 might be increased?
19     A    That is one -- yes, it would be one
20 signal.  But it would, of course, be countered
21 by national coverage which was suggesting
22 lesser voter interest in this election and also
23 the drop in the number of people watching the
24 national debates.  So the election officials,
25 frankly, were sort of having difficulty

1  forecasting turnout because of these two
2  cross-pressures.
3      Q    And what do you base that knowledge
4  on, that they were having that difficulty?
5      A    The fact that their numbers were not
6  exact in terms of precise prediction.  But
7  then, again, they almost never are precise.
8      Q    So you're basing that on what happened
9  after the fact?
10     A    Yes, the turnout rate on election day.
11 Thank you.
12     Q    Dr. MacManus, what conclusions --
13 based on your analysis, what conclusions have
14 you drawn regarding the conduct of elections on
15 November 7, 2000, by Supervisor Iorio and
16 generally throughout the state?
17     A    Well, with regards to the first part
18 of your question with regards to Pam Iorio and,
19 I think, Hillsborough County, the performance
20 of the elections was much higher efficiency and
21 effectiveness than in some of the other
22 counties.  There were a lot fewer complaints
23 about -- we didn't have huge ballot problems in
24 Hillsborough County, ballot design problems.
25 We had increased turnout, we had increased

1  registration.  We had a very positive profile
2  of people who made comments about the conduct
3  of the election.  Massive media coverage,
4  incredible amount of publicity, prior to the
5  election through appearances of Iorio both
6  personally at forums and in media forums as
7  well.
8      Q    Turning to page -- still on page three
9  of your report, the -- now, actually we're onto
10 the first full paragraph, the summary says,
11 "Dr. MacManus will testify as to her analysis
12 of the functioning of state and local
13 officials, including the effectiveness of
14 Florida's efforts in comparison with other
15 jurisdictions."  Can you explain what analysis
16 you used to look into that issue?
17     A    I looked at, of course, the multitude
18 of national task force reports and
19 recommendations and analyses, the consortium
20 analyses; I looked at statutes that have been
21 passed by Florida's legislature regarding
22 improvements in the election system; and looked
23 at statistics regarding undercount and
24 overvotes relative to other states that were
25 included in some of the same reports that I

1  just referenced.
2      Q    Can you define the word "functioning"
3  in that sentence?
4      A    "Functioning."  The closest word I can
5  come to it is "operating."
6      Q    And you applied the same analysis
7  there to assess the operations that you just
8  described?
9      A    Yes, sir.
10     Q    And how would you define
11 "effectiveness" in that sentence?
12     A    Effectiveness is measured in a
13 plethora of ways, but effectiveness could be
14 measured by many of the things we've already
15 discussed.  The complaint -- the comment cards,
16 the profile of the comments, the high turnout
17 rate, the increase in voter registration all
18 are demonstrative of the effectiveness of
19 preelection and election day activities.
20     Q    And that's how you would define
21 "effectiveness" as well?
22     A    "Effectiveness," right.  The smooth
23 operation of the system in terms of making it
24 easy for voters to register and actually cast a
25 ballot.

6 (Pages 158 to 161)

Page 162

1    Q   You mentioned that you're looking at
2  the functioning of state and local officials.
3  Who in particular are you looking at?
4    A   Of course I looked at the 67 county
5  Supervisors of Elections in terms of their
6  voter outreach and voter education plans from
7  the documents that were filed with the Division
8  of Election in order for the counties to
9  qualify for voter education funds that were
10  appropriated by the state legislature in
11  recognition of the fact that voter education is
12  something that needs to be bolstered in this
13  state. And that's, of course, a conclusion
14  that's been reached by virtually every other
15  study that's been done of the elections.
16    Q   And those were filings pursuant to the
17  state requesting part of the $6 million?
18    A   Right. It was required for them to
19  receive funding.
20    Q   And were those filings -- those were
21  actually plans?
22    A   They're actually documents. Some are
23  law. Larger counties like Hillsborough's are
24  much more extensive than smaller counties,
25  which would be expected.

Page 163

1    Q   And were these filings of activities
2  they have done or activities they plan to do?
3    A   It was some of each. The counties
4  somewhat varied. Some would say, "Well, we did
5  this before, we're just going to do more of it
6  in the coming time period between now and the
7  next election," and others took it just that
8  "We're going to look at just -- you know,
9  report things that we're going to do new." But
10  most of them covered something that they were
11  doing and then in addition the things that they
12  were planning to do with the new-found money
13  and the new-found emphasis on voter education.
14    Q   I interrupted you. I apologize. You
15  said you looked at the 67 Supervisor of
16  Elections and you looked at voter education.
17  And what else did you look at?
18    A   Well, I looked at the general task
19  force and consortia overviews of the Florida
20  election, and some were mentioned specific
21  county officials, so that would be in addition
22  to the Supervisor of Election. Some of those
23  documents identified other election personnel
24  that were in counties.
25    Q   What county officials were identified?

Page 164

1    A   I can't recall. I just remember that
2  it was just described as election office
3  supervisors or personnel or something of that
4  nature.
5    Q   You mention also that you're going to
6  do a comparison with other jurisdictions. Can
7  you describe what the elements of that
8  comparison will be, what areas you're going to
9  be comparing?
10    A   I will be taking the recommendations
11  of the various task force reports and looking
12  at how Florida -- how many of those Florida's
13  implemented versus other states.
14    Q   You're talking about the actual
15  reforms?
16    A   Yes.
17    Q   So are you doing comparisons about
18  what was occurring before the 2000 presidential
19  election?
20    A   No, other than through the normal
21  reading of these reports where some of those
22  things are discussed. But they're not
23  quantitative. The only quantitative
24  comparisons that I've seen in most of these
25  task force are comparisons of the undervote

Page 165

1  and/or the overvote or what some would call
2  spoiled ballots.
3    Q   So your comparison that you're
4  describing in this sentence is focused on
5  comparing the various reforms in Florida as
6  compared to reforms in other jurisdictions post
7  2000 election?
8    A   Right.
9    Q   And in terms of those issues or those
10  reforms, what specific elements are you looking
11  at?
12    A   Just the whole gamut. I can't really
13  come up with a comprehensive list here. But
14  among the more common recommendations -- and
15  I'm speaking about recommendations that you
16  will find in almost every report -- things such
17  as recommendation for better and more
18  consistent standards on recounts, getting rid
19  of punch-card ballots, attention to absentee
20  ballot issues; things like, of course, voter
21  education, we mentioned that, provisional
22  ballots, better poll worker training, voters'
23  bills of rights and responsibilities, among
24  others.
25    Q   Dr. MacManus, what conclusions are you

7 (Pages 162 to 165)

Page 166

1   prepared to draw regarding the functioning of
2   state and local officials including the
3   effectiveness of Florida's efforts in
4   comparison with other jurisdictions?
5       A   I would certainly draw the conclusion
6   that there was the effectiveness of voter
7   registration processes. That's, of course,
8   measured by the increase in the number of
9   registrants and also increases in voter
10  turnout. I mean, both of those are the
11  ultimate examples of improvements in an
12  election system which, of course, are often a
13  product of the outreach and educational
14  activities of the people who are elected to do
15  that, the county Supervisors of Elections.
16      Q   Dr. MacManus, turning to the beginning
17  of the last paragraph on page three, beginning
18  with "Finally" --
19      A   Yes, sir.
20      Q   I'm sorry. Staying on the prior
21  paragraph, I have one other question.
22      A   Yes, sir.
23      Q   You mentioned that, "Concerning state
24  and local officials, Dr. MacManus will testify
25  as to the position of the State of Florida as

Page 167

1   compared to other states with similar issues,
2   the interaction of the Division of Elections
3   with the various county supervisors, and the
4   interaction of the Division of Elections with
5   the various agencies that have a role in the
6   electoral framework."
7       In that sentence, can you explain,
8   again, what kind of analysis you went through
9   to conduct that work?
10      A   Of course I am familiar with the fact
11  that many of the reform and task force reform
12  groups contacted the State of Florida and the
13  Division of Elections to have experiences of
14  the Division and recommendations to learn from
15  Florida's reform efforts. And, of course,
16  another aspect of that was the governor's task
17  force on election reform in which Pam Iorio
18  played a major role as sort of the person that
19  set the stage for the task force and their --
20  the quality of their investigations from day
21  one.
22      And, of course, I would have knowledge
23  of their interactions with other agencies
24  through requirements of the Motor Voter
25  registration -- or National Voter Registration

Page 168

1   Act. I know for a fact that there's been a
2   real effort to try and improve the liaisons
3   between the various agencies that can register
4   voters under NVRA.
5       Q   So this assessment, this second
6   sentence of the first full paragraph, is that
7   an assessment made of these issues post 2000
8   election or prior to the 2000 election?
9       A   Some of it is prior because here you
10  would also -- from my own personal knowledge
11  and from reviewing the training documents that
12  were provided to me by the Division of
13  Elections, I am very familiar with the fact
14  that the Division of Elections repeatedly
15  attempted to improve -- for this last election
16  cycle, to improve the operation of the election
17  system and to try and enhance communication
18  between the various actors in the registration
19  process.
20      I'm also quite familiar with the fact
21  that the Division puts out a lot of published
22  brochures and documents and whatever that cover
23  a wide range of subjects that are available
24  free if a voter would like to have copies; most
25  of them are also available online, I believe,

Page 169

1   from candidate handbooks to registration
2   information, brief brochures explaining the
3   process of voting in Florida, things of that
4   nature.
5       Q   You mentioned that the Division of
6   Elections made a number of efforts or attempts
7   to enhance communication and to make other
8   improvements. What's your basis for knowing
9   that?
10      A   From looking at the training sessions
11  that were conducted by them at each of the
12  meetings of the Florida State Association of
13  Supervisors of Elections. FSASE I think is how
14  they refer to it.
15      Q   Any other methods of assessing?
16      A   From personally talking with various
17  supervisors about the accessibility of
18  personnel within the Division of Elections and
19  my own personal experience. When I have had
20  inquiries regarding statistics that are online
21  on the web site or questions about the law,
22  I've been very impressed with the rapidity
23  which the Division of Elections has responded,
24  and that goes back to well before the 2000
25  election.

8 (Pages 166 to 169)

Page 170

1    Q    And was part of your experience as an
2    election commissioner?
3    A    As an election commissioner but more
4    importantly as a political scientist and
5    political analyst.
6    Q    In your opinion, based on those
7    assessments, to what extent were these attempts
8    by the Division of Elections to enhance
9    communications and to make the improvements you
10   described, to what extent were they successful?
11   A    Well, it looks like they were somewhat
12   successful at least because the turnout rates
13   and registration rates went up in the state.
14   Q    Any other measure of success?
15   A    I would think also that the -- I
16   haven't reviewed any other measures.
17   Q    Now, Dr. MacManus, at the bottom of
18   page three, where it says, "Finally,
19   Dr. MacManus will testify as to her analysis of
20   the impact and nature of election reform in
21   Florida" -- do you see where I am?
22   A    Yes, sir.
23   Q    What analysis did you do here?
24   A    Again, I looked at the various task
25   force reports. Explicitly, I carefully

Page 171

1    examined the report of the governor's task
2    force on election reform. And then, of course,
3    I examined the Florida Election Reform Act and
4    acts that were passed this last legislative
5    session which even more elaborated on reform in
6    Florida and put it ahead of the nation in terms
7    of reaching disabled voters and voter rights
8    and responsibilities.
9         And so I looked at election reform,
10   all the different aspects of election reform
11   that have been adopted in Florida. And, of
12   course, the impact of these is -- for example,
13   we know that we've gotten rid of punch-card
14   ballots except for absentee voting. So we've
15   had a major -- or we have -- we've also gotten
16   rid of the centralized counting optical scan
17   systems. So we've adopted standards on
18   acceptable error rates of machines, that kind
19   of thing. The machinery -- the new machineries
20   had to be sort of verified and certified by the
21   Division of Elections. So these are a number
22   of things that we've done.
23        The impact we don't really know yet
24   because we haven't had the next election. We
25   haven't, for example -- we've had some

Page 172

1    municipal elections where some of these things
2    have been put in place but we haven't had a
3    state-wide election, but yet we know that
4    there's an assessment procedure put in place
5    because each county has to report back to the
6    governor and the legislature and the Division
7    as to how election 2002 goes.
8    Q    Will any of these -- will any of your
9    analyses assess any election reform efforts
10   that occurred prior to the 2000 presidential
11   election?
12   A    I have not looked at that yet.
13   Q    Do you plan to look at that?
14   A    If asked, but I've not been asked.
15   Q    In your assessment of, frankly, what
16   reforms would work in Florida, would it be
17   helpful to know if election reform efforts have
18   occurred or attempts have been made in Florida?
19   A    Yes. I am familiar with the attempt
20   to reform the absentee voting process to
21   address emerging fraud problems in some parts
22   of the state, which that was a reform that was
23   put in place prior to the 2000 election which
24   some say might not have worked as anticipated.
25   Q    Any other attempts at reform other

Page 173

1    than that prior to the 2000 election?
2    A    Well, I'm also familiar with prior
3    investigations of things like the possibility
4    of voting by mail. I remember that I was on
5    the task force that looked at that some years
6    ago and we surveyed, again, the voters of
7    Florida to see how they felt about that.
8         I'm also familiar with some attempts
9    to -- by the Division, and I think we did
10   actually have absentee voting via the Internet.
11   I believe it might have been astronauts, I
12   can't remember exactly. But Florida has been
13   long looking at technological reforms. We've
14   made technological reforms in the web site and
15   the availability of registration information,
16   candidate information, turnout statistics, all
17   of these are available through technological
18   reforms that have been put in place with monies
19   expended by the state.
20   Q    When you say "actions," at the top of
21   page four, where you say you're going to
22   testify to your analysis -- you're going to
23   testify regarding your analysis of Supervisor
24   Iorio's actions throughout her term of
25   office" --

9 (Pages 170 to 173)

Page 174

1   A   Yes, sir.
2   Q   -- what period of time does that
3 cover?
4   A   Well, her term of office that I would
5 be focusing on would be the one prior to the
6 election and, of course, the one post election.
7   Q   And when you say "actions" at the top
8 there, what does that mean?
9   A   It means, of course, her numerous
10 outreach activities, the educational
11 activities, the interfacing with the public,
12 including a wide array of special needs
13 populations which are present in Hillsborough
14 County.  It reflects her accessibility to the
15 news media, which we're in -- Hillsborough
16 County is in the largest media market in
17 Florida.  And it would reflect her selection of
18 poll workers, her training of poll workers,
19 her -- the operations of her office, her
20 knowledge of the demographics of the community,
21 and her constantly -- I think her presence also
22 among other supervisors of large counties.
23       She is perceived as a very influential
24 and important leader and is constantly sought
25 after in terms of her recommendations and so

Page 175

1 forth for improvements in other county election
2 systems.  She's served as president of the
3 Florida Association of Supervisors of Elections
4 and was president during election 2000.  And
5 I've had tremendous feedback from national and
6 state and local media about her knowledge of
7 the election laws and procedures and the
8 smoothness which Hillsborough County seemed to
9 function relative to some other counties in
10 Florida that we've already mentioned.
11   Q   Are you analyzing the actions of any
12 other Supervisor of Election in this way?
13   A   I'm focusing specifically on
14 Supervisor Iorio's actions, but I also have
15 knowledge of the actions of other supervisors
16 through the reviews and analyses that have been
17 written about election 2000.
18   Q   But you have no independent -- you're
19 doing no independent analysis of the actions of
20 other Supervisors of Elections?
21   A   No, I'm not.
22   Q   You mention that you're going to
23 testify as to your analysis of the state's
24 actions and efforts for improvement of the
25 elections in Florida and how Florida compares

Page 176

1 to the rest of the country.  Do you see where I
2 am?
3   A   Yes, sir.
4   Q   Can you define -- is "actions" in that
5 sentence the same as you described before?
6   A   Yes.
7   Q   Did you find any deficiencies in
8 Supervisor Iorio's conduct in the 2000
9 presidential election?
10   A   I have not seen any other than the
11 normal kinds of election errors that are, you
12 know, commonplace.  I mean, there, of course
13 were some mistakes in terms of people being
14 registered in a timely fashion or whatever
15 else, but not any mass quantity and certainly
16 not the onslaught of problems that you saw in
17 other counties like Palm Beach.
18   Q   Other than, as you mentioned, people
19 not being registered in a timely manner, were
20 there any other deficiencies that you
21 identified?
22   A   Well, you have certain -- as we
23 mentioned before, people that might have been
24 allowed to vote that really shouldn't have.  I
25 mean, a lot of these are, again, poll worker

Page 177

1 mistakes, erring on the side of the voter as
2 opposed to the election office; and,
3 conversely, sometimes not allowing people to
4 vote that were eligible.  But these are what I
5 think many legal scholars would describe as
6 just kind of regular mistakes, voting mistakes
7 that happen because you can't have a perfect
8 election.
9   Q   When you say "legal scholars," are you
10 saying this is a legal assessment?
11   A   No.  I'm just talking about some
12 literature that I've read, some scholarly works
13 by legal scholars that talk about what they
14 call garden variety mistakes that get made
15 because you've got human error problems, you've
16 got equipment problems, you've got unforeseen
17 events.  I think all the things we discussed
18 earlier today.
19   Q   What do the people in your field say
20 about these things?
21   A   Well, my field doesn't write about
22 this a lot.  I am very familiar with these
23 things because I'm a regular subscriber, and
24 have been for years, of the Election
25 Administration Reports, where they constantly

10 (Pages 174 to 177)

Page 178

1   highlight -- the newsletter highlights problems
2   all around the country.  And these problems
3   that we just mentioned surface often.  And, of
4   course, you desire to minimize.  I mean, you
5   try to reduce them.  But the notion that you
6   can ever 100 percent eliminate these kinds of
7   mistakes is -- I've not seen anyone testify or
8   write that that can be done because you've got,
9   as we've mentioned, some unforeseen
10  circumstances that relate to people.  And we
11  will continue to have problems with, you know,
12  the recruitment of poll workers and the
13  reliance upon elderly poll workers.
14      Q   You mentioned that political
15  scientists don't write about this a lot.  Are
16  there political scientists that are prepared to
17  agree with the analysis that the legal scholars
18  have made, that you're aware of?
19      A   I don't know.  I haven't asked any of
20  them so I don't know.
21      Q   From your reading of any scholarly
22  journals or someone who has been a political
23  scientists for a number of years, would you be
24  willing to -- are you aware of any political
25  scientists that would agree with the legal

Page 179

1   scholars?
2       A   The legal scholars, meaning that these
3   kinds of mistakes are common?
4       Q   Well, what you said before, right?
5       A   I believe you can find political
6   scientists that would agree with that, yes.
7       Q   Are you aware right now specifically
8   of any?
9       A   Not by name.  But state and local
10  politics textbooks constantly talk about some
11  of these issues: difficulties in registration
12  procedures or, you know, voters not being as
13  well educated as they should, or changing
14  technology affecting people's ability to use
15  equipment.
16      For example, there's been a lot of
17  concern that perhaps touch-screen equipment --
18  that elderly people might have a little bit
19  more trouble relying upon that type of voting
20  equipment than others because they're not as
21  technologically sophisticated, things of that
22  nature.
23      Q   The problems that you identified a few
24  minutes ago, people not being registered in a
25  timely matter, people being not allowed to vote

Page 180

1   who should have been allowed to vote. or people
2   who, frankly, you said, may have been allowed
3   to vote that shouldn't have been allowed to
4   vote, those types of problems, have political
5   scientists that you know of identified those as
6   commonplace problems, to your knowledge?
7       A   I haven't seen any political science
8   analyses of the election 2000 other than the
9   book that I mentioned, an edited volume,
10  "Unfinished Business," would be one.  A lot of
11  them talked about the same problems we've
12  mentioned, that you have poll worker problems,
13  you have uneducated voters, you have people who
14  are not literate that have not had experience
15  with -- that make mistakes.  So in that sense,
16  yes, I have read other political science
17  accounts.  And, of course, many political
18  scientists have written about the Palm Beach
19  ballot.
20      Q   You mentioned that -- the problem with
21  poll workers, you mentioned people not being
22  registered in a timely manner or people
23  actually not being allowed to vote that should
24  have been allowed to vote.  I think you
25  mentioned that that was a problem at the poll

Page 181

1   worker level and that wasn't something the
2   elections office controlled.
3       A   Yes, I think at the actual election
4   polling place.  And that's natural because you
5   got one of the largest -- you have one of the
6   largest temporary work forces in America.  They
7   work long arduous hours and so the frailties
8   that are associated with age sometimes affect
9   how they interface with the voter.
10      Q   But ultimately the election office,
11  the central office is responsible for the work
12  at the polling site.
13      A   Well, they're responsible for
14  recruiting and training the poll workers.
15      Q   So they -- in your opinion, they have
16  no responsibility over the actions of the poll
17  workers and the outcomes on election day?
18      A   Well, they do the best they can in
19  light of a very difficult situation, which is
20  finding people that can take a day off work and
21  work those kinds of hours, which leads you to
22  primarily a retiree work force or poll worker
23  force.  And, you know, many poll workers -- in
24  fact, a lot of the plans for reforming call
25  for, not just in Florida but in other places,

11 (Pages 178 to 181)

Page 182

1    for election officials to try to broaden their
2    recruitment base to include younger voters,
3    college students, to get businesses to loan
4    their employees to work at the polls for a day;
5    which I know Hillsborough County is doing.
6         And so, yes, many supervisors would
7    have liked to have had a different poll worker
8    profile, but the bottom line was many of them
9    testified in various venues that they had
10   trouble recruiting, period. And that's a
11   nationwide problem that's been documented in
12   virtually all of these task force reports.
13        Q    I guess my question was:
14   Ultimately -- is it your opinion that
15   ultimately the Supervisor of Elections is
16   responsible for the activities on election day
17   even at the poll worker level?
18        A    Well, I think they're responsible for
19   the training and the recruitment. In terms of
20   the individual behavior of poll workers, I
21   think the individual has responsibility for
22   that.
23        Q    In your opinion, Dr. MacManus, in
24   attempting to reform the election process as
25   you've described it, is the state acknowledging

Page 183

1    that there are problems in this electoral
2    system?
3         A    Absolutely. As did every other state.
4         Q    Dr. MacManus, what are your
5    conclusions regarding the impact and nature of
6    election reform in Florida based on your
7    analysis?
8         A    Well, my conclusion is simply that
9    Florida is way ahead of the rest of the nation
10   in terms of its legislative attention to
11   election reform and its appropriation of
12   election reform.
13        Q    Post 2000 election?
14        A    Yes. We're certainly away ahead of
15   Congress.
16        Q    Dr. MacManus, in your prior work on
17   voting rights cases -- and let me back up and
18   ask you. Have you done expert analysis or
19   expert consulting work in other voting rights
20   cases?
21        A    I have. I believe I testified to that
22   this morning.
23        Q    And in those cases, did you assess the
24   role of race in the election process?
25        A    To the best of my recollection, I'm

Page 184

1    sure I did look at race as one of the factors
2    along with other demographic variables.
3         Q    Have you done that kind of analysis in
4    this case?
5         A    No.
6         Q    Why not?
7         A    I was asked to do the things that have
8    been stated in this report, and so that's what
9    I did.
10        Q    Other than what you were asked, as a
11   political scientist and as a scholar would you
12   want to do that kind of analysis in order to
13   draw the conclusions you have?
14        A    Well, I think I have been very
15   attentive and focused on issues that would
16   demonstrate the openness of the system to
17   minorities in Florida by focusing on
18   registration and turnout and poll worker
19   assignment and, you know, publicity and venues
20   that have been gone to by elected officials.
21   So I have been attentive to racial issues in
22   this issue, but I have not done a racial
23   polarized voting study or anything of that
24   nature.
25        Q    Have you done any kind of other

Page 185

1    analysis of the role of race in this process
2    other than what you've mentioned?
3         A    Just from reviewing the various
4    reports and task forces which call attention to
5    the fact that income and education are -- and
6    other socioeconomic factors play major roles in
7    the voter mistakes: undervotes, overvotes,
8    things of that nature.
9         Q    And what kind of --
10        A    And that these reports also indicate,
11   which Florida has done, which is the need to be
12   attentive to the special needs populations, of
13   which Florida has many and Hillsborough County
14   has many.
15        Q    And you said there was a role for
16   certain socioeconomic groups -- I'm sorry. You
17   mentioned that there were -- that studies you
18   had read mentioned that certain socioeconomic
19   groups, that may be a fact --
20   socioeconomic factors may play a role. What
21   kind of role would they play?
22        A    Well, they often are a key to, first
23   of all, predicting voter errors. That's
24   certainly the conclusion of the reports from
25   election 2000. And they also, of course, play

12 (Pages 182 to 185)

Page 186

1  a role in registering to begin with.
2      Q   Have you done any kind of assessment
3  of the residential patterns of African-American
4  or other minorities and the presence of certain
5  equipment -- with regard to the presence of
6  certain equipment in precincts?
7      A   I have not done that.
8      Q   Have you done any kind of assessment
9  of the residential patterns of African-American
10  or other minorities with regard to the presence
11  of other equipment in the election process?
12      MS. KERT: Object to the form.
13  BY MR. COX:
14      Q   For example, laptop computers.
15      A   I have talked about that and I have
16  reviewed the testimony that Supervisor Iorio
17  gave over the reasons that she used laptops as
18  she did. And, of course, I'm also very
19  familiar with her constant pleas for more money
20  for elections that would have made this
21  possible, but times have been kind of tight
22  budgetarily in Florida.
23      Q   Have you done any kind of assessment
24  of phone line capacities on election day?
25      A   No. I am familiar with across the

Page 187

1  country there were phone line problems. Again,
2  much of it driven by unexpectedly high turnout.
3      Q   Was that a problem in Florida?
4      A   Yes.
5      Q   Was that a problem in Hillsborough
6  County?
7      A   Yes.
8      Q   Was it a problem in any other county
9  specifically that you know of?
10      A   A number of counties. I can't
11  delineate specific ones. It was a common
12  problem, I think, again, going back to the
13  report I referenced earlier that was done for
14  Representative Conyers. I mean, the phone line
15  problems were practically in every state.
16      Q   Dr. MacManus, you had mentioned
17  several times during your testimony that you're
18  a member of the Florida Election Commission.
19      A   Yes. I'm the chair.
20      Q   How long have you been a member?
21      A   I was appointed in 1999 and I'll serve
22  through 2003 when -- I'm a term-limited -- the
23  chair is term limited to one four-year term.
24      Q   And have you been chair the entire
25  time?

Page 188

1      A   Yes.
2      Q   And so at the end of your term is the
3  end of your chair position?
4      A   Yes. Yes.
5      Q   What's your role on the commission?
6      A   The commission has statutory -- we're
7  delegated specific statutory authority.
8  Primarily, it most commonly relates to the
9  election code which deals with the candidate
10  contributions, candidate expenditure,
11  campaigning.
12      Q   Have you held any other leadership
13  posts on the commission?
14      A   No.
15      Q   And what's your role as chair?
16      A   I keep the meetings moving. And we
17  have time-certain appearances or appointments,
18  and I try to make sure the commission keeps to
19  that. I often advise staff as to questions
20  that we might have of the Division of
21  Elections, for example, or things that we would
22  like to tell them that we think might improve
23  electoral operations from, particularly, the
24  candidate's perspective.
25          For example, we made a recommendation

Page 189

1  to the Division this year regarding the need to
2  more explicitly delineate the responsibilities
3  of campaign treasurers because we were seeing a
4  lot of complaints filed on the inadequacies of
5  campaign treasurer reports.
6      Q   And are you appointed --
7      A   Yes.
8      Q   -- to the FEC, to the Florida Election
9  Commission?
10      A   Yes.
11      Q   Who appointed you?
12      A   The governor.
13      Q   That's Governor Bush?
14      A   Governor Bush.
15      Q   How does the appointment process work?
16      A   There are nine members on the
17  commission and eight of the commissioners are
18  selected by the leadership. The minority and
19  majority leadership in each house submit a list
20  to the governor, and I believe the governor
21  selects, but the governor appoints the chair.
22  But, of course, we all have to be confirmed by
23  the Florida Senate.
24      Q   So is the appointment process similar
25  to the FEC, in the sense that two parties --

13 (Pages 186 to 189)

Page 190

1      A    Oh, yes.  It's absolutely required
2    that there be four Democrats and four
3    Republicans.
4      Q    So is it considered a political
5    appointment, being selected to the FEC?
6      A    I think it's just -- I'm not sure what
7    you define as "political."  Anything that
8    requires the approval of a legislative body is
9    probably politically defined.  But I've been
10    told that I was selected because I'm very
11    knowledgeable of Florida politics and write
12    about Florida elections.  There have been other
13    academic chairs in the past.
14      Q    Does your appointment represent any
15    particular political party?
16      A    Absolutely not.  In my job as an
17    analyst and also as a professor, I'm very
18    careful to approach things in a nonpartisan
19    fashion.  It is extremely important for the
20    position that I'm in as an analyst.  And I've
21    been involved through appointments for a number
22    of governors of both parties.
23      Q    Have you ever been on the Florida
24    Election Commission?
25      A    No.

Page 191

1      Q    Are there any commission
2    responsibilities related to election
3    administration?
4      A    Only in -- what I mentioned is the
5    operations from the candidates' perspective and
6    the public's right to know about who's giving
7    money to whom, the openness of the reporting
8    process.  So in that sense, certainly it is.  I
9    mean, candidates are the center of the
10    elections and so in that sense I am part of the
11    election process.
12      Q    Are you compensated for being on
13    Florida Elections?
14      A    Expenses only.
15      Q    Just expenses?
16      A    Yes.
17      Q    What is Neglection 2000?
18      A    Neglection 2000 was a major study that
19    was funded by a lot of corporations which
20    focused on the inattention to younger voters by
21    both of the political parties.  And I, of
22    course, was on the advisory board to that.
23    They got funding to do a number of polls of
24    young people and they tracked, for example,
25    where candidates went.  And they also did some

Page 192

1    very innovative research on how campaign ads do
2    or do not target towards younger voters.  And
3    so it was a very interesting and very rewarding
4    project to be involved in.
5      Q    How did you get involved?
6      A    I was contacted by the group because I
7    have written about -- a lot about generational
8    politics.  I wrote a book called "Young versus
9    Old" that was published in 1996 which has
10    gotten a lot of attention, and so they -- and
11    I'm also on the task force of the American
12    Political Science Association that's aimed at
13    improving civic education and trying to improve
14    the participation of young people.
15      Q    Over what period of time did the
16    survey cover?
17      A    Election year 2000.
18      Q    So this occurred after election 2000?
19      A    No.  It was in the middle of it.
20      Q    In the middle of it?
21      A    Yes.
22      Q    So the conclusions came out prior to
23    the election or after the election?
24      A    Some of each.  They had a major post-
25    election analysis where they -- there was a big

Page 193

1    panel, I was part of it, where people gave
2    different parts of the research.  It was in
3    Washington.  It was covered by the national
4    press.
5          But some of it came out during the
6    election.  For example, they did some studies
7    early on -- they would release surveys --
8    because they were interested in primary
9    participation, so they did some survey work on
10    the primary, and that was released, of course,
11    before the general.  Again, the point of it was
12    showing that candidates were ignoring young
13    people.
14      Q    What were the conclusions drawn from
15    the survey?
16      A    The basic one is that part of the
17    reason why the participation rates of the young
18    have continually declined -- and they were the
19    lowest this election in history -- is because
20    of the growing pattern of candidates to go for
21    older voters who can give money and time and
22    younger people can't.
23          And so the point of it is that --
24    their campaign ad study basically showed that
25    when young people were paid -- you know, paid

14 (Pages 190 to 193)

Page 194

1  attention to by candidates or by ads, their
2  interest increased.
3       And that's not surprising to political
4  scientists but, believe it or not, it's one of
5  the first attempts to try to measure it and
6  that's why this study was so significant.
7     Q   I'm going to hand you, just for your
8  recollection or reference if you need it, a
9  document entitled "Floridians Want Reform of
10  the Election System...Now!"
11     A   Right.
12     Q   And it's a study sponsored by the
13  Collins Center for Public Policy, Inc., and the
14  James Madison Institute. It's dated April 16,
15  2001. I only have one copy. My others are
16  sitting in Miami where this deposition was
17  originally scheduled to be.
18     A   Okay. Thank you.
19     Q   I'll ask you to take a look at it.
20     A   All right.
21     Q   Can you identify that for me?
22     A   Yes. This is the report that this
23  project team, of which I headed, was based
24  upon, a state-wide survey of Floridians done by
25  a well-respected polling firm. The actual

Page 195

1  survey telephoning was done by Rob Schroth &
2  Associates in Washington.
3       And this was a report that was given
4  to the funding agencies, and it was done at
5  a -- we held a state press conference at the
6  State Press Center in Tallahassee to release
7  the results, and it got a lot of attention
8  certainly in Florida and outside as well.
9     Q   What was the time period that that
10  covered?
11     A   I'd have to look at the specifics.
12  The polling was done -- a survey of 600
13  Floridians April the 3rd through the 8th, 2001.
14     Q   So the survey was of voters on their
15  post -- on their -- I guess on their reactions
16  to the 2000 election. Is that correct?
17     A   Yes. We wanted to -- first of all,
18  other outside polls were being done of the
19  American public-at-large. And as social
20  scientists, we thought -- you know, the team
21  and myself thought -- what better place to
22  really look at where the nail storm was than to
23  do -- to look at Florida by itself. So we were
24  very intent on trying to get the opinions of
25  Floridians as to what they saw -- after they

Page 196

1  had time to reflect on things, what they saw
2  were the major problems and what they wanted to
3  be done about it. And that was really the
4  intent of the survey.
5       And it was also designed to kind of
6  test another thing that's of great interest to
7  social scientists which is whether election
8  2000 -- one's experiences with election 2000
9  will have a negative or a positive impact on
10  participation rates in election 2002.
11     Q   And what were the overall conclusions
12  of the survey? What did the group learn?
13     A   Well, we learned that the huge
14  percentage of Floridians absolutely wanted
15  reform, and we also learned that they were
16  going to blame the legislature most if nothing
17  was done about it.
18       And keep in mind that this survey was
19  done while the legislature was in session and
20  considering election reforms. And it's my
21  opinion that this survey had a lot of impact on
22  the actions of the Florida legislature. This
23  was the only evidence that they had which, you
24  know, was a scientific study of the opinion of
25  Floridians, and it was loud and clear that they

Page 197

1  wanted something done about things. And so
2  that the basic gist of it.
3       Also, other conclusions were that
4  there was a lot of blame to go around, that a
5  lot of mistakes were made, including individual
6  voter mistakes, the equipment, the actions of
7  poll workers, a variety of other things which
8  are well documented in here.
9       And the most positive thing that came
10  about from it is, of course, the reforms that
11  were implemented by the legislature, number
12  one; but secondly that it seems that
13  everyone -- the majority of the different
14  groups that we looked at, individual opinions,
15  were not going to let 2000 be a dampening
16  effect on their participation in 2002. If
17  anything, it was going to make them even more
18  convinced that their votes count.
19     Q   Were any of these survey results
20  tabulated or calculated on racial lines?
21     A   We broke out the results on race and
22  ethnicity, yes.
23     Q   And are they --
24     A   And we over-sampled for minority
25  populations to make sure that we were getting a

15 (Pages 194 to 197)

Page 198

1 representative view of minority viewpoints.
2    Q  Is that noted in the report?
3    A  Yes, it is.  In fact, there are tables
4 that break out the opinions by race and
5 ethnicity.
6    Q  What were the demographics of the
7 sample that you-all surveyed?
8    A  We sampled a random sample of
9 Florida's adult population 18 and over.  Again,
10 this was done by -- the sample was drawn by an
11 extremely reputable national Washington-based
12 polling firm that's used by a number of the
13 major newspapers in Florida as well as other
14 professional groups.
15    MR. COX:  I'm going to go ahead and
16 have this marked as an exhibit.
17    A  There was, I might also note, an
18 African-American faculty member on the project
19 team, Professor Thomas, and a Hispanic member
20 as well, Professor Moreno.
21    (Exhibit Number 3 marked for
22 identification.)
23 BY MR. COX:
24    Q  Dr. MacManus, going back to your
25 report, I have two questions regarding your

Page 199

1 conclusions.  In analyzing -- based on your
2 analysis, what conclusions do you draw
3 regarding the problems facing all elections
4 held in a representative democratic form of
5 government?
6    A  That there are -- that these kinds of
7 problems occur in virtually every election
8 held.
9    Q  And what are your conclusions
10 regarding your analysis -- or based on your
11 analysis of the decentralized election system,
12 what conclusions do you draw?
13    A  I think it worked very well for
14 Florida because especially the turnout numbers
15 went up and the registration numbers went up,
16 and in that sense it's indicative that some of
17 the outreach strategies that were utilized by
18 individual Supervisors of Elections were
19 effective.
20    Q  Dr. MacManus, did you serve on the
21 transition team for Governor Bush?
22    A  Yes, I did.
23    Q  And what was your involvement with
24 that?
25    A  I was a project leader in the health

Page 200

1 services transition team.  Again, I was
2 selected by the governor because of my longtime
3 experience managing big projects, you know,
4 research projects, and also because I have done
5 a number of -- extensive number of studies on
6 the concerns of elderly in Florida.  And, of
7 course, health issues and the elderly in
8 Florida go hand and hand.
9    And so I was in charge of getting the
10 project team meeting, going into agencies,
11 analyzing things that needed to be done,
12 problem areas, and then producing a report for
13 the governor-elect.
14    Q  Were there any members of the -- first
15 of all, how large was the transition team?
16    A  They varied.  There were a number of
17 transition teams -- and I have written about
18 this professionally because it was a very
19 unique approach to transition.  Oftentimes
20 governor's transition teams involve
21 appointments.  Ours was a policy analyst
22 responsibility.  There was a separate
23 transition team that involved appointments, so
24 we had nothing to do with that.
25    Q  So your transition group were made up

Page 201

1 of a number of coordinators?
2    A  There were, I believe -- and this has
3 been a long while ago now.  I think there were
4 seven or nine policy transition teams.  Ours
5 was one of the larger ones because we had some
6 of the bigger agencies to over -- to examine.
7 The Agency for Health Care -- AHCA, the Agency
8 for -- I'm forgetting what the acronym stands
9 for.  But in terms of the policy areas that we
10 looked at, health and -- it was the largest
11 portion of the budget because of welfare -- I
12 mean, excuse me, Medicare, Medicaid, those
13 kinds of problems were things that we had to
14 look at.
15    Q  So your transition -- you were policy
16 coordinators?
17    A  Yes.
18    Q  Do you remember how many policy
19 coordinators there were?
20    A  I believe seven to nine.  I'm not sure
21 absolutely.
22    Q  Do you recall what policy coordinator,
23 if any, dealt with election administration
24 issues?
25    A  I don't know.

16 (Pages 198 to 201)

Page 202

1    Q   To your knowledge, was there anyone
2  devoted to that issue?
3    A   I'm not sure. We were under such a
4  tight time constraint, and I also had back
5  surgery at that time and I was really kind of
6  suffering with personal ailments.
7    Q   Dr. MacManus, have you ever been
8  involved in political campaigns?
9    A   No.
10    Q   Never served on a campaign committee?
11    A   No. I've been very, very
12  conscientious about maintaining a sort of
13  nonpartisan analyst perspective on elections
14  because I've worked for news media for quite
15  some time and they're not really interested in
16  having partisan operatives as political
17  commentators and analysts.
18    Q   Before, you had mentioned a major
19  statewide survey of post election 2000. Is
20  that what you were referring to, what we just
21  marked as an exhibit?
22    A   Yes, it was.
23    Q   And we had talked for some time about
24  Pam Iorio's race versus -- was it Pat Robinson?
25    A   Joe Robinson.

Page 203

1    Q   Joe Robinson. And you mentioned he
2  was an African-American. Just for the record,
3  what race is Ms. Iorio?
4    A   She's white.
5    Q   I'm going to hand you what we're going
6  to mark as Exhibit 4 to your deposition.
7       (Exhibit Number 4 marked for
8  identification.)
9       Can you take a look at that, please.
10    A   Kind of a long document. I'm, of
11  course, reviewing it very quickly here. Okay.
12    Q   Exhibit 4 is entitled "Plaintiffs'
13  Third Set of Requests for Documents to
14  Defendants Katherine Harris, Clay Roberts,
15  David Leahy, John Stafford, Pam Iorio, William
16  Cowles, Deanie Lowe, and Choicepoint d/b/a
17  Database Technologies."
18       Have you ever seen this document
19  before?
20    A   No. I haven't read it. I may have
21  seen it but I have not read it.
22    Q   On the fifth page -- you'll have to
23  count, they aren't numbered. Beginning on that
24  page there are a series of requests for
25  documents. In looking that over, were you

Page 204

1  involved, to your knowledge, in providing any
2  of that information?
3    A   Would you point out explicitly?
4  Number 7, 8, what?
5    Q   Number 1. Starting with number 1,
6  "All drafts of summaries and/or reports or
7  other documents written, edited, or reviewed by
8  your expert witnesses relating to the subject
9  matter of their testimony in this case."
10    A   What was your question? I'm sorry.
11    Q   Were you involved in any way in
12  providing that information?
13    A   No, other than through my resume,
14  which the items on that are accessible,
15  libraries and wherever else.
16    Q   And number 2, I'll let you read it for
17  yourself. And the question there is were you
18  involved in providing any of this information?
19    A   I just -- no, I was not responsible
20  for providing that. I just analyzed it.
21    Q   And number 3?
22    A   It's my understanding that counsel
23  provided this. I did not have a role in it.
24    Q   And, finally, number 4?
25    A   I did not provide that. I don't have

Page 205

1  that personally.
2    Q   I'm handing you what we'll mark as
3  Exhibit 5 to your deposition.
4       (Exhibit Number 5 marked for
5  identification.)
6       Exhibit 5 is entitled, "Expert Witness
7  Summary of Supervisor of Elections Pam Iorio."
8    A   That's not what I have. It says John
9  Stafford.
10    Q   Okay. Let's start with that one,
11  then. Exhibit 5 is entitled, "Defendant John
12  Stafford Supervisor of Elections of Duval
13  County's Disclosure of Expert Witnesses." And
14  attached to this is -- on the beginning of the
15  third page is something entitled "Expert
16  Witness Report of John Stafford."
17    A   Third page?
18    Q   Right.
19    A   I just have -- well, these numberings,
20  which is it?
21    Q   Right. There an attachment beginning
22  on the third page.
23    A   I see that. Thank you. Yes, sir.
24    Q   Were you involved in any way -- and
25  I'll, of course, let you look this over. Were

17 (Pages 202 to 205)

Page 206

1   you involved in any way in the preparation of
2   this expert witness report --
3       A   No.
4       Q   -- by Mr. Stafford?
5       A   No, I was not.
6       (Exhibit Number 6 marked for
7   identification.)
8       Q   I now, hopefully, handed you Exhibit
9   6.
10      A   Yes, you have.
11      Q   Which is entitled the "Expert Witness
12  Summary of Supervisor of Elections Pam Iorio."
13      A   Yes.
14      Q   Were you involved in the preparation
15  of this expert summary?
16      A   No.
17      Q   Dr. MacManus -- and I think this was
18  in your vitae -- did you prepare a University
19  of Michigan article on election reform or are
20  you in the process of preparing it?
21      A   I'm in the process of it. It's under
22  review right now. It's not been released. It
23  was just finished and it has to undergo the
24  University of Michigan law students' review,
25  and so it's not been publicly released yet.

Page 207

1       Q   Do you have a tentative release date?
2       A   I understand that they're trying to
3   get it by November, but I'm not sure. You know
4   how those things go.
5       Q   And it will appear in the University
6   of Michigan Law Review?
7       A   I think it's called The Journal of Law
8   Reform or something like that. There are a
9   number of other political scientists that are
10  contributing as well to the issue.
11      MR. COX: Why don't we take a little
12  break.
13      THE WITNESS: That would be wonderful.
14      (Recess from 3:00 p.m. to 3:17 p.m.)
15  BY MR. COX:
16      Q   Dr. MacManus, I'm going to give you
17  the next exhibit in your deposition.
18      (Exhibit Number 7 marked for
19  identification.)
20      I just handed you a Washington Post
21  article.
22      A   Yes, sir.
23      Q   I'll give you a chance to look at it.
24      A   Yes, sir.
25      Q   If you look on page two in I guess the

Page 208

1   last full paragraph of the article, it says,
2   "Harris's office is just down the hall from
3   Bush's, but according to Susan McManus, a
4   University of South Florida political scientist
5   who was appointed by Harris to chair an
6   elections commission, quote, 'They're not close
7   personal friends. Never by any stretch has she
8   been the part of the intimate kitchen cabinet
9   of Governor Bush.'"
10      Is that an adequate quote?
11      A   No.
12      Q   What's the correction?
13      A   I was not ever appointed by Harris to
14  chair the elections commission, that was a
15  governor's appointment. My name is misspelled
16  also.
17      Q   Anything else?
18      A   Not to my knowledge.
19      Q   Is the quote they attribute to you
20  accurate?
21      A   Yes. That was what I had understood
22  to be the case from conversations with
23  Republicans that I frequently interact with as
24  an analyst.
25      Q   Is it your knowledge now?

Page 209

1       A   I haven't looked at this issue.
2       Q   So what is your basis now, what was
3   your basis then, for knowing whether or not --
4       A   My basis was my --
5       Q   -- Governor Bush and Katherine Harris
6   were friends?
7       A   -- my professional following of
8   elections in Florida and speaking with various
9   people from both parties. And this was a
10  comment that's part of my responsibility as an
11  analyst to keep track of, what's happening in
12  Florida politics. And as much, it's an
13  impression, it's a personal observation.
14      Q   Personal observation?
15      A   In terms of my analyst's position. My
16  opinions about the relationship based upon,
17  again, conversations with news reporters, party
18  people, and Tallahassee people.
19      Q   Do you know Katherine Harris
20  personally?
21      A   In a professional manner. Of course I
22  know her as the Secretary of State.
23      Q   But you don't know her personally?
24      A   What do you mean by "personal"? I've
25  met her, I've been introduced to her, I've been

18 (Pages 206 to 209)

Page 210

1 appointed by her to the committee to redo the
2 Florida political history museum in the old
3 capitol. So in that sense I have served on a
4 very large commission, which she appointed, to
5 revamp the political history museum in the old
6 capitol which was dreadfully boring to the many
7 school children that went through it.
8    Q   Dr. MacManus, I'm going to show you
9 what has been identified or numbered as Bates
10 number G002916 through G002917 and a document
11 Bates numbered G002927. I'll show you both of
12 these documents.
13       The first ones that I mentioned, which
14 is 2916 and 2917, is a list of registered --
15 it's entitled "Registered in Hillsborough, Did
16 Not Vote" and is has written at the top
17 "Current felons on file, affirmation
18 completed." I'll let you take a look at that.
19    A   Yes, sir.
20    Q   Are you familiar with that list?
21    A   I've seen this list.
22    Q   And did that list form any of your
23 analysis?
24    A   It would be an example of -- no, it
25 really did not because I did not focus on the

Page 211

1 felon issue. I'm sorry, I thought this was a
2 different document. No.
3    Q   So you never really looked at this
4 list?
5    A   I looked at it; but in terms of
6 analyzing it, it would just -- I didn't really
7 focus on the felon issue. In fact, I was
8 instructed that there was another court case on
9 that, and so I did not focus on the felon
10 issue.
11    Q   So this did not form any support for
12 your analysis?
13    A   No.
14    Q   I'm going to show you document
15 G002927. It's entitled "Convicted Felons
16 Allowed To Voted - Civil Rights Have Not Been
17 Restored." And the grammar error is in the
18 title, not mine. I'll give you a chance to
19 look at that.
20    A   Yes, I saw this as well. And again, I
21 did not really focus on this since I was under
22 instructions that there was another case
23 proceeding on the felon issue so I really
24 didn't analyze it.
25    Q   Dr. MacManus, did you have any contact

Page 212

1 with Pam Iorio prior to your retention in this
2 case?
3    A   Oh, professionally, of course. I
4 mean, she comes to USF, I'm on a number of
5 forums with her. She and I are often on the
6 same panels, civic panels, discussing elections
7 and so forth. I've known her for quite some
8 time in her capacity as supervisor, but in that
9 sense only.
10    Q   So you have not had any personal
11 contacts with her other than what you've
12 described?
13    A   No, just professional contacts.
14    Q   Would you consider Ms. Iorio a friend
15 of yours?
16    A   Professional friend, of course.
17 Friends -- you know, professional friend. A
18 personal friend who comes to my home for dinner
19 or whatever, no.
20    Q   Have you ever been hired by Ms. Iorio
21 for any other purposes other than the purposes
22 for which you're working in this case?
23    A   No.
24    Q   Have you made any media appearances
25 with Ms. Iorio?

Page 213

1    A   We've been on the same forums which
2 have been televised. I think we've been on
3 some candidate -- election forums. I can't
4 recall because there were so many in election
5 2000 that -- you know, I must have been in
6 several hundred and I'm sure she was probably
7 as well.
8    Q   To your knowledge, have any of your
9 students ever volunteered to work for or ever
10 been hired by Ms. Iorio?
11    A   Not to my knowledge they've been
12 hired. I think some of them have volunteered.
13 That's part of our, USF's, community liaison
14 programs, where we try to encourage students to
15 help out on various community things. And
16 election day is always an exciting day for
17 young voters; and, of course, we're trying to
18 get young people interested in politics. And
19 she's always, as are the other supervisors in
20 this area, very amenable to engaging our
21 students in volunteer activities related to
22 elections.
23    Q   Are any of your students currently
24 working for or volunteering for Ms. Iorio?
25    A   Not to my knowledge. Summertime is

19 (Pages 210 to 213)

Page 214

1 always kind of slow when it comes to college
2 students. They want to make money.
3 Q Have you ever volunteered or worked
4 for support -- worked for Pam Iorio's campaigns
5 or in support of her campaigns?
6 A No.
7 Q Based on your experience as a
8 political scientist in Florida, do you believe
9 that she'll seek higher office?
10 A I believe that a lot of people --
11 MS. KERT: Object to the form.
12 A -- believe she will, but I don't have
13 a personal opinion about that.
14 BY MR. COX:
15 Q Dr. MacManus, I'm going to show you a
16 document from the Online News Hour in which Ray
17 Suarez is leading a discussion on the recount
18 in Florida. I'll let you take a look at it.
19 A Oh, yes, sir.
20 Q Do you recall that interview?
21 A Yes. It was -- not explicitly,
22 because there was so many interviews post
23 election 2000 for political analysts in the
24 state, but I do acknowledge that I was on this
25 program.

Page 215

1 Q On page three of the document, the
2 third paragraph from the bottom -- I'll let you
3 take a look at it -- reads, "It's very clear
4 that we need to re-examine the whole process of
5 voting and ballot formats and punch-card
6 ballots and all that."
7 A Yes. And I also continue on with
8 other discussion about not paying attention to
9 making ballots accessible and friendly to older
10 voters and people with disabilities. Yes, sir,
11 I did say this.
12 Q And can you explain what you meant by,
13 it's very clear that we need to look into all
14 of that?
15 A Well, I mean all one had to look at
16 was the inordinate attention to the mistakes
17 that were made, undervoting and overvoting, and
18 the correlation between that and the size of
19 the elderly electorate in the areas that were
20 the most error prone. I mean, that was in the
21 news about every single day.
22 Q And when you say "inordinate," what do
23 you mean?
24 A A lot.
25 Q At the bottom of that same page onto

Page 216

1 the last page of the document reads, "and
2 really, that's a good thing for America because
3 we need to make sure that the election is valid
4 and that people believe in the sanctity of
5 their ballot." Actually, let me read the whole
6 paragraph. I apologize.
7 "Right now we have the best legal
8 minds in America down here monitoring the
9 situation for both parties; and, really, that's
10 a good thing for America because we need to
11 make sure that the election, this election, is
12 valid and that people believe in the sanctity
13 of their ballot." Let me have you take a look
14 at that.
15 A Yes, sir, I did say that.
16 Q Can you explain what you meant by that
17 quote?
18 A I believe I meant exactly what I said.
19 Q When you said "a good thing," what did
20 you mean?
21 A A positive impact of identifying
22 problems and then turning attention to
23 resolutions. The worst thing is for nobody to
24 pay attention to it at all and let it continue.
25 Q Dr. MacManus, earlier in your

Page 217

1 testimony we had talked about your --
2 A Excuse me. Does she get this?
3 Q No. You can share it with your
4 lawyer.
5 Earlier in your testimony we discussed
6 some of the other litigation you've been
7 involved in and you mentioned at that point
8 that you had never received a copy of the
9 deposition or transcript in those cases.
10 A I might have received it but I don't
11 keep -- if you knew how much paper I had at my
12 house. I already had to create a separate
13 storage unit just for the newspapers that I
14 keep as part of being an election analyst. So
15 these cases are so old, I cleaned out things
16 and I, regretfully, didn't keep them.
17 Q Well, just to be sure -- and this is
18 also -- this excludes, obviously, what you've
19 served on us -- I would request that you look
20 for any of these transcripts or any deposition
21 transcripts or trial transcripts that you might
22 have in connection with some of the litigation
23 that you have participated in.
24 A My counsel did ask me for that, and
25 the only thing that I could locate was the -- I

20 (Pages 214 to 217)

Page 218

1  believe it might have been the deposition in
2  the right-to-life case which was very recent.
3  But that's about all I can locate, because I
4  did try to do that.
5       MR. COX:  If we can go off the record
6  for a minute.
7       (Recess from 3:32 to 3:34 p.m.)
8       MR. COX:  I've completed my
9  testimony -- my examination.
10      MR. WAAS:  I have no questions, and
11  we'll take a copy if it's ordered.
12      MR. HARVEY:  This is Walter Harvey.
13  No questions.
14      MR. WHITE:  Tom White.  No questions.
15      MS. KERT:  Rebecca Kert.  No questions
16  for Hillsborough County.
17      MR. LEATHE:  Jeremy Leathe.  No
18  questions.
19      MR. TINKLER:  We'll read.
20       - - - - - - - - - -
21      THE REPORTER:  Are you going to order
22  this?
23      MR. COX:  Yes.
24      MS. KERT:  We'll take a copy.  And
25  we'll also handle signature.

Page 219

1       MR. HARVEY:  I'll take a copy.
2       MR. WHITE:  Yes, I'll take a copy.
3       (At 3:35 p.m., no further questions
4  were propounded to the witness.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

21 (Pages 218 to 219)

# TAB 23

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF FLORIDA

 3                    MIAMI DIVISION

 4

 5          Case No. 01-0120-CIV-GOLD/SIMONTON

 6   - - - - - - - - - - - - - - - - - x

 7   NAACP, INC., et al.,              :

 8              Plaintiffs,            :

 9         vs.                         :

10   KATHERINE HARRIS, Secretary of    :

11   State of Florida, et al.,         :

12              Defendants.            :

13   - - - - - - - - - - - - - - - - - x

14                          Washington, D.C.

15                          Thursday, May 30, 2002

16         Deposition of HENRY FLORES, PH.D., a witness

17   herein, called for examination by counsel for

18   Defendants, in the above-entitled matter, pursuant to

19   notice, the witness being duly sworn by KAREN YOUNG, a

20   Notary Public in and for the District of Columbia, taken

21   at the offices of Lawyers' Committee for Civil Rights

22   Under Law, 1401 New York Avenue, Northwest, Suite 400,

23   Washington, D.C., at 10:24 a.m. on Thursday, May 30,

24   2002, and the proceedings being taken down by Stenotype

25   by KAREN YOUNG, and transcribed under her direction.
```

Henry Flores, Ph.D.                                                        May 30, 2002
                              Washington, D.C.

---

**Page 2**

1  APPEARANCES:
2    On Behalf of the Plaintiffs:
3      LORI OUTZS BORGEN, ESQ.
       CARA H. FINEMAN, ESQ.
4      Lawyers' Committee for Civil Rights Under Law
       1401 New York Avenue, N.W.
5      Suite 400
       Washington, D.C. 20005-2124
6      (202) 662-8600
7
     On Behalf of ChoicePoint, Inc.
8      d/b/a Database Technologies:
9      DANIEL A. RESTREPO, ESQ.
       Williams & Connolly, LLP
10     725 12th Street, Northwest
       Washington, D.C. 20005
11     (202) 434-5000
12
13   On Behalf of Katherine Harris and Clay Roberts:

14     JOHN W. LITTLE, III, ESQ.
       Steel Hector & Davis, LLP
15     1900 Phillips Point West
       777 South Flagler Drive, Suite 1900
16     West Palm Beach, Florida 33401-6198
       (561) 650-7270
17
     On Behalf of William Cowels:
18
         (by telephone)
19
20     JAMES CHEROF, ESQ.
       Josias Goren Cherof Doody & Ezrol, P.A.
21     3099 East Commercial Boulevard, Suite 200
       Ft. Lauderdale, Florida 33308-4311
22     (954) 771-4500
23
24
25

---

**Page 3**

1    On Behalf of David Leahy:
2      JEFFREY P. EHRLICH, ESQ.
       SUSAN TORRES, ESQ. (by telephone)
3      Dade County Attorney's Office
       Metro Dade Center
4      111 Northwest 1st Street, Suite 2810
       Miami, Florida 33128
5      (305) 375-5151
6
7    On Behalf of John Stafford:

8        (by telephone)

9      TRACY J. ARPEN, JR., ESQ.
       Office of General Counsel
10     City of Jacksonville
       117 West Duval Street, Suite 480
11     Jacksonville, Florida 32202
       (904) 630-1835
12
13   On Behalf of Pam Iorio:

14       (by telephone)

15     KEN TINKLER, ESQ.
       Hillsborough County Attorney's Office
16     601 East Kennedy Boulevard, 27th Floor
       Tampa, Florida 33602
17     (813) 272-5670

18   On Behalf of Deanie Lowe:
19       (by telephone)
20     WILLIAM J. BOSCH, ESQ.
       Volusia County Attorney's Office
21     123 West Indiana Avenue
       DeLand, Florida 32720-4613
22     (386) 736-5950
23
24
25

---

**Page 4**

1    On Behalf of Fred Dickinson and Kathleen Kearney:
2        (by telephone)
3      GEORGE L. WAAS, ESQ.
       Department of Legal Affairs
4      PL-01, The Capitol
       Tallahassee, Florida 32399-1050
5      (850) 414-3662
6
     ALSO PRESENT:
7
       Corlie McCormick
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1
2              C O N T E N T S
3    THE WITNESS:
4    HENRY FLORES, PH.D.
5      By Mr. Ehrlich ......................... 7
6      By Mr. Little ........................ 39
7      By Mr. Ehrlich ...................... 132
8      By Mr. Waas ......................... 175
9      By Mr. Restrepo ..................... 182
10     By Mr. Arpen ........................ 193
11     By Mr. Bosch ........................ 201
12     By Mr. Tinkler ...................... 207
13     By Mr. Cherof ....................... 207
14     By Ms. Borgen ....................... 216
15     By Mr. Restrepo ..................... 230
16
17
18
19
20
21
22
23
24
25

---

2 (Pages 2 to 5)

Henry Flores, Ph.D.                                                        May 30, 2002
Washington, D.C.

Page 6

E X H I B I T S

HENRY FLORES, PH.D.

1   Dr. Flores' curriculum vitae .................. 33

2   Hodgkiss letter to Flores, 3/6/02, etc. ....... 54

3   Dr. Flores' expert report ..................... 63

4   Draft report ................................. 65

- - -

Page 7

PROCEEDINGS

Whereupon,

    HENRY FLORES. PH.D.,

    called for examination by counsel for

    Defendants and having been duly

    sworn by the Notary Public, was examined and

    testified as follows:

    - - -

    EXAMINATION BY COUNSEL FOR DAVID LEAHY

    BY MR. EHRLICH:

Q.   Please state and spell your name.

A.   Henry Flores, H-E-N-R-Y F-L-O-R-E-S.

Q.   Professor Flores, my name is Jeff Ehrlich. I represent the supervisor of elections for Miami-Dade County, David Leahy, one of the defendants in this case, and I will begin questioning today. When one of our colleagues join us, we may switch and switch back, but I'm going to begin by asking you some questions about your background. I see that you have testified many times, and I imagine you've had your deposition taken many times; is that right?

A.   That's true.

Q.   About how many times have you been deposed?

A.   I really can't remember.

Q.   More than 20?

Page 8

A.   No, not more than 20, but more than ten for sure.

Q.   Okay. So you know the general rules of court reporter etiquette, that I'll let you finish your answers and you need to let me finish questions. The court reporter can't take us both talking at the same time. Of course, you need to answer by speaking, for example, yes or no answer rather than shaking your head or saying uh-huh or uh-uh, two words that the court reporter can't take down.

    If at any point you don't understand my question or the questions of anybody today, just ask us to -- tell us so. Just ask us to rephrase or say our questions a different way. We want to have a clear record. At least speaking for myself, I'm not trying to trick you or anything. I want to make sure we're understanding each other as we go along today. You are currently a professor?

A.   That's correct.

Q.   What do you teach and where?

A.   I teach political science at the graduate and undergraduate level at St. Mary's University in San Antonio, Texas.

Q.   Have you been retained to provide expert opinions in this case?

Page 9

A.   Yes, I have.

Q.   By whom have you been retained?

A.   The Lawyers' Committee.

Q.   Is it your understanding that you have a particular contact person in the Lawyers' Committee?

A.   Yes, I do.

Q.   Who is that?

A.   Lori Borgen.

Q.   Have you worked with other lawyers from the Lawyers' Committee?

A.   Yes, I have.

Q.   Who?

A.   Cara Fineman.

Q.   Anyone else?

A.   No, I have not.

Q.   Have you worked with any other lawyers who you understand to represent the plaintiffs in this lawsuit?

A.   Not that I know of.

Q.   When were you retained to give expert opinion testimony?

A.   The exact date I'm not sure of. I have looked at the contract letter, but we have a letter of agreement between us and it's dated.

Q.   Is that in the documents that you provided this morning?

3 (Pages 6 to 9)

Henry Flores, Ph.D.
Washington, D.C.
May 30, 2002

Page 10

1    A.   That's correct.
2       MS. BORGEN:  Jeff, I believe it's in the
3  documents that were provided earlier this week.
4       MR. EHRLICH:  To John, okay.
5       MS. BORGEN:  To John, right.  Sent to John and
6  to the repository.
7       BY MR. EHRLICH:
8    Q.   Okay.  Well, do you recall whether that
9  retention occurred this year, in 2002?
10    A.   Yes, it did.
11    Q.   I know you said you couldn't remember an exact
12  date.  Do you remember what month?
13    A.   I think it was March, early March if I'm not
14  mistaken.
15    Q.   Do you recall how you were first contacted
16  about working on this case?
17    A.   If I remember correctly, it was by telephone.
18    Q.   And do you know who called you?
19    A.   Cara Fineman.
20    Q.   Was that before you were retained to give
21  opinions?
22    A.   Yes.
23    Q.   Do you recall how long it was before you were
24  retained that you were first contacted?
25    A.   Just -- no more than a couple weeks.  I don't

Page 11

1  remember the exact timing.
2    Q.   So that might have been in February 2002?
3    A.   It could have been.
4    Q.   Professor Flores, please tell me a bit about
5  your educational background starting with your college
6  education.  Where did you obtain your college education?
7    A.   My B.A.'s from St. Mary's University in 1974
8  in political science and English.  My master's degree I
9  obtained in 1975 from the University of California at
10  Santa Barbara in political science, and my Ph.D. in
11  1981, December of 1981 from the University of California
12  Santa Barbara.
13    Q.   You did a dissertation.  Was that part of your
14  Ph.D.?
15    A.   That's correct.
16    Q.   The dissertation was on land use in Los
17  Angeles?
18    A.   That's correct.
19    Q.   Is that a rough statement?
20    A.   That's a pretty accurate statement.  It's the
21  politics of land use.
22    Q.   Does the subject of your dissertation have
23  anything to do with the opinions you're giving in this
24  case?
25    A.   No, not at all.

Page 12

1    Q.   Since college, where have you been employed?
2    A.   My first employment was for two years
3  beginning in the fall of '79 at Occidental College in
4  Los Angeles, California.
5    Q.   Have all of your -- has all of your employment
6  been in the context of academia since college?
7    A.   Well, one year I taught in a middle school in
8  between Occidental College and Delta College.
9    Q.   That could be academia, couldn't it?
10    A.   It was quite an experience.  It was a magnet
11  school for gang members.  It was street gang members in
12  Los Angeles.
13    Q.   But first -- you began your career at
14  Occidental?
15    A.   Uh-huh.
16    Q.   And I presume you were teaching there?
17    A.   Yes, I was.  I was also the director of urban
18  studies.
19    Q.   What department were you a professor with?
20    A.   Urban studies.
21    Q.   Okay.  Did your teachings in urban studies
22  have anything to do with the opinions that you're giving
23  in this case?
24    A.   Only that I taught an advanced statistics
25  class, but, you know, if anything, it's just a

Page 13

1  technique, but as far as the substantive issues of the
2  case are concerned, no.
3    Q.   Did you use any of the techniques that were
4  the subject of your courses at Occidental College in
5  preparing your report or formulating your expert
6  opinions in this case?
7    A.   One technique, yes, I did.
8    Q.   Which technique is that?
9    A.   Regression analysis.
10    Q.   Did you use regression analysis with regard to
11  all of the subjects that are included in your expert
12  report?
13    A.   No.  In only -- I only used it in three of the
14  areas I looked at.
15    Q.   Tell me the three that you used it in.
16    A.   In comparing the relationship between inactive
17  voters and African American registered voters and
18  comparing the affirmation affidavits in African American
19  registered voters and in comparing the poll workers
20  assignments and African American registered voters.
21    Q.   And so the one that -- you also offered an
22  opinion relating to voters who were removed because they
23  were felons; is that right?
24    A.   That's correct.
25    Q.   And for that -- for the opinions associated

4 (Pages 10 to 13)

Page 14

1  with that subject, you did not use regression analysis?
2      A.   No, I did not.
3      Q.   How long were you at Occidental?
4      A.   Two years.
5      Q.   And where did you go from there?
6      A.   I went to LA City Schools for a year.
7      Q.   That's the year that you talked about earlier?
8      A.   That's correct, and then from there, I went to
9  Delta College in Bay City, Michigan, which is a
10  community halfway between Saginaw and Midland.
11      Q.   The year you taught at the magnet school in
12  Los Angeles, did your experiences there have anything to
13  do with the opinions you're giving in this case?
14      A.   Not really.
15      Q.   Then you said you moved to -- the name of the
16  college again?
17      A.   Delta.
18      Q.   Delta College in Michigan?
19      A.   That's correct.
20      Q.   Is that college still in existence as far as
21  you know?
22      A.   I think so.
23      Q.   And what did you do there?
24      A.   I taught political science.
25      Q.   Can you be more specific about what you

Page 15

1  taught?
2      A.   American government and a course called Raza
3  Studies, R-A-Z-A.
4      Q.   What is Raza Studies?
5      A.   It is -- I'm not sure exactly what it is, but
6  what it has to do with is the political history of
7  Latinos in the United States.
8      Q.   You're confirming my suspicions about many of
9  my own professors.
10      A.   What I meant was that that particular term
11  came under all kinds of -- when my dean told me to teach
12  it, I said excuse me?  What did you say?
13      Q.   So broadly, you stated it had to do with
14  Latino studies; is that --
15      A.   That's correct, broadly stated.
16      Q.   And that course, I imagine, had nothing to do
17  with the opinions you're offering in this case?
18      A.   No.
19      Q.   The American government course you taught --
20  that didn't have anything to do with the opinions you're
21  giving in this case?
22      A.   Only when I covered the subjects of civil
23  rights for about a week or so, but that's about it.  I
24  didn't really go into any great depth.
25      Q.   Where did you go after Delta?

Page 16

1      A.   St. Mary's University, where I'm currently
2  employed.
3      Q.   And did you go as a professor?
4      A.   Yes, I arrived as an assistant professor at
5  St. Mary's.
6      Q.   And you taught political science there?
7      A.   That's correct.
8      Q.   The same general area that you teach now?
9      A.   It's changed a little bit over the years.
10      Q.   I reviewed your resume and it looks as though
11  you teach some classes now that relate to elections or
12  redistricting at least?
13      A.   Correct.
14      Q.   Well, I suppose the answer -- let me ask the
15  question first.  Do any of the courses that you teach
16  now relate to the opinions you've given or are going to
17  give in this case?
18      (Whereupon, Ms. Fineman joined the deposition.)
19      A.   Yes, they do.
20      Q.   What courses?
21      A.   The research methods and statistics classes
22  that I teach at both the graduate and undergraduate
23  level.  I teach the regression technique as part of the
24  class but I also use case studies from voting rights
25  cases to explain how the regression technique is

Page 17

1  utilized, how you can use it in -- with different sorts
2  of databases.
3      Q.   That would be similar to the way you used the
4  regression analysis for the subjects you've already
5  identified?
6      A.   That's correct.
7      Q.   Do you teach any classes that are specifically
8  related to the subject of African Americans and voting
9  rights?
10      A.   In a class I teach that's entitled The
11  Politics of Race and Class -- it used to be race, class
12  and gender until we separated gender out and now there's
13  a subset of gender-related political science classes in
14  my department.  I've taught The Politics of Race
15  Relations and -- which includes the civil rights
16  movement, and I teach everything from the theories of
17  racism that George Morganthau first stipulated to, to
18  the current literature that's available, Cornell West's
19  work for instance.
20          And then I've also included in there
21  literature on Latinos and literature on American Indians
22  and -- so I cover all the major racial groups in the
23  United States and how they've been affected by the
24  political system, how they interact with the political
25  system.  I discuss their voting patterns as well.  And

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Henry Flores, Ph.D.                                                          May 30, 2002
Washington, D.C.

---

Page 18

1  so as far as African Americans, that's where it would
2  appear, in that particular class.
3     Q.   So we've been talking about one class to date;
4  is that correct?
5     A.   Yeah.
6     (Whereupon, Mr. Little joined the deposition.)
7         BY MR. EHRLICH:
8     Q.   Now talking about the entire time you've been
9  employed at St. Mary's, did you teach any classes other
10 than the one you've already talked about that in any way
11 relate to African Americans and their participation in
12 the electoral process?
13    A.   No, not specifically, but I do cover them in
14 other classes. I mean, when I speak -- when I teach my
15 intro to American government class, which is a freshman
16 class, I spend a significant amount of time on civil
17 rights now, more than I used to when I first started
18 teaching, and I do talk about African American politics
19 in that class.
20    Q.   What percentage of the overall class is this
21 civil rights aspect?
22    A.   Probably about 30 percent.
23    Q.   And then what percentage of that is related to
24 voting rights?
25    A.   A significant part of it because I'm more

---

Page 19

1  familiar with that area than I am with other areas of
2  civil rights.
3     Q.   And how does the subject of that class relate
4  to the opinions you're giving in this case?
5     A.   It relates because over the years as I've
6  prepared that particular class, I've had to do some
7  background reading, so my understanding of the general
8  politics of African Americans throughout the southern
9  part of the United States comes out of my preparation
10 for all those classes.
11    Q.   And what specifically about your readings
12 relates to the opinions you've been retained to provide
13 in this case?
14    A.   Well, work -- I mean, you go back as far as
15 1948 with V.O. Key's classical study on southern
16 politics where he discussed the politics of race in
17 various states in the South and how he was the first
18 political scientist who ever really sat down and used
19 empirical techniques to look at the way the different
20 racial groups voted, and he discussed racial politics in
21 great detail in that work. It's like 500 pages long.
22 It's a very big piece. The paperback itself is very
23 large; to Bernie Grofman's "Quiet Revolution," of just
24 now recent vintage where he discusses also the politics
25 of redistricting and voting rights in the various states

---

Page 20

1  in the South.
2     Q.   And what specifically about the politics of
3  voting rights relates to the opinions that you're going
4  to give in this case?
5     A.   Well, fundamentally that African Americans
6  have been discriminated against historically in the
7  United States.
8     Q.   All over the United States?
9     A.   Generally, but more specifically in the South.
10    Q.   And specifically in Florida?
11    A.   There are some examples from Florida, yes,
12 broad histories.
13    Q.   Well, why don't you give some specific
14 examples if you could.
15    A.   Well, the one to refresh my memory that I dug
16 up last night was -- I was -- to help to prepare for my
17 deposition this morning, I was trying to figure out what
18 would be a good example of race relations in Florida, so
19 I typed in Rosewood in the search engine and it dropped
20 all kinds of information on DVDs and anniversary
21 celebrations of the Rosewood massacre, and so I did some
22 reading on that last night. There's a classic example
23 of how ugly race relations could possibly get.
24    Q.   When did the Rosewood massacre occur?
25    A.   1923.

---

Page 21

1     Q.   Can you think of a more recent example of
2  racial discrimination against African Americans in the
3  State of Florida?
4     A.   Well, only newspaper records of police
5  brutality in Miami over the years that have happened.
6     Q.   Can you think of any specific reports?
7     A.   Just from readings in the newspaper of those
8  particular incidents.
9     Q.   And how do you know those are incidents of
10 discrimination?
11    A.   Well, if you -- I don't know.
12    Q.   Do you know of any history of discrimination
13 against African Americans in the State of Florida?
14    A.   Only as a general artifact of the general
15 discrimination African Americans have been experiencing
16 historically in the South.
17    Q.   Is the history of your claimed racial
18 discrimination against African Americans in the State of
19 Florida -- how does it differ from the history of
20 discrimination against African Americans in other
21 southern states?
22        MS. BORGEN:  Objection as to form.
23        BY MR. EHRLICH:
24    Q.   You may answer if you understood the question.
25    A.   Could you be more specific?

---

6 (Pages 18 to 21)

Henry Flores, Ph.D.                                                    May 30, 2002
Washington, D.C.

Page 22

1   Q.   Yes.  Is the history of racial discrimination
2   against African Americans in the State of Florida more
3   severe than the history of discrimination against
4   African Americans in other southern states?
5   A.   What do you mean by more severe?
6   Q.   Is there more of it?
7   A.   I'm not sure you can quantify something like
8   that.
9   Q.   Okay.  So you can't quantify the history --
10  the prominence of racial discrimination against African
11  Americans in the State of Florida; is that right?
12       MS. BORGEN:  Objection as to form.
13  A.   I don't understand your question.
14  Q.   Well, in your report, you conclude that -- you
15  speak of sort of conclusory -- in a conclusory way of
16  this history of racial discrimination in the State of
17  Florida, and I want to understand what is the factual
18  basis for that opinion.
19  A.   Oh, it's just -- I'm just relating to a broad
20  history of discrimination of African Americans in the
21  South generally, and Florida being part of that South,
22  I'm including that as part of the history.
23  Q.   Okay.  And can you -- and I asked you to name
24  if you could specific incidents of racial discrimination
25  towards African Americans in the State of Florida, and

Page 23

1   you mentioned the Rosewood incident.
2   A.   Correct.
3   Q.   Can you think of any others?
4   A.   Not right off the top of my head.
5   Q.   Can you think of any others in Miami-Dade
6   County?
7   A.   Not right off the top of my head.  I'd have to
8   look into that.
9   Q.   Have you looked into that?
10  A.   Not for this report.
11  Q.   Do you intend to look into that?
12  A.   I may.  I may.
13  Q.   I want to talk to you a bit about some of the
14  testimony you've listed in your expert report along with
15  your resume.
16       MS. BORGEN:  Jeff, could we go off the record
17  for a minute?
18       MR. EHRLICH:  Sure.
19       (Discussion off the record)
20       BY MR. EHRLICH:
21  Q.   Professor Flores, in reviewing your litigation
22  research and expert legal testimony section, it appears
23  as though you've testified regarding a history of racial
24  discrimination before; is that right?
25  A.   That's correct.

Page 24

1   Q.   You have found a history of racial
2   discrimination in San Antonio, Texas; is that correct?
3   A.   That's correct.
4   Q.   In the State of Texas, in west -- I'm sorry.
5   A.   That's correct.
6   Q.   You need to --
7   A.   Yes, that's right.
8   Q.   So for the State of Texas the answer is yes?
9   A.   Yes.
10  Q.   West Texas?
11  A.   Yes.
12  Q.   East Texas?
13  A.   Yes.
14  Q.   Pecos County?
15  A.   Yes.
16  Q.   If I pronounced that right.
17  A.   Pecos.
18  Q.   Pecos County
19  A.   Right.
20  Q.   Harris County?
21  A.   That's true.
22  Q.   The state of New Mexico?
23  A.   I didn't do the history of racial
24  discrimination.  Did I state that in my --
25  Q.   I don't mean to imply that you did.  That was

Page 25

1   my understanding, but if you have not, then feel free to
2   clarify.
3   A.   No, not New Mexico I don't think.  I think
4   what I did is I just did some -- they sent me some
5   data -- I never even appeared -- I was not deposed in
6   that particular trial.
7   Q.   Okay.  Have you made any opinions ever
8   regarding a history of racial discrimination in the
9   state of New Mexico?
10  A.   No.
11  Q.   Have you done work regarding racial
12  polarization in the state of New Mexico?
13  A.   Yes, I have.
14  Q.   What does that mean?
15  A.   What does what mean?
16  Q.   Racial polarization.
17  A.   Racial polarization?  In election studies,
18  it's when voters of two different racial groups vote
19  dramatically different from each other.
20  Q.   Is that a product of racial discrimination?
21  A.   It's an artifact of it.
22  Q.   Have you found a history of racial
23  discrimination in Arizona?
24  A.   I'm beginning to.  I'm just beginning that
25  research right now.

7 (Pages 22 to 25)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

**Page 26**

1    Q.   Have you formed an opinion yet regarding a
2  history of racial discrimination in Arizona?
3    A.   Not -- I haven't finished my work there yet so
4  I'm not ready to conclude too many different things.
5  That trial's been put off to January I guess at this
6  point so my work has stopped for the time being.
7    Q.   Have you formed any opinions yet regarding a
8  history of racial discrimination in the state of
9  Arizona?
10   A.   Not yet.  What I've formed opinions of are
11 just racial polarization at this point.
12   Q.   Okay.  What about Wisconsin?
13   A.   I didn't do any history of racial
14 discrimination in Wisconsin.
15   Q.   Was that also a polarization study?
16   A.   Yes.
17   Q.   Did you conclude that there is racial
18 polarization in the state of Wisconsin?
19   A.   Yes, I did.
20   Q.   Have you ever undertaken an analysis and
21 concluded at the end of your analysis that there was not
22 racial polarization in a geographic area you were
23 studying?
24   A.   In parts of geographical areas I've studied,
25 yes.

**Page 27**

1    Q.   I'm talking about the geographical area.  If
2  you need an example, I can give one.  For example, if
3  you were asked to determine whether there's racial
4  polarization in the city of Milwaukee, my question is
5  have you ever undertaken such an analysis and concluded
6  that there was not a history of racial polarization in
7  the city of Milwaukee?  Not parts of the city of
8  Milwaukee.  So now if you understand what I'm talking
9  about when I say a geographical unit --
10   A.   Sure.
11   Q.   I'll repeat the question.  Have you ever
12 undertaken an analysis of a particular geographical unit
13 and concluded that there is not a history of -- or that
14 there is not racial polarization in that unit?
15       MS. BORGEN:  Objection as to form.
16       MR. EHRLICH:  What's the objection?
17       MS. BORGEN:  To clarify what type of analysis
18 of racial polarization in what?  Is it in voting?  In --
19 You have --
20       BY MR. EHRLICH:
21   Q.   I'm sorry.  You used racial polarization, and
22 I think you said in the elections context.
23   A.   In elections.
24   Q.   That's what I'm speaking of.
25   A.   Okay.

**Page 28**

1    Q.   So to repeat, have you ever undertaken an
2  analysis of a particular geographic unit and at the end
3  of your analysis concluded that there is not racial
4  polarization in that unit?
5    A.   Give me a moment to reflect on that.
6    Q.   Sure.
7    A.   No, not in the unit.
8    Q.   Okay.  And I'm going to ask the same sort of
9  question now with regard to a history of racial
10 discrimination.  Have you ever been asked to -- have you
11 ever undertaken a study of a particular geographical
12 unit and concluded at the end of your analysis that
13 there is not a history of racial discrimination within
14 that unit?
15   A.   Of the ones that I've studied that are listed
16 in my litigation part or any study at all?
17   Q.   Any.
18   A.   Again, give me a moment.
19   Q.   Sure.
20   A.   Go back and think about that for a second.
21 Not that I can think of, but that question is very -- is
22 really too broad I think.  There's like parts of
23 jurisdictions and parts of areas of cities and things
24 that don't show racial polarization.  Sometimes there's
25 elections that don't show racial polarization,

**Page 29**

1  individual elections.
2    Q.   Just keep in mind please that my question
3  wasn't asking about polarization.  I was asking about a
4  history of racial discrimination.
5    A.   Oh, I'm sorry.
6    Q.   So if you want to think again and give the
7  answer, you might have been focused on the wrong --
8    A.   Yes, I was focused on the wrong thing.
9    Q.   So the question is whether you've ever
10 undertaken a study of a particular geographical unit and
11 concluded at the end of your analysis that there is not
12 a history of racial discrimination in that unit as a
13 whole.
14   A.   I can't recall.  I really can't recall.  The
15 reason is I've looked at some counties in California and
16 you'll find discrimination in the school system, but you
17 won't necessarily find it in other parts of the
18 community.
19   Q.   Right.
20   A.   So it will -- you know, it will vary from
21 jurisdiction to jurisdiction, but if you want one
22 complete broad statement and say if you find one issue,
23 one item of racial -- or one example of racial
24 discrimination in one jurisdiction and classify that as
25 the total of everything, all those things being -- you

8 (Pages 26 to 29)

Henry Flores, Ph.D.
Washington, D.C.
May 30, 2002

Page 30

1  know, I don't know how to answer that particular
2  question.
3     Q.  Well, my question was a bit more focused.
4  What I'm asking is if you've been asked to undertake a
5  study of a particular school district.
6     A.  Yeah.
7     Q.  Have you ever concluded, for example, using
8  this as an example, that in that school district,
9  there's not a history of racial discrimination?
10    A.  In the school districts that I've studied for
11 litigation purposes, I've always found a history of
12 discrimination.
13    Q.  How about this.  Have you ever offered an
14 expert opinion in litigation that there was no history
15 of racial discrimination?
16    A.  No.  In some of the employment cases I have,
17 but those are specific organizations.
18    Q.  Right.  I'm talking about geographical units.
19    A.  No.
20    Q.  The type of testimony that you've been
21 retained to give here, for example, with regard to the
22 State of Florida.
23    A.  Yeah, no.
24    Q.  That type of testimony, have you ever
25 concluded that there's not a history of racial

Page 31

1  discrimination?
2     A.  No, I have not.
3     Q.  Have you ever testified regarding a history of
4  racial discrimination in the State of Florida?
5     A.  No, I have not.
6     Q.  Anywhere in the State of Florida, including
7  sub-geographical units?
8     A.  No.
9     Q.  Do you recall approximately how many times
10 you've actually testified in court as an expert witness?
11    A.  We counted them last night but I can't
12 remember what the final total was.  Do you remember what
13 it was?
14       MS. BORGEN:  You have to answer.
15    A.  Oh, I have to answer.  No, I can't.  I'd have
16 to count through my resume.
17    Q.  Do you want to give me an estimate or you can
18 feel free to look through your resume if that will --
19 refresh
20    A.  Almost 50 times, and I think 24 of them were
21 voting rights cases.
22    Q.  Okay.  So you've testified in court
23 approximately 24 times as an expert in voting rights
24 cases?
25    A.  Not actually testified in court.  Sometimes

Page 32

1  it's settled before.
2     Q.  Right.
3     A.  You know, or it just depends.
4     Q.  Okay.  My question is limited to testifying in
5  court.  Can you --
6     A.  I'd have to go through to tell you the exact
7  number of times I've testified in court.
8     Q.  Can you give me an estimate?
9     A.  Well, just say it's more than ten.
10    Q.  Has a court, to your knowledge, ever refused
11 your attempt to testify as an expert witness in a case
12 in court?
13    A.  No.
14    Q.  In how many of these cases listed in your
15 resume was your expert opinion related to discrimination
16 or polarization involving African Americans?
17    A.  Three or four.
18    Q.  I'll let you take a look at it.  Can you maybe
19 identify for me which ones?
20    A.  Sure.
21       MS. BORGEN:  I'm not sure which document --
22 what you've given to the witness to look at.  In the
23 materials we provided this morning was an updated
24 version of his resume which does not have any changes --
25       MR. EHRLICH:  Why don't we then mark -- oh,

Page 33

1  this is his updated resume?
2     MS. BORGEN:  Yes.
3     MR. EHRLICH:  Okay.  And this differs from the
4  report that you produced in this case?
5     MS. BORGEN:  There's some updates on it,
6  correct, since the time of the report.
7     MR. EHRLICH:  The rest of the report remains
8  the same?
9     MS. BORGEN:  The report's the same, correct.
10    MR. EHRLICH:  Why don't we mark then this
11 separately as an exhibit and then at least we'll know
12 which one we're talking about.
13    MS. BORGEN:  Okay.
14    MR. EHRLICH:  If we can mark as Exhibit 1 a
15 resume provided by Professor Flores this morning through
16 his counsel.  We can go off the record while you do
17 that.
18       (Flores Exhibit No. 1
19          was marked for
20          identification.)
21    THE WITNESS:  Do you want me to just identify
22 the cases by name for the record or mark them here?
23    BY MR. EHRLICH:
24    Q.  I tell you what.  If you don't mind putting a
25 little check next to the cases --

9 (Pages 30 to 33)

Henry Flores, Ph.D.                                                                                                    May 30, 2002

Washington, D.C.

---

Page 34

1    A.  Sure.
2    Q.  -- that you have listed on your resume that
3  relate to African Americans.
4    A.  These either relate to African Americans or
5  African Americans were part of the lawsuit.
6    Q.  Okay.
7    A.  LULAC and FOCUS versus Midland Community
8  College District, 1993; Willie J. Rollins, Ervine O.
9  Grice and League of United Latin American Citizens
10  Number 188 versus Fort Bend Independent School District,
11  1993; LULAC and Dr. Harold Jones versus North East
12  Independent School District, 1983 through 1995;
13  Milwaukee Branch of the NAACP and Ramon Valdez versus
14  Governor Tommy Thompson and the Wisconsin Association of
15  Trial Judges, 1996.  And the current case.
16    Q.  Right, thank you.  The first one you
17  identified, LULAC and FOCUS versus Midland Community
18  College District -- what was that case about?
19    A.  It was a Section 2 Voting Rights Act case
20  challenging the at-large election system in the
21  community college district elections.
22    Q.  Is this a vote dilution case?
23    A.  Vote dilution.
24    Q.  And what was your opinion promptly summarized
25  in that case?

---

Page 35

1    A.  I was the Gingles 2, 3 expert in that case.
2    Q.  Sorry to interrupt, but what are 2 and 3?
3    A.  Well, sure.
4    Q.  Relating to -- referring to factors?
5    A.  Yeah, the Gingle -- there -- it's where I look
6  at racial polarization among the electorate and -- which
7  is Gingles 2, and then Gingles 3 is whether or not the
8  white majority votes in the block sufficiently large and
9  consistently enough to negate any possibility of a
10  minority group to elect a candidate of choice.
11    Q.  Are you performing any type of Gingles
12  analysis for this case?
13    A.  No, I have not.
14    Q.  What were your conclusions in LULAC FOCUS?
15    A.  I found that there was racial polarization in
16  that particular election and also not sufficient
17  crossover Anglo votes to combine with the minority votes
18  to elect a minority candidate.  That settled out of
19  court.
20    Q.  The next case you identified was Willie J.
21  Rollins et al. versus Fort Bend Independent School
22  District.  Was that a voting right case?
23    A.  That was a voting rights case.
24    Q.  And was it a vote dilution case?
25    A.  Yes, it was.

---

Page 36

1    Q.  And what was the subject of your testimony?
2    A.  Again, it was -- I performed the Gingles 2, 3
3  analysis, racial polarization, block voting analysis for
4  that particular case.  I found that it existed, but they
5  did not give us Gingles 1 so the court ruled against us.
6  The minority group is not compact enough to draw a
7  district.
8    Q.  Why did you not perform a Gingles analysis in
9  this case?
10    A.  I was not asked to.
11    Q.  The third case you identified is LULAC and
12  Dr. Harold Jones versus North East Independent School
13  District, right?
14    A.  That's correct.
15    Q.  What is LULAC?
16    A.  LULAC is the League of United Latin American
17  Citizens.  It's a civic organization founded in 1929 in
18  Corpus Christi, Texas by Mexican American middle class
19  persons I guess, and what -- they have councils in
20  almost every city in the State of Texas and a lot of the
21  large communities throughout the United States, and
22  fundamentally, they do various sorts of civic things.
23  Sometimes they'll sponsor -- they will be plaintiffs in
24  lawsuits, but a lot of times they'll raise money for
25  scholarships and things of that nature.

---

Page 37

1    Q.  And was that a vote dilution case?
2    A.  Yes, it was.
3    Q.  I'm sorry.  Did you talk about your analysis
4  in that case yet?
5    A.  In that case?
6    Q.  Yeah.  What was the opinion you reached in
7  that --
8    A.  Oh, I found racial polarization in that
9  particular election, and at that time, the court agreed
10  with us.
11    Q.  Racial polarization is the second Gingles
12  factor?
13    A.  Yes.
14    Q.  Did you have any conclusions with regard to
15  other Gingles factors in that case?
16    A.  Just Gingles 3.
17    Q.  Because the reason I ask is you said you found
18  racial polarization.  What was your opinion with regard
19  to Gingles 3?
20    A.  That there wasn't a sufficient number of Anglo
21  voters crossing over to vote for the minority candidates
22  so that they could get elected.
23    Q.  The next case you identified is Milwaukee
24  branch of NAACP?
25    A.  Uh-huh.

---

10 (Pages 34 to 37)

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 38

1    Q.    That's a voting rights case?
2    A.    Yes.  That was -- I was an expert for an
3  intervener there, so it was a very small segment of that
4  case.
5    Q.    Was that a vote dilution case?
6    A.    Vote dilution.
7    Q.    And what were your conclusions?
8    A.    That racial polarization existed in trial
9  judge elections in Milwaukee.
10    Q.    Any other conclusions?
11    A.    Well, the Gingles 3 also existed, insufficient
12  number of Anglo crossover votes.
13    Q.    And then the last one you identified was this
14  case.
15    A.    That's correct.
16    Q.    What is your understanding of the type of case
17  that this is?
18    A.    That --
19    Q.    And by that, that might be an unclear
20  question.  We've identified some of your other cases --
21    A.    It's a tough.
22    Q.    -- as voting rights cases.  Is it your
23  understanding that this is a voting rights case?
24    A.    Yes.
25    Q.    And what type of voting rights case?

Page 39

1    A.    A vote denial case; not a dilution case.
2    Q.    Have you ever testified in a vote denial case
3  as an expert before?
4    A.    No, I have not.
5    Q.    So it's fair to say then that you've never
6  been qualified as an expert on vote denial?
7    MS. BORGEN:  Objection as to form.
8    BY MR. EHRLICH:
9    Q.    Is that true?  Have you ever been qualified as
10  an expert?
11    A.    Specifically in vote denial?
12    Q.    Right.
13    A.    No.
14    MR. EHRLICH:  If I could just take a couple
15  minutes to talk to counsel who joined us late and --
16    MS. BORGEN:  Sure.
17    (Recessed at 11:04 a.m.)
18    (Reconvened at 11:13 a.m.)
19    EXAMINATION BY COUNSEL
20    FOR KATHERINE HARRIS AND CLAY ROBERTS
21    BY MR. LITTLE:
22    Q.    Good morning, Dr. Flores.  My name is John
23  Little, and as I said, I represent the Secretary of
24  State for Florida and the Division of Elections in this
25  litigation, and I'm going to be picking up on the

Page 40

1  questioning.  I missed the first few minutes, so if I
2  repeat a question, I'm sure I'll be shouted down asked
3  and answered, and it's not intentional.  If I do ask you
4  a question that you do not understand, I would ask that
5  you stop me, tell me you do not understand the question
6  and I will rephrase it.  All right?
7    A.    Okay.
8    Q.    And if I ask a question and you answer it,
9  we'll have an understanding that you've understood that
10  questioning and -- you understand that question and
11  you're answering it to the best of your ability.
12    A.    Okay, certainly.
13    Q.    Counsel in this case --
14    MS. BORGEN:  Hold on just a minute.  Anyone on
15  the phone still?
16    (Discussion off the record)
17    BY MR. LITTLE:
18    Q.    Dr. Flores, in connection with your
19  deposition, documents were produced to us by counsel for
20  the plaintiffs.  Were you involved in the preparation
21  and collection of those documents?
22    A.    Not really.
23    Q.    Did you send any documents to the plaintiffs'
24  counsel for them to provide to defense counsel?
25    A.    Yes, I did.

Page 41

1    Q.    I want to go over if I could briefly some of
2  the deposition transcripts that were provided in this
3  case because we were just talking about the different
4  cases you've testified in.  The first, and I'm not going
5  to mark this as an exhibit but I'll read into the
6  record.  It's Bates page A041347 through 443, and it's a
7  transcript from January 29, 1999.  If you would tell us
8  the style of that case?
9    A.    It's styled Richard Reynoso, Joe Bosquez --
10  That's B-O-S-Q-U-E-Z -- Billy Swain, S-W-A-I-N, League
11  of United Latin American Citizens, Council Number 4427,
12  parentheses, LULAC, plaintiffs, versus --
13    Q.    I'm sorry.  You can just give us the first
14  plaintiff and the first defendant.
15    A.    Oh, okay.  Versus Amarillo Independent School
16  District.
17    Q.    Who were you retained by in that case?
18    A.    The League of -- the United Latin American
19  Citizens through the Mexican American Legal Defense and
20  Education Fund, MALDEF.
21    Q.    And what was the scope of your retention in
22  that case?
23    A.    I was retained to determine whether or not
24  there was any racial polarization in the elections of
25  that -- that occurred in Amarillo City and Amarillo

11 (Pages 38 to 41)

Henry Flores, Ph.D.                                                                    May 30, 2002

Washington, D.C.

Page 42

1   Independent School District.
2       Q.   Did you select that deposition transcript to
3   be provided to us?
4       A.   No, I did not.
5       Q.   Do you know where it came from?
6       A.   It came from the files of the Mexican American
7   Legal Defense and Education Fund.
8       Q.   Did you contact them and ask them for a copy
9   of that deposition?
10      A.   No, I did not.
11      Q.   Do you know who did?
12      A.   I think Ms. Borgen of the Lawyers' Committee
13  did.
14      Q.   Do you know why this particular transcript was
15  provided as opposed to, say, some of the other cases
16  you've just discussed with Mr. Ehrlich?
17      A.   I have no idea.
18      Q.   Is there any relation between the issues that
19  you addressed in that case and the case that you're
20  currently involved in, NAACP versus Harris?
21      A.   Only that I discussed some history -- some
22  specific instances of racial discrimination in the
23  community of Amarillo, so really only in that regards.
24      Q.   Do you know of any correlation between racial
25  discrimination in the city of Amarillo and any city in

Page 43

1   the State of Florida?
2       A.   No, I do not.
3       Q.   How about any correlation between the city of
4   Amarillo and any alleged racial discrimination within
5   the entire State of Florida?
6       A.   Only that racial discrimination is
7   fundamentally the same thing regardless of whether it's
8   in the State of Florida or any other state of the union.
9   Any time you use race to make a decision against a
10  particular group of people, that's racial
11  discrimination.
12      Q.   But I think in response to Mr. Ehrlich's
13  earlier questions, you've not done any study or analysis
14  of racial discrimination in Florida in order to make a
15  comparison or a contrast with the racial discrimination
16  issues you evaluated with the city of Amarillo, correct?
17      A.   Oh, no, I have not.
18      Q.   The next transcript is Bates page A041444
19  through 778, and it's the case styled Helen Dutmer,
20  D-U-T-M-E-R, versus the City of San Antonio.
21      A.   That's correct.
22      Q.   I'm handing you those two volumes of
23  transcript. Who were you retained by in that case?
24      A.   Ms. Dutmer.
25      Q.   And what were the claims in that case?

Page 44

1       A.   Ms. Dutmer claimed that the term limitation
2   law as it exists in San Antonio, Texas discriminated
3   against the Hispanic voters who elected her to her city
4   council district office.
5       Q.   And what conclusions did you reach in that
6   case?
7       A.   I concluded that -- and in fact, the way the
8   term limits were structured in San Antonio, Texas, that
9   they had a dilutive effect on voters generally and
10  Hispanics specifically.
11      Q.   Did you prepare an expert report in that case?
12      A.   I think I did.
13      Q.   Do you have a copy of that report?
14      A.   In the Dutmer files. I'd have to go dig them
15  out. They're in my storage facility.
16      Q.   If you have a copy, we would request that you
17  provide us with a copy of that report.
18      A.   Absolutely.
19      Q.   Thank you. Again, did you select this
20  transcript to be provided to defense counsel or was this
21  handled in the same way as the previous transcript?
22      A.   No, I have never even seen this transcript, so
23  it was provided the same way, I'm assuming.
24      Q.   Any issues in the Dutmer case that have any
25  relationship or correlation to the issues in the NAACP

Page 45

1   versus Harris case?
2       A.   Only when I referred to just general racial
3   discrimination.
4       Q.   And when you use that -- or when you give me
5   that category, you're simply saying that in that case,
6   there was an issue of racial discrimination, and in this
7   case, there's a question of racial discrimination; is
8   that correct?
9       A.   There's a history of racial discrimination in
10  San Antonio is what I'm saying, and just discrimination
11  in general exists throughout the South. I'm using it in
12  very broad, general terms.
13      Q.   And do you consider -- when you say
14  discrimination throughout the South, are you talking
15  historical discrimination or present-day discrimination?
16      A.   Historical discrimination is what I'm
17  referring to.
18      Q.   When you use the term "historical
19  discrimination," tell me what you mean by that. Is that
20  more than ten years ago, more than five years ago? In
21  your field of expertise, when you use the term
22  "historical discrimination," what do you mean?
23      A.   It could go from yesterday back 150 years,
24  200, 300 years.
25      Q.   When you've used the term in this deposition

12 (Pages 42 to 45)

Henry Flores, Ph.D.                                                                          May 30, 2002
Washington, D.C.

Page 46

1   "historical discrimination," what do you mean?  What
2   period of time?
3       A.   I'm referring to just in broad general terms
4   from recent -- from a recent time frame from the current
5   year to back through the days of slavery.
6       Q.   All right.  The next transcript is Bates page
7   A041779 through 856, and it's the case League of Urban
8   Latin American Citizens versus Roscoe Independent School
9   District.
10      A.   Yeah, Roscoe, yes.
11      Q.   Same question and answer about the selection
12  of that transcript.  You did not select that transcript
13  to provide to us?
14      A.   No, I did not.
15      Q.   Who were you retained by in that case?
16      A.   By LULAC through the offices of Mr. Rolando
17  Rios.
18      Q.   And what were the issues in that case?
19      A.   Again, I was retained to look at the racial
20  polarization among the electorate in Roscoe, Texas.
21      Q.   What conclusions did you reach in that case?
22      A.   That there was severe racial polarization in
23  the history of Roscoe, and there was also a very ugly
24  history of racial discrimination in that particular
25  community.

Page 47

1       Q.   Same question, any correlation or relationship
2   between your analysis and conclusions in the Roscoe case
3   and the present case of NAACP versus Harris?
4       A.   If you had Rosewood, we have Roscoe in
5   Florida.
6       Q.   Are you saying, Dr. Flores, that Rosewood has
7   something to do with the NAACP versus Harris case?
8       A.   What I'm saying is the Roscoe -- the African
9   American community in Roscoe was burned out.  They were
10  literally run out of town.  Their community was burned
11  down, and that was part of the evidence I spoke of in
12  this particular case.
13      Q.   Well, let me return to my specific question.
14  Are you claiming, Dr. Flores, that the Rosewood case in
15  Florida has anything to do with the NAACP versus Harris
16  case?
17      A.   Only that it's part of the history of racial
18  discrimination, an artifact of that in Florida.
19      Q.   No other purpose?
20      A.   No other purpose.
21      Q.   The last transcript, A041857 through 1967,
22  Perez versus Pasadena Independent School District.  Same
23  question on your selection of that transcript.  Not
24  involved?
25      A.   Not involved.

Page 48

1       Q.   Okay.  Who was your client?
2       A.   The Perez family.
3       Q.   What were the issues in the case?
4       A.   The issues had to do -- I was retained to do
5   the Gingles 2, 3 analysis in this particular case,
6   racial polarization and white block voting against
7   minority candidates.
8       Q.   And what conclusions did you reach in that
9   case?
10      A.   That there were in both categories.
11      Q.   Same question as any relationship between your
12  analysis or conclusions in the Pasadena case and the
13  NAACP versus Harris.
14      A.   I didn't do a history of racial discrimination
15  in this particular case.  I did not testify to that in
16  the Pasadena case, so there's no relation.
17      Q.   You've been qualified to testify as an expert
18  witness in courts before, correct?
19      A.   That's correct.
20      Q.   What fields have the courts qualified you as
21  an expert?
22      A.   Voting rights law and labor law, employment
23  law.
24      Q.   Any other fields you can recall?
25      A.   No.

Page 49

1       Q.   Has a court ever refused to qualify you as an
2   expert in any area?
3       A.   Never.
4       Q.   And I understood previously that no court has
5   ever refused to qualify you as an expert overall.  Is
6   that accurate?
7       A.   Correct.
8       Q.   Have you ever had an expert report that you
9   prepared strickened?
10      A.   No.
11      Q.   Have you ever had any challenges to your
12  opinions under the Daubert or Kumho Tire standards?
13          MS. BORGEN:  Objection as to form.
14      A.   I don't understand what those standards are.
15      Q.   Are you familiar with the Supreme Court
16  decision of Daubert or Kumho Tires?
17      A.   No.
18      Q.   There's a lack of foundation for that question
19  then.  Going back to Exhibit Number 1 and the cases that
20  you marked that involved your analysis of African
21  American voters, do you have transcripts of any
22  depositions given in those cases?
23      A.   Let me look at those cases again so I can
24  refresh my memory.
25      Q.   And my question assumes that there was a

13 (Pages 46 to 49)

Henry Flores, Ph.D.                                                                                    May 30, 2002
Washington, D.C.

Page 50

1  deposition given in the case. I'm just trying to hurry
2  it along.
3      A.  Right, sure. I was deposed in LULAC and Focus
4  versus Midland Community College District, Rollins
5  versus Font Bend Independent School District, and LULAC
6  versus North East Independent School District, but I
7  don't have copies of my depositions in any of those
8  cases that I know of. I'm assuming the attorney of
9  record has them.
10     Q.  Do you keep copies of depositions you've given
11 in any cases?
12     A.  Just on occasion. I don't really make a habit
13 of it.
14     Q.  Do you know of any cases that you have copies
15 of your depositions that are shown on Exhibit Number 1
16 that are not in the stack that we've just walked through
17 and identified by Bates number on the record?
18     A.  Yes.
19     Q.  Which transcripts do you have, Dr. Flores?
20     A.  Harris versus City of Houston, and what's the
21 other one? I'm trying to remember. There's another
22 one. It was very, very short. Oh, no. You got it
23 here. It's Dutmer. It's part of the Dutmer deposition,
24 so only one.
25     Q.  And what did Harris versus City of Houston

Page 51

1  involve? What issues?
2      A.  I was retained to do the Gingles 2, 3 analysis
3  for Mr. Harris, Dr. Harris. He was challenging the City
4  of Houston's annexation of his community, and the
5  municipal utility districts hired me as the expert for
6  that particular case. It was a temporary restraining
7  order. They hired another expert for the trial I think
8  it was, or they settled it. I'm not sure exactly what
9  went on beyond the TRL, but it's a very short
10 deposition, just a few pages long, but I'll be glad to
11 furnish that for you.
12     Q.  Dr. Flores, we've used the term in this
13 deposition African American voters. Do you consider
14 black Florida voters and African American Florida voters
15 to be the same group of people?
16     A.  Yes.
17     Q.  And you would see no difference, in other
18 words, you would use those terms, those two groups of
19 people would be identical and overlap identically?
20     A.  Well, you know, I'm sure that there's some
21 national origin questions as well there. For instance,
22 there might be some Haitians in the population or
23 whatever, but generically speaking, when I do the voting
24 analysis, I use both terms interchangeably, yes.
25     Q.  That being black voters and African American

Page 52

1  voters?
2      A.  That's correct.
3      Q.  What do you understand the class of plaintiffs
4  to be in this case or the class that is seeking to be
5  certified in this case to be?
6          MS. BORGEN:  Objection as to form.
7          BY MR. LITTLE:
8      Q.  You can answer.
9      A.  Well, I'm not testifying in a class
10 certification case, am I? At least that's not my
11 understanding. Pardon me?
12     Q.  Sorry. I didn't mean to interrupt you.
13     A.  Well, you were starting first, so go ahead.
14 What were you going to say?
15     Q.  Have you reviewed the second amended complaint
16 filed in this case?
17     A.  Yes.
18     Q.  Do you know what class the plaintiffs are
19 seeking to certify in this case?
20     A.  All I was asked to do is to look at the
21 statistical relationship between inactive voter lists
22 and the African American registered voters in various
23 counties, so I wasn't asked to look at specific class,
24 so I'm looking at African American voters.
25     Q.  Okay. So the answer to the question is you

Page 53

1  don't know what classes the plaintiffs are seeking to
2  certify in this case, correct?
3      A.  You know, I'd have to make an assumption, and
4  I'm not willing to make an assumption without looking at
5  the amended complaint and reading it very carefully.
6      Q.  But as you sit here today, in answer to my
7  question, you don't know what classes the plaintiffs are
8  seeking to certify, correct?
9      A.  Unless it's African American voters.
10     Q.  When were you initially contacted about
11 becoming an expert in this case?
12         MS. BORGEN:  Objection, asked and answered,
13 though if you want to go through a few questions to
14 clarify for your own understanding, that's fine.
15         MR. LITTLE:  Let's go ahead and mark this as
16 Composite Exhibit Number 2.
17         MR. EHRLICH:  For the record, Exhibit 1 was
18 also a composite exhibit. It included multiple pages.
19 I don't know if it was marked that way, but I guess it
20 should be.
21             (Flores Exhibit No. 2
22             was marked for
23             identification.)
24         BY MR. LITTLE:
25     Q.  For the record and those on the phone, we've

14 (Pages 50 to 53)

Page 54

1  marked as Composite Exhibit 2 documents that were
2  produced by the plaintiffs starting at Bates page
3  A041968 through A042011, and I will note that within
4  these Bates ranges, as part of this composite exhibit,
5  there are some other Bates numbers because these
6  documents include materials from the repository -- the
7  depository, and their Bates pages are reflected as well.
8  And this is a composite exhibit because it seems to be a
9  multitude of documents that have gone back and forth
10  between the expert and the counsel for the plaintiffs.
11  Dr. Flores, let me direct your attention to page 41976.
12  I'll give you a moment to read that page.
13      A.   Okay.
14      Q.   Was this your first contact with plaintiffs'
15  counsel in this case?
16      A.   It might have been the second contact.
17      Q.   What was the first contact?
18      A.   Just a telephone call.
19      Q.   And you've previously testified about that
20  initial telephone call, right?
21      A.   Correct.
22      Q.   This e-mail is dated February 21st, 2002 at
23  4:56 p.m., as shown on Bates page 41976. It appears
24  from this single page that you did receive a copy of the
25  plaintiffs' second amended complaint; is that correct?

Page 55

1      A.   That's correct.
2      Q.   The next page is 41977. What is this
3  document, Dr. Flores?
4      A.   That's my response to Ms. Fineman.
5      Q.   I'm sorry.
6      A.   No, go ahead.
7      Q.   This is dated February 21st at 6:51 p.m.
8      A.   That's correct.
9      Q.   Between the time you received the second
10  amended complaint and the time that you sent your e-mail
11  that's on page 41977, what did you do in connection with
12  this case?
13      A.   I read the second amended report -- complaint.
14  Excuse me.
15      Q.   The first paragraph of your response states,
16  quote, "After reviewing the complaint, I decided that I
17  would very much like to have your statistical expert in
18  the NAACP et al. versus Harris et al.," closed quote.
19  Why did you reach that decision, Dr. Flores?
20      A.   Because I read the second amended complaint,
21  at least parts of it that I was asked to look at for
22  purposes of my retention, and I concluded that I could
23  perform that work.
24      Q.   So your response is in connection with your
25  capabilities?

Page 56

1      A.   That's correct.
2      Q.   In the third paragraph, you detail some areas
3  that you would address, and you ask the question, quote,
4  "Is there more you wish me to look at?" question mark,
5  closed quote. Were you given other topics to look at
6  subsequent to this e-mail of February 21st?
7      A.   I cannot remember.
8      Q.   In the fourth paragraph, you state, "Given the
9  above data, I can perform regression analyses on the
10  percentages of the occurrences in each of those
11  categories." Did you perform those analyses?
12      A.   Not in all those categories.
13      Q.   Which categories did you perform the analysis
14  in?
15      A.   I didn't perform regression analysis in any of
16  those categories.
17      Q.   I think you previously told us about the areas
18  where you did perform a regression analysis, correct?
19      A.   That's correct.
20      Q.   When you did perform the regression analyses
21  that you've already told us about, did you perform those
22  against the percentage of African American registered
23  voters or voting age population in each precinct?
24      A.   It was registered voters.
25      Q.   African American registered voters?

Page 57

1      A.   That's correct.
2      Q.   At the very end of your e-mail, you say, "This
3  is" -- quote, "This is indeed an honor, to be asked to
4  be part of such an important case," closed quote. Why
5  do you consider this to be an important case?
6      A.   Because it was part of the Presidential
7  elections. I mean, all these difficulties arose as a
8  result of the -- it was part of the Presidential
9  election, so it's an honor to be a part of this.
10      Q.   Have you written or lectured about the 2000
11  Presidential election?
12      A.   No.
13      Q.   Have you written or lectured about any aspect
14  of the 2000 Presidential election in Florida?
15      A.   I haven't given formal lectures, but I've
16  talked about some of the politics surrounding the
17  elections in a couple of my classes.
18      Q.   Which classes were those? Can you recall?
19      A.   It's a graduate seminar I teach on campaign
20  management, and another graduate seminar on American
21  political institutions.
22      Q.   Have you written or lectured about any of the
23  court decisions that were rendered in connection with
24  the November of 2000 Presidential election?
25      A.   No, I have not.

15 (Pages 54 to 57)

Henry Flores, Ph.D.                                                      May 30. 2002

Washington, D.C.

1    Q.   Have you ever been retained by a governmental
2    body as an expert?
3    A.   Yes.
4    Q.   And what governmental body?
5    A.   The City of San Antonio has retained me. I've
6    been retained by the Arizona Redistricting Commission to
7    defend them in a voting rights challenge.
8    Q.   On how many occasions have you been retained
9    by the City of San Antonio?
10   A.   I think only once.
11   Q.   Is that the Graham versus City of San Antonio
12   case?
13   A.   That's correct.
14   Q.   Have you been retained by any other
15   governmental entity other than the City of San Antonio
16   and the redistricting group you just described?
17   A.   No, but another governmental agency was an
18   intervener in the 1990 round of redistricting in Texas,
19   and I had to come to Washington to share findings with
20   the Attorney General, 1991 or 2, whenever that was.
21   Q.   Were you actually retained by the governmental
22   entity or you were analyzing a particular issue and then
23   you were coming to --
24   A.   I was retained by the Republican Party of
25   Texas.

1    Q.   Have you ever been retained as an expert in
2    connection with any matter involving the State of
3    Florida?
4    A.   No, I have not.
5    Q.   And then it would logically follow you've
6    never testified in a Florida court?
7    A.   That's correct.
8    Q.   Have you ever worked in Florida?
9    A.   No, I have not.
10   Q.   Have you ever lived in Florida?
11   A.   Just passed through.
12   Q.   On how many occasions have you visited the
13   State of Florida?
14   A.   Maybe four or five.
15   Q.   What areas of the state have you been to?
16   A.   Miami, Fort Lauderdale, Clearwater and St.
17   Augustine.
18   Q.   What were the purposes of those trips to
19   Florida?
20   A.   Visiting friends and just pleasure, vacation.
21   Q.   How many days would you say you have been in
22   the State of Florida total?
23   A.   Probably no more than a few weeks grand total.
24   Q.   Two weeks?
25   A.   Maybe three.

1    Q.   At what time period do these visits to
2    Florida co......?
3    A.   I guess the first time I visited Florida had
4    to be -- I'm not even sure. Maybe 18 years ago. Maybe
5    20 years ago, in round figures.
6    Q.   Have you ever read any books on politics of
7    the State of Florida, alleged racial discrimination in
8    the State of Florida, anything of that nature?
9    A.   I've read books and studies on the Cuban
10   community in the State of Florida.
11   Q.   Can you recall any of those books?
12   A.   The book titles, no, but the authors are Maria
13   Lourdes Torres, T-O-R-R-E-S. She wrote a book on Cuban
14   immigration children. She is a professor at De Paul
15   University, and various articles by Professor Dario
16   Moreno, M-O-R-E-N-O, from -- I think he's at Florida
17   International. I'm not sure, but he is considered one
18   of the experts on Cuban voting behavior in the United
19   States.
20   Q.   Have you read any books with respect to the
21   demographics of African Americans in the State of
22   Florida, voting trends, politics, social issues, alleged
23   discrimination?
24   A.   No. Only the government documents I've looked
25   at in preparation for this case.

1    Q.   Flipping over if we could in Composite Exhibit
2    2 to page 41968 to 41969, this is your letter of
3    retention; is that correct?
4    A.   Yes, it is.
5    Q.   It states in the second paragraph of the
6    letter that you will be examining mobility rates of
7    black Floridians. Did you in fact examine that issue?
8    A.   I looked at it, yes. We were talking about
9    geographical mobility.
10   Q.   The next phrase is whether black Floridians
11   are disparately impacted by certain election practices
12   and procedures in that state. Did you look at that
13   issue?
14   A.   Yes.
15   Q.   Who selected the certain election practices
16   and procedures that you looked at?
17   A.   The Lawyers' Committee.
18   Q.   Did you have any input in selecting the
19   practices and procedures or were you told the practices
20   and procedures to look at?
21   A.   No. I was asked to look at certain things.
22   Q.   In the last phrase, "and other issues that may
23   arise during the course of your work," have you done any
24   work that would fall within that rather ambiguous
25   category?

16 (Pages 58 to 61)

Page 62

1   A.   I don't know.
2   Q.   Well, let me ask it this way: Have you
3   performed any work or analysis that would not fall into
4   the two prior categories we just discussed?
5   A.   Not that I'm aware of.
6   Q.   The last paragraph on the first page asks you
7   not to spend more than a total of 80 hours on the case
8   without consulting with counsel. Do you know
9   approximately how many hours you have on the case now,
10  Dr. Flores?
11  A.   I think I'm pushing -- it's more than 90.
12  Q.   If I could direct your attention to page 41974
13  of Composite Exhibit 2, what is that document, sir?
14  A.   Oh, that's what I was looking for actually.
15  That's my last bill, billing statement.
16  Q.   Is that also your first bill?
17  A.   So far, yes.
18  Q.   The letter dated April 25th -- is that your
19  only billing statement to date in this case?
20  A.   That's correct.
21  Q.   You have a number of time entries on page
22  41974. Did anyone work with you in performing the
23  services that are reflected on this statement or are all
24  of the hours listed totalling as of April 25th 72.5
25  hours your time?

Page 63

1   A.   This is strictly my time.
2   Q.   Have you had anyone assisting you on this
3   case?
4   A.   I paid an undergraduate student to do some
5   data entry for me.
6   Q.   Has anyone else assisted you in performing
7   your work on this case?
8   A.   No, not at all.
9   Q.   And I take it you've not billed separately for
10  that person's time?
11  A.   No. I paid her out of my own funds.
12  Q.   And that was strictly data input?
13  A.   Strictly data input.
14  Q.   No analysis or interpretation?
15  A.   None whatsoever.
16       MR. LITTLE: Mark this as Exhibit 3 please.
17            (Flores Exhibit No. 3
18            was marked for
19            identification.)
20       BY MR. LITTLE:
21  Q.   Can you tell us what Exhibit 3 is, Dr. Flores?
22  A.   It's my expert report.
23  Q.   Who was it prepared by?
24  A.   Myself.
25  Q.   Do you know when you finalized this report?

Page 64

1   A.   No, there's no date on this. I'd have to --
2   where would it be? The date is on the -- probably the
3   computer file that holds the report, but I'm assuming
4   that it was completed -- I sent it two days -- I think
5   it was two days prior to its -- when it had to be in, if
6   I'm not mistaken.
7   Q.   Are there any opinions that you intend to
8   offer at trial that are not contained in Exhibit Number
9   3?
10  A.   There may be depending on any kind of
11  follow-up work I may do.
12  Q.   When you say follow-up work, what do you mean
13  by that?
14  A.   Well, I may be -- depending on the
15  availability of data from the various counties being
16  made available to me, I may be doing similar sorts of
17  analysis that I performed in here with that new data.
18  Q.   Let me ask the question this way: With
19  respect to the data that you have analyzed and described
20  in Exhibit 3, do you have any other opinions about that
21  data other than as stated in Exhibit 3?
22  A.   No, not really.
23  Q.   Did you prepare a draft of Exhibit 3?
24  A.   Yes, I did.
25       MR. LITTLE: Mark this as 4.

Page 65

1            (Flores Exhibit No. 4
2            was marked for
3            identification.)
4       BY MR. LITTLE:
5   Q.   For those on the phone, we're marking as
6   Exhibit 4 some documents that were produced in the
7   deposition. Exhibit 3 was the report that's been
8   previously circulated. For the record, Exhibit Number 4
9   is Bates page A042047 through 2075. Can you identify
10  Exhibit 4 for the record, Dr. Flores?
11  A.   It's a copy of my draft report.
12  Q.   Were there multiple draft reports that you
13  prepared?
14  A.   This is the only full-length draft report that
15  I prepared. In other words, there were bits and pieces
16  that I wrote the report up that eventually all came
17  together in this one document.
18  Q.   As you prepare the report and edit it, does it
19  overwrite the document as you make corrections?
20  A.   Yes.
21  Q.   So in other words, on your computer system,
22  this report, for lack of a better term, would be version
23  number 1. It would be the only version on your
24  computer, as opposed to versions 1, 2, 3, 4, 5 as you go
25  through the various edits?

17 (Pages 62 to 65)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

**Page 66**

1    A.   Yeah, it would be the only copy on my
2    computer.
3    Q.   Exhibit 4 was sent to the Lawyers' Committee
4    for review; is that correct?
5    A.   That's correct.
6    Q.   Do you know who reviewed it at the Lawyers'
7    Committee?
8    A.   Lori Borgen and Cara Fineman I assume.
9    Q.   Are you aware of any changes that were made
10   between the draft, which is Exhibit 4, and the final
11   report, which is Exhibit 3?
12   A.   Yes.
13   Q.   What changes were those?
14   A.   Give me a moment please.  In paragraph 4D of
15   the draft, I excluded the data from the Orange County
16   Office of the Florida Department of Highway Safety and
17   Motor Vehicles Registration from the final report.
18   Let's see.  What else?
19   Q.   So if I understand you, paragraph 4D in the
20   draft, which is marked as Exhibit 4, was deleted.
21   A.   That's correct.
22   Q.   Why was it deleted?
23   A.   Essentially what I was trying to do at that
24   point was to look at the percentage of -- compare the
25   persons registered at the Department of Motor Vehicles

**Page 67**

1    in Orange County with the percentage of African American
2    registered voters in Orange County.  The problem was I
3    wasn't sure of what the population of the DMV offices
4    were in that particular county.  In other words, I
5    didn't know if there was one particular county office
6    that was actually servicing clients from another county,
7    and there's no way I could match the data up, so I just
8    said because I couldn't do that, I just left it out of
9    the report.  It's a methodological issue.
10   Q.   So if -- you didn't know whether people who
11   resided in Seminole County could cross the Orange County
12   line and go to the driver's license office and register
13   to vote at that driver's license office?
14   A.   Or get their motor vehicle license.  I didn't
15   know who that agency was servicing.  You know, I didn't
16   know whether it was a regional office, a district office
17   that cut across county lines or what.
18   Q.   The second sentence in paragraph 4D of Exhibit
19   4 relates to the Department of Children and Family
20   Services.  Why was that deleted?
21   A.   For the same reason.  I just wasn't sure how
22   that -- their client group is set up, so I might be
23   comparing more than people from other counties as to
24   just Orange County voters.
25   Q.   Was the subject matter of paragraph 4D in

**Page 68**

1    Exhibit 4 suggested to you by the plaintiffs' lawyers as
2    one of the topics they wanted you to look at?
3    A.   The registered -- the DMV registrations?
4    Q.   Yes.
5    A.   Yes, and I still may complete that analysis if
6    I can work my way through the methodological issue.
7    That may be part of my follow-up work.
8    Q.   And the methodological issue you're talking
9    about is the one you just described to us?
10   A.   That's correct.
11   Q.   And specifically what would you need to know
12   in order to complete that analysis?
13   A.   What I would need to know is -- to do the
14   regression analysis, I would love to have the
15   registered -- the clientele served by precinct level if
16   I knew that's possible, but I'm not sure that's
17   possible.  If they're given -- if they're registered
18   voters though, I'm assuming that the precinct is
19   assigned in a particular DMV office, but more
20   importantly, I need to know that these are all voters
21   from just Orange County going to that particular office.
22   That's really what I would need to know.
23   Q.   And if voters from other counties go to the
24   particular DMV or Department of Children and Family
25   Services office in Orange County, you would not be able

**Page 69**

1    to perform this type of analysis?
2    A.   Well, unless I could glean them out one way or
3    the other.
4    Q.   Any other changes or differences between
5    Exhibits 4 and Exhibit 3, your draft and final reports?
6    A.   Let me check.  In paragraph 4E, the fourth
7    line of the paragraph that begins with "Dade County,"
8    comma, I struck everything from "however" to the end of
9    that sentence.
10   Q.   It says "However, there appears to be a
11   negative and statistically significant relationship
12   between non-Hispanic white registered voters and the
13   percentage of poll workers assigned to those precincts
14   having higher percentages of non-Hispanic white
15   registered voters."
16   A.   That's correct.
17   Q.   Why did you strike that language?
18   A.   Well, because I was curious as to why that
19   came out that way, and one of the rules that you always
20   follow in doing statistical work is when there's a
21   statistic that appears to deviate slightly, you try to
22   find the reason for the deviation.  It could be caused
23   by a data entry problem or whatever.  And so what I went
24   and did is I went back and looked at the database that I
25   ran the statistics on and I couldn't find any strange

18 (Pages 66 to 69)

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 70

1  patterns.
2      And then I went to the lists where the
3  database came from and I found out something very
4  interesting about Miami-Dade County in that Hispanic
5  voters sometimes identify themselves as African American
6  or Hispanic or white, and I would have to go through
7  every registered voter in Miami-Dade, take all the
8  Hispanics out of the white list and make sure I was
9  looking at just strictly non-Hispanic white voters. It
10  wasn't clear that I could do that, so I just didn't do
11  that work.
12      Q.   Any other changes between Exhibits 3 and 4?
13      A.   Well, I expanded the document list to include
14  more documents.
15      Q.   That's in paragraph number 5?
16      A.   That's correct. I've updated my resume, but
17  give me a moment to go through it again. Let me check
18  it. It doesn't look like it.
19      Q.   The two changes that you have identified for
20  us, apart from the listing of the materials you relied
21  upon, were those changes suggested by you or by the
22  Lawyers' Committee or other counsel in the case?
23      A.   No, they were suggested by me, although I did
24  discuss them with the Lawyers' Committee counsel.
25      Q.   Were there any other suggestions that counsel

Page 71

1  for the plaintiffs made to you in connection with the
2  report that was finalized as Exhibit Number 3?
3      A.   Could you repeat your question again?
4      Q.   Were there any other changes suggested to you
5  by attorneys representing the plaintiffs with respect to
6  the final report that you prepared, which was Exhibit
7  Number 3?
8      A.   Just stylistic, but not substantive.
9      Q.   Returning to your resume, which is marked as
10  Exhibit Number 1, I wanted to ask you quickly about two
11  publications.
12      A.   Sure.
13      Q.   Page 7, bottom of the page, can you tell me
14  what that publication involves?
15      A.   "When Is a Sample Not a Sample?"
16      Q.   Yes, sir.
17      A.   "Some Problems Using Multivariate Statistical
18  Analysis in Voting Rights Litigation Research."
19  Essentially what I was referring to there was a
20  discussion that has been kind of ongoing among
21  statisticians that do voting rights work in the area of
22  statistical significance. When we do regression
23  analysis in an election study, we do generally -- for a
24  litigation case where that's an issue, we're doing an
25  analysis of every vote cast possibly with the exception

Page 72

1  of maybe a few little missed votes here and there that
2  are either overs or unders or whatever, and sometimes we
3  include those in our analysis as well depending on what
4  we're looking at. So what we're really doing a
5  statistical test on is the entire population. We're not
6  looking at a sample.
7      Now, you could -- so there's a debate going on
8  whether that election is really a sample of all the
9  registered voters or a sample of the population or are
10  you just looking at the whole population of votes and
11  just trying to make some conclusion about just the
12  voters that cast their votes that particular day.
13      In that case, it makes the whole issue of
14  statistical significance come into play because if your
15  statistical significance is used to verify whether or
16  not a sample reflects the characteristics of the general
17  population that you're studying, but if you're using the
18  statistical test to measure every possible case in your
19  population, then statistical significance takes on
20  something other than statistical significance.
21      You could say, for instance, that you could
22  run a test on an entire population today and use that as
23  a sample of 100 tests of the population you're going to
24  do 100 days in a row, but as a reflection of -- as that
25  population of a sample as something else, it can't be.

Page 73

1  It's impossible because it's the whole population.
2  That's really what that's about.
3      Q.   Do you have a copy of that paper?
4      A.   Not anymore. I tried to find a copy of that
5  paper the other day actually.
6      Q.   To your knowledge, there is not a copy of this
7  in existence that you're aware of?
8      A.   Well, that was a paper delivered at a
9  conference. I don't know if they kept a copy of those
10  papers or not. Sometimes I don't keep copies of papers.
11  That's not an article that was published.
12      Q.   What does the term "multivariate statistical
13  analysis" mean?
14      A.   Simply that you're using more than one
15  variable when you're doing your analysis.
16      Q.   Are you aware of any authoritative treatises
17  on multivariate statistical analysis in the voting area
18  or the elections area?
19      A.   I don't know if there are authoritative
20  treatises, but I know of a couple of articles. I've
21  seen them. I've not really spent too much time on them.
22      Q.   Are there any articles or treatises that you
23  would consider authoritative in the area of multivariate
24  statistical analysis in voting?
25      A.   Well, it depends on what you mean by

19 (Pages 70 to 73)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 74

1  authoritative. To me, all articles are, if they're in
2  refereed journals, are authoritative, just period. I've
3  seen some articles --
4      Q.   You would consider them authoritative?
5      A.   If they're in refereed journals, sure. I
6  think that there -- I've seen a couple.
7      Q.   Can you tell me what those are?
8      A.   No.
9      Q.   Do you know the approximate time frame when
10  you saw those articles?
11      A.   I ran across them a couple years ago. They've
12  been around a few years. There's -- it's not performed
13  very often in voting cases though. Not in voting rights
14  cases.
15      Q.   Can you give me any better leads on where I
16  might find those articles?
17      A.   No, no, but I'm sure that you -- it could be
18  searched out on a regular document search. I'm trying
19  to remember. I think I saw one in a law journal, but
20  I'm not even sure. Maybe Stetson Law Review. Don't
21  quote me on that. I'd have to dig for those things
22  because they are rare pieces.
23      Q.   How about on page 8, the article "Playing
24  Power Politics the American Way?"
25      A.   Again, these are papers that I delivered.

Page 75

1      Q.   What was that about?
2      A.   1987? I don't remember. Oh, that's the one I
3  won the award for. I remember that because I got an
4  autograph on the copy of my paper from a musician who
5  had just picked up a Grammy ward. I accidentally sat
6  next to him on an airplane so I made him autograph my
7  award-winning paper. Essentially what that was is a
8  look at -- it's a structural analysis of economic
9  development politics and their effects on racial
10  segregation in urban areas. It grew out of my doctoral
11  dissertation, is what it was.
12      MR. LITTLE: We're off the record for a
13  minute.
14      (Discussion off the record)
15      BY MR. LITTLE:
16      Q.   Dr. Flores, have you ever been retained by the
17  Lawyers' Committee before?
18      A.   No.
19      Q.   How about any of the other plaintiffs' groups
20  there referenced on the retainer letter, which is the
21  top page of Composite Exhibit 2?
22      A.   The NAACP.
23      Q.   On how many occasions?
24      A.   They were part of group that retained me.
25  They weren't -- they didn't retain by themselves. Maybe

Page 76

1  twice. I'd have to check.
2      Q.   Have you worked with any of the specific
3  lawyers involved in this case on other cases before?
4      A.   I don't know all of the lawyers on this case,
5  but I've never worked with Ms. Borgen or Ms. Fineman
6  before.
7      Q.   Have those been your principal contacts about
8  this case?
9      A.   Yes.
10      Q.   Have you spoken with any of the plaintiffs in
11  this case?
12      A.   No, I have not.
13      Q.   Let me ask you if you would to look at Exhibit
14  Number 3. In paragraph 5, you state that your opinions
15  expressed in paragraphs 4A through 4F is based upon a
16  review of the following documents and data sets and
17  analyses of various data sets that were constructed from
18  the following documents and data sets. Have we been
19  provided with a copy of the analyses of the various data
20  sets that were constructed from the documents and data
21  sets that are listed here in paragraph number 5?
22      A.   Could you be more specific about that?
23      Q.   Well, as I understand what you've written here
24  in paragraph 5, you're saying that your opinion is based
25  on a review of a list of documents and data sets that

Page 77

1  are on pages 4 and 5.
2      A.   That's correct.
3      Q.   And then the sentence continues, "and analyses
4  of various data sets that were constructed from the
5  following documents and data sets." My question is have
6  the defendants been provided with the various data sets
7  that were constructed by you from these various
8  categories listed in paragraph --
9      A.   Oh, I don't know.
10      Q.   Tell me what data sets you constructed.
11      A.   They were data sets that I used to run my
12  regression analyses with so that the data sets
13  themselves include data from other larger data sets.
14  For instance, I was provided by Broward County officials
15  a count of all poll workers in every precinct, so I used
16  that to construct -- that particular variable in one
17  regression analysis. Then the registered voters came
18  out of another data set. I just matched up the precinct
19  numbers to run our regression analysis. So that
20  specific data set was uniquely constructed just to do
21  that work from other sources.
22      MR. LITTLE: Lori, I noticed that there was a
23  CD-ROM that we were given this morning. Is that the
24  data sets he's describing?
25      MS. BORGEN: Yes, you have two CD-ROMs. One

20 (Pages 74 to 77)

Page 78

1  is called FREDS 2000, and that's one big database, and
2  then the other one is called NAACP versus Harris, and
3  that includes several files on there with these
4  databases that Professor Flores is describing. And if
5  you have specific questions about those or if you want
6  to take a look at what's on the CD, Professor Flores
7  does have his laptop computer here and if you wanted to
8  put in the CD-ROM and open up the CD so you can see
9  exactly what files are on there, we can do that now or
10 after lunch if you're interested in doing that.
11     BY MR. LITTLE:
12     Q.  Dr. Flores, let me ask you to look at these
13 two CDs that counsel just described. The first one is
14 marked FREDS 2000, and then below it, it says, "Files of
15 plaintiffs' expert, Professor Henry Flores, 5/30/02."
16 Do you know what is on that CD?
17     A.  It's a list of -- it's a count of registered
18 voters for the entire State of Florida by precinct and
19 by race.
20     Q.  Is that data -- has that data been in any way
21 changed or manipulated by you in performing your
22 analyses in this case?
23     A.  Only that I took out of there the counts of
24 African American voters for the specific counties that I
25 was looking at, but other than that, it's not been

Page 79

1  changed.
2      Q.  When you say you took out of there, I'm not
3  sure I understand.
4      A.  Well, essentially the process goes like this.
5  I'll take a database of that magnitude and I'll make a
6  copy of it so that I don't touch the master database,
7  and on that copy, I'll eliminate, for instance, if I
8  were looking at Miami-Dade, I would just delete all the
9  other counties off of that second copy of the database,
10 so they're just gone.
11         And then with the Miami database, if I'm
12 looking at just the African American registered voters,
13 I'll eliminate all the rest of the registered voters
14 with the exception of the total count so I can have a
15 percentage of African American registered voters, and
16 then that gives me a database of all the African
17 American voters in Miami-Dade County by precinct.
18     Q.  With that explanation then, if we were to open
19 up the first of these two CDs that are marked FREDS
20 2000, what would we find on there?
21     A.  You should find, if it copied correctly and
22 everything, a count of all the registered voters in the
23 State of Florida by precinct level, identified by
24 county, identified by Congressional district, identified
25 by State Senate, State Assembly district. You'll find

Page 80

1  also a count of registered voters by age, by race and
2  ethnicity. I think they're even listed by gender and by
3  party affiliation.
4      Q.  So this first CD that's marked FREDS 2000 is
5  the raw data that has not been changed or massaged by
6  you; is that correct?
7      A.  That's correct.
8      Q.  The second CD is marked "NAACP versus Harris,
9  Files of Plaintiffs' Expert, Professor Henry Flores,
10 5/30/02." Is this second CD the data that you have
11 analyzed and constructed in connection with forming your
12 opinions?
13     A.  The second CD contains every file that I
14 constructed together with a copy of my expert report and
15 all the exhibits -- actually, there's like duplicate
16 copies of exhibits on there, for all my analyses. There
17 are even some -- I noticed there was even some scratch
18 files that are still in there where I was halfway
19 through the construction of the database. They're not
20 usable, but it's what -- it's everything I have.
21     Q.  So in paragraph 5 of Exhibit 3 where you say
22 that your opinion is based on analyses of various
23 databases that -- or data sets that were constructed,
24 those data sets that were constructed are found on the
25 CD we just described?

Page 81

1      A.  That should be the complete set, yes.
2      Q.  And you don't know of any other data sets
3  constructed by you that would not be on that CD?
4      A.  No.
5      Q.  If -- we'll just do one last thing before we
6  break for lunch. If I could direct your attention to
7  paragraph 5 of Exhibit 3 --
8      A.  Okay.
9      Q.  I just want to run through these documents and
10 data sets. If I understand your report correctly,
11 Exhibit Number 3 is based on the 14 sources of data that
12 are identified in paragraph 5; is that correct?
13     A.  Hold it just one second.
14         MS. BORGEN: Objection as to form.
15         THE WITNESS: Can I confer with counsel for a
16 second?
17         MS. BORGEN: No, actually, you can't. If you
18 know the answer, you can answer, and if you don't, if
19 there are any questions about the question, you can ask
20 for clarification.
21         THE WITNESS: There are some documents left
22 off of this, off this list.
23         BY MR. LITTLE:
24     Q.  Can you tell me what those documents are?
25     A.  And there's also -- there's some CDs --

21 (Pages 78 to 81)

Henry Flores, Ph.D.                                                    May 30, 2002
Washington, D.C.

---

**Page 82**

1  there's four CDs of data that was provided by Duval
2  County and Hillsborough that I left in San Antonio,
3  Texas that was the basis for Exhibit 3.
4      Q.   All right. So to be complete, Exhibit Number
5  3 of your report was based on you said four CDs?
6      A.   That's correct.
7      Q.   From which counties?
8      A.   Duval and Hillsborough and I think Broward --
9  there was a collection of different counties, but I have
10  those CDs in my study at home.
11      Q.   And these four CDs you know covered Duval and
12  Hillsborough, you think perhaps Broward?
13      A.   Yes.
14      Q.   Are you certain there are four CDs and no
15  more?
16      A.   That's correct, there's only four.
17      Q.   And you said they're at your study at home?
18      A.   That's correct.
19      Q.   And those four CDs were used in preparing
20  Exhibit 3?
21      A.   That's correct.
22      Q.   Were these four CDs used for any other purpose
23  in connection with this report, which is marked as
24  Exhibit 3?
25      A.   Maybe, but I can't be certain because like I

---

**Page 83**

1  said, I sometimes take bits and pieces off the data sets
2  but I don't use the whole data set, and sometimes data
3  was provided that I just couldn't use so I just didn't
4  use it.
5      MS. BORGEN: John, can I ask one question for
6  clarification? When you say Exhibit 3, are you
7  referring to the whole report as Exhibit 3 or Exhibit 3
8  of the report?
9      MR. LITTLE: I am -- in the last question, I
10  was referring to Exhibit 3 in this deposition. In the
11  earlier question, I was referring to his Exhibit Number
12  3 to Exhibit 3.
13      THE WITNESS: Oh, okay. I was speaking to
14  Exhibit 3 of Exhibit 3.
15      BY MR. LITTLE:
16      Q.   Correct, when you talked about the four CDs?
17      A.   That's correct.
18      Q.   And then my other question was are these four
19  CDs the basis for any other parts of your final report,
20  which we marked as Exhibit 3 to your deposition.
21      A.   Oh, okay. I don't know. I'd have to
22  double-check that.
23      Q.   Going back to paragraph 5, you said that you
24  saw some documents or databases that you have reviewed
25  and form the basis of your opinions in your final report

---

**Page 84**

1  that are omitted from paragraph 5. Did I understand you
2  correctly?
3      A.   Well, I was referring to the four CDs.
4      Q.   Anything else?
5      A.   No.
6      Q.   So between the 14 items listed in paragraph 5
7  of Exhibit 3 to your deposition, the four CDs that are
8  back in San Antonio, Texas and the two CDs that we've
9  previously identified on the record, NAACP versus Harris
10  and FREDS 2000, that is the totality of the documents
11  and data sets that form the bases for your opinions
12  found in this final report?
13      A.   To the best of my knowledge, that's all that's
14  there.
15      Q.   And that's all of the documents or data sets
16  that you've used to form the opinions in your final
17  report?
18      A.   That's correct.
19      MR. LITTLE: Why don't we break here, if
20  that's convenient.
21      (Recessed at 12:29 p.m.)
22      (Reconvened at 1:48 p.m.)
23      BY MR. LITTLE:
24      Q.   Dr. Flores, directing your attention to
25  Exhibit 3, which is your final report, paragraph 5 on

---

**Page 85**

1  page 4, I just want to run through the documents and
2  data sets that are referred to in paragraph 5, and my
3  question is how did each of the items listed in
4  paragraph 5 contribute to the opinions which you form in
5  your final report. That's the general question, and I
6  mean, I can ask you that question on each of the items
7  or we can just walk through them and you can tell me
8  what they were and how they formed a basis for your
9  opinion if that would help us speed it along.
10      A.   Okay, I can do the latter. The first one is
11  the NAACP, Inc. et al. versus Katherine Harris,
12  secretary, et al. It's the second amended complaint and
13  it just provided me with what I'm supposed to be looking
14  at and just some background information on the case
15  itself. The next one is Geographical Mobility
16  Population Characteristics, March 1999 to March 2000
17  from the current population reports produced by the U.S.
18  Bureau of the Census, and that provided me with some
19  general data on geographical mobility patterns by race
20  in various -- let me look at it very quickly. It's in
21  the documents that we provided for you.
22      Q.   All right.
23      A.   I did use it.
24      MS. BORGEN: It's -- if you want to take a
25  look at it first, it's in the pile that was produced --

---

22 (Pages 82 to 85)

Page 86

1  the documents produced this morning.
2       BY MR. LITTLE:
3       Q.  All right.  For the record, this is Bates page
4  A042174 through 2180, and as counsel said, the documents
5  that were produced this morning.  I'm not going to mark
6  it since we've identified it by Bates page, but if you
7  want to refer to it, Dr. Flores --
8       A.  Yes, just to refresh my memory.  Yeah, it just
9  gave me a feel for the mobility rates of African
10  Americans on a regional basis throughout the United
11  States.  It also provided me with some background
12  information on mobility rates for different sorts of
13  demographic subgroups, age, gender, et cetera et cetera,
14  but it's on a general basis, so it's kind of background
15  information.
16      David Lublin and D. Stephen Voss, Federal
17  Elections Project, American University, was a database
18  of registered voters that they had constructed through
19  the Federal Elections Project.  I just used it to really
20  verify lots of the data that I received from FREDS 2000,
21  which I'll talk about in a second.
22      Richard L. Forstall, Population By Counties By
23  decimial Census 1900 to 1990 for the State of Florida
24  from the Population Division of the U.S. Bureau of the
25  Census is a historical -- is a document showing the

Page 87

1  population per census by race for the State of Florida
2  in general.  I was trying to get a feel for any kind of
3  trend in the proportional growth rates of African
4  Americans in Florida.
5       Q.  Let me stop you there.
6       A.  Sure.
7       Q.  Did you see any trend in proportional growth
8  rates?
9       A.  The population stayed relatively stable until
10  about -- from 1900 to about 1980, and then since 1980,
11  we've seen a huge differential take place in growth
12  rates.  It seems like the African American community has
13  grown more in the last 20 years in Florida than at any
14  other time.  Either that or the non-Hispanic white
15  community is diminishing.  They're either leaving or
16  whatever, the population ratios are changing.
17      Q.  Did you see these growth rates throughout the
18  state or in particular areas in the state?
19      A.  No, no, it was just the state in general.
20  Population 1999-2000, Florida vital statistics annual
21  report, these I produced for the defendant counties, and
22  what they are -- wait a minute.  I may be mistaken.
23  No, they're quick facts.  They're also in the set of
24  documents I think we were giving you this morning, the
25  Florida -- these I downloaded off of the U.S. Bureau of

Page 88

1  the Census web site that produced general demographics
2  for each county in the State of Florida.  What I brought
3  with me from Texas was just the defendant counties and
4  the State of Florida itself.  I didn't bring the rest of
5  them, but I produced it for every county in the state,
6  and you can just download those off of the U.S. Bureau
7  of the Census.
8       Q.  And these are Bates pages A042181 through
9  2220, correct?  That's what you've produced and just
10  described?
11      A.  That's correct.
12      Q.  And you used this information in what way?
13      A.  To look at the percentage of renters in
14  various counties for the state.
15      Q.  Did the information break down the renters by
16  race?
17      A.  No.  The other thing I used it for was to
18  determine some general population characteristics by
19  race for each county looking at what else I did, and
20  that was just it.  I was trying to get a feel for also
21  characteristics of housing, the age of the housing.
22  Nothing that appeared in the report.  It's just kind of
23  background information for myself to become familiar
24  with Florida statistics.
25      Q.  Did you make notes on those documents as to

Page 89

1  the areas that you focused on?
2       A.  No, I didn't write on these documents.
3       Q.  The next category was I believe affirmation
4  summary?
5       A.  Oh, affirmation summary for the 2000 general
6  election summary, Hillsborough county.  Those are data
7  provided by Hillsborough County.  They were counts of
8  affirmation, and it was whether, if I remember
9  correctly -- well, that's all it was, counts of
10  affirmation by change of address I think it was and
11  change of name.
12      Q.  And how did you make use of that information?
13      A.  I used the raw counts, the total counts of
14  affirmations regardless of whether change of address or
15  change of name in my regression analysis that appeared
16  in my expert report.
17      Q.  All right.
18      A.  Registered voter list 2000 general election
19  for Miami-Dade County.
20      Q.  What was that?
21      A.  That's a database that I created out of FREDS,
22  so it should be on that -- it will be -- you'll see that
23  database on the NAACP versus Harris CD isolated by
24  itself.
25      Q.  That list that's on the CD you just described

23 (Pages 86 to 89)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 90

1 does not have names on it, correct? It's just voter
2 numbers?
3    A.  Oh, gee. Maybe I'm thinking of a different
4 list. I did give a list of names, but I don't think --
5 I didn't use that list. I did get a list of registered
6 voters from Miami-Dade. They have names and they self-
7 identify by Hispanic, et cetera et cetera et cetera, but
8 I didn't use that list at all.
9    Q.  So the list that you recall seeing from Miami-
10 Dade that had voters names on it you did not use in
11 rendering the opinions that are found in your final
12 report, Exhibit 3?
13    A.  That's correct.
14    Q.  And how did you use the -- this synopsis of
15 the Dade elections information out of FREDS for
16 Miami-Dade?
17    A.  Oh, I used that as a master data list to just
18 pull all the registered voters off. I assumed that
19 because the State of Florida had used those data to
20 construct their districts, their Congressional districts
21 and their state assembly districts and state Senate
22 districts, that it was good solid data because the state
23 produced it for their own use, so I used all the
24 registered data from the FREDS list for my analysis.
25       In the Schlicting, Tuckel and Maisel --

Page 91

1 Schlicting is S-C-H-L-I-C-T-I-N-G. Tuckel is
2 T-U-C-K-E-L, and Maisel is M-A-I-S-E-L, a scholarly
3 article entitled "Racial Segregation and Voter Turnout
4 in Urban American," The American Politics Quarterly. I
5 just -- it's a scholarly article that I just used for
6 background reading to just get a feel for -- I'd never
7 really seen an article that talked about racial
8 segregation and voter turnout in urban America, so I
9 read it and I used it as kind of background information,
10 but it's not part of my report.
11    Q.  Is that a report that's been produced to us?
12    A.  Yeah, there's a copy of the article.
13    Q.  Bates page A042155 through 2173?
14    A.  Yes, this is it.
15    Q.  Okay.
16    A.  Then there's the FREDS 2000, Florida
17 redistricting system. Do you want me to go over that
18 one again?
19    Q.  Is there anything other than what we just
20 spoke to before lunch about the way you used that data?
21    A.  No. Response to interrogatory number 39 from
22 Defendant William Cowels -- excuse me if I mispronounced
23 that. Affirmation affidavit from the primary general
24 elections of 2000. Again, I just used that to create --
25 those were raw counts of affirmations by precinct, and I

Page 92

1 used that in my regression analysis as one of the
2 variables.
3       Count of poll workers for Broward, Miami-Dade
4 and Pinellas Counties and for the 2000 general
5 elections. Again, those were literally sheets produced
6 by the election offices that had poll workers counts and
7 the duties that they had, and all I extracted from that
8 are the raw counts of poll workers to use in my database
9 construction.
10       Raymond E. Wolfinger and Steven J. Rosenstone.
11 Wolfinger is spelled W-O-L-F-I-N-G-E-R, and Rosenstone
12 is R-O-S-E-N-S-T-O-N-E. It's a book entitled "Who
13 Votes?" question mark. It's the classical study that --
14 on why people vote in the United States. I was just
15 refreshing myself. G. Bingham Powell. Bingham is
16 B-I-N-G-H-A-M, Powell, P-O-W-E-L-L, "American Turnout in
17 Comparative Perspective." It's a scholarly article that
18 appeared in the American Political Science Review in
19 1986. Again, just some background information on
20 turnout, how to measure turnout, just background reading
21 for myself.
22       And I don't know if I'm pronouncing either the
23 first or last name correctly on this last document. Ruy
24 Teixeira. The first name is R-U-Y. The last name is
25 T-E-I-X-E-I-R-A, a book entitled "The Disappearing

Page 93

1 American Voter," and it's the classical work on why
2 people don't vote. It's kind of the opposite study of
3 what Wolfinger and Rosenstone did.
4    Q.  And how was that used in your final report?
5    A.  Just some background information on
6 methodologies and things of that nature.
7    Q.  Now, I think you also told us about four CDs
8 that you left in your study back in Texas.
9    A.  That's correct.
10    Q.  And how was that information used by you?
11    A.  From each of those CDs, I extrapolated some
12 data for some of my analysis in the specific counties,
13 Duval, Hillsborough. I'd have to look at what the other
14 counties are for sure, but those two I know for sure are
15 on those data sets.
16    Q.  And then the last source of information that
17 you used in rendering your opinions that are found in
18 Exhibit 3 to your deposition was the NAACP versus Harris
19 CD that we discussed before lunch, correct, and those
20 were the different data sets that you constructed from
21 these sources that we've just gone through?
22    A.  That's correct.
23    Q.  Going back to page 2 of your report,
24 Dr. Flores, in paragraph number 2, next to the last
25 line, it states that you've been retained to act as a

24 (Pages 90 to 93)

Page 94

1    statistical consultant in this case. Is that the -- is
2    that your understanding as to the nature of your
3    retention?
4        A.   Yes.
5        Q.   And so in your view, the opinions that you are
6    offering are statistical opinions?
7        A.   They're based on statistical analysis, yes.
8        Q.   Do you bring any other discipline into play
9    when you interpret this information other than
10   statistical analysis?
11       A.   I'm not sure I understand your question.
12       Q.   Well, you've said that this is an analysis
13   that you're doing of information, statistical analysis
14   of information, correct?
15       A.   Correct.
16       Q.   Are you bringing any other expertise or
17   discipline to bear when you look at that data that
18   you're analyzing?
19       A.   Just my experience as a statistician and my
20   experience as an expert witness in voting rights cases
21   over the years, and also in employment cases that I've
22   worked.
23       Q.   When you say employment cases, what do you
24   mean by that as to how that has any bearing on this
25   case?

Page 95

1        A.   Only in the fact that in almost all of those
2    cases, I perform some sort of statistical process. I
3    ran statistics in those cases to uncover whether or not
4    there was any kind of disparate treatment of employees,
5    and so fundamentally, just my statistical background in
6    legal cases.
7        Q.   The next heading before paragraph 3 is object
8    of reporting, and it states, "I was asked to investigate
9    and report on the following," and you list four
10   categories, correct?
11       A.   That's correct.
12       Q.   Each of those four categories in paragraph 3
13   of Depo Exhibit 3 were identified by plaintiffs'
14   counsel, correct?
15       A.   That's correct.
16       Q.   Paragraph 4 contains your conclusions with
17   respect to the four areas you were asked to investigate
18   in paragraph 3. Is that accurate?
19       A.   That's correct.
20       Q.   In paragraph 4A, in the second sentence, you
21   state, "Given the history of racial discrimination
22   throughout the State of Florida and generally toward
23   African Americans." I'm going to stop there. Which of
24   the documents or databases that we just reviewed in
25   paragraph 5, if any, provided you information about the

Page 96

1    history of racial discrimination throughout the State of
2    Florida generally toward African Americans?
3        A.   None.
4        Q.   You told us that you did some research last
5    night and identified the Rosewood case.
6        A.   Yes.
7        Q.   Apart from that research you did last night,
8    is there any other research or information that you have
9    to support your statement "Given the history of racial
10   discrimination throughout the State of Florida generally
11   toward African Americans" as used in this report?
12       A.   As used in this report, what I'm referring to
13   is just the entire pattern of my findings really seem to
14   be reflective of some sort of discriminatory treatment
15   of African Americans because there's just too much
16   consistency involved here. It seems like everything I
17   looked at, there was disparate treatment, whether it was
18   an over-preponderance of inactive voters in those
19   precincts having a high percentage of African American,
20   whether there was an over-preponderance of affirmation
21   affidavits in precincts having a large number of African
22   American registered voters, the purged voters in Duval
23   and Hills County were over -- African Americans were
24   over-represented in those rolls as compared to the
25   population ratios in those two counties, lack of poll

Page 97

1    workers in Broward and, what was it? Hillsborough
2    County I guess it was.
3        It just kept going on and on and on, and I
4    said you know, if you look at the totality of the whole
5    thing, then you're seeing, there's a history there based
6    on -- there's got to be a history someplace of this
7    disparate treatment. Where is it so consistent? Why
8    are these patterns so consistent, is really what I'm
9    saying.
10       Q.   So if I understand your answer, because you
11   found in your view disparate treatment in the four areas
12   you looked at, there must be a history of racial
13   discrimination throughout the State of Florida generally
14   toward African Americans?
15       A.   That, and then you get the examples like
16   Rosewood, you know, and even though it occurred in 1923
17   and it was particularly violent, a violence like that,
18   it's been my experience in voting rights cases that I've
19   testified in various parts of the State of Texas
20   specifically, violence like that is only generated when
21   there is a perception of a particular group of people
22   that is -- or their being is defined as less than
23   everybody else and they have no worth, and they're
24   identified by race.
25       If you can go in there and just massacre an

25 (Pages 94 to 97)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 98

1 entire community, you really don't care for those people
2 as human beings simply because you're doing it because
3 of their race, and those feelings are generated through
4 a whole history of social relationships between races of
5 people. I'm married to an individual from Mississippi.
6 I go deer-hunting in Mississippi a couple times a year,
7 and inevitably -- you know, I deer-hunt with the former
8 President of the State Senate of Mississippi and a bunch
9 of other very prominent individuals in these particular
10 communities and inevitably, you sit around the campfires
11 talking and they make open jokes of selling black people
12 back and forth.
13       You go to Texas and you still find histories
14 of segregated classrooms that were openly segregated by
15 race. You have histories of violence towards the
16 African American community. You go to Roscoe, Texas,
17 and what was the African American neighborhood is
18 just -- are just charred remains of buildings and
19 concrete foundations. The families were either murdered
20 or run out of town.
21       And there's just too much of that that goes on
22 in the history of the South just in general for Florida
23 to have escaped single-handedly of being the only state
24 in the South that didn't have any type of history of
25 racial discrimination.

Page 99

1       Q.  Dr. Flores, have you ever perceived yourself
2 as being the subject of racial discrimination?
3       A.  I've not perceived myself. I've seen myself
4 be the subject of racial discrimination, certainly.
5       Q.  Could you share that with us?
6       A.  Certainly. The first time I was aware of it
7 was when I started my undergraduate career at Texas Tech
8 University, which is in Lubbock, Texas, and the first
9 day I was there -- I started in mid-semester in the
10 middle of the year, January semester, and the first day
11 I was there, I showed up. It was a dust storm that day
12 and I was not feeling very clean. Not everybody had
13 come back from Christmas break yet. I decided to go
14 down the hallway to take a shower.
15       So I started taking a shower and it was kind
16 of one of those shower rooms that has like 13 shower
17 heads in it, typical in an athletic gym or whatever, and
18 I suddenly felt like I was being watched and I turned
19 around and sure, there was like a dozen or more white
20 guys standing along the wall watching me take a shower,
21 and one of them just bluntly told me, he says, you know,
22 we've never seen a Mexican take a bath before so we
23 thought we'd just check this out. It was pretty --
24 almost a helpless feeling standing there like that.
25       I sit down to the table and eat breakfast and

Page 100

1 everybody would get up and leave. I was the only
2 Mexican in the dorm. I was told by a teacher that I had
3 no business being in college, I should be digging
4 ditches with the rest of the Mexicans simply because
5 that's what Mexicans did, and just -- I mean, I ran into
6 it in the military. I was an Army officer and I served
7 in the first cavalry in Vietnam for two years and I ran
8 into it over there. I ran into it among the officers
9 ranks, I ran into it in the enlisted ranks. I had to
10 deal with it in my unit because the white soldiers and
11 the black soldiers were beating each other at night with
12 baseball bats and I had to put a stop to it. Let's see.
13 Where else did I run into it?
14       Q.  And I'm talking about directed to you,
15 Dr. Flores. That was the question, and you've shared
16 with us in your college days and I think also in your
17 military service.
18       A.  Yeah.
19       Q.  So any other examples that you can think of
20 where you've been the subject of racial discrimination?
21       MS. BORGEN:  Objection as to form.
22       A.  Do you have a more clear question?
23       Q.  You've shared with us some circumstances in
24 which you believe you were subject to racial
25 discrimination.

Page 101

1       A.  Right.
2       Q.  I'm asking are there any others, other
3 circumstances that you can recall other than those that
4 you've shared with us?
5       MS. BORGEN:  Objection as to form.
6       A.  Yeah, there was times in Austin, Texas
7 where -- they let you go into the restaurant but they
8 wouldn't serve you, and after sitting there for an hour,
9 you finally got the hint that no waitress was going to
10 bring you a menu. The waitress just kind of avoided you
11 like the plague, and that happened in my adult life not
12 too long ago. But that's -- you know, I'd have to think
13 some more, but I'm sure I can run across a lot more.
14       Q.  Can you recall any act that you perceive to be
15 a matter of racial discrimination during any of the two
16 to three weeks that you spent in the State of Florida
17 over the last 20 years?
18       MS. BORGEN:  Objection as to form.
19       MR. LITTLE:  Basis of the objection?
20       MS. BORGEN:  No foundation or relevancy to the
21 work he's done in this report.
22       BY MR. LITTLE:
23       Q.  You can answer.
24       A.  I really don't remember.
25       Q.  You cannot recall any circumstance as you sit

26 (Pages 98 to 101)

Henry Flores, Ph.D.
Washington, D.C.
May 30, 2002

Page 102

1   here today?
2       A.   No, I can't.
3       Q.   Have you ever perceived yourself to be the
4   subject of racial discrimination in the context of your
5   voting?
6           MS. BORGEN: Objection as to form.
7       A.   Yes.
8       Q.   Would you please tell me about that?
9       A.   An election judge refused to allow me to vote
10  in San Antonio, Texas because I didn't have a voter
11  registration card and he tried to make a situation
12  uncomfortable enough for me to leave without casting a
13  ballot and I told him I wasn't budging until he verified
14  my registration. I didn't care how long it took.
15      Q.   I don't know the Texas system of voting, so
16  tell me what a registration judge is.
17      A.   Well, it's just an election judge in a polling
18  place. It's not really a judge like in the legal sense
19  of the word. There are poll workers that are certified
20  by the county to make certain decisions about the
21  verification of registered voters, and you present your
22  voter registration card when you come to vote. They'll
23  check you against the rolls and then they'll give you a
24  ballot and you can proceed in your voting at that
25  particular point.

Page 103

1           That day I didn't have my voter registration
2   card and he told me that I couldn't vote, and I told him
3   that -- this is an old white man, and I told him that I
4   have my driver's license, you can look me up in the
5   computer system because there was a laptop there, and he
6   says it would take 45 minutes, it's going to take too
7   long, and I said well, good. I'm going to stand right
8   here until you do it. I'll hold the whole line up if I
9   have to because you're going to check my registration
10  because I have my driver's license, and he did. It took
11  him 20 seconds.
12      Q.   What year was that? Can you recall?
13      A.   The year? It was about three years ago.
14      Q.   Can you recall any other instance of what you
15  perceived yourself to be racial discrimination when
16  you've voted?
17          MS. BORGEN: Objection.
18      A.   No, I can't remember.
19      Q.   Returning to paragraph 4A and the sentence
20  "Given the history of racial discrimination throughout
21  the State of Florida generally toward African
22  Americans," you referenced Rosewood as an example when I
23  asked you to give me the basis for that statement --
24      A.   Uh-huh.
25      Q.   -- in your report, and the fact is you did not

Page 104

1   know about Rosewood at the time you wrote this report,
2   which has been marked as Exhibit 3. You learned about
3   it last night when you were looking on the internet,
4   correct?
5           MS. BORGEN: Objection as to form.
6       A.   No. I'll answer that question.
7       Q.   Then please clarify.
8       A.   No. I mean, I've known about Rosewood for a
9   long long time. It's a very important date in the
10  history of race relations in the United States. I just
11  hadn't recalled it until last night. I was thinking
12  about what would be good examples and then I remembered
13  Rosewood, so I just looked it up on the internet and it
14  gave me a whole history of everything that was going on.
15      Q.   So is it your testimony that when you wrote
16  this sentence, "Given the state of racial discrimination
17  throughout the State of Florida generall toward African
18  Americans" in paragraph 4A of your report, you had
19  Rosewood in mind?
20      A.   No. I had, as I said before, the totality of
21  the continual appearance of disparate treatment of
22  African Americans every time I was putting a data set
23  together.
24      Q.   And I want to come back to that, but you've
25  referred on several occasions in your deposition to the

Page 105

1   history of racial discrimination toward African
2   Americans throughout the South, and if I'm understanding
3   your testimony, you don't have specific incidences in
4   the State of Florida in mind when you make that
5   statement; rather, you're looking at the history of the
6   southern part of the United States. Florida is part of
7   the southern part of the United States. You're aware of
8   a history of racial discrimination in the southern part
9   of the United States, and therefore, that's the basis
10  for your statement of the history of racial
11  discrimination throughout the State of Florida generally
12  toward African Americans?
13          MS. BORGEN: Objection as to form.
14      A.   In general, yes.
15      Q.   Is there a piece that I've missed there? You
16  say in general yes, and I guess what I'm trying to say,
17  is there something specifically that I'm missing when
18  you tell us that you're looking at the history of the
19  South as a whole?
20      A.   I'm not sure what you think you're missing. I
21  don't know -- no, I don't think so.
22      Q.   The rest of that sentence in paragraph 4A
23  states, "And given that the defendant counties share
24  similar racial population percentages as Miami-Dade, I
25  surmise that similar statistical findings may exist in

27 (Pages 102 to 105)

Henry Flores, Ph.D.                                                                May 30, 2002

Washington, D.C.

**Page 106**

1  the defendant counties and in the state as a whole."
2  What similar racial population percentages are you
3  referring to?
4      A.   If you look at Exhibit 9 of my report.
5      Q.   And that Exhibit 9 is the basis for your
6  statement about the similar racial population
7  percentages as Miami-Dade?
8      A.   That's correct.
9      Q.   You finish that sentence by saying, quote, "I
10  surmise that similar statistical findings may exist in
11  the defendant counties and in the state as a whole," end
12  quote.  That's really a supposition on your part; is
13  that correct?
14      A.   Well, also, you know, it will be more -- I
15  guess firmed up more as I do more work on these
16  counties.  If I can get more data from the counties in
17  these four categories and continue the statistical
18  analysis, then that statement will become more firm I
19  think, but at this point, because the patterns are so
20  consistent, if you look at each one of these categories
21  as a whole, you know, together, these patterns are so
22  consistent that I don't see how the consistency will
23  change.
24      Q.   Well, let me go back to my question.  When you
25  say "I surmise that similar statistical findings may

**Page 107**

1  exist in the defendant counties and in the state as a
2  whole," at this point, that's a supposition on your
3  part, correct?
4      MS. BORGEN:  Objection as to form.
5      A.   It's a general conclusion based upon what I've
6  produced in this report.
7      Q.   It's a supposition, isn't it, Doctor?
8      MS. BORGEN:  Objection as to form.
9      A.   What do you mean by supposition?
10      Q.   It's a guess.
11      A.   No.  It's a conclusion -- general conclusion
12  based upon -- as I said, this is the fourth time I've
13  said this, in the various findings throughout my report.
14      Q.   Well, you use the term "may exist."  You don't
15  state that it does exist, and that's my question,
16  Dr. Flores, and I'm trying to understand where you draw
17  the line between a conclusion and what I'm asking you
18  about, which would be supposition or a guess or, to be
19  fair, an educated guess.
20      A.   To be fair, "may" can be based upon further
21  work as well, but the patterns are so consistent in
22  these counties, in these different areas, that I don't
23  think you're going to find the data suddenly changing
24  midstream and completely showing the opposite effect
25  from here on out.  I think the patterns are going to be

**Page 108**

1  consistent in every one of these counties I look at.
2  You may find some deviation, but I think in the overall,
3  consistency's going to be there.
4      Q.   But until you look at that additional data in
5  those counties, you don't know that to be a conclusion
6  that you would state as a matter of fact, correct?
7      A.   I can state as a matter of fact based upon
8  what's in this report.
9      Q.   You can state as a matter of fact --
10      A.   Based on what's in my report.  There's facts
11  in my report.
12      Q.   Correct, but when you say that you surmise
13  that similar statistical findings may exist in the other
14  counties and in the state as a whole, until you look at
15  that other data, you cannot state that conclusion that
16  it is in fact the case, correct?
17      MS. BORGEN:  Objection as to form.
18      A.   "May" is just a word that's used because
19  everything -- you know, I use it because I found all
20  these patterns already existing.  If I do more work, I'm
21  concluding these patterns are going -- will be
22  consistent all the way through, as I said.  They're so
23  consistent that there's got to be an unusual turn of
24  events for all of a sudden the data to just turn around
25  and completely show me something different at this

**Page 109**

1  particular point.  There may be some deviation here and
2  there, but I think if I were to do the same analyses for
3  these four categories for every one of the defendant
4  counties in the overall, I'm willing to bet my
5  reputation that the pattern's going to be the same.
6      Q.   But without the data before you and without
7  your having run that data, is it just that, it's a bet
8  or an educated guess as to what the results would
9  actually show, correct?
10      MS. BORGEN:  Objection, asked and answered.
11      A.   I think I've answered that question.  I did
12  already.  Do you want me to answer it again?
13      Q.   Please.
14      A.   I think that as I gather more data on these
15  same four categories and I rerun the analysis for all
16  the defendant counties and if I could have the data for
17  the entire State of Florida as well and do that
18  analysis, I think overall, you're going to see the same
19  patterns emerge.  I don't think that there's going to be
20  a sudden deviation and these are the only counties in
21  these categories that are going to show disparate
22  treatment and all of a sudden, all the remainder
23  counties go the other way.  Just based upon my
24  experience, I think you're going to see the same
25  consistent pattern all the way through.

28 (Pages 106 to 109)

Page 110

1    Q.  Now, a moment ago when I asked you about the
2  history of racial discrimination throughout the state,
3  you said that when you look at these four areas and you
4  see this consistent pattern, that leads you to conclude
5  there must be a history of racial discrimination against
6  African Americans in the State of Florida.  Is that
7  correctly stating what you told me?
8    A.  Sure, and I've testified in other voting
9  rights cases that the reason you see statistical
10 patterns play themselves out as far as racially
11 polarized voting is concerned or any kind of racial
12 disparate treatment is because they're based on a
13 history of racial discrimination existing in that
14 particular jurisdiction.
15   Q.  Is your conclusion in this regard affected at
16 all by your only looking at four practices and reaching
17 conclusions in those four areas?  In other words, you
18 didn't look at ten different practices and conclude that
19 there were disparate treatment occurring in some of the
20 ten.  You just looked at four and saw four, so you're
21 concluding a hundred percent, therefore, we must have a
22 history of racial discrimination?
23        MS. BORGEN:  Objection as to form.
24   A.  What I'm doing is testifying to these four
25 particular practices as being a result of that, racial

Page 111

1  discrimination.
2    Q.  Your next sentence says, "If this is the case,
3  then an additional burden is placed on the shoulders of
4  African Americans to verify their registration every
5  time they cast a ballot."  What do you mean, if this is
6  the case?
7    A.  Well, again, if these patterns hold true in
8  all the defendant counties, then that would logically
9  follow.  That's what I mean.
10   Q.  The last sentence of 4A talks about the burden
11 becoming even heavier in these counties that do not
12 maintain lists of inactive voters, and you list six
13 counties, correct?
14   A.  That's correct.
15   Q.  Where did you get that information?
16   A.  I was provided that information by counsel.
17   Q.  Have you done anything to verify the accuracy
18 of that information?
19   A.  No, I have not.
20   Q.  Do you know where those six counties maintain
21 their list of inactive voters?
22   A.  No, I do not.
23   Q.  In paragraph -- excuse me.  In paragraph 4B,
24 the last sentence, you state that, "The contention is
25 borne out additionally by the data from Orange County

Page 112

1  where I found that the percentage of African Americans
2  signing affirmations" slash "affidavits during the 2000
3  general election was higher than the proportion of
4  African Americans residing in that county" -- excuse me,
5  "in the county."  What is the basis for that statement?
6    A.  It was aggregate data provided by Orange
7  County.  In other words, I didn't get it by precinct
8  level.  I just got it by total numbers, total counts.
9    Q.  Is this one of the four disks that's back in
10 Texas?
11        MS. BORGEN:  I believe this was already
12 provided to counsel in the materials that were provided.
13        BY MR. LITTLE:
14   Q.  If the witness could help me know the basis
15 for that statement --
16   A.  Yeah, I don't think it came off of those CDs
17 because it was one sheet that just had aggregate counts.
18        MS. BORGEN:  Actually, it was on the list -- I
19 don't know if you want me to clarify the basis or not?
20 If you would like to -- I can give you a document that
21 if you want to take a look at, you might want to show
22 the witness.
23        BY MR. LITTLE:
24   Q.  I'm showing you what is an excerpt of
25 Defendant Cowels' responses to plaintiff's second set of

Page 113

1  interrogatories, interrogatory number 39.
2    A.  Yes, this is the list.
3    Q.  And so the document we've just identified as
4  interrogatory answer 39 is the basis for your statement
5  that we just read into the record at the end of
6  paragraph 4B in your final report?
7    A.  That's correct.
8    Q.  If I understood your testimony before I
9  arrived today, your conclusions in paragraph 4A and 4B
10 were the result of a regression analysis?
11   A.  That's correct.
12   Q.  Paragraph 4C was not the result --
13   A.  No.
14   Q.  -- of a regression analysis, correct?
15   A.  Correct.  Sorry.
16   Q.  In paragraph 4B, you again use the term "I
17 surmise," and "similar statistical findings may exist in
18 the defendant counties and in the state as a whole."  Is
19 your answer the same with respect to paragraph 4B as 4A
20 on the use of the term "surmise" and "may exist"?
21   A.  Yes.
22   Q.  In paragraph 4D of your final report,
23 Dr. Flores, at the top of page 4, how did you measure
24 the percent of poll workers assigned to a particular
25 precinct?

29 (Pages 110 to 113)

Henry Flores, Ph.D.                                                                    May 30, 2002

Washington, D.C.

---

Page 114

1    A.   Essentially what I did was, for instance,
2  Broward County supplied me with a list of counts of
3  individuals that worked at a specific poll and which
4  polling place they were assigned to. They were
5  identified by precinct number. What I did was enter
6  that into -- actually, I didn't do it. My undergraduate
7  assistant entered it into an Excel spreadsheet, and then
8  I transferred that data to an SBSS spreadsheet where I
9  could do the statistical work.
10      From there, what I did was I computed the sum
11 of all of those poll workers and then created a
12 percentage for each precinct based upon the total sum of
13 all the poll workers, so I literally divided the sum of,
14 for instance, the sum of the number of poll workers in
15 the first precinct by the total number of poll workers,
16 came up with a percentage for that precinct, and that
17 particular exercise was computed for every precinct.
18      Q.   And that's found on the CD that you provided
19 today?
20      A.   Yes.
21      Q.   Marked NAACP versus Harris?
22      A.   That's correct.
23      Q.   Paragraph 4E states that, "A thorough and
24 complete analysis of each of the above relationships
25 mentioned in paragraphs 4A through 4D above was not

---

Page 116

1  anybody, I think it was Orange. I might be wrong, but
2  Orange, I asked for a list of registered voters at one
3  point from Orange County, and what I received was two
4  CDs of -- they were in a PDF format, so I received
5  beautiful pictures of everybody's registration card, but
6  there was like 46,000 pages of pictures and I couldn't
7  use it. There's no way I could translate that into a
8  database, so it was just unusable technologically.
9       Q.   Tell me what you mean by your next sentence
10 that starts "Nevertheless" in paragraph 4E.
11      A.   Essentially that the patterns were just so
12 consistent in every one of these categories
13 that -- it goes to what I was saying earlier about --
14 when you were discussing the sentences in 4A and 4B,
15 that the patterns were just so consistent that I don't
16 see the patterns deviating very much from here on out.
17      Again, if I were to receive all the data sets
18 for each one of these categories for all the defendant
19 counties, I think in the overall, you're going to see
20 the same patterns emerge, you know. Again, there may be
21 one pattern or one area where it might deviate, but I
22 think in the overall, you're going to see the same
23 patterns.
24      Q.   So you think -- without looking at this
25 information that you described as either not having been

---

Page 115

1  completed because each of the defendant counties did not
2  make available or made available in an unusable format
3  the necessary data." What counties did not make data
4  available to you?
5       A.   I asked for the same data on inactive voters,
6  affirmation affidavits, purged voters and poll worker
7  counts from each of the defendant counties, and some of
8  the counties gave me different lists, but not one county
9  gave me everything. So for instance, one county would
10 give me a list of poll workers and then maybe some
11 affirmation affidavits but wouldn't provide me with the
12 purged.
13      That's why you see regression analysis on like
14 three or four of the defendant counties on one topic and
15 not on the others, because I didn't have the data from
16 those other three counties. So it just depends on -- I
17 mean, there's data missing -- different types of data
18 missing for different counties I guess is what I'm
19 saying.
20      Q.   When you say you requested, you requested
21 through your counsel?
22      A.   That's correct.
23      Q.   What about unusable format? What information
24 are you referring to there?
25      A.   There was one county, and without disparaging

---

Page 117

1  provided or unusable, you think your conclusions will
2  remain the same?
3       A.   Fundamentally.
4       Q.   Well, when you say fundamentally, is that a
5  yes or no?
6       A.   Yes.
7       Q.   And the last sentence in paragraph 4E, it's
8  again referring to the long history and you're surmising
9  a similar pattern. Is your answer the same as to that
10 sentence and what you mean as what we just finished
11 talking about in 4A and 4B when you use that term
12 "surmise" to refer to long history of discrimination?
13      A.   That's correct.
14      Q.   Paragraph 4F of your final report, the first
15 phrase says, "My final conclusion is that African
16 Americans are over-represented on inactive voting
17 lists." What is the denominator that you are using in
18 reaching that conclusion of over-represented on inactive
19 voter lists?
20      A.   Well, the denominator for the dependent
21 variable is a total number of inactive voters in that
22 county. The numerator is the total number of inactive
23 voters per precinct, and that's the dependent variable.
24 The independent variable is the percentage of African
25 American voters, which is the total count of African

---

30 (Pages 114 to 117)

Page 118

1 American registered voters in a specific precinct
2 divided by the total number of African American voters
3 in that county.
4    Q.  So that gives me the numerator and denominator
5 for both the independent and the dependent.
6    A.  That's correct.
7    Q.  How about the next phrase,
8 "Over-representation in submissions of affirmation
9 affidavits." Would you give me the numerators and
10 denominators for each of those?
11    A.  Sure. The affirmation affidavits is -- again
12 the absolute number of affirmation affidavits by
13 precinct is the numerator, and the denominator is the
14 total for the entire county. And the numerator for the
15 African American registered voters is the total number
16 of African American registered voters per precinct
17 divided by the total number of African American voters
18 for the entire county.
19    Q.  The next phrase is "Over-represented among the
20 voters purged because they are identified as felons."
21 Same question.
22    A.  The numerator is the total number of
23 individuals identified as African American felons who
24 were reported as purged divided by the total number of
25 felons purged for that particular county, and -- versus

Page 119

1 the -- there I didn't use African American voters
2 because there was no regression analysis. I compared it
3 to the total population of the county, so the numerator
4 is the percent of African Americans -- the total number
5 of African Americans in the county divided by the total
6 population of the county.
7    Q.  And then lastly, "And are underserved at the
8 polls." Same question.
9    A.  Again, the numerator or the dependent variable
10 is the total number of poll workers in a specific
11 precinct divided by the total number of poll workers for
12 the county, and the independent variable is the total
13 numbers of African American registered voters in a given
14 precinct divided by the total number of African American
15 voters for the county.
16    Q.  In the next sentence, you use the phrase,
17 quote, "The totality of their circumstances," in
18 quotations. Do you see that?
19    A.  Yes.
20    Q.  What are you quoting from?
21    A.  That comes from -- it's kind of a quote out of
22 Gingles versus Thornburg, the Supreme Court decision
23 that laid out the three-prong Gingles test and section 2
24 challenges that talks about the effects of what -- to
25 better understand the discrimination context, you can't

Page 120

1 look at one specific issue or one specific Senate factor
2 or one specific occurrence. You have to consider the
3 totality of all possible circumstances that exist within
4 a particular case around a specific jurisdiction to
5 understand what the disparate treatment of a particular
6 group of people.
7    Q.  Give me the totality of the circumstances
8 here.
9    A.  Well, the totality of the circumstances here,
10 and one of the reasons I put it in quotation marks is
11 they're specific to the four areas that I looked at in
12 this report and specific to the data results that came
13 out of these four variables.
14    Q.  So in this particular report that's been
15 marked as Exhibit 3, the totality of the circumstances
16 are the four areas -- 4A through D, and the data that
17 you've identified in your report, correct?
18    A.  That's what I was asked to look at, yes.
19    Q.  And there's nothing else that would come
20 within this, quote, totality of the circumstances,
21 closed quote?
22    A.  Not as far as my report is concerned.
23    Q.  You then proceed to state, quote, "They deny
24 African Americans an equal opportunity to participate in
25 the electoral processes in the defendant counties

Page 121

1 specifically and throughout the State of Florida
2 generally," end quotation. What is your basis for that
3 statement?
4    A.  It's based on my analysis in my report here,
5 that these -- the disparate treatment of African
6 Americans in each one of these categories acts as an
7 additional burden for African American -- for the
8 ability of African Americans to participate in the
9 polls.
10    Q.  Dr. Flores, if you could turn to page -- let
11 me see. It's not numbered. Exhibit Number 1 to your
12 final report, which is Depo Exhibit 3 --
13    A.  Okay.
14    Q.  The fourth column is marked STD period beta,
15 B-E-A -- excuse me. B-E-T-A. What does that stand for?
16    A.  That is the standardized beta. If you were
17 doing a correlation coefficient, that would be Pearson's
18 R for that particular regression analysis.
19    Q.  What does standardized beta mean?
20    A.  How you standardize data I can't explain to
21 you, to tell you the truth, because it's done by the
22 software package, but a standardized beta is -- any time
23 you use the word "standardized" in a statistical test,
24 whether it's a standardized T, a T test or a Z test or
25 an F statistic, what they've gone and done is through

31 (Pages 118 to 121)

Henry Flores, Ph.D.                                                                                    May 30, 2002

Washington, D.C.

## Page 122

1  the mathematical manipulation in that particular
2  technique that created an array of numbers that are -- I
3  guess that run from like zero to 1.0, so it's kind of
4  like a standardized format. That's where that term
5  comes from. And then from that, you can use it to
6  compare what is generated with this particular technique
7  to a table and to determine whether it's statistically
8  significant.
9      Q.  What do you consider to be a strong
10 relationship?
11     A.  What do you mean by that?
12     Q.  Well, in the sense of you said statistically
13 significant. The term "strong relationship" and "weak
14 relationship" is used in statistical analysis, correct?
15     A.  Right.
16     Q.  And so -- and you use those terms, correct?
17     A.  That's correct.
18     Q.  What do you mean when you use the term "strong
19 relationship"?
20     A.  It is relative to the type of data that you're
21 using. I'll give you an example. If you are -- if
22 you're working in radiochemistry where you can measure
23 the elements very, very carefully and very precisely and
24 so forth, you're going to have -- a strong relationship
25 could be above a point 9 or something of that nature.

## Page 123

1      If you're working with social statistics
2  that -- or population data which is based upon
3  statistical sampling and self-identification where there
4  can be a lot of margins for error, then the strong
5  relationship would be indicated by a much lower figure.
6  So it just depends on your database. So the way you
7  would determine strength in a relationship is dependent
8  upon the specific data you're looking at.
9      Q.  Let's take it in this case specifically and
10 the analyses that you have performed in this case. In
11 this case, what do you consider to be a strong
12 relationship?
13     A.  I wasn't looking at the strength of the
14 relationship here. I was looking at the significance
15 level and the direction of the relationship. I was
16 looking for general patterns.
17     Q.  When you say significance level, tell me what
18 you mean by that.
19     A.  Well, significance level in statistics is
20 based upon a convention of understanding. If you go
21 back and look at the history of this thing, somebody
22 asked Karl Pearson, who's the inventer of Pearson's
23 product moment correlation coefficient, and they asked
24 him what do you consider a strong statistically
25 significance level. He said 95 percent. So that's the

## Page 124

1  convention we use now to this day and that's the way it
2  was derived.
3      So different researchers set different
4  standards and levels of significance based upon what
5  they're looking at. Again, go back to the hard sciences
6  where they can absolutely control the sorts of variables
7  that they have. They set statistical significance
8  levels of point 00001. They're extremely high. You go
9  into -- with psychologists and they'll set a
10 significance level of point 01 or point 001 because they
11 have very finite constructive testing instruments that
12 they use in their investigations, and they work a lot in
13 experimental settings so they can control all these
14 variables.
15     You get into the world of sociology and
16 political science and the significance level, the
17 general convention is point 05. Sometimes we'll even
18 use point 10. We never go generally beyond that for the
19 most part. But fundamentally what you're doing, when
20 you say statistically significant is you're saying well,
21 these findings that you have are generally the result of
22 a sample that's been drawn from a larger population, and
23 you use the significance level to determine whether or
24 not your sample mirrors the general characteristics of
25 your total population.

## Page 125

1      And if we say that it falls within a certain
2  range of significance, then we can say which a certain
3  percentage of certainty that if you were to draw 100
4  samples from this population and use this test over and
5  over 100 times and 90 percent of the time, 95 percent of
6  the time, 99 percent of the time, you should have
7  similar results.
8      Q.  So if I understood your answer, you did not
9  look to see where the relationships were strong or weak
10 in the report that you prepared as Exhibit 3 in this
11 case. Rather, you looked to see whether there was a
12 statistical significance in your mind and a positive
13 relationship?
14     A.  I was looking for whatever the relationship --
15 whatever the data was going to give me, and -- I mean, I
16 didn't have any preconceived notion. I mean, for all I
17 know, it could have come out looking completely
18 different in some cases, and as a matter of fact -- go
19 ahead. You can look at the significance levels, and
20 they fluctuated all the over the place. The data drove
21 this.
22     Q.  But if I'm understanding your testimony, you
23 looked and found in your exhibits statistical
24 significance and positive relationship. Is that the
25 right terminology?

32 (Pages 122 to 125)

Henry Flores, Ph.D.
Washington, D.C.
May 30, 2002

Page 126

1    A.   In some cases it was positive.  Sometimes it
2  was negative, yes.
3    Q.   The negatives though aren't in the report,
4  right?
5    A.   Sure they are.  Yeah, there's negative
6  relationships in the report.
7    Q.   Okay.
8    A.   Yes, it just depended on what I was looking
9  at.
10    Q.   But going back to the question, you were
11  looking at statistically significant in a positive or
12  negative relationship; not the strength or weakness of
13  the particular relationship; is that right?
14    A.   That's correct.
15    Q.   In this case, how does a point 072 compare
16  with a point 108?
17        MS. BORGEN:  Objection as to form.
18        BY MR. LITTLE:
19    Q.   Those are two standard betas that are found in
20  your charts.
21    A.   Oh.
22    Q.   Point 108's in Exhibit 1 and point 072 is in
23  Exhibit 4.
24    A.   Oh, well.  I don't know how they compare
25  because you're looking at two different things.  Exhibit

Page 127

1  1 is registered voters and percent of inactive voters,
2  and Exhibit 4 is registered voters and percent of poll
3  workers.
4    Q.   My question is how do the standard betas
5  compare.
6    A.   You can't compare them.
7    Q.   Looking over at Exhibit Number 6 where your
8  standard beta is point 604, do you consider that a
9  strong relationship?
10    A.   Well, the significance level is point 151.
11  It's only significant 85 percent of the time.  You know,
12  if you were to offer that in a refereed journal of
13  social sciences, you wouldn't accept that.
14    Q.   As a strong relationship?
15    A.   Right.
16        MR. LITTLE:  Can we take about a five-minute
17  break?
18        (Recessed at 2:53 p.m.)
19        (Reconvened at 3:16 p.m.)
20        BY MR. LITTLE:
21    Q.   Dr. Flores, in performing your analyses, did
22  you consider the use of a multivariate statistical
23  analysis?
24    A.   No, but I've been thinking about it.  I
25  haven't -- if I do any more work, I may do it, but I

Page 128

1  haven't looked at it seriously.
2    Q.   Why did you not do it initially?
3    A.   Fundamentally because I was just looking at
4  one variable at a time and I just didn't really think
5  that I needed to do a multiple regression.
6    Q.   And now you're thinking perhaps you might
7  consider it?
8    A.   Maybe.
9    Q.   In what context?
10    A.   In those counties -- if I get all the data for
11  each one of those four areas that I looked at for each
12  county, I may do a multiple regression at that time for
13  the counties where I have complete data sets just to see
14  if there's a multiple effect, but if I don't get the
15  data, I am not going to do that.
16    Q.   How about on mobility, in looking at the
17  impact on mobility?  Were there other factors that you
18  could have considered to see if it had an impact on your
19  conclusions?
20    A.   Other than what's in my report, I don't think
21  I --
22    Q.   I mean, you looked at mobility and race,
23  correct?
24    A.   Correct.
25    Q.   Did you look at any other factors, such as

Page 129

1  mobility and age?
2    A.   I glanced at it but I didn't really spend any
3  time on it because I really didn't have those kind of
4  data.  In other words, the only mobility data on age
5  that I saw was what I produced to you, that Bureau --
6  U.S. Bureau of the Census report that they put out on
7  general mobility in the various regions of the United
8  States, so I didn't -- other than background thinking,
9  material to help me think about mobility, I just didn't
10  really use that report.
11    Q.   So you did not do any type of analysis to
12  control for the possibility of voters' mobility, age, as
13  against race, correct?
14    A.   Not in the statistical analysis, no.
15    Q.   How about in any other context?
16    A.   Just in a general context of where I looked at
17  the renters.
18    Q.   And how did you factor that in in looking at
19  the renters?
20    A.   When I was looking at renters as a general
21  category, I ran them against -- excuse me.  I regressed
22  them against the percentage of African American
23  registered voters in the seven defendant counties I did
24  that regression analysis that -- it appears in Exhibit
25  6.

33 (Pages 126 to 129)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

---

Page 130

1    Q.   Let me ask if you would pull Exhibits 3 and 4
2   to --
3    A.   In my report?
4    Q.   You've got Exhibit 3, which is the final
5   report, and let me get you Exhibit 4, which is the
6   draft.
7    A.   Right.
8    Q.   And if you would look at paragraph 7 --
9    A.   Of --
10    Q.   -- of the draft and paragraph 7 of the final.
11    A.   Okay.
12    Q.   And specifically, I'd like you to read the
13   first sentence of paragraph 7 in the draft and paragraph
14   7 in the final.
15    A.   The --
16    Q.   I'm sorry. I meant just give you a moment to
17   read them to yourself.
18    A.   Oh, to myself. I'm sorry. All right.
19    Q.   I wasn't clear.
20    A.   Okay.
21    Q.   You initially wrote paragraph 7 to refer to a
22   dilution of voting power of African Americans, correct?
23    A.   That's correct.
24    Q.   Why did you write it that way?
25    A.   Because I was mistaken, and I corrected it in

Page 131

1   the final draft.
2    Q.   What were you mistaken about?
3    A.   Well, since I traditionally do vote dilution
4   studies, I just wrote in vote dilution studies, and
5   realized when I was revising it for final submission,
6   that it wasn't. It wasn't. You know, I just made a
7   mistake. It's a vote denial.
8    Q.   Did counsel point out that mistake to you when
9   they were reviewing your draft?
10    A.   I don't remember.
11    Q.   In the second sentence of your final report in
12   paragraph 7, you say, "This makes the mobility of
13   African Americans a major cause as to why they tend to
14   populate the list of inactive voters." What is the
15   correlation between moving and being on an inactive
16   voting list?
17    A.   I didn't do a correlation study, so --
18    Q.   Well, tell me why mobility of African
19   Americans is a major cause as to why they populate the
20   list of inactive voters.
21    A.   Because if they're constantly changing
22   addresses, they're constantly having to update their
23   registration, and because they move at a higher rate
24   than other racial groups, that means that their constant
25   reregistration rate's going to be always higher than

Page 132

1   everyone else's, if they even choose to reregister
2    Q.   And that puts them on the inactive voter list
3    A.   I would think that would be one of the reasons
4   for it.
5    Q.   You're not offering any opinions concerning
6   the remedies being sought in this case, correct,
7   Dr. Flores?
8    A.   Correct.
9    Q.   Do you anticipate preparing any demonstrative
10   exhibits for use at trial?
11    A.   Probably my exhibits that are in my expert
12   report. Beyond that, at this point I'm not thinking of
13   any others.
14       MR. LITTLE: I don't have any other questions
15   at this time. Thank you.
16     FURTHER EXAMINATION BY COUNSEL FOR DAVID LEAHY
17       BY MR. EHRLICH:
18    Q.   Professor Flores, again, my name is Jeff
19   Ehrlich, and I represent the Supervisor of Elections for
20   Miami-Dade County, David Leahy. I'm going to ask you a
21   few questions that are more specific to your analysis as
22   it pertains to Miami-Dade County.
23    A.   Okay.
24    Q.   Before I get to that, I just had a couple of
25   follow-up questions. Earlier you described an incident

Page 133

1   regarding your voter experience in Texas.
2    A.   Uh-huh.
3    Q.   Did that incident occur during the November 7,
4   2000 Presidential election?
5       MS. BORGEN: Objection as to form.
6    A.   The incident where I was appointed to the poll
7   myself to cast my ballot and I didn't have my
8   registration card?
9    Q.   Right.
10    A.   No, not the 2000 election.
11    Q.   Was it before or after the 2000 election?
12    A.   It was before.
13    Q.   You testified that in this case, you have not
14   performed any analysis with regard to the Gingles
15   factors?
16    A.   That's correct.
17    Q.   And I think I asked you why and you said you
18   were not asked to; is that correct?
19    A.   That's correct.
20    Q.   Did you suggest that you perform an analysis
21   of the Gingles factors?
22    A.   No.
23    Q.   Were you instructed not to perform an analysis
24   of the Gingles factors?
25    A.   No.

34 (Pages 130 to 133)

Page 134

1    Q.   Is examination of the Senate factors
2  identified in Gingles one way to determine whether in
3  the totality of the circumstances, a particular class of
4  persons has been denied an equal opportunity to
5  participate in the electoral process?
6         MS. BORGEN: Objection.
7    A.   I think the courts have ruled that that's part
8  of what you look at, and I think -- and there's a whole
9  array of them, and I think that you -- that whole array
10 put together with voting history, electoral history,
11 things of that nature all go into the soup and then it's
12 up to the judge at that particular time to determine in
13 that specific case if in fact something like that
14 happened.
15   Q.   Did the Senate factors identified in
16 Gingles -- do those generally factor into that
17 determination, that totality of the circumstances
18 determination?
19        MS. BORGEN: Objection as to form.
20   A.   Well, I'm not a judge, but if I were a judge,
21 you know, and I think I probably look at it, but
22 like I said, I'd leave that up to the judge to decide
23 that.
24   Q.   Well, you've testified about the other
25 opinions you've given in other cases, and you have

Page 135

1  analyzed Gingles factors. For what purpose in those
2  other cases?
3    A.   I have most of the time only testified to
4  Gingles 2, 3. Sometimes I've testified to Senate
5  factors, and on occasion, I've testified to Gingles 1,
6  but most of the time I'm usually considered a Gingles 2,
7  3 expert. I just look at racial polarization and/or
8  racial block voting.
9    Q.   And when you testified or used those Gingles
10 factors in formulating your opinions, why do you do
11 that?
12   A.   Because I'm asked to do that by whoever
13 retains my services.
14   Q.   And do you know why they ask you to do that,
15 that particular analysis with regard to the Gingles
16 factors?
17   A.   Oh, because that's what I'm recognized as an
18 expert at doing.
19   Q.   And how does that assist you in forming
20 opinions?
21   A.   Well, I form the opinions about racial
22 polarization because it provides hard data for those
23 opinions.
24   Q.   For what opinions?
25   A.   For my opinions on racial polarization in a

Page 136

1  given situation.
2    Q.   Do the Gingles factors assist you in forming
3  your opinions, analysis of the Gingles factors?
4         MS. BORGEN: Objection as to form.
5         THE WITNESS: Well, what they are are just
6  really three-prong tests that the court has declared
7  saying, you know, this is what you look at, and then the
8  court determines whether or not the degree of my
9  presentation merits whether or not Gingles 2 or 3
10 exists.
11        MR. EHRLICH: Court Reporter, could you please
12 read back the last question?
13            - - -
14        THE REPORTER: Question: "Do the Gingles
15 factors assist you in forming your opinions, analysis of
16 the Gingles factors?"
17            - - -
18        BY MR. EHRLICH:
19   Q.   Professor Flores, I heard your answer and I
20 don't think it was responsive to that question. Could
21 you please answer that question?
22   A.   Well, the Gingles factors as identified by the
23 court are the guidelines that give me direction as to
24 what I do in my expert reports, so with them as
25 guidelines, they do help me form my opinion.

Page 137

1    Q.   Do you know where in Florida the city of
2  Rosewood is?
3    A.   Not exactly.
4    Q.   Do you know whether it's in the panhandle area
5  of Florida?
6    A.   I don't know.
7    Q.   Do you know whether it's in Miami-Dade County?
8    A.   I said I don't know.
9    Q.   I'm just helping you narrow the question.
10   A.   Yeah, I --
11   Q.   Do you consider Haitian Americans to be
12 African Americans as you've used those terms?
13   A.   I would probably consider them to be African
14 Americans for -- I think in general, but I think they're
15 going to think of themselves as either Haitians or
16 they're going to think of themselves as Caribbean -- the
17 way we know who's an African American is the way they
18 self-identify.
19   Q.   Right.
20   A.   Right, and I did not look to see specifically
21 for any kind of Haitian American or group in my
22 research.
23   Q.   So when you rely on statistics regarding
24 racial population, the figures that you're relying on
25 are the product of self-identification by persons.

35 (Pages 134 to 137)

Henry Flores, Ph.D.                                                                                        May 30. 2002
Washington, D.C.

Page 138

1  A.  That's correct.
2  Q.  So if a person identifies themselves as
3  Hispanic, you don't necessarily know whether that person
4  meets industry definitions of Hispanic?
5      MS. BORGEN: Objection as to form.
6      BY MR. EHRLICH:
7  Q.  Is that right?
8  A.  What do you mean by industry definition?
9  Q.  Well, you seem to make some general
10 statements. Even in your report, for example, you talk
11 about how racial populations are similar for the
12 defendant counties.
13 A.  Oh, okay.
14 Q.  And you're using terms like African American,
15 Hispanic. What do you have in mind when you use the
16 term African American, for example?
17 A.  When I'm using that term African American for
18 virtue of this particular report, I'm using the data
19 that's provided to me by the Florida State Redistricting
20 Committee, however they've created that category of
21 African American registered voters, and it's probably
22 based upon self-identification. People that go in and
23 register is the category I'm using.
24 Q.  So whatever definition they use you rely on in
25 forming your opinions?

Page 139

1  A.  That's correct.
2  Q.  Do you know how a person gets on the inactive
3  voter list in Miami-Dade County?
4  A.  Not exactly, no.
5  Q.  Do you have any idea?
6  A.  I don't want to venture a guess, no.
7  Q.  Turning back to paragraph 7 of your report,
8  you say that mobility of African Americans is a major
9  cause as to why they tend to populate the lists of
10 inactive voters. Do you know what the causes are of a
11 voter being placed on the inactive voter list?
12 A.  Well, one reason is changing addresses, but
13 that's the only reason I really know of.
14 Q.  Okay. So it's your understanding that when a
15 voter changes his or her address, they're placed on the
16 inactive voter list?
17     MS. BORGEN: Objection as to form.
18     THE WITNESS: That's my understanding.
19     MR. EHRLICH: What's the objection?
20     MS. BORGEN: Mischaracterizing the witness's
21 statement.
22     BY MR. EHRLICH:
23 Q.  Is it your understanding that when a voter
24 changes his or her address, they are placed on the
25 inactive voter list?

Page 140

1  A.  I think that -- My understanding, that's one
2  of the reasons.
3  Q.  Do you know any other reasons?
4  A.  No.
5  Q.  From the data that you used in forming your
6  opinions, I believe they're listed -- it's the items
7  that you went through with Mr. Little on page 4 and 5 of
8  your report. Which of those items contains a list of
9  inactive voters that you used for purposes of
10 subparagraph A in your opinions relating to inactive
11 voters?
12 A.  Oh, those are on the four CDs that are in my
13 study.
14 Q.  Okay.
15 A.  There's inactive voters on those lists.
16 Q.  Okay. So one of the files on the -- is it the
17 -- you said four CDs. Are you talking about the four
18 that you left in your study?
19 A.  That's correct.
20 Q.  Okay. One of the items on those four CDs --
21 on those four CDs is a list of inactive voters in
22 Miami-Dade County?
23 A.  That's correct.
24 Q.  And you did not have information as to
25 inactive voters in other counties; is that right?

Page 141

1  A.  Let's see. I forget -- which one is it? I
2  think I just did Miami-Dade as far as inactive voters
3  were concerned. Yeah, I just did Miami-Dade. I didn't
4  have it for the other counties.
5  Q.  In that paragraph A, I think that's where you
6  first talk about the history of racial discrimination
7  toward African Americans. Do you have an opinion as to
8  whether the history of discrimination towards African
9  Americans is stronger in Miami-Dade County than it is
10 elsewhere in the State of Florida?
11 A.  No, I do not.
12 Q.  Do you have an opinion as to whether there is
13 a history of racial discrimination in every county in
14 the State of Florida?
15 A.  No, I do not.
16 Q.  Are you aware of a history of discrimination
17 in any particular county in the State of Florida?
18 A.  No.
19 Q.  In that paragraph A, you talk about an
20 additional burden that is placed on the shoulders of
21 African Americans to verify their registration every
22 time they cast a ballot. What additional burden are you
23 talking about?
24 A.  Just the process of having to go through that
25 exceptional state. If you're a registered voter and

36 (Pages 138 to 141)

Page 142

1  you're just normally registered, all you have to do is
2  just present your registration certificate and cast your
3  ballot after it's verified, but to sit there and go
4  through the whole process, it takes additional time to
5  do that and sometimes it can become a very threatening
6  experience for someone who doesn't understand the
7  process.
8      Q.  Is it your understanding that inactive voters
9  are treated differently than active voters at precincts
10  in Miami-Dade County?
11      A.  I have no understanding of how they're treated
12  at the polls.  I just know that there's an over -- that
13  there's a statistical relationship between the number of
14  inactive voters in those precincts and the number of
15  African American registered voters in those precincts.
16      Q.  If inactive voters are -- face the same
17  requirements to vote that active voters have, would you
18  agree that there's not an additional burden placed on
19  African American voters as a result of being
20  over-represented on the inactive lists as you concluded?
21      MS. BORGEN:  Objection.
22      THE WITNESS:  Could you rephrase your
23  question?
24      BY MR. EHRLICH:
25      Q.  Sure.  You conclude that there's an additional

Page 143

1  burden placed on the shoulders of African Americans,
2  right?
3      A.  Correct.
4      Q.  And that's because African Americans are
5  over-represented on the list of inactive voters in your
6  opinion; is that correct?
7      A.  Yes.
8      Q.  If inactive voters were treated the same as
9  active voters at the polls, would you still conclude
10  that there is an additional burden placed on African
11  American voters in Miami-Dade County?
12      MS. BORGEN:  Objection.
13      MR. EHRLICH:  What's the objection?
14      MS. BORGEN:  Calls for speculation.
15      BY MR. EHRLICH:
16      Q.  You may answer.
17      A.  I don't know because I'd have to guess at it
18  and I'm not going to guess.
19      Q.  I'm asking you -- it's a hypothetical
20  question.  You can treat it that way.  Assume that
21  inactive voters are treated the same as active voters at
22  precincts in Miami-Dade County.
23      A.  Okay.
24      Q.  Would you still conclude that there is an
25  additional burden placed on the shoulders of African

Page 144

1  Americans when they cast a ballot in Miami-Dade County?
2      MS. BORGEN:  Same objection.
3      A.  If you want to treat it as a purely
4  hypothetical situation, no relationship to reality,
5  they're treated evenly, equally and so forth, then I
6  think the burden is still there but it's minimized to
7  some extent.
8      Q.  What is the additional burden if they're
9  treated the same?
10      A.  Well, just having to prove that they're active
11  voters because they're going to have to make that proof.
12      Q.  But active voters have to make that proof too,
13  don't they?
14      A.  But only if the action of proof is the same.
15      Q.  And that's what I'm telling you to assume.
16      A.  Okay.
17      Q.  Assume that --
18      A.  If it's exactly the same --
19      Q.  Right.
20      A.  And everything -- all things are perfectly
21  equal, then the burden's not there.
22      Q.  Do you know whether poll workers in Miami-Dade
23  County are able to discern between active and inactive
24  voters?
25      MS. BORGEN:  Objection to the form.

Page 145

1      MR. EHRLICH:  What's the objection?
2      MS. BORGEN:  Use of "discern."
3      BY MR. EHRLICH:
4      Q.  Okay.  Do you understand what that means?
5      A.  In the Biblical sense I do.
6      Q.  You tell me, what does it mean in the Biblical
7  sense?  What does it mean in the Biblical sense?
8      A.  It means that you can understand certain
9  things that come in Bible teachings, that you have a
10  gift to discern it.
11      Q.  Okay.  Let me use a simpler phrase.  Do you
12  know whether poll workers in Miami-Dade County are able
13  to tell the difference between an active voter and
14  inactive voter who appears before them?
15      A.  I don't know that.
16      Q.  Do you know whether the precinct registers in
17  Miami-Dade County distinguish between active voters and
18  inactive voters?
19      A.  I don't know that because I've never seen a
20  register.
21      Q.  Did you ask to look at one?
22      A.  No, I did not.
23      Q.  Would that have been helpful in forming your
24  conclusion in paragraph A?
25      A.  Maybe, but I just don't know what one looks

37 (Pages 142 to 145)

Henry Flores, Ph.D.                                                      May 30, 2002
Washington, D.C.

Page 146

1  like. If I saw it, I could answer that question.
2      Q.   A minute ago you said -- you said that the
3  question I was asking you bears no resemblance to
4  reality. I think those were your words. You don't know
5  whether it bears any resemblance to reality, do you?
6      MS. BORGEN: Objection as to form.
7      A.   That's not what I said.
8      Q.   What did you say?
9      A.   I said if we treat it that way, then it
10  would -- it's purely a hypothetical situation, I said
11  that then let's treat it as a hypothetical situation.
12      Q.   Okay.
13      A.   That's what I said.
14      Q.   Okay. You identify six counties where you
15  believe they do not maintain lists of inactive voters at
16  the polls.
17      A.   That's correct.
18      Q.   Are there any counties other than those six
19  that you're aware of that do not maintain lists of
20  inactive voters at the polls?
21      A.   Not that I'm aware of.
22      Q.   You don't know then whether any of the
23  defendants in this case do not maintain lists of
24  inactive voters at the polls?
25      A.   That's correct.

Page 147

1      Q.   It's in this paragraph A that you also say for
2  the first time that the defendant counties share similar
3  racial population percentages, and I believe earlier you
4  referred to Exhibit 9 of your report.
5      A.   That's correct.
6      Q.   Is it your testimony that Volusia County
7  shares similar racial population characteristics with
8  Miami-Dade County?
9      A.   No. That one's a little bit out of whack.
10      Q.   Would you agree that Volusia County and
11  Miami-Dade County do not share similar racial population
12  characteristics?
13      A.   That's correct, that's correct.
14      Q.   Would you agree that Leon County and Volusia
15  County do not share similar racial population; is that
16  correct?
17      A.   Correct.
18      Q.   You'd agree?
19      A.   I'd agree.
20      Q.   Would you agree that Duval County and Volusia
21  County do not share similar racial population
22  characteristics?
23      A.   I'll agree.
24      Q.   Would you agree that Broward County and
25  Volusia County do not share similar racial population

Page 148

1  characteristics?
2      A.   I'll agree.
3      Q.   Would you agree that Orange County and Volusia
4  County do not share similar racial population
5  characteristics?
6      A.   I'll agree.
7      Q.   Of these counties, which do you contend share
8  similar racial population characteristics with Volusia
9  County?
10      A.   None of them. What they share is that the
11  African American population is much much smaller than
12  the non-Hispanic white population with the exception of
13  Miami-Dade, but you're not going to find -- when you
14  look at social statistics, you're not going to find
15  absolute sameness and in the proportionalities and of
16  racism all up and down the line. You're going to see
17  variation. Volusia is probably the outlier here in this
18  data set.
19      Q.   And you understood my question as not to be
20  asking for absolute similarity, right?
21      A.   Correct, I understand.
22      Q.   Would you agree that Miami-Dade County does
23  not share similar racial population percentages with any
24  of the other counties in Exhibit 8?
25      A.   I'll half agree with you.

Page 149

1      Q.   Okay. What do you mean?
2      A.   Well, the African American population is very
3  similar to the other counties.
4      Q.   Would you agree that the African American
5  population in Miami-Dade County is not a similar racial
6  population percentage with that in Leon County?
7      A.   I think it's similar.
8      Q.   How are they different?
9      A.   Nine percentage points.
10      Q.   On a percentage basis, are there 50 percent
11  more African Americans in Leon County than Miami-Dade
12  County?
13      A.   On a percentage basis, I would say almost,
14  yeah, but in total population, you're looking at a lot
15  more probably in Miami-Dade than Leon County.
16      Q.   Right, but approximately three out of every
17  ten people in Leon County is African American, right?
18      A.   That's correct.
19      Q.   And that number's only two out of ten for
20  Miami County, correct?
21      A.   A difference of one.
22      Q.   Right.
23      A.   Right.
24      Q.   Out of ten?
25      A.   That's correct.

38 (Pages 146 to 149)

Henry Flores, Ph.D.                                                          May 30, 2002
Washington, D.C.

Page 150

1    Q.   Is that statistically significant?
2    A.   I didn't try to draw any conclusions as far as
3  statistical significance.
4    Q.   Do you have an opinion now as to whether that
5  three out of ten as compared to two out of ten is
6  statistically significant?
7    A.   No, I do not.
8    Q.   Did you examine the population of African
9  Americans in the counties in Florida other than those
10 listed in Exhibit 9?
11   A.   I looked at percentages of what the
12 populations were in the counties, and you'll find them I
13 think in Exhibit 7.
14   Q.   The third category, AFA?
15   A.   Correct, African Americans.
16   Q.   So with Alachua County, for example, is it
17 your belief that 19.3 percent of the population in
18 Alachua County is African American?
19   A.   That's correct.
20   Q.   Do you believe that Gadsden County shares
21 similar racial population characteristics with
22 Miami-Dade County as far as African Americans?
23   A.   No.
24   Q.   They do not share similar racial population
25 characteristics?

Page 151

1    A.   No.  There's a higher percentage of African
2  Americans in Gadsden.  As a matter of fact, it looks
3  like in Gadsden, the majority of population's African
4  American, but again, Gadsden has 45,000 individuals and
5  Miami-Dade has more than 2 million.
6    Q.   Right.  My question is whether they share
7  similar racial population characteristics, and you said
8  they do not?
9    A.   Well, in percentages, right.
10   Q.   Right.
11   A.   Right.
12   Q.   Would you agree that Madison County does not
13 share similar racial population characteristics as
14 Miami-Dade County with regard to African Americans?
15   A.   Correct.
16   Q.   Would you agree that Okeechobee County does
17 not share similar racial population percentages as
18 Miami-Dade County with regard to African Americans?
19   A.   Correct.
20   Q.   Is the same true for Monroe County?
21   A.   Correct.
22   Q.   Martin County?
23   A.   Correct.
24   Q.   Santa Rosa County?
25   A.   Correct.

Page 152

1    Q.   Sarasota County?
2    A.   Correct.
3    Q.   St. John's County?
4    A.   Correct.
5    Q.   Walton County?
6    A.   Correct.
7    Q.   Did you count affirmation -- the affirmations
8  or affidavits from Miami-Dade County that were collected
9  during the November 2000 election?
10   A.   No, not the actual affirmations, no.
11   Q.   Were they made available to you?
12   A.   No.
13   Q.   Did you ask for them?
14   A.   No.
15   Q.   Why not?
16   A.   Because I wasn't asked to look at the
17 affirmations themselves.  I was just asked to look at
18 the statistical relationship between the percentage of
19 affirmations that existed in a specific precinct and the
20 percentage of African American registered voters in
21 those precincts.
22   Q.   Did you have data from Miami-Dade County as to
23 the number of affirmations collected in each precinct?
24   A.   I don't know.  I don't think so.  Did I?  No.
25 All I received was affirmation data from Hillsborough

Page 153

1  County.
2    Q.   Did you request affirmation data from
3  Miami-Dade County?
4    A.   Yes, through counsel.
5    Q.   To whom did you make that request?
6    A.   Either Ms. Borgen or Ms. Fineman.
7    Q.   Do you remember which one?
8    A.   No, I do not.
9    Q.   Do you know whether they requested that
10 information from Miami-Dade County?
11   A.   No, I don't have that.
12   Q.   If your assumptions regarding the racial
13 populations of the defendant counties prove false, would
14 that alter your conclusion with regard to subparagraph B
15 with respect to counties other than Hillsborough and
16 Orange?
17      MS. BORGEN:  Objection.
18   A.   Could you rephrase your question please?
19   Q.   Sure.  In paragraph B, you make certain
20 conclusions about Hillsborough County; is that right?
21   A.   That's correct.
22   Q.   And that's based on data related to the
23 affirmations and affidavits collected in Hillsborough
24 County during the 2000 election, correct?
25   A.   That's correct.

39 (Pages 150 to 153)

Henry Flores, Ph.D.                                                                                          May 30, 2002

Washington, D.C.

Page 154

1    Q.   And you say that that -- your conclusions are
2    borne out from data that you reviewed from Orange
3    County; is that right?
4    A.   That's correct.
5    Q.   You testified that you don't have the similar
6    data from Miami-Dade County.
7    A.   That's correct.
8    Q.   You surmise that you would make similar
9    conclusions with regard to Miami-Dade Counties --
10   Miami-Dade and other counties because all of these
11   counties share similar racial population
12   characteristics; is that correct?
13   A.   Well, I think it's not just similar racial
14   population characteristics. It's a matter of also
15   history of racial discrimination just in general.
16   Q.   In fairness, you make both those points. You
17   say given the history of racial discrimination and given
18   that the defendant counties share similar racial
19   population percentages --
20   A.   That's correct.
21   Q.   -- that allows you to conclude that you would
22   have similar opinions with regard to counties other than
23   Hillsborough and Orange; is that right?
24   A.   That's correct.
25   Q.   And my question is if your assumption

Page 155

1    regarding the racial populations of the defendant
2    counties proved false, would that alter your conclusion
3    with regard to opinions that you're forming as to
4    Miami-Dade and other counties other than Hillsborough
5    and Orange?
6        MS. BORGEN: Objection as to form.
7    A.   Yeah, could you clarify that a little bit
8    more? Are you saying if the population percentages are
9    the same?
10   Q.   No.
11   A.   By race?
12   Q.   You're saying given that the defendant
13   counties share similar racial population percentages.
14   A.   Okay.
15   Q.   I'm now asking you to assume hypothetically,
16   if you'd like, that that part of your sentence is false,
17   that the counties do not share similar racial population
18   percentages.
19   A.   Oh, I see.
20   Q.   Okay? So in other words, taking that out,
21   would you still make the same -- would you still have
22   the same opinions as to over-representation with regard
23   to affirmations in Miami-Dade County and other counties
24   other than Hillsborough and Orange?
25   A.   If I had the affirmations from Miami-Dade and

Page 156

1    I could do the analysis and the analysis came out
2    different from Hillsborough, then I can conclude that
3    Miami-Dade doesn't have the same problem Hillsborough
4    has.
5    Q.   Right, but that wasn't the question. Did you
6    understand that to be the question?
7    A.   Yeah.
8    Q.   Okay. I'll state it differently.
9    A.   Sorry.
10   Q.   Your conclusion that Miami-Dade County is
11   likely to have the same over-representation of African
12   Americans filling out affirmations it seems to me is
13   based on two points, one, the history of racial
14   discrimination throughout the State of Florida, and two,
15   that all of these counties share similar racial
16   population percentages. Is that true?
17   A.   Yeah, that's true.
18   Q.   Now I'm asking you to assume that they do not
19   share similar racial population percentages.
20   A.   Oh.
21   Q.   Would your conclusion be the same as to Miami-
22   Dade and the other counties?
23   A.   I don't know. I really don't know. I mean,
24   it would also include the statistical analysis as well.
25   Q.   Okay, but you don't know whether you would

Page 157

1    have the same conclusion or not?
2    A.   No, I don't know.
3    Q.   What is the significance of your conclusion in
4    paragraph B that African Americans are over-represented
5    among those who have to fill out affirmations?
6    A.   Again, that whatever it is that causes them to
7    fill out more affirmations than any other racial group
8    is an additional burden to them on election day because
9    they've got to go through that additional process
10   besides voting.
11   Q.   Could one of the causes of them having to fill
12   out more affirmations be the fact that African Americans
13   tend to move more than other racial populations?
14   A.   Yes.
15   Q.   And I think you identified that one of the
16   reasons for having to fill out an affirmation is change
17   of address, right?
18   A.   Yeah, the data that I received from
19   Hillsborough was very clear, and also in Orange County,
20   the majority of the -- vast majority of individuals
21   that had to fill out an affirmation affidavit was due to
22   the fact they had moved. The other category was name
23   change.
24   Q.   Do you have an opinion as to whether a voter
25   who moves and then goes to a precinct where he's

40 (Pages 154 to 157)

Henry Flores, Ph.D.                                          May 30, 2002
Washington, D.C.

---

Page 158

1  supposed to vote should not be required to fill out an
2  affirmation and just be allowed to vote?
3       MS. BORGEN: Objection as to form.
4    A.  Yeah, no, I don't have an opinion on that.
5    Q.  You just -- you're just concluding that they
6  have to fill out affirmations -- Africans Americans have
7  to fill out affirmations at a higher rate than other
8  racial populations?
9    A.  Yes, that's what I'm concluding.
10   Q.  Do you have an understanding as to whether
11  after someone fills out an affirmation, they're allowed
12  to vote?
13   A.  I really don't know exactly how that's treated
14  at the polls in the State of Florida, so I can't answer
15  that question.
16   Q.  If after someone fills out an affirmation
17  they're allowed to vote, would you consider that to be a
18  vote denial?
19   A.  If they fill out an affirmation and they're
20  allowed to vote immediately?
21   Q.  Right.
22   A.  No.
23   Q.  In paragraph C, you talk about the percentage
24  of those removed from voting lists as felons compared to
25  percentage of African Americans who are registered

---

Page 159

1  voters in each county; is that right?
2    A.  That's correct.
3    Q.  Do you have an opinion as to Miami-Dade County
4  with regard to that issue?
5    A.  Well, only partially. The reason is the
6  data -- I received one sheet, but it came from the
7  government report and it was one page that was Xeroxed,
8  and I looked at it and I drew some conclusions that
9  African Americans appear to be over-represented on a
10  proportional basis out of that list of purged
11  individuals because they are identified as felons in
12  relationship to their percentage in the population. I
13  think it ran something like three to one actually.
14   Q.  Do you know whether the population of felons,
15  of African Americans who are felons, is proportional to
16  the population of African Americans?
17   A.  I think it's higher.
18   Q.  Do you know in Miami-Dade County what the
19  ratio is?
20   A.  No. I'd have to look it up.
21   Q.  So do you know whether that ratio is different
22  than the ratio that you're talking about on the list of
23  people who were removed as felons?
24   A.  Oh, I couldn't answer that question. I don't
25  know.

---

Page 160

1    Q.  Okay. So back to my question, do you have an
2  opinion as to whether in Miami-Dade County African
3  Americans were removed from the voter lists as felons at
4  a disproportionate rate?
5    A.  I'm just saying that the sheet that I was
6  provided indicated that -- I have it in here.
7    Q.  Well, I understand you're talking about a
8  sheet. I'm asking about your report.
9    A.  It's not in my report.
10   Q.  Is that an opinion that you intend to testify
11  about at trial?
12   A.  I may.
13   Q.  But it's not in your report now?
14   A.  No, it's not in my report right now.
15   Q.  Are you going to change your report at any
16  time to give the parties notice about these new opinions
17  that you're going to testify about?
18   A.  If I do change, you'll get proper notice,
19  absolutely.
20   Q.  Before the trial?
21   A.  Oh, yeah, absolutely.
22   Q.  As you sit here now, do you intend to talk
23  about whether African Americans are purged at a higher
24  rate in Miami-Dade County?
25   A.  I don't know. I didn't have time to really

---

Page 161

1  look at those data well enough to really sit down and
2  decide whether I could put it in my report by the time
3  my report was due, and so I left it out.
4    Q.  Did you leave out any other opinions about
5  Miami-Dade County?
6    A.  No.
7    Q.  So your report is complete except for this one
8  area relating to removal of felons in Miami-Dade County?
9    A.  That's correct.
10   Q.  And if you decide to offer a new opinion,
11  you'll let us know sometime before trial, I presume?
12   A.  Oh, yeah.
13   Q.  All right. Will you let us know in time so
14  that we might consider hiring a rebuttal witness?
15   A.  Absolutely.
16   Q.  Will you let us know more than 90 days before
17  trial?
18       MS. BORGEN: Objection.
19   A.  When's the trial?
20   Q.  I don't know. Do you know when the trial is
21  in this case?
22   A.  August 26th?
23   Q.  Okay.
24   A.  When's 90 days prior to August 26th?
25   Q.  I'm asking the questions, Professor.

41 (Pages 158 to 161)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

**Page 162**

1    MS. BORGEN: Objection to the line of
2    questions to the extent you're asking the witness for
3    legal answers that are to be decided by the lawyers.
4        MR. EHRLICH: Or the court, I presume.
5        MS. BORGEN: Ultimately, certainly.
6        BY MR. EHRLICH:
7    Q.   Turning to subparagraph D, is it your opinion
8    that there was no statistically significant relationship
9    found between percentages of African American registered
10   voters and the number of poll workers at precincts in
11   Miami-Dade County?
12   A.   Yeah, it's right -- it fell outside the
13   statistically significant zone at point 09.
14   Q.   Is the answer yes? Do you want me to repeat
15   the question?
16   A.   No. I'll answer the question. It would be
17   statistically significant 90 percent of the time, but
18   ten percent of the time, it doesn't seem to be a
19   problem.
20   Q.   Well, let me quote from your report and I'll
21   just ask you if this is true.
22   A.   Yeah.
23   Q.   "There was no statistically significant
24   relationship found between these two variables in
25   Miami-Dade County." Is that true?

**Page 163**

1    A.   That's true.
2    Q.   And those two variables are the percentage of
3    African Americans at a particular precinct and the
4    percentage of poll workers assigned to those precincts.
5    A.   That's correct.
6    Q.   I think you stated that -- well, tell me what
7    data from Miami-Dade County you did not have at the time
8    you formed your report and opinions that you think you
9    need.
10   A.   The number of affirmation affidavits by -- at
11   the precinct level.
12   Q.   And let's take these one at a time. Do you
13   know whether your lawyers have requested that
14   information?
15   A.   I don't know that.
16   Q.   By your lawyers, I mean the lawyers with whom
17   you're working.
18   A.   That's correct. No, I don't know.
19   Q.   Go ahead.
20   A.   I think that's really all I need. And to
21   justify the data that I've seen in that one government
22   report on the number of African Americans, it identifies
23   felons that were purged. If that data are accurate --
24   if Miami-Dade could provide me with the county-wide
25   data, not by precinct level but just the total counts in

**Page 164**

1    the county by race, that's what I would need. Just
2    those two pieces of information.
3    Q.   And have you asked the lawyers with whom
4    you're working to provide that information to you?
5    A.   No because I got -- like I said, by the time I
6    received what I received, I looked at it. I had to turn
7    my report in. I wasn't sure I could -- the data was
8    that particularly useful for me, but if Miami-Dade could
9    provide me with that information, then I could include
10   it in my report.
11   Q.   Do you know whether your lawyers have
12   requested that information from Miami-Dade?
13   A.   I don't know.
14   Q.   You agree you would need that information in
15   order to form any conclusions with regard to the subject
16   matter of subparagraph C?
17       MS. BORGEN: Objection as to form.
18       BY MR. EHRLICH:
19   Q.   I'm sorry. What was your answer?
20   A.   Let me go back. Just a second.
21   Q.   Sure.
22   A.   Yes.
23   Q.   Let's talk about that because it's an opinion
24   that you may form between now and trial. Would it also
25   be important for you to know the percentage of felons in

**Page 165**

1    Miami-Dade County who are African American?
2    A.   No because I'm comparing it to the overall
3    population of African Americans in the county; not the
4    felon population.
5    Q.   If you were looking to see whether -- well,
6    tell me, is your conclusion with regard to paragraph C
7    that African Americans are removed as felons at a higher
8    rate than whites and Hispanics are removed as felons?
9    A.   No. What I'm saying is in relationship to the
10   way they're represented in the general population of
11   their county, that individuals that have been
12   incarcerated and identified as felons and purged by race
13   are over-represented in relationship to the way they're
14   represented in the population of their home county. So
15   for instance, Miami-Dade has a 20 percent African
16   American population more or less but the sheet that I
17   saw that is yet to be verified indicates that 63 percent
18   of the individuals identified as felons and African
19   Americans were purged from the rolls, so it's 63 percent
20   compared to 20 percent of the population, so that's the
21   comparison I wanted to make.
22   Q.   Assuming that all felons should be removed
23   from the voting rolls in Miami-Dade County -- is that
24   your understanding, that felons are supposed to be
25   removed from the voting rolls? .

42 (Pages 162 to 165)

Henry Flores, Ph.D.
Washington, D.C.
May 30, 2002

Page 166

1    A.   I'm not drawing any conclusions about that at
2  all.
3    Q.   Assume these facts then, another hypothetical.
4  Assume that all felons are supposed to be removed from
5  the voting rolls who have not -- assume that all felons
6  who have not had their right to vote -- felons and ex-
7  felons who have not had their right to vote restored are
8  to be removed from the voting lists in Miami-Dade
9  County, okay?  Assume also that 63 percent of people
10 living in Miami-Dade County who are either felons or ex-
11 felons who have not had their right to vote restored are
12 African American.
13   A.   Okay.
14   Q.   You're saying that because 63 percent of those
15 removed were African American, there's an
16 over-representation?
17       MS. BORGEN:  Objection as to form.
18       BY MR. EHRLICH:
19   Q.   Assuming those facts.
20   A.   If those are the assumed facts, then there
21 would be over-representation among the individuals
22 identified as felons and are African Americans as
23 compared to their representation in the general
24 population of --
25   Q.   Is the problem that you're identifying that

Page 167

1  African Americans are convicted as felons at a higher
2  rate than their percentage of the overall population?
3  Isn't that what you're identifying?
4    A.   No.  I'm talking about individuals that are
5  identified as felons and then purged.
6    Q.   Right.
7    A.   Not all felons.
8    Q.   Okay.  Could I direct your attention to
9  Exhibit 8 of your report?
10   A.   Sure.
11   Q.   What is the source for the data contained in
12 Exhibit 8?
13   A.   I'd have to check my records exactly, but this
14 was -- came off of an Excel spreadsheet that's in the CD
15 that I provided to you all, and the file is labeled as
16 such, but I can't remember the source just off the top
17 of my head right now.
18   Q.   Could it be one of the documents that you
19 provided to us either yesterday or this morning?
20   A.   It's on the CD-ROM.
21   Q.   Well, I think you're saying the spreadsheet
22 format is --
23   A.   Yeah, and I can't remember --
24   Q.   You don't remember where you got it to put on
25 that?

Page 168

1    A.   I think I received it as an Excel spreadsheet
2  just like that.
3    Q.   Okay.  You just don't remember why you
4  received it?
5    A.   I can't remember what the source of the data
6  is, yeah, I can't remember.
7    Q.   Do you know whether it's accurate?
8    A.   I didn't independently verify this, although
9  what I did do is I compared these to the U.S. Bureau of
10 the Census geographic mobility report that appears in
11 the Jason Schacter 2001 geographical mobility study, and
12 the percentages here are very similar to the percentages
13 that they produced.
14   Q.   Why did you not use those percentages in your
15 report?
16   A.   Because those weren't Florida specific.
17   Q.   So --
18   A.   They're regional.
19   Q.   Okay, but that wouldn't tell you whether the
20 numbers included in Exhibit 8 are accurate.
21   A.   Well, just nationally across the country, this
22 same pattern is common to all African Americans.  They
23 move at a higher percentage rate than other racial
24 groups.
25   Q.   Did you find that African Americans in Florida

Page 169

1  move in different patterns than they do nationally?
2    A.   No.  There seems to be a pattern of moving
3  within the county more than anything else, that they're
4  moving apparently from apartment to apartment within the
5  same county.
6    Q.   Is that different than nationally?
7    A.   No.  Nationally it's pretty much the same
8  pattern.
9    Q.   When an African -- you say that African
10 Americans tend to move more and you just stated that
11 they tend to move I guess near where they're moving
12 from.  Is that a fair --
13   A.   Yeah.
14   Q.   -- statement of what you just said?
15   A.   Right.
16   Q.   Do you know what percentage of African
17 Americans that move to a new home in the same voting
18 precinct?
19   A.   No, I don't know that.
20   Q.   Do you know whether when people move and stay
21 in the same voting precinct, they're required to fill
22 out an affirmation or an affidavit at the precinct where
23 they vote?
24   A.   If they stay within the same voting precinct,
25 I wouldn't think so, but I don't know that for sure.

43 (Pages 166 to 169)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 170

1    Q.   Would that be helpful to your analysis, to
2  know of those African Americans that move, what
3  percentage move but stay within the same precinct?
4    A.   It may, yeah, but I'm not sure.  I'd have to
5  look at the data.
6    Q.   Right.  Another hypothetical.  If -- assuming
7  that a large percentage of African Americans who move
8  move to a new home in the same precinct, could that
9  change your opinion as to the burdens placed on African
10  Americans with regard to having to fill out
11  affirmations?
12       MS. BORGEN:  Objection.
13    A.   Again, I don't know.  I'd have to see the data
14  and see how it plays out.  It may.
15    Q.   You've testified about the history of
16  discrimination that you perceive in the State of Florida
17  towards African Americans.  Would you contend that every
18  practice that has a disparate impact on African
19  Americans is the result of this history of
20  discrimination?
21    A.   I think that there are probably artifacts of
22  it.
23    Q.   Would it be possible in Florida for there to
24  be a practice or policy that has a disparate impact on
25  African Americans that is not an artifact of the history

Page 171

1  of racial discrimination in Florida?
2    A.   I don't know.  I really don't know.  I do know
3  that housing values, for instance, just in general --
4  there's been research on this, and my dissertation
5  was -- I did similar sort of research.  A lot of the
6  racial segregation patterns you have are due to the
7  inability of individuals of particular races to be able
8  to afford houses of certain values.  They're literally
9  locked into smaller amounts of choices and end up being
10  restricted to, if you have a larger percentage of them
11  that are poor or lower middle class or working class,
12  they're going to be restricted to that kind of market of
13  houses, and that has -- it's kind of a structurally
14  organized kind of segregation that occurs.  Nobody
15  consciously says just because you're poor, you have to
16  live over here.  The market drives that sort of
17  situation, so --
18    Q.   Is that something that one of the parties in
19  this case should be held accountable for?
20    A.   No.  I'm just giving you an example of a type
21  of thing that does occur in urban areas, and there's a
22  large body of literature on that particular thing.  No
23  one's consciously discriminating.  It's just that the
24  market creates those kinds of housing patterns.
25    Q.   Right, I understand what you're saying, and my

Page 172

1  question is -- I'm not asking whether these practices
2  and policies are the result of intentional
3  discrimination.  What I'm asking is is it possible in
4  the State of Florida, given your opinions about the long
5  history of racial discrimination towards African
6  Americans in the State of Florida, is it possible for a
7  practice that has a disparate impact on African
8  Americans not to be the result of this long history of
9  discrimination or an artifact of this long history of
10  discrimination?  Because all the ones that you've
11  identified you said are an artifact of that history of
12  discrimination.
13    A.   I guess it's possible, but I --
14    Q.   You haven't found one thing?
15    A.   I've only looked at four things at this
16  particular point.
17    Q.   And it's your conclusion that they're all a
18  result of the history of discrimination that you've
19  talked about today?
20    A.   That's correct.
21    Q.   I just want to be real clear because you've
22  talked about this other opinion that you might have
23  before trial relating to paragraph C, the removal of
24  voters identified as felons, and you said that is the
25  only opinion that you might have a trial that is not

Page 173

1  currently contained in this report with regard to Miami-
2  Dade County.
3    A.   Well, the other one would be if Miami-Dade
4  were to provide me with the affirmation affidavits by
5  precinct, then I could do some work on that.
6    Q.   Okay.  But for that, one, you already have a
7  conclusion with regard to Miami-Dade County.  You're
8  making conclusions based on the similar history of
9  discrimination and the similar racial characteristics,
10  so the information on affirmations might alter your
11  opinion, but it would be on the same subject matter at
12  least, correct?
13    A.   Oh.
14    Q.   You see what I'm saying?  You're talking about
15  in C, you don't have an opinion right now as to
16  Miami-Dade County in C, but you said you might if you
17  get this other data that you're interested in.
18    A.   Sure.
19    Q.   So do you understand the distinction I'm
20  drawing?  I'm asking whether you're going to have any
21  new opinions as to a new subject matter relating to
22  Miami-Dade County that's not already in this.
23    A.   Oh, the subject matter I'm going to stick to,
24  these four areas.
25    Q.   Okay.

44 (Pages 170 to 173)

Henry Flores, Ph.D.                                                                              May 30, 2002
Washington, D.C.

---

Page 174

1   A.   That's all I'm going to stick to.
2   Q.   Okay. And right now, you don't have an
3   opinion as to Miami-Dade County with regard to the
4   subject matter found in C, but you might form one before
5   trial?
6   A.   That's correct.
7   Q.   Okay. For A, B and D, you already have
8   opinions as to Miami-Dade County?
9   A.   I don't have one for B.
10  Q.   Okay.
11  A.   That's the affirmation affidavits.
12  Q.   Okay. For D, you said there was no
13  relationship, so you don't have --
14  A.   See, I have the poll workers. That's D.
15  Q.   Right, and B you just said you don't have an
16  opinion as to Miami-Dade County. For A, of course you
17  do. You've stated it already.
18  A.   Right.
19  Q.   And for C, you may form one later but you
20  don't have one right now.
21  A.   That's correct.
22  Q.   And other than those that we've just
23  discussed, there's no other opinion that you have in
24  relation to Miami-Dade County?
25  A.   No.

---

Page 175

1   Q.   No meaning correct?
2   A.   Correct.
3   Q.   There's no other opinion?
4   A.   That's correct.
5        MR. EHRLICH: I have no further questions.
6   Thank you.
7        MR. LITTLE: Guys, before we go on, can I talk
8   to Lori for just a second?
9        MS. BORGEN: Off the record?
10       MR. LITTLE: Yeah.
11       (Discussion off the record)
12       EXAMINATION BY COUNSEL FOR
13       FRED DICKINSON AND KATHLEEN KEARNEY
14   BY MR. WAAS:
15  Q.   Dr. Flores?
16  A.   Yes, I'm here.
17  Q.   Can you hear me? You can. My name is George
18  Waas. I'm with the Florida Attorney General's office in
19  Tallahassee, and I represent the Florida Department of
20  Highway Safety and Motor Vehicles and the Florida
21  Department of Children and Families, and I'll try to be
22  brief and to the point. On pages 4 and 5 of your
23  report, you list 14 categories of documents. My first
24  question is there any reference in those documents to
25  records, documents or data sets involving the Florida

---

Page 176

1   Department of Highway Safety and Motor Vehicles?
2   A.   No, there is not.
3   Q.   Same question with respect to the Department
4   of Children and Families.
5   A.   No, there is not.
6   Q.   So then am I correct in stating that the
7   opinions that you've expressed here today and opinions
8   that you expressed in your report are not based on any
9   documents furnished by or provided to you from the
10  Department of Highway Safety and Motor Vehicles or the
11  Department of Children and Families?
12  A.   That is correct.
13  Q.   You mentioned at the very outset of your
14  examination today that you were seeking additional
15  documents or you may be seeking additional documents.
16  Does that effort include documents from either one or
17  both of these agencies?
18  A.   I don't think so at this point.
19  Q.   What is it that might cause you to change that
20  position? You qualified it by saying at this point.
21  What is it that might cause you to qualify or change
22  that position?
23  A.   At an early point in my research, I began
24  looking at the rate of registration of African Americans
25  by the Department of Motor Vehicles and in one of the

---

Page 177

1   counties.
2   Q.   I think you mentioned Orange County.
3   A.   I think it was Orange County, and I had a
4   methodological problem because I didn't know what the
5   clientele base of what those offices were in Orange
6   County. In other words, I don't know whether a
7   particular DMV office in Orange County services a region
8   that may cross county lines, and that would throw my
9   analysis all off, and so I just stopped there.
10       If I were to be able to somehow or other
11  verify the proper jurisdiction in relationship to
12  registered voters and -- individuals registered by the
13  DMV and I could verify that these individuals came from
14  the specific defendant counties and I could isolate them
15  on a county-by-county basis, then I would probably add
16  that to my report, but at this particular point, if I
17  can't verify it, I just can't do that.
18  Q.   Am I correct in also saying that as you sit
19  there today, you have no facts that allows you to
20  conclude that any information in the possession of the
21  Department of Highway Safety and Motor Vehicles or the
22  Department of Children and Families is erroneous or
23  inaccurate?
24  A.   No, I can't draw that conclusion.
25  Q.   Okay. And am I also correct in stating that

---

45 (Pages 174 to 177)

Henry Flores, Ph.D.                                                                                   May 30, 2002

Washington, D.C.

Page 178

1  you've not undertaken any study or review of any matter
2  pertaining to either one or both of these agencies?
3     A.   With the exception of just what I looked at
4  briefly in Orange County, I have not.
5     Q.   Do you have any personal knowledge regarding
6  the claims in this lawsuit against either one or both of
7  these agencies?
8     A.   Other than what I saw in the second amended
9  complaint, I do not.
10    Q.   Does your retention agreement contemplate
11 undertaking any study or review of either one or both of
12 these agencies other than what you've already mentioned?
13    A.   It may.  The reason is there's a sentence in
14 my -- I think you have a copy of my letter of retention,
15 and in the second paragraph, it reads that you will
16 being examining mobility rates of black Floridians where
17 black Floridians are disparately impacted by certain
18 election practices and procedures in that state, and
19 other issues that may arise during the course of your
20 work.  Other -- that would probably fall under that
21 particular disclaimer, but if it doesn't, then I won't
22 be doing the work.
23    Q.   Okay.  As you sit here today, do you have any
24 facts that the Department of Highway Safety and Motor
25 Vehicles has or bears any responsibility or has any

Page 179

1  involvement in the matters addressed in the lawsuit?
2     A.   I have no opinion on that at this point.
3     Q.   Do you have any facts?
4     A.   Oh, no, uh-uh, I do not.
5     Q.   Same question with respect to the Florida
6  Department of Children and Families.
7     A.   No, I do not.
8     Q.   Is it your opinion that the present effects of
9  past discrimination prevent African Americans from
10 registering to vote in Florida?
11    A.   I haven't looked specifically at the
12 registration process, so I cannot answer that question.
13    Q.   Okay.  Is it your opinion that the present
14 effects of past discrimination prevent African Americans
15 from voting in Florida?
16    A.   I think that the history of racial
17 discrimination and the manner in which they appear on
18 inactive voting rolls and having to move and fill out
19 affirmation affidavits and being underserved in polls
20 places a burden on their ability to participate.
21    Q.   Are you aware of any cases from any Florida
22 court, federal or state, that agrees with the opinion
23 that you just stated?
24    A.   I'm not aware of any.
25    Q.   Are you aware of any cases from any Florida

Page 180

1  court, federal or state, which rejects the opinion that
2  you just stated?
3     A.   No.
4     Q.   If you were to find out that there were cases
5  which addressed this particular subject area, would you
6  find that surprising?
7     A.   Oh, I don't know.
8     Q.   Okay.  Do you know how many African Americans
9  were denied the right to vote by the Department of
10 Highway Safety and Motor Vehicles in the 2000 general
11 election?
12    A.   No, I do not.
13    Q.   Do you know how many African Americans were
14 denied the right to vote by the Department of Children
15 and Families in the 2000 general election?
16    A.   No, I do not.
17    Q.   Do you have any facts as to the conduct that
18 either one or both of these agencies engaged in or
19 failed to engage in that denied African Americans the
20 right to vote in the year 2000 general election?
21    A.   I do not.
22    Q.   Do you know or have any facts as to the
23 relationship between the number of African Americans as
24 opposed to the number of Hispanics and Caucasians by
25 percentages that are attributable to either one or both

Page 181

1  of these agencies with respect to being denied the right
2  to vote in the 2000 general election?
3        MS. BORGEN:  Objection as to form.
4     A.   Yeah, could you simplify that question a
5  little bit please?
6     Q.   I'm in effect asking the same question with
7  respect to the percentages of African Americans as
8  related to the percentage of Hispanics and Caucasians
9  who were denied the right to vote in the 2000 general
10 election based on conduct or lack of performance
11 attributed to either one or both of these agencies.
12    A.   No -- yeah, I do not know any of that.
13        MR. LITTLE:  George, before you ask the next
14 question, does anybody have a conference feature on
15 their phone so they can dial Tracy Arpen in?  He cannot
16 get back in, and the operator says that somebody who has
17 a conference feature who's on this call needs to call
18 him in.
19        (Discussion off the record)
20 BY MR. WAAS:
21    Q.   Dr. Flores, I had just one final question.  Do
22 you have any knowledge at this time regarding the
23 operation of either one or both of these agencies with
24 respect to the allegations in the lawsuit?
25    A.   No, I do not.

46 (Pages 178 to 181)

Page 182

1    MR. WAAS: I have no further questions and I
2  thank you for allowing me to interrupt the rest of you.
3    EXAMINATION BY COUNSEL FOR CHOICEPOINT, INC.
4    BY MR. RESTREPO:
5    Q.  Dr. Flores, my name is Dan Restrepo, and I
6  represent ChoicePoint DVT in this action. I have a
7  number of questions about your report. First, with
8  regard to section 4A of your report, is it correct that
9  you performed a statistical regression analysis to
10  formulate the opinions expressed in section 4A?
11    A.  For Hillsborough County I did.
12    Q.  Is it correct that you constructed a database
13  used for the analysis with regard to Hillsborough County
14  which led to the conclusions in section 4A in your
15  report?
16    A.  That's correct.
17    Q.  Moving on to section 4B, is it correct that
18  you again performed a statistical regression analysis to
19  formulate the opinions in section 4B of your report?
20    A.  I did.
21    Q.  Did you again construct a database used for
22  the analyses which led to the conclusions in section 4B
23  of your report?
24    A.  For Hillsborough County I did.
25    Q.  Skipping to 4D for a second, is it correct

Page 183

1  that you performed -- again performed a statistical
2  regression analysis to formulate the opinions expressed
3  in section 4D?
4    A.  4D?
5    Q.  D.
6    A.  As in dog?
7    Q.  Yes.
8    A.  I did -- yes, I did.
9    Q.  Did you again construct a database to be used
10  in the analysis in section 4D as in dog?
11    A.  Yes.
12    Q.  What does a statistical regression analysis
13  do?
14    A.  It is used to determine whether or not there
15  is a -- in this particular case, a linear relationship
16  between a dependent variable and an independent variable
17  to determine if the value of the independent variable
18  and the value of the dependent variable are somehow
19  related.
20    Q.  Can you make that determination any other way,
21  the linear relationship determination?
22    A.  There's different types of regression
23  techniques. There's curvilinear regression and then
24  there's a cubic regression, and then there's
25  experimental work on a nonlinear dynamical regression.

Page 184

1  It's based on chaos theory, but I don't think so. I
2  really don't think so.
3    Q.  So short of doing some sort of regression
4  analysis of the various forms you just described to get
5  a statistically -- to understand the relationship
6  between two variables, regression analysis is the way to
7  do it; is that correct?
8    A.  Well, it depends on -- if we're speaking in
9  generic terms, what you want to do is use the best
10  statistical technique for the data. The data determines
11  the test, and these type of data are best evaluated in
12  my opinion by a simple regression analysis, because the
13  other principle you want to follow is the more simple
14  the statistical technique, the better it is and the more
15  powerful it is really.
16    Q.  I believe that way back at the beginning of
17  today's deposition, you testified that the courses you
18  are currently teaching are related to the opinion
19  testimony you're offering in this case in part because
20  of the research and statistic methods taught in those
21  courses are some of the same ones used in formulating
22  your opinions as expressed in this report; is that
23  correct?
24    A.  I used a statistical term to describe that.
25  There's a two-way interaction. They kind of feed each

Page 185

1  other.
2    Q.  Of the research and statistic methods that you
3  teach in your classes, which if any of them did you
4  bring to bear on your opinion expressed in Section 4C of
5  your report?
6    A.  Oh, the basic most fundamental one. It's
7  simply a display of descriptive statistics.
8    Q.  When you say a display of descriptive
9  statistics, can you explain to me how you went about --
10  actually, strike that. Let's go step by step. In
11  formulating the opinion in Section 4C, am I correct that
12  one step in reaching the conclusions in Section 4C was
13  to find out the percentage of African Americans in the
14  population of Duval County?
15    A.  That's correct.
16    Q.  And how did you make that determination?
17    A.  From the U.S. Bureau of the Census report.
18    Q.  Did you do anything to verify the accuracy of
19  the U.S. Bureau of Statistics information?
20    A.  The U.S. Bureau of the Census? No. I'm
21  assuming that before they release them to the public,
22  they verify those because I pulled it off of a public
23  web site.
24    Q.  So you took a publicly available number as the
25  percentage of African Americans in the population of

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

---

Page 186

1  Duval County; is that correct?
2      A.  That's correct.
3      Q.  Am I correct another step in reaching the
4  conclusion in 4C was finding out the percentage of
5  African Americans in Hillsborough County?
6      A.  That's correct.
7      Q.  Same question.  How did you make that
8  determination?
9      A.  I pulled it from the same web site.
10     Q.  So we now have two pieces of publicly
11 available information, one the percentage of African
12 Americans in Duval County, and the percentage of African
13 Americans in the population of Hillsborough County; is
14 that correct?
15     A.  That's correct.
16     Q.  Am I correct that another step in reaching the
17 conclusions in Section 4C was finding out the percentage
18 of African Americans removed from the Duval County voter
19 rolls on account of being a felon or ex-felon whose
20 right to vote had not been restored?
21     A.  That's correct.
22     Q.  And how did you make that determination?
23     A.  It was data that I received through our
24 counsel on those specific counties.
25     Q.  And what, if anything, did you do -- did the

---

Page 187

1  data come -- this is the percentage of African Americans
2  on the removal list?
3      A.  It came as counts for county by race and
4  identified as either felons or purged because of death,
5  and I think there was one other category.  I can't
6  remember exactly what it was anymore.
7      Q.  Do you know if that information is publicly
8  available?
9      A.  I don't know that.
10     Q.  Same question with respect to Hillsborough
11 County.  How did you come -- am I correct that the
12 fourth number here is the percentage of African
13 Americans among those removed from the voter rolls in
14 Hillsborough County as felons or ex-felons whose right
15 to vote had not been restored?  Is that another number
16 that you used in your --
17         MS. BORGEN:  Objection to form.
18         THE WITNESS:  Would you repeat your question
19 please?
20         BY MR. RESTREPO:
21     Q.  I may have clearly misstated something.  In
22 reaching the conclusion in Section 4C, was another step
23 finding out the percentage of African Americans among
24 those removed from the voter rolls in Hillsborough
25 County on account of their being a felon or ex-felon who

---

Page 188

1  had not had their rights restored?
2      A.  They were just identified as felons, purged
3  because they were identified as felons.  There was no
4  indication that were ex-felons or not.
5      Q.  Okay.  And you got that number from where?
6      A.  Through counsel.
7      Q.  Do you have any idea if the Hillsborough
8  County number is a publicly available number?
9      A.  I don't know that.
10     Q.  Once you had these four numbers, what did you
11 do with them?
12     A.  I just created simple percentages of the -- I
13 just determined what the percentage of African Americans
14 that were identified as felons and purged was of all
15 those purged as felons, and I compared it to the
16 percentage of African Americans of the population of
17 that particular county.
18     Q.  So you did some long division and --
19     A.  Yes.
20     Q.  -- put that result next to the publicly
21 available U.S. Census number?
22     A.  That's correct.
23     Q.  What, if anything, did you do in formulating
24 those -- in the felon removal opinion, the opinion in
25 4C, that required any expertise beyond long division?

---

Page 189

1      A.  No, if I could have -- if the data were
2  available of felons purged on a per-precinct level, then
3  I could maybe -- you know, I might have been able to do
4  regression analysis on it, but it wasn't available.  It
5  was just available for the county as a whole, so because
6  the data appears that way, the only way you can display
7  it is by the way I did.
8      Q.  Okay.  So it's nice to understand what you
9  didn't do.
10     A.  Yeah.
11     Q.  In answer to my question, what, if anything,
12 did you do beyond -- to formulate the opinion in 4C
13 beyond some long division, putting the result of long
14 division next to a number publicly available from the
15 U.S. Census Bureau?
16     A.  No, nothing.
17         MS. BORGEN:  Objection as to form.
18         BY MR. RESTREPO:
19     Q.  So I'm getting -- I just want to make one
20 thing clear in my mind here.  You compared -- is it
21 correct that you compared the percentage of African
22 Americans removed as felons in Duval and Hillsborough
23 County to the percentage of African Americans in the
24 population of either of those counties?
25     A.  That's correct.

---

48 (Pages 186 to 189)

Henry Flores, Ph.D.                                                                    May 30, 2002
Washington, D.C.

Page 190

1    Q.   Or each of those counties?
2    A.   Each of those counties.
3    Q.   To what, if anything, do you attribute the
4    over-representation that you discussed in Section 4C
5    regarding the percentage of African Americans among
6    those removed as felons?
7    A.   Oh, I don't know.
8    Q.   You have no idea why that exists?
9    A.   No. I just know that there appears -- that
10   Africans Americans were over-represented in that
11   particular category.
12   Q.   Upon seeing that, was there any intellectual
13   curiosity as to why that was?
14   A.   Oh, sure, but -- you know, I had so many other
15   things to do -- maybe after this election, I could do --
16   or after this case, I can do a research project to look
17   into the specific details of something like that, but
18   you know, I could be intellectually curious, but I don't
19   have time to dig at that particular point.
20   Q.   Did you express your intellectual curiosity to
21   the folks who had retained you in this?
22   A.   No, no, I did not.
23   Q.   Did they tell you not to come up with a reason
24   why?
25   A.   No.

Page 191

1    Q.   Or not to look into the reason why?
2    A.   No, they did not.
3    Q.   In forming your opinion on the
4    over-representation of African Americans among those
5    removed as felons as compared to African American
6    percentage of the population in Duval and Hillsborough
7    Counties, did you consider the percentage of African
8    Americans in the felon and ex-felon population in Duval
9    and Hillsborough Counties?
10   A.   I didn't look at ex-felons.
11   Q.   How about felons?  Did you look at the racial
12   composition of the felon population?  Not the felon
13   removed population, but the felon population --
14   A.   No, I did not.
15   Q.   -- in Duval or Hillsborough Counties?
16   A.   No, I did not.
17   Q.   Do you have any understanding of what the
18   racial composition of the felon population -- felon or
19   ex-felon population in the State of Florida would look
20   like?
21   A.   No.
22   Q.   You never looked into that?
23   A.   No, I never looked into that.
24   Q.   Do you know what source or sources of
25   information the County of Duval or the Duval County

Page 192

1    Supervisor of Elections relied upon in deciding whether
2    to remove felons prior to the November 7, 2000 election?
3    A.   No, I do not.
4    Q.   Same question for Hillsborough County.
5    A.   No, I do not.
6    Q.   Now, you have no opinion as to why these
7    people were removed, correct?
8    A.   That's correct.
9    Q.   Other than they were -- you were handed a list
10   that said number of people removed as felons.
11   A.   That's right.
12   Q.   And your report doesn't purport to state that
13   there's a statistically significant relationship between
14   race and being removed from the voter rolls in Duval and
15   Hillsborough County, does it?
16   A.   No, it does not. It's just a depiction of
17   what I have concluded is over-representation in that
18   particular category. There's just a comparison of
19   percentages.
20   Q.   Quick question. If you could look at Exhibit
21   7 in Exhibit 3 -- Exhibit 7 to your report in Deposition
22   Exhibit Number 3, what is the source of the data
23   contained in Exhibit 7?
24   A.   The U.S. Bureau of the Census reports.
25   Q.   And again, did you do anything to verify the

Page 193

1    accuracy of the information before using it?
2    A.   No, I did not.
3    Q.   And why is that?
4    A.   Because I assumed that the U.S. Bureau of the
5    Census verified it as accurate before they put it on
6    their web site and made it available to the general
7    public.
8    MR. RESTREPO:  I have no further questions.
9    MS. BORGEN:  If we could take -- I'm sorry to
10   do this to you guys, a short break again.
11   (Recessed at 4:50 p.m.)
12   (Reconvened at 5:04 p.m.)
13   EXAMINATION BY COUNSEL FOR JOHN STAFFORD
14   BY MR. ARPEN:
15   Q.   Good afternoon, Mr. Flores.
16   A.   Hi. How are you?
17   Q.   Good. My name is Tracy Arpen, and I represent
18   the Duval County Supervisor John Stafford, and I
19   apologize if I ask anything that was asked recently but
20   I was disconnected for about 15 minutes and hopefully
21   I'm not going to repeat what someone else asked, but if
22   I do, please forgive me.
23   A.   Okay.
24   Q.   Let me ask you first if I could to maybe take
25   a look at your report, paragraph 4B on page 3.

49 (Pages 190 to 193)

Henry Flores, Ph.D.                                                                    May 30, 2002

Washington, D.C.

Page 194

1    A.   Yes.
2    Q.   And also I'll ask you to refer to Exhibit 9.
3  With respect to your comment in paragraph 4B that
4  defendant counties share similar racial population
5  percentages as Hillsborough County, is it your opinion
6  that Duval County shares similar racial population
7  percentages with Hillsborough County?
8       (Whereupon, Mr. Little left the deposition.)
9    A.   Well, the non-Hispanic white population is
10  very close and -- though the African American
11  populations in both those counties are markedly smaller
12  than non-Hispanic white ones.
13    Q.   Well, let me see if I can ask you then, as I
14  recall your testimony earlier, I believe you testified
15  in your opinion that the racial population percentages
16  in Volusia County and Broward County were not similar.
17    A.   Yeah, that's correct.
18    Q.   And I believe you said that in your opinion,
19  the racial population percentages in Volusia and I
20  believe you said Orange County were not similar.
21    A.   No, that's correct.
22    Q.   And according to my calculations, the
23  difference in the African American percentages in
24  Broward and Volusia Counties were about 11 percent or
25  so; is that correct?

Page 195

1    A.   That's correct.
2    Q.   The difference between Duval and Hillsborough
3  in the African American population, the difference there
4  is about 12.8 percent; is that correct?
5    A.   That's correct.
6    Q.   So I'm not sure now if I recall or if I got an
7  answer to the question as to whether or not in your view
8  the racial population percentages in Hillsborough and
9  Duval County were similar.
10    A.   Yeah, they're more similar than Volusia simply
11  because the non-Hispanic white population is so skewed
12  in Volusia.
13    Q.   Okay.  Then let's ignore Volusia and talk
14  about some of the others I believe you referred to,
15  which was I believe a comparison between -- I believe
16  there was a reference between Leon and Hillsborough, is
17  that correct, as to whether those two were similar?
18       MS. BORGEN:  Objection as to form.
19    A.   I don't remember.
20    Q.   Okay.  Well, let me ask you freshly then.  In
21  your opinion, are the racial percentages -- racial
22  populations percentages in Hillsborough and Leon
23  Counties similar?
24    A.   I think they're similar, yes.
25    Q.   To decide whether those populations are

Page 196

1  similar or dissimilar, what is the factor you look at to
2  make that determination?
3    A.   Just the general difference between the
4  percentage of African Americans and the percentage of
5  non-Hispanic whites.
6    Q.   So in your view then, a county which has --
7  Leon County, which has approximately twice the
8  percentage of African Americans as Hillsborough County,
9  would still have similar racial populations
10  characteristics; is that correct?
11    A.   Could you restate your question?  I'm sorry.
12  I was --
13    Q.   Sure.  Is it your opinion then that Leon
14  County, which has approximately twice as many African
15  Americans percentage wise as Hillsborough County,
16  nevertheless shares similar racial population
17  percentages with Hillsborough County?
18    A.   Yeah, I used the word "similar."  I didn't use
19  the word "exact."
20    Q.   How great would the difference in percentages
21  need to be before it ceases being similar?
22    A.   Well, it's not just the percentage of African
23  Americans.  As I said, what makes Volusia really really
24  stand out is the non-Hispanic white population being so
25  dense, or so high rather.

Page 197

1    Q.   Is there a percentage of -- is there a point
2  at which the percentages just in the African American
3  column would make the counties dissimilar?
4    A.   Only if they were very, very extreme from each
5  other.
6    Q.   What would constitute very, very extreme?
7    A.   Oh, if you're talking about maybe one percent
8  or 80 percent.  You know, it's a real judgment call
9  really.
10    Q.   Okay.  With respect to your opinions in
11  paragraph 4B of your report on page 3 regarding
12  affirmations and affidavits in Hillsborough County and
13  also in Orange County, did you make any comparison with
14  the -- or let me ask you this:  Did you consider the
15  percentage of voter turnout to racial population at all?
16    A.   No, I haven't looked at that.
17    Q.   So you haven't compared whether one segment of
18  the racial population had a higher percentage turnout in
19  any particular county than did the other racial
20  population?
21    A.   No, I have not looked at that.
22    Q.   With respect to your opinions in paragraph 4C
23  on page 3 concerning the removal of voters in Duval
24  County, I believe you were asked if you had compared the
25  racial breakout of those persons removed from the voting

50 (Pages 194 to 197)

Page 198

1  rolls for the reason of felony convictions with the
2  racial breakout of the felony convictions population in
3  general.
4      A.   That's right, I was asked that question.
5      Q.   And have you or have you not made such a
6  comparison?
7      A.   No, I have not made a comparison.
8      Q.   Do you in fact know what the racial breakout
9  of those persons in Duval County with a particular
10  felony would be?
11     A.   No.
12     Q.   Do you have any opinion as to whether or not
13  the voters referenced in paragraph 4B of your report and
14  Exhibit 3 of your report were properly or improperly
15  removed from voter rolls?
16     A.   I have no information on the process of
17  removal at all.
18     Q.   So then you would have no opinion as to
19  whether in Duval County, the removal of voters based on
20  felony convictions was in any manner other than as
21  provided by law?
22     A.   Yeah, I didn't draw any conclusion concerning
23  that at all.
24     Q.   And am I correct that the only opinion
25  regarding Duval County which were based upon statistics

Page 199

1  obtained from Duval County would be those contained in
2  paragraph 4C concerning removal of voters from the voter
3  registration rolls?
4          MS. BORGEN: Objection as to form.
5      A.   Yes, could you be a little more specific with
6  your question please?
7      Q.   Sure.  Was -- were the opinions expressed in
8  paragraph 4C of your report concerning removal from the
9  voter rolls for felony convictions the only opinion
10  regarding Duval County which were based upon Duval
11  County's statistics as opposed to another county's
12  statistics?
13     A.   What appears in paragraph 4C are the only data
14  I received on Duval County through counsel.  Any other
15  data in the report that appears concerning Duval County
16  came from the U.S. Bureau of the Census databases.
17     Q.   And can you tell me what other portions of the
18  report use any data from the Census with respect to
19  Duval County?
20     A.   Oh, besides the exhibit -- the data in Exhibit
21  9, the data in Exhibit 7 on just general population
22  percentages and total population.
23     Q.   Okay.  That would be the first column on
24  Exhibit 7?
25     A.   Yeah.  You see there for each county and then

Page 200

1  right next to it is the total population of Duval, and
2  then the percentage white, et cetera, and the only other
3  statistic is in that last column where it says the
4  percent renters, 37.8.  Do you see that, point 378?
5      Q.   Yes, I do.
6      A.   That appeared as one of the data entry numbers
7  in the regression analysis on renters that's part of
8  Exhibit 6, but all the counties in Florida were included
9  in that.
10     Q.   So the percentages -- the final product on
11  Exhibit 7 comes from the statewide statistics; is that
12  correct?
13     A.   From the U.S. Bureau of the Census, yes.
14     Q.   But they're statewide as opposed to county-
15  specific statistics; is that correct?
16     A.   No, no.  In Exhibit 7, each county's broken
17  down, so for each county, there's specific population
18  percentages, and then at the end, on the second page of
19  Exhibit 7, the last line is the state total.
20     Q.   Okay, thanks.
21     A.   Do you see that?
22     Q.   One final question.  With regard to your
23  reference in several paragraphs of the report concerning
24  the history of racial discrimination throughout the
25  State of Florida generally towards African Americans, do

Page 201

1  you have any specific knowledge of any history of racial
2  discrimination with regard to Duval County?
3      A.   No, I do not.
4          MR. ARPEN:  That's all I have.  Thank you.
5          THE WITNESS:  Thank you.
6          MS. BORGEN:  Anyone else on the phone?
7          MR. BOSCH:  Yeah, this is Bill Bosch.  Let me
8  go if that's all right.
9          MS. BORGEN:  Sure.
10         EXAMINATION BY COUNSEL FOR DEANIE LOWE
11         BY MR. BOSCH:
12     Q.   Sir, my name is Bill Bosch.  I represent
13  Deanie Rowe.  That's the Supervisor of Elections for
14  Volusia County.  I think most everything's been asked
15  already, so I should be fairly quick here.
16     A.   Okay.
17     Q.   Plus I'm hungry.
18     A.   As we all are.
19     Q.   So quickly, did you render any specific
20  opinions with regard to Volusia County?
21         MS. BORGEN:  Objection as to form.
22     A.   Give me time for a moment please.
23     Q.   Sure.  Let me repeat that question.  Did you
24  render any specific opinions which are unique to Volusia
25  County, different from the other counties?

51 (Pages 198 to 201)

Henry Flores, Ph.D.                                                                          May 30, 2002

Washington, D.C.

| Page 202 | Page 204 |
|---|---|
| 1    A.   I had -- I could not include Volusia County in<br>2 the four areas that I looked at because I didn't have<br>3 any data that I could use.<br>4    Q.   Okay.  And you have some data regarding<br>5 Volusia County, correct?<br>6    A.   Well, I had what I could glean from the U.S.<br>7 Bureau of the Census, that's correct.<br>8    Q.   Okay.  And that data is contained on Exhibit<br>9 7, and I believe you have the summary of it on Exhibit<br>10 9, correct?<br>11    A.   That's correct.<br>12    Q.   And from that data, it's been pointed out<br>13 today, has it not, that Volusia County is significantly<br>14 different from the other counties, correct?<br>15       MS. BORGEN:  Objection as to form.<br>16       BY MR. BOSCH:<br>17    Q.   With regard to its racial makeup.<br>18       MS. BORGEN:  Objection as to form.<br>19    A.   Yeah, I don't know what you mean by<br>20 significantly different, but it is different.<br>21    Q.   Well, would you agree with me that the<br>22 percentage of African American population of Volusia<br>23 County is at least half of what it is in the other<br>24 counties listed on that Exhibit 9?<br>25    A.   Except for Hillsborough. | 1 Exhibit 9.  Other than that, no.<br>2    Q.   That data which you did put in there from --<br>3 that's on Exhibit 9 is the data which we just discussed<br>4 that shows Volusia County as being different than the<br>5 other counties, correct?<br>6       MS. BORGEN:  Objection as to form.<br>7    A.   It is different from the other counties,<br>8 that's correct.  I might add that in FREDS 2000, in the<br>9 middle of that data on page 5 --<br>10    Q.   Yes, sir.<br>11    A.   There's registered voting numbers for Volusia<br>12 County, but I couldn't use it because I didn't have data<br>13 on inactive voters or affirmations or numbers of poll<br>14 workers.<br>15    Q.   Did you request that information?<br>16    A.   Yes, I did.<br>17    Q.   From whom?<br>18    A.   Through my counsel.<br>19    Q.   And was it provided to you?<br>20    A.   No, I don't have the data.  I never received<br>21 it.<br>22    Q.   Based on the differences that you have pointed<br>23 out in your report between Volusia County and the other<br>24 counties with regard to the racial percentages, would<br>25 you agree with me, sir, that your opinions rendered on |

| Page 203 | Page 205 |
|---|---|
| 1    Q.   Okay.<br>2    A.   And except for the Florida state as a whole.<br>3    Q.   Okay.  With the exception of Hillsborough,<br>4 which is still 50 percent higher with regard to the<br>5 African American population, Volusia County is<br>6 significantly lower, is it not?<br>7       MS. BORGEN:  Objection as to form.<br>8    A.   Again, the word "significantly," I'm not sure<br>9 exactly what that means.  It's just very different, and<br>10 it's mostly, as I've been pointing out, not necessarily<br>11 the African American population is different.  It's the<br>12 non-Hispanic white population that's extraordinarily<br>13 high, at 81.9 percent.<br>14    Q.   Well, in fact, on Exhibit 9, both percentage<br>15 of African American and the non-Hispanic white<br>16 population are different than the other defendants<br>17 involved in this lawsuit.  Is that not correct, sir?<br>18    A.   That's correct.<br>19    Q.   On page 4 and 5 of your report, the documents<br>20 that were available to you and that you considered in<br>21 preparing this report, are any of those documents or<br>22 does any of that data pertain to Volusia County?<br>23    A.   Only the data from the U.S. Bureau of the<br>24 Census that were general population characteristics that<br>25 I extracted and put in my report in Exhibit 7 and | 1 pages -- apply to Volusia County?<br>2       MS. BORGEN:  I'm sorry.  If you could repeat<br>3 the question?<br>4       THE WITNESS:  Yeah, something skipped in your<br>5 transmission.<br>6       MS. BORGEN:  You blanked out on the phone for<br>7 a while.<br>8       MR. RESTREPO:  If you repeat the page numbers,<br>9 I think we'll be all right.<br>10       THE WITNESS:  Yeah, the page numbers we<br>11 missed, were skipped.<br>12       MR. BOSCH:  Pages 2 through 4.<br>13       THE WITNESS:  Okay.  Now I forget the<br>14 substance of the question.  I'm sorry.<br>15       MR. BOSCH:  Maybe we can have the court<br>16 reporter read back --<br>17       THE WITNESS:  That might be easier.<br>18       - - -<br>19       THE REPORTER:  Question: "Based on the<br>20 differences that you have pointed out in your report<br>21 between Volusia County and the other counties with<br>22 regard to the racial percentages, would you agree with<br>23 me, sir, that your opinions rendered on pages 2 through<br>24 4 apply to Volusia County?"<br>25       - - - |

52 (Pages 202 to 205)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 206

1     A.   No because I didn't have the data to include
2   Volusia in my statistical analysis.
3     Q.   But my question was will you agree with me
4   that the opinions do not apply to Volusia County?
5     A.   Well, given the lack of data, you're correct.
6   If I had the data and if it's made available to me, I
7   may conclude something completely different.
8     Q.   Have you been asked to do any additional work
9   with regard to Volusia County?
10    A.   No, not beyond the four categories I looked at
11  in my report.
12    Q.   Do you anticipate, with the exception of being
13  asked by counsel, do you anticipate performing any
14  additional studies or rendering any additional opinions
15  with regard to Volusia County?
16    A.   If Volusia County makes those data available
17  for me that I can use in looking at the categories in
18  4A, B -- C and B, then I could draw -- I might be able
19  to draw an opinion about Volusia County.
20    Q.   I'm not asking whether you could.  I'm asking
21  right now, do you anticipate doing so.
22    A.   I anticipate it, but I don't know if I'll get
23  it done.  In other words, if I receive the data, I'll do
24  it.  If I don't receive the data, I cannot do it.  Do
25  you see what I mean?  I'd love to do it.

Page 207

1     MR. BOSCH:  I don't have any other questions.
2   Thank you.
3     EXAMINATION BY COUNSEL FOR PAM IORIO
4     BY MR. TINKLER:
5     Q.   Dr. Flores, this is Ken Tinkler with the
6   Hillsborough County Attorney's Office representing Pam
7   Iorio.  Just two quick questions.  Your Exhibit 5 to
8   your report -- has that data set been provided to
9   defense counsel?
10    A.   I don't know.  Did we provide that data?  Yes,
11  it should be because I included it on the -- it's in the
12  CD-ROM that we gave a copy to defense counsel.
13    Q.   Okay.  And is the same answer for Exhibit 6?
14    A.   Yes.
15    MR. TINKLER:  Okay.  Thank you very much.
16    EXAMINATION BY COUNSEL FOR WILLIAM COWELS
17    BY MR. CHEROF:
18    Q.   Doctor, Jim Cherof for Orange County.
19    A.   Hi.  How are you?
20    Q.   Fine.  How are you?
21    A.   Just fine.
22    Q.   Make reference to Exhibit 3 if you would in
23  your report please.  Are each of your opinions that are
24  set forth in paragraph 4A through F applicable to Orange
25  County?

Page 208

1     MS. BORGEN:  When you refer to Exhibit 3, are
2   you referring to the report as Exhibit 3 or Exhibit 3 to
3   the report?
4     BY MR. CHEROF:
5     Q.   I'm referring to the report specifically.  I'm
6   asking about the conclusions that begin on page 2 with
7   paragraph 4.
8     A.   Correct.  No, only because I did not receive
9   -- as with Duval County, I did not receive data from
10  Orange County.
11    Q.   Tell me which ones as of today are not
12  applicable to Orange County.
13    MS. BORGEN:  Objection as to form.
14    A.   I cannot do the analysis on the relationship
15  between African American registered voters and the
16  percentage of individuals identified as inactive voters.
17    Q.   That's A, correct?
18    A.   That's correct.  I cannot do the statistical
19  analysis on the affirmation affidavits.  I have the data
20  for Orange County as a whole for the county but not at
21  the precinct level data, so lacking precinct level data,
22  I cannot do the regression analysis.  That's B.  I do
23  not have any data on felons purged from Orange County,
24  so I cannot do C, and I do not have any data on the
25  number of poll workers assigned on a precinct level

Page 209

1   basis from Orange County, so I cannot do D.  If I had
2   the data, I will do it, if the data's made available to
3   me.
4     Q.   How about E and F?
5     A.   Well, lacking the data, you know, I can't say
6   anything about that obviously.
7     Q.   What data have you requested from Orange
8   County that you have not received?
9     A.   Just those data that I referred to, inactive
10  voters at the precinct level, affirmation affidavits at
11  the precinct level, the number of felons purged by race
12  for the entire county.  I don't need that at the
13  precinct level, and the number of -- the count of poll
14  workers assigned to each precinct during the general
15  election of 2000.
16    Q.   And is that information that you requested of
17  Orange County through your -- through the attorneys?
18    A.   Yes.
19    Q.   The plaintiffs?
20    A.   Yes.
21    Q.   Is it your opinion that the act of filling out
22  an affirmation affidavit operates to deny African
23  Americans equal opportunity to participate in the
24  electoral process?
25    A.   It's my opinion that the act of filling out an

53 (Pages 206 to 209)

Henry Flores, Ph.D.

Washington, D.C.

May 30, 2002

Page 210

1  affirmation form is an additional step that's placed on
2  any voter during the voting process regardless of race,
3  but in this particular case -- my particular analysis in
4  this case for the data that I have -- that was made
5  available or made available for me, I concluded that
6  there was a statistically significant relationship
7  between the number of affirmations in those precincts
8  having high percentages of African American registered
9  voters, and so there's an additional step being placed
10  on the voters in those particular precincts,
11  consequently, an additional burden.
12     Q.  Are you unable to answer my question?
13     A.  I thought I just did. I'm sorry.
14     Q.  Why don't I restate it for you.
15     A.  Okay.
16     Q.  Is it your opinion that the act of filling out
17  an affirmation affidavit operates to deny African
18  Americans equal opportunity to participate in the
19  electoral process in Orange County?
20     A.  I don't know how Orange County does that, so I
21  can't answer your question.
22     Q.  Can you answer it on a statewide basis in
23  Florida?
24     A.  Again, I don't know that. I don't know the
25  process, the exact process that's going -- that takes

Page 211

1  place at the polls. I know that that process does tend
2  to discourage voting in the State of Texas by Hispanics
3  and African Americans because we have data on that.
4     Q.  Have you looked at any data or are you aware
5  of any data that establishes that fact in Florida?
6        MS. BORGEN:  Objection as to form.
7     A.  Only the data that I have been made -- that's
8  been made available to me and I've incorporated into my
9  report.
10     Q.  Well, you made reference to data that you
11  would rely upon in Texas to reach that conclusion. Is
12  there similar data that you've relied upon in Florida in
13  reaching your conclusion?
14     A.  Yeah, as I said, the only data that I have
15  available to me -- well, the only data that I've ever
16  performed any statistical analysis in relationship to
17  Florida are those data that were made available to me
18  for use in my report, period.
19     Q.  Is it your opinion that the process of having
20  to complete an affirmation affidavit at a polling place
21  would have a greater impact on African Americans than
22  any other voting group?
23     A.  I don't know. I can't answer that question
24  because I don't know. If people -- if there's been a
25  history of difficulty in politically participating on

Page 212

1  the part of any particular group, any time an additional
2  step is placed in their participation process that
3  questions whether or not they have a right to cast a
4  ballot becomes -- is a step toward the denial of that
5  vote simply because lesser educated voters or people
6  that don't understand everything that's going on with
7  elections that even may be pretty well educated may not
8  know that they can fill out an affirmation form, may not
9  even know to ask for one.
10     Q.  Do you know how many affirmation affidavits
11  were filled out in Orange County?
12     A.  No, I do not.
13     Q.  Would it be your opinion that any negative
14  effect that the use of affirmation affidavits would have
15  on somebody who wants to vote would be mitigated by
16  having a list of inactive voters at a polling place?
17     A.  Could you repeat your question? I'm sorry.
18     Q.  Sure.
19     A.  I accidentally spaced just for a second.
20  Sorry.
21     Q.  Would it be your opinion that the negative
22  effect of having to fill out an affirmation affidavit at
23  a polling place could or would be mitigated by having a
24  list of inactive voters at the polling place?
25     A.  Maybe.

Page 213

1     Q.  Do you know whether Orange County was one of
2  the counties that had lists of inactive voters at the
3  polling places?
4     A.  As far as I know, only the six counties I
5  mentioned in my report were the ones that indicated they
6  did not maintain lists of inactive voters, and I don't
7  know if that's a complete list or not, so, you know, I
8  can't really answer that question for Orange County.
9  I'm assuming they did maintain that list or they do
10  maintain that list.
11     Q.  Your report uses the phrase "history of racial
12  discrimination" several times. What historic time frame
13  did you use in relationship to that phrase?
14        MS. BORGEN:  Objection, asked and answered.
15     A.  Several times.
16     Q.  Well, let me make it more specific. What
17  historic time frame in Orange County did you consider?
18     A.  Oh, in Orange County specifically, none.
19     Q.  Can you identify any historical act of racial
20  discrimination in Orange County?
21     A.  Not without doing further research.
22     Q.  If I counted correctly, you used the term
23  "artifact" on several occasions, I think four or five
24  times, specifically when you were asked to relate the
25  1923 Rosewood event --

54 (Pages 210 to 213)

Page 214

1    A.  Uh-huh.
2    Q.  -- to the allegations of this complaint, and I
3  think you described that as the issues that are before
4  us today are an artifact of the 1923 Rosewood event.
5    A.  Well, the Rosewood event was just one event.
6  I mean, the issues that -- of vote denial that are being
7  addressed today are really artifacts of the whole
8  history of African Americans having a difficult time
9  casting a ballot throughout the South.  It's a legacy of
10  that whole history.  That's why we have a Voting Rights
11  Act.
12    Q.  Well, maybe I just don't understand your use
13  of the term "artifact."  Is there some other word that
14  you can substitute for "artifact" in what your answers
15  have been?
16    A.  I like "artifact."  I use it a lot in my
17  writing.  An artifact could be -- the way I mean to use
18  that particular word is that whatever I would call an
19  artifact would be something like one element of a legacy
20  that's a result of past historical occurrences or
21  relationships that have happened.  For instance, I'll
22  give you a for instance.  The lower educational levels
23  of African Americans currently are a legacy of a history
24  of the denial of first education during the days of
25  slavery and post slavery, and later, of segregated

Page 215

1  schools, and later even, poorly economically financed
2  and managed school systems.
3    Q.  So the term "legacy" might be a good
4  substitute?
5    A.  Well, I don't like legacy because legacy kind
6  of -- an artifact does not necessarily connote
7  intentionality.  Legacy may connote it.
8    Q.  What is it about the manner in which Orange
9  County conducted its elections that you believe denies
10  African American voters equal opportunity to vote?
11    A.  I don't know because I don't have any data
12  from Orange County to do my analysis.  Orange County's
13  one of the defendant counties, and I would like to
14  include them in my analysis, but at this point, given
15  the consistency of the patterns and the other
16  statistical analyses I've run, I would be surprised if
17  there were dramatic differences in Orange County.  There
18  may be, but I can't answer that question because I've
19  not seen the data.
20    Q.  Taking into consideration the data that you
21  have looked at and the statistical information, your
22  factors, which other counties in the list of defendant
23  counties is Orange County most like for comparison
24  purposes?
25    A.  For the entire state or just those -- did you

Page 216

1  say defendant counties?
2    Q.  Yes, defendant counties.  Just the ones that
3  are listed in this litigation.
4    A.  Okay.  Oh, Broward, Duval, Leon, Hillsborough
5  would be the principal ones.
6    MR. CHEROF:  Okay.  Thank you.  Remind me not
7  to sit next to them at trial.  Thank you.
8    MS. BORGEN:  Any other questions?
9    MR. CHEROF:  That's all I've got.  Thank you.
10    MS. BORGEN:  Anyone else on the phone?  No?
11  No one else on the phone with questions?  Okay.  I have
12  a few questions.  I'll try to make it quick because I
13  know everybody is getting hungry.
14    EXAMINATION BY COUNSEL FOR PLAINTIFFS
15    BY MS. BORGEN:
16    Q.  Professor Flores, you testified earlier -- is
17  it correct that you testified earlier that you have a
18  background in political science?
19    A.  That's correct.
20    Q.  And did you use that background in political
21  science to help you in preparing your report?
22    A.  Yes, I did.
23    Q.  And you also testified earlier that you have
24  been involved in a number of cases where you were
25  looking at vote dilution; is that correct?

Page 217

1    A.  That's correct.
2    Q.  And did you use statistical methods in those
3  vote dilution cases?
4    A.  Yes, I did.
5    Q.  Were those similar statistical analyses to
6  what you did in this case?
7    A.  They're identical.
8    Q.  You also spoke earlier about some of your past
9  litigation and cases that dealt with race discrimination
10  with African Americans, and you mentioned four cases,
11  LULAC and FOCUS, Rollins, LULAC and Dr. Harold Jones,
12  and Milwaukee branch of the NAACP.  Do you know if there
13  are any other cases in which you've served as an expert
14  that dealt with racial discrimination against African
15  Americans?
16    A.  There was one more I overlooked, and it was --
17    Q.  And you're looking at your resume, or your
18  C.V. there to answer it?
19    A.  Yes, I'm looking at my C.V., Exhibit Number 1,
20  Deposition Exhibit Number 1, and it is labeled -- it's
21  not on here, but my deposition in the case is -- oh,
22  there it is.  Reynosa versus Amarillo Independent School
23  District.
24    Q.  And what type of case is that?
25    A.  It was a racial polarization case and I looked

55 (Pages 214 to 217)

Henry Flores, Ph.D.                                                                              May 30, 2002

Washington, D.C.

---

**Page 218**

1  at the political cohesiveness of African American and
2  Hispanic voters in Amarillo, whether or not they had
3  similar voting patterns.
4     Q.  You testified earlier that I believe there's
5  an undergraduate student who assisted you with some data
6  entry?
7     A.  That's correct.
8     Q.  Were there any other assistants who -- or any
9  other students who assisted you in any way with your
10  report?
11     A.  No, there were not.
12     Q.  You've spoken at times during the deposition
13  about a history of discrimination in Florida.  Would you
14  say that the history of discrimination in Florida
15  includes various socioeconomic factors?
16     A.  I think that's -- yeah, the demographic
17  factors of renters and low income and those kinds of
18  characteristics that are in U.S. Bureau of Census
19  reports are reflective of a history of discrimination,
20  and the courts have concluded that.  They were very
21  specific in Gingles versus Thornburg when they were
22  discussing the Senate factors, that those could be
23  considered as artifacts of a history of racial
24  discrimination.
25     Q.  And what sort of factors would those include?

**Page 219**

1  You mentioned housing or renters.
2     A.  It would include income levels, educational
3  levels, renters versus owner-occupied housing, among
4  others.  There could be -- but those are the principal
5  ones.
6     Q.  Are those factors ones that you anticipate you
7  might testify about in the trial in this case?
8     A.  I anticipate discussing those during trial.
9     Q.  During your deposition, you used the term
10  "Gingles factors."  When you say Gingles factors, what
11  do you mean by that term?
12     A.  Well, what I'm speaking of is the three-
13  pronged Gingles test that was stipulated by the court in
14  Gingles V Thornburg, and essentially those are the three
15  factors that must be met when a plaintiff is
16  challenging -- is making a Section 2 challenge against a
17  particular political jurisdiction.  Generally the first
18  Gingles factor is that the plaintiffs must prove that
19  the minority group that's bringing the challenge is
20  geographically cohesive and a district can be drawn for
21  that particular group of people.
22       The second factor is whether or not the
23  electorate in a specific jurisdiction has a history of
24  racially polarized elections, in other words, whether or
25  not African Americans and/or Latinos and/or Native

**Page 220**

1  Americans or whichever the specific covered group is in
2  a case vote differently than the white voters do.  And
3  Gingles 3 is whether or not there's a history of white
4  block voting so that whites don't vote in high enough
5  percentages for minority candidates to win in an
6  at-large configuration.
7     Q.  In the cases where you have examined Gingles
8  factors, were those vote dilution cases?
9     A.  Yes, they were.
10     Q.  Are you familiar with the term "Senate
11  factors"?
12     A.  Yes, I am.
13     Q.  When you use the term "Gingles factors," does
14  that include Senate factors?
15     A.  No, not really, but Senate factor's a part of
16  the Gingles I guess proof for the court.  Essentially
17  the Senate factors -- the court has concluded the Senate
18  factors are what are the cause of the racially polarized
19  voting and the segregation that allows for the drawing
20  of a single member district for racial minority groups,
21  and the white block voting is an artifact of that
22  particular -- of all the Senate factors as well.
23     Q.  You were asked earlier whether you'd reached
24  any conclusions about the Department of Highway Safety
25  and Motor Vehicles in Florida.

**Page 221**

1     A.  That's correct.
2     Q.  Do you anticipate that you might look at any
3  statewide information about the Department of Highway
4  Safety and Motor Vehicles?
5     A.  If the data are provided to me, I will look at
6  it.
7     Q.  Do you anticipate looking at any statewide
8  data regarding the Department of Children and Families?
9     A.  If the data, again, are provided for me, I
10  will look at that.
11     Q.  In your analysis, you used regression analysis
12  to look at some data.
13     A.  That's correct.
14     Q.  Are there other research methods that could be
15  applied to the same data to analyze the relationship
16  between the -- between the data?
17       MR. RESTREPO:  Objection, asked and answered.
18       MR. TINKLER:  Objection to form.
19       THE WITNESS:  Could you repeat your question?
20       BY MS. BORGEN:
21     Q.  Certainly.
22     A.  Can you be more specific?
23     Q.  Other than regression analysis, are there
24  other research methods that could be applied to election
25  data to determine whether there's a relationship between

---

56 (Pages 218 to 221)

Henry Flores, Ph.D.
Washington, D.C.
May 30, 2002

Page 222

1  certain pieces of data?
2      A.  Oh, certainly.  When we really -- when we do a
3  vote dilution case, we do not just the ecological
4  regression analysis, but we perform what's called
5  extreme case analysis where we look at homogeneous --
6  sometimes it's also called homogeneous precinct analysis
7  where we look at precincts that have at least a 90
8  percent population of a given racial group and we look
9  at their historical voting patterns in those particular
10  precincts.
11      There's also -- Gary King, I guess for lack of
12  a better statistical term, Gary King's approach at
13  Harvard University where he uses kind of -- the best way
14  to describe it is it's a maximum likelihood estimation
15  of how given precincts behave electorally.  Sometimes
16  that's used.  Sometimes it's not used.  It's very
17  difficult to explain to lay people, so sometimes because
18  it's complex, they don't want to use it, but that's a
19  call of the expert in a given case.
20      And then on occasion, there have been -- John
21  Luwen pioneered and he wrote a book on methods to use in
22  civil rights cases, statistical research methods used in
23  civil rights cases, pioneered a technique called an
24  overlapping percentages technique where it's a very
25  simple -- it's an arithmetic technique where you just

Page 223

1  literally look at a given precinct and assume that all
2  voters of one race vote for a specific candidate.
3  Anything left over goes to another candidate and then
4  you can draw some conclusion.
5      When you're doing a vote dilution case as an
6  expert, you would use multiple combinations of those
7  techniques to present your data, so I've used various
8  combinations of those in the past, and actually, in
9  employment cases, discrimination cases, I've used
10  different sorts of other statistical techniques, maximum
11  likelihood chi squared.  I've used comparison of means
12  test a couple of times.  I've used the fi coefficient
13  correlation statistic.
14      It depends on the data.  The data -- the
15  general rule of thumb in statistics is the data
16  determine which statistical test you're to use, the
17  level of measurement of that data.  It's a racial level
18  data, you're going to use regression analysis.  If it's
19  nominal level analysis, you're going to use chi squared
20  analysis.  It just depends.
21      Q.  In paragraph 4C of your report, if I could ask
22  you to take to that -- I think it's marked as Deposition
23  Exhibit 3.  I believe you testified earlier that in that
24  paragraph, you did not do a regression analysis.
25      A.  That's correct.

Page 224

1      Q.  Do you think the type of analysis you did in
2  paragraph 4C is an appropriate research method for
3  analyzing the purged data?
4      A.  Well, when we look at Senate factors in a
5  given vote dilution case, the technique that I used in
6  here to compare the ratios of African American --
7  African Americans identified as felons and purged with
8  the total percentage of African Americans in a given
9  county is the same technique we used to present Senate
10  factor data, so it's appropriate I would think.
11      Q.  If I could ask you to turn to page 4 of your
12  report, the last sentence in paragraph D, you state
13  there that there is no statistically significant
14  relationship found between these two variables in
15  Miami-Dade County.  At what level was no statistical
16  significance found between those two variables?
17      A.  Well, it was barely insignificant, point 083,
18  and in the methodological appendix to my report, I
19  discussed that.  Essentially if you were to interpret
20  that, the relationship I found in Miami-Dade would occur
21  the same way 90 percent of the time if you were to do
22  this particular analysis 100 times.  Statistical
23  significance can be interpreted that way.
24      Q.  Okay.  If I could ask you to turn to page 2 of
25  your report, paragraph 4A, the paragraph regarding

Page 225

1  inactive voters?
2      A.  Uh-huh.
3      Q.  And you state near the top of page 3 that,
4  "Given that the defendant counties share similar racial
5  populations as Miami-Dade, I surmise that similar
6  statistical findings may exist in the defendant counties
7  and in the state as a whole."  Now, for your analysis in
8  paragraph A, is it correct that you only looked at
9  specific inactive data for Miami-Dade?
10      A.  That's correct.
11      Q.  But do you believe that the findings for
12  Miami-Dade may apply to other defendant counties in this
13  litigation?
14      A.  Certainly.
15      Q.  Again, in paragraph B, you state that -- is it
16  correct that you looked at the affirmation affidavits by
17  precinct for Hillsborough County?
18      A.  Yes, I did.
19      Q.  And then the county-wide affirmation
20  information for Orange County?
21      A.  That's correct.
22      Q.  And you surmised that similar statistical
23  findings may exist in the defendant counties and in the
24  state as a whole?
25      A.  Yes.

57 (Pages 222 to 225)

Henry Flores, Ph.D.

May 30, 2002

Washington, D.C.

Page 226

1      MR. TINKLER: Objection to form.
2      BY MS. BORGEN:
3    Q.   Is it your testimony that the findings in
4  paragraph B may apply to some of the other defendant
5  counties?
6    A.   They may.
7    Q.   And would the same case be from your findings
8  in paragraph 4D regarding poll workers, that your
9  findings may apply to other counties beyond where you
10  looked at the data?
11    A.   That's correct.
12    Q.   Turning back to paragraph 4C of your report on
13  page 3, do you believe that your academic experience
14  that you've testified about today assisted you in making
15  the conclusions in paragraph 4C?
16    A.   Could you be more specific?
17    Q.   Sure. You testified earlier about your work
18  as a political scientist and in statistics, and do you
19  think that work assisted you in preparing this portion
20  of your report that's marked as paragraph 4C?
21      MR. TINKLER: Objection to form.
22      THE WITNESS: Oh, yeah.
23      MR. RESTREPO: I join the objection.
24      THE WITNESS: Well, I agree with her, yes.
25      BY MS. BORGEN:

Page 227

1    Q.   And in what way would you say that your
2  background assisted you in the preparation of paragraph
3  4C of your report?
4    A.   Well, from a statistical point of view, the
5  way that -- the form that the data came to me, I found
6  that the way I displayed them in Exhibit 3 was the best
7  way to display those data. You can't really do much
8  more with it, so my experience as a statistician
9  resulted in my determining that's the way to display the
10  data, those data in Exhibit 3. And as a political
11  scientist, I write and teach on race relations, and I
12  know from just the reading that I've done over the last
13  20, 25, 30 years, that the minority groups overpopulate
14  prisons and so forth in general. For a specific county
15  in Florida, I don't have those kind of data. I just
16  have it as a broad general background, understand those
17  sorts of things, and so it made sense to me to see this.
18      And I do know that -- and again, I have a
19  broad background in this. I do know that there's a
20  broad variety of different techniques used by different
21  states to either allow felons to vote or purge them from
22  the rolls. It varies from state to state. In some
23  states you're purged for life. In some states you can
24  petition to request your rights back. In some states
25  you can vote when you're in jail. I think Massachusetts

Page 228

1  is the only state like that, but I don't know exactly
2  how Florida does it, so -- I know that there's a
3  relationship between being a felon and being purged as a
4  voter, and so that all comes from just my own background
5  and doing reading and research in preparation for my
6  classes and things of that nature.
7    Q.   I'd like to show you a document that's Bates
8  numbered A042001 to A042003 that was produced to
9  defendants. They received it yesterday. If you could
10  just look at that and let me know if you recognize it.
11    A.   Yes, I do recognize the document.
12      MS. BORGEN: Actually, I would like to note
13  for the record that this is part of the consolidated
14  exhibit?
15      MR. RESTREPO: Composite exhibit.
16      BY MS. BORGEN:
17    Q.   Composite exhibit. Composite Exhibit Number 2
18  marked for the deposition. Could you tell me what that
19  information is?
20    A.   It's a set of percentages of -- it's
21  identified as percentage of black and non-black movers
22  and non-movers in Florida that I reproduced as Exhibit 8
23  in my report.
24    Q.   And do you know what the basis of this
25  information is?

Page 229

1    A.   Yes, it's identified in the e-mail cover
2  letter to me from Ms. Cara Fineman of the Lawyers'
3  Committee. It reads as follows: "Please see the
4  attached tables, which were prepared using the data from
5  the March supplement of the current population surveys
6  carried out nationwide by the U.S. Bureau" -- "Census
7  Bureau. They show separately for blacks and non-blacks
8  in Florida the numbers and percentages of respondents
9  who report any change of residences in the year before
10  the survey, and for those who moved, the numbers and
11  percentages who moved across county lines, state lines
12  or national borders."
13    Q.   Would it be correct to say that the source of
14  this data is the U.S. Census Bureau?
15    A.   It would be because I trust Ms. Fineman.
16    Q.   Did you take any independent steps to
17  determine the origin of this information?
18    A.   I don't think so.
19    Q.   But you say this is the source for Exhibit --
20    A.   Eight.
21    Q.   -- 8 of your report?
22    A.   That's correct. As I said earlier, it did
23  compare to the geographical mobility study that I cited
24  in my report as part of Deposition Exhibit Number 2 from
25  the U.S. Bureau of Census.

58 (Pages 226 to 229)

Page 230

1    MS. BORGEN:  No further questions.
2    FURTHER EXAMINATION BY COUNSEL FOR CHOICEPOINT, INC.
3       BY MR. RESTREPO:
4       Q.   I've got a couple.  Dr. Flores, you talked
5    about -- a moment ago about a number of alternative
6    approaches to doing statistical analysis; is that
7    correct?
8       A.   That's correct.
9       Q.   Did you use any of those approaches here?
10      A.   The only ones I used were the bivariate
11   regression analysis and sometimes it's known as an
12   orderly squares or OLS.  Sometimes it's also known as
13   ecological regression.  And then I just, for number C, I
14   did a simple data display of the comparisons of felons
15   and compilation.  Those are the only two techniques I
16   used in this report.
17      Q.   Is it your understanding that -- excuse me.
18   Is this a vote dilution case?
19      A.   No.
20      Q.   Going back to Exhibit 3, which is related to
21   4C I believe, did I understand your testimony correctly
22   that your academic training taught you how to display
23   the information in Exhibit 8 in the manner in which you
24   displayed it in Exhibit 3?
25      A.   Both my training and my experience.

Page 231

1       Q.   Okay.  And one final training and experience
2    question.  At what point in your academic career did you
3    learn how to do long division?
4       A.   Long division?
5       Q.   Yes.
6       A.   I don't remember.
7       Q.   Before your graduate studies?
8       A.   Yeah, in elementary school.
9          MR. RESTREPO:  Okay, thank you very much.
10         MS. BORGEN:  Any other questions?
11         MR. TINKLER:  No.
12         MS. BORGEN:  Any questions from anyone on the
13   phone?  All right.  I think that's it then.  Thanks,
14   everyone on the phone.
15         (Whereupon, at 6:00 p.m., the taking of the
16   instant deposition ceased.)
17
18
19
20
21
22
23
24
25

Page 232

1
2    _____
3         Signature of the Witness
4
5    SUBSCRIBED AND SWORN TO before me this _____
6    day of_____, 200__.
7
8    _____
9         NOTARY PUBLIC
10   My Commission Expires _____.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 233

1    UNITED STATES OF AMERICA  )
2                             ss:
3    DISTRICT OF COLUMBIA      )
4
5         I, KAREN C. YOUNG, a Notary Public within and
6    for the District of Columbia, do hereby certify that the
7    witness whose deposition is hereinbefore set forth was
8    duly sworn and that the within transcript is a true
9    record of the testimony given by such witness.
10        I further certify that I am not related to any
11   of the parties to this action by blood or marriage and
12   that I am in no way interested in the outcome of this
13   matter.
14        IN WITNESS WHEREOF, I have hereunto set my
15   hand this _____day of_____, 200__.
16
17
18   _____
19
20
21
22   My Commission Expires:
23   July 31, 2004
24
25

59 (Pages 230 to 233)

# TAB 24

1      UNITED STATES DISTRICT COURT FOR THE
2          SOUTHERN DISTRICT OF FLORIDA
3                 ---oOo---
4
5   NATIONAL ASSOCIATION FOR THE
6   ADVANCEMENT OF COLORED PEOPLE,
7   INC., by its FLORIDA STATE
8   CONFERENCE OF BRANCHES, etc.,
9   et al.,
10          Plaintiffs,
11   vs.                NO. 01-CIV-120,
12   KATHERINE HARRIS, etc., et al.,    Gold/Simonton
13          Defendants.
14   _____/
15
16
17        VIDEOTAPED DEPOSITION OF
18            DAVID KLAUSNER
19         TUESDAY, MAY 28, 2002
20
21
22
23
24
25   PAGES 1-256

                                              1

1
2
3
4
5
6
7
8
9
10        Videotaped deposition of DAVID KLAUSNER,
11   taken on behalf of Defendants, at 4290 El Camino
12   Real, Portofino Room, Palo Alto, California,
13   commencing at 1:10 p.m., Tuesday, May 28, 2002,
14   before Dawn A. Stark, CSR No. 7847.
15
16
17
18
19
20
21
22
23
24
25

                                              2

1   APPEARANCES OF COUNSEL:
2
3   FOR PLAINTIFFS:
4
5       PEOPLE FOR THE AMERICAN WAY FOUNDATION
6       BY:  LARRY OTTINGER, ESQ.
7       2000 M Street, NW, Suite 400
8       Washington, DC 20036
9       Phone No. (202) 467-4999
10      Fax No. (202) 293-2672
11
12  FOR DEFENDANTS CHOICEPOINT, INC.:
13
14      WILLIAMS & CONNOLLY LLP
15      BY:  RAYMOND W. BERGAN, ESQ.
16      725 Twelfth Street, N.W.
17      Washington, DC 20005
18      Phone No. (202) 434-5013
19      Fax No. (202) 434-5029
20
21
22
23
24
25

                                              3

1   APPEARANCES OF COUNSEL (CONTINUED):
2
3       FOR DEFENDANTS KATHERINE HARRIS, SECRETARY
4       OF STATE OF FLORIDA, AND CLAY ROBERTS,
5       DIRECTOR OF THE FLORIDA DIVISION OF
6       ELECTIONS:
7
8       STEEL, HECTOR & DAVIS
9       BY:  DAVID I. SPECTOR, ESQ.
10      1900 Phillips Point West
11      777 South Flagler Driver
12      West Palm Beach, Florida 33401
13      Phone No. (561) 650-7200
14      Fax No. (561) 655-1409
15
16  FOR DEFENDANTS MIAMI-DADE COUNTY AND
17  SUPERVISOR OF ELECTIONS DAVID LEAHY (ON
18  SPEAKERPHONE):
19
20      DADE COUNTY ATTORNEY'S OFFICE
21      BY:  SUSAN TORRES, ESQ.
22      111 NW First Street, Suite 2810
23      Miami, Florida 33128
24      Phone No. (305) 375-5151
25      Fax No. (305) 375-5634

                                              4

APPEARANCES OF COUNSEL (CONTINUED):

FOR DEFENDANTS FRED DICKINSON, EXECUTIVE
DIRECTOR, FLORIDA DEPARTMENT OF HIGHWAY
SAFETY AND MOTOR VEHICLES AND KATHLEEN
KEARNEY, SECRETARY OF THE FLORIDA DEPARTMENT
OF CHILDREN AND FAMILIES (ON SPEAKERPHONE):

   OFFICE OF THE ATTORNEY GENERAL
   BY: GEORGE WAAS, ESQ.
   The Capitol - Suite PL-01
   Tallahassee, Florida 32399
   Phone No. (850) 487-1008
   Fax No. (850) 922-8916

FOR DEFENDANTS HILLSBOROUGH COUNTY AND
SUPERVISOR OF ELECTIONS PAM IORIO (ON
SPEAKERPHONE):

   HILLSBOROUGH COUNTY ATTORNEY'S OFFICE
   BY: KENNETH TINKLER, ESQ.
   601 East Kennedy Boulevard, 27th Floor
   Tampa, Florida 33602
   Phone No. (813) 272-5670
   Fax No. (813) 272-5846

5

---

   ---oOo---

THE VIDEOGRAPHER: My name is Nick Shelley. 13:09:06
I'll be videotaping this proceeding on behalf of 13:09:13
Lex Reporting. 13:09:16
   The date is May 28th, 2002. The time 13:09:17
is 1:10 p.m. The location is the Crowne Plaza 13:09:20
Hotel in Palo Alto, California. 13:09:25
   We are here in the matter of NAACP 13:09:27
versus Harris. 13:09:30
   This will be the deposition of David 13:09:31
Klausner. 13:09:34
   The attorney noticing and taking the 13:09:36
deposition is Raymond Bergan, and the court 13:09:37
reporter is Dawn Stark of Spherion Deposition 13:09:39
Services. 13:09:42
   Would counsel please identify 13:09:42
yourselves, your firm, and those you represent. 13:09:44
   MR. BERGAN: My name is Raymond W. Bergan, 13:09:46
Williams & Connolly in Washington, DC. 13:09:50
   We represent ChoicePoint. 13:09:52
   MR. SPECTOR: David Spector from Steel, 13:09:57
Hector & Davis on behalf of the Secretary of State 13:09:58
Katherine Harris, and Division of Elections 13:10:00
Director L. Clayton Roberts. 13:10:05
   MR. OTTINGER: Lawrence S. Ottinger, People 13:10:06

7

---

APPEARANCES OF COUNSEL (CONTINUED):

FOR DEFENDANTS VOLUSIA COUNTY AND SUPERVISOR
OF ELECTIONS DEANIE LOWE (ON SPEAKERPHONE):

   VOLUSIA COUNTY ATTORNEY'S OFFICE
   BY: WILLIAM VOSCH, ESQ.
   123 West Indiana Avenue
   DeLand, Florida 32720
   Phone No. (386) 736-5950
   Fax No. (386) 736-5990

ALSO PRESENT:
   NICK SHELLEY, VIDEOGRAPHER

6

---

for the American Way Foundation, one of the 13:10:08
counsel representing plaintiffs. 13:10:13
   MR. BERGAN: Do those on the phone care to 13:10:19
introduce themselves, please? 13:10:21
   MS. TORRES: Susan Torres, representing David 13:10:26
Leahy, the Supervisor of Elections for Miami-Dade 13:10:28
County. 13:10:31
   MR. WAAS: This is George Waas with the 13:10:32
attorney general's office in Tallahassee, 13:10:34
representing the Florida Departments of Highway 13:10:36
Safety and Motor Vehicles and Children and 13:10:38
Families. 13:10:41
   MR. TINKLER: This is Kenneth Tinkler of the 13:10:41
Hillsborough County Attorney's Office, 13:10:43
representing Supervisor of Elections Pam Iorio. 13:10:44
   MR. VOSCH: This is William Vosch, County of 13:10:47
Volusia, representing Deanie Lowe, Supervisor of 13:10:52
Elections for Volusia County. 13:10:54
   THE VIDEOGRAPHER: You can swear the witness. 13:11:01

   DAVID KLAUSNER,
having been first duly sworn, testified as
follows:

8

---

2 (Pages 5 to 8)

EXAMINATION

BY MR. BERGAN:

Q.   Mr. Klausner, good afternoon.        13:11:10

A.   Good afternoon, sir.        13:11:12

Q.   As you heard a moment or two ago, my   13:11:13
name is Ray Bergan, and I represent one of the   13:11:18
defendants in this case, and I am the one who has   13:11:20
noticed your deposition.        13:11:22
        I know that you have given a number of   13:11:26
depositions in the past.        13:11:28
        Let me just -- let me just say that I   13:11:31
am -- I am not quite computer illiterate, but I am   13:11:40
certainly computer challenged, so if you don't   13:11:45
understand the way I'm trying to ask a question,   13:11:47
please let me know, and I'll try to rephrase it,   13:11:52
because we want to get as clear a record as we   13:11:55
can.        13:11:57
        What is your educational background,   13:11:58
sir?        13:12:00

A.   I have a bachelor's degree in   13:12:01
mathematics and a master's degree in electrical   13:12:05
engineering.        13:12:09
        MR. BERGAN:  And before we go any further,   13:12:09
I'm going to ask the court reporter if she would   13:12:11

9

mark, as the first exhibit, the notice of   13:12:13
deposition in this case.        13:12:15
        Larry, I have an extra copy if you   13:12:22
want one, but I suspect you have a number.        13:12:24
        MR. OTTINGER:  All right.  I think I do, but   13:12:28
if you've got one, I'll take it.        13:12:30
        Can we just put on -- I assume we'll   13:12:33
just reserve objections except as to form?        13:12:35
        MR. BERGAN:  Except as to form, correct.   13:12:36
        MR. SPECTOR:  That's fine.        13:12:38
        (Deposition Exhibit No. 1 was marked.) 13:12:44
        MR. BERGAN:  While we're doing that, let me   13:12:45
ask the reporter to mark, as Exhibit 2, the expert 13:12:47
report of David Klausner.        13:12:52
        (Deposition Exhibit No. 2 was marked.) 13:13:00

BY MR. BERGAN:

Q.   Tell me something about your business   13:13:10
experience, Mr. Klausner.        13:13:16

A.   I believe my resume, which is attached   13:13:18
to my report, describes generally the business   13:13:21
experience that I have had.        13:13:26

Q.   What kind of experience have you had   13:13:29
in large-scale list merging operations?   13:13:33

A.   How do you define "large-scale list   13:13:38
merging operations"?        13:13:48

10

Q.   Well, let's get at it this way:  Do   13:13:51
you know the size of the Central Voter File in   13:13:56
1999, when ChoicePoint undertook this assignment?   13:14:01

A.   No, I don't.        13:14:07

Q.   All right.  If I were to tell you that 13:14:09
it was approximately 8.2 million names -- that's   13:14:15
the type of large-scale operation that I had in   13:14:22
mind when I ask the question.        13:14:26
        Do you have experience in dealing with   13:14:30
the merging or comparison of lists of that size   13:14:36
with other sources of data?        13:14:41

A.   (Witness reviewing document.)        13:14:43
        Yes, I think I do.        13:15:24

Q.   Would you describe that for us, if you   13:15:26
would, please.        13:15:28

A.   I have experience with automobile   13:15:29
recall data.  That is the identification and   13:15:36
notification of individuals who do or have owned   13:15:46
vehicles that are subject to the NTSB recall   13:15:53
program.        13:15:57

Q.   I recall that, in your CV, you   13:15:57
mentioned experience with one or more auto recall   13:16:01
programs.        13:16:06
        Is it one or is it more than one?   13:16:06

A.   I don't recall that my CV does have   13:16:09

11

that, but it is one.        13:16:15

Q.   One.        13:16:16
        When was that, sir, approximately?   13:16:17

A.   The first half of the 1990s.        13:16:19

Q.   All right, sir.        13:16:22
        Have you had any experience in dealing 13:16:24
with voters lists?        13:16:30

A.   I'd imagine you're asking me about   13:16:33
voters in governmental elections?        13:16:49

Q.   Yes, I'm sorry.  I meant that, state   13:16:52
or federal or county.        13:16:55

A.   I don't think so.        13:16:57

Q.   All right.  You have your CV before   13:16:59
you, Mr. Klausner, and I want to walk through,   13:17:02
fairly quickly, the litigation testimony, which is 13:17:07
listed -- well, it's an attachment to your CV.   13:17:12
        I don't really want to go into any   13:17:19
great detail, but I would like to find out, just   13:17:21
basically, what the cases were about and the   13:17:26
subject matter of your testimony.        13:17:28
        So, let's start with the first one,   13:17:32
that is Globetrotter versus Elan, which describes 13:17:34
a patent-infringement case.        13:17:38
        What was the subject matter of your   13:17:40
testimony?        13:17:43

12

3 (Pages 9 to 12)

| | |
|---|---|
| 1     A.   Globetrotter asserted a patent was     13:17:43 | 1    the software provided for filio management by the  13:20:36 |
| 2   infringed by Elan.                        13:17:48 | 2    defendant was inappropriate for their use.     13:20:44 |
| 3     Q.   And your testimony?                13:17:49 | 3     Q.   Guzik, G-u-z-i-k, Technical          13:20:50 |
| 4     A.   I examined the source program code of  13:17:50 | 4    Enterprises versus KMY Instruments, a trade secret 13:20:54 |
| 5   the defendant, and I testified about what I had  13:17:55 | 5    theft case.                             13:20:59 |
| 6   found.                                 13:18:00 | 6     A.   Guzik claimed that the defendant had   13:21:01 |
| 7     Q.   It was, I take it, the infringement of  13:18:01 | 7    obtained Guzik trade secrets in the form of    13:21:08 |
| 8   a source program code?                    13:18:04 | 8    program source code and specifications and were  13:21:13 |
| 9     A.   Globetrotter had a patent --          13:18:04 | 9    using them.                            13:21:14 |
| 10    Q.   I see.                             13:18:06 | 10    Q.   Tumbleweed versus docSpace, d-o-c,    13:21:16 |
| 11    A.   -- and claimed that the Elan source     13:18:07 | 11   Space, a patent-infringement case.           13:21:22 |
| 12  code was practicing the steps of -- at least some  13:18:12 | 12    A.   Yes.                             13:21:25 |
| 13  of the steps of the claims of the pattern.      13:18:25 | 13        Tumbleweed claimed that docSpace,      13:21:25 |
| 14    Q.   The next one is ABB versus Alstom,    13:18:27 | 14   Incorporated, were infringing claims that were in  13:21:30 |
| 15  theft of trade secrets case.                 13:18:31 | 15   patents owned by Tumbleweed.              13:21:33 |
| 16        Would you tell us the substance -- not  13:18:32 | 16    Q.   Tradescape versus Shivaram,         13:21:36 |
| 17  substance, the subject matter of your testimony in  13:18:34 | 17   S-h-i-v-a-r-a-m, another theft-of-trade-secrets   13:21:42 |
| 18  that case?                              13:18:38 | 18   case.                                 13:21:49 |
| 19    A.   ABB claimed that employees of the      13:18:39 | 19    A.   Yes.                             13:21:51 |
| 20  defendant took trade secrets of ABB when they left 13:18:43 | 20        The plaintiff claimed that the         13:21:52 |
| 21  the employ of ABB.                       13:18:47 | 21   defendant had used trade secrets in creating a    13:21:53 |
| 22    Q.   All right, sir.                      13:18:48 | 22   computer program for day trading on the NASDAQ.  13:21:59 |
| 23        The next is Konrad, that's with a K,   13:18:49 | 23    Q.   Dynacs, D-y-n-a-c-s, Engineering,     13:22:03 |
| 24  versus General Motors and others, a           13:18:53 | 24   versus Juno Pix, a breach-of-contract case.     13:22:07 |
| 25  patent-infringement case.                   13:18:55 | 25    A.   Dynacs Engineering had created        13:22:12 |
|  13 |  15 |

| | |
|---|---|
| 1     A.   Konrad had claimed that General Motors 13:18:57 | 1    software which could colorize otherwise uncolored 13:22:16 |
| 2   and other defendants had been practicing the steps  13:19:02 | 2    film.                                 13:22:20 |
| 3   of some of the claims of the Konrad patent.     13:19:05 | 3        The defendant, Juno Pix, had produced  13:22:21 |
| 4     Q.   And, I take it, you examined the       13:19:12 | 4    a movie called "Pleasantville" and used that     13:22:23 |
| 5   patent and examined the underlying -- was it     13:19:14 | 5    software, without the permission of Dynacs, to   13:22:27 |
| 6   software, and testified in favor of one of the    13:19:18 | 6    colorize their film.                      13:22:29 |
| 7   parties?                               13:19:24 | 7     Q.   DemCo, D-e-m-C-o, versus Public      13:22:30 |
| 8     A.   In this case -- well, I testified       13:19:24 | 8    Storage, a breach-of-contract case.          13:22:33 |
| 9   about what I had found as a result of experiments  13:19:27 | 9     A.   DemCo claimed that they had had a     13:22:37 |
| 10  I had performed.                         13:19:30 | 10   contract with Public Storage for the use of     13:22:42 |
| 11    Q.   I see.  All right, sir.              13:19:31 | 11   software which DemCo had created.           13:22:44 |
| 12        ATD versus Ceridian, C-e-r-i-d-i-a-n,  13:19:33 | 12        Public Storage denied that.           13:22:46 |
| 13  a breach-of-contract case.                  13:19:39 | 13    Q.   Media Optik, O-p-t-i-k, versus Sony   13:22:51 |
| 14    A.   Ceridian were a company handling      13:19:41 | 14   Entertainment, a patent-infringement case.     13:22:55 |
| 15  billing records for ATD, and ATD claimed a      13:19:49 | 15    A.   Media Optik claimed that Sony        13:23:00 |
| 16  mismanagement of the billing.               13:19:53 | 16   PlayStation practiced the elements of the claims  13:23:05 |
| 17    Q.   Last -- not lastly, BAX, B-A-X, all    13:19:57 | 17   of the Media Optik patent.                13:23:09 |
| 18  caps, versus CA, again all caps, another        13:20:01 | 18    Q.   Novadigm, N-o-v-a-d-i-g-m, versus    13:23:13 |
| 19  breach-of-contract case.                   13:20:08 | 19   Marimba, a patent-infringement case.         13:23:19 |
| 20    A.   Burlington Air Express claimed that    13:20:12 | 20    A.   Novadigm had a patent which the       13:23:24 |
| 21  Computer Associates had sold software which was  13:20:15 | 21   Marimba software, according to Novadigm, was    13:23:25 |
| 22  unfit for Burlington's use.                 13:20:18 | 22   practicing the claims of.                  13:23:30 |
| 23    Q.   Budgetel versus Micros/Fidelio,       13:20:25 | 23    Q.   All right.  LAPD versus the City of    13:23:31 |
| 24  another breach-of-contract case.             13:20:32 | 24   Los Angeles, a breach-of-contract case.       13:23:34 |
| 25    A.   The hotel chain Budgetel claimed that  13:20:33 | 25    A.   The Los Angeles Police Department     13:23:37 |
|  14 |  16 |

4 (Pages 13 to 16)

DEPOSITION OF DAVID KLAUSN

| | |
|---|---|
| 1  officers submitted their overtime hours for        13:23:43 | 1  your name?                                  13:27:04 |
| 2  processing, and the City of Los Angeles did not    13:23:50 | 2     A.   She may have. I don't remember.    13:27:05 |
| 3  properly manage the overtime data.              13:23:59 | 3     Q.   Had you done any work for either   13:27:08 |

create a competing product.

DEPOSITION OF DAVID KLAUSN

**Page 17**

1  officers submitted their overtime hours for        13:23:43
2  processing, and the City of Los Angeles did not    13:23:50
3  properly manage the overtime data.              13:23:59
4     Q.   Adaptec, A-d-a-p-t-e-c, versus Prassi,  13:24:03
5  P-r-a-s-s-i, Software, a theft-of-trade-secrets  13:24:08
6  case.                                          13:24:15
7     A.   Adaptec had claimed that former       13:24:16
8  employees of Adaptec had left the company and used  13:24:22
9  trade secrets of Adaptec to create software.    13:24:26
10       Those were the plaintiff -- I'm sorry,  13:24:30
11  of the defendant.                             13:24:32
12     Q.   Canter, C-a-n-t-e-r, versus West     13:24:35
13  Publishing Company, another theft-of-trade-secrets  13:24:36
14  case.                                         13:24:38
15     A.   Canter had a patent and a document    13:24:39
16  that he claimed West Publishing used in order to  13:24:44
17  create its search engine.                     13:24:48
18     Q.   And lastly, Phase Metrics versus MRS,  13:24:52
19  Inc., a theft-of-trade-secrets case.          13:24:58
20     A.   Phase Metrics had hardware and        13:25:03
21  software that was used to test hard-drive platters  13:25:04
22  for integrity.                                13:25:11
23       They claim that MRS -- former MRS -- I  13:25:13
24  should say former Phase Metrics employees who were  13:25:16
25  now at MRS had used the trade secrets in order to  13:25:19

**Page 18**

1  create a competing product.                   13:25:23
2     Q.   All right. Thank you, sir.            13:25:25
3       MR. BERGAN: Let me ask the court reporter to  13:25:28
4  mark as Exhibit 3 a document which I received from  13:25:30
5  plaintiff's counsel within the last several days.  13:25:34
6       It is another list of your litigation    13:25:38
7  experience, but with the case number and court  13:25:43
8  attached to it, so that -- it's the same list, I  13:25:45
9  believe, from which we were working. It's just an  13:25:50
10  -- expanded information on it.                13:25:54
11       (Deposition Exhibit No. 3 was marked.)
12       (Discussion off the record.)            13:26:20
13  BY MR. BERGAN:
14     Q.   Mr. Klausner, when were you first     13:26:34
15  retained in this case?                        13:26:36
16       I don't mean a specific day and week,    13:26:39
17  just a range in time.                         13:26:42
18     A.   I think it was this year.            13:26:43
19     Q.   2002?                                13:26:46
20     A.   I believe so, but I couldn't be       13:26:46
21  certain.                                      13:26:51
22     Q.   All right. And by whom, specifically?  13:26:51
23     A.   I was contacted by Attorney Henderson  13:26:52
24  at People for the American Way Foundation.    13:26:55
25     Q.   Did she tell you how she had gotten    13:27:01

**Page 19**

1  your name?                                    13:27:04
2     A.   She may have. I don't remember.       13:27:05
3     Q.   Had you done any work for either      13:27:08
4  Ms. Henderson or People for the American Way  13:27:11
5  Foundation before?                            13:27:13
6     A.   No.                                   13:27:14
7     Q.   What did she ask you to do?           13:27:16
8     A.   I don't think she asked me to do      13:27:18
9  anything.                                     13:27:26
10       You're talking about our initial        13:27:26
11  contact?                                      13:27:29
12     Q.   Yes.                                 13:27:29
13     A.   Okay.                                13:27:30
14     Q.   What was the subject of the initial   13:27:30
15  contact, then?                                13:27:33
16     A.   As I recall, she explained that there  13:27:34
17  was a lawsuit in progress with respect to the  13:27:37
18  management of data in databases, or something of  13:27:42
19  that ilk.                                     13:27:47
20     Q.   Okay. Did she ask if you would be     13:27:47
21  interested in undertaking some work in that case?  13:27:50
22     A.   Yes, she did.                        13:27:53
23     Q.   All right. Did you agree to do so in  13:27:56
24  that conversation or in a subsequent conversation?  13:27:58
25     A.   I did.                               13:28:01

**Page 20**

1     Q.   How many other lawyers for the        13:28:07
2  plaintiffs, besides Ms. Henderson and counsel  13:28:10
3  who's with you today, have you spoken to in the  13:28:14
4  case?                                         13:28:18
5     A.   I may have spoken to one other        13:28:18
6  attorney, but I don't recall their name, and it  13:28:22
7  may have been only once.                      13:28:25
8     Q.   All right.                            13:28:28
9     A.   It's possible I've not spoken to      13:28:29
10  anyone else, but my --                       13:28:33
11     Q.   All right, sir.                      13:28:34
12     A.   -- my memory is that I may have spoken  13:28:35
13  to one other person.                          13:28:37
14     Q.   Do you recall what document or group  13:28:38
15  of documents were given to you by the plaintiffs  13:28:43
16  to assist you in whatever it was they asked you to  13:28:51
17  do?                                          13:28:54
18     A.   Yes, I do remember.                  13:28:54
19     Q.   Can you give us, to the best of your  13:28:56
20  recollection, what they were?                 13:28:59
21     A.   There were seven CD-ROMs -- you're    13:29:01
22  talking about initially or at any particular point  13:29:05
23  in time?                                      13:29:08
24     Q.   Well, let's start initially, and then  13:29:08
25  we'll go further.                             13:29:11

1    A.    There were seven CD-ROMs, which, for    13:29:12
2    my purposes, I labeled 1 through 7, and referred    13:29:16
3    to them throughout my material as -- including my    13:29:23
4    report, as 1 through 7.    13:29:25
5    Q.    All right.    13:29:26
6    A.    There were boxes of printed material,    13:29:27
7    which included e-mails and documents. I believe    13:29:32
8    they were Bates numbered C00001 through C08008,    13:29:37
9    with gaps in between, because I do know I did not    13:29:48
10    receive 8,000 printed pages.    13:29:52
11    In total, I believe I received two    13:29:55
12    large boxes.    13:29:57
13    Q.    All right, sir.    13:29:57
14    You suggested a moment ago that you    13:30:01
15    may have subsequently received other documents    13:30:03
16    from the plaintiffs.    13:30:07
17    Can you identify them for us?    13:30:08
18    A.    Yes.    13:30:10
19    I did receive a magnetic tape, which    13:30:10
20    was a DLT-III tape. That's I-I-I.    13:30:15
21    Q.    Thank you.    13:30:21
22    A.    That contained the Central Voter File    13:30:23
23    in a backup format.    13:30:28
24    I also received a subsequent CD-ROM,    13:30:31
25    which I labeled CD-ROM No. 8, which I understood    13:30:36

21

1    came from the State of Florida.    13:30:40
2    I also subsequently received three    13:30:42
3    CD-ROMs in a delivery, which I understand also    13:30:46
4    came from the State of Florida and appeared to be    13:30:51
5    data by county.    13:30:54
6    I also received additional documents,    13:30:57
7    which I think are called out in my report --    13:31:01
8    Q.    You mention a number of them.    13:31:05
9    A.    -- on page 12.    13:31:06
10    Q.    Right.    13:31:08
11    Do you have a sense of approximately    13:31:15
12    how many hours you have spent to this point in the    13:31:17
13    work which you've done in this case?    13:31:22
14    A.    I don't.    13:31:24
15    Q.    Have you submitted a bill yet to    13:31:26
16    counsel for the plaintiffs?    13:31:31
17    A.    Yes, and I think I have them, at    13:31:32
18    least I was --    13:31:34
19    Q.    No.    13:31:36
20    MR. OTTINGER:  No.    13:31:38
21    MR. SPECTOR:  No.    13:31:39
22    THE WITNESS:  Okay. I was under the wrong    13:31:40
23    impression, but, yes, I have submitted a bill.    13:31:43
24    BY MR. BERGAN:
25    Q.    Are the hours in the hundreds?    13:31:46

22

1    A.    I think I might be able to give you an    13:31:48
2    approximate number. I think the hours are    13:31:51
3    approximately -- between 100 and 150.    13:31:56
4    Q.    All right, sir.    13:31:58
5    You mentioned a moment ago a DLT-III    13:32:00
6    tape which contained the Central Voter File.    13:32:03
7    Do you recall for what year that was?    13:32:06
8    A.    It was for the year 2000.    13:32:10
9    Q.    2000, all right.    13:32:11
10    Let me ask, sir, whether you reviewed    13:32:15
11    the statutory basis in the State of Florida for    13:32:22
12    the creation of a Central Voter File in the year    13:32:27
13    1999 and 2000.    13:32:31
14    I have specific reference to Florida    13:32:36
15    statute annotated 98.0975.    13:32:39
16    A.    I don't recall specifically reviewing    13:32:42
17    that. It may have been in the materials that I    13:32:45
18    received --    13:32:51
19    Q.    All right.    13:32:51
20    A.    -- but they were copious.    13:32:52
21    Q.    Do you recall studying or having    13:32:57
22    explained to you the various roles which the State    13:32:59
23    Division of Elections, the County Supervisors of    13:33:08
24    Elections, and ChoicePoint or Database Technology    13:33:12
25    were to play under that statute?    13:33:17

23

1    A.    I don't think so.    13:33:19
2    Q.    All right, sir.    13:33:22
3    I ask that question because, at page 5    13:33:30
4    of your expert report, toward the top of the page,    13:33:32
5    and again at page 9, you comment that "Direct    13:33:41
6    person-to-person contact between state or county    13:33:51
7    officials and the affected voter might be    13:33:54
8    required."    13:33:58
9    I ask that question because --    13:34:02
10    MR. OTTINGER:  I'm sorry. What's the -- I'm    13:34:06
11    not sure what the question is.    13:34:09
12    MR. BERGAN:  I'm just about to ask it.    13:34:10
13    MR. OTTINGER:  Okay. I'm sorry.    13:34:12
14    BY MR. BERGAN:
15    Q.    Whether you were aware or had    13:34:14
16    explained to you that, under Florida statutes    13:34:16
17    annotated 98.0975(3) -- (4) -- I'm sorry. Let me    13:34:19
18    start that over again -- Florida statutes    13:34:32
19    annotated 98.0975(4).    13:34:35
20    Do you know, sir, whether that is    13:34:46
21    precisely what the Florida legislature intended?    13:34:48
22    MR. OTTINGER:  I'm going to object as to    13:34:52
23    form.    13:34:54
24    Can we see a copy of the statute?    13:34:54
25    MR. BERGAN:  Well, I thought everybody had a    13:34:59

24

6 (Pages 21 to 24)

| | |
|---|---|
| 1  copy of the statute, but let's mark one.     13:35:00 | 1  various states, you would call that.        13:38:10 |
| 2      That would be 4, if you would, please. 13:35:03 | 2      Q.   And what is your understanding of what 13:38:16 |
| 3      (Deposition Exhibit No. 4 was marked.) 13:35:14 | 3  DBT did with this data, what they produced as an  13:38:20 |
| 4  MR. BERGAN:  I'm sorry, Larry.  I didn't    13:35:15 | 4  end result?               13:38:29 |
| 5  bring extra copies of that.           13:35:18 | 5      A.   Generally, DBT produced lists of      13:38:30 |
| 6  MR. OTTINGER:  That's fine.  I assume we're  13:35:20 | 6  voters and potential voters and provided those to  13:38:42 |
| 7  -- okay.                13:35:21 | 7  the State of Florida Department of Elections.    13:38:46 |
| 8  BY MR. BERGAN: | 8      They may also have produced lists and    13:38:53 |
| 9      Q.   Let me ask again, Mr. Klausner:  Did  13:35:25 | 9  provided them to other parties, as well, such as  13:38:59 |
| 10  you review that statute, if you recall?     13:35:28 | 10  parties in other states.           13:39:04 |
| 11      A.   I don't recall.            13:35:30 | 11      Q.   I'm not quite sure I understand that  13:39:09 |
| 12      Q.   All right.  Let me get -- I'll pass --  13:35:31 | 12  part of your answer.             13:39:11 |
| 13  go on to another subject.            13:35:37 | 13      Produced lists of what type to parties  13:39:14 |
| 14      Now, let me see if I can get from you  13:35:40 | 14  in other states?              13:39:18 |
| 15  your understanding of what ChoicePoint or Database  13:35:42 | 15      A.   As I recall from the information I    13:39:19 |
| 16  Technology did in this case in order to carry out  13:35:46 | 16  have seen, individuals were identified and sent to  13:39:23 |
| 17  their responsibilities under their contract or    13:35:52 | 17  at least the State of Texas or some other people  13:39:34 |
| 18  contracts with the State of Florida.       13:35:54 | 18  in the State of Texas for examination.      13:39:38 |
| 19      Do you have an understanding of the    13:36:01 | 19      Q.   What type of lists, sir?  Lists of    13:39:43 |
| 20  steps that ChoicePoint or DBT -- and I'm using the  13:36:03 | 20  what types of people?             13:39:46 |
| 21  terms interchangably -- did in 1999 and again in  13:36:10 | 21      Are you referring to felony lists?    13:39:47 |
| 22  2000?                 13:36:16 | 22      A.   At the least.             13:39:51 |
| 23      A.   I think I have a general        13:36:16 | 23      Q.   Do you have an understanding as to   13:39:52 |
| 24  understanding, but if you have a specific     13:36:20 | 24  whether such lists may or may not have been sent  13:39:55 |
| 25  question --               13:36:22 | 25  to states other than the State of Texas?     13:39:58 |
| 25 | 27 |

| | |
|---|---|
| 1      Q.   Well --               13:36:22 | 1      A.   I don't know.            13:40:00 |
| 2      A.   -- I can certainly try to answer that. 13:36:23 | 2      Q.   All right.              13:40:02 |
| 3      Q.   Let me see if I can get your general  13:36:25 | 3      A.   But I've answered you to the best of  13:40:02 |
| 4  understanding.              13:36:30 | 4  my recollection.              13:40:07 |
| 5      A.   DBT were employed to manage data of   13:36:31 | 5      Q.   Do you have an understanding of the   13:40:07 |
| 6  voters and potential voters for the State of    13:36:43 | 6  differences -- let me rephrase that question.   13:40:12 |
| 7  Florida in 1999 and 2000.          13:36:47 | 7      Do you have an understanding as to    13:40:18 |
| 8  That's my general understanding.        13:36:50 | 8  whether there were differences in processing    13:40:20 |
| 9      Q.   Do you know the sources of the data  13:36:55 | 9  between 1999 and the year 2000?         13:40:24 |
| 10  which DBT used in order to carry out this task?   13:37:01 | 10      A.   As I sit here today, I haven't     13:40:25 |
| 11      A.   My focus was on the year 2000      13:37:05 | 11  examined that in detail.           13:40:29 |
| 12  processing, and so I will answer you for the year  13:37:11 | 12      Q.   All right.              13:40:30 |
| 13  2000.                 13:37:15 | 13      A.   Except for what I remember, that     13:40:34 |
| 14      To the extent that those sources were  13:37:15 | 14  rather than a 90 percent match on name to select  13:40:38 |
| 15  also present in the year 1999 for DBT, even my   13:37:17 | 15  an individual in 1999, an 80 percent match on name  13:40:46 |
| 16  answers would apply the same.          13:37:21 | 16  was used for the selection criteria in the year  13:40:49 |
| 17      I believe the sources were the State   13:37:23 | 17  2000.                 13:40:53 |
| 18  of Florida databases, from a variety of sources,  13:37:26 | 18      Q.   Do you know what the Division of     13:40:54 |
| 19  which were governmental agencies within the State  13:37:31 | 19  Elections did with the data submitted to it by   13:40:58 |
| 20  of Florida, including the Motor Vehicle Department  13:37:33 | 20  ChoicePoint or DBT?             13:41:05 |
| 21  of the State of Florida, the Central Voter File as  13:37:39 | 21      A.   I can answer your question only by   13:41:06 |
| 22  it existed, the Florida Department of Law      13:37:44 | 22  referring to documents from my memory, and some of  13:41:17 |
| 23  Enforcement, other agencies within the State of  13:37:51 | 23  them are e-mails sent between people.  Some of   13:41:23 |
| 24  Florida, along with data which DBT had available  13:37:56 | 24  them are documents that describe lists being    13:41:28 |
| 25  to it from outside the State of Florida sources,  13:38:02 | 25  provided to Supervisors of Elections.      13:41:34 |
| 26 | 28 |

7 (Pages 25 to 28)

1     Some of the documents I remember are   13:41:35
2   transcripts of depositions of individuals, but I   13:41:38
3   don't have those documents with me.   13:41:45
4     Q.   Lists being provided to the   13:41:49
5   supervisors by whom or by what entity?  By the   13:41:50
6   Secretary of State or by someone in state   13:41:53
7   government, or by DBT or ChoicePoint?   13:41:57
8     A.   Well, I've seen no documents that   13:41:59
9   describe Ms. Harris actually providing lists to   13:42:02
10   anyone personally, but I believe it was people at   13:42:06
11   the Department of Elections providing lists to   13:42:11
12   Supervisors of Elections in the various counties.   13:42:15
13     Q.   All right, sir.   13:42:17
14     And do you have an understanding what,   13:42:18
15   if anything, supervisors in various counties did   13:42:23
16   with the lists which they were provided?   13:42:29
17     A.   Again, this is vague, but my   13:42:31
18   recollection is that it varied between the   13:42:37
19   Supervisors of Elections of the counties.   13:42:41
20     Q.   All right.  There were originally,   13:42:44
21   sir, as I'm sure you know, seven county   13:42:45
22   supervisors who were named defendants in this   13:42:50
23   case.  There are currently five who are still in   13:42:53
24   the case.   13:42:56
25     Do you have any sense of what the   13:42:59

29

1   supervisors of the 60 other counties in the State   13:43:04
2   of Florida did or did not do with the lists that   13:43:07
3   were provided to them?   13:43:12
4     A.   I did not know that there were seven   13:43:13
5   county supervisors named.  I did not know that   13:43:18
6   there were five remaining.   13:43:23
7     I don't know which of the five --   13:43:25
8   which those five supervisors -- which counties   13:43:28
9   those five supervisors represent, so I don't know   13:43:34
10   that I could answer your question about the   13:43:38
11   remaining 62 counties.   13:43:39
12     Q.   All right.  Do you recollect whether   13:43:41
13   you were given any information with respect to the   13:43:44
14   other 60 counties?   13:43:48
15     A.   I don't recollect.   13:43:48
16     Q.   All right.   13:43:52
17     A.   Once again, I may have, but I don't   13:43:53
18   remember.   13:43:55
19     Q.   The data which you've described a few   13:43:59
20   moments ago, which ChoicePoint or Database   13:44:03
21   Technology received from the State of Florida, all   13:44:08
22   came from governmental agencies, did it not, sir?   13:44:12
23     MR. OTTINGER:  Objection as to form of the   13:44:16
24   question.   13:44:19
25   BY MR. BERGAN:

30

1     Q.   You may answer.  That's lawyer talk.   13:44:20
2     MR. OTTINGER:  I don't remember what it was.   13:44:23
3     THE WITNESS:  Well, if we look at page 12, I   13:44:27
4   think it is, of my report --   13:44:31
5     MR. OTTINGER:  Can you repeat the question?   13:44:40
6     I'm sorry.  I don't remember what it   13:44:41
7   is.   13:44:45
8     MR. BERGAN:  I'll rephrase the question.  Let   13:44:46
9   me do that.   13:44:47
10     Q.   A moment or two ago, you described   13:44:48
11   data which Database Technology or ChoicePoint   13:44:50
12   received from the State of Florida for the 2000   13:44:54
13   processing, and you referred to the Division of   13:45:00
14   Motor Vehicles, you referred to the Florida   13:45:04
15   Division of Law Enforcement, and perhaps a couple   13:45:06
16   other governmental agencies.   13:45:09
17     What I was asking you is:  Did all of   13:45:11
18   the data, to your knowledge, which ChoicePoint   13:45:15
19   and/or Database Technology received from the State   13:45:19
20   of Florida come from governmental agencies?   13:45:22
21     A.   You're asking me if that data   13:45:27
22   originated with a governmental agency?   13:45:29
23     Q.   Yes.   13:45:32
24     A.   But not necessarily with a   13:45:32
25   governmental agency of the State of Florida?   13:45:34

31

1     Q.   Well, I was limiting myself initially   13:45:37
2   to the State of Florida, and then I was going to   13:45:39
3   broaden the question.   13:45:44
4     If you want to answer the broad one   13:45:44
5   first, that would be fine.   13:45:46
6     A.   I think it's difficult to say.   13:45:47
7     As far as I can tell from all of the   13:45:49
8   documentation that I've read, there seems to be --   13:45:52
9   let me say it's unclear.   13:46:00
10     Some of the data which was provided by   13:46:02
11   the FDLE itself to either the Department of   13:46:05
12   Elections or to DBT may, in fact, not have   13:46:08
13   originated in the State of Florida.   13:46:14
14     It's just unclear.   13:46:17
15     Q.   All right, sir.   13:46:18
16     Let me ask it this way:  The source   13:46:21
17   from which DBT received data from the State of   13:46:26
18   Florida, was that all from governmental agencies?   13:46:30
19     A.   Again, it's not clear.  The State of   13:46:35
20   Florida, from what I can tell, may have received   13:46:37
21   data from nongovernmental agencies and included   13:46:41
22   that information in its databases.   13:46:45
23     So, to answer your question precisely,   13:46:48
24   it is unclear.   13:46:49
25     Q.   All right.  Does the industry accept   13:46:50

32

8 (Pages 29 to 32)

1  at face value public records -- records and        13:46:59
2  documents from public sources, as a general        13:47:04
3  proposition?                                        13:47:10
4      A.   Your question, I find vague.               13:47:10
5      Q.   All right. Is there an industry            13:47:14
6  standard with respect to dealing with public        13:47:21
7  records?                                            13:47:27
8      A.   It depends on the purpose to which the     13:47:27
9  dealing is aimed.                                   13:47:32
10     Q.   Without meaning to be cute, I kind of      13:47:37
11 find your answer to that vague.                     13:47:41
12          Would you explain that to me a little      13:47:43
13 bit? Perhaps you could give me an example.          13:47:45
14     A.   Well, one example would be if someone      13:47:49
15 has been found guilty of a felony, I would imagine  13:47:55
16 that that record is not available to you or I in    13:47:58
17 our normal operations.                              13:48:04
18          We would have to be authorized to          13:48:05
19 examine that information, so there's some privacy   13:48:09
20 under which such a record is handled.               13:48:14
21     Q.   Let me shift gears and -- you have --      13:48:22
22 in a couple of parts in your report, you have       13:48:28
23 referred to altered or manipulated records, and     13:48:38
24 I'm not sure that I understand what you mean by      13:48:43
25 that.                                               13:48:46

33

1           Are you referring to the process of       13:48:50
2  eliminating periods and apostrophes, and things of  13:48:53
3  that type, when you're using the phrase "altered    13:48:59
4  or manipulated"?                                    13:49:01
5      A.   At least -- yes, at least the ones         13:49:01
6  that you've mentioned.                              13:49:08
7      Q.   And what else?                             13:49:09
8      A.   I reference some of the alterations at     13:49:09
9  the bottom of my page 2. This is page 2 of my       13:49:19
10 report.                                             13:49:24
11          They include the separation of first       13:49:27
12 from middle names, which may have been combined --  13:49:31
13     Q.   You mean like "Maryanne," a name like      13:49:35
14 that into "Mary" and "Anne"?                        13:49:40
15     A.   No.                                        13:49:41
16          An example would be "John Robert           13:49:43
17 Smith," where "John" and "Robert" both occupy the   13:49:52
18 same field inside the database.                     13:49:55
19          Continuing at the bottom of page 2,        13:49:59
20 it's the altering of the initials field, that is    13:50:02
21 the field that contains the initials of the         13:50:06
22 individual, the use of short names or a             13:50:10
23 short-names lookup list to convert shorter or       13:50:13
24 nicknames into full names or English full names.    13:50:16
25     Q.   "Charlie" into "Charles" or "Nick"         13:50:22

34

1  into "Nicholas," or something like that?            13:50:24
2      A.   As an example.                             13:50:29
3      Q.   Yes.                                       13:50:29
4      A.   The use of punctuations, which include     13:50:30
5  hyphens, apostrophes, and periods, and other        13:50:32
6  things, such as the elimination of numbers which    13:50:35
7  may have been found in some of the names.           13:50:40
8      Q.   "III" -- "John Smith III," that kind       13:50:43
9  of thing?                                           13:50:45
10     A.   That's one example.                        13:50:46
11          What I'm thinking of is someone whose      13:50:48
12 name might be "John Five," if someone chose to      13:50:52
13 make such a -- to have such a name or were given    13:51:00
14 such a name.                                        13:51:04
15          In addition, there are the elimination     13:51:05
16 of suffixes, such as "Jr.", "Sr.", "III."           13:51:08
17     Q.   Now --                                     13:51:11
18     A.   And --                                     13:51:13
19     Q.   Go ahead, sir. I thought were you          13:51:14
20 finished.                                           13:51:18
21     A.   I believe I referenced this type of        13:51:19
22 activity in another place in my report.             13:51:21
23     Q.   You did, you did.                          13:51:23
24     A.   On page 6 -- and as I look at the list     13:51:31
25 on page 6, there's nothing in addition to what      13:51:40

35

1  I've already said.                                  13:51:42
2      Q.   You're looking at the first full          13:51:43
3  paragraph on page 6?                                13:51:45
4      A.   You're correct.                            13:51:46
5      Q.   All right.                                 13:51:49
6      A.   By the way, what you have handed me        13:51:52
7  has markings in it.                                 13:51:54
8      Q.   I think I -- they're mine. I won't         13:51:56
9  suggest that they are yours.                        13:51:58
10     A.   I'm just letting you know, in case you     13:52:00
11 want to give me a different copy.                   13:52:03
12     Q.   You criticized the alteration or          13:52:10
13 manipulation, as you call it, of these names.       13:52:15
14 What's wrong with that, sir, if you do              13:52:17
15 it on both lists? You're comparing list one to      13:52:19
16 list two, and you do that same process in both      13:52:24
17 lists.                                              13:52:29
18          What's wrong with that?                    13:52:29
19     MR. OTTINGER: Objection as to form.             13:52:30
20          In what context?                           13:52:31
21 BY MR. BERGAN:                                      13:52:33
22     Q.   In matching the names in list one to      13:52:33
23 the names in list two --                            13:52:34
24     MR. OTTINGER: In order to be sure that          13:52:36
25 they're the same person?                            13:52:38

36

9 (Pages 33 to 36)

BY MR. BERGAN:

1  BY MR. BERGAN:
2     Q.  -- what is wrong with altering or      13:52:42
3  manipulating, to use your word -- words, names if 13:52:43
4  you do it on both lists?           13:52:48
5     MR. OTTINGER: Still an objection as to form. 13:52:56
6     THE WITNESS: Any alterations to the names on 13:53:01
7  a list creates an artificial representation of   13:53:07
8  what was originally in that list, and thereby   13:53:13
9  alters the probability that a unique, successful, 13:53:18
10  and verifiable match may be made.       13:53:25
11     I particularly point you to page 8 in  13:53:30
12  my report in the paragraph marked C, "Matching  13:53:32
13  Methods Used."          13:53:36
14  BY MR. BERGAN:
15     Q.  Uh-huh.           13:53:39
16     A.  In -- I count the fourth sentence,   13:53:40
17  beginning with -- I'll read the sentence, "Each  13:53:48
18  time" --             13:53:53
19     Q.  "Each time," right.        13:53:53
20     A.  "Each time a name was altered by DBT 13:53:54
21  or Florida, it was made to look like another name 13:53:58
22  to which IT was not immediately identical."    13:54:00
23     Q.  Now, my question is: If you took John 13:54:04
24  Smith, Jr., a name which appears on both list one 13:54:08
25  and list two, which we are charged with matching, 13:54:15

37

1  and took the "Jr." off both lists, why would that 13:54:20
2  be -- why would that be bad?        13:54:29
3     A.  Your hypothetical is vague.      13:54:31
4     Q.  I'm sorry. I don't see what's vague  13:54:37
5  about it.             13:54:39
6     I've got a list of names -- I've got  13:54:40
7  two lists of names. I'm matching the names on one 13:54:43
8  list with the names on another list.      13:54:48
9     On list one, the name "John Smith II"  13:54:50
10  appears. On list two, the name "John Smith II"  13:54:52
11  appears, and as a part of the process, you    13:54:56
12  eliminate or delete the "II" from both lists.   13:55:00
13     A.  You have not told me if there are   13:55:04
14  other John Smiths on either list.       13:55:06
15     Q.  All right. So, if the match were made 13:55:09
16  by name only, the elimination of a suffix in the 13:55:12
17  example I gave, you might admit if the match were 13:55:20
18  a "John Smith" that it was not intended to be   13:55:23
19  matched to.            13:55:25
20     Is that a fair statement?       13:55:27
21     A.  It's fair only to the extent that it 13:55:28
22  is at least descriptive of what might happen.   13:55:31
23     Q.  All right.          13:55:36
24     A.  Assuming that one did what we call a  13:55:37
25  100 percent match -- that means all of the letters 13:55:39

38

1  in their exact position without any other   13:55:42
2  additions or subtractions.         13:55:44
3     Q.  All right. Are you aware, sir,    13:55:48
4  whether DBT or ChoicePoint did such 100 percent  13:55:52
5  name matches in any circumstance?       13:55:58
6     A.  I have seen documentation that says  13:56:00
7  that 100 percent matching will be done. And I have 13:56:09
8  also seen documentation that says that less than 13:56:15
9  100 percent matching will be done.      13:56:18
10     I have seen documentation that says   13:56:20
11  that this matching will only be done on the last 13:56:23
12  name.              13:56:25
13     I have seen documentation that says   13:56:28
14  that this matching will be done on the first and 13:56:29
15  the last names and the middle initial.     13:56:32
16     I have seen documentation that says   13:56:36
17  that this matching will be done using the first 13:56:38
18  name.              13:56:42
19     I have seen documentation that says   13:56:42
20  that the matching will be done after the first  13:56:46
21  name has been manipulated using a short name or 13:56:48
22  nickname list, and all of those pieces of    13:56:50
23  documentation I have seen appear to me to be at · 13:56:55
24  odds with each other.          13:56:58
25     Can we take a short break after your   13:57:00

39

1  next question?           13:57:02
2     Q.  Any time.           13:57:03
3     A.  Now is good, then?         13:57:03
4     Q.  Now is fine.          13:57:05
5     MR. BERGAN: We'll go off the record for a  13:57:06
6  few minutes, gentlemen.         13:57:08
7     THE VIDEOGRAPHER: 1:58.        13:57:10
8     (Short recess taken.)        13:57:12
9     THE VIDEOGRAPHER: We're back on at 2:08.  14:07:37
10  BY MR. BERGAN:
11     Q.  Mr. Klausner, is there a broad    14:07:46
12  industry standard which would determine how lists 14:07:50
13  are matched, or does it depend upon the objective? 14:07:58
14     A.  I think the -- each particular purpose 14:08:06
15  determines, for the most part, the methods used  14:08:19
16  and the data used for that purpose.      14:08:22
17     Q.  You draw the distinction in your   14:08:24
18  report between an automobile recall on the one  14:08:27
19  hand, where you try to cast a broad net to make  14:08:34
20  sure you get everyone who either does or has owned 14:08:39
21  a particular line or make of vehicle, and access 14:08:45
22  to bank accounts on the other, where -- I'm    14:08:51
23  referring to pages 3 and 4 of your report -- where 14:08:54
24  you limit the number of people who have access to 14:08:57
25  a given account.          14:09:03

40

10 (Pages 37 to 40)

DEPOSITION OF DAVID KLAUSN

1    Do I understand that the standard can   14:09:05
2  vary by objective?                  14:09:13
3    A.   And you're talking about the standard   14:09:17
4  for --                            14:09:23
5    Q.   Standard for matching --        14:09:24
6    A.   Matching --                  14:09:25
7    Q.   -- lists.                      14:09:28
8    A.   And the matching and verification go   14:09:28
9  together?                          14:09:32
10   Q.   Yes. yes.                     14:09:33
11   A.   I think, generally, that's correct,   14:09:34
12  that the standard for matching verification as a   14:09:37
13  process would vary, depending on the purpose.   14:09:39
14   Q.   And would it also be true that it is   14:09:41
15  the client, in your examples, the automobile   14:09:45
16  manufacturer or the bank, that determines the   14:09:50
17  objective rather than the entity doing the   14:09:55
18  matching and the verifying?           14:10:00
19   A.   My experience is that that is not   14:10:01
20  necessarily the case.               14:10:04
21   Q.   Do you know, from what you have   14:10:05
22  reviewed, what happened in this case, who made   14:10:10
23  that determination, whether it was DBT on the one   14:10:14
24  hand or the Division of Elections on the other?   14:10:17
25   A.   I remember seeing documentation where   14:10:22

41

1  both parties may have suggested -- either party, I   14:10:28
2  should say, may have suggested to the other a   14:10:34
3  change in the process, which was subsequently   14:10:36
4  adopted by the both parties.           14:10:44
5    Q.   And do you recall, from those   14:10:47
6  documents or from any other source, which party it   14:10:49
7  was that suggested the change --       14:10:52
8    A.   I think --                    14:10:57
9    Q.   -- or changes?                 14:10:59
10   A.   I recall both parties suggesting   14:11:00
11  changes.                          14:11:02
12   Q.   And do you recall what those -- what   14:11:02
13  that change or those changes might have been?   14:11:06
14   A.   I recall, on the part of the   14:11:09
15  Department of Elections, the suggestion to DBT   14:11:15
16  that a wide net should be cast or a wider net   14:11:23
17  should be cast than had been cast in the past.   14:11:27
18        Then I also recall suggestions from   14:11:33
19  DBT to include, in the felon data, databases that   14:11:38
20  DBT had from organizations outside the State of   14:11:48
21  Florida.                          14:11:53
22        Those are two examples of what I mean.   14:11:54
23   Q.   All right sir.   Thank you.       14:11:58
24        As I read your report, you focus, in   14:12:01
25  very large part, on the felony matching.   14:12:07

42

1    Let me ask you whether you did any   14:12:14
2  studies or review of the matching for the --   14:12:17
3  either the deaths or duplicate registration lists.   14:12:24
4    A.   Although I did not perform the   14:12:28
5  calculations on the death and duplicate   14:12:33
6  registration lists that I did perform on the Felon   14:12:39
7  Exception Lists, I do recall looking generally at   14:12:41
8  those lists and considering the processes that   14:12:47
9  were used in order to identify individuals to be   14:12:51
10  purged as a result of their appearing on those   14:12:55
11  lists.                            14:12:57
12        They seemed to be similar to the   14:12:59
13  processes on the felon list, and so to the extent   14:13:00
14  that they were the same processes or similar   14:13:05
15  processes, I included, for example, duplicates and   14:13:08
16  reference duplicate lists in my report.   14:13:15
17   Q.   Is it -- other than what you have just   14:13:19
18  told us, is it your expectation that you will   14:13:21
19  offer any opinion at trial about the death or   14:13:25
20  duplicate registration lists?         14:13:32
21   A.   I've not been asked to perform work   14:13:33
22  with respect to those lists to date, and so to the   14:13:37
23  extent that I may be asked to do so between now   14:13:42
24  and trial, the answer is yes.         14:13:45
25   Q.   At page 10 of your report, which   14:13:55

43

1  contains a schedule breakdown by race between the   14:14:06
2  Central Voter File and the Felon Exception File --   14:14:13
3  we'll skip down one, two, three, four lines.   14:14:18
4        You note that blacks make up   14:14:23
5  10.4 percent of the Central Voter File and   14:14:26
6  38.46 percent of the Felon Exception File.   14:14:28
7        As I read your report, you conclude   14:14:37
8  from that and other data that the Felon Exception   14:14:40
9  File significantly discriminated against black   14:14:45
10  voters.                           14:14:49
11        Have I read your report correctly to   14:14:50
12  that extent?                       14:14:52
13   A.   I don't think that that's my opinion   14:14:53
14  particularly.   It may be so, but I don't think   14:15:03
15  that's one of my opinions.            14:15:06
16        I think the use of such a file and the   14:15:10
17  manner in which it was used by DBT and the State   14:15:14
18  of Florida do result in the discrimination against   14:15:17
19  black voters.                      14:15:20
20   Q.   What is the significance, then, of the   14:15:21
21  chart that you have at page 10?       14:15:23
22   A.   (Witness reviewing document.)      14:15:24
23        The purpose of my showing the chart on   14:15:41
24  page 10 was to show the ratios between the   14:15:44
25  different races with respect to the two files, the   14:15:47

44

11 (Pages 41 to 44)

Page 45

1    Central Voter File and the Felon Exception File   14:15:52
2    and --
3        Q.   And -- excuse me. Go ahead.   14:15:55
4        A.   And following the table is a sentence,   14:15:58
5    which I'll read.   14:16:00
6        "It is my opinion by altering the   14:16:03
7    criteria to (erroneously) increase the number called   14:16:05
8    matches for the Felon Exception File, DBT and   14:16:08
9    Florida significantly discriminated against black   14:16:12
10   voters."   14:16:15
11       Q.   And is that reflected by the fact that   14:16:17
12   there are almost four times as many black voters   14:16:20
13   in the Felon Exception File as there are in the   14:16:24
14   Central Voter File?   14:16:27
15       A.   Among other things.   14:16:28
16       Q.   All right. What criteria specifically   14:16:38
17   were altered, referring you to the sentence under   14:16:42
18   the chart?   14:16:45
19       What criteria were altered, to quote   14:16:46
20   you, to erroneously increase the number of   14:16:54
21   matches, if you recall?   14:16:55
22       A.   Under the direction to cast a wider   14:16:56
23   net, DBT lowered the criteria for matching   14:17:02
24   individuals between the CVF and the various felon   14:17:12
25   files that DBT had available to it to identify   14:17:16

45

Page 46

1    more people than would otherwise be identified   14:17:27
2    using proper criteria.   14:17:30
3        In that way, more people were called   14:17:32
4    out erroneously as being matches and passed along   14:17:39
5    on lists to the various Supervisors of Elections.   14:17:44
6        Q.   What specific criteria were lowered?   14:17:49
7        A.   Names were manipulated in order to   14:17:53
8    look like each other and to look unlike what they   14:17:56
9    did originally.   14:18:00
10       Q.   Now, this is the same name   14:18:03
11   manipulation that we discussed a few moments ago,   14:18:08
12   before the recess?   14:18:10
13       A.   Not exactly, because you presented me   14:18:11
14   with a hypothetical without a purpose before the   14:18:13
15   recess.   14:18:15
16       In this case, the purpose was to   14:18:16
17   increase the number of individuals that could be   14:18:21
18   reported by the Department of Elections --   14:18:23
19   reported to the Department of Elections and   14:18:25
20   subsequently passed on to the Supervisors of   14:18:28
21   Elections as being felons.   14:18:30
22       Q.   Did this change between 1999 and 2000,   14:18:33
23   if you know?   14:18:38
24       A.   I believe I've testified before that   14:18:38
25   the percentage match required was lessened in   14:18:41

46

Page 47

1    order to enlarge the lists of people identified as   14:18:56
2    felons.   14:18:59
3        Q.   Is this the 90 percent versus   14:18:59
4    80 percent to which you're referring?   14:19:01
5        A.   At least that.   14:19:03
6        Q.   And what else, sir?   14:19:04
7        A.   I don't recall what else.   14:19:05
8        Q.   All right. Did you do a similar chart   14:19:07
9    for death or duplicate registration percentages?   14:19:11
10       A.   I've not done that to date.   14:19:13
11       Q.   All right. Do you know what the data   14:19:14
12   would show for death or duplicate registrations --   14:19:17
13       A.   No.   14:19:19
14       Q.   -- broken down by race?   14:19:19
15       A.   No, I wouldn't.   14:19:22
16       Q.   Do you know the approximate number --   14:19:25
17       A.   I'm sorry. Let me amend my prior   14:19:27
18   answer.   14:19:30
19       Q.   Surely.   14:19:30
20       A.   No, I wouldn't, as I sit here today,   14:19:31
21   but it is certainly knowable.   14:19:35
22       Q.   All right. All I can ask you is what   14:19:38
23   you know today.   14:19:40
24       A.   Well, you said "would I know," and   14:19:41
25   "would" implies the future.   14:19:43

47

Page 48

1        Q.   You are probably right. I should have   14:19:44
2    said "did you know" or "do you know."   14:19:47
3        Do you know the approximate number of   14:19:51
4    persons reported to the Division of Elections as   14:19:55
5    possible felons in the year 2000, reported by DBT?   14:20:0
6        A.   I think the number is in my report as   14:20:06
7    60,197 --   14:20:24
8        Q.   If I were to suggest that it's   14:20:27
9    approximately 60,000, would that --   14:20:28
10       A.   Well, each one is important. I would   14:20:29
11   say it's 60,197.   14:20:31
12       Q.   All right. I would agree with you   14:20:33
13   that each one is important.   14:20:36
14       And that is 60,000-some-odd out of   14:20:39
15   8.2 million in the Central Voter File?   14:20:46
16       A.   I think it's 8.117 --   14:20:49
17       Q.   All right, sir.   14:20:51
18       A.   -- million.   14:20:53
19       Q.   Now, with respect to that -- I'll use   14:20:53
20   your number, if you can refer me to the correct   14:20:58
21   page, 60,000 --   14:21:01
22       A.   I'm looking at page 7, in the lower   14:21:02
23   third of the page.   14:21:04
24       Q.   All right. I'll use that number,   14:21:05
25   60,197.   14:21:08

48

12 (Pages 45 to 48)

```
 1       You don't suggest, do you, sir, that    14:21:16
 2   every one of those 60,197 was improperly or   14:21:18
 3   incorrectly referred to the Division of Elections   14:21:25
 4   as a potential felon?              14:21:30
 5       MR. OTTINGER: I'll object as to form.    14:21:31
 6       MR. BERGAN: All right.            14:21:33
 7       Q.  You may answer.              14:21:34
 8       MR. OTTINGER: I'm not sure I understand the   14:21:43
 9   question.                     14:21:44
10       Are you saying that --           14:21:45
11       MR. BERGAN: Basically --           14:21:46
12       MR. OTTINGER: -- these people were --    14:21:48
13       MR. BERGAN: -- I'm asking him whether his   14:21:49
14   testimony is: Is every --            14:21:54
15       MR. OTTINGER: Are you asking whether we know   14:21:54
16   from the matches whether --           14:21:56
17       MR. BERGAN: I'm asking him whether --    14:21:57
18       MR. OTTINGER: -- someone's been correctly   14:21:58
19   matched or, you know, whether it's possible?    14:21:59
20       MR. BERGAN: I'm asking whether his testimony   14:22:01
21   will be that 60,197 persons were incorrectly   14:22:05
22   identified as felons by DBT.           14:22:10
23       THE WITNESS: I think that 60,197 were    14:22:14
24   erroneously identified, because the process was   14:22:17
25   deeply flawed.                 14:22:20
```

                                                    49

```
 1   BY MR. BERGAN:
 2       Q.  Is it a corollary of what you're    14:22:23
 3   saying -- is a corollary of what you're saying   14:22:24
 4   that no one of those 60,197 persons were, in fact,   14:22:29
 5   felons?                     14:22:32
 6       A.  No.                   14:22:32
 7       Q.  Then what is it that you're saying?   14:22:34
 8       A.  I'm saying the process used by DBT in   14:22:36
 9   the State of Florida was wrong, and that process   14:22:40
10   leads to people erroneously identified and    14:22:44
11   increases the probability of false positives; that   14:22:47
12   that process leads to the disenfranchisement or   14:22:52
13   purging of voters who would otherwise be eligible   14:22:55
14   from the voter rolls; and their inability to cast   14:23:00
15   a ballot on Election Day.            14:23:02
16       Q.  Have you been asked to offer testimony   14:23:04
17   with respect to the number of persons who were   14:23:07
18   incorrectly removed from the rolls?       14:23:13
19       A.  Yes.                  14:23:14
20       Q.  And what is -- what is the answer to   14:23:15
21   that?                       14:23:19
22       A.  I was unable to provide the actual    14:23:19
23   number.                     14:23:21
24       Q.  All right.               14:23:21
25       A.  Because there was no verification    14:23:22
```

                                                    50

```
 1   process of any -- no meaningful verification   14:23:26
 2   process performed by any governmental agency in   14:23:29
 3   the State of Florida with respect to the people on   14:23:33
 4   this list, and the list is useless for the    14:23:36
 5   purposes of determining whether, in fact, any one   14:23:41
 6   individual is or is not really a felon.      14:23:45
 7       Q.  Do you know what the state did -- I'm   14:23:47
 8   drawing a distinction now between the state and   14:23:51
 9   the county.                   14:23:53
10       Do you know what the state did with    14:23:53
11   respect to that list of 60,197 persons?      14:23:55
12       A.  I seem to recall that approximately   14:23:59
13   60 persons were verified as either being or not   14:24:03
14   being people eligible to vote as a result of their   14:24:06
15   having a felony conviction, and those 60 people   14:24:11
16   were verified by a fax method.          14:24:14
17       In other words, faxes of their records   14:24:16
18   were sent from either the state or DBT -- I don't   14:24:20
19   recall which party -- to some other party, and   14:24:23
20   verification was received from the other party   14:24:26
21   with respect to their status.          14:24:28
22       MR. OTTINGER: I'm sorry. Is this question   14:24:30
23   with respect to the clemency or --        14:24:34
24       MR. BERGAN: No, I did not ask a question   14:24:36
25   with respect to clemency.            14:24:37
```

                                                    51

```
 1       MR. OTTINGER: Okay.              14:24:39
 2       MR. BERGAN: I asked whether Mr. Klausner   14:24:39
 3   knew what the state did with the list of 60,197   14:24:42
 4   identified felons which it received from DBT.    14:24:46
 5       Q.  Is it your answer that some 60 persons   14:24:51
 6   on that list, in some fashion, were removed from   14:24:55
 7   the list?                    14:24:57
 8       A.  I don't recall answering the question   14:24:58
 9   that you've just restated.            14:25:00
10       Q.  Well --                 14:25:02
11       A.  I recall answering a different      14:25:02
12   question.                    14:25:04
13       Q.  Let's try answering the question which   14:25:05
14   I just stated.                 14:25:07
15       Do you know what the state did with    14:25:08
16   respect to the list of 60,197 identified felons?   14:25:10
17       A.  I think I've already testified that   14:25:14
18   they provided, to each of the individual      14:25:19
19   Supervisors of Elections in the counties, the   14:25:25
20   lists of names and other data from this      14:25:28
21   60,197-person list.               14:25:32
22       Q.  And the next question would logically   14:25:36
23   be: Do you know what any individual Supervisor of   14:25:40
24   Election in a county did with the information   14:25:43
25   which he or she received from the state?      14:25:46
```

                                                    52

                                        13 (Pages 49 to 52)

| | |
|---|---|
| 1   A.   I seem to remember documents that show   14:25:48 | 1   the Felons Exception List?   14:28:43 |
| 2   that it may have varied between the different   14:26:03 | 2   A.   I do recall that -- well, I think I   14:28:44 |
| 3   Supervisors of Elections as to what they did with   14:26:06 | 3   recall that the Dade County Supervisor of   14:28:52 |
| 4   the lists.   14:26:10 | 4   Elections used this list to send notices or   14:28:54 |
| 5   Q.   What is your understanding, if you   14:26:11 | 5   letters to various people. Perhaps other counties   14:28:59 |
| 6   have one, of what would happen if a supervisor did   14:26:13 | 6   did that, as well, or other Supervisors of   14:29:03 |
| 7   nothing with respect to the list which it received   14:26:19 | 7   Elections of other counties.   14:29:06 |
| 8   -- or he or she received from the state?   14:26:24 | 8   I also do recall documentation that   14:29:09 |
| 9   That is, would the persons on the list   14:26:26 | 9   stated that the Supervisors of Elections were   14:29:11 |
| 10   remain on the voter list in that particular   14:26:29 | 10   instructed and trained to send letters to validate   14:29:13 |
| 11   county?   14:26:33 | 11   the status of the various voters who they may have   14:29:20 |
| 12   A.   I recall, in at least one case, that   14:26:33 | 12   received on various lists, indicating that they   14:29:23 |
| 13   the persons would remain, and my recollection --   14:26:42 | 13   were felons.   14:29:27 |
| 14   and I might be wrong -- is that the Supervisor of   14:26:47 | 14   Other than that, I don't recall.   14:29:30 |
| 15   Elections in Broward County did not use the felon   14:26:49 | 15   Q.   Do you know whether the supervisors in   14:29:32 |
| 16   list to strike any names from the voter rolls.   14:26:54 | 16   the various counties sent the letters which you   14:29:33 |
| 17   However, I also remember reading   14:26:58 | 17   were describing?   14:29:37 |
| 18   information that would lead me to believe that   14:27:03 | 18   A.   I believe some of them did, and all of   14:29:38 |
| 19   anyone on the list that was provided by the state   14:27:03 | 19   them may have, but I don't recall any more than   14:29:41 |
| 20   to the county supervisor was struck from the roll   14:27:07 | 20   that.   14:29:46 |
| 21   -- struck from the eligible voter roll.   14:27:11 | 21   Q.   Do you know whether this was -- this   14:29:46 |
| 22   I said "from the roll" at first, and   14:27:13 | 22   occurred in 1999 or 2000, or both?   14:29:48 |
| 23   then "eligible voter roll."   14:27:15 | 23   A.   My work focused on 2000.   14:29:50 |
| 24   Q.   In the pattern -- go ahead.   14:27:18 | 24   Q.   All right.   14:29:54 |
| 25   A.   I have to say, given my recollection   14:27:21 | 25   A.   So, that's what I can testify to at   14:29:54 |
|                         53 |                         55 |
| 1   of the documents -- and, certainly, you have   14:27:25 | 1   this point.   14:29:58 |
| 2   better access to the documents than I at this   14:27:27 | 2   Q.   Do you have -- I'm just going to   14:29:59 |
| 3   point -- it seems to be mixed.   14:27:29 | 3   change gears -- shift gears just a little bit.   14:30:01 |
| 4   My recollection as to what was done   14:27:31 | 4   Do you have a sense of the number of   14:30:03 |
| 5   varied by -- varied from some of the Supervisors   14:27:35 | 5   out-of-state felons identified by DBT to the   14:30:05 |
| 6   of Elections to others.   14:27:41 | 6   Secretary of State?   14:30:11 |
| 7   Q.   Well, what is your understanding, if   14:27:42 | 7   A.   I point you in my report -- it's   14:30:12 |
| 8   you have one, as to what would happen in a county   14:27:44 | 8   page 11, and there are various electronic files   14:30:21 |
| 9   in which the Supervisor of Elections did not use   14:27:47 | 9   that I received that I examined for the numbers of   14:30:31 |
| 10   the list at all?   14:27:52 | 10   out-of-state felons.   14:30:37 |
| 11   A.   Theoretically, those people who were   14:27:55 | 11   On the top of page 11, I find 2,397   14:30:39 |
| 12   called out on the exception list would remain on   14:28:00 | 12   people in one file, which I received from the   14:30:45 |
| 13   the active and eligible voter list for those   14:28:03 | 13   State of Florida, and I also find 9,074 people in   14:30:49 |
| 14   situations where they were not -- the lists were   14:28:07 | 14   another file, which I believe comes from DBT, part   14:30:55 |
| 15   not used -- the felon lists were not used.   14:28:11 | 15   of the original set of seven CD-ROMs I testified   14:31:00 |
| 16   Q.   Do you have an understanding of   14:28:15 | 16   to earlier.   14:31:06 |
| 17   whether any of the five counties remaining in this   14:28:17 | 17   There may be additional files, but the   14:31:07 |
| 18   case are counties in which the Supervisor of   14:28:19 | 18   numbers seem to be different between these   14:31:08 |
| 19   Elections did not use the Felon Exception List at   14:28:21 | 19   two files. Certainly, it numbers in the   14:31:11 |
| 20   all?   14:28:25 | 20   thousands.   14:31:16 |
| 21   A.   I don't.   14:28:26 | 21   Q.   I take it, however, that on the basis   14:31:16 |
| 22   Q.   Do you have an understanding of   14:28:27 | 22   of what you have reviewed, you're unable to give   14:31:19 |
| 23   whether any of the other counties in the State of   14:28:32 | 23   an approximation of the number of out-of-state   14:31:23 |
| 24   Florida, that is to say other than the five   14:28:35 | 24   felons identified by DBT to the state?   14:31:26 |
| 25   counties remaining in the case, did or did not use   14:28:40 | 25   A.   Yes. The data seems to be somewhat   14:31:30 |
|                         54 |                         56 |

14 (Pages 53 to 56)

| | |
|---|---|
| 1 unreliable.                                    14:31:36 | 1     MR. BERGAN: The document to which the   14:34:08 |
| 2     In addition, the data that came from   14:31:39 | 2 witness is referring is a typed copy of        14:34:10 |
| 3 FDLE to DBT or to the State of Florida and then on 14:31:41 | 3 FSA 98.0975.                              14:34:13 |
| 4 to DBT may also be unreliable because its original 14:31:44 | 4     MR. OTTINGER: I'm going to object, also, as 14:34:19 |
| 5 source may, in fact, have been from out-of-state 14:31:49 | 5 to form, as to what kind of verification we're   14:34:21 |
| 6 and may have been created in -- let's say in an   14:31:57 | 6 talking about, notice by phone versus -- mail or 14:34:24 |
| 7 unreliable state, an unreliable way.        14:31:59 | 7 over the phone, or which.                   14:34:27 |
| 8     Q.   How would one go about determining the 14:32:02 | 8     I didn't understand the question.      14:34:31 |
| 9 reliability of that kind of data?            14:32:06 | 9     MR. BERGAN: Noted.                    14:34:32 |
| 10     A.   I believe -- | 10     THE WITNESS: Can I take a short break after 14:35:01 |
| 11     MR. OTTINGER: Objection as to form.     14:32:09 | 11 I answer your question?                    14:35:02 |
| 12     Which -- I'm not sure which --      14:32:12 | 12     MR. BERGAN: Of course you can. Please, any 14:35:03 |
| 13     MR. BERGAN: The kind of data which he's just 14:32:15 | 13 time.                               14:35:05 |
| 14 describing having come from FDLE.        14:32:17 | 14     THE WITNESS: And you're asking me about the 14:35:09 |
| 15     MR. OTTINGER: Oh, the FDLE data we're     14:32:20 | 15 intent of this section?                    14:35:34 |
| 16 talking about.                        14:32:26 | 16     MR. BERGAN: Yes.                     14:35:35 |
| 17 BY MR. BERGAN: | 17     Q.   I'm asking you whether -- let me back 14:35:35 |
| 18     Q.   How would one go about determining the 14:32:27 | 18 up a step.                           14:35:38 |
| 19 reliability of that data?                 14:32:28 | 19     You had said, if I understood you      14:35:39 |
| 20     A.   Well, given the information I have   14:32:30 | 20 correctly, that the process would require contact 14:35:41 |
| 21 about missing Social Security numbers and invalid 14:32:31 | 21 between the supervisor and the individual -- by   14:35:50 |
| 22 Social Security numbers -- in other words, the   14:32:37 | 22 which I think we're talking about the prospective 14:35:53 |
| 23 integrity, as well as the reliability of certain   14:32:39 | 23 voter -- to determine whether he or she was   14:35:56 |
| 24 key fields inside the various databases that were 14:32:42 | 24 properly on one of these lists.            14:36:00 |
| 25 used by DBT, whose sources were, among others, the 14:32:45 | 25     My question to you was: Isn't that   14:36:01 |
| 57 | 59 |

| | |
|---|---|
| 1 FDLE, one would have to verify each one        14:32:49 | 1 exactly what the Florida legislature intended by 14:36:06 |
| 2 individually through a personal contact of some   14:32:53 | 2 passing this statute?                     14:36:09 |
| 3 type to make sure that each person was identified 14:32:56 | 3     MR. OTTINGER: Objection as to form.     14:36:09 |
| 4 as a felon properly.                     14:32:58 | 4 BY MR. BERGAN: |
| 5     Q.   A contact with the voter or potential 14:33:00 | 5     Q.   There's an objection pending, but you 14:36:11 |
| 6 voter?                             14:33:03 | 6 may answer.                          14:36:14 |
| 7     A.   Yes.                       14:33:03 | 7     MR. OTTINGER: Okay.                 14:36:14 |
| 8     I've said the individual, but I      14:33:06 | 8     THE WITNESS: I think you left a word out of 14:36:15 |
| 9 would --                            14:33:08 | 9 your characterization of my last answer.     14:36:19 |
| 10     Q.   But that's the individual to whom you 14:33:08 | 10     I believe I answered personal contact 14:36:21 |
| 11 were referring, I take it?                14:33:11 | 11 between --                          14:36:22 |
| 12     A.   That's correct.              14:33:12 | 12 BY MR. BERGAN: |
| 13     Q.   Isn't that just what the Florida      14:33:13 | 13     Q.   You did.                    14:36:24 |
| 14 legislature intended when it passed Florida   14:33:15 | 14     A.   -- between an agent of the state and 14:36:24 |
| 15 statute annotated 98.0975?              14:33:19 | 15 the individual or the voter.              14:36:26 |
| 16     MR. OTTINGER: Objection as to form.     14:33:20 | 16     In addition, my cursory reading of the 14:36:30 |
| 17     What the legislature may think --    14:33:23 | 17 statute says that such personal contact is not   14:36:31 |
| 18 BY MR. BERGAN: | 18 required. It merely says that the supervisor,   14:36:37 |
| 19     Q.   You may answer, if you have a sense of 14:33:26 | 19 upon not being able to determine whether the   14:36:44 |
| 20 that.                              14:33:29 | 20 information is correct, may proceed and strike the 14:36:46 |
| 21     A.   (Witness reviewing document.)    14:33:30 | 21 felon from -- or the -- it says here "the       14:36:52 |
| 22     I've not seen this document before.   14:33:50 | 22 convicted-of-a-felony person from the rolls,"   14:36:54 |
| 23 Please excuse me.                     14:33:52 | 23 which is not what I am saying.            14:36:58 |
| 24     Q.   You may take your time. Please.    14:33:53 | 24     In addition, it also says that -- the 14:37:01 |
| 25     A.   (Witness reviewing document.)    14:33:55 | 25 statute says that the databases used for      14:37:04 |
| 58 | 60 |

| | |
|---|---|
| 1  comparison should contain reliable criminal  14:37:09 | 1  and that if, in fact, that was my intention,  15:00:57 |
| 2  records and records of deceased persons.  14:37:11 | 2  because there is testimony in my report that  15:01:04 |
| 3      I do not find that either the CVF or  14:37:13 | 3  indicates that at least 20,000 were erroneously  15:01:07 |
| 4  the Felon Exception List contained reliable  14:37:16 | 4  identified.  15:01:10 |
| 5  criminal records and, therefore, is not in  14:37:20 | 5      I believe we have it on page 9,  15:01:11 |
| 6  conformance with the statute.  14:37:23 | 6  Section D.  15:01:13 |
| 7      Can we take a short break?  14:37:25 | 7      Q.  I understood your testimony to be that  15:01:19 |
| 8  MR. BERGAN: Yes, of course.  14:37:26 | 8  the 60,197 -- was it?  15:01:21 |
| 9      THE VIDEOGRAPHER: Off the record at 2:38.  14:37:27 | 9      A.  Yes.  15:01:25 |
| 10      (Short recess taken.)  14:57:47 | 10      Q.  That of the 60,197, because you  15:01:27 |
| 11      THE VIDEOGRAPHER: Okay. We're back on at  14:58:47 | 11  believed the process to be flawed, you couldn't  15:01:32 |
| 12  3 o'clock.  14:59:01 | 12  tell whether they were erroneously identified or  15:01:36 |
| 13      This is the beginning of videotape  14:59:01 | 13  not.  15:01:38 |
| 14  No. 2.  14:59:03 | 14      A.  No.  They were clearly erroneously  15:01:39 |
| 15  MR. BERGAN: Dawn, would you tell me what the  14:59:04 | 15  identified.  15:01:42 |
| 16  last question was, please.  14:59:07 | 16      I couldn't tell whether, in fact, any  15:01:42 |
| 17      (Record read.)  14:59:37 | 17  should have been identified as felons because they  15:01:44 |
| 18  BY MR. BERGAN: | 18  actually were felons or ex-felons.  15:01:48 |
| 19      Q.  Mr. Klausner, we've just had a  14:59:37 | 19      In addition --  15:01:52 |
| 20  20-minute recess, during which time you and  14:59:40 | 20      Q.  All right. Now please -- go ahead. I  15:01:52 |
| 21  Mr. Ottinger were out in the parking lot, engaged  14:59:44 | 21  don't mean --  15:01:53 |
| 22  in conversation.  14:59:46 | 22      A.  In addition, when I considered that  15:01:54 |
| 23      I'd like to know whether you were  14:59:48 | 23  all 60,197 had been erroneously identified because  15:01:55 |
| 24  talking about your testimony that you're giving  14:59:49 | 24  of the process, I had been thinking at the time to  15:01:59 |
| 25  today.  14:59:52 | 25  include not just the NAM matching, but also all of  15:02:00 |
| 61 | 63 |

| | |
|---|---|
| 1      A.  Yes, I was.  14:59:53 | 1  the Social Security number matching, and,  15:02:03 |
| 2      Q.  And would you be good enough to tell  14:59:55 | 2  therefore, the entire process was flawed.  15:02:07 |
| 3  us the substance of the conversation between the  14:59:58 | 3      That's why I testified that 60,197  15:02:09 |
| 4  two of you.  15:00:00 | 4  were erroneously identified.  15:02:12 |
| 5      A.  Attorney Ottinger clarified for me  15:00:01 | 5      I'm sorry. Please --  15:02:15 |
| 6  what the 60-person verification was --  15:00:05 | 6      Q.  Now I'm not sure I understand the  15:02:17 |
| 7      Q.  I'm sorry.  What the --  15:00:10 | 7  distinction that you're making with respect to  15:02:20 |
| 8      A.  The verification of 60 persons that I  15:00:12 | 8  those 60,197 persons.  15:02:22 |
| 9  testified about before --  15:00:15 | 9      If I understood what you've just said,  15:02:24 |
| 10      Q.  All right.  15:00:16 | 10  you are not saying that all of them were not  15:02:28 |
| 11      A.  -- that I recalled that there was that  15:00:17 | 11  felons?  15:02:30 |
| 12  verification.  15:00:20 | 12      A.  There were a lot of "nots" in that  15:02:35 |
| 13      Q.  All right.  15:00:21 | 13  sentence.  15:02:38 |
| 14      A.  I may have described what that  15:00:21 | 14      Can you rephrase that?  15:02:39 |
| 15  verification was on the record.  I don't remember  15:00:26 | 15      Q.  I'll try.  15:02:40 |
| 16  what the record says, but Attorney Ottinger was  15:00:28 | 16      You are not saying that of the 60,197  15:02:41 |
| 17  explaining to me what that verification was.  15:00:31 | 17  persons identified on the Felony Exception File  15:02:48 |
| 18      Q.  Was there any other subject of the  15:00:33 | 18  that none of them were felons?  15:02:50 |
| 19  conversation?  15:00:35 | 19      A.  Okay.  I am saying that I am incapable  15:02:53 |
| 20      A.  Yes.  15:00:35 | 20  of telling you if any one particular individual  15:02:57 |
| 21      Q.  Would you tell us what that was,  15:00:38 | 21  actually has been convicted of a felony in the  15:03:01 |
| 22  please.  15:00:39 | 22  past --  15:03:06 |
| 23      A.  Attorney Ottinger pointed out that he  15:00:40 | 23      Q.  That's what I thought you were saying.  15:03:06 |
| 24  had heard that -- he had heard me testify that the  15:00:44 | 24      A.  -- or if that particular individual  15:03:08 |
| 25  60,197 persons were all erroneously identified,  15:00:50 | 25  that may be chosen out that list has received  15:03:10 |
| 62 | 64 |

16 (Pages 61 to 64)

DEPOSITION OF DAVID KLAUS

1  restitution or adjudication of judgment, or any  15:03:13
2  other grant, so to speak, that permits them to  15:03:17
3  have their rights restored towards voting.  15:03:19
4       That's what I am saying.  15:03:21
5  Q.   That's what I had understood you to  15:03:25
6  say.  15:03:27
7  A.   Yes, thank you.  15:03:27
8  Q.   Do you know, as you sit here, what  15:03:28
9  percentage of the Central Voter File contained  15:03:32
10 Social Security numbers?  15:03:36
11 A.   You're asking me if I know what  15:03:36
12 percentage of the Central Voter File contains  15:03:49
13 Social Security numbers?  Okay.  15:03:51
14      The -- I believe the number of records  15:03:55
15 in the Central Voter File -- oh, the Central Voter  15:04:06
16 File --  15:04:10
17 Q.   Central Voter File.  15:04:11
18      Now, the 8.2 million --  15:04:13
19 A.   I think I have that somewhere.  15:04:15
20 Q.   Well, let me help.  15:04:30
21      Would you agree that it was  15:04:32
22 approximately 32 percent?  15:04:33
23 A.   Where are you referring to, sir?  15:04:34
24 Q.   I'm not.  I'm not referring to your  15:04:36
25 report.  15:04:38

65

1       MR. OTTINGER:  I'll just object as to  15:04:45
2  form.  15:04:58
3       THE WITNESS:  (Reviewing document.)  15:05:00
4       I don't recall if I made that --  15:05:06
5  BY MR. BERGAN:
6  Q.   All right, sir.  15:05:09
7  A.   -- assumption myself.  15:05:10
8       But if you're stipulating that it is  15:05:13
9  so and you're asking me to assume that's true,  15:05:15
10 that's fine.  15:05:17
11 Q.   Can you match without Social Security  15:05:18
12 numbers?  15:05:21
13 A.   Match for what purpose?  15:05:21
14 Q.   For any purpose.  15:05:24
15 A.   For any purpose?  15:05:25
16 Q.   For any purpose.  15:05:27
17 A.   Well, for the purpose of creating an  15:05:29
18 invalid list or a list which erroneously  15:05:34
19 identifies persons, you can match using anything  15:05:36
20 you want.  15:05:38
21 Q.   Can you create a valid list without --  15:05:38
22 can you match validly without using Social  15:05:41
23 Security numbers?  15:05:44
24 A.   It depends on whether there are other  15:05:54
25 unique identifiers that are part of the match  15:06:01

66

1  process, if the purpose is to create a valid  15:06:03
2  identification, a correct identification, with  15:06:13
3  integrity and validity of people.  15:06:18
4  Q.   Do you know what identifiers, if any,  15:06:23
5  appear on the Central Voter File -- appeared in  15:06:26
6  the year 2000 in the Central Voter File?  15:06:30
7  A.   There are quite a number of them.  15:06:32
8  There are actually more than 30.  15:06:34
9  Q.   Would you give us some of them?  15:06:40
10 A.   There's the first name; the last name;  15:06:42
11 middle name; suffix; county; voter ID, which I  15:06:49
12 assume is assigned by the State of Florida;  15:06:58
13 address, which is broken into several fields;  15:07:06
14 Social Security number; sex; race; I believe the  15:07:10
15 date of birth; some indication of whether they had  15:07:19
16 voted in some prior period of time.  There may be  15:07:23
17 a date associated with that indication.  15:07:27
18      Those are the fields -- at least those  15:07:34
19 are among the fields that appear in the Central  15:07:39
20 Voter File.  Some of them contain valid data and  15:07:44
21 some contain invalid data.  15:07:46
22 Q.   Now, to the extent the names in the  15:07:48
23 Central Voter File do not contain Social Security  15:07:51
24 numbers, how would one go about matching that with  15:07:55
25 other data?  15:08:01

67

1  A.   If one could find other unique  15:08:02
2  identifiers among the fields of the Central Voter  15:08:07
3  File records, then one could use those  15:08:09
4  identifiers, which call out unique features, with  15:08:13
5  respect to any one particular record.  15:08:18
6  Q.   You criticize, if I read your report  15:08:21
7  correctly, DBT for using the driver's license  15:08:24
8  files to import Social Security numbers where none  15:08:32
9  exist in the Central Voter File.  15:08:40
10      Have I read your report correctly to  15:08:43
11 that extent?  15:08:46
12 A.   Can you direct me to the particular --  15:08:47
13 Q.   All right.  I will see if I can.  15:08:49
14      On the top of page 3 -- in the  15:09:08
15 paragraph which ends at the top of page 3, four or  15:09:10
16 five lines down, you say, "When they are reliable,  15:09:14
17 the actual, rather than the derived Social  15:09:18
18 Security numbers should be used as the primary  15:09:21
19 criteria.  In this case, as I discuss later, these  15:09:26
20 Social Security numbers were not reliable."  15:09:33
21      These, I take it, refer to derived  15:09:36
22 Social Security numbers; am I correct?  15:09:40
23 A.   Yes.  15:09:42
24 Q.   And those are Social Security numbers  15:09:45
25 which DBT derived from driver's license data.  15:09:46

68

17 (Pages 65 to 68)

1    Is that your understanding?        15:09:52
2    A.   At least those.              15:09:52
3    Q.   All right.  Now, I may have missed it,  15:09:54
4    but I don't find later in your report where you  15:09:58
5    describe these derived Social Security numbers as  15:10:07
6    not reliable.                      15:10:10
7         Would you tell us why they're not  15:10:11
8    reliable?                          15:10:13
9         MR. OTTINGER:  I'm going to object as to  15:10:14
10   form, because I think there is -- he does talk  15:10:16
11   about and talked about introducing inaccuracies  15:10:19
12   every time you move away from the original data.  15:10:24
13   That's one of many --               15:10:27
14        MR. BERGAN:  If there is, he can point it out  15:10:28
15   to me.                              15:10:30
16        MR. SPECTOR:  Objection to a speaking --  15:10:33
17        MR. BERGAN:  I have an objection to your  15:10:35
18   speaking objection.  It violates the local rules  15:10:36
19   in the Southern District of Florida.  15:10:38
20        MR. OTTINGER:  Okay.            15:10:40
21   BY MR. BERGAN:
22   Q.   You may go ahead and answer.   15:10:40
23   A.   (Witness reviewing document.)  15:10:48
24        Can you repeat your question, please?  15:11:20
25   Q.   Sure.                         15:11:22

69

1         At the top of page 3, you refer to  15:11:30
2    derived Social Security numbers, and in the  15:11:33
3    following sentence, you say, "In this case, as I  15:11:38
4    discuss later, these Social Security numbers" --  15:11:44
5    by which, I take it, you meant derived Social  15:11:45
6    Security numbers -- "were not reliable."  15:11:47
7         I'm asking you why you believe those  15:11:51
8    derived Social Security numbers were not reliable.  15:11:53
9    A.   (Witness reviewing document.)   15:11:56
10        My understanding of what happened with  15:12:22
11   respect to these records that did not have Social  15:12:27
12   Security numbers in them originally in the CVF was  15:12:31
13   that at least in some cases, Social Security  15:12:35
14   numbers were added to the reports where they had  15:12:39
15   not previously been.                15:12:41
16        Any process that adds data to a   15:12:43
17   record, where that data was not previously in the  15:12:49
18   record, has to be subject to the same matching  15:12:55
19   verification tests in the overall process as the  15:12:57
20   data that will subsequently be used in this case  15:13:00
21   out of the CVF itself.              15:13:03
22        By adding data from another location,  15:13:07
23   a record was created that was not originally  15:13:09
24   present.  That is a record that now has a Social  15:13:12
25   Security number.                    15:13:15

70

1         Now we have to ask ourselves if it was  15:13:16
2    the correct Social Security number for that  15:13:20
3    particular individual, and, therefore, we have to  15:13:22
4    ask ourselves what process was used to match  15:13:23
5    someone from the Central Voter File with the Motor  15:13:26
6    Vehicle File.                       15:13:29
7         As far as I know, the process used to  15:13:30
8    match between those two was the same as used to  15:13:34
9    match Central Voter File people with felon file  15:13:37
10   people.  That is, the first names, middle names,  15:13:39
11   last names, were manipulated, the suffixes were  15:13:42
12   dropped.                            15:13:47
13        Other criteria which may or may not  15:13:48
14   have been reliable were used in doing the matching  15:13:49
15   and, therefore, that process was flawed, as well.  15:13:51
16        As I understand it, by looking at the  15:13:54
17   felon file and the matches based on Social  15:13:58
18   Security number, we find thousands of people whose  15:13:59
19   Social Security number matched, but for whom all  15:14:04
20   the secondary criteria did not match.  15:14:07
21        It is imperative in a situation where  15:14:09
22   matching be done, whose purpose it is to determine  15:14:12
23   who is eligible to vote and who is not -- it is  15:14:17
24   imperative that the primary criteria be unique, be  15:14:20
25   reliable, and have integrity, and that secondary  15:14:23

71

1    criteria be used as a verification or a check -- I  15:14:27
2    should say a check for consistency to make sure  15:14:34
3    that the primary criteria, in fact, are still  15:14:40
4    valid.                              15:14:43
5         The result in Felon Exception File  15:14:45
6    that came as a result of the process that used  15:14:51
7    did not create any reliable Social Security  15:14:57
8    numbers en masse that could be said to have been  15:14:59
9    -- to have either integrity or a basis in a  15:15:03
10   process that followed industry standard, with  15:15:08
11   unique primary criteria and secondary consistency  15:15:12
12   criteria.                           15:15:16
13   Q.   What do you mean by "primary criteria"  15:15:17
14   as opposed to "secondary criteria"?  15:15:20
15   A.   The primary criteria are typically  15:15:21
16   unique to that individual.           15:15:26
17        If, for example, the Social Security  15:15:29
18   number has integrity and is reliable, it can be  15:15:31
19   used as a unique primary criteria.   15:15:37
20   Q.   You would not -- would you or would  15:15:41
21   you not accept a derived Social Security number as  15:15:45
22   a unique primary criteria?           15:15:49
23   A.   In this case, I would not, because the  15:15:50
24   process to -- that was used to determine which  15:15:52
25   individual was the one from whom the Social  15:15:56

72

18 (Pages 69 to 72)

LEX REPORTING (310) 831-DEPO

DEPOSITION OF DAVID KLAUSNER

| | |
|---|---|
| 1 Security number should be derived and placed into 15:15:59 | 1 a process and using criteria for matching in that 15:18:15 |
| 2 the CVF was flawed. 15:16:01 | 2 process that are invalid for the purpose. 15:18:17 |
| 3 Q. Do you know what comparators were used 15:16:02 | 3 Q. Assuming you had been given the 15:18:21 |
| 4 to make that determination? 15:16:05 | 4 assignment that DBT was given in the year 2000, 15:18:25 |
| 5 A. I understand the comparators included 15:16:07 | 5 and assume further that only 32 percent of the 15:18:31 |
| 6 the manipulated name of the individuals. 15:16:11 | 6 names in the Central Voter File have Social 15:18:35 |
| 7 Q. Any others? 15:16:13 | 7 Security numbers attached to them, tell us how you 15:18:38 |
| 8 A. I don't recall. 15:16:14 | 8 would have gone about carrying out that 15:18:42 |
| 9 Q. All right. Give me an example of some 15:16:17 | 9 assignment. 15:18:47 |
| 10 secondary criteria. 15:16:23 | 10 A. I would have refused the assignment. 15:18:47 |
| 11 A. Secondary criteria have less unique 15:16:24 | 11 In other words, it could not have been 15:18:58 |
| 12 characteristics to them. 15:16:34 | 12 done in a way that would have been -- or that 15:19:00 |
| 13 Q. Would that include name? 15:16:37 | 13 would have ensured that valid, eligible voters 15:19:07 |
| 14 A. The name would be at the bottom of the 15:16:40 | 14 would be guaranteed to remain on the voter 15:19:13 |
| 15 list. It would be the least unique. 15:16:44 | 15 lists -- 15:19:16 |
| 16 Examples of secondary criteria that 15:16:47 | 16 Q. If I -- excuse me. Go ahead. 15:19:18 |
| 17 might be useful would be the address of the 15:16:50 | 17 A. -- because the data was too dirty. 15:19:21 |
| 18 person, the zip code of the person, the date of 15:16:53 | 18 Q. I understand. 15:19:24 |
| 19 birth of the person, none of which are unique to 15:17:01 | 19 If I were to tell you that the remedy 15:19:25 |
| 20 an individual; however, they are certainly more 15:17:05 | 20 which the plaintiffs seek against DBT is to create 15:19:31 |
| 21 unique than the person's name. 15:17:08 | 21 a new exceptions list for 1999 and 2000, granting 15:19:47 |
| 22 Q. So -- 15:17:12 | 22 that 32 percent of the names still only have the 15:19:49 |
| 23 A. And those will be used to check the 15:17:13 | 23 Social Security numbers, would you also refuse 15:19:52 |
| 24 consistency of the match that had been based on 15:17:16 | 24 that assignment, were you DBT? 15:19:58 |
| 25 the primary criteria. 15:17:17 | 25 A. The assignment is to take the 15:20:00 |
| | |
| 73 | 75 |

| | |
|---|---|
| 1 Q. And the primary criteria, if I 15:17:18 | 1 32 percent of the CVF? 15:20:03 |
| 2 understand your definition, is something that 15:17:21 | 2 Q. No. 15:20:07 |
| 3 would have to be unique to the individual? 15:17:26 | 3 The assignment is to start over, 15:20:07 |
| 4 A. That's correct. 15:17:28 | 4 create new lists for 1999 and 2000, use 15:20:09 |
| 5 Q. And that would include a Social 15:17:28 | 5 100 percent matching criteria in certain areas, 15:20:16 |
| 6 Security number? 15:17:29 | 6 but you've still only got 32 percent of the names 15:20:20 |
| 7 A. As one example. 15:17:31 | 7 on the list with the Social Security numbers. 15:20:22 |
| 8 Q. And perhaps a voter ID number? 15:17:32 | 8 MR. OTTINGER: Objection as to form, in terms 15:20:24 |
| 9 A. As another example, assuming that no 15:17:34 | 9 of what criteria are in the remedies. 15:20:28 |
| 10 two voters can have that same ID -- 15:17:38 | 10 BY MR. BERGAN: |
| 11 Q. I was just going to add that 15:17:41 | 11 Q. You may answer. 15:20:30 |
| 12 qualification. 15:17:42 | 12 A. Are you asking me if the assignment is 15:20:31 |
| 13 Assuming that they differ throughout 15:17:43 | 13 to use one-third of the -- the one-third of the 15:20:34 |
| 14 the state? 15:17:44 | 14 CVF? 15:20:38 |
| 15 A. And assuming that the numbers 15:17:46 | 15 Q. No, the whole list. 15:20:41 |
| 16 themselves have both integrity and reliability. 15:17:48 | 16 A. The whole list? 15:20:42 |
| 17 In other words, choosing a Social 15:17:53 | 17 Q. The whole list. 15:20:42 |
| 18 Security number for someone out of thin air 15:17:54 | 18 A. Where there are no unique identifiers 15:20:43 |
| 19 doesn't give that number -- that Social Security 15:17:59 | 19 in two-thirds of the list? 15:20:45 |
| 20 number either integrity or validity or, I should 15:18:01 | 20 Q. Well, there are no Social Security 15:20:46 |
| 21 say, reliability. 15:18:05 | 21 numbers on two-thirds of the list, yes. 15:20:47 |
| 22 Q. Are you aware of any instances in 15:18:06 | 22 A. And the other one-third of the list 15:20:51 |
| 23 which Social Security numbers were selected out of 15:18:08 | 23 that has Social Security numbers, in your 15:20:54 |
| 24 thin air? 15:18:10 | 24 hypothetical, are you saying that those are both 15:20:55 |
| 25 A. I meant that as a euphemism for using 15:18:10 | 25 numbers -- those are numbers with both integrity 15:20:57 |
| | |
| 74 | 76 |

19 (Pages 73 to 76)

DEPOSITION OF DAVID KLAUSNER

| | |
|---|---|
| 1 and reliability? 15:20:59 | 1 Q. Fine. Let's stick with 80, because 15:23:04 |
| 2 A. They're not derived. They are on the 15:21:01 | 2 that's what was used in 2000, I believe. 15:23:07 |
| 3 list. 15:21:06 | 3 A. Yes. 15:23:12 |
| 4 A. And what validation was done to 15:21:07 | 4 That 80 percent of the entire name 15:23:13 |
| 5 guarantee that the numbers that are there have 15:21:08 | 5 needed to match in order to call it a match on 15:23:14 |
| 6 integrity and reliability? 15:21:11 | 6 name. 15:23:17 |
| 7 Q. I don't have an answer to that. 15:21:12 | 7 I've seen documents that say that 15:23:17 |
| 8 A. You have -- 15:21:15 | 8 80 percent of the last name only needed to match 15:23:19 |
| 9 Q. I don't know the answer. 15:21:19 | 9 in order for it to be called a match on name. 15:23:23 |
| 10 A. And the further part of your question 15:21:20 | 10 I've seen documents that state that 15:23:26 |
| 11 -- your hypothetical is: You're asking me to take 15:21:22 | 11 80 percent of the entire name but only the middle 15:23:27 |
| 12 that list, given the conditions that I've just 15:21:26 | 12 initial rather than the middle name had to match 15:23:31 |
| 13 described, and do what with it? 15:21:28 | 13 in order for it to be a match on name. 15:23:34 |
| 14 Q. Can you create a new 1999 or 2000 15:21:29 | 14 I've seen documents that say that the 15:23:36 |
| 15 exceptions list, given those criteria which we've 15:21:34 | 15 first name had to match entirely, and I have seen 15:23:40 |
| 16 just discussed? 15:21:39 | 16 source code that talks about the 80 percent, as 15:23:48 |
| 17 A. You're talking about a felons 15:21:39 | 17 well. 15:23:53 |
| 18 exception? 15:21:41 | 18 Q. Have you attempted any experiments to 15:23:54 |
| 19 Q. Yes, let's stay with felons. That's 15:21:42 | 19 determine how the 80 percent rule would work in a 15:23:58 |
| 20 the one we've been discussing mostly this 15:21:46 | 20 given case? 15:24:01 |
| 21 afternoon. 15:21:48 | 21 A. I have. 15:24:02 |
| 22 A. And where does the -- in your 15:21:49 | 22 Q. And would you describe them? 15:24:06 |
| 23 hypothetical, where does the felon information -- 15:21:50 | 23 A. The Felon Exception List of 60,197 15:24:08 |
| 24 I shouldn't say "information" -- that identifies 15:21:52 | 24 contains within it information that -- I should 15:24:16 |
| 25 people as felons come from? 15:21:54 | 25 say those 60,197 are there because of the criteria 15:24:23 |
| 77 | 79 |

| | |
|---|---|
| 1 Q. Let us further assume it comes from 15:21:56 | 1 applied, which include the 80 percent matching 15:24:26 |
| 2 the same source or sources that were used in 1999 15:21:58 | 2 rule. 15:24:30 |
| 3 or 2000. 15:22:00 | 3 I performed experiments to create a 15:24:33 |
| 4 A. And you're asking me to -- in this 15:22:01 | 4 100 percent match total. In other words, if the 15:24:35 |
| 5 hypothetical, to do the processing using the 15:22:05 | 5 entire name were matched 100 percent, what would 15:24:39 |
| 6 information that you've provided and just 15:22:07 | 6 the results be? 15:24:42 |
| 7 described in order to come up with new, correctly 15:22:09 | 7 I believe you've been supplied with 15:24:43 |
| 8 processed felon lists? 15:22:15 | 8 the numbers that come out of that experiment. 15:24:44 |
| 9 Q. I'm asking you if it's doable, in 15:22:16 | 9 MR. BERGAN: Would you mark this, please, as 15:24:49 |
| 10 light of your statement earlier that you would 15:22:19 | 10 the exhibit next in number, which I think is five. 15:24:51 |
| 11 have turned down the assignment that DBT got in 15:22:23 | 11 I'll take your word for it rather than 15:24:55 |
| 12 1999. 15:22:25 | 12 mine. 15:24:57 |
| 13 A. What you've just described, I think, 15:22:26 | 13 (Deposition Exhibit No. 5 was marked.) 15:25:05 |
| 14 and asked me to do is not doable. 15:22:29 | 14 BY MR. BERGAN: |
| 15 Q. All right. Thank you. 15:22:31 | 15 Q. Mr. Klausner, I have written on a 15:25:06 |
| 16 Let me ask you, Mr. Klausner -- 15:22:32 | 16 piece of paper my last name as it is spelled, 15:25:10 |
| 17 A. In other words, not doable -- 15:22:37 | 17 B-e-r-g-a-n, the correct spelling. I have also 15:25:12 |
| 18 Q. Properly and with integrity? 15:22:38 | 18 written it as it is common misspelled, 15:25:15 |
| 19 A. With validity, yes. 15:22:39 | 19 B-e-r-g-e-n. 15:25:19 |
| 20 Q. With validity. 15:22:42 | 20 Can you tell from looking at that 15:25:24 |
| 21 What is your understanding of the 15:22:43 | 21 whether that would -- if you saw those two last 15:25:25 |
| 22 90 percent or 80 percent match rule on names? 15:22:47 | 22 names whether that would meet the 80 percent match 15:25:27 |
| 23 A. I believe I've testified that I have 15:22:52 | 23 rule? 15:25:31 |
| 24 seen documents that describe that 80 percent -- 15:22:57 | 24 A. From what I have seen, yes, it would. 15:25:31 |
| 25 let's stick for the moment with the year 2000. 15:23:02 | 25 Q. It would. All right, sir. Let me 15:25:33 |
| 78 | 80 |

20 (Pages 77 to 80)

1  give you one more example.                    15:25:39
2       In this instance, I'm using the name   15:25:41
3  of an employee of DBT, whose name is "Hindle,"   15:25:47
4  spelled H-i-n-d-l-e, and I've inverted the last   15:25:54
5  two letters and spelled it H-i-n-d-e-l.        15:25:59
6       MR. BERGAN:  If the reporter, when I stop   15:26:05
7  talking, gets a moment, we can mark that as the   15:26:06
8  next exhibit in number.                        15:26:08
9       (Deposition Exhibit No. 6 was marked.)  15:26:09
10 BY MR. BERGAN:
11      Q.   I would ask you if it's your        15:26:19
12 understanding that that meets the 80 percent match  15:26:23
13 rule.                                          15:26:25
14      A.   Yes, it is my understanding.        15:26:25
15      Q.   All right.  Now let me ask you a    15:26:27
16 couple of questions about the logic used in    15:26:30
17 matching.                                      15:26:34
18      Is it your understanding that in any     15:26:39
19 instance, DBT used name only as the match      15:26:44
20 criteria?                                      15:26:52
21      A.   For what purpose?                    15:26:53
22      Q.   For the purpose of creating either the  15:27:01
23 death, duplicate, or Felons Exceptions List, name  15:27:04
24 only, first, middle, last.                     15:27:09
25      A.   I don't know about the lists other  15:27:11

81

1  than the Felons Exception List.                15:27:14
2       Q.   Fine.  We'll stay with the felons,  15:27:15
3  then.                                          15:27:17
4       A.   I have not seen anything that would  15:27:18
5  tell me that only name was used during the match  15:27:21
6  processing for the Felons Exception List.      15:27:25
7       Q.   All right.  Can you tell me whether  15:27:29
8  there are any instances in which Social Security  15:27:31
9  number only was used as the match criteria in the  15:27:35
10 creation of the Felons Exceptions List?        15:27:40
11      A.   I believe there are.                 15:27:41
12      There are several categories, one of     15:27:43
13 which is SSN, and I think that was -- excuse me,  15:27:46
14 that descriptive of those records that match on  15:27:52
15 Social Security number only.                   15:27:55
16      Q.   Only.                                15:27:58
17      And in those instances, do you know      15:27:58
18 whether that is the Social Security number that  15:28:00
19 was found on the Central Voter File or whether it  15:28:03
20 was a derived Social Security number?          15:28:06
21      A.   From everything I've seen, that is  15:28:09
22 generally unclear.                             15:28:11
23      The records in the Felon Exception       15:28:13
24 File were marked in the match column or in one of  15:28:15
25 the columns with Y-9, a two-character indicator,  15:28:21

82

1  which means that this was original data, as    15:28:25
2  opposed to D-9, derived data.                  15:28:28
3       But other than that, I don't know --     15:28:33
4  that is, other than looking at the D-9, and    15:28:34
5  understanding the D-9 to mean derived data and the  15:28:37
6  Y-9 to mean original data, I couldn't say.     15:28:41
7       Q.   All right, sir.                      15:28:46
8       Does the industry utilize, as a          15:28:50
9  general practice, name matches?                15:28:55
10      A.   For what purpose?                     15:28:58
11      Q.   For any purpose.                      15:29:01
12      A.   I think it's acceptable as a secondary  15:29:02
13 or tertiary criteria for consistency checking.  15:29:07
14      Q.   But not as a primary?                 15:29:12
15      A.   Not, at least not for the purpose of  15:29:14
16 inclusive checking.                            15:29:18
17      Certainly, if one were to cast a wide    15:29:20
18 net, one could do it with name, but it wouldn't be  15:29:25
19 valid to do so.                                15:29:28
20      Q.   Okay.  In drawing your schedule or  15:29:30
21 chart on page -- I think it was 10 that we were  15:29:44
22 looking at earlier today, which shows the      15:29:47
23 breakdown by race of the Central Voter File and  15:29:58
24 the Felony Exception File, did you take into any  15:30:01
25 consideration, whatever, the percentage of blacks  15:30:08

83

1  who are in the criminal justice system as either  15:30:14
2  convicted felons in the State of Florida or    15:30:20
3  prisoners in the State of Florida?             15:30:23
4       A.   I don't think so.                     15:30:24
5       Q.   All right.                            15:30:27
6       MR. BERGAN:  Give me about 30 seconds, and I  15:30:32
7  think I'm finished.  Let me just --            15:30:34
8       THE VIDEOGRAPHER:  You want to go off the  15:30:40
9  record?                                        15:30:41
10      MR. BERGAN:  Yes.  Let's go off the record  15:30:42
11 for a moment.                                  15:30:43
12      THE VIDEOGRAPHER:  Off the record at 3:32.  15:30:44
13      (Discussion off the record.)             15:30:50
14      THE VIDEOGRAPHER:  We're back on.         15:31:16
15 3:32.                                          15:31:20
16 BY MR. BERGAN:
17      Q.   I want to ask you if you're familiar  15:31:25
18 with a couple of commonly-used name matching   15:31:28
19 techniques.                                    15:31:36
20      Are you familiar with                     15:31:37
21 Straight-Character Comparison Matching?        15:31:39
22      A.   Yes.                                  15:31:42
23      Q.   Is it considered valid?              15:31:44
24      A.   It depends for what purpose, and     15:31:47
25 things are only as valid -- criteria are only as  15:31:50

84

21 (Pages 81 to 84)

DEPOSITION OF DAVID KLAUSNER

| | |
|---|---|
| 1 valid as their integrity and reliability.        15:31:54 | 1 |
| 2   Q.   Again, it comes back to the objective  15:31:58 | 2        EXAMINATION |
| 3 to be accomplished, basically, does it not?      15:32:02 | 3 |
| 4   A.   Well, yes, to the extent that -- if I  15:32:05 | 4 BY MR. SPECTOR: |
| 5 don't really care how many people I hit, so to    15:32:07 | 5   Q.   Mr. Klausner, again, I'm David    15:36:35 |
| 6 speak, or identify as a match, then I can use any  15:32:11 | 6 Spector.  I represent Katherine Harris, the    15:36:36 |
| 7 criteria regardless of whether it's valid or    15:32:16 | 7 Secretary of the State of Florida, and the    15:36:39 |
| 8 invalid.                    15:32:17 | 8 Division of Elections in this matter.    15:36:40 |
| 9   Q.   How about the Consonant Matching    15:32:17 | 9        Some preliminary questions, just to go 15:36:43 |
| 10 Method?  Are you familiar with that?      15:32:19 | 10 back.                    15:36:45 |
| 11   A.   Yes.                  15:32:21 | 11        Have you ever been qualified as an    15:36:45 |
| 12   Q.   Is that considered valid under the    15:32:21 | 12 expert before any court?          15:36:46 |
| 13 same -- with the same reservations expressed    15:32:24 | 13   A.   Yes.                  15:36:48 |
| 14 previously?                  15:32:28 | 14   Q.   What courts?            15:36:48 |
| 15   A.   Well, for example, in the Consonant    15:32:30 | 15   A.   (Witness reviewing document.)      15:36:49 |
| 16 Matching System, "Hindle," regardless of how it's 15:32:30 | 16   Q.   That's fine if you want to point to    15:37:00 |
| 17 spelled, would be a match.          15:32:34 | 17 the exhibit to your report.          15:37:02 |
| 18        In the Consonant Matching Method,    15:32:38 | 18   A.   The --                15:37:08 |
| 19 "Bergan" or "Bergan," depending on who was    15:32:40 | 19   Q.   You can use the first name in the    15:37:15 |
| 20 pronouncing it, might be a match, or depending on 15:32:43 | 20 matter, if you want, since that's the way Ray did 15:37:18 |
| 21 whether it was middle America or dialect, it would 15:32:46 | 21 it before.                  15:37:21 |
| 22 be a match.                  15:32:50 | 22   A.   Tumbleweed versus docSpace.        15:37:21 |
| 23   Q.   Are you familiar with the American  15:32:51 | 23   Q.   Okay.  That's on page 1 of your      15:38:04 |
| 24 Sound Index Method?              15:32:54 | 24 litigation testimony experience or is that page 2 15:38:07 |
| 25   A.   Yes.                  15:32:56 | 25 of --                    15:38:10 |
| 85 | 87 |

| | |
|---|---|
| 1   Q.   Is that considered valid, utilized by  15:32:56 | 1   A.   I'm looking at Exhibit 3, No. 12.    15:38:10 |
| 2 industry?                  15:32:58 | 2   Q.   Okay.  Tumbleweed versus docSpace.    15:38:14 |
| 3   A.   Yes, it is utilized by industry, but  15:32:59 | 3   A.   I'm also looking at Exhibit 3, No. 17. 15:38:18 |
| 4 depending on the purpose, it would or would not be 15:33:01 | 4   Q.   What's the case name?          15:38:23 |
| 5 valid.                    15:33:06 | 5   A.   Novadigm versus Marimba.        15:38:24 |
| 6        In this case, it would not be valid,  15:33:06 | 6   Q.   Okay.  Any other cases in which you've 15:38:29 |
| 7 that is, in the case of matching for CVF and Felon 15:33:09 | 7 been qualified as an expert?          15:38:31 |
| 8 Exception Lists.              15:33:14 | 8   A.   Yes.                  15:38:33 |
| 9   Q.   Are you familiar with Third Party    15:33:15 | 9   Q.   Okay.  Which case?          15:38:35 |
| 10 Packages, such as SSA, Name III, and First Logic 15:33:16 | 10   A.   InstaTax versus SAIC.          15:38:36 |
| 11 True Name?                  15:33:21 | 11   Q.   InstaTax versus SAIC?          15:38:50 |
| 12   A.   Let's say I don't know the names of    15:33:22 | 12   A.   Correct.                15:38:53 |
| 13 those companies, per se, but to the extent that    15:33:24 | 13   Q.   Is that listed on your exhibit that    15:38:54 |
| 14 they use one of the methods that we've used --    15:33:26 | 14 you're looking at of your litigation experience?  15:38:56 |
| 15 that you have called out or the other methods that 15:33:28 | 15   A.   No.  It's more than four years ago.    15:38:57 |
| 16 I know of, the answer would be yes.        15:33:32 | 16   Q.   Okay.  What year was that in?      15:38:59 |
| 17   Q.   All right.              15:33:34 | 17   A.   Approximately 1996.          15:39:03 |
| 18 MR. BERGAN:  That's it.  That's all I have.  15:33:35 | 18   Q.   And what court was that in?        15:39:03 |
| 19 MR. SPECTOR:  We have some questions here.  15:33:38 | 19   A.   I don't recall the -- it was in      15:39:05 |
| 20 MR. BERGAN:  Let's go off the record while we 15:33:40 | 20 San Diego, but I don't recall of it was federal or 15:39:11 |
| 21 change places (indicating).          15:33:43 | 21 state.                    15:39:15 |
| 22 THE VIDEOGRAPHER:  Off the record at 3:35.  15:33:43 | 22   Q.   And what were the issues in that case? 15:39:15 |
| 23        (Short recess taken.)          15:36:23 | 23   A.   SAIC had provided a system that -- for 15:39:19 |
| 24 THE VIDEOGRAPHER:  Okay.  We're back on.    15:36:25 | 24 processing tax returns that InstaTax found to be    15:39:22 |
| 25        3:37.                  15:36:32 | 25 deficient.                  15:39:32 |
| 86 | 88 |

22 (Pages 85 to 88)

```
 1    Q.   What was the substance of your     15:39:34
 2   testimony?                            15:39:35
 3    A.   That I had found the system was   15:39:36
 4   deficient, as well.                   15:39:46
 5    Q.   Did it involve matching of individuals 15:39:46
 6   or database comparison?               15:39:48
 7    A.   The system did involve those two 15:39:50
 8   things.                               15:39:58
 9    Q.   Did your testimony involve the   15:39:58
10   analysis of database comparison or matching of  15:40:00
11   individuals?                          15:40:03
12    A.   No.                             15:40:03
13    Q.   Are there any other matters in which 15:40:18
14   you were designated as an expert, even in excess 15:40:21
15   of four years ago, that involve database 15:40:23
16   comparison or matching of individuals? 15:40:28
17    A.   Yes.                            15:40:30
18    Q.   Okay. Can you tell me about those? 15:40:34
19    A.   It was a party, whose name I don't 15:40:36
20   remember, versus RL Polk.             15:40:44
21    Q.   What court was it pending in?    15:40:49
22    A.   I don't know which court.        15:40:54
23    Q.   What year, approximately?        15:40:55
24    A.   Approximately 1994.             15:40:56
25    Q.   And the substance of your testimony 15:40:58
```
                                                    89

```
 1   was what?                            15:41:00
 2    A.   The estate of the party was suing 15:41:01
 3   RL Polk for failure to notify them about an 15:41:09
 4   automobile defect recall.            15:41:17
 5    Q.   And the substance of your testimony 15:41:24
 6   was what?                            15:41:25
 7    A.   Was that RL Polk had done the usual 15:41:26
 8   and customary industry procedure for managing 15:41:33
 9   data.                                15:41:41
10    Q.   Managing data or matching individuals 15:41:41
11   in database comparison?              15:41:44
12    A.   Managing data.                 15:41:45
13    Q.   Okay. Can you explain "managing data" 15:41:47
14   to me?                              15:41:49
15    A.   RL Polk acquired motor vehicle records 15:41:50
16   of the states, which contained the owner 15:41:58
17   identification information, along with the vehicle 15:42:04
18   ID numbers.                         15:42:07
19    Q.   And that's what you refer to as  15:42:14
20   "managing data"?                    15:42:16
21    A.   Yes.                           15:42:17
22    Q.   Okay.                          15:42:19
23    MR. BERGAN: Let's go ahead and mark this as 15:42:22
24   -- what are we up to?                15:42:26
25    THE COURT REPORTER: Seven.          15:42:28
```
                                                    90

```
 1    MR. SPECTOR: Okay.                  15:42:29
 2    (Deposition Exhibit No. 7 was marked.) 15:42:38
 3    MR. SPECTOR: Actually, I have one for you 15:42:42
 4   share.                              15:42:43
 5    THE WITNESS: I'm sorry, there was more to 15:42:44
 6   that.                               15:42:47
 7    RL Polk also validated the vehicle ID 15:42:47
 8   numbers.                            15:42:49
 9   BY MR. SPECTOR:
10    Q.   What do you mean by "validated"?  15:42:50
11    A.   The vehicle ID numbers have check 15:42:52
12   digits and other information in them to guarantee 15:42:55
13   that they have integrity and reliability. 15:43:03
14    Q.   Okay.                          15:43:05
15    A.   In those cases, when they failed the 15:43:05
16   test for integrity and reliability, RL Polk made 15:43:08
17   sure that the numbers were correct.   15:43:14
18    Q.   Okay. Same case? We're talking about 15:43:15
19   that unnamed party versus RL Polk?    15:43:18
20    A.   Yes.                           15:43:22
21    Q.   Okay. Mr. Klausner, you've been  15:43:23
22   handed what's been marked as Exhibit 7, which 15:43:24
23   bears a beginning Bates number of A041285. It's 15:43:28
24   entitled "Contract for Services."    15:43:33
25    Do you recognize that?              15:43:34
```
                                                    91

```
 1    A.   (Witness reviewing document.)    15:43:35
 2    Yes.                               15:43:45
 3    Q.   Is that your signature on the last 15:43:46
 4   page?                               15:43:48
 5    A.   Yes.                           15:43:48
 6    Q.   Is this the contract that you have 15:43:49
 7   with the People for the American Way Foundation 15:43:53
 8   with regard to your testimony in this matter? 15:43:55
 9    A.   Yes.                           15:43:59
10    Q.   Okay. How do you keep track of your 15:43:59
11   time, Mr. Klausner?                 15:44:03
12    A.   I do it on electronic spreadsheets. 15:44:04
13    Q.   And in what increment do you keep 15:44:09
14   track of your time?                 15:44:12
15    A.   Daily.                         15:44:12
16    Q.   No, meaning -- how do you divide an 15:44:13
17   hour for the purposes of billing your time to the 15:44:18
18   People for the American Way Foundation? 15:44:20
19    A.   By two-tenths.                  15:44:24
20    Q.   So, a minimum -- if you were to do a 15:44:26
21   two-minute task, it's a minimum .2?   15:44:28
22    A.   Yes.                           15:44:30
23    I don't often have two-minute tasks. 15:44:34
24    Q.   I understand the predicament.     15:44:37
25    MR. BERGAN: Nor do we.              15:44:40
```
                                                    92

23 (Pages 89 to 92)

1    MR. SPECTOR: Right. That's why I said, "I  15:44:41
2  understand the predicament."              15:44:43
3    Q.   How often do you invoice?           15:44:45
4    A.   Once a month, unless my engagement has  15:44:47
5  been terminated, in which case I invoice on    15:44:53
6  termination.                           15:44:59
7    Q.   Your engagement has not been        15:44:59
8  terminated in this matter; is that correct?    15:45:00
9    A.   You're correct.                    15:45:02
10   Q.   You're active?                     15:45:03
11   A.   Yes.                            15:45:04
12   Q.   Okay. Can I see the notice for the    15:45:05
13  deposition for a moment? I believe it was     15:45:12
14  probably marked as Exhibit 1.              15:45:14
15     (Reviewing document.)              15:45:18
16     Mr. Klausner, the notice of deposition  15:45:19
17  required you to bring with you copies of all   15:45:22
18  transcripts referred to in the deponent's CV; any  15:45:24
19  materials provided the deponent by plaintiff or  15:45:27
20  plaintiff's counsel and utilized by him in     15:45:29
21  preparing his report; and the results of any and  15:45:32
22  all tests conducted by the deponent, intermediate  15:45:34
23  steps, and the protocols therefore.          15:45:36
24     Did you bring any of those documents  15:45:37
25  with you today?                       15:45:39

93

1    A.   I've provided all of those that I have  15:45:40
2  to Attorney Ottinger.                    15:45:44
3    Q.   Okay. Did you bring anything with you  15:45:45
4  today responsive to the notice, as you were    15:45:47
5  required to?                         15:45:49
6    A.   No.                          15:45:50
7    Q.   Okay. When you were initially        15:45:52
8  contacted -- going back to my notes, I believe you  15:46:06
9  said that you were contacted by Attorney      15:46:09
10  Henderson?                         15:46:10
11   A.   Yes.                         15:46:11
12   Q.   What did she say was going to be asked  15:46:15
13  of you in this matter?                  15:46:20
14   A.   If I could run tests on databases on   15:46:21
15  the data that was in them.               15:46:29
16   Q.   Did she tell you how to run these     15:46:31
17  tests?                            15:46:34
18   A.   No.                          15:46:34
19   Q.   Did she tell you what opinion she was  15:46:37
20  going to seek from you?                 15:46:41
21   A.   No.                          15:46:42
22   Q.   Okay. The documents that you obtained  15:46:51
23  in this case all came from attorneys for People  15:46:58
24  for the American Way.                  15:47:01
25     Is that correct?                  15:47:04

94

1    A.   I'm not certain. It might be that the  15:47:05
2  tape that I received may have been sent directly  15:47:07
3  by DBT.                            15:47:10
4    Q.   Okay. So, they either came from      15:47:10
5  attorneys for People for the American Way or   15:47:12
6  attorneys for DBT?                    15:47:14
7    A.   That's my understanding.            15:47:16
8    Q.   Okay. Did you do any independent     15:47:17
9  tests to confirm the authenticity of the      15:47:22
10  documents?                         15:47:24
11   A.   No.                          15:47:25
12   Q.   How about to confirm the accuracy of  15:47:28
13  the documents?                      15:47:31
14   A.   No. I wasn't asked to do those      15:47:31
15  things.                           15:47:33
16   Q.   As an expert, do you regularly rely on  15:47:36
17  data provided to you by one of the parties without  15:47:40
18  conducting any tests as to their authenticity or  15:47:43
19  accuracy?                          15:47:46
20     MR. OTTINGER: My objection is as to form.  15:47:46
21     I'm a little bit unclear --            15:47:48
22     MR. SPECTOR: Do me a favor. If you object  15:47:51
23  to form -- I would prefer if we don't have a     15:47:53
24  speaking objection.                    15:47:55
25     Your objection is noted as to form.     15:47:56

95

1    MR. OTTINGER: Okay.                 15:47:57
2    THE WITNESS: Can you repeat your question,  15:47:58
3  please?                           15:47:59
4  BY MR. SPECTOR:
5    Q.   As an expert, do you regularly conduct  15:48:02
6  examinations or try to confirm the authenticity or  15:48:04
7  accuracy of documents upon which you base an   15:48:06
8  opinion?                          15:48:09
9    A.   If I'm asked to do so.              15:48:09
10   Q.   And if you're not specifically asked   15:48:11
11  to do so, you don't do so?               15:48:13
12   A.   That's correct.                  15:48:15
13   Q.   Okay. Now, I know Mr. Bergan showed   15:48:15
14  you Section 98. --                    15:48:20
15   A.   Actually --                     15:48:22
16   Q.   Sure.                        15:48:23
17   A.   -- if I have reason to doubt the       15:48:23
18  authenticity -- because most of the time, I'm    15:48:27
19  given information that I'm told I should not doubt  15:48:31
20  its authenticity, but if I have independent reason  15:48:32
21  to believe that I should, then I will question its  15:48:35
22  authenticity.                        15:48:37
23   Q.   Okay. Mr. Bergan showed you          15:48:37
24  Section 98.0975, the statute which you looked at  15:48:39
25  before.                           15:48:43

96

24 (Pages 93 to 96)

1    Tell me all other statutes, case law, 15:48:44
2  or regulations that you reviewed -- we're going to 15:48:47
3  get a little bit more into this -- either in 15:48:51
4  preparation of today's deposition or before 15:48:54
5  rendering your opinion in this matter. 15:48:55
6    A.    I looked at one of the articles in the 15:48:58
7  Constitution of the United States. 15:49:02
8    Q.    Other than -- I'm assuming that's 15:49:05
9  Article IV? 15:49:08
10    A.    Yes. 15:49:09
11    Q.    Okay.  Other than Article IV of the 15:49:10
12  United States Constitution, you didn't review 15:49:11
13  anything else, correct, as far as statutes, case 15:49:13
14  law, or regulations? 15:49:18
15    A.    I think your statement is correct. 15:49:18
16    Q.    Just out of curiosity, who provided 15:49:21
17  you with -- you may already have one, but who 15:49:24
18  provided you with Article IV of the Constitution? 15:49:27
19    A.    I have my own copy of the 15:49:29
20  Constitution. 15:49:33
21    Q.    Okay.  Did you review any treatises or 15:49:33
22  any formal publications before formulating your 15:49:36
23  opinion? 15:49:39
24    A.    No. 15:49:40
25    Q.    Okay.  Have you had any contact or 15:49:51

97

1  on this matter? 15:51:02
2    A.    Well, let's put it this way:  Your 15:51:03
3  question was opinions that were requested of me -- 15:51:05
4  I was asked to render any opinions that I 15:51:07
5  discovered. 15:51:10
6    I wasn't asked to particularly 15:51:10
7  acknowledge opinions. 15:51:14
8    Q.    I'm not trying to insinuate that you 15:51:15
9  were told by a specific person to render a 15:51:17
10  specific opinion. 15:51:21
11    I'm just asking you if you did 15:51:21
12  everything you feel is necessary to reach the 15:51:23
13  conclusions that you have reached. 15:51:27
14    A.    To the extent that I have testified, 15:51:28
15  both written and oral, today to my opinions, I 15:51:30
16  have, I believe, substantiated all of them 15:51:32
17  sufficiently. 15:51:35
18    Q.    I'm not asking if you've substantiated 15:51:36
19  them sufficiently. 15:51:40
20    I'm asking you if you've done 15:51:41
21  everything you feel necessary to come to the 15:51:44
22  conclusions which you have rendered. 15:51:45
23    A.    Yes, I did. 15:51:48
24    Q.    Okay.  Looking at your expert report, 15:51:49
25  Mr. Klausner, who physically prepared this report? 15:52:04

99

1  communication with any current or former employees 15:49:57
2  of any of the defendants? 15:50:16
3    A.    You mean prior to this matter? 15:50:17
4    Q.    Prior to sitting here today. 15:50:20
5    A.    Yes. 15:50:21
6    Q.    Who? 15:50:22
7    A.    I've had a telephonic communication in 15:50:22
8  conference, that is, on a conference call, with 15:50:24
9  Chris Knowles, who I understand is an employee of 15:50:26
10  DBT, and Attorney Restrepo. 15:50:28
11    Q.    Other than ones where an attorney for 15:50:31
12  one of the parties was present, have you had any 15:50:31
13  communications with any current or former 15:50:36
14  employees of any of the defendants? 15:50:38
15    A.    Not to my knowledge. 15:50:39
16    Q.    Would you recall if you did? 15:50:40
17    A.    Would I remember if I could remember 15:50:41
18  is your question?  I don't know how to answer that 15:50:44
19  question. 15:50:50
20    Q.    Okay.  Have you done everything you 15:50:51
21  feel is necessary to arrive at the opinions 15:50:52
22  requested of you? 15:50:54
23    A.    Yes. 15:50:54
24    Q.    Other than testifying at trial, do you 15:50:57
25  contemplate any other task to be performed by you 15:51:00

98

1    A.    I did. 15:52:09
2    Q.    How so? 15:52:10
3    A.    I used Microsoft Word and I physically 15:52:11
4  inputted everything that's in there. 15:52:17
5    Q.    And you did this on your home -- or 15:52:19
6  your home or business computer? 15:52:23
7    A.    Yes. 15:52:25
8    Q.    This signature on the last page, 15:52:25
9  that's your signature? 15:52:29
10    A.    Yes. 15:52:30
11    Q.    Okay.  You'll notice on that page of 15:52:37
12  the signature, there's a fax header on the top and 15:52:44
13  the bottom.  It has a phone number on it. 15:52:47
14    It's April 26th, 2002, at 9:56. 15:52:50
15    A.    Yes. 15:52:54
16    Q.    And you see how it says "page 2"? 15:52:55
17    A.    Yes. 15:52:57
18    Q.    Was that a fax you were receiving from 15:52:58
19  someone or sending to someone? 15:53:02
20    A.    I think this page is reflective of 15:53:03
21  what I had sent. 15:53:06
22    Q.    This was an outgoing fax page? 15:53:07
23    A.    Outgoing from me. 15:53:09
24    Q.    Okay.  And you reviewed your report in 15:53:11
25  its entirety before you signed it? 15:53:17

100

25 (Pages 97 to 100)

DEPOSITION OF DAVID KLAUS

| | |
|---|---|
| 1   A.   Yes.   15:53:20 | 1         I haven't examined them for validity,   15:56:10 |

1      A.   Yes.   15:53:20
2      Q.   And all the opinions that you have to   15:53:20
3   offer in this matter are contained within your   15:53:22
4   report? You don't have an opinion regarding this   15:53:26
5   matter which is not contained in this report?   15:53:31
6          That's what I'm trying to get at.   15:53:34
7      A.   I understand your question.   15:53:37
8          As is typical in everything I do, I   15:53:38
9   have major and minor opinions. I've given you   15:53:41
10   what I have in the form of major opinions to date.   15:53:44
11      Q.   Okay. As we sit here today, are you   15:53:51
12   aware of specific minor opinions which are not   15:53:54
13   contained in your report and you have not   15:53:57
14   testified about?   15:53:59
15      A.   Not that have the same level of   15:54:00
16   substantiation, and so I'm not prepared to testify   15:54:21
17   about them.   15:54:24
18      Q.   Okay. Explain "not that have the same   15:54:24
19   level of substantiation."   15:54:26
20      A.   If there is anything else I need to do   15:54:28
21   to -- if there is anything else I will be   15:54:31
22   testifying about, then I will have to do   15:54:37
23   additional work to make sure it's substantiated.   15:54:39
24      Q.   Okay. But what I asked you is: Do   15:54:40
25   you have any other minor opinions that you haven't   15:54:42

101

1   testified about to today or aren't contained in   15:54:44
2   your report?   15:54:47
3          You said, "Not that have the same   15:54:48
4   level of substantiation."   15:54:50
5          Well, how about ones that don't have   15:54:52
6   the same level of substantiation?   15:54:54
7      A.   I think they rest on speculation and,   15:54:56
8   therefore, I'm not prepared to testify about them.   15:55:00
9      Q.   What are they?   15:55:03
10      A.   That approximately 4,500 individuals   15:55:04
11   in the Felon Exception List that were identified   15:55:15
12   as being NAM matches have integrity in their   15:55:20
13   Social Security numbers, which also match a CVF   15:55:28
14   Social Security number.   15:55:34
15      Q.   So, if I understand it, it's a minor   15:55:37
16   opinion that 4,500 of the 60,197 have integrity,   15:55:40
17   meaning that they are, in fact, felons whose   15:55:49
18   rights had not been restored.   15:55:53
19          Is that correct?   15:55:55
20      A.   No.   15:55:56
21      Q.   Okay. I'm sorry.   15:55:56
22          Why don't you explain it to me?   15:55:58
23      A.   They have -- the Social Security   15:56:02
24   numbers themselves have integrity, in that they   15:56:03
25   are all nine digits long, and that's it.   15:56:05

102

1          I haven't examined them for validity,   15:56:10
2   I haven't examined them for reliability, and I   15:56:12
3   have reason to believe that they're not reliable.   15:56:15
4          That's why I'm not prepared to offer   15:56:17
5   that at this point as a major opinion.   15:56:21
6      Q.   Why did you not examine them for   15:56:23
7   reliability and validity?   15:56:26
8      A.   I've not had time.   15:56:29
9      Q.   You've not had time?   15:56:30
10      A.   That's correct.   15:56:31
11      Q.   Do you intend to examine these for   15:56:33
12   reliability and validity prior to trial?   15:56:36
13      A.   If I am asked by People for American   15:56:40
14   Way attorneys or other parties of the plaintiff to   15:56:41
15   do so, I will do so.   15:56:44
16      Q.   Has there been any discussion between   15:56:45
17   you and counsel for People for the American Way or   15:56:47
18   any of the plaintiffs in this matter about you   15:56:49
19   rendering additional opinions, prior to trial,   15:56:53
20   that you have not given either in your report or   15:56:54
21   via testimony here today?   15:56:56
22      A.   Yes.   15:56:58
23      Q.   Okay.   15:57:06
24      MR. SPECTOR: Let's go off the record for a   15:57:06
25   second.   15:57:08

103

1      THE VIDEOGRAPHER: Off the record.   15:57:09
2   3:58.   15:57:11
3      (Discussion off the record.)   15:57:12
4      MR. SPECTOR: Let's go back on the record.   15:58:14
5      THE VIDEOGRAPHER: We're back on.   15:58:17
6   3:59.   15:58:18
7   BY MR. SPECTOR:
8      Q.   Regarding the first -- first of all,   15:58:20
9   are there any other minor opinions that have not   15:58:22
10   had the same level of substantiation, that you're   15:58:27
11   aware of?   15:58:30
12          You've named one so far.   15:58:31
13      A.   No.   15:58:32
14      Q.   Okay. You said that you have a reason   15:58:33
15   to question the reliability of the Social Security   15:58:35
16   numbers.   15:58:42
17      A.   Yes.   15:58:42
18      Q.   Why?   15:58:43
19      A.   I believe there's a document that I   15:58:43
20   have seen that indicates that Social Security   15:58:45
21   numbers are unreliable within the Felon Exception   15:58:48
22   List.   15:58:49
23      Q.   What document would that be?   15:58:52
24      A.   I think it's part of the document   15:58:53
25   beginning with Bates C3061.   15:58:55

104

26 (Pages 101 to 104)

1    Q.   Okay.  Mr. Klausner, define the term   15:59:12
2    "industry standard" for me.                        15:59:20
3    A.   What is appropriately usual and          15:59:21
4    customary in the industry for the purpose for     15:59:27
5    which it is done and what is accepted as usual and 15:59:30
6    customary.                                         15:59:39
7    Q.   Now, in the very first page in Section  15:59:42
8    -- the introduction section of your report, you    15:59:46
9    stated that you were asked to expresses opinions 15:59:50
10   on industry standard for matching.             15:59:52
11         Is "the industry" the matching            15:59:54
12   industry?  You referred to just "the usual and   15:59:57
13   customary in the industry."                     16:00:02
14         I'm trying to figure out what industry   16:00:04
15   we're talking about here.                         16:00:06
16   A.   It is an industry which includes the     16:00:07
17   identification of people based on match criteria. 16:00:08
18   Q.   Okay.  Now, in your opinion under        16:00:25
19   Section III.A, you put, in your experience, "Most 16:00:33
20   matching applications make use of other available 16:00:36
21   criteria, such as Social Security numbers, various 16:00:40
22   identification numbers, dates of birth, locations, 16:00:43
23   etc., while the individuals' names may be used as 16:00:47
24   a secondary criteria to further eliminate        16:00:49
25   erroneous matches."                               16:00:51

                                                        105

1    What other types of identification           16:00:54
2    numbers would qualify for criteria there?        16:00:55
3    A.   Passwords.                                  16:00:57
4         In the case of Florida, in this           16:01:01
5    matter, for example, if the voter ID were unique, 16:01:03
6    that would be such a criteria.                    16:01:06
7         Anything that's unique to the            16:01:10
8    individual is valid as a primary criteria.       16:01:13
9    Anything that is not unique becomes a secondary   16:01:16
10   criteria.                                         16:01:19
11   Q.   Okay.  You state in the same opinion,   16:01:20
12   "For the year" -- I'm at the top of page 3 now.   16:01:33
13         "For the year 2000 election, DBT and    16:01:37
14   Florida use the altered names of the individuals  16:01:39
15   as a primary criteria for matching individuals for 16:01:41
16   felony convictions."                              16:01:45
17         How did you differentiate between DBT   16:01:46
18   and Florida?                                      16:01:48
19   A.   With respect to the process, I did       16:01:49
20   not.                                              16:01:58
21   Q.   You said "with respect to the           16:01:59
22   process."                                         16:02:00
23         Did you do it without respect to the    16:02:01
24   process?                                          16:02:04
25   A.   Well, clearly, without respect to the    16:02:04

                                                        106

1    process, they are separate entities.  One is a   16:02:06
2    private company and the other is a governmental   16:02:09
3    body.                                             16:02:11
4    Q.   So, with respect to the process of the 16:02:12
5    creation of Felony Exception Reports, Clemency    16:02:16
6    Exception Reports, the whole CVF file, you did not 16:02:17
7    differentiate between DBT and Florida?            16:02:20
8    A.   That's correct.                            16:02:22
9    Q.   Okay.  You've stated in your opinion    16:02:31
10   that dates of birth alone should not be used as a 16:02:44
11   sole criteria, that they should have used the     16:02:48
12   actual rather than the derived Social Security    16:02:52
13   numbers as the primary criteria.               16:02:55
14         What specific criteria do you believe  16:02:57
15   that DBT and Florida -- since you're lumping them 16:03:00
16   as one -- should have used in performing their    16:03:03
17   analysis?                                         16:03:05
18   A.   They should have used criteria which    16:03:06
19   had integrity and reliability and was unique.     16:03:14
20   Q.   I'm not asking you what                   16:03:19
21   characteristics the criteria should have --       16:03:21
22   A.   Well, I haven't finished my answer.     16:03:23
23   Q.   I'm sorry.  Go ahead.                     16:03:25
24   A.   And in light of what I understand        16:03:27
25   about the contents of the various databases, none 16:03:30

                                                        107

1    of those were there.                              16:03:32
2         Therefore, without having unique         16:03:33
3    identifiers with integrity and reliability, this 16:03:36
4    job could not be done.                            16:03:40
5    Q.   Okay.  You've used the word             16:03:44
6    "integrity" quite often as a characteristic.      16:03:45
7         Can you define "integrity" to me?       16:03:47
8    A.   Well, in the case, for example, of a   16:03:51
9    Social Security number, a Social Security number  16:03:55
10   with integrity would have nine digits.          16:03:56
11         All of the digits would be between      16:03:59
12   zero and nine, inclusive.  Certain positions would 16:04:02
13   not be able to have other than digits zero and one 16:04:05
14   in them.                                          16:04:10
15         The first digit would generally, I      16:04:11
16   believe it's the first digit, indicate the        16:04:12
17   location in the country or the origin of the      16:04:14
18   person at time of birth or at time of entry of    16:04:16
19   immigration.                                      16:04:20
20         The last four digits are a running      16:04:21
21   count based on the first five.                    16:04:23
22         There are certain attributes to the     16:04:24
23   number.  A Social Security number that meets those 16:04:26
24   -- that has all of those attributes is generally  16:04:28
25   considered one with integrity.                    16:04:34

                                                        108

27 (Pages 105 to 108)

DEPOSITION OF DAVID KLAUSNER

| | |
|---|---|
| 1 Q. Okay. That's as to Social Security 16:04:35 | 1 Q. If you bear with me, I'll try not to 16:06:51 |
| 2 number. 16:04:37 | 2 duplicate what Mr. Bergan asked. 16:06:53 |

1  Q.  Okay.  That's as to Social Security  16:04:35
2  number.  16:04:37
3     Give me an industry definition for  16:04:37
4  "integrity" as it applies to criteria.  16:04:40
5     A.  That the component parts of the number 16:04:42
6  are all present or the component parts of the  16:04:44
7  identifier are all present and appear in their  16:04:48
8  correct positions with respect to each other, that 16:04:50
9  they meet the requirements individually and as a  16:04:54
10  whole to be a composite that forms the whole.  16:04:57
11     Q.  Okay.  Give me an industry definition  16:05:01
12  for "reliable" or "reliability."  16:05:04
13     A.  That regardless of whether they have  16:05:07
14  integrity, do they, in fact, represent what they  16:05:09
15  are claiming to represent?  16:05:14
16     In other words, if they're unique to  16:05:15
17  an individual, do they, in fact, represent that  16:05:17
18  individual only?  Are they linked with that  16:05:19
19  individual correctly or incorrectly, etc.?  16:05:21
20     Q.  Okay.  You stated in that same  16:05:24
21  paragraph, "When they are reliable, the actual,  16:05:43
22  rather than derived Social Security numbers should 16:05:46
23  be used as the primary criteria."  16:05:47
24     How do you determine whether an actual 16:05:52
25  Social Security number is reliable?  16:05:54

109

1  A.  Through verification process.  16:05:55
2     Q.  Walk me through that process, please.  16:05:56
3     A.  Well, in this case, the verification  16:05:59
4  would require the personal contact between the  16:06:00
5  individuals who are identified as being felons on  16:06:02
6  the exception list and the people in the  16:06:03
7  governmental body or representatives thereof --  16:06:05
8     Q.  Okay.  16:06:06
9     A.  -- to verify that, in fact, the  16:06:07
10  information assumed about the individual was true. 16:06:1
11     Q.  Is a derived Social Security number  16:06:13
12  always less reliable than an actual?  16:06:14
13     A.  In this case, it is.  16:06:15
14     If you're asking me about "always,"  16:06:18
15  you need to post a hypothetical.  16:06:19
16     Q.  Always in this case.  16:06:23
17     Is every derived Social Security  16:06:24
18  number which was used in this process less  16:06:25
19  reliable than an actual Social Security number?  16:06:27
20     A.  Absolutely, because the method that  16:06:28
21  was used to do the derivation is flawed.  16:06:30
22     Q.  We'll get into that, but I just want  16:06:32
23  to know that -- it's your opinion that they're  16:06:35
24  always less reliable?  16:06:36
25     A.  In our case, it is.  16:06:38

110

1  Q.  If you bear with me, I'll try not to  16:06:51
2  duplicate what Mr. Bergan asked.  16:06:53
3     You make reference to "sole criteria"  16:07:07
4  in your report.  16:07:10
5     To your knowledge, did DBT or Florida, 16:07:11
6  for the 2000 election, use date of birth or any  16:07:13
7  other information as a sole criteria?  16:07:17
8     A.  Where are you referencing in my  16:07:20
9  report?  16:07:22
10     Q.  Okay.  In paragraph -- the first  16:07:22
11  paragraph on page 3, you state, in the  16:07:26
12  second-to-the-last-sentence, "Dates of birth alone 16:07:30
13  should not be used as the sole criteria."  16:07:34
14     This is the first time we're seeing  16:07:36
15  sole criteria versus actual or derived, or  16:07:38
16  something like that.  16:07:38
17     So, I'm asking you:  Did DBT or  16:07:40
18  Florida, for the 2000 election, use date of birth  16:07:42
19  or any other information as a sole criteria for  16:07:46
20  their matching process?  16:07:48
21     A.  Well, for example, the manipulated  16:07:49
22  names, combined with the date of birth, were the  16:07:53
23  sole criteria for NAM matches.  16:07:56
24     Q.  The manipulated names and the date of 16:07:59
25  birth were the sole criteria?  16:08:04

111

1  A.  Yes.  16:08:06
2     Q.  What does "sole criteria" mean?  16:08:06
3     A.  It's a single or a combination of  16:08:08
4  fields used as criteria or as the only criteria.  16:08:13
5     Q.  All right.  Perhaps I'm not  16:08:15
6  understanding.  16:08:18
7     A manipulated name and a date of birth 16:08:18
8  would be two different criteria, correct, in  16:08:20
9  making a match?  16:08:23
10     A.  Well, there are actually either four  16:08:26
11  or five distinct fields in the database.  16:08:27
12     Q.  Okay.  16:08:30
13     A.  By combining them, one creates a  16:08:31
14  criteria.  I use "sole criteria," in that sense,  16:08:34
15  as the basis for the match.  16:08:37
16     Q.  Okay.  Now, you stated before  16:08:41
17  Mr. Bergan that your analysis only focused on the 16:08:47
18  2000 election; correct?  16:08:52
19     A.  That's correct.  16:08:53
20     Q.  So, you have no opinion as to the 1999 16:08:55
21  process or the 1998 process; correct?  16:09:00
22     MR. OTTINGER:  Objection.  Leading.  16:09:02
23     THE WITNESS:  To the extent that the 1999 16:09:03
24  '98 process follow the similar process of --  16:09:06
25  similar to the process of 2000, my opinions are  16:09:09

112

28 (Pages 109 to 112)

the same and do apply to those prior years.  16:09:13
2  BY MR. SPECTOR:
3     Q.   But you don't know if it was the same;  16:09:17
4  correct?                        16:09:19
5     A.   My understanding is that '99 was  16:09:19
6  similar.                         16:09:22
7     Q.   Define "similar."              16:09:22
8     A.   It used a 90 percent match instead of  16:09:23
9  an 80 percent match criteria.          16:09:27
10    Q.   Is that your understanding of the only  16:09:29
11  change between those two?             16:09:32
12    A.   That's all I know, as I sit here.  16:09:33
13    Q.   Okay.  You state, further down on  16:09:35
14  page 3, that "The industry standard for matches  16:09:43
15  (lookups) performed by telephone companies, health  16:09:44
16  providers, Internet service providers, and various  16:09:47
17  local and countrywide public and private  16:09:50
18  organizations, is not to use individuals' names as  16:09:53
19  the primary criteria."               16:09:55
20        What's your basis for that statement?  16:09:56
21    A.   My knowledge of those industries.  16:09:58
22    Q.   What has been your experience in each  16:10:00
23  of those industries?                 16:10:02
24    A.   Well, for example, when someone calls  16:10:03
25  their health provider and says that they need  16:10:08

113

1  service, they're asked for the group ID number or  16:10:12
2  some other identification number, typically based  16:10:14
3  on their Social Security number, to determine  16:10:16
4  whether they are the individual that is rightfully  16:10:18
5  claiming.                         16:10:22
6        In the case of Internet service  16:10:23
7  providers, it's usually a phone number that's  16:10:25
8  provided, which tends to be unique to a  16:10:27
9  household --                      16:10:29
10    Q.   Well, I understand -- if you don't  16:10:32
11  mind me interrupting -- we can go back if we have  16:10:33
12  to.                           16:10:37
13        I understand there may be individual  16:10:37
14  unique identifiers used by these industries.  16:10:40
15        I'm asking you:  How do you know about  16:10:42
16  this -- what is your experience with telephone  16:10:46
17  companies and their use of criteria for matching  16:10:48
18  people?                        16:10:52
19    A.   I have been involved in matters where  16:10:52
20  large databases have been used and matches have  16:10:55
21  been done on criteria.               16:11:00
22        Never once were they done on the main  16:11:02
23  -- as a primary criteria.             16:11:03
24    Q.   For telephone companies, you have?  16:11:05
25    A.   Yes.                     16:11:07

114

1     Q.   Okay.  For what telephone company did  16:11:07
2  you perform these services?            16:11:08
3     A.   For AT&T.                16:11:09
4     Q.   When was this?              16:11:13
5     A.   This was approximately 1993.     16:11:14
6     Q.   Okay.  Do you happen to remember who  16:11:17
7  at AT&T was your main contact?          16:11:22
8     A.   It was a lawsuit.  It was Centillian  16:11:25
9  versus AT&T.                     16:11:33
10    Q.   Okay.  Any other work for telephone  16:11:34
11  companies?                      16:11:41
12    A.   I don't think so.            16:11:41
13    Q.   Okay.  How about health providers?  16:11:45
14    A.   I have done work for Blue Cross and  16:11:46
15  for HSC.                        16:11:58
16    Q.   When was this work performed?     16:11:59
17    A.   I can't tell you about the HSC, but  16:12:01
18  the Blue Cross work was performed in 1997.  16:12:10
19    Q.   Okay.                    16:12:12
20    A.   Yeah.                    16:12:13
21    Q.   How about for Internet service  16:12:13
22  providers?                      16:12:15
23    A.   I don't remember any.          16:12:17
24    Q.   Okay.  You stated for the first time,  16:12:38
25  in the parenthetical, "lookups versus matches."  16:12:43

115

1        Is there a difference?          16:12:46
2     A.   Matches are determined by using  16:12:48
3  lookups, and then they are verified.     16:12:52
4     Q.   Okay.  So, matches comes after the  16:12:54
5  lookup, if I'm understanding it?        16:12:58
6     A.   One determines that something is a  16:13:00
7  match after the lookups are done.       16:13:01
8     Q.   Okay.                    16:13:03
9     A.   Can we take a short break?       16:13:05
10    Q.   Sure.                    16:13:07
11        THE VIDEOGRAPHER:  Off the record.  16:13:07
12        4:14.                     16:13:09
13        (Short recess taken.)          16:13:11
14        THE VIDEOGRAPHER:  Okay.  We're back on at  16:17:47
15  4:19.                          16:17:55
16        MR. SPECTOR:  Okay.            16:17:56
17    Q.   Mr. Klausner, you frequently,        16:17:56
18  throughout your report, refer to the word  16:17:59
19  "Florida."                      16:18:05
20        When you say the word "Florida," what  16:18:05
21  do you mean?                     16:18:07
22    A.   I mean the combination of DBT and the  16:18:08
23  State of Florida Division of Elections and whoever  16:18:12
24  are the responsible people for those entities.  16:18:14
25    Q.   Okay.  Well, do you include the  16:18:17

116

29 (Pages 113 to 116)

DEPOSITION OF DAVID KLAUS

1 legislature in that definition of the "State of 16:18:19
2 Florida"? 16:18:21
3   A. I haven't thought about it. 16:18:21
4   Q. Okay. Well, I'm asking you, then. 16:18:23
5   A. I still haven't thought about it. 16:18:25
6   Q. Do you want to take a moment and think 16:18:27
7 about it? 16:18:29
8   A. No. 16:18:30
9   Q. Well, I need to understand, 16:18:31
10 unfortunately, for the purposes of your testimony, 16:18:36
11 if, when you refer to the "State of Florida," if 16:18:38
12 you mean the legislature. 16:18:40
13   A. I have not meant it when I wrote the 16:18:41
14 report. 16:18:43
15   Q. Okay. Did you mean the executive 16:18:43
16 branch in general? 16:18:47
17   A. I understand -- I understood at the 16:18:48
18 time I wrote my report that it was the named 16:18:49
19 parties in the suit. 16:18:51
20   Q. And who are -- do you understand who 16:18:52
21 are the named parties? 16:18:54
22   A. I don't have a caption, but whatever 16:18:55
23 is on the caption. 16:19:01
24   Q. Okay. So you don't have to pull it 16:19:01
25 out, your understanding is that the word "Florida" 16:19:03

117

1 in this report meant the named parties? 16:19:07
2     Is that your understanding? 16:19:10
3   A. Yes. 16:19:11
4   Q. Does it mean the individual counties 16:19:13
5 that comprise the State of Florida? 16:19:15
6   A. I don't know. 16:19:16
7   Q. Well, I want to understand what your 16:19:18
8 opinions are, and you opine that certain entities 16:19:21
9 or an entity, which you define as the word 16:19:27
10 "Florida" -- and I'm just using an example because 16:19:32
11 it's open -- used the altered names of the 16:19:34
12 individuals as a primary criteria, etc., etc. 16:19:36
13     Do you have different definitions for 16:19:38
14 the word "Florida" throughout your report? 16:19:43
15   A. No. 16:19:45
16   Q. Okay. So, I understand this, you mean 16:19:46
17 the two named entities related to the State of 16:19:47
18 Florida? 16:19:49
19   A. Whoever the entities that are -- 16:19:50
20   Q. -- named in this lawsuit? 16:19:55
21   A. Right. 16:19:56
22   Q. Okay. 16:19:56
23   A. Well, let me say -- I haven't actually 16:20:04
24 gone through the report to see if I've used 16:20:07
25 "Florida" in different ways. 16:20:09

118

1   Q. Well, take a moment -- take a moment 16:20:12
2 to do that, because maybe it's an important 16:20:17
3 distinction. 16:20:19
4   A. (Witness reviewing document.) 16:20:19
5     From what I can see -- and I haven't 16:21:06
6 looked through the entire report -- my intention 16:21:09
7 was -- when I use the "Florida," except for one 16:21:10
8 exception so far, which I'll detail to you, I 16:21:13
9 intended by that usage to mean the named parties. 16:21:15
10 their representatives, and their agents. 16:21:19
11   Q. Named parties, representatives, and 16:21:24
12 agents, okay. 16:21:25
13     Tell me about the exception that you 16:21:27
14 found. 16:21:28
15   A. On page 5, I have a cite at the end of 16:21:29
16 the top paragraph which says, "See Voting 16:21:33
17 Irregularities In Florida." 16:21:37
18     There, what I meant by that is the 16:21:40
19 title of the document. 16:21:43
20   Q. Okay. Other than -- certainly, other 16:21:44
21 than the title of an actual document -- 16:21:46
22   A. I think it's fair to say that I 16:21:47
23 intended by the use of the word "Florida" to mean 16:21:52
24 the named parties, their agents and 16:21:54
25 representatives. 16:21:56

119

1   Q. Okay. On page 4, two-thirds of the 16:21:56
2 way down, you have a statement that says, "DBT and 16:21:58
3 Florida decided to cast a wide net in the matching 16:22:04
4 process." 16:22:06
5     Tell me -- tell me why you believe 16:22:07
6 that was the case. 16:22:10
7   A. I have seen documents that refer to 16:22:12
8 that phrase, and also Mr. Bruder's testimony is 16:22:16
9 consistent with what I just said. 16:22:21
10   Q. Okay. What documents are you aware 16:22:22
11 that refer to that phrase? 16:22:24
12   A. I don't recall which ones. 16:22:26
13   Q. How many documents did you see that 16:22:29
14 refer to that phrase? 16:22:32
15   A. I don't remember. 16:22:33
16   Q. We'll go over the documents in 16:22:35
17 a little bit. 16:22:37
18     You read Mr. Bruder's testimony before 16:22:38
19 the U.S. Civil Rights Commission? 16:22:40
20   A. Particularly these pages. 16:22:42
21   Q. I'm not asking you particularly. 16:22:43
22     Did you read it in its entirety? 16:22:47
23   A. That's a different question. 16:22:49
24   Q. Okay. 16:22:51
25   A. I don't remember. I don't think I 16:22:51

120

30 (Pages 117 to 120)

Page 121

1    did, but I don't remember.          16:22:53
2       Q.   But you specifically remember reading  16:22:56
3    the excerpts, pages 212 to 215?          16:22:57
4       A.   Yes.                  16:23:02
5       Q.   Who provided those to you?       16:23:02
6       A.   I was given those by -- I believe it   16:23:03
7    was certainly attorneys for PFAW Foundation, but I  16:23:06
8    don't know which in particular.         16:23:12
9       Q.   And they -- did they provide you with  16:23:13
10   the full testimony or did they only provide you   16:23:18
11   with those excerpts, those few pages?       16:23:20
12      A.   I don't remember.          16:23:21
13          I certainly do have an entire      16:23:22
14   deposition transcript of Mr. Bruder, but I don't  16:23:24
15   know if it's the one that corresponds with this   16:23:27
16   particular cite.             16:23:29
17      Q.   Okay.  As you sit here today -- in the  16:23:30
18   second sentence, you put, "The fact is clear from  16:23:37
19   the requirements documents, various e-mails, and  16:23:39
20   testimony of Ms. Thorogood."          16:23:42
21          I'm curious:  What makes it clear to  16:23:45
22   you?                  16:23:47
23          MR. OTTINGER:  I'm sorry.  On what page?  16:23:47
24          MR. SPECTOR:  Page 4, same paragraph.  16:23:50
25          THE WITNESS:  (Reviewing document.)  16:23:53

121

Page 122

1          Well, at least that Mr. Bruder     16:23:56
2    testified that this was the intention of the    16:23:59
3    process.                16:24:01
4          MR. SPECTOR:  Let me mark this document,  16:24:02
5    please.                 16:24:07
6          (Deposition Exhibit No. 8 was marked.)  16:24:08
7    BY MR. SPECTOR:
8       Q.   I'm handing you a document which     16:24:15
9    begins with the Bates No. C2552 and ends at C2598.  16:24:17
10          Please tell me if you recognize that  16:24:24
11   document.                16:24:25
12      A.   (Witness reviewing document.)     16:24:25
13          Yes, I recognize it.        16:24:38
14      Q.   What is it?            16:24:39
15      A.   It's, I believe, a requirements     16:24:40
16   document -- I should say specifications document  16:24:50
17   for what will be done -- generally what will be   16:24:52
18   done --                 16:24:59
19      Q.   Is that --            16:25:00
20      A.   -- in managing the data.        16:25:01
21      Q.   For the 2000 election?         16:25:02
22      A.   Yes.                16:25:04
23      Q.   Is that the requirements documents to  16:25:05
24   which you refer in that sentence in your report   16:25:10
25   that we just read?            16:25:12

122

Page 123

1       A.   No.                16:25:13
2       Q.   It is not.            16:25:13
3          What documents do you refer to as,    16:25:14
4    quote, "requirements documents" in that sentence?  16:25:15
5       A.   I don't recall.  I'm sorry.       16:25:19
6       Q.   Okay.  You can put that right in the  16:25:28
7    pile, then.              16:25:33
8          You opine that "The result of doing  16:25:37
9    the matching in this way was the       16:25:39
10   disenfranchisement of otherwise eligible voters."  16:25:41
11          What way are you talking about?     16:25:46
12      A.   The way of using or specifying     16:25:48
13   criteria as defined by, for example, C3005.    16:25:52
14   That's the Bates number.          16:26:02
15      Q.   C3005, okay.            16:26:03
16          MR. SPECTOR:  Actually, if you could, mark  16:26:07
17   that, please.             16:26:10
18          (Deposition Exhibit No. 9 was marked.)  16:26:17
19   BY MR. SPECTOR:
20      Q.   I'm handing you now C3005 as       16:26:17
21   Exhibit 9.              16:26:20
22          C3005 is a legend, correct me if I'm  16:26:21
23   wrong, of match abbreviations with a match made on  16:26:25
24   the following, and it tells it, and then an    16:26:33
25   indication to check to see for that specific item;  16:26:35

123

Page 124

1    correct?                16:26:39
2       A.   Yes, that's what it says.        16:26:40
3       Q.   Okay.  So, how does C3005 fall into  16:26:49
4    what you just said the way -- "doing the matching  16:26:56
5    in this way," and "way" is your word, not mine?   16:27:00
6       A.   Doing NAM matches is a way, doing DBT  16:27:05
7    matches is a way, doing NSD, etc.       16:27:12
8       Q.   Okay.  So, all of those match codes --  16:27:14
9    all of those match ways resulted in what you    16:27:17
10   believe is the disenfranchisement of otherwise   16:27:20
11   eligible voters?             16:27:23
12      A.   Yes.                16:27:24
13      Q.   So, if there was -- for a         16:27:24
14   hypothetical, if there was a match made on an NAM  16:27:28
15   match, a last name, a first name, a DOB, and let's  16:27:32
16   assume for a second that it was 100 percent match,  16:27:35
17   no 90, no 80, 100 percent, no derived information  16:27:39
18   at all.                 16:27:42
19          It's your testimony that because     16:27:43
20   there's an NAM match that that would have     16:27:45
21   contributed to the disenfranchisement of an    16:27:49
22   otherwise eligible voter?          16:27:52
23          MR. OTTINGER:  I'll object as leading and  16:27:54
24   vague.                16:27:59
25          MR. SPECTOR:  Okay.          16:27:59

124

31 (Pages 121 to 124)

1    THE WITNESS: Yes.                16:28:02
2  BY MR. SPECTOR:
3    Q.   Why?                      16:28:06
4    A.   Because those are not unique.   16:28:06
5    Q.   Because the last name, first name, and  16:28:11
6  the date of birth, all being 100 percent with no  16:28:14
7  derived information is not unique, that   16:28:19
8  contributed to a disenfranchisement of an eligible  16:28:21
9  voter?                          16:28:24
10   MR. OTTINGER: Objection. Again --    16:28:25
11   THE WITNESS: To the extent --      16:28:26
12   MR. OTTINGER: -- vague as to the question.  16:28:27
13   THE WITNESS: -- that your hypothetical  16:28:30
14 includes the process that was otherwise followed  16:28:32
15 by DBT in creating, for example, the Felon  16:28:34
16 Exception List, my answer is yes.       16:28:36
17   MR. SPECTOR: Okay.             16:28:39
18   Q.   In your comment of "disenfranchisement  16:28:40
19 of otherwise eligible voters," what is the   16:28:44
20 significance of the word "otherwise" in that   16:28:46
21 sentence?                        16:28:48
22   A.   That -- I intended that to mean that   16:28:49
23 they would remain eligible if not for the actions  16:28:53
24 of DBT and Florida.                16:28:57
25   Q.   They would remain eligible if not for   16:29:02

                                        125

1  the actions of DBT and Florida, okay.    16:29:04
2        Other than placing their name on a   16:29:06
3  felon exception report -- because the only thing   16:29:08
4  you looked at were felons a-- what did DBT or   16:29:10
5  Florida do to make them ineligible to vote?   16:29:13
6    MR. OTTINGER: I'll object just as to the   16:29:17
7  foundation for the question.           16:29:20
8    THE WITNESS: They provided subsets of the  16:29:29
9  Felon Exception Lists to the various Supervisors   16:29:34
10 of Elections, who then used those lists to   16:29:38
11 determine who to strike from the rolls in the   16:29:44
12 upcoming election.                16:29:46
13 BY MR. SPECTOR:
14   Q.   How do you know what these different   16:29:47
15 individual supervisors did with these lists?   16:29:50
16   A.   Well, on the one hand, there is the   16:29:53
17 training that they were provided, which told them   16:29:56
18 that they would be receiving these lists and they   16:30:00
19 would need to verify or use the lists to determine  16:30:02
20 who to eliminate from their local rolls.   16:30:09
21        I've also seen e-mails and read   16:30:11
22 testimony that such action were -- such actions   16:30:14
23 were performed.                  16:30:17
24        In addition, I understand from   16:30:18
25 materials I have seen that various Supervisors of  16:30:20

                                        126

1  Elections sent letters to people who were on the   16:30:24
2  subsets of the Felon Exception Lists that they   16:30:29
3  received, notifying those individuals that they   16:30:33
4  would be ineligible to vote unless they contacted  16:30:35
5  the local election authorities.         16:30:39
6    Q.   Are you aware, as you sit here today   16:30:44
7  and testify, as to which supervisors sent those   16:30:46
8  letters to which you've referred?        16:30:49
9    A.   I can't be sure, but my memory is that  16:30:50
10 Dade County was one of those.          16:30:57
11   Q.   Okay. That's one.              16:30:58
12        Are you aware of any of the others?   16:30:59
13   A.   I don't remember.               16:31:02
14   Q.   As for the ones that Dade County   16:31:04
15 Supervisor Leahy sent out, are you aware of how   16:31:09
16 many people who received those letters took action  16:31:12
17 to ensure that they could vote in the upcoming   16:31:14
18 2000 election?                    16:31:18
19   A.   I seem to recall approximately 270, or  16:31:19
20 so, out of perhaps 1,900.             16:31:28
21   Q.   Those are the ones who took action?   16:31:30
22   A.   Who took some action.            16:31:34
23   Q.   And of those, are you aware of how   16:31:36
24 many were allowed to vote and their names removed  16:31:38
25 from the Felon Exception List --         16:31:41

                                        127

1    A.   I don't --                  16:31:43
2    Q.   -- or names -- let me just correct it  16:31:47
3  -- or names placed on a clemency list?    16:31:49
4    A.   I don't know who actually voted and   16:31:52
5  who did not vote.                 16:31:53
6    Q.   Okay. Going down to the bottom of   16:31:54
7  page 4, you put, "It's also my opinion that dirty  16:31:55
8  input leads to dirty output."          16:32:00
9        Is the word "dirty" a term recognized  16:32:01
10 in the industry?                  16:32:03
11   A.   I think "garbage" is the term   16:32:04
12 recognized in the industry.            16:32:05
13   Q.   Well, we're going to talk about   16:32:06
14 garbage in a little bit, but I'm asking you: Is   16:32:10
15 the word "dirty" --                16:32:13
16   A.   Yes. "Dirty data" is a term which is   16:32:13
17 known to anybody in the programs -- in this   16:32:18
18 industry.                       16:32:19
19   Q.   And what does it mean?           16:32:20
20   A.   It means the data has -- or lacks   16:32:23
21 integrity and reliability.             16:32:25
22        I should say integrity and -- yeah,   16:32:27
23 integrity and reliability.             16:32:29
24   Q.   It lacks integrity and reliability, or  16:32:30
25 can it lack just one of those characteristics?   16:32:35

                                        128

32 (Pages 125 to 128)

1    A.   Well, if it lacks integrity, it's    16:32:38
2  certainly unreliable.  It can still have    16:32:39
3  integrity, but not reliability.    16:32:41
4    Q.   Okay.  It can have integrity and not   16:32:43
5  be reliable?    16:32:47
6       Is that what you said?    16:32:48
7    A.   That's correct.    16:32:50
8    Q.   And does that make it dirty?    16:32:51
9    A.   Yes.    16:32:53
10    Q.   Okay.  You opine that -- on page 5,   16:32:54
11  that "It was necessary for the Division of    16:33:13
12  Elections and individual Supervisors of Elections   16:33:16
13  to do a detailed verification involving a direct   16:33:17
14  person-to-person contact with the individual on   16:33:19
15  the CFV who was defined by DBT as a felon."    16:33:21
16       Can you define for me "detailed    16:33:28
17  verification"?    16:33:29
18    A.   Either the supervisor -- well, the    16:33:29
19  supervisor needs to meet with the individual    16:33:33
20  personally.    16:33:36
21    Q.   The actual supervisor?    16:33:37
22    A.   Or the representative, duly    16:33:37
23  authorized, who's in a position to make the proper   16:33:40
24  determination.    16:33:42
25    Q.   And at this meeting, what is supposed   16:33:44

129

1  to occur?    16:33:46
2    A.   A validation that the individual is   16:33:47
3  who the state believes they are, and perhaps any   16:33:52
4  documentation be brought forth to present to    16:33:56
5  validate that the information that the state    16:34:01
6  believes it has on file about the individual is   16:34:03
7  correct.    16:34:05
8    Q.   How would -- how would the supervisor   16:34:05
9  or their authorized agent, as you just stated,    16:34:10
10  perform this validation sequence?    16:34:13
11    A.   I don't know that I'm in a position to   16:34:14
12  tell you.    16:34:16
13    Q.   But you opined that such verification   16:34:16
14  should occur?    16:34:22
15    A.   It should be personal.    16:34:22
16    Q.   But you're unsure as to how the    16:34:23
17  validation during this verification process should   16:34:25
18  proceed?    16:34:27
19    A.   I'm not in a position to tell you    16:34:27
20  exactly how it should proceed --    16:34:31
21    Q.   Okay.    16:34:35
22    A.   -- because I don't want to run afoul   16:34:35
23  of any state statutes or requirements.    16:34:37
24       I'm not an attorney, but there    16:34:41
25  certainly needs to be a person-to-person    16:34:42

130

1  communication, in person.    16:34:46
2    Q.   Okay.  Are you aware if any    16:34:46
3  person-to-person verifications were made in the --   16:34:50
4  before the 2000 election?    16:34:54
5    A.   I don't know.    16:34:55
6    Q.   Now, your source that such    16:35:06
7  person-to-person verification did not occur in    16:35:09
8  those cases was Chapter 5 of the U.S. Civil Rights   16:35:14
9  Commission report; correct?    16:35:17
10    A.   At least, but I do not recall ever    16:35:18
11  seeing any e-mails between any of the parties or   16:35:27
12  their representatives that any particular party    16:35:31
13  was verified in person.    16:35:37
14    Q.   Okay.  But I'm asking you for all your   16:35:38
15  sources for that opinion.    16:35:40
16    A.   I've just given you the two bases.    16:35:43
17    Q.   Then, I apologize.    16:35:45
18       Can you restate that, because I didn't   16:35:46
19  understand that.    16:35:50
20    A.   One is the lack of any documentation   16:35:51
21  that such person-to-person examinations or    16:35:52
22  validations were performed, and the second are the   16:35:54
23  documents cited.    16:35:56
24    Q.   So, one was the lack of documents that   16:35:56
25  it did occur, and two is Chapter 5 of the    16:36:01

131

1  U.S. Civil Rights Commission report?    16:36:04
2    A.   Yes.    16:36:05
3    Q.   Okay.  You did not conduct any    16:36:05
4  independent investigation; correct?    16:36:07
5    A.   That's correct.    16:36:30
6    Q.   When did you receive the U.S. Civil   16:36:30
7  Rights Commission report?    16:36:33
8    A.   I don't remember.    16:36:34
9    Q.   Within the past 30 days?    16:36:35
10    A.   At least.    16:36:36
11    Q.   You read Chapter 5 in its entirety?   16:36:37
12    A.   I don't know that I read Chapter 5 in   16:36:38
13  its entirety.    16:36:40
14    Q.   Well, explain to me why you would cite   16:36:42
15  to it if you didn't read it in its entirety.    16:36:44
16    A.   I may have read just sections of it.   16:36:46
17       Do you have it here present?  I'll    16:36:48
18  take a look.    16:36:50
19    Q.   Actually, I don't.    16:36:53
20       How did you determine what sections of   16:36:54
21  Chapter 5 to read?    16:36:56
22    A.   I scanned it to see if I could find   16:36:57
23  any representation that county officials or their   16:37:00
24  representatives met personally with individuals.   16:37:01
25    Q.   Did you do -- did you take any action   16:37:03

132

33 (Pages 129 to 132)

1  to confirm that the information contained in   16:37:06
2  Chapter 5 was accurate?   16:37:08
3     A.   No.   16:37:11
4     Q.   So, you relied blindly on what was   16:37:14
5  contained in the report?   16:37:17
6     MR. OTTINGER: Objection. Leading.   16:37:18
7     MR. SPECTOR: Okay.   16:37:19
8     THE WITNESS: And by "blindly," you mean --   16:37:24
9  BY MR. SPECTOR:
10    Q.   Without doing anything else.   16:37:28
11    A.   You mean -- what I did was I read the   16:37:29
12 report. I assumed it was correct.   16:37:32
13    Q.   Okay.   16:37:36
14    A.   I assumed that it was -- in fact, it   16:37:37
15 had integrity and reliability.   16:37:39
16    In other words, it was the entire   16:37:41
17 chapter, it didn't have words excised, and that it   16:37:42
18 was represented to me as being the actual document   16:37:45
19 or a copy thereof.   16:37:48
20    Q.   Why would you assume that?   16:37:49
21    A.   I had no reason to doubt it.   16:37:50
22    Q.   Did you read the rest of the   16:37:56
23 U.S. Civil Rights Commission report?   16:37:58
24    A.   No.   16:38:00
25    Q.   Why not?   16:38:00

133

1     A.   I wasn't asked to examine it.   16:38:01
2     Q.   Do you feel it would have been   16:38:05
3  pertinent for you to review the entire Civil   16:38:06
4  Rights Commission reports before citing to a   16:38:09
5  particular chapter, which you've now testified   16:38:13
6  that you've read portions?   16:38:14
7     MR. OTTINGER: I'll object as to form.   16:38:15
8     MR. SPECTOR: Noted.   16:38:16
9     THE WITNESS: No.   16:38:17
10    MR. SPECTOR: Okay.   16:38:19
11    Q.   You state that you performed -- you   16:38:32
12 examined and performed experiments using the Felon   16:38:35
13 Exception File.   16:38:38
14    Tell me in detail each and every   16:38:40
15 experiment you ran.   16:38:44
16    A.   I determined the total number of   16:38:47
17 matches within each of the criteria described in   16:39:00
18 -- or categories described in C03005.   16:39:04
19    Q.   Okay.   16:39:09
20    A.   I created the racial breakdown --   16:39:12
21    Q.   "Racial"?   16:39:15
22    A.   "Racial."   16:39:17
23    Q.   Not "ratio"?   16:39:18
24    A.   R-a-c-i-a-l.   16:39:19
25    Q.   Okay.   16:39:21

134

1     A.   -- within the file.   16:39:22
2     I examined the matched name of the CVF   16:39:24
3  with the matched name of the felon file --   16:39:32
4     Q.   The Felon Exception Report?   16:39:36
5     A.   The Felon Exception Report columns.   16:39:39
6     Q.   Okay.   16:39:41
7     A.   -- to see if they were 100 percent   16:39:42
8  matches or not.   16:39:45
9     I understood that those particular   16:39:47
10 columns were representative of names that had been   16:39:51
11 manipulated by DBT.   16:39:53
12    Q.   Which columns?   16:39:56
13    A.   In particular -- I'd have to have the   16:39:57
14 attachments, I believe, to my report.   16:40:08
15    THE VIDEOGRAPHER: We need to change tape.   16:40:10
16    MR. SPECTOR: Okay.   16:40:14
17    THE VIDEOGRAPHER: This is the end of   16:40:14
18 videotape No. 2 at 4:41.   16:40:16
19    (Discussion off the record.)   16:40:24
20    THE VIDEOGRAPHER: We're back on at 4:42.   16:41:29
21    This is the beginning of videotape   16:41:31
22 No. 3.   16:41:33
23    MR. SPECTOR: Okay.   16:41:34
24    Q.   While the computer boots up, so far,   16:41:38
25 you've identified three different experiments.   16:41:40

135

1     That's just a picture of me and my   16:41:42
2  wife iceskating.   16:41:43
3     You determined -- you said you had   16:41:46
4  three different experiments; correct?   16:41:49
5     You determined the total number of   16:41:51
6  matches within each category listed in C3005, you   16:41:52
7  did the racial breakdown within the file, and you   16:41:57
8  examined the matched name on the CVF with the   16:42:01
9  matched name of the Felon Exception Report to see   16:42:03
10 if it was 100 percent match or not; correct?   16:42:05
11    A.   I've said that, yes.   16:42:07
12    Q.   Any other experiments that you ran?   16:42:08
13    A.   Yes.   16:42:10
14    Q.   Okay. Tell me which ones.   16:42:11
15    A.   I examined the columns containing the   16:42:14
16 Social Security numbers of both the Felony   16:42:18
17 Exception List and the original CVF to see if they   16:42:23
18 had integrity.   16:42:26
19    Q.   What do you mean by "integrity" there?   16:42:29
20    A.   Same definition I gave prior, that is   16:42:32
21 that they looked like they were correct.   16:42:34
22    Q.   How can you tell if they looked like   16:42:36
23 they were correct?   16:42:40
24    A.   Well, if they were blank, they didn't   16:42:41
25 look like they were correct.   16:42:45

136

34 (Pages 133 to 136)

DEPOSITION OF DAVID KLAUSNER

| | |
|---|---|
| 1 Q. Okay. Other than it being blank or 16:42:46 | 1 state used for NAM, plus whatever was in the 16:44:51 |
| 2 missing a digit, how else did you verify their 16:42:47 | 2 Social Security number field, regardless of the 16:44:54 |
| 3 integrity? 16:42:49 | 3 integrity of that field, plus whatever was in the 16:44:57 |
| 4 A. Those were the two ways I used. 16:42:50 | 4 race field, regardless of the integrity of that 16:45:00 |
| 5 I didn't look to see if they were 16:42:52 | 5 field, which indicated a black voter. 16:45:03 |
| 6 missing a digit in particular. I looked to see if 16:42:56 | 6 Q. I'm confused as to your term "appended 16:45:09 |
| 7 the field had a zero in it. 16:42:59 | 7 the race indicator." 16:45:13 |
| 8 Q. Okay. Any other experiments you ran 16:43:01 | 8 Could you change something? 16:45:15 |
| 9 on this data? 16:43:03 | 9 A. No. 16:45:17 |
| 10 A. So, there may be other Social Security 16:43:03 | 10 When we -- when we do matches, we 16:45:18 |
| 11 numbers that lacked integrity. 16:43:06 | 11 create criteria, and one of the ways of dealing 16:45:20 |
| 12 For example, they're eight digits 16:43:09 | 12 with the test is to string them out as a 16:45:22 |
| 13 instead of nine, but I didn't include those in my 16:43:10 | 13 contabulation of strings. 16:45:25 |
| 14 counts. 16:43:12 | 14 That's what I meant by "appended." 16:45:27 |
| 15 Q. Okay. 16:43:13 | 15 Q. Okay. 16:45:31 |
| 16 A. I also looked to see if the gender 16:43:13 | 16 A. I didn't alter any of the data in the 16:45:31 |
| 17 matched between the CVF voter file and the 16:43:15 | 17 original file. 16:45:33 |
| 18 supposed felon. 16:43:24 | 18 Q. Okay. That's what concerned me when 16:45:34 |
| 19 I also looked to see if the race 16:43:24 | 19 you said "appended." 16:45:37 |
| 20 matched between the CVF voter file and the alleged 16:43:26 | 20 Anything else that you can recall? 16:45:38 |
| 21 felon. 16:43:31 | 21 A. There are other things, but I don't 16:45:39 |
| 22 I also calculated percentages on the 16:43:33 | 22 remember. They're on my Exhibit 1, I believe, the 16:45:43 |
| 23 basis of the various matching criteria. 16:43:38 | 23 CD that was provided to the defendants. 16:45:45 |
| 24 Q. You mean like how many NAM matches we 16:43:40 | 24 Q. Okay. CD-1 is in the computer now and 16:45:47 |
| 25 have versus how many SSL, or whatever the other -- 16:43:44 | 25 has been loaded. 16:45:49 |
| 137 | 139 |

| | |
|---|---|
| 1 is that what you mean? 16:43:49 | 1 CD-1 contains upon it four different 16:45:50 |
| 2 A. Yes. 16:43:50 | 2 reports, a felon report in an Excel database 16:45:54 |
| 3 Q. Okay. 16:43:50 | 3 containing 35,530 kilobytes; a clemency report in 16:45:58 |
| 4 A. And what percentage they were for the 16:43:51 | 4 an Excel database containing 4,177 kilobytes; a 16:46:02 |
| 5 entire file. 16:43:56 | 5 200001felons.tsv file; and a Felons.TXT document 16:46:08 |
| 6 Q. Okay. 16:43:57 | 6 containing 51,869 kilobytes. 16:46:18 |
| 7 A. Similarly, percentages for all of 16:43:57 | 7 Where are the data that you came up 16:46:22 |
| 8 racial breakdowns. 16:43:58 | 8 with as a result of running each of these 16:46:27 |
| 9 Q. Okay. 16:43:59 | 9 experiments? 16:46:29 |
| 10 A. I also took a look at the NAM plus 16:44:00 | 10 A. I'd have to look at the four files to 16:46:29 |
| 11 Social Security number match and what that may 16:44:09 | 11 tell you that. 16:46:31 |
| 12 have been like -- 16:44:14 | 12 Q. Okay. Do you want to do that now? 16:46:32 |
| 13 Q. Okay. 16:44:15 | 13 A. Only if I'm asked to do so. 16:46:35 |
| 14 A. -- without regard for whether the 16:44:15 | 14 Q. Okay. I'm going to ask you to do 16:46:38 |
| 15 Social Security number had integrity or 16:44:18 | 15 that. 16:46:41 |
| 16 reliability. 16:44:20 | 16 Which one would you like to look at 16:46:43 |
| 17 Q. Okay. 16:44:22 | 17 first? It doesn't matter to me. 16:46:45 |
| 18 A. I believe I did the same by appending 16:44:24 | 18 A. Let's take a look at the Felons.TXT 16:46:49 |
| 19 the race indicator for black voters to the NAM, 16:44:31 | 19 document. 16:46:56 |
| 20 plus the Social Security match. 16:44:36 | 20 Q. Which corner is that? It's hard to 16:46:56 |
| 21 Q. Explain to me what you mean by you 16:44:39 | 21 see from here. 16:46:59 |
| 22 "appended the race indicator." 16:44:41 | 22 A. The lower right-hand side. 16:47:00 |
| 23 A. In other words, the criteria that I 16:44:42 | 23 Q. What made you choose the Felons.TXT 16:47:02 |
| 24 used were what the state used for NAM, except it 16:44:43 | 24 document, out of curiosity? 16:47:04 |
| 25 was 100 percent -- I'm sorry, it was what the 16:44:48 | 25 A. It seems to have a size which is more 16:47:05 |
| 138 | 140 |

35 (Pages 137 to 140)

DEPOSITION OF DAVID KLAUSNER

| | |
|---|---|
| 1 | likely to contain 60,197 records.     16:47:09 |
| 2 | Q.   Okay.  Good.     16:47:12 |
| 3 | With any luck, it will open.     16:47:35 |
| 4 | Okay.  Here it is (indicating).     16:47:55 |
| 5 | A.   And your question is?     16:47:59 |
| 6 | Q.   My question is -- I'm trying to     16:48:00 |
| 7 | ascertain -- where is the data that you came up     16:48:02 |
| 8 | with when you ran each of these different     16:48:04 |
| 9 | experiments?     16:48:09 |
| 10 | A.   Well, the data is all at least     16:48:09 |
| 11 | inherent in the original file, as it comes off     16:48:14 |
| 12 | CD No. 7 of the seven CDs that I referenced in the     16:48:16 |
| 13 | -- in my report, particularly on page 5, where I     16:48:22 |
| 14 | point to a particular location on the CD that I     16:48:24 |
| 15 | was provided.     16:48:28 |
| 16 | Q.   I see you point to one single CD     16:48:29 |
| 17 | labeled "DBT-DOE_Delivery_Data."     16:48:31 |
| 18 | I don't see seven CDs, but assuming     16:48:37 |
| 19 | that this was it -- because this was the CD that     16:48:39 |
| 20 | was attached as an exhibit to your report -- I'm     16:48:41 |
| 21 | going to step behind you now as you look at that,     16:48:46 |
| 22 | if that's okay, so we can look at it together.     16:48:50 |
| 23 | What I'm trying to ascertain is:  From     16:48:53 |
| 24 | these four files that were -- that were included     16:48:54 |
| 25 | with your report, where is the backup data for     16:48:57 |

141

| | |
|---|---|
| 1 | each one of the experiments which you just     16:49:02 |
| 2 | testified about?     16:49:04 |
| 3 | A.   The backup data is the data that was     16:49:05 |
| 4 | provided to me.     16:49:11 |
| 5 | Q.   And was this -- was this data provided     16:49:12 |
| 6 | to you (indicating)?     16:49:14 |
| 7 | A.   This data was provided to me.     16:49:16 |
| 8 | Q.   In this form or was this a manipulated     16:49:18 |
| 9 | form?     16:49:20 |
| 10 | A.   This was not a manipulated form.  This     16:49:20 |
| 11 | is a translation of the data directly from the     16:49:24 |
| 12 | Excel spreadsheet.     16:49:26 |
| 13 | Q.   Okay.  Did you produce separate     16:49:29 |
| 14 | reports for each of these experiments?     16:49:31 |
| 15 | A.   No.     16:49:32 |
| 16 | Q.   Why not?     16:49:35 |
| 17 | A.   I surrounded the name body of the data     16:49:36 |
| 18 | with the summaries of the numbers that I came up     16:49:42 |
| 19 | with.     16:49:44 |
| 20 | Q.   I'm sorry.  I don't understand your     16:49:44 |
| 21 | answer, if you could --     16:49:48 |
| 22 | A.   The normal appearance of the     16:49:49 |
| 23 | spreadsheet is in the form of an X/Y matrix.     16:49:51 |
| 24 | Q.   Sure.     16:49:54 |
| 25 | A.   I placed my summaries and my findings     16:49:54 |

142

| | |
|---|---|
| 1 | at the bottom and to the right of the existing     16:49:59 |
| 2 | data as I found that existing data on the CD-7     16:50:01 |
| 3 | spreadsheet.     16:50:04 |
| 4 | Q.   Would that be in -- what would be the     16:50:05 |
| 5 | contained in any of these four files?     16:50:08 |
| 6 | A.   It should be in at least this one, and     16:50:10 |
| 7 | perhaps one other.     16:50:13 |
| 8 | Q.   Okay.  So, it would be in the lower     16:50:13 |
| 9 | right-hand corner?     16:50:15 |
| 10 | A.   Well, it's busy.     16:50:16 |
| 11 | Q.   The computer is busy?     16:50:17 |
| 12 | A.   When you opened this file, you opened     16:50:18 |
| 13 | it without WordWrap.     16:50:22 |
| 14 | Q.   Okay.     16:50:23 |
| 15 | A.   The result was that everything to the     16:50:24 |
| 16 | right was truncated.     16:50:25 |
| 17 | Q.   Okay.     16:50:27 |
| 18 | A.   I believe some of my findings are to     16:50:30 |
| 19 | the right.     16:50:33 |
| 20 | Q.   Okay.  So, now we're down in the     16:50:33 |
| 21 | right, and I'm trying to find where your findings     16:50:37 |
| 22 | are.     16:50:40 |
| 23 | A.   I'm afraid when you moved it, you     16:51:02 |
| 24 | terminated WordWrap, and we really need to have     16:51:05 |
| 25 | WordWrap on; otherwise, I can't see the right     16:51:07 |

143

| | |
|---|---|
| 1 | side.     16:51:12 |
| 2 | Q.   Okay.  Well, why don't we let it run     16:51:12 |
| 3 | that, and we can continue talking.     16:51:15 |
| 4 | Other than what would be contained in     16:51:16 |
| 5 | one of these four files, did you produce any --     16:51:17 |
| 6 | any output, any report, showing the results of any     16:51:20 |
| 7 | of your experiments you purportedly ran?     16:51:24 |
| 8 | A.   Yes.     16:51:26 |
| 9 | Q.   Okay.  Where would that be?     16:51:27 |
| 10 | A.   I believe that's on a CD that was     16:51:28 |
| 11 | provided -- that I provided to Attorney Ottinger     16:51:29 |
| 12 | several days ago.     16:51:54 |
| 13 | Q.   Would that be the one that has --     16:51:55 |
| 14 | which I'm showing you -- that shows FelonReport     16:51:56 |
| 15 | Match2.TXT.ZIP; FelonReport Match3.ZIP;     16:51:59 |
| 16 | FelonReport Match4.ZIP; ClemencyReport.xls; and     16:52:01 |
| 17 | Total_V_Felons_ Race_County_Breakdown?     16:52:05 |
| 18 | A.   Yes.     16:52:08 |
| 19 | Q.   Okay.     16:52:09 |
| 20 | A.   In addition, I believe I provided     16:52:09 |
| 21 | screen-shot printouts of all of the results to     16:52:11 |
| 22 | Attorney Ottinger last week, and I think they were     16:52:14 |
| 23 | forwarded on to you.     16:52:16 |
| 24 | Q.   Okay.  Is there a reason you failed to     16:52:19 |
| 25 | forward them to Attorney Ottinger until late last     16:52:21 |

144

36 (Pages 141 to 144)

145

| | |
|---|---|
| 1 week?                                    16:52:24 | 1 record, there is no finding of the Felons.TXT      16:54:36 |
| 2    A.   I don't think that's a true statement. 16:52:24 | 2 document containing -- can you read that, please,  16:54:38 |
| 3    Q.   You forwarded them for the first time  16:52:25 | 3 the kilobytes?                          16:54:40 |
| 4 to Mr. Ottinger last week?              16:52:27 | 4    A.   51,869 kilobytes.               16:54:41 |
| 5    A.   No.                          16:52:31 | 5    Q.   Okay. Go ahead and open up any of the 16:54:43 |
| 6    Q.   When were they previously forwarded to 16:52:31 | 6 other reports.                          16:54:48 |
| 7 Mr. Ottinger?                           16:52:32 | 7    A.   I'm opening the FelonReport, Excel     16:54:49 |
| 8    A.   On the day when the Match2.TXT.ZIP was 16:52:33 | 8 worksheet, showing 3,535 kilobytes.           16:54:51 |
| 9 provided, which is several months ago, I believe. 16:52:36 | 9    Q.   Okay. While that's opening, you put    16:54:54 |
| 10    Q.   Okay. But we didn't receive it until 16:52:38 | 10 that some of your results are detailed in the rest 16:54:56 |
| 11 hand delivery on May 24th, I'll represent to you. 16:52:39 | 11 of this report in response to when you're      16:55:00 |
| 12    MR. OTTINGER: I don't remember. I don't   16:52:43 | 12 examining calculations and sums on the files.    16:55:02 |
| 13 recall getting it.                      16:52:46 | 13    Where are the remaining results that       16:55:05 |
| 14    MR. SPECTOR: Which, of course, make our   16:52:47 | 14 were not contained in this report?          16:55:06 |
| 15 preparation a bit difficult.             16:52:49 | 15    A.   They're in the electronic files that   16:55:08 |
| 16    Q.   Explain to me the differences between 16:52:52 | 16 are on the CDs.                         16:55:10 |
| 17 Match2, Match3, and Match4.               16:52:54 | 17    Q.   On this CD that was recently -- the    16:55:11 |
| 18    A.   I did additional experiments between  16:52:55 | 18 Match2 CD, we'll call it?               16:55:15 |
| 19 Match2 and Match3, and the results of those  16:52:58 | 19    A.   At least that one. That may also be    16:55:16 |
| 20 additional experiments are reflected in Match3. 16:53:01 | 20 on the one that's being opened right now.      16:55:19 |
| 21    I did additional experiments between     16:53:05 | 21    Q.   Okay. While that's opening, turning    16:55:21 |
| 22 Match3 and Match4, and those results are reflected 16:53:06 | 22 to the next part of your report, you stated that 16:55:27 |
| 23 in Match4.                           16:53:10 | 23 "The first problem with the quality of the data 16:55:32 |
| 24    Q.   What additional experiments did you   16:53:12 | 24 used for matching was that a significant quantity 16:55:34 |
| 25 do, as you've just testified about?       16:53:15 | 25 of Social Security numbers were missing."      16:55:36 |

145                                      147

| | |
|---|---|
| 1    A.   For example, I did matching on -- I    16:53:16 | 1    Did you check this manually?          16:55:38 |
| 2 should say racial breakdown on some categories. 16:53:19 | 2    A.   I checked it electronically.       16:55:41 |
| 3    I may have examined the integrity of     16:53:25 | 3    Q.   By looking for -- by running a query   16:55:44 |
| 4 various fields, such as the date-of-birth field 16:53:29 | 4 to see how many were missing Social Security    16:55:48 |
| 5 and the Social Security number fields.       16:53:34 | 5 numbers?                            16:55:50 |
| 6    Q.   Did you create -- did you run these    16:53:35 | 6    A.   That's correct.                 16:55:51 |
| 7 experiments prior to your signing of your expert 16:53:39 | 7    Q.   Okay. In the query, did you ascertain 16:55:51 |
| 8 report?                             16:53:43 | 8 if there was missing all digits?          16:55:54 |
| 9    A.   Yes.                         16:53:43 | 9    A.   I ascertained if it was blank and if   16:55:58 |
| 10    Q.   The expert report indicates that you   16:53:48 | 10 it had a single-digit zero in it.          16:56:03 |
| 11 performed various calculations and sums on those 16:53:53 | 11    Q.   How many of the 34,525 that you claim  16:56:07 |
| 12 files -- and if the computer is done, please let 16:53:56 | 12 are missing Social Security numbers were only    16:56:10 |
| 13 me know.                            16:54:00 | 13 missing one digit?                     16:56:14 |
| 14    A.   It is done.                   16:54:00 | 14    A.   None.                        16:56:15 |
| 15    Q.   Okay. So, if you could point out to    16:54:01 | 15    Q.   How do you know that?            16:56:18 |
| 16 me in this file where your findings are.     16:54:03 | 16    A.   Because I did the summation. I know    16:56:24 |
| 17    A.   Okay.                        16:54:18 | 17 exactly what I did in order to include it in the 16:56:24 |
| 18    (Witness reviewing document.)          | 18 number.                             16:56:27 |
| 19    They're not in this file.            16:54:21 | 19    Q.   How many were missing two digits?     16:56:27 |
| 20    Q.   Okay.                        16:54:22 | 20    A.   I'm sorry. I misunderstood your       16:56:31 |
| 21    A.   I'm going to close this file.      16:54:23 | 21 question.                           16:56:34 |
| 22    Q.   That's fine.                  16:54:24 | 22    I don't know how many were missing one 16:56:34 |
| 23    The windows should still be up, and     16:54:27 | 23 digit. I don't know how many were missing two.  16:56:37 |
| 24 you can go ahead and pick one of the other four. 16:54:29 | 24    I can tell you how many were missing     16:56:41 |
| 25    You can tell me -- just for the         16:54:32 | 25 eight, and I can tell you how many were missing  16:56:42 |

146                                      148

37 (Pages 145 to 148)

1 nine.                            16:56:47
2        I testified previously that when I   16:56:47
3 validated integrity of the Social Security number  16:56:48
4 fields, I did not look for missing digits, other   16:56:50
5 than looking for zero only in the field or looking  16:56:52
6 for a blank.                     16:56:58
7    Q.   How many of the 12,135 of the     16:56:59
8 60,000-and-change individuals identified by DBT as  16:57:03
9 felons were missing all of the digits of their   16:57:08
10 Social Security number?              16:57:10
11   A.   Can you repeat your question, please?  16:57:13
12   Q.   Sure.                    16:57:19
13        You indicated in your report that   16:57:20
14 12,135 of the 60,000-and-change which were   16:57:21
15 identified as felons were missing a Social   16:57:24
16 Security number.                 16:57:26
17        My question to you is: Does that   16:57:27
18 12,135 mean that they were missing all of the   16:57:31
19 digits of their Social Security numbers?   16:57:33
20   A.   I have to run a calculation on the   16:57:35
21 spreadsheet you have in here right now or on the   16:57:47
22 one that's on the CD that we haven't inserted yet.  16:57:52
23   Q.   Okay.  So, until you look at that   16:57:54
24 data, you're unaware?               16:57:58
25   A.   Until I do one of those two things, I  16:57:59

149

1 don't know how to answer your question.    16:58:03
2    Q.   Let me ask you that question.     16:58:04
3        When you created your report, had you  16:58:06
4 run that query to determine how many of them were  16:58:08
5 missing all of the digits?            16:58:10
6    A.   Yes.                    16:58:10
7    Q.   Okay.  But you just didn't include   16:58:11
8 that result in the report?            16:58:14
9    A.   The number of people -- the number of  16:58:17
10 records in this file with a Social Security number  16:58:27
11 attached to the felon part of the file may --   16:58:31
12 where the Social Security number entry in that   16:58:35
13 record is entirely blank may, in fact, be 12,135,  16:58:39
14 but I don't remember without looking at the   16:58:43
15 formula.                         16:58:45
16   Q.   Okay.  You did no independent     16:58:45
17 calculations, or at least you didn't report any in  16:58:48
18 your report, for Social Security numbers that   16:58:52
19 perhaps were only missing one digit or two digits?  16:58:55
20   A.   That's correct.              16:58:57
21   Q.   I'm assuming that goes for all of your  16:58:57
22 analysis pertaining to Social Security numbers   16:58:59
23 that were missing?                16:59:02
24        You didn't do any analysis or at least  16:59:03
25 indicate any analysis for ones missing from one   16:59:05

150

1 digit to eight digits?              16:59:07
2        MR. OTTINGER:  Objection as to form.   16:59:08
3 BY MR. SPECTOR:
4    Q.   Correct?                  16:59:12
5        I mean, we can -- I can go one by one,  16:59:12
6 by each of your statistics, but I want to make   16:59:16
7 sure -- I'm trying to move a little quickly here   16:59:18
8 -- that you, as you stated before, didn't look at  16:59:21
9 whether or not they were missing between one and   16:59:23
10 eight.  You were only looking to see if they were  16:59:27
11 completely gone or had zeros in it.        16:59:32
12        Is that correct?             16:59:33
13   A.   Yes.  I basically gave the benefit of  16:59:34
14 the doubt to the defendants.          16:59:36
15   Q.   Okay.  Well -- okay.          16:59:39
16        But you did the same thing with the   16:59:42
17 Clemency File; correct?  You looked at -- you used  16:59:46
18 the same analysis; correct?            16:59:49
19        I mean, you stated that 9,624 of the   16:59:54
20 10,181 individuals identified by DBT as felons   16:59:58
21 with clemency were missing Social Security   17:00:01
22 numbers.                         17:00:05
23   A.   I did the same thing that I had done   17:00:06
24 with the Felon Exception File with the Clemency   17:00:07
25 File.                            17:00:11

151

1    Q.   Okay.  It's your understanding that   17:00:14
2 the individuals named on the clemency report were,  17:00:15
3 in fact, reported so to the supervisors and were   17:00:17
4 not determined to be ineligible to vote.     17:00:20
5        Is that correct?             17:00:24
6        MR. OTTINGER:  Objection to the form.  Vague.  17:00:24
7        If understand the question --      17:00:27
8        MR. SPECTOR:  Okay.            17:00:28
9    Q.   Do you understand my question?      17:00:29
10   A.   Can you repeat it?            17:00:30
11   Q.   What's the point of the Clemency File?  17:00:31
12   A.   Well, that's a very good question.   17:00:34
13        I mean, if you're asking me how do I   17:00:38
14 understand how DBT or the State of Florida used   17:00:40
15 the Clemency File, I'm not really sure.    17:00:42
16        I know how I -- I understand perhaps   17:00:44
17 the intent, but the mechanics of it are unclear,   17:00:50
18 from all of the documentation I've seen.   17:00:53
19   Q.   When you say "the mechanics," are you  17:00:57
20 talking about how the individual supervisors used  17:00:59
21 the Clemency File?                17:01:01
22   A.   Or how the state used the Clemency   17:01:02
23 File or how DBT used the Clemency File.     17:01:04
24   Q.   Are you aware of any way the state or  17:01:08
25 DBT used the Clemency File?            17:01:10

152

38 (Pages 149 to 152)

153

```
 1      A.   I have to say I am not.        17:01:14
 2      Q.   Okay. You indicated -- you put in    17:01:16
 3  your report -- you put, quote, "Only 484 of the   17:01:18
 4  10,181 individuals in the Clemency File were    17:01:21
 5  matched on the full nine digits of their Social   17:01:26
 6  Security numbers."                 17:01:28
 7          What's the significance of that    17:01:29
 8  finding?                     17:01:32
 9      A.   That for the purposes of matching,    17:01:32
10  using proper criteria, which are unique ID as the  17:01:34
11  primary criteria, and lesser-unique criteria as   17:01:38
12  secondary criteria, for the purposes of     17:01:45
13  consistency check.               17:01:49
14      Q.   So, to the extent that you objected or  17:01:50
15  found it erroneous to have individuals in the    17:01:54
16  Felony Exception Report missing Social Security  17:01:58
17  numbers, it's also your opinion that it was    17:02:02
18  erroneous to have individuals in the Clemency File 17:02:05
19  missing Social Security numbers.        17:02:08
20          Is that correct?            17:02:12
21      A.   Yes.                  17:02:12
22      Q.   Okay.                 17:02:12
23      A.   I don't know what was done with the   17:02:13
24  Clemency File with respect to matching.     17:02:15
25      Q.   You don't know what was done with the  17:02:16
```

154

```
 1  Clemency File with respect to matching?     17:02:18
 2      A.   Yes.                  17:02:20
 3      Q.   Can you explain that?          17:02:21
 4      A.   In other words, how the Clemency File  17:02:22
 5  was used to purge the Felon Exception List, if at  17:02:23
 6  all.                       17:02:26
 7      Q.   Well, in fact, you didn't know how the  17:02:26
 8  Felon Exception List was, in fact, used by the   17:02:28
 9  individual supervisors, either; correct?     17:02:30
10      MR. OTTINGER: Objection as to form.      17:02:33
11      THE WITNESS: I've already testified today to 17:02:34
12  the extent that I do know the answer to your    17:02:35
13  question.                    17:02:37
14      MR. SPECTOR: Okay.              17:02:37
15      Q.   Now, when you refer, in the last     17:02:55
16  sentence of that paragraph on page 6, "or similar  17:02:57
17  reliable data," you're talking about a unique    17:03:03
18  identifier there?                17:03:04
19      A.   The last paragraph?           17:03:05
20      Q.   The last sentence of the paragraph --  17:03:06
21  of the first paragraph on page 6.        17:03:08
22      A.   "Without reliable Social Security    17:03:12
23  numbers, or similar reliable data as primary    17:03:13
24  matching criteria," by "reliable data," you mean a 17:03:15
25  unique identifier?               17:03:20
```

155

```
 1      A.   That's correct, which has integrity.   17:03:21
 2      Q.   Which has integrity.          17:03:23
 3          Are you aware -- there was some     17:03:25
 4  testimony before with Mr. Bergan about the sources 17:03:28
 5  from where the data came from. You stated that   17:03:32
 6  FDLE was some that you thought of.        17:03:37
 7          Are you aware if Social Security     17:03:39
 8  numbers were, in fact, available to these sources? 17:03:40
 9      A.   I don't know.              17:03:43
10      Q.   What have you done to verify that    17:03:44
11  Social Security numbers were available to these   17:03:48
12  sources?                     17:03:50
13      A.   Nothing.                17:03:50
14      Q.   If Social Security numbers were not   17:03:51
15  available to these sources, would this change your 17:03:53
16  opinion?                     17:03:55
17      A.   No.                   17:03:55
18      Q.   Are you aware of any governmental body  17:04:00
19  or agency that's ever taken a position regarding  17:04:03
20  whether Social Security numbers are reliable data  17:04:05
21  in determining if someone is, in fact, alive?    17:04:09
22      MR. OTTINGER: Objection as to form.      17:04:16
23      THE WITNESS: I believe I've seen a document 17:04:17
24  -- and it may be the C3061 Bates number -- that   17:04:33
25  claims that felons sometimes give the wrong Social 17:04:39
```

156

```
 1  Security number when they are asked to give one -- 17:04:43
 2  to give theirs.                 17:04:48
 3      BY MR. SPECTOR:
 4      Q.   Do you question the veracity of that   17:04:50
 5  statement?                    17:04:53
 6      A.   No, I don't.              17:04:54
 7      Q.   Okay. Are you aware of any reports    17:04:54
 8  issued by the Division of Elections in either 1999 17:04:56
 9  or 2000 -- just to keep it broad in case you saw   17:04:58
10  some -- containing records with matches based    17:05:04
11  solely upon Social Security numbers?       17:05:05
12      A.   I believe that the Felon Exception    17:05:08
13  File has an SSN category in column AK, which    17:05:13
14  includes individuals, to answer your question.   17:05:18
15      Q.   Are you aware of any reports issued by  17:05:22
16  the Division of Elections to the individual     17:05:24
17  supervisors which indicated possible Social     17:05:27
18  Security number errors for a particular county?   17:05:29
19      A.   For a particular county? Not for a    17:05:34
20  particular county --              17:05:40
21      Q.   Okay.                 17:05:41
22      A.   -- but inclusive of particular      17:05:44
23  counties.                    17:05:45
24      Q.   Are you aware of any of the       17:05:45
25  instructions to the Supervisors of Elections,    17:05:47
```

39 (Pages 153 to 156)

DEPOSITION OF DAVID KLAUS

| | |
|---|---|
| 1   given by the Division of Elections, to verify the   17:05:49 | 1                    EXAMINATION |
| 2   Social Security number on the file hard-copy voter 17:05:54 | 2 |
| 3   registration card?                     17:05:56 | 3   BY MS. TORRES: |
| 4       A.   I don't know.               17:05:57 | 4       Q.   Mr. Klausner, my name is Susan Torres.  17:12:02 |
| 5       Q.   Okay. If only full Social Security    17:05:58 | 5   I represent David Leahy, the Supervisor of     17:12:04 |
| 6   numbers had been used in this process, am I      17:06:02 | 6   Elections for Miami-Dade County.         17:12:07 |
| 7   correct in stating that only 484 of the 10,181    17:06:07 | 7            Can you hear me okay?           17:12:11 |
| 8   individuals in the Clemency File would have been  17:06:13 | 8       A.   Yes.                         17:12:12 |
| 9   indicated as having received clemency?        17:06:15 | 9       MR. SPECTOR: He can hear you, Susan.   17:12:13 |
| 10      A.   In your hypothetical, are you saying    17:06:19 | 10      MS. TORRES: Okay.                17:12:14 |
| 11  that the Social Security numbers have integrity?  17:06:22 | 11      Q.   Can you name any individual who was   17:12:15 |
| 12      Q.   Yes.                        17:06:25 | 12  wrongfully removed from diverting rolls in     17:12:16 |
| 13      A.   Are you saying that they are reliable? 17:06:26 | 13  Miami-Dade County?                  17:12:19 |
| 14      Q.   Yes.                        17:06:28 | 14      A.   No.                          17:12:20 |
| 15      A.   Are you saying that the individuals to 17:06:28 | 15      Q.   Do you have any opinions in that      17:12:26 |
| 16  whom those 484 Social Security numbers are     17:06:33 | 16  matter specifically regarding Supervisor Leahy?  17:12:27 |
| 17  attached also appear in the Felon Exception List? 17:06:36 | 17           I haven't heard an answer. Have you    17:13:05 |
| 18      Q.   Yes.                        17:06:38 | 18  answered?                          17:13:07 |
| 19      A.   All of them?                 17:06:39 | 19      MR. SPECTOR: He has not answered yet.   17:13:07 |
| 20      Q.   Correct.                    17:06:41 | 20      THE WITNESS: I'm considering your question. 17:13:11 |
| 21      A.   And so, given that hypothetical -- can 17:06:42 | 21      MS. TORRES: Okay. I'm sorry.        17:13:12 |
| 22  you repeat your question?                17:06:43 | 22      Q.   I just wanted to make sure I didn't    17:13:13 |
| 23      Q.   Am I correct in saying that only the   17:06:44 | 23  miss something.                      17:13:15 |
| 24  484 of the full Clemency File, which has 10,181   17:06:47 | 24      A.   I assume you're asking me about       17:13:28 |
| 25  individuals, would have been indicated as having  17:07:18 | 25  Supervisor Leahy in his official capacity?      17:13:29 |
|                                     157 |                                     159 |

| | |
|---|---|
| 1   received clemency?                    17:07:20 | 1       Q.   Yes.                         17:13:34 |
| 2       A.   How do you mean, "would have been    17:07:21 | 2       A.   I point you to page 11 of my report,   17:13:35 |
| 3   indicated"?                          17:07:24 | 3   where I say, in the second bulleted paragraph,   17:13:41 |
| 4       Q.   By being contained within a Clemency  17:07:25 | 4   that direct person-to-person contact is the    17:13:44 |
| 5   File as having received clemency.           17:07:26 | 5   preferred and most accurate method of         17:13:47 |
| 6       A.   Without regard for a CVF or Felon     17:07:28 | 6   verification.                         17:13:48 |
| 7   Exception List?                       17:07:30 | 7            This is in the section of my report    17:13:48 |
| 8       Q.   Correct.                    17:07:31 | 8   that deals with remedies.                 17:13:50 |
| 9       A.   I have no idea.               17:07:31 | 9            To the extent that the supervisor, in  17:13:52 |
| 10      Q.   Okay.                      17:07:34 | 10  his official capacity, did not do that, I don't   17:13:56 |
| 11      MR. BERGAN: Let's take a couple minutes.  17:07:35 | 11  believe that the supervisor did the right thing.  17:13:58 |
| 12      MR. SPECTOR: Okay.             17:07:36 | 12      Q.   The statement that you just directed    17:14:02 |
| 13      THE VIDEOGRAPHER: Off the record.    17:07:40 | 13  me to on page 11 of your report, is that statement 17:14:04 |
| 14           5:08.                       17:07:40 | 14  directed to all supervisors in this action?     17:14:08 |
| 15           (Short recess taken.)          17:11:42 | 15      A.   Yes.                         17:14:12 |
| 16      THE VIDEOGRAPHER: Okay. We're back on at 17:11:43 | 16      Q.   Do you know whether Supervisor Leahy  17:14:12 |
| 17           5:13.                       17:11:52 | 17  attempted to verify the information that was     17:14:16 |
| 18      MR. SPECTOR: Okay.             17:11:54 | 18  provided to him by the Division of Elections?    17:14:17 |
| 19           Ms. Torres?                  17:11:57 | 19      A.   I do not; however, I answered your    17:14:19 |
| 20      MS. TORRES: Okay. I'm going to go ahead and 17:11:58 | 20  prior question by saying that "to the extent that  17:14:23 |
| 21  thank you again for the courtesy.          17:12:00 | 21  he did not do that."                    17:14:26 |
| 22      A.   MR. SPECTOR: No problem.        | 22      Q.   I understand that, but I want to know   17:14:28 |
| 23 | 23  what you do know about Supervisor Leahy's actions. 17:14:29 |
| 24 | 24           Did you just state that you don't know 17:14:33 |
| 25  --                            -- | 25  whether he attempted to verify the information on  17:14:35 |
|                                     158 |                                     160 |

40 (Pages 157 to 160)

1 the felon list?                                    17:14:39
2    A.  My understanding was that the        17:14:39
3 supervisors sent letters to various persons that  17:14:41
4 were suspected of being ex-felons, notifying them 17:14:44
5 generally -- I should say notifying them of their 17:14:50
6 potential removal from or purging them from their 17:14:54
7 -- the voting lists in Dade County.             17:15:02
8         That's what I understand the           17:15:04
9 supervisor authorized or did.                   17:15:06
10    Q.  And in your answer, do you mean        17:15:09
11 specifically Supervisor Leahy or the supervisors 17:15:13
12 in general?                                      17:15:15
13    A.  I answered this last question with     17:15:16
14 respect to Supervisor Leahy in particular.      17:15:18
15    Q.  Have you seen the letter that he sent  17:15:24
16 out?                                             17:15:26
17    A.  I believe so.                          17:15:26
18    Q.  Do you know whether that letter        17:15:31
19 provided alleged felons, who were appearing on the 17:15:34
20 list, the opportunity to contact the supervisor 17:15:36
21 and discuss the situation outlined in the letter? 17:15:40
22    A.  Yes, I'm aware of that.                17:15:42
23    Q.  You're aware that the letter did       17:15:46
24 provide that opportunity?                        17:15:48
25    A.  I believe the letter outlined for the  17:15:49

                                                        161

1 receiver of the letter a procedure to follow if   17:15:54
2 they wished to contest the assumption.          17:15:55
3    Q.  What do you believe, in your opinion,   17:16:01
4 Supervisor Leahy should have done to verify the  17:16:04
5 information on the felon list?                   17:16:09
6    A.  He or the representatives of the        17:16:10
7 county should have made personal contact with each 17:16:11
8 individual, not via mail, which has a very low   17:16:15
9 return rate.                                     17:16:19
10    Q.  Do you know whether persons --         17:16:22
11 individual or person-to-person contact with the 17:16:24
12 individuals on this list would have been possible? 17:16:27
13    A.  You're asking me if it would have been 17:16:43
14 possible?                                        17:16:48
15         I'm sorry, Attorney, unless you know  17:16:48
16 something I don't know, most of these people were 17:16:52
17 somehow contactable in person.  I don't know --  17:16:54
18 are you suggesting -- I don't understand your    17:16:58
19 hypothetical.                                    17:17:01
20    Q.  Okay.  Let me direct you to page 9 of  17:17:02
21 your report, under Subsection E.                17:17:05
22    A.  I have it.                             17:17:09
23    Q.  In the second sentence, you state,     17:17:10
24 "Such a verification task" -- and you're referring 17:17:13
25 to person-to-person contact in your prior        17:17:19

                                                        162

1 sentence.                                        17:17:21
2         To start again, quote, "Such a         17:17:21
3 verification task would have been practically    17:17:23
4 impossible," end quote.                          17:17:25
5    A.  Right.                                  17:17:26
6    Q.  What did you mean by that?              17:17:27
7    A.  I mean, given the time available, the   17:17:31
8 number of people that needed to be contacted, and 17:17:33
9 the amount of verification that needed to be     17:17:34
10 performed to validate that the person, indeed,  17:17:40
11 should be purged from the voter rolls, the task 17:17:41
12 was practically impossible.                     17:17:47
13    Q.  Now, do you believe that the direct    17:17:48
14 person-to-person contact that you were referring 17:17:51
15 to should have been done with respect to all    17:17:53
16 persons appearing on the felon list?            17:17:55
17    A.  You're talking about the Felon         17:17:58
18 Exception List?                                  17:18:01
19    Q.  Yes, I am.                             17:18:01
20    A.  And you're not limiting it to Dade     17:18:03
21 County; is that correct?                         17:18:06
22    Q.  No.                                    17:18:08
23    A.  I believe person-to-person contact was 17:18:17
24 necessary.                                       17:18:20
25    Q.  And just to clarify, you believe it    17:18:21

                                                        163

1 was necessary for every single person appearing on 17:18:23
2 that list?                                       17:18:25
3    A.  I believe it was necessary for every    17:18:26
4 single person that was going to be purged on the 17:18:29
5 basis of the information in that list.          17:18:32
6    Q.  Regardless of the quality or extent of 17:18:35
7 the match?                                       17:18:37
8    A.  My opinion is that the quality of the   17:18:40
9 match was garbage and, therefore, every person on 17:18:44
10 the list needed verification in the manner I've  17:18:47
11 described.                                       17:18:51
12    Q.  Do you have an opinion, Mr. Klausner,   17:18:51
13 as to how many persons were wrongly identified as 17:18:54
14 felons on the exception list that we've been     17:18:57
15 talking about, in the year 2000 election, and only 17:18:59
16 persons from Miami-Dade County?                 17:19:06
17    A.  I've not determined a number from Dade 17:19:08
18 County particularly.                            17:19:12
19    Q.  Would it be possible to determine such 17:19:15
20 a number?                                        17:19:17
21    A.  If I'm asked to do so, I will do so by  17:19:18
22 counsel for the plaintiff.                      17:19:23
23    Q.  My question was:  Would it be possible 17:19:24
24 to make that determination?                     17:19:26
25    A.  It will be possible to determine the   17:19:27

                                                        164

                                          41 (Pages 161 to 164)

1  number of persons erroneously identified as felons 17:19:28
2  on the Felon Exception List from Dade County.    17:19:32
3      Q.  How would you go about doing that?    17:19:34
4      A.  Looking at how many and which    17:19:36
5  particular records are marked as having -- as    17:19:38
6  being representative of an individual from Dade    17:19:45
7  County.    17:19:46
8      Q.  I'm sorry. I didn't understand that.  17:19:47
9         Can you elaborate on that?    17:19:52
10     A.  Each of the records has a county    17:19:53
11  indicator, that is the county in which the    17:19:55
12  individual supposedly resides, and by counting how 17:19:57
13  many of the records have a county indication of    17:20:01
14  "DAD," which is the code for Dade County, I would  17:20:05
15  be able to tell you how many individuals were    17:20:10
16  erroneously identified as felons in Dade County.    17:20:14
17     Q.  So, in that answer, you're assuming    17:20:18
18  that anyone who was listed from Miami-Dade County 17:20:22
19  would have been erroneously identified.    17:20:24
20        Is that correct?    17:20:26
21     A.  Yes, because the process that was used 17:20:26
22  was flawed and the results are entirely invalid,    17:20:31
23  and there are no unique identifiers available to    17:20:36
24  make the determination that someone should or    17:20:38
25  should not have been on the Felon Exception List.  17:20:40

165

1      Q.  I understand that, but as to those    17:20:44
2  persons appearing on the list from Miami-Dade    17:20:46
3  County, do you have an opinion as to whether those 17:20:49
4  persons actually were felons?    17:20:52
5      A.  I previously testified that I know of  17:20:53
6  no particular individual who was or was not a    17:20:58
7  felon.    17:21:00
8      Q.  And I'm sorry, but just to clarify,    17:21:02
9  you could not make that determination with regard  17:21:05
10  to the individuals from Miami-Dade County, either. 17:21:07
11        Is that correct?    17:21:10
12     A.  That's correct, and, similarly, that    17:21:11
13  determination could not be made for anyone on the  17:21:12
14  Felon Exception List without the verification    17:21:15
15  process that I've outlined.    17:21:17
16     Q.  Okay. I want to direct you again to    17:21:23
17  page 9 of your report.    17:21:27
18        In the sentence following the one that  17:21:30
19  we looked at previously, it starts with, "Although 17:21:32
20  some Florida SOEs sent letters to DBT-identified    17:21:35
21  felons for verification."    17:21:40
22        Do you see that?    17:21:41
23     A.  Yes.    17:21:42
24     Q.  The sentence continues, quote, "It is  17:21:42
25  well known in the mail and solicitation industry   17:21:44

166

1  that response rates to mailings are low," end    17:21:46
2  quote.    17:21:53
3        Do you see that?    17:21:55
4      A.  Yes.    17:21:56
5      Q.  Do you purport to be an expert in this 17:21:56
6  action on the standards in the mail and    17:21:58
7  solicitation industry?    17:22:01
8      A.  With respect to response rates, yes.    17:22:02
9      Q.  What is the basis of that expertise?  17:22:43
10     A.  It's my experiences in the industry    17:22:46
11  over the last 35 years, particularly in the -- I    17:22:47
12  cite to you the RL Polk experience I have, with    17:22:51
13  response rates to auto recall notices.    17:22:53
14     Q.  Is that one of the actions listed in    17:22:54
15  your -- attached to your CV?    17:22:56
16     A.  It is not. It is more than four years  17:22:58
17  ago.    17:23:00
18     Q.  I see.    17:23:00
19        That's the one you testified about    17:23:01
20  earlier?    17:23:02
21     A.  That's correct.    17:23:03
22     Q.  Can you tell me a little bit about    17:23:03
23  what you analyzed in that concerning response    17:23:06
24  rates?    17:23:09
25     A.  I did not do analysis about response  17:23:10

167

1  rates. I was told by the people at RL Polk that    17:23:12
2  the response rates are very low.    17:23:16
3      Q.  And do you know what that conclusion   17:23:17
4  was based on?    17:23:19
5      A.  The conclusion in my report? Is that  17:23:19
6  your question?    17:23:22
7      Q.  Sorry?    17:23:22
8      A.  Are you asking me if that's the --    17:23:23
9      Q.  I'll restate it.    17:23:27
10        You just stated that you were told    17:23:28
11  that response rates were low.    17:23:30
12        Is that correct?    17:23:31
13     A.  Yes.    17:23:32
14     Q.  Did I hear you correctly?    17:23:32
15     A.  Yes.    17:23:34
16     Q.  I'm asking you if you know what the    17:23:35
17  basis of that statement was.    17:23:36
18     A.  No. It was given me by employees and  17:23:40
19  supervisors at RL Polk.    17:23:42
20     Q.  Apart from what they informed you    17:23:50
21  about response rates in that matter that you're    17:23:54
22  referring to, do you have any other experience    17:23:55
23  with response rates?    17:24:00
24     A.  Yes. I have experience with response  17:24:00
25  rates for rebates for purchased items.    17:24:02

168

42 (Pages 165 to 168)

```
 1    Q.  In what context?           17:24:05
 2    A.  In the context of the Fry's      17:24:09
 3  Electronics store chain, which regularly    17:24:10
 4  distributes rebates with its retail sales.   17:24:16
 5    Q.  Is that one of the actions listed --  17:24:20
 6  attached to your report?          17:24:21
 7    A.  No.                17:24:24
 8    Q.  Can you tell me a little more about  17:24:27
 9  that matter?             17:24:30
10    A.  The Fry's response rates on rebates  17:24:31
11  are generally under 10 percent, and that's   17:24:35
12  information I have from the Fry's Electronics  17:24:37
13  authorized employees.            17:24:44
14    Q.  Do you know what they base that    17:24:46
15  conclusion on?              17:24:49
16    A.  It's their experience.        17:24:49
17    Q.  Do you know if any particular analysis 17:24:53
18  was done or --              17:24:55
19    A.  No.  This is what I was told.   17:24:57
20    Q.  So, you don't know what basis they had 17:25:00
21  to reach that conclusion; is that correct?   17:25:03
22    A.  That's correct.          17:25:06
23    Q.  Apart from the two matters that you've 17:25:12
24  just discussed, is there any other basis for your 17:25:16
25  statement that "It is well known in the mail and 17:25:18

                    169
```

```
 1  solicitation industry that response rates to   17:25:20
 2  mailings are low"?            17:25:24
 3    A.  I don't have any other particular   17:25:26
 4  cites for you.              17:25:50
 5    Q.  Okay.  In the context of your report  17:25:51
 6  in this action, do you know why the response rates 17:25:53
 7  are low, if they are, in fact, low?       17:25:57
 8    A.  My understanding is that people throw 17:26:01
 9  their mail away, for the most part.      17:26:09
10    Q.  Do you know why they do that?     17:26:12
11    A.  No.                17:26:13
12    Q.  Could it be that the recipients of   17:26:17
13  mailings are not interested in the subject matter 17:26:21
14  of the mail that is sent to them?       17:26:23
15    MR. OTTINGER:  Object as to form.    17:26:25
16    THE WITNESS:  I don't know.  I couldn't say. 17:26:27
17  BY MS. TORRES:
18    Q.  You don't know one way or the other? 17:26:32
19    A.  All I know is that the response rates 17:26:34
20  tend to be low, and it's based on my experience, 17:26:36
21  both personal and professional.       17:26:38
22    Q.  You can't tell me what the reasons   17:26:39
23  are; is that correct?            17:26:41
24    A.  I've just given you my reasons.   17:26:41
25    Q.  I'm sorry.  I must have not heard it. 17:26:44

                    170
```

```
 1    Can you tell me again?           17:26:47
 2    A.  It's based on the two particular    17:26:50
 3  situations that I've described to you, as well as 17:26:51
 4  my experience over the years.        17:26:54
 5    Q.  I understand that.  I think maybe you 17:26:55
 6  didn't hear my last question.         17:26:57
 7    That is:  Is it correct that you can't 17:27:00
 8  tell me the reasons why the response rates would 17:27:03
 9  be low, in the specific context of this case? 17:27:05
10    A.  I've not done that study, so I cannot 17:27:08
11  tell you.                17:27:10
12    Q.  I believe that, earlier, you were   17:27:15
13  referring to Florida statute Section 98.0975. 17:27:19
14    Do you have that available to you?    17:27:25
15    A.  Yes.               17:27:27
16    Q.  I'd like to direct you to       17:27:28
17  Subsection 4.             17:27:30
18    That subsection reads, quote, "Upon   17:27:40
19  receiving the list from the division, the   17:27:45
20  supervisor must attempt to verify the information 17:27:46
21  provided," end quote.            17:27:48
22    Do you see that?           17:27:49
23    A.  Yes.               17:27:50
24    Q.  Would you agree with me that sending 17:27:51
25  certified letters to all individuals on the Felons 17:27:53

                    171
```

```
 1  Exception List and advertising in newspapers for 17:27:56
 2  those who didn't respond to those certified    17:28:00
 3  letters was an attempt to verify the information 17:28:03
 4  on those lists?             17:28:05
 5    MR. OTTINGER:  Objection as to form.   17:28:06
 6  BY MS. TORRES:
 7    Q.  You can answer.          17:28:12
 8    A.  (Witness reviewing document.)    17:28:12
 9    I've testified that the proper way for 17:28:36
10  verification is personal -- person-to-person.  17:28:39
11    I don't believe that mailings,      17:28:41
12  regardless of whether they're certified or not, 17:28:43
13  are appropriate.             17:28:45
14    Q.  Mr. Klausner, that wasn't my question. 17:28:48
15    We talked before about your opinion as 17:28:49
16  to what form of contact is appropriate, and I  17:28:51
17  understand your opinion on that.       17:28:53
18    My question was:  Would you agree with 17:28:56
19  me that sending certified letters to all    17:28:59
20  individuals on the Felons Exception List and   17:29:01
21  further providing newspaper advertisements    17:29:03
22  directed to those who did not respond to the   17:29:05
23  certified letters was an attempt to verify the 17:29:10
24  information on the Felons Exception List?   17:29:12
25    A.  You're asking --          

                    172
```

43 (Pages 169 to 172)

1    MR. OTTINGER: Objection as to form.    17:29:13
2    THE WITNESS: You're asking me to take a    17:29:14
3 sentence out of context from a law which I've not    17:29:16
4 seen before today, in all likelihood, and asking    17:29:22
5 me to interpret it and to tell you if the word    17:29:25
6 "attempt" is satisfied by the mailing of a    17:29:29
7 certified letter.    17:29:30
8    I'm afraid I can't answer your    17:29:31
9 question.    17:29:32
10 BY MS. TORRES:
11    Q.  I'm not asking you to interpret the    17:29:33
12 subsection, sir.  I'm just asking you to answer my    17:29:37
13 question.    17:29:40
14    A.  I can't answer your question because    17:29:40
15 it requires the interpretation of this law.    17:29:41
16    Q.  Well, let me phrase it this way:    17:29:43
17 Independent of the subsection in this statute,    17:29:46
18 Subsection 4 -- put that aside.    17:29:48
19    Do you agree with me that certified    17:29:49
20 letters sent to all individuals on the Felons    17:29:53
21 Exception List and newspaper advertisements    17:29:54
22 directed to those who did not respond to those    17:29:58
23 letters was an attempt to verify the information    17:30:01
24 on the Felons Exception List?    17:30:04
25    MR. OTTINGER: Objection as to form.    17:30:06

173

1    THE WITNESS: When you say "was an attempt,"    17:30:08
2 are you using "attempt" in the same way that you    17:30:10
3 understand the word "attempt" is used in this    17:30:14
4 statute?    17:30:16
5 BY MS. TORRES:
6    Q.  Well, how do -- what do you understand    17:30:17
7 the word "attempt" to mean?    17:30:20
8    A.  I am not an attorney, and I will not    17:30:21
9 interpret statutes.    17:30:26
10    Q.  I don't want you to interpret the    17:30:27
11 statute, sir.  I want you to tell me what you    17:30:29
12 believe the word "attempt" means.    17:30:31
13    A.  In what context?    17:30:33
14    Q.  Any context, the way the word is    17:30:34
15 normally used.    17:30:38
16    A.  So, you're asking for my opinion not    17:30:39
17 necessarily as an expert, but as a layperson with    17:30:45
18 respect to the word "attempt"?    17:30:47
19    Q.  That's correct.    17:30:48
20    A.  Well, as a layperson, I think that    17:30:51
21 "attempt" means more than something that's feeble,    17:31:03
22 and I think it's feeble to make an attempt by    17:31:06
23 contacting everyone versus -- via mail, when it's    17:31:09
24 well known that mail responses are low.    17:31:14
25    Q.  So, your testimony today,    17:31:19

174

1 Mr. Klausner, is that you believe sending    17:31:20
2 certified letters to all individuals appearing on    17:31:21
3 the Felons Exception List and further providing    17:31:23
4 newspaper advertisements directed to those who did    17:31:25
5 not respond to the certified letter is not an    17:31:29
6 attempt to verify the information on the    17:31:33
7 exceptions list?    17:31:34
8    A.  Are you using "attempt" in the same    17:31:35
9 sense as the statute uses it?    17:31:36
10    Q.  I'm using that word, sir, as I believe    17:31:38
11 I stated earlier, in the way that you just told me    17:31:42
12 you understand that word to mean in normal usage.    17:31:46
13    A.  As a layperson, I believe that it was    17:31:48
14 feeble as an attempt to contact people in that    17:31:50
15 manner.  It was insufficient and it was    17:31:55
16 inappropriate.    17:31:57
17    Person-to-person contact was what was    17:31:59
18 necessary.    17:32:00
19    Q.  I understand it's your opinion, and we    17:32:02
20 can continue to go through this.    17:32:04
21    I'm not trying to trick you, sir, but    17:32:06
22 I do need an answer to my question.    17:32:10
23    A.  I want to make sure that the record    17:32:12
24 correctly reflects my professional and expert    17:32:13
25 opinions.    17:32:14

175

1    I will answer your questions to the    17:32:15
2 best of my ability, but I will not permit you to    17:32:16
3 get on to the record anything which is not my    17:32:23
4 opinion and use it in a fashion and distort it    17:32:25
5 such that it is not my opinion.    17:32:27
6    Q.  I'm not attempting to do that, sir.    17:32:28
7 I'm going to ask you to listen to my question one    17:32:30
8 more time.    17:32:36
9    Is it your testimony today that    17:32:36
10 sending certified to all individuals on the Felons    17:32:38
11 Exception List and providing further newspaper    17:32:39
12 advertisements to those who did not was not an    17:32:41
13 attempt to verify the information on those lists?    17:32:43
14    MR. OTTINGER: Objection as to form.    17:32:47
15    THE WITNESS: In your question, are you    17:32:49
16 referring to the statute's description of    17:32:56
17 "attempt"?    17:32:58
18 BY MS. TORRES:
19    Q.  I've already qualified that for you    17:33:01
20 sir.  I'm not.    17:33:04
21    I want you to answer the question as    17:33:07
22 you understand it.    17:33:09
23    A.  As I understand it, as a layperson, it    17:33:13
24 appears to be an attempt, albeit not a sufficient    17:33:17
25 one.    17:33:22

176

44 (Pages 173 to 176)

1    Q.  It's not sufficient under your        17:33:30
2  interpretation of Florida law as it existed in the  17:33:34
3  year 2000 or is that not sufficient in your     17:33:37
4  understanding of what the word "attempt" means?  17:33:39
5    MR. OTTINGER:  Objection as to form.       17:33:41
6    THE WITNESS:  Given the downside of purging  17:33:42
7  an eligible voter from the voter list, based on  17:33:47
8  what you're calling an attempt, I consider it was  17:33:51
9  insufficient.                          17:33:56
10 BY MS. TORRES:
11   Q.  The answer to my question is that --    17:33:58
12 you mean insufficient in terms of how you    17:34:01
13 understand the word "attempt" in this context?  17:34:04
14   A.  I'm sorry.  Could you repeat the        17:34:06
15 question?                            17:34:10
16   (Discussion off the record.)
17 BY MS. TORRES:
18   Q.  When you just stated a moment ago,      17:34:25
19 Mr. Klausner, that the attempt was insufficient in  17:34:29
20 your opinion, was that insufficient in terms of  17:34:32
21 how you understand the word "attempt" in this  17:34:34
22 context, or is that your interpretation of what  17:34:36
23 Florida law was at the time?               17:34:39
24   A.  I'm not --                        17:34:41
25   MR. OTTINGER:  Objection as to form.       17:34:43

177

1      Go ahead.                        17:34:44
2    THE WITNESS:  It was not my intention to   17:34:45
3  interpret the law.                      17:34:48
4    MS. TORRES:  Okay.  Thank you.  Just a couple  17:34:48
5  more questions.                        17:34:54
6    Q.  To your knowledge, was the           17:34:59
7  person-to-person contact that you've discussed  17:35:01
8  earlier today and in your report -- to your    17:35:03
9  knowledge, was that required by Florida law in the  17:35:07
10 year 2000?                           17:35:09
11   A.  I don't know.                     17:35:09
12   Q.  Have you explored Florida law to try   17:35:18
13 to discern the answer to that question?       17:35:21
14   A.  No, I have not.                   17:35:25
15   Q.  If I were to tell you that Florida --  17:35:29
16 this is just a hypothetical.              17:35:32
17      If I told you to assume that Florida  17:35:33
18 law, in the year 2000, did not require the kind of  17:35:38
19 person-to-person contact that you describe in your  17:35:42
20 report as necessary, would you agree with -- would  17:35:45
21 it be your opinion that the law was insufficient?  17:35:48
22   MR. OTTINGER:  Objection as to form.  Vague.  17:35:50
23      I don't understand the question.       17:35:55
24 BY MS. TORRES:
25   Q.  Mr. Klausner, did you say you didn't   17:36:02

178

1  understand or was that your attorney --       17:36:03
2    MR. OTTINGER:  That was me -- that was    17:36:05
3  counsel.  I didn't understand the question.
4    MS. TORRES:  I'll state it again.         17:36:08
5    Q.  Assume that Florida law, in the year   17:36:09
6  2000, did not require the person-to-person contact  17:36:14
7  that you've described in your report.         17:36:18
8      If that were the case, would you        17:36:20
9  believe that the Florida law at that time was  17:36:23
10 insufficient?                         17:36:26
11   A.  Insufficient for verifying that         17:36:28
12 someone should be purged from the eligible voter  17:36:29
13 list on the basis of their being identified as a  17:36:33
14 felon?                              17:36:35
15   Q.  Yes.                          17:36:35
16   MR. OTTINGER:  I'm going to object as to   17:36:36
17 form.                               17:36:39
18 BY MS. TORRES:
19   Q.  Yes, sir.  You can answer.           17:36:41
20   A.  Yes.  I think that's the gist of what  17:36:42
21 you find on page 11 of my report as a remedy.  17:36:44
22   Q.  And you're referring to the sentence   17:36:50
23 that we talked about earlier, that "Direct    17:36:54
24 person-to-person context is the preferred and most  17:36:55
25 accurate method of verification."             17:37:00

179

1      Is that right?                    17:37:01
2    A.  You're referring to a different page   17:37:02
3  than I am?  Is that correct?               17:37:03
4    Q.  No.  I thought you said page 11.       17:37:04
5    A.  Yes.                          17:37:08
6    Q.  So, is that the section that you were  17:37:08
7  referring to, that last bullet point?         17:37:12
8    A.  Yes, "Direct person-to-person contact  17:37:14
9  is the preferred and most accurate method of  17:37:16
10 verification."                        17:37:18
11   Q.  Okay.  Thank you very much,          17:37:19
12 Mr. Klausner.                         17:37:20
13   MS. TORRES:  I have no more questions.     17:37:20
14   THE WITNESS:  Thank you, Attorney.        17:37:21
15   MR. OTTINGER:  Thank you.               17:37:22
16
17      EXAMINATION
18
19 BY MR. WAAS:
20   Q.  Mr. Klausner, my name is George Waas.  17:37:24
21 I'm over here, about 3,000 miles away, in      17:37:26
22 Tallahassee, Florida.                     17:37:30
23      I'm representing Fred Dickinson, who    17:37:31
24 was the secretary of the Department of Highway  17:37:33
25 Safety and Motor Vehicles, and Kathleen Kearney,  17:37:35

180

45 (Pages 177 to 180)

1 who was the secretary of the Department of        17:37:38
2 Children and Families.        17:37:39
3        I assume that you've read the        17:37:42
4 complaint. You might have been asked that        17:38:10
5 earlier, but it's been a while.        17:38:12
6        Have you read the lawsuit in this        17:38:14
7 case?        17:38:16
8     A.   I think I have.        17:38:16
9     Q.   Then when you mentioned earlier the        17:38:17
10 State of Florida as including all of the state        17:38:19
11 defendants, were you aware at the time that that        17:38:21
12 included the secretaries of the Department of        17:38:23
13 Highway Safety and Motor Vehicles and the        17:38:24
14 Department of Children and Families, as well?        17:38:26
15        Is that a yes or no?        17:38:30
16     A.   I'm considering your question.        17:38:31
17     Q.   Okay.        17:38:32
18     A.   I did not consider the two        17:38:33
19 governmental bodies that you've just mentioned        17:38:36
20 when I wrote my report.        17:38:38
21     Q.   Okay. Then is it true that you --        17:38:39
22     A.   However --        17:38:40
23     Q.   Yes, go ahead.        17:38:41
24     A.   -- to the extent that the integrity        17:38:42
25 and the reliability of data was depended upon by        17:38:47

181

1 the main defendants, then -- actually, I should        17:38:51
2 just say I have not considered those bodies.        17:38:56
3     Q.   Okay. Well, you've anticipated my        17:38:58
4 next few questions.        17:39:01
5        You have a retention agreement with        17:39:03
6 the plaintiffs, do you not?        17:39:04
7     A.   I do.        17:39:07
8     Q.   Okay. Does that agreement involve, in        17:39:08
9 any way, the undertaking of any study or review        17:39:10
10 with respect to the Florida Department of Highway        17:39:15
11 Safety and Motor Vehicles?        17:39:18
12     A.   To date, it does not.        17:39:19
13     Q.   Okay. Same question --        17:39:21
14     A.   Wait a second.        17:39:24
15     Q.   -- with the Department of Children and        17:39:25
16 Families.        17:39:26
17     A.   Wait. Can you repeat your last        17:39:27
18 question? I'm sorry.        17:39:31
19     Q.   Sure.        17:39:32
20        Does your retention agreement with the        17:39:32
21 plaintiffs involve, in any way, any undertaking of        17:39:34
22 any study or review of the Florida Department of        17:39:36
23 Highway Safety and Motor Vehicles?        17:39:39
24     A.   I'm going to ask the reporter to read        17:39:40
25 it back one more time.        17:40:05

182

1     Q.   Go ahead.        17:40:06
2        (Record read.)        17:40:07
3     THE WITNESS: Yes.        17:40:17
4     MR. WAAS: Okay.        17:40:18
5     Q.   What review or study did you undertake        17:40:19
6 with respect to that agency?        17:40:23
7     A.   I reviewed the report of Mr. McClave.        17:40:24
8     Q.   Of who?        17:40:26
9     A.   I believe his name is M-c-C-l-a-v-e.        17:40:27
10     Q.   Okay. And that is the extent of the        17:40:35
11 knowledge that you have with respect to that        17:40:39
12 agency; is that correct?        17:40:40
13     A.   Yes.        17:40:44
14     Q.   Okay. Does your retention agreement        17:40:45
15 involve, in any way, any study or review with        17:40:48
16 respect to the Florida Department of Children and        17:40:52
17 Families, other than your review of Mr. -- of        17:40:53
18 McClave's report?        17:41:01
19     A.   Not that I know of.        17:41:02
20     Q.   Okay. Then, isn't it true that you,        17:41:03
21 yourself, have not undertaken any study or review        17:41:07
22 of any matter pertaining to either one of these        17:41:10
23 agencies?        17:41:14
24     A.   Your statement --        17:41:15
25     MR. OTTINGER: Objection as to form.        17:41:16

183

1     THE WITNESS: Your statement is correct.        17:41:17
2     MR. WAAS: Okay.        17:41:18
3     Q.   Do you have any personal knowledge        17:41:19
4 regarding the claims in this lawsuit against the        17:41:22
5 Department of Highway Safety and Motor Vehicles?        17:41:24
6     A.   I do not.        17:41:28
7     Q.   Do you have any personal knowledge        17:41:29
8 regarding the claims in this lawsuit against the        17:41:31
9 Department of Children and Families?        17:41:34
10     A.   I do not.        17:41:35
11     Q.   Have you been asked to do anything        17:41:36
12 regarding either one of these agencies in        17:41:38
13 connection with this lawsuit?        17:41:42
14     A.   Not to this date.        17:41:43
15     Q.   Okay. Are you anticipating being        17:41:44
16 asked to do anything under your current retention        17:41:48
17 agreement involving both of these agencies or any        17:41:52
18 one of them?        17:41:54
19     A.   I have no anticipation personally, but        17:41:56
20 I cannot speak for attorneys for the plaintiff.        17:42:00
21     Q.   I understand.        17:42:02
22        Have your responsibilities to date        17:42:07
23 involved any one of these agencies with regard to        17:42:09
24 the matters alleged in the lawsuit?        17:42:16
25     A.   Can you repeat the question, please?        17:42:18

184

46 (Pages 181 to 184)

1    Q.   Let me rephrase it this way: Have you  17:42:21
2    reviewed any analysis or study as to the claims in  17:42:24
3    the lawsuit regarding the Department of Highway  17:42:28
4    Safety and Motor Vehicles?              17:42:31
5    A.   Other than Mr. McClave's report, I     17:42:33
6    have not.                    17:42:35
7    Q.   Okay.  What is it in Mr. McClave's     17:42:35
8    report that addresses Highway Safety and Motor   17:42:39
9    Vehicles?                    17:42:41
10   A.   Mr. McClave states that he used the    17:42:41
11   Motor Vehicle File as part of his study.      17:42:46
12   Q.   Do you know which file he used or how  17:42:50
13   extensive the files that he did use -- how      17:42:54
14   extensive was his use of the Department of Highway  17:42:58
15   Safety's files?               17:43:02
16   A.   He claims to have access to a file of   17:43:03
17   17.2 million records.             17:43:05
18   Q.   Okay.  So you're basing it strictly on  17:43:07
19   what McClave says?              17:43:09
20   A.   Yes.               17:43:11
21   Q.   Is that right?           17:43:11
22   A.   I have no independent knowledge of    17:43:12
23   this file.                17:43:15
24   Q.   And your answer would be the same with  17:43:16
25   respect to the Department of Children and      17:43:17

185

1    Families.                 17:43:20
2        Is that correct?         17:43:21
3    A.   Correct.              17:43:21
4    Q.   Okay.  Do you have any knowledge as to  17:43:21
5    how these agencies operate with respect to the   17:43:26
6    allegations in this lawsuit?         17:43:28
7    A.   I find your question vague.       17:43:31
8    Q.   Okay.  I'll ask it -- do you have any   17:43:36
9    knowledge regarding how these agencies operate   17:43:39
10   with respect to the allegations in the lawsuit    17:43:45
11   against these agencies?          17:43:48
12   A.   Unless --              17:43:49
13   Q.   Still having trouble with it?     17:43:59
14   A.   No, but --              17:44:00
15   Q.   This isn't trick time. I just want    17:44:04
16   you to know -- I just want to find out what     17:44:06
17   knowledge you have regarding how these agencies   17:44:10
18   operate with respect to the allegations in the    17:44:11
19   lawsuit against them.            17:44:13
20       That's all.             17:44:14
21   A.   My understanding is that the agencies  17:44:15
22   provide data or have provided data to the      17:44:18
23   Department of Elections.          17:44:20
24   Q.   Okay.              17:44:20
25   A.   Other than that, I don't know very    17:44:21

186

1    much.                   17:44:24
2    Q.   And do you know what that data are?   17:44:25
3    A.   I understand that the Motor Vehicle   17:44:26
4    File was used to do some type of matching process  17:44:32
5    and to derive data from and place that data into   17:44:36
6    the CVF equivalent file for the purposes of doing  17:44:43
7    felon matching.               17:44:47
8    Q.   Okay.  Do you possess, at this time,   17:44:48
9    any facts that either one or both of these      17:44:52
10   agencies bears any responsibility or has any     17:44:55
11   involvement in the allegations in the lawsuit?    17:44:58
12   A.   As I sit here, I believe the answer is  17:45:01
13   no --                   17:45:21
14   Q.   Okay.              17:45:21
15   A.   -- but subject to discovering      17:45:22
16   additional information, I may have to change my   17:45:24
17   answer.                  17:45:27
18   Q.   Okay.  What information would cause   17:45:27
19   you to change your answer?          17:45:30
20       Did you hear my last question, sir?   17:45:50
21   A.   Yes.  I'm considering your question.   17:45:52
22   Sorry.                  17:45:54
23   Q.   Okay.              17:45:54
24   A.   Without instructions or investigations  17:46:14
25   that I may perform, I couldn't answer your      17:46:16

187

1    question, further than to say I don't know.     17:46:18
2    Q.   Okay.  At this time, do you know what  17:46:20
3    duty is imposed on either one or both of these    17:46:23
4    agencies with respect to Social Security numbers?  17:46:27
5    A.   Other than my reading of the McClave   17:46:29
6    report, I do not.               17:46:43
7    Q.   Okay.  The opinions that you've      17:46:44
8    expressed here today, these are your personal    17:46:48
9    opinions.                 17:46:50
10       Is that correct?         17:46:51
11   A.   No.  They're my professional opinions  17:46:51
12   as an expert.               17:46:55
13   Q.   Okay.  Your professional opinion as an  17:46:56
14   expert, but you would agree, would you not, that   17:46:58
15   there are other experts out there with as      17:47:02
16   high-quality qualifications as you have that would  17:47:04
17   disagree with your position; isn't that correct?   17:47:08
18   MR. OTTINGER:  Objection as to form.       17:47:10
19   THE WITNESS:  I imagine, from time to time,   17:47:16
20   people of integrity have differences of opinion.   17:47:19
21   BY MR. WAAS:                17:47:24
22   Q.   And would you agree that in this      17:47:24
23   particular area, there is a legitimate basis for   17:47:26
24   differences of opinions based on different experts  17:47:30
25   examining the same data?          17:47:33

188

47 (Pages 185 to 188)

DEPOSITION OF DAVID KLAUSNER

1    MR. OTTINGER: Objection as to form.    17:47:35
2       Which areas?    17:47:36
3    THE WITNESS: With respect to the experiments 17:47:39
4    that I have performed, they are based totally and   17:47:45
5    entirely on the data that I was provided by the   17:47:48
6    defendants.    17:47:50
7    MR. WAAS: That's not my question.    17:47:52
8    Q.   My question is: Would you agree that   17:47:54
9    there are experts out there, just as qualified as   17:47:58
10   you, just as competent as you are, who would look   17:48:01
11   at the same data and reach different conclusions?   17:48:03
12   MR. OTTINGER: Objection as to form.    17:48:06
13   THE WITNESS: I don't see how that's    17:48:09
14   possible, but --    17:48:10
15   BY MR. WAAS:
16   Q.   Are you representing that your opinion 17:48:13
17   is the only opinion that an expert can render    17:48:14
18   based on the data presented?    17:48:18
19       Is that your opinion, sir?    17:48:20
20   A.   I've seen nothing to date, as I sit   17:48:22
21   here to date, that would lead me to change any of 17:48:31
22   my opinions or to doubt any of them.    17:48:35
23   Q.   I'm not asking you to change your    17:48:38
24   opinions.    17:48:39
25       I'm asking you whether other experts,   17:48:40

189

1    equally qualified, looking at the same    17:48:43
2    information, can reach different conclusions   17:48:46
3    independently.
4    MR. OTTINGER: Objection as to form.    17:48:49
5    THE WITNESS: Sir, I do not see how.    17:48:52
6    MR. WAAS: Okay.    17:49:01
7    Q.   How many experts did you consult prior 17:49:01
8    to the formation of your opinions in your report? 17:49:06
9    A.   I consulted no other persons.    17:49:09
10   Q.   Okay. So, then, if other experts   17:49:16
11   equally qualified, maybe more so, would disagree  17:49:22
12   with your opinions, it would just be a matter of  17:49:26
13   professional disagreement.    17:49:30
14       Isn't that true?    17:49:32
15   A.   I don't know what it would be a matter 17:49:33
16   of.    17:49:35
17       I would need to test the results or to  17:49:36
18   test the opinions and the basis of those opinions 17:49:39
19   before I could concur with your statement.    17:49:42
20   Q.   Wouldn't your analysis also be subject 17:49:43
21   to being tested by other experts?    17:49:46
22   A.   I hope so, if they're competent.    17:49:48
23   Q.   Okay.    17:49:52
24   MR. WAAS: I have no further questions. I   17:49:53
25   thank you for the time.    17:49:56

190

1    MR. OTTINGER: Thank you.    17:49:57
2    (Discussion off the record.)
3
4       EXAMINATION
5
6    BY MR. VOSCH:
7    Q.   This is Bill Vosch. I just have a few 17:50:05
8    questions for you.    17:50:07
9       Mr. Klausner, I represent Deanie Lowe   17:50:08
10   in Volusia County.    17:50:09
11       Let me just ask you this: Were you    17:50:10
12   asked to do any specific analysis or render any   17:50:15
13   specific opinions with regard to Volusia County or 17:50:17
14   Deanie Lowe as the Supervisor of Elections?    17:50:21
15   A.   No, not specifically Volusia County    17:50:23
16   and not specifically Ms. Lowe.    17:50:28
17   Q.   I understand you rendered some    17:50:29
18   opinions which were, in effect, applicable to the 17:50:32
19   counties involved in this lawsuit, particularly   17:50:35
20   with regard to direct person-to-person contact   17:50:38
21   being the preferred method of verification.    17:50:43
22       Other than that, are there any    17:50:46
23   opinions that you have formed with regard to    17:50:47
24   Deanie Lowe and Volusia County?    17:50:50
25   A.   I know of no opinions I've formed that 17:50:52

191

1    unique to either of those entities.    17:51:11
2    Q.   Sir, are you aware of whether or not  17:51:12
3    Volusia County utilized the felons list that was  17:51:15
4    provided by the state for the November 2000    17:51:20
5    election?    17:51:22
6    A.   I either do not know or do not    17:51:22
7    remember how Volusia County used the list of felon 17:51:27
8    exceptions that it received from the DOE.    17:51:32
9    Q.   Sir, is it your testimony, then, that  17:51:34
10   Volusia County's use -- the manner in which    17:51:38
11   Volusia County used or did not use the felon list 17:51:43
12   has no bearing on the opinions you've rendered in 17:51:48
13   your report?    17:51:50
14   A.   I don't agree with your statement.    17:51:50
15       To the extent that Volusia County was   17:51:54
16   involved in the process of purging otherwise valid 17:51:56
17   and eligible voters, then Volusia County is    17:52:00
18   included in my opinions.    17:52:03
19   Q.   But not with -- strike that.    17:52:05
20       Sir, you were provided, you'd    17:52:09
21   mentioned, the McClave report; correct?    17:52:12
22   A.   Yes.    17:52:13
23   Q.   Were you asked to render opinions with 17:52:15
24   regard to that report?    17:52:17
25   A.   Not to date.    17:52:18

192

48 (Pages 189 to 192)

DEPOSITION OF DAVID KLAUSNER

```
 1    Q.   Do you -- you have not been asked to   17:52:22
 2  date to render an opinion?                    17:52:25
 3    A.   That's correct.                        17:52:26
 4    Q.   Nevertheless, have you -- have you     17:52:31
 5  come up with any opinions, having read the McClave 17:52:34
 6  report?                                       17:52:37
 7    A.   I have -- I do not have any opinions   17:52:37
 8  about which I can testify to day. I have no basis 17:52:41
 9  at this point.                                17:52:47
10         I've not performed any tests or done  17:52:51
11  sufficient consideration to form opinions that I 17:52:53
12  can testify about.                            17:52:54
13    Q.   Thank you, Mr. Klausner.              17:52:58
14    MR. VOSCH:  That's all I have.             17:53:00
15    MR. OTTINGER:  Thank you.                  17:53:01
16    MR. SPECTOR:  Anybody else on the phone?   17:53:02
17    MR. TINKLER:  Hillsborough has no questions 17:53:05
18  at this point.                                17:53:09
19    MR. SPECTOR:  Okay.  Great.                17:53:09
20         You want to take a five-minute break?  17:53:10
21    MR. WAAS:  For the record -- this is Bill   17:53:44
22  Waas -- I'm going to be leaving, so officially  17:53:46
23  mark me out.                                  17:53:49
24    MR. SPECTOR:  Take care.                   17:53:50
25    THE VIDEOGRAPHER:  Off the record.          17:53:51

                                             193
```

```
 1    5:54.                                       17:53:51
 2  (Short recess taken.)                         17:53:52
 3    THE VIDEOGRAPHER:  We're back on.          17:57:20
 4    5:58.                                       17:57:27
 5    MR. SPECTOR:  Okay.                         17:57:28
 6
 7         FURTHER EXAMINATION
 8
 9  BY MR. SPECTOR:
10    Q.   Mr. Klausner, again, we're back to my  17:57:30
11  questioning on behalf of the Secretary of State. 17:57:32
12         Your reports cites a second problem,   17:57:34
13  is how you called it on page 6, referring to the 17:57:38
14  manipulation of data that DBT did.           17:57:40
15         My question -- my first question to    17:57:42
16  you is:  Are you able to testify as to how many  17:57:45
17  names in the Felony Exception File had been   17:57:51
18  manipulated by DBT?                           17:57:55
19    A.   As far as I know, they were all       17:57:57
20  manipulated by DBT.                           17:57:59
21    Q.   Why do you believe that they all were 17:58:00
22  manipulated by DBT?                           17:58:04
23    A.   Because they all passed through the    17:58:05
24  same process and the same source code.       17:58:07
25    Q.   But you don't know that all were       17:58:09

                                             194
```

```
 1  manipulated?  There very well could be some or a 17:58:11
 2  lot of names in there that were not manipulated at 17:58:14
 3  all, that had -- let me back up.  Strike that 17:58:20
 4  question.                                     17:58:23
 5         Define, for me, "manipulation."        17:58:24
 6    A.   Where the name -- where the code for   17:58:25
 7  -- the source code in the program written in "C"  17:58:28
 8  works on the names, all four fields of a name, and 17:58:32
 9  removes spaces, quotes, apostrophes, as I've said 17:58:39
10  in my report.                                 17:58:46
11    Q.   Let's assume for a second that there   17:58:48
12  are some names in the report that have no     17:58:50
13  splitting of first and middle names, there were no 17:58:54
14  apostrophes in the name; there were no nicknames; 17:58:57
15  there were no short names; there were no periods. 17:59:00
16         Those are the unmanipulated; correct?  17:59:02
17    A.   No, not correct.                       17:59:10
18    Q.   Okay.  Explain that to me, also.       17:59:11
19    A.   Names also had spaces removed.         17:59:12
20    Q.   Every name had a space removed?        17:59:14
21    A.   Every name, between the first and the  17:59:15
22  last name, at least.                          17:59:17
23    Q.   How do you know that?                  17:59:20
24    A.   Because that's what the code says.      17:59:21
25    Q.   So, it's your testimony that every     17:59:24

                                             195
```

```
 1  name in the Felony Exception File was manipulated? 17:59:25
 2    A.   In order to do a match, yes.           17:59:28
 3    Q.   When you say "in order to do a match," 17:59:32
 4  it wouldn't be in the Felony Exception File unless 17:59:35
 5  it was a match; correct?                      17:59:37
 6    A.   That's correct.                        17:59:37
 7    Q.   So, every name in the Felony Exception 17:59:38
 8  File was manipulated.                         17:59:39
 9         That's your testimony?                 17:59:44
10    A.   That is my testimony.                  17:59:45
11    MR. OTTINGER:  Objection as to form.        17:59:46
12  BY MR. SPECTOR:
13    Q.   And then the same thing would go for   17:59:49
14  all of the names in the Clemency File?  They all  17:59:51
15  were manipulated, then -- excuse me.  I don't know 17:59:56
16  if that came out correctly.                   18:00:01
17         They all were manipulated?  That's     18:00:02
18  your opinion?                                 18:00:06
19    A.   For the purposes of matching, yes.      18:00:06
20    Q.   Okay.  I don't mean to split hairs,    18:00:08
21  but they wouldn't be in the Clemency File unless 18:00:09
22  there was a match; correct?                   18:00:13
23    MR. OTTINGER:  Objection as to form.        18:00:14
24         I think he said there are four fields. 18:00:15
25    MR. SPECTOR:  I'm going to object to any     18:00:16

                                             196
```

49 (Pages 193 to 196)

1  speaking objection.                          18:00:18
2      MR. OTTINGER:  All right.                 18:00:19
3  BY MR. SPECTOR:
4      Q.   If they're in the Clemency File, they  18:00:21
5  are a match; correct?                         18:00:24
6      A.   I believe I've testified earlier that  18:00:24
7  I don't know exactly what was done to create or to  18:00:27
8  do -- to use the Clemency File, so I couldn't   18:00:31
9  really say.                                    18:00:37
10      All I can tell you is that every name,  18:00:37
11  before it was used as any matching criteria, was  18:00:39
12  manipulated.                                  18:00:41
13      Q.   So, if I understand your testimony, it  18:00:41
14  is that you are aware of what was done to have  18:00:42
15  matches for the Felony Exception File, but you are  18:00:47
16  not aware as to what was done to have matches in  18:00:49
17  the Clemency File?                            18:00:51
18      A.   I think that misstates my testimony.  18:00:53
19      Q.   Okay.  Can you clarify that for me,  18:00:54
20  then?                                         18:00:58
21      A.   Prior to doing a match on any name,  18:00:59
22  the name was manipulated, and, therefore, whether  18:01:01
23  I know or not what was done with the Clemency  18:01:02
24  File, to the extent that the Clemency File  18:01:06
25  contains names and those names were used to match  18:01:11

197

1  anything, they were manipulated.              18:01:13
2      Q.   Okay.  Your opinion stated that "In  18:01:14
3  the process, DBT increased the possibility that  18:01:21
4  matches would occur and also increased the  18:01:25
5  possibility of erroneously identifying voters as  18:01:26
6  felons."                                      18:01:31
7      Can you state for me the amount of the  18:01:31
8  increase of the possibility of erroneously  18:01:34
9  identifying voters as felons?                 18:01:35
10      A.   I've tried to categorize -- or  18:01:36
11  characterize approximately how many or what an  18:01:51
12  upper bound might be, but what I've said in here  18:01:56
13  actually says -- it says "erroneously  18:02:01
14  identifying," so everybody on the Felon Exception  18:02:05
15  List was erroneously identified, because the  18:02:07
16  process was flawed.                           18:02:09
17      I believe I've testified to that  18:02:10
18  already.                                      18:02:13
19      Q.   But your report says that it increased  18:02:13
20  the "possibility of erroneously identified."  18:02:15
21      Your report doesn't say that everyone  18:02:17
22  was erroneously identified; is that correct?  18:02:20
23      A.   As I understand it -- well, it is my  18:02:22
24  opinion that everyone was erroneously identified  18:02:26
25  in the Felon Exception List, but I don't know what  18:02:28

198

1  other lists there were or what other people who  18:02:32
2  may have been identified as felons didn't make it  18:02:38
3  to the Felon Exception List.                   18:02:40
4      The process used and the methodology  18:02:40
5  used by DBT in processing these lists was not  18:02:43
6  industry standard.  It was highly unusual and it  18:02:47
7  is inappropriate for the purpose, so I couldn't  18:02:50
8  tell you, other than whatever it was that they  18:02:53
9  resulted in is garbage.                        18:02:57
10      Q.   Just so I'm clear, your -- you  18:02:58
11  reference an increase in possibilities in that  18:03:02
12  sentence.                                     18:03:04
13      A.   Yes.                                 18:03:06
14      Q.   Are you able to quantify the amount of  18:03:06
15  the increase?                                 18:03:08
16      A.   Well, if, hypothetically, the correct  18:03:09
17  number of felons to have been identified is 1,000  18:03:22
18  and we ended up with 60,000, that's a 60-fold  18:03:25
19  increase, as an example.                      18:03:31
20      I'm not saying that those are the  18:03:32
21  actual numbers, but whatever total we ended up  18:03:35
22  with, it is clearly larger than it needed to have  18:03:37
23  been or should have been, or at least is wrong.  18:03:39
24  It's just plain wrong.                         18:03:44
25      I don't -- we're dealing with garbage.  18:03:45

199

1  I just don't know.                            18:03:49
2      Q.   So, you can't quantify it?           18:03:50
3      A.   Well, it certainly increased.  If  18:03:51
4  you --                                        18:03:52
5      Q.   I understand your opinion -- I don't  18:03:52
6  mean to cut you off.                          18:03:54
7      I understand your opinion is that it  18:03:55
8  increased the --                              18:03:56
9      A.   I'll make it easy.  I can't quantify  18:04:00
10  it.                                           18:04:02
11      Q.   Okay.  You state that 25,890 of the  18:04:02
12  45,587 individuals -- this is in the last sentence  18:04:21
13  of that paragraph -- it starts at the top of  18:04:25
14  page 7 --                                     18:04:30
15      A.   Yes.                                 18:04:31
16      Q.   -- had been manipulated or changed in  18:04:31
17  some manner by DBT so as to match with only  18:04:33
18  80 percent of the letters in their names.      18:04:34
19      Does that number of 25,890 include  18:04:37
20  those people -- those individuals that had a  18:04:41
21  100 percent name match?                        18:04:44
22      MR. OTTINGER:  Objection as to form.  18:04:46
23      THE WITNESS:  You're asking me if the 25,890  18:04:55
24  includes individuals that had a 100 percent name  18:05:00
25  match between what and what?                    18:05:04

200

50 (Pages 197 to 200)

1    MR. SPECTOR: We'll back up for a second.   18:05:06
2    Q.   You indicated that 25,000, okay, of   18:05:11
3  the 45,000 individuals -- and I believe it was --   18:05:16
4  45,000 was the number that you came up with -- had   18:05:21
5  an NAM match felon, that 25,000 had been   18:05:26
6  manipulated or changed in some manner by DBT.   18:05:31
7       Your report says, quote, "so as to   18:05:33
8  match with only 80 percent of the letters in their   18:05:34
9  names."   18:05:38
10   A.   Yes, yes, of course.   18:05:39
11   Q.   You understand my question now?   18:05:40
12       My question was: Does that 25,890   18:05:42
13  group of individuals include those that had   18:05:46
14  100 percent name matches?   18:05:49
15   A.   No.   18:05:50
16   Q.   Okay.   18:05:52
17   A.   The number 25,890 is derived by   18:05:53
18  subtracting from 45,587, 19,967.   18:05:57
19   Q.   And the 19,967 were the 100 percent   18:06:02
20  name matches; correct?   18:06:08
21   A.   Post manipulation.   18:06:08
22   Q.   I understand it's your testimony that   18:06:12
23  everything was manipulated; correct. Strike that.   18:06:14
24  We've already gone over that.   18:06:17
25       Who informed you that only 60   18:06:30

201

1  individuals identified as felons by a state other   18:06:33
2  than Florida were verified by DBT using faxes as   18:06:37
3  having received clemency from a state other than   18:06:39
4  Florida?   18:06:42
5    A.   I have seen documents to that effect.   18:06:43
6        I believe I've also seen it in the   18:06:46
7  testimony of Ms. Thorogood, and I also heard that   18:06:48
8  from Mr. Knowles or Attorney Restrepo over his   18:06:54
9  during our telephone conference.   18:07:03
10   Q.   Okay. Are you able to testify as to   18:07:04
11  how many individuals listed on the Felony   18:07:08
12  Exception Report had, in fact, obtained clemency   18:07:09
13  from another state but were not listed on the   18:07:14
14  Clemency Report?   18:07:17
15   A.   No.   18:07:18
16   Q.   What is your understanding that -- at   18:07:25
17  the time of the Felon Exception Report or the   18:07:28
18  Clemency Report was run, what is your   18:07:31
19  understanding of the position of the Office of   18:07:35
20  Executive Clemency regarding individuals who may   18:07:37
21  have received clemency from another state?   18:07:39
22   A.   You're asking me about the position?   18:07:43
23   Q.   What is your understanding of their   18:07:47
24  position as to individuals who had received   18:07:49
25  clemency from another state?   18:07:52

202

1    MR. OTTINGER: Objection as to form.   18:07:54
2  BY MR. SPECTOR:
3    Q.   If you know. If you didn't know, you   18:07:58
4  didn't know.   18:08:01
5    A.   I recall something, but I don't know   18:08:01
6  -- I don't know for certain.   18:08:05
7    Q.   Okay. You put that an additional   18:08:07
8  problem with the source data -- with the source of   18:08:13
9  the felon data is that it included names of   18:08:18
10  individuals who had been convicted of misdemeanors   18:08:21
11  and of individuals who had been convicted of   18:08:25
12  felonies in states other than Florida and whose   18:08:28
13  rights had been automatically restored.   18:08:31
14       What is your source for that opinion?   18:08:34
15   A.   The conversations with Mr. Knowles and   18:08:37
16  Attorney Restrepo during the teleconference.   18:08:38
17   Q.   Okay.   18:08:41
18   A.   The documentation that I have seen and   18:08:42
19  the e-mails that I have seen, and the testimony of   18:09:14
20  Ms. Modrow and Ms. Thorogood.   18:09:18
21   Q.   Is it your testimony that there are   18:09:20
22  individuals listed in the Felon Exception Report   18:09:21
23  that were, in fact, convicted of misdemeanors   18:09:23
24  rather than a felony?   18:09:25
25   A.   Based on what I have seen, yes.   18:09:26

203

1    Q.   Okay.   18:09:31
2    A.   There probably are.   18:09:31
3    Q.   Do you know that?   18:09:32
4    A.   I don't know any individual for a   18:09:33
5  fact, as I've testified before.   18:09:35
6    Q.   Okay.   18:09:36
7    A.   I couldn't point you to one person and   18:09:38
8  tell you this is absolutely the status of this   18:09:42
9  person, because I have not done person-to-person   18:09:44
10  verification, but, in all likelihood, it is the   18:09:46
11  case that someone is on this list who has not ever   18:09:49
12  been convicted of a felony, based on the   18:09:55
13  information that I have seen.   18:09:57
14   Q.   Based upon your creation of your   18:09:58
15  spreadsheets and data, would there be any way to   18:09:59
16  run a test on the data, which you've provided, to   18:10:01
17  see which of those you believe were convicted of a   18:10:06
18  misdemeanor rather than a felony?   18:10:08
19   A.   Unfortunately, because this file is   18:10:09
20  dirty, there really is no way to do that.   18:10:11
21   Q.   Okay. You reference some sources for   18:10:14
22  this opinion in page 8, and you reference Janet   18:10:15
23  Modrow's deposition and Marlene Thorogood's   18:10:19
24  deposition.   18:10:21
25       Did you read their depositions in   18:10:21

204

51 (Pages 201 to 204)

1  their entirety?                        18:10:23
2      A.   Yes, I did.                    18:10:23
3      Q.   Okay.  Do you believe that all  18:10:24
4  individuals whose rights have been restored in  18:10:25
5  another state are automatically entitled to    18:10:27
6  clemency in Florida?                   18:10:29
7      MR. OTTINGER:  Objection as to form.    18:10:30
8      THE WITNESS:  I don't know the law in Florida  18:10:32
9  with respect to restitution.           18:10:36
10  BY MR. SPECTOR:                        18:10:38
11     Q.   Is restitution different than    18:10:38
12  restoration?                          18:10:40
13     A.   I meant "restoration."  I'm sorry.  18:10:41
14     Q.   Okay.  What is the definition of a  18:10:42
15  false positive?                       18:10:53
16     A.   It's a situation that's been verified  18:10:55
17  as having been incorrectly identified as a    18:10:58
18  positive hit.                         18:11:05
19     Q.   You opine, referring to the fact that  18:11:07
20  there may have been people who were convicted of  18:11:11
21  misdemeanors or convicted of a felony in a state  18:11:16
22  other than Florida whose rights may have been    18:11:18
23  restored that, quote, "This data was invalid felon  18:11:20
24  data.  With such invalid data on the Felon    18:11:23
25  Exception File, even a 100 percent match on all  18:11:25

205

1  available criteria would have resulted in    18:11:28
2  erroneous identification of individuals as felons,  18:11:31
3  and would have increased the probability of false  18:11:33
4  positives."                          18:11:35
5      What invalid data are you referring    18:11:41
6  to?                                   18:11:43
7      A.   The names of individuals who had been  18:11:43
8  convicted of misdemeanors and of individuals who  18:11:50
9  had been convicted of felonies in states other    18:11:52
10  than Florida whose rights had been automatically  18:11:56
11  restored.                            18:12:00
12     Q.   But you have no independent knowledge?  18:12:00
13  You've done no test which revealed that, in fact,  18:12:02
14  that data was included in the reports; correct?  18:12:04
15     A.   I have seen and read testimony --    18:12:10
16     Q.   I'm not asking what you saw and read.  18:12:13
17      I'm asking you what you did,    18:12:15
18  Mr. Klausner, to verify that, in fact, that data  18:12:16
19  was included in the reports.           18:12:20
20     A.   I did not do it, and no one could do  18:12:22
21  it.                                  18:12:28
22     Q.   Okay.                         18:12:28
23     A.   Without the personal verification that  18:12:28
24  I described before, the data is sufficiently dirty  18:12:29
25  in this Felon Exception Report to make it    18:12:34

206

1  impossible to determine which individual is on    18:12:37
2  that list erroneously --               18:12:42
3      Q.   Okay.                         18:12:44
4      A.   -- I should say a false positive on  18:12:44
5  the list.                            18:12:46
6      Q.   Do you have any knowledge regarding  18:12:47
7  information that was transmitted by the State of  18:12:50
8  Texas and was included in any of the reports?    18:12:53
9      A.   Do I have any knowledge -- say that  18:12:56
10  again.  I'm sorry.                    18:13:04
11     Q.   I don't remember what my exact    18:13:05
12  question was.                        18:13:06
13      Do you have any knowledge regarding  18:13:07
14  information that was transmitted by the State of  18:13:09
15  Texas to the State of Florida and then    18:13:11
16  incorporated into the Felon Exception Report?    18:13:15
17     A.   I recall that some number of -- number  18:13:18
18  of thousands of individuals were reported by Texas  18:13:33
19  as having been convicted of felonies that were  18:13:38
20  incorporated into the data that DBT used.    18:13:42
21     Q.   Are you aware -- what do you mean by  18:13:43
22  "DBT used"?                          18:13:47
23     A.   In order to come up with a list of    18:13:48
24  felons.                              18:13:52
25     Q.   Are you aware if that information was  18:13:54

207

1  ever corrected?                       18:13:59
2      A.   I've seen documents that say that    18:13:59
3  these people were removed, or most of them were  18:14:05
4  recalled, I think is the word, in the recall file.  18:14:08
5      I don't know if it was all of them,    18:14:13
6  and it's not clear from what I've read that it was  18:14:17
7  all of them.                         18:14:19
8      Q.   Do you have any reason to believe that  18:14:20
9  any of the individuals who may have, at one point,  18:14:22
10  been erroneously identified as a felon in the    18:14:26
11  State of Texas were not completely recalled and    18:14:30
12  new reports run and transmitted to the    18:14:31
13  supervisors?                         18:14:33
14     A.   Yes.                          18:14:33
15      I point you to page 11 of my report,  18:14:34
16  the second bullet on the page --       18:14:43
17     Q.   Okay.                         18:14:47
18     A.   -- where I suggest that in the future  18:14:48
19  -- that is looking forward in time -- that the    18:14:51
20  state guarantee that all data that is used to    18:14:55
21  represent and match voters in Florida be    18:14:59
22  validated, corrected, and verified before use.    18:15:03
23      That's a fundamental requirement.    18:15:05
24  That's part of the industry standard in doing    18:15:07
25  matching.                            18:15:10

208

52 (Pages 205 to 208)

1  Without having done that, all future 18:15:11
2  operations are suspect, and to the extent that 18:15:13
3  felons or alleged felons who turned out not to be 18:15:16
4  felons from the State of Texas were included in 18:15:20
5  any of the data that was forwarded by DBT to the 18:15:24
6  Department of Elections, the entire process is 18:15:28
7  suspect.                    18:15:31
8       That leads me to believe that anything 18:15:32
9  is possible in a list of 60,197 that we're looking 18:15:33
10 at.                         18:15:39
11    Q.   That wasn't my question. My question 18:15:39
12 is, sir: Are you aware of -- strike that. 18:15:43
13      Do you have any reason to believe that 18:15:46
14 the names of the people who may have been 18:15:48
15 erroneously identified as felons from the State of 18:15:50
16 Texas were not rerun and a new list transmitted to 18:15:52
17 the Supervisors of Elections, removing these 18:15:57
18 people from the Felony Exception List? 18:16:00
19    A.   Yes, because I doubt the process had 18:16:02
20 any integrity to it.          18:16:05
21      In fact, I couldn't tell you at this 18:16:06
22 point if we still don't have a supervisor present 18:16:10
23 on the list of the felon exceptions. 18:16:13
24    Q.   Okay. So I'm clear, it's your 18:16:14
25 testimony that the industry standard would have 18:17:00

209

1  required a 100 percent match on the criteria with 18:17:04
2  no manipulation; correct?      18:17:07
3    A.   No.                    18:17:09
4       The industry standard is to use, as a 18:17:10
5  primary criteria, data which is unique to the 18:17:12
6  individual, unique to the record, and a secondary 18:17:16
7  criteria, lesser unique, but certainly having some 18:17:21
8  degree of uniqueness, as a consistency check to 18:17:25
9  the primary criteria --       18:17:28
10    Q.   And for that data --    18:17:30
11    A.   -- in order to achieve the purpose of 18:17:32
12 ensuring that not only eligible voters remain 18:17:34
13 eligible and are not disenfranchised, but also 18:17:41
14 that ineligible voters be properly identified. 18:17:46
15    Q.   And you would require 100 percent 18:17:50
16 match; correct?               18:17:51
17    A.   What I've just said.   18:17:51
18    Q.   Correct?               18:17:54
19    A.   Yes.                   18:17:55
20    Q.   Okay. Are you aware at what point 18:17:55
21 derived Motor Vehicle Data was introduced? 18:18:05
22    A.   How do you mean, "at what point"? 18:18:10
23    Q.   Well, you put, in Section C of your 18:18:12
24 report, "Names and other data were derived from 18:18:16
25 the Motor Vehicle Data for the State of Florida 18:18:19

210

1  and were introduced into the original CVF data for 18:18:22
2  matching to the Felony Exception File. 18:18:24
3       I'm asking you at what point did that 18:18:28
4  occur.                       18:18:28
5    A.   Prior to the matching for the Felon 18:18:29
6  Exception File.               18:18:31
7    Q.   Okay. Are you aware, for all such 18:18:31
8  data, what percentage was derived names? 18:18:37
9    A.   I didn't think there were any derived 18:18:38
10 names, but I might be wrong.   18:18:44
11    Q.   Are you aware of what particular part 18:18:45
12 of those names of the data was derived? 18:18:48
13    A.   To the best of my knowledge, unless 18:18:50
14 I'm mistaken, none of the names were derived, but 18:18:55
15 I don't know.                 18:19:00
16      The process was chaotic.   18:19:01
17    Q.   Okay. Are you aware of the amount of 18:19:04
18 felons you claim were incorrectly matched, due to 18:19:25
19 the use of derived data, how many of them received 18:19:27
20 clemency or restitution, to use your words? 18:19:31
21    A.   I couldn't tell --     18:19:36
22    MR. OTTINGER:   Objection as to form. 18:19:37
23    THE WITNESS:   I couldn't tell you. The file 18:19:41
24 -- the Felon Exception File is unreliable. 18:19:43
25    MR. SPECTOR:   Okay.        18:19:47

211

1    Q.   You conclude that due to the use of 18:20:09
2  derived data, the result was certainly to have 18:20:15
3  broadened the criteria for matching and to produce 18:20:20
4  more erroneous identifications and false 18:20:22
5  positives.                   18:20:24
6       Is that your opinion?     18:20:25
7    A.   Yes.                   18:20:27
8    Q.   Are you able to --     18:20:27
9    A.   Well, actually, I think my opinion is 18:20:28
10 the probability of false positives 18:20:33
11    Q.   I read right from your report. 18:20:34
12    A.   I understand, but I meant the 18:20:36
13 probability of false positives. 18:20:37
14    Q.   Okay.                  18:20:38
15    A.   I mean, it increases the likelihood. 18:20:38
16      I think it's fair to say that it would 18:20:42
17 increase the false positives because "likelihood" 18:20:45
18 and "probability" usually go hand in hand with 18:20:48
19 reality.                     18:20:51
20    Q.   Similar to when I asked you before if 18:20:51
21 you were able to quantify this increase, are you 18:20:53
22 able to quantify the increase here? 18:20:54
23      Do you remember the question, so I 18:20:58
24 don't have to go back?        18:20:59
25    A.   Yes, but I'm looking at the new 18:21:00

212

53 (Pages 209 to 212)

1  circumstances.                          18:21:02
2  Q.    Okay. That's fine.                18:21:02
3  A.    (Witness reviewing document.)     18:21:03
4  I don't know. There's not enough        18:21:09
5  information in the Felon Exception File that's  18:21:11
6  reliable.                               18:21:15
7  MR. SPECTOR: Okay.                      18:21:15
8  THE VIDEOGRAPHER: This the end of videotape  18:21:16
9  No. 3 at 6:22.                          18:21:20
10  (Discussion off the record.)           18:21:22
11  THE VIDEOGRAPHER: We're back on the record  18:22:41
12  at 6:24.                               18:22:43
13  This is the beginning of videotape     18:22:44
14  No. 4.                                 18:22:47
15  MR. SPECTOR: Okay.                     18:22:47
16  Q.    I'm just going to follow up on some of  18:22:49
17  the questions that Mr. Bergan asked you previously  18:22:54
18  about your breakdown on race, comparing the CVF  18:22:58
19  versus the Felony Exception File.       18:23:00
20  You stated, as your opinion, that "by   18:23:02
21  altering the criteria to (erroneously) increase  18:23:05
22  the number of matches for the Felony Exception  18:23:08
23  File, DBT and Florida significantly discriminated  18:23:11
24  against black voters."                  18:23:16
25  Define "discriminated" for me.          18:23:17

213

1  A.    Where are you reading from in my   18:23:18
2  report?                                 18:23:29
3  Q.    The last sentence after the chart --  18:23:29
4  the only sentence after the chart, prior to  18:23:31
5  Section G on page 10.                   18:23:34
6  A.    (Witness reviewing document.)     18:23:37
7  MR. OTTINGER: I'll object as to form, while  18:23:49
8  we're waiting.                          18:23:52
9  THE WITNESS: Created a result that      18:24:10
10  prejudiced black voters.               18:24:11
11  BY MR. SPECTOR:
12  Q.    Define the word "prejudiced."     18:24:44
13  A.    Inappropriately put at disadvantage.  18:24:45
14  (Discussion off the record.)           18:24:51
15  MR. SPECTOR: Okay.                     18:24:52
16  Q.    How did or why did the alteration  18:24:53
17  discriminate against black voters?      18:24:56
18  A.    The Felon Exception File, as it was  18:24:59
19  constructed as a result of casting a wide net,  18:25:08
20  overly represented black voters among its  18:25:12
21  population.                            18:25:16
22  By using this file, knowing or not      18:25:16
23  knowing whatever the circumstances were about  18:25:19
24  preknowledge, to eliminate its population from the  18:25:22
25  voter files -- from the legal or eligible voter  18:25:27

214

1  files, resulted in an inordinate number or a   18:25:32
2  prejudice towards black voters.         18:25:37
3  Q.    Do you have any reason to believe or  18:25:39
4  have you seen any evidence to support a conclusion  18:25:41
5  that the alteration was done differently towards  18:25:43
6  black voters than it was towards nonblack voters?  18:25:46
7  A.    The alteration being?             18:25:50
8  Q.    You put "altering the criteria to  18:25:53
9  increase the number of matches."        18:25:56
10  Do you have any reason to believe or    18:25:57
11  have you seen any evidence to support a finding  18:25:59
12  that the data pertaining to black voters was  18:26:03
13  altered in any way differently than it was for  18:26:07
14  nonblack voters?                        18:26:10
15  A.    I've never testified that any black  18:26:11
16  voters had their data altered unlike any white  18:26:14
17  voters or anyone else.                  18:26:19
18  Q.    That's why I'm asking the question.  18:26:20
19  A.    Right, but my testimony is that the  18:26:22
20  use of the broad criteria or the wide net, so to  18:26:23
21  speak, resulted in discrimination.      18:26:28
22  Q.    Do you consider yourself to be an   18:26:30
23  expert on discrimination?              18:26:32
24  A.    No.                              18:26:35
25  Q.    Yet you feel you're qualified to   18:26:37

215

1  conclude when discrimination occurred?   18:26:41
2  A.    I think I'm looking at it          18:26:44
3  (indicating).                          18:26:46
4  Q.    In your remedies, should the court  18:26:50
5  find for the plaintiffs, you use the word  18:26:53
6  "restoration."                         18:26:58
7  You go on to explain all the           18:26:59
8  individuals who were identified as felons, etc.  18:27:01
9  etc., in the first bullet point.        18:27:03
10  Define, for me, "restoration."         18:27:08
11  A.    With respect to the individuals as I  18:27:09
12  described them in this paragraph, that they be  18:27:19
13  restored to the eligible voter list.    18:27:21
14  Q.    Do you claim to be an expert on voting  18:27:24
15  procedures?                            18:27:28
16  A.    I'm not an expert in government-based  18:27:28
17  voting procedures.                     18:27:41
18  Q.    Are you an expert with regard to the  18:27:41
19  -- strike that.                        18:27:45
20  Is it your testimony -- do you believe  18:27:47
21  that the people included on a Clemency File are  18:27:50
22  already restored, as you use the word   18:27:54
23  "restoration"?                         18:27:56
24  A.    No.                              18:27:56
25  Q.    You state that you are unaware how the  18:27:59

216

54 (Pages 213 to 216)

DEPOSITION OF DAVID KLAUSNER

1  information contained in the 200001felons.tsv and  18:28:04
2  Felons.TXT file affected the contents of Felon  18:28:12
3  Exception File.  18:28:21
4      Is that correct?  18:28:22
5      I point you to the last sentence in  18:28:25
6  the first bullet on page 11 or first half-bullet  18:28:26
7  on page 11.  18:28:30
8      A.  Well, I stated what I stated. I don't  18:28:33
9  remember if you paraphrased it, but it is what it  18:28:35
10  is.  18:28:37
11      Q.  Okay. Did you take any steps to  18:28:37
12  investigate how the data in those two files  18:28:40
13  affected the contents of the Felon Exception File?  18:28:43
14      A.  During my examination of the materials  18:28:47
15  that I had at hand, I attempted to find out, and  18:28:50
16  I'm -- as I sit here today, I was not successful.  18:28:55
17      The processing of the Clemency File  18:29:00
18  with respect to the Felon Exception File remains,  18:29:03
19  to my mind, chaotic.  18:29:06
20      Q.  You state in the last bullet on  18:29:32
21  page 11 -- you make reference to a highly  18:29:35
22  selective and extremely accurate matching process.  18:29:37
23      As you sit here as an expert,  18:29:42
24  testifying, do you have any exact criteria which  18:29:44
25  would qualify as a "highly selective and extremely  18:29:46

217

1  accurate matching process"?  18:29:49
2      A.  In this particular case?  18:29:50
3      Q.  Yes.  18:29:52
4      A.  It would be -- a unique identifier is  18:29:53
5  the primary criteria, where that unique identifier  18:30:00
6  has both integrity and reliability, and a  18:30:04
7  secondary criteria of lesser uniqueness but still  18:30:07
8  of a high level of reliability and integrity as a  18:30:11
9  consistency check on the initial criteria -- on  18:30:16
10  the primary criteria.  18:30:20
11      Q.  Are you an expert -- do you consider  18:30:21
12  yourself to be an expert in clemency, when  18:30:22
13  clemency should be granted?  18:30:28
14      A.  No.  18:30:30
15      Q.  Or under what circumstances an  18:30:32
16  individual should have to prove their clemency?  18:30:35
17      Are you an expert in that?  18:30:38
18      A.  No.  18:30:41
19      MR. SPECTOR: I've got plenty of copies of  18:31:11
20  this one.  18:31:14
21      (Deposition Exhibit No. 10 was  18:31:15
22  marked.)
23  BY MR. SPECTOR:
24      Q.  What's been handed to you has been  18:31:16
25  marked as Exhibit 10, which is a piece of  18:31:18

218

1  correspondence produced by your counsel four days  18:31:21
2  ago, bearing the Bates No. A041284. It's dated  18:31:24
3  April 29th, 2002.  18:31:28
4      Down below, there's a note that says,  18:31:32
5  "Please don't" -- and there's underlining --  18:31:38
6  "spend too much time reviewing this yet."  18:31:39
7      It's referring to a summary of DBT's  18:31:41
8  expert.  18:31:46
9      Do you know why Alicia wrote that to  18:31:46
10  you? Why was she telling you not to spend too  18:31:51
11  much time on it yet?  18:31:53
12      A.  I think this is Alma --  18:31:54
13      Q.  See, even better.  18:31:56
14      MR. BERGAN: I think it's Alma.  18:31:59
15  BY MR. SPECTOR:
16      Q.  Then you obviously don't know why  18:32:01
17  Alicia would be saying that?  18:32:02
18      A.  I couldn't tell you what was in her  18:32:06
19  mind when she underlined the word "don't."  18:32:09
20      Q.  Okay. Just put that in the pile.  18:32:10
21      A.  (Indicating.)
22      MR. SPECTOR: Will you mark that, please.  18:33:19
23      (Deposition Exhibit No. 11 was  18:33:19
24  marked.)  18:33:19
25      MR. OTTINGER: Just for the record, I had a  18:33:20

219

1  hernia operation a week ago. That's why I keep  18:33:23
2  standing up, just because we're on video.  18:33:26
3      MR. SPECTOR: No problem.  18:33:28
4      Q.  It's a note to you from Alma, Bates  18:33:29
5  No. A041277. It enclosed DBT's response to  18:33:31
6  plaintiff's motion for class action certification.  18:33:35
7      Do you recall reviewing that?  18:33:38
8      A.  Yes.  18:33:39
9      Q.  Did you rely upon that in the  18:33:40
10  formulation of your opinions in your  18:33:42
11  expert report or to which you've testified about  18:33:45
12  today?  18:33:47
13      A.  I don't remember.  18:33:48
14      Q.  Okay.  18:33:48
15      MR. SPECTOR: Exhibit 12.  18:33:57
16      (Deposition Exhibit No. 12 was  18:33:57
17  marked.)
18      (Discussion off the record.)  18:34:19
19  BY MR. SPECTOR:
20      Q.  I've handed you what's been marked as  18:34:22
21  Exhibit 12, Bates No. A041291.  18:34:27
22      Do you recognize this?  18:34:33
23      A.  It looks like some of my work.  18:34:34
24      Q.  Who prepared this?  18:34:38
25      A.  I did.  18:34:40

220

55 (Pages 217 to 220)

| | |
|---|---|
| 1 Q. You typed this? 18:34:41 | 1 let's say, about racial composition? 18:36:47 |
| 2 A. Yes. It looks like an outline. 18:34:42 | 2 A. I was asked to run a racial 18:36:50 |
| 3 Q. If you typed this, explain to me why, 18:34:51 | 3 composition test, which I did. I came up with 18:36:53 |
| 4 up above where there's an "Expert Report by," 18:34:54 | 4 results. 18:36:57 |
| 5 blank. 18:34:56 | 5 Q. Were you asked to express an opinion 18:36:58 |
| 6 Do you normally not put your own name 18:34:57 | 6 as to remedies that the plaintiffs should be 18:37:01 |
| 7 in your own reports? 18:35:00 | 7 granted? 18:37:03 |
| 8 A. No, I put my name in. 18:35:01 | 8 A. I suggested -- I was asked what 18:37:04 |
| 9 Oh, I know what happened. 18:35:02 | 9 remedies might be available that I thought would 18:37:10 |
| 10 I was provided a template which had 18:35:05 | 10 be appropriate. 18:37:12 |
| 11 introduction, qualifications. It had the 18:35:08 | 11 I expressed myself and then wrote them 18:37:15 |
| 12 headings. 18:35:12 | 12 into the report. 18:37:16 |
| 13 Q. And who provided you with that 18:35:13 | 13 Q. Well, let me point you to -- under the 18:37:17 |
| 14 template? 18:35:16 | 14 support -- under Section 4 of the draft, "Basis 18:37:25 |
| 15 A. I believe that was sent to me by 18:35:16 | 15 and Reasons for Opinion," if you look down, you 18:37:28 |
| 16 Attorney Henderson. 18:35:19 | 16 break it down by opinions that you've rendered in 18:37:33 |
| 17 Q. Okay. 18:35:21 | 17 the section above. 18:37:36 |
| 18 A. So, I did receive a template. 18:35:22 | 18 In -- the only support for any of your 18:37:39 |
| 19 Q. Okay. 18:35:23 | 19 opinions is the experiments conducted using the 18:37:42 |
| 20 A. It also included the caption, the 18:35:28 | 20 exception list named FelonReport.XLS, but in your 18:37:45 |
| 21 heading "Expert Report by." 18:35:32 | 21 report that you have signed and offered as a 18:37:53 |
| 22 Q. Okay. Your signed report, which I'll 18:35:35 | 22 report in this matter, you list a number of other 18:37:57 |
| 23 ask for you to keep next to that one, okay, under 18:35:39 | 23 -- of other sources for your opinions, such as 18:38:00 |
| 24 items on which you are asked to opine, has 18:35:44 | 24 testimony of George Bruder before the Civil Rights 18:38:04 |
| 25 "Quality of the data used for matching," 18:35:50 | 25 Commission, and I believe you said before almost 18:38:06 |
| 221 | 223 |

| | |
|---|---|
| 1 Section I.B. 18:35:53 | 1 8,000 documents, although there may have been gaps 18:38:10 |
| 2 Do you see that? 18:35:54 | 2 in between, that were produced to you. 18:38:13 |
| 3 A. Yes, I see it. 18:35:55 | 3 How come this draft report doesn't 18:38:16 |
| 4 Q. And that is not contained in this 18:35:57 | 4 cite to all those other documents which you 18:38:19 |
| 5 draft report? 18:36:01 | 5 purportedly relied upon? 18:38:21 |
| 6 A. Right. 18:36:01 | 6 A. I didn't know about them at the 18:38:23 |
| 7 Q. When was the quality of data used for 18:36:02 | 7 time -- 18:38:26 |
| 8 matching, as an opinion which they asked for you 18:36:03 | 8 Q. When was this -- 18:38:26 |
| 9 to express, added? 18:36:06 | 9 A. -- or I didn't include them. 18:38:27 |
| 10 MR. OTTINGER: I'll object as to form and 18:36:08 | 10 Q. Why wouldn't you have included them? 18:38:29 |
| 11 foundation. 18:36:10 | 11 A. This was a bare-bones outline for me. 18:38:31 |
| 12 THE WITNESS: I was never asked to include 18:36:11 | 12 I don't include my cites in the bare-bones 18:38:35 |
| 13 the quality of the data used for matching. 18:36:12 | 13 outline. 18:38:39 |
| 14 MR. SPECTOR: Okay. 18:36:14 | 14 Q. Who drafted the bare-bones outline? 18:38:40 |
| 15 Q. You understand it's in your report -- 18:36:15 | 15 A. I did. 18:38:41 |
| 16 A. I offered my own report. I was never 18:36:19 | 16 Q. Okay. Let me show you -- 18:38:42 |
| 17 asked to put an opinion into my report. 18:36:21 | 17 MR. SPECTOR: Let's mark this, please. 18:38:45 |
| 18 Q. You were never asked by any of the 18:36:26 | 18 (Deposition Exhibit No. 13 was 18:38:47 |
| 19 plaintiffs to render any expert opinions? 18:36:29 | 19 marked.) 18:38:47 |
| 20 Is that your testimony? 18:36:33 | 20 BY MR. SPECTOR: |
| 21 A. I was asked to render opinions based 18:36:35 | 21 Q. As Exhibit 13, a document -- 18:38:57 |
| 22 on my findings. I performed tests. I made 18:36:36 | 22 Exhibit 13 is a document marked Bates No. A041294, 18:39:01 |
| 23 findings. I formed opinions. I communicated 18:36:41 | 23 which, again, was prepared -- produced by your 18:39:07 |
| 24 those opinions. 18:36:44 | 24 counsel a few days ago. 18:39:11 |
| 25 Q. Were you asked to express an opinion, 18:36:45 | 25 When was this draft report prepared? 18:39:12 |
| 222 | 224 |

56 (Pages 221 to 224)

```
 1    A.   I don't know.            18:39:16
 2    Q.   Do you recognize this?        18:39:17
 3    A.   It looks like my stuff, but I don't   18:39:18
 4 know when this was done.          18:39:22
 5    Q.   Do you notice this one, for the first  18:39:23
 6 time, includes some red lines of some changes that 18:39:25
 7 were made?              18:39:28
 8        Do you notice that?         18:39:29
 9    A.   Yes.              18:39:34
10    Q.   Who made those red-line changes?    18:39:35
11    A.   I did.             18:39:37
12    Q.   At whose direction?         18:39:38
13    MR. OTTINGER: Objection as to form.    18:39:41
14    THE WITNESS: (Reviewing document.)    18:39:42
15        I instigated the changes.       18:40:18
16 BY MR. SPECTOR:
17    Q.   All of them?            18:40:20
18    A.   All of them.            18:40:23
19    Q.   Well, then, let me point you to your  18:40:23
20 next draft.              18:40:25
21        (Deposition Exhibit No. 14 was    18:40:26
22 marked.)               18:40:26
23 BY MR. SPECTOR:
24    Q.   Your next draft has been marked as   18:40:27
25 Exhibit 14, Bates No. A04197.        18:40:28

                              225
```

```
 1        Let me retract my statement. I don't 18:40:31
 2 know necessarily that it's your next draft. It's  18:40:35
 3 the draft that was produced to us in the next   18:40:37
 4 order.               18:40:40
 5        First of all, I'd like you to turn to   18:40:41
 6 the last page and tell me if that's your      18:40:42
 7 signature.               18:40:47
 8    A.   Yes.              18:40:47
 9    Q.   Okay. Now, this is not a final      18:40:48
10 report; correct? This has red-line changes in it? 18:40:51
11    A.   That's correct.          18:40:53
12    Q.   Why would you have signed a report   18:40:54
13 that is not your final report and has red-line    18:40:55
14 changes?               18:41:00
15    A.   I thought it was my final report, and  18:41:01
16 my instructions were to have the red lines removed 18:41:03
17 by the attorneys at PFAW Foundation.     18:41:05
18    Q.   So, you would make changes to the    18:41:09
19 report in a red-line fashion, and then transmit it 18:41:14
20 to the attorneys for them to accept the changes   18:41:17
21 and put it into final --           18:41:21
22    MR. OTTINGER: Objection as to form.    18:41:22
23 Leading.                18:41:23
24    MR. SPECTOR: Great. Let me finish my   18:41:25
25 question.               18:41:27

                              226
```

```
 1    MR. OTTINGER: That's fine.        18:41:27
 2 BY MR. SPECTOR:
 3    Q.   You would make changes to your report, 18:41:30
 4 put it -- make the red-line changes, and then    18:41:32
 5 transmit to them in electronic format for them   18:41:36
 6 to accept the changes?          18:41:38
 7        Is that correct?          18:41:39
 8    MR. OTTINGER: Objection as to form.    18:41:40
 9    THE WITNESS: Yes.           18:41:42
10    MR. SPECTOR: Okay.           18:41:43
11    Q.   And each of the changes that are     18:41:50
12 contained in this draft, whose idea were they?   18:41:53
13    Whose changes were they?        18:42:00
14        Were they yours or were they someone  18:42:01
15 else who instructed you to make them?     18:42:03
16    A.   I was never instructed to make any   18:42:05
17 particular changes, any of these.        18:42:10
18        The changes that I made are -- were to 18:42:12
19 clarify, in my opinion, to explain the bases, to   18:42:18
20 resequence or reorder the various paragraphs so  18:42:28
21 that they would make more sense.       18:42:32
22    Q.   Well, let me point to you -- to a     18:42:34
23 couple points in your report.          18:42:36
24        In this draft, on page bearing       18:42:40
25 A041300, there is a section that says -- and it's  18:42:45

                              227
```

```
 1 the very first full sentence -- "In practice, an   18:42:51
 2 onerous and time-consuming burden was placed on  18:42:55
 3 the DOE, the individual Supervisors of Elections,  18:42:56
 4 and ultimately the voters themselves both prior to 18:43:00
 5 and on Election Day to verify and correct the    18:43:05
 6 results of the DBT and Florida processing."     18:43:08
 7        Do you remember putting that in your   18:43:10
 8 report?                18:43:12
 9    A.   Yes.              18:43:12
10    Q.   Okay. That is not included in the    18:43:12
11 report which you have offered as an expert report 18:43:17
12 in this matter?             18:43:19
13    MR. OTTINGER: Objection as to form.    18:43:20
14 BY MR. SPECTOR:
15    Q.   I'm asking you why.         18:43:23
16    A.   Well, I think you're wrong. It is in  18:43:25
17 my report.               18:43:40
18    Q.   Can you show it to me, then?       18:43:41
19    A.   (Witness reviewing document.)      18:43:45
20        I'll point you to page 5.        18:44:04
21    Q.   Okay. I'm there.          18:44:07
22    A.   Top paragraph.          18:44:08
23    Q.   Top paragraph, the one that starts   18:44:09
24 with, "In addition," the first whole sentence?   18:44:13
25    A.   Yes, and two sentences later, "In    18:44:15

                              228
```

57 (Pages 225 to 228)

1 practice." 18:44:19
2 Q. Okay. Let me ask you: This draft had 18:44:21
3 language that originally said, "I do believe that 18:44:27
4 anyone can electronically verify," and it 18:44:29
5 continues. 18:44:33
6 It's on the last paragraph on that 18:44:33
7 page, on A041300. 18:44:35
8 Do you see that? 18:44:37
9 A. (Witness reviewing document.) 18:44:38
10 Q. Do you see that sentence, 18:44:43
11 Mr. Klausner? 18:44:45
12 A. Yes. 18:44:45
13 Q. Okay. Why was that removed? 18:44:46
14 MR. OTTINGER: Objection as to form. 18:44:51
15 Foundation. 18:44:56
16 THE WITNESS: Because in this case, it was 18:44:58
17 not possible. 18:45:04
18 The statement was a generic statement, 18:45:05
19 and it was based on the belief that one could do 18:45:08
20 this if one had unique data that was reliable and 18:45:11
21 had integrity. 18:45:16
22 BY MR. SPECTOR:
23 Q. At one point you believed that anyone 18:45:18
24 could electronically verify, using sound matching 18:45:21
25 criteria, that any individual identified as a 18:45:24

229

1 felon on the DBT felon file was actually a 18:45:26
2 convicted felon or an individual convicted of a 18:45:31
3 misdemeanor or if that individual was someone with 18:45:34
4 clemency from a state other than Florida; correct? 18:45:37
5 A. I still believe that, but it doesn't 18:45:40
6 apply to this case, and that's why I removed it. 18:45:42
7 There are no sound matching criteria here. 18:45:45
8 What we have is garbage, and that's 18:45:47
9 why I removed it, because it didn't have anything 18:45:48
10 do with this matter. 18:45:53
11 Q. Okay. The section which is numbered E 18:45:54
12 on 41303 talks about "Given the dirty data" -- it 18:46:04
13 starts with "Given the dirty data." 18:46:10
14 A. I see it. 18:46:13
15 Q. At the last part of that, there is a 18:46:14
16 section that says "Cite." 18:46:17
17 Did you write that? 18:46:20
18 A. I put in "Cite." 18:46:21
19 Q. Did you ask the attorneys for the 18:46:25
20 plaintiffs to assist you with obtaining that cite? 18:46:29
21 A. Yes. 18:46:31
22 Q. And did they? 18:46:32
23 A. I don't remember. 18:46:36
24 Q. Well, let's look at your report. 18:46:37
25 On page 9, where you have a cite where 18:46:38

230

1 you put "See U.S. Civil Rights Commission Report, 18:46:40
2 Chapter 5; and Miami-Dade Election Department, 18:46:43
3 January 2000 Felon List, Bates No. 33964." 18:46:45
4 A. Yes, they did assist me. 18:46:48
5 Q. Did you independently verify that 18:46:50
6 cite? 18:46:52
7 A. No. 18:46:52
8 I have a copy of that page, but I 18:46:53
9 didn't independently find it. 18:46:56
10 Q. Did you read it before including it in 18:46:58
11 the report? 18:47:02
12 A. Yes. 18:47:02
13 Q. Now, under Section 5 on the last page 18:47:08
14 of this draft report, although you signed it, 18:47:12
15 dated April 25th, 2002, you said, "Attached are 18:47:15
16 exhibits blank that summarize and support my 18:47:25
17 opinions." 18:47:28
18 That was -- that's not included, that 18:47:29
19 language, in the report that was submitted dated 18:47:32
20 April 26th. 18:47:35
21 I'm curious as to why. 18:47:36
22 A. I don't know why. 18:47:38
23 Q. Okay. I'm not going to go through it 18:47:45
24 electronically, but the data that's contained on 18:48:04
25 the CD-ROM which is labeled Match2 -- we called it 18:48:06

231

1 Match2 before. 18:48:10
2 Do you recall that, Mr. Klausner -- 18:48:11
3 A. I recall. 18:48:14
4 Q. -- that we called it that to identify 18:48:16
5 it? 18:48:18
6 Was -- are these duplicates of any 18:48:18
7 other electronic file on the other CD-ROMs which 18:48:20
8 were produced by you in this case? 18:48:22
9 A. No. 18:48:23
10 Q. Okay. Is the data that's in here 18:48:23
11 contained anywhere else electronically or in your 18:48:27
12 report, the data, not the conclusions? 18:48:31
13 MR. OTTINGER: Objection as to form. It's 18:48:36
14 vague. Unclear. 18:48:43
15 MR. SPECTOR: All right. 18:48:46
16 MR. OTTINGER: Sorry. 18:48:46
17 MR. SPECTOR: I'll go slow. 18:48:47
18 Q. This CD-ROM contains a number of 18:48:50
19 different files; correct? 18:48:51
20 A. Yes. 18:48:54
21 Q. The files contain data; correct? 18:48:54
22 A. Yes. 18:48:55
23 Q. So, my first question is: Is the data 18:48:56
24 contained in here a duplicate of data found on any 18:49:00
25 of the other CD-ROMs produced in this case? 18:49:02

232

58 (Pages 229 to 232)

DEPOSITION OF DAVID KLAUS

1    A.   As far as I know, the -- as far as I   18:49:05
2  know, the data that's on the CD-ROMs is present in  18:49:30
3  front of you in printed form, at least the         18:49:35
4  sections that contain the calculations that I've   18:49:38
5  performed.                                          18:49:43
6    Q.   Okay.  To that, you're referring to    18:49:44
7  this stack that I have in front of me?             18:49:49
8    A.   Bates A04- --                              18:49:51
9    Q.   -- -1308?                                  18:49:52
10   A.   Yes.                                       18:49:54
11   Q.   Okay.                                      18:49:55
12      MR. SPECTOR:  Let's mark that as Exhibit 15.  18:49:56
13      (Deposition Exhibit No. 15 was
14  marked.)
15      THE WITNESS:  Can we take a short break?    18:50:00
16      MR. SPECTOR:  Sure.                         18:50:02
17      THE VIDEOGRAPHER:  Off the record at 6:51.  18:50:03
18      (Short recess taken.)
19      THE VIDEOGRAPHER:  We're back on at 6:55.  18:54:30
20  BY MR. SPECTOR:
21   Q.   Mr. Klausner, I think there is a      18:54:42
22  composite exhibit over there.  It's Exhibit 15.   18:54:49
23      Could you read off the Bates number    18:54:53
24  that it starts with?                            18:54:55
25   A.   A041308.                                18:54:56

                                            233

1    Q.   What does that composite represent?   18:54:57
2    A.   These are screen shots.               18:55:01
3       In other words, what you see on the     18:55:05
4  screen copied as if it were a photograph to a   18:55:09
5  printer --                                     18:55:12
6    Q.   Okay.                                 18:55:13
7    A.   -- of two different views -- I should  18:55:14
8  say of two different spreadsheets.           18:55:50
9       The first is the 2001 felon            18:55:52
10  spreadsheet from a zip file, which was identified  18:55:54
11  to me by Attorney Restrepo as being the file that  18:55:56
12  Mr. Hiller used.                             18:56:01
13   Q.   Okay.                                 18:56:02
14   A.   The second group of screen shots are   18:56:02
15  from a file which is very similar to Match4.xls on  18:56:04
16  the CD-ROM that you have.                    18:56:08
17   Q.   Okay.                                 18:56:09
18   A.   It's actually Match8.xls, but it has a  18:56:12
19  support for the numbers which I have in my report.  18:56:14
20   Q.   Okay.  Why did you run these different  18:56:16
21  match reports, Match2, Match3, and Match4?   18:56:18
22   A.   I testified earlier that I ran       18:56:23
23  additional computations or calculations between   18:56:24
24  each of those and saved the newer version under a  18:56:27
25  number which had -- which is one greater than the  18:56:29

                                            234

1  prior version.                                18:56:32
2    Q.   What does Match2 represent?          18:56:32
3    A.   It's the next version beyond Match1.  18:56:33
4    Q.   What did you do different on Match2   18:56:36
5  than you did on Match1?                       18:56:38
6    A.   I don't remember.                    18:56:41
7    Q.   Is there any way for us to tell that?  18:56:42
8    A.   You could look at Match2 and Match3  18:56:45
9  and see what the difference is between them.  18:56:47
10   Q.   Do you have any recollection as to the  18:56:48
11  differences between Match1 and Match2 and Match2  18:56:50
12  and Match3, etc., etc., specifically?       18:56:56
13   A.   No.                                  18:56:58
14   Q.   Do you have any documents which     18:56:58
15  indicate your notes as to when you were making   18:56:59
16  these -- completing these different experiments?  18:57:03
17   A.   It's pretty easy to see what the     18:57:05
18  differences are by putting them on the machine and  18:57:09
19  taking a look.                               18:57:11
20   Q.   Okay.  Have you been paid by the     18:57:12
21  plaintiffs in this case yet?                 18:57:14
22   A.   I have.                               18:57:15
23   Q.   How much have you been paid to date?  18:57:15
24   A.   Probably -- I don't know.  About     18:57:21
25  $5,000.                                      18:57:24

                                            235

1    Q.   Okay.                                18:57:24
2    A.   That's a guess.                      18:57:25
3    Q.   Are you aware that, at some        18:57:26
4  point, the Division of Elections broke down and   18:57:34
5  labeled individuals listed on the Felony Exception  18:57:41
6  Report as either "probable" versus "possible"?   18:57:44
7    A.   Yes.                                 18:57:49
8    Q.   Do you have an opinion as to whether   18:57:50
9  or not that should have been completed?     18:57:51
10   A.   As to whether the people should have  18:57:54
11  been categorized as probables or possibles?  18:57:59
12   A.   Yes.                                 18:58:02
13   Q.   What is the opinion?                 18:58:03
14   A.   I think that no one who was        18:58:07
15  categorized in either way was a possible, much   18:58:10
16  less a probable.                             18:58:13
17   Q.   Okay.  But you have an opinion as to  18:58:14
18  whether or not the Division of Elections should   18:58:19
19  have labeled, from the data subsets which they   18:58:20
20  had, probable versus possible?              18:58:24
21   A.   I think that it was probably a mistake  18:58:25
22  to label people as probables when, in fact, they   18:58:30
23  weren't even possibles.                     18:58:35
24   Q.   And your underlying premise of that is  18:58:36
25  because you don't believe that any of the data   18:58:40

                                            236

59 (Pages 233 to 236)

1  that was in the databases was good data? It was  18:58:42
2  all dirty data; correct?  18:58:44
3    A.  Yes. It was all unreliable, and  18:58:48
4  maintains its unreliability.  18:58:50
5    Q.  To the extent that -- assume for a  18:58:52
6  second, hypothetically, that you believe that the  18:58:54
7  data was reliable; okay?  18:58:55
8      Are you following me?  18:59:00
9    A.  Okay.  18:59:01
10    Q.  Do you believe it was inappropriate  18:59:01
11  for the Division of Elections to then label the  18:59:02
12  data either probable versus possible hits?  18:59:07
13    A.  In your hypothetical, if the data was  18:59:10
14  reliable, then -- in your hypothetical, everyone  18:59:14
15  has a Social Security number with integrity?  18:59:18
16    Q.  Okay.  18:59:21
17    A.  Is that right?  18:59:22
18    Q.  Yes.  18:59:23
19    A.  Okay. Then I -- can I also assume, in  18:59:24
20  your hypothetical, that the secondary criteria,  18:59:28
21  such as date of birth and address, are also with  18:59:31
22  integrity and reliability?  18:59:37
23    Q.  To the extent that they exist in the  18:59:39
24  file, yes.  18:59:41
25    A.  And that they are reliable?  18:59:42

237

1    A.  -- then they would be probables.  19:00:36
2    Q.  Okay.  19:00:39
3    A.  Just to make sure that I'm clear, a  19:00:41
4  unique identifier as a primary criteria: secondary  19:00:45
5  criteria being used for consistency check; the  19:00:50
6  criteria, particularly Social Security number,  19:00:56
7  primary, and date of birth address as secondary,  19:00:59
8  is 100 percent match on those; and that match  19:01:04
9  result is used to determine whether somebody  19:01:08
10  should be on the Felon Exception List, I would say  19:01:13
11  that such an individual matched would be a  19:01:16
12  probable.  19:01:20
13    Q.  Okay. Are you aware of the criteria  19:01:20
14  for the Division of Elections making the  19:01:22
15  distinction between "probable" and "possible"?  19:01:26
16    A.  Yes.  19:01:28
17    Q.  What is that?  19:01:28
18    A.  I believe that's on page 59 of  19:01:29
19  Ms. Modrow's deposition.  19:01:32
20      If you have that, perhaps I can --  19:01:33
21    Q.  I don't. If you don't know, you don't  19:01:36
22  know, and that's okay.  19:01:40
23      As you sit here today and testify --  19:01:42
24    A.  I believe that Ms. Modrow partitioned  19:01:43
25  the file such that all NAM matched -- or criteria  19:01:48

239

1    Q.  Yes.  18:59:46
2    A.  In other words, they really are the  18:59:46
3  address and date of birth of the person to whom  18:59:47
4  they're attached?  18:59:51
5    Q.  Yes.  18:59:52
6    A.  And that the primary criteria used was  18:59:52
7  the Social Security number, for example, as a  18:59:54
8  unique identifier?  18:59:55
9    Q.  Yes.  18:59:56
10    A.  The secondary criteria I've just  18:59:57
11  named, the address and the date of birth, were  18:59:58
12  used as a consistency check?  19:00:00
13    Q.  Yes.  19:00:02
14    A.  Then I think everybody who was so  19:00:03
15  identified could be properly labeled a possible.  19:00:06
16    Q.  Why not a probable?  19:00:10
17    A.  In order to do so, one would have to  19:00:12
18  do a personal verification.  19:00:15
19    Q.  In order to label someone a probable,  19:00:18
20  it is your opinion that you would have to do a  19:00:21
21  person-to-person verification?  19:00:23
22    A.  I'm sorry. I misunderstood.  19:00:25
23      If all of these -- if I've described  19:00:27
24  the hypothetical correctly --  19:00:33
25    Q.  Yes.  19:00:36

238

1  matched by NAM were probables and that all others  19:01:52
2  were possibles.  19:01:57
3      That was the information given to the  19:01:57
4  individual Supervisors of Elections. That's my  19:02:00
5  best recollection of her testimony.  19:02:02
6    Q.  Okay. For each experiment that you  19:02:04
7  ran, was anybody present when you ran those  19:02:08
8  experiments?  19:02:11
9    A.  No.  19:02:11
10    Q.  For each experiment, how many times  19:02:19
11  did you run the experiment?  19:02:23
12    A.  Hundreds of times.  19:02:24
13    Q.  So, for each of the experiments which  19:02:25
14  we listed before -- and we have about a list of  19:02:29
15  nine, and I'm approximating -- you ran each  19:02:33
16  experiment hundreds of times?  19:02:35
17    A.  Yes.  19:02:36
18      Every experiment in Exhibit 15 gets  19:02:36
19  rerun every time I open the spreadsheet, because  19:02:38
20  the calculations are performed all over again.  19:02:42
21    Q.  Okay. Well, the calculations are  19:02:44
22  performed by the spreadsheet automatically;  19:02:45
23  correct?  19:02:47
24    A.  Yes, and those are the experiments, my  19:02:47
25  calculations.  19:02:51

240

60 (Pages 237 to 240)

DEPOSITION OF DAVID KLAUS

| | |
|---|---|
| 1 Q. The calculations that performed by 19:02:52 | 1 File, which comes from CD No. 7. 19:05:03 |
| 2 Excel or the spreadsheet, whatever you may be 19:02:54 | 2 Q. Okay. So, other than the Sequel count 19:05:07 |
| 3 using? 19:02:56 | 3 and the breakdown from CD No. 7 and the running of 19:05:11 |
| 4 A. I have directed the spreadsheet to 19:02:56 | 4 -- the opening of spreadsheets which ran the data, 19:05:15 |
| 5 perform the calculations. 19:02:58 | 5 were there any types of experiments that were run 19:05:17 |
| 6 Q. Okay. How many times did you -- so, 19:02:58 | 6 by you? 19:05:21 |
| 7 you consider it running an experiment by opening a 19:03:03 | 7 A. Not specifically for this matter. 19:05:21 |
| 8 spreadsheet? 19:03:07 | 8 Q. Are there any documents or evidence 19:05:28 |
| 9 A. Yes, because opening the spreadsheet 19:03:07 | 9 which you relied upon in the formulation of your 19:05:30 |
| 10 in my particular case included recalculating all 19:03:11 | 10 opinions in this matter which are not cited in 19:05:35 |
| 11 of the numbers. 19:03:14 | 11 your report? 19:05:38 |
| 12 Q. Okay. 19:03:15 | 12 MR. OTTINGER: Just clarifying, other than 19:05:38 |
| 13 A. I don't see that the result is 19:03:16 | 13 what he's testified to today, earlier? 19:05:54 |
| 14 different from the first time the numbers are 19:03:18 | 14 MR. SPECTOR: Uh-huh. 19:05:56 |
| 15 calculated, but -- 19:03:23 | 15 MR. OTTINGER: Okay. 19:05:57 |
| 16 Q. Other than the input of information 19:03:24 | 16 BY MR. SPECTOR: Yes. 19:05:58 |
| 17 into a spreadsheet and your programming of the 19:03:28 | 17 THE WITNESS: Not to my knowledge. 19:05:58 |
| 18 spreadsheet as to what to do for a particular 19:03:30 | 18 MR. SPECTOR: Okay. Just give me one moment. 19:06:01 |
| 19 cell, did you run any other experiments? 19:03:35 | 19 Q. During the course of you running your 19:06:47 |
| 20 A. Yes. 19:03:39 | 20 experiments, did you ever discover that there was 19:06:48 |
| 21 I also did a Sequel search account on 19:03:39 | 21 a time when you used the incorrect formula in a 19:06:52 |
| 22 the CVF to determine the racial breakdown in the 19:03:41 | 22 particular cell in one of your spreadsheets and 19:06:55 |
| 23 CVF. 19:03:46 | 23 had to rerun or redo the formula for that 19:07:00 |
| 24 Q. And that was a -- when you say "a 19:03:46 | 24 particular experiment? 19:07:02 |
| 25 Sequel count," that is an instruction to discern 19:03:48 | 25 A. Yes. 19:07:04 |
| 241 | 243 |

| | |
|---|---|
| 1 based upon the marker and the racial category. 19:03:53 | 1 Q. Did you keep a list of the times when 19:07:05 |
| 2 Do you understand what I'm asking you? 19:04:00 | 2 errors were created and errors occurred in your 19:07:07 |
| 3 Why don't we strike that, and you 19:04:03 | 3 spreadsheets? 19:07:09 |
| 4 explain to me what the Sequel count is. 19:04:05 | 4 A. No. I corrected it immediately. 19:07:10 |
| 5 A. SQL is a programming language that is 19:04:06 | 5 It's my practice to use cross-check 19:07:11 |
| 6 used to access data in databases, particularly 19:04:11 | 6 columns and rows, and I discovered the error 19:07:13 |
| 7 Microsoft database, called Sequel. 19:04:13 | 7 immediately because of the cross-check practice I 19:07:17 |
| 8 I created instructions to query the 19:04:16 | 8 perform. 19:07:21 |
| 9 CVF database, which I restored from the magnetic 19:04:23 | 9 Q. How many errors did you discover in 19:07:21 |
| 10 tape. 19:04:26 | 10 your spreadsheets? 19:07:23 |
| 11 In those instructions, I asked it to 19:04:27 | 11 A. Two. 19:07:23 |
| 12 count and break the count down by race for the 19:04:29 | 12 Q. And which spreadsheets were that? 19:07:23 |
| 13 entire Central Voter File. 19:04:33 | 13 A. They were -- they may be in Match4 or 19:07:25 |
| 14 Q. And that was the data which you 19:04:34 | 14 Match3, and they involve the -- I believe it's the 19:07:32 |
| 15 premised your chart with the different racial 19:04:37 | 15 SDB number. 19:07:36 |
| 16 breakdowns on; correct? 19:04:41 | 16 Q. In both Match3 and Match4? 19:07:37 |
| 17 A. This is part of the data that appears 19:04:41 | 17 A. Probably. 19:07:40 |
| 18 on the chart on page 10 of my report, and it 19:04:45 | 18 (Witness reviewing document.) 19:07:53 |
| 19 appears specifically under the heading "CVF." 19:04:48 | 19 It's probably the SDB number, although 19:07:53 |
| 20 Q. Under the -- the chart on page 10, was 19:04:51 | 20 I'm not certain. I don't remember which one it 19:07:56 |
| 21 that based upon any other data other than the 19:04:54 | 21 was. 19:07:58 |
| 22 Sequel count? 19:04:57 | 22 Q. Would you have any printouts from the 19:07:58 |
| 23 A. Yes. 19:04:58 | 23 experiments that you ran which were based on a 19:08:02 |
| 24 It was based on a similar count for 19:04:58 | 24 faulty premise or an error in your formula? 19:08:04 |
| 25 racial breakdown performed on the Felon Exception 19:05:00 | 25 A. No, and I didn't use the number in my 19:08:09 |
| 242 | 244 |

61 (Pages 241 to 244)

1   report.                          19:08:14
2   Q.   Did you transmit that data to the   19:08:14
3   plaintiffs' lawyers?               19:08:16
4   A.   No.                         19:08:16
5   Q.   You caught the error before you   19:08:18
6   transmitted it?                    19:08:20
7   A.   That's my memory of it.       19:08:22
8   Q.   Okay. Is there a difference between   19:08:32
9   the term "garbage" and the term "dirty"?   19:08:35
10  A.   Not to my opinion -- not in my   19:08:36
11  opinion.                          19:08:41
12  Q.   Why did you chose to remove the word   19:08:41
13  "garbage" from one of the drafts and replace it   19:08:43
14  with "dirty"?                       19:08:47
15  A.   It was suggested by attorneys for   19:08:48
16  PFAW.                            19:08:49
17  Q.   What else was suggested by attorneys   19:08:50
18  by PFAW, since you mention that that was -- and   19:08:54
19  you should have the drafts there.   19:08:59
20  A.   (Witness reviewing document.)   19:09:11
21  Q.   When you start telling us, it could be   19:09:38
22  good to identify the document that you're looking   19:09:41
23  at. I would appreciate it.         19:09:44
24  A.   Well, in my early drafts, for   19:09:45
25  example --                        19:10:08

                                    245

1   Q.   If you could cite to the actual   19:10:09
2   document number, please --         19:10:11
3   A.   In -- let's see.             19:10:12
4        In document A041291, I have opinions   19:10:33
5   as bullet 3, followed by basis -- basis and   19:10:39
6   reasons for opinion as bullet 4.    19:10:44
7        It was suggested that I change the   19:10:47
8   appearance of this and move paragraphs around,   19:11:22
9   which I did.                      19:11:24
10  Q.   Other than appearance, what   19:11:25
11  substantive changes were requested by the   19:11:26
12  attorneys for the plaintiff?       19:11:29
13  A.   (Witness reviewing document.)   19:11:30
14  MR. OTTINGER: I'm going to object to form,   19:12:06
15  while we're waiting, as to suggest or was telling   19:12:09
16  -- you know, talking back and forth.   19:12:14
17  THE WITNESS: I don't see anything else.   19:13:43
18  BY MR. SPECTOR:
19  Q.   So, to your knowledge, that was the   19:13:45
20  only substantive changes asked to be made by any   19:13:47
21  of the attorneys for the plaintiff?   19:13:49
22  A.   Yes.                         19:13:51
23  Q.   And just real briefly, what did you do   19:13:52
24  to prepare for your deposition today?   19:13:55
25  A.   I read the materials. I --     19:13:56

                                    246

1   Q.   What materials?               19:14:00
2   A.   I read my report.             19:14:00
3   Q.   Other than your report, what did you   19:14:01
4   read?                            19:14:03
5        You said "the materials."      19:14:04
6   A.   I read the report, I read --    19:14:06
7   Q.   Did you read any of the documents --   19:14:12
8   A.   -- C3061.                     19:14:14
9   Q.   Which is what? Refresh my       19:14:15
10  recollection.                      19:14:19
11  A.   I don't remember. I'm good with   19:14:20
12  numbers, I'm not good with names.   19:14:21
13  Q.   What did it say?              19:14:23
14  A.   I don't know.                 19:14:24
15  Q.   Okay. I'll look it up.         19:14:25
16       What else?                    19:14:28
17  A.   That's what I remember reading.   19:14:29
18  Q.   So, the report and C3061?      19:14:31
19  A.   Yes.                         19:14:33
20  Q.   Did you meet with Attorney Ottinger?   19:14:34
21  A.   Yes.                         19:14:36
22  Q.   For how long?                 19:14:36
23  A.   About seven-and-a-half hours.   19:14:37
24  Q.   Did he express to you where his   19:14:51
25  concerns in this case were?         19:14:55

                                    247

1   A.   No.                         19:14:57
2   Q.   Did he express to you -- maybe I'm not   19:15:14
3   using the words "concerns" properly.   19:15:17
4        Did he express to you where he thought   19:15:20
5   his weaknesses in this case were?   19:15:21
6   A.   No.                         19:15:23
7   Q.   Did he indicate to you, at any time   19:15:23
8   during his meetings and these conversations, where   19:15:27
9   he felt you needed to be the strongest in your   19:15:30
10  opinions?                         19:15:32
11  A.   No.                         19:15:34
12  MR. SPECTOR: If I can have just one moment   19:15:47
13  to talk to Mr. Bergan.             19:15:49
14  THE VIDEOGRAPHER: Off the record.   19:15:51
15  7:17.                            19:15:54
16       (Discussion off the record.)   19:15:55
17  THE VIDEOGRAPHER: Back on.          19:16:31
18  7:17.                            19:16:34
19  BY MR. SPECTOR:
20  Q.   Your report on page 13, your signature   19:16:38
21  page -- you don't have to flip to it. I'll show   19:16:41
22  it to you, if you want.            19:16:44
23       It has two signatures on there   19:16:48
24  (indicating).                      19:16:49
25       Can you explain that?          19:16:50

                                    248

                              62 (Pages 245 to 248)

DEPOSITION OF DAVID KLAUSNER

```
 1    A.   I often sign electronically with the   19:16:50
 2  above signature, and I was asked to actually sign  19:16:52
 3  it physically with my hand.          19:16:55
 4    Q.   Did they tell you why they wanted --   19:17:04
 5  who told you?              19:17:07
 6    A.   It was Attorney Ottinger.        19:17:09
 7    Q.   Besides Attorney Ottinger, who else   19:17:09
 8  have you spoken to about this case?      19:17:12
 9    A.   Attorney Henderson.  That's it.     19:17:13
10    Oh, Mr. Knowles, Mr. Restrepo.       19:17:19
11    Q.   And you've not consulted with any    19:17:27
12  other individual with any expertise in database --  19:17:29
13  databases or matching technology with regard to   19:17:33
14  this matter?               19:17:35
15    A.   No.               19:17:36
16    MR. SPECTOR:  I have no further questions.  19:17:37
17    MR. OTTINGER:  Okay.          19:17:42
18    MR. BERGAN:  Mr. Klausner, you have the right  19:17:46
19  to read and sign this deposition or to waive your  19:17:47
20  signature.               19:17:51
21    You may elect to read and sign, make   19:17:53
22  any changes in it that you care to make, or you   19:17:57
23  can waive your signature.          19:18:01
24    It's entirely up to you.          19:18:05
25    MR. OTTINGER:  I can say, as his counsel,   19:18:06
```

249

```
 1  we'd like to at least be able to look at this --   19:18:09
 2    MR. SPECTOR:  He can look at it.      19:18:13
 3    MR. OTTINGER:  I mean, to review it --    19:18:15
 4    MR. BERGAN:  You're going to read and sign,   19:18:18
 5  then?                 19:18:20
 6    MR. OTTINGER:  Yes.          19:18:20
 7    MR. BERGAN:  All right.          19:18:21
 8    MR. SPECTOR:  Are you advising him to read?   19:18:22
 9    MR. OTTINGER:  Not him necessarily.  I'd like  19:18:23
10  -- I don't know that he has to do it.      19:18:25
11    What's your practice?  What do you --   19:18:29
12    MR. BERGAN:  Not my practice, it's --   19:18:32
13    MR. OTTINGER:  Well, I'd like to be     19:18:33
14  consistent with what we're going to do with the   19:18:36
15  other folks, too.             19:18:38
16    I would like, at least, to have a     19:18:39
17  chance to look at it before it's finalized.    19:18:40
18    MR. BERGAN:  I can tell you that George   19:18:45
19  Bruder and Tom Hiller will read and sign --   19:18:46
20    MR. OTTINGER:  Okay.          19:18:50
21    MR. BERGAN:  -- as opposed to waiving.    19:18:50
22    MR. OTTINGER:  Then we should do that.    19:18:52
23    THE VIDEOGRAPHER:  This is the end of     19:18:56
24  videotape No. 4.             19:18:58
25    Off the record at 7:20.         19:18:59
```

250

```
 1    (Time noted:  7:20 p.m.)          19:19:22
 2
 3
 4    _____
 5    DAVID KLAUSNER
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

251

```
 1  STATE OF CALIFORNIA          ) ss.
 2  CITY AND COUNTY OF SAN FRANCISCO  )
 3
 4    I hereby certify that the witness in
 5  the foregoing deposition, DAVID KLAUSNER, was by
 6  me duly sworn to testify to the truth, the whole
 7  truth, and nothing but the truth, in the
 8  within-entitled cause; that said deposition was
 9  taken at the time and place herein named; that the
10  deposition is a true record of the witness's
11  testimony as reported by me, a duly Certified
12  Shorthand Reporter and a disinterested person, and
13  was thereafter transcribed into typewriting by
14  computer.
15    I further certify that I am not
16  interested in the outcome of the said action, nor
17  connected with, nor related to, any of the parties
18  in said action, nor to their respective counsel.
19    IN WITNESS WHEREOF, I have hereunto set
20  my hand and affixed my signature this 30th day of
21  May 2002.
22
23
24    _____
25    DAWN A. STARK, CSR NO. 7847
```

252

63 (Pages 249 to 252)

I N D E X

1
2
3   TUESDAY, MAY 28, 2002
4
5   WITNESS                    EXAMINATION
6
7   DAVID KLAUSNER
8
9           (BY MR. BERGAN)          9
10          (BY MR. SPECTOR)        87
11          (BY MS. TORRES)        159
12          (BY MR. WAAS)          180
13          (BY MR. VOSCH)         191
14          (BY MR. SPECTOR)       194
15
16
17
18
19
20
21
22
23
24
25

253

DEPOSITION EXHIBITS
DAVID KLAUSNER

NUMBER        DESCRIPTION        IDENTIFIED
7    Contract for Services,      91
     dated February 14, 2002,
     Bates Nos. A041285 through
     A041290, six pages

8    Database Technologies, Inc.,  122
     Requirements, dated 1-20-00,
     Bates Nos. C02552 through
     C02598, 46 pages

9    Division of Elections -      123
     2000, Bates No. C03005,
     one page

10   Handwritten note from Alma   218
     to David, dated 4-29-02,
     Bates No. A041284, one page

11   Handwritten note from Alma   219
     to David, dated 4-8-02,
     Bates No. A041277, one page

255

DEPOSITION EXHIBITS
DAVID KLAUSNER

NUMBER        DESCRIPTION        IDENTIFIED
1    Notice of Deposition,        10
     dated May 13, 2002,
     four pages

2    Expert Report by David       10
     Klausner, dated April 26,
     2002, with attachments,
     18 pages

3    Litigation Testimony         18
     Experience of David Klausner,
     Bates Nos. A04264 through
     A04266, three pages

4    FSA 98.0775, one page        25

5    Handwritten document,        80
     one page

6    Handwritten document,        81
     one page

254

DEPOSITION EXHIBITS
DAVID KLAUSNER

NUMBER        DESCRIPTION        IDENTIFIED
12   Draft Expert Report,        220
     Bates Nos. A041291 through
     A041293, three pages

13   Draft Expert Report,        224
     Bates Nos. A041294 through
     A041296, three pages

14   Draft Expert Report,        225
     Bates Nos. A041297 through
     A041305, nine pages

15   Copies of screen shots,     233
     Bates No. A041308 through
     A041345, 37 pages

256

# TAB 25

1

```
 1        IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
 2
          CASE NO.  01-120-CIV-GOLD/SIMONTON
 3
 4   NATIONAL ASSOCIATION FOR THE
     ADVANCEMENT OF COLORED PEOPLE, INC.,
 5   by its FLORIDA STATE CONFERENCE OF
     BRANCHES, et al.,
 6
              Plaintiffs,
 7   vs.
 8   KATHERINE HARRIS, Secretary of
     Florida, et al.,
 9
              Defendants,
10   _____/
11
12
13
14        DEPOSITION OF PLACIDE DOSSOUS
15
16
17
          MONDAY, JANUARY 28TH, 2002
18        600 SOUTH ANDREWS AVENUE, SUITE 200
            FORT LAUDERDALE, FLORIDA
19           4:30 p.m. - 6:20 p.m.
20
21
22
23
24
25
```

3

```
 1
 2              INDEX
 3   WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
     PLACIDE DOSSOUS
 4
     BY MS. NORRIS-WEEKS  4        92
 5   MR. MAC INNES        49
     BY MR. EHRLICH       67
 6   BY MR. CIRULLO       78
     BY MR. TINKLER       81
 7   BY MR. HARVEY        82
     BY MR. WHITE         91
 8   BY MS. DIXON         97
 9
10
11
12
13
14            EXHIBITS
15   DEFENDANT'S            FOR IDENTIFICATION
16   A     DRIVER'S LICENCE       PAGE 100
     B     VOTER'S REGISTRATION CARD  PAGE 100
17   C     DECLARATION            PAGE 100
18
19
20
21
22
23
24
25
```

2

```
 1   APPEARANCES:
 2   THE ADVANCEMENT PROJECT.
     BY: MONIQUE L. DIXON, ESQUIRE.
 3   APPEARING ON BEHALF OF THE PLAINTIFFS.
 4
     LAW OFFICES OF BURNADETTE NORRIS-WEEKS, ESQUIRE.
 5   BY: BURNADETTE NORRIS-WEEKS, ESQUIRE.
     APPEARING ON BEHALF OF BROWARD COUNTY SUPERVISOR
 6   OF ELECTIONS.
 7
     STEEL, HECTOR & DAVIS, LLP.
 8   BY: WALTER JAMES HARVEY, ESQUIRE.
     APPEARING ON BEHALF OF KATHERINE HARRIS and
 9   CLAY ROBERTS, DIRECTOR OF FLORIDA DIVISION OF
     ELECTIONS.
10
11   DADE COUNTY ATTORNEY'S OFFICE.
12   BY: JEFFREY P. EHRLICH, ESQUIRE.
     APPEARING ON BEHALF OF MIAMI-DADE COUNTY, SUPERVISOR
     OF ELECTIONS, DAVID LEAHY.
13
14   GOREN, CHEROF, DOODY & EZROL, P.A.
     BY: MICHAEL CIRULLO, ESQUIRE.
15   APPEARING ON BEHALF OF ORANGE COUNTY, SUPERVISOR
     OF ELECTIONS, WILLIAM COWLES.
16
17   ADORNO & ZEDER, P.A.
     BY: THOMAS W. WHITE, ESQUIRE.
18   APPEARING ON BEHALF OF CHOICEPOINT, INC.
19
     ATTORNEY GENERAL'S OFFICE.
20   BY: DOUGLAS B. MAC INNIS, ESQUIRE.
     APPEARING ON BEHALF OF FRED DICKINSON,
21   FLORIDA DEPARTMENT OF HIGHWAY SAFETY & MOTOR
     VEHICLES and KATHLEEN KEARNEY, SECRETARY
22   OF THE FLORIDA DEPARTMENT OF CHILDREN & FAMILIES.
23
     HILLSBOROUGH COUNTY ATTORNEY'S OFFICE.
24   BY: KENNETH TINKLER, ESQUIRE.
     APPEARING ON BEHALF OF HILLSBOROUGH
25   COUNTY, SUPERVISOR OF ELECTIONS, PAM IORIO.
```

4

```
 1        Deposition of PLACIDE DOSSOUS, taken
 2   before VALERIE LEHTO, Court Reporter/Registered
 3   Professional Reporter and Notary Public in and
 4   for the State of Florida at Large, in the above
 5   cause.
 6
 7        ------------
 8
 9   Thereupon,
10
11        PLACIDE DOSSOUS
12   having been first duly sworn or affirmed, was
13   examined and testified as follows:
14
15        DIRECT EXAMINATION
16
17   BY MS. NORRIS-WEEKS:
18      Q.  Please state your name for the record.
19      A.  My name is Placide Dossous.
20      Q.  Placide Dossous?
21      A.  Yes.
22      Q.  Mr. Dossous, I am Burnadette
23   Norris-Weeks.  I represent the Broward County
24   Supervisor of Elections.
25          This is a deposition to gain
```

1 (Pages 1 to 4)

5

1  information that you may have regarding the
2  November 7th, 2000 election.
3      This deposition is not to trick you in
4  any way or confuse you or harass you.
5      If there are questions that I ask you
6  and you want me to repeat them because you don't
7  understand, please feel free to do so, I'll be
8  happy to repeat it.
9      If you answer a question, I will assume
10  that you understood the question.  Is that fair?
11      A.  Yes.
12      Q.  Okay.
13      Please say yes or no when I ask you a
14  question, because the court reporter can't
15  transcribe hu-huh or uh-huh, those kind of
16  things.  Additionally, don't nod your head yes or
17  no, because she won't be able to take that down
18  either.
19      Wait until I finish my questions, if
20  you would, before you answer them so that we have
21  a clear record at the end of the deposition.
22      Have you understood everything I've
23  just said?
24      A.  Yes, ma'am.
25      Q.  Okay, have you been known by any other

6

1  names?
2      A.  No.
3      Q.  Have you ever had your deposition taken
4  before?
5      A.  This is the first time.
6      Q.  What is your current address?
7      A.  7686 Plantation Boulevard in Miramar.
8      Q.  Plantation Boulevard?
9      A.  Yes, in Miramar.
10      Q.  How long have you lived at that
11  address?
12      A.  Oh, for about three years.
13      Q.  Where were you living prior to that
14  time?
15      A.  14923 Northeast 12th Avenue in Miami.
16      Q.  Okay, now this Plantation address, is
17  that where you were living in November of 2000?
18      A.  Yes, ma'am.
19      Q.  Do you have with you your driver's
20  license?
21      A.  Yes, ma'am.
22      Q.  May I see it, please.
23      And while you're taking that out, if
24  you have your voter's registration card, I'd like
25  to see that as well.

7

1      A.  Okay.  Here you go.
2      Q.  Are you married?
3      A.  Yes, ma'am.
4      Q.  Who are you married to?
5      A.  I'm married to my wife Marie Carmel
6  Dossous.
7      Q.  Marie?
8      A.  Marie, Carmel.
9      Q.  Did you graduate from high school?
10      A.  Yes, ma'am.
11      Q.  And where did you graduate?
12      A.  When I was in the military I had a GED
13  done.
14      Q.  Okay.
15      A.  So I wasn't a graduate in school.
16      Q.  GED?
17      A.  GED.
18      Q.  Okay, and when were you in the
19  military?
20      A.  From 1971 to '75.
21      Q.  All right, have you attended any
22  college courses since then?
23      A.  Yes.  In 1974 in Miami Dade.
24      Q.  Miami Dade Community College?
25      A.  Yes.

8

1      Q.  Did you graduate from there?
2      A.  No.
3      Q.  Have you attended any other college
4  courses other than your schooling at Miami Dade?
5      A.  No.
6      Q.  What do you do for a living?
7      A.  I was working as a private
8  investigator.
9      Q.  As a park investigator?
10      A.  Private investigator.
11      Q.  Private investigator.
12      Okay, and where did you work?
13      A.  I worked for Pinkinton and I worked for
14  some of the investigators, private, like John
15  Main, and I worked with Tony, I worked with
16  Owenstein, Owenstein.
17      Q.  Okay, let me back up a second.
18      Now, the first place that you said you
19  worked at, have you done all of these things
20  within the last three years, roughly?
21      A.  No.
22      Q.  Okay, let's just talk about since
23  January of 1999.  What jobs have you had since
24  then?
25      A.  None so far.

2 (Pages 5 to 8)

9

1    Q. Since 1999 you haven't worked?
2    A. The only job I do so far it was like a
3  driver, as a driver.
4    Q. A driver?
5       What kind of driver?
6    A. A bus driver.
7    Q. What company did you drive for?
8    A. It was a woman's club on Broward
9  Boulevard.
10    Q. A woman's club?
11    A. I forget the name of it. It was
12  Northeast, Northeastern Women's Group.
13       I didn't stay too long. I stayed there
14  for about three months.
15    Q. That's not the Northeastern Stars or
16  anything like that?
17    A. No.
18    Q. Northeastern Women's Group?
19    A. Women's Club.
20    Q. And what kind of club is that?
21    A. It's like an old age people. Usually I
22  used to go pick them up from home and take them
23  to the place to spend a day and take them home,
24  but I was working part-time, that's why I didn't
25  stay too long.

10

1    Q. Now, you mentioned that you weren't
2  doing that too long, so how long did you do that?
3    A. About three months.
4    Q. Three months? And that was in 1999?
5    A. No. That was in 2001.
6    Q. What three months would that have
7  covered?
8    A. I would say, let me see, somewhere
9  around April, 2001, April, 2001 to like April,
10  March --
11    Q. July?
12    A. Around July.
13    Q. So from April to July of 2001, you
14  worked for the women's club?
15    A. Right.
16    Q. Any jobs since then?
17    A. No.
18    Q. Okay, and that's the last job you've
19  had.
20       Have you been self-employed since then?
21    A. I had an affiliation with Quick Star.
22    Q. What kind of company is that?
23    A. That's like an Amway, Amway when you
24  order things that you can order some stuff in big
25  quantity, then we sell them, but --

11

1    Q. Were you going to give me a card or
2  something?
3       I was curious.
4    A. I had a card but it expired, that's why
5  I didn't bring it.
6       MS. DIXON: He was putting his driver's
7  license back in.
8       MS. NORRIS-WEEKS: Actually I'll need
9  your driver's license and your voter's
10  registration card, if you don't mind. We
11  want to make a copy of that for the
12  deposition.
13       THE WITNESS: Here you go.
14  BY MS. NORRIS-WEEKS:
15    Q. You said you worked with Quick Star.
16  Any other positions since then?
17    A. No. Quick Star is something that I was
18  trying because I heard so many things about it,
19  like you could go on your own being an
20  independent business owner, the hours are ideal,
21  but for some reason like I had to send some stuff
22  to Haiti to where I'm from, but the way Haiti is
23  I didn't want to take a chance selling things
24  over there and not for me to be able to get my
25  money in American money, so that's why I didn't

12

1  work with it.
2    Q. Now, I notice that you have -- Or maybe
3  I should back up a second.
4       Do you have a commercial driver's
5  license?
6    A. That's what it is.
7    Q. And have you driven for any companies
8  with this commercial driver's license other than
9  the Northeast Women's Club?
10    A. Not lately. I've been driving since I
11  was in the military back in 19 - since 1975 I
12  used to drive a tractor trailer, those kind of
13  things, but until I went to school in loss
14  prevention that's when I became a private
15  investigator.
16    Q. What's your source of income?
17    A. Mostly from my wife right now and some
18  stuff that I had that my family left for me in
19  Haiti which I'm dealing with.
20    Q. What does your wife do?
21    A. My wife is a secretary.
22    Q. And where does she work?
23    A. She worked in the medical - medical
24  things. She's translating at the same time. Not
25  only she be in, I would say -- She'd be

13

1  establishing appointments for doctors but also at
2  the same time she would be translating from
3  French to English to doctors.
4      Q.  So she does translations, and does she
5  set up IME's, is that what it is, independent
6  medical examinations, perhaps?
7      A.  I don't know exactly what.  I think she
8  just is keeping in contact, you know, with the
9  clients for the doctors.
10     Q.  Are you a U.S. citizen?
11     A.  Yes, ma'am.
12     Q.  You mentioned that you were from Haiti.
13     A.  Uh-huh.  (Affirmative response).
14     Q.  So I imagine you've done everything you
15 need to do to become a U.S. citizen?
16     A.  I became a U.S. citizen while I was in
17 the U.S. Army.
18     Q.  That would make sense.
19         And what year would that have been?
20     A.  1972.
21     Q.  Did you review any documents in
22 preparation for your deposition here today?
23     A.  Some documents that my lawyer sent for
24 me, in other words, for my deposition for my
25 lawyers, that's the kind of paperwork that I

14

1  worked with.
2      Q.  All right, did you by any chance have
3  an opportunity to review this declaration?
4      A.  Yes, declaration.
5      Q.  With your name on it?
6         Other than your attorneys, did you
7  speak with anyone in preparation for your
8  deposition today?
9      A.  No.
10     Q.  How did you become a Plaintiff in this
11 lawsuit?
12     A.  Well, after the incident happened after
13 the election and I was talking to some friends
14 about what happened, and among the Haitians there
15 was a lot of them, also they was talking about
16 what happened, and I heard some on the radio and
17 some directly, and then I was telling them my
18 experience too, the first time I went to vote and
19 I didn't get a chance to vote, neither me, my
20 wife, both of us didn't get a chance to vote.  My
21 son just turned eighteen, he was looking forward
22 to vote too and he didn't get a chance to vote,
23 so as we was talking about it, so I heard that
24 the NAACP was having some discussion, they said
25 they were going to do something about it, so

15

1  somebody contacted me, I don't remember who it
2  was, and I get involved.
3      Q.  What is your son's name?
4      A.  Kenneth.
5      Q.  Kenneth Dossous?
6      A.  Dossous.
7      Q.  Dossous.
8         How old is he?
9      A.  Now he's twenty.  He just turned
10 twenty.
11     Q.  Does he live here in Broward County?
12     A.  The same place with me.
13     Q.  You mentioned that your wife didn't get
14 a chance to vote as well, that was your
15 statement.  Do you know why your wife and your
16 son were not also parties to this lawsuit?
17     A.  Well, I have a feeling -- My wife could
18 be in one, but since she was busy in her work and
19 she's depending on her work since I'm not
20 working, so we both could not afford to do what
21 I'm doing right now.
22     Q.  Have you been declared disabled in any
23 way?
24     A.  No.
25     Q.  So you can work?

16

1      A.  I can, sure.
2      Q.  Okay.
3         When did you first register to vote in
4  Broward County?
5      A.  Somewhere around maybe about five or
6  six months before the election in 2001.
7      Q.  Okay, I'm going to come back to that in
8  just a second.
9         You mentioned that you had heard about
10 the lawsuit or about things that went on
11 regarding the 2000, November election --
12     A.  The election.
13     Q.  -- and you said there was some talk in
14 the Haitian community about events that had
15 happened.  I'm assuming people not being able to
16 vote, is that what you're referring to?
17     A.  Yes.
18     Q.  Are there particular people that you
19 came in contact with that told you they were not
20 able to vote on November 7th other than your son
21 and your mother and your wife?
22     A.  When I went to vote, first of all, in
23 two places that I went, and I saw like maybe
24 altogether about ten people that had just about
25 the same problem that I had, that they couldn't

4 (Pages 13 to 16)

17

```
 1   find their name on the list, and then most of
 2   them, like some of them were Haitian but the
 3   majority of them was Black, and I believe there
 4   was one White guy that was in the last place I
 5   went who didn't get a chance to vote.
 6       Q.  Okay, now where did you go?
 7       A.  Okay, first I went to the Korean
 8   church, that was the place I was supposed to go
 9   to lastly, and then I went to Oak Grove on 159th
10   Street in Miami. I thought my name could have
11   been there, too. My name wasn't there. So
12   finally when I went to those two places, those
13   are the only two places that I thought my name
14   should be on, they said it wasn't there, then I
15   come back home in Broward.
16       Q.  Okay.
17       A.  So when I was home in Broward at 10:00
18   in the morning there was a lady calling me, and
19   when I picked up the phone I heard may I speak to
20   Placide Dossous? I said speaking. And she said,
21   well, I'm calling you to come out to vote because
22   we need your vote. I said, ma'am, I went out two
23   places already and tried to vote and they
24   couldn't find my name, so I don't know what
25   you're talking about. If you say come out to
```

18

```
 1   vote, where do you want me to come? She said I
 2   want you to come to Sheridan because your name is
 3   there. I said where? And I got a pen and she
 4   said Sheridan Vocational School on Sheridan
 5   Street. I said are you sure? She said yes.
 6   Then I said okay, and I was glad to know that I
 7   found a place to vote.
 8       Q.  Now, who was this woman who called you?
 9       A.  She didn't say her name. She didn't
10   say. I didn't ask her who she was either.
11       Q.  Did she say what organization she was
12   calling from?
13       A.  She didn't say. She just said she's
14   just calling people to make them come out to
15   vote, and I thought maybe I was lucky to find
16   somebody to finally reach me telling me where to
17   vote.
18       Q.  All right, you mentioned that the first
19   places that you had gone, I'm assuming before
20   10:00 a.m. that morning --
21       A.  Yes, that was a Korean church, around
22   6:30, 7:00 in the morning.
23       Q.  Now, when you went to the Korean
24   church, do you know who you came in contact with
25   in particular?
```

19

```
 1       A.  There was like about five old ladies --
 2   There was one guy and five old ladies, so I had
 3   to go in front of all of them looking on the list
 4   to see if they could find my name. They looked
 5   under P, they couldn't find it, they looked under
 6   D, they couldn't find it. They looked for my
 7   wife. My wife was with me at the time. They
 8   couldn't find none of us.
 9       Q.  Did they send you to the other place
10   that you --
11       A.  No, they didn't send us. They said
12   they couldn't find it. We stayed there and they
13   tried to call to find out, you know, what
14   happened and they couldn't get through from
15   there, so when I realized that I was losing time
16   I said to my wife maybe let's go to Oak Grove
17   since, you know, they had at one time sent us
18   some cards saying that we were supposed to go to
19   Oak Grove.
20           So when I went to Oak Grove they looked
21   on the list too and they didn't find my name
22   either.
23       Q.  Why did you receive cards that said
24   that you would have voted at Oak Grove?
25       A.  This is something that still puzzles
```

20

```
 1   me, because I was living at the same address,
 2   14923 N.E. 12th Avenue and then at one time I was
 3   supposed to go to the Korean church that was the
 4   first place I was supposed to go, and the second
 5   time I was supposed to go to Oak Grove.
 6           I don't understand if one place had to
 7   be closed, and both of them was working.
 8       Q.  Now, after you went home and this
 9   mystery person, for lack of a better term, called
10   you and told you to go to --
11       A.  To Sheridan.
12       Q.  To Sheridan Vocational School; is that
13   right?
14       A.  Yes.
15       Q.  Did you go?
16       A.  Yes. At that time I went by myself.
17       Q.  You went by yourself?
18       A.  Because my son already went to school
19   and my wife already was at work and it was like
20   10:00, so when I got there I said I'm going to go
21   first then call my wife, and since my wife is
22   getting off at 3:30 I know she would have plenty
23   of time for her to come and vote, too.
24           So when I got there and they couldn't
25   find my name, then I stayed there for about two
```

5 (Pages 17 to 20)

21

1   hours. I left there, it was after 12:00 when I
2   left there. There was like forty people was
3   standing next to me waiting for the same thing
4   that I was waiting for, this guy to get through
5   to the supervisor. He said don't worry about it,
6   once I get through to the supervisor the
7   supervisor will give us a number which we can put
8   down for you and allow you to vote, and I said,
9   okay, even though my name wasn't on the list, but
10  since the guy told me that he's waiting for one
11  number I said I had a chance to vote, and I
12  wanted to vote so bad.
13       Q. Now, why would you think that you could
14  have gone to a place in Broward? Had you
15  registered to vote in Broward at that time?
16       A. When I went and changed my license.
17       Q. Five to six months prior to, you said?
18       A. Yes.
19          As a matter of fact, when I went there
20  I had an operator's license at that time because
21  I didn't feel like going and voting and doing my
22  CDL at the time and plus I didn't have money to
23  come up with the CDL license. The money I had
24  was for an operator's license, so when I went to
25  upgrade the operator's license to that CDL,

22

1   that's when I told them also that I want to
2   register to vote. I looked at the sign that said
3   you can register to vote at that place.
4        Q. Let me stop you for a second.
5           I see that this license says it was
6   issued in September of 2000, September 26th,
7   2000. Is that the date that you would have gone
8   in to register to vote?
9        A. I think so, yes. It might have been.
10       Q. Are you sure about that?
11       A. Because what happened is since I don't
12  have the operator's license to tell you exactly,
13  but I can remember when I went there to change my
14  operator's license to this license, I make sure I
15  tell these people again that I want to register
16  to vote.
17       Q. Okay.
18       A. So when they was giving me the license,
19  at the same time I feel like the guy already
20  registered me to vote, also.
21       Q. Now, this says it was issued on
22  September 26th of 2000. Would that have been the
23  date that you would have told them that you
24  wanted to update or register to vote?
25       A. To vote, right. Right.

23

1        Q. Now you're sure about that?
2        A. I'm quite sure, yes.
3        Q. Would that have been the first time
4   that you would have registered to vote in Broward
5   County?
6        A. Yes.
7        Q. Now, let's talk about when you went to
8   Sheridan Vocational. You mentioned that you went
9   in to Sheridan and you waited for awhile; is that
10  right?
11       A. Okay, when I went to Sheridan there was
12  a line in front of me. but I didn't mind.
13       Q. How long was the line?
14       A. It wasn't quite long. It was maybe -
15  maybe about fifty people.
16       Q. And what time was this? What time of
17  day?
18       A. It was like maybe quarter after 10:00,
19  because I left my house around 10:00, so around
20  ten, fifteen minutes to get there.
21       Q. So it sounds like you would have left
22  sometime shortly after you had the conversation
23  with the lady on the phone?
24       A. Exactly, because I was so glad, you
25  know, to find out somebody said your name is

24

1   there, just go there.
2        Q. But you hadn't received anything in the
3   mail at this point --
4        A. No.
5        Q. -- telling you that Sheridan Vocational
6   was the place that you needed to go vote?
7        A. That's the lady that gave me the
8   address, that's how come I went there. I didn't
9   even know there was a voting place there.
10       Q. When you went to Sheridan Vocational
11  you said you waited for awhile. Who was the
12  person that you spoke with there who would have
13  been getting this number for you?
14       A. Okay, there was an old man there, an
15  old man, because there was some of the ladies but
16  I think it was the only old man that was there
17  working.
18       Q. Can you describe him?
19       A. I think he would probably be somewhere
20  like I would say early sixties, probably.
21       Q. And you said he was the only man?
22       A. The only old man.
23       Q. The only old man?
24       A. He was the only old man that was there
25  besides there was some ladies, maybe about three

6 (Pages 21 to 24)

25

1   or four ladies that was there, and they were
2   sitting at the table next to a wall and he was
3   sitting at the end of the table.
4       Q.  Was there a line at this time?
5       A.  There was a line.  When I got to the
6   first - when I got at the head of the line this
7   lady there, I gave this lady my name, she
8   referred me to this lady and then I went to this
9   lady there, the lady looked on the list and
10  couldn't find my name and she referred me to this
11  lady there, and I went to this lady there, she
12  said she couldn't find my name.  I ended up to
13  the old man in the corner.  So when I went to the
14  old man, I gave the old man my old voting card
15  from Broward and I explained to this old man that
16  I just received a phone call from my house
17  telling me to come vote here.
18      Q.  You gave him your old voting card, you
19  said?
20      A.  I showed him my old voting card.
21      Q.  From Dade?
22      A.  Yes.
23      Q.  Not from Broward but from Dade?
24      A.  Right.
25          And I told him that somebody called me

26

1   from here telling me to come to vote, that's why
2   I'm coming here to vote.
3       Q.  Okay, now when you said somebody called
4   you from here, were you referring to from the
5   Sheridan Vocational?
6       A.  That's what I thought this call was
7   from because the lady didn't tell me her name or
8   anything.  She said your name is there, come to
9   vote.
10      Q.  Did you have any reason to believe
11  after November 7th of 2000 or even on that day
12  that the call was made from the Sheridan
13  Vocational Center?
14      A.  No, I never had this feeling like
15  that's where the call came from, but I was glad
16  to know that somebody called me and told me where
17  to come to vote.
18      Q.  Okay, and, again, this Sheridan Center,
19  I'm assuming, is in Hollywood; is that right?
20      A.  Yes.
21      Q.  At any time after 9/26 of 2001, did you
22  also try to change your voter's registration or
23  update your registration or register to vote?
24  Did you do anything after September 26th of 2000
25  to update any information with the Supervisor of

27

1   Elections of Broward County?
2       A.  Okay, since I know that I live in
3   Broward and I was expecting a voting card to come
4   from Broward, which I never get, and I don't
5   remember exactly where I went, it might have been
6   the post office that I went to mail some letters,
7   and I saw some application saying to apply for a
8   voter's card.  I took one and I filled it out
9   again, that's when I got this one.
10      Q.  Okay, would that have been in December
11  of 2000?
12      A.  I don't exactly remember when.
13      Q.  Was it after the November election?
14      A.  Definitely.
15      Q.  I'm going to show you your declaration
16  that you told me you had a chance to review
17  earlier.  Are you familiar with this document?
18      A.  Yes.
19      Q.  Is that your signature on page three of
20  the document?
21      A.  Yes.
22      Q.  Okay, did you have a chance to review
23  this document prior to the time that you signed
24  it?
25      A.  I was reading this.  I was reading it.

28

1       Q.  Did you have a chance to review it?
2           Who prepared this document?
3       A.  My lawyers.
4       Q.  Did you review it prior to the time
5   that you signed it after your lawyers prepared
6   it?
7       A.  Yes.
8       Q.  Did you agree with everything on the
9   document?
10      A.  Yes.
11      Q.  Did you make any changes on it at all?
12      A.  Let me see.
13          I don't remember making any changes.
14      Q.  Well, on your declaration you state
15  that you went to precinct 141 in Miami, Dade
16  County.
17          MS. DIXON:  I'm sorry, which paragraph
18      is that?
19          THE WITNESS:  141.
20          MS. NORRIS-WEEKS:  Paragraph six.
21          MS. DIXON:  Thank you.
22  BY MS. NORRIS-WEEKS:
23      Q.  To find out where you should vote.
24      A.  141 is the Korean place.
25      Q.  That's the Korean place.

7 (Pages 25 to 28)

29

1  Now, the other question I want to ask
2  you about is in September of 2000, does this
3  document refresh your memory as to whether you
4  actually changed your address at the Department
5  of Highway Safety & Motor Vehicles, paragraph
6  four of the document?
7  Earlier you said you weren't sure.
8  A. What was the question about?
9  Q. Earlier you told me that you weren't
10  sure whether you changed your address on the date
11  that this was issued in September, on the date
12  that your driver's license was issued, but your
13  declaration says that you changed your address
14  with Highway Safety Motor Vehicles on that date.
15  Does that refresh your memory?
16  A. Okay, what happened was I think two
17  times I had to go to that place, to that Motor
18  Vehicle, so I don't exactly remember if it was
19  the first one or the second one, but the last
20  time I went to that place was the time that I got
21  this license, but the first time I went there I
22  didn't get this license. I had to get just a
23  normal operator's license, that's what I had to
24  get first.
25  I went back to upgrade this operator's

30

1  license to the CDL.
2  Q. Did you let your lawyers know that you
3  weren't sure when you signed this declaration?
4  A. Not, it's not that I wasn't sure.
5  What I'm saying is this license that I
6  got, that give me plenty of time when I know that
7  I was supposed to receive my voting card to vote
8  in November of 2000, which I never did.
9  Q. Let me ask you this: Did you have a
10  chance to review your amended complaint that was
11  filed back in August of 2001?
12  A. You mean this?
13  Q. This amended complaint.
14  No, that's your declaration, but this
15  amended complaint, this document, did you have an
16  opportunity to review this?
17  A. I probably did, but some of the stuff I
18  may not understand, not all of it.
19  Q. Did you read the paragraphs that apply
20  to you that had your name in them?
21  A. Yes. Mostly, yes.
22  Q. You read those?
23  A. Yes.
24  Q. Did you read them mostly or did you
25  read them?

31

1  A. I read mine.
2  Q. The ones that applied to you you read?
3  A. Right. Right.
4  Q. Now, I'm looking at paragraph 115, and
5  I'm sure your lawyer will share it with you, and
6  in 115 the first sentence says that in September
7  of 1999 you moved from Miami, Dade County and in
8  July of 2000 you notified the Department of
9  Highway Safety & Motor Vehicles of your new
10  address. So did you notify Highway Safety &
11  Motor Vehicles of your new address in July, or
12  did you do it in September?
13  A. It must have been in July.
14  Q. Okay, so which one is right?
15  Now, this declaration that you told me
16  about --
17  A. In July it must be the first time I
18  went there, that's the first time I went there to
19  let these people know that I don't live no more
20  in Miami, that's where I live, in Broward. At
21  the same time I got me an operator's license from
22  them.
23  Q. Did you ever go into the Supervisor of
24  Elections Office to update your voter's
25  registration?

32

1  A. No.
2  Q. So the only way you would have updated
3  it would have been with the Department of Highway
4  Safety & Motor Vehicles?
5  A. That's right.
6  Q. Now, this person who called you and
7  told you to go to Sheridan Vocational School in
8  Broward, was that a female or a male?
9  A. A female.
10  Q. Did it sound like a younger person,
11  older person?
12  A. They sounded young. Sounded like maybe
13  in their late twenties, probably.
14  Q. Has this person ever called you back
15  since that time?
16  A. No.
17  We had a conversation maybe about, I
18  would say, about more than five minutes.
19  Q. Oh, you did? You spoke with them more
20  than five minutes?
21  A. Yes, because I wanted to make sure, I
22  was trying to make sure that this person knows
23  what she was saying, because I know what I've
24  been through today. I didn't want to go and have
25  the same thing happen to me again.

8 (Pages 29 to 32)

33

1    Q.  How did you make sure before you left
2  the house that you knew that this person was
3  saying was true?
4    A.  The last time I asked her, I said are
5  you sure that's the place that I'm supposed to
6  go, that my name is there, and she said, yes.
7  Placide Dossous?  Your name is there, and get a
8  pen.  I said wait a minute, let me get a pen so I
9  can write it down.  I wrote the place that she
10  told me.
11    Q.  Did she have an accent?
12    A.  No.  She sounded like a real American.
13    Q.  Well, anybody can sound like a real
14  American, right?
15    A.  I mean, she didn't have an accent to
16  me.  She didn't have no accent like I do.
17    Q.  I understand.
18        Do you believe that anyone tried to
19  intentionally prevent you from voting because
20  you're Black or a Haitian American?
21    A.  I have a feeling like something like
22  that happened.  I have a feeling.
23    Q.  Why do you have a feeling?
24    A.  Okay, it's like maybe even before the
25  election there was some guys that was -- I don't

34

1  know if you're familiar with Haitians, how they
2  are because most everybody in this country know
3  Haitians are Democrat.
4        All the Haitians said that they were
5  going to vote and they had the Haitian radios and
6  they had a party on the street saying that
7  they're going to vote.  They're trying to make
8  all the Haitians know, the ones that can vote,
9  make sure that you go over tomorrow because we
10  need your vote.  That's something that was
11  happening for about a week before the election,
12  but normally I've been here a long time.  I've
13  been voting so many times, I know I have to do my
14  duty, but the rest of the Haitians that was in
15  Miami, some of them probably that's the first
16  time they're going to vote.  Some of them maybe
17  just turned a U.S. citizen, but that day early in
18  the morning most of the Haitians that would work,
19  most of them would work, and that day it was like
20  maybe 5:00 in the morning on the radio people
21  were calling the radio saying that they already
22  formed a line, some of the places don't even open
23  yet and they started forming a line to vote.
24    Q.  So you think that because this had been
25  publicized on Haitian radio about voting and so

35

1  forth that there was a concerted effort by some
2  group or some person to prevent Haitians from
3  voting?
4    A.  Not just to prevent Haitians from
5  voting.  I had a feeling like maybe what happened
6  is like that day the Haitians, a lot of them were
7  disappointed, because to begin with, the line
8  that they was forming before they started to vote
9  there was some people coming to them and telling
10  them to be quiet or to move.  They was trying to
11  maybe give them the wrong impression, like if
12  they want to vote they have to stay quiet, and
13  some of them had Clinton and had Gore on their
14  head, they had the Al Gore T-shirt on them, so it
15  was like a big thing to them.
16    Q.  Did you formulate this opinion that you
17  believe that you were prevented from voting
18  because of your race on the day of the election
19  or after the election?
20    A.  No.
21        Okay, I didn't exactly know that there
22  was going to be anything on that election because
23  I thought maybe all the elections that I've been
24  was going to be the same like usual, like you go
25  and you vote for whoever you want to vote for and

36

1  go home, so I didn't feel like there was going to
2  be anything, but especially when I come back home
3  after 10:00, you know, like I was home by 10:00
4  they said on Haitian radio like all the Haitians
5  always do, on the same radio that we had people
6  calling the station and telling them that they
7  want to vote early in the morning and they
8  couldn't vote and the Haitian radio on WRQY, 1320
9  AM.  So it's like, you know, I heard something
10  was going on.
11    Q.  Let me ask you, you mentioned earlier
12  that some of your friends or some other Haitians
13  that you knew they were voting for the first
14  time.  When was the last time that you voted
15  prior to this November, 2000 election or that you
16  actually voted prior to the election?
17    A.  Okay, I voted for Clinton, that was my
18  last election, I was for Clinton when Clinton was
19  coming, but the second time that Clinton was
20  going to be I didn't vote for him.
21    Q.  Okay, so you would have voted in Miami,
22  Dade County when you voted?
23    A.  Yes.
24    Q.  We talked before, and I just want to
25  make sure that I'm right, that I had asked you if

9 (Pages 33 to 36)

37

1 you knew of anyone by name other than your wife
2 and son who wasn't able to vote on November 7th,
3 2000. Do you know of anyone by name, anyone that
4 you can tell me about right now?
5     A.  I know some of them by name but not
6 their full names.
7     Q.  Well, who are the people that you know?
8     A.  Okay, most of them I know are Haitians,
9 but I know them by their one name or the last
10 name or the first name.
11     Q.  Do they live near you?
12     A.  Not really, because most of them live
13 in Broward - live in Miami and I live in Broward.
14 I live in Miramar.
15     Q.  Do you know of anyone in Broward that
16 you know?
17     A.  In Broward I don't know physically
18 anyone, but I heard of some people that the same
19 thing happened to me happened to them also in
20 Broward.
21     Q.  Did you hear of anybody by name that
22 you can recall?
23     A.  I didn't really look for a name or even
24 go look for the name because I had enough for
25 myself, because this is something that I had

38

1 already feel not too happy about it because since
2 I've been in this country I always -- As far as
3 I'm concerned, I feel like when I want to do
4 something and I'm qualified to do it, I always
5 want to do it.
6     For some reason I didn't get to vote
7 and I didn't feel like happy or even want to do
8 anything until I become involved in this thing.
9     Q.  Do you have any evidence to support
10 your belief that someone or some group tried to
11 prevent from voting because you're Black?
12     A.  I don't have any evidence of that, that
13 any group in particular was trying to prevent me
14 from voting except, you know, from my experience.
15 Like I said how can this be?  Because that was
16 the first time I was going to vote when I went to
17 vote in November of 2000. I've been voting so
18 long before.
19     The first President I vote was Richard
20 Nixon. Even though he was a Republican and I was
21 a Democrat, but I kind of liked this guy so I
22 voted for him.
23     Q.  Who do you feel is responsible for your
24 not being able to vote on November the 7th, 2000,
25 or who or what?  Was there an agency or is there

39

1 a Supervisor's office?
2     A.  For some reason I have a feeling it
3 might have been in some kind of division
4 somewhere, whether it's from the election, the
5 county of election or Motor Vehicles, because the
6 guy at Motor Vehicles, first of all he let me
7 think that I was, you know, registered but how
8 come I didn't receive the card?
9     Q.  He let you think that you were
10 registered when you went?
11     A.  No.  To me it's like --
12     Q.  No.  When did he make you think that
13 you were registered?
14     A.  When he told me to sign at the same
15 time I was signing for my license.
16     Q.  Okay, is that in September of 2000?
17     A.  Yes.
18     Q.  And how did he make you think you were
19 registered?
20     A.  Because that's the last thing I was
21 talking to him and he said, okay, no problem.
22     The question that he was asking me, he
23 was questioning me regarding to vote.  He was on
24 the computer.
25     Q.  What did he say to you?

40

1     A.  First he asked me which party I would
2 like to register.  I told him Democrat.  So why
3 somebody would be asking me that when I'm
4 applying not only for my license but if I was
5 applying to get my voting thing, why would he
6 know which party I would represent?  When he
7 asked which one I was, I said I'm a Democrat.
8     Q.  Was this person a White person?
9     A.  He was a Black guy, a young guy.
10     Q.  And you believe the young Black guy was
11 trying to prevent you from voting because of your
12 race?
13     A.  No.  No, I didn't think so but I said
14 to myself -- When I be thinking how come time for
15 me to vote and I don't get my voter's card I said
16 to myself, you know, what happened?
17     Q.  Do you think he neglected to report
18 your information?
19     A.  It might have been him or it might have
20 been the computer error, because there was a time
21 I went to the place to upgrade this license, it
22 would have been before September and I had to
23 come back because the computer went down.
24     Q.  Was that in July or was that some other
25 time?

10 (Pages 37 to 40)

41

1    A.  No, that was just before September.
2    Q.  Just before September 26th when you
3  went in?
4    A.  It might have been like two weeks
5  before I get this license, because I had to come
6  back.  As a matter of fact, I stayed and I signed
7  the line and when I finally get there for this
8  license that's when they told me, oh, you can't
9  get this license because the computer in
10  Tallahassee is down.  Because when you get this
11  license the whole state has to be connected to
12  get this CDL license.  I can get other things at
13  the place that day except the CDL.
14    Q.  Okay, now why are you suing Miriam
15  Oliphant, the Broward County Supervisor of
16  Elections?
17    A.  I didn't exactly sue her.  That's
18  something that I was mentioning talking to my
19  lawyers about.  As a matter of fact, I didn't
20  even know she was the one who was the Supervisor
21  of Elections.
22       To me I feel like somebody has to be
23  responsible for it.
24    Q.  Do you know whether or not she was the
25  Supervisor of Elections in November of 2000?

42

1    A.  No, not exactly.
2    Q.  You don't know whether she was or not?
3    A.  No.
4    Q.  Prior to November 7th of 2000, did you
5  have any problems voting in the past?
6    A.  No.
7    Q.  And just so we're clear, you had never
8  tried to vote in Broward County prior to November
9  7th, 2000?
10    A.  No.
11    Q.  After November 7th, 2000, did you
12  contact the Broward Supervisor of Elections
13  Office and ask why you were not able to vote?
14    A.  No.
15    Q.  Why is that?
16    A.  Well, I didn't even know who to
17  contact, first of all, and second, I did what I
18  was supposed to do which allowed them to know
19  exactly that I need a voter card and that's why I
20  applied for this one here.
21    Q.  Since the time that you filed this
22  lawsuit, did you become aware that the last date
23  that you could have registered for the November
24  7th election was October 10th, 2000?
25    A.  No.

43

1    Q.  You never found that out?
2    A.  I don't exactly know what you're
3  talking about.
4    Q.  Do you vote in a majority African
5  American precinct?
6    A.  Kind of mixed.  Where I usually go and
7  vote, like when I go to the Korean church it's a
8  mixed place, you find all kinds of people that
9  come and go there.
10    Q.  Let me ask you about Broward County.
11       When you went into this Sheridan
12  Vocational Center or school, did there appear to
13  be different kinds of people?
14    A.  White.
15    Q.  It was primarily a White precinct?
16    A.  Yes.
17    Q.  Are you a member of the NAACP?
18    A.  No.
19    Q.  Have you ever been contacted from
20  anybody at the NAACP about this lawsuit?
21    A.  No.
22    Q.  Have you ever been a member of the
23  NAACP?
24    A.  No.
25    Q.  How did you get to the precinct on

44

1  election day?  I'm assuming you drove yourself;
2  is that right?
3    A.  You mean to Sheridan?
4    Q.  Yes.
5    A.  Yes.
6    Q.  And you went by yourself to Sheridan;
7  is that right?
8    A.  Yes.
9       When I got there, the place, it looks
10  like a cafeteria.  I think we were in the
11  cafeteria that day, at the entrance of the
12  cafeteria.
13    Q.  Okay, what kind of a problem did your
14  wife have voting?
15    A.  My wife?
16    Q.  Yes.
17    A.  She never had any problem voting just
18  like me except, you know, that day when we went
19  to vote and we couldn't vote.
20    Q.  Okay.
21       Now, did your wife also register at the
22  DMV to register to vote in Broward County?
23    A.  No.  She had registered before me.  She
24  didn't register at the same time.
25    Q.  She registered where?

11 (Pages 41 to 44)

45

1      A.  Somewhere.  I don't know, maybe through
2  the telephone -- Not the telephone.  Through the
3  post office, probably.
4      Q.  Was it in Dade County that she
5  registered?
6      A.  I don't know exactly where.
7      Q.  But you don't know whether it was in
8  Broward or Dade?
9      A.  No, I don't know, but she never
10 received a card in the mail either, same like me,
11 she never received a card either.
12     Q.  Do you know when she registered to
13 vote?
14     A.  I know she registered.  As a matter of
15 fact, my son --
16     Q.  I said do you know when she registered
17 to vote?
18         I'm sorry.
19         Do you know when she registered to
20 vote?
21     A.  No, but I know she registered way
22 before me.
23     Q.  Way before you which would have been
24 prior to September of 2000?
25     A.  Yes.

46

1      Q.  Your son, when did he try to vote for
2  the first time?
3      A.  My son didn't even think he was going
4  to vote.
5      Q.  Did he register to vote?
6      A.  Yes.
7      Q.  In Broward County?
8      A.  Uh-huh.  (Affirmative response).  I
9  think through Motor Vehicles, also.
10     Q.  When did he try to register to vote?
11     A.  I don't know exactly when, but I know
12 he did, but he never received a card either.
13     Q.  Did he go before or after you went to
14 the DMV?
15     A.  Before.
16     Q.  Is this what he told you?
17     A.  It's not what he told me, because
18 sometime I sent him to do something, because he
19 had a permit to drive and when the permit - when
20 he was going to take a driver's test for him to
21 get his license and everything, I told him that
22 at the same time register to vote, and he was so
23 anxious because everybody heard -- It's like all
24 the Haitians was getting like a team made up to
25 vote for Gore, because everybody was going for

47

1  Gore.  We even said that on the radio because
2  everybody was going for Gore, but the Haitians
3  happened to be frustrated.  Most of them didn't
4  get a chance to vote.
5      Q.  Now, you mentioned on your declaration
6  in the first paragraph that you understand your
7  role and responsibilities as a class
8  representative.  What is your role as a class
9  representative as far as you understand it?
10     A.  Well, I know that I'll be working
11 closely with my lawyers, you know, and talk about
12 what happened and that I was supposed to be
13 voting and I didn't vote, and I know that I'm
14 responsible to vote and for some reason I didn't
15 get to vote.
16     Q.  And what class of people are you
17 representing?
18     A.  I represent myself and maybe some other
19 people that were supposed to vote and didn't get
20 a chance to vote.
21     Q.  What relief are you seeking as a result
22 of the lawsuit?
23     A.  That's a good question, and I know
24 exactly, you know, what happened to me that day,
25 that November, 2000, that's something I wish

48

1  never happened again, and to me it's like the
2  United States is so far up in technology and
3  everything and to me this is unbelievable, like a
4  big country, such a country like the United
5  States for something small like that.
6      Q.  Okay, so what would you like to see
7  happen?  What relief are you seeking as a result
8  of filing this lawsuit?
9      A.  For myself I would like, you know, for
10 something to be more precise as far as voting is
11 concerned.  Like if I go to vote, maybe I
12 probably could have registered to vote and for
13 some reason one week before the election or maybe
14 two days or maybe the same day before the
15 election something could happen to my license or
16 my wallet, then what if I lost my wallet and I
17 lost my vote card?  So does that mean when I get
18 there just because I don't have a vote card to
19 show I'm an American citizen, would that be I
20 can't vote?
21         I would like for them to have something
22 better for when I give them any other kind of
23 identification, my passport, anything, for them
24 to allow me to vote.
25     Q.  Okay.

12 (Pages 45 to 48)

49

1    A.  That's what I'm looking for, something
2  much easier.
3        And I don't have any problem with the
4  ballots, but I know a lot of Haitians had a lot
5  of problem with them, too.  Some of them they had
6  their vote thrown away just because they was
7  voting the wrong way.  They didn't know exactly
8  what to do.
9        Complication.
10       MS. NORRIS-WEEKS:  Okay, thank you.
11       That's all the questions I have right
12  now.
13
14       CROSS EXAMINATION
15
16  BY MR. MAC INNES:
17    Q.  Mr. Dossous, my name is Doug Mac Innes
18  and I represent the Department of Children &
19  Families and the Department of Highway Safety &
20  Motor Vehicles.
21       Let's go back to when you were in the
22  Army.
23    A.  Yes.
24    Q.  And you said those years were when?
25    A.  Okay, when I went to the Army I went

50

1  there two times.  I went to the Army from '71,
2  January, '71 to January, '73 and right after
3  January, '73 I come here to Florida and then I
4  was going at that time to Miami Dade Community
5  College, downtown campus, and then before the
6  year is over maybe I didn't feel like, you know,
7  being outside since I've been already accustomed
8  to discipline and I find people outside so
9  undisciplined, and for me to be among them being
10  so undisciplined I didn't feel like staying
11  anymore outside.  I decided to go back to the
12  Army in 1974.
13    Q.  What month?
14    A.  I think it was, April, '74.
15    Q.  And you stayed in until when?
16    A.  I stayed there until -- It was until
17  '75, April, '75 and at that time I went to
18  Germany.  I stayed in Germany.  But the reason I
19  didn't stay longer is because the guy that when I
20  told him that I want to go back to the service
21  but not to be under the same MOS that I was
22  before.  He said the only way I can promise you
23  that I'm going to change your MOS, you have to
24  join the Army back first, then I will be in the
25  same MOS that I was in the Infantry, then you can

51

1  apply to change your MOS.
2        So over a year in the service and my
3  MOS, nobody feel like they will change my MOS and
4  they would have kept me forever in the Infantry,
5  I said in that case leave me back out because
6  this guy told me after one year if they don't
7  change my MOS, that's how come I went back out,
8  the same way.
9    Q.  And you became a U.S. citizen when?
10    A.  Since 1972.  That was the first time I
11  was in the service.
12    Q.  Were you naturalized?
13    A.  Yes, in Alabama.  Montgomery, Alabama.
14    Q.  And you have a naturalization
15  certificate?
16    A.  I had one.  I lost it.
17    Q.  Any idea how you lost it?
18    A.  How I lost it?
19    Q.  Yes.
20    A.  Okay, I had Army papers with me at the
21  time and I had a briefcase in the back of my car
22  and somebody stole my car with everything that I
23  had, and at that time the reason why it was in my
24  car because I was looking for a job and I had all
25  my papers with me, so when they stole the car I

52

1  lost all these things.
2    Q.  Have you tried to get another copy of
3  it?
4    A.  Yes, I tried, but I never did.  I got
5  some copies.  Not copies of the certificate, but
6  I had some papers from the people saying that,
7  yes, you are a U.S. citizen.  I had some
8  congressman from Washington sending me letters
9  saying congratulations, you know, on becoming a
10  U.S. citizen, all those things, and I had some
11  other papers saying the same thing.  But I know
12  exactly it was December, 1972, Montgomery,
13  Alabama.
14    Q.  You were a professional driver, at
15  least, for some time?
16    A.  Yes.
17    Q.  Did you have any DUI convictions?
18    A.  Yes.
19    Q.  When?
20    A.  That was somewhere back in 1994.  I
21  believe it was '94, '93 or '94, December.
22    Q.  December?
23    A.  Uh-huh.  (Affirmative response.)
24    Q.  How many do you have?
25    A.  That was the second one, which was the

13 (Pages 49 to 52)

53

1 last one.
2     Q. And the one before that was when?
3     A. I think it was maybe -- I don't exactly
4 remember. I don't remember. It must have been
5 three, four years before.
6     Q. In the eighties sometime?
7     A. In the eighties.
8     Q. And that was your first one?
9     A. Yes.
10     Q. Were either of these felony
11 convictions?
12     A. No.
13     Q. Do you have any felony convictions?
14     A. No, sir.
15     Q. When did you first register to vote in
16 the United States?
17     A. In 1973.
18     Q. And where did you register?
19     A. Here in Miami, because after I left the
20 Army that's where I came.
21     Q. And you indicated earlier that you had
22 voted a lot.
23     A. Yes.
24     Q. Can you give me your voting history.
25 Did you vote in every general election since '73?

54

1     A. Mostly, except some of them, like if
2 they be having some election for county, not just
3 that I don't get involved, maybe my activity
4 sometime, you know, might have allowed me to, but
5 never like a Presidential Election, I always vote
6 for a Presidential Election.
7     Q. So since 1973 you voted in every
8 Presidential Election?
9     A. Yes, mostly, except for Clinton. I
10 didn't vote for him the last time.
11     Q. Okay, I didn't understand if you meant
12 you didn't vote for Bill Clinton personally or
13 you didn't vote in that election.
14     A. I didn't vote at all.
15     Q. That was 1996?
16     A. Yes.
17     Q. The second time?
18     A. Right.
19     Q. So you voted in every Presidential
20 Election except 1996?
21     A. Mostly. When I say mostly, I might
22 have skipped one.
23     Q. Did you vote in the primaries?
24     A. What is that?
25     Q. The election before the election.

55

1     A. There are a lot of things in the United
2 States, it sounds funny, but there are a lot of
3 things in the United States that has been
4 happening and I don't really get myself involved.
5 I only get myself involved in things I want to
6 get myself involved. I don't get myself involved
7 in everything that is happening.
8     Like for some reason there may be an
9 election, everybody is talking about the election
10 they're going to vote, to me it just don't have
11 any big meaning, significance to me. I just stay
12 home. I always feel free in the United States,
13 free to vote when I want to vote or if I don't
14 want to vote I just don't vote.
15     Q. Now, let's talk about the Department of
16 Highway Safety & Motor Vehicles office that you
17 visited. I'm still a little fuzzy on when and
18 all that.
19     Did you always go to the same DMV
20 office?
21     A. No.
22     Q. No?
23     All right.
24     A. That was the first time going to the
25 DMV since it wasn't that far from my house and

56

1 since, you know, it's been advertising that you
2 could do that through DMV, because there was a
3 time you couldn't do that through DMV.
4     Q. Right.
5     A. Most of the time it was the post
6 office.
7     Q. All right, so when was the first time
8 that you went into a DMV office to attempt to
9 register to vote?
10     A. That was the time that I went there.
11 That was just the last time I went there.
12     Q. September 26th, 2000?
13     A. Yes.
14     Q. So on September 26th of 2000, that was
15 the only time you applied to register to vote at
16 a DMV office; is that correct?
17     A. Yes.
18     Q. Okay, but did you go to a DMV office
19 sometime before then to conduct other DMV
20 business but not register to vote?
21     A. Well, let's see.
22     There was a DMV one time, I think that
23 was the first time I had gotten my DUI -- I had a
24 DUI at one time and then at that time I told the
25 judge that I got to have -- Because my license

14 (Pages 53 to 56)

ESQUIRE DEPOSITION SERVICES (954) 331-4400

57

1   was suspended for that DUI, and when I tell him
2   that I need to have a license to go to work, at
3   that time I used to work as a professional
4   driver, so they allowed me to go to a DMV
5   somewhere in Hialeah, in Miami, I had to go one
6   time, and that was the only time that I went to
7   conduct any business with DMV, it was about
8   getting that license back.
9       Q.   Well, then anytime, is this correct,
10  that anytime you visited a DMV office other than
11  September 26th, 2000, you did not attempt to
12  vote, attempt to register to vote; is that
13  correct?
14      A.   If I can understand you correctly, is
15  that you want me to tell you if I ever registered
16  at any DMV before?
17      Q.   Yes.
18      A.   No, I didn't.
19      Q.   Now, the DMV office that you went to on
20  September 26th, 2000, was that the Pembroke Pines
21  office?
22      A.   Yes.  That's the same as I got my
23  license from.
24      Q.   And do you recall who waited on you
25  that day?

58

1       A.   Who waited on me?
2       Q.   Yes.
3       A.   I don't understand what you mean
4   waiting on me.
5            Who served me?
6       Q.   Who served you?
7       A.   A young guy, a young Black man.
8       Q.   A young Black man?
9       A.   About 5'3 or 5'4.
10      Q.   Could he have been Hispanic?
11      A.   No.  He looked more like an American.
12      Q.   Did he ask you if you wanted to vote,
13  register to vote?
14      A.   I was the one that asked him.
15      Q.   And did you indicate to him whether you
16  were already registered or not?
17      A.   No.
18      Q.   Did you get a voter registration card
19  in the mail from the Supervisor of Elections
20  following your September 26th, 2000 visit to the
21  DMV office?
22      A.   No, I never did.
23      Q.   Did you contact the Supervisor of
24  Elections and ask why you did not get a voter
25  registration card?

59

1       A.   No, I didn't.
2       Q.   Why didn't you?
3       A.   Well, because at the time I was mostly
4   looking for my voting card was before the
5   election.  Since the election passed I didn't get
6   it, so to me if I was going to get it later it
7   didn't mean that much to me anymore since I
8   missed the big thing.
9       Q.   Tell me about your discussion with the
10  young Black man at the Pembroke Pines DMV office
11  on September 26th, 2000.  What do you recall
12  about that discussion?
13      A.   There wasn't really a discussion.  It
14  was like something it was time for him to serve
15  me for when I come, not only is he going to
16  serve me with my license but at the same time I
17  told him that I want to use this opportunity to
18  register to vote and he said, okay, no problem.
19  All the questions he was asking me, he wasn't
20  writing, he was just tapping.
21      Q.   Did he have you sign anything?
22      A.   Yes.
23      Q.   What did you sign?
24      A.   On some pad.  He just said make an X,
25  he said sign there on the pad, and when I signed

60

1   that's how come my signature get on that thing
2   from the computer.
3       Q.   All right, so it was an electronic
4   computer pad that you signed on?
5       A.   Yes.
6       Q.   Did he print out a piece of paper for
7   you to sign as well?
8       A.   I think he was - I think it was some
9   kind of receipt, a receipt that I paid for
10  everything.
11           I remember it well.
12      Q.   How many times did you sign there, once
13  or twice?
14      A.   One time.
15      Q.   You don't remember signing a piece of
16  paper?
17      A.   I think that was the one time.  It was
18  like a piece of paper that wide, it was about
19  that long and that's the only thing I signed.
20      Q.   And that's when your signature also
21  appeared on the computer screen?
22      A.   Yes.
23      Q.   Did you say that your son also
24  attempted to apply to register to vote at a DMV
25  office?

15 (Pages 57 to 60)

61

1     A.  I told him to do that, so I don't know
2   his story of about what he did or how he did it,
3   but to me he did what I told him to do.
4        I didn't go with him on that day.
5     Q.  You don't know if he actually did
6   attempt to register to vote at a DMV office?
7     A.  I never asked him this question whether
8   he tried it because I think - because usually
9   when I take him to do something he'll usually do
10   it and if I tell him to do something I say we're
11   going to the Motor Vehicle for his license and
12   everything, I told him to do everything, because
13   everybody was waiting and he was so anxious.  He
14   said this year it was the first time he was
15   voting, so I assume he must have did it.
16     Q.  So he was applying for a, what did you
17   say, a learner's permit?
18     A.  No, he had a learner's permit already,
19   so he was to go to get his license, normally his
20   license.  So he went to get his license.  I think
21   he was to make what they call a word test for
22   some reason to get his license.
23     Q.  And how old was he at that time?
24     A.  Just turned eighteen.
25     Q.  Eighteen?

62

1        Now, in your declaration you say that
2   you were denied the right to vote by the
3   Department of Motor Vehicles.  What facts do you
4   have that you were denied the right to vote by
5   the DMV?
6     A.  Okay, to me I didn't - I didn't exactly
7   say that I was denied the right to vote by the
8   Department of Motor Vehicles.  I said it might
9   have been the Department of Motor Vehicles or, I
10   don't know what they call it, the Department of
11   Elections.  For some reason my right to vote was
12   denied by either the Department of Motor Vehicles
13   or the county elections.  To me that's the kind
14   of people to me that didn't allow me to vote,
15   because I went to vote but I didn't vote.
16     Q.  So in your mind it was one or the
17   other?  It was either the DMV or the Broward
18   County Supervisor of Elections; is that correct?
19     A.  I won't say the Supervisor because I
20   didn't even know who the Supervisor was, but I
21   had a feeling that something happened that
22   stopped me from going, that was my feeling.
23     Q.  All right.
24        Well, what facts do you have that it
25   was the Department of Motor Vehicles that denied

63

1   you the right to vote?
2     A.  Okay, knowing me that's where I went to
3   register to vote, so if they didn't send my name
4   where I was supposed to vote or didn't send me a
5   card to tell me where I was supposed to vote, I
6   say that's their fault because that's where I
7   registered to vote.
8     Q.  So are you saying that that is the only
9   place that could be responsible for you not being
10   able to vote?
11     A.  I'm not going to say it's the only one
12   responsible, but since that's the place I start,
13   because I know I'm supposed to have a vote card
14   to vote and to know where to vote, especially I
15   wasn't voting in Broward before, so since that
16   was the first time I was going to do it in
17   Broward and I registered to vote, I had a feeling
18   like Motor Vehicles, that's the place normally
19   for me to register to vote, they was responsible
20   for me to know where I was supposed to vote and
21   where is my voter's card?  So if I don't get my
22   voter's card or they don't tell me where -- I got
23   my license because it was right away.
24     Q.  Well, do you know what the process is
25   for registering to vote?  Who registers you to

64

1   vote, the DMV or the Supervisor of Elections?
2     A.  I won't say the Supervisor.  I would
3   say whoever was talking to me who was there to
4   register me to vote was supposed to be the one
5   that allowed me to have all my things, but I
6   would say all my information goes through them.
7     Q.  Do you understand that when a person
8   goes into a DMV office, aren't they're doing is
9   applying to register to vote?
10     A.  That's what I did.
11     Q.  Okay, and do you understand that the
12   application leaves the DMV office and then goes
13   to the Supervisor of Elections Office?  Do you
14   understand that?
15     A.  I don't know.
16     Q.  You don't know that?
17     A.  I didn't know that.
18     Q.  Do you understand that it's the
19   Supervisor of Elections Office that makes the
20   decision about your application and not the DMV
21   office?
22     A.  I'm not quite sure about that.
23     Q.  All right, you didn't know that?
24     A.  No, because if it was who you said that
25   was supposed to be responsible for me to vote, I

16 (Pages 61 to 64)

65

1  was so anxious to vote on that election I
2  definitely - I had plenty of time to go exactly
3  to that person who was responsible and for me to
4  do what I was supposed to do in order for me to
5  vote that day, but since I thought I had done
6  already what I was supposed to do to vote, so all
7  I was doing was just waiting for my voter card to
8  come.
9      Q.  Well, if I told you that the DMV cannot
10  register you to vote, they don't have the
11  ability --
12      MS. NORRIS-WEEKS:  Objection, assumes
13  facts not in evidence.
14  BY MR. MAC INNES:
15      Q.  If I told you that the DMV does not
16  have the ability to register you to vote, would
17  that change your opinion about whose responsible
18  for denying you the right to vote on November
19  7th, 2000?
20      MS. NORRIS-WEEKS:  Same objection.
21      MR. EHRLICH:  Calls for speculation.
22  BY MR. MAC INNES:
23      Q.  You can answer the question.
24      A.  Well, like, okay, for instance, if I go
25  to the post office -- Let me try to explain to

66

1  you what I understand from your question.
2      If I go to the post office knowing that
3  the post office has signs posted inside that said
4  anyone who wants to register to vote, come to
5  this window, now, if I go to this window and talk
6  to a lady behind this window telling her that I
7  come to register to vote, now, after I give her
8  all the information that she asked me and had me
9  sign something that I signed, now, you mean to
10  say that when I go home I'm going to know whose
11  responsible in case I don't vote?
12      Q.  What I'm saying is that when you do
13  that, you're only applying.  You're filling out
14  an application.
15      MS. NORRIS-WEEKS:  Objection.
16      THE WITNESS:  I understand I apply,
17      yes, but how would I know who is responsible
18      except through the place that I go, that's
19      through the place I thought I was going to
20      have my voter's card come and I never
21      received it, so I said to myself what these
22      people done to me?  And I don't hold them,
23      just them responsible.  I hold whoever is in
24      charge of this whole election responsible,
25      too.

67

1      MR. MAC INNES:  No further questions.
2
3      CROSS EXAMINATION
4
5  BY MR. EHRLICH:
6      Q.  Mr. Dossous, my name is Jeff Ehrlich.
7  I'm an Assistant County Attorney from Miami, Dade
8  County.  I represent the Supervisor of Elections
9  of Miami, Dade County, David Leahy, who is also a
10  Defendant in this case.
11      You testified that you became a United
12  States citizen in December, 1972; is that right?
13      A.  Yes.
14      Q.  Are you certain about that?
15      A.  Well, one thing I know, that I was in
16  the Army at the time, and when I was in the Army
17  that's when I became a U.S. citizen, in
18  Montgomery.  I think it was the 24th of December.
19      Q.  Of 1972?
20      A.  Yes.
21      Q.  And then you first registered to vote,
22  you testified, in 1973?
23      A.  Right.
24      Q.  Is that right?
25      A.  Yes, sir.

68

1      Q.  You also testified that you remember
2  voting for Richard Nixon; is that right?
3      A.  Yes.
4      Q.  Do you remember what year that was?
5      A.  It must have been -- I don't exactly
6  remember what year it was because it's been so
7  long, I don't exactly know, but I know Nixon --
8  As a matter of fact, I wrote Nixon a letter when
9  I was in the Army.  Why I wrote him this letter?
10  Because him and I we have both the same birthday.
11  I was born on January 9th just like him.
12      I wrote him a letter.  He even sent me
13  a letter.  I lost this letter he sent me when I
14  lost my citizenship papers and everything.
15      I would show it to you.
16      Q.  Well, let's see.  Richard Nixon ran for
17  President in three elections.
18      Did you vote for him in 1960?
19      A.  No.
20      Q.  Did you vote for him in 1968?
21      A.  No.
22      Q.  Did you vote for him in 1972?
23      A.  Maybe so.
24      Q.  Would that election have occurred in
25  November of 1972?

17 (Pages 65 to 68)

69

1     A.  I don't exactly remember when, because
2 one thing I know, I was in the Army when I did
3 that and that was the first time I voted.
4     Q.  Were you a United States citizen when
5 you voted for Richard Nixon?
6     A.  Yes.
7     Q.  Were you a registered voter when you
8 voted for Richard Nixon?
9     A.  Not outside.  I was still in the Army
10 then.
11     Q.  Right, but you were a registered voter?
12     A.  I don't know if it was the same,
13 because when I was in the Army I know there was a
14 difference between a civilian and a military guy.
15     I was a military guy.
16     Q.  Well, of course.  If you're in the Army
17 you're a military guy, right?
18     A.  And the way I was voting it wasn't
19 quite the same like a civilian guy was voting.
20     Q.  How is it different?
21     A.  Because I didn't have to really go to
22 the poll where people go vote when I was there.
23 I could vote right in my company.
24     Q.  Right.  I understand.
25     In other words, you were drawing a

70

1 distinction between how people in the military
2 vote and people vote here in the United States
3 when they're not in the military.  Here you go to
4 a poll, in the military you vote in your company?
5     A.  Right.
6     Q.  But you agree you have to be a United
7 States citizen to vote?
8     A.  Sure.
9     Q.  And your testimony is that you became a
10 United States citizen sometime in December, 1972?
11     A.  I think so, yes.
12     Q.  Right.
13     You testified that you did not vote in
14 1996; is that right?
15     A.  Not for President.
16     Q.  Right.
17     Did you vote in that election, in the
18 November, 1996 general election?
19     A.  No.
20     Q.  No.
21     Did you vote in the 1998 federal
22 general election?
23     A.  No.
24     Q.  When did you first register to vote in
25 Miami, Dade County?

71

1     A.  1973.
2     Q.  Was that after you got out of the
3 military the first time?
4     A.  Yes.
5     Q.  Do you remember what month it was?
6     A.  No.
7     Q.  Do you remember what month you got out
8 of the military?
9     A.  Yes.  January, 1973.
10     Q.  Okay, so it was sometime after January
11 of '73?
12     A.  But I don't remember exactly when.
13     Q.  Okay.
14     What was your address in Miami, Dade
15 County just prior to moving to Broward County?
16     A.  Oh, I had many addresses in Miami.
17     Q.  My question is what was your address in
18 Miami, Dade County immediately prior to leaving
19 Miami, Dade County?
20     A.  14923 Northeast 12th Avenue.
21     Q.  And how long did you live at that
22 address?
23     A.  For about more than ten years.
24     Q.  Did you live at that address in 1994?
25     A.  Yes.

72

1     Q.  Where did you live previous to that
2 address, immediately prior to?
3     A.  Let me see if I can remember.
4     I think it was somewhere on 82nd Street
5 in North Miami.
6     Q.  And then you moved from the 82nd Street
7 address to the 12th Avenue; is that right?
8     A.  If I recall.
9     Q.  When you moved to the 12th Avenue
10 address, did you change your address with the
11 Miami, Dade County Supervisor of Elections?
12     A.  Yes.
13     Q.  Is it possible that that occurred on
14 July 22nd, 1994?
15     A.  I don't remember exactly.
16     Q.  Was it around that time?
17     A.  I don't know exactly.  I didn't
18 really - I didn't really go and look and to make
19 sure, to answer your question.  I know this
20 happened sometime before.
21     Q.  Could it have been around that time?
22     A.  Maybe.  I don't know.
23     At one time I was living at 7801
24 Northeast 4th Court.
25     Q.  When was that?

18 (Pages 69 to 72)

73

1    A.  Before I went to that 82nd Street I
2  told you I was at 7801 Northeast 4th Court,
3  Miami.
4    Q.  When did you move from there to the
5  North Miami address?
6    A.  That's maybe -- I stayed there --
7  That's where I got married, that's how come I
8  remember it.  That's where my son was born, too,
9  the one that is twenty years old now, that's
10  where he was born, 7801, that's where he was
11  born.  So I don't exactly remember when I moved
12  from there, but I know I spent like maybe three,
13  four years at that 7801 and then I moved to 82nd
14  Street next to it and then I moved to North
15  Miami, 14923 Northeast 12th Avenue.
16    That's the place I stayed longer in
17  Miami.
18    Q.  You mentioned that you had convictions
19  for DUI's; is that right?
20    A.  Uh-huh.  (Affirmative response).
21    Q.  None of those were felony convictions
22  you testified to, right?
23    A.  No.
24    Q.  Were you ever sentenced to any jail
25  time for any of those convictions?

74

1    A.  No.
2    Q.  Have you ever been sentenced to any
3  jail time for any conviction?
4    A.  No.
5    Q.  You moved out of Miami, Dade County in
6  1999, correct?
7    A.  Uh-huh.  (Affirmative response).
8    Q.  You don't contend that you should have
9  been able to vote in the November 7th, 2000
10  Presidential Election in Miami, Dade County, do
11  you?
12    A.  I don't --
13    MS. DIXON:  Objection to the form.
14    MR. EHRLICH:  What's wrong with the
15  form?
16    MS. DIXON:  The way you asked the
17  question.
18    MR. EHRLICH:  What's wrong with it?
19    MS. DIXON:  Double negative.  You don't
20  contend.
21    It seems unclear.  If you can just
22  clear it up the way you're rephrasing the
23  question.
24    MR. EHRLICH:  Can you repeat the
25  question, please.

75

1    (Whereupon, the requested portion of the
2  record was read back, after which the deposition
3  resumed).
4
5  BY MR. EHRLICH:
6    Q.  Mr. Dossous, do you understand that
7  question?
8    A.  If I understand you correctly, it's
9  like you asked me if I know that I was going to
10  vote in Broward even though that I was living in
11  Miami.  Is that what you said?
12    Q.  No.
13    My question is do you contend that you
14  should have been able to vote in Miami, Dade
15  County in the November, 2000 general election?
16    A.  Well, one thing I know for sure, that
17  when you move to a different county that you're
18  supposed to register to that different county, so
19  I did what I was supposed to do to vote in
20  Broward County since I moved to Broward County.
21    Q.  Right, and I'm not asking any questions
22  about what you did in order to be able to vote in
23  Broward County.  I'm just asking whether you
24  contend that you should have been able to vote in
25  Dade County even though you admittedly no longer

76

1  lived in Dade County?
2    A.  I wasn't supposed to vote in Broward -
3  in Dade County, but just to look, I just went out
4  that day because I started early that day until
5  something happened for me to have plenty of time
6  for me to vote before the vote was over that day.
7  So when I started very early, my wife starts to
8  work at 7:00 in the morning, I left my house
9  somewhere at 6:00, I got there about 6:30 in the
10  morning, enough time to vote.
11    Q.  Right.  There at the Korean
12  Presbyterian church, right?
13    A.  Right.
14    Q.  And you don't think you should have
15  been able to vote there, do you?
16    A.  Well, since that's the last place I had
17  my right to vote there, since I never received no
18  letter or no voting card from nobody telling me
19  where next to vote, so I just assumed when I went
20  there, just maybe those people there could tell
21  me where the next place that I should go.
22    Q.  Right, but you didn't expect to vote
23  there, did you?
24    A.  Not really.
25    Q.  Because you didn't live in Miami, Dade

19 (Pages 73 to 76)

77

1 County anymore?
2    A.  Yes.
3       Finally when this lady called me and
4 tell me to come to Sheridan I was relieved and
5 when she said she find my name there too, because
6 that's what I was really looking for.
7    Q.  Do you contend that David Leahy or the
8 Department of Elections from Miami, Dade County
9 did anything wrong or did anything that caused
10 you to be unable to vote in the 2000 election?
11    A.  No, I don't believe that.
12    Q.  Where did you live on December 12th,
13 1998?
14    A.  On December 12th, 1998 I was still
15 living in Miami, 14923 Northeast 12th Avenue.
16    Q.  And you had been living at that address
17 for several years, correct?
18    A.  Yes.  For more than ten years.
19    Q.  Do you remember who Richard Nixon ran
20 against in the election in which you voted for
21 him?
22    A.  I don't really remember him.  I usually
23 have a good memory, but Nixon usually was my guy.
24    Q.  Nixon was your guy because he shared
25 the same birthday?

78

1    A.  No, not only because the same birthday
2 but I had a feeling like, you know, usually I
3 believe in horoscopes, you know, and my horoscope
4 is saying that anybody in the same sign with me,
5 you don't have to be the same date, if you're a
6 Capricorn like I am, I think you have to be a
7 good guy.
8       I thought Nixon to me was a good guy
9 just being a Capricorn the same day.
10       MR. EHRLICH:  I have no further
11 questions, Mr. Dossous.
12       Thank you for your time.
13       THE WITNESS:  All right.
14 BY MR. HARVEY:
15    Q.  Mr. Dossous --
16       MR. HARVEY:  I'm sorry.  I apologize.
17       MR. CIRULLO:  It's all right.
18       MS. DIXON:  We keep skipping you?
19       MR. CIRULLO:  Yes.
20
21          CROSS EXAMINATION
22
23 BY MR. CIRULLO:
24    Q.  Mr. Dossous, my name is Mike Cirullo.
25 I represent William Cowles.  He's the Orange

79

1 County Supervisor of Elections.  He's one of the
2 Defendants in this case.
3       Just a couple of questions for you.
4       Do you understand how a County
5 Supervisor of Elections works and functions?  Do
6 you understand that the Broward County Supervisor
7 of Elections, for example, would administer
8 elections in Broward County, Florida?
9    A.  I wouldn't know exactly, exactly.  I
10 wouldn't know exactly how they function.
11    Q.  Okay, would you expect, say, for
12 example, the Broward County Supervisor of
13 Elections to be involved in elections in, say,
14 Duval County?
15    A.  I don't think so.
16    Q.  Do you know who William Cowles is?
17    A.  No, I don't.
18    Q.  Have you ever heard of him before this
19 lawsuit?
20    A.  No.
21    Q.  Have you ever resided in Orange County,
22 Florida?
23    A.  No.
24    Q.  How about your wife or your son?
25    A.  Un-hun. (Negative response).

80

1    Q.  So you've never registered to vote in
2 Orange County, Florida?
3    A.  No.
4    Q.  You've never attempted to vote?
5    A.  No.
6    Q.  Do you have any idea how William Cowles
7 administers elections in Orange County, Florida?
8    A.  I have no idea.
9    Q.  Do you contend that William Cowles did
10 anything to impair your ability to vote on
11 November 7th, 2000?
12    A.  Well, to tell you the truth, about this
13 election that happened, maybe if some of the
14 people that you just mentioned, the name that you
15 just mentioned happened to be appear in this
16 lawsuit, I have a feeling like it's not just one
17 county in Florida who happened to be involved in
18 that election, because we was talking on the
19 radio in Miami, everybody was talking about the
20 whole state.
21    Q.  So --
22    A.  The whole State of Florida.
23    Q.  Do you know if William Cowles did
24 anything to impair your ability to vote?
25    A.  I don't even know who this guy is.  I

20 (Pages 77 to 80)

81

1  don't have any business or anything to do with
2  this guy.
3      MR. CIRULLO:  I don't have anything
4  further.
5      Thank you for your time, sir.
6      THE WITNESS:  You're welcome.
7
8      CROSS EXAMINATION
9
10 BY MR. TINKLER:
11     Q.  Good evening, sir.  My name is Ken
12 Tinkler.  I'm from the Hillsborough County
13 Attorney's Office representing the Hillsborough
14 County Supervisor of Elections.
15     Just a couple of quick questions.
16     Have you ever lived in Hillsborough,
17 County, Florida?
18     A.  No.
19     Q.  Tampa, any of the cities there?
20     A.  No.
21     Q.  Do you know who Pam Iorio is?
22     A.  No.
23     Q.  Do you have any knowledge as to the
24 Hillsborough County Supervisor's Office, how they
25 do things?

82

1      A.  No, I don't.
2      MR. TINKLER:  Okay, thank you, sir.
3      THE WITNESS:  You're welcome.
4
5      CROSS EXAMINATION
6
7  BY MR. HARVEY:
8      Q.  Good afternoon.  My name is Walter
9  Harvey and I represent the Department of State
10 and the Division of Elections.
11     I just have a couple of, you know,
12 quick questions, clarification questions.
13     You indicated that you did not vote in
14 1996 in the Presidential Election, so is it fair
15 to say the last time you voted was in 1992?
16     A.  Yes.
17     Q.  Okay, that was when Clinton ran the
18 first time?
19     A.  Right.
20     Q.  And at that time you voted at the
21 Korean Presbyterian church?
22     A.  Yes.
23     Q.  Okay.
24     Now, the Korean Presbyterian church is
25 near your 7801 Northeast 4th Court address; is

83

1  that correct?
2      A.  No.  It's near 14923 Northeast 12th
3  Avenue.
4      Q.  Okay, that's near the 14923.  Okay.
5      Now, prior to that, did you vote at the
6  Korean Presbyterian church before?
7      A.  It might have been, because it's not
8  just one time I was there.  It might have been
9  two times.
10     Q.  Okay, now you indicated also that
11 you --
12     A.  Under the same address I received
13 another vote card saying that I should vote at
14 the one on 159th Street, Oak Grove, Oak Grove
15 Park.
16     Q.  And your voter registration card, was
17 that from Miami, Dade?
18     A.  From Miami, Dade.
19     Q.  Okay, do you recall when you received
20 that card?
21     A.  No.  It must have been between the time
22 that I was living there, the same address, 14923
23 Northeast 12th Avenue.
24     Q.  Okay, when you went to the Korean
25 Presbyterian church, as I understand it, that was

84

1  your first --
2      A.  Place to vote, that address.
3      Q.  Okay, and when you went to the poll
4  worker, which sort of identification did you
5  present to the poll worker?
6      A.  My vote card.
7      Q.  Your voter identification card?
8      A.  Yes, and my license.
9      Q.  And your license?
10     A.  Yes.
11     Q.  So the voter -- I'm sorry.  If I can
12 understand this correctly, the poll worker
13 received a copy of your license which is the
14 current one that we've marked as an exhibit, I
15 believe as Exhibit One to this deposition and
16 they also had, or I should say she had a copy of
17 your voter ID card?
18     A.  No, she didn't.
19     As a matter of fact, that's not even
20 the one I showed the lady.
21     Q.  You had your old voter registration
22 card?
23     A.  The old one.  It was a yellow one.
24     Q.  Do you still have that?
25     A.  I think somewhere in my house.  I will

21 (Pages 81 to 84)

85

1　look for it. I should be able to find it.
2　　Q. You presented both of them to the poll
3　worker?
4　　A. Okay, not only did I present that vote
5　card, the yellow one, too. I say this is the way
6　that I usually vote, but I showed her the address
7　on my license that I moved to Broward. I was
8　expecting to receive a new one and so I assumed
9　that somewhere over here you would be able to
10　tell me where to vote, and that's when they
11　couldn't find my name nowhere on the list.
12　　Q. Okay, but did she indicate it was
13　because she could not find your name on the list
14　or was it because of a discrepancy in the
15　addresses on your ID? In other words, did she
16　tell you it was because you no longer lived at
17　that particular address?
18　　A. Okay, first of all she said that she
19　was trying to call somebody to give me better
20　information when she could find my name, but she
21　couldn't get through. She had been trying. I
22　was waiting for her to get through to whoever she
23　was calling and she said she was calling her
24　supervisor. Two places they keep calling the
25　supervisor and they couldn't get through.

86

1　　Q. But you told the poll worker that you
2　no longer live at that address in Miami?
3　　A. Yes.
4　　Q. Okay.
5　　A. And I told her. I told her just to be
6　sure that was happening because I don't know what
7　happened, and to tell you the truth --
8　　Q. But your voter identification card
9　though, it did say that you were supposed to cast
10　your vote at Oak Grove, not at the Korean
11　Presbyterian church?
12　　A. The Korean. I said Korean.
13　　Q. You said Korean. Okay.
14　　But at one time you said you received a
15　card that said Oak Grove.
16　　A. Yes. Sometime that was where --
17　Because I had two addresses to vote. I didn't
18　know if it was the first one or the second one.
19　Both of them was in Miami, Dade but when I was
20　living at 14923 Northeast 12th Avenue I had
21　received two, because one of them was closed for
22　some reason. That's what I assumed. Maybe one
23　of them was closed, that's why they send me
24　another one, but there was a time I realized both
25　of them was working. I could never understand,

87

1　still today, I still can't understand why that
2　both of them was working and they decided to just
3　switch me to the other one.
4　　I have two, two voters cards. One is
5　green. The one that says Oak Grove is green and
6　the one that is Korean is yellow.
7　　Q. And you said the second polling place
8　you went to to cast a vote was Oak Grove?
9　　A. Yes.
10　　Q. Is that correct?
11　　A. Not to cast the vote, just to see if
12　they could find my name there since I had cards
13　saying that I was supposed to go there, too.
14　　Q. So you went to the poll worker, you
15　presented your voter identification card, the one
16　that had the Korean Presbyterian church?
17　　A. The one that said Oak Grove.
18　　Q. So you presented two voter registration
19　cards?
20　　A. Oak Grove I showed Oak Grove and Korean
21　I showed the Korean because I had both.
22　　The Korean is a yellow one, the Oak
23　Grove is a green one.
24　　Q. Depending on which polling place you're
25　at --

88

1　　A. I was looking for just somebody to
2　assist me to give me what I'm looking for, tell
3　me where to vote.
4　　Q. So you showed them your Oak Grove voter
5　identification card?
6　　A. Yes, and they looked on the list, they
7　didn't find my name and then they called. At Oak
8　Grove they didn't call.
9　　Q. Did you show them your driver's
10　license?
11　　A. Yes. Both places.
12　　Q. And you told them that you lived in
13　Miramar?
14　　A. Yes.
15　　Q. Okay.
16　　A. So that's why something is telling me
17　that something was exactly done purposely,
18　because why all this discrepancy? I never find
19　any problem voting before, and that wasn't the
20　second or third time I vote. I've been voting
21　since 1973. Of 2000 I'm finding this is really
22　simple. Why I have all this problem voting,
23　finding a place to vote?
24　　And, as a matter of fact, when the
25　state called me saying they saw my name at

22 (Pages 85 to 88)

89

1 Sheridan, when I went there I was still
2 surprised. How come they couldn't find my name
3 there?
4     Q. Okay. Okay. If I may, when you went
5 to the Oak Grove site, you did not present them
6 your Korean Presbyterian voter's card?
7     A. No.
8     Q. And it's fair to say then at the Korean
9 Presbyterian you didn't show them your Oak Grove
10 voter registration?
11     A. Yes, assuming they would have my name
12 somewhere on the list.
13        Broward didn't have my name on the
14 list, when I went to Sheridan they didn't have my
15 name on the list in Broward, they don't have my
16 name on the list in Miami. Now where do I check,
17 West Palm Beach?
18        So to me it's like, you know, there was
19 something, I don't know what it was, but there
20 was something that I feel ridiculous that day.
21     Q. All right, but you didn't live in
22 Miami, Dade County at the time. We've clarified
23 that.
24     A. No.
25     Q. And you admitted that to the poll

90

1 worker?
2     A. Yes.
3     Q. And you presented your driver's license
4 to demonstrate that fact?
5     A. As a matter of fact, if I may add, when
6 I was at the Sheridan - when I was at the
7 Sheridan, some people they was waiting for the
8 guy, that old guy to call the supervisor too and
9 couldn't get through. I saw some people who had
10 the card saying that they're supposed to be at
11 the same place, Sheridan, the new card like that,
12 and they couldn't find their name on the list and
13 they had the card.
14        MR. HARVEY: Move to strike, non
15 responsive to that second portion of the
16 answer.
17        THE WITNESS: I mean --
18        MS. NORRIS-WEEKS: Join.
19        MR. HARVEY: Thank you. Thank you.
20        MS. DIXON: Anyone else have some
21 questions?
22        MS. NORRIS-WEEKS: I just have a few.
23 You want me to go first?
24        MS. DIXON: You can go ahead.
25        MR. WHITE: Do you mind if I go first?

91

1        MS. NORRIS-WEEKS: Go ahead.
2
3           CROSS EXAMINATION
4
5 BY MR. WHITE:
6     Q. My name is Tom White. I represent
7 ChoicePoint, Incorporated, doing business as
8 Database Technologies, Incorporated, another one
9 of the Defendants in this lawsuit.
10        Just a couple of questions.
11        Do you know anything about Database
12 Technologies, Incorporated?
13     A. I just heard of them from TV.
14     Q. What did you hear about them on TV?
15     A. Just like they were supposed to be the
16 one in charge of whatever the voting thing,
17 equipment stuff, you know.
18     Q. You heard Database Technologies is in
19 charge of the voting equipment?
20     A. The one that's supposed to be somewhere
21 in Georgia?
22     Q. ChoicePoint, Incorporated is a Georgia
23 corporation.
24     A. In Georgia?
25     Q. Yes.

92

1        But if you don't mind, just let me ask
2 the questions and maybe we can get through this
3 quicker.
4        So your understanding is that Database
5 Technologies is in charge of the voting
6 equipment; is that right?
7     A. Yes, I heard that, but I don't know
8 nothing about them.
9     Q. You don't know anything about them?
10     A. Just what was on TV, that's all.
11     Q. Okay, and your understanding from the
12 television is they are in charge of the voting
13 equipment?
14     A. Yes.
15     Q. Do you know anything about ChoicePoint,
16 Incorporated?
17     A. No.
18        MR. WHITE: No further questions.
19
20           REDIRECT EXAMINATION
21
22 BY MS. NORRIS-WEEKS:
23     Q. I just have a few questions,
24 Mr. Dossous.
25        Your 12/1/2000, the vote card that you

23 (Pages 89 to 92)

93

1  would have received as a result of registering on
2  12/1/2000, where did you register to vote?
3      A. You mean to get this?
4      Q. For this one.
5      A. That was from the post office.
6      Q. Oh, at the post office. So you got the
7  form?
8      A. I just had a card, a form. I filled it
9  out and mailed it to them and I received this
10  letter.
11      Q. Okay, and when we last spoke I thought
12  that you had mentioned that the entity that you
13  felt was responsible for your not being able to
14  vote was the Department of Highway Safety & Motor
15  Vehicles, but as we went on a little bit, I think
16  you mentioned that you thought maybe that could
17  have been a shared responsibility with my client,
18  Miriam Oliphant, Broward County Supervisor of
19  Elections Office.
20          Now, what role do you think that office
21  may have had in your not being able to vote on
22  November 7th, 2000, if any?
23      A. Okay, from my understanding I had a
24  feeling saying like maybe they was trying to
25  eliminate some voters.

94

1      Q. I'm sorry?
2      A. From my understanding I thought maybe
3  there was some voters that probably some people
4  was trying to eliminate, not to vote since they
5  already know.
6      Q. Do you mean the Supervisor of Elections
7  Office?
8      A. No. What I mean -- Okay, there is an
9  election going on in Florida.
10      Q. Right.
11      A. From what I hear on the news after the
12  election and according to me who went to vote and
13  they couldn't find my name and I realize a lot of
14  other people the same thing happened to them,
15  they couldn't find their name either, I had a
16  feeling that something has to be done purposely,
17  it couldn't be a simple mistake.
18      Q. Okay, let me ask you, do you think the
19  Broward County Supervisor of Elections Office had
20  anything to do with your not being able to vote
21  on November 7th, 2000?
22      A. I wouldn't say exactly that's Broward
23  responsible for that.
24      Q. Okay, if it wasn't the Broward County
25  Supervisor of Elections Office, who do you feel

95

1  is responsible for your not being able to vote?
2      A. Maybe the whole state.
3      Q. The whole state?
4      A. Maybe.
5      Q. Okay.
6          What do you mean by that?
7      A. Well, since it's not just Miami, things
8  had happened or just in Broward things had
9  happened. I heard all the counties in Florida
10  things happening. For some reason -- I mean, for
11  example, I had some place to go to vote and they
12  stopped me from going to vote.
13      Q. Do you know who's responsible for your
14  not being able to vote in November of 2000?
15      A. I don't know exactly who, but I know it
16  must have been something arranged.
17      Q. But you don't have any evidence, do
18  you, to suggest that it was the Broward County
19  Supervisor of Elections Office?
20      A. The only evidence I have is the fact
21  that I went to three places for me to find out
22  where I really should be able to vote and nobody
23  could tell me.
24      Q. And two of those places were in Dade
25  County; is that right?

96

1      A. Two of them was in Dade County and one
2  was in Broward, where I was supposed to vote.
3      Q. And finally, you mentioned that your
4  wife, the first time we spoke you mentioned that
5  your wife went with you the morning of November
6  7th to register -- Well, to vote in Miami or to
7  find out where you were going to vote and then
8  later I think you said your wife went off to work
9  about 7:00. So which one was it? Did your wife
10  go with you or did she go off to work?
11      A. Okay, what I did, my wife, when we left
12  early she's supposed to start working at 7:00, so
13  when we got there very early the place was just
14  opened and then we was trying to find out where
15  we have to vote.
16          If they would have allowed us to vote
17  there we both would vote, but then if they
18  wouldn't allow us to vote there, tell us where to
19  vote. I would go -- I would take my wife to work
20  and then go vote, and I know about 7:00 that's
21  when the elections usually be closed, my wife
22  would have plenty of time to vote.
23          As a matter of fact, when I be home
24  finished voting I could call my wife and tell her
25  where to vote.

24 (Pages 93 to 96)

97

1     Q. Okay, let me stop you for a second now.
2     So I'm gathering from the information
3 that you're giving me now is your wife did not go
4 with you to Miami to vote that morning?
5     A. Yes, that same day.
6     Q. She did go with you?
7     A. Yes.
8     Q. And then you took her to work after
9 that?
10     A. Yes.
11     MS. NORRIS-WEEKS: That's all I have.
12 Thank you.
13     MS. DIXON: Anyone else?
14
15         CROSS EXAMINATION
16
17 BY MS. DIXON:
18     Q. You testified earlier that you lived at
19 your current address for the past three years?
20     A. Yes.
21     Q. When you moved from Miami, Dade to your
22 current address, did you change your address at
23 the post office?
24     MR. EHRLICH: Object to the form,
25 leading.

98

1     MS. DIXON: Go ahead and answer.
2     THE WITNESS: Okay, I went -- I didn't
3 do it right away, because at that time I had
4 a back problem, you know, so I didn't feel
5 like, you know, I had to go because I was
6 kind of in pain at that time, so I didn't
7 really feel right after I moved that I had
8 to do that, but my wife did change the
9 address, because if I would go to Motor
10 Vehicles at that time to let them do the
11 change of address it was just sort of to let
12 them know that I live in Broward, but since
13 my wife already done that for both of us, so
14 I didn't really go myself physically.
15 BY MS. DIXON:
16     Q. Since you have been at your current
17 address, have you received any correspondence
18 from the Miami, Dade Supervisor of Elections
19 about your voter status?
20     MR. EHRLICH: Object to the form,
21 leading question.
22     THE WITNESS: No, I never received
23 anything.
24     Q. Okay.
25     MS. DIXON: That's all I have.

99

1     Okay, Mr. Dossous, you'll have an
2 opportunity to read this transcript and to
3 make sure that it's accurate and to make a
4 few changes, if necessary.
5     Would you like to read and sign the
6 deposition?
7     THE WITNESS: Yes.
8     MS. DIXON: Okay.
9     THE COURT REPORTER: Mike, did you want
10 copies of anything?
11     MR. CIRULLO: No.
12     MS. DIXON: I want an electronic on all
13 of them, and you have my E-mail address.
14     THE COURT REPORTER: Jeff, did you want
15 all of them?
16     MR. EHRLICH: I want all of them.
17     THE COURT REPORTER: Ascii, condensed?
18     MR. EHRLICH: No, condensed is fine.
19     THE COURT REPORTER: And, Mr. Harvey?
20     MR. HARVEY: I want all of them.
21     MR. WHITE: I want all of them and a
22 condensed.
23
24     (Whereupon, there was an off the record
25 discussion had, after which the deposition resumed).

100

1     MR. WHITE: I just want straight
2 copies, no condensed.
3
4     (Whereupon, Defendant's Exhibits A, B
5 and C consecutively were marked for Identification).
6
7
8     (Whereupon, signature and formalities
9 not having been waived, the deposition concluded
10 at 6:20 o'clock p.m.).
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

25 (Pages 97 to 100)

101

```
 1
 2          FEBRUARY 7TH, 2002
            MR. PLACIDE DOSSOUS
            7686 PLANTATION BOULEVARD
 3          MIRAMAR, FL. 33023
 4
            IN RE:  NAACP vs. KATHERINE HARRIS
 5          CASE NO. 01-0120 CIV
 6
            Please take notice that on Monday, the
 7    28th day of January, 2002, you gave your deposition
      in the above referred matter.  At that time, you
 8    did not waive signature.  It is now necessary that
      you sign your deposition.
 9
            Please call our office at the below-listed
10    number to schedule an appointment between the hours
      of 9:00 a.m. and 4:30 p.m., Monday through Friday
11    at the Esquire office located nearest you.
12          If you do not read and sign the
      deposition within thirty days, the original, which
13    has already been forwarded to the ordering
      attorney, may be filed with the Clerk of the Court.
14    If you wish to waive your signature, sign your name
      in the blank at the bottom of this letter and
15    return it to us.
16
            Very truly yours,
17
18          VALERIE LEHTO, Notary Public
            ESQUIRE DEPOSITION SERVICES
19          1218 Southeast Third Avenue
            Fort Lauderdale, Fl. 33301
20          954-463-9507
21    I do hereby waive my signature:
22
23    PLACIDE DOSSOUS
      cc via transcript:
24
25
```

102

```
 1
 2          CERTIFICATE
 3    The State of Florida,    )
 4    County of Broward        )
 5
           I hereby certify that I have read the
 6
      foregoing deposition by me given, and that the
 7
      statements contained herein are true and correct
 8
      to the best of my knowledge and belief, with the
 9
      exception of any corrections or notations made
10
      on the errata sheet, if one was executed.
11
12
13         Dated this _____ day of _____,
14    2002.
15
16
17         _____
18
19
20
21
22
23
24
25
```

103

```
 1
 2              CERTIFICATE
 3    STATE OF FLORIDA
 4    COUNTY OF BROWARD
 5         I, VALERIE LEHTO, Registered Professional
 6    Reporter, do hereby certify that I was authorized
 7    to and did stenographically report the foregoing
 8    deposition as hereinabove shown, and the testimony
 9    of said witness was reduced to computer
10    transcription under my personal supervision and that
11    the record is a true record of the testimony given
12    by the witness.
13         I further certify that I am not a
14    relative, employee, attorney, or counsel of any of
15    the parties, nor am I a relative or employee of any
16    of the parties' attorney or counsel connected with
17    the action, nor am I financially interested in the
18    action.
19         Dated this 7th day of February, 2002.
20
21
22         _____
23         VALERIE LEHTO
           Registered Professional Reporter
           COMMISSION NO. CC759583
24         MY COMMISSION EXPIRES 8/22/2002
25
```

26 (Pages 101 to 103)

# TAB 26

**Page 1**

```
         IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA

      CASE NO.  01-120-CIV-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
by its FLORIDA STATE CONFERENCE OF
BRANCHES, et al.,

              Plaintiffs,
vs.
KATHERINE HARRIS, Secretary of
Florida, et al.,

              Defendants,
_____/



         DEPOSITION OF JOANNA CLARK



       MONDAY, JANUARY 28TH, 2002
    600 SOUTH ANDREWS AVENUE, SUITE 200
         FORT LAUDERDALE, FLORIDA
          2:30 p.m. - 3:25 p.m.
```

**Page 2**

```
APPEARANCES:
THE ADVANCEMENT PROJECT.
BY:  MONIQUE L. DIXON, ESQUIRE.
APPEARING ON BEHALF OF THE PLAINTIFFS.

LAW OFFICES OF BURNADETTE NORRIS-WEEKS, ESQUIRE.
BY:  BURNADETTE NORRIS-WEEKS, ESQUIRE.
APPEARING ON BEHALF OF BROWARD COUNTY SUPERVISOR
OF ELECTIONS.

STEEL, HECTOR & DAVIS, LLP.
BY:  WALTER JAMES HARVEY, ESQUIRE.
APPEARING ON BEHALF OF KATHERINE HARRIS and
CLAY ROBERTS, DIRECTOR OF FLORIDA DIVISION OF
ELECTIONS.

DADE COUNTY ATTORNEY'S OFFICE.
BY:  JEFFREY P. EHRLICH, ESQUIRE.
APPEARING ON BEHALF OF MIAMI-DADE COUNTY, SUPERVISOR
OF ELECTIONS, DAVID LEAHY.

GOREN, CHEROF, DOODY & EZROL, P.A.
BY:  MICHAEL CIRULLO, ESQUIRE.
APPEARING ON BEHALF OF ORANGE COUNTY, SUPERVISOR
OF ELECTIONS, WILLIAM COWLES.

ADORNO & ZEDER, P.A.
BY:  THOMAS W. WHITE, ESQUIRE.
APPEARING ON BEHALF OF CHOICEPOINT, INC.

ATTORNEY GENERAL'S OFFICE.
BY:  DOUGLAS B. MAC INNIS, ESQUIRE.
APPEARING ON BEHALF OF FRED DICKINSON,
FLORIDA DEPARTMENT OF HIGHWAY SAFETY & MOTOR
VEHICLES and KATHLEEN KEARNEY, SECRETARY
OF THE FLORIDA DEPARTMENT OF CHILDREN & FAMILIES.

HILLSBOROUGH COUNTY ATTORNEY'S OFFICE.
BY:  KENNETH TINKLER, ESQUIRE.
APPEARING ON BEHALF OF HILLSBOROUGH
COUNTY, SUPERVISOR OF ELECTIONS, PAM IORIO.
```

**Page 3**

```
                    INDEX
WITNESS           DIRECT  CROSS  REDIRECT  RECROSS
JOANNA CLARK

BY MS. NORRIS-WEEKS    4
MR. MAC INNES              23              51
BY MR. EHRLICH             30
BY MR. CIRULLO             44              55
BY MR. WHITE               46
BY MR. HARVEY              47              55
BY MS. DIXON               53
```

```
                  EXHIBITS
DEFENDANT'S                      FOR IDENTIFICATION
A        DRIVER'S LICENCE           PAGE 58
B        VOTER'S REGISTRATION CARD  PAGE 58
C        DECLARATION                PAGE 58
```

**Page 4**

```
         Deposition of JOANNA CLARK, taken before
VALERIE LEBTO, Court Reporter/Registered
Professional Reporter and Notary Public in and
for the State of Florida at Large, in the above
cause.


              ------------

Thereupon,

              JOANNA CLARK
having been first duly sworn or affirmed, was
examined and testified as follows:

              DIRECT EXAMINATION

BY MS. NORRIS-WEEKS:
     Q.   Hi.  I'm Burnadette Norris-Weeks and I
represent Miriam Oliphant who is the Supervisor
of Elections for Broward County.
          I'm here to take your deposition here
today.
          I want you to know that this deposition
is in no way intended to harass you or embarrass
you or anything like that.
```

5

1       If I say something that you don't
2  understand, feel free to ask me to repeat it.
3  I'll be happy to do that.
4       If you shake your head like this like
5  I'm shaking my head now, the court reporter is
6  not going to be able to pick it up, so I would
7  ask that you say yes or no when you're responding
8  to questions.
9       Additionally, if you say hu-huh or
10 uh-huh, she's not going to be able to record
11 that.
12     A.  Okay.
13     Q.  The other thing that I'd ask is let me
14 finish the question before you answer it so that
15 we make sure that everything's on the record and
16 recorded properly, okay?
17     A.  Okay.
18     Q.  If you answer something, I'm going to
19 assume that you understood the question.  Is that
20 fair?
21     A.  Yes.
22     Q.  All right.
23          Please state your name for the record,
24 please.
25     A.  Joanna Lynn Clark.

6

1       Q.  Okay, and are you known by any other
2  names or have you been known by any other names?
3       A.  Nicknames you mean?
4       Q.  Well --
5       A.  Peaches.
6       Q.  Peaches.
7          Anything else?
8       A.  No.
9       Q.  Are you married?
10      A.  No.
11      Q.  Have you had your deposition taken
12 before?
13      A.  No.
14      Q.  What is your current address?
15      A.  7735 Tam Oshanter Boulevard, North
16 Lauderdale, Florida 33068.
17      Q.  Spell Tam Oshanter, if you would.
18      A.  T-a-m  O-s-h-a-n-t-e-r.
19      Q.  Are you a U.S. citizen?
20      A.  Yes.
21      Q.  What is your date of birth?
22      A.  7/23/70.
23      Q.  '70?
24      A.  Yes, '70.
25      Q.  Do you have your driver's license with

7

1  you today?
2       A.  Yes.
3       Q.  Can I take a look at that?
4       A.  Sure.
5       Q.  And while you're getting that, if you
6  could get your voter's registration as well.
7       A.  I have to go to the car and get it.
8       Q.  Okay.
9          MS. DIXON:  Do you have your driver's
10 license?
11          THE WITNESS:  In my car.
12          MS. NORRIS-WEEKS:  Well, maybe we
13 should.
14          Yes, why don't you go ahead and get it.
15
16          (Whereupon, there was a brief recess
17 observed by all parties present, after which the
18 deposition resumed).
19
20 BY MS. NORRIS-WEEKS:
21      Q.  Miss Clark, I see on your voter
22 registration card you have a 1101 Northeast 3rd
23 Avenue address.
24      A.  Yes.
25      Q.  How long ago did you live there?

8

1       A.  The end of '99.
2       Q.  December of '99?
3       A.  More like September, '99.
4       Q.  Through?
5       A.  You mean how long ago did I move from
6  there?
7       Q.  Well, I guess what I'm asking you is
8  through what dates, from when to when did you
9  live there?
10      A.  '96 to '99.
11      Q.  And after moving from that address,
12 where did you move?
13      A.  I moved to 7735 Tam Oshanter.
14      Q.  So at the time of the November 7th,
15 2000 election you were at the address on your
16 driver's license, right?
17      A.  Yes.
18      Q.  And you said you were not married; is
19 that right?
20      A.  Correct.
21      Q.  Did you graduate from high school?
22      A.  Yes.
23      Q.  And when was that?
24      A.  1988, June.
25      Q.  What high school did you graduate from?

2 (Pages 5 to 8)

9

```
 1        A.    Southwest Senior High.
 2        Q.    Is that here in Broward County?
 3        A.    It's in Dade County.
 4        Q.    Did you attend college?
 5        A.    No.
 6        Q.    And have you obtained any special
 7   certifications, certificates or any training in
 8   any particular area?
 9        A.    Just child care.
10        Q.    Where did you grow up, in Dade?
11        A.    Yes.
12        Q.    And with the exception of the time that
13   you've been in Broward, were you in Dade prior to
14   that time?
15        A.    Yes.
16        Q.    And when did you move from Dade to
17   Broward?
18        A.    August, '92.
19        Q.    Did you review any documents in
20   preparation for your deposition today?
21        A.    No.
22        Q.    Did you speak with anyone other than
23   your attorneys in preparation for your
24   deposition?
25        A.    No.
```

10

```
 1        Q.    How did you become a Plaintiff in this
 2   lawsuit?
 3        A.    When I went to register to vote, you
 4   know, I couldn't vote because she was saying
 5   something about my license -- I mean, my address,
 6   I couldn't vote there, and when I got back to
 7   work I was telling a friend about it and she gave
 8   me a number to contact the lawyers, so I
 9   contacted the lawyers and took it from there.
10        Q.    What lawyer were you given the number
11   for to contact?
12        A.    Monique Dixon.
13        Q.    At the Lawyer's Committee for Civil
14   Rights?
15        A.    Yes.
16        Q.    Now, let's go back to November the 7th.
17   I'm assuming that's the day that you're alleging
18   now that you weren't able to vote; is that right?
19        A.    Yes.
20        Q.    Tell me what happened on that day.
21        A.    Okay, I left work off my lunch break
22   and I went to the usual polling place where I
23   usually vote at, Pompano Middle School, and when
24   I got there the lady asked me did I move and I
25   told her I moved but my address on the license
```

11

```
 1   and everything was still the same but I told her
 2   I moved, so she was like, well, if you moved then
 3   you won't be able to vote here, you're going to
 4   have to find out where you have to go.  So she
 5   asked me where I lived and I told her North
 6   Lauderdale, so she said she don't know what poll
 7   I have to go to and she had no way of finding
 8   out.  She said that the place where you call,
 9   Jane Carroll, she said the line's been busy all
10   day so it wouldn't make sense to try because it's
11   been busy all day, and she told me -- She was
12   looking on the list to see -- She told me that
13   they didn't have my name on the list, so she was
14   looking on the list to see if my name was there
15   and she told me we don't have your name, so when
16   she closed the paper back up my name was on the
17   top page, so I said, well, you have my name here
18   and she told me, she said, well, you moved and if
19   you vote it's a felony and I can have you
20   arrested.
21        Q.    Do you know who this person was that
22   you spoke with?
23        A.    No.
24        Q.    Do you know what the person looked
25   like?
```

12

```
 1        A.    No.  All I know, she was a White older
 2   female.
 3        Q.    Did you later find out anymore about
 4   the White older female that you encountered that
 5   day?
 6        A.    No.  No.
 7        Q.    How long had you been at this precinct
 8   before you got to the point where you were able
 9   to talk with this woman?
10        A.    A couple of minutes.
11        Q.    So there were no long lines or anything
12   like that when you went in?
13        A.    No.
14        Q.    When did you first register to vote?
15              We'll come back to that in just a
16   moment.
17              When did you first register to vote?
18        A.    '95.  I'm not sure of the month.
19        Q.    Would that have been here in Broward
20   County?
21        A.    Yes.
22        Q.    What type of identification did you
23   take with you when you went to vote on November
24   the 7th?
25        A.    I have my driver's license and my voter
```

3 (Pages 9 to 12)

13

```
 1   registration card.
 2        Q.   Did you show these forms of
 3   identification to the woman --
 4        A.   Yes.
 5        Q.   -- who was there?
 6        A.   Yes.
 7        Q.   Did you change your address officially
 8   with the Supervisor's Office?
 9        A.   I put in an application.  I filled out
10   another form to have it changed.
11        Q.   When did you fill this form out?
12        A.   Like in 2000, I believe.
13        Q.   Prior to the November election?
14        A.   Yes.
15        Q.   I'm going to show you a declaration
16   that contains your signature.  Is this your
17   signature?
18        A.   Yes.
19        Q.   What I believe is your signature.
20        A.   Yes.
21        Q.   Is that your signature on the back
22   page?
23        A.   Yes.
24        Q.   Did you have a chance to review this
25   document --
```

14

```
 1        A.   Yes.
 2        Q.   -- prior to signing it?
 3        A.   Yes.
 4        Q.   Who prepared the document?
 5        A.   The lawyers.
 6        Q.   Is it the same way it looked when they
 7   initially gave it to you?
 8        A.   Yes.
 9        Q.   Was anything changed by you?
10        A.   No.
11        Q.   And in your declaration you state in
12   paragraph six that the poll worker checked for
13   your name and could not locate it.  What name did
14   you give that poll worker?
15        A.   Joanna Clark.
16        Q.   Do you know whether the poll worker had
17   dark hair, light hair?
18        A.   She had light hair.
19        Q.   Short, long?
20        A.   Short.
21        Q.   And you said she was an older woman?
22        A.   Yes.
23        Q.   Were there other people in the general
24   vicinity where you were standing talking with
25   this woman, if you recall?
```

15

```
 1        A.   No.  All I remember is I think it was
 2   the Miami Times -- There was newspaper people
 3   standing at the door.
 4        Q.   Okay, what time did you go to the
 5   precinct, approximately?
 6        A.   About 12:45.
 7        Q.   So this was during your lunch hour?
 8        A.   Yes.
 9        Q.   Did you go with anyone else?
10        A.   Yes.
11        Q.   Who did you go with?
12        A.   Casandra Mallory.
13        Q.   Where does she live?
14        A.   She lives in Pompano.
15        Q.   Do you have an address for her?
16        A.   No.
17        Q.   She's a co-worker of yours?
18        A.   Yes.
19        Q.   Which brings me to the next question.
20   Where are you currently working?
21        A.   Broward County.  I drive a school bus.
22        Q.   What are your hours normally?
23        A.   5:30 to 9:45 and 1:45 to 5:00.
24        Q.   Would that have been the same time
25   basically around November 7th of 2000?
```

16

```
 1        A.   I wasn't driving a bus then.
 2        Q.   Okay, fair enough.
 3             Where were you working then?
 4        A.   I was working at day-care.
 5        Q.   What day-care were you working at?
 6        A.   Ideal Child Care.
 7        Q.   Where is that located?
 8        A.   It's in Pompano.
 9        Q.   The person Casandra Mallory, is she
10   still at Ideal Child Care?
11        A.   I'm not sure.
12        Q.   Have you seen her recently?
13        A.   Yes.
14        Q.   So you would be able to give your
15   lawyer an address for her?
16        A.   Yes.
17        Q.   Did the poll worker say anything else
18   to you on November 7th that you recall?
19        A.   No.
20        Q.   Now, let's go back to, a little while
21   ago you said that you changed your address at
22   some point.  When did you attempt to change your
23   address?
24        A.   I didn't change it on my driver's
25   license.  I put in a whole other voter
```

4 (Pages 13 to 16)

17

1  registration form at the Children's - Department
2  of Children & Family.
3      Q.   And when did you do this?
4      A.   I think it was like in 2000, April,
5  2000.
6      Q.   What would you have done to put in this
7  new application?  Describe for me, if you would,
8  walk me through, you know, did you talk with
9  somebody?  What happened?
10     A.   No.  I just filled out another form and
11 put it in the box.
12     Q.   And this is a box that's available at
13 the Department of Children & Family Services?
14     A.   It was.  I don't see it up there since
15 the last time I went out.  I haven't seen it up
16 there.
17     Q.   And where is this location?
18     A.   It's on Sample Road.
19     Q.   Sample Road and?
20     A.   It's in Pompano.  I'm not sure of the
21 address.
22     Q.   Was this box inside or outside of the
23 building?
24     A.   Inside.
25     Q.   Was somebody manning this box?

18

1      A.   No.
2      Q.   And did somebody give you the form to
3  fill out?
4      A.   No.  They was just sitting out there.
5      Q.   And you went in and changed your
6  address?
7      A.   Yes.
8      Q.   Did you have to give it back to anybody
9  and have them stamp it or anything like that?
10     A.   No.
11     Q.   After turning in this form, did you
12 prior to November 7th, 2000, did you check with
13 the Supervisor of Elections Office to see whether
14 or not --
15     A.   No.
16     Q.   -- your address had been changed?
17     A.   No.
18     Q.   Now, you remember you have to let me
19 ask the question before you answer.
20     A.   Sorry.
21     Q.   Your declaration states that you looked
22 and you saw your name.  What name did you see?
23     A.   Joanna Clark.
24     Q.   And what address did you see, if you
25 recall?

19

1      A.   1101 Northeast 3rd Avenue, apartment
2  25.
3      Q.   So you saw your old address on there?
4      A.   Yes.
5      Q.   Miss Clark, do you believe that someone
6  or a group of people intentionally tried to
7  prevent you from voting back in November of 2000
8  because you're Black?
9      A.   I don't know.
10     Q.   Did you speak with anyone else while
11 you were there --
12     A.   No.
13     Q.   -- other than this older woman?
14     A.   No.
15     Q.   Besides yourself and the poll worker,
16 how many other people were in the precinct at the
17 time that you went to vote on November 7th?
18     A.   I'm not sure.
19     Q.   More than five?
20     A.   Poll workers?  It was more than --
21 About five or six poll workers.
22     Q.   What about people just in general going
23 in to vote?
24     A.   The only people that I remember is the
25 people that were standing at the door, and there

20

1  was two.  I think it was reporters.  I'm not
2  sure.
3      Q.   Did you know any of the people who were
4  in the precinct when you went in?
5      A.   No.
6      Q.   Including poll workers?
7      A.   No.
8      Q.   Why are you suing Miriam Oliphant?
9      A.   Well, I'm not suing her personally, you
10 know, I don't really know her, but it's just the
11 system, the system needs to be corrected, and I
12 just put in a complaint and my lawyers took it
13 from there.  It was their decision on what to do.
14     Q.   Prior to November 7th, 2000, did you
15 have any problems voting in the past?
16     A.   No.
17     Q.   When was the last time that you voted
18 prior to November 7th, 2000, what date?
19     A.   '96.
20     Q.   I apologize if I've asked you this, but
21 after November 7th, did you contact the Broward
22 Supervisor of Elections Office and ask why you
23 weren't able to vote?
24     A.   No.  I had to go back to work and I was
25 working with the kids and we was to the park, so

5 (Pages 17 to 20)

21

1  I had no way of getting to a phone.
2      Q.   Did you at any time after that day, not
3  necessarily during that day but between November
4  7th, 2000 and today, have you called there to
5  find out --
6      A.   No.
7      Q.   -- why you weren't able to vote on
8  November 7th, 2000?
9      A.   No.
10     Q.   Where you vote, is that predominantly
11 an African American district or is it mixed?
12     A.   African American.
13     Q.   Is that the only district where you've
14 ever voted in Broward County?
15     A.   Yes.
16     Q.   Are you a member of the NAACP?
17     A.   No.
18     Q.   Have you ever been a member?
19     A.   No.
20     Q.   Do you know anyone else in the county
21 who had similar problems to the ones that you're
22 complaining of here today?
23     A.   No.
24     Q.   You said you went with a co-worker when
25 you went to the precinct.  Who drove?

22

1      A.   Me.
2      Q.   Did she also vote there?
3      A.   No.
4      Q.   She was just going with you, just
5  accompanying you?
6      A.   Yes.  Yes.
7      Q.   Did you try to go to any other polling
8  places to vote?
9      A.   No.
10     Q.   On your declaration you state that you
11 understand your roles and responsibilities as a
12 class member.  What do you mean by that?  What
13 kind of roles and responsibilities do you have as
14 a class member?
15     A.   To make sure this don't happen again to
16 me or nobody else.
17     Q.   And what class are you representing?
18     A.   I represent a class of Black voters
19 that was registered to vote and they couldn't,
20 they was turned away.
21     Q.   What relief are you seeking here today?
22 Well, not here today but with this lawsuit, what
23 kind of relief are you seeking?
24     A.   For them to better the system, because
25 I put in the change of address way in enough time

23

1  for them to, you know, redo it and mail out
2  another one, but I didn't receive it.  Just for
3  them to get stuff - speed up on things, you know?
4      Q.   When you were at the precinct, did
5  anybody ask you to fill out any affirmation forms
6  or anything like that that you recall?
7      A.   No.
8      Q.   Were you given any other type of forms
9  to fill out, maybe not an affirmation form but
10 some other type of form?
11     A.   No.
12     Q.   I don't think this is the case, but
13 have you ever been convicted of a felony?
14     A.   No.
15     Q.   Do you have any disabilities?
16     A.   No.
17     Q.   Have you ever been declared
18 incompetent?
19     A.   No.
20     MS. NORRIS-WEEKS:  That's all that I
21 have right now.
22     Thank you.
23     CROSS EXAMINATION
24 BY MR. MAC INNES:
25     Q.   Hi, Miss Clark.  My name is Doug Mac

24

1  Innes and I represent the Department of Highway
2  Safety & Motor Vehicles and the Department of
3  Children & Families in this case, and I have a
4  few more follow-up questions.
5      I understand that you first registered
6  to vote in 1995; is that correct?
7      A.   Yes.
8      Q.   Where did you register, ma'am?
9      A.   It was at the Children & Family.
10     Q.   On Sample Road?
11     A.   Yes.
12     Q.   The same place that you had --
13     A.   Okay, I'm not sure.  I'm not sure if it
14 was on Powerline Road or Sample Road at the time.
15     Q.   But you're pretty sure it was a DCF
16 office?
17     A.   Yes.
18     Q.   And was that registration application
19 successful?
20     A.   Yes.
21     Q.   Were you successfully registered to
22 vote?
23     A.   Yes.
24     Q.   So after you moved in late '99 you went
25 to another DCF office to apply to register to

6 (Pages 21 to 24)

ESQUIRE DEPOSITION SERVICES (954) 331-4400

25

1  vote; is that correct?
2      A.   No.  It was the one on Sample Road.
3      Q.   And to the best of your recollection
4  after you moved, when did you attempt to register
5  to vote again?
6      A.   It was probably March of 2000.
7      Q.   Do I understand you correctly from your
8  first questions that you walked into the DCF
9  office at Sample Road, picked up a form, filled
10  it out and put it in the box?  Is that correct?
11      A.   I didn't go up there just for that
12  purpose, but while I was waiting to be
13  recertified I filled out the application and I
14  put it in the box.
15      Q.   Where were these applications sitting?
16      A.   It was on a desk upstairs right by the
17  secretary.
18      Q.   So it was available to the general
19  public?
20      A.   Yes.
21      Q.   Anybody could have come in and filled
22  one out?
23      A.   Yes.
24      Q.   Did you request anyone's assistance in
25  filling out the form?

26

1      A.   No.  I didn't need it.
2      Q.   Did you fill out all of the blanks on
3  the form?
4      A.   Yes.
5      Q.   Are you sure about that?
6      A.   Yes.
7      Q.   Are you certain that you put your new
8  address on the application?
9      A.   Yes.
10      Q.   Did you sign the application?
11      A.   Yes.
12      Q.   And after you signed it, what did you
13  do with the application?
14      A.   I put it in the box.
15      Q.   And you put it in the box yourself?
16      A.   Yes.
17      Q.   Did you ask anybody to look at it
18  before you did that?
19      A.   No.
20      Q.   You didn't make a copy of it?
21      A.   No.
22      Q.   Did anybody date stamp it before you
23  put it in the box?
24      A.   No.
25      Q.   I know this is a hard question, but do

27

1  you have any evidence that you can show us that
2  would prove that you filled out all of the
3  portions of the application that day?
4      A.   No, I don't have any evidence but I
5  filled out one before and got a card.
6      Q.   Well, the reason I ask is another
7  person in this lawsuit was pretty much in the
8  same shoes as you and we looked at her
9  application and she hasn't signed it and I was
10  wondering if the same thing might have happened
11  to you.
12      A.   No.
13      Q.   Is it possible?
14      A.   Anything is possible, but I believe I
15  filled out the whole thing.
16      Q.   Now, following that visit to the Sample
17  Road DCF office, did you receive a new voter
18  registration card in the mail?
19      A.   No.
20      Q.   And following that visit to the Sample
21  Road DCF office, did you attempt to register to
22  vote again before the November general election?
23      A.   Yes.
24      Q.   Tell me about that.  Where did you
25  attempt to do that?

28

1      A.   I was out to the park with the day-care
2  with the kids and somebody came around with voter
3  registration forms trying to get people to get
4  voter registration, but I told the lady that I
5  already had one and that I just never received
6  it, I changed the address, so she told me to fill
7  out a whole new one, so I filled out a new one
8  and that was it.  That was the last I heard of
9  it.
10      Q.   Do you know where this person was from?
11      A.   No.  I didn't ask her.
12      Q.   Do you know if she was from the
13  Supervisor of Elections Office?
14      A.   I have no idea.
15      Q.   So you filled out another application
16  to register to vote at that time; is that
17  correct?
18      A.   Yes.
19      Q.   And where was this, in a park?
20      A.   Yes.  Pompano Park.
21      Q.   What did you do with that application?
22      A.   I gave it back to her.
23      Q.   Do you recall with any more specificity
24  what the date was, when that was?
25      A.   I think it was more like in June, June

7 (Pages 25 to 28)

ESQUIRE DEPOSITION SERVICES (954) 331-4400

29

1  or July.  I'm not sure of the exact date, but it
2  was in June or July.
3      Q.   Of 2000?
4      A.   Yes.
5      Q.   After you submitted that application,
6  the one that the person gave you in the park, did
7  you get a voter registration card in the mail?
8      A.   No.
9      Q.   Are you registered to vote now?
10     A.   No.  Well, I have the old card but I
11 just don't know where to go.  I never received a
12 new card.
13     Q.   So even today you're uncertain about
14 your voter registration status; is that correct?
15     A.   Correct.
16     Q.   Subsequent to the November, 2000
17 election, have you attempted to find out your
18 correct status?
19     A.   No.
20     Q.   In paragraph eight of your declaration
21 you say, "I was denied the right to vote because
22 of the grossly inadequate administration of
23 elections in Broward County, specifically the
24 Department of Children & Families and/or Broward
25 County Supervisor of Elections failed to update

30

1  my voter registration information when I changed
2  my address at the DCF."
3          What facts do you have that the
4  Department of Children & Families failed to
5  update your voter registration information?
6      A.   I never received a new card.
7      Q.   Do you have any facts that would lead
8  us to believe that it was the Department of
9  Children & Families --
10     A.   No.
11     Q.   -- that caused that?
12     A.   No.
13     Q.   What evidence do you have that the
14 Department of Children & Families denied you your
15 right to vote on November 7th, 2000?
16     A.   Could you repeat that.
17     Q.   What evidence do you have that the
18 Department of Children & Families denied you your
19 right to vote on November 7th, 2000?
20     A.   None.
21     Q.   Have you ever worked for the Department
22 of Children & Families?
23     A.   No.
24          MR. MAC INNES:  No further questions.
25               CROSS EXAMINATION

31

1  BY MR. EHRLICH:
2      Q.   Good afternoon.  My name is Jeff
3  Ehrlich.  I'm an Assistant County Attorney for
4  Miami, Dade County and I represent the Supervisor
5  of Elections of Miami, Dade County, David Leahy
6  who is also one of the Defendants in this case
7  along with Broward County Supervisor of Elections
8  and DCF and all these other folks.
9          I was going to ask you a couple of
10 questions about your voting experience or non
11 experience in 2000.
12          First of all, I want to clear something
13 up.  You testified that you work in Broward
14 County.  I didn't know, is it Broward County
15 Schools you work for or Broward County?
16     A.   I drive the school bus.
17     Q.   Right, but whose your employer?
18     A.   Broward County Schools.
19     Q.   Okay, and you testified that you moved
20 in 1992 from Miami, Dade to Broward; is that
21 right?
22     A.   Yes.
23     Q.   But you never attempted to vote before
24 1995; is that correct?
25     A.   Correct.

32

1      Q.   So you never attempted to vote in
2  Miami, Dade County?
3      A.   No.
4      Q.   You never registered to vote in Miami,
5  Dade County?
6      A.   No.
7      Q.   Were you eligible to vote in the 1998
8  Presidential Election?
9      A.   Yes.
10     Q.   Did you vote in that election?
11     A.   No.
12     Q.   You didn't vote in the 1992
13 Presidential Election either, did you?
14     A.   No.
15     Q.   Did you vote in the 1996 Presidential
16 Election?
17     A.   I'm not sure.
18     Q.   I believe it was Bob Dole versus Bill
19 Clinton, I think.  Does that ring a bell?
20     A.   I'm not sure.
21     Q.   You don't remember voting in that
22 election?
23     A.   I'm not sure.  I don't remember.
24     Q.   Is the November, 2000 election the
25 first Presidential Election you recall trying to

33

1 vote in?

2     A.  Yes.

3     Q.  Now, you say you registered a couple of

4 times, or at least attempted to register a couple

5 of times, in late 1999 and then again in the

6 early summer of 2000; is that right?

7     A.  In March, it was in March and June or

8 July.

9     Q.  Well, in your declaration it says that

10 in late 1999 you moved.

11     A.  Correct.

12     Q.  Did you not change your address with

13 DCF until March, 2000?

14     A.  No.

15     Q.  It was in late 1999?

16     A.  Yes.

17     Q.  Okay, so in late 1999 that's the first

18 time, according to your testimony, you attempted

19 to change your address for voting purposes,

20 right?

21     It's paragraph five of your declaration

22 if you want to take a second.  That's where I'm

23 getting this from.

24     I'm not trying to trick you or

25 anything.

34

1     A.  Okay, yes.

2     Q.  You've read your declaration?

3     A.  Yes.

4     Q.  Do you agree that in late 1999 you

5 attempted to change your address for purposes of

6 voting, that was the first time you did that?

7     A.  I changed my address for what my work,

8 does, that's correct.  That's right.

9     Q.  Okay, so in late 1999 you changed your

10 address with DCF?

11     A.  Yes.

12     Q.  Okay, that's one time.

13     And then you also said in March, 2000.

14 Where was that?  You just testified that in

15 March, 2000 you again attempted to change your

16 address.  Where was that?

17     A.  In '99 I changed my address with my

18 work, but in 2000 when I had to go back that's

19 when I put in the voter registration.

20     Q.  Okay, so it was not 1999 that you

21 changed your address with DCF for purposes of --

22 I'm sorry.  I think I'm confusing you with the

23 terminology I'm using.

24     At the time you dropped your voter

25 registration card in the box at DCF, that was in

35

1 March of 2000?

2     A.  Correct.

3     Q.  I understand now.

4     In late 1999 you changed your address

5 with DCF but you weren't there for purposes of

6 changing your voter registration?

7     A.  Correct.

8     Q.  So it was March, 2000 and then the

9 summer of 2000 and in the summer 2000 was the

10 experience in the park?

11     A.  Correct.

12     Q.  All right.

13     In the summer of 2000, by that point do

14 you recognize that you had not yet received a new

15 card from your March attempt to change your

16 address?

17     A.  Correct.

18     Q.  Were you planning to follow-up with

19 that in any way to find out why you hadn't

20 received the new card even though you had dropped

21 a new Florida registration form in the box at DCF

22 several months earlier?

23     A.  No, I didn't.

24     Q.  Why not?

25     A.  I didn't know that you had a certain

36

1 place to go to vote, and I thought if you are a

2 voter you could go anywhere to vote.  I didn't

3 know you had assigned precincts to go to.

4     Q.  But you did know that you hadn't

5 received your new card?

6     A.  Correct.

7     Q.  Why were you expecting to receive a new

8 card?

9     A.  Because it had my new address on it.

10     Q.  Were you concerned that you had not

11 received a new card with your new address?

12     A.  No.

13     Q.  That wasn't something that you were

14 worried about?

15     A.  No.

16     Q.  But you expected to receive a new card

17 with a new address?

18     A.  Correct.

19     Q.  At any point before November 7th, 2000,

20 did you realize that you still had not received a

21 card, a voter registration card with your proper

22 address on it?

23     A.  Correct.

24     Q.  At what point did you realize that you

25 did not have a current voter registration card

9 (Pages 33 to 36)

37

1  before the November 7th, 2000 election?
2      A.   I thought about it, you know, but it
3  was nothing that like I really, you know, dwelled
4  on, like I said, because I felt as though with a
5  card you can just vote anywhere.  I didn't know
6  you had an assigned place to vote, so I didn't
7  really think of it as a big deal that my address,
8  they never sent me a new card until it was time
9  for me to vote.
10     Q.   Let me go back a second.
11          You said that you didn't vote in 1988,
12 1992 and you don't think you voted in 1996
13 because you stated that the first Presidential
14 Election you voted in you thought - that you
15 attempted to vote in was 2000.
16          Had you ever voted before the November
17 7th, 2000 election?
18     A.   Four years before that.
19     Q.   So you did vote in 1996?
20     A.   Okay, yes.
21          I thought it was '95.  It could have
22 been '96.
23     Q.   Well, four years before that would be
24 '96.
25     A.   Okay.

38

1      Q.   Where did you vote in '96, at the
2  precinct that's on your card that you brought
3  with you today?
4      A.   Yes.
5      Q.   What was your understanding about where
6  a person should vote once they're registered?
7      A.   The understanding I got is as long as
8  you're a registered voter you can go to any
9  precinct to vote.  I didn't know you had an
10 assigned precinct to go to.  That was my second
11 time voting, so I really didn't know you had an
12 assigned precinct.
13     Q.   In paragraph eight of your declaration
14 you state that poorly trained poll workers did
15 not provide appropriate assistance when you
16 attempted to vote on election day.  What
17 assistance should they have provided?
18     A.   From my understanding I could have
19 filled out an affidavit that allowed me to vote,
20 but she didn't offer me that.  The only thing she
21 told me is if I voted it's a felony, she could
22 have me arrested.
23     Q.   It was your understanding you should
24 have been given an affidavit that would allow you
25 to vote at a precinct in which you no longer

39

1  lived?
2      A.   Correct.
3      Q.   Where did you develop that
4  understanding?  How did you develop that
5  understanding?
6      A.   I heard a few friends.  A couple of
7  friends told me about it.
8      Q.   Is there any other assistance that you
9  think you should have been provided on that day
10 by the poll worker?
11     A.   Well, she should have been able to let
12 me know where to go instead of just telling me
13 she don't know where I should go.
14     Q.   Do you think that poll workers should
15 know the precincts of every voter in the county?
16     A.   She shouldn't, but, I mean, somebody
17 should know.  They should have had a list of
18 something, you know.
19     Q.   The list of every voter in Broward
20 County and what precinct they should go to?
21     A.   Well, it was only, what, about five
22 miles away.  No, maybe about ten miles away, you
23 know, a list of what's in the area, at least
24 Pompano, Fort Lauderdale.  I mean, they're close
25 together, so --

40

1      Q.   So other than providing an affidavit of
2  some sort and telling you exactly where you
3  should go to vote, was there any other assistance
4  that the poll worker should have provided to you
5  that day that he or she did not?
6      A.   More honesty.  She told me she didn't
7  see my name on the list, but I saw it and it was
8  there.
9      Q.   Do you think she was dishonest to you
10 when she said she did not see your name on the
11 list?
12     A.   Yes.  Yes.
13     Q.   What did the poll worker say when you
14 told her that you saw your name on the list?
15     A.   She asked me for my license again and
16 she was like, is this your address?  It's you,
17 but if you vote it's considered a felony and I
18 can have you arrested.
19     Q.   So after you gave her your ID she did
20 find your name on the list?
21     A.   No.  I showed her my name.
22     Q.   Right.  You showed it to her on the
23 list?
24     A.   Yes.  And then she looked at my address
25 and the address that was on the list and she

10 (Pages 37 to 40)

41

1  said, well, it's you, but if you vote it's
2  considered a felony, I could have you arrested.
3     Q.   And your ID, when you say ID, you mean
4  your voter registration or driver's license?
5     A.   Both.  Both had the old address.
6     Q.   Why did your driver's license have the
7  old address?
8     A.   I never changed them.  I changed them
9  since then, but when I went to vote I had the old
10 address on the license.
11    Q.   So the driver's license you just showed
12 us is not the driver's license you had when you
13 went to vote on election day, 2000?
14    A.   Right.
15    Q.   What I just said is correct?
16    A.   Correct.
17    Q.   How long had you been at your new
18 address without updating your driver's license,
19 or before you updated your driver's license?
20    A.   I'm not sure.
21    Q.   Was it more than a year?
22    A.   Close, if it wasn't a year.  I'm not
23 sure.
24    Q.   Do you have any understanding of how
25 Supervisor Oliphant trains co-workers in Broward

42

1  County?
2     A.   No.
3     Q.   Do you know what training is required
4  for poll workers in Broward County?
5     A.   No.
6     Q.   Do you know what training is required
7  for poll workers for other counties in Florida?
8     A.   No.
9     Q.   How could the poll workers in the
10 precinct you went to, how could they have been
11 better trained?  You said they were poorly
12 trained.  How could they be better trained?
13    A.   In knowing what to tell me, you know.
14 It was like she didn't know - she wouldn't even
15 make a phone call.
16    Q.   Do you know whether she was trained
17 to -- I mean, it's possible that she was trained
18 to help you the right way and she just didn't do
19 it; isn't that right?
20    A.   Correct.
21    Q.   So you don't know whether she was
22 poorly trained or just a bad poll worker, do you?
23    A.   Correct.
24    Q.   The training might have been
25 sufficient, just the poll worker might have been

43

1  a bad apple, so to speak, right?
2     A.   That's true, but, I mean, she took it
3  over to somebody else.  I don't know what they
4  talked about, so evidently none of them knew.
5     Q.   Well, you don't know what the poll
6  worker said to the other person, do you?
7     A.   Yes, that's true, but she had my
8  license and my voter registration card.
9     Q.   Right, but you don't know what they
10 talked about?
11    A.   Right.
12    Q.   Why do you say that the poll worker was
13 poorly trained?  What led you to that conclusion?
14    A.   I mean, she couldn't help me with
15 nothing and then for her to tell me it was a
16 felony and she could have me arrested, and really
17 I could have signed an affidavit to vote, you
18 know.
19    Q.   What I'm getting at is certainly you've
20 suggesting that the poll worker didn't provide
21 you the assistance that she should have?
22    A.   Correct.
23    Q.   But your assertion is she was poorly
24 trained, and I'm wondering how you reached that
25 conclusion that she was poorly trained as opposed

44

1  to just a person who didn't like you or it was
2  I'm not going to do my job, I don't care what my
3  job is, I'm not going to do it.  How did you
4  reach the conclusion she was poorly trained when
5  you already testified today you don't know what
6  training she got?
7     A.   I'm not sure.  But, I mean, somebody
8  should have been able to answer something.  I
9  mean, nobody knew nothing and they all was
10 trained by the same person.  Nobody knew nothing.
11    Q.   Do you know if they were all trained by
12 the same person?
13    A.   No, I don't.
14    Q.   As I stated, you don't know what
15 training they got and you don't know whether it
16 was sufficient, correct?
17    A.   Correct.
18         MR. EHRLICH:  I have no further
19    questions.
20         Thank you.
21
22              CROSS EXAMINATION
23
24 BY MR. CIRULLO:
25    Q.   Good afternoon, ma'am.  I'm Mike

11 (Pages 41 to 44)

ESQUIRE DEPOSITION SERVICES (954) 331-4400

45

1   Cirullo.  I represent Bill Cowles, he is the
2   Orange County Supervisor of Elections, and I have
3   a couple of questions for you, and they may seem
4   like silly questions given your testimony
5   already, but for purposes of what we're doing
6   today, I need to ask them.
7            On November 7th, 2000, did you attempt
8   to vote in Orange County, Florida?
9        A.   No.
10       Q.   Have you ever attempted to register to
11  vote in Orange County, Florida?
12       A.   No.
13       Q.   So you've never been registered to vote
14  in Orange County?
15       A.   No.
16       Q.   Do you know how Bill Cowles' training
17  has worked for his poll workers?
18       A.   No.
19       Q.   Do you know how he handled the election
20  on November 7th, 2000?
21       A.   No.
22       Q.   Did you at any time attempt to register
23  to vote using an Internet --
24       A.   No.
25       Q.   -- service?

46

1            Did you participate in any way in a
2   voter registration drive?
3        A.   Only when the lady came to the park.  I
4   don't know if they considered that a voter
5   registration drive.
6        Q.   It was at a park in Pompano Beach?
7        A.   Yes.  She was walking around.  It was
8   about 2:00.
9        Q.   It wasn't to your knowledge affiliated
10  with a college or university, to your knowledge?
11       A.   No, not to my knowledge.
12       MR. CIRULLO:  I don't have any further
13  questions.
14            Thank you, ma'am.
15
16            CROSS EXAMINATION
17
18  BY MR. WHITE:
19       Q.   Good afternoon, Miss Clark.  My name is
20  Tom White.  I represent ChoicePoint,
21  Incorporated, doing business as Database
22  Technologies, Incorporated, another Defendant in
23  this lawsuit.
24            I just have two questions for you.
25            Do you know anything about Database

47

1   Technologies, Incorporated?
2        A.   No.
3        Q.   Do you know anything about ChoicePoint,
4   Incorporated?
5        A.   No.
6        MR. WHITE:  No further questions.
7
8            CROSS EXAMINATION
9
10  BY MR. HARVEY:
11       Q.   Good afternoon.  My name is Walter
12  Harvey.  I represent the Department of the State
13  and Division of Elections, and I just have a
14  couple of questions for you.
15            You indicated on November 7th, 2000
16  when you went to cast your vote, you said that
17  there was a second poll worker that the original
18  poll worker consulted; is that correct?
19       A.   Correct.
20       Q.   Okay, could you describe the second
21  poll worker.
22       A.   No, I really don't remember how she
23  looked.  All I remember is her walking over with
24  my ID and voter registration card and I seen her
25  talking to somebody, but I'm not sure who that

48

1   person was.
2        Q.   A female?
3        A.   It was a female.
4        Q.   Younger, older?
5        A.   I don't remember.
6        Q.   African American?
7        A.   She was White.
8        Q.   Okay, and your precinct, is it majority
9   African American?
10       A.   Yes.
11       Q.   Let me see, now, your voter
12  registration card indicates that you registered
13  in 1995; is that correct?
14       A.   Correct.
15       Q.   That was in Broward?
16       A.   Correct.
17       Q.   Have you ever received any other voter
18  registration identification from the Supervisor
19  of Elections?
20       A.   No.
21       Q.   What about any correspondence or
22  pamphlets or anything from the Supervisor of
23  Elections?
24       A.   No.
25       Q.   Do you recall receiving it, or you

12 (Pages 45 to 48)

49

```
 1   don't know?
 2       A.   No, I didn't receive any.
 3       Q.   All right, and this person at the park,
 4   this African American person that was, I guess,
 5   registering voters?
 6       A.   No, she was White.
 7       Q.   A White person?
 8       A.   Yes.
 9       Q.   And this was sometime in June or July?
10       A.   Yes.
11       Q.   You don't recall what organization that
12   person was affiliated with?
13       A.   No.
14       Q.   Okay, and the declaration that was
15   shown to you today, was that prepared by your
16   lawyers?
17       A.   Yes.
18       Q.   Did you speak to them before they
19   prepared that document?
20       A.   Yes.
21       Q.   Did you read the document?
22       A.   Yes.
23       Q.   Okay, and the last point I wanted to
24   clarify was you indicated that you obviously say
25   you tried to cast a vote November of 2000.  You
```

50

```
 1   also indicated, and maybe I'm wrong about this,
 2   but you said you tried to vote once before in
 3   1996; is that correct?
 4       A.   Correct.
 5       Q.   Okay, but you also testified, if I'm
 6   incorrect, that you did not vote in the election
 7   involving President Clinton and Bob Dole; is that
 8   correct?
 9       A.   I wasn't sure.
10       Q.   So did you or didn't you vote?
11       A.   I did.
12       Q.   In 1996?
13       A.   Yes.
14       Q.   And which precinct was that?
15       A.   I'm not sure of the number.  It was
16   Pompano Beach Middle.
17       Q.   So this is your second time trying to
18   cast a vote at Palm Beach Middle?
19       A.   Pompano Beach.
20       Q.   Pompano Beach Middle?
21       A.   Yes.
22       Q.   And the first time you went, did you
23   present your voter ID card and your driver's
24   license as well?
25       A.   Yes.
```

51

```
 1       Q.   And you were able to cast your vote?
 2       A.   Yes.
 3       MR. HARVEY:  I have no further
 4   questions.
 5
 6              CROSS EXAMINATION
 7
 8   BY MR. MAC INNES:
 9       Q.   Miss Clark, did you read the amended
10   complaint before it was filed with the court?
11       A.   Yes.
12       Q.   Paragraph one deals with you.  Was
13   everything in there that dealt with you accurate?
14       A.   Yes.
15       Q.   In paragraph 102 of the amended
16   complaint it says that you submitted a voter
17   registration change of address form approximately
18   two weeks prior to the November 7th, 2000
19   election.  We haven't talked about that one
20   today.
21       Where did you submit that one?
22       MS. DIXON:  I'm sorry, which paragraph?
23       MR. MAC INNES:  102.
24       MS. DIXON:  And where are you reading?
25       MR. MAC INNES:  Paragraph 102, five
```

52

```
 1   lines down.
 2       MS. DIXON:  I'm sorry.  I'm having
 3   trouble finding two weeks, the part that you
 4   just read.
 5       Oh, I see it now.
 6       THE WITNESS:  I remember.
 7   BY MR. MAC INNES:
 8       Q.   Is that accurate?  Did you file another
 9   registration application two weeks prior to the
10   November 7th election?
11       A.   I don't remember doing so.  I'm not
12   sure.
13       Q.   So is this inaccurate?
14       A.   I don't remember.
15       Q.   Well, I'm unsure of what you're telling
16   me.
17       A.   I don't remember if I did or not.  I
18   remember two, I remember doing two.
19       Q.   Okay, the two that we've talked about
20   earlier today?
21       A.   Correct.
22       Q.   March of 2000, maybe April, 2000 and
23   then June or July of 2000?
24       A.   Correct.
25       Q.   Let me clarify one thing.  You moved
```

13 (Pages 49 to 52)

53

1  within the county in late 1999?
2      A.   Correct.
3      Q.   And then this is all in your complaint,
4  paragraph 102, and then it says, "In or about
5  April, 2000, Miss Clark completed a voter
6  registration change of address at the Department
7  of Children & Family Services office in Broward
8  County.  Was that the same time that you changed
9  your address with the Department of Children &
10 Families?
11     A.   No.
12     Q.   No?
13     A.   In '99 is when I changed my address
14 with them, if I'm not mistaken, and then when I
15 went back to re-certify then that's when I put in
16 a new voter registration.
17          MR. MAC INNES:  No further questions.
18          MS. DIXON:  Is everyone done?
19          I just have a few questions.
20
21              CROSS EXAMINATION
22
23 BY MS. DIXON:
24     Q.   You just stated in March you went back
25 to re-certify and that's when you submitted a

54

1  voter registration application.
2      A.   Yes.
3      Q.   When you recertified, did anyone ask
4  you whether or not you wanted to register to
5  vote, also?
6      A.   No.
7      Q.   Do you remember seeing any signs in the
8  Department of Children & Family Services?
9      A.   No.
10     Q.   When you moved, and earlier you
11 testified that you moved in 1999 and changed your
12 address with DCF, Department of Children &
13 Families?
14     A.   Yes.
15     Q.   Did you change your address with anyone
16 else?
17     A.   No.
18     Q.   With the post office did you fill out a
19 change of address form?
20     A.   Yes.  I gave it to the mailman.
21     Q.   And so was mail forwarded to your new
22 address?
23     A.   Yes.
24     Q.   Did you ever receive your new voter
25 registration card?

55

1      A.   No.
2          MS. DIXON:  That's all I have.
3          MR. CIRULLO:  Can I ask one
4  clarification?
5
6              RECROSS EXAMINATION
7
8  BY MR. CIRULLO:
9      Q.   I'm sorry, Mike Cirullo again for
10 Orange County.
11          In paragraph 102 it says you moved from
12 Pompano Beach to Fort Lauderdale.  You moved to
13 North Lauderdale, right?
14     A.   Yes.
15     Q.   So there wasn't two moves involved, it
16 was directly from Pompano Beach to North
17 Lauderdale?
18     A.   Yes.
19          MR. CIRULLO:  Okay, thank you.
20
21              CROSS EXAMINATION
22
23 BY MR. HARVEY:
24     Q.   Walter Harvey from the Department.
25          Did you read that amended complaint?

56

1      A.   Yes.
2      Q.   When?
3      A.   Yesterday.
4      Q.   Had you read it before that?
5      A.   Yes.  I read it when I first got it.
6      Q.   Did you read it more than a month ago?
7      A.   Yes.
8      Q.   You had read it?
9      A.   Yes.
10     Q.   Did you read it before you were joined
11 as a party to this lawsuit?
12     A.   Yes.
13     Q.   You did read it?
14     A.   I read it -- You mean when I first got
15 it did I read it?
16     Q.   Right.
17     A.   That's what you mean?
18     Q.   No.  You were joined in this lawsuit in
19 August.  Did you read it?
20          MS. DIXON:  I object.
21          She was an original Plaintiff in this
22 lawsuit.
23          MR. HARVEY:  Okay, I'm sorry.
24 BY MR. HARVEY:
25     Q.   Did you read the complaint before it

14 (Pages 53 to 56)

57

1  was filed back in January of 2001?

2       A.   I don't understand what you mean.

3       Q.   When did you first read the complaint

4  in this lawsuit?

5       A.   I'm not sure.  I read it when I first

6  received it.

7            I'm not sure when I first received it.

8       Q.   The allegation there, paragraph 102

9  that pertains to you that says that you attempted

10 to register two weeks before the election, is

11 that accurate as you sit here today?

12      A.   I'm not sure.

13           Like I say, I remember twice, but I'm

14 not sure.  I could have.  I'm not sure.

15           MR. HARVEY:  Nothing further.

16           MS. NORRIS-WEEKS:  That's all.

17           MS. DIXON:  Miss Clark, you will have

18      an opportunity to review this deposition

19      once it's transcribed and to sign it to make

20      sure that everything is accurate.

21           Would you like to read and sign your

22      deposition?

23           THE WITNESS:  Yes.

24           MS. NORRIS-WEEKS:  Thank you,

25      Miss Clark.

---

58

1            (Whereupon, Defendant's Exhibits A, B

2  and C consecutively were marked for Identification).

3

4

5            (Whereupon, signature and formalities

6      not having been waived, the deposition concluded

7      at 3:25 o'clock p.m.).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

59

1

2                 FEBRUARY 7TH, 2002
                   MS. JOANNA CLARK

3           7735 TAM OSHANTER BOULEVARD
            NORTH LAUDERDALE, FL.  33068

4

5       IN RE:  NAACP vs. KATHERINE HARRIS
                CASE NO. 01-0120 CIV

6

7            Please take notice that on Monday, the

8  28th day of January, 2002, you gave your deposition
   in the above referred matter.  At that time, you

9  did not waive signature.  It is now necessary that
   you sign your deposition.

10           Please call our office at the below-listed
   number to schedule an appointment between the hours

11 of 9:00 a.m. and 4:30 p.m., Monday through Friday
   at the Esquire office located nearest you.

12

13           If you do not read and sign the
   deposition within thirty days, the original, which

14 has already been forwarded to the ordering
   attorney, may be filed with the Clerk of the Court.

15 If you wish to waive your signature, sign your name
   in the blank at the bottom of this letter and
   return it to us.

16

17           Very truly yours,

18

19           VALERIE LEHTO, Notary Public
             ESQUIRE DEPOSITION SERVICES

20           1218 Southeast Third Avenue
             Fort Lauderdale, Fl.  33301

21           954-463-9507

I do hereby waive my signature:

22

23 _____

24 JOANNA CLARK
   cc via transcript:

25

---

60

1

2

                 CERTIFICATE

3

   The State of Florida,      )

4

   County of Broward          )

5

6            I hereby certify that I have read the

7  foregoing deposition by me given, and that the

8  statements contained herein are true and correct

9  to the best of my knowledge and belief, with the

10 exception of any corrections or notations made

11 on the errata sheet, if one was executed.

12

13

             Dated this _____ day of _____,

14 2002.

15

16

17

             _____

18

19

20

21

22

23

24

25

---

61

```
 1
 2                     CERTIFICATE
 3    STATE OF FLORIDA
 4    COUNTY OF BROWARD
 5             I, VALERIE LEHTO, Registered Professional
 6    Reporter, do hereby certify that I was authorized
 7    to and did stenographically report the foregoing
 8    deposition as hereinabove shown, and the testimony
 9    of said witness was reduced to computer
10    transcription under my personal supervision and that
11    the record is a true record of the testimony given
12    by the witness.
13             I further certify that I am not a
14    relative, employee, attorney, or counsel of any of
15    the parties, nor am I a relative or employee of any
16    of the parties' attorney or counsel connected with
17    the action, nor am I financially interested in the
18    action.
19             Dated this 7th day of February, 2002.
20
21
22             _____
               VALERIE LEHTO
23             Registered Professional Reporter
               COMMISSION NO. CC759583
24             MY COMMISSION EXPIRES 8/22/2002
25
```

16 (Page 61)

# TAB 27

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                     MIAMI DIVISION
3              CASE NO. 01-120-CIV-GOLD
4

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
5  OF COLORED PEOPLE, INC., by its FLORIDA
   STATE CONFERENCE OF BRANCHES, et al.,
6

        Plaintiffs,
7

vs.
8

KATHERINE HARRIS, Secretary of State of
9  Florida, et al.,
10        Defendants.
11
12
13
14
15                      DEPOSITION
16
                           of
17
18                  ADMATHA ISRAEL
19
20
21              111 Northwest First Street
                      Suite 2810
22                  Miami, Florida
23
                Monday, Januray 7, 2002
24              11:14 a.m. - 12:20 p.m.
25

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
                305-371-7692

Page 2

1          APPEARANCES

For the NAACP:

3        THOMASINA H. WILLIAMS, ESQ.
4        Law Offices of
         Williams & Associates, P.A.
5        Brickell Bayview Center
         Suite 1830
6        80 SW Eighth Street
         Miami, Fl 33130
7
8   For Broward County:
9        BURNADETTE NORRIS-WEEKS, ESQ.
         Law offices of
10      Burnadette Norris-Weeks, P.A.
         100 Southeast 6th Street
11      Fort Lauderdale, Fl 33301
12
   For People for the American Way Foundation:
13
        ALMA HENDERSON, ESQ.
14      People for the American Way Foundation
         2000 M Street Northwest
15      Suite 400
         Washington, DC 20036
16
17  For Miami-Dade County:
18      SUSAN TORRES, ESQ.
         JEFFREY EHRLICH, ESQ.
19      Assistant County Attorneys
         111 Northwest First Street
20      Suite 2810
         Miami, Florida 33128
21
22  For Fred Dickinson and Kathleen Kearney:
23      VERONICA E. DONNELLY, ESQ.
         Assistant Attorney General
24      Office of the Attorney General
         PL-01, The Capitol
25      Tallahasse, Florida 32399

---

Page 4

1

        I N D E X

2

3   Witness      Direct     Cross

4   ADMATHA ISRAEL
     (By Ms. Torres)   6
5     (By Ms. Donnelly)        45
     (By Mr. Ortega)         51
6     (By Ms. Norris-Weeks)     54
     (By Mr. Tinkler)        56
7

8     E X H I B I T   I N D E X

9   Defendant's   Description     Page No.

10  No. 1     NAACP Questionnaire   11

11  No. 2     Declaration     36
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1  For Pam Iorio, Hillsborough County:
2      KENNETH A. TINKLER, ESQ.
         Assistant County Attorney
3      County Center, 27th Floor
         P.O. Box 1110
4      Tampa, Fl 33601
5   For ChoicePoint, Inc.:
6      OMAR ORTEGA, ESQ.
         Adorno & Zeder, P.A.
7      2601 South Bayshore Drive
         Suite 1600
8      Miami, Florida 33133
9   For Lowe, Volusia County:
   (via telephone)
10
        DANIEL ECKERT, ESQ.
11      Assistant County Attorney
         Volusia County Attorney's Office
12      123 West Indiana Avenue
         DeLand, Florida 32720
13
   For Katherine Harris and Clay Roberts:
14
        WALTER J. HARVEY, ESQ.
15      Steel Hector & Davis, LLP
         200 South Biscayne Boulevard
16      Miami, Fl 33131
17  Also Present:
18      Earnest Burnes
19      Mabel Brown
20      Brad Brown,
         President, Miami-Dade NAACP
21
22
23
24
25

---

Page 5

1      MS. TORRES:  I think we can announce
2  who we are.  I'm Susan Torres.  I represent
3  Miami-Dade County Supervisor of Elections
4  David Leahy.
5      MR. EHRLICH:  I'm Jeff Ehrlich.  I also
6  represent the supervisor of elections for
7  Miami-Dade County.
8      MS. DONNELLY:  Veronica Donnelly,
9  Assistant Attorney General, and I'm
10  representing Highway Safety and Children and
11  Families.
12     MS. NORRIS-WEEKS:  I'm Burnadette
13  Norris-Weeks.  I represent Broward County
14  Supervisor of Elections.
15     MR. ORTEGA:  Omar Ortega from Adorno
16  Zeder on behalf of ChoicePoint.
17     MR. TINKLER:  Ken Tinkler with
18  Hillsborough County Attorney's Office
19  representing Pam Iorio, Hillsborough
20  Supervisor of Elections.
21     MR. HARVEY:  Walter Harvey on behalf of
22  Florida Department of State and Division of
23  Elections.
24     MR. BURNES:  My name is Earnest Burnes
25  representing NAACP.

Page 6

1     MS. BROWN: I'm Mabel Brown, NAACP rep.
2     MS. HENDERSON: Alma Henderson, People
3  for the American Way Foundation representing
4  the plaintiffs.
5     MS. WILLIAMS: Thomasina Williams,
6  Florida counsel for the plaintiffs.
7     MR. ECKERT: On the telephone is Daniel
8  Eckert, Volusia County Attorney representing
9  Danny Lowe, Supervisor of Elections.
10 THEREUPON:
11     ADMATHA ISRAEL,
12 a witness named in the notice heretofore filed,
13 having been first duly sworn, deposes and says as
14 follows:
15     DIRECT EXAMINATION
16 BY MS. TORRES:
17     Q.  Can you please state your name for the
18 record.
19     A.  Admatha Israel.
20     Q.  Can you spell for the record your name.
21     A.  Sure. It's A-D-M-A-T-H-A. Last name
22 is I-S-R-A-E-L.
23     Q.  Mr. Israel, as I mentioned already, my
24 name is Susan Torres, and I represent the
25 Miami-Dade County Supervisor of Elections David

Page 7

1  Leahy. And in connection with this case I'm going
2  to be asking you some questions today. If there's
3  any question you don't know, please let me know,
4  and I'll do my best to clarify it.
5     A.  Okay.
6     Q.  What is your social security number?
7     A.  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.
8     Q.  And what is your date of birth?
9     A.  August 15th, 1977.
10    Q.  Are you currently a student?
11    A.  Yes.
12    Q.  Where are you a student?
13    A.  Miami-Dade Community College.
14    Q.  And what year are you there?
15    A.  I've been there for three going on four
16 years now.
17    Q.  Are you currently employed?
18    A.  No.
19    Q.  Did you review any documents to prepare
20 for your deposition today?
21    A.  Yes, I did.
22    Q.  And what are those documents?
23    A.  That was the affidavit I signed that I
24 wrote for the NAACP, and that's all.
25    Q.  What's the date of that affidavit?

Page 8

1     A.  I don't recall the exact date of that
2  document.
3     Q.  Approximately when was it?
4     A.  Three or four days, maybe five days
5  after November 7th, 2000.
6     Q.  Did you review any other documents in
7  preparation for your deposition today?
8     A.  Not that I can recall.
9     Q.  Did you speak to anyone about your
10 deposition today?
11    A.  Yes.
12    Q.  And who was that?
13    A.  Thomasina Williams.
14    Q.  is Ms. Williams representing you here
15 today as your attorney?
16    A.  She is assisting me. I'm -- we haven't
17 really gone into whether she's representing me or
18 not. We haven't really established that.
19    MS. WILLIAMS: Just for the record, you
20 should know we have a written retainer
21 agreement with Mr. Israel.
22    Q.  When did you first speak to Miss
23 Williams?
24    A.  I first spoke to her -- it was a while
25 ago. I can't really specify when, but it's been a

Page 9

1  while.
2     Q.  Can you give me an approximate date?
3     A.  An approximate date? I don't know.
4  When was the first time I spoke to you?
5     MS. WILLIAMS: I can't answer questions
6  for you.
7     Q.  Just to the best of your memory. Was
8  it last year? Was it in 2000?
9     A.  I think the first time I spoke to her
10 is when I went to do the affidavit.
11    Q.  The one you mentioned you did shortly
12 after the election?
13    A.  Exactly.
14    Q.  And that was the first time you spoke
15 to her?
16    A.  Probably.
17    Q.  Was that in person or by phone?
18    A.  Probably in person because I went to
19 the event.
20    Q.  What event is that?
21    A.  The one where they had everybody
22 addressing the issues shortly after the election.
23    Q.  And who do you mean when you say they?
24    A.  The NAACP.
25    Q.  Was this a rally that the NAACP was

Page 10

1  sponsoring?
2      A.   I don't know what the name of the event
3  was, but it was a gathering.  People were
4  expressing their views.
5      Q.   Their views about the election?
6      A.   Yes.
7      Q.   And after that meeting with
8  Ms. Williams, have you spoken to her since then?
9      A.   Yes, I have.
10     Q.   On approximately how many occasions?
11     A.   Maybe three times.
12     Q.   Can you tell me approximately when
13  those were?
14     A.   Began with about maybe a week ago up to
15  today.  I didn't speak to her over the phone
16  today, but I spoke to her Sunday morning in person
17  and maybe two days prior over the phone.
18     Q.   Do you have a written retainer
19  agreement, as Miss Williams mentioned, with Miss
20  Williams?
21     A.   Yes, I probably do.  I just have to
22  find it.
23     Q.   And when was that executed?  When did
24  you sign that?
25     A.   Around August last year.

Page 11

1      Q.   So that was after the first time you
2  met Miss Williams at the NAACP event shortly after
3  the election; is that correct?
4      A.   Yes.
5      Q.   During that event, what did you speak
6  to Miss Williams about?
7      A.   Well, we spoke about -- during the
8  event basically we didn't speak about much.  I
9  just -- I was told to write out the events and
10  what I experienced on election day, and I just
11  turned that in.  I didn't really get a chance to
12  speak to anybody in depth over it.
13     Q.   Was that a form that you were given at
14  the event that you filled out?
15     A.   Yes.  That one right there.
16         MS. TORRES:  Why don't we go ahead and
17  mark that.
18         (Thereupon, NAACP Questionnaire was marked as
19         Defendant's Exhibit 1 for Identification.)
20     Q.   I'm showing you what's been marked as
21  Exhibit 1.  Is that the form that you were just
22  mentioning that you filled out at the NAACP event
23  shortly after the election of November 2000?
24     A.   Yes.
25     Q.   Is that your signature on the second

Page 12

1  page?
2      A.   Yes, that's my signature.
3      Q.   And did you sign it on November 11th,
4  2000, the date that appears next to your name?
5      A.   Yes.
6      Q.   Did you speak to any other lawyers in
7  addition to Miss Williams at that event?
8      A.   Not that I can recall.
9      Q.   And apart from this form, do you
10  remember any other conversations that you had with
11  Miss Williams or during that event?
12     A.   During that event, no.
13     Q.   During that event did you discuss with
14  anyone a lawsuit relating to the November 2000
15  election?
16     A.   Can you repeat that?
17     Q.   Sure.  During the NAACP event that we
18  were just speaking about, did you talk to anyone
19  about a lawsuit relating to the November 2000
20  election?
21     A.   Not that I can recall.
22     Q.   Have you spoken to anyone apart from
23  your attorney, Ms. Williams, about a lawsuit,
24  about this lawsuit relating to the November 2000
25  election?

Page 13

1      A.   Yes.
2      Q.   And who would that be?
3      A.   Monique Dixon.
4      Q.   And who is Miss Dixon?
5      A.   She is another attorney for the NAACP,
6  I believe.  The Advancement Project actually.
7      Q.   And when did that conversation take
8  place?
9      A.   A couple of e-mails and a phone call or
10  two over the course of last year and this year.
11     Q.   And was that after you retained Miss
12  Williams as your attorney?
13     A.   Probably about the same time.
14     Q.   In addition to Miss Dixon, have you
15  spoken to anyone else about this lawsuit?
16     A.   She had another woman with her when I
17  spoke to her, but I can't recall her name.
18     Q.   Was she an attorney as well?
19     A.   I believe so.
20     Q.   And where did that conversation take
21  place?
22     A.   In a building off Biscayne and about
23  33rd Street.  I think it's next to an old police
24  department building or something.
25     Q.   In addition to Miss Dixon and the woman

Page 14

1  that was with her, the other attorney, is there
2  anyone else that you've spoken to about this
3  lawsuit relating to the November 2000 election?
4      A.  No, not that I can recall.
5      Q.  Are you a member of the NAACP,
6  Mr. Israel?
7      A.  No.
8      Q.  Are you currently registered to vote in
9  Miami-Dade County?
10     A.  Yes.
11     Q.  When did you first register to vote?
12     A.  I first registered to vote about -- I
13 think it was January 1996.
14     Q.  And where did you register to vote at
15 that time?
16     A.  At Joseph Caleb Center.
17     Q.  And where is that located?
18     A.  It's 5400 Northwest 22nd Avenue.
19     Q.  Can you describe to me the process by
20 which you registered to vote in January 1996?
21     A.  Not in detail.  I had just turned 18
22 years old a little while ago, and I was just
23 applying for my driver's license.  And I believe
24 getting your voter's registration card was just a
25 part of the process.  It wasn't anything I was

Page 15

1  actively getting into.  It was just basically a
2  means to an end, trying to get my driver's
3  license.
4      Q.  So you went to the Caleb Center that
5  day to get your driver's license?
6      A.  Yes.
7      Q.  And do you remember whether you filled
8  out any separate forms regarding voters
9  registration?
10     A.  I don't recall.  I know I filled them
11 out.  I just don't recall that, because I end up
12 getting my voter registration card eventually, so
13 I had to have filled out something.
14     Q.  When did you receive your voter
15 registration card?
16     A.  I don't remember.
17     Q.  You received it after your visit to the
18 Joseph Caleb Center?
19     A.  Yes.
20     Q.  And do you remember approximately
21 months or weeks after that?
22     A.  No, I don't.
23     Q.  Sometime thereafter?
24     A.  Yes.
25     Q.  Do you have a copy of that voter ID

Page 16

1  card with you?
2      A.  No, I don't.
3      Q.  Do you still have a copy somewhere?
4      A.  Probably not.  I've looked for it.  I
5  can't find it.
6      Q.  Did you misplace it or did you throw it
7  away?
8      A.  Probably misplaced it.
9      Q.  What was your home address at the time
10 that you first registered to vote?
11     A.  I believe it was 7302 Northwest 19th
12 Avenue.
13     Q.  And was that the address listed on your
14 voter identification card when you received it?
15     A.  No.
16     Q.  What was the address on your voter ID
17 card when you received it?
18     A.  I think it was 29 -- by this time I
19 moved out and got my own apartment, and it had
20 2932 Northwest 59th Street, Apartment Number One
21 on it.
22     Q.  And are you certain that that was the
23 address on your voter registration card when you
24 received it?
25     A.  I'm pretty sure, yes.

Page 17

1      Q.  What address did you list on the forms
2  that you filled out when you went to the Joseph
3  Caleb Center in January 1996?
4      A.  I can't recall.
5      Q.  Well, what was your address at that
6  time?
7      A.  At that time it was 7302 Northwest 19th
8  Avenue.
9      Q.  So is it fair to say that that's the
10 address you would have listed when you filled out
11 forms in January 1996 at the Joseph Caleb Center?
12     A.  Yes.
13     Q.  And do you remember whether you ever
14 received a voter ID card that had that address on
15 it?
16     A.  No, I can't recall.
17     Q.  And can you remember whether that was
18 the address on the voter ID card that you received
19 shortly after January 1996?
20     A.  I'm sorry.  Say that again.
21     Q.  Do you remember whether the 7302
22 address was the one listed on the voter ID card
23 that you received shortly after January 1996?
24     A.  I don't think so.
25     Q.  You can't remember or --

Page 18

1    A.   I can't really recall.
2    Q.   Now, how long did you live at the 7302
3 address?
4    A.   For about a month.
5    Q.   And then where did you move?
6    A.   I moved to 2932 Northwest 59th Street.
7    Q.   Do you remember approximately what
8 month that was?
9    A.   It was in April.
10    Q.   And that would have been of 1996?
11    A.   Yes.
12    Q.   And did you update your address with
13 the Miami-Dade County Elections Department at that
14 time?
15    A.   I changed my address with the driver's
16 license bureau.
17    Q.   We'll get to that in a second, but did
18 you notify the Miami-Dade Elections Department in
19 any way that you had changed your address?
20    A.   No, I didn't.
21    Q.   Now, you said that you updated your
22 address with DMV; is that correct?
23    A.   Yes.
24    Q.   How did you do that?
25    A.   I told them I changed my address

Page 19

1 shortly after I moved into the new apartment I was
2 in.
3    Q.   Who did you tell?
4    A.   I can't remember the exact procedure,
5 but when you go up into the driver's license
6 bureau, you tell them that you've moved, and they
7 change your address accordingly.
8    Q.   So is this something that you did in
9 person?
10    A.   Yes.
11    Q.   And where did you go to do that in
12 person?
13    A.   I believe it was the 5400 North
14 Northwest 22nd Avenue address, the Joseph Caleb
15 Center.
16    Q.   The same place you had gone to in
17 January 1996?
18    A.   Yes. That was an option. It's --
19 because it was five years ago, I can't remember
20 exactly, but it may have been another location
21 because I've gone to two DMVs over the last five
22 years. And the other one is one that's all the
23 way out on, I think, like -- I'm not sure what the
24 address is. It's out in Opa-locka. It's an
25 Opa-locka address.

Page 20

1    Q.   So when you moved to the 2932 address,
2 you went to one of the two DMV locations that
3 you've mentioned to update your address; is that
4 right?
5    A.   Yes.
6    Q.   And when you did that, did you ask
7 about updating your voter registration
8 information?
9    A.   No, I didn't.
10    Q.   Were you asked at the DMV office about
11 your voter registration information?
12    A.   No.
13    Q.   Did you know prior to going to DMV in
14 approximately April 1996 that you could update
15 your voter registration information there?
16    A.   No, I didn't.
17    Q.   After April 1996, did you receive a new
18 voter identification card at any time?
19    A.   After April '96?
20    Q.   Yes.
21    A.   Not that I can recall, not ever.
22    Q.   After April 1996, did you call the
23 Miami-Dade County Elections Department at any time
24 to find out whether you should receive a new voter
25 identification card?

Page 21

1    A.   No, I didn't.
2    Q.   Now, when you moved from the 7302
3 address to the 2932 address, which you stated was
4 approximately April of 1996, did you notify the
5 post office of your change of address?
6    A.   Not really sure. By that time I was
7 just turning 18. I wasn't really getting any
8 mail. And by the time I moved into the new
9 apartment, I was starting to get bills there, so I
10 don't recall getting any mail forwarded to my
11 house from the previous address.
12    Q.   Because you didn't think at the time
13 that there was a need to have your mail forwarded;
14 is that right?
15    A.   Exactly.
16    Q.   How long did you live at the 2932
17 Northwest 59th Street address?
18    A.   From April '96 until August 2000.
19    Q.   And then where did you move to at that
20 time?
21    A.   After that I moved to 4740 Northwest
22 25th Avenue.
23    Q.   And at that time did you update your
24 address with the Miami-Dade County Elections
25 Department?

KRESSE, VALDES-PRIETO & ASSOCIATES, INC
305-371-7692

**Page 22**

1    A.   No, I didn't.
2    Q.   Did you change your address with DMV?
3    A.   Yes.
4    Q.   And where did you do that?
5    A.   I believe it was at the same location,
6    the Joseph Caleb Center location.
7    Q.   And when you visited the Joseph Caleb
8    Center to update your address in approximately
9    August of 2000, did you ask about updating your
10   voter registration information?
11   A.   No, I didn't.
12   Q.   Were you asked about updating your
13   voter registration information?
14   A.   No.
15   Q.   And after that time, did you receive a
16   new voter identification card in the mail?
17   A.   No, I didn't.
18   Q.   Did you make any inquiries after that
19   move of the Miami-Dade County Elections Department
20   about whether you should be receiving a new voter
21   ID card?
22   A.   I didn't.
23   Q.   Did you notify the post office of your
24   change of address in approximately August of 2000?
25   A.   Yes, I did.

**Page 23**

1    Q.   And where did you do that?
2    A.   At -- it's a location in Allapattah. I
3    believe it's off 29th Street and maybe 18th
4    Avenue. I'm not sure exactly what the address is.
5    Q.   And you went there in person?
6    A.   Yes, I did.
7    Q.   And what did you do to change your
8    address there?
9    A.   I filled out the change of address
10   form.
11   Q.   And was your mail forwarded to your new
12   address after you went to that location?
13   A.   Yes.
14   Q.   Did you vote at any time prior to
15   November 7th, 2000?
16   A.   No, I didn't.
17   Q.   Please describe what you did to vote on
18   November 7th, 2000.
19   A.   Well, I left work early, ended up
20   having car trouble, so I went to school instead of
21   going straight home, talked to my professor. My
22   professor helped me to get a ride down there. He
23   gave me a ride down to the elections area.
24   What I did before that, before he gave
25   me a ride, I went and called the voter hot line

**Page 24**

1    number or something like that. I couldn't get
2    through, but I ended up calling another number so
3    they can transfer me to that number. And I got in
4    touch with a woman, and she told me where I can go
5    vote at.
6    She told me I can go to precinct 261.
7    That's Olenda Elementary School, I believe, and
8    she told me if they had any problems, they can
9    just give her a call.
10   Q.   Let me stop you for a second. You said
11   you left work early that day?
12   A.   Yes.
13   Q.   Where were you working at the time?
14   A.   Precision Response Corporation.
15   Q.   Where is that located?
16   A.   It's 1505 Northwest 167th Street.
17   Q.   And around what time did you leave
18   work?
19   A.   Around 3:00.
20   Q.   And then you stated that you went to
21   see a professor; is that correct?
22   A.   Yes.
23   Q.   What was his name?
24   A.   Professor Charles Hashim.
25   Q.   Can you spell the last name?

**Page 25**

1    A.   H-A-S-H-I-M.
2    Q.   I-M?
3    A.   Yes.
4    Q.   You also testified that you called the
5    voter hot line number; is that correct?
6    A.   Yes.
7    Q.   How did you obtain that phone number?
8    A.   I can't remember. I think I saw it
9    somewhere on TV or something. I'm not sure
10   though.
11   Q.   And when you called that phone number,
12   you said you were transferred to another phone
13   number?
14   A.   No. That number was busy. And I
15   called another number, and they transferred me to
16   the number I was trying to reach originally.
17   Q.   And you spoke to a woman; is that
18   correct?
19   A.   Yes.
20   Q.   Do you know what her name is?
21   A.   I can't remember her name.
22   Q.   And tell me everything you can remember
23   about that conversation.
24   A.   She told me that I was on the inactive
25   list, but if I went there, they would be able to



Page 26

1  make some type of provision where I could vote.
2      Q.   And by there you mean precinct 261?
3      A.   Exactly.
4      Q.   Which was what she mentioned to you
5  that was the precinct you had to go to?
6      A.   Yes.
7      Q.   Did she explain to you what the
8  inactive list was?
9      A.   No, she didn't.
10     Q.   Did you ask her what that was?
11     A.   No, I didn't.
12     Q.   Did you ask her why you were on an
13 inactive list?
14     A.   I didn't.
15     Q.   After that phone conversation, what did
16 you do?
17     A.   I went to my professor, and we rode up
18 to the precinct. And after so many -- after
19 trying to vote, standing in line and speaking to
20 one of the supervisors there, I kept getting
21 turned down. I asked her if I can vote -- I told
22 her that I wasn't on the list, but I spoke to
23 someone, they told me I can vote here. And the
24 lady told me I couldn't. This was the supervisor.
25     Q.   That was the supervisor at the

Page 27

1  precinct, precinct 261?
2      A.   Yes.
3      Q.   And do you remember what her name is?
4      A.   No, I don't.
5      Q.   Did you wait in line when you first got
6  to the precinct?
7      A.   Yes.
8      Q.   And then after that you spoke to the
9  supervisor?
10     A.   Yes.
11     Q.   What is it that she told you again?
12     A.   Not in these exact words, but she told
13 me that since my name was not on the list, she was
14 not able to help me. And I told her that I spoke
15 to someone through the voter registration line,
16 and they told me I can just come up here, and if
17 they had any problems, then they can just call the
18 supervisor, the supervisor can call the
19 registration line, and they would be able to get
20 information.
21        And they said I'm sorry. I still can't
22 help you. We can't get through. And I told her,
23 well, let me try. I can get through for you. She
24 said no, we are waiting for incoming calls.
25     Q.   Did someone actually look for your name

Page 28

1  on the voter rolls that day or did you tell them
2  that your name was not on the rolls?
3      A.   Well, they looked for my name on the
4  rolls. I told her that my name was -- might be on
5  the rolls, but it might not be. I'm not sure.
6  And they checked for my name. They couldn't find
7  it.
8      Q.   And you stated that they couldn't get
9  through on the telephone lines. Did they actually
10 call to verify your registration status?
11     A.   No.
12     Q.   They never made a phone call? Did you
13 ask that a phone call be made?
14     A.   Yes, I did.
15     Q.   And what was their response?
16     A.   She said I'm sorry, I can't help you.
17     Q.   Did she tell you why?
18     A.   She told me that she was expecting
19 incoming calls and the lines were busy to the
20 voter registration line.
21     Q.   What did you do after that?
22     A.   I spoke to my professor, and we just
23 went back to school.
24     Q.   Did you provide the supervisor or any
25 other poll worker that day with your voter

Page 29

1  identification card?
2      A.   No, I didn't.
3      Q.   Did you have it with you that day?
4      A.   No, I didn't.
5      Q.   Do you know whether precinct 261 is a
6  predominantly black precinct?
7      A.   Yes, it is.
8      Q.   Did you make any attempts to call the
9  voter hot line number that you had called earlier
10 in the day after you left precinct 261?
11     A.   No, I didn't. After that I figured
12 there was nothing else I could do.
13     Q.   And did you go back to the polls later
14 that day?
15     A.   By the time we got there to the polls,
16 it was about six, and after waiting and going
17 through that ordeal, it would have been useless to
18 try going back. I mean, because they were about
19 to close anyway.
20     Q.   Do you know, Mr. Israel, whether the
21 Miami-Dade County Elections Department ever
22 received notification that you had changed your
23 address in April of 1996?
24     A.   I'm sorry. Repeat that.
25     Q.   Sure. Do you know whether the



Page 30

1  Miami-Dade County Elections Department ever
2  received notification of your change of address in
3  April of 1996?
4      A.  No, I can't say I do.
5      Q.  And do you know whether the Miami-Dade
6  County Elections Department ever received
7  notification of your change of address in
8  September of 2000?
9      A.  No, I can't say.
10     Q.  Would you agree with me that if the
11  Miami-Dade County Elections Department had sent
12  mail to your first address that you mentioned
13  today at 7302 Northwest 19th Avenue where you
14  lived when you first registered to vote, that you
15  wouldn't have received that?
16     A.  I probably would have.
17     Q.  Why is that?
18     A.  My mother still stayed at that address.
19  She still gave me whatever mail I had.
20     Q.  And how long did she live there?
21     A.  She stayed there for quite a while
22  after I left.  It had to be at least four or five
23  more months.
24     Q.  So that would have been toward the ends
25  of 1996; is that correct?

Page 31

1      A.  Well, from January, and I moved in
2  April.
3      Q.  Right.
4      A.  And I believe she stayed there until at
5  least June.  Probably well after, but she moves a
6  lot.  That's one of the reasons why I moved away.
7      Q.  So sometime in the fall or later of
8  1996 your mother moved from that address to
9  another address; is that correct?
10     A.  Yes.
11     Q.  So would it be fair to say that if the
12  Miami-Dade County Elections Department had sent
13  mail to you at that address after your mother had
14  moved that you would have not received that?
15     A.  Probably not.
16     Q.  I'm sorry?
17     A.  Probably not.
18     Q.  After election day on November 7th,
19  2000, did you do anything to find out why you were
20  not on the voter rolls that day?
21     A.  Basically that's what I went to the
22  rally for, the little event that happened on the
23  11th.  I figured I would be able to find some type
24  of answers there.
25     Q.  And that's the NAACP event that you

Page 32

1  mentioned earlier?
2      A.  Yes.
3      Q.  Did you contact the Miami-Dade County
4  Elections Department at any time after November
5  7th, 2000 to find out why your name was not on the
6  voter rolls on election day?
7      A.  No, I didn't.
8      Q.  I'm going to ask you to look again at
9  what's been marked as Exhibit 1.  This is what you
10  stated that you filled out at the NAACP event
11  shortly after the election in November 2000; is
12  that right?
13     A.  Yes.
14     Q.  And is this your handwriting on the
15  form?
16     A.  Yes, this is my handwriting.
17     Q.  On page two you state that there are no
18  other voters that you know personally that were
19  effected by the same problem that you encountered;
20  is that right?
21     A.  I'm sorry.  Say that again.
22     Q.  At the top of page two, you stated that
23  there were no other voters that you know
24  personally that were effected by the same problem
25  that you encountered on election day; is that

Page 33

1  correct?
2      A.  Yes, at that time.
3      Q.  Do you know of any other voters at this
4  time that encountered the same problem that you
5  did on election day?
6      A.  I've met a few during a television
7  interview I did, but it's not like we keep in
8  touch or anything.
9      Q.  All right.  Can you tell me about the
10  television interview.
11     A.  I met up with two guys and a woman.  I
12  can't remember their names.  We set up inside
13  this -- inside a law office, I believe, and did an
14  interview for -- I believe it was Jim Lehrer, the
15  Jim Lehrer News Hour.
16     Q.  Did someone contact you about appearing
17  on that program?
18     A.  Yes.
19     Q.  And who was that?
20     A.  I can't remember.  I think her name was
21  Joanne.  I'm not sure exactly.
22     Q.  And do you remember what organization
23  Joanne was affiliated with?
24     A.  I believe she was just with the news
25  show.

Page 34

1     Q.   And do you know how Joanne got your
2  name?
3     A.   No, I'm not sure.
4     Q.   And approximately when did you first
5  speak to her about this program?
6     A.   It had to be maybe a week or two before
7  the interview, before the television interview.
8     Q.   And when did that interview take place?
9     A.   I can't remember.
10     Q.   Can you tell me what year?
11     A.   It was -- November 2000. It had to
12  have been later on, probably in January of next
13  year.
14     Q.   January of --
15     A.   2001.
16     Q.   2001?
17     A.   Yes. I'm not really sure. I'm bad
18  with times with school, work and everything else.
19     Q.   But you think it was approximately
20  January 2001?
21     A.   Yes.
22     Q.   Can you describe the actual news
23  program for me. I'm sorry, your appearance on it,
24  what happened.
25     A.   Well, you know, the guy that was

Page 35

1  interviewing us, he just asked us a few questions
2  and what our -- and how we felt about the events
3  that happened on that day, on election day, and we
4  just gave a -- well, I know I gave him my frank
5  opinion on what happened that day.
6     Q.   And what was that opinion?
7     A.   That something had to be wrong for so
8  many other people -- I mean, I thought it was just
9  me until I went to the NAACP event on the 11th,
10  and I seen all these people out here that had
11  similar complaints.
12          And then during the interview, I met
13  three people who had similar complaints up close
14  and personal, and I just thought it was kind of --
15  something had to be wrong.
16     Q.   The three people that were on this news
17  program with you, what were their complaints
18  regarding the election?
19     A.   Well, their complaints were -- I mean,
20  I can't remember exactly what each individual
21  complaint was, but, I mean, I've heard things
22  stemming from police road blocks and police
23  checking tags in areas predominantly black.
24          I believe the lady that was on the
25  panel with us, I think she's a lawyer, and she

Page 36

1  talked about going to vote and not being able to
2  vote. I can't remember what the particular
3  circumstances were, but for all three of those
4  people, including myself, it was all the same
5  thing. They went to vote and they were not
6  allowed to vote for whatever the reason was.
7     Q.   Did any of those three people have the
8  same problem that you encountered, that their name
9  was not on the voter roll when they went to vote
10  that day?
11     A.   I can't say for sure.
12     Q.   And you don't remember their names?
13     A.   No. It's on the show. There should be
14  a way to find out, getting access to the tape or
15  calling the show.
16     Q.   Do you know the names of any other
17  people that you've spoken to since the election
18  that had problems similar to those that you
19  encountered?
20     A.   No.
21          MS. TORRES: Can you mark this, please.
22     (Thereupon, Declaration was marked as
23     Defendant's Exhibit 2 for Identification.)
24     Q.   Mr. Israel, I'm going to show you
25  what's been marked as Exhibit Number 2. Can you

Page 37

1  please take a look at that and tell me whether you
2  recognize that document.
3     A.   Yes.
4     Q.   Is that your signature on page three?
5     A.   Yes.
6     Q.   What is the date that you signed this?
7     A.   11-1-2001.
8     Q.   Did you draft this declaration?
9          Just for the record, the document is
10  entitled Declaration of Admatha Israel.
11     A.   No, I did not draft this.
12     Q.   Who drafted this document?
13     A.   I believe it was -- maybe it was
14  Monique Dixon. I'm not sure.
15     Q.   And when did she draw up this document?
16     A.   I don't know when she drafted it.
17     Q.   When did you see this for the first
18  time?
19     A.   A couple of days before November the
20  1st.
21     Q.   And when you first saw this document,
22  did it appear as it does today?
23     A.   Yes.
24     Q.   And was it Miss Dixon who showed you
25  this document?

Page 38

1    A.   I received it in the mail via Federal
2    Express.
3    Q.   And who sent it to you?
4    A.   Probably Miss Dixon or some other
5    representative for the NAACP.
6    Q.   And did you review this document when
7    you received it?
8    A.   Yes.
9    Q.   And did you make any changes to it?
10   A.   Not that I recall.  I don't see any
11   changes I made on here.
12   Q.   So as far as you can remember, you
13   signed it pretty much in the form that you
14   received it?
15   A.   Yes.
16   Q.   Did you show this document to anyone
17   else before you signed it?
18   A.   No.
19   Q.   I would like for you to look at
20   paragraph ten on page two.  And for the record,
21   can you tell us what that states.
22   A.   It says, "On November 7th, 2000, I was
23   denied the right to vote due to the grossly
24   inadequate election administration at Miami-Dade
25   County.  Specifically, the DMV failed to update my

Page 39

1    change of address on my voter registration card
2    when I updated my driver's license in April 1996
3    and September 2000."
4    Q.   How did you learn that the DMV should
5    have updated your change of address in April 1996
6    and September 2000?
7    A.   Basically by speaking with Monique
8    Dixon.  Over the course of the last couple of
9    months I've come to realize that the DMV is -- may
10   be partly responsible for my voter registration
11   being updated.
12   Q.   To your knowledge is DMV a state
13   agency?
14   A.   I'm not sure.
15   Q.   If I were to tell you that DMV was a
16   state as opposed to a county agency, would you
17   have any reason to dispute that?
18   A.   No, I wouldn't.
19   Q.   If DMV did not, as you claim, update
20   your voter registration information, then why do
21   you state in the first sentence in paragraph ten
22   that the election administration in Miami-Dade
23   County was grossly inadequate?
24   A.   Well, I signed this paper basically
25   because the State and the County both are -- I

Page 40

1    mean, should be responsible for things that happen
2    during election.  And I mean, that's basically how
3    I felt.  I'm not sure -- I'm not well versed in
4    the intricate workings of the State and County,
5    but I was denied the right to vote.  And whether
6    or not it was the State or County or both or
7    either or, somebody was involved, so that's why I
8    worded it that way.
9    Q.   Okay.
10   A.   Actually, signed this because Monique
11   Dixon or the person who drafted this worded it
12   that way.
13   Q.   But I would like for you to explain to
14   me to the best of your knowledge why the election
15   administration in Miami-Dade County was grossly
16   inadequate.
17   A.   Because I feel that I was not a
18   convicted felon at the time, so I should have had
19   my right to vote regardless of whether I voted
20   previously or not.  And given a procedure that
21   they had at the Olenda Elementary School, it was
22   grossly inadequate.
23       There are a number of things that maybe
24   could have done.  I mean, she could have tried a
25   little bit harder.  She could have made a phone

Page 41

1    call.
2    Q.   Who do you mean by --
3    A.   The supervisor at that particular
4    precinct.  She could have made a phone call or at
5    least tried.  And that's basically my side of it.
6    And then hearing -- I mean, like the people that
7    were in the television interview with me who
8    talked about the punch card issues and such, that
9    led me to believe that -- I mean, it was just more
10   than inadequate on my behalf.  It was grossly
11   inadequate on behalf of so many other people that
12   had problems, I mean, who had different types of
13   problems.
14       We have a range of problems that have
15   to be dealt with.  I'm not sure of all the
16   different legal issues that are entailed and what
17   happened on that day, but as far as I know so far,
18   there are at least ten different things that went
19   wrong, and that right there does add up to being
20   grossly inadequate in my definition.
21   Q.   Focusing only on your experience on
22   November 7th, 2000, apart from what you mentioned
23   already with DMV and apart from the supervisor
24   which you just stated about making a phone call,
25   is there anything else that happened on that day

Page 42

1  in your personal experience that you consider to
2  be grossly inadequate?
3      A.   In my personal experience?  Outside of
4  the way that the supervisors behave, nothing on
5  myself, no.
6      Q.   Explain to me again what was it about
7  the supervisor's behavior that you found to be
8  inadequate.
9      A.   Well, it was unprofessional, and she
10 didn't put forth an effort to have encouraged the
11 voting process.
12     Q.   Did she state to you that she couldn't
13 get through to the elections department because
14 the phone lines were busy?
15     A.   Yes.
16     Q.   Is that what you testified to earlier?
17     A.   Yes.
18     Q.   Now I would like to turn to paragraph
19 11.  And in that paragraph you state that you did
20 not receive correspondence from the Miami-Dade
21 Supervisor of Elections asking you to update your
22 address on your voter registration card.  Is that
23 correct?
24     A.   Yes.
25     Q.   And why do you believe that you should

Page 43

1  have received correspondence from the Miami-Dade
2  Supervisor of Elections asking you to update your
3  address?
4      A.   Well, I didn't say that I believed I
5  should have.  I was just saying that I didn't.
6      Q.   Do you have any reason to believe that
7  you should have received such correspondence from
8  the Miami-Dade County Supervisor of Elections?
9      A.   Being that it's an issue on here,
10 that's reason enough for me to believe that.
11     Q.   What is?  I'm sorry.
12     A.   Being that it's an issue on this right
13 here, this draft, makes me believe that maybe it's
14 pertinent enough, yes.
15     Q.   Apart from the fact that it appeared on
16 this draft that you received, is there any other
17 reason for you to believe that you should have
18 received such correspondence from the Supervisor
19 of Elections of Miami-Dade County?
20     A.   Not at all.  At least not yet.
21     MS. TORRES:  If you'll give me one
22 second, I think I'm almost done.
23     Q.   Were you ever asked to be a plaintiff
24 in this lawsuit, Mr. Israel?
25     A.   Excuse me?

Page 44

1      Q.   Were you ever asked to be a plaintiff
2  in this lawsuit?
3      A.   In so many words, I believe so.
4      Q.   When did that take place?
5      A.   Over the course of last year.  I recall
6  that the lawsuit was going on, and I volunteered.
7      Q.   And how did you volunteer?
8      A.   Well, I told Monique Dixon that should
9  there be a lawsuit, yes, I wouldn't mind being a
10 plaintiff in the lawsuit.
11     Q.   And how did she respond?
12     A.   We kept in touch after that, and she
13 sent me several documents such as this one right
14 here.
15     Q.   And do you know why you eventually were
16 not made a plaintiff in this lawsuit?
17     A.   I believe it was because the judge was
18 supposed to receive an amended copy, and it didn't
19 reach him in time or something like that,
20 something of that nature.  She told me that she
21 was going to file a motion to amend or something
22 like that, and the judge -- either it didn't reach
23 a deadline, and because of that I wasn't really
24 placed on the case as a plaintiff.
25     Q.   Did she tell you anything else about

Page 45

1  your involvement in this lawsuit?
2      A.   Such as?
3      Q.   Anything else you can remember
4  regarding your involvement in this lawsuit.
5      A.   Nothing else.  Nothing I can recall
6  right now.
7      Q.   Have you ever been convicted of a
8  crime, Mr. Israel?
9      A.   No.
10     MS. TORRES:  That's all the questions
11 that I have.  Thank you very much.
12     THE WITNESS:  You are welcome.
13     MS. DONNELLY:  I have a few questions.
14     CROSS EXAMINATION
15 BY MS. DONNELLY:
16     Q.   Do you have your driver's license with
17 you here today?
18     A.   No, I don't.
19     Q.   Why is that?
20     A.   Hectic day.  I just came from early
21 this morning trying to get lights turned on at my
22 house, and I end up leaving it at the agency.
23     Q.   What agency?
24     A.   I think L-I-E-H-A-P.  It's some type of
25 agency that helps families that have problems with

Page 46

1  their bills.
2      Q.  Have you contacted them and let them
3  know that your wallet is there today?
4      A.  No.  I have my wallet.  I just don't
5  have my ID, but I've been trying to make it over
6  here and find parking and hoping my car wouldn't
7  get towed.  So I really haven't been able to call
8  them back yet and get over there.
9      Q.  Referring to Exhibit 2 and paragraph
10  four when it says that you moved in September 2000
11  to your current address.  Do you recall about what
12  time of the month that you moved there?
13      A.  It was about the beginning of the
14  month, maybe the 1st through the 5th.
15      Q.  Do you recall approximately what day
16  you changed your address on your driver's license?
17      A.  The day?  No, I can't recall that.  It
18  should be on the driver's license, right?
19      Q.  Yes.  That's why I was asking for it.
20  Do you recall whether or not the clerk who took
21  the information regarding your changes at the
22  Department of Highway Safety and Motor Vehicles
23  was male or female?
24      A.  I can't recall.
25      Q.  Do you recall their race?

Page 47

1      A.  No.
2      Q.  Were you issued a completely new
3  license that day with a new picture?
4      A.  New picture?  I don't think so.
5      Q.  How was your license changed to reflect
6  your new address?
7      A.  Just changed the address.  That's it.
8  Changed the address and gave me another card.
9      Q.  Was that with a sticker that was placed
10  on the back of your license or did they issue a
11  completely new license?
12      A.  I believe it was a completely new
13  license.
14      Q.  Now, you testified earlier that you
15  believed that your voter's registration reflected
16  your 2932 Northwest 59th Street address.  What
17  makes it stick in your mind that that was possibly
18  the address on your voter's registration?
19      A.  Because I was at that address for a
20  substantial amount of time, and I kept my voter's
21  registration card for almost -- about as long as I
22  stayed over there.  At least I knew where I had it
23  as long as I stayed over there.  I believe I
24  misplaced it somewhere around the time when I
25  moved.

Page 48

1      Q.  So that would be in September 2000?
2      A.  Yes.
3      Q.  Now, at the 4740 Northwest 25th Avenue
4  address, your current address, would you be at the
5  same voters' precinct as you would have at the
6  2932 Northwest 59th Street?
7      A.  I'm not sure.
8      Q.  And were you attending school in
9  September 2000?
10      A.  Yes.
11      Q.  Did they have voter registration drives
12  at the school at that time?
13      A.  Not that I can recall.
14      Q.  Did you go there during the daytime or
15  the nighttime?
16      A.  Nighttime.
17      Q.  Now, in paragraph one of Exhibit 2, you
18  say that you are a citizen of the United States.
19  Have you always been a citizen of the United
20  States?
21      A.  Yes.
22      Q.  Do you know when your social security
23  number was issued?
24      A.  No, I don't.
25      Q.  Have you always used the same social

Page 49

1  security number?
2      A.  Yes.
3      Q.  Do you know of anyone else who has the
4  same name as you do, first and last?
5      A.  No.
6      Q.  Do you know if any other person has
7  used your name which you've discovered at a later
8  time?
9      A.  No.
10      Q.  Referring more specifically to
11  September 2000, again, when you changed your
12  address, do you recall what type of forms you were
13  given by the worker?
14      A.  At the DMV?
15      Q.  Yes.
16      A.  No, I don't.
17      Q.  Going to paragraph ten on Exhibit 2,
18  which is your declaration, it says, Specifically,
19  the DMV failed to update my change of address on
20  my voter registration card when you updated your
21  driver's license.  Do you recall whether or not
22  you told DMV to update that?
23      A.  No, I don't.
24      Q.  You don't recall or you know that you
25  didn't.  Which is that no to?

Page 50

1    A.   I don't remember telling them
2  specifically.  In fact, I probably didn't tell
3  them specifically to update my voter's
4  registration card.
5    Q.   Now, when did you first decide that you
6  were going to vote on election day?
7    A.   I don't know.  Maybe about two months,
8  three months prior.  I think it was shortly after
9  the primaries that I decided I was going to vote.
10   Q.   Were you aware that you would need to
11 have your voter registration card with you when
12 you went to the polls?
13   A.   No, I wasn't.
14        MS. WILLIAMS:  Object to the form and
15   to the assumption that he needed to have his
16   card with him.
17        MS. DONNELLY:  I'll withdraw it.
18   Q.   Did you look for your voter's
19 registration card after you made that decision?
20   A.   No, I didn't.
21   Q.   In addition to your driver's license,
22 what other forms of identification do you use when
23 somebody asks you to present information for
24 identification?
25   A.   Passport.

Page 51

1        MS. DONNELLY:  I have no further
2   questions.
3        MS. NORRIS-WEEKS:  No questions.
4        CROSS EXAMINATION
5  BY MR. ORTEGA:
6    Q.   Hi.  I'm Omar Ortega on behalf of
7  ChoicePoint.  I have some very brief questions.
8        When you were told your voter's
9  registration was inactive, you said you did
10 testify that you were told it was inactive at the
11 time?
12   A.   Yes.
13   Q.   Were you given a reason why it was
14 inactive?
15   A.   It was because I had not voted before.
16   Q.   They did not tell you it was inactive
17 because you had been convicted of a crime,
18 correct?
19   A.   Say that again.
20   Q.   You were told it was inactive because
21 you had not voted before, correct?
22   A.   Yes.
23   Q.   You were not told that it was inactive
24 because you had been convicted of a crime,
25 correct?

Page 52

1    A.   Yes.
2    Q.   I'll rephrase it for you.  Were you
3  told you couldn't vote because you had been
4  convicted of a crime?
5    A.   No.
6    Q.   As far as you know, did that ever
7  happen?  In other words, was your name removed
8  because you were convicted of a crime?
9    A.   No.
10   Q.   Did anyone ever tell you that your name
11 had been removed or inactive because you had
12 change your residence in Miami-Dade County?
13   A.   Had anyone ever told me that I was
14 removed because I changed my residence?
15   Q.   Correct.
16   A.   No.
17   Q.   As far as you know, did that ever
18 happen?  Do you know if that's why they put you as
19 inactive?
20   A.   No.  I'm not sure.
21   Q.   Did anyone ever tell you that your name
22 had been removed because you were listed as having
23 died or deceased?
24   A.   No.
25   Q.   Other than what you may have been told

Page 53

1  or what you've heard, have you heard of Database
2  Technologies, Inc.?
3    A.   No, I can't say I have.
4    Q.   Other than what you may have heard or
5  been told, have you ever heard of ChoicePoint,
6  Inc.?
7    A.   No.
8    Q.   Do you know when you lost your voter's
9  registration card?
10   A.   Had to have been around the time when I
11 moved.
12   Q.   Which time?
13   A.   In September 2000.
14   Q.   And at that time when you moved, you
15 didn't go to or contact the voter's registration
16 to change your address, correct?
17   A.   I didn't know that it was missing until
18 I went looking for it.
19   Q.   Go ahead.
20   A.   And I found out it's not necessary to
21 always have your voter's registration card to
22 vote.
23   Q.   Did you notify them of the change of
24 address?
25   A.   The voters registration?

Page 54

1   Q.   Yes.
2   A.   No, I didn't.
3        MR. ORTEGA:  I don't have any further
4   questions.
5        MS. NORRIS-WEEKS:  I have a couple of
6   questions.
7             CROSS EXAMINATION
8   BY MS. NORRIS-WEEKS:
9   Q.   You mentioned that you were interviewed
10  on television at some point after the November 7th
11  election?
12  A.   Yes.
13  Q.   Do you recall whether those other two
14  people that you met who were also interviewed,
15  whether either one of those persons was from
16  Broward County?
17  A.   I think one of them was.  They
18  mentioned a long drive, but I can't be certain.
19  Q.   Do you know the name of that person?
20  A.   No, I don't.
21  Q.   Do you know what that person looked
22  like?
23  A.   If I saw him again, yes.
24  Q.   Was it a male?
25  A.   There were two guys and a woman.

Page 55

1   Q.   And the person that was from Broward
2   County, was that a male?
3   A.   I can't remember which one was -- it
4   could have been the female that was from Broward
5   County or it could have been one of the two guys.
6   I knew one of those guys came from far out in
7   Broward probably, but I'm not sure which one it
8   was exactly.
9   Q.   I see.  Do you know of anyone in
10  Broward County who has similar complaints to the
11  complaints that you made here today?
12  A.   I believe that the complaints they made
13  were different from the complaints that I made.
14  Q.   How is that?
15  A.   I don't believe they, per se, went up
16  there and found their name not on the list.  I
17  believe maybe it was something else, like police
18  officer.  I believe one of the guys spoke of
19  police officers being in the vicinity checking
20  tags.
21  Q.   Are we talking about Broward County
22  again?
23  A.   This was the guy, but I don't know.
24  Like I was saying earlier, I don't recall exactly.
25  One of these guys was from Broward.

Page 56

1   Q.   Let me back-up a second.  My question
2   is, do you know of anyone in Broward County, not
3   necessarily the people that you met with on the
4   day that you had the television interview, but
5   anyone who has similar complaints to the ones that
6   you are making here today?
7   A.   No, I can't say I do.
8   Q.   Have you spoken with anyone in Broward
9   County who has any complaints regarding the
10  November 7th, 2000 election?
11  A.   Not that I can -- outside of the person
12  that was with us, no.
13       MS. NORRIS-WEEKS:  Okay.  Thank you.
14  That's all I have.
15       MR. TINKLER:  Just one question.
16            CROSS EXAMINATION
17  BY MR. TINKLER:
18  Q.   The news hour interview you were on,
19  was that during the recount process or was that
20  after the election had been resolved?
21  A.   I think it was during the recount
22  process.  I'm not sure.  The recount process was
23  kind of iffy to me because when I heard they did
24  the recount, then I heard they finished doing it.
25  Next thing I heard they were doing the recount.

Page 57

1   Q.   But you are not sure of the exact date?
2   A.   I'm not sure of the exact date.
3        MR. HARVEY:  No questions.
4        MS. TORRES:  Mr. Eckert, any questions?
5        MR. ECKERT:  No questions.
6        MS. WILLIAMS:  That's it.  I can
7   explain.  You have the right to read the
8   deposition if you want to make sure that
9   there are no corrections that need to be
10  made.  If you have any corrections, they will
11  be attached as an errata sheet or you can
12  waive that right.  It's up to you.  The
13  deposition -- the transcript of what happened
14  today is what I'm referring to.
15       THE WITNESS:  Oh, okay.  What was that
16  again?
17       MS. WILLIAMS:  You have the right to
18  read it before it's finalized before the
19  court reporter certifies that this is it to
20  make any technical corrections.  For example,
21  if there's a misspelling or something like
22  that, an errata sheet would be attached to it
23  saying you made those corrections.  You have
24  a right to read it before it's finalized or
25  you can waive that right.  It's up to you.

Page 58

1    THE WITNESS:  I'll waive that right.
2    MS. TORRES:  Thank you very much,
3 Mr. Israel.
4    MS. DONNELLY:  I'll take a copy.
5    MR. HARVEY:  Copy.
6    MR. ORTEGA:  We will order a copy.
7    MR. TINKLER:  Yes, copy.
8    MS. HENDERSON: Copy.
9    MS. NORRIS-WEEKS:  No copy.
10    MR. ECKERT:  No copy.
11
12    (Thereupon, the deposition was concluded)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 59

1         CERTIFICATE OF NOTARY
2 STATE OF FLORIDA:
3           SS.
4 COUNTY OF DADE:
5         I, JANET BALDAUF, Registered Professional
6 Reporter and Notary Public in and for the State of
7 Florida at Large, do hereby certify that I
8 reported in shorthand the deposition of ADMATHA
9 ISRAEL, a witness called by the defendant in the
10 above styled cause; that the witness was first
11 duly sworn by me; that the reading and signing of
12 the deposition were waived by the witness; that
13 the foregoing pages, numbered from 1 to 59,
14 inclusive, constitute a true record.
15         I further certify that I am not an
16 attorney or counsel of any of the parties, nor
17 related to any of the parties, nor financially
18 interested in the action.
19         WITNESS my Hand and Official Seal this
20 14th day of January, 2002.
21
22
         _____
         JANET BALDAUF, RPR
23       Notary Public - State of Florida
         Commission No. CC822036
24       Expires 3-31-2003
25

# TAB 28

COPY

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF FLORIDA
2              MIAMI DIVISION
     Case No. 01-0120-CIV-GOLD/SIMONTON
3

4    NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
     PEOPLE, INC., by its FLORIDA STATE CONFERENCE OF
5    BRANCHES, JIMMIE PANNELL, JULIA STONER, NATALIE
     CARNEGIE, JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q.
6    ODOM, WILLIE STEEN, WALLACE McDONALD, JERMAINE TERRY,
     LORINE WALDEN, EMERY TIMBERLAKE, VALERIE BUFORD-
7    WELLS, MICHELLE FLOYD, CONSUELLO MARIA GRAHAM, SHERRY
     EDWARDS, KANDY WELLS, JOANNA CLARK, JANICE KELLY,
8    PLACIDE DOSSOUS, RONDRICK ROSE, URSULA HARVEY, and
     ADMATHA ISRAEL in their own right and as
9    representatives of all similarly situated citizens
     and residents of the State of Florida,
10
                    Plaintiffs,
11
     -vs-
12
     KATHERINE HARRIS, Secretary of State of Florida;
13   CLAY ROBERTS, Director of the Florida Divisions
     of Elections, FRED DICKINSON,  Executive Director
14   of the Florida Department of Highway Safety and
     Motor Vehicles; KATHLEEN A. KEARNEY, Secretary of
15   the Department of Children and Families; DAVID C.
     LEAHY, Miami-Dade County Election Supervisor; MIRIAM
16   OLIPHANT, Broward County Election Supervisor; JOHN
     STAFFORD, Duval County Election Supervisor; PAM
17   IORIO, Hillsborough County Election Supervisor; ION
     SANCHO, Leon County Election Supervisor; WILLIAM
18   COWLES, Orange County Election Supervisor; and DEANIE
     LOWE, Volusia County Election Supervisor (all in
19   their official capacities), and CHOICE POINT, INC., a
     Georgia corporation d/b/a DATABASE TECHNOLOGIES,
20   INC.,

21                  Defendants.
     _____/
22

23

                DEPOSITION OF URSULA HARVEY
24

25

```
 1                              700 Catalina Drive
                               Daytona Beach, Florida
 2                             March 13, 2002
                               3:23 p.m. - 4:43 p.m.
 3

 4

 5

 6              The above-styled cause came on for hearing

 7      before me, Jane I. O'Brien, Certified Shorthand

 8      Reporter, Registered Merit Reporter, and Notary

 9      Public, State of Florida at Large, at the time and

10      place above indicated for the purpose of taking

11      testimony.

12

13

14      APPEARANCES:

15
                        JANAI S. NELSON, ESQUIRE
16                      NAACP Legal Defense and Educational
                        Fund, Inc.
17                      99 Hudson Street
                        New York, NW  10013
18
                        On Behalf of Plaintiff NAACP
19

20                      TODD A. COX, ESQUIRE
                        NAACP Legal Defense and Educational
21                      Fund, Inc.
                        1444 Eye St., N.W., 10th Floor
22                      Washington, D.C.

23                      On Behalf of Plaintiff NAACP

24

25
```

```
 1        DANIEL D. ECKERT, ESQUIRE
          County Attorney's Office
 2        123 W. Indiana Ave.
          DeLand, FL  32720-4613
 3
          On Behalf of Defendant Deanie Lowe
 4

 5        DANIEL A. RESTREPO, ESQUIRE
          Williams & Connolly, LLP.
 6        725 12th Street, N.W.
          Washington, D.C.  20005-5901
 7
          Appearing by Telephone on Behalf of
 8        Defendant ChoicePointe, Inc.

 9

10        WALTER HARVEY, ESQUIRE
          200 S. Biscayne Blvd.
11        Miami, FL  33131

12        Appearing by Telephone on behalf of
          Defendant Department of State and
13        Florida Division of Elections

14        JEFFREY EHRLICH, ESQUIRE
          SUSAN TORRES, ESQUIRE
15        Assistant County Attorney
          111 N.W. First St., Suite 2810
16        Miami, FL  33128

17        Appearing by Telephone on Behalf
          of Defendant David Leahy
18

19        TRACEY I. ARPEN, ESQUIRE
          Office of the General Counsel
20        117 W. Duvall St., Suite 480
          Jacksonville, FL  32202-3700
21
          Appearing by Telephone on Behalf
22        of Defendant John Stafford

23

24

25
```

```
 1              GEORGE WAAS, ESQUIRE
               Office of the Attorney General
 2              PL-01 The Capitol
               Tallahassee, FL  32399-1050
 3
               Appearing by Telephone on Behalf
 4             of Defendants Katherine Harris,
                Kathleen Kearney and Fred Dickinson
 5

 6              MICHAEL D. CIRULLO, JR., ESQUIRE
               Goren, Cherof, Doody & Ezrol, P.A.
 7             3099 E. Commercial Blvd., No. 200
               Fort Lauderdale, FL  33308
 8
               On Behalf of Defendant William Cowles
 9

10

11

12

13                     I N D E X

                                              Page
14
```

```
15    Direct Examination by Mr. Cirullo, Jr........... 5
      Cross-Examination by Mr. Ehrlich .............. 16
16    Cross-Examination by Mr. Harvey ............... 36
      Cross-Examination by Mr. Waas ................. 38
17    Cross-Examination by Mr. Arpen ................ 40
      Cross-Examination by Mr. Eckert................ 41
18    Recross-Examination by Mr. Ehrlich ............ 50
      Cross-Examination by Mr. Restrepo ............. 52
19    Cross-Examination by Ms. Nelson ............... 53
      Recross-Examination by Mr. Eckert ............. 55
20
```

```
21

22

23

24

25
```

```
 1    THEREUPON,

 2              MS. NELSON:  Can we get some stipulations

 3         on the record?

 4              MR. CIRULLO, JR.:  Sure.  We'll go ahead

 5         and see if we agree.

 6              MS. NELSON:  We would like to stipulate

 7         we preserve all objections except to

 8         privilege and form.

 9              MR. CIRULLO, JR.:  Sure.

10              MS. NELSON:  Okay.

11    THEREUPON,

12                   URSULA HARVEY

13    was called as a witness and, after having first been

14    duly sworn, testified as follows:

15                   DIRECT EXAMINATION

16    BY MR. CIRULLO, JR.:

17         Q    Miss Harvey, my name is Mike Cirullo.  I

18    represent Orange County Supervisor of Elections Bill

19    Powell.

20              Can you hear me okay?

21         A    Yes, sir.

22         Q    Okay.  If you ever can't hear me, please

23    say so and I'll repeat the question, all right?

24         A    Okay.

25         Q    Have you ever had your deposition taken
```

```
 1   before?

 2        A    No.

 3        Q    Okay.  The purpose of a deposition is for

 4   myself and perhaps the other attorneys to ask you

 5   questions to try to get some information about your

 6   knowledge in this case, and your knowledge of the

 7   allegations against these defendants.

 8             The purpose of my questions are not to fool

 9   you or trick you into certain type answers, just

10   trying to get you to answer based on your knowledge.

11             If you don't understand a question, please

12   tell me and I'll try to rephrase it so you do, okay?

13        A    Okay.

14        Q    I'd ask that you don't interrupt me or the

15   other questioners, because the court reporter cannot

16   take down more than one person at a time.

17             And obviously if your answers to any

18   questions are yes or no, please articulate that,

19   because we won't be able to see any gestures or

20   mumbling, and the court reporter needs to take down

21   your answers, okay?

22        A    Yes, sir.

23        Q    Okay.  For the record, please state your

24   name and your proper spelling.

25        A    Ursula Harvey, U R S U L A, H A R V E Y.
```

```
 1          Q    What is your date of birth?

 2          A    January 11, 1980.

 3          Q    Are you a U.S. citizen?

 4          A    Yes, sir.

 5          Q    What is your current address?

 6          A    1017 Blackwell Street, Waycross, Georgia,

 7    31501.

 8          Q    How long have you lived at that address?

 9          A    For about four months.

10          Q    Four months?  I'm sorry, did you say four

11    months?

12          A    Yes.

13          Q    Thank you.

14               On November 7, 2000, where did you live?

15          A    In Daytona Beach.

16          Q    Do you have a street address for that?

17          A    640 Dr. Mary McLeod Bethune Boulevard,

18    Ja-Flor Davis.

19          Q    Are you a member of the NAACP?

20          A    No, sir.

21          Q    Did you say yes?

22          A    No.

23          Q    No, you're not a member?

24          A    No.

25          Q    Okay.  Have you read the second amended
```

```
 1      complaint?
 2          A    No.
 3          Q    Have you read the first amended complaint
 4      in this case?
 5               MS. NELSON:  Let me just jump in and
 6          mention these are the documents that we --
 7               THE WITNESS:  Yes, sorry.
 8      BY MR. CIRULLO, JR.:
 9          Q    I'm sorry.  You have copies of the second
10      amended complaint there?
11          A    No.
12               MS. NELSON:  Mr. Eckert is right now
13          passing Miss Harvey --
14      BY MR. CIRULLO, JR.:
15          Q    You have read the second amended complaint?
16               MS. NELSON:  Right now Mr. Eckert is
17          passing Miss Harvey a copy of the second
18          amended complaint.
19      BY MR. CIRULLO, JR.:
20          Q    Miss Harvey, have you read that second
21      amended complaint?
22          A    Yes, sir.
23               MS. NELSON:  Mr. Cirullo, did you hear
24          that last answer?
25               MR. CIRULLO, JR.:  No.
```

```
 1              THE WITNESS:  Yes, sir.  Yes
 2   BY MR. CIRULLO, JR.:
 3        Q    I'm sorry.
 4             So you're familiar with the allegations in
 5   the complaint?
 6        A    Yes, sir.
 7        Q    Okay.  Let me go back to you live currently
 8   in Waycross, Georgia?
 9        A    Yes, sir.
10        Q    Are you registered to vote there?
11        A    No.
12        Q    Do you intend to register to vote in
13   Waycross?
14        A    No.
15        Q    Why not?
16        A    I'm just there for this semester.  I'll be
17   coming back to Daytona in August.
18        Q    Okay.  Have you ever lived in Orange
19   County, Florida?
20        A    No, sir.
21        Q    Was that no?
22        A    No.
23        Q    I'm sorry.  You've never lived in Orange
24   County?
25        A    No.
```

```
 1        Q    Have you ever registered to vote in Orange

 2   County?

 3        A    No.

 4        Q    Besides Volusia County, have you ever

 5   registered -- I'm sorry.  Strike that.

 6             Besides Volusia and Martin county, have you

 7   ever registered to vote in any other county in

 8   Florida?

 9        A    No, sir.

10        Q    Did you vote in Orange County, Florida, on

11   November 7, 2000?

12        A    No.

13        Q    Did you attempt to vote in Orange County on

14   November 7, 2000?

15        A    No, sir.

16        Q    Other than Volusia County, did you either

17   vote or attempt to vote in any other county in the

18   state of Florida?

19        A    No.

20        Q    Do you know how William Powell purged

21   registered voters from his voter log?

22             MS. NELSON:  Objection to form.

23             You can answer.

24             THE WITNESS:  Could you say that again,

25        please?
```

```
1    BY MR. CIRULLO, JR.:

2         Q    Do you know how William Powell, the Orange

3    County Supervisor of Elections, purged voters from

4    their voter roll?

5         A    No.

6         Q    Do you know how any supervisor of elections

7    in the state of Florida purges voters from voter

8    roll?

9         A    No.

10        Q    Do you know how William Powell verified the

11   change of address?

12             MS. NELSON:  Objection.  Calls -- lacks

13        foundation.

14             You can answer.

15             THE WITNESS:  No.

16   BY MR. CIRULLO, JR.:

17        Q    Okay.  Let me rephrase that.  When a

18   registered voter moves, do you know how William

19   Powell, the Orange County Supervisor of Elections,

20   verified a change of address for that registered

21   voter?

22             MS. NELSON:  Objection.  Lacks

23        foundation.

24             You can answer, if you know.

25             THE WITNESS:  No.
```

1    BY MR. CIRULLO, JR.:

2         Q    Do you know how any other supervisor of

3    elections in the state verifies changes of address?

4              MS. NELSON:  Objection.  Lacks

5         foundation.

6              THE WITNESS:  No.

7              MR. CIRULLO, JR.:  Janai, what's the

8         lack of foundation?  These are all

9         allegations in the complaint.  If there's

10        anything I can do to clarify that, let me

11        know.

12             MS. NELSON:  The foundation is any

13        registered voter who moves gets their address

14        verified by any supervisor of elections.

15             MR. CIRULLO, JR.:  Okay.  All right.

16             MS. NELSON:  I think we have a clear

17        record, though, in terms of your questions

18        and her answers, though.

19             MR. CIRULLO, JR.:  All right.  Thanks.

20   BY MR. CIRULLO, JR.:

21        Q    In paragraph 114 of the second amended

22   complaint, tell me when you get there.

23        A    I'm there.

24        Q    Okay.  You make an allegation of unequal

25   access to the complete county voter roll.  Do you

```
 1      know how William Powell provides access to the
 2      complete voter roll?
 3              MS. NELSON:  Objection.  Lacks foundation.
 4      BY MR. CIRULLO, JR.:
 5          Q   Ma'am, did you answer that?
 6              MS. NELSON:  You can answer.  She has
 7          not answered as yet.
 8              THE WITNESS:  No.
 9      BY MR. CIRULLO, JR.:
10          Q   Okay.  Do you know how any other supervisor
11      of elections provides access to the complete voter
12      roll?
13              MS. NELSON:  Objection.  Lacks foundation.
14              You can answer.
15              THE WITNESS:  No.
16      BY MR. CIRULLO, JR.:
17          Q   Okay.  Do you know how Bill Powell trains
18      poll workers?
19              MS. NELSON:  Objection.  Lacks
20          foundation.
21              THE WITNESS:  No.
22      BY MR. CIRULLO, JR.:
23          Q   Do you know how Bill Powell's office was
24      equipped to handle complaints on November 7, 2000?
25              MS. NELSON:  Objection.  Lacks
```

1       foundation.

2              THE WITNESS:  No, sir.

3       BY MR. CIRULLO, JR.:

4          Q    Do you know how many phone lines Bill

5       Powell used on November 7, 2000?

6          A    No, sir.

7          Q    Do you know whether laptops were placed in

8       precincts in Orange County on November 7, 2000?

9          A    No, sir.

10         Q    Do you know whether any other counties used

11      computers at their precincts on November 7, 2000?

12         A    No, sir.

13         Q    Do you have any evidence that Bill Powell

14      acted in a discriminatory manner in regards to the

15      November 7, 2000 election?

16             MS. NELSON:  Objection.  Calls for a

17             legal conclusion.

18             Do you understand the question?

19             THE WITNESS:  No, sir.  Sorry.

20      BY MR. CIRULLO, JR.:

21         Q    No, okay.

22             Do you have any evidence that any acts Bill

23      Powell took on November 7, 2000, had any adverse

24      effect on African-Americans?

25             MS. NELSON:  Objection.  Calls for a

1          legal conclusion.

2                    THE WITNESS:  No, sir.

3      BY MR. CIRULLO, JR.:

4          Q      Do you know that this complaint is

5      fashioned as a class action, correct?

6          A      Yes.

7          Q      What class do you represent in this

8      lawsuit?

9          A      I don't understand what you mean.

10         Q      Well, you say you are a named plaintiff in

11     a class action lawsuit, which means you are asserting

12     or moving forward on a claim on behalf of a number of

13     people too numerous to name who join in this

14     complaint.

15                    I was wondering if you know what class you

16     represent in this lawsuit.

17         A      No, sir.

18         Q      What relief are you specifically seeking in

19     this case?

20                    MS. NELSON:  Objection.  Calls for a

21              legal conclusion.

22                    Do you understand the question?

23                    THE WITNESS:  No, I don't understand

24              that question.

25     BY MR. CIRULLO, JR.:

1    Q    Miss Harvey, what relief are you asking

2    for?  Why are you suing?

3    A    I just want to know why I couldn't vote.

4    Q    So if you knew why you couldn't vote you

5    would be satisfied?

6    A    Yes.

7    Q    Okay.  I don't have any further questions,

8    but there may be other people on this phone that do.

9    But I want to thank you for taking the time to travel

10   down and meet with us this afternoon.

11   A    Yes, sir.  You're welcome.

12                 CROSS-EXAMINATION

13   BY MR. EHRLICH:

14   Q    My name is Jeff Ehrlich.  I'm an assistant

15   county attorney from Miami-Dade County.  I represent

16   the Supervisor of Elections from Miami Dade County,

17   David Leahy.

18         I wanted to ask you a few questions about

19   your experiences on election day, 2000.

20         Did you attempt to vote in the presidential

21   election on November 7, 2000?

22   A    Yes, sir.

23   Q    Where did you attempt to vote?

24   A    In Daytona Beach, Florida.

25   Q    Do you recall what precinct you went to?

1       A    Not off the top of my head.

2       Q    Do you recall where it was located?

3       A    Yes.

4       Q    Where was it located?

5       A    I believe Bethune Boulevard.

6       Q    Is there a particular building that the

7    precinct was in?

8       A    Yes.  I don't remember the name of it.

9       Q    Was it a building affiliated with

10   Bethune-Cookman College?

11      A    No, sir.

12      Q    What happened after you arrived at the

13   precinct?

14      A    I gave one of the ladies there my voter

15   registration card and my license, and she saw my name

16   wasn't on the list and she asked the director to come

17   over and check my name to see if I was on the list.

18   My name wasn't on the list again.  The director took

19   my license and voter registration card and called to

20   another area to ask someone why -- excuse me -- where

21   or why I couldn't vote.  And she told me that they

22   said I had to go back to Martin County to vote.

23      Q    Okay.  You say you showed your voter ID

24   card to someone, right?

25           MS. NELSON:  Objection.

```
 1              Mischaracterizes her testimony.
 2    BY MR. EHRLICH:
 3         Q    Did you show your voter ID card to someone
 4    that day?
 5         A    Yes, sir.
 6         Q    I thought that's what I heard before.  I
 7    wanted to make sure.
 8              What was the address on your voter ID card?
 9              MS. NELSON:  Are we using voter ID card
10         and voter registration card interchangeably?
11              MR. EHRLICH:  I'm just asking a question
12         and I'm waiting for an answer.
13              MS. NELSON:  Can you read the question
14         back, please?
15         (Whereupon, the last question was read back by
16    the reporter.)
17              THE WITNESS:  Yes, sir.
18    BY MR. EHRLICH:
19         Q    I think my question was what was the
20    address on your voter ID card that day.
21         A    640 Dr. Mary McCleod Bethune Boulevard.
22         Q    I think what I'm referring to is on your
23    voter ID card.  Was your name on your voter ID card?
24         A    Yes.
25              MS. NELSON:  Did you hear her last
```

1        answer?

2                MR. EHRLICH:  No.  I'm sorry, I did not,

3        no.

4                THE WITNESS:  Yes, sir.

5    BY MR. EHRLICH:

6        Q      Thank you.

7                Did you have an address belonging to you on

8    your voter ID card?

9                MS. NELSON:  Objection.  Unclear.

10               Can you rephrase that for her, please?

11               MR. EHRLICH:  No.  I think it was clear.

12       I'd like the witness to answer, please.  And

13       if I may, Miss Nelson, I ask you not make

14       speaking objections to my questions.

15               MS. NELSON:  If they're unclear, I think

16       it helps everyone, but we can ask to have the

17       question read back.

18               MR. EHRLICH:  The local rules of the

19       Southern District of Florida require you not

20       make speaking objections, so although I

21       accept you can probably make this easier for

22       everyone, I would ask you abide by the local

23       rules.

24               Court reporter, please read back the

25       question.

```
 1          (Whereupon, the last question was read back by

 2     the reporter.)

 3               MS. NELSON:  Objection to form.

 4               You can answer.

 5               THE WITNESS:  Can I ask him a question?

 6               Do you mean the address where I was

 7          living at at the time?

 8     BY MR. EHRLICH:

 9          Q    That could be the address that was on your

10     voter ID card, but my question is:  What -- did you

11     have an address that belonged to you on your voter ID

12     card?

13               MS. NELSON:  Objection to form.  You can

14          answer.

15               THE WITNESS:  Belonging to me?  Do you

16          mean where I paid rent or something?

17     BY MR. EHRLICH:

18          Q    Miss Harvey?

19          A    Yes, sir.

20          Q    That could be the address that was on your

21     voter ID card, I don't know.  I'm just asking if

22     there was an address on the voter ID card that you

23     acknowledge now belonged to you at the time.

24          A    Yes.

25          Q    Okay.  What was that address?
```

```
 1            A      640 Dr. Mary McCleod Bethune Boulevard,

 2     Ja-Flo Davis, Daytona Beach, Florida.

 3            Q      Is that where you lived on November 7,

 4     2000?

 5            A      Yes, sir.

 6            Q      I believe you said you showed your driver's

 7     license when you went to vote; is that correct?

 8            A      Can I go back?

 9            MS. NELSON:  He has a question pending.

10            Can you read the last question back?

11     Let her answer.

12            (Whereupon, the last question was read back by

13     the reporter.)

14            THE WITNESS:  Yes.

15     BY MR. EHRLICH:

16            Q      What was the address on your driver's

17     license that day?

18            A      I'm not quite sure.  I can't give you the

19     number, but I can tell you the rest of it.  It's in

20     Stuart, Florida.  I think 1348 Northwest Charlie

21     Green Drive.

22            MS. NELSON:  I'd like to take a quick

23            break, please.

24            MR. EHRLICH:  I'm sorry, what was that?

25            MS. NELSON:  This is Janai Nelson.
```

1          I would like to take a quick break,

2     please.

3          MR. EHRLICH:  Okay.  We've only been

4     going for about 20 minutes.

5          MS. NELSON:  I understand that.

6          MR. EHRLICH:  Okay.

7          MS. NELSON:  Thank you.

8          MR. EHRLICH:  We'll take a break for

9     five minutes.

10         (Whereupon, there was a recess from

11    approximately 3:38 p.m. to 3:41 p.m.)

12          MS. NELSON:  My client wanted to

13    clarify one thing that she mentioned earlier.

14    I'll let her do that now.

15         MR. EHRLICH:  Actually I had an answer

16    to my last question, and Janai, of course

17    you'll have an opportunity to ask on redirect

18    anything you need to to clarify, but I'm

19    ready to move on.

20    BY MR. EHRLICH:

21         Q    Miss Harvey, you stated that the address on

22    your driver's license was in Stuart; is that correct?

23         A    Yes, sir.

24         Q    What county is Stuart, Florida, in?

25         A    Martin.

1      Q    We just returned from a short break.  Did

2    you talk to anyone during that break?

3      A    Yes.

4      Q    Who did you talk to?

5      A    Janai.

6      Q    By Janai, are you referring to your

7    counsel?

8      A    Yes, sir.

9      Q    Is that right?

10     A    Yes, sir.

11     Q    Okay.  Back to what happened to you on

12    November 7.

13          Now, you stated that you showed your voter

14    card and your driver's license to a poll worker, and

15    that person went and got a -- I think you said a

16    director; is that right?

17          MS. NELSON:  Objection.  Asked and

18        answered.

19          You can answer.

20          THE WITNESS:  Yes.

21          MR. EHRLICH:  I don't think I asked that

22        question.

23    BY MR. EHRLICH:

24     Q    Did that person then call a director?

25     A    The poll worker, sir?

1      Q      Yes.

2             Who did the poll worker call or get the

3      attention of to help you after you showed your card

4      and license and they were not able to locate you on

5      the list at the precinct?

6      A      The director, I believe.

7      Q      When you say director, that's your word.

8      Are you referring to someone who was supervising at

9      the precinct you were at?

10            MS. NELSON:  Objection to form.

11            MR. EHRLICH:  What's wrong with the

12        form?

13            MS. NELSON:  Yes.

14            MR. EHRLICH:  What was wrong with the

15        form?

16            MS. NELSON:  I think the question is

17        confusing, and it also asks Miss Harvey to

18        determine who was a supervisor or directing,

19        which also could be a legal term as well.

20     BY MR. EHRLICH:

21     Q      Okay.  Miss Harvey, you used the word

22     director.  What did you mean by that term?

23     A      The person I thought was in charge of that

24     polling area at the time.

25     Q      Okay.  Do you know that person's name?

```
 1          A     No, sir.

 2          Q     Do you know the name of the poll worker you

 3    had initial contact with?

 4          A     No, sir.

 5          Q     Okay.  Now, I believe you testified that

 6    the director then went and made a phone call; is that

 7    right?

 8          A     Yes, sir.

 9          Q     Do you know who -- was it a woman?

10          A     Yes, sir.

11          Q     Do you know who she called?

12          A     I don't know.

13          Q     Did she say to you who she was calling?

14          A     No, sir.

15          Q     You had a conversation with her while she

16    was on the phone, right?

17          A     Yes, sir.

18          Q     What did she tell you?

19                MS. NELSON:  Objection.  Hearsay.

20                Go ahead.

21                THE WITNESS:  She told me that the

22          person on the other end said the only way I

23          was able to vote was if I went back to Martin

24          County.

25    BY MR. EHRLICH:
```

```
 1        Q    Do you know why she said that?

 2        A    She said because my name wasn't on the

 3   voting list for Volusia County.

 4        Q    How did she know that you had been

 5   registered in Martin county?

 6             MS. NELSON:  Objection.  Calls for

 7        speculation.

 8             MR. EHRLICH:  You may answer.

 9             THE WITNESS:  Could you say that again,

10        please?

11             MR. EHRLICH:  Court reporter, please

12        read back the question.

13             (Whereupon, the last question was read back by

14   the reporter.)

15             MS. NELSON:  Objection.  Calls for

16        speculation.

17             THE WITNESS:  I didn't tell her.  The

18        person on the other end just told her, I

19        think.

20   BY MR. EHRLICH:

21        Q    Okay.  So what did you do after you were

22   told you would have to go to Martin County to vote

23   that day?

24        A    I told her that I did register in Martin

25   County, but I remember registering in Volusia County,
```

```
 1    and she said she couldn't do anything about it.
 2        Q    When did you register in Martin County?
 3        A    In 1998.
 4        Q    And then when did you next register to
 5    vote?
 6        A    In late 1998.  I don't know the month.  I
 7    can't remember the month.
 8        Q    Where was that?
 9        A    In Volusia County.
10        Q    After you registered in late 1998 in
11    Volusia County, did you register to vote anywhere
12    else?
13        A    No, sir.
14        Q    Did you vote in 1998 in Volusia County?
15        A    Yes, sir.
16        Q    You told me you registered to vote in
17    Volusia County in late 1998.  Do you remember where
18    you registered to vote?
19        A    On my school campus, Bethune-Cookman
20    College.
21        Q    Was there some sort of voter registration
22    drive going on?
23        A    Yes, sir.
24        Q    And you registered during that drive?
25        A    Yes, sir.
```

1          Q     Then you voted subsequent to that?

2                MS. NELSON:  Objection.

3                Are you going to state that as a

4        question?

5                MR. EHRLICH:  It was a question.

6                MS. NELSON:  Objection to form.

7                MR. EHRLICH:  What's wrong with the

8        form?

9                MS. NELSON:  You're making a statement.

10       BY MR. EHRLICH:

11         Q     Okay.  You may answer my statement/

12       question.

13               MS. NELSON:  Objection to form.

14               THE WITNESS:  Yes, sir.

15               MS. NELSON:  Can you read back the

16       question?

17               (Whereupon, the last question was read back by

18       the reporter.)

19               THE WITNESS:  Yes, sir.

20               MS. NELSON:  Did you hear Miss Harvey's

21       last response?

22               MR. EHRLICH:  Yes, I did.  I'm pondering

23       it.  I'm sorry.  Give me one second.

24               MS. NELSON:  No problem.

25               MR. EHRLICH:  I did hear it, though.

1          MS. NELSON:   Okay.

2    BY MR. EHRLICH:

3          Q    Miss Harvey, you never registered to vote

4    in Miami-Dade County; is that right?

5          A    Yes, sir.

6          Q    And you never attempted to vote in Miami-

7    Dade County, right?

8          A    Yes, I never did.

9          Q    Do you know whether the supervisor of

10    elections of Miami-Dade County keeps a list of

11    inactive voters at each precinct during elections?

12          A    No, sir.

13          Q    Do you know whether the supervisor of

14    Miami-Dade County had a list at each precinct during

15    the November 7 of 2000 election of all the inactive

16    voters at that precinct?

17          A    No, sir.

18          Q    Do you know whether the supervisor of

19    elections in Miami-Dade County has any sort of

20    training for poll workers?

21          A    No, sir.

22          Q    When did you move to Volusia County?

23          MS. NELSON:   Objection.   Lacks

24          foundation.

25          THE WITNESS:   In August of 1998.

1      BY MR. EHRLICH:

2          Q      When you moved to Volusia County, did you

3      change your address on your driver's license?

4          A      No, sir.

5          Q      After you registered to vote in Volusia

6      County, did you change your address within Volusia

7      County?

8          A      No, sir.

9          Q      When did you move from Volusia County to

10     Georgia?

11         A      When?

12         Q      Yes.

13         A      In December.

14         Q      Of what year?

15         A      2001.

16         Q      Did you move from your address in Volusia

17     County directly to Waycross, Georgia?

18         A      Yes, sir.

19         Q      During the time you lived in Volusia County

20     from, I suppose, late 1998 until December 2001, did

21     you only live at one address?

22         A      Yes, sir.

23         Q      When you moved to Georgia, did you obtain a

24     Georgia driver's license?

25         A      No, sir.

1       Q    Is the driver's license you have today the

2    same one that you showed at the precinct in November

3    2000?

4              MS. NELSON:   Objection.   Lacks

5         foundation.

6              Go ahead.

7              THE WITNESS:   No, sir.

8    BY MR. EHRLICH:

9       Q    How is it different?

10      A    I changed the address on it.

11      Q    Why did you change the address?

12      A    Because I got a new license, and instead of

13   -- I just wanted to change the address.

14      Q    The Stuart address you had in November of

15   2000, was that your permanent residence?

16      A    No, sir.

17      Q    Was there more to the answer?

18      A    No.

19      Q    What was that Stuart address on your

20   driver's license?

21      A    1348 Northwest Charlie Green Drive.

22      Q    Of what significance was that address to

23   you?

24      A    That's where my mother lived.

25      Q    Did you ever live at that address?

1    A    Yes, sir.

2    Q    From when to when?

3    A    October of 1994 to August of 1998.  Excuse

4    me.  1995.   October of 1995 to August of 1998.

5    Q    Okay.  And then August of 1998 you moved to

6    Volusia County?

7    A    Yes, sir.

8    Q    But you did not change your address on your

9    driver's license at that time?

10   A    No, sir.

11        MS. NELSON:  Is that a question?

12   BY MR. EHRLICH:

13   Q    When you moved to Volusia County in August

14   1998, you did not change your address on your

15   driver's license; is that correct?

16   A    No, I didn't change it.

17   Q    When did you change it?

18   A    In 2001.

19   Q    What did you change your address to?

20   A    1017 Blackwell Street, Waycross, Georgia.

21   Q    Do you have a Florida driver's license

22   today?

23   A    Yes, sir.

24   Q    I'm sorry.  I don't know if there was an

25   answer to the question.

```
 1          A    Yes, sir.
 2          Q    You have a Florida driver's license?
 3          A    Yes, sir.
 4          Q    On that driver's license you have a Georgia
 5     address?
 6          A    Yes, sir.
 7          Q    That was a yes?
 8          A    Yes.
 9          Q    Okay.  Thank you.
10               Why didn't you change your address on your
11     Florida driver's license?
12               MS. NELSON:  Objection.  Asked and
13          answered.
14               MR. EHRLICH:  You may answer again.
15               THE WITNESS:  Because I didn't want to
16          have a Daytona Beach license, and my mother
17          moved to Georgia.  Excuse me.  A Daytona
18          Beach address.
19               MR. EHRLICH:  Just give me one second,
20          please.
21     BY MR. EHRLICH:
22          Q    Miss Harvey, did you ever have a driver's
23     license with a Volusia County address on it?
24          A    No, sir.
25          Q    You mentioned you changed the address on
```

```
 1      your Florida driver's license to the Georgia address,

 2      and I think you said you did that in 2001.  Do you

 3      recall what month you did that?

 4           A    I think in July.

 5           Q    July 2001?

 6           A    Yes, sir.

 7           Q    You put the Georgia address on your Florida

 8      driver's license?

 9                MS. NELSON:  Objection.  Asked and

10           answered.

11      BY MR. EHRLICH:

12           Q    Is that correct?

13           A    Yes, sir.

14           Q    And I may have asked this before, but tell

15      me again, please.

16                The month that you moved to Georgia, the

17      month and year.

18                MS. NELSON:  Objection.  Asked and

19           answered.  You can answer.

20                THE WITNESS:  December of 2001.

21      BY MR. EHRLICH:

22           Q    So you put the Georgia address on your

23      Florida driver's license before you moved to Georgia?

24           A    I would visit --

25                MS. NELSON:  Can we have the question
```

1    read back, please?

2         (Whereupon, the last question was read back by

3    the reporter.)

4              THE WITNESS:  Yes.

5    BY MR. EHRLICH:

6         Q    Was that a yes?

7         A    Yes.

8         Q    Why did you do that?

9         A    Because my mother moved to Georgia and I

10   would visit her, and that's where she lived.

11        Q    Did your mother move to Georgia in July of

12   2001?

13             MS. NELSON:  I'm going to object to the

14        relevance of this line of questioning.  You

15        can answer.

16             THE WITNESS:  No, sir.

17   BY MR. EHRLICH:

18        Q    When did your mother move to Georgia?

19        A    Sometime in 2000.

20        Q    Why did you wait until July of 2001 to

21   change the address on your driver's license?

22        A    Because I wasn't living in Georgia, I was

23   still in Florida.

24        Q    Right.  But you weren't living in Georgia

25   at the time you changed your address on your driver's

1    license either, right?

2    A    Yes.

3    Q    Is that right?

4    A    Yes, sir.

5    Q    All right, Miss Harvey.  I have no further

6    questions.  Thank you for your time today.

7    A    You're welcome.

8                        CROSS-EXAMINATION

9    BY MR. HARVEY:

10    Q    Good afternoon, Miss Harvey.  My name is

11    Walter Harvey.  I represent the Department of State

12    and Florida Division of Elections.

13         How are you?

14    A    Fine, sir.  And you?

15    Q    Good, good.

16         I just have a couple quick questions.

17         First of all, have you had an opportunity

18    to read the second amended complaint that was filed

19    in this case by your attorneys?

20    A    Yes, sir.

21    Q    Okay.  And did you read the allegations

22    that related to yourself?

23    A    Yes, sir.

24    Q    Okay.  Do you have any knowledge concerning

25    the duties or responsibilities of the Secretary of

1    State and the Division of Elections with regard to

2    the administration and maintenance of the State's

3    overall maintenance programs of the state central

4    voter file?

5         A    No, sir.

6         Q    Do you have any knowledge concerning the

7    manner in which voter registration is maintained or

8    the circumstances in which individuals or registrants

9    may be removed from voter rolls?

10        A    No, sir.

11        Q    I'm sorry, I didn't hear that.

12        A    No, sir.

13        Q    Do you have any evidence the Department of

14   the State or Division of Elections failed to properly

15   perform their duties and responsibilities under the

16   National Board Registration Act or Florida

17   Registration Act for the November 7, 2000 election?

18             MS. NELSON:   Objection.   Calls for legal

19        conclusion.

20   BY MR. HARVEY:

21        Q    Hello?

22        A    No, sir.

23        Q    Okay.

24             MR. HARVEY:   I have no further questions.

25             MS. NELSON:   Let me take a moment to

```
 1          note that Todd Cox from the NAACP Legal

 2          Defense and Educational Fund, D.C. office,

 3          has joined us.

 4               MR. WAAS:  This is George Waas.  I'll be

 5          prepared to take a few minutes and go ahead,

 6          if that's okay.

 7               MR. ECKERT:  That's fine.  I'm going to

 8          have some questions, George, but please go

 9          ahead.

10                         CROSS-EXAMINATION

11     BY MR. WAAS:

12          Q    My name is George Waas, and I'm senior

13     assistant attorney general up here in Tallahassee.

14          Can you hear me?

15          A    Yes, sir.

16          Q    Okay.  Have you ever applied for or

17     received any services from the Department of Children

18     and Families?

19          A    No, sir.

20          Q    Is that -- I didn't hear the first word.

21          A    No, I haven't.

22          Q    You have not.

23               When did you last go to a driver's license

24     office, if you can recall?

25          A    In July of 2001.
```

1       Q     Okay.   At the time you went there, which

2    office did you go to, do you recall?

3       A     Not a specific one.   It was in Palm Beach

4    County.

5       Q     Palm Beach County?

6       A     Yes, sir.

7       Q     At the time you went there were you a

8    registered voter in Florida?

9       A     Yes, sir.

10       Q     You were.

11             What did you go there for?

12       A     To take my driver's license test.

13       Q     And did you take the test?

14       A     Yes, sir.

15       Q     Okay.   Do you have any knowledge that the

16    Department Of Highway Safety and Motor Vehicles

17    failed to perform any duty under the Federal Voting

18    Rights Act or the Motor/Voter law, or any other law

19    to your knowledge?

20             MS. NELSON:   Objection.   Calls for legal

21         conclusion.

22             MR. WAAS:   Fine.

23             THE WITNESS:   No, sir.

24             MR. WAAS:   I have no further questions.

25         Thank you for your time.

```
 1              THE WITNESS:  Yes, sir.

 2              MR. ECKERT:  Anybody else?  I have a

 3         few.

 4                      CROSS-EXAMINATION

 5    BY MR. ARPEN:

 6         Q    I'm Tracey Arpen, deputy general counsel

 7    representing John Stafford, Duval County Supervisor

 8    of Elections.

 9              Can you here me?

10         A    Yes, sir.

11         Q    Let me begin by asking you if you have

12    any knowledge regarding the conduct of the election

13    in Duval County in November of 2000.

14         A    No, I don't.

15              MR. ECKERT:  Tracey, this is Dan Eckert.

16         I turned it down a little bit.  Can you still

17         hear?

18              MR. ARPEN:  Yes.

19              MR. ECKERT:  You were a bit loud at this

20         end.

21              MR. ARPEN:  I was leaning too close to

22         the thing.  I'll back off some.

23              MR. ECKERT:  All right.

24    BY MR. ARPEN:

25         Q    Miss Harvey, do you have any knowledge with
```

```
1        respect to the practices and procedures employed by

2        Duval County Supervisor of Elections John Stafford

3        regarding voter registration in Duval County?

4            A    No, sir.

5            Q    Do you have any knowledge regarding the

6        policies and -- I'm sorry, regarding the practices

7        and procedures utilized by John Stafford and the

8        Duval County Supervisor of Elections Office

9        concerning the processing of changing of addresses of

10       voters?

11               MS. NELSON:  Objection.  Lacks

12           foundation.

13               You can answer.

14               THE WITNESS:  No, sir.

15               MR. ARPEN:  I don't have any other

16           questions.  Thank you.

17               MR. ECKERT:  I have a few questions.

18               I'm going to turn the volume back up

19           just a bit, since I'm a few feet further than

20           Miss Harvey from the phone.

21               MS. NELSON:  Can you hear Mr. Eckert?

22               MR. ECKERT:  Can you hear me?

23                       CROSS-EXAMINATION

24       BY MR. ECKERT:

25           Q    Miss Harvey, where did you change your
```

```
 1      license address most recently?  Where did you go to
 2      change your license address?
 3           A     To a driver's license place in Palm Beach
 4      County.
 5           Q     That's the most recent change?
 6           A     Yes, sir.
 7           Q     I want to be sure I understand your
 8      testimony.
 9                 You gave them a Georgia address?
10           A     Yes, sir.
11           Q     Now, do you have any voter registration
12      card with you today?
13           A     Yes, sir.
14           Q     Can you take that out, please?
15           A     It's the same thing.
16           Q     Okay.  Is that the driver's license --
17      excuse me.  Is that the -- I misspoke.
18                 Is that the registration card you had at
19      the time of the 2000 general election?
20           A     Yes, sir.
21           Q     What registration date does it have on
22      there?
23           A     October 2 -- sorry.  Yeah, October 2, 1993.
24           Q     Okay.  Now, have you noticed that date
25      before today?
```

1     A    Someone pointed it out to me prior to this,

2    yeah.

3     Q    Okay.  Was it someone other than your

4    lawyer?

5     A    No, sir.

6     Q    Okay.  Did you have -- did you notice it

7    prior to the 2000 election?

8     A    No, sir.

9     Q    Did you look at your registration card on

10   that day and observe that date?

11    A    I didn't notice it.

12    Q    Now, in 1993 you were 13; is that correct?

13    A    Yes, sir.

14    Q    Now, did you do anything on your own to

15   cancel your registration in Martin County?

16    A    No, sir.

17    Q    Okay.  Did you have a car on November 7,

18   2000?

19    A    No, sir.

20    Q    Okay.  Insofar as you know, are you still

21   registered in Martin County?

22    A    I don't know.

23    Q    You plan to return to Bethune-Cookman?

24    A    Yes, sir.

25    Q    And when would that be?

```
 1          A     In August of this year.

 2          Q     How far along are you in your education?

 3          A     I am a third semester junior.

 4          Q     When will you graduate, according to your

 5     plan?

 6          A     Probably in 2004.

 7          Q     In June of 2004?

 8          A     No.  Probably in May, I believe.

 9          Q     In May?

10          A     Yeah.

11          Q     Okay.  After the spring semester?

12          A     Yeah.

13          Q     Did you vote in 2001 in Daytona Beach?

14          A     Yes, sir.

15          Q     Okay.  In November?

16          A     Yes, sir.

17          Q     And have you -- did you have a registration

18     card that day?

19          A     Yes, sir.

20          Q     Did you have another registration card?

21          A     No, sir.

22          Q     Have you ever seen a copy of a letter from

23     the Supervisor of Elections Deanie Lowe to you?

24          A     No, sir.

25          Q     One moment, please.
```

1          Miss Harvey, in the first series of

2     questions there was so many double negatives, and I

3     want to make sure.

4          Do you belong to the NAACP?

5     A     No, sir.

6     Q     Thank you.

7          Miss Harvey, do you have any knowledge

8     whether Supervisor of Elections Lowe has already

9     restored you to the registration roll?

10    A     Do I know of it?

11    Q     Yes.

12    A     Yes, sir.

13    Q     And do you know of any letter that she

14    wrote to you in July of 2001?

15    A     No, sir.

16    Q     Did you ever make a complaint directly to

17    -- after the election day, did you ever make a

18    complaint directly to the Volusia County Elections

19    Office concerning the events of that day?

20         MS. NELSON:   Objection.   Calls for legal

21         conclusion.

22         THE WITNESS:   No, sir.

23    BY MR. ECKERT:

24    Q     Okay.   Did you call up the Elections Office

25    in DeLand?

```
 1        A    No, sir.

 2        Q    Did you go to visit?

 3        A    No, sir.

 4        Q    Did you write to them?

 5        A    No, sir.

 6        Q    Are you familiar with the term central

 7   voter file list?

 8        A    No, sir.

 9        Q    Tell me the circumstances of your

10   registration in 1998.  Was it part of a drive of some

11   sort?

12        A    Yes.

13             MS. NELSON:  Objection to form.

14             THE WITNESS:  Yes, sir.

15   BY MR. ECKERT:

16        Q    Can you describe in your own words the

17   circumstances of your registration in 1998?

18        A    One of the groups on campus were

19   registering new students to get their registration

20   card in Volusia County on campus.

21        Q    And when you registered, did you fill out

22   the form entirely yourself?

23        A    Yes, I did fill it out.

24        Q    Okay.  Is that the form you filled out?

25             MS. NELSON:  Are you marking this as an
```

1           exhibit?

2    BY MR. ECKERT:

3           Q     Miss Harvey, do you know whether or not you

4    listed Martin County as being a prior place that you

5    registered previously?

6           A     I don't remember.

7           Q     Okay.  You have -- what you seek is an

8    explanation for your cancellation?

9                 MS. NELSON:  Objection to form.

10                Is that a question?

11   BY MR. ECKERT:

12          Q     Is what you seek an explanation for your

13   cancellation?

14          A     That's what I want, yes.

15          Q     Did you have any difficulty voting in 2001?

16          A     In Volusia County?

17          Q     Yes.

18          A     No, sir.

19          Q     Do you -- is it a fair statement you don't

20   understand why you didn't get to vote that day?

21                MS. NELSON:  Objection to form.  Calls

22          for speculation.

23                THE WITNESS:  Yes, sir.

24   BY MR. ECKERT:

25          Q     The first lady that you approached, your

```
1     affidavit you signed says she was an African-
2     American; is that correct?
3          A    Yes, sir.
4          Q    Then the second lady was white; is that
5     correct?
6          A    Yes, sir.
7          Q    Did you call the elections office yourself
8     that day?
9          A    No, sir.
10         Q    Did you try to call the elections office in
11    Martin County?
12         A    No, sir.
13         Q    What time of day was this?
14         A    That I went to go and vote?
15         Q    Yes.
16         A    It was around -- a little bit before 7.  7
17    a.m.
18              MR. ECKERT:  That's all the questions I
19         have.  Thank you.
20              MS. NELSON:  We would like to take a
21         break and come back.
22              Is there anyone else planning on asking
23         questions on your side?
24              MR. RESTREPO:  Dan Restrepo on behalf of
25         ChoicePoint.  I will have a small number of
```

 1          questions.

 2          (Whereupon, there was a recess from

 3     approximately 4:16 p.m. to 4:34 p.m.)

 4     BY MR. ECKERT:

 5          Q    Miss Harvey, let me just show you some

 6     documents here.

 7               MS. NELSON:  Are you marking that as an

 8          exhibit?

 9               MR. ECKERT:  Yes, we'll mark that as

10          Defendant Lowe's Exhibit 1.

11     BY MR. ECKERT:

12          Q    Would you describe that document to me?

13          A    I think it's my registration form to vote

14     in Volusia County.

15          Q    Okay.  Would you look at the lower left of

16     that?

17          A    Okay.

18               MS. NELSON:  I'm sorry.  Can you

19          describe what this document is?  It's two

20          pages.

21               Is this all one in the same document?

22               MR. ECKERT:  This is the front and back

23          of her registration form.

24     BY MR. ECKERT:

25          Q    Now, in block 14, did you list Martin

```
 1      County?
 2           A    No.
 3           Q    Okay.  Now, I referred to a letter.  I want
 4      to show you a letter that was sent to you.  I would
 5      mark this next as Defendant's Exhibit 2.  Defendant
 6      Lowe's Exhibit 2, a letter dated July 16, and then
 7      the second page of that is an envelope, return of an
 8      envelope.
 9           A    Okay.
10           Q    Now, just to be clear, did you know
11      Mrs. Lowe had written to you in July instating you?
12           A    No.  Not then, no.
13           Q    When did you learn that?
14           A    I was informed that I could go and vote
15      again.  I don't know the month, but it was in 2001.
16           Q    Now, that's all I have.  Thank you.
17                MR. EHRLICH:  This is Jeff Ehrlich from
18           Miami Beach County.  I have just a couple
19           questions I would like to ask at this time.
20                         RECROSS-EXAMINATION
21      BY MR. EHRLICH:
22           Q    Miss Harvey, we just came back from a
23      second break.  During the second break did you talk
24      to Miss Nelson?
25           A    Yes, sir.
```

```
 1          Q    Did you talk to her regarding the

 2    deposition today?

 3          A    Yes.

 4          Q    And during the first break that we took,

 5    which was taken during my direct examination of you,

 6    did you talk to Miss Nelson about the deposition that

 7    was occurring?

 8          A    Yes, sir.

 9          Q    Did you talk to her about determining

10    whether or not to assert a privilege?

11          A    Today?

12          Q    During that break, that first break, did

13    you talk to Miss Nelson about asserting a privilege

14    during your testimony, during my direct examination

15    of you?

16          A    No.

17          Q    What did you talk to her about?

18               MS. NELSON:  Objection.  Calls for

19          attorney/client privilege.

20               I'm instructing my client not to answer.

21    BY MR. EHRLICH:

22          Q    During the second break, the one we just

23    took, lasted at least ten minutes.  What did you talk

24    to Miss Nelson about?

25               MS. NELSON:  Objection.  Calls for
```

1           attorney/client privileges, communications.

2                I'm instructing my client not to answer.

3      BY MR. EHRLICH:

4           Q     Did you discuss with Miss Nelson during the

5      second break whether to assert a privilege?

6           A     No.

7                MR. EHRLICH:  I have nothing further.

8                MR. RESTREPO:  This is Dan Restrepo on

9           behalf of ChoicePoint.

10                If no one has any objection, I'll go at

11           this point.

12                      CROSS-EXAMINATION

13      BY MR. RESTREPO:

14           Q     Before I announced myself as representing

15      ChoicePoint and DataBase Technologies today, have you

16      heard of either of those companies?

17           A     Aside from the complaint thing, no.

18           Q     I'm sorry.  I didn't hear your answer.

19           A     No, sir.

20           Q     Could you repeat your answer for me,

21      please?

22           A     No, sir.

23           Q     You had not heard of either ChoicePoint or

24      DataBase Technologies prior to today?

25           A     No, sir.

1        Q    No, sir, you hadn't heard of them, or yes,

2    you had?  I asked the question in a confusing manner.

3        A    No, I haven't heard of the companies

4    before.

5        Q    Thank you very much.

6        MR. RESTREPO:  I have no further questions.

7        MS. NELSON:  Is that it on defendant's

8    side?

9        MR. CIRULLO, JR.:  Yes, for now.

10       MS. NELSON:  I have a few questions for

11   Miss Harvey.

                    CROSS-EXAMINATION

12

13   BY MS. NELSON:

14       Q    Miss Harvey, you testified earlier you

15   obtained a new driver's license in July of 2001; is

16   that correct?

17       A    Yes, ma'am.

18       Q    Can you describe what happened when you

19   went to DMV in Palm Beach County?

20       A    I went to take a driver's license test, and

21   after the completion of that I asked the lady

22   entering my information if I could have a Georgia

23   address and would there be any problem.  She said

24   yes, I could have one, and no, there wouldn't be a

25   problem with me having a Georgia address.

1      Q   You asked her for a driver's license with a

2 Georgia address; is that right?

3      A   Yes, ma'am.

4      Q   I'm sorry, can you tell me what her

5 response is, again?

6      A   She said no, there wouldn't be a problem in

7 you having the Georgia address and you could have it.

8      Q   Okay. You testified that you presented a

9 driver's license to a poll worker when you attempted

10 to vote in November 7, 2000. Was this the same

11 driver's license, this driver's license you obtained

12 in July 2001?

13      A   No, ma'am.

14      Q   The one that you presented in 2000, in the

15 general 2000 elections bore what address on it?

16      MR. EHRLICH: Objection. Asked and

17      answered.

18 BY MS. NELSON:

19      Q   You can answer.

20      A   It was 1348 Northwest Charlie Green Drive,

21 Stuart, Florida.

22      Q   Right now as far as you know are you a

23 matriculated student at Bethune-Cookman College?

24      A   Yes, ma'am.

25      Q   Is Bethune-Cookman College in Volusia

```
 1        County?

 2             A    Yes, ma'am.

 3             MS. NELSON:  I have no further

 4        questions.

 5             MR. CIRULLO, JR.:  This is Mike Cirullo.

 6        I don't have any further questions.

 7             This is Mike Cirullo again.

 8             In the absence of anybody speaking up, I

 9        think that's it.

10             MR. ECKERT:  I have a question, Mike.

11             MR. CIRULLO, JR.:  Sorry.

12                        RECROSS-EXAMINATION

13        BY MR. ECKERT:

14             Q    Miss Harvey, what is your status with

15        regard to Bethune-Cookman?  Would you explain in your

16        own words?

17             A    Right now I'm not an attending student at

18        the school.  Is that okay?  But I'm still registered

19        there to attend.

20             Q    You're not registered this semester?

21             A    No.  I didn't re-register.

22             Q    Do you have any active registration status

23        that continues between semesters?

24             A    You mean can I come back next semester and

25        just attend?
```

1       Q      You're not registered now?

2       A      For classes, no.

3       Q      What are you registered for?

4       A      I'm not sure.  I mean, I'm still there, but

5    I'm just not registered for this semester.

6       Q      Thank you.

7              MR. ECKERT:  Any other questions from

8         anyone?

9              MR. CIRULLO, JR.:  No.

10             This is Mike Cirullo.  No.

11             MR. ECKERT:  Last call.

12             MS. NELSON:  We're done on this side.

13             (Whereupon, at approximately 4:43 p.m. the

14        testimony was concluded.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA    )

COUNTY OF VOLUSIA   )

        I, the undersigned authority, certify that
_Ursula Harvey_ personally appeared before me
and was duly sworn.

        WITNESS my hand and official seal this
_2nd_ day of _March_, 2002.

                        _Jane I. O'Brien_
                        Jane I. O'Brien
                        Notary Public - State of Florida
                        My Commission Expires:  12-19-05

                        Jane I O'Brien
                        My Commission DD074648
                        Expires December 19, 2005

NARUP, VOUVAKIS & ASSOCIATES

```
 1                          CERTIFICATE

 2    STATE OF FLORIDA   )
                         )
 3    COUNTY OF VOLUSIA  )

 4              I, Jane I. O'Brien, Certified Shorthand

 5    Reporter, Registered Merit Reporter, certify that I

 6    was authorized to and did stenographically report the

 7    deposition of Ursula Harvey, that a review of

 8    the transcript (was) was not requested; and that the

 9    transcript is a true and complete record of my

10    stenographic notes.

11

12              I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the

15    parties' attorney or counsel connected with the

16    action, nor am I financially interested in the

17    action.

18

19              DATED this ___ day of March _____,

20    2002.

21

22

23                          _____
                            Jane I. O'Brien
                            Certified Shorthand Reporter
24                          Registered Merit Reporter

25
```

NARUP, VOUVAKIS & ASSOCIATES

# TAB 29

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 01-0120-CIV-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA
STATE CONFERENCE OF BRANCHES, JIMMIE PANNELL,
JULIA STONER, NATALIE CARNEGIE, ERMA J. KELLY,
JOHN L. CHEEVER, JAMES MARSHALL, LILLIE Q. ODOM,
WILLIE STEEN, WALLACE MCDONALD, JERMAINE TERRY,
LORINE WALDEN, EMERY TIMBERLAKE, VALERIE BUFORD-
WELLS, MICHELLE FLOYD, CONSUELO MARIA GRAHAM,
SHERRY EDWARDS, KANDY WELLS, JOANNA CLARK,
JANICE KELLY, PLACIDE DOSSOUS and RONDRICK ROSE
in their own right and as representatives of all
similarly situated citizens and residents of the
State of Florida,

          Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of the State of Florida;
CLAY ROBERTS, Director of the Florida Division of
Elections; DAVID C. LEAHY, Miami-Dade County Election
Supervisor; MIRIAM OLIPHANT, Broward County Election
Supervisor; JOHN STAFFORD, Duval County Election
Supervisor; PAM IORIO, Hillsborough County Election
Supervisor; ION SANCHO, Leon County Election
Supervisor; WILLIAM COWLES, Orange County Election
Supervisor and DEANIE LOWE, Volusia County Election
Supervisor (all in their official capacities); and
CHOICE POINT, INC., a Georgia corporation d/b/a
DATABASE TECHNOLOGIES, INC.,

          Defendants.

------------------------------------------------------------

     The deposition of CONSUELO MARIA GRAHAM, taken
pursuant to notice on behalf of Defendant Cowles on
Friday, October 19, 2001, beginning at 2:30 p.m., at
201 South Rosalind Avenue, Fourth Floor, Orlando,
Florida, before michelle M. Marzuki, R.P.R., and
Notary Public, State of Florida at Large.

## CERTIFIED COPY

A P P E A R A N C E S:

ANITA S. HODGKISS, ESQ.
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, Suite 400
Washington, DC  20005-2124

Appearing on behalf of the Plaintiffs.

MICHAEL D. CIRULLO, JR., ESQ.
Goren, Cherof, Doody & Erzol, P.A.
3099 E. Commercial Boulevard, No. 200
Fort Lauderdale, Florida  33308

KAYE COLLIE, ESQ.
Orange County Comptroller, General Counsel
201 South Rosalind Avenue, Fourth Floor
Orlando, Florida  32801

Appearing on behalf of William Cowles, Orange
County Supervisor of Elections.

WALTER HARVEY, ESQ.  (BY SPEAKERPHONE)
Steel, Hector & Davis, LLP
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, Florida  33401

Appearing on behalf of Katherine Harris,
Secretary of State of Florida and Clay Roberts,
Director of the Florida Division of Elections.

JEFFREY EHRLICH, ESQ.
SUSAN TORRES, ESQ.
Miami-Dade County Attorney's Office
111 N.W. First Street, Suite 2810
Miami, Florida  33128

Appearing on behalf of David Leahy, Miami-Dade
County Supervisor of Elections.

BURNADETTE NORRIS-WEEKS, ESQ.  (BY SPEAKERPHONE)
Burnadette Norris-Weeks, P.A.
100 S.E. 6th Street
Fort Lauderdale, Florida  33301

Appearing on behalf of Miriam Oliphant,
Broward County Supervisor of Elections.

A P P E A R A N C E S (con't.)

            KENNETH A. TINKLER (BY SPEAKERPHONE AT FIRST)
            Hillsborough County Attorney's Office
            County Center, 27th Floor
            Tampa, Florida  33601

            Appearing on behalf of Pam Iorio, Hillsborough
            County Supervisor of Elections.

            DANIEL ECKERT, ESQ.  (BY SPEAKERPHONE)
            Volusia County Attorney's Office
            123 West Indiana Avenue
            DeLand, Florida  32720

            Appearing on behalf of Deanie Lowe, Volusia
            County Supervisor of Elections.

            PHILLIP HARRIS, ESQ.
            Adorno & Zeder
            2601 South Bayshore Drive, Suite 1600
            Miami, Florida  33133

            Appearing on behalf of Choice Point, Inc., d/b/a
            Database Technologies, Inc.

            DOUGLAS MACINNES, ESQ.  (BY SPEAKERPHONE)
            Office of the Attorney General
            107 W. Gaines Street
            Tallahassee, Florida  32399

            Appearing on behalf of Fred Dickinson, Director,
            Department of Highway Safety and Motor Vehicles,
            and Kathleen Kearney, Secretary, Department of
            Children and Family Services.

            Also Present:  William Cowles, Orange County
                           Supervisor of Elections

                          CENTRAL FLORIDA REPORTERS, INC.

4

## I N D E X

TESTIMONY OF CONSUELO MARIA GRAHAM

| | |
|---|---|
| Direct Examination by Mr. Cirullo | 5 |
| Cross Examination by Mr. Ehrlich | 49 |
| Cross Examination by Mr. Harris | 84 |
| Cross Examination by Mr. MacInnes | 89 |
| Cross Examination by Mr. Harvey | 96 |
| Cross Examination by Ms. Norris-Weeks | 98 |
| Cross Examination by Mr. Eckert | 100 |

CERTIFICATE OF REPORTER     102

## E X H I B I T S

Exhibit No. 1     34

Exhibit No. 2     39

Exhibit No. 3     69

- - - - -

## S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties and the witness that the reading and signing of the deposition be waived.

CENTRAL FLORIDA REPORTERS, INC.

5

```
 1   WHEREUPON,

 2                    CONSUELO MARIA GRAHAM

 3   having been first duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5   BY MR. CIRULLO:

 6        Q.   Good afternoon, ma'am.  I'm Michael Cirullo.

 7   I represent William Cowles, Orange County Supervisor

 8   of Elections.

 9             As you know, this is a case where you're

10   suing, along with the NAACP and several other named

11   defendants -- I mean plaintiffs -- several county

12   supervisors of elections and state agencies regarding

13   events in the November 7, 2000 election.

14             And what we're here to do is to take a

15   deposition of you to determine your knowledge of

16   certain aspects of the case.  Have you ever had your

17   deposition taken before?

18        A.   No.

19        Q.   Okay.  Have you ever been a party to

20   lawsuit?

21        A.   No.

22        Q.   Okay.  Well, basically how this works is I'm

23   gonna ask you some questions and other people may ask

24   you questions when I get done.  I'm gonna try to be as

25   straightforward and simple as I can with the
```

CENTRAL FLORIDA REPORTERS, INC.

6

1    questions.  I'm not trying to fool you or to corner

2    you into a specific answer.  I just want to know what

3    you know about something.

4           So if you do not understand anything that I

5    ask you, tell me.  Okay?  Also, let me finish the

6    question, even if you want to answer the question real

7    fast, so the court reporter can pick up completely the

8    question and the answer.

9       A.   Okay.

10      Q.   And when you answer, if it's a "yes" or a

11   "no," please say "yes" or "no" because the court

12   reporter can't pick up gestures, nods, and whatnot.

13   All right?

14          Are you okay?  Ready to go?  Do you have any

15   questions about the procedure at all?

16      A.   No.

17      Q.   Okay.  For the record will you please just

18   give us your name?

19      A.   I'm Consuela Graham.

20      Q.   And how do you spell your last name for the

21   record?

22      A.   G-r-a-h-a-m.

23      Q.   And what day were you born?

24      A.   9/3/73.

25      Q.   Are you a U.S. citizen?

CENTRAL FLORIDA REPORTERS, INC.

```
1    A.   Yes.

2    Q.   Okay.  What's your current address?

3    A.   4726 Point Lookout Road, Orlando, 32808.

4    Q.   And that's in Orange County?

5    A.   Yes.

6    Q.   How long have you lived at that address?

7    A.   Going on two years now.

8    Q.   Before that where did you live?

9    A.   Hollywood, Florida.

10   Q.   Hollywood.  Are you working?

11   A.   Yes.

12   Q.   And what do you do for a living?

13   A.   I am a title clerk.

14   Q.   Title clerk.  How long have you done that?

15   A.   Going on ten years now.

16        MR. MACINNES:   I cannot hear the witness at

17   all.  I have heard nothing that she's said.

18        MR. CIRULLO:   Okay.

19        MR. HARVEY:   I can barely hear her.

20   Q.   Say something.

21   A.   Can you hear me now?

22        MR. HARVEY:   Yes.

23        MR. MACINNES:   Yes.

24        MR. CIRULLO:   Okay.  Sorry about that,

25   guys.
```

CENTRAL FLORIDA REPORTERS, INC.

8

```
 1          MR. MACINNES:   Can you start over?

 2          MR. CIRULLO:   Sure.

 3          MR. MACINNES:   I've been hollering, but

 4     nobody heard me.

 5          MR. CIRULLO:   I have not been hearing you

 6     holler.

 7  BY MR. CIRULLO:

 8     Q.   So anyway, let me just go through -- just

 9  give me your name again.

10     A.   Consuela Graham.

11     Q.   And how do you spell your last name?

12     A.   G-r-a-h-a-m.

13     Q.   And you date of birth?

14     A.   9/3/73.

15     Q.   And you're a U.S. citizen?

16     A.   Yes.

17     Q.   And your current address?

18     A.   3726 Point Lookout Road, Orlando, Florida

19  32808.

20     Q.   And that's in Orange County?

21     A.   Yes.

22     Q.   Okay.  And how long have you lived there?

23     A.   Two years.

24     Q.   And before that?

25     A.   Hollywood, Florida.
```

CENTRAL FLORIDA REPORTERS, INC.

1   Q.   Okay.  And are you employed?

2   A.   Yes.

3   Q.   And what do you do for a living?

4   A.   Title clerk.

5   Q.   And how long have you done that?

6   A.   For about ten years.

7        MR. CIRULLO:   I think we're caught up.

8   Q.   Okay.  Do you have any college or post-high

9   school education?

10  A.   I'm in college now.

11  Q.   Where did you attend school?

12  A.   ACI High Tech Institution.

13  Q.   And where is that?

14  A.   That's located by the Florida Mall.  No.

15  I'm sorry.  Fashion Square Mall.

16  Q.   In Orlando?

17  A.   Yes.

18  Q.   And what are you studying there?

19  A.   Medical assistant.

20  Q.   Oh, okay.  How long have you been in school?

21  A.   This will make my tenth month.

22  Q.   And you're --

23  A.   It's only a 14-month program.

24  Q.   Okay.  Are you represented by legal counsel?

25  A.   Yes.

CENTRAL FLORIDA REPORTERS, INC.

10

```
 1        Q.    Okay.  And who might that be?

 2        A.    Anita Hodgkiss.

 3              THE WITNESS:   Did I pronounce your last

 4        name right?

 5              MS. HODGKISS:   Yes.

 6        Q.    How long has she been your attorney?

 7        A.    Ever since this has been going on.

 8        Q.    Which is approximately?

 9        A.    I can't --

10        Q.    Before or after January 1st?

11        A.    After January.

12        Q.    After January 1st, 2001?

13        A.    I think that's correct.

14        Q.    Okay.  Have you done anything to prepare for

15        your deposition today?

16        A.    No.

17        Q.    Okay.

18              MR. MACINNES:   I can't hear the witness.

19              MR. CIRULLO:   Are you talking about the

20        last question, Doug, or any of them?

21              MR. MACINNES:   Well, what I hear is little

22        squeaks.  I mean, I think I got the essence of it.

23        We're not into the important stuff yet.  But have

24        her sit closer to the telephone.

25              THE WITNESS:   I'll be on the table.
```

CENTRAL FLORIDA REPORTERS, INC.

11

```
 1              MR. CIRULLO:   All right.  Now, Doug, can
 2      you hear me?
 3              MR. MACINNES:   Yeah.
 4              MR. CIRULLO:   Okay.
 5              THE WITNESS:   Can you hear me?
 6              MR. MACINNES:   I can hear you better now.
 7              THE WITNESS:   All right.
 8              MR. CIRULLO:   Okay.  I'm gonna yell.  Sorry
 9      about that for the people in the room here.
10         Q.   Are you a member of the NAACP?
11         A.   Yes.
12         Q.   And how long have you been a member?
13         A.   For about four months, four or five months.
14         Q.   Four or five months.  Do you pay dues?
15         A.   No.  I did it through my girlfriend.
16         Q.   Oh, okay.  Are you active in the NAACP?
17         A.   No, not at the present time.
18         Q.   No.  Okay.  Have you ever been registered to
19      vote anywhere?
20         A.   No.
21         Q.   Okay.  Have you ever voted in elections
22      before?
23         A.   No.
24         Q.   Okay.  On November 7th, 2000, where did you
25      live?
```

CENTRAL FLORIDA REPORTERS, INC.

12

```
 1        A.    Same address, 4726 Point Lookout Road.

 2        Q.    In Orange County?

 3        A.    In Orange County.

 4        Q.    Now, in your complaint you allege that you

 5  completed a voter registration application on line; is

 6  that correct?

 7              (Whereupon, Mr. Tinkler entered the room.)

 8        A.    Yes.

 9        Q.    Do you know the web site?

10        A.    Elections.com.

11        Q.    Do you know who administers that web site?

12        A.    No.

13        Q.    How did you come across that web site?

14        A.    I heard it through Tom Joiner, the morning

15  show.

16        Q.    And -- on the morning show?

17        A.    Yes.

18        Q.    What's that?

19        A.    That's a -- a radio station.

20        Q.    Oh, it's a show on the radio?

21        A.    Yeah.

22        Q.    You just heard it somewhere.  Do you know

23  about when -- what day you filled out that on-line

24  application?

25        A.    Had to have been September.  I don't know
```

13

1    exactly what date.

2         Q.   Do you know if it was mid or late September?

3         A.   I can't -- I can't give you an answer on

4    that one because I -- I just know it was in September.

5         Q.   Can you describe the web site to me?

6         A.   It asks you some questions like where you

7    live, your gender, your --

8         Q.   Well, was the web site just an application

9    or was it an information web site for --

10        A.   It was an application.

11        Q.   Just applications.  So when you went -- when

12   you punched in Elections.com it immediately sent to

13   you an app -- a voter application?

14        A.   I don't -- I don't think so.  I think you

15   had to find your state that you lived in.

16        Q.   Okay.  So you would scroll down and

17   locate --

18        A.   The state you live in.

19        Q.   -- your state?  Okay.  And so tell me how

20   you -- you went through the process.  You went to the

21   web site and you scrolled down and you looked for

22   Florida?

23        A.   Yes.

24        Q.   Okay.

25        A.   If I'm not mistaken, yes.

CENTRAL FLORIDA REPORTERS, INC.

14

1      Q.    And when you punched "Florida," what

2  happened next?

3      A.    I remember an application coming up.

4      Q.    Okay.  Now, the application came up on your

5  computer.  Was it something to print out or did you

6  type in the information?

7      A.    You can -- you type in the information.  You

8  can print or they'll send it to you.

9      Q.    Okay.  Which way did you do it?

10     A.    I had them send it to me.

11     Q.    Okay.  So they sent you an application?

12     A.    They sent it to me already filled out.  All

13  I had to do was sign it.

14     Q.    Okay.  So back up a little bit.  When you

15  were on the web site, you typed in all of your

16  personal information?

17     A.    Uh-huh.

18     Q.    Is that a yes?

19     A.    Yes.  I'm sorry.

20     Q.    Okay.  And you reviewed it?

21     A.    Yes.

22     Q.    Okay.  And what did you do when you

23  completed it?

24     A.    They ask do you want me to make a

25  copy -- do you want to print it from a printer or do

CENTRAL FLORIDA REPORTERS, INC.

15

1    you want me to send it to you?  And I had them send it

2    to me.

3         Q.   You had it sent to where you were living at

4    the time?

5         A.   Yes.  4726.

6         Q.   Okay.  Did you get any confirmation back

7    when you did that, when you asked them to send it to

8    you?  Was there any indication that they had received

9    an order or anything from you?

10        A.   Yes.

11        Q.   Okay.  When did you -- approximately how

12   long after you completed that form -- well, let me

13   back up.  Can you go through the form with me?  Do you

14   recall the information that the form asked for?

15        A.   Not off the top of my head, no.

16        Q.   Okay.

17        A.   It just asked for your name, address, and

18   what you -- what party you were with.

19        Q.   Right.  Okay.  And you received the form in

20   the mail?

21        A.   Yes.

22        Q.   Do you know approximately how long after you

23   finished the application?

24        A.   Probably, like, a week or two -- two.

25        Q.   Okay.  A week or two.  Do you know where it

CENTRAL FLORIDA REPORTERS, INC.

16

1  came from?

2      A.   I assume them.

3      Q.   When you say "them," who?  Who do you mean

4  by them?

5      A.   Well, it had to come from here because the

6  address is on the back of it, the elections board

7  here.  I don't know where it come from, but I just

8  know their address was on the back of it.  And it's

9  just a card that you sign and you send it back to

10 them.

11     Q.   Okay.  What exactly did you receive in the

12 mail?  Did you receive, like, a sealed envelope with

13 materials inside?

14     A.   No.

15     Q.   You received, like, a postcard?

16     A.   I received an envelope with the card within

17 it.  Something like a postcard with a little sticky

18 stuff on top of it.

19     Q.   Okay.  And you don't know where you received

20 that from?

21     A.   No.

22     Q.   Okay.  So you completed a second form.  When

23 you received that in the mail, what did you do?

24     A.   No.  I completed the second form before I

25 received that in the mail.

CENTRAL FLORIDA REPORTERS, INC.

17

```
 1          Q.   No.  Back up.  You received something in the

 2   mail as a result of your on-line --

 3          A.   Yes.

 4          Q.   -- action?

 5          A.   The application form, yes.

 6          Q.   That document you received in the mail, did

 7   you have to do anything?

 8          A.   Just sign it.

 9          Q.   Just sign it.  And then what did you do with

10   it?

11          A.   I put it back in the mail.

12          Q.   Okay.  Did you put it into another envelope?

13          A.   No.  It was already pre --

14          Q.   It was preaddressed?

15          A.   Uh-huh.

16          Q.   And do you know where it was preaddressed

17   to?

18          A.   To -- I don't know the address.  I know it

19   was on Kaley -- West Kaley --

20          Q.   Okay.

21          A.   -- the address for they election board here.

22          Q.   So the postcard had an address on it of West

23   Kaley?

24          A.   Yes.

25          Q.   Okay.  Did you keep a copy of this form?
```

CENTRAL FLORIDA REPORTERS, INC.

18

1       A.    It came back.  Yeah.

2       Q.    Okay.  You said you kept a copy.  How did

3  you -- did you make a copy of it?

4       A.    No.

5       Q.    Okay.  You sent it out by mail.  I guess you

6  kind of led me to the next question.  Did it get

7  returned to you?

8       A.    Yes.

9       Q.    Okay.  Do you know why?

10      A.    I have no clue.

11      Q.    Do you know when it got returned to you?

12      A.    It came after the fact, elections.

13      Q.    It got returned to you --

14      A.    After the elections.

15      Q.    -- after the elections?  Do you know who

16 returned it to you?

17      A.    I'm assuming they did or the post office.  I

18 don't know.

19      Q.    Did you keep that document?

20      A.    Yes.

21      Q.    Do you still have that document?

22      A.    Yes.

23      Q.    Okay.  You didn't happen to bring it today,

24 did you?

25      A.    Yes.

CENTRAL FLORIDA REPORTERS, INC.

19

1      Q.    Oh, you did?  Can you show it to me?

2          MS. HODGKISS:    She's just today provided it

3      to us.  I have not had a chance to make copies.

4      But I can show you what the -- the original that

5      she brought.

6          MR. CIRULLO:    Okay.

7          MR. HARVEY:    I did not hear what Anita

8      Hodgkiss just said.

9          MR. CIRULLO:    Anita just said that -- go

10     ahead.

11         MS. HODGKISS:    I said that we were just --

12     that I was just given a copy of this today and

13     that -- so I have not had an opportunity to make

14     photocopies or distribute it.  But that we

15     would -- you could use, for the purposes of this

16     deposition, the original that I just received

17     today.

18         MR. HARVEY:    Okay.  Thank you.

19         MR. CIRULLO:    I don't want to have this

20     marked as an exhibit because I'm gonna -- we'll

21     probably need this, the original, as evidence

22     somewhere.

23         MS. HODGKISS:    Right.

24         MR. CIRULLO:    But when we get copies made,

25     is it okay if I supplement the copy of this into

CENTRAL FLORIDA REPORTERS, INC.

20

```
1     the --
2          MS. HODGKISS:   Or if you want to make
3     copies right now --
4          MR. CIRULLO:   Do you want to make copies
5     now?  Okay.
6          For the record, it's Official Election Mail
7     addressed to Supervisor of Elections, County, 119
8     West Kaley Street, Orlando, Florida 32806,
9     postmarked October 3rd, and it's still sealed.
10         We're gonna get some copies made of this
11    that.
12         We are gonna take a break just for a second.
13         (A short break was had.)
14         MR. CIRULLO:   Back on the record.  Is
15    everybody there?
16         MR. HARVEY:   Yes.
17         MR. MACINNES:   Yes.
18         MR. ECKERT:   Yes.
19         MR. CIRULLO:   For those of you on the
20    phone, I guess what I'm gonna do is this:  I'm
21    going to -- on one side -- I'm just gonna describe
22    it to you real fast.  On one side of this
23    postcard, which is sealed on the top and bottom,
24    it has "Supervisor of Elections, County" --
25    doesn't say Orange County, just County -- "119
```

CENTRAL FLORIDA REPORTERS, INC.

21

1    W. Kaley, K-a-l-e-y, Street, Orlando, Florida,

2    32806." And it's postmarked October 3rd out of

3    Orlando, Florida. And it's got a gloriosa lily

4    stamp.

5         And on the back side when you flip it over

6    it has a thick blue stripe and in that stripe it

7    says "For Official Use Only." And it's got

8    several blank lines -- two columns of blank lines

9    and then it has Ms. Graham's address. And

10   apparently it has on it -- it's a fold-over and on

11   the bottom of it it's sealed with one of those

12   hyphenated things you would tear off to open up.

13   And the two sides are open but I haven't opened it

14   yet and I don't know if I'm going to today. So

15   anyway.

16   BY MR. CIRULLO:

17        Q.   So that was returned to you -- I'm gonna go

18   back to my questions.

19        That was returned to you after the

20   November 7, 2000, election?

21        A.   Yes.

22        Q.   Okay. Can you tell me if there's any

23   indication on that document that it was received by

24   William Cowles's office?

25        A.   Can I tell you that?

CENTRAL FLORIDA REPORTERS, INC.

22

```
1        Q.    Just by looking on either side of it, is
2   there any notations or anything that shows it was
3   received --
4        A.    I would assume it went out because of the
5   marks on the back.  But on the same token, when I sent
6   it out, I didn't tape it up.
7        Q.    You didn't -- it wasn't sealed like that?
8        A.    No.
9        Q.    So you sent out an open form?
10       A.    It wasn't open.  There was sticky stuff in
11  there to keep it stuck together.
12       Q.    Okay.
13             MS. HODGKISS:   There's tape.
14       Q.    Okay.  So -- but this isn't the same form
15  that it was in when you sent it out?
16       A.    Yes.  It's the same form.
17       Q.    Okay.  Right.  So this came back to you
18  identical to the way you sent it out?
19       A.    No.
20       Q.    Okay.
21       A.    Tape was on it.
22       Q.    There was tape on it.  I see.  There's
23  scotch tape on the bottom.  So when you sent it out,
24  there was no tape?
25       A.    No.  And no red markings on the back.
```

CENTRAL FLORIDA REPORTERS, INC.

23

1     Q.   And no red markings on the back?

2     A.   Exactly.

3     Q.   Okay.  But when you got it back --

4     A.   It looked just like that.

5     Q.   It has -- it's scotch taped and it has red

6  markings?

7     A.   Yes.

8     Q.   Okay.  In your complaint -- I might come

9  back to this later.

10    A.   Okay.

11    Q.   In your complaint you alleged that you

12  filled out a second application --

13    A.   Yes.

14    Q.   -- on or about October 9th?

15    A.   Yes.

16    Q.   Now, on October 9th did you have any reason

17  to believe that William -- that your first application

18  hadn't been received or processed?

19    A.   No.

20    Q.   Why did you fill out the second application?

21    A.   Because my girlfriend asked me did I get a

22  card because I did it so long and I was like, "No," so

23  I did another one just in case something happened,

24  just to be on the safe side.

25    Q.   Okay.  So you hadn't received a card as of

CENTRAL FLORIDA REPORTERS, INC.

24

1   October 9th --

2       A.    Yes.

3       Q.    -- and you had just mailed that out on

4   October 3rd so you filled out a second one.  Now, how

5   did -- where did you fill out that second application?

6       A.    At her home.

7       Q.    At her home.  Who is she?

8       A.    Raquel.

9       Q.    Raquel.  What's her last name?

10      A.    Findley.

11      Q.    Could you spell that for me?

12      A.    F-i-n-d-l-e-y.

13      Q.    F-i-n-d-l-e-y.  And how do you know

14  Ms. Findley?

15      A.    We went -- we worked together where we be at

16  at the time.

17      Q.    Okay.  You filled out -- do you know where

18  you got that application form from?

19      A.    Her.

20      Q.    Do you know where she got the application?

21      A.    Her school.  At Valencia.

22      Q.    Okay.  Ms. Findley attended Valencia?

23      A.    Yes.

24      Q.    Okay.  Did you fill that out on the same day

25  you sent it in?

CENTRAL FLORIDA REPORTERS, INC.

25

1    A.    No.   The night before.

2    Q.    Okay.   So what date was that?

3    A.    The 8th.

4    Q.    The 8th.   And you filled out -- do you

5    recall the information that that form asked for?

6    A.    It asked for about the same thing as that

7    asked for.

8    Q.    When you say "that," the one you got --

9    A.    Yes.

10   Q.    -- from the Internet site?   Okay.   On

11   October 9th what did you do with the application?

12   A.    Well, I gave it to her October the 8th.   I

13   was at her house and left it with her.

14   Q.    So on October 8th you filled out an

15   application for voter registration at Ms. Findley's

16   house?

17   A.    Yes.

18   Q.    Did you sign it?

19   A.    Yes.

20   Q.    And you left it with Ms. Findley?

21   A.    Yes.

22   Q.    Do you know what Ms. Findley did with your

23   application?

24   A.    She took it with her because they were

25   having some kind of drive.   They were having people

CENTRAL FLORIDA REPORTERS, INC.

26

1  come vote.  So she took it with her and she gave it to

2  her -- her -- I don't know if it was the president

3  over her school -- because she was a student --

4  something, student, something.  I can't recall

5  exactly, but she was a student for a school.

6      Q.   Ms. Findley took it to school?

7      A.   Yes.

8      Q.   Okay.  How do you know that she actually

9  took it with her?

10      A.   Because I asked her and she told me she did.

11      Q.   Okay.  When she got it there, do you know

12  what she did with the application?

13      A.   She gave it to Shawn.

14      Q.   And Shawn -- do you know Shawn's last name?

15      A.   No.

16      Q.   Do you know who Shawn is?

17      A.   Yes.  He was the president of the student

18  council.

19      Q.   Do you know why she gave it to Shawn?

20      A.   Because he was the one who was gonna take it

21  down to the elections on Kaley.

22      Q.   How did she know he was going to do that?

23      A.   Because they had been doing it prior to

24  that.  So he's the one that's been taking it.

25      Q.   When you say "they," you mean --

CENTRAL FLORIDA REPORTERS, INC.

27

```
 1        A.    The student council, SAG.

 2        Q.    Forgive me.  That was at Valencia?

 3        A.    Valencia.

 4        Q.    Do you know if he actually took your

 5  application anywhere?

 6        A.    Yes.

 7        Q.    Okay.  Where did he take it?

 8        A.    To the election building on Kaley.  I don't

 9  know exactly what it's called.

10        Q.    Do you know how -- do you have any evidence

11  that he took it there?

12        A.    No, I don't have any evidence.

13        Q.    Okay.  But this Shawn person was supposed to

14  take it to the Supervisor of Elections offices?

15        A.    Not supposed to.  I think he did.

16        Q.    But you don't have any evidence that he did?

17        A.    Exactly.

18        Q.    Do you know if yours was the only

19  application he took?

20        A.    No.  There were several others.

21        Q.    Okay.  Do you know the names of anybody else

22  he would have taken?

23        A.    No.

24        Q.    Okay.  Did you keep a copy of this second

25  application?
```

CENTRAL FLORIDA REPORTERS, INC.

28

1      A.    No.

2      Q.    Okay.   On November 7th did you try to vote?

3      A.    Yes.

4      Q.    Where did you go to vote?

5      A.    The same place my father goes to vote since

6  we live in the same house.

7      Q.    Do you know where that is?

8      A.    It's apartments.   Oh, what are they called?

9  They on Long Road.   I can't think of them.   I just

10  know --

11      Q.    What's your father's name?

12      A.    Brooks Coleman.

13      Q.    And he lives at the same address you gave

14  earlier?

15      A.    Yes.

16      Q.    Do you know how long he's lived there?

17      A.    No.   I know it's been several years now.

18      Q.    Okay.   Did you go with your father?

19      A.    No.

20      Q.    You went separately?

21      A.    Yes.

22      Q.    What time of the day did you go?

23      A.    I went around seven.

24      Q.    A.m. or p.m.?

25      A.    A.m.

CENTRAL FLORIDA REPORTERS, INC.

29

1    Q.    But you don't -- you said it was at an

2  apartment complex?

3    A.    It was an apartment complex.

4    Q.    On Long?

5    A.    Long Road.

6    Q.    Were there any lines there?

7    A.    Not really.

8    Q.    Okay.  Would you describe for me what

9  happened when you arrived at the poll?

10   A.    I had to show them my license --

11   Q.    Okay.

12   A.    -- because I didn't have that card with me.

13   Q.    Now, when you say "them," who did you show?

14   A.    The lady at the desk, the -- whatever she's

15 called.

16   Q.    Okay.  Someone at the --

17   A.    The person that's helping --

18   Q.    -- table?

19   A.    Yeah.

20   Q.    Okay.  Go ahead.  I'm sorry.

21   A.    That's okay.  And I showed her my license.

22 Like I said, I didn't have the card.  And she said I

23 wasn't on this piece of paper they had.

24   Q.    Okay.  Do you know who that person was?

25   A.    No.

CENTRAL FLORIDA REPORTERS, INC.

30

1          Q.    Had you ever met her before?

2          A.    No.

3          Q.    Okay.  You didn't see a name?

4          A.    I really wasn't paying attention.  I was

5    just trying to go in there and get out because I had

6    to go to work.

7          Q.    Okay.  What did you do when she told you

8    that?

9          A.    I asked her to check one more time and can

10   she call someone.

11         Q.    You asked her to call somebody?

12         A.    (Witness nodded head.)

13         Q.    Okay.  What was her response?

14         A.    She looked at me just like -- she told me to

15   step to the side.  When she finished with the rest of

16   the people, then she'd help me out.

17         Q.    Okay.  Did you step to the side?

18         A.    Yeah, I stepped to the side.

19         Q.    And what happened next?

20         A.    I went back to her again and asked her if

21   she called because I really had to go to work.

22         Q.    And how long did you wait on the side?

23         A.    My patience -- about 30 -- 30 minutes,

24   45 minutes.

25         Q.    You waited 30 minutes?

CENTRAL FLORIDA REPORTERS, INC.

31

```
 1         A.    Or 45 minutes.

 2         Q.    Were people coming in to vote that whole

 3    time?

 4         A.    Yes.

 5         Q.    Okay.  And you went back to the same poll

 6    worker --

 7         A.    Yes.

 8         Q.    -- a second time?

 9         A.    Uh-huh.

10         Q.    And --

11         A.    Yes.

12         Q.    -- what did you say to that poll worker the

13    second time?

14         A.    I asked her did she call them.

15         Q.    Okay.  And what was her response?

16         A.    She didn't -- she didn't do anything.  She

17    was, like, "Okay."  And she tried to call them, but

18    they told her I wasn't on there.

19         Q.    Okay.  So what did you do next?

20         A.    Left.

21         Q.    Okay.  Did you tell anybody about what

22    happened that day?

23         A.    My mother.

24         Q.    When did you tell her?

25         A.    When I got to work.
```

CENTRAL FLORIDA REPORTERS, INC.

32

1      Q.   How long after you left the poll did that

2   happen?

3      A.   That I told my mom?

4      Q.   Right.

5      A.   I told her, like, around -- probably, like,

6   two or three hours later because she's -- she's in

7   Virginia.  I had to wait until she get up.

8      Q.   Okay.  Did you do anything else to try to

9   vote that day?

10      A.   No.

11      Q.   Did you go back to the poll?

12      A.   No.

13      Q.   Did you make any calls yourself to the

14   Supervisor's office?

15      A.   I did a couple of days prior to the election

16   day.

17      Q.   Okay.  I'll go back to that.  But on

18   November 7th did you make any phone calls to anybody?

19      A.   No.

20      Q.   Okay.  You called the Supervisor of

21   Elections office before November 7th, 2000?

22      A.   Yes.

23      Q.   Do you know about how many days before?

24      A.   Probably, I want to say, two or three.

25      Q.   Okay.

CENTRAL FLORIDA REPORTERS, INC.

33

```
 1         A.    I know it was close.

 2         Q.    Why did you call?

 3         A.    Because I hadn't received no card.

 4         Q.    Okay.  Were you able to speak with anybody?

 5         A.    Yes.

 6         Q.    Do you know who you spoke with?

 7         A.    No.

 8         Q.    Okay.  Was it a male or a female?

 9         A.    It was a female.

10         Q.    Okay.  And what did you say to that

11    individual; do you recall?

12         A.    I just gave her my name and then she

13    couldn't find it by my name.  So I gave her my

14    father's name because we live in the same household.

15         Q.    And she was --

16         A.    She couldn't find anything.  She found him,

17    but she couldn't find me because they also put it by

18    the address too.

19         Q.    So they could not verify you by phone?

20         A.    What you mean?

21         Q.    When you called them, they couldn't -- they

22    couldn't -- what did you ask them to do, see if you

23    were registered?

24         A.    Yes.

25         Q.    And they checked for you?
```

CENTRAL FLORIDA REPORTERS, INC.

34

1        A.    Yes.

2        Q.    And what did they tell you?

3        A.    No.

4        Q.    And what did you do then?

5        A.    I called them back and I said, "Well" --

6   well, I called them back because I didn't understand

7   how come because I did it twice.  So I called back

8   just to make sure.

9        Q.    Did you --

10        A.    Because they were busy.

11        Q.    -- tell them that?

12        A.    Yes, I told them that.  I understand they

13   were busy and they just kept running through things.

14        Q.    And what was their response that time?

15        A.    No.

16        MR. CIRULLO:    Okay.  Let me see.  Let me

17     just go off the record for a second.

18        (A short break was had.)

19        (Whereupon, Exhibit No. 1 was marked for

20     identification.)

21   BY MR. CIRULLO:

22        Q.    Ms. Graham, do you have -- do you know how

23   Williams Cowles's office processes voter registration

24   applications?

25        A.    No.

CENTRAL FLORIDA REPORTERS, INC.

35

 1      Q.   Did you ever receive anything from

 2 William Cowles's office stating that your application

 3 had been received?

 4      A.   No.

 5      Q.   Let me see.  Have you registered to vote

 6 since November 7th, 2000?

 7      A.   No.

 8      Q.   Why not?

 9      A.   Because of all this mess-up.

10      Q.   Okay.  You haven't tried to go back to his

11 office or made any efforts to get on the voter roll?

12      A.   No.

13      Q.   Okay.  Do you know how William Cowles purges

14 voters from their voter rolls?

15      A.   No.

16      Q.   Do you know how any other supervisors of

17 elections in the state purges voters from voter rolls?

18      A.   No.

19      Q.   Then -- and have you seen the amended

20 complaint that was filed on your behalf in this case?

21      A.   Yes.

22      Q.   Well, in paragraph 81 you allege that the

23 supervisors used widely varying approaches to purging

24 names.  Do you know why you said that?

25      A.   Not I.

36

1    Q.   You didn't say that?

2    A.   No.  I just told them what happened with me.

3    Q.   Okay.

4    A.   I don't --

5    Q.   Well, I have to ask you a lot of questions

6    about the complaint because --

7    A.   That's fine.

8    Q.   -- you are purporting to represent a class

9    of individuals.  Do you know what class you represent

10   in this case?

11   A.   What you mean by "what class"?

12   Q.   Well, who do you represent?  Who are you

13   representing?

14   A.   Who am I representing?

15   Q.   Yes.

16   A.   The people that didn't get a chance to

17   elect.

18   Q.   Okay.  Any person who didn't get a chance to

19   elect?

20   A.   Anyone.

21   Q.   Anyone.

22   A.   If anybody was just uncool to them.

23   Q.   Okay.  Do you have any evidence that

24   William Cowles's office wrongfully purged ex-felons

25   from the voter rolls --

CENTRAL FLORIDA REPORTERS, INC.

37

1    A.    No.

2    Q.    -- for the November 7th, 2000, election?

3    A.    You asked me do I have any evidence?

4    Q.    Right.

5    A.    No.

6    Q.    Do you have any evidence that he wrongfully

7 purged anybody from the voter rolls for the 2000 --

8 November 7th, 2000, election?

9    A.    I don't have any.

10    Q.    Do you know how William Cowles verifies his

11 changes of address --

12    A.    No.

13    Q.    -- for voters?  Do you have any evidence

14 that anything William Cowles did for the November 7th,

15 2000, election had a disproportionate effect on Blacks

16 as opposed to Whites?

17    A.    I'm not following what you're asking.

18    Q.    Do you know if any procedures William Cowles

19 did for the November 7th, 2000, election had affected

20 black citizens more than white citizens?

21    A.    No.

22    Q.    Do you know if William Cowles handles voter

23 registration applications differently for black

24 applicants than white applicants?

25    A.    I wouldn't know that.

CENTRAL FLORIDA REPORTERS, INC.

38

1    Q.    Do you have any evidence that he does?

2    A.    No.  Sorry.

3    Q.    Do you know how Williams Cowles provides

4    access to his polls for the complete voter roll -- the

5    complete voter roll -- everybody on the voter roll?

6    Do you know how he provides access to his polls to

7    that list?

8    A.    No.

9    Q.    Do you have any evidence that he provides

10   unequal access of that list to his polls?

11   A.    Would it be considered what I went through?

12   Q.    Well, do you have any evidence that he

13   provides voter lists differently depending on the poll

14   or precinct?

15   A.    I can't answer that.  I mean, if you ask me

16   if it affected me, then I would say yes.

17   Q.    Well, you allege that William Cowles's polls

18   have unequal access to the complete county voter roll.

19   And I'm wondering if you have any evidence to show

20   that his polls have unequal access to that roll?

21   A.    I couldn't answer that because I -- I can't

22   answer for someone else.

23   Q.    So you don't have any evidence?

24   A.    No.

25   Q.    Okay.  I need to show you a letter.

CENTRAL FLORIDA REPORTERS, INC.

```
 1              MR. CIRULLO:   Can I get that marked Exhibit
 2         No. 2, please?
 3              (Whereupon, Exhibit No. 2 was marked for
 4         Identification.)
 5              MR. CIRULLO:   I'm gonna pass around copies
 6         to you-all so you can see.
 7              For the record, for you-all on the phone,
 8         it's a copy of the December 22nd, 2000, letter
 9         from Anita Hodgkiss to Katherine Harris.
10    BY MR. CIRULLO:
11         Q.   Do you want to take a moment and take a look
12    at that?
13              MR. MACINNES:   Was a copy of the returned
14         postcard made Exhibit 1?
15              MR. CIRULLO:   Yes.
16              MR. MACINNES:   Thank you.
17              MR. EHRLICH:   Is that a two-page exhibit?
18              MR. CIRULLO:   Which one?
19              MR. EHRLICH:   Exhibit 1 is a two-page
20         exhibit.  The first page is the -- well, I guess
21         it could be termed the back side of the envelope
22         and the second page is the front of the envelope
23         that was mailed in.  And for the record, this is
24         Jeff Ehrlich from Miami-Dade County.
25    BY MR. CIRULLO:
```

CENTRAL FLORIDA REPORTERS, INC.

40

1   Q.   Tell me when you're ready, Ms. Graham.

2   A.   Okay.  Go ahead.

3   Q.   Okay.  Did you write -- I'm sorry.  I'm

4   gonna refer to the letter as Exhibit 2.

5        Ms. Graham, did you write the December 22nd

6   letter to Katherine Harris?

7   A.   No.

8   Q.   Did you authorize anybody to write this

9   letter on your behalf?

10  A.   Yes.

11  Q.   Okay.  Who did you authorize?

12  A.   Ms. Anita.

13  Q.   Okay.  How did you authorize her to write

14  this letter?

15  A.   Because I -- I asked for her to be my

16  counsel.

17  Q.   Didn't you testify earlier that she became

18  your counsel after January 1?

19  A.   Yes.  But there's several of them.

20  Q.   Okay.

21  A.   So I'm assuming she's already in the pack

22  with the rest of them.

23  Q.   Had you seen this letter before today?

24  A.   No.

25  Q.   Did you see this letter -- so you did not

CENTRAL FLORIDA REPORTERS, INC.

41

1    see this letter before it went out?

2        A.   No.

3        Q.   Okay.  But you authorized this letter to be

4    sent on your behalf?

5        A.   Yes.

6        Q.   Did you have conversations about this letter

7    before it went out with anybody else?

8        A.   I'm pretty sure I did.

9        Q.   Are you certain that you authorized this

10   letter before it went out?

11            MS. HODGKISS:   You've asked her three times

12       now whether she saw the letter.

13            MR. CIRULLO:   Is that an objection?

14            MS. HODGKISS:   Yeah.

15            MR. CIRULLO:   Asked and answered?

16            MS. HODGKISS:   Yes.

17       Q.   Okay.  I may have some follow-up on that.

18            Do you know what -- what a punch-card

19   balloting system is?

20       A.   I have a little idea -- I have a little

21   knowledge of it.

22       Q.   Okay.  What is your knowledge of the system?

23       A.   That there's a card that you punch on, but

24   it's got the person's name on each side and they give

25   you, like, a little school card, somewhat, and --

CENTRAL FLORIDA REPORTERS, INC.

42

1    Q.    Do you know what system --

2    A.    I don't know what system.

3    Q.    -- of voting Orange County uses?

4    A.    No.

5    Q.    Okay.  Do you know how William Cowles trains

6    his poll workers?

7    A.    I have no clue.

8    Q.    Do you know how William Cowles's office was

9    equipped to handle complaints on November 7th, 2000?

10   A.    Not very well.

11   Q.    Well, I'm asking you if you know how his

12   office was equipped to handle those complaints?

13         MS. HODGKISS:   And her answer was "not very

14      well."

15   Q.    Okay.  Do you know if he had telephone lines

16   to handle complaints?

17   A.    Yes, he had telephone calls (sic) to handle

18   complaints.

19   Q.    Do you know how many staff members he had

20   hired to handle election issues on November 7th, 2000?

21   A.    I have no clue.

22   Q.    Do you know if he employed the use of

23   computers?

24   A.    I'm assuming he did since they had to look

25   it up through the computer.

CENTRAL FLORIDA REPORTERS, INC.

43

1      Q.   Okay.  Do you know if he used laptop

2  computers?

3      A.   I have no clue.

4      Q.   Okay.  Do you know if there was a laptop at

5  the precinct that you visited on November 7th, 2000?

6      A.   I don't recall.  I'm not gonna say it's no

7  or yes, but I don't recall.

8      Q.   You may have answered this.  Do you know --

9  you don't know if laptops were used in Orange County?

10     A.   I don't know.

11     Q.   Okay.  Do you know how William Cowles

12  selects his poll workers?

13     A.   I don't know.

14     Q.   Okay.  In paragraph 119 of the complaint you

15  allege that (as read):  "William Cowles failed to

16  establish uniform training and election day procedures

17  in regard to the November 7th, 2000, election."

18          What do you mean by that?

19     A.   I can't answer that.  I mean --

20     Q.   Do you know if William Cowles --

21     A.   According to my experience, no, the training

22  sucks.

23     Q.   Okay.  Well, your -- that's your opinion.

24     A.   But if I wrote this, that's -- then that's

25  me.

CENTRAL FLORIDA REPORTERS, INC.

44

1      Q.   Do you --

2      A.   I --

3      Q.   Do you think Williams Cowles trained workers

4  differently depending on where they were going to be

5  assigned?

6      A.   I can't answer that.

7      Q.   You don't have any evidence that he trained

8  poll workers differently?

9      A.   In my experience?  No.  I mean, he trained

10  workers terribly.

11      Q.   Okay.  But you don't have any evidence that

12  they were -- what evidence do you have for your

13  allegations that he failed to establish uniform

14  methods, then, throughout Orange County?

15      A.   The way I was treated when I went to go

16  register.  That's the only thing.  That's the only

17  evidence I got.

18      Q.   What do you mean by the term "predominantly

19  black precinct"?

20      A.   What do you mean?

21      Q.   In paragraph 72 of the complaint, the term

22  "predominantly black precinct" is used.  What do you

23  mean by that?

24      A.   I was -- I was supposed to have wrote that?

25      Q.   Yes.

CENTRAL FLORIDA REPORTERS, INC.

45

1      A.   Is that what you're saying?

2      Q.   Uh-huh.

3      A.   The only thing I did is tell all my
attorneys what happened to me.

5      Q.   Okay.  So -- but to you what does the term
"predominantly black precinct" mean?

7      A.   You're asking me what it means?

8      Q.   Right.  What do you think it means?

9      A.   Majority, three-fourths.

10      Q.   Major -- okay.  Was the precinct you
attempted to vote at on November 7th, 2000, a
predominantly black precinct?

13      A.   I wouldn't say so.

14      Q.   Okay.  What evidence do you have that you
were not on the voter rolls for November 7, 2000,
because you were black?

17      A.   What evidence?

18      Q.   Do you have any evidence that you were not
on the rolls for the November 7th, 2000, election
because you were black?

21      A.   Yeah.  Because on it it asked you.

22      Q.   What evidence do you have that you were not
on the voting roll on November 7, 2000, because you
were black?

25      A.   The card that's sitting in front of you.

CENTRAL FLORIDA REPORTERS, INC.

46

 1   Open it up and look to the side of it.

 2       Q.    You want me to open this (indicating)?

 3       A.    No.  Look through the side of it.  You don't

 4   have to open it up.  You can look through the side and

 5   get all of the information you need out of it.

 6       Q.    Okay.  What evidence in this postcard leads

 7   you to believe it was returned to you because you were

 8   black?

 9       A.    That's my opinion.  So that's my evidence

10   right there (indicating).

11       Q.    Okay.  Your evidence is this postcard?

12       A.    Uh-huh.  Yes.  Sorry.

13       Q.    Okay.  Do you have any evidence that

14   William Cowles processes voter registration

15   applications differently for Blacks than Whites?

16       A.    You already asked me that question.

17       Q.    No.  I asked you whether you had any

18   evidence that you weren't on the voting rolls because

19   you were black.  I'm asking you now if you have any

20   evidence that your voter registration application was

21   treated differently by William Cowles because he

22   treats -- okay.  Let me back up.

23           Do you have any evidence that William Cowles

24   processes voter registration applications differently

25   for black applicants than white applicants?

CENTRAL FLORIDA REPORTERS, INC.

47

1      A.    I don't answer that because I don't know.  I

2  don't wrote that.

3      Q.    But do you have any evidence --

4      A.    But according to me, yes, because I'm

5  sitting right here.  I'm still not voting.  I

6  haven't --

7      Q.    Do you have any evidence that he handles

8  those applications differently?

9          MS. HODGKISS:   She just gave you your

10      answer.

11          MR. CIRULLO:   No.  She didn't say she had

12      evidence or she didn't have evidence.  She said it

13      was her feeling.

14      A.    No.  I said if it's pertaining to me, yes.

15      Q.    No.  I'm asking --

16      A.    If I --

17      Q.    -- do you have any evidence that

18  William Cowles's office processes voter applications

19  differently for black applicants than white

20  applicants? -

21      A.    I'm saying right here, to me, yes.

22      Q.    That's your evidence --

23      A.    That's enough.

24      Q.    -- your situation?  Okay.  What relief are

25  you seeking in this case?

CENTRAL FLORIDA REPORTERS, INC.

48

1       A.    What do you mean by that?

2       Q.    What's are you -- what's your goals?  Why

3   are you suing Bill Cowles?

4       A.    So everyone can be able to vote regardless

5   of what political party you belong to or what color

6   you should be.

7       Q.    Okay.

8       A.    What ethnic group you should be.

9       Q.    So you want everybody to be able to vote?

10      A.    Exactly.  Without any purging or any tricks.

11            MR. CIRULLO:   Let me just take a minute.

12            We'll go off the record for just a second.

13            (A short break was had.)

14   BY MR. CIRULLO:

15      Q.    We're back on.  I've just got one more

16   question, Ms. Graham.  Do you know anybody else who

17   filled out one of those on-line applications?

18      A.    No.

19            MR. CIRULLO:   Okay.  That's all I have.  I

20      think that some of these folks here might have

21      some questions for you.  We're gonna start inside

22      the room.

23            Jeff Ehrlich from Miami-Dade County is up at

24      the plate right now.

25            MR. EHRLICH:   Up at the plate.

CENTRAL FLORIDA REPORTERS, INC.

49

CROSS-EXAMINATION

BY MR. EHRLICH:

   Q.   Ms. Graham, my name is Jeff Ehrlich again.
I represent the Supervisor of Elections from
Miami-Dade County who is, along with Mr. Cowles and
several others, one of the defendants in this case.
As you know, you are one of many plaintiffs in this
lawsuit that is part of the class-action lawsuit.   And
that's --

       MR. MACINNES:   Could you switch places with
   Mike, please?

       MR. EHRLICH:   I'll speak louder, Doug.   I
   will.   I'm sorry.   I don't want to shout at
   Ms. Graham.   She's five feet away from me.   But so
   you can hear, I'll be rude.

       MR. MACINNES:   Okay.   Thank you.

BY MR. EHRLICH:

   Q.   First, Ms. Graham, you brought an envelope
here today.   Would you mind -- would you open that,
please?

       MS. HODGKISS:   Because it's taped -- this
   is Anita -- and because her testimony is that it
   was not taped when she --

       MR. CIRULLO:   I think we need to keep it --

       MR. EHRLICH:   I disagree.   I think her

CENTRAL FLORIDA REPORTERS, INC.

50

1   testimony is clear that it was not taped when she

2   mailed it out and it came back taped.  What more

3   do we need?  I'd like to see what the inside of

4   the -- what the application says.  I think that's

5   relevant and I'd like her to open it.

6          THE WITNESS:   You can open it.

7          MR. EHRLICH:   I understand her testimony

8   has been very clear that she sent it out without

9   any tape on it and it came back to her and as it

10  exists today it has tape on it.  Is there any

11  other reason to -- I mean, is there any reason to

12  keep it closed?

13         MS. HODGKISS:   I guess I -- as long as

14  everyone -- all of the parties in the case are

15  willing to stipulate that it was taped closed.

16         MR. EHRLICH:   Well, no.  I'll stipulate

17  that that was her testimony, but her testimony was

18  very clear.

19         MS. HODGKISS:   Well, no.  No.  If you're

20  gonna alter the condition of the envelope as it

21  exists right now, I want a stipulation as to the

22  condition of the envelope right now.

23         MR. CIRULLO:   I will -- I will stipulate.

24         MR. EHRLICH:   Oh, that it's taped now?

25         MS. HODGKISS:   Yes.

CENTRAL FLORIDA REPORTERS, INC.

51

1    MR. EHRLICH:   Oh, yeah, yeah, yeah.  I'll

2    stipulate to that.

3    MR. CIRULLO:   Why don't you go ahead and

4    describe it in great detail, Jeff.

5    MR. EHRLICH:   For those of you over the

6    phone and those of you in the room that can't see

7    it there are apparently three pieces of tape that

8    are folded over in half that keep this envelope

9    sealed in half.  There -- you know, for what it's

10   worth, I agree that it's taped.  I think any

11   reasonable person would agree that there are three

12   pieces of tape on this envelope.  And if there's

13   no objection, I'm going to open the envelope and

14   we'll see who the winner is.

15        Any objection?

16   MR. MACINNES:   I will stipulate that it's

17   taped as you described and I have no objection to

18   you opening it.

19   MR. EHRLICH:   Okay.  No other -- no other

20   objections?

21   MR. HARVEY:   No objection.

22   MR. EHRLICH:   All right.  I'm gonna hand

23   the envelope to Ms. Graham and she can tell us --

24   BY MR. EHRLICH:

25      Q.   Ms. Graham, open the envelope, please.

CENTRAL FLORIDA REPORTERS, INC.

52

1          MR. EHRLICH:   Off the record.

2          (An off the record discussion was had.)

3  BY MR. EHRLICH:

4      Q.   Okay.   The envelope is open.   If I may

5  just -- we're back on the record.

6          Ms. Graham, is this the same form that you

7  sent in sometime at the beginning of October 2000?

8      A.   Are you talking about this right here

9  (indicating)?

10     Q.   Yeah.

11     A.   Yes.

12     Q.   This looks to be in the same form as it was

13  when you put it in the mail?

14     A.   Yes.

15     Q.   Would you look at -- there's a box marked

16  No. 9.  It's -- would you agree that the box -- that

17  in -- within Box 9 there's a place for you to sign

18  your full name?

19     A.   Yes.

20     Q.   And is there a signature in that box?

21     A.   This right here (indicating)?

22     Q.   Yes.

23     A.   No.

24     Q.   Would you agree that underneath that box

25  there's a place for the date?  Would you agree that

CENTRAL FLORIDA REPORTERS, INC.

53

1   there is no date written in that box?

2       A.   Yes.

3       Q.   You did not sign Box 9 where your signature

4   is required; correct?

5       A.   No.   I signed under.

6       Q.   Now, I see that you signed in Box 10.  Just

7   for the record, Box 10 says that if the applicant is

8   unable to sign, a person who helped the applicant fill

9   out the application should sign.  You're indicating

10  that you signed in Box 10.  Is that your testimony?

11      A.   Uh-huh.

12      Q.   Did you -- did someone help you fill out

13  this form?

14      A.   No.

15      Q.   Did you help someone else fill out this

16  form?

17      A.   No.

18      Q.   Why did you sign in Box 10 and not Box 9?

19      A.   In a rush.

20      Q.   Would you say that was a mistake?

21      A.   Yes.

22      Q.   Do you think you should have signed in Box 9

23  if you wanted this application to be processed

24  correctly?

25      A.   Yes.

CENTRAL FLORIDA REPORTERS, INC.

54

1      Q.     And you agree that you did not sign in

2   Box 9?

3      A.     Yes.

4      Q.     Would you -- and why did you not write the

5   date in Box 9?

6      A.     Because I didn't sign in Box 9.

7      Q.     And, again, that was a mistake?

8      A.     Yes.

9           MR. EHRLICH:   Okay.   I'm gonna ask that

10      a -- that we have a photocopy made now of the

11      opened envelope and that would be Exhibit 3 to

12      this deposition.   While that's happening, we can

13      continue.

14           All right.   I'm gonna speak even louder now

15      because we're in the middle of a monsoon here in

16      Orlando and it's making a loud noise in our

17      conference room.

18           Can everybody hear me?

19           MS. NORRIS-WEEKS:   Actually, you're a

20      little too loud now.

21           MR. MACINNES:   You were fine before.

22   BY MR. ERLICH:

23      Q.     Ms. Graham, you testified that you joined

24   NAACP a few months ago; is that right?

25      A.     Yes.

CENTRAL FLORIDA REPORTERS, INC.

55

1    Q.    Did you join the NAACP after this litigation

2    had been filed?

3        A.    Yes.

4        Q.    You testified that you did not pay any dues

5    to be a member of the NAACP.  Do you know whether dues

6    are a condition of membership to the NAACP?

7        A.    You mean a registration fee?  Is that what

8    you're talking about?

9        Q.    Or membership dues --

10       A.    Yes.

11       Q.    -- or a membership fee.

12       A.    Yes.

13       Q.    Do you know whether you have to pay that in

14   order to be a member?

15       A.    Yes.

16       Q.    I'm sorry.  What is --

17       A.    Oh, I'm sorry.  You do.

18       Q.    While it's important that I hear you, the

19   court reporter also has to hear your answer.

20            You said that you believe it is a condition

21   of membership that you pay dues?

22       A.    You do.

23       Q.    How is it that you are a member of the NAACP

24   if you have not paid dues?

25       A.    My girlfriend did it for me.

CENTRAL FLORIDA REPORTERS, INC.

56

1    Q.    Okay.  And what is your girlfriend's name?

2    A.    Raquel Findley.

3    Q.    I'm sorry?

4    A.    Raquel Findley.

5    Q.    Ms. Graham, how is it that you became

6    involved in this litigation -- in this lawsuit?

7    A.    Raquel informed me what was going on.

8    Q.    When you say "what was going on," what

9    exactly did --

10        MR. MACINNES:    I can't hear the witness at

11    all.

12    Q.    Okay.  We're gonna speak louder.  What

13    exactly did Raquel tell you when you say "she told me

14    what was going on"?

15    A.    About the incident about how -- how the

16    voter registration and everything wasn't right, how

17    people had been purged and how people couldn't vote.

18    Q.    And how is it that you became involved in

19    this lawsuit?

20    A.    Because mine came back to me with tape on it

21    and I haven't received anything and I did two of them.

22    Q.    Okay.  I'm gonna try to be a little more

23    clear.  What I'm getting at is how you became involved

24    with your lawyers and decided to file a complaint.  I

25    understand that Raquel was telling you more about the

CENTRAL FLORIDA REPORTERS, INC.

57

1    problems involved with the election.  My question is,

2    how did you become involved in the lawsuit part of

3    this?

4         A.   I went down to Miami.

5         Q.   Okay.  And what did you do in Miami?

6         A.   I went to a conference.

7         Q.   What was -- who was the sponsor of the

8    conference?

9         A.   NAACP.

10        Q.   And what was the purpose of the conference?

11        A.   To bring to the open what was happening to

12   everybody.

13        Q.   And what was said at the conference that

14   made you want to be a part of this lawsuit?

15        A.   I wanted to change what was going down.

16        Q.   And so when you decided you wanted to become

17   involved, what did you do next?  Specifically at that

18   conference, take it from there.  What did you do?

19        A.   I went to them and asked them "How can I

20   help?"

21        Q.   And what did they tell you?

22        A.   They just told me, you know, to tell them

23   about my problem and we'll go from there.

24        Q.   Okay.  And what happened then?

25        A.   They called me a couple of weeks later.

CENTRAL FLORIDA REPORTERS, INC.

58

1      Q.    Who called you?

2      A.    I can't remember her name.

3      Q.    Was it someone from the NAACP?

4      A,    I think it was someone from -- I don't know.

5  NAACP or a lawyer.

6      Q.    So you don't remember whether --

7      A.    I don't remember.  But someone did call me.

8      Q.    Okay.  And you don't remember whether that

9  person was a lawyer?

10      A.    No.

11      Q.    Do you know whether that person was

12  Ms. Hodgkiss?

13      A.    Nope.  I don't think so.

14      Q.    You don't think it was her or you don't

15  remember?

16      A.    I don't remember.

17      Q.    Okay.  You mentioned when you were asked

18  before who was -- who were your lawyers.  You

19  mentioned Ms. Hodgkiss.  Are there other people who

20  are your lawyers in this case?

21      A.    Yes.  Several.

22      Q.    Can you name them?

23      A.    No.

24      Q.    Are there people other than lawyers with

25  Ms. Hodgkiss's office?  Do you know who the other

CENTRAL FLORIDA REPORTERS, INC.

59

1    lawyers in her office are?

2        A.  .  I have no clue.

3        Q.  Okay.  Was it the -- it was the October

4    9th -- you testified that on October 9th or

5    thereabouts you filled out a second application to

6    register to vote; is that right?

7        A.  The 8th.

8        Q.  I'm sorry.  The 8th.  What was it that you

9    filled out?  Was it an application to become a

10   registered voter or was it something else?

11       A.  Voter.

12       Q.  Okay.  The reason I ask is it seems like

13   what you filled out on line was basically an

14   application to get an application; is that right?  You

15   filled it out on line and then someone sent you an

16   application?

17       A.  No.

18       Q.  No.  What --

19       A.  They didn't send me anything.  They sent me

20   that (indicating).

21       Q.  Right.  That.  And when you say "that,"

22   you're referring, I suppose, to what's been marked as

23   Exhibit 1 and then also as Exhibit 3 after it was

24   opened.  That form that came back to you in the mail?

25       A.  Yes.

CENTRAL FLORIDA REPORTERS, INC.

60

1     Q.    Okay.  They sent you that.  What is that in

2 your --

3     A.    An application.

4     Q.    Okay.  So on line you filled out an on-line

5 form and the result was that that, Exhibit 3, came to

6 you in the mail?

7     A.    Yes.

8     Q.    Okay.  And my question is, on October 8th

9 you filled out something else.  Was that -- was what

10 you filled out on October 8th similar to what you sent

11 in on October 3rd?

12    A.    That's similar to what I filled out on the

13 computer, yes.

14    Q.    Okay.  It was similar to what you filled out

15 on the computer which was not an application to

16 register to vote, was it?

17    A.    Yes.

18    Q.    Okay.  If that was an application to

19 register to vote, why were you required to send in

20 something else?

21    A.    I wasn't required.  I did it on my own.

22 You're talking about this right here (indicating)?

23    Q.    I'm --

24    A.    You had to have a signature.

25    Q.    Okay.  So the -- now, again, we're talking

CENTRAL FLORIDA REPORTERS, INC.

61

1    about what was marked as Exhibit 3.  You filled out

2    the information on line.  It came to you for you to

3    put your signature on --

4         A.   Yes.

5         Q.   -- and then send it in --

6         A.   Yes.

7         Q.   -- as a completed application?

8         A.   Yes.

9         Q.   I understand.  And on October 8th you filled

10   out another application?

11        A.   Yes.

12        Q.   And you said you gave it to your friend.

13   And I'm sorry, I didn't catch your friend's name.

14        A.   Raquel.

15        Q.   Raquel.  And you said -- do you know her

16   last name?

17        A.   Findley.

18        Q.   Findley.  Thank you.  I know it's been said

19   a couple of times.

20             And you gave it to her and that's the last

21   you saw of it; is that right?

22        A.   Yes.

23        Q.   And it's your understanding that she gave it

24   to someone named Shawn; is that right?

25        A.   Yes.

CENTRAL FLORIDA REPORTERS, INC.

62

1      Q.    And what is the basis for that

2  understanding?  In other words, how do you know that?

3      A.    Because prior -- she's been doing it ever

4  since -- she's been having, like, a drive for voters.

5      Q.    Okay.  I'm talking specifically about your

6  application.  Did she tell you that she gave it to

7  someone named Shawn?

8      A.    Yeah.  She told me she gave it to him.

9      Q.    Okay.  That's what I was -- that's what I

10  was asking for.

11      A.    Okay.

12      Q.    And then you stated you also had an

13  understanding that Shawn -- and you don't remember his

14  last name; correct?

15      A.    No.

16      Q.    It's your understanding that Shawn then took

17  that application and delivered it to the Supervisor of

18  Elections?

19      A.    Yes.

20      Q.    And what is the basis for -- for that

21  statement by you?  In other words, how do you know

22  that to be true?

23      A.    Because Raquel told me.

24      Q.    Okay.  So Raquel told you that she gave it

25  to Shawn and that he took it to the Supervisor of

CENTRAL FLORIDA REPORTERS, INC.

63

1  Elections?

2       A.   ..Yes.

3       Q.   And do you know whether Shawn told Raquel

4  that he delivered it to the Supervisor of Elections?

5       A.   I don't know.  You'd have to ask her.

6       Q.   Okay.  We will.  You said something else

7  when -- I think you were asked when did you first

8  retain Ms. Hodgkiss and there was some question about

9  the date and you said -- and I think your words were

10 "She was in the pack with the rest of them."  Do you

11 remember saying that, first of all, just a few minutes

12 ago?

13      A.   Yes.

14      Q.   Okay.  What did you mean by that?

15      A.   That there's several other attorneys.

16      Q.   Okay.

17      A.   The one I've been speaking to a lot is --

18 what is --

19      Q.   Laurie Borgen?

20           THE COURT REPORTER:   I'm sorry?

21      A.   Yes.

22           MR. EHRLICH:   Her name is Laurie Borgen,

23      B-o-r-g-e-n.

24      A.   I think that's her.

25      Q.   Right.  I've been talking to Laurie a lot

CENTRAL FLORIDA REPORTERS, INC.

64

1    too.

2         A.   Brown hair.

3         Q.   Right.  Short brown hair.

4         A.   That's who I'm always talking with.

5         Q.   Okay.  And do you remember when your first

6    conversation with Ms. Borgen was?

7         A.   When I was in Miami.

8         Q.   Okay.  And was that before January 1st of

9    this year?

10        A.   Oh, no.

11        Q.   It was after January 1st of this year?

12        A.   Yes.  It was before January 1st of this

13   year.

14        Q.   Oh, I'm sorry.  Okay.

15        A.   It's 2001, yeah.

16        Q.   It was in 2000, in other words?

17        A.   2000.

18        Q.   Okay.  Do you know whether it was in

19   November of 2000?  I imagine it was either in November

20   or December.

21        A.   It was around that time.  I can't give you

22   exact, but I know it was around that time right there.

23        Q.   Okay.

24        A.   Within two months.

25        Q.   Right.  Within the last two months of the

CENTRAL FLORIDA REPORTERS, INC.

65

```
 1   year?

 2        A.   .. Yeah.

 3        Q.   Okay.  Do you know whether it was before

 4   this December 22nd date?

 5        A.   Oh, yeah.  It was before that.

 6        Q.   It was before that?

 7        A.   Yes.

 8        Q.   Okay.  Now, Ms. Graham, you've testified

 9   today about the problems that you allegedly had here

10   in Orange County; right?

11        A.   Yes.

12        Q.   Do you have any claim against the Supervisor

13   of Elections of Miami-Dade County?  That's who I

14   represent.  Do you have any claim against him?

15        A.   Do I personally?

16        Q.   Right.

17        A.   No.

18        Q.   You did not have -- obviously, you didn't

19   attempt to vote in Miami-Dade County, did you?

20        A.   No.

21        Q.   You didn't attempt to register in Miami-Dade

22   County, did you?

23        A.   No.

24        Q.   You were not wrongfully purged from the

25   rolls of Miami-Dade County voters, were you?
```

CENTRAL FLORIDA REPORTERS, INC.

66

1      A.    No.

2      Q.    You had no problems at any polling places on

3  election day in Miami-Dade County, did you?

4      A.    I didn't, no.

5      Q.    No.  In fact, you were here in Orange County

6  the whole day?

7      A.    Yes.

8      Q.    Do you have any knowledge of any problems

9  that others had in Miami-Dade County on election day?

10     A.    Yes.

11     Q.    And what is the basis for that knowledge?

12 How do you know that, what you know?

13     A.    Because I go to Miami quite a lot still and

14 some of my friends told me what was going on down

15 there.

16     Q.    What friends?

17     A.    The friends I used to work with.

18     Q.    Can you tell me their names?

19     A.    No.  I really don't want to because I

20 don't --

21     Q.    Well --

22     A.    -- I don't see them being dragged into this.

23     Q.    Well, Ms. Graham, I -- the reason I'm asking

24 the question -- maybe this will help you feel

25 comfortable answering -- is you and others have sued,

CENTRAL FLORIDA REPORTERS, INC.

1    among others, my client, the Supervisor of Elections

2    of Miami-Dade County.  And in this lawsuit you are

3    making some very serious allegations, as you know.

4    Allegations about discrimination.  You're alleging

5    that the Supervisor of Elections of Miami-Dade County

6    discriminated against people in the course of

7    administering the November 2000 election.

8            The Supervisor of Elections of Miami-Dade

9    County takes that allegation very seriously and he

10   wants me to investigate those allegations.  And as

11   part of this lawsuit, what we're doing now, in fact,

12   I'm attempting to gather information so that I can

13   investigate your allegations.  If you have a basis for

14   knowledge that serves as part of your allegations in

15   this lawsuit, I'm entitled to probe that.  I'm

16   entitled to ask you questions like this.  And so

17   you've said that you have a basis for knowledge that

18   there were problems in Miami or in Dade County in

19   November 2000.  And I've asked you what the basis was

20   and you said several friends or people that you know.

21           And, again, I'll ask you what those persons'

22   names are so that I can follow through with that and

23   probe that -- that information that you are giving.

24   Can you please tell me their names?

25       A.   I can't do that because, like I said, it's

CENTRAL FLORIDA REPORTERS, INC.

68

1    my allegations, not Miami.  My allegations are up here

2    in Orange County, not Dade County.

3             MS. HODGKISS:  If we can take a break and I

4        can confer with my client.

5             MR. EHRLICH:  Well, let me just ask a few

6        other questions then and we can get back to this

7        and I'll let you help me out.

8    BY MR. EHRLICH:

9        Q.   You've never met the Supervisor of Elections

10   of Miami-Dade County, have you?

11       A.   No.

12       Q.   And you said -- just a minute ago you said

13   "These are my claims (sic) here in Orange County"; is

14   that right?

15       A.   Yes.

16       Q.   And you have no claims, as you stated, in

17   Dade County; right?

18       A.   No.

19       Q.   Or against the Supervisor of Elections of

20   Miami-Dade County?  No claims?

21       A.   No.

22       Q.   Do you represent a class of persons in

23   Miami-Dade County who had problems there?

24       A.   I think so, yes.

25       Q.   And what class -- what experiences did -- in

CENTRAL FLORIDA REPORTERS, INC.

69

1   common with you do you think those persons had?   Are

2   you aware of people who had problems registering in

3   Miami-Dade County?

4        A.   Yes.

5        Q.   Okay.   Now, I'm going to ask what are those

6   persons' names and you can take a shot at an answer

7   first and then we might need to take a break so you

8   can talk to your lawyer.

9        A.   We might need to take a break.

10            MR. EHRLICH:    Okay.   You're not -- you've

11       said you don't want to answer my question, but

12       we're gonna take a very short break then.   Thank

13       you.

14            (Whereupon, a short break was had.)

15            (Whereupon, Exhibit No. 3 was marked for

16       identification.)

17  BY MR. EHRLICH:

18       Q.   Ms. Graham, before we broke I asked you --

19  you mentioned that you were aware of people that had

20  problems registering to vote in Miami-Dade County and

21  you refused to answer my question as to what those

22  persons' names were.   I'll ask you again, and I guess

23  risk the chance that your counsel will object to my

24  question as being asked and answered, although I don't

25  think it was.

CENTRAL FLORIDA REPORTERS, INC.

70

1       Can you please tell me the names of the

2  persons that you know who had problems registering to

3  vote in Miami-Dade County?

4       A.    I didn't say they had problems.  But they

5  told me about the problems that goes on -- that went

6  on down there.

7       Q.    Right.  They told you.  And I'm asking you

8  what their names are?

9       A.    One name is Jackie.

10      Q.    Yup.  Last name?

11      A.    McKay?  McAlly (phonetic).  Like that.

12  M-a-c-i --

13      Q.    I'm sorry.  Say that again.

14      A.    M-a-c --

15      Q.    Yes.

16      A.    -- l-a-i.

17      Q.    Maclai.  M-a-c-l-a-i, is that how you

18  spelled it?

19      A.    Yeah.  Something like that, I think.

20      Q.    Okay.  That's one person.  And what did

21  Ms. Maclai tell you about the problems she had

22  registering?

23      A.    Not she.

24      Q.    I'm sorry.  Is that a -- is that a man?

25      A.    No, that's her name.  But she didn't tell me

CENTRAL FLORIDA REPORTERS, INC.

71

1   about problems she had. She just told me about a

2   problem that -- an incident that happened.

3        Q.   Oh, okay. So Ms. Maclai doesn't claim to

4   have any problems having registered or --

5        A.   Not that I know of.

6        Q.   Well, she didn't tell you about any?

7        A.   Exactly.

8        Q.   Right. And you don't know -- you don't have

9   any other knowledge of problems that she had?

10       A.   No.

11       Q.   But she seems to -- you're saying she told

12  you about problems that other people she knows had --

13       A.   Yes.

14       Q.   -- is that right? And do you know their

15  names?

16       A.   No.

17       Q.   Other than Ms. Maclai, has anyone else told

18  you about problems that they had in Miami-Dade County?

19       A.   No.

20       Q.   So it's just her? That's the only source of

21  information you have about any problems that occurred

22  in Miami-Dade County; is that right?

23       A.   No. Well, you're talking about them

24  personally. So personally, no, nothing with them.

25  It's what they told me that other people had told

CENTRAL FLORIDA REPORTERS, INC.

72

1  them.

2       Q.   Right.  And I want to know all of the people

3  who told you about problems that other people, not

4  them or not you, had in Miami-Dade County.

5       A.   Oh, okay.  There's several of them.

6       Q.   Okay.

7       A.   There's Rosezenia.

8       Q.   Give me -- I'm sorry.  You're gonna have to

9  go slow and you're gonna have to spell the names for

10 both me and the court reporter.

11      A.   Rosezenia, R-o-s-e-z-e-n-i-a, Jackson.

12 That's the last name.

13      Q.   Okay.  And we'll take them one at a time.

14 What did Ms. Jackson tell you about the problems that

15 other people had in Miami-Dade County?

16      A.   About how polls are -- the cards and stuff

17 are left in the back of the seats -- the trunks.

18      Q.   Okay.  What -- I'm sorry.  What -- let's

19 break that down.  You said -- you said something about

20 the polls.

21      A.   The polls -- the cards.

22      Q.   You mean the ballots?

23      A.   The ballots that --

24      Q.   The ballots were left where?

25      A.   In trunks.

CENTRAL FLORIDA REPORTERS, INC.

73

```
1        Q.    Trunks of what?

2        A.   The cars.   The vehicle of the person that's

3   supposed to take them to the elections.

4        Q.    Okay.  And what did Ms. Jackson say to you

5   about those ballots in trunks?

6        A.    Just what I told you.

7        Q.    That she thinks they weren't counted?

8        A.    No, they couldn't have been counted.

9        Q.    They were not counted.  Do you know whether

10  those were -- she knew they were completed ballots?

11       A.    I don't know.

12       Q.    Okay.  Other than Ms. Jackson and you

13  mentioned Ms. Maclai, who else told you about problems

14  they knew about in Miami-Dade County?

15       A.    Sandra Vasquez.

16       Q.    Vasquez?

17       A.    Uh-huh.

18       Q.    And what did Ms. Vasquez tell you?

19       A.    Oh, she just told me about how -- how one

20  church had a -- how one church you supposed to go

21  ahead and vote and they -- they voted there but they

22  never came and picked up --

23       Q.    Never -- in other words --

24       A.    Picked up the ballots.

25       Q.    -- there were ballots left after election
```

CENTRAL FLORIDA REPORTERS, INC.

74

1    day?

2         A.   Exactly.

3         Q.   Ms. Maclai, is that someone who lives in

4    Dade County?  Does she live in Dade County?

5         A.   I don't think so.

6         Q.   Do you know where she lives?

7         A.   I think Plantation.

8         Q.   Okay.  That would be in Broward County --

9         A.   Yeah.

10        Q.   -- is that right?  The complaints she made

11   to you, were those about problems that happened in

12   Dade County or Broward County?

13        A.   I don't know.  I don't know.

14        Q.   Oh, so --

15        A.   I just know it's down in that area.

16        Q.   Okay.  So Ms. Maclai's comments to you may

17   have been about problems that were not even occurring

18   in Dade County?

19        A.   I can't say it was and I can't say it

20   wasn't.

21        Q.   You don't know?

22        A.   I don't know.

23        Q.   Okay.  And Ms. Jackson, where does she live?

24        A.   She lives in Miami.

25        Q.   Okay.  Do you know whether she voted in

CENTRAL FLORIDA REPORTERS, INC.

75

1    Miami?

2         A.    I don't know.

3         Q.    Okay.  Do you know where -- what city she

4    lives in?

5         A.    She lives in North -- what is it called?

6    Carol -- right --

7         Q.    Carol --

8         A.    Carol City -- but not in Carol City.

9         Q.    My geography in Miami-Dade County is being

10   tested.  But in North Dade?

11        A.    Yeah.

12        Q.    All right.  And Ms. Vasquez, do you know

13   where she lives?

14        A.    Oh, she lives in Sunrise.  She lives in --

15        Q.    In Broward County.

16        A.    -- Broward.

17        Q.    The problems that she told you about, are

18   you -- do you know whether those were problems that

19   occurred in Dade County or Broward County?

20        A.    Same thing.  I don't know.

21        Q.    You don't know?

22        A.    No.

23        Q.    Okay.

24        A.    I didn't ask her all that.

25             THE COURT REPORTER:   I'm sorry?

CENTRAL FLORIDA REPORTERS, INC.

76

```
 1        A.    I didn't ask her all that.

 2        Q.    Ask her all that?

 3        A.    Yeah.

 4        Q.    You want me to ask her all that?  All right.

 5   If I can, I will.

 6             You mentioned three people.  Do you have

 7   others that told you about problems?  And maybe we can

 8   short circuit this a bit.  I'm only interested --

 9   because I represent the Supervisor of Elections in

10   Dade County.

11        A.    Uh-huh.

12        Q.    -- so I'm particularly interested in

13   problems that happened in Dade County.  As you've

14   stated, some of these people may have told you about

15   things that happened in Broward County.  So in

16   completing the rest of this answer -- and I'm asking

17   you about people who have told you about problems they

18   heard about -- can you -- can you just tell me the

19   names of people who are aware of problems that

20   happened in Dade County?  And are there any others,

21   other than the three that you've already told me

22   about?

23        A.    No.

24        Q.    Okay.  Just a few more questions,

25   Ms. Graham.  I'm gonna show you the -- the amended
```

CENTRAL FLORIDA REPORTERS, INC.

77

1    complaint and let you take a look at, in particular,

2    paragraph 81.  If you're -- you can look at it with

3    your lawyer.

4              In paragraph 81 the plaintiffs allege that

5    (as read):  "The Supervisors of Elections adopted

6    widely varying approaches to purging the names of

7    registered voters based on the list provided by the

8    state."

9              Do you know what approach Supervisor Leahy

10   in Miami-Dade County used to purge voters from the

11   list of voters?

12        A.   I don't know.

13        Q.   You don't know that?  And do you know what

14   approach other Supervisors of Elections in other parts

15   of the state used to purge voters?

16        A.   I have no clue.

17        Q.   And -- well, why is it that if you -- if you

18   don't know what approach Supervisor Leahy used and you

19   don't know what approach other supervisors used, why

20   is it that you allege that the supervisors used widely

21   varying approaches?

22        A.   The only thing I can tell you is that I

23   discussed my problem with my attorney.  And they may

24   have other stuff from other victims.  So that's all I

25   can give you.

CENTRAL FLORIDA REPORTERS, INC.

78

1    Q.    Okay.  But you don't know -- you don't know

2  whether that's true or not?

3    A.    I'm not -- I'm not -- with me?  Yes, it's

4  true.

5    Q.    Well, you weren't purged, were you?

6    A.    No.

7    Q.    So you don't know whether the supervisors

8  applied widely varying methods of purging?  I mean,

9  that's -- is that --

10    A.    I can't -- I can't answer that.

11    Q.    You don't know that.  You said that your

12  attorneys have other -- you used the word "victims."

13  Which victims have information about the approaches

14  used by the Supervisors of Elections; do you know?

15    A.    It's in the package.

16    Q.    Which package?  You're referring to the

17  amended complaint?

18    A.    Yes, I'm referring to --

19    Q.    And would you know if you saw their names

20  which ones have -- have any complaints about purging?

21    A.    I have to look at it.

22    Q.    Okay.  Here (indicating) are their names.

23       MS. HODGKISS:   I'll just say the complaint

24     speaks for itself.

25    Q.    Right.  And I'm just trying to identify --

CENTRAL FLORIDA REPORTERS, INC.

79

```
 1   because --

 2       A.   Now, I can't see it from here.

 3       Q.   Just for the record, the allegations in

 4   paragraph 81 are not made on a plaintiff-specific

 5   basis and they're not made on a defendant-specific

 6   basis.  So if this person has knowledge about which

 7   plaintiffs have knowledge about the allegations in

 8   paragraph 81, which she said she might by looking at

 9   the names involved in this lawsuit --

10       A.   No.  Because I read that (indicating).

11   That's how I have it.

12            MS. HODGKISS:   All right.  Her testimony is

13       her only basis of knowledge is reading the

14       complaint.

15       A.   Yes.  I read -- I read the complaint.  I

16   read the whole thing.

17       Q.   Okay.  Okay.  So you don't know any --

18       A.   But I read from -- that is what I have --

19   the knowledge I have.  Now, I don't know the people

20   personally, no.

21       Q.   Okay.  You don't have any information other

22   than what's in this complaint except for what happened

23   to -- to you --

24       A.   Exactly.

25       Q.   -- specifically?
```

CENTRAL FLORIDA REPORTERS, INC.

80

1     A.    Yes.

2     Q.    Okay.  And you don't know anything about

3  what Supervisor Leahy did in Dade County?

4     A.    No.

5     Q.    Do you know whether the Supervisors of

6  Elections all used the same methods or different

7  methods in administering the election?

8     A.    I don't know.

9     Q.    Do you know whether Supervisor Leahy

10  wrongfully purged any voters?

11     A.    I don't know.

12     Q.    Do you know what procedures Supervisor Leahy

13  used to train poll workers?

14     A.    I don't know.

15     Q.    I heard you had some complaints about the

16  procedures that Supervisor Cowles used that you

17  stated --

18     A.    Concerning me.

19     Q.    -- concerning you.  But you have -- but you

20  don't know whether the supervisor used the same

21  procedures as Supervisor Cowles; do you?

22     A.    No.

23     Q.    If he used -- if Supervisor Leahy used

24  different procedures than those used by Supervisor

25  Cowles, would you expect the experiences of voters in

81

1   Dade County to be different than your experience?

2        A.   I can't answer that because I don't live in

3   Dade County.

4        Q.   Right.  My question is, if the Supervisor of

5   Elections in -- in any other county in Florida used

6   different procedures than the ones that resulted in

7   your allegations of not being able to vote --

8        A.   Uh-huh.

9        Q.   -- do you think your experiences would be

10  the same as the experiences of that voter from some

11  other county where different methods were used?

12       A.   Would I have to live there to find that out?

13       Q.   I don't know.  You --

14       A.   I don't know then.

15       Q.   What do you think?  Do you think --

16       A.   I would think I'd have to be there or live

17  there in order to know the answer to that.

18       Q.   You couldn't know whether your experiences

19  would be the same --

20       A.   It's different everywhere you go.

21            MR. EHRLICH:   I agree with you.  If you

22       give me just one second, I'll consult --

23       Ms. Graham, I'm finished asking you questions.

24            We may meet again.  The purpose of this

25       deposition was to ask you questions that related

CENTRAL FLORIDA REPORTERS, INC.

82

1    to class certification, which is a preliminary

2    stage of this litigation.  I reserve the right to

3    depose you again when we get -- if we get to the

4    merits of this lawsuit and ask you some

5    substantive questions about the merits of your

6    claim.  But for now I'm finished.

7         MS. HODGKISS:   I need to at this point --

8    this is Anita -- need to say that we -- I did not

9    object to the questions that went to the merits

10   that were asked initially and that was my

11   understanding that we --

12        MR. CIRULLO:   Well, I agreed to depose her

13   on the merits as well as the class.  But as we

14   discussed, I also reserve in case we find

15   something out subsequent to this that renders a

16   further need that I might have to take it.  But I

17   was taking this in an effort to do both in one.

18   But I don't know what the other attorneys --

19        MS. HODGKISS:   Right.  And my position is

20   if there is new information that comes to light

21   that makes an additional -- that makes --

22        MR. MACINNES:   I'm sorry.  I cannot hear

23   you.

24        MS. HODGKISS:   I'm saying if there's new

25   information that comes to light that makes

CENTRAL FLORIDA REPORTERS, INC.

83

 1      additional questions of this plaintiff necessary,

 2      then, of course, we'll make her available for

 3      deposition.

 4           MR. CIRULLO:   Just for the record, just --

 5      one of those types of new information might be

 6      that card since it was just -- you know, we just

 7      learned of it today.  So I just want to let you

 8      know I may -- based on whatever I need to do, may

 9      have to speak to you again on that.  But we'll

10      talk about that.

11           MR. EHRLICH:   And just in response to the

12      objection, it was my understanding that I was

13      limited today on class-related issues, so I didn't

14      go as fully into the merits as I would if this had

15      been a deposition on the merits.  And that's

16      why -- and that was clear in the Court's order in

17      my opinion.  But, Ms. Hodgkiss, your objection is

18      noted for the record.  And I'm finished today.

19           MS. HODGKISS:   Who is next?

20           MR. CIRULLO:   Ken?

21           MR. TINKLER:   No questions.

22           MR. CIRULLO:   Okay.  Phil from DBT?

23           MR. HARRIS:   Okay.

24                     CROSS-EXAMINATION

25   BY MR. HARRIS:

                CENTRAL FLORIDA REPORTERS, INC.

84

1       Q.    Again, my name is Phil Harris.    You

2   probably --

3             MR. HARRIS:    Can those on the telephone

4       hear me?

5             MR. MACINNES:    Yes, I can.

6             MR. HARRIS:    Great.

7             MR. HARVEY:    Yes.

8             MR. ECKERT:    Yes.

9             MS. NORRIS-WEEKS:    Yes.

10      Q.    Okay.  I'm Phil Harris.  Once again, I

11  represent Database Technologies, Choice Point, Inc.

12            Ms. Graham, do you have any knowledge of

13  whether any of your applications that you presented to

14  the Supervisor of Elections were ever processed?

15      A.    No.

16      Q.    Have you subsequently since this election

17  been accepted or denied a voter registration card?

18      A.    Have I tried to reapply?  Is that what

19  you're asking me?

20      Q.    Well, I'll -- yeah.  Tell me if you've tried

21  to reapply.

22      A.    No.

23      Q.    Okay.  Have you been accepted or rejected

24  based on your prior applications?

25      A.    I don't know.  I haven't even tried to

CENTRAL FLORIDA REPORTERS, INC.

85

1    contact them.

2         Q.   Okay.  Have you received a voter

3    registration card?

4         A.   No.

5         Q.   And you said that along with the application

6    in the form of the card that you provided us today --

7         A.   Yes.

8         Q.   -- you filled out another application, as

9    well --

10        A.   Yes.

11        Q.   -- and sent that in?  Has that been returned

12   in any manner or --

13        A.   No.

14        Q.   -- did you get a follow-up letter from

15   anybody?

16        A.   No.

17        Q.   So it would be correct you're not now

18   registered to vote in Orange County?

19        A.   Yes.

20        Q.   Have you ever been registered to vote in any

21   county?

22        A.   No.

23             MR. HARVEY:  I'm sorry.  Did she say she is

24      now registered or not?

25             MR. HARRIS:  She said no.

CENTRAL FLORIDA REPORTERS, INC.

86

```
 1              MR. HARVEY:   No.  Okay.  Thank you.  I

 2       apologize.

 3   BY MR. HARRIS:

 4        Q.   Ms. Graham, I'm not saying this to be mean

 5   or to imply anything or to say anything out of line,

 6   but I just need to ask you if you have ever been

 7   convicted of a felony in any state?

 8        A.   No.

 9        Q.   Has anyone ever told you that your name has

10   been removed from a voter registration list because of

11   a criminal conviction?

12        A.   No.

13        Q.   Okay.  Do you know if your name has ever

14   been removed from a voter registration list because of

15   any criminal conviction?

16        A.   Well, I never voted.  I never registered

17   anywhere.  This is my first time.

18        Q.   Okay.  But you have no knowledge that your

19   name has ever been removed from a list for the reason

20   that it's being connected with a conviction?

21        A.   But I never did it.  You know what I'm

22   saying?  I never registered anywhere so my name

23   shouldn't be on anybody's list.  So the answer would

24   be no.

25        Q.   And you said you're at your present address
```

CENTRAL FLORIDA REPORTERS, INC.

87

1    for two years?

2         A.   Yes.

3         Q.   So going back to when you registered, you

4    had been at that address for one year?

5         A.   Yes.

6         Q.   Has anyone ever told you that your name has

7    been removed from a voter registration list because

8    you changed your residence either within Orange County

9    or from Broward County up to Orange County?

10        A.   Have I ever been on a list?

11        Q.   No.  Has anyone told you, "Ms. Graham, it

12   appears to us that your name has been removed from our

13   list because we're showing you as a resident of

14   somewhere else"?

15        A.   But I never registered in the beginning

16   anywhere else.

17        Q.   Whether you registered there or not -- did

18   you ever get a driver's license?

19        A.   Yes.

20        Q.   Did you ever get a driver's license when you

21   were living in Hollywood?

22        A.   Yes.

23        Q.   So your name would be on records somewhere

24   as having lived in Hollywood?

25        A.   Yes.

CENTRAL FLORIDA REPORTERS, INC.

88

```
 1          MS. NORRIS-WEEKS:   I'm sorry.  I didn't

 2     hear the last question that you asked.

 3          MS. HODGKISS:   You're gonna get a

 4     transcript.

 5          MR. HARRIS:   I'm sorry.  I asked her if she

 6     had received a driver's license with a Hollywood

 7     address.

 8          MS. NORRIS-WEEKS:   And the response was?

 9          MR. HARRIS:   Was affirmative.

10          MS. NORRIS-WEEKS:   Thank you.

11 BY MR. HARRIS:

12     Q.   So has anyone ever told you that your name

13 has been removed from a list for consideration of

14 being an Orange County voter because you're showing up

15 as a resident of Hollywood, Florida?

16     A.   No.

17     Q.   Has anyone ever told you your name had been

18 removed from a voter registration list because you've

19 been listed as deceased?

20     A.   No.

21     Q.   Other than what you have read or may have

22 been told, do you know anything about Database

23 Technologies, Inc., or Choice Point, Inc.?

24     A.   No.

25          MR. HARRIS:   Ms. Graham, that's all of the
```

CENTRAL FLORIDA REPORTERS, INC.

89

```
 1        questions I have for you.
 2               MS. HODGKISS:   Does that mean we're ready
 3        for the folks on the phone?
 4               MR. CIRULLO:   Yes.  We're ready for the
 5        folks.
 6               MS. HODGKISS:   Who is going first on the
 7        phone?
 8               MR. MACINNES:   I'll jump in.
 9                        CROSS-EXAMINATION
10   BY MR. MACINNES:
11        Q.   Ms. Graham, my name is Doug MacInnes.  I
12   work in the Attorney General's office and I represent
13   two defendants here.  One is Kathleen Kearney, who is
14   the Secretary of the Department of Children and
15   Families.  And the other is Fred Dickinson, who is the
16   Director of the Florida Highway -- strike that --
17   Department of Highway Safety and Motor Vehicles.
18               How old were you on November 7th, 2000?
19        A.   Twenty-seven.
20        Q.   Okay.  Now, bear with me, please.  You
21   understand that I'm appearing by telephone and I
22   cannot see that postcard which is Exhibit 1 and
23   Exhibit 3.  So I'd like you to take that exhibit if
24   you would, please, and hold it in your hand.  Do you
25   have that exhibit, ma'am?
```

CENTRAL FLORIDA REPORTERS, INC.

90

1    A.    Yes.

2    Q.    All right.  Now, when Mr. Cirullo was

3  talking to you -- he was the first lawyer who

4  questioned you today -- he asked you generally what

5  evidence that you had that you could not vote because

6  you were black.  And if my notes indicate -- if my

7  notes are correct, I think you responded something

8  like "my evidence is the returned postcard."  Was that

9  your testimony earlier?

10    A.    Yes.

11    Q.    Okay.  Now, would you look at both the -- at

12  the front and the back of that postcard and tell me if

13  there's anything that appears on that that would

14  indicated your race?

15    A.    Nothing.

16    Q.    Okay.  How does the card show, then, that

17  you were denied a vote because of your race?

18    A.    The sides of it is open --

19    Q.    Yeah.

20    A.    -- and you can see.

21    Q.    Okay.  But if a person who was racially

22  prejudiced, you know, wanted to deny people a vote,

23  opened that card in front of you, how would they

24  determine your race?

25    A.    I told you that the sides of it is open --

CENTRAL FLORIDA REPORTERS, INC.

91

Q.    Yeah.

A.    -- and if you bunch it up you can read the
information that's inside the card.

Q.    Oh, is there something inside that indicates
your race?

A.    Yes.

Q.    Oh, I see.  Tell me what it says about your
race inside.

A.    Race or ethnic group.

Q.    And what does it say?

A.    BLK.

Q.    Okay.  So if a person squeezed it in such a
manner that they could peer inside, they might be able
to see that you had checked BLK on it; is that
correct?

A.    I wrote it.

Q.    You wrote it.  Okay.  Now, on that card,
Mr. Ehrlich, who is the Dade County attorney, had
you -- or asked you if you had signed Box 9 and dated
it and your answer was no.  And you admitted that that
was a mistake on your part.  Would you agree now that
this application could have been returned to you
because it was not signed and dated?

A.    No.

Q.    You wouldn't agree with that?

CENTRAL FLORIDA REPORTERS, INC.

92

1      A.   No.

2      Q.   Well, if it -- is it reasonable to you that

3   if a person who was supposed to act upon this postcard

4   saw that it was not signed and dated would it be

5   reasonable that they would return it to the sender?

6      A.   Yes.

7      Q.   Okay.  So if a person saw your postcard and

8   saw that Box 9 was not signed and there was no date,

9   would it be reasonable for that person to return it to

10  you?

11     A.   Not without an explanation.

12     Q.   I'm sorry?

13     A.   Not without an explanation.

14     Q.   Okay.  So you wanted some sort of a letter

15  or something saying, "Hey, you didn't sign Box 9"?

16     A.   Yes.

17     Q.   Okay.  Well, is it still your belief today,

18  then, that it was returned to you because somebody had

19  a racial motive in mind?

20     A.   Yes.

21     Q.   Okay.  Now let's go to Shawn, who was the

22  president of the college or university there.  What

23  college was it?

24     A.   Valencia.

25     Q.   Valencia?

CENTRAL FLORIDA REPORTERS, INC.

93

1      A.    Yes.

2      Q.   Do you know how many students go there?

3      A.    I have no clue.

4      Q.   Now, did I understand correctly in your

5 response to Mr. Ehrlich that you said you do not know

6 if Shawn took it -- took the application, your

7 application to the Supervisor of Elections; is that

8 correct?

9      A.    I can say I know by someone telling me.

10     Q.   Okay.  But do you have any personal

11 knowledge?

12     A.    That's what I'm telling you, yes, because --

13     Q.   You didn't talk to Shawn about it?

14     A.    No, I haven't spoken to Shawn about it.

15     Q.   Okay.  Do you know Shawn personally?

16     A.    No.

17     Q.   Okay.  So if -- was this a large voter drive

18 that Valencia was having?

19     A.    Yes.

20     Q.   Well, do you think that it's logical that

21 even if your friend Raquel asked Shawn if he took your

22 application to the Supervisor of Elections he would

23 know -- he would be able to differentiate between

24 yours and any of the others?

25     A.    Would he be able to differentiate?

CENTRAL FLORIDA REPORTERS, INC.

94

1      Q.    Yes.

2      A.    No, I don't know.

3      Q.    Okay.  Now, you told us at great lengths --

4  and I appreciate your testimony -- about how you went

5  about attempting to register.  Understand that the

6  next couple of questions I have to ask you just

7  because I represent this client.

8      A.    Okay.

9      Q.    Have you ever attempted to register to vote

10 at a Department of Highway Safety and Motor Vehicles

11 office?

12     A.    No.

13     Q.    Have you ever attempted to register to vote

14 at an office that provides public assistance, such as

15 the office of the Department of Children and Families?

16     A.    No.

17     Q.    I'm referring now to paragraph 33 of the

18 complaint.  And you don't need to return to that

19 because I'll -- it's not important for that.  But do

20 you have any evidence that Fred Dickinson, who is the

21 Executive Director of the Florida Department of

22 Highway Safety and Motor Vehicles improperly or

23 inequitably implemented his department's

24 responsibilities under the National Voter Registration

25 Act and the Florida Voter Registration Act?

CENTRAL FLORIDA REPORTERS, INC.

1      A.   I don't have any.

2      Q.   All right.  Same question as to

3 Kathleen Kearney.  Do you have any evidence that

4 Kathleen Kearney, who is the Secretary of the Florida

5 Department of Children and Families improperly or

6 inequitably implemented the National Voter

7 Registration Act and the Florida Voter Registration

8 Act?

9      A.   Repeat your question.

10     Q.   Do you have any evidence that

11 Kathleen Kearney, the Secretary of the Department of

12 Children and Families improperly or inequitably --

13 that is that they did not properly or they did not

14 equitably implement their resp -- her responsibilities

15 under the National Voter Registration Act and the

16 Florida Voter Registration Act?

17     A.   Well, according to my card that I received

18 back, I would say yes.

19     Q.   Well, does Kathleen Kearney, the Secretary

20 of the Department of Children and Families, have

21 anything to do with your voter registration card?

22     A.   Okay.  No then.

23     Q.   Okay.  But do you have -- I take it -- do

24 you have any evidence, then, that Kathleen Kearney did

25 not do her -- did not fulfill her responsibilities

CENTRAL FLORIDA REPORTERS, INC.

96

1    under the National Voter Registration Act and the

2    Florida Voter Registration Act?

3        A.    Well, I don't know what her responsibilities

4    would be.

5             MR. MACINNES:   Okay.  I have no further

6        questions.

7             MS. HODGKISS:   Walter, are you next?

8             MR. HARVEY:   Yes.

9                      CROSS-EXAMINATION

10   BY MR. HARVEY:

11       Q.    Good afternoon.  My name is Walter Harvey.

12   I represent the Secretary of State and the Director of

13   the Division of Elections and I just actually have a

14   few points of clarification because -- I'm

15   participating in this deposition by telephone so

16   pardon me if I seem repetitive.

17            But I just wanted to clarify that -- did you

18   testify earlier -- I believe it was during the

19   examination of Mr. Cirullo -- that your current

20   regis -- that you are not currently aware of what your

21   voter registration status is?

22       A.    Exactly.

23       Q.    Was that in your testimony?

24       A.    Yes.  I don't know what it is at this

25   moment.

CENTRAL FLORIDA REPORTERS, INC.

97

1    Q.    Okay.  And did you take any steps to

2  ascertain what your voter registration status is since

3  the November 2000 presidential election?

4    A.    Not since all of this craziness, no.

5    Q.    Have you ever heard of Clayton Roberts, who

6  is the Director of the Division of Elections?

7    A.    Say it again.

8    Q.    Clayton Roberts, who is the Director of the

9  Division of Elections.

10    A.    Have I ever heard of him?

11    Q.    Yes.

12    A.    No.

13    Q.    Do you know what his responsibilities were

14  under the Voter Registration Act?

15    A.    No.

16    Q.    Do you have any evidence that

17  Clayton Roberts, the Director of the Division of

18  Elections, improperly or inequitably implemented his

19  responsibilities under the Florida Voter Registration

20  Act or the National Voter Registration Act?

21    A.    I can't answer that because I don't know his

22  responsibilities.

23    Q.    The answer is you don't?

24    A.    I don't know his responsibilities, so I

25  don't know if he did or if he didn't.  He could have;

CENTRAL FLORIDA REPORTERS, INC.

98

1  he could not have.

2      Q.   Okay.  I'm sorry.  I couldn't hear you.

3      A.   I said I don't know if he did or didn't.

4      Q.   Okay.  You also allege in paragraph 78 of

5  the amended complaint that the defendants, Harris,

6  Roberts, and DBT determined matching criteria and

7  other criteria as sources of information for creating

8  lists of ineligible voters for the county supervisors

9  under the Florida -- under Florida Section 98.0975.

10      Do you have any evidence to support any

11  allegations regarding the selection of match criteria?

12      THE WITNESS:   What is he asking?

13      Q.   Hello.

14      MS. HODGKISS:   She's saying that she

15  doesn't understand your question, Walter, but I

16  have to say I think she's answered several times

17  that she doesn't have knowledge of purging or

18  any -- any --

19      MR. HARVEY:   Okay.  I'm sorry.  I didn't

20  hear that.

21      Okay.  I have no further questions.

22      MS. HODGKISS:   Burnadette?

23          CROSS-EXAMINATION

24  BY MS. NORRIS-WEEKS:

25      Q.   Yes.  This Burnadette Norris-Weeks.  I

CENTRAL FLORIDA REPORTERS, INC.

1   represent the Broward County Supervisor of Elections.

2          How long had you been living in Orange

3   County prior to moving from Broward County?

4      A.   Huh?

5          MR. CIRULLO:   You're breaking up,

6      Burnadette.

7          MS. HODGKISS:   Was your question how

8      long --

9      Q.   How long had you been living in Orange

10  County prior to moving from Broward County?

11     A.   I don't understand.

12         MR. CIRULLO:   Burnadette, she -- this is

13     Mike Cirullo --

14     Q.   Okay.  Did I understand that you moved from

15  Broward County?  You had been living in Hollywood,

16  Florida?

17     A.   Yes.

18     Q.   Okay.  And how long was it before you moved

19  from Broward that you had been living in Orange?

20         MR. CIRULLO:   She testified she's been

21     living in Orange County for two years and --

22         MS. NORRIS-WEEKS:   Okay.

23         MR. CIRULLO:   Okay.

24         MS. NORRIS-WEEKS:   I have no further

25     questions.  Thank you.

CENTRAL FLORIDA REPORTERS, INC.

100

```
 1              MS. HODGKISS:   Dan Eckert?

 2              MR. ECKERT:   Yes.

 3              MS. HODGKISS:   Do you have any --

 4                    CROSS-EXAMINATION

 5   BY MR. ECKERT:

 6         Q.   Ma'am, how long did you live in Hollywood,

 7   Florida, before you moved?

 8         A.   I lived in Hollywood for about two -- two

 9   years.

10         Q.   Two years.  And where did you live before

11   that?

12         A.   Virginia.

13         Q.   Okay.  And is that all of the places that

14   you've lived since you were 18?

15         A.   Oh, no.

16         Q.   Well, have you ever lived in Volusia County,

17   Florida?

18         A.   No.

19         Q.   And so I would take it that you have never

20   attempted to register to vote in Volusia County

21   Florida?

22         A.   No.

23              MR. ECKERT:   Thank you.  I have no further

24      questions.

25              MR. CIRULLO:   Anyone here have any
```

CENTRAL FLORIDA REPORTERS, INC.

101

 1       follow-ups?   No?

 2              MS. HODGKISS:   Great.   All right.   Thank

 3       you.

 4              MR. CIRULLO:   I think we're all done.

 5              MR. EHRLICH:   Is she gonna read or waive?

 6              MR. MACINNES:   Court reporter, I would like

 7       a copy of that, please.

 8              MS. HODGKISS:   We'll waive reading.

 9              (The deposition concluded at 4:15 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CENTRAL FLORIDA REPORTERS, INC.

102

## CERTIFICATE OF OATH

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, MICHELLE M. MARZUKI, R.P.R., certify that CONSUELO MARIA GRAHAM personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 31st day of October, 2001.

```
_____
MICHELLE M. MARZUKI, R.P.R.
Notary Public, State of Florida
Commission No.:  CC730684
Commission Expires:  April 5, 2002
```

* * * * *

## CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, MICHELLE M. MARZUKI, R.P.R., certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties nor am I a relative or counsel connected with the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the action.

DATED this 31st day of October, 2001.

```
_____
MICHELLE M. MARZUKI, R.P.R.
```

CENTRAL FLORIDA REPORTERS, INC.

# TAB 30

**1**

1    IN THE UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2
     CASE NO. 01-120-CIV-GOLD/SIMONTON
3
4    NATIONAL ASSOCIATION FOR THE
     ADVANCEMENT OF COLORED PEOPLE, INC.,
5    by its FLORIDA STATE CONFERENCE OF
     BRANCHES, et al.,
6
          Plaintiffs,
7    vs.
8    KATHERINE HARRIS, Secretary of
     Florida, et al.,
9
          Defendants,
10   _____/
11
12
13
14   DEPOSITION OF VALERIE BUFORD WELLS
15
16
17
         MONDAY, JANUARY 28TH, 2002
18       600 SOUTH ANDREWS AVENUE, SUITE 200
         FORT LAUDERDALE, FLORIDA
19       11:55 a.m. - 1:20 p.m.
20
21
22
23
24
25

---

**2**

1    APPEARANCES:
2    THE ADVANCEMENT PROJECT.
     BY: MONIQUE L. DIXON, ESQUIRE.
3    APPEARING ON BEHALF OF THE PLAINTIFFS.
4
     LAW OFFICES OF BURNADETTE NORRIS-WEEKS, ESQUIRE.
5    BY: BURNADETTE NORRIS-WEEKS, ESQUIRE.
     APPEARING ON BEHALF OF BROWARD COUNTY SUPERVISOR
6    OF ELECTIONS.
7
     STEEL, HECTOR & DAVIS, LLP.
8    BY: WALTER JAMES HARVEY, ESQUIRE.
     APPEARING ON BEHALF OF KATHERINE HARRIS and
9    CLAY ROBERTS, DIRECTOR OF FLORIDA DIVISION OF
     ELECTIONS.
10
11   DADE COUNTY ATTORNEY'S OFFICE.
     BY: JEFFREY P. EHRLICH, ESQUIRE.
12   APPEARING ON BEHALF OF MIAMI-DADE COUNTY, SUPERVISOR
     OF ELECTIONS, DAVID LEAHY.
13
14   GOREN, CHEROF, DOODY & EZROL, P.A.
     BY: LINDSEY A. PAYNE, ESQUIRE.
15   APPEARING ON BEHALF OF ORANGE COUNTY, SUPERVISOR
     OF ELECTIONS, WILLIAM COWLES.
16
17   ADORNO & ZEDER, P.A.
     BY: THOMAS W. WHITE, ESQUIRE.
18   APPEARING ON BEHALF OF CHOICEPOINT, INC.
19
     ATTORNEY GENERAL'S OFFICE.
20   BY: DOUGLAS B. MAC INNIS, ESQUIRE.
     APPEARING ON BEHALF OF FRED DICKINSON,
21   FLORIDA DEPARTMENT OF HIGHWAY SAFETY & MOTOR
     VEHICLES and KATHLEEN KEARNEY, SECRETARY
22   OF THE FLORIDA DEPARTMENT OF CHILDREN & FAMILIES.
23
     HILLSBOROUGH COUNTY ATTORNEY'S OFFICE.
24   BY: KENNETH TINKLER, ESQUIRE.
     APPEARING ON BEHALF OF HILLSBOROUGH
25   COUNTY, SUPERVISOR OF ELECTIONS, PAM IORIO.

---

**3**

1
2              INDEX
3    WITNESS      DIRECT CROSS REDIRECT RECROSS
     VALERIE BUFORD WELLS
4
     BY MS. NORRIS-WEEKS   4
5    BY MR. EHRLICH        41
     BY MR. WHITE          56
6    BY MR. HARVEY         58
     BY MS. PAYNE          64
7    BY MR. TINKLER        65
     BY MR. MAC INNES      66
8    BY MS. DIXON          68
9
10
11
12
13
14             EXHIBITS
15   DEFENDANT'S           FOR IDENTIFICATION
16   A    DRIVER'S LICENCE     PAGE 72
     B    VOTER'S REGISTRATION CARD  PAGE 72
17   C    DECLARATION          PAGE 72
18
19
20
21
22
23
24
25

---

**4**

1        Deposition of VALERIE BUFORD WELLS, taken
2    before VALERIE LEHTO, Court Reporter/Registered
3    Professional Reporter and Notary Public in and
4    for the State of Florida at Large, in the above
5    cause.
6
7              ------------
8
9    Thereupon,
10
11        VALERIE BUFORD WELLS
12   having been first duly sworn or affirmed, was
13   examined and testified as follows:
14
15        DIRECT EXAMINATION
16
17   BY MS. NORRIS-WEEKS:
18       Q.  Good afternoon.  I'm Burnadette
19   Norris-Weeks.
20       Please state your name for the record.
21       A.  Valerie Buford Baggs.
22       Q.  I'm sorry?
23       A.  Valerie Buford Baggs.
24       Q.  B-a?
25       A.  G-g-s.

---

1 (Pages 1 to 4)

5

Q. Okay, and is that hyphenated?
A. Well, I guess on my driver's license.
Q. Did you hyphenate your name or not?
A. No.
Q. I'm Burnadette Norris-Weeks again and I represent Miriam Oliphant who is the Supervisor of Elections here in Broward County.
You have been named as a Plaintiff in this case, and I need to ask you some questions.
This deposition is not to trick you or harass you in any way. If there is something that I say and you don't understand, feel free to ask me to clarify. I'll be more than happy to do that.
If you answer a question, I'll assume that you understood the answer and you're answering based upon your understanding of my question. Is that fair?
A. Yes.
Q. Okay.
Please say yes or no, because the court reporter can't transcribe hu-huh or uh-huh. Likewise, please don't nod, because she can't take that down either.
If you would wait, please, until I

6

finish my questions before you answer. It will allow the court reporter to accurately transcribe both what I'm saying and what you say and we'll get a nice clean record.
A. Okay.
Q. All right, have you been known by any other names?
A. Wells, Valerie Wells.
Q. Valerie Wells?
Okay, any other names?
A. Valerie Buford.
Q. Okay, any other names?
A. No.
Q. What about Valerie Buford Wells?
A. That's the name I was known as at the time I was voting.
Q. Okay, Valerie Buford Wells.
And did you hyphenate your name then Valerie Buford Wells?
A. No.
Q. Can I see your driver's license. Do you have that with you?
A. Uh-huh. (Affirmative response).
Q. And if you could also take your voter's registration out as well.

7

A. Okay, let me look in here again.
THE WITNESS: Do you still have a copy of my card?
MS. DIXON: Yes.
THE WITNESS: Can we use a copy?
MS. NORRIS-WEEKS: Sure.
THE WITNESS: Because I can't seem to find it.
Here it is. Sorry.
BY MS. NORRIS-WEEKS:
Q. If you don't mind, we're going to make a copy of both of those.
Miss Wells, I notice that in your amended complaint, paragraph 121, your name is hyphenated Valerie Buford-Wells. Did you ever hyphenate your name?
A. No, I didn't, and it may be like that because in the beginning when I first started voting I voted as Wells and when I got divorced I started back using Buford.
Q. Okay, and I also notice that on your declaration where it says Declaration of Valerie Buford-Wells -- Are you familiar with this document?
A. Well --

8

Q. You signed this document, right?
A. I'm sure that if I look at it.
Are you talking about my signature?
Q. Well, I'm wondering if this is your declaration?
A. Yes, I'm sure.
Q. Now you see on the top of it it also says Valerie Buford-Wells and that's hyphenated as well.
A. The top of here?
Q. Right.
A. Okay, Valerie Buford-Wells.
Q. Did you ever tell anyone that wasn't supposed to be hyphenated?
A. No, I never did.
Q. Did you sometimes hyphenate it?
A. I never did.
Q. Have you ever had your deposition taken before?
A. Yes. Not here. I mean not for this case, but I've done a deposition before.
Q. Tell me what case you had your deposition taken in.
A. I had an assault against me and I did a deposition in that but never anything for this

---

9

1   particular case.
2       Q.  How long ago would that have been?
3       A.  That's about six months ago.
4       Q.  Is that something that the State
5   Attorney's Office is prosecuting at this time?
6       A.  Yes.
7       Q.  You mentioned a little while ago that
8   you are not married.  Was that your testimony?
9       A.  I'm married to a second husband now.
10      Q.  Okay, and what is your husband's name?
11      A.  Stevie Baggs.
12      Q.  Stevie Baggs?
13      A.  B-a-g-g-s.
14      Q.  Baggs, okay.
15          When were you married?
16      A.  November 20th, '98, '99.
17      Q.  November 20th, 1999?
18      A.  Is it all right if I answer that, or
19  should I just let it ring?
20      MS. DIXON:  You probably need to turn
21      that off.
22  BY MS. NORRIS-WEEKS:
23      Q.  You mentioned that you were married to
24  Steve Baggs or Stevie Baggs on November the 20th
25  of 1999?

---

10

1       A.  Yes.
2       Q.  Okay, I'm assuming you would have
3   divorced Mr. Buford; is that right?
4       A.  No.  Buford is my maiden name.
5       Q.  Oh, Buford is your maiden name.  Okay.
6           And is Wells a married name?
7       A.  Yes.
8       Q.  How long ago did you divorce Mr. Wells?
9       A.  1989.
10      Q.  19?
11      A.  '89.
12      Q.  Did you go by the name Valerie Wells up
13  until 1989?
14      A.  Yes.
15      Q.  And then you started using Valerie
16  Buford again, is that what happened?
17      A.  Yes.
18      Q.  Okay, and that would have been in 1989
19  when you got the divorce?
20      A.  No.
21      Q.  When did you start using --
22      A.  I continued to use Wells until -- I had
23  to go before a judge because I didn't start using
24  the maiden name right after the divorce some
25  years past, so I had to go before a judge to get

---

11

1   him to, I don't know, I guess sign papers for me
2   to start using my maiden name again, and I don't
3   really remember exactly the year, but I know it
4   was at least six years after the divorce.  It was
5   awhile.
6       Q.  What is your current address?
7       A.  2741 Northwest 9th Street, Pompano.
8       Q.  How long have you resided at that
9   address?
10      A.  Twenty years.
11      Q.  Are you a U.S. citizen?
12      A.  Yes.
13      Q.  What is your date of birth?
14      A.  4/2/60.
15      Q.  Valerie, how do you spell your first
16  name?
17      A.  V-a-l-e-r-i-e.
18      Q.  Now, I noticed on your driver's license
19  it says V-a-l-a-r-i-e.  Why is that?
20      A.  They've always done it.  They've always
21  done it.
22      Q.  You've never asked them to correct your
23  driver's license?
24      A.  No, because when I'm there and I let
25  them know that they're misspelling it they want

---

12

1   documents to show that it's supposed to be an E
2   instead of an A, so I figured leave it.
3       Q.  Does that cause you a lot of problems?
4       A.  It's never caused me any problems.
5       Q.  How is it spelled, or if you recall,
6   how was it spelled on the final judgment for your
7   divorce?
8       A.  The certificate.
9       Q.  Your divorce final judgment, how was it
10  spelled there?
11      A.  It's spelled with an E.
12      Q.  And how is it spelled on your birth
13  certificate?
14      A.  With an E.
15      Q.  Did you graduate from high school?
16      A.  Yes.
17      Q.  What year?
18      A.  '79.
19      Q.  And where did you graduate?
20      A.  Collins High School, Chicago, Illinois.
21      Q.  Did you grow up in Chicago?
22      A.  Yes.
23      Q.  Did you attend college?
24      A.  Yes.
25      Q.  Where did you go to college?

---

3 (Pages 9 to 12)

13

1    A. I went to the loop, downtown Chicago
2    and when I came here I went to BCC.
3    Q. Is that Broward Community College?
4    A. Yes.
5    Q. And did you graduate?
6    A. No.
7    Q. And how many years did you attend
8    college?
9    A. Just different classes I'd say for
10   about three years, different classes.
11   Q. What do you do for a living?
12   A. I'm a nail tech.
13   Q. Where is your shop?
14   A. Amy's Nails at North Riverside Drive,
15   Pompano.
16   Q. How long have you been working there?
17   A. A year and four months.
18   Q. Did you review any documents in
19   preparation for your deposition here today?
20   A. Yes.
21   Q. What did you review?
22   A. I reviewed -- Well, I have the
23   documents with me.
24   Q. Let's see what you have.
25       MS. DIXON: May I see them first.

14

1       These aren't relevant to the
2    deposition.
3       MS. NORRIS-WEEKS: Are they your work
4    product?
5       MS. DIXON: They are my work product.
6       MS. NORRIS-WEEKS: And what are the
7    documents, for the record?
8       MS. DIXON: They are letters to
9    Miss Buford Wells dated January 17th, 2002.
10      MS. NORRIS-WEEKS: All of the letters
11   have the same date?
12      MS. DIXON: Yes.
13      MS. NORRIS-WEEKS: And they're from you
14   to Miss Buford Wells?
15      MS. DIXON: Yes.
16   BY MS. NORRIS-WEEKS:
17   Q. Miss Buford Wells, did you review your
18   declaration that I showed you a few minutes ago
19   before the depo here today?
20   A. Yes.
21   Q. Any other documents that you may have
22   reviewed in preparation?
23   A. No.
24   Q. Other than your attorney, did you speak
25   with anyone in preparation for your deposition?

15

1    A. No.
2    Q. How did you become a Plaintiff in this
3    lawsuit?
4    A. I was at one of the games, the Classic
5    Games for Bethune and M.&.U (sic).
6    Q. A.&M.U.?
7    A. Yes.
8    Q. And you were in Orlando for the
9    Classic?
10   A. Yes.
11       And a young lady from the NAACP wanted
12   to know if anyone was there who had problems at
13   the polls that year and I spoke out and I told
14   her, yes, that I was not allowed to vote because
15   my name was not found on the voter's list.
16   Q. Do you know who this lady was that you
17   spoke with?
18   A. No. I just know that she was from the
19   NAACP.
20   Q. And this was in Orlando when you spoke
21   with this woman?
22   A. Yes.
23   Q. Have you seen this woman since?
24   A. No.
25   Q. Did you receive any documentation from

16

1    this woman?
2    A. I just received a phone call from the
3    NAACP and they asked me what was the problem,
4    what had happened and they asked me if I would
5    like to be represented and I said yes.
6    Q. Okay, so the phone call followed your
7    meeting with the woman at the Classic?
8    A. Yes.
9    Q. And when would the Classic, and I'm
10   assuming this is a football game, right?
11   A. Yes.
12   Q. Between Florida A.&M. University and
13   Bethune-Cookman College, is that what we're
14   talking about?
15   A. Yes.
16   Q. When would this have taken place, this
17   football game?
18   A. The game?
19   Q. Yes.
20   A. It was, I guess, the 27th of November.
21   It was the end of November.
22   Q. And we're talking about 2000, the year
23   2000, right?
24   A. It was the same year - it was the same
25   month that I couldn't vote.

4 (Pages 13 to 16)

17

1    Q. Do you know the name of the current
2  Supervisor of Elections in Broward County?
3    A. Miriam Oliphant.
4    Q. And do you know the name of the former
5  Supervisor of Elections?
6    A. Well, I knew her name but now I don't.
7    Q. Miss -- I don't want to call you by
8  your wrong last name. Miss Baggs, when did you
9  first register to vote in Broward County?
10    A. Back in '79, '80 when I arrived here.
11    Q. Where would you have registered to
12  vote?
13    A. It was downtown Fort Lauderdale. I'm
14  not exactly sure which building.
15    Q. Were you married at that time?
16    A. Yes.
17    Q. And you would have been married to --
18    A. Wells, Jessie Wells.
19    Q. Mr. Wells, okay.
20      Now, the date on your voter's
21  registration card says 1995. Would you have any
22  reason to believe this isn't the correct date on
23  your voter's registration card?
24    A. It is the correct date. I had to
25  reregister.

18

1    Q. Okay, why did you reregister?
2    A. Because I missed one of the elections,
3  and following another local election my name
4  wasn't there again, so they said, well, your name
5  isn't here, you have to reregister.
6    Q. And you received notice for that?
7    A. No. I found out when I went to vote.
8    Q. When was this?
9    A. Actually it was the same year, because
10  when I found out that my name wasn't there, I
11  went to the library in Collier City and
12  reregistered.
13    Q. So you're saying that would have been
14  1995 that you reregistered to vote?
15    A. Either the end of '94 or '95. It was
16  very close.
17    Q. And it's your testimony that you were
18  on the voter's rolls prior to that time?
19    A. Yes.
20      MS. DIXON: Objection. It's unclear.
21  If you could read back her previous
22  testimony about when she reregistered to
23  vote.
24      She said that she had to reregister and
25  it was after '95, is what my understanding

19

1  was from her testimony.
2      MS. NORRIS-WEEKS: Okay, so what is
3  your objection?
4      MS. DIXON: The objection is that --
5      MR. HARVEY: That's not what I heard.
6      MS. DIXON: -- it's a misstatement.
7      MS. NORRIS-WEEKS: I'm going to ask you
8  if you could please refrain from making
9  comments. If you can limit your objections
10  to objections.
11      MS. DIXON: That's fine.
12      MS. NORRIS-WEEKS: And the rest of it
13  will have to be my problem.
14      MS. DIXON: Okay. That's fine. Not a
15  problem.
16      MS. NORRIS-WEEKS: Can you read back my
17  last question.
18
19      (Whereupon, the requested portion of the
20  record was read back, after which the deposition
21  resumed).
22
23  BY MS. NORRIS-WEEKS:
24    Q. Did you attempt to vote on November
25  7th, 2000?

20

1    A. Yes.
2    Q. And where did you attempt to vote?
3    A. At McNair Recreation at 9th Court in
4  Collier City, Pompano.
5    Q. I'm sorry, at what Court?
6    A. 9th Court.
7    Q. And that's in Pompano?
8    A. Yes.
9    Q. And that would be the precinct listed
10  on your voter's registration card is Precinct
11  34C; is that right?
12    A. I'm not sure if that's correct, because
13  this is not where I voted the last time I voted.
14  I voted at the school, and when I went to that
15  school to vote they said you're not here anymore,
16  you're at the recreation center, so that's why I
17  went to the recreation center.
18    Q. Okay, now your card says that you're
19  polling address is McNair Recreation Center which
20  is 951 Northwest 27th Avenue in Pompano.
21    A. Okay, that would be the same place that
22  I went.
23    Q. Is that the place that you would have
24  gone to register to vote?
25    A. No. That's the place I went to vote on

21

1   the 7th.
2       Q.  On the 7th of November, 2000, right?
3       A.  Yes.
4       Q.  Okay.
5           Now, did you actually vote when you
6   went to this address?
7       A.  No.
8       Q.  What happened?
9       A.  They said that we can't find your name,
10  so talk to Walter Hunter and maybe he'll let you
11  sign an affidavit, and he went over to the voting
12  tables and he looked for my name.  He couldn't
13  find it, so he proceeded to make a telephone
14  call.  He said we're going to get to the bottom
15  of this, but the phone call to the place where he
16  was calling, the line was busy, so he said, well,
17  I don't know what to tell you.  We can't find
18  your name, we can't get through to the
19  supervisors, so give me your name and number and
20  we'll get to the bottom of it, I'll give you a
21  call.
22      Q.  Did they give you another place to go
23  at this time?
24      A.  No.  They gave me a phone number and
25  told me that I can call and speak to some

22

1   supervisors to find out why my name wasn't on the
2   list.
3       Q.  Okay, what name did you ask for when
4   you went to this address?
5       A.  They checked for Buford and Wells
6   because when they couldn't find Buford I said,
7   well, I voted under Wells before, so maybe it's
8   under Wells, so they couldn't find Wells either.
9       Q.  Now, by this time you had gotten the
10  order from the judge, I'm assuming, to change
11  your name back to Buford; is that right?
12      A.  Yes.
13      Q.  Did you notify the Supervisor of
14  Elections Office that your name had changed back
15  to Buford?
16      A.  When I went to reregister I believe
17  that when I went to reregister that all that had
18  already taken place.
19      Q.  When you went to reregister meaning in
20  1995?
21      A.  Yes, I believe that the name change, I
22  believe, had already taken place.
23      Q.  So if your voter's registration says
24  Valerie Wells on your card --
25      A.  I would have noticed that --

23

1       Q.  Let me finish.
2       A.  And I signed it Buford.
3       Q.  Let me finish.
4           If your voter's registration says
5   Valerie Wells, would someone have made a mistake?
6       A.  I guess someone made a mistake, because
7   when I received my card I never even noticed that
8   it said Wells.
9       Q.  When did you sign it?
10      A.  I signed it as soon as I got it.
11      Q.  As soon as you got the card in the
12  mail?
13      A.  Yes.  And I put it in my wallet and I
14  never noticed that it said Wells.
15      Q.  Now, when you went into the precinct on
16  the 7th of November, were there long lines there?
17      A.  Yes.
18      Q.  And once you got into the door of the
19  precinct, did you see several other lines that
20  you could have stood in?
21      A.  They had it separated by alphabet.
22      Q.  Okay, and what alphabet did you stand
23  in?
24      A.  I stood in Buford, in the B's.
25      Q.  Now, when you got up and it became your

24

1   turn to give your identification, what did you
2   give?
3       A.  I gave my voter's registration card.
4       Q.  Did they ask you for any other
5   identification at that time?
6       A.  Yes.  After they couldn't find my name
7   they asked if I had a driver's license and I gave
8   them my driver's license.
9       Q.  Did you at any point go over to the W's
10  and check on the W's to see whether your name was
11  under the W's?
12      A.  Yes.
13      Q.  Did you stand in that line?
14      A.  No, because by that time Walter Hunter
15  who was in charge there, he was like -- I was
16  just following him around.
17      Q.  Was Walter Hunter one of the precinct
18  workers --
19      A.  Yes.
20      Q.  -- working that day?
21      A.  Yes.
22      Q.  And you got his name?  Is that how you
23  know his name?
24      A.  I already knew Walter Hunter prior to
25  that.

ESQUIRE DEPOSITION SERVICES (954) 331-4400

25

1    Q.  Okay, have you spoken with Walter
2  Hunter since November 7th, 2000?
3    A.  Yes.
4    Q.  Okay, and what have you spoken with
5  Walter Hunter about since that time?
6    A.  He called me the next day and asked me
7  if I had spoken to anyone, if I reached anyone at
8  the number that he had given me and I told him
9  no, the lines stayed busy for me as well, and he
10  said I'll be in touch, I'm going to speak to
11  someone about this and I'll let you know.
12    Q.  Did he get back with you after that
13  time?
14    A.  Yes.
15    Q.  And what was that conversation about?
16    A.  By the time I spoke to him again I had
17  already went to the game and gave the NAACP my
18  number and name and by the time I spoke to Walter
19  Hunter again he had spoke to some of the same
20  people concerning the situation with the NAACP,
21  so we were actually talking to the same people
22  concerning the problem that I had at the voting
23  polls.
24    Q.  Concerning your problem?
25    A.  Yes.

26

1    Q.  Okay, so when you spoke with Walter
2  Hunter again, although I understand you had
3  already spoken with the NAACP, what was your
4  conversation with Walter Hunter?  What did that
5  involve this third time?
6    A.  He just said that I've given your name
7  to someone and they will represent you further,
8  and when I told him that I had spoken to someone
9  he was like, okay, those were the same people I
10  spoke to, so they'll handle it from here on.
11    Q.  Did he say who he had given your name
12  to?
13    A.  I can't remember.  It was a young lady.
14  I can't remember her name.
15    Q.  Who did you speak to?
16    A.  I can't remember her name.
17    Q.  Was this the same person?
18    A.  The same person, because he was like,
19  well, okay, this is the same person that I had
20  spoken to.
21    Q.  Was that one of the lawyers involved
22  with this case?
23    A.  Actually someone from the NAACP.
24       The NAACP, they're the ones that got me
25  in touch with the lawyers.

27

1    Q.  Is that the NAACP, the local branch?
2    A.  It was local and someone from
3  Washington as well who I had met with.
4    Q.  Now, let's go back to Walter Hunter.
5       Where does he live?
6    A.  He lives in Pompano on 27th Avenue.
7  I'm not exactly sure about his address, but I
8  know it's about three blocks from where I live.
9    Q.  He's a neighbor of yours?
10    A.  He's a neighborhood council president.
11    Q.  He's the president of a neighborhood
12  association?
13    A.  Yes.
14    Q.  What's the name of that association?
15    A.  The Pompano Beach Council Association.
16    Q.  Do you see him regularly?
17    A.  He visits my church from time to time.
18    Q.  Does Walter Hunter, was he one of the,
19  and I just want to make sure I'm clear, he was
20  one of the precinct workers on this day, right?
21    A.  Yes.
22    Q.  And you said he was the supervisor?
23    A.  I guess he was the supervisor because
24  he wasn't sitting at any other tables.  He was
25  just standing handling problems.

28

1    Q.  Now, did Walter Hunter go over and look
2  for your name in the W's?
3    A.  Yes.
4    Q.  Because I know you didn't make it over
5  there.
6    A.  He went from one end to the other
7  flipping pages and looking.
8    Q.  Walter Hunter would have done this?
9    A.  Yes, and I was just following him.
10    Q.  Did he tell you at some point that he
11  saw your name on the voter's list?
12    A.  He told me that he did not see my name
13  and I'm not on the list, so I can't vote.
14    Q.  Did he tell you in any of your
15  subsequent conversations with him that he
16  actually did see your name on the voter's list?
17    A.  You mean later?
18    Q.  Later.
19    A.  No.
20    Q.  He never told you he saw your name at
21  all?
22    A.  I never talked to him anymore.  Once I
23  started talking to lawyers I never spoke with him
24  again concerning the matter.
25    Q.  Only that third time?

7 (Pages 25 to 28)

29

1    A.  Yes.
2    Q.  Approximately what time did you go to
3  vote?
4    A.  I got there at 6:30 p.m.
5    Q.  Did you go with anyone?
6    A.  I had two children with me.
7    Q.  What time did the polls close, to your
8  knowledge?
9    A.  They closed at 7:00.  Well, they
10  wouldn't let anybody else in to that door.
11    Q.  How long were you there that they were
12  trying to --
13    A.  I stayed there.
14    Q.  And how long was that?
15    A.  I guess I was there until about 8:00,
16  because I was just talking to people coming and
17  going.
18    Q.  Why were you there?
19    A.  I was outside just talking because I
20  saw a lot of people that I knew.
21    Q.  Socializing?
22    A.  Yes.
23    Q.  Just so I'm clear, you stood in the
24  lines that had the B's; is that right?
25    A.  Yes.

30

1    Q.  You never went to the W line to stand
2  in that line; is that right?
3    A.  Yes.
4    Q.  Okay, and how long did you stand in the
5  B line?
6    A.  I was only there, I guess, about ten
7  minutes.
8    Q.  The names that you gave them were what
9  names?
10    A.  Valerie Buford and Valerie Wells.
11    Q.  Have you ever gone by Valerie R. Wells?
12    A.  Yes.  That's my middle name.
13    Q.  And what's the R. stand for?
14    A.  Rotelia.
15    Q.  Did you ever attempt to change your
16  name in any of the Department of Highway Safety &
17  Motor Vehicles places?
18    A.  To what?
19    Q.  Any local offices of the Highway Safety
20  & Motor Vehicles.
21    A.  To what?
22    Q.  To anything.  Did you ever attempt to
23  make any name changes in any of those local
24  stations?
25    A.  The only time I attempted to change my

31

1  name was after I started back to my maiden name.
2  Buford, I went to the Motor Vehicles place and.
3  you know, showed them the documents and they
4  changed my driver's license to Buford.
5    Q.  I see on your driver's license that it
6  was issued in April of last year.  What did your
7  driver's license, what name did it have on it
8  prior to April of last year --
9    A.  Buford.
10    Q.  -- if you recall?
11    A.  Buford.
12    Q.  Valerie Buford --
13    A.  If I recall.
14    Q.  -- was the name?
15    A.  Yes.
16    Q.  And would that have been the driver's
17  license that you would have given the Supervisor
18  of Elections Office when you went to vote on
19  November the 7th of 2000?
20    A.  Yes.
21    Q.  The driver's license that said Valerie
22  Buford?
23    A.  Yes.
24    Q.  I'm going to show you again your
25  declaration form.

32

1    That's your signature at the bottom, is
2  it not?
3    A.  Yes.
4    Q.  Is this the way this document looked
5  when you first saw it?
6    A.  Yes.
7    Q.  Pretty much the same?
8    A.  Yes.
9    Q.  Who prepared this document?
10    A.  The lawyers.
11    Q.  Okay, and you agreed with everything on
12  it?
13    A.  Yes.
14    Q.  And you went ahead and signed it after
15  reviewing it?
16    A.  Yes.
17    Q.  Did you change anything?
18    A.  No.
19    Q.  Now, I read on your declaration in
20  paragraph seven it says that you contacted a few
21  months later Walter Hunter who was a City Council
22  member in Pompano Beach.  This is the same Walter
23  Hunter that we're talking about?
24    A.  Yes.
25    Q.  Now, why did you contact him several

ESQUIRE DEPOSITION SERVICES (954) 331-4400

33

1   months later? Or a few months later. I'm sorry.
2       A.   It would be only to let him know that I
3   was speaking to lawyers and that the NAACP
4   lawyers was representing me, and I don't think it
5   would be for any other reason.
6       Q.   Okay, and he told you at that time that
7   your name was on the list as Valerie Buford; is
8   that right?
9       A.   I don't remember that conversation, but
10  if I said that at that time it would be true.
11      Q.   Let me show this to you.
12          Do you see the paragraph I'm referring
13  to?
14      A.   Seven.
15      Q.   Who would have given him that
16  information that your name was Valerie Buford and
17  it was on the voter rolls as Valerie Buford?
18      A.   I guess by him being a worker he would
19  probably speak to the Supervisor of Elections or
20  whoever had employed him and be able to find it
21  out.
22      Q.   So he never --
23      A.   I really don't remember the
24  conversation, but I'm sure it happened.
25      Q.   If you had it on here it's true, you

34

1   believe?
2       A.   Yes.
3       Q.   You mentioned earlier that he contacted
4   you the next day. Who contacted who? And now
5   I'm really confused. Did you contact him or did
6   he contact you?
7       A.   Well, he had given me his home number
8   and a few times that I tried to call him I never
9   reached him because the machine would always come
10  on, so I left a message.
11      Q.   Okay, so he gave you his home number.
12  Was that on November the 7th of 2000?
13      A.   Yes.
14      Q.   And you tried to contact him several
15  times after that time?
16      A.   Yes.
17      Q.   And you weren't able to reach him?
18      A.   I left a message.
19      Q.   But then sometime later you were able
20  to reach him?
21      A.   Well, I had spoken to him one time, I
22  know, at my church because I saw him there and we
23  did speak at church concerning this matter, and
24  that could be the time when he told me that my
25  name was on there.

35

1       Q.   As Valerie Buford and not Valerie
2   Buford Wells?
3       A.   Yes.
4       Q.   In your declaration you also state that
5   while you were at the polling place you saw three
6   other people not on the registration list who
7   were Black and not able to vote.
8       A.   Yes.
9       Q.   Is that your testimony?
10      A.   Yes.
11      Q.   Do you know who these three people
12  were?
13      A.   No, I didn't know them.
14      Q.   Have you seen them since November the
15  7th of 2000?
16      A.   If I see them --
17      Q.   Have you seen them?
18      A.   -- I wouldn't know them.
19      Q.   And do you know whether or not they
20  were not able to vote because of something that
21  they didn't produce or didn't do? You really
22  don't know why they weren't able to vote?
23      A.   Their names wasn't on the list, that's
24  all I know.
25      Q.   And you don't know what these people

36

1   looked like, do you?
2       A.   I know there were two females and a
3   male and I know that they left. They didn't
4   stick around and talk to anyone. They was mad
5   when they left and Walter tried to get their
6   names and numbers and they just threw their hands
7   up and was like, you know, they didn't -- I know
8   they didn't talk to him like I did.
9       Q.   Do you know where the folks lived,
10  these three people?
11      A.   No.
12      Q.   Do you believe that someone or a group,
13  some group intentionally tried to prevent you
14  from voting back on November 7th of 2000 --
15      A.   No.
16      Q.   Of 2000 because you're Black?
17      A.   No.
18      Q.   Why are you suing Miriam Oliphant, the
19  Broward County Supervisor of Elections?
20      A.   Well, I'm not exactly suing her
21  personally. I'm just teaming up with lawyers in
22  the NAACP to change the voting polls so that
23  problems stopped other people from voting.
24      Q.   When was the last time that you voted
25  prior to November 7th, 2000?

9 (Pages 33 to 36)

37

1   A.  I had voted in the locals.
2   Q.  Do you know when that was?
3   A.  I'm not exactly sure the last time I
4   voted.
5   Q.  After November 7th, did you contact the
6   Broward Supervisor of Elections Office and ask
7   why you were not able to vote in the November
8   7th, 2000 election?
9   A.  No.
10  Q.  Why not?
11  A.  Because I was already speaking with
12  Walter Hunter and he said he'll get to the bottom
13  of it and then quickly after that I started
14  talking to the NAACP and lawyers.
15  Q.  You mentioned that Walter Hunter was
16  actually working in the precinct on November 7th.
17  He's a City Council member, to your knowledge?
18  A.  Yes.
19  Q.  Do you vote in a majority African
20  American precinct?
21  A.  Majority, yes.
22  Q.  The people that you saw walking away
23  and not being able to vote, the three people that
24  you mentioned, were all of those African American
25  voters?

38

1   A.  Yes.
2   Q.  Is this the only precinct that you've
3   voted in prior to November 7th of 2000, the
4   precinct that's mentioned on here, the McNair
5   Recreation Center?
6   A.  No.  I had voted at a school.
7   Q.  And where was that school?
8   A.  It's one block from there.
9       I'm trying to think of the name of it.
10  It's a grammar school.  It's right there in my
11  neighborhood.
12      Charles Drew.
13  Q.  Charles Drew?
14  A.  Yes.
15  Q.  Okay, and how long before November 7th
16  did you vote at this school?
17  A.  I voted in the last elections at that
18  school.
19  Q.  The last general election or the
20  last --
21  A.  Local.
22  Q.  Okay.
23  A.  At McNair would have been my first time
24  voting there.
25  Q.  Oh, I see.  Okay.

39

1       Are you a member of the NAACP?
2   A.  No.
3   Q.  Have you ever been a member of the
4   NAACP?
5   A.  No.
6   Q.  Are you aware other than the three
7   people that you told me about earlier of anyone
8   else who alleged to have had the same problems
9   that you're telling us about today?
10  A.  Well, there's other people that I had
11  met prior to this --
12  Q.  Who are these people?
13  A.  -- who the same lawyers are
14  representing that's representing me.
15  Q.  Where did you meet these people?
16  A.  I met them at I guess you could call it
17  a declaration meeting where they had us all to
18  come in and meet with the lawyers, the NAACP,
19  they had us all come in to meet with the lawyers
20  on the same date.
21  Q.  What are some of the names of these
22  people that you met?
23  A.  I don't know their names, you know,
24  right off the top of my head.  I never really
25  actually sat and talked to them or held a

40

1   conversation with them.  It was just, you know,
2   sitting around a table just like we're doing now.
3   Q.  Was this meeting held here in Broward
4   County?
5   A.  No.  It was in Dade County.
6   Q.  Did you drive yourself to the polls on
7   November the 7th --
8   A.  Yes.
9   Q.  -- 2000?
10      And you mentioned that your kids went
11  with you, right?
12  A.  I have two children.  I took them with
13  me.
14  Q.  What are their ages?
15  A.  Four and five.
16  Q.  On your declaration you state here in
17  the first paragraph that you understand your role
18  and responsibility as a class representative.
19  What is your role and responsibility as a class
20  representative, to your knowledge?
21  A.  Well, just to work with the lawyers and
22  the NAACP to bring about a change at the polls to
23  see it carried out, to see better voting systems
24  at the polls.
25  Q.  What class do you represent as a

10 (Pages 37 to 40)

41

1 potential class representative?
2     A. I guess just a class of the Plaintiff,
3 I'm a Plaintiff.
4     Q. What relief are you seeking?
5     A. Just to have, you know, if your name is
6 supposed to be on the list, that your name is
7 there when you get there and that the way to vote
8 is an easy and comprehensive way, it's not
9 something complicated, you know, for people who
10 may not even be able to read, may even be easy
11 for them to vote.
12     MS. NORRIS-WEEKS: Okay, thank you.
13     That's all that I have for right now.
14
15         CROSS EXAMINATION
16
17 BY MR. EHRLICH:
18     Q. Miss Baggs, my name is Jeff Ehrlich.
19 I'm an Assistant County Attorney. I represent
20 the Supervisor of Elections from Miami, Dade
21 County, David Leahy, whose one of the other
22 Defendants in this lawsuit. There are a number
23 of Defendants. One is Supervisor Oliphant, so
24 I'm going to ask you a few additional questions
25 about your experiences in November, 2000, and I'd

43

1     MS. DIXON: Objection.
2     MR. EHRLICH: I'm sorry?
3     MS. DIXON: That's fine. I was just
4 going to ask if she can look at it.
5     MR. EHRLICH: Oh sure.
6     Do you have a copy?
7     MS. DIXON: I do, but I'll be happy to
8 show it to her.
9 BY MR. EHRLICH:
10     Q. Anyway, your statement is that is true,
11 that poor poll worker training is what caused you
12 to be unable to vote?
13     A. Yes.
14     Q. Do you believe that Mr. Hunter was not
15 adequately trained?
16     A. No.
17     Q. Do you have any reason to believe that
18 he was not properly trained to assist voters in
19 locating their names on voter rolls?
20     A. No.
21     Q. Do you have any information about the
22 training that Mr. Hunter and other poll workers
23 received --
24     A. No.
25     Q. -- I'm sorry. I paused, but let me

42

1 like to begin with Mr. Hunter.
2     Your testimony was that Mr. Hunter was
3 at the precinct on the day you attempted to vote
4 and was unable to locate your name on the rolls
5 there; is that right?
6     A. Yes.
7     Q. Is Mr. Hunter African American?
8     A. Yes.
9     Q. Do you have any reason to believe that
10 Mr. Hunter discriminated against you on that day
11 because you are African American?
12     A. No.
13     Q. You contend in your declaration that
14 the reason you were not able to vote is poor poll
15 worker training; is that right?
16     A. You say that I said that in my
17 declaration?
18     Q. Well, I can show you your declaration
19 and you can put it in your own words now.
20     What you say in paragraph eight of your
21 declaration, you say, "Specifically poor poll
22 worker training resulted in the denial of my
23 opportunity to participate in the Presidential
24 Election." Is that true?
25     A. Yes.

44

1 finish the question.
2     That Mr. Hunter or other poll workers
3 received for the November 7th, 2000 election?
4     A. No.
5     Q. Do you have any information on how poll
6 workers in other counties other than Broward
7 County, how they are trained or how they were
8 trained to work during the November 7th, 2000
9 election?
10     A. Do I have any information?
11     Q. Do you know how they were trained in
12 other counties?
13     A. No.
14     Q. Do you know whether poll workers were
15 trained the same ways in various counties of the
16 State of Florida?
17     A. No.
18     Q. In other words, was the training the
19 same in Broward County as it was in Dade County
20 or Pinellas County or Palm Beach County?
21     A. I don't have any knowledge.
22     Q. How is it that poor poll worker
23 training resulted in your not being able to vote?
24 Explain that.
25     A. What I meant by that was when I got

11 (Pages 41 to 44)

45

1 there, there was a lot of older women and they
2 seemed so gung ho and I felt like they should
3 have probably had younger people who was not so
4 eager to, you know, be there, that was my
5 feeling, because they were carrying on as if this
6 was like a permanent job, and it was just like a
7 one day position.
8    Q. Okay, I hear what you said. I'm going
9 to try to understand what you mean by that.
10    There were some older people working at
11 the polls. First of all, do you remember whether
12 they were mostly Black or mostly White? Do you
13 remember their race predominately?
14    A. Black.
15    Q. Mostly older Black women that worked at
16 the poll at the precinct where you went to vote?
17    A. Yes.
18    Q. And you say they were acting as though
19 their job were permanent. Do you mean they were
20 taking their job too seriously?
21    A. Very serious.
22    Q. And you think they were taking their
23 job as poll workers too seriously?
24    A. I felt that, yes.
25    Q. And by that do you mean that they were

46

1 checking carefully people to make sure that they
2 were on the list before allowing them to vote?
3 Is that what you mean?
4    MS. DIXON: I'm going to object to the
5 form.
6    MR. EHRLICH: What's wrong with the
7 form?
8    MS. DIXON: Leading, number one.
9    MR. EHRLICH: I'm representing a
10 Defendant and I'm asking a Plaintiff leading
11 questions at a deposition. I believe that's
12 permitted.
13    Your objection is noted.
14    MS. DIXON: Okay.
15    MR. EHRLICH: Read back the question,
16 please.
17
18    (Whereupon, the requested portion of the
19 record was read back, after which the deposition
20 resumed).
21
22    MR. EHRLICH: You may answer the
23 question.
24    THE WITNESS: They was very careful.
25 They was checking -- Yes, I felt like they

47

1 was taking their job too serious.
2 BY MR. EHRLICH:
3    Q. Do you think they shouldn't check that
4 carefully when someone comes in to say I want to
5 vote, they should just let them vote?
6    A. No. They should check and they should
7 make sure that you have proper ID, but to me my
8 feeling was that they was just, you know, so
9 serious like they was very very important, like
10 much more important than you, and you are the
11 voter, that's how I felt.
12    Q. Do you have reason to believe that
13 these poll workers discriminated against you and
14 prevented you from voting that day because you
15 are African American?
16    A. No.
17    Q. Were there many White voters at your
18 precinct?
19    A. There wasn't many. I did see some.
20    Q. Did you see any White voters have any
21 problems when they got up in front of the line
22 with the same women poll workers giving a hard
23 time to some of the White voters that you saw?
24    A. No, I didn't see anyone at the lines
25 having a problem.

48

1    The three people that I saw was outside
2 of the voting room, was like out in the hallway,
3 and the only reason that I knew that they had a
4 problem is because they came out talking loud and
5 they was mad and Walter went to say, hold up, let
6 me get your name and they was like, no, don't
7 worry about it.
8    Q. I understand you talked about those
9 three people and I'll get back to them in a
10 minute, but I'm talking now specifically about as
11 you described it the older women poll workers who
12 you thought took their job too seriously. I
13 imagine that your characterization is with regard
14 to you, you thought they were taking their jobs
15 too seriously in the way they treated your
16 attempt to find your name on the list, and my
17 question --
18    A. Yes.
19    Q. Yes, and my question is, did they act
20 that same way with regard to the White voters who
21 they encountered?
22    A. No, they acted that way with me before.
23 These was the same people, just a different
24 location before when I voted.
25    Q. Oh, I see. So when you say they were

12 (Pages 45 to 48)

49

1  taking their job too seriously, you were
2  referring to prior elections?
3      A.  Yes, because it was the same people,
4  just a different location, and before I didn't
5  have my card, and I gave them my name and they
6  was like we're going to need to see some ID. I
7  was like you know me, you know I'm Valerie, why
8  are you acting this way?  And so that's why I
9  said that.
10     Q.  Okay, so getting back to this election
11 November of 2000, the one we're talking about in
12 this lawsuit, these were generally the same
13 people --
14     A.  The same people.
15     Q.  -- that you had seen at prior
16 elections?
17     A.  Yes.
18     Q.  And, again, were they taking their
19 jobs, in your opinion, too seriously?
20     A.  Yes.
21     Q.  And here's what I'm getting at:  Did
22 they treat you differently, you or any other
23 African American voter, did they treat you
24 differently than they treated the White voters
25 that they encountered in November of 2000?

50

1      A.  No.
2      Q.  They treated everybody the same?
3      A.  Yes.
4      Q.  With the same serious attitude?
5      A.  Yes.
6      Q.  Now, other than these older African
7  American women, Mr. Hunter, of course, was there,
8  and I believe you testified that you thought he
9  was some sort of supervisor; is that right?
10     A.  I assumed he was, because he was like
11 all over the place and --
12     Q.  Resolving problems?
13     A.  Yes.
14     Q.  Was he sort of a troubleshooter?
15     A.  Yes.
16     Q.  And your testimony was that he was
17 unable to find your name on the list that day at
18 the precinct?
19     A.  Yes.
20     Q.  Yet several months later you testified
21 in your declaration that he told you that your
22 name was, in fact, on the list during the
23 election under the name Valerie Buford, not
24 Valerie Buford Wells; is that correct?
25     A.  Yes.

51

1      Q.  And you remember that conversation now?
2      A.  I don't remember that conversation.
3      Q.  Okay, you signed your declaration on
4  October 30th, 2001.  At the time you signed your
5  declaration, did you remember that conversation?
6      A.  At that time I probably did remember
7  that conversation.
8      Q.  Okay.
9      A.  But this is like over a year ago.
10     Q.  Well, your declaration was signed on
11 October 30th --
12     A.  That was almost a year ago.
13     Q.  It's October 30th, 2001, so I believe
14 that was about four, five months ago.
15     A.  October 30th?
16     Q.  Right.
17     A.  2001?
18     Q.  Right.
19     A.  The election was November, 2000 --
20     Q.  Okay, what I'm getting at --
21     A.  -- so that's almost a year.
22     Q.  It's almost a year after the election,
23 but my question is, when you signed your
24 declaration, at the time you signed your
25 declaration on October 30th, 2001, did you

52

1  remember at that time the conversation where
2  Mr. Hunter told you that your name was, in fact,
3  on the list as Valerie Buford?
4      A.  At that time?
5      Q.  Yes.
6      A.  I would have to say yes, I remember
7  that conversation.
8      Q.  So you forgot the conversation sometime
9  between October 30th, 2001 and today when you
10 testified that you don't specifically remember
11 that?
12     A.  Yes.
13     Q.  So based on your declaration where you
14 say Mr. Hunter told you that he checked and, in
15 fact, your name was on the list, do you conclude
16 that he was mistaken when he told you on election
17 day that he couldn't find your name on the list?
18     A.  To be honest with you, I feel like my
19 name probably was added later, because I looked
20 on those papers as well and I did not see my
21 name.
22     Q.  Which papers did you look at?
23     A.  I looked at the B's and then we went
24 down to the W's.
25     Q.  And you looked on both parts, and I

53

1  take it they were different lists in different
2  areas of the room based on your testimony?
3      A.  Yes.
4      Q.  And you didn't see your name on any
5  list?
6      A.  I didn't see my name.
7      Q.  Why would your name be added to the
8  list after the election?  Do you have any reason
9  to know why that would happen?
10     A.  Well, all I have to go on is my own
11  feelings.  No one has told me that maybe your
12  name was added because they're trying to, you
13  know, create a problem.
14          When I was told that we did, in fact,
15  see your name on the list, I felt like, yes, my
16  name was added to like stop some of maybe the
17  problems that could arise with my name being off
18  of the list for no apparent reason.
19     Q.  So if we could obtain the actual list,
20  the one that was actually at the precinct that
21  day, we could probably resolve this one way or
22  another, we could tell whether your name was on
23  it.  You would agree that that would be helpful
24  to resolving this issue that you've brought here?
25     A.  Yes.

54

1      Q.  If it turns out that Mr. Hunter was
2  right that, in fact, your name was on the list as
3  Valerie Buford and yet he told you that your name
4  wasn't on the list, would you agree that he made
5  a mistake on election day?
6      A.  Well, I would agree that we all made a
7  mistake, because we all looked.
8      Q.  When you say we all, you mean you and
9  Mr. Hunter?
10     A.  Me, Walter and the young lady.
11     Q.  And the precinct workers?
12     A.  Yes.
13     Q.  All of you would have made the same
14  mistake if, in fact, we go back, pulled a list
15  from that precinct and your name was on it, then
16  those three people, you, Mr. Hunter and the
17  precinct worker would have made a mistake in not
18  seeing your name on the list?
19     A.  Yes.
20     Q.  Getting back to the three people you
21  saw turned away, you've identified three,
22  specifically you identified three African
23  Americans who were not able to vote, you heard
24  them talking loudly and these were the people
25  that Mr. Hunter tried to talk to but they just

55

1  walked away; is that right?
2      A.  Yes.
3      Q.  Do you know whether those persons were
4  registered to vote in another county on that day
5  and that's why their names weren't on the list at
6  your precinct?
7      A.  No.
8      Q.  Do you know whether those persons were
9  convicted felons and that's why their names
10  weren't on the list?
11     A.  No.
12     Q.  Do you know whether those persons had
13  moved out of the State of Florida and that's why
14  their names weren't on the list?
15     A.  No.
16     Q.  Do you know whether those persons had
17  been adjudged mentally incompetent and that would
18  be the reason why their names were not on the
19  list?
20     A.  No.
21     Q.  You have no facts as to any of those
22  possibilities; is that right?
23     A.  That's right.
24     Q.  Have you ever voted in Miami, Dade
25  County?

56

1      A.  No.
2      Q.  Have you ever registered to vote in
3  Miami, Dade County?
4      A.  No.
5      Q.  Have you ever attempted to vote in
6  Miami, Dade County?
7      A.  No.
8      Q.  Are you familiar at all with the poll
9  worker training procedures of Supervisor Leahy in
10  Miami, Dade County?
11     A.  No.
12          MR. EHRLICH:  Give me one more second.
13     I have no further questions.
14     Thank you.
15
16          CROSS EXAMINATION
17
18  BY MR. WHITE:
19     Q.  Miss Baggs, my name is Tom White.  I
20  represent ChoicePoint, Incorporated, doing
21  business as Database Technologies, Incorporated,
22  another Defendant in this case, and I just have a
23  couple of questions for you.
24          When you went to the precinct on
25  November 7th, 2000, did anybody tell you why your

14 (Pages 53 to 56)

57

1  name wasn't on the list?
2      A.  No.
3      Q.  Did anybody ever tell you that your
4  name may have been removed from the list because
5  of a potential felony that you may have had?
6      A.  No.
7      Q.  So as far as you know, that never
8  happened?
9      A.  As far as I know the conversation?
10     Q.  Your name had been removed from the
11  list because of a felony conviction.
12     A.  Well, that I know for sure.
13     Q.  You know for sure?
14     A.  Yes.
15     Q.  Did anyone ever tell you that your name
16  had been removed from the voter rolls because you
17  changed your address?
18     A.  They asked me if I had moved and I told
19  them no, I'm at the same address forever.
20     Q.  So as far as you know, your name wasn't
21  removed from the list because you changed your
22  address?
23     A.  Yes.
24     Q.  Did anybody tell you your name may have
25  been removed from the voter rolls because you

58

1  were listed as deceased?
2      A.  No.
3      Q.  So as far as you know, that never
4  happened?
5      A.  Yes.
6      Q.  Other than what you may have read or
7  may have been told, do you know anything about
8  Database Technologies, Incorporated?
9      A.  No.
10     Q.  Other than what you may have read or
11  may have been told, do you know anything about
12  ChoicePoint, Incorporated?
13     A.  No.
14         MR. WHITE:  Thank you.
15     I have no further questions.
16
17         CROSS EXAMINATION
18
19  BY MR. HARVEY:
20     Q.  Good afternoon.  My name is Walter
21  Harvey.  I represent the Department of State and
22  the Division of Elections.
23     I just have a couple of follow-up
24  questions.
25     First of all, during your testimony you

59

1  testified that you had been deposed before in an
2  assault case, and I was just curious. was that a
3  charge against yourself or was that a charge
4  against someone else?
5      A.  A charge against someone else.
6      Q.  Now, you indicated when you arrived at
7  the polling place that day on November 7th, 2000
8  that you went to stand in the B line.  Now, I've
9  looked at a copy of the voter registration card
10  that you had.  Is that the voter registration
11  card that you took to the polling place that day?
12     A.  Yes.
13     Q.  Okay, on the voter ID card it indicates
14  Valerie Wells, and it's Valerie with an E.  Is
15  that your correct name or spelling that day?
16     A.  I don't know where Valerie E would even
17  be on there, because I've never even used the
18  initial E for anything.
19     Q.  But you went by Wells at that time?
20     A.  At that time?
21     Q.  Yes.
22     A.  I went by Buford.
23     Q.  Buford?
24     A.  Yes.
25     Q.  Okay, and so when you stood in the B

60

1  line, you were going by Buford, you weren't going
2  by Baggs?
3      A.  Right.
4      Q.  I just wanted to clarify that.
5      And today you go by what, what name?
6      A.  Today?
7      Q.  Yes.
8      A.  I use Buford.  I use Buford in
9  everything.
10     Q.  And it's not hyphenated, it's just
11  Buford?
12     A.  On my driver's license it may say
13  Valerie B. Buford.
14     Can I take a look at it?
15     Okay, it's my middle name with Buford
16  on my driver's license.
17     Q.  And that's the name you go by?
18     A.  Yes.  I don't use my married name.
19     Q.  Have you read the amended complaint
20  that was filed in this case?
21     A.  If my lawyers have supplied me with it
22  I've read it, but just to say what it says, I
23  wouldn't be able to sit here and tell you about
24  it.
25     Q.  Did you read it before it was filed?

15 (Pages 57 to 60)

61

1    A.  I've read a lot of stuff.  They've been
2   sending me stuff and a lot of it is just reading,
3   you know, because I'm not a lawyer, I don't know
4   what I'm reading, but they've been supplying me
5   with like to me books.
6    Q.  What about your declaration, you read
7   that before you signed it?
8    A.  I've read everything before I've signed
9   it.
10   Q.  On your declaration it says
11  Buford-Wells.  Is that the name you go by?
12   A.  No.
13   Q.  Did you bring that to your lawyer's
14  attention?
15   A.  No, and I'm sure they probably wrote my
16  name up like that because my voter's registration
17  says Valerie Wells.
18   Q.  So it's fair to say that that was --
19  All right, one other thing.
20        You indicated that you had voted at the
21  different precinct once, I believe it was, or
22  different polling location.  That was the Charles
23  Drew polling location?
24   A.  Yes.
25   Q.  When did you vote there?  Do you recall

62

1   what year that was?
2    A.  It probably would have been - it
3   probably would have been the locals in 2000,
4   because --
5    Q.  It was in 2000?
6    A.  It probably would have been, because
7   the last time I had voted it was locals, it was
8   not for the Presidential Election, so the last
9   local elections that would have been the last
10  time I had to go there.
11   Q.  But on your voter ID card it indicates
12  that it was issued in July of '98 and it lists a
13  polling location as the McNair site, so would
14  that change anything that you recollect in terms
15  of your polling place, where you voted and when
16  you voted in 2000 in the local election?
17   A.  What do you mean?
18   Q.  Well, according to your voter ID card,
19  the one you showed us, it was issued in 1998,
20  July, '98.
21   A.  Okay.  That was when I reregistered.
22   Q.  And it listed the polling place as the
23  McNair site, the McNair Recreation Center.
24   A.  Okay, I can explain that.
25        When I received this card it was not

63

1   time to vote.  I signed it and put it in my
2   wallet.  When it was time to vote again I went
3   back to where I had last voted at and that's when
4   I was told you're not voting here, you're voting
5   at McNair, and that's when I went to McNair.
6        This would have been my first time
7   voting here.
8    Q.  All right, that would have been your
9   first time voting?  November, 2000 would have
10  been your first time voting at McNair?
11   A.  Exactly.
12   Q.  But according to that card, it says
13  that the McNair polling site was assigned to you
14  in 1998 because that is when it was issued.
15   A.  Okay.
16   Q.  But you're testifying here today that
17  you voted in 2000 at the Charles Drew site.
18   A.  No.  I'm testifying here today that the
19  last time I voted was at Charles Drew.
20   Q.  And you say that's in 2000?
21   A.  I'm saying that was the last time I
22  voted.
23        I did say it was in 2000 and I also
24  said it would have been the last time that I
25  voted in the locals.

64

1    Q.  So you did vote at Charles Drew?
2    A.  That would have been the last time I
3   actually voted.  It would have been at Charles
4   Drew.
5        Now, as far as you wanting me to
6   remember dates, I'm sorry, I cannot do that.
7    Q.  I'm not asking you a date, I'm just
8   asking you what year it was.
9        You voted in Charles Drew sometime
10  in --
11   A.  Well, I'm sorry, but I cannot remember
12  the last year that I voted.
13   Q.  Okay.
14   A.  And I do remember the last time I voted
15  it was at Charles Drew.
16      MR. HARVEY:  Nothing further.
17      MS. PAYNE:  Are you guys going to go?
18
19        CROSS EXAMINATION
20
21  BY MS. PAYNE:
22   Q.  My name is Lindsey Payne and I
23  represent one of the Defendants of Orange County,
24  Supervisor of Election Mr. Cowles, and have you
25  ever resided in Orange County, Florida?

16 (Pages 61 to 64)

65

1   A. No.
2   Q. Have you ever attempted to vote there?
3   A. No.
4   Q. Have you ever attempted to register to
5   vote there?
6   A. No.
7   Q. Are you familiar with any of the
8   procedures that they use in voting there or the
9   training of the poll workers?
10   A. No.
11   MS. PAYNE: I have nothing further.
12
13   CROSS EXAMINATION
14
15   BY MR. TINKLER:
16   Q. Ma'am, my name is Ken Tinkler. I
17   represent Pam Iorio, the Hillsborough County
18   Supervisor of Elections.
19   I just wanted to clear up one thing.
20   Have you ever gone by the name Valerie
21   Buford Wells?
22   A. Yes. When I was married.
23   Q. When was the last time you used that
24   name?
25   A. The last time I used Valerie Buford

66

1   Wells?
2   Q. Yes.
3   A. I would have to say before I received
4   papers from the judge telling me that I can use
5   Buford.
6   Q. Okay, about when was that,
7   approximately?
8   A. I would say about six years. About six
9   years ago.
10   Q. It's been six years since you used that
11   name?
12   A. Yes.
13   MR. TINKLER: Thank you.
14
15   CROSS EXAMINATION
16
17   BY MR. MAC INNES:
18   Q. My name is Doug Mac Innes. I represent
19   the Department of Highway Safety & Motor Vehicles
20   and the Department of Children & Families.
21   Is it correct to say that you never
22   attempted or never applied to register to vote at
23   a Department of Highway Safety & Motor Vehicles
24   office or a Department of Children & Families
25   office?

67

1   MS. DIXON: Object to the form of the
2   question.
3   MR. EHRLICH: What's wrong with the
4   form?
5   MS. DIXON: Which question do you want
6   her to answer?
7   THE WITNESS: I don't understand the
8   question.
9   MR. MAC INNES: It's one question.
10   MS. DIXON: You asked for DMV or DCF?
11   MR. MAC INNES: It's one question.
12   BY MR. MAC INNES:
13   Q. Have you ever applied to register to
14   vote at a Department of Highway Safety & Motor
15   Vehicles office?
16   A. No.
17   Q. Have you ever applied to register to
18   vote at a Department of Children & Families
19   office?
20   A. No.
21   MR. MAC INNES: No further questions.
22   MS. DIXON: I need a few, maybe a
23   minute or two to go back through my notes.
24   I do have a few follow-ups, but I need
25   to collect my thoughts.

68

1   MS. NORRIS-WEEKS: Okay.
2   Off the record.
3
4   (Whereupon, there was a brief recess
5   observed by all parties present, after which the
6   deposition resumed).
7
8   CROSS EXAMINATION
9
10   BY MS. DIXON:
11   Q. Miss Baggs, a few minutes ago you were
12   asked was it safe to say that you never applied
13   to vote at DMV or at DCF and you said, yes, you
14   never applied to vote there; is that correct?
15   A. Yes.
16   Q. When you went to the DMV to renew your
17   driver's license or to do whatever, were you ever
18   asked whether or not you wanted to register to
19   vote?
20   A. I can't remember.
21   Q. Do you recall seeing any signs at the
22   DMV that said that you could register to vote at
23   DMV or DCF?
24   A. I don't recall.
25   Q. Have you ever been a client at DCF?

17 (Pages 65 to 68)

69

1    A. What do you mean?
2    Q. The Department of Children & Family
3  Services.
4       I'm sorry.
5    A. What do you mean by a client?
6    Q. Have you ever received services from
7  the Department of Children & Family Services?
8    A. Yes.
9    Q. Okay, when did you receive those
10  services?
11    A. Okay, it would be safe to say --
12  Actually it would have been before I changed my
13  name back to Buford when I was Wells, because I
14  had surgery on my hand.
15    Q. Do you remember the year?
16    A. And I had to stop working.
17       No, but I can accumulate documents that
18  would show.
19    Q. That's not necessary.
20       Now, you stated that the last time you
21  voted you voted at another location than the one
22  that's on your voter's registration card.
23    A. Yes.
24    Q. At any time were the polling places
25  changed? Did you receive notice from the Broward

70

1  County Supervisor of Elections that the polling
2  places would change?
3    A. It's not safe for me to say that I did
4  not receive knowledge because I could have and
5  just, you know, threw it away, so I would have to
6  say that I don't know.
7    Q. But the last time you voted in a local,
8  you testified that you had voted last in a local
9  election?
10    A. It would have to be the local, because
11  how I knew to reregister to vote I went back to
12  Charles Drew and that's where my name was not
13  found and they said your name is not here, did
14  you vote in the last Presidential Election and I
15  said, no, I didn't. So they said, well, you're
16  not going to be able to vote, you're going to
17  have to reregister, because if you don't vote,
18  they will take your name off the list.
19    Q. And that was --
20    A. And that was why I reregistered.
21    Q. Okay, had you tried to vote before that
22  election, that local election?
23    A. When I found out that my name was not
24  there?
25    Q. Let me be clear.

71

1       When was the first time you registered
2  to vote?
3    A. The very first time?
4    Q. Yes.
5    A. In 1980, '79 or '80 when I first
6  arrived in Florida.
7    Q. And had you voted at that same school
8  before? Had you voted in any election before the
9  last local election?
10    A. I had voted there, so I went back
11  there.
12    Q. Now, you testified earlier that you
13  assumed that Walter Hunter was a supervisor.
14    A. Yes.
15    Q. A polling place supervisor.
16       Do you know for sure whether or not he
17  was?
18    A. No, I don't know.
19    Q. Could he have been a volunteer?
20       MR. EHRLICH: Object to the form.
21       THE WITNESS: Yes.
22       MR. EHRLICH: Leading.
23  BY MS. DIXON:
24    Q. You also testified that the poll
25  workers were taking their job too seriously.

72

1  Were they helpful to you?
2       MR. EHRLICH: Object to the form,
3    leading.
4  BY MS. DIXON:
5    Q. Go ahead and answer.
6    A. Yes. At the time when my name was not
7  able to be found everyone tried to be helpful.
8       MS. DIXON: That's all I have.
9       This deposition will be transcribed,
10    meaning typed out, and you'll have an
11    opportunity to read it and review your
12    testimony and to make some changes, not many
13    changes.
14       Would you like to have the opportunity
15    to read and sign the deposition?
16       My recommendation is that you do.
17       THE WITNESS: Yes.
18       MS. DIXON: For all the depos I would
19    like an electronic copy.
20
21       (Whereupon, Defendant's Exhibits A, B
22  and C consecutively were marked for Identification).
23
24
25
       (Whereupon, signature and formalities

18 (Pages 69 to 72)

73

1
2    not having been waived, the deposition concluded

2    at 1:20 o'clock p.m.).

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

75

1
2

CERTIFICATE

3  The State of Florida,   )

4  County of Broward      )

5
6    I hereby certify that I have read the
7  foregoing deposition by me given, and that the
8  statements contained herein are true and correct
9  to the best of my knowledge and belief, with the
10  exception of any corrections or notations made
11  on the errata sheet, if one was executed.
12
13

    Dated this _____ day of _____,

14  2002.

15
16
17

18       _____
19
20
21
22
23
24
25

74

1
2    FEBRUARY 7TH, 2002
     MS. VALERIE BUFORD BAGGS
3     2741 N.W. 9TH STREET
     POMPANO BEACH, FL.  33069
4
5    IN RE:  NAACP vs. KATHERINE HARRIS
     CASE NO. 01-0120 CIV
6
7    Please take notice that on Monday, the
  28th day of January, 2002, you gave your deposition
8  in the above referred matter.  At that time, you
  did not waive signature.  It is now necessary that
9  you sign your deposition.
10    Please call our office at the below-listed
  number to schedule an appointment between the hours
11  of 9:00 a.m. and 4:30 p.m., Monday through Friday
  at the Esquire office located nearest you.
12
13    If you do not read and sign the
  deposition within thirty days, the original, which
14  has already been forwarded to the ordering
  attorney, may be filed with the Clerk of the Court.
15  If you wish to waive your signature, sign your name
  in the blank at the bottom of this letter and
16  return it to us.
17    Very truly yours,
18
19    VALERIE LEHTO, Notary Public
     ESQUIRE DEPOSITION SERVICES
20    1218 Southeast Third Avenue
     Fort Lauderdale, Fl.  33301
21    954-463-9507
22  I do hereby waive my signature:
23  _____
    VALERIE BAGGS.
24  cc via transcript:
25

76

1
2     CERTIFICATE
3  STATE OF FLORIDA
4  COUNTY OF BROWARD
5    I, VALERIE LEHTO, Registered Professional
6  Reporter, do hereby certify that I was authorized
7  to and did stenographically report the foregoing
8  deposition as hereinabove shown, and the testimony
9  of said witness was reduced to computer
10  transcription under my personal supervision and that
11  the record is a true record of the testimony given
12  by the witness.
13    I further certify that I am not a
14  relative, employee, attorney, or counsel of any of
15  the parties, nor am I a relative or employee of any
16  of the parties' attorney or counsel connected with
17  the action, nor am I financially interested in the
18  action.
19    Dated this 7th day of February, 2002.
20
21
22    _____
     VALERIE LEHTO
23    Registered Professional Reporter
     COMMISSION NO. CC759583
24    MY COMMISSION EXPIRES 8/22/2002
25

19 (Pages 73 to 76)



EXHIBIT

A  wells



BROWARD COUNTY VOTER REGISTRATION

YOUR POLLING PLACE ADDRESS IS:

10080319
REGISTRATION #

340        DEM    F   B
PRECINCT    PARTY   SEX RACE

MC NAIR RECREATION CTR
951 N W 27 AVE
POMPANO BEACH FL 33069

04/02/60   10/30/95   07/20/98
BIRTH DATE   REGISTRATION DATE   ISSUE DATE

YOU ARE ELIGIBLE TO VOTE FOR THE REPRESENTATIVES LISTED BELOW

VALERIE R WELLS

POMPANO BEACH DIST 4

SIGNATURE OF VOTER

EXHIBIT
B   Wells
1-28-02  VL

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.01-CIV-120-Gold/Simonton

-------------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, INC. by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of State of Florida; et al.,

Defendants.

-------------------------------------------------------------------------------x

### DECLARATION OF VALERIE BUFORD-WELLS

I, Valerie Buford-Wells, hereby declare the following:

1. I am a named plaintiff in this case and I am willing to be a class representative. I understand my role and responsibilities as class representative. I will competently and adequately represent the concerns of my fellow class members. I give this declaration based upon personal knowledge. I do not waive the confidentiality of any information for any purpose beyond the above-entitled action.

2. I am a citizen of the United States and a legal resident of the State of Florida and Broward County. I am at least 18 years of age and African American.

3. I have been a registered voter in Broward County since 1995 and voted in the 1996 and 1998 general elections with little or no difficulty.

4. On the evening of November 7, 2000, I went to precinct 34C, my local polling place, to vote. I presented my voter registration card and driver's license to the poll worker who



a

informed me that my name was not on the list of registered voters.

5.  I explained to the poll worker that I had voted in the past and could not understand why my name was not on the list. The poll worker tried to contact the Broward County Supervisor of Elections' Office to find out the status of my voter registration. The line was busy. The poll worker took my name and explained that he would try to see what he could do about the problem. I was not allowed to vote.

6.  While I was at the polling place, I witnessed three (3) other people whose names were not on the voter registration lists. They also were not able to vote. They were Black.

7.  A few months later, Walter Hunter, city council member for Pompano Beach, contacted the Broward County Supervisor of Elections Office on my behalf to find out the status of my voter registration. He was informed that my name was on the list as "Valerie Buford" and not "Valerie Buford-Wells."

8.  On November 7, 2000, I was denied the right to vote because of the grossly inadequate administration of elections in Broward County. Specifically, poor poll worker training resulted in the denial of my opportunity to participate in the presidential election.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _Oct 30_____, 2001          _Valerie Buford Wells_
                                              VALERIE BUFORD-WELLS

2