UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No.01-120-CIV-GOLD/SIMONTON

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, INC.,
by its FLORIDA STATE CONFERENCE OF BRANCHES,
et al.,

      Plaintiffs,

    —vs—

KATHERINE HARRIS, Secretary of State of Florida;
et al.,

      Defendants.

_____

## NOTICE OF FILING FULLY EXECUTED COPY
## OF JUNE 28, 2002 CHOICEPOINT SETTLEMENT AGREEMENT

Plaintiffs hereby give notice of filing the attached fully executed copy of the "Final Settlement Agreement" between Plaintiffs and Defendant ChoicePoint, Inc., d/b/a Database Technologies, Inc. ("ChoicePoint"), dated June 28, 2002, and state as follows:

1.      On July 2, 2002, Plaintiffs and ChoicePoint filed a Motion for Approval of Settlement Agreement.

2.      Attached to the Motion as Exhibit "A" is a copy of the "Final Settlement Agreement" between the parties dated June 28, 2002.

3.      Attached to the "Final Settlement Agreement" as a Exhibit 1 is a "Settlement Agreement" between the parties dated June 14, 2002.



4.    Although the Exhibit 1 June 14, 2002 version of the "Settlement Agreement" attached to the Motion was fully executed by the parties, by oversight, the copy of the June 28, 2002 "Final Settlement Agreement" attached to the Motion was not fully executed.

5.    Accordingly, a fully executed copy of the "Final Settlement Agreement" dated June 28, 2002 is attached hereto.

Dated: July 3, 2002

Respectfully submitted,

LAW OFFICES
WILLIAMS & ASSOCIATES, P.A.
Attorneys for Plaintiffs
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Telephone:    305/379-6676
Facsimile:    305/379-4541

By:
THOMASINA H. WILLIAMS
FLORIDA BAR NO. 629227

## CERTIFICATE OF SERVICE

I HEREBY certify that a true and correct copy of the foregoing was served by U.S. Mail on the following counsel on this 3rd day of July, 2002:

John W. Little, III, Esq.
Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
Attorneys for Secretary of State and
Director, Division of Elections
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Miami-Dade County
111 N.W. First Street, Suite 2810
Miami, FL 33128-1930

Mitchell Bloomberg, Esq.
Adorno & Zeder
Attorneys for ChoicePoint, Inc.
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133-5413

Tracey I. Arpen, Esq.
Office of General Counsel, Duval County
117 West Duval Street, Suite 480
Jacksonville, FL 32202-3700

H. Ray Allen, Esq.
Senior Assistant County Attorney
Hillsborough County, Florida
P.O. Box 1110
Tampa, FL 33601

George L. Waas, Esq.
Douglas B. MacInnes, Esq.
Office of the Attorney General
Department of Legal Affairs
PL-01 The Capital
Tallahassee, FL 32399-1050

Michael Cirullo, Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
Attorneys for Orange County Supervisor
3099 East Commercial Boulevard
Fort Lauderdale, FL 33308

Daniel D. Eckert, Esq.
County Attorney
Frank Gummey, Esq.
Assistant County Attorney
County of Volusia
123 West Indiana Avenue
DeLand, FL 32720-4613

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
Attorneys for ChoicePoint, Inc.
725 Twelfth Street, NW
Washington, D.C. 20005-5901

David V. Kornreich, Esq.
  Casey, Crosland & Bramnich
First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131

THOMASINA H. WILLIAMS

## Final Settlement Agreement
## NAACP, et al. v. Harris, et al.
## June 28, 2002

Plaintiffs and Defendant ChoicePoint Inc., d/b/a Database Technologies, Inc. (known hereafter as "ChoicePoint") agree and stipulate as follows:

Nothing in this Agreement shall be considered or interpreted to be an admission of liability or wrongdoing by ChoicePoint. This Settlement Agreement is entered into solely to resolve this litigation in the most effective and efficient manner for all parties.

Although this litigation was brought as a class action, the parties have agreed to this settlement prior to any decision on class certification and without certifying a class as part of the settlement. Counsel for Plaintiffs and ChoicePoint agree to recommend approval of this settlement to the Court pursuant to Fed. R. Civ. P. 23(e) and agree that the fact of this settlement shall not be cited or urged by them in this or other litigation as an indication of the propriety or impropriety of class certification.

This Agreement protects the interests of all Plaintiffs and ChoicePoint. This settlement will not harm the interests of the putative class members, and is fair, reasonable and adequate to protect the interest of the class regarding claims against ChoicePoint. This settlement achieves some, if not all, of the relief that might conceivably be awarded by the Court against ChoicePoint, and puts the putative class members in a better position than they would have been had the case never been filed.

This Agreement is conditioned upon Plaintiffs joining ChoicePoint in opposing any motion by any other defendant for leave to amend its answer to include a cross-claim or third-party complaint against ChoicePoint and joining ChoicePoint in opposing any effort by any other defendant to bring suit against ChoicePoint in state or federal court based upon its work performed for the State of Florida, Department of State, Division of Elections.

In exchange for the Plaintiffs' Agreement to file a voluntary dismissal of this action against ChoicePoint and Plaintiffs' promise to comply with the condition stated in the preceding paragraph, ChoicePoint agrees:

A.  Exceptions Reports

1.      To assist Plaintiffs and their experts in identifying source state and any other relevant information on 1999 and 2000 "felon" exceptions reports

1

relating to out-of-state felon data, including data from "automatic restoration" states;

2.   To perform agreed upon data processing, as described below, and to provide Plaintiffs with a new comprehensive 1999-2000 felons exceptions report meeting criteria established by Plaintiffs.

3.   In constructing the new comprehensive 1999-2000 felons exceptions report identified in ¶A.2, ChoicePoint will first combine the electronic version of the 1999 felons exceptions report used by the State of Florida, Department of State, Division of Elections in 1999 as that data is currently found in the document depository established in this case, with the electronic version of the 2000 felons exceptions report used by the State of Florida, Department of State, Division of Elections in 2000 as that data is currently found in the document depository established in this case. In combining the 1999 and 2000 felons exceptions reports, ChoicePoint will eliminate any overlap between the two reports to create a comprehensive list of names identified on the 1999 and 2000 felons exceptions reports.

4.   After Plaintiffs identify those Florida counties, on a statewide basis, which have never utilized either the 1999 or 2000 felons exceptions report as part of any list maintenance procedures, including any actions pursuant to F.S.A. §98.0975(4), ChoicePoint will process the comprehensive 1999-2000 exceptions report resulting from the processing described in ¶A.3, to remove therefrom all names identified from Central Voter File records as having originated in the counties which have never used either the 1999 or 2000 felons exceptions report at any time for removal purposes.

5.   After Plaintiffs secure from the State of Florida, Office of Executive Clemency, a current electronic version of the official Florida clemency files and provide it to ChoicePoint with all necessary releases to use it for data processing, ChoicePoint will further process the comprehensive 1999-2000 list, resulting from the processing described in ¶¶A.2 – A.4, to identify those individuals on the list who may have received clemency and had their right to vote officially restored.

6.   Prior to performing the clemency processing described in ¶A.5, ChoicePoint will work with Plaintiffs and their designated expert to establish matching criteria designed to identify those persons listed on the comprehensive 1999-2000 list who may have received clemency either before or after the November 7, 2000 election.

7.     The matching criteria described in ¶A.6 is as follows:

ChoicePoint will process the comprehensive 1999-2000 list resulting from the processing described in ¶¶A.2 – A.4, against the refreshed clemency file secured by Plaintiffs from the Office of Executive Clemency using all categories of match criteria used to create the 1999 and 2000 felon exceptions reports.

In processing the comprehensive 1999-2000 list against the refreshed clemency file, ChoicePoint will include in the resulting report all matches regardless of the date of receipt of clemency.

8.     To further process the 1999-2000 comprehensive list resulting from the processing described in ¶¶A.2 – A.7 to determine which matches thereon fail to match based upon matching criteria established by Plaintiffs after consultation between Plaintiffs, their expert(s) and ChoicePoint personnel.

9.     The matching criteria described in ¶A.8 is as follows:

ChoicePoint will identify all matches on the comprehensive list resulting from the processing described in ¶¶A.2 – A.7 that do not match based on all of the following data fields:

   Validated 9 digit Social Security Number
   Non-normalized (i.e., as name appears in original source data)
   Last Name
   Non-normalized (i.e., as name appears in original source data)
   First Name
   Non-normalized (i.e., as name appears in original source data)
   Middle Name
   Suffix
   Race
   Gender
   Date of Birth

ChoicePoint will perform Social Security Number validation in accordance with guidelines established by the Social Security Administration.

Records will be deemed to match under the criteria listed above if a middle name in one record begins with the same letter as a middle initial shown in the match record assuming all other fields listed above match.

3

Records will be deemed not to match under the criteria listed above if they share common blank data fields among the fields listed above, except for cases in which the middle name field or suffix field is blank in both records.

Records will be deemed not to match under the criteria listed above if one of the fields being compared contains data and the same field in the match record contains no data.

10. To identify those individuals listed on the comprehensive list created by the processing described in ¶¶A.2 – A.4 whose felony match was based on non-Florida criminal conviction data used by ChoicePoint.

11. To identify those individuals from the subset of the comprehensive list described in ¶A.10 whose felony match was based on non-Florida criminal conviction data used by ChoicePoint from states which ultimately provide automatic restoration of voting rights to those convicted of felonies.

12. To provide Plaintiffs with reports showing the results of the processing described in ¶¶ A.3, A.4, A.5 A.8, A.10 and A.11.

13. To perform agreed upon data processing, as described below, and to provide Plaintiffs with a new comprehensive 1999-2000 duplicates exceptions report, meeting criteria established by Plaintiffs.

14. In constructing the new comprehensive 1999-2000 duplicates exceptions report identified in ¶A.14, ChoicePoint will first combine the electronic version of the 1999 duplicates exceptions report used by the State of Florida, Department of State, Division of Elections in 1999 as that data is currently found in the document depository established in this case, with the electronic version of the 2000 duplicates exceptions report used by the State of Florida, Department of State, Division of Elections in 2000 as that data is currently found in the document depository established in this case. In combining the 1999 and 2000 duplicates exceptions reports, ChoicePoint will eliminate any overlap between the two reports to create a comprehensive list of names identified on the 1999 and 2000 duplicates exceptions reports.

15. After Plaintiffs identify those Florida counties, on a statewide basis, which have never utilized either the 1999 or 2000 duplicates exceptions report as part of any list maintenance procedures, including any actions pursuant to F.S.A. § 98.0975(4), ChoicePoint will process the comprehensive 1999-2000 exceptions report resulting from the processing described in ¶A.15, to remove therefrom all names for which the earlier

4

registration in the duplicate match is identified as having originated in counties which have never used either the 1999 or 2000 duplicates exceptions report.

16.   To further process the 1999-2000 comprehensive list resulting from the processing described in ¶¶A.14 – A.15 to determine which matches thereon fail to match based upon matching criteria established by Plaintiffs after consultation between Plaintiffs, their expert(s) and ChoicePoint personnel.

17.   The matching criteria described in ¶A.16 is as follows:

ChoicePoint will identify all matches on the comprehensive list resulting from the processing described in ¶¶A.14 – A.15 that do not match based on all of the following data fields:

Validated 9 digit Social Security Number
Non-normalized (i.e., as name appears on original source data) Last Name
Non-normalized (i.e., as name appears on original source data) First Name
Non-normalized (i.e., as name appears on original source data) Middle Name
Suffix
Race
Gender
Date of Birth

ChoicePoint will perform Social Security Number validation in accordance with guidelines established by the Social Security Administration.

Records will be deemed to match under the criteria listed above if a middle name in one record begins with the same letter as a middle initial shown in the match record assuming all other fields listed above match.

Records will be deemed not to match under the criteria listed above if they share common blank data fields among the fields listed above, except for cases in which the middle name field or suffix field is blank in both records.

Records will be deemed not to match under the criteria listed above if one of the fields being compared contains data and the same field in the match record contains no data.

18. To provide Plaintiffs with reports showing the results of the processing described in ¶¶ A.15 and A.16.

19. To begin the consultations described in ¶¶A.6, A.8 and A.16 within five (5) working days of the execution of the initial Settlement Agreement.

20. To complete the processing described in ¶¶A.2—A.19 and provide Plaintiffs with the reports described in ¶¶A.12 and A.18 within twenty (20) calendar days of Court approval of this Agreement and the processing described herein.

21. To provide reasonable consultation and cooperation to Plaintiffs concerning technology and data processing issues relating to past processing and the processing described in ¶¶A.2—A.18.

22. Plaintiffs' failure to secure the information required in ¶¶A.4, A.5 and/or A.15 within a reasonable period shall not preclude ChoicePoint from performing the balance of the processing described in ¶¶A.2—A.19 and for that processing to constitute full compliance with ChoicePoint's processing obligations hereunder.

B. Cooperation and Assistance with Discovery and Trial

1. To agree to provide fact witness(es) concerning data processing and the processes performed in carrying out the 1999 and 2000 Central Voter File work for the Division of Elections for deposition or trial purposes.

C. Costs and fees

1. In lieu of providing Plaintiffs' counsel attorneys' fees, ChoicePoint will make a contribution to Plaintiffs' designee in the amount of $75,000, such payment to be made within ten (10) days of the Court's final approval of the settlement between the parties.

2. To waive labor, photocopying and all other fees for obtaining any documents requested by Plaintiffs in the future in connection with this case whether by subpoena or public records request.

D. Scope & Enforcement

1. This document contains the full Agreement of the parties.

2. This document replaces the Settlement Agreement entered into by Plaintiffs and ChoicePoint on June 14, 2002 per ¶D.2 of that Agreement. See Exhibit 1.

3. ChoicePoint will fulfill the obligations identified in ¶¶A20, 21 and B.1 within 30 days of Court approval of this Agreement.

4. Upon completion of the 30 day processing and consultation period described in ¶D.3, during which time ChoicePoint will comply with the requirements of ¶¶A.20, 21 and B.1, Plaintiffs will move the Court for dismissal with prejudice of all claims against ChoicePoint. At that time, Plaintiffs will ask the Court to enter a Final Order dismissing all claims with prejudice, consistent with the terms of this Agreement, which shall be attached to the Order of Dismissal, and ChoicePoint shall not oppose that request.

5. Notwithstanding the Order of Dismissal, the parties agree that enforcement of the Agreement, including any further relief or such other orders that may be necessary to enforce its terms and effectuate its purposes, shall be by appropriate motion to this Court, following consultation with the other party's counsel in a good faith attempt to resolve the issue, for as long as Plaintiffs' case against the remaining defendants are before the Court.

6. Nothing contained herein shall be interpreted to waive any claims Plaintiffs may make against other defendants in this litigation, including in particular State defendants, or the validity of specific provisions of FERA, or of the regulations that may be adopted thereunder, under the Voting Rights Act of 1965 or the National Voter Registration Act.

7. Although the parties may begin work under their Agreement prior to Court approval hereof, this Agreement is conditioned upon receipt of approval from the United States District Court for the Southern District of Florida, and no work produced by ChoicePoint shall be delivered to Plaintiffs until such approval has been obtained.

E. Disclosure

1. The parties hereto agree that neither party will issue any public statement regarding this Agreement until it is formally presented to the Court for its approval.

2. Upon presentation of this Agreement to the Court, the parties will issue a joint press release regarding the settlement Agreement, the contents of which will be agreed upon by the parties in advance.

Dated June 28, 2002.

Raymond W. Bergan
Daniel A. Restrepo
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005

For Defendant ChoicePoint

Anita S. Hodgkiss
Lawyers Committee for Civil Rights
1401 New York Ave, NW Suite 400
Washington, DC 20005

For Plaintiffs

8

**Settlement Agreement**
**NAACP, et al. v. Harris, et al.**
**June 14, 2002**

Plaintiffs and Defendant ChoicePoint Inc., d/b/a Database Technologies, Inc. (known hereafter "ChoicePoint") agree and stipulate as follows:

Nothing in this Agreement shall be considered or interpreted to be an admission of liability or wrongdoing by ChoicePoint. This Settlement Agreement is entered into solely to resolve this litigation in the most effective and efficient manner for all parties.

Although this litigation was brought as a class action, the parties have agreed to this settlement prior to any decision on class certification and without certifying a class as part of the settlement. Counsel for Plaintiffs and ChoicePoint agree to recommend approval of this settlement to the Court pursuant to Fed. R. Civ. P. 23(e) and agree that the fact of this settlement shall not be cited or urged by them in this or other litigation as an indication of the propriety or impropriety of class certification.

This Agreement protects the interests of all Plaintiffs and ChoicePoint. This settlement will not harm the interests of the putative class members, and is fair, reasonable and adequate to protect the interest of the class regarding claims against ChoicePoint. This settlement achieves some, if not all, of the relief that might conceivably be awarded by the Court against ChoicePoint, and puts the putative class members in a better position than they would have been had the case never been filed.

This Agreement is conditioned upon Plaintiffs joining ChoicePoint in opposing any motion by any other defendant for leave to amend its answer to include a cross-claim or third-party complaint against ChoicePoint and joining ChoicePoint in opposing any effort by any other defendant to bring suit against ChoicePoint in state or federal court based upon its work performed for the State of Florida, Department of State, Division of Elections.

In exchange for the Plaintiffs' Agreement to file a voluntary dismissal of this action against ChoicePoint and conditioned upon obtaining the above-referenced waivers, ChoicePoint agrees:

A. Exceptions Reports

1.  To assist Plaintiffs and their experts in identifying source state and any other relevant information on 1999 and 2000 "felon" exceptions reports relating to out-of-state felon data, including data from "automatic restoration" states;  ATTACHMENT / EXHIBIT _____

1

2.    To perform agreed upon data processing, as described below, and to provide Plaintiffs with a new comprehensive 1999-2000 felons exceptions report meeting criteria established by Plaintiffs.

3.    In constructing the new comprehensive 1999-2000 felons exceptions report identified in ¶A.2, ChoicePoint will first combine the electronic version of the 1999 felons exceptions report used by the State of Florida, Department of State, Division of Elections in 1999 as that data is currently found in the document depository established in this case, with the electronic version of the 2000 felons exceptions report used by the State of Florida, Department of State, Division of Elections in 2000 as that data is currently found in the document depository established in this case. In combining the 1999 and 2000 felons exceptions reports, ChoicePoint will eliminate any overlap between the two reports to create a comprehensive list of names identified on the 1999 and 2000 felons exceptions reports.

4.    After Plaintiffs identify those Florida counties, on a statewide basis, which have never utilized either the 1999 or 2000 felons exceptions report as part of any list maintenance procedures, including any actions pursuant to F.S.A. §98.0975(4), ChoicePoint will process the comprehensive 1999-2000 exceptions report resulting from the processing described in ¶A.3, to remove therefrom all names identified from Central Voter File records as having originated in the counties which have never used either the 1999 or 2000 felons exceptions report at any time for removal purposes.

5.    After Plaintiffs secure from the State of Florida, Office of Executive Clemency, a current electronic version of the official Florida clemency files and provide it to ChoicePoint with all necessary releases to use it for data processing, ChoicePoint will further process the comprehensive 1999-2000 list, resulting from the processing described in ¶¶A.2 – A.4, to identify those individuals on the list who may have received clemency and had their right to vote officially restored.

6.    Prior to performing the clemency processing described in ¶A.5, ChoicePoint will work with Plaintiffs and their designated expert to establish matching criteria designed to identify those persons listed on the comprehensive 1999-2000 list who may have received clemency either before or after the November 7, 2000 election.

7.    The matching criteria described in ¶A.6 is as follows:

·

2

**[Agreed upon clemency matching criteria to be inserted upon completion of consultations between Plaintiffs, Plaintiffs' expert and ChoicePoint personnel.]**

8.   To further process the 1999-2000 comprehensive list resulting from the processing described in ¶¶A.2 – A.7 to determine which matches thereon fail to match based upon matching criteria established by Plaintiffs after consultation between Plaintiffs, their expert(s) and ChoicePoint personnel.

9.   The matching criteria described in ¶A.8 is as follows:

**[Agreed upon matching criteria to be inserted upon completion of consultations between Plaintiffs, Plaintiffs' expert and ChoicePoint personnel.]**

10.   To identify those individuals listed on the comprehensive list created by the processing described in ¶¶A.2 – A.4 whose felony match was based on non-Florida criminal conviction data used by ChoicePoint.

11.   To identify those individuals from the subset of the comprehensive list described in ¶A.10 whose felony match was based on non-Florida criminal conviction data used by ChoicePoint from states which ultimately provide automatic restoration of voting rights to those convicted of felonies.

12.   To provide Plaintiffs with reports showing the results of the processing described in ¶¶ A.3, A.4, A.5 A.8, A.10 and A.11.

13.   To perform agreed upon data processing, as described below, and to provide Plaintiffs with a new comprehensive 1999-2000 duplicates exceptions report, meeting criteria established by Plaintiffs.

14.   In constructing the new comprehensive 1999-2000 duplicates exceptions report identified in ¶A.14, ChoicePoint will first combine the electronic version of the 1999 duplicates exceptions report used by the State of Florida, Department of State, Division of Elections in 1999 as that data is currently found in the document depository established in this case, with the electronic version of the 2000 duplicates exceptions report used by the State of Florida, Department of State, Division of Elections in 2000 as that data is currently found in the document depository established in this case.  In combining the 1999 and 2000 duplicates exceptions reports, ChoicePoint will eliminate any overlap between the two reports to create a comprehensive list of names identified on the 1999 and 2000 duplicates exceptions reports.

15. After Plaintiffs identify those Florida counties, on a statewide basis, which have never utilized either the 1999 or 2000 duplicates exceptions report as part of any list maintanence procedures, including any actions pursuant to F.S.A. § 98.0975(4), ChoicePoint will process the comprehensive 1999-2000 exceptions report resulting from the processing described in ¶A.15, to remove therefrom all names for which the earlier registration in the duplicate match is identified as having originated in counties which have never used either the 1999 or 2000 duplicates exceptions report.

16. To further process the 1999-2000 comprehensive list resulting from the processing described in ¶¶A.14 – A.15 to determine which matches thereon fail to match based upon matching criteria established by Plaintiffs after consultation between Plaintiffs, their expert(s) and ChoicePoint personnel.

17. The matching criteria described in ¶A.16 is as follows:

    **[Agreed upon matching criteria to be inserted upon completion of consultations between Plaintiffs, Plaintiffs' expert and ChoicePoint personnel.]**

18. To provide Plaintiffs with reports showing the results of the processing described in ¶¶ A.15 and A.16.

19. To begin the consultations described in ¶¶A.6, A.8 and A.16 within five (5) working days of the execution of this Agreement.

20. To complete the processing described in ¶¶A.2—A.19 and provide Plaintiffs with the reports described in ¶¶A.12 and A.18 within twenty (20) calendar days of Court approval of this Agreement and the processing described herein.

21. To provide reasonable consultation and cooperation to Plaintiffs concerning technology and data processing issues relating to past processing and the processing described in ¶¶A.2—A.18.

22. Plaintiffs' failure to secure the information required in ¶¶A.4, A.5 and/or A.15 within a reasonable period shall not preclude ChoicePoint from performing the balance of the processing described in ¶¶A.2—A.19 and for that processing to constitute full compliance with ChoicePoint's processing obligations hereunder.

B.  Cooperation and Assistance with Discovery and Trial

4

1. To agree to provide fact witness(es) concerning data processing and the processes performed in carrying out the 1999 and 2000 Central Voter File work for the Division of Elections for deposition or trial purposes.

C. Costs and fees

1. In lieu of providing Plaintiffs' counsel attorneys' fees, ChoicePoint will make a contribution to Plaintiffs' designee in the amount of $75,000, such payment to be made within ten (10) days of the Court's final approval of the settlement between the parties.

2. To waive labor, photocopying and all other fees for obtaining any documents requested by Plaintiffs in the future in connection with this case whether by subpoena or public records request.

D. Scope & Enforcement

1. This document contains the full Agreement of the parties and is complete except with respect to the matching criteria referenced in ¶¶A.7, A.10 and A.19 which will be determined by Plaintiffs following consultation between Plaintiffs, their expert and ChoicePoint in the manner proscribed herein.

2. Upon the determinations referenced in ¶D.1, this document will be replaced by a document containing the terms described herein supplemented with the matching criteria called for in ¶¶A.7, A.10 and A.19.

3. Until such time as the formal document described in ¶D.2 has been executed, this document is fully enforceable.

4. It is anticipated that the parties will present a formal document to the Court for its approval not later than ___July 1, 2002___. The parties agree to cooperate toward that end.

5. At the time the parties present the formal document described in ¶D.2 to the Court, Plaintiffs will move to voluntarily dismiss their claims against ChoicePoint conditioned on ChoicePoint fulfilling the obligations identified in ¶¶A20, 21 and B.1 within 30 days of Court approval of the matching criteria established in this Agreement as amended per ¶D.2.

6. Upon completion of the 30 day processing and consultation period described in ¶D.5, during which time ChoicePoint will comply with the requirements of ¶¶A.20, 21 and B.1, Plaintiffs will move the Court for dismissal with prejudice of all claims against ChoicePoint. At that time, Plaintiffs will ask the Court to enter a Final Order dismissing all claims

with prejudice, consistent with the terms of this Agreement as amended per ¶D.2, which shall be attached to the Order of Dismissal, and ChoicePoint shall not oppose that request.

7. Notwithstanding the Order of Dismissal, the parties agree that enforcement of the Agreement, including any further relief or such other orders that may be necessary to enforce its terms and effectuate its purposes, shall be by appropriate motion to this Court, following consultation with the other party's counsel in a good faith attempt to resolve the issue, for as long as Plaintiffs case against the remaining defendants are before the Court.

8. Nothing contained herein shall be interpreted to waive any claims Plaintiffs may make against other defendants in this litigation, including in particular State defendants, or the validity of specific provisions of FERA, or of the regulations that may be adopted thereunder, under the Voting Rights Act of 1965 or the National Voter Registration Act.

9. Although the parties may begin work under their Agreement prior to Court approval hereof, this Agreement is conditioned upon receipt of approval from the United States District Court for the Southern District of Florida, and no work produced by ChoicePoint shall be delivered to Plaintiffs until such approval has been obtained.

E. Disclosure

1. The parties hereto agree that neither party will issue any public statement regarding this Agreement until it is formally presented to the Court for its approval.

2. Upon presentation of the Agreement described in ¶D.2, the parties will issue a joint press release regarding the settlement Agreement, the contents of which will be agreed upon by the parties in advance.

Dated June 14, 2002.

_signature_

Raymond W. Bergan
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005

For Defendant ChoicePoint

_signature_

Anita S. Hodgkiss
Lawyers Committee for Civil Rights
1401 New York Ave, NW Suite 400
Washington, DC 20005

For Plaintiffs