UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-0120-Civ-Gold
Magistrate Judge Simonton

------------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.

                    Plaintiffs,

        vs.

KATHERINE HARRIS, Secretary of State of Florida, et al.

                    Defendants.

------------------------------------------------------------------------------x

NIGHT BOX
FILED

JUL 17 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## PLAINTIFFS' OPPOSITION TO DEFENDANTS HARRIS AND ROBERTS' MOTION FOR SUMMARY JUDGMENT

Defendants Katherine Harris and Clay Roberts ("Harris and Roberts") are not entitled to summary judgment on any of Plaintiffs' remaining claims against them.[1]  With regard to certain claims, the undisputed facts demonstrate that Harris and Roberts have violated Plaintiffs' voting rights under state and federal laws.  There are disputed issues of material fact with regard to other claims, requiring a finder of fact to weigh the evidence.  Defendants Harris and Roberts have failed to meet the standard of Federal Rule of Civil Procedure 56(c) and their motion should be denied.

### INTRODUCTION

Three general categories of injury caused by Defendants Harris and Roberts are not resolved by the Florida Election Reform Act of 2001 ("FERA") or by 2002 changes to the Florida election code.  Specifically, these are:

1.      Wrongful purging from the voter rolls prior to November 7, 2000, based on lists prepared pursuant to the instruction of Harris and Roberts, and improper standards for removal from the Central Voter File on an ongoing basis;

---

[1] Plaintiffs have conceded that all claims relating to the use of punch card voting systems are now moot.  Plaintiffs intend to move for voluntary dismissal of Plaintiffs who assert those claims.

2.      Failure of Harris and Roberts to fulfill their duties under the National Voter Registration Act ("NVRA"), including coordinating and ensuring uniformity in voter registration and list maintenance; and

3.      Failure of Harris and Roberts to ensure uniformity and equal treatment in election day administration practices such as accessibility to the voter rolls.

For a comprehensive review of the impact of FERA, the 2002 legislative changes, and rulemaking pursuant to FERA, please refer to the addendum attached to this memorandum. Plaintiffs are entitled to summary judgment on some of these issues, as set forth in their motion for partial summary judgment (DE 400), and with regard to others, there are disputed material facts that call for the denial of Defendants' motion for summary judgment.

The defenses of Harris and Roberts to the remaining claims are not valid. The mootness and ripeness arguments have already been rejected by this Court and nothing in the most recent legislation changes that conclusion with regard to the general claims outlined above. While Florida's election reform measures deal with a variety of matters, neither the 2001 nor the 2002 legislation solves the problems that led to Plaintiffs and those similarly situated being unable to cast a vote even though they were qualified, registered voters or had taken all possible steps to become registered. Plaintiffs have standing to bring these claims. They have demonstrated a connection between the actions or inactions of Harris and Roberts and the deprivation of their right to vote. Harris and Roberts have the authority and the duty to carry out the responsibilities that will provide genuine relief for the Plaintiffs. In addition, this Court has followed several other courts in concluding that there is a private right of action under 42 U.S.C. § 1971 and the Florida Voting Rights Act, Fla. Stat. Ann. §104.0515, as well as an equal protection claim under the Fourteenth Amendment to the U.S. Constitution that does not require proof of intentional discrimination.

Because Defendants Harris and Roberts have failed to demonstrate that there are undisputed issues of material fact that entitle them to judgment as a matter of law, their motion for summary judgment must be denied.

2

## ARGUMENT

I.   **PLAINTIFFS' CLAIMS ARE NOT MOOT AND THEY ARE RIPE FOR ADJUDICATION.**

The Court should deny Defendants' motion to the extent that Harris and Roberts contend that Plaintiffs' claims are moot or in the alternative are not yet ripe for review.[2] As an initial matter, much of the argument of Harris and Roberts regarding ripeness and mootness is an attempt to relitigate issues raised in their motion to abate, as well as in the motion of Defendants Kearney and Dickinson to dismiss or abate. Specifically, Harris and Roberts argue that class certification should be denied because Plaintiffs' claims are moot due to the enactment and preclearance of FERA. They further contend that Plaintiffs' claims are not yet ripe for adjudication because the rules being developed pursuant to FERA may address all of Plaintiffs' claims. By Order dated August 14, 2001, the Court denied the motion of Harris and Roberts to abate pending preclearance and rule-making without prejudice. Harris and Roberts did not refile such a motion, but the motion to dismiss or abate filed by defendants Dickinson and Kearney raised nearly identical issues. On February 15, 2002, the Court denied the motion of Dickinson and Kearney to dismiss or abate. The Court held:

> At this juncture it is unclear what effect the Florida Election Reform Act of 2001 and
> administrative rule making will have in eliminating the need for this litigation,

---

[2] Since the defendants had an opportunity to raise these claims at the earlier hearing, the court should refrain from re-examining issues of law which it has already settled. Law-of-the-case doctrine suggests that "an issue decided at one stage of the case is binding at later stages of the same case." *United States v. Escobar-Urrego*, 110 F.3d 1556 (11th Cir., 1997); *see e.g., Al-Site Corp. v. VSI Int'l, Inc.*, 1997 U.S. Dist. LEXIS 18148 (affirming plaintiff's motion for summary judgment against defendants affirmative defense partly on the basis of the court's earlier decision on the issue at a bench trial). This doctrine advises the court against reconsidering its earlier decisions, because "[i]t would be utterly destructive . . . if each successive decision resulted in the reconsideration of every previous one, and a sequence of decisions in the same case based on different views of overlapping issues of law would likely result in an internally inconsistent judgment." *Gillig v. Advanced Cardiovascular Sys.*, 67 F.3d 586, 589 (6th Cir. 1995)(quoting Moore's Federal Practice). Thus, to avoid this dilemma, "it is the practice to treat each successive decision as establishing the law of the case and depart from it only for convincing reasons." *Id.* Because the cases Defendants cite do not materially effect the controlling authority which the court previously relied on, the court should uphold its earlier decision.

including the extent to which such rules will affect some or all of the relief which plaintiffs seek, or when or if such rules will take effect.

In the Court's view, abstention is not warranted at this time given the importance and immediacy of the problems addressed in the amended complaint. Additionally, I conclude that the plaintiffs have established standing under the case or controversy requirements of Article 3 because they have claimed – because their claimed injuries are real and immediate and can be redressed by favorable decision of this Court.

I disagree with the defendants that the claims are moot and I hereby deny without further comment the remaining bases to dismiss.

[DE 299], Williams Decl. 4/17/02, Ex. 15, Tr. of Oral Arg., Feb. 15, 2002, at 43-44.

Nothing has changed since the Court issued its order on February 15, 2002 to warrant a grant of summary judgment based on mootness and unripeness of the claims. While the Department of Justice has now precleared all aspects of FERA, that Act still does not address all of the issues raised in the Second Amended Complaint, it is still unclear how the new law will be administered, and the rules implementing the new law have not yet been precleared. Furthermore, key portions of the 2002 election legislation regarding purging of alleged felons has not even been precleared at this time. *See* Plaintiffs' Response to Defendants Harris and Roberts' Statement of Facts, at para. 15. For a complete explication of how the Florida Election Reform Act does not address all of the issues raised in Plaintiffs' complaint, please see Plaintiffs' submissions in opposition to the motions to dismiss or abate filed by Defendants. [DE 113 and 200.]

Moreover, FERA does not even begin to address most of the issues raised by Plaintiffs. FERA does not restore individuals improperly purged under the previous purge statute, including those who were improperly purged by the purge process implemented by Defendants Harris and Roberts, which included improper matching and verification processes in violation of industry standards and federal law. Thus, voters who were improperly purged may show up to vote in 2002 or 2004 and find their name missing from the voter rolls. These individuals who were improperly purged prior to 2000 should not have to re-register to be eligible to vote. FERA does not even attempt to address these issues.

FERA also fails to remedy the flawed matching and verification processes employed by the state and counties. Indeed, FERA actually codifies many of these deficiencies that resulted

4

in the improper purging of thousands of eligible voters prior to the 2000 election. Rather than improving the accuracy, integrity and reliability of the data and matching criteria used and requiring personal, detailed verification, the state of Florida continues to rely on the same flawed processes which still fail to meet industry standards and violate federal law.

Plaintiffs' standing to bring these claims does not end when they are restored to the voter rolls or a specific practice is changed temporarily. The principle that voluntary cessation does not render a claim moot has been specifically applied to the amendment or repeal of laws or policies on the state and local level. *See, e.g., Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993) (ruling that an action challenging a city ordinance was not rendered moot when the ordinance was repealed and replaced with a narrower one); *True Life Choice, Inc. v. Department of Health and Rehabilitative Servs.*, 914 F.Supp 507 (M.D. Fla. 1994), *aff'd* 74 F.3d 1251 (11th Cir. 1995) (holding that a claim challenging provisions of the Florida administrative code was not rendered moot by the amendment of those provisions); *City of Mesquite*, 455 U.S. at 289 (stating that the repeal of objectionable language in a city ordinance did not render a lawsuit moot); *Solomon v. City of Gainesville*, 763 F.2d 1212 (11th Cir. 1985) (refusing to find mootness after the City Commission instructed the City Manger not to prosecute under a challenged ordinance, either in the present or future).

Furthermore, even if some of Plaintiffs' claims were to be resolved by FERA, when one issue remains viable, courts have refused to look into whether other issues have become moot. *Powell v. McCormack*, 395 U.S. 486, 496 (1969) (finding it unnecessary to determine whether other issues were moot, as plaintiff's claim for back salary remained viable); *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) (finding that where a superseding statute leaves objectionable features of the prior law substantially undisturbed, the case is not moot).

Given that elections occur regularly and that Plaintiffs plan to participate in those elections, without systemic changes of a permanent nature, it is likely that Plaintiffs will again

be harmed.  FERA does not moot Plaintiffs' claims, Plaintiffs' claims are ripe for review, and summary judgment in favor of Defendants Harris and Roberts on this issue must be denied.

## II.   PLAINTIFFS HAVE STANDING AND SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS HARRIS AND ROBERTS MUST BE DENIED.

### A.   The Individual Plaintiffs have Standing to Raise their Claims Against Defendants Harris and Roberts.

Defendants Harris and Roberts allege that Plaintiffs lack injury-in-fact standing and claim that they are not responsible for and cannot redress any alleged injury suffered by Plaintiffs.  Through the allegations in the complaint and the evidence developed during litigation, Plaintiffs have established that they have standing because they have demonstrated an injury in fact, a causal connection between the injury and the conduct complained of, and redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 560-61 (1992).  It is clear that Plaintiffs will once again attempt to exercise their right to vote and that they will likely be denied their right to vote if the requested injunctive relief is not granted.

Defendants Harris and Roberts erroneously assert that they have no authority to redress Plaintiffs' grievances and remedy Plaintiffs' injuries.  As Plaintiffs allege in their complaint, Harris "is the chief election officer of the State of Florida and has responsibility for general supervision and administration of the election laws." 2d Am. Compl., ¶ 31.  Roberts, as Director of the Division of Elections, is responsible for, among other things, "administration of the statewide central voter file and for contracting with a private entity to compare voter registration lists with other computer databases." *Id.* at ¶ 32.

Moreover, to the extent that FERA addresses any of Plaintiffs' claims, Defendants Harris and Roberts are responsible for establishing, implementing and overseeing rules for FERA, including uniform and non-discriminatory implementation and verification requirements under the new law.  Because Defendants Harris and Roberts have to date failed to provide guidance or set minimum standards to ensure statewide uniformity as required by the NVRA and Florida law, it is likely that Harris and Roberts will not fulfill their mandate under FERA, which is one reason why it is imperative that this Court mandate Defendants to comply with and carry out their duties under the law.

6

Defendants' alleged lack of authority is merely a means of placing blame on county Defendants while attempting to escape liability for their own actions and inactions. For example, Defendants argue that they lack authority to redress the wrongful purging of eligible voters from the voter rolls. Defendants claim to have no responsibility for this statewide problem that possibly affected thousands of eligible voters across the state, ultimately denying many of them the right to vote, including Plaintiffs Wallace McDonald and Ursula Harvey. Contrary to Defendants' allegations here and "[p]ursuant to state and federal law, Defendants Harris and Roberts. . . are charged with administering and maintaining the state's overall list maintenance programs and the state's central voter file." *Id.* at ¶ 76.

Furthermore, state and federal law make it clear that Defendants Harris and Roberts are jointly responsible with county supervisors for administering election practices. For example, pursuant to the National Voter Registration Act, Harris is the state official ultimately responsible for its implementation, while county supervisors conduct registration and list maintenance in their counties. Similarly, Fla. Stat. 98.0975 clearly contemplated a joint operation between Harris, Roberts, DBT, and the supervisors regarding list maintenance and voter purges. *See, e.g.,* (DE 299) Williams Dec. 4/17/02, Ex. 18 (memo from Roberts to Supervisors regarding voter purge). The Supreme Court has emphasized the importance of uniformity in election administration and Defendants Harris and Roberts are uniquely situated to ensure uniformity statewide. Plaintiffs have alleged sufficiently an injury-in-fact caused by the actions or inactions of Defendants Harris and Roberts, as well as their authority and ability to remedy Plaintiffs' injuries, and have standing against them.

**B.    The NAACP has Representational and Associational Standing as to Defendants Harris and Roberts.**

The NAACP has both representational and associational standing, as discussed at length by Plaintiffs in their memoranda supporting their motion for class certification.[3]

---

[3] Please see Plaintiffs' memoranda of law in support of motion for class certification for a complete explication of why the NAACP has both representational and associational standing as to Defendants Harris and Roberts.

7

Moreover, Defendants have not even asserted that the NAACP lacks standing.  Thus, clearly the NAACP has standing to bring suit against Defendants Harris and Roberts.

### III.   HARRIS AND ROBERTS HAVE SIGNIFICANT RESPONSIBILITIES UNDER THE NVRA AND THEIR MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM UNDER THE NVRA MUST BE DENIED.

Defendants Harris and Roberts contend that they do not have responsibilities under the NVRA as alleged by Plaintiffs in the Second Amended Complaint, and that they have complied with the limited NVRA responsibilities that they concede apply to them.  A review of the NVRA and implementing Florida laws demonstrate the absurdity of Defendants' first contention, while a review of the evidence in this case demonstrates how Defendants Harris and Roberts have failed to meet their duties under the NVRA.

#### A.   The NVRA Imposes on Harris and Roberts the Legal Duties Asserted by Plaintiffs.

Defendant Katherine Harris, in her capacity as Secretary of State, is responsible for providing uniform standards for the proper and equitable implementation of voter registration laws. Fla. Stat. § 97.012 (2001).  In addition, she is responsible for the coordination of the State's responsibilities under the NVRA.  *Id.*  Defendant Clay Roberts, Director of the Divisions of Elections, administers and coordinates the State's responsibilities under the NVRA.  Ciccolo Decl., 07/01/02, Ex. 28, E. Kast Dep. at 10-19.   Plaintiffs and those similarly situated were denied the right to vote on November 7, 2000, in part, because of the failure of Defendants Harris and Roberts to comply with their duties under the NVRA.

Defendant Harris is the chief election official in Florida and as such has the responsibility to properly supervise and administer Florida's election laws. *See Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1242 (11th Cir. 1998).  Under Florida law, Defendant Harris is given explicit duties to coordinate the State's responsibilities under the NVRA. *See* Fla. Stat. § 97.021(7) (2001); *see also*, 42 U.S.C. § 1973gg-8.  Defendant Roberts as Director of the Division of Elections shares in this duty.   Ciccolo Decl., 07/01/02, Ex. 28, E. Kast Dep. at 22.  Additionally, Defendant Harris must "actively seek out and collect the data and statistics necessary to knowledgeably scrutinize the effectiveness of election laws." Fla. Stat. §

8

97.021(3) (2001). Finally, Defendants Harris and Roberts have the legal authority under Florida law to request information from supervisors of elections for program evaluation and reporting to the Federal Election Commission pursuant to the NVRA. Fla. Stat. § 98.212(2) (2001).

According to the NVRA, each state is required to provide list maintenance programs which are designed to insure an accurate and current voter registration roll that must be "uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965" 42 U.S.C. § 1973gg-6 (4). In order to ensure uniformity, the NVRA requires states to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this act." 42 U.S.C.S. § 1973gg-8. As Florida's Chief Election Official, the Secretary of State is required to coordinate all State responsibilities including list maintenance procedures. Though county supervisors of elections share responsibility for voter registration and list maintenance, under state and federal law the Secretary of State shares responsibility for statewide implementation and compliance with state and federal voter registration and list maintenance laws. *See* Fla. Stat. §97.012 (1) (2001); Fla. Stat. §97.012 (2) (2001); Fla. Stat. §97.012 (7) (2001); 42 U.S.C.S. §1973gg-8. Defendants Harris and Roberts are also responsible for providing guidance to designated state agencies on "proper implementation" of "state responsibilities" including list maintenance and voter registration procedures. These duties are essential to both adhering to the requirements of the NVRA and effectively implementing the Act. *See* 42 U.S.C. § 1973gg-6-8; McIntosh Dep. at 102:15-105:21. Defendants Harris and Roberts clearly have significant responsibilities under the NVRA and implementing Florida laws.

**B.     Defendants Harris and Roberts Have Failed to Comply with the NVRA.**

In Defendants' motion for summary judgment, Harris and Roberts contend that the State is in full compliance with the NVRA. However, Defendants misinterpret the requirements imposed upon them both by the NVRA and Florida law. 42 U.S.C. § 1973gg-6 (4); 42 U.S.C.S. § 1973gg-8; Fla. Stat. § 97.012; Fla. Stat. §97.021 (3). The State's actions to date fail to satisfy the NVRA's requirement that the Chief Election Official ensure uniformity

9

and coordinate State responsibilities. *See id*; Def. Memo. Supp. Summ. Judg., p. 12-13. Additionally, though the State claims to "coordinate with the Supervisors of Elections to compile data" Harris and Roberts provide no guidance to county supervisors on list maintenance procedures, thereby failing to comply with Florida's requirement to "actively seek out and collect the data and statistics necessary to knowledgeably scrutinize the effectiveness of election laws". Harris and Roberts Memo. Supp. Summ. Judg., p.14; Fla. Stat. §97.021 (3).

Though Ed Kast, Assistant Director of the Florida Division of Elections, implements and conducts trainings for county supervisors of elections' staff on list maintenance requirements pursuant to the NVRA, the State provides no written manual to county election employees to even attempt to promote uniform procedures and practices for NVRA list maintenance compliance. *See* Ciccolo Decl., 07/01/02, Ex. 29, Deposition Transcript of Ed Kast, at 33. In fact, according to Hillsborough County Supervisor of Elections Pam Iorio, county supervisors were left to their own devices as to implementation of voter registration list maintenance procedures. Defendant Iorio states,

> When we received the list in the summertime of 2000 from the state, the supervisors, at that time, did not receive information from the state as to how we were to proceed. And so the supervisors did what we often do, which was that we informally contacted one another, informally contacted like counties of similar size and decided what we thought would be the best process to use.

Ex. 30, Iorio Dep., at 42.

While there appears to have been some minimal level of communication among county supervisors of elections in regard to list maintenance procedures, clearly the Department of State failed to implement – or even attempt to implement – uniform procedures, failed to coordinate with county supervisors, and failed to provide guidance to them regarding list maintenance procedures, all in violation of the NVRA and Florida law. *See* 42 U.S.C. § 1973gg-6 (4); 42 U.S.C.S. § 1973gg-8; Fla. Stat. § 97.012; Fla. Stat. §97.021 (3).

Defendants Harris and Roberts are unwilling to exercise their statutory responsibility to monitor statewide compliance with the NVRA. Although the NVRA clearly contemplates

monitoring as a part of states' responsibility under the Act,[4] Defendants Harris and Roberts have failed to conduct any statewide monitoring of voter registration activities which would enable them to identify and possibly resolve systemic problems.

One of the duties of the Department of State is coordination of the state's responsibilities under the NVRA. Fla. Stat. § 97.021(7) (2001). Florida law provides that "[t]he Department of State may adopt rules…to administer the provisions of law conferring duties upon the department." Fla. Stat. ch. 20.10(3) (2001). The failure of Defendants Harris and Roberts to adopt rules for monitoring, or to comply with any of their duties under the NVRA, resulted in the disenfranchisement of voters throughout the State of Florida. Summary judgment in favor of Defendants Harris and Roberts is inappropriate on Plaintiffs' claims under the NVRA.

### C.    The Testimony of Gary McIntosh Does Not Support Defendants' Motion for Summary Judgment.

Defendants Harris and Roberts mischaracterize the testimony and status of Plaintiffs' expert Gary McIntosh, who concluded that the most efficient voter registration programs are those where the Chief Election Official assumes the responsibility for providing statewide leadership. McIntosh Dep. at 107:14-108:4. Mr. McIntosh is not "the NVRA expert" designated by Plaintiffs, as Defendants assert. Indeed, Plaintiffs have designated three other expert witnesses, in addition to Mr. McIntosh, who also opine as to violations of the NVRA. *See* Ciccolo Decl., 07/01/02, Ex. 61 and 64, expert and supplemental expert reports of Henry Flores; *id.* at Ex. 60, expert report of David Klausner; *id.* at Ex. 63, expert rebuttal report of

---

[4] In addition to such monitoring being legally required, it is also considered to be a crucial function of chief state election officials. Gary McIntosh, an expert on election administration, stated that "it is essential that someone, preferably the State's chief elections official, be responsible for monitoring the performance levels of state agencies that have designated responsibilities under the National Voter Registration Act." Ciccolo Decl., 07/01/02, Ex. 27, at 102. McIntosh, who has approximately 23 years of experience as an elections administrator in the State of Washington, bases his opinion on his personal experience, as well as the Federal Election Commission Guide to Implementing the NVRA which also encourages the appointment of a state official to monitor voter registration activities. G. McIntosh Expert Witness Report, Ex. 59, at 9-10.

Ronald Hayduk. For example, Mr. Kausner opines about the non-uniform and discriminatory purge process resulting from thousands of improper matches that disproportionately affected black voters and from lack of any meaningful verification process in most cases in violation of the NVRA. *See id.* at Ex. 60.

Mr. McIntosh is not an attorney and, therefore, does not have the ability to determine whether Defendants violated the law. Defendants imply that Mr. McIntosh should have been able to definitively answer Defendants' questions at McIntosh's deposition about possible violations of the NVRA when the parties in this case have been grappling with that very question for over one and a half years. Questions of law are for this Court to decide – not Plaintiffs' expert. Indeed, Mr. McIntosh has been retained by Plaintiffs to provide guidance to the Court on effective implementation of the NVRA and "best practices" – not on the legality of Defendants' implementation of the Act. Mr. McIntosh's expert report and opinions he shared at his deposition support Plaintiffs' claims regarding the ineffectiveness of Florida's voter registration procedures. *See* Harris and Roberts Memo. Supp. Summ. Judg., p. 15-16; *see also* McIntosh Depo. at 107:14 – 108:4.

### D.    This Court Has the Authority to Grant the Relief Sought by Plaintiffs.

Defendants Harris and Roberts argue that if the Court were to order the relief sought by Plaintiffs, it would be undertaking improper judicial law-making. This argument has no basis in law. The Eleventh Circuit has held that the Chief Election Official is responsible for supervising and administering Florida's election laws. *See Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1242 (11th Cir. 1998); *see also National Coalition for Students with Disabilities Educ. and Legal Defense Fund v. Taft,* 2001 WL 1681115, 3 (holding that the Secretary of State, and not the Governor, "has the duty and authority to implement and enforce the provisions of the NVRA").

Moreover, this court has authority over Plaintiffs' claims because the NVRA explicitly permits it. In particular, § 1973gg-9(b) of the Act empowers district courts to issue declaratory or injunctive relief against state officials acting in violation of the provisions of the Act. 42 U.S.C. § 1973gg-9(b). "Defendants' laws, policies, and practices with respect to the State of

12

Florida's voter registration requirements and procedures for federal elections deny Plaintiffs, and others similarly situated, rights secured by the National Voter Registration Act and 42 U.S.C. § 1983." (¶ 53 of the Amended Complaint). These violations threaten Plaintiffs with irreparable injury and entitle this court to determine Plaintiffs' civil action.

Finally, it is clear that the injuries suffered by Plaintiffs can easily be remedied by a judicial decree. "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.* 528 U.S. 167, 185-86 (2000). In fact, all that is required is that there is a "substantial likelihood" that their injuries would be redressed by a favorable decision. *Made in the USA*, 242 F.3d at 1311; *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-803 (1992). In the case at bar, all of the relief requested in the Prayer for Relief is either aimed at correcting mistakes that occurred during the 2000 election or preventing them from happening in future elections. Accordingly, because many of the institutional problems in the Florida election system remain and continue to harm Plaintiffs, a judicial decree preventing current and future violations will afford redress to Plaintiffs.

## IV.    PLAINTIFFS HAVE DEMONSTRATED A SECTION 2 VIOLATION.

Count 2 of Plaintiffs' Second Amended Complaint alleges violations of the Voting Rights Act by Defendants Harris and Roberts, among other Defendants. Certain election practices employed by Defendants resulted in the disproportionate denial of the franchise to black voters, in violation of Section 2 of the Voting Rights Act.

In determining whether a particular voting practice violates Section 2 of the Voting Rights Act, the focus of a court's inquiry is on the results, not the intent, of the practice. ("[P]ractices and procedures that result in the denial or abridgement of the right to vote are forbidden" even without proof of discriminatoy intent. *Chisom v. Roemer, 501* U.S. 380, 383 (1991)). To succeed on a Section 2 claim, Plaintiffs must prove that (1) a "standard, practice, or procedure" (2) impairs the ability of minority voters to equal participation in the political

process. 42 U.S.C. § 1973(b); *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); *United States v. Jones*, 57 F.3d 1020, 1023 (11th Cir. 1995).[5]

**A.     Defendants Harris and Roberts Violated the Voting Rights Act by Failing to Ensure Uniformity of Elections, Provide County Supervisors of Elections with Guidance or Set Minimum Standards for the Administration of Elections.**

Defendants Harris and Roberts are responsible for ensuring statewide compliance with the Voting Rights Act. As the chief elections officers in the state of Florida, they are ultimately responsible for the proper and uniform enforcement of the election laws. Defendant Harris, as Secretary of State, is responsible for the "general supervision and administration of the election laws", Fla. Stat. § 15.13, and must obtain and maintain uniformity "in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1).

Federal courts have recognized that Florida's Secretary of State, as the Chief Elections Officer, bears the responsibility for the supervision and administration of the election laws. *See, Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1242 (11th Cir. 1998) ("when a state is sued with regard to its election laws, the proper state representative is the chief elections officer...[who] has the authority to bind the state as a whole [under Florida Law]"); *See also, Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324 (N.D. Fla. 2000). In addition to finding county supervisors of elections liable for improper administration of election laws, Florida courts have found the Secretary of State similarly liable. *See, e.g., CBS, Inc. v. Smith*, 681 F. Supp. 794 (S.D. Fla. 1988) (enjoining the Secretary of State and county supervisors of elections from enforcing an unconstitutional statutory restriction on exit polling).

Pursuant to its statutory duty to supervise the administration of election laws and ensure uniformity in their operation, application, and interpretation, the Department of State has been granted the authority to "adopt rules...to administer the provisions of law conferring duties upon the department." Fla. Stat. § 20.10(3). Due in part to Defendant Harris' failure to adopt

---

[5] For a complete explication of Plaintiffs' claims under the Voting Rights Act, please see Plaintiffs' Motion for Partial Summary Judgment. [DE 399]

any rules, provide any guidance or set any minimum standards to ensure compliance with the Voting Rights Act, voters throughout the state were subjected to non-uniform election administration practices which had a racially discriminatory impact on black voters. To properly fulfill her mandate to obtain and maintain uniformity "in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1), Defendant Harris must provide guidance to county supervisors of elections to ensure nondiscriminatory administration of elections and compliance with the Voting Rights Act throughout the state of Florida.

Despite Defendants' legal mandate to ensure uniformity in the administration of elections, there was a total lack of uniformity throughout the State. The State's failure to ensure uniformity in the administration of elections in November 2000 created an environment where black voters were disparately impacted by certain election practices. At a minimum, Defendants Harris and Roberts had a duty to provide county supervisors of elections with minimum standards and guidance on proper administration of elections. Instead, county supervisors received no guidance on the administration of elections. *See, e.g.*, Ciccolo Decl, 07/01/02, Ex. 30, Iorio Depo., at 42. As a result, different procedures and practices were employed throughout the state. This created a situation where black voters were disparately impacted by unequal distribution of laptop computers to predominantly black precincts, unequal assignment of poll workers to predominantly black precincts, and inadequate lines of communication to central election offices throughout the state and the disparate purging of black voters for alleged felony conviction in some counties. "[U]niform criteria for allocating poll workers and laptops, for designating voters to precincts and to poll sites . . . and a host of other practical changes would reduce poll site problems and disparate treatment." Ciccolo Decl., 07/01/02, Ex. 63, Hayduk Report, at 47-48. In addition, "clear and uniform standards and practices [for] handling affirmation/affidavit ballots would reduce poll site problems and disputes." *Id.; see also id.,* at Ex. 38 to Ex. 47, Defendants' Responses to Plaintiffs' First Set of Interrogatories, responses 5, 6, 7, 8, 10, and 11.

**V.    HARRIS AND ROBERTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS UNDER THE FOURTEENTH AMENDEMENT, 42 U.S.C. § 1971, AND THE FLORIDA VOTING RIGHTS ACT.**

In its order denying the motions to dismiss of Defendants Choicepoint Inc., Kearney, and Dicksinson, this Court found that there is an implied right of action under 42 U.S.C. § 1971 and Fla. Stat. 104.0515, that the Plaintiffs have standing, that FERA has not mooted the case, and that Plaintiffs' Fourteenth Amendment claim is not based on intentional racial discrimination, but rather on the abridgement of the fundamental right to vote. [DE 299], Williams Decl. 4/17/02, Ex. 15, Tr. of Oral Arg., Feb. 15, 2002.

However, in their motion for summary judgment, Defendants Harris and Roberts argue for the same positions that this Court has already rejected with respect to the aforementioned issues. Since the Defendants had an opportunity to raise these claims at the earlier hearing, the Court should refrain from re-examining issues of law which it has already settled.

Furthermore, the law-of-the-case doctrine suggests that "an issue decided at one stage of the case is binding at later stages of the same case." *United States v. Escobar-Urrego*, 110 F.3d 1556 (11th Cir., 1997); *see e.g.* Al-Site Corp. v. VSI Int'l, Inc., 1997 U.S. Dist. LEXIS 18148 (affirming plaintiff's motion for summary judgment against defendant's affirmative defense partly on the basis of the court's earlier decision on the issue at a bench trial). This doctrine advises the court against reconsidering its earlier decisions, because "[i]t would be utterly destructive . . . if each successive decision resulted in the reconsideration of every previous one, and a sequence of decisions in the same case based on different views of overlapping issues of law would likely result in an internally inconsistent judgment." Gillig v. Advanced Cardiovascular Sys., 67 F.3d 586, 589 (6th Cir. 1995)(quoting Moore's Federal Practice). Thus, to avoid this dilemma, "it is the practice to treat each successive decision as establishing the law of the case and depart from it only for convincing reasons" *Id.*

**A.    Plaintiffs Have Properly Stated, and Put Forth Evidence to Support, a Claim Under the Fourteenth Amendment.**

Defendants Harris and Roberts erroneously assert that Plaintiffs must prove "invidious discriminatory purpose" in order to show a violation of the fundamental right to vote under the Fourteenth Amendment. *See* Harris and Roberts Memo. at 18. However, this Court already

16

rejected this argument when it denied Defendant Choicepoint's Motion to Dismiss. [DE 299], Williams Decl. 4/17/02, Ex. 15, Tr. of Oral Arg., Feb. 15, 2002, at 40-41. Defendants Harris and Roberts cite only one new case, *Clark v. Putnam County,* 2002 WL 1274045, 15 Fla. L. Weekly Fed. C668 (11th Cir. June 10, 2002), to support their argument that Plaintiffs must show intentional discrimination to succeed on their claim under the Fourteenth Amendment. *See* Harris and Roberts Memo. at 19. *Clark v. Putnam County* stands for the basic principle that racial vote dilution claims under the Fourteenth Amendment require a showing of discriminatory intent. *Clark* does not even discuss *Bush v. Gore* or similar cases discussing the Fourteenth Amendment's guarantee of the fundamental right to vote. As Defendants Harris and Roberts have advanced essentially the same argument which this Court has already rejected, the Court should refrain from re-opening legal issues which it has already settled.

Defendants Harris and Roberts do not dispute that non-uniform methods and practices were used in Florida's Nov. 7, 2000 general election. Defendants merely seek to deny any legal responsibility for the lack of uniformity in counties throughout the state and state-designated voter registration agencies. Defendants Harris and Roberts assert that they have no legal authority or responsibility for voter registration, list maintenance and poll worker training in the state of Florida. However, Defendants' position is contradicted by a plain reading of state and federal law. Under the NVRA, each state must establish specific procedures for voter registration in federal elections, 42 U.S.C. 1973gg-2, conduct its list maintenance programs in a uniform and non-discriminatory fashion, 42 U.S.C. 1973gg-6(b)(1), and designate a "chief State election official" who is responsible for coordinating the state's compliance with the NVRA. Florida designated the Secretary of State, Defendant Harris, as the chief State election official charged with this responsibility. *See* Fla. Stat. §97.012 (7). Defendant Roberts, as Director of the Division of Elections, shares in this responsibility.

Florida's Secretary of State is also responsible for "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1), and "[providing] uniform standards for the proper and equitable implementation of the registration laws," Fla. Stat. §97.012 (2). Thus, rather than absolving Defendants Harris and Roberts of responsibility, a plain reading of state and federal law demonstrates that

17

Defendants are *explicitly* responsible for ensuring that uniform and non-discriminatory practices are administered in the electoral process, *even if* Defendants Harris and Roberts do not directly administer such practices.

Defendants Harris and Roberts violated Plaintiffs' rights under the Fourteenth Amendment by failing to provide uniform and consistent list maintenance and election administration procedures. It has long been established that the right to vote is a fundamental right under the Fourteenth Amendment. *See e.g., Reynolds v. Sims*, 377 U.S. 533, 561-562 (1963). ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.") Importantly, the Supreme Court recently reaffirmed that the Fourteenth Amendment prohibits a state from valuing the voting rights of one person over another: "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105 (2000).

Federal Courts interpreting the *Bush* decision have found that the fundamental right to vote under the Fourteenth Amendment can be violated both before and during an election. *See Charfauros v. Bd. of Elections*, 2001 U.S. App. LEXIS 15083, 2001 D.A.R. 7001 (9th Cir. 2001) (Defendant boards arbitrary practice of removing voters from the list of qualified voters treated them in a disparate manner, violating their fundamental right to vote under the 14th amendment); *see also, Black v. McGuffage*, 2002 U.S. Dist. LEXIS 5435, *28-29 (N.D. Ill. 2002) (refusing to dismiss Plaintiffs' claim because Illinois' selection and allowance of local voting systems with greatly varying accuracy rates "value[s] one person's vote over that of another," (quoting *Bush*, 104-105), thus violating Plaintiffs equal right to vote under the Fourteenth Amendment).

In the case at bar, Defendants concede that they enacted no statewide standards to prevent the improper removal of eligible voters from the registration rolls or to correct such mistakes at precincts on election day. Furthermore, the evidence discussed herein and as set forth at length in Plaintiffs' Statement of Undisputed Material Facts in support of their Motion

18

for Partial Summary Judgment, [DE 401], demonstrates the lack of uniformity in the administration of elections in Florida. Defendants Harris and Roberts, through their failure to implement statewide uniform election practices and procedures, have allowed the disenfranchisement of Plaintiffs and other similarly situated voters. Summary Judgment in favor of Defendants Harris and Roberts on Plaintiffs' claims under the Fourteenth Amendment is inappropriate.

**B.     Plaintiffs Have Properly Stated, and Put Forth Evidence to Support, a Claim Under the Civil Rights Acts of 1957 and 1960 and Fla. Stat. 104.0415.**

Defendants Harris and Roberts assert that § 1971 contains no private right of action, an argument which this court has already rejected. [DE 299], Williams Decl. 4/17/02, Ex. 15, Tr. of Oral Arg., Feb. 15, 2002. As discussed herein, the law-of-the-case doctrine suggests that "an issue decided at one stage of the case is binding at later stages of the same case." *United States v. Escobar-Urrego*, 110 F.3d 1556 (11th Cir., 1997). This doctrine advises the court against reconsidering its earlier decisions, because "[i]t would be utterly destructive . . . if each successive decision resulted in the reconsideration of every previous one, and a sequence of decisions in the same case based on different views of overlapping issues of law would likely result in an internally inconsistent judgment." *Gillig v. Advanced Cardiovascular Sys.*, 67 F.3d 586, 589 (6th Cir. 1995) (quoting Moore's Federal Practice). Thus, to avoid this dilemma, "it is the practice to treat each successive decision as establishing the law of the case and depart from it only for convincing reasons". *Id.*

Defendants cite no authority to suggest that the Eleventh Circuit has decided to overturn its longstanding precedent of recognizing a private right of action pursuant to 42 U.S.C. § 1971. *See, e.g., Reddix v. Lucky,* 252 F.2d 930 (5th Cir. 1958) (finding that Amended Complaint filed by individual voter stated a cause of action pursuant to 42 U.S.C. §§ 1971 and 1983 based on improper purge from voter list). Defendants have failed to prove that 42 U.S.C. § 1971 prohibits a private right of action.

Finally, Defendants argue that 42 U.S.C. § 1971 requires Plaintiffs to show discriminatory intent in order to succeed on this claim. The cases relied upon by Defendants Harris and Roberts to support their argument, however, do not provide support for an intent

19

requirement under § 1971.  In *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252

(1977), cited by Defendants, an intent requirement was not required under 42 U.S.C. § 1971.

Defendants Harris and Roberts also rely on *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189

(11th. Cir. 1999), as evidence of the discriminatory purpose requirement under § 1971.

Although the court in *Burton* made no mention of an intent requirement under § 1971, the court

did conclude that there is an implied private right of action for injunctive or declaratory relief

to enforce regulations promulgated under a similar civil rights statute "even if not intentionally

discriminatory, that results in disparate impact or discriminatory effects on the basis of race,

color, or national origin." *Id* at 1202.

Plaintiffs have clearly alleged sufficient facts to support their claims under the Civil

Rights Acts and Fla. Stat. 104.0415.  Summary judgment in favor of Defendants Harris and

Roberts is inappropriate here.

## CONCLUSION

For the reasons set forth above, the motion for summary judgment of Defendants Harris

and Roberts should be denied.

Dated: July 17, 2002

Respectfully submitted,

Barbara Arnwine
Thomas J. Henderson*
Anita Hodgkiss*
Lori Outzs Borgen*
Cara Fineman*
Lawyers' Committee for Civil Rights
   Under Law
1401 New York Ave., N.W., Suite 400
Washington, D.C. 20005-2124
Tel. 202-662-8600 or 888-299-5227
Fax 202-783-5130
lborgen@lawyerscomm.org

Thomasina H. Williams
Williams & Associates, P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Tel. 305-379-6676
Fax 305-379-4541
FL Bar No. 629227
thwilliams@wms-law.com

Dennis C. Hayes*
Angela Ciccolo*
NAACP Legal Department
4805 Mt. Hope Drive, Fifth Floor
Baltimore, MD 21215-3297
Tel. 877-622-2798
Fax 410-358-9350
aciccolo@naacpnet.org

Todd A. Cox*
NAACP Legal Defense & Educational
    Fund Inc.
1444 Eye Street, N.W., 10th Floor
Washington, DC 20005
Tel. 202-682-1300
Fax 202-682-1312
tcox@naacpldf.org

Penda Hair*
Judith Browne*
Monique Dixon*
Advancement Project
1730 M Street NW, Suite 401
Washington, DC 20036
Tel. 202-728-9557
Fax 202-728-9558
jbrowneesq@aol.com

Elaine R. Jones
    Director-Counsel
Theodore M. Shaw*
Norman J. Chachkin*
Janai S. Nelson*
NAACP Legal Defense & Educational Fund, Inc.
99 Hudson St., Suite 1600
New York, NY 10013
Tel. 212-965-2200
Fax 212-216-7592
jnelson@naacpldf.org

Laughlin McDonald
ACLU Voting Rights Project
2725 Harris Tower
233 Peachtree Street NE
Atlanta, GA 30303
Tel. 404-523-2721
Fax 404-653-0331
lmcdonald@aclu.org

Louis M. Bograd
American Civil Liberties Union Foundation
National Legal Department
733 15th Street, NW, Suite 620
Washington, DC 20005
Tel. 202-393-1918
Fax 202-393-4931
BOGRAD1@aol.com

Elliot Mincberg*
Larry Ottinger*
Alma C. Henderson*
People for the American Way Foundation
2000 M Street, Suite 400
Washington DC 20036
Tel. 202-467-2392
Fax 202-293-2672
lottinger@pfaw.org

* Admitted *pro hac vice*.

21

## CERTIFICATE OF SERVICE

I HEREBY certify that a true and correct copy of the foregoing was served by U.S. Mail on the following counsel on this ⎍ day of July, 2002:

John W. Little, III, Esq.
Walter J. Harvey, Esq.
Steel Hector & Davis, LLP
Attorneys for Secretary of State and
Director, Division of Elections
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Miami-Dade County
111 N.W. First Street, Suite 2810
Miami, FL 33128-1930

Mitchell Bloomberg, Esq.
Adorno & Zeder
Attorneys for ChoicePoint, Inc.
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133-5413

Tracey I. Arpen, Esq.
Office of General Counsel, Duval County
117 West Duval Street, Suite 480
Jacksonville, FL 32202-3700

H. Ray Allen, Esq.
Senior Assistant County Attorney
Hillsborough County, Florida
P.O. Box 1110
Tampa, FL 33601

George L. Waas, Esq.
Douglas B. MacInnes, Esq.
Office of the Attorney General
Department of Legal Affairs
PL-01 The Capital
Tallahassee, FL 32399-1050

Michael Cirullo, Esq.
Josias, Goren, Cherof, Doody & Ezrol, P.A.
Attorneys for Orange County Supervisor
3099 East Commercial Boulevard
Fort Lauderdale, FL 33308

Daniel D. Eckert, Esq.
County Attorney
Frank Gummey, Esq.
Assistant County Attorney
County of Volusia
123 West Indiana Avenue
DeLand, FL 32720-4613

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
Attorneys for ChoicePoint, Inc.
725 Twelfth Street, NW
Washington, D.C. 20005-5901

David V. Kornreich, Esq.
Casey, Crosland & Bramnich
First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131

THOMASINA H. WILLIAMS

NAACP v. Harris
Case No. 01-CIV-120-GOLD

## ADDENDUM

### COMPARISON OF PRAYER FOR RELIEF IN SECOND AMENDED COMPLAINT AND FLORIDA ELECTION REFORM ACT AND RULEMAKING AND 2002 ELECTION LAWS

To assist the Court and respond to the charts provided by Defendants Harris and Roberts in support of their motion for summary judgment, Plaintiffs have prepared this chart. Plaintiffs emphasize, however, that their relief is not limited to the specifically-enumerated items in the prayer for relief, but rather, could encompass any measure of declaratory or injunctive relief deemed appropriate by the Court to remedy the violations proven by Plaintiffs. Plaintiffs further detailed relief being sought under the claims in this case and the impact of election reform legislation in their mediation submission and in their briefs in opposition to Defendants' motions for summary judgment, and Plaintiffs reserve the right to update or amend this chart at a later date.

1.   **Certification and use of "punch-card" voting machines or systems, as well as other unreliable voting systems**

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, FERA rulemaking, and 2002 election laws | Remaining Relief Required/ Role of Defendants Harris and Roberts/ Additional Comments |
|---|---|---|
| To decertify all "punch-card" voting methods and other unreliable voting methods as acceptable voting methods under Florida law. ¶ 4(a). | FERA decertifies the use of punch-card voting machines, and Defendants Harris and Roberts have provided plaintiffs with a letter regarding compliance with the law by the counties. | Plaintiffs will be filing a motion for voluntary dismissal of the punch-card plaintiffs. |

## 2.    Maintenance and administration of voting systems

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, FERA rulemaking, and 2002 election laws | Remaining Relief Required/ Role of Defendants Harris and Roberts/ Additional Comments |
|---|---|---|
| To adopt standards and implement training designed to insure that voting systems and procedures at polling places within their jurisdiction are cqual, accurate and reliable, and are uniformly administered. ¶ 4(b).<br><br>To develop and implement training for all personnel involved in the administration of the electoral process to ensure compliance with this order and all laws related to the non-discriminatory operation of the political process. ¶ 4(s). | Pre-election procedures established by FERA for testing voting systems, and for training elections officials in order to increase the reliability and accuracy of vote tabulation and administration. FERA required development of a polling place procedures manual to be maintained at every polling place on election day.<br><br>Pollworker training and recruitment are mandated and funded by FERA.<br><br>Additional voter education programs established by FERA, and rules for non-partisan voter education adopted. | The administrative rules adopted pursuant to FERA have not been precleared by the Department of Justice (DOJ).<br><br>FERA only provides a one-time disbursement of supplemental funding to the SOEs.<br><br>Pursuant to the 14th Am., U.S. Const., NVRA, VRA, and Civil Rights Acts, Harris and Roberts are required to ensure uniformity and fairness in the administration of elections, including administration of voting systems. |

3.      **Voter registration procedures**

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, FERA rulemaking, and 2002 election laws | Remaining Relief Required/ Role of Defendants Harris and Roberts/ Additional Comments |
|---|---|---|
| To provide a receipt to each voter who registers to vote in person at a designated voter registration site, including a Supervisor of Elections office, a DHSMV office, or a DCF office. ¶ 4(c). | Not addressed by FERA, rulemaking or 2002 election laws. | Harris and Roberts have duty to ensure that voter registration is carried out in manner consistent with the U.S. Constitution, NVRA, and other federal law. Could develop rules to require use of a receipt.<br><br>Procedure implemented by DHSMV regarding receipts is voluntary and could be ceased at any time.<br><br>Harris and Roberts are not providing oversight over DHSMV and DCF as required by law. |
| To process all incomplete voter registrations initially received by the book closing date for an election, if it is possible to obtain the missing information prior to the election date. ¶ 4(d). | Not directly addressed by FERA or 2002 election laws. Section 62 of FERA provides that if SOE receives incomplete voter registration application, SOE must request that the applicant supply the missing information in writing, but statute is silent as to implementation and date by which missing information can be provided. | Harris and Roberts required by NVRA to coordinate compliance with State's voter registration functions and to ensure uniformity in list maintenance, and to ensure compliance with other federal laws.<br><br>Fla. Stat. § 97.053(5)(a) and § 97.055(1) can be interpreted to allow completion of submitted applications after book closing. |
| For all complete voter registration applications or updated information received by | Not addressed by FERA or 2002 elections laws. | Harris and Roberts required by NVRA to coordinate State's voter registration functions and |

| | | |
|---|---|---|
| the book closing date for an election, to process that information and mail to the voter a new voter registration card at least 10 days before the next scheduled election. ¶ 4(e). | | ensure uniformity in list maintenance, and to ensure compliance with other federal laws. |
| To develop procedures that will ensure that voter registration applications are processed in a timely manner. ¶ 4(f). | Not addressed by FERA or 2002 elections laws. | Harris and Roberts required by NVRA to coordinate State's voter registration functions and ensure uniformity in list maintenance, and to ensure compliance with other federal laws. |
| To develop and implement procedures to ensure that all customers at Department of Highway Safety and Motor Vehicle offices have an equal opportunity to register to vote or to update a voter registration, including, but not limited to: (i) use of combined forms for motor vehicle and voter registration application; and (ii) require written declination for customers who do not with to register to vote at DHSMV. ¶ 4(g). | Not directly addressed by FERA or 2002 election laws. The 2002 election laws amend one provision of the existing election code to require all complete and incomplete applications to be forwarded by DHSMV to SOEs within 5 days. | Harris and Roberts required by NVRA to coordinate compliance with State's voter registration functions and ensure uniformity in list maintenance, and to ensure compliance with other federal laws. |
| To develop and implement procedures to ensure that all customers at Department of Children and Families offices have an equal opportunity to register to vote and to update a voter registration, including but not limited to receipt of assistance in completing voter registration application forms. ¶ 4(h). | Not addressed by FERA or 2002 election laws. | Harris and Roberts required by NVRA to coordinate State's voter registration functions and ensure uniformity in list maintenance, and to ensure compliance with other federal laws. |

4

| | | |
|---|---|---|
| To develop and implement training for all personnel involved in the administration of the electoral process to ensure compliance with this order and all laws related to the non-discriminatory operation of the political process.  ¶ 4(s). | Pre-election procedures established by FERA for testing voting systems, and for training elections officials in order to increase the reliability and accuracy of vote tabulation and administration. FERA required development of a polling place procedures manual to be maintained at every polling place on election day.<br><br>Pollworker training and recruitment are mandated and funded by FERA.<br><br>Additional voter education programs established by FERA, and rules for non-partisan voter education adopted. | The administrative rules adopted pursuant to FERA have not been precleared by the Department of Justice (DOJ).<br><br>FERA only provides a one-time disbursement of supplemental funding to the SOEs.<br><br>Pursuant to the 14th Am., U.S. Const., NVRA, VRA, and Civil Rights Act, Harris and Roberts are required to ensure uniformity and fairnes in the administration of elections, including administration of voting systems.<br><br>Statute only requires that poll workers have "working knowledge" related to voter registration. FERA § 64.<br><br>Uniform polling place manual does not adequately address voter registration procedures. |
| To provide equitable, accurate equipment, facilities and resources for the administration of the electoral process statewide, including, but not limited to, the technology to facilitate verification of voter registration in all polling sites.  ¶ 4(t). | Not fully addressed by FERA or 2002 election laws. | Statute does not:<br>1.  Require equipment in polling places to verify voter registration.  For example, no requirement that statewide voter registration database be accessible in the polls.<br><br>2.  Require that registration applications be processed within a specified time period, or even in a timely manner. |
| | | |

| | | |
|---|---|---|
| Declaring that Fla. Stat. Ann. §§ 97.057 and 98.045(2) are inconsistent with the NVRA in the manner described in this [Second] Amended Complaint and are therefore invalid. ¶ 3. | Not addressed by FERA or 2002 election laws. | Harris and Roberts required by NVRA to coordinate compliance with State's voter registration functions and ensure uniformity, fairness, and compliance in list maintenance, and to ensure compliance with other federal laws. |

4.    **List maintenance procedures and purging**

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, FERA rulemaking, and 2002 election laws | Remaining Relief Required/ Role of Defendants Harris and Roberts/ Additional Comments |
|---|---|---|
| To develop and implement uniform procedures regarding list maintenance, including but not limited to the use of a standardized form for change of address confirmation mailing. ¶ 4(i). | Not addressed by FERA or 2002 election laws. | Harris and Roberts required by NVRA to coordinate compliance with State's voter registration functions and ensure uniformity, fairness, and compliance in list maintenance, and to ensure compliance with other federal laws. |
| To accurately determine and restore to appropriate status all persons wrongfully purged based on the DBT list and all other persons purged in violation of state and federal law.  ¶ 4(n). | Not addressed by FERA or 2002 election laws. | Statute does not address injunctive relief to restore voters wrongfully purged. Provisional balloting and the statewide voter registration database do not afford any relief to those individuals who have already been purged wrongfully.  FERA's purge provisions continue to violate the NVRA, VRA, 14th Amendment and other federal law because of flawed matching and verification process.  Harris and Roberts required by NVRA to coordinate State's voter registration functions and ensure uniformity in list maintenance, and to ensure compliance with other federal laws. |
| To discontinue all voter purges of the voter registration rolls until the development of | Not directly addressed by FERA or 2002 election laws. | Purges allowed to continue under old law during period of implementation of new law. |

7

| | | |
|---|---|---|
| procedures to ensure uniform, non-discriminatory application of the law.  ¶ 4(o). | | New state-wide voter registration system does not include development of standards for uniform, non-discriminatory application of the law.<br><br>FERA's purge provisions continue to violate the NVRA, VRA, 14th Amendment and other federal law because of flawed matching and verification process.<br><br>Harris and Roberts required by NVRA to coordinate State's voter registration functions and ensure uniformity in list maintenance, and to ensure compliance with other federal laws. |
| To prohibit the removal of the name of any person from the official voter registration lists on account of death, felony conviction or adjudication of mental incapacity based on information that has not been verified and determined to be a correct match for that person.  ¶ 4(p). | Not directly addressed by FERA or 2002 election laws. | Statute does not require verification before sending voter notice of ineligibility. Standards for use of the list have not been determined.  The DOJ has requested more information regarding the 2002 election laws specifically on the issue of verification, and that section of the 2002 law has not been precleared.<br><br>Harris and Roberts required by NVRA to coordinate State's voter registration functions and ensure uniformity in list maintenance, and to ensure compliance with other federal laws. |

8

| | | |
|---|---|---|
| To complete all purges not later than 90 days before any election.  ¶ 4(q). | Not addressed by FERA or 2002 election laws. | The NVRA requires that any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters must be completed not later than 90 days prior to the date of a primary or general election for Federal office.  42 U.S.C. § 1973gg-6(c)(2)(A). |
| To extend, by at least four years, the time that voters identified as those why may have moved, who did not vote in November 2000, remain on the active list before they are purged, to remedy the situation of inactive voters who were denied the right to vote in the November 2000 election.  ¶ 4(r). | Not addressed by FERA of 2002 election laws. | Laws do not address retroactive relief for those inactive voters who tried to vote but were turned away because of jammed telephone lines, and who therefore may have been purged from the list of registered voters, or may be in danger of being purged if there is no record of their voting in the 2002 elections.   Must be extended under the NVRA to include a Presidential election, which has higher voter turnout.<br><br>42 USC 1973gg-6(d)(2)(A) (NVRA) does not apply because Defendants are not able to make an accurate determination of whether voters attempted to cast a ballot in the November 7, 2000 election but were unable to do so due to acts of Defendants, such as failure to provide adequate communications systems |

**5.     Use of inactive voter lists and accessibility to those lists**

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, FERA rulemaking, and 2002 election laws | Remaining Relief Required/ Role of Defendants Harris and Roberts/ Additional Comments |
|---|---|---|
| To maintain any list of inactive voters at polling places as part of the official list of eligible voters and as accessible to precinct officials as are the active lists.  ¶ 4(j). | Not addressed by FERA or 2002 election laws. | Statutes do not address how voters designated as inactive will be treated in statewide voter registration database.<br><br>Statutes do not address accessibility of the list in polling places during an election or equal treatment of voters on inactive list at polls. |

10

6.     **Maintenance and administration of polling places**

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, FERA rulemaking, and 2002 election laws | Remaining Relief Required/ Role of Defendants Harris and Roberts/ Additional Comments |
|---|---|---|
| To provide a mechanism for persons whose names do not appear on the list of registered voters at the polling place to vote in as timely a fashion as those whose names do appear on the list, subject to challenge if they are shown not to be qualified to vote.  ¶ 4(k). | Not fully addressed by FERA or 2002 election laws. | FERA established provisional balloting, but under the 2002 election laws, the provision was changed to state that a provisional ballot will only be counted if it is cast in the correct precinct. Ch. 2002-17, Section 6.<br><br>FERA does not:<br>1.  Require that voter be notified of whether provisional ballot is counted.<br>2.  Give voter opportunity to demonstrate that they registered and their vote should count.<br>3.  Permit a voter whose signature is questioned the opportunity to vote by sworn affidavit as can be done at the polls.<br>4.  Provide for those situations where the poll worker is unable to communicate with the Supervisor of Elections office to determine the correct polling place of a voter.  While voters can cast a ballot if there is a problem with communications, if that ballot is cast in the wrong precinct, it will not be counted.<br>5.  Require that persons whose names do not appear on a precinct list be able to vote a provisional ballot in as timely a |

11

| | | |
|---|---|---|
| | | fashion as those on the voter rolls. |
| To provide notice to those who vote a provisional ballot and are found not to be qualified to vote regarding the basis for the disqualification, and an opportunity to challenge their disqualification.  ¶ 4(l). | See above. | See above. |
| To establish a mechanism for timely communication on an election day between the polling places and the Supervisor of Elections office, and between individual voters and the Supervisor of Elections office.  ¶ 4(m). | Not addressed by FERA or 2002 election laws. | Changes in FERA address polling place procedures generally, but do not cover communications between precincts and SOEs, for example, by requiring computers at the precincts to access the voter registration rolls |
| To develop and implement training for all personnel involved in the administration of the electoral process. ¶ 4(s). | FERA and the 2002 election laws address polling place procedures and poll worker training. | The administrative rules adopted pursuant to FERA have not been precleared by DOJ.<br><br>The proposed polling place manual does not address several key issues, such as:<br>1.  voter registration procedures;<br>2.  communications systems between precincts and SOEs, including access to the voter rolls;<br>3.  procedures for casting and counting of provisional ballots; and,<br>4.  requirement that voters not on the list be verified and directed, if necessary, to correct precinct. |

| | | |
|---|---|---|
| To provide equitable, accurate equipment, facilities and resources for the administration of the electoral process statewide, including, but not limited to, the technology to facilitate verification of voter registration in all polling sites. ¶ 4(t). | See above. | Statute does not require equipment in polling places to verify voter registration or correct precinct. |
| To affirmatively notify voters of their rights at polling places, by posted notice or otherwise, including their rights to assistance, to correct their ballots if they believe they have made an error, to alternative identification procedures if they do not have a photo ID and to vote even if they have changed address, including the steps to follow to assert these rights. ¶ 4(u). | FERA included adoption of the Voter's Bill of Rights and Responsibilities, which must be posted at all polling places. | The Voter's Bill of Rights: 1. Does not address a voter's right to vote even if they have changed address. 2. Does not tell voters how to assert these rights.<br><br>FERA does not require distribution or public education on the Bill of Rights |

7.    **Monitoring**

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, FERA rulemaking, and 2002 election laws | Remaining Relief Required/ Role of Defendants Harris and Roberts/ Additional Comments |
|---|---|---|
| Appointing, pursuant to Section 3(a) of the Voting Rights Act, 42 U.S.C. § 1973a, federal examiners in each of the Defendant counties for the next ten years. ¶ 4. | Not addressed by FERA or 2002 election laws. | |

14

**8.      General Declaratory Relief**

| Prayer for Relief in Second Amended Complaint | Florida Election Reform Act of 2001, FERA rulemaking, and 2002 election laws | Remaining Relief Required/ Role of Defendants Harris and Roberts/ Additional Comments |
|---|---|---|
| Declaring that Defendants' use of "punch-card" voting machines or systems, other unreliable voting systems, and procedures connected with their use; failure to process timely voter registration applications; wrongful purge of qualified voters; failure to have complete and accurate voter lists at the polls and effective election day procedures; and failure to allow voters who have moved within the county to vote; caused the Plaintiffs and members of the Plaintiff class to be treated differently than similarly situated white voters, and denied them fundamental fairness and an equal opportunity to participate in the electoral process in the November 2000 general election, all in violation of the law as set forth in the claims for relief. ¶ 2. | See above. | Plaintiffs are entitled to requested declaratory relief. While some of Plaintiffs' requested relief has been addressed by FERA and the 2002 election laws, much of it has not been addressed by statutory changes or rulemaking.  Furthermore, some Defendants claim that they have addressed Plaintiffs' claim through voluntary actions. Given that Defendants can change their minds about their voluntary practices and statutes can be amended, Plaintiffs seek declaratory relief to establish the legal parameters within which Defendants must operate. |