UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 01-120-CIV-GOLD/SIMONTON

NIGHT BOX
FILED

JUL 2 2 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., by its FLORIDA STATE
CONFERENCE OF BRANCHES, et al.,

       Plaintiffs,

vs.

KATHERINE HARRIS, Secretary of
State of Florida, et al.,

       Defendants.

## PLAINTIFFS' CORRECTED REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

None of the Plaintiffs in this case were allowed to vote in the general election in November, 2000, an election in which Florida's voters played a pivotal role in the outcome of the Presidential contest. Defendants do not contend that any of the Plaintiffs, or other voters similarly situated to them, did in fact vote. Instead their opposition to partial summary judgment is based on inconsistent denials of authority, which lead, for example, to the conclusion that no governmental entity in Florida was responsible for wrongfully purging voters who were convicted of offenses in states that automatically restore an ex-offender's right to vote. Harris and Roberts, in particular, make conclusory statements about how they uniformly carried out their responsibilities under the National Voter Registration Act, completely ignoring the reality that Florida's sixty-seven counties had widely varying ways of responding to the Central Voter File exceptions lists that were sent to them by the Division of Elections. Harris and Roberts also represent that recent election reform acts are a panacea when the new laws do not restore wrongfully purged voters to the registration rolls and do not correct other problems that denied Plaintiffs the right to vote. Other defendants, in response to Plaintiffs' summary judgment motion, simply ignore Plaintiffs' arguments, or urge this court to adopt legal positions that



previously were rejected.  In short, plaintiffs are entitled to partial summary judgment on the eight discreet claims for which there are no disputed issues of material fact.[1]

**I.     Harris, Roberts, Iorio, Cowles, Leahy and Lowe Purged Ex-Felons with Out-Of-State Convictions in Violation of the National Voter Registration Act of 1993 and Section 2 of the Voting Rights Act.**

**A.     Florida Law in 2000 Required the Division of Elections and Supervisors of Elections to Properly Carry Out List Maintenance Procedures.**

Harris and Roberts contend that only the Supervisors made any decisions to purge voters, while the Supervisors contend they had no choice but to purge the voters on the State's exceptions lists.  *Compare* Defendant Secretary of State Harris' and Defendant Director of the Division of elections Roberts' Response to Plaintiffs' Motion for Partial Summary Judgment, Filed July 17, 2002, Docket Number 451 [Harris Response] at 3, 6 (Division of Elections has no jurisdiction over voter rolls, *citing* Fla. Stat. § 98.015(3) (2001)) *with* Defendant Pam Iorio, Hillsborough County Supervisor of Elections, Response to Plaintiffs' Motion for Partial Summary Judgment, Filed July 16, 2002, Docket Number 438 [Iorio Response] at 2 (Division of Elections directed who would be included in list, once the list was supplied, Supervisor Iorio was mandated to remove the names identified unless she could verify that the names were incorrect, *citing* Fla. Stat. § 98.0975(1)(b) and (4) (2000); *and* Defendant, William Cowles, Orange County Supervisor of Elections, Response to Plaintiffs' Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof, Filed July 16, 2002, Docket Number 449 at 5 (state law limited the county supervisors of elections to a role upon receipt of the exceptions lists)).

In fact, under Florida law at the time, both entities had different and important responsibilities in administering the Central Voter File.  It was the responsibility of the Division of Elections and their agents, PASS and then DBT, to "provide to each county supervisor of elections a list ... of each person included in the central voter file as a registered voter in the

---

[1]  Defendant Cowles complains that Plaintiffs did not even mention Consuelo Maria Graham's claims in their motion for partial summary judgment.  As noted in Plaintiffs' response to Defendant Cowles' motion for summary judgment,  Plaintiffs believe that there are genuine issues of material fact that preclude summary judgment – either for Defendants or Plaintiffs – as a matter of law concerning the specific claims of Consuelo Maria Graham.

supervisor's county who ... has been convicted of a felony and has not had his or her civil rights restored ..." Fla. Stat. § 98.0975(1) (1999). The supervisor then had the responsibility to "attempt to verify the information provided. If the supervisor does not determine that the information provided by the division is incorrect, the supervisor must remove from the registration books by the next subsequent election the name of any person ... convicted of a felony ..." Fla. Stat. § 98.0975(4) (1999). The Division of Elections was required to come up with a list of ex-felons, the supervisors were required to verify that the information was not incorrect. Flaws in both processes led to many voters being wrongfully removed from the list of registered voters. The State was sloppy and intentionally overbroad in putting names on the exceptions lists, and the supervisors used ineffective verification measures. However, at this stage Plaintiffs are only seeking partial summary judgment with regard to those felons whose convictions were in states other than Florida that automatically restore an ex-felon's right to vote when the sentence is completed.

**B.    Florida Law was Clear from at least 1998 that If an Ex-Felon's Civil Rights were Restored in the State of His or Her Conviction, Florida Could Not Deny Their Civil Rights.**

Harris and Roberts again claim they had no authority, this time to decide who has clemency, as a defense to their producing exceptions lists with names of Florida voters whose right to vote had already been restored. *See* Harris Response at 16-17 & 19. However, the issue is not who should be granted clemency. The question here is whether Harris and Roberts, in directing DBT to compare the Central Voter File with lists of persons convicted of felonies from other states, should have included states where offenders' rights are automatically restored upon their release from custody.[2] They quote from correspondence between Bucky Mitchell and Janet Keels implying without stating outright that ex-offenders from other states must "make application for restoration of civil rights in the state of Florida." Harris Response at 17. After the election, Keels said she never meant that such residents had to obtain clemency in Florida,

---

[2] DBT compared lists from the following states: CT, IL, OH, SC, TX, WI, WA, NJ, VA, and KY. Ciccolo Decl., 07/01/02, Ex. 22, Janet Modrow Depo. at 45; Ciccolo Decl., 07/01/02, Ex. 24 (DE 409), Marlene Thorogood Depo. at 48-51. Eight of these ten states automatically restore ex-felons right to vote: CT, IL, NJ, OH, SC, TX, WA, and WI. *Id.*, Thorogood Depo. at 36-37.

only that they should make an inquiry of their local supervisor of elections. Williams Decl.,
07/22/02, Ex. 1, Letter from Janet Keels to Ed Kast dated February 23, 2001, Exhibit 18 to
Deposition of David C. Leahy, May 24, 2002; Willams Decl., 07/22/02, Ex. 5, Keels Depo. at
59-64. Whatever Keels meant is irrelevant, as it was the duty of the Division of Elections to
know and apply the law and to carry out their duties consistent with that law. Even now, the
Division of Elections apparently refuses to apply the plain meaning of the Florida Court of
Appeals decision in *Schlenther v. Dep't of State, Div. of Licensing,* 743 So. 2d 536 (1998).
Harris and Roberts argue that requiring ex-felons from automatic restoration states to apply for
restoration of rights in Florida is consistent with the *Schlenther* decision. Harris Response at 17.
However, *Schlenther* unequivocally holds that "once appellant's civil rights were restored by the
state that suspended them, the matter was completed, and this State had no authority to suspend
or restore those rights here on the basis of that earlier out-of-state suspension." *Schlenther,* 743
So. 2d at 536. If this is not clear enough, the Court goes on to explain that:

> it was never intended that the Governor of Florida would have authority to act in a
> case such as this, where the individual's civil rights had been suspended and
> restored by another state, all before the individual arrived in this State. Under
> these circumstances, we conclude that Florida must give full faith and credit to the
> Connecticut restoration of appellant's civil rights.
>
> At the time Appellant moved to Florida in 1973, he did so in full possession of all
> civil rights of Connecticut citizenship. He did not arrive here under a disability.
> To the contrary, he arrived as any other citizen, with full rights of citizenship.
> Appellant must not now be required, twenty-five years later, to ask this Sate to
> restore his civil rights. There were never lost here.
> ...
> Once another state restores the civil rights of one of its citizens whose rights had
> been lost because of a conviction in that state, they are restored and the State of
> Florida has not authority to suspended or restore them at that point. The matter is
> simply at an end.

*Id.*, 743 So. 2d at 537 (*citing Staluppi v. Dep't of Highway Safety & Motor Vehicles,* 688 So. 2d
431 (Fla. 1st DCA 1997)). The Division of Elections, in order to comply with the NVRA, which
allows the purging of felons without notice, but not of persons whose right to vote has been
restored, 42 U.S.C. § 1973gg-6a and 6g, and in order to follow Florida law as stated in the
*Schlenther* decision, was compelled to avoid listing as "exceptions" those voters whose civil

4

rights had already been restored in states that automatically restore an ex-offenders rights. However, they instructed DBT to do just the opposite. *See* Ciccolo Decl., 07/01/02, Ex. 24 (DE 409), Dep. of Marlene Thorogood, dated October 18, 2001, at 45-46 ("In those states where restoration is considered automatic, there's not a formal process to go through. Bucky Mitchell at the Division of Elections informed me that Florida does not recognize that procedure and they must apply for Florida clemency in order to have their rights restored, so in a state where the clemency is automatic, I was to take those felony convictions and run those against the Florida clemency file then that indicated to us they did not have clemency or the right to vote in the State of Florida.").

It does not matter, for purposes of this claim, why the Division of Elections decided to ask DBT to provide information about persons with out-of-state convictions. Hiding behind the skirts of the Office of Executive Clemency can not save the Division. The Division was obliged to follow the law, and it admittedly did not. The facts here are undisputed: the Division of Elections asked DBT to include on exceptions lists ex-felons from states that automatically restored their right to vote. The Division then sent those lists to the supervisors of each county as provided by § 98.0975(1) Fla. Stat. (1999). In so doing, the Division's actions under color of law contributed to the wrongful purging of qualified voters.

### C.   Plaintiffs Have Identified Out of State Felons Who Were Wrongfully Purged.

Several defendants argue that Plaintiffs' motion for partial summary judgment on this issue must be denied because Plaintiffs have failed to identify persons who were purged due to out-of-state convictions. This is not true. The Supervisors admit that they removed such persons when they describe the procedures they used upon receipt of the exceptions lists.[3] In addition, Plaintiffs have identified out-of-state felons from states that automatically restore an offenders'

---

[3] *See* Defendant David C. Leahy's Response to Plaintiffs' Motion for Partial Summary Judgment, Filed July 15, 2002, DE 432 at 2-3 (describing a process for verification which does not allow persons who were convicted in states with automatic restoration of voting rights to avoid being purged); Williams Decl., 07/22/02, Ex. 1, Deposition of David Leahy, May 24, 2002 at 167:30 to 170:74; Williams Decl., 07/22/02, Ex. 2, Deposition of Pam Iorio, May 6, 2002 at 102:9 – 109:19.

right to vote upon release from custody who appeared on the exceptions lists and were purged from the voter registration rolls.  In response to discovery requests, for example, Hillsborough County identified voters who were purged from the voter rolls who were ex-felons without clemency in Florida, who had been convicted in other states.  *See* Ciccolo Decl., 07/01/02, Ex. 44 (D.E. 409).  A printout of the electronic data provided in the response indicates there were 13 such voters, 11 of whom received convictions in states that automatically restore an ex-felon's right to vote.  *See* Williams Decl., 07/22/02, Ex. 3.  However, data provided by the Florida Secretary of State's office in initial disclosures indicates there were a total of 720 persons listed as having out of state convictions in Hillsborough County on just one of DBT's three exceptions lists.  *See* Williams Decl., 07/22/02, Ex. 4.  Following Iorio's procedures, all of these persons would have been purged.  Similar large numbers and similar procedures were followed by Miami-Dade and Orange counties.

By the time that Defendant Leahy had been notified by Office of Executive Clemency that people from automatic restoration states remained eligible to vote without having to prove their eligibility or go through the clemency process in Florida, the Miami-Dade Elections Department had removed 1,090 (or 78.5%) of the 1,388 people on the 2000 "ex-felon" purge list because they did not respond to Defendant Leahy's administrative hearing notices.  Williams Decl., 07/22/02, Ex. 1, Leahy Deposition at 129-34; *see, also*, testimony of Defendant Leahy before the U.S. Commission on Civil Rights, Feb. 16, 2002, at 317-18 , and "Miami-Dade Elections Department, January 2000 Felon List," attached as Exhibits C, and E, respectively, to Plaintiffs' Opposition to Defendant Leahy's Motion for Summary Judgment.  The 2000 purge list that Defendant Leahy used to remove voters from the rolls contained the names of people who had been convicted of felonies in automatic restoration states and who, therefore, were eligible to vote and should not have been included on the list.  This purging was done without regard to whether the felony conviction information came from within Florida or from automatic restoration states: if voters did not respond to Defendant Leahy's administrative hearing notices, they were purged from the list without any personal (person-to-person) verification of whether they were, in fact, eligible to vote.  Even after having received the February, 2001 letter explaining that voters from automatic restoration states did not lose their right to vote when they

6

moved to Florida, Defendant Leahy has failed to undertake any systematic effort to investigate much less restore people from automatic restoration states to the voter rolls. *See* Plaintiffs' Br. in Opposition to Defendant Leahy's Motion for Summary Judgment at 2 and n.5.

Uncontested evidence shows that the improper purge discussed above had a disparate impact on African-American voters using the proper comparison between representation on the erroneous purge lists versus the county voter list. *See id.* at 3-5. For these reasons, and those outlined in Plaintiffs' Opposition to Defendant Leahy's Motion for Summary Judgment (Plaintiffs' Opp. Br.) at 8-18, these defendants' process of removing purported ex-felons from the voter roll violated the Voting Rights Act and the National Voter Registration Act.

II.     **Harris and Roberts Directed a Purge of Qualified Registered Voters in a Non-Uniform Fashion That Violated the Requirements of the NVRA.**

    A.     **The State Has the Authority to Coordinate and Monitor NVRA Compliance.**

Defendants Harris and Roberts continue to deny their responsibilities under state and federal law. Defendants' insistence that the NVRA imposes no supervisory responsibilities upon them actually reinforces Plaintiffs' earlier argument that they are not fulfilling their responsibilities to "[c]oordinate the state's responsibilities under the National Voter Registration Act of 1993." Fla. Stat. §97.012(7) (2002). While state law has long granted "exclusive control" of *actual* voter registration to the county supervisors of elections, when the state of Florida passed the Florida Voter Registration Act (FVRA) in 1994, the secretary of state (as the designated chief election official) became responsible for supervising the registration activities of the county officials and ensuring that they were uniform and in compliance with federal law. *See* Fla. Stat. §97.012 (1994) (designation of the Secretary of State as the Chief Election Official). Florida's pre-NVRA statutory scheme is modified by the NVRA, which mandates state compliance with its provisions (*see e.g. Voting Rights Coalition v. Wilson*, 60 F.3d 1411 (9th Cir. 1995) (upholding Congressional authority to enact the NVRA and enjoining California to comply with its requirements)), establishes requirements for voter registration which apply *statewide* (*see e.g.* 42 U.S.C. § 1973gg-6(b) (2002) (requiring any state list maintenance program to be uniform, non discriminatory and in compliance with the Voting Rights Act of 1965); 42

7

U.S.C. § 1973gg-6 (a)(1)(2002) (requiring each state to ensure that any eligible applicant is registered to vote in specified circumstances); 42 U.S.C. § 1973gg-6(d)(1) (requiring that each state not remove registrants from the official list of eligible voters for federal elections except under certain conditions)) and requires the designation of a "chief State election official" who would be "responsible for coordination of State responsibilities under [the NVRA]." 42 U.S.C. § 1973gg-8 (2002).

With the passage of the NVRA, the role of the Secretary of State as the chief election official took on new meaning and required compliance not only with state law, but with federal law as well. The Secretary has the specific legal duties to "obtain and maintain uniformity in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1) (1994), "[p]rovide uniform standards for the proper and equitable implementation of the registration laws," Fla. Stat. §97.012(2)(1994), and "[p]rovide training to all affected state agencies on the necessary procedures for proper implementation of this chapter," Fla. Stat. §97.012(8)(1994), all of which must be carried out to ensure that the state of Florida complies with the mandate of the NVRA. The enactment of the NVRA altered Florida's statutory scheme. While the county supervisors remained responsible for adding and removing individuals from the voter rolls, the Secretary became responsible under federal law for providing proper standards and supervision to ensure that the county supervisors met the State's responsibilities under the NVRA.

While it seems clear that fulfilling the statutory responsibility to "obtain and maintain uniformity" would require the use of rules or some other enforcement mechanism, Defendants again deny that they have *any* powers at all in this regard. Defendants rely heavily on a 1996 revision to Florida's Administrative Procedures Act (APA), which stated that "A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a *specific law* to be implemented is also required. An agency may adopt only rules that implement, interpret or *make specific* the *particular* powers and duties granted by the enabling statute." Fla. Stat. §120.536(1)(1996)(emphasis added). *See also* Fla. Stat. § 120.52(8)(1996). Prior to this legislative enactment, when agencies were given a general grant of rulemaking authority, courts had relied on a "rational relationship" test to determine whether a rule making effort was a valid

8

exercise of delegated legislative authority.[4]  However, a Florida Appellate court interpreting the effect of the 1996 APA amendments doubted that the legislature "could...have meant to condition rulemaking authority on the existence of a statute describing in detail the subject of each potential rule" for if they had, then "the agency might not be able to carry out the very task the Legislature assigned to it." *St. Johns River Water Mgmt. Dist. v. Consolidated-Tomoka Land Co.,* 717 So. 2d 72, 80 (Fla. App. 1998).  Attempting to reconcile this dilemma, the court held that a rule is a valid exercise of delegated legislative authority "if it regulates a matter directly within the class of powers and duties identified in the statute to be implemented." *Id.*  However, in amending the APA in 1999, the Legislature rejected the "class of powers and duties" analysis of *Consolidated-Tomoka*, and again revised the APA such that an agency could "adopt only rules that implement or interpret the *specific* powers and duties granted by the enabling statute." Fla. Stat. §120.536(1)(1999) (emphasis added).

While the Florida Legislature further cabined the discretion of administrative agencies by adopting the 1999 amendments to the APA, it is important to note that the amendments did not use "'specific'...as a synonym for 'detailed'" as this would have led to the same unworkable interpretation rejected in *Consolidated-Tomoka*. *See Southwest Fla. Water Mgmt. Dist. v. Save the Manatee Club, Inc.,* 773 So. 2d 594, 599 (Fla. App. 2000).  Rather, *Consolidated-Tomoka*'s decision in that respect "appears to have survived". *Id.*  Furthermore, as Plaintiffs have argued before, the limitations of the APA do not apply to the present case.  For here, there can be no doubt that the "specific dut[ies]" which the Secretary of state must fulfill include "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1)(2002), "[p]rovid[ing] uniform standards for the proper and equitable implementation of the registration laws," Fla. Stat. §97.012(2)(2002) and "[c]oordinat[ing] the state's responsibilities under [the NVRA]." Fla. Stat. §97.012(7)(2002).  Defendants nonetheless continue to conflate "specific powers and duties" with "specific authority to promulgate rules" to

---

[4] "It is an established principle that where the empowering provision of a statute states simply that an agency 'may make such rules and regulations as may be necessary to carry out the provisions of this act,' the validity of the regulations promulgated thereunder will be sustained as long as they are reasonably related to the purposes of the enabling legislation, and are not arbitrary or capricious." *Employment Sec., Div. of Workers' Compensation v. Bradley*, 636 So. 2d 802, 807 (Fla. 1st DCA 1994) (internal quotation omitted).

imply that the latter is a prerequisite to rulemaking (*see* Defs' Response at 5, 6), but insofar as they attempt to advance this argument, they are contradicted by the weight of Florida Law. For example, the Florida appellate court in 1998's *St. Petersburg Kennel Club v. Department of Bus. & Prof'l Regulation* held that a rule was properly issued in the absence of specific direction to adopt rules when "a clear logical connection between the law giving authority… and the rule" existed. *St. Petersburg Kennel Club v. Department of Bus. & Prof'l Regulation,* 719 So. 2d 1210, 1212 (Fla. App. 1998). Furthermore, another important decision by Florida's appellate courts, issued after the adoption of the 1996 APA amendments which stated that a grant of rulemaking authority "is necessary but not sufficient to allow an agency to adopt a rule," upheld a longstanding Florida precedent that "[r]ule making authority may be implied to the extent necessary to properly implement a statute governing the agency's statutory duties and responsibilities." *Board of Dentistry v. Payne,* 687 So. 2d 866, 868 (Fla. App. 1997).

Finally, Defendants place "perhaps [the] most importan[ce]" on the fact that the Department of State did not receive a general grant of rulemaking authority until 2001 to support their claim that they lacked authority or duty to adopt rules. Harris Response at 6. However, Defendants have unfortunately misplaced their reliance on this fact, because when the FVRA was adopted in 1994, the 1996 revisions to the APA were not in existence and Florida's courts would imply rulemaking to the extent necessary to fulfill the statutory mandate. *See Witmer v. Department of Business & Professional Regulation, Div. of Pari-Mutuel Wagering,* 662 So. 2d 1299, 1301 (1995 Fla. App). Florida's legislature had statutorily mandated a clear regulatory responsibility for the Secretary of State to "obtain and maintain uniformity in…the election laws" and "provide uniform registration standards for the proper and equitable implementation of the registration laws," and added to this the Secretary's responsibility for NVRA coordination and training to ensure fulfillment of the State's duties under the NVRA. When Florida implemented the NVRA, the legislature would have been cognizant of the fact that Florida's courts would recognize the rulemaking necessary to the achievement of this clear statutory mandate. Fla. Stat. §97.012 (1)(1994); Fla. Stat. §97.012 (2)(1994).

Even if Harris and Roberts lacked rulemaking authority during the 2000 elections, which Plaintiffs strenuously deny, they still had the responsibility for the "general supervision and

10

administration of the election laws," Fla. Stat. § 15.13 (2001), "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1), "[p]rovid[ing] uniform standards for the proper and equitable implementation of the registration laws," Fla. Stat. §97.012(2), and "[c]oordinat[ing] the state's responsibilities under [the NVRA]," Fla. Stat. §97.012(7). The State performed none of these statutorily functions, by the adoption of rules or by any other means.

**B.     The State's Conclusory Statements About NVRA Training Do Not Satisfy the Summary Judgment Standard and They Improperly Rely Upon Kast as an Expert.**

In response to Plaintiffs' evidence on this point, Defendants' cite to more of Kast's deposition, suggesting he did not understand the question he was being asked. *See Harris Response* at 11. However, the best evidence they could find from Mr. Kast is a conclusory statement that the Division provided training. *Id.* Such statements are not sufficient to survive summary judgment or create a disputed issue of fact. *Lee v. Warner Bros. Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000); *Evers v. General Motors Corp.*, 770 F.2d 984 (11th Cir. 1985).

Defendants rely upon Mr. Kast as an expert to argue that the Division in fact conducted training and that the Division did not violate the NVRA. Defs. at 11-12, 15. However, Kast does not qualify as an expert because he fails to meet the requirements under S. D. Fla. L.R. 16.1(K), which require identification of specific facts on which the expert will testify. "To warrant the use of expert testimony, two elements are required. First, the subject of the inference must be *so* distinctly related to some science, profession, business or occupation as to be beyond, [*sic*] the knowledge of the average layman, and second, the witness must have such knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *U.S. v. Johnson*, 575 F.2d 1347, 1361 (5th Cir. 1978) (citing *Fineberg v. United States*, 393 F.2d 417, 421 (9th Cir. 1968)). Thus, "if the question is one which the layman is competent to determine for himself, the opinion is excluded." *Id.* (citing *Steinberg v. Indemnity Insurance Company of North America*, 364 F.2d 266, 274 (5th Cir. 1966)).

11

Furthermore, an expert must demonstrate use of sound scientific methodology to reach his or her conclusions. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert II*"), 43 F.3d 1311, 1318 (9th Cir. 1994) (declaring experts must explain precisely how they went about reaching their conclusions and point to some objective source to demonstrate that they have followed the scientific method); *Sanderson*, 950 F. Supp. at 993. In other words, conclusory opinions are inadmissible. *Id.*; *Claar v. Burlington Northern R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). In *Kumho Tire Co. v. Carmichael*, the Court applied this standard not only to testimony regarding scientific matters, but to all expert testimony. 526 U.S. 137, 141 (1997).

Not only does Kast's summary lack detail, but his deposition testimony demonstrates that he is not qualified to give expert witness testimony under FRE 702. Kast lacks the educational, training, and practical experience necessary to qualify him as an expert. While obtaining a degree similar to business management, he has no degrees or educational training in election administration. Exhibits in Support of Harris & Roberts Mtn for Summ. Jdgmt., Tab 17, Kast Dep. at 67:1-17. He spent 21 years in the United States Air Force where he had no involvement with armed services voting. *Id.* at 66:14-25. Prior to his work with the Division of Elections, he held a position with the Department of Environmental Protection in the Bureau of General Services which had no relation to the NVRA or with election administration. *Id.* at 66:4-12. He has never testified as an expert witness. *Id.* at 69:17-20. He has not written or published any articles on compliance and has not even really followed any of the election reform bills that are currently pending in Congress affecting NVRA compliance. *Id.* at 69:1-8.

Additionally, his deposition indicates that nothing he is anticipated to testify to as an "expert" will assist the trier of fact. For example, Kast does not give specific examples of *how* the Division complies with the NVRA. In his opinion, the mere existence of a regulation and a training program developed by the Division gives rise to the mandatory inference that the Division is in compliance with the NVRA. *Id.* at 56:14-25; 57:1-9. The basis of his opinion lies upon the Florida statutes and NVRA itself. This is an inadequate, flawed, and circular approach to giving expert testimony. The mere existence of training materials does not qualify Kast to opine, in an expert capacity, that the Division is in compliance. While Kast may be knowledgeable on Division procedures with regard to the NVRA, he has no expertise to opine

12

that the Division is in fact in compliance.  He conducted no studies.  He made no investigation into the matter.  He made no analysis whatsoever, but instead gave only a blanket assertion that the Division is in compliance with all the appropriate regulations without any foundational evidence. Such unsupported speculation will not assist the trier of fact in deciding whether the Division is actually in compliance.  If this qualifies him as an expert, any other person who works in the Division of Election and is aware of the existence of these materials would also qualify as experts.  Surely, this is not what FRE 702 envisioned.

Even if designated as an expert, the State's reliance on Kast to show full compliance is misplaced.  Plaintiffs do not object to the fact that Mr. Kast suggested the State performed certain activities required by the NVRA, Kast Dep. at 24, but see *id.* at 35, and that the State offered to amend its mistake in the purge lists, *see* Defs. Response at Ex. 50, 51, but such performance of those activities alone does not ensure the State's full compliance with the NVRA.  Despite the State's plea that the training has been uniform, other witnesses, and even Mr. Kast himself, have testified that there has been little guidance from the State.  *See* Ciccolo Decl., 07/01/02, Ex. 30, Iorio Dep. at 42, 50 (no instructions or training on use of purge lists); Kast Dep. at 33 (no manuals provided); Modrow Dep. at 33 (guidance on purge lists limited to one letter stating codes and matching codes, but no other training).  While the State continues its parroting of the NVRA requirements as training, it provides too little in guidance or practice to ensure uniformity.   The State has not ensured that voters are not inappropriately removed voter rolls, nor has it ensured uniform and nondiscriminatory voter registration rolls.  Defendants Harris and Roberts have not fulfilled their NVRA requirements.

**D.     Plaintiffs' Claims are Not Moot.**

For a comprehensive review of the impact of FERA, the 2002 legislative changes, and rulemaking pursuant to FERA, please refer to the addendum attached to Plaintiffs' Response to Defendants Harris and Roberts' Motion for Summary Judgment.  In addition, please see Section V(A), *infra*, discussing why FERA does not moot Plaintiffs' election administration claims.

**III.** **The Court Should Grant Summary Judgment on Plaintiffs' Claims Against Defendant Lowe Regarding Ursula Harvey**.

Defendant Lowe puts forth several arguments in her Response to Plaintiffs' Motion for Partial Summary Judgment which Plaintiffs will address in turn. First, Defendant Lowe contends that she has "reinstated the registration of those whose listed conviction was from a state which automatically restores rights." This supports Plaintiffs' argument that Defendant Lowe's alleged "remedy" is incomplete and insufficient. Although Lowe has indicated that she has partially retracted her misstatement to a subset of the recipients of her January 2001 letter, Ex. E to Plaintiffs' Response to Defendant Lowe's Motion for Summary Judgment, Letter to Anita Hodgkiss from Daniel Eckert dated July 15, 2002, to date, Plaintiffs have received no proof that Lowe has issued a complete retraction to all recipients. Moreover, Plaintiffs have received no indication that Defendant Lowe recognizes that former felons whose right to vote was restored in another state, even if such restoration is not automatic, may vote in Florida. To the contrary, it is clear on its face that Lowe's letter does not go all the way. It is specifically limited to persons convicted in states where the right to vote is never lost or suspended or where the right to vote is automatically restored to former felons. *See id.* The law however is broader than that and permits those whose right to vote was restored in another state, even if such restoration was not automatic, to vote in Florida. In light of her past actions, until Lowe indicates that she will apply the correct application of the law in election administration in Volusia County, Plaintiffs maintain that there is a continuing violation of the laws that requires redress.

Second, Defendant Lowe argues that Plaintiff Ursula Harvey has no standing because Defendant Lowe has reinstated her to the voter rolls. This argument is untenable. Ms. Harvey has standing to represent a class of similarly situated individuals, even if she has been reinstated because, based on Defendant Lowe's own reading of the NVRA, there is a likelihood of repeated harm. Indeed, even though Ms. Harvey has been reinstated to the voter rolls, it is likely that she may experience similar problems in future elections if Defendant Lowe is not held accountable for violating the law.

Third, Defendant Lowe does not even attempt to contest Plaintiffs' contention that FERA's provisional ballot does not moot Ms. Harvey's claim that she was unlawfully denied the

14

right to vote. Lowe points out that the NVRA provides that a voter who moves within a jurisdiction may be required to vote at the new location. This argument is irrelevant because it does not address Plaintiffs' contention that a provisional ballot is not the functional equivalent of a "regular" ballot which is what Ms. Harvey and those similarly situated would be entitled to cast in future elections upon affirmation of their address on election day.

**IV.   Summary Judgment Should Be Granted as to Plaintiffs' Claims Against DCF.**

     Defendant Kearney, Secretary of the Department of Children and Family Services ("DCF"), would have this court believe that DCF should not be held liable for its failure to comply with the law because DCF has learned its lesson. Adding this insult to the injury sustained by Floridians denied the right to vote on November 7, 2000, DCF states, "[t]he 2000 general election was a great teaching experience, and those with the administration of election laws are those who learned from that experience." DCF asserts that because Plaintiffs continue to pursue their claims, they are not mindful of the Court's scarce resources. Unfortunately, in its arrogance, DCF refuses to recognize that Plaintiffs and other Floridians were the victims of its failure to comply with the law and as a result of this failure, lost the opportunity to exercise the most precious right accorded in our democratic society – the right to vote.

    **A.   Plaintiffs Are Not Required To Show A System-Wide Violation.**

     As she did in her motion for summary judgment, Defendant Kearney argues that Plaintiffs have failed to show a system-wide violation, citing to *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1574 (11th Cir. 1994) and *Lewis v. Casey*, 518 U.S. 343 (1996). In support of this argument Kearney asserts that Plaintiffs have pointed to only ten persons who were denied voter registration at DCF offices whereas DCF served over 4.6 million public assistance and disability clients since July 2000. Kearney's arguments are misguided.

     First, *Ensley Branch, NAACP* and *Lewis* are not relevant to the analysis here. These cases address the appropriateness of remedies, not sufficiency of evidence in relation to a motion for summary judgment. *Ensley Branch, NAACP*, 31 F.3d at 1552-63; *Lewis*, 518 U.S. at 346-48. In both cases, the courts required a showing of system-wide violations solely in fashioning proper remedies; "[t]he remedy must of course be limited to the inadequacy that produced the

injury…" *Lewis*, 518 U.S. at 357 (citation omitted.) Here, we are not at the remedial stage of the case and thus, these arguments are irrelevant.

Second, Plaintiffs' evidence, which includes evidence from offices throughout the State, does in fact show systemic problems with implementation of NVRA. *See* Plaintiffs' Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment (Plts. Undisputed Facts) at ¶¶ 29-55. While DCF believes that its servicing of 4.6 million clients disposes of any claims of systemic violations because Plaintiffs cite to ten DCF clients, DCF's statistics bolster Plaintiffs' claims. That DCF provided 4.6 million people with these services since July 2000, dictates that DCF should have retained *at least* 4.6 million voter registration preference forms – documents which indicate whether or not a client desires to register to vote – as required by NVRA. These forms must be completed by each client each time she applies/re-certifies for assistance or changes her address with DCF. 42 U.S.C. § 1973gg-5. These forms must be retained for two years. Yet, Defendant has only 13,000 voter registration preference forms. Plts. Undisputed Facts ¶50.[5] The paucity of voter registration preference forms alone demonstrates a violation of NVRA. It also heavily suggests that DCF failed to provide opportunities to register to vote, as required under NVRA, at all.

Kearney's other arguments should similarly be disregarded. Defendant argues Plaintiffs failed to assert that Plaintiffs applied for, re-certified for or reported a change of address for purposes of public assistance, as required by NVRA. Def. Kearney's Opp. Mot. at 2. Defendant once again is sadly mistaken. Plaintiffs have repeatedly alleged that they visited DCF offices to apply, recertify or change an address for public assistance. Plts' Undisputed Facts ¶¶ 29, 34-38. Indeed, Defendant's own discovery responses prove this fact. Ciccolo Decl., Ex. 57 Def. Kearney's Second Supplemental Response to Plts.' First Set of Interrogatories.

Moreover, Defendant argues that Plaintiffs' claims are time-barred. This is simply wrong. For example, Plaintiff Joanna Clark's claims against DCF related to a DCF visit that occurred within one year of the filing of this action; clearly, this is within the statute-of-

---

[5]  Defendant tries to justify this low number of voter registration preference forms by arguing that only declinations need to be kept and only for two years. This argument falls on its face, because Defendant previously admitted that the 13,000 voter registration forms "show voter preferences other than the registrant's declination." *See* Ciccolo Decl., 07/01/02, Ex. 54 at 1.

16

limitations.  Furthermore, other allegations raised by plaintiffs occurred within that period and through the present, while others demonstrate that DCF has failed to comply with NVRA from the date of its required implementation.

Finally, relying on a misrepresentation of Plaintiffs' expert's testimony, (Gary McIntosh), Kearney argues that McIntosh found no evidence of violations of NVRA and excused the problems as human error.  McIntosh made no conclusions as to whether DCF had fully implemented NVRA, nor was he asked to do so.  McIntosh was asked to provide an opinion about recommended practices and compare them to DCF's practices.  Also, McIntosh clearly identified some of DCF's compliance problems as more than excusable human error.  Ciccolo Decl., Ex. 27 at 73-74, 118, 198-99.  *See also*, Plaintiffs' Mem. of Law in Opp. to Motion for Summ. Judgmt. by Def. Kearney at 8-11.

**B.      DCF Has Failed To Comply With The Law.**

Defendant Kearney argues that Plaintiffs' claims against DCF must fail because Plaintiffs' would require DCF to fully comply with NVRA.  DCF believes it should only have to be in "substantial compliance" with the law.  Def. Kearney's Opp. Mot. at 3. This argument must fail because this standard does not apply to federal laws and the case law cited is irrelevant here.

The state court cases Kearney relies on to argue that DCF only need be in "substantial compliance" are inapposite.  First, these cases involve interpretation of state election laws, not federal laws.  In fact, states have been required to comply fully with NVRA.  *See e.g., Association of Community Organizations for Reform Now v. Candice*, 912 F. Supp. 989, 991 (W.D. MI 1996) (ordering defendants agencies to comply fully with the NVRA) *aff'd by Association of Community Organizations for Reform Now v. Miller*, 129 F.3d 833 (6th Cir. 1997); *National Coalition for Students with Disabilities Educ. And Legal Defense Fund v. Scales*, 150 F. Supp. 2d 845 (D.Md. 2001) (finding that a voter registration agency's practice of only offering voter registration services at the initial intake interview does not satisfy its statutory duties under the NVRA).  *Cf. Carrie v. Menke*, 176 F. Supp.2d 786, 799-807 (M.D. Tenn. 2001) (requiring strict compliance with the federal health program's statutory requirements).

17

Second, the cases cited in support of Kearney's argument are irrelevant because they involve administration of elections where the election outcome was being challenged. These were "extraordinary proceeding[s]," *Garvin v. Jerome*, 767 So.2d 1190, 1193 (Fla. 2000), where the courts were faced with potentially treading on the will of the voters. *See Garvin,* 767 So.2d 1190 (challenge to petition to recall an election because it did not comply with recall petition laws); *Klein v. Carannante*, 778 So.2d 1093 (Fla. 2001) (petition for injunction to remove candidates name from the ballot for failure to comply with resign to run statute); *Beckstrom v. Volusia County Canvassing Board*, 707 So.2d 720 (Fla. 1998) (challenge to election return arguing county election officials failure to comply with absentee ballot laws); *Jacobs v. Seminole County Canvassing Board*, 773 So.2d 519 (Fla. 2000) (challenge to election on grounds that absentee ballots did not comply with state law). In *Beckstrom,* the Florida Supreme Court explained that it was not "condoning anything less than strict adherence" to election procedures, but that only "substantial compliance" was necessary where the will of the voters were at stake and the failures by election officials were unintentional wrongdoing. *Beckstrom,* 707 So.2d at 725-26. The court noted, "the right to vote is the right to participate . . . speak . . . [and] to be heard . . . By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right." *Id.* at 724. Here, DCF's failure to comply with NVRA and FVRA, has deprived citizens of the very right Florida courts, referred to in the cases above, sought to respect – the right to vote.

### C.   DCF's Post-2000 Actions Do Not Preclude Plaintiffs' Claims for Relief.

Defendant argues that the affidavit of John Bowman, a DCF administrator, shows the steps DCF has taken to make the voter registration process "trouble-free." DCF claims it learned from the 2000 debacle and thus, there is no need for this litigation. In fact, defendant assures that if there are any problems in the future, they will make more changes – that is the "nature of governmental processes." Defendant's argument must fail as she has not met the heavy burden of proving "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant*, 345 U.S. 629, 633 (1953). This court should not entertain Defendant's position, for it is "the duty of the courts to be aware of efforts to defeat injunctive relief by protestations of

18

repentance and reform, especially when abandonment seems timed to anticipate suit and there is a probability of resumption." *W.T. Grant Co.,* 345 U.S. at 632. *See* Plaintiffs' Mem. of Law in Opp. Motion for Summ. Judgmt. By Def. Kearney at 13-18.

Plaintiffs' motion for summary judgment against Defendant Kearney should be granted in full. Plaintiffs have demonstrated that DCF has and continues to fail to comply with NVRA and FVRA by failing to transmit voter registration applications, provide voter registration opportunities, and record the registration choices of DCF clients. DCF has failed to provide any defense, other than promises of reform. For these reasons, summary judgment should be granted as to Defendant Kearney.

## V.  Harris, Roberts, Leahy, Iorio and Lowe Permitted and Administered Non-Uniform Practices in Violation of Section 2 of the Voting Rights Act.

### A.  Plaintiffs' Election Administration Claims Are Not Moot.

Defendants argue that Plaintiffs' election administration claims are mooted by FERA's provision regarding the use of provisional ballots. Specifically, Defendants argue that provisional ballots will give an individual the right to vote on election day even if election officials cannot verify the voter's eligibility.

While permitting a voter at the correct precinct to cast a provisional ballot is preferable to sending the voter away from the polls without having had the opportunity to vote, FERA does not require and Defendants have not agreed to permit voters to cast a provisional ballot in as easy and timely a fashion as other voters and such votes will not be counted on election day, if they are counted at all. Given the communications and pollworker problems that occurred during the November 2000 election, voters will improperly be denied the right to vote in future elections unless these problems are corrected. Moreover, significantly, Defendants fail to mention a key part of the provisional ballot process that will severely limit the effectiveness of the law: even if a voter is properly registered in the county where the provisional ballot is cast, the ballot will not count unless it is cast in the precinct where the voter is registered. *See* Florida Statutes, Chap. 2002-17, Sec. 6.

Therefore, provisional ballots do not provide adequate relief for the problems that Plaintiff Admatha Israel and other similarly situated voters experienced on November 7, 2000. A voter who is in the wrong precinct and attempts to vote by provisional ballot, may be in a worse position than if communications problems were fixed and the voter was directed to her correct precinct based on her street address. Because a voter must cast a provisional ballot in her/his correct precinct in future elections, determining a voter's correct precinct will be an extremely important job of poll workers on election day.

Furthermore, Defendants fail to acknowledge that voting by provisional ballot can not be equated to voting by a regular ballot on election day. Provisional ballots carry an additional risk that an error may occur, as in order for the provisional ballot to count it must go through an added governmental check which allows for the possibility of additional errors and problems to occur. Provisional ballots, although useful, do not address the injuries suffered by Plaintiffs.

**B.**   **Plaintiffs Have Demonstrated that Defendants Violated the Voting Rights Act by Employing Practices or Procedures which Disparately Impacted Black Voters and Denied them the Opportunity to Participate Fully in the Electoral Process.**

Count 2 of Plaintiffs' Second Amended Complaint alleges violations of the Voting Rights Act by Defendants Harris, Roberts, Leahy, Lowe, and Iorio. In contrast to Defendants' contentions, Plaintiffs have sufficiently alleged practices and procedures that resulted in the denial of the right to vote on account of race. Plaintiffs have produced sufficient evidence to establish the disproportionate disenfranchisement of black citizens throughout the state of Florida. Specifically, Plaintiffs have demonstrated that black Floridians: (1) tend to be more mobile than other groups, making them more likely to require assistance at the polls on election day; (2) black voters completed more affirmation forms than non-black voters on November 7, 2000 in Hillsborough County; (3) fewer poll workers were assigned to predominantly black precincts in Hillsborough County and Volusia County; (4)  fewer computers were assigned to predominantly black precincts in Hillsborough County; and (5) disproportionately more black voters were purged on account of felony conviction in Hillsborough County and Miami-Dade County.

C.    **Socioeconomic Disparities between Black Floridians and non-Black Floridians Demonstrate that Black Floridians Continue to Bear the Effects of Past Official Race Discrimination.**

Black Floridians continue to bear the effects of past official race discrimination. Complex social and historical factors have created an environment in which Black voters were more likely than non-Black voters to be disenfranchised during the November 2000 general election. These disparities result, in part, from a history of official race discrimination against Black citizens in Florida and the present day effects of that discrimination. *See, e.g., Nash v. Consolidated City of Jacksonville*, 905 F.2d 355 (1990) (reversing district court's finding that city's examination given to firefighters did not disparately impact minorities); *Ammons v. Dade City*, 783 F.2d 982 (1986) (holding that the city intentionally provided disparate services to Black and white communities, resulting in a discriminatory impact on the Black community); *Baker v. Kissimmee*, 645 F. Supp. 571 (1986) (finding that the city's conduct had a discriminatory impact when it disproportionately allocated resources to racially segregated communities for street paving and maintenance in such a way that the foreseeable outcome was a deprived Black residential community); *Dowdell v. Apopka*, 698 F.2d 1181 (1983) (finding the municipal services to Black residents having "foreseeable and anticipated disparate impact" on the Black community); *see also*, Ciccolo Decl., 07/01/02, Ex. 64, Select Historic Racial Discrimination in Florida.

Defendants Leahy, Iorio and Lowe argue that Plaintiffs' Section 2 claim must fail because the socio-economic data upon which Plaintiffs rely is not localized. Plaintiffs acknowledge that they previously relied upon statewide data, but present county-specific data here to support their claim under Section 2 of the Voting Rights Act.

The effects of past official race discrimination in Miami-Dade County, Hillsborough County and Volusia County are reflected by the relatively lower levels of education and income for blacks compared with whites in those counties. According to 2000 Census Data, in Hillsborough County, 25.8% of blacks ages 25 and over have not graduated from high school, or achieved the equivalent of a high school diploma, compared with 16.7% of whites.[6] The average

---

[6]   Census data regarding Florida counties is available on the U.S. Census Bureau website at http://factfinder.census.gov. Plaintiffs request that the Court take judicial notice of this data.

21

per capita income of blacks in Hillsborough in 1999 was $12,916, while the average per capita income for whites was $23,066. The percentage of blacks living below the poverty line in Hillsborough in 1999 was 25.69% compared to 10.8% of whites. According to 2000 Census Data, in Miami Dade County, 34.5% of blacks ages 25 and over have not graduated from high school, or achieved the equivalent of a high school diploma, compared with 25.9% of whites. The average per capita income of blacks in Miami Dade in 1999 was $12, 051, while the average per capita income for whites was $20,497. The percentage of blacks living below the poverty line in Florida in 1999 was 15.9% compared to 31% of whites. According to 2000 Census Data, in Volusia County, 29.15% of blacks ages 25 and over have not graduated from high school, or achieved the equivalent of a high school diploma, compared with 16.2% of whites. The average per capita income of blacks in Florida in 1999 was $9,789, while the average per capita income for whites was $19,461. The percentage of blacks living below the poverty line in Florida in 1999 was 28% compared to 14.2% of whites. Socioeconomic differences between blacks and non-blacks also are a factor in blacks being less likely than other groups to own homes, which leads to higher rates of mobility for blacks. Ciccolo Decl., 07/01/02, Ex. 61, Flores Report, at 8.

> **D.     Defendants Violated the Voting Rights Act by Employing Election Practices and Procedures which Disparately Impacted Black Voters, Denying them the Opportunity to Participate Fully in the Political Process.**
>
> > **1.     Black Floridians Have Higher Mobility Rates than Other Groups in the State.**

Blacks "[t]end to have a higher propensity of populating the ranks of renters, as opposed to homeowners, than other racial groups . . . ." Ciccolo Decl., 07/01/02, Ex. 61, Flores Report at 8. Renters are more mobile than homeowners and since blacks are more likely to be renters than non-blacks, they are also more mobile than non-blacks.[7]

---

[7]   Plaintiffs no longer rely on the conclusions of Dr. Henry Flores regarding inactive voters in Miami-Dade County and Volusia County in regard to motions for summary judgment.

Because black Floridians are more mobile than other groups, they are more likely to encounter problems on election day related to change in address information and require additional assistance from poll workers, including confirmation of their eligibility to vote.[8]

### 2. Disparities Existed in the Assignment of Poll Workers in Some Counties.

Although black voters may require additional assistance on election day in comparison to other voters, fewer poll workers were assigned to predominantly black precincts in Volusia County and Hillsborough County.[9]   Ciccolo Decl., 07/01/02, Ex. 61, Flores Report at 3-4; *Id.* at Ex. 62, Flores Supp. Report, at 2. These lower numbers of poll workers in black plurality precincts are very significant because they suggest that voters in black plurality precincts received less voter assistance than those in white plurality precincts and were subjected to less effective election administration overall.[10]   *Id.* at Ex. 63, Hayduk Report, at 32.

For the first time, Defendant Iorio produced evidence annexed to her Response to Plaintiffs' Motion for Partial Summary Judgment to dispute Plaintiffs' allegation that fewer poll

---

[8]   Defendants argue that there is no distinction between the way in which inactive and active voters are treated on election day.  That is, in many counties inactive voters are not even identified as inactive on the precinct register.  They are simply listed with all other registered voters without distinction.  Plaintiffs do not dispute these allegations.  Plaintiffs continue to contend, however, that higher mobility rates for black Floridians suggest that black voters may require additional assistance at the polls on election day because of change of address complications requiring confirmation of eligibility.

[9]   In Defendant Cowles' Response to Plaintiffs' Motion for Partial Summary Judgment, he argues that the evidence upon which Plaintiffs' expert, Ronald Hayduk, relied to conclude that fewer poll workers were assigned to predominantly black precincts in Orange County was incomplete and therefore erroneous.  Plaintiffs do not dispute that Mr. Hayduk's conclusion about poll workers in Orange County may be erroneous due to his inadvertent omission of 27 pages of documents upon which he relied to reach his conclusions.  Plaintiffs would like to point out to the Court that Defendant Cowles produced additional documents to Plaintiffs regarding election day administration issues in the midst of summary judgment motions and several weeks after the close of discovery, making it difficult for Plaintiffs' experts to evaluate election administration problems in Orange County.

[10]   Poll workers assist voters and facilitate elections in a broad variety of ways including checking voter rolls, answering questions, calling the central office for registration verification, and using the laptop for voter registration verification.  *See* Ciccolo Decl., 07/01/02, Hayduk Report at 30 & 32.

workers were assigned to predominantly black precincts in Hillsborough County. *See* Affidavit of Charles Smith, dated July 16, 2002. Plaintiffs acknowledge that this fact is now in dispute.

### 3.   Blacks Were Disproportionately Identified as Felons and Purged in Miami-Dade County and Hillsborough County.

The state-mandated purge based on alleged felony status disparately affected black voters throughout the state of Florida. In Miami-Dade County, a higher percentage of black voters were purged from the voter roll in 2000 for alleged felony convictions than the population of blacks in the county. Ciccolo Decl., 07/01/02, Ex. 62, Flores Report at 3.

Defendant Leahy contends that Plaintiffs' analysis is incorrect in that in order to determine whether blacks were disparately impacted by the felon purge in Miami-Dade County, one must compare the race of those purged with the race of the felon population in the county, rather than the race of the total population in the county. Plaintiffs maintain that their analysis is correct, but recognize that a material issue of fact is now in dispute.

Thousands of individuals who were removed from the county voter rolls based on alleged felony convictions in Miami-Dade County did not receive or respond to notice that they were believed to be ineligible to vote. *See* Williams Decl., 07/22/02, Ex. 1, Leahy Depo. at 127-29. Defendant Leahy had knowledge of this fact at least as early as 1999 but to date Defendant Leahy has made no efforts to investigate or reinstate improperly purged voters.

The state-mandated purge on account of alleged felony conviction also disparately impacted black voters in Hillsborough County, where a higher percentage of black voters were purged from the voter rolls in 2000 for alleged felony convictions than the population of blacks in the county. Ciccolo Decl., 07/01/02, Ex. 61, Flores Report, at 3.

The Central Voter File felony purge lists that the state provided to county supervisors of elections erroneously included the names of thousands of eligible voters who did not have felony convictions. Wallace McDonald, for example, was one of the voters in Hillsborough County who was erroneously identified as a former felon. Although Mr. McDonald informed Defendant Iorio that he was erroneously identified as a felon, Defendant Iorio purged Mr. McDonald from the voter rolls without conducting any independent verification of Mr. McDonald's alleged felony conviction. *See* Fineman Decl, 06/13/02, FDLE Report (indicating that Mr. McDonald

has *no* felony convictions). Defendant Iorio finally acknowledges in her Response to Plaintiffs'
Motion for Partial Summary Judgment that Mr. McDonald was in fact erroneously purged. *See*
letter from Defendant Iorio to Mr. James T. Moore, Executive Director, Florida Department of
Law Enforcement, dated July 9, 2002, annexed to Iorio Response, July 17, 2002.

> **4.     Predominantly Black Precincts in Hillsborough County Were Less
> Likely than Predominantly White Precincts to Have Access to a
> Computer on Election Day.**

In Hillsborough County, ten precincts had access to a computer for the 2000 general
election; however, none of those precincts had a majority black registered voter population or
total population.[11] Ciccolo Decl., 07/01/02, Ex. 63, Hayduk Report, at 19. In Defendant Iorio's
Response to Plaintiffs' Motion for Partial Summary Judgment, she argues that Plaintiffs fail to
acknowledge all of the criteria upon which she relied to determine which precincts received
computers on November 7, 2000. One of the criteria Defendant Iorio indicates she considered
was which precincts had a high number of affirmation forms completed during pre-2000
elections. It appears that consideration of this criterion would indicate a need for computers in
predominantly black precincts. Indeed, Plaintiffs have produced evidence demonstrating that
black voters completed more affirmation forms on November 7, 2000 than other groups.
Further, Plaintiffs have shown that black Floridians are more mobile than other groups and that
change of address information is one reason for completing an affirmation form on election day.
These facts support Plaintiffs' claim that there was a heightened need for computers in
predominantly black precincts and, particularly, a need for access to the complete database of
registered voters in Hillsborough County.

Defendant Iorio also argues that although no predominantly black precincts had computer
access on November 7, 2000, some non-majority black precincts with larger numbers of black
registered voters than some predominantly black precincts did have access to a computer.
Defendant Iorio further contends that Plaintiffs must demonstrate that more black voters vote in

---

[11]   In Defendant Cowles' Response to Plaintiffs' Motion for Partial Summary Judgment, he
indicates that Plaintiffs' expert, Ronald Hayduk, inadvertently compared 2000 data on laptop
assignments to 1998 precinct data. Thus, Plaintiffs do not intend to rely on Mr. Hayduk's
conclusions regarding laptop assignments in Orange County in regard to motions for summary
judgment.

predominantly black precincts than other precincts in order to show a disparate impact of the assignment of computers in the 2000 general election. Plaintiffs disagree with Defendant Iorio's analysis, but acknowledge that a material issue of fact now exists on this issue.

> **E.    Plaintiffs Have Demonstrated a Sufficient Nexus Between the Actions and Inactions of Defendants Harris and Roberts and the Election Practices and Procedures which Disparately Impacted Black Voters Throughout the State to Support Plaintiffs' Claims Under Section 2 of the Voting Rights Act.**

Defendants Harris and Roberts are responsible for ensuring statewide compliance with the Voting Rights Act.[12] As the chief elections officers in the state of Florida, they are ultimately responsible for the proper and uniform enforcement of the election laws. Defendant Harris, as Secretary of State, is responsible for the "general supervision and administration of the election laws", Fla. Stat. § 15.13, and must obtain and maintain uniformity "in the application, operation, and interpretation of the election laws," Fla. Stat. §97.012 (1).

Federal courts have recognized that Florida's Secretary of State, as the Chief Elections Officer, bears the responsibility for the supervision and administration of the election laws.

---

[12] Defendants Harris and Roberts additionally argue that Plaintiffs' underlying data and conclusions upon which they rely are in dispute, citing to the deposition transcript of Dr. Susan MacManus. However, a close examination of MacManus' testimony does not support Defendants' claims. Defendants' contentions are undercut when one evaluates MacManus' testimony more closely. MacManus concentrated on only one county -- Hillsborough County -- for most of her expert testimony. *Id.* at 23:24-24:4, 89-90,107-108. Defendants' attempt to expand her knowledge of one county into the whole state is unsupported. Moreover, according to MacManus, Florida uses a decentralized system and each county varied in, for example, the training of poll workers. *Id.* at 104-105. Indeed, such variations between counties are a crucial part of Plaintiffs' complaints in this action.

Furthermore, Defendants cites to MacManus are misleading. For instance, her review of outreach to minority communities was limited to post-2000 work of Pam Iorio, not the whole state of Florida. *Id.* at 34-41, 97. Additionally, MacManus did not state that election day problems did not correlate to race. Rather, she stated that perhaps not 100 percent, but "there is some correlation." *Id.* at 127:17. Furthermore, it is unclear what is meant when Defendants state parenthetically that there is "no lingering effect associated with socio-economic factors." Yet, at the exact pages to which the Defendants cite, MacManus actually stated: "Many of the consortium reports reported that voter mistakes were most common among low-income and lower-educated individuals," which would be true in Florida. *Id.*, at 82:8-12. Defendants' narrow and sometimes mistaken reading of MacManus' testimony shows that Plaintiffs' underlying data and the conclusions in support of partial summary judgment are not disputed as the Defendants would like the Court to believe.

*See, Socialist Workers Party v. Harris*, 145 F.3d 1240, 1242 (11th Cir. 1998) ("when a state is sued with regard to its election laws, the proper state representative is the chief elections officer...[who] has the authority to bind the state as a whole [under Florida Law]"); *See also*, *Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324 (N.D. Fla. 2000). In addition to finding county supervisors of elections liable for improper administration of election laws, Florida courts have found the Secretary of State similarly liable. *See, e.g., CBS, Inc. v. Smith*, 681 F. Supp. 794 (S.D. Fla. 1988) (enjoining the Secretary of State and county supervisors of elections from enforcing an unconstitutional statutory restriction on exit polling).

Due in part to Defendant Harris' failure to provide any guidance or set any minimum standards to ensure compliance with the Voting Rights Act, voters throughout the state were subjected to non-uniform election administration practices which had a racially discriminatory impact on black voters.

As Plaintiffs have argued in previous pleadings, despite Defendants' legal mandate to ensure uniformity in the administration of elections, there was a total lack of uniformity throughout the State. The State's failure to ensure uniformity in the administration of elections in November 2000 created an environment where black voters were disparately impacted by certain election practices. At a minimum, Defendants Harris and Roberts had a duty to provide county supervisors of elections with minimum standards and guidance on proper administration of elections. Instead, county supervisors received no guidance on the administration of elections. *See, e.g.*, Ciccolo Decl, 07/01/02, Ex. 30, Iorio Depo., at 42. As a result, different procedures and practices were employed throughout the state. This created a situation where black voters were disparately impacted by unequal distribution of laptop computers to predominantly black precincts, unequal assignment of poll workers to predominantly black precincts, and inadequate lines of communication to central election offices throughout the state and the disparate purging of black voters for alleged felony conviction in some counties. "[U]niform criteria for allocating poll workers and laptops, for designating voters to precincts and to poll sites . . . and a host of other practical changes would reduce poll site problems and disparate treatment." Ciccolo Decl., 07/01/02, Ex. 63, Hayduk

27

Report, at 47-48. In addition, "clear and uniform standards and practices [for] handling affirmation/affidavit ballots would reduce poll site problems and disputes." *Id.; see also id.,* at Ex. 38 to Ex. 47, Defendants' Responses to Plaintiffs' First Set of Interrogatories, responses 5, 6, 7, 8, 10, and 11.

**VI.    All Defendants Permitted and Administered Non-Uniform Practices on Election Day in Violation of the Civil Rights Act and Analogous Florida Law.**

Plaintiffs allege a claim under the Civil Rights Act of 1957 and 1960 and analogous Florida law against all Defendants. A claim under the Civil Rights Act can be shown where there is state action, racial discrimination through discriminatory application of the law, and the existence of a standard, practice or procedure that was applied differently to black voters as compared to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote. The practices described, *supra,* as part of Plaintiffs' argument under the Voting Rights Act, such as those regarding assignment of computers and poll workers to precincts, support Plaintiffs' claim against Defendants under the Civil Rights Acts.

Defendants argue that 42 U.S.C. § 1971 requires Plaintiffs to show discriminatory intent in order to succeed on this claim. The cases relied upon by Defendants Harris and Roberts to support their argument, however, do not provide support for an intent requirement under § 1971. In *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977), cited by Defendants, an intent requirement was not required under 42 U.S.C. § 1971. Defendants Harris and Roberts also rely on *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999), as evidence of the discriminatory purpose requirement under § 1971. Although the court in *Burton* made no mention of an intent requirement under § 1971, the court did conclude that there is an implied private right of action for injunctive or declaratory relief to enforce regulations promulgated under a similar civil rights statute "even if not intentionally discriminatory, that results in disparate impact or discriminatory effects on the basis of race, color, or national origin." *Id* at 1202. Plaintiffs have clearly alleged sufficient facts to support

28

their claims under the Civil Rights Acts and Fla. Stat. 104.0415 and summary judgment should be granted on these claims.

**VII.    Harris and Roberts Failed to Ensure that All Voters Were Treated in a Non-Arbitrary, Equal Manner, in Violation of the Fourteenth Amendment**

The Supreme Court recently reaffirmed that the Fourteenth Amendment prohibits a state from valuing the voting rights of one person over another: "The right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104-105 (2000).

**A.    *Bush v. Gore* and Its Progeny Are Applicable To This Case.**

Harris and Roberts erroneously assert that the Supreme Court's decision in *Bush v. Gore* is inapplicable to the case at hand. [13]  *See* Harris Response at 31.  The Supreme Court's decision in *Bush v. Gore* is in fact applicable.  Harris and Roberts erroneously assert that *Bush v. Gore* is so limited that its holding is not applicable here, though they concede that the District Court in *Black v. McGuffage,* Nos. 01C208, 01C796, 2002 WL 483403 (N.D. Ill. March 29, 2002)

---

[13]   Since the defendants had an opportunity to raise these claims at the earlier hearing, the court should refrain from re-examining issues of law which it has already settled.  Law-of-the-case doctrine suggests that "an issue decided at one stage of the case is binding at later stages of the same case." *United States v. Escobar-Urrego,* 110 F.3d 1556, 1560 (11th Cir. 1997); *see e.g., Al-Site Corp. v. VSI Int'l, Inc.,* 1997 U.S. Dist. LEXIS 18148 (affirming plaintiff's motion for summary judgment against defendant's affirmative defense partly on the basis of the court's earlier decision on the issue at a bench trial). This doctrine advises the court against reconsidering its earlier decisions, because "[i]t would be utterly destructive . . . if each successive decision resulted in the reconsideration of every previous one, and a sequence of decisions in the same case based on different views of overlapping issues of law would likely result in an internally inconsistent judgment." *Gillig v. Advanced Cardiovascular Sys.,* 67 F.3d 586, 589-90 (6th Cir. 1995)(quoting Moore's Federal Practice). Thus, to avoid this dilemma, "it is the practice to treat each successive decision as establishing the law of the case and depart from it only for convincing reasons." *Id.* Because the cases Defendants cite do not materially effect the controlling authority which the court previously relied on, the court should uphold its earlier decision.

29

followed the Supreme Court's reasoning in *Bush*, as did the Ninth Circuit in *Charfauros v. Board of Elections*, 249 F.3d 941 (9th Cir. 2001).  *See* Def. Resp. Brief p. 32.

Despite the Defendants' unsupported argument to the contrary, *Charfauros* clearly supports the Plaintiffs' argument and *McGuffage* directly addresses the current controversy.[14]  In *McGuffage*, the court, while acknowledging the Supreme Court's limited holding in *Bush v. Gore*, states that "[t]his case presents a situation much more analogous to that in *Bush* than that of other voting rights cases." 2002 WL at *9.  The court distinguishes *McGuffage* from other cases, analogizing it to *Bush* and noting that,

> it leaves the choice of voting system up to local authorities.  But that choice necessarily means that some authorities will choose a system with less accuracy than others.  As a result, voters in some counties are statistically *less likely to have their votes counted* than voters in *other counties in the same state in the same election* for the same office.

*Id.* (emphasis added).

Under these circumstances, the court stated that the "situation presented by this case is sufficiently related to the situation presented in *Bush* that the holding should be the same." *Id.* Holding that the Plaintiffs did sufficiently state a claim, the court remarked that "[a]ny voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional. Even without a suspect classification or invidious discrimination." *Id.* Just as *McGuffage* falls within the scope of *Bush*'s limited holding, so does the present controversy because the State here, too, has implemented a non-uniform procedure by allowing the local authorities to undertake disparate practices.

### B.   Plaintiffs' Injuries Are Redressable By Ensuring Uniformity Throughout the State.

Defendants are attempting to maintain the *status quo* of inefficiency and non-accountability in violation of the NVRA and Florida law.  The current non-uniform practices have led to an unequal distribution of voting power, in violation of the Fourteenth Amendment's Equal Protection clause.

---

[14]  In *Charfauros*, the court found that the defendant board's arbitrary practice of removing voters from the list of qualified voters treated them in a disparate manner, violating their fundamental right to vote under the Fourteenth Amendment.  2001 U.S. App. LEXIS 15083 (2001).

Defendants assume, without indicating any evidence in support of their assertion, that Plaintiffs Floyd and Wells would not have been able to escape injury, even if the Secretary of State chose to adhere to the statutorily-required uniformity standards of the NVRA and Florida law. *See* Harris Response, at 33. At the very least, statewide uniformity ensures equal voting power without illegally placing a higher value of "one person's vote over that of another." *McGuffage,* 2002 WL 483403, at *9 (citing *Bush*).

The Defendants implicitly concede that the Secretary, in violation of the NVRA, has failed to insure uniformity, but claim that the lack of uniformity can be linked to no injury. Defendants cite no authority for this assertion, continuing to ignore Plaintiffs' argument. The United States Constitution and the Supreme Court of the United States recognizes citizens' rights to equal protection. Indeed, the Supreme Court clearly holds the "one person one vote" standard in high regard. *See Bush,* 531 U.S. at 104-5.

**C.    Defendants Ignore the Uniformity Requirements of Florida Statutes and Federal Law.**

Harris and Roberts continue to assert, notwithstanding inconsistency, that Florida law does in fact require uniformity and that the Secretary and Director have maintained uniformity, though they further contend that neither may be held accountable for the lack of uniformity in list maintenance procedures. As discussed herein, the NVRA and Florida Elections law require the Chief Election Official to maintain uniformity. *See* 42 U.S.C. § 1973gg6-8. While Harris and Roberts erroneously interpret the uniformity and non-discriminatory requirements of the NVRA to not extend to election day administration, the Plaintiffs assert that the NVRA requirements must be satisfied 365 days of the year without exception. *See Id.* Case law, state and federal statutes, along with the legislative history of these statutes provide evidence that the Secretary of State as the Chief Election Official must ensure a uniform and non-discriminatory elections process. *See* Plaintiffs' Response, at 8-12. Harris and Roberts have failed to ensure uniformity throughout the State and continue to ignore their responsibilities under federal and state law.

31

## CONCLUSION

For the reasons set forth above, and in Plaintiffs' earlier pleadings and submissions in support of the motion, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment.

Dated: July 22, 2002

Respectfully submitted,

Barbara Arnwine
Thomas J. Henderson*
Anita Hodgkiss*
Lori Outzs Borgen*
Cara Fineman*
Lawyers' Committee for Civil Rights
   Under Law
1401 New York Ave., N.W., Suite 400
Washington, D.C. 20005-2124
Tel. 202-662-8600 or 888-299-5227
Fax 202-783-5130
lborgen@lawyerscomm.org

Thomasina H. Williams
Williams & Associates, P.A.
Brickell BayView Centre, Suite 1830
80 S.W. Eighth Street
Miami, FL 33130
Tel. 305-379-6676
Fax 305-379-4541
FL Bar No. 629227
thwilliams@wms-law.com

Dennis C. Hayes*
Angela Ciccolo*
NAACP Legal Department
4805 Mt. Hope Drive, Fifth Floor
Baltimore, MD 21215-3297
Tel. 877-622-2798
Fax 410-358-9350
aciccolo@naacpnet.org

Elaine R. Jones
   Director-Counsel
Theodore M. Shaw*
Norman J. Chachkin*
Janai S. Nelson*
NAACP Legal Defense & Educational Fund, Inc.
99 Hudson St., Suite 1600
New York, NY 10013
Tel. 212-965-2200
Fax 212-216-7592
jnelson@naacpldf.org

32

Todd A. Cox*
NAACP Legal Defense & Educational
    Fund Inc.
1444 Eye Street, N.W., 10th Floor
Washington, DC 20005
Tel. 202-682-1300
Fax 202-682-1312
tcox@naacpldf.org


Penda Hair*
Judith Browne*
Monique Dixon*
Advancement Project
1730 M Street NW, Suite 401
Washington, DC 20036
Tel. 202-728-9557
Fax 202-728-9558
jbrowneesq@aol.com


Laughlin McDonald
ACLU Voting Rights Project
2725 Harris Tower
233 Peachtree Street NE
Atlanta, GA 30303
Tel. 404-523-2721
Fax 404-653-0331
lmcdonald@aclu.org


Louis M. Bograd
American Civil Liberties Union Foundation
National Legal Department
733 15th Street, NW, Suite 620
Washington, DC 20005
Tel. 202-393-1918
Fax 202-393-4931
BOGRAD1@aol.com


Elliot Mincberg*
Larry Ottinger*
Alma C. Henderson*
People for the American Way Foundation
2000 M Street, Suite 400
Washington DC 20036
Tel. 202-467-2392
Fax 202-293-2672
lottinger@pfaw.org

* Admitted *pro hac vice*.

33

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via overnight mail on July 22, 2002 and a courtesy copy sent by electronic mail on July 22, 2002.

Walter James Harvey, Esq.
Steel Hector & Davis, LLP
200 S. Biscayne Boulevard
41st Floor
Miami, FL 33131-2398
phone: 305-577-2934
fax:    305-577-7001
Attorneys for Katherine Harris,
Secretary of State of Florida, and
Clay Roberts, Director of the
Florida Division of Elections

John W. Little, III, Esq.
Steel Hector & Davis, LLP
1900 Phillips Point West
777 South Flager Drive, Suite 1900
West Palm Beach, FL 33401
phone: 561-650-7270
fax:    561-655-1509
Attorneys for Katherine Harris,
Secretary of State of Florida, and
Clay Roberts, Director of the
Florida Division of Elections

H. Ray Allen, II, Esq.
Sr. Assistant County Attorney
Rebecca M. Kert, Esq.
Assistant County Attorney
Kenneth Tinkler
Assistant County Attorney
Hillsborough County Attorney's Office
601 E. Kennedy Blvd., 27th Floor
Tampa, FL 33602
phone: 813-272-5670
fax: 813-272-5846
Attorneys for Hillsborough County
Supervisor of Elections Pam Iorio

Tracey I. Arpen, Jr., Esq.
Office of General Counsel
City of Jacksonville
117 W. Duval St., Suite 480
Jacksonville, FL 32202
phone: 904-630-1835
fax:    904-630-1316
Attorney for Duval County Supervisor
of Elections John Stafford

Jeffrey P. Ehrlich, Esq.
Assistant County Attorney
Dade County Attorney's Office
Metro Dade Center
111 NW 1st Street, Suite 2810
Miami, FL 33128
phone: 305-375-5151
fax:    305-375-5634
Attorney for Miami-Dade County
Supervisor of Elections David Leahy

Michael Cirullo, Jr., Esq.
Josias Goren Cherof Doody & Ezrol, PA
3099 E. Commercial Blvd., Suite 200
Ft. Lauderdale, FL 33308-4311
phone: 954-771-4500
fax:    954-771-4923
Attorney for Orange County
Supervisor of Elections William Cowles

34

Mitchell Bloomberg, Esq.
Stephanie Gail Kolman, Esq.
Adorno & Zeder
2601 South Bayshore Drive, Suite 1600
Miami, FL 33133
phone: 305-858-5555
fax:    305-858-4777
Attorney for ChoicePoint, Inc.
d/b/a Database Technologies, Inc.

Raymond W. Bergan, Esq.
Daniel A. Restrepo, Esq.
Williams & Connolly, LLP
725 12th Street, NW
Washington, DC 20005
phone: 202-434-5000
fax:    202-434-5029
Attorneys for ChoicePoint, Inc.
d/b/a Database Technogies, Inc.

Daniel D. Eckert, Esq.
William J. Bosch, Esq.
Volusia County Attorney's Office
123 W. Indiana Avenue
DeLand, FL 32720-4613
phone: 386-736-5950
fax:    386-736-5990
Attorneys for Volusia County
Supervisor of Elections Deanie Lowe

David V. Kornreich, Esq.
Muller, Mintz, PA
First Union Financial Center
200 South Biscayne Boulevard, Suite 3600
Miami, FL 33131
phone: 305-358-5500
fax:    305-379-3802
Attorneys for Volusia County
Supervisor of Elections Deanie Lowe

George L. Waas, Esq.
Douglas B. Mac Innis
Assistant Attorneys General
Department of Legal Affairs
PL-01, The Capitol
Tallahassee FL 32399-1050
phone: 850-414-3662
fax: 850-488-4872
Attorneys for Fred Dickinson,
Executive Director
Florida of Highway Safety and Motor
Vehicles and
Kathleen Kearney, Secretary of the
Florida Department of Children and
Families

By: